UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA




    IN RE:                    )
                              )     Case No. 01-MDL-00875
    ASBESTOS PRODUCTS         )
    LIABILITY LITIGATION      )     Philadelphia, PA
                              )     January 17, 2013
                              )     10:49 a.m.
    --------------------------



                    TRANSCRIPT OF TELEPHONIC HEARING
               BEFORE THE HONORABLE DAVID R. STRAWBRIDGE
                  UNITED STATES MAGISTRATE JUDGE

    APPEARANCES:


    For the Plaintiffs:       ROBERT G. McCOY, ESQUIRE
                              ALLEN VAUGHAN, ESQUIRE
                              KEVIN HANBURY, ESQUIRE
                              MICHAEL P. CASCINO, ESQUIRE
                              CASCINO VAUGHAN LAW OFFICES, LTD.
                              220 South Ashland Avenue
                              Chicago, Illinois  60607

    For the Defendants,       JOHN A. FONSTAD, ESQUIRE
    G.E.:                     SIDLEY AUSTIN, LLP
                              1051 K Street, N.W.
                              Washington, D.C.  20005

                              TIMOTHY E. KAPSHANDY, ESQUIRE
                              EDWARD P. KENNEY, ESQUIRE
                              SIDLEY AUSTIN, LLP
                              One South Dearborn
                              Chicago, Illinois 60603

    For the Defendants,       RICHARD M. LAUTH, ESQUIRE
    Westinghouse, Hirco:      MICHAEL EVERT, ESQUIRE
                              EVERT, WHEATHERSBY, HOUFF
                              3405 Piedmont Road
                              Suite 200
                              Atlanta, Georgia  30305

```
Audio Operator:          NELSON MALAVE

Transcribed by:          DIANA DOMAN TRANSCRIBING
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Phone:  (856) 435-7172
                         Fax:    (856)  435-7124
                         Email:  dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                            I N D E X

2     TOPICS

3     Morning

4     09-61495 - Morris Settlement

5     ARGUMENT BY:                              PAGE

6     Mr. McCoy                    5, 14, 23, 26, 30, 34

7     Mr. Vaughan                                    11

8     Mr. Cascino                                    32

9     Mr. Lauth                        18, 25, 28, 33

10    Mr. Evert                                  15, 21

11

12    Afternoon

13    MOTION RE: PRODUCTION OF GE'S SALES RECORDS

14    ARGUMENT                              PAGE

15    By Mr. Fonstad                        46

16    By Mr. Kenney                         49, 65

17    By Mr. Cascino                        63, 66

18

19    COMMENTS

20    By the Court                          40, 69

21

4

1          (The following was heard telephonically at 10:49 a.m.)

2               THE COURT:  All right.  Counsel, good morning.  It's

3     Judge Strawbridge.

4               COUNSEL:  Good morning, Your Honor.

5               THE COURT:  May I take roll?  We have Bob McCoy,

6     Allen Vaughan, Mike Cascino on for plaintiff, is that right?

7               MR. MCCOY:  Yes.

8               THE COURT:  And Richard Lauth and Mike Evert for the

9     defendant?

10              MR. LAUTH:  Yes, Your Honor.

11              THE COURT:  Okay.  Thank you.  I wanted to have --

12    to have this hearing because it is -- there are, in my

13    judgment, a number of holes and gaps in the presentation of

14    the information with respect to this settlement, or not

15    settlement, and I wanted to see whether or not I could fill

16    the gaps.

17              So I'm going to ask counsel that need to be

18    considered that they are responding to my questions pursuant

19    to their obligations as counsel, to obviously answer

20    truthfully, to the best of their recollection, as to the way

21    in which these circumstances came about, and what happened,

22    principally from 2002 onward.

23              It appears to me, and I'm going to ask Mr. Cascino,

24    or Mr. Vaughan, or Mr. McCoy from the plaintiff's side, it

25    appears to me from the documentation that was submitted by the

1    defendants going back to 2002, the email communications from

2    Mr. Vaughan to Mr. Evert in September of 2002, and then

3    apparently a further reference in December of 2002 from Mr.

4    Vaughan to Mr. Evert confirming settlements in the Morris

5    case, that that would -- I haven't heard the plaintiffs

6    contest that that would have done anything other than

7    constitute a written confirmation of a valid settlement.

8         Is that -- am I right about that, Mr. Vaughan and

9    Mr. Cascino, particularly with respect to where this thing

10   would have stood say at the end of 2002?

11        MR. McCOY:  Judge, this is Bob McCoy.  I'm going to

12   respond first, because I just want to draw the parameters here

13   from our side.  I'm going to be handling the legal issues.

14   Mike and Allen will be handling questions that Your Honor has

15   on the fact issues.

16        And if they overlap into what I consider the legal

17   issues, I'll interject at that point in time.  So that's how

18   we perceive this.  We also have made and raised a concern,

19   Judge, about the handling of this motion, since we've -- it's

20   a motion that would effectively be a summary judgment for a

21   final disposition on the case.

22        And that's -- we raise this question under this 28

23   U.S.C Section 636.  And I didn't -- I didn't myself quite

24   understand properly what the jurisdictional basis was here for

25   this motion being considered by Your Honor rather than Judge

1    Robreno.

2           And I say that because I think jurisdiction's

3    something important to have that made clear on the record

4    before we proceed with this type of situation.

5           THE COURT:  Okay.  Well I will -- I'm sorry, is

6    there something more you wanted to add on that point?

7           MR. McCOY:  I missed what you said, Judge.

8           THE COURT:  I was -- I thought that you were still

9    trying to speak again.  I wondered if there was anything more

10   you wanted to say on that point?

11          MR. McCOY:  No.  Just that I don't understand what

12   the jurisdictional grounds are for Your Honor to rule on this

13   motion.

14          THE COURT:  Okay.

15          MR. McCOY:  That's my --

16          THE COURT:  All right.  Well it is my judgment that

17   it fits within the general purview of case management that has

18   been referred to me by Judge Robreno.  However, that does not

19   in any way, Mr. McCoy, preclude you from making a -- your own

20   -- articulating your own position to Judge Robreno.

21          What matters I think is whether or not, whatever

22   determination I make, how that determination would be

23   considered.  Would it be considered simply as a matter for

24   Judge Robreno to have to reconsider it again de novo, and you

25   could make that argument to him, or would it be considered as

1    something that he would be -- you know, feel that he would be

2    obligated to respond to, unless it was determined that it was

3    clearly erroneous determinations.

4           And you're certainly free to make that argument to

5    Judge Robreno.  What I wanted to do is to try to move this

6    forward as an initial matter.  I would also point out to you

7    that it is my recollection that -- and I don't think it's

8    technically a matter of jurisdiction, but it is my

9    recollection that I previously had been asked by the parties,

10   I'm not going to recall specifically who initiated it, but

11   there was never any difficulty expressed by any party with

12   respect to a motion to enforce settlement that concerned

13   something that your firm was involved in with Owens Illinois,

14   some time ago, a year or more ago, which we did -- which we

15   did rule upon.

16          And there was never any objection made to any of

17   those rulings, or the basis upon which I have the authority to

18   make those rulings.  So I hear you, I respect your right to

19   make such an objection to that basis, but I'm not going to

20   defer from considering the question here now, and providing at

21   least a report and recommendation, or my own determination to

22   Judge Robreno, if we have to do that.

23          Let me also say that what I had as I've looked at

24   the papers, some additional papers that came in this morning,

25   and I would -- I'm going to submit this to you gentlemen to

1    consider, as to whether or not I would defer from making any

2    ruling whatsoever, leave that determination entirely to Judge

3    Robreno -- with Judge Robreno with his permission, and order

4    you all in here to look at this question from the perspective

5    of settlement.

6            As I started out today, and this is the direction I

7    really want to take, is that it was my understanding, and I'm

8    still waiting for a confirmation of that from -- on behalf of

9    CVLO, which I'm happy to accept from you, Mr. McCoy or from

10   Mr. Vaughan, or Mr. Cascino, that this matter was deemed and

11   perceived to be settled as of the end of 2002.

12           So at some point it appears, and if I'm wrong about

13   that I suspect you'll correct me, it some point it appears

14   that agreement was reached between the parties with respect to

15   the appropriate settlement sum to be provided by -- by the

16   Viacom entity as of that date.

17           And I, you know, I'm at a complete loss to

18   understand what happened for eight or nine years subsequent to

19   2002, but it obviously appears to be the case that the

20   settlement was ever fully consummated by virtue of a release

21   having been provided, or funds having been paid.

22           So having said all that, can I go back to my earlier

23   question, and as you would have seen I have -- I'm

24   operating --

25           MR. McCOY:  Judge, I still have a couple of items

1    here, before we fully get down to that question that Your

2    Honor posed.  As I then -- I'm not clear from what you just

3    said, this is something that's within the scope under this 28

4    U.S.C Section 636 as something that you have been designated

5    to hear as a result of the general order that was issued

6    assigning the cases, or of Cascino Vaughan law offices, or if

7    it's something that's like a specific hearing that you're

8    conducting to assess the evidence, which is a separate section

9    of the Statute.

10              I wasn't clear which -- which one we're under.

11              THE COURT:  Well there's not been -- there has not

12    been a specific order of reference as to this specific motion.

13    The issue was raised, was brought by -- by CBS, and generally,

14    as you well know, I've been dealing with virtually all of the

15    motions -- case management related motions.

16              And I saw this, particularly given what we had done

17    on Owens Illinois, as fitting within that category.  And I am

18    going to proceed on that basis.  So if you want to bring this

19    up with Judge Robreno, you can bring it up with Judge Robreno

20    afterwards, but you're not going to get me to not take any

21    action with respect to this, if that's what your purpose or

22    intent is.

23              MR. McCOY:  What I'm -- I just want to make sure the

24    jurisdictional points are dealt with here.  I mean, what the

25    Statute says, and what would be appropriate would be a

McCoy - Argument                                       10

1   specific designation by -- to you as Magistrate Judge to

2   conduct these hearings.

3           When we go back to that Owens Illinois situation

4   that Your Honor was referencing, that's what we had.  And that

5   was by agreement of the parties, and then there was an order

6   entered that that would be undertaken by the Magistrate Judge

7   at the time being if a mediator really, Judge Reed.

8           So that's how that came about, and that was passed

9   on to Your Honor when you took over.

10          THE COURT:  Mr. McCoy, first of all, that's not

11  consistent with my recollection.  And I certainly don't have

12  all those particular documents in front of me.

13          My recollection is that was after -- after Judge

14  Reed's time.  But I've stated what I've stated on this, and I

15  want to move on.  So you can take up your concerns that you

16  have with Judge Robreno.

17          And to the extent that I get to the point where I

18  have to write something on this, I will lay out with

19  particularity the basis upon which I believe I have the right

20  to -- the right to proceed with respect to this, and you can

21  accept it or not accept it, and take it to Judge Robreno.

22          So can I have an answer to my question, please?

23          MR. McCOY:  The question -- the question is one that

24  -- you're talking now about the correspondence from

25  Westinghouse, and then from Mr. Vaughan?

1          THE COURT:  That's right.

2          MR. McCOY:  So I'll let Mr. Vaughan go ahead and

3    give the understanding that he had in representing Cascino

4    Vaughan Law Office when he wrote that letter back.

5          MR. VAUGHAN:  Good morning, Your Honor.  Allen

6    Vaughan here.  Regarding asbestos settlements and Westinghouse

7    and CVLO here in particular, the custom and practice has

8    always been that once an agreement or a number had been

9    established that the defendant would provide a release within

10   30 days, and generally paid within 30 to 60 days of a signed

11   release.

12         And we have to say that it's my experience handling

13   the majority of these situations in our office that 95, 98

14   percent of the deals are done within the 60 to 90 days, with

15   the notable exception discussed, OI.

16         Here, the defendants did not pay.  We have no record

17   of defendants providing a proposed dismissal order.  We have

18   records we keep, as you recall, we had over 10,000 B reads.

19   But -- that we were able to find in our basement.  But we also

20   note that there was no scanning of computer records until

21   approximately over -- around or about 2005.

22         We have no documentation that we got a release.  I

23   have no recollection of ever getting a release.  I have no

24   record of an attempt to trying to get a signature.  What we

25   have is a cold trail.

1           And what we also have is CVLO continuing to work up

2     the case.  We sent several pieces of material by email last

3     evening showing our continued understanding that this case had

4     not been settled, since it had not been paid.

5           And we even have in the Court record on the MDL-875

6     docket order of 10/12/10 the case listed as still being open

7     as regard to Westinghouse.

8           So what we find is a cold trail with regard to the

9     Michael Morris case.

10          THE COURT:  All right.  So understanding that you

11    have no indiction -- let me just back up for a second.  What

12    you've referred to as -- I'm not sure if you used the exact

13    phrase, but custom and practice with respect to usually

14    getting releases within 30 days and then payment within 30 to

15    60 days.

16          Was that a procedure that was also a custom and

17    practice in negotiations that you had with Westinghouse?

18          MR. VAUGHAN:  Well here in the letter it's

19    documented that we would get -- they would make their best

20    efforts to pay in 2002.  The letter is dated September 20th of

21    2002.

22          THE COURT: Okay.  But my question was whether or not

23    that custom and practice that you referred to was a custom and

24    practice that you found in your dealings with Westinghouse and

25    with Mr. -- I guess it was Mr. Evert at the time?

Vaughan - Argument                                          13

1          MR. VAUGHAN:  I must say that it's a limited

2     relationship, but that is true, yes.

3          THE COURT:  Okay.  And is there anything in your

4     materials that indicate at the end of 2002, in 2003, or 2004,

5     or 2005 that anybody from CVLO made any effort to contact

6     Westinghouse in order to, you know, determine where the

7     release was, why the release isn't coming, and, you know, to

8     get the settlement finalized such that payments could be made

9     to your client pursuant to whatever agreements had been taken

10    place?

11         MR. VAUGHAN:  I could find no such record.

12         THE COURT:  Okay.  Either way, nothing either --

13    nothing whatsoever, is that what you're saying?

14         MR. VAUGHAN:  No.  And we were also not able to find

15    a record that the defense provided a proposed dismissal order

16    or any payment.

17         THE COURT:  Right.  Okay.  I have that.  So what I

18    had, and I didn't sort thorough everything that was submitted

19    to us which came in, I guess overnight or early this morning,

20    some 50 or so pages apparently from your office, from what

21    Joel tells me.

22         But what I thought I saw in there was some

23    communication that picked up again as of about September of

24    2010.  And my question is whether or not September of 2010 is

25    the first time after December 2002 that there was any activity

1    at all with respect to this case between your firm and the

2    Evert firm, or any other firm representing Viacom or

3    Westinghouse?

4            MR. VAUGHAN:  Our record shows in September 2007 the

5    AO12, which the non-bankrupt, unsettled defendant as CBS in

6    this case.  Michael Morris.

7            THE COURT:  All right.  Good.

8            MR. McCOY:  Meaning that that date when we submitted

9    an AO12 filing that had that listed.

10           THE COURT:  All right.  And that AO12 filing copy --

11   would have been copied to Westinghouse, right?

12           MR. VAUGHAN:  Yes, Your Honor.

13           MR. McCOY:  And it would have been served in the

14   normal procedures of AO12, yes.

15           THE COURT:  Yeah --

16           MR. CASCINO:  This is Mike Cascino.  Mike Evert

17   would probably remember those boxes he got, I think he and I

18   had a conversation kind of joking about his office having all

19   these documents delivered.

20           THE COURT:  Okay.  So let me go back, if I could ask

21   Mr. Evert if you'd be good enough to respond, Mr. Evert, was

22   it -- do you have -- and I fully appreciate maybe some

23   difficulties of specific recollection to events so long ago.

24   But is it your understanding, and I'm going to take it that it

25   was Mr. Vaughan's understanding, that at least as of the end

 1    of December that there had been an agreement reached between

 2    Viacom and Mr. Morris, through his lawyers, that that case was

 3    to be settled under very, very broad terms as set out in the

 4    communications from Mr. Vaughan.

 5            And would that have been the understanding that

 6    Viacom would have had through you, Mr. Evert?

 7            MR. EVERT:  Yes, sir.

 8            THE COURT:  Okay.  So do you have any indication of

 9    -- it's also been explained to me by Mr. Vaughan that the

10    general practice was that he would have understood from other

11    defendants, and some limited experience I guess with your

12    office, that a release would have been sent by your office

13    normally within about 30 days, release would be signed.

14            And once the signed release went back there'd be

15    payment within something like 30 to 60 days.  Broadly

16    speaking, is that an accurate representation of the way these

17    things normally worked?

18            MR. EVERT:  Yeah.  I think, Your Honor, I guess my

19    broad answer would be yes.  I mean, the only quibble I would

20    have is that obviously we've resolved a number of cases over

21    the years with Cascino Vaughan, and we typically use the same

22    release.

23            So whether or not there was an expectation in my

24    mind that we were to send them a specific release for the

25    Morris case, or whether or not the understanding was that we

1    would just use the same release, I can't recall.

2           I do, you know, my only -- I do recall being in

3    Philly, and I do recall Bruce Lassman being there, and I do

4    recall Allen and I sitting in a room, but beyond that, I don't

5    recall very much.

6           But, yes.  Certainly the expectation would be and

7    the agreement would be that the release would be of a form

8    that was acceptable to both parties.  Whether or not we would

9    just use a release from a previous case, or we would send them

10   a specific one for this case, I don't know.

11          I just don't recall.

12          THE COURT:  All right.  Is there any indication of

13   any activity, can you tell me, from your files, or from

14   Viacom's files, as to any question having been raised as to,

15   you know, where is the release, let's get the settlement

16   finalized?  You know, anything of that sort, up until the next

17   indication of any activity on this, which appears now to be

18   the submission of the AO12's by the CVLO in 2007?

19          MR. EVERT:  Yeah, the only comments that I would

20   have between 2002 and 2010, Your Honor, would be, I am sure

21   that at some point we would have either been served or had

22   access to the AO12.  Mr. Cascino is right, he and I did have

23   a conversation about a bunch of records he sent to us.

24          But I don't think -- if they served the AO12 on May

25   31, if we didn't get a copy, we certainly have gotten one.

1    So, you know, I don't think that's much of -- I'm sorry, they

2    served it on I think in September of '07, May 31 was when

3    Judge Robreno issued the order.

4            Then the only other activity that we've got relevant

5    to this matter is, the Court may know that we settled six

6    cases on that particular day, Mr. Vaughan and I did.  And

7    according to our records, the last one that was paid was --

8    the release was submitted in July of 2008, which because of in

9    these matters with estate -- estates and representatives

10   getting appointed and stuff like that, it's not unusual from

11   our perspective for several years to pass before a settlement

12   is consummated.

13           THE COURT:  Okay.  The six cases you're referring

14   to, are you referring to the cases identified in Mr. Vaughan's

15   letters of September the 20th?

16           MR. EVERT:  Yeah.  The two letters of September the

17   20th.

18           THE COURT:  Right.  Each of which identify three

19   cases, Morris being one of them?

20           MR. EVERT:  That's correct.  And the last case

21   submitted for payment was actually the Neu case, which is on

22   the other -- N-E-U --

23           THE COURT:  Yes.

24           MR. EVERT:  -- which is the other letter, and it was

25   submitted in July of 2008 and CBS paid it in August of 2008.

1          THE COURT:  Do you have any indication with

2   specifics, or generally, about the timing of the payments in

3   the other five, or maybe other four, since apparently there

4   was no payments ever made in Morris?

5          MR. EVERT:  I'm sure I do, Your Honor, but I don't

6   have it in front of me.  I just asked my office for the last

7   one that was paid.

8          THE COURT:  Yes.

9          MR. EVERT:  So it would have occurred prior to that.

10          THE COURT:  Okay.  Now my understanding is that when

11   you all were before Judge Reed, that -- and the -- and the

12   first interrogatories were to be propounded, that there were

13   interrogatories propounded, and were there -- was there

14   discovery ongoing during Judge Reed's time with respect to the

15   Morris case?  Mr. Evert, can you answer that?

16          MR. LAUTH:  This is Richard Lauth, Your Honor.  I

17   can answer that.  I think from anecdotal evidence, there was

18   discovery going on in the Morris case.  They were submitting

19   interrogatory responses and other discovery in that case, just

20   like they were the rest of their cases.

21          Westinghouse did not propound any specific discovery

22   to plaintiff in the case, though.  We were not actively

23   litigating it, because we considered it settled.

24          THE COURT:  Okay.  Well when you say you considered

25   it settled but what -- what did you do, even as of that time,

1    about -- or any prior to that time to get back to the

2    plaintiffs to try to find out what happened to the release or

3    why no release was being submitted to you?

4              MR. LAUTH:  That was one of the -- that was the item

5    I sent to you yesterday afternoon that we submitted around

6    4:00 yesterday, Your Honor.  Joel will certainly recall this,

7    I'm not sure whether or not you will, because it predated you

8    to the Cascino Vaughan litigation.

9              But right toward the end of Judge Reed's tenure, he

10   had asked the parties to endeavor to reconcile their case

11   list, because there were so many discrepancies that were

12   considered open by one party or another.

13             Bob Knox of the Cascino Vaughan firm sent some

14   correspondence to us in September of 2010 enclosing their case

15   list which they considered open.  Morris did appear on that

16   case list.  And in April of 2011, I sent a letter to the

17   Cascino Vaughan law firm specifically identifying Morris,

18   among a number of other cases that we considered as settled,

19   or otherwise requiring dismissal.

20             I flagged that to them, that was on the forty

21   something -- it was on page 37 of the PDF that I sent

22   yesterday afternoon to the Court.  And in that letter, I said

23   with regard to those cases that we previously considered

24   settled or otherwise requiring dismissal, I requested that if

25   CVLO had any disputes on that issue that they contact me

1    immediately to provide an explanation.  And on that point, I

2    never heard anything else.

3         That was the first attempt to reconcile this issue

4    with Cascino Vaughan.  A little over a year later in June of

5    2012, and I believe, I'm trying to remember what prompted me

6    to send the email, but I believe it may have been depositions

7    being noticed that may have impacted the cases.

8         I sent an email to Kristen Stambaugh, who was with

9    Cascino Vaughan at the time, requesting a dismissal in Morris

10   and providing her the settlement documentation that's part of

11   this motion to enforce, and requesting that a dismissal be

12   filed in Morris, in another case called Binder.

13        THE COURT:  All right.  Now hang on a minute, Mr.

14   Lauth.  So as of that point in time in order for the dismissal

15   to be effectuated, I would of thought it would have had to

16   have been the case that there would be a satisfaction that

17   releases had been signed and settlement funds had been paid.

18        Did you have that satisfaction at the time?

19        MR. LAUTH:  No, we do not.  We have not received a

20   release from them on the Morris case.

21        THE COURT:  So I don't understand how you would ask

22   them to see to effectuating a dismissal under that

23   circumstance.

24        MR. LAUTH:  In my correspondence, I asked them to

25   submit a release and sign a dismissal, so that they could be

1    paid.

2              THE COURT:  And this was in April of 2011?

3              MR. LAUTH:  No, that is in June of 2012.

4              THE COURT:  June of 2012.  Okay.  And you're telling

5    me that June of 2012 -- was the next thing you heard about

6    this, Mr. Cascino's note or email of November 2012?

7              MR. LAUTH:  That's correct.  On November 8th, 2012,

8    Mr. Cascino emailed me seeking consent to the remand of the

9    Morris case.  And at that point in time I replied back, less

10   than an hour later, forwarding him the correspondence that I'd

11   sent earlier to his office reminding him that it was subject

12   of a settlement agreement, and requesting that they submit a

13   release.

14             THE COURT:  You mean the -- when you said the

15   correspondence earlier, you meant the June 2012 correspondence

16   to Stambaugh?

17             MR. LAUTH:  That's correct.

18             THE COURT:  Okay.  So what I need to understand is

19   when the AO12 submissions were made in September of 2007, I

20   don't remember enough about how those things were being done

21   at the time, was it -- maybe the depository was being used,

22   but there -- were there notification to Westinghouse that an

23   AO12 submission had been made on behalf of Mr. Morris back in

24   September 2012, or 2007?

25             MR. EVERT:  Probably -- this is Michael Evert,

1    Judge, probably a better one for me to answer.

2               THE COURT:  Right.

3               MR. EVERT:  The direct answer is, I don't recall.

4    But my assumption is that, as I tried to say earlier, that if

5    we had wanted to find the AO12 for the Morris case, we could

6    have found it.

7               Whether it was -- you know, whether we had a copy

8    directly sent to us, whether we had it in our office, whether

9    it was in a depository, I can't answer any of those questions.

10   But we certainly could have found the AO12 on the Morris case

11   had we wanted to find it.

12              THE COURT: All right.  Okay.  So I guess the way in

13   which I was looking at this earlier would have to do with, as

14   I -- and I think I set this out in this email, and what I'm

15   troubled about, and I'm happy for Mr. McCoy or anyone else to

16   chime in on this, is if there is in fact an agreement to

17   settle, and if there's a sufficient basis upon which to make a

18   legal determination that there is an agreement to settle, an

19   issue has been raised with respect to the enforceability of

20   that agreement, and the extent to which the enforceability of

21   that agreement is impacted by the passage of time.

22              The parties seem to agree that Wisconsin law would

23   apply.  And my understanding from the parties that Wisconsin

24   law would provide that settlement agreement would be deemed

25   like any contractual action and there would likely be a

1    six-year limitation would be applied.

2              And I haven't seen either side suggest that's not

3    the case.  So it seems to me that the question arises,

4    defendants apparently take the position that there is, I

5    guess, the time within which the statute would begin to run

6    would be that time of the agreement.  It would seem to me that

7    the time at which the Statute would begin to run would be

8    rather at the time of the breach.

9              And that's, for me, the difficult question.  If

10   there is a breach, and there appears to be, who's responsible

11   for the breach, and when did the breach occur?  So I guess I'm

12   going to ask either counsel to address that, and I'd ask Mr.

13   McCoy to address it first.

14             MR. McCOY:  Judge, I will.  But I think there's one

15   more item that we need to make clear on the record.

16             THE COURT:  Mr. McCoy, let me -- if you'd be good

17   enough to just answer my question first, and then I'll give

18   you a opportunity to go on to whatever else you want to say.

19             MR. McCOY:  Judge, the answer to that question is

20   that there was no agreement, based on custom and practice.

21   That's how the situation develops.  Because the trail is cold.

22   We just know there was no agreement based on custom and

23   practice, because there wasn't a release and there wasn't a

24   payment.

25             So -- and it's our position on this that that's the

1    answer.   And if Westinghouse thought different, then they had

2    six years from the date of Mr. Vaughan's letter, or you could

3    probably extend that out based on the custom and practice of

4    completing the releases and making the payments within a

5    period of about 90 days.

6          And that would give them six years after that to

7    enforce that agreement, if they thought different.   But the

8    position of our firm is there was simply no agreement, because

9    based on custom and practice things didn't happen, and now the

10   trail is cold about that.   And that's what Statute of

11   Limitations are about.   There isn't a sufficient record after

12   this long passage of time to be able to figure out exactly if

13   anything happened.

14         We just know there was no payment, no release,

15   therefore, no agreement based on custom and practice.   So if

16   Your Honor believes that there's a need to find a breach, we

17   disagree with that position.   But if there was a breach, it's

18   probably better the words -- we would need to find a breach

19   based on what Your Honor's saying, I think the better way to

20   put it is, there was simply non-performance here of this

21   agreement, and if so, within that reasonable period of time

22   based on the custom and practice, then there's a six-year

23   Statute of Limitations.

24         And so that would be the point where I would say

25   there's been non-performances, that period of about 90 days

1    based on what Mr. Vaughan said, and Mr. Evert confirmed about

2    the practices concerning releases or payments in these

3    situations.

4            So that's how we see it.

5            THE COURT:  All right.  Mr. Lauth, or Mr. Evert, do

6    you want to respond to that?

7            MR. LAUTH:  Your Honor, we believe there was clearly

8    an agreement to resolve the case.  We believe that we were

9    ready to consummate that agreement upon submission of a

10   release.  We believe that the -- no one has given any

11   indication that there was an potential notice to CBS of a

12   breach, until the submission of the AO12.

13           Whether we saw it or not, if you assume that that's

14   notice of a breach, it was not submitted until September of

15   2007.  We're still well within the six years based on that

16   discovery of the breach.  And so we believe there was an

17   agreement and the settlement was enforceable.

18           And the fact that one of -- at least one of the six

19   cases that was resolved on that same day wasn't submitted

20   until 2008, is further evidence of the fact that these cases

21   often take a long time, and it's not until we receive notice

22   of the breach that the Statute should begin to run.

23           So we absolutely believe there was an agreement to

24   settle the case.  We absolutely believe that we had the right

25   to enforce it and we're within the Statute.

1          MR. McCOY:  I'd like to add a couple of more things,

2     Judge, if I can --

3          THE COURT:  Is it right on this specific point?

4          MR. McCOY:  Yes.

5          THE COURT:  Okay.  Go ahead, Bob.

6          MR. McCOY:  Yeah, there's a case in Wisconsin this

7     CLL Associates Limited Partnership case, which was 174 Wis.2d,

8     604 Supreme Court of Wisconsin 1993 decision, where it talks

9     about the discovery rule and contract actions, meaning you

10    have an extension on your Statute of Limitations period

11    because you didn't discover that there was a breach or a

12    non-performance.

13         THE COURT:  Right.

14         MR. McCOY:  The Court said that, and I'm quoting

15    from the opinion, and they were comparing it to tort law.  But

16    the Court says:

17         "In addition to the distinctions between contracts

18    and tort law, we are persuaded by the fact that the Wisconsin

19    Legislature has expressly rejected discovery rule when

20    enacting the contract statute of limitations.  The Court

21    concludes here that there is no discovery rule applicable to

22    contract statutes."

23         Which is what I understand the position of CBS and

24    Mr. Evert's explanation to be, which is, we didn't discovery

25    the breach until later.

1          And that simply doesn't matter.  There's no

2    discovery rule.  The breach occurred when, based on custom and

3    practice, there wasn't performance through a release or

4    payment.  And there's no extension of that under the discovery

5    because there's no discovery rule.

6          THE COURT:  Okay.

7          MR. McCOY:  Now I would say further, Judge, pointing

8    out in this opinion, if you read through it, it says, we

9    recognize -- this is the Court:

10         "We recognize that a contract breach may sometimes

11   be latent, and in practical terms undetectable."

12         So, again, the situation here of people not knowing

13   that there was, at least on Westinghouse's claim that they

14   didn't know about there was a breach, is dealt with in this

15   opinion by acknowledging that there are these latent,

16   undetectable situations, which it doesn't matter, there's

17   still no discovery rule.

18         So that's the Wisconsin law, and that would govern

19   the position that somehow this rule -- that there's a

20   discovery rule that extends out the period of time to 2007, or

21   whenever Westinghouse suggests it should be extended out.

22         There's no extensions allowed under Wisconsin law.

23         THE COURT:  Okay.

24         MR. LAUTH:  Your Honor, if you want to hear comments

25   on that I'm glad to give them.

1          THE COURT:  Yeah, go ahead.  Go ahead.

2          MR. LAUTH:  I was just going to say, Your Honor,

3    that what is critical to Mr. McCoy's analysis -- first of all,

4    there is the discovery rules from discovery of the breach.

5    And what's critical to his analysis is that purported common

6    practice of 60 to 90 days, and that is belied by the fact that

7    the Neu case was submitted in 2008, and paid in 2008.

8          And, frankly, Your Honor, if the shoe was on the

9    other foot, they would submit a release, if we refused to pay,

10   that's when the breach would occur.

11         So the discovery of the breach doesn't come -- there

12   is no common practice that dictates that the breach occurred

13   within 60 or 90 days, we would dispute that.

14         THE COURT:  All right.  I'm not sure if this is

15   applicable to this question, but it might be.  In the letter

16   that Mr. Lauth prepared in April of 2011, which was submitted

17   to us late yesterday, there is reference to what is identified

18   as Attachment B.

19         And I -- it's unclear to me precisely the number of

20   cases.  I think it's something in excess of 400 cases that

21   might be identified on that attachment, and Morris being among

22   them.

23         And I'm -- my -- it looks as if, at this point, in

24   April of 2011 that there is some dispute between Cascino

25   Vaughan and Evert -- the Evert firm with respect to cases that

1    are still pending, or whether or not cases have been resolved,

2    and those are the cases that are, I guess, set out by this

3    exhibit.  That's the way this attachment -- that's the way

4    that I see it.

5            So I'm going to ask Mr. Lauth if that's right, I

6    mean, if my understanding is right of what was indicated

7    there, and to explain something about what happened with these

8    other cases, and to the extent those other cases might say

9    something about custom and practice, if you've got as many as

10   400 cases with the Cascino Vaughan firm, and between the

11   defense firm, the Evert firm, and Cascino Vaughan firm, there

12   are apparently 400 plaintiffs out there, in excess, whose

13   cases are apparently in limbo.

14           And the lawyers are unable to agree whether or not

15   they've been settled or unsettled, which sounds rather

16   troubling to me, frankly.  But help me out here and explain to

17   me if that's exactly what you were trying to say, Mr Lauth,

18   and what the -- how things came to be in that fashion and what

19   came of it after April 12th of 2011?

20           MR. LAUTH:  Your Honor, you are correct in your

21   assessment that there were in excess of 400 claims on the

22   disputed open list.  But the important thing I guess to

23   realize is that only a -- that the vast majority of those

24   claims were claims that were Indiana claims, for example,

25   which the Cascino Vaughan Law Offices had agreed to dismiss

1    based on the applicable Statute of Repose defense, that

2    happened under the Judge Reed tenure.  I haven't gone back and

3    looked to see how many of those 406, if any, still survive.

4    But the amount of those claims that would have been prior

5    settlement would have been, you know, small, small percentage

6    of them.

7            Morris being one of them, Binder, which we've --

8    which I mentioned, was a paid claim would have been another

9    one.  But I have not gone back and recreated how many of the

10   400 or so fit into that characterization.

11           And where are they now?  I think the short answer is

12   they've been dismissed due to winnowing down process from

13   Judge Reed and also from Your Honor of these claims from the

14   thousands to the hundreds.

15           THE COURT:  Mr. McCoy, can you address that?  Or Mr.

16   Cascino, or Mr. Vaughan.

17           MR. McCOY:  Judge, this just came in yesterday.

18           THE COURT:  Yes.

19           MR. McCOY:  If we're having a factual evidentiary

20   hearing, I don't want to commit ourselves.  But if you'd give

21   us a moment, let me see if I can give you an answer.

22           THE COURT:  Okay.  I appreciate that.  I'll

23   certainly give you the time you need.

24           MR. McCOY:  I'm going to put us on mute here, Judge.

25           THE COURT:  Yes, that's fine.

1              MR. McCOY:  One second.

2              THE COURT:  That's fine.

3              MR. McCOY:  I'll get back to you.

4              THE COURT:  That's fine.

5                          (Pause)

6              MR. McCOY:  Judge?

7              THE COURT:  Yes.

8              MR. McCOY:  I'm back.  Okay.  Yeah, we've -- we

9    can't answer the question right now.  The question was what

10   response was made to this April 12, 2011 letter to Mr. Lauth

11   with these attachments and the 400 cases, we can't answer

12   right now.  We don't know.  We have to go back through the

13   records and see if anything was -- specifically was sent on

14   this.

15             THE COURT:  Okay.  All right.  So let me just ask

16   just a couple of more questions with respect to what -- where

17   there is -- what there is, or what there might be with respect

18   to this case now.  And I'm going to ask you, first of all, I

19   guess it's -- I guess you, Mr. McCoy, I'm not sure on your

20   side, or Mr. Cascino, and Mr. Lauth, as to whether or not you

21   have gone back and looked at the underlying merits with

22   respect to this case, whatever number it was that you may have

23   discussed agreement or "agreed," understanding that Mr. McCoy

24   says no agreement, but there was an -- obviously a reference

25   to a number, which I don't have, it was blocked out in your

1   materials to me, which is fine, by which the case perhaps

2   might be resolved.

3          And if I'm guided by that, have you had any further

4   discussions with respect to whether or not this case could now

5   be deemed resolved, based upon whatever happened previously,

6   or based upon, you know, a fresh consideration?  Mr. Lauth?

7          MR. LAUTH:  Judge, there hasn't been any further --

8          MR. CASCINO:  Excuse me, this is Mike Cascino.

9   Richard and I -- I sent a letter to Richard saying, can we

10  resolve this matter, and he responded by saying that, you're

11  the kind of person that once a settlement is made, a

12  settlement is a settlement, and they were willing to take

13  their chances in Court.

14         So I did make the overture of trying to resolve this

15  matter.

16         THE COURT:  Mr. Lauth?

17         MR. LAUTH:  Well, Your Honor, I said we'd be glad to

18  honor our settlement of the matter.

19         THE COURT:  Okay.  And would you be glad to honor

20  your settlement of the matter and take into account in

21  connection with that that there's been no payment on the

22  settlement for in excess of 10 years, and agree to, maybe be

23  legally to entitled to, but agree to the payment of interest

24  over the 10 years for whatever that settlement amount was?

25         MR. LAUTH:  The timing for payment would have been

1    from receipt of the release, which we haven't received one

2    yet.  So that would be the time that the clock would start

3    running on when the settlement was due.

4              THE COURT:  Well --

5              MR. EVERT:  I'm sorry, Judge, this is Michael Evert

6    I misunderstood your question, I think.  What did you ask?

7              THE COURT:  I'm putting on a different hat now.  And

8    the different hat I'm putting on is kind of as a settlement

9    Judge.  And my question would be whether or not you guys would

10   consider, and I would be -- this is what I was suggesting

11   before and whether or not Judge Robreno makes a hard

12   determination on all this and I sit back to you and talk to

13   you by way of settlement.

14             But you would consider a resolution which would be

15   predicated upon the proposition that this case would be

16   settled based upon whatever number was agreed upon or

17   discussed in the communications with Mr. Vaughan back at the

18   end of 2002, with an allocation, and make an assumption that

19   there would have been a release submitted and payment would

20   have been, you know, legally due and owing, and I understand

21   there's no release submitted apparently, but, you know, assume

22   you've got approximately 10 years worth of interest.

23             It obviously would add up, I don't' know what the

24   legal interest rate is in Wisconsin, but would add up to be a

25   healthy sum in prejudgment interest.

1             And given the fact that your client has had that

2    money and hasn't had to spend that money for ten years, you

3    know, perhaps there's some equities that flow in that

4    direction, would you give consideration to, and if you want to

5    just report back on this separately, that would be fine, but

6    give some consideration to the question of a resolution on

7    that basis, generally speaking?

8             MR. EVERT:  We'll certainly talk to the client about

9    it, Judge, and --

10            THE COURT:  All right.

11            MR. EVERT:  -- if we could get back to you, then

12   we'll be glad to do that.

13            THE COURT:  All right.  And, Mr. Cascino, do you

14   think that you would be willing to talk to your clients about

15   it on that basis?

16            MR. McCOY:  Judge, there's been a lot of work done

17   on these cases since, that provided additional evidence.  So

18   the answer to that is, our firm certainly views this case in

19   light of what we now have in the way of evidence, and we're

20   obligated to treat it in that vein in representing the client.

21   And by that, the factual evidence is just, I mean, the case

22   was settled based on, I think that Mr. Vaughan said no

23   exposure to turbines.  We didn't even pursue switch gear

24   claims back in those days.

25            And I'm talking about the 2002 agreement.  So today

McCoy - Argument                                        35

1    the case has a whole different set of evidentiary points that

2    we would be raising at a jury trial and for summary judgment

3    purposes, if we had to, that involved both switch gear

4    exposures and the exposures to Westinghouse turbine.

5              THE COURT:  Mr. McCoy, that sounds to me like a very

6    long way to simply answer my question as no, you wouldn't be

7    interested in talking to your clients about the formulation I

8    suggested.  Am I right about that?

9              MR. McCOY:  Yes, that's right, Judge.

10             THE COURT:  All right.

11             MR. McCOY:  Not that we're not interested, Judge,

12   but what we're saying is, from a practical standpoint of our

13   obligations as counsel ,we have all this evidence now that we

14   can't discount that we didn't have in 2002.

15             THE COURT:  All right.  Hang on a second.  Thank

16   you.  Hang on one second.

17             MR. McCOY:  When the -- when this thing went

18   through, all the procedures, only now to be told, by the way,

19   now that you worked up your case, we have something 10 years

20   ago we didn't pursue that we want to pursue now.

21             THE COURT:  Hang on one second.

22                          (Pause)

23             THE COURT:  Okay.  I'm going to ask Mr. Evert to

24   pursue, or Mr. Lauth to pursue what Mr. Evert referred to with

25   respect to these other six -- these other cases.  We have the

1    six cases that are identified in the correspondence from Mr.

2    Vaughan to Mr. Evert in September of 2002.

3            And there's one of which apparently was paid in

4    2008, and I want to hear what the defendants -- I want to

5    receive from the defendants a correspondence that would

6    particularize the question of as to each of those cases.  I

7    mean, I have what we have in Morris, but to have something

8    anew.  But as to the other cases, at what point in time was it

9    that AO12's were submitted with respect to those cases.

10           At what point in time was it releases were submitted

11   in those cases?  And to the extent that some of those cases

12   were paid, at what point in time was it that those cases were

13   paid?

14           I'm hearing that -- and it's not clear to me the

15   full extent of the pattern and practice that would have

16   existed between these particular parties, but that to the

17   extent that matters, and it may to us, the information with

18   respect to that might have some particular bearing.

19           So I'm going to ask you if you can pull that

20   together.  And you tell me if this is -- I would think this

21   could be done certainly within a week, Mr. Lauth?

22           MR. LAUTH:  Yes, Your Honor.

23           THE COURT:  And, obviously, you'd provide a copy to

24   Mr. McCoy.  And Mr. McCoy would give me a response to that

25   within a week from that date.  And then we would make a

                              Colloquy                                37

1    determination from that point.

2              Okay?

3              MR. LAUTH:  Is a letter brief acceptable?

4              THE COURT:  Yes.

5              MR. LAUTH:  Or a letter submission?

6              THE COURT:  Letter brief is fine.  Mr. McCoy, are

7    you with me?

8              MR. McCOY:  Yes, I understand what Your Honor's

9    asking for.  We'll submit that, but I have one other request.

10             THE COURT:  Yes.  Go ahead.

11             MR. McCOY:  I would like to be able to submit a

12   surreply on this case, because in this situation we were faced

13   with a motion to enforce, and in reply Westinghouse has raised

14   the question of a breach and the necessity of that.

15             Which is a new issue that we wanted to make clear of

16   our position on that.

17             THE COURT:  Okay.  I'll give you the opportunity to

18   file a surreply within one week from today.  And within that

19   one week, also Mr. Lauth will have submitted his letter on the

20   question about these other -- the totality of all these six

21   claims.  And then you will give me a response in the following

22   week with respect to your response to that letter.

23             If you don't feel you need to, or if you feel you're

24   able to accept what Mr. Lauth presents about the factual

25   circumstances of those cases, just simply indicate that, and

Colloquy                                              38

1    then we'll give you a determination promptly -- promptly after

2    we receive those submissions.

3          Mr. McCoy, at one point you said you had another

4    point, and I was trying to hold you to where I was at the

5    time.  Is there something else you wanted to bring to my

6    attention on this?

7          MR. McCOY:  Judge, the only -- what we can -- let me

8    put it this way, we'll just put that in the reply.

9          THE COURT:  Okay.  That's up to you.

10         MR. McCOY:  Surreply.  And I do want to just point

11   out one other thing.  Which is, I was just looking through the

12   records, and at least as of November 30th, 2010, Judge Reed

13   had issued orders about the procedures in the Owens Illinois

14   agreements to be resolved.

15         So like Your Honor said, I'm not sure that it

16   matters much but this -- the Owens Illinois did initiate and

17   was the subject of many orders that were by agreement under

18   Judge Reed.

19         THE COURT:  Okay.  But, you know, ultimately, I

20   think it got resolved by virtue of -- by the time it got

21   resolved, it got resolved by my opinion that obviously took

22   place after Judge Reed had retired.

23         MR. McCOY:  Certainly.  And we certainly remember

24   that opinion, and appreciated it well when it came in.  But

25   I'm saying is that was done pursuant to the agreement of the

Colloquy                                                     39

1    parties.

2              THE COURT:  I get your point.  Okay.  I get your

3    point.  All right.

4              MR. McCOY:  Yes.  I just think the jurisdictional

5    point here needs to be resolved.  It just seems like Your

6    Honor's basically conducting this proceeding under this second

7    section of 28 U.S.C. Section 636, which is to gather the

8    evidentiary facts.  And from what Your Honor just said, it

9    sounded like that the recommendation for the decision is going

10   to be coming through Judge Robreno.

11             That's what I gathered but --

12             THE COURT:  Well, as I said, I will comment

13   specifically upon that, as to the basis upon which we see the

14   order of reference, and that will give you at least my view

15   with respect to what it means in terms of the effect of it,

16   but that obviously it's going to be subject to whatever it is

17   you're able to convince Judge Robreno about.

18             So you're not -- I'm not foreclosing you from

19   anything here.  I'm just -- I'm just telling you that we're

20   going to give this a look whether -- what Judge Robreno does

21   with the look, is going to be up to him.  And you can, you

22   know, make your effort to influence him, or argue to him one

23   way or another, depending upon what -- I suppose depending

24   upon what the resolution is from our perspective.  So,

25   gentlemen, thank you very much for giving me the time today,

1   and we at least have a way forward with this thing now.   Thank

2   you,

3            ALL COUNSEL:   Thank you, Judge.

4            THE COURT:   Take care.

5       (Recess taken, 11:58 a.m.)

6       (Transcriber Change)

7       (Beginning of afternoon session 2:57 p.m.)

8            THE COURT:   Good afternoon, Judge Strawbridge is on.

9   Who's on for plaintiff

10           MR. CASCINO:   Your Honor, Mike Cascino.   Kevin

11  Hanbury is here, another attorney, and Jason Sheen, my legal

12  assistant, is here.

13           THE COURT:   All right, good.   Thank you very much,

14  Mr. Cascino.   And for GE?

15           MR. FONSTAD:   Good afternoon, Your Honor.   This is

16  John Fonstad, and in addition my colleagues, specifically Tim

17  Kapshandy and Ed Kenney are on the line.

18           THE COURT:   Okay.   Anybody else?   Okay.

19           Okay.   I think that what I want to do here is to

20  kind of give you the current state of my thinking on this

21  motion and get you to respond to it, rather than to have you

22  all go through full presentations.

23           There's been a healthy written submission on the

24  motion, and a response and a reply.   We have been through

25  them.   We've been through the applicable interrogatories and

1    requests to produce.  And I'm going to give you what I would

2    characterize as kind of an indication of leaning of where

3    we're going, and then as I say, give you a chance to reply.

4           First off, I appreciate from GE's perspective the

5    positions articulated with respect to the lack of timeliness

6    of the discovery.  I would conclude however that under the

7    overall circumstances of the way these cases have progressed,

8    that I'm not going to preclude the interrogatories from going

9    forward or being answered, you know, appropriately, simply

10   based upon the question with respect to any late requests for

11   discovery as posited by GE or any delay between the time of

12   the answers and the time of the filing of the motion.

13          And I want to proceed rather to the question of the

14   merits of the particular interrogatories and the interrogatory

15   responses.  So I'll do that now but I'll give you an

16   opportunity, if you want, Mr. Fonstad, to try to elaborate on

17   that.  But let me move to the particular interrogatory answers

18   if I could.

19          I think the first, the threshold question as I see

20   it, is the issue with respect to the extent to which the

21   plaintiffs have provided information pertaining to Mr.

22   Sypchalla's potential exposure to GE related products.  And

23   Mr. Fonstad has effectively demonstrated what certain

24   limitations are, including an apparent reliance upon a

25   deposition which has been quashed -- I'm referring to Mr. Sal

1   or Sallie (sic) or something, and some other bits of

2   transcripts of depositions which apparently indicate that

3   particular witnesses that have been cited by the plaintiffs

4   have not articulated or have not testified specifically that

5   they ever actually saw Mr. Sypchalla in the presence of

6   something that they could identify as GE parts or working in

7   specific manners in which there would have been some direct

8   specific evidence with respect to exposures.

9           Nevertheless, as I read this and as I see this, I

10  understand it to be the case that there's at least evidence

11  that there were GE engines on two, apparently two, at least

12  two apparently types of aircraft that were being worked on,

13  referring to these Falcons and these Challengers, and as I

14  understand it anyway, and that there was some testimony from

15  certain of the witnesses that there were these kinds of

16  aircrafts that were at certain of the locations involved.  I

17  think the principal focus seems to be this KC Aviation

18  location during the time frames that Mr. Sypchalla worked

19  there and where generally that he would have been working

20  there.

21          And I'm satisfied that for the purpose of discovery,

22  certainly not -- it would be an entirely different question as

23  to whether or not this establishes legal causation.  But I

24  think for the purposes of moving forward to the next step with

25  respect to discovery, that that does trigger enough that it

1    would be appropriate for the defendant to apply some kind of a

2    response.

3            Now, the next thing that strikes me is that there is

4    apparently some evidence, I don't know how extensive it was,

5    of something in the nature of a meet and confer, at least it

6    was so certified in one of the paragraphs of the motion which

7    was filed by Mr. Cascino.

8            But I have to tell you that as I look through this,

9    I kind of thought to myself, wouldn't this have been more

10   productive to have been done in the mode of a 30(b)(6) type

11   deposition where there could have been some true explanation

12   provided with respect to the nature of the manner in which GE

13   does or does not keep or maintain records.

14           It is implicit, as I see it, and perhaps explicit

15   from other information that's out there, and I suspect Mr.

16   Fonstad will make some admission explicitly with respect to

17   some record keeping having been done by GE.

18           I assume, and there's probably a record in the

19   various places, that given GE's involvement as a frequent

20   defendant in asbestos litigation, there's been some

21   organizational efforts with respect to the maintenance of

22   certain data.

23           And I would have -- I want to focus a lot of the

24   discussion that we have today on what the circumstance of that

25   data collection is, and how that data collection would bear

1   upon the questions with respect to burden.

2           And that's the -- that's an area that I would have

3   thought or I would have hoped that there would have been

4   exchange in terms of an extensive and meaningful meet and

5   confer between Mr. Cascino and Mr. Fonstad or some other

6   representative of their firms, in order to try to explore

7   things like, you know, what are the types of engines that

8   would -- that they might have used on these particular

9   aircrafts that have been identified, the admission to certain

10  GE engines that are sometimes used on these aircraft, during

11  what time period, during the time periods that are involved,

12  which I appreciate it's a broad time period, but at least has

13  been limited somewhat from what it was originally down to, as

14  I understand it, 13 years from 1978 to 1991 at this location.

15          I don't know whether or not GE tracks records based

16  upon a particular location where someone works.  It strikes me

17  they may or may not, I don't know, but I would want to hear

18  about that.  I thought maybe I did see something in one of

19  your responses, Mr. Fonstad, that there was no tracking on

20  that basis, in terms of the sales records which are in some of

21  the earlier interrogatories, 2 and 3 and 4 I think.

22          But to the extent to which there would be records

23  that would show sales of the products to particular employers,

24  it seems to me it needs to be refined.  I would guess that the

25  real question ought to be whether or not they are -- may be

Colloquy                                45

1    employers I guess, but the extent to which they would provide

2    parts to those folks who would be the companies that would be

3    working there, who would be in a position to purchase the

4    parts.

5         I'm just thinking of a situation where -- and I

6    don't know if this is applicable with Sypchalla -- who might

7    simply work for a, you know, a delivery person and would show

8    up and would be on the site for some period of time, even

9    though his particular employer would not have been the enemy

10   that would have acquired, that would have purchased the

11   engines.

12        But I think these are the kinds of things that I

13   would have expected some discussion about.  And I'm going to

14   -- the bottom line of this is that I'm very inclined to order

15   that there be a robust meet and confer process dealing with

16   some of these things, but I do want to hear, I think initially

17   from Mr. Fonstad with respect to some elaboration on the way

18   and the manner in which GE records are kept, as it would

19   relate to a significant narrowing -- and I appreciate, Mr.

20   Fonstad, that you may have taken a position that there has not

21   been a sufficient narrowing, or the manner in which any such

22   narrowing might have been done -- but nonetheless a narrowing

23   that would go to engines or engine parts that would be related

24   to the engines, aircraft engines used on these aircrafts that

25   have been identified at this location during this time period.

Colloquy                                46

1            So that's generally the way I see all this.  And

2    frankly, part of me says I wish I hadn't -- I wish I had

3    picked this up and looked at it rigorously back in November

4    when this motion was first filed and maybe we could have cut

5    through some of the delay that we've had so far.

6            But, this is where we are now, and that's the

7    inclination I'm at.  So, Mr. Fonstad, let me hear from you --

8    I'll give you the opportunity to address any particular issue

9    you want, but as you've heard, I really want you to focus upon

10   the manner in which GE does maintain whatever records it may

11   have.

12           MR. FONSTAD:  Thank you, Your Honor.  And I'll

13   address that corporately, but first, just on the procedural

14   issue.  I respect your ruling.  But the only thing I would

15   comment on that is that the procedural, and the timing of the

16   discovery request, certainly plays into the response that GE

17   had.

18           Where, there was a discovery request that Mr.

19   Cascino served with the 22 different aircrafts, none of which

20   were the Falcon or the Challenger.  And also at the time that

21   these discovery requests were served, we didn't even have the

22   deposition transcripts that provided the discovery that serves

23   as a basis for the claims about the Falcon and Challengers.

24   Those depositions took place after October 1st.

25           So a lot of this -- we're dealing with, what is

1    essentially plaintiff's retroactive and bladed attempt to

2    change their interrogatory requests to GE to now comport after

3    the close of fact discovery, with whatever the evidence that

4    they produced after the close of -- after the close of fact

5    discovery resulted in.

6         And I think that's kind of one of the troubling

7    aspects of this for GE, where it seems like plaintiffs are

8    allowed to benefit from their own deleteriousness and delay in

9    this litigation.

10        But to address --

11        THE COURT:  Let me just respond to that, to say that

12   I think that you have set that proposition out very well in

13   your papers.  I think it is set out in a persuasive way, and I

14   completely get the point.

15        Nonetheless, I still think on balance, given where

16   we were on all of this, and given the fast, as you know we

17   had, maybe not from plaintiff's perspective but at least from

18   my perspective, we have been a bit forgiving and we've been

19   more flexible with respect to some of the minor delay issues,

20   or what I would concede are minor is in terms of specific

21   dates or a couple of weeks delay issues that are involved, and

22   I'm working off of what I have now, and I'm -- I don't know if

23   I ever would have focused on exactly when you would have

24   received certain information, but nonetheless, I'm working off

25   the record I have now, so --

1          MR. FONSTAD:  And I appreciate that, Your Honor.

2          THE COURT:  -- just so you know --

3          MR. FONSTAD:  I guess then getting to the bulk of

4   your questions concerning what GE documents are available and

5   the like.  I'm going to turn this over to my colleague, Ed

6   Kenney who has dealt with the aircraft litigation for GE in

7   the past.  And the only thing that I would comment before Mr.

8   Kenney proceeds is that some of Your Honor's assumptions about

9   what GE's documents may exist and when aircraft even kind of

10  came into the realm of the asbestos litigation may be a bit, a

11  bit incorrect.

12          And now I'll let Mr. Kenney explain how the

13  documents exist, what we have concerning these two different

14  types of planes.

15          And then the only other bit of background is that

16  the two different types of planes that are there that are at

17  issue, the Falcons and the Challengers, are actually families

18  of planes.

19          THE COURT:  Okay.

20          MR. FONSTAD:  The GE engine could only have been in

21  some of the models within those families.  And even if a

22  particular model within the family had a GE jet engine, it

23  doesn't mean that every model of the plane in that family had

24  a GE jet engine.

25          THE COURT:  So --

1          MR. FONSTAD:  But with that, I think I've spoken

2     enough and I'll let Mr. Kenney speak.

3          THE COURT:  Well, let me just commend you for the

4     rather polite way in which you told me that my basic position

5     was absolutely incorrect and perhaps worse, but I hear that

6     and I think it might be a distinction that's worth noting, as

7     I think I've seen you point out in other documents there would

8     be, perhaps, you know, who knows, hundreds, thousands,

9     millions of particular products, or when you break it down by

10    models that GE would have produced over time, and shame on me

11    if I'm trying to throw out some kind of blanket assumption.

12          So I will hear, I'd be interested to hear what Mr.

13    Kenney has to say about this.

14          Mr. Kenney, would you be good enough to identify

15    your firm and let me know whether or not your appearance is

16    actually entered in the --

17          MR. KENNEY:  Yes, my appearance is entered.  My name

18    is Edward Kenney, K-E-N-N-E-Y, and I'm with Sidley, Austin.

19          THE COURT:  Okay.

20          MR. KENNEY:  Representing General Electric Company.

21          THE COURT:  Thank you, Mr. Kenney, I'm happy to hear

22    from you.

23          MR. KENNEY:  Okay.  First of all, what Mr. Fonstad

24    said about GE obviously has been involved in some asbestos

25    litigation involving aircraft engines over the years.  The

1    first one that I can recall was back in probably 2000 -- early

2    2000 to 2003, 2004, somewhere in that neighborhood.

3              GE does not maintain a central repository of

4    documents concerning aircraft engines.  GE has over the years

5    manufactured a number of different aircraft engines at two

6    principal locations, Lynn, Massachusetts and Evendale, Ohio,

7    and the records tend to be kept on an engine, specific

8    records, engine specific basis in the location where the

9    engines are manufactured.

10             The two engines that are potentially at issue in

11   this case, and I should say the two engine families, are the

12   CF700 in the case of the Falcon, and the CF34 in the case of

13   the Challenger.  And there's a number of different variants of

14   each of those that could potentially have been in, for

15   example, in Falcon jets there's three different variations of

16   CF700's that could have been present in a Falcon jet.  And in

17   terms of CF34's, from what I understand, there's probably four

18   or five different variations over the years that were used.

19             As Mr. Fonstad indicated, in the case of Falcon

20   jets, there were other engines that were also used.  Some of

21   the Falcons have Garrett engines which GE did not manufacture.

22             In the case of the Challengers, I believe some of

23   them, the early versions of them had Lycoming engines which GE

24   did not manufacture.

25             Now in terms of what records would be available, to

1   determine whether or not GE engines were present at the KC

2   Aviation facility in Appleton, Wisconsin during the years,

3   between the years 1978 and 1991.

4          I talked to the engine managers for both the CF700

5   and the CF34 and from what I've been told there are no sales

6   records that were, that are available that would be able --

7   that would enable us to determine whether or not a particular

8   GE engine went to KC Aviation.

9          Let me just explain that typically, and typically in

10  the case of business or executive jets, GE doesn't sell the

11  engines or didn't sell the engines to a company like KC

12  Aviation.  They sold them to the air frame manufacturer, which

13  in the case of Falcon jets was Dassault, it's a French

14  company.  In the case of the Challenger jets, it was

15  Bombardier.

16         So basically GE would have sold the engines to

17  Dassault in the case of Falcons.  Dassault would have put the

18  engines on the jets and sold them to whatever customer they

19  sold them to.  Same thing would be true with the CF34 engines

20  that were sold to Bombardier.  And from what I understand from

21  the engine managers, GE does not have sales records that go

22  back that far.

23         Basically the Falcon, the CF700 program goes back to

24  the late sixties and production of CF700's was discontinued in

25  1982.  So, their sales records that would basically show how

1    many engines were sold to Dassault and when they were shipped

2    and that sort of thing don't exist anymore.

3            In the case of the CF34, they're still being

4    produced.  Its production of that model, of that engine family

5    I should say started in about 1978 or thereabouts.  And they

6    are still being produced.  But we don't have sales records

7    that date back to the seventies and eighties in terms of

8    particular CF34 engines that were sold to Bombardier for

9    inclusion on Challenger aircraft.

10           So, in terms of what records may still exist, one of

11   the things that plaintiff indicated they were very interested

12   in obtaining was technical manuals that would have been

13   involved in maintenance of those particular engines.  And I

14   checked to see, you know, what was available with respect to

15   those technical manuals.

16           Technical manuals are prepared by GE for engines it

17   produces.  There's technical manuals that exist for the

18   CF700.  There's also technical manuals that exist for the

19   CF34.  The way that these records, the way the technical

20   manuals are maintained is, we would be able to produce the

21   records -- the manuals as they exist today.

22           They go through a revision process, revised for a

23   number of different reasons.  They're revised for issues that

24   might come up during operation of the aircraft and the

25   engines.  They may be revised due to issues that are addressed

1  by customers or by the FAA.  And essentially what GE does is

2  modify the manual and provide the revised versions of it to

3  customers.

4        What we have today is we have the present version of

5  the technical manuals for the CF700 and the present version of

6  the manuals for the CF34.  We might have some -- and they are

7  not maintained all in one place.  We don't have all the

8  background information that went into the revisions.  There's

9  really no reason to keep, in the case of the CF700, all the

10  revisions that you know, occurred from 19 -- the late 1960's

11  to today.  So the manual that we have today basically

12  represents the manual as revised over the years.

13        Some background may still be available, although

14  it's not organized in one particular place.  And it would

15  take, from what I have been told, a effort to find and collect

16  the revisions to the manual over the -- even in recent years.

17  And in terms of all the revisions going back to when the

18  manual was first created back in the late sixties, a lot of

19  that documentation probably no longer exists.  And what does

20  exist would be very difficult to locate.

21        THE COURT:  Let me just interrupt you for one

22  second.  And again, I don't know enough about airplanes.  But

23  isn't there some place, whether it's your own historical

24  reference or some kind of GE airplane engine, you know,

25  historical whatever, that they would keep track for whatever

1    purposes, old manuals that would be --

2            MR. KENNEY:  No.  In fact, Your Honor, the FAA kind

3    of discourages that, because originally as you can imagine,

4    the manuals were produced in kind of looseleaf form.  And when

5    revisions were made, revised pages were sent to the customers

6    and that sort of thing.

7            More recently, now it's done, they're done in PDF

8    form.  But the FAA has always discouraged keeping old manuals

9    around because they don't want people who would be relying on

10   the manuals to be relying on old information.  So GE does not

11   have old copies of the manuals.

12           Like for example, they wouldn't have a copy of the

13   CF700 field level maintenance manual for the CF700 for, as it

14   existed in 1985 or any other year before that.

15           THE COURT:  So you're a hobbyist and you have money

16   and you get a hold of a 1985 whatever, Falcon or Challenger,

17   and you needed to repair it, there's no manual that exists?

18           MR. KENNEY:  A manual exists for the CF700, you

19   know, as revised up until the present time.  So all the, all

20   the changes that have been made and all the maintenance

21   improvements and that sort of thing that have been made over

22   the years, that's available to people who subscribe to the

23   manual, owners of that engine.

24           But in terms of you know, could you get a 1985

25   manual or version of the manual as it existed in 1985, you

Kenney - Argument                              55

1    couldn't get it from GE.  Now whether you could get it from

2    some private source or not, I don't know, but GE does not keep

3    copies of the old manuals.

4              THE COURT:  Okay.

5              MR. KENNEY:  As they're revised, they're updated

6    basically and revised.  And what we have today is the manual

7    as revised through 2013.

8              With respect to the CF700, remember it hasn't even

9    been produced since 1982.

10             THE COURT:  I guess I just wonder how much that

11   helps you if you're trying to repair a 1975 aircraft.

12             MR. KENNEY:  Well, I've never repaired a 1975

13   aircraft, Your Honor, so I'm not sure.  But my understanding

14   is, as far as the aircraft, as far as the engines that still

15   exist, they've gone through two or three different owners at

16   least.

17             THE COURT:  Okay.

18             MR. KENNEY:  And so, somebody who is maintaining a

19   CF700 engine as it exists today would, should at least in

20   accordance with FAA requirements, should use the manual as it

21   exists today.

22             THE COURT:  Okay.  So I interrupted you, so go

23   ahead.

24             MR. KENNEY:  No, that's okay.

25             And CF34 is the similar situation.  We don't have

1    sales records that go back to the 1978 to 1991 period that

2    would show which engines were sold to Bombardier for the most

3    part.

4         We don't think -- in some cases, the larger airlines

5    might buy a spare engine, like United Airlines or somebody

6    like that, might buy an engine specifically from -- a spare

7    engine from GE to use on their particular maintenance

8    operations.  But, we don't believe that -- and we haven't

9    found any record that indicated that KC Aviation would have

10   ever purchased an engine directly from GE.

11        It's my understanding that they would have been

12   working on aircraft that were manufactured by Bombardier.

13   Bombardier would have purchased the engines from GE.  And so

14   we don't have any ability really to determine which CF34

15   engines went to, or ended up at KC Aviation.  That would

16   depend on who was operating the aircraft and that sort of

17   thing.

18             THE COURT:  Okay.  So --

19             MR. KENNEY:  I'm sorry, go ahead.

20             THE COURT:  So if I'm an aircraft mechanic at KC in

21   the 1980's and I'm working on a Bombardier aircraft with a GE

22   engine, and I needed a replacement or find some components to

23   work on it, I would go to, call Bombardier or go to Bombardier

24   and they would then --

25             MR. KENNEY:  Or you would have had a technical

1    manual as it existed at that point in time.

2                THE COURT:  Okay.

3                MR. KENNEY:  And basically, as I understand the way

4    that companies that do maintenance -- now I don't know exactly

5    what kind of maintenance KC Aviation was doing, and what

6    manuals it would have had in its possession would depend on,

7    because there are different manuals for different purposes.

8                THE COURT:  Sure.

9                MR. KENNEY:  There's -- there are basically three

10   different, or three major types of maintenance that go on on

11   aircraft and aircraft engines.  There's field -- and there's a

12   different manual for each one.  There's basically a field

13   level maintenance manual, there's an intermediate maintenance

14   level and then there's an overhaul maintenance level.  And

15   I've not seen any indication or any evidence to suggest that

16   KC Aviation was doing overhauls of GE engines.

17               So which manuals they would have had in their

18   possession would depend on what exactly they were doing.

19               THE COURT:  I got that, okay.

20               MR. KENNEY:  And we don't have the ability to track

21   that either back, you know, at that point in time.  And as I

22   understand it, KC Aviation has been -- it doesn't exist

23   anymore.  It now is Gulf Stream.

24               So anyway, if you were doing maintenance on an

25   aircraft in 1985 or on an aircraft engine in 1985, what you

1   would have, what you should have would be the manual, the

2   technical manual as it existed at that point in time.  And you

3   would have been, if you were a subscriber to the manuals, the

4   GE manuals, you would have been provided with the revisions as

5   they were adopted by GE and approved by the FAA.  GE would

6   send those to you.  You should, what you were supposed to do

7   was replace the section of the manual that had been revised

8   and get rid of the old part, and then rely on that manual as

9   revised.  That's how the system worked.

10          So, and what we have in the case of both the CF700

11  and the CF34 is we have the manuals as they exist today, and

12  as they've been revised over the years.  We have some backup

13  that when they made a revision, we don't -- certainly with

14  respect to the CF700, we don't have anywhere near all of it,

15  at least in a way that it can be located without a tremendous

16  amount of effort.

17          And with the case of the CF34, my understanding is

18  it's been in production since 1978.  The manuals have been

19  revised more that 50 times.  And it would be a -- it would

20  take a tremendous amount of effort to try and figure out and

21  find all the documentation that may have gone into any of the

22  revisions.  Probably the more recent ones it might be a little

23  bit easier, but the ones going back to the seventies and

24  eighties, if they still, if all that backup exists at all, it

25  would be extremely difficult to find it.

1          THE COURT:  Okay.  So, then I'm hearing that to the

2     extent that there may be, and I guess I've heard you say that

3     based upon your inquiries, there are not.  But to the extent

4     that there may be any sales records available that would

5     relate to GE engines, they would not be organized in any way

6     that would show to KC Aviation, and you have nothing on

7     KC Aviation in your materials, as far as you know?

8          MR. KENNEY:  That's correct.

9          We don't think -- frankly, Your Honor, we don't have

10    records that show sales to KC Aviation.  We don't think that

11    there's any likelihood that their engines would have been sold

12    to them, that they -- and we don't have sales records that go

13    back, you know, to anybody back in the early, in the case of

14    the CF700 we're talking late sixties, early seventies.  We

15    don't have sales records at all for those.

16         But we think that where they would have been sold

17    would have been to Dassault.  What the Dassault has in France,

18    we have no idea, in terms of what records they have.

19         And basically what happened, Your Honor, was GE

20    would sell the engines to an aircraft manufacturer; in the

21    case of the Falcons it was Dassault, in the case of the

22    Challenger it was Bombardier.  And so they would sell it to

23    the airframe manufacturer.  The airframe manufacturer would

24    put the engine on its aircraft and sell it to whoever they

25    would sell it to.

1          I'm not sure that we've seen information as to these

2     aircraft that were allegedly present at KC Aviation, who

3     actually owned them.

4          THE COURT:  Right.  Okay.  Let me ask you just to

5     follow-up on this, and then I'm going to ask Mr. Cascino what

6     comment he wants to make about this, or any other information.

7          On -- I don't know how familiar you are with the

8     specific interrogatories, but one of the interrogatories for

9     which there's a bit more of a robust response is number 9, and

10    it -- just give me your answer to this.  You circled around it

11    certainly, but they asked for does the defendant GE have

12    records concerning the sales of asbestos-containing products

13    used in the aircraft industry during the period of 1958

14    through 1991.

15         That interrogatory I think has effectively been

16    amended by the plaintiffs to indicate that they would be

17    concerned with the sales of asbestos-relating products or

18    components in jet engines or jet engines at KC Aviation

19    between 1978 and 1991.

20         Do you believe you covered that by virtue of the

21    answers that you've given me so far?

22         MR. KENNEY:  Well, Your Honor, I think what we said

23    in our answer was that there were, there were asbestos-

24    containing components in aircraft engines historically.

25         THE COURT:  Right.

1          MR. KENNEY:   And over a period of time, those

2    components were eliminated.   In terms of the CF700 and the

3    CF34, the kind of components we're talking about are clamps,

4    gaskets and basically we're talking about clamps that are

5    maybe a couple of inches, two, three inches, J-shape type

6    clamps that had a asbestos-containing cushion on them that

7    would hold hoses and that sort of thing in place.

8          The gaskets would typically be, I would say three

9    inches maybe, sometimes rectangular maybe two-by-three inches.

10   In many cases, the gaskets would be, would have basically kind

11   of a metal sandwich with some asbestos-containing material in

12   between.

13         Those were the kind of parts that were included in

14   the engines.   And GE eliminated those over a period of time.

15   In terms of -- I think I mentioned that there were a number of

16   different variants of the engines that were used on Falcon

17   jets, I think I was told somewhere, three different variants,

18   and four or five different variants on the CF34's that were

19   used on Challenger aircraft.

20         We do have some drawings, historical drawings, that

21   show the particular parts and that sort of thing.   And the way

22   that GE drawings are maintained is there's an overall drawing

23   and it references down to very detailed drawings.   And there

24   in many cases would be potentially hundreds or thousands of

25   them altogether.

1          We do have some information concerning asbestos-

2     containing parts that were included in these engines over a

3     period of time.  But whether you would even -- or whether

4     someone would even potentially have access to them would

5     depend on exactly what kind of work they were doing.

6          And typically, the asbestos-containing components

7     were in the hot end of the engines, and would only be exposed

8     if a major overhaul was conducted.

9          THE COURT:  Right, okay.

10          MR. KENNEY:  I don't know if that addresses your

11     question, Your Honor, but that's about the best way I know how

12     to try to address it.

13          THE COURT:  All right.  Where would these historical

14     drawings be located?

15          MR. KENNEY:  They're located, I believe the drawings

16     for both these engines would be in Lynn, Massachusetts.

17          THE COURT:  And would these cover the 1978 to 1991

18     time periods?

19          MR. KENNEY:  It would cover the period up to the

20     present.  And again, you know, they're revised over time as

21     well.

22          So going through a search of those particular

23     drawings would be a major, a major effort.

24          THE COURT:  Right.  Okay.  Is there any more

25     specific information you have with respect to the, you said

1    some of the asbestos-containing specifics, or whether they're

2    components or whatever, all these engines were eliminated over

3    time, do you have any -- does your information have any more

4    specific information about that?

5         MR. KENNEY:  Not really, Your Honor.  It's -- the

6    information that, the historical information that we have

7    particularly is not very organized.  And in order to try and

8    find every potential reference to, you know, these are small

9    parts.  To find every reference or potential document that

10   would be potentially responsive would be, would take a --

11   would be a tremendous effort.

12        THE COURT:  All right.  Mr. Cascino, is there

13   anything -- I want to give you an opportunity to comment here,

14   or any issues you want to raise?

15        MR. CASCINO:  Yes, Your Honor.

16        Number one, the plane family for the Challenger

17   would be the CL-601 during the time period that -- right,

18   Jason -- okay, and Your Honor, only 60 of those, just for your

19   information, that are active today.  They stopped making them

20   in 1987.

21        The engine has a CF34 family as counsel indicated,

22   most likely it's CF34-3A was the engine that was the GE engine

23   used on the Challenger.

24        With regard to the Falcon jet, most likely they had

25   a GE CF700-2D-Z engine in them.  Again, there's not a lot of

Cascino - Argument                                        64

1    these planes in either case that are out there.  I think as of

2    today there's roughly 33 of these Falcons that have GE

3    engines.

4         We are interested in going and looking at the

5    drawings that they do have.  It is my understanding from

6    talking to -- oh, I'm sorry, it's 2D-2, I'm being handed a

7    note on the -- on what, Jason -- on the Falcon I gave the

8    wrong thing, it's 2D-2.

9         With regard to these drawings, it's my understanding

10   from an expert that I've retained, that you can go back, you

11   start with the original engine and then you, whatever the

12   engine is, and I just told you, we think we even know what

13   engines there are, and then you go look at that, and then

14   there's, the asbestos parts which the defendants admit in one

15   of their responses on page 13 which are clamps, seals,

16   adhesives, straps, troughs or gaskets in that they have.

17        You would then work your way backwards on those

18   drawings to look at the actual piece that you're talking

19   about, which could be identified by looking at the master

20   drawing, and you'll have like, you'll have like numbers and

21   then you go to those pages or whatever, and then you can see

22   what that is actually made out of.

23        Of course, our interest from these drawings is when

24   do they have asbestos in them and when do they stop having

25   asbestos in them.  That's important from our perspective.

Cascino - Argument                                        65

1          I would like to make a comment too, that counsel

2    keeps talking about sales records.  And you know, we use the

3    words sales of products or services.

4          Number one, GE supplied parts.  And counsel did not

5    mention any of that.  And so if they were to take off, if they

6    were to work on a GE engine, they would do certain things

7    every six months.  The way they do the service on these is

8    they would do service for six months service, and a different

9    service in six months, and a different service another six

10   months later.  So that the servicing of these engines went

11   over, unless there was a problem with them, went over a period

12   of months.

13         Secondly --

14         THE COURT:  Mr. Cascino, can I interrupt you on that

15   and ask Mr. Kenney to respond to the question about service.

16         MR. KENNEY:  About parts?

17         THE COURT:  Yes.

18         MR. KENNEY:  And service.

19         THE COURT:  Yes.

20         MR. KENNEY:  Well, first of all, although GE does

21   service engines for, as a contractor for customers, we don't

22   know that -- and there's no way to tell whether or not we

23   would have performed any service on the aircraft that would

24   have, or engines that would have been present at KC Aviation.

25   Probably not.  But there's really no way for us to tell.

1        In terms of parts, GE does provide parts if

2   requested by customers.  We don't have records of parts that

3   would have been provided to KC Aviation back in that time

4   frame.  It's too distant.

5        But the other thing too to understand is that many

6   people, many companies that service aircraft or who own

7   aircraft, can find out who the -- basically any of these

8   asbestos-containing components that were formally in GE

9   engines were basically provided by third-party vendors.  And

10  the third-party vendors are pretty well known to people in the

11  aircraft industry.  And it was pretty common, from what I

12  understand, for people servicing aircrafts to purchase these

13  sorts of parts directly from the vendors rather than from GE,

14  because it's cheaper for them to do it.

15            THE COURT:  Okay.  All right, Mr. Cascino, go ahead.

16            MR. CASCINO:  My understanding is that these engines

17  are serviced, and they did not do the overhauls in the sense

18  that what Mr. Sypchalla would have done is he would have

19  inspected the engine, he might remove a gasket or fix it if

20  it's small like that, but mostly they would take these

21  aircraft engines off and in the process of taking them off,

22  there were certain gaskets and things that were going to be

23  disturbed, and then they would ship the engine to General

24  Electric who would do the work on the engine, and then GE

25  would ship the engine back.

Cascino - Argument                                    67

1          And I'd be shocked if GE doesn't have those kind of

2     records of those transactions going because you're talking

3     about a jet engine being transferred.   And there's not many of

4     these planes.

5          I mean, understand that you know, you're talking

6     about very, very few planes in total.   You know, there might

7     be as I said, 33 Falcon jets that would have had the GE

8     engine.   Or, you know, there -- the plane family for the GE

9     engine with the Challenger is a CL-601.   So there's not that

10    many of these things, these airplanes that are out there that

11    have the GE engines on these specific types of aircraft.

12              MR. KENNEY:   Can I respond to that?

13              THE COURT:   Please.

14              MR. KENNEY:   There is, my understanding is there is

15    somewhere in the neighborhood of a thousand CF700's that were

16    manufactured.   And in the case of the CF34's there's somewhere

17    in the neighborhood of 1800 engines that were manufactured for

18    business-type executive jet type service, and probably another

19    1800 that were manufactured for retail jets.

20              And in terms of, my understanding is, in terms of

21    the Falcons, that there were somewhere around -- originally,

22    now we're talking about back in the sixties and seventies,

23    somewhere around 400 or more of them that were manufactured.

24              So I think Mr. Cascino is right, in that the number

25    of them that presently exist is pretty small.   But this is 20

Cascino - Argument                                   68

1    years after, more than 20 years after the fact.

2              THE COURT:  All right.

3              MR. CASCINO:  Again, there are 400 of the Falcons

4    counsel is indicating, that's not a whole lot.

5              And again, with the other, I don't know whether he's

6    talking about the 1800, -- counsel, are you talking about the

7    ones with GE engines in it or are you --

8              MR. KENNEY:  I'm talking about CF34's that were

9    manufactured for business or executive jet type service.

10             MR. CASCINO:  Okay.  And are you talking about the

11   ones that have the CF34 --

12             MR. SHEEN:  Referring to the number of the engine.

13             MR. CASCINO:  Oh, number of the engine.

14             MR. KENNEY:  Yes.  And just to put things in a

15   little bit of perspective.  My understanding is the Falcons

16   each had two engines on them, as did the Challengers.  So one

17   aircraft isn't one engine.  One aircraft is two engines.

18             MR. CASCINO:  And we're not dealing with a whole lot

19   of airplanes.  And when you said 1800 plus 1800 or whatever,

20   are you including the ones that would not have had a GE engine

21   or are you talking GE engines?

22             MR. KENNEY:  No, I'm talking GE engines, CF34's that

23   were manufactured.  Some on Challengers, some on other

24   aircraft.  That's 1800 for business -- they sort of

25   categorized them as either business or executive type aircraft

Colloquy                                    69

1    like the Challenger.

2                MR. CASCINO:  The records on the CF was 34-3A or 2A?

3    CF34-3A.

4                MR. KENNEY:  Well, I mean we really didn't have,

5    until now, identification --

6                MR. CASCINO:  Is that something you can provide?

7                MR. KENNEY:  Is that something we can provide?

8                MR. CASCINO:  Yes.

9                MR. KENNEY:  In terms of what?

10               MR. CASCINO:  Well, in terms of the design or the

11   designs, the drawings that you talked about, records of parts

12   from GE, the service of these engines from GE?

13               MR. KENNEY:  Well, I don't -- from what I

14   understand, we could not provide that, at least part

15   information on that sort of thing dating back to 1991 and

16   before, more than 20 years ago.

17               THE COURT:  Let me just, what I'm -- I think what

18   I'm kind of concluding from this is that yes, there are, there

19   were obviously documents that GE would have had that would

20   pertain to the sale or even products or parts used in

21   servicing of these aircrafts.  They don't seem to be

22   particularly -- even though it might be a small number of

23   planes involved, at least as of today a small number of

24   planes, organized in a way that would make easy reference to

25   them, at least from what we're hearing.

1          But I think there's potentially relevant evidence

2     out there, which to me would at least meet the threshold

3     admissibility question.  And I think this comes down, is

4     likely going to come down to a question of burden relevance as

5     to burden kind of question.

6          And I think the only way for me to sort through

7     that, and Mr. Kenney has made broad general references I think

8     as to the difficulties of trying to accomplish things and has

9     given us some information, but I think what the productive way

10    to proceed with this would be dealing now with what I think is

11    a lot -- I trust and I hope you agree, Mr. Fonstad, is much

12    more specific information than you would have had before from

13    Mr. Cascino, since the process helped at least in that regard,

14    and Mr. Cascino at least has some understanding as to what

15    they did have, perhaps don't have anymore but what they did

16    have, that there be a revision to be very promptly done from

17    Mr. Cascino as to the narrow specifics of what's being looked

18    at, which I think one could do based upon what is on this

19    record here today, and whatever elaboration needs to be

20    obtained with consideration of this record here today.

21         And then, that can be assessed from the perspective

22    of GE in terms of burden that might be applicable.  I think

23    it's best -- I don't know that we have to have affidavits in

24    connection with ascertaining burden based upon consideration

25    of what appears reasonable in our experience, but I do think

Colloquy                                             71

1    affidavits or declarations are helpful in that regard.

2              And I think against that, depending upon if there

3    are circumstances that there can be an indication of a further

4    search, and that further search bears fruit or not bear fruit,

5    there can be declarations that would address that question.

6    And then declarations might address the question of a more

7    extensive burden.

8              But I'm hearing this now to be limited to these two

9    types of aircraft, these two types of engines, somewhat

10   limited.  The time period is now a lot more limited.  There is

11   a specific identification of small components, of small

12   aspects of these things, perhaps not readily accessible

13   according to Mr. Kenney, but nonetheless present with asbestos

14   in them.  And we don't have clear information yet as to when

15   it was that those components would have been eliminated, and

16   that would obviously be relevant information.

17             But I think that this ought to be -- I've heard

18   enough here to say that this ought to be developed a bit more,

19   both from the perspective of the narrowing of the request, and

20   Mr. Cascino, I'm happy for you to say you stand on the record

21   based upon what you articulated here today and what came out

22   from what Mr. Kenney has said today.  If you want to

23   supplement it a bit more in terms of a letter that would be

24   somewhat specific and you can do it very promptly within the

25   next two or three days, that would be okay too.

1           And then, we'll give the defendants, we'll give GE

2     an opportunity to respond.  That's the way I think it makes

3     the most sense to proceed.

4           MR. CASCINO:  That's fine, Your Honor.  I just need

5     -- it will take me till Tuesday, the 21st is a holiday, to get

6     a transcript of today, maybe the 23rd.  I am not going to be

7     available on the 24th and the 25th, and I'm not trying to push

8     this off, but we'll do our best to get it done by Wednesday

9     the 23rd.

10          THE COURT:  Okay, I'm going to put that into an

11    order.

12          MR. CASCINO:  Yes, we'll do our damnedest, we'll do

13    our very best.

14          THE COURT:  And then I would ask -- when Mr. Fonstad

15    receives that, if you think, Mr. Fonstad, you could give us a

16    response by the 30th, and that response may very well be you

17    found out that you don't have enough time, but make a real

18    effort to try to provide some kind of response, because it

19    sounds to me like Mr. Kenney has obviously done a lot of work

20    on this and looked at this, and is reasonably knowledgeable

21    about this, but there have been some issues that have come up

22    that maybe can be somewhat amplified.

23          MR. CASCINO:  Your Honor, may I also be able to talk

24    with Mr. Kenney?  Maybe he and I can sort through some of this

25    as well before I write whatever it is to the Court.  At least

Colloquy                                          73

1    that we state out our position, if nothing else.

2             THE COURT:  Yes, I would encourage that.  And Mr.

3    Kenney, I hope you have no objection to that.

4             MR. KENNEY:  No, I have no objection to that.

5             THE COURT:  All right.  Okay.

6             MR. KENNEY:  If you want to talk after this call,

7    Mr. Cascino, you can call me at 312-853-2602.

8             MR. FONSTAD:  Your Honor, this is John Fonstad.  The

9    only question I have is, we have, under the current scheduling

10   order which still applies to this case, our summary judgment

11   motion is due on February 1st.

12            I'm assuming that Mr. Cascino, you know, depending

13   on whether or not, you know, how this actually shakes out in

14   terms of if we can find anything responsive to a more tailored

15   discovery request, might want to file an expert report

16   concerning GE engines, and we might need to depose that

17   expert.

18            THE COURT:  Yes.

19            MR. FONSTAD:  So I'm wondering, should we move that

20   summary judgment deadline?

21            THE COURT:  Yes.  What I will do is to enter an

22   order specifically with respect to Sypchalla that will suspend

23   for now the summary judgment deadline.  And I'll have to take

24   a look at the order and see what it says about submission of

25   expert reports and that thing, but suspend those deadlines

1  subject to a further order, once this aspect of it gets worked

2  out.  But I'm sure Mr. Cascino appreciates the need for that,

3  and that's what we'll do.

4          MR. CASCINO:  That's fine, Your Honor.

5          And the other point is that we still don't have a

6  date, because we have to have the hearing of this motion, and

7  I think there's another UPC one or Boeing one or something out

8  there that still exists before our expert, and the Court on

9  November 5th said we didn't have to name an expert until we

10 got through all of this discovery.

11         THE COURT:  Yes.

12         MR. CASCINO:  So this thing is, this individual case

13 has fallen on its own track.

14         THE COURT:  That's right, that's right.

15         MR. CASCINO:  And as the Court indicated way back

16 when, it did see that this was a possibility that cases could

17 wind up on their own track.  But as long as we did the

18 substantial amount of submissions, the Court was going to be

19 permissible in that regard, and that sounds like what's going

20 on.  So we appreciate that.

21         THE COURT:  That's right.  That's exactly right.

22 Don't get the idea that I suggested that it was going to

23 happen with more than one case.  We were talking about

24 Sypchalla at the time.

25         MR. CASCINO:  No problem.

Colloquy                                  75

1          THE COURT:  All right, gentlemen.  So, Mr. Fonstad,

2     you're good with that?

3          MR. FONSTAD:  I'll trust your judgment, Your Honor.

4     Thank you.

5          THE COURT:  You're very diplomatic today, Mr.

6     Fonstad.

7          MR. KENNEY:  Yes, he only criticizes the judge once

8     per call.

9          THE COURT:  Yes, that's good.

10          MR. FONSTAD:  And very delicately at that.

11          THE COURT:  Indeed, indeed.  All right, gentlemen,

12     thank you very much.

13          ALL COUNSEL:  Thank you, Your Honor.

14          (Proceeding concluded at 3:56 p.m.)

15                          * * * *

**C E R T I F I C A T I O N**

We, Josette M. Jones and Sandra Carbonaro, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

JOSETTE M. JONES


_____

SANDRA CARBONARO

Diana Doman Transcribing                    _____

AGENCY                                      DATE