**212**

```
1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3    CHARLES KRIK,                    )
                                      )
4                 Plaintiff,          )
                                      )
5         vs.                         )  No. 10 C 7435
                                      )
6    OWENS-ILLINOIS, INC. and         )
     EXXON MOBIL OIL CORP.,           )  Chicago, Illinois
7                                     )  April 21, 2015
                  Defendants.         )  1:15 o'clock p.m.
8

9                             VOLUME 2
10              TRANSCRIPT OF PROCEEDINGS - Trial
            BEFORE THE HONORABLE MANISH S. SHAH
11                        and a Jury

12
     APPEARANCES:
13
     For the Plaintiff:        CASCINO VAUGHAN LAW OFFICES, LTD.
14                             BY:  MR. ROBERT G. McCOY
                                    MR. DANIEL B. HAUSMAN
15                             220 South Ashland Avenue
                               Chicago, Illinois  60607
16                             (312) 944-0600

17   For Defendant Owens-IL:   SCHIFF HARDIN, L.L.P.
                               BY:  MR. BRIAN O'CONNOR WATSON
18                                  MR. EDWARD M. CASMERE
                               233 South Wacker Drive, Suite 6600
19                             Chicago, Illinois  60606
                               (312) 258-5784
20
     For Defendant ExxonMobil: JOHNSON & BELL, LTD.
21                             BY:  MR. H. PATRICK MORRIS
                                    MR. DAVID F. FANNING
22                             33 West Monroe Street, Suite 2700
                               Chicago, Illinois  60603
23                             (312) 372-0770

24

25
```

1   APPEARANCES (Continued):

2   For Defendant ExxonMobil:BLACKWELL BURKE, P.A.
                             BY:  MR. JERRY W. BLACKWELL
3                            431 South Seventh Street, Suite 4600
                             Minneapolis, Minnesota  55415
4                            (612) 343-3200

5   Also Present:           EXXON MOBIL CORPORATION
                             BY:  MR. BEDOUIN L. JOSEPH
6                            P.O. Box 2180
                             CORP-EMB-1540C
7                            Houston, Texas  77252-2180
                             (713) 656-7827
8
                             Mr. Michael J. Barron, Paralegal
9                            Schiff Hardin, L.L.P.

10                           Mr. Sean Swaggerty, IT technician
                             Johnson & Bell, Ltd.
11

12

13

14

15

16

17

18

19

20

21

22
                    COLLEEN M. CONWAY, CSR, RMR, CRR
23                        Official Court Reporter
               219 South Dearborn Street, Room 1714
24                      Chicago, Illinois  60604
                          (312) 435-5594
25                  colleen_conway@ilnd.uscourts.gov

1      (Jury out.  Proceedings heard in open court:)

2           THE CLERK:  10 C 7435, Krik versus Crane Company, et

3    al., jury trial.

4           THE COURT:  Okay.  Good afternoon.  The jury is

5    willing to stick around a little bit later today, tomorrow, and

6    Thursday till about 5:00 o'clock.  So if that's okay with the

7    parties, I'd like to take advantage of that time.

8           MR. McCOY:  Sounds good.

9           THE COURT:  Any housekeeping issues to take up?

10          MR. McCOY:  Judge, I just want to make a brief

11   proffer of evidence on one point, which is the one day of

12   exposure evidence.  Everything else I'll wait as it comes up.

13   But I'd like to proffer one day since you already ruled on that

14   one.

15          THE COURT:  Okay.  Go ahead.

16          MR. McCOY:  We're on the record?

17      DR. ARTHUR LEONARD FRANK, M.D., PLAINTIFF'S WITNESS,

18                      PREVIOUSLY SWORN

19                   VOIR DIRE EXAMINATION

20   BY MR. McCOY:

21   **Q.**  Dr. Frank, I wanted to ask, in terms of lung cancer, is

22   there evidence out there that a single day of exposure can --

23   to asbestos, can be the cause of lung cancer?

24   **A.**  Yes, in animal studies.

25   **Q.**  Can you just explain to us where that comes from, the

**215**

1   studies?

2   **A.**  The study by Wagner in 1974, the British Journal of Cancer,

3   he had animals exposed to varying periods of asbestos.  The

4   shortest period was one day, and some of the animals developed

5   lung cancer with only one day of exposure.  With greater

6   exposures, as per you would expect with a dose-response

7   relationship, more animals got lung cancer with increasing

8   amounts of exposure.

9   **Q.**  Was this study published?

10  **A.**  It was published in the British Journal of Cancer, a

11  peer-reviewed journal.

12  **Q.**  Approximately when did you say it was?

13  **A.**  1974.

14  **Q.**  Is that data and that study something that you consider

15  reliable?

16  **A.**  Yes.

17  **Q.**  Is that data something that others in your field have also

18  considered reliable?

19  **A.**  Yes.

20          MR. McCOY:  Judge, I would proffer that testimony on

21  the issue of causation as to how much dose it would take to

22  cause lung cancer.  And I also would add that the defense has

23  introduced animal studies through the deposition you just

24  heard, and their position is there is a safe level, and this

25  evidence also not only relates to the dose and causation but

1   would relate to the question of whether there is a safe level.

2          THE COURT:  Is there any inquiry that the defendants

3   want to do with respect to the 1974 study with the witness?

4          MR. CASMERE:  Does the Court want us to?

5          THE COURT:  I'm giving you an opportunity to inquire

6   based on the evidentiary proffer of the witness's testimony,

7   which is limited to the existence of the Wagner study in 1974.

8                    VOIR DIRE EXAMINATION

9   BY MR. CASMERE:

10  **Q.**  That was in rats.

11  **A.**  Yes.  They're animals.

12  **Q.**  Three rats.

13  **A.**  Two rats.

14  **Q.**  Two rats.  And out of dozens that were exposed for one day,

15  right?

16  **A.**  There was -- I forget the exact number, but there were no

17  lung cancers in the control group.  So animals with no exposure

18  got no lung cancers, two with one day got it, and the numbers

19  went up with increasing amounts of exposure.

20  **Q.**  Was this a strain of Wistar rats?

21  **A.**  Well, I honestly don't remember what strain of rats they

22  used.  The usual strains are either Wistar rats or F3 44.

23  Those are the ones that are generally used in laboratories.

24  **Q.**  Is this a strain that's known to be susceptible to getting

25  cancer?

1    **A.**  Not particularly, no.

2    **Q.**  Is there a strain of Wistar rats that's known to get -- is

3    susceptible to getting cancer?

4    **A.**  Not that I'm aware of, but I don't know the rat veterinary

5    literature that well.  But again, no animals in the control

6    group -- if they were susceptible, none of the animals in the

7    control group, and there were a couple hundred, I think, got

8    lung cancer.

9              MR. CASMERE:  Thanks.

10             THE WITNESS:  You're welcome.

11             MR. BLACKWELL:  No questions from Owens.

12             THE COURT:  Any argument that the defendants want to

13    make in response to the evidentiary proffer that we've just

14    heard?

15             MR. CASMERE:  Not with Dr. Frank standing here.

16             THE COURT:  Well, Dr. Frank, why don't you step

17    outside for a minute.

18             THE WITNESS:  Yes, sir.

19             MR. CASMERE:  Sorry, Dr. Frank.

20        (Witness exits courtroom.)

21             MR. CASMERE:  First as to the point that Mr. McCoy

22    raised about the animal studies that were brought up during

23    Mr. Hazard's deposition, he has a claim that my client didn't

24    investigate its product before we produced it.  And that's

25    obviously not true.

1           That study, it will become obvious later, was

2       published, and there was no cancer found in those animals.

3       That's apples and oranges in terms of what's going on here.

4           What's going on here is now there's two rats in an

5       experiment in 1974 some doctor was able to produce lung cancer

6       for one day of exposure.  It's not relevant to humans.  There

7       is no testimony that that's convertible to a human being's

8       exposure.  If this were a case of lung cancer in rats maybe it

9       would be relevant, but it's not.

10          MR. BLACKWELL:  Your Honor, there is no testimony

11      that the rat study that was referred to was even meant to

12      simulate human exposures, much less workplace exposures.

13          And beyond that, this whole line of a single day and

14      so on, it just gets us right back around to the same point

15      where he's trying to accumulate exposures to be able to say

16      they all add up, one by one, every exposure, etcetera.

17          And for that matter also, to the extent that the

18      doctor is now espousing opinions based upon rat studies, he

19      didn't do so in his report and he didn't do so at his

20      deposition.  So this is new.

21          MR. McCOY:  Judge, that obviously was not an opinion,

22      that's what's published in the literature.

23          And I would also comment that Owens-Illinois in their

24      testimony of Mr. Hazard and his -- as I understand their

25      position in this case based on that is that there is a safe

1    level.  I mean, that that level was one that would protect

2    everybody from getting any disease, including lung cancer, and

3    that's why there is no warning on their boxes.

4            THE COURT:   That's not what the Hazard testimony was.

5    But I'm going to overrule the defendants' objection to this

6    limited testimony; that Dr. Frank can say that there exists a

7    1974 study that made this finding.

8            So with that, can we resume the testimony with the

9    jury in the box?

10           MR. McCOY:   Yes.

11           THE COURT:   Okay.

12           MR. McCOY:   Just give me about two minutes to get

13   everything in order and I'll be ready to go.

14           THE COURT:   Okay, I'll give you two minutes.  I think

15   the jury is lined up outside, so let's try and get this

16   together.

17           MR. McCOY:   As long as it takes to get Dr. Frank in

18   here.  I don't want him coming in late.

19       (Witness enters courtroom.)

20           MR. McCOY:   I'm just clarifying with Dr. Frank the

21   limited testimony he just gave can be admitted, but the every

22   exposure is still off limits.

23           THE COURT:   Correct.

24           MR. McCOY:   Okay.

25           THE COURT:   You can have a seat while Mr. McCoy gets

**Frank - direct by McCoy**                                    **220**

1    ready for everybody else.

2              MR. McCOY:  I'm set now, Judge.

3              THE COURT:  Okay.  Let's bring in the jury.

4         (Jury in.)

5              THE COURT:  Good afternoon.  Please be seated.

6              Members of the jury, good afternoon.  We'll resume

7    with Dr. Frank's testimony.

8              And I understand that you are able to stay a little

9    bit past 4:30 today, and I do appreciate that.  I appreciate

10   your attention, close attention to the case.

11             And before I forget, Ms. Lloyd, I did receive your

12   note as well.  It's taken under advisement.  Hang in there with

13   us as we continue the trial.

14             And one other housekeeping matter to let you all know

15   is that on Friday we will be ending early.  We'll be ending

16   early on Friday, around 3:15 or so.  So that's in part why I'm

17   looking for any opportunity I can to make up some time, but I

18   appreciate your patience, and we can resume with Dr. Frank's

19   testimony.

20            DR. ARTHUR LEONARD FRANK, M.D., PLAINTIFF'S WITNESS,

21                          PREVIOUSLY SWORN

22                    DIRECT EXAMINATION (Resumed)

23   BY MR. McCOY:

24   **Q.**  Dr. Frank, did you have a chance to look at some of

25   Mr. Krik's medical records?

**Frank - direct by McCoy**

1    **A.**  I did.

2    **Q.**  These are the ones from the hospitals and doctors that he

3    saw, right?

4    **A.**  Yes, sir.

5    **Q.**  I worked with you to come up with a selection for the jury,

6    and I'm just going to go through that selection here one by

7    one.

8    **A.**  Yes, sir.

9    **Q.**  I'm going to use this Elmo over here to do it.

10           First I'll -- and by the way, you do have an

11   understanding of Mr. Krik's smoking history, right?

12   **A.**  I do.

13   **Q.**  Approximately from 1952 through 1982?

14   **A.**  Yes.  He smoked different amounts at different periods and

15   had a three-year period where he didn't smoke.

16   **Q.**  You understand that for at least from sometime after he got

17   in the Navy in '54 he started smoking for some period of time a

18   pack and a half a day?

19   **A.**  Yes, sir.

20   **Q.**  And you also had an opportunity then to get an

21   understanding of his history of asbestos exposure, right?

22   **A.**  I did.

23   **Q.**  And you understood that to include starting sometime in

24   1954 in the Navy?

25   **A.**  Yes, sir.

**Frank - direct by McCoy**

1  **Q.** Continuing to approximately the same time he quit smoking

2  in '82?

3  **A.** Yes, sir.

4  **Q.** So the first record -- and please tell me if I'm going too

5  fast.  I'm trying to move this along quickly for the jury by --

6  **A.** Certainly.

7  **Q.** -- focusing on things here, but let me know.

8          So this record here -- so this is one from his

9  treating physicians.  Can you -- this would be -- it says:

10  "Chest, two views."

11          What's that?

12  **A.** It's a chest X-ray, back-to-front view, and a side view as

13  well.

14          THE COURT:  So for purposes of the record, Mr. McCoy,

15  is there an exhibit number on this, and is there any objection

16  to these records being admitted?

17          MR. CASMERE:  No, Your Honor.

18          THE COURT:  Okay.

19          MR. CASMERE:  Are we going to do them one by one?

20          THE COURT:  If you've seen them all, then you can --

21          MR. CASMERE:  The ones he's shown we have no

22  objection.

23          THE COURT:  And just for the record, what exhibit

24  number are we going to refer to?

25          MR. McCOY:  This is Exhibit No. 5, this first

**Frank - direct by McCoy**

1  document.

2          THE COURT:  It's admitted.

3  BY MR. McCOY:

4  **Q.** This is a chest X-ray from 2003 here?

5  **A.** Yes, sir.

6  **Q.** So I've highlighted a part in here, please explain anything

7  further that hasn't been highlighted, the part I highlighted

8  says:  "Emphysematous changes of both lungs are seen."

9          What's the significance of that in the context of

10  Mr. Krik's case here?

11  **A.** Emphysema is one of the diseases of the lungs that's not

12  cancer.  The most common cause for it is cigarette smoking, but

13  there are also other reasons that will give you emphysematous

14  changes, which means a breakdown of lung tissue.  And in

15  addition to his smoking Mr. Krik has a history as part of his

16  work being a welder, studied welding, and welding on a regular

17  basis.  That also can cause this as well.

18  **Q.** What is it about welding:  The fumes that it generates?

19  **A.** Yes, the welding fumes.

20  **Q.** Anything else on this one?

21  **A.** No, sir.

22  **Q.** Okay.  The next one is Exhibit No. 4, and this one is from

23  the Department of Radiology at Palos Community Hospital.  What

24  type of imaging was this one?

25  **A.** This was also a chest X-ray, two views.

**Frank - direct by McCoy**                    **224**

1    **Q.** And this one is, looks like -- I don't have my glasses.

2    I'll get them.

3              This is September of 2004, right?

4    **A.** September 21st, 2004, and the highlighted areas state:

5    "Minimal pleural thickening laterally/bilaterally seen, which

6    could be secondary to asbestos exposure."

7    **Q.** Let's stop at that one for a second.

8              What's the significance of that in terms of your

9    assessment of Mr. Krik?

10   **A.** This is the kind of change that you see almost exclusively

11   with exposure to asbestos.  Cigarette smoking will not cause

12   pleural thickening.

13             And the reason that this is extraordinarily likely to

14   be related to asbestos, there are other causes of thickening of

15   the pleura, but they're usually on one side, and it's only with

16   asbestos that you would get it on both sides.

17   **Q.** Does this pleural thickening happen overnight?

18   **A.** No.

19   **Q.** Or is this something that develops over time?

20   **A.** It develops over time.  It can take literally decades to

21   appear.

22   **Q.** It's the same latency concept you talked about?

23   **A.** Exactly.

24             THE COURT:  May I ask a question, Doctor?

25             THE WITNESS:  Certainly.

1          THE COURT:  Just to make sure I'm thinking about this

2     the right way.

3          The pleural thickening, that would not be cancer, is

4     that right?

5          THE WITNESS:  That is correct.  As I mentioned to the

6     jury this morning, there are nonmalignant, noncancerous

7     changes, scarring, and pleural thickening is another expression

8     of scarring.

9          THE COURT:  Thank you.

10    BY MR. McCOY:

11    **Q.**  Is it fair to say these are like markers or evidence of

12    asbestos exposure?

13    **A.**  Very much so, yes.  And a considerable amount of exposure.

14    **Q.**  Okay.  Next one we've got highlighted says:  "Linear

15    fibrotic strands in the lung bases."

16          What's the significance of that one?

17    **A.**  From just that description it is unclear.  One of the

18    possibilities is that it could be --

19          MR. CASMERE:  I'm going to object, Your Honor.  It's

20    speculation.  He said it's unclear.  Now we're speculating.

21          THE COURT:  Objection sustained.

22          Doctor, I think the easiest thing would be to just

23    tell us what those words mean and --

24          THE WITNESS:  Linear fibrotic strands means what

25    appears to be scar tissue at the base of the lung, on both

1     sides in this case.

2     BY MR. McCOY:

3     **Q.** And based on what you know about Mr. Krik, what do you --

4     do you have anything that you would attribute that to?

5              MR. CASMERE:  Objection, Your Honor.  Foundation.

6     Causation.

7              THE COURT:  Overruled.

8     BY THE WITNESS:

9     **A.** The likely explanation in Mr. Krik's case is his prior

10    exposure to asbestos.

11    BY MR. McCOY:

12    **Q.** Does smoking cause this kind of linear fibrotic strands?

13    **A.** No.

14    **Q.** And the next statement is:  "Chronic obstructive pulmonary

15    disease."  That's smoking-related?

16    **A.** Yes.  That's another term for the emphysematous changes we

17    saw in the previous X-ray report.

18    **Q.** Is it fair to say then that this document, Exhibit 4, from

19    2004, which is four years before the lung cancer diagnosis,

20    shows markers of both asbestos exposure and cigarette smoking?

21    **A.** That is a fair statement.

22    **Q.** The next document is Exhibit No. 153.  This one is from

23    Morris Hospital, and it's -- let me find the date.  You can

24    find it faster than me.  Page 2.

25    **A.** 3/5/08.

Frank - direct by McCoy

1    Q.  So now we're talking about March of 2008?

2    A.  Correct.

3    Q.  In here they find -- I've highlighted this statement here:

4    "There is a spiculated noncalcified 1.5 centimeter posterior

5    lateral left lower lobe lung nodule less than one centimeter

6    from the overlying pleural surface.  This is worrisome for a

7    primary lung malignancy."

8            What's the medical -- the layperson's explanation of

9    that?

10   A.  Simply put, this looks like a lung cancer to the

11   radiologist.

12   Q.  And that's like one centimeter, a small tumor?

13   A.  Yes.

14   Q.  Okay.  They haven't diagnosed it yet, but --

15   A.  No.  That's why it says it's worrisome.  The radiologist

16   can't diagnose it completely on the X-ray, but that's his

17   strong suspicion.

18   Q.  And this was, it says, a CT scan --

19   A.  Correct.

20   Q.  -- of the chest, right?

21   A.  Yes.

22   Q.  That's different than X-rays?

23   A.  It's a different kind of radiologic procedure.  It gives

24   you more of a three-dimensional view of the chest, not just a

25   static view of the chest X-ray.

1    **Q.**  So moving forward from that March 2008, the next document

2    we picked out here was -- this one is November 12, 2008, and it

3    says:  "Rad chest."

4             What's that?  Is that an X-ray?

5    **A.**  Radiology, chest X-ray, two views again, the standard two

6    views.

7    **Q.**  This one is November 2008, so about eight months after the

8    last one, and the part I've highlighted says:  "There is a

9    linear area of increased parenchymal density in the right mid

10   lung and in the left base which has the appearance for areas of

11   discoid atelectasis or scarring."

12            So again, this is Exhibit 167.  I would ask you to

13   give us a layperson's explanation on that.

14   **A.**  This is where the radiologist is looking at the X-ray,

15   seeing changes at the lung bases, which is the common area for

16   asbestosis, and is not able to discern if it is a condition

17   called discoid atelectasis, which means that the air sacs

18   collapse, or if it is scarring, which is the fibrotic

19   equivalent.  It's another word for the fibrosis that the

20   earlier radiologist said, and again, could well be related to

21   his prior exposure to asbestos.

22   **Q.**  So next is Exhibit No. 2.  This one is November 20 of 2008.

23   This is a cervical pathology report.

24            What's a pathology report, for those who may not

25   know?

1   **A.** It's when a doctor trained in looking at tissue examines it

2   through the microscope and makes a judgment, is it normal

3   tissue, is it abnormal, or is it so abnormal that he would call

4   it cancer.  He or she.

5   **Q.** And it says:  "There is a number of specimens."

6        Do these represent different parts of the lung area,

7   or --

8   **A.** Yes.

9   **Q.** How about the lymph nodes, are they for the lung?

10  **A.** Lymph nodes are areas that are part of the immune system.

11  They drain lymph, which is the tissue fluid that carries around

12  immune cells.  And you have nodes every so often, and cancer

13  cells will deposit in those and show evidence of spread of some

14  cancers.

15  **Q.** All right.  So does this then report the findings that were

16  made after the pathologist read this?

17  **A.** Yes.

18  **Q.** It says:  "Frozen section diagnosis reported to doctor as

19  malignant adenocarcinoma consistent with --"

20  **A.** There is a B missing there.

21  **Q.** Bron --

22  **A.** It should say bronchiolar.

23  **Q.** It's cut off.  Bronchial alveolar tumor.

24  **A.** It's a specific type of lung cancer, and the causes of this

25  type of lung cancer are both cigarette smoking and asbestos.

Frank - direct by McCoy                                    **230**

1    **Q.** Talking about the adenocarcinoma?

2    **A.** Yes.

3    **Q.** It has another section here I've highlighted which says:

4    "Left lower lobe lobectomy demonstrating the following

5    attributes."

6                What's a left lower lobe lung lobectomy?

7    **A.** On the right side of the lung there are three lobes.  On

8    the left side there are two lobes.  What the doctors did here

9    is took out half the lung on the left side, the lower lobe,

10   leaving only the upper lobe.

11   **Q.** A lobe is like a --

12   **A.** A section.

13   **Q.** A section.  Like an ear lobe, except in the lung?

14   **A.** Well, there's three sections on the right, they're a little

15   smaller, there are two sections on the left.  Each one is a

16   little bigger.  They took out one whole section on the left, so

17   essentially a quarter of the totality of the lung tissue.

18   **Q.** So this next part that I've highlighted says:  "Pleural

19   tissue demonstrating incipient pleural plaque formation, site

20   designated left pleura."

21   **A.** If you recall we saw earlier an X-ray that talked about

22   bilateral, both sides, pleural thickening.  Now what we have,

23   now that the tissue was taken out of Mr. Krik, a pathologist

24   looked at it through the microscope, he confirms that that

25   thickening that was seen on the X-ray actually does exist and

1    is a pleural plaque.  And the most common cause of pleural

2    plaques is exposure to asbestos.

3         MR. CASMERE:  I object to foundation and

4    characterizing this document beyond what's actually written

5    there and what the doctor meant or saw.

6         THE COURT:  The objection is overruled.

7    BY THE WITNESS:

8    **A.**  This document, for the record, is 15 -- I'm sorry.  Is 02,

9    if you mention that or not.

10   BY MR. McCOY:

11   **Q.**  The pleural area or the pleura again is what part of the

12   lung?

13   **A.**  The lining on the outside of the lung and the inside of the

14   chest wall.  The rib cage.  There's two pleuras actually.  This

15   is the one on the outside of the lung.  When they took the lung

16   out they took the pleura with it.

17   **Q.**  This particular report is actually based on having tissue

18   under the microscope?

19   **A.**  Yes, sir.

20   **Q.**  I'm going to switch to this other document for a second.

21        There we go.  Okay.

22        This is not Mr. Krik's lung, but it's a

23   demonstration, a type of photograph that you might even use in

24   medical teaching, right?

25   **A.**  It's actually -- it's not a photograph, it's a drawing or

Frank - direct by McCoy                    **232**

1    painting by Frank Netter.

2    **Q.**  Okay.

3    **A.**  He's a physician, medical illustrator.  I'm well-familiar

4    with his work.  And this shows the scar tissue that we call

5    pleural plaques.

6    **Q.**  So this is the type of finding that was seen when the

7    pathologist looked at -- he didn't see all of this, but he saw

8    a piece of that plaque?

9    **A.**  Correct.

10               MR. CASMERE:  Objection.  Foundation.

11               THE COURT:  The objection is overruled.  You can

12   inquire on that later.

13   BY MR. McCOY:

14   **Q.**  And so the plaque is what area?  Is it the white or the

15   red?

16   **A.**  It's the white.

17   **Q.**  Is the red the normal type of lung color that you see?

18   **A.**  The red is normal.  The white is abnormal.

19               MR. MORRIS:  Your Honor, not to interrupt, I know

20   it's demonstrative, but should we give these a number, too, so

21   the record is clear?

22               MR. McCOY:  It has a number.  We'll look it up and

23   come back to it, Judge.

24               THE COURT:  Ladies and gentlemen, let me just note

25   for your purposes that some exhibits are being used as

1    demonstrative exhibits, and what that means is that they are

2    not evidence in the case that you will be considering during

3    your deliberations.  They are pieces of -- it's really a way of

4    demonstrating and assisting the witness in describing what the

5    witness is testifying.

6           So to the extent you hear reference to demonstrative

7    exhibits, keep in mind that those are exhibits that you will

8    not be considering during your deliberation.

9    BY MR. McCOY:

10   **Q.**  Dr. Frank, I'm going back to Exhibit 2.  I'm going back to

11   Exhibit 2 which we were looking at.

12          This is the report from November 19th, the surgical

13   pathology report.  I want to turn to page 2?

14   **A.**  Yes, sir.

15   **Q.**  Okay.  Page 2 says -- the part I've highlighted says:

16   "Multiple focally anthracotic lymph nodes negative for

17   metastatic adenocarcinoma."

18          What does that mean:  Anthracotic lymph nodes?

19   **A.**  When you look at tissue, particularly tissue from the lung,

20   a description that is used to describe the finding of black

21   particles in the lung is the expression anthracotic pigment, or

22   in this case anthracotic lymph nodes.  It comes from an 1813

23   term of anthracosis, which was coal dust that deposited these

24   black pigments.

25          And are there are many causes of the deposition of

1   this black pigment:  Coal dust, people who work in bakeries can

2   get it, it's been seen secondary to air pollution, and

3   cigarettes will also do it.  But there are many factors that

4   will give you this deposition of black pigment in the lung, and

5   that's what that refers to.

6   **Q.**  Does the finding of this anthracotic pigment mean that it

7   has to be smoking-related?

8   **A.**  Absolutely not.  As I just said, it could be many things.

9   In Mr. Krik's case specifically, besides some of the things

10  that I mentioned, his smoking would be a cause of it, but

11  Mr. Krik was also a welder for part of his career.  Welding

12  fumes will do that as well, air pollution can do it, if he

13  worked around coal, I believe some of his work was in power

14  plants so he may have been around coal.  All of that would give

15  him anthracotic pigments, not just his cigarette smoking.

16  **Q.**  Okay.  That's the end of 2.  Let's go to Exhibit 166.

17          This makes mention of the -- and this is on the

18  discharge from the lung procedure.

19          This makes mention of a history of penile cancer.  Is

20  that something that you'd seen in the records?

21  **A.**  Oh, yes, I saw it in his records.  It was several months

22  earlier in the same year, March or April of 2008.  His lung

23  cancer was in November.  I had been aware of that.

24  **Q.**  Does that penile cancer have anything to do with the lung

25  cancer?

Frank - direct by McCoy

1    **A.** No, absolutely not.  And it was described in the records as

2    being two separate cancers.

3         And for the record, penile cancer would not be caused

4    by exposure to asbestos.

5    **Q.** And as far as the status of his penile cancer, based on the

6    records that you've seen today --

7    **A.** The records that I've seen shows that he's doing well from

8    that and seems to have no difficulty following his surgery at

9    that time.

10   **Q.** No evidence of any current penile cancer, right?

11   **A.** Correct.

12   **Q.** And same true for lung cancer; no evidence of any lung

13   cancer?

14   **A.** At the present time here we are, seven years later, there

15   is no evidence of his lung cancer.  His cancer was at an early

16   stage; he has done well.  One can't yet say for sure that he's

17   cured from that, but he's had a much greater longevity than

18   many people would with lung cancer.  That's because his was at

19   an early stage.

20   **Q.** All right.  The next record is Exhibit No. 8.  And this is

21   from the same time period as all the other lung procedure

22   there, 11/26/08, which would be soon after the surgery.

23        And this is another chest X-ray, right?

24   **A.** Yes, sir.  Just before he was discharged.

25   **Q.** Right.  So this part I've highlighted says:  "There is a

1  combination of presumed atelectasis as well as subtle ground

2  glass opacity in the left perihilar region and lower lung as

3  well as possible small pleural effusion or consolidation at the

4  lateral base."

5          What I'd like to do is to just briefly explain what

6  that means, and then I'll ask the next question about asbestos

7  and smoking.

8  **A.**  This is following his surgery and appear to be the kinds of

9  changes you would see relatively acutely after surgery.  Here

10  we have evidence of what's thought to be atelectasis or parts

11  of the lung that aren't aerating well.

12          The ground glass opacity is yet another expression

13  that some radiologists use to talk about scarring or

14  atelectasis, but since it's talked about separately, the

15  radiologist thought of them as two separate problems.

16          Perihilar means the central part of the lung, lower

17  lung, and pleural effusion is small amount of fluid which could

18  be the residual of the surgery that he'd had just a few days

19  before.

20  **Q.**  Now, do any of these findings, to you as a medical doctor,

21  have anything to do with either asbestos or cigarette smoking?

22  **A.**  At this point they're more related to the surgery that he

23  just had and could not be said to be just the asbestos or

24  smoking.

25  **Q.**  Okay.

Frank - direct by McCoy

1    MR. McCOY:  For the record, Judge, that was Exhibit

2  No. 66, where we had the illustration of the pleural plaques.

3    THE COURT:  Okay.  Thank you.

4  BY MR. McCOY:

5  **Q.**  Next we've got Exhibit 13, the last one on the medical

6  records.

7    This is Joliet Oncology, a final report, and this one

8  is dated June 14th of 2011.

9    It says:  "Type of examination:  PET scan."

10    Is that another radiological procedure?

11  **A.**  It's another radiological procedure done with radioactive

12  sugar molecules that highlight tumor tissue, because tumor

13  tissue is metabolically more active than other tissue.  So it's

14  done to see if there is any recurrence of the cancer.

15  **Q.**  This part I've highlighted here says:  "There is calcified

16  pleural plaque bilaterally probably due to asbestos exposure."

17    What -- calcified pleural plaque, we've already

18  talked about the pleural plaque.  What does calcified mean?

19  **A.**  Sometimes these plaques, which are scar tissue, for reasons

20  that we don't quite understand, calcium will deposit in them.

21  It's like getting a bone spur where you get calcium deposit in

22  connective tissue in your tendons or in your joints sometimes.

23  But bilateral calcified pleural plaques I've never seen, nor

24  have I ever heard of any cause of this other than asbestos,

25  with the one exception of a very small percentage of people

1    exposed to talc, which is a chemical very similar to asbestos

2    but occurs with much less frequency.

3           And for somebody like Mr. Krik, who I don't know had

4    any exposure to talc, but now has had many, many years of

5    exposure to asbestos, the almost certainty, as the radiologist

6    suspected, was that his qualified pleural plaques on both sides

7    was due to his prior exposures to asbestos.

8    Q.  What's the significance of the both sides?

9    A.  Again, there are occasions where pleural thickening will

10   occur on one side only.  It can be from asbestos, but it also

11   can be related to chest trauma.

12          For example, somebody who was in an automobile

13   accident with a steering wheel may have hit them in the chest

14   on one of their sides could get some pleural thickening and

15   very rarely those could become calcified.  But to see it on

16   both sides is extraordinarily -- I've never seen it, except for

17   some reports of talc exposure, in anything but exposure to

18   asbestos.

19          The one other case of a calcified diaphragmatic

20   plaque, which is not what we're dealing with here, where the

21   diaphragm becomes calcified, was due to somebody who had trauma

22   from a knife wound, but this, much, much more likely than not,

23   was due to his exposure to asbestos.

24   Q.  Does that chronic obstructive pulmonary disease, the COPD

25   from smoking, does that contribute to breathing problems later?

1   **A.**  Yes.

2   **Q.**  Could that be a reason why he has the breathing device now?

3   **A.**  Yes.

4   **Q.**  How about these other findings, like the scarring that

5   you're talking about?

6   **A.**  The scarring would contribute, the fact that he's lost a

7   quarter of his lung essentially, all of that will contribute to

8   shortness of breath and the requirement for supplemental

9   oxygen.

10  **Q.**  How about the calcified bilateral pleural plaque?

11  **A.**  That's much harder to say.  There are many studies that

12  show that plaques in most people don't affect their breathing,

13  but there are some studies and some work in a particular

14  setting, there happens to be some studies I've done in Libby,

15  Montana, that show that plaques can contribute to shortness of

16  breath.

17          So they could be part of it, but you can't tease out

18  how much is to this, how much is to that, how much is to

19  something else.  Clearly the fact that he lost his lung is easy

20  to understand and a major piece of why Mr. Krik would be short

21  of breath.  But if he had emphysematous changes, which would

22  be, as I said already, from the cigarettes and likely from some

23  welding activities, that would further add to that and

24  complicate his pulmonary care.

25  **Q.**  How about pleural thickening; can that affect the breathing

**Frank - direct by McCoy**

1    shortness?

2    **A.**  I would have to give you the same answer.  It can, and in

3    some people it does, but when you have a combination of factors

4    you can't say this one does it, this one doesn't do it, and how

5    much.  It just -- you can't sort it out that way.

6    **Q.**  Okay.  Next question:  What's the term "attribution" mean

7    when you talk about the cause of a disease?  Very briefly.

8    **A.**  It means cause.  What do you say was the cause, or what do

9    you attribute it to.

10   **Q.**  Okay.  And how do you go about attributing the cause of

11   lung cancer in Mr. Krik?

12              MR. CASMERE:  Objection, Your Honor.

13              THE COURT:  Sustained.

14   BY MR. McCOY:

15   **Q.**  How do you go about attributing, in the field of asbestos

16   disease where you've got asbestos and smoking, the cause of

17   lung cancer?

18              MR. CASMERE:  Objection, Your Honor.

19              THE COURT:  The objection is sustained.

20   BY MR. McCOY:

21   **Q.**  Dr. Frank, I'd like to get one of the documents you've got

22   in your stack there, I think it's Exhibit 306, and it's the

23   Helsinki report.

24              Are you familiar with that one?

25   **A.**  Yes, sir.

1          MR. BLACKWELL:  Objection, Your Honor.

2          THE COURT:  The objection is overruled.  We'll take

3     it one question at a time.

4          MR. BLACKWELL:  Your Honor, objection.

5          MR. CASMERE:  We object to the display of the

6     document.

7          THE COURT:  Let's go to the sidebar.

8          (Discussion at sidebar on the record:)

9          THE COURT:  So the issue for me is to get a better

10    handle on what you intend to do with the Helsinki report and

11    how the Helsinki article is to be considered by this witness in

12    terms of what the witness's testimony is going to be.

13         MR. McCOY:  It's an example of the methodology by

14    which he determined the cause of lung cancer and any asbestos

15    disease, and it's just the methodology that is followed by,

16    like I said, a large, large number of people in the scientific

17    field.

18         THE COURT:  Right, but that all leads to the

19    methodology, as I understand it, that underlay his opinion in

20    this case, which was ultimately not an admissible basis to make

21    the conclusion that he made.

22         MR. McCOY:  It doesn't.  It doesn't state the every

23    exposure contributes, no.  The first question is -- see, the

24    every exposure, Judge, goes to is it Mobil or is it

25    Owens-Illinois.  The question of what caused the disease

1    overall is what the Helsinki methodology is about.  That's how

2    scientists go about determining this, and that's not based on

3    every exposure contributes.

4              THE COURT:  But it's based on, as I understand it,

5    it's based on the cumulative nature of exposure --

6              MR. McCOY:  Right.

7              THE COURT:  Mr. McCoy, let me finish my thought.

8    -- and to draw that link in this particular trial with these

9    particular defendants, being the only defendants that the jury

10   is supposed to consider, that testimony does not fit the

11   particular facts of this case that the jury has to consider.

12             And in light of the pretrial rulings about the

13   limited scope of Dr. Frank's testimony and the fact that a

14   significant part of his opinion was not to be admissible, there

15   is now an additional concern that I have, which is that to try

16   to get at it along the margins of these at a very high level of

17   generality -- which I can appreciate your attempt to do so --

18   but at a high level of generality, it then interjects a

19   confusion and, in fact, a prejudice to the defendants because

20   the building blocks aren't there; that to skip to a broad

21   picture, as I think the Helsinki report and the cumulative

22   exposure causation that you are alluding to here would do,

23   would end up being unfairly prejudicial and confusing to the

24   jury.

25             So I'm not going to allow that.

1     MR. BLACKWELL:  Your Honor, could we make one request

2   since we're all here?  Mr. McCoy, before he puts things up and

3   shows them to the jury, could we at least have a chance to see

4   it first in case there is an objection of some kind?

5     THE COURT:  You should.  Before you publish

6   something, you should let the defense know that you want to put

7   it on the screen.

8     MR. McCOY:  Judge, I mean, I said it many times, but

9   Dr. Frank's opinion on if he did it, if he did give it in the

10   case, which I never said he would, ever, in this case, myself,

11   that was a motion by the defense to strike him from giving that

12   testimony.  But the ruling on that was limited to the statement

13   that every exposure contributes.  The Helsinki report is only

14   about how you would go about determining the overall cause.

15     We presented this in front of Judge Lee, and he

16   specifically distinguished that, you know, in the argument

17   about every -- about the overall total exposure being distinct

18   from whether a particular defendant is a cause.

19     THE COURT:  Well, that piece of that presentation is

20   ultimately what led Judge Lee to conclude that it was not

21   proper in the way it was being attempted to fit in this

22   particular case, so I'm not going to allow the reference to the

23   Helsinki article.

24     MR. McCOY:  All right.  I just -- I need to somehow

25   then get to the point of these hypotheticals based on these

1   defendants.

2           THE COURT:  Well, you've laid the foundation of this

3   witness's background, his experience; you can ask him a

4   hypothetical, and we'll see how that goes.

5           MR. McCOY:  I'll go -- I will do it this way, okay?

6   I will ask him, like I said:  Will one day cause it, will one

7   month cause it.  I don't mean to -- I mean, what dosage will

8   cause it, and then I will go to the specific hypotheticals.

9   He's not going to say --

10          MR. MORRIS:  No.

11          MR. BLACKWELL:  That's exactly what shouldn't happen.

12          THE COURT:  That does run afoul of the ruling.  One

13  thing that you haven't done with the jury is elicit the 1974

14  article.

15          MR. McCOY:  I will do that.

16          THE COURT:  You can establish that, but the --

17          MR. McCOY:  I'll do some other ones, too.

18          THE COURT:  -- but the overall basis of any opinion

19  of his that would be that yes, that could cause cancer is, as

20  we've discussed before, all part of this any exposure

21  testimony.

22          So you can ask your hypotheticals, and we'll take it

23  a hypothetical at a time, but I think I have been clear as to

24  what the scope of the ruling is.

25          MR. CASMERE:  He's establishing a foundation that the

1    rat study in 1974 is relevant to Mr. Krik.

2            THE COURT:  You can draw that out, but it's an

3    article that exists in the literature and is a historical part

4    of fact, and we are going to receive, as I understand it,

5    plenty of historical facts about the history of these products,

6    so I'll allow that.

7            MR. CASMERE:  Here's another concern I have.  He's

8    continually asking questions that he knows run afoul of your

9    rulings, and I have to stand up and object, and those

10   objections are sustained.  Now we're suggesting he has to ask

11   the hypothetical out there and I have to stand up and object

12   again.  That prejudices me, because every time he asks a

13   foundational question I have to stand up and object.

14           He has to tell us now what those hypotheticals are

15   going to be so that the Court can rule on them, so I don't have

16   to get up yet again and object to a causation question, and

17   he's just doing it so I have to stand up and look like I'm

18   afraid of the answer.

19           MR. MORRIS:  That's true.  Two jurors shook their

20   heads when Mr. Casmere made his third objection.

21           THE COURT:  That's what happens in trials.  The

22   jurors are instructed that they're not to consider objections

23   against any lawyer.  They're going to ultimately be instructed

24   that lawyers have a duty to object if they believe an objection

25   is proper, they're going to get my rulings whether the

1    objection is overruled or the objection is sustained, they will

2    be told what to do with that.  We have been doing trials that

3    way for a long time now.  I'm not concerned that that's an

4    unfair procedure to have in place.

5           I do caution Mr. McCoy to adhere to the rulings, and

6    you'll have to use your judgment about what you think is within

7    the bounds of the ruling or not, and if there is an objection

8    I'll take the objection up, but I think we can all fairly

9    appreciate that this witness's causation opinion is

10   significantly limited.  If there is any room for any causation

11   opinion at all from him, it's very limited, and based on his

12   report and everything that we've seen in the pretrial filings,

13   I've yet to see an opinion from Dr. Frank that would be

14   admissible.

15          So with those observations, let's go back.

16          MR. BLACKWELL:  Your Honor --

17          MR. CASMERE:  We haven't seen it, so why are we going

18   to elicit him to give a new opinion?  If you haven't seen it,

19   we haven't seen it.  We have disclosure issues.  We shouldn't

20   be hearing about it for the first time.  And then I have to

21   stand up and object.

22          We know this is coming.  This is a problem that can

23   be ameliorated right now if he would tell us what they're going

24   to do.

25          MR. McCOY:  A proffer of evidence -- I can't sit here

**Frank - direct by McCoy**

1    and read every question.  I don't know what objections are

2    getting sustained.  I think all my questions are proper.

3    That's within light of Judge Lee's ruling.

4              THE COURT:  Okay.  Let's go back to the examination.

5              MR. MORRIS:  Since he brought up the Helsinki study,

6    I would ask you to instruct the jury to disregard it.

7              THE COURT:  I will.

8         (End of discussion at sidebar.)

9              THE COURT:  Ladies and gentlemen, there was an

10   article that was briefly published on the screen.  You're not

11   to consider that article.

12             You may proceed.

13   BY MR. McCOY:

14   **Q.**  Dr. Frank, what is the literature that scientifically you

15   rely upon about the duration of the dosage of asbestos that's

16   necessary to cause lung cancer?

17             MR. CASMERE:  Objection, Your Honor.

18             THE COURT:  The objection is overruled.  The question

19   is what is the literature, so you can answer the question about

20   what literature there is.

21   BY THE WITNESS:

22   **A.**  There is a lot of literature that I rely upon that

23   describes the amounts of asbestos that are necessary to produce

24   disease both in animals and in humans.

25   BY MR. McCOY:

**Frank - direct by McCoy**

1   **Q.** Can you tell us the examples of that literature and the

2   duration or the doses in terms of period of time that are

3   involved in that literature?

4                MR. CASMERE:  Objection, Your Honor.

5                THE COURT:  Overruled.

6   BY THE WITNESS:

7   **A.** Starting with the animal literature, there is data where

8   people looked at two kinds of cancer that were related to

9   having animals breathe asbestos, they had rats breathe it for

10  varying periods of time, and what they found is that in as

11  little as one day of exposure where the animals breathe

12  asbestos and never again caused a small number of cancers,

13  including lung cancer.  For --

14  BY MR. McCOY:

15  **Q.** Okay.  Go ahead.

16  **A.** For human data, specifically for lung cancer, there is a

17  study --

18                MR. BLACKWELL:  Objection, Your Honor.

19                THE COURT:  The objection is overruled.  Continue

20  your answer.

21  BY THE WITNESS:

22  **A.** For lung cancer, there is a study from a factory in

23  Patterson, New Jersey that was studied by Dr. Selikoff I would

24  examine as part of my experience within those workers as well.

25  It was a factory where there was a huge turnover of workers

1   during World War II.  Some of them worked there a long time,

2   but many of them worked for very shorts period of time,

3   including a month or less.

4          And when that data was looked at for workers who

5   worked at this factory in New Jersey, one month or less than

6   one month of total work time with no other exposures known to

7   asbestos doubled the risk of those individuals getting lung

8   cancer.  And by the time you worked there for two years or

9   more, you had a seven-fold increased risk of getting lung

10  cancer.  Again, the dose response curve documenting this.

11         There are also, not for lung cancer but other forms

12  of cancer, individual case reports, some of which have made it

13  into the literature of one day of exposure giving rise to

14  cancer.

15  BY MR. McCOY:

16  **Q.**  The study about the rats that got lung cancer in a day from

17  asbestos, who is the author of that, and where was it

18  published?

19  **A.**  It was Dr. Wagner published in the British Journal of

20  Cancer 1974.

21  **Q.**  Is that peer-reviewed?

22  **A.**  It is a peer-reviewed journal.

23  **Q.**  And the human data you talked about for the factory in New

24  Jersey where it was a month or less for lung cancer?

25  **A.**  That was published in the annals of the New York Academy of

Frank - direct by McCoy

1    Sciences, again a peer-reviewed publication, after a major

2    asbestos meeting that was held in New York.

3           And the one day was the work of Greenberg and Davies

4    published in The Lancet, a British medical journal, on

5    short-term exposure to asbestos and the development of disease.

6    And that was 1974.  I forget the page numbers.

7    **Q.**  New York Academy of Sciences, what role has that

8    organization played in asbestos disease?

9    **A.**  A very significant one.  Dr. Selikoff was a governor, he

10   was one of the members of the board of directors.  They even

11   elected him an honorary life governor when his term was up.

12   And three times, once in 1964, that was before I joined him;

13   once in 1979 when I was with him; and once in 1991 when he

14   invited me back to be with him, I had left Mount Sinai by then,

15   there were major multi-day conferences on asbestos and

16   asbestos-related diseases, each one being published as a

17   collection of those papers, somewhere around 6 or 700 pages

18   worth of scientific papers, all of which were peer-reviewed, to

19   make it into the final publication.

20          And the Patterson, New Jersey factory data can be

21   found in the second of those, I think it's Volume 330,

22   published in 1979.

23   **Q.**  Are you aware of any data that was actually done measuring

24   how much asbestos was in the air when Mr. Krik was working?

25   **A.**  None whatsoever.  I'm not aware of any data.  If it exists,

1  I haven't seen it, and I imagine if you had it to show me you

2  would have.

3  **Q.**  If someone is cutting and sawing pipe covering, as you've

4  seen in a setting like whether it's a Navy shipyard or an oil

5  refinery, how many asbestos fibers are being released into the

6  air during that kind of activity?

7           MR. CASMERE:  Objection, Your Honor.  Foundation.

8           THE COURT:  Objection sustained.  That's outside the

9  scope of this witness's disclosure.

10  BY MR. McCOY:

11  **Q.**  All right.  Are you familiar with a product called Kaylo?

12  **A.**  I am.

13           MR. CASMERE:  Objection, Your Honor.  Foundation.

14  Outside of the scope of this witness's Rule 26 disclosures.

15           MR. McCOY:  Judge, he had the depositions.

16           THE COURT:  There is an objection, Mr. McCoy.  The

17  objection to that question:  "Are you familiar with a product

18  called Kaylo," is overruled.

19           MR. CASMERE:  I would request a sidebar, Your Honor.

20           THE COURT:  Let's keep going, but I understand the

21  concern.

22           Let me just get the first answer, which is:  Are you

23  familiar with a product called Kaylo.

24  BY THE WITNESS:

25  **A.**  Yes, I am.

1    BY MR. McCOY:

2    **Q.**  How do you know about Kaylo?  What's your basis for your

3    experience or knowledge?

4    **A.**  Many different avenues of investigation, including working

5    for lawyers on behalf of the company that made that who hired

6    me to testify about Kaylo, so I had to become quite

7    knowledgeable about that.

8              And there are other lines of inquiry I've made of

9    workers who have used it, of understanding the materials that

10   went into the product, and have certainly examined and spoken

11   to many workers who have worked with that product.  But I

12   actually did work for the company that made it.

13   **Q.**  Now, I'd like you to, first of all, take into account what

14   you learned from Mr. Krik's medical records, and I'd like you

15   to assume that he personally installed or removed, cleaned up

16   over 200 boxes of asbestos containing Kaylo from 1954 through

17   the end of 1960; and that visible dust was generated from the

18   cutting and removing of the Kaylo with hammers; and that he was

19   working in smaller areas, inside ship boilers and compartments.

20   I'd also like you to assume that he had a history of smoking

21   cigarettes of a pack and a half, one and a half packs per day

22   during this same period of '54 through the end of '60, and then

23   he developed lung cancer in 2008.

24             Taking into account those assumptions and what you

25   know about his medical records, what is your opinion as to

1    whether this dose was a substantial factor in causing Charles

2    Krik's lung cancer?

3              MR. CASMERE:  Objection, Your Honor.

4              THE COURT:  The objection is sustained.

5    BY MR. McCOY:

6    **Q.**  I'd also like to ask you to assume, Dr. Frank, that

7    Mr. Krik had worked two to three weeks in small enclosed huts

8    at a Mobil Oil refinery in 1975, about, and he removed, using a

9    hammer, over 150 linear feet of asbestos-containing pipe

10   covering from lines that were two-inch and three-quarter-inch

11   lines.  And, of course, the same history of smoking cigarettes

12   of about a pack and a half per day in the same period.

13             Do you have an opinion about the cause of Mr. Krik's

14   lung cancer based on that and the medical records you've seen?

15             MR. BLACKWELL:  Objection, Your Honor.

16             THE COURT:  The objection is sustained.

17             MR. McCOY:  Judge, I can continue with the rest of

18   this if you like me to.

19             THE COURT:  Well, why don't we have another sidebar.

20        (Discussion at sidebar on the record:)

21             THE COURT:  So, each of the hypotheticals that were

22   posed just now for which I sustained objections were

23   hypotheticals that a response from the witness that included an

24   opinion that yes, that would cause lung cancer, would, in fact,

25   have been based on what the witness had previously disclosed in

1    his report, which was this notion that cumulative exposures

2    and, as the witness had previously testified in Judge

3    Pallmeyer's case, that you can't separate out individual

4    exposures in rendering a causation opinion, which is exactly

5    the problematic aspect of the opinion.  So those hypotheticals

6    are not proper in light of the pretrial rulings.

7           If the remainder of the hypotheticals are going to be

8    similar, that would inexorably lead the witness to opine that

9    yes, that hypothetical could cause cancer, but it's based on

10   the witness's previously-stated opinions that you can't

11   separate out any particular exposure, and that it's the

12   cumulative exposure that leads to the causation, then none of

13   them are appropriate, and I can give you that ruling now to

14   save time.

15          MR. McCOY:  All right.  So the only way I know to

16   deal with this is I can finish the few other questions I have

17   here, and then I'd like to make another proffer of evidence.

18          MR. MORRIS:  I'd rather that the questions and

19   proffer go together.

20          MR. McCOY:  If you want to do the proffer now, I'll

21   do the proffer now.

22          THE COURT:  What, in effect, would the proffer be

23   that is --

24          MR. McCOY:  His answer to the questions.

25          THE COURT:  But that is --

1    MR. McCOY:  And the medically derived that has been

2    previously disclosed consistent with his Rule 26 disclosure.

3    MR. CASMERE:  I'm looking at his Rule 26 report, and

4    it doesn't include most of this, so there is a disclosure

5    problem as well.

6    THE COURT:  I don't want to take the time to do a

7    proffer now if it's a proffer of things that have not been

8    disclosed to the defense, because that's not problem.

9    MR. CASMERE:  And not when I don't have a chance to

10   cross-examine this man today.

11   And I want to note for the record in the deposition

12   of Dr. Frank, page 128 lines 8 through 11, Mr. McCoy says he

13   will stipulate that Dr. Frank will not be testifying as a

14   witness about the brand names of a particular type of product

15   at trial.

16   He just did it.  I stood up and objected, made a Rule

17   26 objection, and he had the stipulation in there, and then he

18   did it anyway.  I'm not standing up there objecting, Your

19   Honor.

20   THE COURT:  I understand the objection.  The

21   objection was overruled at the time.  We've moved past that

22   point.  If there is an issue we need to take up later, we can

23   take that up later.

24   So the question to you, Mr. McCoy, is how do you want

25   to proceed with this witness on the stand right now?

1       MR. McCOY:  I'm happy to finish my question.  Like I

2   said, I have to make a proffer.

3       THE COURT:  But you didn't answer my question, which

4   is:  What about your proffer has been previously disclosed --

5       MR. McCOY:  The proffer of the evidence, okay.

6       THE COURT:  -- in his expert disclosure.

7       MR. McCOY:  Okay.  Within his expert disclosure are

8   the materials he relied upon.  The materials he relied upon

9   include the substance of what's in the hypotheticals.  Judge

10  Lee ruled he can testify to a hypothetical.  He said in his

11  deposition he's going to testify to a hypothetical.

12      THE COURT:  That's not an accurate statement of Judge

13  Lee's ruling, because Judge Lee's ruling was he could testify

14  to a hypothetical consistent with Judge Lee's opinion on

15  keeping out the any exposure basis for his opinion.

16      MR. McCOY:  That's part of the proffer, is to explain

17  how the any exposure basis is not actually his opinion.  So the

18  proffer deals with that aspect.

19          As far as the disclosure issue goes, that's something

20  that I don't have any questions about there being a disclosure

21  of this information, because he had the deposition testimony of

22  Krik, he had a chance to be deposed on it, he said he would

23  testify to hypotheticals, and this is one of the exposures

24  that's in the case.

25          Judge Lee actually said that the testimony was okay,

1   in addition to that statement that I just made about what

2   happened in the past.  So as we came here today, I'm relying on

3   that proper disclosure and what Judge Lee ruled.  Those are the

4   two things.

5            Again, I can make this clear at any point in time.

6   I'm happy to -- I don't have all of the documents in front of

7   me to go through it line by line, but I will if you need to go

8   through the disclosures.

9            MR. BLACKWELL:  Your Honor, is it fairest to all

10   concerned, since Mr. McCoy wants to make his proffer, and if we

11   have to get up and down again it is somewhat prejudicial to us;

12   if he has ten minutes to simply do it outside the presence of

13   the jury, and then we come back.  I know Your Honor is

14   certainly concerned about moving this along, but it's a bit

15   sticky now.

16            MR. CASMERE:  I haven't heard a single thing where he

17   said he disclosed what he's going to do, and now he wants to

18   bring it up brand new at trial.  We briefed and argued this

19   thing, and now we're going to take up more time.

20            You have the report.  We have a deposition.  He can't

21   point to anything in here about what he wants to do.  Why we're

22   taking up more time right now for a proffer he's just going to

23   make up, and he had to disclose this years ago -- we briefed

24   this thing.

25            MR. BLACKWELL:  The issue is we haven't heard it,

Frank - voir dire by McCoy

1    though, and Your Honor hasn't heard it.

2         THE COURT:  Okay.  I'll take a break now and let the

3    jury out, and you can ask a few questions of the witness

4    outside the presence of the jury and give me a better sense for

5    how anything that he may have to say in response to your

6    questions was previously disclosed in his report and not

7    inconsistent with Judge Lee's ruling.

8         (End of discussion at sidebar.)

9         THE COURT:  Members of the jury, there are a few more

10   things that the lawyers and I have to talk about before we can

11   continue with Dr. Frank's testimony, so I'm going to ask you to

12   take a break right now for about ten minutes so the lawyers and

13   I can continue to have that conversation, and we'll resume in

14   about 10 minutes.  Thank you.

15        (Jury out.)

16        THE COURT:  I think you can remain seated there,

17   Dr. Frank.  Mr. McCoy is going to ask you some questions.

18        THE WITNESS:  Oh, okay.

19                 VOIR DIRE EXAMINATION

20   BY MR. McCOY:

21   **Q.**  Dr. Frank -- this is part of the proffer testimony here,

22   Judge, on Helsinki.

23        Dr. Frank, what is the methodology for attributing

24   causation in a person who has had significant asbestos

25   exposures and who has also smoked cigarettes in terms of your

1   -- the way that you go about doing it, and what are the sources

2   that you rely upon or point to in doing that?

3   **A.**  I would like to think I do what every physician does, is

4   start with considering what might be called a differential

5   diagnosis, studying what the diagnosis is, coming to some

6   conclusion as to what the diagnosis is, and then bringing to

7   bear many, many lines of scientific evidence, both

8   independently for asbestos and for cigarette smoking.

9          The evidence for asbestos and its ability to cause

10  disease, cellular changes, etcetera, would include cell culture

11  studies, organ culture studies, whole animal studies, case

12  reports, case series, human epidemiology, and simply put, the

13  totality of the evidence in all of those areas with regard to

14  the effects of asbestos leads one incontrovertibly to the

15  conclusion that exposure to asbestos has the ability to cause

16  lung cancer.

17         With regard to cigarette smoking, similarly one looks

18  at the totality of evidence:  What are the carcinogens in

19  cigarettes, how have they been testified, have they been tested

20  in cell cultures, in whole animals, in animals forced to

21  breathe cigarettes, and what does the human epidemiology tell

22  us.  So all of that is considered.

23         Then the complication, of course, is when you have

24  multiple exposures is it possible to attribute the disease to

25  one or the other, or if both, to a percentage.  And the simple

1   answer is what science tells us is that the attribution of a

2   particular disease in a given individual must be attributed to

3   all of those prior exposures that had the ability to cause that

4   disease if those exposures can be documented, if they meet

5   appropriateness of dose, and if they meet the appropriateness

6   of latency, and if they meet the appropriateness of cell type.

7           One also should consider other potential causes for

8   any given individual, and so specifically in the case of

9   Mr. Krik, what I'm aware of is that he had significant exposure

10  to asbestos, he had a significant smoking history, and that at

11  the end of the day science tells me I must attribute his lung

12  cancer to both of those exposures, and science also tells me

13  that I cannot apportion that attribution, but what I can do is

14  characterize, as I did earlier, to a certain extent with the

15  numbers I gave the jury and to the development of lung cancer

16  after cessation of either use of asbestos or the use of

17  cigarettes and what the role might be, but without putting any

18  specific characterization to it.

19  Q.  Now, in terms of the word "attribution," you're talking

20  about the overall cause of the disease, right?

21  A.  I'm interpreting attribution as cause, what caused

22  Mr. Krik's lung cancer, and it's very clear to me what caused

23  his lung cancer, and that is a combination of his exposure to

24  asbestos and his cigarettes smoking.

25  Q.  When you talk about this, is that a scientific methodology

1    that you're following?

2    **A.**  Absolutely.

3    **Q.**  What is --

4    **A.**  It's the science that every physician uses, and it's also

5    keeping in mind, though I didn't mention it, I used the term

6    Bradford Hill earlier today, or Austin Bradford Hill.  He has

7    characteristics that scientists are to consider with regard to

8    being able to link an exposure to an outcome.

9           And there are nine such criteria.  All of them need

10   not be met, but they have to do with such things as did the

11   exposure take place before the disease.  The answer to that is

12   yes.  Are there -- is it biologically plausible.  So when you

13   have something like cigarette smoke with many carcinogens is it

14   plausible it would cause lung cancer; yes.  Asbestos causes

15   cancer, again, because of many lines of evidence, so is that

16   biologically plausible.  Is there a dose-response relationship.

17   There is for both of these.

18          And I could go on and on, but one applies what is

19   standard, well-accepted principles of science in reaching such

20   a conclusion.

21          THE COURT:  But is it fair to say, Doctor, that you

22   can't, consistent with the science, in your view, isolate out

23   particular exposures in order to rule in or rule out those

24   particular exposures in isolation as a cause?

25          THE WITNESS:  Science tells us, Your Honor, that if

1    you have exposure to a carcinogen -- and it is well-accepted

2    that there is no known safe level to carcinogens.  And that

3    applies not only to asbestos but radiation.  The American

4    Petroleum Institute in 1948 said there is no known safe level

5    of exposure to benzene.  It's a principle that applies to

6    cancer-causing agents.

7            So it's not a question of ruling in or ruling out.

8    It's really a question of ruling in.  If the exposure took

9    place, it was part of the cumulative exposure that someone had.

10           I do understand that there are differences when one

11   looks at it scientifically and perhaps judicially, and I have

12   been doing this long enough to understand some of that, but

13   from a scientific standpoint I have to say to you that if there

14   is exposure to a cancer-causing agent, that becomes part of the

15   totality of the exposure.  Some may contribute more, some may

16   contribute less, but they are all part of the exposure.

17           THE COURT:  Thank you.

18   BY MR. McCOY:

19   Q.  So let's take the statement that, first off, the statement

20   that the cumulative exposure is the cause.  That's the

21   statement that you talked about that meets the Bradford Hill

22   criteria.

23   A.  Yes, sir.

24   Q.  Okay.  Now, let's deal with the statement that every

25   exposure is a cause.  Is that a statement of methodology the

1   way you would say like for the Bradford Hill, or is that --

2   **A.**  That's not part of Bradford Hill.  It is the cumulative

3   exposure.  How one gets there depends on the circumstances.

4           Mr. Krik smoked two brands of cigarettes.  He smoked

5   Pall Malls for awhile, he smoked Marlboros for awhile.  Can I

6   rule in one or the other and say one did it and one didn't do

7   it?  Of course not.

8           Similarly, he had multiple exposures to asbestos.

9   Can I rule any of them out as being part of his contributory

10  cumulative exposure?  I cannot do that.

11  **Q.**  All right.  So that, again, cumulative exposure is the

12  scientific methodology that meets the Bradford Hill criteria?

13  **A.**  Right, with the ability that I need to be asked about, can

14  I reasonably say that the kind of exposure he had in other

15  circumstances has caused this disease; we haven't gotten there

16  with perhaps some of the testimony that I might yet give, but

17  for the benefit of the Court, the fact that Mr. Krik has a

18  nonmalignant asbestos disease speaks to a large cumulative

19  exposure and to the fact that he had such disease has been

20  documented in the scientific literature as being predictive of

21  people more likely to get lung cancer from asbestos.

22  **Q.**  And that's another aspect of how you go about attributing

23  the overall cause?

24  **A.**  It's part of the totality of reading the scientific

25  literature.  And, you know, after 45 years it's thousands and

1    thousands of articles which I've distilled down as best as I

2    can as a scientist to create what I think is the truth about

3    asbestos science.

4    **Q.**  Okay.  Who else out there says that the cumulative

5    exposure, besides yourself today, is the cause of -- is

6    considered the cause of these types of exposures like asbestos

7    or smoking?

8    **A.**  Government agencies, the Helsinki criteria, many other

9    scientists.  I mean --

10   **Q.**  What government agencies?

11   **A.**  IARC, which is a branch of the International Agency for

12   Research on Cancer, part of the World Health Organization that

13   studies these issues; OSHA, that came out as recently as last

14   year saying not only there is no safe level of exposure, but

15   that it speaks to the totality of the exposure giving rise to

16   disease.

17   **Q.**  You mentioned Helsinki.  Is that something that espouses

18   the cumulative exposure as the cause of the disease?

19   **A.**  Yes.  And they come to the documentation of the cumulative

20   exposure by a qualitative description, which is rife throughout

21   this document.

22              And not only that, they address the subject of

23   attribution to asbestos and cigarette smoking by saying in

24   here, if I can quote:  "No attempt has been made in this report

25   to apportion the relative contributions of asbestos exposure

1    and tobacco smoking because it can't be done."

2              No attempt was even done to do it because it's not

3    something that science in a rational way can do.

4    **Q.** All right.  Just stay with my questions for a moment here.

5              The Helsinki report in this case is Exhibit 306.

6    This was published in 1997, and it was based on what type of

7    scientific process to arrive at this?

8    **A.** The consensus document was put together by 19 scientists,

9    all of whom worked in the area of asbestos, who met in

10   Helsinki, created this document, which they again produced by

11   consensus.  Between them they had over a thousand publications

12   on the subject of asbestos, and this is that consensus

13   document.

14             The full document runs about 125 pages, but this is

15   the summary of that.  And it discusses all of the diseases that

16   I've talked about earlier -- not all of them.  The significant

17   ones that I talked about earlier.

18   **Q.** So let me move on from there.

19             All right.  All of their names are listed at the end

20   of the document, right?

21   **A.** I'm sorry?

22   **Q.** All of their names are listed at the end of the document?

23   **A.** Yes, sir.

24   **Q.** By Dr. Roggli, R-o-g-g-l-i, he's a witness who now usually

25   testifies for the defense, right?

1   **A.**  That is accurate.

2   **Q.**  He's one of the signatories back here, right?

3   **A.**  Yes, sir.

4   **Q.**  And it says in the Helsinki document -- and I'm at page

5   314.  I'll put it up on the screen to make it easier for you.

6           Page 314 of this Helsinki document says:  "Estimates

7   of the relative risks for asbestos-associated lung cancer are

8   based on different-sized populations."

9           Do you agree with that?

10  **A.**  Yes.

11  **Q.**  "Because of the high incidence of lung cancer in the

12  general population, it is not possible to prove in precise,

13  deterministic terms that asbestos is the causative factor for

14  an individual patient even when asbestosis is present.

15  However, attribution of causation requires reasonable medical

16  certainty on a probability basis that the agent, asbestos, has

17  caused or materially contributed to the disease."

18          You agree with that?

19  **A.**  Yes.

20  **Q.**  "The likelihood that asbestos exposure has made a

21  substantial contribution increases when the exposure

22  increases."

23          Do you agree with that?

24  **A.**  I have been stating that all day under oath.

25  **Q.**  "Individual exposure on a probability basis should not be

1    considered the main criteria for the attribution of a

2    substantial contribution by asbestos to lung cancer risk."

3           Do you agree with that statement?

4    **A.** Absolutely.

5    **Q.** Okay.  Now, what I'd like you to do for us is -- and is it

6    fair to say that the Helsinki document sets forth a methodology

7    for attributing causation?

8    **A.** Yes.

9    **Q.** And would this -- this part of this document, you agree

10   that that's something you would follow?

11   **A.** Yes.  That's essentially what I just outlined.

12   **Q.** And this consensus statement of the scientists, has it been

13   altered, or changed, or regrouped, by any subsequent document?

14   **A.** It's actually just been reaffirmed.  They just met again in

15   Helsinki last year, and they basically reaffirmed that

16   approach.

17   **Q.** Who is the "they?"

18   **A.** Another consensus body.  I don't know exactly who was

19   there, but there were another group of scientists in 2014 that

20   revisited this earlier document, and that approach would still

21   be valid.

22   **Q.** How do you know that that happened?

23   **A.** Because I've seen the document.

24   **Q.** Has it been published yet, the document?

25   **A.** Yes.  It's available online, yes.

1   **Q.** And this Helsinki criteria, the summary document, this is

2   published in the peer-reviewed journal, right?

3   **A.** Yes.

4   **Q.** Can you explain the difference between what you might say,

5   if you did say in a case, that all exposures contribute versus

6   the Helsinki methodology, and what I'm talking about is in the

7   context of a specific individual exposure, that's a conclusion

8   versus a methodology?

9   **A.** Well, it's the cumulative exposure and how do you get to

10  the cumulative exposure.  It's from the individual exposures

11  that took place over that person's lifetime.

12  **Q.** So when you use the term every exposure is a cause, though,

13  I think you said in your deposition earlier in this case that

14  that's the conclusion and not your methodology.

15  **A.** That's the conclusion.  That's not a methodology, that's a

16  statement of how you get to cumulative.

17  **Q.** Okay.  So the difference is the cumulative is the

18  methodology that underlies how you attribute causation, whereas

19  the every exposure is just -- is a conclusion that someone else

20  may or may not accept; is that a difference?

21  **A.** Correct.  And some people, frankly some jurisdictions,

22  specifically do not accept that.  That, again, you know,

23  meaning no disrespect to the judiciary, is a judicial

24  conclusion that does not comport with science.

25  **Q.** Okay.  Let's put that aside for a moment.

1          THE COURT:   That ends up being the wrinkle, right?

2     We have to apply the law to the science in a way that is

3     consistent with the rules of evidence, and I appreciate your

4     adoption of staying in your lane in terms of telling us what

5     the science is and then letting us figure out what we do with

6     the science.

7          THE WITNESS:   And we know the science doesn't vary --

8     BY MR. McCOY:

9     Q.  Dr. Frank --

10    A.  -- the law varies by jurisdiction.

11    Q.  Dr. Frank, please.

12         So we know the ruling has been made in this case

13    about that, and we're not -- I'm not here today with you

14    questioning that ruling at the moment.  We're accepting that

15    for the moment.

16         MR. McCOY:  And just to be clear, Judge, obviously

17    that's something we disagree with, I'll preserve that

18    disagreement, but let's continue for a moment here.

19         THE COURT:  Let me ask, Mr. McCoy:  About how much

20    more proffer do you have?

21         MR. McCOY:  I'm getting near the end.  I have just a

22    couple more minutes.

23    BY MR. McCOY:

24    Q.  I just want to make clear here:  When you're not able to

25    say every exposure is a cause, can you still apply the

1    methodology of the Helsinki and the other organizations you've

2    talked about to come up with a causation opinion when you have

3    specific facts, like we have here, about Mobil Oil and

4    Owens-Illinois Kaylo?

5    **A.** Absolutely.  My report says that.  It says the cumulative

6    exposure.  It doesn't say every exposure.

7    **Q.** And that's a different statement, is what you're

8    explaining?

9    **A.** Yes.

10   **Q.** That's what I'm trying to get across.

11              Now, going to the next set of questions that I would

12   follow based on that:  Assume Mr. Krik personally installed or

13   removed and cleaned up over 200 boxes of asbestos-containing

14   block and pipe covering from 1954 to 1960, visible dust is

15   generated from cutting and removing the pipe covering and block

16   with hammers, small -- that the work was done in smaller areas

17   inside ship boilers and compartments, and also to assume the

18   history of smoking a pack and a half of cigarettes in that same

19   time period, assuming that Mr. Krik developed lung cancer in

20   2008 based on the other medical findings that you've seen about

21   the markers of asbestos exposure in him, and whatever other

22   factors you put in the totality, do you have an opinion as to

23   the cause, as to whether that exposure, that dose, was a cause

24   and a substantial factor in Mr. Krik's lung cancer?

25   **A.** I do have an opinion.

1    **Q.** What is your opinion?

2    **A.** That the exposures as described in that setting and with

3    that material was a substantial contributing cause to his

4    cumulative exposure which is what gave him his lung cancer.

5    **Q.** And in terms of the basis for your saying that an exposure

6    of that type of duration, under those conditions, with these

7    markers of disease, are a -- is a substantial contributing

8    cause, what is it -- you already talked about the one day.  In

9    addition to the one day, what is the other evidence of

10   exposures of shorter durations that would be relevant to that

11   being a cause?

12   **A.** A month or less, doubling the risk of lung cancer.

13   **Q.** Any others that you'd like to talk about here?  In terms of

14   risk.

15   **A.** There, again, are other reports of short-term exposure on

16   the order of a few months.  I've certainly seen cases besides

17   what's in the literature of only a few months of exposure

18   giving rise to malignancy.  And even the Helsinki criteria

19   speaks to the twofold risk of lung cancer can be achieved with

20   exposures of less than one year.  Here we're talking about

21   multiple years.

22   **Q.** Now going to the other situation involving Mobil, and

23   again, assuming Mr. Krik worked two to three weeks in small

24   enclosed huts at a Mobil Oil refinery in 1975 and removed,

25   using a hammer, over 150 linear feet of asbestos-containing

1   pipe covering from a two-inch and three-quarter-inch lines,

2   assume again that same history of cigarette smoking of a pack

3   and a half a day during that time period, and the other

4   information you know about, the markers of asbestos and

5   cigarette smoker, smoking, do you have you have an opinion to a

6   reasonable degree of scientific medical certainty about whether

7   the dose at the Mobil Oil refinery was a substantial factor in

8   causing Mr. Krik's lung cancer?

9   **A.**  Yes, I have an opinion.

10  **Q.**  And your opinion on that is what?

11  **A.**  That the exposure he had to the asbestos at the Mobil

12  facility was a substantial contributing cause to his cumulative

13  exposure which gave him his disease.

14  **Q.**  And is the basis in terms of the duration and types of

15  activities the same as you've expressed already?

16  **A.**  Yes, sir.

17         MR. McCOY:  Judge, I think that completes the proffer

18  of evidence or the questions that we would ask should they be

19  allowed to be asked in connection with this case.

20         THE COURT:  Do the defense attorneys want to inquire

21  of the witness with respect to the proffer?

22         MR. CASMERE:  Briefly.  We'll obviously incorporate

23  our briefing.

24                    VOIR DIRE EXAMINATION

25  BY MR. CASMERE:

1    Q.  Doctor, your opinions or your answers to those

2    hypotheticals would be the same if the hypothetical was that he

3    was exposed in that manner on a single occasion, correct?

4    A.  Yes, sir.

5    Q.  And it would be the same as if he was exposed on a single

6    occasion for a minute.

7    A.  I've never run in such a case, I doubt that I would ever

8    get such a case --

9    Q.  But if you did?

10   A.  You know, there are times when you talk about speculation;

11   that is speculative.  I would say that exposures above

12   background all contribute to one's cumulative exposure.  It is

13   almost inconceivable to me that that would be the reality of a

14   situation.  I've never known someone to be exposed for one

15   minute.  That's not how the reality of life works.

16           But the principle of science gets to cumulative

17   exposure -- let's take a similar example.  Somebody smokes one

18   brand of cigarettes -- I've been asked this -- for different

19   years, bums a different brand and smokes one cigarette.  You

20   may have even asked me this, somebody asked me, many times,

21   would I say that was a significant contributing cause.

22           I would have to say that it was part of the

23   cumulative exposure.  Obviously 40 years and one cigarette are

24   very different.  But on the other hand, if there were a million

25   brands of cigarettes, and somebody lit up a different brand

1     every time, smoked a million cigarettes and got lung cancer,

2     would you say that any one cigarette was not causative or that

3     the cumulative exposure was causative?

4              So you can't leave out any documentable exposure as

5     exposure as being part of the cumulative exposure.  The

6     question is is there such evidence.  And we certainly have

7     that, and we don't have it for just a minute here.

8     **Q.**  That's the beauty of the hypothetical.  If the hypothetical

9     was one minute of exposure, your answer would be yes?

10    **A.**  It would add to the cumulative exposure.

11    **Q.**  And it would be a substantial contributing factor to that

12    person's ultimate disease?

13    **A.**  As I understand science, I would have to say yes.

14    **Q.**  Your opinion is that every exposure above background is a

15    substantial contributing factor to a person's asbestos-related

16    disease?

17    **A.**  From a scientific standpoint that is what science tells me

18    I have to say, though I've clearly been in situations where

19    courts have ruled that some exposures are considered

20    insubstantial or cases are dismissed because of, you know, a

21    variety of reasons.  But science and the law are different, and

22    I have to stick with what science tells me.  I'm a scientist.

23    I'm not trained in the law.

24    **Q.**  And that would be true regardless of the dose, duration, or

25    intensity?

1    **A.**  If there is documentation above background, it adds to

2    someone's cumulative exposure that they wouldn't have otherwise

3    had.

4              And just to be clear, background levels are part of

5    someone's cumulative exposure, but I've often testified many

6    times that if that was the only exposure, I would not say that

7    background alone, with a reasonable degree of certainty, was

8    the cause of that person's disease, because it doesn't rise to

9    that level.  But when you get exposures above background, it

10   becomes more likely than not, which is the standard as I

11   understand it, that it was contributory.

12   **Q.**  We all appreciate your candor and your consistency on this

13   issue, Doctor.

14              The reality is that for you to make an attribution of

15   someone's lung cancer to asbestos, assuming there was proper

16   latency, and assuming that they had a cell type of lung cancer

17   that can be caused by asbestos, you only need two pieces of

18   information.  One is that they had the disease, lung cancer of

19   that cell type, and two, that they had some documentable

20   exposure above background?

21   **A.**  And a proper latency.

22   **Q.**  I'm sorry?

23   **A.**  And proper latency.

24   **Q.**  And a proper latency.

25   **A.**  And then it becomes reasonable to say that asbestos was a

1    contributing factor.  That doesn't mean that there aren't other

2    contributing factors.

3    **Q.** The last thing is:  Are you now completely embracing

4    Helsinki and using that as your basis to give causation

5    opinions in asbestos cases?

6    **A.** I'm not totally embracing Helsinki.  There are

7    statements in here --

8         THE COURT:  I think that's getting a little farther

9    afield than what we need to be covering right now.

10        Anything from Mobil?  Let me ask if Mobil has

11   anything they want to add.

12        MR. BLACKWELL:  A couple questions, Your Honor.

13              VOIR DIRE EXAMINATION

14   BY MR. BLACKWELL:

15   **Q.** Good afternoon, Dr. Frank.

16   **A.** Good afternoon, sir.

17   **Q.** Let's talk about the science, just briefly.

18        Can we agree scientifically that dose and exposure

19   are not the same thing?

20   **A.** Absolutely.

21   **Q.** Because it's possible to be exposed to a certain quantity

22   of asbestos and not receive a dose of it, at least not a dose

23   that's the same as the exposure?

24   **A.** Well, it depends how you define exposure and dose.  I have

25   a piece of asbestos in my office, it's in a plastic box tightly

1    sealed up, so in one sense I'm exposed to it every day, but I

2    get no dose.  But if I open that box, then not only would there

3    be an exposure, but some proportion of that would end up being

4    breathed in by me, and it would be a dose.

5    **Q.** But you know which proportion, at least something about

6    portions that actually end up in the lungs that are called

7    respirable, don't you?

8    **A.** Right.  Some fibers are not respirable, some are, but --

9    **Q.** There is a size threshold, isn't there?

10   **A.** Excuse me?

11   **Q.** There is a size threshold.

12   **A.** Yes, there is a size threshold.

13   **Q.** Is it roughly 10 microns?

14   **A.** 10, some fibers up to 15 can get in.

15   **Q.** And so when we say 15 microns, 25,400 microns in one inch,

16   right?

17   **A.** Something like that.

18   **Q.** So if we're talking about what dose of asbestos that

19   somebody got, we're talking about what dose was the respirable

20   portion, true?

21   **A.** We are talking about what is respirable.  There are other

22   reasons things are not respirable.  If the material is in a

23   binder it may be algomerated so that it doesn't get in.  Not

24   every fiber that's in the air will end up in people's lungs.

25   **Q.** Right.  And in terms of the --

1    **A.** And we'd never know what the dose is that actually gets

2    into someone.

3    **Q.** In terms of the dose that Mr. Krik would have gotten at any

4    work site, and especially Mobil, you don't have any information

5    regarding the dose of exposure from any product and/or how much

6    that dose would have incrementally increased the risk for

7    cancer, do you?

8    **A.** I don't have those numbers, and those numbers, if they

9    exist, have not been shown to me.

10               I believe there is a regulation that requires a

11   measurement of asbestos when it's being used in work places.

12   The workers are not expected to collect that data, that's for

13   the work site to do.  So those numbers exist, I'd be happy to

14   look at them, but in the absence of that we go by what the

15   Helsinki criteria says, which is a description or a history of

16   exposure, not that we know the actual number or dose.

17   **Q.** Dr. Frank, Helsinki is about the types of exposures that

18   might increase risk, true?

19   **A.** And every exposure increases risk; not everybody who is at

20   risk gets the disease.

21   **Q.** Sir, I'm asking you specifically about Helsinki, if we

22   could stick with that.

23               The Helsinki criteria define and speak to which types

24   of exposures increase simply the risk for developing a disease,

25   lung cancer, true?

1   **A.**  No, it goes beyond that.  I mean, Mr. McCoy read:

2   "Cumulative exposure on a probability basis should thus be

3   considered the main criteria for the attribution of a

4   substantial contribution by asbestos to lung cancer risk."

5          Yes, to risk.

6   **Q.**  Lung cancer risk.

7   **A.**  Right.

8   **Q.**  Is that what you read on the end?

9   **A.**  Yes, it does talk about risk, and the risk goes up with

10   every exposure, but that doesn't mean everybody gets it.

11   **Q.**  The last question for you, I want to know if you stand by

12   this statement that you actually gave in this case:  Every

13   exposure adds to the risk, and the cumulative exposure from

14   each one is significant in and of itself, but cumulatively they

15   more significantly give somebody the disease when you take into

16   account the sum total.  But you say that each and every

17   exposure adds to the risk?

18   **A.**  That's what I testified to in, what, 2011 when I gave the

19   deposition?

20   **Q.**  No, I think that was at -- that's right.  2012.

21   **A.**  2011.

22   **Q.**  2012.  You stand by that?

23   **A.**  I do.

24   **Q.**  Thank you, Doctor.

25          THE COURT:  Anything further, Mr. McCoy?

**280**

1          FURTHER VOIR DIRE EXAMINATION

2     BY MR. McCOY:

3     **Q.** Dr. Frank, if in this case with Mr. Krik you didn't testify

4     that every exposure is a cause, would that affect your ability

5     to answer the hypotheticals?

6     **A.** Not at all.

7     **Q.** You could do it without testifying to every exposure or

8     cause?

9     **A.** Certainly.

10    **Q.** I'm sorry.  Your answer was?

11    **A.** Yes.  Certainly I could do that.  I could talk about the

12    cumulative exposure that increased his risk that in his case

13    actually gave him the disease.

14          MR. McCOY:  That's all I have, Judge.  I would again

15    tender this evidence either as a proffer or as evidence in this

16    case.

17          THE COURT:  Okay.  I'm adhering to my ruling that I

18    articulated at sidebar.  I can explicate that further at a

19    later time, but I'd like to just move on.

20          MR. McCOY:  Judge, I would have to say one thing at

21    this point.  I mean, I think this issue should be certified to

22    the Seventh Circuit, because this is a long trial, and I just

23    don't think it's something that's worth getting forward on here

24    if we don't have an expert who can testify to causation in a

25    way specific to Mr. Krik.  I've got great concerns about it.

1          I'm happy to go ahead right now with the rest of the

2    examination and we can talk about that later after the jury is

3    gone, so I'm fine to go, but I just want to let you know my

4    very grave concern about what's happened here.

5          THE COURT:  Okay.  We can come back --

6          MR. McCOY:  But I appreciate you letting me make the

7    record.

8          THE COURT:  Of course.  We can take that issue up at

9    the end of the day as well.

10          Why don't we resume.  Let's get the jury.

11          MR. CASMERE:  Can we have one minute to run to the

12    bathroom, Your Honor?

13          THE COURT:  Sure.

14          Do you need a break, Dr. Frank?

15          THE WITNESS:  I wouldn't mind.

16          THE COURT:  Go ahead.

17          THE WITNESS:  Thank you, Your Honor.

18          MR. MORRIS:  Five minutes?  Less?  Two?

19      (Recess.  Jury in. )

20          THE COURT:  Please be seated.

21          Members of the jury, I'm usually much better at

22    predicting how long our break is going to be, but that one I

23    did not get correct.  But we are ready to resume.

24          Go ahead, Mr. McCoy.

25    BY MR. McCOY:

Frank - direct by McCoy

1    **Q.** Dr. Frank, in the literature that's been published, what

2    period of time does it take for asbestos exposure to cause lung

3    cancer?

4    **A.** As little as a month or less in humans has been documented

5    as being able to increase the risk and in some people cause

6    lung cancer.

7    **Q.** What publication is that?

8    **A.** That is the study of Dr. Selikoff from the UNARCO plant,

9    U-N-A-R-C-O, UNARCO plant in Paterson, New Jersey.

10   **Q.** How about is there any exposures in animal studies about

11   how long it takes to cause lung cancer from asbestos?

12   **A.** Yes.  In animal studies, as little as one day of exposure

13   has been shown to cause lung cancer.

14           MR. MORRIS:  Your Honor, this is cumulative.  This

15   has been asked and answered.

16           MR. McCOY:  I'm sorry if I covered something.

17           THE COURT:  I think we did cover this, but you can

18   continue.  Go ahead.

19   BY MR. McCOY:

20   **Q.** I don't want to restate something.  I lost my -- that in my

21   notes here that we covered that.

22           So we've covered that, Dr. Frank.  Did you need to

23   add anything else on that?

24   **A.** No.

25   **Q.** Okay.  Is it necessary that someone would have a diagnosis

1   of asbestosis before they could have a lung cancer that's

2   caused by asbestos?

3          MR. CASMERE:  Objection to the extent he's asking the

4   doctor his causation opinion.

5          THE COURT:  That objection is overruled.

6   BY THE WITNESS:

7   **A.**  There are differing opinions.  The majority opinion is

8   clearly that there's no need to have asbestosis to attribute

9   asbestos as a cause of someone's lung cancer.  There are many

10  publications on that and many lines of evidence that would make

11  that not be so.

12  BY MR. McCOY:

13  **Q.**  And just to cut through this, you provided me some of the

14  pieces of literature that support that position; is that right?

15  **A.**  Yes, sir.

16  **Q.**  Okay.  And one of those would be the Selikoff 1968

17  publication; is that correct?

18  **A.**  No, that's -- that's the one where he talks about the

19  synergy with smoking.  That's not one that addresses that

20  issue.

21          There's a paper that he wrote -- the first author is

22  Kippen -- showing that you don't need radiologic asbestosis.

23  There's the Markowicz paper we've already talked about from

24  2013.  There's work from Scandinavia from Hillerdal.  There's

25  Dr. Roggli who has made that statement in the past, and many

1    others who have said that asbestosis and lung cancer, in fact,

2    are two separate diseases, which they are.  They're caused by

3    two different kinds of cells.

4         There's no analogy to any other situation where you

5    have to say that you have a nonmalignant disease to attribute a

6    malignant disease.  Some people with lung cancers have

7    asbestosis.  Some people with asbestosis don't get lung cancer,

8    and some people with lung cancer don't have asbestosis.

9    **Q.**  Is another example of one of these publications the Banks

10   publication?

11   **A.**  I'm sorry, who?

12   **Q.**  The Banks publication?  I think it's our Exhibit 311.

13   **A.**  Banks?

14   **Q.**  Yes.  Lung cancer --

15        MR. CASMERE:  Could I just ask that a year be given

16   with each of these publications, Your Honor?

17        MR. McCOY:  I will, Judge.

18        THE COURT:  Okay.  Thank you.

19        MR. McCOY:  I'll give the exhibit number and the

20   year.

21   BY MR. McCOY:

22   **Q.**  So --

23   **A.**  That's not one that I'm immediately familiar with, Banks.

24   If you show it to me or --

25        MR. McCOY:  Banks is 311.

1          MR. CASMERE:  I just want to know if it's before 1958

2     or after 1958.

3          MR. McCOY:  It's a 2009 publication.

4     BY MR. McCOY:

5     **Q.**  I'll give you a copy.

6     **A.**  Oh, I don't know it under the author's name because it's,

7     again, a consensus document.

8          I know it is-- here, I have that.  It's a consensus

9     document, not -- I know it as that.  I don't know it as the

10    first author.

11    **Q.**  So that's one of the ones that supports --

12    **A.**  Oh, absolutely.

13    **Q.**  -- that you don't need asbestosis?

14         Okay.  How about the Cullen article in --

15    **A.**  The Cullen article, the Finkelstein article, Hillerdal, I

16    mean, there's just a lot of such articles.  There was actually

17    a series of commentaries about eight -- 1987 in the

18    International -- American Journal of Industrial Medicine that

19    Dr. Selikoff was editor of.  He asked for people to comment on

20    that subject, and I think there was one that said you needed to

21    have asbestosis.  Everybody else pretty much said no.

22         There was some confusion.  The earliest cases of lung

23    cancer seen in people exposed to asbestos were all in workers

24    who had a lot of exposure.  So they had asbestosis and lung

25    cancer.  So some people thought, well, you had to have one to

1    have the other.  But clearly there's many lines of evidence

2    since then that that's not the case.

3    **Q.**  Okay.  The Cullen publication was 2005 --

4    **A.**  Yes.

5    **Q.**  -- that we mentioned?  That's our Exhibit 326.

6         How about the American Thoracic Society publication

7    in, I think it's 2003?

8    **A.**  Right.  That's another one, the diagnosis and initial

9    management of nonmalignant diseases related to asbestos.

10   **Q.**  All right.  Let's change topics for a moment.

11        Do persons who lived in their fifties -- into their

12   fifties or sixties or seventies have asbestos fibers in their

13   lungs even if they did not work in industrial settings?

14   **A.**  Yes.

15   **Q.**  And how many do those persons have compared to people in

16   industrial settings?

17   **A.**  Far less.

18   **Q.**  If in the lung tissue of Mr. Krik there wasn't any reported

19   asbestos fibers, does that mean he could not have a diagnosis

20   of an asbestos-related disease?

21   **A.**  No, it does not.  As I mentioned very early today, there

22   are different kinds of asbestos.  One of the fiber types,

23   chrysotile, the most common one, the one that Mr. Krik clearly

24   had exposure to, does not stay in the lungs very long.  It --

25   what we call half life, half of it disappears on the order of

Frank - direct by McCoy

1    about 90 days.  The amphiboles, the other types, stay around

2    for two or three years.

3            So if he stopped being exposed in 1982 and he had his

4    lung out in 2008, a lot of that asbestos would have

5    disappeared.  And it also depends on which laboratory does the

6    testing.  There's no standard methodology for the testing of

7    asbestos.  And some labs, in my opinion, are reliable, and some

8    labs are totally unreliable because of the techniques they use.

9            So I don't know if he had such a testing done, but

10   just the fact that somebody says they didn't find asbestos

11   doesn't really mean anything.  Again, the much more important

12   criteria is a history of exposure, not what you find in the

13   lung.

14   Q.  Are you familiar with something along the lines of a

15   standard of 5 million particles per cubic foot in asbestos

16   cases?

17   A.  Yes, it's --

18           MR. CASMERE:  Objection, Your Honor.  This is beyond

19   the scope of the witness' Rule 26.

20           THE COURT REPORTER:  I'm sorry?

21           MR. CASMERE:  This is industrial hygiene.  This is

22   beyond the scope of the witness' Rule 26.

23           MR. McCOY:  He can say he knows about it.

24           THE COURT:  Right.  I'll let the witness answer this

25   question but --

**Frank - direct by McCoy**                    **288**

1    BY THE WITNESS:

2    **A.**  Yes, I know about it.  As an occupational physician, that's

3    the kind of thing you learn.

4    BY MR. McCOY:

5    **Q.**  And this was a standard that was in place back in the 1940s

6    and '50s?  Is that where you have learned about it?

7    **A.**  In some places, it was a standard.  In some places, it was

8    a recommendation.  There were no federal government uniform

9    standards before OSHA, which was 1992 when they started putting

10   standards that were universal for the United States in place.

11           So some jurisdictions had standards that they

12   adopted.  Some simply went by recommendations, and the

13   recommendations came from an organization called the ACGIH,

14   American Conference of Governmental Industrial Hygienists.

15   **Q.**  So from your perspective as an occupational physician,

16   based on your knowledge and history, and was that a standard or

17   a guideline, the 5 million particles per cubic foot, that was

18   intended to protect persons from getting cancer?

19   **A.**  No, it was not.

20   **Q.**  Does it -- in terms of asbestos diseases, does it take more

21   or less or what's the comparison between asbestosis to get that

22   disease and lung cancer?

23   **A.**  It takes far more asbestos to develop asbestosis or pleural

24   plaques.  There's actually something we call "the threshold."

25   You have to pass a certain amount before you'll see those.

Frank - direct by McCoy

1    That's not true for cancer where even, as we've

2  already talked, very small amounts can cause cancer.  And that

3  5 million particles number was never intended to protect

4  against cancer.

5  **Q.**  Charles Krik has not had any lung cancer recurrence since

6  that lung removal operation in 2008.  Does that mean he's

7  forever cured of lung cancer?

8  **A.**  No, it doesn't mean he's forever cured.  He's obviously

9  doing very well.  It's a long period of time.  But five-year

10  survival is generally less than 15 percent or about 15 percent.

11  He's managed to get past five years.  He hasn't yet gotten to

12  ten years, so we don't quite know what the future will bring.

13    But he had an early stage, and he's obviously doing

14  well.  With regard to his cancer, though, it clearly has

15  compromised his breathing.

16  **Q.**  Is someone who has developed one asbestos-related cancer

17  any more likely to develop mesothelioma than would persons in

18  the general population?

19    MR. CASMERE:  Objection, Your Honor.  This is beyond

20  the scope.  This is also a Rule 26.

21    THE COURT:  That objection is sustained.

22  BY MR. McCOY:

23  **Q.**  If the life expectancy charts that the U.S. Government puts

24  out -- you are familiar with those, right?

25  **A.**  Yes.

1    **Q.**  Okay.  If those charts showed that Mr. Krik had 9.6 years

2    to live based on his current age, is there any reason to

3    believe that he would -- his situation would be different based

4    on his medical records?

5    **A.**  I think so, yes.

6    **Q.**  And what would be the difference?

7    **A.**  Given that he's had lung removal, that he's on chronic

8    oxygen, I think that would be very optimistic to think that he

9    would still be with us on the average of 9.6 years.

10   **Q.**  If Mr. Krik quit smoking in 1982, 26 years before he got

11   the cancer, does that time gap there make it more or less

12   likely that he would develop the lung cancer?

13   **A.**  It would have made it far less likely that he would have

14   developed lung cancer, but it wouldn't have eliminated the

15   totality of his risk, for two reasons.  One, it wasn't yet long

16   enough to say that there was no role of his smoking; and

17   secondly, no matter how long he would have given up cigarettes,

18   the fact that he'd been exposed to asbestos would have put him

19   at an increased risk.

20           There's scientific evidence that if you work with

21   asbestos and give up cigarette smoking -- Selikoff showed this;

22   Markowicz has shown it in his papers -- if you give up smoking,

23   the longer you give up smoking, the lower your risk of

24   developing lung cancer becomes.  However, for those people that

25   have had exposure to asbestos, you do not go down as much as

1    someone who only smoked and gave it up.  You go back to what's

2    essentially the baseline of just asbestos exposure.

3            So you can give up cigarettes.  He did.  It lowered

4    his risk, but he still had the existing risk of his prior

5    exposures to asbestos.

6    **Q.**  Have you studied a couple other papers on this just to --

7    **A.**  I've studied many papers on this and a lot of things.

8    **Q.**  The paper by Peto?

9    **A.**  Yes.

10   **Q.**  That's -- let's see the date.  This is a 19 -- well, it's

11   2000.

12   **A.**  That's another paper that speaks to the reduction in risk

13   of getting lung cancer with a reduction in smoking after

14   asbestos exposure.

15           MR. McCOY:  Dr. Frank, I've gone through those notes

16   of mine here, and I think that's all the questions I've got for

17   you now.  Thank you.

18           THE WITNESS:  You're very welcome.

19           THE COURT:  For the defense?

20           MR. CASMERE:  Good afternoon.

21                     CROSS-EXAMINATION

22   BY MR. CASMERE:

23   **Q.**  Good afternoon, Dr. Frank.

24   **A.**  Good afternoon.

25   **Q.**  Welcome to Chicago.

1    **A.**  Thank you.  It's a nice city.

2    **Q.**  Thanks for coming.  Do you mind if I ask you a few

3    questions?

4    **A.**  That's why I'm here.

5    **Q.**  Okay.  You never looked at any of Mr. Krik's x-rays?

6    **A.**  No.

7    **Q.**  You never looked at any of Mr. Krik's CT scans?

8    **A.**  Correct.

9    **Q.**  You never looked at any of Mr. Krik's PET scans?

10   **A.**  Correct.

11   **Q.**  You never looked at any tissue taken from Mr. Krik?

12   **A.**  I'm not a pathologist.  I wouldn't know how to interpret

13   the tissue.

14   **Q.**  You're --

15   **A.**  I have to rely on the pathologist's report.

16   **Q.**  You're not a radiologist either?

17   **A.**  I'm not a radiologist.

18   **Q.**  There's actually a test you can take to interpret B --

19   x-rays to give an occupational disease opinion under the NIOSH

20   B-reader program, right?

21   **A.**  Something called a B-reader exam.  I took it once in 1983.

22   Half the doctors like myself don't pass it when they first take

23   it.  I never took it again.

24              I've published in the peer-reviewed literature on

25   reading x-rays, but I'm not a B-reader.

Frank - cross by Casmere                    **293**

1    **Q.** You took it and failed it?

2    **A.** Yes.

3    **Q.** You're not a treating physician for Mr. Krik?

4    **A.** I am not.

5    **Q.** You do not feel that you have a physician-patient

6    relationship with him?

7    **A.** I do not.

8    **Q.** You never talked to him, have you?

9    **A.** I have.  I talked to him earlier today when I first met

10   him.

11   **Q.** Before today, you never talked to him?

12   **A.** Before today, I had not.  I had read his depositions, so he

13   spoke to me about his case but through paper.

14   **Q.** You've never talked to any of his treating physicians?

15   **A.** No.

16   **Q.** You play no role whatsoever in his treatment or his

17   diagnosis from a standpoint of his treating physicians?

18   **A.** As you just pointed out, I'm not one of his treating

19   physicians.

20   **Q.** Your only role here is that Mr. McCoy has hired you to give

21   expert opinions?

22   **A.** Yes, sir.

23   **Q.** In order to do that, they gave you about 100 pages of

24   medical records, right?

25   **A.** I forget how many.  They gave me medical records, which I

1   reviewed.

2   **Q.** Do you have your file up here that was marked at your

3   deposition?

4   **A.** Maybe.  I have my deposition transcript.

5           MR. CASMERE:  May I approach, Your Honor?

6           THE COURT:  You may.

7   BY MR. CASMERE:

8   **Q.** Dr. Frank, I've handed you what was marked as Exhibit, I

9   think, 6 to your deposition, which I believe was your file that

10  you had on Mr. Krik?

11  **A.** I believe it was also.

12  **Q.** The last half of that file is the deposition transcripts of

13  Mr. Krik, right?

14  **A.** Yes, sir.

15  **Q.** The first half is some medical records --

16  **A.** Medical records, yes.

17  **Q.** -- that were provided to you by Mr. McCoy?

18  **A.** Yes.

19  **Q.** I tabbed one in there.

20  **A.** Yes, sir.

21  **Q.** That's a medical record about a report from a doctor in

22  October of 1997, right?

23  **A.** Yes.

24  **Q.** And in that report, that doctor says that Mr. Krik told him

25  he was exposed to asbestos as recently as two days ago, right?

1    **A.**  The record speaks for itself.

2    **Q.**  Is that what it says?

3    **A.**  I'll read the sentence.  It may or may not be true, but

4    this is what it says.  "He indicates that he's been exposed to

5    asbestos as recently as two days ago."

6    **Q.**  And that was written in October of 1997?

7    **A.**  It was.

8    **Q.**  You can close that.

9    **A.**  Could I have the rubber band so it doesn't go flying all

10   over?

11              MR. CASMERE:  Yes.  May I?

12              THE WITNESS:  You can have it back even.

13              MR. CASMERE:  I'll take it.  Teamwork.

14   BY MR. CASMERE:

15   **Q.**  Asbestos diseases of the lungs are permanent, right?

16   **A.**  Not all of them.  Most of them.

17   **Q.**  Which ones aren't permanent?

18   **A.**  Benign asbestotic pleural effusions.  They come; they go;

19   they can come back.

20   **Q.**  The pleura is the saran wrap that you described, right?

21   **A.**  Yes, sir.

22   **Q.**  That's not the lung tissue?

23   **A.**  No.

24   **Q.**  What you just said is not permanent are effusion which are

25   liquid that fills into that pleural space, right?

1   **A.**  Caused by irritation of the pleura.

2   **Q.**  And then it can go away?

3   **A.**  It can.

4   **Q.**  That type of irritation is also caused by a lot of things

5   other than asbestos?

6   **A.**  Yes.

7   **Q.**  But the plaque, pleural plaque, once --

8   **A.**  That's permanent.

9   **Q.**  -- it's there, it doesn't go away?

10  **A.**  That's permanent.

11  **Q.**  Asbestosis, the scarring of the lungs, once it's there, it

12  doesn't go away, right?

13  **A.**  Correct.

14  **Q.**  Mr. McCoy showed you some medical records.  I'd like to do

15  some of that as well.  I want to show you this one that

16  Mr. McCoy showed you, which was Krik No. 5.

17  **A.**  Correct.

18  **Q.**  And you talked about the emphysema that was seen in this

19  chest x-ray dated January 20, 2003, right?

20  **A.**  Yes.

21  **Q.**  That is five-and-a-half years before he was diagnosed with

22  lung cancer?

23  **A.**  Yes.

24  **Q.**  Is there a report in there -- there's no report in there

25  that says he has asbestosis?

1    **A.**  It does not say that.

2    **Q.**  There's no report in there that says that they see pleural

3    plaque?

4    **A.**  Not on that report.

5    **Q.**  Asbestos-related scarring, the asbestosis is usually

6    bilateral on both lungs, right?

7    **A.**  So I earlier testified.

8    **Q.**  Because when the asbestos goes in, it doesn't decide to go

9    left or right; it goes both places?

10   **A.**  Correct.

11   **Q.**  So when you usually see asbestosis, it's bilateral?

12   **A.**  Yes.

13   **Q.**  When you usually see asbestos-related pleural plaques, it's

14   bilateral?

15   **A.**  Yes.

16   **Q.**  Scarring of the lungs from asbestos is -- you said it was

17   collagen that was sort of built up around the gas exchange

18   area?

19   **A.**  There's a cell called "the fiber blasts," and it -- it

20   turns on other cells to produce collagen, which is what's the

21   scar tissue.

22          It's not very different if you cut yourself in the

23   kitchen with the knife and you get a little scab there.  It's

24   the same kind of tissue.  It falls off on the skin, leaving you

25   with normal skin, but once it occurs in the lung, it's

1    permanent.

2    **Q.**  It actually adds more tissue to the area?

3    **A.**  Yes.

4    **Q.**  And that's the scarring?

5    **A.**  Yes.

6    **Q.**  Atelectasis is actually the collapse of the lung space,

7    right?

8    **A.**  So I testified earlier.

9    **Q.**  It's totally different than asbestosis?

10   **A.**  Yes.

11   **Q.**  And there's something called discoid atelectasis, which

12   people will see on an x-ray where there's a collapse of the

13   lung, and the x-ray it looks like a disc because of the shape

14   or the angle at which they take the picture, right?

15   **A.**  That's how it gets the name.

16   **Q.**  Right.  So you agree with me that no asbestosis and no

17   pleural plaques as of January 20th, 2003, per this x-ray?

18   **A.**  That one report makes no such documentation.

19   **Q.**  The next one he showed you was Exhibit 4, September 21,

20   2004, right?

21   **A.**  Yes.

22   **Q.**  Right here, this linear fibrotic strands in the lung bases?

23   **A.**  Yes.

24   **Q.**  That's also a way to describe atelectasis, correct?

25   **A.**  No.  Fibrotic means scar tissue.  Atelectasis, as you

1   pointed out, is a collapse.  They look the same, but you

2   wouldn't use the term "fibrotic" to describe atelectasis.

3   **Q.**  If you looked at -- if the radiologist looked at it and

4   thought it was scar tissue, they would say fibrosis; if they

5   thought it was atelectasis, they would say that --

6   **A.**  That's right.

7   **Q.**  -- depending on their interpretation?

8   **A.**  Exactly.

9   **Q.**  Right.  But if it's a scarring, it doesn't go away?

10  **A.**  That would be true.

11  **Q.**  This pleural thickening, that's what you talked about where

12  the pleura can be inflamed from something like an effusion or

13  something else, right?

14  **A.**  Well, I didn't say -- there are things that will give you a

15  thickened pleura.  Some infections will do it.  Trauma will do

16  it.  But bilaterally, it's usually asbestos.

17  **Q.**  Pneumonia will do it?

18  **A.**  It can, but usually on one side, and it's very rare.

19  **Q.**  But if it's asbestos-related pleural thickening, it doesn't

20  disappear?  Do you agree with that?

21  **A.**  Usually not, and we have pathologic evidence that it's

22  actually there.

23  **Q.**  My question was, does it disappear if it's asbestos

24  related?

25  **A.**  No.

1  **Q.** Now I want to show you a record that he didn't show you,

2  Owens-Illinois 1018.

3          MR. CASMERE:  May I approach, Your Honor?

4          THE COURT:  You may.

5  BY MR. CASMERE:

6  **Q.** I'll give you one.

7  **A.** Thank you.

8  **Q.** This is a CT scan report from February 2005, correct?

9  **A.** Yes.

10 **Q.** That is a little more than three years before he was

11 diagnosed with lung cancer, correct?

12 **A.** Yes.

13 **Q.** The CT scan of the chest was done with one millimeter

14 cuts --

15 **A.** Yes.

16 **Q.** -- correct?  Is that correct?

17 **A.** That's what it says.

18 **Q.** The examination shows hyperaeration of the lungs consistent

19 with a chronic obstructive lung change -- changes.  There was a

20 nodule at the left lung base approximately 8 millimeters in

21 size.  It has two to three lucent centers adjacent to it and

22 within it.  They are unlikely, therefore, to be malignancy.

23 There is probable scar tissue or dilated bronchi adjacent to

24 each other.  Most likely bronchiectasis.

25          Bronchiectasis, that's not asbestosis?

1    **A.**  No.

2    **Q.**  Other bronchi throughout the lower lobes do not show

3    dilation, but they do have slightly thickened walls consistent

4    chronic bronchitis.

5         That's one form of COPD, correct?

6    **A.**  Right.

7    **Q.**  There are no pleural plaques or pleural calcifications or

8    diaphragmatic calcifications as seen in asbestos exposure,

9    correct?

10   **A.**  That's what it says.

11   **Q.**  Under the impressions, the findings are consistent with

12   chronic obstructive lung changes and some mild chronic

13   bronchitis.  Nodule at the left lung base, probably area of

14   bronchiectasis, although scar tissue from previous inflammatory

15   process could produce these findings.

16        Number two, the larger area of interstitial change --

17   the interstitial is the working tissue of the lung, right?

18   **A.**  Yes.

19   **Q.**  Interstitial in the lingula consistent --

20   **A.**  Lingula.

21   **Q.**  I'm sorry?

22   **A.**  Lingula.

23   **Q.**  I knew I couldn't make it through this without

24   mispronouncing one of these.

25             -- the lingula --

Frank - cross by Casmere

1    **A.** Right.

2    **Q.** -- consistent with scar tissue.  Similar changes were seen

3    on the chest film of 2003.  No pleural masses or plaques or

4    thickening or calcifications are seen as in asbestosis.  The

5    lung findings are therefore nonspecific and could be due to any

6    cause of chronic bronchitis, bronchiectasis, or chronic

7    obstructive lung disease, correct?

8    **A.** Yes.

9    **Q.** I want to show you another record that I don't believe you

10   were shown this morning.  This is Owens-Illinois 343-A.  It is

11   also Plaintiff's No. 11.

12          It is -- can you see that okay, Doctor?

13   **A.** I do.

14   **Q.** It is a chest x-ray report from November 12, 2008, correct?

15   **A.** Yes.

16   **Q.** That's right around the time when he's having his surgery?

17   **A.** Yes, that's the admission on which he had his surgery.

18   **Q.** Right.  I highlighted something on here.  The lungs are

19   otherwise clear, and therefore, no pleural effusions, right?

20   **A.** That's what it says.

21   **Q.** Is there any notation on here of asbestosis?

22   **A.** No, there was never a notation on any x-ray of asbestosis.

23   **Q.** You agree that Mr. Krik does not have the disease

24   asbestosis?

25   **A.** If you read my report, I did not say that he had

1    asbestosis.  It never says that in my report.  I never agreed

2    that he did.  I wrote that I believed he had asbestos-related

3    pleural disease or pleural asbestosis.

4    **Q.**  You agree that he does not have asbestosis?

5    **A.**  He does not have parenchyma asbestosis.  I -- the

6    possibility exists, but it didn't rise to a level of certainty

7    that I wrote it in my report.

8    **Q.**  And it's not in any of the chest x-rays or CTs I've showed

9    you so far in my cross-examination, right?

10   **A.**  Correct.

11          MR. CASMERE:  Your Honor, consistent with the other

12   records, I would move for admission of 343-A and 1018.

13          MR. McCOY:  No objection, Judge.

14          THE COURT:  They're admitted.

15       (Owens-Illinois 343-A and 1018 received in evidence.)

16   BY MR. CASMERE:

17   **Q.**  One more, Doctor.  Owens-Illinois 618, is it okay with you,

18   Doctor, if I just put it on the screen?

19   **A.**  Sure.

20   **Q.**  This is a chest CT from June 19, 2013, correct?

21   **A.**  Correct.

22   **Q.**  That is several years after his lung cancer diagnosis and

23   after his surgery, correct?

24   **A.**  Yes.

25   **Q.**  The findings:  Previously seen reticular nodular densities

Frank - cross by Casmere

1  in both lungs, especially the right, have resolved, correct?

2  **A.** That's what it says.

3  **Q.** Later on I highlight:  There is some emphysema change in

4  both upper lungs, correct?

5  **A.** That's what it says.

6  **Q.** No diagnosis of asbestosis, no diagnosis of pleural

7  plaques, correct?

8  **A.** No, there's no comment on the pleura at all, so you don't

9  know what the radiologist thought, saw, or included in what he

10  thought was important.

11        Follow-up for lung cancer, which is why he was asked

12  to look at the x-ray, does not imply that he should

13  necessarily -- I would think he should, but they don't always

14  report on the pleura.

15  **Q.** Does he report --

16  **A.** He does not.

17  **Q.** -- pleural plaques?

18        Did you look at this x-ray?

19  **A.** I did not.

20        MR. CASMERE:  I move for admission of 618.

21        THE COURT:  Any objection?

22        MR. McCOY:  No objection.

23        THE COURT:  It's admitted.

24     (Owens-Illinois 618 received in evidence.)

25

Frank - cross by Casmere

1   BY MR. CASMERE:

2   Q.  You talked about cigarettes a little bit.  You said 30 to

3   40 carcinogens in cigarettes.  It's actually about 69 or 70,

4   correct?

5   A.  It depends who you read.  It varies, but there's certainly

6   many of them, dozens.  How's that?

7   Q.  I told the jury yesterday morning there were 69.  Would you

8   quibble with that?

9   A.  I don't recall exactly that number.  I've got a book at

10  home on lung cancer and cigarette smoking that talks about 36

11  or 40.  You know, it's all in the same ballpark.  There's a lot

12  of different cancer-causing agents in cigarettes.

13  Q.  Well, I want to make sure that no one accuses me of saying

14  something to the jury that's not true.

15          So do you know what the Surgeon General says about

16  how many --

17              MR. McCOY:  I object.  It's argumentative.

18              THE COURT:  The objection to the form of the

19  question, to the extent it wasn't even a question, it was just

20  a statement, is sustained.

21  BY MR. CASMERE:

22  Q.  Do you know what the Surgeon General says about how many

23  carcinogens there are in cigarettes?

24  A.  Specifically, no.

25  Q.  Would you dispute the fact that they say that there's 69 or

1    70?

2    **A.**  No.

3    **Q.**  Okay.  Half a pack of cigarettes a day, every day for 30

4    years would be a 45-pack-a-year smoking history, right?

5    **A.**  Half a pack a day?

6    **Q.**  I'm sorry.

7    **A.**  A pack and a half a day would be.

8    **Q.**  A pack and a half a day --

9    **A.**  Yes.

10   **Q.**  -- every day for 30 years, that would be 45 --

11   **A.**  Right, the math was wrong the first time.  You got it right

12   now.

13   **Q.**  Math was never my strong suit.

14          You would consider that a significant smoking

15   history?

16   **A.**  Yes.

17   **Q.**  Do you agree with the Surgeon General in terms of the fact

18   that about half a million Americans will be -- will die because

19   of smoking this year?

20   **A.**  Yes.

21   **Q.**  And that's roughly about 1,300 a day or 1 every minute,

22   right?

23   **A.**  Cigarette smoking is the largest contributor to death in

24   the United States, because more people smoke compared to the

25   other exposures that people get.

1    **Q.** So it's about 1,300 people a day, you agree?

2    **A.** I didn't do the math.  I'll trust that you got it right.

3    **Q.** Thank you.  Even though we just established my math is not

4    my strong suit, you trust me on that.

5          You were asked about the life expectancy charts?

6    **A.** Yes.

7    **Q.** Some of the other things that impact Mr. Krik's life

8    expectancy would be his COPD?

9    **A.** Yes.

10   **Q.** His history of high blood pressure?

11   **A.** Not if it's well controlled.

12   **Q.** How about coronary artery disease?

13   **A.** It depends if it's controlled or not and if he's having

14   symptoms.

15   **Q.** There are other conditions that he has that are completely

16   unrelated to smoking or asbestos that may impact his life

17   expectancy in a negative way, correct?

18   **A.** Which ones are you thinking about?  Heart disease is

19   related to smoking.  What other ones are you thinking about?

20   **Q.** Are -- do people who are above the average body weight, are

21   they expected to life as long as people who are at the average

22   body weight?

23   **A.** It depends on how much above.  I'm overweight.  He's a

24   bit -- he could do like I could with losing a few pounds, but

25   he's probably more sedentary than he used to be.

1   **Q.** Does a history of having prior cancers impact your life

2   expectancy as well?

3   **A.** It depends on what kind of cancer and what his status is.

4   You know, he seems to be cured of his penile cancer, and he's

5   done very well with his lung cancer.

6         You know, I think it's probably less likely than more

7   likely that it will be the cause of his death ultimately.

8   **Q.** Now, you've called yourself an academic physician, right?

9   **A.** Yes.

10   **Q.** You don't really see patients that much anymore, correct?

11   **A.** Not anymore. I've certainly seen patients all my life. I

12   still do clinical research. I still evaluate records. I

13   consult with colleagues, but I don't see a lot of patients.

14         My home base, if you will, is at a school of public

15   health even though I'm also a professor of medicine, but I get

16   paid to do the public health side of things.

17   **Q.** You've seen in the last ten years, average, about one or

18   two patients a year?

19   **A.** That's probably about right.

20   **Q.** You said that there were no federal regulations that

21   adopted the threshold limit values before OSHA?

22   **A.** Not that I'm aware of.

23   **Q.** The Navy adopted the threshold limit values when they

24   adopted the Walsh-Healey Act in the 1950s, correct?

25   **A.** Yes, but I don't think of that as federal regulations that

1   apply to all the states.

2   **Q.** It certainly applied to the Navy?

3   **A.** It applied to the Navy.

4   **Q.** You mentioned that you worked for the company that

5   manufactured Kaylo?

6   **A.** Yes.

7   **Q.** That's Owens-Corning Fiberglas?

8   **A.** Yes.

9   **Q.** You never worked for Owens-Illinois?

10   **A.** No, I can't -- you know, it was either an O-I or O-C lawyer

11   that hired me to testify on behalf of the company.  And I was

12   sitting here trying to remember was it O-I or O-C, and I just

13   can't remember.

14         I mean, the product was made and used -- it was made

15   by one company and used by another, and then they bought the

16   first one, I understand.

17   **Q.** You've talked about this -- the idea that the threshold

18   limit value was not designed to protect against cancer.

19         There was a thought that was well published in the

20   1950s that if you protected against asbestosis, you would

21   protect against cancer, correct?

22   **A.** I'm not aware that that necessarily was the case.  What I

23   remember is Herb Stokinger, who eventually ended up working for

24   NIOSH, who in 1956 wrote that the levels of protection were

25   designed for asbestosis and that if you were going to protect

1    for cancer -- and he wrote this in 1956 -- the levels should be

2    100 to 500 times lower.  That's what I recall from that era.

3    **Q.**  You talk about Dr. Hueper?

4    **A.**  No.  Dr. Stokinger.

5    **Q.**  No, no.  In the direct examination, you mentioned

6    Dr. Hueper --

7    **A.**  I did talk about Dr. Hueper.  He wrote a book in 1942

8    calling asbestos the carcinogen for the lung.

9    **Q.**  He also published articles in the 1950s and the 1960s --

10   **A.**  He did.

11   **Q.**  -- that said asbestosis was a prerequisite to getting lung

12   cancer, correct?

13   **A.**  He did write that, because the cases that he saw back in

14   the '40s all had asbestosis.

15   **Q.**  But he published in the literature, as did others, that

16   asbestosis was a prerequisite to getting lung cancer, at least

17   at that time in the '50s and '60s, correct?

18   **A.**  Right, that's what he wrote.  And he turned out to be

19   wrong.

20   **Q.**  Now, you also mentioned Dr. Roggli --

21   **A.**  Yes.

22   **Q.**  -- and this question about asbestosis?

23            You're familiar with Dr. Roggli's textbook?

24   **A.**  Yes.  I get shown it a lot by folks like yourself.

25   **Q.**  People like me, right.

**Frank - cross by Casmere**

1    You're familiar with his position on whether you need

2    asbestosis as a prerequisite to getting lung cancer, right?

3    **A.** Sure, I'm aware of his old position, and I'm aware of his

4    new position.  His old position in about 1990 was you didn't

5    need it.  Now he says you need it.

6    **Q.** You certainly respect Dr. Roggli?

7    **A.** Not especially, no.

8    **Q.** But you certainly would acknowledge that he has a textbook

9    on asbestosis-associated diseases, right?

10   **A.** You can have a textbook.  That doesn't mean you earned

11   someone's respect.

12   **Q.** Has he testified for plaintiffs in this litigation?

13   **A.** In the past, he did some.  He predominantly now testifies

14   for defendants, and he -- I'll just leave it at that.

15   **Q.** Okay.  You're aware that in his textbook -- well, strike

16   that.  We'll leave Dr. Roggli alone.

17        You mentioned Dr. Selikoff and Dr. Markowicz and

18   their publications on this, quote/unquote, "synergy," right?

19   **A.** Yes.

20   **Q.** And the --

21   **A.** And the Surgeon General.

22   **Q.** The chart that you were shown by Mr. McCoy was this one?

23   **A.** Yes.

24   **Q.** All right.  Now, first of all, Dr. Markowicz couldn't get

25   the same numbers that Dr. Selikoff got, right?

1  **A.**  He wasn't looking at the exact same population.  These were

2  the survivors who lived a lot longer than the insulators who

3  died earlier.  It's a different group.

4  **Q.**  Well, he looked at the same group of insulators, but he

5  looked at that group and the people who died from 1981 through

6  2008?

7  **A.**  And Selikoff looked at them from about 1960 -- the early

8  '60s to '91.  So there's a little bit of overlap.  But the ones

9  that died earlier of lung cancer, perhaps, are not the same

10  ones that died later of lung cancer or other things.

11  **Q.**  But it's the same cohort of insulators --

12  **A.**  It's the same group, but there's -- you know, just like

13  there is something called the healthy worker effect, the people

14  who work are generally healthier than people who don't work,

15  there are survivors and cohorts who end up having a different

16  experience than the rest of the cohort.

17  **Q.**  But these --

18  **A.**  But it is the same -- it's originally the same group.

19  **Q.**  But these weren't healthy workers.  This was a mortality

20  study.  These were gentlemen that passed away?

21  **A.**  Right, there were 2,200-and-70-some-odd deaths.

22  **Q.**  And what Dr. Markowicz actually found was that for the

23  group of people who had asbestos exposure but supposedly no

24  asbestosis, that their risk was 3.6, right?

25  **A.**  I'd have to look at the numbers.

1    **Q.** I have it for you.

2    **A.** Yeah, I mean, they had an elevated risk compared to

3    nonsmoking/nonasbestos workers.

4           Thank you.

5    **Q.** I handed you Owens-Illinois Exhibit 46 for identification,

6    Doctor.  This is the study we're talking about?

7    **A.** Okay.

8    **Q.** So if you turn to the -- it's page 93.

9    **A.** Page?

10   **Q.** In the upper right-hand corner, it's got the bar charts?

11   **A.** Yes.

12   **Q.** This is what we're looking at.  What he found is this group

13   of people without asbestosis but the insulators had an

14   increased risk of 3.6, correct?

15   **A.** So they had a three-and-a-half times increased risk with

16   asbestos exposure without asbestosis.  Just from asbestos.

17   **Q.** That's what he says there, right?

18   **A.** Right.

19   **Q.** And he uses as the risk for smoking a modified CPS II,

20   which is the Cancer Prevention Study II number, of 10.3,

21   correct?

22   **A.** Right, the earlier Selikoff paper had 10.6.  This is

23   essentially the same but obviously slightly different.

24   **Q.** But the actual Cancer Prevention Study number is about 23

25   times, but they did a subsection of that for this study,

1    correct?

2    **A.** Well, the 23 times is, I think, for a two-pack-a-day

3    smoker.

4    **Q.** And the current Surgeon General number is about 25 times

5    for that?

6    **A.** Again, I think for that level of smoker.

7    **Q.** So what he found -- what he used is that for smoking, the

8    insulators, because these are all insulators, right, the risk

9    from smoking was 10.3, but for the insulators without

10   asbestosis and who didn't smoke or didn't smoke regularly,

11   their risk was 3.6?

12   **A.** It's three-and-a-half times more than somebody without

13   either exposure showing that --

14   **Q.** And smoking was three and a half -- was almost three times

15   that of the asbestos exposure, right?

16   **A.** About that.

17   **Q.** Okay.  And then over here, he has insulators without

18   asbestosis --

19   **A.** Right.

20   **Q.** -- but who were smokers, and they are 14.4, right?

21   **A.** Right.

22   **Q.** So 10.3 and 3 -- it's barely additive, correct?

23   **A.** Yes.

24   **Q.** And so even in this group of smokers who were insulators,

25   union insulators, their combined risk was 14.4, and it was only

1    10 if they were just a smoker, and it was only 3.6 if they were

2    a smoker or exposed to asbestos but not a smoker, right?

3    **A.**  That's what that number would tell you.

4    **Q.**  So two-thirds of their risk is from smoking; one-third is

5    from the asbestos exposure, right?

6    **A.**  That is one way to interpret that.

7    **Q.**  And he didn't get a multiplicative or even a

8    supra-additive; it's barely additive, right?

9    **A.**  Well, if you look at the other data, some of it was

10   multiplicative or supra-additive, not for that specific group.

11   **Q.**  But these are supposedly gentlemen who do not have

12   asbestosis, right?  The people who have asbestosis, they're in

13   a completely different category?

14   **A.**  They have a different set of numbers.

15   **Q.**  Right.  With asbestosis, they're way up here, right?

16   **A.**  Right.

17   **Q.**  Now, Mr. Krik would never be accepted to be in this cohort

18   because he's not a union insulator, right?

19   **A.**  No, he was a boilermaker.

20   **Q.**  So he would not be accepted to be in this cohort?

21   **A.**  It's a different group.

22   **Q.**  So he would not be accepted --

23   **A.**  He's not a member of this union, so he was not part of that

24   cohort.

25   **Q.**  Okay.  And he couldn't get in -- if it was an academic

Frank - cross by Casmere

1    study, they wouldn't let him in?  That's how epidemiology

2    works, right?

3    **A.**  Right, I mean, if you're studying insulators, he's not an

4    insulator.  He wouldn't be part of the group.  That's pretty

5    self-evident.

6    **Q.**  So in 2013, Dr. Markowicz looked at the same group of

7    people.  He couldn't come up with the same numbers as

8    Dr. Selikoff, and he also said that there were some serious

9    limitations with his study, right?

10   **A.**  Right.

11   **Q.**  Now, Dr. Markowicz is a gentleman who, like you, testifies

12   for plaintiffs in asbestos litigation?

13   **A.**  Yes.

14   **Q.**  Can you show me in his article where he disclosed that?

15   **A.**  It may not be here.  It depends on what the journal

16   requests of the authors.

17   **Q.**  Don't you think that that's something that should be in a

18   peer-reviewed published literature is a disclosure --

19   **A.**  Wait, wait, wait, wait.  Okay.  It doesn't say it here, but

20   it does say -- and let's be fair to him -- "Author disclosures

21   are available with the text of this article at

22   www.atsjournals.org."

23              So if you've printed that out, I presume you'll find

24   that he said that he testified for plaintiffs.

25   **Q.**  You think that's what he would have said, right?

1    **A.**  I would have thought.  Now, if you have it and you can show

2    it to me and he doesn't, you know, then you have to ask him why

3    it's not there.

4            I put down on the articles now that I publish that

5    have to do with asbestos, where it's appropriate, not like in a

6    textbook because that's a different kind of setting, that I

7    testify primarily for plaintiffs.

8    **Q.**  But you haven't looked at that website to see --

9    **A.**  I did not look at the website.

10   **Q.**  Okay.

11   **A.**  But I know Dr. Markowicz, and I know that's what he does.

12   So I take that into account when I look at his data.

13   **Q.**  Now, a couple of things that he noted about the notable

14   limitations of his study, it's on page 94, Doctor, right-hand

15   column, bottom right.

16   **A.**  Okay.

17   **Q.**  He says that this study has some notable limitations,

18   smoking status, and then the second one is a misclassification

19   of asbestosis, right?

20   **A.**  That's what it says.

21   **Q.**  And if you look at the front of the article, what they did

22   was is they looked at the smoking status between 1981 and 1983,

23   and then they stopped, right?

24   **A.**  That's the only data they had.

25   **Q.**  And they looked at the asbestosis data from looking at

1   x-rays from 1981 to 1983, and then they stopped?

2   **A.** That's the data they had.

3   **Q.** And they didn't look for anything after 1983 for smoking or

4   x-ray changes or pathological changes to see if these people

5   actually had asbestosis?

6   **A.** The study that they carried out was a death certificate

7   study.  They didn't go back and examine those individuals as we

8   had done for decades with Dr. Selikoff, that's correct.

9   **Q.** And Dr. Kippen in 1987 went back and looked at

10  Dr. Selikoff's cohort, and what he found was that when they

11  looked at the pathology of those insulators that they thought

12  did not have asbestosis on x-rays --

13  **A.** They had it pathologically.

14  **Q.** -- they had it pathologically, right?

15  **A.** Right.

16  **Q.** A hundred percent?

17  **A.** Well, they didn't have everybody's case, but the ones they

18  had, yes.

19  **Q.** Right.

20  **A.** But radiologically, it was absent.

21  **Q.** That was published in 1987, knowing that you can't rely

22  just on those x-rays for this group of insulators; you got to

23  look at their pathology to determine if they have asbestosis?

24  **A.** If you've got pathology.  You don't go around taking tissue

25  out of people to carry out your studies.  When they did have

1    tissue, they looked at it, just as they looked at Mr. Krik's

2    tissue when he had his lung out.

3    **Q.**  And this column right here, that's based on seven people in

4    this study?

5    **A.**  Okay.  That's because most insulators ended up with

6    asbestosis.

7    **Q.**  If these people -- if a couple of these individuals

8    actually ended up having asbestosis, if they would have looked

9    at their pathology a couple years later, they wouldn't be in

10   this column; they'd be over here in the asbestosis column?

11   **A.**  We could speculate about all kinds of things, if, if, but I

12   don't know.  But --

13   **Q.**  But --

14   **A.**  -- if that would be the case -- and, again, they say, you

15   know, it could be misclassified.  Some others may deserve to go

16   back the other way, too.  So the data is what the data is.

17   **Q.**  And the point is, is that if these numbers are wrong, this

18   number is wrong; and if it's lower, this number is lower,

19   right?

20   **A.**  Right.  If it's wrong.

21   **Q.**  If it's wrong?

22   **A.**  I don't know that it's wrong.

23   **Q.**  And if the smoking numbers actually should be higher, maybe

24   at 15 or 25, right?

25   **A.**  We could speculate all you want.

1      THE COURT:  Dr. Frank, as tempting as it is to take

2   issue with the way the question may be asked, it's better

3   off -- we're all better off if you just answer the question.

4      THE WITNESS:  Okay.  Yes, your Honor.

5      THE COURT:  If there's an issue that needs

6   clarification, another lawyer can ask clarification questions.

7      THE WITNESS:  Okay.

8      THE COURT:  But to make the examination go a little

9   bit more smoothly --

10      THE WITNESS:  Yes, sir.

11      THE COURT:  -- take the question that's being asked

12   of you and just answer the question.

13   BY MR. CASMERE:

14   **Q.**  And one other thing on this Markowicz study, they exempted

15   that study from review by the institutional review boards at

16   Mount Sinai and at Queens College, correct?

17   **A.**  That's what it says.

18   **Q.**  Going back here, to be fair to me, for somebody who doesn't

19   have asbestosis in the Markowicz column, that number is 14.4?

20   It's right here, right?

21   **A.**  For those seven patients, yes.

22   **Q.**  But when we're looking at this chart, to look at this

23   supposed synergistic risk of lung cancer, if you're looking at

24   somebody who smoked but didn't have asbestosis, that number is

25   right about here, fair?

1    **A.**  Fair.

2    **Q.**  It's a good sign my turning the pages like this.

3              I want to talk to you about your report for a minute.

4    Your report in this case was dated September 16, 2011, correct?

5    **A.**  Yes, sir.

6    **Q.**  Do you know how many reports you authored on that day?

7    **A.**  On that day?  No.

8    **Q.**  I'm going to hand you --

9    **A.**  Well, I didn't author them on that day.  That's the day

10   that they were finalized and typed.  So there probably were a

11   number of them, because they usually get done in batches.

12   **Q.**  I'm going to hand you Owens-Illinois 1025, Doctor.

13   **A.**  Okay.

14   **Q.**  If you include Mr. Krik's report, September 16, 2011, you

15   authored an additional 11 reports to Mr. -- the Cascino Vaughan

16   law firm on that day, September 16th, 2011?

17   **A.**  I didn't author them on that day.  That was the day they

18   were approved for final signature.

19   **Q.**  Well, you have 12 reports from September 16th, 2011 --

20   **A.**  Which means --

21   **Q.**  -- that go the Cascino Vaughan law firm?

22   **A.**  -- Mr. McCoy's office got back to me and said these reports

23   are okay to be signed off on.

24              MR. McCOY:  Rule 26 objection on this.

25              THE COURT:  That objection is overruled.

1          MR. McCOY:  Judge, may I be heard on that briefly?

2          THE COURT:  Sure.

3      (Proceedings at sidebar on the record.)

4          THE COURT:  Mr. McCoy.

5          MR. McCOY:  Judge, my objection is that this violates

6   the confidentiality privilege and Rule 26 about communications

7   with retained experts.  The report -- they can inquire about

8   the report, but they can't inquire about all these

9   communications, especially when they're getting into cases in

10  other courts now.

11          It may be these reports were prepared for a long

12  period of time, but this requires a lot -- this is why that

13  privilege is there, and this is a classic example of inquiring

14  into that communications with retained expert.

15          They can ask about the final study but not all this

16  other stuff, especially when you get into other cases like

17  this.  Because like I said, as he's trying to explain, he

18  worked on these over a long period of time.  That's the day my

19  firm said, "Okay, these final drafts are okay."  And he sends

20  them all to be typed.

21          What I'm saying is, though, this is a classic.  This

22  should be off limits.  It's a violation of the rule.

23          THE COURT:  From the defense.

24          MR. CASMERE:  These are reports authored by the

25  doctor in litigation for the Cascino Vaughan firm that have

1    been filed and made Rule 26 disclosures in all these different

2    cases.  There was a motion in limine that said that we can go

3    into the work with the lawyers to establish bias.

4          So this is fair game.  This isn't draft reports back

5    and forth.  These are the final reports that he drafted for

6    submittal.

7          THE COURT:  And the point that's trying to be

8    established that he has authored many reports on behalf of

9    the -- at the request of the firm over a particular period of

10   time, that can be established as it tends to go to bias.  But

11   the details of the communications back and forth -- and part of

12   the problem is that the witness doesn't wait for a question to

13   be asked, and the witness --

14         MR. McCOY:  Right.

15         THE COURT:  -- starts offering up additional details

16   that might stray into the exact kind of communications that the

17   plaintiff doesn't want out.  That's the witness that's doing

18   that.

19         What I can do now is to admonish counsel to stay

20   clear of the communications that the witness is having in other

21   cases on substance, but if the point is just the volume --

22         MR. CASMERE:  That's it.

23         THE COURT:  -- and the time period --

24         MR. CASMERE:  Yes.

25         THE COURT:  -- you can establish that.

1          MR. McCOY:  Communications, communications in this

2     case, too.  I mean, it's a rule for all cases.

3          THE COURT:  Understood.  To the extent there are work

4     product communications between the expert and counsel, those

5     are not to be inquired of.

6          MR. McCOY:  Judge, I'd appreciate it if you'd advise

7     the jury of exactly that, what you just said, the exposure --

8          MR. CASMERE:  I haven't gone there yet.  Hold on.

9     We're putting the cart before the horse.

10          All I've done is say that in the same day he sent

11     this report, he sent 12 other -- 11 other reports to the

12     Cascino Vaughan firm.  My next thing is going to be how much he

13     did in the next year.  And then I'm done.

14          MR. McCOY:  That's exactly what the problem is.

15          THE COURT:  He can establish the volume of work that

16     this witness does on behalf of the firm to establish his bias

17     point.  I will instruct the witness to listen very carefully to

18     the question that's being asked and answer only the question,

19     and we can resume.

20          MR. CASMERE:  Thank you.

21          (End of proceedings at sidebar.)

22          THE COURT:  Okay.  We can resume.

23          And again, Dr. Frank, I think it does become

24     important to make sure you wait for the question to be

25     completed and then just answer the question.  Particularly in

1   certain areas, there may be a detail that you would like to

2   offer that would ultimately not be relevant and appropriate for

3   the jury's consideration.  So I'd like you to continue to just

4   listen carefully to the question and just answer the question.

5         And counsel is also directed to limit the questions

6   and the form of the question to the appropriate areas that we

7   discussed.

8         MR. CASMERE:  I forgot what my last question was,

9   Your Honor.  Could I ask that it be read back for me?

10        (Record was read.)

11  BY MR. CASMERE:

12  **Q.**  Doctor, you sent 12 reports to Mr. McCoy's firm dated

13  September 16th, 2011, correct?

14  **A.**  Yes.

15  **Q.**  Nine of those were for lung cancer cases, correct?

16  **A.**  I believe so.

17  **Q.**  Do you know how many you sent to Mr. McCoy's office in the

18  next year after that?

19  **A.**  I have not counted them.  There was a period of time where

20  I sent many back, and then it's been quite awhile since I've

21  written any new ones.

22  **Q.**  I believe in that stack that I handed you that there are 36

23  reports to Mr. McCoy's office at Cascino Vaughan for lung

24  cancer within one year of September 16th, 2011.

25        Does that sound right to you?

1   **A.**  It sounds as reasonable as any other number.

2   **Q.**  Mr. McCoy's firm is not your only client from asbestos

3   firms in this litigation, is it?

4   **A.**  No, I don't think of them as clients.  But there are many

5   firms that I work with around the United States.

6   **Q.**  You have worked in the last five years with probably 25 to

7   30 different plaintiffs' law firms in asbestos litigation,

8   correct?

9   **A.**  That's probably accurate.

10  **Q.**  Do you produce as many reports for those 25 to 30 other

11  firms as you do for the Cascino Vaughan law firm?

12  **A.**  Some I do more.

13  **Q.**  You've been providing testimony like this for about 35

14  years, correct?

15  **A.**  A bit longer, yes.

16  **Q.**  You have never testified in court at the request of -- on

17  behalf of a defendant in a personal injury case?

18  **A.**  Correct.

19  **Q.**  Ninety-nine-point-something percent of your time or your

20  testimony is for plaintiffs in asbestos litigation; is that

21  fair?

22  **A.**  Yes.

23  **Q.**  You generate about 400 to $500,000 a year in billings for

24  this expert work that you do, correct?

25  **A.**  Yes, for the university.

Frank - cross by Casmere

1   **Q.** You've told us that the money doesn't go directly to you;

2   it goes directly to Drexel University?

3   **A.** Correct.

4   **Q.** It goes into a fund at Drexel, correct?

5   **A.** Yes.

6   **Q.** You know the account number?

7   **A.** 150421.

8   **Q.** You have access to that?

9   **A.** With the approval of the dean.

10  **Q.** And you've told us some of the things that you spend

11  money -- that money on, correct?

12  **A.** Yes.

13  **Q.** One of the things that you spend that money on is research

14  and paying for researchers at the university, right?

15  **A.** Yes.

16  **Q.** And those researchers work on material that you end up

17  putting your name on, correct, as a co-author?

18  **A.** No.  The person that I'm thinking of who I've supported

19  primarily to do research, I've never put my name on any of her

20  papers.

21          The only papers that I put my name on out of Drexel

22  is either research that I've done with funding from my funding

23  sources, which include the Department of Energy or the CDC.

24          I have not put my name on any papers that I have done

25  with colleagues at the university that came out of research

1    that I decided to do with these funds.

2    **Q.**  So in 35 years of this litigation, in taking the money and

3    putting it into the institutions and using that money to pay

4    for researchers, you've never put your name on any article

5    that's been authored by somebody who you paid from that money;

6    is that your testimony?

7    **A.**  I'm trying to think.  I would pay my own way to China.  I

8    didn't pay anybody in China, and we have our name on papers

9    together.

10            I'm doing work in Sri Lanka.  I've never paid anybody

11   over there directly.  I gave moneys to a colleague, and what he

12   did with it was probably paid some radiologists to look at

13   x-rays.

14            I don't recall that I've ever used any of that money

15   where I've paid somebody and then put my name on it where I

16   wasn't part of the research.  And I can't even think of any

17   work that I've done at the universities where that was done.

18   It would usually be done with my work overseas.

19   **Q.**  You charge $425 an hour for your time?

20   **A.**  Yes.

21   **Q.**  You spend about 300 to 400 hours a year doing legal work,

22   correct?

23   **A.**  Something like that.

24   **Q.**  300 hours time 425 is $127,500, correct?

25   **A.**  Again, I don't have a calculator, and I'll take it that

1    your math is correct.

2    **Q.**  400 hours times $425 an hour is $170,000, correct?

3    **A.**  Yes, but I have a -- you know, as I've testified many

4    times, I have an hour minimum for looking at a chart.  Some

5    charts take me an hour; some charts take me less.  Every lawyer

6    I work with knows that there's a one-hour charge to look at a

7    case and write a report.

8    **Q.**  And the point is that you bill out 400 to $500,000, but the

9    amount of hours that you actually work is a lot less than that?

10   **A.**  Well, it may be -- you know, it may be more than that.

11   It's been creeping up over the years.  There have been more

12   trials and more depositions, which is what generates moneys,

13   too.  But I certainly sometimes get multiple charts done within

14   an hour.

15   **Q.**  But you -- if you did 400 hours at $425 an hour, that's

16   $170,000, correct?

17   **A.**  Something like that.

18   **Q.**  And you bill out -- last year, what -- you just did your

19   taxes, right?  How much did you bill out?

20   **A.**  Last year was, for asbestos litigation, other litigation,

21   reimbursement for travel, such as I'll get today because I

22   bought my own ticket, the totality was $448,000.

23   **Q.**  And you only worked 400 hours last year on this?

24   **A.**  I didn't keep track of it.  I don't work a 40-hour week.  A

25   short week for me is 55 hours.  Some weeks it's 70 or 80 hours.

1   **Q.** Your point is that people like Mr. McCoy know that you

2   charge that minimum and that they may be overcharged, but they

3   pay it anyway, right?

4   **A.** If you consider it overcharged.  I've never had anybody

5   accuse me of overbilling them in 35 years.

6   **Q.** And they don't complain about it, right?

7   **A.** Nobody has ever complained.

8          MR. McCOY:  Your Honor, object again to inquiring

9   into fees.

10         THE COURT:  The objection to the form of the question

11  is sustained.

12         So, ladies and gentlemen, you can disregard that last

13  question and the answer that was just given.

14  BY MR. CASMERE:

15  **Q.** Have they ever told you that you're charging them too much?

16  **A.** I've actually been told I don't charge enough.  There are

17  many people who do this kind of work, first of all, that keep

18  all the money; secondly, who charge far more than I do.

19         Nobody has ever accused me of overcharging.  Nobody

20  has ever said I've under -- overcharged them.  People tell me

21  I'm worth more than what I charge, but obviously, I'm not doing

22  it for the money.

23  **Q.** Last thing, Doctor, and then you'll be done with me.

24         ADAO, Asbestos Disease Awareness Organization --

25  **A.** Yes, sir.

1   Q.  -- that's an organization you're involved with, correct?

2   A.  I am the co-chair of the Scientific Advisory Board.  I've

3   been involved with them since 2004.

4   Q.  And the other co-chair is Dr. Richard Lemen, correct?

5   A.  Yes.

6   Q.  He also testifies for plaintiffs in asbestos litigation,

7   correct?

8   A.  Yes.

9   Q.  Wasn't there just a conference last weekend?

10  A.  It was last Saturday.  I was there.  I spoke.  I gave

11  Dick's paper because he couldn't come at the last minute.  I

12  gave my own paper.  I introduced the keynote address-giver.

13          Yes, I was there, and I participated.  And I paid my

14  own way there.

15  Q.  The tag line or, I guess, the trademark or the slogan for

16  the ADAO is "Voice of the Victims," correct?

17  A.  That's what it says.

18          MR. CASMERE:  Thank you, Doctor.  I appreciate your

19  time.

20          Thank you, Your Honor.

21          THE COURT:  For Defendant Mobil.

22          THE WITNESS:  Would you like your documents back?

23                      CROSS-EXAMINATION

24  BY MR. BLACKWELL:

25  Q.  Good afternoon again, Dr. Frank.

Frank - cross by Blackwell                          **332**

1    **A.** Good afternoon, sir.

2            MR. BLACKWELL:  Members of the jury.

3    BY MR. BLACKWELL:

4    **Q.** My name is Jerry Blackwell, and I'm speaking on behalf of

5    Mobil in this trial.

6            I've got a copy of your report here, and with the

7    attachments, that's about 150 pages, would you say?

8    **A.** Something like that.

9    **Q.** The actual report portion, though, is about a page and just

10   a little piece onto the second page, right?

11   **A.** I write short reports.

12   **Q.** I understand that.  Well, in the short report you wrote,

13   did you use the word "Mobil" in it anywhere?

14   **A.** No.

15   **Q.** When you were asked to perform an evaluation for the

16   attorney here, were you asked to do anything to evaluate Mobil

17   specific?

18   **A.** No.  I was asked to determine what diseases I thought

19   Mr. Krik had and what I thought caused it.  It doesn't matter

20   to me and it never matters to me whose product it was that may

21   have caused it.

22   **Q.** Well, you understand in this case, Mobil has been accused,

23   so it matters to us.  Do you understand that?

24   **A.** I do now.

25   **Q.** Have you ever been to the Mobil facility in Joliet?

1    **A.**  No.

2    **Q.**  Now, you told us that you met Mr. Krik just -- just today,

3    right?  You said hello to him?

4    **A.**  Yes, this morning.

5    **Q.**  So if I said hello to him yesterday, I met him the day

6    before you, right?

7    **A.**  Yes.

8    **Q.**  Now, do you have any knowledge whatsoever of whether

9    Mr. Krik was exposed to any asbestos above the background level

10   when he was working out there for the three weeks at the Joliet

11   facility?

12   **A.**  If one reads his deposition, one comes to that conclusion.

13   And I confirmed that as I spoke with him this morning.

14   **Q.**  Now, do you have --

15   **A.**  He believed that the product he was taking out of those 25

16   or so heater units in those boxes were asbestos.

17           MR. CASMERE:  Your Honor, I'm going to object that

18   this is a Rule 26 problem.

19           MR. BLACKWELL:  And my question is whether he has any

20   knowledge.

21           THE COURT:  This is similar to an earlier issue,

22   which is, if you just listen carefully to the question that's

23   being asked --

24           THE WITNESS:  Okay.

25           THE COURT:  -- the more you stray from the question,

1    Doctor, the more we're going to get into issues that might

2    complicate things.

3              THE WITNESS:  Okay.  Yes, sir.

4              THE COURT:  So the jury will disregard the doctor's

5    last part of his answer there.

6              And let me ask counsel for Mobil to just move on to

7    the next question.

8              MR. BLACKWELL:  All right.  Yes, Your Honor.

9    BY MR. BLACKWELL:

10   **Q.**  Let me clarify a couple things with respect to background,

11   and I'll try not to be repetitive, because I'm just going to

12   try to fill in some of the gaps of the previous counsel.

13             He talked with you quite a bit about your history in

14   providing testimony for plaintiffs' attorneys?

15   **A.**  Yes, sir.

16   **Q.**  The first case you had for a plaintiff's attorney was in

17   1977, true?

18   **A.**  I believe that was the year.

19   **Q.**  Since that time, you worked with over 50 different

20   plaintiffs' law firms?

21   **A.**  Yes.

22   **Q.**  You've been retained in over 2,000 cases?

23   **A.**  Yes.

24   **Q.**  You have -- in the year 2010 alone, I think you said you

25   reviewed 500 cases for plaintiffs' lawyers?

1    **A.** Four to five hundred probably.

2    **Q.** That's because you review four to five hundred a year --

3    **A.** Yes, so it would be more than 2,000.

4    **Q.** All right.  How many would it be?

5    **A.** I've never added them up.  It's thousands.

6    **Q.** You've done over a thousand depositions alone?

7    **A.** Yes.

8    **Q.** You've testified in trials like this over 150 times,

9    haven't you?

10   **A.** Yes.

11   **Q.** Now, is it true, Dr. Frank, that you don't have any

12   information regarding the dose of exposure from any product

13   and/or how much that dose of asbestos from any product would

14   have incrementally increased any risk of cancer?

15   **A.** That's two questions.  I have no information about dose.

16   And not having any, I can't do a calculation, not that I've

17   ever done one like that.

18   **Q.** You've never attempted to do any kind of dose

19   reconstruction estimate?

20   **A.** No.  That's a science that is built on very shaky ground,

21   according to the people who do it.

22   **Q.** Now, have you got any air sampling data from anywhere

23   related to --

24   **A.** That's a very generic question.  I've seen lots of air

25   sampling data.  I've seen none from the Mobil facility.

1  Q.  Have you seen any that relates to any place Mr. Krik

2  worked?

3  A.  No.

4  Q.  Now, just the fact that somebody is in an environment where

5  there is dust doesn't mean, even if there's asbestos present,

6  that it's all asbestos dust, does it?

7  A.  Of course not, not -- products are made up of a mixture of

8  things, and the dust that's created from those products will be

9  a percentage asbestos and a percentage some other material.

10  Q.  So in order to know what the percentage asbestos is, you

11  have to have some kind of analytic done, don't you?

12  A.  If you want to know what the amount was in either the

13  original product or the air, you can do analytics.

14  Q.  Well, if you want to know if an exposure level is above or

15  below the OSHA permissible exposure limit, analytics would be

16  helpful, wouldn't they?

17  A.  They'd be required.

18  Q.  And the permissible exposure limit is the amount of

19  asbestos, for example, a worker might be exposed to over a

20  40-year working life and not be expected to have adverse health

21  consequences, right?

22  A.  No, it doesn't say that.  And the OSHA regulations actually

23  say that at the permissible level, people will still get

24  disease.

25  Q.  So the OSHA, the PEL, permissible exposure limit, doesn't

1    say, as far as you're concerned, that it is the amount that a

2    worker can be exposed to over a 40-year working life and not be

3    expected to have adverse health consequences?

4    A.  Well, for any individual worker, they will not be expected

5    to get it.  But in populations exposed at that level, some

6    people in that environment at those levels will be expected to

7    get disease, and that's what the OSHA regulations clearly

8    state.

9    Q.  I'm asking you what does -- how does OSHA define

10   permissible exposure limit, if you know?  Does OSHA define --

11   A.  It's a legally allowable limit for what a worker can be

12   exposed to at the workplace.  It doesn't mean that it's safe.

13   Q.  But doesn't OSHA say that it's a legal allowable limit a

14   worker can be exposed to over a working life and not be

15   expected to have adverse health consequences?  Yes or no?

16   A.  It's a legally allowable limit, but it doesn't mean that

17   it's safe.

18   Q.  Would you answer my question, sir?

19   A.  Yes, it says that.

20   Q.  It does say that?

21   A.  I believe so.  I'd have to get the regulations out to see

22   if it says it exactly that way, but that's the implication of

23   what it says.  It never uses the word "safe."

24   Q.  But it does use the words, though, "not expected to have

25   adverse health consequences," doesn't it?

Frank - cross by Blackwell                    **338**

1   **A.** Not expected, yes.

2   **Q.** I'm going to talk with you about cigarettes and smoking a

3   little bit.  The jury has heard quite a bit already.

4           Well, first let me ask you about asbestos.  I think

5   you've told us in spades now that asbestos is a toxic mineral,

6   haven't you?

7   **A.** I have said that.

8   **Q.** And is it your view that as a toxic mineral that there is

9   no minimal level of exposure that's safe for asbestos?

10  **A.** No, it's not because it's a toxic mineral.  It's because

11  it's a carcinogen.  Not all toxic minerals are carcinogens.

12  **Q.** Well, cigarettes contain roughly 4,000 toxic chemicals,

13  don't they?

14  **A.** Yes, but they also contain 69 or 70 carcinogens.

15  **Q.** Yeah, we'll get through quicker if -- you answered ahead of

16  my question.  You got to let me ask you the question.

17          So I think you did tell us earlier there are roughly

18  69 carcinogens in cigarette smoke?

19  **A.** Yes.

20  **Q.** Now, would you agree that if an asbestos worker is not a

21  smoker, then that worker has a very limited risk of lung

22  cancer?

23  **A.** I don't understand the question.  I don't know what

24  "limited risk" is.

25  **Q.** All right.

1   **A.**  Has an increased risk, more limited than if he was also a

2   smoker.

3   **Q.**  Could you pull up M 104, please?  Let's see what

4   Dr. Selikoff says about it.  Could you go to page 9?

5          MR. McCOY:  Which year is this one?

6          MR. BLACKWELL:  1967.

7   BY MR. BLACKWELL:

8   **Q.**  Okay.  We'll read together.  "Among the 87 men" --

9   **A.**  Yes.

10  **Q.**  "Among the 87 men who did not smoke and now we're using

11  statistics based upon smoking habits in the population, there

12  should have been between zero and one cancer of the lung.

13  There were none.  In other words, from 1963 to the present time

14  in 1967, and that includes up to today or up to yesterday when

15  I left New York, have yet to see a lung cancer in an asbestos

16  worker who didn't smoke."

17         Next page.  This says, "Also, I didn't see a cancer

18  of the lung in an asbestos worker who smoked cigars or an

19  asbestos worker who smoked pipes if he didn't smoke cigarettes

20  at the same time."

21         So he makes a little joke.  "If levity were in order,

22  I perhaps should say put that in your pipe and smoke it."

23         But here's his point.  "But this information is of

24  tremendous importance.  It is almost like saying that if you

25  work in a dynamite factory, you shouldn't smoke.  And cancer of

1    the lung would be wiped out in your trade if you people

2    wouldn't smoke cigarettes, period."

3              Is that what Dr. Selikoff said?

4    **A.** That's what he said to the gathering of asbestos insulators

5    the year before he published on the synergy.

6    **Q.** My question is --

7    **A.** That's what he said.  It speaks for itself.

8    **Q.** And he didn't say, you would wipe out all lung cancer in

9    the trade if you first stopped being exposed to asbestos.

10   That's not what he said, did he?

11   **A.** It speaks for itself.

12   **Q.** You can answer my question.

13   **A.** It speaks for itself.

14   **Q.** In 1978, he reported only four lung cancer cases out of

15   over two thousand nonsmokers in the insulation trade; isn't

16   that true?

17   **A.** Yes.

18   **Q.** So if a nonsmoker has an increased risk, then it's a very

19   limited risk, isn't it?

20   **A.** It's more limited than if you do smoke, yes.

21   **Q.** Are you aware that the World Health Organization says that

22   smoking is the -- is the cause of 95 percent of lung cancers?

23   **A.** I have not seen that statement.  I've seen the Surgeon

24   General's statement in this country.

25   **Q.** All right.  90 percent then?

1    **A.** Or 85.

2    **Q.** All right.  Now, you've seen a statement from no one, no

3    health organization in the industrialized world, that says

4    asbestos exposure is the cause of 85 percent of lung cancers,

5    have you?

6    **A.** I would never expect to see that.

7    **Q.** I didn't ask what you would expect.

8            I asked you what you've seen.  Have you --

9    **A.** I've never seen it.

10   **Q.** Now, cigarette smoking weakens the lungs, doesn't it?

11   **A.** It can.

12   **Q.** Well, it decreases their ability to remove dust like

13   asbestos, doesn't it?

14   **A.** It does.

15   **Q.** It irritates the air passageways, doesn't it?

16   **A.** Yes.

17   **Q.** It leads to the development of more mucus in --

18   **A.** Yes.

19   **Q.** -- the respiratory system, correct?

20   **A.** Yes.

21   **Q.** And that, in turn, can block the air passageways, true?

22   **A.** It can.

23   **Q.** And if they're blocked, then that decreases the body's

24   ability to remove dust, including asbestos fibers, doesn't it?

25   **A.** Yes.

1    **Q.** So the other thing that tobacco smoke can do, it damages

2    something called the mucociliary escalator?

3    **A.** Yes.

4    **Q.** And the mucociliary escalator is what, for the ladies and

5    gentlemen of the jury?

6    **A.** It's the upper airways where you have mucus globules that

7    attract foreign materials, be it asbestos or bacteria or

8    viruses.  And then the cilia are little hair-like cells that

9    push these up and out of the lung.  You end up swallowing it.

10   **Q.** And the cilia are little hair-like structures, aren't they?

11   **A.** That's what I just said.

12   **Q.** And they flip about how many times a minute?

13   **A.** Many.

14   **Q.** Many as in hundreds?

15   **A.** Yes.

16   **Q.** So they represent somewhat the body's last defense

17   mechanism for keeping foreign particulate out before it can

18   make its way into the lungs?

19   **A.** There are other ones, too.  There's macrophages, but it's

20   the main one of the upper airway.

21   **Q.** It's the mucociliary escalator?

22   **A.** Yes.

23   **Q.** And so when that's been damaged by cigarette smoke, it

24   makes it then easier for all types of dust to get into the

25   lungs because it's damaged?

1   **A.**  Yes.

2   **Q.**  Then it makes a pathway for more asbestos to get into the

3   lungs, this smoking, true?

4   **A.**  Yes.

5   **Q.**  And it also is the reason that the fibers can go deeper

6   into the lungs, true?

7   **A.**  I don't know that that's ever been shown.

8   **Q.**  So do you -- you say you just don't know or are you --

9   **A.**  I don't know.  I've never seen any data that says they get

10  deeper into the lungs because of smoking.

11  **Q.**  Well, but the point is, when we're talking about cigarette

12  smoking, it really is a horrible gift that keeps on giving,

13  isn't it?

14  **A.**  It can be, yes.

15  **Q.**  Now, despite there being countless publications and

16  presentations to this day, researchers have not reported

17  another single case where there's been a mortality of an

18  asbestos worker who didn't smoke regularly; is that true?

19  **A.**  I think Dr. Markowicz reported on some.

20  **Q.**  Do you know or do you think?

21  **A.**  I'd have to look at the paper.  I believe he has nonsmokers

22  who got excess lung cancer.

23  **Q.**  And so I ask about whether or not you knew of any

24  mortalities of an asbestos worker who was a nonsmoker?

25  **A.**  The Markowicz paper has some of those individuals.

1    **Q.** All right.  We'll take a look at it.

2            Now, so smoking is a number one cause of lung cancer

3    in the general population, and we also know it's a number one

4    cause -- it's related in lung cancers also with respect to

5    asbestos-exposed workers?

6    **A.** Because more people smoke than are exposed to asbestos or

7    arsenic or other things, it naturally would be the number one

8    cause.

9    **Q.** I'm simply asking if it is or isn't.  And it is, isn't it?

10   **A.** Yes.

11   **Q.** Number one in the general population and number one for

12   asbestos-exposed workers, too, right?

13   **A.** Because it's the number one exposure that people in the

14   population have, yes.

15   **Q.** But cigarette smoking does more than that, because

16   cigarette smoking causes COPD -- it can cause COPD?

17   **A.** And many other diseases which your colleague asked me

18   about.

19   **Q.** Let's just stick with COPD for a minute.

20   **A.** Yes.  He asked me that already.

21   **Q.** Well, I'm going to ask you something maybe he didn't.  All

22   right?

23           Now, would you degree with me that COPD, the fact

24   that someone has COPD in addition to the smoking, is an

25   independent risk factor for developing lung cancer?

1    **A.**  I'm not sure it's an independent factor.  You don't have to

2    have COPD to get lung cancer.  It's another disease that occurs

3    from cigarettes.  And if you are someone who has COPD, you're

4    more likely to get lung cancer because you've had more smoking.

5    **Q.**  Have you studied the literature to assess whether or not

6    COPD is an independent risk factor for developing lung cancer?

7    **A.**  Not especially.  I've read some of the literature, and my

8    take on it is that it represents people who smoke more are more

9    likely to get COPD.  They're also more likely to get lung

10   cancer, therefore, because they've had a higher amount of

11   smoking.

12           MR. BLACKWELL:  Your Honor, I move to strike the

13   answer after the words "not particularly" as not responsive.

14           THE COURT:  Objection is overruled.  The answer can

15   stand.

16   BY MR. BLACKWELL:

17   **Q.**  Have you looked at the literature, Dr. Frank, to determine

18   whether or not emphysema, the fact that someone has emphysema,

19   is an independent risk factor also for developing lung cancer?

20   **A.**  COPD includes two diseases, one of which is emphysema.  So

21   I haven't looked beyond what I've just told you.

22   **Q.**  Now, you had made a statement that I have on my note pad.

23   You were talking to Mr. McCoy about the synergy, and at the

24   time you were discussing smoking and asbestos.  And you made

25   the statement that smoking and something else may also increase

1    harm.  So it isn't just smoking and asbestos, but it can be

2    smoking in combination of other types of exposures that can

3    cause harm?

4    **A.**  I did share that with the jury.

5    **Q.**  Now, were you aware that Mr. Krik was exposed to a number

6    of other carcinogens beyond cigarettes?

7    **A.**  Not specifically.

8    **Q.**  Were you asked to -- well, could we first pull up -- I want

9    to show you what's been marked as Mobil's Exhibit 353.  It's a

10   medical record.

11          This is a medical record that's dated March 16th,

12   2011.  And do you see here where it says, "Mr. Krik reports

13   contact with the following hazardous chemicals:  Asbestos,

14   benzene, coal, lead, radiation, and chemicals"?

15   **A.**  I see that.

16   **Q.**  Would you agree with me that, in your view, benzene is also

17   a known carcinogen?

18   **A.**  Yes, but not for the lung.

19   **Q.**  Would you agree with me that in your view that there's no

20   safe level of exposure to benzene?

21   **A.**  I agree with the American Petroleum Institute that said

22   that in 1948, that as a carcinogen there was no known safe

23   level.

24   **Q.**  Dr. Frank, I would love to get us out of here by 5:00.  So

25   if you could answer yes or no if you're able to --

1    **A.**  I would agree.

2    **Q.**  Radiation --

3    **A.**  Is a carcinogen.

4    **Q.**  -- is a known cause of cancer?

5           THE COURT REPORTER:  I'm sorry.  One at a time,

6    please.

7    BY MR. BLACKWELL:

8    **Q.**  Radiation, a known cause of cancer?

9    **A.**  Yes.

10   **Q.**  Were you asked to evaluate to what extent Mr. Krik's

11   exposure to radiation played a role in the development of lung

12   cancer?

13   **A.**  No.

14   **Q.**  Were you asked to evaluate to what extent his exposure to

15   any other chemicals or exposures other than asbestos and

16   cigarettes could have contributed to his lung cancer?

17   **A.**  No.

18   **Q.**  Were you even aware of this document?

19   **A.**  Not that I recall seeing.

20   **Q.**  Is this the first time you've seen it?

21   **A.**  That I recall.  It may have been in the records, but I have

22   no details beyond what's there.

23   **Q.**  So all the records that you have in this case, everything

24   you got, you received from Mr. McCoy?

25   **A.**  Yes.

1 **Q.** And as you sit here on the stand today, you don't recall

2 him showing you this record?

3 **A.** Listen, it was back in 2011.  I don't remember of 150 pages

4 if it was there or not --

5 **Q.** I'm just asking if you remember it or not.

6 **A.** I do not remember.

7 **Q.** Just a couple other questions that I want to put something

8 in context for the jury about, just the nature and the volume

9 of the lungs.

10 Doctor, if you were to take a human lung and spread

11 it out on the floor, if you could imagine that, about how much

12 surface area would the lungs take up?

13 **A.** A huge amount, probably if you spread it out thin enough,

14 bigger than this room.

15 **Q.** So there is tremendous amount of reserve and capacity in

16 the lungs, true?

17 **A.** Yes.

18 **Q.** There are any number of people who live -- lead fairly --

19 fairly normal lives with one lung?

20 **A.** Some do; some don't.

21 **Q.** Pope Francis, for example, has had one lung since he was a

22 teenager.  Did you know that?

23 **A.** Yes.

24 **Q.** And he had a lung removed as a teenager due to an

25 infection?

1    **A.** Yes.

2    **Q.** But the point is that the lungs do have a great deal of

3    reserve and capacity in them, and it takes a great deal of

4    insult to cause them damage?

5    **A.** That's probably a fair statement.

6              MR. BLACKWELL:  Doctor, give me one moment.  I think

7    that's going to be all I have, so just a second.

8         (Brief pause.)

9              MR. BLACKWELL:  Thank you, Dr. Frank.

10             THE WITNESS:  You're welcome.

11             THE COURT:  Anything further from the plaintiff for

12   Dr. Frank?

13             MR. McCOY:  Just a couple questions.

14                       REDIRECT EXAMINATION

15   BY MR. McCOY:

16   **Q.** Dr. Frank, I'm going to go to this Exhibit 353 that Mobil

17   just has up here still about the asbestos, benzene, coal, lead,

18   radiation, and chemicals.

19             For someone who has worked in the Navy ships since

20   1954 or someone who has been a boilermaker or a pipefitter

21   since 1970, is there anything unusual about reporting those

22   exposures?

23   **A.** Not especially.

24   **Q.** Would it surprise you if they didn't report those

25   exposures?

1    **A.** If they didn't have them, it would be unusual, given the

2    nature of work of pipefitters, boilermakers.

3    **Q.** So those would be common exposures that someone in those

4    trades would encounter?

5    **A.** Yes.

6    **Q.** There was some testimony that you had reviewed four to five

7    hundred cases per year for attorneys; is that right?

8    **A.** Yes, sir.

9    **Q.** Okay.  And I think there was testimony that you had in one

10   year generated maybe 36 reports for my firm; is that right?

11   **A.** Yes, sir.

12   **Q.** Okay.  So in terms of the number of cases per year that you

13   do for lawsuit work, the four to five hundred would not be

14   anything unusual; is that right?

15   **A.** No, it's been the average for the last few years.

16   **Q.** Does that include some nonasbestos cases?

17   **A.** Yes.

18   **Q.** What other areas do you look at sometimes?

19   **A.** Occasionally some benzene work.  From my days in Kentucky,

20   I still occasionally do a black lung case, co-workers'

21   pneumoconiosis.  And then I may do some odd workers' comp

22   cases.

23          The lady who looks after the firefighters in

24   Philadelphia brings me some of her cases, and they're not

25   always asbestos.

1   **Q.** Would it be fair to say that there was a lot of years in

2   the last ten years where you did five or less reports for my

3   law firm?

4   **A.** Most of those years.

5   **Q.** Would be five or less?

6   **A.** Yes.

7   **Q.** Okay.  The question about the data in the Markowicz study

8   being from insulators; is that right?

9   **A.** Yes.

10   **Q.** Okay.  And the Selikoff-Hammond study that was done

11   earlier?

12   **A.** It was also insulators, the same group.

13   **Q.** Why is it that those have application to somebody who is a

14   pipefitter?

15   **A.** Because they're both trades that have a lot of exposure to

16   asbestos.  There are many trades that have exposure to

17   asbestos.  And while insulators may have more than others, the

18   basic principles apply to these other crafts, pipefitters,

19   boilermakers, plumbers, sheet metal workers, that would all

20   apply to them, shipyard workers.

21   **Q.** Based on the questions you were asked by the defense

22   counsel and the things they pointed out, is there anything that

23   changes your view that the Markowicz and Selikoff studies

24   support the synergistic effect?

25   **A.** No.

1          MR. McCOY:  That's all the questions I've got.  Thank

2     you.

3          MR. CASMERE:  No, thank you.

4          MR. BLACKWELL:  Your Honor, I just want to move into

5     evidence Mobil's Exhibits 353, the medical report, and 104, the

6     Selikoff.

7          THE COURT:  The Selikoff document will not be

8     admitted as a substantive piece of evidence, but the medical

9     record will be admitted.

10         (Mobil Exhibit 353 received in evidence.)

11         THE COURT:  Thank you, Dr. Frank.  You may step down.

12         THE WITNESS:  Thank you, Your Honor.

13         (Witness excused.)

14         THE COURT:  Ladies and gentlemen of the jury, we are

15    right at 5:00.  I certainly very much appreciate your

16    willingness to stay until 5:00.

17         Have a good evening.  We'll resume again tomorrow at

18    10:00 a.m.

19         Oh, that's right.  Ms. Heckert, you have your job

20    interview that is scheduled to go until 10:30?

21         JUROR HECKERT:  Correct.

22         THE COURT:  So let's get started at 11:00.

23         Will that give you enough time to --

24         JUROR HECKERT:  It should, yes.

25         THE COURT:  So we'll start a little late tomorrow at

1    11:00 a.m.  Don't discuss the case amongst yourselves or with

2    anyone.  Don't try to do any research or investigate any

3    matters involving the case.

4              Have a good evening.  We'll see you tomorrow at

5    11:00.  Thank you.  All rise.

6         (Jury out.)

7              THE COURT:  Is there anything we need to take up this

8    evening?

9              MR. McCOY:  Judge, it's what I mentioned before.

10   And, you know, with the testimony on causation being stricken,

11   I have to say, you know, I've got significant concerns about

12   proceeding forward with the expenditures in this case.

13             I don't know that I have an answer at this very

14   minute because we were in the midst of all kinds of things here

15   today, but I think it's something that should be decided by the

16   Court of Appeals.  Whether I absolutely have to ask for some

17   sort of a certification in the case, I can't say I absolutely

18   have to now.  I have to just think about that for a little bit.

19             THE COURT:  Okay.  Well --

20             MR. McCOY:  I'm very concerned that that's the remedy

21   that we should be asking for here.

22             THE COURT:  Well, what we have is an evidentiary

23   ruling by, first, Judge Lee and then later me and then in the

24   midst of trial.

25             And with respect to the in-court ruling, let me just

1    clarify, in light of the factual proffer that was made, that

2    it's not a misapprehension on my part that the -- about the

3    distinction between the cumulative exposure testimony and the

4    each-and-every-exposure testimony.

5          For testimony about cumulative exposure causing lung

6    cancer to be useful testimony for this trial, for this jury, as

7    to these defendants, it needs to be related to whether the

8    exposure at the hands of these defendants caused plaintiff's

9    lung cancer, which is what this trial is about.

10          As was clear when Judge Lee said that it is not an

11   acceptable approach for a causation expert to take, namely, to

12   draw a causation opinion as to particular defendants, including

13   hypothetical defendants in response to a hypothetical question,

14   for that causation expert to take an approach based on

15   cumulative exposure that's informed by an

16   each-and-every-exposure opinion, it remains clear to me in

17   light of the factual proffer that Dr. Frank's cumulative

18   exposure testimony is based on the each-and-every-exposure

19   theory above -- exposure meaning above background amounts and

20   that that testimony is based on each and every exposure being a

21   substantial factor.

22          And just as Dr. Frank, to his credit, cannot

23   disaggregate exposures as a matter of science, cumulative

24   exposure opinion cannot be disaggregated from the

25   each-and-every-exposure opinion as a matter of evidence under

1    Rule 702, and now that I've heard the proffer, under Rule 403.
2    The risk that that answer to the hypothetical relying on the
3    cumulative exposure opinion would be considered as evidence of
4    a particular causation as to these defendants would, in fact,
5    in my view, be unfair and confusing given the weakness of the
6    probative value of the opinion when it's informed, as it is, by
7    the each-and-every-exposure principle.

8              And the goal under 702 is to be a gatekeeper.  And
9    once the parameters are set by that rule, Rule 403 still has a
10   role to play in precluding testimony that would be confusing or
11   unfairly prejudicial in a way that outweighs the probative
12   value.

13             So for those reasons, I've ruled that the proffered
14   testimony is not admissible in the context of this particular
15   trial.

16             Now, whether that kind of evidentiary ruling ought to
17   be certified for a mid-trial interlocutory appeal, the answer
18   to that question, in my view, is quite clearly no.  It is not a
19   case-dispositive ruling.  It is an evidentiary ruling that, if
20   erroneous, would be taken up in the context of an appeal on
21   final judgment.  It is not a case-dispositive ruling that has
22   the likelihood of resolving this case in an expeditious manner.

23             Mr. McCoy earlier made the point that this is a long
24   trial.  It's not that long of a trial.  It's two weeks.  It is
25   not the case that there is a dearth of evidence about

1    causation.  There is evidence that's in the case, even from

2    Dr. Frank himself, about asbestos, about exposures, about how

3    exposure has been reported to cause cancer.  So it's not the

4    case that that -- though my ruling is dispositive of the issues

5    in the trial.

6            The other alternative, as I imagine it would be,

7    would be a mandamus petition, which is up to the plaintiff.  If

8    the plaintiff wants to petition the Court of Appeals for a writ

9    of mandamus, that's an option that the plaintiff has.  But I am

10   not staying this trial for that.

11           And I would also note that Judge Lee's opinion has

12   been the ruling that's been operative for quite some time now.

13   My pretrial rulings have been the operative rulings for some

14   time now.  And if there were other appellate options that the

15   plaintiffs wanted to pursue, they had the opportunity to do so

16   earlier.

17           Where we are in the trial at this point is simply

18   that I've made evidentiary rulings and that I've accepted

19   factual proffers.  I've evaluated them.  I've looked at the

20   Daubert rulings many, many times now, and I have exercised my

21   discretion, as I feel I am obligated to do, and I've issued the

22   rulings that I've issued.

23           So that's where we are with that.  People have their

24   options, and they are what they are.

25           MR. CASMERE:  If the plaintiff wants to consent to a

1    directed evidence, Owens-Illinois would accept that --

2              THE COURT REPORTER:  I'm sorry.

3              MR. CASMERE:  If the plaintiff wants to consent to a

4    directed verdict for Owens-Illinois, we would accept that and

5    consent to that, and then he can appeal it.

6              MR. MORRIS:  Your Honor, one perspective --

7    additional perspective on that, Bob -- and I'm not trying to

8    talk you into this at all -- but you mentioned the amount of

9    days that could be wasted.

10             If it is true, as we believe it would be, that

11   Dr. Burhani will not deviate from her evidence deposition and

12   say that asbestos caused this man's disease, which she did not

13   say, and we can argue about what's in the record, but I think

14   the record as it stands would still say, Your Honor, that under

15   the *Korte versus Exxon* case, the plaintiff is still required to

16   have expert testimony.

17             And I guess what our approach would be is to say, you

18   know, the Court commented on the literature that he commented

19   on.  But, of course, the literature that he commented on can't

20   be substantive evidence.  So that in and of itself cannot --

21             THE COURT:  But his testimony about the literature

22   can be considered.

23             MR. MORRIS:  I think you would need to comb that

24   record to see whether he gave an opinion based on that

25   literature or whether he merely recited that the literature

1    said it.  If it's the latter, I don't think it's in play for

2    those purposes.  If it's the former, it may be, depending upon

3    whether it was an opinion.  Not just that asbestos generally

4    has been shown to cause those things, which tells us nothing

5    and doesn't inform the law on this.

6            It would have to be that in some respect these

7    defendants, either separately or maybe combined, were a

8    substantial factor in causing the injury.

9            So if you don't have Frank and you don't have Burhani

10   and the law says you need an expert and all you are is an oath

11   helper with literature, maybe, maybe we could get to the issue

12   of deciding that a directed verdict is the way to go.

13           But, Bob, believe me, I'm not trying to push that if

14   it's not something you don't want to hear.

15           MR. McCOY:  Well, I'm not going to take the position

16   on whether any of the defense statements are right or wrong.

17           THE COURT:  Right.

18           MR. McCOY:  Or whether Your Honor's statement is

19   right or wrong.

20           THE COURT:  That is certainly a careful approach at

21   this point.

22           MR. McCOY:  I would say this.  You know, I've had two

23   cases in my life where on motions *in limine* things have gotten

24   knocked out, and we've taken appeals, so -- but I don't

25   remember one specific to this kind of situation.  That's why

1    it's hard for me to say one way or the other exactly what's the

2    right thing to do for my client.  That's what I'm concerned

3    about, my client, Mr. Krik.

4         (Discussion off the record.)

5         MR. McCOY:  I hear him breathing back there.  I was

6    trying to say he can leave the courtroom.

7         But it did happen to me twice before.  I've taken two

8    appeals, stipulated to entry of judgment, whatever you want to

9    call it, based on a particular ruling, and then had that go up.

10        THE COURT:  Sure.  And that option was not what I

11   thought was being asked.

12        I thought what was being asked was an interlocutory

13   appeal under 1292, and that was the basis for my earlier

14   comments.

15        MR. McCOY:  Right.  And that's why I was listening to

16   Your Honor's thought about it, the defense attorneys about it.

17   So like I say, I don't have enough knowledge on experts with

18   particular reference, I think, to what Mr. Morris was saying

19   about the issues about -- you know, he's saying now we need

20   expert testimony or I might take that position.  That's really

21   one of my concerns down the road, is when we get to the jury,

22   what will happen.  Will people say, "Well, Dr. Frank

23   couldn't -- plaintiff had nobody who said causation"?

24        And that's my concern.  If that argument is made,

25   then that's what I'm most worried about.

1          Secondly, I'm worried about just not having somebody

2    who tells the jury in his opinion it's causation, because

3    oftentimes jurors expect that, whether it's required or not

4    required, which I think is what Your Honor is saying.  It may

5    not be required that somebody says that.  That's why it's not

6    dispositive, in your view.

7          So -- but jurors certainly look for that, and they

8    saw what happened.  I mean, the opinions were not allowed.  Why

9    were they not allowed?  Well, they can go back there and

10   speculate on all kinds of things, because it might be because

11   Your Honor thought that the evidence didn't support that, so --

12   or they might think that it wasn't allowed because a witness

13   was not qualified.  There's all kinds of reasons why they're

14   going to speculate about what happened.

15         So, I mean, that's -- I'm just laying out for you why

16   I don't have --

17         THE COURT:  No, right.  Look, there is no --

18         MR. McCOY:  -- why I don't have an immediate course

19   of action.

20         THE COURT:  There's no reason for you to have an

21   immediate course of action at this very moment.

22         And there's also no doubt that the plaintiff's case

23   was impacted by Judge Lee's opinion many months ago and the

24   subsequent history of the case.

25         What I've got before me is making the rulings that

1  get teed up for ruling, and I've endeavored to give those

2  rulings.

3          We have some time to consider what you want to do

4  since we're not starting until 11:00 a.m. tomorrow with the

5  jury.  You should consider what your options are.  If the

6  parties want to discuss amongst themselves issues, they are

7  certainly free to do so.  There's nothing -- other than what I

8  had taken to be a request for an immediate certification under

9  1292, which I think is not quite the request that was made, but

10  that's what I thought it was -- that request is denied for the

11  reasons I've earlier stated.  I have no other pending request

12  before me.  And you should consider what your options are, and

13  we can move forward.

14          On my end, I will be here ready to resume the trial

15  tomorrow morning.

16          MR. McCOY:  And the other things, I mean, I'm

17  concerned with is that I believe, you know, Judge Lee's ruling

18  has been expanded, and I don't necessarily agree from the start

19  with Judge Lee's ruling.  Well, all these issues are preserved

20  to go up on what could be an appeal.

21          I think the only question I have for my client is

22  should I attempt to do that -- to do that now.  And I don't

23  want to waste anybody's time, is what I'm saying.  I don't want

24  to play around with this.

25          THE COURT:  Okay.

1      MR. McCOY:  So I'm going to think about this with the
2  others at my office, and I may send an email or two to the
3  defense attorneys on it.  But, of course, the difficulty is
4  trying to do it in the middle of a trial with another witness
5  coming tomorrow.  But you're right, there's a little more time.
6      THE COURT:  There is a little bit more time.  And who
7  is our next witness?
8      MR. McCOY:  The next witness would be Frank Parker,
9  who is our industrial hygienist.  So I didn't hear any
10  limitations about him other than the every-exposure ruling from
11  Judge Lee, which again --
12      THE COURT:  Right.  As I recall, he was less a
13  causation person than a --
14      MR. CASMERE:  He is not a causation person.
15      THE COURT:  -- an exposure person.
16      So he is somebody who can talk about what the type of
17  work entails and how that might generate exposure.
18      MR. MORRIS:  Except at Mobil, pursuant to the Court's
19  ruling.
20      THE COURT:  Right.
21      MR. CASMERE:  And within the confines of his
22  disclosure.
23      THE COURT:  Fair enough.
24      MR. McCOY:  What was the ruling on except at Mobil?
25      MR. MORRIS:  He couldn't testify about Mobil.

1           MR. McCOY:  Specifically?

2           MR. MORRIS:  Right.

3           THE COURT:  Correct.

4           MR. MORRIS:  Or asbestos content at Mobil.

5           THE COURT:  Right.  He was not a properly disclosed

6      fact witness with respect to Mobil.

7           MR. MORRIS:  And so that we're clear, we'll have a

8      little bit of that same line that we're navigating today, which

9      is, what is the relevance of general testimony about steel

10     mills and other locations and presumably perhaps even slinking

11     into other refineries used as, as you said, at a high level for

12     an indicator of what the jury ought to think about Mobil.

13          And the closer it gets to that lower level and the M

14     word, the closer the significant prejudice to us will be.  So I

15     expect we'll have a lot of the same sorts of questions that we

16     saw today, and we'll just try to have to navigate around them.

17          I'm, again, expressing my concern that we do look a

18     little like popinjays having to keep getting up.  And I think

19     the jury is a little bit irritated at the defense for objecting

20     to this stuff.

21          MR. CASMERE:  He -- I believe Mr. Parker's opinions

22     are general in terms of insulation, cement.  Not Kaylo, not

23     defendant specific.

24          MR. McCOY:  Well, he certainly filed an affidavit,

25     summary judgment with Judge Robreno about Mobil.  I mean, that

1   was part of the summary judgment.

2           THE COURT:  Well, we're not going backwards.  You

3   know, we've got the ruling on Mr. Parker.  Everyone, including

4   myself, will go back and remind ourselves of the parameters.

5           MR. BLACKWELL:  But, Judge Shah, is there any kind of

6   admonition that can be given?  Because it's difficult and just

7   a tad bit frustrating when we do have to continue to get up.

8   And oftentimes issues they're raising are not new.  It's the

9   same thing again and again.

10          And I don't -- I'm not sure what Your Honor can do.

11  But is there something Your Honor can do?

12          THE COURT:  What I can do in our -- given our current

13  posture is make sure that we convene tomorrow no later than,

14  say, 10:45 or let's say 10:45, and we can talk more

15  specifically about Mr. Parker and what is fair game, what is

16  not fair game, without the pressure of the jury sitting in the

17  box and being concerned about jury time.

18          And if I could give you some more rules of the road

19  before Mr. Parker hits the stand, then I will endeavor to do

20  that.

21          Anything else?

22          MR. CASMERE:  No, Your Honor.

23          THE COURT:  Our 48-hour exhibit rule is still in

24  place, and I have not heard of any issues.  So I'm not

25  expecting any exhibit issues tomorrow.

1          MR. MORRIS:  I think after Mr. Parker, Bob said that

2     there were two Mobil depositions that he wanted to read.  So if

3     that's true, we'll have readers here.  Parker is not going to

4     take up the whole day, I can't imagine.

5          MR. McCOY:  No, it shouldn't take up any -- should

6     take up less time than Dr. Frank.

7          MR. MORRIS:  So does that sound like a plan, Bob?

8          MR. McCOY:  Yeah, I mean, that's what I think we

9     said.

10          MR. MORRIS:  And not --

11          MR. McCOY:  That's the plan.  We agreed on that

12     already.

13          MR. MORRIS:  And not someone else, too?

14          MR. McCOY:  Talking about another?

15          MR. MORRIS:  That will be plenty for tomorrow, in

16     other words?

17          MR. McCOY:  Yeah, I'm sure that will pretty much

18     occupy the day, I think, yeah.

19          THE COURT:  Okay.  Thank you.  Then we are adjourned.

20          (Adjournment of proceedings until 4/22/15 at

21          10:45 a.m.)

22

23

24

25

1          C E R T I F I C A T E

2              We, Colette M. Kuemmeth and Nancy L. Bistany, do

3    hereby certify that the foregoing is a complete, true, and

4    accurate transcript of the Trial proceedings, Volume 2, had in

5    the above-entitled case before the HONORABLE MANISH S. SHAH,

6    one of the Judges of said Court, at Chicago, Illinois, on

7    April 21, 2015.

8

9          _/s/ Colette M. Kuemmeth, CSR,RMR,FCRR_     _04/21/15_

10

11         _/s/ Nancy L. Bistany,CSR,RPR,FCRR_         _04/21/15_

12              Official Court Reporters              Date
                United States District Court
13              Northern District of Illinois
                   Eastern Division
14

15

16

17

18

19

20

21

22

23

24

25