# EXHIBIT 1

STATE OF WISCONSIN          CIRCUIT COURT          DANE COUNTY

DELORES SUOJA, Individually       )
and as Special Administrator      )
of the Estate of Oscar Suoja,     )
deceased,                         )
                                  )
              Plaintiffs,         )
                                  )
    v.                            )    Case No.  97CV2370
                                  )
                                  )
ACandS, INC., a foreign           )    COMPLAINT
corporation; ALLIED INSULATION)
SUPPLY CO., INC., a Wisconsin )         Case code: 30108 (Asbestos)
Corporation; A. P. GREEN,         )
INC., a foreign corporation;      )
ARMSTRONG WORLD INDUSTRIES,       )
INC., individually and as         )
successor corporation to          )
Armstrong Cork Co., a             )
Pennsylvania corporation;         )
ASBESTOS CLAIMS MANAGEMENT        )
CORP. (f/k/a National Gypsum      )
Corp.) a  Texas corporation;      )
API, INC., a foreign              )
corporation; BUILDING SERVICE )
INDUSTRIAL SALES CO., INC., a )
Wisconsin corporation; CROWN      )
CORK & SEAL CO., a                )
Pennsylvania corporation, as      )
successor in interest to          )
Mundet Cork Corporation; GAF      )
CORP., a foreign corporation; )
GARLOCK, INC., a New York         )
corporation; L & S INSULATION )
COMPANY, INC., a Wisconsin        )
corporation; METROPOLITAN LIFE)
INSURANCE CO., a New York         )
corporation; OWENS-CORNING        )
CORP., a Delaware corporation;)
PITTSBURGH CORNING CORP.,         )
a Pennsylvania corporation;       )
PPG INDUSTRIES, INC., a           )
Pennsylvania corporation,         )
Individually and as Successor )
Corporation to Pittsburgh         )
Plate Glass Co.;RAPID-AMERICAN)
CORP., a Delaware corporation,)

THIS IS AN AUTHENTICATED COPY OF THE ORIGINAL DOCUMENT FILED WITH THE DANE COUNTY CLERK OF CIRCUIT COURT.

JUDITH A. COLEMAN
CLERK OF CIRCUIT COURT

DANE COUNTY, WI
CIRCUIT COURT
'97 JUL 29 12 2

as Successor in interest to      )
Philip Carey Manufacturing       )
Co.; RAYMARK CORP., a Utah        )
corporation, as Successor         )
Corporation to Raybestos-         )
Manhattan, Inc.; SPRINKMANN       )
SONS CORPORATION, a Wisconsin )
corporation; UNITED STATES        )
GYPSUM CORP., a foreign corp.;)

        Defendants.        )

**NOW COME** Plaintiffs, DELORES SUOJA, individually and as Special Administrator of the Estate of OSCAR SUOJA, by and through their attorneys, CASCINO VAUGHAN LAW OFFICES, LTD, and complain of the above-named Defendants, as follows:

### JURISDICTION

1.  Prior to his death on December 28, 1996, Decedent, OSCAR SUOJA (hereinafter Decedent), was an adult citizen of Wisconsin, residing at 1902 Maryland Av., Superior, Wisconsin, and at all times material to the allegations contained in this complaint was an insulator using asbestos-containing products or working in the vicinity of persons using such products at various job sites in the State of Wisconsin, including Dane County.

2.  Plaintiff DELORES SUOJA (hereinafter Plaintiff) is an adult citizen of Wisconsin, residing at 1902 Maryland Av., Superior, Wisconsin, and at all times material to the allegations contained in this complaint was the wife of Decedent and is now the Special Administrator of his Estate.

3.  The following Defendants are all corporations, none of which

is incorporated in or has its principal place of business in the State of Wisconsin: ACandS, INC., a foreign corporation; A. P. GREEN, INC., a foreign corporation; API, INC., a foreign corporation; ARMSTRONG WORLD INDUSTRIES, INC., individually and as successor corporation to Armstrong Cork Co., a foreign corporation; ASBESTOS CLAIMS MANAGEMENT CORP. (f/k/a National Gypsum Corp.) a Texas corporation; CROWN CORK & SEAL CO., as successor in interest to Mundet Cork Co., a Pennsylvania corporation; GAF CORPORATION, a foreign corporation; GARLOCK, INC., a New York corporation; METROPOLITAN LIFE INSURANCE CO., a New York corporation; OWENS-CORNING FIBERGLAS CORPORATION, a Delaware corporation; PITTSBURGH CORNING CORPORATION, a Pennsylvania corporation; PPG INDUSTRIES, INC., Individually and as Successor Corporation to Pittsburgh Plate Glass Co., a Pennsylvania corporation; RAPID-AMERICAN CORPORATION, a Delaware corporation; and RAYMARK INDUSTRIES, INC., as successor corporation to Raybestos-Manhattan, Inc., a Connecticut corporation; UNITED STATES GYPSUM CORPORATION, a foreign corporation.

4. The following Defendants are all WISCONSIN corporations or have their principal place of business in the State of Wisconsin: ALLIED INSULATION SUPPLY CO., INC.; BUILDING SERVICE INDUSTRIAL SALES CO., INC.; L & S INSULATION COMPANY, INC.; and SPRINKMANN SONS CORPORATION.

5.  Defendant ARMSTRONG WORLD INDUSTRIES, INC., liable to Plaintiffs individually and as successor in interest to the Armstrong Cork Co.

6.  Defendant CROWN CORK & SEAL CO. is liable to Plaintiffs as successor corporation to Mundet Cork Corporation.

7.  Defendant PPG INDUSTRIES, INC., is liable to Plaintiffs individually and as successor interest to Pittsburgh Plate Glass Co.

8.  Defendant RAPID-AMERICAN CORP. is liable to Plaintiffs as successor corporation to Philip Carey Manufacturing Co.

9.  RAYMARK CORPORATION is liable to plaintiffs as successor corporation to Raybestos-Manhattan, Inc.

10. Defendant SPRINKMANN SONS CORP. is liable to Plaintiffs in its own behalf and as successor corporation to Northwestern Insulation Co.


**FIRST CAUSE OF ACTION -- PRODUCTS LIABILITY -- NEGLIGENCE**

11. This cause of action applies to all defendants except METROPOLITAN LIFE INSURANCE CO.

12. Decedent during the course of his employment at various job sites, including job sites in Milwaukee County and in the State of Wisconsin, was exposed to asbestos dust or fibers emanating from the asbestos products which were sold, manufactured, distributed, packaged, installed or otherwise placed into the stream of commerce by Defendants.

13. Defendants, at all times relevant hereto, and for a long time prior thereto, were engaged in the manufacture or distribution of products containing asbestos; the products manufactured or distributed by Defendants, acting through their servants, employees, representatives, and agents, were placed on the market to be purchased and used by the public in Wisconsin and elsewhere, and resulted in substantial, not isolated, transactions in Wisconsin.

14. During Decedent's normal course of employment, and in the performance of his duties, Decedent was required to handle or be around others who handled large quantities of the asbestos products manufactured and distributed by the named Defendants.

15. At all relevant times, Decedent was ignorant of the dangerous nature of asbestos and of the nature of the risks incurred by workers working with or near said materials.

16. Decedent became aware of his asbestos-related condition and aware that said condition was caused by Defendants' wrongful conduct within three years before the filing of this action.

17. At all relevant times, it was reasonably foreseeable by Defendants that Decedent and other workers would be working with or in the proximity of Defendants' asbestos products.

18. At all relevant times, Defendants had a duty to exercise reasonable care for the safety of Decedent and others who worked with or were exposed to the Defendants' asbestos

products.

19.  Prior to, during and after the time Defendants manufactured, produced, processed, packaged, designed, distributed and/or shipped the asbestos products to which Decedent was exposed, each Defendant knew or in the exercise of ordinary or reasonable care ought to have known that exposure to their asbestos products caused disease and/or death and that Decedent and others did not know that asbestos products were dangerous or harmful.

20.  Notwithstanding the aforementioned duty, Defendants, and each of them, were negligent by one or more of the following acts or omissions:

    a.  Failed to adequately warn Decedent or others of the danger and harm to which he was exposed while handling Defendants' said asbestos products or to recommend or provide reasonably safe and sufficient wearing apparel and proper protective equipment and/or appliances or packaging to protect Decedent from being exposed to asbestos products,

    b.  Failed to *subsequently* warn Decedent or others of the danger and harm of the asbestos products after Defendants manufactured and distributed the products into the stream of commerce.

    c.  Failed to investigate or test for the health effects of their asbestos products prior to distribution and sale despite the fact that Defendants knew or reasonably should have known that such an investigation was necessary to prevent harm to individuals who had no way of knowing about the harmful effect of asbestos products,

    d.  Failed to instruct Decedent, his employers or others in the proper handling of asbestos products, and/or failed to adopt and enforce a

reasonably safe plan and method of handling and installing such asbestos products, and/or

e.   Manufactured, produced, processed, packaged, designed, distributed and/or shipped unsafe asbestos products.

21.   As a direct and proximate result of the negligent acts and/or omissions of Defendants, Decedent developed mesothelioma, which resulted in Decedent's death.

22.   As a direct and proximate result of the asbestos-caused diseases, Decedent incurred great and permanent physical pain and suffering, as well as severe emotional distress, and medical and hospital expenses.

23.   As a direct and proximate result of Decedent's condition, Plaintiff has suffered the loss of the society and companionship of her husband and has now suffered the wrongful and premature death of her husband.

24.   Defendants herein acted in accordance with a common scheme or plan:  Namely, Defendants acted in concert with each other to manufacture, distribute, and install asbestos products.

25.   Because of their concerted action, each of the Defendants are jointly and severally liable for all damages alleged and incurred by Decedent and Plaintiff in this action, pursuant to § 895.045(2), Wis. Stats.

26.   Defendants herein, their agents, servants and employees, acted maliciously, with willful and wanton disregard for the rights of Decedent and Plaintiff and otherwise engaged in

outrageous conduct toward Decedent and Plaintiff by failing
to warn and/or by producing, distributing and encouraging
the use of asbestos products which Defendants knew were
certain to cause grave personal injury and death.  Such
conduct entitles Plaintiff to recover punitive damages from
Defendants.

**SECOND CAUSE OF ACTION - PRODUCTS LIABILITY - STRICT LIABILITY**

27.   This cause of action applies to all defendants except
      METROPOLITAN LIFE INSURANCE CO.

28.   Plaintiff realleges paragraphs 1 through 15 as if fully set
      forth herein.

29.   Defendants' above-described asbestos products were mined,
      manufactured, developed, tested, marketed, packaged,
      labeled, sold and distributed so as to contain certain
      unreasonably dangerous defects at the time Defendants
      possessed, controlled and sold the products, in that they
      contained harmful and deleterious asbestos fibers known, or
      in the exercise of reasonable care would have been known, to
      Defendants herein, and each of them, as presenting dangers
      to the life and health of the ultimate users thereof and to
      persons in the position of Decedent.

30.   At all relevant times, Defendants herein, and each of them,
      placed their asbestos products on the market knowing that
      they would be used without inspection for such unreasonably
      dangerous defects and Defendants expected such asbestos

products to reach Decedent and other users and consumers without substantial change in the condition they were in when sold.

31. Decedent used and handled, or was otherwise exposed to, the Defendants' asbestos products in the condition in which they left the control of the Defendants and in a manner that was reasonably foreseeable and/or anticipated by Defendants herein.

32. Each Defendant sold, marketed, processed, distributed, installed and/or manufactured a product that was unreasonably dangerous in nature in that it contained asbestos, and in particular:

   a.   Was not accompanied by any type of warning and/or an inadequate warning notifying foreseeable users and others of the unreasonably dangerous nature of the asbestos products; and

   b.   Was not accompanied by safety equipment and/or information concerning measures to be taken to minimize the risk associated with the unreasonably dangerous asbestos products; and

   c.   Was improperly designed with the use of asbestos as opposed to non-asbestos substitutes.

33. As a direct and proximate result of the Decedent's exposure to the unreasonably dangerous and defective products designed, manufactured, sold, installed or distributed by Defendants as alleged herein, Decedent and Plaintiff have suffered and incurred the damages alleged in the First Cause of Action above, including Punitive damages for the reasons stated above, and are further entitled to collect said

damages from the defendants jointly and severally.

## COUNT THREE -- CONSPIRACY

### The Conspirators

34. This cause of action applies to Defendants A. P. GREEN, INC., ARMSTRONG WORLD INDUSTRIES, INC., ASBESTOS CLAIMS MANAGEMENT, INC., CROWN CORK & SEAL CO., GAF CORP., GARLOCK, INC., METROPOLITAN LIFE INSURANCE CO., OWENS CORNING FIBERGLAS CORP., PITTSBURGH CORNING CORP., PPG INDUSTRIES, INC., RAPID-AMERICAN CORP., RAYMARK CORP., and UNITED STATES GYPSUM CORP., hereinafter referred to as "civil conspiracy defendants."

35. Co-conspirators with whom the civil conspiracy defendants conspired include the following, together with other co-conspirators known and unknown to Plaintiff:

    GAF Ruberoid
    Owens Illinois
    Philip Carey
    Johns-Manville Corporation, now Manville Corporation
    Union Asbestos & Rubber Co., now Unarco Industries, Inc.
    United States Rubber Company
    Keasby & Mattison Company
    Turner & Newell, Ltd.
    Cape Asbestos Company Ltd., and its U.S. subsidiary, North American Asbestos Corp.

36. All of the civil conspiracy defendants and their co-conspirators were, during the time relevant to the allegations herein, in the business of manufacturing, distributing, and selling asbestos containing products, except Metropolitan Life Insurance Company.

37. All of the civil conspiracy defendants and their co-conspirators had actual knowledge, or through the exercise of

ordinary care should have known as early as the 1930s, that exposure to asbestos caused serious disease and death; that the risks and health hazards of asbestos were not widely known; and that the general public in the United States was ignorant of the hazardous properties of asbestos.

### The Conspiracy And Its Purpose

38.  The civil conspiracy defendants knowingly and wilfully combined, agreed, and conspired with each other, and with co-conspirators, by their specific actions stated below, and by others unknown to Plaintiff, for the purpose of accomplishing by concerted action, one or more of the following unlawful purposes:

   a.  Suppressing information about the health hazards of asbestos, including medical and scientific data, from those persons who would be exposed to the asbestos from the products made and sold by the conspirators, causing them to be and to remain ignorant of that information.

   b.  Affirmatively asserting, in a manner not warranted by the information possessed by the conspirators, claims that the conspirators knew were false, namely, that it was safe to work with and in close proximity to asbestos.

39.  The civil conspiracy defendants, together with their co-conspirators, agreed to concerted action for the above stated unlawful purposes both in communications directly between and among each other, and in communications between them through trade organizations to which various conspirators belonged and their committees, specifically the National Insulations Manufacturers Association ("NIMA") and Asbestos Textile Institution ("ATI"), by the specific actions set out below; by

tacitly ratifying and adopting actions of other conspirators; and by other actions unknown to the Plaintiff.

### Acts Done In Furtherance of the Conspiracy

40. One or more of the conspirators performed tortious acts in furtherance of the conspiracy, as set out in paragraphs below.

41. Each of the following conspirators, acting with actual or constructive knowledge of the health hazards of such exposure, sold asbestos products to which the Plaintiff was exposed, without giving any warning of the dangers of asbestos:

   Johns Manville Corporation
   Owens-Corning Corp.
   Pittsburgh Corning Corp.
   And others unknown

42. At a date unknown to Plaintiff, but substantially before September 25, 1935, Raybestos-Manhatten, Inc., Johns-Manville Corp., and other conspirators unknown to Plaintiff, obtained an agreement from the editors of ASBESTOS, the only trade magazine devoted exclusively to asbestos, that the magazine would never publish articles on the fact that exposure to asbestos caused a potentially fatal disease, asbestosis.

43. In approximately December 1934, Metropolitan Life Insurance Company, Johns-Manville Corporation, Raybestos-Manhatten, Inc., and other conspirators known and unknown to Plaintiff, edited and altered the reports and drafts of publications prepared by a medical researcher, Dr. Anthony J. Lanza, in order to intentionally misrepresent and suppress competent medical evidence as to the dangers of asbestos, by making and

agreeing to changes in the draft of Lanza's publication, in order to cause Plaintiff and others to remain ignorant of the dangers of asbestos.

44. In approximately November, 1936, Johns-Manville Corporation and Raybestos-Manhatten, Inc., together with other conspirators known and unknown to Plaintiff, engaged The Saranac Laboratory of Saranac Lake, New York, a prestigious lung research institute, to conduct medical research on asbestos dust and the causes and effects of asbestosis, with the proviso that the results of the studies would become the "property" of the conspirators funding the studies, and that the results of the study would be "submitted for approval" of the conspirators, who retained control of their publication.

45. In approximately February and March 1943, Johns-Manville Corporation, Keasbey & Mattison Company, and other conspirators unknown to Plaintiff, exercised their prerogative to control of the publication rights of the medical research of The Saranac Laboratory. They did so by omitting references to "observations [that] are suggestive but not conclusive evidence of a cancer stimulating action by asbestos dust" from an Outline of Proposed Monograph on Asbestosis submitted to them by Dr. Leroy U. Gardner, Director of The Saranac Laboratory.

46. After the death of Dr. Leroy U. Gardner of The Saranac Laboratory, in late 1946, the conspirators, including

Metropolitan Life Insurance Company, Johns-Manville Corporation, and others known and unknown to Plaintiff, arranged for the publication of the results of his medical research on asbestos. They exercised their right of control of publication by omitting "all references to cancer or tumors" while at the same time representing the finished article to be "a complete survey of the entire experimental investigation" by Dr. Gardner. The article was published in January 1951 in the American Medical Association's Archives of Industrial Hygiene and Occupational Medicine, with all references to cancer and tumors omitted.

47. On approximately October 22, 1948, Vandiver Brown of the Johns-Manville Corporation distributed copies of the original draft of the article, while still containing its references to cancer and tumors to other conspirators for their review, with instructions not to further distribute or publicize them; on approximately November 11 or 12, 1948, he also collected them from all conspirators who had received them for review, for the purpose of keeping them secret and suppressing them. All conspirators agreed to, and did return their copies of the draft article to Brown for purposes of suppressing and keeping secret the results of the medical research disclosed therein.

48. On or about November 11, 1948, Dr. Anthony J. Lanza on behalf of Metropolitan Life Insurance Company; Vandiver Brown of Johns-Manville Corporation; and other conspirators, known and

unknown to Plaintiff, met in New York at the Johns-Manville offices and unanimously agreed "that the reference to cancer and tumors should be deleted" from the draft of the article reporting the results of Dr. Leroy U. Gardner's medical studies before permitting its publication.

49. The Saranac Laboratory, on about November 16, 1948 informed U.E. Bowes, the Director of Research at Owens Illinois, who was also a member of the Board of Directors of Owens Corning Fiberglas, that Owens Illinois' asbestos product, Kaylo, "is capable of producing asbestosis." The Saranac Laboratory also warned Owens Illinois on February 7, 1952 that "every precaution should be taken to protect workers against inhaling the dust" from Kaylo. Thereafter, Owens Illinois, with actual knowledge of the risks associated with its asbestos product, fraudulently misrepresented that it was safe to work with and in close proximity to them, by publishing a product brochure in 1952 which stated that Kaylo was "non-toxic," thereby causing workers to suffer asbestos-related injuries.

50. The Saranac Laboratory wrote, on February 6, 1956, to Owens Corning Fiberglas in response to its request for a letter incorporating "favorable statements" on fiberglas which it could show to customers or unions, by sending a letter which stated, among other things, that "asbestos is fairly well incriminated as a carcinogen." Owens Corning Corporation suppressed the information, and, with actual or constructive

knowledge of the risks associated with asbestos products, fraudulently misrepresented that it was safe to work with and in close proximity to them, by publishing product brochures in June 1956, and in September 1959, which stated that Kaylo, an asbestos product, was "non-toxic," thereby causing workers to suffer asbestos-related injuries.

51. On May 9, 1957 Harold Boeschenstein, President of Owens Corning Fiberglas, received notice of claims that eleven members of the Asbestos Workers Union, who installed asbestos containing insulation products, had died of asbestosis and silicosis in 1957; thereafter, on about April 30, 1958, Owens Corning Fiberglas purchased the Kaylo plant and the Kaylo product line from Owens Illinois, and, with actual or constructive knowledge of the dangers of asbestos containing insulation products, began manufacturing and distributing asbestos containing Kaylo insulation products, which it had previously distributed for Owens Illinois, thereby causing workers to suffer asbestos-related injuries.

52. In 1966, John Vyverberg of Owens Corning Fiberglas, Cliff Sheckler of Johns-Manville Corporation, and Dr. Lee Grant of PPG Industries, Inc. wrote a brochure about asbestos insulation products that they distributed to users of asbestos insulation products through the conspirators' trade association, the National Insulation Manufacturers Association, with full knowledge of the hazards of asbestos

and the diseases it caused, without placing any warning in the brochure to the users of such products about the diseases which they could incur, thereby causing workers to suffer asbestos-related injuries.

53.   In September, 1967 Owens Corning Fiberglas suppressed portions of a report to Dr. J. O. Everhart, Department of Ceramic Engineering, Ohio State University, prepared by William Robertson, a student working for Owens Corning Fiberglas, by removing the portions containing a discussion of "cancer and asbestos fibers," on the grounds that such information was "proprietary" to Owens Corning Fiberglas.

54.   On or about January 22, 1971, Owens Corning Fiberglas deleted paragraphs concerning lung cancer caused by asbestos from a draft of a pamphlet entitled An Education Program For Employees Exposed to Airborne Asbestos Fiber drafted by its medical director, Dr. Jon L. Konzen, for distribution to employees, for the purpose of suppressing from such employees knowledge which Owens Corning Fiberglas possessed about the causal connection between asbestos and lung cancer.

55.   On or about March 21, 1972, Owens Corning Fiberglas caused the deletion of the words "You should always wear an approved respirator for asbestos dust" from the draft of a safety booklet issued by the National Insulation Contractors Association for distribution to workers installing asbestos containing insulation, thereby causing workers to suffer

asbestos-related injuries.

56.   On or about February 14, 1968, Owens Corning Fiberglas filed fraudulent answers to interrogatories specifically denying that prolonged use of its insulation materials could cause asbestosis; and claiming that it had no information or belief that prolonged use of its products causes asbestosis; both of which answers it knew were false, because its Medical Director, Dr. Jon Konzen, had reviewed the interrogatories and had informed Owens Corning's legal counsel on February 9, 1968 that the condition was well known and well documented during the relevant time period. Owens Corning's answers were held to be "a fraud upon the . . . court" because "the answer contained a statement which Owens-Corning knew was patently false." Owens Corning Fiberglas Corp. V. Watson, 243 Va. 128, 413 S.E.2d 630, 639 (1992).

57.   On June 6, 1963, at a meeting of the Air Hygiene and Manufacturing Committee of the Asbestos Textile Institute, various conspirators were informed that Dr. Irving Selikoff would be reading a research paper at the American Medical Association showing a "very large incidence of lung cancer over normal expectancy" in asbestos insulation applicators. On June 4, 1964 at a meeting of the same committee, various conspirators were informed of the conference to be held by Dr. Irving Selikoff on the Biological Effects of Asbestosis on October 19-21, 1964 at the New York Academy of Sciences, a

prominent national scientific organization; they also monitored a medical research paper given by Dr. Selikoff at the American Industrial Hygiene Association titled "Asbestos Exposure and Neoplasia" [tumors] based on a study of asbestos workers. At a meeting of the same committee on October 8, 1964, various conspirators agreed to attend Dr. Selikoff's conference because he would link asbestos with cancer, and because of concern for news releases expected to be released by Dr. Selikoff on the link between asbestos and cancer. On October 19 through 21, 1964, various conspirators, including Edward Schuman for Johns-Manville and Robert Cryor for North American Asbestos Company, attended Dr. Selikoff's conference on the Biological Effects of Asbestos, and, together with other conspirators unknown to Plaintiff, prevented and suppressed the release of three press releases reporting the findings by prominent medical researchers presented at the conference, which linked asbestos and cancer.

58. At an April 12, 1966 meeting attended by Johns-Manville Corporation, Owens Fiberglas Corporation, PPG Industries, Inc. and other conspirators, the National Insulation Manufacturers Association and its members agreed to establish a "Health and Safety Committee" in order to "combat adverse opinions with respect to the health and safety aspects of thermal insulation (asbestos and mineral fiber)." The "reactivation" of this committee was further discussed by representatives of PPG

Industries, Inc., Owens Corning Fiberglas, and Johns-Manville on April 12, 1966 at a meeting at the Industrial Hygiene Foundation, and its establishment was communicated by PPG Industries, Inc. to the president of Pittsburgh Corning Corporation on April 23, 1966.

59. On or about May 29, 1968, the National Insulation Manufacturer's Association, by Clifford Sheckler of Johns-Manville Corporation and John Vyverberg of Owens Corning Fiberglas, at a meeting attended by Roy E. Fuhs of Pittsburgh Corning Corporation, discussed the "the health hazards imposed on workers through the use of asbestos in high temperature insulation," and "what NIMA is doing to counteract some very adverse activity at the present time."

60. On or about January 8, 1963, Pittsburgh Corning Corporation, with actual or constructive knowledge of the risks associated with its asbestos products, fraudulently misrepresented that it was safe to work with and in close proximity to them, by falsely representing that "with UNIBESTOS there are no hazardous chemicals in the dust from cutting," thereby causing workers to suffer asbestos related injuries.

61. On or about August 15, 1966, Dr. Lee Grant, medical director of PPG Industries, Inc, wrote a letter to Bath Iron Works of Bath, Maine, regarding "the health experience of our Pittsburgh Corning employees in the manufacture of UNIBESTOS." In it he fraudulently misrepresented that it was safe to work

with and in close proximity to the asbestos product, by representing that "our product contains amosite asbestos which has thus far not been incriminated as a produce of asbestosis." This representation was false in that it was well known by then, including to Dr. Grant, that all types of asbestos, including amosite, would produce asbestosis.

62. In 1971, after a NIOSH inspection of Pittsburgh Corning's Port Allegheny plant for the manufacture of asbestos insulation found the plant in violation, Mr. Robert Winter, assistant to the president of Pittsburgh Corning, visited the plant, and, after inspecting all plant records pertaining to Unibestos, destroyed certain of those records, and removed certain others.

### The Agreement and Participation in the Conspiracy By the Conspiracy Defendants and Their Co-Conspirators

63. In 1929 the Metropolitan Life Insurance Company was approached by "officials representing the asbestos industry in the United States," who are unknown to Plaintiffs, but believed to include agents of Johns-Manville Corporation and the Raybestos-Manhatten, Inc. and others unknown to Plaintiff, for purposes of learning whether asbestos was an occupational hazard in their manufacturing establishments.

64. Vandiver Brown of Johns-Manville Corp.; George S. Hobart, believed by Plaintiff to have been an outside attorney for Johns-Manville Corp.; M.F. Judd of Raybestos-Manhatten, Inc.; and Dr. Anthony J. Lanza of Metropolitan Life Insurance

Company communicated with each other regarding proposed changes to a draft of a medical publication written by Dr. Lanza, by letters and telephone conversations between them on or about December 10, 1934, December 15, 1934, December 18, 1934, December 21, 1934, and December 24, 1934.

65. On or about November 19, 1936 Vandiver Brown of Johns-Manville Corp. and Sumner Simpson of Raybestos-Manhatten, Inc., together with other conspirators unknown to Plaintiff, met and agreed to engage The Saranac Laboratory to do medical research on asbestos and asbestosis which they would fund and whose publication they would control. "A few days" earlier Vandiver Brown had met with Dr. Anthony J. Lanza of Metropolitan Life Insurance Company and others known and unknown to Plaintiff for the same purpose.

66. On May 3 and May 4, 1939, and on May 1, 1940, Vandiver Brown of Johns-Manville Corp. and Sumner Simpson of Raybestos-Manhatten, Inc. wrote to each other expressing their agreement that certain publications of the Director of The Saranac Laboratory were in violation of the conspirators' right of control of publication of the results of the study of asbestos and asbestosis funded by them.

67. On March 8, 1943, Ernest Muehleck of Keasbey & Mattison Co. communicated by letter with W.W.F. Shepherd of Turner & Newell, Ltd., about removing "reference to the question of cancer susceptibility" from the Outline of Proposed Monograph

on Asbestosis of Dr. Leroy U. Gardner of The Saranac Laboratory, in exercise of the conspirators' right of control of the publication of the results of the study.

68. Correspondence was written by and among the conspirators for the purpose of securing agreement to the removal of all reference to cancer and tumors from the posthumously published article on Dr. Gardner's medical studies, including letters of Vandiver Brown on October 22, and October 27, 1948; and correspondence was written reflecting the agreement, including a letter of Vandiver Brown on November 12, 1948, and a letter on December 14, 1948 from Dr. Lanza to The Saranac Laboratory dictating the changes required by the conspirators in the proposed article.

69. On about October 27, 1948 Vandiver Brown requested in a letter that all conspirators return to him their copies of the original draft of the article, with its references to cancer and tumors, for the purpose of preventing their further dissemination, and on or about November 11, 1948 the conspirators in fact returned their copies of the draft article to Brown for the purpose of suppressing the results of the medical research disclosed therein.

70. In the 1940s Harold Boeschenstein, President of Owens Corning Fiberglas, was on the Board of Directors of Owens Illinois, and U.E. Bowes, Director of Research of Owens Illinois, was on the Board of Directors of Owens Corning Fiberglas.

71. In 1941 and 1942 Owens Corning Fiberglas assembled a 600 page file of medical literature on asbestosis as a "weapon-in-reserve" to be used to expose the dangers of asbestos to workers who used asbestos products, but, by 1943, had reversed itself  as a result of its decision to begin manufacturing asbestos textile products, and did not disclose to the workers the information it had learned about the hazards of asbestos.

72. As part of Owens Corning's assembly of its file of medical literature on the health hazards of asbestos, in approximately early September, 1941 Willis G. Hazard of Owens Illinois gave copies of articles on asbestos and its hazards to Edward C. Ames, assistant to the president of Owens Corning Fiberglas.

73. On or about April 1, 1953 Owens Illinois entered into a distributorship agreement with Owens Corning Fiberglas for the distribution of Kaylo, an asbestos containing product manufactured by Owens Illinois, and Owens Corning Fiberglas began selling Kaylo as a distributor for Owens Illinois.

74. In the mid 1950s, including approximately 1955 through 1957, Owens Illinois and Owens Corning Fiberglas retained the services of the same public relations consultant, Ira Brought & Associates, of Toledo, Ohio, in connection with asbestos related publicity matters.

75. In the early 1960s, and before June 24, 1963, Owens Corning Fiberglas and Owens Illinois agreed to the use of Owens Illinois' personnel by Owens Corning Fiberglas in evaluating

the health hazards of Kaylo dust.

76.   During the period in which Owens Corning Fiberglas manufactured asbestos products, the exact time being unknown to Plaintiff, it purchased raw asbestos from co-conspirator Johns-Manville Corporation for incorporation into Owens Corning Fiberglas' asbestos products; and from approximately 1958 to 1960 Owens Corning Fiberglas had a rebranding agreement with co-conspirator Johns-Manville under which Owens Corning sold Kaylo which was manufactured for it by Johns-Manville, and re-labeled for Owens Corning as an Owens Corning Fiberglas product.

77.   On approximately November 29, 1965, F.H. Edwards of Owens Corning Fiberglas met with the medical directors of Johns-Manville Corporation, Dr. Kenneth Smith, and the medical director of PPG Industries, Dr. Lee Grant, for the purpose of "preventing Dr. [Irving] Selikoff from creating problems and affecting sales." Dr. Selikoff was a prominent medical researcher at Mount Sinai Hospital in New York City who had published an article in the Journal of the American Medical Association linking asbestos insulation products to a high incidence of cancer among workers using them.

78.   On February 23, 1968 Carl Staelin, a member of the legal department of Owens Corning Fiberglas; Richard Shannon, the head of its Research and Development Department; and other Owens Corning employees met with the Vice President and with

the Director of Research and Development and other employees of Johns-Manville and discussed, among other things, the health hazards of amosite asbestos and chrysotile asbestos.

79. In 1978 Dr. John Konzen of Owens Corning Fiberglas, together with Owens Corning Fiberglas Vice President Louis Saxby and others contacted representatives of Johns-Manville, Owens Illinois, and other conspirators, for purposes of making a coordinated response to a statement by U.S. Secretary of Health, Education, and Welfare about the health effects of asbestos.

80. Garlock, Inc., along with various co-conspirators, was a member of a trade association known as the Asbestos Textile Institute at various times, including from 1946 to 1948, and from November 1965 to at least 1977; at other times, Garlock was a guest participant in Asbestos Textile Institute proceedings, including in March 1956 and in October 1965.

81. At the general meeting of the Asbestos Textile Institute of April 7, 1949, co-conspirators, including Johns-Manville and Raybestos Manhattan, agreed to confer with Dr. Anthony J. Lanza, of co-conspirator Metropolitan Life Insurance Company, for the purpose of formulating a joint effort to rebut the incrimination of asbestos as a carcinogen contained in the Scientific American of January 1949.

82. At the meeting of the Air Hygiene Committee of the Asbestos Textile Institute on March 11, 1953, Dr. Kenneth W. Smith,

medical director of co-conspirator Johns-Manville met with representatives of other co-conspirators for the purpose of arranging the "accumulation and exchange of disease experience" of the conspirators who were members of the Asbestos Textile Institute; and for the purpose of discussing the results of the medical research on asbestos conducted by The Saranac Laboratory.

83. At the meeting of the Air Hygiene Committee of the Asbestos Textile Institute on March 10, 1954, and at the general meeting of the Asbestos Textile Institute on March 11, 1954, various co-conspirators agreed to coordinate responses to "those making inquiry concerning the health and hygiene aspects of asbestos fiber exposure."

84. At the meetings of the Air Hygiene Committee and of the Board of Governors of the Asbestos Textile Institute on October 6, 1954, and at the general meeting of the Asbestos Textile Institute on October 7, 1954, various co-conspirators agreed to gather and share information on fatalities caused by asbestos exposure, and to share the results of autopsy studies of such cases conducted by The Saranac Laboratory.

85. At the general meeting of the Asbestos Textile Institute on June 9, 1955, various co-conspirators reversed their previous decision, and agreed not to have The Saranac Laboratory conduct autopsy studies of fatalities cause by asbestos exposure, in order to avoid the implication that a

relationship   existed between asbestosis and carcinogenic development.

86.  At the meetings of the Air Hygiene Committee and the Board of Governors of the Asbestos Textile Institute on March 7, 1956, George E. Houghton of Garlock Packing Company (now known as Garlock, Inc.; Dr. Kenneth Smith, Medical Director of Johns-Manville; and various other conspirators met and discussed the relationship of asbestos and cancer, and agreed to a preliminary fact-finding study on the relationship of asbestosis and cancer.

87.  At the meeting of the Air Hygiene Committee of the Asbestos Textile Institute on June 4, 1956, various conspirators met for the purpose of discussing the relationship between asbestos and cancer and agreed to the importance of establishing a program of medical research by the Industrial Hygiene Foundation into the relationship between asbestos and cancer; at the same time the conspirators agreed not to support or fund the medical research of Dr. Kenneth M. Lynch of the Medical College of South Carolina on the relationship of asbestosis and cancer of the lung.

88.  At the meeting of the Air Hygiene Committee of the Asbestos Textile Institute on March 7, 1957 various conspirators met and agreed to reject a program of medical research by the Industrial Hygiene Foundation into the relationship between asbestos and cancer, in order to avoid stirring up "a hornet's

nest" and "put the whole industry under suspicion."

89.   Between October 8, 1964 and October 19, 1964, Dr. Kenneth
      Smith of Johns-Manville and Stanton J. Peele of U.S. Rubber
      Company contacted various conspirators for the purpose of
      coordinating their response to Dr. Selikoff's disclosure of
      the link between asbestos and cancer.

90.   On February 11, 1965 at a meeting of the board of governors of
      the Asbestos Textile Institute, J.A. Brown, Jr., of Raybestos-
      Manhatten, Inc; W.S. Hough and E.A. Schuman of Johns-Manville
      Corporation; and S.J. Peele, Jr. of United States Rubbert
      Company agreed to a coordinated response to the adverse
      publicity resulting to "the entire asbestos industry" from Dr.
      Selikoff's conference on the Biological Effects of Asbestos at
      the New York Academy of Sciences, and agreed to "standardized
      answers to questions regarding the alleged adverse effects of
      asbestos to those who handle or fabricate the products."

91.   On May 28, 1969 M.Q. Snowcroft of Raybestos-Manhatten, Inc.
      wrote a letter to Johns-Manville, and sent a copy to all
      members of the Asbestos Textile Institute's Board of
      Governors, requesting coordinated action for the purpose of
      "discouraging a development program on substitutes for
      asbestos in shipboard insulation."

92.   At a meeting of the Asbestos Textile Institute on June 12,
      1970, Garlock, Inc., Raybestos-Manhatten, Inc., and other
      conspirators discussed booklets that the Asbestos Textile

Institute contemplated publishing about asbestos.

93.  At a meeting of the Asbestos Textile Institute on October 8, 1971 various conspirators discussed publication of booklets about asbestos and potential problems arising for them from new OSHA safety requirements pertaining to asbestos.

94.  On March 14, 1972, Alex Kazmuk of Garlock, Inc., and as a member of, and on behalf of, the Board of Governors of the Asbestos Textile Institute, opposed the lowering of the recommended asbestos exposure limits proposed by the National Institute of Occupational Safety and Health and the Asbestos Advisory Committee, despite knowledge of the conspirators of the hazards of asbestos.

95.  On August 10, 1967, at a meeting of the Occupational Health & Safety Committee of the National Insulation Manufacturers Association, Dr. Lee Grant of PPG Industries, Inc.; J. Vyberberg of Owens Corning Fiberglas; and Francis H. Edwards of Owens Corning Fiberglas Corporation were informed by University of California medical researcher Dr. W.C. Cooper that his study showed that about 25% of asbestos workers were contracting asbestosis after exposure to asbestos below the then allowable limits, and that they were contracting bronchiogenic carcinoma at a rate of three times expected, and that their cancers included cases of mesothelioma, all raising doubts about the validity of the prevailing exposure limitations for asbestos.

96.  On October 10, 1967, at a meeting of the Occupational Health
     & Safety Committee of the National Insulation Manufacturers
     Association, Dr. Lee Grant of PPG Industries, Inc.; Clifford
     Sheckler of Johns-Manville Corporation; and Francis H. Edwards
     of Owens Corning Fiberglas Corporation discussed "bad press in
     New Jersey in regard to the relationship of asbestos exposure
     and mesothelioma."

97.  Pittsburgh Corning was a member of the National Insulation
     Manufacturers Association (NIMA) from at least 1960 through
     1965. On or about May 29, 1968, Roy E. Fuhs of Pittsburgh
     Corning recommended "very strongly" to his superior that
     Pittsburgh Corning re-join NIMA because "the problem of health
     hazards amongst asbestos workers is rapidly becoming critical
     (30% of current asbestos workers have pulmonary problems) and
     . . . a strong united front is necessary to preserve this
     industry" and because "NIMA is doing an excellent job . . .
     and through research and discreet publicity are probably our
     best hope of combating this very serious situation." Fuhs
     further stated that "it appears that the only defense is a
     strong united front . . . ." Pittsburgh Corning re-joined NIMA
     and remained a member through at least 1972.

98.  Johns-Manville was at all times relevant hereto a member of
     the National Insulation Manufacturers Association and the
     Asbestos Textile Institute.

99.  Raybestos-Manhattan, Inc. was at all times relevant hereto a

member of the Asbestos Textile Institute.

100. PPG Industries, Inc. was at all times relevant hereto a member of the National Insulation Manufacturers Association.

101. PPG Industries, Inc. was, in the 1960s, a partial owner of Pittsburgh Corning Corporation, and its medical director, Dr. Lee Grant, at all times throughout the 1960s, consulted with Pittsburgh Corning's management about the health hazards of asbestos. In addition, PPG Industries, Inc.'s industrial hygiene engineer, a Mr. DeStefano, advised Pittsburgh Corning on health matters related to asbestos.

102. In July and August, 1963, PPG Industries, Inc., and Pittsburgh Corning Corporation caused a study to be done of the "asbestos dust hazard" at the Tyler, Texas plant of the Pittsburgh Corning Corporation which manufactured asbestos insulation.

103. On November 20, 1968 Dr. Lee Grant of PPG Industries, Inc. communicated by letter with Byrl Stout, Vice President of Pittsburgh Corning Corporation regarding the dust control system at the Port Allegheny plant of Pittsburgh Corning Corporation.

104. On September 16, 1971, management of PPG Industries, Inc., including medical director Dr. Lee Grant; and management of Pittsburgh Corning met with NIOSH officials at Pittsburgh Corning's Port Allegheny plant in connection with a request by Pittsburgh Corning for a variance exempting them from asbestos exposure limitations, and during a meeting with employee

representatives, Dr. Grant falsely represented that to Pittsburgh Corning's employees that it takes 20 years of asbestos exposure to develop asbestosis, and falsely minimized the hazards of asbestos.

### The Results of the Conspiracy--Proximate Cause

105. Plaintiffs relied upon the misrepresentations made by defendants, or by employees, agents or servants of the defendants, to the detriment of Plaintiffs.

106. The agreement of the conspirators and the acts done in furtherance of the agreement were the proximate causes of the injuries to plaintiff.

107. Plaintiff's injuries were proximately caused by Defendants' conspiratorial actions to further the conspiracy to deceive Plaintiff of the dangers of asbestos which substantiates this cause of action under Wisconsin common law. See Onderdonk v. Lamb, 79 Wis.2d 241, 146-47, 255 N.W.2d 507 (1977) (citing Hoffman v. Halden, 268 F.2d 280, 295 (9th Cir. 1959)).

108. As the result of these injuries, Plaintiff and Plaintiff/spouse have suffered and incurred the damages alleged in paragraphs 22 through 27 above, and are further entitled to Punitive damages for the reasons stated in paragraph 27.

### FOURTH CAUSE OF ACTION - DECLARATORY JUDGMENT

109. This cause of action applies to all defendants.

110. Plaintiff realleges the First and Second Causes of Action as though fully set forth herein.

111. Defendants' conduct alleged herein occurred many years before certain changes in the Wisconsin Statutes affecting the law of joint and several liability, as set forth in §§ 895.045(1) and 895.85, Wis. Stats., were enacted as part of so-called "tort reform" in 1995.

112. Retroactive application of  the 1995 legislation purporting to apply the new versions of §§ 895.045(1) and 895.85, Wis. Stats., to Defendants' tortious acts, which occurred many years before the effective date of such legislation, merely because this lawsuit was filed after the effective date of such legislation, would materially and adversely affect the interests of Plaintiff in this matter.

113. Retroactive application of the current versions of §895.045(1) and §895.85, Wis. Stats., to the facts of this case would be unreasonable and unconstitutional, in violation of Article I, § 10 and the Fifth and Fourteenth Amendments of the Constitution of the United States, and in violation of Article IV, § 17(2) of the Constitution of the State of Wisconsin, and contrary to the Supreme Court of Wisconsin's ruling in *Martin v. Richards,* 192 Wis. 2d 156 (1995).

114. §895.045(1) and §895.85, Wis. Stats., do not apply to the causes of action set forth in this complaint because

defendants acted in concert and conspired with one another as set forth in the first three causes of action.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

1.  Judgment against Defendants, jointly and severally, for compensatory and punitive damages in such amounts as the Court finds reasonable and necessary;

2.  Declaratory Judgment that §§ 895.045(1) and 895.85, Wis. Stats., as amended in 1995, are unconstitutional as applied to the facts of this case, and that said amended statutes do not apply to this case, or in the alternative, that Defendants' conduct constitutes concerted action so that the limitation on joint and several liability does not apply in this case;

3.  Such further legal and equitable relief as the Court may find reasonable and necessary to do justice in this case; all together with the costs and disbursements of this action.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by a jury of 12.

Dated this _____ day of _____, 199__.

Respectfully submitted,

CASCINO VAUGHAN LAW OFFICES, LTD.

BY: _____
Michael A. Pollack, Plaintiff's Attorney
Wisconsin Attorney #1004431


P.O. Address:

Cascino Vaughan Law Offices, Ltd.
633 W. Wisconsin Av., Suite 330
Milwaukee, WI.  53203
(414) 223-4777