```
 1              IN THE UNITED STATES DISTRICT COURT

 2

 3            FOR THE WESTERN DISTRICT OF WISCONSIN

 4

 5   _____

 6

 7   GARY SUOJA, Individually and as      )

 8   Special Administrator for the        )

 9   Estate of OSWALD F. SUOJA,           )

10   Deceased,                            )

11                                        ) No. 3:99-cv-00475-bbc

12                  Plaintiff,            )

13                                        )

14            vs.                         )

15                                        )

16   OWENS-ILLINOIS, INC.,                )

17                                        )

18                  Defendant.            )

19   _____

20

21        VIDEOTAPED DEPOSITION OF GARY E. SUOJA

22

23                  June 26, 2015

24

25                  Seattle, Washington
```

Gary E. Suoja

Page 2

## APPEARANCES

1
2

For the Plaintiff (via teleconference):

3      Robert G. McCoy, Esquire
4      Cascino Vaughan Law Offices
       220 South Ashland Avenue
5      Chicago, Illinois 60607
       312.944.0600
6      312.944.1870 Fax
       bmccoy@cvlo.com
7
8    For the Defendant:
       Joshua D. Lee, Esquire
9      Schiff Hardin, LLP
       233 South Wacker Drive
10     6600 Sears Tower
       Chicago, Illinois 60606
11     312.258.5500
       312.258.5600 Fax
12     jdlee@schiffhardin.com
13
     Also present: Dan Bassett, videographer
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

EXHIBIT INDEX (Continuing)

1
2    EXHIBIT NO.     DESCRIPTION          PAGE NO.
3    Exhibit No. 8    E-mail from Gary E. Suoja to    181
                        Bob G. McCoy dated 12/18/14.
4
     Exhibit No. 9    Special Administration -       191
5                       Order of Discharge; Special
                        Administration - Petition for
6                       Discharge; Notice of Summary
                        Procedures Deadline; Notice
7                       to Close Estate; Letters of
                        Special Administration;
8                       Special Administration -
                        Order Appointing Special
9                       Administrator; Special
                        Administration - Petition.
10
     Exhibit No. 9A   Special Administration -       193
11                      Petition for Discharge.
12   Exhibit No. 10   Order of Barbara B. Crabb,     196
                        District Judge.
13
     Exhibit No. 11   Collection of photograph       243
14                      copies.
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

EXAMINATION INDEX

1
2    EXAMINATION BY:              PAGE NO.
3    Mr. Lee              13
4    Mr. McCoy                    263
5
6           EXHIBIT INDEX
7    EXHIBIT NO.    DESCRIPTION        PAGE NO.
8    Exhibit No. 1    Owens-Illinois, Inc.'s       5
                        Amended Notice of Deposition
9                       of Gary Suoja.
10   Exhibit No. 2    Notice of Service,           66
                        Plaintiff's Responses to
11                      Owens-Illinois
                        Interrogatories 5-28-15,
12                      Plaintiff Response to
                        Owens-Illinois Requests for
13                      Production 5-28-15.
14   Exhibit No. 3    Plaintiff's First Response to   116
                        Standard Interrogatories -
15                      6/20/12.
16   Exhibit No. 4    Report Pursuant to           123
                        Administrative Order No. 12;
17                      physician's report from Alvin
                        J. Schonfeld, D.O.; surgical
18                      pathology report; routine
                        cytology; certificate of
19                      death; Settlement Report as
                        of 2/3/2010.
20
     Exhibit No. 4A   Settlement Report as of      124
21                      2/3/2010.
22   Exhibit No. 5    Declaration of Gary Suoja.   138
23   Exhibit No. 6    Declaration of Robert McCoy.  160
24   Exhibit No. 7    E-mail string with subject   176
                        "Viola & Suoja" dated
25                      12/18/14.

---

Page 5

1         BE IT REMEMBERED that on Friday,
2    June 26, 2015, at 2100 Alaskan Way, Seattle,
3    Washington, at 10:27 a.m., before JOHN M.S. BOTELHO,
4    Certified Court Reporter, appeared GARY E. SUOJA, the
5    witness herein;
6         WHEREUPON, the following
7    proceedings were had, to wit:
8         <<<<<< >>>>>>
9         (Exhibit No. 1 marked for
10        identification.)
11        THE VIDEOGRAPHER:  We are on
12   record.  My name is Dan Bassett.  I am the
13   videographer here today for Golkow Technologies.
14   Today's date is June 26, 2015.  Time now is 10:27
15   a.m.  This video deposition is being held in Seattle,
16   Washington, in the matter of Suoja vs.
17   Owens-Illinois, Incorporated, for the United States
18   District Court, Western District of Wisconsin.  The
19   deponent is Gary Suoja.
20       Counsel, please identify yourselves for the
21   record, and then our court reporter, John Botelho,
22   will swear in the witness.
23        MR. LEE:  This is Josh Lee on
24   behalf of Owens-Illinois.
25        MR. McCOY:  Bob McCoy for the

Gary E. Suoja

Page 6

1    plaintiffs.

2

3    GARY E. SUOJA,        having been first duly sworn

4           by the Certified Court

5           Reporter, deposed and

6           testified as follows:

7           MR. LEE:  Bob, I thought you had

8    something you wanted to put on the record.

9           MR. McCOY:  Okay.  Yes.  Today, if

10   there are objections concerning the attorney/client

11   privilege that are being made, there -- for the

12   purpose of the communications except those which

13   relate to the narrow issue of the enforcement of the

14   alleged agreement for settlement of $150,000, and as

15   to that issue as we've already stated in the filings,

16   that the privilege is waived and that can be the

17   subject of discovery.

18          MR. LEE:  Well, Bob, then I have a

19   question about that.  You have filed a motion for

20   protective order and have not produced several

21   documents related to the settlement.  Those

22   documents, as I understand it, are not here in the

23   room with us today.

24      Are you still asserting a privilege with regard

25   to those documents?

Page 7

1           MR. McCOY:  Well, yes.  As

2    explained in the motion.

3           MR. LEE:  Okay.

4           MR. McCOY:  The privilege as to --

5    as to the forces of those documents that would not

6    relate to the settlement part, that's still being

7    asserted.

8           MR. LEE:  But, Bob, you haven't

9    even produced redacted forms of those documents.  So

10   if the privilege is waived with regard to the non --

11   to the parts of it that aren't at issue, you still

12   have not produced documents that are relevant for the

13   purposes of this deposition today.

14      So now as I understand it, you're asserting

15   privilege that's not going to allow us to complete

16   this deposition today, and yet you're here admitting

17   that it's been waived.  So I don't see how we're

18   going to be able to complete the deposition today

19   until we get those documents.

20          MR. McCOY:  You know, let me talk

21   to Gary on this briefly.  If he can step out.

22          MR. LEE:  That's fine.  Let's go

23   ahead and go off the record.

24          MR. McCOY:  Call me on the cell

25   phone, Gary.

Page 8

1           THE WITNESS:  Okay.

2           THE VIDEOGRAPHER:  Going off

3    record.  The time now is 10:30 a.m.

4           (Pause in proceedings from

5           10:30 a.m. to 10:44 a.m.)

6

7           THE VIDEOGRAPHER:  Back on record.

8    Time now is 10:44 a.m.

9           MR. LEE:  Bob, there's something

10   you wanted to put on the record following our prior

11   discussion?

12          MR. McCOY:  Yes.  I'm sending now

13   the redacted copy of the e-mail from December 18th

14   that Gary Suoja sent to me, subject to the same

15   provisions about the attorney/client privilege that

16   I've already put on the record, that it's only for

17   the purpose of the limited waiver as to the

18   enforcement of the agreement.

19          MR. LEE:  And so, Bob -- sorry.

20   Was there something else that you wanted to add?

21          MR. McCOY:  No, I think that's all

22   I wanted to say.  You should be getting the e-mail in

23   a minute or two here.  I'm just about to hit the

24   "send" button.

25          MR. LEE:  Okay.  And so we

Page 9

1    discussed this slightly before, Bob.  I also wish to

2    put on the record that we are dismayed that we're

3    here.  I've come all the way to Seattle for this

4    deposition.  You have filed a motion for protective

5    order, asserting that the whole documents were

6    privileged.  You have not until this moment provided

7    us with any of the communications, the content, or

8    the actual communications, themselves, either in

9    whole or redacted.

10      You've asked for in camera review.  You've asked

11   for the documents not to be provided to us.  And

12   you've asserted that they're privileged in whole.

13   Now we get here today.  I do not have the documents.

14   We're prepared for a deposition, and you say that

15   you're going to provide them with a limited waiver.

16   Of course we'll get a redacted version which won't

17   tell us at all whether any of the portion that has

18   been redacted is relevant to this issue.

19      And we do not agree that the only communications

20   that are relevant here with regard to the settlement

21   issue are those communications that surround the

22   December 18th conversation.  You guys have put in and

23   you have -- as you know, Mr. Cascino agreed to a

24   settlement on behalf of the estate.  You have now

25   suggested that he did so without authority from the

Gary E. Suoja

Page 10

1  estate. And that puts at issue the whole issue of
2  how Mr. Cascino or Cascino Vaughan Law Offices gets
3  authority for the estate, whether they've ever had
4  authority from the estate, what conversations were
5  had about the authority, what conversations were had
6  about the settlement, and everything there has been
7  put at issue.
8    There can be no limited waiver when a party, on
9  their own behalf, voluntarily puts their attorney's
10  conduct at issue. That's exactly what we've got
11  here, and we do not agree to a limited waiver. So
12  regardless of any offer you make, I'm not agreeing
13  that we won't terminate at the end of this and still
14  come back to ask further questions. So I just want
15  to be sure we're clear on that.
16          MR. McCOY: Right. Well, your
17  comments are noted on the record. And if it's
18  necessary, we'll respond, you know, in a courtroom
19  motion or whatever. So --
20          MR. LEE: I agree, Bob. I just
21  want to make sure we're clear going forward. I'm
22  going to terminate at the end, because you're still
23  redacting portions of this and making your own
24  determination as to what's privileged after you and
25  Mr. Suoja and Mr. Cascino have put your conduct at

Page 11

1  issue. So --
2          MR. McCOY: Like I said, your
3  comments are noted for the record.
4          MR. LEE: Right.
5          MR. McCOY: If we need to deal with
6  them further in a courtroom filing, we would.
7          MR. LEE: And I just want to make
8  sure we're not going to see anything in a courtroom
9  filing that you and I had any agreement whatsoever
10  about what impact you producing these documents today
11  will have on our ability to seek further information
12  and come back for a second deposition if necessary.
13  Because we have no such agreement, correct?
14          MR. McCOY: I -- you know, I guess,
15  as you say, we don't have such agreement, then that
16  sounds all right with me. I mean, I -- like I said,
17  I -- subject -- you know, I'm going to reserve, until
18  a court filing, any comments I have with what you
19  said on the record here today.
20          MR. LEE: Well, I'm just making
21  clear, Bob. You and I have no agreement, and that's
22  your understanding, correct?
23          MR. McCOY: I have no understanding
24  one way or the other. You can go ahead with your
25  questions.

Page 12

1          MR. LEE: Okay. I have not entered
2  into an agreement with you on anything, have I, Bob?
3          MR. McCOY: Go ahead with your
4  questions.
5          MR. LEE: I just want to make sure
6  we're clear, Bob. Because I've had -- I don't want
7  to get stuck in a situation where you say later on
8  that we have an agreement on anything.
9          MR. McCOY: You have not, during this
10  deposition, entered into any additional agreements. No,
11  Josh, you have not.
12          MR. LEE: Okay. Thank you. With
13  that, we'll start. And once I get the documents,
14  I'll take a look at them. And if we can get them
15  printed off, we'll use them. If we can't get them
16  printed off, then we still may have to come back and
17  deal with it later.
18          THE WITNESS: Well, as I said,
19  it'll probably take me an hour, hour and a half, and
20  I can print them off and return them. You've got the
21  room until 5 p.m., I see. So...(Pause.)
22          MR. LEE: And I don't know if
23  taking an hour will still give us enough time. So
24  that's the --
25          THE WITNESS: Well --

Page 13

1          MR. LEE: -- issue here.
2          THE WITNESS: -- all right.
3          MR. LEE: So we'll do what we can
4  to work it out, Mr. Suoja. But we're put in a pretty
5  difficult situation here.
6
7
8          EXAMINATION
9  BY MR. LEE:
10  Q  So all right. Have you ever given a deposition
11    before?
12  A  Yes.
13  Q  When was the last time you were deposed?
14  A  I actually cannot remember. I took a deposition at
15    my divorce. That was in approximately 1995. I gave
16    a deposition in another party's divorce probably in
17    1978, '79. And I think there was another deposition,
18    but I -- very vague memories about it.
19  Q  You're a lawyer; is that right?
20  A  That's correct.
21  Q  Do you conduct depositions yourself?
22  A  Not for some time. I have in the past.
23  Q  You understand generally what the purpose of a
24    deposition is?
25  A  Yes, I do. Generally.

Gary E. Suoja

Page 14

1  Q  All right.
2  A  Here in Washington.
3  Q  You actually went to law school in the state of
4     Illinois, didn't you?
5  A  That's correct.
6  Q  Have you practiced law in any state other than
7     Washington?
8  A  No, I have not.
9  Q  You were licensed to practice in Illinois, were you
10    not?
11 A  I was licensed to practice in Illinois. I never did
12    practice in Illinois.
13 Q  You're still listed as an inactive member of the
14    Illinois Bar, are you not?
15 A  That's correct. I did that a large number of years
16    ago.
17 Q  And as an inactive member of the Illinois Bar, you're
18    also still covered by the Illinois Rules of
19    Professional Conduct, are you not?
20 A  I wouldn't know.
21 Q  You haven't kept up on your responsibilities under
22    the Illinois --
23 A  I haven't done anything in Illinois since I went
24    inactive.
25 Q  So you understand that you're under oath today,

Page 15

1     correct?
2  A  That's correct.
3  Q  You understand that oath is the same oath that you
4     would take as if you were testifying in court before
5     a judge and a jury?
6  A  That's correct.
7  Q  And you understand that that oath means that you will
8     tell the truth today, correct?
9  A  That is correct.
10 Q  And as part of that oath, you agree not to say
11    anything that you don't know to be true, correct?
12 A  That's correct.
13 Q  Okay. And as we go through today, you understand
14    that I'm going to ask you a series of questions,
15    correct?
16 A  I understand that you will be asking questions and I
17    will be answering them.
18 Q  All right. And it will be important for us that your
19    answers be verbal answers as opposed to guttural
20    answers like "uh-huh" or "huh-uh." Do you understand
21    that?
22 A  That's correct.
23 Q  And nodding your head or shaking your head won't
24    constitute an answer as well. Do you understand
25    that?

Page 16

1  A  Yes, I do.
2  Q  Okay. As you know how this goes, you're doing a
3     great job. Thank you for listening to my questions
4     before you give your answer. And I'll try and do the
5     same. I'll try and let you finish your answer before
6     I ask my next question. All right?
7  A  Okay.
8  Q  And if you need a break at any time, just let me
9     know. As long as there's not a question pending,
10    we'll go ahead and take the break then. If there is
11    a question pending, I'll ask that you finish your
12    complete answer before we take a break. Okay?
13 A  Well, I assume that that's what you will do. But
14    that's subject to Mr. McCoy's comments.
15 Q  Okay. Do you understand the legal rules that govern
16    depositions, including when you need to give an
17    answer, and that you can't confer with counsel while
18    there's an answer pending, for purposes other than to
19    establish a privilege?
20 A  I -- that I -- that I pretty much understand, yes.
21 Q  Okay. Can you please state your name for the record?
22 A  Gary Suoja, S-u-o-j-a.
23 Q  Who were your parents?
24 A  My parents were Oswald F. Suoja and Delores A. Suoja.
25 Q  What year were you born?

Page 17

1  A  I was born in 1944.
2  Q  And where were you born?
3  A  I was born in Superior, Wisconsin.
4  Q  Where did you grow up?
5  A  I grew up in many places. Raised for a while in
6     Superior, Wisconsin, and raised for a while in
7     Milwaukee, Wisconsin. I was in Green Bay, Wisconsin.
8     We were in Elma. We were near Fargo, North Dakota,
9     for a while. Of that, the majority of time that I
10    recall was generally in south Milwaukee, at a trailer
11    park there. And then I believe it was about the
12    start of third grade we moved to Rockford, Illinois.
13    And I finished high school in Rockford, Illinois.
14 Q  So how long were you in Superior?
15 A  I can't tell you exactly. We moved when I was quite
16    young. Probably -- since I started -- I did
17    kindergarten near Fargo, North Dakota. I started
18    kindergarten there. When we returned to Wisconsin, I
19    was still too young to get into first grade, so I had
20    to repeat kindergarten. So whatever that was. We
21    left Superior, I was four, four and a half, five,
22    something.
23 Q  So you would have left Superior sometime between
24    1948, 1950?
25 A  That's my guess. They didn't consult me, and we

Gary E. Suoja

Page 18

1    didn't hit a calendar when we left.
2  Q  I know.  I'm just trying to get a general sense.
3       And after you -- your family moved out of
4    Superior, did you move to Fargo?  Was that the next
5    place you moved?
6  A  I think -- I think so.  I think we were there until
7    about 1950 or 19 -- yeah, probably 1950.  '49, '50,
8    we were there.  And it was on the Minnesota side of
9    Fargo.  There's another town over there.  And we were
10   there for a year or more.
11 Q  Okay.  And after you lived in Fargo, where is the
12   next place you remember living?
13 A  The next place that I remember is Milwaukee.
14 Q  How long were you in Milwaukee?
15 A  We were there several times.  I think we moved to
16   Green Bay for about six months in 1951.  I started
17   first grade.  I did kindergarten at Burdick School in
18   south Milwaukee.  Then we moved to Green Bay, and I
19   did -- started first grade there in Green Bay.  And
20   we were in Green Bay for a minimum of six months.
21   And we were still in the small trailer at that point.
22   Then we moved back to Milwaukee, and we -- now we're
23   living high on the hog.  We had a 44-foot trailer.
24 Q  So you were in Green Bay for about six months.  You
25   moved back to Milwaukee.  How long did you stay in

Page 19

1    Milwaukee that time?
2  A  We stayed in Milwaukee, so I finished first grade,
3    second grade, and probably started third grade before
4    we moved to Rockford, Illinois.
5  Q  So you were only in Milwaukee a total of about three
6    years?
7  A  I would guess so.  Maybe a little longer.  Maybe a
8    little less.  I'm not absolutely certain on the
9    dates.  They weren't terribly important, but I kind
10   of considered Milwaukee my home at that point before
11   we moved to Rockford.
12 Q  So maybe three to five years, you were in Milwaukee?
13 A  Yeah, some -- somewhere like that.
14 Q  Okay.  And then you moved to Rockford.  How long did
15   your family live in Rockford?
16 A  From the time I started third grade.  So that would
17   probably be '53 or '54.  And they stayed there while
18   I was in -- some point while I was in law school, I
19   believe they moved.
20 Q  So --
21 A  Didn't tell me either.
22 Q  What year did you graduate law school?
23 A  I graduated from law school in 1969.
24 Q  So your family was in Rockford for about 16 years?
25 A  That would probably be a good guess.  14, 15, 16

Page 20

1    years, somewhere in there.
2  Q  Okay.  So, really, the majority of the time growing
3    up, you lived in Rockford; is that right?
4  A  That's -- that's correct.  Finished grade school and
5    finished high school in Rockford.
6  Q  Did you move out of your house when you finished high
7    school?
8  A  No.  I -- I would return for -- on holidays and on
9    vacation, and I would work in Rockford.
10 Q  While you were at college?
11 A  Yes.
12 Q  And did you return -- continue to return home on
13   holidays and vacations all the way through law
14   school?
15 A  No.  I was married in 1967.  And in the summer of
16   '68, we returned to Rockford because I had work
17   there.  But we lived separate from my parents.  We
18   had an apartment.  And then in '69, we stayed in
19   Champaign to study for the bar exam.  And then after
20   the bar exam and my draft physical, we returned to my
21   wife's family's home until I would get my draft
22   notice.
23 Q  Where was your wife's family from?
24 A  They lived in Wood River, Illinois.
25 Q  For folks who don't know, what part of Illinois is

Page 21

1    Wood River in?
2  A  Wood River is in the southwest portion, near St. Louis.
3  Q  You'd mentioned you were in Champaign.  Did you go to
4    law school at the University of Illinois?
5  A  I did.
6  Q  Did you do undergrad at the University of Illinois?
7  A  I finished my undergrad at the University of
8    Illinois.
9  Q  Where did you start your undergrad?
10 A  I started in -- at Villanova.
11 Q  And where is Villanova located?
12 A  Villanova is located in Villanova, Pennsylvania.
13 Q  Is there a reason why you switched from Villanova to
14   U of I?
15 A  Yes.
16 Q  Why is that?
17 A  They doubled their tuition.
18 Q  Seems like a good reason.
19 A  They would not increase my scholarship, and their
20   tuition went up to an amount that equaled what my dad
21   made annually.  So we knew there was no way that we
22   could possibly afford that without an increase in
23   tuition, so I transferred to University of Illinois.
24 Q  Okay.  What did you study in undergrad?
25 A  I was a math major at Villanova.  When I transferred

Gary E. Suoja

Page 22

1    to the University of Illinois, I transferred into
2    an -- they call it a James Scholar biology program.
3    It was really meant for people intending to go on in
4    the -- in the biological sciences.
5        The reality is, is that half of the group were
6    premed students. And I had a number of people that I
7    knew, including a close neighbor named Dick
8    Cappoliitti, who talked me into coming into the
9    program, and so I did, with a view towards eventually
10   going to medical school.
11 Q   At some point you switched your decision about
12   medical school; is that right?
13 A   I did. My senior year, as it came time to apply for
14   medical school, I -- I, frankly, had grown tired of
15   dealing with premed students. And I wanted to deal
16   with someone else, and I wanted to avoid the draft.
17   So I decided not to go to medical school. And
18   somebody said, If you go to law school, you can do
19   anything. And I could keep my student deferment. So
20   that was the direction that I went.
21 Q   So you entered law school at the University of
22   Illinois in what year?
23 A   That would have been '66, I believe.
24 Q   Graduated in 1969; is that right?
25 A   That's correct.

Page 23

1 Q   Did you have any specific area of focus while you
2    were in law school?
3 A   Not really. I tried -- I was very intrigued by trial
4    work. And that was about the time that schools
5    decided to start trying a trial advocacy program.
6    And I was very intrigued by that. But I didn't have
7    any special area of focus.
8 Q   Did you do any internships or clerkships while you
9    were in law school?
10 A   No, I did not.
11 Q   Did you work with any law firms while you were in law
12   school?
13 A   No, I did not.
14 Q   Where did you work in the summers during your law
15   school?
16 A   I generally had two jobs during the summers. I would
17   typically work construction, and I also had started
18   working at the Rockford Clutch Division of
19   Borg-Warner, working in the factory generally on
20   either a drill press or some other mechanical
21   equipment.
22 Q   After you graduated from law school, you talked about
23   going to get your draft physical; is that right?
24 A   That's correct.
25 Q   And then going to live with your wife's family in

Page 24

1    Wood River?
2 A   That's correct.
3 Q   And you said you were awaiting your draft notice.
4    Were you drafted into the military?
5 A   I received my draft notice while I was in the
6    reception station at Fort Leonard Wood, Missouri. I
7    signed up early, trying to achieve some benefit of
8    going in early. So I took my -- I studied for the
9    bar in the summer of 1969, took the bar exam at
10   Northwestern, something like the 10th, 11th, and
11   12th, and reported for my physical at the Halsted
12   Street station the following day.
13 Q   What branch of the military did you join?
14 A   The Army.
15 Q   How long were you in the Army?
16 A   I was in the Army from September of '69, and I
17   believe I was released in January of '74 and received
18   the discharge in '76, after six years of service.
19   But I was actually on active duty until '74.
20 Q   Were you honorably discharged?
21 A   Yes, I was.
22 Q   And did you serve in the JAG Corps?
23 A   Yes. I took basic training at Fort Leonard Wood,
24   Missouri. And after completion of basic training, I
25   had applied for a direct commission. And I passed

Page 25

1    the bar exam in November of 1969. So once I had
2    passed, I applied for a direct commission. And in
3    January 1 of 1970, or early January of '70, I
4    received a direct commission to captain in the JAG
5    Corps.
6 Q   Did you see any combat?
7 A   Did I see any combat? At home or Fort Leonard Wood
8    or what?
9 Q   Did you see any combat in the field?
10 A   In the field? I did end up in Vietnam. And I hate
11   to say this, but I don't know what you mean by
12   "combat." Was I actually shot?
13 Q   Were you a combat soldier?
14 A   No. I was a JAG officer the entire time.
15 Q   So you were a lawyer in the military?
16 A   I was a lawyer in the military.
17 Q   But you were in a combat zone? You were in Vietnam?
18 A   I was definitely in a combat zone. I was a bunker
19   commander when I was in the Central Highlands. I
20   would arrange for the arming of the Claymore mines
21   every night. We pulled guard duty. We supervised
22   guard duty. We worked six and a half days a week.
23   And while in the Central Highlands on Sunday
24   afternoons, we went to the firing range, preparing
25   for what appeared to be an imminent attack.

Gary E. Suoja

Page 26

1  Q  And I just -- I'm trying to figure out:  You're in
2     the JAG Corps?
3  A  Mm-hmm.
4  Q  Your primary duty is to act as a lawyer for the
5     military?
6  A  That's correct.
7  Q  But it sounds like you had additional duties as a
8     soldier; is that right?
9  A  Well, I guess what I could say is, it depended on
10    where you were.  When I was originally assigned to
11    Vietnam, my -- I was assigned to Military Region 2,
12    which is the Central Highlands.  I was stationed in
13    Nha Trang, which is where the command headquarters
14    was, which is generally what the JAG unit was
15    attached to.  During that time, we were on a beach in
16    what was considered a French resort town.  And so as
17    far as being in Vietnam, we were living the high
18    life.
19       Toward the end of October, which was after about
20    two and a half months or so in country, the command
21    transferred to Pleiku.  Pleiku was the opposite of
22    being a resort town.  And I was assigned to what was
23    called the MACV compound.  That compound was
24    stationed surrounding General Zhu's headquarters.
25    General Zhu was the ARVN or the -- or the Vietnamese

Page 27

1     Army's commanding general for the Central Highlands.
2     He had a reputation as a drug dealer and a very
3     roguish-type person.  He could have done well in
4     Chicago.  Let's put it that way.
5        So while we were at that MACV compound, when we
6     were in Nha Trang, the general -- come September,
7     there was a local holiday.  The general had to order
8     the JAG officers to draw weapons.  And we pooh-poohed
9     that.  And then we got a very direct order that we
10    were going to draw weapons, and so we did.  Put them
11    in our closets and left it at that, and even when
12    there were some sappers that blew up near us that we
13    didn't think too much about it.
14       Once we got to Pleiku, things changed a bit,
15    because now we were in an area where, you know,
16    rockets would come in on occasion.  We could be in
17    court and hear rockets, and everybody hit the floor
18    and we'd go off the record for a while.  And then
19    starting with February of '72, there started to be a
20    rather significant offensive that was coming down.
21    And I ended up having to go to the G2, and so I was
22    getting the reports from the field on what was
23    occurring.
24       And at that point, everything changed.  So not
25    only did we have weapons; we were practicing with

Page 28

1     them.  We were determining, much as people did in
2     basic training, who could fire and who could not.
3     Since this was a headquarters unit, you could see
4     that many of the headquarters types didn't know which
5     end of a rifle the rounds would come out.  And so we
6     very carefully selected who was capable of fighting,
7     if necessary, and who wasn't.  So --
8  Q  So you were in a combat zone?
9  A  There was no doubt that was -- all of Vietnam was a
10    combat zone.
11 Q  Okay.
12 A  Everybody could have been hit at any time.  We were
13    just in a very pointed combat zone at that point.
14 Q  All right.  So how long were you in Vietnam?
15 A  317 days in country.  321 days away from my family.
16 Q  Okay.  So you were in Vietnam for about a year?
17 A  A little less than a year, yes.
18 Q  And then where did you serve the rest of your
19    service?
20 A  I was at Fort Lewis both before and after Vietnam.
21 Q  So Fort Lewis here in Washington?
22 A  That's correct.
23 Q  So what division were you attached to?
24 A  There were a number of them.  While I was in Vietnam,
25    I was with the 4th Infantry Division --

Page 29

1  Q  Were you?
2  A  -- typically.
3  Q  My brother-in-law served with the 4th.
4  A  Oh.  Very interesting.
5  Q  And it was here at Fort Lewis.
6  A  Well, that's interesting.  Because I was -- I was at
7     Fort Lewis and in the JAG office through '73.
8  Q  Okay.  And so then in '74, '73 or '74, were you
9     stationed someplace else?
10 A  No.  I -- my four-year commitment was up.  So I ended
11    up finding a job.  And that was during a downturn in
12    the economy here in Washington.  So I was fortunate
13    to find a job position as an assistant attorney
14    general with the State of Washington.
15 Q  Before I move on to that, first of all, let me thank
16    you for your service, sir.
17 A  Thank you.
18 Q  So you get this job with the assistant -- as an
19    assistant attorney general here in the state of
20    Washington.  What type of work did you do with the
21    Attorney General's Office?
22 A  I was assigned to the Department of Transportation.
23    So I ended up in kind of an oddball position.  The
24    Department of Transportation, majority of the 23, 24
25    attorneys were assigned to working condemnation cases

Gary E. Suoja

Page 30

1   as they were finishing out the interstate highway
2   build-out. And I went into kind of an administrative
3   position where I did oddball things.
4       And my first assignment was to pick up the Adler
5   case, which was the Clean Air Act portion of an
6   environmental lawsuit on I-90, on the construction of
7   I-90. I helped trying to analyze the environmental
8   aspects of that suit because they were -- they were a
9   fairly new attack on highway construction.
10      I also revamped the State's water claims analysis
11  for what would we do -- you know, what is the basis
12  for a water claim and how do we cover that. So I
13  rewrote the bible for the State on that.
14      Then I also served as an alternate for the
15  Washington State Highway Commission at the time.
16  That was before the Department of Transportation came
17  on. And did other miscellaneous things. Wrote
18  legislation and so on.
19      Then in -- after about a year with the Attorney
20  General's Office, one of the other fellas in that
21  office moved on and went to a prosecutor's office up
22  at Jefferson County. And I took over his position.
23  In that position, I ended up being the attorney
24  assigned to the Washington State Ferries, Washington
25  Toll Bridge Authority, County Road Administration

Page 31

1   Board, handled personnel matters and did a number of
2   other things. A majority of my time was taken up by
3   the Washington State Ferries.
4  Q  How long did you work for the AG's office here in
5     Washington?
6  A  I worked there until 1977.
7  Q  After you left the AG's office in '77, what did you
8     next do for employment?
9  A  I went in-house with a firm called Forest Investment
10    Corporation. Forest Investment Corporation was a
11    firm that developed affordable housing using the USDA
12    515 Rural Rental Housing program.
13 Q  So it was a real-estate-related job?
14 A  It was real estate and development related. Build
15    affordable housing in rural areas.
16 Q  How long were you with Forest Investment?
17 A  I was with Forest Investment until 1980, when the
18    company pretty much collapsed. And then I went into
19    private practice. And my clients were typically
20    people who had worked at Forest Investment. And
21    I've -- other people that I had met there.
22      And also some of the people -- Forest Investment
23    was required to divest itself of certain projects,
24    and a number of people came in to buy those projects.
25    Those people were referred to me to do their legal

Page 32

1   work, and so I still work with two of them. I still
2   work with two or three of the other people that I met
3   out of that. And those have been -- through the
4   years, those have been some of my principal clients
5   through the years.
6       Another individual who became chief financial
7   officer for them, he was a mortgage banker that I had
8   met. And we were friends and stayed in contact. And
9   after about four years, one of his new firms he was
10  working with had a conflict with another attorney.
11  And they asked me to represent them. And so I did
12  commercial loan closings with them and with 1st
13  Nationwide Bank for some number of years.
14 Q  So in 1980, you went into private practice; is that
15    right?
16 A  That's correct.
17 Q  Sole proprietorship private practice?
18 A  Sole proprietor private practice.
19 Q  Okay. And you did real estate and commercial loan
20    work?
21 A  Yes. In addition, yes.
22 Q  Okay. And did you do any other type of work in your
23    private practice?
24 A  I did occasional condemnation work. I would have --
25    I would do other transactions for clients who had

Page 33

1   needs, things that I could handle and didn't refer on
2   to other attorneys.
3  Q  Okay. Have you been in private practice, solo
4     private practice since 1980?
5  A  No. I joined the firm of Goddard & Wetherall. That
6     was in about 1990. 1989, '90. It was in '90, '91,
7     or '92. And that was a small group of attorneys in
8     the same building that -- that I was in.
9  Q  While you were with Goddard & --
10 A  Goddard & Wetherall.
11 Q  -- Wetherall --
12 A  Yeah.
13 Q  -- did you do the same type of work?
14 A  Did the same type of work. We just -- we all
15    associated together. And that -- I was with Goddard &
16    Wetherall until about 1997.
17 Q  Okay. And --
18 A  And then I decided to go back out on my own.
19 Q  Okay. And since 1997, have you been in private
20    practice on your own?
21 A  Yes, I have.
22 Q  Okay. And since 1997, had you been doing this same
23    type of work, real estate, commercial transactions?
24 A  That's correct. I no longer do any commercial
25    transactions. That ended about 2001, 2002, with all

Gary E. Suoja

Page 34

1    the bank consolidations. And I -- I stopped doing
2    trial work about that same time.
3  Q  Okay. That's what I was going to go back and ask.
4    In your real estate practice, did you do trial work
5    related to real estate?
6  A  Yes, I did.
7  Q  Okay. Have you ever done any trust and estates work?
8  A  I -- I have. But usually I've associated other
9    counsel in those cases.
10 Q  When you say you've associated other counsel, have
11   you ever been responsible to a client in managing
12   their estate or the estate of someone who they were --
13 A  No.
14 Q  -- related to?
15 A  No.
16 Q  Okay. Have you ever done any trial work related to
17   someone's estate?
18 A  I don't -- don't believe so.
19 Q  Okay. Have you ever served as a trustee for
20   someone's estate?
21 A  Other than my dad's here.
22 Q  As a lawyer?
23 A  As a lawyer? No, other than, you know, talking to my
24   mother and -- about, you know, this matter. Other
25   than that -- I take that back. I am a -- I am a

Page 35

1    trustee right now on a trust for one of my long-term
2    clients who is now in failing health. And -- and
3    I've -- he just recently had -- his health had
4    failed, and I -- they realized that I was on -- he
5    was listing me as a trustee.
6      So for the interim, I'm there. But my
7    expectation is I will -- I will soon resign that once
8    I -- once the family gets everything stabilized.
9    They're still gathering assets and so on.
10 Q  I want to go back to our discussion earlier about the
11   time when you were in high school. You said you
12   worked summer jobs in Rockford.
13 A  Mm-hmm.
14 Q  Is that right?
15 A  Well, I -- I worked pretty much full-time during high
16   school.
17 Q  Okay. What type of jobs did you work during high
18   school?
19 A  I worked as a clerk in a grocery store, Zanocco
20   Brothers grocery store next to the grade school that
21   I attended. And I started out as, you know, just a
22   clerk in 19 -- 1957. And then aside from periods
23   that I played football, and school, I worked there
24   pretty much on a regular basis.
25 Q  You talked about doing some construction work in the

Page 36

1    summers when you were in college. Did you do any
2    construction work while you were in high school?
3  A  No. What I did in -- during the high school, I
4    wouldn't consider it a regular job. But I knew -- I
5    knew the people who had built our house, the
6    Lundbergs. And on occasion, they would need some
7    help and I would assist them as a laborer. But I
8    wouldn't consider it construction.
9      Later on, Lundberg and Kosleski had a firm going,
10   and they asked that I work with them. And so I
11   would -- I did that. And then shortly after that, I
12   found working at the factory, make more money. And
13   so I ended up generally working two jobs.
14 Q  So did I hear the name right, Lundberg and Kosiwoski
15   (phonetic)?
16 A  Kosleski.
17 Q  Kosleski. Lundberg and Kosleski, what type of
18   contracting business did they have?
19 A  They were -- they were small contractors. We did
20   everything from single-family homes, replacing roofs
21   on large barns. We did some additions. We did a
22   factory that was a small factory. It was probably
23   5,400 square feet. We -- we built it and did the
24   concrete work.
25     The Lundbergs were kind of famous. They did a

Page 37

1    lot of concrete work before -- while it was still
2    manual labor generally. They had just -- they were
3    just starting to use concrete-pumping trucks, and
4    they almost always failed. So I -- I was the nominee
5    to haul concrete in the wheelbarrows.
6  Q  All right. Done a little bit of that myself. It's a
7    hot job.
8  A  Very hot job.
9  Q  When you worked with Lundberg and Kosleski, was that
10   only -- I guess, there was a little bit of work that
11   you did during high school kind of as just a general
12   laborer?
13 A  Just a -- just a general laborer. Usually
14   short-term. They just needed some help or wanted
15   some pickup, and, you know, pretty -- pretty minimal-
16   type work.
17 Q  And then once you were in college, though, you did a
18   little bit more work with that; is that right?
19 A  I did -- I did quite a bit more work with them. And
20   as a matter of fact, one summer that's all that I did
21   is just the construction work. But the factory work
22   offered so much more. And then the construction work
23   was -- it would come and go. So working full-time at
24   the factory allowed more. And I would usually have
25   to work the swing shift, so I'd get up at 8:00 and go

Gary E. Suoja

Page 38

1  to work, work construction until 3 or 4 in the
2  afternoon, when I'd have go in for the swing shift in
3  the factory.
4  Q  Other than working at Lundberg and Kosleski, did you
5    have any other work in the construction industry?
6  A  No.
7  Q  We're here today to talk a little bit about a lawsuit
8    that's been filed on behalf of your father's estate;
9    is that right?
10  A  That's correct.
11  Q  Tell me about your dad.  What did he -- when was he
12    born?
13  A  My dad was born in January of 1923.
14  Q  When were your parents married?
15  A  They were married in October of 1943.
16  Q  Do you have any siblings?
17  A  Yes, I do.
18  Q  How many siblings do you have?
19  A  I have an older brother, Derald, who's now passed.
20  Q  Okay.
21  A  I have a younger sister, Suzanne, who is about two
22    years younger than I am.  And I have a much younger
23    sister, Kimberly.
24  Q  What year was Derald born?
25  A  I believe it was 1941.

Page 39

1  Q  And what year was Suzanne born?
2  A  I don't remember exactly.  She's just slightly more
3    than two years younger than me, so it was probably
4    '40 -- '46.  February of '46 would be my assumption.
5  Q  Sometime between '45 and '47, we'll say?
6  A  Well, she's a little more than two years younger, so
7    I was born at the tail end of '44.  So '45, '46.  So
8    it would have been, I guess, '47.  February '47.
9  Q  Okay.  And then Kimberly is...?
10  A  She, I think, was born in '57.
11  Q  Did your mother have a job while you were growing up?
12  A  She would -- she would work.  She worked as a -- as a
13    waitress when we were in Rockford.  She did that for
14    a while.  Actually, did that with relatives of the
15    Lundbergs.  Then she also worked in a small factory
16    in Rockford while I was going to college.  Actually,
17    a little bit before I went to college.  She -- while
18    I was in high school, she worked at that factory job.
19  Q  What type of factory job?
20  A  It was a -- it -- she ran a small little -- like, a
21    little punch press, you know.  So you'd run things
22    through it and punch things out.  But it wasn't -- it
23    wasn't a very large shop that she worked in.
24    Maybe -- maybe a thousand, 1,500 square feet at most.
25    And there were about maybe a dozen employees at most.

Page 40

1  Q  Do you know what they made at that factory?
2  A  I do not recall.
3  Q  You don't remember what the name of the factory was?
4  A  No.
5  Q  Before you all moved to Rockford, did your mother
6    have a job that you recall?
7  A  Not that I recall.  That doesn't mean she didn't have
8    one.  I just don't recall.
9  Q  Sure.  What did your dad do for a living?
10  A  As long as I knew my dad, he was an asbestos worker.
11    That's all he did.  He was a pipe coverer and -- his
12    entire life.
13  Q  When you say "asbestos worker," he was an insulator?
14  A  Well, they call themselves pipe coverers.  And that's
15    basically what they would do.  And if you want to
16    call them insulators, that's basically the work that
17    they did, was provide insulation on pipes and boilers
18    and where needed.
19  Q  You use the term "asbestos worker."  Was your dad a
20    member of the asbestos workers union?
21  A  I'm not certain what the name of the union was, but
22    he was a union member.
23  Q  How did you find out -- why did you use the term
24    "asbestos worker" when you described your dad's job?
25  A  Because that's -- that's what they call themselves.

Page 41

1    You know, early on, that's what I remember.  Pipe
2    coverer, asbestos worker.  I remember both of those.
3  Q  So your dad knew that he was working with asbestos?
4  A  Oh, yes.  Early on.
5  Q  You would have been about 14 in 1958; is that right?
6  A  I turned 14 in 1958.
7  Q  And have you ever worked as an insulator?
8  A  I -- I helped my dad a few times.
9  Q  How old were you?
10  A  Well, my recollection is, I helped my dad -- he --
11    once we moved to our house, I believe he insulated
12    the pipes, and that would have been -- we moved to
13    that house in 1957.
14  Q  That would have been in Rockford?
15  A  That would have been in Rockford.  It was either in
16    late '56 or early '57.  And it was one of the first
17    things he did, I believe, is insulated the pipes.
18    And then there was another occasion when he
19    was -- he was working on a job in January, and he was
20    having -- there was some big push on the job.  And --
21    and I went to help him out.  He just wanted some
22    help.  And it was at a hardboard factory.  And I
23    would have been probably in high school, is my -- my
24    guess.  Maybe a senior in high school or so.  So that
25    would have been in the early '60s.

Gary E. Suoja

1    And -- and it was where they -- they made
2  cardboard.  I want to say Weyerhaeuser, but I can't
3  be sure.  And it was January.  And they had these big
4  bay doors, you know, the 14-foot doors, real tall
5  ones.  And my dad was in covering the boiler.  And
6  the boiler was going.  And the warehouse, the
7  operation was going.
8    And he asked me to push along these, you know,
9  pipe covers, you know, the sort of open things, and
10  put them on these -- these lines, you know, just so
11  that it would be done and just save him some time.
12  So I was up on this high ladder, trying to push --
13  push these things on these copper pipes that were
14  around.
15  Q  So this was copper pipe that you were insulating?
16  A  It was -- it was copper pipe.  And I wasn't
17  insulating.  I was pushing these items on it, you
18  know, and climbing up and down from the ladder.  I
19  can remember very, very vividly thinking -- because
20  it was itchy and uncomfortable.  The door was mostly
21  open, and it was about zero outside.  So I was
22  thinking, Boy, I need to keep on going to school.
23  This is not what I want to do for a living.
24  Q  It's amazing how some of us become lawyers.
25  A  Mm-hmm.

1  Q  I had a similar experience.
2    So what you were insulating these copper pipes
3  with was fiberglass, right?
4  A  I have no idea what it was.
5  Q  Can you describe it for me?
6  A  Well, they were -- they were cloth-covered rounds
7  that, you know, the cloth would fold back and you
8  could hold them open.
9  Q  Kind of like a clamshell?
10  A  Yeah, like a -- somewhat like a clamshell.  It
11  didn't -- I don't recall it as being fiberglass, but
12  it might have been.  But I don't know.
13  Q  Made your skin itchy, though?
14  A  It did make my skin itchy.
15  Q  Okay.  Do you recall what the color of the material
16  was?
17  A  It was almost like a paper gray.
18  Q  Okay.
19  A  So I have no idea what it was.  And I just -- to me,
20  I think from -- I still have the habit of calling all
21  of it asbestos covering.  It's just -- you know, it
22  was just kind of engrained from, I guess, when I was
23  young, but...(Pause.)
24  Q  So your dad was a member of the asbestos workers
25  union.  Did he go to union meetings; do you know?

1  A  I -- I'm assuming that he did.  But I never
2  specifically recall him going.  I know that he was --
3  everywhere he worked, he was remembered.  He was well
4  known.  And that's from Illinois, in Chicago,
5  Wisconsin, Minnesota, Dakotas.  He would get calls
6  from people who wanted him to come to work for him.
7  Q  So your father was kind of a highly skilled
8  craftsman?
9  A  He was.  He was very proud of the work that he did.
10  I can remember at the J.C. Penney store in downtown
11  Rockford one time, we went there to buy clothes for
12  high school, and my dad taking me and showing me,
13  pointing out to me the pipes along the -- the top
14  there.  And he said, That's what I do, and that's
15  what I have -- look at that.  You know, there's no
16  seams.  You can't see anything.  Then he'd go to
17  another section of the store and said, This is --
18  somebody else did this.
19    And he was very proud of what he did.  He was --
20  he was a very hard worker.  And the people that he
21  worked for recognized that.  So much so, when he
22  retired, because he was having trouble seeing at
23  night, and so he couldn't -- he couldn't drive
24  anymore, so he retired at 62.
25    But the firm that he was working for at that

1  time -- and I think it was Sprinkmann, but I don't
2  know for sure.  When he first transferred to that
3  group, he said there were about 50 employees.  And
4  over time, as the work went away, they kept on laying
5  people off until there were just two of them left.
6    And my dad is, you know, 60-plus at the time.
7  And his boss said, Ozzie, don't worry.  You'll be the
8  last guy we ever let go.  And that's -- that's what
9  everyone thought of him.
10  Q  Okay.  Was your dad proud of being a member of the
11  union?
12  A  I -- I believe -- I believe he was.  We had -- when
13  we were young, we had discussions about unions.  And
14  we would talk about the pros and the cons.  And --
15  and dad would say, But -- you know, would usually
16  come down and say, Okay, but think about where would
17  we be if there were no unions.  What would the --
18  what would the workmen get?  How would they compete?
19  Would they just have to take what they're given and
20  be happy?
21    So, and I think this resulted from discussions
22  because of the Teamsters union in the '60s was so, so
23  very powerful.  And coming -- the Teamsters used to
24  deliver groceries to Zanocco Brothers.  And we were
25  familiar with this guy that delivered them.  The guy

Gary E. Suoja

1    is probably two inches shorter than me, wider than
2    the both of us, and it was all muscle.
3       He was one of the strongest guys I recall seeing
4    in quite some time. And he used to unload the back
5    end of a semi. And three of us were down -- three
6    young guys were down below, trying to keep up with
7    him. And he had fun just throwing stuff on there,
8    and the three of us are just dying, trying to keep
9    up, unloading these cans and boxes of goods.
10       And one Wednesday he didn't show up. And -- and
11   so on Thursday he showed up. And so we started
12   kidding him about having a girlfriend or meeting
13   somebody. And he said, Nope, I was at the O'Hare
14   Oasis last night. And we said, Well, why? He says,
15   Because my shop steward said this was a two-day job,
16   a two-day trip. And we started laughing at him. And
17   we were kidding him, and he was throwing more stuff
18   off.
19       And we said, You're afraid. And he turned
20   around, and he was sheet-white. And he just said,
21   Look, when my steward says it's a two-day job, it's a
22   two-day job. He was terrified. He was scared to
23   death. Of course, you're from Chicago. You know how
24   things were back then. And that was a shock to me
25   that somebody that strong and powerful was terrified

1    of what the union told him to do.
2  Q  So did your dad receive union publications at home?
3  A  Not that I recall.
4  Q  Okay. Would you have been the person who got the
5     mail?
6  A  Generally, no. I did on occasion, but typically not.
7  Q  All right. So you wouldn't have necessarily known
8     what your parents would or would not have received in
9     the mail while you were growing up?
10 A  That's correct. I don't ever recall him handing me
11    something to read or, you know, "Here. Read this.
12    This is from the union," or anything. You know,
13    as -- I think it's possible that my memory could be
14    jogged, but I just don't recall that right now.
15 Q  Okay. Did you ever work with your father as an
16    insulator prior to the 1960s?
17 A  Well, it would have been, I think, helping him when
18    he insulated the pipes in our house. And that was
19    '56, the end of '56, '57.
20 Q  Do you remember what products your father used to
21    insulate the house?
22 A  No.
23 Q  You don't remember the name of the product?
24 A  No.
25 Q  Don't know who manufactured it?

1  A  No.
2  Q  Other than that work in your house in the late '50s,
3     did you ever work with your father as an insulator
4     prior to 1960?
5  A  No.
6  Q  And the only other time you ever worked with your
7     father after 1960 was the one job at the cardboard
8     plant; is that right?
9  A  Yes.
10 Q  Okay.
11 A  I might have helped him once or twice with relatives.
12    Whenever we went on vacation, the relatives would ask
13    him to come over for some help, so...(Pause.)
14 Q  Sure.
15 A  You know, but I didn't do any insulating. He always
16    did that, so...(Pause.)
17 Q  Do you remember the name of any of the products that
18    your dad worked with at the cardboard plant?
19 A  No, I do not.
20 Q  Have you ever seen your father use a cement product
21    in his insulating work?
22 A  I -- I don't know if it's a cement product. I know
23    he used to use mud, you know, some sort of mud to
24    wrap pipes. I -- oddly enough, I have a very
25    distinct memory of my dad in Badger Ordnance.

1  Q  How do you have a memory of that?
2  A  In -- my dad and I used to be very close, and all of
3     our trips tended -- you know, vacations, Christmas,
4     summer vacations --
5  Q  Mm-hmm.
6  A  -- tended to be heading towards Superior. And we
7     would either go as a family, or if my dad and I were
8     working or he was busy, I would frequently stay and
9     we'd go together. Frankly, that was one of my
10    thrills, is to spend time with my dad.
11 Q  Mm-hmm.
12 A  And my mother's family was there in Superior, and my
13    dad's family was in northern Minnesota. And for
14    quite some time, just my dad and I would go to see
15    Grandma Suoja. And one of the people -- I've got --
16    I did bring some pictures here.
17 Q  That's okay. We can leave those pictures aside for
18    the time being. I'll ask you about it.
19 A  One of the guys -- one of the relatives, a fella
20    named Bernard Auberg, he married my Grandma Dalbec's
21    sister. He ran the General Motors sales operation in
22    Withee and Thorp, Wisconsin. And the -- the normal
23    trip -- you know, because it was a long drive. It
24    was a nine-hour drive. I always remember that nine
25    hours before the interstate. The normal trip was to

Page 50

1  the west of Withee and Thorp.  But we would typically
2  go there to stop and see other relatives on the way.
3     And dad bought his cars from Bernard.  And in
4  '55, he bought a '55 Pontiac, or I should say '55 or
5  '56.  It was a new Pontiac.  And I know somewhere
6  there's a picture of dad with his Pontiac, standing
7  by the door of the Pontiac.
8     And he wanted to show me where he was working.
9  And so instead of taking the usual route home, there
10  was -- it was a few extra miles.  And we came back
11  down this long, relatively straight highway, which
12  was a little unusual for Wisconsin.  And he pointed
13  out to me, and I remember it distinctly as Badger
14  Ordnance because it was pretty unique.
15     But as we went along, there were, like, these two
16  buildings or almost chimneys, but they were fairly
17  thick, and then there was a walkway between them.
18  But they were quite a ways off the ground.  You know,
19  it was maybe 80 feet.  60, 80 feet.  And then the
20  walkway ran for quite a distance.  And, you know, at
21  least a football field, or it seemed like, or maybe
22  more.
23     And he was talking about insulating those pipes
24  up there on that walkway.  And he was talking about
25  it -- doing it in January.  And he said, When you get

Page 51

1  up there -- and he was commenting on the wind being
2  cold, the wind blowing and the low temperatures.  And
3  he said it had to get done.
4     And he said, I was trying to use gloves to get
5  this mud mixed, you know, and make it work, and he
6  said, You just couldn't do it with gloves on.  So he
7  said, It's miserable.  I just had to do it with my
8  hands and then, you know, get the mud on.  And -- and
9  for some reason that stuck with me.  There were a
10  number of things on those trips that stuck with me,
11  but that -- that was one of them.
12     And the odd thing is, because I hadn't thought of
13  Badger Ordnance for the longest time until it came up
14  in this transaction.  But that was a memory that I
15  still have.  And I recall it with the new Pontiac.
16  Because we never -- we never otherwise would have
17  taken that road.  He just wanted to show me what he
18  was doing.
19  Q  So that was in 1955?
20  A  It was '55 or '56.  You know -- you know, the car,
21  you know, coming out.  It was a new -- a new Pontiac,
22  so...(Pause.)
23  Q  And so what I want -- I want to make sure that I'm
24  clear on -- oh, and I should have said this before as
25  well.  Another important thing as we go through today,

Page 52

1  which --
2  A  Mm-hmm.
3  Q  -- I assume that you would understand, but I just
4  want to make sure we're clear:  If I ask you a
5  question and you don't understand what I'm asking, or
6  you think that we might be on a different page,
7  please tell me.  Because I want to make sure --
8  A  Certainly.
9  Q  -- that at the end of the day, you and I are as much
10  on the same page as possible.
11  A  Okay.
12  Q  Okay?
13  A  That's fine.
14  Q  And I'll do the same with you when I'm trying to --
15  A  Okay.
16  Q  -- clarify.  All right?
17     So I heard you say earlier that you have a
18  recollection of your father working at Badger
19  Ordnance.
20  A  Yeah.
21  Q  But you weren't there while your father was working
22  at Badger Ordnance?
23  A  No, I was not there while he was actually working.
24  Q  The only way you know that your father was there is
25  from this conversation you two had; is that right?

Page 53

1  A  That's correct.  And we -- we drove by, and he was
2  showing me where he worked.
3  Q  Okay.  And this was after the work had already been
4  completed?
5  A  No, I don't have that impre -- I have the impression
6  that it was potentially still going on.  And my
7  recollection of it is not that this was something he
8  did before.  He was talking about having to insulate
9  this up above.  But the impression I had was that it
10  was still going on.
11     Because it was -- he would frequently have jobs
12  where he'd have to go and stay for a week and then
13  he'd -- then he'd come home.  That was -- that was
14  not unusual.  And we used to go through Wisconsin
15  Dells on these trips.  And this was -- this was -- my
16  recollection is this was north of Wisconsin Dells.
17  And it was -- it was something that he wanted to show
18  me, you know, where he worked.
19  Q  So let me clarify that a little bit.  It may be your
20  impression that the work was still going on, but you
21  don't actually know one way or the other?
22  A  I can't recall that it was, you know, definitely one
23  way or the other.  But the impression I had was that
24  it was.
25  Q  Okay.  But you weren't actually present while your

Gary E. Suoja

| Page 54 | Page 56 |
|---|---|
| 1 father was working at Badger Ordnance; is that right? | 1 father worked with at Badger Ordnance were asbestos, |
| 2 A No. Other than that one trip and that -- I just | 2 fiberglass, or otherwise? |
| 3 remember going down that straight highway with the | 3 A I had no idea what they were. |
| 4 new car and dad showing me where he worked. And he | 4 Q Same with Swedish Hospital? |
| 5 did that on occasion, he'd show me. The Chicklet | 5 A Same with Swedish Hospital. |
| 6 plant in Rockford, Illinois, we went by there. He | 6 Q Okay. So you don't have any idea whether the |
| 7 had done work there. Swedish Hospital. Showed me | 7 products your father worked with at Swedish Hospital |
| 8 where he was crawling in these holes, insulating | 8 contained asbestos or not; is that right? |
| 9 pipes on his back. It was just -- to me, it was | 9 A That's correct. |
| 10 nuts. | 10 Q Okay. In fact, if I were to ask, are you -- from |
| 11 Q And I apologize. The way I asked the question, the | 11 your own knowledge, do you know any job site where |
| 12 way -- | 12 your father may or may not have worked with asbestos- |
| 13 A Yeah. | 13 containing materials? |
| 14 Q -- your answer came out's going to look different on | 14 A As far as specific jobs, no. |
| 15 the transcript. | 15 Q Okay. |
| 16 Were you present while your father was doing any | 16 A I know he worked with asbestos, and I know at some |
| 17 insulating work at Badger Ordnance? | 17 point asbestos was phased out. But whether he used |
| 18 A No, I was not. | 18 asbestos on any particular job, I do not know. |
| 19 Q Okay. Were you present at -- other than the | 19 Q Okay. Do you know from your own knowledge any names |
| 20 cardboard plant we talked about earlier and -- | 20 of products that your father worked with? |
| 21 A Yeah. | 21 A No, I do not. |
| 22 Q -- taking out any home or homes of relatives, when | 22 Q Okay. When your father was -- when you were growing |
| 23 your father was on a job site, working as an | 23 up and at home, did your father come home and talk |
| 24 insulator, were you ever present? | 24 about product names that he was using on job sites? |
| 25 A A few times -- | 25 A No. |

| Page 55 | Page 57 |
|---|---|
| 1 Q Okay. | 1 Q Okay. Did your father ever discuss with you the |
| 2 A -- I was. Either because we had the vehicle and had | 2 names of products that he used in his job? |
| 3 to pick him up. And dad was not somebody that, you | 3 A He may have mentioned them, but I don't remember any |
| 4 know, when the 5:00 bell rang, he was there. So | 4 of that. |
| 5 you'd go looking for him. And I remember that -- I | 5 Q Okay. So you can testify that your father worked |
| 6 remember the Chicklet plant just because we went in | 6 with a Johns Manville product or an Owens Corning |
| 7 and kind of wanted to see what was -- what was going | 7 product or an Owens-Illinois product; is that right? |
| 8 on. He showed me some of the work that he did at | 8 A I could not say -- |
| 9 Swedish, because he was showing me the places that he | 9 MR. McCOY: Objection; that's -- |
| 10 had to get to. | 10 Gary, wait a minute. |
| 11 Right now, I can't think of any other times I -- | 11 THE WITNESS: Sure. |
| 12 when he was away from Rockford, I don't recall any | 12 MR. McCOY: That calls for a legal |
| 13 other times that I was present when he was working. | 13 conclusion by the judge as to what he can testify to. |
| 14 Q While you were at the Chicklet plant, did you | 14 You can go ahead and answer. |
| 15 actually see your father working on pipes? | 15 THE WITNESS: Yeah, I -- I know all |
| 16 A Yes. | 16 of those names, so I -- you know, I -- I don't know, |
| 17 Q Okay. Do you recall what he was doing? | 17 you know, what it is. You know, working in |
| 18 A He was covering pipes. | 18 construction and working in real estate, all those |
| 19 Q Do you know what products he was using to cover those | 19 names are familiar. I can't say that dad ever |
| 20 pipes? | 20 mentioned them or that I saw them back then. They're |
| 21 A I have no idea. | 21 just familiar names to me. |
| 22 Q Do you know if the products were asbestos-containing | 22 Q (By Mr. Lee) To address Mr. McCoy's objection, do |
| 23 or fiberglass? | 23 you know whether your father ever worked with |
| 24 A I have no idea. | 24 Owens-Illinois, Owens Corning, Pittsburgh Corning, |
| 25 Q Do you know whether or not the products that your | 25 Johns Manville products? |

Page 58

1  A  No. I can -- I can only assume he did. I don't know
2     specifically what products he worked with.
3  Q  And just so we're on the page, you understand I'm not
4     asking you to make an assumption about anything when
5     we're here today; is that right?
6  A  That's -- I'm -- I'm not assuming. If I'm assuming
7     something, I'd state it.
8  Q  Okay. You don't know, from your knowledge, whether
9     your father worked with any Owens-Illinois, Owens
10    Corning, Johns Manville, or Pittsburgh Corning
11    products; is that correct?
12 A  I know he worked with some of those products. I do
13    not know when or on what jobs --
14 Q  Okay.
15 A  -- he worked with them.
16 Q  How would you have found out what products your
17    father worked with?
18 A  You -- if you were in construction or you worked in
19    construction, you know, those things would either --
20    boxes would come home, products would come home, and
21    you'd just see the names. And I can't have -- I
22    don't have any specific recollection of them. But if
23    you're working in construction, those are just common
24    names.
25 Q  Okay.

Page 59

1  A  So you see that all over. Just like going into a
2     hardware store. You'll see those names.
3  Q  Okay. Your father never told you he worked with any
4     of those products, right?
5  A  I -- I do not have any recollection of him telling me
6     that.
7  Q  Okay. And your father never told -- and you were
8     never on a job site where you saw any of those
9     products while your father was working there; is that
10    right?
11 A  I know he was -- he had products that he was putting
12    on the pipes. I don't recall the names of what
13    product was what.
14 Q  Okay. So you can make an assumption about what
15    products your father might have worked with, but you
16    don't actually have any knowledge of the products he
17    worked with; is that right?
18 A  No, I can't relate any particular product to any
19    particular job.
20 Q  But I'm going a little bit farther than that. You
21    don't actually have any knowledge of the products he
22    worked with at any job site, do you?
23 A  Well, no. That's too far.
24 Q  Okay.
25 A  I know he was covering pipes. I know that he was

Page 60

1     using insulating material to cover those pipes. I
2     know the names of some of the -- some of the products
3     that were used in that -- in insulating product or in
4     insulating pipes. Can I -- can I tell you what he
5     used on any job? No. Can I -- can I tell you that
6     I've heard the name John Mansville [sic], Mansville
7     before? Yes. Might he have used that? Yes. But on
8     any particular job, I can't tell you. I don't know.
9  Q  And I think we're -- we're missing each other a
10    little bit, and that's my fault. So what I'm really
11    trying to ask is: For any job site, can you say that
12    your father definitely worked with a Johns Manville
13    product?
14 A  No, I cannot for any specific job say that.
15 Q  Okay. And so you can't say for -- from your own
16    knowledge whether your father ever worked with a
17    Johns Manville product, can you?
18 A  I don't think I'd go that far. Because my -- you
19    know, of the products that I'd seen and over time --
20    you know, because you see these things. Something
21    might come home in a trunk or, you know, in the
22    backseat of the car. So I've seen those. So I know
23    that he used them. I don't know on what job he used
24    them. I don't know when he used them. Those are --
25    those are just familiar names. They were just there,

Page 61

1     and you'd see them on occasion.
2  Q  Okay. What products do you recall coming home in
3     your father's car?
4  A  Well, John Mansville is -- is a name that's -- that's
5     just familiar. I -- I just don't recall the others.
6     And I don't think I could give you a particular name.
7     I just -- they were just around. And because I'd
8     worked in construction, they're just names that are
9     around. So I can't -- I can't tell you. I can't --
10    I can't remember a particular box with a particular
11    name on it. I can't remember dad identifying a
12    particular product. We just -- it was just, Here,
13    we're going to wrap these here, and away you go.
14 Q  Okay. So let me break that down a little bit. You
15    can't remember your father ever naming any of the
16    products he worked with; is that right?
17 A  No, other than asbestos and something not asbestos.
18    And that's about it.
19 Q  And I'm sorry. I keep phrasing these questions in a
20    way that's not helpful to us, so I'll rephrase it
21    again. It's my fault.
22 A  I'm sorry. My goal here is to help you out as much
23    as I can.
24 Q  I understand. And do you remember your father ever
25    mentioning the specific names of any products he

Gary E. Suoja

Page 62

1  worked with?
2  A  No, not that I could -- not that I could identify any
3  conversation.
4  Q  Okay.  And do you remember the names of any products
5  that your father brought home?
6  A  I cannot remember any specific product he brought
7  home.
8  Q  Okay.  Got there.  Thank you.
9     All right.  We've been going for about an hour
10  and a half.  If you don't mind, I would like to take
11  a quick break.  And I'm also going to try and see if
12  I can get the document that Mr. McCoy sent to me
13  printed, so that maybe we can -- that can expedite
14  things.  So if we could take a --
15  A  Okay.
16  Q  -- 15-minute break?
17  A  Bob?
18         MR. McCOY:  Okay.  I'll see you
19  guys in 15.
20         THE WITNESS:  Okay.
21         MR. LEE:  All right.  That'll be
22  12:15, so 2:15 by you, Bob.  Okay.  Thank you.
23         THE VIDEOGRAPHER:  Going off
24  record.  The time now is 11:59 a.m.
25         (Pause in proceedings from

Page 63

1         11:59 a.m. to 12:22 p.m.)
2
3         THE VIDEOGRAPHER:  Back on record.
4  Time now is 12:22 p.m.
5  Q  (By Mr. Lee)  All right.  I want to go back and ask a
6  little bit more about your family.  Your brother,
7  Derald, does he have any children?
8  A  He has two children.
9  Q  What are their names?
10  A  Lisa and Lynn.
11  Q  How old are Lisa and Lynn?
12  A  I can't tell you.
13  Q  Are they adults?
14  A  They are adults.  They were born before I had any
15  children, so...(Pause.)
16  Q  Okay.  Does your sister Sue have any children?
17  A  Yes, she does.  She has two.
18  Q  And what are their names?
19  A  Donnie and -- oh, my goodness.  She's going to kill
20  me.  I can't think of her daughter's name.
21  Q  Okay.  Are Sue's children adults?
22  A  Yes, they are.
23  Q  And do you have any children?
24  A  I do.
25  Q  And what are their names?

Page 64

1  A  Aaron, A-a-r-o-n; Nicole, N-i-c-o-l-e; and Tate, who
2  now spells it T-a-t-e.
3  Q  Is that not how it was originally spelled?
4  A  That's correct.
5  Q  Okay.
6  A  He changed it himself when he was in first grade.
7  Q  Oh.  That's an early change.
8  A  He made the decision, and that was it.
9  Q  My understanding is that your sister Nicole -- or
10  Kimberly does not have any children; is that right?
11  A  That's correct.
12  Q  Okay.
13  A  To my knowledge.
14  Q  She confirmed that, so I'm going to go with that.
15  A  Okay.
16  Q  So our understanding is that your sister Sue has some
17  medical issues; is that correct?
18  A  She does.
19  Q  Are those medical issues such that they would
20  prohibit her from testifying and sitting like this?
21  A  That's correct.  They would.
22  Q  Okay.  Can you tell us generally what they are that
23  would prohibit her from sitting in a deposition?
24  A  She has breathing problems and COPD and has been on
25  oxygen for, I believe, six-plus years.

Page 65

1  Q  So you'll forgive me for asking, and the reason why
2  I'm asking is we've agreed -- you probably know we've
3  agreed with Mr. McCoy to suspend a subpoena that we
4  sent to your sister Sue on the representation --
5  A  Well --
6  Q  -- that she's too ill to sit for a deposition.
7  A  The subpoena you sent to my sister caused her a great
8  deal of discomfort.  And I can tell when there's
9  discomfort, because she cannot continue talking.  She
10  has to go lay down.
11  Q  Mm-hmm.
12  A  When that subpoena showed up, especially after I told
13  Mr. McCoy that she could neither testify nor take a
14  deposition, that was -- that was just uncalled for.
15  It was more than uncalled for.  That was sleazy.
16  Q  Well, sir, that information was never communicated to
17  us.
18  A  Well, that can -- that can be your story.  But I'm
19  telling you, that was a very, very wrong thing to do.
20  Q  Well, she was listed as a person with knowledge in
21  your discovery responses.
22  A  I believe she was listed as a person who was a
23  daughter of Oswald Suoja.
24  Q  Actually, no, sir.  She was listed as a person who
25  had discussions about the settlement offer.

Page 66

1  A  Well, I would tend to disagree.
2  Q  Okay.
3  A  She shouldn't have been subpoenaed.
4  Q  So, I mean, I don't really want to get in a fight
5     with you over this, sir, but we'll make the record
6     clear.
7              MR. LEE:  Could we mark this as
8     Exhibit 2?
9              (Exhibit No. 2 marked for
10                identification.)
11
12  Q  (By Mr. Lee)  I'm going to hand you what we've marked
13     as Exhibit 2, sir.  Do you have that in front of you?
14  A  Yes, I do.
15  Q  Are those Plaintiff's Responses to Owens-Illinois
16     Interrogatories dated 5/28/15 and Plaintiff's
17     Responses to Owens-Illinois Requests for Production,
18     5/28/15?
19  A  The response to production appears to be the case,
20     but that was signed by -- looks -- appears to be
21     signed by Mr. McCoy.  I did not sign that.  So --
22  Q  Okay.
23  A  -- I didn't know it.  The response to the
24     interrogatories, I did sign.  And that appears to be
25     what I signed.

Page 67

1  Q  Okay.  And if we go in to Page 3 and 4 -- sorry -- 2
2     and 3 of the interrogatories.
3  A  Mm-hmm.
4  Q  We see that there was a question asked:  Was anyone
5     else involved in your communication regarding the
6     proposed settlement with Owens-Illinois?
7        Do you see that question on Page 2, the bottom,
8     No. 4?
9  A  Yes, I do.
10  Q  And the answer, which you verified, states that you
11     conferred with your sister Sue Merwin about the
12     settlement.  Is that not true?
13  A  No, I said I mentioned the OI offered to my sister
14     Sue Merwin.
15  Q  Right.  And so she would be a person who would have
16     some knowledge with regard to the settlement offer,
17     right?
18  A  She is just what I said.  I mentioned the offer to my
19     sister Sue.
20  Q  And if we were trying to figure out what was
21     discussed about the settlement offer, she'd be a
22     person who would have knowledge about that, correct?
23  A  Well, I would assume that you would have talked to
24     Mr. McCoy.  And I believe -- my understanding is
25     Mr. McCoy told you that she was too ill to either be

Page 68

1     involved or to testify.
2  Q  That e-mail was sent to us after we'd issued the
3     subpoena.
4  A  Well, you and Mr. McCoy can argue about that.
5  Q  No, I'm just trying to -- you said that there was no
6     information to us that would suggest she had anything
7     to do with the settlement discussions.  Actually, your
8     responses to our interrogatories indicated she had
9     knowledge regarding the settlement discussions, right?
10  A  You -- apparently you didn't read the rest of the
11     sentence then.  She was not involved in my decision
12     to not accept the OI offer, my response to the OI
13     offer, or my communication to Mr. McCoy about my
14     response to the offer.
15  Q  But your sister is a member of the estate, right?
16  A  She is.
17  Q  She would have authority to weigh in on the estate
18     and --
19  A  No, she wouldn't.
20  Q  -- how it changed?
21  A  I believe that I am the one that has the authority as
22     the appointee here, am I not?
23  Q  You don't --
24              MR. McCOY:  Yeah, let me object at
25     this time now.  Now, this is asking for a legal

Page 69

1     conclusion on areas that Gary Suoja is not an expert
2     in on Wisconsin law of special administrators or
3     whatever might be the applicable federal points here.
4        So the question about authority is one for the
5     judge to resolve as a matter of law.  You can go
6     ahead and ask your questions, but the question asking
7     him to give a legal conclusion as to whether somebody
8     has authority is improper, and I object to that
9     question.
10        Subject to that, you can go ahead and answer it,
11     Gary.
12              THE WITNESS:  Well, I think I did.
13              MR. LEE:  Okay.
14              THE WITNESS:  Unless you want to
15     repeat the question.
16              MR. McCOY:  Next question.
17              MR. LEE:  Can you read back his
18     answer, please?
19              THE WITNESS:  Or read back the
20     question so I can --
21              MR. LEE:  I'm going to ask you to
22     read back the answer, please.
23              THE WITNESS:  Well, without the
24     question -- okay, you can read the answer, but then
25     I'm going to have to have the question back again.

Gary E. Suoja

Page 70

```
1            MR. LEE:  Well, it depends on
2    whether --
3            MR. McCOY:  Please read both.
4            MR. LEE:  It depends on whether I'm
5    going to ask another question or not, sir.
6        So can I just have the answer, please?
7                (Question on Page 69, Lines
8                1 through 2, read by the
9                reporter.)
10           THE WITNESS:  Special
11   administrator, I guess.
12   Q   (By Mr. Lee)  Do you understand -- do you know who's
13       appointed you a special administrator?
14   A   No.  I just am.  I'm the one that's -- everything has
15       been addressed to.
16   Q   Okay.  Has the State of Wisconsin appointed you as
17       the special administrator?
18   A   I don't know.
19           MR. McCOY:  Let me again pose an
20   objection to the extent that these are legal
21   conclusions as to whether some government agency has
22   appointed or not.
23       Subject to that, Gary, you can go ahead and
24   answer.
25           THE WITNESS:  All I know is that
```

Page 71

```
1    the attorney at Cascino Vaughan that I dealt with
2    went through the process to have me appointed.
3    That's all I know.
4    Q   (By Mr. Lee)  Who's that lawyer?
5    A   That was -- at the time was Jill Rakauski.
6    Q   Okay.  That would have been back in the '90s?
7    A   No.  I think it was in the -- sometime in the 2000s.
8        I don't know the exact date.
9    Q   Okay.  As special administrator, do you have any
10       duties to the other members of the estate?
11   A   I would assume --
12           MR. McCOY:  Let me object again.
13   This calls for a legal conclusion.
14       You can go ahead and answer.
15           THE WITNESS:  I would assume that I
16   do.
17   Q   (By Mr. Lee)  Okay.  Do you know what those duties
18       are?
19   A   No.
20   Q   What have you done to determine what you need to do
21       to fulfill your duties as special administrator?
22   A   Well, I've relied on Cascino Vaughan.  I haven't done
23       any separate research or anything else.  I --
24       basically, I rely on what they have to say.
25   Q   Do you have an obligation to keep the members of the
```

Page 72

```
1    estate informed of all matters material to the
2    estate?
3    A   I don't know.
4            MR. McCOY:  Same objection.  Go
5    ahead.
6    Q   (By Mr. Lee)  Do you have an obligation to inform the
7        other members of the estate with regard to any
8        settlement offer?
9            MR. McCOY:  Can I have a standing
10   objection on the legal conclusions being asked for
11   here on the estate law?
12           MR. LEE:  So, Bob, I mean, to the
13   extent that the judge is going -- you're making an
14   objection to form and/or foundation, correct?
15           MR. McCOY:  I'm making an objection
16   as to -- as to both, but -- those grounds.  But I'm
17   also objecting specifically for the legal conclusions
18   being called for.
19       And while we're on it, I mean, I don't understand
20   the relevance of all this, given that the judge has
21   already ruled specifically that discovery is precluded.
22   Because any questions about his status as special
23   administrator is forfeited.
24       You know, you can go ahead and relate these
25   questions to the issue that is on the table for
```

Page 73

```
1    discovery about enforcement of the settlement
2    agreement.  That's fine.  But to generally ask him
3    about a estate law, I don't understand the relevance.
4    And the judge ruled that's out.
5        Subject to that, I'm not going to take up any
6    more time here.  Gary can go ahead and answer what he
7    knows.
8            MR. LEE:  So if you have an
9    objection, Bob, with regard to the legal conclusion,
10   I think that's a foundation objection.  I'm happy to
11   give you a standing objection on any issue you
12   believe is a legal conclusion that I'm asking for so
13   that we can move this along.
14           MR. McCOY:  Okay.  That's fine.
15   Thank you.
16           MR. LEE:  On the grounds that it's
17   a foundation objection, okay?
18           MR. McCOY:  Fine.  I'll accept
19   that.
20           MR. LEE:  Okay.  Sorry.  What was
21   my last question?
22                (Question on Page 72, Lines
23                13 through 15, read by the
24                reporter.)
25
```

| Page 74 |
|---|

1    MR. LEE:  What was the answer?
2    THE REPORTER:  Directly after that,
3  Mr. McCoy asked for the standing objection.
4    MR. LEE:  Okay.
5  Q  (By Mr. Lee)  As the special administrator of your
6    father's estate, do you have an obligation to inform
7    other members of the estate of any settlement offer?
8  A  I don't believe so.
9  Q  What have you done to determine whether you have any
10    obligations as special administrator?
11  A  I rely on at this point Mr. McCoy and Cascino
12    Vaughan.
13  Q  Okay.  Have you ever asked the other members of the
14    estate for the authority to represent them as the
15    special administrator?
16  A  No.
17  Q  So no one in your family has given you authority to
18    represent the estate; is that correct?
19  A  Nobody -- nobody specifically has, no.  They all know
20    that I am, and nobody has objected.
21  Q  Okay.  Did you know that your sister Kimberly
22    testified that she didn't even know there was a
23    lawsuit until you called her to let her know that she
24    had been subpoenaed as a witness?
25  A  That's -- that's possible.  Well, actually, that's --

| Page 75 |
|---|

1    you know, I'm not sure that she was fully thinking
2    about that.  Because as settlements have occurred,
3    I've written her checks for her portion of the
4    settlement.
5  Q  She said she's only received one $500 check.
6  A  I don't believe that's correct.
7  Q  Okay.  She said she didn't know why you wrote her the
8    check.
9    MR. McCOY:  Let me object at this
10  point in time to counsel restating answers of another
11  witness and using those as part of the question.
12  Because that's something that should only be taken
13  from the actual transcript.
14    Subject to that, and without regard to whether
15  counsel's statements of Kimberly's answers are
16  correct or not, you can go ahead and answer, Gary.
17    MR. LEE:  And so, Bob, I just want
18  to make sure your objection is to the form of the
19  question.
20    MR. McCOY:  Yes.  Right.
21    MR. LEE:  Okay.  Go ahead.
22    THE WITNESS:  Well, I have written
23  the check, so...(Pause.)
24  Q  (By Mr. Lee)  Okay.  But I just want to be clear.
25    Your family may have known there was a lawsuit going

| Page 76 |
|---|

1    on, but they never gave you express authority to act
2    on their behalf; is that right?
3  A  Well, they knew that there was a claim going on.
4    They knew after mother passed away -- I'm pretty sure
5    they knew that I was going to be handling it.
6    Because as we did -- as we went through mother's
7    estate and so on, I think that was pretty clear at
8    that point in time.
9  Q  Did you have an actual discussion about it?
10  A  We did not have an actual discussion that I recall.
11  Q  As a lawyer, do you understand the difference between
12    express authority and implied authority?
13  A  I do.
14  Q  Do you have express authority from the other members
15    of your family to represent them as special
16    administrator of the estate?
17  A  Well, you can have express authority in different
18    fashion.  And it doesn't have to be, "I give you this
19    authority."  It can -- it can occur out of a course
20    of conduct.  And in this particular case, the family
21    has received checks from me.  I've talked to them on
22    occasion about it.  I -- for example, I -- I talked
23    to my brother and his wife about the possibility that
24    my brother might have a claim just like dad did, and
25    we went through that.

| Page 77 |
|---|

1    So there have been -- you know, there has been a
2    number of times that -- that they've known about it.
3    But there's been so little action because this thing
4    has been delayed so damn long.  Nothing -- nothing
5    has occurred.  And so there hasn't been much going
6    on.  And, frankly, I didn't think much more was ever
7    going to go on.
8  Q  Do you have express authority from your -- each of
9    your family members to be --
10  A  I feel I do.
11  Q  Please let me --
12  A  Okay.
13  Q  -- finish my question.
14    Do you have express authority from each member of
15    the estate to represent them as the special
16    administrator?
17  A  I -- I --
18    MR. McCOY:  Objection.
19    THE WITNESS:  I feel --
20    MR. McCOY:  Objection.  He's
21  already answered.  Go ahead and answer again.
22    THE WITNESS:  I feel that I do.
23  Q  (By Mr. Lee)  Okay.  How was that express authority
24    communicated by your sister Kimberly?
25  A  I -- I can't tell you --

Gary E. Suoja

Page 78

1    MR. McCOY:  Object.  Let me object
2  to the form of that question.  I didn't understand
3  it.
4    MR. LEE:  Okay, Bob.  That's okay.
5  You don't have to.
6  Q  (By Mr. Lee) How is express authority for you to
7  serve as administrator of your father's estate
8  conveyed by your sister Kimberly?
9  A  Well, I believe that it came about as a result of
10  after my mother had passed on, because she had been
11  handling it before; that as we took care of my
12  mother's estate and we were all there, that was
13  pretty much the conclusion, is that I would continue
14  handling this for the family.
15  Q  How was that --
16  A  Now, that --
17  Q  -- conclusion reached?
18  A  -- was -- well, there wasn't a big discussion, as I
19  recall.  But it was -- it was probably talked about.
20  But I don't recall anything where we sat down and
21  said, Well, we're going to do this and have this.  We
22  were busy handling the estate, divvying things up,
23  going through records, and on.  We were going through
24  checkbooks.  And we were talking about this as part
25  of it, and how the estate would be handled.  And as

Page 79

1  we discussed it, it just came to the conclusion that
2  I would end up handling it.
3  Q  Handling your --
4  A  And that's how this came --
5  Q  -- mother's estate?
6  A  -- about.
7    No.  Handling my dad's claim.
8  Q  Okay.
9  A  The -- my mother's estate was all dealt with among us
10  kids right there.  There -- there wasn't much of an
11  estate to deal with.  And so we all handled it right
12  at the time, and we arranged for the sale of the
13  house and the distribution of the -- the personal
14  property.
15    But the handling of dad's claim, that was just --
16  you know, as I recall, it was just discussed and, you
17  know, kind of briefly as, "Yeah, you go ahead and do
18  it," because nobody else wanted to screw around with
19  it, frankly.
20  Q  Okay.  Have you had any conversations with your
21  brother Derald's children about this lawsuit?
22  A  No, I have not.
23  Q  Have they given you any authority to represent the
24  estate?
25  A  No, I have not.

Page 80

1  Q  Okay.
2  A  I -- as a matter of fact, I haven't talked to them
3  since my brother's death.
4  Q  And, in fact, they're members of the estate, aren't
5  they?
6  A  They would be his heirs.
7  Q  And you don't have any authority from them, do you?
8  A  Well, I haven't talked to them about it, no.
9  Q  Okay.  So that would mean you don't have any
10  authority from them to act on --
11  A  No, that's --
12    MR. McCOY:  Objection.
13    THE WITNESS:  That's your --
14    MR. McCOY:  Objection.
15    THE WITNESS:  That's your
16  conclusion.  That isn't --
17    MR. McCOY:  Stop for a minute,
18  guys.  Okay, I'm going to make an objection here.  I
19  mean, this is enough questioning about a subject that
20  the judge has ruled is outside the scope of
21  discovery.  So he specifically says that this -- that
22  these issues have been forfeited by Owens-Illinois
23  for further discovery.
24    So I'd like you to wrap this up here in a minute
25  or two, Josh.  Otherwise I'm going to suggest that we

Page 81

1  should get on the phone with the judge about the
2  order that he issued.
3    MR. LEE:  Sure.  You mean the order
4  that she issued?
5    MR. McCOY:  Right.
6    MR. LEE:  Okay.  So, Bob, you can
7  say that.  But an issue that you have raised is the
8  person who has authority to act on behalf of the
9  estate.  And that also has issues that pertain to who
10  has authority to resolve the claim and whether a
11  valid and enforceable settlement was issued and
12  entered into on behalf of the estate with regard to
13  Owens-Illinois.  And all of these questions are
14  relevant for that purpose.  So you can --
15    MR. McCOY:  I'm not -- I don't
16  understand how -- that you can say anything about the
17  issue of authority as a person on behalf of the estate
18  in the context of a settlement agreement where the
19  question is, was my firm authorized to enter into that
20  settlement agreement for that amount of money.
21    I mean, if you're establishing, Josh, that these
22  people didn't have -- that Gary doesn't have
23  authority to act for these people, that obviously
24  there was no authority by my firm, I mean, you're
25  proving our point.  So I don't understand it.  I

Page 82

1    mean, that's why the judge has ruled that his
2    authority is -- or his role as special administrator
3    and the appointment of that is outside the further
4    scope of discovery here.
5         So I would say you need to confine your questions
6    to the issue of whether there was authority given to
7    my firm by somebody to make that settlement.  I mean,
8    that's what's on the table here.
9              MR. LEE:  And, Bob, I -- one of the
10   things I have to figure out is who exactly has
11   authority and what the extent of that authority is
12   and how it can be granted and who all was talked to.
13   And these questions go directly to that.  If you
14   would like to call the judge, that's up to you.  I'm
15   going to keep asking the questions.  I'm not going to
16   be limited to a one- or two-minute or any limitation
17   that you put on me.  But if you --
18             MR. McCOY:  Why don't you just --
19             MR. LEE:  But if you think -- but,
20   Bob, if you think that this is something we should
21   talk to the judge about right now, I'm happy to have
22   you make that call.
23             MR. McCOY:  Why don't you just ask
24   him, then, the question that you just said, like who
25   has the authority?

Page 83

1              MR. LEE:  Bob, I can ask the
2    questions that I choose to ask.  I really --
3              MR. McCOY:  Go ahead.
4              MR. LEE:  If you do want --
5              MR. McCOY:  Josh, go -- just go
6    ahead.  Let's --
7              MR. LEE:  Hold on, Bob.
8              MR. McCOY:  -- move this along.
9    Hopefully -- hopefully we can close this into the
10   -- to the relevant topic here.  Keep going.
11             MR. LEE:  Well, Bob, I just want to
12   be clear.  If you want to call the judge, I'm not
13   prohibiting you from doing that.  I'll be happy to
14   allow you to make the call.
15             MR. McCOY:  I understand.
16             MR. LEE:  Do you wish to?
17             MR. McCOY:  I'm not making the call
18   right now.  I'll see if we can get this closed out to
19   the relevant issues here.
20             MR. LEE:  Okay.  What was my last
21   question before we were interrupted by Mr. McCoy?
22             (Question on Page 80, Lines
23             16 through 17, read by the
24             reporter.)
25

Page 84

1              THE REPORTER:  And then there was
2    an objection interruption.
3              MR. LEE:  Okay.
4    Q  (By Mr. Lee)  So neither of your brother Derald's
5       children has given you authority to act on their
6       behalf with regard to your father's estate; is that
7       right?
8    A  Neither of them have specifically given me that
9       authority nor have they talked to me about it, no.
10   Q  Okay.  Have you talked to them about it?
11   A  No, I have not.
12   Q  Have you sent them settlement checks?
13   A  No.  Because there have been none since my brother
14      passed.
15   Q  So there's absolutely no course of dealing with
16      regard to your brother's children; is that correct?
17   A  That's correct.
18   Q  So you have no authority on their behalf; is that
19      right?
20   A  That -- I disagree with that conclusion on your part.
21   Q  How could someone give you authority if you've never
22      had a conversation with them about the issue?
23   A  They're successors and heirs.  They come in and they
24      take the place of their -- of their father.  So if
25      you want to do a legal argument, we can.  I don't

Page 85

1    want to get into it here, but I'm happy to discuss it
2    with you another time.
3    Q  Okay.  And so are you saying that whoever steps into
4       the shoes of a prior party in interest, accepts
5       whatever authority was granted by that prior party in
6       interest?
7    A  I'm not going to get into a legal argument with you.
8       And that's what you seem to want to go.  I'm not
9       going to answer that question, because I'm not going
10      to get into a legal discussion about it.  If you have
11      a conclusion, let me know.  If you want to go to the
12      judge and say, "He's got to answer this," or "He
13      needs this," that's for a motion for you.
14   Q  Okay.
15   A  That's not for me to argue with you about.
16   Q  So are you refusing to answer my question?
17   A  I'm refusing to answer that question.
18   Q  Okay.  That's fine.  That's something that the judge
19      can decide.
20   A  That's right.
21   Q  Okay.  When did you become the special administrator
22      of your father's estate?
23   A  I do not remember the specific date.
24   Q  Was it before or after your mother passed away?
25   A  It was, I believe, after or maybe towards the end of

Gary E. Suoja

Page 86

1   my mother's life.
2  Q  Had there been settlements with regard to your
3     father's estate prior to your mother passing away?
4  A  Yes.
5  Q  Okay.  Were you aware of a prior lawsuit that your
6     mother had filed with regard to your father's estate?
7  A  No.  I wasn't -- I knew something was going on.  I
8     didn't -- you know, I didn't know exactly what was
9     going on, because I wasn't directly involved.
10 Q  Okay.  Were you aware that there was a case filed in
11    Wisconsin state court on behalf of your father's
12    estate?
13 A  Not specifically.  I knew there -- I knew my dad had
14    a claim going.  Cascino Vaughan was handling it.  I
15    had talked to my mother about it when she'd call and
16    ask questions about things.  She'd ask, you know,
17    some help filling out forms or whatever.  And I
18    recall talking to Jill Rakauski, I think with my
19    mother on the phone once or twice, or maybe my
20    brother and Jill Rakauski.  But I wasn't a direct
21    participant.  And that was with my mother and Cascino
22    Vaughan.
23        MR. McCOY:  And for the record,
24    there was a time when Jill Rakauski was an attorney
25    at Cascino Vaughan Law Offices.  She hasn't been an

Page 87

1  attorney here for at least 12 years, I'd say.
2        MR. LEE:  I know that, Bob.
3     Thanks.
4  Q  (By Mr. Lee)  So were you involved -- well, what
5     paperwork did you help your mother sign on behalf of
6     the estate?
7  A  Well, I don't know.  It's been, you know, somewhere
8     in the past.  It was -- if she had questions, she'd
9     call me and we'd talk about things, you know, "What
10    is this?" you know, or, "What is this?  What does
11    this mean?" and things of that nature.  So I would
12    just try to talk her through it.  She could get it
13    and understand it.
14 Q  Okay.
15 A  And I hope you don't ask me for everything that's
16    gone on here, because this has gone on for 20 years,
17    so...(Pause.)
18 Q  Well, I'm going to ask you about your recollection of
19    what's gone on.
20 A  Well --
21 Q  And I'm going to ask you if you have any documents.
22    I'm going to ask you where those documents would be.
23    I'm going to ask you if they've been produced.  I'm
24    going to ask you all that stuff, because that is at
25    issue.

Page 88

1  A  Well, ask away.
2  Q  Okay.  So when did you first become aware that your
3     father had filed a lawsuit -- or your mother had
4     failed a lawsuit on behalf of your father's estate?
5  A  That was sometime after my father had passed away.
6     Maybe '97, '98.  I just knew it was -- it was -- it
7     may even have started before that.  I don't know.  I
8     wasn't directly involved.
9  Q  So you were aware as early as '97 or '98 that a
10    lawsuit had been filed on behalf of your father's
11    estate?
12 A  I am vaguely aware.  I don't remember the dates.  I
13    wasn't involved.
14 Q  Okay.  At what point in time did you start consulting
15    with your mother about the lawsuit?
16 A  Whenever she would call.  We'd be on the phone back
17    and forth on a fairly regular basis just because she
18    was my mother.
19 Q  Okay.  Were you acting in your role as an attorney
20    for your mother when you were on those calls or just
21    as a son?
22 A  Probably both.  It's kind of hard to distinguish when
23    your -- your mother asks you questions.  You know,
24    she did pay, you know, a lot of my schooling, so I
25    didn't feel like, Okay, Mom, now I need a retainer

Page 89

1  agreement.
2  Q  Did you ever represent your mother for any other
3     legal purposes?
4  A  No, not that I recall.
5  Q  Okay.  Were you at all involved in the choice to
6     retain Cascino Vaughan Law Offices to represent your
7     father's estate?
8  A  No.  I had no say in that whatsoever.
9  Q  Since you've become the administrator of your
10    father's estate, have you entered into an agreement
11    with Cascino Vaughan regarding the representation of
12    your father's estate?
13 A  No.
14 Q  So whatever agreement was in place between your
15    mother and Cascino Vaughan when she was the special
16    administrator of your father's estate has just
17    carried over?
18 A  That would be -- that's my assumption.  And I don't
19    know if it was with my mother or my dad.  As I said,
20    I don't know if he was involved in it at that point
21    or not.
22 Q  Have you ever seen a written agreement between the
23    estate and Cascino Vaughan Law Offices?
24 A  No.  As a matter of fact, I requested it and I looked
25    for it, but I believe they sent it to me, but I have

Page 90

1  not found it.
2  Q  Okay.  Is your belief that there is such a written
3     agreement?
4  A  Yes, I believe there is.
5  Q  Is it your belief that that written agreement touches
6     on who has authority to resolve the case?
7  A  I -- you know, I -- you know, maybe I'm naive, but I
8     always assume the client has that decision.
9  Q  Of course, the client could give express direction in
10    a written agreement to his attorneys to resolve the
11    case as they see fit, right?
12 A  I have never seen that.  I have never requested it of
13    my clients.  And I have never seen that occur,
14    frankly.
15 Q  But you don't know whether the estate ever gave that
16    authority to Cascino Vaughan Law Offices or not; is
17    that correct?
18 A  I -- I am not aware of them actually having that
19    authority.
20 Q  Okay.
21 A  And in my discussions with them, that has never
22    seemed to be the case.
23 Q  Okay.  But you don't know one way or the other
24    whether that authority was ever given?
25 A  I don't know if there's written authority that says

Page 91

1     that.  I -- I am -- my presumption is -- and I
2     believe I'm entitled to that presumption -- is that
3     that is not the case, that I make the decisions.
4  Q  Okay.  And you're entitled to whatever presumption
5     you want to have.  I'm not going to try and --
6  A  It's --
7  Q  -- move you off of that.
8  A  It's a little more than that.  I'm the client.
9  Q  But if there were a written agreement that --
10 A  Yeah.
11 Q  -- is operating --
12 A  Well, written agreements can be revoked.
13 Q  Have you ever revoked --
14 A  If I'm the -- if I'm the client -- I can tell you
15    that if I'm the client, they're going to do what I
16    tell them to do.  If they don't like it, they can
17    leave and I can get somebody else.
18 Q  Have you ever revoked any provision of the agreement
19    between the estate and Cascino Vaughan Law Offices?
20 A  No, I don't feel that I've had to.
21 Q  Okay.  Do you believe there is a written agreement
22    with regard to the representation between the estate
23    and Cascino Vaughan Law Offices?
24 A  Yes, I do.
25 Q  And that agreement, despite the fact that we asked

Page 92

1     for it, has not been produced; is that correct?
2  A  You mean the --
3            MR. McCOY:  Objection.  Objection,
4     again, to the question that has been posed for reasons
5     of foundation and so on.
6            Could you read that question back one more time
7     for me?
8            MR. LEE:  I'll ask a new question.
9  Q  (By Mr. Lee)  Sir, do you still have Exhibit 2 in
10    front of you?
11 A  I do.
12 Q  Could you turn to Page 1 of the requests for
13    production?
14 A  Okay.
15 Q  Could you read for us, please, what the first request
16    is?
17 A  You mean under "General Response" or Item 1, "All
18    documents..."?
19 Q  Item 1, "All documents..."
20 A  "All documents that constitute your agreement with
21    CVLO to engage or retain them as your attorneys in
22    the federal court action."
23 Q  Okay.  And that would include your retention
24    agreement with CVLO, wouldn't it?
25 A  I don't know.

Page 93

1  Q  Okay.  What's the second request?
2  A  "All documents that constitute your agreement with
3     CVLO to engage or retain them as your attorneys in
4     the state court action."
5  Q  That would also cover your retention agreement with
6     CVLO, wouldn't it?
7  A  No.  I don't know anything about a state court
8     action.
9  Q  When did you become the special administrator again?
10 A  As I said, it was sometime in the 2000s, and I don't
11    know the exact date.
12 Q  Was there a state court action pending at that time?
13 A  I have no idea.  I'm not aware of any state court
14    action, to tell you the truth.
15 Q  As special administrator of the estate, you've
16    succeeded to the authority that your mother had prior
17    to her death, correct?
18 A  Yes.  But I don't know everything that went on with
19    my mother and what went before.
20 Q  But if you were still the special administrator of
21    the estate, and the state court action was still
22    proceeding, you were responsible for that state court
23    action as a --
24 A  Well, I'm --
25 Q  -- special administrator, correct?

Gary E. Suoja

Page 94

1  A  Well, I'm -- yeah, I'm -- I'm the client.  I would
2      have heard from -- from the attorneys, I presume.
3  Q  And it's your testimony that the agreement, whatever
4      agreement your mother had on behalf of the estate
5      with CVLO, has carried over to your representation of
6      the estate; is that right?
7  A  That is -- that is my understanding, is that it
8      would.  That was my intention that it would carry
9      over.
10 Q  And so whatever agreement between your mother as
11     special representativity of the estate and you as
12     special representative of the estate, with regard to
13     the state court action, would be responsive to
14     Request No. 2, correct?
15 A  I would -- I would assume so, but I believe they did
16     respond with an objection.
17 Q  They did.  And I want to get to the basis of that
18     objection.  To the extent that objection has anything
19     to do with the authority to settle the case or not,
20     it's --
21 A  Well --
22 Q  -- relevant to the issues we're talking about here,
23     isn't it?
24 A  Well, no, I wouldn't --
25         MR. McCOY:  Let me object.  You're

Page 95

1      asking him --
2         THE WITNESS:  If you're asking --
3         MR. McCOY:  -- for legal
4      conclusions.
5         THE WITNESS:  Yeah.
6         MR. McCOY:  And he can go ahead and
7      answer, but --
8         THE WITNESS:  Yeah.
9         MR. McCOY:  -- you know, this is
10     within the scope of these legal conclusions.
11        MR. LEE:  Okay.
12        THE WITNESS:  I'll
13        MR. LEE:  I take that.
14        THE WITNESS:  I'll give you --
15     I'll give you my --
16        MR. McCOY:  The basis for asserting
17     the objection is obviously an objection I asserted,
18     I signed off on it, and, you know, that's my judgment
19     as his lawyer.  You can ask him what he thinks about
20     it, but he's not the lawyer for that objection.  Go
21     ahead.
22        THE WITNESS:  Maybe not a capable
23     lawyer either.  I can give you what my conclusion is.
24     My conclusion is, is that the client controls the
25     transaction.  The Owens-Illinois offer was proposed

Page 96

1      to me.  I rejected it.
2         MR. LEE:  Okay.
3         THE WITNESS:  And it was that
4      simple.  And in my opinion, I have that authority, I
5      had that authority, I exercised that authority.  And
6      nobody was given any authority that's contrary to
7      that.
8         Now, if someone asserts that they have had a
9      different opinion or a different authority, that
10     would be news to me.  Because people always asked me
11     whether or not, you know, we could do this, and is
12     this appropriate or not, and I would talk to them.
13        So nobody approached me from the standpoint of,
14     We are going to settle this here.  The standpoint
15     was, We're going to have a settlement.  It's going to
16     be this amount, okay?  And I would say "yes."  So if
17     there was a written agreement, and there is, I doubt
18     very much there was authority handed to Cascino
19     Vaughan.
20        But my course of transaction with Cascino Vaughan
21     was, I'm in charge.  I don't care what anybody else
22     says.  And to the extent there was an agreement, that
23     changed through the course of conduct between me and
24     Cascino Vaughan.
25        So the answer to your question ultimately is, no,

Page 97

1      I have the authority, and only I have the authority.
2      I don't know Mr. Cascino.  I don't know Mr. Vaughan.
3      I've never spoken to either one of them.  They have
4      never spoken to me.  I've not -- you know, aside from
5      maybe a form letter that has come or something,
6      they've never communicated with me.  I've talked to
7      Jill Rakauski.  I've talked to Bob McCoy.  The OI
8      offer came from Mr. McCoy to me:  What do you want to
9      do?
10 Q  (By Mr. Lee)  All right.  However, you don't know one
11     way or the other whether the written retention
12     agreement between Cascino Vaughan and the estate has
13     any provisions about who has authority to settle the
14     case; is that right?
15 A  That's right.  I don't know if that is in there, and
16     I don't care.  Because --
17 Q  I understand that you don't care.
18 A  Yeah.
19 Q  But you understand that we might care, right?
20 A  You might care.  But to the extent that you might
21     care if it's in there, I can tell you, that from our
22     course of conduct, it has been revoked, if it is in
23     there.  Because I've always had the decision-making
24     authority.
25 Q  And whether the authority was revoked or not, since

Page 98

1 that's been put at issue, would be something for a
2 judge or jury to decide?
3 A Well, I'm -- I'm not -- I'm not certain about that.
4 Q And that would be the evidence one way or the other,
5 wouldn't it?
6 A Well, I --
7           MR. McCOY: Objection. Objection.
8 Objection. Now, you're interrupting his answers.
9 And that's not proper either. And again, this is
10 getting into this, but we've already had the standing
11 objection on legal conclusions. I won't keep
12 asserting that. But let me just -- he shouldn't be
13 cut off in his answers.
14     And also, for the record, the order appointing
15 special administrator, which has been attached to the
16 motions filed by Owens-Illinois, and I think even my
17 firm also in this case, was part of the court record,
18 says that order -- it's dated March 20 -- March 3,
19 2009, signed by Judge Robreno in the Eastern District
20 of Pennsylvania.
21     And it says, Order appointing special
22 administrator. This matter coming on to be heard on
23 plaintiff's motion for appointment of special
24 administrator and to amend the complaint to reflect
25 said appointment, it is hereby ordered: Gary Suoja

Page 99

1 is appointed special administrator solely for the
2 purposes of pursuing the above lawsuit. Complaint is
3 hereby amended on its face, substituting Gary Suoja
4 individually and as special administrator for the
5 estate of Oswald S. Suoja as plaintiff herein."
6     So those decisions are in the order reflecting
7 -- or made by Judge Robreno. And I don't understand
8 any questioning that would be attempting to undo an
9 order which says he is appointed special administrator
10 solely for the purposes of pursuing the above lawsuit.
11     Subject to that, go ahead with your questions,
12 Josh.
13           MR. LEE: I understand that, Bob.
14 And you can go ahead and make your objections. I
15 didn't ask him anything about the order appointing.
16 I'm trying to find out, since you've refused to
17 produce it, whether or not there are any provisions
18 within the retention agreement that talk about who
19 has authority to resolve cases.
20           MR. McCOY: You can ask him what
21 his knowledge is on that. It's fine.
22           MR. LEE: Right. And he's telling
23 me he doesn't have any knowledge, which means that
24 I'm going to have to come back and ask for that
25 again. And that's part of the discovery here, and

Page 100

1 that's part of what we're going to have to go talk to
2 about with the judge when we talk about the
3 protective order that you've sought with regard to
4 your objections, and this is all relevant for that
5 purpose, Bob.
6           MR. McCOY: That's fine. That's --
7 like I say, that's my objection that I assert. He
8 didn't assert the objection. You and I can have that
9 issue with the judge if we need to.
10           MR. LEE: But what he knows about
11 the agreement goes to the validity of your objection,
12 Bob.
13           MR. McCOY: That's -- I'm not
14 questioning that you can ask him about his knowledge
15 under the agreement. He said he -- he understood
16 that he's stepped into the -- I'm paraphrasing his
17 words, so I'm not going to -- I'm not trying to
18 change it.
19     But what I've heard him say is that he's stepped
20 into the role of being the person for carrying out
21 whatever duties there are as special administrator,
22 and pursuant to whatever the past history of dealings
23 has been, subject to whatever changes are
24 implemented, because he's now the person. Go ahead.
25 You can ask questions along those lines.

Page 101

1           MR. LEE: Which is what I was
2 doing.
3     We need to change the tape, Bob. It's now about
4 1:00. Mr. Suoja, do you want any lunch?
5           THE WITNESS: No.
6           MR. LEE: Okay. We'll take five,
7 change the tape.
8           THE VIDEOGRAPHER: All right. This
9 is the end of Disc 1. Deposition will continue on
10 Disc 2. Time now is 1:04 p.m. Going off record.
11           (Pause in proceedings from
12               1:04 p.m. to 1:09 p.m.)
13           THE VIDEOGRAPHER: Back on record.
14 This is the beginning of Disc 2 in the continuing
15 deposition of Gary Suoja. Time now is 1:09 p.m.
16 Q (By Mr. Lee) When you signed discovery responses on
17 behalf of -- well, when you signed discovery
18 responses in this case, you understood that you're
19 answering on behalf of the estate, correct?
20 A Yes, that's what I signed as, as the special
21 administrator.
22 Q And as signing on behalf of the estate, you
23 understood that when you sign discovery responses,
24 you have an obligation to investigate whatever
25 information's available to the estate, correct?

Gary E. Suoja

Page 102

1  A   I investigated what information I had available to
2      me.
3  Q   And to the rest of the estate, correct?
4  A   To me.
5  Q   Okay.  So how can you sign a document on behalf of an
6      estate if you haven't investigated the information
7      that's available to the estate?
8  A   Because I didn't have anything except what was
9      available to me.
10  Q   Well, you have whatever information's available to
11      your lawyers as well, right?
12  A   Well, and I talked to my lawyers about it, and that
13      was the information that I had.  They didn't have
14      anything in addition, and so it was what was
15      available to me.
16  Q   When you sign on behalf of the estate and say that
17      all the information that's available has been
18      produced, you are representing that the estate has no
19      additional information; is that correct?
20  A   Well, when -- yeah, when I sign on behalf of the
21      estate, yes, my statement is correct.
22  Q   Well, but what you're representing is that there's no
23      more information available, not just to you --
24  A   When --
25  Q   -- but to the estate, right?

Page 103

1  A   When I sign the statement, it is correct.  To the
2      best of my knowledge and ability, it's correct.
3  Q   Okay.  And I'm just trying to make sure I'm clear
4      what you're signing.  You're not just saying, I, Gary
5      Suoja, as Gary Suoja, have no more information.
6      You're saying the estate has no information, right?
7  A   I'm saying that what I sign is true and correct to
8      the best of my knowledge.
9  Q   Are you making that representation as you as a person
10      or on behalf of the estate?
11  A   It's based on what I'm signing.  What I sign is what
12      I'm saying, is it's to the best of my knowledge and
13      belief, it's true and correct.
14  Q   As the personal representative of the estate or just
15      as Gary Suoja?
16  A   Well, how --
17  Q   Suoja?
18  A   -- how did I -- how did I sign it?  What does my
19      signature say?
20  Q   As special representative, sir.
21  A   Well, then -- then it's true and correct to the best
22      of my knowledge as special representative.
23  Q   I'm just trying to figure out, when you sign that as
24      the special representative of the estate, what you're
25      representing is, to the best of your knowledge,

Page 104

1      there's no additional information available to the
2      estate, correct?
3  A   Well, when I sign it, it is true and correct to the
4      best of my knowledge.  I know you want me to say
5      something else.  I'm not going to say it.  I'm
6      telling you my answer.  My answer is, it is true and
7      correct to the best of my knowledge.
8  Q   And I'm asking you a different question, sir.
9  A   Well, I'm giving you the same answer to your
10      question.
11  Q   When you are signing and saying that, "I've produced
12      all the information," you're saying that there's no
13      more information that you're aware of that's
14      available to the estate; is that right?
15  A   No.  What I'm saying when I signed, is this
16      information is true and correct to the best of my
17      knowledge.  That's what I'm saying.  Now, if you
18      don't like that, fine.  That's what I'm saying.
19  Q   Okay.
20              MR. McCOY:  Josh, let me object
21      here.  I don't know why you need to repeat the
22      same questions five times.  I know your firm has
23      the video on client abuse at depositions as a
24      training measure that attorneys review.  But I
25      don't really think that that should be employed in

Page 105

1      this deposition.  Go ahead.
2              MR. LEE:  Bob, I appreciate that
3      you're making an objection.  Are you making an
4      objection to the form or the foundation?  So that I
5      have it --
6              MR. McCOY:  I'm objecting to the
7      repetitive questioning.  I don't know whether that's
8      a form or foundation objection.  But it's a repetitive
9      question.  He's already answered these questions.  But
10      go ahead.  Keep going.
11              MR. LEE:  And I don't believe that
12      I've gotten an answer to the question, which is why I
13      re-asked it.  And I'm entitled to get an answer to
14      the question that I asked.
15              THE WITNESS:  And I will give you
16      the same answer.
17  Q   (By Mr. Lee)  Okay.  So are you refusing to answer
18      the question that I actually asked?
19  A   No.  I'm -- I'm answering the question you asked.
20      When I sign it, it is true and correct to the best of
21      my knowledge.
22  Q   When you verify that all information has been
23      provided, are you stating that all information
24      available to the estate has been provided or just
25      information that's in the possession of Gary Suoja?

Gary E. Suoja

Page 106

1 A   It's -- the information that I give you, the answer I
2     give you is true and correct to the best of my
3     knowledge.  To the best of my knowledge, it's what I
4     have available to me and what -- the information that
5     I get from my attorneys.
6 Q   Have you ever, in response --
7 A   I can't -- oh, I'm sorry.  Go ahead.
8 Q   Have you ever, in responding to discovery on behalf
9     of the estate, done anything to determine what
10    information is available to the estate as opposed to
11    Gary Suoja as an individual?
12 A  By asking my attorneys.  I can't ask my dad, and I
13    can't ask my mother.
14 Q   Can you ask --
15 A   So I ask the attorneys.
16 Q   Can you ask your siblings?
17 A   I am aware that my siblings do not have any
18    information.
19 Q   Okay.  Would you --
20 A   I could ask your firm.  If you will produce the
21    information, I'll be happy to go through it and give
22    you another answer.
23 Q   About which information, sir?
24 A   Well, all the information you're asking for.  Give me
25    access to your files.  I'll be happy to produce some

Page 107

1     more information.
2 Q   Well, sir --
3 A   Okay.  Let's -- let's go on.
4 Q   That's fine.  Have you, sir -- well, let me ask you
5     this.
6         Could you testify truthfully that your father has
7     been exposed to any particular product by any
8     manufacturer?
9 A   I do not know what specific products my father has
10    been exposed to.
11 Q   So you, for instance, could not sign an affidavit
12    stating that your father was exposed to any product;
13    is that correct?
14 A   No, that's not true.  I knew that he was exposed to
15    asbestos.
16 Q   Okay.  That's a good gloss.  You could not sign an
17    affidavit saying, My father was exposed to a product
18    manufactured by any specific company; is that true?
19 A   No, I know generally the names of the people that
20    produce products.  But I do not know specifically
21    when or what products he was exposed to at what time.
22 Q   You don't know specifically what products your father
23    was exposed to at all; is that right?
24 A   I know he's exposed to asbestos.
25 Q   But --

Page 108

1 A   That's a product, isn't it?
2 Q   No, it's not.  It's a mineral.
3 A   Then what do you -- well, isn't that the product that
4     was used?
5 Q   No, sir.
6 A   So what are -- what are you asking then?  I guess I
7     don't understand your question.
8 Q   Sure.  So you could not say -- you could not sign an
9     affidavit saying that your father was exposed to --
10    to a product manufactured by any specific
11    manufacturer; is that right?
12 A   I do not have any specific knowledge of my dad
13    dealing with a specific product on a specific job.  I
14    just don't have that information.
15 Q   And I'm not even going to that level of specificity.
16    You couldn't sign an affidavit saying that your
17    father was exposed to any specific product by any
18    specific manufacturer, could you?
19 A   That's not necessarily true.  I think on some of the
20    names, you know, over the course of times, as we
21    discussed earlier, some of the names are familiar.
22    And I know that my dad dealt with John Mansville,
23    Owens, Owens Corning, Owens-Illinois.  I don't know
24    the distinction, really.
25        You know, those are names that were around.  So

Page 109

1     they were around, you know, because there was
2     construction.  They were around because, you know,
3     dad would have stuff with him.  So I know that those
4     occurred.  But I couldn't tell you exactly when.  I
5     couldn't tell you if I'm mixing them up with later
6     construction activity on my own.  I just -- I know he
7     worked with asbestos, and I know he covered pipes.
8 Q   And that's what I'm trying to get at.  In order to
9     sign an affidavit, you'd have to be able to sign
10    truthfully that you know for a fact that your father
11    worked with a product by that manufacturer, right?
12 A   Well, and I could say that with regard to certain
13    products because I've seen them around before.
14 Q   But you've never seen your father work with them,
15    right?
16 A   I have not seen my father work with them.
17 Q   Your father never told you he worked with any
18    specific product; is that right?
19 A   Not that I recall.
20 Q   Okay.  So --
21 A   But I would see boxes and names.  But, I mean, it
22    wasn't -- it wasn't --
23 Q   And you can't remember the names on any of the boxes
24    that you saw, right?
25 A   Not at any individual time, you know.  And I'm

Gary E. Suoja

Page 110

1    thinking back to when we were living in the house in
2    Rockford.
3  Q  Okay.
4  A  You know, did I see this particular box or that
5    particular box?  And the answer is, I can't say for
6    sure what it was.
7  Q  Right.  Which means that you can't say one way or the
8    other that your father worked with any particular
9    product made by a particular manufacturer; is that
10   right?
11 A  At a particular time.
12 Q  Ever?
13 A  No, that's not true.  Because --
14 Q  Okay.
15 A  Because we knew what my dad did.  You know, and it --
16   you know, it's like saying you're a lawyer.  You
17   never worked with books.  You don't know what books
18   your dad worked with.  You don't know, you know, what
19   specific books he worked with.  Did he deal with
20   West?  Did he deal with AI?  And the answer is "no."
21   Did he work with books?  Yes, because you knew that's
22   what he did.  That was his job.  And that's what my
23   dad did.  My dad was an asbestos worker.  That was
24   his life.
25 Q  Sure.

Page 111

1  A  So I know he dealt with those products.
2  Q  I'm not --
3  A  Which specific ones?  I can't tell you.
4  Q  And that's the thing.  I'm asking you, could you sign
5    an affidavit stating which specific manufacturers'
6    products your father worked with?
7  A  No.  Not at any given time, no.
8  Q  And that's not my question.  I'm not asking for a
9    specific time.  Could you sign an affidavit stating
10   which manufacturers' products your father worked
11   with?
12 A  No.  Probably not.
13 Q  Okay.
14 A  Depending on how trickily it's worded.  But
15   generically, I think I could.
16 Q  Generically, you could say he worked with asbestos
17   products, right?
18 A  That's correct.
19 Q  But you could not --
20 A  And he worked at these places.
21 Q  And you could state where you know he worked?
22 A  Right.
23 Q  But you could not state that he worked with a
24   specific manufacturer's products?
25 A  Probably not.

Page 112

1  Q  Okay.  You wouldn't be willing to do so under
2    penalties of perjury, would you?
3  A  Well, I -- I wouldn't do it under penalty of perjury
4    unless I was -- I was certain.
5  Q  Have you signed affidavits in the past?
6  A  Yes, I have.
7  Q  Have you signed them both in litigation on behalf of
8    your father and in other circumstances?
9  A  I -- I know I've signed affidavits in other cases, in
10   other situations.  I can't tell you if I've signed
11   affidavits in this particular case or not.  I'm
12   assuming I have, but I don't recall.
13 Q  You don't recall ever signing any --
14 A  No, I --
15 Q  -- affidavit in this case?
16 A  I -- I said I don't recall.  You know, I signed an
17   affidavit here on these -- your Exhibit No. 2.
18 Q  Okay.  Do you recall signing an affidavit in
19   opposition to a motion to enforce a settlement in
20   this case?
21 A  Yes.
22 Q  Okay.  Do you as a lawyer have -- you ever asked your
23   clients to sign affidavits?
24 A  Yes.
25 Q  Okay.  Do you generally know the purpose of an

Page 113

1    affidavit?
2  A  Yes.
3  Q  Do you understand that to be similar to providing
4    testimony in front of a court?
5  A  Yes.
6  Q  And so it's under the same oath like what you took
7    here today; is that correct?
8  A  That's correct.
9  Q  Okay.  Do you think it's important that when --
10   before you sign an affidavit, you ensure that the
11   information in the affidavit is correct and true?
12 A  As correct as you possibly can at the time, yes.
13 Q  Okay.  And that's because it's intended for a court
14   to rely on; is that correct?
15 A  Well, it's -- it's not because it's for a court to
16   rely on.  It's because it's the truth.
17 Q  Okay.  As a lawyer, do you believe that when you
18   sign a statement attesting to a matter in court,
19   it's reasonable for another party to rely on those
20   statements?
21 A  I would assume that would be the case, yes.
22 Q  Okay.  And as a lawyer, do you understand how
23   important it is that you are careful and accurate in
24   any statements you file before a court because they
25   can be held against you as an admission later on?

Gary E. Suoja

| | Page 114 |
|---|---|
| 1 | A  That's correct.  Or it could be just used to |
| 2 | contradict what you're testifying to. |
| 3 | Q  What lawyers sometimes call is impeachment? |
| 4 | A  That's -- that's correct. |
| 5 | Q  Okay.  And you're familiar with that concept as well? |
| 6 | A  That's correct. |
| 7 | Q  As a trial attorney, you've probably used it a couple |
| 8 | of times? |
| 9 | A  Well, I wouldn't call myself a trial attorney, but I |
| 10 | have been in court, yes. |
| 11 | Q  When you were in JAG, you were -- you did some |
| 12 | trials, right? |
| 13 | A  I did. |
| 14 | Q  Can you impeach people in military trials? |
| 15 | A  Oh, absolutely.  It's the federal rules in JAG. |
| 16 | Q  I'm assuming -- |
| 17 | A  Military court. |
| 18 | Q  -- you probably did that once or twice? |
| 19 | A  I did. |
| 20 | Q  Okay.  So you're really familiar with the idea that |
| 21 | people's prior statements can be used against them? |
| 22 | A  That's correct. |
| 23 | Q  And you understand that that's especially true when |
| 24 | it's a statement that's been made to a court? |
| 25 | A  It's not especially true when it's made to a court. |

| | Page 115 |
|---|---|
| 1 | It's still the question of what is the truth of the |
| 2 | statement made. |
| 3 | Q  Okay. |
| 4 | A  And I don't see an additional significance.  It's |
| 5 | either a true statement or -- |
| 6 | Q  Or not? |
| 7 | A  -- or a question. |
| 8 | Q  Okay. |
| 9 | A  Well, it -- you know, or not?  Yeah.  As the longer |
| 10 | we live, the more we find that people look at what we |
| 11 | say, and they try to come up with a different |
| 12 | interpretation.  And so the statements may still be |
| 13 | true.  It's just that people are looking at it with |
| 14 | different glasses. |
| 15 | Q  Okay. |
| 16 | A  That's why we -- that's why we have trials. |
| 17 | Q  As I understand in looking at your affidavit in this |
| 18 | case and in talking with you today, you've never |
| 19 | talked to Mike Cascino; is that right? |
| 20 | A  Not to my knowledge. |
| 21 | Q  Okay.  You wouldn't be able to pick him up out of a |
| 22 | lineup if you saw him? |
| 23 | A  No, I would not.  As a matter of fact, I'd hate to |
| 24 | even try.  Because if it was a lineup, it wouldn't be |
| 25 | a good thing. |

| | Page 116 |
|---|---|
| 1 | Q  All right.  If you saw him in court or walking down |
| 2 | the street, you wouldn't be able to figure out who he |
| 3 | was, would you? |
| 4 | A  No, I would not. |
| 5 | Q  All right.  Have you verified -- other than what |
| 6 | you've got in front of you as Exhibit 2, have you |
| 7 | verified other discovery responses in litigation |
| 8 | involving your father's estate? |
| 9 | A  I'm not sure I understand that question.  Because |
| 10 | this is -- this is one.  I think there were some -- |
| 11 | there may have been some other interrogatories.  I'm |
| 12 | not exactly sure, but...(Pause.) |
| 13 | Q  Do you recall one way or the other verifying |
| 14 | discovery responses in this case other than what |
| 15 | you've got in front of you as Exhibit 2? |
| 16 | A  I -- I don't recall off the top of my head, no. |
| 17 | MR. LEE:  Let's go ahead and mark |
| 18 | this. |
| 19 | (Exhibit No. 3 marked for |
| 20 | identification.) |
| 21 | Q  (By Mr. Lee)  I'm going to hand you what we've marked |
| 22 | as Exhibit 3 for your deposition.  Do you see that as |
| 23 | Plaintiff's First Response to Standard |
| 24 | Interrogatories dated 6/20/2012? |
| 25 | A  Yes, I do. |

| | Page 117 |
|---|---|
| 1 | Q  And that's in the case of Suoja v. Owens-Illinois? |
| 2 | A  Yes, I assume that's the same Suoja, even though it's |
| 3 | misspelled.  And I don't know what particular case |
| 4 | this is, because it is for the Eastern District of |
| 5 | Pennsylvania. |
| 6 | Q  Okay.  If you'll look -- well, let me ask you this: |
| 7 | Have you ever been the personal representative for |
| 8 | another case involving a Suoja? |
| 9 | A  No. |
| 10 | Q  Okay.  Will you go ahead and look at the very end of |
| 11 | this document that we've marked as Exhibit 3? |
| 12 | A  What is the very end? |
| 13 | Q  The last page. |
| 14 | A  Okay. |
| 15 | Q  You there? |
| 16 | A  I am here.  Declaration of Persons Making the |
| 17 | Answers? |
| 18 | Q  Yes, sir. |
| 19 | A  Yes. |
| 20 | Q  Who is the person making the answers to these |
| 21 | interrogatories? |
| 22 | A  That is my signature. |
| 23 | Q  So Gary -- does it say that for the answers, it's |
| 24 | Gary Suoja who's making the answers to these? |
| 25 | A  That's correct. |

Gary E. Suoja

Page 118

1 Q And you signed them?
2 A That's correct.
3 Q And you signed them under penalty of perjury?
4 A That's correct.
5 Q That they were true and correct?
6 A That's correct.
7 Q Okay. And before you would have signed these, you
8   would have gone through to make sure that the answers
9   were correct?
10 A That's correct.
11 Q And you would have consulted with any other person
12   who's helping you prepare them to make sure that the
13   answers were true and correct, correct?
14 A That's correct. And that would have been -- that
15   would have been Cascino Vaughan.
16 Q Okay. Could you turn to Page 4, please?
17 A Okay.
18 Q Do you see an answer to No. 14 -- or Request No. 14
19   here on the page there?
20 A Item 14.
21 Q Do you see it?
22 A "State whether you have ever filed a lawsuit for
23   personal injury or a claim for Social Security
24   disability benefits, and if so, state the title."
25   Yes.

Page 119

1 Q And you were answering these as the personal
2   representative for the estate of Oswald Suoja,
3   correct?
4 A Yeah. Again, to the best of my knowledge and belief.
5 Q What was your answer when we asked whether there'd
6   been a prior lawsuit?
7 A Only this lawsuit.
8 Q Meaning only the lawsuit filed against
9   Owens-Illinois, correct?
10 A That's the only one I knew about.
11 Q That's not actually true, is it?
12 A I don't know.
13 Q You still don't know that there's a prior lawsuit?
14 A I -- I -- I've heard you reference a prior lawsuit,
15   but it, you know, does not ring a bell for me.
16 Q Okay. And so you signed these on --
17 A Well, I believe it was --
18 Q Let's see if there's a date, actually.
19 A -- in 2012.
20 Q Okay. There's not a date on your declaration, but
21   the response is dated 6/20/2012, right?
22 A Yeah. So it would have been signed at approximately
23   that time.
24 Q And you have -- let me ask you this: You have never
25   signed a blanket verification for discovery that was

Page 120

1   to be used over and over again, have you?
2 A No, absolutely not. I -- you know, actually, I
3   generally sort of recognize these. But, yeah, no,
4   this was -- this was not a blanket verification. I
5   went through each one.
6 Q Did you ask your lawyers whether there had ever been
7   a case filed, previous case filed on behalf of your
8   father?
9 A I don't remember asking that specific questions.
10     MR. McCOY: Let me object, object
11   to that. That's a communication with counsel that is
12   not subject to the limited waiver that we've provided
13   about enforcement of the settlement agreement. The
14   existence of prior cases had no bearing on that.
15     MR. LEE: You're objecting on
16   behalf of privilege?
17     MR. McCOY: I'm asserting the
18   privilege. I mean, Gary's client. He can waive
19   it. But I'm asserting privilege.
20     MR. LEE: I just want to be clear,
21   Bob. I'm not asking anybody to waive it. I'm just --
22   I want to make sure I understand the objection. And
23   the objection is that the information is privileged;
24   is that correct?
25     MR. McCOY: Right. But I --

Page 121

1     MR. LEE: Okay.
2     MR. McCOY: -- also said, if Gary
3   wants to, he can waive it.
4     MR. LEE: And I don't want to get
5   in between you and Mr. Suoja on that. Are you
6   directing Mr. Suoja not to answer the question on
7   behalf of privilege?
8     MR. McCOY: I don't think I need to
9   direct him not to answer. He can make the judgment
10   on that question himself.
11
12 Q (By Mr. Lee) Would you like to answer that question
13   now, sir?
14 A I'm not aware of the other lawsuit, and I didn't hear
15   anything different from my attorneys.
16 Q Okay. You're still not aware of the prior lawsuit to
17   this day?
18 A I'm -- I'm aware of the talk about a potential prior
19   lawsuit, but that's -- you know, I don't know really
20   any specifics.
21 Q Okay.
22 A Just heard that there was some state court action.
23   But it's all been, you know, very recent. I don't
24   know really any of the specifics about it.
25 Q Okay. Are you receiving any compensation for your

Gary E. Suoja

Page 122

1    work as special administrator for your father's
2    estate?
3  A  No.
4  Q  You said that you have made some distributions to
5    your siblings?
6  A  That's correct.
7  Q  Have you kept -- have they been distributed pro rata
8    or have you kept a larger provision?
9  A  No, they went pro rata.
10  Q  Okay.  So equally split?
11  A  That's correct.
12  Q  Okay.  How much?
13  A  I -- you know, this has been going on so long, I
14    can't tell you.  I didn't keep an accounting.  There
15    is -- the last payment that came in was -- or
16    settlement was a fairly nominal number.  And I recall
17    about $500.  But that there was supposedly going to
18    be another one following up.  And I didn't distribute
19    that one.  And -- and this has gone on and on and on.
20      So there's -- there's probably about $500,
21    somewhere close to that.  Maybe that was a settlement
22    amount and that's -- you know, after the attorney's
23    fees and costs, there's something less.  But I was
24    just going, Who's going to write these checks for
25    this piddling amount until the next one comes?  And

Page 123

1    so far, it hasn't come.
2          MR. LEE:  Mark that as Exhibit 4,
3    please.
4          (Exhibit No. 4 marked for
5            identification.)
6  Q  (By Mr. Lee)  So you were appointed special
7    administrator, as far as you know, in this case in
8    2007; is that right?
9  A  I thought it was -- from what we did earlier, I
10    thought Mike was reading something to indicate that I
11    was appointed in the Eastern District back in, was it
12    2003, I believe.
13  Q  Okay.
14  A  Or 2002.
15  Q  Okay.  I'm going to hand you what we've marked as
16    Exhibit 4 for your deposition.
17          MR. LEE:  Go ahead and mark that as
18    4A, please.
19          (Exhibit No. 4A marked for
20            identification.)
21  Q  (By Mr. Lee)  As Exhibit 4 for your deposition, we've
22    marked what is entitled "Report Pursuant to
23    Administrative Order No. 12," right?
24  A  I don't know.  I just see -- let's see.  It's
25    Asbestos Products Liability Litigation.  Relates to

Page 124

1    cases from the law firm of Cascino Vaughan, U.S.
2    District Court for the Western District of Wisconsin.
3  Q  And then the title of the document is "Report
4    Pursuant to Administrative Order No. 12"?
5  A  That's correct.
6  Q  Okay.  So what you've got in front of you is a Report
7    Pursuant to Administrative Order No. 12, correct?
8  A  That's correct.
9  Q  Signed by Michael Cascino?
10  A  Signed by Michael P. Cascino.
11  Q  Of the Cascino Vaughan Law Offices?
12  A  That would appear to be the case.
13  Q  Is the plaintiff for this case identified?
14  A  Oswald F. Suoja, deceased.  That would be my father.
15  Q  Okay.  And the case status here, do you see under
16    No. -- the third bullet down, No. 3, says "Case
17    Status - Defendant Identification"?
18  A  Okay.
19  Q  And Owens-Illinois is listed as a defendant there; is
20    that correct?
21  A  I'm sorry.  I don't see that.
22  Q  Do you see 3d?
23  A  3d.  Non-bankruptcy unsettled defendants.
24    Owens-Illinois.  I see it.
25  Q  Okay.  And so Owens-Illinois is also identified on

Page 125

1    Exhibit 4 as a defendant in this case; is that
2    correct?
3  A  That would appear to be the case.
4  Q  And do you see that also there's a representation as
5    to related pending court actions?  Do you see that?
6  A  Yeah.  "Related pending court actions."  Says "none."
7  Q  Okay.  If we go to the last page of this Exhibit 4,
8    do you see that it's dated Thursday, February 25th,
9    2010?
10  A  What is the last page?
11  Q  The last page is the last page, sir.
12  A  And what is on this last page?  The --
13  Q  Says "Settlement Report as of 2/3/2010."
14  A  Okay.
15  Q  It's the last page of the --
16  A  Sometimes the last pages fall off of stapled copies,
17    and that's why I wanted to know.
18  Q  Okay.
19  A  Okay.
20  Q  Do you see the Settlement Report as of --
21  A  I see --
22  Q  -- 2/3/2010?
23  A  -- the Settlement Report as of 2/3/2010.
24  Q  So I'm going to actually mark, as Exhibit 4A for your
25    deposition, that last page.  Will you confirm that

Gary E. Suoja

Page 126

1  the last page of Exhibit 4 and Exhibit 4A are the
2  same?
3  A  I have a -- I have a question here.  There seems to
4  be an inconsistency.  This is for the Eastern
5  District of Pennsylvania, but I don't see a date on
6  Mike Cascino's signature on the front.  It says "File
7  Date:  8/5/99."  And I'm -- and then I see a letter
8  that's dated '99 and St. Mary's report that's
9  dated -- you know, that's obviously related to my
10  dad's passing, which is in '96, and Duluth Clinic
11  cytology report, register of deeds dated January 14th
12  '97, and then this is a settlement report that's
13  dated in 2010.  So I'm trying to correlate how
14  they -- how the dates line up.
15  Q  Have to talk to Mr. McCoy and Mr. Cascino about that.
16  A  Because -- because this -- yeah, this doesn't -- I
17  don't see any -- any date on the front page, so I'm
18  just wondering.
19  Q  That's a practice that you'd have to talk to Cascino
20  Law --
21          MR. McCOY:  Let me just ask a quick
22  voir dire question here.
23      Mr. Suoja, have you ever seen either of these
24  documents before they were just presented to you?
25          THE WITNESS:  I have not seen this

Page 127

1  last one, no.  Exhibit 4 I have not seen.  Exhibit 4A
2  I have not seen before.
3          MR. McCOY:  Okay.  And 4A is what?
4          THE WITNESS:  4A appears to be just
5  a -- another copy of the last page of Exhibit 4.
6          MR. McCOY:  Okay.
7          THE WITNESS:  And I have --
8          MR. McCOY:  Exhibit 4 -- and
9  Exhibit 4 is what?
10          THE WITNESS:  Exhibit 4 is the
11  Report Pursuant to Administrative Order No. 12.  This
12  is in the Eastern District of Pennsylvania.  District
13  Court, Eastern District of Pennsylvania, Civil Action
14  No. MDL 875.  Report Pursuant to --
15          MR. McCOY:  All right.
16          THE WITNESS:  -- Administrative
17  Order No. 12, and then that's -- that's Exhibit 4.
18      And then Exhibit 4A is a repeat of the last page
19  of Exhibit 4.  It is Thursday, February 25th, 2010,
20  Settlement Report as of 2/3/2010.  "Name:  Oswald F.
21  Suoja," and then it lists "Settlement."  And it
22  lists --
23          MR. McCOY:  So before today, have
24  you -- before you were presented these at the
25  deposition now, have you seen either Exhibit 4 or 4A

Page 128

1  before?
2          THE WITNESS:  No.  This is the
3  first time I've seen them.
4          MR. McCOY:  All right.  We can --
5  you can go ahead, Josh.
6          MR. LEE:  Okay.  Bob, just -- I'll
7  ask some -- a couple more questions to clarify so
8  that you have some confidence.  You should be able to
9  find this in your records, because it was submitted
10  by your firm.
11  Q  (By Mr. Lee)  Mr. Suoja, if you go back to the first
12  page of Exhibit 4, which is the caption page.
13  A  Yes.
14  Q  Do you also see that in the caption, there's a
15  specific designation for the specific case and the
16  case number?
17  A  I see that there is a designation of the Product
18  Liability Litigation No. Roman VI, civil action
19  number, and I presume to be the case number.  This is
20  unusual case setting from my experience.
21  Q  And I can understand that.
22      And then does the -- is there any other information
23  that tells us which case this relates to?
24  A  This document relates to cases from the law firm of
25  Cascino Vaughan Law Offices, Limited, U.S. Western

Page 129

1  District Court for the Western District of Wisconsin,
2  Suoja Case No. 97, dash, 2307.
3  Q  When you were reading it before, you kind of missed
4  that part of it.  This is the case that we're talking
5  about here today, isn't it?
6  A  I would presume so.  As I recall, it went from the
7  Eastern District back to the Western District of
8  Wisconsin.
9  Q  And if you recall even more, it actually started in
10  the Western District of Wisconsin, got transferred to
11  the Eastern District of Pennsylvania, and then came
12  back, right?
13  A  I -- you know, unfortunately, I didn't have any
14  knowledge of that.  I only -- this -- when I talked
15  about that last few hundred dollars that we had
16  received in a settlement, at that time somebody
17  informed me -- because I thought we were pretty much
18  wrapped up, and somebody informed me that there was
19  still a case pending in -- another case pending of
20  some sort out of bankruptcy or whatever, but -- and
21  that this was it.
22      And I -- when nothing was happening, I got
23  frustrated and went to the Internet.  I found this
24  case by Googling, searching for my dad's name, and
25  found this litigation in the Eastern District of

Gary E. Suoja

| | Page 130 |
|---|---|
| 1 | Pennsylvania, which I didn't understand how in the |
| 2 | hell it got there.  So that's -- that's what I know |
| 3 | about it. |
| 4 | MR. LEE:  Okay.  And so, Bob, I was |
| 5 | just asking those questions to clarify.  Will you |
| 6 | agree that this is your firm 's AO 12 report in this |
| 7 | case? |
| 8 | THE WITNESS:  I -- |
| 9 | MR. McCOY:  I'm not there -- |
| 10 | THE WITNESS:  I don't know. |
| 11 | MR. McCOY:  -- to see it.  I mean, |
| 12 | I'm not questioning -- |
| 13 | THE WITNESS:  I -- |
| 14 | MR. McCOY:  -- that -- |
| 15 | THE WITNESS:  I see -- |
| 16 | MR. LEE:  Okay. |
| 17 | THE WITNESS:  -- Mike Cascino's |
| 18 | signature on it, but I don't know what it is. |
| 19 | MR. LEE:  All right.  Mr. Suoja, I |
| 20 | was trying to see if we could get a stipulation |
| 21 | between me and Mr. McCoy. |
| 22 | THE WITNESS:  Oh. |
| 23 | MR. LEE:  I don't think -- |
| 24 | THE WITNESS:  I'm sorry. |
| 25 | MR. LEE:  -- we're going to get |

| | Page 131 |
|---|---|
| 1 | there. |
| 2 | MR. McCOY:  I'm not able to |
| 3 | stipulate, because I'm not there to see it, nor do I |
| 4 | know that it's all of it, nor was I a part of that, |
| 5 | that filing, myself.  So all I can tell you is that I'm |
| 6 | not questioning -- |
| 7 | MR. LEE:  Okay. |
| 8 | MR. McCOY:  -- that Mike Cascino |
| 9 | signed right now.  Go ahead. |
| 10 | Q  (By Mr. Lee)  Can you look at Exhibit 4A, sir? |
| 11 | A  I am looking at it. |
| 12 | Q  Does this have your father's name at the top of it? |
| 13 | A  It does. |
| 14 | Q  Does it say it's a Settlement Report as of 2/3/2010? |
| 15 | A  It does. |
| 16 | Q  And is the date on Exhibit 4A February 25th, 2010? |
| 17 | A  It is. |
| 18 | Q  As you look down through this settlement report, does |
| 19 | it include settlements all the way from the year 1999 |
| 20 | through the year 2007? |
| 21 | A  I see them.  Yeah, 2000, 2001, 2007, '97.  So, yes, |
| 22 | I -- I would agree with what you say. |
| 23 | Q  And there's even one on here from, the date was 2/25 |
| 24 | of 2009, right?  National Gypsum Corporation? |
| 25 | A  Yes.  2/25/2009. |

| | Page 132 |
|---|---|
| 1 | Q  So these settlements occurred during the time that |
| 2 | you were special administrator of the estate? |
| 3 | A  Some of them did. |
| 4 | Q  You gave -- were you asked for authority to make each |
| 5 | of these settlements? |
| 6 | A  I was asked if these were adequate settlements. |
| 7 | Q  You were asked for specific authority to settle each |
| 8 | one of these? |
| 9 | A  I -- I was contacted about them.  Jill Rakauski was |
| 10 | careful to talk to me. |
| 11 | Q  So Jill Rakauski, though, was not at Cascino Vaughn |
| 12 | Law Office for all these settlements? |
| 13 | A  No, I don't believe so. |
| 14 | Q  Okay.  So who other than Jill Rakauski contacted you? |
| 15 | A  I -- I would be contacted by some of the clerks.  And |
| 16 | then, frankly, that was one of my frustrations with |
| 17 | Cascino Vaughn, is I would usually end up getting a |
| 18 | clerk or someone and say, you know, Send me something |
| 19 | to sign or sign off on.  And I would try to get ahold |
| 20 | of an attorney, and I had some frustration not being |
| 21 | able to do that.  And the clerks were always |
| 22 | different.  So there was no continuity.  So I was |
| 23 | pretty ticked sometimes. |
| 24 | Q  Try and understand, has this litigation proceeded |
| 25 | without regular consultation with you, sir? |

| | Page 133 |
|---|---|
| 1 | A  I guess -- |
| 2 | MR. McCOY:  Let me object. |
| 3 | THE WITNESS:  I guess I -- |
| 4 | MR. McCOY:  Which litigation are we |
| 5 | talking -- |
| 6 | THE WITNESS:  Yeah. |
| 7 | MR. McCOY:  -- about now? |
| 8 | THE WITNESS:  And -- and what -- |
| 9 | yeah. |
| 10 | MR. McCOY:  What is it? |
| 11 | THE WITNESS:  And what -- what |
| 12 | specific -- |
| 13 | MR. McCOY:  Are you talking about |
| 14 | settlements with bankrupt entities?  Are you talking |
| 15 | about a lawsuit that -- the first one that he didn't |
| 16 | know anything about?  Are you talking about the one |
| 17 | against Owens-Illinois?  I just don't know, Josh. |
| 18 | Answer. |
| 19 | Q  (By Mr. Lee)  Whatever litigation has been proceeding |
| 20 | on behalf of your father's estate while you've been |
| 21 | special -- |
| 22 | MR. McCOY:  Well, I think that's |
| 23 | compound question.  Subject to that, because there's |
| 24 | different forums in which to proceed, I mean, each of |
| 25 | these bankruptcy trusts or -- subject to that, he |

Gary E. Suoja

Page 134

1    can answer however the best that he can.
2            MR. LEE:  I don't think I'd
3    actually finished a question, sir.  Is it okay if I
4    finish a question?
5    Q   (By Mr. Lee)  Whatever litigation has proceeded on
6        behalf your father's estate while you've been special
7        administrator, has it proceeded without regular
8        consultation between can the Cascino Vaughan law
9        firm?
10   A   No.
11   Q   Okay.  Why, then, were you frustrated?
12   A   Because the consultation and the contact that I had
13       wasn't adequate.  I wanted other answers.
14   Q   Okay.
15   A   And so that's why I was calling them.  So was it
16       proceeding without regular consultation?  No.  It
17       was -- there was feedback.  It wasn't adequate, in my
18       opinion.  And I -- when I found out Jill Rakauski was
19       gone, that was frustrating because I could reach her,
20       and then when I got ahold of Bob.
21           And, of course, part of it was, and my ability to
22       locate the case on the Internet, was based on
23       feedback that I got from some of the clerks there.
24       But on -- on more than one occasion, you know, people
25       indicated to me that we have the settlement coming,

Page 135

1    this is what we're looking at.
2    Q   Did you -- were the communications about the prior
3        settlements verbal or were they done via e-mail or
4        letter?
5    A   Sometimes they were done by telephone.  And that was
6        the result of my calling in and asking questions and
7        trying to find people, find out what was going on.
8        And I would hear from them, you know, what the
9        settlement was.  And then away we'd go, and I'd get a
10       letter to sign off.
11   Q   Okay.  Have you kept the correspondence between
12       yourself and the Cascino Vaughan Law Offices?
13   A   Not on a real regular basis, no.
14   Q   Do you still have some of it?
15   A   I might -- I might have some of it.
16   Q   Do you still have correspondence that relates to
17       settlements on behalf of your father's estate?
18   A   I don't believe so.
19   Q   Okay.  What would have happened to that
20       correspondence?
21   A   Well, my offices got moved several times during the
22       course of this.  It's a -- I have a usual habit of
23       dumping files after so long, and out they go once
24       they're outdated, so...(Pause.)
25   Q   Would you expect that your attorneys would have

Page 136

1    copies of that correspondence?
2    A   I -- I would assume that they -- that they would.
3    Q   And that correspondence would relate to how, over the
4        course of time, authority has or has not been granted
5        with regard to settlements on behalf of your father's
6        estate?
7    A   Don't know.
8    Q   Okay.  Okay.  You do, however, believe that there has
9        been correspondence between you and your attorneys
10       about authority to settle on behalf of --
11   A   Well, when --
12   Q   -- your father's estate?
13   A   I don't know what you mean by "authority."  By -- do
14       I consent to this?  They've sent me items, you know,
15       do I consent to this, and if so, send it back.  And
16       that has occurred.
17   Q   So in that context, authority for a particular
18       settlement, there should be correspondence going back
19       between you and your attorneys?
20   A   That would be correct.
21   Q   Okay.
22   A   And I would sign off on each settlement.  It required
23       my signature.
24   Q   Okay.  And that would be true for each of the
25       settlements that's identified here post 2003 when you

Page 137

1    were appointed special administrator?
2    A   I -- you're asking me -- you know, I'm -- I'm over 70
3        years old, and you're asking me to go back and
4        remember each of these things.  This wasn't the
5        highlight of my life.
6    Q   Okay.
7    A   And it -- it wasn't something that I was, you know,
8        waiting with bated breath on.
9            You know, to clarify some of this, you know, as I
10       think about this, I do recall discussing some of
11       these settlement offers with Jill Rakauski, and --
12       and perhaps some of them with my mother when she was
13       there.  I do -- I do recall talking to Jill, and we
14       talked certainly on more than one occasion about
15       accepting these settlements.
16   Q   Okay.
17   A   So it was -- you know, it was her recommendation and
18       a discussion.  And I can -- I can definitely remember
19       that.  And, of course, I remembered the
20       Owens-Illinois discussion with -- with Bob.  But as I
21       think about it, we did have discussions on the
22       settlement.
23   Q   Okay.  I want to ask you a little bit about an
24       affidavit that you signed in this case.  We'll go
25       ahead and mark this as, I think we're on Exhibit 5.

Gary E. Suoja

Page 138

1          (Exhibit No. 5 marked for
2          identification.)
3  Q   (By Mr. Lee)  And I'll go ahead and hand you Exhibit
4      5, sir.
5  A   Okay.
6  Q   Do you now have in front of you what we've marked
7      "Exhibit 5" for your deposition today?
8  A   That's correct.  I do.
9  Q   Is this a Declaration of Gary Suoja?
10  A   It is.
11  Q   And you understand that a declaration used for these
12      purposes is akin to an affidavit, correct?
13  A   That's correct.  Line 9 covers it.  And in
14      Washington, declaration under penalty of perjury is
15      the equivalent of an affidavit or a sworn testimony.
16  Q   And so when you signed this affidavit, you were
17      signing it with the intention of following the type
18      of oath that you took at the beginning?
19  A   Absolutely.
20  Q   And you understood that this could be used just as
21      testimony before a court or a jury, correct?
22  A   That's correct.
23  Q   Is there anything in this affidavit that's incorrect?
24  A   I -- I don't know.  I haven't read it.  I've just
25      looked at it.

Page 139

1  Q   I'm going to give you a second to take a look through
2      it.
3  A   Okay.  Probably the date of my appointment as special
4      administrator is different.  I thought it was later.
5      Other than that, I'd say it's correct.
6  Q   Okay.  Why would you say that Paragraph 4 is
7      incorrect?
8  A   Because when we earlier heard Bob talk about the
9      order from the court in the Eastern District of
10      Pennsylvania, I believe that was in 2003, which
11      surprises me because of that early, is my mother was
12      still around, but she -- she was having some
13      problems.  So it's possible we decided that it would
14      be better if I just stepped in at that point.
15  Q   Is it your testimony that your mother was still alive
16      in 2009?
17          MR. McCOY:  Let me --
18          THE WITNESS:  No.
19          MR. McCOY:  -- stop you guys --
20          MR. LEE:  Bob, Bob, there's a
21      pending question.
22          MR. McCOY:  The order was entered
23      in 2009.
24          THE WITNESS:  2009?  Okay.  I'm
25      sorry.  That was my mistake then.

Page 140

1          MR. McCOY:  Maybe when I read it,
2      Gary, you didn't hear the date correctly, but it says
3      March 3, 2009.
4          THE WITNESS:  All right.  That was --
5          MR. LEE:  Bob.
6          THE WITNESS:  I misunderstood then.
7      It was 2009.  I'm sorry.
8          MR. LEE:  That's fine.  Bob, please
9      let me finish my question and get an answer before
10      you insert your own testimony.
11          MR. McCOY:  Are you saying Judge
12      Robreno got it wrong?
13          MR. LEE:  No, Bob.  I'm saying that
14      I asked a question of the witness and I wasn't asking
15      for your testimony, and I'd appreciate it if you'd
16      allow me to get an answer from the witness before you
17      insert your testimony, which is not actually an
18      objection.  And if you had something to clear up, you
19      can do that through your own questions after I'm
20      done, please.
21          THE WITNESS:  Well, then, if I can
22      finish my answer.
23          MR. LEE:  I'm very happy to have
24      you finish your --
25          THE WITNESS:  Yeah.

Page 141

1          MR. LEE:  -- answer, sir.
2          THE WITNESS:  Based on what Mr. McCoy
3      had said earlier, I heard 2003, which kind of
4      surprised me.  But I thought he read off 2003.
5      Apparently the order was 2009.  So that would be more
6      consistent.
7  Q   (By Mr. Lee)  Okay.  Your mother passed away in 2003,
8      didn't she?
9  A   No.  I believe it was later than that.
10  Q   Do you know what year your mother passed away in?
11  A   No, I don't.  I'm a little embarrassed to say that.
12      But my -- my recollection was, it was -- it was about
13      2006.
14  Q   Okay.
15  A   And I can -- and the reason I say that is, she was 84
16      when she passed away.  She was born in December of
17      '20 -- 1921.  So I believe that she passed away in
18      2005 or early 2006.
19  Q   So in this affidavit, where it says, "After the death
20      of my mother, in 2009," that would be not correct?
21  A   Well, in 2009, I was appointed special administrator.
22  Q   Okay.
23  A   So it's --
24  Q   You weren't trying to tell --
25  A   It depends.

Gary E. Suoja

Page 142

1 Q  -- us that your mother passed away in 2009?
2 A  No.
3 Q  All right.  And, in fact, your mother did pass away
4    in 2003, didn't she?
5 A  I don't -- I thought it was 2006.  But I could be
6    wrong.
7 Q  Okay.  So the estate went for six years without a
8    special administrator?
9 A  It's possible.
10 Q  Okay.  Do you know if anybody was a special
11    administrator between the time that your mother was
12    the special administrator and there was a petition in
13    the Eastern District of Pennsylvania to see if a
14    federal court could appoint you as a --
15 A  I'm --
16 Q  -- special administrator?
17 A  I'm pretty -- I'm pretty certain that I was acting on
18    behalf of my dad's estate after my mother passed
19    away, because there was nobody -- nobody else to do
20    that.  And my siblings were more than happy.  And if
21    they didn't say it directly, they were -- by default,
22    they were more than happy to have me handle it,
23    because nobody else wanted to screw around with it.
24 Q  In order to have the authority to handle the estate,
25    though, some court has to represent -- recognize you

Page 143

1    as a special administrator; is that correct?
2 A  Well, they did here.  I don't know about the others.
3    I think the others were mostly settlements.  And I
4    acted on behalf of the estate.  And I'm not certain
5    how the attorneys set it up, but I was the one that
6    signed off on everything.
7 Q  Okay.  So if we look at Paragraph 4, you weren't
8    trying to tell us that your mother died in 2009; is
9    that correct?
10 A  That's correct.
11 Q  Okay.  That's fair.  So if we look at your affidavit,
12    you receive notification that there were settlement
13    negotiations going on between you and Owens-Illinois
14    when?
15 A  Well, I received notification that Owens-Illinois had
16    made an offer to settle for $150,000.
17 Q  Have you ever been involved in a settlement?
18 A  Yes.
19 Q  Generally, is it the person who is seeking damages,
20    they make a demand and then the defendant makes an
21    offer back in response to a demand?
22 A  It depends on the situation.  As -- my recollection
23    is from -- from Bob that, you know, it was coming to
24    the end of the year.  There was some money available.
25    They were willing to see the case settled for

Page 144

1    $150,000.
2 Q  He didn't communicate the fact that there'd been
3    several demands made in this case prior?
4 A  No, I did not hear about that.  I heard that -- that
5    this was the response from Owens-Illinois, at
6    150,000.
7 Q  And that's the question.  That's a response to a --
8 A  Yeah.
9 Q  -- demand, right?
10 A  Well, I -- I didn't know if it was a response to a
11    demand.  It's just that they had offered to settle it
12    for 150,000.
13 Q  Okay.
14 A  So I didn't -- I didn't get any kind of that detail.
15    I don't recall any of that detail being offered.
16 Q  So in late December 2014, you were informed that
17    there was a proposal that the case be resolved for
18    $150,000; is that correct?
19 A  That's correct.
20 Q  Okay.  And were you informed who was making
21    negotiations on behalf of the estate?
22 A  No.  I think I just heard that that was the offer.  I
23    might have heard that it came to Mike Cascino.
24 Q  Okay.
25 A  But I -- I don't specifically recall that.  It might

Page 145

1    have been said.
2 Q  And tell me, was this initial communication via e-mail
3    or a telephone conversation?
4 A  It was a telephone conversation.
5 Q  Was there any e-mail that went back and forth between
6    you and anyone at Cascino Vaughan Law offices
7    regarding this settlement proposal?
8 A  Not at that time.  Not at the -- the initial time.
9    It was a -- it was a phone call.
10 Q  Okay.  Over the course of the next three days, were
11    there any e-mail communications that went back and
12    forth between you and the Cascino Vaughan Law
13    Offices?
14 A  I sent an e-mail back to Bob McCoy, turning down the
15    offer.
16 Q  Were there any other communications between you and
17    the Cascino Vaughan Law Offices that were via e-mail?
18 A  At that time, no.  I believe that was it.
19 Q  Okay.  Have there been any e-mail communications
20    between you and the Cascino Vaughan Law Offices since
21    the December 16th/17/18 time frame regarding the
22    settlement with Owens-Illinois?
23 A  I'm sorry.  I don't --
24 Q  Yeah, that's a bad question.
25 A  Yeah.

Gary E. Suoja

Page 146

1  Q  Since December 18th, have you had any e-mail communication
2     with the Cascino Vaughan Law Offices regarding the
3     settlement with Owens-Illinois?
4  A  Yes.
5            MR. LEE:  Okay.  Bob, have those
6     been produced?
7            MR. McCOY:  I didn't -- I don't
8     know that I'm aware of any that have been.  I mean,
9     I'd have to -- if you want Gary and I to talk on
10    this, I'm just -- I don't think I'm aware of any.  I
11    can talk to him right now and find out what he's
12    talking about, but I'm not certain I know of any --
13           MR. LEE:  Let me inquire a little
14    bit more.
15 Q  (By Mr. Lee)  Who at the Cascino Vaughan Law Offices
16    have you communicated via e-mail about the
17    settlement?
18 A  Only Bob McCoy.
19 Q  So there are -- in addition to the one e-mail on
20    December 18th, there are additional e-mails between
21    you and Bob McCoy related to the settlement; is that
22    correct?
23 A  Well, they -- what they were related to was that, in
24    January, is the question about whether Cascino
25    Vaughan had properly accepted an offer or not.  And

Page 147

1     that's what had came to light.
2            MR. LEE:  Okay.  Have those
3     communications been produced, Bob?
4            MR. McCOY:  That's a different set
5     of communications.  I mean, I didn't know that's
6     what he was addressing.  Those are -- those
7     communications are not about anything other than the
8     motions that were subsequently filed.  So those
9     were about motions, not about the actual existence
10    of the agreement, itself.
11       So that's a different subject matter, and I
12    would say these are certainly attorney/client
13    privilege.  So that's what I understand now it was
14    talking about.
15           MR. LEE:  Okay.
16           MR. McCOY:  Those would be objected
17    to as privileged.
18           MR. LEE:  Thank you for that.
19           MR. McCOY:  They all come long after
20    the rejection of the offer.  I mean, there was the
21    rejection that you know that Mike Cascino sent on to
22    Ed Casmere right away after that December 18 e-mail,
23    like, the next day.  So these e-mails that Gary's
24    talking about are all relating to the subsequent
25    motions on attempts to get the agreement enforced.

Page 148

1     And those are not -- those will not be produced.
2            MR. LEE:  Okay.  So the answer to
3     my question is they have not been produced?
4            MR. McCOY:  Right.
5            MR. LEE:  Okay.  Because you're
6     asserting a privilege with regard to those
7     communications; is that correct?
8            THE WITNESS:  I am.
9            MR. McCOY:  Yes, those are
10    attorney/client privileged, and they're not part of
11    the issue of the existence of a valid agreement.
12           MR. LEE:  Okay.
13           MR. McCOY:  They're relating to the
14    motions made for enforcement purposes.
15           MR. LEE:  Okay.
16           MR. McCOY:  And advising him of
17    what's going on in the case that's followed the
18    rejection of the offer that was -- that had already
19    been communicated long before that.
20           MR. LEE:  Okay.
21 Q  (By Mr. Lee)  So, Mr. Suoja, I'm going to ask you a
22    few more questions about this.  The communications
23    between you and the Cascino Vaughan Law Office after
24    December 18th, 2014, that relate to the settlement
25    agreement between Owens-Illinois and the estate of

Page 149

1     Oswald Suoja, do any of those communications discuss
2     whether there was or was not a valid settlement
3     agreement between the estate and Owens-Illinois?
4            MR. McCOY:  Let me object again to
5     that question on attorney/client grounds.  I think,
6     though, Gary can answer the -- to the narrow issue
7     of whether there originally had been some enforceable
8     agreement and not as to the strategy of defending
9     the motion to enforce, itself.
10           MR. LEE:  I didn't ask about the
11    strategy with regard to the motion.  I asked whether
12    those communications discussed whether or not there
13    had been a valid and enforceable agreement.
14           THE WITNESS:  They -- they
15    discussed generally, and sometimes pointedly, the
16    question of whether there had been a prior agreement.
17           MR. LEE:  Okay.
18           THE WITNESS:  And -- and the
19    question of that Cascino had apparently, or somebody
20    at the firm -- I think it was Mike Cascino -- had
21    accepted the offer, and a little bit of consternation
22    on my part, and as you can imagine, on Mike's part,
23    because I had clearly rejected that offer.
24 Q  (By Mr. Lee)  Okay.  So there are discussions in
25    there about Mike Cascino's conduct on behalf of the

Page 150

1  estate?
2  A  That -- well, I -- I don't know if it's on behalf of
3     the estate, because I question whether he had that
4     authority, and clearly he did not. So the question
5     in -- in my mind is, if we didn't authorize it, where
6     are we? What's going on? You know, and then we
7     started -- we started talking about what to do about
8     it.
9  Q  Okay. In those communications, there is discussion
10    of the factual background leading up to the
11    settlement; is that correct?
12 A  Not so much. It was -- it was a discussion by Bob
13    McCoy telling me what apparently happened.
14 Q  Okay. And so --
15            MR. McCOY: Let me just again
16    interpose an attorney/client objection on this. I
17    don't think this is part of the question of whether
18    there was a valid and enforceable settlement
19    agreement that was authorized by -- properly
20    authorized for Cascino Vaughan to act on.
21       This is not part of that. This is not the
22    questions and strategy relating to the defense of the
23    motion and to the question of what -- it's unrelated
24    to the question of what was authorized by the -- by
25    Gary or anybody with proper authority to so authorize.

Page 151

1            MR. LEE: Okay.
2            MR. McCOY: Subject to that, I
3     mean, I guess Gary can waive the privilege, but I
4     would direct him not to answer questions on these
5     follow-up e-mails further, unless he wants to waive
6     that privilege.
7            THE WITNESS: And I do not.
8            MR. McCOY: Go ahead.
9  Q  (By Mr. Lee) Okay. So you're going to follow your
10    attorney's instruction not to answer?
11 A  That's correct.
12 Q  Okay.
13            MR. McCOY: Josh, let me say this.
14    I mean, if you want me to submit anything further
15    for in camera review, but I can. But these are
16    different. That's my judgment as his lawyer, so...
17    (Pause.)
18            MR. LEE: Sure.
19            MR. McCOY: We can move on from
20    there. Go ahead.
21            MR. LEE: And, Bob, you know me.
22    Once you assert the privilege and the client accepts
23    it, I don't press on that.
24 Q  (By Mr. Lee) I just want to make sure that if I ask
25    you any additional questions about these subsequent

Page 152

1     e-mails, the post December 18th --
2            MR. McCOY: Right.
3  Q  (Continuing by Mr. Lee) -- 2000 --
4            MR. LEE: Bob, I'm asking Mr. Suoja.
5  Q  (By Mr. Lee) If I ask you any more questions about
6     these e-mails that occurred post December 18th, 2014,
7     you're going to refuse to answer any questions on
8     that base of privilege; is that correct?
9  A  That's correct.
10           MR. McCOY: That's what I've
11    directed him to do.
12           THE WITNESS: Yes.
13           MR. McCOY: He can choose to waive
14    otherwise, but I directed.
15           THE WITNESS: And I'm going to
16    follow my attorney's advice.
17           MR. LEE: As you should, sir.
18       I think, Bob, those communications are going
19    to be at issue. But we can talk about that after
20    the deposition.
21           MR. McCOY: Fine.
22 Q  (By Mr. Lee) You are aware that Owens-Illinois --
23    well, that Mike Cascino entered into a settlement
24    agreement purportedly on behalf of the estate of
25    Oswald Suoja with Owens-Illinois; is that right?

Page 153

1  A  That's what I understand.
2  Q  Okay. You understand that Mr. Cascino actually sent
3     an e-mail to the attorneys for Owens-Illinois,
4     stating that he accepted the settlement offer, right?
5  A  I did not know that.
6  Q  Okay.
7  A  I didn't know any specifics.
8  Q  Okay. And you still have Exhibit 5 in front of you,
9     correct, which is your declaration?
10 A  That's correct.
11 Q  What was your understanding of why you were signing
12    this declaration?
13 A  I believe this related to a motion or some other
14    issues related to that settlement.
15 Q  Okay.
16 A  Or purported settlement is more likely the proper
17    term.
18 Q  Okay. Now, you understood that Owens-Illinois had
19    filed a motion to enforce the settlement that was
20    entered into; is that right?
21 A  Yes, I believe that's correct.
22 Q  And you understood that the estate, through you, was
23    opposing that motion; is that right?
24 A  That is correct.
25 Q  And when you signed this affidavit, this declaration,

Page 154

1   you -- that we have as Exhibit 5A -- or, sorry,
2   Exhibit 5, you understood that that declaration was
3   going to be used in support of the motion -- or the
4   opposition to our motion to enforce the settlement;
5   is that correct?
6   A   That's correct.
7   Q   Okay.  And one of the things that you were doing in
8   signing that declaration was creating an issue about
9   whether Michael Cascino had authority to settle the
10  case, correct?
11  A   I was not creating the issue.
12  Q   Well, unless you create an issue, there was a
13  settlement agreement made?
14  A   No.  That's the -- whether or not there was an issue,
15  that was well ahead of that.  I didn't create it.
16  Q   Okay.  You were placing at issue whether Michael
17  Cascino had authority to settle the case on your
18  behalf; is that right?
19  A   I think the -- I think the question -- the question
20  was more whether or not he had any authority to begin
21  with.
22  Q   Okay.  At issue is Mr. Cascino's conduct in
23  representing the estate; is that right?
24  A   Apparently.
25  Q   Okay.  You would agree that his conduct is an issue

Page 155

1   in this case?
2   A   Whether or not there's -- there's another settlement
3   that we rejected, that's the issue in the case.  I
4   don't -- I don't and haven't tried to pass any
5   judgment on Mr. Cascino's conduct.
6   Q   Okay.
7   A   If I knew him, I might.  I don't -- I don't know him,
8   and that's the problem.
9   Q   Okay.  Would you agree that it is not a -- it's not
10  proper conduct for an attorney to represent that they
11  have an -- have authority to resolve a case when they
12  do not?
13  A   From my -- from my personal opinion, that would be
14  correct.
15  Q   You're generally familiar with the rules that govern
16  attorney professional conduct, correct?
17  A   Generally, yes.
18  Q   And you understand that it's improper for an attorney
19  to make a representation with regard to a settlement
20  if they don't have authority to do so?
21  A   As a general rule, that is the case.
22  Q   Okay.  You never expressed to the Cascino Vaughan Law
23  Offices that they had authority to settle this case,
24  correct?
25  A   That's correct.

Page 156

1   Q   And, in fact, prior to December 18th, you had
2   informed the Cascino Vaughan Law Offices that they
3   did not have authority to resolve this case; is that
4   correct?
5   A   No, on December 18th I informed them that they did
6   not have the authority to accept this particular
7   offer.
8   Q   Well, let's take a look at your affidavit, which is
9   Exhibit 5.
10  A   Mm-hmm.
11  Q   And please take a look at Paragraph 6, sir.
12  A   Yeah.
13  Q   What did you say in Paragraph 6 in your affidavit?
14  A   I said that Robert McCoy called me.  He advised me --
15  Q   What date?
16  A   This was December 16th.
17  Q   And, in fact, could you just read that word for word
18  for us, please?
19  A   Yeah.  "On" -- "On or about December 16th, 2014, I
20  spoke on the phone with Attorney Robert McCoy at
21  CVLO.  During that conversation, Mr. McCoy advised me
22  that Owens-Illinois had made a settlement offer.  I
23  instructed Mr. McCoy not to settle the case as I
24  wanted to discuss the settlement with other
25  beneficiaries."

Page 157

1   Q   Okay.
2   A   "On December 18th, I communicated to Mr. McCoy" --
3   Q   I'm sorry, sir.  I asked you to read Paragraph 6.
4   Paragraph 6 ended with the --
5   A   Oh.
6   Q   -- prior sentence, right?
7   A   Okay.
8   Q   Is that correct?
9   A   Yes.  You are correct.
10  Q   All right.  So the question I asked you before is,
11  prior to December 18th, you hadn't told the Cascino
12  Vaughan Law Offices that they did not have authority
13  to settle this case, correct?
14  A   Yeah, well, yes.  And I should expand on that a
15  little bit so you get the full story.  So when I
16  talked to Mr. McCoy, I said, No, I don't want to
17  accept it at this time.  I need to talk to the
18  others, and I think I should.  And I'll get back to
19  you soon.  And that's -- that's basically what I told
20  him.
21  Q   Right.  But in your affidavit, you stated that on
22  December 16th, you instructed Robert McCoy not to
23  settle the case, correct?
24  A   Read the rest of it.  You don't get only part of the
25  sentence.  You got to get the rest of it.  And that's

Gary E. Suoja

---

Page 158

1   what I was trying to explain to you when I expanded
2   on my answer, so that you would be sure to get all of
3   it in and not just the part you like.
4   Q   No, I'm just asking:  You instructed them not to
5   settle the case on December 16th, right?
6   A   And the reason why.
7   Q   And it's fine to have the reason why.  I just want --
8   you're not saying that you gave them partial
9   authority to settle the case, are you?
10  A   No, I told them to hold on a minute.  I wanted to
11  talk to some of the other people.
12  Q   On December 16th, you told them they could not settle
13  the case?
14  A   I told them to hold on.  I wanted to talk to others.
15  Q   You told them they could not settle the case as of
16  December 16; is that correct?
17  A   I did not -- I did not give them permission to settle
18  the case on the 16th.
19  Q   Right.  And, in fact, what you say is, you instructed
20  him not to settle the case?
21  A   Because I wanted to talk to the other parties.
22  Q   Right.  Do not settle the case, is what you told them
23  as of December 16th?
24  A   Well, that's correct.
25  Q   Okay.

---

Page 159

1   A   Yeah.  They had no authority to settle on -- from me
2   on December 16th.
3   Q   And that was clear?
4   A   Yes, that was pretty clear.
5   Q   It was express?
6   A   It was express.
7   Q   You actually used the words, "Do not settle the
8   case"?
9   A   I believe so.
10  Q   Okay.  So there could have been no confusion between
11  you and Cascino Vaughan Law Offices as of December
12  16th?
13  A   There was no confusion between me and Bob McCoy.
14  Q   And Bob McCoy represents Cascino Vaughan Law Offices?
15  A   Bob McCoy is an attorney at Cascino Vaughan.
16  Q   Okay.  So between you and Cascino Vaughan Law
17  Offices, there was no disagreement about whether they
18  had the authority to settle the case?
19  A   Between me and Bob McCoy, there was no --
20  Q   Okay.
21  A   -- disagreement.
22  Q   Have you seen Mr. McCoy's affidavit in opposition to
23  Owens-Illinois's --
24  A   I -- I may.  I don't know.
25  Q   -- motion to enforce a settle?

---

Page 160

1   A   I may have.  I don't know.
2           MR. LEE:  Okay.  Let's go ahead and
3   mark this as Exhibit 6, please.
4           (Exhibit No. 6 marked for
5           identification.)
6   Q   (By Mr. Lee)  Would you agree with me that it would
7   be improper for a lawyer to enter into a settlement
8   after they had been instructed by their client not to
9   do so?
10  A   Yes.
11  Q   Okay.  And would you agree that it would be improper
12  for a lawyer to enter into a settlement after another
13  lawyer in their firm said, "I talked to our client,
14  and they instructed me not to settle the case"?
15  A   Yes, that would --
16  Q   Okay.
17  A   -- be correct.
18  Q   And would you agree that it's improper for a lawyer
19  to settle a case without the client's knowledge or
20  consent?
21          MR. McCOY:  Let me object to,
22  again, this line of questioning is just outside
23  the scope of the discovery that's been offered on
24  question of enforcement of the settlement agreement.
25  The judge has already ruled that the case cannot

---

Page 161

1   be settled by the lawyer without authority.  So, you
2   know, these questions have already been contemplated
3   as, in essence, the ruling that you can't -- lawyers
4   can't act without authority.
5       So, I mean, I don't know where you're heading
6   with this, Josh, but the judge has already ruled
7   that.  Go ahead.  You can proceed.
8   Q   (By Mr. Lee)  I'm going to re-ask my question, sir.
9   Would you agree that it's improper for a lawyer to
10  settle a case without his client's knowledge or
11  consent?
12  A   Well, generally, yes.
13  Q   Okay.  I'm going to hand you what we've marked as
14  Exhibit 6 for your deposition today.  Go ahead and
15  read through that, sir.
16  A   (Witness peruses exhibit.)  Okay.
17  Q   Have you had a chance to read through what we've
18  marked as Exhibit 6 for your deposition today?
19  A   I have.
20  Q   And is that a document that is marked the
21  "Declaration of Robert McCoy"?
22  A   It is.
23  Q   And if you look to the second page of that
24  declaration, which we've marked as Exhibit 6, is it
25  dated February 2nd, 2015?

---

Gary E. Suoja

Page 162

1  A  It is.
2  Q  Are you familiar with Mr. McCoy's signature?
3  A  Not really.
4  Q  I'm going to represent to you that this is a
5     declaration that was filed by your attorney, Robert
6     McCoy, in opposition to our motion to enforce the
7     settlement in this case.
8  A  Okay.
9              MR. McCOY:  I'd so stipulate.
10             MR. LEE:  Okay.
11 Q  (By Mr. Lee)  And, in fact, it has some identifying
12    information.  It says in Paragraph 2 that Mr. McCoy
13    is an attorney licensed in the states of Wisconsin
14    and Illinois and that he works at the Cascino Vaughan
15    Law Offices, which has offices in Milwaukee,
16    Wisconsin, and Chicago, Illinois, correct?
17 A  I -- I don't -- that's what it says, yes.
18 Q  Yes.
19 A  I assume that they do.
20 Q  That would be consistent with what you know about the
21    Cascino Vaughan Law Offices; is that correct?
22 A  It's what it says.
23 Q  Okay.  Do you know where Cascino Vaughan has offices?
24 A  No.  I know they're in Chicago.
25 Q  All right.  It then says, "CVLO," which in the

Page 163

1     preceding paragraph has been stated to be "Cascino
2     Vaughan Law Offices," correct?
3  A  That's correct.  That's my understanding.
4  Q  Says, CVLO represents Gary Suoja as special
5     administrator of the estate of his father, Oswald
6     Suoja, in Suoja v. Owens-Illinois, Case No.
7     99-cv-475-bbc, in the Western District of Wisconsin,
8     correct?
9  A  And I believe that's correct.
10 Q  Okay.  So Mr. McCoy then says, in Paragraph 5 of his
11    declaration, that, "On December 16th, 2014, I was
12    directed by Michael Cascino, an attorney at CVLO, to
13    contact the client to obtain approval settlement
14    offer by Owens-Illinois in the Suoja case"; is that
15    correct?
16 A  I am assuming that it's correct.  I wasn't involved
17    in that end of it.  So I don't know.
18 Q  And I'm just saying, that's what Mr. McCoy stated in
19    his declaration; is that right?
20 A  Well, that's -- that's what's in the declaration.
21    That's correct.
22 Q  Okay.  And it says, Later that day, on December 16th,
23    I spoke with Gary Suoja on the phone and advised him
24    that Owens-Illinois had made a settlement offer.
25        And you recall that happening, right?

Page 164

1  A  That's correct.
2  Q  And then it says, "During that conversation, Gary
3     Suoja instructed me not to settle the case because he
4     wanted to discuss the settlement offer with the
5     beneficiaries of the estate."
6         And you see that in that Paragraph No. 6, correct?
7  A  That is correct.
8  Q  And that's actually what happened, correct?
9  A  That is correct.  I discussed it with one of the
10    beneficiaries.  And I contacted another one of the
11    beneficiaries just to find out generally how things
12    were going, so...(Pause.)
13 Q  And that's great.  I want to stick with what we're
14    talking about --
15 A  Yeah.
16 Q  -- here, is Mr. McCoy says in Paragraph 6 of his
17    affidavit --
18 A  Mm-hmm.
19 Q  -- or declaration, that during your conversation with
20    him on December 16th, you instructed CVLO not to
21    settle the case, right?
22 A  That's -- that's correct.  That's what it says.
23 Q  That's because you actually instructed them not to
24    settle the case, right?
25 A  That's correct.

Page 165

1  Q  Okay.  In Paragraph 7, then, what does Mr. McCoy say?
2  A  "After my conversation with Gary Suoja, I
3     communicated with Michael Cascino that Gary Suoja had
4     directed not to settle the case."
5  Q  Okay.  And you didn't have any communications with
6     Mr. McCoy between the 16th and the 18th of December,
7     did you?
8  A  No, I did not.
9  Q  All right.  And so if we go, then, to Paragraph
10    No. 10 of Mr. McCoy's statement, his declaration
11    here, which is Exhibit 6, what does he say in
12    Paragraph 10 of his declaration?
13 A  "Michael Cascino was never given authority to settle
14    the case for the amount offered by OI and which
15    Michael Cascino agreed to."
16 Q  So would you agree that there's no dispute that
17    Michael Cascino agreed to accept the offer that
18    Owens-Illinois made to resolve this case?
19 A  That's my understanding, that he did accept or
20    purport to accept the offer of Owens-Illinois.
21 Q  And do you agree with Mr. McCoy that Mr. Cascino was
22    never given authority to settle the case?
23 A  And I certainly would agree with that.
24 Q  Okay.  And in Paragraph 11, what does Mr. McCoy say
25    about Mr. Cascino's actions?

Gary E. Suoja

Page 166

1  A   Mr. Cascino -- well, in Paragraph 11, "Michael
2      Cascino settled the Suoja case without Gary Suoja's
3      knowledge or consent."
4  Q   And that's your understanding what happened, right?
5  A   That would -- yes, that's -- that's what I know about
6      it.
7  Q   Okay.
8  A   What is here.  Because I have no direct information
9      other than that.
10 Q   Okay.  So you agree that Mr. Cascino settled this
11     case without --
12 A   No.  I said --
13 Q   -- the client's knowledge and consent?
14 A   -- this is what I know about it, is what's written
15     here.
16 Q   Okay.
17 A   So I don't -- do I agree with it?  I have no
18     knowledge of it.
19 Q   Okay.
20 A   Other than what's here.
21 Q   Would you agree that if Mr. Casci -- if Mr. McCoy is
22     right that Mr. Cascino settled your case without your
23     knowledge or consent, that would have been improper?
24 A   That's -- that is what I have heard, is that he did
25     settle it --

Page 167

1  Q   Okay.
2  A   -- or make -- accepted the offer.  And, yes, in my
3      opinion, that was improper, because he did not have
4      authority.
5  Q   Okay.  Now, I just want to make sure we're clear for
6      the record.  Do you believe that Mr. McCoy is stating
7      an untruth here in Paragraph 11 of his declaration?
8  A   I -- I presume that he is not.  I presume that he's a
9      very truthful person.
10 Q   Okay.  And if Mr. McCoy is stating this, Mr. Cascino
11     settled this case without your knowledge or consent,
12     correct?
13 A   I -- that's what I presume based on what he has said.
14 Q   And your belief is that would be an improper thing
15     for a lawyer to do?
16 A   That it would.
17 Q   And it's your belief that was an improper thing for
18     Mr. Cascino to do in this circumstance?
19 A   If, in fact, he did that, then -- then it would have
20     been improper.  Sort of like sending subpoenas out.
21 Q   Well, it's proper to send subpoenas for people who
22     may have knowledge in a case, correct, sir?
23 A   We're going to have to have a lot of discussions and
24     make some motions on that as well.
25 Q   We'll be happy to respond to that, sir.

Page 168

1      And if Mr. McCoy can point us to an e-mail where
2      he alerted us to your sister's issue prior to us
3      sending the subpoena, I would apologize for that,
4      sir.
5  A   That will be interesting.
6  Q   Well, if you're aware of communication, sir.  I'm not.
7  A   Yeah.
8  Q   And I will tell you, that as soon as Mr. McCoy gave
9      us that communication, I told him that we would be
10     happy to put that off if he would provide us some
11     information that would allow us to determine that she
12     could not sit.  And he never did.  And he refused to.
13     And he stated there were HIPAA requirements that
14     wouldn't allow him to disclose the reason.  And I
15     said if we can go through with these depositions,
16     we'll be more than happy if we can get some
17     information to withdraw that subpoena.
18 A   All right.  Are you going to withdraw the subpoena
19     now?  I presume you have?
20 Q   Well, I can't do anything while I'm here, sir.
21 A   Okay.  So when are you going to do it?
22 Q   Well, I am going to go back, I'm going to look at
23     what's been said, and I suspect that we will.
24 A   Okay.  I will expect to hear from you that you've
25     done it.

Page 169

1  Q   Well, we'll take a look at it, sir.
2      Now, part of the problem is, like I said, we try
3      to get that resolved, and if -- I'm sure you'll see
4      the transcript from your sister's deposition as well,
5      where I tried to ask her to find out and Mr. McCoy
6      said it was privileged by HIPAA and she couldn't give
7      me any information.
8  A   Well, I'm -- I'm not -- I'm not reticent about giving
9      you the information.  Don't contact her.  I mean,
10     you've already killed one of my family members.
11     Don't try and make it two.
12 Q   Sir.
13 A   And I'm not joking.  I am very serious about this.
14 Q   If you are telling me --
15 A   This is very offensive, and it is life-threatening to
16     her.
17 Q   And if you're telling me, sir, that that is as
18     serious as her condition is --
19 A   It is.
20 Q   -- then I will take that to heart and I fully suspect
21     we're going to withdraw that subpoena.
22 A   I would hope so.
23 Q   And if that had been explained --
24 A   And I suspect you will.
25 Q   -- to us before we sent the subpoena after she was

Gary E. Suoja

Page 170

1 identified as a witness who was contacted about the
2 settlement offer, we would not have sent the
3 subpoena.
4 A Well --
5 Q But that was not explained to us.
6 A You now -- you now know.
7 Q I do.
8 A My expectations are she will not be here when this
9 trial occurs.
10 Q And I am sorry for that, sir.
11 A So am I.
12 Q That is certainly something that we would not have
13 known. So...(Pause.)
14 Are you aware that -- well, let me ask you this:
15 Are you aware that your sister Sue was also
16 identified as a person who would be a witness in this
17 case?
18 A No, I was not.
19 MR. McCOY: Let me object again.
20 That's just simply not a correct statement of the
21 discovery procedures in this case. And I don't even
22 think there's been an identification of witnesses
23 required in any document. So the only thing that's
24 happened has been, as we know, she's listed as a
25 child and Gary said he talked to her.

Page 171

1 There's nothing about Gary talking to her that
2 makes her a witness in this case. He can -- he's
3 already made clear that he's the only person who's
4 communicated with our firm about any of these
5 settlements as far as providing authority to our
6 firm, and there's nothing to indicate she has any
7 role in this.
8 So to keep asserting this and taking up
9 everybody's time, again, you know, that's something
10 that should just hopefully stop here. Go ahead, and
11 let's proceed with the deposition.
12 Q (By Mr. Lee) Whose e-mail address is
13 jmerwin815@comcast.net?
14 A That is my sister's e-mail address.
15 Q She was involved in the communications back and forth
16 with Mr. McCoy, wasn't she?
17 A Later on.
18 Q In fact --
19 A She was --
20 Q -- on December 18th, wasn't she?
21 A I -- I probably sent her a copy of the e-mail because
22 I had talked to her.
23 Q And so she does have some knowledge in addition to
24 just your conversation about --
25 A She has -- she has a copy of my e-mail.

Page 172

1 Q And there have been discussions since about the
2 settlement, and those have been exchanged with her,
3 correct, sir?
4 A No.
5 MR. McCOY: Objection. Objection
6 to that question again. That's attorney/client
7 privilege. He can make his waiver of that if he
8 wants to, but I would direct not to answer to the
9 communications that occurred after December 18th
10 that all relate to questions of defending the
11 motion and what -- how to proceed on that issue.
12 MR. LEE: And I didn't ask about
13 questions about defending the motion. I asked
14 specifically about discussions pertaining to the
15 settlement.
16 MR. McCOY: I've already stated the
17 attorney/client objection. I'd direct him not to
18 answer, but he can waive it --
19 MR. LEE: Okay.
20 MR. McCOY: -- on the post December
21 18th.
22 MR. LEE: I'm not going to ask you
23 to waive in situations where your counsel has
24 directed you not to answer, sir. So if you want to
25 take your counsel's --

Page 173

1 THE WITNESS: Then let's go.
2 MR. LEE: -- advice, please do.
3 THE WITNESS: I do.
4 Q (By Mr. Lee) Okay. Do you believe, sir, that when
5 attorneys are in negotiations, they reasonably should
6 be able to rely on the representations made by
7 attorneys on the other side?
8 A Well, I believe that would normally be the case.
9 Q Okay. And when an attorney communicates that his
10 clients have agreed to accept an offer made by the
11 other side, the other side -- absent any other
12 indication -- should be allowed to rely on that,
13 correct?
14 A Well, that depends on the situation. I mean, rely on
15 it for what purposes?
16 Q That the lawyer has the authority and is allowed to
17 act on behalf of the client who retained him.
18 A Well, in such a way that it binds the client?
19 Q Yes, sir.
20 A If the client didn't authorize it?
21 Q Well, if it's never been communicated that the client
22 didn't authorize it, it's reasonable for the
23 attorneys on the other side to rely on what the
24 attorney states, right?
25 A Well, if -- you know, we're going to argue legal

Gary E. Suoja

Page 174

1 issues here. But if -- if the client didn't
2 authorize it, the attorney makes a representation
3 either by mistake or because he's making an improper
4 recommendation, then something else, I don't believe
5 that that binds the client.
6 Q I didn't ask about binding. I asked about reasonably
7 rely on.
8 A Well, they can rely on. But, again, it's for what
9 purpose? You don't want to respond. I'm -- I'm
10 guessing, as I said, if the purpose is to try to bind
11 the client, then, no, it's not reasonable.
12 Q Do you have any reason to believe that Owens-Illinois
13 had any information to suggest that Mike Cascino
14 didn't have authority to act on behalf of the estate
15 in entering into and concluding settlement
16 negotiations with Owens-Illinois?
17 A I have no real faith in asbestos manufacturers at
18 all. We already know that they've lied about the
19 lethality of their product. So saying that they, you
20 know, were truthful or so on about anything is
21 suspect in my mind.
22 Q That does not answer my question. I'm going to
23 ask that the --
24 A That does answer it.
25 Q It does not, sir.

Page 175

1 A I don't believe anything that Owens-Illinois says.
2 Q Okay. Well, we'll go through the e-mails, but that's
3 fine.
4        MR. LEE: Can you read my prior
5 question back, please?
6        (Question on Page 175, Lines
7        13 through 17, read by the
8        reporter.)
9        THE WITNESS: Could you read it
10 again so I can -- he's kind of rambling on with the
11 question there, trying to --
12        MR. LEE: Sure. I'll ask a
13 different question.
14        THE WITNESS: Do you want to strike
15 that question? Is that what you're doing then? So I
16 don't have to answer it?
17        MR. LEE: I'll ask a different
18 question.
19        THE WITNESS: Okay.
20 Q (By Mr. Lee) Sir, do you have any information that
21 Owens-Illinois had reason to believe, prior to
22 December 18th, that Mike Cascino didn't have
23 authority to enter into settlement negotiations on
24 the estate's behalf?
25 A I don't have such information aside from what I

Page 176

1 related to my attorneys.
2 Q Okay.
3 A Indicating he did not have that authority.
4 Q And you don't have any information that the attorneys
5 actually representing you actually relayed that
6 information to Owens-Illinois prior to December 18th?
7 A I -- I wasn't part of those negotiations, so I don't
8 know.
9 Q Okay.
10        (Exhibit No. 7 marked for
11         identification.)
12 Q (By Mr. Lee) I'm going to hand you two pages that
13 we've marked as Exhibit 7 for your deposition. Have
14 you had a chance to look at those two pages, sir?
15 A Appear to be e-mails.
16 Q E-mails between whom?
17 A Sent from Michael Cascino on Thursday, December 18th,
18 at 2:57, to Casmere, Edward M., re "Viola & Suoja."
19 Q Okay. And in those e-mails, does that appear to be a
20 conversation between Edward Casmere at Schiff Hardin
21 and Michael Cascino at Cascino Vaughan Law Offices?
22 A I -- I can't tell what law firm. Maybe there at the
23 end, Edward Casmere, Schiff Hardin. They're e-mails
24 back and forth.
25 Q What is the topic of discussion in those e-mails?

Page 177

1 A It is -- there are several. "Follow up," "flagged."
2 It's, Should we wait for -- to confirm on the Crider
3 and Connell, or are we passing for now? So that's
4 one of the things. I don't know what that relates
5 to.
6        The other subject is "Viola & Suoja." And this
7 one says at December 18th at 1:48 p.m.: "We accept,"
8 something, "on Viola and Suoja. Have a great
9 holiday. Thanks."
10 Q Okay. What is the immediately preceding
11 communication from Mr. Casmere?
12 A The immediate preceding one was, "Thanks, you too.
13 Should we wait to confirm yes/no on Crider and
14 Connell, or are we passing on that for now?"
15 Q Okay. Do you see that that e-mail says, "We accept
16 on Suoja and Viola"?
17 A That was on --
18        MR. McCOY: You know, let me just
19 again make a statement that this has all been decided
20 already that there wasn't an agreement, it was
21 stipulated to, that Mike Cascino made. That's
22 stipulated to. It's been acknowledged. I mean, I
23 don't know what the purpose of asking Gary to admit
24 something that my firm's already stipulated to --
25        THE WITNESS: All I'm --

Gary E. Suoja

Page 178

```
1        MR. McCOY:  -- on his behalf --
2        THE WITNESS:  All I'm doing --
3        MR. McCOY:  -- and serve here, but
4   go ahead with your questions.
5        MR. LEE:  Well, I'll tell you, Bob,
6   the purpose of this is Mr. Suoja just accused me and
7   my firm of making this whole thing up.  So I want to
8   make sure that we're all on the same page as to what
9   Mike did.
10        THE WITNESS:  Well, are you
11   testifying?
12        MR. LEE:  No.  I'm responding to
13   Mr. McCoy.
14   Q  (By Mr. Lee)  So, Mr. Suoja --
15        MR. McCOY:  All right.  Well, like
16   I said, it's -- I mean, it's all stipulated to.  It
17   was stipulated to as part of the defense of the
18   motion that Mike Cascino did make an agreement to
19   settle with Ed Casmere.  There's no question about
20   it.  So if you want to -- like I said, I don't know
21   what the purpose is to serve, because that
22   representation was made as an agent for the Suoja
23   family that my firm made, and it's binding on them.
24      So if you want to pursue it further, I guess -- I
25   guess, you know, we can spend the time, but hopefully
```

Page 179

```
1   we can cut some of that.  Go ahead.
2   Q  (By Mr. Lee)  Okay.  On the second page of Exhibit 7,
3     Mr. Suoja, the initial e-mail from Ed Casmere to Mike
4     Cascino is December 18th, 2014, at 12:13 p.m.,
5     correct?
6   A  I don't see that on the second page.
7   Q  Sorry.  It moves from the bottom of the second page
8     over -- or the bottom of the first page over to the
9     top of the second page; is that correct?
10   A  That appears to be the case.  It's assuming that this
11     is a string of e-mails.
12   Q  Okay.
13   A  Because there's no date on the second page other than
14     the filed date, that this Document 46, dash, 3 filed
15     1/12/15.
16   Q  Okay.  And what Mr. Casmere said to Mr. Cascino in
17     that December 18th, 2014 e-mail at 12:13 is, "Mike,
18     please allow this e-mail to confirm the settlement of
19     the Viola and Suoja cases," correct?
20   A  That's what it says.
21   Q  And then Mr. Cascino, at 1:48 p.m. on December 18th,
22     responded to Mr. Casmere, saying, "We accept on Voila
23     and Suoja," correct?
24   A  That's what it says.
25   Q  Okay.  There's no ambiguity about that, about having
```

Page 180

```
1   to wait for authority from the family or anything
2     like that, is there?
3   A  I don't see any reference to it that he listed there.
4     That would appear to -- that would appear on this.
5     So...(Pause.)
6   Q  Okay.  And, in fact, then, Mr. Casmere tried to
7     confirm again what the agreement was and confirm
8     whether there was a broader agreement than just on
9     the Voila and the Suoja cases.  And Mr. Cascino
10     responded and just said, no, just those two cases,
11     right?
12   A  I don't quite know what you're saying.  If you're
13     testifying what it says, it says what it says.  I
14     mean, I don't quite interpret what you're saying the
15     same.  There were just additional e-mails.
16   Q  All right.  So is it your testimony that if we want
17     to understand this e-mail, we should probably talk to
18     Mike Cascino?
19   A  Or maybe Mr. Casmere.
20   Q  Okay.  Show you what we've marked -- we're going to
21     mark as Exhibit 8 for your deposition.
22              (Exhibit No. 8 marked for
23               identification.)
24   Q  (By Mr. Lee)  Do you have Exhibit 8 in front of you,
25     Mr. Suoja?
```

Page 181

```
1   A  I do.
2   Q  What is that?
3   A  This looks to be a copy of an e-mail that I sent to
4     Bob McCoy on December 18th.
5   Q  And what is the subject of the e-mail?
6   A  The subject of the e-mail is the offer by
7     Owens-Illinois.  This was the e-mail in which I
8     firmly rejected, permanently, the Owens-Illinois
9     offer, as previously I'd indicated I'd wanted them to
10     hold off until I discussed it.  And with this e-mail,
11     I rejected the offer.
12   Q  Okay.  And so this says that you discussed the offer
13     with your sister, who spent a number of years as a
14     clerk in the Winnebago County courts and as a
15     secretary in the prosecutor's office.
16        Which sister is that?
17   A  That's my sister Sue.
18   Q  Okay.  It says, "The only other sibling who had" --
19     "who would have an interest is my sister Kimberly,"
20     and then it talks about your brother's surviving
21     spouse and his two children by his first wife; is
22     that correct?
23   A  That's correct.
24   Q  Okay.  You didn't talk to Kimberly about this offer,
25     did you?
```

Gary E. Suoja

Page 182

1  A  No, I did not.
2  Q  Okay.  And you didn't talk to your brother's wife; is
3     that correct?
4  A  I did talk to my brother's wife, but I didn't talk
5     directly about the settlement.  I talked to her to
6     see how things were going with her, what her
7     situation was.
8  Q  Okay.  But you didn't inform her that there'd been a
9     settlement offer?
10 A  No, I did not.
11 Q  Okay.  And you did not discuss the settlement offer
12    with either of your brother's two children; is that
13    right?
14 A  Lisa or Lynn.  No, I did not.
15 Q  Okay.  So the issue here, as you related to Mr. McCoy,
16    is that you and your siblings are getting up in
17    years; is that correct?
18 A  Every year, we grow older.
19 Q  Okay.  And your sister Sue is two years younger, but
20    with -- and then that's blacked out.  Were you
21    discussing her COPD at that time?
22 A  We were discussing her illness.
23 Q  Okay.
24 A  And her inability to participate in the transaction,
25    in the case.

Page 183

1  Q  Okay.  Then you say that Kimberly is 13 years younger
2     but with some disabilities; is that right?
3  A  That's correct.
4  Q  Then you talk about your sister-in-law Marsha having
5     a number of serious medical issues; is that correct?
6  A  That's correct.
7  Q  And then you say you can't talk about your brother's
8     daughters because it's been a while since you've
9     talked to them?
10 A  That's correct.  Since my brother's funeral.
11 Q  Okay.  And then it said, "The purpose of this
12    preamble is not only to point out my father's
13    survivors," and then the rest is blacked out?
14 A  That's correct.
15 Q  What's in the blacked-out portion?
16 A  None of your business.  That's why it's redacted.
17 Q  Does it relate to the settlement offer?
18 A  No.
19 Q  What does it relate to?
20 A  It relates to my evaluation, for purposes of trial,
21    of these individuals.
22 Q  Okay.  Was that for the purpose of determining
23    whether the settlement was appropriate or not?
24 A  No.  I would say it was more just a -- an overall
25    view on my part to Mr. McCoy on what was going on and

Page 184

1     so he was aware of why I was getting to where I --
2     was getting to with regard to the settlement.
3  Q  Okay.  So it was for the purpose of informing Mr. McCoy
4     about how and why to make a decision about the
5     settlement offer?
6  A  Well, why I made the decision on the settlement.  It
7     was for the purpose of trial preparation and an
8     evaluation of, here are the potential people
9     involved, here's what we have, and a discussion about
10    it.
11 Q  Okay.
12 A  And it was fairly direct and to the point.  And then
13    when I got down, you know, to the end, I just said,
14    no, it's low and it's not acceptable, and asked him,
15    What do we do next?
16 Q  Okay.  So it looks like there's a section.  It looks
17    like there's about three -- well, two full paragraphs
18    and a portion of two paragraphs --
19 A  Mm-hmm.
20 Q  -- blocked out.
21 A  Yep.
22 Q  So we can say there's a paragraph that says, "The
23    portion [sic] of this preamble is not only to point
24    out my father's survivors," comma, and then the rest
25    of that paragraph is blacked out, correct?

Page 185

1  A  You're very good at pointing out what's on the paper.
2  Q  And then there's a paragraph that follows that,
3     that's blacked out; is that correct?
4  A  You're getting even better.
5  Q  That's three lines, correct?
6  A  That's -- that's correct.
7  Q  And then there's a second paragraph that follows
8     those three lines that's also blacked out; is that
9     correct?
10 A  It's amazing how you've noticed that.
11 Q  And so, sir, the three lines that are blacked out,
12    those talk about your assessment of the case?
13 A  Those directly related to my assessment on what was
14    going to go on in the case and the impact.  And they
15    were directed only to Bob McCoy.  They were between
16    me and Mr. McCoy regarding the case.
17 Q  Okay.  And then the second paragraph that is blacked
18    out is a paragraph of, looks about two lines; is that
19    correct?
20 A  Boy, you're -- you're right on.
21 Q  What's included in that paragraph?
22 A  Same material.
23 Q  Okay.
24 A  It's blacked out because we don't want to tell you
25    what's in there and it's -- it's redacted for that --

Gary E. Suoja

Page 186

1    for that reason.  We don't do the trial preparation
2    work or give you that information.
3  Q   Well, and, sir, part of the issue here is that you
4    understand that when you put your attorney's conduct
5    at issue, you waive the privilege with regard to that
6    conduct, right?
7  A   Well, that's -- it has nothing to do with Mike
8    Cascino.
9  Q   And I don't know that.  I've never seen the --
10 A   Well, I -- I.
11 Q   -- rest of this.
12 A   Now you do.
13 Q   So I'm just inquiring.
14 A   I've told you it doesn't have anything to do with
15   Mike Cascino.
16 Q   But it has to do with the settlement negotiations?
17 A   And as you can see, it was a rejection of the
18   settlement negotiations.  So now you know.
19 Q   And all I'm inquiring, sir, I don't know if there'll
20   be additional motion practice, but I'm entitled to
21   inquire with regard to this document as to the basis
22   for the privilege.  And that's what I'm trying to get
23   at.  And when you selectively redact a document that
24   we've never seen, I have the right to inquire as to
25   what's been redacted.

Page 187

1  A   Okay.  But that kind of defeats the purpose of
2    redacting, then, doesn't it?
3  Q   Do you recall actually what words are here in the
4    redaction?
5  A   I -- I can't recall the exact words.  I'd have to go
6    to the original.
7  Q   Okay.  Can you state for a fact that everything here
8    is solely strategy about litigating the case?
9  A   I would say "yes."
10 Q   Okay.  And after, "That being said, both my sister
11   Sue and I feel that the settlement offer is on the
12   low side," there is a second -- well, there's a
13   series of redactions following that sentence as well,
14   correct?
15 A   That's correct.
16 Q   What is the subject matter of those redactions?
17 A   That's more of the same.  But it is -- it is a
18   different position that we've decided to redact.
19 Q   What do you mean by "different position"?
20 A   It relates to our position in the litigation.
21 Q   Okay.  But does it relate to settlement negotiations?
22        MR. McCOY:  He can answer if it
23   relates to that topic, but that's not the issue
24   that's before us.  The issue before us is -- but
25   he can't disclose what's in there.  That's why

Page 188

1    it's redacted.  Because it doesn't relate to the
2    precise issue of the enforcement of the alleged
3    agreement for $150,000 and authority for that amount
4    of money.
5        Go ahead.  You can answer it, Gary.
6        MR. LEE:  So, Bob, I'm not asking
7    him to tell me what's those words.
8        MR. McCOY:  I said he can answer.
9    He can answer it.  Subject to what we've agreed to as
10   the limited waiver of the privilege, he can answer, I
11   believe.
12       MR. LEE:  Well, okay.  Go ahead and
13   give me your answer, sir, and we'll see if there's
14   additional questions.
15       MR. McCOY:  Why don't you read back
16   the question just so he knows where we're heading.
17   He'll answer it within the scope of our waiver.
18       MR. LEE:  Well, Bob, you don't get
19   to determine the scope of your waiver.  That's a
20   judicial question.
21       THE WITNESS:  Well, if I can ask a
22   question to clarify this:  Has -- have these e-mails
23   and these documents been sent to the court for an in
24   camera review on the issues that Owens-Illinois is
25   reviewing?

Page 189

1        MR. McCOY:  They have been
2    presented by our motion.  That's correct.
3        THE WITNESS:  Then that -- that
4    would seem --
5        MR. McCOY:  By Owens-Illinois.
6        THE WITNESS:  That would seem to be
7    the place to get all of these questions answered as
8    to whether they can see any of this stuff or not.
9    Rather than asking me the questions about them, is
10   the court will let you know what they feel you're
11   entitled to see --
12       MR. LEE:  Actually --
13       THE WITNESS:  -- based on the
14   motion.
15       MR. LEE:  -- you know, sir, I don't
16   know that these have been presented, because Mr. McCoy
17   has not shared with us what documents have been
18   provided.
19       THE WITNESS:  Well, I've -- I've
20   asked Mr. McCoy, and so I believe that these have
21   been, based on what he's indicated, that they've been
22   sent to the court for in camera review and then the
23   court will advise you as to what you can see with
24   regard to these e-mails.
25       MR. LEE:  Okay.

Gary E. Suoja

Page 190

1     MR. McCOY:  They have been, yes,
2   presented.  So, again, you know, the questions
3   about these e-mails are privileged.  We've already
4   asserted that.  That's why they're redacted.  Gary
5   can either provide whatever he can answer to it,
6   or he's not going to answer because it's privileged.
7     So subject to that, like I say, I think he can
8   provide whatever answer within the scope of what --
9   what's been agreed upon as a limited waiver.
10  Q  (By Mr. Lee)  The subject matter of the redaction in
11    the second-to-last paragraph of your e-mail to
12    Mr. McCoy on December 18th, 2014, at 10:33 p.m., does
13    it relate to the settlement offer made by
14    Owens-Illinois?
15  A  It relates to correspondence and discussions between
16    and my request and discussions with Bob McCoy.  To
17    that extent, that's -- I believe it to be privileged.
18  Q  Okay.
19  A  And the redactions are privileged.  And -- and if the
20    documents, which I believe they are, are in court,
21    then the court can determine if there's more of it
22    that should be disclosed.
23  Q  And I don't know whether that document's been
24    presented, because we haven't been provided with it.
25    So I'm just asking because we may have other issues,

Page 191

1   and I'm trying to get the full record on that, sir.
2  A  Well, I -- I understand that.  But Mr. McCoy has
3    represented that, and I trust my lawyer.
4  Q  As you should.
5     MR. McCOY:  Okay.  Next question, I
6   guess.
7     THE WITNESS:  You've got quite a
8   load of paper there.  Did you have to pay extra to
9   get it on the plane?
10    MR. LEE:  No, I did not.  I'm a
11  compact packer.
12    (Exhibit No. 9 marked for
13      identification.)
14  Q  (By Mr. Lee)  Now, you've testified before that
15    you've never had any conversations with Mike Cascino?
16  A  Not to my recollection.
17  Q  Never met Mike Cascino?
18  A  I have never met Mike Cascino, no.
19  Q  Never worked with him on anything that has to do with
20    the estate?
21  A  Not to my knowledge.
22  Q  Okay.
23  A  I think, as I said, I might have received a letter or
24    something from him, but I don't ever recall talking
25    to Mike Cascino.

Page 192

1  Q  Now, you have told us that you understand that you
2    are the special administrator for the estate of your
3    father, right?
4  A  That's correct.
5  Q  And you believe that there was an estate that was
6    opened on your behalf for your father, correct?
7  A  That's correct.
8  Q  And you've testified that that didn't happen until
9    2009 the first time?
10  A  Well, the -- the transfer over of the estate
11    apparently was in 2009.
12  Q  Okay.
13  A  That's on this matter.  I don't know if it would have
14    occurred on other matters.  Because I think Mr. McCoy
15    indicated that this was in this particular case that
16    he had an order.  So it's possible that it occurred
17    related to other matters.  And, frankly, I don't -- I
18    don't recall and didn't keep track, I mean,
19    so...(Pause.)
20  Q  In fact, you were actually appointed special
21    administrator by the State of Wisconsin to pursue
22    lawsuits with regard to your father's estate in this
23    April of 2002, correct?
24  A  I don't know.
25  Q  Okay.

Page 193

1  A  I don't recall.
2  Q  I'm going to hand you what we've marked as Exhibit 9
3    for your deposition, sir.
4     (Exhibit No. 9A marked for
5       identification.)
6  Q  (By Mr. Lee)  Let me know when you've had a chance to
7    go ahead and read through all those pages, sir.
8  A  Okay.  I've had a chance to go through them.
9  Q  Okay.  Are these documents that relate to the estate
10    of Oswald Suoja?
11  A  They appear to be in the matter of the estate,
12    Special Administration, Order of Discharge, in
13    Wisconsin Circuit Court, Douglas County.
14  Q  Okay.
15     MR. McCOY:  You know, once again, I
16  don't know what relevance there is in the state court
17  proceeding here.  The judge has already said there's
18  no issues about the appointment of Gary Suoja.  We're
19  talking about a matter that was in the federal court
20  case which was -- had some special administration
21  appointment and the enforcement of the alleged
22  agreement made for one of the -- for the defendant in
23  that -- in that particular case.
24     So I don't know why there needs to be any
25  discussion about the earlier case and the estate

Page 194

1  matters in that earlier case.  The judge has already
2  said discovery is denied on the appointment on the
3  estate matters.  You want to -- I mean, at some point
4  in time, I guess Gary probably needs to go on his
5  hourly billing rate.
6           MR. LEE:  Bob, are you making an
7  objection to form or foundation?
8           MR. McCOY:  I'm making an objection
9  to the -- what appears to be, you know, a violation
10  of the court order on the scope of discovery and what
11  appears to be, you know, basically harassment of a
12  witness in a deposition.  This has gone on where you've
13  been reading things and saying, "Is that what it
14  says?  Is that what it says?  Is that what it says?"
15  on topics that aren't even within the scope of discovery
16  here.
17     So, like I said, at some point in time, I think
18  we should -- we're going to consider a motion here
19  for charging you for Gary's hourly billing rate for
20  that sort of conduct.  Subject to that, though, you
21  can go ahead at your peril here, because we may make
22  that motion, okay?
23           MR. LEE:  That's okay, Bob.  What I
24  want to do, is we're starting to run out of the
25  second tape.  I actually have a copy of the order

Page 195

1  allowing the discovery here.  It's not quite as
2  limited as you state, and so I'm just going to make
3  that an exhibit.
4     Mr. Suoja can read through it if he wants to or
5  not.  But I'm going to make that an exhibit here.
6  But I'll do that after we change the tape.
7           THE VIDEOGRAPHER:  This is the end
8  of Disc 2.  This dep -- I'm sorry?
9           MR. LEE:  We're going off the
10  record.
11           THE VIDEOGRAPHER:  This is the end
12  of Disc 2.  We will continue on Disc 3.  Time now is
13  3:04 p.m.
14           (Pause in proceedings from
15           3:04 p.m. to 3:14 p.m.)
16           (Exhibit No. 10 marked for
17           identification.)
18           THE VIDEOGRAPHER:  Back on record.
19  This is the beginning of Disc 3 in the continuing
20  deposition of Gary Suoja.  Time now is 3:14 p.m.
21           MR. LEE:  In response to Mr. McCoy's
22  statements about the scope of the order entered by
23  the judge, I've attached or marked as an Exhibit to
24  Mr. Suoja's deposition the April 14th, 2015 order,
25  Document No. 77 in this case, by the judge relating

Page 196

1  to our motion to extend discovery, which allowed
2  discovery both with regard to the alleged settlement
3  and with regard to the previous state court action.
4  That's marked as Exhibit 10.
5 Q  (By Mr. Lee)  Do you have Exhibit 9 in front of you,
6  sir?
7 A  I have Exhibit 9 in front of me.
8 Q  Are those documents that relate to your appointment
9  as special administrator of your father's estate?
10 A  I have one here that's dated January 2nd, 2007, that
11  discharges me.  Here's one where I state that I am
12  the special administrator.  Says December 18th, 2006.
13           MR. McCOY:  So...(Pause.)
14           THE WITNESS:  I'm sorry.  Did --
15  there's --
16           MR. McCOY:  I didn't mean to
17  interrupt.  Is the --
18           THE WITNESS:  Okay.
19           MR. McCOY:  -- answer finished?
20           THE WITNESS:  No.  There's one
21  that's a Notice of Summary Procedures Deadline that's
22  dated December 8th, 2006.  Notice to Close Estate
23  dated August 29th, 2006.  A letter on Cascino Vaughan
24  letterhead.  It's dated May 22nd, 2006.  There is
25  a -- I don't know what the -- Letter of Special

Page 197

1  Administration dated April 29, 2002, that's directed
2  to me.  That's powers to prosecute actions.
3     And then another one dated April 29th, 2002 --
4  they're all filed at the same time -- about Special
5  Administration Petition, Special Administration Order
6  Appointing Special Administrator.
7           MR. McCOY:  Is that the end of the
8  answer?
9           THE WITNESS:  Yeah.  That's --
10  that's what Exhibit 9 appears to be to me.
11           MR. McCOY:  So my objection is
12  relevance, and that's contempt to ask that question.
13           MR. LEE:  What's that?  It's
14  relevance, and I didn't hear the other part, Bob.
15           MR. McCOY:  Contempt.
16           MR. LEE:  Contempt?
17           MR. McCOY:  Go ahead.  Go ahead.
18           MR. LEE:  You're going to move --
19  you're threatening me with contempt for asking these
20  questions; is that right, Bob?
21           MR. McCOY:  Go ahead.
22           MR. LEE:  No, I just want to make
23  sure what "contempt" means, since it's not a proper
24  objection in a deposition.  You're threatening to
25  seek contempt against me if I continue to ask

Page 198

1  questions; is that right?
2           MR. McCOY:  Go ahead, Josh.
3           MR. LEE:  Bob, I really need
4  to understand what you're threatening here.
5           MR. McCOY:  Go ahead, Josh, please.
6  I've made my statement.  I don't want to waste any
7  more time.
8           MR. LEE:  I have the opportunity
9  understand what the objection is, Bob.  Are you
10  threatening me with contempt?  Is that what that
11  means?
12           MR. McCOY:  You can go ahead with
13  your questions, please.
14           MR. LEE:  Well, if I have an
15  obliga -- Bob, if you think I need to rephrase my
16  question in some way that won't get me into contempt,
17  please tell me.  I would like to confer with you
18  about your objection.
19           MR. McCOY:  I have nothing to add.
20  You've read the court order, obviously.  You marked
21  it.  Go ahead.
22           MR. LEE:  Okay.  So I'd like to put
23  on the record that while we were off the record
24  during the last break, Mr. McCoy threatened me with
25  sanctions if I continued with this deposition.  I

Page 199

1  take his contempt statement as a continuation of that
2  threat.
3  Q  (By Mr. Lee)  That being said, sir, what you've got
4  in front of you as Exhibit 9, are those documents
5  relating to your appointment as the special
6  administrator of your father's estate?
7  A  They appear to be.  And this is for -- appears to be
8  for certain items.
9  Q  And if we look at -- would you agree that you were
10  appointed special administrator of your father's
11  estate on April 29th, 2002?
12  A  That -- there's a document in here that seems to do
13  that.
14  Q  Okay.  And you were aware that you were seeking
15  appointment as the special administrator for your
16  father in April of 2002?
17  A  Based on this, yes.
18  Q  You actually signed the petition to be appointed
19  special administrator --
20  A  That's --
21  Q  -- in 2002?
22  A  That's correct.
23  Q  And in 2002, you know -- you knew that you were being
24  appointed administrator to pursue legal action,
25  lawsuits, on behalf of your father's estate, right?

Page 200

1  A  That's what the petition requests.
2  Q  And what you knew was that you were seeking to be
3  appointed special administrator to pursue lawsuits
4  related to your father's asbestos exposure; is that
5  right?
6  A  I would presume that would be the case --
7  Q  Have you contemplated --
8  A  -- with these.
9  Q  Sorry.  Have you contemplated filing lawsuits on
10  behalf of your father's estate for any reason other
11  than his asbestos exposure?
12           MR. McCOY:  Let me object to that
13  question on attorney/client grounds.  And -- but
14  subject to that, he can answer.  And I say that in
15  two ways.  One is as to discussions with my firm,
16  second as to his own thoughts as a lawyer versus his
17  thoughts as a nonlawyer, if he can separate that out.
18       Subject to all that, you can answer, Gary.
19           THE WITNESS:  These items were
20  prepared by Cascino Vaughan, sent to me for
21  signature, and that's where I went.  Now, possibility
22  of bringing other lawsuits for other things on other
23  occasions, we probably did talk about it, but nothing
24  ever went anywhere.
25  Q  (By Mr. Lee)  Okay.  So when these documents were

Page 201

1  prepared by Cascino Vaughan and sent to you, you knew
2  they were for the purpose of pursuing asbestos
3  lawsuits; is that right?
4  A  That was generally my understanding.
5  Q  Okay.  And, of course, since you signed them, you
6  read them and got the best understanding of them that
7  you could before you signed them, right?
8  A  Well, I -- I did talk to -- as a matter of fact, I
9  believe I saw Jill Rakauski's name on one of these.
10  I did talk to Jill Rakauski generally when there was
11  something like this going on.  She was the one that I
12  had access to.
13       And I -- I do -- as we talk about it, I do kind
14  of remember her, before she left, sending off this,
15  telling me that we had to sign to close this out for
16  some -- some reason.  I don't know what it was.  But
17  said we had to close this out.  So she sent that to
18  me, and I signed off at some point, or okayed it,
19  signed.
20  Q  Okay.  Included in these documents is a petition
21  for discharge as administer -- administrator of your
22  father's estate; is that right?
23  A  That's correct.
24  Q  We've marked as Exhibit 9A for your deposition, sir,
25  a subset of the documents that are included in

Gary E. Suoja

Page 202

1    Exhibit 9. And what's marked as 9A is your petition
2    for discharge as special administrator of your
3    father's estate, correct?
4  A  That's correct. So the subset consists of one page.
5  Q  Okay. And you signed that petition for discharge,
6    correct?
7  A  That's correct.
8  Q  And it was notarized?
9  A  It was.
10 Q  It was notarized, in fact, here in the state of
11    Wisconsin -- or Washington; is that right?
12 A  That's correct. In Washington.
13 Q  And the discharge was filed -- or your petition was
14    filed in December of 2006; is that right?
15 A  I -- I would presume that. That's what seems to be
16    marked on the document.
17 Q  This lawsuit that we're talking about here today was
18    filed in '99 by your mother; is that right?
19 A  I don't know.
20 Q  It was filed by your mother before you became the
21    special administrator; is that correct?
22 A  I -- I don't know.
23 Q  All right.
24 A  If you -- if you say so, I can go with that.
25 Q  This lawsuit was pending in 2002 when you became the

Page 203

1    special administrator of your father's estate; is
2    that right?
3  A  I don't know.
4  Q  This lawsuit was pending in --
5  A  When you say "this lawsuit," which one specifically?
6    The one that went to the Eastern District of
7    Pennsylvania?
8  Q  I'm talking about the lawsuit we're here in today,
9    sir.
10 A  Okay. This is the one in the Western District of
11    Wisconsin, federal court.
12 Q  Federal court, sir. The one that was filed in 1999.
13 A  Okay. I -- yeah, I don't know on the filing. I just
14    have no recollection of it. So I can't tell you.
15 Q  Okay. This lawsuit was pending in December of 2006
16    when you filed your petition for dissolution of the
17    estate, right?
18 A  I don't know.
19 Q  Okay. When you filed your --
20           MR. McCOY: Object again to the
21    statement that he filed anything. I mean, this was
22    all filed by, you know, Vaughan Law Offices.
23 Q  (By Mr. Lee) You signed the petition, didn't you,
24    sir?
25 A  My signature is on what's shown as Exhibit 9A and in

Page 204

1    Exhibit 9, and that's the -- out of the Circuit Court
2    of Douglas county.
3  Q  Wisconsin?
4  A  Wisconsin. And, yes, I did sign that. That is my
5    signature. I know the notary. Yes, that's mine.
6  Q  Okay. And I don't want to parse words. I think what
7    Mr. McCoy means when he says that Cascino Vaughan
8    filed this, they probably did the physical filing in
9    Wisconsin because you're here in Washington, right?
10 A  They prepared this and sent it to me for signature
11    and sending back to them, and I did so.
12 Q  And you reviewed it before you signed it; is that
13    right?
14 A  I -- I did. And I talked to Jill Rakauski about why.
15 Q  And you made sure you understood what you were doing,
16    right?
17 A  Well, I -- she -- I had her explain to me why it
18    needed to be done, and there was some question about
19    it. But there was the timing requirement, timing
20    limitation, and the court wanted it terminated.
21 Q  Okay. And you didn't -- there's no lawyer who signed
22    this petition for discharge, is there, other than
23    you?
24 A  Just me. That was signed at the recommendation of my
25    attorneys.

Page 205

1  Q  Right. But when Mr. McCoy says that it was the
2    lawyers that filed this, you're the one who took
3    action to sign this petition?
4  A  I -- I definitely signed it, had it notarized, and
5    sent it back to them.
6  Q  And you knew it was going to be filed?
7  A  I knew that they were going to use it for the
8    purposes they sent it to me for.
9  Q  For closing your father's estate, right?
10 A  In Douglas County, yes.
11 Q  Yes. And that was in 2006.
12 A  Right.
13 Q  Is that right?
14      And you knew -- you made all of the
15    representations in the petition for discharge
16    intentionally, correct?
17 A  Well, I signed it.
18 Q  And I want to make sure that you understood what you
19    were doing when you were signing. You made these
20    representations --
21 A  It's a --
22 Q  -- voluntarily?
23 A  It's a very simple document. I did sign it.
24 Q  You signed it voluntarily?
25 A  I did.

Gary E. Suoja

Page 206

1  Q  And intentionally?
2  A  I did at the recommendation of my attorney.
3  Q  Okay.  And you knew that it would close your father's
4     estate?
5  A  I knew that it was something that my attorney
6     represented had to be done because the County
7     required it.
8  Q  And you knew that it would close your father's
9     estate?
10 A  I -- I signed it.  And it does what it does.
11 Q  Okay.  And you never instructed your lawyers to
12    extend the estate, did you?
13 A  I -- I relied on my lawyers to handle everything that
14    needed to be done.
15 Q  Okay.  And that's a fair statement.  Did you ever --
16
17            MR. McCOY:  Let me -- before you
18    continue, I just want to make sure.  I think it's clear,
19    but these questions are all within the scope of my
20    objections about relevance and contempt.  Go ahead.
21            MR. LEE:  Okay.  So you're
22    continuing to threaten me with contempt if I continue
23    to ask questions; is that right, Bob?
24            MR. McCOY:  I said go ahead.  I've
25    made the objections.

Page 207

1            MR. LEE:  But I don't understand
2     that.  Because contempt's not an objection for a
3     deposition.  So I'm trying to understand where we're
4     at.
5            MR. McCOY:  Well, like I said, I'm
6     not going to say anything more, because it's -- I
7     want the deposition to be ended as quick as possible.
8     Go ahead.
9            MR. LEE:  Okay.
10 Q  (By Mr. Lee)  You didn't instruct your attorneys back
11    in 2006 to try and extend the estate; is that right?
12 A  No, not to -- not to my knowledge.
13 Q  Okay.
14 A  I'm not a Wisconsin lawyer.  I listened to my
15    attorneys.
16 Q  Okay.  And one of the things that you did in filing
17    your petition -- if you go back to Exhibit 9, sir.
18    With your petition, you actually included a list of
19    everything you collected on behalf of the estate; is
20    that right?
21 A  That appears to be the case.
22 Q  And those were all settlements from the asbestos
23    litigation on behalf of your father, right?
24 A  That would be the case.
25 Q  Okay.  And you listed that -- that you've completed

Page 208

1     your assigned duties as the administrator of your
2     father's estate, right?
3  A  For Douglas County, yes.  Well, whatever it says
4     here.
5  Q  Okay.  And this lawsuit was pending at the time that
6     you discharged the estate, wasn't it?
7  A  If you're testifying to that effect, then yes.
8  Q  I'm asking whether you know.
9  A  I don't know off the top of my head, no.
10           MR. LEE:  Bob, can we stipulate
11    that this lawsuit was pending at the time Mr. Suoja
12    discharged the estate of Oswald Suoja in 2006?
13           MR. McCOY:  The lawsuit that's
14    within the Eastern District of Pennsylvania, I
15    stipulate that that was pending.
16           MR. LEE:  Okay.
17 Q  (By Mr. Lee)  And the representation that you made
18    when you filed for discharge of the estate was that
19    you had completed the assigned duties as
20    administrator of your father's estate and collected
21    all of the assets that were available which were
22    attached as an exhibit to your petition for
23    discharge, right?
24 A  That's -- that is correct.
25 Q  Okay.  And so --

Page 209

1  A  Shows we collected apparently to that point.
2  Q  Okay.  And based on your representation that you had
3     completed all of your assigned duties as special
4     administrator of your father's estate and collected
5     all the assets that were available, the court granted
6     your petition for discharge as administrator of your
7     father's estate?
8  A  Apparently they did.
9  Q  Okay.  And you would agree that you represented that
10    you had fully discharged your responsibilities as the
11    special administrator of your father's estate at that
12    time?
13 A  That -- that would be the case.
14 Q  That's correct?
15 A  To my knowledge, I had.
16 Q  But that's the representation you made?
17 A  That's -- that's correct.  To my knowledge, I had.
18 Q  Okay.  And you knew when you filed that petition for
19    discharge that there was litigation relating to your
20    father's asbestos exposure that was pending, correct?
21 A  No, that's not necessarily true.
22 Q  You didn't know that there was a lawsuit pending in
23    2006?
24 A  No.  As a matter of fact, I didn't.  I don't -- I
25    don't have a recollection of it, to tell you the

Gary E. Suoja

Page 210

1  truth.  I -- and as a matter of fact, as I'd
2  indicated, I'd have some frustration getting
3  information out of Cascino Vaughan as to where we
4  were.  And some time ago, I thought we were pretty
5  much wrapped up.  I was surprised to find out about
6  this litigation.
7  Q  When you say some time ago you thought you were
8  wrapped up with your father's --
9  A  Well, that -- that would have been in the -- you
10  know, earlier in the 2000s.  I just -- I just didn't
11  get any impression that we had outstanding items yet.
12  Q  Okay.  So early in the 2000s, you thought that
13  litigation had been concluded?
14  A  It was being concluded.  That's -- that's correct.  I
15  thought everything was pretty much wrapped up.  You
16  know, when things get drug out over 20 years, it's
17  easy to lose track of things, especially when they
18  dribble in a little bit at a time and they just sit.
19  Q  Do you know if between 2002 and 2007, you signed any
20  documents on behalf of your father's estate regarding
21  litigation?
22  A  I do not recall, to tell you the truth.
23  Q  Okay.  You would agree with me that if you had signed
24  documents as the special representative or special
25  administrator of your father's estate in that time,

Page 211

1  you had to know that there was litigation pending?
2  A  I -- I would -- certainly that would, you know,
3  wake -- wake things up.  But as I said, this thing
4  has dribbled on so long, and there was, you know,
5  just a little sporadic activity and then that would
6  be it, and trying to find out what's going on.  And
7  nothing -- we'd hear nothing and nothing, and it
8  would just go on.  So I -- I thought we were pretty
9  much all wrapped up.
10  Q  Okay.  You believed at the time that you filed your
11  petition for dissolution of your father's estate that
12  all the claims had been resolved?
13  A  Or were being resolved or pretty much there.
14  Q  But you represented to the court that all the claims
15  had been --
16  A  That's --
17  Q  -- resolved, correct?
18  A  That's what I signed here, yes.
19  Q  And you represented -- and your intention was to
20  represent to the court that there were no further
21  claims to --
22  A  To the best --
23  Q  -- pursue on behalf of your father's estate?
24  A  To the best of my knowledge and belief, and based on
25  the information from my attorneys, and they were

Page 212

1  preparing this, so that's the way we went.
2  Q  Okay.  And I just want to make sure that we're clear
3  as to what you were representing to the court.
4  You were representing that there were no further
5  claims to be pursued on behalf of your father's
6  estate as of two thousand --
7  A  To the best of my --
8  Q  -- six?
9  A  -- knowledge and belief, that was the case.
10  Q  Okay.
11      MR. McCOY:  Let me also add, I
12  think that in the actions that are taken based on
13  advice of Cascino Vaughan Law Offices, he can assert
14  privilege to any communications with my law firm, but
15  he can also answer if he wants to.  So I'm not
16  directing him to not answer these questions.  He can
17  make his judgment on it.  So I think he has been as
18  to this probate matters.  Go ahead.  And again, I'm
19  continuing my concerns that I expressed about
20  relevance and contempt throughout this.  Go ahead,
21  though.
22      MR. LEE:  And so, Bob, just so that
23  you understand, what I'm probing here is any
24  preclusive effect that Mr. Suoja's actions with
25  regard to any prior litigation would have had on this

Page 213

1  subsequent litigation.  And will you at least agree
2  that that is exactly what the court ordered we were
3  allowed to inquire as to?
4      MR. McCOY:  I think it's contempt,
5  what you're doing, like I said.  But go ahead.
6      MR. LEE:  Okay.
7  Q  (By Mr. Lee)  If this case was filed in 1999, you
8  would agree that by 2002, you had been appointed as
9  special administrator to pursue this action on behalf
10  of your father's estate, right?
11  A  I'm -- to begin with, I'm not certain when this case
12  was filed.  Frankly, I don't know.  I just relied on
13  the attorneys.  You're asking me as though I were a
14  probate attorney.  I'm not.  I don't know.  I relied
15  on Cascino Vaughan and what they recommended to me
16  and what we discussed, and that -- that's generally
17  the direction we would go.
18      You know, with regard to -- to items of
19  settlement and with regard to some recommended
20  language, those things were -- you know, I would
21  always write on things.  I would always ask
22  questions.  But for the most part, you know, for --
23  for things like filings and what cases and so on, I
24  just relied on Cascino Vaughan.
25  Q  Sure.  And I'm asking you these questions, sir, because

Gary E. Suoja

Page 214

1  on several occasions there were documents that were
2  signed and representations made both by you and by
3  your lawyers that there was no other litigation pending.
4     We found out since that there was a prior lawsuit
5  that actually named Owens-Illinois as a potentially
6  responsible party that was then dismissed. And now
7  we have found that there was a prior estate that was
8  opened and then closed. And none of that has been
9  disclosed to us until we got to this point.
10     You know, you've seen your own verification that
11  there was no other lawsuit. And so what I'm trying
12  to figure out is, we don't have information about
13  that, sir, and I'm trying to figure out what actions
14  you took in that prior lawsuit and whether they might
15  be preclusive.
16  A  Of what?
17  Q  Of this lawsuit.
18          MR. McCOY: Let me object, object
19  to this -- whatever that was, but it's certainly not
20  a proper question. I mean, it's compound.
21
22          THE WITNESS: You know, I'm sorry.
23  I -- you know, I appreciate what you're trying to do.
24  But you just said you were dismissed out of the case.
25  So how in the world do we go through three hours of

Page 215

1  this nonsense when you already state you were
2  dismissed out of the prior case? I don't understand.
3  It -- maybe I'm not as bright as you are, and that's
4  probably true. But it seems to me that we've just
5  been running around the pole, wasting time.
6  Q  (By Mr. Lee) Well, sir, part of this is that there
7  have been several representations -- and you've seen
8  some of them yourself, right -- that you have
9  verified that there was no prior litigation relating
10  to your father's asbestos exposure, right?
11  A  I -- I indicated that I think somewhere in here there
12  was something about, you know, litigation. And I
13  don't know if it was prior or concurrent or whatever.
14  And to the best of my knowledge and belief, there
15  wasn't.
16  Q  Okay. And so that's -- if there was a prior or
17  concurrent litigation, your statement that there
18  wasn't is an inconsistency, correct?
19  A  Well, it's --
20          MR. McCOY: I object to that as,
21  again, calling for some form of legal conclusion and
22  as argumentative. You can ask -- you may ask him what
23  he knows. He's said what he knows. To ask him to make
24  conclusions of law based on that, that's not proper
25  here.

Page 216

1     You can go ahead and answer to the best of your
2  knowledge there, Gary.
3          THE WITNESS: Yeah. Well, it is
4  what it is. And if -- if you don't like it or feel
5  it's inconsistent, that's -- that's up to you.
6  Q  (By Mr. Lee) Okay. Do you know if any documents
7  relating to other lawsuits on behalf of your father's
8  estate have been destroyed?
9  A  I--
10          MR. McCOY: Let me object again to
11  the --
12          THE WITNESS: I wouldn't know.
13          MR. McCOY: -- to the statement by
14  counsel about the factual background there. But you
15  can go ahead and answer.
16          THE WITNESS: I -- I wouldn't know.
17          MR. LEE: Okay.
18          THE WITNESS: I...(Pause.)
19  Q  (By Mr. Lee) Have you instructed your lawyers to
20  destroy any documents related to your father's
21  estate?
22  A  No.
23  Q  Have you --
24          MR. McCOY: I'll object again based
25  on privilege. But he can answer the question if he

Page 217

1  wants to waive it.
2          THE WITNESS: Yeah. I can waive
3  it. The answer is "no."
4  Q  (By Mr. Lee) Have you instructed your lawyers to
5  destroy any documents related to the litigation of
6  issues related to your father's asbestos exposure,
7  whether in this lawsuit or any other lawsuit?
8  A  No.
9          MR. McCOY: Same objection. Go
10  ahead.
11          THE WITNESS: And again, I'll waive
12  this. Absolutely not.
13  Q  (By Mr. Lee) Okay. Have your lawyers told you that
14  they've destroyed any documents related to this
15  lawsuit or any other lawsuit related to your father's
16  asbestos exposure?
17  A  Well, that's probably --
18          MR. McCOY: Same objection.
19          THE WITNESS: That's probably over
20  the board on -- with disclosure. And so I -- I will
21  not answer that, because I don't want to waive any
22  attorney/client privilege.
23          MR. LEE: Okay.
24          THE WITNESS: But that's -- that's
25  just too far over the pale on that question.

Gary E. Suoja

| Page 218 |
|---|
| 1 Q  (By Mr. Lee)  Okay.  Do you know whether any |
| 2    documents related to your father's -- to litigation |
| 3    relating to your father's asbestos exposure have been |
| 4    destroyed? |
| 5 A  No, I do not.  I do not believe they have.  But I -- |
| 6    you know, I have no knowledge of that occurring. |
| 7       MR. McCOY:  Does that conclude the |
| 8    documents of Owens-Illinois, Josh?  Go ahead. |
| 9       THE WITNESS:  You mean the ones |
| 10    they destroyed because they were trying to cover up |
| 11    what they knew?  Is that what you're referencing, |
| 12    Bob? |
| 13       MR. McCOY:  Well, that's what I -- |
| 14    that's basically what I had in mind.  But, like I |
| 15    said, I don't want to waste any more time, so let's |
| 16    ignore -- we'll ignore that comment and move on. |
| 17 Q  (By Mr. Lee)  All right.  Sir, do you have any |
| 18    evidence that my client destroyed documents? |
| 19 A  No. |
| 20 Q  Okay.  So you're making that accusation without any |
| 21    evidence? |
| 22 A  Well, I'm -- I'm trying to recall something that I |
| 23    read years ago regarding the asbestos manufacturers |
| 24    and the -- and what they did with their -- in the |
| 25    process of developing and distributing asbestos and |

| Page 219 |
|---|
| 1    the things that they hid and destroyed regarding the |
| 2    lethality of their product when they sent it out. |
| 3    That was -- you know, that was -- that was years ago, |
| 4    probably in law school that I came up with that.  But |
| 5    I remember it to be a very distasteful period -- |
| 6 Q  Do you know how many -- |
| 7 A   -- to the best of my recollection. |
| 8 Q  Do you know how many companies manufactured asbestos- |
| 9    containing products? |
| 10 A  No, I do not. |
| 11 Q  Were you aware it's over 3,000 companies? |
| 12 A  No, I do not. |
| 13 Q  Do you know how many asbestos-containing products |
| 14    were on the market over the years? |
| 15 A  No, I do not. |
| 16 Q  When you say "asbestos companies," sir -- |
| 17       MR. McCOY:  This, again -- Josh, |
| 18    let me again object to the relevance of this line of |
| 19    questioning.  I mean, we will stipulate -- |
| 20       MR. LEE:  Are you still there, Bob? |
| 21       THE WITNESS:  Doesn't sound like |
| 22    it. |
| 23       MR. LEE:  We'll let him call back |
| 24    in and finish his statement. |
| 25       THE WITNESS:  Should we go off the |

| Page 220 |
|---|
| 1    record until he calls back? |
| 2       MR. LEE:  Sure. |
| 3       THE VIDEOGRAPHER:  Going off record. |
| 4    Time now is 3:45 p.m. |
| 5       (Pause in proceedings from |
| 6       3:45 p.m. to 3:52 p.m.) |
| 7 |
| 8       THE VIDEOGRAPHER:  Back on record. |
| 9    Time now is 3:52 p.m. |
| 10       MR. LEE:  Bob, I think you wanted |
| 11    the portion of your statement that you were able to |
| 12    make before the phone cut out read back to you; is |
| 13    that correct? |
| 14       MR. McCOY:  Right.  That's all. |
| 15    Just where I was talking. |
| 16       (Page 221, Lines 7 through 9, |
| 17       read by the reporter.) |
| 18       THE REPORTER:  And that's where it |
| 19    cuts out. |
| 20       MR. McCOY:  Yes.  This is the |
| 21    questioning on the prior proceeding.  I can't |
| 22    remember what actually we were questioning about. |
| 23    Was that what it was, Josh?  We were talking about |
| 24    that prior proceeding still? |
| 25       MR. LEE:  I'm not sure what you're |

| Page 221 |
|---|
| 1    objecting to, Bob, so...(Pause.) |
| 2       MR. McCOY:  Yeah.  Well, just read |
| 3    me back his question before that, then.  I'll have to |
| 4    have that too. |
| 5       THE REPORTER:  The last question |
| 6    was a partial question. |
| 7       (Question on Page 221, Line 6, |
| 8       read by the reporter.) |
| 9       MR. McCOY:  Right.  Yeah.  Okay. |
| 10    So I understand now.  Yeah.  So my objection is that, |
| 11    again, we're outside the scope of the relevance here, |
| 12    you know, as to, you know, I'll stipulate that Gary |
| 13    Suoja is not a witness as to the conduct of |
| 14    Owens-Illinois as to other than what he knows about |
| 15    the Badger Ordnance site.  And that's, again, far |
| 16    outside the relevance of what his knowledge is and |
| 17    what the purpose of this deposition was for, for the |
| 18    enforcement of the settlement agreement. |
| 19    So, once again, you know, we're here longer than |
| 20    we need to be for that very reason.  Okay.  Go ahead. |
| 21       MR. LEE:  So, Bob, I think I'll |
| 22    agree to your stipulation.  But I want to make sure |
| 23    we're clear.  Then I want to ask how far that |
| 24    stipulation goes so that there's no disagreement |
| 25    later.  As I agree it, you're stipulating that |

Gary E. Suoja

Page 222

1    Mr. Suoja won't offer any testimony with regard to
2    the conduct of Owens-Illinois; is that right?
3                MR. McCOY:  Yes.  Except, like I
4    said, as to his knowledge of what went on at Badger
5    Ordnance with his father.
6                MR. LEE:  Okay.  So will you agree
7    to the entry of a motion in limine regarding any
8    stipu -- regarding any testimony from Mr. Suoja about
9    asbestos companies destroying documents or engaging
10   in any conduct to hide information with regard to the
11   effects of asbestos?
12               MR. McCOY:  Is that all right with
13   you, Gary?
14               THE WITNESS:  That's not all right.
15   But I'll agree to it.
16               MR. McCOY:  Okay.  Then it's agreed
17   to.
18               THE WITNESS:  And I -- I say that
19   because it's true.  But I won't testify to it.
20               MR. LEE:  Okay.  As long as we're
21   agreed that there will be no testimony about that
22   from Mr. Suoja, I will -- and the only reason I went
23   there, Bob, is because he inserted that issue into
24   this deposition -- I will not ask any more questions
25   about that.  All right?

Page 223

1                MR. McCOY:  Okay.  Let's move on.
2  Q  (By Mr. Lee)  All right.  I do want to follow up on
3    something Mr. McCoy just inserted, though, with
4    regard to Badger Ordnance.  You have no personal
5    knowledge of Owens-Illinois or any of its products
6    ever being at Badger Ordnance, do you?
7  A   No.  My -- my knowledge about Badger Ordnance is
8    having, you know, my dad and my parents talk about
9    it, because it -- it was apparently a big-deal job
10   that was going on.  So I knew the name.  And the one
11   occasion when I drove back with my dad, just the two
12   of us in -- in the Pontiac coming back.
13       And I don't know exactly the year, but it was --
14   you know, dad was pointing out what he did and up on
15   that high line, as they called it, and was very proud
16   of it.  And I just remember it being a long, straight
17   road and this thing going up and dad talking about
18   it.  And he did that on occasion about his work,
19   because he was proud of what he did.
20  Q   So, and I'm just --
21               MR. McCOY:  So we'll stipulate
22   that he's not going to be testifying that
23   Owens-Illinois Kaylo was used at Badger Ordnance.
24               MR. LEE:  Okay.  And even farther,
25   Bob, you talked about Owens-Illinois's conduct with

Page 224

1    regard to Badger Ordnance.  Will you stipulate that
2    he won't testify about Owens-Illinois and Badger
3    Ordnance in any way?
4                MR. McCOY:  Mean --
5                THE WITNESS:  How -- how could I do
6    that?
7                MR. LEE:  Okay.  Let me -- that's
8    fair, Mr. Suoja.
9                MR. McCOY:  All right.  Just -- you
10   know, if you want to ask questions on it, Josh,
11   again, I don't see the relevance, but go ahead.
12               MR. LEE:  I don't want to if I
13   don't have to.  He's not going to be a product
14   identification witness at least with regard to
15   Owens-Illinois at Badger Ordnance; is that correct?
16               MR. McCOY:  I think our stipulation
17   covered that, yes.
18               MR. LEE:  Okay.
19               MR. McCOY:  Not as to the use of
20   Owens-Illinois Kaylo.  He's a product identification
21   witness as to his father being there at Badger
22   Ordnance, okay?
23               MR. LEE:  Okay.  And he's not --
24   the thing that's throwing me for a loop there, Bob,
25   is that --

Page 225

1                MR. McCOY:  Okay.  So let's -- he's
2    given you his testimony, what he knows about Badger
3    Ordnance.  You want to ask him if he knows any more
4    about Badger Ordnance and then we'll move on from
5    there?
6                MR. LEE:  No.  I'm actually trying
7    to see if we're on the same page, Bob, because I'm
8    thinking --
9                MR. McCOY:  I'm not going to
10   attempt any more stipulations --
11               MR. LEE:  Okay.
12               MR. McCOY:  -- with Kaylo.
13               MR. LEE:  That's fine.
14               MR. McCOY:  Okay?  You want to ask
15   him what else he knows about Badger Ordnance, he'll
16   answer it for you.
17               MR. LEE:  All right.  Thanks, Bob.
18  Q  (By Mr. Lee)  Mr. Suoja, you don't know anything
19   about any conduct of Owens-Illinois with regard to
20   Badger Ordnance, do you?
21  A   I -- I did not know Owens-Illinois provided product
22   at Badger Ordnance.
23  Q   You still don't know whether Owens-Illinois provided
24   product --
25  A   I don't know that.  I don't have any firsthand

Gary E. Suoja

Page 226

1   knowledge of it.
2  Q  I'm sorry, sir. I'm going to need to finish my
3   question.
4     Do you know whether Owens-Illinois ever provided
5   any products to Badger Ordnance?
6  A  No, I don't.
7  Q  Okay. And so you wouldn't be able to testify with
8   regard to any conduct of Owens-Illinois related to
9   Badger Ordnance, would you?
10  A  No. When I had information on Badger Ordnance, I
11   knew nothing about Owens-Illinois and its
12   relationship to Badger Ordnance.
13  Q  Okay. Your father worked on a lot of different job
14   sites, didn't he?
15  A  He did. Usually they were -- in almost all
16   instances, they tended to be large, more expensive
17   projects. Because having -- having pipes insulated,
18   having boilers insulated was a costly process. So
19   those tended to be larger, government-financed
20   projects as a general rule.
21  Q  So your father worked on a lot of projects that were
22   financed and overseen by the government?
23  A  Well, some government. Yeah, either state, county,
24   so on. Power plants, Badger Ordnance. You know, if
25   not a -- if not a government project, they were, you

Page 227

1   know, directly working with the government. Swedish
2   Hospital. Large corporations, which I consider
3   Chicklet to be. I remember that. I knew he worked
4   at power plants at various locations. He worked at
5   hospitals at various locations, also large
6   corporations. And -- and I generally am aware of him
7   going around to those -- those jobs.
8  Q  How would you possibly know what years your father
9   worked at various job sites?
10  A  Some of it was from general recollection, such as the
11   Badger Ordnance. That was -- that one was really
12   unusual, because it was an unusual situation. Some
13   of them, I kind of can relate to, going back, you
14   know, as to, you know, approximately what time it
15   was. And those are things that, you know, from my
16   direct knowledge or direct recollection, I can go
17   through.
18     And then there were -- when a series of
19   interrogatories came down, I remember helping my
20   mother, and the two of us were going down through
21   the interrogatories over the phone as to what jobs
22   dad had worked on. And she would remember some, and
23   then occasionally I would remember some. And we'd
24   discuss them and, you know, get our understanding of
25   when things happened.

Page 228

1     And it -- it was surprising. She -- she had a
2   very good memory of where his jobs were, because
3   typically he was away from home. And it wasn't the
4   case until later that he was home on a regular basis.
5   Typically he'd be gone for a week or a good portion
6   of a week. But there were a few jobs that he had
7   that I remembered that my mother hadn't, you know,
8   until we kind of talked things through. So those
9   were -- you know, that's kind of how we ended up on
10   things.
11     The dates that she came up with, you know, were --
12   were a lot of them were related to her and things
13   that she -- she remembered or, you know, had
14   information that she recalled. And that's kind of
15   how we went through and developed up the jobs that
16   he'd been working on.
17  Q  Do you know whether your father worked at Greenlee
18   Tool?
19  A  If he would have done work there, I don't know. I
20   don't recall that one specifically. But Greenlee
21   probably would have been a probable. Greenlee was
22   one of the bigger industrial plants in the Rockford
23   area. I almost said Seattle. In -- world of
24   difference between Rockford and Seattle.
25  Q  So you don't know whether he worked there or not?

Page 229

1  A  I wouldn't doubt that he did work there. And if --
2   if my mother and I had gone through a list, she would
3   have known, you know, specifically, and it's quite
4   possible he did.
5  Q  Okay. And I'm just -- so it's a little unclear where
6   your testimony may end in this case. And so I'm just
7   trying to get from your recollection, do you know
8   from your personal knowledge whether your father
9   worked at Greenlee Tool in Rockford?
10  A  No, I cannot say specifically that I recall that
11   right now.
12  Q  Okay. Do you know whether your father worked at
13   Kelsey-Hayes Gunite Division?
14  A  I recall the name, but I don't recall when.
15  Q  Okay. So you don't know what years he worked there?
16  A  No. No. That would have been -- those would have
17   been things that would have come from my mother.
18  Q  Okay.
19  A  Discussing them with her.
20  Q  Do you know if your father worked at Litton/Gardner
21   machine shop?
22  A  That I cannot tell you. That name does not ring a
23   bell with me.
24  Q  Do you know if your father worked at Sundstrand?
25  A  Yes.

Gary E. Suoja

Page 230

1 Q Okay. Do you know what years?
2 A No, I don't recall the years. But it would have
3   been -- I think he worked at Sundstrand off and on
4   over time. Because Sundstrand was a major
5   manufacturer, and they were doing something
6   important, so he was there off and on. That was a
7   job that was done quite a bit. So Sundstrand was
8   prominent in discussions at home as to where dad was.
9 Q Okay. Other than the affidavit that we talked about
10  in Exhibit -- do you still have it in front of you,
11  sir? It was the exhibit that -- the affidavit that
12  you signed.
13 A There are several here. Declara -- well, that's
14  Robert McCoy. Declaration of Gary Suoja. This is on
15  settlement?
16 Q Yes. It's Exhibit 3; is that right?
17 A This is Exhibit 5. Exhibit 3?
18 Q 5, okay.
19 A I have 4 and 4A.
20 Q Have you ever signed any affidavits relating to your
21  father's asbestos exposure?
22 A I don't recall.
23 Q Have you ever verified, for the purposes of obtaining
24  settlement with any party, your father's asbestos
25  exposure?

Page 231

1 A When you say verified asbestos exposure, what do you
2   mean?
3 Q Have you ever signed an affidavit saying, My father
4   was exposed to asbestos at this location?
5 A I don't -- I don't recall. I'm -- I'm not sure that
6   I could. But I don't recall doing that.
7 Q Have you ever signed an affidavit in support of
8   obtaining a settlement that your father was exposed
9   to a product from a specific manufacturer?
10 A Not that I recall.
11 Q And as we discussed earlier today, you would not sign
12  such an affidavit because you don't have that
13  knowledge, right?
14 A I don't have that knowledge right now. I'm -- you
15  know, as I said, it's been 20 years. And it's
16  possible I might have remembered something before and
17  I've since forgotten it. But the answer is, right
18  now, I don't have any such specific requirement or
19  recollection. I do recall talking on the phone to
20  doctors that were involved in doing the autopsy work
21  and reporting that dad died of mesothelioma.
22 Q Okay. Do you know whether your father was exposed to
23  asbestos-containing products manufactured by National
24  Gypsum Company?
25 A I don't know.

Page 232

1 Q Okay. You wouldn't be able to sign an affidavit that
2   he was?
3 A I wouldn't be able to say that he was.
4 Q Okay.
5 A But he did work in the industry where they provided
6   product, so...(Pause.)
7 Q Do you know what products National Gypsum made?
8 A No.
9 Q Do you know if they made products that your father
10  would have used?
11 A I do not. But if they provided product in the
12  insulating, asbestos insulation business, then the
13  odds are he would have used them.
14 Q Do you know if insulators had favorite products,
15  types of products, or anything like that?
16 A No, I don't know. Based on my knowledge of how
17  contracts and construction contracts work, they're
18  specified either by an architect or an engineer and
19  away you go. You get somebody's favorite product,
20  and that's what you have to use, because they -- it's
21  directed by the contract.
22 Q So you wouldn't know one way or the other whether
23  your father was ever exposed to a National Gypsum
24  product; is that right?
25 A That's correct. I would not specifically know.

Page 233

1 Q Okay. Do you know whether your father was ever
2   exposed to asbestos from a Johns Manville product?
3 A Not specifically, no.
4 Q Do you know whether your father was ever exposed to
5   asbestos from an Owens Corning product?
6 A Not specifically that I know of.
7 Q Do you know whether your father was ever exposed to
8   asbestos from a Pittsburgh Corning product?
9 A Not specifically, no.
10 Q Okay. Do you know whether your father was ever
11  exposed to asbestos from an Owens-Illinois product?
12 A Not specifically, no.
13 Q Do you know whether your father was ever exposed to
14  asbestos from a Garlock product?
15 A No, not specifically. I wish I could ask him.
16        MR. McCOY: Again, I'm just
17  questioning the relevance of these questions. I
18  mean, we've provided discovery responses, none of
19  which identified Gary Suoja as a witness for any of
20  these matters. So asking questions that he has not
21  been identified as a witness for.
22        MR. LEE: I agree, Bob. And some
23  of these may go to credibility as well, on issues
24  that the order addresses, particularly with regard to
25  the signing of affidavits and the basis for those

Gary E. Suoja

Page 234

1  knowledge.  So do you understand, Bob?
2         MR. McCOY:  I understand what
3  you're saying.
4         MR. LEE:  Okay.  And you would
5  agree that credibility of someone who signed an
6  affidavit is always an issue that can be explored,
7  right?
8         MR. McCOY:  I don't know --
9         MR. LEE:  Okay.
10        MR. McCOY:  -- one way or the
11 other.  I mean, that's an issue you can take up with
12 the court.  Like I said, we're here for the complete
13 deposition.
14        MR. LEE:  Okay.
15 Q  (By Mr. Lee)  Now, it's your testimony, right, sir,
16    that you would never sign an affidavit that your
17    lawyers presented to you without actually reading it
18    and understanding what was being asked of you, right?
19 A  I -- I will read the affidavits that are presented to
20    me before I sign them.
21 Q  And you would never sign an affidavit just for the
22    purpose of obtaining a settlement when you didn't
23    believe the underlying information was true and
24    correct, right?
25 A  Yeah, to the best of my knowledge and belief.

Page 235

1  Q  Okay.  You would never sign an affidavit based on
2     personal knowledge just because someone else told you
3     that it was true, right?
4  A  Well, it depends.  If it was somebody that I could
5     rely on and -- and they were in that -- you know, in
6     that work, I would.  For example, if somebody asked
7     me if my dad dies of mesothelioma, I didn't do the
8     autopsy.  I'm relying on what the doctors and so on
9     have said.  When I'm dealing with probate-type
10    matters and signing documents, I'm relying on what my
11    attorneys are telling me.  And, you know, I don't see
12    how you can operate any other way.  That's -- that's
13    how we make our living.
14 Q  Have you authorized Mike Cascino to make any other
15    statements on behalf of your family?
16 A  No, I've not talked to Mike Cascino.  I have
17    authorized others at Cascino Vaughan to make
18    settlements.
19 Q  Okay.
20 A  I've -- I've never talked to Mike Cascino, so I
21    wouldn't know.
22 Q  Have you ever signed documents as special
23    administrator of your father's estate at a time in
24    which you were not actually the special administrator
25    of your father's estate?

Page 236

1  A  I do not know.
2  Q  Have you ever authorized settlements on behalf of
3     your father's estate during a time in which you were
4     not special administrator?
5  A  I wouldn't -- I wouldn't know.
6  Q  Okay.  Do you think it's important before you act on
7     behalf of an estate to know whether you have the
8     authority to do so or not?
9  A  Well, I would -- I would assume that my lawyers are
10    telling me that I'm authorized to sign if they
11    present me with material.  So to that extent, when I
12    ask them if that's what's going on, then away we go.
13 Q  Okay.  And I'm just -- I'm trying to figure out kind
14    of the background here, sir.  Because this is kind of
15    an odd situation.  Usually people know about the
16    lawsuits that they've filed and what's going on in
17    them.  Here, you really don't have any information
18    about this lawsuit over the last 20 years; is that
19    right?
20 A  Now, I had much more information, you know, early on,
21    generally, about my dad, where he worked, what
22    was gone, where he worked, approximate times, talking
23    to my mother and working up interrogatories and so
24    on.  Since that time, I've had very little knowledge,
25    and it's mostly because things have been stretched

Page 237

1  out so long.
2         I mean, if I asked you about some of the cases
3  you had 20 years ago, you'd be amazing, because you
4  could remember bunches of things and you could go
5  right down the line and remember them.  I know you
6  could, because I've been able to do that in the past.
7  You're smarter than me.
8         But then you'll think that you've done everything
9  right, and somebody will come up and say, Well, what
10 about this?  And you go, I don't remember that at
11 all.  And it will happen more and more, especially
12 as -- as you get older and as you see documents, you
13 realize that really solid memory that you thought you
14 had -- perhaps you do -- there are just gaps.  You're
15 busy.  You do a lot of things.  Some of the things
16 you don't remember.
17 Q  And I get that.  And that's not what I'm trying to
18    get at.  But one of the things that we're trying to
19    figure out and one of the things that the court told
20    us --
21 A  Mm-hmm.
22 Q  -- that we could inquire on is the prior litigation.
23    And in discovery responses, the way that we've read
24    them, is that you're the person who knows the most
25    about that.

Page 238

1  A  Well --
2  Q  And you don't seem to really know anything about it;
3     is that right?
4  A  Well, I -- I signed off on the discovery responses.
5     And I, to the best of my knowledge and belief,
6     verified the information or got the information from
7     a reliable source.  And that source was either me or
8     my mother or somebody that we thought was in -- you
9     know, involved.  Typically the lawyers.  And that
10    was -- that was a big process when we went through
11    all of that initially.  Do I remember everything we
12    put in there?  Oh, heavens, no.  Did we verify it at
13    the time?  Absolutely.
14 Q  Okay.  If you signed documents, though, after -- you
15    know, a decade after your mother had passed away, you
16    wouldn't have been able to consult her before signing
17    those affidavits, right?
18 A  That's -- that's correct.  That's how it works.
19 Q  Okay.  Is there anybody else other than your mother
20    that you've consulted with about your father's work
21    history?
22 A  Oh, I had talked to my brother some, because my
23    brother worked in the asbestos trade for a while as
24    well.  And I think he was part of some of the things
25    that we -- we'd talked about.  Other than that, it

Page 239

1     was primarily the attorneys and the information that
2     had been gathered and the prior interrogatories and
3     information gathered on my dad's claims.
4  Q  Okay.  Do you know when your brother first started
5     working with your father or working as an insulator?
6  A  No.
7  Q  Was it in the 1960s, 1950s, 19 -- wouldn't have been
8     in the 1940s.  He wouldn't have been old enough,
9     correct?
10 A  Well, he -- he ended up retiring as a cop up in
11    Superior.  So he was not the most industrious guy.
12    And I'll say that generally with regard to police
13    officers.  I'm trying to remember when he moved up
14    there.  Because once he moved from Rockford to
15    Superior, he didn't work in the industry anymore.
16    And his daughters were both young, but they were
17    alive.
18       And I just don't know when that was.  And it
19    was -- it was probably after I graduated from high
20    school.  And I know they drafted me to help load up
21    this -- this "Beverly Hillbillies" type of trailer
22    and something behind it.  They probably had two rigs
23    that ran about 70 feet, you know, hanging behind
24    whatever they were hauling.  And I had to help them
25    move that.

Page 240

1        And so I'm guessing I was probably early in
2     college or maybe somewhere in college when that
3     occurred.  So that would have been the mid '60s.  So
4     I'm pretty certain that was the end of my brother's
5     working on asbestos at that time.
6  Q  Okay.
7  A  It's possible, little bit in Superior before he -- he
8     got on with the police force.  But I'm -- I don't
9     think so.  I think -- I think that was it.  Sometime
10    in the mid '60s was the end of it.
11 Q  Do you remember when he might have started working?
12    If you know.  If you don't, that's fine.
13 A  No, in my opinion, he never did.  And at my -- as a
14    matter of fact, I -- I made that comment at my
15    mother's funeral as we were selecting a casket for
16    her.  All of us were gathered around, and he knew the
17    funeral home director.  And instead of requiring a
18    deposit, he says, Well, I know Smokey here, and so
19    I'm sure he's good for it.  And if he's not, I'll
20    just put him to work.  And my comment was, You'd be
21    the first.  And that kind of -- that kind of broke
22    the house down.
23       But -- so I'm guessing -- and it's kind of a
24    guess -- he might have started that work in, oh,
25    maybe 1960.  Maybe something like that.  My dad might

Page 241

1     have gotten him on to do some stuff.  And he did a
2     number of odd jobs, and I just -- I just knew that he
3     didn't have any money.  And I'm the one that always
4     had to cough up the money when something would occur.
5     It's been the story of my life so far.
6  Q  Are you the one who generally takes care of your
7     family?
8  A  Well, to the -- to the extent is, I'm very close with
9     my children, or at least I feel I'm close with my
10    children.  Of course, they've moved all over the
11    place.  I am close with my sister Sue.  I am not as
12    close with Kimberly.  And so in that regard, I try to
13    help out where I can.
14       So I -- I don't worry about my -- my daughter and
15    my son too much anymore.  I've got -- my oldest boy
16    works for Microsoft out in the Boston area.  My
17    daughter -- or my son-in-law works at Apple, in their
18    product development.  So he's in China right now,
19    because that's where he spends a good portion of his
20    time.  So I don't worry about them too much.
21       My youngest son, however, got caught in the --
22    the Great Recession and finished school.  And the
23    industry he was trying to go into came close to
24    disappearing.  And so he's been -- he's been
25    scrambling.

Gary E. Suoja

Page 242

1  Q  My understanding is your father got sick in 1996; is
2     that right?  And if you don't remember the date, we
3     can say late '90s?
4  A  That's -- that's -- I don't think that that's quite
5     accurate.
6  Q  Okay.
7  A  I was there at their 50th wedding anniversary, and
8     dad was looking like he was aging.  You know, my dad
9     was a very vigorous guy, and he was -- you know, even
10    when he had trouble seeing.  I can remember coming up
11    there to visit him.  Says, Well, let's go to the
12    store.  And, bang, off we'd go.
13       And he'd have his little stick on the sidewalks,
14    and I'd be -- I'd be kind of pushing, you know.
15    Overweight and out of shape, I'd be pushing to keep
16    up with him and warning him where we had frost even,
17    so on.  And he'd be there with a stick, and we're off
18    to this little store.  And -- and he'd be -- you
19    know, he'd get something.  He knew the people there.
20    He knew the change.  We'd go.
21       And, you know, as I said, I had some -- I have
22    some pictures here of him.  This -- these were
23    primarily -- Bob, should I put these in as exhibits?
24    I made copies of them because I don't want to lose
25    the originals.

Page 243

1          MR. LEE:  So these are not original
2     pictures?
3          THE WITNESS:  These are -- these
4     are copies that I made today, and they're color
5     copies of the original photographs which I have.
6     And they --
7          MR. McCOY:  Let's mark these, yes.
8          THE WITNESS:  Pardon?
9  Q  (By Mr. Lee)  Let me ask you this, Mr. Suoja.
10 A  Yeah.
11 Q  Which will inform whether we should mark them.  Are
12    these pictures that you might use if you're a witness
13    at trial to explain how your family operated and your
14    father's history?
15 A  They -- they are.
16 Q  Okay.  We should mark those as exhibits today.
17 A  Okay.  Let's mark those as an exhibit.  We have two
18    others that we can mark as exhibits.  I didn't bring
19    all of them, because I didn't go through everything.
20    I'm a guy, and I don't organize pictures properly.
21 Q  That's fine.  Let's go ahead and mark them as a group
22    exhibit.  Be easier.
23 A  Okay.
24          MR. LEE:  I think we're on 11; is
25    that right?

Page 244

1          (Exhibit No. 11 marked for
2          identification.)
3  Q  (By Mr. Lee)  I think we've marked now the pictures
4     that you've brought with you today --
5  A  Yeah.
6  Q  -- as Group Exhibit 11; is that right?
7  A  That's -- that's correct.
8  Q  Let me go through them with you, just --
9  A  Okay.
10 Q  -- so we can identify them.  You've brought, and so
11    Mr. McCoy knows --
12 A  This -- this is a black-and-white photograph of my
13    parents at their wedding.
14          MR. LEE:  Bob, just so that you're
15    clear, I think this is the same picture that Kimberly
16    brought with her --
17          THE WITNESS:  Probably.
18          MR. LEE:  -- to her deposition.  It
19    looks like the kids may all have a picture.
20          THE WITNESS:  Yeah.  I think I have
21    a copy and somebody else has the original on that
22    one.  All right.
23       Then what I -- what I also have is, this was easy
24    for me to find.  This is based on the -- my parents'
25    50th anniversary.  And there's four photographs here.

Page 245

1  And in the upper left, we are -- this -- the house
2  that -- that we're seeing here in the -- in the upper
3  left, that is my -- at my brother's house, Smokey and
4  Marsha.  That's Kimberly, my sister, and then my dad.
5     Now, what I -- what I kind of notice about this
6  is dad's happy and he's smiling, but he -- he seems
7  to me to be aging -- this is in '93 -- you know,
8  pretty -- pretty rapidly.  And this is a picture of
9  my dad down below in the bottom left.  This is my
10 dad, my mother, and my Grandma Dalbec.  This is my
11 mother's mother, Agnes.
12    And then on the -- on the bottom right, this
13 always gets me about dad.  It's my brother Smokey is
14 here on the left.  As you can see, he's kind of
15 trying to peek at my dad's cards.  My dad was playing
16 a little slow.  He had cards that he could, you know,
17 feel to determine what they are, and you can see
18 we're playing cribbage.  This is Suzie's wife [sic]
19 Jerry, and then the big fat guy here is me.
20    And then up above here, in the upper right-hand
21 corner, dad had downstairs in the basement -- it was
22 a very small house.  You see the wall, and the guy
23 who took the picture pretty much is up against the
24 wall.  And that's me pouring drinks.  And this is
25 Uncle Archie.  This is Bernard Auberg.  That's the

Gary E. Suoja

Page 246

1  one that had the GM dealerships up in Withee and
2  Thorp. My dad. And I don't know who the fourth guy
3  is. I just -- I blanked. I don't recognize him
4  right now.
5       But you can -- you can kind of see that dad
6  was -- you know, he enjoyed playing cards and
7  cribbage. He was -- had terrible luck at cards,
8  though. Just, it was terrible. It used to be funny,
9  he was so terrible. And my brother was unusually
10  lucky. Not good. He was lucky at playing cards. As
11  you can see, you know, that was a lot of fun. But my
12  dad wasn't yet 70. And he was really a very vigorous
13  guy.
14       And then on the third page, I have two pictures
15  kind of trying to give you an idea of who my dad was.
16  One of them was just -- I think this was a Polaroid
17  that I have. This was taken in 1970 when I first was
18  at Fort Lewis and they came out here to see me. This
19  is my oldest son, who is -- he was born while I was
20  in basic training, which is why we went back to Wood
21  River, Illinois, with my wife.
22       So as a matter of fact, the month he was born,
23  after the Army took out the money that I was getting
24  paid, I had $69 and change left. And that was in
25  November of 1969. We were on bivouac the day he was

Page 247

1  born. And I sat down and cried because I used to
2  make more money than that when I was in high school,
3  working in the grocery store.
4       So, at any rate, this is -- again, I believe this
5  is Kimberly that came -- came with ma and dad. And
6  this is my dad. And this is how I always remember my
7  dad, is down on the floor playing with us.
8  Q  (By Mr. Lee)  Do you want to take a second, sir?
9  A  Yeah.
10            MR. LEE: Can we go off the record
11  for a second, please?
12            THE VIDEOGRAPHER: Going off
13  record.
14            MR. LEE: Before you start talking
15  again.
16            THE VIDEOGRAPHER: Time is 4:28 p.m.
17            (Pause in proceedings from
18            4:28 p.m. to 4:29 p.m.)
19
20            THE VIDEOGRAPHER: Back on record.
21  Time now is 4:29 p.m.
22            THE WITNESS: As you can see, he
23  was on the floor, playing with the kids. And that's
24  how I always remember him when I was younger. And
25  the other picture here is dad, and I'm presuming -- I

Page 248

1  don't know for sure, but I'm presuming that this is
2  in Rapid City, South Dakota. The reason is, he is
3  with my cousin Ricky. He's my Aunt Lillian's boy.
4  He had diabetes. He died at 44. So Ricky was about
5  six to eight years younger than I was. So this was
6  probably in the early '90s, '91, '92.
7       You can see dad climbing up -- this looks look
8  the Badlands, because I've been there with my
9  youngest son. So you can see my dad climbing around,
10  and he's got his stick. And I don't know if he posed
11  this or not. I wasn't there. Just one of the
12  pictures I got. But he was always close to his
13  family and to Aunty Lil, and I've got a bunch of
14  pictures of Aunty Lil. She and my dad almost looked
15  like twins even though they were separated by about
16  two years.
17       And, you know, but -- but that's what he would
18  do. You know, he was not someone to sit around,
19  watch TV. He might watch a football game. But he
20  was always on the move. And he was proud of that.
21       When he was -- when he was young and first
22  married, he was trying out for the Superior Blues,
23  which was a -- the equivalent of a AAA baseball team.
24  And he was confident he was going to make it, but my
25  mother objected so much to him being away after

Page 249

1  working that he finally gave it up. Now, I did at
2  one point find an old glove that, you know, looked to
3  me like it had been sitting in a dump or something,
4  but that was apparently his glove. He played third
5  base.
6       I can also remember when I was 14, we went to his
7  high school reunion. And like so many other
8  situations, the people there remembered him, because
9  he -- not only did he play third base and played
10  well; some of the old-timers that were watching the
11  game, and I thought, Oh, they're going to invite me
12  in. You know, I'm a young kid. I'm a good baseball
13  player. I've been recruited by teams to play. My
14  dad was way better than I was.
15       And -- and they -- they remembered him as that
16  guy who used to knock the ball way out -- out out of
17  the park, because there weren't any parks -- out into
18  the woods, because that's -- northern Illinois,
19  that's what there -- or Minnesota, that's what there
20  was. You'd finish mowing. The rest of it was woods.
21       And then when he was -- and my mother realized
22  this while he was there. When he was down in
23  Janesville at the school for the blind, which is
24  another place that he'd worked years before, he came
25  back 30 years later. They remembered him. I mean,

Gary E. Suoja

Page 250

1  he's just a Joe Schmo working at a job, and they
2  remembered him.
3  Q  (By Mr. Lee)  So your dad was well liked by all the
4  people around him?
5  A  He was fun.
6  Q  And you can see that in these pictures.  And that's
7  one of the reasons why you brought them today, right?
8  A  That's right.
9  Q  You wanted to give us an idea of who your dad was; is
10  that correct?
11  A  Well, of how -- how he was, my stories about who he
12  was.  The pictures are kind of showing a bit of where
13  he was going.  Because he should not have, in my
14  opinion -- now, you know, I'm 70.  Dad wasn't this
15  age, you know, when these -- when these pictures were
16  taken, or he was just about turning 70.  I guess they
17  were taken in '93.  Yeah, so he would have been just
18  reaching 70.  And I'm -- you know, I'm looking at
19  him, and I'm going, you know -- and this is kind of
20  in retrospect, granted.
21  Q  Mm-hmm.
22  A  But I'm going, How did he -- you know, as I look at
23  him now, he's so old.  And I look at myself, and I
24  say, Something is -- something's wrong here.  I don't
25  feel like I'm, you know, all that old.  But I look at

Page 251

1  him, and I can say, Wow, he's -- you know, he's
2  older.
3  And -- and then I was there in '92.  I was there
4  again in '93.  And then I didn't come back till '96.
5  And when I got back in '96, in August of '96, there
6  was something wrong.  You know, I kind of knew that.
7  And we always ended up spending time together
8  talking.  And he was talking about having, you know,
9  difficulties.  And, you know, you know, and it was
10  mostly related to his -- his bowels.  And I wanted to
11  take him to the hospital, and he just -- or to the
12  doctors.  And he said, no, he's got an appointment,
13  and, you know, mother would take him.
14  And I said, She'll skip this, or something.  Then
15  he said, No, no, we'll go.  Don't -- don't worry
16  about it.  Don't worry about it.  You know, he knew
17  something was wrong.  You know, he'd -- over the
18  years, he had testified in -- in these cases.  And,
19  you know, I didn't know individual cases, what ones.
20  And I just know that he talked about going to
21  so-and-so's trial.  He was -- he was there about
22  where he'd worked and so on.
23  And one of the friends -- one of the guys that he
24  had worked with eventually died of -- of cancer.  And
25  this guy used to drink a lot of beer.  They had --

Page 252

1  they had a German shepherd that they'd feed beer to.
2  It's -- it was kind of ridiculous.  But he ended up
3  passing away of cancer.
4  And this was way back, you know, before -- before
5  I even knew much about any of this.  And dad -- dad
6  was -- testified.  And he was called on, on a number
7  of occasions to testify in these cases.  So, you
8  know, and I was hoping it was never going to hit him,
9  but I'm -- I'm beginning to think he knew.
10  Q  So here's a question:  You knew that your dad had
11  testified in a number of cases.  Do you know who --
12  who the law firms were for any of those cases?
13  A  No.  No, I don't have -- I don't have any idea.  And --
14  and it was -- you know, it was just in passing.  I
15  knew that these guys had visited and had come over to
16  see us, and they had their beer-swilling dog.  I
17  know, you know, that he had passed on with cancer,
18  and dad had gone to a trial and testified.  And I
19  knew that he did it for other people, because other
20  people counted on him.  They liked him.
21  Q  Sure.  First of all, thank you for bringing these
22  pictures.  I think it's -- you know, helps you tell
23  your story.  So thank you for bringing them.  And it
24  helps you tell your dad's story.
25  I had a couple of questions about these pictures.

Page 253

1  On the second page, which is the picture -- the four
2  color pictures.
3  A  Uh-huh.
4  Q  The one in the top left is your sisters and your dad,
5  right?
6  A  That's correct.
7  Q  Okay.  And, or one is your sister-in-law, one is your
8  sister Kimberly, and one is your dad?
9  A  No.  No.  Those -- those were Kimberly and my sister
10  Sue.
11  Q  Okay.
12  A  And that was at Sue's house.
13  Q  Okay.  This is at Sue's house.  Your dad is wearing a
14  "Best Dad on Earth" sweatshirt, right?
15  A  That's right.
16  Q  That one you said was taken in '93; is that correct?
17  A  I believe that was in -- in '93.  Now, I -- yeah.
18  Q  There's four pictures on these -- this page.  Are
19  these all pictures from 1993?
20  A  I believe they're all from 1993.
21  Q  And then there's another picture, two pictures on the
22  third page that you brought.
23  A  Yeah.
24  Q  One is the Polaroid of your son on your dad's back?
25  A  That's right.  And that was 1970.

Gary E. Suoja

Page 254

1  Q  1970.  And then the one that I have a question on,
2     I'm trying to get the parameters of all --
3  A  Yeah.
4  Q  -- of these.  The one with your cousin with your dad
5     standing in the rocks, what year do you think that
6     is?
7  A  Yeah, with my cousin Ricky.  Because -- because he
8     died of a heart attack at 44, I -- I am pretty
9     certain that that was taken prior to 1994.
10 Q  Okay.
11 A  And the reason is just because of the difference in
12    our age.  In '94, I turned 50, and -- and he was
13    younger, so he...(Pause.)
14 Q  But you don't know whether this is 1993, 1990, in the
15    '80s?
16 A  No.  No.  It was in the -- it was in the early '90s.
17 Q  Okay.
18 A  And -- and Ricky was gone before that, so...(Pause.)
19 Q  Okay.  And we know when the picture of your parents'
20    wedding was taken?
21 A  Yes.  I wasn't there, but...(Pause.)
22 Q  But we got a good sense of when that is.
23 A  Yes.  One of the things that I would testify to is
24    this picture of my parents at their wedding.
25 Q  Yeah.

Page 255

1  A  Even though I wasn't personally there and don't have
2     firsthand knowledge.
3  Q  I get that.  Sir, you brought a manila folder with
4     you today.  Are there other documents that you
5     brought to assist with your testimony today?
6  A  No.  These are --
7  Q  What else is in that folder?
8  A  These are other -- other items that I have received
9     from -- from Bob, and then notes to myself, notice of
10    the deposition.
11 Q  Okay.
12 A  And a yellow pad that I've made some notes on.
13 Q  All right.  So I started -- before you pulled the
14    pictures out, I started asking you when your father
15    got sick.  And you said you thought it was coming for
16    a while?
17 A  Yeah.  But I don't know how long.  Because, you know,
18    it'd been '93 and I was -- I was noticing, you know,
19    at the 50th that he wasn't -- he wasn't as chipper as
20    he -- he was.  And if you knew him, he's just full of
21    weird jokes and, you know, and the babble back and
22    forth and having fun with everyone.
23       And in '93, there was less.  And I go, Oh, God,
24    he's been married 50 years.  That's probably it.
25    And, you know, I didn't do more.  Then I didn't get

Page 256

1     back till '96.  Although, you know, I'd call and I'd --
2     well, my mother would say, Dad's not feeling good.
3     And I'm -- you know, what do I know?  But in '96, it
4     was -- it was quite clear that he knew what was going
5     on.
6  Q  So your dad had some pretty severe diabetes; is that
7     right?
8  A  Yes.  My dad had diabetes that -- you know, that
9     couldn't be controlled except with insulin.
10 Q  And, in fact, that's the reason why he had to retire,
11    was his diabetes got so bad, he was no longer able to
12    work?
13 A  No, not work.  He -- he still would work.  You
14    couldn't stop him from working.  His problem was, he
15    couldn't see at night to drive.
16 Q  Okay.
17 A  So you're in -- you're in Wisconsin, and, you know,
18    once -- once the fall comes, you're down to eight
19    hours of daylight.  So how's he going to get there?
20    So he just couldn't see enough.  And even when you
21    see, you know, the pictures -- and there's probably
22    other pictures you saw of him -- he could get around
23    pretty well for being blind.  But it wasn't, you
24    know, like everything went black.
25       And I only know this because I talked to him

Page 257

1     about this.  When I was at Illinois, I worked with
2     the rehab students when I was a counselor in the
3     dorms.  What he had is, it -- it was -- was like
4     the -- the -- the views became fuzzy and you started
5     going to not a sharp color and it began just to fade
6     into fuzzy lights and grays, and that's where his
7     problem came.
8  Q  And so let me rephrase that a little bit, because I
9     think we're talking about the same thing.  His
10    eyesight problems were caused by his diabetes?
11 A  That's -- to my knowledge, that's the case.
12 Q  And so ultimately he wasn't able to work any longer
13    because of the issues that arose from his diabetes?
14 A  That's correct.  But to make it very perfectly
15    clear --
16 Q  Yeah.
17 A  -- the only item related to his not working was his
18    inability to see at night to drive, because he
19    couldn't get to and from work, because he'd be
20    driving in the dark.  So he was physically capable of
21    working and would have wanted to.  And he did relate
22    to me that he would have.  But he just couldn't see
23    anymore, and that's why he retired.
24 Q  Okay.  So let me rephrase the first question that
25    kind of got us here.  Looking at the medical records,

Gary E. Suoja

Page 258

1  so I -- there's not a documentation of what was
2  going on with your father in '93, '94, '95. In the
3  medical records, we see that he got sick, was
4  diagnosed in 1996; is that right?
5  A  I -- that's -- to the best of my knowledge, that's
6  it. If you've seen the medical records, you've seen
7  way more than I have.
8  Q  Okay. So if -- when I say your father got sick, the
9  first kind of notation in the medical records is, in
10  earlier '96, it took a while, and then he was
11  diagnosed later in 1996; is that correct?
12  A  That's correct.
13  Q  Okay. So your father got sick in 1996. Were you --
14  did you come home at all after your father's
15  diagnosis?
16  A  Well, I -- I don't agree that he got sick in '96.
17  But once I -- once I heard -- and I think my
18  recollection of the sequence is, I left in late
19  August. September, he went to see the doctor
20  sometime, mid September. They scheduled him for an
21  exploratory operation sometime in October. They
22  discovered the mesothelioma, and they just sewed him
23  back up.
24      And he went into -- I forget what they did. I
25  think he stayed at the -- at the hospital or sort of

Page 259

1  at hospice, and he may have come home for a period.
2  And I remember talking to my mother about what was
3  going on and, you know, what the -- what the
4  prognosis was.
5      And then he went into hospice, and then I came
6  back again. I was back for -- it would be just
7  before Christmas. I was having all of the kids and
8  everything coming back for Christmas. And so I came
9  back in mid December and just stayed until, like,
10  December 24th. Then I got back on a plane and came
11  back.
12      Worst Christmas in the world. I think -- as a
13  matter of fact, I think I got home, unpacked, went
14  back to the airport to pick up my daughter and her
15  fiance, brought them home for Christmas. Hadn't --
16  nothing was decorated. Christmas Day, or during that
17  period, my oldest boy was in Bellingham with his
18  wife, and a snow blizzard hit. And they almost
19  didn't make it to the house from -- their car hit a
20  snow pile. They almost didn't make it in. They were
21  snowed in for a week.
22      My future son-in-law got a call from the family.
23  His mother had died of diabetes overnight. So I now
24  had to pack them up. And my youngest son at that
25  point, my ex-wife decided that she was going to keep

Page 260

1  him until January 1. So I -- I just trundled my
2  daughter and son off to the airport so that they
3  could go back to Boston. I scheduled a plane for
4  myself, and I went back. Left on the 27th, I think,
5  the day after dad died when I got word. Not a good
6  Christmas.
7  Q  No, sir.
8      So what I -- what wanted to ask is: You came
9  back -- between the time that your father was
10  diagnosed with mesothelioma and the time he passed
11  away, it was a few short months; is that right?
12  A  It was from August until the end of December.
13  Q  Okay. Between August and December, it sounds like
14  you came home a couple of times; is that right?
15  A  No. No. I was there in August, and then I didn't
16  come back until mid December.
17  Q  Okay. And what I was getting at is, you weren't
18  there for the majority of the course of his
19  treatment; is that right?
20  A  That's -- and we're talking about the time frame
21  August to December?
22  Q  Yes, sir.
23  A  Yeah. That's -- that's correct. I was not --
24  Q  Okay.
25  A  -- there during the majority of that time.

Page 261

1  Q  Okay. So from your own -- when I say from your own
2  personal knowledge, from stuff that you saw or
3  observed as opposed to what somebody told you,
4  between August and September you don't have
5  information regarding your dad's treatment?
6  A  Just -- just from the phone calls.
7  Q  Okay.
8  A  And believe me, there were -- there were plenty of
9  them. And -- and that, you know, was Kimberly and my
10  mother. A lot from my mother. Marsha, my brother's
11  wife. I doubt I heard from my brother very much.
12  And then I would have my Aunt Ruth Ann. There was a
13  lot of discussion.
14  Q  And you understand, particularly being a lawyer,
15  trying to figure out what you observed as opposed to
16  what you were told, and --
17  A  Yeah, well, I can -- I can talk about what I saw and
18  our discussions in '96. Probably talking a little
19  bit to my dad on the phone, you know, in October,
20  because nobody knew, you know, until October when
21  that exploratory operation went. And then I spent a
22  good deal of time with my dad when I came back in --
23  in December.
24  Q  And -- yep. And so I think we're on the same page,
25  but I'm trying to be clear.

Gary E. Suoja

Page 262

1 A  Mm-hmm.
2 Q  You didn't --
3 A  Yeah.
4 Q  -- observe anything about your dad or his treatment
5    physically.  You weren't there to see it.  You
6    weren't there --
7 A  Yeah.
8 Q  -- to watch it?
9 A  During that period.
10 Q  Okay.  That's all I was trying to get at.
11 A  Yeah.  Yeah.
12 Q  So, okay.  And that's not saying you didn't talk to
13    your family or anything.
14 A  Yeah.
15 Q  That's not what I'm trying to get at.  I'm just
16    trying to see what you observed personally.
17 A  But, yeah, that's -- talking to your family, that's --
18    I mean, that's what you do:  How is everyone?  How is
19    so-and-so?  And that's -- that's what you do.
20       MR. LEE:  Absolutely.  I think,
21    sir, unless Mr. McCoy has some questions, I don't
22    have any more questions for you today.
23       THE WITNESS:  Mr. McCoy?
24       MR. McCOY:  Just a couple brief
25    questions here.

Page 263

1       THE WITNESS:  I was afraid of that.
2       MR. LEE:  Lawyers always have
3    follow-up.
4       MR. McCOY:  Just a second here.
5       THE WITNESS:  Are you still awake,
6    John?
7       THE REPORTER:  (Nods head.)
8              EXAMINATION
9 BY MR. McCOY:
10 Q  Based on your interactions with your father before he
11    passed away, Gary, did you -- do you have any belief
12    about whether your father knew that he was going to
13    be dying?
14 A  Well, at the time -- and this is in -- in August.  At
15    the time, I didn't know.  I knew from talking to him
16    that something was wrong.  He didn't tell me what it
17    was, and, you know, I didn't -- I didn't surmise.
18    But in retrospect and after, you know, being there
19    with him in December, I'm quite certain that he knew.
20    I remember I was all up in arms about, they just
21    sewed him up and didn't even try anything.  But it
22    didn't bother him at all.  He knew.
23 Q  Now, on another topic, am I correct in saying, that
24    during the communications about who might be a
25    witness for the family, that you had identified

Page 264

1    Kimberly as a witness; is that correct?
2 A  I think I was --
3 Q  As a witness.
4 A  Yeah, I think I was talking about who might attend.
5    And I -- I think I indicated to you that I only
6    believe that Kimberly could attend, that the others
7    just weren't physically capable of doing so.
8 Q  And just to clarify something on that, you and I have
9    worked out that I would be the attorney representing
10    Kimberly at her deposition; is that right?
11 A  Well, yeah, I -- when the notices went out and -- and
12    you told me that Kimberly had been notified and that
13    you were going to give her a call, I decided I'd give
14    her a call first just to make sure she understood
15    what was going on.  So I -- I told her what was going
16    on.  I told her that you were representing us on
17    dad's claim and that you'd be giving her a call and
18    she should talk to you.
19       And -- and then she was, Oh, jeez, it's going to
20    be in Chicago.  And I said, Don't worry.  It'll be --
21    I believe it was at your office.  And I said, Bob
22    will talk to you.  He'll be there.  Don't worry about
23    it.  He'll talk to you, and you can go ahead and --
24    and tell what you know.  And he'll call you pretty
25    soon and talk to you about it.

Page 265

1 Q  So Kimberly hadn't -- had said at her deposition that
2    she had no agreement with me to be her lawyer.  That
3    would be a true statement, because that was just
4    something that you and I have worked out and she
5    understood that you were handling, right?
6 A  Well, she's -- she's part of the -- as I saw it, it
7    was part of the estate.  And I told her you were
8    representing us.
9       MR. McCOY:  Okay.  Then I think
10    that's all the questions I've got.  Thanks.
11       MR. LEE:  I don't have anything
12    more.
13       THE VIDEOGRAPHER:  This concludes
14    the video deposition of Gary Suoja.  Time now is
15    4:53 p.m.  Going off record.
16       (Signature reserved.)
17       (Deposition concluded at
18         4:53 p.m.)
19
20
21
22
23
24
25

Gary E. Suoja

Page 266

1   STATE OF WASHINGTON )   I, John M.S. Botelho, CCR, RPR,
2                        ) ss a certified court reporter
3   County of Pierce   )   in the State of Washington,
4                do hereby certify:
5
6        That the foregoing deposition of GARY E. SUOJA was
7   taken before me and completed on June 26, 2015, and
8   thereafter was transcribed under my direction; that the
    deposition is a full, true and complete transcript of the
9   testimony of said witness, including all questions, answers,
    objections, motions and exceptions;
10       That the witness, before examination, was by me
    duly sworn to testify the truth, the whole truth, and
11  nothing but the truth, and that the witness reserved the
    right of signature;
12       That I am not a relative, employee, attorney or
    counsel of any party to this action or relative or employee
13  of any such attorney or counsel and that I am not
14  financially interested in the said action or the outcome
15  thereof;
16       That I am herewith securely sealing the said
17  deposition and promptly delivering the same to
18  Attorney Joshua D. Lee.
19       IN WITNESS WHEREOF, I have hereunto set my hand
20  this 9th day of July, 2015.
21
22       _____
23       John M.S. Botelho, CCR, RPR
24       Certified Court Reporter No. 2976
25       (Certification expires 5/26/16.)

Page 268

ACKNOWLEDGMENT OF DEPONENT

1
2
3        I,_____, do
4   hereby certify that I have read the
5   foregoing pages, and that the same is
6   a correct transcription of the answers
7   given by me to the questions therein
8   propounded, except for the corrections or
9   changes in form or substance, if any,
10  noted in the attached Errata Sheet.
11
12
13  _____
14   GARY E. SUOJA                DATE
15
16
17  Subscribed and sworn
18  to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
22  _____
23  Notary Public
24
25

Page 267

1       - - - - - -
2         E R R A T A
3       - - - - - -
4
5   PAGE  LINE  CHANGE
6   ____  ____  _____
7        REASON: _____
8   ____  ____  _____
9        REASON: _____
10  ____  ____  _____
11       REASON: _____
12  ____  ____  _____
13       REASON: _____
14  ____  ____  _____
15       REASON: _____
16  ____  ____  _____
17       REASON: _____
18  ____  ____  _____
19       REASON: _____
20  ____  ____  _____
21       REASON: _____
22  ____  ____  _____
23       REASON: _____
24  ____  ____  _____
25       REASON: _____