TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     951

```
 1        STATE OF WISCONSIN : CIRCUIT COURT : MILWAUKEE COUNTY

 2                          BRANCH #24

 3        - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 4        HELEN GOSZ, Individually and
          as Special Administrator on behalf
 5        of the Estate of Clarence Goss,

 6                    Plaintiff,

 7                vs.            Case No. 05-CV-9218

 8        AMERICAN STANDARD, INC., et al.,

 9                    Defendants.

10        - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                        JURY TRIAL TRANSCRIPT
11        - - - - - - - - - - - - - - - - - - - - - - - - - - - -

12        November 10th, 2008                    Volume VI

13

14              Before the HONORABLE CHARLES F. KAHN, JR.
                     CIRCUIT COURT JUDGE PRESIDING

15

16

17                        A P P E A R A N C E S

18        MR. ROBERT G. McCOY and MR. THOMAS BLACKSTOCK, Attorneys
          at law, appearing on behalf of the Plaintiff
19
          MR. JOHN J. LAFFEY and MS. SARAH E. THOMAS PAGELS,
20        Attorneys at law, appearing on behalf of Building
          Service Industrial Supply
21

22

23

24        Reported by:  Julie A. Poenitsch, RPR/RDR/CRR

25
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     952

```
 1                        I N D E X

 2        WITNESS        EXAMINATION              PAGE

 3        ROBERT VIOLA

 4              Voir Dire by Mr. McCoy            967
                Direct by Mr. McCoy              991
 5              Cross by Mr. Laffey             1011
                Redirect by Mr. McCoy           1017
 6
          Portion of depositions read in:       1020
 7        JAMES H. MIELKE 8/10/06
          DONALD C. POPALISKY 6/13/80
 8        DONALD C. POPALISKY 3/25/86
          DONALD C. POPALISKY 3/17/87
 9        DONALD C. POPALISKY 12/16/92
          DONALD C. POPALISKY 10/4/96
10
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     953

```
 1                   TRANSCRIPT OF PROCEEDINGS

 2             THE COURT:  This is the case of Clarence

 3        Gosz versus Building Services Industrial Sales, and

 4        it's the same appearances as last week.

 5             Good morning.  Welcome back, Attorney

 6        Blackstock --

 7             MR. BLACKSTOCK:  Good morning, Judge.

 8             MR. McCOY:  Good morning, Judge.

 9             THE COURT:  -- Attorney McCoy, Ms. Thomas

10        Pagels, Mr. Laffey.

11             MS. THOMAS PAGELS:  Good morning, Judge.

12             MR. LAFFEY:  Good morning, Judge.

13             THE COURT:  You know, we all have parts

14        to play here, and -- I'm going to just wait until

15        Mr. McCoy is ready.  There's no doubt that the work

16        that the lawyers do in preparation and execution of

17        the trial is a lot more intense, time consuming,

18        and difficult than what the judge does, but I do

19        have also a role which has some significance, and

20        duties.  And one of the duties that I didn't really

21        come through in time for was getting you a draft of

22        the jury instructions.

23             I -- as we know, this is a -- among

24        trials, this is a matter of relative complexity,

25        and I think that with the efforts that we've all
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     954

```
 1        put into the jury instructions, it's becoming more

 2        clear in our minds, from time to time more muddled

 3        and then clear again, and even after I e-mailed

 4        that draft to you at 12:30 -- 12:30 a.m. this

 5        morning, I have new and additional ideas about

 6        formatting to make the text which I created easier

 7        to understand by the jury.  And I'll show you some

 8        of that later on.

 9             Of course, there are some more

10        substantive things than that.  But one of the big

11        concerns I had in working on the jury instructions

12        was the confusion to the jury of all these -- of

13        the various questions and their subparts.

14             I have an idea of how to make it

15        basically identical text but less confusing in the

16        way we graphically display the questions.

17             The -- but, really, I have to go back to

18        what I started with.  This is an apology to you for

19        not getting something to you earlier.  I've been --

20        it's been on my mind all weekend, but I just had

21        other -- other things which kept my mind and body

22        also doing other things.  And I just was -- and

23        then when I did get to it, of course, as we know,

24        it was a substantial project, which I thought I had

25        under control throughout the project last week
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     955

1   while we were in progress, but it just was a little
2   too confusing and complex so I kept reworking it.
3          Now, of course, we're not even close yet
4   because we have to have our own interaction,
5   either -- partly this morning and then the rest of
6   it this afternoon.
7          We've got 20 minutes now before the jury
8   was required to be back.  What are we going to use
9   that time for?
10         Mr. Laffey.
11         MR. LAFFEY:  Well, Judge, there are three
12   outstanding issues, as far as I know.  We still are
13   awaiting Mr. McCoy's position on the James Mielke
14   motion on the one question and answer that lacks
15   foundation.  That was brought up last Monday.
16   Don't understand or know what Mr. McCoy's position
17   is on that.
18         There is an issue regarding the scope of
19   Mr. Viola's testimony.  He's the last live witness,
20   I believe, that Mr. McCoy has.  And I think
21   Mr. Viola is in the courtroom.  Right or wrong,
22   he's here.
23         And then, finally, goes to the issue of
24   the invoice summary.  I -- we briefed it.  I
25   proposed a version of the stipulation relative to

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     956

1   the invoice --
2          THE COURT:  Hold on just a minute.
3          (There was discussion off the record.)
4          THE COURT:  Okay.
5          MR. LAFFEY:  And we have the invoice
6   summary issue I proposed in our brief alternative
7   stipulation language.  I have not received any
8   feedback whatsoever from Mr. McCoy in the week
9   that's passed regarding the stipulation language,
10   and we're opposed to the use of the summaries.  So
11   that remains open.
12         Those are the three things that I'm aware
13   of that we were supposed to be addressing this
14   morning.
15         THE COURT:  Mr. McCoy.
16         MR. McCOY:  Judge, that's probably the
17   three items that are on my list, too.  There might
18   be a couple others.
19         On Mr. Viola, he's here in court.  We
20   were planning to have the voir dire.  I can send
21   him out in the hall now if Your Honor thinks I need
22   to.  Otherwise, he's here for that.
23         THE COURT:  I don't think so.  I think we
24   can do that.
25         MR. McCOY:  The second --

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     957

1          THE COURT:  Yes.
2          MR. McCOY:  The second thing is, on the
3   Mielke deposition, if -- I wasn't clear on what the
4   remedy is that Mr. Laffey was seeking under his
5   motion, whether it was striking all the testimony
6   or only some portion of it.
7          MR. LAFFEY:  Just the question and answer
8   at issue.  That's it.  The rest of the testimony is
9   fine.
10         MR. McCOY:  Okay.  So if he'll show me
11   that, I think we can work that out.
12         And then, finally, on the invoice
13   summary, we have looked at his proposal.  Your
14   Honor has already ruled, in part, on part of it.
15         THE COURT:  Correct.
16         MR. McCOY:  And as far as the actual
17   language of it, I believe that is going to require
18   a ruling by Your Honor.  But, of course, it's not a
19   very long summary -- I'm sorry, I shouldn't say not
20   the summary, but the stipulated language.
21         THE COURT:  Now, I have ruled that some
22   summary is allowed.
23         MR. McCOY:  Right.
24         THE COURT:  You're proposing, then, the
25   very same summary that you submitted earlier; is

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     958

1   that right?
2          MR. McCOY:  We've actually taken a look
3   at it and made a couple small revisions to it,
4   Judge.  And we actually had one error in the math.
5   So we've got a revision, but it's essentially the
6   same with a couple word clarifications.  So we do
7   have that here.  I can file that now.
8          THE COURT:  Okay.
9          MR. McCOY:  And that is going to require
10   some discussion and ruling on the exact language.
11         THE COURT:  Yes.  The language of the --
12   of the summary or the language of some -- the
13   language of what's read to the jury about the --
14   about the summary.
15         MR. McCOY:  Probably both.  But as I say,
16   neither one that long.  The summaries year by
17   year is the same language, so whatever is
18   appropriate for one year I assume would be included
19   for all the years.
20         THE COURT:  Okay.
21         MR. McCOY:  I'm going -- I'm just going
22   to file our revision now, if that's all right.
23         THE COURT:  Thank you.
24         MR. LAFFEY:  While Mr. McCoy is filing
25   the revision, let me direct him and Mr. Blackstock

1     in Mr. Mielke's deposition.
2             THE COURT:  Yes.
3             MR. LAFFEY:  Page 13, line 5, 6, and 7.
4     The question is at line 5:  "And was that asbestos
5     insulation they were applying?"
6             There was a foundation objection, and the
7     answer at line 7 was:  "Sometimes, yes."
8             And it's a question without foundation.
9     So all I'm asking is that those three lines be
10    taken out of the proposed read-ins for Mr. Mielke,
11    and with that, we have no objection to anything
12    else from his deposition being read in.
13            MR. McCOY:  That's fine, Judge.  That can
14    be out.
15            THE COURT:  Okay.  Then that's taken care
16    of.  Then we need the testimony of Mr. Viola.
17            MR. LAFFEY:  I'd like to see the invoice
18    summary.
19            THE COURT:  Oh, you didn't get it?
20            MR. LAFFEY:  I have no idea what we're
21    talking about.
22            THE COURT:  That was just filed.
23            MR. LAFFEY:  Can I get a copy?
24            MR. McCOY:  It's the revised stipulation,
25    yes.

1             Judge, before I forget, on Mr. Mielke --
2             THE COURT:  Yes.
3             MR. McCOY:  -- so we can be prepared for
4     our jurors --
5             THE COURT:  Yes.
6             MR. McCOY:  -- we had marked up copies at
7     deposition for read-in.  We can't find that one.
8     It's a real short deposition.  It's only about 12
9     pages or so.  I was wondering if we could get a --
10    make another copy here in court now soon and -- so
11    we can mark it up.
12            THE COURT:  Right.  If Mr. Blackstock or
13    someone can come over here.  How many pages is it?
14            MR. BLACKSTOCK:  It's about 15 or 20.
15            THE COURT:  So what we can do is --
16            MR. LAFFEY:  Here's your designation
17    pages.
18            THE COURT:  We've got a photocopy machine
19    without a document feeder.  You can just come right
20    over here and use it.
21            MR. LAFFEY:  Judge, here's what I have.
22            MR. BLACKSTOCK:  Thank you, Your Honor.
23            MR. LAFFEY:  I have, I believe, what they
24    submitted to me for their designations.  I'm going
25    to give it to Mr. McCoy and he can copy the

1     highlighting, with the exception of page 13, lines
2     5 through 7.
3             And then we have given you our copy,
4     right, Bob?  Do you have ours, our designations?
5             MR. McCOY:  Oh, yeah, your designations
6     are marked.  We have them already marked on that
7     one; we just need to make another copy because we
8     lost it.
9             THE COURT:  The only problem is the color
10    is not going to show up.
11            MR. McCOY:  Right.  We're going to
12    highlight it right now in court.
13            THE COURT:  All right.  So now,
14    Mr. McCoy, did you have other things before the
15    jury returns?
16            MR. McCOY:  Only with regard to
17    Mr. Viola, Judge.  We want to use this
18    demonstration during the testimony that I've shown
19    Mr. Laffey before.
20            MR. LAFFEY:  I've never seen it before,
21    but that's okay.
22            MR. McCOY:  And I've shown it to you,
23    your office, a couple times here in the trial.
24            MR. LAFFEY:  I thought before that these
25    demos -- I think he told Mr. Gonzalez that he

1     wasn't going to use this stuff.
2             MR. McCOY:  Judge, I've repeatedly said
3     that this is what we want to use.
4             THE COURT:  Normally demonstrations are
5     appropriate.  But, of course, there needs to be
6     enough notice and some relevance and an avoidance
7     of unfair prejudice.  But I don't know that it's
8     going to be a problem.  Let's just -- why don't you
9     show it over to Mr. Laffey, have a little
10    discussion with him, but the jurors are just about
11    ready to come back.
12            MR. LAFFEY:  And my only question with
13    Mr. Viola, I -- and I honestly, with all sincerity,
14    I really have no idea what Mr. McCoy is proposing
15    to use Mr. Viola for.
16            THE COURT:  Let's --
17            MR. LAFFEY:  I understand that Mr. Viola
18    is an experienced pipe insulator, and if Mr. McCoy
19    is proposing to put Mr. Viola on the stand and talk
20    about how you insulate pipe, how you cut insulation
21    and what you do, to the extent -- you know,
22    relevance aside, I suppose, it's certainly
23    informational for the jury.
24            I'm not going to sit here and say he
25    shouldn't testify about that, but I don't know,

1     beyond that, what else he's going to use him for.
2     And if he's going to tell me it's nothing but to
3     talk about how pipes are insulated and what the
4     mechanics of it are, I'd say let's just get going.
5     But if he's going to do something more, then I'd
6     say we have an issue.
7                THE COURT:  Okay.  Mr. McCoy.
8                MR. McCOY:  Okay.  Let me check the
9     outline, and I can tell you what he's going to
10    cover.
11               He's going to cover, in these photos
12    we've been using, 4, 5, and 6, these materials,
13    what ones were asbestos-containing.  He's going to
14    identify a picture of the Kaylo insulation that was
15    the type that Building Services was selling.  And
16    he's going to talk about how they insulated the
17    pipe and what dust was made during the work.  And
18    that's the purpose of that demonstration, is to
19    show the jury, here's how --
20               THE COURT:  Mr. Laffey.
21               MR. LAFFEY:  If it's limited to
22    reidentifying the photos of exemplar insulation
23    that's been talked about multiple times, that's
24    fine.
25               Kaylo, I haven't even seen the photo, so

1     that can be handled.  Can I just see that?
2                MR. McCOY:  It's the same Kaylo photo we
3     have case after case.
4                THE COURT:  Mr. McCoy --
5                MR. LAFFEY:  I guess that's fine.  I
6     guess -- it says the box is Kaylo.
7                THE COURT:  Mr. McCoy, you can have that
8     box.
9                MR. LAFFEY:  I don't know that you need a
10    witness to do that.  That's fine.  And if it's only
11    how the pipe are insulated and that dust is
12    created, that's fine.  If I can get a
13    representation from Mr. McCoy that we are not going
14    to have questions of him as to what the asbestos
15    content of various products are and things of that
16    nature, if it's limited to those three areas, we
17    can save a lot of time and just get going.
18               THE COURT:  Mr. McCoy.
19               MR. McCOY:  He's not talking about
20    percentages of asbestos, but he is going to talk
21    about that it was asbestos.
22               THE COURT:  That at the time he was
23    installing it, he had personal knowledge that some
24    of the piping covering contained asbestos fibers?
25               MR. McCOY:  Right.  Just like the other

1     witnesses who were talking about, in the read-in
2     depositions, it was or wasn't asbestos --
3                THE COURT:  Okay.  Mr. Laffey.
4                MR. McCOY:  -- who were also just members
5     of the same trade as Mr. Viola, or the same
6     industry.
7                MR. LAFFEY:  Wait.  The read-in
8     depositions, nobody that you read in is in the same
9     trade as Mr. Viola.  I don't think -- you haven't
10    read in anybody.
11               THE COURT:  Shall we call him?  I mean,
12    shall we ask Mr. Viola questions now?
13               MR. LAFFEY:  I think we need to lay the
14    foundation, because our motion was premised on his
15    foundation being something --
16               THE COURT:  Mr. Viola, would you step up
17    here, please.  Thank you for coming.
18    ROBERT VIOLA, called as a witness herein,
19    having been first duly sworn on oath, was examined
20    and testified as follows:
21               THE COURT:  Please have a seat.  Tell us
22    your name.  Spell your first name and your last
23    name.
24               THE WITNESS:  Robert Viola, V-I-O-L-A.
25               THE COURT:  Okay.  Mr. Laffey.  I'm

1     sorry, Mr. McCoy.
2                MR. McCOY:  Did you want me to go ahead
3     and lay the foundation?
4                THE COURT:  I think so.
5                MR. McCOY:  I'll lay the foundation just
6     on the asbestos knowledge point, Judge.
7                THE COURT:  Yes, right.
8                     VOIR DIRE
9     BY MR. McCOY:
10    Q    Exhibits 4, 5 and 6, Mr. Viola, I'm going to show
11         these to you briefly.  Do you recognize all these?
12    A    Yes, I do.
13    Q    Okay.  Were these all types of products that you
14         worked with in your trade as a pipe coverer?
15    A    Yes.
16    Q    Okay.  And did you work with these back in the
17         '50s, '60s, and early '70s?
18    A    Yes.
19    Q    Okay.  Do you have a basis for knowing whether or
20         not these products contained asbestos back in that
21         time period?
22    A    Yes.
23    Q    What are the reasons why you know whether they
24         contained asbestos?
25               THE COURT:  Just a minute.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI      967

1    Mr. Mulligan, we have -- we're going to
2    be doing the foreclosures off the record at about
3    ten minutes after 9:00.  As far as I can tell, we
4    haven't seen any takers for your cases, but please
5    check in with Nyla.
6         Okay.  Sorry about that.  Mr. McCoy.
7    BY MR. McCOY:
8    Q   Do you remember the question?
9    A   Would you repeat it?
10   Q   The question was:  Do you have a basis for knowing
11       whether or not these contained asbestos back in the
12       '50s, '60s, and early '70s?
13   A   Yes, I do.
14   Q   Okay.  And what are the reasons why you know about
15       asbestos in those products?
16   A   Because when I went through my training program, my
17       apprenticeship, I was told that.
18   Q   Okay.  What other reasons?
19   A   When I went through the abatement training, I was
20       told how to identify it.
21   Q   Training program came later?
22   A   Came later.
23   Q   So at first it was your initial training?
24   A   Yes.
25   Q   All right.  And then what other reasons?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI      968

1    A   I just knew that it did contain the asbestos fiber.
2    Q   Was there anything on the packaging then?
3    A   No, not in that time frame.
4    Q   Okay.  Was there anything to show when it wasn't
5        asbestos anymore?
6    A   Not until later on in the early '70s.
7    Q   Okay.  And what was on the packaging then?
8    A   It was asbestos-free.
9    Q   Was that stated on the packaging?
10   A   That was on the package after 1973.
11   Q   All right.  And those -- and, also, the name of the
12       union that you worked for back in the -- that time
13       frame, '50s, '60s and '70s, what was it called?
14   A   Asbestos Workers Local 19.
15       MR. McCOY:  Judge, I think that's the
16   foundation that we would provide here.
17       MR. LAFFEY:  No questions.
18       THE COURT:  Okay.  Just stay here for a
19   minute.
20       How long did you say you worked in this
21   field?
22       THE WITNESS:  38 years.
23       THE COURT:  Beginning?
24       THE WITNESS:  19 -- the end of 1956,
25   early 1957.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI      969

1         THE COURT:  Okay.  Mr. Laffey, are you
2    maintaining your question -- or objection, or are
3    you going to withdraw that now?
4         MR. LAFFEY:  I'm assuming it would be
5    overruled based on this record.
6         THE COURT:  Okay.  You may step down.
7    And then when the jury comes back, we're going to
8    call you back, we'll do the same thing all over
9    again, even a little more.
10        (There was discussion off the record.)
11        THE COURT:  Okay.  We're still on the
12   record.  I just got a note that the high school
13   student did not show up today and called and said
14   she cannot come today.  And I'm going to call her
15   back, and if you'd like, we can just do it right
16   here on the record on the speakerphone and have
17   that conversation.
18        Madam clerk, would you hand me the
19   telephone?
20        (There was discussion off the record.)
21        THE COURT:  Back on the record.
22        What's the juror's name?
23        MS. THOMAS PAGELS:  Amanda Janik.
24        THE COURT:  Janik.
25        MS. THOMAS PAGELS:  J-A-N-I-K.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI      970

1         THE COURT:  Hello, Ms. Janik.  This is
2    Charles Kahn.  I'm the judge.  How are you doing
3    today?
4         MS. JANIK:  Not so good.
5         THE COURT:  What's up?
6         MS. JANIK:  I was in -- doing open
7    enrollment for school.  Yes, doing open enrollment
8    for schools, yes.  I used to live in South
9    Milwaukee, and I'm going to Cudahy, and now I moved
10   in with my boyfriend, so I live in Cudahy.  And
11   now, like, since I missed, like, a whole week of
12   school, like, the school brought it up to the
13   board, and the board looked at my stuff, and they
14   said I still lived in South Milwaukee.  So now, as
15   of today, I'm enrolled in South Milwaukee, so I
16   have to go meet with the board for South Milwaukee
17   and Cudahy and try to get it so I can go back to
18   Cudahy.
19        THE COURT:  Ma'am, I'll call the school
20   board in Cudahy and tell them that if they deny you
21   the right to continue in Cudahy, then they'll be
22   facing -- well, I don't usually say this: as a
23   matter of fact, I don't know if I've ever said
24   this -- but they'll be facing the wrath of Kahn.
25        Ms. Janik, come here to the courthouse

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     971

1    right away, and I will find the president of the
2    school board in Cudahy, and I will find the
3    superintendent, and I will let them know the law on
4    this subject.
5           First, I'm letting you know the law.  You
6    must come immediately.  And, really, you just have
7    to trust me on this, that they -- if they try to
8    mess with your enrollment in Cudahy, then they're
9    going to be facing some more difficulties than they
10   want to have.
11          MS. JANIK:  Okay.
12          THE COURT:  So we'll see you then in
13   about 20 minutes.
14          MS. JANIK:  Okay.
15          THE COURT:  And you can come right to our
16   courtroom on the fourth floor, the regular old jury
17   room upstairs on the fourth floor, you know,
18   beyond -- next to our courtroom and up the stairs.
19          MS. JANIK:  Um-hum.
20          THE COURT:  Okay.  Thank you.  Bye-bye.
21   School district of Cudahy, 294-7400.
22          MARY ANN:  Good morning, Cudahy School
23   Board.  Mary Ann speaking.
24          THE COURT:  Good morning, Mary Ann.  May
25   I speak to the superintendent, please.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     972

1           MARY ANN:  He's on another call, but I
2    can transfer you.  One moment, please.
3           THE COURT:  Okay.  Wait a minute.  So
4    I'll get a receptionist or something, or a
5    secretary?
6           MARY ANN:  Well, I don't see that his
7    line is busy right now, so he will answer or it
8    will go to his voice mail.
9           THE COURT:  Well, okay.  I need to talk
10   to him, actually interface back and forth.  Can you
11   tell me his name?
12          MARY ANN:  Jim Heiden.
13          THE COURT:  Okay.  Heiden.  Great.  I
14   appreciate you transferring me.
15          MARY ANN:  Okay.  Thank you very much.
16   One moment, please.
17          MR. HEIDEN:  Cudahy Schools, Jim Heiden.
18          THE COURT:  Good morning.  You're
19   Mr. Heiden?
20          MR. HEIDEN:  Yes, this is Mr. Heiden.
21          THE COURT:  Okay.  And you're the
22   superintendent?
23          MR. HEIDEN:  Yes, I am.
24          THE COURT:  Okay.  Great.  Thank you.  My
25   name is Charles Kahn, K-A-H-N.  I'm a judge in the

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     973

1    Circuit Court for Milwaukee County.  And, actually,
2    we're right in the middle of a trial right now, and
3    we have the court reporter going and the lawyers
4    here in the courtroom, and you're on a
5    speakerphone.  Sounds like fun, right?
6           MR. HEIDEN:  Okay.  Can I ask what the
7    nature of this call is?
8           THE COURT:  Yes.  You've got a juror of
9    ours, and we need her, and we need you to -- I'm
10   sorry.  I'm going to start over.
11          One of the people we selected on a very
12   important trial that started last week was an
13   18-year-old high school student at Cudahy -- at
14   Cudahy High School.
15          MR. HEIDEN:  Yes, sir.
16          THE COURT:  She was very concerned about
17   missing school to be on the jury.  But after we
18   brought 40 people into the courtroom and had a
19   two-day jury selection process, Amanda Janik was
20   selected as a juror in our case.
21          She was very upset, and I informed her
22   in -- of the law, that she was required to
23   participate in our trial and that -- I had learned,
24   because her boyfriend also came in later to
25   complain that she had been selected -- that she's

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     974

1    an honor student at Cudahy and she definitely did
2    not want to miss any school.  But I informed her
3    that she was required to participate.
4           I personally felt that this would be an
5    excellent addition to her education and her -- and
6    her civic knowledge and world experience, and as a
7    matter of fact, it has been, with the detailed
8    scientific testimony that we had in court all
9    last -- for the remaining part of last week.
10          She did follow my order and attended the
11   trial all day Wednesday, Thursday, and Friday.
12   Now, she's called this morning to say that she's
13   being essentially eliminated from the Cudahy
14   schools because she was an open enrollment
15   student -- although she's actually moved into
16   Cudahy now, but that's a different issue -- and
17   that she's got to deal with board issues about her
18   right to continue in the Cudahy schools.
19          And I'm sure, Mr. Heiden, that you can
20   take care of this, but I don't really think that it
21   would be appropriate to give her any doubt at all
22   as to whether she's going to remain in the Cudahy
23   schools because she fulfilled her civic duty and
24   court order to participate in this trial.
25          MR. HEIDEN:  Sir, first of all, there's

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     975

1  two separate issues.  First of all, the -- whether
2  Amanda Janik serves in the trial, that is -- I
3  completely agree with you; that's her civic duty.
4  That has no bearing on her standing here in the
5  school.
6        The issue with the open enrollment is
7  that it came to our light that the mother had
8  fraudulently filled out paperwork for the last four
9  years, and it just came to light last week, as to
10  whether or not she is a resident of our district.
11        We discovered that last week.  We met
12  with the family.  We talked about options.  And mom
13  is out checking out what those options are.  That
14  has no bearing on what it is you're doing, and it
15  has no bearing on the court case, sir.
16        Whether or not she is a student in the
17  district, Amanda Janik can -- you know, we
18  understand that she has moved in with a boyfriend.
19  We've been working with that family to tell them
20  what they need to do to get in and get her
21  registered and enrolled.  And we're trying to work
22  through that.
23        So it has no bearing on the court case.
24  Yes, I imagine she's probably a little stressed
25  out.  She also happens to be a star basketball

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     976

1  player.  But under circumstances under -- not under
2  our control, she won't be able to do that because
3  of the WIAA rules and regulations.  But that has no
4  bearing on your trial, sir.
5        THE COURT:  Okay.  In one respect it does
6  in that if she's got to deal with --
7        MR. HEIDEN:  She can deal with it when
8  she gets back, sir.
9        THE COURT:  Right.  That's what I'm
10  asking, is that let her deal with it once this
11  trial is over.
12        MR. HEIDEN:  She doesn't need to -- we
13  don't expect her to deal with it right now.  I
14  mean, her status with us, as long as she hasn't
15  started to attend a different high school, her
16  status with us still remains that she's a Cudahy
17  High School student.
18        THE COURT:  Thank you.
19        MR. HEIDEN:  Not a problem.
20        THE COURT:  I appreciate your help and
21  your clarifications.  Hold on just a minute,
22  Mr. Heiden.  I'm going to see if the lawyers have
23  any additional questions that they would like to
24  ask you about her current status.
25        Mr. McCoy.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     977

1        MR. McCOY:  No questions.
2        THE COURT:  Mr. Laffey.
3        MR. LAFFEY:  None.
4        THE COURT:  Okay.  I appreciate your time
5  this morning.
6        THE WITNESS:  You're welcome, sir.
7        THE COURT:  Bye.
8        Madam clerk, would you close this door
9  right next to the courtroom?
10        Okay.  Now, as you heard, I told
11  Ms. Janik to come right away.  Apparently we have
12  13 jurors.  We're on the -- hopefully, I mean, it
13  looks like the last day of testimony, and 13
14  still -- jurors who appear to be relatively
15  healthy.
16        Excuse me.  So what do we do, Mr. McCoy,
17  specifically about Amanda Janik?
18        MR. McCOY:  I don't have any real feeling
19  one way or the other about whether we should go
20  ahead and let her off the jury, or how you'd even
21  accomplish that.  I really don't like the jury
22  being held up.  That's my only -- that's my
23  concern.
24        THE COURT:  Mr. Laffey?
25        MR. LAFFEY:  I think it's -- I think it's

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     978

1  principally your issue, Your Honor.  And I think
2  that the only -- I think the only way to handle it,
3  if there's an issue about her staying on the jury,
4  is to call her in and ask her some questions.
5  Because I think the concern would be whether or not
6  she's too distracted by the ancillary issues
7  relating to her status, which I accept the
8  superintendent's explanation.  Apparently this has
9  been going on for a little while about what school
10  district she belongs to.
11        So if you have a concern, which I think
12  would be fair, my suggestion would be to sit her
13  down, ask her some questions, take her pulse as to
14  whether she's able to focus.  Otherwise, let's just
15  move on.
16        THE COURT:  Let's say, hypothetically,
17  that the delay in her appearance takes us until
18  9:50, ten minutes to 10:00, to get her seated and
19  the jury back.  We've got Mr. Viola's testimony and
20  Mr. Mielke's testimony this morning, both of which
21  are going to be short.  And then the -- then
22  the plaintiff rests; is that right?
23        MR. McCOY:  There's another -- there's
24  another read-in set of Mr. Popalisky of, roughly,
25  you know, an hour.  Again, that includes

1   Mr. Laffey's designations.  And this is the
2   Mr. Popalisky who's deceased, the father.
3   THE COURT:  Sure.  And then Mr. Laffey,
4   how long would your evidence be?
5   MR. LAFFEY:  Very short.  Assuming we get
6   to my case, Judge --
7   THE COURT:  Yes.
8   MR. LAFFEY:  -- it would just be really
9   very brief testimony from Mr. Popalisky, the
10  junior.
11  THE COURT:  Yes.
12  MR. LAFFEY:  But that's it.  Because
13  of -- because we've been able to include read-ins
14  from these depositions that we suggested in all the
15  plaintiff's case and because I was able to deal
16  with plaintiff's experts, I just have Mr. Popalisky
17  to put on the stand, just very briefly.  Under a
18  half an hour for certain.
19  MR. McCOY:  And Mr. Viola's testimony is
20  also likely to be certainly less than 45 minutes,
21  maybe as short as a half hour.
22  THE COURT:  I think that, under the
23  circumstances here, it makes most sense to wait
24  another half hour, see if we get Ms. Janik, and
25  then -- and then go from there.

1   MR. McCOY:  Can the jury be advised,
2   without regards to explaining all the
3   circumstances, that we're waiting on her?
4   THE COURT:  Sure.  Sure.
5   MR. McCOY:  Then I think that is fine,
6   Judge.
7   THE COURT:  So I'd like our two law
8   clerks, Ms. Yunnus and Ms. Christianson, to explain
9   to the jury that they're going to be on vacation
10  now until 20 minutes to 10:00, that is 8:00 -- I'm
11  sorry, 9:40.  We'll need them all back in the jury
12  room at 9:40, but that we are waiting for the 14th
13  juror.  And then when the 14th juror comes, they
14  can just buzz us now with the traditional doorbell.
15  We don't need a cell phone anymore.  And we'll
16  bring them right in.
17  And then if it's okay, Mr. Laffey,
18  Mr. McCoy, with the parties here, I will take the
19  two cases here that we have involving foreclosure
20  matters.
21  MR. LAFFEY:  Absolutely.
22  (A recess was taken.)
23  THE COURT:  We are back on the record
24  now.  As far as I know, we do not -- we still do
25  not have that juror, but I would like to ask our

1   law clerk what she's learned about the foot and toe
2   and knee issues of the other juror.
3   Ms. Yunnus.
4   LAW CLERK:  She is up in the jury room
5   right now.  She doesn't even have a problem.  I
6   told her she could wait by the court reporter's
7   office if she had a problem going up and down the
8   stairs, and she didn't do that; she went upstairs
9   with the other jurors.
10  THE COURT:  Did you watch her climb the
11  stairs?
12  LAW CLERK:  I didn't.  I came on the
13  second elevator.  But it doesn't seem like she had
14  a problem, and they're very eager to be back in
15  this jury room.
16  THE COURT:  Okay.  Good.  Then now with
17  the attorneys.  Shall we talk a little about the
18  structure of the verdict form and then back off
19  from that to the -- to the instruction set?
20  MR. McCOY:  Sure.  We can talk about it.
21  I didn't get a chance to print out what Your Honor
22  sent.
23  THE COURT:  Okay.  Well, what I did is I
24  took a lot of Mr. Laffey's proposal, I re- --
25  reordered some of the things and changed the

1   numbering system than what he had proposed, but the
2   basic theory is this:
3   The first question that has to be
4   identified -- oh, I guess she arrived -- it's
5   something Mr. Laffey was saying throughout the
6   earlier procedures, that we compare the conduct of
7   the plaintiff against the product.  But first we
8   have to know what is the product that caused the
9   mesothelioma.  And so obviously, we can't -- we now
10  have been interrupted by the return of all the
11  jurors, and we hopefully will have a substantial
12  period of time this afternoon to discuss this, but
13  we -- I do feel that we are getting close and will
14  have a rational juror form this afternoon by the
15  time the lawyers and I leave.
16  So, Madam clerks, law clerks, would you
17  please bring in the jury.  Thanks.
18  MR. LAFFEY:  Let me just say on the
19  summaries --
20  THE COURT:  Yes.  Oh, we didn't do that
21  yet.
22  MR. LAFFEY:  No, we haven't done that
23  yet, Judge.
24  THE COURT:  Sorry.
25  MR. LAFFEY:  I can live with the text of

1    the stipulation, but I will not stipulate to the

2    use of the summaries at all, and the stipulation,

3    as proposed, I would want edited out any reference

4    to the summary as being part of the stipulation.

5          THE COURT:  Okay.  Thank you.

6          MR. LAFFEY:  If you're going to order

7    that it get used, then I will have to live with the

8    order.

9          THE COURT:  Right.

10         MR. LAFFEY:  But the summary is out of

11    context.  It makes assumptions and judgments based

12    upon incomplete data, and that's my problem.  There

13    are percentages in there.  And Mr. McCoy starts off

14    every year's summary saying we have X percent of

15    all invoices for the year.  Well, that is

16    presumptively impossible to know when the records

17    are incomplete.

18         So we start off with this supposition

19    that we know that we're looking at so many

20    percentages of so many invoices; that's not true.

21    And then each year ends with a breakdown of

22    percentage of asbestos-containing versus

23    non-asbestos-containing for each year, again, off

24    of incomplete data.

25         I think that those percentages are very

1    problematic and unfounded, and we have nobody here,

2    nobody to test or cross-examine on how these

3    calculations were made, what the foundation for

4    that is.

5         Finally, in terms of any issue that's of

6    importance to this case, with the stipulation --

7    which has been the case since the beginning.  We

8    have never denied that Building Services sold to

9    Bay and Bartelt and that those sales included

10    asbestos-containing materials.  How these summaries

11    actually advance the ball on that issue is

12    something that is lost on me and, frankly, I think

13    crosses into 904.03 area because the potential for

14    misuse, as a part of any potential relevance, would

15    be grossly outweighed and unfairly outweighed.

16         That's the basic --

17         THE COURT:  Okay.  I have just a couple

18    simple questions for Mr. McCoy, and then we'll

19    defer the rest of the discussion until a reasonable

20    jury break.

21         The simple questions are, one, what

22    evidentiary method do you have for getting this

23    into evidence if it's not a stipulate -- an actual,

24    agreed stipulation?

25         MR. McCOY:  Evidentiary method?

1         THE COURT:  Yes.

2         MR. McCOY:  It's a summary of records

3    that are admissible themselves.

4         THE COURT:  Regularly admissible.

5         MR. McCOY:  The invoices, right.

6         THE COURT:  Well, that would be if you

7    have a proper custodian for the underlying records,

8    then you would be able to have the exception to the

9    rule against hearsay, I believe, under 908.03.

10         But doesn't someone have to identify that

11    these are records kept in the course of ordinary

12    business?

13         MR. McCOY:  Well, these documents were

14    produced as sales records of Building Services by

15    their former attorneys before Mr. Laffey.

16         THE COURT:  But normally, in a -- any

17    civil lawsuit in Wisconsin, if a party produces

18    documents responsive to a request for production of

19    documents, and let's say, hypothetically, the

20    request specifically says send me documents which

21    are admissible under the -- the exception against

22    hearsay, and you clearly identify it as records

23    kept in the ordinary course of business or

24    whatever, just merely having it in response to a

25    request to produce, is that sufficient to bring it

1    into the trial and have it admitted, Mr. McCoy?

2         MR. McCOY:  I don't know that that's

3    sufficient, Judge.  But I didn't have anybody raise

4    an objection that these are not records kept in the

5    ordinary course of business.  I mean, these records

6    have been used over and over in lawsuit after

7    lawsuit as records kept in the ordinary course of

8    business.  So, I mean, that's -- I just didn't hear

9    any objection to know to bring in the appropriate

10    record-keepers.

11         THE COURT:  We'll have to bring in the

12    jury now, and then we'll get back to this issue.

13         MR. LAFFEY:  Thank you, Judge.

14         LAW CLERK:  All rise for the jury.

15         (Whereupon, the following proceedings

16    were held in the presence of the jury:)

17         THE COURT:  Please be seated.  Welcome

18    back, ladies and gentlemen.  I appreciate your

19    patience this morning, and your special efforts,

20    Ms. Janik, to be here.  And I'm happy for the

21    health recovery.  And now we are ready to continue.

22         I hope everyone had a really nice

23    weekend.  As I said, the schedule today is to --

24    here's our plan for today -- is to finish the

25    courtroom work that we have, and -- I'm sorry, not

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     987

1   the courtroom work -- to finish the evidence part
2   of the trial.
3           Again, I'll briefly say this.  We did the
4   jury selection, the opening statements.  Now we're
5   in this -- the heart of the trial, the evidence
6   part of the trial.  By the time you leave today,
7   the evidence part of the trial will be complete,
8   and then it's just -- what we have left in the
9   courtroom is -- are my instructions to you about
10  the law, followed by the closing arguments of the
11  lawyers.
12          Then we will allow you to enter into your
13  deliberations, and the final 12 will meet as a
14  group together, alone, and discuss the questions
15  that you have to answer on the verdict form.
16          The verdict form, I think, is going to be
17  substantial; that is, it's not a simple like yes or
18  no question.  Sometimes in a criminal case you just
19  have to answer guilty or not guilty.  But in a
20  civil lawsuit, really what we are looking for is
21  the facts.  You tell us what these facts are, and
22  you have to answer questions and subparts of
23  questions.
24          So it's a -- so you'll have to do a
25  careful job of reviewing together the details of

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     988

1   the evidence in light of these questions that
2   you're asked as to what it -- what all the evidence
3   means, with respect to the important questions that
4   you have to answer, and there are many that we're
5   going to ask you to answer.
6           Now, the -- I'm going to just say one
7   more thing about this.  It sure would be nice if we
8   could just tell you what the questions are at the
9   beginning of the trial so you'd know what to listen
10  for.  The problem with that -- the brief answer to
11  that conundrum is that we have to learn -- we all
12  have to learn -- the lawyers and I also have to
13  learn exactly what the evidence is that comes in
14  first before we can design the details of exactly
15  what the questions are that we're going to be
16  asking you.
17          So we've been working on developing my
18  set of instructions to you and also the layout of
19  the verdict form, but we don't have it final yet,
20  and we won't until after all the evidence is
21  completed.  And that's why you got some information
22  in the opening statements, and now you're listening
23  to all the evidence, but it's all going to come
24  together as to what we need from you when I give
25  you the instructions, you hear the closing

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     989

1   arguments, and then you'll have the documents
2   yourself to work with.
3           The schedule, then, will be that this
4   afternoon, when we're done with all the courtroom
5   evidence part of the trial, you'll have the rest of
6   the afternoon off while the lawyers and I do that
7   final work here in court.  Tomorrow morning we'll
8   bring you back for my instructions and the closing
9   arguments.
10          Of course, the closing arguments are not
11  law -- are not evidence or law.  The closing
12  arguments are merely the summations of what the
13  lawyers recall that the evidence showed and their
14  request to you to answer the verdict form in a
15  particular way.
16          But ladies and gentlemen -- that will be
17  helpful, but, ladies and gentlemen, it is your job,
18  of course, to reach your verdict based on the
19  evidence that you heard during the evidence part of
20  the trial and the law as I give you the law.
21          Now we are ready to continue.  And
22  Mr. McCoy, you may call your next witness.
23          MR. McCOY:  Thank you, Judge.  Thank you
24  all for being patient.  Mr. Viola, Robert Viola is
25  the next witness.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     990

1           ROBERT VIOLA, called as a witness herein,
2   having been first duly sworn on oath, was examined
3   and testified as follows:
4           THE COURT:  Please have a seat.  Tell us
5   your name.  Spell your first name and your last
6   name.
7           THE WITNESS:  Robert Viola, V-I-O-L-A.
8           DIRECT EXAMINATION
9   BY MR. McCOY:
10  Q   This is your water, Mr. Viola.  You can put that
11      other one aside there.
12  A   Thanks.
13  Q   Where do you live at, Mr. Viola?
14  A   Pardon me?
15  Q   Where do you live?
16  A   I live in the Town of Erin.
17  Q   In where?
18  A   The Town of Erin.
19  Q   And how long have you lived in that town?
20  A   About 13 years.
21  Q   Okay.  And where is that located from here?
22  A   It's in Washington County.  It's over in the Holy
23      Hill area.
24  Q   And before that time period, where did you live at?
25  A   I lived in the Town of Richfield.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     991

1   Q   About how long did you live around there?
2   A   Twenty years.
3   Q   Have you lived most of your life within close
4       distance to Milwaukee here?
5   A   Yes, I have.
6   Q   Okay.  And your birth date is what day?
7   A       /33.
8   Q   Are you retired?
9   A   Yes, I am.
10  Q   And what was your occupation back when you were
11      working?
12  A   I was an asbestos worker by trade.
13  Q   And when did you begin your work as an asbestos
14      worker?
15  A   The end of 1956, early part of 1957.
16  Q   And when did you retire?
17  A   1994.
18  Q   Okay.  I want to go back, then, to the 1950s, '60s,
19      early part of the '70s.  Can you tell us what basic
20      kind of work asbestos workers did?
21  A   We were a subcontractor through a mechanical
22      contractor.  We did the heating, the plumbing, the
23      ventilating, boilers, industrial vessels, chillers,
24      ductwork, all types of insulation.
25  Q   What about the piping leading up to it?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     992

1   A   And all the piping:  High pressure, low pressure,
2       steam condensate.
3   Q   Do some people refer to you all as the pipe
4       coverers?
5   A   Yes.
6   Q   Also, some people refer to you as the insulators?
7   A   Yes.
8   Q   Okay.  Mr. Viola, what we have, I'm going to put up
9       on the screen, is Exhibit No. 4.  Put it that way.
10      Okay.  And also Exhibit No. 5.
11          Okay.  And do you recognize Exhibits 4
12      and 5?
13  A   Yes, I do.
14  Q   Okay.  What were those in relationship to the kind
15      of work you did?
16  A   Exhibit 4 was half-round calcium silicate asbestos
17      pipe covering.
18  Q   Okay.  And 5?
19  A   And that looks like it's Kaylo pipe covering,
20      calcium silicate.
21  Q   Even with the label off, you recognize the box?
22  A   Yes, I do.
23  Q   Okay.  I guess just -- this is -- okay.
24      Exhibit No. 6 is the same as 5 except the label is
25      now on there.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     993

1   A   That's Kaylo.  That's calcium silicate.
2   Q   Okay.  And now, calcium silicate, is that described
3       like the type of material, this half-round?
4   A   Yes.
5   Q   Also, Exhibit No. 6 -- I'm just interested not in
6       the brands here, but in the -- is this a type of
7       product that you also recognize?
8   A   Yes, I do.
9   Q   Okay.  And what was that called?
10  A   That's mineral wool wall insulation, asbestos
11      insulation.
12  Q   Okay.  In terms of the -- it says "insulating
13      cement" on it.
14  A   Yes.
15  Q   Is that what was used to make like the muds?
16  A   Yes, it is.
17  Q   Now, these products that we just had up there on
18      the screen, are these products that you used in
19      your time as an asbestos worker?
20  A   Yes, they are.
21  Q   Do you have any reason to know what -- whether or
22      not those products contained asbestos back in the
23      '50s, '60s, and early '70s?
24  A   In that time frame, all the insulation in the
25      industry contained asbestos with the exception of

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     994

1       maybe two, and those two were cork and foam glass.
2   Q   And the pictures we had up there on the screen, the
3       half-rounds, were those cork or foam glass?
4   A   No, they weren't.
5   Q   Okay.  Calcium silicate is not -- is not cork or
6       foam glass?
7   A   That's right.
8   Q   And the bag of the insulating cement, that's also
9       not cork or foam glass, right?
10  A   That's right.
11  Q   How is it that you knew that there was asbestos in
12      those products back in that time period of the
13      '50s, '60s, early '70s?
14  A   I was told that when I went through my
15      apprenticeship.
16  Q   Did you also learn about other reasons later on?
17  A   Yes, I was, when I went through the abatement
18      training for the removal, I was told how to
19      identify it.
20  Q   Abatement training, did that come later in your
21      career?
22  A   That was later.  That was in the early '80s.
23  Q   And how about on the packaging of the products?
24      Was there anything that indicated whether it was
25      asbestos-containing or not?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     995

```
 1   A    In that time frame, '50s, '60s, and '70s, there was
 2        no warning labels on nothing.
 3   Q    Was there anything that came out later?
 4   A    Later on, after 1973, it was asbestos-free labels.
 5   Q    And you say the change was about 1973?
 6   A    Around that time, yes.
 7   Q    Was that -- what was the reason why -- or what
 8        event happened that that change took place?
 9            MR. LAFFEY:  Foundation.
10            THE COURT:  Okay.  That's sustained.
11   BY MR. McCOY:
12   Q    Have you heard about the OSHA --
13            MR. LAFFEY:  Objection, hearsay.
14            THE COURT:  Okay.  Sustained.  That's
15        sustained at this point.
16   BY MR. McCOY:
17   Q    You've heard about OSHA?
18   A    Yes.
19            MR. LAFFEY:  Same objection.
20            THE COURT:  Wait a minute.  Wait a
21        minute.  Hold on.  That's overruled.  That
22        objection is overruled.
23            And now, sir, wait until you hear --
24        until after the question is done --
25            THE WITNESS:  Okay.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     996

```
 1            THE COURT:  -- before you answer.  And if
 2        you hear somebody say "objection," just wait until
 3        I tell you whether or not to answer.
 4            Mr. McCoy.
 5   BY MR. McCOY:
 6   Q    So the question was, have you heard about OSHA?
 7   A    Yes, I have.
 8   Q    Okay.  And the change to the asbestos-free labels,
 9        when did that occur in relationship to when you
10        heard about OSHA?
11   A    Well, it was in that time frame, '73.  We would get
12        information from our international telling us of
13        the dangers of the asbestos.
14   Q    Now, just to be clear here, your international was
15        called what?
16   A    Asbestos Workers Local -- International in
17        Washington, D.C.
18   Q    Is that something different than the bricklayer's
19        local union?
20   A    Yes, it is.  It's totally different.
21   Q    Before 1973, was there any difference between the
22        Kaylo and the other calcium silicate half-round
23        products as far as whether they had asbestos or
24        not?
25   A    Yes, there was a difference.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     997

```
 1   Q    What?
 2   A    Before '73, it was very hard, and they had to saw
 3        through it.  And the consistency after '73, there
 4        was a difference; it would break up a lot easier.
 5   Q    Okay.  Now you're comparing the calcium silicate,
 6        like Kaylo, before 1973 and after?
 7   A    Yes.
 8   Q    Okay.  All right.  What color was the
 9        asbestos-containing Kaylo?
10   A    It was white.
11   Q    Now, the local -- your international union is in
12        Washington?
13   A    Yes, it is.
14   Q    But you worked out of one of the Wisconsin locals?
15   A    Yes.
16   Q    Which one did you work out of?
17   A    Out of 19.
18   Q    Okay.  And 19 is based where?
19   A    It's based in Milwaukee, but our jurisdiction is
20        Milwaukee and Madison.
21   Q    Okay.  Meaning the territory that it covers?
22   A    That's right.
23   Q    If we go up up north to the Appleton area, what local
24        of the asbestos workers was up there?
25   A    That's Local 127.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     998

```
 1   Q    Did you ever work in Local 127 yourself?
 2   A    Yes, I have.  I ran work in that area.
 3   Q    You got to wait until I finish my question.
 4   A    Okay.
 5   Q    I know these are things you know, but you got to
 6        wait.
 7            So what were the situations in which you
 8        might be working in Local 127?
 9   A    If the contractor that I was working for bid a job
10        up in that area and he sent me up there to run the
11        job, I would have to hire out of that local.
12   Q    All right.  So how did the techniques and methods
13        for pipe covering work compare between Milwaukee
14        and Green Bay area, or Appleton area?
15   A    It's applied all the same.  No matter where you
16        work in the country, it's all applied the same.
17   Q    All right.  So what kinds of job environments or
18        settings did you work at?
19   A    I worked in major powerhouses.  I worked in
20        hospitals, schools, industrial factories.  I ran
21        jobs in California, all the states in the Midwest,
22        Tennessee, any construction site.
23   Q    Did you work in any paper mills?
24   A    Just two.
25   Q    Okay.  Which ones?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     999

```
 1    A    Fort Howard Paper Company and Mead Paper Company.
 2    Q    Here in Wisconsin?
 3    A    Mead Paper Company is in Escanaba, Michigan, and
 4         Fort Howard is up in Green Bay.
 5    Q    Have you ever worked around bricklayers?
 6    A    Yes, I have.
 7    Q    Okay.  How about the contractors called Bay
 8         Insulation or Bartelt Insulation here in Wisconsin?
 9         Did you ever work for those companies?
10    A    No, but I know of them.
11    Q    Did you have any knowledge as to what job sites
12         those companies worked at?
13    A    No, I don't.
14    Q    You just know the names.
15    A    Yes.
16    Q    Those are in the Local 127 territory?
17    A    Yes, they are.
18    Q    All right.  And just for your time and preparation
19         for this case, you're being compensated by our
20         firm, right?
21    A    Yes.
22    Q    Okay.  And the amount of your compensation for this
23         time on this case was how much?
24    A    The amount?
25    Q    Yes.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1000

```
 1    A    $300.
 2    Q    And you work on other cases for my law firm?
 3    A    Yes.
 4    Q    Now, the types of the materials that we had, the
 5         half-rounds and the cements, were those used on
 6         piping?
 7    A    Yes.
 8    Q    Okay.  What kinds of piping were they used on?
 9    A    The calcium silicate was primarily used on low- and
10         high-pressure steam and sometimes domestic hot
11         water.
12    Q    How about the cements?
13    A    The cements were used on all of them.
14    Q    Now, I've brought some -- best attempt here to
15         bring some -- just to demonstrate or illustrate to
16         our jury here, I've got in my right hand a piece of
17         pipe?
18    A    Yes.
19    Q    Is this the type that you might be insulating?
20    A    Yes.  That's 2-inch galvanized.
21    Q    And then I've got something I'm attaching to it.
22         What's that right there?
23    A    That's a ball valve, one crank off, one crank on.
24    Q    Okay.  Can't say I'm much of a pipe fitter, but --
25         Now, these were put together on the job
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1001

```
 1         by the pipefitters?
 2    A    Yes.
 3    Q    Okay.  And then your -- the asbestos workers would
 4         come along and put the insulation on?
 5    A    Yes.
 6    Q    Okay.  And this is another section of pipe here.
 7         Now I'm putting on here another thing.  What's this
 8         called, this green thing?
 9    A    That's a flange.
10    Q    Okay.  And then -- let's see here.  I put this on
11         so it looks like a clamp here.  What do you call
12         that?
13    A    That's some kind of a hanger.
14    Q    Okay.  And then I put another piece on here.
15         What's that called?
16    A    That's a 90-degree elbow.
17    Q    Okay.  All right.  Got another piece of --
18    A    If you put any more on, you won't be able to lift
19         it.
20    Q    Yeah, I may have to enlist your help, or
21         Mr. Blackstock here.  There he is.
22              Okay.  And then, finally -- would there
23         be more than one hanger on these things?
24    A    Yes.
25    Q    Okay.  Put that on there.  Why don't you hold this
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1002

```
 1         on this end right here.
 2              Okay.  And, finally, we've got another --
 3         is this what would happen at the flange, where
 4         you'd have a piece of pipe coming off of each end?
 5    A    Yes.
 6    Q    Okay.  Now, briefly, what were the -- what would be
 7         the purpose of like this valve here?
 8    A    That would turn the system off downstream, off or
 9         on.
10    Q    The flow of whatever is going through there?
11    A    Right, whatever flows through.
12    Q    Steam or hot water or whatever?
13    A    I don't think steam would go through galvanized
14         pipe.
15    Q    Okay.  Another kind of pipe?
16    A    That would have to be iron.
17    Q    But shaped similarly, though, right?
18    A    Yes.
19    Q    And then this flange here, what function does that
20         serve?
21    A    That's to break into the pipe, where you can get at
22         it.  If you have to take anything apart, you take
23         those bolts off, and that's a parting flange.
24    Q    And these hangers here, what purpose do they serve?
25    A    That's to hold the pipe up.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1003

1  Q   Okay.  So now -- write a check to the courthouse
2      for a little dent in the wood there, Judge.
3          Okay.  So let's take this right here.
4      Have you just show our jurors where you'd be
5      putting the half-rounds and where you'd be putting
6      the cements.
7  A   All from here to here and from here to here, and
8      then that would be -- we would use the cements on
9      the elbows and on the valves.
10 Q   Okay.  And where would the half-rounds be?
11 A   Here, here, here, on all the straight piping.
12 Q   Okay.  What about on these hangers?
13 A   You'd bury the hangers if it was -- if the
14     insulation on this system was going to be greater
15     than 1-inch thick, we could bury this and this and
16     this hanger in the inside of the insulation.  But
17     if the insulation wasn't greater than 1-inch thick,
18     then we'd have to use the cements for all of this.
19 Q   Okay.  So you could sometimes put the half-rounds
20     on it --
21 A   On it.
22 Q   -- when you say "bury it"?
23 A   We could bury it -- if the thickness of the
24     insulation was greater than 1 inch, we could bury
25     some of this.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1004

1  Q   Thickness of like the calcium silicate piece?
2  A   Yes.  Yes.
3  Q   Okay.  And if you couldn't bury it, then what would
4      you have to do to --
5  A   We would either use an oversize covering on this or
6      we'd mud this in with rock wool cement, asbestos
7      cement.
8  Q   Okay.  And the valve would have to be -- if you
9      couldn't bury it --
10 A   We'd have to use the cements on it.
11 Q   Okay.  Put this down before I do any more damage.
12         Some -- the pipe came in different sizes,
13     like this is a smaller piece.
14 A   That's 1-inch galvanized.
15 Q   Okay.  So you worked on different sizes of pipe
16     like this?
17 A   Yes.
18 Q   Okay.  This -- now, this thicker pipe --
19 A   That's 4-inch --
20 Q   Okay.
21 A   -- galvanized.
22 Q   All right.  This would be like the steam piping
23     sometimes?
24 A   Yes.
25 Q   Okay.  And in these kinds of industrial settings,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1005

1      they're -- would this size be used?
2  A   That's 6-inch.
3  Q   Okay.  Would that be used in those --
4  A   Yes.
5  Q   Okay.  Like in a paper mill setting sometimes?
6  A   Right.
7  Q   All right.  So now, when you come to one of those
8      places where you've got to -- like the valve, what
9      do you have to do to the half-round material?
10         Or let me change the question.  I'm
11     just -- where would you be having to do any cutting
12     or sawing on the half -- on the half-round pieces?
13 A   Depending on the thickness of the insulation, when
14     you're insulating the horizontal piping and you
15     come to a valve, you could do it two ways.  You
16     could stop the insulation up to the flange,
17     continue it on the other side of the flange, use
18     oversize covering on that valve or mud that valve
19     in with rock wool cement.
20 Q   How long -- did the half-round pieces come in a
21     certain length?
22 A   It comes 3 feet.
23 Q   Okay.  And you had to fit those onto the pipe to --
24     if you had to cut them -- let me change the
25     question.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1006

1          So if the pipe was less than 3 foot,
2      you'd have to cut it?
3  A   Yes.  Right.
4  Q   Okay.  And how did you cut it?
5  A   There again, what's important is the thickness of
6      the insulation.
7  Q   But how did you cut it?  What tool?
8  A   With a saw.
9  Q   Okay.  And what, if any, dust was created during
10     the sawing of half-rounds?
11 A   Quite a bit of dust.
12 Q   All right.  So when you're mixing up the cements --
13     you also call those muds?
14 A   Yes.
15 Q   Okay.  What, if any, dust is created during the
16     preparation of these muds?
17 A   There's quite a bit of dust in those bags of
18     cement.  You take a mud box and you'd fill it up
19     with water and open up the bag and dump it in, and
20     the dust would just be airborne.
21 Q   Can you give us any examples from your own
22     knowledge or observation of how far that the dust
23     from your work can sometimes travel at construction
24     sites?
25         MR. LAFFEY:  Objection, foundation.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1007

1           THE COURT:  Just a minute.  That's
2    sustained.
3    BY MR. McCOY:
4    Q    Have you observed the dust?
5    A    Yes.
6    Q    Okay.  And have you seen it in the air at the
7         construction sites?
8    A    Yes.
9    Q    Okay.  Does it always stay right in the area where
10        you're working?
11   A    No.  Usually, most construction sites, the
12        buildings are not totally enclosed because they
13        leave one chunk of the building open.  They're
14        bringing in equipment or bringing in drywall.  They
15        have a tarp over that particular part of the
16        building, and when you're in the boiler room or
17        mechanical room and you're mixing the cements, you
18        can see it drifting because of the drafts through
19        the building.
20   Q    When you can say -- when you say you can see it
21        drifting, what's the "it"?
22   A    When you dump the bag into a mud box and you start
23        mixing it, it's just dust.  And you can see it
24        moving.  It's moving with the wind, with the
25        drafting in the building, going through the

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1008

1    building.
2    Q    And are you familiar with the term "standard
3         canvas"?
4    A    Yes.
5    Q    Was that a term you knew about in the '50s, '60s,
6         and early '70s?
7    A    Yes.
8    Q    Okay.  And back in that time period -- first off,
9         what is standard canvas?
10   A    Standard canvas is a muslin jacket over the calcium
11        silicate asbestos insulation.  It's a jacket right
12        over the 3-foot insulation.
13   Q    Like a cloth?
14   A    Yes.  That's what it is, a cloth.
15   Q    And how is that used in terms of applying the --
16        the half-rounds?
17             Or maybe it's a bad question.  How do you
18        use that in the application of the pipe covering
19        materials?
20   A    It has a horizontal lap and a butt lap.  You bend
21        the lap back, take the horizontal lap, pull it off
22        the parting seam.  And you use a lagging adhesive
23        and a brush, and you'd paint up the horizontal seam
24        and the butt seam.  And you put it on a pipe and
25        put the muslin over the splitting part of the

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1009

1    insulation if it's only 1-inch thick.  The
2    thickness of the insulation determines how you're
3    going to apply it.
4    Q    Okay.  So basically you'd wrap it around?
5    A    Yes.
6    Q    Okay.  And you said something about if it's only
7         1-inch thick.  What's the difference if it's below
8         or above 1 inch?
9    A    If 1-inch thick, you can apply the insulation with
10        that standard canvas lap.  It will stay on the
11        pipe.  If it's 2 inches, 3 inches, 2 1/2 inches
12        thick, you have to wire it on the pipe because the
13        weight of the insulation, the standard canvas, will
14        not hold that heavy piece of insulation on the
15        pipe.  The minute you put the lap on and it's wet
16        and you leave it go, it's going to fall off.  So we
17        have to wire it on and then mud the wires in and
18        then rejacket it with standard canvas.
19   Q    That's for the more than 1-inch thick.
20   A    That's correct.
21   Q    Okay.  Back in the '50s, '60s, and early part of
22        the '70s, what type of insulation products were
23        under the standard canvas?
24   A    All of the calcium silicate in my past experience
25        that I worked with had the standard canvas on it.

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1010

1    Q    And that --
2    A    Yes.  And there was others, like Air-Cell, which is
3         a --
4    Q    Well, let's stick with the calcium silicate for a
5         moment.
6    A    Okay.  Calcium silicate had standard canvas on it
7         unless you bought it in thick layers, 2 inches,
8         3 inches thick, and then it didn't come with
9         standard canvas; it came with no jacket on it at
10        all.  It's just the calcium silicate.  You had to
11        rejacket it on the job site.
12   Q    So back in the '50s, '60s, and '70s, when it's a
13        standard canvas covering, well, what, if any,
14        asbestos would be in the insulation underneath?
15   A    Yes, it would be.
16   Q    And was Kaylo a type of insulation that could be
17        used under standard canvas?
18   A    Yes.
19   Q    Black mastics, are you familiar with what has that
20        appearance?
21   A    Yes.  Fiber adhesives is like a black mastic.  It's
22        a weather-proofing to protect the insulation.
23   Q    And what was it -- what was it used for and how was
24        it applied in your work on pipe covering?
25   A    You could -- it came -- it was trowel grade, spray

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1011

1      grade, or brush grade, and it would go on on the
2      elbows, on the valves, on the T's, on the 45s.
3      That's where you would apply it on.
4              MR. McCOY:  That's all the questions I
5      have, Mr. Viola.  Thank you.
6              THE COURT:  Mr. Laffey.
7              MR. LAFFEY:  Thank you, Judge.
8                    CROSS-EXAMINATION
9   BY MR. LAFFEY:
10  Q    Mr. Viola, you're aware of other manufacturers of
11       calcium silicate insulation, aren't you?
12  A    Other manufacturers?
13  Q    Besides this Kaylo you've been talking about.
14  A    Yes.
15  Q    Johns-Manville makes them?
16  A    I would imagine, but I'm not positive.
17  Q    You're not positive.  You've heard of
18       Johns-Manville, have you?
19  A    Pardon me?
20  Q    You've heard of Johns-Manville, have you?
21  A    Yes, I have.
22  Q    You've worked with it in your career --
23  A    Yes.
24  Q    -- as an asbestos worker?  Yes?
25  A    Yes.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1012

1   Q    You've worked with asbestos-containing
2        Johns-Manville insulation in your career as an
3        asbestos worker?
4   A    Yes.
5   Q    85 percent magnesia insulation, are you familiar
6        with that?
7   A    Yes.
8   Q    That's another form of half-round pipe covering?
9   A    No, it's not.
10  Q    It's not a half-round?  What is it?
11  A    It's a bag of finish cement, 85 percent magnesium.
12  Q    It's another variation of pipe insulation in terms
13       of a cement product?
14  A    It's a cement product in conjunction with the pipe
15       insulation.
16  Q    Any other manufacturers of calcium silicate besides
17       Johns-Manville and this Kaylo product?
18  A    I'm guessing, but I would think they all made it.
19  Q    All the manufacturers of insulation.
20  A    Yes.
21  Q    Sure.  Calcium silicate, this pipe -- half-round
22       pipe covering, it's got a white chalky appearance,
23       does it?
24  A    Yes.
25  Q    Does the non-asbestos-containing half-round product

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1013

1        also have a white chalky appearance?
2   A    Yes, it did.
3   Q    You said the consistency was a little different --
4   A    Yes.
5   Q    -- but in general, it still is white, chalky?
6   A    Yes.
7   Q    Are you familiar -- if I -- with the term of "spun
8        glass"?
9   A    Fiberglass.
10  Q    Fiberglass.  Have you ever worked with fiberglass
11       in your career as an insulation worker?
12  A    Yes.
13  Q    And that goes back to the '50s?
14  A    I'm not really positive --
15  Q    You can't remember?
16  A    -- if fiberglass was on the market in the '50s.
17  Q    You just can't recall?
18  A    I did work with fiberglass insulation.
19  Q    Fiber -- okay.  I'm sorry.
20  A    But I can't say for sure if it was in the '50s.
21  Q    Fiberglass looks completely different than these
22       half-rounds, correct?
23  A    Yes.
24  Q    You're not going to get them confused, right?
25       Piece of fiberglass versus a piece of half-round,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1014

1        nobody could confuse the two; is that correct?
2   A    That's right.
3   Q    You don't know who Clarence Gosz is, do you?
4   A    No, I don't.
5   Q    Okay.  You don't know anything about where he
6        worked?
7   A    No, I don't.
8   Q    You never -- strike that.
9            You know that you're here testifying in a
10       case about Clarence Gosz, or did Mr. McCoy not tell
11       you that?
12  A    I don't know who the gentleman is.
13  Q    Are you still a client of Mr. McCoy's law firm?
14  A    Yes, I am.
15  Q    How long have you been a client of Mr. McCoy's law
16       firm?
17  A    Maybe four or five years.
18  Q    You have some kind of a claim going on or -- or
19       what?
20  A    No.
21  Q    Calcium silicate half-rounds, they basically look
22       the same regardless of who the manufacturer is; is
23       that right?
24  A    Yes.
25  Q    So when Mr. McCoy showed you that picture, whatever

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1015

1  was Exhibit 4, when he put that on the screen, you
2  have no idea who made that particular half-round,
3  right?
4  A  No, I don't.
5  Q  You talked about dust that was created when
6  you would cut the half-rounds, right?
7  A  Yes.
8  Q  And you talked about dust that was created when
9  you'd be mixing the cements?
10 A  Yes.
11 Q  The people who were creating the dust would be
12 insulators like yourself?
13 A  Yes.
14 Q  Did any of your employers ever instruct you or your
15 brother insulators about having to segregate your
16 work areas so as to protect other workers, like
17 brick masons who were in the area, from the dust
18 you created?
19 A  No, that was never told to us.
20 Q  Did your union ever talk to you about doing your
21 job with dusty materials like half-rounds and
22 cement in a way that would segregate the dust so
23 that it wouldn't go near bystanders?
24 A  No, that was never told to us.
25 Q  When you talked to Mr. McCoy about what was on

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1016

1  packages of insulation products -- or, frankly,
2  actually you said there was nothing on packages of
3  insulation products before the early '70s to
4  indicate what was in it.  You were talking about
5  the packages that came from the manufacturers?
6  A  Yes.
7  Q  Do you know who, from your experience on job sites,
8  who is it that would decide what kind of insulation
9  got used on a particular project?
10 A  It would be the architect who designed the
11 building.
12 Q  You weren't making those decisions, right?
13 A  No, not at all.
14 Q  You said you worked in large industrial
15 construction sites, right?
16 A  Yes.
17 Q  What did you say, some powerhouses and schools, a
18 couple of paper mills you recall, right?
19 A  Yes.
20 Q  Do you ever remember if any of the people who ran
21 those projects did any air testing at all,
22 before -- before OSHA came out in the early '70s?
23 A  No, I don't.
24 Q  Do you know if your employers ever did any air
25 testing where you worked before OSHA came out?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1017

1  A  No, they never did, not that I know of.
2  Q  You can't tell this jury about any products --
3  strike that.
4      You can't identify for this jury what
5  products may or may not have been used around
6  Mr. Gosz, right?  You have no idea?
7  A  I have no idea.
8  Q  You can't tell this jury what insulation
9  contractors may or may not have done any work
10 around Mr. Gosz, can you?
11 A  I can't.  No, I can't.
12 Q  You can't tell this jury anything about Mr. Gosz
13 and his alleged exposure to asbestos, can you?
14 A  No.
15     MR. LAFFEY:  Okay.  I don't have any
16 other questions.  Thank you.
17     THE COURT:  Mr. McCoy.
18     REDIRECT EXAMINATION
19 BY MR. McCOY:
20 Q  The name of your local back in the '50s, '60s, and
21 '70s time period again or your union was what?
22     MR. LAFFEY:  Beyond the scope, Judge.
23     THE COURT:  Okay.  Just a minute.  I
24 don't understand the question.  Would you ask the
25 question one more time if you think it's --

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1018

1  BY MR. McCOY:
2  Q  What was the name of your union back in the '50s,
3  '60s, and '70s?
4      THE COURT:  Okay.  Just a minute.  Hold
5  on just a minute.
6      That's sustained.  Please ask your next
7  question.
8  BY MR. McCOY:
9  Q  You mentioned working around bricklayers?
10 A  Yes.
11     MR. LAFFEY:  Again, Your Honor, beyond
12 the scope of cross.
13     THE COURT:  Okay.  That's overruled.
14 BY MR. McCOY:
15 Q  What materials were you using around bricklayers in
16 industrial settings if you were doing pipe
17 insulation work?
18     MR. LAFFEY:  Form and foundation.
19     THE COURT:  Okay.  Hold on a minute.
20 That's overruled.
21     You can answer that question.
22     THE WITNESS:  I used calcium silicate,
23 and I used it around all the trades in the
24 Milwaukee building and construction trades, all the
25 trades that are on a job site:  Electricians,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1019

1    steamfitters, plumbers, drywallers, cement
2    finishers, bricklayers, tile setters.
3         Of all the building trades in Milwaukee,
4    I worked around all these people at one time or
5    another in my past experience with
6    asbestos-containing materials, in that time frame.
7    BY MR. McCOY:
8    Q    What, if any, of the cements --
9    A    And the cements.
10        MR. McCOY:  That's all the questions I
11   have.
12        MR. LAFFEY:  No questions.
13        THE COURT:  Okay.  Just a minute.
14        Ladies and gentlemen, are there jurors
15   who have questions for this witness?  Just raise
16   your hand and I'll give you time.  Okay.  Who else?
17        Everyone's done now with your questions?
18        Ladies and gentlemen, for additional questions, if
19   you have one that you've already written and are
20   ready to hand to us, raise your hand.  Someone's
21   still writing?
22        Okay.  Thank you, sir.  You may step
23   down.
24        THE WITNESS:  Thank you.
25        THE COURT:  Now, Mr. McCoy, you may call

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1020

1    your next witness.
2         MR. McCOY:  Yes, Judge.  We're going to
3    go back to the depositions to be read in.
4         THE COURT:  Okay.
5         MR. McCOY:  Including the designations by
6    Mr. Laffey, as well as by my firm.
7         THE COURT:  Thank you.  So, Mr. McCoy,
8    you're playing the role of someone who testified
9    earlier; is that right?
10        MR. McCOY:  Yes.
11        THE COURT:  Mr. Blackstock, you're
12   playing the role of a lawyer, whoever that might
13   be?
14        MR. BLACKSTOCK:  That's correct, Your
15   Honor.
16        THE COURT:  Okay.
17        MR. LAFFEY:  Can we approach just
18   briefly?
19        THE COURT:  Sure.  Ladies and gentlemen,
20   we'll be right back.
21        (Sidebar discussion held off the record.)
22        MR. BLACKSTOCK:  This is the deposition
23   of James H. Mielke from August 10th, 2006.
24   BY MR. BLACKSTOCK:
25   Q    Question:  Mr. Mielke, will you please tell us your

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1021

1    name and spell it.
2    A    My name is James H. Mielke, M-I-E-L-K-E.
3    Q    Mr. Mielke, are you currently retired?
4    A    Yes, I am.
5    Q    When did you retire?
6    A    March of 1992.
7    Q    And before you retired, what kind of work did you
8    do?
9    A    I was a mason for most of my life for P.G. Miron
10        Construction Company.  When I retired, I was
11        working for, I think, Oscar Boldt Construction
12        Company.
13   Q    What year did you start in the trade?
14   A    I started in October 1952.
15   Q    Were you a member of a union?
16   A    Yes, I was.  I started as an apprentice for P.G.
17        Miron Construction Company.
18   Q    When was that?
19   A    In October 1952.
20   Q    What union were you a member of?
21   A    Local No. 10, Appleton, Wisconsin.
22   Q    And what kind of union was Local No. 10?
23   A    A bricklayer's, mason, plasterer's, stone mason.
24   Q    When you started in the trade in October of 1952,
25        you were working for P.G. Miron at that time?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1022

1    A    Yes.
2    Q    How long did you work for P.G. Miron?
3    A    Approximately -- oh, I would say, 34 to 35 years.
4         My last two years I worked for three or four
5         different contractors, but I worked for Miron
6         until, I'd say, about 1989, 1990.
7    Q    Do you know Clarence Goss?
8    A    Yes, I do.
9    Q    How do you know him?
10   A    Well, I worked with him for approximately all that
11        time from -- I don't know exactly what year he
12        started with Miron.  I would say probably in '49,
13        '50, '51, '52.  I don't know the exact date.  From
14        that time on, I knew Clarence.
15   Q    So he started at Miron about the same time you did?
16   A    Approximately the same time, yes.
17   Q    Do you know whether Clarence worked anywhere else
18        before he went to work for Miron?
19   A    Yes.  He worked for Hoffman Construction Company,
20        Appleton.
21   Q    Do you know how long he worked for Hoffman?
22   A    I assume after he got out of the service in 1940.
23        I served an apprenticeship with him, and then he
24        came to work after -- to work for Hoffman and then
25        P.G.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1023

```
 1   Q   At the time that you retired in 1992, was Clarence
 2       still working?
 3   A   No.  He was retired at that time.
 4   Q   Do you know when Clarence retired?
 5   A   I have no idea.  I would assume probably eight to
 6       ten years before I did.
 7   Q   Did he retire while you were still working for
 8       Miron?
 9   A   Yes.
10   Q   Do you know whether Mr. Gosz was a member of a
11       union?
12   A   Yes.
13   Q   What union?
14   A   Same union as I was.
15   Q   And during the time that both you and Mr. Gosz
16       worked for P.G. Miron, did you work on jobs with
17       Clarence?
18   A   Yes, I did.
19   Q   Did you work on some jobs not with Clarence?
20   A   Yes.
21   Q   Clarence worked on some jobs not with you?
22   A   Yes.
23   Q   But sometimes the two of you worked together?
24   A   Yes.
25   Q   Did you ever work at a place called American Can?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1024

```
 1   A   Yes, we did, quite a few.
 2   Q   Quite a few?
 3   A   Quite a bit, yes.
 4   Q   And what type of facility is American Can?
 5   A   American Can was a paper -- was in the paper
 6       industry I believe.  And there could be other
 7       industries.  What they did around here -- they were
 8       in the paper industry.
 9   Q   And where is American Can located?
10   A   General office or where their plants are?
11   Q   The plants that you worked in.
12   A   The plants were in Neenah, Menasha, and in Green
13       Bay, as far as I know.  Those are the plants that I
14       worked in for American Can.
15   Q   You worked at both of those?
16   A   At Menasha and Neenah and Green Bay, three
17       different places.
18   Q   So that's Menasha, Neenah, and Green Bay?
19   A   Yes.  And, of course, each city had more than one
20       building, more than one plant, too.
21   Q   And you said that it was somewhere that you worked
22       quite a bit?
23   A   I would say so, yes.
24   Q   Were you there every year?
25   A   Yes, I would say so.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1025

```
 1   Q   About how many times each year?  How much of the
 2       time each year?
 3   A   Maybe 10 percent.  Anywhere from -- depends on the
 4       job.  If it was a new job, they lasted a month,
 5       month and a half, two months.  Some repairs, a
 6       week, some days, only a day or two.
 7   Q   So you did repair-type work and also --
 8   A   New construction.
 9   Q   Like additions to the plant?
10   A   Yes.
11   Q   And was that throughout your career that you were
12       there every year?
13   A   Yes, I would say so.  I managed to get there.
14   Q   When you say that you did repair work at American
15       Can, can you describe for me what that is, what you
16       did as repair work?
17   A   Well, it was a general contractor.  We tore down
18       walls, put up new walls.  We repaired floors,
19       concrete floors, so on and so forth.  Took out
20       windows, replaced windows, replaced doors.
21   Q   And maybe I should have asked you a more general
22       question.  What kind of work did bricklayers
23       generally do?  What was your trade generally doing?
24   A   We laid brick and stone.  Some of us plastered.  I
25       did not plaster.  Some plastered, some put in
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1026

```
 1       tiles.  Some put in tile around shower rooms.
 2               What else would they do?  Any kind of
 3       mason work.
 4   Q   So when you're talking about repair, did you say
 5       moving and building walls?
 6   A   Yes.
 7   Q   When you were doing that sort of repair work, did
 8       you ever work around insulators at American Can?
 9   A   Sure.  Yes.
10   Q   What were the insulators doing?
11   A   They were insulating the pipe.  They would -- once
12       we put up the walls, they would be there putting --
13       insulating the pipe as we put the walls up.
14   Q   Was that pipe that was running through the walls?
15   A   Yes.
16   Q   And can you describe for me, what are they doing
17       when they're insulating pipe?  What does that look
18       like?
19   A   Well, the insulation usually came in like 4-foot
20       lengths, and they would wrap it around and make
21       sure to -- and to tape it -- wrap it up around
22       the pipe.  And as we were putting the wall up,
23       they'd run their insulation in there, and we'd
24       build our walls around the insulation and the pipe.
25   Q   And when the insulators were doing their work, what
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1027

```
 1      was the air like when they were working?
 2   A  What was the air like?  Well, there was the dust
 3      and general construction.  It's hard to describe.
 4      A dust.
 5   Q  Was it dust that you were breathing?
 6   A  Oh, definitely.
 7   Q  How thick was the insulation they were applying to
 8      the pipes?
 9   A  I guess it depends on the size of the pipe.  Some
10      of it was a half inch, all the way up to 2,
11      3 inches, depending upon, I imagine, the steam
12      pressure and everything.  They had to hold the heat
13      into the pipes.
14   Q  So those were steam pipes?
15   A  Definitely steam and water, yes.
16   Q  Did you and Mr. Gosz ever have to work with
17      insulation yourselves?
18   A  Yes.
19   Q  Describe that.
20   A  Sometimes they would leave their insulation in --
21      they didn't spend the whole day on the job, and
22      they would leave their insulation there, and they'd
23      say, wrap it around, just where the wall goes
24      through, and just put a piece around it and let it
25      there.  And we'd continue on in the open rooms when
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1028

```
 1      they came back.
 2   Q  So sometimes you would actually --
 3   A  Put it up around the pipes, yes.
 4   Q  Did you ever have to remove any insulation?
 5   A  Yes.  On old buildings, when they tore old walls
 6      down and remodeled buildings, yes.
 7   Q  That's at American Can?
 8   A  Yeah.  A lot of other jobs, too, not just
 9      specifically American Can.
10   Q  But that did happen at American Can?
11   A  Yes, definitely.
12   Q  What sort of tools -- or how did you go about
13      removing the insulation?
14   A  Well, a lot of times we just tore it off.  If it
15      wasn't to be used again, if we had a knife, we cut
16      the insulation, tear it off, or used our trowel,
17      cut it and removed it.
18   Q  When you and Mr. Gosz were removing the insulation,
19      what was the air like?
20   A  What was the air like?
21   Q  Yes.
22   A  Created dust.
23   Q  Were you breathing that dust?
24   A  Definitely.
25   Q  You had described that maybe 10 percent of every
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1029

```
 1      year of your career you were at American Can.
 2      Could you estimate for me about how much time
 3      Mr. Gosz spent at American Can?  Was it similar or
 4      different?
 5   A  I would say similar, yes.
 6   Q  Was he doing the same kind of work you were doing?
 7   A  Yes.
 8   Q  And did you ever work with Mr. Gosz at Thilmany?
 9   A  Yes, I believe I did once.
10   Q  Once, did you say?
11   A  I think.  It could have been twice.
12   Q  And what is Thilmany?
13   A  Thilmany is a paper -- pulp and paper manufacturing
14      plant.
15   Q  Where is it located?
16   A  In Kaukauna, Wisconsin.
17   Q  What kind of work was Miron doing at Thilmany?
18   A  Same thing, repair work, new construction.
19   Q  When you say "same thing," same thing as you just
20      described at American Can?
21   A  Yes.
22   Q  The same kind of repair work?
23   A  Construction work, yes.
24   Q  Were there insulators also working at Thilmany
25      while you were doing your work?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1030

```
 1   A  Yes.
 2   Q  Were the insulators doing anything different than
 3      what you told us at American Can?
 4   A  No, basically the same thing.
 5   Q  And you described working around insulators at both
 6      American Can and Thilmany.  Did you work around
 7      insulators at other locations as well?
 8   A  Yes.  For Western Condensing -- I think it's
 9      Foremost Dairies in Appleton -- and we did work up
10      at -- let's see, I think it's at Alto, Wisconsin.
11      That's over on Lake Michigan.  And we did work up
12      at Owen, Wisconsin.  There's three places that I
13      know that I worked with Clarence.
14   Q  Around the insulators also?
15   A  They were definitely there, yes, doing the same
16      type of work.
17   Q  Do you recall any of the contractors, any of the
18      insulators you worked around?
19   A  Well, there was Bartelt Insulating and there was
20      Industrial Insulation, I believe.  And I think
21      there was -- I shouldn't say "I think" -- there was
22      possibly an outfit Baumgardt in later years, I
23      would say in the '90s when they'd -- we'd run
24      across those people.
25   Q  Bartelt, Industrial Insulation, and Baumgardt.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1031

```
 1   A    There was Bartelt and there was another, Industrial
 2        Insulation.  Those are two different companies.
 3   Q    And you and Mr. Goss worked around insulators from
 4        all three of these companies?
 5   A    Yes.
 6   Q    The repair work that you did at American Can, do
 7        you recall who did that insulation work?
 8   A    Sometimes that was in-house, their own insulators
 9        did that.  If they were small repair jobs, they
10        furnished the insulation themselves, American Can
11        did.  They had their own people that did that.
12   Q    So the insulators, during some of the repair jobs
13        at American Can, were American Can employees?
14   A    Yes.
15   Q    Did you work around any insulators from Bay
16        Insulation?
17   A    I would say yes, there were probably.
18   Q    Mr. Gosz also?
19   A    If he was with me, yes, at that time.  If I was
20        with him, he would be there, yes.
21   Q    Have you told us today all of the locations where
22        you worked with Mr. Goss?
23   A    I worked at many more places with him.
24   Q    But you can't remember the specific locations,
25        correct?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1032

```
 1   A    Yes.  I worked at Post Crescent, the paper company
 2        here in Appleton, at Zaugs Catering
 3        Service in Appleton, the building across the
 4        street.  At that time it was called Eagle
 5        Manufacturing.  We put up a new building across the
 6        street.
 7             I worked at two different banks with him
 8        in Appleton, new construction.  Many other places.
 9   Q    Do you know who did the insulation work when you
10        were there at American Can, who the insulators were
11        at American Can?
12   A    No.  Other than at times when their own people were
13        there, no, I couldn't give you a construction
14        company.
15   Q    You know at some point that American Can had their
16        own insulators, but if any subcontractor insulators
17        were there, you don't know who that was?
18   A    I can't remember, no.
19   Q    Do you know who the subcontractor insulators at
20        Thilmany would have been?
21   A    Have no idea.
22   Q    I know you mentioned that you know you worked
23        around Bartelt Insulation.  Do you know what job
24        sites you worked at with Bartelt?
25   A    It's hard to say.  No, I can't put my finger on any
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1033

```
 1        one.
 2   Q    Any specific job sites?
 3   A    Yes.
 4   Q    Good morning.
 5             You testified earlier that you heard of
 6        Bay, correct?
 7   A    Yes, I did.
 8   Q    And that you probably worked around Bay employees?
 9   A    I could have, yes.
10   Q    You're not certain?
11   A    No, I'm not certain.
12   Q    And is it true that you're not certain that
13        Mr. Goss worked around Bay?
14   A    No, I'm not.  No, I cannot say he did, no.
15   Q    You testified earlier regarding working around
16        Industrial Insulation.  Do you recall that?
17             MR. McCOY:  What page?
18             MR. BLACKSTOCK:  43.
19             MS. THOMAS PAGELS:  You skipped --
20             MR. BLACKSTOCK:  Oh, did I?
21   BY MR. BLACKSTOCK:
22   Q    I appreciate your response.  What I'm looking for
23        is specific sites.  You mentioned American Can
24        Company specifically.  Can you give me any other
25        specific names?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1034

```
 1             MR. McCOY:  Still, what page and line?
 2             MS. THOMAS PAGELS:  41, line 2, Thomas.
 3             MR. BLACKSTOCK:  Oh, okay.
 4   BY MR. BLACKSTOCK:
 5   Q    Do you know how long a job that was for Miron
 6        Construction?
 7   A    I would say close to a year.  Probably nine to ten
 8        months.  Nine to -- nine months to a year probably,
 9        that -- that overall period, yes.
10   Q    Miron served as the general contractor?
11   A    Yes.
12   Q    Miron had subcontractors?
13   A    Yes.
14   Q    My understanding is you don't know the name of any
15        of the subcontractors?
16   A    No idea, no.
17             (There was discussion off the record.)
18   BY MR. BLACKSTOCK:
19   Q    To your knowledge, did Miron Construction supply
20        any asbestos-containing materials for that James
21        Madison job?
22   A    No, they did not, I don't believe.
23   Q    Do you know whether Miron Construction did any
24        other construction jobs at Madison Junior High
25        School?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1035

1   A   I don't believe they did.
2   Q   That's all I have.
3                   I'm in the corner here.  My name is Lee
4       Seese.  I'm a lawyer representing one of the
5       defendants.  I just have a couple --
6               MR. McCOY:  Where -- where are we at?
7               MR. BLACKSTOCK:  We're going through 48,
8       17.
9               MR. McCOY:  I don't have this marked in
10      mine.
11              MR. BLACKSTOCK:  Yeah, I don't have it
12      marked either.  They said they have us designated
13      to go through 48, 17.
14              MR. McCOY:  I'll follow you.
15              MR. BLACKSTOCK:  All right.
16  BY MR. BLACKSTOCK:
17  Q   Have you ever heard of the company County Concrete
18      Corporation?
19  A   Who?
20  Q   County Concrete Corporation?
21  A   County Concrete?
22  Q   County Concrete Corporation.
23  A   I don't believe so, no.
24  Q   How about County Concrete Industries, Inc.?
25  A   I don't believe so, no.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1036

1   Q   No further questions.
2               Good morning, sir.  Can you hear me?
3   A   Um-hum.
4   Q   Are you familiar with the name Garlock?
5   A   No, I'm not.
6   Q   You cannot testify that Mr. Fischer or Mr. Gosz
7       worked with or around any Garlock products, can
8       you?
9   A   No, I cannot.
10  Q   You testified earlier regarding working around
11      Industrial Insulation.  Do you recall that?
12  A   Yes, I do.
13  Q   Do you recall which sites you worked at where
14      Industrial Insulation was present?
15  A   Specific sites?
16  Q   Yes.
17  A   Just about all of the ones at American Can, any of
18      the new constructions, any banks we put up, they
19      were all pipe coverers just about on every job that
20      we worked on.
21  Q   I appreciate your response.  What I'm looking for
22      is specific sites.  You mentioned American Can
23      specifically.  Can you give me any other specific
24      names?
25  A   Buildings that we worked on?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1037

1   Q   Or sites, yes.
2   A   Or sites?
3   Q   Insulators is what he's asking.  Not just with
4       insulators, but with Industrial Insulation
5       insulators, the company.
6   A   The company?  Yeah.
7   Q   Yeah.
8   A   No, I do not.
9   Q   Okay.  Do you recall if Mr. Gosz ever worked around
10      Industrial Insulation insulators?
11  A   I can't say for sure that he was with any of them,
12      but there were times that they were on the jobs
13      when we were there, yes.  But I can't put my finger
14      on any specific jobs we worked with Industrial
15      Insulation.
16  Q   Have you heard of insulators called B & B
17      Insulation?
18  A   No, I have not.
19  Q   During your career, did you work around any
20      drywallers?
21  A   Yes, quite a bit.
22  Q   Do you recall a job site where you worked with
23      Mr. Gosz where you worked around drywallers?
24  A   Yeah, just about every bank we were on, any new
25      construction, were drywallers.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1038

1               When we -- when we built the shopping
2       center in downtown Appleton, there were drywallers.
3       Just about every new job we had at the bank in
4       Appleton, the Valley Bank, there were drywallers
5       there, worked with them there.
6   Q   Let's break that down a bit.  There's a bank in
7       Appleton?
8   A   Valley Bank on Wisconsin Avenue, there were
9       drywallers there.
10  Q   You said something center?
11  A   Downtown Appleton at the shopping center, there
12      were drywallers there all the time.
13  Q   And other locations other than those two that you
14      recall?
15  A   At the research building for American Can in
16      Neenah, there were drywallers there.
17  Q   Any others that you recall?
18  A   There was a bank at Valley Fair.  I guess that's
19      about it.
20  Q   The Valley Bank in Appleton, do you remember when
21      that construction took place?
22  A   '70s.
23  Q   Do you remember when in the '70s?  How long were
24      you there with Mr. Gosz?
25  A   Probably two weeks to three weeks.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1039

```
 1   Q   Do you recall the manufacturer of the products the
 2       drywallers used there?
 3   A   No, I do not.
 4   Q   At the shopping center in Appleton, do you remember
 5       when that was, when that job -- when you were at
 6       the job site with Mr. Goss?
 7   A   It was in 1980, I believe, when they built the
 8       shopping center in downtown Appleton.
 9   Q   Do you recall the products -- who manufactured the
10       products the drywallers used there?
11   A   No, I do not.
12   Q   Do you recall when you were at the research center
13       with Mr. Goss when the drywallers were also there?
14   A   That was in the '80s, too.
15   Q   Do you recall who manufactured those products?
16   A   No, I cannot.
17   Q   Finally, the bank at Valley Fair, do you remember
18       when you were at that job site with Mr. Gosz?
19   A   Late '80s, early '90s.
20   Q   Do you recall who manufactured the products that
21       were used at that job site?
22   A   No.
23   Q   You talked -- you testified earlier quite a bit
24       about being around insulators throughout your
25       career when you worked with Mr. Goss.  Do you know
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1040

```
 1       who manufactured any of the pipe insulation?
 2   A   No, I do not.
 3   Q   Did that pipe insulation change in appearance from
 4       the '50s through the '80s?
 5   A   Yes, I believe so.  They went from spun glass, I
 6       think, to polyurethane.
 7   Q   Can you describe it to me, what it looked like and
 8       how it changed from differently?
 9   A   Well, the spun glass was spun glass, and it had a
10       wrapping around it.  And the polyurethane was just
11       like rubber.  And they were in lengths, too, and
12       they just slipped those over the pipes.
13   Q   I'm unfamiliar with spun glass.  What do you mean
14       by that?
15   A   I don't know exactly either what it is, but that's
16       what it looked like.  It's hard to describe what it
17       looked like, but it seemed to me like it was
18       insulation.  And it's just hard to describe.
19   Q   What was its texture?
20   A   Texture was prickly.  I'm trying to compare it with
21       something.  Just -- just can't.  It's hard to
22       describe what it looked like.
23   Q   Was it similar to insulation that you'd use in your
24       house, the yellow spongy-type insulation?
25   A   Yeah.  But it was more firm, and it had a paper
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1041

```
 1       wrapping around it.
 2   Q   And is that the insulation you recall being
 3       installed by the insulators when you worked with
 4       Mr. Goss throughout the '50s and '60s?
 5   A   Earlier, yeah.
 6   Q   And once it was installed on the pipe, you
 7       testified earlier that they put a tape around it?
 8   A   They taped the ends to keep -- most of it came in
 9       4-foot lengths and they tape the end, and they
10       would also staple it so the paper would cover it so
11       it would hold on to it.  It was slit down the
12       middle and they -- then they'd wrap it.
13   Q   Was it flexible?
14   A   No, that was not flexible.  They had to -- the
15       flexible stuff that they pasted joints with when
16       they made a 45- or 90-degree angle.
17           MR. BLACKSTOCK:  Okay.  Then go on to 49,
18       6.
19   BY MR. BLACKSTOCK:
20   Q   The insulation that you tore out of the various
21       facilities with Mr. Gosz that you spoke of earlier,
22       do you know who manufactured any of that
23       insulation?
24   A   No.
25   Q   Do you know any way how you could tell who
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1042

```
 1       manufactured the insulation once it's been
 2       installed?
 3   A   No.
 4   Q   Did you ever have an opportunity to see the boxes
 5       that any of the insulation came in?  During your
 6       career, did you have an opportunity to see any of
 7       the packaging that the insulation came in?
 8   A   Yes.  I recall seeing in the boxes where the stuff
 9       came in, Johns-Manville was on it.
10   Q   Do you recall seeing John -- Johns-Manville's pipe
11       insulation throughout your career with Mr. Goss?
12   A   Yes.
13   Q   Do you recall seeing any other manufacturers?
14   A   I don't recall, no.
15   Q   You testified earlier that you did a -- that you
16       did wear a respirator on a few occasions, correct?
17   A   I wouldn't -- what do you call a respirator?
18   Q   I apologize.  Do you recall putting a white mask on
19       on occasion throughout your career?
20   A   Yes.
21   Q   And you testified that was when you would cut brick
22       with a dry saw?
23   A   Right.
24   Q   You testified that because -- that was -- I
25       believe you termed it a heavy amount of dust?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1043

```
 1   A   Right.
 2   Q   When you were around the insulators, you didn't put
 3       one of those white masks on, correct?
 4   A   No.
 5   Q   Is it fair to say the amount of dust created from
 6       the dry brick sawing was more than the amount when
 7       you were around the insulators?
 8   A   I would say so, yes.
 9   Q   Why did you put the mask on around the brick
10       sawing?
11   A   Well, I guess it all depends upon which way the
12       wind was blowing from.  If the wind carried the
13       dust away, we probably didn't put one on.  But if
14       the wind hung around the -- congested around the
15       saw, you put it on because you couldn't breathe;
16       you're inhaling all the dust from the brick saw.
17   Q   How long did you work with Mr. Gosz?
18   A   Well, on and off for some 30 years.
19   Q   And can you testify, based on personal knowledge,
20       what company supplied asbestos-containing
21       insulation to which Mr. Gosz was exposed?
22   A   She's asking who supplied it.  The only one I can
23       recall is Johns-Manville.
24   Q   When you were talking about the insulation they
25       were wrapping around the pipes, were they ever
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1044

```
 1       using a more chalky-type insulation rather than the
 2       spun glass?
 3   A   Not that I can recall, no.
 4   Q   And you also talked about occasions where you'd
 5       wear the mask because it was dusty.  Were you told
 6       by someone to do that?
 7   A   No.  We did it on our own, I believe.
 8   Q   Did anyone ever tell you that you needed to wear a
 9       mask to protect yourself from asbestos?
10   A   They told us in later years that we should, yes.
11   Q   And did you once they told you to do that?
12   A   I don't believe I did, no.
13           MR. BLACKSTOCK:  Your Honor.
14           THE COURT:  Thank you.
15           MR. BLACKSTOCK:  This is the deposition
16       of Donald C. Popalisky, taken on June 13, 1980.
17   BY MR. BLACKSTOCK:
18   Q   Is your name Donald C. Popalisky?
19   A   Yes.
20   Q   Did I pronounce that right?
21   A   Yes.
22   Q   What is your home address?
23   A   4464 North Prospect.
24   Q   And what is your business address?
25   A   620 North 108th Place.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1045

```
 1   Q   Now, you are with Building Service Industrial Sales
 2       Co., Inc.?
 3   A   Building Service Industrial Sales Co., Inc.
 4   Q   What type of work did you put under the name
 5       Building Service Industrial Sales Co.?
 6   A   The sale and distribution of insulation products.
 7   Q   And when you started that company in 1952, were
 8       there any particular manufacturers that you worked
 9       with more than others?
10   A   It's Building Service Industrial Sales Co.  We
11       handled fiberglass, Owens-Corning Fiberglass
12       material.
13   Q   And other manufacturers that you worked through?
14   A   I don't recall.  We sold some insulation materials
15       for Eagle-Picher and Unarco.  Other than that, I
16       don't recall.
17   Q   Well, as we went through the years, was your main
18       manufacturer that you dealt with, was that
19       Owens-Corning Fiberglass?
20   A   Yes.
21   Q   Has that always been true from 1952 through the
22       present time?
23   A   Yes.
24   Q   And, say, in the mid-'50s and into the '60s, what
25       percentage of products that went through the
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1046

```
 1       partnership and then the corporation, the initial
 2       partnership was Building Service Industrial Sales
 3       Co. and then Building Service Industrial Sales Co.,
 4       Inc., what was the percentage of Owens-Corning
 5       Fiberglass products?
 6   A   I have no idea.
 7   Q   Was it 90 percent or in that area?
 8   A   You want me to guess.
 9   Q   I'd like your best estimate.
10   A   90 percent, 85 percent.
11   Q   During the '50s and '60s, did you have salesmen for
12       the company, the partnership and then its
13       successor, Building Service Industrial Sales Co,
14       inc., that went throughout the state selling
15       products?
16   A   Yes.
17   Q   And can you give us the names of the various
18       salesmen you had and their addresses, if possible?
19   A   I have the names Robert Friauf, George Leisenring.
20   Q   Those were the two during the '50s and '60s?
21   A   That's correct.
22   Q   And did they both work at the same time or at
23       different times?
24   A   Yes.
25   Q   At the same time?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1047

1  A   Yes.  One started a little bit earlier than the
2      other, but they both worked at the same time.
3  Q   Did the two men, Friauf and Leisenring, have
4      different territories?
5  A   Yes.
6  Q   Can you tell us the territories for each one as
7      best as possible?
8  A   Generally speaking, Friauf was northern part of the
9      state and Leisenring was in the southern.
10 Q   And specifically, what was their function?  What
11     was their job description?
12 A   Sell insulation products.
13 Q   And evidently, the main manufacturer that you
14     purchased from in the 1950s was Owens-Corning
15     Fiberglass, too?
16 A   Yes.
17 Q   Can you describe generally what type of product you
18     purchased from Eagle-Picher?
19         MR. BLACKSTOCK:  That's page 41.
20         THE WITNESS:  No.
21 BY MR. BLACKSTOCK:
22 Q   Can you describe the types of products you might
23     have purchased from Owens-Corning Fiberglass?
24 A   How many do you want?
25 Q   The ones you recall.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1048

1  A   Pipe covering, boiler covering, duct covering,
2      wallboard, insulation board, fiberglass cloth,
3      fiberglass yarn, fiberglass tapes.
4  Q   Very good.
5  A   With reference to Eagle-Picher, we did purchase
6      insulating cement from them.
7         MR. BLACKSTOCK:  Your Honor.
8         This is the deposition of Donald C.
9      Popalisky taken on March 25th, 1986.
10 BY MR. BLACKSTOCK:
11 Q   What's your occupation?
12 A   President of Building Service Industrial Sales.
13 Q   How long have you been president?
14 A   14, 18 years.  18 years maybe.
15 Q   Since 1964?
16 A   Um-hum.
17 Q   All right.  How long have you been --
18 A   Yes.  Yes.
19 Q   All right.  How long have you been employed by
20     Building Service?
21 A   Same time.
22 Q   Could you tell me, sir, what the nature of the
23     business of Building Service has been since 1964?
24 A   We are distributors of insulation products.
25 Q   All right.  Are you saying that 1964, to your

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1049

1      knowledge, the insulation that you supplied did not
2      contain asbestos?
3         MR. McCOY:  What page?
4         MR. BLACKSTOCK:  8.
5         THE WITNESS:  I'm saying that at that
6      time I did not know it had asbestos in it.
7  BY MR. BLACKSTOCK:
8  Q   Okay.  Have you later found out that it did?
9  A   In 1972, when they said it didn't.
10 Q   Do you want to tell me what that's all about?
11 A   Well, I saw a box in the warehouse, and it said no
12     asbestos.  And that was the first indication that I
13     had that there was any in it to start with.
14 Q   That was in 1972, about?
15 A   Latter part of '72, early '73.
16 Q   All right.  And am I right that when you saw that
17     in the warehouse, you said, well, that's odd, I
18     never thought it had any to begin with?
19 A   Yes.
20 Q   Okay.  So up until then, you didn't realize that
21     you had been selling asbestos products; is that
22     correct?
23 A   Yes.
24 Q   Did you about that time discontinue selling any
25     product that had asbestos in it?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1050

1  A   Yes.
2  Q   And would it be your testimony, then, that after
3      1972, there would have been no asbestos in your
4      insulating products?
5  A   To the best of my knowledge, no.
6  Q   All right.  Sir, I would like you to look at
7      Exhibit No. 12.  I see you have a copy in front of
8      you.  And I'd like to ask you, are you acquainted
9      with the companies that are named on Exhibit 12?
10 A   Not all of them.
11 Q   All right.  Let me go through them one by one.
12     Industrial Insulation, are you acquainted with
13     them?
14 A   Yes.
15 Q   Bartelt?
16 A   Yes.
17 Q   Bay?
18 A   Yes.
19 Q   Garrett?
20 A   No.
21 Q   Jaeger?
22 A   Yes.
23 Q   Northwestern?
24 A   Yes.
25 Q   ACandS, or Armstrong Contract & Supply?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI   1051

```
 1   A   Yes.
 2   Q   Hickory Insulation?
 3   A   No.
 4   Q   Asbestos and Magnesia?
 5   A   No.
 6   Q   Taylor Insulation?
 7   A   Yes.
 8   Q   McDermaid?
 9   A   Yes.
10   Q   Were all of the companies that you answered yes for
11       companies that you have supplied insulation to over
12       the years?
13   A   Yes.
14   Q   And to your knowledge, did you supply
15       asbestos-containing insulation to those companies?
16   A   No.
17   Q   All right.  Sir, I'd like to take one of these
18       files that happens to be up in front, and this
19       happens to be the Ray Insulation.  And you might as
20       well start with the first page, but there appear to
21       be pieces of paper stapled together.
22           Could you explain to me what those pieces
23       of paper are?
24   A   I don't know what it is.  This is the order we
25       wrote to credit the invoice.  There was credit due
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI   1052

```
 1       on the invoice.
 2   Q   What is the blue sheet?
 3   A   This is a copy of the invoice that was sent to the
 4       customer.
 5   Q   All right.  So when you would send the product to
 6       the customer, you would send along with it an
 7       invoice?
 8   A   No, this was made out later.  This went with it.
 9   Q   When you're saying "this" --
10   A   The yellow copy went with it.
11   Q   When you send the order to a customer, you would
12       send the yellow copy along with the order; is that
13       correct?
14   A   I'll put it this way:  That was the procedure.
15   Q   That was your customary procedure; is that right?
16   A   If it's shipped out by common carrier, we did not
17       send it out.
18   Q   All right.  If it was shipped by common carrier,
19       then what would you do?
20   A   We'd keep it in the office of the warehouse until
21       it was time to be invoiced.  This is the office
22       copy, the yellow.
23   Q   The yellows are the office copies?
24   A   Right.
25   Q   And what are the blue copies?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI   1053

```
 1   A   Blue copies are the actual invoice that went to the
 2       customer.  This is just -- this is an invoice that
 3       was sent out to them.  This is just a record of the
 4       fact that we sent it out so we have something to
 5       type the invoice from.  This never did go to the
 6       customer.
 7   Q   The yellow would be what you would keep?
 8   A   Right.
 9   Q   Would there be another document to the yellow sheet
10       that would accompany the order?
11   A   Should be.
12   Q   And then you would copy it to the invoice and bill
13       the customer off the invoice.  Do I have that
14       right?
15   A   This is a copy of the invoice that was sent to the
16       customer in the mail.  This is our bill to the
17       customer, a copy of it.
18   Q   That's the blue one that you're holding on to?
19   A   Right.
20   Q   All right.  So this would be your record of what
21       you sold to that particular customer; is that
22       correct?
23   A   On that day.
24   Q   Okay.  And the records in these various boxes and
25       those which you've agreed to produce would be
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI   1054

```
 1       records which would be kept in the ordinary course
 2       of business of Building Service; is that right?
 3   A   Yes, but we throw them away when it gets
 4       cumbersome.
 5   Q   Okay.  For some reason you held on to some.
 6   A   Well, we didn't mean to.
 7   Q   I realize that.  But for some reason you have them
 8       for certain years from 1961 to 1972.
 9   A   That's right.
10   Q   Okay.  And all these records were records which
11       were kept in the ordinary course of business; is
12       that correct?
13   A   Yes.
14   Q   And these records would be the best records
15       indicating your sales to particular customers; is
16       that right?
17   A   Yes.
18   Q   When you discovered in '72 or '73 that products
19       that you had been supplying might have contained
20       asbestos, did you do anything at all at that time?
21   A   We disposed of what we had in the warehouse.
22   Q   And did you have some in the warehouse?
23   A   Yes.
24   Q   Do you recall what products they were?
25   A   No.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1055

1    Q    Okay.  And then you made certain you didn't have
2         any in the future; is that right?
3    A    Yes.
4    Q    How did you determine that they were
5         asbestos-containing products that you had in your
6         warehouse?
7    A    Well, we were told that they contained asbestos
8         through a certain period of time, and anything that
9         we had that came in in that time that we had left,
10        we threw away.
11   Q    By "they," who is "they"?
12   A    The manufacturer told us when they discontinued
13        putting asbestos in it.
14   Q    Who is that manufacturer?
15   A    Fiberglass.
16   Q    Owens-Corning?
17   A    Yes.
18   Q    Do you recall what period of time it was through?
19   A    Late '72.
20   Q    It was through that period of time that they
21        contained asbestos.
22   A    Yes.
23   Q    Okay.  So you then disposed of everything prior to
24        that time?
25   A    Yes.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1057

1    Q    Was that at your own volition?
2    A    Yes.
3    Q    And Building Service took the loss for that
4         disposal of any product?
5    A    Yes.
6    Q    Mr. Popalisky, when you were distributing these
7         products to certain contractors, was there any
8         agreement you had with these contractors that you
9         would be their exclusive supplier of those
10        products?
11   A    No.
12   Q    Is there any reason that you would imagine that you
13        were their exclusive supplier of products?
14   A    No.
15   Q    Do you know for a fact that you were not their
16        exclusive supplier?
17   A    Yes.
18   Q    So many of these contractors would buy products
19        from not only you but other distributors; is that
20        right?
21   A    Other manufacturers.
22   Q    Other manufacturers.
23             Now, your distribution area included most
24        of Wisconsin, except for the western part of
25        Wisconsin and Rockford, Illinois.  Within that

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1056

1    Q    Sir, am I correct that Building Service has never
2         been a distributor of Johns-Manville products?
3    A    No.
4    Q    I'm correct?
5    A    Yes.
6    Q    You've made a search of your records, and you did
7         not find any records for the year '66 through '71.
8         Would that be accurate to say?
9    A    Nothing that's on here.
10   Q    Do you have any records after 1972?
11   A    Yes.
12   Q    Would you have them for the year '73 on forward?
13   A    I should have.
14   Q    Do you have anything prior to 1961?
15   A    No.
16   Q    I believe sometime in 1972 you disposed of any
17        products you had in your warehouse that contained
18        products?
19   A    Say that again.
20   Q    You disposed of any products in your warehouse.
21   A    Date, please.
22   Q    1972.
23   A    In the latter part of '72, when we found out they
24        had asbestos, we disposed of them.  Not prior to
25        '72.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1058

1         market area, were you the exclusive distributor?
2    A    For fiberglass.
3    Q    For fiberglass.  Are you familiar with Keene
4         Corporation?
5    A    No.
6    Q    Are you familiar with Celotex Corporation?
7    A    I know the name.
8    Q    Have you ever distributed their products?
9    A    No.
10   Q    Are you familiar with the Fibreboard Corporation?
11   A    No.
12   Q    Are you familiar with the H.K. Porter Company?
13   A    No.
14   Q    Are you familiar with the Owens Illinois Company?
15        That's not the same as Owens-Corning Fiberglass, if
16        you're wondering.
17   A    I've heard that name.
18   Q    Have you ever distributed their products?
19   A    No, no business with them so far.
20   Q    Are you familiar with the Pittsburgh-Corning
21        Corporation?
22   A    No.
23   Q    Are you familiar with Pabco Products?
24   A    How do you spell it?
25   Q    P-A-B-C-O?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1059

1   A   I am now.

2   Q   Have you distributed their products?

3   A   No.  Pardon me.  We have.  In the last four years,

4       we've sold some.

5   Q   To clarify one thing, when you were referring to

6       exclusive distributorship before, you meant

7       Owens-Corning Fiberglass company?

8   A   Right.  We were exclusive except for house

9       accounts.

10  Q   And by that you mean that you were supposed to be

11      the only supplier of Owens-Corning Fiberglass

12      products in the area that you have mentioned,

13      except for people that bought directly from the

14      company?

15  A   That's right.

16          A JUROR:  Can we have a break to go to

17      the bathroom?

18          THE COURT:  Yes.  You're in between

19      people?

20          MR. BLACKSTOCK:  Yes, I'm going between

21      depositions.

22          THE COURT:  You have finished with Mr.

23      Popalisky?

24          MR. McCOY:  We have more.

25          THE COURT:  You have more from Mr.

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1060

1       Popalisky?

2          MR. McCOY:  Yeah.  I think there's five

3       in total maybe.

4          THE COURT:  Let's take a break.  Ladies

5       and gentlemen, ten minutes.  Please give us a

6       doorbell ring at 11:30.

7          Oh, ladies and gentlemen, three rules of

8       who not to talk to, what not to do.  Leave your

9       notepads right on your chairs.  We'll see you at

10      11:30.

11          LAW CLERK:  All rise for the jury.

12          (Whereupon, the following proceedings

13      were held outside the presence of the jury:)

14          THE COURT:  Please be seated.  We're

15      still on the record.

16          Anything else for the record at this

17      time, Mr. McCoy?

18          MR. McCOY:  No, Judge, except when we do

19      finish the read-in depositions, we do have to make

20      sure our exhibits are complete for the plaintiffs.

21          THE COURT:  Okay.  And, Mr. Laffey,

22      anything for right now?

23          MR. LAFFEY:  Nothing at this time, Judge.

24          THE COURT:  So we expect to finish the --

25      all -- you're on your last witness, is that right,

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1061

1       Mr.-- Mr. McCoy, Mr. Blackstock, for the

2       depositions?

3          MR. McCOY:  Yes.

4          THE COURT:  And you have three more

5       transcripts of Mr.-- the elder Mr. Popalisky,

6       right?

7          MR. BLACKSTOCK:  Yes, that's correct.

8          THE COURT:  And then that's the end of

9       your evidence other than the exhibits?

10          MR. McCOY:  Right, and our stipulation on

11      the sale records.

12          THE COURT:  Yes.  Good point.  Okay.

13      Thanks.  Well, we'll see everyone at 11:30.

14          (A recess was taken.)

15          THE COURT:  Okay.  We're on the record.

16      Mr. McCoy.

17          MR. McCOY:  Yes.  In the testimony we

18      just heard of Donald Popalisky, there was reference

19      to the Building Services invoices being kept in the

20      ordinary course of business, and I had not heard,

21      until earlier today, any objection to the actual

22      invoices that we're using to prepare those

23      summaries.  The only -- and I heard that for the

24      first time today.  Now -- although we had discussed

25      this stipulate -- this proposed stipulation now

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1062

1       throughout the trial, Judge.

2          The only gap that I see missing, if there

3       is one from an evidentiary foundation, is that the

4       invoices we're using are the ones that Building

5       Services had had in its files.  The person who

6       actually provided those invoices to my firm was

7       their previous attorney, Laura Schuett, who at the

8       time was with Crivello Carlson.  Now I believe

9       she's with -- she might be with the Whyte

10      Hirschboeck firm, but I don't --

11          THE COURT:  Mr. Laffey?

12          MR. LAFFEY:  No, she is not.  She is with

13      the Crivello firm.  I'm with the Whyte Hirschboeck

14      firm.

15          MR. McCOY:  My confusion, Judge.  I

16      apologize.  So she is with the Crivello Carlson

17      firm now.

18          THE COURT:  Oh, I see.  She left Whyte

19      Hirschboeck to go --

20          MR. LAFFEY:  No, no.  Cook & Franke to

21      Crivello Carlson.  The records -- the deposition

22      that Mr. McCoy is referencing is from 20 years ago.

23      Ms. Schuett was not the attorney of record, but

24      Cook & Franke apparently was.  And I know that when

25      I inherited this -- this account, I got CDs with

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1063

1    records on it, and I think that's what Mr. McCoy is
2    referring to that he got, and that came from Laura
3    Schuett.
4            THE COURT:  Okay.
5            MR. LAFFEY:  Now, just to clarify, we
6    briefed this issue, and in our brief filed a week
7    ago, or shortly before that even, we clearly raised
8    the 908.03 issue on the record, in addition to
9    every other problem that we've raised with the use
10   of the summaries themselves.
11           THE COURT:  Okay.  Also, I don't recall
12   that -- I mean, what I recall Mr. Popalisky saying,
13   and we will -- we've got the transcript, is simply
14   that there were some records and there were some
15   missing, but it's not like any were identified at
16   that time by the witness.  So thanks for pointing
17   that out, and that is something we'll take into
18   account.
19           MR. McCOY:  And what I'm saying, Judge,
20   is to the extent that the records themselves, the
21   custody of those, the custody is from the attorneys
22   who were representing Building Services, that's who
23   gave them to -- or allowed my firm to have them
24   copied and that was what was put on the CDs.
25           THE COURT:  I understand that.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1064

1            MR. LAFFEY:  And that's correct.  But
2    beyond that, I certainly am not going to sit here
3    and represent the other -- other foundation to that
4    because I don't think I or even Ms. Schuett has
5    that foundation because it all predated our
6    involvement with this -- with this material.  I
7    have no idea.
8            THE COURT:  Okay.  We'll bring in the
9    jury, then.  Bring in the jury.
10           LAW CLERK:  All rise for the jury.
11           (Whereupon, the following proceedings
12   were held in the presence of the jury:)
13           THE COURT:  Please be seated.
14           Okay.  Welcome back, ladies and
15   gentlemen.  Now we are ready to continue.
16           And, Mr. Blackstock, who's next?
17           MR. BLACKSTOCK:  This is Donald C.
18   Popalisky again, a deposition taken March 17th,
19   1987.
20   BY MR. BLACKSTOCK:
21   Q    Okay.  Did you personally do sales during those
22        partnership years?  I'm talking now from 1952,
23        apparently, until 1964.  Did you?
24           MR. McCOY:  What page?
25           MR. BLACKSTOCK:  15.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1065

1            THE WITNESS:  Yes.
2    BY MR. BLACKSTOCK:
3    Q    Did you have any specific customers that you've
4         considered your sales customers?
5    A    No.
6    Q    What kind of products did your company sell in
7         those years?
8    A    Basically glass products and accessory items.
9    Q    What type of glass products are we talking about?
10   A    Fiberglass board, pipe covering.
11   Q    Do you recall from whom you purchased the
12        fiberglass insulation?
13   A    Owens-Corning Fiberglas.
14   Q    Let's take the decade from 1950 -- well, let's take
15        the years from 1952 up to 1960, up to it.
16           Have you any independent recollection
17        that your company dealt in Kaylo during that
18        period?
19   A    Yes.
20   Q    Let's put it this way:  Did you only deal with
21        Owens-Corning in getting insulation supplies?
22   A    Yes.
23   Q    That was your only company from 1950 on -- 1952 on
24        that you ordinarily --
25   A    Are you talking about '52 or -- on, or are you

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1066

1         talking about all the way up to 1973?
2    Q    No, no, I'm taking the -- let's take that era again
3         of 1952 to 1959.
4    A    Yes.
5    Q    Let's direct ourselves only to that.
6            Was Owens-Corning Fiberglas the only
7         company, or essentially the only company, from whom
8         you bought the product that you were purveying in
9         your partnership?
10   A    We bought the Unarco product.
11   Q    What products did you buy from Unarco?
12   A    High-temperature insulation.
13   Q    Do you remember the name of that high-temperature
14        insulation?
15   A    I do now, but I didn't then.
16   Q    What was that product?
17   A    It was Unibestos.
18   Q    When did you start to buy Unibestos?
19   A    I don't recall.  Early part of the period.
20        That's -- that's all I can --
21   Q    The early what?
22   A    The early part of the period, but I don't remember
23        when.
24   Q    And was that -- Unarco's Unibestos insulation pipe
25        insulation?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1067

```
 1   A   Yes.
 2   Q   You have a personal recollection earlier in that
 3       period, you started -- you purveyed Unibestos?
 4   A   I sold -- our company sold Unarco.  Bob Friauf
 5       handled the high-temperature insulation, which is
 6       what this product is.
 7   Q   But your company did sell it?
 8   A   We sold Unarco.  It's a high-temperature
 9       insulation.  I didn't know what the generic name
10       was for it.
11   Q   You have learned since --
12   A   I have learned since --
13   Q   -- that it was Unibestos.
14   A   Right.
15   Q   When you said Owens-Corning, you said you had
16       bought product from Owens-Corning.
17   A   Yes.
18   Q   There's a company called Owens-Corning Fiberglass
19       Company.  Is that the company we're both talking
20       about when you say "Owens-Corning"?
21   A   That's my understanding, yes.
22   Q   Okay.  When you were distributing their products in
23       the partnership, do you know -- do you know if you
24       had an exclusive right of distribution in any
25       territory?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1069

```
 1   A   Not to the best of my knowledge.
 2   Q   Do you know whose insulating cement you bought?
 3   A   We bought Eagle-Picher.
 4   Q   Do you remember the company named Eagle-Picher.
 5   A   That's correct.
 6   Q   That's correct.  And you do remember it -- sometime
 7       selling their cement.  That's correct?
 8   A   Correct.
 9   Q   Did your company sell the products of
10       Johns-Manville Corporation?
11   A   No.
12   Q   Never?
13   A   No.
14   Q   Did your company sell the products of Raymark?
15   A   No.
16   Q   Or Raybestos products?
17   A   No.
18   Q   Did you sell the products of Nicolet Insulation?
19   A   No.
20   Q   Forty-Eight Insulation?
21   A   I don't remember.
22   Q   Standard Insulation?
23   A   No.
24   Q   Do you know when asbestos was removed from
25       insulation products?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1068

```
 1   A   No, we did not.
 2   Q   You're answering that you -- you, in effect, are
 3       saying that you knew what your arrangement was and
 4       it was not an exclusive right of distribution.  Is
 5       that correct?
 6   A   I don't know.  I don't know what our arrangement
 7       was, but it was not exclusive.
 8   Q   When you said "fiberglass," you're using the
 9       popular name by which Owens-Corning Fiberglass was
10       known, correct?
11   A   Yes.
12   Q   By the way, I'd like to go in -- did you handle
13       both Kaylo pipe covering and Kaylo block?
14   A   Yes.
15   Q   And would that be essentially during the period
16       that you handled -- that you have some recollection
17       of handling Kaylo?
18   A   Yes.
19   Q   Have you, prior to this time, made any examination
20       to find out what other companies you -- from whom
21       you had purchased products?  And I'm talking about
22       the corporation now.
23   A   We bought insulating cement.
24   Q   Did Owens-Corning Fiberglass provide an insulating
25       cement?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1070

```
 1   A   I was told when Fiberglass removed from --
 2   Q   When, meaning --
 3   A   When Fiberglass removed asbestos, I was told that
 4       they did it in late 1972.
 5   Q   Meaning when you say "Fiberglass" --
 6   A   Owens-Corning Fiberglass.
 7   Q   Owens-Corning Fiberglass.  Do you know why they
 8       took it out in '72?
 9   A   I know how.  I didn't then.  I didn't even know it
10       was in there.
11   Q   What do you know now about why they did it?
12   A   They took it out because asbestos was in the
13       product.
14   Q   So someone from Johnson would call you or you would
15       call someone at Johnson & Johnson and Johnson would
16       place an order for X rolls of Z material?
17   A   Yes.
18   Q   There would be no discussion, as a rule, with you
19       about what they were using it for or how they were
20       going to put it on?
21   A   No.
22   Q   No, there would be no discussion?
23   A   No, there would be no discussion.
24   Q   Would the person you had contact with at Johnson,
25       or whatever the purchaser's name, would that person
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1071

1    tell you where to deliver it?
2  A  Yes.
3  Q  And would the delivery site differ because of the
4     differing project sites of the applicator?
5  A  Yes.
6        MR. BLACKSTOCK:  All right.  I think
7     we're done with that one.
8           This is the deposition of Donald
9     Popalisky taken on December 16, 1992.
10 BY MR. BLACKSTOCK:
11 Q  Just so the record is clear, it's Building Service,
12    not Building Services.  Excuse me.
13           And could you tell me the year, sir, that
14    Building Service was founded?
15 A  I think it was 1951.
16 Q  And the initial location of the building was where?
17 A  620 North 108th Place.
18 Q  In the city of Milwaukee?
19 A  Yes.  But I think maybe it started before when we
20    were down on North 8th Street.  I don't remember
21    the address.
22 Q  The initial organization, Building Service
23    organization, Building Service, was that formed as
24    a partnership --
25 A  Yes.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1072

1  Q  -- and the partners were just you and Mr. Rachlin?
2  A  Yes.
3  Q  Okay.  Now, are you saying you didn't become a
4     distributor of Owens-Illinois?
5  A  No, we were not a distributor of Owens-Illinois,
6     but Owens-Corning Fiberglass was a distributor of
7     Owens-Illinois, as I understand it, and they had
8     Kaylo.  And when Fiberglass had it, we bought some
9     prior to the time, but we were not a distributor
10    for them.
11 Q  Did Building Service ever become a distributor for
12    Owens-Corning Fiberglass with regard to the Kaylo
13    product line?
14 A  Not exclusive.
15 Q  How about nonexclusive?
16 A  I guess we were distributors.  We sold their
17    product.
18 Q  Would you agree, sir, that the records that are
19    maintained at that office are not complete records
20    regarding sales and distribution of Kaylo
21    products --
22 A  Yes.
23 Q  -- during the life of the partnership?
24 A  Yes.
25 Q  Do you have complete records regarding the sale of

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1073

1     Kaylo product that took place after the formation
2     of the corporation?
3  A  No.
4  Q  Did you ever have a record retention policy of some
5     kind?
6  A  No.
7  Q  So when that order came in, the ordinary course of
8     business at Building Service would be to send an
9     order to Owens-Corning Fiberglass for the specific
10    product requested?
11 A  Yes.
12 Q  And that is based upon your knowledge and the
13    operation of this business during the 1960s, true,
14    sir?
15 A  To the best of my knowledge.
16        MR. BLACKSTOCK:  73.
17 BY MR. BLACKSTOCK:
18 Q  When is the last year that Building Service
19    Industrial Sales Company, Inc., sold
20    asbestos-containing insulation materials?
21 A  Probably early part of 1972.
22 Q  When did you first become aware of hazards that may
23    be caused by the exposure to asbestos dust?
24 A  In early 1972.
25 Q  That is the first time you became aware of that?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1074

1  A  Yes.
2  Q  Are you aware, you personally aware, of any
3     warnings that may have been contained on cartons
4     containing Kaylo product that was purchased by
5     Building Service, the corporation?
6  A  No.
7  Q  Building Services, the partnership, never
8     formulated any warnings on its own relating to
9     asbestos and exposure to asbestos, true?
10 A  No.
11 Q  The corporation Building Services Industrial Sales
12    Company, Inc., never formulated any warnings
13    relating to exposure to asbestos, true?
14 A  Well, yes.  My previous answer would be yes to --
15 Q  I'm sorry?
16 Q  You said the statement only with reference to the
17    partnership, and I said no; it should be yes.  We
18    did not know anything about it.
19 Q  You didn't formulate any warnings?
20 A  We did not formulate any warnings.
21 Q  Neither the partnership nor the corporation?
22 A  Correct.
23        MR. BLACKSTOCK:  This is the deposition
24    of Donald Popalisky taken on October 4, 1996.
25

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1075

BY MR. BLACKSTOCK:

1  BY MR. BLACKSTOCK:
2  Q    Okay.  All right.  The Industrial Sales Company,
3       did it provide insulation products since it was
4       formed back in about 1951?
5  A    Yes.
6  Q    What geographic territory was -- would you consider
7       to be its sales area?
8  A    State of Wisconsin.
9  Q    What about outside the state of Wisconsin?  Did you
10      have -- was there any significant sales of
11      insulation products?
12 A    There was fiberglass.
13 Q    Was most of the sales of Industrial Sales Company
14      by orders that were placed by customers?
15 A    Yes.
16 Q    Can -- withdraw that.
17              Was it the customers who chose what type
18      of insulating materials would be supplied, or did
19      you or someone at Industrial Sales Company make
20      that determination in most cases?
21 A    Customer determined.
22 Q    So it was pursuant to some customer specification
23      that product was obtained by Industrial Sales
24      Corporation for most of the sales.  Would that be
25      correct?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1076

1  A    You'll have to repeat the question.
2  Q    Was most of the product obtained by Industrial
3       Sales Company pursuant to some specification by the
4       customer?
5  A    Yes.
6  Q    Would the customer normally specify a brand name
7       for insulating products, or would they specify a
8       type of insulating product?
9  A    They specified the type of product.
10 Q    Did the customers ever specify specific suppliers?
11 A    No.
12 Q    So that the choice of the supplier was made by
13      Industrial Sales Company; is that right?
14 A    No.  It was whatever the specified product was
15      specified, that's what we sold them.
16 Q    Okay.
17 A    I would say that is generally really true, but
18      normally we sold fiberglass.
19 Q    Okay.  What was the nature of the relationship --
20      was there a written contract about this
21      relationship between Industrial Sales Company and
22      Owens-Corning Fiberglass?
23 A    With reference to what?
24 Q    With reference to any part of this business
25      relationship.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1077

1  A    Yes, we had an arrangement with them to sell
2       fiberglass.
3  Q    Did it list any particular type of products that
4       were governed by the contract?
5  A    Fiberglass products.
6  Q    What other products were listed besides fiberglass?
7  A    That's all.
8  Q    What kind of fiberglass products did the contract
9       specify?
10 A    Owens-Corning Fiberglass.
11 Q    But what types of products did you specify?
12 A    Just glass.
13 Q    Did it say "glass" or "fiberglass"?
14 A    It said fiberglass.
15 Q    Do you have any reason today to believe that any
16      prior testimony you've given about the sales of the
17      asbestos-containing products is inaccurate?
18 A    All I can remember is that 90 percent of the
19      products we sold were fiberglass.
20 Q    What information did you provide to the customers
21      of Industrial Sales Company about health hazards of
22      asbestos?
23 A    Didn't know about them.
24 Q    So is your answer that there was no --
25 A    There was none.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1078

1  Q    Sir, is it accurate to -- for me to say that in
2       1972 -- am I right in saying that in 1972
3       industrial Sales Company stopped selling any
4       asbestos-containing products?
5  A    I don't know the exact date, but that was
6       approximate.
7  Q    Did Owens-Corning Fiberglass provide information
8       about the health hazards of fiberglass?
9  A    No.
10 Q    How many employees did Industrial Sales Company
11      have in about 1960?
12            MR. McCOY:  What page?
13            MR. BLACKSTOCK:  47.
14            THE WITNESS:  How many what?
15 BY MR. BLACKSTOCK:
16 Q    Employees.
17 A    Three, four.
18 Q    And how many employees did Industrial Sales Company
19      have in about 1970?
20 A    Approximately the same.
21 Q    Were you one of the employees in about 1960?
22              Is your answer yes?
23 A    Yes.
24 Q    And were you also one of the employees in about
25      1970?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1079

```
 1   A   Yes.
 2   Q   Okay.  Do you have any knowledge today about health
 3       hazards of asbestos?
 4           MR. McCOY:  What page?
 5           MR. BLACKSTOCK:  64.
 6           THE WITNESS:  Do I have any knowledge
 7       today?  Yes.
 8   BY MR. BLACKSTOCK:
 9   Q   Okay.  And could you describe for us what your
10       general knowledge is today?
11   A   Well, my general knowledge, I guess, is I know it
12       causes asbestosis, and it's called mesothelioma.
13   Q   And how did you -- when did you first acquire the
14       knowledge that you have today?
15   A   In 1972.
16   Q   And how did you acquire that knowledge?
17   A   I saw it on a box when it said "no asbestos."
18   Q   Did the box tell you about --
19   A   No.
20   Q   -- the asbestosis or the mesothelioma?
21   A   It just said "asbestos-free."
22   Q   Okay.  So how did you learn about the diseases --
23       diseases asbestosis and the mesothelioma?
24   A   Well, I read it in the paper.
25   Q   Okay.  And when did you read it in the paper?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1080

```
 1   A   I don't know.
 2   Q   Which paper was it published in?
 3   A   I don't know.
 4   Q   Was this on the -- which manufacturers' boxes were
 5       you looking at when you saw the statement that said
 6       "no asbestos" or "asbestos-free"?
 7   A   Fiber- -- Fiberglass Kaylo.
 8   Q   What did you do when you saw the statement that
 9       said "no asbestos" or "asbestos-free"?
10   A   I asked the company about it.
11   Q   Okay.  And what questions did you put to the
12       company?
13   A   I just asked them why they stopped putting asbestos
14       in it.
15   Q   And what was the answer that you got?
16   A   Just they reflected it was harmful.
17   Q   And whom did you speak to?
18   A   I don't -- no -- no idea.
19   Q   But it was someone from Owens-Corning Fiberglass
20       that spoke to you?
21   A   It was from the local Fiberglass office.
22   Q   And when you say "Fiberglass," you mean
23       Owens-Corning Fiberglass?  Is the answer --
24   A   Yes.
25   Q   And did you have this conversation shortly after --
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1081

```
 1   A   I don't know.
 2   Q   My question is, did you have this conversation with
 3       the person from Owens-Corning Fiberglass soon after
 4       you saw the boxes marked "no asbestos" or
 5       "asbestos-free"?
 6   A   Yes.
 7   Q   And after you had the -- was there anything else
 8       that the person from Owens-Corning Fiberglass'
 9       office told you about the asbestos?
10           You can answer.
11   A   No.
12   Q   Okay.  What actions did you take after this
13       conversation with the person from Owens-Corning
14       Fiberglass's office?
15   A   We disposed of it.
16   Q   And when you say "disposed of it," what do you mean
17       by "it"?
18   A   We threw away the material that was not -- not
19       asbestos-free.
20   Q   When you spoke to the person from the Owens-Corning
21       Fiberglass office, did they explain what they meant
22       by the term "harmful"?
23   A   No.
24   Q   Did anything else happen because of your learning
25       that the asbestos was harmful?
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1082

```
 1   A   We disposed of it.  I don't know who disposed of
 2       it.
 3   Q   And the best of your recollection is that was
 4       sometime around 1972.  Is that --
 5   A   About that time, yes.
 6   Q   Well, my question is, though, did Industrial
 7       Sales --
 8   A   No, we didn't provide any information.  The
 9       manufacturer supplied the information.
10   Q   But you discontinued selling the asbestos?
11   A   No, I -- no, we didn't sell that asbestos.
12   Q   After the note was received from Owens-Corning
13       Fiberglass, did Industrial Sales Company take any
14       action to notify its customers about the health
15       hazards of asbestos?
16   A   I don't know anything about the health hazards of
17       asbestos.  I still didn't know what they had
18       said -- just said -- proposed -- they just said the
19       words to the effect that it was asbestos-free, and
20       I asked them why, and they just said it was harmful
21       to the lungs.  And they were about as vague as I
22       was.
23   Q   Okay.  So they did not provide any specific
24       information about the diseases at that time?
25   A   No.
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1083

1  Q   Mr. Popalisky, I'd like to ask you some questions
2      related to some of the questions that Mr. McCoy was
3      asking you for clarification purposes.
4          You spoke in your testimony about a
5      contract with Owens-Corning Fiberglass for
6      fiberglass products.  Did that contract pertain
7      exclusively to products that contained fiberglass?
8  A   Yes.
9  Q   Mr. Popalisky, with respect to the testimony that
10     you gave concerning the contract with Owens-Corning
11     where you indicated it was for fiberglass products,
12     what did you mean when you said "fiberglass
13     products"?
14 A   I mean Owens-Corning Fiberglass made out of glass.
15 Q   What do you mean by "glass"?
16 A   Well, common terminology for pipe covering now is
17     glass.
18 Q   Did that glass product contain any asbestos, to
19     your knowledge?
20 A   No.
21 Q   So the contract you had with Owens-Corning dealt
22     with products which did not contain asbestos; is
23     that right?
24 A   Right.
25 Q   What percentage of your company's business was

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1084

1      related to the sale of fiberglass products as
2      opposed to asbestos products?  Was what?
3  A   85 to 90 percent.  90 percent probably.
4  Q   Was what?
5  A   Was not fiberglass.  It was other products other
6      than fiberglass.
7  Q   You mean --
8  A   90 percent of our sales were glass fiber pipe
9      covering.
10 Q   Did the glass fiber pipe covering contain asbestos?
11 A   No.
12 Q   Well, let me ask you this:  Did Building Service
13     have any exclusive arrangement with Owens-Corning
14     Fiberglass as to the sale of asbestos products in
15     this area?
16 A   No.
17 Q   To your knowledge, did anyone else sell
18     Owens-Corning asbestos-containing products in
19     Wisconsin?  To your knowledge, did anyone else
20     within the state of Wisconsin sell Owens-Corning
21     asbestos-containing product?
22 A   Yes.
23 Q   Who?
24 A   Armstrong, ACandS, and Sprinkmann and board
25     manufacturer up north.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1085

1  Q   To your knowledge, did Owens-Corning Fiberglass
2      also sell products into the State of Wisconsin
3      directly?
4  A   Yes.
5  Q   Did Owens-Corning Fiberglass have to go through you
6      for all the sales in Wisconsin?
7  A   No.
8  Q   Are you aware of any other Wisconsin company that
9      had an Owens-Corning Fiberglass distributor
10     arrangement with respect to asbestos-containing
11     product?
12 A   Well, Sprinkmann got the material from Peoria and
13     shipped it in here.  And ACandS had agreement.
14     Weinberger had a house account, as they called it.
15 Q   Now, you told Mr. McCoy about the size of your
16     company and how many employees it had both in the
17     '60s and today.  Were any of those three or four
18     employees in your company called -- in your company
19     medical doctors?
20 A   No.
21 Q   Did your company employ any scientists?
22 A   No.
23 Q   Where did your company obtain the information it
24     needed to know about the products it sold?
25 A   From the manufacturers.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1086

1  Q   If there would have been something wrong with a
2      product that you were selling, who, if anyone,
3      would you have expected to tell you about that?
4  A   Manufacturers.
5  Q   Is Owens-Corning a big company?
6  A   Yes.
7  Q   What, if any, reliance did you place on
8      Owens-Corning to inform you about the products that
9      Owens-Corning was manufacturing?
10 A   Complete reliance.
11 Q   Now, Mr. McCoy asked you some questions about a
12     time when you saw something that said
13     "asbestos-free" on some Owens-Corning products.
14         Prior to that time, had Owens-Corning or
15     any other manufacturer advised you that there could
16     be any potential health hazards related to
17     asbestos-containing products?
18 A   No.
19 Q   Your answer was?
20 A   No.
21 Q   When you asked Owens-Corning why they stopped
22     putting the asbestos in the products and they
23     responded because it was harmful, did they give you
24     any details on that?
25 A   No.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1087

1  Q  After that point in time, did your company sell any
2     asbestos-containing products?
3  A  Not -- not the asbestos.  We sold the asbestos-free
4     product.
5  Q  After the point in time when you had the
6     conversation with Owens-Corning Fiberglass about
7     why asbestos was removed from their product, did
8     you sell any asbestos-containing products?
9  A  No.
10 Q  Did you maintain any asbestos-containing products
11    in your warehouse after that point in time?
12 A  To the best of my knowledge, they were destroyed.
13 Q  Mr. McCoy asked you a question concerning whether
14    you had ever asked anyone at Owens-Corning
15    Fiberglass about potential health hazards of
16    asbestos, and you said you did not.  Can you tell
17    us why?
18 A  I had no reason to.  I didn't even know what
19    asbestos was or anything else as far as -- I mean,
20    I -- as far as being in the product.
21 Q  Mr. McCoy asked you whether you had ever been on
22    any jobs for Owens-Corning Fiberglass, and you
23    indicated that you had.  And then I wanted to ask
24    you a clarification question, and Mr. McCoy
25    wouldn't let me.  Let me ask you that question now.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1088

1     With respect to any of those jobs that
2     you had been on which involved Owens-Corning
3     Fiberglass products, did any of those jobs involve
4     an asbestos-containing product, to your knowledge?
5  A  No.
6  Q  Okay.  You indicated in an answer to Mr. McCoy's
7     question that you had been on jobs where
8     Owens-Corning Fiberglass products were present.
9     What kind of products were present when you were on
10    those jobs?
11 A  Glass products.
12 Q  When you say "glass products" --
13 A  I meant manufactured by Fiberglass or for -- they
14    were strictly glass products without anything in
15    them.
16 Q  When you say "strictly glass products," you're
17    saying that they were not asbestos-containing
18    products?
19 A  Correct.
20 Q  Mr. Popalisky, did your company ever install any
21    asbestos-containing products?
22 A  No.
23 Q  Did your company ever manufacture any
24    asbestos-containing products?
25 A  No.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1089

1  Q  When you purchased products from a manufacturer to
2     be sold to customers, were there occasions when
3     those products were shipped directly from the
4     manufacturer to the customer without coming to your
5     offices?
6  A  Yes.
7  Q  How common of an occurrence was that?
8  A  It was not unusual.
9  Q  Did your company ever belong to any trade
10    associations?
11 A  No.
12 Q  You answered several of his questions concerning
13    products that he asked you which came from those
14    invoices that he was reading the numbers off of and
15    said that -- and said that would have been glass.
16    What did you mean by that vis-a-vis whether that
17    product contained asbestos?
18 A  Just that was manufactured from glass.
19 Q  And what does that mean as to whether the product
20    contained asbestos or not?
21 A  It had no asbestos in it.
22 Q  I just want to make sure, Mr. Popalisky.  The
23    conversation that you had with the Owens-Corning
24    representative that you've testified about, that
25    came after you saw packages marked "asbestos-free"?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1090

1  A  Yes.
2  Q  You've talked about something called a house
3     account --
4  A  Yes.
5  Q  -- with Owens-Corning Fiberglass.  What is a house
6     account?
7  A  A house account is where the manufacturer sells
8     direct to another manufacturer, which -- or which
9     in this case a Fiberglass person sold the product
10    direct from the Fiberglass Corporation to the
11    Weinberger Corporation.
12 Q  So a house account is a sale directly from the
13    manufacturer to a customer?
14 A  Right.
15         MR. BLACKSTOCK:  That's the last
16    deposition, Your Honor.
17         THE COURT:  Ladies and gentlemen, it's
18    time for your break for lunch.  I'm going to make
19    another more than an hour lunch break again.  It
20    will be -- 1:30 is when we'll need you back.  At
21    this time return to our regular jury room upstairs
22    where you were just now.
23         Mr. McCoy, you may step down.  And -- but
24    before you go, there are some things I'd like to
25    discuss.  Our schedule, you know, we hope to be

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1091

1    able to let you go early this afternoon to return
2    tomorrow morning for the final aspects of the work.
3           It's important that over lunch, you
4    remember, of course, the same rules that you're
5    about to hear again.  But it's also important this
6    afternoon, once the evidence is completed, that you
7    recognize that you really still, even though you've
8    been hearing evidence now all of Wednesday,
9    Thursday, and Friday and then Monday, that even
10   with all the evidence, you still only have about
11   half the story because you haven't seen the
12   questions on the verdict form.
13          So it's important that you not begin to
14   think that it's okay to start asking other people
15   anything to fill out your information base or to
16   discuss it amongst yourselves or even to say
17   anything to someone else about the case.
18          You do not know -- or you will not know,
19   once the evidence is done, or feel comfortable
20   knowing, that you've got everything you need,
21   particularly since you don't know what the
22   answers -- what the questions are that you're going
23   to be asked.
24          And if you need a little more
25   information, I know where you'll be able to get it.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1092

1    And I know that it's not from saying anything to
2    anyone else about the case.  It's not from looking
3    up something in -- some word in the dictionary.
4    It's not from any browsing on the Internet.  It's
5    not from going any place to look at anything.  It's
6    not from striking up a conversation with the people
7    in the court case.
8           The way that you will get all the
9    information that you need to fill out your personal
10   comfort level with the knowledge in order to answer
11   the questions on the verdict form is by talking to
12   the 11 other jurors in the jury room tomorrow when
13   you begin your deliberations.
14          We -- just in the 12 final jurors alone,
15   you will have 24 eyes and 24 ears.  And you'll have
16   the notes that you'll be able to use during your
17   deliberations to remind yourselves of certain
18   things, certain aspects of the testimony.  So
19   you'll have everything you need, which is why it's
20   important that you continue on with these rules.
21          Rule No. 1, do not talk to anyone at all
22   about the case.
23          Rule No. 2, do not share any thoughts and
24   impressions with each other about anything going on
25   in the courtroom or any aspect of this case or any

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1093

1    of the related things that you can, you know, think
2    might have something to do with the issues in this
3    case.
4           Rule No. 3, if you see the people
5    involved in the case in the coffee shop, the
6    hallway, the elevators, just "good afternoon" and
7    that's all.
8           And, of course, Rule No. 4, no homework.
9           And so after our deputy court clerk who's
10   filling in for Sam today, who's sick, tells us all
11   to rise and lets you out, we will keep Ms. Janik
12   here for a minute just to talk to her briefly about
13   the problems that -- that occurred this morning
14   that resulted in her being a little late.
15          So Madam clerk.  Oh, yes.
16          A JUROR:  Yes, question.  You said get
17   out early.  Are you thinking like 3:00-something or
18   4:00-something?
19          THE COURT:  I would say you pretty much
20   can expect that I'll do my best to get you out
21   around 3:30.  And I can't be absolutely certain,
22   but really, I doubt that it's going to be longer
23   than that.  But if you're really making plans that
24   are firm, I would say 4:00.
25          THE CLERK:  All rise for the jury.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1094

1           (Whereupon, the following proceedings
2    were held outside the presence of the jury. Juror
3    Janik present:)
4           THE COURT:  Okay.  Please be seated.
5           Ms. Janik, I'm really proud of you for
6    making it so much -- so consistently every day and
7    then coming here right away after our conversation.
8    I did immediately call the superintendent and
9    explained to him that we need you, and he explained
10   to me then in return -- thank you.  That would be
11   Mr. Heiden.
12          MS. JANIK:  Yep.
13          THE COURT:  And then he explained to me
14   in return that no one is holding the jury service
15   against you at all, but that it's an entirely
16   different issue relating to your residency that
17   they're interested in.  And he also assured me that
18   they can wait to sort it out, that you do not have
19   to lose the opportunity to be on the jury service
20   while they're doing something.
21          And the clear impression I got from him
22   is that they're not going to be wheeling and
23   dealing behind your back while you're stuck here,
24   that they'll allow, you know, your participation in
25   the process.  That's the impression I got.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1095

1    He also -- he also seemed to give me the
2  impression that, like with school, teachers, and
3  administrators from time to time, that he's working
4  with your mother also on clarifying what the issues
5  are.
6    So I did want to let you know that.
7    Mr. McCoy, Mr. Laffey, anything else?
8    MR. McCOY:  I have nothing, Judge.
9    MR. LAFFEY:  No, Judge.  You got it right
10  from what I heard.
11    THE COURT:  Good.  Thank you.  Enjoy your
12  lunch break, and we'll see you then at 1:30.
13    MS. JANIK:  Okay.  Thank you.
14    (Whereupon, the following proceedings
15  were held outside the presence of the jury:)
16    THE COURT:  Now I think we've got some
17  work to do.  I have not read your brief yet,
18  Mr. Laffey.  How about if we take about 15 or 20
19  minutes for whatever you want to do to get some
20  food and relaxation, and then we'll come back and
21  see what we can accomplish.  So let's say -- let's
22  say 12:35.  Thanks.
23    (A recess was taken.)
24    THE COURT:  Okay.  We're back on the
25  record.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1096

1    The evidence -- the plaintiff's evidence
2  is almost done.  The only remaining -- the only
3  remaining item of evidence for the plaintiff is the
4  so-called stipulation, or a partial stipulation.
5    And, also, I've ruled that the summary
6  information would be admissible.  That's a ruling I
7  made before, but what we did not deal with is the
8  methodology of how it's going to be presented into
9  evidence.
10    Assuming, hypothetically, that that gets
11  in, then that summary of invoices and the
12  additional exhibits that we've been dealing with so
13  far in the trial would be considered as part of the
14  evidence in addressing Mr. Laffey's motion at the
15  end of the plaintiff's case, which is what I'd like
16  to do right now.  And I don't know that it's going
17  to turn on the admissibility of the summary of
18  invoices.
19    So, Mr. McCoy, I asked you to be ready
20  with the answer to this question:  What items of
21  evidence do you have to show that either of these
22  two deficits that Mr. Laffey points out have been
23  met and satisfied by the evidence in this case
24  showing that Mr. Goss was exposed to BSIS products
25  and that any BSIS products -- or, rather, that

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1097

1  Mr. Goss was exposed to BSIS-supplied
2  asbestos-containing products and also that BSIS
3  distributed any products that were unreasonably
4  dangerous and defective?
5    MR. McCOY:  Okay.  Should I go ahead?
6    THE COURT:  Go ahead.
7    MR. McCOY:  First, Judge, of course,
8  Building Services' products were not labeled with
9  the name "Building Services."
10    THE COURT:  Can I just stop us here for a
11  second?  I'm sorry about that.
12    We heard the testimony of Mr. Popalisky
13  this morning, the deposition testimony of the late
14  Mr. Popalisky, who said that the name is Building
15  Service and there's no "S" on the end.  I went back
16  and checked the filing from the defendant, who adds
17  the S, so I figured that was right.  But now,
18  having heard that testimony and then checking the
19  Department of Financial Institutions website for
20  the State of Wisconsin, it looks like there's no
21  "S."
22    Is that correct, Mr. Popalisky?  It's
23  Building Service Industrial, and currently now it's
24  Industrial Supply.
25    MR. POPALISKY:  Yes, Your Honor.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1098

1    THE COURT:  So at some point we're going
2  to have to figure out exactly the name of the
3  defendant, whether it's Industrial Sales or
4  Industrial Supply inc. or Company, but anyway,
5  that's an aside.  I've taken out the extra "S" on
6  the word "service."
7    Mr. McCoy, I interrupted you.  I
8  apologize.
9    MR. McCOY:  Probably a key point to get
10  the right name.
11    Just as a beginning point, Judge, no one
12  is going to see at these job sites Building
13  Service's name on this product.  So that's not
14  unusual here, not surprising, because they are a
15  distributor and they're selling products that came
16  from -- some of the products came from
17  Owens-Corning Fiberglass -- that was the Kaylo
18  product -- and they were also selling cements.  I
19  think he said Eagle-Picher was where they bought
20  cement, Mr. Popalisky did.  But those
21  manufacturers' names is what would be on the
22  products.
23    Now, as far as how we place these
24  products on job sites without anybody ever having
25  recognizing -- recognizing the name Building

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1099

1   Service, that starts with the testimony of
2   Mr. Debenack about two of the contractors who were
3   the insulation companies that did the work at the
4   job sites of P.G. Miron, which is where that -- he
5   and Clarence Goss worked for many, many years.  The
6   two companies that Mr. Debenack identified were Bay
7   Insulation and Bartelt Insulation.
8           Now, the kind of work that went on at
9   those job sites was also described in detail by
10  Mr. Debenack to show how they were putting on the
11  half-rounds, which were the calcium silicate
12  products, and the cements out of the bags, which
13  also were called muds.  And there was testimony
14  from several witnesses, including, I think,
15  Dr. Hammar, Mr. Parker, and I think Dr. Anderson
16  also, that, based on their knowledge as expert
17  witnesses, of course, these are frequent --
18  products that are frequently in asbestos, that's
19  how the medical doctors even know about them.
20          Frank Parker, being an industrial
21  hygienist, his job is to know what is in the
22  products.  But these -- they all testified that
23  those products were asbestos-containing in that
24  time period before 1972.  Basically before the OSHA
25  regulations came out, these were

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1101

1   about 20 and 25 percent of the time.  Sometimes
2   they were a couple feet away, sometimes they were
3   farther away.  But that was his testimony.
4           And I actually -- we had prepared a
5   summary from the transcript citations of a number
6   of these items here, Judge, that I'm looking at.
7   And this is the transcript of this trial I'm
8   talking about.
9           THE COURT:  You know, what it's going to
10  come down to is what Mr. Laffey wrote in his brief,
11  how are we going to allow the jurors to make a
12  decision that is not merely a guess.  And using the
13  alarm company example, how are we going to -- how
14  have you shown that the evidence is more likely
15  than not that Mr. Goss suffered this exposure which
16  resulted in the mesothelioma as opposed to just a
17  coin toss.
18          So go on.  Please continue.  I know that
19  you know that that's what you're addressing.
20          MR. McCOY:  Right.  Okay.  So if we take
21  that testimony that there's the portion of time
22  that Bay and Bartelt are on the job sites with
23  Miron bricklayers --
24          THE COURT:  I'm sorry.  It's just that we
25  have got different responsibilities to handle

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1100

1   asbestos-containing products, and then when OSHA
2   came out, there was a change to asbestos-free
3   products.
4           So Clarence Goss had a lot of jobs before
5   that time period.  With Miron, he was full-time.
6   Bay and Bartelt were the contractors.  This was the
7   kind of work they were doing.  Mr. Debenack
8   testified these were the kinds of materials they
9   would be using, consistent with testimony by
10  Mr. Parker especially these are the kinds of
11  materials that you find in this type of paper mill
12  setting, that you would be finding on the pipe
13  covering because you've got the thermal systems,
14  these half-rounds and cements.  Half-rounds being
15  basically the calcium silicate, is what those were
16  known as, and those would be asbestos-containing.
17          Now, the next step in the link here --
18          THE COURT:  Excuse me just a minute.
19          (There was discussion off the record.)
20          THE COURT:  Okay.  Sorry about that.
21          Mr. McCoy, please continue.
22          MR. McCOY:  Okay.  Yeah, just a couple of
23  additional points from Mr. Debenack's testimony.
24          The bricklayers and the pipe covers on
25  these jobs, Miron jobs, would be together between

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1102

1   everything and not really to -- I mean, it's lunch
2   hour, so I could just ignore it, but I don't think
3   I'm going to.
4           (There was discussion off the record.)
5           THE COURT:  Okay.  Okay.  So please
6   continue.
7           MR. McCOY:  Okay, Judge, so that's -- the
8   testimony is to the insulation contractors that
9   were there, the frequency with which they were
10  there over these many years on the P.G. Miron jobs.
11          Now, if we go next to the question of
12  what were the product sources for Bay and
13  Bartelt -- and as I say, you're not going to see
14  Building Services on a box, but what we do have is
15  the evidence that Building Services is the conduit
16  through which these products were passed by the
17  manufacturers to Bay and Bartelt.
18          And the testimony was, for Bay, that
19  Building Services was essentially their supplier of
20  choice, unless somebody else did not have -- unless
21  Building Services did not have the right size
22  materials.
23          Mr. Schmidt, who ultimately became the
24  president of Bay and was with since, I think,
25  1965, testified that Bay would order first from

1    BSIS and then find other contractors if BSIS did

2    not have the necessary size of Kaylo.

3            Mr. Schmidt also testified that Bay used

4    almost entirely Kaylo block and pipe covering and

5    that it was all from Building Services, Kaylo block

6    and pipe covering.

7            He testified that Bay ordered

8    Owens-Corning products from Building Services

9    because he understood they had an exclusive

10   distributorship in Wisconsin.  I mean, the

11   relationship there was very close.  I think he also

12   mentioned going to the ballgame at the invitation

13   of Building Services.

14           So he was -- his company was intimately

15   tied for these types of materials, the block and

16   pipe covering material, the half-rounds that were

17   used or the calcium silicate that was used, to

18   Building Services.

19           Essentially, the inference can be drawn

20   that although you don't see the name Building

21   Services on the boxes, that if it was Bay

22   Insulation on the job and it was this type of

23   calcium silicate half-round pipe covering, that it

24   would have come from Building Services.  And that's

25   the inference that a juror could draw.

1            Now, if it's Bartelt, we have similar

2    type of testimony.  Perhaps not quite as strong a

3    statement that it's exclusive, but we have the

4    testimony of Mr. Fondow, who worked for Bartelt,

5    and he says that Building Services supplied Bartelt

6    from at least 1961 to 1973 and that what they

7    supplied was pipe covering and cement and it did

8    contain asbestos and that he himself sometimes did

9    the ordering.  That's one of the reasons why he

10   knew; he ordered from Building Services, and that

11   Building Services supplied Bartelt with this same

12   Owens-Corning insulation, the Kaylo.

13           And he also made it clear that Bartelt

14   bought the majority of its asbestos insulation --

15   and that was his terminology -- the majority was

16   from Building Services.

17           So, again, there is a very strong

18   supplier relationship testified to -- I mean, I

19   think both of these relationships are undisputed

20   supplier relationships between these two

21   contractors and Building Services.

22           So, again, although we don't have any

23   Building Services at the job site, we certainly

24   have the product that was supplied by Building

25   Services, or certainly the inference can be drawn.

1            In fact, I don't know what other

2    inference you could draw for Bay; and the most

3    likely inference for Bartelt, because it was the

4    majority, is certainly that it was also from

5    Building Services when we're on these job sites.

6            And then if we go to the law, Judge --

7    and first, maybe I should ask, is there any other

8    questions that I need to address about the supplier

9    relationships?

10           THE COURT:  Just a minute.  I'll let you

11   know.

12           MR. McCOY:  The facts.  Because I'm going

13   to talk about the law briefly next.

14           THE COURT:  I think that's it for now.

15   After I hear from Mr. Laffey, you may want -- I may

16   have some more questions from you or you may want

17   to add some more, but go ahead on the law.

18           And, also, after I hear from Mr. Laffey

19   on what -- why he's saying that there's been no

20   evidence of defective or dangerousness, I'll let

21   you respond to that, too, which is his Roman

22   numeral II.  It's only one sentence long.

23           MR. McCOY:  Okay.  So, Judge, on the law

24   about the exposure proof.  Okay.  Wisconsin's got

25   three cases in the appellate courts that I'm going

1    to refer to.  The first one is the Zielinski case,

2    the second one is the Horak case, and the third one

3    is the Anderson case versus Combustion Engineering.

4            In Zielinski, the Court of Appeals made

5    it clear that circumstantial evidence can be used

6    when you don't have a witness who says that the

7    victim held the product in his hands or was working

8    right next to it.  You don't need an eyewitness to

9    prove the exposure.  You can do it by establishing

10   that the product was of the type used at the job

11   sites and that it was of the type that the person

12   would have been around.  So that's the first

13   precedent.

14           And the Horak case adds to that and

15   clarifies that other kinds of information can be

16   used to establish that these products were in the

17   vicinity where they would cause exposure, including

18   evidence which might be drawn from whatever

19   invoices are available and the testimony of

20   witnesses who say that this is what happened in

21   these kinds of situations, even though they can't

22   say that I saw, again, the victim in this

23   particular -- with this particular product from

24   this particular supplier.

25           So that -- and there was no specific

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1107

1   place or date or time identified in the Horak case
2   as to these exposures, but all there was was that
3   this was how the businesses were conducted, this is
4   what the victim did, these were the products that
5   were used, and that, in absence of a specific date,
6   job site, and place, it was still proper to infer
7   that because somebody has been doing this kind of
8   work for all these years and these products are
9   used in connection with that kind of work, that
10  that's proper.
11          Also, it specifically dealt with the
12  concept of these supplier relationships because
13  Building Services was the defendant in the case
14  there, and they approved the use of proving
15  supplier relationships via invoices or whatever
16  other testimony there might be and that you don't
17  have to show Building Services' product by name at
18  that job site, or any job site.  Just it would be
19  the type of material the person would be working
20  around.
21          So if you take Zielinski and you take
22  Horak, that's what we based our case on.  In
23  showing that we have supplier relationships, even
24  though we don't know the Building Services product
25  by name, we do know that there are suppliers or

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1109

1   that they bought their asbestos from BSIS.  All
2   those things are inferences that can be drawn.
3          If you draw that series of inference,
4   then there's no question, Judge, that it's
5   asbestos, so we're no longer speculating.
6          So if the inferences are drawn the way
7   the plaintiff is asking and we've got evidence to
8   support all those inferences, then there would not
9   be any speculation that it's BSIS.  It's
10  essentially up to the jury.
11          THE COURT:  Mr. Laffey.
12          MR. LAFFEY:  Mr. McCoy conveniently
13  ignores the evidence in the case gained through the
14  witnesses --
15          THE COURT:  We need your microphone.
16          MR. LAFFEY:  Mr. McCoy ignores the
17  further evidence gathered from his witnesses.
18          First, Mr. Debenack, who on
19  cross-examination identified Bay, Bartelt.
20  Industrial Insulation.  And Industrial Insulation
21  was identified directly by seeing actually a truck
22  on site with the name on site, as well as a fourth,
23  unidentified insulation company.
24          Mr. McCoy also ignores the testimony that
25  was read in today on the part of Mr. Mielke.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1108

1   contractors who are supplied by Building Services
2   on many of the job sites of P.G. Miron, and 20,
3   25 percent of the time, they're there with the
4   bricklayers.  So inferences can be drawn by the
5   jury based on Zielinski and Horak that would allow
6   this -- the jury to find in favor of the plaintiff
7   in this case.
8          Now, going on, taking it one step
9   further, Judge, the third case, Anderson versus
10  Combustion Engineering, also has some application
11  because that case makes it clear that you don't
12  have to establish every day this is what a person
13  is doing; that if you show this is the type of
14  thing that -- in that case it was a boiler worker
15  would be doing, that, from there, a jury can
16  extrapolate that this is the type of thing they
17  were doing in many other situations because that
18  was the nature of their job.  So the Anderson case
19  adds that to the mix.
20          And, Judge, granted, a jury could find
21  otherwise on this evidence, but there is certainly
22  plenty of evidence here from which a jury could
23  make a conclusion that it's pipe covering with
24  asbestos, that Mr. Gosz was working around that,
25  and that it came from Bartelt or Bay's workers and

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1110

1   Mr. Mielke also identifies having heard of Bay,
2   Bartelt, Industrial Insulation, and then introduces
3   the specter of American Can having its own
4   employees perform insulation work on site and those
5   American Can employees providing their own
6   insulation materials, according to Mr. Mielke.
7          Now, Mr. Mielke also went on to say that
8   the only insulation he ever saw was spun glass, and
9   when specifically asked on clarification in the
10  read-in whether he ever saw the white chalky
11  insulation, he said no.
12          And we've had ample testimony from
13  experts, Mr. Parker and the insulator today,
14  Mr. Viola, that you can't confuse the two as being
15  asbestos-containing.  Spun glass is spun glass.
16          The fact now, Your Honor, is the fact
17  that we have now in this record five potential
18  avenues of introducing insulation materials onto
19  job sites that Mr. Gosz apparently frequented, at
20  least through the lay witnesses and the testimony
21  that we have in this case.
22          Merco found -- and Mr. McCoy didn't
23  address the Merco case.  And Horak, Zielinski and
24  Anderson are not the controlling case law here.
25  The controlling paradigm, Your Honor, is Merco.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1111

1    And Merco deals with what we will submit to a jury
2    in this state.
3            And the Court says that it is
4    impermissible to base a judgment on conjecture,
5    unproved assumptions, or mere possibilities.  In
6    Merco, it "Failed to remove" -- and I'm quoting --
7    "Failed to remove the issue of causation from the
8    realm of speculation by establishing facts
9    affording a logical basis for the inference which
10   it claims; namely, that the loss occurred because
11   Commercial defendant failed to notify Merco that
12   the alarm system was not functioning."
13           And in Merco, the jury was presented with
14   a factual scenario, one where there would be no
15   fault on the part of Commercial and one where there
16   could be.
17           We are a few steps even further outside
18   the realm of any reasonable basis, Your Honor,
19   because we have introduced three additional
20   potential sources of insulation material, and it's
21   that conduit -- it's not merely that BSIS was a
22   conduit from a manufacturer to insulation
23   contractor.  But in order for the product from BSIS
24   to get into a position where Mr. Gosz could have
25   been exposed, it would have to get there through a

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1112

1    customer of BSIS.
2            On this record, there's no reasonable
3    basis for the jury to make a decision.  They're
4    choosing from five potential avenues, and that is
5    pure speculation.
6            If Your Honor thinks back a few months,
7    the reason we're here, the reason Your Honor denied
8    my summary judgment motion after you had dismissed
9    Bay is because you said, and I'm paraphrasing,
10   Mr. Laffey, it doesn't matter that Bay is no longer
11   in this case.  You sold to both of them; that's all
12   that really matters.  That was the choice.
13           That's not the choice anymore.  The
14   choice is Bay, Bartelt, Industrial, American Can,
15   and some unidentified fifth company.  Mr. McCoy
16   hasn't addressed that.
17           THE COURT:  Mr. Laffey, what about the
18   recognition in the law that there can be more than
19   one cause for an injury and that the jury has to
20   find a -- that in order for the plaintiff to
21   prevail, that a particular defendant -- that the
22   conduct or product of the particular defendant was
23   a substantial cause, not the cause?
24           MR. LAFFEY:  Understood, Your Honor.  In
25   fact, there are a number of causes that have been

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1113

1    identified in this record, that we know through
2    those claim form exposure forms.  There's
3    undisputed evidence as to what Mr. Gosz was
4    admittedly exposed to and where.  But a cause does
5    not go to this element, Your Honor.  It does not go
6    to the proof of availability of this particular
7    product.  It does not address that.
8            The "a cause" goes to the product.  The
9    problem we have here is that we're not even to the
10   product stage, because in order for the jury to do
11   its work, it has to find that my clients
12   distributed material that reached Mr. Gosz, and the
13   only way on this record you could find that is to
14   guess at the source of the insulation materials
15   that Mr. Gosz, on this record, was exposed to.
16           And if -- if it were limited to Bay and
17   Bartelt, as Your Honor had originally thought, that
18   would be somewhat of a different analysis, but it's
19   not.  We have now, through the benefit of trial,
20   adduced all the testimony that, as far as I can
21   tell, we're going to adduce, and we now have the
22   full picture that it's more than just those two.
23   It's three more than just those two.
24           And the jury can't make a reasoned
25   decision that it was Bay and/or Bartelt that

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1114

1    delivered the product to the job site because we
2    have three others to choose from, and there's no
3    basis for them to choose other than to guess how it
4    got there.
5            THE COURT:  Mr. Laffey, you mentioned in
6    your brief that the cases of Horak and Zielinski
7    dealt with the decision of the judge at the -- when
8    confronted with a motion for summary judgment and
9    seemed to suggest that the test might be different
10   for the submission of the case to a jury than it
11   would be for a judge to decide whether the case
12   should go forward and whether evidence should be
13   presented to a jury at all.
14           Is there really a difference?
15           MR. LAFFEY:  Oh, I'm not -- I'm not
16   necessarily contending that there is.  And I raise
17   that as a distinction only because it's a
18   distinction, Your Honor.  And it was at the summary
19   judgment stage on affidavit and the -- in both
20   Horak and Zielinski, the scenario is quite
21   different, completely different, particularly in
22   Horak.
23           The plaintiff in Horak was an employee of
24   Jaeger Insulation, J-A-E-G-E-R.  It was a company
25   that had three or four insulators.  There was

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1115

1    invoice evidence that at some level BSIS did have a
2    commercial transaction with Jaeger providing
3    asbestos-containing insulation.  There was no other
4    testimony or evidence in the case that
5    Mr. Benzinger, the deceased, ever worked with
6    BSIS-distributed product.  None.
7            And that was the basis for the motion for
8    summary judgment, which was originally granted.
9    The Court of Appeals said, well, wait a second, he
10   was an insulator, he worked for BSIS's customer, he
11   had invoices, to some degree, of sales; that's
12   enough to create an inference and a general issue
13   of material fact, you can move forward.
14           There weren't five -- I mean, it's
15   different.  You have the asbestos invoices there.
16   In this case, that's not the situation.  Mr. Gosz
17   didn't have that direct contact.  Mr. Gosz is a
18   secondary or tertiary exposure individual, and it
19   can only get there by other people.  And the other
20   people or the other companies we had, Your Honor,
21   are, five.  And that cannot, by definition, in my
22   mind, meet the Merco standard at all.
23           And the jury, if they were to decide that
24   the product did reach Mr. Gosz, they would have to
25   do so on speculation alone.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1117

1    potentially the source of putting product into the
2    breathing zone of Mr. Gosz.
3            Again, pure, unguided speculation.  Just
4    because he possibly could have been in the area
5    with nothing more doesn't give the jury a rational
6    basis upon which to render a verdict.
7            THE COURT:  Well, but added to that is
8    the testimony of Mr. Fondow and the executive from
9    Bay as well.
10           MR. LAFFEY:  All they testified to, Your
11   Honor, is that they were customers of BSIS, which
12   is not a matter of dispute.  That's all they
13   testified to.  Neither of those gentlemen, Your
14   Honor, give any evidence of job site or location
15   confirmation.
16           In fact, Mr. Schmidt testifies -- he's
17   the Bay gentlemen -- he testifies on questioning by
18   Mr. McCoy that Bay didn't do work at the known job
19   sites that we have for Mr. Gosz.  If we take the
20   job sites off those exposure forms, Mr. McCoy asked
21   him, did you work at Banta's; no.  Did you work at
22   Foremost; no.  Did you work at American Can in
23   Neenah; no.  Et cetera, et cetera.
24           The evidence there is that they had no
25   involvement at any of the known job sites that's in

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1116

1            THE COURT:  Let me ask you to comment on
2    one more factor that I think may help me come to a
3    determination to deny your motion, so you should
4    have an opportunity to know about that and tell me
5    where my thinking is erroneous, Mr. Laffey.
6            You referred to the five possible sources
7    of exposure for Mr. Gosz, but we're not talking
8    about one discrete event.  We're talking about a
9    career of 30-some years, I think.  Wouldn't it be
10   okay for him to get exposed from five different
11   sources and one of the substantial sources was
12   BSIS-supplied Kaylo?  And can't the jury make a
13   determination, based on the evidence in this case,
14   that that was a substantial factor, a cause, in the
15   malignant mesothelioma?
16           MR. LAFFEY:  I don't believe that's
17   possible, Your Honor, when three of the -- the
18   testimony is, I'm aware of insulation companies.  I
19   can't -- nobody can tell me, the jury, that an
20   insulation contractor of any particular identity
21   was in place.
22           Both Debeneck and Mielke say there were
23   insulators and, collectively, they gave us the
24   identities of five who could have been around,
25   could have been in the area, could have been

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1118

1    this record.
2            THE COURT:  And Fondow did not know about
3    any of those?
4            MR. LAFFEY:  Zero.  He has no job site
5    information, Your Honor.  Fondow's testimony,
6    uncontradicted, is they didn't do much of that
7    commercial stuff.  His testimony is 99 percent of
8    the work, for what it's worth, was
9    non-asbestos-containing.
10           And the only identity or location
11   information we have is in conjunction with Debenack
12   and Mielke, which is, we recognize those two
13   people, those two companies' names, along with
14   three other potential sources, all of them.
15           And the only positive ID, Your Honor, is
16   by Mr. Debenack of Industrial Insulation, where he
17   testified on direct that he saw -- he remembers
18   seeing a white truck with Industrial Insulation on
19   it.  And then on cross-examination, he, once again,
20   reiterated that he specifically recalled working
21   around Industrial Insulation and we have a truck on
22   site.
23           We had nothing of that kind for anybody
24   else except for the American Can in-house people.
25   This record, Your Honor, is asking that jury to

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1119

1    come to the conclusion that Bay and Bartelt must
2    have been a source purely on a guess, purely on a
3    possibility at best.  And that's not the standard,
4    Your Honor.  It's to be with reasonable certainty.
5    And this jury is not going to be provided with the
6    basis for reasonable certainty to conclude, and
7    they have to conclude, Your Honor -- in order to
8    find a verdict against BSIS, they must conclude to
9    a reasonable certainty that Bay or Bartelt were a
10   source of the asbestos-containing materials.  They
11   have to.  And this record doesn't provide them with
12   that opportunity.
13          THE COURT:  Okay.  Thank you.  Mr. McCoy.
14          MR. McCOY:  Just a couple of things I can
15   add.
16          The other potential sources, I don't
17   believe the evidence on them is any different than
18   what we have as far as Bay and Bartelt is concerned
19   in terms of what the strength of the evidence might
20   be.
21          For instance, on Industrial Insulation,
22   there's no showing that Industrial was providing
23   asbestos-containing materials at all.  But having
24   said that, I believe, Judge, that, again, the fact
25   that there can be scientific fact that there can be

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1120

1    multiple causes of asbestos -- of mesothelioma --
2    which not only is perhaps that there could be but
3    that typically there is multiple causes of asbestos
4    exposures that lead to mesothelioma, especially
5    when you're talking about someone who's in the
6    building trades, that if we were to say that each
7    defendant could get out because there might be
8    other causes, then we would end up with nobody
9    who's legally responsible.
10          And I believe, Judge, that is the
11   position of Building Services, is we're simply not
12   legally responsible because there are other ones
13   that could be responsible.  And that, Judge, just
14   isn't the law on the responsibility under the state
15   of Wisconsin.
16          I mean, if there's -- if these companies
17   were supplying products that were unreasonably
18   dangerous and were defective, then each one would
19   be responsible for whatever share ultimately is
20   determined, either through Your Honor or the jury
21   or however that's to be allocated.  That's a
22   question that then would go to the hands of the
23   jury.  But we just can't simply say because we're
24   the last defendant that everybody else was the
25   source of it and, therefore, don't include us.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1121

1          I have nothing further to say, Judge.
2          THE COURT:  Mr. McCoy, if there is
3    sufficient evidence to establish exposure, how the
4    heck can the jury answer any of the comparison
5    questions on the verdict form?  I mean, is there
6    some evidence from which they can do that?
7          MR. McCOY:  Judge, remember we brought
8    this case as a strict products case, in part to
9    eliminate the need to put in, at least from our
10   end, evidence about percentages of responsibility.
11   That's what we chose to do as plaintiffs.  The idea
12   was to simplify the case to reduce the need to go
13   into all the different other exposures.
14          Mr. Laffey has chose to open that up, for
15   whatever relevance that has.  I can't -- I can't
16   say that that has relevance on the end of
17   apportionment in a nonnegligence situation.
18          But it might have some relevance as to
19   causation, which I think is fair game; that he
20   could introduce evidence that it was somebody
21   else's asbestos that was a cause and not ours.  But
22   I don't see that we need to concern ourselves -- at
23   least that's the reason why we dropped the
24   negligence claim, was to bring the strict products
25   claim so that we could simplify all the evidence

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1122

1    needing to show, you know, who's got what level of
2    responsibility.  And that is a choice we made
3    there.
4          So I don't know -- although the evidence
5    of other exposures relevant to establish
6    potentially -- if the jury were to believe that
7    Building Services' exposures were not a cause,
8    it's -- I don't think there's any need to concern
9    ourselves here with the apportionment of the
10   responsibility the way we've structured the
11   plaintiff's claim in this case, by dropping the
12   negligence count.
13          And I think that's a discussion we had,
14   I'd venture to say, ad nauseam, Judge, over several
15   hearings and many hours.  So I go back to that in
16   response to the question.
17          THE COURT:  Okay.  We'll get to the
18   verdict form.  And we'll get to the verdict form
19   and the nature of what's going to be compared,
20   because I am satisfied that under the state of the
21   law, that the cases that just happen to be more
22   recent are really significant here.  It's not just
23   the Merco Alarm Company case, which, of course,
24   provides valuable guidance and key principles that
25   must be followed in Wisconsin courts.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1123

1    Nevertheless, the Horak case, involving
2    Building Service Industrial Supply and the
3    Zielinski case and the Anderson case also provide
4    guidance with respect to the option and the duty of
5    the Court to allow jurors to consider
6    circumstantial evidence.
7         This record is a record of decades of
8    construction site work by Mr. Gosz in which there
9    is evidence from which a jury could conclude that
10   Mr. Gosz was -- could conclude to a reasonable
11   certainty that Mr. Gosz was exposed to
12   asbestos-containing Kaylo, Owens-Corning Fiberglass
13   Kaylo products, Fiberglass being the name of the
14   company, not the materials of the product.
15        And the jury could conclude to a
16   reasonable certainty, based on the circumstances
17   presented here and all of the details provided,
18   over a period of many years, at a variety of job
19   sites working for the Miron Company, and perhaps
20   others, that the asbestos-containing products that
21   Mr. Gosz was exposed to had been supplied by
22   Building Service Industrial Sales Company or
23   Building Service Industrial Supply, Incorporated.
24        Therefore, the motion at the conclusion
25   of the plaintiff's case is denied.  The jury is

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1125

1    this case started.  I did not hear until now an
2    objection to these being -- and I'm not sure what
3    the problem is exactly, Judge, but apparently that
4    these are not invoices from BSIS.
5         THE COURT:  No, just that you need to get
6    items into evidence -- for any evidentiary fact or
7    exhibit that comes in, you need to put it in in a
8    certain way.
9         And, you know, my general preference is
10   to allow evidence to come in and to allow lawyers
11   to clear up misunderstandings about what is being
12   stipulated to or bolster whatever they need to
13   bolster in order to basically end up at the trial
14   about the substance of the case and not keep things
15   out on technical aspects, even the fairness rules
16   of evidence, if -- unless that's necessary.  And
17   that's basically how I look at any lawsuit.  And I
18   know it's frustrating to lawyers that I'm not as
19   picky on many of the technical rules, the deadlines
20   in particular, as Judge Jean DiMotto or Judge
21   Michael Brennan might be.  I'm not sure about Judge
22   Brennan, but anyway we lost him, which is a
23   terrible loss.
24        MR. McCOY:  Judge, I do want to speak to
25   this further, because the purpose of the summary

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1124

1    ready to return.  How about if we take a brief
2    break, and then I'll get -- and then I'll give
3    you -- oh, before we do that, I'd like to know,
4    Mr.-- I'd like to let you know what I think,
5    Mr. McCoy, about the summaries.
6         I think that I ruled earlier that the
7    substance is allowable.  But, of course, we didn't
8    quite address the question of how do you get it
9    into evidence.  The text that you cited to me from
10   the late Mr. Popalisky is not sufficient.
11        The mere fact that it came from lawyers
12   representing a company in response to a precise
13   request for production of documents, which you
14   don't exactly have here the exact request that they
15   responded to, but in any event, assuming it was
16   very correct and very precise, the fact that it
17   came from the law firm that represents the
18   defendant, you know, simply does not create an
19   exception to the normal evidentiary rules.  I just
20   don't see how you're going to get it in unless you
21   suddenly come up with a surprise star witness.
22        Mr. McCoy?
23        MR. McCOY:  Judge, we had these
24   discussions now about those summaries for quite a
25   period of time, certainly with Mr. Laffey before

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1126

1    was to avoid the introduction of all the invoices
2    into the trial.
3         THE COURT:  You'd still have to have
4    those --
5         MR. McCOY:  We do.  We have the invoices.
6    I have them --
7         THE COURT:  I know.  But you'd have to
8    have them identified.  And, you know --
9         MR. McCOY:  Well, Judge, I mean, I agreed
10   not to try to introduce the evidence -- not to try
11   to introduce the invoices in lieu of using the
12   summary.  Now, all of a sudden, I'm told that
13   because I didn't introduce the evidence, didn't
14   introduce the invoices, now I can't use the
15   summary.  I mean, I was -- I was using the
16   summary --
17        THE COURT:  How would you get the
18   invoices in?
19        MR. McCOY:  Well, Judge, that wasn't the
20   way it was posed to me.  I was told that a summary
21   was preferred so we didn't have to be using the
22   invoices.
23        THE COURT:  But I told you, according to
24   my recollection of what Mr. Laffey and you said
25   last week, is I told you, work it out.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1127

```
 1              MR. LAFFEY:  You told --
 2              THE COURT:  And Mr. Laffey said
 3    repeatedly last week that he never did work it out.
 4              MR. LAFFEY:  Your Honor, this was a
 5    subject of a motion in limine months ago and a
 6    march on invoices.  And it was ruled conditionally
 7    that the invoices were not relevant, but please
 8    work out a stipulation, which I have said over and
 9    over and over again, I can agree to a stipulation,
10    and I can agree almost entirely to the
11    stipulation -- the latest version of the
12    stipulation statement.
13              But the summaries I have never agreed to,
14    and I have never indicated that I would agree to
15    it.  And Your Honor, if you look at the transcript,
16    never suggested a summary.  Judge Kahn suggested a
17    stipulation and agreement on what to tell the jury.
18    That's it.
19              THE COURT:  I just want to finish up what
20    I was saying about -- I think I may have used the
21    term "technicalities," but I don't really mean
22    technicalities.  I mean important principles.
23              I like to be flexible and allow certain
24    deadlines to be met a little later than originally
25    stated, if -- if it's feasible.  Of course, the
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1129

```
 1    invoices don't say which job site the product went
 2    to.  I think that's going to be part of the
 3    stipulation."
 4              "I agree."  This is me speaking now in
 5    realtime.  "I agree.  I've never denied that."  And
 6    that's what we were talking about.
 7              MR. McCOY:  And, Judge.
 8              THE COURT:  Yes.
 9              MR. McCOY:  Continuing on in that same
10    hearing, I think -- let me check the date.  Right,
11    March 21 of 2008 -- Your Honor stated -- this is
12    page 100 of the transcript -- "I am also ruling
13    that the parties have agreed that there will be no
14    reference to or introduction of a stack of
15    invoices.  Unless that matter is reconsidered
16    outside the presence of the jury, that ruling will
17    stand."
18              So that's why I haven't concerned myself
19    with anything to do with the invoices themselves
20    and focused purely on getting a stipulation about
21    what's in the invoices.
22              THE COURT:  But you haven't gotten a
23    stipulation.  I mean, you did -- you got a
24    stipulation.  Here's what it says.
25              "Over the course of time, through 1972,
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1128

```
 1    problem is, and here's the punch line, it's not
 2    feasible anymore because we're in -- we're at the
 3    end of the trial and -- and there's no option to
 4    find other witnesses or anyone who's going to get
 5    this in.
 6              I mean, theoretically, Mr. McCoy can take
 7    his chances on calling Mr. Popalisky adversely and
 8    seeing what he knows about all the invoices one at
 9    a time.  I don't know what he knows.  And I don't
10    know if Mr. McCoy know what he knows.
11              But if you don't have a witness who can
12    identify the documents and get them in, that is,
13    the underlying documents or the summary, either one
14    or the other, I don't know how you're going to get
15    either in.
16              MR. McCOY:  Judge --
17              MR. LAFFEY:  Your Honor, back on
18    March 21st in the transcript, the hearing:
19    "Mr. McCoy, why do you need all those invoices?"
20              The major reason, he says, was to prove
21    the supplier relationship.
22              "Court:  But if that's admitted, that's
23    stipulated, then it's not needed to prove the
24    supplier relationship so long as it's also supplied
25    in the context of that stipulation that the
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1130

```
 1    part of the business of BSIS" -- or, rather, it
 2    says Building Services -- "involved supplying
 3    asbestos-containing pipe covering to contractors,
 4    including Bartelt and Bay."
 5              MR. LAFFEY:  And I'm agreeable, and have
 6    been agreeable since this stipulation was posed, to
 7    those statements where the reference to the
 8    attached summaries or invoices.
 9              THE COURT:  It says not all the sales
10    records have been preserved, and you can go that
11    far.
12              MR. LAFFEY:  You take out the next
13    sentence and then start with, "The invoices do not
14    list the locations for delivery of the products,"
15    period, end of stipulation.  And I have agreed to
16    that in principle consistently.
17              THE COURT:  Okay.  The jury is getting a
18    little itchy here.
19              MR. McCOY:  And I couple that, Judge,
20    with the ruling Your Honor made earlier in this
21    trial that the summaries will go in.  At that point
22    in time, I thought --
23              THE COURT:  That was last week.
24              MR. McCOY:  Right.  And that's why I say,
25    I thought that that was all I needed to do on the
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1131

1  summaries.  I'm not -- I wasn't prepared to do
2  anything more because of --
3        THE COURT:  Right.  I understand that.
4  And I don't -- you know, I made a ruling that
5  somehow --
6        MR. McCOY:  And the Court of Appeals --
7  remember, we had the statement of the Court of
8  Appeals in Horak that said summaries of matters are
9  preferred.
10        THE COURT:  You know, if I made a ruling
11  that -- that was clearly different than what I see
12  now, then I feel awful about it, Mr. McCoy.  I
13  don't know if I made that ruling.
14        I think I did that to you once before,
15  and I felt awful about it then and -- with respect
16  to this case earlier on but where I think we're
17  dealing with all those issues.
18        As to the -- what exactly I ruled on last
19  week when I said that those could come in, you've
20  got daily copy; you can tell that, too.  But the
21  jury is really itchy, and they've been in there 15
22  minutes now.
23        At this point, I have to say that the
24  trial lawyer is the one responsible for dotting the
25  I's and crossing the T's, and even though I thought

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1132

1  that these would be coming in in one way or another
2  last week, the -- without a stipulation, it just --
3  it returns to the trial lawyer who wants to get the
4  documents in evidence to actually have -- use a
5  methodology that will get it into evidence.
6        Later on, after we're not -- while we're
7  not holding up the jury, I would be happy to
8  consider the language of last week's hearing where
9  I may have lulled Mr. McCoy into thinking that,
10  okay, fine, everything is -- all the groundwork is
11  done; just, you know, hand it to the jury.  That's
12  not how I recall it, but I don't recall exactly
13  what it was I ordered.
14        In any event, Madam clerk, let's bring in
15  the jury.
16        MR. McCOY:  Judge --
17        THE COURT:  I'm sorry.
18        MR. McCOY:  -- just to clarify where
19  we're at right now.  The language of the
20  stipulation now is acceptable except for the
21  summary?
22        MR. LAFFEY:  Not the entirety.
23        THE COURT:  No, but the one sentence that
24  gets removed is, "The amount of the sales to these
25  two contractors based upon available records

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1133

1  include the attached summaries of available
2  invoices."
3        MR. LAFFEY:  And then the sentence
4  underneath it that says, "Please see attached."
5        THE COURT:  Correct.  Everything else
6  goes in.  And I can read that or, Mr. McCoy, you
7  can read it if you would prefer.
8        MR. McCOY:  Your Honor can read that
9  part; however, I do want to hold open, like Your
10  Honor said, the question of the summary still.
11        THE COURT:  Okay.
12        MR. McCOY:  And, Judge, the final thing
13  is, again, before we actually close our case, I
14  have this -- about six items of -- seven items of
15  our exhibits and then to review what we've actually
16  marked in addition to that.
17        THE COURT:  What I would like to do is
18  let Mr.--
19        MR. McCOY:  Let me clarify that, Judge.
20  I have no further testimony to present in
21  connection with these.
22        THE COURT:  So what I would like to do is
23  read in this stipulation.  Then allow Mr. Laffey to
24  present any evidence he has.  And then after that,
25  we'll deal with the question of exhibits.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1134

1        Is that acceptable to you, Mr. McCoy?
2        MR. McCOY:  Yes, Judge.
3        THE COURT:  Maybe even after -- well, I'm
4  not sure we can do it after the jury leaves or not.
5  Probably so.  And then you'd be able to argue from
6  whatever exhibits and, you know, show displays of
7  whatever exhibits during closings.
8        MR. McCOY:  There's no more that I need
9  to show the jury before closing.
10        THE COURT:  Okay.  So if anyone needs to
11  rush to the restroom for about one minute and come
12  right back, do be as fast as you can, please.
13        (A recess was taken.)
14        THE COURT:  All rise for the jury.
15        (Whereupon, the following proceedings
16  were held in the presence of the jury:)
17        THE COURT:  Okay.  Please be seated.
18        Ladies and gentlemen, I have to apologize
19  for making you wait.  We were having too much fun
20  to bring you back over our lunch hour.
21        Actually, the fact is, we got about --
22  about some of the -- between the lawyers and me,
23  got something close to 20 minutes or a little less
24  for lunch because we were working on making sure we
25  got everything put together for you so that you

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1135

1   could have the early departure this afternoon and
2   so tomorrow morning we're ready for the
3   instructions and the closing arguments.
4           But there's a lot that goes into a trial,
5   and I appreciate your understanding that sometimes
6   we don't get you back as quickly as we have
7   previously promised.
8           In any event, now we are ready to
9   continue.  And I do want to let you know something.
10  This is evidence in the case.  The parties have
11  stipulated and agreed that Building Service
12  Industrial Sales is an industrial supply company,
13  and over the course of time through 1972, part of
14  its business involved supplying asbestos-containing
15  pipe covering to contractors.
16          The insulation company supplied -- the
17  insulation companies that were supplied by Building
18  Services Industrial Sales included Bartlett
19  Insulation and Bay Insulation, but not all the
20  sales records have been preserved.
21          The invoices that -- oh, invoices from
22  BSIS do not include the locations for delivery of
23  the products.
24          Ladies and gentlemen, that's what both
25  parties agree make up part of the facts in this

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1136

1   case.
2           Now, Mr. McCoy, any additional evidence
3   other than the exhibits?
4           MR. McCOY:  Subject to our discussions
5   about this, Judge, I have no further evidence on
6   behalf of the plaintiff at this time.
7           THE COURT:  Okay.  Thank you.  Plaintiff
8   rests subject to the possibility of something else
9   might come up that I'll -- that would make a
10  change.
11          Now, Mr. Laffey, you may call your first
12  witness.
13          MR. LAFFEY:  Thank you, Judge.  Based
14  upon the extent of the deposition read-ins that we
15  were able to take care of throughout this case and
16  based upon the information that we were able to
17  obtain on cross-examination of various witnesses,
18  Building Service Industrial Sales rests.
19          THE COURT:  Okay.  Thank you, Mr. Laffey.
20  Did I say four o'clock?
21          Ladies and gentlemen, there is a
22  possibility that tomorrow morning we will have a
23  little bit more evidence for you before the
24  instructions and the closing arguments.  However,
25  you have completed your work for today.  The -- if

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1137

1   you'll just excuse me for a minute.  I have to
2   answer the phone.
3           (There was discussion off the record.)
4           THE COURT:  Ladies and gentlemen, we
5   provide service to the people of Milwaukee County
6   in the dispute resolution responsibilities that we
7   have, and I know that you are the first priority
8   that we have, this trial, but I'm also certain that
9   it's vital that we keep the lines of communication
10  open.  And when a clerk isn't here to answer the
11  phone, I just think it makes a lot of sense to do
12  something other than having the phone ring and ring
13  and ring unanswered and have the people wonder
14  whether anyone's here or when they'll be able to
15  get through.  So I apologize for the interruption.
16  Sometimes that's not possible, but I was right
17  here.
18          So now, as I was saying, the -- with the
19  possible other couple little items, the evidence in
20  this case is closed.
21          Now, for the remainder of the afternoon,
22  I'm going to be working with the attorneys on
23  developing the exact presentation that I will give
24  you tomorrow with the instructions on the law and
25  also the verdict that you will have to answer.

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1138

1           It will be a multipart form with sub --
2   subparts to the questions, but we're working to
3   make it as easy to follow as possible.
4           It will be understandable, and I'm sure
5   that you'll be able to -- to clearly understand
6   what it is that we're -- what the questions are
7   that I'm asking that you answer.
8           The timing will be something like this:
9   I think we have to start at 8:30 again tomorrow.  I
10  was hoping it could be a little later, but,
11  unfortunately, the reason why is to give you a
12  substantial opportunity to deliberate in the
13  afternoon.
14          With the nature of this case and the
15  extent of the evidence, I would expect that my
16  instructions to you and then the closing arguments
17  of the two lawyers will likely consume the entire
18  morning.  And then what I'm hopeful for is that
19  you'll have the entire afternoon in which to start
20  your deliberations.  That would be Tuesday.  And
21  then you'll, of course, be able to have all of
22  Wednesday, which is -- was my original prediction
23  for the last day that we'd require your services.
24          It may not be.  It may be that you'll
25  spend -- that perhaps it will get a little bit of a

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1139

1    late presentation to you tomorrow and -- and you
2    might not get the case until 2:00 or 2:30 in the
3    afternoon, I don't know, but whether it's earlier
4    or later, it's not likely that you'll finish your
5    deliberations tomorrow afternoon.
6              And then on Wednesday, it may take all
7    day.  And then you might still not be in agreement
8    on your verdict, and you may then be required to
9    come back on Thursday to finish the work.
10             The point is this:  You've given us a lot
11   already.  You've given us now a week and a day, and
12   you'll continue to give the additional time to do
13   this important work for the people of the
14   community.
15             Don't stop now.  We -- we've -- it's not
16   just you.  The lawyers have worked tirelessly over
17   years to get all these details presented to you.
18   You are the jury that they selected, and if it
19   takes more than a day and a half for your
20   deliberations, well, then, that's the duty you
21   have, is to provide that time in order to do the
22   job of justice.
23             So what I'm just cautioning you about is
24   not to be intimidated or discouraged because of the
25   clock or the calendar.  After all of this time and

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1140

1    effort and with the significance of the issues in
2    this lawsuit, it's really important that you
3    continue to do this -- this work with integrity and
4    personal honesty, to continue to analyze and
5    discuss the matter until you reach the consensus
6    that's required to have a valid verdict.
7              So I thank you for everything that you've
8    done so far, and I thank you in advance for the
9    difficult work that you'll have in your
10   deliberations.
11             We will need you back at 8:30 tomorrow
12   morning.  I plan to make sure that we get
13   everything done this afternoon here for the rest of
14   the afternoon that I'm going to do now with the
15   lawyers so that we're ready to go right at 8:30.
16             These rules of who not to talk to and
17   what not to do are more important than ever now.
18   We've just got a short time left for you to have to
19   stick with these rules.
20             Rule No. 4, it's just as important as it
21   has been.  If you think you're missing something,
22   do not look for it on the Internet or anyplace
23   else.  It's not where you'll find the information
24   that you need.  You'll find the information that
25   you need from three other sources:  My instructions

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1141

1    on the law; the analysis and summations, even
2    though it's not evidence, from the lawyers; and the
3    viewpoint of the other jurors once the final 12 of
4    you meet together for your deliberations.
5              So do no homework.  Take the afternoon
6    off.  Enjoy -- is it still sunny out there?  Enjoy
7    the wonderful cool, crisp fall day, and catching up
8    on whatever, you know, we've kept you from so far
9    in the short time you have left this afternoon.
10             Rule No. 2 -- I'm sorry, that was 4.
11             Three is don't talk to the people
12   involved in the case, not even about the weather.
13             Rule No. 2 is about yourselves.  You
14   know, you've gotten the evidence, but you don't
15   know the law.  You don't know the questions on the
16   verdict form.  You haven't had the insight of the
17   lawyers' analysis in closing argument.  And there
18   are two extra jurors who are not going to be
19   allowed to deliberate with the rest of you.
20             It's sort of strange.  I am insisting and
21   demanding that all 14 jurors continue to be with us
22   up until the very end, and then what are we going
23   to do?  We're going to yank two people out.  But we
24   don't know who those are.  You don't know who those
25   are.  I don't know who those are.  The lawyers

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1142

1    don't know because we're going to pick a number out
2    of a box to figure out who the jurors are,
3    unfortunately, who will be removed.  But only the
4    12 final jurors will be the ones who have a say in
5    this, and so -- and not only that, but when you
6    deliberate, it must be all together.  All 12 have
7    to be there.  You can't do it in little groups, you
8    know, walking to your cars or coming in the line
9    for security.  It's got to be all together so each
10   of you can hear what the other has to say.
11             So Rule No. 2, don't talk to each other
12   about this case.  Do not share any thoughts and
13   impressions until you get that event when all 12 of
14   you are there for the purpose of your
15   deliberations.
16             And Rule No. 1, do not talk to anyone at
17   all about the case.  You know what I mean.  Do not
18   talk to anyone at all about the case.
19             Enjoy your afternoon and your evening,
20   and we'll see everyone back here refreshed at 8:30.
21             THE CLERK:  All rise for the jury.
22             (All rise for the jury.)
23             (Whereupon, the following proceedings
24   were held outside the presence of the jury:)
25             THE COURT:  Please be seated.  We are

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1143

1  still on the record.  What we have left is the
2  verdict form perhaps first and then the rest of the
3  instructions to follow, and --
4        MR. LAFFEY:  Two things, briefly.
5        THE COURT:  Two things.
6        MR. LAFFEY:  Point of clarification and a
7  technicality.
8        You -- before the jury came back in, Your
9  Honor, you denied the motion to dismiss, and we had
10  quite a conversation on the first ground for the
11  motion to dismiss but no comment was made on the
12  second ground, that the record is devoid of any
13  expert testimony or opinion that any product
14  distributed by Building Service Industrial Sales,
15  i.e., Kaylo, is defective and unreasonably
16  dangerous.
17        And I have the daily transcript here,
18  which includes the testimony of Mr. Parker, and I
19  will represent to Your Honor that there's no such
20  testimony in this record in this case.
21        So I didn't get a ruling on that.  I
22  wanted to point that out.
23        THE COURT:  Right.  And I wanted you to
24  explain exactly where the deficit was because you
25  were -- in your one sentence -- actually, two

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1144

1  sentences on the subject, it was a little bit
2  unclear to me exactly what you were saying.
3        MR. LAFFEY:  I'm sorry.  The basis for --
4  the second basis for the motion, Your Honor, is
5  that there's no testimony in this case from any
6  qualified expert that a product distributed by
7  Building Service Industrial Sales is defective and
8  unreasonably dangerous, period.
9        THE COURT:  Don't you think that would be
10  necessary then, Mr. McCoy?  I mean, isn't that an
11  issue?  And what -- and how do you respond?
12        MR. McCOY:  Certainly it's something we
13  have to prove, that the products were unreasonably
14  dangerous.  But, again, that's for the jury to
15  determine on the facts when they're applying the
16  law of the products, meaning be unreasonably
17  dangerous.  There's no requirement that we would
18  have a witness come into court and use the magic
19  words to say they're unreasonably dangerous.  Even
20  if that were to have happened specifically that
21  way, that wouldn't be binding on the jury.  That's
22  an element that we have to prove.
23        But the nature of the dangers, Judge, is
24  that the combination of hazards that we've talked
25  about, had many witnesses describe, for instance,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1145

1  there's no cure for this, that low levels of
2  exposure can cause it, that there was no warning on
3  the product, and that that combination of
4  circumstances is what we're going to contend in
5  closing makes the product unreasonably dangerous,
6  and that's a jury finding.
7        I don't think anybody has denied in this
8  courtroom asbestos was -- or has said in this
9  courtroom that asbestos was not dangerous.  The
10  question is the unreasonable element of it, and
11  that's the jury's prerogative to determine that.
12        We've got lots of evidence that if a
13  product will have these invisible fibers, that you
14  have no cure for it, that you can't see how far
15  they travel and they travel for a long distance,
16  that they're virtually indestructible, that under
17  that kind of circumstance, a jury could find that
18  this product, asbestos, is unreasonably dangerous.
19        THE COURT:  Mr. Laffey, why would you
20  need expert testimony when you've got those obvious
21  things?
22        MR. LAFFEY:  Well, I look at Dippel
23  versus Sciano, Judge.  I'd look at the standard of
24  proving a product liability case, and this will be
25  the first product liability case that I've ever

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1146

1  been involved in that gets to go to a jury without
2  some expert explaining to the jury why the subject
3  product, that would be a product sold or
4  distributed by my client, emphasized by Mr. McCoy,
5  which would be apparently Owens-Corning Kaylo, was
6  defective and unreasonably dangerous.
7        There is no testimony, none, that the
8  product at issue for which liability is being
9  sought to be imposed on my client for is defective
10  and unreasonably dangerous.  There is nothing.
11        THE COURT:  Wait, you said no expert
12  testimony.
13        MR. LAFFEY:  Right.
14        THE COURT:  But what about those facts
15  that Mr. McCoy just referred to?  Aren't those?
16        I mean, let's say we come up with a
17  simple analogy, some -- perhaps a -- perhaps a
18  flame lighter, like a BIC lighter.  Perhaps it's
19  got a large storage tank of fuel and it leaks and
20  it explodes and burns a kid -- and burns a kid's
21  arm off or something, or takes the life of a child
22  who was using it.
23        And the evidence comes in that the
24  company manufactured it this way, and perhaps
25  there's information that there were other -- that,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1147

1  in fact, it was a manufacturing defect.  Why would
2  a jury need expert testimony that that's
3  unreasonably dangerous and defective?
4          MR. LAFFEY:  You're not going to get that
5  kind of testimony, Judge, without an expert.
6  You're not going to get lay witness testimony to
7  say, in your instance, a lighter is manufactured
8  defectively or is unreasonably dangerous.  That's
9  not a matter of common knowledge.
10         THE COURT:  And if it leaks --
11         MR. LAFFEY:  And asbestos, Your Honor --
12  where talking -- what Mr. McCoy is talking about is
13  asbestos, not a product.
14         And there's no testimony that a product
15  that my client sold was defective and unreasonably
16  dangerous because my client didn't distribute or
17  sell asbestos.  They sold asbestos-containing
18  products, but they didn't sell asbestos.
19         And at best, what Mr. McCoy is talking
20  about is asbestos fibers and asbestos is dangerous.
21  There's no testimony that any product sold by my
22  client is defective and unreasonably dangerous.
23         THE COURT:  Okay.  Mr. Kaylo -- sorry,
24  Mr. McCoy, what about Kaylo?  Was there anyone who
25  talked about Kaylo?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1149

1  was that these half-rounds -- Kaylo was a calcium
2  silicate in that period of time.  They were 5 to
3  15 percent asbestos-containing; that the muds were
4  in that same category.  That was the testimony of
5  Dr. Hammar and Mr. Parker.  I don't know if
6  Dr. Anderson had gotten into it or not.  I think it
7  was sort of beat down by then already what the
8  percentages were, that there's what happens when the
9  fibers are released during the cutting or mixing
10  activities for these calcium silicate products or
11  for these cement muds.
12         The question of the defect was
13  specifically addressed in that it was testified to
14  by a couple witnesses that there was no warnings on
15  Kaylo specifically; including Mr. Popalisky
16  testified to that, there were no warnings on it.
17         Now, the defect in this case is and
18  what's in the jury instruction, of course, is that
19  the absence of a warning is the defect in this
20  situation.  And that's actually in the jury
21  instruction.
22         THE COURT:  You're saying you don't need
23  any expert testimony that that kind of warning is
24  required to --
25         MR. McCOY:  I do think we do need

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1148

1          MR. McCOY:  Kaylo was talked about in
2  that it was one of the calcium silicate materials
3  which are discussed throughout this case and that
4  Kaylo was in that same category.
5          THE COURT:  I mean, we have to -- you
6  have to show that there was a product that was
7  unreasonably dangerous and defective, and then we
8  compare the participation of your client to the
9  product and then, you know, all the Fuchsgruber
10  analysis.
11         But first there needs to be a product.
12  What product are you saying is dangerous?  I mean,
13  we went through this more than six months ago on
14  the question of whether it's asbestos that you're
15  complaining about or some product.
16         MR. McCOY:  The product is, of course,
17  the pipe covering materials.  It's the half-rounds.
18  It's the cement.
19         THE COURT:  Cement.
20         MR. McCOY:  Those two product.  The pipe
21  covering material.  The half-round in this case
22  from BSIS, the evidence is pretty clear, is Kaylo.
23  The cements, the only one they said was
24  Eagle-Picher.
25         But the point of our testimony, Judge,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1150

1  testimony about the necessary warning, and that's
2  what Mr. Parker talked about at length.  Remember,
3  I had him get up there on the board and describe
4  here's the four elements, the warning --
5          THE COURT:  Yes.
6          MR. McCOY:  -- here's the engineering
7  controls that could have been warned about and
8  talked about.
9          THE COURT:  He did.
10         MR. McCOY:  So that we did provide, yes.
11         THE COURT:  Mr. Laffey?
12         MR. LAFFEY:  I'd like a page cite to
13  where Mr. Parker testified that my client's product
14  was defective and unreasonably dangerous.  I'd like
15  you to find it.
16         THE COURT:  Well, he said a warning would
17  be --
18         MR. LAFFEY:  He said in general, in
19  general, from an industrial hygienist's point of
20  view, it would be good to have a warning about X,
21  Y, Z.  He never -- there's no testimony.  Mr. McCoy
22  can have my copy of the transcript.  I defy you to
23  find a page cite.  I defy it, because it's not
24  there.
25         THE COURT:  Okay.  Hold on just a minute,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1151

1   please.

2              MR. McCOY:  I don't have Mr. Parker's

3   testimony.

4              MR. LAFFEY:  I have it right here.  You

5   can have it.

6              MR. McCOY:  And I don't remember ever

7   asking Mr. Parker, and I don't think the opinion

8   would be allowed, whether is the product

9   unreasonably dangerous.  I don't think that

10  question has been allowed.

11             MR. LAFFEY:  Every product case I've ever

12  been involved with, a qualified expert on that

13  product is asked whether a product is defective and

14  unreasonably dangerous, and they tell you why.

15  This would be the first case -- and I represent as

16  an officer of the court, absolutely the first

17  product liability case I would ever have been

18  involved in that it would be permitted to get a

19  case to a jury without expert testimony explaining

20  to the jury why the product at issue is defective

21  and unreasonably dangerous.

22             MR. McCOY:  I appreciate Mr. Laffey's

23  representations.  I've had two findings of asbestos

24  products, including pipe covering, being

25  unreasonably dangerous on the floor of this

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1152

1   courthouse from juries, and I never did ask those

2   questions, Judge.

3              THE COURT:  Okay.  Just a minute, please.

4              MR. McCOY:  Although, Judge, I will point

5   out on page 547 of Mr. Parker's testimony in one of

6   the answers --

7              THE COURT:  Yes.

8              MR. McCOY:  -- he's testifying to -- he

9   says in his answer, "If it didn't have warning,

10  that's one of the components of making it

11  unreasonably dangerous, yes."  So apparently he

12  said it in an answer.

13             MR. LAFFEY:  So what?  To what,

14  Mr. McCoy?

15             MR. McCOY:  Well, the question was asked,

16  "Are you intending to offer an opinion to this jury

17  that a particular product is defective and

18  unreasonably dangerous due to the lack of some

19  warnings of some kind?

20             "Answer:  If it didn't have a warning,

21  that's one of the components of making it

22  unreasonably dangerous, yes."

23             I guess that's -- that's Mr. Laffey's own

24  question, Judge.  So like I said, I didn't ask the

25  witness that question.  I don't think I could

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1153

1   because that would be like a conclusion of the law.

2   But apparently in Mr. Laffey's examination, he did

3   say it.

4              MR. LAFFEY:  Did he identify a product,

5   Mr. McCoy?

6              MR. McCOY:  I don't -- I read to you what

7   he said.  The whole context of it I didn't look at

8   before.

9              MR. LAFFEY:  Okay.

10             THE COURT:  Well, he was referring to the

11  hypothetical -- I mean, he may -- I don't have the

12  transcript in front of me.  He may have been

13  referring to a hypothetical circumstance in which

14  a -- an asbestos-containing product had no warning.

15  And other witnesses testified that the Kaylo had no

16  warning, including -- I mean, that was the late

17  Mr. Popalisky who said that.

18             So please give me a minute.  I'm just

19  going to look at one little case here cited by

20  Mr. Laffey, and I'll be right back with you.

21             Well, what we've got here is no specific

22  analysis by any person with knowledge about the

23  Kaylo product.  Is that right, Mr. McCoy?

24             What we know is that Kaylo contained

25  asbestos, and you just told me that a witness said

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1154

1   a certain percentage of the -- of the weight or

2   volume of the insulating material was asbestos

3   fibers.  Is that right?  And that's specifically

4   for Kaylo or generally for pipe wrap?

5              MR. McCOY:  For pipe covering in that

6   period of time.  I have to see what they -- I'd

7   have to go back and review the piece of testimony

8   about what they said about Kaylo.  Because -- let

9   me see here.

10             I mean, there is testimony about Kaylo

11  witness by witness; I just don't remember it all,

12  Judge.  I'm just looking at, now that Mr. Laffey

13  gave me Mr. Parker's testimony, I asked Mr. Parker,

14  "Are you familiar with the product called Kaylo?"

15             And he talks about -- as an industrial

16  hygienist, I asked him, "Have you had to deal

17  specifically with Kaylo?"

18             He answered "Yes."

19             "Roughly, what was the asbestos content

20  of Kaylo back in the '50s and '60s?"

21             This is page 590 of Mr. Parker's

22  testimony.

23             "Well, the data, I've seen a lot of stuff

24  we've taken out, all of those typically range 5 to

25  15 percent, somewhere in there.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI   1155

1    "Did the pipe covering materials like
2    Kaylo, did they always have asbestos in them -- did
3    they?
4         "What time frame?
5         "Question:  Throughout.
6    "I have not run into any
7    non-asbestos-containing thermal insulation either
8    as described, like I said, the chalky white
9    silicate insulation that did not have asbestos in
10   them until starting in the '70s."
11        So I'm -- again, he's specifically
12   addressing my questions on Kaylo by saying this is
13   what all the materials were.  But he's talking --
14   he's answering about Kaylo.  And he says he knows
15   about Kaylo.
16        Let's see what else.
17        There's references throughout about Kaylo
18   in some of these experts.  Here's a discussion
19   about the asbestos fiber types in Kaylo.  Because,
20   remember, there was amosite, some of which were
21   more dangerous, the amosite types than the
22   chrysotile types on a quantity -- on a
23   fiber-by-fiber basis.
24        So on page 593 of Mr. Parker's testimony,
25   he says, "Some, like Kaylo, actually at times have

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI   1156

1    both in them depending on where you are."
2         So, again, he's saying Kaylo specifically
3    has the more dangerous fibers as well as the less
4    dangerous fibers in it.
5         THE COURT:  What is he saying about --
6         MR. McCOY:  There's references throughout
7    about Kaylo.  I mean, Judge, I can go through and
8    find each reference to Kaylo.
9         What I, though, say is that the
10   unreasonably dangerous and defective nature of the
11   pipe coverings was that there weren't warnings on
12   any of the pipe coverings.  Kaylo specifically is
13   referenced in Mr. Popalisky's testimony as having
14   no warnings on it.
15        The characteristics of the pipe coverings
16   which contained this 5 to 15 percent asbestos is
17   talked about throughout this case in the form of
18   calcium silicate, with occasional direct references
19   to Kaylo being the same as all those other calcium
20   silicates.
21        THE COURT:  Okay.
22        MR. McCOY:  I mean, that's throughout
23   this -- that's throughout this evidence.  I'd have
24   to go through --
25        THE COURT:  What I think I need is to

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI   1157

1    give you the opportunity, Mr. McCoy, to gather it
2    all together and preferably to write something for
3    me showing how you're going to -- that is, how the
4    jury can conclude that the specific product
5    supplied by BSIS was unreasonably dangerous and
6    defective.
7         Now, it might all be there in these bits
8    and pieces.  And it would not be fair for me to
9    take the word for it from Mr. Laffey or you,
10   Mr. McCoy, just based on what we all recall of the
11   evidence.  You've got the daily copy, and so I need
12   you to pull it together.
13        And Mr. Blackstock should learn, you
14   know, what it's really like to be a lawyer.  It's
15   not like the fun and games of law school anymore.
16   It's -- particularly in a trial, I'm sure he
17   already knows, it's the full, total commitment of
18   everything you've got.
19        And in the meantime, I will defer the
20   remaining issues on this motion and will do the
21   verdict form followed by the jury instructions.
22   But I do need a break first because I did not eat
23   enough over the lunch hour.  I was working on those
24   graphics, and so when we come back in about 10 or
25   15 minutes, we'll talk about what factors we

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI   1158

1    really -- what subjects we really have to present
2    to the jury in terms of the inquiry, what we really
3    need them to answer in terms of subject areas on
4    the verdict form.
5         Thanks.  15 minutes.
6         (A recess was taken.)
7         THE COURT:  We are back on the record.
8         You've both -- I assume you've both had
9    the opportunity to look at what I prepared and laid
10   out with respect to jury verdict at least, which I
11   think we have to conclude before we go any further
12   with the set of instructions.
13        And who wants to go first with some
14   comments about how -- what the questions are that
15   we should ask of the jury and how to lay them out.
16   Mr. McCoy.
17        MR. McCOY:  Judge, I would, except I'm
18   looking for my copy.  And I was also --
19        THE COURT:  How about if I give you mine?
20        MR. McCOY:  Okay.  I found my copy.
21        THE COURT:  Okay.
22        MR. McCOY:  This special verdict form,
23   the questions I got go through number --
24        THE COURT:  Mr. Blackstock, would you
25   hand Mr. McCoy the microphone?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1159

1    MR. BLACKSTOCK:  Yes, Your Honor.
2    MR. McCOY:  The questions I've got go
3  through No. 7.  And is this a complete set of
4  questions that Your Honor envisions basically?
5    THE COURT:  You know, it's a starting
6  point for us to talk about.  But no, I don't
7  think -- I'm not thinking of more at this point.
8    MR. McCOY:  All right.
9    MR. LAFFEY:  I don't believe -- on
10  Question 7, I don't believe there are any other
11  questions you can ask.
12    THE COURT:  Well, funeral expenses was on
13  there at one point, but I don't know -- I don't
14  remember if there was any testimony about it, but if
15  there was --
16    MR. LAFFEY:  There hasn't been any.
17  There's medical bills that I believe we're just
18  going to stipulate to the amount.  I think it was
19  $12,000.  And I've seen nothing in the way of
20  funeral expenses, Your Honor.
21    THE COURT:  Okay.  So, Mr. McCoy, you
22  were saying?
23    MR. McCOY:  Yes.  Okay.  My comments
24  first were that the inclusion of other product
25  suppliers on this form, I thought we had already

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1160

1  dealt with that in the context of strict products
2  liability, that we were left only with Building
3  Services as the comparison to the plaintiff and
4  that -- or the products that they sold, is what I
5  should say, as comparison to the plaintiff, and
6  that the other companies -- the only one that I
7  remember being discussed on the verdict form was
8  Bartelt, that there was a contribution claim.  And
9  I didn't see any attempt to try a contribution
10  claim in this case.
11    So I assume if that's -- if that's not
12  part of the case, that we're basically just left
13  with the question of the Building Services product.
14    THE COURT:  Okay.  I'm going to start --
15    MR. McCOY:  That would be the comparison.
16    THE COURT:  Just in order to do this in
17  some kind of orderly way, I'm going to ask
18  Mr. McCoy a couple more things and let you know
19  some of my thoughts, and eventually we'll get to
20  Mr. Laffey also.
21    You know, at one point, that's exactly
22  what I said, Mr. McCoy, that it's just the issue of
23  the defendant product as compared to the
24  plaintiff's own contributory negligence.  But then
25  Mr. Laffey pointed out that you had settled some

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1161

1  matters with Pierringer releases, in which case you
2  would take the percentage due, that percentage
3  attributable to that particular product -- or,
4  rather, contribution level, and so just for a
5  minute, if I essentially accepted your entire point
6  of view on that, Mr. McCoy, that the verdict should
7  not compare the participation of other parties who
8  have not -- for whom -- that is, other companies
9  who are not actually parties to the lawsuit for
10  contribution purposes, if that's the case, still
11  wouldn't I have to include so we know about the
12  contribution those who you've released through
13  Pierringer so that then when it comes to
14  determining who owes what with the joint and
15  several liability, Helen Goss can take the part of
16  those parties.
17    MR. McCOY:  Okay.  I agree, if there's a
18  contribution claim, that there has to be
19  distribution among the potential contributors.
20  And, Judge, you have to pardon me.  And I can say
21  this right up front because I'm just not an expert
22  in contribution law by any means.
23    THE COURT:  Contribution?
24    MR. McCOY:  Contribution law, as to how
25  that should work.  That's the defendant's

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1162

1  bailiwick.  I can only tell you my gut reaction to
2  this, which is, yes, that's how it would work if it
3  was a contribution claim.
4    What I'm saying is I didn't hear anything
5  or see any pleadings creating that contribution
6  claim.  And I know -- I know it was discussed, but
7  I never saw it.  And I -- and, Judge, I go back to
8  the order that was entered on April 10th, 2008.
9  And I do have a copy of that, Your Honor.
10    THE COURT:  Do you want to just tell me
11  about it?  What does it say?
12    MR. McCOY:  Okay.  Should I read it or do
13  you want to --
14    THE COURT:  Sure, you can read it.
15    MR. McCOY:  Because it's a few
16  paragraphs.
17    THE COURT:  Just whatever you want --
18  whatever point you want to make about it.
19    MR. McCOY:  So this order was entered by
20  Your Honor on April 10th, 2008.  And it says, "The
21  plaintiff is dismissing her negligence claims
22  against the sole remaining defendant, Building
23  Services Industrial Sales, with prejudice."  That's
24  No. 1.
25    No. 2, "That this court granted Building

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1163

1    Services Industrial Sales Company's motion for
2    reconsideration and agreed to revisit its decision
3    regarding Motion in Limine No. 8 to preclude any
4    testimony that suggests that Building Services
5    Industrial Sales Company supplied
6    asbestos-containing products to Bay/Taylor
7    Insulation.
8         "After reconsideration, for the reasons
9    stated on the record, the Court stands by its prior
10   decision allowing plaintiff to adduce evidence of
11   sales by Building Services Industrial Sales Company
12   of asbestos-containing products to Bay
13   Industries/Taylor Insulation."
14        No. 3, "That the structure of the verdict
15   form that will be submitted to the jury in this
16   matter relative to the assessment of fault will
17   ultimately depend upon the evidence produced at
18   trial.  However, based upon the pretrial
19   proceedings in this matter, it appears likely that
20   the verdict form will ask the jury to compare the
21   fault of Clarence Gosz to the product known as
22   Kaylo.  The jury will then be asked to compare the
23   fault of BSIS with the fault of International Paper
24   and Bartelt Insulation Company."
25        THE COURT:  Are those the two Pierringer

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1165

1    again?
2         MR. McCOY:  International Paper and
3    Bartelt Insulation are the ones that were in the --
4    that were in the last order.  And those are the two
5    Pierringer release defendants.
6         THE COURT:  So we'll take whatever
7    percentage is assigned to International Paper and
8    whatever -- and whatever percentage is assigned to
9    Bartelt Insulation and reduce the 100 percent
10   responsibility for the damages that BSIS would owe
11   by those amounts, and by the amount that Clarence
12   Gosz is responsible, to come up with the amount due
13   to Helen Goss if the -- if the jury finds that BSIS
14   is more at fault than Clarence Gosz.
15        So having -- so my question then is, if
16   that's how we do it, I'm sure it's not going to
17   please either lawyer, but I need to hear why from
18   both of you.  And we're still starting with
19   Mr. McCoy.
20        MR. McCOY:  Okay.  Again, not knowing
21   contribution law, I'm at a big disadvantage here,
22   but if there's two -- essentially two questions,
23   which is what I understand in Fuchsgruber, one is
24   the comparison between the plaintiff and the
25   product --

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1164

1    companies?
2         MR. McCOY:  Those were the two Pierringer
3    companies.
4         THE COURT:  Okay.
5         MR. McCOY:  So that's the order that I'm
6    looking at.  But I still didn't see anything that
7    structures that kind of a claim.  And I say that,
8    Judge, because not being a contribution lawyer, I
9    really have no clue how this works if you don't
10   file a formal, whatever you call it, complaint -- I
11   call it a plaintiff, but in contribution, maybe
12   it's got a different name, but something that says
13   here's what we're pursuing.
14        THE COURT:  Let me ask you this:  What's
15   the harm if we put everyone on the verdict form and then
16   do our own separate -- on the comparison and then
17   do our own separate analysis as to what that means?
18        In other words, if Clarence Gosz was less
19   at fault than BSIS, you'd have your judgment with
20   joint and several liability, and then the BSIS
21   percentage would be essentially presumed at that
22   point to be 100 percent minus whatever percentage
23   Clarence Gosz is.  And then in addition to that,
24   the percentages for the two Pierringer companies --
25        Do you want to tell me what they are

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1166

1         THE COURT:  We could do it sequentially.
2         MR. McCOY:  -- that is on trial, there
3    should be a two-part comparison, the plaintiff
4    against the BSIS pipe covering.  And that may not
5    be the perfect word when I say "BSIS pipe
6    covering."  And that's No. 1, is plaintiff more at
7    fault or BSIS more at fault on that, or is BSIS at
8    fault at all?
9         Then the next question being everybody
10   who might be responsible for exposing Mr. Gosz to
11   asbestos in contribution, which would include a lot
12   of companies' names that I've heard here,
13   Johns-Manville, all the seven or eight affidavits
14   that Mr. Goss signed from the prior proceeding --
15   and those were all in the contribution list -- I
16   suppose that -- that's a way to work the
17   contribution claim.
18        But it would be a lot of entities on that
19   contribution question, which is a separate question
20   under Fuchsgruber.  So --
21        THE COURT:  Yes.
22        MR. McCOY:  -- might have 25 or more
23   entities on even in this case if we went through
24   the list.  Probably more than that.
25        But I think that would -- that would

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1167

1  be -- again, without knowing contribution law, that
2  sounds okay to me, on the contribution issue, to
3  resolve that.  Again, just assuming, Judge --
4           THE COURT:  You're saying it's a two-step
5  process.
6           MR. McCOY:  Right.  It has to be two
7  step, that's right, that's for sure, under
8  Fuchsgruber.
9           THE COURT:  It certainly seems -- without
10  having heard Mr. Laffey yet, it sounds like that's
11  pretty much what Fuchsgruber says, once we know
12  what the product is that we're using.
13           MR. McCOY:  But I do have to keep that
14  caveat in there is that I'm really depending on
15  Your Honor to -- on the contribution claim, I can't
16  tell you what the law is.  I can go out and
17  research it if I had to, but I believe that it
18  includes all the possible entities.
19           THE COURT:  Well, yeah, that's true.
20  That may be the case, but as far as the law on
21  contribution goes, it's interesting because
22  Mr. Laffey may know the law, but I don't really
23  think anyone in Wisconsin does because it's not a
24  negligence case.  And what we're doing is
25  struggling -- we've been struggling throughout the

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1169

1  testimony that Mr. Gosz and his mesothelioma were
2  caused by, specific testimony, by Celotex products,
3  Johns-Manville products, Foster-Wheeler products
4  and Combustion Engineering products.
5           That testimony was obtained from
6  Dr. Hammar and Dr. -- and Mr. Parker.  And
7  Mr. Parker testified that those products were
8  defective and unreasonably dangerous as well.
9           The record this jury has heard
10  specifically -- specifically are that those
11  products were substantial contributing factors to
12  his mesothelioma and that those products were
13  specifically defective and unreasonably dangerous.
14           The law in this state, Fuchsgruber or
15  not, is that all substantially causal entities or
16  things get submitted to the jury.  That has been
17  the law forever.
18           Fuchsgruber is not applicable to this
19  case because Fuchsgruber was a one plaintiff/one
20  product case.  There were no other potentially
21  contributing factors to the loss in Fuchsgruber.
22  It was a product.  And the only issue in
23  Fuchsgruber was whether the defense was going to be
24  able to parse out all the participants in the
25  product chain so that it could put them all

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1168

1  entire time that the three of us have been together
2  on this and the Eske and Schieble case is we're
3  struggling to figure out how to interface the
4  negligence concepts in Wisconsin law with the
5  strict products liability concepts and, without
6  using the fault aspect of negligence, how we
7  compare responsibility.
8           In any event, Mr. Laffey, how do you
9  think we should do this and what do you think about
10  initially starting with a simple comparison of the
11  one product with Mr. Gosz?
12           MR. LAFFEY:  Disagree with it completely.
13  Now, that can't be a surprise to Your Honor.
14           THE COURT:  No, it's not.
15           MR. LAFFEY:  My views on this have never
16  changed, and I dare say, until the Court of Appeals
17  and/or the Supreme Court tells me that my views
18  need to change, they're not going to change.  And
19  that's -- I mean, that's with all due respect.
20  It's just a matter of fact.
21           So we're back in our circular discussion,
22  Your Honor, that we were back in March, April, and
23  maybe even slopping into May.
24           But the record in this case is
25  unequivocally clear.  There is unquestionable

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1170

1  separately on the verdict in an attempt to get a
2  negligence apportionment that would get them lower
3  than the plaintiff under 895.045.
4           To that extent, Fuchsgruber does not deal
5  with our situation.  It simply does not.  And we're
6  left with the controlling authority that we've
7  cited to you many times, Connar and Sumnicht,
8  et cetera, that calls for all potentially at fault
9  entities and people to be presented to the jury and
10  apportioned as part of 100 percent pie of causal
11  fault.
12           THE COURT:  And Connar and Sumner, if I
13  remember correctly --
14           MR. LAFFEY:  Sumnicht.
15           THE COURT:  What?
16           MR. LAFFEY:  Connar and Sumnicht were a
17  combination products/negligence cases, and they
18  involved nonparties and immune parties.  And all
19  were submitted to the jury because evidence was
20  submitted in the trial that they were substantial
21  factors in causing the harm.  That is exactly what
22  we have in this case.
23           Moreover, Your Honor, if one were to look
24  at the exhibits in their entirety, Exhibits 1001
25  through 1005, I believe, you will find in there

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1171

1   that Pierringer releases were entered into with
2   those parties.
3          THE COURT:  Will you tell me which --
4   now, you started out, Mr. Laffey, with the list of
5   products that you say contributed to Mr. Gosz's
6   mesothelioma.  Would you tell me that once more?
7          MR. LAFFEY:  Certainly, Your Honor.
8   Celotex asbestos-containing materials;
9   Foster-Wheeler asbestos-containing boiler;
10  Combustion Engineering asbestos-containing boilers;
11  and Johns-Manville pipe insulation.
12         As Your Honor will recall, the only pipe
13  insulation or insulation products that were
14  identified by any witness who ever worked with
15  Mr. Gosz was Johns-Manville products.  They've all
16  been identified specifically.
17         Dr. Hammar testified that those exposures
18  would be substantial contributing factors in his
19  getting mesothelioma.  And Mr. Parker, plaintiff's
20  liability witness, testified critically of each and
21  every one of those products as being defective.
22         THE COURT:  Specifically then, you're
23  saying a total of five manufacturers, the four that
24  you listed and Owens-Corning Fiberglass?
25         MR. LAFFEY:  Accepting Your Honor's

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1172

1   position that there was evidence submitted that the
2   product was even identified as to the fact that it
3   was unreasonably dangerous and that he was exposed
4   to it, but that's what we're here for, so I assume
5   that that's what you put on.  I don't agree with
6   that.  But yes, if you're going to put the product
7   sold by my client on there, then you would have to
8   put on at least those four, yes.
9          There's also testimony by Mr. Parker
10  critical of paper mill owners, such as Thilmany,
11  which is the International Paper property, that
12  where these paper mills specify use of asbestos,
13  which has been the undisputed testimony in this
14  case, that these properties specify the use of
15  asbestos, that they were under an obligation to be
16  aware of the medical issues surrounding asbestos
17  and they have an obligation under the state
18  statutes and the medical state of the art to
19  exercise care for the safety of the employees and
20  under safe place, obviously, for those frequenters
21  on the premises, one of whom would be Mr. Gosz.
22         And there's been testimony, Your Honor,
23  that none of these work sites had any provisions
24  for the safety of these individuals, no air
25  testing, no segregation of work, no anything.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1173

1          THE COURT:  How does that help us with
2   the verdict or --
3          MR. LAFFEY:  I think they have to go on
4   the verdict as part of the apportionment of fault,
5   Your Honor, not as a separate -- a separate
6   comparison later.  It all is contributing to the
7   fault assessment.  And it is fault; it's tortious
8   fault.  It's not negligence necessarily, but it is,
9   in fact, tortious fault because we have a
10  collection of substantial factors, Your Honor, that
11  contribute to the totality of Mr. Gosz's
12  mesothelioma.
13         And as you said, as you noted earlier,
14  it's not the cause, it's a cause.  It's not the
15  substantial factor, it's a substantial factor.
16         THE COURT:  What about the joint and
17  several liability which is a principle of strict
18  products liability?  In other words, once we get
19  all this information, isn't BSIS -- doesn't BSIS
20  have 100 percent duty to pay the damages?
21         MR. LAFFEY:  No.
22         THE COURT:  Why not?
23         MR. LAFFEY:  Because I don't think
24  Fuchsgruber stands for that proposition.  It stands
25  for that proposition relative to a particular

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1174

1   product, okay?  So let's just assume for sake of
2   our discussion that you choose to attribute
3   Owens-Corning Kaylo -- okay -- to BSIS -- all
4   right -- on the product comparison.
5          Whatever percentage of fault is
6   attributable to that product, then you have inside
7   the comparison of that product, Your Honor,
8   Mr. McCoy could then tag whoever is inside that
9   product chain for the percentage of fault --
10  percentage of causal harm that that product caused.
11         This doesn't escape 895.045 for the
12  totality comparison of fault, the 100 percent.
13  Fuchsgruber doesn't stand for that because
14  Fuchsgruber was not a joint and several case.
15  Fuchsgruber was a plaintiff versus a product.
16         And 895.045 does not come into play in
17  that case except -- except for the principle that
18  if the plaintiff is more at fault than the
19  defendant or the defendant product, plaintiff
20  loses.  There wasn't a multiple party case in
21  Fuchsgruber.
22         THE COURT:  Okay.  Just a minute, please.
23  Well, let me ask you this, Mr. Laffey.
24  If the product that was being accused of causing
25  harm and being unreasonably dangerous and defective

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1175

1   was the chemical called ibuprofen, chemical
2   compound ibuprofen, and the names that were --
3   rather, the different manufacturers and different
4   products -- I'm sorry, I said that wrong.
5          Let's say the product that was at trial
6   here was Advil and you also put on the verdict form
7   Motrin.  And let's say, hypothetically, both of
8   them -- one is identical to the other.  In other
9   words, it's like fungible.
10          Then for your theoretical analysis under
11   Wisconsin products liability law, are they -- is
12   that one product or more than one if you can just
13   exchange one for the other and it basically has the
14   same effect on the body?
15          MR. LAFFEY:  Well, they're separately
16   identifiable products, aren't they, Your Honor?
17          THE COURT:  Yes.
18          MR. LAFFEY:  They are.  And they are
19   separate entities against which to pursue a claim.
20   And there are means whereby you can separate out
21   Motrin from Advil.  They don't look the same,
22   Judge.  The containers are completely different.
23   They are distinct in that manner.  They may both be
24   made up of 200-milligram pills in those containers,
25   but they are marketed differently, they are

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1177

1          These are not fungible products.  There's
2   no record that they're fungible, nondistinguishable
3   products.  They're very discrete, and they've been
4   discretely identified by the plaintiff.
5          THE COURT:  So you would say that -- that
6   under Wisconsin's principles of strict -- strict
7   products liability and the joint and several
8   liability for every party in the chain of
9   distribution, that each product gets considered
10   separately and compared against each other and that
11   there is no joint and several liability as to the
12   separate -- the harm caused by each -- by the
13   various separate products, only joint and several
14   liability for the distribution of each
15   individual discrete product?
16          MR. LAFFEY:  Inside of each product, Your
17   Honor.  The --
18          THE COURT:  Mr. McCoy?
19          MR. LAFFEY:  -- the products themselves,
20   which in the product liability analysis, are the
21   causal things, okay -- the pockets of cause are the
22   products if they're proven to be defective and
23   unreasonably dangerous.
24          THE COURT:  So that between BSIS and the
25   manufacturer, Owens-Corning Fiberglass, and perhaps

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1176

1   packaged differently, the pills are different
2   shape, different colors, different appearance.  So
3   no, they are not the same product.  They are
4   distinctly identifiable.
5          The same is true in this case, Your
6   Honor.  We have unchallenged -- unchallenged
7   testimony that Mr. Goss was specifically exposed to
8   products specifically manufactured by specific
9   manufacturers.  Dates, places, Judge, product
10   identifications, all of it here unchallenged in
11   this record.
12          They're not all the same product.
13   They're all very different product.  Boilers are
14   not pipe insulation.  Foster-Wheeler is a boiler
15   company.  Combustion Engineering is a boiler
16   company.  Johns-Manville manufactured 85 percent
17   magnesia and Thermobestos.  And they're
18   specifically identified by Mr. Goss as being
19   exposed to him in places, during times
20   specifically.
21          The same is true with the Celotex
22   product.  These are specifically identifiable
23   product.  We are not slopping into some potential
24   market share risk contribution, Thomas or Collins
25   versus Eli Lilly situation.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1178

1   some major warehouse or -- I can't remember what
2   the combination --
3          MR. LAFFEY:  In the chain of distribution
4   for a Building Service product in this case would
5   be the manufacturer, the supplier, and the
6   installer.  And according to Mr. McCoy, that's Bay
7   and/or Bartelt.  They would be inside the chain.
8          THE COURT:  Okay.  Now, Mr. McCoy,
9   looking at each of these separate items, the
10   Celotex, the Foster-Wheeler, the Combustion
11   Engineering, the Johns-Manville, you say you're not
12   an expert with respect to Wisconsin law on the
13   subject of contribution, but doesn't -- isn't what
14   Mr. Laffey is saying somewhat persuasive, that, in
15   fact, there's no joint and several liability as to
16   the harm caused by the different products, that
17   each one should stand on its own?
18          MR. McCOY:  I don't agree with that,
19   Judge, because Fuchsgruber said the amendment to
20   the statute on comparative negligence did not
21   change the historical law of joint and several
22   liability in the strict products liability case.
23   And there's nothing that I've ever seen that
24   says -- in any strict products liability case that
25   there's been some sort of distribution of the

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1179

1    responsibility based on the different products in

2    the strict products liability cases in Wisconsin.

3              It's been -- I mean, joint and several

4    liability is that; it's joint and several.  And the

5    idea again, Judge, I keep saying -- I said this

6    before when we had the original arguments, but

7    there's nothing that precludes Mr. Laffey's client,

8    being jointly and severally liable, from now

9    turning around and filing its contribution claim to

10   go after everybody else who's responsible.

11             So the plaintiff has had the one trial,

12   has been -- has reached a certain amount of

13   responsibility for whatever defendants are jointly

14   and severally liable, has pursued the case against

15   one or more of those defendants, and that money

16   then goes to the plaintiff, subject to whatever

17   Pierringer offsets might exist.

18             And then from there, Building Services

19   can go out and pursue that claim and argue all the

20   different defendants, what their responsibilities

21   might be.  I don't have any reason to doubt that

22   right exists.  In fact, I've seen many times where

23   it says under the law that, once the amount of

24   liability is determined, that's when the statute

25   starts running on the claim that might be filed

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1180

1    amongst the various --

2              THE COURT:  Well, let me ask you this,

3    Mr. McCoy:  Let's say the evidence were more

4    available, and let's say that Mr. Gosz spent most

5    of his career doing -- most of his career doing

6    boiler enclosures, with -- that is, working with

7    brick masonry, right up against boilers that had

8    asbestos covering.  And sometimes, you know, he had

9    to cut into the asbestos.  And Celotex or

10   Foster-Wheeler or Combustion Engineering made those

11   products.  And then one day a year for 25 years, he

12   worked in the -- in the vicinity of Owens-Corning

13   Fiberglass product known as Kaylo supplied by BSIS,

14   and the other 364 days a year -- he was a hard

15   worker and worked every day -- it was right up next

16   to the boilers.

17             And let's say, hypothetically, you sued

18   BSIS.  What -- and what are we supposed to ask the

19   jury about that?  Do you understand what I'm

20   saying?

21             MR. McCOY:  I understand what you're

22   saying, Judge.

23             THE COURT:  We're talking about different

24   products, aren't we?

25             MR. McCOY:  I understand what you're

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1181

1    saying, that there are different products involved.

2              But, again, joint and several liability

3    from a causation standpoint doesn't -- doesn't make

4    it necessary to include all the different products

5    in the lawsuit.  If one of the -- if it's just a

6    substantial cause, then it's joint -- there's joint

7    and several liability.  That's the law.

8              Fuchsgruber made clear that that law had

9    not changed in the comparative negligence statute.

10   That's where we went with this products liability

11   claim, why I did what I did here, is to keep out.

12   And that's why the original ruling of Your Honor

13   was to keep out all the additional clutter of

14   evidence that might be required to --

15             THE COURT:  Right.  And I really thought

16   at the time -- and this is what I felt so badly

17   about, Mr. McCoy -- that I really thought at the

18   time that that would clear this all up.  But, you

19   know, Mr. McCoy is a little more -- a little more

20   of a deep thinker than I had been myself.

21             MR. LAFFEY:  Mr. McCoy or Mr. Laffey?

22             THE COURT:  What?

23             MR. LAFFEY:  Mr. McCoy or Mr. Laffey?

24             THE COURT:  I'm sorry, Mr. Laffey is more

25   of a deep thinker than I am myself.  On some

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1182

1    subjects I can be very deep.  And, obviously, this

2    is his job as an advocate, and he's convinced me

3    that it wasn't quite that simple.

4              Let me give you another hypothetical.

5    Let's say that Mr. Gosz worked around asbestos.

6    Well, you just had this example.  And also he was a

7    smoker.  And let's say he had the opportunity to

8    sue someone with respect to the harm caused by

9    the -- by the tobacco and also sue BSIS for

10   supplying the asbestos.

11             Do you -- is it -- I mean, I'm going to

12   switch the hypothetical and say that -- one, I'm

13   not going to use the smoking.

14             MR. LAFFEY:  You could use smoking if you

15   assumed that the injury was lung cancer, not

16   mesothelioma.  Then you might have a contribution

17   on cause from the smoking and asbestos.

18             THE COURT:  Let's say it's asbestos and

19   mesothelioma.  And then the -- and then in order

20   to -- in order to ease the pain from the continual

21   lung -- let's say coughing, Mr. Gosz uses some

22   inhaler that was laced with some kind of poison;

23   that is, unintentionally, but it came from China

24   and they tried to save some money, and there was --

25   and the product was unreasonably dangerous and

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1183

1    defective.
2              So now we've got him -- the guy dying of
3    mesothelioma specifically from BSIS Kaylo, and he
4    actually inhales some other unreasonably dangerous
5    and defective product which causes his death more
6    quickly, let's say, another couple weeks of
7    excruciating suffering.
8              Are you not going to -- I mean, these are
9    discrete, separate products.
10             MR. McCOY:  Right.
11             THE COURT:  They're not in the same
12   chain.
13             MR. McCOY:  Right.  That's different.
14             THE COURT:  Are they both jointly and
15   severally liable?  And let's say, for some reason,
16   you can sue them both.  Are they both jointly and
17   severally liable or not?
18             MR. McCOY:  In the example Your Honor
19   just gave, I don't believe they're jointly and
20   severally liable for the full injury if you combine
21   the part from the mesothelioma plus the part from
22   the inhaler because those are two distinct things.
23             It's like the second crash or car injury
24   type of case.  That's already been dealt with under
25   the law, that you've got -- I can't remember, it's

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1184

1    one of those cases we talked about by name, but it
2    was the one where there was the car crash and there
3    was the negligent driver, and then there was the
4    negligent seat belt or something like that, auto
5    manufacturer.  So you had two different things.
6              MR. LAFFEY:  Sumnicht.
7              MR. McCOY:  Sumnicht?  Okay.
8              MR. LAFFEY:  Sumnicht versus Toyota.  It
9    was a strict liability claim on the seat belt.
10             MR. McCOY:  And see, there was some
11   different treatment there, I know.  That's
12   different.
13             I mean, here you have mesothelioma as the
14   injury resulting from the products of more than one
15   defendant.  It's only one injury here.
16             THE COURT:  Have you established that
17   asbestos fiber is fungible?
18             MR. McCOY:  Well, I would say, yeah,
19   basically it's fungible, yes.  I don't doubt that.
20   I mean, it's all dangerous.  People may disagree
21   with me scientifically, but I'm just saying that's
22   the gist of our evidence in this case, is that
23   asbestos fibers are all dangerous.
24             MR. LAFFEY:  Can I just ask where that
25   testimony came from in this case?  Because I didn't

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1185

1    hear it.  I'm just -- because that's news to me,
2    Your Honor.  If there's testimony in this record
3    that asbestos fibers are fungible and that
4    Mr. McCoy really is putting in a record on a market
5    share risk contribution theory, I missed that
6    evidence.  I just didn't hear it.
7              I did hear that all exposures are
8    substantial contributing factors to mesothelioma,
9    which means exposures to Celotex, Foster-Wheeler,
10   Combustion Engineering, Johns-Manville,
11   Owens-Corning's Kaylo, if proved.
12             Those are all substantially contributing
13   factors, and despite Mr. McCoy's protestation, the
14   law in this state has been that all substantial
15   contributing factors get submitted to the jury so
16   that they can assess how that plays out as a matter
17   of apportionment of cause and fault, causal fault,
18   tortious fault, out of 100 percent.
19             That has always been the case in this
20   state, Judge, and it has never, to my knowledge in
21   my -- since 1985 when I started practicing here, I
22   have never known that a plaintiff could define what
23   a jury could hear in terms of how to divide up
24   fault, how to divide up cause.  If there's
25   admissible evidence presented to the jury that says

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1186

1    there's more than one cause, more than one
2    substantial factor, I have never known a jury not
3    to be permitted to consider all of that evidence in
4    assessing that 100 percent on cause.  I've never
5    known it.  And that's what Connar is.
6              THE COURT:  Mr. McCoy, you know, there's
7    some -- there are some fairness issues here, and if
8    there are all these different contributing factors,
9    but you can't, you know, really put your finger on
10   which one caused it, or perhaps a lot of defendants
11   are unavailable, the fairness might sort of lead
12   the courts to provide for the joint and several
13   liability that you say exists here in Wisconsin.
14             But then there's sort of the flip side of
15   it, and that is that if you've -- Clarence Gosz or
16   Helen Gosz has made claims against various
17   manufacturers or trust funds or distributors,
18   either in other lawsuits, perhaps -- perhaps in
19   bankruptcy court or in the federal district court
20   or in -- in settlements with certain defendants,
21   isn't there a fair -- shouldn't I have a concern
22   about the fairness of allowing the other
23   resolutions and then still ordering joint and
24   several liability for whoever is left unsettled?
25             MR. McCOY:  Oh, I thought there was some

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1187

1    form of offsets on that.  I mean, that's -- I
2    thought joint and several liability was applicable
3    to whatever part of the recovery wasn't recovered
4    someplace else.  I mean, that's my understanding of
5    joint and several liability.  I mean, you know,
6    you're liable for whatever hasn't been collected
7    from everybody else.
8            But, again, they have their right to go
9    out there and file that lawsuit, too; BSIS
10   certainly does.
11           THE COURT:  So theoretically, if the jury
12   determines that the damages are $100,000, and you
13   say BSIS has joint and several liability and,
14   theoretically, you've already recovered from other
15   parties $150,000, what does BSIS pay for this
16   lawsuit?
17           MR. McCOY:  If that's been the recovery
18   for the mesothelioma claim, then I don't know
19   the -- again, Judge, I don't know the exact law,
20   but it would be -- my reaction would be that there
21   probably wouldn't be a recovery against BSIS if the
22   amount of the verdict was less than the amount that
23   had been recovered for that same injury.
24           THE COURT:  But now you're making a
25   distinction between a mesothelioma claim and some

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1188

1    other lung cancer claim; is that right?
2            MR. McCOY:  Well, the earlier asbestos
3    injury, so they're different.
4            THE COURT:  Asbestos injury.
5            MR. McCOY:  Right.  Because he did have
6    some settlements.  I mean, they're not big
7    settlements; they're small.
8            THE COURT:  Okay.  But how come you can
9    make these distinctions but you're saying Mr.
10   Laffey -- maybe I'm just too simple.  Maybe I don't
11   think deeply enough.  It's possible that you're
12   totally right, Mr. McCoy.
13           MR. McCOY:  I thought what I just said is
14   basically -- is that operates regardless of
15   whatever the structure of the verdict form is, that
16   you can't recover more from joint and several
17   liability than what the defendants they determine
18   to be liable for or what -- what -- Judge, I spoke
19   wrong, what the value of the loss is in total.
20           THE COURT:  But wouldn't the asbestos
21   injury that you've gotten some recoveries for in
22   the past really be a part of the development of the
23   mesothelioma?
24           MR. McCOY:  Wisconsin law has that Sopha
25   decision where you've got two separate causes of

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1189

1    action, one for your nonmalignant, one for your
2    malignant.  That's -- that's why I say that.
3            And again, the question you're asking is
4    somehow the nonmalignant injuries offset the
5    malignant injuries?  I don't believe that's been
6    considered anywhere by anybody.
7            I don't have any legal answers to that,
8    but I just go on the basis that they're considered
9    two separate injuries.  And I think medically, that
10   there is quite a bit of difference.  I mean, the
11   asbestosis is a very slow, gradual process on the
12   body.  Mesothelioma is that traumatic, quick ending
13   like Mr. Gosz had.  So you have those two distinct
14   factors operating what would probably be considered
15   separate losses and injuries.  And that's what the
16   Sopha case is saying when it says it's a new cause
17   of action.
18           But as far as offsets or recoveries on
19   the mesothelioma, whatever we recover for the
20   mesothelioma, we couldn't also recover -- from
21   someone else, we couldn't also recover from a joint
22   and several liability finding against BSIS.  We
23   couldn't recover twice.  You can't.
24           MR. LAFFEY:  I dare say, the exposures
25   that made up the resolutions of Exhibits 1001

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1190

1    through 1005 and the great pains that were taken to
2    make sure that those claims were resolved pursuant
3    to and/or consistent with Pierringer, had those
4    entities not been bankrupt, they would have been
5    parties to a mesothelioma lawsuit.
6            My point, Your Honor, as we have heard
7    time and again in this case, every exposure is a
8    substantial factor.  Those exposures that made up
9    the claim forms and the exposure histories in
10   Exhibits 1001 through 1005 contributed to
11   Mr. Gosz's mesothelioma.  They've been released by
12   Pierringer, as well as just the basic concept of
13   how we decide cases in Wisconsin, their fault has
14   been released by Mr. McCoy's office, and Mrs. Gosz,
15   as releasing that fault by way of a Pierringer
16   release, that has to be submitted for assessment.
17           That's how Pierringer works.  Whether
18   it's negligence or strict liability, if a
19   Pierringer release works in a strict product
20   liability case, then all of those products have to
21   be provided to somebody to determine what
22   percentage of fault those products -- those
23   products bear in order to evaluate the Pierringer
24   release.  That's separate and above the basic
25   submission for fault in any tort lawsuit in this

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1191

```
 1    state.
 2              MR. McCOY:  I'm not questioning the
 3    inclusion of those as contribution claimed
 4    defendants.
 5              MR. LAFFEY:  Mr. McCoy continues to turn
 6    the Pierringer discussion into a contribution
 7    discussion, and that is not the question.
 8    Pierringer versus Hoger allows joint tortfeasors to
 9    resolve their portion of the claim and permit the
10    remainder of the claim to proceed to trial.  And
11    then it charges the jury with assessing the
12    100 percent fault scenario attributable to that
13    loss.  And the plaintiff, by entering into a
14    Pierringer release, eats whatever percentage of
15    fault, causal fault, is attributable to those
16    released parties, period.
17              It has nothing to do with contribution.
18    There's no exchange of money in a Pierringer
19    release situation once a verdict comes in.  All
20    that happens is that plaintiff has transferred to
21    her in this case, all fault attributed to all
22    parties that have been released out by a Pierringer
23    release, period, end of story.
24              THE COURT:  So the Pierringer case and
25    cases which cite Pierringer are primarily cases
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1192

```
 1    involving the cause of action of negligence and not
 2    strict liability claims.
 3              However, I think that we're getting close
 4    to coming to a conclusion here on the issues, and I
 5    at this point think that I'm convinced that
 6    Mr. Laffey is correct and that the -- and that
 7    Wisconsin law does not require or allow joint and
 8    several liability under the type of circumstances
 9    that we have in this case.
10              That, in fact, this is different from
11    Fuchsgruber because there are different products
12    which are not interchangeable.  And even with the
13    identical product, which has not been established
14    in the evidence in this case, such as my ibuprofen
15    example, Mr. Laffey makes some good points, that if
16    the harm was caused by ibuprofen and the parties
17    could establish that the victim consumed 99 percent
18    Motrin and 1 percent Advil and the pills were
19    marketed differently, looked different, but all
20    contained exactly the same identical chemical, I
21    don't think that -- I don't think that the law
22    requires that Advil pay 100 percent of the damages
23    suffered by the victim when Motrin was the
24    overwhelmingly larger contributing product.
25              Mr. McCoy, what's wrong with that?  I
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1193

```
 1    mean, I know I'm ready to make a decision, but I
 2    want to get the right decision.  So I'm going to
 3    put it to you again, what's wrong with that
 4    reasoning?
 5              MR. McCOY:  The Motrin example is --
 6    because it's combined with asbestos, it's two
 7    different injuries.  I'm not disputing that.
 8    However -- and that's the Sumnicht case.  But,
 9    Judge --
10              MR. LAFFEY:  You didn't combine --
11              MR. McCOY:  There's lots --
12              THE COURT:  Mr. McCoy, what I'm just
13    talking about is a totally clean separate
14    hypothetical in which the product is almost
15    fungible, not quite because they're a different
16    color, shape, price of pills.
17              MR. McCOY:  Then, Judge, then you go to
18    the Thomas case.  And the Thomas case says you deal
19    with fungible products that you can sue and they're
20    jointly and severally liable.  I mean, it says that
21    in those words in those types of lead paint
22    situations.  And you can sue the ones that aren't
23    bankrupt.
24              I mean, that throws us into that
25    situation which is what I've been trying to avoid,
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1194

```
 1    to just deal with the strict products liability
 2    claim here against Building Services.  But if you
 3    want to go that route of market share liability
 4    that Mr. Laffey seems to be suggesting, then we go
 5    to the Thomas case and we go to, again, joint and
 6    several liability.
 7              The Fuchsgruber case is just as plain as
 8    day that joint and several liability is not changed
 9    by that statutory amendment.  We had all these
10    arguments before.  The order was entered before
11    about the single product situation, knowing that
12    there was many other products out there at that
13    time and those arguments.
14              And, Judge, all I can say is, again, the
15    law doesn't stop Building Services from having
16    filed this claim again and having brought all these
17    people into this courtroom.  They chose not to do
18    that.  Now the plaintiff should not be penalized by
19    somehow changing what the law is on strict products
20    liability.
21              I mean, we dropped our negligence claim
22    to get around this whole issue.  Fuchsgruber says
23    if you go back to a theory that everybody somehow
24    gets on the verdict form, then you're in the lead
25    paint situation and you're still running into joint
```

1    and several liability on that.
2         So I guess the bottom line on it is,
3    Judge, that I would have to -- I can pull out the
4    case law and start going through this again and the
5    briefing that we did before, but I don't believe
6    there's any reason to change the ruling that was
7    already in place.
8         And it's nothing -- there's no unfairness
9    to a defendant having to pursue a contribution
10   action if it hadn't chosen to combine it with the
11   original action, which is what happened here, the
12   recovery of what it might get against the other
13   defendants.  I mean, that's not -- there's no
14   inequity -- I mean, there's no inequity in that.
15        I mean, that's specifically what is
16   provided under the law.  Fuchsgruber makes
17   reference to that comparison being done.  I mean,
18   if you could do it all in the one question, why
19   would there even be any discussion in Fuchsgruber
20   about the second question?  I mean, they make that
21   very clear.  That's seven to nothing.
22        And, Judge, I know sometimes everybody
23   feels, okay, in asbestos, a company is being
24   taken -- singled out in a trial.  But, again, they
25   had the right throughout this proceeding -- it's

1    I understand it to be.
2         And sometimes, you know, like John Kerry,
3    that our understandings change, and I might have
4    been for it before I was against it.  But I'm just
5    doing the best I can here.  And I did the best I
6    can when I may have encouraged -- I don't really
7    think that that was my decision to drop the
8    negligence claims.  I think you made that decision
9    yourself.  And I suggested that I thought I knew
10   what the result would be.  But now, here we are
11   today, ready to submit a verdict form to the jury,
12   and I have to look at the facts that we have today.
13        And the good news about what we're doing
14   here is -- I mean, let me tell you one more thing
15   about the important responsibilities that each of
16   us have.
17        My duty is to create a verdict form that
18   is consistent with the law in Wisconsin.  I can't
19   just simply say, well, let's just ask the jury
20   everything and let the Court of Appeals work it
21   out.
22        In fact, the result of what we're going
23   to be doing here is that we will collect
24   everything, and the Court of Appeals will be able
25   to sort it out.  And if I'm wrong on the law,

1    been going on for over three years -- to have
2    brought in all these other entities, and they would
3    all be in court today.  And maybe that would have
4    caused the case to settle by having brought them
5    all in under that basis, but that didn't happen.
6         Instead, they've chosen to go to trial,
7    BSIS has itself, and not bring in all the
8    contributors to join them in sharing the liability.
9    They still have that right to do it even after this
10   verdict.
11        But, Judge, the Fuchsgruber case is clear
12   that it's two questions and not one.
13        THE COURT:  Well, the problem with your
14   analysis, Mr. McCoy, is that Fuchsgruber really is
15   a single product case.  And that's what
16   Mr. Laffey's been saying for, you know, almost a
17   year now.
18        And to the extent that I gave you either
19   an impression or a full total ruling which
20   encouraged you to withdraw your negligence claims,
21   well, sorry about that.  I mean, really.  I'm not
22   just saying sorry about that.  I mean that I never
23   intended to mislead any party.  I just keep -- this
24   is just the way I do the work here, is I keep --
25   basically insisting myself that I follow the law as

1    Mr. McCoy, you will still get that 100 percent
2    joint and several determination from the Court of
3    Appeals, depending on how the jury answers the
4    questions on the verdict form.
5         But what I'm convinced of, which will
6    allow the Court of Appeals to get all the
7    information, is that the current law allows
8    comparison of fault with respect to companies that
9    were independently acting, producing, or
10   distributing separate products even if the products
11   were very similar.
12        In this case, there's been no evidence
13   about the chemical properties of Celotex or the
14   Foster-Wheeler products or the Johns-Manville
15   products or the Kaylo.  All we know is that they
16   contain asbestos and that -- and that Kaylo
17   contains a certain percentage of its weight or
18   volume of asbestos.
19        We know that asbestos -- I think the
20   evidence has been in here that asbestos comes in
21   different fiber lengths and has different qualities
22   with respect to its likelihood of causing bodily
23   harm.  But we don't -- we have not had any chemical
24   analysis of the Kaylo to determine exactly where
25   that falls in the relative mix of dangerous

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1199

1   asbestos products.
2          Under these circumstances, the only --
3   the conclusion that I have to draw is that each of
4   these constitutes separate products and each of
5   these will be reviewed separately by the jury for a
6   comparison of the fault or harm that they caused to
7   Mr. Gosz.  And the evidence available will be those
8   in the affidavits and the documents beginning with
9   Exhibit No. 1000, as well as the testimony of the
10  witnesses, including the deposition testimony.
11         And so I will rewrite the verdict form to
12  include the items, but then we have to do it in
13  some rational, sensible way so that the jury -- so
14  that it's a manageable format.
15         And now I'm going to go back to
16  Mr. Laffey and ask what you think we should do
17  about the -- I don't know if you want to start with
18  my verdict as a template and see what we should do
19  about the different sections.
20         MR. McCOY:  Judge, can I --
21         THE COURT:  Yes.
22         MR. McCOY:  One more point I want to
23  make.  I'm looking -- there's a lot of transcript
24  rulings before, but I didn't understand the ruling
25  of joint and several liability, which was entered

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1200

1   before in this case, to be under reconsideration
2   today.  So I'd just make that point.  I don't have
3   the exact citation to it, but it's in this previous
4   record.
5          So I understand Your Honor's concern
6   about getting the law right.  I'm just saying that
7   was stated in the record, and I don't have that
8   page right now.
9          THE COURT:  Well, if you're caught off
10  guard and need a day to prepare your closing
11  argument or something, I could -- I would consider
12  your request for an additional delay to get
13  oriented and tell -- you know, and consider the
14  possibility of telling the jury to take Tuesday
15  off -- we've got their phone -- their emergency
16  phone numbers -- and to come back on Wednesday or
17  Thursday, something like that.  That's a
18  possibility, if you think that's necessary because
19  of the earlier rulings.
20         MR. McCOY:  I don't know right now,
21  Judge, but it may be that I need some additional
22  time.  I mean, I'd have to -- it does come as a
23  great surprise and shock to me, and it wasn't how I
24  presented the case --
25         THE COURT:  Furthermore --

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1201

1          MR. McCOY:  -- and my thinking --
2          THE COURT:  -- again, if I'm wrong on the
3   law, we'll still have all the facts on the verdict
4   form so that I can sort it out in motions after
5   verdict or the Court of Appeals can, if I need a
6   correction.
7          MR. McCOY:  That part I understand,
8   Judge.
9          THE COURT:  Okay.
10         MR. McCOY:  But I don't -- I mean, let me
11  just think about it in my mind.
12         THE COURT:  Sure.
13         MR. McCOY:  Because this is significantly
14  news to me, period.
15         THE COURT:  As you know, what I did,
16  essentially using Mr. Laffey's form, is break this
17  up into six different sections, plus damages.
18  The -- Question 6 is the comparison of fault, and
19  the other five -- No. 1 is just was there
20  disease caused by asbestos, so that really the
21  confusing ones are 2, 3, and 4.  Because 5 is
22  contributory negligence.
23         So 2, 3, and 4, aren't they like
24  redundant to each other and shouldn't -- could they
25  all be just like one section, Mr. Laffey?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1202

1          MR. LAFFEY:  Well, I think that's -- I
2   appreciate what Your Honor did graphically, trying
3   to lump things together, but I think that may
4   create more confusion than actually assisting
5   anybody.
6          THE COURT:  Okay.
7          MR. LAFFEY:  I think that if we start
8   with the comparison question and agree what should
9   be in the comparison question --
10         THE COURT:  Yes.
11         MR. LAFFEY:  -- the number of potential
12  items in there, then you work backward and just ask
13  the questions to lead up to the appropriate "yes"
14  answers to get somebody on that comparison line --
15         THE COURT:  Okay.
16         MR. LAFFEY:  -- rather than trying to
17  caption them as something.
18         So I think you ask -- the way we broke it
19  out on ours, Your Honor, was that the questions for
20  the defective product assessments, I think there
21  were three for each product.
22         THE COURT:  Right, and that's what I have
23  here.  There's actually two.
24         MR. LAFFEY:  And then for those parties
25  who were negligent, it's the traditional was X, Y,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1203

1    Z negligent, yes or no, and then the cause
2    question.
3        So I think if you keep that same
4    three-question structure for each of the products,
5    a two-question structure for the negligent parties,
6    then you just say -- on the comparison, you go back
7    and say, if you've answered "yes" on one or more of
8    the -- what the applicable cause questions are,
9    then answer this question. And you list all those
10   parties on there, add up to 100 percent, and that's
11   the verdict.
12       THE COURT: There are three different
13   types of parties here that I took from your format.
14       MR. LAFFEY: Correct.
15       THE COURT: One is manufacturers.
16   Another is, I think, distributors. I'm not sure.
17       MR. LAFFEY: Yeah, you did that. And I
18   was going to point out, if we ever got there, you
19   listed Kaylo first, and then you had a separate
20   question for Building Services.
21       THE COURT: Right.
22       MR. LAFFEY: And I don't -- because
23   there's no negligence claim against Building
24   Services, it's a strict products claim, so I think
25   the decision that has been made is how are you

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1204

1    going to identify the product for Building Services
2    purposes? Because we have testimony in the record
3    that Building Services sold Kaylo and pipe -- and
4    cement. So are we going to do separate products?
5    There's really no testimony about the
6    cements.
7        Or are you going to call it Building
8    Services Industrial Sales Supply
9    asbestos-containing products? I don't know. But I
10   don't think you can have a Kaylo question and a
11   BSIS question where there's no negligence claim.
12       THE COURT: Where does negligence come in
13   here? Why are you --
14       MR. LAFFEY: Well, it comes in with
15   other -- it comes in with other -- it comes in with
16   the premises owners; it comes in on the employer
17   question.
18       THE COURT: You're saying as an offset?
19       MR. LAFFEY: No, as a contributing
20   factor. They're all contributing factors, is what
21   I would say, all add up to 100 percent.
22       Clearly, all the products need to be
23   compared. And I think all fault is compared as
24   part of that 100 percent. That's how I think it
25   ought to be.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1205

1        So I think it is -- in a case in
2    Wisconsin, that's Sumnicht; that's Connar. Product
3    liability, negligence, employer fault, that's
4    Connar.
5        Sumnicht is second collision, fault for
6    the accident in the main, then enhanced injury,
7    second collision product liability assessment, but
8    all done, you know, in one comparison.
9        THE COURT: So if you were putting -- if
10   you were creating one comparison list -- see, in
11   your submission, Mr. Laffey, you never used names.
12       MR. LAFFEY: Well, right, because --
13   because what we were trying to do was set up a
14   macro --
15       THE COURT: Yes.
16       MR. LAFFEY: -- to work with. And then
17   the evidence is closed. Who's in the evidence?
18   Now fill in the names.
19       THE COURT: The time has come.
20       MR. LAFFEY: The time has come, that's
21   right.
22       So on the product defendants, you need
23   Combustion Engineering, Celotex, Johns-Manville,
24   Foster-Wheeler. And then you have to decide -- and
25   I don't have an answer for this, Judge, but what --

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1206

1    what do you want to tell the jury on the product
2    liability claim about the Building Services,
3    quote/unquote, product?
4        THE COURT: Well, there is -- I think
5    there's a little evidence that BSIS may not
6    have been the sole distributor of the Owens-Corning
7    Fiberglass Corporation Kaylo.
8        MR. LAFFEY: There's evidence -- there's
9    evidence statewide, statewide, with no tie in to
10   the Goss case. There's evidence in this record
11   that there were other companies who either dealt in
12   Kaylo distributerwise or had, I think, house
13   accounts, Mr. Popalisky said.
14       But none of that testimony, Judge, has
15   any relationship in a causal way to this case.
16   It's just a generalized understanding of Building
17   Services.
18       THE COURT: Now, Kaylo is the half-round
19   pipe wrap?
20       MR. LAFFEY: Yes.
21       THE COURT: And what's the cement called?
22       MR. LAFFEY: What do you call it, Bob?
23   Insulating cement?
24       MR. McCOY: Yeah, insulating cement or
25   insulating mud.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1207

1    THE COURT:  Made by Owens-Corning?
2    MR. LAFFEY:  No.  We don't know -- we
3    think, from some snippet from Mr. Popalisky, that
4    they sold some Eagle-Picher somewhere along the
5    line, but that's what's in there.
6    MR. McCOY:  That's what he said.
7    THE COURT:  So theoretically we could
8    say -- in the comparison, we could compare Celotex
9    products or specifically what did Celotex --
10   Celotex --
11   MR. LAFFEY:  Celotex asbestos-containing
12   pipe covering.
13   THE COURT:  And Foster-Wheeler pipe cover
14   also?
15   MR. LAFFEY:  Foster-Wheeler
16   asbestos-insulated boilers.
17   THE COURT:  Oh, yes.
18   MR. LAFFEY:  And the same thing is true
19   for Combustion Engineering.
20   And then Johns-Manville would be
21   Johns-Manville asbestos-containing pipe covering.
22   THE COURT:  Okay.  So -- okay.  So here's
23   one possibility.  When we're referring to the
24   manufacturers, or possibly, let's say, certain
25   initial parties with fault, or potential fault,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1209

1    And we have testimony from Mr. Parker
2    that entities like American Can should have been
3    keeping abreast with the state of the art and
4    taking precautions, et cetera, et cetera.  And I
5    think a similar assessment would probably be for
6    Thilmany Paper, which is International Paper.
7    That's the record in the preceding parts
8    of this case.  International Paper bought whoever
9    owned Thilmany.  But International Paper was a
10   defendant in this case because of its ownership and
11   assumption of liabilities, I suppose, for Thilmany.
12   So I think those are two locations that we have
13   sufficient testimony in the record that would
14   justify submitting that to the jury.
15   THE COURT:  And employers?
16   MR. LAFFEY:  It would be Miron.  I don't
17   believe the Hoffman testimony is all that
18   extensive.  But we clearly have repeated testimony
19   that, for all intents and purposes, this case was
20   presented by Mr. Goss being an employee of Miron.
21   And it's M-I-R-O-N, not Y.
22   THE COURT:  Oh, thank you.
23   So you're saying the negligence of
24   International Paper or American Can or P.G. Miron
25   just are simply assigned a value, just as the

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1208

1    they would be the following five:  One, Celotex
2    asbestos-containing pipe cover.
3    I'm sorry, these are -- these are
4    products I'm referring to, not manufacturers or
5    parties, but products.
6    Two, Foster-Wheeler asbestos-containing
7    insulated boilers.
8    Three, Combustion Engineering
9    asbestos-containing insulated boilers.
10   Four, Johns-Manville asbestos-containing
11   pipe covers.
12   And, five, products distributed by
13   Building Service Industrial Sales, including
14   asbestos-containing joint cement and Owens-Corning
15   Fiberglass, Incorporated, asbestos-containing pipe
16   cover.
17   Now, that's one grouping.  Then we have
18   another grouping, which would be locations and
19   employers.
20   Mr. Laffey?
21   MR. LAFFEY:  I think the record would
22   support placing on the verdict -- as far as
23   locations were concerned, we have extensive
24   testimony about American Can and we have testimony
25   from Mr. Mielke that they had their own insulators.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1210

1    products are assigned a value, all within the same
2    100 percent comparison?
3    MR. LAFFEY:  Yes.
4    THE COURT:  And I have to say -- I'm not
5    terribly comfortable with that, but I know of no
6    better way.  So that would leave us, so far, with,
7    oh, eight -- no, nine, nine products, that is,
8    items or parties for comparison.  They are as
9    follows:  Celotex asbestos-containing pipe cover.
10   I'll number them.
11   Two, Foster-Wheeler asbestos-containing
12   insulated boilers.
13   Three, Combustion Engineering
14   asbestos-containing insulated boilers.
15   Four, Johns-Manville asbestos-containing
16   pipe covers.
17   Five, products distributed by Building
18   Service Industrial Sales, including
19   asbestos-containing joint cement and Owens-Corning
20   Fiberglass asbestos-containing pipe cover.
21   MR. McCOY:  Can we say Kaylo?
22   THE COURT:  Yes.
23   MR. McCOY:  Sometimes it was
24   interchangeably referred to Owens-Corning
25   Fiberglass or Kaylo.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1211

1        THE COURT:  Sure.  Owens-Corning
2  Fiberglass, Inc., Kaylo asbestos-containing pipe
3  cover.
4        Six, American Can company.
5        Seven, International Paper.
6        MR. LAFFEY:  We should have a parentheses
7  in there and then put "Thilmany," because that's --
8  International Paper is -- in fact, I don't even
9  think you need to put International Paper, Your
10  Honor, because they succeeded, based upon -- I
11  mean, Mr. McCoy settled with International Paper,
12  so I would think he would know.  But it's for the
13  Thilmany property.
14        MR. McCOY:  Judge, I know that Mr. Drumke
15  in one case, or somebody it seems like, they had
16  the -- maybe not Mr. Drumke but somebody, I think,
17  challenged the International Paper/American Can
18  successorship relation.
19        MR. LAFFEY:  International Paper isn't a
20  successor to American Can.  International Paper was
21  a successor to Thilmany.  Mr. Drumke challenged the
22  Georgia-Pacific relationship with some property, I
23  believe it's American Can.
24        THE COURT:  Yes.
25        MR. LAFFEY:  That's not the issue here.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1212

1        THE COURT:  How do you spell Thilmany?
2        MR. LAFFEY:  T-H-I-L-M-A-N-Y, Paper.
3        THE COURT:  Company?
4        MR. LAFFEY:  I think so, yes.
5        THE COURT:  So it's American Can Company,
6  Thilmany Paper Company, P.G. Miron Company.  I
7  think I told you eight so far.
8        MR. LAFFEY:  Right.
9        THE COURT:  Nine is Clarence Gosz.
10        MR. McCOY:  What's the evidence of
11  Clarence Gosz's fault here?
12        THE COURT:  Mr. Laffey, what's the
13  evidence of Clarence Gosz's fault?
14        MR. LAFFEY:  We have evidence from
15  Mr. Mielke that respirators were provided and never
16  worn, in spite of the fact that they were in
17  obvious dusty conditions.
18        THE COURT:  That he didn't.  I don't
19  think there was anything about what other people
20  did.
21        MR. LAFFEY:  Oh, I think Mielke did
22  testify that Goss did not wear them either.
23        THE COURT:  Well, it might be there.  I
24  just didn't hear that this morning.
25        Mr. -- Mr. McCoy, do you recall that?

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1213

1        MR. McCOY:  I don't recall anybody saying
2  what Clarence Gosz wore or didn't wear.  My basis
3  on this, Judge, is --
4        THE COURT:  Yes.
5        MR. McCOY:  -- really what's the evidence
6  that he had any reason to know what to wear.
7        THE COURT:  Right.
8        MR. LAFFEY:  Let's do it this way.
9        THE COURT:  Yes.
10        MR. LAFFEY:  How about we do not put
11  Mr. Gosz on the verdict, pending if I can find a
12  record cite?
13        THE COURT:  Okay.
14        MR. LAFFEY:  I don't want to have him on
15  the verdict if there's nothing there because I
16  don't want another reason for a verdict to get
17  overturned.  So what I'd ask is let me go back,
18  read through the designation.  I can send an e-mail
19  to everybody if it's there.  But let's work with
20  the assumption at this point that he's not on the
21  verdict.
22        Does that work for everybody?  Or would
23  you rather work with the assumption that he's on
24  and then I'll tell you that he's not there?
25        THE COURT:  No.  I think even if he was

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1214

1  given a respirator but without any information
2  saying this is -- you know, you're breathing poison
3  in, so you better wear this --
4        MR. LAFFEY:  I agree.  No, I agree.  You
5  are correct.  Presence is the better part of that.
6        THE COURT:  So he's not going to be on
7  the verdict.  So that will make everything a lot
8  easier for the jury.  No, it won't because this
9  would have been an easy question for them.  But it
10  will clear something up in terms of the length of
11  the document.
12        Now, as to how this looks, we know
13  what -- we know that Question No. 5 is out, so all
14  the other numbers get changed.
15        MR. McCOY:  Is this on the draft you gave
16  us, Judge?
17        THE COURT:  Yes.  Going back to -- to
18  No. 7 for a minute, which is now renumbered as 6,
19  the damages, were there any other damages than
20  those, Mr. McCoy?
21        MR. McCOY:  I don't believe there's --
22  not from the estate of Clarence Gosz.  I didn't see
23  anything on here about Mrs. Gosz.
24        THE COURT:  Oh, that's explained in
25  the -- in the instructions themselves of what we

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1215

1    mean by loss of society and companionship.

2                Actually, it's not in there yet because I

3    couldn't get access to the jury instructions last

4    night, the standard instructions last night, but I

5    will get those tonight into the instructions.  So

6    that's an explanation of loss of society and

7    companionship.

8                MR. LAFFEY:  That's her claim.

9                THE COURT:  That's her claim.

10               MR. LAFFEY:  She doesn't have a separate

11   mental anguish or anything like that.

12               THE COURT:  So how about if I change the

13   language -- the introductory language to No. 7:

14   "What sum of money will fairly and reasonably

15   compensate Helen Goss and the estate of Clarence

16   Goss?"

17               MR. LAFFEY:  Yes, I agree.

18               MR. McCOY:  Okay.

19               THE COURT:  Okay.  Now, that becomes 6.

20   We're going to change the numbers again in a

21   minute.

22               Going back to number -- what's

23   currently -- or what on your form there is No. 6

24   and currently I'm rechanging it to No. 5,

25   Comparison of Fault, but I think it's going -- the

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1216

1    number is going to change again.  We're going to

2    take that list we just discussed and basically drop

3    them in in place of the ones that we had there.

4                (Pause in proceedings.)

5                THE COURT:  Now we've got the comparison

6    of fault question and the damages question.  So

7    let's go back to Question No. 1 regarding whether

8    the malignant mesothelioma was caused by a

9    significant occupational exposure to asbestos

10   fibers.  Do we need that question, Mr. Laffey?

11               MR. LAFFEY:  I think that's the universal

12   predicate question for everything after.

13               THE COURT:  Okay.  Mr. McCoy?

14               MR. McCOY:  I agree it's a predicate.  I

15   don't know if it's disputed, but --

16               THE COURT:  Okay.

17               MR. McCOY:  -- it's a predicate.

18               THE COURT:  Okay.

19               MR. McCOY:  We could just tell them yes,

20   answer it yes.  I thought Mr. Laffey stipulated to

21   that in opening statement, but I agree it's a good

22   predicate question.  It could be just answered yes,

23   I believe.

24               THE COURT:  Well, let's go on with some

25   of these others.  We'll not take more time with

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1217

1    that right now.

2                Mr. Laffey, regarding the language and

3    formatting of the No. 2 series questions, with the

4    little numbers i, ii, and iii for the little letter

5    of the alphabet, lower-case, do you think this

6    makes sense for how we approach the No. 2 series

7    questions?

8                MR. LAFFEY:  Well, it makes sense, or you

9    could just do it the traditional way, Your Honor,

10   and simply have the numbers sequentially.

11               So Question 1, let's just assume, is the

12   predicate question on mesothelioma.

13               Question 2, I have your list as Celotex.

14   So then I would have -- the first Celotex question

15   would be 2; the second Celotex question would be 3,

16   and then the third one would be 4.  Then start at

17   5, and then proceed down the line, rather than 2A,

18   sub this, ii, blah, blah, blah.

19               And then the jury is just instructed, on

20   the comparison question, to go back to the "yes"

21   cause numbers.  And I think that just might be

22   easier for them to follow.  The 2 and the letter

23   and then the i's might just get to be too

24   cumbersome for you to say, on the comparison, if

25   you've answered "yes" to one or more of the

---

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1218

1    following and then have it 2A iii, 2B iii.  I mean,

2    that's my suggestion.  Just a straight numerical

3    sequence.  Run it down however many numbers it

4    comes out to be.

5                THE COURT:  But you're still asking them

6    in triples.

7                MR. LAFFEY:  Yes.  I think with the

8    product questions, I think you need the triple --

9    the triad of questions, yes.

10               THE COURT:  And really, that -- in terms

11   of the formatting that I did, that covers the two

12   series, three series, and four series questions,

13   right?

14               MR. LAFFEY:  You could actually -- and

15   Ms. Thomas Pagels, because she's way smarter than I

16   am, had a very good suggestion.  You could number

17   them sequentially, okay, but on the triad of

18   questions for the products, do the graphic graying,

19   and do that for all the products.

20               Then for the two-question negligent/safe

21   place-type questions, just put those two questions

22   in the gray box without even labeling them, if you

23   don't want to.  But that would set them off but you

24   keep the sequential numbering so that it doesn't

25   just -- because the danger of having a verdict with

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1219

1  so many questions is that it all kind of blends
2  into the white noise on the paper.  Do you
3  understand what I'm getting at?
4          THE COURT:  Well --
5          MR. LAFFEY:  Do what you did, but just
6  number them 2, 3, 4.
7          THE COURT:  Sure, I know.  I understand
8  that.
9          But in terms of safe place, what you're
10 saying is that I should be using -- what I hear you
11 bringing up is that perhaps I should be using
12 different language for the employer question for
13 Miron than I do for the contribution question of
14 Johns-Manville -- of Johns-Manville.  And I think
15 you might be right, if that's what you're saying.
16         MR. LAFFEY:  Well, I think there's a safe
17 place question for Thilmany and American Can.
18         THE COURT:  Okay.
19         MR. LAFFEY:  And I think the employer,
20 because there wasn't a safe place with the employer
21 because he was working at other places, I think
22 it's a straight negligence question for the
23 employer.
24         THE COURT:  Okay.
25         MR. LAFFEY:  So I think there would be

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1220

1  two safe place questions, one negligence question
2  for the employer, and the products.
3          THE COURT:  Let's say, hypothetically, I
4  take your suggestion modified by Ms. Thomas Pagels'
5  suggestion for the formatting and use numbers.  I
6  could still use the title for each box.
7          MR. LAFFEY:  Sure.
8          THE COURT:  And the question could be 2,
9  3, and 4.
10         MR. LAFFEY:  Yes.
11         THE COURT:  Question 5, 6, and 7 --
12         MR. LAFFEY:  Agreed.
13         THE COURT:  -- relating to these
14 individual parties.
15         MR. LAFFEY:  It lets them focus.  I think
16 that that's entirely workable, yes.  I agree with
17 that.
18         MS. THOMAS PAGELS:  As a former print
19 journalist in the room, I find that preferable,
20 Your Honor.
21         THE COURT:  Okay.  Okay.  I'm going to
22 give it a try with one example here.
23         MR. LAFFEY:  Can I have 90 seconds, Your
24 Honor?
25         THE COURT:  Yes.  As a matter of fact,

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1221

1  I'm just going to be putzing here.  Take your time.
2          (Pause in proceedings.)
3          THE COURT:  Now, at this point, I am --
4  I've gotten through like five of these eight --
5  that's correct, five of the eight designations, and
6  I'm printing them out to show to you, although it
7  takes a while for the printer to work because it
8  sees these as images that take some time to print.
9          The -- and I'm going to take a brief
10 break, not too long, and then get back to the work
11 here.
12         MR. McCOY:  Judge, in terms of the jury,
13 sounds like we probably should maybe move them back
14 a little bit to allow time to finish this, plus I
15 don't need a long, long time.  I can prepare
16 something tonight, but -- which will be short, but
17 I need to get my concerns specifically into the
18 record on this.  You know, it won't be but about 15
19 minutes, but I'll probably need about that.
20         THE COURT:  Okay.  Now, there are a
21 couple things here.  First of all, I don't think
22 that we need a deputy court clerk here any longer.
23 However, we -- obviously, we need the court
24 reporters, and -- although we could do some things
25 without them, too, but I think we should have court

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI    1222

1  reporters.
2          But you just brought up something a
3  little -- about ten minutes too late, Mr. McCoy,
4  and that is contacting the jurors.  I could call my
5  law clerk and get her on her cell phone and ask her
6  to come here and make the phone calls to each of
7  the jurors telling them nine o'clock -- or, I'm
8  sorry, 9:30 or ten o'clock.
9          MR. McCOY:  I would say 10:00.
10         THE COURT:  Okay.  Then I'm going to ask
11 our deputy court clerk to try to do that, to try to
12 reach Soniya.
13         Mr. Laffey, what do you think about that?
14         MR. LAFFEY:  I don't have a problem with
15 that if that's going to help Mr. McCoy.
16         MR. McCOY:  Just save our jurors waiting
17 around, is what I'm contemplating.
18         THE COURT:  Well, I agree.
19         MR. LAFFEY:  Logistically, though, that
20 means that we're going to have instructions and
21 closing going until two o'clock in the afternoon,
22 presumably without a lunch break.  I just -- I
23 raise it only for that reason.  That's an odd time
24 to start instructing and closing, at ten o'clock.
25 I'm just -- I'm just saying.

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1223

```
 1              THE COURT:  Okay.  Madam clerk, try her
 2       home -- for some reason, I don't see her cell phone
 3       on here, but I must have it.  Oh, I've got an
 4       e-mail.  Darn it.  Home phone, 899-6212.  And does
 5       Sam have a Rolodex there?  No, it's probably in her
 6       cell phone.
 7                   (There was discussion off the record.)
 8                   (The proceedings were adjourned at 6:30
 9       p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TRANSCRIPT OF PROCEEDINGS, 11/10/08, Volume VI     1224

```
 1       STATE OF WISCONSIN )
                            ) SS
 2       MILWAUKEE COUNTY   )
 3
 4              I, Julie A. Poenitsch, RPR/RDR/CRR, do hereby
 5       certify that the foregoing proceedings were recorded by
 6       me and reduced to writing under my personal direction
 7       and that it is a true and correct transcript of said
 8       proceedings had in said matter to the best of my
 9       knowledge.
10              In witness whereof, I have hereunto set my
11       hand at Milwaukee, Wisconsin, on this 10th day of
12       November, 2008.
13
14
15
16       _____
17       Julie A. Poenitsch, RPR/RDR/CRR
18
19
20
21
22
23
24
25
```