2782272

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CC81-0552-M

-----

JAMES S. PRICE,            )
                        )
      Plaintiff,     )
                        )
    vs.               )
                        )
JOHNS-MANVILLE SALES     )
CORPORATION and JOHNS-    )
MANVILLE AMIANTE CANADA,  )
INC.,                  )
                        )
      Defendants.    )

-----

      DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken pursuant to the
Federal Rules of Civil Procedure, by and before Richard E.
Powers, a Registered Professional Reporter and a Notary
Public in and for the Commonwealth of Pennsylvania, at the
University Club, 123 University Place, Pittsburgh, Pa., on
Wednesday, May 5, 1982, at 10:00 a.m.

-----

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

-----

IN RE:                    )
                          )
    ASBESTOSIS CASES      )

-----

    DEPOSITION OF DR. DANIEL CARL BRAUN, a witness called in behalf of the Plaintiffs, taken pursuant to the Federal Rules of Civil Procedure, by and before Richard E. Powers, a Registered Professional Reporter and a Notary Public in and for the Commonwealth of Pennsylvania, at the University Club, 123 University Place, Pittsburgh, Pa., on Wednesday, May 5, 1982, at 10:00 a.m.

-----

gk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

-----

DONALD A. HEIRONIMUS, As Personal            )
Representative of the Estate of              )
OVAL EDGAR HEIRONIMUS                         )
                                             )
        vs.                                  )    No. EV 81-88-C
                                             )
ATLAS ASBESTOS COMPANY, LTD, A               )
Division of Bell Asbestos Mines,             )
Ltd., et al                                  )
                                             )
_____            )
                                             )
CHARLES WILEY MATTOX and                     )
GARNETT IRENE MATTOX,                         )
                                             )
        vs.                                  )    No. EV 81-212-C
                                             )
A C & S, INC., et al                         )
                                             )
_____            )
                                             )
JOHN BOONE,                                  )
BETTY J. BOONE,                              )
RALPH DUNKEL and                             )
KATHLEEN ANN DUNKEL                          )
                                             )
        vs.                                  )    No. EV 81-213-C
                                             )
A C & S, INC., et al                         )
                                             )
_____            )
                                             )
MARTHA JANE TUCKER, Personal                 )
Representative of the Estate of              )
ROBERT C. TUCKER, Deceased                   )
                                             )
        vs.                                  )'   No. EV 80-168-C
                                             )
JOHNS-MANVILLE SALES CORPORATION, et al      )

-----

<u>DEPOSITION OF DR. DANIEL CARL BRAUN</u>

POWERS & GARRISON
COURT REPORTERS
SUITE 610, MANOR BUILDING
PITTSBURGH, PA. 15219

PHONE: (412) 263-2088

1-A

1

2

3

4

5          DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

6    called in behalf of the Plaintiffs, taken pursuant to

7    the Federal Rules of Civil Procedure, by and before

8    Richard E. Powers, a Registered Professional Reporter

9    and a Notary Public in and for the Commonwealth of

10   Pennsylvania, at the University Club, 123 University

11   Place, Pittsburgh, Pa., on Wednesday, May 5, 1982, at

12   10:00 a.m.

13                           -----

14

15

16

17

18

19

20

21

22

23

24

25

gk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

ELEANOR L. PLAS, Extrx. of the ) CIVIL ACTION NO. C78-946
Estate of Edward Leroy Plas, )
Deceased, et al., ) JUDGE JOHN M. MANOS
)
            Plaintiffs, )
)
    vs. )
)
BETHLEHEM STEEL CORPORATION, )
et al., )
)
            Defendants. )

- - - - -

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

called in behalf of the Plaintiffs, taken pursuant to the

Federal Rules of Civil Procedure, by and before Richard E.

Powers, a Registered Professional Reporter and a Notary

Public in and for the Commonwealth of Pennsylvania, at the

University Club, 123 University Place, Pittsburgh, Pa., on

Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

gk

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

- - - - -

HUGH F. TEFFT, et ux, et al.,)
                        )
           Plaintiffs,  )    NO. C80-924M
                        )
     vs.                )
                        )
A. C. & S., INC., et al.,   )
                        )
           Defendants.  )

- - - - -

       DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken pursuant to the
Federal Rules of Civil Procedure, by and before Richard E.
Powers, a Registered Professional Reporter and a Notary
Public in and for the Commonwealth of Pennsylvania, at the
University Club, 123 University Place, Pittsburgh, Pa., on
Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

qk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - -

IN RE:   MINNESOTA ASBESTOSIS-RELATED LITIGATION

- - - - -

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken pursuant to the
Federal Rules of Civil Procedure, by and before Richard E.
Powers, a Registered Professional Reporter and a Notary
Public in and for the Commonwealth of Pennsylvania, at the
University Club, 123 University Place, Pittsburgh, Pa., on
Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

gk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

- - - - -

Roger N. Grenier,                    )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             )    Civil Action No. 81-123-L
                                     )
Johns-Manville Sales                 )
Corporation, et al.,                 )
                                     )
          Defendants.                )

- - - - -

          DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

called in behalf of the Plaintiffs, taken pursuant to the

Federal Rules of Civil Procedure, by and before Richard E.

Powers, a Registered Professional Reporter and a Notary

Public in and for the Commonwealth of Pennsylvania, at the

University Club, 123 University Place, Pittsburgh, Pa., on

Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

gk

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.        SUPERIOR COURT        JANUARY TERM, 1982

C-81-173

Roger Morrissette

vs.

Johns-Manville Sales Corporation, et al.

C-81-164

Robert J. deRepentigny and Yvette deRepentigny

vs.

Johns-Manville Sales Corporation, et al.

- - - - -

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken by and before
Richard E. Powers, a Registered Professional Reporter and
a Notary Public in and for the Commonwealth of Pennsylvania,
at the University Club, 123 University Place, Pittsburgh,
Pa., on Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

gk

STATE OF RHODE ISLAND                          SUPERIOR COURT

PROVIDENCE, SC.


PASQUALE SQUILLANTE              )
                                 )
        vs.                      )
                                 )
BETHLEHEM STEEL CORP. and        )      C.A. File No.:  77-48
JOHNS-MANVILLE CORP.             )
                                 )
        vs.                      )
                                 )
BENJAMIN FOSTER COMPANY,         )
et al.                           )


- - - - -


        DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

called in behalf of the Plaintiffs, taken by and before

Richard E. Powers, a Registered Professional Reporter and

a Notary Public in and for the Commonwealth of Pennsylvania,

at the University Club, 123 University Place, Pittsburgh,

Pa., on Wednesday, May 5, 1982, at 10:00 a.m.


- - - - -

gk

IN THE CIRCUIT COURT OF CABELL COUNTY, WEST VIRGINIA

------

WILLIE D. IVEY and                          )
MARY JANE IVEY,                             )
                                            )
            Plaintiffs,                     )        CIVIL ACTION NO.
                                            )           81-1896
      vs.                                   )
                                            )
JOHNS-MANVILLE SALES CORPORATION,           )
a Delaware corporation, et al.,             )

------

        DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

called in behalf of the Plaintiffs, taken by and before

Richard E. Powers, a Registered Professional Reporter and

a Notary Public in and for the Commonwealth of Pennsylvania,

at the University Club, 123 University Place, Pittsburgh,

Pa., on Wednesday, May 5, 1982, at 10:00 a.m.

------

POWERS & GARRISON
COURT REPORTERS
SUITE 610, MANOR BUILDING
PITTSBURGH, PA.   15219
PHONE: (412) 263-2088

qk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - -

ANTONIO C. MIRANDA, et al.,        )
                                   )
         vs.                       )    C. A. NO:   80-0217
                                   )
JOHNS-MANVILLE PRODUCTS            )
CORPORATION, et al.                )

- - - - -

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken pursuant to the
Federal Rules of Civil Procedure, by and before Richard E.
Powers, a Registered Professional Reporter and a Notary
Public in and for the Commonwealth of Pennsylvania, at the
University Club, 123 University Place, Pittsburgh, Pa., on
Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

gk

IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

-----

IN RE MASSACHUSETTS     )   M.B.L. NO. 1
                    )
    ASBESTOS CASES      )   M.B.L. NO. 2

--------

    DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken pursuant to the
Federal Rules of Civil Procedure, by and before Richard E.
Powers, a Registered Professional Reporter and a Notary
Public in and for the Commonwealth of Pennsylvania, at the
University Club, 123 University Place, Pittsburgh, Pa.,
on Wednesday, May 5, 1982, at 10:00 a.m.

--------

POWERS & GARRISON
COURT REPORTERS
SUITE 610, MANOR BUILDING
PITTSBURGH, PA. 15219

PHONE: (412) 263-2066

gk

IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF NORTH DAKOTA
Southeastern Division

- - - - -

IN RE:   ASBESTOSIS CASES   )        Civil No. A3-81-02
                            )        Civil No. A3-81-103
                            )        Civil No. A3-81-194

- - - - -

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

called in behalf of the Plaintiffs, taken pursuant to the

Federal Rules of Civil Procedure, by and before Richard E.

Powers, a Registered Professional Reporter and a Notary

Public in and for the Commonwealth of Pennsylvania, at the

University Club, 123 University Place, Pittsburgh, Pa., on

Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

gk

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

-----

IN RE:  ASBESTOS-RELATED LITIGATION )   C/A No. MDCP-82-1

-----

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness called in behalf of the Plaintiffs, taken pursuant to the Federal Rules of Civil Procedure, by and before Richard E. Powers, a Registered Professional Reporter and a Notary Public in and for the Commonwealth of Pennsylvania, at the University Club, 123 University Place, Pittsburgh, Pa., on Wednesday, May 5, 1982, at 10:00 a.m.

-----

qk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

-----

HENRY APPLING, et al.,          )
                                )
          Plaintiffs,           )
                                )
     vs.                        )          CIVIL ACTION NO.
                                )             81-2254-M
OWENS-CORNING FIBERGLAS         )
CORPORATION, et al.,            )
                                )
          Defendants.           )

-----

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

called in behalf of the Plaintiffs, taken pursuant to the

Federal Rules of Civil Procedure, by and before Richard E.

Powers, a Registered Professional Reporter and a Notary

Public in and for the Commonwealth of Pennsylvania, at the

University Club, 123 University Place, Pittsburgh, Pa., on

Wednesday, May 5, 1982, at 10:00 a.m.

-----

gk

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

-----

GEORGETTE BRADY AS REPRESENTATIVE          C.A. NO. 79-0626B
OF THE ESTATE OF FRANK G. BRADY

     VS.

JOHNS-MANVILLE SALES
CORPORATION, et al.

---

EDWARD HACKETT, JR., et al.               C.A. NO. 80-0154

     VS.

JOHNS-MANVILLE CORPORATION, et al.

---

LEO C. DUNN, et al.                       C.A. NO. 81-0076

     VS.

JOHNS-MANVILLE CORPORATION, et al.

---

ANTHONY BETTENCOURT                       C.A.  NO. 80-0602

     VS.

JOHNS-MANVILLE CORPORATION, et al.

---

        DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken pursuant to the
Federal Rules of Civil Procedure, by and before Richard E.
Powers, a Registered Professional Reporter and a Notary
Public in and for the Commonwealth of Pennsylvania, at the
University Club, 123 University Place, Pittsburgh, Pa., on
Wednesday, May 5, 1982, at 10:00 a.m.

-----

gk

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

-----

IN RE:                                    )   CAUSE NO. 81-2-08702-7
                                          )
KING COUNTY ASBESTOS CASES OF             )
LEVINSON, FRIEDMAN, VHUGEN,               )
DUGGAN, BLAND & HOROWITZ                  )
                                          )
_____     )
                                          )
IN RE:                                    )   CAUSE NO. 81-2-08703-5
                                          )
KING COUNTY ASBESTOS CASES OF             )
SCHROETER, GOLDMARK & BENDER              )
                                          )
_____     )
                                          )
IN RE:                                    )   CAUSE NO. 81-2-08704-3
                                          )
KING COUNTY ASBESTOS CASES OF             )
BANGS, CASTLE, SCHNAUTZ & HILFER)
_____     )
                                          )
IN RE:                                    )   CAUSE NO. 81-2-08705-1
                                          )
KING COUNTY ASBESTOS CASES OF             )
DODD, CONEY & BISHOP                      )
                                          )
_____     )
                                          )
IN RE:                                    )   CAUSE NO. 81-2-08706-0
                                          )
KING COUNTY ASBESTOS CASES OF             )
McCUTCHEON & GROSHONG                     )
                                          )
_____     )
                                          )
IN RE:                                    )   CAUSE NO. 81-2-17287-3
                                          )
KING COUNTY ASBESTOS CASES                )
OF WALTHEW, WARNER, KEEFE,                )
ARRON, COSTELLO & THOMPSON                )
                                          )

DEPOSITION OF DR. DANIEL CARL BRAUN

POWERS & GARRISON
COURT REPORTERS
SUITE 610, MANOR BUILDING
PITTSBURGH, PA. 15219

PHONE: (412) 263-2066

1-A

<u>DEPOSITION OF DR. DANIEL CARL BRAUN</u>, a

witness called in behalf of the Plaintiffs, taken

by and before Richard E. Powers, a Registered Profes-

sional Reporter and a Notary Public in and for the

Commonwealth of Pennsylvania, at the University Club,

123 University Place, Pittsburgh, Pa., on Wednesday,

May 5, 1982, at 10:00 a.m.

- - - - -

gk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

- - - - -

JOE McGRATH, et al.,            )
                               )
          Plaintiffs,          )
                               )
     vs.                       )        CIVIL ACTION NO.
                               )
OWENS-CORNING FIBERGLAS        )        81-2658-M
CORPORATION, et al.,           )
                               )
          Defendants.          )

- - - - -

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken pursuant to the
Federal Rules of Civil Procedure, by and before Richard E.
Powers, a Registered Professional Reporter and a Notary
Public in and for the Commonwealth of Pennsylvania, at the
University Club, 123 University Place, Pittsburgh, Pa., on
Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

qk

| | |
|---|---|
| STATE OF MAINE | SUPERIOR COURT |
| CUMBERLAND, SS. | Docket Nos. CA 80-612 and |
| | CA 80-866 (Consolidated) |

BARBARA J. BEAULIEU,                    )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )
                                        )
AMATEX CORP., et al.,                   )
                                        )
                Defendants.             )
                                        )
BARBARA J. BEAULIEU,                    )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )
                                        )
THE ANCHOR PACKING COMPANY,             )
et al.,                                 )
                                        )
                Defendants.             )

- - - - -

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

called in behalf of the Plaintiffs, taken by and before

Richard E. Powers, a Registered Professional Reporter and

a Notary Public in and for the Commonwealth of Pennsylvania,

at the University Club, 123 University Place, Pittsburgh,

Pa., on Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

POWERS & GARRISON
COURT REPORTERS
SUITE 610, MANOR BUILDING
PITTSBURGH, PA.  15219

PHONE: (412) 263-2088

gk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

- - - - -

JOSEPH E. BROWN and          )
JEAN BROWN,                  )
                             )
          Plaintiffs,        )
                             )
     vs.                     )     CIVIL ACTION NO. 82-0015-W(H)
                             )
JOHNS-MANVILLE SALES         )
CORPORATION, ET AL.,         )
                             )
          Defendants.        )

- - - - -

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness

called in behalf of the Plaintiffs, taken pursuant to the

Federal Rules of Civil Procedure, by and before Richard E.

Powers, a Registered Professional Reporter and a Notary

Public in and for the Commonwealth of Pennsylvania, at the

University Club, 123 University Place, Pittsburgh, Pa., on

Wednesday, May 5, 1982, at 10:00 a.m.

- - - - -

gk

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

-----

IN RE:   ASBESTOS – RELATED LITIGATION        )        MDCP-82-1

-----

DEPOSITION OF DR. DANIEL CARL BRAUN, a witness
called in behalf of the Plaintiffs, taken pursuant to the
Federal Rules of Civil Procedure, by and before Richard E.
Powers, a Registered Professional Reporter and a Notary
Public in and for the Commonwealth of Pennsylvania, at the
University Club, 123 University Place, Pittsburgh, Pa., on
Wednesday, May 5, 1982, at 10:00 a.m.

----------

POWERS & GARRISON
COURT REPORTERS
SUITE 610, MANOR BUILDING
PITTSBURGH, PA.  15219
PHONE: (412) 263-2068

2

COUNSEL PRESENT:

For the Plaintiffs:

        Charles W. Patrick, Jr., Esq.
        Blatt & Fales
        1611 Allen Street
        Barnwell, S. C.   29812

For Deft. Johns-Manville:

        Lane Young, Esq.
        Freeman & Hawkins
        618 Fulton Federal Building
        Atlanta, GA   30335

For Defts. H. K. Porter and Southern Textile:

        James M. Moher, Esq.
        Howard, Kohn, Sprague & Fitzgerald
        237 Buckingham Street
        Hartford, Conn.   06106

For Defts. Eagle-Picher, Armstrong World and Keene
Corporation:

        Herbert N. Rosenberg, Esq.
        Rosenberg, Kirshner, Kaleugher & Winikoff
        1000 Law & Finance Building
        Pittsburgh, PA   15219

For Deft. J. P. Stevens:

        Bruce M. Killion, Esq.
        Willis & Holahan
        955 Main Street
        Bridgeport, Conn.   06604

For Deft. Pittsburgh Corning:

        Thomas P. Lawton, III, Esq.
        Reed, Smith, Shaw & McClay
        747 Union Trust Building
        Pittsburgh, PA   15219

3

COUNSEL PRESENT:   (Continued)

For Deft. Raybestos-Manhattan:

     Glenn E. Bost, II, Esq.
     Thorp, Reed & Armstrong
     2900 Grant Building
     Pittsburgh, PA   15219

For Deft. Owens-Illinois, Inc.:

     Michael V. Elsberry, Esq.
     Mitchell, Loggins, Campbell & Elsberry
     950 The Equitable Building
     Atlanta, GA   30303

For Defts. Standard Asbestos, Revere, Eagle-Picher,
Fibreboard, Johns-Manville, Armstrong Cork,
H. K. Porter, Southern Textile, J. P. Stevens, Celotex,
Carey Canadian, Nicolet, Keene Corporation,
Baldwin-Ehret-Hill, and GAF Ruberoid (Washington cases
only):

     Michael A. Small, Esq.
     Preston, Thorgrimson, Ellis & Holman
     2000 IBM Building
     Seattle, WA   98101

For Deft. Keene Corporation:

     Jerome Iwler, Esq.
     Meyer, Darragh, Buckler, Bebenek & Eck
     2500 Grant Building
     Pittsburgh, PA   15219

For Deft. Fibreboard:

     J. Michael Doherty, Esq.
     Doherty & Robb
     1475 Porter Building
     Pittsburgh, PA   15219

For Deft. GAF:

     Ronald J. Rademacher, Esq.
     Tucker, Arensberg, Very & Ferguson
     1200 PNB Building
     Pittsburgh, PA   15212

4

COUNSEL PRESENT:   (Continued)

For the Witness and Industrial Health Foundation:

        W. McCook Miller, Jr., Esq.
        Kirkpatrick, Lockhart, Johnson & Hutchison
        1500 Oliver Building
        Pittsburgh, PA   15222

- - - - -

I N D E X

- - - - -

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Dr. Daniel Carl Braun | | | | |
| by Mr. Patrick | 20 | - | 116 | - |
| by Mr. Young | - | 45 | - | - |
| by Mr. Small | - | 112 | - | - |
| by Mr. Lawton | - | 115 | - | - |
| by Mr. Moher | - | - | - | 118 |
| by Mr. Rosenberg | - | - | - | 123 |
| by Mr. Iwler | - | - | - | 125 |

- - - - -

I N D E X (Continued)                    4-A

- - - - -

| BRAUN EXHIBITS | PAGE | BRAUN EXHIBITS | PAGE | BRAUN EXHIBITS | PAGE |
|---|---|---|---|---|---|
| A | 10 | 7 | 28 | 15 | 35 |
| B | 119 | 8 | 29 | 16 | 36-A |
| 1 | 22 | 9 | 30 | 17 | 36-A |
| 2 | 24 | 10 | 32 | 18 | 37 |
| 3 | 25 | 11 | 32 | 19 | 37 |
| 4 | 26 | 12 | 33 | 20 | 38 |
| 5 | 27 | 13 | 34 | 21 | 39 |
|   |   |   |   | 22 | 42 |

- - - - -

| J-M EXHIBITS | PAGE | J-M EXHIBITS | PAGE | J-M EXHIBITS | PAGE |
|---|---|---|---|---|---|
| 1 | 66 | 11 | 89 | 19 | 97 |
| 2 | 80 | 12 | 91 | 20 | 98 |
| 3 | 81 | 13 | 91 | 21 | 100 |
| 4 | 83 | 14 | 92 | 22 | 103 |
| 5 | 83 | 14A | 92 | 23 | 104 |
| 6 | 84 | 15 | 93 | 24 | 105 |
| 7 | 86 | 16 | 95 | 25 | 106 |
| 8 | 87 | 17 | 95 | 26 | 107 |
| 9 | 87 | 17A | 95 | 27 | 109 |
| 10 | 87 | 18 | 96 | 28 | 110 |
|   |   |   |   | 29 | 112 |

DEPOSITION CORRECTION SHEET

WITNESS: D. C. BRAUN          TITLE: Deposition 5/5/87

| E | LINE | CHANGE FROM | TO | REASON |
|---|------|-------------|-----|--------|
| 31 | 9 | " STUDY IN LUNG CANCER | STUDY OF LUNG CANCER | |
| 39 | 12 | H. C. L. HENFON | W. C. L. HEMECN | |
| 49 | 3 | "CAUSED" IS REPEATED FROM PREVIOUS PAGE | | |
| 49 | 6 | "CORPS" | "CORE" | |
| 49 | 16 | "RESEARCH" | "PULMONARY" | |
| 113 | 14 | DELETE FIRST "NO" | | CONTRADICTORY AND INCORRECT |
| 115 | 6 | "        "        "NO" | | "        "        "        "        " |
| 116 | 22 | "1957" | "1937" | |
| 80 | 22 | "OF" | "FOR" | |
| 01 | 12 | INSERT "THE" BETWEEN "THAT" AND "FINAL" | | |
| 02 | 6 | "THAT" | "AND" | |
| 03 | 17 | "I'LL" "EXPLAIN" | "I'VE" "EXPLAINED" | |
| 120 | 13 | "RECORD" | "RECORDS" | |
| | | | | |
| | | | | |
| | | | | |

RETURN TO:   POWERS & GARRISON
             610 Manor Building
             Pittsburgh, PA   15219

_____
Signature of witness

P R O C E E D I N G S                    5

- - - - -

MR. PATRICK:   This is the deposition of

Dr. Daniel Braun, the subpoena of which was

issued out of the Middle District of North

Carolina.   This deposition has been noticed

in the Middle District of North Carolina for

those cases entitled IN RE:   ASBESTOS -

RELATED LITIGATION.

It is a multi-jurisdictional deposition

and has been noticed in the following

jurisdictions.   I will read a list of those

cases of which I am presently aware that the

deposition has been noticed.

This deposition has been noticed for

the United States District Court for the

Northern District of West Virginia at

Wheeling in the case of Joseph E. Brown and

Jean Brown, Plaintiffs, versus Johns-

Manville.

It has been noticed in the State of

Maine for Cumberland Superior Court in the

case of Barbara J. Beaulieu versus Amatex

Corporation.

It has been noticed for the United

Mr. Patrick                                    6

-----

States District Court for the District of
Rhode Island in the IN RE:  RHODE ISLAND
ASBESTOSIS CASES, and it applies to all
Rhode Island Asbestosis No. 1 Cases.

It has been noticed in the Superior Court
for the State of Washington for King County
and the following asbestos cases of the
following law firms, as listed on the notice:
Levinson, Friedman, Vhugen, Duggan, Bland &
Horowitz; the King County asbestos cases of
Schroeter, Goldmark & Bender; the King County
asbestos cases of Bangs, Castle, Schnautz &
Hilfer; the King County asbestos cases of
Dodd, Coney & Bishop; and the King County
asbestos cases of McCutcheon & Groshong.

This deposition has also been noticed in
the cases of Joe McGrath, et al., Plaintiffs,
versus Owens-Corning Fiberglas Corporation,
with the cases pending in the United States
District Court for the Western District of
Tennessee, Western Division.  Also pending in
the Western District of Tennessee, Western
Division, in the case of Henry Appling, et al.,

Mr. Patrick                                    7

-----

Plaintiffs, versus Owens-Corning Fiberglas.
The deposition has been noticed in those
cases.

The deposition has been also noticed for
the United States District Court for the State
of North Dakota, Southeastern Division, in
the IN RE: ASBESTOS CASES.

The deposition has been noticed for the
IN RE: ASBESTOS LITIGATION pending in the
Eastern District of North Carolina, those
cases having been consolidated for discovery
by Judge Dupre.

This deposition has been noticed in the
IN RE: MASSACHUSETTS ASBESTOS CASES, these
cases pending in the District of
Massachusetts.

This deposition has been noticed in the
case of Antonio C. Miranda, et al.,
Plaintiffs, versus Johns-Manville Products
Corporation, this case pending in the
District of Rhode Island.

Also in the State of Rhode Island,
Superior Court of Providence, this case has

Mr. Patrick                                          8

- - - - -

been noticed in the case of Pasquale Squillante

versus Bethlehem Steel Corporation.

Also in the State of West Virginia,

Circuit Court of Cabell County, the deposi-

tion has been noticed in the cases of

Willie D. Ivey and Mary Jane Ivey, Plaintiffs,

versus Johns-Manville.

The deposition is also being taken for

the State of New Hampshire, Superior Court

in the cases of Roger Morrissette versus

Johns-Manville Sales Corporation and

Robert J. deRepentrigny and

Yvette deRepentrigny versus Johns-Manville

Sales Corporation.

This deposition has been noticed in the

case of Roger N. Greiner, Plaintiff, versus

Johns-Manville Sales Corporation, this case

pending in the District of New Hampshire in

the United States District Court.

There is a notice also in the United

States District Court for the District of

Rhode Island in the cases of Georgette Brady

versus Johns-Manville Sales Corporation and

Mr. Patrick                                          9

- - - - -

Edward Hackett, Leo C. Dunn and

Anthony Bettencourt versus Johns-Manville

Corporation.

Notice has also been sent out for this

deposition in those cases captioned IN RE:

MINNESOTA ASBESTOS-RELATED CASES OF RECORD

pending in the United States District Court

for the District of Minnesota.

Also in the following cases pending in

the United States District Court for the

Western District of Washington:  Hugh F. Tefft,

et al., versus A. C. & S., Inc., and

Margie Armstrong, et al., versus A. C. & S,

Inc.

I believe that covers the list of

cases of which I am aware that notices have

been sent out.  Plaintiffs' position would

be that the deposition is to be taken in

all cases in which notices have been properly

sent out to counsel and this is not an

exclusive listing of all notices that have

been sent out.  There may be some notices

of which I am not aware.

Mr. Patrick                                    10

- - - - -

Do any other counsel have any other
statements to place into the record?

MR. MILLER:  I'd like to make one
comment.  I'm McCook Miller, counsel for
Dr. Braun and also the Industrial Health
Foundation.  Before the deposition started,
there was a motion and order signed by his
Honor, Judge Hubert Teitelbaum, of the
United States District Court for the Western
District of Pennsylvania, Proceedings
Miscellaneous No, 9091.  It is here today
and we'd like to just indicate that this
proposed order, two-page order, was sent
along with the motion to all counsel listed
on the Notice of Deposition.  The Court, of
course, does have jurisdiction and will
retain jurisdiction.

At this time I'd like to mark a
conformed copy of this order as Dr. Braun
Deposition Exhibit A.

(The document above referred to was
marked Dr. Braun Deposition Exhibit A for
identification.)

Mr. Young                                          11

-----

MR. YOUNG:  On behalf of Johns-Manville,
we would object to the classification in the
alleged noticing of this deposition as a
multi-state or multi-jurisdictional deposi-
tion.

We further object on the grounds that
we have not been furnished copies of any and
all notices that have allegedly been filed
and, in fact, counsel for Plaintiffs has been
so kind as to state on the record that he is
not even sure of all of the courts in which
the deposition has been noticed, which is
further indication as to why we object to
this type of deposition.

We appear at the deposition on behalf
of Johns-Manville only insofar as a particu-
lar court in which the deposition was
properly noticed and all counsel were served
has specifically ruled that this type of
deposition is allowable in that court.

We further appear subject to any motions
to quash that have been filed or will be
filed, reserving any and all rights which we

Mr. Young                                    12

- - - - -

have with respect to said motion and the

ultimate decision of the court with respect

to the motion; and we object to the multi-

jurisdictional nature of the deposition on

those grounds.

MR. RADEMACHER:  My name is

Ronald Rademacher of the firm of Tucker,

Arensberg, Very & Ferguson of Pittsburgh, PA.

I represent GAF Corporation at this

deposition in those cases where (1)  GAF

is a party and where GAF has been properly

served with a complaint or other appropriate

process; (2) where GAF has not raised any

jurisdictional objection; (3) where GAF has

been properly notified of this deposition;

and (4) where there is no outstanding order

of court which would preclude the taking

of this deposition.

My presence today is not to be deemed

a waiver of any jurisdictional objections

GAF may have in any such case, and all such

objections are expressly reserved.

(Discussion off the record.)

Mr. Iwler                                    13

----

MR. IWLER:  My name is Jerome Iwler from the law firm of Meyer, Darragh, Buckler, Bebenek & Eck.  I'm here representing Keene Corporation and Keene Building Products Corporation, and I adopt the objections stated on the record by counsel for Johns-Manville and counsel for GAF.

MR. DOHERTY:  My name is Michael Doherty from the firm of Doherty & Robb.  We represent Fibreboard Corporation and any other divisions of Fibreboard that may be named. We join in the same objection.

MR. SMALL:  My name is Michael Small. I'm from the firm of Preston, Thorgrimson, Ellis & Holman in Seattle.  I'm here repre- senting for the purposes of the cases pending in the state courts of Washington and the federal courts the following clients: Standard Asbestos, Revere, Eagle-Picher, Fibreboard, Johns-Manville, Armstrong Cork, H. K. Porter, Southern Textile, J. P. Stevens, Celotex, Carey Canadian, Nicolet, Keene Corporation, Baldwin-Ehret-Hill, GAF

Mr. Small                                        14

----- 

Ruberoid, and I adopt the same objections.

MR. ELSBERRY:  My name is Michael Elsberry.
I'm here representing Owens-Illinois.  We
adopt on behalf of Owens-Illinois the objec-
tions which have been stated; and, in addition,
we state the objection that, insofar as the
deposition is purported to be taken in the
Minnesota cases in which discovery has been
closed, it is unauthorized and contrary to
the judge's rulings and should not be used
in any of those cases.

And in case it is not clear, we also
object to the deposition in any state in any
court in which it has not been properly and
appropriately noticed so as to give an
opportunity to counsel in each respective
state to determine what course of action to
take on behalf of his client in that state.

MR. BOST:  I'm Glenn Bost from the firm
of Thorp, Reed & Armstrong, representing
Raybestos-Manhattan.  We adopt the objections
that have been heretofore stated.

MR. LAWTON:  Thomas Lawton of Reed,

```
 1              Mr. Lawton                    15

 2              -----

 3    Smith, Shaw & McClay on behalf of Pittsburgh

 4    Corning Corporation.  Pittsburgh Corning

 5    Corporation joins in the objections heretofore

 6    made.

 7         MR. KILLION:  Bruce M. Killion here for

 8    J. P. Stevens.  J. P. Stevens adopts all

 9    foregoing objections.

10         MR. ROSENBERG:  H. N. Rosenberg of

11    Rosenberg, Kirshner, Kaleugher & Winikoff.

12    I'm representing Eagle-Picher, Armstrong

13    World and Keene Corporation.  I adopt all

14    objections that have been made heretofore

15    and all objections that will be made here-

16    after, unless I specifically state that I

17    will not participate in that objection.

18         MR. MOHER:  Attorney James M. Moher.

19    I represent H. K. Porter, Inc., and the

20    Southern Textile Corporation, also known as

21    the Southern Asbestos Company.  I likewise

22    join in all of the objections previously

23    stated by counsel with respect to the taking

24    of this deposition.

25         MR. PATRICK:  Does that cover it for all
```

Mr. Patrick                                16

-----

the Defendants?

MR. MOHER:  I think the record should reflect that counsel for the Plaintiffs has agreed that, rather than have each of the attorneys recite the objections of counsel for J-M, Fibreboard and Owens-Illinois, you have agreed to the procedure we can just adopt those as they apply to our respective clients, and that should be stated on the record.

MR. PATRICK:  All right.  I think stated on the record also should be the fact that all objections, except as to the form of the question, are reserved until time of trial, with particular application to the examination we anticipate by Johns-Manville.

MR. MOHER:  And the objection of any one of the Defendants will apply to all of the Defendants, so that we need not all echo the same objection.

MR. PATRICK:  That's agreeable.

MR. SMALL:  I would also like to note for the record that, at least in the notices

Mr. Small                                17

- - - - -

of deposition that were served in the cases
aforementioned pending in the State of
Washington, that this deposition was noticed
to take place at the offices of the Industrial
Health Foundation and then, without prior
notice to us, the place of the deposition
was changed to this location, the University
Club, and we would object to the deposition
on that further basis.

MR. PATRICK:  It is my understanding that
an amended notice was sent out with the
change in place.

MR. SMALL:  If that's the case, I have
never seen it, and the record will show what
was and wasn't sent out and who did and didn't
receive it.

MR. PATRICK:  Okay.  Why don't we
proceed.

(Discussion off the record.)

MR. PATRICK:  On the record.  The
statement that Mr. Moher had made about
the Defendants' statements Plaintiffs'
attorney is agreeable with.

Mr. Young                                          18

-----

MR. YOUNG:  Charles, I have one other
thing.  The documents that I am going to ask
Dr. Braun about have previously been marked
as exhibits to his deposition.  Is it agree-
able with everyone here to just use those
prior exhibit numbers as opposed to having
this court reporter mark the exhibits?
Does anybody have any problem with that?

MR. PATRICK:  That's perfectly agreeable
with me.  I also have documents on which I
am to examine Dr. Braun that are documents
that were marked in a deposition taken
December 14, 1979.  I would like for these
documents to also reflect the same exhibit
numbers as that deposition.

MR. IWLER:  Do you know what case that
deposition was taken in?

MR. PATRICK:  It was taken for the
Eastern District of Pennsylvania in the cases
of Clarence Johnson and Virginia Johnson
versus Turner Newall.  That's the first
named case on the caption.

MR. YOUNG:  And the documents that I

Mr. Miller                                    19

'------

have were taken in the Circuit Court of

Tennessee for the Fifteenth Judicial Circuit,

the Circuit Court of Knox County, Tennessee,

the United States District Court for the

Eastern District of Tennessee, and the

United States District Court for the Western

District of Texas, San Antonio Division,

on March 11, 1981.

Just so you all won't forget, I have

agreed to take the exhibits to this deposi-

tion and provide all counsel to the deposi-

tion with copies of the exhibits, with an

invoice for copying charges.  Mr. Rosenberg

and Mr. Bost didn't indicate on my list that

they wanted copies.

MR. ROSENBERG:  I do, yes.

(Discussion off the record.)

MR. MILLER:  I think the record should

reflect, if it is not in the protective

order, that the doctor does not waive the

reading and signing of the deposition.

------

Dr. Braun - Direct                           20

                    -----

          DR. DANIEL CARL BRAUN, a witness called

          in behalf of the Plaintiffs, having been

          first duly sworn, was examined and testified

          as follows:

                DIRECT EXAMINATION

BY MR. PATRICK:

Q    Doctor, could you state your full name for the

     record, please.

A    Daniel Carl Braun.

Q    What is your present address?

A    Home address is 5700 Bunker Hill, Pittsburgh, PA

     15206.

Q    And what is your business address?

A    Business address is 5231 Centre Avenue, Pittsburgh

     15232.

Q    By whom are you presently employed?

A    Industrial Health Foundation.

Q    And what is the Industrial Health Foundation?

A    It's a nonprofit research organization dedicated

     to the improvement of healthful working conditions

     in industry.

Q    How long has the Industrial Health Foundation been

     in existence?

Dr. Braun - Direct                              21

-----

A    Under previous names it has been in existence since
     December 1935.

Q    What was it originally called back in 1935?

A    At that time it was known as the Air Hygiene
     Foundation of America, Incorporated.

Q    Did it have a subsequent name change?

A    Yes.  In about 1941 it was changed to the
     Industrial Hygiene Foundation of America,
     Incorporated.

Q    When did it come to be called the Industrial
     Health Foundation?

A    I think it was about 1969 or 1970.

Q    And, despite these changes in names, has the
     function of the Industrial Health Foundation
     changed in any way since 1935?

A    No.  The basic function has remained the same
     and the organization is the same.

Q    What is your present position with the Industrial
     Health Foundation?

A    I'm president.

Q    How long have you been president?

A    Since 1972.

Q    Have you had any prior association with the

Dr. Braun - Direct                                    22

-----

Industrial Health Foundation?

A     Yes, sir.  In 1951 I was first employed there
      as medical director.  I left at the end of 1957
      to join the U. S. Steel Corporation, and I returned
      in 1970 as manager of Occupational Health Services.
      In 1972 I was elected president.

Q     Dr. Braun, I have a subpoena for your appearance
      today and it asks you to bring some documents,
      reports, articles, correspondence among the
      IHF, the Defendant, Johns-Manville Sales Corpora-
      tion, and the ATI, research, minutes, surveys
      and studies regarding asbestos, and such
      correspondence.  Have you brought those documents
      here today?

A     Yes, I have.

            MR. PATRICK:  I'd like this subpoena
         to be marked as Plaintiff's Exhibit No. 1.

            (The document above referred to was
         marked Plaintiff's Deposition Exhibit No. 1
         for identification.)

Q     Doctor, does the IHF maintain files, a library,
      or some kind of archives of documents?

A     Yes, it does.

Dr. Braun - Direct                    23

-----

Q    And has your deposition been taken on prior

     occasions?

A    Yes, it has.

Q    And have you, in fact, been asked to bring these

     documents to depositions on some prior occasions?

A    Yes, sir.

Q    Do you remember having your deposition taken in

     December 1979, I believe it was, by a gentleman

     from our office by the name of Mr. Terry Richardson?

A    I'm not certain of the date, but I do remember his

     taking my deposition.

Q    Do you remember that deposition along with a

     Mr. Reuben and a Mr. Parnell?

A    Yes, I do.

Q    Do you remember on that occasion bringing

     documents or having documents copied for those

     gentlemen from your files?

A    Yes, I do.

Q    And were you asked in that deposition to identify

     certain documents?

A    I was.

Q    Now, what I have brought are the same documents,

     copies of those documents which were shown to you

Dr. Braun - Direct                                    24

- - - - -

3      previously at that deposition, and what I am going

4      to do is simply ask you some questions of an

5      identification nature on each one of these docu-

6      ments again.  For certain legal reasons we have

7      to go through it again.

8           The first document I'm going to show you is a

9      letter dated December 6, 1956, which has been

10     previously marked Braun Deposition Exhibit No. 2

11     for the 1979 deposition.  I would simply ask that

12     these documents retain the same numbering system.

13     I would ask you, Doctor, if you could identify that

14     letter for us.

15  A  Yes, sir.  As you have said, it's a copy of a

16     letter dated December 6, 1956, to Mr. Hugh M.

17     Jackson, Manager of the Industrial Health Program

18     at Johns-Manville Corporation, bearing my typed

19     signature.

20  Q  Did you author that particular letter, Doctor?

21  A  Yes, I did.

22  Q  And was it sent out on the date of December 6,

23     1956?

24  A  Yes, sir.

25  Q  Were you at that time employed by the IHF?

-----

A     Yes, I was, as Medical Director.

Q     Do you know if the original of that document is

      kept in the files or the archives of the IHF?

A     Yes, it is.

Q     And has the original been produced on prior

      occasion so that a copy may be made of that

      document?

A     Yes, it was.

Q     And do you find that a true and accurate copy of

      the original of that document?

A     Yes, I do.

Q     The next document I'll show you has previously

      been marked as Braun Deposition Exhibit No. 3 and

      is a letter dated May 3, 1957.  If you could,

      identify that letter for us, please.

A     Yes.  It's a copy of a letter dated May 3, 1957,

      a letter to Mr. D. R. Holmes, Chairman of the

      Air Hygiene Committee, Asten-Hill Manufacturing

      Company, Philadelphia, bearing my typed signature.

Q     Did you write that letter to Mr. Holmes?

A     Yes, I did.

Q     Who is Mr. Holmes or was Mr. Holmes?

A     Mr. Holmes was employed by Asten-Hill Manufacturing

-----

3  Company.  I don't know in what position.  He was

4  Chairman of the Air Hygiene Committee of the

5  Asbestos Textile Institute, in which capacity I

6  wrote this letter.

7  Q  Did the IHF have any relationship with the Air

8     Hygiene Committee of the Asbestos Textile

9     Institute?

10  A  I don't know what you mean by connection.

11  Q  Was the IHF doing any studies or any research for

12     the ATI at that particular time?

13  A  No.  We hoped to, and this letter was in that

14     connection.

15  Q  I think I may have not asked you this question.

16     You did author that letter to Mr. Holmes?

17  A  Yes, I did.

18  Q  And you did it in your capacity as Medical Director

19     of the IHF?

20  A  Yes, sir.

21  Q  The next letter I'm to show you is Braun

22     Deposition Exhibit No. 4, and it bears the date

23     of April 26, 1957.  If you could, identify that

24     letter for us, please.

25  A  Yes, sir.  That's a copy of a letter on Asten-Hill

-----

3    Manufacturing Company letterhead directed to me,

4    signed by Mr. D. R. Holmes, Chairman of the

5    Air Hygiene Committee of the Asbestos Textile

6    Institute.

7  Q   Do you recall receiving that letter?

8  A   Yes, I do.

9  Q   And is the original of that letter maintained

10     in the files of the IHF?

11 A   Yes, it is.

12 Q   And would that be a true and accurate copy of

13     that original?

14 A   Yes, it is.

15 Q   The next document I'm going to show you is

16     what has been marked as Braun Deposition Exhibit

17     No. 5.  It is a letter dated August 23, 1957.

18     If you could, tell us what that letter is.

19 A   Yes, sir.  That's a letter to Mr. Hugh M. Jackson,

20     Manager of the Industrial Health Program for

21     Johns-Manville Corporation, with my typed signature.

22     It is, as you say, dated August 23, 1957, a two-

23     page letter with attachment of three references.

24 Q   Did you, in fact, write that letter to Mr. Jackson?

25 A   Yes, I did.

-----

Q    Who was Mr. Jackson?

A    He was Manager of the Occupational Health Program

     or Industrial Health Program for Johns-Manville.

Q    And is the original of this letter kept in the

     archives of the IHF?

A    Yes, it is.

Q    And would this be an accurate copy of that

     original?

A    It is.

Q    Because of a previous deposition, there is no

     Exhibit 6, so I'm simply going to skip to Exhibit

     No. 7.  This next document is a letter dated

     August 3, 1953, which was previously marked as

     Braun Deposition Exhibit No. 7, with an attachment

     entitled, "Memorandum on Research Projects for

     Johns-Manville Corporation."  If you could,

     identify the letter and the attached document

     for us, please, Dr. Braun.

A    Yes, sir.  This is a copy of a letter dated

     August 3, 1953, directed to Mr. Hugh M. Jackson,

     Manager of the Industrial Health Program, Johns-

     Manville Corporation, bearing the typed signature

     of C. Richard Walmer, M.D., Managing Director of

Dr. Braun - Direct                                    29

-----

the Foundation, with a copy to Dr. Kenneth Smith.

Q    Who is Dr. Smith?

A    Dr. Smith was Medical Director of Johns-Manville
     Corporation.  And to the letter was attached,
     "Memorandum on Research Projects for Johns-Manville
     Corporation."

Q    On the attachment do you recognize that particular
     logo as the logo of the Industrial Health Founda-
     tion?

A    Yes, I do.  It was the Industrial Hygiene
     Foundation at that time.

Q    Excuse me, Industrial Hygiene Foundation.  And
     did that logo in 1953 appear to be as such?

A    Yes, it did.

Q    And did in 1953 the Industrial Hygiene Foundation
     do studies for certain industrial concerns?

A    Yes, it did.

Q    Do you recognize Exhibit No. 7, both of those
     documents, as being copies of documents that
     are maintained by the Industrial Health Foundation
     in its archives?

A    Yes, I do.

Q    The next document I'm going to show has been marked

-----

as Exhibit No. 8 to the 1979 Braun deposition.

It is a letter dated August 26, 1959, and it has

an attached letter dated August 13, 1955.  If you

could, identify both of those documents for us,

please.

A    Letter directed to Mr. Hugh M. Jackson, bearing

typed signature of Dr. C. Richard Walmer, who was

Managing Director of the Foundation, with enclosure

listed as letter of August 13, 1955, from

John W. Kane, Corresponding Secretary, Interna-

tional Association of Heat and Frost Insulators

and Asbestos Workers, and the attachment is a copy

of that letter.

Q    Do you recognize both of these letters as being

accurate copies of documents which are maintained

in the archives of the IHF?

A    Yes, I do.

Q    The next exhibit I'm going to show has been

marked as Braun Deposition Exhibit No. 9.  It is a

letter dated May 21, 1956, and attached to it is a

"Memorandum on Proposed Epidemiological Study of

Lung Cancer in Asbestos Workers for the Asbestos

Textile Institute."  I would ask you if you can

Dr. Braun - Direct                              31

- - - - -

3   identify this document for us.

4   A   Yes, sir.  That was a letter to Mr. Myril C. Shaw,

5       Secretary of the Asbestos Textile Institute in

6       Philadephia from Dr. C. Richard Walmer, with copies

7       to Mr. D. R. Holmes and Dr. Kenneth Smith, and

8       attached to it is a proposal for an epidemiological

9       study in lung cancer in asbestos workers for the

10      Textile Institute.

11  Q   Why would Dr. Kenneth Smith be copied with a copy

12      of this particular proposal?

13              MR. MOHER:  I'm going to object to the

14          form of the question.  My understanding is

15          that the letter was authored by somebody

16          other than the doctor, and to ask him why

17          somebody else would have sent this letter I

18          think is going beyond --

19              MR. PATRICK:  I'll withdraw the question.

20  BY MR. PATRICK:

21  Q   Is this letter and the attachment in a format

22      that was used by the Industrial Hygiene Foundation

23      in 1956?

24  A   Yes, it is.

25  Q   Do you recognize these documents as documents that

Dr. Braun - Direct                                    32

- - - - -

3      have been maintained by the IHF up to this time

4      in their archives?

5  A    Yes, I do.

6  Q    The next document is Braun Deposition Exhibit No.

7      10, the first page of which is a letter dated

8      June 19, 1956.  The second page is a letter dated

9      June 18, 1956.  If you could, identify both of

10     these letters for us, please.

11 A    Yes, sir.  The June 19, 1956, letter is also

12     addressed to Dr. Myril C. Shaw, Secretary of the

13     Asbestos Textile Institute, from Dr. C. Richard

14     Walmer, Managing Director of the Foundation, and

15     attached is a copy of a letter on the letterhead

16     of Asbestos Textile Institute to Dr. Walmer from

17     Mr. Shaw.

18 Q    Are these accurate copies of documents that are

19     presently maintained by the IHF in their archives?

20 A    Yes, they are.

21 Q    The next letter is a letter dated June 10, 1957,

22     which has been marked as Braun Deposition Exhibit

23     No. 11.  Would you identify this for us, please.

24 A    Yes.  It's a copy of a letter, as you say, dated

25     June 10, 1957, addressed to Dr. Kenneth W. Smith,

-----

Medical Director, Johns-Manville Corporation,

from Dr. Paul Gross, Research Pathologist for the

Foundation.

Q    How long did Dr. Gross work with the Foundation?

A    From about 1950 until 1972 in the active category,

and since 1972 as consultant.

Q    And do you recognize this particular letter as

being one that is maintained by the IHF in its

archives?

A    Yes, I do.

Q    The next document is marked as Braun Deposition

Exhibit No. 12.  If you could, identify this

particular document for us.

A    Yes, sir.  It's a copy of a letter dated June 21,

1957, to Dr. Kenneth W. Smith, Medical Director

of Johns-Manville, from Paul Gross, M.D., Research

Pathologist for the Foundation, and it has an

enclosure which is noted.  Well, it's mentioned

in the letter.

Q    Did you know Dr. Gross at that time?

A    Yes, I did.

Q    And are you, in fact, mentioned in this particular

letter?

Dr. Braun - Direct                                34

- - - - -

A    I didn't read the letter.

            MR. MOHER:  I'm going to object to the

            form of the question.  The document speaks

            for itself.  If his name is mentioned, it's

            mentioned.  He didn't author it, from what

            I understand, and it wasn't directed to him.

Q    Do you recognize that letter as being one that

     has been maintained by the IHF in its archives?

A    Yes, I do.

Q    And is it a true and accurate copy of that

     original?

A    Yes.

Q    Now, the next exhibit has been marked as Braun

     Deposition Exhibit No. 13.  If you could, tell

     us what that particular letter is.

A    Yes, sir.  It's a copy of a letter on Johns-

     Manville Corporation letterhead, dated December 30,

     1957, addressed to Mr. Ivan Sabourin, St. Johns,

     Quebec, signed by Kenneth W. Smith, M.D., Medical

     Director for Johns-Manville.

Q    Who was Mr. Sabourin?

A    He was an attorney for the Quebec Asbestos Mining

     Association, and I believe also for Johns-Manville

Dr. Braun - Direct                                    35

-----

of Canada.

Q    Were you familiar with this letter in 1957?

A    It is dated the last day I worked for the
     Foundation at that time.  I did see the letter
     following my leaving the Foundation.

Q    And I believe, if I am correct, that this concerns
     some work that you were presently doing at that
     time?

          MR. MOHER:  Objection.

A    Had finished doing, yes.

Q    Do you recognize this as a letter that has been
     maintained by the IHF in its archives?

A    Yes, I do.

Q    And would it be a true and accurate copy of
     the original of that letter?

A    It is.

Q    Because of misnumbering in a prior deposition,
     there is no Exhibit No. 14, so we'll skip over
     to Exhibit No. 15.

          The next document is Braun Deposition Exhibit
     No. 15, and I'd ask for you to look at that and
     see if you can identify it for us.

A    This is a copy of a memo on the letterhead of

Dr. Braun - Direct                                    36

- - - - -

Industrial Hygiene Foundation of America,

Incorporated, dated January 7, 1959, addressed to

Dr. Kenneth W. Smith, Medical Director, Johns-

Manville, Re:  Case of Walter Burek, from

Paul Gross, M.D., Research Pathologist.  It

consists of an unnumbered series of pages.

Q    I believe there are some letters attached.

A    Yes.  Attached is a letter directed to Mr. Hugh M.

Jackson, Manager, Industrial Health Program,

Johns-Manville Corporation, bearing Dr. Paul Gross's

typed signature, and a letter to Dr. C. U. Culmer,

care of Johns-Manville Corporation, Waukegan,

Illinois, also bearing Dr. Paul Gross's typed

signature.

Q    Does this represent the type of pathological

evaluation that was done at this time by the IHF?

          MR. MOHER:  Objection.  My understanding

     is that the doctor would not have been there

     in 1959.

          THE WITNESS:  I was not there in 1959.

          MR. PATRICK:  All right.  I'll withdraw

     the question then.

Q    Do you recognize this document, this pathological

1
2                         - - - - -
3         report with the letters attached, as being true
4         and accurate copies of documents that are now
5         maintained by the IHF?
6    A    Yes, I do.
7    Q    The next document is Braun Deposition Exhibit No.
8         16.  I'd ask for you to look at that, if you could,
9         and tell us what it is.
10   A    Yes, sir.  It's an internal memorandum entitled,
11        "Notes on Preliminary Visits to Asbestos Textile
12        Plants; 1.  Asten-Hill Manufacturing Company,"
13        and I recognize it as a memorandum that I wrote
14        for our file and for Dr. Walmer's review.
15   Q    Is that a true and accurate copy of documents
16        which you originally authored?
17   A    Yes.
18             MR. IWLER:  Excuse me.  Is that document
19        dated?
20             MR. PATRICK:  It does not bear a date.
21   Q    Can you tell us generally about what time that
22        document was generated?
23   A    Yes.  I would date it in 1957, sometime in 1957,
24        early in 1957.
25   Q    The next document is marked Deposition Exhibit No.

Dr. Braun - Direct                                    37

-----

3   17, and I would simply ask you whether or not that

4   would be a continuation of what was Braun

5   Deposition Exhibit No. 16?

6   A   Yes, it is, and it's marked, "Notes on Preliminary

7   Visits to Asbestos Textile Plants (cont.)," and

8   has the number "4," the previous one ending with

9   the number, "3," and it continues to the number,

10  "7."

11  Q   I believe you said that you prepared Exhibit No.

12  16.  Did you also prepare this Exhibit No. 17?

13  A   Yes, I did.

14  Q   I show you what has been marked as Plaintiff's

15  Exhibit No. 18.  Could you identify that particu-

16  lar page for us, please.

17  A   Yes.  It's a tabulation of information probably

18  contained in the previous two documents and

19  relates to that same memorandum.

20  Q   There are some handwritten notes on this document.

21  Would those be in your handwriting?

22  A   That's my handwriting, yes.

23  Q   And the same goes for Braun Deposition Exhibit

24  No. 19.  There appears to be some handwriting

25  on that page.  Would that be, in fact, your

-----

3  handwriting?

4  A  Yes, it is my handwriting.  The previous one was

5     typed from this handwritten document.

6  Q  Do you recognize that as a true and accurate copy

7     of the notes which you prepared in the early part

8     of 1957?

9  A  Yes, I do.

10  Q  The next document has been marked as Braun

11     Deposition Exhibit No. 20.  If you could, identify

12     that particular document for us.

13  A  It's entitled, "Autopsy Protocol; Lukas, Mary;

14     Prosector, Michel Janis, M.D."

15  Q  What is the date on that document?

16  A  The document itself doesn't have a date.  The

17     protocol is numbered, not dated, which is

18     unusual.

19  Q  I believe the date of expiration is in what year?

20  A  1959.  That's the date that the subject died.

21  Q  Then that would have been after the time that

22     you would have been employed by the IHF; is that

23     correct?

24  A  Yes, it would have been.

25  Q  But do you recognize this as an accurate copy of

-----

a document that has been maintained by the IHF

in its files?

          MR. MOHER:  Objection.

A    Yes.

Q    Now, the next document has been identified as

    Braun Deposition Exhibit No. 21.  If you could,

    look at that and identify it for us, please.

A    Yes, sir.  That's a "Report of Preliminary Dust

    Investigation for Asbestos Textile Institute" made

    by W.C.L. Hemeon, who was the head engineer for

    the Industrial Hygiene Foundation of America,

    dated June 1947.

Q    When did you first see this particular study?

A    I believe it was after these depositions began.

Q    Do you know Mr. Hemeon?

A    Yes, I do.

Q    Have you had any occasion to have any type of

    communication with him about that study?

A    Yes, I have.

Q    And what was that?

          MR. MOHER:  Objection.

Q    You can answer.

A    I believe when this was requested in one of the

Dr. Braun - Direct                                      40

-----

early subpoenas, we didn't have a copy of it in
our files and I communicated with Mr. Hemeon to
find out if he had a copy, which he did, and I
think that's where we got our present copy of it.

Q    So the document, the Hemeon study that is main-
tained by the IHF, was, in fact, one that was
obtained from Mr. Hemeon?

A    Yes, I believe that's correct.

            MR. MOHER:  Objection.

            MR. IWLER:  I object to the form of the
       question because the witness never testified
       that the document was maintained by the IHF.
       On the contrary, he testified that he got it
       from someone else in response to a subpoena
       attached to a deposition notice.

BY MR. PATRICK:

Q    Is this document, the Hemeon study, which has
been marked as Exhibit No. 21, now maintained
in the files of the Industrial Health Foundation?

A    Yes, our copy of it is.

Q    And did the Industrial Health Foundation receive
its copy of the Hemeon study from Mr. Hemeon
himself?

-----

A    Yes.

            MR. IWLER:  Objection.

            MR. ROSENBERG:  I would object to it,

       too, because the document was apparently

       prepared before Dr. Braun began employment

       with the IHF.

            MR. IWLER:  Dr. Braun has already

       testified how he got the document.  It was

       not kept in the ordinary course of the

       records of the IHF.

BY MR. PATRICK:

Q    Is this document, as it is now being kept by the

       IHF, kept in the normal and ordinary course of

       the business of the IHF?

A    Yes, sir.

Q    Approximately what year, if you can remember,

       was it when you received a copy of this report

       from Mr. Hemeon?

A    The earliest of the depositions was, I think,

       1977, so it would be between 1977 and 1979.

Q    Is Mr. Hemeon still around?

A    Yes, he is.

Q    Where does he live?

Dr. Braun - Direct                          42

-----

A    He lives on Aliquippa Street.  No.  That was his

     old address.  I don't know his present address,

     but he lives in Pittsburgh.

Q    Have you had any recent communications with him

     at all?

A    I see him almost every day at lunch upstairs.

Q    The final document is Braun Deposition Exhibit

     No. 22.  If you could, identify that for us,

     please.

A    Yes, sir.  That's on the letterhead of Industrial

     Hygiene Foundation of America, Incorporated,

     dated February 15, 1956, "Critique of Fiberglas

     Literature for Owens-Corning Fiberglas Corpora-

     tion by Paul Gross, M.D., Research Pathologist."

     It's ten pages -- nine and a half pages.

Q    Does it bear the IHF logo?

A    Yes, it does.

Q    As that logo was used in 1956?

A    Yes, sir.

Q    And is it an accurate copy of a document that

     is presently maintained in the archives of the

     IHF?

A    Yes, it is.

Dr. Braun - Direct                              43

----

Q    Would the archives or files of the IHF be maintained

     in the normal and ordinary course of the business

     of the IHF?

A    Yes.

Q    And when a document is received by the IHF, is

     it received into these archives in the normal

     and ordinary course of business of the IHF?

A    Yes.

          MR. MOHER:  Objection to the form of

          the question.  It doesn't have any time.

          You've got a witness here who was employed

          apparently from 1951 to 1957 and from 1970

          through the present time, and you are talking

          about documents that apparently have dates

          from 1947 through a period of time that he

          was not employed by the IHF.

BY MR. PATRICK:

Q    In your employment with the IHF have you become

     familiar with the business procedure by which the

     IHF maintains its files?

A    Yes, I have.

Q    And when it receives a document, is that document

     then placed on file with the IHF?

Dr. Braun - Direct                                44

-----

A       Yes, it is.

Q       And, again, are these archives presently maintained

        in the normal and ordinary course of the business

        of the IHF?

A       Yes, they are.

                MR. PATRICK:  I have no further

        questions.

                MR. MILLER:  Under the court order,

        Dr. Braun has the opportunity to take a

        15-minute recess.

                MR. YOUNG:  Dr. Braun, I think that

        I'm the only one going to ask you any

        questions, so whatever you want to do is

        fine.

                THE WITNESS:  I think I'd just as soon

        continue.

                MR. YOUNG:  Whatever.

BY MR. PATRICK:

Q       Doctor, in your capacity as Director of the IHF,

        are you the custodian of the records of the IHF?

A       I'm the ultimate custodian of them, yes.

Q       And were all these documents that I showed you

        from the files of the Industrial Health

-----

3    Foundation?

4  A    Yes, they were.

5                  MR. PATRICK:  Thank you.

6                           -----

7                  CROSS-EXAMINATION

8  BY MR. YOUNG:

9  Q    Dr. Braun, you and I have met before.  My name is

10       Lane Young and I represent Johns-Manville in this

11       litigation.  I have a number of questions that I

12       need to ask you.  If you don't understand any of

13       the questions, just tell me and I'll be glad to

14       repeat it or rephrase it.  Is that agreeable?

15  A    That's agreeable.

16  Q    All right, sir.  Now, in an effort to save a little

17       bit of time, did I ask you to review documents that

18       have previously been marked as Defendant Johns-

19       Manville's exhibits to your deposition, Nos. 1

20       through 29?

21  A    Yes, you did.

22  Q    Did you do that, sir?

23  A    Yes, I did.

24  Q    Before this deposition?

25  A    Yes, sir.

Dr. Braun - Cross                                    46

----

Q    This morning?

A    Immediately before, yes.

Q    All right, sir.  Now, I'd like to ask you some
     questions about all of those documents, if that's
     okay.  Are you also the custodian of the originals
     of all of those documents in your capacity as
     president of IHF?

A    Yes, I am.

Q    Are these copies of documents that you have
     previously produced for Al Parnell in our office?

A    Yes, sir.

Q    At an earlier deposition?

A    Yes, sir.

Q    Are these copies of originals of those documents
     that are currently in your files or the IHF's
     files?

A    Yes, they are.

Q    Are they true and accurate and correct copies
     of those originals?

A    Yes, they are.

Q    Were these documents either produced or received,
     to your knowledge, in the ordinary course of the
     business of the IHF or one of its predecessors?

-----

A      Yes, sir.

Q      And it is the business of the IHF or its

       predecessors to keep such documents?

A      Yes.

               MR. DOHERTY:  Lane, what was the

       date of the prior deposition that you were

       referring to?

               MR. YOUNG:  March 11, 1981.  Off the

       record for just a second.

               (Discussion off the record.)

               MR. PATRICK:  Let me put on the

       record that, of course, I have no objections

       to authentication of any new documents or

       any other documents that you have.  Of course,

       I will reserve my objection as to what we

       previously stated in prior depositions, which

       is the anticipation of questions going

       beyond the scope of direct examination.

               MR. YOUNG:  Right.  As I understand it,

       we are reserving all objections, except as

       to the form of the question specifically with

       respect to whether or not you feel like it's

       leading.

Dr. Braun - Cross                                    48

                         -----

               MR. PATRICK:   Right.

BY MR. YOUNG:

Q      Dr. Braun, Mr. Patrick asked you about the

       Industrial Health Foundation and your position

       there and the predecessor companies and things

       of that nature.  What I'd like for you to do now,

       please, sir, is tell the court and the jury that

       might be later hearing this deposition how and why

       the Industrial Health Foundation or its predecessors

       came into being and how it evolved to what it is

       today.

A      Of course, again, I wasn't present in 1935, but

       I have had access to historical records and I've

       talked to the people involved.  In 1934 they were

       digging some tunnels at Gauley Bridge, West

       Virginia, and a large number of the workers

       contracted silicosis, and it became a matter of

       national importance.  A number of industrialists

       approached Dr. Weidlein, who was then president

       of Mellon Institute here in Pittsburgh, and asked

       him how they might go about conducting research,

       funding research, on not only silicosis but other

       diseases, particularly pulmonary diseases, caused

Dr. Braun - Cross                                    49

- - - - -

~~caused~~ by the inhalation of dust at work.

Dr. Weidlein suggested that they constitute a

fellowship within the Mellon Institute.

The Mellon Institute operated with a ~~corps~~ *core*

of five or six departments and about 60 or 70

sponsored fellowships.  These sponsored fellow-

ships worked on different problems, none of which,

to my knowledge, were health-related problems at

that time.

These industrialists formed and incorporated

the Air Hygiene Foundation of America as a fellow-

ship within the Mellon Institute to collect funds

and expend those funds in research on silicosis and

allied ~~research~~ *pulmonary* disorders.

Q   All right, sir.  Then did the Air Hygiene

Foundation move on into other diseases besides

silicosis?

A   Yes.

Q   Can you give us some examples of some things that

they moved into?

A   Well, it soon became evident to everybody

involved that there were other occupational

hazards in addition to silica.  Such things as

Dr. Braun - Cross                                    50

-----

solvents came under their jurisdiction, and heat,
excessive heat, improper lighting, and that sort
of thing.

Q   All right, sir.  At some point in time did the
    Foundation begin to have industrial members?

A   From the beginning they had industrial members.

Q   And did they start at some point in time -- I
    guess from the beginning they started doing
    research for these members?

A   They didn't do the research within the Intra-
    mural Foundation, but they collected funds from
    these member companies and distributed them to
    organizations which were doing actual laboratory
    research.  One of these was the University of
    Pennsylvania.  Dr. Leroy Gardner at Saranac Lake
    was provided some support, and Johns-Hopkins
    University scientists got some support.

Q   And now, during the period of time from the
    beginning of the Air Hygiene Foundation until
    today, can you tell us whether or not the IHF
    and its predecessors or corporations have had
    a number of different corporate members?

A   Yes, they have.  That original group numbered

Dr. Braun - Cross                              51

- - - - -

something less than 20, and at the present time
we have about 145.   In the interim we have had
maybe as many as 160 and as few as 112 or 113.

Q   All right, sir.   From time to time you have some
members who drop out?

A   Yes.

Q   And you obtain new members   is that correct?

A   Membership is on an annual basis.   They will join
and stay in for a while and, for various reasons,
they drop their membership, possibly coming back
later.

Q   All right, sir.   How is it that the members are
charged or how do they pay the IHF?

A   They pay annual dues, and the dues are based on
the number of employees.

Q   Has that always been the case?

A   Yes, I think that has always been the case.

Q   Now, the IHF offices are located in Pittsburgh;
is that correct?

A   Yes, sir.

Q   And not too terribly far from where we are today?

A   No.   A few miles.

Q   Can you just give us that address, if you would,

Dr. Braun - Cross                                    52

-----

please.

A   5231 Centre Avenue, and that's in zip code 15232.

Q   Is there a library at the IHF offices?

A   Yes, there is.

Q   Do you feel like that library is fairly large
    with respect to the types of materials that are
    found therein?

A   Yes.  It has specialized in industrial health,
    industrial medicine, industrial hygiene, and in
    that respect it's fairly complete.  As compared
    to general libraries, it's a small library.

Q   Sir, in addition to the library at IHF head-
    quarters, do you also have a number of documents
    that are kept in archives that Mr. Patrick
    referred to?

A   Yes.  We have correspondence files and report
    files.

Q   Can you give us some idea of how these documents
    are located in those archives, total documents?

A   Well, I could give you an estimate.  We have
    about 13 five-drawer file cases and they are
    packed, and I would estimate that each drawer has
    perhaps 200 documents in it.  So 1300 documents

Dr. Braun - Cross                                            53

-----

times five.

Q    And the documents that you have brought here today
in response to the Plaintiffs' subpoena are
contained in two cardboard boxes.  They are about
a foot wide and a foot and a half long.  Is that
correct?

A    That's correct.

Q    All right, sir.  Could you give us some idea as
to what percentage of the total documents archived
at the IHF the documents that you have brought
today represent?

            MR. PATRICK:  Excuse me, Lane.  There
        are some more documents in the back.

            THE WITNESS:  Those are bound copies
        of the Digest.  They are not these documents.

            MR. PATRICK:  I see.

A    You want to know what  percentage of the total
number of documents we have that these represent?

Q    Yes, sir.

A    Well, I'd say one/one hundredth as a very crude
estimate.

Q    Approximately one percent?

A    Yes.

-----

Q    Now, has the IHF done research for member companies

     that does not involve the topics discussed in

     these documents that you brought in response to

     Mr. Patrick's subpoena?

A    Yes, they have.

Q    Could you give the jury some idea of all of the

     other areas in which the IHF has done studies or

     research?

A    Yes, sir.  In the laboratory, in Dr. Gross's

     laboratory, they have studied the effects of

     exposure of animals to oven cleaners, paints,

     solvents, metals such as chromium; and the bulk

     of our work outside of the laboratory is

     epidemiological studies, which have been involved

     with oil dermatitis, chromium, effects of some

     trade chemicals not related to asbestos.

Q    Dr. Braun, without going into discussion that

     could possibly take you all day, could you just

     tell us very briefly what an epidemiological

     study is?

A    Yes, I think that I can do that briefly.  An

     epidemiological study is an attempt to determine

     the health experience of a group of workers

Dr. Braun - Cross                                    55

-----

carefully defined as compared to the general

population or a similar population not exposed to

the same thing that your study group is exposed to.

Q    Thank you, sir.  Now, with respect to the docu-

ments that may have been generated by the IHF in

doing the studies and work that you just told me

about, you have not been asked to produce those

today, have you?

A    No.

Q    All right, sir.  Specifically, you haven't been

asked to produce any documents except for those

documents that involve the IHF's work in the area

of asbestos?

A    That's true.

Q    Could you give us some idea as to the percentage

of the IHF's work that is represented by the

documents that you have been asked to produce?

A    Well, the percentage of documents represented by

these documents is not exactly similar to the

percentage of our work.  Some studies require a

great deal more work than others.  Much of our

work is not related to specific studies.  So if

the documents represent one percent, the work

Dr. Braun - Cross                                56

- - - - -

related to asbestos must represent one-tenth of a

percent.

Q    Thank you, sir.  Has asbestos and related research

ever been a major endeavor of the Industrial Health

Foundation or its predecessors?

A    Well, at the time we are doing a study it's a

major effort and a lot of people are involved, but

over the history of the Foundation work with

asbestos has not been a major endeavor.

Q    Has research that you have done in the area of

chemical fields and related fields of that type

been more of a major endeavor of the IHF?

A    Yes.  I think collectively the work that we have

done and the studies we have made on things other

than asbestos would be a much more important part

of our work.

Q    I believe you have already told us that you are

currently the president of the IHF.  Is that

correct?

A    Yes, sir, I told you that.

Q    And you first started work with the IHF or its

predecessor in approximately 1951?

A    I think that was the case.

1

2                          - - - - -

3    Q    Then you left for about 13 years beginning in

4         1957?

5    A    Beginning in '58, yes, or through '57.

6    Q    What did you do while you were away from the IHF

7         during that period of time?

8    A    I joined the U. S. Steel Corporation as medical

9         director of the Homestead Works here in Pittsburgh

10        for about two years, and then I was made associate

11        medical director of the corporation.

12   Q    During the time period that you were with U. S.

13        Steel, did you have any involvement with the

14        ongoing day-to-day work of the IHF?

15   A    No.  I kept in contact with the Foundation as the

16        chairman of its Medical Committee and served as

17        trustee for some period of time.

18   Q    All right, sir.  To the extent that you have

19        produced documents for the Plaintiff and testified

20        about documents that were involved in that period

21        of time, do you have any direct or personal

22        knowledge concerning those documents?

23   A    I have to ask you to restate that.

24   Q    In other words, you weren't at the IHF at the

25        time they were either created or received?

-----

A    For some of these documents that's very true, yes.

Q    So to the extent that you have knowledge concerning
     documents from 1958 to 1970, that is not a direct
     first-hand type of knowledge?

A    No, it is not.

Q    I'm sure that I have already asked you this, but
     when you produced the documents that have been
     marked as Defendant's Exhibits 1 through 29 for
     Mr. Parnell earlier, you did that in your capacity
     as president of the Industrial Health Foundation?

A    Yes, I did.

Q    Now, Dr. Braun, when the documents that we've
     talked about today and will talk about that I've
     asked you to look at earlier were generated, do
     you feel like the IHF had gained a certain pre-
     eminence in its ability to do certain kinds of
     work relative to research for industrial and
     related people?

A    I feel that the Foundation is a unique organiza-
     tion.  I don't think there is any other organiza-
     tion that does all of the things that we do.
     There are, of course, a number of laboratories
     that do excellent research.

Dr. Braun - Cross                                    59

-----

Q    Did the IHF have a library during the time period

     of 1950 before you left, or access to a laboratory?

A    Laboratory or library?

Q    Laboratory.

A    During the time that you mentioned, Dr. Gross was

     in charge of an animal laboratory which was

     situated on the property of the Magee Hospital,

     which is here in Pittsburgh.  That laboratory was

     subsequently moved to the campus of the University

     of Pittsburgh in a building that was originally

     the Mellon Institute.

Q    Was there an organization known as the Trudeau

     Foundation during that period of time?

A    Yes, there was.

Q    Had that particular organization also acquired

     certain expertise in the same or similar fields

     to the IHF?

A    Yes.

Q    Now, with respect to the generation of the

     documents that we are talking about today,

     was there an association or any communications

     between the IHF and the Trudeau Foundation and/or

     the Saranac Lake people?

Dr. Braun - Cross                                    60

-----

A    As I mentioned earlier, some of the funds collected
by the Air Hygiene Foundation were distributed to
the Saranac Lake group to fund certain research.
That would have ended, I imagine, in the early
1940's.  From then on, there was no such connec-
tion between the Foundation and the Trudeau
Foundation or Saranac Lake group; but
Dr. Leroy Gardner of Saranac was active in our
Medical Committee and Dr. Lanza was active in it
and there may have been communications.

     I don't think that we did any joint studies
or anything like that.  We appeared on some of
their programs, they appeared on our programs,
and entirely irrelevant to that is the fact that
toward the end of this period Saranac Lake wanted
to sell their properties and there was a time that
the Foundation thought they might be interested
in purchasing them.

Q    Do you recall any particular pneumoconiosis that
Saranac might have been studying as a result of
receiving funds?

A    That would have been on silicosis.

Q    Anything else that you recall?

-----

A    No, I don't recall anything else.

Q    Now, with respect to the Dr. Gardner that you
     mentioned earlier, was he one of the leading
     people in the lung area or the lung field during
     the time that you were involved with the IHF?

A    He was pre-eminent in the field of lung pathology
     from the standpoint of animal experimentation.

Q    Was he ever involved with the IHF Medical
     Committee?

A    Yes.  He was a member of the Medical Committee.

Q    Do you remember when that was?

A    No, I don't.  Prior to 1950.

Q    You mentioned Dr. Lanza.  Can you tell us who
     he was?

A    Yes.  Dr. Lanza was at the time I knew him
     Medical Director of Metropolitan Life Insurance
     Company, and I believe a vice-president.  He had
     been at Saranac Lake laboratory sometime in his
     career.

Q    Was he also a leading person in the field of
     lung research and study?

A    Yes.

Q    Just so the jury will understand all of this, the

Dr. Braun - Cross                                    62

‐‐‐‐‐

moneys that you testified to earlier that were

paid by members as dues, was some of that money

the money that was used to fund these outside

studies you are talking about?

A    Yes.  In the very early days it is my understanding

that the object of the Air Hygiene Foundation was

to collect funds from its member companies and

distribute those funds to people who were capable

of doing research on silicosis primarily.

Q    And, of course, some of the money was kept to run

the IHF itself?

A    Very little.

Q    Now, has the IHF and its predecessor corporations

also, in order to supplement the moneys that

it receives as membership dues, done special

or specific research problems for member companies

at their request?

A    Yes, it has.

Q    Can you give the jury just a few examples of

what type of research and services might have

been performed in this regard?  We'll go into

specifics in a minute, but just generally.

A    The services of the Foundation ever since it

-----

acquired industrial hygiene engineers have

included monitoring of the workplace for

environmental hazards, contaminants, analyzing

the samples collected, doing literature searches

either in our library or through the data banks

that are existent and can be entered by our

library, during all of Dr. Gross's time animal

pathology, animal exposure experiments; and our

services now include courses that we put on,

auditing of a medical department or industrial

hygiene program.

Q    Now, Plaintiffs' counsel asked you about certain

letters between you and Hugh Jackson.  Did those

particular documents relate to a study which the

IHF did for the QAMA, or Quebec Asbestos Mining

Association?

A    Many of those letters did, yes.

Q    So the jury will understand the background for

those documents being generated, can you tell me,

please, sir, if, for example, a member company

wanted something done by the IHF, what would you

do in terms of figuring out how you were going

to go about doing it and how you were going to

Dr. Braun - Cross                                    64

- - - - -

charge that particular company?

A    Well, we would probably generate a proposal cover-
ing our understanding of what it was the company
wanted to have done.  In that proposal we would
make as accurate an estimate as possible of how
long it would take to do the study.  This is any
study in general.  And, based on the time involved
and travel costs and so forth, we would estimate
the cost to them.

Q    So, in other words, a member company would come
to you and say, "We suspect such and such to be
a problem, and we would like for you to do a
study in that regard"?

A    Yes.

Q    Then you would come back with some type of a
proposal?

A    Delineating the manner in which it could be
attacked.

Q    Now, assuming that you were doing such a study
today for a member company, would you tell the
jury to what extent, if any, that member company
would be allowed to direct your activities with
respect to the study.

Dr. Braun - Cross                                65

----

A     At no time have we permitted interference.  We
      have certainly asked the member company what was
      available, how to go about getting it, who to talk
      to in their organization to get the facts; but we
      take on a study -- and we do this all the time --
      with the understanding that we are not to be
      interfered with in the way that we do it or the
      conclusions that we reach.

Q     Would that be true for the time period that
      involves the documents I asked you about earlier?

A     It's always been true.

Q     Specifically with respect to my client, Johns-
      Manville, could you tell this court and jury if
      you have any recollection of it ever directing
      your activities in terms of any study, whether it
      be one involving the Plaintiffs' exhibits or
      another study?

A     The only study of which I have personal knowledge
      that involved Johns-Manville was the study done
      for the Quebec Asbestos Mining Association, of
      which Johns-Manville was a member.  I have
      excellent recollection of how that was done, and
      there was no attempt on the part of Johns-Manville

Dr. Braun - Cross                                           66

-----

to influence our findings.

Q   All right, sir.  Would you take a look at what
has been previously marked as Defendant Johns-
Manville Exhibit No. 1 and tell us what that is,
please, or identify it, if you can.

A   Yes, sir.  That's a copy of a letter dated
November 21, 1955, directed to Dr. K. W. Smith,
Medical Director of Johns-Manville, from me.

Q   Does that particular document relate to a study
or proposed study by the IHF?

A   Yes, it does.

            MR. MILLER:  Could we go off the record?

            MR. YOUNG:  Yes.

            (Discussion off the record.)

            MR. YOUNG:  For the record, we will
       recess until 1:00.

            (Noon recess.)

BY MR. YOUNG:

Q   Doctor, just as a matter of formality, I'll advise
you that you are still under oath.  You know that?

A   Yes, sir.

Q   All right, sir.  Now, I believe before we took
the lunch recess we were just getting into the

-----

documents that I asked you to look at before the
deposition that have been marked as Defendant's
Exhibits 1 through 29.  Do you recall that?

A    Yes, I do.

Q    All right, sir.  And you had looked at and
identified, I believe, Defendant Johns-Manville's
Exhibit No. 1.  Is that correct?

A    I don't remember whether I had finished identifying
it.  To be sure, I'll say that it's a copy of a
letter dated November 21, 1955, directed to
Dr. K. W. Smith, Medical Director, Johns-Manville
Corporation.  It bears my typed signature at the
bottom.

Q    Now, having reviewed that letter, does that
refresh your recollection or allow you to recall
discussions that you had with Dr. Smith relative
to the proposed epidemiological study?

A    Yes, sir.

Q    Can you tell us what discussions you had with
Dr. Smith during that time?

A    I discussed two things with Dr. Smith.  One was
the survey, epidemiologic survey, of asbestos
miners in Quebec in the towns of Asbestos and

Dr. Braun - Cross                                       68

- - - - -

Thetford Mines, and the other thing was proposed
survey of the medical setup at Johns-Manville's
several locations.

Q    All right, sir.  Would this particular document
be a part of the letterwriting correspondence that
you had with Dr. Smith, some of which has already
been identified as Plaintiff's Exhibits 2, 5,
7, 8 and 13, assuming that those are documents
involving correspondence with Dr. Smith?

A    Yes, it would be.

Q    Referring again to Defendant Johns-Manville's
Exhibit No. 1, could you tell us, please, sir,
how it was that you first started moving towards
the epidemiological study you have referred to
and that is referred to in these particular
documents, or have you ever told us that?

A    No, I may not have.  Obviously sometime prior
to November 21, 1955, there was some informal
discussion which led us at the Foundation to
believe that Johns-Manville as a member of the
QAMA was interested in an epidemiologic study.
It was also mentioned informally that they would
like to have a medical survey, which was quite

Dr. Braun - Cross                                    69

-----

different.  It would be a survey or audit of their

medical facilities.

Q   All right, sir.  What was the proposed subject

matter of this particular epidemiological study?

A   To determine whether or not there was an excess

of lung cancer among miners of asbestos.

Q   Could you tell the court and jury, please, at this

point in time in late 1955 what your understanding

was of the present state of medical knowledge or

the present state of the studies with respect to

that particular topic.

        MR. PATRICK:  Excuse me.  Let me go

    ahead and put on the record an objection at

    this point, because this is where we contend

    that the scope of examination greatly exceeds

    that of direct.  Just for any future use

    of this deposition -- as I understand it,

    this objection is reserved, but at this

    point I'd simply like to make the record

    clear that we would object to any questions

    along this line and previous questions which

    you have had as being beyond the scope of

    direct examination, and when you start

Dr. Braun - Cross                                      70

-----

getting into the QAMA study.

MR. YOUNG:  As I understand it, we are
reserving all objections to the form of the
question, except as to the question being
leading; and that would, at least on behalf
of Johns-Manville, encompass objections you
might have as to whether or not the questions
are outside the scope of direct.

MR. PATRICK:  Thank you.  I just wanted
to make sure that that was clear on the
record.

BY MR. YOUNG:

Q    Do you remember what I asked you, Doctor?

A    No.  I'd have to have that read back.

Q    Let me just see if I can ask it again.  What
was your understanding or your feeling in
November of 1955, and at the time the plans were
being made for this particular study, as to the
state of the research or medical knowledge with
respect to the proposed topic for this study?

A    My understanding at that time was that over a
period of about 20 years there had been reports
of the simultaneous appearance of lung cancer and

Dr. Braun - Cross                              71

----

asbestosis, and that some people felt that the

asbestos or asbestosis was the cause of the lung

cancer, but I realized that those opinions were

formulated on something that didn't satisfy me

and didn't satisfy a lot of other people as to

a direct causal connection.  They were in selected

groups of people.  In some cases it was autopsy

material, only people who came to autopsy.  And

while there was a strong suggestion, my feeling

at that time was that it had not been proven one

way or the other and that an epidemiology survey

would be helpful.

Q    Were there some writers or experts in the field

at that period of time who took both sides of

the issue?

A    Some on each side; that's right.

Q    Who was it that was ultimately chosen to be the

cohort for the study?  Do you understand my

question?

A    Yes, I do.

Q    And once you have told us that. tell us why it

was that you picked that particular group or

that group was picked.

Dr. Braun - Cross                                    72

-----

A    Well, I thought you meant how did I exactly define

     the cohort.  We define a cohort usually as a group

     of people who are on the payroll on a certain date

     and who can be followed for a certain period of

     time, hopefully at least 20 years.  The exact

     date that I picked them I don't remember now, but

     we wanted to confine it to asbestos miners in the

     crysotile mines because we felt that that would

     be a pure exposure.

Q    To asbestos?

A    To asbestos, to crysotile asbestos.

Q    Then was it your suggestion or someone else's

     suggestion that the study be done and involve

     that particular group of people?

A    It was my suggestion.

Q    Did you approach anyone at Johns-Manville

     relative to the study?

A    Yes.

Q    And who was that, sir?

A    Dr. Smith with respect to the exact implementation

     of the study because he had been the physician

     at Asbestos, the town of Asbestos.

Q    Tell the jury who Dr. Kenneth Smith was or what

-----

3        his title was at this time.

4    A   By this time he was Medical Director of the

5        Corporation, Johns-Manville Corporation.

6    Q   Was anyone else from Johns-Manville involved

7        in these discussions?

8    A   Yes; Hugh Jackson.

9    Q   What was his title?

10   A   Hugh Jackson was manager of their Health & Safety

11       Program.

12   Q   Is that the Hugh Jackson that you referred to

13       earlier on your examination by Mr. Patrick?

14   A   Yes.

15   Q   Did you have a meeting with Dr. Smith in connec-

16       tion with this work through the IHF?

17   A   Yes.  I had several meetings with him.

18   Q   All right, sir.  Had you ever met or dealt with

19       Dr. Smith before that time?

20   A   Yes, I'm sure I had.

21   Q   During the course of the years that you worked

22       on the epidemiological study, did you continue to

23       converse and correspond with Dr. Smith?

24   A   Yes.

25   Q   Was that a frequent or infrequent occasion, or how

Dr. Braun - Cross                                    74

-----

3   would you describe that particular situation?

4   A   I would say during that time we frequently talked.

5   Q   Tell the jury, if you would, sir, what input with

6       you, if any, Dr. Smith had in forming either the

7       scope of this study or the manner in which it was

8       carried out.

9   A   Well, as I mentioned, Dr. Smith had been the

10      plant physician at the town of Asbestos and was

11      familiar with the type of records that were kept,

12      and his successor, Dr. Granger, was also brought

13      into the discussions, regarding the type of

14      records that were available, whether they had

15      knowledge of the employment period of the people

16      that were there, whether there was an insurance

17      program that covered these people; and Dr. Smith

18      suggested, and I concurred, that we make the

19      cohort as large as it could be because it's a

20      disease of small incidence and you want to get as

21      many people as you can for as long a period of time

22      as you can.

23  Q   All right, sir.  Would it be fair to say then that

24      Dr. Smith was basically providing you with

25      information that would assist you in carrying out

-----

3       the study?

4   A   Dr. Smith among others, yes.

5   Q   Did you all develop a working relationship during

6       the period of time that the study was being

7       undertaken and done?

8   A   Well, we worked together as was necessary.   I

9       didn't bother him with things that I didn't need

10      his help on, and he didn't bother me.

11  Q   To the extent that you needed him to do something

12      for you or provide you with some information, was

13      he generally available and willing to do that?

14  A   Yes, he was.  He was very helpful.

15  Q   And did he direct your activities or tell you

16      specific things to do in connection with the

17      study?

18  A   No, he did not.

19  Q   Would you classify Mr. Smith as being supportive

20      or not supportive of your work and your study?

21  A   Very supportive.

22  Q   Did you have discussions with Dr. Smith about

23      the methods and approaches by which your

24      organization might undertake to perform this

25      epidemiological study?

Dr. Braun - Cross                                76

2                          -----

3    A    Yes.   In the proposal, I suppose, we told him how

4         we thought we could approach it and welcomed any

5         suggestions from him as to the approach to the

6         study, not the conduct of the study.

7    Q    In the initial stages of the study did you do a

8         literature research up to that point in time?

9    A    That was our starting point.   That's right.

10   Q    Did you discuss the results of that literature

11        search with Dr. Smith?

12   A    I don't know.   I'm not sure.

13   Q    Ultimately you and the IHF undertook to do an

14        epidemiological study on a cohort of crysotile

15        miners in Quebec?

16   A    Right.

17   Q    During the period of time that we have been

18        talking about and during the period of time that

19        the study was done, performed and produced, do

20        you recall whether or not you had any discussions

21        with Dr. Smith concerning the subject of health

22        hazards to insulators as opposed to miners or

23        textile workers?

24   A    Not with Dr. Smith.

25   Q    So the jury will understand your answer then,

-----

do I understand that you said that there were not

any discussions of that type with Dr. Smith?

A    No.  My reply is that I don't recall that I

talked over insulators or textile workers or

anything like that with Dr. Smith.

Q    All right, sir.  Were there any discussions at

any point in time when you were proposing the

cohort of the study relative to including therein

textile workers as well as miners?

         MR. MOHER:  I'm going to object to the

         form of the question.  I don't know whether

         you are asking him if Dr. Smith spoke to him

         or he spoke to Dr. Smith.  In one situation

         I obviously have a hearsay objection.

Q    You can answer the question.

A    Repeat your question, please.

Q    Did you discuss with Dr. Smith during the initial

stages of the study as the cohort was being

formulated increasing the cohort itself to

include textile workers as well as miners?

A    I think I answered that.  I don't recall discuss-

ing that with Dr. Smith.

Q    Did those discussions take place later when you

Dr. Braun - Cross                              78

-----

began to consider the survey or study for the

American Textile Institute?

A    Those discussions?

Q    Not with Dr. Smith but just in general.

A    In general.  Well, specifically the discussions

relating to the inclusion of textile workers, not

in this study but in a separate study which could

be compared with this study, were with, I guess it

was, Myril Shaw of the American Textile Institute.

Q    I'll ask you some questions about that ATI study

in a minute.  Can you tell the court and jury why

you didn't choose asbestos insulation workers as

a subject for this particular epidemiological

study?

A    I didn't exclude them, but it was my feeling, my

thinking, at the time that insulation workers are

not like a group of miners that you can gather

together and have a cohort followed.  I thought

insulation workers worked in different places in

small groups possibly and would not be easy to

make a study of.

Q    Was your decision in that regard affected in any

way by your understanding as to the amount of

-----

exposure insulators had to asbestos and, if so,
could you tell us about that?

A     I had no knowledge of how much exposure they had,
but, as I say, I thought it was an intermittent
type of exposure and I had no reason to think that
insulation workers were at risk separately from
miners.  Our information was that if asbestos
were to cause lung cancer, the best information
that you could get would be among miners who were
exposed only to crysotile asbestos.  Over a
period of time, I should say.

Q     Did your literature of sorts reveal any reports
dealing with insulation workers that in any way
affected this decision?

A     Well, I'm sure that insulation workers were
mentioned, as were weavers and textile workers,
in the British literature.  I can be gratuitous
and say that I knew that there were no mines in
England, asbestos mines, and that the reports of
cases out of England were in people who worked in
factories using asbestos.

Q     What about the Fleischer-Drinker Report?  Did
your review of the Fleischer-Drinker Report have

Dr. Braun - Cross                                    80

-----

any effect on your not including insulation

workers in your cohort?

A    I think it probably did.

Q    Why was that?

A    Because Drinker felt that the exposure of

insulation workers in shipyards, at least in the

Norfolk shipyards, represented minimal risk, if

any.

Q    Do you recall whether or not you provided Hugh

Jackson with any of that particular information?

A    That I did.

Q    Is that mentioned in the correspondence with

Hugh Jackson that we have already discussed?

A    I'm sure it is, yes.

Q    Would you look at Defendant's Exhibit No. 2 and

identify that for us, please.

A    Yes, sir.  That's a memorandum to Dr. Walmer,

my superior at that time, from me about a meeting

that I had with Ken Smith and Hugh Jackson to

discuss the proposed study for the Quebec Asbestos

Mining Association.

Q    Was that document prepared after the study group

of the cohort had already been chosen?

Dr. Braun - Cross                              81

----

A    No.  It was before.

Q    Take a look at Defendant's Exhibit 3 and identify
     that for us, if you will, please.

A    All right.  Seven pages entitled, "Notes on
     Dr. Braun's trip to Canada Re:  Lung Cancer
     Survey for Johns-Manville Corporation, February 28,
     1956."

Q    Did you prepare that particular document?

A    Yes, I did.

Q    Is that a document that was prepared after you had
     made a trip to Canada?

A    Yes, sir.

Q    Tell the court and jury, if you will, sir, what
     transpired when you went to Canada that gave
     rise to that document or those notes?

A    Well, as I said, it covers seven pages, and it
     must have covered a week's time or ten days' time.

Q    Well, with the other lawyers' permission, did you
     basically go there to begin to gather information
     so that you could start your study?

A    I went there primarily on this occasion to find
     out whether a study of this kind was feasible and
     what sources of information were available.

Dr. Braun - Cross                                    82

- - - - -

Q    Was that document prepared during the time
     period that you were writing and receiving those
     documents involving Hugh Jackson that the
     Plaintiffs' lawyer asked you about earlier?

A    Well, in the same time frame, yes.

Q    All right, sir.  And you were telling your
     superior at that time about the trip and what
     you had done with respect to seeing that this
     study was feasible and those types of things?

A    That's right.

Q    Was that particular trip referenced in Defendant's
     Exhibit No. 3 after the meeting that you had with
     Ken Smith and Hugh Jackson that's referred to in
     Defendant's Exhibit No. 1?

A    Well, I think it was.  No. 1 simply refers to the
     willingness to have a meeting.  No. 2 refers to
     a meeting of December 15, 1955, and this is
     February 1956.

Q    So I should have said Defendant's Exhibit No. 2?

A    Right.

Q    Now, by the time that Defendant's Exhibit No. 3
     had been produced, had you already gotten into
     the beginnings of your epidemiological study?

Dr. Braun - Cross                                     83

- - - - -

A    No.  Possibly the literature search, I don't know,
     but not the actual study.

Q    All right, sir.  This was just a sort of a
     forerunner of the beginnings of the study itself?

A    Yes.

Q    Will you look at Defendant's Exhibit No. 4,
     please, and identify that for us.

A    Yes, sir.  This is dated March 16, 1956.  It's
     on the letterhead of the Industrial Hygiene
     Foundation, Mellon Institute, 4400 Fifth Avenue,
     Pittsburgh, PA.  It's addressed to Mr. W. H.
     Soutar, Secretary of the Quebec Asbestos Mining
     Association, and it is the preliminary proposal
     to do a study which I had by that time found to
     be feasible.

Q    All right, sir.  Is that the epidemiological
     study that we have been talking about?

A    Yes, it is.

Q    Now, once again with respect to the epidemiologi-
     cal study, will you take a look at Defendant's
     Exhibit 5 and identify that for us, please.

A    That's a five-page document entitled, "Memorandum
     on Proposed Epidemiological Study of Lung Cancer

Dr. Braun - Cross                                        84

-----

in Asbestos Workers for the Quebec Asbestos

Mining Association."  It's dated March 16, 1956.

Q     What was the purpose of that particular document?

Why was it prepared?

A     Well, it was prepared to give the Quebec Asbestos

Mining Association an idea of what we thought we

could do and how long it would take, how it would

be done, and how much it would cost.

Q     Did you prepare that?

A     Yes, I guess I did most of it.

Q     Has your opinion with respect to the state of

the evidence and the data on the relationship

between asbestos exposure and lung cancer changed

at all between the time that you testified about

earlier and the time that this proposal was

prepared?

A     No.  When you asked me that, I was talking about

1955, 1956, and I said for the 20 years preceding

that there had been conflicting information.

Q     All right, sir.  Will you take a look, please,

at Defendant's Exhibit No. 6 and identify that

for us, if you will.

A     Yes, sir.  That's copy of a letter dated

1

2                        -----

3      March 16, 1956, to D. R. Holmes of the Asbestos

4      Textile Institute from Dr. Walmer.

5  Q   I believe you previously identified for Plaintiffs'

6      counsel a proposed epidemiological study for the

7      ATI.  Do you remember that?

8  A   Yes, I did.

9  Q   Can you tell us, please, sir, the relationship

10     between Defendant's Exhibit No. 6 and the proposed

11     epidemiological study for the American Textile

12     Institute?

13 A   I have to have that read back or clarified.

14 Q   All right.

15 A   Do you mean the proposed study for the QAMA?

16 Q   No, sir.  I'm talking about the proposed study

17     for the ATI now.  Defendant's Exhibit No. 6, what

18     was the purpose of that document?

19 A   Well, as I said, we had the feeling -- when I

20     say, "we," I mean the Foundation -- that if we

21     could also study asbestos textile workers as well

22     as asbestos miners, we would develop more meaning-

23     ful information.

24 Q   Were you trying to set up a meeting with someone

25     in Defendant's Exhibit No. 6?

Dr. Braun - Cross                                    86

-----

A    That's the letter from Dr. Walmer and he is trying

to set up a meeting with Mr. Holmes.

Q    So that the jury will understand this, were you

and the IHF at this point in time then proposing

two separate studies?

A    Yes, we were.  Separate, but I would say comple-

mentary.

Q    And you have already told us the classification

of persons that would be involved in the studies.

Is that correct?

A    Yes, the miners in the one study and the textile

workers in the other.

Q    At any time during this time period -- and I'm

talking about 1955, '56 and '57 -- did you or

the IHF make any proposal to any organization to

do a study on insulation workers?

A    No.

Q    Would you take a look, please, sir, at --

A    I have the cover sheet.  It's Exhibit 7.

         MR. YOUNG:  Let's go off the record for

         a second.

         (Discussion off the record.)

Q    Dr. Braun, look at Defendant's Exhibit No. 7 and

-----

3    tell us what that is and if perhaps you have

4    already identified it.

5    A    It's an exact duplicate of your Exhibit No. 4,

6         a letter to Mr. Soutar from myself, dated March 16,

7         1956.

8    Q    Okay.  I'm sorry.  What about Defendant's Exhibit

9         No. 8?  You already identified that document?

10   A    Yes.  That's the duplicate of your No. 5.

11   Q    Dr. Braun, will you look at Defendant's Exhibit

12        No. 9 and identify that for us, please.

13   A    Yes, sir.  It's a letter dated April 2, 1956, to

14        Kenneth Smith from me.

15   Q    What is the purpose of that document?

16   A    To let Dr. Smith know that we appreciated his

17        approval of our proposal to the QAMA.

18   Q    And when you say proposal, you are talking about

19        the epidemiological study?

20   A    Yes, sir.

21   Q    And you are indicating that Dr. Smith apparently

22        approved your proposal?

23   A    Yes.  He thought it was all right.

24   Q    So would you look at Defendant's Exhibit No. 10

25        and identify that for me, please, sir.

Dr. Braun - Cross                          38

- - - - -

A    That's a letter on Johns-Manville Corporation
     letterhead addressed to me from Dr. Smith, dated
     March 29, 1956.

Q    What is Dr. Smith doing?

A    Thanking me for sending a copy of our proposed
     study.

Q    Was he acknowledging receiving your proposed
     study?

A    Yes, and making the suggestion that we look at
     the people who lived around the mines as well.

Q    Well, at this point in time what discussions, if
     any, did you and Dr. Smith have as to how long
     this particular study might ultimately go on and
     with respect to following the cohort and those
     types of things?

A    I think that the proposal would indicate the
     length of time we expected this study to take,
     but we had suggested that it be a continuing
     study because, as you accumulate years of
     exposure and continue your calculations of what
     they call standardized mortality ratios, you get
     more complete, more definitive information.

Q    So there was some thinking on your part that it

2        - - - - -

3        might last into a period of ten to twenty years?

4   A    Yes.

5   Q    All right, sir.  Would you take a look at

6        Defendant's Exhibit No. 11, please, sir, and

7        identify that for us.

8   A    Well, that is a duplicate of your No. 9.  Here

9        is No. 9.

10  Q    All right, sir.  We've already talked about that

11       particular document.

12  A    Yes, sir.

13  Q    Does that particular document have discussions

14       in it relative to the dual proposition that we

15       talked about earlier?

16  A    It has no reference to the proposal to do an

17       epidemiology study on the textile workers, but

18       it does mention the medical survey for J-M.

19  Q    These documents that we have been talking about

20       and which you have identified, are these documents

21       part of the ongoing relationship that you earlier

22       told us about with Dr. Smith during the time

23       period of the study?

24  A    Yes.

25  Q    And they would, I assume, include in there

Dr. Braun - Cross

-----

3          suggestions that he had relative as to how to go

4          about this study and how to gather information

5          and those types of things?

6  A    Yes; how to gather information.

7  Q    And you have already told us why it was that

8          Dr. Smith was particularly suited to help you in

9          that regard?

10  A    Yes, I have.

11  Q    Did Dr. Smith introduce you to someone at the

12          Thetford Mines that was of assistance to you with

13          respect to gathering information for your study?

14  A    Yes.  I think that he introduced me to Dr. Paul

15          Cartier.

16  Q    Who was he?

17  A    He was the chief physician of the Thetford

18          Mines Clinic, which was similar to the clinic at

19          Asbestos, Quebec.

20  Q    Did Dr. Cartier make information available to

21          you?

22  A    Yes, he did.

23  Q    Can you give us some idea as to the information

24          that you requested and was provided to you in

25          that regard?

-----

A   Well, if it covered the same thing it usually does,
    I would have asked for employment records, medical
    records, X-rays, insurance records if they were
    kept at the clinic.  It turned out that the
    insurance records were at the Sun Life Insurance
    Company.  I went there to look at them.

Q   Would you look at Defendant's Exhibit No. 12 and
    identify that for us, please, sir.

A   That's a copy of a letter on National Cancer
    Institute of Canada's letterhead, dated April 13,
    1956, to me from Dr. A. J. Phillips, the
    statistician for the National Cancer Institute.

Q   Was that document subsequent to any dealings that
    you might have had with that individual?

A   Yes, sir.  He was one of the people I met on that
    extended trip to Canada in order to develop as
    much information as possible.

Q   Would you take a look at Defendant's Exhibit No. 13
    and identify that for us, please, sir.

A   That's a copy of a letter dated June 7, 1956, to
    Mr. Ivan Sabourin from Dr. Walmer.

Q   What was the purpose of that letter being written?

A   To inform Mr. Sabourin that we were pleased to

Dr. Braun - Cross                                        92

- - - - -

have the approval of the QAMA to do the study.

Q    Who was Mr. Sabourin?

A    He was the attorney, as I say, for QAMA, and
     I believe also for Johns-Manville, Canada.

Q    Was he of assistance to you in preparing and
     carrying out your study?

A    He was of great assistance.  He was a very well-
     known attorney in the Province of Quebec.  He
     knew all of the government people who were con-
     cerned with occupational medicine, statistics, and
     demography, and he introduced me to many of them,
     including the Minister of Health.

Q    Would you look at Defendant's Exhibit 14 and
     identify that for us, please, sir.

A    Yes.  Another letter dated October 11 on the
     letterhead of National Cancer Institute addressed
     to me.  It consists of two pages from Dr. Phillips
     with a copy to Mr. Sabourin.

Q    I believe we previously marked the second page
     of that document, for whatever reason, as 14A.

A    Yes.

Q    Is that correct?

A    That's correct.

-----

Q    Would you tell the court and jury, sir, why you
     would have consulted with Dr. Phillips and how
     the information you gained from him was to be
     used in the epidemiological study.

A    Yes.  As statistician for the National Cancer
     Institute of Canada, he would have a record of
     the cases of cancer that occurred in Canada and
     a breakdown of the types of cancer and where
     they occurred and that sort of thing.

Q    Saying that he was interested in your study?

A    Yes, he was.

Q    Would you look at the Defendant's Exhibit No. 15
     and identify that for me, please, sir.

A    Yes, sir.  It's a letter to Dr. W. M. Gafafer,
     dated November 16, 1956, from me.

Q    Who was Dr. Gafafer?

A    Dr. Gafafer was a statistician of national
     repute.  He was called technical adviser to the
     Occupational Health Program, Division of
     Special Health Services, Department of Health,
     Education & Welfare, Washington, D.C.

Q    All right, sir.  Was that letter generated during
     about the same period of time as the other

- - - - -

3       documents we have discussed dealing with your

4       epidemiological study for the QAMA and the

5       proposal for the ATI?

6   A    It was generated about the same time.

7   Q    If you would, please, sir, would you tell this

8       court and jury who David Truan is or was.

9   A    Dave Truan was a graduate of the Graduate School

10      of Public Health in Pittsburgh at the University

11      of Pittsburgh in epidemiology and biostatistics.

12      He came out of the school to work with me on this

13      particular study and several others of an

14      epidemiological nature.

15   Q    "This particular study" is the epidemiological

16      study that we have been talking about?

17   A    Of lung cancer in asbestos miners, right.

18   Q    For the QAMA?

19   A    Right.

20   Q    Did that ultimately become known as the Braun-

21      Truan Study?

22   A    That's what some people call it.

23   Q    Not to be facetious, but the Braun is obviously

24      you.  Right?

25   A    Yes, sir.

Dr. Braun - Cross                                                95

- - - - -

Q    Was the Braun-Truan Study, in simple terms, your

     report of the results of the epidemiological

     study?

A    That's right.

Q    Would you take a look at Defendant's Exhibit No.

     16 and identify that for me, please, sir.

A    That's an interim report dated January 29, 1957,

     to the QAMA on the epidemiologic study of lung

     cancer in asbestos workers.

Q    Would you give the date of that report to us.

A    January 29, 1957.

Q    To whom was that interim report submitted,

     Doctor?

A    Well, everything we submitted to the QAMA was

     submitted to Mr. Sabourin.  There isn't any

     indication on here of an addressee, but I would

     be certain that this would go to Mr. Sabourin

     for distribution to his client.

Q    Would you look at Defendant's Exhibit No. 17.

A    Yes, sir.

Q    And there is an attachment there that's been

     identified as 17A, which I believe is the same

     as 16, but would you identify 17 for us.

Dr. Braun - Cross                                    96

- - - - -

A     Yes, sir.  That's dated January 29, 1957, a letter
      from me to Dave Truan enclosing a draft of this
      interim report and asking for his comments.

Q     All right, sir.  Look at Defendant's Exhibit No.
      13, if you will, and identify that for us.

A     Copy of letter of March 8, 1957, to Ivan Sabourin
      from me covering the enclosure of 20 copies of
      this interim report.

Q     The interim report was D-16; is that correct?

A     Yes, sir.

Q     So then we have now established that the report
      was sent to Mr. Sabourin.  Is that correct?

A     I'm sure it was.

Q     The interim report that we have been talking about,
      is that a followup from the original proposal for
      the epidemiological study that we talked about
      earlier?

A     Well, it's our custom to give interim reports to
      the sponsor to tell them what we have gotten, what
      we have done up to date, that sort of thing.

Q     Was that the first report that you did with
      respect to this epidemiological study?

A     I would think it would be.

Dr. Braun - Cross                                      97

            - - - - -

Q    Even though you did the majority of the work

     on the particular report, it was actually produced

     by the IHF; is that correct?

A    Yes.

Q    Would you look at Defendant's Exhibit No. 19 and

     tell me if that is another copy of Defendant's

     Exhibit No. 16, or is that possibly a later

     interim report?

A    No, I don't think so.  I think it's the same

     thing but typed.  It's not a copy.  It's re-typed

     so that the pages don't exactly match.

Q    All right, sir.  Could you tell the jury, if you

     would, up to this point in time what Dave Truan

     had done or was to do toward the production of

     the Braun-Truan report?

A    Yes, sir.  David Truan, as I said, was an

     epidemiologist-biostatistician.  His expertise

     was in mathematics and statistics.  When a person

     such as I collected data and turned it over to

     him, he would tabulate it and make calculations

     from which he would draw statistical conclusions.

Q    Did he make any changes of any substance to the

     interim report that you forwarded to him that we

Dr. Braun - Cross                                    98

----

discussed earlier?

A   No.   His input would have been into the material

    that went into the interim report, and if he made

    any changes in that, they would have been grammati-

    cal or punctuation or something like that.   They

    would not have been substantive changes.

Q   All right, sir.   Would you look at Defendant's

    Exhibit No. 20 and identify that for me, please,

    sir.

A   It seems to be another 19.   Exhibit No. 20 is

    the report on an epidemiological study of lung

    cancer in asbestos miners for Quebec Asbestos

    Mining Association, Quebec, Canada, July 1956

    to July 1957, dated September '57, the work done

    by me, the report countersigned by Dr. Walmer.

Q   Dr. Braun, can you tell us, if you will, please,

    what discussions you might have had with

    Mr. Gafafer or Dr. Gafafer relative to this

    epidemiological study.

A   Well, I can't tell you specifically or exactly,

    but I had great respect for Dr. Gafafer's

    ability as an epidemiologist.   On this study and

    several others I asked him to look at them to see

                              -----

3       if he felt that there was anything that I should

4       have done that I hadn't done, if I had handled

5       the material in the proper way, and that sort of

6       thing.

7    Q   And had you dealt with Dr. Gafafer when you had

8        done other epidemiological studies?

9    A   Yes, I had.

10   Q   You pretty much told us already who he is, but,

11       as I understand it, he was one of the leading

12       epidemiologists during this time period.

13   A   Yes, I think he was.

14   Q   Did you solicit his advice and opinions and

15       suggestions relative to Defendant's Exhibit No.

16       20?

17   A   Yes.  I sent him a copy of it.  I sent him a copy

18       of the condensation which was to be published.  I

19       asked him the same questions that I asked him

20       about other epidemiology studies that I conducted

21       at that time.

22   Q   Did you tell him during the period that the

23       study was being performed and put into final

24       form that you would try to keep him advised as

25       to how it developed?  Do you recall doing that?

-----

A    I probably did.

Q    Look at Exhibit No. 21 and identify that for me,
     if you will, please.

A    It's a letter to Dr. Gafafer dated January 14,
     1957, from me, which is a covering letter for the
     manuscript which was to be published in the
     Archives of Industrial Medicine or Occupational
     Health or whatever.

Q    In what position were you writing Dr. Gafafer?
     What was his title or how was he being written
     in that particular exhibit?

A    Technical Adviser of the Occupational Health
     Program, Division of Special Health Services,
     Department of Health, Education & Welfare in the
     National Capital; but not in that position.  Just
     as a friend and as a consultant, somebody in
     whom I had a lot of confidence.

Q    Did you ultimately submit a condensed version
     of the study to someone for publication?

A    Yes, we did.

Q    Now, we previously discussed some correspondence
     back and forth between you and Mr. Sabourin
     concerning comments that Dr. Smith had about your

Dr. Braun - Cross                                   101

                          -----

3    report.  Do you recall those documents?

4    A    I do recall the documents.

5    Q    Did Dr. Smith in fact suggest some matters rela-

6         tive to your report and its publication?

7    A    Yes, he did.

8    Q    Now, with respect to the IHF and its policy on

9         the submitting of reports to be published to the

10        sponsor, can you tell the jury what the IHF's

11        policy was at this time in that regard?

12   A    It was and is that the final report of any study which

13        was to be published -- I should go back and say

14        that our policy is that if we do a study and it's

15        publishable, we reserve the right to publish it,

16        but we do give the sponsor the courtesy of looking

17        at it before it's published.

18   Q    All right, sir.  Did you all do that in this

19        instance?

20   A    Yes, we did.

21   Q    Now, would you tell the jury, if you would, sir,

22        with respect to any changes suggested by

23        Dr. Smith in this report, whether or not they

24        were incorporated and, further, whether or not

25        these changes in any way changed the content or

Dr. Braun - Cross                                    102

-----

the substance of the report.

A     Well, the letter was from Dr. Smith to

Mr. Sabourin and it commented on several things

in the report ~~that~~ made suggestions.  That's the

letter that was received, I think, on the last

day of my tenure with the Foundation at that time.

        I subsequently saw the letter, and it must

have been before we actually submitted it for

publication.  I don't remember.  I think that we

have the letter here.  I can find out what those

suggestions were.  They did not change the substance

of the report.

        Dr. Smith suggested that maybe I was talking

over the heads of people if I said certain things;

and I didn't think that I was, so I didn't incor-

porate that change.  There may have been other

smaller changes of words or something like that.

Q     Getting back to the publication situation that

we discussed a minute ago, was Dr. Gafafer the

individual you sent the condensed version of the

Braun-Truan Study to?

A     I think I did send him the full report and the

condensed version, but not for publication.

-----

Q    No, sir.  I'm sorry.  Would you look at Defendant's

     Exhibit No. 22 and identify that for us, if you

     will please, sir.

A    I think this is another copy of the report.

Q    We lost the cover sheet.  My notes indicate that

     it's a copy of the condensed version.

A    That's possibly true.  Is this 22?  Yes, it has

     to be.  Yes, this is the version for publication.

     The way I can tell that is it has the footnote,

     "This study was made possible through a grant."

Q    All right, sir.  If you would, would you tell

     us if there is any substantive change between the

     condensed version and the full version that we

     discussed earlier.  *I've explained*

A    No, there is not.  ~~I'll explain~~ many times that

     when you publish an article, a report that's

     200-some pages, you must get it down into

     publishable, manageable size.  There would be

     no sense at all in publishing it if it didn't

     tell what was in the report, but there are a lot

     of extraneous things in the report, for the

     edification of the sponsor perhaps, which don't

     go into a scientific journal.  The report is

Dr. Braun - Cross                          104

                        -----

3    exactly the same.

4    Q    Would you look at Defendant's Exhibit No. 23 and

5         identify that for us, please, sir.

6    A    Yes, sir.  This is a copy of a letter dated

7         January 8, 1958, to Dr. Herbert Stokinger, Division

8         of Occupational Health Field Headquarters, U. S.

9         Public Health Service, 1014 Broadway, Cincinnati

10        26, Ohio, explaining to Dr. Stokinger, who was

11        acting editor of the Archives, whatever it was

12        called at that time, that Dr. Drinker had advised

13        me to send the manuscript to him in his absence

14        for consideration for publication.

15   Q    Who was Dr. Stokinger?

16   A    Dr. Stokinger was with the U. S. Public Health

17        Service and I believe was head of their Division

18        of Field Headquarters, and he was also their

19        representative on the American Conference of

20        Governmental Industrial Hygienists.

21   Q    What is the U. S. Public Health Service called

22        now?

23   A    That is now the National Institutes of Occupa-

24        tional Health, or NIOSH.

25   Q    Now, this is where you were sending the manuscript

Dr. Braun - Cross                                    105

-----

       to begin a move towards having it published.

       Is that correct?

A      That's correct.

Q      At any point in time did the QAMA ever ask you

       not to publish this work or any part of it?

A      No.  They were anxious to have it published.

Q      And that would be true from the time period that

       the study was initially contemplated throughout?

A      Yes.  There was an understanding between us that

       if it was a publishable report, acceptable to a

       scientific journal, it would be published.

Q      Dr. Braun, would you look at Exhibit No. 24 and

       identify that for us, please.

A      That is a reprint of the report that was

       published, and it was then called the American

       Medical Association Archives of Industrial

       Health.  The journal changed its name a number

       of times.

Q      That's the name of the journal in which the

       Braun-Truan Study was published?

A      That's correct.

Q      And was it published in the same form it was

       originally submitted to Dr. Stokinger?

Dr. Braun - Cross

2          -----

3    A    Yes.

4    Q    All right, sir.

5              MR. IWLER:  Excuse me.  Do you have

6         a date of publication?

7              THE WITNESS:  Yes.  Accepted for

8         publication January 20, 1958.  The date of

9         the journal in which it was published is

10        Volume 17, June 1958.

11   BY MR. YOUNG:

12   Q    Was Dr. Stokinger the acting editor of that

13        particular journal at that time?

14   A    Yes, he was.

15   Q    Would you look at Defendant's Exhibit No. 25,

16        please, Doctor, and identify that for us.

17   A    That's a letter on the letterhead of the AMA,

18        American Medical Association, Archives of

19        Industrial Hygiene and Occupational Medicine,

20        to me from Dr. Stokinger.

21   Q    What is Dr. Stokinger telling you in that letter?

22   A    He's telling me that the article has been reviewed.

23        This is a peer review journal, and they are

24        pleased to accept it for publication; and he

25        was kind enough to say that he found it a model

-----

of the epidemiological method in diseases of the

lung.

Q   And you received that letter?

A   With gratitude.

Q   Would you look at Defendant's Exhibit No. 26.

MR. ROSENBERG:  What is the date of

Exhibit 25, please?

THE WITNESS:  January 20, 1958.

MR. ROSENBERG:  Thank you.

BY MR. YOUNG:

Q   Look at Exhibit 26, if you would, please, and

I'll ask you to identify that and tell us whether

or not that's a document that Dr. Stokinger sent

you along with Exhibit 25.

A   Right.  It refers to the last part of his

letter to me, saying that he was enclosing a

review, which contains a few sentences that

I have marked in this connection, that appears

in the Annual Review of Medicine, which was

his paper published in the Annual Review of

Medicine, Volume 7, 1956, called, "Toxicological

Aspects of Occupational Hazards."

Q   Dr. Braun, had you before corresponding with

Dr. Braun - Cross                          108

-----

Dr. Stokinger discussed the publication of your

paper with Dr. Drinker, whom we referred to

earlier?

A      Yes.  Dr. Drinker was the editor of the Archives

and was the logical man to approach for permission

to publish, and he was going to be away and

suggested -- and I imagine that this was by

telephone call -- that I contact Dr. Stokinger,

who was acting editor.

Q      Is he the Drinker of the Fleischer-Drinker Report?

A      Yes, indeed.

Q      That we've talked about earlier?

A      Yes.

Q      Do you recall what position Dr. Stokinger had, if

any, with the American Conference of Governmental

Industrial Hygienists?

A      I think that he was the chairman of that

conference.

Q      Do you have any recollection of him having

involvement with the Threshold Limit Value

Committee?

A      Yes.  That's the committee that sets the TLV's

or Threshold Limit Values.

Dr. Braun - Cross                                    109

----

Q   Can you tell us, if you would, please, sir, the
    reputation that the journal that the Braun-Truan
    Study was published in and enjoyed in the medical
    research community.

A   It's what is considered a reputable peer review
    journal.

Q   So that the jury will understand that, that means
    that, generally speaking, medical and research
    personnel across the country would be receiving
    or viewing that particular journal as it was
    published?

A   Yes.  Scientific people would receive the
    journal.  The articles submitted are submitted
    to a peer review committee, who review the
    articles before they are accepted for publication.

Q   So would you look at Defendant's Exhibit No. 27,
    please, Doctor, and identify that for us.

A   That's a reprint from the Archives of Environment
    Health, Volume 28, February 1974, entitled,
    "The Health of Crysotile Asbestos Mine and
    Mill Workers of Quebec," by J. Corbett McDonald
    and others.

Q   Who was he?

Dr. Braun - Cross                                    110

- - - - -

A    J. Corbett McDonald was an epidemiologist

originally from England, I believe, who went to

McGill University and was there at the time that

he made this study, and he has since returned

to England.

Q    Now, sir, so that the jury will understand the

relationship of this document to your work, if

you would, just tell us if there is a relationship

and, if so, what it is.

A    There is in the sense that he studied the same

problem some 17 years later and, therefore, had

the advantage of a longer exposure time to review,

and I believe more people.  I'm sure that he had

more people, but he included the people that we

had studied and, in fact, we gave him our data.

Q    All right.  Would you look at the Defendant's

Exhibit No. 28 and identify that for me, sir.

A    Yes, sir.  That's a letter dated April 26,

1957, on letterhead of Asten-Hill Manufacturing

Company, addressed to me, from Mr. D. R. Holmes,

Chairman of the Air Hygiene Committee of the

Asbestos Textile Institute.

          MR. MOHER:  What is the date on that,

Dr. Braun - Cross                           111

-----

3      please?

4            MR. YOUNG:  April 26, 1957.

5  Q   Is your proposal which we discussed earlier for
6      the ATI being rejected?

7  A   Yes.

8  Q   So that the jury will understand everything that
9      we've talked about today, then the QAMA study
10     went forward, was completed and published; but
11     the ATI ultimately rejected your proposed study
12     of the textile workers?

13 A   That's correct.

14 Q   And you don't have any knowledge as to why that
15     happened?

16 A   No.

17 Q   Was Mr. Hugh Jackson your contact at the ATI?

18 A   Yes.  Hugh Jackson was the person that we relied
19     upon to get our message across to ATI.  Holmes
20     was the fellow that we eventually wrote to to
21     formalize it.

22 Q   Was Mr. Jackson cooperative in that regard?

23 A   Yes.  I'm sure he wanted to get that study for
24     us.

25 Q   Now, would you tell us, please, sir, if you would,

Dr. Braun - Cross                              112

                        -----

3     with respect to the Braun-Truan Study itself,

4     that was the final writing, so to speak, with

5     respect to this epidemiological study.  Is

6     that correct?

7   A   That's correct.

8   Q   Would you tell us, please, sir, whether or not

9     anybody ever tried or did alter or change that

10    particular study or the opinions therein?

11  A   I have already stated that nobody did.

12  Q   Would you look at Defendant's Exhibit No. 29,

13    please, Dr. Braun, and identify that for us.

14  A   Letter dated May 3, 1957, to Mr. Holmes of the

15    Air Hygiene Committee of the ATI, from me, thanking

16    him for turning us down.

17  Q   Dr. Braun, those are all the questions that I have.

18    Thank you very much.

19  A   You are very welcome.

20                        -----

21  BY MR. SMALL:

22  Q   Dr. Braun, I have just a few questions for you.

23    You testified earlier that the offices of the

24    Industrial Health Foundation are located in

25    Pittsburgh.  Is that correct?

Dr. Braun - Cross                                    113

----- -----

A     Yes, they are.

Q     And has at any time the IHF or any of its
      predecessors had any office in any city other
      than Pittsburgh?

A     No.   It started out in the Mellon Institute in
      Pittsburgh, and the only other office we had is
      what we occupy now.

Q     Is it correct then to say that the IHF never had
      any staff or field office located in the Pacific
      Northwest, in particular in the States of
      Washington and Oregon?

A     ~~No.~~  That's correct.

Q     And during the period of time about which you
      have testified this morning, namely, the period
      1951 to 1957, did you have any communications with
      any personnel from the Puget Sound Naval Shipyard
      in Bremerton, Washington?

A     Not that I know of.

Q     To your knowledge, did anyone else from the Industrial
      Health Foundation or its predecessors?

A     I wouldn't be able to answer that.

Q     During that same period of time did you have any
      discussions with any personnel from any other

Dr. Braun - Cross                                      114

-----

shipyard in the Northwest?

A    Not to my knowledge.

Q    Did you have any communications, be they discus-

sions or correspondence, with any of the personnel

from any of the unions whose members worked at

shipyards in the Pacific Northwest?

A    No.  The only correspondence from a union that

I remember was in this group of exhibits and was

from the Refrigeration Workers Union.

Q    That was the letter from Mr. Kane; is that

correct?

A    That's correct, yes.

Q    And that was previously marked and identified

as Exhibit 8, I believe.  Is that correct?

A    I don't remember the number.

Q    I think the record will show that it was.  And

that was a letter from Mr. Kane, who was a local

union representative.  Is that correct?

A    Yes, that's right.

Q    From Pittsburgh?

A    I don't remember.

Q    Is it correct to say, based on your prior

testimony about the cohort with respect to your

Dr. Braun - Cross                               115

-----

    epidemiological study, that it did not encompass

    any workers at any shipyards in the Pacific

    Northwest?

A    -No.- It was strictly limited to crysotile miners

    in Asbestos and Thetford.

Q    Thank you very much.

A    You're welcome.

-----

BY MR. LAWTON:

Q    Doctor, on certain occasions did the IHF perform

    studies for or at the request of companies which

    were not members of IHF?

A    I can't say that they didn't, but it's our

    general policy to do studies only for member

    companies.

Q    Do you recall IHF performing a study for

    Pittsburgh Corning Corporation?

A    Yes, I do, and I can explain that in that

    Pittsburgh Plate Glass, now PPG, was the member

    that requested that study.

Q    But Pittsburgh Corning Corporation was not a

    member?

A    Was not.  That's correct.

Dr. Braun - Redirect                              116

----

                    MR. LAWTON:  Thank you, Doctor.

                         ------

                    REDIRECT EXAMINATION

BY MR. PATRICK:

Q    I have just a few questions, Doctor.  Pursuant

     to the subpoena you did bring all of your records

     relating to asbestos-related diseases?

A    Yes.

Q    And that kind of research done by the IHF, and

     I had you identify certain particular documents.

     Would that be correct?

A    Yes.

Q    But there are here at the deposition today a

     number of other boxes of materials relating to

     asbestos disease, and in the back I believe you

     said that there are some Industrial Hygiene

     Digests.  Is that correct?

A    Yes.  In those five boxes back there are the

     bound volumes of our Industrial Hygiene Digest,

     which has been published since 1957 *1957* to the

     present date, and they are bound year by year

     in those.

Q    Would the Industrial Hygiene Digest be sent out

Dr. Braun - Redirect                                117

- - - - -

to member companies?

A     Yes, it was.

Q     And within the other correspondence and the
      other documents you brought with you, would there
      be a list of the member companies as they existed
      yearly as members of the IHF?

A     During the course of these depositions we have
      been asked for the membership list year by year
      and we found that we didn't have some of them,
      but we tried to reconstruct it and we have a
      reconstructed list which may not be 100 percent
      accurate but represents the members that we have
      had over the years.

Q     And all of these documents you brought today are
      maintained within the archives of the IHF?

A     Yes, they are.

Q     Not limited to the documents I had you identify?

A     No.

Q     But all of the documents that you brought today?

A     That's correct.

Q     And are you, in fact, as president of the IHF
      the custodian of all of these documents within
      the archives?

Dr. Braun - Redirect                    118

-----

A     Yes.   They are my responsibility.

          MR. PATRICK:   I have no questions as

          to the subject matters raised by the cross-

          examination of the representative from

          Johns-Manville.   I would object strenuously

          to the cross-examination being beyond the

          scope of my direct examination.   I would like

          to place that on the record.   If at any time

          that examination is used by a court, I would

          reserve my right to come back and examine

          Dr. Braun on the substantive matters as

          raised within the cross-examination by

          Johns-Manville.

          MR. MOHER:   I have just a couple questions.

-----

          RECROSS-EXAMINATION

BY MR. MOHER:

Q     Dr. Braun, H. K. Porter Company was not a member

      company of IHF, was it?

A     Not to my knowledge.   I wouldn't say definitely

      they were not.

Q     And the Southern Asbestos Company, now known as

      the Southern Textile Corporation, was created in

Dr. Braun - Recross                              119

-----

1974 and they are not a member of the IHF?

A     No.  My knowledge goes back to 1974 and I'm
sure that they weren't.

Q     Doctor, you said there is a list in the documents
that you brought.

A     Yes.

Q     Could you identify that list for us, please?

A     I think I could.

                    (Discussion off the record.)

                    (Dr. Braun Deposition Exhibit B was
               marked for identification.)

BY MR. MOHER:

Q     Dr. Braun, the documents that have now been
marked Braun B for identification, do those
documents contain the lists, and that's plural,
of the member companies that are available to you
today?

A     Yes, they do.

Q     And you have spent some time in compiling those
lists or trying to locate those lists?

A     Yes.

Q     And if a company did not appear on those lists,
the probability would be that they would not be

Dr. Braun - Recross                              120

-----

a member of IHF.  Is that correct?

A    A strong probability that they were not a member.

Q    Doctor, when you were involved with the QAMA,
     did you deal with any other mining company other
     than Johns-Manville?

A    Well, indirectly.  The Thetford Mine Clinic
     served seven or eight mining companies grouped
     around Thetford Mines, Quebec; and the Asbestos
     Clinic served, as far as I know, only Johns-
     Manville's Asbestos, Quebec, Mine.  So that the
     records that we looked at at Thetford would
     include a number of companies.  Bell Asbestos is
     one that I remember.

Q    Any mining concerns other than Bell and Johns-
     Manville?

A    Yes, sir.  In those documents we just looked at,
     the report, the memorandum I prepared for
     Dr. Walmer lists the companies served at
     Thetford Mines Clinic.

Q    Other than employees of Johns-Manville Corpora-
     tion, did you associate or deal with, during
     your study dealing with the QAMA, any other
     employees of any other corporation that mined

Dr. Braun - Recross                    121

- - - - -

asbestos?

            MR. YOUNG:  I'm going to object to the

        form of that question.  There has been no

        testimony that he was dealing just with

        employees of Johns-Manville for the reasons

        that he just stated; and, furthermore, I

        don't believe that Johns-Manville is the

        appropriate employer for the persons that

        were working and being seen at that

        particular clinic.

A       I'm not even sure that any Johns-Manville people

        were seen at the Thetford Clinic.

Q       You seem to have had some dealings with Hugh

        Jackson.

A       Yes.

Q       And with Dr. Kenneth Smith.

A       Right.

Q       Both of those gentlemen were employees of

        Johns-Manville?

A       Yes, they were.

Q       Now, did you deal with employees of any other

        corporation on the same level that you dealt with

        Dr. Smith or Hugh Jackson?

Dr. Braun - Recross                              122

-----

A     I don't know what level Dr. Paul Cartier was on

      with the various companies that he served, but

      he had a position equivalent to the position that

      Dr. Smith held at Asbestos, not in New York but

      at Asbestos.  He was the plant physician, let's

      say.

Q     And that's the asbestos corporation of Canada?

A     Asbestos, Canada.  Asbestos is the city or town

      or whatever, and Thetford Mines is a town.  Grouped

      around Thetford Mines is a number of other

      mining companies, asbestos mining companies.

      Bell is the one I remember, probably because it's

      easy to remember.

           Dr. Cartier was the plant physician for those

      companies, as Dr. Smith was in his time at

      Asbestos, the City of Asbestos.  He was succeeded

      there by Dr. Granger, with whom I also dealt,

      and I may have met -- I wouldn't say dealt with --

      executives of some of those other companies.

           MR. MOHER:  Thank you, Doctor.  I have

      no further questions.

-----

Dr. Braun - Recross                                        123

-----

BY MR. ROSENBERG:

Q    Doctor, you indicated that some companies are
     in and out of IHF as members.

A    Yes.

Q    They would get the Digest only in the year of
     membership.  Would that be correct?

A    Well, that's technically correct.  When a company
     quits, they don't always tell us immediately,
     and we think that they are just late in paying
     their dues and continue their subscriptions.

Q    But, by and large, that would be so?

A    Technically, that's so.

Q    Do you have any personal knowledge of the
     dissemination of the Digest, as to how it is
     done from IHF, who does it, the mechanics of it?

A    Yes, I have personal knowledge of that.

Q    Do you have any personal knowledge -- I gather
     you would not -- how it is received at the
     various recipient companies?

A    Yes, in a way I do.  We have in each member
     company what we call a liaison person.  That's
     the person to whom the invoice for dues goes,
     any correspondence that's related to membership

-----

services, and that sort of thing; and that's

where the Digest goes, except that companies

that get a number of subscriptions furnish us

with a list of personnel to whom the Digest is

to be directed.  Some companies get 20 subscrip-

tions.  They give us 20 names to put on the

addressograph machine.

Q    Would you have this information available now as

to whom the various Digests were sent ten, fifteen

twenty years ago?

A    No way, no.

Q    If I would pinpoint one of those companies to

whom the Digest would be sent or how it would

be handled after it was received by that company,

you could not tell us that today?

A    No.  That mailing list is kept current, but ones

that are taken off are not kept.

Q    All you can say is that a certain company got at

least one Digest?

A    Yes, sir.

Q    But not to whom it was sent, the capacity of the

person who received it, or the knowledge of the

person?

Dr. Braun - Recross                              125

-----

A     No.

Q     Or what happened to it after he received it?

A     Or whether he read it.

          MR. ROSENBERG:  Thank you, Doctor.

-----

BY MR. IWLEN:

Q     Dr. Braun, I noticed that when you were talking

      about epidemiological surveys as opposed to

      case studies, I believe you defined what an

      epidemiological study is for the attorney for

      Johns-Manville.  Are case studies given more

      credence in the medical literature and among

      medical people, or are epidemiological studies

      given more credence?

A     That's very difficult to answer.  They serve

      different purposes.  A case study is a report of

      a series of cases.  It might be one or two or

      dozens of cases.  It is not intended to show a

      causal relationship between exposure and an

      end result.  For example, the case study that

      started all this was Lynch's case study in 1935.

Q     Well, Lynch was a pathologist.  Is that correct?

A     Right.

-----

Q     And that was one study of one person?

A     That was, yes.  Then it came along with another,

      and that made a series of two or three case

      studies.

Q     Is it a fair statement that within the medical

      community, in order to determine cause and

      effect relationship, epidemiological studies

      are given greater weight than case studies?

A     Yes, I think that's true.  That's why over those

      20 years that I mentioned no real attention was

      paid to that kind of thing, because they were

      simply isolated case studies.

Q     Are you aware of when the first epidemiological

      study was done with regard to the insulation

      workers in the field, not textile workers or

      workers in mills but insulation workers in the

      field?

            MR. PATRICK:  Again I interpose my

      objection as to these questions going beyond

      tha scope of direct examination.  Counsel

      for Johns-Manville is aware, but I just

      want to make it clear as to all the other

      Defendants.

Dr. Braun - Recross                                127

----

A    I'm not really aware of it, but the first one that
     I know of that dealt with insulation workers was
     the Fleischer-Drinker Study, and that was in the
     sixties, I think.

Q    And what were the conclusions of that study?

A    I can almost quote Drinker as saying that the
     occupation in the shipyard did not pose any
     serious hazard.

Q    And this is the same Dr. Drinker who was later
     the editor of the publication where your study
     was eventually printed?

A    Yes.

Q    I believe the Fleischer-Drinker Report was in the
     middle to late forties.

A    Oh, was it?

Q    You also talked earlier in your testimony about
     some reports out of England, out of Great Britain.

A    Yes.

Q    As I understand it, in the 1950's, around the
     time that you did your report, there was a dispute
     among medical people as to whether or not the
     type of asbestos used in England would affect
     people the same way as the type of asbestos used

Dr. Braun - Recross                    128

-----

3    in the United States.  Is that not correct?

4  A    I don't know whether there was a dispute, but

5       there was a difference of opinion, that's true,

6       and it has been since then generally acknowledged

7       that crocidolite, the African type of asbestos,

8       is more damaging, more toxic, if you will.

9  Q    Now I'm trying to go back to the mid-fifties.

10      As I understand it, at that time there were

11      medical people on both sides of the argument as

12      to whether or not American workers would get the

13      same results or get the same effects as British

14      workers because we were using asbestos that was

15      mined in Canada while in Britain they were using

16      asbestos that was mined in South Africa.  Is

17      that not correct?

18           MR. PATRICK:  I object to that question

19           as being inaccurately based.

20  A    I can't really answer it, either.  I know there

21      were differences of opinion.  I don't know

22      whether they were based on the type of asbestos

23      at that time.

24           MR. IWLER:  No further questions.

25           MR. MILLER:  Mr. Patrick, you started

Dr. Braun - Recross                                    129

                         -----

this.  Do you want to finish it?

          MR. PATRICK:   I don't have any further

questions.

                    -----

          (Thereupon, the above deposition

concluded at 2:40 p.m.)

                    -----

130

## CERTIFICATE

I, Dr. Daniel Carl Braun, do hereby certify that I have read the foregoing transcript, containing 129 pages of testimony, and it is a true and correct copy of my deposition, except for the changes, if any, made by me on the attached Deposition Correction Sheet.

_____
Dr. Daniel Carl Braun

Date: _____

131

COMMONWEALTH OF PENNSYLVANIA )
                                ) SS:
COUNTY OF ALLEGHENY            )

CERTIFICATE

I, Richard E. Powers, a notary public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, Dr. Daniel Carl Braun, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness.

I further certify that I am not a relative, employee or attorney of any of the parties, or a relative or employee of either counsel, and that I am in no way interested, directly or indirectly, in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this _____7____ day of ___February____, 19_85_.

RICHARD E. POWERS, NOTARY PUBLIC
PITTSBURGH, ALLEGHENY COUNTY
MY COMMISSION EXPIRES MARCH 10, 1987
Member, Pennsylvania Association of Notaries