STATE OF WISCONSIN  :   CIRCUIT COURT   :  MILWAUKEE COUNTY
HON. CHRISTOPHER R. FOLEY
CIVIL DIVISION
BRANCH #14

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

GRACE TELLEFSEN, Individually
and as Special Administrator
of the Estate of Elmer Tellefsen,
Deceased,

               Plaintiff,

     vs.                   Case No. 96 CV 009914

SPRINKMANN SONS CORPORATION,

               Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
EXCERPT OF PROCEEDINGS               JURY TRIAL
WITNESS:  MICHAEL DOWLING

              The following proceedings were had upon
the above-entitled matter before the HONORABLE
CHRISTOPHER R. FOLEY, Circuit Court Judge, Civil
Division, Branch #14, Milwaukee, Milwaukee County,
State of Wisconsin, on the 27th day of October, 1998.

                      APPEARANCES:
                      ROBERT McCOY and JILL RAKAUSKI, Attorneys-
                      at-Law, Cascino Vaughan Law Offices, Ltd.,
                      633 West Wisconsin Avenue, Suite 330,
                      Milwaukee, Wisconsin 53203, appeared on
                      behalf of the plaintiff.
                      JAMES A. NIQUET, Attorney-at-Law,
                      Crivello, Carlson, Mentkowski & Steeves,
                      S.C., 710 North Plankinton Avenue,
                      Milwaukee, Wisconsin 53203, appeared on
                      behalf of the Defendant.

June K. Teeguarden, Court Reporter.

1              _P_R_O_C_E_E_D_I_N_G_S_

2              WHEREUPON, the following proceedings

3      were had in open court:

4                  *       *       *

5              THE COURT:  Okay, Mr. McCoy, please.

6      Your first witness.

7              MR. McCOY:  Thank you, your Honor.

8      Plaintiff calls its first witness, Michael Dowling.

9      I believe he's here pursuant to subpoena.

10             THE COURT:  All right.

11             Remain standing, just a second.

12             THE CLERK:   Raise   your   right   hand.

13             **MICHAEL DOWLING**, Called herein as a

14     witness on behalf of the Plaintiff, was first duly

15     sworn on oath, was interrogated and testified as

16     follows:

17             THE WITNESS:  I do.

18             THE CLERK:  You may be seated.

19             Would   you   state   your   name   for   the

20     record,  please,  and  spell  your  last  name.

21             THE WITNESS:  Sure.

22             Michael Dowling.   Last name spelled

23     D-O-W-L-I-N-G.

24             MR. McCOY:  Can we proceed, your Honor?

25             THE COURT:  Yes, please.

                              2

1                          MR. McCOY:   Thank you.

2                      **DIRECT EXAMINATION:**

3    BY MR. McCOY:

4    Q    Mr. Dowling, can you tell us what your job is now?

5    A    I'm controller, Sprinkmann Sons Corporation.

6    Q    How long have you had that job as controller?

7    A    I would guess approximately ten years.

8    Q    You work at Sprinkmann Sons' office presently, is

9         that right?

10   A    That is correct.

11   Q    And you stated you had that job for about ten years?

12   A    Correct.   I have been employed, employed there since

13        1973, in the office.

14   Q    In the office.   You have worked for Sprinkmann since

15        1973?

16   A    That is correct.

17   Q    And you also worked for Sprinkmann before 1973, is

18        that right?

19   A    I worked in the warehouse for a couple of summers

20        while I was going to college.

21   Q    And when you say you worked in the warehouse, this

22        is a place where Sprinkmann has materials that it

23        used on its' jobs, is that right?

24   A    That is correct.

25   Q    And your time period in that warehouse was before

```
 1            1973, is that right?

 2     A      That is correct.

 3     Q      And you worked there, what was it, approximately

 4            1969 or 1970?

 5     A      I worked two summers while I was going to college,

 6            either '69, '70, or '70, or '71; I'm not sure

 7            exactly which they were.

 8     Q      Now, in your time period when you were working in

 9            the warehouse what type of work did you have to do

10            for Sprinkmann during the summers?

11     A      Unload a truck, load trucks, picked up orders,

12            unload boxcars, occasionally would go on jobs and

13            help the drivers carry materials to wherever we were

14            working.

15     Q      You said unloaded boxcars as part of the job?

16     A      On occasion, yes.

17     Q      Okay.  And when you unload boxcars did you take out

18            insulation materials from those boxcars, is that

19            mostly what it was?

20     A      Yes.

21     Q      Sometimes boxcars full of product called Kaylo, is

22            that right?

23     A      I don't recall.

24     Q      Do you know what Kaylo is?

25     A      Yes, it's a pipe covering made by Owens-Corning.
```

4

| | | |
|---|---|---|
| 1 | Q | Made by Owens-Corning and earlier it was made by a |
| 2 | | company call Owens-Illinois, is that right? |
| 3 | A | That I don't know. |
| 4 | Q | I'm sorry.  You say don't know if it's made by |
| 5 | | Owens-Illinois? |
| 6 | A | Correct. |
| 7 | Q | Did Sprink -- Do you know if Sprinkmann bought any |
| 8 | | materials from Owens-Illinois? |
| 9 | | MR. NIQUET:  What time?  Objection for |
| 10 | | the time frame, your Honor. |
| 11 | | THE COURT:  Let's specify by time frame. |
| 12 | BY MR. McCOY: | |
| 13 | Q | Before 1973, did Sprinkmann buy any material from |
| 14 | | Owens-Illinois? |
| 15 | A | I don't recall off the top of my head. |
| 16 | Q | I show a document to your attorney here, Mr. Niquet, |
| 17 | | is Sprinkmann's attorney, is that your |
| 18 | | understanding? |
| 19 | A | Yes. |
| 20 | Q | He arranged for you to be here today, is that right? |
| 21 | A | You subpoenad me for today. |
| 22 | Q | Okay.  Pursuant to the subpoena from our law firm he |
| 23 | | arranged for you to be here, is that right? |
| 24 | A | Correct. |
| 25 | | THE COURT:  Mr. Dowling, can you get -- |

```
 1           slide up and I'm concerned that some jurors can't

 2           hear you unless you are real close to that.  It

 3           don't --

 4                   THE WITNESS:  I'm not used to talking

 5           into one of these.

 6                   THE COURT:  Okay.

 7                   MR. McCOY:  Probably should have this

 8           marked as an exhibit, your Honor.

 9                   (Whereupon Exhibit Number 1 was marked

10           for identification by the Court Reporter.)

11  BY MR. McCOY:

12      Q    Mr. Dowling, you have in front of you Plaintiff's

13           Exhibit Number 1.  And is that a document, an

14           affidavit which you signed in another case?

15      A    That is correct.

16      Q    Okay.  And do you remember your signature on that

17           affidavit, signing it?

18      A    Yes.

19      Q    Okay.  And about what date did you sign that

20           affidavit, does it say?

21      A    April of 1996.

22      Q    Okay.  And you signed that affidavit under a

23           statement of oath to tell the truth just like today,

24           is that right?

25      A    Correct.
```

1  Q    In that affidavit you talked about Owens-Illinois

2       Company, is that right?

3  A    That is correct.

4  Q    This is one that you said you didn't know if any

5       products were bought from before 1973, is that

6       right?

7  A    At the time I signed.

8  Q    Sir, my question is simply the same one that you

9       said you didn't know products were bought for in

10      1973, is that right?

11               MR. NIQUET:  Object to the form of the

12      question.

13               THE COURT:  Overruled.

14 BY MR. McCOY:

15 Q    It's the same one you testified here today, you

16      didn't remember, is that right?

17 A    That I didn't recall.

18 Q    Okay.  Okay.  Looking at that affidavit, sir, let's

19      show the jury what you're looking at, okay?  This

20      was a case involving a Mary Casper, do you recall

21      that?

22 A    Yes.

23 Q    Okay.  And it's your affidavit in support of

24      Sprinkmann Sons Corporation's motion for dismissal

25      and, in the alternative, for various trial orders

7

1    you had changed, reviewed that affidavit before you

2    signed it?

3  A    Yes.

4  Q    Okay.  And as I begin here it says you being sworn

5       under oath deposes and states, number one, that

6       you're controller just like you said here today,

7       right?

8  A    Correct.

9  Q    And you also said in paragraph number two, you said

10      that you were aware that there are present and past

11      business records of Kaylo purchased and resold on a

12      regular basis from Owens-Illinois, directly, and

13      also through Owens-Corning, is that right?

14 A    That is correct.

15 Q    So back then which was April 29, 1996, about two

16      years ago, little more than two years ago, you had

17      good recollection of Owens-Illinois selling Kaylo

18      products to Sprinkmann, is that right?

19 A    I have reviewed our business records and they

20      indicated the same.

21 Q    But, sir, back then two years ago you signed an

22      affidavit stating you had good recollection, is that

23      right?

24 A    After reviewing our business records, correct.

25 Q    Okay.  For this case you were asked to review

8

| | | |
|---|---|---|
| 1 | | business records also, is that right?  You were |
| 2 | | asked to review? |
| 3 | A | Correct.  But not -- you did not ask anything about |
| 4 | | Owens-Illinois. |
| 5 | Q | All right.  We asked you to review business records |
| 6 | | of sales of asbestos products, is that right? |
| 7 | A | Correct. |
| 8 | Q | Okay.  So having look at this now, would you agree |
| 9 | | that what you said to the jury earlier is not right; |
| 10 | | that you did purchase Kaylo from Owens-Illinois for |
| 11 | | Sprinkmann, is that right? |
| 12 | | MR. NIQUET:  Object to the form. |
| 13 | | Misrepresents his testimony.  He said didn't know. |
| 14 | | THE COURT:  Rephrase it, please. |
| 15 | BY MR. McCOY: | |
| 16 | Q | Mr. Dowling, having reviewed your affidavit today |
| 17 | | can we agree that you now remember that Sprinkmann |
| 18 | | purchased Kaylo from Owens-Illinois, is that right? |
| 19 | A | That is correct. |
| 20 | Q | Okay.  All right.  Let's stay with this affidavit |
| 21 | | for a moment while we have it out, sir.  This |
| 22 | | affidavit also describes some of the business |
| 23 | | practices of Sprinkmann, is that right? |
| 24 | A | That is correct. |
| 25 | Q | Okay.  It talks about Sprinkmann, in fact, it says |

```
 1              you have, first of all, let's say what it talks

 2              about, your knowledge.  It says you're aware of

 3              present and past business records.  And you also

 4              have knowledge of the practices of Sprinkmann Sons

 5              Corporation; that's what it says, right?

 6   A    Correct.

 7   Q    And that's now knowledge you have gotten since you

 8              have been working there all the way back to the --

 9              say when you unloaded boxcars, is that right?

10   A    Correct.

11   Q    And it says here that Sprinkmann Sons Corporation

12              purchased and resold on a regular basis Kaylo,

13              that's the next part of the statement, you see that?

14   A    Yes.

15   Q    Okay.  And Kaylo, that was a type of pipe covering

16              which came, either the form that went around, like

17              half around, that went around the pipe or in blocks

18              that would be cut to shape to fit the pipe, is that

19              right?

20   A    That is correct.

21   Q    So like an elbow you might cut blocks and put the --

22              put it around the pipe, is that right?

23   A    I believe so.

24   Q    Okay.

25   A    That's not my expertise.
```

1    Q    Okay.  And this Kaylo before 1973, had asbestos in

2         it, is that right?

3    A    Based upon the knowledge now and what's said, yes;

4         but I'm not capable of making any determination on

5         my own.

6    Q    Okay.  But you know today that before '73, Kaylo had

7         asbestos in it, is that right?

8    A    Before early '70, that at some point they stopped

9         putting asbestos in the pipe covering.  I'm not sure

10        what the date is.

11   Q    Okay.  Kaylo had asbestos in it sometime before

12        1973, is that right?

13   A    At some point, yes.

14   Q    And about 1973, Mr. Dowling, that is about when

15        they took the asbestos out, is that right?

16   A    Again, I'm not positive, the -- generally 1972, used

17        as the end of it.  Different manufacturers,

18        different time.

19   Q    Okay.  About 1972, maybe 1973, right?

20   A    I'll agree with that.

21   Q    When they took asbestos out, right?

22   A    Correct.

23   Q    Can I ask you to speak up a little bit.  It's a

24        little hard to hear.

25   A    Okay.  I'll try.

1    Q    Maybe if you want to pull the microphone forward a

2          little bit?

3               THE COURT:  Unless you are practically

4          swallowling it, Mr. Dowling, it doesn't pick you up.

5               THE WITNESS:  I'll try it again.

6  BY MR. McCOY:

7    Q    I want to stop with your affidavit for a moment.  By

8          the way, having looked at this it refresh your

9          memory?  Some of the boxcars that came in that you

10        unloaded did have Kaylo in it?

11   A    I do not recall unloading boxcars that had Kaylo in

12        it at this point in my life.  That's 25 years ago.

13   Q    Okay.  You don't remember today.  There may have

14        been some boxcars of Kaylo but you don't remember.

15        That is what you're testifying to today?

16   A    I do not recall unloading boxcars that had Kaylo in

17        it.

18   Q    You are not sure?  You may have?

19              MR. NIQUET:  Objection.  Asked and

20        answered.

21              THE COURT:  Sustained

22  BY MR. McCOY:

23   Q    All right.  Taking a look at question number or

24        continuing with another statement, number two, Kaylo

25        was bought, and there is your statement, in 1996.

| | | |
|---|---|---|
| 1 | | By the way, is there any change having look at this |
| 2 | | what you know today? |
| 3 | A | No, there is not. |
| 4 | Q | Okay.  So the Kaylo was bought from Owens-Illinois, |
| 5 | | some of it, is that right? |
| 6 | A | Correct. |
| 7 | Q | Okay.  And what is your understanding what |
| 8 | | Owens-Illinois is? |
| 9 | A | A manufacturer of asbestos-containing asbestos |
| 10 | | materials. |
| 11 | Q | That's the understanding we're talking about in |
| 12 | | 1950, is that right? |
| 13 | A | I don't know the '50's.  I -- |
| 14 | Q | Before the -- 1972 or '73, time, right? |
| 15 | A | Yes. |
| 16 | Q | Okay.  So Owens-Illinois is the manufacturer and |
| 17 | | Sprinkmann bought directly from Owens-Illinois, is |
| 18 | | that right? |
| 19 | A | On occasion, correct. |
| 20 | Q | And there was a contract that allowed -- let me |
| 21 | | withdraw that question.  Not everyone in a business |
| 22 | | can buy directly from the manufacturer, is that |
| 23 | | right? |
| 24 | A | It depends upon the manufacturer. |
| 25 | Q | Okay.  So there are some companies who were selling |

13

```
 1           insulation or installing insulation products that
 2           could not buy directly from the manufacturer, is
 3           that right?
 4    A      I'm not qualified to answer that.
 5    Q      Okay.  Well, let's stay what you know about
 6           Sprinkmann then.  And I apologize if I got outside
 7           your knowledge.  But Sprinkmann could buy directly
 8           from the manufacturer, is that right?
 9    A      Certain manufacturers, yes.
10    Q      Okay.  Owens-Illinois, was one of them back
11           before --
12    A      On occasion, correct.
13    Q      Okay.  And in -- again in asbestos-time period
14           another one was Owens-Corning, is that correct?
15    A      Correct.
16    Q      And also some situations where Owens-Illinois sold
17           to Owens-Corning and then it sold to Sprinkmann, is
18           that right?
19    A      I would not know about the first transaction,
20           Owens-Illinois selling to Owens-Corning.  We would
21           have no way of knowing that.
22    Q      But there was some instance where Owens-Corning sold
23           to Sprinkmann, is that right?
24    A      That is correct.
25    Q      Later Owens-Corning took over from Owens-Illinois as
```

1        the manufacturer of Kaylo?

2   A    That I don't have any first-hand knowledge of

3        either.

4   Q    Well, in your affidavit you indicated you purchased

5        both those Owens-Illinois and Owens-Corning?

6   A    That is correct.

7   Q    And you indicated that these purchases also included

8        as dealer-distributor, Sprinkmann buying; this is

9        paragraph 3, Owens-Illinois, Kaylo wholesale, is

10       that right?

11  A    Correct.

12  Q    Okay.  Wholesale, what does that mean?

13  A    At a price less than retail.  So you could mark it

14       up and resell it.

15  Q    So Sprinkmann got an advantage to be able to buy

16       Kaylo for less so he could sell it maybe to another

17       insulation contractor, is that right?

18  A    I assume so, yes.

19  Q    And that's part of Sprinkmann's business, is that

20       right?

21  A    The distribution part of our business is primarily

22       selling it to the end-user rather than another

23       contractor.

24  Q    Okay.  And end-users are being, for instance, for

25       like the Milwaukee Journal, is that right?

```
 1    A    That's possible.

 2    Q    Okay.  And another contractor could be someone else

 3         who might be doing work at the Milwaukee journal, is

 4         that right?

 5                   MR. NIQUET:  Object to the form of the

 6         question.

 7                   THE COURT:  Yeah, rephase.

 8                   MR. NIQUET:  Calls for speculation.

 9                   THE COURT:  Rephrase, please.

10    BY MR. McCOY:

11    Q    Could Sprinkmann sell to another contractor doing

12         work at the Milwaukee Journal?

13                   MR. NIQUET:  Again, your Honor, object

14         on the grounds of speculation and to the form of the

15         question.  That's a phrase, that term or time.

16                   THE COURT:  I don't know the

17         possibilities are particularly informative to the

18         jury.  Let's make a point.  Did you sell it to other

19         distributors of the product, to other customers who

20         you knew were using it to install it in other

21         locations?

22                   THE WITNESS:  Yes.

23                   MR. McCOY:  All right.

24    BY MR. McCOY:

25    Q    Let me show a document to you.
```

1           MR. NIQUET:  Let me see this.  Judge,

2      can I approach?

3                THE COURT:  Sure.

4                (Whereupon a sidebar conference was had

5      outside of the jury's hearing.)

6                THE COURT:   Okay.  Let's go.

7                MR. McCOY:   Thank you, your Honor.

8                I'll have this marked Exhibit Number 2.

9                (Whereupon Exhibit Number 2 was marked

10     for identification by the Court Reporter.)

11  BY MR. McCOY:

12  Q     Mr. Dowling?

13  A     Yes?

14  Q     I apologize, if I have to step over here.  Maybe

15        it's easier.  I'm having you look at a chart before

16        I show this to anyone else here.  I'd like you to

17        take a look at it.  Now, my question to you is:

18        Does this chart reflect the type of arrangement,

19        business arrangement, that Sprinkmann had in place

20        regarding Kaylo?

21  A     I have never seen a contract.  I don't know that

22        there was one that existed.

23  Q     Well, doesn't say there is any contracts.  I'm just

24        saying does the chart reflect the method in which

25        the product was sold?

                           17

1          MR. NIQUET:  Object to the form of

2      question.  Relevancy.

3          THE COURT:  Overruled.  Go ahead.

4          THE WITNESS:  As regards to us?  But

5      we're not the only supplier, distributor.

6          MR. McCOY:  Thank you.  All right, your

7      Honor, I'm going to put this up on a chart for the

8      jury to look at.

9          THE COURT:  Fine.

10         MR. McCOY:  I apologize.  I wanted to

11     blow it up to get a little larger, but I'll do my

12     best here with it.  Your Honor, may I ask?  Is it --

13     Can I have the witness just indicate from --

14         THE COURT:  Sure.

15         MR. McCOY:  Move down here.  Explain

16     this?  Step down.

17         THE COURT:  Sure.

18 BY MR. McCOY:

19  Q    All right.  Now, Mr. Dowling, now, based upon your

20       affidavit and your other knowledge of the business

21       that Sprinkmann was involved in Kaylo distribution,

22       is that right?

23  A    That is correct.

24  Q    Okay.  And during the period when it had asbestos in

25       it, is that right?

                        18

| | | |
|---|---|---|
| 1 | A | That's my understanding, yes. |
| 2 | Q | And it was involved with Owens-Illinois, and |
| 3 | | Owens-Corning as suppliers to Sprinkmann, is that |
| 4 | | right? |
| 5 | A | That is correct. |
| 6 | Q | Okay.  And then Sprinkmann when it received the |
| 7 | | materials sometimes would resell to other dealers |
| 8 | | and contractors in the state, is that right? |
| 9 | A | Well, to the best of my knowledge we would resell to |
| 10 | | contractors and end-users.  I don't know what the |
| 11 | | term dealer means. |
| 12 | Q | Contractor and end-users? |
| 13 | A | Correct. |
| 14 | Q | Would you and Sprinkmann use it for yourselves?  And |
| 15 | | also do your own installations, correct? |
| 16 | A | Correct. |
| 17 | Q | Okay.  And this was a significant part of the |
| 18 | | business of Sprinkmann prior to 1973,  is that |
| 19 | | right? |
| 20 | A | What was? |
| 21 | Q | The sale of asbestos including Kaylo? |
| 22 | A | Sprinkmann's primary business is as a contractor; |
| 23 | | always has been. |
| 24 | Q | Well, sales of Kaylo though were a significance part |
| 25 | | of the business, either to someone else or for |

1          Sprinkmann's own contracts for insulation, is that

2          right?

3     A    They were a portion of the materials that we

4          installed on jobs.  They were not the primary or

5          only one.

6     Q    But take this one.  Mark this Exhibit Number 3.

7                    (Whereupon Exhibit Number 3 was marked

8          for identification by the Court Reporter.)

9  BY MR. McCOY:

10    Q    This document, Exhibit 3, is a type of sales record

11         for Sprinkmann back in the period of about 1962, is

12         that right?

13    A    That's a delivery ticket.

14    Q    And you know about this from your review of the

15         records and current position, is that right?

16    A    We still use the same type of documents today.

17    Q    Okay.  And on this document now does it say though

18         that the first item is asbestos insulating material,

19         is that right?

20    A    We use those documents to -- we ran out of them at

21         some point.  I have to look.  We continued to use

22         them for another ten years because we had them

23         printed.

24    Q    You kept using the documents?

25    A    Correct.

1    Q    Okay.  And it was the choice of Sprinkmann to put

2           asbestos as the first insulation on this ticket, is

3           that right?

4    A    I was not involved in that.  That was, I think from

5           1962.  I was 12 years old at the time.  I have know

6           idea why they put it on there.

7    Q    Okay.  But there is a lot of these types of tickets

8           in the file, is that right?

9    A    That is correct.

10    Q    Okay.  You can return to your seat.  Thank you.

11                 THE COURT:  He would like some water,

12           Mr. Niquet.

13  **BY MR. McCOY:**

14    Q    Now, when you worked in the warehouse in the

15           summers, Mr. Dowling, how many months did you

16           actually work in the warehouse?  The whole summer?

17    A    Probably the best part of three months, whenever the

18           vacation was from school.

19    Q    And you worked full-time, right?

20    A    Yes.

21    Q    And you said you can't remember what is in the

22           boxcars now, is that right?

23    A    For the most part, correct.  I remember, I don't

24           remember products so-to-speak.  I remember unloading

25           the boxcar but I don't necessarily remember what it

1            was, or boxcars, plural, on occasion.

2    Q      But had you ever seen a box of Kaylo insulation?

3    A      Yes.

4    Q      Okay.  I mean it's what comes three-foot high,

5           right; usually?

6    A      Right, because sections are three-foot.

7    Q      Okay.  And boxes are big enough you can sometimes

8           have trouble putting your arms around them, is that

9           right?

10   A      Depending upon the size of the covering, yes.

11   Q      And you say though, you don't remember unloading any

12          of those, right?

13   A      They were boxes.  I was doing this as a summer job.

14          They're boxes of things.  And that was my job.

15          Unload something and put it somewhere else.  No, I

16          don't.

17   Q      Okay.  Other than the summer-job work and your

18          full-time position you began in '73, was there any

19          other type of work you did for Sprinkmann?

20   A      No.

21   Q      Okay.  When you began your -- began work in '73, and

22          what was your first job in '73?

23   A      I was hired to originally keep the payroll logs.

24   Q      So you kept track of the employees for Sprinkmann,

25          is that right?

| | | |
|---|---|---|
| 1 | A | Issue payroll checks, posted times to do jobs, yes. |
| 2 | Q | Okay.  What group of employees are you talking |
| 3 | | about, all Sprinkmann employees? |
| 4 | A | All field personnel. |
| 5 | Q | Field personnel meaning what type of jobs were they |
| 6 | | doing? |
| 7 | A | Hourly workers.  It would have been our carpenters |
| 8 | | that were involved in the cold storage work.  And at |
| 9 | | that time we used plasters and bricklayers and |
| 10 | | laborers, insulators who were insulating mechanical |
| 11 | | systems, our wage-hour people. |
| 12 | Q | So it was -- |
| 13 | A | It would be three categories. |
| 14 | Q | Okay.  So in terms of the people doing insulation |
| 15 | | work that you described, that group, those are the |
| 16 | | ones who might be putting on asbestos products |
| 17 | | before '73, is that right? |
| 18 | A | That would be an assumption, yes.  I wasn't there |
| 19 | | before '73, doing that job. |
| 20 | Q | Okay.  How many people were doing, had the insulator |
| 21 | | type of job titles back in '73, when you started? |
| 22 | | How many checks would you cut? |
| 23 | A | I really couldn't answer that.  It would be less |
| 24 | | than one hundred total field payroll. |
| 25 | Q | Would that field payroll sometimes go up and down? |

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | Depends upon maybe if there was a large power house      |
| 2  |   | job that required a lot of people or something like      |
| 3  |   | that?                                                    |
| 4  | A | It fluctuated all the time based upon the amount of      |
| 5  |   | work we had going for the particular time.               |
| 6  | Q | All right.  And then you mentioned some other            |
| 7  |   | categories, people like -- people who delivered          |
| 8  |   | material, right?                                         |
| 9  | A | Correct.                                                 |
| 10 | Q | And you mentioned did they have like estimators who      |
| 11 |   | were included within the group you did payroll for?      |
| 12 | A | No.  They would be separate.  They would be              |
| 13 |   | salaried.                                                |
| 14 | Q | I'm sorry.  I missed it.                                 |
| 15 | A | I'm sorry.  They were separate.  They were a             |
| 16 |   | separate payroll.  They were salaried employment.        |
| 17 | Q | So there was a separate division for salaried            |
| 18 |   | employees in 1973?                                       |
| 19 | A | Not separate division, separate payroll.                 |
| 20 | Q | So payroll that you worked on in '73, was only           |
| 21 |   | hourly personnel?                                        |
| 22 | A | Correct.                                                 |
| 23 | Q | Okay.  And did you get more responsibility after         |
| 24 |   | '73?                                                     |
| 25 | A | Well, as time went on; yes, sir, progressed.             |

```
 1    Q    Okay.  What was the next, next significant change in
 2         responsibility that you remember?
 3    A    It just kind of grew.  It was -- I helped people who
 4         were costing registers.  I helped with the accounts
 5         receivable.  I eventually got into doing the general
 6         ledger and handling the insurance and more recent
 7         years personnel issues.
 8    Q    So your responsibilities over time have increased,
 9         is that what you are saying?
10    A    Correct.  It's -- we were a small company.  This was
11         not something who is responsible, compartmentalized
12         jobs.  Kind of everybody does all kinds of things.
13    Q    How many people worked in the office back in 1973?
14    A    I really don't know.  I would say less than 15 or 20
15         would be a guess.
16    Q    Just office workers?
17    A    Total.  That would be, that would be all salaried
18         people.  That would be management, the sales people,
19         the office clerical people, the accounting people.
20    Q    And back in 1973, there was a company called
21         Sprinkmann of Wisconsin, one corporation, and there
22         is another corporation called Sprinkmann of
23         Illinois, is that right?
24    A    Sprinkmann Sons Corporation.
25                   MR. NIQUET:  Just object to the form.
```

```
 1            I'll withdraw.

 2                      THE COURT:  All right.  Missed your

 3            answer.  What was the name of Sprinkmann

 4            Corporation?  Is a Wisconsin Corporation?

 5   BY MR. McCOY:

 6    Q       That is the name of the Wisconsin Corporation,

 7            Sprinkmann?

 8    A       That is correct.

 9    Q       Could you say that again for me?

10    A       That is correct.  Sprinkmann Corporation is a

11            Wisconsin corporation.

12    Q       And that's been in -- that was the correct name for

13            quite a few years before that, is that right?

14    A       I believe it was incorporated in 1934, yes.

15    Q       Okay.  Have you ever heard of another corporation

16            call Sprinkmann Corporation?

17    A       Not -- no.

18    Q       There --

19    A       There is only one Sprinkmann Corporation that I am

20            aware of.

21    Q       Okay.

22                      MR. McCOY:  Your Honor this might be --

23            I don't know whether you want to take a break for

24            the jury?  I can keep going.  We can take 15 minutes

25            now?  Do you want to give them, the jury, a break?
```

26

1           THE COURT:  We'll go right to five to

2     12:00.  I have to be somewhere right at noon.  So

3     we'll take an hour.  We'll take 15 minutes now.

4           Don't discuss the case.  You can go down

5     get soda, coffee, whatever.  Be back in our jury

6     room at 25 minutes to 11:00.  Okay.  See you then,

7     20 minutes to 11:00, see you then.  Leave your notes

8     on the desk.  Lenora will show you out there.  Take

9     your notes with you and put them out in the hallway.

10          (Whereupon the jury left the courtroom.)

11          (Whereupon a short recess was had.)

12          (Whereupon the jury was brought back

13    into the courtroom.)

14          THE COURT:  You can have a seat.

15          Mr. Dowling, do you want to rejoin us

16    here?  We're going to get rolling.  We'll quit about

17    five to 12:00.  We'll have until 1:00 o'clock for

18    lunch.  It's going to be relatively short for lunch

19    so...

20          THE WITNESS:  Can I get a cup of water?

21          THE COURT:  Okay.  Go ahead, Mr. McCoy.

22          MR. McCOY:   Thank you, your Honor.

23  BY MR. McCOY:

24    Q    Mr. Dowling, since you began work in the office at

25         Sprinkmann in 1973, do -- you have had

27

1           responsibility for various types of paperwork, is

2           that right?

3    A      Correct.

4    Q      Some of that paperwork has included the records of

5           sales of products, is that right?

6    A      I guess it could be defined that a little bit.  We

7           don't keep our records on so much of this, so much

8           of that.  It's mostly a per-job basis or total

9           sales.

10   Q      You said you don't keep your records or that you

11          only keep them a certain way or what were you

12          saying?  I missed the point.  I'm sorry.

13   A      Okay.  We keep the job records on the basis of a

14          job.  And we keep our material sales based upon a

15          total sales not divided up so-to-speak by product.

16   Q      So there is records of the jobs that Sprinkmann did,

17          is that what you are saying?

18   A      Correct.

19   Q      And those records, what they keep, an invoice number

20          assigned that particular job?

21   A      That would be correct.

22   Q      So if there is, if a job is done at the Milwaukee

23          Journal then is it assigned a number, is that right?

24   A      Correct.

25   Q      Okay.  And if there is materials sold to the

                              28

1          Milwaukee Journal there is also a record of that,

2          right?

3     A    That is correct.

4     Q    So those are the, among the types of records that

5          you're responsible for, is that correct?

6     A    That is correct.

7     Q    Now, in this particular case for -- let me have the

8          court reporter mark this.

9                    (Whereupon Exhibit Number 4 was marked

10         for identification by the Court Reporter.)

11    BY MR. McCOY:

12    Q    Mr. Dowling, this is Plaintiff's Exhibit Number 4.

13         I have shown that to your attorney. I'll hand you a

14         copy. Do you recognize that?

15    A    Yes.

16    Q    That document is something that you signed off on,

17         is that right?

18    A    Correct.

19    Q    And again you signed off on that document under

20         oath, is that right?

21    A    Correct.

22    Q    And that document, I'll let you take a look if you

23         need to for a moment, make sure you got the whole

24         thing in front of you. Does that appear to be a

25         rightful copy of it?

1  A   Correct.

2  Q   Okay.  That document involves this case, right?

3  A   Correct.

4  Q   And you were asked to do some work and give some

5      answers about what information Sprinkmann might have

6      pertaining to this case, is that right?

7  A   Correct.

8  Q   And you did that and then you signed, you put that

9      information into this document, is that right?

10 A   Yes.

11 Q   And then you, under oath, verified that that was

12     true, accurate statements of the information, is

13     that right?

14 A   Correct.

15 Q   We'll show the jury an overhead of this document.

16     This document, Mr. Dowling, is entitled Sprinkmann

17     Sons Corporation's answers to plaintiff's first set

18     of interrogatories and requests for production of

19     documents to all defendants, is that right?

20 A   Yes, sir.

21 Q   And Sprinkmann got a copy of this and this is -- and

22     you provided the answers to that, is that right?

23 A   Correct.

24 Q   And you did it with the assistance of your attorney,

25     Mr. Niquet, is that right?

1    A    That would be correct.

2    Q    So in this document, let's go to the last page for a

3         moment.  We'll go to the page before that, I'm

4         sorry.  Page 17 of this document.  This is your

5         statement under oath that the information, answers

6         you provided are true and correct, is that your

7         statement?

8    A    Correct.  Yes.

9    Q    Your statement Mr. Dowling?

10   A    Yes.

11   Q    And that you are the Controller of Sprinkmann.  You

12        have read the answers to plaintiff's first set of

13        interrogatories and requests for production of

14        documents, and that is right, number paragraph 1?

15   A    Yes.

16   Q    Okay.  That you prepared to respond with the

17        assistant and advice of counsel.  And you relied

18        upon counsel's advice previous too, is that right?

19   A    That is correct.

20   Q    And then paragraph number 4, down here, you reserve

21        the right to make changes if it appears that at any

22        time that omissions or errors have been made

23        therein, is that right?

24   A    Correct.

25   Q    Have you, since preparing this document found

1      anything that needs to be corrected in it?

2   A  Not that I'm aware of.

3   Q  I'm sorry, Mr. Dowling.  Your answer?

4   A  Not that I'm aware of.

5   Q  It's sound here today?  It's still a true, accurate

6      response, is that right?

7   A  I believe so.

8   Q  Let's go to the next page.  Okay.  Last page of this

9      document, page 18, you signed it.  Looks like your

10     own unique mark there, June 11, 1997, is that right?

11  A  That is correct.

12  Q  Okay.  And is -- it was subscribed to and sworn

13     before a notary public on June -- June 14th or June

14     11th, little confused on the dates there.  Do you

15     remember?

16  A  It was sworn on the 11th of June.  It says that her

17     commission expires the 14th of June, 1998.

18  Q  Okay.  My mistake then.  So sworn on the 11th of

19     June.  And then your attorney also signed off, is

20     that right?

21  A  Correct.

22  Q  All right.  So let's take a look at a couple of

23     parts of this document for a moment.  Take that page

24     over.  Can you return to requests -- document

25     request number 7, Mr. Dowling; that's on page 15, I

1        believe.

2    A    I'm sorry.  What number?

3    Q    Document request number 7?

4    A    Okay.

5    Q    On page 15.  You find that one?

6    A    Yes.

7    Q    Okay.  May I have -- document request number 7 talks

8         about --

9              MR. NIQUET:  Your Honor, could I just be

10        heard for a minute, please?

11             THE COURT:  Can I see this, please.

12        Let's move on.  I have sustained the objection.

13             MR. McCOY:   Thank you, your Honor.

14   BY MR. McCOY:

15   Q    Mr. Dowling, as part of this request for information

16        you were asked to provide records of sales to the

17        Milwaukee Journal or to other contractors who did

18        work at the Milwaukee Journal, Sprinkmann sales, is

19        that right?

20   A    Correct.

21   Q    Okay.  And at the time you were asked to provide

22        that information tell us what you did?

23   A    We have a number of file boxes that contain records

24        pertinent -- from the early '60's to the early

25        '70's.  We would have made a search of those boxes

1        in an attempt to come up with any records that were

2        relevant.

3   Q    Did you personally make this search?

4   A    Yes.

5   Q    Did anybody else help you or just yourself?

6   A    I may have had some help from our attorneys.

7   Q    Who did -- it was yourself or the attorneys who did

8        the search?

9                    MR. NIQUET:  Objection.  Argumentative.

10       I'm objecting on grounds it's argumentative.

11                   THE COURT:  I'll overrule the argument

12       Answer the question and then I'd like to move on,

13       please.

14                   THE WITNESS:  We both went through the

15       records.

16  BY MR. McCOY:

17  Q    And from that period, for that period of time it's

18       talking about '60's, early '70's, are all of the

19       records of Sprinkmann still in the files?

20  A    To the best of my knowledge, yes.

21  Q    You say to the best of your knowledge.  My

22       question -- my question is -- is:  Did you have

23       knowledge that there may be any of those records

24       that are no longer in the files of Sprinkmann?

25  A    No, I don't have any indication that there are some

                              34

```
 1            missing.
 2     Q      Sir, I want to ask the question:  Back in '73, when
 3            you went to work there, isn't it true that there was
 4            more records than there are today about sales of
 5            asbestos products?
 6     A      To the best of my knowledge all the records from
 7            1962 to about 1975 are intact.  When I sorted this,
 8            I believe those were the earliest records the
 9            company posted.
10     Q      My question -- My question is:  So those -- were
11            there more records, you went to work in '73; for
12            that period of time than there are today?
13     A      I do not believe so.
14     Q      Do you know one way or another?
15                     MR. NIQUET:  Objection.
16                     THE COURT:  Let's move on, Mr. McCoy.
17            You know he has testified that to the best of my
18            information the records he has examined relating to
19            sales of asbestos related products is complete.  If
20            you have other information then you can bring that
21            forward.  But we're just going around in the same
22            circle at this point.
23                     MR. McCOY:  All right.  I'll move on,
24            your Honor.
25   BY MR. McCOY:
```

1    Q    In your search of the records for this case you did
2         find some sales of asbestos products to the
3         Milwaukee Journal or contractors who were working
4         there, is that right?
5    A    We have found some jobs we did at the Journal,
6         correct.
7    Q    What types of records were reviewed to determine the
8         sales of the, to the Milwaukee Journal, other
9         contractors that worked there?
10   A    Our job records which basically are filed by
11        physical year, alphabetically.  We made a search of
12        those for, again for the time period.  We would have
13        went through our material sales and that would be it
14        for the time of search.
15   Q    Did you go through, is there a log of jobs that
16        Sprinkmann does?
17   A    There is one now.  I'm not sure that it goes back
18        that far.
19   Q    You are saying that the job log did not exist before
20        '73, or that you did not know, don't know if those
21        records are still available?
22   A    I don't know that there is a job log that existed
23        before 1973.
24   Q    Was there one maintained some, at some earlier time?
25   A    I believe so.

36

1    Q    But you don't have that anymore, is that right?

2    A    I do not know.

3    Q    All right.  And what about records of accounts

4         receivable prior to 1973, what records are there of

5         those?  Asbestos sales?  Asbestos materials?

6    A    Again our sales weren't categorized by product.

7         That's what I was trying to say.  There is no

8         difference between asbestos and non-asbestos sales.

9         It would be just sales.

10   Q    Sales categorized by how?

11   A    Either by job or by materials.

12   Q    What about sales categorized by customer?  Were

13        those maintained?

14   A    At some point in life, yes, but...

15   Q    You don't have those anymore either, is that right?

16   A    That is correct.

17   Q    So the job log of where Sprinkmann did his work is

18        no longer available, is that right?

19   A    I don't know that there ever was one.

20   Q    Well, you thought -- I thought you said there was

21        one?

22   A    We do have one and now, but I don't know that there

23        was one back then.

24   Q    Okay.  Now, you are no longer sure if there was one

25        then?

1     A     I thought that's what I said before.

2                         MR. NIQUET:  Objection.

3                         THE COURT:  Okay.

4                         THE WITNESS:  I don't remember.

5                         THE COURT:  The jury should rely on

6           their own recollection as to what was said.

7     BY MR. McCOY:

8     Q     Okay, Mr. Dowling.  Now, there were records of

9           customer sales by customers and those are no longer

10          available, is that right?

11    A     They're -- to the best of my knowledge we never kept

12          those types of records other than an individual jobs

13          records, which would have contained the labor

14          charged to the job, the material used on the job,

15          copies of invoices to the customer.

16    Q     There you are saying, there never was a record or

17          ledger of sales to that particular customer?

18    A     Not that I am aware of.

19    Q     Is there someone who would have better knowledge

20          than you of the records before 1973?

21    A     There is no one there anymore.  That's 25 years ago

22          at this point.

23    Q     What you are saying is that you can't go to

24          Sprinkmann's records and find what jobs were done at

25          the Milwaukee Journal, is that what you're saying?

1     A      Yes, I can.  We can -- we have our records, again

2            our jobs are stored alphabetically, okay.  Only

3            problem is you have to search all the job records to

4            find the work that was done in that time period.

5     Q      Alphabetically by what?

6     A      By whomever was the bill to.  So if I were doing a

7            job for you, say, and it was through a plumber, the

8            bill to, would be the plumber.  If I was doing a job

9            would be filed on the plumber's name.  If I was

10           doing a job for you directly it would be filed under

11           your name.

12    Q      I see.  And the -- which of the records for the

13           other contractors did you search?

14    A      We would have searched them all alphabetically.

15    Q      Every one before '73, you searched, is that what you

16           are saying?

17    A      That we had, correct.

18    Q      Is there any records of -- of the distribution or

19           receiving of particular products, like were at the

20           warehouse; send out materials to a site?  Are those

21           records maintained before '73?

22    A      I'm not sure what you're asking.

23    Q      Well, is there receiving, accepting and receiving

24           tickets when you send out materials from the

25           warehouse?

                                39

```
 1    A    Again tickets you showed before was a shipping
 2         ticket, okay.  A specific receiving ticket, if there
 3         was one, it would be logged on to a copy of the
 4         checks that we issued in payment of suppliers'
 5         invoices.
 6    Q    Did you look at those records?  Before '73?  The
 7         Milwaukee Journal?
 8    A    This is supplier invoices for materials.  There
 9         would have been no reason to look at that.
10    Q    You would -- I'm sorry I misunderstood.  Did you
11         look to see if there was any sales of products to
12         the Milwaukee Journal?
13    A    Yes, we did.  The materials sales.
14    Q    Okay.  And did you find, you found nothing in there?
15    A    No.
16    Q    Okay.  All right.  Did you look to see if there was
17         any tickets that showed shipping of materials to
18         another contractor working at the Milwaukee Journal?
19    A    For delivery to the Journal?
20    Q    Yes?
21    A    When we went through material sales, yes.
22    Q    Okay.  And all those record you find that have been
23         provided, is that right?
24    A    Correct.
25                   (Whereupon Exhibit Numbers 5 and 6 were
```

1          marked for identification by the Court Reporter.)

2    BY MR. McCOY:

3    Q    Mr. Dowling, I'm going to hand you Exhibits 5 and 6.

4         Ask you to look at those.  Do you recognize those?

5         You recognize those documents?

6    A    Yes.

7    Q    All right.  Those documents, Mr. Dowling, are those

8         some of the records that you found of sales to the

9         Milwaukee Journal where contractors were working

10        there?

11   A    They're copies of two jobs we did at the Milwaukee

12        Journal.

13   Q    Is that all the jobs Sprinkmann ever did at the

14        Milwaukee journal?

15   A    I -- what time frame?

16   Q    Before 1973?

17   A    In the period that we have the records, that would

18        be correct.

19   Q    I'm sorry.  When you say in the period that you have

20        the record?

21   A    Our records existing from about 1962 forward.

22   Q    Okay.  So you are saying that from 1962 forward that

23        Sprinkmann did two jobs at the Milwaukee Journal, is

24        that right?  These ones you gave me?

25   A    If that's what we produced, that's what we did.

```
 1    Q    Okay.  My question to you is:  And there was only
 2         two jobs done at the Milwaukee Journal, that is all
 3         that Sprinkmann did, right?
 4    A    Based somewhat you are giving me here, that would be
 5         correct.
 6    Q    Okay.  In searching your records how many jobs did
 7         you find, if it was difficult?
 8    A    I don't recall.  If this was what we gave you, this
 9         is all we had.
10    Q    Sir, as part of the trial subpoena today you were
11         asked to bring records of the sales to the Milwaukee
12         Journal or contractors working, is that right?
13                   MR. NIQUET:  Objection.  May I be heard,
14         please?  I'm sorry.
15                   THE COURT:  I want to make this point
16         and move on.
17                   MR. McCOY:  Thank you, your Honor.
18                   THE COURT:  Mr. Dowling, I -- you have
19         testified based upon your search of the records, and
20         I believe we're talking about a period from 1962 to
21         1963; your search of records indicates that
22         Sprinkmann did a very limited number of jobs at the
23         Journal Company, is that right?
24                   THE WITNESS:  Correct.  The time period
25         was through 1973.
```

1          THE COURT:  '60, through '73?

2          THE WITNESS:  Through '73, correct.

3          THE COURT:  And I believe based upon

4     your review of the records that Sprinkmann did less

5     than five jobs, is that fair?

6          THE WITNESS:  Correct.

7          THE COURT:  Okay.

8          MR. McCOY:  Thank you, your Honor.

9  BY MR. McCOY:

10   Q    Okay.  Let's take a look at Exhibit Number 5?

11   A    Okay.

12   Q    Now, Exhibit 5, Mr. Dowling, do you have your copy?

13   A    Okay.

14   Q    You can just -- can read along with?  Is Exhibit 5,

15        what type of document would you describe this is?

16   A    This is a delivery ticket.

17   Q    So it shows delivery of materials by Sprinkmann to

18        another place, is that right?

19   A    That is correct.

20   Q    And in this instance where would -- where were these

21        materials delivered to?

22   A    To the Milwaukee Journal.

23   Q    For?

24   A    I'm sorry.  Milwaukee journal.  I'm sorry.  To

25        the -- I'm looking at -- to the Milwaukee Journal

43

1           fourth floor telephone office, it says.

2    Q      Okay.  And they were delivered to another contractor

3           right?

4    A      That's probably whom we were doing the job for.

5    Q      Okay.  Delivered to it.  Kind of hard for the jury

6           may be to read this.  It says deliver, sold,

7           Milwaukee Journal's address, Pflugradt?

8    A      Correct.

9    Q      Okay.  Pflugradt is another contractor, right?

10   A      Pflugradt was a plumbing contractor who we would

11          have been doing the work for.

12   Q      Sprinkmann was doing work for the plumbing

13          contractor, is that what you are saying?

14   A      Correct.

15   Q      All right.  And in instances, some of them materials

16          delivered included on this first line, again this is

17          asking you to interpret this, based upon your

18          knowledge of the record for the Journal purposes

19          included Calsil, is that right, correct?

20   A      Correct, that is a pipe covering, correct.

21   Q      Yes.  In this case what is the size, is the pipe

22          covering?

23   A      Three-quarters by one.

24   Q      So its' size is a relatively small pipe?

25   A      Correct.

                              44

1    Q    Okay.  And 60 feet of this, is that right?

2    A    Correct.

3    Q    Back in this period of time I think the record is a

4         little hard to read was 1962, right?

5    A    Correct.

6    Q    Back in this period of time this Calsil contained

7         asbestos, is that right?

8    A    Correct.

9    Q    All right.  Also in here there is also deliver a bag

10        of Eagle 66, is that cement?

11                  MR. NIQUET:  Objection to the

12        characterization of the exhibit as a bag.  It

13        doesn't say that, quarter of a bag.

14                  MR. McCOY:  I apologize, your Honor, if

15        I -- Counsel is correct.

16   BY MR. McCOY:

17   Q    Quarter of a bag of Eagle 66 cement, is that right?

18   A    Says Eagle 66, yes.

19   Q    Okay.  And that's also a product that contained

20        asbestos, is that right?

21   A    Correct.

22   Q    And again that product was used to put on elbows and

23        certain other places on the steamline, is that

24        right?

25   A    Correct.

```
 1    Q    And the second line also indicates 60 feet of this

 2         Calsil asbestos-containing pipe covering, is that

 3         right?

 4    A    Correct.

 5    Q    Is just a little different size, half inch by one

 6         inches, right?

 7    A    Correct.

 8    Q    And by the way, this particular work was assigned

 9         job number 8691, is that correct?

10    A    Correct.

11    Q    Okay.  8691.  Now, if you take the next exhibit, I

12         think it's Number 6, do you have that one?

13    A    Auh-uhn.

14    Q    All right.  In Exhibit Number 6, Mr. Dowling, this

15         reflects a job filled which is assigned what number?

16    A    8969.

17    Q    Okay.  Again, I think that's a little hard to read

18         on the one we have up in front of the jury.  But

19         it's written up there and this job was done in what

20         year?

21    A    January '72.  I'm sorry, I think that is the

22         incorrect date.  I think it should be August of '62,

23         I apologize.  That's the delivery ticket for,

24         registered, that is dated August 6, 1962.

25    Q    Okay.  Which job number was this one?
```

1    A      8969.

2    Q      This is 8969.  When did you say this job was done?

3    A      I believe August of 1962.

4    Q      Okay.  But has got -- what is the date on the

5           delivery ticket?

6    A      I don't know.  I believe it's incorrect.

7                       THE COURT:  Well, what is the date on

8           it?

9                       THE WITNESS:  Well, the way it reads

10          here is 1/7/62.

11                      THE COURT:  Okay.

12                      THE WITNESS:  But the delivery ticket

13          refers to the attached register which is written up

14          August 6th of 1962.

15   BY MR. McCOY:

16   Q      So?

17   A      Sometime in 1962.

18   Q      All right.  There is two different dates on the

19          document in job file 8969, that's what you're

20          saying?

21   A      Correct.

22   Q      Okay.  And you don't have any explanation why that

23          might be?

24   A      Other than there is an incorrect date on one of

25          them.

```
 1   Q    All right.  Well, in this particular job, whenever
 2        it was done here, this job contains a bag of -- it's
 3        the last entry, don't know, maybe it's -- I'm
 4        reading it wrong.  How much is in Eagle?
 5   A    Half a bag.
 6   Q    Half a bag of the Eagle 66 cement, is that right?
 7   A    Correct.
 8   Q    And again that's asbestos containing at that time
 9        period, correct?
10   A    Correct.
11   Q    All right.  And up above it's also got a reference
12        to some -- One-Kote on the second line?
13   A    Correct.
14   Q    Okay.  And how much of that?
15   A    Also half a bag.
16   Q    All right.  And at this time period was One-Kote
17        usually asbestos-containing also?
18   A    It -- it would be my understanding that it was.
19   Q    It was?
20   A    Yes.
21   Q    Okay.  And any other item on this list that, you
22        think back then, could have been asbestos-containing
23        such as this cement on line 4?
24   A    I can't read what it's saying exactly.
25   Q    Maybe this one is better.
```

```
 1    A      It's possible that it could have been.

 2    Q      Okay.  All right.  We'll go to the next document.

 3                  (Whereupon Exhibit Number 7 was marked

 4           for identification by the Court Reporter.)

 5  BY MR. McCOY:

 6    Q      Mr. Dowling, this is Plaintiff's Exhibit 7.  And if

 7           I can show you that one, ask you to look at that.

 8           We don't have that one in an overhead.  This is also

 9           a job that was done by Sprinkmann involving sales to

10           the Milwaukee Journal or contractor there, is that

11           right?

12    A      Correct.  It would be a job we did for the Journal.

13    Q      Okay.  And this was?

14    A      For a contractor at the Journal.

15    Q      That was a subcontractor working under P.J. Grunau,

16           is that right?

17    A      Correct.

18    Q      And what was their role?

19    A      They're generally a plumbing contractor, mechanical

20           contractor.

21    Q      So the jobs at the Milwaukee Journal that we have

22           seen so far are all situations where Sprinkmann is

23           working as a subcontractor doing insulation work

24           under the plumbing contractor, is that right?

25    A      Under a contractor, yes; all cases plumbing.
```

1 Q Okay.  All right.  And this -- in this particular

2   instance their job was assigned number 4041, is that

3   correct?

4 A That is correct.

5 Q And the job was done in 1967, isn't that right?

6 A That is correct.

7 Q And in this particular job it indicates there was

8   some, again one-half bag of One-Kote cement, 32

9   pounds, is that right?

10 A Correct.

11 Q Okay.  So again back then, it's '67, this would be

12   usually asbestos-containing that, right?

13 A Correct.

14 Q On that -- on this list here any other items that

15   you see that would be asbestos-containing products?

16 A Not that I'm aware of.  Bulk of the job was a

17   fiberglass job.

18 Q And this particular job though did use One-Kote

19   cement, right?

20 A Correct.

21 Q Did you discover to your knowledge the records that

22   you found in looking for the sales to the Journal

23   contractors working there?

24 A Yes.

25 Q Mr. Dowling, were you also requested in this

50

```
 1           particular case to provide records about

 2           health-hazard asbestos, if there were any in the

 3           Sprinkmann files?

 4     A     I would have to read the interrogatories.  If -- do

 5           you have a specific one?

 6     Q     I do.  Let me look at my notes here.  I believe it's

 7           document request number ten.  It's on page 15.  Do

 8           you find that one?

 9     A     Yes, I did.

10     Q     That request specifically asks for all documents,

11           health-hazard asbestos, right?

12     A     Correct.

13     Q     Okay.  Did you find -- did you find any documents?

14     A     Relevant to that time frame, no.  I'm not aware of

15           anything.

16     Q     No documents relevant to the time frame before 1973,

17           is that right?

18     A     Correct.

19     Q     I believe that there was some testimony or I mean I

20           was -- I believe there was some reference by your

21           attorney to the death of somebody in Sprinkmann's

22           family from an asbestos-related condition.  Do you

23           recall that or do you know about that incident?

24     A     Yes.

25     Q     Okay.  And was there -- is there anything in the
```

|    |   |                                                        |
|----|---|--------------------------------------------------------|
| 1  |   | Sprinkmann files?  First of all, that occurred         |
| 2  |   | before 1973, right?                                    |
| 3  | A | Correct.                                               |
| 4  | Q | Okay.  Is there anything in the Sprinkmann files       |
| 5  |   | about that situation?                                  |
| 6  | A | Not that I am aware of.                                 |
| 7  | Q | Did you look for the -- anything on that subject?      |
| 8  | A | We have no files that would contain health             |
| 9  |   | information.  We're a small contractor.                |
| 10 | Q | I'm sorry.  You say you got no files of health         |
| 11 |   | information?                                           |
| 12 | A | Correct.                                               |
| 13 | Q | Okay.  And would that be true before 1973?            |
| 14 | A | In what I have been able to local, yes; that is       |
| 15 |   | true.  We did -- none existed.                         |
| 16 | Q | So what you are saying is before 1973, Sprinkmann     |
| 17 |   | had no file which it would use to invoice to its'     |
| 18 |   | customers or anybody that was around its' products    |
| 19 |   | about the health hazards; that's what you're saying?  |
| 20 |   | MR. NIQUET:  Object to the form of the                |
| 21 |   | question.                                              |
| 22 |   | THE COURT:  Overruled.                                 |
| 23 |   | THE WITNESS:  Could you repeat it,                     |
| 24 |   | please.                                                |
| 25 |   | MR.  McCOY:  Have the reporter read it                |

1          back, please.

2                          (Whereupon the last question was read

3          back by the Court Reporter.)

4                          THE COURT:  Invoice.

5                          THE WITNESS:  Not that I'm aware of,

6          correct.

7  BY MR. McCOY:

8     Q    You are responsible for the records of Sprinkmann

9          today, is that right?

10    A    Correct.

11    Q    You are the person that is responsible, right?

12    A    Correct.

13    Q    So you did not find anything in the Sprinkmann files

14         to say that before 1973, Sprinkmann told anybody at

15         the Milwaukee Journal about the health hazards of

16         asbestos, isn't that right?

17    A    I did not find anything in the file, correct.

18    Q    And Sprinkmann did not tell anybody at the Milwaukee

19         Journal that one of its' owners had died from an

20         asbestos disease, is that right?

21    A    I'm not qualified to answer that.  I don't know what

22         someone may have said.

23    Q    Okay.  But in the file you found nothing to show

24         that, right?

25    A    Correct.

| | | |
|---|---|---|
| 1 | Q | By the way, you were working with William |
| 2 | | Sprinkmann, is that right? |
| 3 | A | Correct. |
| 4 | Q | And he is present in this courtroom, is that right? |
| 5 | A | Yes, he is. |
| 6 | Q | Okay.  Can you tell when, to the best of your |
| 7 | | recollection, he began to work for Sprinkmann? |
| 8 | A | In the office about the same time I did.  Maybe |
| 9 | | slightly before. |
| 10 | Q | About just slightly before '73, you say? |
| 11 | A | I believe so. |
| 12 | Q | When you say slightly before like a year before or |
| 13 | | two years before?  How -- what do you mean? |
| 14 | A | I'm not positive when he started.  He was there when |
| 15 | | I started. |
| 16 | Q | And what is your relationship of, to William |
| 17 | | Sprinkmann?  Is -- was he your boss?  Were you equal |
| 18 | | in terms of your responsibilities?  What is the |
| 19 | | relationship? |
| 20 | | THE COURT:  Presently you want to know, |
| 21 | | Mr. McCoy? |
| 22 | | MR. McCOY:  I'm -- I'm interested, maybe |
| 23 | | starting with when you came on board there? |
| 24 | | Thank you, your Honor, for having me |
| 25 | | clarify. |

1               THE WITNESS:   I was hired to do work in

2          the office.   He was hired to do work in sales.

3  BY MR. McCOY:

4     Q     And what about today?   What is the relationship

5          between you and William Sprinkmann as far as the job

6          concerns?

7     A     Co-workers.

8     Q     Is he your boss now?

9     A     Technically correct, yes.

10    Q     In looking for records of sales to the Milwaukee

11          Journal or contractors did you do any inquiry of any

12          people who worked for Sprinkmann?

13    A     I am not sure exactly what you're -- in what

14          regards.

15    Q     My question:   Did you ask them if it sounds like

16          there was only two or three total jobs that

17          Sprinkmann did during that time period?

18    A     There is no one there with the exception of Mr. Van

19          Beck who -- who worked for Sprinkmann prior to 1972,

20          '73, maybe '71.

21    Q     Mr. Van Beck is the only current employee who goes

22          back to that time period, is that what you are

23          saying?

24    A     That is correct.

25    Q     Did you ask Mr. Van Beck whether he thought that

|     |   |                                                         |
|-----|---|---------------------------------------------------------|
| 1   |   | there was just five or less sales to the Milwaukee      |
| 2   |   | Journal or contractors there?                           |
| 3   | A | Yes.                                                    |
| 4   | Q | Okay.  And that -- that was something you did though    |
| 5   |   | as of your record search, is that right?                |
| 6   | A | Correct.                                                |
| 7   | Q | Did you ask any of the people who actually worked in    |
| 8   |   | the warehouse sending out materials?                    |
| 9   | A | There is no one who works in the warehouse who          |
| 10  |   | worked for us in that timespan anymore.                 |
| 11  | Q | Who is current employees?                               |
| 12  | A | Who is current employees.                               |
| 13  | Q | Okay.  About, about former employees who work in the    |
| 14  |   | warehouse and send out materials, did you ask them      |
| 15  |   | if, sounds like there was only five or less jobs for    |
| 16  |   | the Milwaukee Journal or contractors there?             |
| 17  | A | No, I did not.                                          |
| 18  | Q | Some of these people alive today, is that right?        |
| 19  | A | Correct.                                                |
| 20  | Q | You have never had any conversation with -- with --     |
| 21  |   | let me withdraw that question.  Do you know who         |
| 22  |   | Matthew Rogina is?                                       |
| 23  | A | No, I do not.                                            |
| 24  | Q | You don't know whether or not he had a position at      |
| 25  |   | the Milwaukee Journal, is that right?                    |

```
 1    A    Other than reading some correspondence.  Well, I do

 2         from reading correspondence from our attorney, yes.

 3    Q    And what is your understanding of his position?

 4    A    He was some type of supervisor.

 5    Q    And you have not spoken with him though about the

 6         sales at Sprinkmann made to the Journal or other

 7         contractors working there, is that right?

 8    A    Correct.

 9    Q    Let me just go back to one point in time.  There is

10         or it's sometime in the '60's or '70, Sprinkmann

11         Sons Corporation split into two companies, is that

12         right?

13    A    No.

14    Q    Two separate companies?

15    A    Not -- I'm not aware of, no.

16    Q    There was a company setup in Illinois, is that

17         right?

18    A    There was separate companies that's been in

19         existence for, I'll guess 50 years, that is located

20         in Illinois.  But it has no relationship to

21         Sprinkmann Sons Corporation.

22    Q    This is a company that also goes by the name of

23         Sprinkmann Sons except it uses Illinois in its'

24         name, right?

25    A    It's Sprinkmann Sons Corporation of Illinois.  It
```

1            has -- it's a separate corporation.  It has separate

2            stockholders.

3      Q     Shareholders of the two corporations through

4            Sprinkmann Sons Corporation that's here in

5            Wisconsin, Sprinkmann Sons Corporation, Illinois;

6            they were the same shareholders, is that right,

7            prior to sometime before, sometime in 1980, same

8            shareholders, right?

9      A     There was some commonalty of shareholders.

10     Q     Identical, is that right?

11     A     I don't know that.

12     Q     Do you know Mr. Carlton who works in the -- for the

13           Sprinkmann Sons of Illinois?

14     A     Could you repeat that?

15     Q     Do you know Mr. Carlton who works for the Sprinkmann

16           Sons of Illinois?

17     A     Not personally, no.

18     Q     But you do know of him, right?

19     A     I have heard of his name.

20     Q     And Miss Stockman?

21                     MR. NIQUET:  Your Honor, I object.

22           Grounds of relevancy.

23                     THE COURT:  What is the relevancy of

24           this, Mr. McCoy?

25                     MR. McCOY:  My question, your Honor, is

1          in regards to the identity of the shareholders and

2          if those persons would have better knowledge.

3                    THE COURT:  Better, better knowledge of

4          what?

5                    MR. McCOY:  Identity of shareholders

6          between Illinois and the Wisconsin Company.

7                    THE COURT:  I don't -- I don't --

8                    MR. McCOY:  I'll withdraw the question.

9                    THE COURT:  All right.

10                    MR. McCOY:  Make it easier.

11    BY MR. McCOY:

12    Q    Before 19 -- records before 1973, how many boxes did

13          those occupy, the records of the sales?

14    A    The total records we have, I hate to have hazard,

15          probably in the vicinity of one hundred for that

16          time period.

17    Q    If you go through those records are those jobs

18          numbered all in there?

19    A    To the best of my knowledge, yes.

20    Q    Have you ever done any inventory to determine if

21          they're all there?

22                    MR. NIQUET:  Your Honor, I think we have

23          been through this.

24                    THE COURT:  I readily agree with that,

25          Mr. McCoy.  We have reached the outer limits of the

1          evidentiary value of this exhaustive -- their

2          search, was what those records show, you know.   I

3          know where this is going and you have established

4          the foundation for putting in what you want to put

5          in later.  So let's close out this inquiry with this

6          witness, please.

7                    MR. McCOY:   Could I just have an answer

8          to that one last question, your Honor?   Then I'll

9          leave that line for --

10                   THE COURT:   Fine.  Did you ever --

11                   MR. McCOY:    Except I don't remember

12         what the question was.

13                   THE COURT:  All right.

14                   MR. McCOY:   Did you ever do --

15                   THE COURT:   That makes two of us.

16    BY MR. McCOY:

17    Q    Did you ever do an inventory to see if all of the

18         job numbers are there before '73?

19    A    There is no reason to do inventory.

20    Q    So your answer is you have not done an inventory, is

21         that right?

22    A    Correct.

23    Q    As part of the requests for information in this

24         case, Mr. Dowling, we also asked you to provide any

25         information about workers' compensation claims, is

```
 1          that right?
 2                        MR. NIQUET:  Objection.  Relevancy.
 3                        THE COURT:  Overruled.
 4                        THE WITNESS:  If it's in here, yes.  I'm
 5          not sure where it is.
 6   BY MR. McCOY:
 7    Q     Maybe I can help you with my notes again.  I believe
 8          interrogatory number 14, do you see that one?
 9    A     Yes, I do.
10    Q     And specifically it asks when was the -- when was
11          the -- I'll withdraw that.  Just you look to see
12          there were any workers' compensation claims when you
13          got this request, is that right?
14    A     I --
15                        THE COURT:  Can we narrow that in --
16                        MR. McCOY:  I'm talking about before
17          1973.
18                        THE COURT:  And relating to -- asbestos
19          related --
20                        MR. McCOY:  Yes, your Honor.
21                        THE COURT:  -- Incidents.  Okay.
22                        MR. McCOY:   I'll restate the question,
23          okay.
24                        THE COURT:  Thank you.
25   BY McCOY:
```

1    Q    Did you look to see if there were any workers'

2         compensation claims made for asbestos diseases

3         before 1973?

4    A    I don't believe we did.

5    Q    My question was:  Did you look for any?

6    A    I do not believe that we did.

7    Q    You say you did not look for any?

8    A    Correct.

9    Q    Okay.  So you don't know.  Do you know if there were

10        any before 1973 for asbestos diseases?

11   A    I'm not aware one way or another.

12   Q    I'm sorry?

13   A    I don't know.

14   Q    Let's me rephrase that.  These are also records that

15        are under your care and charge, is that right,

16        workers' compensation?

17   A    Correct.

18   Q    And you are saying you did not look at those, right?

19   A    Correct.

20                  THE COURT:  Can I see that, please?

21        Thanks.

22   BY MR. McCOY:

23   Q    Mr. Dowling, I don't have any further questions now.

24        I appreciate your time.  I'll turn the witness over

25        to Mr. Niquet.

                              62

1                      THE COURT:   Mr. Niquet, are you going to

2          do your exam now?

3                      MR. NIQUET:   Five, ten minutes.

4                      THE COURT:   That's fine.

5                      **CROSS EXAMINATION:**

6    BY MR. NIQUET:

7    Q     Mr. Dowling, I just have clarification questions for

8          you.   You got their document requests and you

9          provided the records, correct?

10   A     Correct.

11   Q     Those were all the records you and I could find,

12         correct?

13   A     Correct.

14   Q     And you opened your warehouse up to their firm,

15         correct?

16   A     Number of times, yes.

17   Q     Many times through the years, correct?

18   A     Yes.

19   Q     And Micky Pollack, an attorney from their office,

20         you know him, correct?

21   A     Yes.

22   Q     Had an opportunity to go through, look for all the

23         records also?

24                     MR. McCOY:   Objection, your Honor.

25         Objection, your Honor, to this continued line of

```
1              questioning.
2                        THE WITNESS:  Yes.
3                        MR. McCOY:  I don't think we have
4              established personal knowledge on the part of
5              Mr. Dowling through what our firm did or did not
6              have the opportunity to do.
7                        THE COURT:  Overruled.  Answer stands.
8              All right.  Go ahead, Mr. Niquet.
9   BY MR. NIQUET:
10    Q    And those records, I'm not going to go by labor and
11         name by job, correct?
12    A    Correct.
13    Q    And you have looked at some of these invoices when
14         they were put up in front of you, didn't all contain
15         asbestos, did they?
16    A    Correct.
17    Q    Some of it was what?
18    A    Fiberglass.
19    Q    That was something else your company sold?
20    A    Yes.
21    Q    Fiberglass consists of asbestos components?
22    A    No, it does not.
23    Q    How old were you in 1973?
24    A    1973 I was 23.
25    Q    How oldest is our past.  How old were you when
```

1   those -- back when those invoices were, '62?

2 A 12.

3 Q Let's take a look at that one again.  Does this

4   accurately depict the distribution cycle?   Let me

5   rephrase the question.   You heard of a company

6   called BSIS?

7 A Yes, I have.

8 Q What are they?  What do they do?

9 A They're the major Owens-Corning distributor in

10   Wisconsin.

11 Q Major one?

12 A Major.

13 Q Would that more accurately portray?

14 A Correct.

15 Q How did -- based upon your knowledge you have any

16   knowledge of how BSIS works with Kaylo,

17   Owens-Corning?

18 A I don't know.

19 Q But you remember based upon your experience that

20   they were the major distributor for that product in

21   Wisconsin?

22 A Correct and continues to be.

23       MR. McCOY:  Objection, your Honor.

24       THE COURT:   Overruled.  Answer can

25   stand.

1    BY MR. NIQUET:

2    Q    And I didn't hear the last part.  And what?

3    A    And continues to be.

4    Q    There was a little confusion when you were asked

5         about the warehouse and why you didn't know what was

6         in this warehouse.  Could you just give the jury an

7         idea, kind of a mind's eye picture, of what this

8         warehouse looks like?

9    A    It's a standard contractor, insulation contractor

10        warehouse.  There is probably 30 different products

11        and each product, pipe covering variety, may have

12        ten or 15 sizes or thicknesses to it.

13   Q    Are you able in your head to think back to 1973, and

14        inventory everything that went in there?

15   A    No.  There is glimmers of something that's

16        particularly memorable because it was heavy or

17        fiberglass, because it was itchy or tight, for

18        instance, because when you open up the boxcar you

19        wonder how you were going to get the first piece out

20        because it was packed so full.

21   Q    So there were materials that came from the boxcar

22        other than asbestos-type material?

23   A    Oh, yes.

24   Q    And what were some of those?

25   A    Again Styrofoam, was lots of that, was used in the

1    cold storage insulation. Cork insulation or cork

2    board insulation which at the time also was used in

3    some freezers, some coolers. Fiberglass. Obviously

4    asbestos. Other things.

5  Q  And one more question for you. With respect to this

6    diagram, the way it's depicted Sprinkmann's in the

7    middle. From a business standpoint is that where

8    Sprinkmann likes to be, selling to other distributor

9    dealers?

10 A  Our primary business is contracting, that is the

11    bulk of our sales, both cold coverage and mechanical

12    system insulation.

13 Q  So what, with respect to laborers or people that

14    actually put it on, is that the position you like to

15    be where you not only sell, you also install it?

16 A  Correct.

17 Q  Middleman doesn't make as good a profit as when you

18    put it on yourself?

19 A  That would be correct.

20 Q  So you don't really, during that time frame, didn't

21    really have any incentive to be that sole dealer

22    that spread this out to you, correct?

23 A  No. We and other contractors really can't afford to

24    buy from you.

25 Q  Thank you, sir.

1                    MR. NIQUET:  That's it, your Honor.

2                    MR. McCOY:  Couple brief questions.

3                    THE COURT:  Very brief, please.

4                    MR. McCOY:  Right.

5                    THE COURT:  We may have -- we may not

6        get done.  I don't know.  Go ahead.

7                    **RE-DIRECT EXAMINATION:**

8   BY MR. McCOY:

9    Q    Mr. Dowling, did you -- Sprinkmann does not, I

10        should say, Sprinkmann does not keep track of its'

11        sales of asbestos products, is that right?

12   A    We don't sell any asbestos at this point in time.

13   Q    I'm talking about before 1973.  Sprinkmann keep

14        track of annual sales of asbestos products?

15   A    No, not that I'm aware of.

16   Q    You did not keep track of any annual sales of Kaylo,

17        is that right?  Sprinkmann?

18   A    That is correct.  Other than looking at our

19        purchases they were a relatively minor supplier.

20   Q    And you don't have actual sales figures on Building

21        Services of Kaylo either, do you?

22   A    No, I do not.

23   Q    Okay.  Both Sprinkmann and Building Services had

24        this distributorship relationship which gave

25        favorable pricing, is that right?

```
 1   A     I'm not aware of the price advantage.

 2   Q     Okay.  But think both had a distributorship

 3         relationship, is that what you are saying?

 4   A     I'm not sure exactly what you are asking.

 5   Q     Well, my question was:  In this distribution chart

 6         you would have either Sprinkmann and Building

 7         Services here, is that what you are saying?

 8   A     Correct.  But again --

 9                   MR. McCOY:  Well, that is -- that is all

10         my questions, your Honor.

11                   Thank you, very much.

12                   THE COURT:  Okay, that's it,

13         Mr. Dowling.

14                   (Witness excused.)

15                   THE COURT:  Let's break for lunch.  1:00

16         o'clock back in our jury room.  Leave your notes.

17         Don't discuss the case.  Enjoy your lunch.  We'll

18         see you then.  Lenora is coming around there.

19                   (Whereupon a recess was had for lunch.)

20                        *      *      *

21

22

23

24

25
```

```
 1   STATE OF WISCONSIN    )
                           (  SS:
 2   MILWAUKEE COUNTY      )

 3                I, June K. Teeguarden, do hereby

 4          certify that I am the Official Court Reporter

 5          for the Honorable Christopher R. Foley, Circuit

 6          Court Judge, Branch #14, Civil Division,

 7          Milwaukee, Milwaukee County, State of Wisconsin;

 8          that as such Court Reporter, I made full and

 9          correct stenographic notes of all the testimony in

10          the above-entitled action, and that the

11          excerpted proceedings annexed hereto is a true and

12          correct transcript of the hearing at said time.

13                I further certify that said transcript

14          was requested by Sielas K. Dixon, Legal Assistant,

15          from the Cascino Vaughan Law Offices, Ltd., by

16          written request on dated November 25, 1998,

17          received by me on December 2, 1998, with said

18          request being completed by me this 5th day of

19          December, 1998.


21                              _____ 10/15/02
                         June K. Teeguarden, R.P.R.,C.P.
22
```