1                    SUPERIOR COURT OF NEW JERSEY
                    LAW DIVISION:MIDDLESEX COUNTY
2                    DOCKET NO.  L-7759-90

3

RAYMOND FREEMAN, individually
4   and as Executor of the Estate
   of MADELINE FREEMAN,
5   deceased;

6              Plaintiff          DEPOSITION UNDER
                           ORAL EXAMINATION
7        vs                    OF
                         RICHARD GRIMMIE
8   A.C.&.S., INC., formerly      (Volume I)
9     Armstrong Contracting &
     Supply, Inc.;
10  THE ANCHOR PACKING COMPANY;
    A.P. GREEN INDUSTRIES, INC.,
11    individually and
    as successor to A.P. Green
12    Firebrick Company and A.P. Green
    Refractories Co.;
13  ARMSTRONG WORLD INDUSTRIES,
    INC., formerly Armstrong Cork
14    Company and Armstrong Contracting
    & Supply;
15  THE BABCOCK & WILCOX COMPANY,
    individually and as successor
16    to B&W Refractories Limited, Standard
    Refractories Limited and Holmes
17    Blunt Limited;
    BECHTEL CORPORATION;
18  BETHLEHEM STEEL CORPORATION;
    BURNS & ROE ENTERPRISES, INC.,
19    formerly known as Burns and
    Roe, Inc.;
20  BURNS AND ROE SYNTHETIC FUELS,
    INC.;
21  CAREY CANADA, INC., formerly
    Carey Canadian Mines, Ltd.,
22    individually and as successor
    to Quebec Asbestos Corp., Ltd.;
23  THE CELOTEX CORPORATION, individually
    and as successor to Philip
24    Carey Corporation, Philip Carey
    Mfg. Co.,  Philip Carey Company,
25    Inc., XPRU Corporation, Briggs Manufacturing

1    Company, Panacon Corporation, Smith
     and Kanzler, Inc., and Quebec
2    Asbestos Corp., Ltd.;
     COLUMBIA ACOUSTICS AND FIRE-
3      PROOFING COMPANY;
     COMBUSTION ENGINEERING, INC.,
4      individually and as successor
       to M.H. Detrick Company,
5      Walsh Refractory Corporation,
       and Refractory and Insulation
6      Corporation, now known as
       C. & E.  Refractories, Inc.;
7    COURTER & COMPANY, INCORPORATED;
     CROWN, CORK & SEAL COMPANY,
8      INC., individually and as
       successor to Mundet Cork
9      Corporation;
     DANA CORPORATON, individually
10     and as successor to Smith
       & Kanzler, Inc. and Victor
11     Gasket Co.;
     DURABLA MANUFACTURING COMPANY;
12   EAGLE-PICHER INDUSTRIES, INC.;
     EASTCO INDUSTRIAL SAFETY CORP.,
13     a/k/a/ Charkate Glove and
       Specialty Company;
14   EMPIRE-ACE INSULATION MFG.
       CORP., individually and as
15     successor to Empire Asbestos
       Co. and Ace Asbestos Mfg. Company;
16   FIBREBOARD CORPORATION,
       individually and as successor
17     to Fibreboard Paper Products
       Corporation, Pabco Products
18     Inc. and Plant, Rubber &
       Asbestos Works, Inc.;
19   FLEXITALLIC, INC.,  formerly
       Flexitallic Gasket Company,
20     Inc.;
     THE FLINTKOTE COMPANY, individually
21     and as successor to Van
       Packer Inc.;
22   FOSTER WHEELER CORPORATION;
     GAF CORPORATION, individually
23     and as successor to the
       Ruberoid Co. and Vermont
24     Asbestos Corporation;
     GARLOCK, INC.;
25   GIAMBOI BROS., INC.;

GUYON GENERAL PIPING, INC.,
    individually and as successor
    to and formerly known as
    Charles F. Guyon, Inc.;
HATZEL & BUEHLER, INC.;
H.H. ROBERTSON CO.;
H.K. PORTER COMPANY, INC.,
    individually and as successor
    to Southern Asbestos Company,
    Carolina Asbestos Company and
    Thermoid Company;
IMO INDUSTRIES,
    individually and as successor
    to, and formerly known as
    De Laval Turbine,
    Transamerica De Laval, and
    IMO De Laval;
INDUSTRIAL INSULATORS CORP.;
INGERSOLL-RAND COMPANY;
INSULATION MATERIAL CORP.;
JANOS INDUSTRIAL INSULATION,
    INC.;
J.H. FRANCE REFRACTORIES CO.,
    INC.;
JOHN W. WALLACE & CO.;
KEENE CORPORATION, individually
    and as successor to Ehret
    Magnesia Mfg. Co.,
    Baldwin Hill Co., Baldwin-
    Ehret-Hill Co., Inc., Keene
    Building Products Co.;
LIBERTY PIPE & BOILER COVERING
    CO., INC.;
METROPOLITAN REFRACTORIES
    COMPANY;
M.H. DETRICK COMPANY;
NATIONAL GYPSUM COMPANY individ-
    ually and as successor to
    Asbestos Ltd. and Smith
    Asbestos Co. and alter ego
    of and/or successor to
    National Asbestos Mines, Ltd.;
NATIONAL INSULATION COMPANY;
ORANGE AND ROCKLAND UTILITIES, INC.;
OWENS-CORNING FIBERGLAS
    CORPORATION;
OWENS-ILLINOIS INC.;
PFIZER, INC.;
PITTSBURGH CORNING CORPORATION.;

```
 1   PORTER HAYDEN COMPANY,
         individually and as successor
 2       to H.W. Porter and Co. and
         Reid Hayden Co.;
 3   PULMOSAN SAFETY EQUIPMENT
         CORPORATION;
 4   QUIGLEY COMPANY, INC.;
     ROBERT A. KEASBEY COMPANY;
 5   ROCKWOOL MANUFACTURING COMPANY;
     SAFEGUARD INDUSTRIAL EQUIPMENT
 6       CO.;
     SCHAEDEL AND BEYER, INC.;
 7   SOUTHERN TEXTILE CORPORATION,
         division of H.K. Porter
 8       Company;
     STANDARD INSULATION CO.,
 9       formerly Standard Asbestos
         Co.;
10   STONE & WEBSTER, INCORPORATED;
     THOMAS O'CONNOR & CO., INC.;
11   TODD SHIPYARD CORPORATION;
     TREADWELL CORPORATION;
12   THE TRYBEE CO., INC.;
     TRYBEE COMPANY, INCORPORATED;
13   TURNER & NEWALL, INC.,
         individually and as successor
14       to and alter ego of Keasbey
         & Mattison Company and Bell
15       Asbestos Mines, Ltd.;
     UNIROYAL, INC.;
16   UNITED STATES MINERAL PRODUCTS
         COMPANY, individually and as
17       successor to H.&A. Construction
         Corp., Spraycraft Corp., Asbestos
18       Products Mfg. Corp.,  Asbestospray
         Applicators, Inc. and Asbestospray
19       Corporation;
     UNITED STATES GYPSUM COMPANY;
20   UNITED STATES RUBBER COMPANY,
         INC.;
21   UNIVERSAL FABRICATED PRODUCTS
         COMPANY;
22   VETERAN PIPE COVERING CO., INC.;
     WILLIAM MERTEN, INC.;
23   WOLFF & MUNIER SERVICE COMPANY,
         INC.;
24   WORTHINGTON CORPORATION;
     W.R. GRACE & CO.-CONN, formerly
25       W.R. Grace & Co.,
```

 1          individually and as successor
           to Zonolite Corporation;
 2     YORK INDUSTRIES CORP., formerly
           York Insulation Company;
 3     JOHN DOE 1 through JOHN DOE 75,
           (fictitious);
 4
                    Defendants.
 5     _____

 6          TRANSCRIPT of the deposition of the witness,

 7     called for Oral Examination in the above-captioned

 8     matter, said deposition being taken pursuant to

 9     Superior Court Rules of Practice and Procedure by and

10     before SANDRA A. PRASNAL, a Notary Public and Certified

11     Shorthand Reporter of the State of New Jersey, at the

12     law offices of WILENTZ, GOLDMAN & SPITZER, 90

13     Woodbridge Center Drive, Woodbridge, New Jersey, on

14     Friday, September 20, 1991, commencing at approximately

15     10:30 in the forenoon.

16

       A P P E A R A N C E S:
17
       WILENTZ, GOLDMAN & SPITZER, ESQS.
18     BY:  CHRISTOPHER M. PLACITELLA, ESQ.
       Attorneys for Plaintiffs
19
       KELLEY, JASONS, McGUIRE & SPINELLI, ESQS.
20     BY:  JOSEPH W. McGUIRE, ESQ.
       Attorneys for Defendant, Owens-Corning Fiberglas and
21     Mr. Grimmie

22     McCARTER & ENGLISH, ESQS.
       BY:  ANDREW T. BERRY, ESQ.
23     Attorneys for Defendants, Owens-Illinois

24

25

1    A P P E A R A N C E S:  (Cont'd)

2    ROBERT M. GRAHAM, P.A.
     BY:  ROBERT M. GRAHAM, ESQ.
3    Attorneys for Defendant, Charles Guyon, Inc. and Thomas
     O'Connor
4
     BRAFF, HARRIS & SUKONECK, ESQS.
5    BY:  STEVEN W. GRILL, ESQ.
     Attorneys for Defendant, Giamboi Brothers
6
     MALOOF, LEBOWITZ & BUBB, ESQS.
7    BY:  DONNA M. JENGSEN, ESQ.
     Attorneys for Defendant, Durabla Manufacturing Co.
8
     PICILLO, BROMBERG & CARUSO, ESQS.
9    BY:  ARTHUR D. BROMBERG, ESQ.
     Attorneys for Defendant, Combustion Engineering and CCR
10
     WATERS, McPHERSON & McNEILL, ESQS.
11   BY:  GLENN FARRELL, ESQ.
     Attorneys for Defendants, Wallace and Anchor Packing
12
     PENNINGTON & THOMPSON, ESQS.
13   BY:  CAROL T. TARGUM, ESQ.
     Attorneys for Defendant, M.H. Detrick Company and
14   Treadwell Corporation

15   GARRITY, FITZPATRICK, GRAHAM, HAWKINS & FAVETTA, ESQS.
     BY:  ANTHONY J. MARINO, ESQ.
16   Attorneys for Defendant, Standard Insulation

17   STRYKER, TAMS & DILL, ESQS.
     BY:  WILMA M. KENNY, ESQ.
18   Attorneys for Defendant, Uniroyal

19   MEGARGEE, YOUNGBLOOD, FRANKLIN, CORCORAN, ESQS.
     BY:  THOMAS M. SAVON, ESQ.
20   Attorneys for Defendant, H.H. Robertson

21   MARKS, KENT & O'NEILL, ESQS.
     BY:  FRANCIS X. CANUSO, ESQ.
22   Attorneys for Defendant, Foster Wheeler Corporation

23   SHANLEY & FISHER, P.C.
     BY:  ANDREW P. SLOWINSKI, ESQ.
24   Attorneys for Defendant, Bechtel

25

1    A P P E A R A N C E S:   (Cont'd)

2    WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, ESQS.
     BY:  LUIS L. HAQUIA, ESQ.
3    Attorneys for Defendant, Ingersoll-Rand

4    BORRUS, GOLDIN, FOLEY, VIGNUOLO, HYMAN & STAHL, ESQS.
     BY:  APHRODITE C. KOSCELANSKY, ESQ.
5    Attorneys for Defendant, Burns & Roe

6    CHASAN, LEYNER, TARRANT & LAMPARELLO, ESQS.
     BY:  MARK C. CURTIS, ESQ.
7    Attorneys for Defendant, Robert A. Keasbey Company

8    McELROY, DEUTSCH & MULVANEY, ESQS.
     BY:  MARCIA C. MAHAN, ESQ.
9    Attorneys for Defendant, U.S. Mineral Products

10   HOAGLAND, LONGO, OROPOLLO & MORAN, ESQS.
     BY:  RICHARD L. HESS, JR., ESQ.
11   Attorneys for Defendant, Janos Industrial Supply
     Incorporated
12
     STEVEN A. WEINER, ESQ.
13   BY:  STEVEN A. WEINER, ESQ.
     Attorneys for Defendant, Veteran Pipe Covering
14   Co., Inc.

15   CONNELL, FOLEY & GEISER, ESQ.
     BY:  KATHY CEHELSKY, ESQ.
16           -and-
         GEORGE PARSELLS
17   Attorneys for Defendant, W.R. Grace and Bethlehem Steel

18   JOHN J. PRIBISH, ESQ.
     BY:  BENJAMIN S. BUCCA, JR., ESQ.
19   Attorneys for Defendant, IMO Industries

20   DONINGTON, KARCHER, LEROE, SALMOND, LUONGO, RONAN &
     CONNELL, ESQS.
21   BY:  JEFFREY KLUGER, ESQ.
     Attorneys for Defendant, Safeguard Industrial Equipment
22   Company

23   VanDEVENTER, BLACK, MEREDITH & MARTIN, ESQS.
     BY:  ROBERT L. O'DONNELL, ESQ.
24   Attorneys for Defendant, Owens-Illinois

25

1                           I N D E X

2      WITNESS NAME                              PAGE NO.

3      RICHARD GRIMMIE

4           Direct by Mr. Placitella              9
            Cross by Mr. Weiner                  177
5
                          E X H I B I T S
6
       EXHIBIT NO.          DESCRIPTION          PAGE NO.
7
       P-1         Letter from Dr. Vorwald to Bowes,
8                  11/16/48                        32

9      P-2         Interim report, 10/30/48        46

10     P-3         Letter from Gillis, 11/26/51    67

11     P-4         Letter to Whitie, 9/2/52        70

12     P-5         Memo to C.W. Howard, 6/16/52    73

13     P-6         Spread sheet produced by
                   Jameson case                    92
14
       P-7         Special Hazard Survey          103
15
       P-8         Report, 10/23/68               114
16
       P-9         Letter from Hazard to McMahon,
17                 11/10/49                       128

18     P-10        Letter from Durkan to Hazard,
                   8/7/51                         133
19
       P-11        Memo from Dr. Konzen to Schauerla 145
20
       P-12        Report of Dr. Billmaier        156
21
       P-13        Memo from Urban to Vorwald,
22                 1/31/51                        162

23

24

25

1    R I C H A R D    G R I M M I E,

2              202 First Avenue, West Berlin, New Jersey,

3              called as a witness, having been first

4              duly sworn according to law, testifies as

5              follows:

6    DIRECT EXAMINATION BY MR. PLACITELLA:

7              Q    Good morning, Mr. Grimmie.  How are you?

8    A    Oh, getting older, I hope.

9              Q    That's because you get better looking

10   every day.

11   A    Yeah.  Well, you flattered me.  I'll tell you

12   how I feel.  I just recently read that there's 1 lawyer

13   to every 300 of the population in the United States.

14             Q    And --

15   A    I feel flattered.

16             Q    The statistics are higher in New Jersey.

17   It's frightening thought, isn't it?

18   A    Yeah.  When I look around.

19             MR. PLACITELLA:  Mr. McGuire is here today

20        on behalf of Owens-Corning Fiberglas.  Are you

21        representing -- in what capacity are you here

22        with respect to Mr. Grimmie,

23        Mr. McGuire?

24             MR. McGUIRE:  We're representing

25        Mr. Grimmie as well.

GRIMMIE - Direct                                    10

1              MR. PLACITELLA:  As a former employee of

2         Owens-Corning Fiberglas?

3              MR. McGUIRE:  Yes.

4         Q    Mr. Grimmie, as you know, my name is Chris

5    Placitella and I'm here representing the plaintiffs in

6    these cases.

7              We're here today for the purpose of taking

8    your deposition.

9              You've had your deposition taken before,

10   correct?

11   A    Yes.

12        Q    And you've actually given trial testimony

13   in asbestos cases before, correct?

14   A    One.

15             MR. McGUIRE:  Let's clarify that.  He gave

16        trial testimony in a single case in 1979, if I

17        remember correctly.

18             MR. PLACITELLA:  Why don't you let him

19        answer the question, Mr. McGuire, and then if

20        he's having a problem with his memory, maybe you

21        can help him out?

22   A    One case.

23        Q    One case?  And that was the McGrath case?

24   A    Yes, sir.

25        Q    Have you testified since the McGrath case,

Brody & Geiser (908) 738-8555 or (212) 732-0644

1     in any asbestos case either by deposition or by trial?

2     A     I believe it was after the McGrath case at my

3     deposition, was video-taped in Newark.

4          Q     And was that involving Mr. Gavin?  Do you

5     remember him?

6     A     Yes, I remember Mr. Gavin.

7          Q     So is it fair to say, you are pretty well

8     versed in the procedures of depositions?

9     A     I believe so.  Yes.

10         Q     I'm going to ask you some questions today

11    that I ask you give answers to, to the best of your

12    ability.

13              If, for some reason, you don't understand

14    one of my questions, please let me know and I'll

15    attempt to rephrase it.

16              Do you understand that?

17    A     Yes, sir.

18         Q     If, for some reason, you don't know the

19    answer to the question, please tell me you don't know,

20    but if you are able to give your best estimate, please

21    do that.  Okay?

22    A     Yes, sir.

23         Q     If, for some reason, your attorney should

24    object to a question that I ask, please don't answer

25    the question until such time as your attorney and I

1    have the opportunity to work out whatever differences

2    we might have.

3    A       Yes, sir.  May I make a statement?

4          Q       Sure.

5    A       I have what is known as a benign tremor.

6    Without control, my head may start going this way

7    (indicating).  Please don't be offended or feel as if

8    I'm rejecting.

9                I'll answer -- if I have to answer in a

10   negative, I will answer verbally.

11         Q       Fine.  We're used to, as lawyers,

12   Mr. Grimmie, speaking in a large crowd and have most

13   people shake their head back and forth, so we wouldn't

14   offend them.

15                You are certainly 69 years of age?

16   A       69 is correct.

17         Q       And do you still live in West Berlin, New

18   Jersey?

19   A       Yes, sir.

20         Q       You are retired?

21   A       Yes, sir.

22         Q       You are retired from Owens-Corning

23   Fiberglas?

24   A       Yes, sir.

25         Q       When did you retire?

1   A      My last day of work was February 29, 1984.   They

2   got me for an extra day.

3          Q      And you're a former employee of both

4   Owens-Illinois and Owens-Corning Fiberglas.   Is that

5   correct?

6   A      Yes, sir.

7          Q      One more instruction.   I know that you

8   know what's going to come out of my mouth many times.

9   A      I'll wait.

10         Q      You have to wait.

11                Okay.   I want to review with you briefly

12   your work history.   Just in terms of chronology.   In

13   1947 you went to work for Owens-Illinois.   Is that

14   correct?

15   A      Yes, sir.

16         Q      And that was as a maintenance handyman?

17   A      Yes, sir.

18         Q      And what plant was that?

19   A      Berlin, New Jersey.

20         Q      How long did you spend as a maintenance

21   handyman in Berlin, New Jersey?

22   A      Just a few months, as I recall.

23         Q      What was the next job you had after that?

24                At this point it was -- strike that.   Go

25   ahead.

1                   What was the next job that you had?

2    A       I believe it was pipe covering pourer.

3            Q       Was that in 1948, approximately?

4    A       Approximately, yes.

5            Q       And what plant were you working at, the

6    Sayreville plant at that time for Owens-Illinois?

7    A       I went to the Sayreville plant to help them get

8    the plant started.  I believe it was 19 -- right after

9    the new year, 1948.

10           Q       Well, let me ask you this:  When you

11   worked as a pipe coverer pourer, was that at Berlin?

12   A       Berlin.

13           Q       And then at some point after you worked as

14   a pipe coverer pourer, you went to Sayreville to help

15   train men?

16   A       Yes.

17           Q       In what capacity did you go there in?

18   A       Just hourly employee.

19           Q       Did you have a title at that point?

20   A       No, I didn't.

21           Q       Was this in 1948 when you went to

22   Sayreville?

23   A       I believe it was 1948.

24           Q       What did you do when you went to

25   Sayreville specifically in 1948 for Owens-Illinois?

1    A       I helped familiarize the new employees with the

2    operation of any equipment that was at Sayreville that

3    I was familiar with at the Berlin plant.

4            Q       How long were you there at Sayreville?

5    A       Approximately eight months.

6            Q       And what kind of products were they making

7    at the Sayreville plant at that time?

8    A       Calcium silicate insulation.

9            Q       Was that known as a Kaylo insulation?

10   A       Kaylo is the trade name.

11           Q       Were they making pipe covering there as

12   well as door material?

13   A       No, sir.

14           Q       What were they making?

15   A       Flat block.

16           Q       And in 1949 did you go back to Berlin?

17   A       Yes, sir.

18           Q       And were you there as a personnel

19   assistant?

20   A       Eventually, yes.

21           Q       And when did you become personnel

22   assistant at the Berlin plant?

23   A       I believe it was prior to 1953.

24           Q       What did you do between 1949 and say 1951?

25   What was your job for Owens-Illinois?

1    A       Well, I think during that period of time I was a

2    batch mixer, and I may have worked in the finishing

3    department for a short period of time.

4            Q       What specifically did you do in the

5    finishing department, if you can recall?

6    A       If I recall, I was -- I was a stripper.

7            Q       What did a stripper do?

8    A       Take ware off of a ware car and put it in a

9    container so it could be moved around.

10           Q       And in 1951 did you become a shift

11   supervisor at Berlin?

12   A       I believe somewhere in that time frame.

13           Q       And after that did you take the job in the

14   latter part of 1951 as a personnel assistant?

15   A       Yes.

16           Q       And did you have that job until

17   approximately 1952?

18   A       Approximately.  These times are --

19           Q       I'm asking for your best approximation.

20           MR. BERRY:  Let him finish.

21           Q       Are you done?

22           MR. BERRY:  Do you want to finish your

23   answer?

24   A       I believe it was in that time frame.

25           Q       And, again, were you working at Berlin at

1    this time?

2    A     Yes, sir.

3          Q     From 1952 to 1954 did you work as a

4    production supervisor at Owens-Illinois Berlin plant?

5    A     I believe it was in that time frame, yes.

6          Q     And from 1954 to 1956 did you work as a

7    personnel supervisor for Owens-Illinois?

8    A     I never heard the term "personnel supervisor."

9    But personnel director.

10         Q     Okay.  You were a personnel director from

11   '54 to '56?

12   A     I believe in that time frame, yes.

13         Q     And was that also at the Berlin plant?

14   A     Yes, sir.

15         Q     From 1956 until 1961, was your job a

16   production supervisor?

17   A     Yes, sir.

18         Q     Now, during that period of time, is my

19   understanding correct that Owens-Corning Fiberglas

20   purchased the Kaylo operation from Owens-Illinois?

21   A     The period of time that we've been talking

22   about?

23         Q     During the time period '56 to '61 when you

24   were production supervisor, at some poin' 'ring that

25   time period?

1    A      Yes, sir.

2           Q      Was that 1958?

3    A      I believe so.  Yes.  May 1st.

4           Q      Now, are you aware of, prior to 1958 what

5    the relationship was between Owens-Illinois and

6    Owens-Corning Fiberglas, if any?

7    A      Yes, sir.

8           Q      What was that?

9    A      I believe Owens-Corning Fiberglas took over the

10   national distribution, sales and marketing for the

11   Kaylo product.

12          Q      And when was that?

13   A      I don't --

14          Q      Some time in early 1950s?

15   A      I believe it would have been early or mid '50s.

16          Q      Are you aware as to whether Owens-Illinois

17   had any ownership interest in Owens-Corning Fiberglas

18   prior to the purchasing of the Kaylo facility?

19   A      Your question is in Owens-Corning Fiberglas?

20          Q      That's correct.

21   A      I believe Owens-Illinois was a stockholder in

22   Owens-Corning Fiberglas.

23          Q      And do you know whether the two shared any

24   common officers or directors, that is, Owens-Illinois

25   and Owens-Corning Fiberglas?

1    A      I have no knowledge of that.

2           Q      Now, in 1961 did your job change from

3    production supervisor to personnel director?

4    A      I believe so.  Yes.

5           Q      How long did you have that job, personnel

6    director for Owens-Corning Fiberglas?

7    A      There was a period of time that I had two

8    departments.  I was production manager and personnel

9    manager.  I think that was for about a period of 12, 14

10   years.

11          Q      Some time until the early 1970s?

12   A      I believe so.  Yes.

13          Q      And in the early 1970s, did your job

14   change again for Owens-Corning Fiberglas?

15   A      Well, I believe it was during that time period

16   that a new production manager was brought in and I went

17   exclusively to the personnel department.

18          Q      And what was your title in the personnel

19   department?

20   A      Personnel manager.

21          Q      And did you retire from that position?

22   A      Yes, I did.

23          Q      The operations that you were involved with

24   at Owens-Illinois, did that involve exclusively with

25   the one exception you spoke about concerning

GRIMMIE - Direct                                        20

1    Sayreville, the Owens-Illinois Kaylo plant in Berlin,

2    New Jersey?

3              MR. BERRY:   Object to the form of the

4         question.

5         Q    You can answer.

6    A    Yes, sir.

7         Q    And the operations that you were involved

8    in when you worked for Owens-Corning Fiberglas, was

9    that exclusively the Kaylo plant in Berlin, New Jersey?

10   A    Yes, sir.  In 1948 when I went to Sayreville,

11   that was Owens-Illinois.

12        Q    Okay.  You told us one time about when you

13   went to Owens-Illinois Sayreville to do some training?

14   A    Yes.

15        Q    Did you visit the Sayreville plant at any

16   time other than that one five or six-month period where

17   you did the training in 1948 of Owens-Illinois

18   personnel?

19   A    Yes, sir.

20        Q    When was that?

21   A    Oh, I don't remember.  It was after I went back

22   to my job at Berlin, I went back up to Sayreville for a

23   visit.

24        Q    And was that in your work capacity or a

25   social visit?

Brody & Geiser (908) 738-8555 or (212) 732-0644

1     A       It was not in my work capacity.  At the time I

2     was an officer in the local union and I went up to

3     visit the local up there.

4             Q       Other than that one time, were there any

5     other times?

6     A       Not that I recall.

7             Q       Okay.  Now, would you agree with me that

8     while you worked at Owens-Illinois, Owens-Illinois was

9     concerned about the health and welfare of the employees

10    in its plants?

11    A       Yes, sir.

12            Q       And would you agree with me that while you

13    worked with Owens-Corning Fiberglas, they were

14    concerned about the health and welfare of the employees

15    in its Kaylo plant?

16    A       Yes, sir.  I agree with that.

17            Q       Is it fair to say that as part of your

18    responsibilities from '51 until the time you retired,

19    you were involved with the implementation or

20    enforcement of safety programs at the plant?

21    A       Yes, sir.

22            Q       And that was for both Owens-Illinois and

23    Owens-Corning Fiberglas, correct?

24    A       Yes, sir.

25            Q       So from when you became a shift supervisor

GRIMMIE - Direct                                          22

1    in 1951, that was part of your responsibility and

2    continued to be part of your responsibility until the

3    time you retired?

4    A      Yes, sir.

5         Q      Now, I believe you previously indicated in

6    other testimony that you became aware of the disease,

7    asbestosis, in approximately 1947.  Is that correct?

8              MR. BERRY:  Object to the form of the

9              question.  Are you asking him whether he recalls

10             his prior testimony or is that true or not?

11        Q      Let me ask the question this way:  Is it

12   true that you became aware of the disease, asbestosis,

13   some time in 1947?

14   A      Yes, sir, I believe so.

15        Q      And did you know at that time that it was

16   a disease caused by inhaling asbestos dust?

17   A      I believe so.  Yes, sir.

18        Q      And you learned about that disease,

19   asbestosis, at the Owens-Illinois plant?

20   A      I don't know that for sure.

21        Q      All right.  Where do you believe you first

22   learned about the disease, asbestosis; from what

23   source?

24   A      Well, I really don't know.  I may have heard of

25   it before then but around 1947 is the first

1    recollection I have of it.

2            Q      Was it known to the management at the

3    Owens-Illinois plant, the disease, asbestosis, when you

4    got there in 1947?

5            MR. BERRY:  Object to the form.

6    A       I don't know.

7            Q      You knew that there was asbestos fiber in

8    Kaylo, correct?

9    A       Yes.

10           Q      And you knew that, that was harmful if it

11   got into your lungs.  Is that correct?

12           MR. McGUIRE:  Objection to the form of the

13           question.  I think you have to specify in what

14           quantities and under what circumstances.

15           MR. PLACITELLA:  All right.

16           Q      Is that correct, sir, you knew that if the

17   asbestos in Kaylo was breathed, that it could get into

18   your lungs and could injure your lungs?

19           MR. BERRY:  Objection on competency

20           grounds.

21           Q      You can answer.

22   A       Yes, sir.

23           Q      That's something you knew, correct?

24   A       That's something that I understood to be.

25           Q      Okay.  And were you aware in 1947 that the

1       asbestos that was put into Kaylo was toxic to the human

2       body.

3               MR. BERRY:  Object to the form of the

4           question.

5               MR. McGUIRE:  Object to the form of the

6           question, toxic as to non-toxic form.

7               MR. PLACITELLA:  You can object to the

8           form.

9       Q    Is that a fair statement, sir?

10              MR. McGUIRE:  Do you know what "toxic"

11          means, sir?

12   A      Explain toxic to me.

13       Q    All right.

14              MR. PLACITELLA:  Mr. McGuire, if you want

15          to ask questions later on, that's all perfectly

16          well and good.

17                  These are terms used by

18          Owens-Illinois and Owens-Corning Fiberglas

19          concerning their products and I think that

20          they're fair questions and I wish you would let

21          him answer the question.

22       Q    Do you understand what "toxic" means,

23   Mr. Grimmie?

24   A      I understand toxic to mean something that would

25   be harmful.

1           Q      All right.  And if someone told you a

2    product was non-toxic, would that mean to you, sir,

3    that they were telling you the product was not harmful?

4    A       That's what that would mean to me.

5                  MR. McGUIRE:  Objection to the question.

6           Q      Would that understanding have been any

7    different in 1950 when you worked for Owens-Illinois?

8                  MR. BERRY:  Object to the form of the

9           question.

10   A       In 1950 when I worked for Owens-Illinois?

11          Q      Yes.

12   A       No.

13          Q      Would have been the same?

14   A       Yes.

15          Q      Would it have been a fair statement by

16   Owens-Illinois, given your knowledge at the time, to

17   say that Kaylo was a non-toxic product?

18                 MR. BERRY:  Objection to the form of the

19          question.

20                 MR. McGUIRE:  Objection to the form of the

21          question, beyond the competency of the witness.

22          Furthermore, you are asking for an opinion.

23          Q      Based upon what your knowledge was at the

24   time as part of the management of Owens-Illinois, would

25   it be a fair statement to say that Kaylo was a

GRIMMIE - Direct                                    26

1      non-toxic product?

2                      MR. BERRY:  Same objection.

3                      MR. McGUIRE:  I have to object because I

4              think it's unfair.  This witness is brought here

5              to testify as to his knowledge and what he may

6              know, but to ask him whether it's fair, that

7              someone else may have characterized something in

8              a different way, I don't see how this witness

9              can answer, unless you can rephrase the question

10             as to something that lays within his competence.

11             I don't see how he can answer it.

12                     Q      If you were to characterize Kaylo in 1951,

13     Mr. Grimmie, would you have told customers it was

14     non-toxic?

15                     MR. BERRY:  Same objection.

16     A      Kaylo?  Yes, I would have told them it's

17     non-toxic.

18                     Q      Non-toxic?

19     A      Yes.

20                     Q      Why?

21     A      Kaylo is an insulating product, and you're

22     asking me about Kaylo, not the contents of Kaylo?

23                     Q      Right.

24     A      In my opinion, Kaylo is not a dangerous product.

25                     Q      And why is that?

1   A      Well, it's primarily because in its form it

2   doesn't give off any -- once it's trimmed and packaged,

3   there's no dust involved.  It's not going to leap up

4   and grab you by the throat.

5          Q      So when you trim and package it -- when

6   you trim it, dust is involved; is it not?

7   A      Yes.

8          Q      Okay.  And if you saw it, dust is

9   involved; is it not?

10             MR. McGUIRE:  Objection to form of the

11         question.  I think the witness is talking about

12         the manufacturing process and unless you mean

13         for him to be answering in terms of something

14         other than the trimming and sawing in the

15         manufacturing process, I'm going to object that

16         the witness has no foundation to understand or

17         to answer as to anyone else who may be trimming,

18         cutting or sawing.

19         Q      Let me ask the question this way,

20   Mr. Grimmie:  When the Kaylo product was trimmed and in

21   the factory the ends were trimmed as part of the

22   production process, correct?

23   A      Yes.

24         Q      And that released asbestos fiber, did it

25   not?

1    A      Yes.

2           Q      And in that context, would you say that

3    Kaylo was non-toxic, sir?

4           MR. BERRY:  Object to the form of the

5           question.

6    A      Well, it's very awkward because obviously you

7    don't understand the process at the Berlin plant and I

8    would have to say, if asbestos is toxic and if the

9    product went through the sawing process and if the dust

10   was not captured in the dust collector from a pick-up

11   hood, then, yes, it's possible that there could have

12   been a toxic substance in the air.

13          Q      Okay.  That's fair enough.

14          MR. McGUIRE:  Before we proceed,

15          can we get a stipulation on the record that the

16          objection by any one counsel will be deemed to

17          be effective as to any other party here so that

18          we don't have a chain of people, perhaps,

19          repeating each other's objections?

20          MR. PLACITELLA:  Well, I don't have a

21          problem with that, except the only two

22          objections I've heard so far is by yourself so

23          far and Mr. Berry.

24          MR. McGUIRE:  That's specifically what I'm

25          referring to.

1              MR. BERRY:  I haven't objected to a thing

2         Mr. McGuire said.

3         Q    You are aware, are you not, that

4    Owens-Illinois was involved in a five-year study on the

5    effects of asbestosis with the Saranac Laboratory?

6    A    No, sir.

7         Q    You are not aware of that?

8    A    No, sir.  I'm not aware of the fact that it was

9    a five-year study on asbestosis.

10        Q    Mr. Grimmie, I'm going to read to you from

11   page 75 of your testimony, trial testimony in the

12   McGrath case, you recall giving that, don't you?

13             MR. McGUIRE:  Give us just a second,

14        please, counsel?

15             MR. PLACITELLA:  Sure.

16             MR. McGUIRE:  Which day?

17             MR. PLACITELLA:  October 24, 1979.

18             MR. McGUIRE:  75, was it?

19             MR. PLACITELLA:  That's correct.

20        Q    You do recall testifying in that case, I

21   think you told us before, correct, Mr. Grimmie?

22   A    Yes.

23        Q    On page 75, starting at line 14, I'm going

24   to read it to you to see if it refreshes your memory,

25   okay?

1                    "Have you ever heard of Saranac

2       Laboratories or the Trudeau Institute?

3                    ANSWER:  Yes, sir."

4             Page 76:  "When did you first hear of these

5                    people?

6                    ANSWER:  Very early in my work career.  I

7             would say '47 or '48.

8                    QUESTION:  Okay.  That was in what regard?

9                    ANSWER:  I heard that there was" --

10                   MR. BERRY:  Objection.  Would you reread

11            that?

12      Q       "I heard that there was" --

13                   MR. BERRY:  How do you spell that?

14      Q       "I hear that there was a Saranac

15      Laboratory that had been retained to conduct a

16      five-year study for Owens-Illinois on the effects of

17      asbestosis to the lung area."

18                   Do you recall giving that testimony,

19      Mr. Grimmie?

20      A       Yes, sir.  I stand corrected.

21              Q       Okay.  Thank you.

22                   MR. McGUIRE:  Can we agree for the record,

23            that the testimony in question is referring to

24            information given to him as distinguished from

25            his personal knowledge at/or about the time?

1           MR. PLACITELLA:  I will note that and you

2       can do that on your portion of this deposition,

3       sir, because I don't think that's what the

4       report reflects.

5           MR. BERRY:  Can we generally agree that

6       the witness said hear --

7           MR. PLACITELLA: If you mean, we know

8       hear and heard?

9           MR. BERRY:  Yes.

10          MR. PLACITELLA:  I'm sure it reflects

11      exactly as you corrected me Mr. Berry.  I'm sure

12      if I make any correction during this deposition,

13      I think you will correct me.

14          MR. BERRY:  I'd like to think

15      they're inadvertent.

16          MR. PLACITELLA:  I would hope that that's

17      what you would think, unless proven otherwise.

18          MR. GRAHAM: Gentlemen, I don't want to pay

19      for these comments on the record.

20          (Discussion off record.)

21      Q     You are aware, sir, are you not, that as a

22  result of those experiments at the Saranac

23  Laboratories, that certain reports were generated to

24  the Owens-Illinois Company from Saranac?

25  A     Yes, sir.

1        Q     And are you aware, sir, that as a result

2    of those experiments, the Saranac Laboratory informed

3    Owens-Illinois that Kaylo was capable of causing

4    asbestosis?

5              MR. BERRY:  Object to the form of the

6         question.

7              MR. McGUIRE:  Objection to the form of the

8         question.  I don't think you laid a foundation

9         here, either.

10             MR. PLACITELLA:  All right.

11                   Let me have this document

12        marked first.

13        Q     And I'll show it to your attorney before I

14   ask you questions about it.

15             MR. PLACITELLA:  It's a November 16, 1948

16        letter from Arthur J. Vorwald to Mr. U.E. Bowes.

17             (The above-mentioned document is marked as

18             P-1 for Identification.),

19             MR. PLACITELLA:  Mr. McGuire, you are

20        familiar with this letter.

21             MR. McGUIRE:  This will be exhibit which?

22             MR. PLACITELLA:  P-1.

23             MS. TARGUM:  May I ask that the exhibits

24        be attached to the transcript?

25             MR. PLACITELLA:  No problem.

GRIMMIE - Direct                                    33

1          MR. McGUIRE:  Okay.

2     Q    I'll let you take a look at that for a

3     second, Mr. Grimmie.

4          (Witness reviewing document.)

5     Q    Have you seen that document before?

6     A    I have no recollection of seeing any documents

7     from Trudeau.  And let me explain, that I have had a

8     massive number of documents shoved in my face --

9     Q    I don't want to shove anything in your

10    face.

11         MR. BERRY:  Let him finish.

12    A    -- at trial and deposition, so if I answer no,

13    I'm answering during my work period.

14    Q    I'll clarify that.

15         This is not going to be tricky.

16    A    I have no recollection.

17    Q    Okay.  While you worked at Owens -- let me

18    ask you some questions first.

19         Do you know Mr. who Mr. Bowes was?

20    A    U. E. Bowes?

21    Q    Yes.

22    A    I think he was --

23         MR. McGUIRE:  If you know.

24         THE WITNESS:  Hum?

25         MR. McGUIRE:  If you know.

1    A    I don't know what his title was.  I've heard the

2    name.

3         Q    Would it refresh your memory if I told you

4    he was a director of research for Owens-Illinois in

5    1948?

6    A    I wouldn't dispute that.

7         Q    Do you know who Mr. Dayton was at that

8    time?  D-a-y-t-o-n.

9    A    I have no recollection of that.

10        Q    Are you aware that in 1948 Mr. Bowes also

11   served on the board of directors of Owens-Corning

12   Fiberglas?

13   A    I have no recollection of that.

14        Q    I'm going to read for the record and show

15   you the last paragraph of this letter, sir.

16        MR. McGUIRE:  Before we do that, I'm going

17        to enter an objection.  The witness already said

18        that during the time of his employment he did

19        not see this letter and, therefore, I'm at a

20        loss to understand how reading the document into

21        the record is intended to do anything here.

22             If the witness is going to be asked

23        to give his reaction in the 60 Minute style, I'm

24        going to object in advance.  But since the

25        document is being attached to the record, I fail

1          to see the point of reading it, but, of course,

2          you are free to do that.

3               MR. PLACITELLA:  I'm flattered at your

4          objection that you would think that my

5          questioning is akin to Mr. Wallace's, but, in

6          any event, I am going to go through some of the

7          these documents with him and your objection is

8          noted for the record.

9               MR. BERRY:  You think it was morally

10         safe on a bad day?

11              MR. PLACITELLA:  I thought we had

12         an agreement, Mr. Berry, objection for one

13         was an objection for all?

14         Q    The last paragraph says, "I realize that

15    our findings regarding Kaylo are less favorable than

16    anticipated.  However, since Kaylo is capable of

17    producing asbestosis, it is better to discover it now

18    in animals rather than later in industrial workers.

19    Thus the company, being forewarned, will be in a better

20    position to institute adequate control measures for

21    safeguarding exposed employees and protecting its own

22    interest."

23              I'll put this in front of you,

24    Mr. Grimmie, and ask you if that information was ever

25    conveyed to you by Owens-Illinois in 1948 when you were

1   working for them?

2              MR. BERRY:  Object to the form of the

3       question.

4       Q     The information contained in the last

5   paragraph that I've read to you?

6              MR. BERRY:  The same objection.  It's

7       an incomprehensible question with respect --

8              MR. McGUIRE:  Objection --

9              MR. PLACITELLA:  An objection for one is

10      an objection for all.  Mr. McGuire, there's no

11      reason to make any speeches.

12              Let the witness answer his question.

13             MR. McGUIRE:  I understand that.  And I

14      don't mean to repeat Mr. Berry's objection or to

15      suggest that he might have omitted something.

16      But --

17             MR. PLACITELLA:  Mr. Berry doesn't make

18      mistakes.

19             MR. BERRY:  Frequently.

20             MR. McGUIRE:  But my puzzlement

21      here is as to whether you are asking the witness

22      whether this letter was given to him, the

23      portion you read or whether, in fact, to his

24      knowledge, the company was applying the

25      precautions referred to by the Saranac

GRIMMIE - Direct                                          37

1              Laboratory and, therefore, I think any answer he

2              gives will add that qualification and it might

3              be extremely misleading on the story of the

4              incomplete record we have.

5                    MR. PLACITELLA:  All right.  Are you done?

6                    MR. McGUIRE:  Yes.

7                    MR. PLACITELLA:  Okay.  Thank you.

8         Q     Let me back up for a second, Mr. Grimmie,

9    so no one accuses me of playing tricks here, okay?

10             We've established that that document was

11   never given to you by Owens-Illinois or a copy of that

12   document while you worked for them, correct?

13   A    Correct.

14        Q     And am I also correct that, Owens-Corning

15   Fiberglas never gave you a copy of that document

16   either?

17   A    Correct.

18        Q     My question to you is:  The information

19   contained in that last paragraph about what was found

20   by the Saranac Laboratory, was that communicated to you

21   verbally or in any other memoranda by Owens-Illinois

22   during the time you worked for them?

23                   MR. BERRY:  Objection.

24   A    That's an unfair question.

25        Q     I'm sorry, sir, but I wish you answer it.

1    A      No.

2           Q      It wasn't communicated, correct?

3    A      Not the way you put it.

4           Q      Was anything communicated to you,

5    Mr. Grimmie, by Owens-Illinois concerning the results

6    of the experiments at the Saranac Laboratory?

7           MR. BERRY:   I object to the form of the

8           question.   Saying are unfair, they are unfair.

9           I would ask that you be precise about pieces of

10          information.

11          Q      You can answer the question, Mr. Grimmie.

12   A      Well, the way you put the question, I'm going to

13   have to answer no.

14          MR. McGUIRE:   Is there another way the

15          question should be put?

16          MR. PLACITELLA:   Sir, I'll ask the

17          questions, please.

18   A      You know, I feel like a bride here.   I know I'm

19   going to get something, I don't know how hard it's

20   going to be or how long, but you guys are battling back

21   and forth here, I'm up here trying to help.

22          Q      I appreciate that, sir.

23          MR. BERRY:   As do we all.

24          Q      I'm just trying to do my job, so is your

25   lawyer.

1           Let me ask you the question again.  Was

2    any information communicated to you by anyone at

3    Owens-Illinois concerning the results of the

4    experiments at the Saranac Laboratory on asbestosis in

5    animals?

6           MR. BERRY:  Object to the form of the

7       question.

8    A    Sir, I don't know if it was as a result of

9    reports from Saranac Lab., but certainly there was

10   information passed on, on the safety of the employees

11   in the plant.

12      Q    I understand that, and I'll get to that.

13   I'm asking you a specific question.  Did any of the

14   management at Owens-Illinois ever talk to you about the

15   results of the experiments at the Saranac Laboratories?

16   A    No, sir.  Not to my recollection.

17      Q    Did any of the management at

18   Owens-Illinois ever communicate to you the information

19   that was contained in the last paragraph of that letter

20   that I read to you?

21          MR. BERRY:  Object to the form of the

22      question.

23   A    No, sir.

24          MR. McGUIRE:  Let me object to the

25      question.

1          MR. PLACITELLA:  It's already been

2     answered.

3          MR. McGUIRE:  What information are we

4     talking about?  Are we talking about the

5     adequate control measures?

6          MR. PLACITELLA:  You know what?  I'll go

7     through it one at a time, Mr. McGuire, just so

8     you don't think I'm being unfair anyway.

9     Q     Let's take one sentence at a time to

10    attempt to keep you out of the wedding party and in a

11    deposition, okay, Mr. Grimmie?

12    A     Yes.

13    Q     Was it ever indicated that Kaylo was

14    capable of producing asbestosis?  Was that indicated to

15    you by anyone at Owens-Illinois?

16    A     Yes.

17    Q     And when was the first time that was

18    communicated to you?

19    A     I have no recollection of the time period.

20    Q     Was that communicated to you prior to

21    1950?

22    A     I believe so.  Yes.

23    Q     So I understand correctly then, management

24    at Owens-Illinois told you that Kaylo was producing --

25    is capable of producing asbestosis prior to 1950?

1          MR. BERRY:  Objection to form.

2          MR. McGUIRE:  Objection.

3    A      No, sir, that's not the way it was.  They told

4    me that asbestos is capable of producing asbestosis.

5          Q      All right.  My question to you, sir, is --

6    please listen to it carefully because I'm going from

7    what's in this letter, that's what your lawyer would

8    like me to do -- did they tell you that Kaylo is

9    capable of producing asbestosis?

10         MR. BERRY:  Object to the form of the

11         question.

12         MR. McGUIRE:  I object.  I think you are

13         being repetitive.  The witness is talking about

14         atmosphere in the plant.  He's trying to answer

15         your question.

16              If we're saying that they used the

17         word "asbestosis" instead of the word "Kaylo," I

18         think maybe we're quibbling.

19              If the witness is able to understand

20         the question, he can go ahead and answer.

21         MR. PLACITELLA:  Mr. McGuire, just so I'm

22         clear, are you telling me that Kaylo was

23         synonymous with asbestos in understanding of

24         this document?

25         MR. McGUIRE:  No.  I think what we're

1     trying to do is make sure the witness is

2     testifying as to his recollection.

3         MR. PLACITELLA:  I think, Mr. McGuire,

4     you're trying to disrupt this deposition to the

5     best of your ability.  That's what I think you'd

6     like to do.

7              What I'd like to do, Mr. McGuire, is

8     let the witness answer the question and get to

9     the truth.  I'm not sure how things are

10    conducted in South Jersey and Philadelphia

11    when depositions are taken but in Middlesex

12    County we try to get to where we're going by

13    asking fair questions.  And I don't think,

14    frankly, that your objections are fair and the

15    only thing you're doing is attempting to

16    obstruct every question I ask of this witness

17    and I ask that you stop it as soon as possible.

18        MR. McGUIRE:  Okay.  I'd just like to

19    briefly point out that the witness plainly is

20    trying to explain to you that the company was

21    taking precautions and you're phrasing questions

22    out of the letter in a way that are designed to

23    have him answer questions in the negative as if

24    there were no precautions being taken and I'm

25    very concerned.

1          I don't know about Middlesex County

2     but most of the other states that I practiced in

3     really try to focus on the search for the truth

4     rather than simply getting a witness to give an

5     answer that's going to be helpful or favorable

6     and that's the entire spirit in which we have

7     cooperated to produce Mr. Grimmie here and he's

8     prepared to answer all of your questions, but he

9     does mean to try to explain answers that are

10    truthful and accurate rather than being

11    misleading.

12          If that's a problem, then sobeit.

13    We're here to cooperate.

14          MR. PLACITELLA:  Mr. McGuire, I'm

15    perfectly willing to state that Mr. Grimmie is

16    trying to be cooperative.  The problem is you

17    are not letting him be.  So if you just let him

18    answer the question, maybe we could finish his

19    deposition today, sir, okay?

20          MR. McGUIRE:  Fine.

21    Q     Let me ask the question again, please.

22          Were you told in 1948 by Owens-Illinois

23    that Kaylo was capable of producing asbestosis?

24          MR. BERRY:  Object to the form of the

25    question.  Witness has already answered it?

1        THE WITNESS:  May I answer?

2        MR. McGUIRE:  Sure.

3   A     I'm not sure it was 1948 but, yes, I was told

4   that the asbestos in Kaylo would cause asbestosis.

5        Q     All right.  And just so I understand your

6   answer.  Are you telling me that if asbestos was

7   released from Kaylo when it was either cut or packaged

8   that, that was capable of causing asbestosis?  Is that

9   what you are saying?

10       MR. BERRY:  Object to the form of the

11       question.

12  A     I knew that.  Yes, sir.

13       Q     And would you agree with me that you knew

14  that from the people at Owens-Illinois prior to 1950?

15       MR. BERRY:  Object to the form of the

16       question.

17  A     I believe so.  Yes, sir.

18       Q     I will promise you, Mr. Grimmie, we will

19  get into the control measures later on, and if I don't,

20  I'm sure your attorney will tell me that I have not,

21  okay?

22       MR. McGUIRE:  Can I see the exhibits a

23       moment, please?

24       (Handing).

25       Q     Is it my understanding, Mr. Grimmie, that

1    certain control measures were taken by Owens-Illinois

2    to prevent asbestosis from resulting from cutting and

3    packaging Kaylo?

4                MR. BERRY:  Object to the form of the

5           question.

6    A       I'm going to maybe elaborate a bit.  The answer

7    is, we had dust collecting systems in the plant to

8    gather, capture all forms of dust.

9           Q       Okay.  I promise you I'm going to give you

10   all the opportunity --

11               MR. McGUIRE:  Let him finish the answer.

12               MR. PLACITELLA:  He is done.

13          Q       I promise I'm going to give you all the

14   opportunity in the world to explain that.  If I don't,

15   tell me when the deposition is over.

16               MR. BERRY:  You can tell him in the course

17          of the deposition if you want, Mr. Grimmie.

18               MR. PLACITELLA:  I'd like to have this

19          marked as P-2.

20          Q       I'm going to show you what's been marked

21   P-2 and I'll ask that your attorneys take a look at it

22   first.  I'm going to ask you some questions about it.

23               MR. PLACITELLA:  I don't need objections

24          from you, Mr. McGuire, until I ask the first

25          question.

1              MR. PLACITELLA:  P-2 for the record is the

2         October 30, 1948 interim report regarding the

3         biological activity of Kaylo dust to the

4         Owens-Illinois Glass Company by the Saranac

5         Laboratory.

6              (The above-mentioned document is marked as

7              P-2 for Identification.)

8         Q      My question to you, Mr. Grimmie, is:

9    During the time that you worked for Owens-Illinois were

10   you ever shown a copy of this report?

11   A      No, sir.  I don't have to look at it because I

12   have no recollection of any report being shown to me.

13        Q      During the time you worked for

14   Owens-Corning Fiberglas was this report shown to you?

15   A      No, sir.

16        Q      I'm going to show you a portion of this

17   report contained on page 3, which I've highlighted.

18   I'm going to read it first so the attorneys in the room

19   know what it says and then I'm going to ask you some

20   questions about it, okay?

21              The third full paragraph on page 3, the

22   following statement appears, "It is evident, therefore,

23   that a considerable portion of the asbestos component

24   in Kaylo remains unchanged during the manufacturing

25   process or, if it is changed, that the altered product

1    maintains its capacity to cause fibrosis."

2              My question to you:  Was that your

3    understanding as of 1948 concerning the properties of

4    Kaylo, Mr. Grimmie?

5    A     I had no knowledge of that, that breaking down

6    or whatever you are saying.  I knew I had been told

7    that asbestos was harmful --

8              Q     Okay.

9    A     -- if inhaled and it lodged in the lungs.

10             Q     Were you ever told that somehow the

11   asbestos was changed some way during the manufacturing

12   process?

13   A     I have no recollection of that.

14             Q     Was it your understanding that even after

15   Kaylo was manufactured, that when, for instance, in the

16   trim sawing when you cut it, asbestos fibers would be

17   released?

18             MR. BERRY:  Object to the form of the

19        question.

20             MR. McGUIRE:  Object to the form of

21        question.  You are saying after it was

22        manufactured and you're describing --

23             MR. PLACITELLA:  During the manufacturing

24        process.

25             MR. McGUIRE:  Okay.

1    A      It was my understanding that dust would be

2    released from the trim saw process?

3           Q      Would that include the asbestos dust that

4    was contained in it?

5    A      I would make an assumption and say yes.

6           MR. BERRY:  Objection.

7           Q      All right.

8    A      It would be logical, wouldn't it?

9           MR. BERRY:  Mr. Placitella certainly

10          doesn't want you to assume anything,

11          Mr. Grimmie.

12          Q      Were you aware during the time that you

13   worked for Owens-Illinois, that Owens-Illinois was

14   aware of other studies conducted at the Saranac

15   Laboratories that were sponsored by companies other

16   than Owens-Illinois?

17          MR. BERRY:  Object to the form of the

18          question.

19   A      Would you please repeat that?

20          Q      Sure.  We've just discussed studies

21   concerning the Kaylo product and animal studies at the

22   Saranac Laboratory, correct?

23   A      Yes, sir.

24          Q      Are you aware that during the time that

25   those studies were going on, the Saranac Laboratory -'s

1      doing other studies for other asbestos companies?

2                 MR. BERRY:  Object to the form of the

3            question.

4      A      No, I'm not aware of that.

5                 MR. BERRY:  Object to the

6            characterization.  Owens-Illinois was not an

7            asbestos company, it was a glass product

8            company.

9                 MR. PLACITELLA:  Mr. Berry, I think that's

10           been litigated sufficiently.  We don't have to

11           go into that at this point.

12                MR. BERRY:  Every time you make a mistake,

13           I'm obliged to correct you Mr. Placitella.

14                MR. PLACITELLA:  Certainly we have

15           disagreements with what are mistakes and what

16           are not.

17     Q      Did you know in 1948 -- I'm going to read

18     from page five, last paragraph -- that, certain

19     investigations have indicated that a seemingly

20     negligible proportion of fibrous asbestos is sufficient

21     to produce the characteristic reaction of asbestosis?

22                MR. BERRY:  I object to the form of the

23           question.  I object in the manner of proceeding.

24           The witness has said he doesn't recall the

25           document.  The incorporation of reference to the

1          document adds absolutely nothing.

2                          If you want to ask him if he

3          knew specific facts or information, then ask

4          him.

5               MR. PLACITELLA:  I think that's what I

6          did.

7               MR. BERRY:  The reference to the document

8          seems to me to add nothing when the witness has

9          not seen the document in the ordinary course.

10               MR. McGUIRE:  Do you know what this is

11          about?

12               THE WITNESS:  I would like to hear the

13          question again.

14                          No, I don't know.

15          Q    Can I ask you the question again?

16     A    Please.

17          Q    Okay.  Thank you very much.

18               Were you aware in 1948 or any time while

19     you worked for Owens-Illinois, that seemingly

20     negligible proportion of fibrous asbestos is sufficient

21     to produce the characteristic reaction of asbestosis?

22               MR. McGUIRE:  I got to enter a different

23          objection here.  You've now changed it.

24                          We thought the question was, was he

25          aware that the Saranac Laboratories report that.

1       He never saw that it actually says this.

2                I have to further object that you're

3       now making a representation here, which I don't

4       understand how this witness could know what the

5       Saranac Laboratory was doing.

6            MR. PLACITELLA:  Mr. McGuire, it's getting

7       a little silly.  You just told me I couldn't

8       reference the document.  So when I didn't, you

9       objected when I didn't reference the document.

10               Why don't we just let him answer the

11      question and then I'll proceed?

12           MR. McGUIRE:  Well, maybe we should

13      instruct him not to answer.

14           MR. PLACITELLA:  Maybe you should do that.

15      Maybe we'll make a telephone call, Mr. McGuire,

16      to see if that question is proper or not and

17      maybe we'll relate to the court that I have

18      barely asked two questions in a row without an

19      objection by you.

20               Are you going to let him answer the

21      question or not?

22           MR. McGUIRE:  Sure.  If he can.

23  A        Well, I don't know what knowledgeable in this

24  case means.

25           Q    So I understand, was it ever conveyed to

1    you by Owens-Illinois that it took a little bit of

2    asbestos to cause asbestosis?

3              MR. BERRY:  Object to the form.

4    A      No.  I'm going to have to say I have no

5    recollection of "a little bit of asbestos."

6              Q      Okay.  Was it ever indicated to you by

7    Owens-Illinois that they were told by the Saranac

8    Laboratory that the studies that were done for Kaylo

9    was an example of a negligible proportion of fibrous

10   asbestos being able to cause asbestosis?

11             MR. BERRY:  Object to the form of the

12             question.  It's compound.

13                      You can answer.

14   A      I have no recollection of that.

15             Q      Okay.  Now, at some point in time did

16   Owens-Corning Fiberglas -- well, strike that.

17             At some point in time did Owens-Illinois

18   management ever inform you that asbestos was capable of

19   causing lung cancer?

20   A      Owens-Illinois.

21             Q      Owens-Illinois?

22   A      Yes, sir, I believe so.  Oh, no.  No, I take

23   that back.  No.

24             Q      Not Owens-Illinois?

25   A      Not Owens-Illinois.

1          Q      At some point in time did Owens-Corning

2    Fiberglas management make you aware that asbestos was

3    capable of causing lung cancer?

4    A      Yes, sir.  After the newspaper article that I

5    read.

6          Q      And when was that?

7    A      I believe in the mid 1960s.

8          Q      Were you aware, sir, that Owens-Illinois

9    was informed by at least 1957 that asbestos was capable

10   of causing lung cancer?

11              MR. BERRY:  Object to the form of the

12         question.

13              MR. McGUIRE:  How can this witness know,

14         sir --

15              MR. BERRY:  Gross misrepresentation.

16              MR. McGUIRE:  Furthermore, how can this

17         witness know what was told to someone else.  I

18         don't see how he can give you an answer to that.

19         It doesn't, A:  Suggest that such communication

20         took place.  This is totally beyond his

21         competency.

22              MR. PLACITELLA:  I have the right,

23         Mr. McGuire, to explore the extent of

24         information that was conveyed to this man.

25              MR. McGUIRE:  Of course.

1            MR. PLACITELLA:  Who was in charge of

2       safety at the plant, that was Owens-Illinois and

3       Owens-Corning fiberglass and to know whether it

4       was communicated or not communicated.

5            MR. BERRY:  Mischaracterization of the

6       witness' testimony about his work history.

7            Mr. Grimmie, you are not obliged to

8       accept as true what Mr. Placitella tells you,

9       even if it's in the form of a question if it's

10      not true or you don't remember it as being true.

11           THE WITNESS:  I understand that.

12           MR. PLACITELLA:  Now, can I ask the

13      question again without 10 objections?

14      Q       Were you ever told that by 1957

15 Owens-Corning Fiberglas was aware that asbestos was

16 capable of causing lung cancer?

17           MR. McGUIRE:  Same objection.

18 A       You better rephrase that.  You said '59 -- 1957?

19      Q       That's correct.

20 A       I had no association with Owens-Corning

21 Fiberglas --

22      Q       All right.

23 A       -- at that time.

24      Q       Were you told in 1958 when you went to

25 work for Owens-Corning Fiberglas that asbestos was

1    capable of causing lung cancer?

2    A      I have no recollection of that.

3          Q      Now, I want to talk to you about some of

4    the control measures that I told you we would have the

5    opportunity to discuss, okay?

6    A      (Motioned).

7          Q      Am I correct, that by 1947 Owens-Illinois

8    had in its plants a respirator program?

9    A      Yes, sir.

10         Q      And that those respirators involved were

11   the kind of respirators that use removable filters?

12   A      Yes, sir.

13         Q      And did they have removable filters by

14   1957 when you went to work there?

15   A      Yes, sir.

16         Q      And were some respirators of that type or

17   a more advanced type available at Owens-Illinois and

18   Owens-Corning Fiberglas during the entire time that you

19   worked there?

20   A      Yes, sir.

21         Q      And as part of your responsibilities at

22   Owens-Illinois and Owens-Corning Fiberglas, were you

23   active in the campaign to get employees to wear these

24   respirators?

25   A      Yes, sir.

1          Q      And did you actually instruct, while you

2    were at Owens-Illinois, the employees on the dangers of

3    not wearing a respirator?

4    A      Yes, sir.

5          Q      And while you were at Owens-Corning

6    Fiberglas, did you also instruct the employees on the

7    dangers of not wearing respirators?

8    A      Yes, sir.

9          Q      Am I correct, sir, that one of the ways

10   that you instructed the employees was to actually,

11   while you were at Owens-Illinois, was to actually put

12   notices on the bulletin boards in the plant?

13   A      Yes, sir.

14         Q      And would the same be true for

15   Owens-Corning Fiberglas?

16   A      Yes, sir.

17         Q      Am I correct, sir, that while you were at

18   Owens-Illinois, truck drivers who worked in the plant

19   were required to wear respirators?

20   A      Yes, sir.

21         Q      And am I correct, that while you were at

22   Owens-Corning Fiberglas, truck drivers who worked in

23   the plant were required to wear respirators?

24   A      Yes, sir.

25         Q      Am I correct, sir, that while you worked

1   for Owens-Illinois, maintenance men who worked in the

2   plant were required to wear respirators?

3   A      We better clarify here.  There were certain

4   areas in the plant that were designated respirator

5   area.  Anyone working in that area, not just passing

6   through, working in those areas, were required to wear

7   respirators.

8           Q     All right.  Let me explore that a little

9   bit.

10          Was one of the respirator areas the trim

11  saw area?

12  A      Yes, sir.

13          Q     I want to make sure I understand it, was

14  the trim saw area the area where the finished Kaylo

15  product was taken and trimmed with a saw before being

16  put into a package?

17  A      I'm not being critical, the finished Kaylo

18  product would be after the trim saw.

19          Q     Okay.

20  A      The processed Kaylo product was taken to the

21  trim saw to be finished and then packaged.

22          Q     All right.  So is it correct to say that

23  the last step in the manufacturing process before

24  packaging was the trim saw area?

25  A      No, sir.

1          Q      What was the last step?

2     A      Well, for a period of time we were putting a

3     canvas jacket on or aluminum jacket, so I would have to

4     say the packaging area would be the last in the

5     process.

6          Q      All right.  Let's focus on the trim saw

7     area just for a second and see if I can get it

8     straight.

9               The trim saw area is where they took the

10    Kaylo product and they trimmed the ends off, correct?

11    A      That's part of it.

12         Q      And that was done with a saw, correct?

13    A      Yes, sir.

14         Q      In that area, that was a respirator area,

15    correct?

16    A      Yes, sir.

17         Q      So anyone who worked in that area, not

18    just pass through, but anyone who worked in that area

19    had to wear a respirator, correct?

20    A      For a period of time, yes.

21         Q      And was this during the time you were at

22    Owens-Illinois?

23    A      Yes, sir.

24         Q      And Owens-Corning Fiberglas?

25    A      For a period of time, yes.

GRIMMIE - Direct                                    59

1          Q     When you say "period of time," what do you
2    mean by that?
3    A     Well, after we improved the dust collecting
4    system to the point that tests showed it was no longer
5    a hazardous area, then we relieved the people of
6    wearing a respirator.
7          Q     Okay.  Let's focus during the time --
8    let's break down the time period to be fair with your
9    qualification.
10               While you were at Owens-Illinois, were
11   people who worked in the trim saw area required to wear
12   respirators?
13   A     Yes, sir.
14         Q     And was that limited simply to the people
15   who were doing the trimming themselves?
16   A     Those working in the area.
17         Q     All right.  So if a maintenance man was
18   doing work in the area and he was there for say a full
19   day, would he be required to wear a respirator?
20   A     Yes.
21         Q     And if a millwright was working in the
22   area, would he be required to wear a respirator?
23   A     Yes, sir.
24         Q     And if a truck driver or laborer were
25   working in the area for an extended period of time,

GRIMMIE - Direct 60

1  would they be required to wear a respirator?

2  A     Yes, sir.

3         Q     And if somebody was just sweeping up the

4  area with a broom, would they be required to wear a

5  respirator?

6  A     Yes.

7         Q     Now, when you first went to Owens-Corning

8  Fiberglas, was it required that people working in the

9  trim saw area wear respirators?

10  A     Yes.

11         Q     And did truck drivers working in the

12  trim saw area have to wear respirators?

13  A     Yes.

14         Q     Would millwrights?

15  A     Yes.

16         Q     Would maintenance men?

17  A     Yes.

18         Q     Would laborers?

19  A     Yes.

20         Q     Would clean-up men?

21  A     Yes.

22         Q     Okay.  You told me that the last step in

23  the manufacturing process, I believe, was putting the

24  product in the package --

25  A     Yes.

1          Q      -- correct?

2                 Did the men while you were working at

3    Owens-Illinois who were physically taking the product

4    and putting it in the package, were they required to

5    wear respirators?

6    A      I don't believe so.

7          Q      Were the men --

8    A      May I clarify?

9          Q      Sure.

10   A      If a canvas jacket was being applied, no,

11   because the piece of ware was wet down with liquid

12   paste and the dust was eliminated.

13         Q      So let me explore that a little bit.

14                Under what circumstances would you have to

15   put a canvas jacket and/or not put the canvas jacket

16   on?

17                Was that a customer's special

18   specification?

19   A      No, sir.  That was standard procedure.  If a

20   customer required no jacket, then we would make it that

21   way.  But standard material was with a jacket.

22         Q      Okay.  And part of the procedure for

23   putting the jacket on would be to wet down the material

24   in order to glue the jacket on?

25   A      Wet it down with liquid paste.

1        Q      Okay.  And that would suppress the dust

2    that would emanate from the product.  Is that correct?

3    A      That one -- that was one of the benefits we got

4    from it.

5        Q      Now, I believe you previously testified

6    that people who packaged Kaylo were given respirators.

7    Were you talking about when the Kaylo did not have a

8    jacket on it?

9    A      Yes, sir.

10               MR. BERRY:  Objection.  Belated objection

11          to the form of the question.

12        Q      Under those circumstances where you

13    were -- had an employee packaging Kaylo without a

14    canvas jacket, would anybody who worked in that area be

15    required to wear a respirator?

16    A      Passing through?  No.

17        Q      I'm saying working in, as you've defined

18    before?

19    A      Yes.

20        Q      And that, again, would include

21    millwrights?

22    A      Yes.

23        Q      Maintenance people?

24    A      Yes.

25        Q      Truck drivers?

GRIMMIE - Direct                    63

1   A      Yes.

2          Q      The men who were loading Kaylo into trucks

3   or boxcars, were they -- that were put in boxes, were

4   they required to wear respirators while you were at

5   Owens-Illinois?

6   A      Not to my recollection, no.

7          Q      What about when you were at Owens-Corning

8   Fiberglas?

9   A      Not to my recollection.

10         Q      Now, you indicated at some point -- well,

11  strike that.

12                Was ventilation equipment also installed

13  in the Owens-Illinois Kaylo plant during the time you

14  worked there?

15  A      Would you define "ventilation"?

16         Q      Certainly.  Let me try to be more

17  specific.

18                I believe you indicated before that dust

19  collection equipment was installed in the area where

20  the Kaylo was cut in the Berlin plant, correct?

21  A      Yes, sir.

22         Q      And was that during the time that

23  Owens-Illinois owned the plant?

24  A      Yes.

25         Q      And could you answer for me, Mr. Grimmie,

1    if you know, why that dust collection equipment was

2    needed if a respirator program was being enforced?

3    A      Yes.   Dust is a nuisance, and we collected dust

4    to keep the nuisance problem down.

5           Q    I'm not sure you answered the question and

6    you tell me if you did.

7                My question was:   If the respirator

8    program was being enforced in the trim saw area, why

9    was it necessary to put ventilation equipment or dust

10   collecting equipment in that area --

11               MR. BERRY:   Object to the form of the

12         question.

13         Q      -- if you know?

14               MR. BERRY:   If you, in fact, can tell

15         Mr. Placitella that.

16   A      Well, I don't understand a question like that,

17   so I don't know.

18         Q      That's fair.

19               MR. PLACITELLA:   Off the record.

20               (Recess.)

21               MR. PLACITELLA:   Ready, counsel?

22               MR. McGUIRE:   Why I'm ready.   Let's wait

23         for Mr. Berry.

24         Q      Mr. Grimmie, have you taken any medication

25   today that would in any way impede your ability to

1    testify here?

2    A       No, sir.

3            Q       You told me about some of the control

4    programs and we spoke about respirators.

5            I'd like to ask you about some other

6    areas, okay?

7    A       Yes, sir.

8            Q       When you were at Owens-Illinois, did they

9    have a program where they would give their employees

10   annual X-rays?

11   A       Yes, sir.

12           Q       And did they also have X-rays as part of a

13   pre-employment examination?

14   A       Yes.

15           Q       What was the purpose, if you know, of

16   giving X-rays for pre-employment exams?

17   A       It was part of the health examination for

18   pre-employment.

19           Q       And what was the purpose of administering

20   annual chest X-rays to employees?

21   A       For comparison reasons, as I understood it.

22           Q       What do you mean by comparison reasons as

23   you understood it?

24   A       As I understood, the annual X-ray would be

25   compared to the last annual and the original to see if

1   there was any change in the lung area.

2           Q      And they were specifically concerned about

3   changes in the lung area?

4                  MR. BERRY:  Objection to the form of the

5           question.

6   A       That's usually what a chest X-ray is for.

7           Q      And can you tell me, sir, how many people

8   in the Owens-Illinois plant participated -- well,

9   strike that.

10                 Did everyone in the plant participate in

11  the annual physical with X-rays?

12  A       I'll have to question, if by in the plant you

13  are including office people?

14          Q      Yes.

15  A       No.

16          Q      Did all people other than office people

17  participate in the annual X-ray?

18  A       Yes.

19          Q      And that would include truck drivers,

20  maintenance people and the like, correct?

21  A       Yes.

22          Q      Now, am I correct, sir, that in the early

23  1950s many people actually missed their annual X-rays?

24                 MR. BERRY:  Object to the form of the

25          question.

GRIMMIE - Direct                         67

1      A       Not to my knowledge.

2              Q    All right, sir, I'm going --

3              MR. PLACITELLA:  Can you mark this,

4      please?

5              Q    I want to show you what's been marked P-3

6      for Identification, which is a letter from Mr. Preston

7      E. Gillis, dated November 26, 1951.

8              (The above-mentioned document is marked as

9              P-3 for Identification.)

10             Q    Who was Preston E. Gillis?

11     A       He was a former employee of Owens-Illinois.  He

12     worked in the personnel department in Sayreville and

13     Berlin.

14             Q    All right.  Now, I'm going to show you

15     this letter and ask you if that is what you understand

16     to be Owens-Illinois Glass Company letterhead as of

17     1951?

18             (Witness reviewing document.)

19             MR. BERRY:  What's the pending question?

20             MR. PLACITELLA:  If he recognizes that

21     letter.

22     A       I believe that was Owens-Illinois letterhead.

23             Q    Do you recognize the signature of

24     Mr. Preston on that particular document?

25             MR. BERRY:  Mr. Gillis, you mean?

GRIMMIE - Direct

68

1       Q     Mr. Gillis?

2   A     I couldn't dispute it.  I --

3              MR. McGUIRE:  Does that mean you don't

4         know?

5              THE WITNESS:  I don't know if Preston

6         signed that.

7       Q     Do you have any reason to doubt that he

8   signed it?

9   A     I would have no reason to doubt that.

10      Q     Now, this is sent to the attention of a

11  Mr. E. H. Marks.  Do you know who he was?

12  A     I believe I know the name, Ernie Marks.

13      Q     Did he work for Owens-Illinois at the

14  time?

15  A     I believe so.  Yes.

16      Q     And do you know in what capacity?

17  A     No.  I don't recall.

18      Q     It's also cc'd to a Mr. Hazard.  Were you

19  aware of who he was at the time, W. G. Hazard?

20  A     I know a Bill Hazard.  I have met Bill Hazard.

21      Q     He was an industrial hygienist for

22  Owens-Illinois at the time?

23  A     That was my understanding.

24      Q     It was also cc'd to Dr. C F. Shook.  Were

25  you aware of him at the time?

1      A       I believe Dr. Shook was the corporate physician.

2              Q       And also to a Mr. G. W. Walker.  Were you

3      familiar with him?

4      A       What's the initial?

5              Q       G. W. Walker?

6      A       George Walker was, I believe, the plant manager

7      at that time.

8              Q       At Berlin?

9      A       Yes, sir.

10             Q       And the first sentence in this letter

11     says, "In reviewing the Annual X-ray Program here at

12     Berlin, we have found that one-hundred and eighty

13     people missed an annual X-ray last year."

14             Does that refresh your memory that in 1950

15     one-hundred and eighty people missed their X-rays at

16     Owens-Illinois?

17     A       I have no knowledge of that.  That sounds like

18     the entire plant population.

19             Q       Would you have any reason to dispute this,

20     sir, from the personnel director?

21             MR. BERRY:  Object to the form of the

22             question.

23             MR. McGUIRE:  Objection to the form of the

24             question.

25     A       Would I dispute it?

GRIMMIE - Direct                                    70

1          Q      Yes.

2     A      No, I can't dispute it.

3          Q      Now, sir, you told me that one of the

4     reasons for taking X-rays was to monitor the employees'

5     health from year two year, correct?

6     A      Yes, sir.

7          Q      Was another reason also to use the X-rays

8     in case there was a legal case brought against

9     Owens-Illinois?

10              MR. BERRY:  Objection.

11              MR. McGUIRE:  Objection.

12     A      I have no knowledge of that.

13              MR. PLACITELLA:  Could you mark this,

14          please?

15              (Letter dated September 2, 1952 to Whitie

16              is marked as P-4 for Identification.)

17              MR. BERRY:  Can I see that, Chris?

18              MR. PLACITELLA:  I'll show it to you in a

19          second.

20              MR. BERRY:  Mr. Grimmie, I'd like you not

21          to answer until we've had a chance to see the

22          letter.

23                  I'm directing him not to answer.

24              MR. PLACITELLA:  How can you do that,

25          Mr. Berry, you are not for Owens-Illinois?

Brody & Geiser (908) 738-8555 or (212) 732-0644

1           MR. McGUIRE:  I'm directing him.

2           MR. PLACITELLA:  Oh, all right.

3      Q      In 1952 were you aware of a man that

4  worked at Sayreville by the name of J. J. Hoffman?

5  A      Yes, sir.

6      Q      Who was J. J. Hoffman?

7  A      I believe he was a personnel manager.

8      Q      Who was O. W. Pfeifer?

9  A      O. W. Pfeifer was a plant manager at Sayreville.

10     Q      And was there somebody called, to your

11  knowledge, Whitie, W-h-i-t-i-e, as a nickname or Whitey

12  (sic)?

13  A      Whitie, we had a Whitie Sharff, S-h-a-r-f-f.

14  I don't --

15     Q      I'm going to show you a letter dated

16  September 2, 1952, unsigned, addressed to

17  Mr. J. J. Hoffman, Sayreville, which reads:

18           "Dear Whitie:

19           Reference your letter of August 27th,

20  covering storage of X-ray films, am not surprised that

21  it is becoming a problem.  I plan on visiting your

22  plant this fall and can advise you better then.

23           We have never set any time limit on X-rays

24  as we never know when we will need them for legal

25  evidence.  Personally, I think we should keep them as

1    long as the employee lives.

2                    A memorandum covering all medical records,

3    including X-ray films, will be issued as soon as our

4    Legal Division presents an opinion."

5                    MR. McGUIRE:  Can we stipulate for the

6                    record, that Dr. Shook is stating in 1952 what

7                    is apparently now the OSHA policy on the

8                    retention of medical records?

9                    MR. PLACITELLA:  Is it OSHA policy,

10                   Mr. McGuire, that you retain them for legal

11                   evidence?

12                   MR. McGUIRE:  You simply are legally

13                   required to retain them Mr. Placitella, okay?

14                   It's a rather interesting spin but that's

15                   fine.

16          Q     Do you see that letter, Mr. Grimmie?

17    A     Did I ever see it?

18          Q     Have you ever seen that letter before?

19    A     No, sir.

20          Q     Were you aware back in 1951 that

21    Owens-Illinois was holding on to the records and one of

22    the reasons was to save them in case they needed them

23    for legal evidence?

24                   MR. BERRY:  Object to the form of the

25                   question.

1      A        That's a two-part question.

2               Q        Were you aware that one of the purposes of

3      maintaining the records of X-rays was to be used for

4      legal evidence in the future, sir?

5      A        No, sir.

6                        MR. PLACITELLA:  Being we mark this the

7               next one?

8                        MR. PLACITELLA:  P-5 for the record is a

9               June 16, 1952 memo from Mr. Hazard to a C. W.

10              Howard, with attachment.

11                       (The above-mentioned document is marked as

12                       P-5 for Identification.)

13              Q        I'm going to show it to your attorney

14     before I ask you questions.

15                       Mr. Grimmie, before I ask you some

16     questions about this document, were you aware in 1952

17     that Owens-Illinois was already planning to defend

18     medical/legal cases arising out of their plant?

19                       MR. BERRY:  Objection to the form of the

20              question.

21     A        No.

22              Q        Were you aware of that?

23     A        No.

24                       MR. BERRY:  Objection.

25                       MR. McGUIRE:  What plants are you talking

GRIMMIE - Direct                    74

1       about.   Owens-Illinois had a lot of plants.

2                MR. PLACITELLA:   Out of the Kaylo plant.

3       Q       Were you aware that they were already

4    planning on how they were going to defend cases that

5    would arise out of the Berlin plant, medical/legal

6    cases?

7                MR. BERRY:   Asked and answered.   The

8                witness said no.

9    A       No, sir.

10       Q       Did you ever have any discussions with

11   anyone at Owens-Illinois about the potential for

12   medical/legal cases to be brought concerning injury to

13   the lung at that time?

14   A       No, sir.

15       Q       Let me just show you what's been marked

16   P-5 for Identification.

17                (Witness reviewing document.)

18       Q       I'm going to ask you whether the first

19   page of this document accurately sets for the X-ray

20   program as it existed at Owens-Illinois in 1952.

21                MR. McGUIRE:   Do you understand the

22                question now?

23   A       I believe the question --

24       Q       The question is, whether that memoranda

25   accurately sets for what the X-ray program was at the

1    Berlin plant as of 1952?

2    A       Not to my recollection.

3            Q       How was the X-ray program different then?

4    A       I have no recollection of an exit X-ray.

5            Q       Other than an exit X-ray, does it set

6    forth the plant plan as you knew it to exist in 1952?

7    A       The numbers and the time periods, I'm going to

8    say no.  The rest of it, yes.

9            Q       Do you have any reason to doubt that this

10   is, in fact, an internal memoranda of Owens-Illinois

11   concerning the X-ray program in Berlin in 1952?

12           MR. BERRY:  Object to the form of the

13           question.

14   A       It appears to be.  Yes.

15           Q       Would that be the form that it would have

16   taken in terms of layout and everything else?

17           MR. BERRY:  Object to the form of the

18           question.

19   A       Yes, sir.

20           Q       Do you recognize the signature of

21   Mr. Hazard?

22   A       No, I don't.

23           Q       You are not familiar with that signature?

24   A       No, I'm not.

25           Q       The second page concerns a chest X-ray

GRIMMIE - Direct                                    76

1    schedule for Kaylo employees based upon the number of

2    employees as of May 31, 1952.

3              I ask you to look at that and tell me

4    whether that's accurate, to the best of your knowledge?

5              (Witness reviewing document.)

6    A     There are some things on here I know nothing

7    about.  The number of employees in each department, I

8    don't remember that.

9         Q     Would you have any reason to doubt the

10   numbers as they existed there?

11             MR. BERRY:  Objection to the form of the

12        question.

13   A     I have no reason to doubt that.

14        Q     Tell me if I'm reading the last paragraph

15   underneath correctly, it says --

16             MR. McGUIRE:  We'll stipulate you're

17        reading it correctly.

18             MR. PLACITELLA:  That's okay.  I want to

19        read it for the record.

20        Q     "X-rays should be made on 14x7" film.

21   Minature films are not reliable for detection and

22   identification of pulmonary changes caused by breathing

23   asbestos dust - especially in the early stages.  This

24   is especially true if a case is presented for

25   medical/legal action."

1          Did I read that correctly, sir?

2     A     I understood you to say 14 by 7?

3          Q     Is that what it says 14 inches by 7

4     inches?

5     A     I see 14 by 17.

6          Q     All right.  With that change, did I read

7     it correctly, sir?

8               MR. McGUIRE:  Can you remember what he

9          read?

10              THE WITNESS:  Well, I'm reading what he

11         read.

12         Q     Why don't you read it, Mr. Grimmie,

13    because Mr. McGuire thinks that I can't read?  So why

14    don't you read it accurately?

15              MR. BERRY:  Objection just based on the

16         evidence to date.

17              MR. McGUIRE:  You are simply reading

18         pieces of the document to him and asking him if

19         you read it correctly?

20              MR. PLACITELLA:  That's correct.

21              MR. McGUIRE:  Since we're going to attach

22         these things, whether you read it correctly or

23         not, probably doesn't make any difference

24         inasmuch as the document be there.

25              MR. PLACITELLA:  Fine.

GRIMMIE - Direct                                78

1          Q      Let me ask the question again so the

2    record is not trashed, okay, Mr. Grimmie?

3              This document states underneath -- let me

4    see if I can get it right this time.

5              MR. McGUIRE:  Let's go off the record a

6          second.

7          Q      "X-rays should be made on 14x17" film" --

8              MR. McGUIRE:  We have a problem.

9          Q      -- "Miniature films are not reliable for

10   the detection and identification of pulmonary changes

11   caused by breathing asbestos dust - especially in the

12   early stages.  This is especially true if a case is

13   presented for medical/legal action."

14             Did I read that correctly, Mr. Grimmie?

15             MR. McGUIRE:  I'm going to object and

16        instruct him not to answer.  How can he tell

17        without the document in front of him?  The thing

18        says what it says.

19         Q      Mr. Grimmie, can you do me a favor?

20   Please, read the last paragraph.

21             (The witness complies.)

22   A      "X-rays should be made on 14x17" film.

23   Miniature films are not reliable for" the something

24   "and identification of pulmonary changes caused by

25   breathing asbestos dust - especially in the early

1    stages.  This is especially true if a case is presented

2    for medical/legal action."

3           Q     Thank you, sir.

4                 Now, Mr. Grimmie, am I correct that you,

5    yourself, have asbestosis?

6    A     That is correct.

7           Q     And that was diagnosed in approximately

8    1977?

9    A     I believe that's correct.

10          Q     And that was diagnosed by an Owens-Corning

11   Fiberglas plant physician?

12   A     Yes.

13          Q     And you started work in 1947, correct?

14   A     Correct.

15          Q     So it took approximately 30 years for your

16   asbestosis to show up, correct --

17                MR. BERRY:  Object to the form of the

18                question.

19          Q     -- on X-ray?

20   A     Well, I can't agree with that because prior to

21   the time I went into the Army in World War II, I worked

22   at New York Ship Building Cooperation in the insulation

23   department.

24          Q     Okay.  In Camden, New Jersey?

25   A     In Camden, New Jersey.

GRIMMIE - Direct                                    80

1          Q     And did you actually do some insulation

2    work yourself there?

3    A     Yes.

4          Q     So more than 30 years you were first

5    exposed, you were diagnosed with asbestosis, correct?

6    A     Yes.

7          Q     You do understand, do you not, that that

8    time period from first exposure to diagnosis is

9    something known as latency?

10              MR. BERRY:  Object to the form of the

11         question.

12              MR. McGUIRE:  Is it something you know?

13              THE WITNESS:  I've been told of a period

14         of time before the disease shows itself.

15         Q     Let me ask you the question this way:

16   When you went to work for Owens-Illinois, did you

17   understand that it took a number of years from the time

18   you could be exposed until you would possibly develop a

19   disease from asbestos?

20   A     Not immediately when I went to work.

21         Q     When was the first time you were familiar

22   with the concept that it would take a number of years

23   from your -- the time you were first exposed to get the

24   disease?

25   A     Well, all I can say is some time after I

GRIMMIE - Direct                                      81

1   started.  It may have been a year or two.  I really

2   don't know.

3            Q       Before 1950, sir?

4   A        I believe so.  Yes.

5            Q       Were you aware, then, at least by 1950

6   that it would take a number of years from the time an

7   individual was exposed before disease would show up on

8   X-ray?

9   A        Yes.

10           MR. McGUIRE:  Objection to form.

11           Q       Did you have an understanding at that time

12  approximately how many years that would be?

13           MR. BERRY:  Object to the form of the

14           question.

15           MR. McGUIRE:  Furthermore, under what

16           conditions of exposure are we talking about?  I

17           don't know see how the witness, assuming he had

18           the expertise to answer it, would be able to

19           give a good answer.

20           Q       You can answer it, sir.

21  A        From what I had heard, 20 years was the term

22  that I heard.

23           Q       So when you were working for

24  Owens-Illinois, you were told by somebody at

25  Owens-Illinois that it would take at least 20 years

GRIMMIE - Direct                                    82

1    before the effects of asbestos would show up on someone

2    who was exposed to asbestos?

3              MR. BERRY:  Objection to the form of the

4         question.

5    A    I don't know if it was an Owens-Illinois

6    employee that told me that.

7         Q    Let me ask the question this way:  Were

8    you aware while you worked for Owens-Illinois that it

9    would take approximately 20 years before asbestos

10   disease could show up on X-ray from someone who was

11   exposed to asbestos dust?

12   A    Yes.

13        Q    Sir, would you have expected that someone

14   who went to work at Owens-Illinois in 1948 would have

15   had any demonstration of asbestos disease before

16   1958 --

17             MR. BERRY:  Object to the form of the

18        question.

19        Q    -- if they were exposed to asbestos then?

20   A    I can't answer that.

21        Q    Why is that, sir?

22   A    Well, I don't have that expertise to answer a

23   question like that.  You should have asked that

24   question of a doctor.

25        Q    Would you have any reason to believe,,

1    sir, that if someone who was working at Owens-Illinois

2    and was exposed to asbestos dust in 1950 would have

3    X-ray evidence of asbestos disease prior to 1958?

4              MR. BERRY:  Objection.  The witness has

5         already said it's beyond his competency.

6    A    No.

7              MR. PLACITELLA:  I think he answered no.

8         Q    Your answer?

9    A    That's my answer.  I wouldn't have known that.

10        Q    Okay.  At some point in time when you

11   worked for Owens-Corning Fiberglas, they actually went

12   and did an epidemiologic survey of the plant workers,

13   did they not?

14   A    I don't -- I don't remember.

15        Q    That's a bad question.  I'm sorry, let me

16   rephrase it.

17             You know, Dr. Konzen, don't

18   you?

19   A    Yes.

20        Q    Did there come a time in approximately

21   1970 where Dr. Konzen went and looked at the X-rays

22   himself or someone in the Owens-Corning Fiberglas

23   medical department looked at the X-rays to determine if

24   employees showed X-ray changes from asbestos exposure?

25   A    I have some recollection of that.

GRIMMIE - Direct                                    84

1       Q      And that was part of a study that

2  Owens-Corning Fiberglas was conducting of its own

3  employees, correct?

4  A      I don't know what the purpose of it was.

5       Q      Okay.  You are familiar with a man by the

6  name of Clarence Adams?

7  A      Yes, sir.

8       Q      All right.  And did he work in the

9  finishing and packaging department as well as the

10 maintenance department for both Owens-Illinois and

11 Owens-Corning Fiberglas?

12 A      Would it be a conflict to tell you he was my

13 brother-in-law?

14      Q      I don't think so, sir.

15 A      The answer is yes.

16      Q      And was he hired, sir, in approximately

17 1956 by Owens-Illinois?

18 A      No.  I have no recollection of a hire date but I

19 won't dispute it, if that's the record.

20      Q      And are you aware as to whether that man

21 was ever diagnosed with asbestosis, sir?

22 A      I heard that he was.

23      Q      You are familiar with a man by the name of

24 William Cassario?

25 A      Yes.

GRIMMIE - Direct                                              85

1          Q     Did he work for both Owens-Illinois and

2    Owens-Corning Fiberglas?

3    A     Yes.

4          Q     And did he work in the finishing and

5    packing department?

6    A     Yes.

7          Q     Did he also work in the warehouse?

8    A     Bill Cassario?  I don't remember that.

9          Q     Are you familiar with a man by the name of

10   William Jose, J-o-s-e?

11   A     I kr   a bill Joes (phonetic).

12         Q     Is that how you say it?  Sorry.

13   A     Yes.

14         Q     Did he start working for Owens-Corning

15   Fiberglas in approximately 1961?

16   A     After he retired from the Navy, yes.

17         Q     Did he also work in the finishing and

18   packing?

19   A     Yes.

20         Q     You are familiar with Thomas McGrath, are

21   you not?

22   A     Yes.

23         Q     Did he also work in finishing and packing?

24   A     Yes.

25         Q     Did he start in approximately 1957 at

1      Owens-Illinois?

2      A       I would say that, yes.

3              Q       Are you familiar with a William Bodine?

4      A       Yes.

5              Q       And did he work in maintenance for

6      Owens-Corning Fiberglas?

7      A       Yes.

8              Q       Did he start working there in

9      approximately 1959?

10     A       That's best of my recollection.

11             Q       Are you aware of a Charles Congron,

12     C-o-n-g-r-o-n?

13     A       Yes.

14             Q       And did he work in maintenance?

15     A       Yes.

16             Q       And did he work for both Owens-Illinois

17     and Owens-Corning Fiberglas in maintenance?

18     A       Yes.

19             Q       Charles Elliott, are you familiar with

20     him?

21     A       Yes.

22             Q       Did he also work in maintenance?

23     A       Yes.

24             Q       And he started the same year you did at

25     Owens-Illinois, didn't he?

1    A    Yes.

2         Q    Did he start in the maintenance gang with

3    you?

4    A    He was a mechanic.

5         Q    Okay.  And did he work for both

6    Owens-Illinois and Owens-Corning Fiberglas?

7    A    Yes.

8         Q    Raymond, and I'll spell this one,

9    G-a-n-g-l-u-f-f-?

10   A    Gangluff.

11        Q    Did he work for Owens-Corning Fiberglas?

12   A    Yes.

13        Q    And did he also work in the maintenance

14   department?

15   A    Yes.

16        Q    And did he start in Owens-Corning

17   Fiberglas in approximately 1967?

18   A    I would believe so.  Yes.

19        Q    Charles Schaffer?

20   A    Yes.

21        Q    Was he also in maintenance?

22   A    Yes.

23        Q    Did he start with Owens-Corning Fiberglas

24   in approximately 1962?

25   A    Yes.

1          Q      Ivan Benstead?

2    A     Bensted (sic).

3          Q      Did he start with Owens-Illinois in

4    approximately 1955?

5    A     Yes.

6          Q      What department did he work in?

7    A     Oh, I only remember him on the security force as

8    a guard.

9          Q      He was a security guard?

10   A     Yes.

11         Q      He didn't work in the hands-on in

12   production, did he?

13   A     I can't say that.  I have no recollection of it.

14         Q      Let me ask you about this one, John

15   Rhoads.  Did he work in production?

16   A     John Rhoads was a quality assurance supervisor,

17   manager.

18         Q      Did he work hands-on in production?

19   A     No.

20         Q      And did he start at Owens-Corning

21   Fiberglas in approximately 1961?

22   A     No.  We better fess up here.  John Rhoads worked

23   in Berlin.  He trained in Berlin, went to Sayreville.

24   Now John, we may have John Rhoads, Jr. on that.

25         Q      Okay.  Was there a John Rhoads, Jr.?

1    A      Yes.

2           Q      And did he work at Berlin?

3    A      Yes.

4           Q      And did he begin in approximately 1961 or

5    so at Owens-Corning Fiberglas?

6    A      I believe so.

7           Q      Did he work in production?

8    A      Yes.

9           Q      What did he do?

10   A      I don't remember.

11          Q      George Singley, did you know him?

12   A      Yes.

13          Q      Did he start working at Owens-Corning

14   Fiberglas in approximately 1966?

15   A      I wouldn't dispute it.

16          Q      What did he do, if you recall?

17   A      I believe he was in finishing and then he went

18   to the security guard.

19          Q      Frank Pino, P-i-n-o?

20   A      Yes.

21          Q      Are you familiar with him?

22   A      Yes.

23          Q      He worked in Owens-Illinois before you got

24   there, correct?

25   A      Yes.

GRIMMIE - Direct                                                     90

1          Q      Was he in maintenance?

2     A      Yes.

3          Q      Did he continue to work for Owens-Corning

4     Fiberglas after the take over?

5     A      Yes.  As a supervisor.

6          Q      Harry Copeland, are you familiar with him?

7     A      Yes.

8          Q      Was he hired by Owens-Illinois in

9     approximately 1952?

10    A      '52?

11         Q      Yes.

12    A      Yes.

13         Q      Did he work in pouring and then in

14    finishing and packing?

15    A      I remember Harry in finishing and packaging.  I

16    don't remember him in pouring, but that doesn't say he

17    didn't.

18         Q      George Zepp, are you familiar with him?

19    A      Yes.

20         Q      Was he hired by Owens-Illinois in

21    approximately 1950?

22    A      Yes.  You are going down death row here, aren't

23    you?

24         Q      Well, we'll get to that.

25                Did he continue to work for Owens-Corning

1    Fiberglas?

2    A       Yes.

3            Q       And did he also work in finishing and

4    packing?

5    A       Yes.

6            Q       Gerald Southard, are you familiar with

7    him?

8    A       Sutterd (sic).  Yes.

9            Q       Did he start working in Owens-Illinois the

10   same year you did, 1947?

11   A       Yes.  I don't remember.  I won't dispute it.

12           Q       Did he also work in finishing and packing

13   as well as maintenance?

14   A ·     Yes.

15           Q       And did he continue to work for

16   Owens-Corning Fiberglas?

17   A       Yes.

18           Q       Are you aware that all these men were a

19   subject of a study done by Dr. Konzen in 1970 that we

20   discussed before?

21   A       No, I'm not aware of that.

22           Q       This is the first time you've heard of

23   that?

24   A       Yes.

25                   MR. PLACITELLA:  I want to have this

GRIMMIE - Direct                           92

1        marked.

2             Q    I'm going to show you what's been marked

3    P-6 and I'll have your attorney look at it and then I'm

4    going to ask you just a couple questions about it

5             Q    I'm going to show you what's been marked

6    P-6, Mr. Grimmie, which I represent to you is produced

7    by Owens-Corning Fiberglas in the case of Jamison,

8    dated October 16, 1989, Docket No. 87-L1230?

9                  (The above-mentioned document is marked as

10                 P-6 for Identification.)

11                 MR. McGUIRE:  What's the docket number

12        again?

13                 MR. PLACITELLA:  87-L1230.

14                 MR. BERRY:  New Jersey case?

15                 MR. PLACITELLA:  No, not a New Jersey

16        case.

17                      I think this was a Virginia case.

18        I'm sure there are counsel that might be

19        familiar with that.

20                 MR. O'DONNELL:  It's not a Virginia case.

21            Q    I represent it was produced by

22    Owens-Corning Fiberglas and their files.

23                 MR. BERRY:  It's not a representation you

24        have to accept.

25                 MR. PLACITELLA:  If it's necessary to

1              prove, Mr. Berry, I'll prove it.

2              Q       This is a spread sheet with 16 columns, am

3     I correct?  I'm describing this for the record.

4     A       16 is correct.

5              Q       Can you read for the record the names of

6     each column?

7     A       Column No. 1, age.  Column No. 2, date of hire.

8     Column No. 3, years of service.  Column No. 4,

9     department.  No. 5, dust level.  No. 6.  Time on job.

10    No. 7, sketal change.

11             MR. McGUIRE:  Can you read that?

12             THE WITNESS:  I don't know what that says.

13             Q       Okay.  Next?

14    A       The next one, I can't read that.

15             Column No. 9, bronchial trees.  No. 10,

16    intestinal fibrosis.

17             MR. McGUIRE:  Or is that interstitial, or

18             can you read it?

19             Q       Does it say interstitial fibrosis, sir?

20    A       No. 11, I can't read that.  No. 12, pleura.

21    No. 13, other.  No. 14, I can't read that.  I can guess

22    but I won't.  No. 15 is blank and No. 16, comment.

23             Q       Okay.  Let's focus on No. 14.  Would you

24    agree that that states "Radiological Abnormality

25    Noted"?

GRIMMIE - Direct                                        94

1              MR. McGUIRE:  Witness said he wouldn't

2         want to guess.

3    A    Well --

4         Q    Is that a fair reading of that, sir?

5    A    It appears to say that.

6         Q    "Radiological Abnormality Noted"?

7    A    Yes.

8         Q    And I've asked you for a good 10 minutes

9    before this, all of the information, concerning these

10   men in terms of the first four columns, have I not?

11             MR. BERRY:  Object to the form of the

12        question.

13   A    Name, age.  You didn't ask me -- their --

14        Q    Let me --

15   A    -- date of hire.  Years of service, you didn't

16   ask me.  Department, you did.

17        Q    The information that's contained in the

18   first four columns for these men, is it accurate to

19   your understanding?

20   A    I can't answer that.

21        Q    All right.  Sir, looking at Column No. 14

22   for a Mr. George Zepp, under "Radiological Abnormality

23   Noted," does it say, sir, the year 1956?

24             MR. BERRY:  Object to the form of the

25        question.  The document, to the extent it's

1       legible speaks for itself.  If it's admissible,

2       if you want to get it admitted through this

3       witness, maybe you could ask him if he had

4       ever seen it before.  I don't see much purpose

5       in having this witness read a document he's

6       having trouble reading.  Probably not a good use

7       of time for any of us here.

8               MR. McGUIRE:  Furthermore, obviously there

9       is a Best Evidence Rule because obviously there

10      is someone's summary station of data, the

11      accuracy of which, or the actual interpretation

12      of which is not plain to us here.

13                  If you want the witness to read a

14      couple things, we object, but he can do it.  But

15      we're not going to have him spend the whole day

16      here having him read things he isn't sure of.

17              MR. PLACITELLA:  Can I ask the question

18      again?

19              MR. McGUIRE:  Sure.

20      Q       The document in front of you, Mr. Grimmie,

21  was that ever shown to you by anyone in Owens-Corning

22  Fiberglas medical department?

23  A       Not to my recollection.

24      Q       Do you recognize any of the handwriting on

25  it?

1    A      No, I don't.

2           Q      Do you have any reason to doubt from the

3    review of the document the accuracy of the information

4    located on it?

5                  MR. BERRY:  Objection to the form.

6                  MR. McGUIRE:  Objection.  The witness

7           can't answer that.  He doesn't have the medical

8           records, he doesn't know who prepared it and

9           he doesn't know the basis on why it was

10          prepared.

11                 I'm directing him not to answer it.

12          Q      Let me ask the question again of you,

13   Mr. Grimmie.  In looking at Column 14, with respect to

14   George Zepp, under "Radiologic Abnormality Noted," does

15   it not say the year 1956?

16                 MR. BERRY:  Object to the form of the

17          question.  The document speaks for itself.

18   A      Yes.

19          Q      And that was during the time, 1956, when

20   Owens-Illinois owned the plant, wasn't it?

21   A      Yes.

22          Q      Were you aware in 1956 that Mr. Zepp had

23   anything wrong with his lungs?

24                 MR. BERRY:  Object to the form of the

25          question.

1  A       Not to my recollection.

2          Q       Is that something that would have been

3  ordinarily communicated to you in your capacity in

4  1956?

5          MR. BERRY:  Object to the form of the

6          question.

7  A       I don't recall what my capacity was in 1956.

8          Q       Do you remember what job you had?

9  A       I just don't remember.

10         Q       You don't remember in 1956 what job you

11 had?

12 A       Believe it or not, no.

13         Q       Were you production supervisor?  Does that

14 refresh your memory?

15 A       If that's what it says, you have the advantage.

16         Q       That's what you testified to earlier this

17 morning, sir.

18 A       Okay.

19         Q       As a production supervisor in 1956, would

20 information concerning disease found in the employees

21 be something that would be communicated to you by the

22 company physician?

23         MR. BERRY:  Object to the form of the

24         question.

25 A       Not necessarily.

1        Q      Were you aware that Clarence Adams had

2    "Radiological Abnormality Noted" in 1959?

3               MR. BERRY:  Objection.

4               MR. McGUIRE:  Objection to the form of the

5               question.  The witness has no expertise to

6               answer that question.

7        Q      Were you ever told that?

8    A     No.

9        Q      Sir, you are familiar with the term

10   "threshold limit of value," are you not?

11   A     I've heard that.

12       Q      Do you know what it means?

13   A     I believe so.

14       Q      Okay.  Am I correct that you really can't

15   recall the first time you heard that term?

16   A     You are correct.

17       Q      Are you familiar with a person by the name

18   of L. B. Moffet?

19   A     L. B. Moffet?

20       Q      M-o-f-f-e-t of Owens-Illinois?

21   A     I have no recollection of that name.

22       Q      Okay.  Are you familiar with the TLV being

23   5 million -- prior to 1968, being 5 million particles

24   per cubic foot of asbestos-containing dust?

25   A     Yes.

1          Q      That was your understanding?

2     A      Yes.

3          Q      Now, you are familiar with a Lynn Shall,

4     are you not?

5     A      Who?

6          Q      Lynn Shall used to work for New Jersey

7     Department of Health?

8     A      Lynn Shall?  I have no recollection.

9          Q      At some point in time, sir, did you become

10    aware that Aetna was performing dust surveys in the

11    Kaylo plant?

12    A      Yes.

13         Q      And was that even prior to 1958?

14    A      I don't like to assume something.  I believe so.

15         Q      Were you aware that prior to 1958 in the

16    sawing area that we discussed before, the trim saw

17    area, that the TLV was being exceeded?

18              MR. BERRY:  Object to the form of the

19              question.

20    A      No.  I have no direct recollection of that.

21         Q      Do you have a recollection of the TLV ever

22    being exposed in the packaging area?

23    A      Ever being exceeded?

24         Q      Yes.

25    A      Yes.

1          Q    When was the first time you came to know

2     that the TLV was being exceeded in the packaging area?

3     A    I don't remember.

4          Q    Was it during the time that you worked for

5     Owens-Illinois?

6     A    I don't remember.

7          Q    Would it be fair to say, Mr. Grimmie, that

8     the conditions that existed in 1958 when Owens-Corning

9     Fiberglas took over the Kaylo plant were substantially

10    similar to that when Owens-Illinois owned the plant?

11             MR. BERRY:  Object to the form of the

12             question.

13    A    At that period of time, yes.

14         Q    And would it be also fair to say that if

15    anything after 1958, the dust conditions in the plant

16    got better than they were when Owens-Illinois owned the

17    plant?

18             MR. BERRY:  Object to the form of the

19             question.

20    A    Improvements were made.

21         Q    Is the answer yes?

22             MR. BERRY:  The answer is "improvements

23             were made."

24    A    Yes.

25         Q    Let me ask the question again.  Is it fair

1    to say that after Owens-Corning Fiberglas took over the

2    plant in 1958, the conditions concerning dust in the

3    plant were improved over that which existed when

4    Owens-Illinois owned the plant?

5              MR. BERRY:  Object to the form of the

6         question.

7    A    We had an expansion program, new equipment was

8    added and the new equipment improved the condition.

9         Q    The answer is yes?

10   A    The answer is yes.

11        Q    Okay.  You are familiar with a man by the

12   name of Durwood Stayton (phonetic)?

13   A    Yes.

14        Q    And he was the inspector for Aetna, was he

15   not?

16   A    Yes.

17        Q    And did he inspect the Owens-Illinois

18   plant for safety purposes while you worked there?

19   A    I believe so.  Yes.  The only hesitation I have

20   is the time period, but he inspected the plant.

21        Q    While it was owned by Owens-Illinois and

22   Owens-Corning Fiberglas -- let me rephrase that.

23              Did he do the inspections while

24   Owens-Illinois owned the plant?

25   A    I believe so.

GRIMMIE - Direct                                    102

1          Q      And do you know whether he did similar

2     inspections after Owens-Illinois Fiberglas took over

3     the plant?

4     A      I'm confused because there was an inspector from

5     Aetna, Paul Shoe, and I believe he was before Pat

6     Stayton, and I'm confused on the time period.

7          Q      All right.  We'll go to some documents and

8     we can help out a little bit.

9                 Did you have discussions with Mr. Stayton

10    about dust in the plant?

11    A      Yes.  I'm sure I did.

12         Q      Are you also familiar with a man by the

13    name of Robinson who worked for Aetna?

14    A      I know of Robby Robinson.  I can't place him.

15         Q      Was he an inspector who did dust surveys

16    in the plant, to your recollection?

17    A      I don't recall Robby being an inspector.

18         Q      Okay.  Let me show you what's been -- what

19    will be marked P-7 after your attorney has a chance to

20    look at it.

21                MR. PLACITELLA:  Referring to P-7, which

22                for the record is Special Hazard Dust Survey

23                prepared for Owens-Illinois, Kaylo Division,

24                Berlin, New Jersey by a F.W. Sehl.

25                (The above-mentioned document is marked is

Brody & Geiser (908) 738-8555 or (212) 732-0644

1                    P-7 for Identification.)

2              Q    Sehl's, is that the name you were trying

3    to remember for us, Sehl?

4    A    Sehl?

5              Q    What was the name you were trying to

6    remember before, who was the inspector for

7    Owens-Illinois?

8    A    Paul Shoe?

9              Q    Shoe?  Okay.

10             MR. PLACITELLA:  And it's blurred but

11             looks like it's S-e-l, J.M. Robinson.  April

12             28th and May 2, 1958.

13             Q    While you were at --

14             MR. PLACITELLA:  S-e-h-l.

15             Q    While you were at Owens-Illinois, were you

16   ever shown a copy of this document.

17             (Witness reviewing document.)

18             MR. BERRRY:  I think that's physically

19             impossible.

20             MR. PLACITELLA:  No.  I know your

21             argument, I don't think it is.

22   A    No, I have no recollection of it.

23             Q    Okay.  in 1958 was Mr. Pfeiffer the plant

24   manager for Owens-Illinois?

25   A    Yes.

1       Q       And was Mr. Justin the personnel director?

2   A       Yes.

3       Q       Was a Mr. Cassario the personnel

4   assistant?

5   A       Yes.

6       Q       And, Mr. Grimmie, you were production

7   superintendent then, correct?

8   A       Yes.

9       Q       Was Mr. Gardner safety director for

10  Owens-Illinois at that time?

11  A       I don't remember.

12      Q       And Mr. Paul Shoe, that was the man you

13  were talking about before?  He was the Aetna safety

14  engineering representative who serviced the plant at

15  that time, correct?

16  A       I believe so, yes.

17      Q       The first paragraph of this document

18  indicates, "The purpose of this visit was to determine

19  the employee exposure to dust in production

20  operations."

21          The second paragraph says, "Contacts:

22  Mr. F. W. Sehl and the writer contacted Mr. Pfeiffer,

23  Plant Manager, Mr. Justin, Personnel Director,

24  Mr. Cassario, Personnel Assistant and Mr. Grimmie,

25  Production Superintendent.  Also present were

1    Mr. Gardner, Safety Director for Owens-Illinois, and

2    Mr. Paul Shoe, Aetna Safety Engineering Representative

3    who services this plant."

4                Do you recall in approximately April/May

5    1958, having a meeting with people from Aetna and

6    others at Owens-Illinois concerning a dust survey that

7    was done at that point in time?

8    A       I don't recall the specific meeting or any other

9    meeting.

10             Q       You don't have a specific recollection of

11   this meeting?

12   A       No, I don't.

13             Q       All right.  Were the results of the dust

14   surveys conducted by Aetna communicated to you in your

15   capacity as a production superintendent for

16   Owens-Illinois?

17                MR. BERRY:  Objection to the form of the

18             question.

19   A       In any areas of responsibilities, yes.

20             Q       In 1958, what were your areas of

21   responsibility?

22   A       Evidently the production and finishing area,

23   batch, mixing, production, finishing.

24             Q       Would that include the horizontal

25   splitting saw area?

1    A      Yes.

2           Q      Would that include the flat ware finishing

3    area?

4    A      Yes.

5           Q      And would information concerning dust

6    inspections on those areas done by Aetna be

7    communicated to you?

8                  MR. BERRY:  Object to the form of the

9           question.  You mean was it communicated?

10          Q      In your capacity, was that something that

11   would have been communicated?

12   A      Yes.

13          Q      Now, have I shown you this?

14                 MR. McGUIRE:  Yes, you did and he didn't

15          see it or doesn't remember seeing it.

16   A      I have no recollection of this document.

17          Q      I just want you to look at the first page.

18                 (The witness complies.)

19          Q      I didn't see you turn the page over.

20   A      Well, I looked at the first page and -- just the

21   first page?

22          Q      Look at the whole document.  The reason I

23   said that, I only saw you look at the first page

24   before.

25                 (Witness reviewing document.).

1              MR. BERRY:  Is this all prefatory to him

2         having seen the document because I recall him

3         saying no?

4         Q      You've had the opportunity to review the

5    whole document.

6              Can you recall seeing this document

7    before?

8    A      No, sir.

9         Q      Are you familiar with any of the

10   information contained in this document?

11             MR. McGUIRE:  That's rather broad, "any

12        information."

13             MR. PLACITELLA:  I'll narrow it down.

14        Q      Sir, let me ask the question.

15   A      The question is?

16             MR. BERRY:  He's going to try another one,

17        Mr. Grimmie.

18        Q      Let me ask the question this way,

19   Mr. Grimmie:  Were you aware as of 1958 as reflected in

20   this document that the TLV was exceeded in the

21   horizontal splitting saw area?

22             MR. BERRY:  Object to the form of the

23        question.

24             MR. McGUIRE:  Let me see the document,

25        please?

1    A       I have no recollection of that.

2            Q      Okay.

3                   MR. McGUIRE:  At the time of the

4            measurement?

5            Q      While Mr. Berry is looking at that, let me

6    ask you a couple other questions.

7                   Were you aware in 1958 that the TLV was 5

8    million particles per cubic foot of asbestos-containing

9    dust?

10                  MR. BERRY:  Object to the form of the

11           question.

12                  MR. PLACITELLA:  What's wrong with the

13           form, Mr. Berry?

14                  MR. BERRY:  That assumes that the witness

15           can make a distinction between asbestos dust and

16           asbestos-containing dust.

17                  MR. PLACITELLA:  I'm asking him the

18           question, Mr. Berry.  I know your argument, I'm

19           asking him the question.

20           Q      Are you aware in 1958 of the TLV of

21    5 million particles per cubic foot for

22    asbestos-containing dust?

23                  MR. BERRY:  Same objection.

24    A       I have have no recollection of that.

25           Q      Do you know in 1958 whether you were aware

1     of the TLV at all?

2                    MR. McGUIRE:  You mean whether it was

3            asbestos or asbestos --

4                    MR. PLACITELLA:  I'm not asking him that,

5            any of that.  Save that for the judge.

6            Q     What?

7     A      I have no recollection of that.

8            Q     That's what I'm trying to understand.  You

9     have no recollection of a TLV or what the TLV was?

10    A      I know what a TLV is.  I think I know.  I don't

11    know when I learned it.

12           Q     Okay.  What is your understanding that the

13    TLV was 5 million particles per cubic foot for

14    asbestos-containing dust?

15                   MR. BERRY:  Object to the form of the

16           question.  Same objection as before.

17    A      I don't remember when I learned that.

18           Q     Did there come a point in time when you

19    learned that to be the case?

20    A      Yes.

21                   MR. BERRY:  Object to the form of the

22           question.

23                   MR. PLACITELLA:  Can I have the document

24           now, Mr. Berry?

25                   MR. BERRY:  For sure.

1               MR. PLACITELLA:  Thank you.

2          Q    I'm going to refer you on the first page

3     of this document where it says "Air Sample No. 4,

4     Flatware Finishing - Charging end - taken at breathing

5     level of operator feeding flat ware to the trim saw."

6               Do you see that?

7     A    Yes.

8          Q    And can you tell me what that document

9     indicates in terms of the dust count as of 1958 --

10              MR. BERRY:  Object to the form of the

11         question.

12         Q    -- at that area?

13              MR. BERRY:  Object to the form of the

14         question.  The document speaks for itself.  The

15         witness has said he doesn't have any

16         recollection of ever seeing the document.

17              MR. McGUIRE:  Furthermore, I think the

18         witness has already explained this was one of

19         several areas where respirators were required.

20         So that the effect of our record, could be a

21         little misleading.

22              MR. PLACITELLA:  In what way, Mr. McGuire?

23         Let me understand.

24              MR. McGUIRE:  The document then goes on to

25         explain that there's a respirator program which

1      is designed to deal with those areas where the

2      TLV at the time of the measurement was being

3      exceeded.

4              So that on one hand when you ask him

5      wasn't the TLV being exceeded, well, that may be

6      true but the other side of the question is the

7      witness has already explained that there was

8      another precaution, that is the respirators.

9      MR. PLACITELLA:  Mr. McGuire, you are

10     willing to stipulate that the TLV was being

11     exceeded, that's why respirators were being used

12     in this area of the plant?

13     MR. BERRY:  I'm not.

14     MR. PLACITELLA:  Is that something

15     you are willing to stipulate?

16             But it sounds like you are.

17     MR. McGUIRE:  I can't stipulate.

18     MR. PLACITELLA:  And then we can cut down

19     a lot of questions.

20     MR. BERRY:  Mr. Placitella, I think we can

21     cut down a lot of questions anyway.

22             The document does speak for itself.

23     You can ask him if he knew in point of time what

24     a dust measurement was at a particular

25     operation.  He doesn't know or does know.

GRIMMIE - Direct                                          112

1              You can ask him if his

2      recollection is refreshed by seeing a document

3      that he says he hasn't seen before.

4              I mean, you know?

5          MR. PLACITELLA:  I can ask the questions I

6      want to ask.

7          MR. BERRY:  That's true.  Whatever

8      falls out from that, falls out.

9          MR. PLACITELLA:  Fine.

10         MR. PLACITELLA:  You are willing to

11     stipulate, Mr. McGuire, Mr. Berry, that if this

12     document is used in any proceedings it speaks

13     for itself?

14         MR. BERRY:  Mr. Placitella, I'm not even

15     willing to concede it's an admissible document

16     and authenticate.

17         MR. PLACITELLA:  It's already been

18     numerous times, Mr. Berry.

19              You are well aware of it, including

20     against your complaint.

21         MR. BERRY:  I don't have to stipulate to

22     anything.

23         MR. PLACITELLA:  I'm not asking you to.

24     You just said it speaks for itself.

25         Q    Why don't we do this, Mr. Grimmie, you

1  have to take a pill with food right about now, do you

2  not?

3  A       Pretty soon.

4          Q       Why don't we break for lunch and we'll

5  come back and we'll talk a little bit more about this,

6  okay?

7                  (Luncheon recess taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               A F T E R N O O N   S E S S I O N

2               MR. PLACITELLA:  Mark this, please.

3               (Report dated October 23, 1968 is marked

4               as P-8 for Identification.)

5       Q    Mr. Grimmie, hopefully I'll move things

6   along this afternoon a little quicker so you can beat

7   the rush hour traffic home.

8   A       I appreciate it.

9       Q    Let me just back up a little bit to make

10  sure I understand what your testimony is.

11              Do you ever recall receiving reports from

12  Aetna in connection with your responsibility that air

13  samples in certain areas were elevated beyond a

14  reasonable TLV?

15              MR. McGUIRE:  "A reasonable TLV"?

16              MR. PLACITELLA:  Right.

17              MR. McGUIRE:  I object to the form of the

18          question.

19              MR. PLACITELLA:  All right.

20  A       Receiving reports?  No.

21      Q    Do you want to say something else?

22  A       Well, I remember hearing and being directed to

23  certain actions to take, I believe, which as a result

24  of reports that were made.

25      Q    Well, let me read to you your trial

```
 1    testimony in October 24, 1979, at page 176 starting at

 2    line 10:

 3                    "QUESTION:  Do you ever recall receiving

 4            reports from Aetna in connection with your

 5            responsibility that air samples in certain areas

 6            were elevated and beyond a reasonable TLV?

 7                    ANSWER:  Yes.  I have a recollection of

 8            that."

 9                    Does that refresh your memory,

10    Mr. Grimmie?

11    A       If you have these answers, why are you asking me

12    these questions?

13            Q       Can you answer my question?

14    A       Yes, my recollection is --.

15            Q       Refreshed?

16    A       Okay.  Go ahead.

17            Q       You did receive such reports, correct?

18    Correct?  Correct, you did?

19    A       Correct what?

20            Q       You did receive such reports?

21    A       Evidently.  Yes.

22            Q       You now remember that having my shown you

23    your testimony from a trial that you testified in, in

24    the McGrath case, correct?

25    A       Yes, you have refreshed my memory.
```

GRIMMIE - Direct                                              116

1        Q     Okay.  And am I correct, that you were

2   informed that the TLV was exceeded in areas where

3   sawing of Kaylo was done in the Berlin plant?

4   A     Yes.

5        Q     And am I correct, that you were also

6   informed that the TLV was exceeded in areas where

7   packaging was done of Kaylo in the Berlin plant?

8   A     Yes.

9        Q     Now, let me go back now and show you P-7

10  and ask you if this refreshes your recollection in

11  connection with your McGrath testimony as to whether

12  you received such a report?

13            MR. BERRY:  I object to the form of the

14            question.  The witness has already answered.

15            (Witness reviewing document.)

16  A     What was the question?

17       Q     Does that refresh your memory, sir, now

18  having recalled your testimony in McGrath as to whether

19  you saw this report back in 1958?

20  A     No.  I don't remember that report other than

21  what was shown to me a little while ago.

22       Q     Okay.  Were you made aware of the results

23  of this report in 1958, sir, even if the report was not

24  shown to you?

25  A     I was made aware of conditions around the plant

1      pertaining to dust.  Whether it was as a result of that

2      report or not, I don't know.

3           Q     Well, let me read you from page 86 of your

4      testimony of October 24, 1979 in the McGrath trial,

5      sir.

6                 MR. McGUIRE:  Page 86?

7           Q     Starting on page 5.

8                 "Were there reports that would come into

9           the plant in regard to the dust survey?

10                MR. McGUIRE:  page 5?

11                MR. PLACITELLA:  86.

12                MR. BERRY:  Line 5.

13          Q     Line 5.

14                "ANSWER.  Yes, sir."

15                And page 87:  "And were you made aware of

16          the results of the reports?

17                "ANSWER:  Yes, sir."

18                Sir, I'm going to show you, if I may,

19     certain items.  Let me show you an item marked D-78 for

20     Identification, entitled "Special Hazard Survey Dust

21     Survey by Aetna Casualty Surety."  At the bottom,

22     prepared for Owens-Illinois, dated April 28th and May

23     2, 1958.

24                And I represent to you, sir, that this is

25     within less than a week of the time that the change

1    over was made between Owens-Illinois and Owens-Corning.

2    It's just almost precisely at that time.

3                  Does that part of the transcript refresh

4    your memory as to --

5                  MR. BERRY:  Wait.  Wait.  Wait.

6                  MR. PLACITELLA:  Let me finish.

7                  MR. BERRY:  No.

8                  MR. PLACITELLA:  Then you can make your

9           objection.

10                  MR. BERRY:  When an answer to the question

11           is "I have no recollection of that," that's an

12           unfair question.

13                  MR. PLACITELLA: No.  Let me finish the

14           question and then you can make your objection,

15           okay?

16           Q     Do those questions and those answers

17    refresh your memory of whether you ever saw this report

18    in 1958?

19                  MR. BERRY:  I object to the question.

20    A     I have no recollection.

21                  MR. McGUIRE:  I move to strike the

22           answers you're referring to.  They are simply

23           read portions of the very exhibit and the

24           witness answered.  So that the record is

25           complete.

1              MR. PLACITELLA:  Why don't you let me

2         finish because I have another question and then

3         you can make your objection, okay?

4              MR. McGUIRE:  Very good.

5         Q    You have the transcript in front of you,

6    Mr. McGrath?

7              MR. McGUIRE:  Grimmie.

8              MR. BERRY:  Grimmie.  Mr. McGrath was the

9         plaintiff in the case.

10        Q    And then they talk about a number of

11   recommendations that are made and it's asked whether

12   the recommendations were done and you state at page 88,

13   "I have no recollection of that."  Is that correct?

14             MR. BERRY:  I object to the form.

15             MR. McGUIRE:  What is it you're referring

16        to, the report, the specific time or what?

17        Q    Let's read the whole thing, okay,

18   Mr. Grimmie?  Leaving off, it's just almost precisely

19   at that time.

20             I draw your attention to page 3 of the

21   survey in regard to Air Sample No. 3 and show you that

22   it says, Air Sample No. 3 shows a dangerously high

23   count.  Air Sample No. 4" -- and I'm only reading part

24   of it -- Air Sample No. 4 shows a high count, also.

25             There are a number of recommendations in

1    this report and I draw your attention to Figure 1A.  It

2    says, "A review should be made of the present

3    respiratory program in order to bring it up to

4    Owens-Illinois standard and should include the

5    following:  A:  Two respirators should be provided for

6    each employee exposed to dust so that one respirator

7    can be cleaned, checked and sterilized while the other

8    is being used."

9              "Was that done, sir?

10             ANSWER:  I have no recollection of that."

11             Was that your testimony in the McGrath

12   case, sir?

13   A     Well, the court reporter wouldn't lie, would he?

14        Q     Doesn't it say in this testimony, sir,

15   that you never received a copy of the report and you

16   have no recollection?

17             MR. BERRY:  Objection.  I request that the

18             witness not answer that, although I'm sure the

19             jury is impressed.

20             MR. PLACITELLA:  Fine.

21        Q     Let's walk-through the report now,

22   Mr. Grimmie.

23             Under Air Sample No. 4 on page two.  It

24   indicates, "Flatware Finishing - Charging end - taken

25   at breathing level of operator feeding flat ware to the

GRIMMIE - Direct                                    121

1    trim saw.  46.3 million particles per cubic foot of

2    air."

3              Were you made aware, sir, in 1958 that the

4    dust count and the flatware finishing area was 46.3

5    million particles per cubic foot?

6    A    I have no recollection of being made aware of

7    that.

8         Q    And the next air sample reading, No. 5, on

9    the same page says, Flatware Finishing - Turnover at

10   Rubber - taken at breathing level of operator.  9.5

11   million particles per cubic foot of air."

12             Were you ever made aware of that reading

13   in 1958, sir?

14   A    I have no recollection of that.

15        Q    Next reading, next page, -- page 2, Air

16   Sample No. 6, "Packaging - Taken at the breathing level

17   midway between two men filling boxes.  11.5 million

18   particles per cubic foot of air."

19             Were you made aware of that reading in

20   1958, sir?

21   A    I have no recollection.

22        Q    Going to page 3, under Air Sample No. 3,

23   which corresponds --

24             MR. McGUIRE:  I object to this.  The

25             witness has already explained to you, he has not

1           seen the document, he obviously does not know

2           its particular content and you are going to

3           spend the next couple of pages just reading him,

4           to have him say no, he has no recollection which

5           is his original answer.

6                MR. PLACITELLA:  If that's so, if he's

7           going to testify he was in charge of production

8           at, and safety at this plant, he has no idea

9           whatever about the dust counts, that's fine.

10   A      That's a crock of canal water.

11        Q      That's fine.  Let me ask you some

12   questions.  You weren't at the wedding.

13           It states on page 3, "Air Sample No. 3

14   shows a dangerously high count.  In the operation here,

15   which is the splitting of flat ware on a band saw, the

16   man removing the pieces separates the two pieces and

17   the dust is due to this handling of the ware.  The band

18   saw itself does not create too great a problem, as it

19   is equipped with a dust collector which is working

20   quite effectively.  We feel that an exhaust system

21   should be installed which will remove this excessive

22   dust from the breathing area of the man.  We noted that

23   this operator was not wearing a respirator.  Use of a

24   respirator for this operation should be mandatory."

25           Were you made aware of that by Aetna or

1    anybody else at Owens-Illinois or Owens-Corning

2    Fiberglas on/or about 1958?

3    A      Would you mind reading that again?

4           Q    Sure.  I'll give it to you again, sir.

5    A      I don't want to read it, I can't.  That's

6    blurry.

7           Q    It's not blurry.  Why don't you try it,

8    sir.  Your lawyer can read it to you.

9           MR. McGUIRE:  Which part?

10           MR. PLACITELLA:  Where it says "Air Sample

11           No. 3."

12           MR. McGUIRE:  Okay.  Well, I'm going to

13           object because the witness has already explained

14           that this was a respirator area and the

15           recommendation here was that a respirator should

16           be mandatory.

17                  Are you able to read this,

18           Mr. Grimmie?

19           THE WITNESS:  Well, I just missed the

20           area he was talking about.  That's the splitting

21           saw.  I had no recollection of that.

22           Q    Were you made aware of that?

23    A      I have no recollection of being made aware of

24    that.

25           Q    Are you aware of a meeting in 1958

1   involving the department managers who had, in fact,

2   received this report, sir?

3   A     I have no recollection of that meeting.

4        Q     Let me read to you from your testimony of

5   December 18, 1984, sir, page 38, line 19.

6              "Now, in 1958, did you become aware while

7        you were working for Owens-Corning that

8        threshold limit values were being exceeded in

9        certain parts of the plant?"

10             MR. McGUIRE:  Page 39?

11             MR. PLACITELLA:  38, line 19.

12       Q     "ANSWER:  I have a recollection of that.

13       Yes, sir.

14             QUESTION:  How did you become aware of it,

15       if you recall?

16             ANSWER:" --

17             MR. McGUIRE:  That's not our page 38.

18             MR. PLACITELLA:  December 18, 1984.

19             MR. McGUIRE:  Sorry, wrong date.

20             MR. PLACITELLA: Page 39.

21             MR. McGUIRE:  Hold on.

22       Q     I'll start again.  Stephen Copperafy

23   (phonetic), Civil Action No. 81-2,000, December 18,

24   1984.

25             MR. McGUIRE:  Do you want to show the

1          witness the transcript?

2                  MR. PLACITELLA:  Don't you have it with

3          you?

4                  MR. McGUIRE:  No, I don't.

5                  MR. PLACITELLA:  I'm sorry.  Well, sure.

6          Q     Let me start to read it again, sir, then

7     I'll show you the transcript, okay?

8                  "Now, in 1958 did you become aware while

9          you were working for Owens-Corning that

10         threshold limit values were exceeded in certain

11         parts of the plant?

12                 ANSWER:  I have a recollection of that.

13         Yes, sir.

14                 How did you become aware of it, if you

15         recall?

16                 ANSWER:  I believe in a morning meeting,

17         the plant manager announced to all of the

18         department managers that he had received a

19         report.

20                 QUESTION:  From whom?

21                 ANSWER:  We needed work.  I don't recall

22         from where, and that was generally the way the

23         information was conveyed whenever a survey

24         was made.

25                 QUESTION:  When you say "morning meeting,"

GRIMMIE - Direct                                    126

1          who attended that?

2                ANSWER:  All the department managers and

3          the plant manager."

4                Would that refresh your recollection as to

5     whether --

6     A     I don't remember that specific report.

7          Q     All right.  Do you remember other reports,

8     sir?

9     A     No.

10         Q     Let me go back to page 3 where it says,

11    "Air Sample No. 4 also shows a high count also.  As in

12    the operation discussed in the above paragraph, the

13    dust is not due to a sawing operation but rather to a

14    handling of the flat ware.  The operator in placing the

15    flat ware on the line stirs up considerable dust.  The

16    saw collector itself appears to be working effectively.

17    Here again we feel that an exhaust system should be

18    considered for removal of the dust from the breathing

19    level of this man.  At the time of this visit, the

20    operator was wearing a respirator and we feel that this

21    is essential for this work."

22                Do you recall being informed of that in

23    1958, sir?

24    A     I have no recollection of that.

25                MR. McGUIRE:  Of that report?  Of that

1          report?

2                    THE WITNESS:  That's what he's reading

3          from, isn't it?

4          Q      Air sample No. 6, page 4, "Air sample

5      No. 6 was taken at the packaging of flat ware.  Here

6      two men were placing the flat ware in cartons.  Again

7      the dust was due mainly to the handling operation.  We

8      would like to see both men wearing respirators for this

9      operation."

10                   Were you made aware of that in 1958, sir?

11     A      I have no recollection of that.

12     Q      Sir, in 1949 were you ever made aware --

13     well, strike that.

14                   At any time that you worked for

15     Owens-Illinois, were you ever made aware that dust

16     studies were done of men loading Kaylo into boxcars?

17     A      I have no recollection of that.

18                   MR. PLACITELLA:  Can I have this marked?

19     Q      I'm going to show you what's been marked

20     P-9 for Identification.  I ask you to take a look at

21     it.

22                   MR. PLACITELLLTA:  P-9 is a November 10,

23          1949 letter from William Hazard, signed

24          "Sincerely yours, Bill, Industrial Relations

25          Division," to Mr. J. F. McMahon, Managing

1          Director, Industrial Hygiene Foundation of

2          America.

3                  (The above-mentioned document is marked as

4                  P-9 for Identification.)

5                  MR. BERRY:  Was there a P-8?

6                  MR. PLACITELLA:  Yes, it's coming.

7                  MR. BERRY:  Okay.

8                  (Witness reviewing document.)

9          Q      Sir, have you ever seen that letter

10   before?

11   A       Not to my recollection.

12         Q      Would you agree with me that this is on

13   Owens-Illinois Glass Company stationery?

14   A       It appears to be, yes.

15         Q      I'm referring to a portion of the third

16   paragraph that I have highlighted, which states, "While

17   all the fabricating operations are equipped with good

18   dust exhaust systems, there is a dust exposure when

19   finished slabs are stacked in box cars for shipment.

20   Recent dust counts show this to range from about 25 to

21   50 million particles per cubic foot as sampled with an

22   impinger."

23                 Were you ever made aware of these dust

24   counts, sir, 25 to 50 million particles per cubic

25   foot --

1    A       Not to my recollection.

2            Q       -- for simply installing?  I mean for

3    simply stacking asbestos Kaylo?

4            MR. BERRY:  Object to the form of the

5            question, the characterization.

6            MR. PLACITELLA:  What's wrong with the

7            characterization?

8            MR. BERRY:  I didn't hear the word

9            simply there.

10           MR. PLACITELLA:  Let me redo it again.

11           Q       Were you ever made aware, sir, that dust

12   counts -- that Owens-Illinois was aware that in

13   stacking Kaylo in boxcars that the dust counts were 25

14   to 50 million particles per cubic foot?

15           MR. McGUIRE:  At what time?

16           MR. BERRY:  I object to the form of the

17           question.  Was he aware that Owens-Illinois

18           was aware when he was a batch mixer?

19           MR. PLACITELLA:  I'll strike it and do it

20           again.

21           Q       Were you ever made aware during the time

22   that you worked for Owens-Illinois that stacking Kaylo

23   in boxcars generated dust counts of 25 to 50 million

24   particles per cubic foot?

25           MR. McGUIRE:  We'll accept that without

GRIMMIE - Direct                           130

1          objection if you will qualify further by saying

2          by Mr. Hazard in 1950 or '51.

3                  MR. PLACITELLA:  It was 1949, but don't

4          let me get in the way.

5                  MR. McGUIRE:  Are you aware of what

6          Mr. Hazard --

7                  THE WITNESS:  I am aware of putting a

8          double-faced corrugated piece on the top of the

9          carton of block before it was sealed to hold the

10         dust down.  That's what I am aware of.  Why

11         was it?  It was to hold the dust down.

12                 Q    Let me understand that for a second, then.

13    I'll go back to this.

14                 You say there was a double-faced

15    corrugated what?

16    A     A square the shape of the carton, the dimension

17    of the carton.

18                 Q    Yes?

19    A     Double-faced corrugated placed on top of the

20    block before it sealed -- the flaps were sealed.

21                 Q    You put the Kaylo in the box and then you

22    put this corrugated --

23    A     That's cardboard to you.

24                 Q    Cardboard inside the box to keep the dust

25    down?

1    A        That's what my understanding was.

2             Q        And what would happen when you took the

3    Kaylo out of the box?

4    A        I didn't take it out of the box, I can't answer

5    that.

6             Q        All right.  Would you expect, sir, that

7    when you removed the corrugated piece of cardboard from

8    the box, when you took it out that dust would be

9    created?

10            MR. BERRY:  Objection to form.

11   A        I wouldn't expect anything, I wouldn't know.

12            Q        All right.  Would you agree, sir, that if

13   you take blocks of Kaylo and knock them together you

14   will see a small cloud of dust given off?

15   A        I know that to be a fact.

16            Q        Thank you, sir.

17            Now, between 1958 and 1968 were

18   improvements made in the flat ware finishing end in the

19   Berlin plant in terms of dust control?

20   A        I believe in that time frame, yes.

21            Q        What kind of improvements?

22   A        Oh, I believe there was dust collecting systems

23   added, new pick up hoods which would exhaust dust from

24   the saw blades and the sanders, and the dust collecting

25   system.

1          Q      And are you aware, sir, that 10 years

2      after Owens-Corning Fiberglas took over the plant,

3      despite all of the improvements that you've discussed,

4      that Owens-Corning received a report that said that

5      dust counts in the area of the flat ware line where the

6      product is boxed or stacked on pallets is higher than

7      desirable?

8      A      No, I don't remember that, but I can -- well, go

9      ahead.

10         Q      You were never made aware of that, sir?

11     A      I don't recall that.

12         Q      Do you recall a company called William

13     R.   Bradley and Associates?

14     A      I've heard that, yes.

15         Q      And in what connection have you heard of

16     them?

17     A      I understood they were sampling air sampling.

18         Q      For what purpose?

19     A      Dust count, I assume.

20         Q      And who is Mr. S. H. Thomas, sir?

21     A      S. H. Thomas?

22         Q      Right.

23     A      Well, there's Sam Thomas, was the former officer

24     of Owens-Corning.

25         Q      Do you recall that he was a director of

1    environmental control for Owens-Corning Fiberglas

2    Corporation?

3    A      I believe I recall that.

4           Q      I'm going to show you what's been marked

5    P-8 for Identification and ask you if you've seen this

6    document before?

7                  (Witness reviewing document.)

8                  MR. PLACITELLA:  Mark this, please.

9                  (Letter dated August 7, 1951 from Thomas

10                 Durkan to W. G. Hazard is marked as

11                 P-10 for Identification.)

12          Q      Did you have a chance to look at that,

13   sir?

14   A      I'm going to read it.  I don't have to go any

15   further.  I have no recollection of every seeing

16   that.

17          Q      Okay.  So Owens-Corning Fiberglas never

18   showed you this report, sir.  Is that correct?

19   A      Not to my recollection.

20          Q      And in 1968 you were serving in what

21   capacity as Owens-Illinois employee?

22   A      I believe what?  Production and personnel

23   manager.

24          Q      And you were charged with safety

25   responsibilities at that time, sir?

1    A      That's correct.

2           Q      And page 2 of the report indicates --

3    well, strike that.

4           Were you in charge of the flat ware lines

5    at that point in time?  Was that something you had

6    jurisdiction over?

7    A      Yes.

8           Q      Page 2 of the report indicates, "Dust

9    counts in the area of the flatware line where the

10   product is boxed or stacked on pallets are higher than

11   desirable.  It is suggested that cartons to be loaded,

12   travel on a roller/conveyor that passes through a

13   mechanically exhausted booth enclosure.

14          The design of dust collection hoods on the

15   integrated line sawing stations should be improved in

16   order to provide more complete enclosure.  Dust counts

17   are excessive at these stations, and it is recommended

18   that employees wear respiratory protection until

19   environmental control has been installed."

20          Do you recall being told that by anyone at

21   Owens-Corning Fiberglas in around 1968, sir?

22   A      I recall equipment such as you just described

23   being worked on and installed.

24          Q      Do you recall anyone in Owe    Corning

25   Fiberglas telling you that there was excessive dust

1     levels in 1968 where the flatware line was where the

2     product is boxed or stacked?

3               MR. McGUIRE:  You mean as the reason for

4          the improvements he's explaining?

5               MR. PLACITELLA:  That's not what I'm

6          asking.

7     A     I have no recollection of anyone telling me

8     that.

9          Q     Next sentence, "Dust control at the two

10    band sawing stations for pipe needs improvement.

11    Operators are exposed too high dust concentrations."

12               Do you recall being told that by anyone at

13    Owens-Corning Fiberglas in 1968?

14    A     I have no specific recollection of that.

15         Q     Thank you, sir.

16               Did Owens-Illinois ever tell you that they

17    were informed by the Saranac Laboratory that the

18    Saranac Laboratory was not certain of what -- at

19    measuring concentration of asbestos fibers is a limit

20    of safety?

21               MR. BERRY:  Object to the form of the

22          question.

23    A     I have no recollection of that.

24         Q     If Owens-Illinois was told, Mr. Grimmie,

25    that the Saranac Laboratory wasn't sure what was safe,

1    what level was safe, would you want them to know that,

2    sir?

3                    MR. BERRY:  Objection.

4                    MR. McGUIRE:  Objection.

5    A       I would assume that somebody in the corporation

6    would know it.

7            Q       Would you like to have had that

8    information communicated to you?

9                    MR. BERRY:  Objection to the form.

10                   MR. McGUIRE:  Objection to the form of the

11                   question.  Unless you are talking about

12                   recommendations for the protection and control

13                   of a hazard at the plant, I don't see how this

14                   witness can respond.

15                   MR. PLACITELLA:  All right.  Let me follow

16                   up on your objection, sir.

17           Q       I'm going to show you a document marked

18   P-10, August 7, 1951, from Thomas M. Durkan to

19   Mr. W. G. Hazard, Industrial Relations Division,

20   Owens-Illinois Glass Company.

21                   MR. McGUIRE:  Okay, counsel, having looked

22                   at this, I think I can see there's a problem in

23                   your question.

24                   MR. PLACITELLA:  Well, I'm going to ask

25                   him a question now.  I didn't refer to the

1          document before when I was asking him a

2          question.  Now I'll ask him questions about the

3          document so then you can determine whether

4          there's a problem with my question or not.  I,

5          please, ask that you don't coach the witness

6          about anything I'm about to ask him until I've

7          asked him and then we'll discuss whether your

8          objection is valid.

9          Q    I want to show you what's been marked

10   P-10, Mr. Grimmie, and ask you if you've ever seen this

11   letter before.

12                (Witness reviewing document.)

13   A    I have no recollection of seeing it.

14          Q    This is not a document that Owens-Illinois

15   ever showed you while you worked for them up until

16   1958, is it, sir?

17   A    Not to my recollection.

18                MR. BERRY:  Objection to the form of the

19          question.

20          Q    Thank you, sir.

21                Did Owens-Illinois ever tell you,

22   Mr. Grimmie, that they were informed by the Industrial

23   Hygiene Foundation that the TLV was unreliable?

24                MR. BERRY:  Object to the form of the

25          question.

1    A       I have no recollection of that.

2            Q       Is that something that you would like to

3    have known --

4                    MR. McGUIRE:  Objection.

5            Q       -- in the management capacity while you

6    worked for Owens-Illinois?

7                    MR. McGUIRE:  Objection.  Instruct the

8                    witness not to answer.

9                    MR. BERRY:  Objection.

10                   MR. PLACITELLA:  What's the basis for the

11                   objection?

12                   MR. McGUIRE:  A:  There's no foundation

13                   for the representation that you made.  B: It's

14                   calling for speculation.  C:  There's no

15                   indication that the precautions recommended by

16                   these agencies were not legitimate and it was

17                   not reasonable to follow.

18                          You are asking this witness and that

19                   can't possibly be answered.

20           Q       Did anyone at Owens-Illinois ever show you

21   something called a Hemian Report (phonetic), sir?

22   A       I have no recollection of that.

23                   MR. BERRY:  Objection.

24                   MR. PLACITELLA:  Is there something I

25                   said, Mr. Berry, that's funny?

1              MR. BERRY:  Yes.

2              MR. PLACITELLA:  Oh, would you want to let

3         us all in on the joke, please?

4              MR. BERRY:  No.

5              MR. PLACITELLA:  Okay.

6         Q    During the course of your employment with

7    Owens-Illinois, did you have meetings with any of the

8    employees on the issues of asbestos and health?

9    A    That would have been part of meetings.

10        Q    When was the first such meeting held with

11   employees of Owens-Illinois, to your knowledge?

12   A    I have no recollection of when the first meeting

13   was held.

14        Q    Can you recall while you were employed by

15   Owens-Illinois informing the employees that cutting

16   Kaylo without adequate respiratory protection or dust

17   collection equipment could be hazardous to their

18   health?

19   A    I may have said that, I don't remember

20   specifically when.  That would seem to me to be common

21   sense.

22        Q    What would be "common sense"?

23   A    To inform people that the dust in the plant was

24   not a healthy condition.

25        Q    That wasn't my question.  That's why I

1    want to make sure we understand.

2                    Would it make common sense to inform the

3    people in the plant that when you cut Kaylo without

4    wearing adequate respiratory protection and without

5    adequate dust collection equipment, that there was a

6    potential health hazard?

7                    MR. BERRY:  Objection to the form of the

8          question.

9    A      Yes.

10         Q      Would you believe that during the time

11   that you worked for Owens-Illinois?

12   A      Did I believe that?

13         Q      Yes.

14   A      Yes.

15         Q      And would you have helped, sir, if

16   Owens-Illinois gave the same information to their

17   customers?

18                    MR. BERRY:  Object to the form of the

19         question.

20                    MR. McGUIRE:  Objection.  You are talking

21         about the plant here and its manufacturing

22         environment, not any risk or potential risk to

23         users, none of which was perceived at the time.

24                    MR. PLACITELLA:  That's your

25         characterization, Mr. McGuire.  I think that's

1              something for a jury to decide.

2                   MR. McGUIRE:  Of course.

3                   MR. PLACITELLA:  Okay..

4                   MR. McGUIRE:  That's why I bring it to

5              your attention.  It's also your

6              characterization.  It's very opposite.

7                   MR. PLACITELLA:  I'll ask a direct

8              question.  I'll go at it another way.

9              Q      Do you recall monthly unit management

10        meetings as of 1953 where the hazards of cutting Kaylo

11        were discussed with union management?

12        A      I don't know when.  I recall the union

13        management meetings where dust was part of the

14        discussion.

15             Q      Would you dispute if I told you that you

16        previously testified that in 1953 employees were

17        complaining about dust in the plant?

18        A      I wouldn't dispute that.

19             Q      Now, you previously indicated, I think,

20        that you learned about asbestos as a potential cancer

21        hazard after reading some newspaper article.  Is that

22        fair?

23        A      That's a fair assumption, yes.

24             Q      And when was that?

25                   MR. BERRY:  Asked and answered.

GRIMMIE - Direct                                    142

1              MR. PLACITELLA:  I'm sorry, forgive me.

2         Q    Do you know when that was?

3    A    Exactly, no.  It was some time after my

4    employment, February 14, 1947.

5         Q    Do you know whether it was before 1960 or

6    after 1960?

7    A    It was before 1960.

8              MR. PLACITELLA:  Mr. McGuire, there's no

9              reason for you to interrupt or to coach the

10             witness at this point.

11             MR. McGUIRE:  I object to the question.

12             The witness had previously given an answer.  You

13             obviously confused his answer about the time in

14             the 1960s after he read those articles.  You

15             have him thinking about something else when he

16             began at Owens-Illinois and I think that the

17             witness should be given a chance to clarify.

18             MR. PLACITELLA:  I think the judge will

19             read your comments, Mr. McGuire, and the judge

20             should note that the minute he answered that

21             question, you went to whisper in his ear until I

22             stopped you, okay?

23             MR. McGUIRE:  Okay.

24        Q    Mr Grimmie, did there come a time in 1971

25    where shift meetings were set up to discuss the hazards

1      of asbestos with employees at the Owens-Corning

2      Fiberglas plant?

3      A      I know there were shift meetings set up.  I'm

4      not sure of the timing on that.

5             Q      All right.  The dates are important, so I

6      want to see if I can refresh your memory with your

7      prior testimony.

8                    In your testimony in the McGrath trial,

9      October 24, 1979, page 113, line 2 -- before I get to

10     that, who is Mr. Shirley?

11     A      Paul Shirley was a former plant manager for

12     Owens.

13            Q      Beginning on page 2, line 13:

14                   "Did Mr. Shirley ever make any attempts to

15                   communicate with the workers in regard to the

16                   subject of asbestos and your health?

17                   ANSWER:  Yes, sir.

18                   QUESTION:  Briefly, what did he do?

19                   We'll get to that in a moment.

20                          If you know the exact date, you tell

21                   us without looking at a piece of pipe, otherwise

22                   I'll show you a piece of paper?

23                   ANSWER:  I believe in September of 1971 we

24                   had shift meetings."

25                   Does that refresh your recollection, sir

1    A      That's what it says.

2           Q      And at those shift meetings, can you

3    recall what was discussed, sir?

4    A      I believe Paul Shirley discussed the asbestos

5    situation in/and around the plant and what he expected

6    of employees and what the employees company expect of

7    the company.

8           Q      Okay.  Was the subject of cancer and

9    asbestos brought up at that time, sir?

10   A      I have no recollection of that.

11          Q      Okay.  And you're aware, sir, are you not

12   that, in fact, cancer was supposed to be brought up and

13   that Owens-Corning Fiberglas medical department nixed

14   it?

15                 MR. McGUIRE:  Objection to the form of the

16          question.

17   A      I'm not aware of that.

18          Q      You are not aware of that, sir?

19                 MR. PLACITELLA:  Can I have this marked

20          next, please?

21          Q      I'm going to show you what's been marked

22   P-11, a memo from Jon L. Konzen to P. H. Schauerla,

23   Berlin.  Subject, employee educational program, cc'd

24   are R. E. Grimmie.

25                 (The above-mentioned document is marked as

1                    P-11 for Identification.)

2          Q      That's you, sir.  Is that right?

3    A      That's right.

4          Q      Was there a Mr. W. L. Kreuttz also

5    employed by Owens-Corning at that time?

6    A      Who?

7          Q      Mr. Kreuttz, K-r-e-u-t-t-z?  He was from

8    Toledo?

9    A      Bill Kreuttz?

10         Q      He was employed by Owens-Corning at that

11   time?

12   A      That's correct.

13         Q      Was there a Mr. McNally employed by

14   Owens-Corning at that time?

15   A      Plant physician.

16         Q      And was there a Mr. Sepessy, S-e-p-e-s-s-y

17   employed by Owens-Corning at that time?

18   A      Seppessy?  Yes.

19         Q      Okay.  You can take a look at that, sir?

20   I'll ask you some questions.

21                (The witness complies.)

22                MR. McGUIRE:  Okay, counsel, I have to

23         take sharp exception on the record to the

24         representation that Owens-Corning is said to

25         have nixed something.  I read this document,

1      which you've shown the witness, which you're

2      showing the witness P-11, specifically.

3          MR. PLACITELLA:  There's no question

4      pending, sir.

5          MR. McGUIRE:  I know that, sir.

6          MR. PLACITELLA:  And I will get to it.  I

7      will demonstrate just how they nixed it.  You

8      don't have to worry about it.

9          MR. McGUIRE:  I'm sure you will.

10             Let us note for the record that the

11     document specifically points out that the

12     relationship between asbestos over exposure and

13     cancer is to be discussed with the workers, if

14     it does not arise in the course of the

15     particular discussion.  And I think you know

16     you are suggesting something on the record here

17     that's a little inappropriate.

18         MR. PLACITELLA:  The record will speak for

19     itself, sir.

20             Can I have the document now, sir?

21         MR. McGUIRE:  Sure.

22         MR. PLACITELLA:  Thank you.

23         MR. McGUIRE:  That's all right.

24     Q    We'll get to the beginning of the

25 document, Mr. Grimmie.

1                    I want you to take a look at it and tell

2          me if you recall ever receiving a copy of that document

3          which is indicated cc'd to you in 1971.

4                    (Witness reviewing document).

5          A       It's cc'd to me, but I don't remember it.  It's

6          copied to me.

7                    Q       I'm going to show you page 3 of this

8          document, sir, which is a draft -- strike that.

9                    Attached to the document is a document

10         entitled, "Draft, An Educational Program For Employees

11         Exposed To Airborne Asbestos Fiber," 1/22/71.  And I'm

12         going to show you page 3 of this document, sir, and ask

13         if in reading the part with the X through it, that

14         refreshes your memory as to whether you've seen this

15         document before.

16                    (The witness complies.)

17                    MR. McGUIRE:  Does that refresh your

18              recollection?

19         A       I have heard of what it said there but I don't

20         remember this document.

21                    Q       Okay.  Let's just go through it for the

22         record and for the jury, sir.

23                    Page 3 indicates, does it not in the

24         proposed draft, "Up to now I've been talking about the

25         disease asbestosis, which again, is a scarring of the

1    lungs.  There is another condition I am sure you have

2    all heard can be caused by excessive exposure to

3    asbestos and that is cancer of the lungs.  Indications

4    are that excessive exposure for a long period of time

5    can cause cancer of the lungs in some people.  The

6    frequency that this occurs is very much less than

7    asbestosis.  We believe that the concentration must be

8    very high, and the exposure prolonged.  Therefore, it

9    is important to reduce the exposure to asbestos dust as

10   much as possible.

11           It is important to note that cancer is to

12   believed to have occurred more frequently in the

13   asbestos exposed worker that smokes cigarettes than in

14   the nonsmoker.  Therefore, this is an added inducement

15   to you men who are smokers to quit smoking or, at least

16   reduce your smoking.  The very least, it is strongly

17   suggested that you do not smoke while working."

18           Did I read that correctly, sir?

19           MR. BERRY:  Object to the form of the

20           question.  I invoke the Rule of Completeness.

21           MR. McGUIRE:  I further object to what is

22           obviously a draft here.  There is no evidence or

23           suggestion that the redaction of any part of the

24           proposed draft had any specific motivation.  It

25           certainly represents a number of things that may

1              or may not be accurate.  And the bottom line is,

2              there's no evidence that this particular

3              document, in fact, either with or without the

4              redactions is a transcript for the sum and

5              substance of the very presentation.  And all we

6              have here is a draft marked up presumably by

7              Dr. Konzen and the relevance of this excapes me

8              and it certainly doesn't establish that the

9              employees were not told about any of the

10             particular risks that might have been applicable

11             to them.  And I think that it's really

12             misleading to try to read this thing as if it

13             were.  And I probably don't need to remind you

14             that ordinarily this sort of thing is not

15             admissible.

16                  MR. PLACITELLA:  It's terrible.  You done?

17                  MR. McGUIRE:  I'm done.

18                  MR. PLACITELLA:  Okay.  Thank you.

19             Q    Mr. Grimmie, did I read those two

20    paragraphs correctly?

21    A       Evidently, yes, as I recall what you read and

22    what I see here.

23             Q    Am I correct, sir, those two paragraphs

24    have a big black X going through them?

25    A       Yes.  No one initialed the X, though.

GRIMMIE - Direct                                    150

1          Q     All right.  Your testimony has been here

2    today, sir, correct, that you have no recollection at

3    this meeting of asbestos and cancer being discussed,

4    correct?

5                MR. McGUIRE:  Objection.  That's not his

6          testimony.

7          Q     Correct?

8    A     I told you.  Why are you looking over there?

9    Are they coaching you?

10         Q     Yes, they are, sir.

11   A     Or are you talking to me?

12         Q     I'm a lawyer in training.

13               Please, answer the question.

14   A     That's understandable.

15               What I told you was, I have no

16   recollection if it was that specific meeting or other

17   meetings.  I know it was discussed.  You're trying to

18   pinpoint me to this particular meeting and I don't know

19   if it was that particular meeting.

20         Q     So now has your testimony changed that you

21   think they might have discussed cancer?

22   A     Did I change it?

23               MR. McGUIRE:  Objection.  And I instruct

24         the witness not to answer.  This is totally

25         outrageous the way you are trying to turn this

1              gentleman's testimony around.

2                    MR. PLACITELLA:  Mr. McGuire, what is

3              outrageous is your conduct.

4                    MR. BERRY:  Objection.

5         Q    Is it your recollection as you sit here

6    today that cancer might have been discussed at this

7    meeting?

8    A    Yes.

9         Q    What do you base that upon, sir?

10   A    I base it upon the fact that I remember keeping

11   a record of everyone attending the meetings and those

12   that did not attend, there was a special meeting for

13   those people.

14        Q    And that is what makes you think you told

15   them about cancer, sir?

16   A    Me?

17        Q    Yes.

18   A    I'm pretty sure Paul Shirley conducted the

19   meetings.

20        Q    You are pretty sure he told them about

21   cancer?

22   A    Yes, sir, I'm pretty sure of that.

23        Q    Do you have any knowledge as to why in the

24   draft of this speech, that Owens-Corning Fiberglas

25   would want to X out the portion on cancer, sir?

1    A       I'm not sure Owens-Corning X'd it out.

2               MR. McGUIRE:  Objection.

3       Q       Excuse my?

4    A       I'm not sure Owens-Corning X'd it out.

5       Q       Let me show you the front page of this

6    particular document, sir.

7               MR. McGUIRE:  I'm going to object here.  I

8               think you are badgering the witness.  He has

9               already explained that he has a recollection of

10              what was discussed at this or other meetings,

11              that it did include cancer, that he has never

12              recalled seeing the particular document you are

13              showing to him.

14                      The fact that the particular draft

15              may differ in some respect from his independent

16              recollection of some other situation is

17              immaterial and you're just harassing this

18              witness.

19              MR. PLACITELLA:  I'm not harassing him,

20              Mr. McGuire.  I fully intend to introduce

21              evidence at trial that will indicate that

22              subsequent drafts that were delivered did not

23              include cancer and that the X'd out portion did

24              not appear in the final draft, okay?  And I'll

25              make that representation to you because you

1          should know that.  You produced these documents

2          from Owens-Corning Fiberglas files.

3                   MR. McGUIRE:  You should also --

4                   MR. PLACITELLA:  Let me finish my.

5                   MR. McGUIRE:  Let him finish telling you

6          that what he knows from hearing at the meetings

7          is not what is shown in pieces of paper --

8          Q     You read the first page of this document,

9    did you not, Mr. Grimmie?

10   A     Yes.

11         Q     And this is to Mr. Shirley, Berlin, from

12   Dr. Konzen, correct?

13   A     That's correct.

14         Q     And the third paragraph of the document

15   starts, "It is noted that you deleted the paragraph

16   concerning the relationship between asbestos

17   over-exposure and cancer."  Did it not start that way,

18   sir?

19   A     You are reading it.

20         Q     Did it not start that way?

21   A     Let me see.

22               (Handing.)

23   A     Yes, that's what it says.

24         Q     All right.  So is your memory refreshed

25   now, sir, as to whether somebody at Owens-Corning

1    Fiberglas put an X through the section on cancer, sir?

2    A      I don't know.

3              MR. McGUIRE:  Objection.  The witness

4          has already said he doesn't know.  How can he

5          have his recollection refreshed as to something

6          he doesn't know?

7              MR. PLACITELLA:  Because the document is

8          addressed to him, sir.  The first line of the

9          third paragraph says, "Cancer was deleted."

10         That's a legitimate question and I'm entitled to

11         have an answer.

12   A      I have no recollection of that.

13         Q      Thank you, sir.

14   A      You're welcome.

15         Q      Do you recall at that meeting a question

16   and answer, sir, in 1971, question and answer session?

17   A      I have no recollection of that.

18         Q      Do you have a recollection as to whether

19   at a question and answer session the subject of cancer

20   ever came up?

21             MR. McGUIRE:  Wait a minute.  Hold on.

22         The witness just finished saying he does not

23         remember whether there was a question and answer

24         session.

25             MR. PLACITELLA:  I'm seeing if I can

GRIMMIE - Direct

1          pique his memory, sir, and I'm entitled to ask

2          that question.

3               MR. McGUIRE:  Okay.

4          Q    Do you recall at a question and answer

5    session whether the subject of asbestos and cancer was

6    discussed?

7               MR. McGUIRE:  Does that help you remember

8          whether there was a question and answer session?

9               THE WITNESS:  At the present time I have

10         no recollection of that.

11         Q    Thank you, sir.

12              Do you know a Dr. Billmaier, sir, Donald

13   J. Billmaier?

14   A    Donald Billmaier?  I know a Dr. Billmier

15   (phonetic).

16         Q    Do you know a Dr. Donald Billmaier?

17   A    Yes.

18         Q    Who is he, sir?

19   A    I believe he was assistant to Dr. Konzen in the

20   medical department.

21         Q    All right.  And do you recall Dr.

22   Billmaier in 1978 giving the presentation to the Berlin

23   employees concerning the health aspects of asbestos?

24   A    I don't remember that.

25              MR. PLACITELLA:  Can I have this marked,

1          please?

2                    (Report by Dr. Billmaier is marked as

3                    P-12 for Identification.)

4          Q    Okay.  Sir, I'm going to show you what's

5    been marked P-12 for Identification.  And see if this

6    refreshes your recollection as to whether Dr. Billmaier

7    gave a presentation on the health aspects of asbestos

8    to the Berlin employees in May, 1978.

9                    (Witness reviewing document.).

10                   (Discussion off record.)

11                   (Recess.)

12         Q    Have you had the opportunity to look at

13   P-12, Mr. Grimmie?

14   A·    Yes, sir.

15         Q    From reviewing this document, which I'll

16   represent to you is produced to us by Owens-Corning

17   Fiberglas, does that refresh your memory as to whether

18   Dr. Billmaier gave a presentation on the health aspects

19   of asbestos on/or about May, 1978 to the Berlin

20   employees?

21   A     I have a recollection of meetings but no

22   specific meetings or dates.

23         Q    Do you recall Dr. Billmaier giving a

24   presentation --

25   A     Yes.

GRIMMIE - Direct                                    157

1          Q      -- to employees?

2     A      Yes, I have recollection of that.

3          Q      Now, I'm going to refer to page 4 of the

4     presentation where Dr. Billmaier states and I quote, or

5     at least this document states, "Based on my

6     understanding of the plant environment in the past you

7     probably had a significant exposure to asbestos.  I

8     don't believe it was a severe as the exposures others

9     had in ship building.  I don't believe this plant ever

10    had the concentrations of dust that I've seen reported

11    in ship building and heavy construction."

12               Did you understand that to be the case

13    when Dr. Billmaier made his presentation in 1978?

14    A      I don't remember that.

15         Q      Did you understand that to be the case,

16    sir, that the exposures in the plant were not as heavy

17    as they were in heavy construction?

18               MR. McGUIRE:  Objection to the form of the

19               question.  The witness has already explained he

20               did work in ship construction in the shipyard.

21               MR. PLACITELLA:  Mr. McGuire, I know you

22               really want to answer these questions, but if

23               you can just let me ask the questions and get an

24               answer, maybe we can finish today.

25               MR. BERRY:  The witness answered the

Case: 3:99-cv-00475-sle   Document #: 147   Filed: 11/30/15   Page 158 of 187

1          question.

2              Q    Let me ask the question again.  Please

3      bear with me.  I really want to finish soon.

4                   Were you aware, as this document

5      indicates, that the plant exposures weren't as severe

6      as exposure that had been reported in ship building and

7      heavy construction?

8                   MR. BERRY:  Object to the form of the

9              question.

10     A     No.  I was not aware of that.  I --.

11             Q    I'm sorry, did you want to finish?

12     A     Well, from my recollection, when I worked in the

13     shipyard, I don't remember any severe exposure.

14             Q    Well, you worked in the Camden Shipyard,

15     correct?

16     A     New York Ship Building Corporation, Camden, New

17     Jersey.

18             Q    And what years was that, sir?

19     A     I believe 1941, 42.  I left there to go in the

20     Army.

21             Q    You didn't use Kaylo at that shipyard, did

22     you, sir?

23     A     Kaylo was not invented then.

24             Q    So any exposures that you saw, didn't have

25     anything to do with the Kaylo product, correct, sir?

1    A       That's correct.

2            Q       Now, Mr. Grimmie, do you know a man by the

3    name of Sam Schillaci?  Have you ever heard of a man by

4    the name of Sam Schillaci?  Am I saying it correctly?

5    A       Can I see the name?

6            Q       Well, Mr. Berry, I'm sure will correct me

7    if I spell it wrong.  S-c-h-i-l-l-a-c-i.

8                    MR. PLACITELLA: Is that correct,

9            Mr. Berry?

10                   MR. BERRY:  That's right.

11           Q       Have you ever heard of him before?

12   A       I have recollection of the name Scallati

13   (phonetic) but I have no memory of this.

14           Q       You never heard of a man named Sam

15   Schillaci in connection with your employment at

16   Owens-Illinois?

17   A       I have no recollection at this time.

18           Q       Mr. F. W. Sherwood, have you ever heard of

19   a man named F.W. Sherwood?

20   A       Sherwood?

21           Q       Right.  S-h-e-r-w-o-o-d.  In connection

22   with your employment at Owens-Illinois?

23   A       Not in connection with my employment.  There's a

24   family of Sherwoods that live in my hometown.

25           Q       Okay.  Mr. A. C. Harth, are you familiar

1   with that name in connection with your employment at

2   Owens-Corning?

3   A       What was the name, Harth?

4           Q       A. C. Harth, H-a-r-t-h?

5   A       I have no recollection of that name.

6           Q       Now, can you tell me during the time that

7   Owens-Illinois owned and manufactured Kaylo, what the

8   basic composition of the product was?

9   A       Basically lime, silica, diatomaceous earth,

10  asbestos and a small amount of clay.

11          Q       And water?

12  A       And water.

13          Q       From the time that Owens-Illinois

14  manufactured Kaylo up through until 1972, was there any

15  significant change in the composition of the product?

16          MR. BERRY:  Object to the form of the

17          question.  Which particular product ar you

18          talking about, pipe or block, door core,

19          ceiling, roofing block?

20          MR. PLACITELLA:  If he tells me they're

21          different, we'll get into that.

22          Q       Let's talk about pipe covering?

23  A       Pipe covering would have been a late density,

24  what they called the late density formulation and I

25  don't recall any specific changes.

1          Q       So the record is clear, because I think

2     Mr. Berry's objection is a valid one for a change, the

3     pipe covering that was manufactured by Owens-Illinois,

4     did the composition of that pipe covering change

5     substantially from 1957 up until 1972?

6     A       Not substantially.

7          Q       What kind of changes were made, if any?

8     A       There may have been slight changes made because

9     of the calcium content in the lime, testing of

10    materials may require changes to balance out the

11    different raw materials.

12         Q       Did the asbestos component change

13    significant during that time?

14    A       That would be possible, too.

15         Q       Do you have any knowledge as to that?

16    A       No, I have no memory no recollection of it

17    but --.

18         Q       Would that be something you think that you

19    would know in the context of your employment whether

20    there were any significant changes in the asbestos

21    component?

22    A       Significant changes, yes.

23         Q       I'm going to see if I can move this along.

24              MR. PLACITELLA:  Could you mark this next?

25         Q       For the record and for the objection of

1     counsel here, marked P-13 is a January 31, 1951 memo

2     from Mr. E. C. J. Urban to Dr. Vorwald.  Subject:

3     Preliminary industrial hygiene survey, Owens-Illinois

4     Glass Company, Kaylo Division Plant, Sayreville, New

5     Jersey.

6                    (The above-mentioned document is marked as

7                    P-13 for Identification.)

8                    (Witness reviewing document.)

9          Q     I'd like you to -- well, first of all,

10    have you ever seen this document before, sir.

11    A     I have no recollection of seeing it.

12         Q     Okay.  Now, if my understanding is

13    correct, you worked for a period time at the Sayreville

14    plant in 1949 and then you had one occasion to go back

15    there at some time later in your career.  Is that

16    correct?

17    A     I was there for eight months, approximately

18    eight months and then I recall one day visit back

19    there.

20         Q     Now,

21                    MR. McGUIRE:  '48 or '49, counsel?

22         Q     Was it '48 or '49?

23                    MR. McGUIRE:  My notes indicate '48.

24                    MR. PLACITELLA:  Let me ask the witness?

25    A     I believe it was '48.

GRIMMIE - Direct                                    163

1          Q      Okay.

2     A      But January 2nd, I believe, 1948.

3          Q      Fine.  Now, I want to show you the third

4     page of this document, which is a diagram of the plant

5     and ask you, does this accurately reflect how the plant

6     was laid out during the time that you worked at the

7     Sayreville plant?

8                        (Witness reviewing document.)

9     A      To the best of my recollection, yes.  I thought

10    there was more autoclaves than that, but -- that

11    generally.

12         Q      Is that how you recall it when you were

13    there in 1948 for that eight-month period?

14    A      Yes.

15         Q      Now, this document indicates that a number

16    of people at the Sayreville plant were contacted.  I

17    want to make sure this is correct, the following

18    individuals were contacted at Sayreville.

19                   MR. BERRY:  That what is correct?

20                   MR. PLACITELLA:  These people I want to

21         make sure, their identities are correct, okay?

22         Q      O. W Pfeifer, plant manager.  Was he plant

23    manager in 1951?

24    A      Yes.

25         Q      William Barker, personnel manager.  Was he

1    personnel manager in '51?

2    A      Yes.

3           Q      P. E. Gillis, was he safety director in

4    1951?

5    A      I believe so.  Yes.

6           Q      And John Roades, I think we discussed him

7    before, quality control engineer?

8    A      Yes.

9           Q      The list of raw materials is listed right

10   below that and can you tell me if that proports to your

11   understanding of what the raw materials were at the

12   Sayreville plant while you were there, or in 1951?

13          MR. BERRY:  I object on the foundation

14          grounds.

15   A      I believe, to the best of my recollection,

16   that's a complete list.

17          Q      And that indicates, for the record, raw

18   materials diatomaceous earth?

19   A      Yes.

20          Q      Silica flour?

21   A      Yes.

22          Q      Tripoli?

23   A      Tripoli, is a form of silica.

24          Q      Lime?

25   A      Yes.

GRIMMIE - Direct

1    A      Both quick and hydrated.

2           Q      Asbestos, chrysotile,

3    Johns-Manville-Quebec Canada?

4    A      Asbestos.

5           Q      Asbestos, amosite, iron bearing, South

6    Africa?

7    A      Asbestos, yes.

8           Q      Kayolin clay?

9    A      Yes.

10          Q      And cement, commercial grades?

11   A      Yes.

12          Q      Does this indicate, sir, that in 1951 in

13   round form for pipe insulation covering, two types of

14   Kaylo were made, light density and heavy density, both

15   contain different mixtures of the same original

16   components?  Does it indicate that, sir?

17          MR. BERRY:  You mean, is that what that

18          document says?

19          MR. PLACITELLA:  That's correct.

20          Q      As to what was manufactured at the

21   Sayreville plant?

22          (Witness reviewing document.)

23          MR. McGUIRE:  Which paragraph are you

24          referring to, again?  Counsel, I think you are

25          .isreading.  It says two types of Kaylo were

Brody & Geiser (908) 738-8555 or (212) 732-0644

GRIMMIE - Direct                                          166

1              made, not two types of pipe covering.

2    A       No.   We never made heavy density pipe covering.

3            Q     Let me read it from the beginning.

4    "Finished Products:   'Kaylo' product in tile forms for

5    structural uses.   Reinforced with wire for roofing.

6    Sheets for fire-proof doors and panels.   In round forms

7    for pipe insulation covering.   Two types of 'Kaylo'

8    were made.   'Light density' and 'Heavy density.'   Both

9    contain different mixtures of the same original

10   components."

11             Is that an accurate division of what was

12   made in the Sayreville plant?

13   A       Yes.

14           Q     Thank you.

15             The light density pipe insulation is what

16   we're discussing.   There is no heavy density pipe

17   insulation.   is that my understanding?

18   A       Yes.   The roof tile and core material was heavy

19   density.

20           Q     Do you recall that the suppliers of

21   asbestos to Owens-Illinois included North American

22   Asbestos and Johns-Manville as reflected in that

23   document?

24   A       I remember those names, yes.

25           Q     And that the amosite asbestos came from

1   North American and the chrysotile from Johns-Manville?

2   A       I remember that, yes.

3           Q       And those products were used at the

4   Sayreville plant, correct?

5   A       Yes.

6           Q       Were they also used at the Berlin plant?

7   A       Yes.

8           Q       Thank you, sir.

9                   Just a few more questions and I'm done,

10  Mr. Grimmie, and I promise.

11                  From your deposition today, we understand

12  that you had as part of your responsibilities

13  enforcement of safety program in the plant from at

14  least 1951 forward, correct?

15  A       Yes.

16          Q       We know that the Owens-Illinois never

17  showed you the results of any of the Saranac

18  experiments, true?

19                  MR. BERRY:  Object to the form of the

20          question.

21  A       To the best of my recollection, I never saw

22  those documents.

23          Q       And they never told you that one of the

24  reasons they were saving X-rays was to defend

25  medical/legal cases, correct?

1           MR. McGUIRE:  Objection asked.  And

2       answered.

3           MR. BERRY:  Objection to the form of the

4       question.

5       Q     Correct?

6   A   They never told me that.

7       Q     Okay.

8   A   That's correct.

9       Q     Did they ever tell you that people in the

10  plant were getting sick as of 1956?

11          MR. BERRY:  Object to the form of the

12      question.

13          MR. McGUIRE:  Objection.  Lack of

14      foundation, too.

15  A   You say "they"?

16      Q     Owens-Illinois or Owens-Corning, did

17  either one ever tell you that people were getting sick

18  in the plant by 1956?

19  A   No.

20          MR. McGUIRE:  I further object.  There's

21      no further indication what these people were

22      getting sick from or actually they don't explain

23      it.

24      Q     Were you ever informed, Mr. Grimmie, that

25  men working for Owens-Corning Fiberglas, who were

1     applying insulation, were getting sick from

2     asbestos-related disease in the 1950s?

3                    MR. McGUIRE:  Objection.  Lack of

4              foundation.  Lack of competency.

5     A      Again?

6                    MR. McGUIRE:  This witness didn't even

7              work for Owens-Corning?

8     A      Men working for Owens-Corning?

9          Q      Were you aware that men working in the

10    contracting units for Owens-Corning Fiberglas were

11    getting sick from exposure to asbestos in the 1950s?

12                   MR. McGUIRE:  Same objection.

13    A      No, I was not aware of that.

14         Q      Were you ever told that beginning as early

15    as 1953, that employees of Owens-Corning Fiberglas who

16    worked in their contracting divisions were filing

17    Worker's Compensation claims for asbestos-related

18    disease?

19                   MR. McGUIRE:  Same objection.

20    A      I'm not aware of that.

21                   MR. McGUIRE:  Hold on.  Let me finish the

22             objection.

23         Q      Were you ever aware that Owens-Corning

24    Fiberglas had a contracting unit where

25    asbestos-containing products were applied?

GRIMMIE - Direct                                    170

1              MR. McGUIRE:  Don't answer the question.

2          I want to continue the objection that was

3          interrupted.  I objected to it, and I ask to

4          have the courtesy to be permitted to finish it

5          without you riding over them.  And I make the

6          same objection, that there is no showing that

7          your representation is true.

8                  This gentlema did not work for

9          Owens-Corning and at any of those material

10         times.  You have no foundation whatsoever upon

11         which this witness can answer the question.

12             MR. PLACITELLA:  Well, sir, I will prove

13         that at trial, exactly that and I'm entitled to

14         ask him the questions.

15     Q     Were you made aware, sir, at any time that

16  Owens-Corning Fiberglas even had a division called a

17  contracting division where they applied

18  asbestos-containing products?

19  A     Yes.

20     Q     But you were not made aware that in the

21  1950s, that members of that contracting division were

22  suing Owens-Corning Fiberglas for an asbestos-related

23  disease?

24             MR. McGUIRE:  Again, same objection.  Lack

25         of foundation.

Brody & Geiser (908) 738-8555 or (212) 732-0644

1          Q     Were you made aware of that, Mr. Grimmie?

2                MR. McGUIRE:  Same objection.

3                MR. PLACITELLA:  You can say the objection

4          as much as you want, Mr. McGuire.  I'm going to

5          ask the question, he's going to answer it, okay?

6                MR. McGUIRE:  Perhaps a continuing

7          objection?

8                MR. PLACITELLA:  I would never give you

9          any continuing objection.

10               MR. McGUIRE:  Okay.

11         Q     Mr. Grimmie?

12   A     I have no recollection of that.  These are

13   contract, supplying contract employees --

14         Q     That's right.

15   A     -- that were handling Kaylo since when, 1946?

16         Q     Since --

17   A     And they got asbestosis in 1953.

18         Q     I said, during the --

19   A     I have no recollection of ever knowing that.

20         Q     And were you made aware that any of these

21   contracting employees ever filed Worker's Compensation

22   claims against Owens-Corning Fiberglas?

23   A     I have no recollection of that.

24         Q     They never told you about a single one?

25               MR. McGUIRE:  Objection.  At what

1        particular time, if ever?

2                MR. PLACITELLA:  At any point in time,

3        sir.  That's my question.

4                MR. McGUIRE:  There is absolutely no

5        reason for Owens-Corning to have done this

6        anyway.  You are free to ask.  This is one more

7        thing he had no knowledge of that.

8                MR. PLACITELLA:  You will stipulate that

9        that statement can be read to the jury that

10       there was no reason for Owens-Corning to have

11       done this?

12               MR. McGUIRE:  That has nothing to do with

13       that here at the deposition.

14       Q      Let me ask you the question again, please,

15  Mr. Grimmie.

16               Am I true, that Owens-Corning Fiberglas

17  never told you that a single employee in their

18  contracting division ever sued them in Worker's

19  Compensation for an asbestos-related disease?

20  A      I can't imagine why they would tell me something

21  like that.  That's out of my jurisdiction.

22       Q      Is the answer no, sir?

23  A      No.

24       Q      And am I correct, sir, that Owens-Illinois

25  never told you that the TLV was unreliable?

1              MR. McGUIRE:  Objection.

2              MR. BERRY:  Objection.

3    A      I have no recollection of that.

4         Q      Am I correct that Owens-Corning Fiberglas

5    never told you that the TLV was unreliable.

6              MR. McGUIRE:  Same objection.

7    A      I have have no recollection of that.

8         Q      Sir, while you worked at the

9    Owens-Illinois plant, were you ever given any

10   information distributed to Owens-Illinois by the

11   industrial hygiene foundation?

12   A      I have no recollection of that.

13        Q      It's always a good sign when a lawyer

14   flips through his papers.

15              MR. BERRY:  I'm sure, Mr. Grimmie, is won

16        over by your continuing warmth.

17        Q      Okay.  That's all the questions I have.

18   Thank you very much.

19              MR. McGUIRE:  We'll take a short break.

20              MR. PLACITELLA:  I do have a couple other

21        questions.  I'm sorry.

22   BY MR. PLACITELLA:

23        Q      During the lunch break did you discuss the

24   substance of this deposition?

25              MR. McGUIRE:  Objection.

1              MR. BERRY:  Objection.

2    A    No.

3              MR. McGUIRE:  I Instruct the witness not

4         to answer.

5         Q    Who was present at lunch, Mr. Grimmie?

6              MR. McGUIRE:  Same objection.  Don't

7         answer.

8         Q    Mr. Berry was present?

9    A    Yes.

10        Q    He's not your lawyer here today?

11   A    I had lunch with Mr. Berry.

12             MR. PLACITELLA:  Now, counsel, is it your

13        position that I'm not able to inquire as to what

14        happened during lunch given the fact that

15        Mr. Berry, who is not the witness' counsel,

16        was present during the lunch period?

17             MR. BERRY:  Mr. Placitella, we assert

18        a joint defense privilege.

19             MR. PLACITELLA:  You can assert a

20        privilege, Mr. Berry, on behalf of the witness?

21             MR. BERRY:  A joint defense privilege.

22             MR. McGUIRE:  This witness is here also as

23        a former Owens-Illinois employee.

24             MR. PLACITELLA:  Just so I know, because I

25        will bring this to the attention of the court,

1      if he's not able to answer the question, will

2      you allow him to answer the question, what

3      transpired over lunch given the fact that

4      Mr. Berry was present and was not representing

5      this individual and is not his attorney.

6              MR. GRAHAM:  Maybe Mr. Berry was paying

7      for the lunch.

8              MR. PLACITELLA:  That's all I want to

9      know.

10             MR. GRAHAM:  I'll take him along, that's

11     okay, you can pay for my lunch of any time.

12             MR. McGUIRE:  I think it's an improper

13     area to inquire into.  I don't know what

14     Mr. Berry's position is.

15             MR. BERRY:  I frankly don't -- I don't

16     waive anything, but we got to get on with this

17     and so --?

18             THE WITNESS:  Well, I have no objection,

19     but I can't see some donkey prying into my

20     private affairs.

21                 I went to lunch.  I thought we were

22     out of here.  It was going to be a luncheon.  It

23     was a very delicious sandwich, incidentally,

24     which I needed to take the medicine to keep my

25     head from wobbling, which it's about ready to

1         start doing from fatigue.

2              MR. BERRY:  We better take a break then.

3         Mr. Placitella can think about what he'd like to

4         do.

5              MR. PLACITELLA: The question is still

6         before the witness, you can decide.

7              MR. McGUIRE:  Okay.

8              MR. BERRY:  We will break.

9              (Recess.)

10             MR. PLACITELLA:  I'll solve some of the

11        problem, I'll withdraw the pending question

12        for now --

13   BY MR. PLACITELLA:

14        Q     -- except that, Mr. Grimmie, your counsel

15   just showed you something.  What did he show you?

16   A     A picture.

17        Q     What was the picture of?

18   A     A carton sealer at the Berlin plant.

19        Q     A carton sealer?

20   A     Yes.

21        Q     What did that picture demonstrate?

22   A     Demonstrated cartons going through the sealer to

23   be sealed.

24        Q     And during the brake you also had

25   discussions with Mr. Berry, did you not?

1    A    Yes.

2         Q    That's all the questions I have.  Thank

3    you.

4              MR. McGUIRE:  Any other questions.

5    CROSS-EXAMINATION BY MR. WEINER:

6         Q    Mr. Grimmie, I'll be asking you some

7    questions now.  I'm going to try to do them from here.

8    A    So far.

9         Q    I will talk louder to make sure the court

10   reporter can get everything, and if you can't hear

11   anything I say, please just indicate and I'll speak up.

12             MR. McGUIRE:  Indicate whom you represent.

13             MR. WEINER:  I beg your pardon?

14             MR. McGUIRE:  Could you indicate whom you

15         represent?

16             MR. WEINER:  You can look it up, my

17         appearance.

18             MR. BERRY: Madam reporter, would you

19         indicate who he represents?

20             MR. WEINER: I represent Veteran Pipe.

21   BY MR. WEINER:

22        Q    Mr. Grimmie, do you have a health

23   condition that would in any way prevent you from

24   understanding or answering any of the questions posed

25   to you?

1   A       Only my long absence from my work and my memory

2   is not as good as it used to be.  No health condition.

3           Q       And that applies as to questions that have

4   been asked up to this point by Mr. Placitella, there

5   was no health problem that would have interfered with

6   what he asked you today?

7   A       No, sir.

8           Q       You are not taking any medication that

9   would interfere with your ability to understand

10  questions and answer questions, are you?

11  A       No.

12          Q       And it's now 4 o'clock, and you have been

13  here most of the day, do you have any problem with

14  going on for awhile longer and answering some

15  questions?

16  A       No.

17                  MR. WEINER:  Off the record for one

18          second.

19                  (Discussion off record.)

20                  MR. McGUIRE:  Mr. Grimmie has advised me

21          that he's feeling tired and his medical

22          condition that affects the, I believe you said

23          the waving of the head?

24                  THE WITNESS:  Benign tremor.

25                  MR. McGUIRE:  Benign tremor is a problem

1          for him and considering the lateness of the hour

2          and the fact that we have more questioning than

3          is going to be completed in the half an hour the

4          court reporter will be available, we want to

5          adjourn the deposition to a future agreed date.

6               MR. PLACITELLA:  Well, Mr. McGuire, five

7          minutes ago Mr. Grimmie said he was fine to

8          proceed.  I think all counsel can recollect

9          that.  I am quite concerned that you'e

10         attempting to adjourn this deposition so that

11         you can further counsel Mr. Grimmie prior to

12         another day of deposition.

13              We are ready to proceed, and let's

14         see if you actually finish your questions in

15         less than a half hour.

16              MR. BERRY:  Mr. Placitella, I'm quite sure

17         I can't.  I make that as a good faith

18         representation to you.  I'm sorry, it distresses

19         you.  The witness is 69 years old.  He's been

20         working all day.  It's 4 o'clock.  We're not

21         going to finish.  If you have concerns that you

22         believe are appropriate to bring to the court,

23         you know, you could do that, that's okay.

24              So, I mean, for my part, I would

25         unwelcome being a party to keeping Mr. Grimmie

1    here and then having to start up on another day

2    anyway, so.

3            THE WITNESS:  Well, I want to say

4    something, all I said, if we can't finish today,

5    then break it and we come back another day.  I

6    don't seeing going on and then coming back

7    again.  If we can finish, go on.

8            MR. PLACITELLA:  It's not a question of

9    your health then, Mr. Grimmie?

10           THE WITNESS:  All I'm saying is, that I

11   know from my fatigue, my head going to start

12   bouncing, all right?

13           MR. PLACITELLA:  Mr. McGuire just said

14   your health was not going to --

15           THE WITNESS:  What the hell is the head

16   tremor, if it's not my health?

17           MR. PLACITELLA:  Do you feel like

18   continuing today, Mr. Grimmie?

19           THE WITNESS:  Yes.  Can we finish?

20           MR. McGUIRE:  Mr. Grimmie, to make sure,

21   we have a half hour with the court reporter's

22   ability.  Mr. Berry has anticipated at least

23   another hour of questioning.  I, too, have

24   questioning.  We cannot represent to you in good

25   faith that we can conclude this deposition

1    inside of the next 28 minutes.

2         MR. PLACITELLA:  I guess you hold the

3    cards, Mr. McGuire.  I hope the next deposition,

4    when you're asking the question it's conducted

5    in quite a different atmosphere than today.

6         MR. McGUIRE:  Thank you.  We'll arrange

7    another date.

8         MR. PLACITELLA:  Within the next week,

9    please?

10        MR. McGUIRE:  I will be on trial.

11        MR. PLACITELLA:  You can assign another

12   attorney, please, to finish the deposition.

13        MR. McGUIRE:  All right.

14        MR. PLACITELLA:  Because I cannot

15   wait for you to finish your trial in order to

16   finish Mr. Grimmie's deposition.

17             There are many fine counsel here in

18   New Jersey on behalf of Owens-Corning Fiberglas

19   that can do that and could you please tell me

20   now, who I should contact to make those

21   arrangements because I do not want to chase you

22   through the courthouse in order to get your

23   attendance here to finish this deposition?

24        MR. McGUIRE:  Okay.  You can contact

25   myself.  I'm flattered with your inclusion of me

1        as to the very fine New Jersey attorneys

2        representing New Jersey Owens-Corning and I'm

3        honored by that.  But I'm the attorney who is

4        responsible for this proceeding and it would

5        plainly be unfair to try to interrupt this.

6        We're certainly available to work with you.  I'm

7        sure we might be able to persuade one of the

8        judges that your deposition is more important

9        than his trial.  I'll give it a good faith

10       effort but --

11              MR. PLACITELLA:  I'm prepared to proceed

12       tomorrow, Mr. McGuire.  Do you have trial

13       tomorrow?

14              MR. McGUIRE:  Tomorrow being Saturday?

15              MR. PLACITELLA:  That's correct.

16              MR. McGUIRE:  No, I don't have trial.

17              MR. PLACITELLA:  I want to accommodate

18       your trial schedule, sir.  I am prepared to come

19       down to Berlin tomorrow to finish this

20       deposition because it is needed in a case that

21       is scheduled for trial this particular month and

22       we cannot wait for your availability.

23              MR. McGUIRE:  Okay.

24              MR. PLACITELLA:  In order to accommodate

25       you, sir, I will come to Mr. Grimmie's home if

1      necessary tomorrow to accommodate your schedule.

2              MR. McGUIRE:  Okay.  Unfortunately, I'm

3      unavailable tomorrow.  There may be a time, a

4      motion day next week, perhaps, where we can do

5      this.  Motion days in Camden typically

6      being Friday, but on this short notice I can't

7      rearrange my schedule to be available tomorrow

8      and we haven't even inquired as to the

9      availability of the witness on such shortness to

10     drop whatever he's doing on Saturday, much less

11     less the other counsel here.

12              Now, Mr. Grimmie has been deposed

13     many times and I think in the course of this

14     deposition, we've referred to each of the three

15     different occasions.  So it's not as if you

16     been refused of any testimony of Mr. Grimmie on

17     the record including by video-tape deposition

18     taken specifically to avoid the very incident

19     we're here today on and other deposition taken

20     in front of then Magistrate Cohen, now a member

21     of the Third Circuit, specifically in

22     anticipation of Mr. Grimmie, should have to be

23     coming back repeatedly for these sorts of

24     occasions.  So it's not as if you don't have

25     testimony you can use, sir.

1                 MR. PLACITELLA: Is it my understanding,

2      Mr. McGuire, you're willing to stipulate that

3      all prior transcripts of Mr. Grimmie are useable

4      against Owens-Corning Fiberglas?

5                 MR. McGUIRE:  I think under the rules

6      virtually any deposition can be used provided it

7      meets the appropriate requirement of the rules.

8                 MR. PLACITELLA:  Not given the posture

9      they had in that case, I want to ask the

10     question again, are you stipulating that all

11     prior transcripts of Mr. Grimmie are useable

12     against Owens-Corning Fiberglas?

13               MR. McGUIRE:  I think we would have a hard

14     time conjuring up to the court a reason why any

15     of those transcripts cannot be used in New

16     Jersey.

17               MR. PLACITELLA:  Let me ask the question

18     again, are you stipulating that all prior

19     transcripts of Mr. Grimmie can be used against

20     Owens-Corning Fiberglas?

21               MR. McGUIRE:  In this case?  Yes.

22               MR. PLACITELLA:  What do you mean "in this

23     case"?

24               MR. McGUIRE:  In the cases in which these

25     depositions -- this deposition has been noticed.

1              MR. PLACITELLA:  No.  That's not my

2  question.  Are you stipulating that all prior

3  transcripts can be used against Owens-Corning

4  Fiberglas in any proceeding in which

5  they're a party?

6               MR. McGUIRE:  I don't think I even have to

7  stipulate.  I think as a matter of law that can

8  be.

9               MR. PLACITELLA:  Is the answer yes, sir?

10              MR. McGUIRE:  The answer is we are not

11  making such a stipulation, although I think

12  they're admissible anyway.

13              MR. PLACITELLA:  The answer is, you won't

14  stipulate, correct, sir?

15              MR. McGUIRE:  That's right.

16              MR. PLACITELLA: So, then, we have to

17  finish his deposition and we have to finish it

18  in short order.

19              MR. McGUIRE:  Okay, Mr. Placitella.

20                   Mr. Grimmie, are there days

21  that you are not available?

22             THE WITNESS:  I'll ask the surgeon.

23              MR. PLACITELLA:  Is that your wife?

24             THE WITNESS:  No.  That's the surgeon.

25  You ought to know that.  If I said the warden,

1    then you could ask that question and I would say

2    yes.

3         MR. PLACITELLA:  You got to explain things

4    very clearly to donkeys.

5         (Discussion off record.)

6         (The deposition is adjourned at 4:15 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C  E R T I F I C A T E

 2

 3

 4              I, SANDRA A. PRASNAL, Notary Public and

 5   Certified Shorthand Reporter, do hereby certify that

 6   prior to the commencement of the examination

 7

 8                    RICHARD GRIMMIE

 9

10   was duly sworn by me to testify the truth, the whole

11   truth, and nothing but the truth.

12              I DO FURTHER CERTIFY that the foregoing is

13   a true and accurate transcript of the testimony as

14   taken stenographically by and before me at the time,

15   place, and on the date hereinbefore set forth.

16              I DO FURTHER CERTIFY that I am neither a

17   relative of nor employee nor attorney nor counsel for

18   any of the parties to this action; and that I am

19   neither a relative nor employee of such attorney or

20   counsel; and that I am not financially interested in

21   the action.

22                    Sandra A. Prasnal

23   _____

24   Notary Public of the State of New Jersey

25   My Commission Expires March 25, 1992
```

Brody & Geiser (908) 738-8555 or (212) 732-0644