1    STATE OF MINNESOTA                      DISTRICT COURT

2    COUNTY OF RAMSEY            SECOND JUDICIAL DISTRICT

3    - - - - - - - - - - - - - - -
     Neil Humphreys, Lona Jensen, File No. 62-CV-13-7709
4    individually and as husband
     and wife,

5                    Plaintiffs,

6        vs.                          **VOLUME XVII**

7

8    Owens-Illinois, Inc.,         **OCTOBER 17, 2014**
                                   **MORNING SESSION**
9

10                   Defendant.
     - - - - - - - - - - - - - - -
11            The above-entitled matter came duly on for

12   jury trial before the Honorable John H. Guthmann,

13   Judge of District Court, on the 17th day of October

14   2014, at the Ramsey County Courthouse, 15 West Kellogg

15   Boulevard, St. Paul, Minnesota.

16                   A P P E A R A N C E S

17            Patrick DeBlase, Esq., Curtis M. Glaccum,

18   Esq., and Michael R. Strom, Esq., appeared for and on

19   behalf of the Plaintiffs.

20            Patrick T. Tierney, Esq. and John D.

21   Cosmich, Esq., appeared for and on behalf of the

22   Owens-Illionis, Inc.

23            Kathleen M. Conlee - Court Reporter

24

25

                                                         -1-

1                    I N D E X

2

3                                            Page

4    Dr. Earl Gregory

5        Continued Direct by Mr. Cosmich        9

6        Cross by Mr. DeBlase                    21

7        Redirect by Mr. Cosmich                98

8        Recross by Mr. DeBlase                 99

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RAMSEY COUNTY DISTRICT COURT

1              (Whereupon, the following proceedings were

2        duly had outside the presence of the jury on October

3        17, 2014 at approximately 9:03 a.m.)

4              THE COURT:  Everyone ready to go?

5              MR. DE BLASE:  Yes, Your Honor.

6              MR. COSMICH:  Yes, Your Honor.

7              MR. TIERNEY:  Ready to go home.

8              THE COURT:  I didn't finish the sentence,

9        I'm sorry.  A couple things I want to put on the

10       record:  One, I had requested the plaintiffs to mark

11       and offer the Lona Jensen deposition as it was

12       presented to the jury so we have an actual transcript

13       in addition to the thumb drive, so let's take care of

14       that sometime today.

15             The other thing I wanted to do was put on

16       the record the side-bar discussion we had late

17       yesterday with regard to the EPA document that was

18       discussed by Dr. Gregory and Mr. Cosmich in

19       connection with the issue of the definition of toxic.

20       The court's ruling permitting the questioning was

21       based upon qualification of the document as a learned

22       treatise as an exception to the hearsay rule.  It's

23       also a type of state-of-the-art argument that the

24       terminology of the time was part of the

25       state-of-the-art in the industry at the time, or in

1          industry at the time, and for those two reasons, the

2          objection was overruled.  And if anyone wants to put

3          anything else on the record to supplement that, they

4          may.

5                    MR. COSMICH:  Only that it was also

6          defense's position it was a government publication

7          but we also -- the court was not convinced of that, I

8          think.

9                    THE COURT:  Well, I don't recall that

10         coming up as a separate exception to the hearsay

11         rule, but --

12                    MR. DE BLASE:  Well, it's my understanding,

13         Your Honor, that when we're talking about

14         state-of-the-art notice, if you will, we're not

15         offering documents for the truth of the matter

16         asserted, so therefore it's substantive nonhearsay,

17         all the state-of-the-art stuff.  But when we're

18         talking postexposure, 1958 and beyond, and we're

19         talking about other issues like causation or other

20         opinions, well, that's something that has to come in

21         through an expert.  It can't come in through

22         documents submitted, shown to the jury and admitted

23         into evidence.  That is still hearsay.  I cannot

24         cross-examine a document.  A learned treatise isn't

25         necessarily admitted as evidence.  I mean --

1            THE COURT:  A learned treatise can be shown

2       to the jury.  This particular document wasn't

3       admitted as evidence as an exhibit, but the contents

4       of the document were shared with the jury, which is

5       exactly what the hearsay exception talks about.  In

6       addition, the fact that the document is dated after

7       the events doesn't mean that it's not relevant to the

8       issue of state-of-the-art.  In fact, the document

9       itself was describing the state-of-the-art in a

10      previous era, which is exactly why it was relevant to

11      the point that was being made by the defense.

12           MR. DE BLASE:  Sure.  And that's, if you

13      will, Your Honor, the opinion of that document after

14      the time.  In other words, somebody during the time

15      period opening up a document necessarily has the

16      document to look at.  Postexposure time, 1958 and

17      beyond, well, that's, you know, if somebody's

18      commenting on what was known or knowable before that

19      time, that's subject to cross-examination.  One

20      cannot cross-examine a document that's produced later

21      and talking about things that happened in the past.

22           THE COURT:  It was a learned treatise

23      relied upon by the expert who formed an opinion.

24           MR. DE BLASE:  I understand the court's

25      position.

1          THE COURT:  And I think the plaintiff has

2     been doing that throughout the case.  And I just

3     wanted to make a record of our side bar because it

4     wasn't on the record.

5          MR. DE BLASE:  Sure.  But just for the

6     record, Your Honor, just so the record is complete, I

7     don't believe I have shown the jury any documents

8     post-1958, certainly not over objection in this

9     trial.  I don't think I've shown, I mean, other than

10    things that have been agreed on, like the Social

11    Security records.  I mean --

12         THE COURT:  There have been all kinds of

13    treatises postdating 1958 that have been put in for

14    purposes of the state-of-the-art, and this document

15    is in that same category.

16         MR. DE BLASE:  Right.  I've never shown the

17    contents of those books, Your Honor.  I've only shown

18    what, you know, that they are books and that the

19    state-of-the-art is contained therein, and that is

20    the basis of the chapter -- Dr. Lemen wrote the

21    state-of-the-art chapter and the epidemiology chapter

22    in the asbestos book, but I didn't crack it open and

23    start going through --

24         THE COURT:  No, but the contents were

25    shared with the jury.  If you paraphrase the contents

1    or quote the contents, that isn't any different than

2    putting it on the screen.

3              MR. DE BLASE:  Understood, Your Honor, but

4    that's not what Dr. Lemen did.  He testified as to

5    his opinions in the case, and his bases are the

6    articles that are contained in the books and

7    treatises.  Thank you.

8              THE COURT:  Okay.

9              MR. STROM:  Your Honor, the other point

10   that we made at the time -- and you've made your

11   ruling, the evidence has come in, it's purely for the

12   record -- is that we objected that EPA document

13   reporting a problem with a landfill full of asbestos

14   superfund site does not qualify as a learned treatise

15   at all.  It's simply a publication by the EPA

16   discussing something that happened.  It was in --

17   somewhat akin to a newspaper article discussing what

18   had happened.  It just happened to be on EPA

19   letterhead.  It also was not a document discussing

20   the definition of toxic or what it meant.  It was

21   simply an offhand comment, and it also referred to, I

22   mean, not coincidentally, to 1972 when the EPA and

23   the government agencies started regulating asbestos,

24   which they hadn't done before.

25              So it was very misleading when they're

1    saying toxic, nontoxic.  They're talking about

2    whether or not something's regulated or not

3    regulated, and their inability to cross-examine on

4    that particular point was I think part of the

5    problem.

6              THE COURT:  Well, you will have your chance

7    to cross-examine the witness who formed the opinion

8    and the strength and weight to be given to this

9    particular resource that he used in forming that

10   opinion.  I gave the plaintiff the opportunity to

11   cross-examine Dr. Gregory before it was put up on the

12   screen, and that opportunity was passed upon.  You

13   still can cross-examine him because the direct

14   examination is taking place.

15             Your characterizations of the document are

16   rather hollow.  They just go to the weight in light

17   of the fact that there's unopposed testimony from Dr.

18   Gregory that it's a learned treatise and Rule 803(18)

19   allows the statements to be read into the, read into

20   evidence but not admitted as exhibits.  That's

21   exactly what happened.  And that's treating it as an

22   exception to the hearsay rule.  If it's treated as

23   state-of-the-art as Mr. DeBlase suggests, not that he

24   agrees with this characterization, but as he properly

25   suggests, if it's state-of-the-art, that goes to

1    notice and not to truth of the matter asserted.  It's

2    not hearsay at all.  So for those two reasons, I

3    permitted the defense to proceed.

4         MR. STROM:  We understand the court's

5    ruling and we're ready to move on.  Thank you.

6         THE COURT:  Okay.  Let's bring in the jury.

7         (Whereupon, the following proceedings were

8    duly had in open court in the presence of the jury:)

9         THE COURT:  Good morning.  Have a seat.

10   Dr. Gregory, you can come back and resume your seat.

11        Mr. Cosmich, you can continue with your

12   direct exam.

13        MR. COSMICH:  Thank you, Your Honor.

14        CONTINUED DIRECT EXAMINATION

15   BY MR. COSMICH:

16   Q    Good morning, Dr. Gregory.

17   A    Good morning.

18   Q    When we left off yesterday we had been talking about

19        dose and toxicity.  Do you recall that?

20   A    Yes.

21   Q    Where I want to go now is back to the concept of a

22        threshold limit value briefly, okay?

23   A    Yes.

24   Q    At any point did the ACGIH or any other entity ever

25        have a separate TLV for asbestosis and cancer?

—9—

| | | |
|---|---|---|
| 1 | A | No, they did not. |
| 2 | Q | Some mention has been made about suggestions by a Dr. |
| 3 | | Stockinger about a safety factor.  Are you aware of |
| 4 | | discussions with respect to a safety factor? |
| 5 | A | Yes, I am. |
| 6 | Q | Do you know Dr. Stockinger? |
| 7 | A | Yes, Dr. Stockinger was a guest lecturer at the |
| 8 | | University of Cincinnati while I was there working on |
| 9 | | my master's degree in industrial hygiene.  In fact, |
| 10 | | he worked across the town of Cincinnati at the Public |
| 11 | | Health Service.  At that time it was called the |
| 12 | | National Institute of Occupational Safety and Health, |
| 13 | | or NIOSH. |
| 14 | Q | At any point are you ever aware of Dr. Stockinger |
| 15 | | suggesting a safety factor or a lowering, or a |
| 16 | | different level of TLV for asbestos? |
| 17 | A | No. |
| 18 | Q | Are you aware of publications by the American |
| 19 | | Industrial Hygiene Association called Quarterly |
| 20 | | Reports? |
| 21 | A | Yes. |
| 22 | Q | Are those the types of materials that hygienists such |
| 23 | | as yourself would rely upon and read? |
| 24 | A | Yes. |
| 25 | Q | Would you consider them to be authoritative? |

RAMSEY COUNTY DISTRICT COURT

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | If there were writings by Dr. Stockinger and such at |
| 3 | | issue, would that be authoritative and something that |
| 4 | | would be relied upon by folks such as yourself out in |
| 5 | | the field? |
| 6 | A | Certainly, yes. |
| 7 | Q | Are you aware of the publication by Dr. Stockinger in |
| 8 | | the American Industrial Hygiene Association's |
| 9 | | Quarterly Report in September of 1956? |
| 10 | A | Yes, I am. |
| 11 | | MR. DE BLASE:  Your Honor, may I have an |
| 12 | | opportunity -- I object.  I haven't seen this.  I'd |
| 13 | | like to see it.  It hasn't been shown to me. |
| 14 | | MR. COSMICH:  It's literature just like you |
| 15 | | mentioned. |
| 16 | | THE COURT:  Okay, take a look at it. |
| 17 | | MR. DE BLASE:  I have it.  It's fine; go |
| 18 | | ahead. |
| 19 | | THE COURT:  Proceed. |
| 20 | BY MR. COSMICH: | |
| 21 | Q | Do you recall Dr. Stockinger specifically writing |
| 22 | | about his view of asbestos and cancer in that report? |
| 23 | A | Yes, I do. |
| 24 | Q | You know, on page 342 Dr. Stockinger talks about Dr. |
| 25 | | Doll, there's been a lot of discussion about Dr. |

—11—

1      Doll?

2   A  Correct.

3   Q  This is 1956, right after Dr. Doll's publication

4      comes out, correct?

5   A  Correct.

6   Q  Dr. Stockinger goes on to say:  With such relatively

7      small numbers of cases, one must be extremely

8      cautious in drawing the conclusion of a causal

9      relationship between exposure and the disease.

10            Do you recall reading that?

11  A  Yes.

12  Q  Further, the question to resolve then in the asbestos

13     exposures is whether a tenfold greater incidence of

14     lung cancer is large enough to be significant when

15     dealing with small samples of this sort.  Before a

16     final decision is reached it would seem well to wait

17     until a more impressive number of cases has been

18     documented.

19            What is your interpretation of what Dr.

20     Stockinger is telling us there?

21  A  Well, basically he's stating there's not enough

22     scientific evidence to conclusively conclude that

23     asbestos results in an increased rate of lung cancer

24     among exposed workers at that time.  That was the

25     state-of-the-art of thinking during that time period.

RAMSEY COUNTY DISTRICT COURT

| | | |
|---|---|---|
| 1 | Q | And he goes on.  We won't read it all, but toward the |
| 2 | | end he refers to asbestos as a fibrous form of |
| 3 | | mineral? |
| 4 | A | Correct. |
| 5 | Q | And the ACGIH, as we established before when they had |
| 6 | | the threshold limit values, categorized asbestos as a |
| 7 | | mineral dust as opposed to a toxic dust, correct? |
| 8 | A | That's correct. |
| 9 | Q | Is there any indication from Dr. Stockinger's writing |
| 10 | | in 1956 that would indicate to you that he was |
| 11 | | recommending a safety factor for asbestos with |
| 12 | | respect to the TLV? |
| 13 | A | No, he was not recommending one at that time. |
| 14 | Q | Some mention was also made about a publication by the |
| 15 | | Manufacturing Chemists Association.  Do you recall |
| 16 | | reading about that before? |
| 17 | A | Yes. |
| 18 | Q | And are you familiar with that publication? |
| 19 | A | Yes. |
| 20 | Q | And whether or not warnings for certain products |
| 21 | | should be issued? |
| 22 | A | Correct. |
| 23 | Q | Do you recall that? |
| 24 | A | I sure do. |
| 25 | Q | Was asbestos ever included in that recommendation or |

—13—

1        that association's publication?

2    A  No, it was not.

3    Q  But they did suggest a lot of warnings for other

4        types of materials that were carcinogens, correct?

5    A  That's correct.

6    Q  I want to move to another area.  We've talked a lot

7        about the types of controls that were known about or

8        knowable in the field of industrial hygiene for

9        controlling dust, okay?  What types of controls would

10       have been known about in the 1950s at a work site to

11       control dust?

12   A  Well, basically they fall into three categories:

13       Engineering controls, which involves the use of

14       ventilation to remove contaminated air away from the

15       employees' breathing zone or the area that the

16       employees are working.  So engineering controls, and

17       there's various other types of engineering controls,

18       but ventilation is the primary one.

19             The other category is called work practice

20       or administrative controls where you use methods such

21       as wetting down a material to prevent it from

22       becoming airborne, or you reduce the time that you're

23       working with the material so that your exposure

24       duration is not as long.  So administrative controls

25       vary, and there's many different types of them.

1              And then the other major category includes

2        personal protective equipment which is the wearing of

3        respirators or respiratory devices, either reusable

4        respirators or dust masks, disposable respirators

5        that filter out the fibers or the dust as you're

6        working and breathing in that particular area.

7     Q  And these are all controls that were state-of-the-art

8        in the 1950s?

9     A  Yes.

10    Q  And had been written about -- we're not going to

11       rehash it -- but since Merewether, et al. in the

12       1930s?

13    A  Yes, they even go back farther than that, yes.

14    Q  And published by industrial hygienists like Dr.

15       Brandt and others in authoritative journals?

16    A  Yes.

17    Q  And written about in industrial hygiene Quarterly

18       Reports?

19    A  Correct.

20    Q  With respect to dust at a work site, in order to know

21       whether or not the dust is approaching a threshold

22       limit or a certain exposure level, how do you find

23       that out?

24    A  You have to do industrial hygiene air monitoring

25       using a device similar to what I described to the

1      jury yesterday where you have a filter or an

2      impinger.  In the old days they used impingers, which

3      is nothing more than a little flask that you bubble

4      air through a water solution.  But the new technology

5      in the late '60s was the filter that you attached to

6      the lapel to represent the employee's breathing zone,

7      and you connect that to a battery-powered pump that

8      then draws air through that filter, and all of the

9      dust and the fibers collect on that filter.  And then

10     that is analyzed and counted by people who are

11     analytical chemists or those who are trained in

12     counting asbestos fibers.

13  Q  Was there a mechanism to do that in the 1950s?

14  A  Oh, yes.

15  Q  Also written about in a lot of journals that were

16     discussed in this case?

17  A  Oh, yes.

18  Q  In your opinion, should employers provide a safe

19     place to work?

20  A  Oh, yes.  There's no question about it.  When you

21     hire an employee you take full responsibility because

22     you are the one that is paying for their labor, but

23     you're not paying for them to get hurt or to suffer

24     any overexposures.  All you are entitled to is their

25     labor.  When they leave you at the end of that day

1      you pay them, but they shouldn't be taking in

2      excessive amounts of chemicals home in their body

3      that are going to result in adverse health effects.

4            And the employer is the one that has the

5      total control over the workplace.  They hire the

6      people.  They control the people.  They control the

7      material.  They control the exposure conditions.

8      They control the work practices.  They control the

9      procedures.  They have total control over their

10     employees.  Only employers have not only the control

11     but the ability and the resources to prevent

12     overexposure to their employees.

13  Q   You talk about the particular work practices and

14     controls.  Why are those important in how much

15     exposure would occur at a work site in the 1950s, or

16     with asbestos, with asbestos?

17  A   Yes.  Those controls are the only effective ways of

18     reducing an employee's exposure to asbestos or any

19     other chemical.  And the employer is the one that has

20     the ability to implement and require the use of those

21     controls, and to monitor and police those controls to

22     make sure that they remain effective while the

23     employee is performing his or her job.

24  Q   And do the work practices, how the products are

25     handled, affect how much dust may be in a given

```
1              application?
2     A    Oh, definitely.  All of those controls, the
3          engineering controls, the administrative or work
4          practice controls and respiratory controls, reduce
5          exposures that the employee will receive while
6          performing their job.
7     Q    In any work site such as was described by Mr.
8          Humphreys, there are a lot of different hazardous
9          materials?
10    A    Yes.
11    Q    And this control doesn't just relate to asbestos, it
12         would be for everything, correct?
13    A    Exactly, everything that's potentially hazardous.
14    Q    Should an employer who is conducting a certain
15         activity or a subcontractor of a specialized field,
16         should they know about the hazards associated with
17         the type of work that they're holding themselves out
18         to do?
19    A    Yes, they should.  As an employer you take that
20         responsibility when you hire people to perform a
21         task.  You take that responsibility of knowing what
22         they're doing, what they're working with, and what
23         the potential health effects of those particular
24         products are going to be so that you can make sure
25         they're not overexposed and suffer adverse health
```

1              effects.

2     Q    And Dr. Gregory, from an industrial-hygiene

3              perspective, does this responsibility to provide a

4              safe workplace and protect workers depend on the size

5              of the employer?

6     A    No.  The engineering, administrative and personal

7              protective equipment controls are controls that every

8              employer has available to them, whether they have one

9              employee or thousands of employees, so they're

10             available and always have been available to

11             employees.

12    Q    Is that a concept that OSHA applies even today?

13    A    Yes, when OSHA passed their Occupational Safety Act

14             of 1970, it made it very clear that it was the

15             employer's responsibility to protect each and every

16             employee.

17    Q    Dr. Gregory, I want to show you one more exhibit

18             that's been entered into evidence.

19                    MR. COSMICH:  May I approach, Your Honor?

20                    THE COURT:  You may.

21    BY MR. COSMICH:

22    Q    Dr. Gregory, I have Exhibit 15.  It's been entered

23             into evidence.  It's the specifications from the work

24             site.  Are you familiar with that?

25    A    Yes, I am.

1   Q   I want to turn to one of the provisions and see if

2       this is consistent with what you're talking about.  I

3       don't know if you can read it there.  Under section

4       E, labor:  The insulation contractor shall furnish

5       all necessary labor to perform properly the work

6       covered by these specifications.  He shall adopt all

7       precautions to prevent injury to persons and

8       property.  Did I read that correctly?

9   A   Yes, you did.

10  Q   What type of precautions to protect injury to persons

11      would be available to the insulation subcontractor in

12      the summer of 1957 when this contract was going on?

13  A   All the engineering work practice, administrative and

14      personal protective equipment controls that I've

15      previously discussed were available at that time.

16  Q   And from your review of Mr. Humphreys' testimony and

17      the depositions, are you aware of whether or not

18      Mr. Humphreys' employer instituted any of those

19      controls?

20  A   There was no evidence that any of those controls were

21      used during the time period that Mr. Humphreys worked

22      at that power plant during the summer of '57.

23          MR. COSMICH:  Your Honor, those are all the

24      questions I have.

25          THE COURT:  All right.  Cross-examination.

1          MR. DE BLASE:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3   BY MR. DE BLASE:

4   Q   Good morning, Dr. Gregory.  How are you?

5   A   Good.  Good morning, and I'm great, thank you.

6   Q   Let's start where we left off.  All right, give the

7       projector some time to warm up.

8                The article, Industrial Hygiene Quarterly,

9       you were shown that on direct just now?

10  A   Yes.

11  Q   That was -- this is by Stockinger commenting on the

12      Dr. Doll article, 1955, right?

13  A   That's correct.

14  Q   And something we didn't read was the article by

15      Cartier above that section, right?  We heard about

16      Cartier from Dr. Lemen in this trial as writing a

17      paper concerning asbestos in cancer.  Are you

18      familiar with that paper?

19  A   No, I'm not.

20  Q   Well, let's read what it says here:  Cartier studying

21      over a nine-year period involving 4,000 asbestos

22      miners in Canada, involving 128 cases of asbestosis,

23      40 of them with autopsies, found six of these have

24      bronchogenic carcinoma.  Seven cases of lung cancer

25      were found among asbestos miners with no asbestosis.

```
 1                    There's been some talk in this trial about

 2          asbestosis being needed to have lung cancer.  Is this

 3          an indication to you as an industrial hygienist as a

 4          professional in safety and industrial engineering,

 5          that Cartier's reporting there's this question about

 6          having lung cancer without having asbestosis?

 7    A     I'm not familiar with that particular study, but just

 8          because you have lung cancer without asbestosis

 9          doesn't mean that it was caused by asbestos or

10          exposure.  So I'd have to see the whole study,

11          because when you're doing an epidemiological study --

12          and I'm not sure that that even qualifies as an

13          epidemiological study -- but you have to rule out

14          other potential causes of lung cancer, for example,

15          the most prevalent cause, cigarette smoking, so --

16    Q     Doctor Lemen has testified in this case that it is an

17          epidemiological study.  Do you know Dr. Lemen?

18    A     Yes.

19    Q     He's an epidemiologist, right?

20    A     Yes.

21    Q     Okay.  Would he be the best person to tell us in this

22          trial as to whether or not that study was an

23          epidemiology study?

24    A     If he accepts it as a valid and scientifically

25          performed epidemiological study, then I would accept
```

—22—

```
 1         that, but as far as your conclusion, I wouldn't
 2         accept that.
 3    Q    I'm not asking you to accept anything that I say.
 4    A    Right, right.
 5    Q    But let's talk about it.  In 1956 this researcher
 6         Stockinger is reporting something that Cartier has
 7         reported, right?
 8    A    Right.
 9    Q    And the implication is well, maybe we could have
10         lesser -- let's start with this:  In order to have
11         asbestosis you need significant exposures to
12         asbestos, right?
13    A    That's correct.
14    Q    And the thinking is maybe you don't need those sorts
15         of significant exposures to asbestos to get lung
16         cancer; is that the implication by that sentence?
17    A    That indicates there's a possibility of that and it
18         requires more epidemiological studies to prove one
19         way or the other.  At that point it's not conclusive
20         though, which is what Dr. Stockinger indicated.
21    Q    Okay.  It's not for sure at this point, right?
22    A    That's right.
23    Q    Okay.  All right.  As an industrial hygienist, you
24         want to be absolutely positive of things before you
25         expose workers to industrial carcinogens?
```

—23—

```
 1   A   You want to have conclusive information in order to
 2       establish the TLV values.
 3   Q   And if you don't have those conclusive information
 4       but you have strong suspicions, it's okay to expose
 5       workers to carcinogens?
 6   A   Well, first of all, you have to have conclusive
 7       information that it is or is not a carcinogen.  We
 8       found out later that it definitely was a carcinogen
 9       but that was later, you know, after the 1955 and a
10       few studies after that, many of them with Selikoff
11       and Chris Wagner.  But you establish a TLV based on
12       the best available scientific information, and the
13       people who reviewed that information were
14       governmental industrial hygienists with no ties to
15       private industry.  Their only concern was the
16       American worker and making sure that that American
17       worker was not overexposed to a material that was
18       going to result in cancer or asbestosis.
19   Q   Let's get back to something you just said, and that
20       is that as of 1955, is it your testimony that
21       asbestos has not been conclusively proven to cause
22       cancer?
23   A   In 1955, with the Richard Doll study, that's
24       recognized as the first epidemiological study that
25       concluded that overexposure to asbestos resulted in
```

—24—

```
1            an increased risk of lung cancer among the employees

2            who were exposed to asbestos.

3   Q    So as of 1955 we can consider asbestos a carcinogen,

4        yes or no?

5   A    It was considered at that time a carcinogen based on

6            that study, although there was still a lot of doubt,

7            still many people felt you had to have asbestosis to

8            develop cancer.  And, you know, those were the people

9            who were the leaders in the world as far as their

10           knowledge of asbestos.  For example, Selikoff, for

11           example, stated in as late as 1972 that before 1960

12           there was uncertain and tenuous information as far as

13           whether asbestos was a --

14               MR. COSMICH:  Objection, Your Honor.

15               THE COURT:  Overruled.

16  BY MR. DE BLASE:

17  Q    Let's get back and start at the beginning, okay, Dr.

18           Gregory?  You have mentioned I think -- maybe you

19           didn't.  Have you published anything on asbestos?

20  A    Nothing particular on asbestos, that's correct.

21  Q    How about anything generally?

22  A    Yes, I have, generally.

23  Q    Tell us?

24  A    Well, they're management of safety and health

25           programs.  I published two management articles on how
```

—25—

1          to use techniques to prevent overexposure to

2          chemicals and occupational injury, so they're just

3          basically indicating to management what management

4          has to do to prevent occupational diseases and

5          occupational injuries and all those techniques

6          involving engineering and work practice, engineering

7          controls, personal protective equipment,

8          accountability, observations, and a bunch of other

9          additional controls that I've put into those articles

10          on how to make sure that employees are working safely

11          and under safe working conditions.

12     Q   And is that published in the peer-reviewed

13          literature?

14     A   Yes.

15     Q   Where is that?

16     A   American Safety Society, publication called

17          Professional Safety and the American Industrial

18          Hygiene Association Journal.

19     Q   And does the word "asbestos" appear in any of those

20          articles?

21     A   No.  I covered all potential health hazards as a

22          group in those articles.

23     Q   But the word "asbestos" appears nowhere in any of

24          those articles?

25     A   No, there was no reason to specify asbestos.  The

1              controls for asbestos are similar to the controls for

2              all other occupation potential health hazards.

3    Q    Your Ph.D. dissertation had nothing to do with

4              asbestos, correct?

5    A    No, it did not.

6    Q    Your master's thesis had nothing to do with asbestos,

7              correct?

8    A    No.  They were industrial hygiene monitoring

9              techniques, but they didn't apply specifically to

10             asbestos because those techniques had already been

11             developed for years and years long before I entered

12             my master's degree program or Ph.D. program.  They

13             wouldn't have awarded me a master's thesis or a Ph.D.

14             if I had repeated what everyone else had done before

15             me, at least at the University of Cincinnati they

16             wouldn't.

17   Q    The air sampling you did for that dissertation had

18             nothing to do with asbestos, did it?

19   A    That's correct, but I've sampled for asbestos

20             hundreds and hundreds of times.

21   Q    Have you brought with you here today any results of

22             air-sampling testing you've done?

23   A    No.  As I indicated, I've sampled for asbestos

24             hundreds of times during my career.

25   Q    We're going to talk a little bit about that today,

1       but you haven't brought the results of air-sample

2       testing, in other words, the actual fibers per cc

3       here in court today?

4  A   No, most of that would have been government documents

5       that OSHA owned and not me.  It would have been

6       illegal for me to have taken those from OSHA, and

7       then the others were owned by the companies that I

8       worked for, and I did not take copies of those as

9       well.

10  Q   And you've never measured the level of asbestos

11       released from a Kaylo product, correct?

12  A   I have measured the removal of various calcium

13       silicate thermal insulation products.  I couldn't

14       tell you that it was Kaylo.  It could have been one

15       of the other calcium silicate thermal insulation

16       products, because once the product is installed, and

17       then you remove it, of course, you know, there's no

18       Kaylo on the product so -- but with all the sampling

19       that I've done during removal operations where

20       employees have had to remove insulation to repair

21       lines, valves and things like that, it's highly

22       probable that I have sampled during a removal of

23       Kaylo and other types of calcium silicate insulation

24       products.

25  Q   So getting back to my question.  You don't know,

1          you've never actually sampled Kaylo, what you know to

2          be Kaylo, and taken dust measurements from Kaylo, is

3          that right?

4     A    During a removal operation you don't know whether

5          it's Kaylo or Johns Manville or Pabco.  I mean, you

6          can identify by its texture in the smoothness and the

7          whiteness that it is a calcium silicate material.

8     Q    They all look about the same?

9     A    The calcium silicates do, yes.

10    Q    And you're talking about tear out or removal of this

11         pipe covering, right?

12    A    Yes.

13    Q    That's your experience with testing?

14    A    That's correct, because by the time I got into the

15         field --

16    Q    And specifically --

17                   THE COURT:  Don't interrupt the answer.

18                   THE WITNESS:  By the time I got into this

19         profession they were not installing Kaylo or any

20         other type of calcium silicate.  Manufacturers

21         stopped manufacturing those products in 1973, and I

22         started in 1974.

23    BY MR. DE BLASE:

24    Q    Right.  So you've never had an opportunity to test

25         anything that was actually installed, right?

```
 1    A    Just during a removal.
 2    Q    My question is, you never had an opportunity to test
 3         anything that was actually installed, right?
 4    A    As far as Kaylo or any other thermal insulation
 5         products, that's correct.
 6    Q    Thank you.
 7    A    I did test other asbestos-containing products that
 8         were installed or used but not thermal insulation
 9         because, again, it was not being manufactured at that
10         time.
11    Q    Now, you have done in the past, in past cases, this
12         thing called a cumulative dose reconstruction, is
13         that what you call it?
14    A    That's correct.
15    Q    Now, some scientists, or perhaps many scientists,
16         think that that's not a valid contribution to
17         science.  Are you familiar with that controversy?
18    A    Yes.  It's an estimate in most cases, because
19         typically you don't have enough detailed information
20         on frequency and duration and working environmental
21         conditions to be very accurate.  At best you come up
22         with an estimation.
23    Q    So you'll read a person's deposition who has
24         mesothelioma, take down what they have to say about
25         their exposure and come to conclusions as to what
```

```
 1              their cumulative dose to asbestos was in their

 2              lifetime, that's what you've done in the past?

 3     A   Not for their lifetime, just during a particular job

 4              where they give me enough information on frequency

 5              and duration, that I can make those types of

 6              calculations and estimations, you know.  As far as

 7              lifetime, you're talking about ever since they were a

 8              child and exposed to the ambient concentration of

 9              asbestos and summer jobs and things like that.

10              Usually -- in fact, I can't think of any case where

11              I've ever had that kind of detailed information,

12              where I could come up with quantitative results on a

13              person's total lifetime exposure that I could say is

14              scientifically reliable or at least has scientific

15              certainty.

16     Q   Background exposures or ambient exposures to

17              asbestos, would you agree that those do not increase

18              one's risk of getting mesothelioma?

19     A   Well, it depends.  If someone lives in an environment

20              where those levels are relatively high, it certainly

21              increases their overall cumulative dose of exposure.

22     Q   Let's talk -- well, you're talking about if somebody

23              lives near an asbestos mine, right?

24     A   No.  I mean, it could be in an urban area where there

25              was a lot of mobile traffic with the braking of cars
```

1    and use of clutches where you get some asbestos from

2    brake materials, clutch materials, or they could be

3    in a school room where there's a deteriorated

4    fireproofing material or soundproofing material where

5    asbestos fibers are being released into the air, or

6    the ventilation system was sprayed with a

7    fireproofing or soundproofing material and that's

8    deteriorated with time and those fibers are being

9    blown out into the classroom, or in their home.

10            I mean, asbestos was a material that was

11    used for everything from coats to diapers, to

12    tissues, to dish towels, to mattresses, and there's

13    just -- asbestos was everywhere in those days.  And

14    there was all types of potential exposures in the

15    house as well as outside the house and in the ambient

16    environment, in your school rooms and other places.

17  Q   Dr. Gregory, I'm talking about ambient exposures to

18      asbestos.  You're familiar with that term, ambient,

19      right?

20  A   Yes, ambient means around us.

21  Q   Okay.  Well, when used and discussed in scientific

22      literature when it relates to asbestos, it doesn't

23      mean somebody who's sitting next to their couch that

24      might have asbestos in it, it doesn't mean somebody

25      who's in a classroom breathing in asbestos from a

1      ceiling, right, it doesn't mean that, does it?

2   A   Ambient means outside or inside.  It means the

3      environment that surrounds you.  Typically when they

4      talk about ambient levels they're talking about

5      ambient environmental levels outside of a building,

6      in other words, out in the open spaces.

7   Q   Away from a point source of asbestos, right,

8      something we can identify as being asbestos as being

9      given off by that?

10  A   Well, you can't usually say point source because some

11     rock formations contain naturally occurring asbestos.

12     When the wind blows or when there's some construction

13     activity, those fibers can be released into the air.

14     So ambient environmental just means what's in the

15     outdoor environment at that particular point in time.

16  Q   So would you agree with me that it has nothing to do

17     with a point source of asbestos; in other words, we

18     can talk urban areas, and there have been studies on

19     urban background levels of asbestos, right?

20  A   Yes.

21  Q   Okay.  And those background levels of asbestos have

22     been quantified, have they not?

23  A   In certain areas but in very few.

24  Q   Yeah, okay.  And that's what I'm talking about when I

25     talk about ambient.  Is that what you're talking

1        about, you're including these other things like

2        inside a school?

3    A   No.  If you want to say ambient outdoors, then we can

4        agree that that's outside of any building or any

5        structure.

6    Q   Okay.  But I mean, it could include somebody who

7        lives next to an asbestos mine and then we're not

8        talking about ambient then, are we?

9    A   Yes, you are, because you're outdoors and that

10       asbestos mine or asbestos manufacturing plant is

11       releasing asbestos fibers into the outdoors.  They

12       have to come from somewhere.

13   Q   Understood.  They certainly didn't happen naturally.

14   A   No, they can happen naturally from the ground.

15   Q   They can.  And so that happens when it happens from a

16       natural outcropping in the ground, right?

17   A   Correct.

18   Q   And it can also happen if somebody's in a

19       neighborhood, say, in London there have been papers

20       about this, a London neighborhood, people getting

21       mesothelioma from just living in their own home but

22       there's a factory nearby, right?

23   A   Or a high-traffic area, sure.

24   Q   High-traffic area, what are you talking about?

25   A   Where you use brakes that contain asbestos.

1    Q    Let's talk about that, the brakes.  Tell me about

2         this brake study that you know of where there has

3         been a documented increased risk of mesothelioma from

4         living near an area where there's a lot of brakes?

5    A    Well, there's nothing that specific showing an

6         increased risk.  It just shows an increased exposure

7         to anyone that happens to live or work or pass

8         through that area, but I'm not aware of any

9         scientific publications that have had the information

10        to determine that that particular type of exposure

11        resulted in an increased risk of mesothelioma to any

12        particular population.  But it certainly increases

13        the inhalation or the cumulative dose that anyone

14        that might be exposed would have.

15   Q    Okay.  All right.  So that doesn't increase risk.

16        Does ambient, just being a naturally occurring rock

17        deposit -- in other words, there's no point sources

18        anywhere around you, the levels are very, very low in

19        very rural areas as opposed to being in urban areas,

20        and they have decreased with time as we get away from

21        using asbestos in the 1970s.  So getting back to my

22        question.  In those areas, just the background that

23        happens to be in those areas, the background on

24        asbestos, is that something that increases one's risk

25        of mesothelioma?

```
 1    A    I think you're asking me a medical question.
 2    Q    I'm not actually; I'm asking you about risk.
 3         Industrial hygienists talk about risk, do they not?
 4         I'm not talking about causation; I'm talking about
 5         risk.
 6    A    Well, we like to avoid getting into medical issues to
 7         determine the cause of mesothelioma and increase the
 8         risk of mesothelioma, but there's certainly very low
 9         levels that you would find in an urban area today as
10         far as ambient environmental concentration of
11         asbestos.
12    Q    Okay.  So getting back to my question.  Does ambient,
13         away from a factory, away from a mine, does that
14         increase one's risk of mesothelioma?
15    A    If you're in an area where you have very, very low
16         exposures to asbestos due to -- in the absence of any
17         of those things you're talking about, and you live in
18         that area for your whole life, then it does not
19         increase your risk, in my opinion, as an industrial
20         hygienist, which like I'm indicating to you you're
21         getting into some medical-type questions.
22    Q    I don't want to get into the medicals.  I want to
23         stick where your specialty is.
24    A    In my opinion, in an area where the concentrations
25         are very, very low, it does not increase your risk or
```

| 1 | | at least put you in a category of people that have an |
| 2 | | increased risk of developing mesothelioma. |
| 3 | Q | Now, you said something that caused me a little |
| 4 | | concern.  I want to go over it, this high-traffic |
| 5 | | area.  What is the high-traffic area, and is that |
| 6 | | something that increases one's risk of getting |
| 7 | | mesothelioma? |
| 8 | A | Well, back in the years before the 1980s when brakes |
| 9 | | contained asbestos, in a high urban area near stop |
| 10 | | lights, stop signs and things like that in the city |
| 11 | | where you had the constant application and releasing |
| 12 | | of brakes, there have been significant levels of |
| 13 | | asbestos measured in those areas.  Now, fortunately, |
| 14 | | most of the people braking and going through there or |
| 15 | | walking through there aren't staying there, so |
| 16 | | they're not breathing all that in; they're moving |
| 17 | | away from that, but there have been those studies |
| 18 | | that have shown significant levels of asbestos in |
| 19 | | those particular areas. |
| 20 | Q | And what kind of levels are we talking about on a |
| 21 | | fiber per cc basis? |
| 22 | A | Oh, it varies from less than .1 up to above one fiber |
| 23 | | per cc. |
| 24 | Q | And what studies do you refer to for that? |
| 25 | A | Well, the ones I'm thinking about now are the |

1        California studies.

2    Q   The Baxter studies?

3    A   I don't remember the name of them.  There's been a

4        lot of studies done around the country.

5    Q   I've never heard of anything above -- or background

6        for ambient -- above .01 fibers per cc, and you have?

7    A   Well, maybe you've read more industrial hygiene

8        articles and maybe you've been to more presentations

9        that I have.

10   Q   So tell us, what do you have?

11   A   I can't remember the exact publication and whether it

12       was a publication or just a study that was presented

13       at the American Industrial Hygiene Conference.

14   Q   The highest I've heard is .01 by a fellow named

15       Baxter in California, which is significant, is it

16       not?

17   A   It's significant for an ambient concentration,

18       ambient environmental concentration.

19   Q   Would you consider .01 fibers per cc to be something

20       increasing one's risk of getting mesothelioma?

21   A   Well, again, you're getting into a medical question.

22   Q   I'm just talking about risk.

23   A   If you have 24 hours of exposure to that you're

24       exposed at three times what an employee in a

25       workplace would be exposed to, so it would depend on,

1          you know, how long your exposure to that was and how

2          much of that you were actually absorbing into your

3          lungs, and if it was being retained by your lungs,

4          and what particular type of asbestos it was.

5    Q     Moving away from that, is it your understanding that

6          ambient, other than that Baxter study I talked about,

7          is more along the lines of .00005 fibers per cc?

8    A     The latest that I've seen was published in 1984 and

9          it was .0004 fibers per --

10   Q     Is that from the ATSDR, is that where you got that

11         figure from?

12   A     Yes.

13   Q     And that's a pretty authoritative publication.  Tell

14         us what the ATSDR is?

15   A     Well, it's a publication that involves studying

16         various hazardous materials and ambient

17         concentrations of various hazardous materials in the

18         asbestos toxicology profile, is what they're referred

19         to, and they periodically publish their results at

20         various meetings on that, but that was a 1984 study.

21         There's been other studies, even Selikoff did air

22         monitoring in cities -- of course, that was back in

23         the '60s -- and found much higher levels than that

24         which you would expect because asbestos was being

25         used in large volumes throughout the country during

1          that time period.

2     Q    And when you say much higher, .0000, no -- four now?

3     A    Yes.

4     Q    .0004 is from the ATSDR?

5     A    Right.

6     Q    And when you say it was probably significantly higher

7          in Seilkoff's era in the '60s, you're saying well,

8          let's take a zero off or something like that?

9     A    No, no.  See, he reported his in different units, and

10         so it's difficult to convert his into fiber per cc,

11         which you have from that document as fibers per cc.

12         But as I recall, there have been studies where they

13         -- many have reported near some areas in the '70s of

14         .02 fibers per cc converted from some of his studies

15         as well as other studies.  But it varies, it varies

16         all over the place, and it depends on whether you're

17         near a factory, near a high-urban area where there's

18         a lot of brake work, the wind directions.  It just

19         depends on so many factors.

20    Q    In this case, in Mr. Humphreys' case, is there any

21         indication that ambient played a role in his

22         mesothelioma?

23    A    Well, I don't know what the exposure levels were in

24         the ambient environment that he worked in outside of

25         the power plant where he was a construction worker.

1         I know there was a lot of concerns involving northern

2         Minnesota during the dumping of --

3                 MR. DE BLASE:  Object, Your Honor.  This is

4         -- and the subject of a motion in limine.  I mean,

5         it's outside the scope.

6                 THE COURT:  Just object nonresponsive.

7                 MR. DE BLASE:  Nonresponsive.

8                 THE COURT:  Sustained.

9    BY MR. DE BLASE:

10   Q   All right, by the way -- well, let's get back to

11       this.  Okay, so in your opinion, ambient did not play

12       a role in Mr. Humphreys' mesothelioma?

13   A   I don't have enough information to say that.

14   Q   Okay.  The information that you do have is what you

15       testified to on direct, is that right?

16   A   Yes.

17   Q   He had a substantial exposure to pipe covering,

18       right?

19   A   Based on his testimony, he did have exposures to the

20       use of pipe covering and the use of

21       asbestos-containing insulating cements as well as --

22                 MR. DE BLASE:  Your Honor, I move to

23       strike.  I'm asking a question.

24                 THE COURT:  It's nonresponsive.  Sustained.

25   BY MR. DE BLASE:

```
 1    Q   All right.  So the next thing he had exposure to was
 2        the mud, he had a substantial exposure to
 3        asbestos-containing mud, correct?
 4    A   Based on his testimony, that's correct.
 5    Q   He also had other exposures in his life, right?
 6    A   Yes, he did.
 7    Q   And we'll talk about those.  Now, your background is,
 8        you started with OSHA in 1974, you worked there for
 9        seven years, is that right?
10    A   That's correct.
11    Q   And after that seven years you worked for companies,
12        right?
13    A   That's correct.
14    Q   So when you were talking about you were the enforcer,
15        the cop, that's when you were with OSHA?
16    A   That's correct.
17    Q   When you were with the companies though you were
18        being paid by the companies, right?
19    A   That's correct.
20    Q   And you were part of somebody who was in the
21        management of those corporations, right?
22    A   Well, not really management.  I, you know, was a
23        staff person who made recommendations to management,
24        I guess is a better way of putting that.
25    Q   And then after your work with companies, that ceased
```

—42—

1           when?

2     A     In 2012.

3     Q     All right.  2012.  And then -- well, before 2012 you

4           were doing some of this asbestos litigation

5           consulting work, right?

6     A     Yes, on a part-time basis, on evenings, weekends, and

7           then I negotiated vacation time with my employers to

8           work on it.

9     Q     And when did that start?

10    A     That happened beginning of 1996.

11    Q     That's when you began testifying for companies,

12          right?

13    A     Yes, very little at that time.

14    Q     And then since 2012, this testifying for defendants

15          has been your exclusive occupation?

16    A     Well, I do other industrial hygiene type of work as

17          well, but most of it is litigation-related work.

18    Q     All right.  And you've always worked on behalf of

19          defendants in asbestos cases, right?

20    A     In asbestos cases, all but one.

21    Q     And some of the companies that you have done work for

22          include Owens-Illinois, obviously, right?

23    A     Yes.

24    Q     And you've worked for them on numerous occasions,

25          right?

-43-

1    A    Yes.

2    Q    But you've also worked for other companies as well in

3         this asbestos litigation, right?

4    A    That's correct.

5    Q    And some of those other companies are Garlock?

6    A    Pardon?

7    Q    Garlock?

8    A    Yes.

9    Q    Armco?

10   A    Yes.

11   Q    Motion Industries?

12   A    Yes.

13   Q    Ajax?

14   A    Yes.

15   Q    Goodrich and Goodyear?

16   A    Yes.

17   Q    Peters Supply Company?

18   A    Yes.

19   Q    Buffalo Pumps?

20   A    Yes.

21   Q    Gould Pumps?

22   A    Yes.

23   Q    Anybody else?

24   A    American Standard.

25   Q    Okay.   Ingersoll Rand Pumps, Bechtel Corporation?

1        What did Bechtel make?

2    A   Bechtel was a general contractor involved in building

3        the plant that I got involved with.

4    Q   Anybody else?

5    A   Yeah, there were others, but there have been just one

6        or two cases involving -- Insull Company manufactured

7        risers for ingot molds in the steel industry.

8    Q   And in each of these cases, it involved a person who

9        has an asbestos-related disease, right?

10   A   Yes.

11   Q   And in each of those cases, your conclusion was that

12       person did not have enough exposure to that

13       particular defendant's product to have constituted a

14       significant risk, right?

15   A   No, that was not my conclusion at all of those cases.

16   Q   You concluded in some of those cases that the

17       defendant's product did in fact contribute to the

18       disease?

19   A   In some of those cases I was asked to look at all the

20       different products that were used and determine which

21       ones resulted in significant exposures to asbestos,

22       not necessarily the company that I was representing

23       or that the attorneys represented that hired me, but,

24       in other words, to determine whether or not there

25       were other exposures that that employee may have had

1          at that work site.

2    Q   The Eaton defendant that you worked for, that was

3          work for a company where you were testifying, and

4          that company was actually an employer of somebody who

5          got sick from being exposed to asbestos, right?

6    A   Which company are you talking about?

7    Q   Eaton.

8    A   Oh, Eaton Corporation.  Yes, I was representing Eaton

9          Corporation at that point.  I was hired by attorneys

10         who were representing Eaton Corporation.

11   Q   And the attorneys were paid by the company that needs

12         the testimony, right?

13   A   Right.

14   Q   And Eaton was an employer of somebody who got sick,

15         right?

16   A   Eaton bought a company, Cutler-Hammer, if that's the

17         case you're talking about.  Cutler-Hammer was a

18         manufacturer of electrical switches and components,

19         and Eaton bought Cuttler-Hammer, but it was

20         Cuttler-Hammer that produced the products that the

21         employees used and manufactured, and that resulted in

22         asbestos exposures.

23   Q   Now, you talked about the hierarchy of controls a

24         little bit on direct today.  That hierarchy of

25         controls, you don't consider substitution of the

1    offending material to be in the hierarchy of

2    controls; you consider that to be a separate category

3    all together?

4  A  Well, if you substitute it you don't need to control

5    it; in other words, if you substitute a less

6    hazardous material for a more hazardous material,

7    then you don't have to control it so it eliminates

8    the need for control.  But many include substitution

9    as a -- as one of the hierarchies of control, but in

10   my opinion, if you don't have it, you're using

11   something else, then it's not a control; it's a

12   prevention.

13 Q  What materials did Owens-Illinois provide you in this

14   case?

15 A  Well, the depositions that I reviewed, or that I

16   listed yesterday, including the specifications for

17   the combustion engineering boilers that were

18   installed at the power plants.  That was the extent

19   of it that I listed yesterday.

20 Q  Well, you didn't list the depositions, and I didn't

21   hear the name.  Did you review the deposition of

22   Lloyd Stavich?

23 A  Yes, I did.

24 Q  So you heard his testimony and his use of the Kaylo

25   product at the plant, right?

1    A    Yes, I did.

2    Q    Other than those materials, you've done no other

3         independent research in this case, have you?

4    A    That's correct.

5    Q    Okay.  And have you ever asked Owens-Illinois for a

6         piece of their Kaylo?  I know it's made many years

7         ago, 1958 they stopped making it?

8    A    Yeah.

9    Q    Have you ever asked them hey, do you guys have any of

10        those Kaylo around and can I test it?

11   A    I wouldn't want to do that.

12   Q    You wouldn't want to do that?

13   A    No, I wouldn't want to do that.

14   Q    Why not?

15   A    Well, number one, you know, it would be 60 years old

16        -- or 50 years old, I guess, if they had at that

17        point, 50 -- well, it's 56 years old, and it's

18        probably going to be fairly dried out, more brittle

19        than it would have been when it was installed prior

20        to 1958, and I can't think of any reason why I would

21        want to test it.

22   Q    Okay.  Just clearing up the last topic on

23        substitution.  Is substitution, in your mind, from an

24        industrial-hygiene perspective, one of the most

25        important ways to prevent hazards in the workplace?

-48-

1   A   Yes.  If you're not using a potentially hazardous

2        product, then you've eliminated the need for any kind

3        of controls, assuming that that is a safer product

4        than the product that it's being substituted for.

5   Q   And what -- and that was known in the '30s, '40s and

6        '50s, right, this concept of substitution?

7   A   Well, substitution has always been known.  I mean,

8        you select the products that your employees are going

9        to be working with, and, you know, if there's a

10       suitable substituted material that you can use, then

11       yes, substitution's always, as far as I know, been a,

12       something that an employer had available to them.

13       But I don't know if it applied to thermal insulation

14       at that time period because that was what everyone

15       was using.  To my knowledge, there was no available

16       suitable substitutes for the type of insulation work

17       that they were doing during that time period.

18   Q   You're not an expert on substitution of materials

19       within products, are you?

20   A   Well, based on what I've read about what was being

21       used during that time period and the other products

22       that were tried during that time period for thermal

23       insulation, the general consensus was that there were

24       no suitable substitutes for asbestos and thermal

25       insulation until the '60s.

```
 1   Q    Thank you.
 2                MR. DE BLASE:  May I approach, Your Honor?
 3                THE COURT:  You may.
 4   BY MR. DE BLASE:
 5   Q    I'm going to hand you some deposition testimony that
 6        you've given in the past.
 7                THE COURT:  Thank you.
 8   BY MR. DE BLASE:
 9   Q    You were asked a question before under oath, do you
10        remember?
11   A    I'll have to look at it.
12   Q    If you're an expert on substitution with respect to
13        asbestos-containing products?
14   A    Yeah.
15   Q    Do you remember being asked that question?
16   A    I don't remember exactly, no.  I've been asked a lot
17        of questions.
18   Q    Do you remember saying no, I'm not an expert on
19        substitution of asbestos-containing products?
20   A    I'm not an expert on thermal insulation products and
21        how to manufacture those and which ones you need for
22        any particular type of application, especially in a
23        power plant where the temperatures are usually very
24        high that they're trying to insulate piping with.
25   Q    So the answer is you're not an expert with respect to
```

—50—

1      substitution in asbestos-containing products, or you

2      are?

3    A  Well, I have knowledge on what was available during

4      that time period based on the depositions that I've

5      read and the publications that I've reviewed, but I'm

6      not an expert on, you know, what was being tested

7      during that time period and then where it was being

8      used and what all the results were.

9           All I have is what the literature indicated

10     to me, and that was that there were no suitable

11     substitutes found for asbestos until the 1960s as far

12     as for their use in thermal insulation products.

13   Q  All right.  Well, we've heard a lot of testimony in

14     this trial; in fact, defendant brought an expert to

15     talk about that in this case.  Did you talk to him at

16     all?

17   A  No.  Which --

18   Q  Dr. German.

19   A  No, I didn't talk to Dr. German.

20   Q  Were you ever asked to go back and form an opinion in

21     this case about materials, substitute materials,

22     other than asbestos?

23   A  I don't think I --

24   Q  In this case.

25   A  I wasn't asked in this case, no.

RAMSEY COUNTY DISTRICT COURT

```
1    Q   Have you ever been asked to do that?

2    A   I don't believe I have, no.

3    Q   Did the lawyers give you an agenda of things to do in

4        this case, what they were looking for?

5    A   They indicated that they wanted me to review the

6        depositions and the job specifications that they sent

7        and asked me if I would give my opinion as to, first

8        of all, whether I could calculate or estimate a dose

9        of exposure that Mr. Humphreys may have received to

10       Kaylo as well as to the Mundet insulating cement that

11       he used.

12   Q   You've been able to provide us with metrics

13       concerning exposure levels that you received to those

14       products, right?

15   A   That he specifically received?

16   Q   Yeah, assuming of course that he was exposed to Kaylo

17       and exposed to the mud as testified, you've given us

18       metrics as to the amount of fibers per cc from those

19       operations, right?  Did I hear that right from your

20       testimony?

21   A   No.  I gave you the general exposure levels that have

22       been reported in the literature for insulators during

23       the pre-1965 period and the post-1965 period, but I

24       didn't specifically mean to imply that those were his

25       particular exposure levels to OI Kaylo, if that's
```

1        what you're asking.

2    Q   And why is that?

3    A   Because I didn't have enough information in his

4        deposition as far as the job activities that he

5        performed, the number of times that he performed

6        them, and the distance that he was from others who

7        performed similar operations, not only from the

8        insulators that he was providing the product to,

9        mixing the cement for, as well as the distance that

10       he was and how often he was near other contractors

11       that were insulating other types of equipment rather

12       than just piping.

13   Q   You didn't see that testimony in his deposition, in

14       his trial testimony here?  You didn't see testimony

15       concerning his cutting of the product, his working

16       around the product, his working with people?

17   A   I saw --

18   Q   Let me finish the question.  His working with people

19       that were working with the product, the fact that he

20       was cutting the product in about a foot and a half

21       away while he was cutting it, the fact that he was

22       sweeping up the dust from the product, the fact that

23       he saw that there was dust, the fact that this

24       process -- this summer was about three or so months,

25       the fact that he did this eight hours a day as a

1     full-time job during that time period, the fact that
2     he worked around other insulators who were doing the
3     same thing, all of that information was not enough
4     for you to give a range of exposures to this product?
5  A  No, because it was not specific as far as frequency
6     and duration as well as distances.
7  Q  Okay.  And you've done this sort of thing in other
8     cases, though, have you not?
9  A  I have, where there's been more explicit and more
10    consistent information.
11 Q  What was inconsistent about Mr. Humphreys' testimony?
12 A  Well, for example, he indicated at one point that he
13    mixed the insulating cement or mud, as they called
14    it, anywhere from two to three times an hour, but
15    later he said three to five times a day.  And then
16    also in his testimony he said for half a day, so, you
17    know, it was hard to pick how often he actually did
18    the mixing.  He was explicit on the duration of
19    mixing.  He said it took him about ten to 15 minutes,
20    but as far as how frequent, in other words, how
21    often, I didn't have that information.
22              And I really didn't have specific
23    information on exactly how long he worked, other than
24    he said he thought he started in late June, possibly
25    early July, and he worked possibly three weeks into

1          September before he went back to college.

2     Q    You couldn't give us ranges just based on those

3          parameters alone, a low and a high, you couldn't do

4          that?

5     A    No.

6     Q    But you have done that in other cases, haven't you?

7     A    Where it has been explicit; in other words, I mixed

8          the insulating cement two times per hour, took me

9          15 minutes to do that mixing, and I did that five

10         days a week for 12 weeks, and I did this mixing in

11         this type of environment, or I worked within 20 feet

12         of other insulators that were using similar, not

13         similar products, but they were using insulating

14         products and insulating cement while insulating

15         piping.  So I have been able to do that but not in

16         this particular case.  It just wasn't consistent

17         enough or explicit enough for me to do that.

18    Q    If you took the low end of everything that you just

19         talked about with respect to Mr. Humphreys'

20         testimony, would that be in your mind a substantial

21         exposure to asbestos, just based on his work at the

22         taconite power plant, all of the different things

23         that he did there?

24    A    Well, I don't know what you're defining as

25         "substantial."

```
 1   Q   You've read his deposition, right?
 2   A   Yes.
 3   Q   And you have an understanding of all of the avenues
 4       and opportunities that he had to be exposed to
 5       asbestos, right?
 6   A   Yes.
 7   Q   And of all of the universe of opportunities for him
 8       to be exposed to asbestos, his work at the taconite
 9       power plant was the biggest exposure to asbestos he
10       had in his life, right?
11   A   Based on his deposition and the duration of time that
12       he was there, it was certainly a significant source
13       of exposure.
14   Q   All right.
15           Now, I heard in your direct testimony
16       criticisms of Mr. Templin, and I was scratching my
17       head because I was trying to figure out what was
18       going on there.  His MAS studies you criticized,
19       right, not his but MAS's studies?
20   A   I don't think I criticized him.  If I did, I
21       apologize to the court, but I criticized the studies.
22       As far as I know, he wasn't involved in those studies
23       and so I certainly wouldn't criticize him.
24   Q   Okay, so the studies are actually less than the
25       numbers that you were giving us for these operations
```

—56—

```
 1              , aren't they?

 2     A    Yes, based on his testimony.

 3     Q    Okay.  So are you saying that the studies are trying

 4          to overstate the exposures, is that what you were

 5          trying to say yesterday?

 6     A    All I indicated is that when you do simulation

 7          studies in a confined space with limited ventilation

 8          you're not representing the workplace and what the

 9          worker was exposed to.  And also, when you use people

10          who have never cut pipe, never handled pipe, or mixed

11          cement, you know, those are skilled people with

12          specialized techniques.  Only sampling those people

13          in a real field-type situation in the workplace is

14          going to represent their exposure and not a study

15          done in a confined space by a -- nonskilled people.

16     Q    Understood.  And I think that's what he testified to,

17          that these are not trying to replicate work practices

18          in the field but we're trying to understand if we

19          have exposures to asbestos, and at least insofar as

20          that's concerned, these tests give us some

21          information on that, don't they?

22     A    Yes, they show that asbestos can be released when

23          that product is handled in the way that they handled

24          it in their simulation chamber, yes.

25     Q    And the -- but you would prefer to see information
```

```
 1          from the literature on actual -- where do you get
 2          your numbers?  You were talking about, I think you
 3          said ten to 15 fibers per cc with the Kaylo, right?
 4     A    Not with the Kaylo.
 5     Q    With thermal insulation?
 6     A    With asbestos-containing thermal insulation product
 7          among insulators that were installing those types of
 8          products pre-1965.
 9     Q    Which is what we're talking about in this case,
10          right?
11     A    Right, um-hum.
12     Q    We're not talking about post-1965?
13     A    Right.
14     Q    So pre-1965, you're saying the literature supports
15          ten to 15 fibers per cc while working with thermal
16          insulation?
17     A    That's correct.
18     Q    And what is the basis of that, what paper are you
19          referring to?
20     A    Most of that is from the Fleischer and Drinker
21          studies of 1946.
22     Q    Anything else?
23     A    There was also a Ferris study.
24     Q    Anything else?
25     A    No.
```

RAMSEY COUNTY DISTRICT COURT

1          THE COURT:  How do you spell Ferris?

2          THE WITNESS:  F-E-R-R-I-S, I'm sorry.

3    BY MR. DE BLASE:

4    Q   How about Hodgson and Darnton, have you read that

5        article?  H-O-D-G-S-O-N, and Darnton, D-A-R-N-T-O-N.

6    A   I've heard about that.  I haven't reviewed that

7        recently, though.

8    Q   This is something that Mr. Templin talked about in

9        his direct testimony.  This is a paper that was --

10       may I publish it, Your Honor?

11         THE COURT:  Any objection?

12         MR. COSMICH:  I don't think he has a

13       foundation for it yet.  He hasn't read it.

14         MR. DE BLASE:  Well, he doesn't need to

15       read it.  This is a publication that Mr. Templin has

16       talked about and found to be authoritative and

17       reliable.

18         MR. COSMICH:  I don't know that that was

19       established.

20         MR. DE BLASE:  Yes, it was.

21         THE COURT:  The objection is overruled.

22   BY MR. DE BLASE:

23   Q   All right.  We're not going to do this too much.  But

24       let's talk about it a little bit.  Hodgson Darnton.

25       You know who these researchers are?

—59—

1    A    I've heard of them, yes.

2    Q    They're folks that talk about asbestos and exposure.

3         We're not going to talk about this whole article

4         because it's pretty thick, but they actually talked

5         about the insulator cohort that Dr. Selikoff studied.

6         You know what that's all about, right?

7    A    Oh, yes.

8    Q    And that was a large cohort, I think what, 14,000 --

9    A    Yes, thousands.

10   Q    And that cohort which started in the 1960s and is

11        even being studied to this day, is being referred to

12        in this paper.  These researchers found insulators --

13        see that cohort number eight there?

14   A    Yes.

15   Q    That's the U.S.-Canada insulators?

16   A    Yes.

17   Q    And they have provided average cumulative exposure at

18        the top there, you see that, that column, average

19        cumulative exposure, fibers per milliliter year,

20        that's fiber per cc year?

21   A    Right, um-hum.

22   Q    And so that's basically a -- we multiply the numbers

23        of years now to our fiber per cc metric, right?

24   A    Right, um-hum.

25   Q    So for this, in this cohort, that's a big number,

1       right, 500 fiber per cc years?

2   A   Right.

3   Q   If we look elsewhere in the paper we see that the

4       number of years that they're talking about is

5       25 years?

6   A   Okay.

7   Q   So from that the conclusion was -- and Mr. Templin

8       testified to this -- was that on average an insulator

9       is really going to be in the neighborhood of 20

10      fibers per cc, because if we divide 500 by 25 years

11      we get 20 fibers per cc.

12           Is that within the range of what we're

13      talking about here, ten, 15, 20 fiber per cc years?

14   A   Well, I don't know when that study was done.  It's a

15      Canadian insulators.  I mean, I don't know what years

16      they're looking at.

17   Q   But they're looking at the cohort.  This study was

18      done in 2000, published in 2000.  So anyway, does

19      that make a difference when?  I mean, are we talking

20      about numbers that, you know -- and it varies, we're

21      not going to get exact science on this because we

22      don't know because nobody was there with the

23      breathing apparatus?

24   A   Right.

25   Q   We're talking about numbers that are ten, 15, 20

```
 1         fibers per cc for this operation, right?
 2    A    Well, that article was.  I don't know how that would
 3         pertain to those numbers that I gave you.  Again, it
 4         said Canadian insulators on the -- I'm not familiar
 5         with their study.
 6    Q    Do Canadian insulators do insulating different than
 7         the Americans?
 8    A    Well, they could have; I don't know.
 9    Q    They do things differently, correct?
10    A    Well, they could have used different products, sure.
11    Q    All right.  So --
12    A    And had less controls.  I don't really know.
13    Q    When we're talking about exposures and the numbers of
14         fibers per cc an individual might be exposed to, it's
15         variable, right?
16    A    Yes.
17    Q    And a number like 20 fibers per cc doesn't surprise
18         you, does it, for this operation, thermal insulation,
19         the cutting, the cleanup, the sawing, the carrying,
20         those sorts of things?
21    A    Well, it would be an extreme peak in, based on what
22         I've read, as far as American literature and the
23         research.  I don't believe the range would get up
24         that high.  There certainly could be peaks; for
25         example, mixing insulation can go up as high as a
```

1    hundred fibers per cc.  I said mixing insulation.  I

2    meant mixing insulating cement, so it varies.

3         Using a band saw can raise the levels, but

4    typically the ten to 15 I think is a better range for

5    at least American insulators during that time period.

6    Q   Okay.  All right.  So what about these other

7        operations, the brake work that he did, how many

8        brake jobs did he do?

9    A   Well, that varied, too.  He first said he did two a

10       year for about seven years.  Then he said he did more

11       like ten, and then he said at the end, that maybe he

12       just did six, so it varied.

13   Q   Okay.  Well, if we took the top number, two a year

14       for seven years, that's 14 brake jobs?

15   A   Fourteen, right.

16   Q   And then we have a low number of six.  Is anything in

17       that range, in your opinion as an industrial

18       hygienist, does that increase one's risk of getting

19       mesothelioma?

20   A   Well, again you're asking a medical question, but you

21       certainly can, depending upon the environment that

22       you're doing the brakes in, and he indicated that

23       with new brakes he would sand them, which brake shoes

24       in that time period contained a lot of asbestos, so

25       when you're sanding your shoes you're getting some

1    pretty high exposure levels.  So depending upon the

2    number that he did, the way he did them, the

3    environment that he was in, he would certainly have

4    significant asbestos exposures while doing brake

5    work.

6  Q  So it's your opinion that brake work gives somebody a

7    significant exposure to asbestos?

8  A  Yes, I think doing brake work with

9    asbestos-containing brake materials, especially

10   scuffing the new brakes, will give you a significant

11   exposure to asbestos.

12 Q  Is it something that increases one's risk of getting

13   the disease?

14 A  If you do it enough and you get a high enough dose,

15   in my opinion -- again, you're asking me to come up

16   with a medical opinion -- but in my opinion, it

17   increases or puts you in a category of people that

18   have an increased risk of developing mesothelioma.

19 Q  Well, what about in Mr. Humphreys' case where we have

20   a maximum of 14 brake jobs?

21 A  Well, if he -- again, I don't know exactly what his

22   exposure level was while he was scuffing those

23   brakes.

24 Q  Let's presume it was the worst?

25 A  He would have a significant exposure while sanding

1          those brake shoes, there's no question about it.

2    Q    What kind of metrics can we put on that, what kind of

3          fiber per cc metrics?

4    A    We can't because no sampling was done.  We don't know

5          how close he was to the brakes.  We don't know if he

6          was downwind, upwind.  We just don't have enough

7          information to know what his exposure level would

8          have been.

9    Q    Well, he testified that he did the brakes indoors so

10         there wasn't any wind.  So let's take that out of the

11         equation, and let's take the worst-case scenario,

12         what kind of fiber per cc exposure did Mr. Humphreys

13         have to brakes?

14   A    I would not have enough information to estimate that.

15         It would vary and it would depend, again, on him

16         sanding the brakes and the environment that he was

17         sanding and how close his mouth was to that

18         particular activity, so I wouldn't be able to put a

19         number on that.

20   Q    Well, let's presume -- let's do a hypothetical.

21         Let's presume that his face was a foot away from the

22         brakes while he was sanding, and he sanded every

23         single one that he did, and in terms of brake work it

24         was the worst possible exposure he could get.  What

25         kind of exposure -- what kind of fiber per cc can you

```
1              give us for Mr. Humphreys' work on brakes?
2    A    I can't give you an exact number other than to say it
3         was a significant exposure to asbestos.
4    Q    Why can't you give us a number?
5    A    Because I didn't sample that operation, and I don't
6         know the conditions that he performed those
7         activities in.
8    Q    Did you sample this operation?
9    A    No, I didn't sample any of those operations.
10   Q    You gave us numbers there?
11   A    Right.
12   Q    You know what the literature is with respect to
13        brakes and sanding and brushing out the brake dust as
14        he testified, putting in the new brakes.  Give us
15        some numbers so we can compare it to his experience
16        at Taconite Harbor?
17   A    The exposure with brakes can be high; it can peak
18        when you're sanding the brakes, but, again, the exact
19        amount of exposure is something you have to determine
20        by actually doing sampling.
21   Q    Is that something that you have ever done?
22   A    Yes, I've sampled the removal and installation of
23        brake shoes.
24   Q    So what kind of fiber per cc numbers did you get when
25        you did that sort of testing?
```

```
 1    A    Well, I was doing it with controls.  We had our
 2         employees wearing respirators and wetting down the
 3         new brakes as well as the old brakes before they took
 4         them off, plus we had local exhaust ventilation, so
 5         my levels, my concentrations of exposure that I
 6         determined were very low.
 7    Q    My question is, do you have any data for us?  I mean,
 8         you've got literature, do you not, that talk about
 9         how many fibers per cc one gets when they sand
10         brakes?
11    A    I haven't seen anything specific to sanding
12         automobile brakes.  I mean, the highest levels that
13         I've seen on performing any kind of brake work has
14         been five fibers per cc.
15    Q    You've seen five fibers per cc?
16    A    Yes, but it's a peak exposure.
17    Q    What publication is that?
18    A    I don't remember the particular publication.
19    Q    And that's a peak exposure for a few minutes,
20         15 minutes, what?
21    A    A short period of time, right.
22    Q    Is it less than 15 minutes?
23    A    Yes.
24    Q    Is that kind of experience the kind of experience one
25         gets when they're constantly exposed like one would
```

1     be at the Taconite Harbor all day long?

2   A   Well, even at Taconite Harbor your exposure levels

3     are going to vary with the activity.

4   Q   Sure.

5   A   So it -- all -- most environments at least you'll

6     have a variation of your exposure level depending

7     upon your activity.

8     THE COURT:  We're going to take our morning

9     recess at this time, ladies and gentlemen,

10    15 minutes.  Why don't you put your note pads on your

11    chairs.  Don't talk about the case, and we'll see you

12    soon.

13    (Whereupon, the jury was excused.)

14    THE COURT:  We're on the record.

15    Mr. Glaccum, you may proceed.

16    MR. GLACCUM:  Your Honor, I have what has

17    been marked as Plaintiff's Exhibit -- or sorry --

18    Exhibit 50A for identification.  It's the video

19    deposition of Lona Jensen taken September 25th, 2014,

20    transcript.  As the court requested, we have produced

21    it to attach it to the thumb drive which has already

22    been admitted into evidence.  At this time we'd

23    request to admit it into evidence.

24    THE COURT:  Is this the redacted version or

25    the unabridged version?

1          MR. GLACCUM:  Unabridged, Your Honor.

2          THE COURT:  All right.  And of course

3     Exhibit 50 is the actual video itself with

4     redactions, so if there's ever an appeal, that court

5     can have a full array of materials to review the

6     record.

7          Is there any objection to the receipt of

8     Exhibit 50A as a court exhibit?

9          MR. TIERNEY:  No objection as a court

10    exhibit, Your Honor.

11         THE COURT:  All right, it's received as a

12    court exhibit.

13         We'll go off the record and take our break.

14         (Court stood in recess.)

15         (Whereupon, the following proceedings were

16    duly had in open court in the presence of the jury:)

17         THE COURT:  Mr. DeBlase, you may continue

18    with your cross-examination.

19         MR. DE BLASE:  Thank you.

20  BY MR. DE BLASE:

21  Q   Dr. Gregory, this five fibers per cc when you're

22      talking about the worst possible brake exposure you

23      can get, that was a peak exposure, right?

24  A   Yes, it was a peak.  In fact, now that I think about

25      it, I've actually seen it as high as eight fibers per

1          cc.

2     Q    What is that over a time-weighted average?

3     A    Well, it depends upon how many brakes you do, and

4          that study I don't believe indicated that.

5     Q    Well, what about with Mr. Humphreys' case, if he's

6          doing 14 brake jobs total, what kind of time-weighted

7          average fiber per cc number can we get?

8     A    The time-weighted average would be fairly low

9          compared to doing the insulation-type work that he

10         was assisting with, including the mixing of

11         asbestos-containing cement, so it would be low,

12         relatively speaking, compared to --

13    Q    I understand, but we want to give the jurors some

14         tools to equate the two, so what kind of

15         time-weighted average fiber per cc -- by the way,

16         this is a time-weighted average, right?

17    A    Yeah.

18    Q    What kind of time-weighted average fiber per cc

19         number can we give to Mr. Humphreys' experience with

20         brakes?

21    A    I can't give one, because I don't know how long it

22         took him to do the brakes, how many he did under the

23         circumstances that he performed the brake job.  You

24         know, it's just too many variables that would have to

25         go into that equation for me to try to give any kind

1    of estimate of what his exposure was, other than to

2    say it was less than what his exposure would have

3    been during the insulation activities that he

4    described.

5  Q  Are we talking about a number that starts with a zero

6    and a decimal point, at least that much, can we

7    figure that much out?

8  A  No, I can't say that either.  Again, it's something

9    that you have to monitor to determine.  I mean, it's

10   going to be above the range of from maybe .01 to up

11   to maybe one-and-a-half, maybe over an eight-hour

12   average, but it's going to be low, again, compared to

13   insulation-related activities, particularly the

14   mixing of asbestos-containing cements.

15 Q  But we just don't have enough information to make any

16   determination at all as to that?

17 A  That's correct.

18 Q  What about the joint compound, same thing?

19 A  The same thing is true there because he wasn't a

20   Drywaller, so he was just patching cracks and nailing

21   holes in a house that he had bought, so he was

22   working intermittently, both mixing the joint

23   compound and sanding the joint compound.

24        So I don't know the size of the rooms that

25   he was doing these things in or how close he was

1  |  | while he was doing the sanding, as well as the mixing

2  |  | of the joint compound.  So his exposure level would

3  |  | have varied.

4  | Q | Can you give us some information that is in the

5  |  | literature concerning joint compound exposures?

6  | A | Yes.  The time-weighted average for a Drywaller, that

7  |  | I'm aware of, that I think is one of the more recent

8  |  | ones that was published -- I just can't remember the

9  |  | name of the author, although I think it was Murdock

10 |  | -- but the time-weighted average for Drywallers that

11 |  | included installing the Drywall, mixing the joint

12 |  | compound and then sanding the joint compound, the

13 |  | time-weighted average there ranged up to

14 |  | five-and-a-half fibers per cc, I believe it was.

15 | Q | And that obviously is a professional Drywaller,

16 |  | right?

17 | A | That's correct.

18 | Q | Not a person doing random patch jobs for a few

19 |  | minutes, a few hours?

20 | A | That's correct.

21 | Q | Whatever the testimony is in this case, right?

22 | A | That's right.

23 | Q | That exposure, in your opinion, is significantly less

24 |  | than his experience at Taconite Harbor?

25 | A | The exposure that he had as patching holes and

-72-

1       patching cracks or the exposure that a Drywaller

2       would have?

3  Q  His exposure of patching holes, patching cracks.

4  A  Yes, his exposure during the mixing of the

5       asbestos-containing joint compound would have been

6       similar to the mixing of asbestos-containing

7       insulating cements, although I would suspect

8       significantly lower, but you're mixing a dry powder

9       material that has a tendency to disperse into the air

10      easily, but in general, his operation of sanding,

11      mixing would have been lower -- mixing of joint

12      compound, sanding of joint compounds -- his total

13      exposure there would have been less than his exposure

14      during the same time period for the same duration of

15      while he was working as an insulator, or as an

16      insulator helper, excuse me.

17  Q  We went through some of the information that's in the

18      literature that Mr. Templin talked about in this

19      case.  The numbers that you're giving are lower than

20      the numbers that he gave for the literature, the

21      scientific literature with respect to those

22      operations, is that right?

23  A  Yes, but, I mean, he may be aware of some other

24      research or some other presentations that I'm not

25      aware of.

1   Q   And the exposures to the joint compound, that's all

2       chrysotile, right?

3   A   Yes.

4   Q   And that's in contrast to the Kaylo product which had

5       a component of amosite in it, right?

6   A   During that time period from 1956 to '58, it's my

7       understanding that Owens-Illinois Kaylo did contain

8       some amosite in addition to chrysotile.

9   Q   And we heard Charlie Ay's testimony on that and we've

10      seen some interrogatory responses on that.  I don't

11      think that's in dispute.  Do you have an

12      understanding as to the difference in toxicity, if

13      you will, between the fiber types chrysotile and

14      amosite?

15  A   Yes.  The general consensus is that amosite is a more

16      potent, more potentially toxic form of asbestos as

17      compared to chrysotile in causing an increased risk

18      of mesothelioma.

19  Q   Can you quantify that?

20  A   Well, there's been all types of factors that have

21      been used for that, so -- none of it has been

22      scientifically validated, so I'm not comfortable to

23      even give a range.  All I know is the epidemiological

24      studies have indicated that amosite is potentially

25      more toxic than chrysotile, and crocidolite is more

1        toxic, potentially toxic, than amosite.

2  Q  All right.  And crocidolite is not a fiber that's in

3        play in this case?

4  A  As far as we know, that's correct.

5  Q  Let's briefly go over what we talked about yesterday.

6        I have my notes here.  By the way, you respect

7        Charlie Ay and what he has to say about his

8        experience with insulating materials, right?

9  A  Yes, I've read his depositions in the past as well.

10  Q  You yourself were never an insulator, right?

11  A  No.

12  Q  You never applied insulation or worked with it,

13        correct?

14  A  No, but I've worked with raw asbestos as a high

15        school kid.

16  Q  But my question was as to insulation.

17  A  No.

18  Q  Now, as far as insulation of, thermal insulation,

19        Charlie Ay would be the best person to talk to us

20        about that, right?

21  A  Since he was an insulator who installed thermal

22        insulation, he would be more qualified to talk about

23        the techniques of installation of thermal insulation

24        and not me because I was never an insulator, that's

25        correct.

```
1    Q   And what these things look like, too, right?
2    A   He was knowledgeable.  He used them in the field
3        while they were being installed rather than being
4        removed.
5    Q   And you said in your testimony yesterday Kaylo is
6        white, very, very chalky white.  I think you used the
7        words "very" and "chalky" and "white" like seven
8        times in your answer.  That's a little bit in
9        contrast to what Charlie Ay said in this case,
10       because we had the picture of the Kaylo up on the
11       screen, and he testified that the advertising is
12       white but it's not as white as that.  It's an off
13       white?
14   A   I think he indicated kind of a pinkish white with a
15       pinkish hew, I believe he indicated.
16   Q   Well, the testimony is what it is.
17   A   Right.
18   Q   We'll talk about that in closing argument.  But the
19       testimony that he gave is about the description of
20       the product as something that you would respect,
21       right?
22   A   Yes.
23   Q   You have no reason to dispute Charlie Ay's testimony
24       in this case, do you?
25   A   That's correct.
```

—76—

```
 1   Q   And do you have any -- now, the Mundet mud that
 2       Mr. Humphreys has described working with, that, too
 3       was a chrysotile product, right?
 4   A   Yes, as far as I know, or as far as the literature
 5       has indicated, yes.
 6   Q   That product did not have amosite in it, right?
 7   A   To the best of my knowledge, it did not, but that's
 8       based on what I know from the literature.
 9   Q   Now, you said -- I didn't think I was going to have
10       to talk about this, but then it changed.  You said
11       when you were talking about standards, the ACGIH and
12       other standards, that folks were trying to get the
13       workplace, if they followed these standards, that
14       nearly all employees, you said that, nearly all
15       employees would be safe, or that most people would be
16       safe.  But then you said something towards the end
17       that said that -- it was more definitive -- that if
18       you followed these TLVs you would be safe.  Is it
19       more that answer or the answer, most people, or
20       nearly all?
21   A   Well, that was our standard.  I mean, industrial
22       hygienists really refer to that as their bible to
23       determine whether people were being overexposed or
24       exposed within safe limits.  That was the best
25       available scientific information that we had.  As a
```

1    young compliance officer running around the plants

2    sampling employees and coming back with the results,

3    discussing it with the employees, and they wanted to

4    know, and their employer wanted to know, are my

5    people going to be safe, that's what we used.  Of

6    course then it was the permissible exposure levels,

7    PELs that OSHA had adopted from the ACGIH TLVs, but

8    they were essentially the same as the original TLVs

9    although the TLVs changed a little bit.  OSHA's

10   changed as well.

11  Q   Let's get back to my question.  My question is, those

12      standards, the ones that were not, you know,

13      enforceable by government, the ACGIH standards, and

14      then thereafter the ones that were enforceable by

15      government, the OSHA standards, all of those

16      standards throughout time have never said that

17      following these standards you're going to be safe,

18      have they?

19  A   Yes, they've said that nearly all people exposed

20      below those levels will not suffer adverse health

21      effects.

22  Q   And we've all seen the ACGIH -- I'm not going to put

23      that back on the screen -- from 1948.  I'm sure

24      you've seen it, too, from the tenth transactions,

25      right?

1   A   I don't know which one you're referring to.

2   Q   And then thereafter literature in OSHA when they're

3       describing these standards, they're talking about it

4       in terms of even at these standards people are going

5       to get sick, right?

6   A   Well, when OSHA established their PELs they were

7       mandated by Congress and the Supreme Court to

8       promulgate and enforce the most protective health

9       standards that they could promulgate, and they have

10      been tested many times.  Like I said, the Supreme

11      Court said you will produce and enforce the most

12      protective standard to prevent material impairment of

13      health for all working Americans.

14  Q   Understood, but let's get back to my question.  And

15      that is, that even at that standard for all the world

16      to see when we're talking about what the standard is

17      and what it does and what it purports to do, that

18      even at that standard -- and it's changed over time

19      -- but even at the standard at whatever time, if you

20      expose somebody below that standard, they tell

21      everybody people are still going to get sick, don't

22      they?

23  A   I'm not aware of them saying that other than to say

24      that there are some hypersensitive individuals who,

25      for one reason or another -- maybe it's the

|    |   |                                                             |
|----|---|-------------------------------------------------------------|
| 1  |   | particular medication that they're on, or maybe they        |
| 2  |   | smoked cigarettes -- that interferes with the body's        |
| 3  |   | defense mechanisms, but some of those people have a         |
| 4  |   | challenged system that makes them more susceptible to       |
| 5  |   | concentrations of chemicals as opposed to someone who       |
| 6  |   | does not have those types of hypersensitivities or          |
| 7  |   | weakened autoimmune or defense mechanisms.                  |
| 8  | Q | None of that's a factor in this case, is it?                |
| 9  | A | I don't know that it is.  I'm not a medical expert on       |
| 10 |   | that so I can't really give you an opinion.                 |
| 11 | Q | Let's stick with industrial hygiene.  Let's talk            |
| 12 |   | about what's in the literature, what the standards          |
| 13 |   | are, because you talked about that on direct, what          |
| 14 |   | the standards are.  Let's talk about what that means        |
| 15 |   | to folks that are looking at it at the time.  At the        |
| 16 |   | time of the 1950s, we didn't have OSHA, we're looking       |
| 17 |   | at the ACGIH, right?                                        |
| 18 | A | That's correct.                                             |
| 19 | Q | That wasn't enforceable, nobody could get a ticket          |
| 20 |   | for violating the ACGIH standards, they were                |
| 21 |   | recommended standards, but even in those standards          |
| 22 |   | they said that this is a rough guesstimate pretty           |
| 23 |   | much, right?                                                |
| 24 | A | No, I don't recall anyone saying it was a rough             |
| 25 |   | estimate.  And some states did adopt those as               |

1           regulations, the TLVs.

2    Q   Understood.  Now, when we moved to OSHA, OSHA tells

3           folks that even at this level, even at today's level,

4           .1 fibers per cc, which is extremely low compared to

5           the past, right?

6    A   Yes.

7    Q   Even at .1 fibers per cc, folks will still get

8           cancers?

9    A   Well, what they say is OSHA's acceptable risk is less

10          than one person per thousand that will develop a

11          disease for any of their occupational health

12          standards, and they say that with the current

13          standard, in addition to the permissible exposure

14          limit but all the work-practice requirements that are

15          in that, if all of those are implemented and

16          maintained there will be no significant risk of

17          material impairment of health.

18   Q   Right.  They're trying to prevent -- that's what

19          they're trying to do -- they're trying to prevent

20          asbestosis, and they think that that .1 level will

21          prevent asbestosis, right, can we agree on that?

22   A   I don't know how we got on asbestosis.  I was talking

23          about asbestos-related diseases including

24          mesothelioma and lung cancer.

25   Q   Let's start with asbestosis.  They're trying to

1       prevent asbestosis at the .1 level, right?

2   A   They're trying to prevent mesothelioma at the .1

3       level.

4   Q   Can we just start with asbestosis.  We'll get to

5       mesothelioma.

6   A   Right.

7   Q   Asbestosis, trying to prevent?

8   A   That would prevent --

9   Q   Prevent asbestosis at .1, right?

10  A   That would prevent it, yes.

11  Q   And OSHA says -- have you read the regs for OSHA?

12  A   Yes, the 1994 was the last regulation, yes.

13  Q   So the regs say right in there that we're trying to

14      prevent asbestosis but this will not prevent excess

15      cancers, does it not say that?  You want me to pull

16      it out?

17  A   It says it will reduce cancers to, I believe the

18      exact language is three per thousand.  Their target

19      is one per thousand, but the rest of the regulation,

20      the work-practice controls that are also required in

21      a regulation, will bring that risk within one per

22      thousand, and that any significant reduction in the

23      permissible exposure level will not increase the

24      safety to the employee or decrease the risk of

25      material impairment.

```
 1    Q   I just want to make sure I'm clear.  At the .1 fiber
 2        per cc level, which is today's standard, you're
 3        saying that's -- that OSHA believes that that's going
 4        to prevent cancers?
 5    A   That, in addition to the rest of their work-practice
 6        requirements, which are also part of their asbestos
 7        standard.
 8    Q   Okay.  At the time of the 1950s, did folks -- well, I
 9        think we've beaten that subject enough.  Let's move
10        on.
11                We talked a little bit -- or you talked a
12        little bit about toxic and nontoxic, the definition
13        -- you were shown some documents.  If there was some
14        testimony in this case about what somebody who
15        actually worked at the company, how they defined
16        toxic and nontoxic, is that something that you would
17        consider to be important in terms of understanding
18        what folks were thinking at the company at the time
19        about what the definition of those words means?
20    A   Well, the definition varied a little bit depending
21        upon the individuals.  I gave you the general
22        consensus as far as the definition of toxic versus
23        nontoxic.
24    Q   It's a technical kind of thing?
25    A   Right.
```

```
 1   Q   You're not saying by putting up those documents, that
 2       asbestos was considered nontoxic up and through the
 3       '70s, you're not saying that it was considered not
 4       harmful to health through the 1970s, are you?
 5   A   No, I'm just saying that the definition on toxicity
 6       changed with time, and during that time it was not
 7       considered a toxic mineral dust.  It was considered
 8       just a mineral dust.
 9   Q   According to their defining scheme, right?
10   A   During that time period, that's correct.
11   Q   And we're talking about the '70s, right?
12   A   Before the '70s.
13   Q   Well, for somebody who's an insulator or a customer
14       who's not looking at these documents that you showed
15       the jury, and looking at just the normal definitional
16       sense of the word in the 1950s, that could be
17       different than what you're talking about in terms of
18       toxic, nontoxic, right?
19   A   No, that was the general definition during that time
20       period before it was changed, that toxic referred to
21       systemic materials that were absorbed into the body
22       and it traveled to remote or systemic locations
23       within the body rather than causing harm right at its
24       initial origin or its -- where it initially entered
25       the body.
```

1    Q    So you're saying that the definition of toxic, at

2         least up through the 1970s, was toxic meant that if

3         it touched your body you'd get an immediate type

4         reaction, versus nontoxic which you'd take it into

5         your body and maybe you'd get hurt a little time

6         later?

7    A    Well, toxic was that it was a systemic material that

8         would travel through your body and then attack or

9         damage target organs, and the mineral dust was a dust

10        that stayed pretty much where it entered.  If it

11        entered the lungs, it stayed in the lungs.  It wasn't

12        absorbed into the bloodstream; it wasn't carried to

13        other parts of the body, but eventually that

14        definition was changed and the definition became -- a

15        toxic material was any material that could cause

16        damage to the body if it comes in contact with the

17        body or travels through the body.

18   Q    But before that time -- let's get to the bottom of

19        this -- before that time is it your point that while

20        asbestos was considered to be harmful to the body --

21        you agree with that, asbestos is harmful to the body

22        because it can cause asbestosis and cancer, and folks

23        knew that in the 1950s, right, 1955 and thereafter,

24        right?

25   A    In 1955, with the Richard Doll study, which was a

1              very well done epidemiological study, that was an

2              indication that overexposure to asbestos could cause

3              lung cancer, that's correct.

4    Q    Right, so that's harmful to the body, right?

5    A    Right.

6    Q    So you're saying that still is somehow not toxic

7              because of some technical definition, just to be

8              fair, right?

9    A    Right, the definition of toxicity at that point was

10             that it had to be a systemic poison.  It had to be

11             like arsenic lead, entered the body through the lungs

12             or through the intestinal tract or through the skin

13             and then traveled to other parts of the body.  It's

14             just a difference in definition.

15   Q    A difference in defining things?

16   A    Right.

17   Q    So folks in the sciences, you know, might have had

18             this hierarchy of what is toxic and nontoxic, but for

19             the average Joe, let's say, working at Owens-Illinois

20             and the average Joe looking at an advertisement,

21             toxic and nontoxic mean other things, right?

22                  MR. COSMICH:  Object; calls for speculation

23             as to what it may mean to somebody else.

24                  THE WITNESS:  Yeah.

25                  THE COURT:  Witness can answer.  Overruled.

1              THE WITNESS:  I wouldn't know how other

2        people, your average Joe, at that time probably would

3        be familiar with the definitions of toxic versus

4        nontoxic.

5   BY MR. DE BLASE:

6   Q    Exactly.  So a fellow working at Owens-Illinois

7        explained to folks what, in a deposition, what was

8        meant by toxic or nontoxic in the 1950s is giving you

9        the straight scoop on what he meant at OI in the

10       1950s?

11  A    That was his interpretation of what toxicity was at

12       that point, yes.

13  Q    Okay.  Let's talk about your work with Eaton, okay.

14       That was the defendant you did work with, that

15       particular defendant was an employer in an asbestos

16       case.  Do you remember giving testimony -- let me

17       just ask you a question.  Forget about this testimony

18       stuff, this lawyer stuff.  Let me just ask a

19       question.

20              In performing the work for the various

21       companies that you've performed work for, have you

22       specifically come to opinions that the supplier of

23       asbestos material must rely upon the manufacturer to

24       tell them when the product is unsafe?

25  A    That's one source of information, and it's required

```
 1        by the OSHA Hazard Communication Act since the early

 2        1980s.

 3   Q    And that was one source of information in the 1950s

 4        as well, right?

 5   A    It was not required in the 1950s.

 6   Q    Understood.  There were no laws requiring them to do

 7        anything in the '50s?

 8   A    Right.

 9   Q    I'm talking about your answer, and that is it's one

10        source of information?

11   A    That's one source of information.  There are many

12        other sources of information.

13   Q    And from an industrial-hygiene standpoint, employers

14        have a -- have come to rely upon product suppliers to

15        provide information on product safety, true?

16   A    That's one source of information, sure, one of many

17        but you can't just go on one source.  In that

18        particular case the company was given misinformation

19        about the product that they were being supplied.

20   Q    Let's talk about that.  So obviously information that

21        is received or put out by the company needs to be

22        accurate, right?

23   A    That's correct.

24   Q    And you believe from an industrial-hygiene standpoint

25        that it would be wrong for a manufacturer to give
```

-88-

```
 1          misinformation about its product, right?
 2   A    That is wrong, yes.  Yes, I do agree with that.
 3   Q    And when you're giving that opinion, you're giving
 4          that opinion not just as a scientist but also as a
 5          professional involved in safety, correct?
 6   A    That's correct.
 7   Q    Because an industrial hygienist is a person who is
 8          involved in safety, right?
 9   A    Not all of them, but I was because I was certified in
10          safety as well.
11   Q    And from an industrial hygiene and logic standpoint,
12          manufacturers are in the best position to know
13          precisely what materials are contained in the
14          products they produce, right?
15   A    Yes, a manufacturer of a product does know, since
16          they obviously manufacture the product, they know
17          exactly what's in that product.
18   Q    And manufacturers are in the best position to let
19          others know what's in their product?
20   A    Yes, if they sell their product, of course they can
21          tell others what's in their product.
22   Q    And manufacturers are in the best position to test
23          their own product, true?
24   A    They're in the position to test it as well as anyone
25          else could test it.  Users can test it.  The
```

1   |   universities can test it; the government can test it,

2   |   of course.

3   Q   You could test it?

4   A   That's right.

5   Q   Manufacturers are in the best position to understand

6   |   the hazards that are particular to their own product,

7   |   correct?

8   A   Not really, because the hazard depends upon exposure,

9   |   and exposure is -- depends upon the usage, in other

10  |   words, the environment that it's used in, how much

11  |   you're using, how often you're using it, and the way

12  |   you're using it, essentially.

13  Q   Is there anything that would prevent a manufacturer

14  |   from testing all those things that you just said?

15  A   Yes, because I'm not aware of manufacturers who can

16  |   walk into the job site and put a sampling pump on an

17  |   employee to monitor their exposure level.  Even as an

18  |   OSHA compliance officer I carried a federal badge and

19  |   I had trouble getting into some situations with some

20  |   employers and testing the environment that the

21  |   employees were exposed to.

22  Q   But a manufacturer could do the best it could to test

23  |   what it perceived to be the end users' use of the

24  |   product, couldn't it?

25  A   The employer is in the best position since they

1          control the people.  For example, as an OSHA

2          compliance officer, I ran into several employees who,

3          despite me telling them who I was and why I wanted to

4          monitor their exposure, they didn't want to wear a

5          pump.  So I had to go to their bosses and ask them to

6          please ask that employee to wear my sampling pump so

7          I could find out what they're being exposed to.

8     Q    Manufacturers are in the best position to provide

9          information about their product, true?

10    A    As far as the content of their product, they know

11         better than anyone else what the content is, the

12         percentage of different types of material that goes

13         into their products.

14    Q    Manufacturers are in the best position to

15         communicate, right on their own packaging,

16         information about any hazards related to their

17         products that they know?

18    A    Manufacturers can't really communicate hazards

19         because hazards depend upon exposures.

20              MR. DE BLASE:  I'll object as not

21         responsive, Your Honor.  It really calls for a yes or

22         no.

23              THE COURT:  Overruled.  The next question.

24         He answered your question.

25              MR. DE BLASE:  Got it.  Okay.

1    BY MR. DE BLASE:

2    Q   And from an industrial-hygiene standpoint, one of the

3        ways an end user may receive information about the

4        hazards of a product is by way of information

5        contained on the packaging of that product, true?

6    A   No, because hazard depends upon exposure and working

7        conditions, and you can't indicate that on a package

8        because you don't know how the material is going to

9        be used once you sell it to a user, and you don't

10       know how often it's going to be used, how much of it

11       is going to be used, the environmental conditions

12       under which it's being used.  So you really don't

13       know whether or not that's going to be a hazard to

14       the employees of that employer.

15   Q   If a manufacturer has a strong suspicion that a

16       certain disease will result through the normal use of

17       its product, is that something that should be

18       contained on the packaging of the product?

19   A   If a manufacturer knows that their product and the

20       way it's going to be used in the workplace is going

21       to result in a disease to employees, then yes, a

22       manufacturer should put that on the product or on

23       some kind of technical information sheet that goes

24       along with the product if they know that information

25       is accurate.  In other words, you use this product,

1        you're going to get sick.

2    Q   If we're talking about a product that, let's say,

3        doesn't have a track record, is a fairly new product,

4        is a manufacturer in the best position to provide end

5        users information that it actually knows or even

6        suspects about that product?

7    A   No, I think the user is in the best position because

8        they know how much they're going to use, where

9        they're going to use it, how often they're going to

10       use it.  All of those constitute exposure, and it's

11       exposures, overexposures that increase the risk of

12       occupational diseases.

13   Q   I think you testified to this before, but a

14       manufacturer obviously is in the best position to let

15       others know and the consumer or the end user know

16       what materials are in the product, right?

17   A   That's correct.

18   Q   And so if a product had a material that was known to

19       cause a specific disease but folks didn't know

20       whether that material was actually in the product, is

21       that something that the manufacturer is in the best

22       position to let the end user know?

23   A   If a manufacturer knows that the use of the product

24       will result in disease, then the manufacturer should

25       tell the employer, but the employer has the

1           obligation of determining whether or not a

2           potentially hazardous material is actually going to

3           be a hazard to their employees, and that depends on

4           exposure which is duration and frequency of use as

5           well as quantity of use.

6    Q      What is the best way to make sure that any

7           information that a manufacturer wanted to provide

8           about its product to ultimately get to the end user?

9           Is it communicating with the employer, communicating

10          with the distributor, communicating with a number of

11          people, or is it just putting that information on the

12          packaging so that when it's cracked open and used it

13          can be read by the end user?

14   A      Well, again, since a hazard depends upon exposure

15          level, duration frequency of use, how it's used in

16          the workplace, the environment it's used in, in my

17          opinion, the employer has the obligation as soon as

18          they hire someone to make sure they're not using

19          anything that's going to cause adverse health effects

20          to those employees.  And they can do that by going

21          to, in those days before the Internet, going to the

22          library and researching that information, or they can

23          contact their suppliers and get that information, or

24          they can contact the local universities, government

25          officials and those types of sources of information.

```
 1    Q    Sure, they could do all that.  So the answer to my
 2         question is the former, not the latter, right?
 3    A    I'm sorry?
 4    Q    In other words, the latter is not putting that label
 5         on, just going ahead and letting the distributor
 6         know, let the employer know about these things,
 7         that's the best way?
 8    A    No, I'm saying it's the employer's responsibility to
 9         find out what their people are using, potential
10         hazards of what they're using, monitor the
11         environment with IH monitoring and determine what
12         their employees are exposed to and if they are
13         overexposed, implement controls immediately.
14    Q    Understood.  What's easier in terms of making sure
15         that the hazards of a product end up with an end
16         user, putting something on the packaging of the
17         product, or contacting an employer to let that
18         employer know what the hazards are in the product?
19    A    The most effective means is for the employer to take
20         the responsibility of evaluating their workplace and
21         the chemicals that their employees are working with
22         to determine what their potential hazards might --
23    Q    So an employer should then undertake, when they
24         purchase a product to be used in the workplace, to
25         undertake testing of that product, do destructive
```

| | | |
|---|---|---|
| 1 | | testing of that product, to even first figure out |
| 2 | | what's in the product, then to determine whether or |
| 3 | | not that is a hazard to the body, and then do other |
| 4 | | sorts of testing, that's the best way to go about |
| 5 | | letting folks know, the end users know, about |
| 6 | | something that the manufacturer actually knows, is |
| 7 | | that what you're saying? |
| 8 | A | No.  The user of a product has the obligation to know |
| 9 | | what they're using, and when your name is Asbestos |
| 10 | | Products, Incorporated, you know you're using |
| 11 | | asbestos.  And you need, since you've hired that |
| 12 | | person, you're paying for their labor, you need to |
| 13 | | find out what the potential health hazards of |
| 14 | | asbestos are, and you need to monitor your people and |
| 15 | | find out that they're not being exposed at excessive |
| 16 | | levels.  And if they are you need to protect them |
| 17 | | with the various controls that we discussed earlier. |
| 18 | Q | You're saying that the manufacturer has no role in |
| 19 | | that whatsoever? |
| 20 | A | I'm saying if the manufacturer knows that a |
| 21 | | particular use of their product is going to result in |
| 22 | | a disease or an injury, then that manufacturer does |
| 23 | | need to contact that end user to let them know if |
| 24 | | they have that information available.  But since they |
| 25 | | don't know how often and how much of their product |

1          and under what circumstances they're going to be

2          used, they don't know what their exposure level is,

3          you know.

4     Q    So let her rip, right?

5     A    No.  I'm just saying if you sell someone a product

6          and they're going to keep it in the box and not use

7          it, there's no exposure.  If they're going to use it

8          a few times, there's less exposure.  If they're going

9          to be using it constantly, the exposure level is

10         higher.  So the manufacturer who controls the people,

11         the conditions, and has all the resources, they have

12         the ability to evaluate that person's exposure and

13         make it safe and make it healthy for that employee.

14              And I did that as a compliance officer

15         before there were MSDS's.  I went to the library --

16         it's available to anyone -- and looked up the

17         information on chemicals long before any of that

18         information was produced in material safety data

19         sheets to make sure that I was sampling for the right

20         things and monitoring in the right ways to ensure

21         that those employees were not overexposed in the

22         workplace.

23    Q    Thank you very much, doctor.

24    A    You're welcome.  Thank you.

25              THE COURT:  Redirect?

1              REDIRECT EXAMINATION

2   BY MR. COSMICH:

3   Q    Dr. Gregory, briefly, when you put the -- you gave us

4        ranges of exposure for thermal insulation.  That was

5        not specific to Kaylo, was it?

6   A    No, that was not.

7   Q    In fact, these activities that were studied involved

8        thermal insulations, it involved more asbestos than

9        Kaylo?

10  A    That's correct, and those were not eight-hour

11       averages.  Those were concentrations during the

12       actual handling of asbestos and not what their

13       eight-hour average was.

14  Q    You were asked about products with a track record.

15       Would you agree that prior to 1948 there was a track

16       record for asbestos?

17  A    Oh, yes, there was.

18  Q    And folks before 1948, when Kaylo was commercially

19       produced and sold, there was a track record for how

20       to control exposures to asbestos?

21  A    Yes, there was, the engineering controls that I

22       discussed earlier.

23            MR. COSMICH:  That's all I have for you,

24  Dr. Gregory.  Thank you.

25            THE WITNESS:  Thank you.

```
 1                    THE COURT:  Mr. DeBlase?

 2                    MR. DE BLASE:  Yes, Your Honor.

 3                           RECROSS EXAMINATION

 4     BY MR. DE BLASE:

 5     Q   The time-weighted average that we're talking about, I

 6         think you said this, but with respect to the joint

 7         compound, that in your mind is a significant -- you

 8         won't put a metric on it but it's significantly

 9         substantially less than in Mr. Humphreys' experience

10         at Taconite Harbor, right?

11     A   Right.  During the time period that he was an

12         insulator helper his exposure levels would have been

13         higher than when he was sanding joint compound that

14         had contained asbestos.

15     Q   And we talked about a track record for a product.

16         The Kaylo product, do you understand the history of

17         the Kaylo product?

18     A   Well, I mean, from the litigation activity that I've

19         been involved with, I understand a lot of it, yes.

20     Q   Okay.  So that was a new product that they were

21         manufacturing, right?

22     A   It was a new product to them, but asbestos-containing

23         insulation had been around many, many years before

24         they started producing it.

25     Q   Understood.  But that product was new to
```

```
 1        Owens-Illinois, thermal insulation was new to
 2        Owens-Illinois, right?
 3    A   That's correct.
 4    Q   And thermal insulation, the way they manufactured it
 5        so it would be nice and light, calcium silicate with
 6        asbestos, that was new to Owens-Illinois and it was a
 7        brand new product, right?
 8    A   Yes, that's my understanding.
 9    Q   And so that information is information that would
10        have been beneficial, the results of any testing that
11        they did would be beneficial to folks who are end
12        users, employers, would it not?
13    A   No.  I think anyone that was using insulation
14        products knew it contained asbestos and knew that --
15        or not all of them knew that there were TLVs that
16        dealt with permissible exposure levels to asbestos,
17        but in that time period I know, based on all the
18        depositions that I've read of insulators, they all
19        knew that they were using asbestos, and most of them
20        were members of the Asbestos Workers Union.  So they
21        had knowledge that they were using asbestos.
22    Q   Well, we have a new product though that's being
23        tested for adverse health effects by a company
24        spending money to do these tests.  They're not doing
25        it because it's already known, right?
```

```
 1   A   Well, they were testing their product, but the
 2       asbestos that was used in it had been tested many,
 3       many times before, so there was no new information
 4       that they were going to obtain by testing as far as
 5       asbestos was related.
 6   Q   Who tested this product before?
 7   A   Well, all the epidemiology studies that have been
 8       done on exposures to asbestos and the fact that it
 9       caused asbestosis beginning way back in 1930.
10   Q   Okay, you're talking about asbestos, you're not
11       talking about a specific product, right?
12   A   I'm talking about asbestos.  Asbestos was contained
13       in the Kaylo product.
14   Q   Are you aware of any product that was actually
15       tested, or is this the first one that you're aware
16       of, this Owens-Illinois Kaylo, that was tested and
17       you got results from?
18   A   I don't know if there were other tests performed on
19       calcium silicate or other forms of
20       asbestos-containing insulation.  I don't know if any
21       of those studies were done as far as animal testing
22       or anything like that, but certainly from 1930 on up
23       epidemiology studies were performed on people that
24       were working with asbestos.
25   Q   Well, wouldn't it be beneficial to folks, to
```

—101—

```
1              employers, who may have been confused about the
2              constituency of a particular product, to have that
3              information, that testing result?
4       A      I think every insulation contractor in the country
5              knew they were using asbestos during that time
6              period.
7       Q      Let me ask you a question:  With regards from an
8              industrial hygienist's point of view, you believe
9              that employers were confused about asbestos and the
10             asbestos standards as it applied to them until the
11             late 1970s, true?
12                    MR. COSMICH:  Objection, beyond the scope
13             of the redirect?
14                    THE COURT:  Overruled.
15                    THE WITNESS:  I'm sorry.
16      BY MR. DE BLASE:
17      Q      I'll read it again.  With regards from an industrial
18             hygienist's point of view, you believe that employers
19             were confused about asbestos and the asbestos
20             standards as it applied to them until the late 1970s,
21             true?
22      A      Yes, because employers didn't know whether they had
23             to implement certain parts of the standard.  For
24             example, medical monitoring was never defined until
25             the later '70s, and the original standard in 1970
```

RAMSEY COUNTY DISTRICT COURT

1    just listed a PEL -- 1971 was the first standard --

2    listed a PEL.  1972 required that you do monitoring

3    for asbestos, but it didn't indicate whether you did

4    monitoring if you used asbestos once a year or if it

5    was just in the workplace, or when you had to do

6    monitoring.  Later on OSHA defined that and said that

7    anyone using asbestos where it could possibly be

8    released into the air had to do initial monitoring to

9    find out what their employees were exposed to to

10   ensure that their levels were within the OSHA

11   permissible exposure limits.  That was the confusing

12   issue, and I was one of the ones going around trying

13   to straighten that out with a lot of the

14   manufacturers.

15             MR. DE BLASE:  That's all I have.  Thank

16   you, Your Honor.

17             THE COURT:  Anything further?

18             MR. COSMICH:  Nothing further, Your Honor.

19             THE COURT:  All right, Dr. Gregory, you can

20   step down.  Thank you.

21             THE WITNESS:  You're welcome.

22             MR. COSMICH:  May I consult with Mr.

23   Tierney real quick, Your Honor?

24             THE COURT:  Sure.

25             MR. COSMICH:  Your Honor, the defense

1    rests.

2              THE COURT:  All right, any rebuttal?

3              MR. DE BLASE:  No, Your Honor.

4              THE COURT:  All right, want to approach?

5              (Off-the-record discussion.)

6              THE COURT:  Ladies and gentlemen of the

7    jury, both sides have rested so we've completed the

8    evidence phase of the case.  Because of preparations

9    that we need to make in order to smoothly present the

10   case to you, including the final drafting of the

11   instructions that you're going to be given, you're

12   getting this afternoon off.  That means the case will

13   be submitted to you first thing Monday morning.

14             So leave your note pads here.  Remember all

15   the instructions I've given you about your conduct.

16   It's always important that you follow those

17   instructions.  It's even more important now because

18   we'd hate to have to start over.  So please follow

19   all the instructions that the court has given you and

20   enjoy your weekend.  Don't forget your juror badges

21   on Monday.

22             (Court stood in recess.)

23

24

25

RAMSEY COUNTY DISTRICT COURT

```
 1                           CERTIFICATE

 2              I, Kathleen M. Conlee, one of the Official

 3     court reporters in and for the District Court of the

 4     Second Judicial District, State of Minnesota, do

 5     hereby certify that the foregoing transcript

 6     constitutes a full, true and correct record of the

 7     proceedings had in the matter of State of Minnesota

 8     versus Neil Humphreys, Lona Jensen, individually and

 9     as husband and wife vs. Owens-Illinois, Inc., as

10     taken at the time and place stated herein.

11              Dated:  November 12, 2014

12

13

14

15

16                   /s/ Kathleen M. Conlee
                  _____
17                   Kathleen M. Conlee
                     Official Court Reporter
18                   15 West Kellogg Boulevard - #1530
                     St. Paul, MN  55102
19                   (651) 266-9191

20

21

22

23

24

25
```

                                                          —105—