1   STATE OF MINNESOTA                    DISTRICT COURT

2   COUNTY OF RAMSEY          SECOND JUDICIAL DISTRICT

3   - - - - - - - - - - - - - - -
    Neil Humphreys, Lona Jensen, File No. 62-CV-13-7709
4   individually and as husband
    and wife,

5                   Plaintiffs,

6      vs.                          **VOLUME XVII**

7

8   Owens-Illinois, Inc.,          **OCTOBER 17, 2014**
                                   **MORNING SESSION**
9

10                  Defendant.
    - - - - - - - - - - - - - - -
11          The above-entitled matter came duly on for

12   jury trial before the Honorable John H. Guthmann,

13   Judge of District Court, on the 17th day of October

14   2014, at the Ramsey County Courthouse, 15 West Kellogg

15   Boulevard, St. Paul, Minnesota.

16                   A P P E A R A N C E S

17          Patrick DeBlase, Esq., Curtis M. Glaccum,

18   Esq., and Michael R. Strom, Esq., appeared for and on

19   behalf of the Plaintiffs.

20          Patrick T. Tierney, Esq. and John D.

21   Cosmich, Esq., appeared for and on behalf of the

22   Owens-Illionis, Inc.

23          Kathleen M. Conlee - Court Reporter

24

25

                                                        -1

1                          I N D E X

2

3                                                Page

4    Dr. Earl Gregory

5         Continued Direct by Mr. Cosmich        9

6         Cross by Mr. DeBlase                   21

7         Redirect by Mr. Cosmich               98

8         Recross by Mr. DeBlase                99

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—2—

RAMSEY COUNTY DISTRICT COURT

1          (Whereupon, the following proceedings were

2     duly had outside the presence of the jury on October

3     17, 2014 at approximately 9:03 a.m.)

4          THE COURT:  Everyone ready to go?

5          MR. DE BLASE:  Yes, Your Honor.

6          MR. COSMICH:  Yes, Your Honor.

7          MR. TIERNEY:  Ready to go home.

8          THE COURT:  I didn't finish the sentence,

9     I'm sorry.  A couple things I want to put on the

10    record:  One, I had requested the plaintiffs to mark

11    and offer the Lona Jensen deposition as it was

12    presented to the jury so we have an actual transcript

13    in addition to the thumb drive, so let's take care of

14    that sometime today.

15         The other thing I wanted to do was put on

16    the record the side-bar discussion we had late

17    yesterday with regard to the EPA document that was

18    discussed by Dr. Gregory and Mr. Cosmich in

19    connection with the issue of the definition of toxic.

20    The court's ruling permitting the questioning was

21    based upon qualification of the document as a learned

22    treatise as an exception to the hearsay rule.  It's

23    also a type of state-of-the-art argument that the

24    terminology of the time was part of the

25    state-of-the-art in the industry at the time, or in

—3—

1  industry at the time, and for those two reasons, the

2  objection was overruled.  And if anyone wants to put

3  anything else on the record to supplement that, they

4  may.

5      MR. COSMICH:  Only that it was also

6  defense's position it was a government publication

7  but we also -- the court was not convinced of that, I

8  think.

9      THE COURT:  Well, I don't recall that

10  coming up as a separate exception to the hearsay

11  rule, but --

12      MR. DE BLASE:  Well, it's my understanding,

13  Your Honor, that when we're talking about

14  state-of-the-art notice, if you will, we're not

15  offering documents for the truth of the matter

16  asserted, so therefore it's substantive nonhearsay,

17  all the state-of-the-art stuff.  But when we're

18  talking postexposure, 1958 and beyond, and we're

19  talking about other issues like causation or other

20  opinions, well, that's something that has to come in

21  through an expert.  It can't come in through

22  documents submitted, shown to the jury and admitted

23  into evidence.  That is still hearsay.  I cannot

24  cross-examine a document.  A learned treatise isn't

25  necessarily admitted as evidence.  I mean --

1          THE COURT:  A learned treatise can be shown

2     to the jury.  This particular document wasn't

3     admitted as evidence as an exhibit, but the contents

4     of the document were shared with the jury, which is

5     exactly what the hearsay exception talks about.  In

6     addition, the fact that the document is dated after

7     the events doesn't mean that it's not relevant to the

8     issue of state-of-the-art.  In fact, the document

9     itself was describing the state-of-the-art in a

10    previous era, which is exactly why it was relevant to

11    the point that was being made by the defense.

12          MR. DE BLASE:  Sure.  And that's, if you

13    will, Your Honor, the opinion of that document after

14    the time.  In other words, somebody during the time

15    period opening up a document necessarily has the

16    document to look at.  Postexposure time, 1958 and

17    beyond, well, that's, you know, if somebody's

18    commenting on what was known or knowable before that

19    time, that's subject to cross-examination.  One

20    cannot cross-examine a document that's produced later

21    and talking about things that happened in the past.

22          THE COURT:  It was a learned treatise

23    relied upon by the expert who formed an opinion.

24          MR. DE BLASE:  I understand the court's

25    position.

1          THE COURT:  And I think the plaintiff has

2     been doing that throughout the case.  And I just

3     wanted to make a record of our side bar because it

4     wasn't on the record.

5          MR. DE BLASE:  Sure.  But just for the

6     record, Your Honor, just so the record is complete, I

7     don't believe I have shown the jury any documents

8     post-1958, certainly not over objection in this

9     trial.  I don't think I've shown, I mean, other than

10    things that have been agreed on, like the Social

11    Security records.  I mean --

12         THE COURT:  There have been all kinds of

13    treatises postdating 1958 that have been put in for

14    purposes of the state-of-the-art, and this document

15    is in that same category.

16         MR. DE BLASE:  Right.  I've never shown the

17    contents of those books, Your Honor.  I've only shown

18    what, you know, that they are books and that the

19    state-of-the-art is contained therein, and that is

20    the basis of the chapter -- Dr. Lemen wrote the

21    state-of-the-art chapter and the epidemiology chapter

22    in the asbestos book, but I didn't crack it open and

23    start going through --

24         THE COURT:  No, but the contents were

25    shared with the jury.  If you paraphrase the contents

1     or quote the contents, that isn't any different than

2     putting it on the screen.

3             MR. DE BLASE:  Understood, Your Honor, but

4     that's not what Dr. Lemen did.  He testified as to

5     his opinions in the case, and his bases are the

6     articles that are contained in the books and

7     treatises.  Thank you.

8             THE COURT:  Okay.

9             MR. STROM:  Your Honor, the other point

10    that we made at the time -- and you've made your

11    ruling, the evidence has come in, it's purely for the

12    record -- is that we objected that EPA document

13    reporting a problem with a landfill full of asbestos

14    superfund site does not qualify as a learned treatise

15    at all.  It's simply a publication by the EPA

16    discussing something that happened.  It was in --

17    somewhat akin to a newspaper article discussing what

18    had happened.  It just happened to be on EPA

19    letterhead.  It also was not a document discussing

20    the definition of toxic or what it meant.  It was

21    simply an offhand comment, and it also referred to, I

22    mean, not coincidentally, to 1972 when the EPA and

23    the government agencies started regulating asbestos,

24    which they hadn't done before.

25            So it was very misleading when they're

—7—

1    saying toxic, nontoxic.  They're talking about

2    whether or not something's regulated or not

3    regulated, and their inability to cross-examine on

4    that particular point was I think part of the

5    problem.

6              THE COURT:  Well, you will have your chance

7    to cross-examine the witness who formed the opinion

8    and the strength and weight to be given to this

9    particular resource that he used in forming that

10   opinion.  I gave the plaintiff the opportunity to

11   cross-examine Dr. Gregory before it was put up on the

12   screen, and that opportunity was passed upon.  You

13   still can cross-examine him because the direct

14   examination is taking place.

15             Your characterizations of the document are

16   rather hollow.  They just go to the weight in light

17   of the fact that there's unopposed testimony from Dr.

18   Gregory that it's a learned treatise and Rule 803(18)

19   allows the statements to be read into the, read into

20   evidence but not admitted as exhibits.  That's

21   exactly what happened.  And that's treating it as an

22   exception to the hearsay rule.  If it's treated as

23   state-of-the-art as Mr. DeBlase suggests, not that he

24   agrees with this characterization, but as he properly

25   suggests, if it's state-of-the-art, that goes to

1  notice and not to truth of the matter asserted.  It's

2  not hearsay at all.  So for those two reasons, I

3  permitted the defense to proceed.

4  MR. STROM:  We understand the court's

5  ruling and we're ready to move on.  Thank you.

6  THE COURT:  Okay.  Let's bring in the jury.

7  (Whereupon, the following proceedings were

8  duly had in open court in the presence of the jury:)

9  THE COURT:  Good morning.  Have a seat.

10  Dr. Gregory, you can come back and resume your seat.

11  Mr. Cosmich, you can continue with your

12  direct exam.

13  MR. COSMICH:  Thank you, Your Honor.

14  CONTINUED DIRECT EXAMINATION

15  BY MR. COSMICH:

16  Q  Good morning, Dr. Gregory.

17  A  Good morning.

18  Q  When we left off yesterday we had been talking about

19  dose and toxicity.  Do you recall that?

20  A  Yes.

21  Q  Where I want to go now is back to the concept of a

22  threshold limit value briefly, okay?

23  A  Yes.

24  Q  At any point did the ACGIH or any other entity ever

25  have a separate TLV for asbestosis and cancer?

—9—

```
 1  A  No, they did not.
 2  Q  Some mention has been made about suggestions by a Dr.
 3     Stockinger about a safety factor.  Are you aware of
 4     discussions with respect to a safety factor?
 5  A  Yes, I am.
 6  Q  Do you know Dr. Stockinger?
 7  A  Yes, Dr. Stockinger was a guest lecturer at the
 8     University of Cincinnati while I was there working on
 9     my master's degree in industrial hygiene.  In fact,
10     he worked across the town of Cincinnati at the Public
11     Health Service.  At that time it was called the
12     National Institute of Occupational Safety and Health,
13     or NIOSH.
14  Q  At any point are you ever aware of Dr. Stockinger
15     suggesting a safety factor or a lowering, or a
16     different level of TLV for asbestos?
17  A  No.
18  Q  Are you aware of publications by the American
19     Industrial Hygiene Association called Quarterly
20     Reports?
21  A  Yes.
22  Q  Are those the types of materials that hygienists such
23     as yourself would rely upon and read?
24  A  Yes.
25  Q  Would you consider them to be authoritative?
```

RAMSEY COUNTY DISTRICT COURT

```
1    A   Yes.

2    Q   If there were writings by Dr. Stockinger and such at

3        issue, would that be authoritative and something that

4        would be relied upon by folks such as yourself out in

5        the field?

6    A   Certainly, yes.

7    Q   Are you aware of the publication by Dr. Stockinger in

8        the American Industrial Hygiene Association's

9        Quarterly Report in September of 1956?

10   A   Yes, I am.

11              MR. DE BLASE:  Your Honor, may I have an

12       opportunity -- I object.  I haven't seen this.  I'd

13       like to see it.  It hasn't been shown to me.

14              MR. COSMICH:  It's literature just like you

15       mentioned.

16              THE COURT:  Okay, take a look at it.

17              MR. DE BLASE:  I have it.  It's fine; go

18       ahead.

19              THE COURT:  Proceed.

20   BY MR. COSMICH:

21   Q   Do you recall Dr. Stockinger specifically writing

22       about his view of asbestos and cancer in that report?

23   A   Yes, I do.

24   Q   You know, on page 342 Dr. Stockinger talks about Dr.

25       Doll, there's been a lot of discussion about Dr.
```

—11—

1       Doll?

2   A   Correct.

3   Q   This is 1956, right after Dr. Doll's publication

4       comes out, correct?

5   A   Correct.

6   Q   Dr. Stockinger goes on to say:  With such relatively

7       small numbers of cases, one must be extremely

8       cautious in drawing the conclusion of a causal

9       relationship between exposure and the disease.

10              Do you recall reading that?

11  A   Yes.

12  Q   Further, the question to resolve then in the asbestos

13      exposures is whether a tenfold greater incidence of

14      lung cancer is large enough to be significant when

15      dealing with small samples of this sort.  Before a

16      final decision is reached it would seem well to wait

17      until a more impressive number of cases has been

18      documented.

19              What is your interpretation of what Dr.

20      Stockinger is telling us there?

21  A   Well, basically he's stating there's not enough

22      scientific evidence to conclusively conclude that

23      asbestos results in an increased rate of lung cancer

24      among exposed workers at that time.  That was the

25      state-of-the-art of thinking during that time period.

1   Q   And he goes on.  We won't read it all, but toward the

2       end he refers to asbestos as a fibrous form of

3       mineral?

4   A   Correct.

5   Q   And the ACGIH, as we established before when they had

6       the threshold limit values, categorized asbestos as a

7       mineral dust as opposed to a toxic dust, correct?

8   A   That's correct.

9   Q   Is there any indication from Dr. Stockinger's writing

10      in 1956 that would indicate to you that he was

11      recommending a safety factor for asbestos with

12      respect to the TLV?

13  A   No, he was not recommending one at that time.

14  Q   Some mention was also made about a publication by the

15      Manufacturing Chemists Association.  Do you recall

16      reading about that before?

17  A   Yes.

18  Q   And are you familiar with that publication?

19  A   Yes.

20  Q   And whether or not warnings for certain products

21      should be issued?

22  A   Correct.

23  Q   Do you recall that?

24  A   I sure do.

25  Q   Was asbestos ever included in that recommendation or

—13—

1          that association's publication?

2     A    No, it was not.

3     Q    But they did suggest a lot of warnings for other

4          types of materials that were carcinogens, correct?

5     A    That's correct.

6     Q    I want to move to another area.  We've talked a lot

7          about the types of controls that were known about or

8          knowable in the field of industrial hygiene for

9          controlling dust, okay?  What types of controls would

10         have been known about in the 1950s at a work site to

11         control dust?

12    A    Well, basically they fall into three categories:

13         Engineering controls, which involves the use of

14         ventilation to remove contaminated air away from the

15         employees' breathing zone or the area that the

16         employees are working.  So engineering controls, and

17         there's various other types of engineering controls,

18         but ventilation is the primary one.

19              The other category is called work practice

20         or administrative controls where you use methods such

21         as wetting down a material to prevent it from

22         becoming airborne, or you reduce the time that you're

23         working with the material so that your exposure

24         duration is not as long.  So administrative controls

25         vary, and there's many different types of them.

```
 1                  And then the other major category includes
 2          personal protective equipment which is the wearing of
 3          respirators or respiratory devices, either reusable
 4          respirators or dust masks, disposable respirators
 5          that filter out the fibers or the dust as you're
 6          working and breathing in that particular area.
 7     Q    And these are all controls that were state-of-the-art
 8          in the 1950s?
 9     A    Yes.
10     Q    And had been written about -- we're not going to
11          rehash it -- but since Merewether, et al. in the
12          1930s?
13     A    Yes, they even go back farther than that, yes.
14     Q    And published by industrial hygienists like Dr.
15          Brandt and others in authoritative journals?
16     A    Yes.
17     Q    And written about in industrial hygiene Quarterly
18          Reports?
19     A    Correct.
20     Q    With respect to dust at a work site, in order to know
21          whether or not the dust is approaching a threshold
22          limit or a certain exposure level, how do you find
23          that out?
24     A    You have to do industrial hygiene air monitoring
25          using a device similar to what I described to the
```

```
 1        jury yesterday where you have a filter or an
 2        impinger.  In the old days they used impingers, which
 3        is nothing more than a little flask that you bubble
 4        air through a water solution.  But the new technology
 5        in the late '60s was the filter that you attached to
 6        the lapel to represent the employee's breathing zone,
 7        and you connect that to a battery-powered pump that
 8        then draws air through that filter, and all of the
 9        dust and the fibers collect on that filter.  And then
10        that is analyzed and counted by people who are
11        analytical chemists or those who are trained in
12        counting asbestos fibers.
13   Q    Was there a mechanism to do that in the 1950s?
14   A    Oh, yes.
15   Q    Also written about in a lot of journals that were
16        discussed in this case?
17   A    Oh, yes.
18   Q    In your opinion, should employers provide a safe
19        place to work?
20   A    Oh, yes.  There's no question about it.  When you
21        hire an employee you take full responsibility because
22        you are the one that is paying for their labor, but
23        you're not paying for them to get hurt or to suffer
24        any overexposures.  All you are entitled to is their
25        labor.  When they leave you at the end of that day
```

—16—

1          you pay them, but they shouldn't be taking in

2          excessive amounts of chemicals home in their body

3          that are going to result in adverse health effects.

4                    And the employer is the one that has the

5          total control over the workplace.  They hire the

6          people.  They control the people.  They control the

7          material.  They control the exposure conditions.

8          They control the work practices.  They control the

9          procedures.  They have total control over their

10         employees.  Only employers have not only the control

11         but the ability and the resources to prevent

12         overexposure to their employees.

13     Q   You talk about the particular work practices and

14         controls.  Why are those important in how much

15         exposure would occur at a work site in the 1950s, or

16         with asbestos, with asbestos?

17     A   Yes.  Those controls are the only effective ways of

18         reducing an employee's exposure to asbestos or any

19         other chemical.  And the employer is the one that has

20         the ability to implement and require the use of those

21         controls, and to monitor and police those controls to

22         make sure that they remain effective while the

23         employee is performing his or her job.

24     Q   And do the work practices, how the products are

25         handled, affect how much dust may be in a given

1          application?

2     A    Oh, definitely.  All of those controls, the

3          engineering controls, the administrative or work

4          practice controls and respiratory controls, reduce

5          exposures that the employee will receive while

6          performing their job.

7     Q    In any work site such as was described by Mr.

8          Humphreys, there are a lot of different hazardous

9          materials?

10    A    Yes.

11    Q    And this control doesn't just relate to asbestos, it

12         would be for everything, correct?

13    A    Exactly, everything that's potentially hazardous.

14    Q    Should an employer who is conducting a certain

15         activity or a subcontractor of a specialized field,

16         should they know about the hazards associated with

17         the type of work that they're holding themselves out

18         to do?

19    A    Yes, they should.  As an employer you take that

20         responsibility when you hire people to perform a

21         task.  You take that responsibility of knowing what

22         they're doing, what they're working with, and what

23         the potential health effects of those particular

24         products are going to be so that you can make sure

25         they're not overexposed and suffer adverse health

1        effects.

2    Q   And Dr. Gregory, from an industrial-hygiene

3        perspective, does this responsibility to provide a

4        safe workplace and protect workers depend on the size

5        of the employer?

6    A   No.  The engineering, administrative and personal

7        protective equipment controls are controls that every

8        employer has available to them, whether they have one

9        employee or thousands of employees, so they're

10       available and always have been available to

11       employees.

12   Q   Is that a concept that OSHA applies even today?

13   A   Yes, when OSHA passed their Occupational Safety Act

14       of 1970, it made it very clear that it was the

15       employer's responsibility to protect each and every

16       employee.

17   Q   Dr. Gregory, I want to show you one more exhibit

18       that's been entered into evidence.

19           MR. COSMICH:  May I approach, Your Honor?

20           THE COURT:  You may.

21   BY MR. COSMICH:

22   Q   Dr. Gregory, I have Exhibit 15.  It's been entered

23       into evidence.  It's the specifications from the work

24       site.  Are you familiar with that?

25   A   Yes, I am.

—19—

1   Q   I want to turn to one of the provisions and see if

2       this is consistent with what you're talking about.  I

3       don't know if you can read it there.  Under section

4       E, labor:  The insulation contractor shall furnish

5       all necessary labor to perform properly the work

6       covered by these specifications.  He shall adopt all

7       precautions to prevent injury to persons and

8       property.  Did I read that correctly?

9   A   Yes, you did.

10  Q   What type of precautions to protect injury to persons

11      would be available to the insulation subcontractor in

12      the summer of 1957 when this contract was going on?

13  A   All the engineering work practice, administrative and

14      personal protective equipment controls that I've

15      previously discussed were available at that time.

16  Q   And from your review of Mr. Humphreys' testimony and

17      the depositions, are you aware of whether or not

18      Mr. Humphreys' employer instituted any of those

19      controls?

20  A   There was no evidence that any of those controls were

21      used during the time period that Mr. Humphreys worked

22      at that power plant during the summer of '57.

23          MR. COSMICH:  Your Honor, those are all the

24      questions I have.

25          THE COURT:  All right.  Cross-examination.

1            MR. DE BLASE:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. DE BLASE:

4    Q    Good morning, Dr. Gregory.  How are you?

5    A    Good.  Good morning, and I'm great, thank you.

6    Q    Let's start where we left off.  All right, give the

7         projector some time to warm up.

8                 The article, Industrial Hygiene Quarterly,

9         you were shown that on direct just now?

10   A    Yes.

11   Q    That was -- this is by Stockinger commenting on the

12        Dr. Doll article, 1955, right?

13   A    That's correct.

14   Q    And something we didn't read was the article by

15        Cartier above that section, right?  We heard about

16        Cartier from Dr. Lemen in this trial as writing a

17        paper concerning asbestos in cancer.  Are you

18        familiar with that paper?

19   A    No, I'm not.

20   Q    Well, let's read what it says here:  Cartier studying

21        over a nine-year period involving 4,000 asbestos

22        miners in Canada, involving 128 cases of asbestosis,

23        40 of them with autopsies, found six of these have

24        bronchogenic carcinoma.  Seven cases of lung cancer

25        were found among asbestos miners with no asbestosis.

```
 1                     There's been some talk in this trial about
 2          asbestosis being needed to have lung cancer.  Is this
 3          an indication to you as an industrial hygienist as a
 4          professional in safety and industrial engineering,
 5          that Cartier's reporting there's this question about
 6          having lung cancer without having asbestosis?
 7     A    I'm not familiar with that particular study, but just
 8          because you have lung cancer without asbestosis
 9          doesn't mean that it was caused by asbestos or
10          exposure.  So I'd have to see the whole study,
11          because when you're doing an epidemiological study --
12          and I'm not sure that that even qualifies as an
13          epidemiological study -- but you have to rule out
14          other potential causes of lung cancer, for example,
15          the most prevalent cause, cigarette smoking, so --
16     Q    Doctor Lemen has testified in this case that it is an
17          epidemiological study.  Do you know Dr. Lemen?
18     A    Yes.
19     Q    He's an epidemiologist, right?
20     A    Yes.
21     Q    Okay.  Would he be the best person to tell us in this
22          trial as to whether or not that study was an
23          epidemiology study?
24     A    If he accepts it as a valid and scientifically
25          performed epidemiological study, then I would accept
```

—22—

```
 1        that, but as far as your conclusion, I wouldn't
 2        accept that.
 3   Q    I'm not asking you to accept anything that I say.
 4   A    Right, right.
 5   Q    But let's talk about it.  In 1956 this researcher
 6        Stockinger is reporting something that Cartier has
 7        reported, right?
 8   A    Right.
 9   Q    And the implication is well, maybe we could have
10        lesser -- let's start with this:  In order to have
11        asbestosis you need significant exposures to
12        asbestos, right?
13   A    That's correct.
14   Q    And the thinking is maybe you don't need those sorts
15        of significant exposures to asbestos to get lung
16        cancer; is that the implication by that sentence?
17   A    That indicates there's a possibility of that and it
18        requires more epidemiological studies to prove one
19        way or the other.  At that point it's not conclusive
20        though, which is what Dr. Stockinger indicated.
21   Q    Okay.  It's not for sure at this point, right?
22   A    That's right.
23   Q    Okay.  All right.  As an industrial hygienist, you
24        want to be absolutely positive of things before you
25        expose workers to industrial carcinogens?
```

— 23 —

1   A   You want to have conclusive information in order to

2       establish the TLV values.

3   Q   And if you don't have those conclusive information

4       but you have strong suspicions, it's okay to expose

5       workers to carcinogens?

6   A   Well, first of all, you have to have conclusive

7       information that it is or is not a carcinogen.  We

8       found out later that it definitely was a carcinogen

9       but that was later, you know, after the 1955 and a

10      few studies after that, many of them with Selikoff

11      and Chris Wagner.  But you establish a TLV based on

12      the best available scientific information, and the

13      people who reviewed that information were

14      governmental industrial hygienists with no ties to

15      private industry.  Their only concern was the

16      American worker and making sure that that American

17      worker was not overexposed to a material that was

18      going to result in cancer or asbestosis.

19   Q   Let's get back to something you just said, and that

20      is that as of 1955, is it your testimony that

21      asbestos has not been conclusively proven to cause

22      cancer?

23   A   In 1955, with the Richard Doll study, that's

24      recognized as the first epidemiological study that

25      concluded that overexposure to asbestos resulted in

```
 1              an increased risk of lung cancer among the employees

 2              who were exposed to asbestos.

 3     Q   So as of 1955 we can consider asbestos a carcinogen,

 4              yes or no?

 5     A   It was considered at that time a carcinogen based on

 6              that study, although there was still a lot of doubt,

 7              still many people felt you had to have asbestosis to

 8              develop cancer.  And, you know, those were the people

 9              who were the leaders in the world as far as their

10              knowledge of asbestos.  For example, Selikoff, for

11              example, stated in as late as 1972 that before 1960

12              there was uncertain and tenuous information as far as

13              whether asbestos was a --

14                   MR. COSMICH:  Objection, Your Honor.

15                   THE COURT:  Overruled.

16     BY MR. DE BLASE:

17     Q   Let's get back and start at the beginning, okay, Dr.

18              Gregory?  You have mentioned I think -- maybe you

19              didn't.  Have you published anything on asbestos?

20     A   Nothing particular on asbestos, that's correct.

21     Q   How about anything generally?

22     A   Yes, I have, generally.

23     Q   Tell us?

24     A   Well, they're management of safety and health

25              programs.  I published two management articles on how
```

—25—

1          to use techniques to prevent overexposure to

2          chemicals and occupational injury, so they're just

3          basically indicating to management what management

4          has to do to prevent occupational diseases and

5          occupational injuries and all those techniques

6          involving engineering and work practice, engineering

7          controls, personal protective equipment,

8          accountability, observations, and a bunch of other

9          additional controls that I've put into those articles

10         on how to make sure that employees are working safely

11         and under safe working conditions.

12    Q    And is that published in the peer-reviewed

13         literature?

14    A    Yes.

15    Q    Where is that?

16    A    American Safety Society, publication called

17         Professional Safety and the American Industrial

18         Hygiene Association Journal.

19    Q    And does the word "asbestos" appear in any of those

20         articles?

21    A    No.  I covered all potential health hazards as a

22         group in those articles.

23    Q    But the word "asbestos" appears nowhere in any of

24         those articles?

25    A    No, there was no reason to specify asbestos.  The

```
 1              controls for asbestos are similar to the controls for

 2              all other occupation potential health hazards.

 3     Q   Your Ph.D. dissertation had nothing to do with

 4              asbestos, correct?

 5     A   No, it did not.

 6     Q   Your master's thesis had nothing to do with asbestos,

 7              correct?

 8     A   No.  They were industrial hygiene monitoring

 9              techniques, but they didn't apply specifically to

10              asbestos because those techniques had already been

11              developed for years and years long before I entered

12              my master's degree program or Ph.D. program.  They

13              wouldn't have awarded me a master's thesis or a Ph.D.

14              if I had repeated what everyone else had done before

15              me, at least at the University of Cincinnati they

16              wouldn't.

17     Q   The air sampling you did for that dissertation had

18              nothing to do with asbestos, did it?

19     A   That's correct, but I've sampled for asbestos

20              hundreds and hundreds of times.

21     Q   Have you brought with you here today any results of

22              air-sampling testing you've done?

23     A   No.  As I indicated, I've sampled for asbestos

24              hundreds of times during my career.

25     Q   We're going to talk a little bit about that today,
```

1          but you haven't brought the results of air-sample

2          testing, in other words, the actual fibers per cc

3          here in court today?

4     A    No, most of that would have been government documents

5          that OSHA owned and not me.  It would have been

6          illegal for me to have taken those from OSHA, and

7          then the others were owned by the companies that I

8          worked for, and I did not take copies of those as

9          well.

10    Q    And you've never measured the level of asbestos

11         released from a Kaylo product, correct?

12    A    I have measured the removal of various calcium

13         silicate thermal insulation products.  I couldn't

14         tell you that it was Kaylo.  It could have been one

15         of the other calcium silicate thermal insulation

16         products, because once the product is installed, and

17         then you remove it, of course, you know, there's no

18         Kaylo on the product so -- but with all the sampling

19         that I've done during removal operations where

20         employees have had to remove insulation to repair

21         lines, valves and things like that, it's highly

22         probable that I have sampled during a removal of

23         Kaylo and other types of calcium silicate insulation

24         products.

25    Q    So getting back to my question.  You don't know,

1     you've never actually sampled Kaylo, what you know to

2     be Kaylo, and taken dust measurements from Kaylo, is

3     that right?

4  A   During a removal operation you don't know whether

5     it's Kaylo or Johns Manville or Pabco.  I mean, you

6     can identify by its texture in the smoothness and the

7     whiteness that it is a calcium silicate material.

8  Q   They all look about the same?

9  A   The calcium silicates do, yes.

10  Q   And you're talking about tear out or removal of this

11     pipe covering, right?

12  A   Yes.

13  Q   That's your experience with testing?

14  A   That's correct, because by the time I got into the

15     field --

16  Q   And specifically --

17          THE COURT:  Don't interrupt the answer.

18          THE WITNESS:  By the time I got into this

19     profession they were not installing Kaylo or any

20     other type of calcium silicate.  Manufacturers

21     stopped manufacturing those products in 1973, and I

22     started in 1974.

23  BY MR. DE BLASE:

24  Q   Right.  So you've never had an opportunity to test

25     anything that was actually installed, right?

```
 1   A   Just during a removal.
 2   Q   My question is, you never had an opportunity to test
 3       anything that was actually installed, right?
 4   A   As far as Kaylo or any other thermal insulation
 5       products, that's correct.
 6   Q   Thank you.
 7   A   I did test other asbestos-containing products that
 8       were installed or used but not thermal insulation
 9       because, again, it was not being manufactured at that
10       time.
11   Q   Now, you have done in the past, in past cases, this
12       thing called a cumulative dose reconstruction, is
13       that what you call it?
14   A   That's correct.
15   Q   Now, some scientists, or perhaps many scientists,
16       think that that's not a valid contribution to
17       science.  Are you familiar with that controversy?
18   A   Yes.  It's an estimate in most cases, because
19       typically you don't have enough detailed information
20       on frequency and duration and working environmental
21       conditions to be very accurate.  At best you come up
22       with an estimation.
23   Q   So you'll read a person's deposition who has
24       mesothelioma, take down what they have to say about
25       their exposure and come to conclusions as to what
```

—30—

1          their cumulative dose to asbestos was in their

2          lifetime, that's what you've done in the past?

3     A    Not for their lifetime, just during a particular job

4          where they give me enough information on frequency

5          and duration, that I can make those types of

6          calculations and estimations, you know.  As far as

7          lifetime, you're talking about ever since they were a

8          child and exposed to the ambient concentration of

9          asbestos and summer jobs and things like that.

10         Usually -- in fact, I can't think of any case where

11         I've ever had that kind of detailed information,

12         where I could come up with quantitative results on a

13         person's total lifetime exposure that I could say is

14         scientifically reliable or at least has scientific

15         certainty.

16    Q    Background exposures or ambient exposures to

17         asbestos, would you agree that those do not increase

18         one's risk of getting mesothelioma?

19    A    Well, it depends.  If someone lives in an environment

20         where those levels are relatively high, it certainly

21         increases their overall cumulative dose of exposure.

22    Q    Let's talk -- well, you're talking about if somebody

23         lives near an asbestos mine, right?

24    A    No.  I mean, it could be in an urban area where there

25         was a lot of mobile traffic with the braking of cars

1      and use of clutches where you get some asbestos from

2      brake materials, clutch materials, or they could be

3      in a school room where there's a deteriorated

4      fireproofing material or soundproofing material where

5      asbestos fibers are being released into the air, or

6      the ventilation system was sprayed with a

7      fireproofing or soundproofing material and that's

8      deteriorated with time and those fibers are being

9      blown out into the classroom, or in their home.

10                 I mean, asbestos was a material that was

11     used for everything from coats to diapers, to

12     tissues, to dish towels, to mattresses, and there's

13     just -- asbestos was everywhere in those days.  And

14     there was all types of potential exposures in the

15     house as well as outside the house and in the ambient

16     environment, in your school rooms and other places.

17  Q  Dr. Gregory, I'm talking about ambient exposures to

18     asbestos.  You're familiar with that term, ambient,

19     right?

20  A  Yes, ambient means around us.

21  Q  Okay.  Well, when used and discussed in scientific

22     literature when it relates to asbestos, it doesn't

23     mean somebody who's sitting next to their couch that

24     might have asbestos in it, it doesn't mean somebody

25     who's in a classroom breathing in asbestos from a

 1              ceiling, right, it doesn't mean that, does it?

 2    A    Ambient means outside or inside.  It means the

 3         environment that surrounds you.  Typically when they

 4         talk about ambient levels they're talking about

 5         ambient environmental levels outside of a building,

 6         in other words, out in the open spaces.

 7    Q    Away from a point source of asbestos, right,

 8         something we can identify as being asbestos as being

 9         given off by that?

10    A    Well, you can't usually say point source because some

11         rock formations contain naturally occurring asbestos.

12         When the wind blows or when there's some construction

13         activity, those fibers can be released into the air.

14         So ambient environmental just means what's in the

15         outdoor environment at that particular point in time.

16    Q    So would you agree with me that it has nothing to do

17         with a point source of asbestos; in other words, we

18         can talk urban areas, and there have been studies on

19         urban background levels of asbestos, right?

20    A    Yes.

21    Q    Okay.  And those background levels of asbestos have

22         been quantified, have they not?

23    A    In certain areas but in very few.

24    Q    Yeah, okay.  And that's what I'm talking about when I

25         talk about ambient.  Is that what you're talking

1          about, you're including these other things like

2          inside a school?

3     A    No.  If you want to say ambient outdoors, then we can

4          agree that that's outside of any building or any

5          structure.

6     Q    Okay.  But I mean, it could include somebody who

7          lives next to an asbestos mine and then we're not

8          talking about ambient then, are we?

9     A    Yes, you are, because you're outdoors and that

10         asbestos mine or asbestos manufacturing plant is

11         releasing asbestos fibers into the outdoors.  They

12         have to come from somewhere.

13    Q    Understood.  They certainly didn't happen naturally.

14    A    No, they can happen naturally from the ground.

15    Q    They can.  And so that happens when it happens from a

16         natural outcropping in the ground, right?

17    A    Correct.

18    Q    And it can also happen if somebody's in a

19         neighborhood, say, in London there have been papers

20         about this, a London neighborhood, people getting

21         mesothelioma from just living in their own home but

22         there's a factory nearby, right?

23    A    Or a high-traffic area, sure.

24    Q    High-traffic area, what are you talking about?

25    A    Where you use brakes that contain asbestos.

—34—

1    Q    Let's talk about that, the brakes.  Tell me about

2         this brake study that you know of where there has

3         been a documented increased risk of mesothelioma from

4         living near an area where there's a lot of brakes?

5    A    Well, there's nothing that specific showing an

6         increased risk.  It just shows an increased exposure

7         to anyone that happens to live or work or pass

8         through that area, but I'm not aware of any

9         scientific publications that have had the information

10        to determine that that particular type of exposure

11        resulted in an increased risk of mesothelioma to any

12        particular population.  But it certainly increases

13        the inhalation or the cumulative dose that anyone

14        that might be exposed would have.

15   Q    Okay.  All right.  So that doesn't increase risk.

16        Does ambient, just being a naturally occurring rock

17        deposit -- in other words, there's no point sources

18        anywhere around you, the levels are very, very low in

19        very rural areas as opposed to being in urban areas,

20        and they have decreased with time as we get away from

21        using asbestos in the 1970s.  So getting back to my

22        question.  In those areas, just the background that

23        happens to be in those areas, the background on

24        asbestos, is that something that increases one's risk

25        of mesothelioma?

```
1    A    I think you're asking me a medical question.

2    Q    I'm not actually; I'm asking you about risk.

3         Industrial hygienists talk about risk, do they not?

4         I'm not talking about causation; I'm talking about

5         risk.

6    A    Well, we like to avoid getting into medical issues to

7         determine the cause of mesothelioma and increase the

8         risk of mesothelioma, but there's certainly very low

9         levels that you would find in an urban area today as

10        far as ambient environmental concentration of

11        asbestos.

12   Q    Okay.  So getting back to my question.  Does ambient,

13        away from a factory, away from a mine, does that

14        increase one's risk of mesothelioma?

15   A    If you're in an area where you have very, very low

16        exposures to asbestos due to -- in the absence of any

17        of those things you're talking about, and you live in

18        that area for your whole life, then it does not

19        increase your risk, in my opinion, as an industrial

20        hygienist, which like I'm indicating to you you're

21        getting into some medical-type questions.

22   Q    I don't want to get into the medicals.  I want to

23        stick where your specialty is.

24   A    In my opinion, in an area where the concentrations

25        are very, very low, it does not increase your risk or
```

| 1 | | at least put you in a category of people that have an |
|---|---|---|
| 2 | | increased risk of developing mesothelioma. |
| 3 | Q | Now, you said something that caused me a little |
| 4 | | concern.  I want to go over it, this high-traffic |
| 5 | | area.  What is the high-traffic area, and is that |
| 6 | | something that increases one's risk of getting |
| 7 | | mesothelioma? |
| 8 | A | Well, back in the years before the 1980s when brakes |
| 9 | | contained asbestos, in a high urban area near stop |
| 10 | | lights, stop signs and things like that in the city |
| 11 | | where you had the constant application and releasing |
| 12 | | of brakes, there have been significant levels of |
| 13 | | asbestos measured in those areas.  Now, fortunately, |
| 14 | | most of the people braking and going through there or |
| 15 | | walking through there aren't staying there, so |
| 16 | | they're not breathing all that in; they're moving |
| 17 | | away from that, but there have been those studies |
| 18 | | that have shown significant levels of asbestos in |
| 19 | | those particular areas. |
| 20 | Q | And what kind of levels are we talking about on a |
| 21 | | fiber per cc basis? |
| 22 | A | Oh, it varies from less than .1 up to above one fiber |
| 23 | | per cc. |
| 24 | Q | And what studies do you refer to for that? |
| 25 | A | Well, the ones I'm thinking about now are the |

1          California studies.

2    Q     The Baxter studies?

3    A     I don't remember the name of them.  There's been a

4          lot of studies done around the country.

5    Q     I've never heard of anything above -- or background

6          for ambient -- above .01 fibers per cc, and you have?

7    A     Well, maybe you've read more industrial hygiene

8          articles and maybe you've been to more presentations

9          that I have.

10   Q     So tell us, what do you have?

11   A     I can't remember the exact publication and whether it

12         was a publication or just a study that was presented

13         at the American Industrial Hygiene Conference.

14   Q     The highest I've heard is .01 by a fellow named

15         Baxter in California, which is significant, is it

16         not?

17   A     It's significant for an ambient concentration,

18         ambient environmental concentration.

19   Q     Would you consider .01 fibers per cc to be something

20         increasing one's risk of getting mesothelioma?

21   A     Well, again, you're getting into a medical question.

22   Q     I'm just talking about risk.

23   A     If you have 24 hours of exposure to that you're

24         exposed at three times what an employee in a

25         workplace would be exposed to, so it would depend on,

1          you know, how long your exposure to that was and how

2          much of that you were actually absorbing into your

3          lungs, and if it was being retained by your lungs,

4          and what particular type of asbestos it was.

5     Q    Moving away from that, is it your understanding that

6          ambient, other than that Baxter study I talked about,

7          is more along the lines of .00005 fibers per cc?

8     A    The latest that I've seen was published in 1984 and

9          it was .0004 fibers per --

10    Q    Is that from the ATSDR, is that where you got that

11         figure from?

12    A    Yes.

13    Q    And that's a pretty authoritative publication.  Tell

14         us what the ATSDR is?

15    A    Well, it's a publication that involves studying

16         various hazardous materials and ambient

17         concentrations of various hazardous materials in the

18         asbestos toxicology profile, is what they're referred

19         to, and they periodically publish their results at

20         various meetings on that, but that was a 1984 study.

21         There's been other studies, even Selikoff did air

22         monitoring in cities -- of course, that was back in

23         the '60s -- and found much higher levels than that

24         which you would expect because asbestos was being

25         used in large volumes throughout the country during

1           that time period.

2    Q     And when you say much higher, .0000, no -- four now?

3    A     Yes.

4    Q     .0004 is from the ATSDR?

5    A     Right.

6    Q     And when you say it was probably significantly higher

7           in Seilkoff's era in the '60s, you're saying well,

8           let's take a zero off or something like that?

9    A     No, no.  See, he reported his in different units, and

10          so it's difficult to convert his into fiber per cc,

11          which you have from that document as fibers per cc.

12          But as I recall, there have been studies where they

13          -- many have reported near some areas in the '70s of

14          .02 fibers per cc converted from some of his studies

15          as well as other studies.  But it varies, it varies

16          all over the place, and it depends on whether you're

17          near a factory, near a high-urban area where there's

18          a lot of brake work, the wind directions.  It just

19          depends on so many factors.

20   Q     In this case, in Mr. Humphreys' case, is there any

21          indication that ambient played a role in his

22          mesothelioma?

23   A     Well, I don't know what the exposure levels were in

24          the ambient environment that he worked in outside of

25          the power plant where he was a construction worker.

—40—

```
 1            I know there was a lot of concerns involving northern
 2            Minnesota during the dumping of --
 3                      MR. DE BLASE:  Object, Your Honor.  This is
 4            -- and the subject of a motion in limine.  I mean,
 5            it's outside the scope.
 6                      THE COURT:  Just object nonresponsive.
 7                      MR. DE BLASE:  Nonresponsive.
 8                      THE COURT:  Sustained.
 9    BY MR. DE BLASE:
10    Q    All right, by the way -- well, let's get back to
11         this.  Okay, so in your opinion, ambient did not play
12         a role in Mr. Humphreys' mesothelioma?
13    A    I don't have enough information to say that.
14    Q    Okay.  The information that you do have is what you
15         testified to on direct, is that right?
16    A    Yes.
17    Q    He had a substantial exposure to pipe covering,
18         right?
19    A    Based on his testimony, he did have exposures to the
20         use of pipe covering and the use of
21         asbestos-containing insulating cements as well as --
22                      MR. DE BLASE:  Your Honor, I move to
23         strike.  I'm asking a question.
24                      THE COURT:  It's nonresponsive.  Sustained.
25    BY MR. DE BLASE:
```

—41—

| | | |
|---|---|---|
| 1 | Q | All right.  So the next thing he had exposure to was |
| 2 | | the mud, he had a substantial exposure to |
| 3 | | asbestos-containing mud, correct? |
| 4 | A | Based on his testimony, that's correct. |
| 5 | Q | He also had other exposures in his life, right? |
| 6 | A | Yes, he did. |
| 7 | Q | And we'll talk about those.  Now, your background is, |
| 8 | | you started with OSHA in 1974, you worked there for |
| 9 | | seven years, is that right? |
| 10 | A | That's correct. |
| 11 | Q | And after that seven years you worked for companies, |
| 12 | | right? |
| 13 | A | That's correct. |
| 14 | Q | So when you were talking about you were the enforcer, |
| 15 | | the cop, that's when you were with OSHA? |
| 16 | A | That's correct. |
| 17 | Q | When you were with the companies though you were |
| 18 | | being paid by the companies, right? |
| 19 | A | That's correct. |
| 20 | Q | And you were part of somebody who was in the |
| 21 | | management of those corporations, right? |
| 22 | A | Well, not really management.  I, you know, was a |
| 23 | | staff person who made recommendations to management, |
| 24 | | I guess is a better way of putting that. |
| 25 | Q | And then after your work with companies, that ceased |

—42—

```
 1          when?

 2     A    In 2012.

 3     Q    All right.  2012.  And then -- well, before 2012 you

 4          were doing some of this asbestos litigation

 5          consulting work, right?

 6     A    Yes, on a part-time basis, on evenings, weekends, and

 7          then I negotiated vacation time with my employers to

 8          work on it.

 9     Q    And when did that start?

10     A    That happened beginning of 1996.

11     Q    That's when you began testifying for companies,

12          right?

13     A    Yes, very little at that time.

14     Q    And then since 2012, this testifying for defendants

15          has been your exclusive occupation?

16     A    Well, I do other industrial hygiene type of work as

17          well, but most of it is litigation-related work.

18     Q    All right.  And you've always worked on behalf of

19          defendants in asbestos cases, right?

20     A    In asbestos cases, all but one.

21     Q    And some of the companies that you have done work for

22          include Owens-Illinois, obviously, right?

23     A    Yes.

24     Q    And you've worked for them on numerous occasions,

25          right?
```

```
 1   A   Yes.
 2   Q   But you've also worked for other companies as well in
 3       this asbestos litigation, right?
 4   A   That's correct.
 5   Q   And some of those other companies are Garlock?
 6   A   Pardon?
 7   Q   Garlock?
 8   A   Yes.
 9   Q   Armco?
10   A   Yes.
11   Q   Motion Industries?
12   A   Yes.
13   Q   Ajax?
14   A   Yes.
15   Q   Goodrich and Goodyear?
16   A   Yes.
17   Q   Peters Supply Company?
18   A   Yes.
19   Q   Buffalo Pumps?
20   A   Yes.
21   Q   Gould Pumps?
22   A   Yes.
23   Q   Anybody else?
24   A   American Standard.
25   Q   Okay.  Ingersoll Rand Pumps, Bechtel Corporation?
```

1           What did Bechtel make?

2    A      Bechtel was a general contractor involved in building

3           the plant that I got involved with.

4    Q      Anybody else?

5    A      Yeah, there were others, but there have been just one

6           or two cases involving -- Insull Company manufactured

7           risers for ingot molds in the steel industry.

8    Q      And in each of these cases, it involved a person who

9           has an asbestos-related disease, right?

10   A      Yes.

11   Q      And in each of those cases, your conclusion was that

12          person did not have enough exposure to that

13          particular defendant's product to have constituted a

14          significant risk, right?

15   A      No, that was not my conclusion at all of those cases.

16   Q      You concluded in some of those cases that the

17          defendant's product did in fact contribute to the

18          disease?

19   A      In some of those cases I was asked to look at all the

20          different products that were used and determine which

21          ones resulted in significant exposures to asbestos,

22          not necessarily the company that I was representing

23          or that the attorneys represented that hired me, but,

24          in other words, to determine whether or not there

25          were other exposures that that employee may have had

1           at that work site.

2    Q   The Eaton defendant that you worked for, that was

3           work for a company where you were testifying, and

4           that company was actually an employer of somebody who

5           got sick from being exposed to asbestos, right?

6    A   Which company are you talking about?

7    Q   Eaton.

8    A   Oh, Eaton Corporation.  Yes, I was representing Eaton

9           Corporation at that point.  I was hired by attorneys

10          who were representing Eaton Corporation.

11   Q   And the attorneys were paid by the company that needs

12          the testimony, right?

13   A   Right.

14   Q   And Eaton was an employer of somebody who got sick,

15          right?

16   A   Eaton bought a company, Cutler-Hammer, if that's the

17          case you're talking about.  Cutler-Hammer was a

18          manufacturer of electrical switches and components,

19          and Eaton bought Cuttler-Hammer, but it was

20          Cuttler-Hammer that produced the products that the

21          employees used and manufactured, and that resulted in

22          asbestos exposures.

23   Q   Now, you talked about the hierarchy of controls a

24          little bit on direct today.  That hierarchy of

25          controls, you don't consider substitution of the

1           offending material to be in the hierarchy of

2           controls; you consider that to be a separate category

3           all together?

4    A     Well, if you substitute it you don't need to control

5           it; in other words, if you substitute a less

6           hazardous material for a more hazardous material,

7           then you don't have to control it so it eliminates

8           the need for control.  But many include substitution

9           as a -- as one of the hierarchies of control, but in

10          my opinion, if you don't have it, you're using

11          something else, then it's not a control; it's a

12          prevention.

13   Q     What materials did Owens-Illinois provide you in this

14          case?

15   A     Well, the depositions that I reviewed, or that I

16          listed yesterday, including the specifications for

17          the combustion engineering boilers that were

18          installed at the power plants.  That was the extent

19          of it that I listed yesterday.

20   Q     Well, you didn't list the depositions, and I didn't

21          hear the name.  Did you review the deposition of

22          Lloyd Stavich?

23   A     Yes, I did.

24   Q     So you heard his testimony and his use of the Kaylo

25          product at the plant, right?

```
 1    A    Yes, I did.
 2    Q    Other than those materials, you've done no other
 3         independent research in this case, have you?
 4    A    That's correct.
 5    Q    Okay.  And have you ever asked Owens-Illinois for a
 6         piece of their Kaylo?  I know it's made many years
 7         ago, 1958 they stopped making it?
 8    A    Yeah.
 9    Q    Have you ever asked them hey, do you guys have any of
10         those Kaylo around and can I test it?
11    A    I wouldn't want to do that.
12    Q    You wouldn't want to do that?
13    A    No, I wouldn't want to do that.
14    Q    Why not?
15    A    Well, number one, you know, it would be 60 years old
16         -- or 50 years old, I guess, if they had at that
17         point, 50 -- well, it's 56 years old, and it's
18         probably going to be fairly dried out, more brittle
19         than it would have been when it was installed prior
20         to 1958, and I can't think of any reason why I would
21         want to test it.
22    Q    Okay.  Just clearing up the last topic on
23         substitution.  Is substitution, in your mind, from an
24         industrial-hygiene perspective, one of the most
25         important ways to prevent hazards in the workplace?
```

-48-

1    A    Yes.  If you're not using a potentially hazardous

2         product, then you've eliminated the need for any kind

3         of controls, assuming that that is a safer product

4         than the product that it's being substituted for.

5    Q    And what -- and that was known in the '30s, '40s and

6         '50s, right, this concept of substitution?

7    A    Well, substitution has always been known.  I mean,

8         you select the products that your employees are going

9         to be working with, and, you know, if there's a

10        suitable substituted material that you can use, then

11        yes, substitution's always, as far as I know, been a,

12        something that an employer had available to them.

13        But I don't know if it applied to thermal insulation

14        at that time period because that was what everyone

15        was using.  To my knowledge, there was no available

16        suitable substitutes for the type of insulation work

17        that they were doing during that time period.

18   Q    You're not an expert on substitution of materials

19        within products, are you?

20   A    Well, based on what I've read about what was being

21        used during that time period and the other products

22        that were tried during that time period for thermal

23        insulation, the general consensus was that there were

24        no suitable substitutes for asbestos and thermal

25        insulation until the '60s.

1     Q    Thank you.

2                    MR. DE BLASE:  May I approach, Your Honor?

3                    THE COURT:  You may.

4     BY MR. DE BLASE:

5     Q    I'm going to hand you some deposition testimony that

6          you've given in the past.

7                    THE COURT:  Thank you.

8     BY MR. DE BLASE:

9     Q    You were asked a question before under oath, do you

10         remember?

11    A    I'll have to look at it.

12    Q    If you're an expert on substitution with respect to

13         asbestos-containing products?

14    A    Yeah.

15    Q    Do you remember being asked that question?

16    A    I don't remember exactly, no.  I've been asked a lot

17         of questions.

18    Q    Do you remember saying no, I'm not an expert on

19         substitution of asbestos-containing products?

20    A    I'm not an expert on thermal insulation products and

21         how to manufacture those and which ones you need for

22         any particular type of application, especially in a

23         power plant where the temperatures are usually very

24         high that they're trying to insulate piping with.

25    Q    So the answer is you're not an expert with respect to

1    substitution in asbestos-containing products, or you

2    are?

3  A  Well, I have knowledge on what was available during

4    that time period based on the depositions that I've

5    read and the publications that I've reviewed, but I'm

6    not an expert on, you know, what was being tested

7    during that time period and then where it was being

8    used and what all the results were.

9        All I have is what the literature indicated

10   to me, and that was that there were no suitable

11   substitutes found for asbestos until the 1960s as far

12   as for their use in thermal insulation products.

13 Q  All right.  Well, we've heard a lot of testimony in

14   this trial; in fact, defendant brought an expert to

15   talk about that in this case.  Did you talk to him at

16   all?

17 A  No.  Which --

18 Q  Dr. German.

19 A  No, I didn't talk to Dr. German.

20 Q  Were you ever asked to go back and form an opinion in

21   this case about materials, substitute materials,

22   other than asbestos?

23 A  I don't think I --

24 Q  In this case.

25 A  I wasn't asked in this case, no.

1    Q    Have you ever been asked to do that?

2    A    I don't believe I have, no.

3    Q    Did the lawyers give you an agenda of things to do in

4         this case, what they were looking for?

5    A    They indicated that they wanted me to review the

6         depositions and the job specifications that they sent

7         and asked me if I would give my opinion as to, first

8         of all, whether I could calculate or estimate a dose

9         of exposure that Mr. Humphreys may have received to

10        Kaylo as well as to the Mundet insulating cement that

11        he used.

12   Q    You've been able to provide us with metrics

13        concerning exposure levels that you received to those

14        products, right?

15   A    That he specifically received?

16   Q    Yeah, assuming of course that he was exposed to Kaylo

17        and exposed to the mud as testified, you've given us

18        metrics as to the amount of fibers per cc from those

19        operations, right?  Did I hear that right from your

20        testimony?

21   A    No.  I gave you the general exposure levels that have

22        been reported in the literature for insulators during

23        the pre-1965 period and the post-1965 period, but I

24        didn't specifically mean to imply that those were his

25        particular exposure levels to OI Kaylo, if that's

1          what you're asking.

2     Q    And why is that?

3     A    Because I didn't have enough information in his

4          deposition as far as the job activities that he

5          performed, the number of times that he performed

6          them, and the distance that he was from others who

7          performed similar operations, not only from the

8          insulators that he was providing the product to,

9          mixing the cement for, as well as the distance that

10         he was and how often he was near other contractors

11         that were insulating other types of equipment rather

12         than just piping.

13    Q    You didn't see that testimony in his deposition, in

14         his trial testimony here?  You didn't see testimony

15         concerning his cutting of the product, his working

16         around the product, his working with people?

17    A    I saw --

18    Q    Let me finish the question.  His working with people

19         that were working with the product, the fact that he

20         was cutting the product in about a foot and a half

21         away while he was cutting it, the fact that he was

22         sweeping up the dust from the product, the fact that

23         he saw that there was dust, the fact that this

24         process -- this summer was about three or so months,

25         the fact that he did this eight hours a day as a

1   full-time job during that time period, the fact that

2   he worked around other insulators who were doing the

3   same thing, all of that information was not enough

4   for you to give a range of exposures to this product?

5   A   No, because it was not specific as far as frequency

6   and duration as well as distances.

7   Q   Okay.  And you've done this sort of thing in other

8   cases, though, have you not?

9   A   I have, where there's been more explicit and more

10   consistent information.

11   Q   What was inconsistent about Mr. Humphreys' testimony?

12   A   Well, for example, he indicated at one point that he

13   mixed the insulating cement or mud, as they called

14   it, anywhere from two to three times an hour, but

15   later he said three to five times a day.  And then

16   also in his testimony he said for half a day, so, you

17   know, it was hard to pick how often he actually did

18   the mixing.  He was explicit on the duration of

19   mixing.  He said it took him about ten to 15 minutes,

20   but as far as how frequent, in other words, how

21   often, I didn't have that information.

22            And I really didn't have specific

23   information on exactly how long he worked, other than

24   he said he thought he started in late June, possibly

25   early July, and he worked possibly three weeks into

1         September before he went back to college.

2    Q    You couldn't give us ranges just based on those

3         parameters alone, a low and a high, you couldn't do

4         that?

5    A    No.

6    Q    But you have done that in other cases, haven't you?

7    A    Where it has been explicit; in other words, I mixed

8         the insulating cement two times per hour, took me

9         15 minutes to do that mixing, and I did that five

10        days a week for 12 weeks, and I did this mixing in

11        this type of environment, or I worked within 20 feet

12        of other insulators that were using similar, not

13        similar products, but they were using insulating

14        products and insulating cement while insulating

15        piping.  So I have been able to do that but not in

16        this particular case.  It just wasn't consistent

17        enough or explicit enough for me to do that.

18   Q    If you took the low end of everything that you just

19        talked about with respect to Mr. Humphreys'

20        testimony, would that be in your mind a substantial

21        exposure to asbestos, just based on his work at the

22        taconite power plant, all of the different things

23        that he did there?

24   A    Well, I don't know what you're defining as

25        "substantial."

1    Q    You've read his deposition, right?

2    A    Yes.

3    Q    And you have an understanding of all of the avenues

4         and opportunities that he had to be exposed to

5         asbestos, right?

6    A    Yes.

7    Q    And of all of the universe of opportunities for him

8         to be exposed to asbestos, his work at the taconite

9         power plant was the biggest exposure to asbestos he

10        had in his life, right?

11   A    Based on his deposition and the duration of time that

12        he was there, it was certainly a significant source

13        of exposure.

14   Q    All right.

15             Now, I heard in your direct testimony

16        criticisms of Mr. Templin, and I was scratching my

17        head because I was trying to figure out what was

18        going on there.  His MAS studies you criticized,

19        right, not his but MAS's studies?

20   A    I don't think I criticized him.  If I did, I

21        apologize to the court, but I criticized the studies.

22        As far as I know, he wasn't involved in those studies

23        and so I certainly wouldn't criticize him.

24   Q    Okay, so the studies are actually less than the

25        numbers that you were giving us for these operations

```
 1              , aren't they?

 2     A    Yes, based on his testimony.

 3     Q    Okay.  So are you saying that the studies are trying

 4          to overstate the exposures, is that what you were

 5          trying to say yesterday?

 6     A    All I indicated is that when you do simulation

 7          studies in a confined space with limited ventilation

 8          you're not representing the workplace and what the

 9          worker was exposed to.  And also, when you use people

10          who have never cut pipe, never handled pipe, or mixed

11          cement, you know, those are skilled people with

12          specialized techniques.  Only sampling those people

13          in a real field-type situation in the workplace is

14          going to represent their exposure and not a study

15          done in a confined space by a -- nonskilled people.

16     Q    Understood.  And I think that's what he testified to,

17          that these are not trying to replicate work practices

18          in the field but we're trying to understand if we

19          have exposures to asbestos, and at least insofar as

20          that's concerned, these tests give us some

21          information on that, don't they?

22     A    Yes, they show that asbestos can be released when

23          that product is handled in the way that they handled

24          it in their simulation chamber, yes.

25     Q    And the -- but you would prefer to see information
```

1      from the literature on actual -- where do you get

2      your numbers?  You were talking about, I think you

3      said ten to 15 fibers per cc with the Kaylo, right?

4   A  Not with the Kaylo.

5   Q  With thermal insulation?

6   A  With asbestos-containing thermal insulation product

7      among insulators that were installing those types of

8      products pre-1965.

9   Q  Which is what we're talking about in this case,

10     right?

11  A  Right, um-hum.

12  Q  We're not talking about post-1965?

13  A  Right.

14  Q  So pre-1965, you're saying the literature supports

15     ten to 15 fibers per cc while working with thermal

16     insulation?

17  A  That's correct.

18  Q  And what is the basis of that, what paper are you

19     referring to?

20  A  Most of that is from the Fleischer and Drinker

21     studies of 1946.

22  Q  Anything else?

23  A  There was also a Ferris study.

24  Q  Anything else?

25  A  No.

—58—

1          THE COURT:  How do you spell Ferris?

2          THE WITNESS:  F-E-R-R-I-S, I'm sorry.

3    BY MR. DE BLASE:

4    Q   How about Hodgson and Darnton, have you read that

5        article?  H-O-D-G-S-O-N, and Darnton, D-A-R-N-T-O-N.

6    A   I've heard about that.  I haven't reviewed that

7        recently, though.

8    Q   This is something that Mr. Templin talked about in

9        his direct testimony.  This is a paper that was --

10       may I publish it, Your Honor?

11         THE COURT:  Any objection?

12         MR. COSMICH:  I don't think he has a

13       foundation for it yet.  He hasn't read it.

14         MR. DE BLASE:  Well, he doesn't need to

15       read it.  This is a publication that Mr. Templin has

16       talked about and found to be authoritative and

17       reliable.

18         MR. COSMICH:  I don't know that that was

19       established.

20         MR. DE BLASE:  Yes, it was.

21         THE COURT:  The objection is overruled.

22   BY MR. DE BLASE:

23   Q   All right.  We're not going to do this too much.  But

24       let's talk about it a little bit.  Hodgson Darnton.

25       You know who these researchers are?

1    A    I've heard of them, yes.

2    Q    They're folks that talk about asbestos and exposure.

3         We're not going to talk about this whole article

4         because it's pretty thick, but they actually talked

5         about the insulator cohort that Dr. Selikoff studied.

6         You know what that's all about, right?

7    A    Oh, yes.

8    Q    And that was a large cohort, I think what, 14,000 --

9    A    Yes, thousands.

10   Q    And that cohort which started in the 1960s and is

11        even being studied to this day, is being referred to

12        in this paper.  These researchers found insulators --

13        see that cohort number eight there?

14   A    Yes.

15   Q    That's the U.S.-Canada insulators?

16   A    Yes.

17   Q    And they have provided average cumulative exposure at

18        the top there, you see that, that column, average

19        cumulative exposure, fibers per milliliter year,

20        that's fiber per cc year?

21   A    Right, um-hum.

22   Q    And so that's basically a -- we multiply the numbers

23        of years now to our fiber per cc metric, right?

24   A    Right, um-hum.

25   Q    So for this, in this cohort, that's a big number,

1           right, 500 fiber per cc years?

2    A     Right.

3    Q     If we look elsewhere in the paper we see that the

4           number of years that they're talking about is

5           25 years?

6    A     Okay.

7    Q     So from that the conclusion was -- and Mr. Templin

8           testified to this -- was that on average an insulator

9           is really going to be in the neighborhood of 20

10          fibers per cc, because if we divide 500 by 25 years

11          we get 20 fibers per cc.

12                  Is that within the range of what we're

13          talking about here, ten, 15, 20 fiber per cc years?

14   A     Well, I don't know when that study was done.  It's a

15          Canadian insulators.  I mean, I don't know what years

16          they're looking at.

17   Q     But they're looking at the cohort.  This study was

18          done in 2000, published in 2000.  So anyway, does

19          that make a difference when?  I mean, are we talking

20          about numbers that, you know -- and it varies, we're

21          not going to get exact science on this because we

22          don't know because nobody was there with the

23          breathing apparatus?

24   A     Right.

25   Q     We're talking about numbers that are ten, 15, 20

1    fibers per cc for this operation, right?

2  A   Well, that article was.  I don't know how that would

3      pertain to those numbers that I gave you.  Again, it

4      said Canadian insulators on the -- I'm not familiar

5      with their study.

6  Q   Do Canadian insulators do insulating different than

7      the Americans?

8  A   Well, they could have; I don't know.

9  Q   They do things differently, correct?

10  A   Well, they could have used different products, sure.

11  Q   All right.  So --

12  A   And had less controls.  I don't really know.

13  Q   When we're talking about exposures and the numbers of

14      fibers per cc an individual might be exposed to, it's

15      variable, right?

16  A   Yes.

17  Q   And a number like 20 fibers per cc doesn't surprise

18      you, does it, for this operation, thermal insulation,

19      the cutting, the cleanup, the sawing, the carrying,

20      those sorts of things?

21  A   Well, it would be an extreme peak in, based on what

22      I've read, as far as American literature and the

23      research.  I don't believe the range would get up

24      that high.  There certainly could be peaks; for

25      example, mixing insulation can go up as high as a

1          hundred fibers per cc.  I said mixing insulation.  I

2          meant mixing insulating cement, so it varies.

3               Using a band saw can raise the levels, but

4          typically the ten to 15 I think is a better range for

5          at least American insulators during that time period.

6     Q    Okay.  All right.  So what about these other

7          operations, the brake work that he did, how many

8          brake jobs did he do?

9     A    Well, that varied, too.  He first said he did two a

10         year for about seven years.  Then he said he did more

11         like ten, and then he said at the end, that maybe he

12         just did six, so it varied.

13    Q    Okay.  Well, if we took the top number, two a year

14         for seven years, that's 14 brake jobs?

15    A    Fourteen, right.

16    Q    And then we have a low number of six.  Is anything in

17         that range, in your opinion as an industrial

18         hygienist, does that increase one's risk of getting

19         mesothelioma?

20    A    Well, again you're asking a medical question, but you

21         certainly can, depending upon the environment that

22         you're doing the brakes in, and he indicated that

23         with new brakes he would sand them, which brake shoes

24         in that time period contained a lot of asbestos, so

25         when you're sanding your shoes you're getting some

```
 1              pretty high exposure levels.  So depending upon the
 2              number that he did, the way he did them, the
 3              environment that he was in, he would certainly have
 4              significant asbestos exposures while doing brake
 5              work.
 6      Q       So it's your opinion that brake work gives somebody a
 7              significant exposure to asbestos?
 8      A       Yes, I think doing brake work with
 9              asbestos-containing brake materials, especially
10              scuffing the new brakes, will give you a significant
11              exposure to asbestos.
12      Q       Is it something that increases one's risk of getting
13              the disease?
14      A       If you do it enough and you get a high enough dose,
15              in my opinion -- again, you're asking me to come up
16              with a medical opinion -- but in my opinion, it
17              increases or puts you in a category of people that
18              have an increased risk of developing mesothelioma.
19      Q       Well, what about in Mr. Humphreys' case where we have
20              a maximum of 14 brake jobs?
21      A       Well, if he -- again, I don't know exactly what his
22              exposure level was while he was scuffing those
23              brakes.
24      Q       Let's presume it was the worst?
25      A       He would have a significant exposure while sanding
```

| | | |
|---|---|---|
| 1 | | those brake shoes, there's no question about it. |
| 2 | Q | What kind of metrics can we put on that, what kind of |
| 3 | | fiber per cc metrics? |
| 4 | A | We can't because no sampling was done.  We don't know |
| 5 | | how close he was to the brakes.  We don't know if he |
| 6 | | was downwind, upwind.  We just don't have enough |
| 7 | | information to know what his exposure level would |
| 8 | | have been. |
| 9 | Q | Well, he testified that he did the brakes indoors so |
| 10 | | there wasn't any wind.  So let's take that out of the |
| 11 | | equation, and let's take the worst-case scenario, |
| 12 | | what kind of fiber per cc exposure did Mr. Humphreys |
| 13 | | have to brakes? |
| 14 | A | I would not have enough information to estimate that. |
| 15 | | It would vary and it would depend, again, on him |
| 16 | | sanding the brakes and the environment that he was |
| 17 | | sanding and how close his mouth was to that |
| 18 | | particular activity, so I wouldn't be able to put a |
| 19 | | number on that. |
| 20 | Q | Well, let's presume -- let's do a hypothetical. |
| 21 | | Let's presume that his face was a foot away from the |
| 22 | | brakes while he was sanding, and he sanded every |
| 23 | | single one that he did, and in terms of brake work it |
| 24 | | was the worst possible exposure he could get.  What |
| 25 | | kind of exposure -- what kind of fiber per cc can you |

1           give us for Mr. Humphreys' work on brakes?

2   A   I can't give you an exact number other than to say it

3           was a significant exposure to asbestos.

4   Q   Why can't you give us a number?

5   A   Because I didn't sample that operation, and I don't

6           know the conditions that he performed those

7           activities in.

8   Q   Did you sample this operation?

9   A   No, I didn't sample any of those operations.

10  Q   You gave us numbers there?

11  A   Right.

12  Q   You know what the literature is with respect to

13          brakes and sanding and brushing out the brake dust as

14          he testified, putting in the new brakes.  Give us

15          some numbers so we can compare it to his experience

16          at Taconite Harbor?

17  A   The exposure with brakes can be high; it can peak

18          when you're sanding the brakes, but, again, the exact

19          amount of exposure is something you have to determine

20          by actually doing sampling.

21  Q   Is that something that you have ever done?

22  A   Yes, I've sampled the removal and installation of

23          brake shoes.

24  Q   So what kind of fiber per cc numbers did you get when

25          you did that sort of testing?

1    A    Well, I was doing it with controls.  We had our

2         employees wearing respirators and wetting down the

3         new brakes as well as the old brakes before they took

4         them off, plus we had local exhaust ventilation, so

5         my levels, my concentrations of exposure that I

6         determined were very low.

7    Q    My question is, do you have any data for us?  I mean,

8         you've got literature, do you not, that talk about

9         how many fibers per cc one gets when they sand

10        brakes?

11   A    I haven't seen anything specific to sanding

12        automobile brakes.  I mean, the highest levels that

13        I've seen on performing any kind of brake work has

14        been five fibers per cc.

15   Q    You've seen five fibers per cc?

16   A    Yes, but it's a peak exposure.

17   Q    What publication is that?

18   A    I don't remember the particular publication.

19   Q    And that's a peak exposure for a few minutes,

20        15 minutes, what?

21   A    A short period of time, right.

22   Q    Is it less than 15 minutes?

23   A    Yes.

24   Q    Is that kind of experience the kind of experience one

25        gets when they're constantly exposed like one would

1      be at the Taconite Harbor all day long?

2   A  Well, even at Taconite Harbor your exposure levels

3      are going to vary with the activity.

4   Q  Sure.

5   A  So it -- all -- most environments at least you'll

6      have a variation of your exposure level depending

7      upon your activity.

8              THE COURT:  We're going to take our morning

9      recess at this time, ladies and gentlemen,

10     15 minutes.  Why don't you put your note pads on your

11     chairs.  Don't talk about the case, and we'll see you

12     soon.

13             (Whereupon, the jury was excused.)

14             THE COURT:  We're on the record.

15     Mr. Glaccum, you may proceed.

16             MR. GLACCUM:  Your Honor, I have what has

17     been marked as Plaintiff's Exhibit -- or sorry --

18     Exhibit 50A for identification.  It's the video

19     deposition of Lona Jensen taken September 25th, 2014,

20     transcript.  As the court requested, we have produced

21     it to attach it to the thumb drive which has already

22     been admitted into evidence.  At this time we'd

23     request to admit it into evidence.

24             THE COURT:  Is this the redacted version or

25     the unabridged version?

1          MR. GLACCUM:  Unabridged, Your Honor.

2          THE COURT:  All right.  And of course

3     Exhibit 50 is the actual video itself with

4     redactions, so if there's ever an appeal, that court

5     can have a full array of materials to review the

6     record.

7          Is there any objection to the receipt of

8     Exhibit 50A as a court exhibit?

9          MR. TIERNEY:  No objection as a court

10    exhibit, Your Honor.

11         THE COURT:  All right, it's received as a

12    court exhibit.

13         We'll go off the record and take our break.

14         (Court stood in recess.)

15         (Whereupon, the following proceedings were

16    duly had in open court in the presence of the jury:)

17         THE COURT:  Mr. DeBlase, you may continue

18    with your cross-examination.

19         MR. DE BLASE:  Thank you.

20  BY MR. DE BLASE:

21  Q   Dr. Gregory, this five fibers per cc when you're

22      talking about the worst possible brake exposure you

23      can get, that was a peak exposure, right?

24  A   Yes, it was a peak.  In fact, now that I think about

25      it, I've actually seen it as high as eight fibers per

```
1         cc.
2    Q    What is that over a time-weighted average?
3    A    Well, it depends upon how many brakes you do, and
4         that study I don't believe indicated that.
5    Q    Well, what about with Mr. Humphreys' case, if he's
6         doing 14 brake jobs total, what kind of time-weighted
7         average fiber per cc number can we get?
8    A    The time-weighted average would be fairly low
9         compared to doing the insulation-type work that he
10        was assisting with, including the mixing of
11        asbestos-containing cement, so it would be low,
12        relatively speaking, compared to --
13   Q    I understand, but we want to give the jurors some
14        tools to equate the two, so what kind of
15        time-weighted average fiber per cc -- by the way,
16        this is a time-weighted average, right?
17   A    Yeah.
18   Q    What kind of time-weighted average fiber per cc
19        number can we give to Mr. Humphreys' experience with
20        brakes?
21   A    I can't give one, because I don't know how long it
22        took him to do the brakes, how many he did under the
23        circumstances that he performed the brake job.  You
24        know, it's just too many variables that would have to
25        go into that equation for me to try to give any kind
```

1      of estimate of what his exposure was, other than to

2      say it was less than what his exposure would have

3      been during the insulation activities that he

4      described.

5  Q   Are we talking about a number that starts with a zero

6      and a decimal point, at least that much, can we

7      figure that much out?

8  A   No, I can't say that either.  Again, it's something

9      that you have to monitor to determine.  I mean, it's

10     going to be above the range of from maybe .01 to up

11     to maybe one-and-a-half, maybe over an eight-hour

12     average, but it's going to be low, again, compared to

13     insulation-related activities, particularly the

14     mixing of asbestos-containing cements.

15  Q   But we just don't have enough information to make any

16     determination at all as to that?

17  A   That's correct.

18  Q   What about the joint compound, same thing?

19  A   The same thing is true there because he wasn't a

20     Drywaller, so he was just patching cracks and nailing

21     holes in a house that he had bought, so he was

22     working intermittently, both mixing the joint

23     compound and sanding the joint compound.

24           So I don't know the size of the rooms that

25     he was doing these things in or how close he was

1           while he was doing the sanding, as well as the mixing

2           of the joint compound.  So his exposure level would

3           have varied.

4     Q     Can you give us some information that is in the

5           literature concerning joint compound exposures?

6     A     Yes.  The time-weighted average for a Drywaller, that

7           I'm aware of, that I think is one of the more recent

8           ones that was published -- I just can't remember the

9           name of the author, although I think it was Murdock

10          -- but the time-weighted average for Drywallers that

11          included installing the Drywall, mixing the joint

12          compound and then sanding the joint compound, the

13          time-weighted average there ranged up to

14          five-and-a-half fibers per cc, I believe it was.

15    Q     And that obviously is a professional Drywaller,

16          right?

17    A     That's correct.

18    Q     Not a person doing random patch jobs for a few

19          minutes, a few hours?

20    A     That's correct.

21    Q     Whatever the testimony is in this case, right?

22    A     That's right.

23    Q     That exposure, in your opinion, is significantly less

24          than his experience at Taconite Harbor?

25    A     The exposure that he had as patching holes and

1    patching cracks or the exposure that a Drywaller

2    would have?

3  Q  His exposure of patching holes, patching cracks.

4  A  Yes, his exposure during the mixing of the

5    asbestos-containing joint compound would have been

6    similar to the mixing of asbestos-containing

7    insulating cements, although I would suspect

8    significantly lower, but you're mixing a dry powder

9    material that has a tendency to disperse into the air

10    easily, but in general, his operation of sanding,

11    mixing would have been lower -- mixing of joint

12    compound, sanding of joint compounds -- his total

13    exposure there would have been less than his exposure

14    during the same time period for the same duration of

15    while he was working as an insulator, or as an

16    insulator helper, excuse me.

17  Q  We went through some of the information that's in the

18    literature that Mr. Templin talked about in this

19    case.  The numbers that you're giving are lower than

20    the numbers that he gave for the literature, the

21    scientific literature with respect to those

22    operations, is that right?

23  A  Yes, but, I mean, he may be aware of some other

24    research or some other presentations that I'm not

25    aware of.

1   Q   And the exposures to the joint compound, that's all

2       chrysotile, right?

3   A   Yes.

4   Q   And that's in contrast to the Kaylo product which had

5       a component of amosite in it, right?

6   A   During that time period from 1956 to '58, it's my

7       understanding that Owens-Illinois Kaylo did contain

8       some amosite in addition to chrysotile.

9   Q   And we heard Charlie Ay's testimony on that and we've

10      seen some interrogatory responses on that.  I don't

11      think that's in dispute.  Do you have an

12      understanding as to the difference in toxicity, if

13      you will, between the fiber types chrysotile and

14      amosite?

15  A   Yes.  The general consensus is that amosite is a more

16      potent, more potentially toxic form of asbestos as

17      compared to chrysotile in causing an increased risk

18      of mesothelioma.

19  Q   Can you quantify that?

20  A   Well, there's been all types of factors that have

21      been used for that, so -- none of it has been

22      scientifically validated, so I'm not comfortable to

23      even give a range.  All I know is the epidemiological

24      studies have indicated that amosite is potentially

25      more toxic than chrysotile, and crocidolite is more

1        toxic, potentially toxic, than amosite.

2    Q   All right.  And crocidolite is not a fiber that's in

3        play in this case?

4    A   As far as we know, that's correct.

5    Q   Let's briefly go over what we talked about yesterday.

6        I have my notes here.  By the way, you respect

7        Charlie Ay and what he has to say about his

8        experience with insulating materials, right?

9    A   Yes, I've read his depositions in the past as well.

10   Q   You yourself were never an insulator, right?

11   A   No.

12   Q   You never applied insulation or worked with it,

13       correct?

14   A   No, but I've worked with raw asbestos as a high

15       school kid.

16   Q   But my question was as to insulation.

17   A   No.

18   Q   Now, as far as insulation of, thermal insulation,

19       Charlie Ay would be the best person to talk to us

20       about that, right?

21   A   Since he was an insulator who installed thermal

22       insulation, he would be more qualified to talk about

23       the techniques of installation of thermal insulation

24       and not me because I was never an insulator, that's

25       correct.

```
 1    Q   And what these things look like, too, right?
 2    A   He was knowledgeable.  He used them in the field
 3        while they were being installed rather than being
 4        removed.
 5    Q   And you said in your testimony yesterday Kaylo is
 6        white, very, very chalky white.  I think you used the
 7        words "very" and "chalky" and "white" like seven
 8        times in your answer.  That's a little bit in
 9        contrast to what Charlie Ay said in this case,
10        because we had the picture of the Kaylo up on the
11        screen, and he testified that the advertising is
12        white but it's not as white as that.  It's an off
13        white?
14    A   I think he indicated kind of a pinkish white with a
15        pinkish hew, I believe he indicated.
16    Q   Well, the testimony is what it is.
17    A   Right.
18    Q   We'll talk about that in closing argument.  But the
19        testimony that he gave is about the description of
20        the product as something that you would respect,
21        right?
22    A   Yes.
23    Q   You have no reason to dispute Charlie Ay's testimony
24        in this case, do you?
25    A   That's correct.
```

—76—

```
 1   Q   And do you have any -- now, the Mundet mud that
 2       Mr. Humphreys has described working with, that, too
 3       was a chrysotile product, right?
 4   A   Yes, as far as I know, or as far as the literature
 5       has indicated, yes.
 6   Q   That product did not have amosite in it, right?
 7   A   To the best of my knowledge, it did not, but that's
 8       based on what I know from the literature.
 9   Q   Now, you said -- I didn't think I was going to have
10       to talk about this, but then it changed.  You said
11       when you were talking about standards, the ACGIH and
12       other standards, that folks were trying to get the
13       workplace, if they followed these standards, that
14       nearly all employees, you said that, nearly all
15       employees would be safe, or that most people would be
16       safe.  But then you said something towards the end
17       that said that -- it was more definitive -- that if
18       you followed these TLVs you would be safe.  Is it
19       more that answer or the answer, most people, or
20       nearly all?
21   A   Well, that was our standard.  I mean, industrial
22       hygienists really refer to that as their bible to
23       determine whether people were being overexposed or
24       exposed within safe limits.  That was the best
25       available scientific information that we had.  As a
```

—77—

1          young compliance officer running around the plants

2          sampling employees and coming back with the results,

3          discussing it with the employees, and they wanted to

4          know, and their employer wanted to know, are my

5          people going to be safe, that's what we used.  Of

6          course then it was the permissible exposure levels,

7          PELs that OSHA had adopted from the ACGIH TLVs, but

8          they were essentially the same as the original TLVs

9          although the TLVs changed a little bit.  OSHA's

10         changed as well.

11    Q    Let's get back to my question.  My question is, those

12         standards, the ones that were not, you know,

13         enforceable by government, the ACGIH standards, and

14         then thereafter the ones that were enforceable by

15         government, the OSHA standards, all of those

16         standards throughout time have never said that

17         following these standards you're going to be safe,

18         have they?

19    A    Yes, they've said that nearly all people exposed

20         below those levels will not suffer adverse health

21         effects.

22    Q    And we've all seen the ACGIH -- I'm not going to put

23         that back on the screen -- from 1948.  I'm sure

24         you've seen it, too, from the tenth transactions,

25         right?

1    A    I don't know which one you're referring to.

2    Q    And then thereafter literature in OSHA when they're

3         describing these standards, they're talking about it

4         in terms of even at these standards people are going

5         to get sick, right?

6    A    Well, when OSHA established their PELs they were

7         mandated by Congress and the Supreme Court to

8         promulgate and enforce the most protective health

9         standards that they could promulgate, and they have

10        been tested many times.  Like I said, the Supreme

11        Court said you will produce and enforce the most

12        protective standard to prevent material impairment of

13        health for all working Americans.

14   Q    Understood, but let's get back to my question.  And

15        that is, that even at that standard for all the world

16        to see when we're talking about what the standard is

17        and what it does and what it purports to do, that

18        even at that standard -- and it's changed over time

19        -- but even at the standard at whatever time, if you

20        expose somebody below that standard, they tell

21        everybody people are still going to get sick, don't

22        they?

23   A    I'm not aware of them saying that other than to say

24        that there are some hypersensitive individuals who,

25        for one reason or another -- maybe it's the

1          particular medication that they're on, or maybe they

2          smoked cigarettes -- that interferes with the body's

3          defense mechanisms, but some of those people have a

4          challenged system that makes them more susceptible to

5          concentrations of chemicals as opposed to someone who

6          does not have those types of hypersensitivities or

7          weakened autoimmune or defense mechanisms.

8     Q    None of that's a factor in this case, is it?

9     A    I don't know that it is.  I'm not a medical expert on

10         that so I can't really give you an opinion.

11    Q    Let's stick with industrial hygiene.  Let's talk

12         about what's in the literature, what the standards

13         are, because you talked about that on direct, what

14         the standards are.  Let's talk about what that means

15         to folks that are looking at it at the time.  At the

16         time of the 1950s, we didn't have OSHA, we're looking

17         at the ACGIH, right?

18    A    That's correct.

19    Q    That wasn't enforceable, nobody could get a ticket

20         for violating the ACGIH standards, they were

21         recommended standards, but even in those standards

22         they said that this is a rough guesstimate pretty

23         much, right?

24    A    No, I don't recall anyone saying it was a rough

25         estimate.  And some states did adopt those as

1         regulations, the TLVs.

2    Q    Understood.  Now, when we moved to OSHA, OSHA tells

3         folks that even at this level, even at today's level,

4         .1 fibers per cc, which is extremely low compared to

5         the past, right?

6    A    Yes.

7    Q    Even at .1 fibers per cc, folks will still get

8         cancers?

9    A    Well, what they say is OSHA's acceptable risk is less

10        than one person per thousand that will develop a

11        disease for any of their occupational health

12        standards, and they say that with the current

13        standard, in addition to the permissible exposure

14        limit but all the work-practice requirements that are

15        in that, if all of those are implemented and

16        maintained there will be no significant risk of

17        material impairment of health.

18   Q    Right.  They're trying to prevent -- that's what

19        they're trying to do -- they're trying to prevent

20        asbestosis, and they think that that .1 level will

21        prevent asbestosis, right, can we agree on that?

22   A    I don't know how we got on asbestosis.  I was talking

23        about asbestos-related diseases including

24        mesothelioma and lung cancer.

25   Q    Let's start with asbestosis.  They're trying to

```
 1        prevent asbestosis at the .1 level, right?

 2   A    They're trying to prevent mesothelioma at the .1

 3        level.

 4   Q    Can we just start with asbestosis.  We'll get to

 5        mesothelioma.

 6   A    Right.

 7   Q    Asbestosis, trying to prevent?

 8   A    That would prevent --

 9   Q    Prevent asbestosis at .1, right?

10   A    That would prevent it, yes.

11   Q    And OSHA says -- have you read the regs for OSHA?

12   A    Yes, the 1994 was the last regulation, yes.

13   Q    So the regs say right in there that we're trying to

14        prevent asbestosis but this will not prevent excess

15        cancers, does it not say that?  You want me to pull

16        it out?

17   A    It says it will reduce cancers to, I believe the

18        exact language is three per thousand.  Their target

19        is one per thousand, but the rest of the regulation,

20        the work-practice controls that are also required in

21        a regulation, will bring that risk within one per

22        thousand, and that any significant reduction in the

23        permissible exposure level will not increase the

24        safety to the employee or decrease the risk of

25        material impairment.
```

RAMSEY COUNTY DISTRICT COURT

```
 1   Q   I just want to make sure I'm clear.  At the .1 fiber
 2       per cc level, which is today's standard, you're
 3       saying that's -- that OSHA believes that that's going
 4       to prevent cancers?
 5   A   That, in addition to the rest of their work-practice
 6       requirements, which are also part of their asbestos
 7       standard.
 8   Q   Okay.  At the time of the 1950s, did folks -- well, I
 9       think we've beaten that subject enough.  Let's move
10       on.
11           We talked a little bit -- or you talked a
12       little bit about toxic and nontoxic, the definition
13       -- you were shown some documents.  If there was some
14       testimony in this case about what somebody who
15       actually worked at the company, how they defined
16       toxic and nontoxic, is that something that you would
17       consider to be important in terms of understanding
18       what folks were thinking at the company at the time
19       about what the definition of those words means?
20   A   Well, the definition varied a little bit depending
21       upon the individuals.  I gave you the general
22       consensus as far as the definition of toxic versus
23       nontoxic.
24   Q   It's a technical kind of thing?
25   A   Right.
```

Q    You're not saying by putting up those documents, that
     asbestos was considered nontoxic up and through the
     '70s, you're not saying that it was considered not
     harmful to health through the 1970s, are you?

A    No, I'm just saying that the definition on toxicity
     changed with time, and during that time it was not
     considered a toxic mineral dust.  It was considered
     just a mineral dust.

Q    According to their defining scheme, right?

A    During that time period, that's correct.

Q    And we're talking about the '70s, right?

A    Before the '70s.

Q    Well, for somebody who's an insulator or a customer
     who's not looking at these documents that you showed
     the jury, and looking at just the normal definitional
     sense of the word in the 1950s, that could be
     different than what you're talking about in terms of
     toxic, nontoxic, right?

A    No, that was the general definition during that time
     period before it was changed, that toxic referred to
     systemic materials that were absorbed into the body
     and it traveled to remote or systemic locations
     within the body rather than causing harm right at its
     initial origin or its -- where it initially entered
     the body.

1   Q   So you're saying that the definition of toxic, at

2       least up through the 1970s, was toxic meant that if

3       it touched your body you'd get an immediate type

4       reaction, versus nontoxic which you'd take it into

5       your body and maybe you'd get hurt a little time

6       later?

7   A   Well, toxic was that it was a systemic material that

8       would travel through your body and then attack or

9       damage target organs, and the mineral dust was a dust

10      that stayed pretty much where it entered.  If it

11      entered the lungs, it stayed in the lungs.  It wasn't

12      absorbed into the bloodstream; it wasn't carried to

13      other parts of the body, but eventually that

14      definition was changed and the definition became -- a

15      toxic material was any material that could cause

16      damage to the body if it comes in contact with the

17      body or travels through the body.

18  Q   But before that time -- let's get to the bottom of

19      this -- before that time is it your point that while

20      asbestos was considered to be harmful to the body --

21      you agree with that, asbestos is harmful to the body

22      because it can cause asbestosis and cancer, and folks

23      knew that in the 1950s, right, 1955 and thereafter,

24      right?

25  A   In 1955, with the Richard Doll study, which was a

1          very well done epidemiological study, that was an

2          indication that overexposure to asbestos could cause

3          lung cancer, that's correct.

4    Q     Right, so that's harmful to the body, right?

5    A     Right.

6    Q     So you're saying that still is somehow not toxic

7          because of some technical definition, just to be

8          fair, right?

9    A     Right, the definition of toxicity at that point was

10         that it had to be a systemic poison.  It had to be

11         like arsenic lead, entered the body through the lungs

12         or through the intestinal tract or through the skin

13         and then traveled to other parts of the body.  It's

14         just a difference in definition.

15   Q     A difference in defining things?

16   A     Right.

17   Q     So folks in the sciences, you know, might have had

18         this hierarchy of what is toxic and nontoxic, but for

19         the average Joe, let's say, working at Owens-Illinois

20         and the average Joe looking at an advertisement,

21         toxic and nontoxic mean other things, right?

22              MR. COSMICH:  Object; calls for speculation

23         as to what it may mean to somebody else.

24              THE WITNESS:  Yeah.

25              THE COURT:  Witness can answer.  Overruled.

1           THE WITNESS:  I wouldn't know how other

2     people, your average Joe, at that time probably would

3     be familiar with the definitions of toxic versus

4     nontoxic.

5  BY MR. DE BLASE:

6  Q   Exactly.  So a fellow working at Owens-Illinois

7     explained to folks what, in a deposition, what was

8     meant by toxic or nontoxic in the 1950s is giving you

9     the straight scoop on what he meant at OI in the

10    1950s?

11 A   That was his interpretation of what toxicity was at

12    that point, yes.

13 Q   Okay.  Let's talk about your work with Eaton, okay.

14    That was the defendant you did work with, that

15    particular defendant was an employer in an asbestos

16    case.  Do you remember giving testimony -- let me

17    just ask you a question.  Forget about this testimony

18    stuff, this lawyer stuff.  Let me just ask a

19    question.

20           In performing the work for the various

21    companies that you've performed work for, have you

22    specifically come to opinions that the supplier of

23    asbestos material must rely upon the manufacturer to

24    tell them when the product is unsafe?

25 A   That's one source of information, and it's required

1          by the OSHA Hazard Communication Act since the early

2          1980s.

3    Q    And that was one source of information in the 1950s

4          as well, right?

5    A    It was not required in the 1950s.

6    Q    Understood.  There were no laws requiring them to do

7          anything in the '50s?

8    A    Right.

9    Q    I'm talking about your answer, and that is it's one

10         source of information?

11   A    That's one source of information.  There are many

12         other sources of information.

13   Q    And from an industrial-hygiene standpoint, employers

14         have a -- have come to rely upon product suppliers to

15         provide information on product safety, true?

16   A    That's one source of information, sure, one of many

17         but you can't just go on one source.  In that

18         particular case the company was given misinformation

19         about the product that they were being supplied.

20   Q    Let's talk about that.  So obviously information that

21         is received or put out by the company needs to be

22         accurate, right?

23   A    That's correct.

24   Q    And you believe from an industrial-hygiene standpoint

25         that it would be wrong for a manufacturer to give

```
 1              misinformation about its product, right?
 2    A    That is wrong, yes.  Yes, I do agree with that.
 3    Q    And when you're giving that opinion, you're giving
 4              that opinion not just as a scientist but also as a
 5              professional involved in safety, correct?
 6    A    That's correct.
 7    Q    Because an industrial hygienist is a person who is
 8              involved in safety, right?
 9    A    Not all of them, but I was because I was certified in
10              safety as well.
11    Q    And from an industrial hygiene and logic standpoint,
12              manufacturers are in the best position to know
13              precisely what materials are contained in the
14              products they produce, right?
15    A    Yes, a manufacturer of a product does know, since
16              they obviously manufacture the product, they know
17              exactly what's in that product.
18    Q    And manufacturers are in the best position to let
19              others know what's in their product?
20    A    Yes, if they sell their product, of course they can
21              tell others what's in their product.
22    Q    And manufacturers are in the best position to test
23              their own product, true?
24    A    They're in the position to test it as well as anyone
25              else could test it.  Users can test it.  The
```

1          universities can test it; the government can test it,

2          of course.

3     Q    You could test it?

4     A    That's right.

5     Q    Manufacturers are in the best position to understand

6          the hazards that are particular to their own product,

7          correct?

8     A    Not really, because the hazard depends upon exposure,

9          and exposure is -- depends upon the usage, in other

10         words, the environment that it's used in, how much

11         you're using, how often you're using it, and the way

12         you're using it, essentially.

13    Q    Is there anything that would prevent a manufacturer

14         from testing all those things that you just said?

15    A    Yes, because I'm not aware of manufacturers who can

16         walk into the job site and put a sampling pump on an

17         employee to monitor their exposure level.  Even as an

18         OSHA compliance officer I carried a federal badge and

19         I had trouble getting into some situations with some

20         employers and testing the environment that the

21         employees were exposed to.

22    Q    But a manufacturer could do the best it could to test

23         what it perceived to be the end users' use of the

24         product, couldn't it?

25    A    The employer is in the best position since they

```
 1              control the people.  For example, as an OSHA
 2              compliance officer, I ran into several employees who,
 3              despite me telling them who I was and why I wanted to
 4              monitor their exposure, they didn't want to wear a
 5              pump.  So I had to go to their bosses and ask them to
 6              please ask that employee to wear my sampling pump so
 7              I could find out what they're being exposed to.
 8     Q   Manufacturers are in the best position to provide
 9              information about their product, true?
10     A   As far as the content of their product, they know
11              better than anyone else what the content is, the
12              percentage of different types of material that goes
13              into their products.
14     Q   Manufacturers are in the best position to
15              communicate, right on their own packaging,
16              information about any hazards related to their
17              products that they know?
18     A   Manufacturers can't really communicate hazards
19              because hazards depend upon exposures.
20                   MR. DE BLASE:  I'll object as not
21              responsive, Your Honor.  It really calls for a yes or
22              no.
23                   THE COURT:  Overruled.  The next question.
24              He answered your question.
25                   MR. DE BLASE:  Got it.  Okay.
```

1   BY MR. DE BLASE:

2   Q   And from an industrial-hygiene standpoint, one of the

3       ways an end user may receive information about the

4       hazards of a product is by way of information

5       contained on the packaging of that product, true?

6   A   No, because hazard depends upon exposure and working

7       conditions, and you can't indicate that on a package

8       because you don't know how the material is going to

9       be used once you sell it to a user, and you don't

10      know how often it's going to be used, how much of it

11      is going to be used, the environmental conditions

12      under which it's being used.  So you really don't

13      know whether or not that's going to be a hazard to

14      the employees of that employer.

15  Q   If a manufacturer has a strong suspicion that a

16      certain disease will result through the normal use of

17      its product, is that something that should be

18      contained on the packaging of the product?

19  A   If a manufacturer knows that their product and the

20      way it's going to be used in the workplace is going

21      to result in a disease to employees, then yes, a

22      manufacturer should put that on the product or on

23      some kind of technical information sheet that goes

24      along with the product if they know that information

25      is accurate.  In other words, you use this product,

1          you're going to get sick.

2     Q    If we're talking about a product that, let's say,

3          doesn't have a track record, is a fairly new product,

4          is a manufacturer in the best position to provide end

5          users information that it actually knows or even

6          suspects about that product?

7     A    No, I think the user is in the best position because

8          they know how much they're going to use, where

9          they're going to use it, how often they're going to

10         use it.  All of those constitute exposure, and it's

11         exposures, overexposures that increase the risk of

12         occupational diseases.

13    Q    I think you testified to this before, but a

14         manufacturer obviously is in the best position to let

15         others know and the consumer or the end user know

16         what materials are in the product, right?

17    A    That's correct.

18    Q    And so if a product had a material that was known to

19         cause a specific disease but folks didn't know

20         whether that material was actually in the product, is

21         that something that the manufacturer is in the best

22         position to let the end user know?

23    A    If a manufacturer knows that the use of the product

24         will result in disease, then the manufacturer should

25         tell the employer, but the employer has the

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | obligation of determining whether or not a               |
| 2  |   | potentially hazardous material is actually going to      |
| 3  |   | be a hazard to their employees, and that depends on      |
| 4  |   | exposure which is duration and frequency of use as       |
| 5  |   | well as quantity of use.                                 |
| 6  | Q | What is the best way to make sure that any               |
| 7  |   | information that a manufacturer wanted to provide        |
| 8  |   | about its product to ultimately get to the end user?     |
| 9  |   | Is it communicating with the employer, communicating     |
| 10 |   | with the distributor, communicating with a number of     |
| 11 |   | people, or is it just putting that information on the    |
| 12 |   | packaging so that when it's cracked open and used it     |
| 13 |   | can be read by the end user?                             |
| 14 | A | Well, again, since a hazard depends upon exposure        |
| 15 |   | level, duration frequency of use, how it's used in       |
| 16 |   | the workplace, the environment it's used in, in my       |
| 17 |   | opinion, the employer has the obligation as soon as      |
| 18 |   | they hire someone to make sure they're not using         |
| 19 |   | anything that's going to cause adverse health effects    |
| 20 |   | to those employees.  And they can do that by going       |
| 21 |   | to, in those days before the Internet, going to the      |
| 22 |   | library and researching that information, or they can    |
| 23 |   | contact their suppliers and get that information, or     |
| 24 |   | they can contact the local universities, government      |
| 25 |   | officials and those types of sources of information.     |

1    Q    Sure, they could do all that.  So the answer to my

2         question is the former, not the latter, right?

3    A    I'm sorry?

4    Q    In other words, the latter is not putting that label

5         on, just going ahead and letting the distributor

6         know, let the employer know about these things,

7         that's the best way?

8    A    No, I'm saying it's the employer's responsibility to

9         find out what their people are using, potential

10        hazards of what they're using, monitor the

11        environment with IH monitoring and determine what

12        their employees are exposed to and if they are

13        overexposed, implement controls immediately.

14   Q    Understood.  What's easier in terms of making sure

15        that the hazards of a product end up with an end

16        user, putting something on the packaging of the

17        product, or contacting an employer to let that

18        employer know what the hazards are in the product?

19   A    The most effective means is for the employer to take

20        the responsibility of evaluating their workplace and

21        the chemicals that their employees are working with

22        to determine what their potential hazards might --

23   Q    So an employer should then undertake, when they

24        purchase a product to be used in the workplace, to

25        undertake testing of that product, do destructive

1            testing of that product, to even first figure out

2            what's in the product, then to determine whether or

3            not that is a hazard to the body, and then do other

4            sorts of testing, that's the best way to go about

5            letting folks know, the end users know, about

6            something that the manufacturer actually knows, is

7            that what you're saying?

8    A    No.  The user of a product has the obligation to know

9            what they're using, and when your name is Asbestos

10           Products, Incorporated, you know you're using

11           asbestos.  And you need, since you've hired that

12           person, you're paying for their labor, you need to

13           find out what the potential health hazards of

14           asbestos are, and you need to monitor your people and

15           find out that they're not being exposed at excessive

16           levels.  And if they are you need to protect them

17           with the various controls that we discussed earlier.

18   Q    You're saying that the manufacturer has no role in

19           that whatsoever?

20   A    I'm saying if the manufacturer knows that a

21           particular use of their product is going to result in

22           a disease or an injury, then that manufacturer does

23           need to contact that end user to let them know if

24           they have that information available.  But since they

25           don't know how often and how much of their product

| | | |
|---|---|---|
| 1 | | and under what circumstances they're going to be |
| 2 | | used, they don't know what their exposure level is, |
| 3 | | you know. |
| 4 | Q | So let her rip, right? |
| 5 | A | No.  I'm just saying if you sell someone a product |
| 6 | | and they're going to keep it in the box and not use |
| 7 | | it, there's no exposure.  If they're going to use it |
| 8 | | a few times, there's less exposure.  If they're going |
| 9 | | to be using it constantly, the exposure level is |
| 10 | | higher.  So the manufacturer who controls the people, |
| 11 | | the conditions, and has all the resources, they have |
| 12 | | the ability to evaluate that person's exposure and |
| 13 | | make it safe and make it healthy for that employee. |
| 14 | | And I did that as a compliance officer |
| 15 | | before there were MSDS's.  I went to the library -- |
| 16 | | it's available to anyone -- and looked up the |
| 17 | | information on chemicals long before any of that |
| 18 | | information was produced in material safety data |
| 19 | | sheets to make sure that I was sampling for the right |
| 20 | | things and monitoring in the right ways to ensure |
| 21 | | that those employees were not overexposed in the |
| 22 | | workplace. |
| 23 | Q | Thank you very much, doctor. |
| 24 | A | You're welcome.  Thank you. |
| 25 | | THE COURT:  Redirect? |

1          REDIRECT EXAMINATION

2    BY MR. COSMICH:

3    Q    Dr. Gregory, briefly, when you put the -- you gave us

4         ranges of exposure for thermal insulation.  That was

5         not specific to Kaylo, was it?

6    A    No, that was not.

7    Q    In fact, these activities that were studied involved

8         thermal insulations, it involved more asbestos than

9         Kaylo?

10   A    That's correct, and those were not eight-hour

11        averages.  Those were concentrations during the

12        actual handling of asbestos and not what their

13        eight-hour average was.

14   Q    You were asked about products with a track record.

15        Would you agree that prior to 1948 there was a track

16        record for asbestos?

17   A    Oh, yes, there was.

18   Q    And folks before 1948, when Kaylo was commercially

19        produced and sold, there was a track record for how

20        to control exposures to asbestos?

21   A    Yes, there was, the engineering controls that I

22        discussed earlier.

23             MR. COSMICH:  That's all I have for you,

24   Dr. Gregory.  Thank you.

25             THE WITNESS:  Thank you.

1          THE COURT:  Mr. DeBlase?

2          MR. DE BLASE:  Yes, Your Honor.

3                RECROSS EXAMINATION

4    BY MR. DE BLASE:

5    Q    The time-weighted average that we're talking about, I

6         think you said this, but with respect to the joint

7         compound, that in your mind is a significant -- you

8         won't put a metric on it but it's significantly

9         substantially less than in Mr. Humphreys' experience

10        at Taconite Harbor, right?

11   A    Right.  During the time period that he was an

12        insulator helper his exposure levels would have been

13        higher than when he was sanding joint compound that

14        had contained asbestos.

15   Q    And we talked about a track record for a product.

16        The Kaylo product, do you understand the history of

17        the Kaylo product?

18   A    Well, I mean, from the litigation activity that I've

19        been involved with, I understand a lot of it, yes.

20   Q    Okay.  So that was a new product that they were

21        manufacturing, right?

22   A    It was a new product to them, but asbestos-containing

23        insulation had been around many, many years before

24        they started producing it.

25   Q    Understood.  But that product was new to

| | | |
|---|---|---|
| 1 | | Owens-Illinois, thermal insulation was new to |
| 2 | | Owens-Illinois, right? |
| 3 | A | That's correct. |
| 4 | Q | And thermal insulation, the way they manufactured it |
| 5 | | so it would be nice and light, calcium silicate with |
| 6 | | asbestos, that was new to Owens-Illinois and it was a |
| 7 | | brand new product, right? |
| 8 | A | Yes, that's my understanding. |
| 9 | Q | And so that information is information that would |
| 10 | | have been beneficial, the results of any testing that |
| 11 | | they did would be beneficial to folks who are end |
| 12 | | users, employers, would it not? |
| 13 | A | No.  I think anyone that was using insulation |
| 14 | | products knew it contained asbestos and knew that -- |
| 15 | | or not all of them knew that there were TLVs that |
| 16 | | dealt with permissible exposure levels to asbestos, |
| 17 | | but in that time period I know, based on all the |
| 18 | | depositions that I've read of insulators, they all |
| 19 | | knew that they were using asbestos, and most of them |
| 20 | | were members of the Asbestos Workers Union.  So they |
| 21 | | had knowledge that they were using asbestos. |
| 22 | Q | Well, we have a new product though that's being |
| 23 | | tested for adverse health effects by a company |
| 24 | | spending money to do these tests.  They're not doing |
| 25 | | it because it's already known, right? |

1    A   Well, they were testing their product, but the

2        asbestos that was used in it had been tested many,

3        many times before, so there was no new information

4        that they were going to obtain by testing as far as

5        asbestos was related.

6    Q   Who tested this product before?

7    A   Well, all the epidemiology studies that have been

8        done on exposures to asbestos and the fact that it

9        caused asbestosis beginning way back in 1930.

10   Q   Okay, you're talking about asbestos, you're not

11       talking about a specific product, right?

12   A   I'm talking about asbestos.  Asbestos was contained

13       in the Kaylo product.

14   Q   Are you aware of any product that was actually

15       tested, or is this the first one that you're aware

16       of, this Owens-Illinois Kaylo, that was tested and

17       you got results from?

18   A   I don't know if there were other tests performed on

19       calcium silicate or other forms of

20       asbestos-containing insulation.  I don't know if any

21       of those studies were done as far as animal testing

22       or anything like that, but certainly from 1930 on up

23       epidemiology studies were performed on people that

24       were working with asbestos.

25   Q   Well, wouldn't it be beneficial to folks, to

1      employers, who may have been confused about the

2      constituency of a particular product, to have that

3      information, that testing result?

4  A   I think every insulation contractor in the country

5      knew they were using asbestos during that time

6      period.

7  Q   Let me ask you a question:  With regards from an

8      industrial hygienist's point of view, you believe

9      that employers were confused about asbestos and the

10     asbestos standards as it applied to them until the

11     late 1970s, true?

12             MR. COSMICH:  Objection, beyond the scope

13     of the redirect?

14             THE COURT:  Overruled.

15             THE WITNESS:  I'm sorry.

16  BY MR. DE BLASE:

17  Q   I'll read it again.  With regards from an industrial

18     hygienist's point of view, you believe that employers

19     were confused about asbestos and the asbestos

20     standards as it applied to them until the late 1970s,

21     true?

22  A   Yes, because employers didn't know whether they had

23     to implement certain parts of the standard.  For

24     example, medical monitoring was never defined until

25     the later '70s, and the original standard in 1970

1    just listed a PEL -- 1971 was the first standard --

2    listed a PEL.  1972 required that you do monitoring

3    for asbestos, but it didn't indicate whether you did

4    monitoring if you used asbestos once a year or if it

5    was just in the workplace, or when you had to do

6    monitoring.  Later on OSHA defined that and said that

7    anyone using asbestos where it could possibly be

8    released into the air had to do initial monitoring to

9    find out what their employees were exposed to to

10   ensure that their levels were within the OSHA

11   permissible exposure limits.  That was the confusing

12   issue, and I was one of the ones going around trying

13   to straighten that out with a lot of the

14   manufacturers.

15            MR. DE BLASE:  That's all I have.  Thank

16   you, Your Honor.

17            THE COURT:  Anything further?

18            MR. COSMICH:  Nothing further, Your Honor.

19            THE COURT:  All right, Dr. Gregory, you can

20   step down.  Thank you.

21            THE WITNESS:  You're welcome.

22            MR. COSMICH:  May I consult with Mr.

23   Tierney real quick, Your Honor?

24            THE COURT:  Sure.

25            MR. COSMICH:  Your Honor, the defense

1    rests.

2              THE COURT:  All right, any rebuttal?

3              MR. DE BLASE:  No, Your Honor.

4              THE COURT:  All right, want to approach?

5              (Off-the-record discussion.)

6              THE COURT:  Ladies and gentlemen of the

7    jury, both sides have rested so we've completed the

8    evidence phase of the case.  Because of preparations

9    that we need to make in order to smoothly present the

10   case to you, including the final drafting of the

11   instructions that you're going to be given, you're

12   getting this afternoon off.  That means the case will

13   be submitted to you first thing Monday morning.

14             So leave your note pads here.  Remember all

15   the instructions I've given you about your conduct.

16   It's always important that you follow those

17   instructions.  It's even more important now because

18   we'd hate to have to start over.  So please follow

19   all the instructions that the court has given you and

20   enjoy your weekend.  Don't forget your juror badges

21   on Monday.

22             (Court stood in recess.)

23

24

25

RAMSEY COUNTY DISTRICT COURT

1                         CERTIFICATE

2              I, Kathleen M. Conlee, one of the Official

3      court reporters in and for the District Court of the

4      Second Judicial District, State of Minnesota, do

5      hereby certify that the foregoing transcript

6      constitutes a full, true and correct record of the

7      proceedings had in the matter of State of Minnesota

8      versus Neil Humphreys, Lona Jensen, individually and

9      as husband and wife vs. Owens-Illinois, Inc., as

10     taken at the time and place stated herein.

11              Dated:  November 12, 2014

12

13

14

15

16              /s/ Kathleen M. Conlee
               _____
17              Kathleen M. Conlee
               Official Court Reporter
18              15 West Kellogg Boulevard - #1530
               St. Paul, MN  55102
19              (651) 266-9191

20

21

22

23

24

25

                                                          —105—