STATE OF WISCONSIN   :   CIRCUIT COURT   :   MILWAUKEE COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

HUGH C. SCHIEFER and
PATRICIA A. SCHIEFER,

               Plaintiffs,

   -vs-                   Case No. 657-164

KEENE CORPORATION, a foreign corporation,
EAGLE-PICHER INDUSTRIES, INC., a foreign
corporation, OWENS-ILLINOIS, INC., a foreign
corporation, OWENS-CORNING FIBERGLAS CORP.,
a foreign corporation, ROCK WOOL MANUFACTURING
COMPANY, a foreign corporation, CELOTEX
CORPORATION, a foreign corporation, BUILDING
SERVICES INDUSTRIAL SALES CO., INC., a
Wisconsin corporation,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

                Examination of DONALD C. POPALISKY,

called as a witness upon the trial, taken at the instance

of the Plaintiffs, under and pursuant to Chapter 804 of

the Wisconsin Statutes and the Acts amendatory thereof and

supplementary thereto, before LORI J. CUNICO, a Notary

Public in and for Milwaukee County, State of Wisconsin,

at offices located at 1710 South 106th Street, Milwaukee,

Wisconsin, on the 17th day of March, 1987, commencing at

10:00 o'clock in the morning.

A P P E A R A N C E S:

GOLDBERG, PREVIANT, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C., by ALBERT J. GOLDBERG, ESQ., 788 North Jefferson Street, Milwaukee, Wisconsin, appeared on behalf of the Plaintiffs.

FOLEY & LARDNER, by RICHARD H. PORTER, ESQ., 777 East Wisconsin Avenue, Milwaukee, Wisconsin, appeared on behalf of all Defendants except Nicolet, Inc., Raymark, Inc. and Building Services Industrial Sales Company, Inc.

ALBERT, JUDE & VAN REMMEN, S.C., by JOHN S. JUDE, ESQ., 524 Seventh Street, P.O. Box 456, Racine, Wisconsin, appeared on behalf of Building Services Industrial Sales Company, Inc.

GREGORY B. HAYS, ESQ., 7635 West Bluemound Road, Milwaukee, Wisconsin, appeared on behalf of Building Services Industrial Sales Company, Inc.

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Donald C. Popalisky | By Mr. Goldberg | 3 |
| | By Mr. Porter | 51 |
| | By Mr. Goldberg | 61 |
| | By Mr. Jude | 64 |
| | By Mr. Goldberg | 81 |
| | By Mr. Porter | 83 |

E X H I B I T S

| EXHIBIT NO. | PAGE |
|---|---|
| Nos. 1 and 2 | 3 |

1          P R O C E E D I N G S:

2                    DONALD C. POPALISKY, called as a witness

3          herein by the Plaintiffs, having been first duly sworn,

4          was examined and testified as follows:

5                    (Exhibit Nos. 1 and 2 were marked for

6          identification.)

7                    E X A M I N A T I O N:

8     BY MR. GOLDBERG:

9     Q    Would you state your name, sir.

10    A    Donald C. Popalisky.

11    Q    What was the --

12    A    Popalisky.

13                   MR. GOLDBERG:  Could we go off the

14         record.

15                   (Discussion off the record.)

16    BY MR. GOLDBERG:

17    Q    Where do you live?

18    A    Shorewood.

19    Q    Address please.

20    A    4464 North Prospect.

21    Q    And when were you born?

22    A    August 4, 1919.

23    Q    Okay.  For whom do you work presently?

24    A    Building Service Industrial Sales Company, Incorporated.

25    Q    What is your status with them?

| | | |
|---|---|---|
| 1 | A | Vice-president. |
| 2 | Q | How long have you held that position? |
| 3 | A | Three months -- two months. |
| 4 | Q | When did you come to work for this company? |
| 5 | A | Since -- since its inception, 1952 I think. |
| 6 | Q | Okay.  What was the job you entered when you came in |
| 7 | | 1952? |
| 8 | A | It was a company, it was a partner. |
| 9 | Q | When this company started out -- well, let's go -- |
| 10 | | let's get into that.  The original identity of this |
| 11 | | company was as a partnership; is that correct? |
| 12 | A | That's right. |
| 13 | Q | And that partnership -- what did that partnership |
| 14 | | call itself from the inception? |
| 15 | A | Building Service Industrial Sales Company. |
| 16 | Q | In other words, that's essentially the same as its |
| 17 | | present entity, only it is now incorporated, and as |
| 18 | | its partner is styled with Inc.? |
| 19 | A | That's correct. |
| 20 | Q | When did it become a corporation?  About when, any |
| 21 | | idea? |
| 22 | A | Greg?  1961?  '62? |
| 23 | | MR. HAYS:  About '62. |
| 24 | | MR. JUDE:  We know from prior testimony |
| 25 | | and -- I'm sorry, we know from prior depositions and |

1      we will furnish that information to you, you've

2      requested it by way of interrogatory, it is August

3      26, 1964 was the date of inception of the corporation.

4  BY MR. GOLDBERG:

5  Q   Who were the incorporators of the company?

6  A   Myself and Joel I. Rachlin.

7  Q   Joe who?

8  A   Joel, J-o-e-l, Rachlin, R-a-c-h-l-i-n.

9  Q   Was he one of the original partners?

10  A   Yes.

11  Q   And were there two partners to begin with?

12  A   Yes.

13  Q   In incorporating did you take over all the assets and

14      liabilities of the preexisting Building Service

15      Industrial Sales Company?

16  A   Yes.

17  Q   Did you take over the physical plant of that company?

18  A   It wasn't a separate plant.

19  Q   Well, I -- by that I mean the sales premises of that.

20  A   We were all in the same offices, the two corporations

21      were in the same office.

22  Q   Now, you say two corporations --

23  A   Building Service, Incorporated was a separate company.

24      Building Service  Industrial Sales Company, Incorporated

25      was in the same office as Building Service, Incorporated.

| | | |
|---|---|---|
| 1 | Q | All right.  Prior to the incorporation were there two |
| 2 | | different companies then too or did you split into two |
| 3 | | corporations, that partnership? |
| 4 | A | No, we had a separate corporation, Building Service, |
| 5 | | Incorporated was incorporated in 1947. |
| 6 | Q | Okay.  And who owned that corporation? |
| 7 | A | Myself and Joel Rachlin, and I think John Ervan had |
| 8 | | one share of it, I can't remember. |
| 9 | Q | What was the difference in those two -- well, the |
| 10 | | corporation and the partnership? |
| 11 | A | One corporation was a construction company and the |
| 12 | | other corporation sold materials. |
| 13 | Q | Which one was the building company? |
| 14 | A | It's separately. |
| 15 | Q | It was -- the corporation though was the building one? |
| 16 | A | You say the building? |
| 17 | Q | You said they had two different roles. |
| 18 | A | Are you saying billing or building? |
| 19 | Q | Building. |
| 20 | A | Building corporation was Building Service, Incorporated. |
| 21 | Q | So that Building Service Industrial Sales Company was |
| 22 | | the one that engaged in sales of building products; |
| 23 | | is that correct? |
| 24 | A | Right. |
| 25 | Q | All right.  Now, let's again take the successor |

1     corporation of Building Service Industrial Sales

2     Company, it continued business in essentially the same

3     premise as -- well, strike that.  The corporation

4     continued business in essentially the same premises

5     as Building Service Industrial Sales Company; is that

6     correct?

7  A  That's correct, as far as the sales is concerned, they

8     had warehouses separately.

9  Q  And did they have those same warehouses prior to

10    incorporating?

11  A  Yes, some of them, not all of them.

12  Q  Well, I mean the day before you became a corporation.

13  A  Well, from two weeks afterwards we took another -- we

14    took and put more space in another building.

15  Q  Right.

16  A  Okay.

17  Q  Did you maintain the same employees from the day you

18    -- the day before you became incorporated into the

19    corporation?  And now whenever I say corporation I'm

20    referring to Building Service Industrial Sales Company,

21    Inc.

22  A  Yes, we did.

23  Q  And you assumed all the liabilities of the -- that is,

24    the corporation assumed all the liabilities of the

25    company; is that correct?

PENDAFLHOY  MUNCIE, IN  47302

SF-SEL-2547

1    A    To the best of my knowledge.

2            MR. JUDE:  By company are you referring

3    to partnership?

4            MR. GOLDBERG:  The non -- the partner-

5    ship.

6            MR. PORTER:  Off the record.

7            (Discussion off the record.)

8    BY MR. GOLDBERG:

9    Q    From now on whenever I refer to the corporation I

10    will specifically be referring to Building Service

11    Industrial Sales Company, Inc., and not to Building

12    Service, Inc.  Okay.

13            MR. JUDE:  Could we also clarify that

14    when you ask about the corporation that you -- that

15    that question also assumes that you're referring to

16    the predecessor partnership.

17            MR. GOLDBERG:  Yes, yes, I'm sure that

18    there will be no confusion in that respect.

19            MR. JUDE:  Okay.

20    BY MR. GOLDBERG:

21    Q    Okay.  Now, am I correct then, at the time of incorpora-

22    tion those persons who had been the partners that formed

23    Building Service Industrial Sales Company were John

24    Popalisky and Joel I. Rachlin; is that correct?

25    A    Donald Popalisky.

1    Q    Donald.

2                      MR. GOLDBERG:  Off the record.

3                      (Discussion off the record.)

4    BY MR. GOLDBERG:

5    Q    Had you taken in any more partners at the time by the

6         time you incorporated?

7    A    At that specific date, no.

8    Q    Had you taken any partners in in the interim who had

9         since dropped out?  In other words, taking your forma-

10        tive date in 1952, until you became a corporation, had

11        anybody come in as a partner?

12   A    No.

13   Q    When you incorporated did you expand the number of

14        stockholders or did Joel I. Rachlin and Donald Popa-

15        lisky own all the stock in the corporation?

16   A    At that specific time?

17   Q    Yes.

18   A    Yes.

19                     MR. JUDE:  The question was multiple in

20        form, could you clarify the question, unless I mis-

21        understood it.

22                     MR. GOLDBERG:  Read it back.  It may

23        have been one of those that become multiple, yes.

24        Read it back.

25                     (Question and answer read back.)

BY MR. GOLDBERG:

Q   Let's break that down.  At the time you became a
    corporation -- or strike that.  Subsequent to the time
    you became a corporation did you get new stockholders?

A   No.

Q   Has there been any change in stockholders since the
    time you became a corporation?

A   Yes.

Q   And do you remain a stockholder?

A   Yes.

Q   Who, if anybody, is a changed stockholder from the day
    of incorporation?

A   George Leisenring, Al Simonson, Tom Popalisky, Tom
    Zeinert.

Q   Tom who?

A   Zeinert, Z-e-i-n-e-r-t.  Scott Bauman.

Q   What was the last name?

A   Scott Bauman.  Is that it, George?

                    GEORGE LEISENRING:  Yes.

BY MR. GOLDBERG:

Q   I note that Joel I. Rachlin no longer is listed as a
    corporate stockholder; is that correct?

A   He's still a stockholder.

Q   All right.  Would it be a correct statement then that
    in addition to the five men you mentioned still

1   remaining as stockholders are Joel I. Rachlin and

2   Donald Popalisky?

3 A  Yes.

4 Q  Is that correct?

5 A  George Leisenring is no longer a stockholder.

6 Q  He is no longer a stockholder.  Is that due to the

7   fact that George Leisenring has since terminated con-

8   nection -- any connection with this corporation?

9 A  No, he has not terminated but he decided to sell his

10   stock.

11 Q  Okay.  Is -- what is the role now of Joel I. Rachlin?

12   What is his connection with the corporation?

13 A  Now?

14 Q  Right.

15 A  Right this minute?

16 Q  At the present time is what I'm talking about.

17       MR. JUDE:  Other than stockholder?

18       MR. GOLDBERG:  Yeah.

19 BY MR. GOLDBERG:

20 Q  Other than stockholder is he connected in any active

21   capacity?

22 A  No, he's not active at the present time.

23 Q  When did he cease activity with the corporation?

24 A  Several years ago, I don't know for sure.

25 Q  Okay, thank you.  Okay.  Going back now to the year

1    when you became a partnership how many employees did

2    you have, if you can recall, at the time?

3  A  Couldn't remember.

4  Q  Well, what was -- what did the partners do?  Let's take

5    each partner.  What was the role of Donald Popalisky

6    at the time the partnership formed?

7  A  Officially president.

8  Q  As a partnership?

9  A  No.

10  Q  I'm talking about the partnership.

11  A  Oh, all right.  He was a partner.

12  Q  And what -- as a partner did you take on specific

13    duties, such as the one in charge of sales and another

14    in charge of buying, or how did you work that at that

15    time?

16  A  I guess everybody was part of everything except that

17    I work in the office most of the time.  That's not

18    really true either, I guess, but I -- I said I can't

19    remember.  I don't know what, but everybody, I guess,

20    did some of everything.  We're talking about the two

21    of us.

22  Q  Um-hmm.  Well, to the best of your recollection it

23    would be a correct statement then that as you recall,

24    and it's redundant, you gave more of your time to

25    in-office work than the other partner would have; is

PENGAD/INDY  MUNCIE, IN  47302

SF-SEL-2547

1          that correct?

2   A   No.  I don't remember to be very frank with you.

3   Q   Okay.  Would it be a correct statement then that in

4          the setup you had you pretty well interchanged duties,

5          did everything?

6   A   Joel didn't do any of the book work, but other than

7          that.

8   Q   But you did the book work?  Your answer is yes?

9   A   Yes.

10  Q   Who did the buying for the partnership at that time?

11  A   Several people.  Bob Friauf and George Leisenring did

12         buying, I did buying.

13  Q   Did you have a designated sales force at that time

14         that only did sales?

15  A   George Leisenring and Bob Friauf, but it's hard to say,

16         they also worked in the office upon occasion.

17  Q   And the second name was -- what was that?

18  A   Friauf, F-r-i-a-u-f, Robert.  I recall he bought a lot

19         of materials for his customers only.

20  Q   Okay.  Well, you're talking about Friauf now?

21  A   Yes.

22  Q   When you say his customers only explain what you mean

23         by that.

24  A   Well, he had certain customers that needed certain

25         items that we wouldn't normally stock, miscellaneous

1       items, and he would secure them for them.

2    Q   Was Sprinkmann one of his customers?

3    A   I don't know.

4    Q   Do you know who were some that you would have speci-

5        fically designated as his customers?

6    A   All I can say is he traveled the northern part of the

7        state.

8    Q   Okay.  Now, I want to go back to the time before the

9        partnership was formed, for whom did you work before

10       this partnership was formed?

11   A   Building Service, Incorporated.

12   Q   Were you a stockholder in that company?

13   A   Yes.

14   Q   And have you continued to be a stockholder in that

15       company to this date?

16   A   No.

17   Q   Does that company exist yet?

18   A   Yes.

19   Q   Okay.  When did you cease to be a stockholder in that

20       company?

21   A   Two -- three years ago, I don't remember which.

22   Q   Okay.  Have you worked for anybody before you went to

23       work for that other corporation that I've referred to?

24   A   I worked for the  Shock Machine Company.

25   Q   What kind of work did you do for them?

1   A   I was in the assembly department.

2   Q   Okay.  What products did they deal with?

3   A   Machine tools, fabrication of tools for the foundry

4       type of thing.  I don't exactly remember what they

5       did.

6   Q   Okay.  Did you personally do sales during those partner-

7       ship years?  I'm talking now from 1952, apparently,

8       until 1964.  Did you?

9   A   Yes.

10  Q   Did you have any specific customers that you've con-

11      sidered your sales customers?

12  A   No.

13  Q   What kind of products did your company sell in those

14      years?

15  A   Basically glass products and accessory items.

16  Q   What type of glass products are we talking about?

17  A   Fiberglass board pipe covering.

18                  MR. GOLDBERG:  Off the record.

19                  (Discussion off the record.)

20  BY MR. GOLDBERG:

21  Q   Did that include fiberglass insulation?

22  A   Glass insulation, yes.

23  Q   Were there other building products made of fiberglass

24      that your company sold at that time?

25  A   I don't think they had anything else, no.

1  Q   Then you used the phrase glass products and accessories,

2      what accessories did you --

3  A   Well, stick clip, for example, was a clip that you

4      could cement to a wall and then impale the fiberglass

5      over it and put a clip on it to hold it in place, to

6      hold the clip in place, that type of thing.

7  Q   Do you recall from whom you purchased the fiberglass

8      insulation?

9  A   Owens-Corning Fiberglas.

10 Q   This clip accessory you have described, was that fur-

11     nished as a product of Owens-Corning?

12 A   It wasn't a clip insulation, it was a clip.

13 Q   A clip product?

14 A   Right.  No, it wasn't from this, it came from the

15     Stick Clip Manufacturing Company.

16 Q   Now, was that the only accessory we're talking about

17     or were there others?

18 A   I remember buying aluminum bands to hold pipe coverings

19     together, but I don't remember anything else.

20 Q   These accessories you're talking about, would it be a

21     correct statement that essentially they were acces-

22     sories to the insulation product regardless of -- or

23     insulation procedure regardless of what product we're

24     talking about; would that be a correct statement?

25 A   They were used to install the material, if that's what

1     you're saying.

2  Q    But of insulation products generally?

3  A    Insulation products and others too.  The banding of the

4     pipe covering obviously didn't, but the stick clip

5     could have been used for anything, I don't know what

6     they used it for.

7  Q    But the -- would it be a correct statement then that

8     the products that you're -- that that company was using,

9     Building Service Industrial Sales Company was pretty

10     narrowly used for supplying or was supplying insula-

11     tion products aside from the fact that they might be

12     used for other, but their primary purpose was intended

13     to be used for insulation; would that be a correct

14     statement?

15  A    Yes.

16  Q    As a part of that supplying of insulation products

17     you supplied a product called Kaylo, spelled K-a-y-l-o;

18     is that correct?

19             MR. JUDE:  I'm going to object as to

20     vague and indefinite as to time and ask you to be more

21     specific.

22  BY MR. GOLDBERG:

23  Q    Just first let's lay in a foundation for the next

24     question which will pin down time.  Did you supply

25     at anytime during the partnership tenure, before it

PENGAD/INDY  MUNCIE  IN  47302

SF-SEL-2547

1        became a corporation, did you deal in a product called

2        Kaylo, K-a-y-l-o?

3  A   I don't remember when we started using --

4  Q   I just asked you --

5  A   Yes, we used it.

6  Q   -- did you, that's all I asked you at this time.

7              MR. JUDE:  Well, I guess to clarify

8        here, you had -- you had put in the time frame during

9        the partnership, which means from '52.

10            MR. GOLDBERG:  Right, now that's the

11        time frame I'm referring to.

12            MR. JUDE:  From '52 to '64?

13            MR. GOLDBERG:  Right.

14            MR. JUDE:  And is that -- Pop, is that

15        the time frame that you're referring to or are you --

16  A   I don't really remember when we started using Kaylo.

17  BY MR. GOLDBERG:

18  Q   Let's take the decade from 1950 -- well, let's take the

19        years from 1952 up to 1960, up to it.  Have you any

20        independent recollection that your company dealt in

21        Kaylo during that period?

22  A   Yes.

23  Q   To the best of your recollection, in that period, when

24        did you first start to deal in Kaylo?

25  A   I don't remember.

1  Q   Well, let's work back.  You said yes, so probably 1959

2      would be one of the years?

3  A   Probably.

4  Q   To the best of your recollection, and based upon a

5      probability, would 1958 have been one of those years?

6  A   I couldn't remember.

7  Q   You cannot then give me an answer for any years other

8      than 19 -- as a probability, other than 1959; is that

9      correct?

10 A   A probability, I can say yes, but I don't know definitely.

11 Q   Okay.  As a probability though you would say what would

12     be the earliest year you used it as a product, to the

13     best of your recollection?

14 A   I don't remember to be frank with you.  '57 -- '58 --

15     '59.

16 Q   Do you recall when you first heard of the product

17     called Kaylo?

18 A   Yes.  No, I don't remember when I first heard about

19     Kaylo.  Kaylo is a product that we handled when I

20     first heard of it.

21 Q   You first went into this partnership in 1952, did you

22     hear about it in the early years of that partnership?

23 A   No, I don't remember because Fiberglas bought the

24     product from Owens-Illinois, they bought the manu-

25     facturing process and everything else, and when that

| | | |
|---|---|---|
| 1 | | was I don't know. |
| 2 | Q | Let's put it this way, did you only deal with Owens- |
| 3 | | Corning in getting insulation supplies? |
| 4 | A | Yes. |
| 5 | Q | That was your only company from 1952 on that you |
| 6 | | ordinarily -- |
| 7 | A | Are you talking about '52 on or are you talking about |
| 8 | | all the way up to 1973? |
| 9 | Q | No, no, I'm taking the -- let's take that era again |
| 10 | | of 1952 to 1959. |
| 11 | A | Yes. |
| 12 | Q | Let's direct ourselves only to that.  Was Owens-Corning |
| 13 | | Fiberglas the only company, or essentially the only |
| 14 | | company from whom you bought the product that you are |
| 15 | | purveying in your partnership? |
| 16 | A | We bought the Unarco product. |
| 17 | Q | What product did you buy from Unarco? |
| 18 | A | High temperature insulation. |
| 19 | Q | Do you remember the name of that high temperature |
| 20 | | insulation? |
| 21 | A | I do now but I didn't then. |
| 22 | Q | What was that product? |
| 23 | A | It was Unibestos. |
| 24 | Q | When did you start to buy Unibestos? |
| 25 | A | I don't recall.  Early part of the period, that's all |

PENGAD/INDY  MUNCIE, IN  47302

SF-SEL-2547

1           I can --

2    Q     The early what?

3    A     The early part of the period, but I don't remember

4          when.

5    Q     And was that Unarco's Unibestos insulation, pipe

6          insulation?

7    A     Yes.

8    Q     You have a personal recollection early in that period

9          you started -- you purveyed Unibestos?

10   A     I sold -- our company sold Unarco, Bob Friauf handled

11         the high temperature insulation, which is what this

12         product is.

13   Q     But your company did sell it?

14   A     We sold Unarco, it's a high temperature insulation.

15         I didn't know what the generic name was for it.

16   Q     You have learned since --

17   A     I have learned since.

18   Q     -- that it was Unibestos?

19   A     Right.

20                   MR. GOLDBERG:  Off the record.

21                   (Discussion off the record.)

22   BY MR. GOLDBERG:

23   Q     Were you -- are you aware that Unarco manufactured a

24         Unibestos block?

25   A     I think they had block.

1    Q    Okay.  And that was high temperature also; is that

2         correct?

3    A    Right.

4    Q    Did you, at anytime during the period 1952 to 1959,

5         know that Kaylo contained asbestos fiber?

6    A    No.

7    Q    Did you know what were the ingredients that made up

8         Kaylo?

9    A    No.

10   Q    When I mentioned -- say Kaysill, would that mean any-

11        thing to you in relationship to Kaylo?

12   A    No.

13   Q    In the period 1952 to 1959 did you observe the package

14        in which Kaylo came to your plant?

15   A    No.

16   Q    You never specifically -- am I correct that you never

17        specifically looked at the package in which Kaylo was

18        delivered?

19   A    That's correct, to the best of my knowledge I didn't

20        go out in the warehouse and examine any boxes of any

21        products.

22   Q    Okay.  Now, direct the questions to Unibestos, and I'm

23        going to ask essentially the same questions.  Did you,

24        at anytime from 1952 to 1959, know that Unibestos

25        contained asbestos fiber?

1  A     I didn't know that Unarco handled an asbestos product.

2  Q     Okay.  And did you ever observe the package in which

3        Unibestos products --

4  A     No.

5  Q     -- was delivered to you?  Well, your answer, if you'd

6        heard the whole question, would have been no essentially,

7        okay?

8              MR. PORTER:  Let the record show that

9        the witness nodded his head yes.

10  BY MR. GOLDBERG:

11  Q     Yes, his answer would have been no in distributing

12        Owens-Corning Fiberglas Company products, and that is

13        the company we're talking about; is that correct?

14  A     Excuse me?

15  Q     When you said Owens-Corning -- you said you had bought

16        products from Owens-Corning?

17  A     Yes.

18  Q     There is a company called Owens-Corning Fiberglas

19        Company, is that the company we're both talking about

20        when you say Owens-Corning?

21  A     That's my understanding, yes.

22  Q     Okay.  When you were distributing their products in

23        the partnership do you know if you had an exclusive

24        right of distribution in any territory?

25  A     No, we did not.

1    Q    You're answering that you -- you, in effect, are saying

2         that you knew what your arrangement was and it was not

3         an exclusive right of distribution; is that correct?

4    A    I don't know, I don't know what our arrangement was,

5         but it was not exclusive.

6    Q    Do you know anybody else that had the right to dis-

7         tribute their product from 19 -- when you went into

8         partnership in 1952 and through 1959?

9                        MR. JUDE:   In a specific geographic area?

10   BY MR. GOLDBERG:

11   Q    In the geographic area that you worked or sold.

12   A    You would have to ask the question again.

13   Q    Aside from yourself distributing Owens-Corning Fiber-

14        glas insulation products do you know of anybody else

15        -- let's take the Milwaukee County, do you know of

16        anybody else that was a distributor of their -- or

17        seller of their products?

18   A    Fiberglas sold direct.

19   Q    Okay.  Did you --

20                        MR. PORTER:   Off the record.

21                        (Discussion off the record.)

22   BY MR. GOLDBERG:

23   Q    When you said Fiberglas you're using the popular name

24        by which Owens-Corning Fiberglas was known; correct?

25   A    Yes.

1   Q     Within the trade it's like saying the Brewers instead

2         of their official corporate name?

3                       MR. JUDE:  Band-Aids.

4                       MR. GOLDBERG:  Hmm?

5                       MR. JUDE:  Band-Aids, yeah.

6   BY MR. GOLDBERG:

7   Q     We've established that aside from your company Owens-

8         Corning Fiberglas Company sold directly to consumer

9         builders or other companies during that period from

10        1952 to 1959, that's one we've established; is that

11        correct?

12  A     That's correct.

13  Q     All right.  Let's go further then.  Any other company

14        that you knew of or you know of now that dealt in

15        their products during that period, 1952 to 1959?

16  A     You mean did they sell to somebody to resell to some-

17        body else?

18  Q     Yes, yes, yes.  Do you know of any?

19  A     No, I don't know of any.

20  Q     Okay.  You're not saying they didn't sell it to anybody

21        else, just you don't know it?

22  A     I don't know it.

23  Q     Okay.  During that period, 1952 to 1959, what was your

24        sales district?

25  A     I would have to answer I suppose it -- it -- it -- I --

1          it was Wisconsin.

2     Q   Well, I notice you did mention that Bob Friauf --

3          Friauf or Friauf?

4                    MR. JUDE:  Friauf.

5     BY MR. GOLDBERG:

6     Q   Had the Northern Wisconsin district, so at least you

7          were selling in Northern Wisconsin area?

8     A   We were in Wisconsin.

9     Q   Generally whomever you could sell to in Wisconsin,

10         those were your customers?

11    A   Yes.

12    Q   Do you know if you sold to Johnson Insulation in

13         Madison?

14    A   Insulation products?

15    Q   Yes.

16    A   Yes.

17    Q   During that period, from 1952, when you became a partner-

18         ship, through 1959, was Sprinkmann & Sons Company one

19         of your customers?

20    A   To a very limited degree.  They bought from us when

21         they ran out of something that they couldn't get and

22         they needed something right now.

23    Q   Okay.  Of your own knowledge do you know if you sold

24         them any Kaylo?

25    A   No, I don't know.

1                    MR. JUDE:  You're talking, again, we're

2       in a time frame from '52 to '59?

3                  MR. GOLDBERG:  Yes, I still -- I want

4       to keep that time frame.

5  BY MR. GOLDBERG:

6   Q   You -- is it a correct statement that you did sell

7       them some products during that period of 1952 to 1959;

8       is that correct?

9   A   Yes.

10  Q   Did you personally take any orders from Sprinkmann

11      during that period?

12  A   I personally?

13  Q   Yes.

14  A   No.

15  Q   Do you know who dealt with them during that period?

16  A   I don't remember.  I could have taken an order, I

17      suppose, I don't remember to be very frank with you.

18      I didn't have any dealings with them, calling on them

19      or anything else.

20  Q   Have you records that would show when you started to

21      buy Kaylo from Owens-Corning?

22  A   No, just the -- the books that you -- when we bought

23      Kaylo from them.  I don't know when we started, we

24      didn't identify by product, it was just company.

25  Q   Do you know when you -- if your company sold any

1        Unibestos to Sprinkmann & Sons during that period,

2        1952 to 1959?

3   A   Not to the best of my knowledge.

4   Q   You just don't know?

5   A   I don't know.

6   Q   You're not saying you didn't sell it to them?

7   A   I -- I don't remember.

8   Q   Did you have an exclusive right of sale of Unarco

9        products in the Milwaukee area?

10  A   No.

11  Q   To your knowledge who else had handled Unarco products

12       in the Milwaukee area?

13  A   I don't know.

14  Q   And again, we're always talking about from '52 to '59,

15       you understand?

16  A   I don't know.

17  Q   Did Owens-Corning Fiberglas ever provide you with any

18       kind of sales literature describing their products

19       during 1952 to 1959?

20  A   Yes.

21  Q   And what kind of literature did they provide you?

22  A   Form literature, standard literature, two-page

23       literature on the products that they sold.

24  Q   Do you have that literature yet?

25  A   No.

1   Q   Do you recall reading that literature in that time?

2   A   Do I recall reading it, no.

3   Q   Do you recall reading any literature that described

4       Kaylo?

5   A   No.

6   Q   You remember reading any literature from Owens-Corning

7       Fiberglas that mentioned that their Kaylo had asbestos

8       fiber in it?

9   A   They didn't have it in their literature, they just

10      listed -- they didn't list basically what went into

11      the composition of products, like the binders and that

12      type of thing.

13  Q   Well --

14  A   They gave the -- their literature was based on what

15      it would do, what the performance was rather than the

16      content.

17  Q   How do you know?

18  A   I said I don't remember for sure, but I remember all

19      the literature I've seen since, and I assume it's all

20      the same literature.  I can't answer that question.

21  Q   All right.  Referring to that period of 1952 to 1959,

22      first you made some sales; is that correct?

23  A   Yes.

24  Q   Who else might have made sales during that period?

25  A   George Leisenring and Bob Friauf.

| | | |
|---|---|---|
| 1 | Q | Those are the only two? |
| 2 | A | Yes. |
| 3 | Q | What about Joel Rachlin? |
| 4 | A | Well, he could have made some but I don't remember. |
| 5 | Q | Is Joel Rachlin still living? |
| 6 | A | Yes. |
| 7 | Q | Have you got an address for him? |
| 8 | A | The young lady in the office does, I don't. |
| 9 | Q | Okay. Is he living in Milwaukee? |
| 10 | A | He's living in Arizona. |
| 11 | Q | Did you have -- in that period of 1952 to 1959 you had |
| 12 | | -- you did have a warehouse for the products; is that |
| 13 | | correct? |
| 14 | A | We shared a warehouse, plus other single products, but |
| 15 | | they were in different warehouses. |
| 16 | Q | I'm not quite tracking that. You had other single |
| 17 | | products, are you saying your company? |
| 18 | A | Single warehouse, we had a warehouse, we shared a |
| 19 | | warehouse, and we had a separate warehouse for insulat- |
| 20 | | ing products. |
| 21 | Q | Okay. Who was in charge of your warehouse when you |
| 22 | | started the partnership? |
| 23 | A | First person that I can remember that -- I don't |
| 24 | | remember who started, but Rip Yandrt. |
| 25 | Q | And what was his first name? |

1   A   Rupert.

2   Q   Rupert.   Is he living presently?

3   A   No.

4   Q   When did he die?

5   A   I don't know.

6   Q   To the best of your knowledge then who would be the

7       next person you can remember was in the warehouse?

8   A   I don't know who would be the next one, the present

9       man has been there for some time.

10   Q   Who?

11   A   The present warehouse superintendent has been there

12       for some time but I don't know when he started.

13   Q   When did he start?   What's his name

14   A   Dick Hardstad.

15   Q   Would your office have a record of when he did start

16       with that -- your company, your partnership?

17   A   I don't know how far back the payroll records go.

18   Q   Would you provide counsel -- I'm talking about Mr. Jude

19       now -- with the work record of Mr. Hardstad depending

20       -- meaning when he first started to work for you and

21       his tenure since then?

22   A   Yes.

23   Q   Is he still with your company?

24   A   Yes.

25   Q   How old of a man is he?

| | | |
|---|---|---|
| 1 | A | I don't know.  Young by my standards. |
| 2 | Q | Okay.  Now, let's go into the era starting with 1960 |
| 3 | | to 1964 when you were still a partnership.  Is it a |
| 4 | | probable -- a correct statement that at least by 1960 |
| 5 | | you were handling Kaylo? |
| 6 | A | Yes. |
| 7 | Q | And did you continue then to handle Kaylo through the |
| 8 | | period when you finally became a corporation? |
| 9 | A | Yes. |
| 10 | Q | And during that period did you sell any Kaylo to |
| 11 | | Sprinkmann Sons Corporation? |
| 12 | A | Yes. |
| 13 | Q | Did you ever, in that period, observe the package in |
| 14 | | which Kaylo came? |
| 15 | A | No. |
| 16 | Q | By the way, I'd like to go in -- did you handle both |
| 17 | | Kaylo pipe covering and Kaylo block? |
| 18 | A | Yes. |
| 19 | Q | And would that be essentially both during the period |
| 20 | | that you handled -- that you have some recollection |
| 21 | | of handling Kaylo? |
| 22 | A | Yes. |
| 23 | Q | Your answer is yes.  Taking that same period now, this |
| 24 | | series of questions will be addressed to the remaining |
| 25 | | period of the partnership.  During that period did you |

PENGAD/INDY   MUNCIE  IN  47302

SF-SEL-2547

| 1 | | handle Unarco products? |
|---|---|---|
| 2 | A | No. |
| 3 | Q | Had the ownership -- strike that.  Did you handle |
| 4 | | Unibestos products? |
| 5 | A | No. |
| 6 | Q | When did you cease to handle Unibestos? |
| 7 | A | I don't remember. |
| 8 | Q | But you do feel -- or it's your best recollection that |
| 9 | | you had ceased to handle them by 1960 to 1964? |
| 10 | A | Yes. |
| 11 | Q | Are you aware that in that period the manufacturer of |
| 12 | | Unibestos had changed to Pittsburgh-Corning?  Are you |
| 13 | | aware of that? |
| 14 | A | No. |
| 15 | Q | Did you start to handle Pittsburgh-Corning products |
| 16 | | during that period? |
| 17 | A | No. |
| 18 | Q | Had you -- have you ever handled, as a partnership, |
| 19 | | Pittsburgh-Corning products? |
| 20 | A | Not to the best of my knowledge, no. |
| 21 | Q | Do you have an independent recollection as to when |
| 22 | | you stopped -- I may have asked this but -- and if I |
| 23 | | did we'll go over the same ground -- when did you stop |
| 24 | | using -- handling Unibestos products? |
| 25 | A | When Fiberglas bought the Kaylo operation from Owens- |

MENGARILINDY MUNCIL IN 47302

SF-SEL 2547

1      Illinois.

2   Q  And if I tell you that they bought it in 1958 would

3      that be an indication of when you stopped handling the

4      Unibestos?

5   A  If you tell me they stopped --

6   Q  They --

7   A  1958 was the year that I would say yes, that's when

8      we started and we used Kaylo as a major product.

9   Q  Are you saying -- and tell me if this is a correct

10     statement then -- that until Owens-Corning Fiberglas

11     became the manufacturer of Kaylo you did not handle

12     it?  Do you understand my question or is it too devious?

13  A  Well, what you're asking me is -- is I don't know when

14     Fiberglas bought Kaylo.  Prior to that time I don't

15     think that we handled anything from Owens-Illinois

16     if that's what you're asking.

17  Q  That's what I'm asking.  How old -- strike that.  If

18     -- if Owens-Corning Fiberglas were -- had been a dis-

19     tributor of the Kaylo products for Owens-Illinois from

20     1952 until 1958 would that influence your answer as to

21     whether you handled Kaylo before 1958?

22  A  To the best of my recollection we started to handle

23     Kaylo when Fiberglas bought -- I didn't even know that

24     Fiberglas was a distributor of Kaylo.

25  Q  Was a what?

1   A    I didn't know they were a distributor of Kaylo.  We

2          started handling Kaylo when Fiberglas offered the

3          product.

4   Q    Well, then you're not sure if they offered it before

5          1958; is that correct?

6   A    No.

7                 MR. PORTER:  No, that is not correct?

8   BY MR. GOLDBERG:

9   Q    It is correct?

10   A    Yes, it is correct.

11   Q    That is correct.  Well, then is it your statement --

12          would it be -- I want to say this so it won't be one

13          of these oddball answers -- is it correct so far as

14          you can recollect that when Owens-Corning started to

15          manufacture Kaylo you then ceased to handle the

16          Unibestos?

17   A    I don't know when we stopped using Unibestos.

18   Q    Okay.  You have no independent recollection then and

19          you cannot say to any degree of probability that you

20          did not handle the Kaylo and the Unibestos at the same

21          time?  Your answer is you cannot?

22   A    No, I -- that's what --

23                 MR. JUDE:  I'm just saying take some

24          time and answer.  I'm not sure that you are answering

25          his question, or thinking about answering his question.

1      Are you thinking of something else?

2  A   I'm trying to think of what he's asking me.

3            MR. PORTER:  Off the record.

4          (Discussion off the record.)

5  BY MR. GOLDBERG:

6  Q   Did you -- to the best of your recollection did you

7      sell both Unibestos and Kaylo at the same time?

8  A   That is possible.

9  Q   Good question.  But you -- your answer then is --

10     implies --

11  A  No, I don't know.

12  Q  You have no independent recollection?

13  A  Right.

14  Q  Is it possibly true, therefore, that you were handling

15     Unibestos before you started to handle Kaylo?

16  A  We handled Unarco products. You keep inserting the

17     word Unibestos.

18  Q  I meant Unarco products.

19          MR. JUDE:  Okay.

20  BY MR. GOLDBERG:

21  Q  And so your answer is that you're probably handling

22     Unarco products prior to the time you started using

23     Kaylo?

24  A  Yes.

25  Q  Now, I want to put that all in perspective that you

1       were using Owens-Corning Fiberglas products, which may

2       not have been Kaylo, from the time you opened your

3       partnership?

4   A   That's correct.

5   Q   Now, taking that period again of 1960 to 1964 did you

6       personally, so far as you can recall, make any sales

7       to Sprinkmann & Sons Company?

8   A   No.

9   Q   In other words, you're saying you have no personal

10      recollection?

11  A   No personal recollection.

12  Q   Does that exclude an answer though that you may have

13      made some sales to them?

14  A   I would not have sold Kaylo products to them because

15      I didn't handle high temperature insulation.

16  Q   Okay.

17              MR. JUDE:  You're talking of him

18      personally?

19              MR. GOLDBERG:  Yes, oh yeah.

20  BY MR. GOLDBERG:

21  Q   You personally, I was talking about you personally.

22      However, during that period your company did sell

23      Kaylo products to Sprinkmann Sons Corporation --

24  A   Yes.

25  Q   -- is that correct?  Now, I'm going to show you Exhibit

1      No. 1, and ask you to examine that.  All right, you've

2      examined that?

3  A  Is this the first page or do you want me to go through

4      it all or what?

5  Q  Yeah, glance through it so that you're familiar with

6      what in general it is.

7  A  It's up to 1971, we're not talking about that yet.

8  Q  Well, in general I'm asking you what this is, that's

9      all.

10  A  I know what it is.

11  Q  Do you know who prepared -- got this together?

12  A  Got the information together?

13  Q  Yes.

14  A  I did.

15  Q  And how did you go about getting this information?

16  A  I examined the records sitting on the table in the

17      corner.

18  Q  I note that there are records of sales to Sprinkmann

19      & Sons in 1962, and then there's a skip to 1971 when

20      the company, by the way, had already been incorporated

21      by 1971; is that correct?

22  A  Yes.

23  Q  Did you so examine all of those records so that you

24      could say you did not find any other sales between

25      1962 and 1971?

PENGAD/INDY  MUNCIE, IN 47302

SF-SEL-2547

1   A   To the best of my knowledge that's it.

2   Q   Those are the only ones you found --

3   A   That's correct.

4   Q   -- is that correct?  Okay.  All right.  Now, addressing

5       ourselves again from 1960 to 1964, did you see the

6       package in which Kaylo came to your premises?

7   A   No.

8   Q   From 1960 until 1964 was there any literature concern-

9       ing the product that Owens-Corning Fiberglas was sell-

10      ing you that was sent to your -- at your company?

11  A   I presume there was.

12  Q   Do you remember any literature concerning Kaylo in

13      that period?  We're talking about that period.

14  A   I don't know it specifically, no.

15  Q   For the remainder of the period that you were a partner-

16      ship did you continue to handle Owens-Corning Fiberglas

17      products?

18  A   Yes.

19  Q   Did you handle any other companies' products?  I'm

20      talking now about insulation products.

21  A   We handled -- George, you know, you worked for them.

22                    MR. JUDE:  Just to the best of your

23      recollection.

24  BY MR. GOLDBERG:

25  Q   The best of your recollection.

1    A    Best of my recollection, no.

2    Q    Okay.  I am now going to address myself to the period

3         that you -- the company was a corporation.  Did the

4         corporation continue to handle Owens-Corning Fiberglas

5         products?

6    A    Yes.

7    Q    Did they -- did you handle any other companies'

8         products after you became a corporation?

9    A    Yes.

10   Q    Who -- what other companies' products?  I'm referring

11        to insulation products.

12   A    Yeah, I know that but I don't remember the name.

13        George, can you remember the name?

14                  MR. JUDE:  Just do the best you can.

15   BY MR. GOLDBERG:

16   Q    I'll get to George.

17   A    Okay.  No, I don't remember the name.

18   Q    Okay.  Was it more than one company do you think?

19   A    No, it was one.

20                  MR. JUDE:  Just so the -- just so the

21        answer is clear, the record isn't misled here, there

22        are records in existence of sales, and I assume by

23        referring to records we can refresh our recollection

24        as to who our customers were.

25                  MR. GOLDBERG:  I was talking about

1          purchases from other companies.

2                    MR. JUDE:  Or purchases from other

3          companies.

4                    MR. GOLDBERG:  Yeah.

5                    MR. JUDE:  Both.

6    BY MR. GOLDBERG:

7    Q    Have you, prior to this time, made any examination to

8         find out what other companies you -- from whom you had

9         purchased products?  And I'm talking about the corpora-

10        tion now.

11   A    We bought insulating cement.

12   Q    Did Owens-Corning Fiberglas provide an insulating

13        cement?

14   A    Not to the best of my knowledge.

15   Q    Do you know whose insulating cement you bought?

16   A    We bought Eagle-Picher.

17   Q    All right.  I'm going to be going back now to the period

18        of the partnership between 1952 and 1959, did you deal

19        in insulating cement in that period?

20   A    I don't recall, I don't know.

21   Q    What is the first time that you remember buying or

22        using or selling an insulating cement?

23   A    I don't know.

24   Q    Do you know whether the partnership at any time during

25        this tenure sold insulating cement?

| | | |
|---|---|---|
| 1 | A | Specifically I don't know. |
| 2 | Q | You do remember -- |
| 3 | A | I don't remember. |
| 4 | Q | You do remember the company named Eagle-Picher? |
| 5 | A | That's correct. |
| 6 | Q | That's correct.  And you do remember at some time |
| 7 | | selling their cement; that is correct? |
| 8 | A | Correct. |
| 9 | Q | Do you have any independent recollection of when you |
| 10 | | started to sell their cement? |
| 11 | A | No. |
| 12 | Q | Do you remember selling any insulating cement during |
| 13 | | your partnership years? |
| 14 | A | No. |
| 15 | Q | You are not -- correct me if I'm wrong -- you are -- |
| 16 | | is it true that you are not excluding the possibility |
| 17 | | that you sold insulating cement in -- from 1952 to 1959? |
| 18 | A | We could have. |
| 19 | Q | And you are not excluding the possibility that that |
| 20 | | could have been Eagle-Picher? |
| 21 | A | That's correct. |
| 22 | Q | If I mentioned a name, Eagle Sixty-Six, now you recall |
| 23 | | that specific tradename of a product? |
| 24 | A | No. |
| 25 | Q | At no time either? |

1    A    I don't recall.

2    Q    Okay.  I want to show you now what has been marked as

3         Exhibit No. 2, and take a look at that all the way

4         through, you know, just -- just overview.

5    A    I don't know what ledger these came out of, whether

6         they came out of a sales ledger or purchases ledger.

7    Q    That was going to be my next question.  You have looked

8         at Exhibit No. 2, did you have anything to do with

9         getting this specific exhibit together?

10   A    No.

11   Q    Do you know who did do that?

12   A    No, wherever you got it from I guess.

13   Q    You do have a bookkeeper?

14              MR. JUDE:  Let's go off the record for

15        a second.

16              (Discussion off the record.)

17   BY MR. GOLDBERG:

18   Q    Who is the bookkeeper in the years 1952 through 1956?

19   A    I was part of the period.

20   Q    As such bookkeeper, and looking at these ledger sheets,

21        would you recognize what was the code or what did these

22        entries mean?

23   A    I don't know where you got them, I don't know where

24        they came from, whether they came from a purchase

25        journal or a sales journal.

1    Q    Well, you've mentioned the two things, a purchase

2         journal and a sales journal, to what did the purchase

3         journal address itself?

4    A    Materials that we purchased.

5    Q    Okay.  And then the sales journal would be to whom you

6         sold it; is that correct?

7    A    Yes.

8    Q    Did you ever buy any products from Sprinkmann & Sons

9         Company from 1952 on while you were a partnership?

10   A    I don't know.

11   Q    You have no personal --

12   A    No.

13   Q    -- independent recollection?  All right.  Now, showing

14        you this ledger sheet, let's take the first page of

15        that ledger sheet, and I notice something that looks

16        like a heading F-O-L, address yourself to that.

17   A    It's not my writing, I don't know what that is.

18   Q    Okay.  But did you, in that period, prepare a sales

19        ledger?

20   A    No.

21   Q    So as a bookkeeper you didn't have contact with any

22        such records; is that correct?

23   A    No.

24   Q    Who else would have been a bookkeeper at that time?

25   A    I don't remember, it's not my writing so that's --

PENGAD/INDY   MUNCIE, IN  47302

SF-SEL-2547

1          MR. PORTER:  Can we go off the record.

2          MR. GOLDBERG:  Yeah.

3          (Discussion off the record.)

4    BY MR. GOLDBERG:

5    Q    Then under F-O-L there are a bunch of items that are

6         marked P, like P46, P47, one item that is C-D, the way

7         it looks, do you know what the reference is in putting

8         P46, seems to run in fact --

9    A    I would presume that's a purchase, and the C-D has

10        got to be the cash disbursements, that's probably a

11        C-D.  So that's purchases from Sprinkmann.

12   Q    We knew --

13         MR. JUDE:  Off the record for a second.

14         (Discussion off the record.)

15   BY MR. GOLDBERG:

16   Q    Looking at the first page of -- and it seems to be

17        marked 31 in the corner, upper right-hand corner --

18   A    Um-hmm.

19   Q    -- is any item -- any entry on that page which would

20        identify what the product was that was sold to Sprink-

21        mann?

22   A    That was a purchase from Sprinkmann.

23   Q    Purchase from Sprinkmann?

24   A    That's correct.

25   Q    What products were you buying from Sprinkmann?

1    A    I don't know what it was, I don't know what it was.

2    Q    Let's turn to Page -- something that has something in

3         the upper corner, 119, which is about four pages down.

4    A    Okay.

5    Q    Looking at that would you identify that as recording

6         their purchases from your company?

7    A    Right, yes.

8    Q    Is there anything on that record that would enable

9         one to identify what the product was they bought?

10   A    No.

11   Q    And that would be true for Pages 117, that's the next

12        page?  Well, 119's out of order, that's the trouble

13        there.  It goes 117, 119.  Anyway, this batch I have,

14        does that --

15                    MR. JUDE:  Do you have 118?

16                    MR. GOLDBERG:  Yeah, it follows 117.

17        Off the record.

18                    (Discussion off the record.)

19   BY MR. GOLDBERG:

20   Q    Your answer to my question, which was directed to Page

21        119, is -- would be the same if I directed your atten-

22        tion to 117 and 118, to wit, nothing on those pages

23        would be -- allow you to identify what product was

24        purchased --

25   A    No.

1  Q    -- is that correct?

2                    MR. JUDE:  Did he make a **correct** state-

3       ment?

4  A    I do not know what products were purchased.

5  BY MR. GOLDBERG:

6  Q    Directing your attention to 3 -- Page 348, can you find

7       that?

8  A    Yes.

9  Q    Can you tell from that -- well, strike that.  Is that

10      a purchase sheet of Sprinkmann buying from you -- your

11      company?

12 A    Yes.

13 Q    And is there anything on that page which would enable you

14      to  identify that product was purchased from -- by

15      Sprinkmann from you?

16 A    No.

17                    MR. JUDE:  Is that a mis -- I believe

18      you made a misstatement on that question, if we could

19      back up.

20                    MR. GOLDBERG:  Read it back then.

21                    (Question read back.)

22 BY MR. GOLDBERG:

23 Q    And your answer is, there is nothing thereupon that

24      would enable you to identify; is that correct?

25 A    No.

1 Q Referring -- I don't know how far I got, but let's say

2   I hadn't gotten yet to 349, 350, 351, 352, 353, 354

3   and 355, referring to that -- those pages as a group,

4   and considering them as a group, is it a correct state-

5 .  ment that nothing on any of those pages would enable

6   you to identify what product was purchased from your

7   company by Sprinkmann?  I'm asking you if that's a

8   correct statement.

9 A Repeat the question.

10 Q All right.  Can you identify from looking at the figures

11   on those -- or entries on those pages, which I have

12   enumerated, identify any product that was purchased

13   by Sprinkmann from your partnership?

14 A No.

15 Q I don't know if I asked you this question, is Bob

16   Friauf still living?

17 A Yes.

18 Q Do you know where?

19 A No.  He's in the phone book, living on Woodburn Avenue

20   but I don't know where.

21      MR. GOLDBERG:  Off the record.

22      (Discussion off the record.)

23 BY MR. GOLDBERG:

24 Q Is he still working for your company?

25 A No.

1    Q    When did he cease to work for your company?

2    A    Five years ago -- six years ago.

3    Q    When did he first start to work for your company?

4    A    I don't remember.

5    Q    As a -- did he work for your company when it was a

6         partnership?

7    A    Yes.

8    Q    You mentioned before that he was the salesman who

9         directed his attention to the high temperature insula-

10        tion products; is that correct?

11   A    Yes.

12   Q    You also -- is it true that you indicated that he

13        essentially worked the northern part of the state in

14        dealing with those products?

15   A    Yes.

16   Q    Did he deal with any customers in the Milwaukee area?

17   A    He could have.

18   Q    Could he have dealt with Sprinkmann?

19   A    He could have.

20   Q    When did George Leisenring come to work for your

21        company?

22   A    I don't remember.

23   Q    Or Mr. Simonson, when did he come to work for the --

24   A    I don't remember.

25   Q    I'm talking about either the partnership or the

1  corporation.

2  A    Leisenring was there in the partnership.

3  Q    What about Simonson?

4  A    I don't remember.

5  Q    Did this -- all right.  Tom Popalisky, is that a rela-

6  tive of yours?

7  A    Yes.

8  Q    And that's what, a son?

9  A    Son.

10  Q    Is he an employee of the company?

11  A    Yes.

12  Q    When did he come to work for the company?

13  A    Three or four years ago.

14  Q    Tom Zeinert?

15  A    Zeinert.

16  Q    How do you spell that again?

17  A    Z-e-i-n-e-r-t.

18  Q    Is he an employee of the company?

19  A    Yes.

20  Q    Did he work for the partnership?

21  A    No.

22  Q    Scott Bauman, is he an employee of the company?

23  A    Yes.

24  Q    Did he work for the partnership?

25  A    Not to the best of my knowledge.

1    Q    I think that's all.

2                    (Short break taken.)

3                    E X A M I N A T I O N:

4    BY MR. PORTER:

5    Q    Just for the record, sir, you have identified what has

6         been marked as Exhibit 2 as copies of Building Service

7         Industrial Sales Company records of one sort or another;

8         correct?

9    A    Yes.

10   Q    And you have identified what has been marked as Exhibit

11        1 as records of one kind or another of Building Service

12        Industrial Sales Company?

13   A    Yes.

14   Q    Have any of your employees had an asbestos-related

15        disease?

16   A    No.

17   Q    How about workers at the construction company?

18   A    No.

19   Q    Looking at Exhibit 2, I notice in the column entitled

20        F-O-L., that there are these numbers, for instance,

21        the first number on the first page is P46.

22   A    Right.

23   Q    And it continues that way on all of these pages with

24        different numbers, would that be a reference to some

25        order number?

1    A    That is where -- this would be the -- the -- the journal

2         sheet that it was taken from.

3    Q    P46?

4    A    Yes.

5    Q    So even if we went to a journal sheet it wouldn't tell

6         us what was sold or purchased?

7    A    No.   Not -- no, not the item, it's just the number,

8         the amount is all that's shown.

9    Q    Would the ledger sheet P46 refer us to something that

10        would allow us to tell the product?

11   A    Not to the best of my knowledge.

12   Q    With   the information that's available from Exhibit 2

13        there is no way to go back and look at something else

14        which might, itself, tell us what the product was, to

15        your knowledge?

16   A    No.

17   Q    Did your company sell the products of Johns-Manville

18        Corporation?

19   A    No.

20   Q    Never?

21   A    No.

22   Q    Did your company sell the products of Raymark?

23   A    No.

24                      MR. GOLDBERG:   Off the record.

25                      (Discussion off the record.)

BY MR. PORTER:

Q    Or Raybestos products?

A    No.

Q    Did you sell the products of Nicolet Insulation?

A    No.

Q    Forty-Eight insulation?

A    I don't remember.

Q    Standard insulation?

A    No.

Q    Do you know when warnings first appeared on asbestos-
     containing products?

A    No.

Q    I understand your testimony was that you yourself never
     looked at any packaging?

A    I don't specifically remember going out and looking at
     a box, I didn't look at the boxes.  It didn't make any
     difference to me what was in the box.

Q    So you never looked at a box?

A    No.  I mean, I can't say I didn't look at one, but
     nothing registered, nothing more than it being a box.

Q    Or bag, as the case may be?

A    The bag, yes.

Q    You wouldn't know whether a product came in a box or
     a bag since you never saw the packaging?

A    I know that the boxes -- excuse me.

1                  MR. JUDE:  Let me interject an objection.

2    It's somewhat of a misstatement of his testimony.  He

3    did say that he was aware of products coming in boxes

4    or bags, but I think his testimony was that he didn't

5    specifically remember any specifics about that packaging.

6                  MR. PORTER:  Well, Counsel, I think you

7    ought to let the witness answer, he's perfectly able

8    to say that if he can.

9                  MR. JUDE:  I believe your question though

10    was a misstatement of his prior testimony.

11                  MR. PORTER:  And I don't believe it was,

12    but I would like to hear the witness's testimony.

13                  MR. JUDE:  Okay.  Go ahead.

14  A    Would you ask the question again please.

15  BY MR. PORTER:

16  Q    Do you know whether stuff came in boxes or bags?

17  A    Yes.  Yes, I do.

18  Q    What did cement come in?

19  A    Bags.

20  Q    And what did an Eagle-Picher cement bag look like?

21  A    I don't know.  Plain old bag.

22  Q    What's a plain old bag?

23  A    50-pound bag or 60-pound bag or 25-pound bag, I don't

24    know how big they were or what coloring they were or

25    --

1    Q    But you remember Eagle-Picher, in particular, came in

2         a bag?

3    A    That's correct.   Cement.

4    Q    And it was 50 or so pounds?

5    A    Big bag.

6    Q    But you don't remember what, if anything, it said on

7         the bag?

8    A    No.

9    Q    Or the color of the bag or the lettering?

10   A    A brown bag.

11   Q    Where would you have seen the bag?

12   A    On a skid in a warehouse.

13   Q    As you walked through?

14   A    As I walked by, yes.

15   Q    And in the many years you've been in the business you

16        would have walked by occasionally, which is why you

17        remember, but you never looked at it to look at it for

18        a reason?

19   A    No.

20   Q    Do you know when asbestos was removed from insulation

21        products?

22   A    I was told when Fiberglas removed from --

23   Q    When meaning?

24   A    When Fiberglas removed asbestos I was told that they

25        did it in the late 1972.

Q    Meaning when you say Fiberglas --

A    Owens-Corning Fiberglas.

Q    Owens-Corning Fiberglas.  Do you know why they took it out in '72?

A    I know now, I didn't then.  I didn't even know it was in there.

Q    Why do you -- strike that.  What -- strike that.  What do you know now about why they did it?

A    They took it out because asbestos was in the product.

Q    It's true, isn't it, that your company sold asbestos-containing products for as long as the companies you've talked about made it available?

A    I did not know that it had asbestos in it at the time.

Q    I don't say that you did.

A    Well, I'm only saying that, how else do you want me to answer the question?

Q    I want you to give me your best recollection.  I'll rephrase the question.  You told me you didn't know some of these products may have had asbestos during the time they may have had asbestos in them; correct?

A    Yes.

Q    You, therefore, did nothing to inform your customers about the presence or absence of asbestos in the products you sold them?

             MR. JUDE:  I'll object to the question

1          based on foundation, assumes a fact that is not in

2          evidence, also assumes that he had an obligation to

3          so inform.  With that -- with that objection on the

4          record now you can go ahead and answer it.

5     A    I didn't inform having asbestos in it because I didn't

6          know it had any asbestos in it.  I didn't even know

7          what asbestos was, I had never heard of it.

8     BY MR. PORTER:

9     Q    And I don't say you didn't, I just asked you what seems

10         logical, if you don't know it had asbestos in it you

11         didn't tell anybody anything about asbestos products?

12    A    No, I didn't.

13    Q    Or lack of asbestos?

14    A    That's correct.

15    Q    Who would -- who at your company would have been in a

16         position to know when warnings appeared on insulation

17         with asbestos in it?

18    A    I don't know whether anybody would.

19    Q    And it's possible that nobody would because you, mean-

20         ing the company, would receive an order, place the order

21         with the manufacturer, the material would come into the

22         warehouse, a truck driver would deliver it to the

23         purchaser, therefore, front office people would not

24         have an opportunity to see what the material said or

25         didn't say?

1          MR. JUDE:  I'm going to object to the

2    question as assumes certain facts not in evidence.

3    It's not really multiple in form, but I think there's

4    certain assumptions there that need to be broken down

5    before he can answer the question.

6    BY MR. PORTER:

7    Q    You may answer the question.

8          MR. JUDE:  Are you able to answer the

9    question in the form that he posed it?

10   A    I'm not quite sure what he wants to know.

11         MR. PORTER:  Read it back.

12         MR. JUDE:  Listen to -- she's going to

13   read it back to you now and listen to all he is asking

14   you and try to do the best you can in answering it.

15              (Question read back.)

16         MR. JUDE:  He's really asking you in

17   one question what your sales distribution procedure

18   was.

19   A    The front office didn't know anything about the material,

20   when it came in or if it came in it would be handled

21   merely -- well, I -- we didn't look at the box, we

22   didn't go out to look at the boxes or examine the

23   material or anything else when it came in, the ware-

24   house people, that was their job.

25              (Discussion off the record.)

BY MR. PORTER:

Q    You're telling me that however it came in that's how
     it was delivered?

A    That's correct.

Q    You're also telling me that people in the front office
     would have no reason to be familiar with information
     on the materials packaging?

A    That's correct.

Q    Do I understand from that then that front office
     people would not discuss use or method of application
     with customers?

A    The sales people would know how to apply the material.

Q    I had understood you to say that you made some sales,
     am I wrong in --

A    No, I made some sales, you're correct.

Q    But your sales at least didn't require you to be very
     familiar with the method of application or specific
     uses of a product?

A    No, I sold to applicators.

Q    What's an applicator?

A    An applicator was a man who put the product on, they
     know how to do it, they don't need my help.

Q    Sprinkmann, in your mind, an applicator?

A    Yes.

Q    Who is an applicator that you sold to?

1   A   Johnson Insulation, Bertlett's Insulation.

2   Q   That's enough, good enough, unless you want to name

3      more.

4   A   No.

5   Q   So someone from Johnson would call you or you would

6      call someone at Johnson and Johnson would place an

7      order for X rolls of Z material?

8   A   Yes.

9   Q   There would be no discussion, as a rule, with you about

10     what they were using it for or how they were going to

11     put it on?

12   A   No.

13   Q   No, there would be no discussion?

14   A   No, there would be no discussion.

15   Q   Would the person you had contact with at Johnson or

16     whatever the purchaser's name, would that person tell

17     you where to deliver it?

18   A   Yes.

19   Q   And would the delivery site differ because of the

20     differing project sites of the applicator?

21   A   Yes.

22   Q   Would any of your records tell us delivery points

23     even if they didn't tell us what was delivered?

24   A   Some do.

25   Q   Thank you, no other questions.

PENGAD/INDY MUNCIE IN 47302

SF-SEL-2547

| | | |
|---|---|---|
| 1 | | R E E X A M I N A T I O N: |
| 2 | | BY MR. GOLDBERG: |
| 3 | Q | I've got one or two.  You were asked if you handled |
| 4 | | certain other products, do you remember handling |
| 5 | | Keys-be Madison Products (phonetically)? |
| 6 | A | No. |
| 7 | Q | Do you -- now in speaking of insulation, did you ever |
| 8 | | sell the spray-on type insulation? |
| 9 | A | No. |
| 10 | Q | Or any kind of ceiling tile type insulation? |
| 11 | A | You mean ceiling tile is one as the same product? |
| 12 | Q | A ceiling tile that is used. |
| 13 | A | This is a ceiling tile fiberglass, had a ceiling tile, |
| 14 | | it was an insulating product but it was also an |
| 15 | | acoustical product. |
| 16 | Q | That's the type I'm talking about.  Did you use that? |
| 17 | | Did you sell that I mean? |
| 18 | A | Not in Industrial Sales. |
| 19 | Q | Now, taking this other corporation that existed from |
| 20 | | 1940-something on, that was a construction company |
| 21 | | essentially; is that correct? |
| 22 | A | An interior finishing construction company. |
| 23 | Q | Did they have a contract unit that did insulating? |
| 24 | A | No. |
| 25 | Q | So this other corporation -- I would be correct then |

1        in stating that this other corporation did not use

2        insulating products of the type you later sold as a

3        partnership --

4    A   No.

5    Q   -- is that correct?

6                    MR. JUDE:  Wait.

7    BY MR. GOLDBERG:

8    Q   It is correct that your -- that that -- it is correct

9        that that company did not sell the same product?

10   A   That's correct.

11   Q   Did not use the same product that the partnership

12       sold?

13   A   Correct.

14                   MR. JUDE:  I believe you limited it to

15       insulation products.

16                   MR. GOLDBERG:  Oh, yes.

17                   MR. JUDE:  That was the phrase you

18       inserted.

19                   MR. GOLDBERG:  No, I meant insulation

20       products.

21   A   They did install glass insulation underneath garages,

22       apartment type buildings.

23   BY MR. GOLDBERG:

24   Q   That was Fiberglas?

25   A   Right.

Q    Going to this Exhibit No. 2 again and skipping the

first -- all pages that have Ps on it, which would

seem to be the first page only, would there anywhere

be an invoice that gave the original information that

went onto those pages that don't have a P on them?

A    No.

MR. JUDE:  Were they ever in existence?

BY MR. GOLDBERG:

Q    No.  Are they presently in existence?

A    No.

Q    Can you explain why they would not be in existence

today?

A    Well, we destroyed all the invoices up to 1970.

Q    When did you do that?

A    Way back in the -- well, 1970 I think.

Q    Now, taking -- turning to Page --

A    It could have been later than 1970.

Q    Well, I don't think it's -- I'm not pressing that point.

Taking Page 117, upper right-hand corner it must be

about the fifth -- sixth page down, all right.  Taking

those items, did those come from some journal?

A    The journals that are over there.

Q    Now, what is the difference between -- I'm not a book-

keeper -- what is the difference between a journal

and these pages here?

1   A   These are photocopies of those.

2   Q   What is the journal?

3   A   Well, it's -- the sales journal keeps -- keeps the

4       records of the sales, a purchase journal keeps the

5       records of the purchases.

6   Q   In other words, what you're saying is that these are

7       photostats of the journal?

8   A   That's what --

9   Q   Oh, I thought I misunderstood, my impression before was

10      that these items came from were entered from a journal

11      and that's wrong.

12  A   No, no.

13  Q   These are the actual photostats of what you call the

14      journal?

15  A   Right.

16  Q   They are not two different sets of books?

17  A   No.

18                  MR. GOLDBERG:  Off the record.

19                  (Discussion off the record.)

20                  MR. GOLDBERG:  That's all.

21                  E X A M I N A T I O N:

22  BY MR. JUDE:

23  Q   As long as you're on Exhibit No. 2, what I'd like you

24      to do is start off with the first page, which has been

25      numbered 31 for purposes of identification, and tell

1     me if that is a record of sales to Sprinkmann from

2     Building Service or is it a record of a purchase from

3     Sprinkmann to Building Service?

4  A   A purchase from Sprinkmann by us, by Building Service.

5  Q   Okay.  And then could you go to Page 32 and indicate

6     again, as between yours and Sprinkmann, what does that

7     record?

8  A   This is a purchase from Sprinkmann by us.

9  Q   And whatever records other than this ledger that this

10     came from that may identify the type of product that

11     would have been reflected in the sales, those records

12     no longer exist; is that correct?

13  A   That's correct.

14  Q   All right.  Now, Page 1 -- or strike that.  Page 42

15     is the next one, there is an entry, September 29, 1954,

16     Sprinkmann appears there.  Does this refer to a pur-

17     chase from Sprinkmann or is this a Sprinkmann purchase

18     from Building Service?

19  A   A purchase from Sprinkmann.

20  Q   All right.  And is there any way of telling what was

21     purchased from Sprinkmann at that time?

22  A   No.

23  Q   The -- what information is on that sheet regarding that

24     purchase?  What can you tell us about it by looking at

25     that sheet?

HENGADINDY  MUNCIE IN 47302

SF-SEL-2547

1    A    Well, it says it came from Purchase Journal 35 and the

2         amount was $531.59.  I don't know what the date is on

3         the back, what that's for, that's not mine.

4    Q    There's some other numbers -- are there some other

5         numbers that appear in the columns under --

6    A    That's the cash disbursement, that's when we paid for

7         it.

8    Q    Okay.  Let me back up a second.  This -- this document

9         reflects the amount of the purchase, $269.38?

10   A    Got to go down one more.

11   Q    Strike that.  $531.59?

12   A    Right.

13   Q    Thank you.  And it also reflects that that was paid?

14   A    That's correct.

15   Q    Now, this -- this is a purchase that you made from

16        Sprinkmann?

17   A    That's correct.

18   Q    All right.  So the cash disbursement would show when

19        you paid Sprinkmann for that material; is that right?

20   A    That's correct.

21   Q    And the Purchase Journal 35 that you're referring to,

22        does that journal exist anywhere today?

23   A    Yes.

24   Q    All right.  So that would be in a separate book?

25   A    Well, it's -- this is a photocopy of the journal that

1     exists.

2  Q   All right.  But when you enter P35 on -- on this par-

3     ticular page, is that -- is that the --

4  A   That's it.

5  Q   That's -- this is P35 that you're recording it in?

6  A   Right.

7  Q   All right.  Go to the next document, which is 117.

8     Now, is that a record of a sale to Sprinkmann from

9     Building Service?

10  A   Yes.

11  Q   And one look at 118 and 119, which follow, and I

12     believe you had also previously testified as to those

13     two documents, that they are sales to Sprinkmann from

14     Building Service?

15  A   Yes.

16  Q   Referring to 117, 118 and 119, is there any record

17     that exists anywhere that you know of that would tell

18     us what type of product was sold to Sprinkmann on

19     those occasions?

20  A   No.

21  Q   Okay.  The next is No. 348, is that a record of a sale

22     to Sprinkmann from Building Service or vice versa?

23  A   From Building Service to Sprinkmann.

24  Q   And 349?

25  A   Yes.

1    Q    The same?

2    A    Yes.

3    Q    And 350?

4    A    Yes.

5    Q    That's the same also?

6    A    Yes.

7    Q    And 351, is that also the same?

8    A    Yes.

9    Q    352?

10   A    Yes.

11   Q    And 353?

12   A    Yes.

13   Q    And 354?

14   A    Yes.

15   Q    Now, from -- so from Pages 348 to 354, those record

16        sales to Sprinkmann from Building Service --

17   A    Yes.

18   Q    -- of some product that -- that we distributed; is

19        that correct?

20   A    Yes.

21   Q    And there -- is there any record anywhere that exists

22        that would tell us what type of product was involved

23        in those sales?

24   A    No.

25   Q    Referring to Exhibit No. 1, these generally differ from

| | | |
|---|---|---|
| 1 | | the types of the type of document that's involved in |
| 2 | | Exhibit No. 2; isn't that correct? |
| 3 | A | Yes. |
| 4 | Q | And what is -- what is the difference generally about |
| 5 | | with these documents? |
| 6 | A | These are copies of the actual invoices that were sent |
| 7 | | to Sprinkmann. |
| 8 | Q | All right.  So would it be safe to say that some time |
| 9 | | before at least 1962 these types of invoices were |
| 10 | | destroyed in the past? |
| 11 | A | Yes. |
| 12 | Q | When I say -- when I say destroyed, what were the |
| 13 | | circumstances in which they -- they were destroyed, |
| 14 | | if you remember? |
| 15 | A | They were just thrown in the trash bin as far as I |
| 16 | | know. |
| 17 | Q | Was that for space-saving reasons? |
| 18 | A | Space saving. |
| 19 | Q | Now, you testified earlier that you yourself went |
| 20 | | through records and obtained the documents that are |
| 21 | | contained in Exhibit No. 2; isn't that right? |
| 22 | A | Yes. |
| 23 | Q | I'm sorry, that's Exhibit 1. |
| 24 | A | Exhibit 1. |
| 25 | Q | Exhibit 1.  And you did this at -- in preparation for |

PENGADINUT MUNCIE IN 47302

SF-SEL-2547

1        today's deposition, as well as other asbestos cases

2        we're involved; isn't that correct?

3   A   Yes.

4   Q   Now, when you were going through these records were

5        you pulling out every single invoice that had Sprink-

6        mann's name on it?

7   A   I looked at all of them.

8   Q   Okay.  And the copies that you have made here today,

9        does that reflect all of the invoices that -- that you

10       looked at that had Sprinkmann's name on it?

11  A   No, these are only the Kaylo products.

12  Q   Okay.  So you only made copies of the invoices with

13       Sprinkmann & Sons that had Kaylo listed on it?

14  A   That's correct.

15  Q   Okay.  Now, does this document -- this invoice document

16       indicate who may have been the salesperson for Building

17       Service that would have been involved in this sale?

18  A   Yes.

19  Q   And where does that appear?

20  A   That's the handwriting.

21  Q   I see.  You're referring to the second page, which --

22       well, let's -- let's identify this then.  The first

23       page of the exhibit is invoice No. 29195; correct?

24  A   That's correct.

25  Q   And that's -- that has typewriting appearing on it?

1        today's deposition, as well as other asbestos cases

2        we're involved; isn't that correct?

3    A   Yes.

4    Q   Now, when you were going through these records were

5        you pulling out every single invoice that had Sprink-

6        mann's name on it?

7    A   I looked at all of them.

8    Q   Okay.  And the copies that you have made here today,

9        does that reflect all of the invoices that -- that you

10       looked at that had Sprinkmann's name on it?

11   A   No, these are only the Kaylo products.

12   Q   Okay.  So you only made copies of the invoices with

13       Sprinkmann & Sons that had Kaylo listed on it?

14   A   That's correct.

15   Q   Okay.  Now, does this document -- this invoice document

16       indicate who may have been the salesperson for Building

17       Service that would have been involved in this sale?

18   A   Yes.

19   Q   And where does that appear?

20   A   That's the handwriting.

21   Q   I see.  You're referring to the second page, which --

22       well, let's -- let's identify this then.  The first

23       page of the exhibit is invoice No. 29195; correct?

24   A   That's correct.

25   Q   And that's -- that has typewriting appearing on it?

PENGAD/INDY, MUNCIE, IN 47302

SF-SEL-2547

1   A   Right.

2   Q   The second page is the handwritten page?

3   A   That's correct.

4   Q   Does this have any reference to the first page?

5   A   First page should be a copy of the second page, I

6       didn't examine it.

7   Q   Well, do you just want to look at it again to tell us

8       if it is a reply, so to speak, of the first page.

9   A   Well, it would be, it appears to be.

10   Q   All right.  Now that you can tell by the handwriting

11       who is the salesperson involved?

12   A   Yes.

13   Q   And who was that?

14   A   George Leisenring.

15   Q   And that order specifies a delivery point; does it not?

16   A   Yes.

17   Q   And where was this material delivered?

18   A   Nelson Dewey, Nelson Dewey Station in Passville, Wiscon-

19       sin.

20   Q   By looking at this invoice are you able to tell if

21       Building Services' truck delivered this or if it was

22       delivered direct from a manufacturer?

23   A   The routing says prepaid car, how it got there I don't

24       know.

25   Q   What does prepaid car mean?

PENGAD/INDY  MUNCIE, IN  47302

SF-SEL-2547

1   A   No.  If -- if it was a large order it would be directly

2       to the job site, if we didn't have the material which

3       we most -- in most cases we did not, it was shipped

4       directly from the manufacturer to the job site.

5   Q   All right.  It would not have --

6   A   Unless  it was in Milwaukee, then it would go directly

7       to the customer in Milwaukee.

8   Q   All right.  Let's take the Milwaukee geographic area

9       then.  Following up on your earlier statement, if a

10       Milwaukee area customer had a large order, how generally

11       would the material get or be shipped to that customer?

12   A   If it was a large order it would be directly to the

13       customer or to the job site, whichever he specified.

14   Q   All right.  If it were a smaller order what would be

15       the case?

16   A   If we had it they would pick it up here.

17   Q   All right.  And if you didn't have it?

18   A   We would probably order it, it would either go to them

19       or come to us, depending on how large it was.

20   Q   Okay.  If there were an order placed for a specific

21       customer at a specific job site and you did not have

22       it available in your facility how would that product

23       routinely be delivered to that customer or job site?

24   A   I would presume to save time they would ship it direct,

25       rather than ship it to us and turn around and ship it

1     someplace else.

2  Q  Are you testifying from any memory or are you just

3     making an assumption?

4  A  A general statement.

5  Q  Looking at invoice No. 29196, can you tell us if there

6     is any documentation there that indicates where that

7     material was shipped?

8  A  Not on the -- on -- not on the invoice, but on the

9     order preparation that George made.

10  Q  And where was that shipped?

11  A  Nelson Dewey Station in Passville.

12  Q  And do we know how it got there?

13  A  Same truck line, Roadway.

14  Q  Okay.  Now, let's go to invoice No. 63391, dated 3-17-

15     71.  Is there any documentation that tells you where

16     that material was delivered?

17  A  No.

18  Q  Did you look for some documentation?

19  A  I wouldn't have it, they picked it up, they didn't tell

20     us where they were taking it.

21  Q  Okay.  And you can tell that because it says on the

22     invoice itself pick-up?

23  A  Right.

24  Q  That would mean that they would have picked that up

25     from your -- from Building Services' facility?

PENGAD/INDY   MUNCIE, IN  47302

SF-SEL-2547

1   A   That's correct.

2   Q   And that facility would be at 620 North 108th Place?

3   A   No, we were -- I don't know when we acquired this --

4       this space, but we kept this, we would -- the office

5       was at 620 North 108th Place, but they could have

6       picked it up here rather than over there because I

7       think we moved into this warehouse.

8   Q   Okay.  And here what is the address of here?

9   A   1610 South 106th Street.

10  Q   Okay.  So this invoice would not tell you where

11      Sprinkmann eventually delivered this particular

12      product; would it?

13  A   No.

14  Q   And in a normal course of your business with Sprink-

15      mann -- would your salespeople or yourself know where

16      Sprinkmann was delivering this stuff?

17  A   No.

18  Q   It was not a question that you would even be interested

19      in; would it?

20  A   Well, I would be interested but they weren't very

21      willing to give me the information.

22  Q   And why was that?

23  A   Because they didn't want us to sell the same people

24      that they were selling.

25  Q   They were a competitor, in other words?

PENGAD/INDY  MUNCIE, IN 47302

SF-SEL-2547

1    A    That's right.

2    Q    They also sold insulation products in the Milwaukee

3         area?

4    A    That's correct.

5    Q    Now, let me ask you something else that I wish to

6         clarify, in 1952 there was a partnership formed called

7         Building Service Industrial Sales; is that correct?

8    A    Yes.

9    Q    And now who were the -- who were the partners involved

10        in that?

11   A    Joel Rachlin and myself.

12   Q    There were just the two partners at that time?

13   A    Yes.

14   Q    And those were the only two partners in this business

15        up until the time it was incorporated?

16   A    That's correct.

17   Q    All right.  Now, when you started in 1952 with the

18        two partners were there other employees of the partner-

19        ship, so to speak, other than yourself and Mr. Rachlin?

20   A    Yes, there were other employees.

21   Q    And what type of work did these other employees do?

22   A    In 1952 they worked in the warehouse.

23   Q    Were there -- it would have been some clerical person

24        or not?

25   A    Not -- not in 1952.  When we started, I don't know,

1    when somebody else took over the paperwork, probably

2    a year or two later.

3  Q    Did you do the paperwork at that time?

4                    MR. GOLDBERG:   Your answer is yes?

5  A    Yes.

6  BY MR. JUDE:

7  Q    And the other people that worked in the warehouse,

8    what kind of work would they be doing?

9  A    If we had the material in stock they would be getting

10    it out and getting it ready to give to the customer.

11  Q    Okay.  Do you know how many people were involved in

12    that?

13  A    One.

14  Q    Now, sometime later somebody else took over the record

15    keeping?

16  A    Yes.

17  Q    Is that a fair statement?  Obvious statement, I guess.

18    In terms of looking at the sales journal or the ledger

19    sheets are you able to determine by -- let's say by

20    1955, is that your handwriting or somebody else's

21    handwriting?

22  A    It's somebody else's.

23  Q    And do you know who that person would be?

24  A    No.

25  Q    And when you -- you would -- referred earlier to two

1        warehouses, I believe, or maybe more than two?

2  A   Yes.

3  Q   Now, other than the warehouse that we're in today at

4        this particular address was there another warehouse

5        that Building Service operated from?  Building Service

6        Industrial Sales operated from?

7  A   We stored material in the buildings, we had no personnel

8        except the personnel that came from the main warehouse.

9  Q   All right.  This was all considered the main warehouse?

10  A   Yes.

11  Q   And what type of material -- strike that.  So you had

12        a separate warehouse that was used for storage?

13  A   Correct.

14  Q   And where was that?

15  A   Well, there was one on 108th Place, there was one out

16        in -- off of Sunnyslope Road, I guess, I don't even

17        remember, I can take you to it.

18  Q   And you shared that with Building Service, Inc.?

19  A   We shared one with Building Service, Incorporated,

20        the other two that I recall were just buildings where

21        we stored material.

22  Q   Okay.  And generally what kind of material was stored

23        in -- let's say in the -- well, strike that.  Was the

24        third warehouse just used by Building Service, Inc.

25        or was it also used by Industrial Sales?

PENGAD/INDY  MUNCIE, IN  47302

SF-SEL-2547

1   A   The other two warehouses were strictly Industrial Sales

2       warehouses.

3   Q   And what type of material were stored in those other

4       two warehouses?

5   A   Glass products from Fiberglas.

6   Q   And what type of material was stored in the main ware-

7       house here?

8   A   Same kind.

9   Q   Can you recall as you sit here today that any calcium

10      silicate was ever stored in those warehouses?

11  A   No.

12  Q   Do you recall any Kaylo or Unibestos being stored in

13      the warehouses?

14  A   Kaylo at the end.

15  Q   At --

16  A   Just before we came into here there was Kaylo products

17      in them but no Unibestos or Unarco.

18  Q   What time period are you talking about?

19  A   I'd have to look to see when we came in here, I don't

20      know.

21  Q   That's -- you're referring to the warehouse at 106th

22      Place?

23  A   That warehouse we had since 1949.  I'm talking about

24      this building, I don't know when we moved in here.

25  Q   Okay.  You had also referred to the State of Wisconsin

PENGAD/INDY   MUNCIE, IN  47302

SF-SEL-2547

| | | |
|---|---|---|
| 1 | | as sort of the territory for the company on earlier |
| 2 | | testimony. Were you personally involved in sales |
| 3 | | throughout the State of Wisconsin? |
| 4 | A | No. |
| 5 | Q | Did you have a particular geographic area that you |
| 6 | | concentrated on? |
| 7 | A | No. I called on insulation applicators. |
| 8 | Q | And those applicators were located throughout the State |
| 9 | | of Wisconsin? |
| 10 | A | Yes. One in Appleton and Madison. |
| 11 | Q | And you mentioned those names before? |
| 12 | A | Yes. |
| 13 | Q | And had you -- were you personally involved in sales |
| 14 | | of insulation products other than fiberglass to these |
| 15 | | applicators? |
| 16 | A | No. |
| 17 | Q | Do you recall ever selling any calcium silicate to |
| 18 | | these applicators? |
| 19 | A | No. |
| 20 | Q | Were you involved in selling any Eagle-Picher cement |
| 21 | | to these applicators? |
| 22 | A | Not to the best of my knowledge. |
| 23 | Q | You were aware that it was -- that there were some |
| 24 | | sales through the company of Eagle-Picher but you |
| 25 | | weren't involved in that? |

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | All right.  Had you ever studied, taken any courses in, |
| 3 | | read anything about high temperature insulation before |
| 4 | | 1972? |
| 5 | A | No. |
| 6 | Q | I guess I have no further questions. |
| 7 | | R E E X A M I N A T I O N: |
| 8 | | BY MR. GOLDBERG: |
| 9 | Q | Just a very short one.  Now, you mentioned that Johns |
| 10 | | -- Sprinkmann was a competition of yours, do you know |
| 11 | | what product they handled in competition with you? |
| 12 | | Let's take the period 1952 to '59, were they your -- |
| 13 | | considered your competition at that time? |
| 14 | A | No. |
| 15 | Q | Would you recognize if they handled a product called |
| 16 | | Ehert, E-h-e-r-t? |
| 17 | A | I don't know. |
| 18 | Q | Or did you handle any products of Ehert? |
| 19 | A | No. |
| 20 | Q | Or Baldwin, Ehert, Hill? |
| 21 | A | No. |
| 22 | Q | Do you recognize any products -- Carey products?  C- |
| 23 | | a-r-e-y. |
| 24 | A | No. |
| 25 | Q | Or Phillip Carey? |

PENGAD/INDY  MUNCIE, IN  47302

SF-SEL-2547

```
1    A    No.

2    Q    At anytime when you would have considered them your

3         competition do you know what product they handled?

4         I'm going into the '60s now, or anytime.

5    A    They handled a Johns-Manville products.

6    Q    At what period do you think that was?

7    A    As long as I can remember.

8    Q    Now, just one thing, I notice on the bottom of these

9         invoices you actually have Fiberglas printed on there,

10        that refers to Owens-Corning Fiberglas; is that correct?

11   A    That's correct.

12              MR. JUDE:    It says Owens-Corning

13        Fiberglas.

14              MR. GOLDBERG:  It's so small I can't

15        read it.

16   BY MR. GOLDBERG:

17   Q    In other words, did you so closely identify yourself

18        with Owens-Corning Fiberglas that you put it as part

19        of your invoice during your tenure as a company?

20   A    That started when Fiberglas was the only people that

21        had fiberglass insulation.

22   Q    Back in the '50s did you also put them down on your

23        invoices?

24   A    I don't recall.

25   Q    Do you recall when you started to put them down on
```

1       your invoices?

2   A   No.

3   Q   I think that's all.

4                  R E E X A M I N A T I O N:

5   BY MR. PORTER:

6   Q   Sir, you said that in your search of the records you

7       just looked for invoices of sales to Sprinkmann that

8       said Kaylo, why did you restrict yourself to Kaylo?

9   A   That's what I understood we were talking about, you're

10      not interested in glass products; are you?

11  Q   No, sir, but we are interested in all possible asbestos-

12      containing products, one that you have identified is

13      Eagle-Picher cement.  I gather you did not look for

14      invoices of sales to Sprinkmann for Eagle-Picher cement?

15  A   That's correct.

16  Q   So there might be such invoices?

17  A   That's correct.

18              MR. JUDE:  We can look now, Counsel,

19      if you want.

20              MR. PORTER:  For the record, there

21      appear to be eight boxes, there are three --

22              MR. GOLDBERG:  Eight?

23              MR. PORTER:  There are three under the

24      table.

25              MR. GOLDBERG:  Oh, I'm sorry.

PENGAD/INDY  MUNCIE, IN 47302

SF-SEL-2547

1                      MR. PORTER:  I don't require that these

2        witnesses go through those boxes right now.  If they

3        want to look here after they may and we can always

4        reconvene.  I wouldn't inconvenience them on the spot.

5   BY MR. PORTER:

6   Q    What I'm trying to think of is this, the question I

7        want to ask you, sir, is, since you only looked for

8        Kaylo, if there are other products as to which there

9        were invoices you neither looked nor found -- you

10       neither looked for nor found those; is that right?

11  A    I didn't look for them.

12  Q    That's all, thank you.

13                      (Witness excused at 12:35 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF WISCONSIN )
                   ) SS:
MILWAUKEE COUNTY   )


          I, LORI J. CUNICO, a Notary Public in

and for Milwaukee County, State of Wisconsin, do hereby

certify that the deposition of DONALD C. POPALISKY, called

as a witness upon the trial, was taken at the instance of

the Plaintiffs, before me, at offices located at 1710 South

106th Street, Milwaukee, Wisconsin, on the 17th day of March,

1987, commencing at 10:00 o'clock in the morning.

          That the same was taken to be used in an

action now pending in the Circuit Court of Milwaukee County,

in which HUGH C. SCHIEFER and PATRICIA A. SCHIEFER are the

Plaintiffs, and KEENE CORPORATION, a foreign corporation,

et al., are the Defendants.

          That the appearances were as follows:

          GOLDBERG, PREVIANT, UELMEN, GRATZ,

MILLER & BRUEGGEMAN, S.C., by ALBERT J. GOLDBERG, ESQ.,

788 North Jefferson Street, Milwaukee, Wisconsin, appeared

on behalf of the Plaintiffs.

          FOLEY & LARDNER, by RICHARD H. PORTER,

ESQ., 777 East Wisconsin Avenue, Milwaukee, Wisconsin,

appeared on behalf of all Defendants except Nicolet, Inc.,

Raymark, Inc. and Building Services Industrial Sales Company,

Inc.

ALBERT, JUDE & VAN REMMEN, S.C., by
JOHN S. JUDE, ESQ., 524 Seventh Street, P.O. Box 456,
Racine, Wisconsin, appeared on behalf of Building Services
Industrial Sales Company, Inc.

GREGORY B. HAYS, ESQ., 7635 West Blue-
mound Road, Milwaukee, Wisconsin, appeared on behalf of
Building Services Industrial Sales Company, Inc.

That at the taking of said deposition,
it was stipulated by and between counsel for the respective
parties that the reading of the deposition by, or to said
witness and affixing his signature thereto was waived.

That before said witness testified, he
was first duly sworn, by me, to testify the truth, the whole
truth, and nothing but the truth relative to said cause.

That the foregoing proceedings are true
and correct as reflected by my original machine shorthand
notes taken at said time and place.


Dated at Milwaukee, Wisconsin,

this ___ day of March, 1987.




                                    _____
                                    Notary-Public
                                    State of Wisconsin
My commission expires 2-5-88.