1          IN THE CIRCUIT COURT

2      OF THE ELEVENTH JUDICIAL CIRCUIT

3          MCLEAN COUNTY, ILLINOIS

4

5    LOIS BICKNELL, Individually and as      )
     Special Administrator of the Estate     )
6    of Hugh Bicknell, deceased,             )
                                             )
7              Plaintiff,                    )
                                             )
8              vs.                           )  92 L 140
                                             )
9    OWENS-CORNING FIBERGLAS CORPORATION     )
     and ILLINOIS CENTRAL RAILROAD COMPANY,  )
10                                           )
               Defendants.                   )
11
     RON THACKER,                            )
12                                           )
               Plaintiff,                    )
13                                           )
               vs.                           )  92 L 62
14                                           )
     OWENS-CORNING FIBERGLAS CORPORATION,    )
15                                           )
               Defendant.                    )
16
     DELORES MCCLURE, Individually and as    )
17   Special Administrator of the Estate     )
     of Robert McClure, deceased,            )
18                                           )
               Plaintiff,                    )
19                                           )
               vs.                           )  94 L 107
20                                           )
     ILLINOIS CENTRAL RAILROAD COMPANY,      )
21   OWENS-CORNING FIBERGLAS CORPORATION     )
     and OWENS-ILLINOIS, INC.,               )
22                                           )
               Defendants.                   )
23

24             NOVEMBER 26, 1996

                         1

1              REPORT OF PROCEEDINGS of a portion of the

2     jury trial held in the above-entitled cause on the

3     26th day of November, 1996, before THE HONORABLE

4     W. CHARLES WITTE, Circuit Judge of the Eleventh

5     Judicial Circuit, presiding in courtroom 4-B of

6     the McLean County Law & Justice Center, in the

7     City of Bloomington, County of McLean and State of

8     Illinois.

9

10    APPEARANCES:

11    JAMES WALKER and JAMES WYLDER,
      Bloomington, Illinois,
12      Representing the Plaintiffs.

13    ANDREW CONSTANTINE, II,
      Cherry Hill, New Jersey,
14      Representing Owens-Corning Fiberglas Corp.

15    JOHN L. MOREL,
      Bloomington, Illinois,
16      Representing Owens-Corning Fiberglas Corp.

17    THOMAS R. PETERS,
      Belleville, Illinois,
18      Representing Illinois Central Railroad Co.

19    JOSEPH O'HARA and MATTHEW FISCHER,
      Chicago, Illinois,
20      Representing Owens-Illinois Inc.

21

22

23    Susan E. Geshwilm, CSR
      104 West Front Street
24    Bloomington, Illinois 61701
      Lic. No. 084-002578

1                          INDEX                    Pg.

2    RICHARD E. GRIMMIE

3         Direct Examination ....................   23

4         Cross Examination .....................   76

5         Cross Examination .....................  161

6         Redirect Examination ..................  165

7         Recross Examination ...................  169

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    November 26, 1996

2

3        THE COURT:   These are causes 92 L 140, <u>Lois</u>

4    <u>Bicknell, plaintiff, vs. Owens-Corning Fiberglas</u>

5    <u>and Illinois Central Railroad</u>; 92 L 162 entitled

6    <u>Wilma Thacker, plaintiff, vs. Owens-Corning</u>

7    <u>Fiberglas Corporation, defendant</u>; and 94 L 107,

8    <u>Delores McClure, plaintiff, vs. Illinois Central</u>

9    <u>Railroad Company, Owens-Corning Fiberglas</u>

10   <u>Corporation and Owens-Illinois Incorporated,</u>

11   <u>defendants</u>.

12       Causes come on for continued consolidated

13   jury trial.   The plaintiffs, all three are present

14   personally and by counsel Mr. Walker and Mr.

15   Wylder.   The defendant Owens-Corning Fiberglas

16   present by counsel, Mr. Andrew Constantine.   The

17   defendant Illinois Central Railroad by counsel

18   Thomas Peters and representative Charles Garrett.

19   The defendant Owens-Illinois by counsel Matthew

20   Fischer.

21       Counsel ready to proceed?

22       MR. CONSTANTINE:   Ready, Your Honor.   I was

23   trying to locate some documents last evening, I

24   couldn't find them.   I have found them, they are

4

1    OCF 600, 601, 602 and 603.  I have given counsel

2    copies this morning and I'm going to be seeking

3    their admission.

4         THE COURT:  All right.  Plaintiff had a

5    chance to look at them yet?

6         MR. WALKER:  Plaintiffs are looking at them

7    now and don't know their position yet, so we'll

8    have to object until we are in a position to do

9    differently.

10        THE COURT:  All right.  Record reflect that

11   counsel Morel and O'Hara have also appeared.  Mr.

12   Fischer, you've got something?

13        MR. FISCHER:  Your Honor, we have some

14   documents as well, a redacted copy as requested of

15   plaintiffs' exhibit 433 as well as a few medical

16   records which -- I'm sorry, yes, defendant

17   Owens-Illinois 433.

18        THE COURT:  And some medical records?

19        MR. FISCHER:  And some medical records.  That

20   is right.

21        THE COURT:  Illinois Central have anything?

22        MR. PETERS:  We get to my case Your Honor,

23   all I'm going to do is read a stipulation and

24   rest.

5

1        THE COURT:  Okay.  Will you need a hearing on

2   your motion before that?

3        MR. PETERS:  Yeah.

4        MR. FISCHER:  One other point, Your Honor.

5   We have a blow up we intend to use with Mr.

6   Grimmie, it's a blow up of this photo that Mr.

7   Grimmie will be authenticating and I haven't had a

8   chance to show it to plaintiffs' counsel, so I

9   will do that.

10       MR. O'HARA:  Your Honor I think this is the

11  first day I'm late, I apologize for being a little

12  late --

13       THE COURT:  Not concerned about it.  Also

14  need a copy of Dr. Barrett's reports, the one on

15  Mr. McClure and the one on Mr. Bicknell.

16       Mr. O'Hara, Mr. Grimmie is here?

17       MR. WYLDER:   Plaintiffs have some thoughts

18  on the schedule but I suggest we defer all of that

19  until we finish whatever is coming on today.

20       THE COURT:  Well except before I let the jury

21  go, we'll need to --

22       MR. WYLDER:  Right, but I mean when it looks

23  like all the evidence is in perhaps we send them

24  back there for a little bit and then discuss it.

1        THE COURT:  All right.

2        MR. O'HARA:  He's here.

3        THE COURT:  Mr. Constantine, I think you

4    indicated you had four new exhibits, 600 through

5    603.  Are those to be used with Mr. Grimmie?

6        MR. CONSTANTINE:  Perhaps.  They don't have

7    to be, but depending upon what he says they may

8    be.

9        THE COURT:  All right.

10       MR. CONSTANTINE:  We are going to put him up

11   first?  Is that what we are going to do?

12       THE COURT:  Well I will want to see if we

13   conclude your case first, your case in chief

14   first.  Then I presume it may be dependent upon

15   the plaintiffs' reactions on those three and we'll

16   go to the Owens-Illinois case.

17       All right, Owens-Corning ready to present

18   some additional exhibits?  Is that what you wish

19   to do?

20       MR. CONSTANTINE:  Yeah, 600 through 603.

21       THE COURT:  Mr. Walker?

22       MR. WALKER:   Plaintiffs object to 600 on

23   authentication and hearsay.

24       THE COURT:  All right.  Now I need to see

7

1    copies of these Mr. Constantine.

2         MR. CONSTANTINE:  I have copies Your Honor.

3         THE COURT:  Thank you sir.  Record reflect

4    he's handed me copies of those exhibits.  Let's

5    just do them one at a time.  You said authenticity

6    and hearsay on 600?

7         MR. WALKER:  Yes.

8         THE COURT:  Mr. Constantine?

9         MR. CONSTANTINE:  As it is a -- like some of

10   the medical records that we have seen Your Honor,

11   it is a business record.  It is a dust study dated

12   May 11th, 1961.  I think that qualifies that as an

13   ancient document which I believe at least under

14   the federal rules is self-authenticating.  It is a

15   business record and it is -- I would think --

16        THE COURT:  A business record of

17   Owens-Corning?

18        MR. CONSTANTINE:  It is.

19        THE COURT:  Any other comment on it?

20        MR. CONSTANTINE:  No.

21        THE COURT:  Mr. Walker, any comment?

22        MR. WALKER:  Well, so far as I know, the

23   statements of counsel are not sufficient evidence

24   to lay a foundation for the admissibility of an

1    exhibit.  We objected on the basis of authenticity

2    and hearsay.  There has been no evidence to show

3    that it falls within the exception to hearsay rule

4    and there has been no evidence of authenticity.

5        MR. CONSTANTINE:  It's a business record

6    under I think local rule 236.

7        THE COURT:  Well generally there is someone

8    that authenticates that when it is your own

9    business record and says they're the custodian and

10   this is a document kept in the regular course of

11   business.

12       MR. CONSTANTINE:  We do have a custodian of

13   records.  I can have an affidavit faxed to the

14   court.

15       THE COURT:  Well at this point, the objection

16   will be sustained.

17       MR. CONSTANTINE:  Well then Your Honor, I ask

18   for leave to call the -- to call that person live.

19       THE COURT:  All right.  You can do that.  The

20   custodian?

21       MR. CONSTANTINE:  I can do that sometime as

22   soon as we can.  Of course I won't be able to rest

23   until they get here.

24       THE COURT:  That is fine.  Number 601?

1              MR. WALKER:   Same objections.

2              MR. CONSTANTINE:   That too Your Honor is a

3      business record and an ancient document, it's

4      dated January 24th, 1946.   Your Honor can see it

5      bears the Bates stamp number and it's again not

6      being offered for the truth of the matter asserted

7      in the letter but rather it goes to the state of

8      mind of Owens-Corning inasmuch as it appears as

9      though in 1946, January 24th, Owens-Corning was

10     sent or I'm sorry -- actually there is a response.

11     This letter is read in conjunction with OCF 602.

12             THE COURT:   Okay, okay.

13             MR. CONSTANTINE:   602 which is dated just

14     several days before January 18th, 1946 is a letter

15     from the health department of the State of Ohio

16     enclosing a copy of the legal requirements for the

17     prevention and control of industrial public health

18     hazards and a letter going back on January 24th

19     which is, 601 acknowledges receipt of that

20     document which is OCF 603.   And the matters

21     asserted in the letter are not offered for the

22     truth of the matters asserted, but rather on the

23     issue of receipt of the document which contains

24     the threshold limit value for asbestos dust at

1    five million particles per cubic foot of air.

2         THE COURT:   Is 603 the document that was

3    attached to 602?

4         MR. CONSTANTINE:   I think that 606 -- I think

5    the answer to that is that it's not.   And what was

6    sent with 602 was a draft versions of 603 and 603

7    which, you know, which it's a draft version of

8    what later appeared in the law to be 603.

9         THE COURT:   Well 602 doesn't seem to suggest

10   it's a draft copy.

11        MR. CONSTANTINE:   I mean that is just based

12   upon my best recollection, Your Honor.   It could

13   very well be -- although I think there is an

14   attachment to this letter -- well no I'm not

15   offering it, the attachment is a draft version,

16   but it has got my handwriting on it and some

17   markings that I made, so I'm not even offering it.

18        THE COURT:   All right.   Plaintiff, response?

19   Actually 601 and 602 go together?

20        MR. WALKER:   Well if 602 is before the court,

21   then we have a third objection.   We object on

22   authenticity, hearsay and incompleteness.   The

23   first paragraph says, enclosed is a copy and

24   counsel has already indicated he's not tendering

1    the copy.  If the Bates stamping numbers were put

2    on there by Owens-Corning, then those numbers work

3    against Owens-Corning because exhibit 601 has

4    Bates stamp 161.  Exhibit 602 has Bates stamp 162.

5    But there is no 163 on the front of Owens-Corning

6    exhibit 603 which would indicate that the -- that

7    the printed document wasn't what was enclosed with

8    the January 18th letter, most likely it was

9    something else and it may be that Owens-Corning

10   has already confessed that something else is

11   different from 603 and therefore whatever it is

12   that 602 is being offered to show notice of isn't

13   in front of the jury if 601 and 602 were received

14   into evidence.

15       So for all those reasons, we object to the

16   admissibility of 601 and 602.

17       MR. CONSTANTINE:  I have the attachments,

18   Your Honor.  601 is -- the last four numbers are

19   161.  The last four numbers of 602 are 0162.  I

20   have in my hands the attachment 163, 164, 165,

21   166, 167, 168, 169 and 170.  Your Honor will see

22   that on 170 there are some circle marks that I

23   made, so in an effort not to delay things and

24   offer something that had marks on it, I'm not

1    offering it for (inaudible).  But for the purposes

2    of establishing that this was indeed attached to

3    the letter, I'm offering it to the court for an in

4    camera review of exactly what was attached.  And

5    you'll see if you compare it with 603, Your Honor,

6    it's a draft or what appears to be a draft version

7    of what later became --

8        THE COURT:  All right, at this point I will

9    sustain the objections, give you an opportunity to

10   call that person that you --

11       MR. CONSTANTINE:  Just so I'm clear Your

12   Honor, you're sustaining the objection on what

13   grounds?

14       THE COURT:  Um, on hearsay and at this point

15   authenticity.

16       MR. CONSTANTINE:  Could I just inquire of the

17   court is how is it that the plaintiffs introduce

18   medical records claiming them to be business

19   records and authentic, and the court allows them

20   in; but yet when Owens-Corning makes an offer of a

21   document, an ancient document the same way, the

22   court denies it?  I'm just curious.

23       THE COURT:  Well --

24       MR. WALKER:  Well first of all I object to

13

1   the court having to defend itself --

2        THE COURT:  The court is not going to --

3        MR. CONSTANTINE:  Your Honor, the reason I

4   ask the question is it is not an issue of the

5   court defending itself and it's really not a

6   personal matter.  Counsel for Owens-Corning has

7   identified the record and made motions for recusal

8   based on bias and prejudice and based on the way

9   the case has been handled.  There is nothing

10  personal about it, lawyer steps into a courtroom,

11  calls it like he sees it.  I say --

12       MR. WALKER:  Well the problem is this lawyer

13  can't see the truth --

14       THE COURT:  Now counsel --

15       MR. WALKER:  -- can't give the court one

16  single example of when an objection was made to a

17  medical record and the objection wasn't ruled upon

18  the same way that these objections were ruled

19  upon.

20       THE COURT:  The Appellate Court will have the

21  opportunity to review the court's rulings and can

22  make whatever findings they perceive to be

23  appropriate.

24       All right, are we ready for Mr. Grimmie?

1    MR. CONSTANTINE:  Well, Your Honor, with

2    respect to 603, could I venture forward to suggest

3    perhaps that Your Honor could take judicial notice

4    of the State of Ohio legal rules -- legal

5    requirements for the prevention and control of

6    industrial public health hazards published in

7    document 603 dated 1946?

8    MR. WALKER:  You won't have to do that

9    because the plaintiffs don't object to 603.

10    THE COURT:  All right.  603 will be admitted.

11    Anything else?  All right, ready for the

12    jury?

13    MR. WALKER:  Judge I wonder if we may not

14    have passed the plate as far as 603 as far as any

15    other party.

16    THE COURT:  Any objection Illinois Central?

17    MR. PETERS:  I don't have any objection Your

18    Honor.

19    THE COURT:  Owens-Illinois?

20    MR. O'HARA:  No objection Your Honor.

21    MR. WALKER:  Thank you Your Honor.  Sorry I

22    didn't bring it up before the jury came in.

23    THE COURT:  That's all right.

24    All right, now we are ready for the jury.

1          (THE FOLLOWING PROCEEDINGS WERE HAD IN THE

2     PRESENCE OF THE JURY.)

3          THE COURT:  All right, you may be seated.

4     Record reflect the ladies and gentlemen of the

5     jury have returned to the courtroom.  Mr. O'Hara,

6     do you wish to present some evidence on behalf of

7     Owens-Illinois?

8          MR. O'HARA:  Yes Your Honor, I do.

9          THE COURT:  Call your first witness.

10         MR. O'HARA:  Your Honor, Owens-Illinois

11    exhibit 409 was previously admitted into evidence.

12         THE COURT:  Yes, sir.

13         MR. O'HARA:  With your permission, I would

14    like to pass this exhibit to the jury.

15         THE COURT:  You may.

16         MR. O'HARA:  Your Honor, again with your

17    permission I would like to read a portion of this

18    to the jury.

19         THE COURT:  Any objection?  You may.

20         MR. O'HARA:  Title of exhibit Owens-Illinois

21    409 is "Pioneers in the Profession."  And the

22    title of the article is "Willis G. Hazard" and the

23    article is by Paul D. Halley.  The first paragraph

24    in the first page of the article begins, "Willis,

1    Bill Gilken (phonetic) Hazard, son of Willis and

2    Mary Hazard, was born in Westchester, Pennsylvania

3    on April 27th, 1907."

4         In the second paragraph, in the second

5    sentence, "From there, Bill entered Harvard

6    University where he received his bachelor of arts

7    degree in physics in 1929 and his master's in

8    physics in 1930.  He became an instructor at the

9    Harvard School of Public Health working with

10   notables Phillip Drinker and Theodore Hatch.  With

11   Drinker he assisted in development of the iron

12   lung which was a major factor in the treatment of

13   patients whose respiration was impaired by polio.

14   With Hatch, Bill worked on evaluation and control

15   of air quality matters, especially of inhalation

16   of silicosis-producing dusts.

17        When Owens-Illinois Glass Company, OI, of

18   Toledo, Ohio appealed to Harvard for assistance in

19   solving a problem of silicosis in their

20   operations, Bill Hazard was recommended to them.

21   So OI proposed and Bill accepted and in 1934,

22   moved to OI's home office in Toledo.  His work at

23   OI took him to that company's many operations

24   across the United States to evaluate and control

1   environmental problems such as silicosis-producing

2   dusts, radiant heat and noise.

3        His academic training in physics, ventilation

4   and industrial hygiene type subjects, plus his

5   experience at Harvard, made him uniquely qualified

6   to handle those problems at OI."

7        In the second full paragraph on the column on

8   the right, the second sentence, "They," and there

9   is a reference to above to Mr. Hazard's family,

10  "lived in Toledo except for four years during

11  World War II when Bill joined the U.S. Public

12  Health Service and moved east to serve as an

13  officer assigned to New Jersey and New York City.

14  At war's end he left the service with the rank of

15  major and returned to OI in Toledo where he

16  continued until retirement in 1972."

17       Then I would ask you to turn to the next page

18  under "Accomplishments, Contributions and Honors."

19       Your Honor I'm not going to read all of this.

20       The first sentence is "Bill was a founding

21  father of AIHA, president in 1961, and Cummings

22  Memorial Awardee and lecturer in 1968."  The first

23  sentence of the next paragraph.  "Bill was a

24  founding member of the Konacide Club (phonetic)

1   (Greek for death to dust) which was a voluntary

2   and informal group dedicated to control of dust

3   exposures in the workplace."

4       And the last sentence of that paragraph, "He

5   authored numerous articles in such publications as

6   National Safety News, American Journal of Public

7   Health, Journal of Industrial Hygiene and

8   Toxicology and Occupational Hazards.  He authored

9   three sections of the Encyclopedia of

10  Instrumentation for Industrial Hygiene and," I

11  think it says "three chapters in National Safety

12  Council publications on ventilation of local

13  exhaust systems and heat stress."

14      Under "The Early Years."  "I first got to

15  know Bill when I was in my beginning years in

16  industrial hygiene with the Bureau of Industrial

17  Hygiene, West Virginia State Department of Health.

18  OI had several plants in West Virginia.

19      At Bill's invitation I visited OI's plants

20  with him and together we conducted evaluations of

21  potential exposures at OI's operations.  It was

22  one of the best cooperative approaches by

23  employers/government that I am aware of.  The

24  cooperation between Bill and myself continued

1    after I left government and entered industry in

2    1953.  In 1948 I convened a statewide

3    organizational meeting to form an industrial

4    hygiene section of the West Virginia Public Health

5    Association.  One of the speakers was Bill Hazard.

6    Bill's talk was on health of glass workers.  He

7    discussed medical and engineering controls in the

8    glass industry and told us that out of four glass

9    plants -- and told us that one of four glass

10   plants in the United States was in West Virginia.

11       Then Bill spoke of illnesses of workers

12   generally.  At that time there was very limited

13   information available on medical and toxicological

14   aspects of the workplace exposure to chemicals and

15   other stresses (most attention at that time had

16   been directed to exposures to silicosis producing

17   dusts).  Bill mentioned one approach being

18   followed by his company which was to keep

19   sickness, absentee records on all employees and

20   look for quote bunches end quote of absences.  He

21   suggested that employers should concentrate their

22   attention on the largest percentage of absences

23   rather than using a quote shotgun end quote

24   approach of checking on all employees.

20

1    I was especially fascinated by Bill's ability

2    and knowledge of exhaust ventilation to control

3    exposures of workers to dust and vapors by

4    ventilation of the work area.  The norm in those

5    days was use of a large propeller fan placed in

6    either the ceiling or outside wall of the work

7    area.  Systems that had quote pick up end quote

8    hoods (or quote positioners end quote as they were

9    sometimes called) at the point of emission of the

10   dust or vapor were to come later.  But not so with

11   Bill and OI.  Bill was years ahead in his design

12   of local exhaust systems which included such

13   niceties as adequate face velocities, being close

14   to the point of emission for adequate capture

15   velocity and adequate transport velocity to insure

16   dust would not collect in piping. The common

17   practice ini those days was to have exhause

18   ventilationsystems designed, built, and installed

19   by tinsmiths, who could adequately install a wall

20   or ceiling fan but had no knowledge of proper

21   ventilation systems."

22   Under Some Vignettes.  "Bill's quote

23   consultant end quote stationery carried this

24   message at the bottom of the page.  It takes a

1    Hazard to spot a Hazard."

2         Under the bottom under To Reach or Not to

3    Reach for a Star.  "In 1968 Bill Hazard delivered

4    his Donald E. Cummings award lecture.  This was

5    the oldest and at the time the only AIHA award for

6    those living in the United States.  Bill titled

7    his lecture To Reach or Not to Reach for a Star."

8    In the second sentence of the next paragraph, well

9    I will just read the first sentence too.  "Then

10   Bill went to to say about dealing with AIHA,

11   quote, let us look at two points of view.  There

12   have been two ways of tackling the problems of

13   life such as of a family's growing up end quote.

14   One is to set our goals reasonably low because not

15   to do so causes too much anxiety and

16   disappointment brought on by the failure to meet

17   goals, so do not reach for a star.

18        The second point of view he said is to set

19   our goals high so that we grow by stretching and

20   if we reach for a star we may go higher than we

21   thought we could."

22        The next column in the middle paragraph,

23   "Bill concluded by saying industrial hygiene which

24   means AIHA by virtue of its position is the only

1    all encompassing professional society in the

2    field, must answer the question to reach or not to

3    reach for a star.  Then he made one final

4    statement.  I hope we reach for a star."

5        Your Honor, at this time Owens-Illinois calls

6    Bill Hazard by deposition from his deposition

7    transcript in 1981.

8        MR. WYLDER:  The court's already ruled on

9    that and counsel knows that.

10        MR. O'HARA:  Can we make an offer of proof on

11    that at some --

12        THE COURT:  You may, the court's previously

13    ruled.  Objection is sustained.

14        MR. O'HARA:  Your Honor at this time with

15    your permission, Owens-Illinois would like to call

16    Mr. Richard Grimmie.

17        THE COURT:  You may.

18                    RICHARD E. GRIMMIE

19        CALLED AS A WITNESS ON BEHALF OF THE

20    DEFENDANT OI, HAVING BEEN FIRST DULY SWORN, WAS

21    EXAMINED AND TESTIFIED AS FOLLOWS:

22                    DIRECT EXAMINATION

23        BY MR. O'HARA:

24        Q  Mr. Grimmie, would you please introduce

1     yourself to the court and the jury?

2          A   I'm Richard E. Grimmie, I reside at 202

3     First Avenue, West Berlin, New Jersey.   08091.

4          Q   I'm not sure that the jury needed that but

5     -- will you please tell the jury in what year were

6     you born?

7          A   1922.

8          Q   And how old does that make you?

9          A   Well, I will be seventy-five next year,

10    January.

11         Q   For how long have you lived in New Jersey?

12         A   All of my life.

13         Q   And did you grow up there in New Jersey?

14         A   I -- we can stand on our front porch and

15    look over there and see the house my wife was born

16    in, four doors down see the house I was born in.

17    So I grew up with the exception of time in World

18    War II when I was in Europe and North and South

19    Carolina.   But for all practical purposes I grew

20    up in West Berlin.

21         Q   Mr. Grimmie, could you please tell the

22    jury the extent of your education?

23         A   I'm a high school drop out.

24         Q   How many years of high school did you

1    have?

2         A   Well in my second year was during the

3    Great Depression, if anyone here remembers that.

4    I had no clothes, no shoes.  My father left my

5    mother with eight children.  So I had to drop out

6    of school.  And I went to work for -- pumping gas

7    for fifty cents from six o'clock in the morning to

8    four o'clock in the afternoon.

9         Q   You mentioned a little bit earlier that

10   you did some things during World War II.  Right?

11        A   Yes.

12        Q   Just focusing on the years between 1940

13   and 1945, can you tell the jury what you were

14   doing?

15        A   I went into the 100th Infantry Division, a

16   company 399th Infantry Regiment.  I went in as a

17   private.  I held every enlisted pay grade but Pfc.

18   I was discharged as first sergeant.

19        Q   For what years were that?

20        A   1943 to 1945.

21        Q   Before 1943 but during the time the war

22   was still on, what were you doing then?

23        A   Oh I was working in a lumber yard and then

24   I went to work at New York Shipbuilding

1    Corporation in Camden, New Jersey.  And in the

2    shipyard we built ships for the Navy from PT boats

3    to a battleship.

4         Q   And what kind of work did you do in the

5    shipyard?

6         A   I worked in the insulation department.

7         Q   Now Mr. Grimmie, are you currently

8    suffering any medical conditions?

9         A   Yes, sir.

10        Q   Is there anything that is currently

11   affecting you?

12        A   Yeah, I just recently took seven pills

13   which is a weekly dose for arthritis.  I have

14   asbestosis.  I have a benign tremor, you'll notice

15   my head will shake.  I can't write anymore because

16   I have lost the use of my left hand and I'm left-

17   handed.

18        Other than seventy-four year aches and pains,

19   I guess that would be it.

20        Q   Are any of these conditions to the extent

21   that you can tell, do they affect your memory or

22   your mental capacities?

23        A   Not that I know of.

24        Q   Mr. Grimmie, have you ever testified in a

1    court like this room before in front of a jury

2    like this one here?

3          A   Yes, sir.

4          Q   How many times have you testified in a

5    courtroom like this before?

6          A   Just one time.

7          Q   And do you remember how long ago that was?

8          A   It was I believe in the 1960s.  No no, in

9    the 1970s.

10         Q   Has Owens-Illinois or any lawyers for

11   Owens-Illinois ever asked you to come and testify

12   at a trial before?

13         A   For Owens-Illinois?  No.

14         Q   Now you've had a couple of depositions.

15   Right?

16         A   Five.

17         Q   And at the depositions, lawyers had a

18   chance to ask you some questions about your prior

19   work experience?

20         A   Yes.

21         Q   Did there come a time Mr. Grimmie that you

22   became an employee of Owens-Illinois?

23         A   I beg your pardon?

24         Q   Did there come a time when you became an

1    employee of Owens-Illinois?

2         A   Yes.

3         Q   Please tell the jurors when that was?

4         A   It was February 14th, 1945 I believe.

5         Q   Are you certain of the year?

6         A   Well my wife is going to kill me because

7    it was just before we were married.

8         Q   Your wife is here with you today?

9         A   Yes.

10        Q   Is it difficult for you to travel without

11   having some help?

12        A   Yes, it is.

13        Q   When you started at Owens-Illinois, did

14   you start out in an hourly capacity or in some

15   other capacity?

16        A   Hourly.

17        Q   That means you actually punched a clock or

18   how did they do it back then?

19        A   You punched the clock and report to the

20   supervisor.

21        Q   And for about how long did you stay at

22   Owens-Illinois as an hourly employee just

23   approximately?

24        A   Well there was a period of time I left the

28

1    Berlin plant to go to Sayreville and then back to

2    Berlin.  I believe I left the Berlin plant on

3    January 2nd, 1947, and I'd have got back 2nd or

4    3rd of August of that year.

5        Q   Did I understand that you started at

6    Berlin and I think -- you started at Berlin, then

7    you spent some time at Sayreville and then you'd

8    gone back to Berlin?

9        A   Yes.

10       Q   And these -- the Berlin plant and the

11   Sayreville plant that you mentioned, were these

12   plants operated or owned by Owens-Illinois?

13       A   Yes.

14       Q   Now when you -- when you joined

15   Owens-Illinois, was it a glass company primarily?

16       A   Well Owens-Illinois was a glass company,

17   but our plant did not make glass.

18       Q   Okay.  And what did you -- what did

19   Owens-Illinois make at the Berlin and Sayreville

20   plant?

21       A   At the Berlin plant was a pilot plant to

22   develop a product.

23       Q   When you say pilot, I don't mean to

24   interrupt you, what do you mean?

1    A   Just that, to develop a product, to -- a

2    calcium silicate high temperature insulation.

3        Q   Did it have a name?

4        A   Yes, Kaylo.   And Sayreville plant was

5    built to produce Kaylo.   When the Sayreville plant

6    got up to production, Berlin was to close.

7        Q   When you first joined Owens-Illinois, did

8    you have any medical examination?

9        A   Yes.   Before I went to work I went into

10   the plant dispensary, I was given a preliminary

11   examination by the plant nurse who was on duty

12   eight hours every day, Monday through Friday.   And

13   the plant physician at eleven thirty to twelve

14   o'clock every day, he finished the examination.

15       Q   Were you actually seen by both of those

16   people?

17       A   Yes.

18       Q   And the doctor that you mentioned, did he

19   actually, you know, put a stethoscope on you and

20   ask you questions and things like that?

21       A   Yes.

22       Q   Did the plant nurse -- was this the

23   first day that you ever arrived at any facility

24   that was owned by Owens-Illinois?

1        A   Yes.

2        Q   Did the plant nurse on the first day say

3   anything to you about any of the dust protection

4   programs in place at Owens-Illinois?

5        A   Yes, sir.

6        Q   Will you please just tell the jury what

7   she told you about that?

8        A   During her portion of the orientation

9   program, she told me that there were certain areas

10  which dust masks or respirators, whichever you

11  want to call them, were required as long as you

12  were working in that area.

13       Q   Did she describe these as something or

14  areas where the employees had a choice about

15  whether to use them?

16       A   No, they were specifically designated

17  respirator areas.

18       Q   And did she say anything to you on that

19  first day about why there were those kinds of

20  areas in the plant?

21       A   Yes.   She mentioned to me the fact that we

22  used silica in our product and asbestos.

23       Q   Is it fair to say that as of the first day

24  or the first hours that you came to work at

1   Owens-Illinois, you understood that asbestos was
2   part of the ingredients of the product that was
3   being made?
4        A   Yes.
5        Q   As an hourly employee at Owens-Illinois,
6   were you made aware of any of the health effects
7   of asbestos, Mr. Grimmie?
8        A   Yes.   I understood that if asbestos,
9   inhaled, it's a very tiny fiber and if you look at
10  it under a microscope it has a little barb on it,
11  that will impale itself in your lung and cause
12  what they call pleural thickening.   This reduces
13  breathing capacity.
14       Q   When you're an hourly employee, were you
15  ever specifically advised about the possibility of
16  asbestosis or the disease asbestosis?
17       A   Yes.
18       Q   Which people at Owens-Illinois actually
19  talked to you about asbestosis?
20       A   Well the plant nurse and my supervisor.
21       Q   What about the plant doctor?
22       A   I don't remember the plant physician.   He
23  was there for a half hour each day to take care of
24  bumps and bruises.

32

1    Q   I would like to just ask you a couple of

2    questions about the jobs that you did when you

3    were an hourly employee at Owens-Illinois.   Could

4    you please describe for the jurors, you know, what

5    kind of jobs that you had during that time?

6    A   Yes.   I started as a production handyman,

7    and I think that means just what it says, wherever

8    I was needed to assist the mechanic, that is where

9    I would be sent.   I went from that to batch mixing

10   and from batch mixing to pouring, and from pouring

11   I went into the personnel department.

12   Q   It might be helpful Mr. Grimmie if you

13   could explain to the jury just the general way,

14   the general processes that were involved in making

15   Kaylo so that they have some context within which

16   to understand the jobs that you do?

17   A   Okay.   Now this is during the time period

18   that we are talking about.

19   Q   Right.

20   A   Kaylo was mixed in a ribbon mixer.

21   Q   Did you say ribbon?

22   A   Yes, it's a curly-Q thing and it just

23   keeps going, a cement mixer.   And the ingredients

24   were silica, lime, diatomaceous earth, clay,

33

1   asbestos and for general Kaylo that was it.   They
2   were introduced into the mixer, mixed and pumped
3   down to a pouring line.
4        Q   When you say pumped, in what form was the
5   substance?   Was it solid or liquid?
6        A   It was a slurry, slurry type of -- very --
7   you couldn't carry it in your hand, but in a
8   fourteen quart bucket you could ladle it into a
9   mold.
10       Q   And what happened to the slurry material?
11  Where did it go and what happened to it?
12       A   Well, at Berlin at the time, we were
13  making flatware and it would be powered into a
14  mold.   It would be poured into a mold, the excess
15  would be secreted off and the car built up and
16  then the car, when there was enough cars which
17  would be fourteen, we would go into an autoclave.
18       Q   What is an autoclave?
19       A   An autoclave is a pressure vessel and
20  incidentally, that is the reason Owens-Illinois
21  located the pilot plant in Berlin, because there
22  was two autoclaves there.   It was formerly a sand
23  lime brick manufacturing facility.   After the
24  material was autoclaved at a hundred twenty-five

1    pounds per square inch steam pressure, it set it

2    up in what would be considered a solid form.   It

3    was taken out of the autoclave, stripped out of

4    the mold, put into a drying -- put into a drying

5    car and put into a drier to bring it down to the

6    necessary moisture content.

7         Q   And then what happened to the material

8    after it came out of the autoclave and dried?

9         A   Then it went to the finishing department

10   and at the time the flatware, the top surface

11   which was rather rough would -- was sanded off by

12   a huge sander and the sides were beveled slightly.

13   They were trimmed square and we wound up with an

14   eighteen by thirty-six inch piece of ware.

15        Q   And did you have a variety of jobs that

16   were involved in making this flatware?   I think

17   you described pourer and --

18        A   Yeah, I was a pourer and I worked at

19   loading autoclaves, at stripping the molds.

20        Q   Mr. Grimmie, when you were an hourly

21   employee at Owens-Illinois, did you have -- were

22   you a member of a union?

23        A   Yes, sir.

24        Q   What union was it?

35

1          A   Glass Bottle Blowers' Association of the

2      United States and Canada.

3          Q   And did you have any position with the

4      union?

5          A   I was the secretary of the --

6          Q   What did that mean at the Berlin plant?

7          A   Well, that meant at union meetings I took

8      minutes of the meetings and if there was an

9      executive meeting, I would sit in on it with the

10     president, vice president.

11         Q   As secretary of the union, did you have

12     any interaction with the -- the management people

13     at Owens-Illinois about what was going on in the

14     plant?

15         A   Yes, sir.

16         Q   And how frequent were those contacts?

17         A   Well I would have to say that not too

18     frequent, but the frequency -- the biggest reason

19     I would have to contact management would be when a

20     supervisor threatened to fire an employee for not

21     wearing his respirator.  And this was rather

22     frequently.  And this was a constant struggle to

23     get people to wear the respirators.

24         Q   Can I -- at the Berlin plant, where you

1   started at the Berlin plant when you returned, did

2   they have any dust control systems?

3        A   Yes, sir.

4        Q   Could you please describe for the jurors

5   what was -- what kind of equipment was involved

6   and what it did?

7        A   We had in place a Sly dust collector,

8   S-l-y is a manufacturer's name.  And the dust

9   collector was rather huge.  It works the same way

10  -- the same principle as our vacuum cleaner at

11  home.  But this may have been fourteen feet wide

12  and thirty feet long.  And there was a series of

13  -- series meaning hundreds, of filter bags hanging

14  on a rack inside of the dust collector.  And what

15  this rack was for was to shake the bags to shake

16  whatever dust may have accumulated on them.  Um --

17       Q   How did -- how -- how many of these

18  machines were there?

19       A   Well at the time, at the time of the pilot

20  plant operation there was one.

21       Q   And how is it that the Sly dust collector

22  does, since it's located in one spot, how does it

23  do its job at other locations in the plant?

24       A   There was very large ducts going to each

1   operation and off of the large ducts were smaller

2   flexible hoses going to, if I may use a trim saw

3   as an example, a trim saw had a twelve inch

4   sawblade and this mechanism was built to straddle

5   that sawblade and leave four and a half inches of

6   it exposed.  Because the largest material, the

7   thickest material we made was four inches so that

8   would bring this in.  And then the duct work would

9   pull the dust from the sawblade up into the

10  collector.

11       Q   How powerful was this system?

12       A   How powerful was it?  I -- it was -- I

13  think I mentioned twenty thousand cubic feet a

14  minute.  I don't mean to be joking, but sometimes

15  an unsuspecting maintenance man would be working

16  on the saw and he would get too close and it would

17  pull the hat right off of his head.  So it was I

18  would say a very powerful system and it was well

19  maintained.

20       Q   Speaking of the maintenance, what was --

21  what was the maintenance schedule for this

22  machinery?

23       A   Okay.  We were scheduled to shut down

24  every two hours.

1    Q   Shut down what?

2    A   The operation.   The dust collector would

3    be shut down and when it was turned off, it would

4    automatically shake the bags.   Now this was also a

5    ten minute break for the people.

6    Q   Like you, when you were an hourly

7    employee?

8    A   Yes.   And I appreciated it.   And at noon,

9    at lunch time, the dust collector was shut off and

10   the maintenance man, the truck driver, would go up

11   inside of the baghouse to make sure all of the

12   dust had gone down through the chutes into the

13   hoppers underneath so that it wasn't clogging up.

14   Q   Who controlled at Owens-Illinois when this

15   system was operating?

16   A   Well it would be turned on at the

17   beginning of the shift.   Now we had a policy in

18   place that is almost unheard of, but we had --

19   hourly people had authority to shut down the

20   operation if they could see dust coming out of one

21   of these pick up hoods.

22   Q   So you, when you were an hourly employee,

23   did you have that authority?

24   A   Yes.

1    Q   In your experience when you were an hourly

2    employee, did it ever happen that one of your own

3    colleagues declared I see dust?

4    A   Yes.

5    Q   And the production in this operation will

6    stop?

7    A   Yes.

8    Q   And then what happened?

9    A   Well, the maintenance people would go up

10   into the collector to check the bags and then

11   check to see if it was clogged up anyplace or if

12   the duct work was clogged.

13   Q   You mentioned I think earlier some trim

14   saws.  Correct?

15   A   Yes.

16   Q   Now how many trim saws were there?

17   A   Well in the beginning, we had what we

18   called the flatware finishing line.  The product

19   that we developed was roof tile, it was a roof

20   deck that was made eighteen by thirty-six inches,

21   two and a half inches thick.  It was a fire proof

22   material and that is what Kaylo was to be.  But we

23   had a somewhat of a genius at Berlin and he

24   developed a low density product that could be made

1    into pipe covering.   And when we made molds and

2    started pouring pipe covering, then additional

3    dust collecting capacity was added.

4         Q   In the Sly dust collection system, was

5    there a way to manage whether the dust collection

6    was going on in one operation as opposed to

7    another?

8         A   Yes, absolutely.   There was gate valves in

9    the duct work and if one saw was being operated,

10   the gates on all of the other pick up lines could

11   be closed so that all of the effort of the

12   collector was concentrated on the air that was

13   being worked.

14        Q   Mr. Grimmie, when you were an hourly

15   employee, did you know whether Owens-Illinois had

16   an industrial hygienist?

17        A   Yes.

18        Q   Could you please tell the ladies and

19   gentlemen whom you remember to be the industrial

20   hygienist at Owens-Illinois?

21        A   Bill Hazard.

22        Q   When you were at Berlin and then at

23   Sayreville and then back at Berlin as an hourly

24   employee, did you ever see Bill Hazard at the

41

1    plants?

2         A   Yes.

3         Q   When you saw Bill Hazard at the Berlin

4    plant and at the Sayreville plant, could you just

5    describe for the ladies and gentlemen of the jury

6    what you saw him doing?

7         A   Well Bill would come in with a team of his

8    people, and that is if we may take a trim saw,

9    they would strap around the trim saw feeder's neck

10   a pipe that would -- a flexible rubber that would

11   come up right to his breathing zone and then it

12   would go down to his belt line where there was a

13   little mechanism that created a vacuum.  And this

14   was to create the same conditions that this

15   operator was working in, his breathing zone.  Then

16   this material went into some solution and then it

17   was analyzed.

18        Q   You had an understanding at this time that

19   this was a dust counting procedure?

20        A   Absolutely.

21        Q   And you actually saw him putting these --

22   with the equipment, putting the tubes on the

23   workers at a place where they would be breathing.

24   Is that what you saw?

1        A   Well, yes.   And I actually had it put on

2   me.

3        Q   By Bill Hazard or some of his team?

4        A   No, one of his team.

5        Q   Mr. Grimmie, I would like to show you a

6   picture if I could, it has been marked as

7   Owens-Illinois exhibit 530.   Mr. Grimmie, do you

8   recognize that picture?

9        A   Yes, I recognize it.

10       Q   Are you --

11       A   I'm in it.

12       Q   You're in it.   And you recognize yourself?

13       A   Yes.

14       Q   And you recognize the other people that

15   that are in that picture?

16       A   Preston Gillis.   Paul Shoe from Aetna who

17   was our insurer.   Bill Hazard.

18       Q   Is this a picture that was taken at the

19   Owens-Illinois plants?

20       A   Yes.   This incidentally, this piece of

21   equipment --

22       Q   Well before you testify any more, is this

23   a fair and accurate picture of yourself and these

24   other Owens-Illinois employees at the time that

1       you were working there?

2           A   Yes, absolutely.

3           MR. O'HARA:   Your Honor I would move --

4           A   But I was salary at the time.

5           MR. O'HARA:   Okay, I move for its admission

6       Your Honor.

7           THE COURT:   Any objection?

8           MR. WALKER:   Could I ask a couple questions

9       about it?

10          THE COURT:   Sure.

11          BY MR. WALKER:

12          Q   About when was this taken, Mr. Grimmie?

13          A   Um, probably after 1958.  I don't know

14      exactly.

15          Q   And at which plant was it taken?

16          A   At Berlin plant.

17          Q   And when you say prior to '58, what would

18      make that a cut off time that it couldn't have

19      been later than '58?

20          A   Well the fact that Pres Gillis was there

21      and after 1958 he --

22          MR. WALKER:   No objection.

23          THE COURT:   Any other objection?   No?   It

24      will be admitted.

1           MR. O'HARA:  Your Honor, with your permission

2     then, may I use the enlargement that we brought?

3           THE COURT:  You may.  What is that marked?

4           MR. FISCHER:  Your Honor this is marked

5     530-A.

6           Q  Mr. Grimmie, I'm going to show you an

7     enlargement of the picture that I have just showed

8     you.  If you could, could you tell, I don't mean

9     to cut off the reporter here, but could you tell

10    the jurors who these people are and -- well why

11    don't we start with yourself?

12          A  This is me.

13          Q  In the work shirt?

14          A  Yes.

15          Q  This is Preston Gillis.

16          Q  Who was he?

17          A  He was in the personnel department.  Paul

18    Shoe was Aetna, our insurer's inspector.  He would

19    also do the same work that Bill Hazard was doing.

20          Q  You mean the dust counting?

21          A  Yes, dust sampling.

22          Q  Could you point out Bill Hazard please?

23          A  I think this is Bill Hazard.  But I don't

24    recognize this other gentleman.

1        Q   Why don't you see if -- if the caption

2    there helps you?

3        A   Okay.   Bernie Haven was Aetna.

4        Q   In this caption here, it says that all of

5    you are looking over a trim saw installation at

6    Berlin?

7        A   Yes.

8        Q   And when you say -- when it says trim saw

9    installation, what does that mean?

10       A   Well what this piece here --

11       Q   In the lower left?

12       A   Is what we called a mandrel.   And that is

13   where the piece of pipe covering would go on.   The

14   inside diameter of the pipe covering would fit

15   right on there.   The leg would come down.   That

16   would go through.   There was a sawblade on each

17   side, it would cut the leg off and cut it to size.

18   What we were doing there is looking at duct work.

19       Q   Why would Bill Hazard show up at a trim

20   saw installation?

21       A   Well I don't know if that is the reason he

22   was there specifically.   But if it was a new

23   installation, then he probably wanted to see it.

24       Q   This -- the testing that you saw Bill

1    Hazard do, is this the kind of testing that would

2    be done in just one area or in --

3         A   No, every area where dust would be

4    generated.

5         Q   You mentioned that there were some Aetna

6    people who did counting similar to Mr. Hazard?

7         A   Yes.

8         Q   Did you actually see the Aetna people in

9    the Owens-Illinois plants doing this kind of

10   testing?

11        A   Yes, sir.

12        Q   And was Mr. Hazard with them on occasion?

13        A   I have no recollection of him being with

14   them.

15        Q   Were there any housekeeping procedures in

16   place at the Owens-Illinois plants?

17        A   Yes, sir.

18        Q   Why don't you just tell the jury what

19   efforts were made at the Owens-Illinois plants to

20   keep work areas clean?

21        A   Each shift by union contract got off five

22   minutes before the end of their shift.  We worked

23   three shifts and then we got up to three shifts

24   seven days a week.  Each shift was allowed five

1      minutes personal time by union contract; so at

2      quarter to the hour, the operation would shut down

3      and the people working would clean up their work

4      area.

5           We had a mechanical sweeper on each shift,

6      guy would sit on it and drive around and sweep the

7      floor.  It was a vacuum type thing.  And out back,

8      we had a bin for him to empty his -- the container

9      in the sweeper that was as air proof as we could

10     get it.  If there happened to be any batch spills

11     or any mishaps, they were immediately taken care

12     of.

13          I think the floor sweeper was one of the

14     greatest things we ever spent money on because we

15     had quite a few lift trucks operating in the

16     plant, and if you allowed any dirt at all to

17     accumulate on the floor, it generated dust.  But

18     with the floor sweeper operating we kept that down

19     to acceptable levels or below.

20          Q   The jury in this trial has heard some

21     evidence about I think what was characterized as

22     unbelievably bad dust conditions in a non-

23     Owens-Illinois plant.  Given what you saw of the

24     house keeping practices at Owens-Illinois, do you

48

1   have any reason to believe that things were ever

2   unbelievably bad at the Owens-Illinois plants?

3            MR. WALKER:   I don't object to Mr. Grimmie

4   telling us what he saw, but this is leading.

5            THE COURT:   Sustained.   You can rephrase.

6        Q   Mr. Grimmie, why don't you characterize

7   using your own words the quality of the

8   housekeeping efforts that you observed when you

9   were an Owens-Illinois hourly employee?

10       A   Will I think I mentioned I worked in a

11  lumber yard before I went to Owens-Illinois and I

12  was somewhat amazed at the effort that management

13  put into housekeeping.   They had housekeeping

14  contests where crews would be judged on the way

15  they left the operation at the end of their shift.

16           We had housekeeping slogans that the

17  personnel guy would call the home of one of the

18  employees picked at random and ask if that person

19  knew what the housekeeping slogan was for that

20  week and if that person happened to no know, we

21  were affiliated with Libby Glass at the time and

22  usually the award was a beautiful set of Libby

23  glassware.

24           But it appeared to me that management was

1    trying to take housekeeping with the person, with

2    the employee and take it home so that the wife

3    could beat on him there.

4        Q   Let me switch subjects just for a second

5    and I think earlier in one of your answers you

6    mentioned respirators.  Did Owens-Illinois at its

7    plant, did they have a respirator program?

8        A   Yes, sir.

9        Q   Why don't you just tell the jury what the

10   program involved, who managed it, where it

11   applied?

12       A   There were certain areas that -- where the

13   dust level could not be controlled that were

14   designated respirator areas.  People working there

15   were required to wear a respirator, and I won't

16   hesitate to tell you it was a tough proposition to

17   get a person to wear a respirator.  They -- the

18   respirator program was primarily administered by

19   the plant nurse.  And she had boxes of

20   respirators.  When a shift -- before a shift

21   started, the supervisor would go into the

22   dispensary and get his respirators.  They had been

23   cleaned with alcohol and a new filter put in.  He

24   would take them to his -- he had a field desk and

1    deal them out to the people in his crew that were

2    required to wear them.  At the end of the shift,

3    the people would put the respirators in a box and

4    he would return that to the dispensary and the

5    nurse once again would clean them with alcohol and

6    change the filters.  Eventually we got a

7    dishwasher.

8         Q  A what?

9         A  A dishwasher and cleaned the respirators

10   with a dishwasher.

11        Q  Mr. Grimmie, at the Owens-Illinois plants,

12   did everybody have his or her own personal

13   respirator that they took care of?

14        A  No.

15        Q  Why?

16        A  Well we wanted to be sure that they were

17   properly maintained and the only way -- and this

18   just started before I was in personnel, but it was

19   later described to me the only way the personnel

20   director who was also the safety director could

21   feel confident that they were properly maintained,

22   that they were turned in and the nurse cleaned

23   them and changed the filter.

24        Q  You've talked about some of the

1   difficulties in enforcing the respirator program.

2   Did -- what steps did you observe while you were

3   an hourly employee at Owens-Illinois about the way

4   in which Owens-Illinois tried to enforce the

5   respirator program?

6       A   Well, it was usually through a threat and

7   there was a procedure, a contractual procedure.

8   Verbal warning, written warning, time off,

9   termination.

10      Q   By time off you mean suspension?

11      A   Yes, three days time off.   And the

12  supervisor would talk to the person and try to

13  convince him to wear his respirator.   It was not

14  uncommon to walk around the plant and see certain

15  people that just seemed as if they didn't care, to

16  be protecting their Adams apple instead of being

17  up there.   A respirator is very uncomfortable to

18  wear and that is why we put all the money and

19  effort into collecting dust so that the hazard

20  didn't exist.

21      Q   When you were an hourly employee, did you

22  personally know of instances where people were

23  either given an oral warning or a written warning

24  or suspended or terminated because they failed to

1    comply with respirator requirements?

2        A   I don't recall any termination.   But being

3    a union officer, I had to sit in on the grievance

4    procedure and yes, I remember warnings being

5    given, union officers would talk to the people,

6    tell them look, you're at the point we can't

7    protect you anymore.

8        Q   And when you were involved as the union

9    secretary and the union representative during this

10   period, did you have communications with people

11   about these issues?

12       A   With people?

13       Q   Or with -- did you have interaction at all

14   with Owens-Illinois management personnel about the

15   enforcement of the respirator program?

16       A   Yes.   In meetings that -- we had a monthly

17   meeting with management and it is fair to say that

18   not a month went by that it wasn't on the agenda.

19       Q   When you were the union representative,

20   were you urging the enforcement of the program or

21   urging the abandonment of the program?

22       A   No, I urged the enforcement of the

23   program.

24       Q   As the union representative?

1    A  Yes.   When I was a batch mixer I was
2  required to wear a respirator and I did and it is
3  very uncomfortable, it's unnatural.   But you can
4  become accustomed to it if you stay with it.   If
5  you hang by your neck long enough and don't die,
6  you can become accustomed to that.   So just stick
7  with it and it would work.
8    Q  Let me move to a different area --
9    THE COURT:  Can we take a break now?
10    MR. O'HARA:  Your Honor, can I just do this
11  one point and then we can break?
12    THE COURT:  Sure.
13    Q  Mr. Grimmie, while you were at
14  Owens-Illinois, I think I forgot to ask you a
15  question earlier.   When you had your first
16  physical, I think you described that for the jury,
17  did you actually -- did you have any x-ray taken
18  at that time?
19    A  Yes.
20    Q  Where did you have to go for that?
21    A  At the time they had an x-ray lab in
22  Glassboro.   They had a contract with a doctor
23  there.   And I had to go to Glassboro which means
24  nothing here, but it's about fourteen miles from

1    Berlin.   And every employee had a pre-employment

2    x-ray.

3         Q   Now after the x-ray and the physical that

4    you had when you first came to work at

5    Owens-Illinois, did you ever have any x-rays after

6    that?

7         A   Every year.

8         Q   Did you have to go to the same place?

9         A   No, no, it was changed.

10        Q   You got to go to a closer place?

11        A   Um, yes, it did get closer.   But it didn't

12   matter because we were paid to travel.

13        Q   It wasn't taken out of your time?   You

14   mean you weren't docked part of your salary?

15        A   No no, we either went on company time or

16   the company paid the employees to go.

17        Q   Were you the only one who had x-rays

18   annually?

19        A   Oh no.   Every factory worker had an annual

20   x-ray.   Office workers were every two years.   I

21   still have -- I don't have in my possession but,

22   if I may, Monday I go for an x-ray and all of my

23   x-rays are still in a packet about that thick.

24        Q   With your personal physician?

1      A   No, with the plant nurse whom

2   Owens-Corning retained to maintain the -- those

3   x-rays.

4      Q   During the entire time that you were at

5   Owens-Illinois, did you have an x-ray every year?

6      A   Yes, sir.

7      Q   Was that something that you had a choice

8   about?  I mean could you choose not to go?

9      A   No, you go or else.

10      MR. O'HARA:  Your Honor I think this would be

11   a good time for a break.

12      THE COURT:  All right, go ahead and put your

13   note pads upside down, go ahead and step back to

14   the jury deliberation room and relax for a few

15   minutes.

16      (THE FOLLOWING PROCEEDINGS WERE HAD OUT OF

17   THE PRESENCE OF THE JURY.)

18      THE COURT:  Record reflect the jurors have

19   left the courtroom, go ahead and take a break for

20   a minute Mr. Grimmie.  Take a fifteen minute

21   recess.

22      (A RECESS WAS TAKEN.)

23      THE COURT:  Record reflect all parties have

24   returned to the courtroom.  Ready for the jurors?

56

1          Have you concluded your questioning yet Mr.

2   O'Hara?

3          MR. O'HARA:  No I haven't.

4          (THE FOLLOWING PROCEEDINGS WERE HAD IN THE

5   PRESENCE OF THE JURY.)

6          THE COURT:  You may be seated.  Record

7   reflect the ladies and gentlemen have returned to

8   the courtroom.

9          Mr. O'Hara, you may continue.

10          BY MR. O'HARA:

11          Q  Mr. Grimmie, let me switch gears a little

12   bit.  I think earlier today you mentioned the fact

13   that you became a member of the I think personnel

14   and production parts of Owens -- the

15   Owens-Illinois Kaylo division at some point.  Is

16   that right?

17          A  Personnel production?

18          Q  Personnel and production?  Did you have --

19          A  Yes, at one time I was personnel manager

20   and production manager.  But that was not for

21   Owens-Illinois.  I was personnel manager with

22   Owens-Illinois.

23          Q  Will you just describe for the jurors what

24   you did as personnel manager at Owens-Illinois?

57

1          A   Um, we -- I always enjoyed -- we had

2     people programs and if I may, in South Jersey

3     there was four Owens-Illinois plants.  One at

4     Glassboro, Bridgeton, Vineland, Berlin.  And on

5     the map, they're sort of a diamond.  So we formed

6     what we called the Diamond Derby, and each summer

7     all four plants would get together and we would

8     compete in volleyball, archery, all sorts of

9     things.

10         Within the plant I established safety

11    programs to purchase posters, to hang around the

12    plant.  I supervised the plant nurse and the plant

13    physician and made sure that everything out in the

14    plant was going as it should.  And we were on

15    three shift operation and I made it a practice to

16    go in or work -- our workday started at eight

17    o'clock.  I made it a practice to go in at maybe

18    quarter to seven and just walk around the plant to

19    see -- let people see me and if they had anything

20    to talk about, we could talk.  I also monitored

21    the safety boards or bulletin boards for graffiti.

22    During the day I would walk around the plant so

23    people could see me.

24         Q   Did you have short days during that period

1    or was it straight nine to five?

2         A   No, sir.   As I mentioned before, I'm a

3    high school drop out and I worked twelve, fourteen

4    hours a day to make up for what I didn't have up

5    here.   I stayed there and learned and I learned

6    from people I worked with.   And as an aside if I

7    may, our first child one time asked her mother

8    when her father was going to come visit her,

9    because she would be in bed when I got home and

10   she would be in bed when I left for work.   But it

11   was really my enjoyment, and you have to

12   understand that it was sort of my hometown and I

13   knew most of the people and we were, we were

14   family, really.

15        Q   Did you have any responsibilities with

16   respect to the new people that Owens-Illinois

17   hired to work at that plant?

18        A   Yes, yes.   I interviewed and if a person

19   was to be hired, I conducted a pre-employment

20   interview and I would go over what was expected of

21   this person and our safety procedures.

22        Q   Did you give any of these people that you

23   talked to before they actually began work at

24   Owens-Illinois, did you give them any information

1  about dust hazards at the Owens-Illinois plants?

2      A  Yes, sir, I did.

3      Q  Please tell the jury what you told people

4  before they started work at Owens-Illinois about

5  that.

6      MR. WALKER:  Object unless we have -- excuse

7  me Mr. Grimmie, object unless we have the time

8  Judge.

9      THE COURT:  Sustained.

10     Q  In what what position were you at

11 Owens-Illinois when you were having these

12 discussions with people before they started work

13 at Owens-Illinois?  What was your job then?

14     A  Personnel manager.

15     Q  And do you remember approximately in what

16 years you had personnel responsibilities at the

17 Berlin plant?  Was it after you were an hourly

18 employee?

19     A  Oh yes.

20     Q  Okay.  And it's before 1958?

21     A  Yes.

22     Q  Can you remember, can you remember

23 specifically what different personnel jobs that

24 you had during that period?

1    A   I was a personnel assistant and then

2    personnel manager.   Well excuse me, I went from

3    personnel assistant to production supervisor which

4    was in charge of the production department and

5    then back into personnel as personnel director.

6        Q   And was it both in your assistant

7    personnel capacity as well as your personnel

8    director capacity that you had these conversations

9    with people before they started work at

10   Owens-Illinois?

11       A   Yes, sir.

12       Q   And what did you tell these people about

13   dust hazards at the Owens-Illinois plants?

14       A   I told them that we had regulations, we

15   had designated respirator areas.   I told them that

16   we used silica which is a source of silicosis and

17   I told them that we used asbestos which is a

18   source of asbestosis.   If you are assigned to a

19   respirator area, for your own protection, you must

20   wear the respirator.

21       Q   Is there anybody that you spoke to before

22   they started work at Owens-Illinois that you

23   talked to in your personnel capacity that you

24   didn't say or that you didn't tell this

1    information to?

2         A   Oh I have no recollection of that.   I had

3    a sheet of paper and I checked off the items as I

4    went down and --

5         Q   And were these health hazards --

6         A   Yes.

7         Q   -- part of the check list?

8         A   Part of the orientation program.

9         Q   When you were in the personnel area or in

10   the production area, did you have any continuing

11   responsibilities regarding enforcement of the

12   respirator program?

13        A   Yes sir.

14        Q   Will you please tell the jurors when you

15   were in these areas at Owens-Illinois what you

16   did?

17        A   Well, generally I would take up the

18   problem with the shift supervisor.   He was the guy

19   on the front line and he was the guy responsible

20   for enforcing the program.   And more times than

21   not, if he couldn't enforce the program, there

22   would be a grievance.   He would take disciplinary

23   action and there would be a grievance, and the

24   union committee would bring the grievance to me,

1    and I generally was not too sympathetic to it.  So

2    then they would take it to the plant manager.

3         Q  When you say you weren't very sympathetic

4    to it, will you please describe for the jurors the

5    positions that you took when you were in the

6    personnel department or in the production

7    departments regarding the enforcement of the

8    respirator program?

9         A  Yes.  What the grievance -- generally what

10   the grievance asked for was if it happened to be a

11   written warning or a suspension, they would want

12   me to call this off, don't let this happen to this

13   man.  And if I knew that this particular person

14   was a habitual offender, I would do everything I

15   could to talk reason.  And then the grievance

16   would go to the plant manager and it would be his

17   decision whether to call off the disciplinary

18   action or not.

19        Q  Are the positions you took on the

20   respirator program when you were in personnel or

21   production, were they different than the positions

22   you had taken when you were a union

23   representative, when you were an hourly employee?

24        A  Yes.

1          Q   In terms of the enforcement of the

2     respirator program?

3          A   Yeah, I would be arguing for the guy -- I

4     would take them in the corner and threaten to

5     knock a couple teeth out if he didn't do what he

6     was supposed to do.   But as a union representative

7     I couldn't tell him I'm going to recommend that

8     you get three days off.

9          Q   Did you have any interaction with the

10    plant nurse in connection with the respirator

11    program?

12         A   Yes.

13         Q   Could you please tell the jurors about

14    that?

15         A   Um, I would occasionally talk to her how

16    it was going, were the supervisors doing their

17    part, were they picking up their respirators, were

18    they returning them.   In her medical literature

19    that she got, did she feel there was a better type

20    of respirator we could be using.   Just general

21    type of things that -- to be sure that she was

22    doing her job.

23         Q   Mr. Grimmie, I think you mentioned earlier

24    that all of the Owens-Illinois employees were

1      required to have annual chest x-rays.   Correct?

2      Except for the -- except for the office employees?

3          A   That is right.

4          Q   Is that right?

5          A   All of the production people, people

6      working in the factory were required to have

7      annual x-rays.   Office employees were once every

8      two years.

9          Q   During the entire time you were at

10     Owens-Illinois, did it ever come to your attention

11     that any of the x-rays that were taken of the

12     Owens-Illinois employees showed evidence of

13     asbestos-related disease?

14         A   Not that I recall.   I thought we were

15     doing a terrific job.

16         Q   During the entire time you were at

17     Owens-Illinois, did it ever come to your attention

18     that anybody -- any of the employees at the

19     Owens-Illinois plants were making or had made a

20     workers' compensation claim for asbestos-related

21     disease?

22         A   During the time I was with Owens --

23         Q   During the time you were with

24     Owens-Illinois, right through April of 1958?

1    A   I have no recollection of that.

2    Q   Mr. Grimmie, when you were working at

3  Owens-Illinois, was the operation of the Kaylo

4  division financially successful?

5    A   No, sir.

6    Q   Um, when you first started there, was it

7  financially successful?

8    A   No, sir.

9    Q   Did -- at any time when you were there,

10  did it ever become financially successful?

11    A   I think towards the end we got things

12  rolling pretty good with expansion, but with pipe

13  insulation, not with flatware.   We made material,

14  I think I mentioned roof deck and pipe insulation.

15  And after we converted the plant for pipe

16  insulation and we started to roll and production

17  couldn't keep up to sales, so we went on three

18  shifts a day five days a week and we still

19  couldn't keep up, so we went three shifts a day

20  seven days a week.   And -- but I think the

21  philosophy -- see Owens-Corning was a national

22  distributor for Kaylo for many years.

23    Q   As of 1953, correct?

24    A   That when it was?   Well, thank you.

1    Q   Do you have a recollection?

2    A   I -- and what Kaylo was, being a high

3    temperature insulation and this was after the war,

4    there was many oil refineries, atomic power

5    generating stations, fossil fuel generating

6    stations being built and they all required high

7    temperature insulation.   So the feeling was if we

8    were to provide the high temperature insulation to

9    the Owens-Corning sales force, then they would

10   have a better opportunity to sell the entire job.

11   Q   Do you know after 1953 whether

12   Owens-Illinois kept its own sales force after 1953

13   when Owens-Corning took over the distribution?

14   A   I -- I don't remember.   I don't want to

15   guess.   I don't remember any of them coming in the

16   plant any more.   There was contact with some very

17   nice folks.

18   Q   There has been some testimony in this case

19   about a Unarco plant in Bloomington where we are.

20   To the best of your knowledge, Mr. Grimmie, during

21   the time you were at Owens-Illinois, were there

22   any communications between Owens-Illinois and

23   people at the Unarco plant about how the Unarco

24   people should run their plant?

1      A   Well I don't want to hurt feelings, but I

2   never heard of Unarco until probably two weeks

3   ago.

4      Q   So you don't know the company Unarco?

5      A   No, sir.

6      Q   And you certainly didn't have any

7   communications with Unarco?

8      A   No, sir.

9      Q   Did Owens-Illinois at the Kaylo plant, did

10  they make any textile products?

11     A   Textile?

12     Q   Right, like blankets or rope?

13     A   No, sir.

14     Q   Was there any name for the Owens-Illinois

15  products other than just Kaylo?

16     A   No, sir, not out of the Berlin plant.

17     Q   You talked a little bit earlier today

18  about the fact that people from Aetna whom I think

19  you identified in this photograph actually came in

20  and did dust counting at Owens-Illinois?

21     A   Yes.

22     Q   Were you ever or did you ever have the

23  training to either conduct those kinds of tests

24  yourself or interpret those kinds of tests?

1          A   No, sir.

2          Q   Who at Owens-Illinois had that expertise,

3     at least to the best that you know?

4          A   People in Toledo.

5          Q   Did that include Bill Hazard?

6          A   There may have been someone in our

7     laboratory in Berlin, but we didn't do it.   It was

8     Toledo.

9          Q   At some of your other depositions, have

10    lawyers shown you some of the dust counting test

11    results?   Do you remember that?

12         A   Well I don't.   I have been deposed five

13    times and it --

14         Q   If you were shown those kinds of test

15    results, would you be in a position today to

16    analyze or interpret those kinds of results?

17         A   No, sir, I don't think so.

18         Q   I think you told the jury a little bit

19    earlier today that you were diagnosed with

20    asbestosis?

21         A   That is correct.

22         Q   And please tell the jury when that

23    diagnosis occurred?

24         A   I believe it was 1968.

69

1      Q   Has that disease which you have been

2   diagnosed with, does that currently cause you any

3   breathing problems?

4      A   No, sir.

5      Q   Has that disease which was diagnosed many

6   years ago, has that disease been stable or has it

7   progressed?

8      A   It has been stable.   I'm diagnosed at ten

9   percent disability.   What this means is that I

10  have lost ten percent of my breathing capacity.

11  If I may, as soon as I found out I stopped smoking

12  which is in my opinion a must.   But --

13     Q   Has your asbestosis, as far as you can

14  tell, has that been any limitation on your normal

15  activities?

16     A   No.   Nothing that I can't attribute to

17  being seventy-four years old and a hundred pounds

18  overweight.   I have been able to do things.   I

19  have had a boat out in the ocean, the Atlantic

20  ocean that is.   And camping, hiking, things like

21  that.   Usually I meet them on the way back, but

22  the weight situation, I gained fifty pounds when I

23  stopped smoking if you please.

24     Q   When you testified a little bit earlier

today that you worked in the shipyards during
World War II?

          A   Yes, sir.

          Q   The -- and I think you described your work
as insulation work, is that right?

          A   That is right, fifty-eight (phonetic)
department.

          Q   Now was there any kind of pipe covering
products that were used during that period?

          A   Yes, sir.

          Q   And did you actually apply some of that
pipe covering yourself?

          A   Yes.

          Q   In the course of a day, when you were
doing -- well was that the only kind of product
that you worked with when you were an insulator in
the shipyards in World War II?

          A   No.   I worked with asbestos.

          Q   Can you describe for the jury what kind of
a product that that was?

          A   During the war when we were building
ships, we were building anywhere from PT boats to
a battle kit if you please.   And when a pipe was a
straight line which covered and then it would run

1    off at a ninety degree angle, we would take raw

2    asbestos, put it in a bucket, make a slurry, muck,

3    and mold it around that joint.  And following up

4    the insulator after it dried would be a guy who

5    would sew a canvas covering on it so it wouldn't

6    deteriorate.  But what situation we had there was

7    an open bag of asbestos and grabbing it in the

8    hands and dump it in a bucket.  And the government

9    never provided any protection nor did the

10   shipyards.

11        Q   You mean respirators?

12        A   That is right.

13        Q   Or dust collection equipment?

14        A   Nothing.

15        Q   You mentioned canvas.  Did Kaylo come with

16   a canvas covering?

17        A   Yes.  After the material was trimmed to

18   size, it would go through a tunnel and glue would

19   be sprayed on it and it would go to a wrapper

20   packer and there is two sections and the wrapper

21   packer would take one section, lay it on a piece

22   of canvas, take the other section, lay it on top

23   and then roll it and then put it in the carton.

24        Q   Will you tell the ladies and gentlemen of

1    the jury what was the purpose for putting the

2    canvas covering on the top of Kaylo?

3        A   Well when the job was -- the application,

4    all the applicator had to do was open that hinge,

5    put the piece of pipe covering, the section and

6    reglue that hinge and it was a finished job.

7        Q   At the Kaylo plant, approximately how many

8    pieces of Kaylo were produced on every shift?

9        A   Well, are you talking pipe covering or --

10   see we had a flatware pouring line that was

11   independent of pipe covering.  On a pipe covering

12   pouring line, according to the schedule, and the

13   schedule was laid out by the people that got the

14   sales, and let's say approximately four thousand

15   pieces per shift.

16       Q   And the plant was running about three

17   shifts per day?

18       A   Yes.  Now this is when we were at peak

19   efficiency.

20       Q   And when you were a pipe coverer, and an

21   insulator during World War II, how many pieces of

22   pipe covering would you normally use in one of

23   your shifts?

24       A   I haven't the slightest idea.

1      Q  Was it less than four thousand pieces a

2  shift?

3      A  Gracious sakes no.

4      Q  It wasn't less than four thousand pieces a

5  shift?

6      A  Oh yes, yes, there was a lot of cutting to

7  do around the angles and it -- I don't know, if I

8  had to guess I would say if you could put on a

9  hundred pieces you were a star performer.

10      Q  Mr. Grimmie, during the entire time you

11  were at Owens-Illinois, was there anything that

12  you saw or heard that suggested to you that

13  Owens-Illinois didn't take dust control very

14  seriously?

15      A  Absolutely not.

16      Q  Is there anything that you heard, saw,

17  observed at Owens-Illinois when you were there

18  that suggested to you that Owens-Illinois didn't

19  try to enforce its respirator program?

20      A  Absolutely, they tried to enforce.

21      Q  Is there anything that you heard or saw

22  while you were at Owens-Illinois that suggested

23  that Owens-Illinois didn't try to find out how

24  much dust was in the air in the plant where its

1    employees were working?

2         A   No, they always monitored, very frequently

3    monitored the plant atmosphere.

4         Q   Is there anything that you heard or

5    observed while you were at Owens-Illinois that

6    suggested that Owens-Illinois didn't try to

7    monitor, didn't try to look at the health of its

8    own workers to see whether any of them was

9    developing any asbestos-related conditions?

10        A   No, sir.

11        Q   Mr. Grimmie, do you know of anything from

12   the time that you were at Owens-Illinois that

13   suggested to you that Owens-Illinois agreed with

14   anyone else to hide from its workers any

15   information regarding the hazards of asbestos?

16        A   I don't believe that.

17        MR. O'HARA:   Your Honor that is all the

18   questions I have.

19        THE COURT:   Any questions, Owens-Corning?

20        MR. CONSTANTINE:   I have no questions at this

21   time.

22        THE COURT:   Illinois Central Railroad?

23        MR. PETERS:   None Your Honor.

24        THE COURT:   All right.   Mr. Walker?

75

1            MR. WALKER:  Thank you, Your Honor.

2                  CROSS EXAMINATION

3       BY MR. WALKER:

4       Q   Mr. Grimmie, you mentioned that this is

5  the first time you have testified for you thought

6  maybe like fifteen years or something like that.

7  Is that about how long ago you remember it being?

8       A   Um, no, it's been longer than that.

9       Q   Okay.

10      A   I have been retired for -- since 1984 so I

11 think the McGrath trial was probably ten years

12 before that.

13      Q   Be about 1974 would be your estimate as to

14 when you last testified?

15      A   Yes.

16      Q   Over twenty years ago?

17      A   Yes.

18      Q   Now, who contacted you about coming out to

19 Illinois and testifying in this case?

20      A   Um, Bob Kelly.

21      Q   Did you know Mr. Kelly before he contacted

22 you?

23      A   No, sir.

24      Q   Okay.  And when did he contact you?

                        76

1        A   Oh, three or four weeks ago.

2        Q   What does Mr. Kelly do for a living?   If

3    you -- if he told you?

4        A   I think he is a lawyer.

5        Q   And where does he make make his office?

6        A   I really don't know.   I could guess and I

7    think it may be Chicago.

8        Q   Has he ever met you -- was the first

9    contact by phone or in personal?

10       A   I think it was by phone.

11       Q   Have you ever met Mr. Kelly face to face?

12       A   Have I?

13       Q   Yes.

14       A   Yes.

15       Q   Okay.   When did you first see him face to

16   face?

17       A   When he came to my house.

18       Q   About how long ago was that?

19       A   Probably four weeks ago maybe.

20       Q   Who all came with him?

21       A   I think there was a young lady with him,

22   but I don't remember her name.

23       Q   And was that the first meeting you had

24   with anyone to get ready for testifying in this

1    case?

2         A   Yes.

3         Q   Okay.  Have you had any other meetings

4    with anyone -- any other people to prepare you for

5    your testimony in this case?

6         A   Only since I got here in this beautiful

7    city I might have.

8         Q   Okay.  We appreciate that.  When did you

9    get here?

10        A   Last night.

11        Q   Okay.

12        A   Yesterday evening.

13        Q   And how did you travel?

14        A   By air.

15        Q   And who all came with you?

16        A   Mr. Kelly, it's embarrassing, a young

17   lady, I can't remember her name.  My wife is

18   sitting back there and she is --

19        Q   Is the lady in the back of the room your

20   wife?

21        A   Yes.

22        Q   Okay.

23        A   And just four of us.

24        Q   Okay.  So it was Mr. Kelly.  Was it the

1    same young lady who came to your home with Mr.

2    Kelly?

3        A   No.

4        Q   And a lady and then of course your wife

5    and yourself.   Is that correct?

6        A   That is correct.   Yeah, there was a pilot

7    and a co-pilot.

8        Q   Did you all fly on a commercial plane?

9        A   No, I --

10       Q   Oh, it was a private plane?

11       A   It was what, sir?

12       Q   I'm sorry.   Was your flight on a regular

13   commercial plane?

14       A   No, sir.

15       Q   It was on a privately arranged plane?

16       A   Privately arranged flight.

17       Q   You took off somewhere in New Jersey and

18   you landed in Bloomington?

19       A   No, it was Philadelphia.

20       Q   Oh, Philadelphia.   Okay.   Is that fairly

21   near your home, Philadelphia?

22       A   It's about fourteen miles.   I think if I

23   may that arrangement was made because of my

24   condition with the paralysis in my hips.

1      Q   Okay.   Insofar as you know, nobody is

2   charging you for this air flight.   Correct?   Kelly

3   or somebody --

4      A   If they do it's going to be a lean

5   Christmas.

6      Q   Kelly or somebody other than yourself is

7   going to pick up the tab for the plane.   Right?

8      A   Lord, I hope so.

9      Q   Has he told you who is going to pay for

10   the plane?

11      A   Nope.

12      Q   Okay.   Now did Mr. Kelly show you any

13   documents or anything at your home or anywhere

14   else in preparation for your testifying?

15      A   Not that I recall.   The picture that you

16   see here he got from me.   My wife made a scrap

17   book when I retired and that picture was in the

18   scrap book and it's been grossly enlarged, but not

19   that I recall.

20      Q   You still have the scrapbook?

21      A   I hope.

22      Q   Do you still have the scrapbook?

23      A   Yes, I do.

24      Q   Now you mentioned that you retired in what

1    did you say?

2         A    1984.

3         Q    Okay.  And you were how old at that time?

4         A    Sixty-two.

5         Q    Since then, have you been able to enjoy

6    the fishing and the camping and the hiking and so

7    forth that you mentioned?

8         A    For awhile, yes.

9         Q    Okay.

10        A    Until spinal stenosis caught up to me.

11        Q    All right.  And then since then you've

12   been more limited in what you've been able to do

13   physically?

14        A    That is correct, sir.

15        Q    You mentioned that your wife came with you

16   this time.  You and your wife enjoy traveling

17   together when you can?

18        A    Well yes.  She comes more or less to help

19   me bathe and -- see at home we have a shower

20   stall, I can get in there and shower.  I can't get

21   in a bathtub.

22        Q    Okay.  In 1958 when the plant was sold by

23   Owens-Illinois to Owens-Corning, what was your

24   position then?

1          MR. CONSTANTINE:  Objection, scope.

2          THE COURT:  Overruled.  You may answer, sir.

3          A   I was production supervisor.

4          Q   And you stayed on in that position for how

5     long?

6          A   Oh, I'm going to say I had -- allow me to

7     correct.  They changed titles and fortunately in

8     order to up the salaries, they made managers.  So

9     I was production manager and then the plant

10    manager asked me if I could take over the

11    personnel department.  So for fifteen years

12    approximately, I was production manager and

13    personnel manager.

14         Q   So for about fifteen years you held both

15    positions?

16         A   Yes, sir.

17         Q   And do you know approximately when that

18    started?

19         A   I would say approximately 1965.

20         Q   So were you production supervisor from

21    when Owens-Corning bought it in '58 up till about

22    '65?  And then from '65 until your retirement, you

23    were production supervisor or excuse me,

24    production manager and personnel director?

1          A   Sir, that is generally as I recollect it.

2     It may be months different, but --

3          Q   Now I'm going back to the beginning of

4     your employment there.

5          A   Yes.

6          Q   You first worked at Berlin, then you

7     worked at Sayreville, then you worked at Berlin

8     for the rest of your career.   Is that correct?

9          A   Yes.

10         Q   About how long were you at Berlin the

11    first time?

12         A   Well I started in Berlin on the 14th of

13    February, 1947.  And I went to Sayreville on the

14    2nd of January, 1948.  And I went to Sayreville to

15    organize the union and to help train people on

16    equipment that they had there that I was familiar

17    with.  I was there and returned home being a newly

18    married person, I returned home on August 2nd.

19         Q   Of the same year, of '48?

20         A   Yes, yes, sir.

21         Q   So you were in Sayreville about eight

22    months?

23         A   Just about even, um um.

24         Q   The rest of the time, from '47 to '86 you

83

1    worked at the Berlin, New Jersey plant?

2        A   '47 to '86?  Other than the time out for

3    Sayreville.

4        Q   Oh I'm sorry, I think I said '86 wrong.

5    What year did you retire?  I had that wrong.

6        A   '84.

7        Q   '84.  Okay.  Were you at Berlin from '47

8    to '84?

9        A   Yes, sir.

10       Q   Except for the eight months you told us

11   about at Sayreville.  Now during that time you met

12   Jerry Helser, correct?

13       A   Jerry Helser?

14       Q   Yes?

15       A   Yes, sir, yes.

16       Q   When did you first meet Jerry?

17       A   In Berlin.

18       Q   And what brought the two of you together

19   there at Berlin?

20       A   Well Jerry worked at Berlin for awhile.

21       Q   What jobs did he do at Berlin?

22       A   I think Jerry was a product supervisor or

23   shift supervisor.

24       Q   So would he have been a shift supervisor

1 while you were a production manager?

2   A Yes.

3   Q Did he -- like was he immediately under

4 you then?

5   A Yes.

6   Q And how long were you his boss?

7   A Oh I really don't remember, because Jerry

8 moved along.  Jerry had higher training than what

9 was required for production supervision, and I

10 really don't remember, sir.

11   Q Okay.  And about how long did Jerry work

12 at the Berlin plant?

13   A That I don't remember.

14   Q Did you see Jerry come to the plant from

15 time to time even when he wasn't there as a

16 regular full-time employee?

17   A Yes, I think I remember him coming in.

18   Q What was he doing on those visits?

19   A I don't know.  He was there to see the

20 plant manager and whatever they had -- whatever

21 business they had was not mine.

22   Q When did you become a part of the

23 management of the plant?

24   A When?

1          Q   Yes.

2          A   Um, --

3          Q   Were you still in the union in '58 when

4     Owens-Corning bought the plant?

5          A   Oh no, no.  I became a shift foreman right

6     after I got back from Sayreville which was 1947.

7     And then I went to assistant personnel director

8     with Jim Gaylord (phonetic) who was the personnel

9     director in probably 1948.

10         Q   So from '48 on approximately, you were a

11    part of management at the plant and never again

12    were a member of the union?

13         A   I think that is correct, sir.

14         Q   Now you mentioned that you have had a

15    chest x-ray approximately every year from 1947 to

16    the present.  Is that correct?

17         A   Yes, sir.

18         Q   Have you also had a physician physically

19    examine you, you know, thump around on you and

20    listen to your heartbeat and all that sort of

21    thing at about the same time as the chest x-ray?

22         A   No, sir, not since I was diagnosed with

23    asbestosis.

24         Q   When you were told you had asbestosis,

86

1    that is when the physical examinations stopped?

2        A   No.   That's when I started going to a

3    chest, Dr. Sokolowski (phonetic), every year.   Now

4    as a manager I did have a yearly physical

5    examination.

6        Q   Okay.   So every year that you have worked

7    for either Owens-Illinois or Owens-Corning, you've

8    had a chest x-ray.   Right?

9        A   Yes, sir.

10       Q   And every year you've had a physical

11   examination by a doctor at the company's expense.

12   Is that correct?

13       A   No, sir.

14       Q   Okay.   When you first started there, how

15   often were you having an examination by a company

16   doctor?

17       A   Yearly.

18       Q   When did that stop?

19       A   I really don't remember.

20       Q   About how many do you remember having?

21       A   Oh, I'm going to say ten.   Used to go to

22   the University of Pennsylvania and had a very

23   thorough physical.   That was one of the reasons I

24   stopped smoking.

1    Q   Tell us more about that?

2    A   Well, smoking and asbestosis don't go

3    together.  And the doctor told me there is two

4    things wrong, you're overweight and you smoke.  So

5    I was using three packs of cigarettes a day.  Not

6    smoking three, I may light up and phone rang and

7    lay it in the ashtray and burn an ash that long.

8    But in three days I was finished smoking.  And I

9    just felt that -- I just felt that smoking wasn't

10   a good thing to continue to do with a lung

11   condition.

12   Q   You stopped smoking at the same time as

13   you were told that you had asbestosis?

14   A   Um, just a few weeks after.

15   Q   And what year was that?

16   A   It was around, between 1965 and 1970.

17   Somewhere in there.

18   Q   Now, when you went to the University of --

19   did you say Pittsburgh?

20   A   Pennsylvania.

21   Q   University of Pennsylvania, are their

22   facilities in Philadelphia?

23   A   Yes, sir.

24   Q   Okay.  When you went to the University

1        of --

2              A   University Hospital.

3              Q   Okay.   When you went to University

4        Hospital there in Philadelphia, did the other blue

5        collar workers go with you?

6              A   No, sir.

7              Q   Did you first go to the University of

8        Pennsylvania at Philadelphia as a management

9        employee?

10             A   Yes, sir.

11             Q   Did the other management --

12             A   Just department managers.

13             Q   Did the other department managers go there

14       for physicals also?

15             A   Yes, sir.

16             Q   When the department managers were going to

17       University Hospital for their physicals, where

18       were the production workers going for their

19       physicals?

20             A   Plant physician.

21             Q   What was that person's name?

22             A   Well to begin with, it was doctor -- um.

23       I forget the first one.   I will remember it.   Then

24       it was Dr. Schwartz.   Dr.  McNalley and -- the

89

1    name escapes me.  The first -- the physician that

2    was there when I started was Dr. Girard.

3         Q   Did you ever meet a Dr. Charles Shook?

4         A   Yes.

5         Q   And how did you meet him?

6         A   Well he was into the plant, and I met him

7    on an elevator in Washington one time.

8         Q   Now, was Charles Shook the plant physician

9    when you first applied for work?

10        A   No, he was not a plant physician.

11        Q   What did Charles Shook have to do with

12   Owens-Illinois?

13        A   He was the corporate medical director.

14        Q   So Shook didn't come out and give anybody

15   physical examinations, correct?

16        A   No, sir, not to my knowledge.

17        Q   Now when you had that initial physical

18   examination, was that probably by Dr. Girard did

19   you think?

20        A   Yes, sir.

21        Q   What did Dr. Girard tell you about

22   asbestos?

23        A   The only thing I recall him saying was

24   talking about the respirator program.  And at the

1    time, silicosis was the big -- considered to be

2    the big threat.

3        Q   Well, do you remember Dr. Girard saying

4    anything about asbestos when he gave you your

5    first examination?

6        A   No, sir, I don't.  But I do remember the

7    nurse talking to me about it.

8        Q   And what was the nurse's name?

9        A   I don't remember.

10       Q   How long did she serve the plant there

11   after you hired on?

12       A   That I don't remember.

13       Q   What did the nurse tell you about

14   asbestos?

15       A   She told me that it was a fibrous material

16   that could be inhaled and if it went down in the

17   lungs, you could not get it out and that it caused

18   a pleural thickening in the lung.

19       Q   So in 1947 when you first hired on with

20   Owens-Illinois, Owens-Illinois' nurse told you

21   that you could get pleural thickening from

22   inhaling asbestos.  Correct?

23       A   Yes, sir.

24       Q   Did she tell you it was a good thing or a

91

1    bad thing to get pleural thickening?

2         A  I don't remember her saying it was good or

3    bad.  But I interpreted what she said it was a bad

4    thing.

5         Q  Did you know at that time what part of the

6    anatomy got thick when you got this pleural

7    thickening?

8         A  What part of the anatomy got what?

9         Q  Yes.  When the nurse said now, Mr.

10   Grimmie, if you hire on here, and if you inhale

11   asbestos it's going to make you have pleural

12   thickening, did you understand what she meant by

13   your pleura was going to get thick?

14        A  She said the lung.

15        Q  She said the pleura was part of the lung?

16        A  Yes.

17        Q  Okay.  And did she tell you what you might

18   notice yourself if your pleura became thick?

19        A  No, I have no recollection of her saying

20   that.  I didn't -- didn't know the pleura was part

21   of the lung.  I thought it was a condition.

22        Q  I'm sorry, go ahead.

23        A  Well if you look at my chest x-ray, you'll

24   see the bottom of both lungs, you can see the line

1    where I'm contaminated. And the doctor called

2    that pleural thickening.

3        Q    And this nurse back in 1947 used those

4    same words, pleural thickening, to describe to you

5    what would happen if you breathed in any asbestos

6    while you worked for Owens-Illinois. Is that

7    right?

8        A    As part of the respirator program, she

9    said that respirators were needed to protect me

10   from silica and asbestos and she said that

11   asbestos was a lung disease that would reduce my

12   breathing capacity.

13       Q    Did she tell you how soon after you

14   breathed in the asbestos you would have this --

15       A    Now this was a registered nurse, not a

16   doctor. A registered nurse. And I don't think

17   that she knew any of this information. She knew

18   what to tell me to try to prevent this from

19   happening. But I think she would be stepping out

20   of her territory if she were to diagnose me. So I

21   have no recollection of her telling me. Her main

22   objective was to instill in my mind the necessity

23   for a respirator program in this particular area.

24       Q    Did you apply for work in the dusty area?

93

1    A   Apply for work?

2    Q   Yes.

3    A   I went where I was assigned.

4    Q   Did the nurse say that you were going to

5    be assigned to the dusty area?

6    A   No.  She didn't know where I was going to

7    be assigned.

8    Q   She just --

9    A   It was up to the plant engineer where I

10   was going to be assigned.

11   Q   She just said in case you get assigned to

12   the dusty area, then you will be asked to wear a

13   respirator?

14   A   I don't remember her saying that.  She

15   said your supervisor will provide you a respirator

16   when you go into an area where it's needed.  And

17   that is the program we had set up.

18   Q   Did the nurse tell you how soon after you

19   inhaled the asbestos you would notice some

20   consequence from it?

21   A   I don't know if she told me, or whether I

22   read it, but it takes about twenty years for it to

23   show up.

24   Q   I don't think anyone is quarreling with

94

1    that.  But my question was, did the nurse back

2    there at that time when you first applied for

3    work, did she tell you how soon after you breathe

4    in the asbestos you'll notice something bad from

5    having breathed it in?

6         A  I have no recollection of her telling me

7    that.

8         Q  When in your career did you learn that

9    twenty years have to go by between when you

10   breathe in the asbestos and you notice something

11   going on in your body as a result of breathing it

12   in?

13        A  I don't know if it was when I read a

14   report in the medical journal written by Dr.

15   Selikoff from the Mount Sinai Hospital in New York

16   where his work convinced the medical field that

17   asbestos could cause lung cancer, and I think I

18   read in there where it takes twenty years for the

19   condition to develop.

20        Q  How did you come into contact with the

21   article written by Dr. Selikoff?

22        A  I think the nurse showed it to me.

23        Q  Do you remember that lady's name?

24        A  Naomi Blatherwick (phonetic).

1     Q   And do you remember approximately what

2     part of the sixties it was when she gave you a

3     copy of the Selikoff article?

4     A   Around 1965.

5     Q   Had you heard about asbestos being a cause

6     of cancer before 1965?

7     A   No, sir.

8     Q   So nothing about that first meeting that

9     you had with the nurse alerted you to the fact

10    that asbestos would cause cancer, correct?

11    A   No, sir.

12    Q   Is that true Mr. Grimmie?

13    A   That's true.

14    Q   And then throughout the rest of your

15    journey with Owens-Illinois and then later with

16    Owens-Corning, you heard nothing about asbestos

17    being a cause of cancer until you got the Selikoff

18    article in approximately 1965.  Is that true?

19    A   That is true.  Did anyone?

20    MR. WALKER:  May I answer Your Honor?

21    THE COURT:  No counsel.

22    Q   When Mr. Kelly came to your home there and

23    was talking with you about Grimmie, could you go

24    out to Illinois and help us out in this trial, did

1    he tell you that one of the issues in this case is

2    when was it that Owens-Illinois learned that

3    asbestos caused cancer?

4        A   No, sir.

5        Q   Did Mr. Kelly tell you that by the time

6    you get there on the stand, Mr. Grimmie,  there

7    will already be a lot of documents in evidence

8    showing that Owens-Illinois did know or should

9    have known that asbestos was a cause of cancer

10   clear back in the fifties?

11       A   No, sir.

12       MR. O'HARA:   Objection Your Honor,

13   argumentative, misstates the prior testimony.

14       THE COURT:   Overruled.

15       Q   Did Mr. Kelly tell you that the day before

16   you're on the stand, a fellow by the name of Kerby

17   whom we have called in a lot of trials will

18   testify that it was well known in the medical

19   community that asbestos was a cause of cancer at

20   least by the 1950s?

21       A   No, he didn't tell me anything about Dr.

22   Kerby.

23       Q   What kind of fellow is this Kelly?

24       A   Well I think he's a decent sort of guy.

97

1        MR. WALKER:  Would this be a time to break,

2   Your Honor?

3        THE COURT:  Yes, it would be.  Go ahead and

4   put your note pads upside down.  Step back to the

5   jury deliberation room, get ready for lunch.

6        (THE FOLLOWING PROCEEDINGS WERE HAD OUT OF

7   THE PRESENCE OF THE JURY.)

8        THE COURT:  Jurors have left the courtroom.

9   Let's take a lunch recess.

10        You can step down, sir.  Thank you.  Enjoy

11   your lunch.

12        (THE NOON RECESS WAS TAKEN.)

13        THE COURT:  Record reflect all parties have

14   returned to the courtroom.  Counsel ready to

15   proceed?

16        MR. O'HARA:  Yes Your Honor.

17        THE COURT:  All right.  Bring the jurors back

18   in.

19        (THE FOLLOWING PROCEEDINGS WERE HAD IN THE

20   PRESENCE OF THE JURY.)

21        THE COURT:  Be seated, record reflect jurors

22   have returned to the courtroom.

23        THE COURT:  You may continue.

24        BY MR. WALKER:

1        Q   Mr. Grimmie, I forgot to ask, this fellow

2   Kelly, whom did he say he was working for?

3        A   I misstated.  Riley.

4        Q   Riley is his name?  Okay.  And whom did

5   Mr. Riley say he was working for?

6        A   For Joe.

7        Q   Riley said that he was a partner with Joe

8   O'Hara?

9        A   Yes.

10       Q   The fellow that asked you the questions

11   here first this morning?

12       A   Yes.

13       Q   Okay.  Now we were talking about your

14   physical examinations and you said once you became

15   part of management, then you had an annual

16   physical examinations for about ten years at the

17   University of Pennsylvania in Philadelphia.  Do

18   you remember that?

19       A   Well I said all department managers had an

20   annual physical examination.  Just department

21   managers.

22       Q   And when is the last time you had an

23   annual physical examination at the University of

24   Pennsylvania?

1    A   I don't remember.

2    Q   Would it have ended in the sixties or in

3    the seventies?

4    A   I honestly don't remember.

5    Q   Okay.  After you had your last examination

6    at the University of Pennsylvania, where did you

7    have your next company physical examination?

8    A   From Dr. Sokolowski.

9    Q   Where does he make his office?

10   A   He makes his office in Pennsaukin.

11   Q   For those of us that haven't been that far

12   east, is that a town in New Jersey?

13   A   Yes, it's between Camden and Berlin.

14   Q   All right.

15   A   He is a lung specialist.

16   Q   And who pays for your appointments with

17   that physician?

18   A   Workers' compensation.

19   Q   Um, how often do you see that doctor?

20   A   I see him twice a year, which incidentally

21   I see him Monday.

22   Q   Okay.

23   A   I have x-ray once a year, so I have to get

24   x-rayed before I go to him on Monday.  Then it's

1   six months I go back and he'll put me on a machine

2   and check my breathing capacity.

3         Q   Okay.   Where do you get the x-ray?

4         A   At an x-ray facility operated by a group

5   of doctors, one of which is Dr. Sokolowski.

6         Q   Okay.   And is that the place where you go

7   in there, you see all the other old x-rays of your

8   chest?

9         A   Yes, sir.

10        Q   And --

11        A   The --

12        Q   Go ahead.

13        A   Well when I go for the x-ray, they file my

14   x-rays there.   They'll take the new one, put it in

15   the file, give it to me and I will take it to the

16   doctor's office, it's filed at the --

17        Q   Probably goes clear back to the forties

18   when you had your first chest x-ray at

19   Owens-Illinois?

20        A   Yes.

21        Q   Now, is there like a club or a group of

22   you fellows that used to work at Berlin that you

23   get together from time to time, like an old

24   timers' club or anything of that nature?

1    A   No.   I tried to get something started when

2    I found out that Owens-Corning was leaving Berlin,

3    I thought we should have a group together so we'd

4    have some sort of contact.   But I didn't have

5    enough money to pull them together and no one else

6    was -- no, there is no old timers' club.

7    Q   Okay.   The fellows that you do run into,

8    where are they having their physical examinations

9    now?

10    A   Dr. Sokolowski.

11    Q   He gives the exam for all the fellows that

12    you know of?

13    A   Yes.

14    Q   And so far as you know, who pays for his

15    examining the Berlin workers?

16    A   Workers' compensation.

17    Q   And like is that -- well who is workers'

18    compensation?   What company is that?

19    A   Well it's an organization in New Jersey

20    that each worker pays a certain percentage of his

21    weekly earnings into workers' comp and then if

22    you're hurt on the job in New Jersey, you can't

23    sue your employer.   Workers' compensation takes

24    care of your needs.

1      Q   And so far as you can tell, is workers'

2   compensation providing for the annual physicals

3   for all the old Berlin workers that you know of?

4      A   Yes, sir.

5      Q   And that includes an annual chest x-ray?

6      A   Yes, sir.

7      Q   Now, when you got your physical

8   examination there at the University of

9   Pennsylvania, how were the results reported to

10   you?

11      A   I sat down and had a consultation with the

12   doctor.  And his report went to Dr. Shook I

13   believe it was at the time in Toledo.

14      Q   And did the doctor there at the University

15   of Pennsylvania, did he or she tell you about what

16   could happen if you breathed in asbestos?

17      A   I don't recall that.  The last time I

18   remember the doctor sat down and he said there is

19   two things wrong.  You're too fat and you smoke.

20      Q   So you don't remember any of the doctors

21   at the University of Pennsylvania talking to you

22   about what might happen to you if you breathed in

23   asbestos?

24      A   No.

1      Q   How about Dr. Shook?   Did he ever come up

2    to you and explain to you what could happen if you

3    inhale asbestos?

4      A   Not to my knowledge, not to my

5    recollection.

6      Q   How about Dr. McNally?   He was the company

7    doctor for awhile?

8      A   Yes, yes.

9      Q   Did Dr. McNally ever come up to you and

10   explain what could happen from inhaling airborne

11   asbestos?

12     A   Yes.   Dr. McNally and I sat across the

13   table from each other and discussed this.   I hired

14   Dr. McNally.

15     Q   When was that?

16     A   Wow.   Dr. McNally followed Dr. Schwartz.

17   Dr. Schwartz died.   I don't remember the exact

18   year.

19     Q   Do you think it might have been in the

20   seventies or in the eighties?

21   MR. O'HARA:   Objection Your Honor.

22   THE COURT:   Overruled.

23     A   I think in the seventies.

24     Q   Did you ever meet a man named Jon Konzen?

1        A   John Konden?

2        Q   Konzen, K-o-n-z-e-n.

3        A   We had a John Konden and a Charlie Konden

4    work at the plant.   One was a sheet metal worker

5    and one was a machinist.

6        Q   This fellow was a physician and he made

7    his office in Toledo.   Dr. Jon Konzen?

8        A   Konzen?

9        Q   Yes.

10       A   Yes.

11       Q   When did you first meet Dr. Konzen?

12       A   I don't remember.

13       Q   Did Dr. Konzen ever explain to you what

14   happens when someone inhales airborne asbestos?

15       A   Well, to me alone?   When Dr. Konzen would

16   come in, he would go to the plant manager.   And

17   the plant manager, if there was something that

18   needed to be relayed, he would call all department

19   managers in to the conference room.   I don't

20   specifically remember Dr. Konzen speaking on

21   inhaling asbestos.

22       Q   Now, do you remember a Dr. Billmaier?

23   That is his last name, Billmaier together for the

24   last name.   Dr. Billmaier?

1       A   The name is familiar, I don't remember

2   the --

3       Q   Before you came, the jury saw an exhibit,

4   one of -- well they have seen a number of exhibits

5   but one is 29 and it is dated May of 1978 and it's

6   a memo about Dr. Billmaier having gone to the

7   Berlin plant in 1978 and talked to the employees

8   at several different shifts about asbestos and

9   health.

10      Do you remember Dr. Billmaier coming there

11  and talking --

12      A   I have no recollection of that.

13      Q   Talking to the whole shift at a time?

14      A   I have no recollection of that.

15      Q   Who was R.S. Hite?

16      A   Dick Hite was the plant manager.

17      Q   Would he have been in 1978?

18      A   I believe so, yes.

19      Q   How about W.H. Warmath?

20      A   Russ Warmath was in personnel.

21      Q   What was his position in 1978?

22      A   I believe he was personnel manager.

23      Q   Was he like your immediate boss?

24      A   No, I was production manager at the time.

1        Q   You didn't have a personnel responsibility

2    in '78?

3        A   Right.

4        Q   And Dr. McNally, we have already talked

5    about him.  How about first initial B last name

6    Neill?

7        A   B. Neill?  Is there an RN following it?

8        Q   Well not in this memo, it's just

9    N-e-i-l-l.

10       A   Well we had -- our plant nurse was Barbara

11   Neill.

12       Q   Okay.  And who was W.K. Hamilton?

13       A   The name again please.

14       Q   W.K. Hamilton?

15       A   Don't know that one.

16       Q   Now in this document, Owens-Corning says

17   that Dr. Billmaier told the workers about asbestos

18   and health and then, you know, some of the fellows

19   asked questions and Dr. Billmaier made notes of

20   the questions.  One of the questions was does

21   asbestosis lead to lung cancer and according to

22   this memo Dr. Billmaier answered, "If a person has

23   asbestosis, it indicates there has been exposure

24   to asbestos.  However, a person with asbestosis

1    does not have a greater chance of getting lung

2    cancer than a fellow worker exposed to asbestos

3    but without asbestosis."

4         Do you remember anybody at Owens-Corning

5    telling you that?

6         A   No, sir.

7         Q   Do you remember anybody at Owens-Illinois

8    telling you that?

9         A   No, sir.

10        Q   Do you remember anyone coming back to

11   Berlin and correcting what Dr. Billmaier said some

12   time after May of 1978?   In other words somebody

13   came back and said you know Billmaier, some of his

14   speech was wrong and we need to get that

15   corrected?

16        A   No, I don't remember that.   I hope they

17   did, though.

18        Q   In exhibit 29 it says that "It might be

19   worthwhile to print these questions and answers up

20   into a pamphlet and distribute the pamphlet to

21   employees."

22        Did you ever get a pamphlet from

23   Owens-Corning that explained the hazards of

24   asbestos in sort of a question and answer form?

1       A  Not to my recollection.

2       Q  Did you ever see other employees around

3   there that had such a pamphlet?

4       A  Not to my recollection.

5       Q  Well did you ever get a pamphlet from

6   Owens-Corning that explained the hazards of

7   asbestos even if it didn't use the question and

8   answer method?  Just in text just laid it all out?

9       A  A pamphlet?  No, sir.

10      Q  How about any written document?

11      A  Yes, there was bulletin board notices.

12      Q  Okay.  Were these on the bulletin boards

13  in the plant itself?

14      A  Yes, five locations.

15      Q  Tell us what you saw on those bulletin

16  boards about the relationship between asbestos and

17  health?

18      A  Just exactly what we have been talking

19  about.  If you inhale asbestos, it can eventually

20  cause asbestosis and that could turn to I believe

21  the term is melanoma, cancer.

22      Q  When did you first see something on the

23  bulletin boards at Berlin that said that asbestos

24  could cause asbestosis?

1       A    I haven't the slightest idea when I saw

2    it.

3            Q    Was it there when you went to work in '47?

4       A    No, sir.

5            Q    Can you give the jury any feel for the

6    decade that you first saw on the bulletin boards

7    of Berlin information that asbestos could cause

8    asbestosis?

9       A    I would say sometime in the 1960s.

10           Q    Who puts the materials on the bulletin

11   board that talked about asbestos and asbestosis?

12      A    In that case it would have been the plant

13   manager, went out over his signature.

14           Q    And what was the plant manager's name?

15      A    I -- hmm -- there was only eleven of them.

16   I think it might have been Hite.  Dick Hite.

17           Q    Now when you first saw a bulletin board

18   document that talked about asbestos, and

19   asbestosis, did it say anything about cancer?

20      A    I don't recall.

21           Q    When the nurse gave you the article

22   written by Dr. Selikoff, do you remember that?

23      A    Yes.

24           Q    Had you already seen something on the

110

1   bulletin board about asbestos causing cancer?

2        A   I don't recall seeing anything.   I think

3   that was the first time that connection was made.

4        Q   Did the plant manager put a copy of Dr.

5   Selikoff's article on the bulletin board?

6        A   Not to my recollection.   The plant

7   physician did.

8        Q   What was his name?

9        A   Henry Schwartz.

10       Q   How many of the bulletin boards did Dr.

11  Schwartz put a copy of Selikoff's article on?

12       A   Five.

13       Q   And about when did Dr. Schwartz do that?

14       A   Sometime after I believe the middle of

15  1965.

16       Q   How long did the Selikoff articles --

17  excuse me.   How long did the Selikoff articles

18  stay on each of the five bulletin boards?

19       A   I don't know.   The articles like that

20  would have remained for at least two weeks.

21       Q   If Jerry Helser was working there, it

22  would almost be impossible for him not to see that

23  article on at least one bulletin board, wouldn't

24  it?

1      MR. CONSTANTINE:  Objection, speculation.

2      A  It would appear to me, yes.

3      THE COURT:  Objection sustained.

4      Q  Well in your opinion, Mr. Grimmie, given

5  that there were five bulletin boards and they were

6  all five in fairly prominent locations, weren't

7  they?

8      A  Yes, that is the purpose of bulletin

9  boards.

10     Q  I mean one was by the restroom, right?

11     A  Yes.

12     Q  And the others were by equally populated

13  places, places where people had to go and

14  sometimes lingered a minute and might be likely to

15  read whatever is on the bulletin board?

16     A  Yeah, like the men's room and the ladies'

17  room.

18     Q  So if the Selikoff article was on there in

19  1965 and if Helser was there at the plant in '65,

20  it's likely he would have seen it at least on one

21  occasion?

22     MR. CONSTANTINE:  Hold on Mr. Grimmie.

23  Objection, speculation Your Honor.

24     THE COURT:  Sustained.

1          Q   What is the next thing you saw on the

2    bulletin board about the relationship between

3    asbestos and human disease?

4          A   I haven't the slightest idea.

5          Q   Do you think anything else was posted on

6    the bulletin board about asbestos and disease?

7          A   I don't remember.

8          Q   If anything else was posted you don't

9    remember it.  Is that correct?

10         A   That is correct.

11         Q   So far as this disease asbestosis that Mr.

12   O'Hara was asking you about, can you give us some

13   feel for what part of your body is affected by

14   that?

15         A   Asbestosis?

16         Q   Yes?

17         A   My lung.

18         Q   Okay.  And is that the same part of your

19   body that has this thickening?

20         A   Yes.

21         Q   So asbestosis and pleural thickening are

22   the same thing as it's been described to you.

23   Correct?

24         A   That is as I understood it.

1      Q   And how many different times has a law --

2   a doctor paid by Owens-Corning explained it to

3   you?

4      A   Every six months for the past, since,

5   what, 1968 I believe.

6      Q   Now the asbestos that Owens-Illinois was

7   putting in Kaylo back in 1947 and '48, what type

8   of asbestos was that?

9      A   There was several types.

10     Q   Do you remember the names of any of them?

11     A   One was amosite, one was chrysotile.

12     Q   Did the amosite come in bags that are

13  similar to the bags here on exhibit 170-F?

14     THE COURT:   That is plaintiffs' exhibit?

15     MR. WALKER:   Plaintiffs' exhibit 170-F?

16     A   Burlap.   Yes.

17     Q   In fact, the amosite came to the Berlin

18  plant in burlap bags that weighed about a hundred

19  pounds is your recollection?

20     A   Yes.

21     Q   And did you sometimes pile the bags

22  similar to what the piles are shown in Exhibit

23  170-F?

24     A   No, we piled them on pallets.

1       Q   Then used a forklift?

2       A   So a forklift could pick them up and put

3   them up on the batch floor.

4       Q   Well when they arrived at your plant, they

5   were in railroad cars.  Is that right?

6       A   Yes, sir.

7       Q   And the fellows had to unload them out of

8   the cars by hand, right?

9       A   That is correct.

10      Q   Where did they pile them before they put

11  them on the pallets and moved them to the grinding

12  machines?

13      A   Before they -- no, they put them --

14  immediately when they picked them up, they put

15  them on the pallet.

16      Q   Okay.  So in your plant, when they were

17  stacked ready to use, they were already on a

18  pallet?

19      A   Yes.

20      Q   How much asbestos did you use a week at

21  Berlin?

22      A   Well, I have not the slightest idea.  I

23  can tell you how much asbestos went into a batch

24  if you or anyone can figure that.  But I have

1    heard Kaylo referred to as asbestos insulation.

2    Thirteen percent of the solids in the batch was

3    asbestos.

4        Q  So far as how many train cars came in a

5    week or a month, it wasn't part of your job to

6    order that, is that correct?

7        A  No, that was the purchasing agent.

8        Q  Now, what did the bags of asbestos say

9    would happen to you if you breathed any of the

10   dust that came off the asbestos?

11       A  I don't remember them saying anything

12   until later on after Dr. Selikoff.

13       Q  What did they say then?

14       A  Harmful to your health.

15       Q  Did it explain what part of your body

16   would be harmed?

17       A  Not that I recall.  There is only so much

18   you can put on burlap.

19       Q  Did it use the word cancer?

20       A  Not that I recall.

21       Q  What did the boxes of Kaylo say would

22   happen to someone if they breathed the dust given

23   off by Kaylo when the boxes went out of the Berlin

24   plant?

1    A   Um, in the beginning we were stenciling --

2   I forget the exact wording, harmful if inhaled.

3   And then it became art work on the box.  But --

4    Q   Now when you say in the beginning, when

5   was it that either -- when was it that

6   Owens-Illinois first put on the box that the dust

7   from Kaylo would be harmful if inhaled?

8    A   I think when it became known that asbestos

9   could cause lung cancer.

10    Q   So when you learned that asbestos could

11   cause lung cancer, that is when whoever owned the

12   plant started putting something on the box that

13   asbestos could be harmful.   Correct?

14    A   I believe so.

15    Q   And you learned about asbestos and cancer

16   in 1965?

17    A   Yes, sir.

18    Q   So then would it be correct that

19   throughout the time that you worked there for

20   Owens-Illinois in the forties and fifties, there

21   was nothing on the box about the dust causing

22   harm?

23    A   That is as I recall.

24    Q   And then throughout the rest of the

1    fifties and the first half of the sixties when you

2    worked there for Owens-Corning, there was nothing

3    on the box that talked about harm?

4         A   That is as I recall.

5         Q   Who at Owens-Corning told you what

6    Owens-Corning just learned that caused it to start

7    putting something on the box?

8         MR. CONSTANTINE:  Objection, compound, calls

9    for speculation.

10        THE COURT:  Overruled.  You can answer.

11        A   I thought I answered that.  Dr. Schwartz

12   had a medical journal and he gave it to the nurse

13   and she passed it around.  She passed it to me and

14   I passed it around.

15        Q   You did tell us that about the article.  I

16   was now over on the boxes that the Kaylo was

17   shipped out in.  Do you remember that?

18        A   Yes.

19        Q   Okay.  You had worked there for about

20   eighteen years and the boxes didn't say anything

21   about harm.  Remember, from '47 to '65 or '66?

22        So for the first eighteen years you were

23   there, there was nothing about harm on the boxes.

24   Do you remember that?


                              118

1          A   Okay.

2          Q   Okay.   Then all of the sudden

3    Owens-Corning decided to start stamping something

4    on the box talking about harm.   Remember that?

5          A   Yes.

6          Q   Okay.   And of course then that was

7    changed, right?

8          A   Changed.

9          Q   I say that was -- in other words things

10   had been going one way for seventeen or eighteen

11   years and now all of the sudden the boxes say

12   something about the dust coming from the product

13   being harmful?

14         A   Yeah, I think that is better than ignoring

15   the condition.

16         Q   And my question was, when the fellows that

17   decided to put this on the box were talking with

18   you about it, what did they say had come into the

19   life of Owens-Corning that caused it to put this

20   stamped material on the box?

21         A   Why do you think they would talk to me

22   about it?

23         Q   I'm just asking you if they did talk to

24   you about it?

1        A   The production planning manager would

2    issue instructions on what was produced, how it

3    was packaged and where it went in the warehouse.

4    If he wanted something on the carton, he would be

5    the one to put the instruction in.   His name is

6    Bill Justice.   Excuse me.   Was Bill Justice.

7        Q   So your recollection is that Bill Justice

8    is the fellow who decided to put this language on

9    the box?

10       A   No.

11       Q   Who did decide?

12       A   I do not know.   All I'm saying is someone

13   probably told Bill Justice we want something on

14   the carton saying that there is a hazard here.

15       Q   Did the carton ever say that the dust was

16   hazardous?

17       A   I forget what the wording was.

18       Q   Those maintenance fellows that went into

19   the baghouse, you know they went down into the

20   baghouse and shook the dust out of the dust

21   collectors, do you remember telling us about that?

22       A   Yes.

23       Q   What were their names?

24       A   What were their names?

1      Q   Yes?

2      A   Frank Kafao (phonetic) and his brother,

3  Paul Kafao.  They're the only two that I remember.

4      Q   How are Frank and Paul getting along now?

5      A   How are they getting along?

6      Q   Yes?

7      A   Well it's hard to tell, they're both dead.

8      Q   Right.  And when did they die?

9      A   Some years ago.  They were up in years.

10     Q   How old were they when they died?

11     A   Oh I think Paul was the oldest.  Paul was

12  probably between seventy-five and eighty, and

13  Frank was a few years younger.

14     Q   This photograph that was taken here had

15  you fellows standing around the saw and I think

16  you saw the saw was used, what, to kind of trim up

17  the ends of the Kaylo pipe covering?

18     A   Trim the legs.

19     Q   Trim the long horizontal cut?

20     A   That is correct.

21     Q   Okay.  Now of course when that saw went

22  through the Kaylo, it gave off dust, didn't it?

23     A   Yes.

24     Q   So the saw was one of the dusty areas of

1    the plant.   Right?

2         A   It would have been if we hadn't had a dust

3    collecting system.

4         Q   So the saw wasn't one of the areas where

5    employees were ordered to wear a respirator?

6         A   That is correct, it was not required.

7         Q   I see in this picture none of you fellows

8    are wearing a respirator, none of the ones in the

9    photograph.   Do you see -- I assume it looks the

10   same to you?

11        A   Um-hmm.

12        Q   When you went out in the plant there in

13   the fifties and sixties, did you wear a

14   respirator?

15        A   No, sir.

16        Q   Well did any of the management people wear

17   a respirator?

18        A   Not that I recall.

19        Q   Now when you were in the service you saw

20   that one of the ways that officers lead troops is

21   by example.   Right?

22        A   I beg your pardon?

23        Q   When you were in the military service, you

24   observed that one of the ways that officers lead

1    their troops is by example.   Correct?

2         A   Sometimes.

3         Q   And when did you see management of

4    Owens-Corning showing the workers by example that

5    they needed to wear a respirator to protect them

6    from some hazard that was in the air of the plant?

7         A   I didn't.

8         Q   The jury has seen an exhibit, it's marked

9    282 and it's dated April and May of 1958.   Now you

10   were at Berlin in April and May of 1958.   Correct?

11        A   Yes.

12        Q   This document for example refers to you as

13   being the production superintendent.   Does that

14   sound right?

15        A   Yes, sir.

16        Q   And it is one of those instances

17   where Aetna came into the plant; and two of these

18   five fellows are employees of Aetna, aren't they,

19   in the photograph?

20        A   I think so, Bernie and Paul Shoe.

21        Q   Two of the fellows from Aetna came into

22   the plant in April and May of 1958 and they

23   commented about the practices of using a broom to

24   sweep up the dust.   Were Owens-Illinois people

1    told to sweep up asbestos dust with brooms in

2    1958?

3         A   Asbestos dust?

4         Q   Perhaps I should call it Kaylo dust?

5         A   Well, they were to clean work areas, yes.

6         Q   And did they use brooms -- were they

7    provided brooms to do that?

8         A   Yes.

9         Q   And then also Aetna talks about blowing

10   down dust off of the overhead beams and so forth.

11   Do you remember doing that there at the plant

12   where the workers used compressed air and blew the

13   dust off the flat surfaces?

14        A   I remember doing that during the strike,

15   yeah.

16        Q   What strike was that?

17        A   When the union struck the plant.

18        Q   And what -- why did the union strike the

19   plant?

20        A   Well, perhaps you could answer that

21   question.   We were in the negotiations.   President

22   Nixon had put a freeze on wages, and the company

23   offered the union what the government regulation

24   was and they turned it down.   And they struck for

1    92 days.  And then they came back to work for the

2    very same thing that they struck.

3         Q   Now this is a strike you're talking about

4    during the time that Richard Nixon was President

5    of the United States?

6         A   Yes, sir.

7         Q   Okay.  I was talking about an earlier

8    period, 1958 where Aetna reported that

9    Owens-Illinois had been blowing dust down off of

10   the overhead beams and so forth with compressed

11   air.  Do you remember that?

12        A   I don't remember it, but I don't doubt it.

13        Q   Okay.

14        A   It may have been a plant clean up which

15   gets everything cleaned up and start from scratch.

16        Q   The jury has also seen exhibit 264.  It

17   shows fellow running a saw through a piece of

18   Kaylo.  Do you see that picture there inside of

19   plaintiffs' exhibit 264?

20        A   Yes.

21        Q   And you see how the artist depicted some

22   lines coming down from that saw where dust -- it

23   appears that he's trying to portray dust coming

24   off?  Is that the way you remembered what happened

1    when Kaylo pipe covering or block was cut with a

2    power saw that gave off dust?

3        A  No, sir, you couldn't see that.  The dust

4    collector would grab it before you could see it.

5        Q  So actually --

6        A  This is a handled saw.

7        Q  What were the fellows sweeping up then

8    with the brooms?

9        A  What were they sweeping up then with the

10   brooms?

11       Q  Yes, sir.

12       A  Dirt from molds.

13       Q  What was that dirt made of?

14       A  Well it could have been dried Kaylo.  It

15   could have been wet Kaylo.  I don't know.  My wife

16   sweeps the kitchen quite frequently and I don't

17   ask her what the dirt is made up of.

18       Q  The jury has seen exhibit 284 --

19   plaintiffs' exhibit 284 where Owens-Illinois said

20   that Kaylo was non-irritating to the skin.  Did

21   you ever find Kaylo to be irritating to the skin?

22       A  No, sir.

23       Q  Now what did Owens-Illinois tell you as to

24   whether Kaylo was toxic or not?

126

1      A   Toxic?

2      Q   Yes.

3      A   The only thing that we were told was

4   inhaling.

5      Q   Inhaling what, Mr. Grimmie?

6      A   Kaylo dust.

7      Q   You were told by Owens-Illinois that if

8   you inhaled Kaylo dust, it could be toxic to you?

9      A   Asbestos, silica.

10      Q   Am I correct though that Owens-Illinois

11   told you that Kaylo dust was toxic?

12      A   I don't understand toxic.  To me toxic is

13   getting a bad bottle of booze or something like

14   that.  You can walk up to a piece of Kaylo and

15   pick it up and it's not going to bite you.  And

16   chances are it won't harm you unless you scrape it

17   or disturb it; and then it takes from what I have

18   been told a certain amount or more to become

19   harmful to you.

20      Q   The jaws of Kaylo close fairly slowly,

21   don't they?

22      MR. O'HARA:  Objection Your Honor,

23   argumentative.

24      THE COURT:  Sustained.

1          A   No, sir.

2          Q   Well --

3          A   Is there an objection?   Can I answer that?

4          THE COURT:   No, don't answer that sir.

5          Q   Do you remember you talked about the

6    posters that were there on the wall at the Berlin

7    plant?

8          A   On the wall and bulletin boards.

9          Q   Walls, bulletin boards and so forth?

10         A   Yes.

11         Q   What did those posters say about the

12   effect of asbestos or Kaylo dust being in the air

13   of the plant?

14         A   I don't remember the exact wording, but

15   basically inhaling Kaylo dust can be harmful to

16   your health.

17         Q   There were posters like that on the walls

18   of the plant at Berlin, New Jersey?   Is that your

19   testimony?

20         A   Were there posters like that?   Yes.

21         Q   Were there posters on the walls of the

22   plant at Berlin, New Jersey that said inhaling

23   Kaylo dust can be harmful to your health?

24         A   Yes.

1          Q   When did they first appear?

2          A   I don't remember.

3          Q   Were there any there in the 1940s, the

4     first three years that you worked there?

5          A   I don't remember that.

6          Q   Were there any there in the 1950s, the

7     next ten years that you worked there?

8          A   I would say yes in the 1950s.

9          Q   When did the signs go up at the Berlin

10    plant saying Kaylo dust was dangerous?

11         A   Kaylo dust is dangerous?

12         Q   Yes.

13         A   I thought that was the last question you

14    asked.  You're repeating the question?

15         Q   Do you remember when you first saw a sign

16    on the wall of the Berlin, New Jersey plant that

17    said Kaylo dust was dangerous?

18         A   I believe sometime in the 1950s.

19         Q   Before you saw the Selikoff article,

20    correct?

21         A   Yes.

22         Q   When you saw that sign, did you get close

23    enough that you could read all the words?

24         A   Yeah, there wasn't many words on it.  It

1   was a big poster.

2   Q   Tell us again as best you remember what

3   the words were?

4   A   Kaylo dust can be harmful to your health.

5   Wear your respirator.

6   Q   Did the sign explain what harm would come

7   from Kaylo dust?

8   A   Not that I recall.

9   Q   Did the sign explain when the harm would

10  come so far as you remember?

11  A   Not that I recall.

12  Q   Did the sign use the word asbestosis to

13  explain the harm?

14  A   Not that I recall.

15  Q   Did the sign use the word cancer to

16  explain the harm?

17  A   No.   We knew nothing about association

18  with cancer until 1965.

19  Q   So far as you know, Owens-Illinois never

20  knew anything about cancer during the time that

21  you worked for Owens-Illinois, because

22  Owens-Illinois never told you anything about

23  cancer.   Right?

24  A   Did Owens-Illinois know anything about it?

1      Q   That is my question.

2      A   Did I mention to you that every hourly

3   employee got a physical examination each year?

4      Q   I think you did.

5      A   Every hourly, not only salary.   Every

6   hourly employee got a physical examination by the

7   plant physician and he explained to them what the

8   situation was.

9      Q   Oh.   When you were an hourly employee, did

10  the physician that gave you a physical examination

11  explain to you what could happen from breathing

12  the airborne dust in the plant?

13     A   Yes, I could get asbestosis.

14     Q   Okay.   And the first physician was

15  Schwartz did you say?

16     A   No, sir.   Dr. Girard.

17     Q   Girard, thank you.   And did Dr. Girard

18  tell you how long after you inhaled the material

19  in the plant's air it would take for you to become

20  sick?

21     A   I don't recall that.   I don't know if they

22  knew that then.

23     Q   Well let's take it one step at a time.

24     Do you remember Dr. Girard telling you how

131

1    long after you inhaled the dust that it might make

2    you sick?

3         A   I don't recall him telling me that.

4         Q   When did Owens-Illinois learn the length

5    of time it takes between inhaling the type of dust

6    that was at the Kaylo plant and when the worker

7    comes down with disease?

8         A   I don't know.

9         Q   Your thinking was as soon as

10   Owens-Illinois learned about the details of what

11   bad could happen from inhaling Kaylo dust, it told

12   all of the members of it's workforce.   Correct?

13        A   Yes.

14        Q   And the same is true --

15        A   By bulletin board or poster communication.

16        Q   And of course by telling each worker at

17   the annual physical by the company doctor?

18        A   That is correct.

19        Q   Which was first Dr. Girard and then Dr.

20   Schwartz and then Dr. McNally?

21        A   Right.

22        Q   And had Dr. McNally known about the

23   relationship between asbestos and cancer before

24   '65, he would have told the workers as soon as he

1    knew about it, right?

2         A   I can't answer for Dr. McNally.

3         Q   When you interviewed Dr. McNally for his

4    job there, did he tell you about the relationship

5    between asbestos and disease or did you tell him?

6         A   I didn't interview him.  He was my family

7    doctor.  I just hired him on.

8         Q   I see.  You just asked him if he would be

9    willing to work for the plant?

10        A   Yes.

11        Q   Okay.  But did you ever discuss asbestos

12   and disease with Dr. McNally?

13        A   There were times when he would get in his

14   medical journals, there would be articles on

15   asbestosis and he would show them to me and the

16   plant nurse as did all the doctors.  But there was

17   never a sit down classroom that we are going to

18   give you a crash course in medicine.

19        Q   Um-hmm.  And how was it that you then

20   conveyed this information on to the hourly

21   workers?

22        A   By poster and bulletin board and the plant

23   physician talking to them at their annual physical

24   time.

1    Q   Did you ever sit in on any of those plant

2    physician discussions to see what it was that Dr.

3    McNally told the workers?

4        A   Privileged communication.

5        Q   Well, who claims it is confidential what

6    Owens-Corning told its employees about the health

7    hazards of asbestos?

8        A   What the doctor discussed with his

9    patient, we did not stick our nose into.

10       Q   How did Owens-Corning make sure that the

11   doctor was telling the patient all the patient

12   needed to know about the health hazards --

13       A   There is such a thing as trust.

14       Q   Like employees trust their employer?

15       A   Yes.

16       Q   You were telling us a little bit about why

17   it is that Owens-Corning bought the plant from

18   Owens-Illinois, and what you said was that

19   Owens-Corning was already in the insulation

20   business before it started distributing Kaylo in

21   '53.   Right?

22       A   That was my understanding, yes.

23       Q   But there was some jobs where

24   Owens-Corning wasn't currently able to sell the

1    entire range of products that would be needed to

2    finish a project.   Correct?

3        A   That was my understanding of the thought

4    process.

5        Q   So Owens-Corning, who in the forties were

6    talking about the evils of asbestos started

7    selling asbestos-containing Kaylo in the fifties

8    so that it could sell an entire job?

9        MR. CONSTANTINE:   Well objection, misstates

10   whatever it is Mr. Walker --

11       THE COURT:   Sustained.

12       Q   Actually this worked out all right from

13   the Owens-Corning standpoint, because eventually

14   it became the largest insulation supplier in the

15   United States.   Right?

16       MR. CONSTANTINE:   Objection, relevance.

17       A   Well it probably earned it.

18       THE COURT:   Overruled.

19       Q   Do you remember talking about you yourself

20   wore a device that captured some air and pulled it

21   through a filter down here by your hip?

22       A   Yes, sir.

23       Q   Now, when you got into management -- well

24   let me ask a different question.   When you were

1     one of the workers who wore that device, did

2     someone bring you the results of the analysis

3     after the stuff was counted on the filter?

4          A   No, sir.

5          Q   Well how is it that you learned whether

6     there was enough or too much or too little of this

7     dust in the air?

8          A   The report went to the plant manager.

9          Q   And did the plant manager tell you how

10    much dust was in the air?

11         A   The plant manager would pass it onto the

12    department manager.

13         Q   Did the --

14         A   Usually the plant engineer would be

15    brought in if there was a problem, and they would

16    engineer the problem out.

17         Q   And when you were wearing this device in

18    the forties, did they bring you a copy of the

19    results of the test for the device that you wore?

20         A   No.  I thought I just answered that, no.

21         Q   Was there ever a point in your career

22    where the results of these dust sampling efforts

23    were communicated to you?

24         A   Yes.  The plant manager would get the

1   reports and he would go over them with me and the

2   plant engineer and if there was a problem area,

3   the engineer department would go out and construct

4   new equipment to solve the problem.

5       Q   Take a look at exhibit 282.   Is this the

6   type of report that you got and -- let me ask you

7   a different question.   Do you remember getting

8   that report in 1958?

9       A   No.

10      Q   Did you get reports like that in the

11  fifties?

12      A   I don't remember that report.

13      Q   It talks about you being part of the group

14  there when the dust was collected.   It says that

15  in the first paragraph.   Did you notice that?

16      A   Yes.

17      Q   Well was it your recollection that whoever

18  collected the dust, they didn't report the results

19  to you?

20      A   That is correct.   It would have gone to

21  the plant manager.

22      Q   Where are the results of the other tests

23  if there were tests done in the forties and

24  fifties?   Where are those results?

1    A   Where are they?

2    Q   As far as you know?  I mean, does

3  Owens-Illinois or Owens-Corning still have them as

4  far as you know?

5    A   No, I think all of that stuff has been

6  scrapped except medical records when they closed

7  -- the plant is closed.  You know that.

8    Q   The Berlin plant is closed?

9    A   I'm sure you know that.

10    Q   Were you there when it was closed to see

11  what was thrown away and what wasn't?

12    A   No, I was retired before that happened.

13    Q   Okay.  Well somehow this 1958 record is

14  still surviving and I wondered if you knew

15  anything about the other records that were made in

16  the fifties and the records made in the forties

17  and so forth?

18    A   No, I don't.

19    Q   Now the posters that were on the wall that

20  said breathing Kaylo dust can be harmful, did they

21  stay up into the sixties?

22    A   I don't think so.

23    Q   They were in the fifties, but came down

24  before 1960?

1      A  Yeah, I think they would become tattered

2  and torn and just sort of housekeeping bit would

3  eliminate them.

4      Q  Well, were new posters erected when the

5  old ones became tattered and torn?

6      A  There was bulletin board announcements

7  would go up periodically.

8      Q  In the 1960s, were there any posters on

9  the wall of the plant that said Kaylo dust can be

10  hazardous to your health?

11      A  I don't know if there was posters on the

12  wall.

13      Q  How about in the 1970s, were there any

14  posters on the wall at the Berlin, New Jersey

15  plant?

16      A  I don't recall.

17      Q  Saying that Kaylo dust can be hazardous to

18  your health?

19      A  I don't recall.

20      Q  Now the jury has seen exhibit 265 where

21  Mr. Staelin sent some articles on asbestos dust to

22  Mr. Hazard in September of 1941.  Did Mr. Hazard

23  ever share those articles with you?

24      A  In 1941?

1      Q   Take a look at that exhibit if you want.

2  It is a letter from Mr. Staelin to Mr. Hazard

3  saying thanks for letting us borrow these two

4  articles about asbestos, and it's written in 1941?

5      A   So the articles must have been written

6  before 1941.

7      Q   That is the assumption I made.  And my

8  question is, did Mr. Hazard ever loan them to you?

9      A   No sir.

10     Q   Did Mr. Hazard describe to you how

11 Owens-Illinois sent Kaylo dust off to a place

12 called Saranac Lake, New York, and had certain

13 experiments run there with animals other than man?

14     A   No.  Mr. Hazard did not.

15     Q   Have you ever learned about the animal

16 experiments that were done at Saranac Lake?

17     A   No.  I knew that samples were sent to

18 Saranac Lake, but I didn't know there was animal

19 experiments.  That is the Trudeau Laboratory

20 you're speaking of?

21     Q   The Trudeau Foundation is a part of what

22 is known as the Saranac Laboratory, yes, sir.

23 When did you first learn that Kaylo dust had been

24 sent to Saranac or Trudeau?

140

1       A   I don't remember when I first learned.

2       Q   Was it in the forties or fifties?

3       A   I don't remember when I first learned.

4       Q   And when you first learned, was it at one

5    of the depositions or did you learn about it

6    before the depositions?

7       A   No, I think I learned of it somewhere

8    through the personnel department.

9       Q   And what did you learn was the reason that

10   Owens-Illinois sent the Kaylo dust to Saranac

11   Lake?

12      A   As I recall, they were asking for tests to

13   be made on the effects of Kaylo dust and asbestos

14   to the lung.

15      Q   And were you given any information as to

16   the nature of those tests?

17      A   It was out of my area.

18      Q   Were you told that Saranac had exposed

19   animals other than man to this Kaylo dust and then

20   allowed the animals to live for various lengths of

21   time, killed them and looked at their lungs to see

22   if they were having any lung disease as a result

23   of inhaling the Kaylo dust?

24      A   No, that is news to me.

1    Q  So today is the first you learned about

2    the animals inhaling the Kaylo dust at Saranac.

3    Correct?

4    A  Yes, sir.

5    Q  The jury has plaintiffs' exhibit 263 where

6    Arthur Vorwald of Saranac writes to U.E. Boews

7    (phonetic).  Did you ever know Boews?

8    A  Yes.

9    Q  And among other things, he concludes his

10   letter by saying, "I realize that our findings

11   regarding Kaylo are less favorable than

12   anticipated.  However, since Kaylo is capable of

13   producing asbestosis, it is better to discover it

14   now in animals rather than later in the industrial

15   workers."

16   Today is the first you learned that Kaylo

17   dust caused asbestosis in animals.  Correct?

18   A  Yes.

19   Q  Plaintiffs move into evidence OI 513 and

20   OI 516.

21   THE COURT:  I don't have any copies of those.

22   Any objection?

23   MR. O'HARA:  No Your Honor, we were going to

24   move them anyway.

1     MR. CONSTANTINE:  Objection, hearsay,

2     authentication as to Owens-Corning, Your Honor.

3     MR. WALKER:  Let me ask a couple questions if

4     I may, Judge.

5     THE COURT:  All right.

6     Q  Mr. Grimmie, the jury has seen exhibit 283

7     which is the contract between Owens-Corning and

8     Owens-Illinois regarding the sale of the Berlin

9     plant and the Kaylo line.  And of course you were

10    there at Berlin -- I mean literally you worked for

11    Owens-Illinois and the next day you worked for

12    Owens-Corning.  Correct?

13    A  That is correct.

14    Q  And were you aware that the records stayed

15    there at the facilities?  I mean Owens-Illinois

16    didn't move all the paper out of the plant the day

17    it sold the plant, correct?

18    MR. CONSTANTINE:  Objection, compound,

19    leading.

20    THE COURT:  Sustained.

21    MR. CONSTANTINE:  Well I will withdraw as to

22    leading but as to compound I object.

23    MR. WALKER:  I will ask a different question.

24    Q  Mr. Grimmie, you had an office job in

1      1958.  Correct?

2          A  Office job?

3          Q  Well you had a desk that was considered

4      your desk in 1958.  Correct?

5          A  Yes.

6          Q  And you had some papers that you had

7      gathered together in the manner that you wanted to

8      gather them.  Correct?

9          A  Yes.

10         Q  Other people with managerial

11     responsibilities had also gathered together

12     certain papers which they wanted, correct?

13         MR. CONSTANTINE:  Objection, speculation.

14         A  I would imagine so.

15         THE COURT:  Overruled.

16         Q  Now the day it was last called an

17     Owens-Illinois plant, the papers you had were

18     still there. Correct?

19         A  Yes.

20         Q  And the next morning when it was --

21     started being called an Owens-Corning plant, the

22     papers you had when you were an Owens-Illinois

23     employee were still at your desk, correct?

24         A  Yes.

1        Q   Pardon?

2        A   Yes, sir.

3        Q   So whatever it was that Owens-Illinois had

4    in 1950 and 1951 in terms of documents,

5    Owens-Corning had them in 1958?

6        MR. CONSTANTINE:   Hold on Mr. Grimmie.

7    Objection, speculation Your Honor.

8        THE COURT:   Sustained.

9        Q   Do you know of any documents that were

10   prepared during the Owens-Illinois period that

11   Owens-Corning destroyed?

12       MR. CONSTANTINE:   Objection.   Speculation.

13       THE COURT:   Overruled.

14       A   Would you please repeat that question?

15       Q   Do you know of any documents that were

16   prepared during the time that Owens-Illinois ran

17   the Berlin plant which would include the late

18   forties and the first eight years of the fifties

19   which documents were then later destroyed by

20   Owens-Corning?

21       A   What, sir, do you mean by documents?   You

22   mean the attendance record of an employee?   Is

23   that a document?

24       Q   I would say so.

1        A  I have -- I have no recollection of that

2    ever happening.

3        Q  So you don't remember Owens-Corning

4    destroying any of the documents that it received

5    from Owens-Illinois, do you?

6        MR. CONSTANTINE:  Objection, assumes a fact

7    not in evidence.

8        MR. WALKER:  Just asking what he remembers

9    Your Honor.

10        THE COURT:  Overruled.

11        A  No.

12        MR. WALKER:  I reoffer OI 513 and 516.

13        MR. CONSTANTINE:  Judge I object to 513 and

14    516 on hearsay and authentication grounds.

15        MR. WALKER:  Let me have another shot at it

16    Judge.

17        MR. CONSTANTINE:  Well could we approach,

18    Your Honor?

19        THE COURT:  Counsel.

20        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE

21    BENCH OUT OF THE HEARING OF THE JURY.)

22        MR. WALKER:  Judge, I'm not ready to call it

23    quits yet.  I think I can do more to authenticate

24    this.

1          THE COURT:   That's fine.

2          (THE FOLLOWING PROCEEDINGS WERE HAD IN THE

3      PRESENCE OF THE JURY.)

4          THE COURT:   Let's take a break at this time.

5      Ladies and gentlemen, go ahead and close your note

6      pads up and step back to the jury deliberation

7      room and relax for a few minutes.

8          (THE FOLLOWING PROCEEDINGS WERE HAD OUT OF

9      THE PRESENCE OF THE JURY.)

10          THE COURT:   Record reflect jurors have left

11      the courtroom.

12          Mr. Grimmie, you can step down again, take a

13      break, relax.

14          Record reflect Mr. Grimmie has left the

15      courtroom.   Why don't we take a fifteen minute

16      break.

17          MR. CONSTANTINE:   I just -- I had initially

18      asked to approach because I made an objection.

19      Mr. Walker was given an opportunity, Your Honor

20      didn't rule on the objection.   Mr. Walker

21      indicated that he wanted to ask some more

22      questions, the court allowed him to do that.   He

23      asked some more questions, I lodged another

24      objection, the court didn't rule.   Mr. Walker said

147

1    I want to ask some more questions.  The court was

2    intend -- I would presume intending on allowing

3    Mr. Walker to do that and I think that Your Honor

4    can cut really to the quick, because

5    authentication and hearsay are two objections that

6    we are familiar with and unless this gentleman was

7    the custodian of records and can testify as to the

8    authenticity of the document, then I don't see how

9    it is that Mr. Walker can get the document

10   authenticated through this gentleman who

11   apparently worked in personnel and production.

12        So I guess I would like a ruling from the

13   court on my objections to 513 and 516.

14        MR. WALKER:  Judge I don't think counsel has

15   that standing to say that he determines when I am

16   done authenticating it.  I have indicated I think

17   I can do more to authenticate it and boy, my

18   clients join with Mr. Constantine in this constant

19   struggle against these forged documents.  That is

20   probably the only thing we have in common, but the

21   man must have a history to know a forgery when he

22   sees it and he's seen one and therefore we are

23   trying to help him stamp out this admission of

24   forged documents and we are going to try to do

1    more to authenticate 513 and 516.  Or is his

2    position that he as the opponent of the party

3    introducing a document chooses when to cut off the

4    evidence of authenticity?  He does happen to be

5    wrong on that point.

6        MR. CONSTANTINE:  Judge, just let me respond

7    since this is my motion.  Mr. Walker just uttered

8    some words about forgeries and all that, I just

9    for the life of me, I don't know what he's talking

10   about and I don't know if anybody else does

11   either.  But we are talking about --

12       THE COURT:  Well what does authentication

13   mean in your vocabulary?

14       MR. CONSTANTINE:  Well, Your Honor,

15   authentication, to authenticate a document,

16   usually you have to either -- most of the times in

17   most cases counsel just say here are my documents,

18   here are your documents, we put them in in this

19   search for the truth, we just put our documents in

20   and they argue their position and we argue our

21   position.  Now the truth to some degree is

22   regulated by that which the court admits and one

23   of the hurdles an attorney must pass is

24   authenticity which I'm struggling with on my

149

1   documents in the 600 series.

2        Now this document 513 wasn't authored by the

3   gentleman on the witness stand, doesn't seem to

4   have been received by him, he wasn't -- hasn't

5   testified that he was the custodian of records in

6   1950 or at any other time and the same is true for

7   516.  So my objection is that they cannot be

8   authenticated through this witness and they are

9   hearsay as to Owens-Corning.

10       THE COURT:  That may be right, I don't know.

11  But the attorney has an opportunity to attempt to

12  authenticate it.  Give him a reasonable

13  opportunity, if he can't, he can't.

14       Let's take a fifteen minute recess.

15       (A RECESS WAS TAKEN.)

16       THE COURT:  Record reflect all parties have

17  returned following the recess.

18       MR. PETERS:  Since these documents are going

19  to obviously be admitted against OI, since they

20  have no objection and I have no objection to the

21  authenticity of the document --

22       THE COURT:  Which one, 513 and 516?

23       MR. PETERS:  513 and 516, since I am not a

24  co-conspirator I would object to them as

1      conspiracy as to the railroad.

2          THE COURT:  Are they offered against the

3      railroad?

4          MR. WALKER:  They were, but I can't think of

5      an exception to overcome his hearsay objection.

6          THE COURT:  His objection will be allowed.

7      Mr. O'Hara, do you have something?

8          MR. O'HARA:  I was just going to give you a

9      stack of documents that we were going to offer

10     because you may find some of the documents that

11     Mr. Walker is talking about now are going to be in

12     this pile.

13         THE COURT:  All right, thank you.  Ready for

14     the jury?

15         MR. WYLDER:   We are.

16         THE COURT:  Do we know how much longer Mr.

17     Walker it's going to take?

18         MR. WALKER:  About twenty minutes.

19         (THE FOLLOWING PROCEEDINGS WERE HAD IN THE

20     PRESENCE OF THE JURY.)

21         THE COURT:  All right, you may be seated.

22     Record reflect ladies and gentlemen of the jury

23     have returned to the courtroom.

24         Mr. Walker, you may examine.

1      Q  Mr. Grimmie, do you recognize

2  Owens-Illinois exhibit 515 as being a letter on

3  Owens-Illinois stationery?

4      A  I recognize the stationery, yes, sir.

5      Q  And do you recognize the signature there

6  at the bottom as that of Bill Hazard?

7      A  Well, the only way I would recognize it as

8  Bill Hazard is I see W.C. Hazard here.

9      MR. WALKER:  Offer Owens-Illinois 515?

10      A  Yes, defendant's exhibit 515 --

11      MR. WALKER:  Just wait a minute, the Judge

12  has got to go know --

13      MR. O'HARA:  Your Honor, no objection.

14      MR. CONSTANTINE:  Hearsay authentication as

15  to Owens-Corning.

16      MR. PETERS:  Same objection as 515 and 516,

17  Your Honor.

18      THE COURT:  Are you done with your offer?

19      MR. WALKER:  No, I would ask the court to

20  take judicial notice of Owens-Illinois 419 which

21  is in evidence and compare the signature with that

22  on 515.

23      THE COURT:  All right.  Objection will be

24  overruled as to Owens-Corning Fiberglas and

1    objection sustained as to Illinois Central

2    Railroad.

3         MR. CONSTANTINE:  As to which exhibit Your

4    Honor?

5         THE COURT:  515.

6         MR. CONSTANTINE:  Your Honor is taking

7    judicial notice, is that --

8         MR. WALKER:  I offer Owens-Illinois 516 into

9    evidence which is a letter dated August 7th, 1951.

10        THE COURT:  The objection of Owens-Corning --

11   Owens-Illinois is not objecting.

12        MR. O'HARA:  Right Your Honor.

13        THE COURT:  Owens-Corning objection is

14   sustained.  Illinois Central?

15        MR. PETERS:  Yeah, my objection has already

16   been sustained Your Honor.

17        MR. WALKER:  Could I have the Owens-Corning

18   objection again Your Honor?

19        THE COURT:  Authenticity and hearsay.

20        MR. WALKER:  May I approach?

21        THE COURT:  You may.

22        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE

23   BENCH OUT OF THE HEARING OF THE JURY.)

24        MR. WALKER:  Plaintiffs' response to the

1    hearsay objection is that it is a statement by a

2    co-conspirator in furtherance of the conspiracy

3    and as to --

4         THE COURT:  Are there specific sentences that

5    you suggest are statements?

6         MR. WALKER:  Well the best sentence in it is

7    the last one.  In view of the fact that we are not

8    certain just what atmospheric concentrations of

9    asbestos fibers is the limit of safety -- and as

10   to authenticity, it is the letter written in

11   response to 515.  515 just came into evidence.

12        THE COURT:  All right, go ahead.

13        MR. CONSTANTINE:  Your Honor, I want to set

14   the record straight on my objection as to asking

15   the court to take judicial notice of a signature,

16   judicial notice to comparing signatures, the

17   expertise is that of a handwriting expert.  And

18   when the court is asked to take judicial notice of

19   a matter, those matters generally are so common to

20   the public and there are rules relating to what

21   the court is permitted to take judicial notice of.

22   I'm not aware of a rule that allows the court to

23   take judicial notice of handwriting and make a

24   fact determination that the handwriting is the

1    same.  So I object to 516 on the basis of the

2    court's ruling -- I'm sorry, 515 if the basis was

3    it appears to be that Your Honor compared the

4    handwriting and made a factual determination that

5    the two are the same.  I object to those grounds.

6         As for 516, the fact that it was sent in

7    response or sent back, that doesn't meet the

8    authenticity rule.  This gentleman is not the

9    custodian of records.

10        I have been compelled to bring, show some

11   proof by virtue of the custodian of records to

12   authenticate documents.  This man was not the

13   custodian of records.  Didn't write the letter,

14   didn't send it, the letter is unsigned and I don't

15   think the fact that Mr. Walker testifies that it's

16   in response to another or -- that that makes it

17   authentic.  That simply is not the requirement.

18   So I object on those grounds and I would -- just

19   let me, it's my understanding that the court ruled

20   and sustained Owens-Corning's objection.  Now we

21   are hearing Mr. Walker argue for Your Honor to

22   reverse that ruling.  I object to that as well.

23        MR. WALKER:  As to Owens-Corning's motion to

24   reconsider your ruling on 515, it's not by rule in

1    Illinois, it's by statute.  The statute provides

2    the authority for the court to make the comparison

3    of signatures.  As to 516, there is decisional law

4    that says a letter appears on its face to be

5    authentic and is clearly in response to another

6    letter that is already properly into evidence can

7    come into evidence for that reason.  That is why

8    we would ask you to consider 516 authentic.

9        THE COURT:  The problem is with 516 is there

10   is no evidence that it was received to my

11   knowledge or that it was sent.

12       MR. WALKER:  Well since this is a carbon

13   copy, I would agree with the court.  But there is

14   at least a presumption they wouldn't type a letter

15   without sending it.  I admit it doesn't say

16   received on it.

17       THE COURT:  Well it doesn't say received and

18   there is no other indicia of receipt like the

19   Bates stamp that I'm aware of.  It certainly -- I

20   mean I think it's clear at this point that the

21   court has admitted documents that were in

22   possession of Owens-Illinois at that plant or were

23   transferred to Owens-Corning.

24       MR. CONSTANTINE:  That is not clear to me.

1   What are you basing that on Judge?  That is just a

2   fact that's been -- you excluded the testimony of

3   Willis Hazard which is the only person in the

4   world that can speak to that transfer.

5        THE COURT:  I don't believe that is true.

6        MR. CONSTANTINE:  Is there something else

7   that the court is basing that finding of fact on?

8        THE COURT:  There is a contract in evidence

9   which indicates that if I recall correctly.

10       MR. WALKER:  It's counsel's comments that

11  Owens-Corning doesn't keep its contracts Judge,

12  that is what he was basing it on.

13       MR. CONSTANTINE:  Mr. Walker is probably

14  right.  He likes to make those little comments and

15  I suspect that it burdens the record, but that is

16  fine.  The fact of the matter is Judge without

17  proof of receipt --

18       THE COURT:  All right, at this point I'm not

19  going to admit Owens-Illinois 516 against OCF.  I

20  will against Owens-Illinois, but not against OCF

21  or Illinois Central.

22       MR. CONSTANTINE:  Will Your Honor indicate

23  that to the jury?

24       THE COURT:  Yeah.

(THE FOLLOWING PROCEEDINGS WERE HAD IN THE PRESENCE OF THE JURY.)

THE COURT:  I believe I indicated that Owens-Illinois exhibit 516 is admitted only with regard to Owens-Illinois.

BY MR. WALKER:

Q  Mr. Grimmie, there is in evidence a document called Owens-Illinois 516 which as letter from Thomas Durkan to Bill Hazard dated August 7th, 1951, and it says, in view of the fact that we are not certain just what atmospheric concentration of asbestos fibers is the limit of safety, it would be well to apply -- and the sentence goes on.

In 1951, what had you been told by Owens-Illinois was a level of airborne asbestos in which people could work safely?

MR. O'HARA:  Your Honor, I would just object that we shouldn't read half sentences.  We should at least finish off the sentence.

THE COURT:  Sustained.  Let's read the whole sentence.

MR. WALKER:  Sure.

Q  In a letter written by Thomas Durkan to

1   Bill Hazard on August 7th, 1951, Mr. Durkan says,

2   "Nevertheless, in view of the fact that we are not

3   certain just what atmospheric concentration of

4   asbestos fibers is the limit of safety, it would

5   be well to apply the protective measures suggested

6   in the report including the wearing of a

7   respirator and if possible some method of reducing

8   the amount of atmospheric dust."

9        My question to you Mr. Grimmie is, in August

10  of 1951, what had Owens-Illinois told you was the

11  safe level of airborne asbestos in which people

12  could work without becoming ill?

13       A  I have no recollection of that sir.

14       Q  Did Owens-Illinois tell you that there was

15  a -- an amount above zero of airborne asbestos in

16  which people could work and none of them become

17  ill?

18       A  I have no recollection.

19       Q  Do you have in front of you Owens-Illinois

20  exhibit 419?

21       A  Yes, sir.

22       Q  Now this is already in evidence.  It says,

23  it is a letter from Hazard to Arthur Vorwald at

24  Saranac.  "Dear Art.  Some time ago we mentioned

1    to you that our Kaylo division wants to gather

2    together in brochure form material on the health

3    aspects of Kaylo dust and wants to consider the

4    possibility of publishing some of your

5    experimental findings."

6        Do you see that first paragraph there?

7        A   Yes, sir.

8        Q   Now, did you ever see a brochure that the

9    Kaylo division of Owens-Illinois prepared

10   regarding the health aspects of Kaylo dust?

11       A   I have no recollection.

12       Q   Do you have a present recollection that

13   you ever saw a brochure on the health aspects of

14   Kaylo dust?

15       A   No, I don't.

16       Q   And you worked in Kaylo dust from 1947 to

17   at least 1972, Kaylo dust that had -- let me ask a

18   different question.  You worked in the dust of

19   asbestos-containing Kaylo from at least 1947 into

20   1972.  Is that correct?

21       A   Yes, approximately.

22       MR. WALKER:  Someone else may ask.

23       THE COURT:  Mr. Constantine, do you have any

24   questions?

CROSS EXAMINATION

BY MR. CONSTANTINE:

Q   Good afternoon, Mr. Grimmie.

A   Good afternoon, sir.

Q   Mr. Grimmie, my name is Andrew
Constantine, I represent Owens-Corning Fiberglas.

A   How do you do?

Q   How do you do?  Have we ever met before
today?

A   Not to my knowledge.

Q   And have I ever asked you to come into a
courtroom and testify as you're doing here today?

A   No, sir.

Q   Okay.  And the questions I'm about to ask,
do you have any idea what they are?

A   No, sir.

Q   You testified on direct examination or in
response to Mr. O'Hara's questions that when you
came to work for Owens-Illinois as an hourly
employee, you sat down with a nurse and a nurse
explained to you the necessity of using a
respirator for the diseases silicosis and
asbestosis.  Do you recall that?

A   Yes, sir.

1          MR. WALKER:   Leading.

2          MR. CONSTANTINE:   This is cross, Judge.

3          THE COURT:   Overruled.

4          Q   Now, were you the only hourly employee

5     that had to sit down with that nurse or did other

6     hourly employees have to sit down?

7          A   No, everyone that was hired went through

8     the same procedure.

9          Q   Every single person that was hired by

10    Owens-Illinois as far as you know had to sit down

11    with that nurse and get that training, is that --

12         A   Yes, sir, that is my understanding.

13         Q   Now when Owens-Illinois -- after

14    Owens-Illinois sold the plant and the product line

15    to Owens-Corning, you stayed on and became an

16    employee of Owens-Corning.   Correct?

17         A   Yes, sir.

18         Q   Now the day that that happened, in 1958,

19    all those people that had worked for

20    Owens-Illinois, did Owens-Corning fire them or did

21    they become Owens-Corning employees too?

22         A   They became Owens-Corning employees.

23         Q   Okay.   And I think you mentioned that in

24    1965, one of the plant supervisors over his

162

1    signature put one of Dr. Selikoff's articles on

2    the bulletin board or on all five bulletin boards

3    at the Berlin plant.   Correct?

4        A   I believe so, yes.

5        Q   And if that happened in 1965, that would

6    have occurred during a time period that you were

7    working for Owens-Corning.   Correct?

8        A   Yes.

9        Q   And then I -- now, after people sat down

10   with the nurse and was told about wearing a

11   respirator for silicosis and asbestosis, did you

12   ever see any of those workers after being told

13   that not wearing respirators?

14       A   Yes, sir.

15       Q   This doctor -- then I think you said Dr.

16   McNally talked about asbestos and asbestosis with

17   you?

18       A   Yes.

19       Q   Another -- there were meetings with

20   department heads?

21       A   Yes.

22       Q   Do you recall that?   Was asbestos and

23   asbestosis ever discussed at those meetings?

24       A   Yes, the plant manager had meetings.

1      Q   When you were working for Owens-Illinois
2   or Owens-Corning Fiberglas, was asbestos and
3   asbestosis a secret?
4      A   Never.
5      Q   Well, if somebody were to suggest that
6   Owens-Corning and Owens-Illinois were conspiring
7   to keep from people like you who worked in the
8   plant information about asbestos and asbestosis,
9   what would you say to that?
10      A   I would say that was ridiculous.
11      Q   This Dr. Sokolowski -- and you were there
12   since what time with Owens-Illinois?  I'm sorry,
13   you started with OI when?
14      A   With OI?
15      Q   In the forties?
16      A   In '47.
17      Q   And you were with Owens-Corning until the
18   day you retired?
19      A   Yes, sir.
20      Q   In, what, '84 it was I think?
21      A   '84.
22      Q   Okay.  Now this Dr. Sokolowski, was that a
23   doctor that just management people went to or did
24   everybody go to?

1      A   Everyone.

2      Q   So there wasn't some special doctor that

3   management went to and the other people that

4   worked hard in the plant just like you, they went

5   to some other doctor.  It wasn't like that,

6   correct?

7      A   Everyone on workers' comp with asbestosis

8   goes to Dr. Sokolowski.  We even have one guy

9   comes up from Florida to go to Dr. Sokolowski.

10      MR. CONSTANTINE:  Thank you, Mr. Grimmie.

11      THE WITNESS:  Yes, sir.

12      THE COURT:  Illinois Central?

13      MR. PETERS:  No questions Your Honor.

14      THE COURT:  Owens-Illinois?  Mr. O'Hara?

15                  REDIRECT EXAMINATION

16   BY MR. O'HARA:

17      Q   Hello Mr. Grimmie.  I think you testified

18   a little bit earlier today about the fact that you

19   spent some time at Owens-Illinois as an hourly

20   employee?

21      A   Yes, sir.

22      Q   Do you remember about how many years you

23   spent at Owens-Illinois as an hourly employee?

24      A   Um, I would say about four.

1      Q   You gave some testimony about physical

2   examinations you had at the University of

3   Pennsylvania.   Do you remember that?

4      A   Yes.

5      Q   Were those --

6      A   That is University of Pennsylvania Medical

7   Center.

8      Q   Were those examinations during the time

9   you were with Owens-Illinois or were they at the

10  time when you were with Owens-Corning Fiberglas?

11     A   I believe they were Owens-Corning

12  Fiberglas.

13     Q   Mr. Walker asked you some questions about

14  whether there was any warning on the Kaylo boxes

15  when you were at Owens-Illinois.   Did Bill Hazard

16  ever tell you that he thought that Kaylo was

17  dangerous for people who were going to use it in

18  the field?

19     A   Not to my recollection.

20     Q   Mr. Walker showed you a document which was

21  plaintiffs' exhibit 282.   Do you think you could

22  find that, Mr. Grimmie?   Do you still have that

23  one?   I think that was the longer one.

24     A   Yes, I have it.

1      Q  Can you turn to the last page of that

2   document, the page that has the signature?  Can

3   you find that?

4      A  Recommendations?

5      Q  Is that the --

6      MR. O'HARA:  Your Honor, may I go next to the

7   witness please?

8      THE COURT:  You may.

9      A  I'm sorry.

10     Q  Do you see Mr. Grimmie that there is a

11  reference in that document, do you see in the

12  second sentence to the fact that the Aetna people

13  found some things that did not come up to

14  Owens-Illinois standards?  Do you see that?  The

15  second sentence on that page?

16     A  Yes, I see that.

17     Q  Okay.  Did Owens-Illinois when you were at

18  Owens-Illinois, did they have standards that

19  related to dust control and to respirator programs

20  and to monitoring employee health?

21     A  Yes.

22     Q  Mr. Walker asked you whether -- whether

23  you learned today for the first time that the

24  Saranac experiments involved animals that

1          developed asbestosis.  Correct?

2               A   Yes, sir.

3               Q   Did you learn on the first day of work at

4     Owens-Illinois from the plant nurse that the Kaylo

5     dust might cause asbestosis in people?

6               A   Asbestosis was, I thought, I interpreted

7     at the time to be secondary to silicosis.

8               Q   Okay.

9               A   And then shortly after that, asbestosis

10    became --

11              Q   Separate?

12              A   Yeah, it became the big problem.

13              Q   So -- but in any event, based on your

14    conversations with the plant nurse, you understood

15    that there was risks of asbestosis from the Kaylo

16    dust that was being used?

17              A   Yes.

18              MR. WALKER:   Leading.

19              THE COURT:   Sustained.

20              Q   Did you have any notion about whether

21    Kaylo dust used in the Owens-Illinois plants

22    created a potential hazard for people based on

23    your conversations with the plant nurse?

24              A   Yes.

1      Q  You talked -- you mentioned in one of your

2  responses to Mr. Walker about the notion of trust.

3  Did you trust Bill Hazard with your health when

4  you worked at Owens-Illinois?

5      A  Absolutely.

6      Q  If he were alive today, would you trust

7  him with your health?

8      A  Absolutely.

9      MR. O'HARA:  Absolutely.

10     THE COURT:  Plaintiff?

11                  RECROSS EXAMINATION

12     BY MR. WALKER:

13     Q  About four weeks ago Mr. Grimmie,

14  Owens-Illinois told the jury that Bill Hazard went

15  to Saranac Lake in 1952 and heard a whole bunch of

16  speeches about asbestos being a cause of cancer.

17  Now we know only thing that Owens-Illinois would

18  tell the jury -- excuse me, that Owens-Illinois

19  would tell the jury is the truth.

20     What did Bill Hazard tell you when he got

21  back from Saranac Lake that he had learned about

22  asbestos being a cause of cancer in 1952?

23     A  Sir --

24     MR. O'HARA:  Your Honor, wait, I have an

1    objection.  I don't know to what Mr. Walker is

2    referring but I have never said anything like that

3    in front of this jury.

4         MR. WALKER:  I did misspeak, I said --

5    Owens-Corning said it in opening statement.

6         MR. CONSTANTINE:  Oh, well then I heard

7    Owens-Illinois, so I guess I have an objection.

8         MR. WALKER:  Let me ask the question again

9    please, I butchered it.

10        MR. CONSTANTINE:  Can we have that stricken

11   from the record then, Mr. Walker's --

12        THE COURT:  Question is stricken from the

13   record, jury instructed to disregard the question.

14        Q   In opening statement Owens-Illinois -- in

15   opening statement Owens-Corning said, in 1952, as

16   well you heard about the Seventh Saranac Symposium

17   you heard about how one of the principle subjects

18   was -- discussed was asbestos and cancer.  Let me

19   give you the lineup of the people that were there,

20   because a suggestion has been made that

21   information about asbestos and disease and

22   asbestos and cancer was suppressed or

23   misrepresented.  Well, one of the main topics at

24   this particular symposium was asbestos and cancer.

1           When Bill Hazard got back from that 1972

2    symposium at Saranac Lake where asbestos and

3    cancer was discussed --

4           THE COURT:  '72?

5           MR. WALKER:  Did I say 72?  I'm sorry.

6           Q   When Bill Hazard got back from that 1952

7    symposium at Saranac Lake where asbestos and

8    cancer was discussed, what did he tell you he

9    learned at that symposium?

10          MR. O'HARA:  Your Honor I object to Mr.

11   Wylder's (sic) question.

12          THE COURT:  Overruled.

13          A   Sir, please understand, Bill Hazard was

14   Toledo staff.  He would contact the plant manager.

15   He wouldn't come to me to tell me anything.  He

16   would go to the plant manager.  Any report that he

17   had would go to the plant manager.  So I have no

18   recollection of what was reported from this

19   1952 --

20          Q   Well Bill Hazard never talked to you about

21   asbestos and cancer.  Is that correct?

22          A   Oh, Bill and I had discussions, yes.

23          Q   Did you and Bill discuss the relationship

24   between asbestos and cancer?

1      A   Um, after 1965 when Dr. Selikoff I believe

2    it was at Mount Sinai who proved to the medical

3    profession that asbestos could cause lung cancer,

4    then we started talking and acting on it.

5      Q   But the first time that Bill Hazard talked

6    to you about asbestos being a cause of cancer was

7    after you had seen Selikoff's article in 1965.

8    Correct?

9      A   To the best of my recollection.

10     MR. WALKER:   Offer plaintiffs' exhibit 520.

11   And 519.

12     THE COURT:   Any objection to 519 and 520?

13     MR. CONSTANTINE:   Hearsay and authentication

14   as to Owens-Corning, Your Honor.

15     THE COURT:   Owens-Illinois?

16     MR. O'HARA:   Your Honor, I have no objection

17   to 519.  I do object to 520 as hearsay.

18     MR. WALKER:   Well Judge, once you have 519

19   in, 520 comes in because 519 shows that Hazard was

20   there.  The sixth sheet of paper.  The eighth

21   signature from the bottom.

22     THE COURT:   The objection of Owens-Illinois

23   to 520 is overruled.  Owens-Illinois -- both 519

24   and 520 will be admitted with regard to

1    Owens-Illinois.

2         Do you want to speak to Owens-Corning?   I

3    will overrule those objections with regard to

4    Owens-Illinois.

5         MR. CONSTANTINE:  I'm sorry, did Your Honor

6    rule?

7         THE COURT:  I have not.  Asked Mr. Walker if

8    he had any response to hearsay and authentication

9    with regards to Owens-Corning.

10        MR. WALKER:  If it is authentic Your Honor --

11        THE COURT:  Counsel approach the bench.

12        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE

13    BENCH OUT OF THE HEARING OF THE JURY.)

14        MR. WALKER:  If it's authentic, it has to

15    come in because Owens-Corning talked about it in

16    opening statement.  It was Owens-Corning who said

17    that this conference did take place and that

18    everybody knew as a result of this conference.

19    Here is the agenda for the conference that took

20    place, so this would be notice to Owens-Corning.

21    They have admitted whatever notice is created by

22    this.

23        MR. CONSTANTINE:  I don't know how an opening

24    statement, I wish my opening statements could

1    authenticate documents because if they could I

2    would line all the ones up that Mr. Walker has

3    erroneously objected to --

4        THE COURT:  It might against you, but it

5    won't help you.

6        MR. CONSTANTINE:  An opening statement by a

7    lawyer doesn't authenticate documents in any state

8    that I'm aware of and I don't think it

9    authenticates them here, and I object on that

10    basis as to hearsay authentication.

11        MR. WALKER:  I was just talking about hearsay

12    Judge.  If there is an objection about

13    authentication I will have to take the stand

14    myself because we got this document from

15    Owens-Corning.

16        MR. CONSTANTINE:  That doesn't authenticate

17    anything.  Mr. Walker can get on the stand and say

18    he got letters from Abex and Owens-Corning.

19    Unless he's the custodian of the records over at

20    Saranac he can't testify as to authenticity, and I

21    object.

22        MR. WALKER:  All we are doing now is hearsay.

23    When Owens-Corning says in opening statement that

24    there was this symposium, asbestos and cancer was

1    discussed, it makes what is discussed their

2    knowledge to Owens-Corning and therefore all of

3    this other is made out of court, it's admissible

4    against Owens-Corning because it shows what

5    Owens-Corning knows.

6        THE COURT:  The court will sustain the

7    objection with regard to Owens-Corning.

8        (THE FOLLOWING PROCEEDINGS WERE HAD IN THE

9    PRESENCE OF THE JURY.)

10       THE COURT:  The court will sustain the

11   objections with regard to Owens-Corning.

12       BY MR. WALKER:

13       Q  Would you turn Mr. Grimmie to the eighth

14   page, the one that has the agenda for Wednesday,

15   September 24th?

16       A  Yes, sir, Wednesday, September 24th.

17       Q  When you had that discussion with Bill

18   Hazard in 1965 about the relationship between

19   asbestos and cancer, did he reflect upon the fact

20   that he had heard Dr. Hueper discuss on this

21   subject back in 1952?

22       A  I have no recollection.

23       Q  Did he discuss that he heard Dr. Cartier

24   reflect -- did he reflect that he had heard Dr.

1     Cartier discuss this subject back in 1952?

2          A   I have no recollection.

3          Q   Did he say well I heard Dr. Kenneth Lynch

4     talk about this in September of 1952 at the

5     Seventh Saranac Symposium?

6          A   I have no recollection.  As I suggested to

7     you, Bill Hazard was Toledo staff and he would

8     tell our plant manager.

9          Q   And when you had this discussion with Mr.

10    Hazard in 1965, did he say I heard from -- of all

11    people Dr. Merewether himself back in 1952 at the

12    Seventh Saranac Symposium lead the discussion

13    following the Hueper Cartier and Lynch

14    presentations?

15         A   I have no recollection of that.

16         Q   The jury has seen exhibit 65 in which

17    Saranac Laboratory told Owens-Corning in February

18    of 1956 that asbestos was fairly well incriminated

19    as a carcinogen.

20         Did Owens-Corning tell you that as soon as it

21    bought the plant in 1958, that asbestos had been

22    incriminated as a carcinogen?

23         A   Owens-Corning?

24         Q   Yes, sir.

1      A   I don't know how it was related, but -- I

2  don't know how to answer that.   Owens-Corning was

3  related to our plant long before 1958.

4      Q   But it became your employer in 1958.

5  Correct?

6      A   Yes.

7      Q   I can appreciate there was some

8  Owens-Corning people that visited the plant

9  between '53 and '58 probably, correct?

10      A   Management.

11      Q   But once Owens-Corning bought the plant

12  and assumed the responsibilities that it had as

13  your employer, did it promptly come up to you and

14  say, Mr. Grimmie, I want you to know that as long

15  ago as two years ago we were told that asbestos

16  has been fairly well incriminated as a carcinogen?

17      A   I have no recollection of that.

18      Q   You said that Dr. Sokolowski gives these

19  examinations to everyone that has asbestosis.   How

20  many fellows that worked at the Berlin plant are

21  alive today and have asbestosis?

22      A   I don't know.

23      Q   Has the doctor ever shared with you how

24  many people there are?

1    A  He would not do that, that is doctor/

2  patient privilege.

3    Q  How many are sick is privileged?

4    A  I meet two or three occasionally when I am

5  in there, but I haven't the slightest idea how

6  many.

7    Q  How about Owens-Corning?  Has

8  Owens-Corning told you how many are currently

9  living and have asbestosis?

10    A  No.

11    Q  Has Owens-Corning told you how many of the

12  group of people that worked for Owens-Illinois and

13  Owens-Corning at Berlin have contracted lung

14  cancer?

15    A  No.

16    Q  Has Owens-Corning told you how many of the

17  people who worked at Berlin for either

18  Owens-Illinois or Owens-Corning have contracted

19  mesothelioma?

20    A  No, sir.

21    MR. WALKER:  Thank you, Mr. Grimmie.

22    THE WITNESS:  Thank you sir.

23    THE COURT:  Mr. Constantine?

24    MR. CONSTANTINE:  I have no questions.  Thank

1    you Mr. Grimmie.

2        MR. PETERS:   None.

3        THE COURT:   Mr. Peters?

4        MR. O'HARA:   No Your Honor.

5        THE COURT:   All right Mr. Grimmie, thank you.

6    You can step down.   Thank you for your time today.

7    Have a nice day.

8        (WITNESS EXCUSED.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1              IN THE CIRCUIT COURT

2          OF THE ELEVENTH JUDICIAL CIRCUIT

3            MC LEAN COUNTY, ILLINOIS

4

5

6         I, Susan E. Geshwilm, an Official Court

7    Reporter and Certified Shorthand Reporter in and

8    for the Eleventh Judicial Circuit of the State of

9    Illinois, do hereby certify that I reported in

10   shorthand the foregoing proceedings and that the

11   foregoing is a true and correct transcript of my

12   shorthand notes so taken as aforesaid.

13        Dated: _November 30, 1996_

14

15        _Susa E. Gel_

16        Susan E. Geshwilm, CSR
          License #084-002578

17

18

19

20

21

22

23

24