DEPOSITION OF:
ELMER BORCHARDT (5-12-03) CONDENSED

IN THE CIRCUIT COURT OF MILWAUKEE COUNTY

STATE OF WISCONSIN

MARJORIE A. TAKAVITZ,
individually and as special
administrator of the Estate
of WILLIAM A. TAKAVITZ,

        Plaintiffs,

        CASE NO. 02-CV-002551

-vs-

SPRINKMANN SONS, INC.,
a corporation, et al.,

        Defendants.


COPY

      Deposition of ELMER H. BORCHARDT, called for examination by and on behalf of the Plaintiffs, under and pursuant to the provisions of Chapter 804 of the Wisconsin Statutes, and the acts amendatory thereof and supplementary thereto, pursuant to Notice of Deposition, taken at the Law Offices of Terschan, Steinle & Ness, 2600 North Mayfair Road, Suite 700, Milwaukee, Milwaukee County, Wisconsin, on the 12th day of May, 2003, commencing at 10:10 a.m. to 10:45 a.m. in the forenoon. Reported by Melody D. West, Notary Public, Court Reporter.

* * * *

DEPOSITION OF:
# ELMER BORCHARDT (5-12-03) CONDENSED

PAGE: 2

A-P-P-E-A-R-A-N-C-E-S

    CASCINO VAUGHAN LAW OFFICES, LTD., by GEORGE H. SENTENEY, ESQ., 220 South Ashland, Chicago, Illinois, 60607, appeared on behalf of the Plaintiffs.

    CRIVELLO, CARLSON & MENTKOWSKI, S.C., by TRAVIS J. RHOADES, ESQ., 710 North Plankinton Avenue, Suite 500, Milwaukee, Wisconsin, 53203, appeared on behalf of the Defendant, SPRINKMANN SONS, INC. and on behalf of TOWER AUTOMOTIVE PRODUCTS COMPANY.

    TERSCHAN, STEINLE & NESS, by FRANK R. TERSCHAN, ESQ., 2600 North Mayfair Road, Suite 700, Milwaukee, Wisconsin, 53226-1314, appeared on behalf of the Defendant L & S INSULATION.

    HINSHAW & CULBERTSON, by MELLISSA A. SCHAFER, ESQ., 100 East Wisconsin Avenue, Suite 2600, Milwaukee, Wisconsin, 53202-4115, appeared on behalf of the Defendant OAKFABCO.

    SCHIFF, HARDIN & WAITE, by MATTHEW C. JARDINE, ESQ., 6600 Sears Tower, Chicago, Illinois, 60606, appeared on behalf of the Defendant OWENS-ILLINOIS.

\* \* \* \*

I-N-D-E-X

E. BORCHARDT:                           PAGE:
   Examination by Mr. Senteney.....................4
   Examination by Mr. Jardine.....................32
   Examination by Mr. Senteney....................38

\* \* \* \*

PAGE: 3

E-X-H-I-B-I-T-S

BORCHARDT DEPOSITION:            PAGE MARKED:
No. 1 - Contract Ledger Book from L & S Corporation
        dealing with contracts....................4(23)

No. 1-A Actual ledger book...........................40

No. 2 - Contract Ledger Book from L & S Corporation
        dealing with contracts....................4(24)

No. 2-A Actual ledger book...........................40

No. 3 - Contract Ledger Book from L & S Corporation
        dealing with contracts....................4(24)

No. 3-A Actual ledger book...........................40

No. 4 - Contract Ledger Book from L & S Corporation
        dealing with contracts....................4(24)

No. 4-A Actual ledger book...........................40

No. 5 - Summary of L & S contracts at A. O.
        Smith Corporation..........................4(7)

(The above marked Exhibits 1 through 4 were retained by Attorney George Senteney. Exhibit No. 5 was attached to the back of the original transcript. Exhibit Nos. 1-A, 2-A, 3-A and 4-A were retained by Attorney Frank Terschan.)

\* \* \* \*

(The original transcript was filed with Attorney George H. Senteney.)

\* \* \* \*

PAGE: 4

1            TRANSCRIPT OF PROCEEDINGS
2       ELMER H. BORCHARDT, called for examination
3  by and on behalf of the Plaintiffs, being first duly
4  sworn, was examined and testified as follows:
5       (Deposition Exhibit Nos. 1 through 5
6      were marked for identification by the Court
7      Reporter.)
8            EXAMINATION
9  BY MR. SENTENEY:
10  Q. Would you state your full name, sir?
11  A. Elmer H. Borchardt.
12  Q. And your current address -- your professional
13     address is what? Professional business address
14     is what?
15  A. 616 South 89th Street, Milwaukee, 53214.
16  Q. Are you currently employed, sir?
17  A. By L & S.
18  Q. In what capacity are you employed by them?
19  A. I'm the president.
20  Q. You've been employed by them for approximately
21     53 years now; is that correct?
22  A. Correct.
23  Q. You've been deposed before, sir?
24  A. Many times.
25  Q. What's your best estimate of the number of

PAGE: 5

1     times?
2  A. Fifteen.
3  Q. Okay. Would all of those be in some way or
4     another in your capacity as president of L & S
5     Corporation?
6  A. Not all as president, but probably more familiar
7     with the workings in the field than anyone else
8     in the company at that time.
9  Q. Okay. What percentage of those depositions have
10    you been involved in would be related to
11    asbestos litigation of any type?
12  A. I don't know.
13  Q. Okay.
14  A. I don't have the faintest idea. They just ask a
15    lot of questions in relation to people, and I
16    gave them the answers and was truthful.
17  Q. So you don't know what percentage is related to
18    asbestos litigation?
19  A. Well, I presume there's some related to that;
20    but I wouldn't have the -- I'm not going to
21    guess at it.
22  Q. You brought four books today; correct? And
23    they're the contract ledger books of L & S
24    Corporation?
25  A. Yes.

DEPOSITION OF:
ELMER BORCHARDT (5-12-03) CONDENSED

PAGE: 6

1  Q. And we'll get into those in more detail later;
2     but those books, essentially, represent the --
3     as I understand it, numerical sequence, the
4     contracts that L & S entered into from at least
5     in 1947 until the 1970s; is that correct?
6  A. That's correct.
7  Q. And then we've marked as Deposition Exhibits 1
8     through 4 today copies of those books; correct?
9  A. If you say so. I'll accept that.
10 Q. Well, sometime I would like you to take a chance
11    to review those and see whether you agree that
12    Exhibits 1 through 4 -- Your counsel will
13    stipulate that they are copies -- reasonable
14    copies of the ledger books brought.
15        MR. TERSCHAN: Yeah, I don't think it
16 makes a lot of sense for Mr. Borchardt to go
17 through a page at a time and make sure they're
18 accurate copies. I think we can work out, if
19 you have someone who says that they made the
20 copies or if we had Kinko make it or someone, we
21 can make out that they're reasonable copies.
22        MR. SENTENEY: Okay.
23        MR. TERSCHAN: Or accurate copies.
24        THE WITNESS: Well, the handwriting
25 would correspond. That handwriting and the copy

PAGE: 7

1  should be the same. It was all done by one
2  individual.
3         MR. SENTENEY: Okay. We will go into
4  that later then, sir.
5  Q. Other than the four books, have you brought
6     anything else with you today?
7  A. No, sir.
8  Q. Did you review anything prior to today's
9     deposition?
10 A. Yes.
11 Q. What did you review?
12 A. I was furnished a summary of all of this.
13 Q. And would that summary be Exhibit 5?
14        MR. TERSCHAN: Was that the same
15 summary, just for the record, on April 8th that
16 you sent a summary? I don't know if it's the
17 same one or not.
18        MR. SENTENEY: It should be the same
19 one. Maybe it's different printing, but the
20 information is the same.
21        MR. TERSCHAN: Yeah.
22        THE WITNESS: Yes.
23        MR. TERSCHAN: Then that's the one he
24 reviewed.
25        MR. SENTENEY:

PAGE: 8

1  Q. Anything other than Exhibit 5 did you review?
2  A. No. I'm sorry. I'm shaking my head. No.
3  Q. Other than your counsel, did you talk to anyone
4     in preparation for today?
5  A. No.
6  Q. What's your educational level, sir?
7  A. High school, touch of college, Air Force, cadet
8     training, little bit back in school after that
9     and then into the trades.
10 Q. Okay. And by "the trades," you mean starting
11    with L & S in about 1950?
12 A. Yes.
13 Q. What did you do -- Any work other than your
14    military career before you started at L & S?
15 A. I worked in several different bits of employment
16    in Milwaukee.
17 Q. Okay. Just examples, like what, sir?
18 A. Breweries.
19 Q. Okay.
20 A. Work that was readily available.
21 Q. Is this like the general labor type of work or
22    what?
23 A. Yeah, you had to join the union.
24 Q. Okay.
25 A. Anything that's done in the brewery.

PAGE: 9

1  Q. All right. In your education, professional
2     career, have you gained what you consider to be
3     any specialized knowledge in the area of what's
4     called industrial hygiene?
5  A. No.
6  Q. How about any specialized knowledge or training
7     in the area of product safety?
8  A. Only what we picked up as we went through the
9     years.
10 Q. Do you claim to have any specialized knowledge
11    as far as the hazards associated with asbestos,
12    sir?
13 A. Only from the time -- from the time factor that
14    occurred after Dr. Selikoff's initial articles
15    and then when it became more public knowledge,
16    that's when I became more aware of it.
17 Q. So would it be fair to say that your knowledge
18    came from newspaper articles or just some
19    journal references you've read?
20 A. Well, that was a composite report by --
21    authorized by the union, so that's how we
22    eventually found out about it.
23 Q. And you found out about Dr. Selikoff's article
24    in the early '70s; is that correct?
25 A. I think it was earlier than that.

GREAT LAKES REPORTING, INC. - (414) 272-4007

DEPOSITION OF:
ELMER BORCHARDT (5-12-03) CONDENSED

PAGE: 10

1  Q. What is your best estimate of when that would
2     have been?
3  A. I think one of your interrogatories said it was
4     1964.
5  Q. So you would at least have had knowledge as far
6     as the hazards of asbestos as early as 1964; is
7     that your best estimate?
8  A. I don't know that I had knowledge of the hazards
9     at that time. I was aware of the report.
10 Q. Okay. And what is your understanding what the
11    report said?
12 A. That -- I thought they targeted more toward
13    powerhouse work, where it was used probably 95
14    or 100 percent products that contained asbestos.
15    That was not applicable to our company, because
16    we used mostly fiberglass.
17 Q. My question, again, sir: What was your
18    understanding as far as the hazard that that
19    article talked about related to asbestos? What
20    did it indicate that people could potentially
21    get as far as the conditions or diseases?
22 A. If they were exposed to asbestos and smoke, they
23    were high risk.
24 Q. High risk for what, sir?
25 A. Cancer.

PAGE: 11

1  Q. And you were aware, were you not, by the late
2     '50s or early '60s, at least from co-workers,
3     were you aware that people died from asbestos?
4  A. Not in our company.
5  Q. I didn't ask you that. Were you aware in
6     talking to people, that people by the late '50s
7     or early '60s had died from asbestos exposure?
8  A. It was occasionally mentioned.
9  Q. When you started with L & S, there was both a
10    Roofing Division and an Insulation Division;
11    correct?
12 A. Correct.
13 Q. You started off as an estimator in the Roofing
14    Division or trained to be an estimator in the
15    Roofing Division?
16 A. Yes.
17 Q. You did that approximately five to seven years;
18    correct?
19 A. Yeah, three, four solid, and then an intermix
20    of -- I started helping out with the pipe
21    covering portion of our firm; and then I would
22    do both for a period of time until such a time
23    that we stopped doing roofing, and I then became
24    full time out in the field for insulation.
25 Q. When you say "pipe covering," that's referring

PAGE: 12

1     to the Insulation Division; correct?
2  A. Yeah, plumbing, heating or ventilating.
3  Q. You liquidated the roofing part of the company
4     in about the early 1960s; is that right?
5  A. That sounds about right.
6  Q. Now, you did -- L & S has historically been
7     commercially -- Strike that.
8        Typically their products or customers
9     have been in the commercial and industrial
10    sector; is that correct?
11 A. That is correct.
12 Q. So your insulation work would be commercial
13    insulation and industrial insulation for
14    factories and hospitals, schools, et cetera,
15    breweries; right?
16 A. Yes.
17 Q. You would use -- Strike that.
18        The insulation you would use would also
19    include for high temperature steam lines;
20    correct, or high temperature lines?
21 A. Yes.
22 Q. Okay. And from the time you started with L & S
23    in the early '50s to the 1970's or so, it would
24    be in the steam lines or high temperature lines
25    that you used asbestos insulation; correct?

PAGE: 13

1  A. No, that's not 100 percent correct. We
2     started -- Because of the products that were
3     available in the early '50s, that was all that
4     was available. And when Fiberglass started
5     promoting their products, we were one of the
6     first companies to switch over to fiberglass
7     because of a cost factor.
8        So anywhere from 1953 or '4 -- I don't
9     remember the exact date, into the '70s, we were
10    heavy in glass.
11 Q. You also used asbestos; correct?
12 A. When we were required to, yes.
13 Q. Okay. And when you used asbestos, it would be
14    for steam pipes and related boiler work;
15    correct?
16 A. No.
17 Q. Where else would you use asbestos then, sir?
18 A. Prechanged, high temperature tanks, generator
19    exhausts; those types of things.
20 Q. And steam pipes?
21 A. Could be, but we had by that time switched
22    primarily to fiberglass.
23 Q. Okay. By the 1970s, L & S was up to maybe about
24    60 or so employees; would that be a fair
25    statement?

PAGE: 14

1    A.  That's probably correct.
2    Q.  How many employees are there today, sir?
3    A.  Today?
4    Q.  Today.
5    A.  40ish.
6    Q.  What do you -- Do you still do insulation work
7        today?
8    A.  Oh, yes. That's all we do.
9    Q.  What kind of insulation work do you do today?
10   A.  We insulate systems for plumbing, heating and
11       ventilating.
12   Q.  Your -- Strike that.
13           Do you still own about 89 percent of
14       the shares of stock in L & S Corporation?
15   A.  No.
16   Q.  How many -- What percentage do you own today,
17       sir?
18   A.  I don't know the exact count. I've been giving
19       the stock away to the children.
20   Q.  You still own stock in the company, though;
21       correct?
22   A.  Yes.
23   Q.  You were up to about 89 percent a few years ago;
24       correct?
25   A.  No. My wife died five years ago. We have been

PAGE: 15

1        giving stock away for probably ten years prior
2        to that. So now I'm limited to giving away
3        stock from one person.
4    Q.  Would you -- If I indicated to you that you
5        testified at a deposition in 1996 that you owned
6        about 89 percent of the stock, would you
7        disagree with that?
8    A.  I probably didn't take into consideration that
9        we were -- had been giving it away. That might
10       be reasonably correct, but I -- My accountant
11       would have to go back through the books for
12       that.
13   Q.  And you became a part owner in 1957; correct?
14   A.  Yes.
15   Q.  Over the years, who has been the primary
16       supplier for L & S?
17           MR. TERSCHAN: Supplier of what?
18           MR. SENTENEY:
19   Q.  Supplier of products, like asbestos or
20       fiberglass or whatever.
21   A.  Fiberglass was Owens-Corning.
22   Q.  Okay. Would you buy directly from Owens-Corning
23       or through an intermediary supplier?
24   A.  A distributor.
25   Q.  Who would that distributor be?

PAGE: 16

1    A.  Building Service Industrial Sales.
2    Q.  And they were your primary distributor that you
3        would buy the products from over the years?
4    A.  To this date.
5    Q.  For how long have you had that business
6        arrangement with them?
7    A.  Since the early '50s.
8    Q.  So basically, you had an account with them; and
9        so if you ever needed a product, you would call
10       them and say, "Building Services, we need brand
11       X, or we need X amount of pipe covering." Is
12       that basically how it works?
13   A.  Yes, truckload, carload quantities.
14   Q.  And if you needed asbestos, they would be who
15       you would contact?
16   A.  For the limited amount we purchased, yes.
17   Q.  You're familiar with a brand Kaylo; correct?
18   A.  Yes.
19   Q.  You've used it for high temperature insulations;
20       correct?
21   A.  I've used it, yes, that's correct.
22   Q.  And you, yourself, have indicated you've seen
23       the brand name on the product Kaylo for
24       insulation you've used; correct, at L & S?
25   A.  Yes.

PAGE: 17

1    Q.  Okay. And you've used it -- L & S used Kaylo
2        before 1959; correct?
3    A.  Yes.
4    Q.  And if I would represent to you that
5        Owens-Illinois has indicated in answers to
6        interrogatories that they began to manufacture
7        commercial quantities of Kaylo asbestos
8        containing products in about 1948 and until
9        April 30th, 1958, they made Kaylo -- that, in
10       quote, this defendant sold its Kaylo Containing
11       Manufacturing Division to Owens-Corning
12       Fiberglass Corporation in 1958, if I represent
13       to you that that is on record from
14       Owens-Illinois prior to 1958, would L & S have
15       used Kaylo?
16   A.  Prior to '58?
17   Q.  Yes.
18   A.  I would imagine that we purchased some.
19   Q.  Okay.
20   A.  If Building Service handled it, that was our
21       source.
22   Q.  And so if you purchased Kaylo, one of the
23       applications for the Kaylo you would purchase
24       would be for steam pipe insulation; correct?
25   A.  Possibly.

PAGE: 18

1  Q. Would that be one of the applications?
2  A. One, yes.
3  Q. When you first learned of the hazards of
4     asbestos, or at least the possibility that
5     people could get cancer from asbestos exposure,
6     did L & S do anything to ever -- for the
7     customers who may come into contact with the
8     asbestos that you sold or installed, do anything
9     to minimize, reduce the risk to those workers?
10 A. You want to repeat that?
11 Q. Yes. You've indicated that at least by 1964, or
12    if not by the late 1950s, you were aware at
13    least that people had died from asbestos
14    exposure; the hazard at least you indicated was
15    getting cancer.
16         With that background, I'm asking you,
17    sir: At any time did L & S do anything to warn
18    or advise potential workers who came into
19    contact with asbestos that L & S sold or
20    installed about the hazards of asbestos or take
21    any steps to minimize or reduce the hazard of
22    asbestos to the workers that came into contact
23    with the product?
24 A. We weren't that aware of those hazards until
25    much later.

PAGE: 19

1  Q. Okay.
2  A. And our switching to fiberglass was more based
3     on cost factor, having to be a beneficial one;
4     but we switched products in favor of fiberglass
5     for the majority of our work in the late '50s
6     and '60s.
7  Q. Okay. Then again, sir, what steps did you take,
8     in the face of the hazard you testified to
9     you're aware of, to minimize or reduce the risk
10    to workers?
11 A. If I testified that I was aware of those hazards
12    that early, that I don't know. I don't know --
13    We didn't do anything extraordinary until after
14    Selikoff's articles became very public.
15 Q. Okay. And that would then have been when, sir?
16 A. Oh, probably the late '60s.
17 Q. What did you do then when the Selikoff article
18    became public?
19 A. We warned our employees, suggested that they
20    didn't smoke, because that was the gist of the
21    whole article.
22 Q. Was that only to your employees you suggested
23    they didn't smoke?
24 A. Well, they are the only ones we were in contact
25    with.

PAGE: 20

1  Q. Did you do anything to the customers who were
2     buying your product where you were installing
3     the product, warn them of the hazards or make
4     any recommendations or suggestions?
5  A. We made recommendations that they switch to
6     fiberglass because of cost. And later, because
7     of the -- If they insisted that we use a product
8     that had contained asbestos and they specked it,
9     we were obligated to use it.
10 Q. And anything else, sir?
11 A. I don't know what you mean by "anything else."
12 Q. Anything else that you ever did to advise
13    customers and their employees who may come into
14    contact with the hazards of asbestos as far as
15    recommendations and steps to minimize and reduce
16    the hazards?
17 A. We were not in a position to do that. We were
18    told what to do. The specifications were
19    written by someone other than ourselves just for
20    any job.
21 Q. I understand. The question, sir: Can I take it
22    that you did nothing else -- L & S did nothing
23    else?
24 A. Other than what I stated.
25 Q. L & S is a member of the Wisconsin Insulation

PAGE: 21

1     Contractors' Association; correct?
2  A. Yes.
3  Q. When was it formed, sir?
4  A. It's probably in the deposition somewhere, and I
5     would certainly agree that whatever I previously
6     said is the start date of that.
7  Q. What's your best estimate, sir? I'm not holding
8     you to a particular, specific year; but a best
9     estimate as to an approximate time.
10 A. Oh, I think they formed somewhere in the --
11    Well, they formed prior to our joining. We were
12    one of the last holdouts. Let's say the '60s.
13 Q. Okay.
14 A. Early '60s.
15 Q. And when you joined, how many members were
16    there?
17 A. Three, four maybe.
18 Q. Okay. And it included Sprinkmann Sons and L & S
19    and who else?
20 A. It was Industrial. I think they were a member.
21    McDermott out of Rockford was a member.
22 Q. Is this association still active today?
23 A. With three members, yes.
24 Q. Okay. When you joined, what was the purpose of
25    this association, as you understood it?

DEPOSITION OF:
ELMER BORCHARDT (5-12-03) CONDENSED

PAGE: 22
1  A.  Just a group of contractors that would discuss
2      mutual problems and work for the benefit of the
3      trade.
4  Q.  And would these contractors all be insulators in
5      the sense that L & S was an insulator and as you
6      just described earlier today?
7  A.  Yes.
8  Q.  So these would be companies that all do at least
9      on -- and part of the business would be
10     commercial insulation for things, including
11     steam pipes; correct?
12 A.  Yes.
13 Q.  Now, when you started with L & S in 1950, was
14     A. O. Smith a customer of L & S?
15 A.  Yes.
16 Q.  Okay. When was your first contact in any nature
17     with A. O. Smith?
18 A.  Well, I was aware that the company was doing
19     miscellaneous work there prior to my eventually
20     going out to the site with Mr. Underberg.
21     Mr. Underberg handled most of their requests.
22     It was just a habit. They wanted the same
23     person, and he would always go out and measure
24     and quote them; and if we were low bidder, we
25     would be successful in doing it.

PAGE: 24
1  "A. O. Smith Building steam pipe insulation";
2  correct?
3  A.  It says Building 5 and -- 5 and 6, steam pipe
4      insulation, correct.
5  Q.  Correct.
6  A.  This one doesn't give the year. Is that on that
7      list?
8  Q.  If you look, sir, at the beginning it shows it's
9      1947.
10 A.  Well, I was not employed by them then.
11 Q.  I understand.
12         MR. SENTENEY: Let's go off the record
13 for a second.
14         (Discussion off the record.)
15         MR. SENTENEY:
16 Q.  Sir, if I direct your attention to just going
17     back a little bit to 2550, contract number, you
18     will see at the top of that page, there's a 1947
19     date; correct?
20 A.  Yes, that's right.
21 Q.  Okay. So you wouldn't have any specific
22     knowledge of that contract because you hadn't
23     started with the company then; is that correct?
24 A.  Yes.
25 Q.  Let's just, you know, backtrack for the record.

PAGE: 23
1  Q.  Did you ever become more involved in that as far
2      as -- Strike that.
3          Mr. Underberg, how long was he
4      responsible for the A. O. Smith job?
5  A.  Until he retired.
6  Q.  When was that, approximately?
7  A.  That would be a pure guess.
8  Q.  Who replaced him?
9  A.  No one.
10 Q.  Did you ever do anything as far as the actual
11     direct work with A. O. Smith as far as
12     contracting?
13 A.  I was one of the people that might have gone
14     there and measured work.
15 Q.  And that work would include steam line, pipe
16     covering insulation?
17 A.  And plumbing and ventilating and everything that
18     they requested bids on.
19 Q.  And it would be high temperature lines related
20     to boilers and such, too?
21 A.  Could be.
22 Q.  Now, sir, I'm going to show you what we
23     previously marked as Exhibit 1; and I'm going to
24     show you, as far as a reference, on Contract
25     No. 2588, which has been highlighted. It says,

PAGE: 25
1  Exhibits 1 through 4, we've talked before, these
2  are copies of the ledgers that you brought here
3  today?
4  A.  Yes.
5  Q.  Okay. And with that, the ledgers you brought
6      here today were business records of L & S;
7      correct?
8  A.  Contract recording dates.
9  Q.  But they are generally business records that
10     L & S kept; correct?
11 A.  Yes.
12 Q.  And they were kept in the ordinary course of
13     your business; correct, and documents prepared
14     by L & S; correct?
15 A.  All of them are there.
16 Q.  But I'm correct, my statement?
17 A.  Yes.
18 Q.  Let's then look to Contract No. 4120, sir. This
19     is Page 234, Counsel.
20         MR. TERSCHAN: Thanks.
21         MR. SENTENEY:
22 Q.  1420, can you read that entry, sir?
23 A.  "A. O. Smith Corporation, Building No. 11, steam
24     pipe covering."
25 Q.  Okay.

PAGE: 26

1  A.  1952.
2  Q.  You were working with L & S by that time;
3      correct, sir?
4  A.  Yes.
5  Q.  Making a reference to steam pipe, that would
6      have been a high temperature line?
7  A.  Not necessarily. I think when it was high
8      temperature, they indicated it.
9  Q.  Steam is not high temperature?
10 A.  Steam could be low temperature, medium pressure
11     and high temperature.
12 Q.  You don't believe that generally in cases, steam
13     is indicated to be a high temperature?
14 A.  Most -- Most companies didn't have that much
15     high pressure steam. They generated high
16     pressure steam in order to reduce the pressure
17     to low temperature steam, which was more
18     economical to do.
19 Q.  Sir, I'm going to direct your attention, I'm
20     going to show you from your -- the Berkhahn,
21     B-e-r-k-h-a-h-n, deposition, taken on
22     January 16, 1998, I'm going to show you --
23 A.  This is --
24 Q.  -- Page 45, sir. Excuse me for coming across so
25     I can look over your shoulder, so I can

PAGE: 27

1      accurately read it to you.
2  A.  Page 45, yeah.
3  Q.  In that deposition, sir, there's a reference to
4      a contract number, and it says, quote, "Steam
5      pipe insulation"; correct? Do you see that
6      question there?
7  A.  Yes.
8  Q.  Then there's a question on page -- I'm sorry, on
9      Line 17, quote, "What does that mean when it
10     says steam pipe insulation?" The answer, quote,
11     "That means they insulated some high temperature
12     steam lines, which was very common at A. O.
13     Smith," unquote.
14          Did I read that correctly?
15 A.  Some. Some.
16 Q.  Okay.
17 A.  Some being maybe 10 percent of all the steam
18     lines.
19 Q.  And you said that was very common at A. O.
20     Smith; correct?
21 A.  Steam lines were, not high pressure.
22 Q.  Did I read that accurately, sir?
23 A.  Yes, you did. Some. Yes, I agree with that.
24 Q.  When it was high temperature, was it possible
25     that they were -- at least possible, would you

PAGE: 28

1      grant me, it was asbestos insulation that you
2      used?
3  A.  It could have been.
4  Q.  Were you using fiberglass at that time in 1952?
5  A.  No.
6  Q.  So it was likely it was asbestos; correct?
7  A.  Probably.
8  Q.  Okay. And it was probably then like Kaylo,
9      would that also be a fair statement?
10 A.  Not necessarily.
11 Q.  Would it possibly have been Kaylo?
12 A.  Some of it might have been.
13 Q.  That was the typical product you bought from
14     Building Services prior to 1958; correct?
15 A.  We also bought asbestos-containing products from
16     other companies.
17 Q.  But I'm correct, that's a product that you used
18     during that time for insulation for steam lines?
19 A.  It was one of the products used.
20 Q.  And that would be true for a contract example
21     5910 and 5918; correct?
22 A.  Where are you?
23 Q.  Just for example, 5910.
24 A.  Have you got that? Okay.
25 Q.  Would you read that, sir?

PAGE: 29

1  A.  "1957, A. O. Smith, Building 113, steam pipe
2      insulation."
3  Q.  Then 5918, which is the next page.
4  A.  "A. O. Smith, Building 1 of forced steam pipe
5      insulation."
6  Q.  Were you using fiberglass by that time, sir?
7  A.  Yes, we could have at that time with the owner's
8      permission.
9  Q.  With the owner's permission?
10 A.  Yes.
11 Q.  So you had to specifically get permission to use
12     fiberglass?
13 A.  If they specified the product, in order for us
14     to change it, we had to get the owner's
15     permission to get that.
16 Q.  So do you know what product would have been
17     specified during that time for that contract?
18 A.  Not specifically, no.
19 Q.  If not specified, what would have been the
20     standard course of procedure to use?
21          MR. TERSCHAN: For L & S?
22          MR. SENTENEY:
23 Q.  For L & S.
24 A.  We purchased quite a bit of material from
25     Triple A out of Chicago.

PAGE: 30

1   Q. And that was what?
2   A. It was magnesia-type. Not cal-sil, but they
3      called it magnesia.
4   Q. Did it contain an asbestos product?
5   A. It contained some asbestos product.
6   Q. Were you also using Kaylo at that time frame?
7   A. Could have.
8   Q. Okay. Now I'm not going to belabor going
9      through all the different contracts; but as you
10     reviewed the books today, you will agree that
11     there are steam pipe references, at least as
12     exemplified in Exhibit 5 and as set forth in
13     Exhibits 1 through 4 from it, 1947 into at least
14     1970, 1971, through contracts 9078; correct?
15  A. Yes, I -- But please note that in '71, there was
16     no more asbestos made.
17  Q. Okay.
18  A. So anything after '71, it had to be fiberglass
19     or a non-asbestos product.
20  Q. You were using asbestos up to 1970 or '71 then
21     at least; correct?
22  A. If it was required, yes.
23  Q. Now on Exhibit 5, sir, there are references, you
24     know, like are taken from Exhibits 1 through 4.
25     For example, you will see relative -- In the

PAGE: 31

1      1949 ledger, I'm just going to show you,
2      Contract 3262, where there's a contractor named
3      Standard Distributing Corporation.
4   A. Yes.
5   Q. Okay.
6   A. 3262.
7   Q. Just for example, when it makes reference to
8      "contractors," how would that come about? Is
9      that, you know, an intermediary; or was that
10     someone who contacted you, or were they actually
11     doing the contract work for A. O. Smith, sir, or
12     what?
13  A. They were doing the contract work. If there's a
14     contractor mentioned, then we did the work for
15     them. We bid to them.
16  Q. So they had the bid with A. O. Smith, and they
17     would have contacted you for the material that
18     they needed; is that how it would work?
19  A. For installing.
20  Q. For installing? And that would be true for the
21     contractor references throughout Exhibits 1
22     through 4 and summarized in Exhibit No. 5; is
23     that correct?
24  A. That's correct.
25  Q. Is A. O. Smith still a customer of L & S?

PAGE: 32

1   A. I don't think A. O. Smith is in Milwaukee.
2   Q. Is Tower Automotive still a customer for L & S?
3   A. What?
4   Q. Is Tower Automotive a customer of L & S?
5   A. We might have done some work there for --
6      through contractors.
7   Q. Do you know when the last time was you were
8      there?
9   A. No.
10     MR. SENTENEY: I don't have anything
11  else.
12     MR. RHOADES: I have nothing.
13     MR. JARDINE: I have a couple of
14  questions. My name is Mike Jardine, and I've
15  got a couple questions for you.
16     EXAMINATION
17  BY MR. JARDINE:
18  Q. If I understand this correctly from your earlier
19     testimony, L & S generally worked at schools and
20     churches and hospitals; or is it my
21     understanding that it is correct they didn't
22     work at huge places, large places?
23  A. It's true.
24  Q. Mostly schools, churches and hospitals?
25  A. Some industrial accounts, but all small batch

PAGE: 33

1      jobs, fill-in things. That's what most of these
2      are at A. O. Smith, they are small quantities of
3      things, repair jobs I think you would say.
4   Q. Okay. And then also you testified earlier that
5      by 1953 or 1954, L & S used primarily
6      fiberglass; is that correct?
7   A. We swung toward glass heavily.
8   Q. And you remember that date being around '53 or
9      '54?
10  A. Somewhere in there.
11  Q. In general, what -- When L & S was called out to
12     do a job, what percentage would involve high
13     temperature lines, would you estimate?
14  A. Well, other than an industrial account, very --
15     none.
16  Q. Of L & S's overall work, though, how much would
17     involve high temperature lines?
18  A. Oh, 5 percent.
19  Q. Now L & S, I think I understand correctly,
20     bought its products from outside sources; right?
21  A. Other than Building Service, yes.
22  Q. In other words, you used more than one supplier;
23     right?
24  A. Yes.
25  Q. Now, when you bought materials from one of these

PAGE: 34

```
 1      various outfits, would you generally ask for a
 2      type of product, or would you ask for a specific
 3      brand name?
 4   A. Well, generically, it was cal-sil; and the trade
 5      names, I don't recall all of them.  I'm familiar
 6      with Kaylo, because it was from Owens-Corning,
 7      and it was -- asbestos had a name.  Triple A had
 8      a name for it, but I can't tell you all those.
 9   Q. When L & S would work on a job, was there a way
10      to generalize, would they ask for a type of
11      material as opposed to a brand name; or would
12      they say, "Give me this amount of this brand"?
13   A. They would specify a type of material and allow
14      a -- and name one or two brands or equal.  That
15      was always the case.
16   Q. So if on a particular job you would ask for a
17      type, what was supplied to you could be from a
18      number of different manufacturers?
19   A. We might have purchased it from any source, that
20      type of material.
21   Q. From job to job, it could be any material?
22   A. Yes.  We didn't stock too much of that material;
23      it was too costly.
24   Q. Do you have records to identify which of the
25      manufacturers' products went to which particular
```

PAGE: 35

```
 1      job site?
 2   A. That's impossible.
 3   Q. Do you, yourself, know, have any idea which
 4      manufacturers of asbestos products would be at a
 5      specific job site?
 6   A. I've gone through this entire list, and I
 7      couldn't in all honesty tell you -- Only from
 8      the standpoint of knowing what we were doing,
 9      what products in high temperature type, the
10      cal-sil type material came from.  For any job on
11      that list, no one could tell you.
12   Q. It's impossible to know?
13   A. It's impossible.
14   Q. Now, Mr. Senteney asked you before, you were
15      asked if you knew that L & S used Kaylo before
16      1958, and you said "I would imagine."  Do you
17      know that for sure?
18   A. I'm supposing that they did.  We purchased from
19      Building Service, and I think they had it
20      available to them, so I assume in the small
21      quantities that we bought, we probably got some
22      from them.
23   Q. But can you testify for sure when L & S used a
24      product called Kaylo for the first time; do you
25      know?
```

PAGE: 36

```
 1   A. No, I can't.
 2   Q. At any rate, as you testified, you wouldn't know
 3      where it went?
 4   A. No.
 5   Q. No, that's not true; or no, you wouldn't know?
 6   A. No, I wouldn't know.
 7   Q. I asked a poor question.  Now, in the limited
 8      amount of high temperature work, I think you
 9      made it clear that you used a number of
10      different brands.  Did you use Johns-Manville
11      insulation?
12   A. Yes, we did.
13   Q. Did you use Pabco insulation?
14   A. I think I remember some of that.  That might
15      have been purchased.
16   Q. And you also mentioned some material from Atlas,
17      or is Atlas the brand?
18   A. No, Atlas Asbestos.
19   Q. Any others?
20   A. A Canadian firm.  I think Johnson Insulation
21      from Madison might have gotten into the pipe
22      covering portion of that, too, at some time.
23   Q. Now, can you tell me the degree to which
24      L & S used any one of those in particular?
25   A. To the degree?
```

PAGE: 37

```
 1   Q. Can you tell me to what degree L & S used any
 2      one of those in particular?
 3   A. Well, it would rely on the -- I would have to
 4      say, if the specifications demanded that it be
 5      used entirely on that job, not singling out
 6      A. O. Smith or -- but if the government or the
 7      school system or A. O. Smith, that's what they
 8      wanted, that's what you would have to install.
 9      If the opportunity was presented and we could
10      switch to fiberglass, we did that from a cost
11      factor.
12   Q. I think what I'm getting at, do you know how
13      much Johns-Manville insulation you used as
14      compared to Pabco?
15         MR. TERSCHAN:  You mean as a
16      percentage?
17         MR. JARDINE:  Yes.
18         THE WITNESS:  In general, we used so
19      little overall, it's impossible to factor that
20      in.
21         MR. JARDINE:
22   Q. Okay.  And with regard to L & S jobs, you had
23      mentioned earlier that you associate the Kaylo
24      that was used with being manufactured by
25      Owens-Corning; is that correct?
```

PAGE: 38
```
 1   A.  That was my assumption.
 2           MR. JARDINE:  That's all I have.
 3           MS. SCHAEFER:  I have no questions.
 4           MR. SENTENEY:  Just a little bit.
 5           MR. TERSCHAN:  Oh.
 6                   EXAMINATION
 7   BY MR. SENTENEY:
 8   Q.  Mr. Borchardt, again I refer you to your
 9       testimony in the Neubauer, N-e-u-b-a-u-e-r,
10       case.
11   A.  Yes, I'm aware of Neubauer.
12   Q.  The deposition was given on July 14, 1980, sir.
13   A.  Okay.
14   Q.  I refer you to Page 58.  The top of the page.
15       Question: "Mr. Borchardt, you testified that
16       you did use the brand product called Kaylo as
17       opposed to the general cal-sil product that your
18       ticket showed as Kaylo?"
19           Answer: "Yes."
20           Did I read that correctly?
21   A.  If that's what I said.
22   Q.  Is that true today?  Is that accurate?
23   A.  Well, I think further along, if you go to one of
24       these depositions, you will see I will -- I
25       stated under oath that if our ticket said Kaylo
```

PAGE: 39
```
 1       written on it, that doesn't necessarily mean it
 2       came from Owens-Corning.
 3   Q.  Did I read that quote correctly?
 4   A.  Yes, you did.
 5   Q.  And it goes on to state: "Can you tell me the
 6       earliest date that you recall L & S using that
 7       brand product?"
 8           Answer: "I'm sorry, I can't; but I
 9       would think, you know, if it was manufactured,
10       it would have been just a reasonable time after
11       that that we probably purchased them."
12           Question: "Are you talking about in
13       the '50s or the '60s, as far back as that?"
14           Answer: "If it was manufactured in the
15       '50s, I'm sure that we purchased some in the
16       '50s." Unquote.
17           Did I read that accurately?
18   A.  Yes, you did, for Building Service, Industrial,
19       yes.
20   Q.  And it goes on to say, question, on the same
21       page: "Did you use that product for specific
22       types of jobs, or did you use it generally in
23       insulation?"
24           Answer: "Only for high temperature
25       insulation."  End of quote.
```

PAGE: 40
```
 1           Is that correct, sir?
 2   A.  That's correct.
 3   Q.  Now then, on the next page, Page 59:
 4           Question: "Did you, yourself, actually
 5       see the Kaylo product?  All my questions are the
 6       specific brand Kaylo."
 7           Answer: "Yes."
 8           Question: "Did you, yourself, see it?"
 9           Answer: "Yes."
10           Did I read those correctly, sir?
11   A.  Yes.
12           MR. SENTENEY:  Just off the record.
13           (Discussion off the record.)
14           MR. SENTENEY:  For the record, we're
15       going to mark the actual ledger books 1-A, 2-A,
16       3-A and 4-A, which will be kept in the
17       possession of L & S's counsel; and I'm done.
18           (Deposition Exhibit Nos. 1-A, 2-A, 3-A,
19       and 4-A were marked for identification by the
20       Court Reporter.)
21           (Whereupon, the above proceedings
22       concluded at 10:50 o'clock in the forenoon.)
23
24                     * * * *
25
```

PAGE: 41
```
 1   STATE OF WISCONSIN  )
                        ) SS:
 2   WAUKESHA COUNTY    )
 3           I, MELODY D. WEST, a Notary Public in and
 4   for the State of Wisconsin, do hereby certify that
 5   ELMER H. BORCHARDT, the witness named herein, personally
 6   appeared before myself on the 12th day of May, 2003,
 7   commencing at 10:00 o'clock in the forenoon at the Law
 8   Offices of Terschan, Steinle & Ness, 2600 North Mayfair
 9   Road, Suite 700, Milwaukee, Milwaukee County, Wisconsin,
10   and was by me duly sworn to testify the truth and nothing
11   but the truth in the within-entitled cause.
12           That said deposition was reported by myself
13   as an independent court reporter and disinterested person
14   and was thereafter transcribed into typewritten form under
15   my direction.
16           I further certify that I am not of counsel
17   nor attorney for either or any of the parties to said
18   deposition, nor in any way interested in the outcome of the
19   cause named in the caption.
20           I further certify that the appearances to
21   this deposition are as noted in the index of this
22   transcript as set forth on Page 2.
23
24
25
```

```
                                                    PAGE: 42
 1             I have hereunto set my hand and affixed my
 2  seal of office this 12th day of May, 2003.
 3
 4
 5
 6
                   _____
                   MELODY D. WEST - NOTARY PUBLIC
 7                 IN AND FOR THE STATE OF WISCONSIN
 8
 9
10
11  My commission expires:  November 2, 2003.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```