STATE OF WISCONSIN    CIRCUIT COURT   MILWAUKEE COUNTY

DALE W. BRANDT, AS PERSONAL            )
REPRESENTATIVE OF THE                  )
ESTATE OF GLENN W. BRANDT,             )
                                       )
                 PLAINTIFF,            )
                                       )
         VS.                           )    NO. 605-147
                                       )
OWENS-ILLINOIS, INC., ET AL.,          )
                                       )
                 DEFENDANTS.           )
                                       )

DEPOSITION OF WILLIAM Z. FLUCK

OCTOBER 15, 1985

Reported By: MARY A. ARSENEAU, CSR NO. 4848



**C**entral
**C**oast
**C**ourt
**R**eporters

106 East Boone Street
Santa Maria, CA 93454
(805) 928-2683

1264 Higuera St., Suite 102-D
San Luis Obispo, CA 93401
(805) 544-6352

VOLUME I - PAGES 2 TO 90

**Registered Professional Reporters**

I

1

2

3           DEPOSITION OF WILLIAM Z. FLUCK, A WITNESS,

4           TAKEN ON BEHALF OF DEFENDANTS, AT THE

5           RESIDENCE OF WILLIAM Z. FLUCK, 122 INVERNESS

6           AVENUE, LOMPOC, CALIFORNIA, COMMENCING AT

7           10:00 A.M., TUESDAY, OCTOBER 15, 1985,

8           BEFORE MARY A. ARSENEAU, CSR NO. 4848,

9           REGISTERED PROFESSIONAL REPORTER, A NOTARY

10          PUBLIC, PURSUANT TO NOTICE.

11

12   APPEARANCES:

13   FOR THE PLAINTIFF:        THOMAS HART
                            ATTORNEY AT LAW
14                       1611 ALLEN STREET
                       BARNWELL, SOUTH CAROLINA
15                       BY:  KENNETH S. BURGI
                            ATTORNEY AT LAW
16                            4526 WILSHIRE BLVD.
                          LOS ANGELES, CALIFORNIA
17
   FOR DEFENDANTS OWENS-
18   ILLINOIS INC., OWENS CORNING
   FIBERGLASS CORP., ET AL.:    SCHIFF, HARDIN & WAITE
19                       BY:  ROBERT H. RILEY
                            ATTORNEY AT LAW
20                       7200 SEARS TOWER
                       CHICAGO, ILLINOIS
21
   FOR DEFENDANTS L.A.Q.
22   AND JENSEN-SOUDERS
   ASSOCIATES, INC.:         COOK & FRANKE S.C.
23                       BY:  THOMAS N. HARRINGTON
                            ATTORNEY AT LAW
24                       660 EAST MASON STREET
                       MILWAUKEE, WISCONSIN

25

26

27

28

II

## I N D E X

| WITNESS | EXAMINATION | PAGE |
|---------|-------------|------|
| WILLIAM Z. FLUCK | BY MR. RILEY | 2, 161 |
| | BY MR. HARRINGTON | 77, 166 |
| | BY MR. BURGI | 102 |

## EXHIBITS FOR IDENTIFICATION

FLUCK EXHIBIT NO. 1.   MULTI PAGE DOCUMENT   P.33

FLUCK EXHIBIT NO. 2.   DOCUMENT                P.34

2

1            WILLIAM Z. FLUCK,

2    THE WITNESS HEREIN, HAVING BEEN FIRST DULY SWORN,

3    WAS DEPOSED, AND TESTIFIED AS FOLLOWS:

4

5                  EXAMINATION

6    BY MR. RILEY:

7        Q.    FOR THE RECORD, SIR, WOULD YOU STATE

8    YOUR FULL NAME AGAIN, PLEASE, FOR THE COURT

9    REPORTER?

10       A.    WILLIAM Z. FLUCK.

11       -- DO YOU WANT -- DO YOU NEED THE MIDDLE INITIAL?

12       Q.    NO.   THAT'S ALL RIGHT.

13       LET THE RECORD REFLECT THIS IS THE DEPOSITION

14   OF WILLIAM Z. FLUCK TAKEN PURSUANT TO NOTICE AND

15   AGREEMENT OF COUNSEL PURSUANT TO THE APPLICABLE

16   RULES OF THE WISCONSIN STATUTES.

17       MR. BURGI:    I'D LIKE TO LODGE AN OBJECTION

18   BRIEFLY AT THIS POINT THAT WE DO OBJECT TO THIS

19   DEPOSITION ON BEHALF OF PLAINTIFF.  BY APPEARING

20   HERE TODAY WE DO NOT WAIVE OUR OBJECTION OR THE USE

21   OF THIS DEPOSITION; AND ALL OTHER OBJECTIONS ARE

22   RESERVED, EXCEPT THOSE WITH RESPECT TO THE PHRASING

23   OF QUESTIONS TODAY.

24       MR. RILEY:    WELL, YOUR OBJECTIONS WILL BE

25   RESERVED AS THEY ARE RESERVED UNDER THE APPLICABLE

26   WISCONSIN STATUTES, AND IF YOU ARE PROPOSING A

27   STIPULATION THAT'S DIFFERENT FROM THAT, THAT'S

28   UNILATERAL, THAT'S NOT BEEN DISCUSSED.

1    WITH RESPECT TO YOUR OBJECTION TO THE TAKING

2    OF THIS DEPOSITION, IT TAKES ME A LITTLE BIT BY

3    SURPRISE GIVEN THE FACT THAT THERE HAVE BEEN

4    DISCUSSIONS BETWEEN COUNSEL FOR THE PLAINTIFF AND

5    MYSELF WITH RESPECT TO THE TAKING OF THESE

6    DEPOSITIONS AND THE SCHEDULING OF THESE DEPOSITIONS.

7         I UNDERSTAND, MR. BURGI, YOU DON'T HAVE ANY

8    PERSONAL KNOWLEDGE OF ANY OF THAT, AND YOU ARE HERE

9    AS A REPRESENTATIVE WHO GOT CALLED APPARENTLY AT

10   MIDNIGHT YOUR TIME LAST NIGHT TO COME TO THIS

11   DEPOSITION.  AND I TAKE IT THAT SOMEBODY TOLD YOU TO

12   MAKE THE OBJECTION YOU JUST MADE.  I THINK IT'S

13   INAPPROPRIATE, BUT THAT WILL BE RESOLVED AT SOME

14   FUTURE TIME I'M SURE.

15        MR. HARRINGTON:   MAY I JUST ASK A QUESTION?

16   WHAT IS THE SPECIFIC BASIS OF YOUR OBJECTION FOR

17   OBJECTING TO THIS DEPOSITION?

18        MR. BURGI:   WITH RESPECT TO THE MANNER IN

19   WHICH THE DEPOSITION WAS NOTICED.

20        MR. RILEY:   WHAT'S WRONG WITH THE NOTICE?

21   WHAT'S WRONG WITH THE NOTICE?

22        MR. BURGI:   I HAVEN'T THE NOTICE WITH ME

23   HERE TO DISCUSS THE DETAILS OF THE NOTICE.

24        MR. RILEY:   I'VE GOT IT.

25        THE WITNESS:   MAY I MAKE A COMMENT OFF THE

26   RECORD?

27        MR. RILEY:   NO.  NO.  THAT'S NOT A GOOD

28   IDEA.

4

1        THE WITNESS:    I'D LIKE TO SIMPLY SAY THAT

2   I'M SOMEWHAT HARD OF HEARING.  AND SO IF I SHOULD

3   KNOW WHAT'S BEING SAID YOU HAVE TO RECOGNIZE THAT

4   YOU'LL HAVE TO SPEAK UP A LITTLE BIT.

5        MR. RILEY:    WE'RE JUST NOW DOING WHAT

6   LAWYERS DO, BECAUSE THERE ARE SOME ISSUES THAT DON'T

7   RELATE DIRECTLY TO YOUR TESTIMONY, MR. FLUCK.  WE

8   DON'T MEAN TO EXCLUDE YOU FROM THAT, BUT WE NEED TO

9   DO SOME SEPARATE BUSINESS.

10        I'M HANDING MR. BURGI A COPY OF THE DEPOSITION

11   NOTICE WHICH WAS DULY SERVED IN THIS CASE.

12        I'D LIKE TO KNOW WHAT YOUR OBJECTION TO THAT

13   NOTICE IS.

14        MR. BURGI:    MR. HART WAS NOT ABLE TO BE

15   PRESENT HERE TODAY.  IT'S MY UNDERSTANDING THAT HE

16   HAD AN OBJECTION, IN FACT, TO THE NOTICE AND THE

17   TIMING OF THE DEPOSITION.

18        MR. RILEY:    I TALKED TO MR. HART YESTERDAY

19   AFTERNOON IN THE COURTHOUSE, AND HE DIDN'T LODGE ANY

20   SUCH OBJECTION TO THE NOTICE.

21        MR. BURGI:    THIS IS A MATTER THAT CAN BE

22   RESOLVED AT A LATER POINT IN TIME.

23        MR. HARRINGTON:    JUST SO THE RECORD IS

24   CLEAR, YOUR OBJECTION IS TO THE FORM OF THE NOTICE

25   AND THE TIMING OF THE DEPOSITION; IS THAT CORRECT?

26        MR. BURGI:    TO THE DEPOSITION ITSELF.

27        MR. HARRINGTON:    WELL, WE WANT TO GET THIS

28   CLEAR.

1      AS I UNDERSTAND IT, YOUR OBJECTION IS TO THE

2  NOTICE, THE FORM OF THE NOTICE BEING IMPROPER, OR AN

3  INSUFFICIENT AMOUNT OF TIME FOR THE NOTICE.  IS THAT

4  CORRECT?

5      MR. BURGI:    THERE MAY BE A PROBLEM,

6  ADDITIONALLY, WITH RESPECT TO THIS WITNESS IN

7  PARTICULAR.

8      MR. RILEY:    WE WANT TO KNOW WHAT THAT

9  PROBLEM IS.

10      MR. HARRINGTON:    IF IT'S SOMETHING THAT CAN

11  BE CURED WE SHOULD KNOW ABOUT IT RIGHT NOW, WHILE

12  WE'RE IN CALIFORNIA, INSTEAD OF HAVING TO MAKE A

13  SEPARATE TRIP BACK TO CALIFORNIA, WHICH IS EXPENSIVE

14  FOR THOSE OF US WHO ARE IN THE MIDWEST.

15      THAT'S WHY I THINK IT'S IMPORTANT THAT YOU

16  STATE CLEARLY AND SUCCINCTLY THE EXACT BASIS OF YOUR

17  OBJECTION TO THE DEPOSITION THIS MORNING.

18      MR. BURGI:    WELL, IN ORDER TO DO SO, IN

19  ORDER TO STATE THE OBJECTION WITH MORE SPECIFICITY,

20  I WOULD HAVE TO CONTACT MR. HART.

21      MR. RILEY:    LET ME PHRASE THE QUESTION A

22  LITTLE DIFFERENTLY, THEN.

23      ARE YOU AWARE OF ANY BASIS FOR OBJECTION OTHER

24  THAN THE ONES THAT YOU'VE MADE HERE?

25      MR. BURGI:    I'M NOT AWARE OF THE SPECIFIC

26  BASIS.

27      THERE MAY BE A PROBLEM WITH RESPECT TO THIS

28  WITNESS, EXACTLY WHAT HE'S GOING TO BE CALLED FOR,

6

1   WITH RESPECT TO WHETHER OR NOT HE IS A PERCIPIENT
2   WITNESS OR AN EXPERT WITNESS.
3        THERE MAY BE A PROBLEM WITH RESPECT TO WHETHER
4   OR NOT HE WAS NOTICED AS A WITNESS.
5        THERE MAY BE A PROBLEM WITH RESPECT TO
6   DISCOVERY CUT-OFF.
7        IF YOU LIKE, WHEN WE TAKE A BREAK, I CAN GET
8   YOU MORE SPECIFICITY ON THE OBJECTION.
9        MR. RILEY:     NO.  YOU DON'T HAVE TO DO
10  ANYTHING TO PLEASE ME.  I'M NOT INTERESTED IN HAVING
11  YOU MAKE -- ALL I WANT YOU TO DO IS MAKE THE RECORD
12  CLEAR AS TO WHAT YOUR OBJECTION IS, SINCE YOU'VE
13  GONE OUT OF YOUR WAY TO MAKE ONE.
14       I GUESS YOU'VE TOLD US EVERYTHING YOU CAN TELL
15  US ABOUT YOUR OBJECTION, SO LET'S GO ON.
16       Q.     NOW THAT THAT'S DONE, MR. FLUCK,
17  OBVIOUSLY THE COURT REPORTER IS HERE TO TAKE DOWN
18  EVERYTHING THAT EVERYONE IN THE ROOM SAYS.
19  THEREFORE, IT'S IMPORTANT THAT WE ALL TRY TO TAKE
20  TURNS WHEN WE TALK.
21       WHEN I ASK A QUESTION, IF YOU'LL LET ME FINISH
22  THE QUESTION BEFORE YOU START TO ANSWER IT WILL BE
23  MUCH EASIER FOR THE COURT REPORTER TO TAKE DOWN THE
24  TRANSCRIPT AND THE TRANSCRIPT WILL READ MUCH MORE
25  LOGICALLY IF WE DO THAT.
26       IN ESSENCE, WE CAN'T TALK THE WAY WE WOULD IF
27  WE WERE JUST HAVING A CONVERSATION HERE IN YOUR
28  LIVING ROOM.

7

1     IT IS IMPORTANT, ALSO, FOR YOU TO HAVE ALL OF

2  YOUR ANSWERS MADE OUT LOUD USING WORDS AS OPPOSED TO

3  A GESTURE OR A NOD OR THE PHRASES WE ALL USE SUCH AS

4  "UH-HUH" OR "HUH-UH." BECAUSE AGAIN, THE COURT

5  REPORTER CAN'T TAKE THAT DOWN VERY EFFECTIVELY.

6     IF AT ANY TIME YOU DON'T UNDERSTAND ONE OF MY

7  QUESTIONS OR IF YOU HAVE ANY TROUBLE HEARING THE

8  QUESTION BECAUSE I'M NOT KEEPING MY VOICE UP, IF

9  YOU'LL PLEASE LET ME KNOW THAT I'LL DO A BETTER JOB

10  OF ASKING THE QUESTIONS SO THAT YOU HAVE A FAIR

11  OPPORTUNITY TO ANSWER MY QUESTIONS.

12     I DO WANT THE RECORD TO REFLECT THAT THIS

13  DEPOSITION IS GOING FORWARD IN YOUR LIVING ROOM,

14  MR. FLUCK, HERE IN LOMPOC, CALIFORNIA.

15     THAT'S CORRECT; ISN'T IT?

16     A.     YES.

17     Q.     YOU'VE BEEN VERY GRACIOUS TO HAVE US

18  HERE, AND I'M SURE ALL OF US THANK YOU FOR DOING

19  THAT.

20     IT'S MY UNDERSTANDING THAT YOU HAVE HESITENCY

21  TO TRAVEL, AND THERE IS A SITUATION WITH YOUR WIFE'S

22  HEALTH THAT MAKES IT VERY DIFFICULT FOR YOU TO

23  TRAVEL, AND YOU'VE ASKED THAT WE BE HERE AS OPPOSED

24  TO YOU GOING TO SOME OTHER AREA OF THE COUNTRY TO

25  GIVE THIS TESTIMONY.  IS THAT CORRECT?

26     A.     THAT'S RIGHT.

27     Q.     AND DO I UNDERSTAND CORRECTLY THAT IT IS

28  VERY DIFFICULT BECAUSE OF YOUR WIFE'S HEALTH

8

1  SITUATION TO TRAVEL?

2      A.      THAT'S CORRECT.

3      Q.      OKAY.  MR. FLUCK, COULD YOU TELL US

4  BRIEFLY WHAT YOUR EDUCATIONAL BACKGROUND IS, PLEASE?

5      A.      I HAVE A BACHELOR OF SCIENCE DEGREE IN

6  CHEMICAL ENGINEERING FROM THE UNIVERSITY OF

7  WISCONSIN, 1935; A MASTERS DEGREE FROM THE

8  UNIVERSITY OF WISCONSIN IN ENGINEERING, 1937.

9      Q.      DID YOU -- I'M SORRY.  WERE YOU

10  FINISHED?

11      A.      PLUS NUMEROUS EXTENSION COURSES

12  PERTINENT TO INDUSTRIAL HYGIENE.

13      Q.      BEFORE YOU GRADUATED WITH A MASTERS IN

14  1937 DID YOU HAVE ANY FULL OR PART TIME JOB IN THE

15  INDUSTRIAL HYGIENE FIELD?

16      A.      NO.

17      Q.      OKAY.  AFTER RECEIVING YOUR MASTERS IN

18  ENGINEERING IN 1937 WHAT DID YOU DO?

19      A.      I WENT TO A THREE-WEEK SHORT COURSE OR

20  SEMINAR IN INDUSTRIAL HYGIENE GIVEN BY THE

21  U.S. PUBLIC HEALTH SERVICE IN WASHINGTON D.C.

22      Q.      HOW WAS IT THAT YOU CAME TO BE INVITED

23  TO ATTEND THAT COURSE?

24      A.      I HAD BEEN HIRED AS AN INDUSTRIAL

25  HYGIENE ENGINEER BY THE STATE OF WISCONSIN, AND THIS

26  COURSE WAS PRESENTED BY THE PUBLIC HEALTH SERVICE TO

27  INDOCTRINATE NEW INDUSTRIAL HYGIENISTS THAT JUST

28  ENTERED STATE WORK.

9

1   Q.   NOW, HAD YOU JUST ENTERED STATE WORK OR
2   WERE YOU ABOUT TO ENTER INTO STATE WORK?
3   A.   I HAD JUST ENTERED.
4   Q.   OKAY.  AND WHAT JOB HAD YOU TAKEN?
5   A.   I WAS AN INDUSTRIAL -- THE JOB WAS
6   CALLED INDUSTRIAL HYGIENE ENGINEER, WISCONSIN STATE
7   BOARD OF HEALTH.
8   Q.   OKAY.  WERE THERE OTHERS WORKING FOR THE
9   WISCONSIN STATE BOARD OF HEALTH IN SIMILAR
10  CAPACITIES AT THE TIME YOU JOINED?
11  A.   NO.  I WAS ONE OF THE ORIGINAL GROUP
12  THAT FORMED THE INDUSTRIAL HYGIENE UNIT OF THE
13  WISCONSIN STATE BOARD OF HEALTH.
14  Q.   WHO WERE THE OTHER MEMBERS OF THAT
15  GROUP?
16  A.   DR. PAUL BREHM WAS THE MEDICAL DIRECTOR,
17  A MR. HAROLD RUFF WAS THE OTHER ENGINEER.  AND THAT
18  WAS THE ENTIRE INDUSTRIAL HYGIENE UNIT.
19  Q.   OKAY.  NOW LET'S GET BACK TO THE UNITED
20  STATES PUBLIC HEALTH SERVICE AND THIS SEMINAR.
21  WAS THERE SOME RELATIONSHIP BETWEEN THE
22  ACTIVITIES OF THE UNITED STATES PUBLIC HEALTH
23  SERVICE AND THE FORMATION OF THE WISCONSIN
24  INDUSTRIAL HYGIENE UNIT?
25  A.   YES.  THE FORMATION OF THE INDUSTRIAL
26  HYGIENE UNIT WAS MORE OR LESS AT THE INSTIGATION OF
27  THE PUBLIC HEALTH SERVICE.  AT THAT TIME THEY WERE
28  PROMOTING A RELATIVELY NEW FIELD, INDUSTRIAL

10

1   HYGIENE.  THEY CONTACTED THE VARIOUS STATES AND

2   ENCOURAGED THEM TO ESTABLISH UNITS, AND WISCONSIN

3   WAS ONE OF THE MANY STATES THAT DID.

4       Q.     WHAT DID YOU STUDY DURING THIS THREE

5   WEEK COURSE IN WASHINGTON D.C.?

6       A.     WE STUDIED JUST ABOUT EVERYTHING THAT

7   WAS KNOWN ABOUT INDUSTRIAL HYGIENE AT THE TIME.

8       Q.     WAS THAT A GREAT DEAL OR --

9       A.     NOT TOO MUCH, IF YOU CAN PRESENT IT IN

10  THREE WEEKS.

11      INDUSTRIAL HYGIENE WAS A RELATIVELY NEW FIELD.

12      Q.     HOW MANY STATES WERE REPRESENTED BY

13  INDIVIDUALS ATTENDING THIS SHORT COURSE IN

14  WASHINGTON D.C.?

15      A.     THERE WERE ON THE ORDER OF 25 TO 30.  I

16  DON'T REMEMBER THE EXACT NUMBER.

17      Q.     WHAT WAS THE FOCUS OF THE COURSE WHEN IT

18  CAME TO AIRBORNE MATERIALS WHICH MIGHT PRESENT A

19  HEALTH HAZARD IN THE WORK PLACE, IF THERE WAS A

20  FOCUS?

21      WAS THIS A FOCUS ON CERTAIN SUBSTANCES AS

22  BEING OF THE GREATEST CONCERN?

23      MR. BURGI:     I'M GOING TO OBJECT TO THE

24  QUESTION AS VAGUE AND AMBIGUOUS.

25      MR. RILEY:

26      Q.     YOU GO AHEAD.  THAT'S ALL RIGHT.  THAT'S

27  LAWYER TALK.

28      A.     EACH CATEGORY OF INDUSTRIAL -- OF

1  POTENTIAL INDUSTRIAL HAZARD WAS DISCUSSED IN GENERAL

2  AND THEN DETAILED DISCUSSIONS WERE MADE ON THE MORE

3  IMPORTANT SUBSTANCES WITHIN A CATEGORY -- BY

4  CATEGORIES, I MEAN SUCH THINGS AS DUSTS, FUMES,

5  VAPORS, GASES -- EACH WAS DISCUSSED IN GENERAL AND

6  THEN SPECIFIC, DETAILED INFORMATION ON THE MORE

7  IMPORTANT MATERIALS WITHIN EACH CATEGORY.

8       Q.    AND IN THE CATEGORY OF DUST, WHAT WERE

9  THE MORE IMPORTANT MATERIALS THAT WERE DISCUSSED, IF

10  YOU RECALL?

11       A.    WELL, OF COURSE, THE EMPHASIS WAS ON

12  SILICOSIS, WHICH WAS CONSIDERED THE MOST IMPORTANT

13  DUST DISEASE.   OTHER DUSTS WERE MENTIONED AND SOME

14  DISCUSSION ON THEM, BUT SILICOSIS OCCUPIED PERHAPS

15  70 PERCENT OF THE DISCUSSION.

16       Q.    DO YOU RECALL WHETHER THERE WAS ANY

17  DISCUSSION WITH RESPECT TO ASBESTOS?

18       A.    I DO NOT RECALL THAT SPECIFICALLY, NO.

19  MR. BURGI:    DID WE ESTABLISH THE YEAR OF

20  THIS CONFERENCE?

21  MR. RILEY:    I BELIEVE MR. FLUCK SAID 1937.

22       Q.    YOU DID, DIDN'T YOU?

23       A.    1937.

24  MR. BURGI:    THANK YOU.

25  MR. RILEY:

26       Q.    CAN YOU TELL ME WHO WAS ON THE FACULTY

27  FOR THIS SHORT COURSE?

28       I REALIZE IT'S BEEN A NUMBER OF YEARS, BUT CAN

12

1   YOU REMEMBER ANY OF THE NAMES?

2        A.    AS FAR AS I REMEMBER THEY WERE ALL

3   REPRESENTATIVES OF THE U.S. PUBLIC HEALTH SERVICE,

4   DIVISION OF INDUSTRIAL HYGIENE.

5        Q.    OKAY.

6        A.    I CAN REMEMBER THE NAME J.J. ~~BLUMFIELD~~, *BLOOMFIELD (W?)*

7   BECAUSE HE TOOK A VERY LARGE PART IN THE DISCUSSION.

8   I BELIEVE HE WAS AN ENGINEER.

9        THERE ALSO WERE DOCTORS, AND EACH -- LET'S

10  SEE.  THERE WAS A DR. SAYERS, S-A-Y-E-R-S, I BELIEVE

11  HIS FIRST NAME WAS ROYD, WHO WAS THE CHIEF SURGEON

12  FOR THE INDUSTRIAL HYGIENE DIVISION OF THE PUBLIC

13  HEALTH SERVICE.  THERE WAS A MR. RICHARD PAGE WHO

14  DISCUSSED DUST COUNTING TECHNIQUES.  I CAN'T

15  REMEMBER --

16       Q.    OKAY.

17       A.    -- ANY MORE NAMES.

18       Q.    AFTER THIS SHORT COURSE WAS OVER DID YOU

19  THEN COME BACK TO WISCONSIN?

20       A.    YES.  WE CAME BACK TO WISCONSIN AND

21  IMMEDIATELY ORGANIZED THE INDUSTRIAL HYGIENE UNIT OF

22  THE WISCONSIN BOARD OF HEALTH.

23       Q.    DID THAT INDUSTRIAL HYGIENE UNIT INVOLVE

24  THE SAME THREE PEOPLE YOU IDENTIFIED BEFORE, THAT

25  BEING MR. BREHM, MR. RUFF AND YOURSELF?

26       A.    THAT'S CORRECT, YES.  THAT'S CORRECT.

27  PLUS A SECRETARY WHO HADN'T GONE TO THE COURSE.

28       Q.    HOW LONG DID YOU WORK AT THE INDUSTRIAL

1  HYGIENE UNIT FOR THE STATE BOARD OF HEALTH?

2      A.    FROM MAY 1937 UNTIL THE SUMMER OF '43,

3  WHEN I WENT INTO THE SERVICE.  I CAN'T TELL YOU THE

4  EXACT MONTH.

5      THEN WHEN I GOT OUT OF THE SERVICE IN 1946 I

6  RETURNED TO THE INDUSTRIAL HYGIENE UNIT AND STAYED

7  WITH THEM UNTIL DECEMBER 1949.

8      Q.    NOW DURING THE ENTIRE LENGTH OF TIME

9  THAT YOU WERE AT THE INDUSTRIAL HYGIENE UNIT WAS

10  YOUR POSITION THE SAME OR DID THAT CHANGE AT SOME

11  POINT?

12      A.    IT WAS THE SAME FOR MOST OF THAT PERIOD.

13  I WAS, HOWEVER, ACTING DIRECTOR FOR A VERY SHORT

14  TIME IN LATE '48 OR '49, UPON THE DEATH OF DR.

15  BREHM, THE DIRECTOR.  I FRANKLY DON'T KNOW WHETHER I

16  EVER OFFICIALLY HELD THE TITLE OR NOT, BUT I WAS THE

17  ACTING DIRECTOR FOR A SHORT PERIOD.

18      Q.    OKAY.  DURING THE TIME THAT YOU WERE IN

19  THE SERVICE DID ANY OF YOUR SERVICE INVOLVE

20  INDUSTRIAL HYGIENE WORK?

21      BY THAT, I'M TALKING ABOUT THE PERIOD FROM THE

22  SUMMER OF 1943 UNTIL 1946.

23      A.    YES.  YES.

24      Q.    OKAY.  NOW AFTER YOU LEFT THE INDUSTRIAL

25  HYGIENE UNIT IN 1949, WHAT DID YOU DO?

26      A.    I TOOK A JOB AS INDUSTRIAL HYGIENIST FOR

27  THE NAVY, AT THE NAVAL AIR STATION, NORTH ISLAND,

28  SAN DIEGO, CALIFORNIA.

14

1    Q.    HOW LONG DID YOU REMAIN IN THE NAVY
2  BEGINNING WITH THAT STINT IN '49?
3    A.    IT COVERED A PERIOD FROM JANUARY 1950
4  THROUGH SOMETIME IN '55, BUT WITH A 21-MONTH PERIOD
5  TAKEN OUT OF THAT FOR ACTIVE MILITARY DUTY.
6    I CAN'T GIVE YOU THE EXACT DATES WITHOUT
7  LOOKING UP MY RECORDS, BUT IT COVERED FIVE YEARS,
8  WITH 21 MONTHS -- APPROXIMATELY FIVE YEARS, WITH
9  21 MONTHS DELETED.
10    MR. BURGI:    I'M SORRY.  DID YOU SAY 1950 OR
11  1940?
12    THE WITNESS:    1950.
13    MR. BURGI:    THANK YOU.
14    THE WITNESS:    JANUARY 1950 IS WHEN I STARTED
15  WITH THEM.
16    MR. RILEY:
17    Q.    WERE YOU AN INDUSTRIAL HYGIENIST FOR THE
18  NAVY DURING THE ENTIRE FIVE YEARS?
19    A.    THAT'S RIGHT.
20    Q.    INCLUDING WHEN YOU WERE ON ACTIVE DUTY?
21    A.    NO.  NO.  THE 21 MONTHS ACTIVE DUTY WAS
22  WITH THE AIR FORCE.
23    Q.    WERE YOU AN INDUSTRIAL HYGIENIST FOR THE
24  AIR FORCE DURING THE 21 MONTHS OR DID YOU DO
25  SOMETHING ELSE?
26    A.    IT WASN'T EXACTLY INDUSTRIAL HYGIENE.
27  IT WAS CALLED VARIOUS THINGS, INCLUDING
28  BIO-ENVIRONMENTAL ENGINEERING, BUT PART OF THE WORK

15

1   WAS INDUSTRIAL HYGIENE.

2       Q.      WHAT DID YOU DO IN 1955 WHEN YOU LEFT

3   THE NAVY?

4       A.      I WENT TO THE OFFICE OF THE SURGEON

5   GENERAL, AIR FORCE, IN WASHINGTON D.C.

6       Q.      WHAT WAS YOUR JOB?

7       A.      BIO-ENIRONMENTAL ENGINEER.

8       Q.      WHAT DOES A BIO-ENVIRONMENTAL ENGINEER

9   DO?

10      A.      ALMOST THE SAME AS AN INDUSTRIAL

11  HYGIENIST, BUT A BROADER FIELD, SOMEWHAT BROADER.

12  IN OTHER WORDS, APPLYING THE TECHNICAL KNOWLEDGE TO

13  THE CONTROL OF ENVIRONMENTAL FACTORS THAT AFFECT THE

14  HEALTH OF PEOPLE.

15      Q.      OKAY.

16      NOW, HOW LONG DID YOU STAY WITH THE OFFICE OF

17  THE SURGEON GENERAL AIR FORCE?

18      A.      21 MONTHS.

19      I WOULD LIKE TO CORRECT THAT --

20      Q.      OKAY.

21      A.      -- A BIT.  I ACTUALLY SPENT

22  APPROXIMATELY ONE MONTH AT WRIGHT PATTERSON AIR BASE

23  PRIOR TO GOING WITH THE SURGEON GENERAL --

24      Q.      OKAY.

25      A.      -- IN THE INDUSTRIAL HYGIENE FIELD

26  THERE.

27      Q.      ALL RIGHT.  AFTER YOUR 21 MONTHS WITH

28  THE OFFICE OF THE SURGEON GENERAL AIR FORCE WHAT DID

16

1   YOU DO?

2        A.      I WENT BACK TO THE JOB WITH THE NAVY AT

3   NAVAL AIR STATION, NORTH ISLAND.

4        Q.      WAS THIS ONCE AGAIN IN THE POSITION OF

5   AN INDUSTRIAL HYGIENIST?

6        A.      THAT'S RIGHT.

7        Q.      HOW LONG DID YOU REMAIN WITH THE NAVY

8   COMMENCING IN 1957?

9        A.      THAT'S NOT '57.

10       Q.      OKAY.  WHEN WAS IT?  YOU TELL ME.

11       A.      IN THERE WAS A PERIOD FROM '54 THROUGH

12  '55 THAT I STAYED WITH THEM.  MY TOTAL TIME WITH THE

13  NAVY WAS FROM '51 THROUGH '55, WITH 21 MONTHS OUT,

14  21 MONTHS DELETED IN THE MIDDLE OF THAT PERIOD --

15       Q.      RIGHT.

16       A.      -- TO GO WITH THE SURGEON GENERAL AIR

17  FORCE.

18       Q.      OKAY.  DID YOU LEAVE THE NAVY IN 1955?

19  THAT'S WHERE I MAY BE A LITTLE CONFUSED.

20       A.      TO THE BEST OF MY RECOLLECTION.

21       Q.      ALL RIGHT.  WHAT DID YOU DO WHEN YOU

22  LEFT THE NAVY?

23       A.      I WENT BACK ON ACTIVE DUTY WITH THE AIR

24  FORCE.

25       Q.      ALL RIGHT.  AND HOW LONG DID THAT ACTIVE

26  DUTY STINT LAST?

27       A.      UNTIL MAY OF 1971.

28       Q.      WHAT WAS YOUR POSITION WITH THE AIR

17

1    FORCE DURING THIS PERIOD?

2         A.    BIO-ENIRONMENTAL ENGINEER.

3         Q.    ALL RIGHT.  WHAT DID YOU DO IN 1971?

4         A.    RETIRED FROM THE AIR FORCE.

5         Q.    OKAY.  AND DID YOU TAKE ANY OTHER

6    POSITION IN 1971?

7         A.    NO.

8         Q.    OKAY.  SINCE 1971 HAVE YOU HELD ANY

9    POSITIONS, CONSULTING POSITIONS, OR OTHER TYPES OF

10   EMPLOYMENT?

11        A.    NO.

I2        Q.    ALL RIGHT.  NOW I DID NOT ASK YOU THIS

13   AS WE WENT THROUGH THERE THE TYPE OF WORK THAT YOU

14   DID FOR THE INDUSTRIAL HYGIENE UNIT OF THE STATE

15   BOARD OF HEALTH OF WISCONSIN.

16        I'D LIKE TO CONCENTRATE ON THAT PERIOD OF TIME

17   FROM 1937 TO 1949, AND ASK YOU TO DESCRIBE HOW IT

18   WAS THAT THE INDUSTRIAL HYGIENE UNIT GOT STARTED,

19   WHAT DID IT DO?

20        MR. BURGI:    I'M GOING TO OBJECT TO THE

21   QUESTION ON THE GROUNDS IT CALLS FOR SPECULATION.

22        MR. RILEY:    SPECULATION?

23        MR. BURGI:    YES.  THERE MAY BE ASPECTS OF

24   THE DEPARTMENT THAT HE'S NOT FAMILIAR WITH THAT YOU

25   ARE CALLING FOR IN YOUR QUESTION.

26        MR. RILEY:

27        Q.    JUST TALK ABOUT THOSE THINGS YOU ARE

28   FAMILIAR WITH.

18

1    APPARENTLY, COUNSEL IS AFRAID YOU ARE GOING TO

2    MAKE SOMETHING UP.

3    I ONLY WANT YOU TO TELL ME WHAT YOU KNOW FROM

4    YOUR EXPERIENCE THAT THE INDUSTRIAL HYGIENE UNIT --

5    A.    WHAT I DID WITH THE INDUSTRIAL HYGIENE

6    UNIT?

7    Q.    YES, SIR.

8    A.    OUR JOB PRIMARILY WAS TO MAKE STUDIES OF

9    INDUSTRIAL OPERATIONS, FACTORIES GENERALLY, TO

10   DETERMINE IF THERE WERE ANY POTENTIAL HEALTH

11   HAZARDS; AND IF SO, THE DEGREE OF THAT HAZARD.  AND

12   IF ANY POTENTIAL HAZARD WERE FOUND TO RECOMMEND

13   CONTROL PROCEDURES TO ALLEVIATE THE PROBLEM.

14   Q.    NOW, HOW DID YOU GO ABOUT ACCOMPLISHING

15   THOSE THINGS?

16   A.    (NO AUDIBLE RESPONSE.)

17   Q.    FOR EXAMPLE, HOW WAS IT THAT A STUDY

18   TOOK PLACE?

19   A.    DO YOU MEAN THE MECHANISM OF A STUDY?

20   WHAT WE DID DURING THE STUDY?

21   Q.    NO, SIR.

22   RIGHT NOW I'M TRYING TO FIND OUT HOW IT WAS

23   THAT YOU CAME TO DO A STUDY IN A PARTICULAR PLACE AT

24   A PARTICULAR TIME.

25   A.    THERE WERE A NUMBER OF REASONS FOR

26   MAKING A STUDY.

27   INDUSTRIAL HYGIENE BEING A VERY NEW FIELD WE

28   INSTIGATED SOME OF THE STUDIES OURSELVES.  WE WOULD

19

1    LOOK THROUGH THE LITERATURE OR TALK TO OTHERS IN THE

2    FIELD OR SURVEY INDUSTRIES IN WISCONSIN AND PICK OUT

3    AN INDUSTRY THAT WE THOUGHT NEEDED A STUDY OR COULD

4    BENEFIT FROM A STUDY.

5         FOR INSTANCE, WE PROBABLY STARTED WITH THE

6    FOUNDRY INDUSTRY BECAUSE OF THE HISTORY OF SILICOSIS

7    AS A VERY COMMON OCCUPATIONAL DISEASE.  AND THERE

8    HAD BEEN CASES OF SILICOSIS IN WISCONSIN, SO WE MADE

9    QUITE A DETAILED SURVEY OF THE FOUNDRY INDUSTRY.

10        PROBABLY FOLLOWING THAT OR MAYBE JUST PRIOR TO

11   IT WE ALSO STUDIED SILICOSIS IN THE GRANITE CUTTING

12   INDUSTRY, THE MINING OR QUARRYING OF GRANITE AND THE

13   MANUFACTURING PROCESSES.

14        SOMEWHERE ALONG THE LINE, STILL TALKING

15   SILICOSIS, WE STUDIED THE -- DID I START WITH

16   FOUNDRY?

17        Q.    YES, SIR.

18        A.    WELL, THEN WE WENT INTO ANY OF THE OTHER

19   SILICOSIS POTENTIAL INDUSTRIES WE COULD THINK OF,

20   SUCH AS MINING OF SILICA SAND, THE USE OF SANDSTONE

21   AND GRINDING WHEELS -- THIS ISN'T AN INDUSTRY, BUT

22   IT'S A PROCESS THAT ONE WOULD FIND IN VARIOUS

23   INDUSTRIES.

24        AT THE SAME TIME WE WOULD RESPOND TO ANY

25   REQUESTS FOR SURVEYS THAT HAD POTENTIAL -- WHERE

26   POTENTIAL HAZARDS WERE INVOLVED IN INDUSTRY.  THESE

27   REQUESTS COULD COME FROM THE INDUSTRIAL COMMISSION

28   OF WISCONSIN, WHICH IS A REGULATORY AGENCY IN

1   MATTERS OF SAFETY, IT COULD COME FROM WORKERS

2   GROUPS, IT COULD COME FROM THE MANAGEMENT LEVEL OF

3   INDUSTRY.   THOSE ARE THE MAIN REASONS FOR

4   INSTIGATING STUDIES.

5        Q.     OKAY.  WHEN IT WAS DETERMINED THAT A

6   STUDY WOULD BE DONE, EITHER INSTIGATED BY THE

7   INDUSTRIAL HYGIENE UNIT ITSELF OR BY A REQUEST FROM

8   SOME OF THE TYPES OF SOURCES YOU'VE JUST IDENTIFIED,

9   WHAT PROCEDURES WERE FOLLOWED THEN BY THE INDUSTRIAL

10  HYGIENE UNIT IN ORDER TO CARRY OUT THAT STUDY?

11       A.     IF IT WERE SOMETHING NEW TO US OR

12  RELATIVELY NEW WE WOULD MAKE AN EXTENSIVE SEARCH OF

13  THE LITERATURE TO LEARN EVERYTHING WE COULD ON THE

14  SUBJECT.

15       OCCASIONALLY, WE WOULD CONTACT THE PUBLIC

16  HEALTH SERVICE FOR ADVICE IF THERE WAS SOME POINT

17  THAT WE WEREN'T SURE OF, AND THEN WE WOULD DETERMINE

18  THE PROPER ANALYTICAL PROCEDURES TO USE OR SAMPLING

19  PROCEDURES TO USE AND THEN GO AND DO OUR TESTING.

20       Q.     OKAY.  NOW IF YOU WERE OUT THERE

21  SAMPLING SAY AIRBORNE DUST, ONCE THE SAMPLING WAS

22  DONE THEN WHAT PROCEDURES WERE FOLLOWED IN ORDER TO

23  ANALYZE THAT?

24       A.     WE WOULD TAKE IT BACK TO OUR LABORATORY,

25  INDUSTRIAL HYGIENE LABORATORY AND SUBSEQUENTLY MAKE

26  THE ANALYSES OR COUNTS OURSELVES.

27       MR. RUFF OR I WOULD DO THE WORK.  OCCASIONALLY

28  WE GOT SOME HELP FROM THE STATE LABORATORY OF

21

1    HYGIENE.   IF IT WERE ON SOME ANALYTICAL PROCEDURE WE

2    WEREN'T TOO SURE OF OURSELVES WE WOULD GET SOME HELP

3    FROM THEM IN THE EARLY STAGES, TEACHING US

4    TECHNIQUES AND SO FORTH.

5         Q.    NOW YOU MADE A REFERENCE TO COUNTS.

6    AGAIN, IF YOU ARE DOING A STUDY OF AIRBORNE DUST

7    DOES THE COUNT REFER TO HOW MUCH OF A CERTAIN

8    SUBSTANCE YOU FOUND?

9         A.    THE METHOD OF EVALUATING THE EXTENT OF

10   THE POTENTIAL HAZARD FOR A DUST IN THOSE DAYS WAS

11   DUST COUNTING, AND THE STANDARDS WERE GIVEN IN TERMS

12   OF MILLION OF PARTICLES PER CUBIC FOOT.

13        Q.    WHERE DID THOSE STANDARDS COME FROM?

14        A.    THOSE STANDARDS CAME PRIMARILY FROM THE

15   U.S. PUBLIC HEALTH SERVICE.  SOME OF THEM CAME FROM

16   THE U.S. BUREAU OF STANDARDS, BUT THEY WERE THEN

17   INTEGRATED INTO THE LISTING THAT THE PUBLIC HEALTH

18   SERVICE HAD.

19         AND SOMEWHERE ALONG THE LINE IN POINT OF TIME,

20   SOMEWHERE PRIOR TO 1948, A COMMITTEE WAS SET UP IN

21   THE ORGANIZATION CALLED THE AMERICAN CONFERENCE OF

22   GOVERNMENTAL INDUSTRIAL HYGIENISTS THAT EVALUATED

23   ALL THE KNOWN STANDARDS OR ALL THE SUGGESTED

24   STANDARDS FOR HAZARDOUS MATERIALS AND PUBLISHED A

25   LIST OF RECOMMENDED MAXIMUM ALLOWABLE CONCENTRATIONS

26   AS IT WAS CALLED IN THOSE DAYS.  IT GOES BY VARIOUS

27   OTHER NAMES NOW.

28        Q.    OKAY.

22

1       A.    I MIGHT SAY THAT THAT GROUP, THE

2   COMMITTEE ON THRESHHOLD LIMIT VALUES OF THE AMERICAN

3   INDUSTRIAL -- AMERICAN CONFERENCE OF GOVERNMENTAL

4   INDUSTRIAL HYGIENISTS IS STILL WORKING AT THAT

5   PARTICULAR JOB -- NEW COMMITTEE MEMBERS, OBVIOUSLY

6   -- AND THEY ANNUALLY PUBLISH A LIST OF SUGGESTED

7   VALUES.  IT ACTUALLY REVISES THE LIST OF VALUES

8   BASED ON THE LATEST SCIENTIFIC DATA.

9       Q.    OKAY.  FOR A SHORTHAND TERM CAN WE REFER

10  TO THE AMERICAN CONFERENCE OF GOVERNMENT AND

11  INDUSTRIAL HYGIENIST AS THE A.C.G.I.H.? IS THAT HOW

12  IT WAS COMMONLY REFERRED TO --

13      A.    THAT'S THE WAY --

14      Q.    -- DURING YOUR -- I'M SORRY.

15      A.    THAT'S WHAT IT'S CALLED.

16      Q.    DURING THE TIME THAT YOU WORKED AT THE

17  INDUSTRIAL HYGIENIST -- I'M SORRY, THE INDUSTRIAL

18  HYGIENE UNIT, DID YOU CONSIDER THE MAXIMUM ALLOWABLE

19  CONCENTRATIONS ESTABLISHED BY THE A.C.G.I.H. TO BE

20  AUTHORITATIVE AND RELIABLE?

21      A.    THEY WERE THE BEST THAT WAS AVAILABLE.

22  THE MOST AUTHORITATIVE, YES.

23      Q.    ALL RIGHT.  NOW YOU'VE DESCRIBED TAKING

24  COUNTS ON THE ONE HAND, AND YOU'VE DESCRIBED THESE

25  MAXIMUM ALLOWABLE CONCENTRATIONS.

26     WAS THERE A COMPARISON MADE BETWEEN THE COUNT

27  THAT YOU ACTUALLY FOUND AND THE MAXIMUM ALLOWABLE

28  CONCENTRATION THAT YOU REFERRED TO?

1    A.    YES.   THAT WAS THE WAY OF EVALUATING

2    WHETHER THERE WAS OR WAS NOT A HAZARD.

3        Q.    OKAY.  AND COULD YOU DESCRIBE FOR ME

4    THEN WHAT THE MAXIMUM ALLOWABLE CONCENTRATION WAS

5    FOR A GIVEN SUBSTANCE AS YOU UNDERSTOOD IT?

6        A.    ARE YOU ASKING ABOUT A PARTICULAR

7    SUBSTANCE?

8        Q.    OKAY.  WE CAN GET INTO THAT WHEN WE GET

9    INTO PARTICULAR SUBSTANCES BUT --

10        A.    THERE WERE DIFFERENT MAXIMUM ALLOWABLE

11    CONCENTRATIONS FOR DIFFERENT MATERIALS.

12        Q.    CORRECT.

13        AND I'M NOT ASKING FOR THE NUMBER NOW, I'M

14    JUST ASKING YOU TO EXPLAIN TO US WHAT A MAXIMUM

15    ALLOWABLE CONCENTRATION FOR ANY GIVEN SUBSTANCE WAS.

16        WHAT DID IT MEAN IN THE INDUSTRIAL HYGIENE

17    FIELD?

18        A.    IN BROADEST TERMS, IT WAS CONSIDERED THE

19    CONCENTRATION THAT A PERSON COULD TOLERATE EIGHT

20    HOURS A DAY THROUGHOUT A LIFETIME OF WORK WITHOUT

21    ADVERSE EFFECT, EITHER ON SHORT EXPOSURE OR, AS I

22    SAID, PROLONGED EXPOSURE FOR A LIFETIME.

23        Q.    OKAY.

24        A.    IT WAS NOT A HARD AND FAST LEVEL.

25        IN OTHER WORDS, IT WAS CONSIDERED A VERY SAFE

26    LEVEL.  THERE ARE FACTORS OF SAFETY BUILT INTO IT.

27        Q.    OKAY.  WHEN MAKING THE DUST COUNTS AND

28    COMPARING THEM TO THE MAXIMUM ALLOWABLE

1   CONCENTRATIONS, IF THE DUST COUNTS WERE BELOW THE

2   MAXIMUM ALLOWABLE CONCENTRATION, WHAT IN A GENERAL

3   SENSE DID THAT INDICATE?

4        A.    IT INDICATED A NUMBER OF THINGS.

5        IT INDICATED THAT VERY LIKELY THAT WAS A SAFE

6   OPERATING PROCEDURE IF ENOUGH COUNTS HAD BEEN MADE

7   OVER VARIABLE CONDITIONS.

8        IT ALSO MEANT TO US, FROM THE STANDPOINT OF

9   CONTROL, THAT THE PLANT WAS OPERATING UNDER -- I

10  HESITATE, I'M SEARCHING FOR THE WORD -- ALMOST

11  IDEALIZED -- ALMOST IDEAL CONDITIONS.  IT WAS

12  OPERATING IN A SAFE MANNER AND UNDER THE BEST OF

13  PRACTICES FOR THE INDUSTRY.

14       THESE LIMIT VALUES WERE USED AS A MEANS OF

15  DETERMINING WHETHER THE PLANT WAS DOING A GOOD JOB

16  OF TRYING TO CONTROL ITS PROBLEM.

17       Q.    OKAY.  NOW YOU MADE A REFERENCE IN

18  DESCRIBING THE MAXIMUM ALLOWABLE CONCENTRATIONS TO

19  EIGHT HOURS A DAY FOR A LIFETIME.

20       DOES THAT HAVE SOMETHING TO DO WITH THE TERM

21  TIME WEIGHTED AVERAGE?

22       A.    YES.

23       OBVIOUSLY, IF IT CAN TOLERATE A CERTAIN LEVEL

24  CONTINUOUS IT CAN TOLERATE HIGHER LEVELS FOR SHORT

25  PERIODS OF TIME.  SO, WE USED A TECHNIQUE OF TIME

26  WEIGHTING THE AVERAGE.

27       Q.    JUST SO WE'RE CLEAR ON WHAT THAT MEANS:

28  IF YOU HAD ONE PARTICULAR AREA IN A PLANT WHERE THE

1  DUST COUNT WAS ABOVE THE MAXIMUM ALLOWABLE

2  CONCENTRATION BUT EXPOSURE WAS FOR ONLY A BRIEF

3  PERIOD OF TIME DURING THE DAY, WHAT DOES TIME

4  WEIGHTED AVERAGE HAVE TO DO THEN WITH

5  UNDERSTANDING --

6          A.      WELL --

7          Q.      -- THE DUST COUNT?

8          A.      A ROUGH EXAMPLE WOULD BE IF A LIMIT WERE

9  TEN FOR EIGHT-HOUR DAY EXPOSURE AND A PERSON WERE

10  ONLY EXPOSED FOR HALF THAT TIME, YOU COULD EXPECT

11  THEM TO TOLERATE TWICE AS MUCH.  THAT'S NOT TRUE ALL

12  THE WAY UP AND DOWN THE LINE, THAT'S JUST AN

13  EXAMPLE.

14          Q.      IS IT POSSIBLE THEN WHEN YOU WERE DOING

15  THESE STUDIES FOR THE INDUSTRIAL HYGIENE UNIT THAT

16  IF YOU FOUND A DUST COUNT IN A PARTICULAR LOCATION

17  IN A PLANT THAT WAS ABOVE THE MAXIMUM ALLOWABLE

18  CONCENTRATION THAT YOU WOULD STILL CONSIDER THE

19  OVERALL EXPOSURE IN THE WORK PLACE TO BE WITHIN THIS

20  SAFE LEVEL YOU'VE DESCRIBED IF THE AMOUNT OF TIME

21  INVOLVED IN BEING EXPOSED TO THE HIGH LEVEL WAS VERY

22  SHORT?

23          A.      THAT'S RIGHT.

24          IF A PERSON WERE EXPOSED TO A LEVEL HIGHER

25  THAN THE PERMISSIBLE, THE M.A.C., FOR A SHORT TIME

26  AND THEN EXPOSED TO A ZERO CONCENTRATION OR MUCH

27  LOWER CONCENTRATION, ONE WOULD CONSIDER WHAT HIS

28  EXPOSURE FOR THE DAY WAS, HIS AVERAGE EXPOSURE.

1   AVERAGE WOULD BE A GOOD TERM -- TIME WEIGHTED.

2        Q.     OKAY.  SO IN DETERMINING, MAKING THESE

3   COUNTS AND ANALYZING THEM AS PART OF YOUR STUDIES

4   WITH REGARD TO THE INDUSTRIAL HYGIENE IN THE PLANT,

5   IS IT CORRECT THAT YOU TOOK INTO ACCOUNT THE DUST

6   COUNT AS WELL AS THE TIME DURING WHICH SOMEONE MIGHT

7   BE EXPOSED TO A PARTICULAR DUST COUNT?

8        A.     THAT'S RIGHT.

9        Q.     NOW DURING THE ENTIRE PERIOD THAT YOU

10  WORKED FOR THE INDUSTRIAL HYGIENE UNIT OF THE

11  WISCONSIN STATE BOARD OF HEALTH DID YOUR TESTING

12  EVER INCLUDE DUSTS WHICH INCLUDED ASBESTOS AS PART

13  OF THE COMPOSITION?

14       A.     YES.

15       Q.     ON HOW MANY OCCASIONS DID YOU TEST THE

16  ATMOSPHERE IN THE WORK PLACE FOR ASBESTOS DUST?

17       A.     DO YOU MEAN HOW MANY DIFFERENT

18  FACTORIES?

19       Q.     YES, SIR.  HOW MANY DIFFERENT LOCATIONS.

20       A.     I CAN ONLY RECALL TWO, AND I CAN'T EVEN

21  NAME ONE OF THEM.

22       Q.     GIVE US THE ONE YOU CAN NAME, PLEASE.

23       A.     THE ONE I CAN NAME?

24       Q.     YES, SIR.

25       A.     IT WENT BY VARIOUS NAMES, BUT IT'S

26  PROBABLY CALLED ALGOMA PLYWOOD.  AT ONE TIME IT WAS

27  A BRANCH OF U.S. PLYWOOD, AND IT'S HAD VARIOUS

28  NAMES, BUT ALGOMA PLYWOOD WAS THE ONE I REMEMBER.

1      Q.      IF FOR THE REST OF THIS DEPOSITION I

2  REFERRED TO THAT AS THE ALGOMA PLANT, WOULD YOU HAVE

3  IT CLEAR IN YOUR MIND, REGARDLESS OF WHO THE OWNERS

4  MIGHT HAVE BEEN FROM TIME TO TIME, WHAT WE WERE

5  TALKING ABOUT?

6      A.      YES.

7      Q.      AND WE WOULD BE TALKING ABOUT THE SAME

8  LOCATION --

9      A.      YES.

10      Q.      -- ON EACH INSTANCE; CORRECT?

11      A.      YES.

12      Q.      ALL RIGHT.   THEN LET'S USE THE TERM

13  ALGOMA PLANT.

14      DURING THIS PERIOD OF TIME THAT YOU WERE

15  WORKING FOR THE INDUSTRIAL HYGIENE UNIT DID YOU -- I

16  TAKE IT YOU TESTED FOR OTHER TYPES OF AIRBORNE

17  MATERIALS BESIDES ASBESTOS; CORRECT?

18      A.      YES.

19      Q.      WAS SILICA ONE OF THEM?

20      A.      YES.

21      Q.      AGAIN, DURING THE ENTIRE PERIOD YOU WERE

22  EMPLOYED BY THE INDUSTRIAL HYGIENE UNIT, CAN YOU

23  GIVE US AN APPROXIMATE PERCENTAGE OF HOW MUCH OF

24  YOUR TIME YOU SPENT WORKING ON PROBLEMS RELATED TO

25  SILICA?   THAT IS, READING LITERATURE OR DOING TESTS

26  OR ANALYZING TESTS OR WRITING REPORTS AS OPPOSED TO

27  ALL THE OTHER MATERIALS?   HOW MUCH OF YOUR TIME WAS

28  TAKEN UP WITH SILICA RELATED STUDY?

28

1       A.      PROBABLY ONE-FOURTH.

2       Q.      OKAY.

3       A.      IT VARIED.

4    IN THE EARLY DAYS IT WAS A MUCH HIGHER

5  PERCENTAGE.  IN THE EARLY DAYS, I MEAN '37, '38.

6  THEN IT DROPPED OFF AS SILICA BECAME QUITE WELL

7  CONTROLLED IN WISCONSIN AND SILICOSIS BECAME LESS OF

8  A PROBLEM.

9      AND IN THE LATE '40'S IT WAS PROBABLY ABOUT

10  -- SILICA WAS PROBABLY ABOUT 25 PERCENT OF OUR WORK,

11  MUCH MORE THAN THAT IN THE EARLY DAYS.

12      Q.      I TAKE IT YOUR WORK INCLUDED THINGS

13  OTHER THAN AIRBORNE DUST CONCENTRATIONS?

14      A.      YES.

15      Q.      I THINK YOU MENTIONED BEFORE DUSTS AND

16  FUMES.  AND CAN YOU GIVE ME THAT LIST AGAIN SO

17  I'M --

18      A.      WELL --

19      Q.      -- WITH YOU HERE?

20      A.      THE BROAD CATEGORIES ARE DUST, FUMES,

21  VAPORS AND GASES.  THAT'S ONE OF THE FEW THINGS I

22  REMEMBER.

23      DO YOU WANT DEFINITIONS OF EACH, OR DO YOU

24  WANT EXAMPLES, OR WHAT?

25      Q.      WELL, JUST AN EXAMPLE OF EACH SO WE'D

26  HAVE AN IDEA OF THE VARIOUS KINDS OF THINGS YOU

27  STUDIED.

28      A.      DUSTS, OF COURSE, WOULD BE THE SILICA

1   THAT YOU MENTIONED, ASBESTOS, WOOD DUST, COAL DUST,

2   NONSILICA CONTAINING ROCK DUSTS.

3        FUMES WOULD BE VAPORIZED METALS, SUCH AS LEAD

4   FROM SOLDERING, ZINC, IRON.  NOW, THERE'S PARTICULAR

5   METALS, USUALLY.

6        VAPORS WOULD BE SOLVENTS, PAINT SOLVENTS,

7   VARIOUS ORGANIC SOLVENTS, SUCH AS ARE USED IN THE

8   DRY CLEANING INDUSTRY AND USED IN MANY MANUFACTURING

9   PROCESSES.

10       GASES, CARBON MONOXIDE, CHLORINE, YOU CAN NAME

11  A THOUSAND OF THEM.

12       WE MADE STUDIES OF LITERALLY A HUNDRED OR MORE

13  DIFFERENT SUBSTANCES THAT HAD POTENTIAL HAZARD

14  VALUE.

15       Q.    NOW OF ALL THE WORK YOU DID WITH REGARD

16  TO ALL OF THOSE AREAS AND TYPES OF SUBSTANCES, CAN

17  YOU TELL US WHAT PERCENTAGE OF THE TIME WHILE YOU

18  WERE AT THE INDUSTRIAL HYGIENE UNIT DID YOU SPEND

19  WORKING WITH RESPECT TO ASBESTOS?

20       A.    IT MUST HAVE BEEN LESS THAN ONE PERCENT.

21       Q.    DURING THE TIME THAT YOU WERE WITH THE

22  INDUSTRIAL HYGIENE UNIT HOW WAS ASBESTOS VIEWED IN

23  THE INDUSTRIAL HYGIENE FIELD IN THE GRAND SCHEME OF

24  THINGS?

25       MR. BURGI:    I'M GOING TO OBJECT TO THAT

26  DEFINITELY AS CALLING FOR SPECULATION.

27       MR. HARRINGTON:    I'LL JOIN IN THAT

28  OBJECTION.

1     MR. RILEY:    AGAIN, THAT'S LAWYER TALK.

2     MR. BURGI:    YOU ARE FREE TO RESPOND.  WE'RE

3  JUST LODGING AN OBJECTION.

4     MR. RILEY:

5     Q.    LET ME REPHRASE THE QUESTION.

6     LET'S LIMIT IT TO HOW YOU VIEWED ASBESTOS IN

7  THE GRAND SCHEME OF THINGS DURING THE TIME PERIOD

8  THAT YOU WERE WORKING AT THE INDUSTRIAL HYGIENE

9  UNIT.

10     A.    WE KNEW OF ASBESTOS AS A POTENTIAL

11  HAZARD.  WE KNEW THAT IT COULD CAUSE ASBESTOSIS, A

12  LUNG DISEASE, BUT WE NEVER HAD A RECORDED CASE OF

13  ASBESTOSIS IN WISCONSIN AS FAR AS I KNOW.  AND WE

14  HAD MANY -- WE GOT MUCH OF OUR INFORMATION FROM THE

15  INDUSTRIAL COMMISSION STATISTICS, AND I DON'T RECALL

16  EVER SEEING ANYTHING ON A CASE OF ASBESTOSIS.

17     WE KNEW ABOUT ASBESTOS FROM THE LITERATURE,

18  FROM OUR PROFESSIONAL MEETINGS, DISCUSSIONS OF

19  ASBESTOS, JUST AS THERE WERE DISCUSSIONS ON MANY,

20  MANY OTHER SUBSTANCES.  BUT WE DIDN'T CONSIDER IT A

21  SERIOUS HAZARD IN THE INDUSTRIES THAT WE KNEW OF IN

22  WISCONSIN.

23     Q.    NOW, WAS YOUR VIEW OF ASBESTOS IN ANY

24  WAY RELATED TO THE M.A.C.?

25     YOU TALKED ABOUT KNOWING THAT IT WAS A

26  POTENTIAL HAZARD.  WAS THE POTENTIAL FOR CAUSING

27  ADVERSE HEALTH EFFECTS RELATED TO THE AMOUNT OF

28  EXPOSURE, BASED ON YOUR UNDERSTANDING?

31

1    A.    IF I UNDERSTAND YOUR QUESTION CORRECTLY,

2  THE DEGREE OF HAZARD IS BASED ON THE DEGREE OF

3  EXPOSURE.

4    Q.    OKAY.  THAT'S WHAT -- YEAH.  THAT'S

5  RIGHT.

6      AND I'M TRYING TO FIGURE OUT WHEN YOU SAY

7  ASBESTOS WAS A POTENTIAL HAZARD BASED ON YOUR

8  UNDERSTANDING, WAS IT A POTENTIAL HAZARD IN TERMS OF

9  ANY LEVEL OF EXPOSURE OR AT GREAT LEVELS OF

10 EXPOSURE?

11   MR. BURGI:    I'M GOING TO OBJECT TO THE

12 QUESTION AS VAGUE AND AMBIGUOUS.

13   THE WITNESS:    IT WAS A POTENTIAL HAZARD ONLY

14 WHEN THE EXPOSURE WAS SUFFICIENTLY HIGH TO BE

15 SERIOUS.

16   MR. RILEY:

17   Q.    OKAY.  WAS THERE A MAXIMUM ALLOWABLE

18 CONCENTRATION FOR ASBESTOS DURING THE TIME PERIOD

19 THAT YOU WERE WORKING --

20   A.    YES.

21   Q.    -- AT THE STATE BOARD OF HEALTH?

22    YOU'VE GOT TO WAIT UNTIL I FINISH THE

23 QUESTION.

24   A.    OH.

25   Q.    MY QUESTION IS, WAS THERE A MAXIMUM

26 ALLOWABLE CONCENTRATION FOR ASBESTOS DURING THE

27 PERIOD THAT YOU WERE WORKING FOR THE STATE BOARD OF

28 HEALTH?

32

1       A.    YES.

2       Q.    AND WAS THAT THE MEASURING STICK THAT

3   YOU USED TO DETERMINE WHETHER OR NOT THERE WAS AN

4   ACTUAL POTENTIAL HAZARD IN A GIVEN WORK PLACE?

5       A.    YES.

6       Q.    OKAY.  AND WHEN DETERMINING WHETHER OR

7   NOT THERE WAS ANY HAZARD IN THE WORK PLACE FROM

8   ASBESTOS, WAS THE MAXIMUM ALLOWABLE CONCENTRATION

9   THE TOOL YOU USED TO MAKE THAT DETERMINATION?

10      A.    YES, BUT WITH QUALIFICATIONS.

11      THERE ARE OTHER THINGS INVOLVED IN MAKING THE

12  DETERMINATION BESIDES JUST THE RELATIONSHIP WITH THE

13  DUST COUNT.  ONE ALSO LOOKS INTO THE QUALITY OF THE

14  CONTROL TECHNIQUES USED, PERIOD.

15      MAY I EXPAND ON THAT?

16      Q.    SURE.

17      A.    THE EVALUATION OF THE CONCENTRATION OF

18  POTENTIALLY HAZARDOUS MATERIAL IN THE AIR AND

19  BREATHED BY THE WORKERS IS ONE PART OF THE OVERALL

20  EVALUATION TO DETERMINE WHETHER A HAZARD TRULY

21  EXISTS.

22      IN ADDITION, AS I SAID, WE EVALUATE THE

23  CONTROL TECHNIQUES.  WE DETERMINE THE -- WE CHECK

24  THE STATISTICS TO SEE IF THERE HAS BEEN ANY

25  INDICATION OF HARM CAUSED BY THE MATERIAL IN THE

26  MEDICAL RECORDS SO TO SPEAK, OR MEDICAL STATISTICS,

27  TO DETERMINE WHETHER THERE'S BEEN ANY SYMPTOM OR

28  SIGN OF DAMAGE DONE BY THIS PARTICULAR MATERIAL.

33

1          IN OTHER WORDS, YOU EVALUATE EVERYTHING THAT
2  MIGHT CONTRIBUTE TO THE HEALTH OF THE WORKER OR
3  MIGHT -- YEAH.  THE DUST COUNT IS PART OF THE
4  OVERALL STUDY, OVERALL EVALUATION.
5      Q.    DID THE INDUSTRIAL HYGIENE UNIT MAINTAIN
6  A LIBRARY OF WRITTEN INFORMATION, PERIODICALS ON THE
7  SUBJECT OF INDUSTRIAL HYGIENE?
8      A.    YES.
9      Q.    DID THAT LIBRARY INCLUDE UNITED STATES
10 PUBLIC HEALTH SERVICE PUBLICATIONS?
11     A.    YES.
12     Q.    DID YOU VIEW THOSE AS AUTHORITATIVE
13 SOURCES OF INFORMATION IN THE INDUSTRIAL HYGIENE
14 FIELD?
15     A.    YES.
16     Q.    DID THE LIBRARY INCLUDE THE JOURNAL OF
17 INDUSTRIAL HYGIENE AND TOXICOLOGY?
18     A.    IT DID.
19     Q.    DID YOU CONSIDER THAT JOURNAL TO BE
20 AUTHORITATIVE IN THE FIELD OF INDUSTRIAL HYGIENE?
21     A.    YES.
22     MR. RILEY:    I'D LIKE THE COURT REPORTER TO
23 MARK AS FLUCK EXHIBIT 1 FOR IDENTIFICATION A
24 MULTI-PAGE DOCUMENT WHICH PURPORTS TO BE A COPY OF
25 AN ARTICLE ENTITLED "THE STUDY OF ASBESTOSIS IN THE
26 ASBESTOS TEXTILE INDUSTRY," PUBLISHED BY THE --
27 ACTUALLY, IT COMPRISES PUBLIC HEALTH BULLETIN NUMBER
28 241, DATED AUGUST 1938.

1      THERE ARE SEVERAL AUTHORS, THE FIRST OF WHICH

2  IS WALDEMAR C. DREESEN.

3      Q.    MR. FLUCK, WOULD YOU TAKE A LOOK AT WHAT

4  HAS BEEN MARKED AS EXHIBIT 1 AND TELL ME WHETHER YOU

5  CAN JUST IDENTIFY THE DOCUMENT.

6      A.    YES.

7      Q.    WAS THAT AN ARTICLE WHICH WAS IN THE

8  INDUSTRIAL HYGIENE UNIT'S LIBRARY OF MATERIALS

9  DURING THE TIME THAT YOU WERE THERE?

10      A.    IT WAS.

11      Q.    OKAY.  IS THAT SOMETHING THAT YOU READ

12  IN THE ORDINARY COURSE OF YOUR WORK?

13      A.    YES.

14      Q.    WAS THAT INFORMATION THAT YOU USED IN

15  CARRYING OUT YOUR DUTIES FOR THE INDUSTRIAL HYGIENE

16  UNIT?

17      A.    I'M SURE WE CONSIDERED IT.

18      Q.    SURE.

19      I'D LIKE THE COURT REPORTER TO MARK AS FLUCK

20  EXHIBIT 2 FOR IDENTIFICATION AN ARTICLE ENTITLED,

21  "THE HEALTH SURVEY OF PIPE COVERING OPERATIONS IN

22  CONSTRUCTING NAVAL VESSELS."  THE FIRST PAGE OF THE

23  DOCUMENT IS APPARENTLY THE COVER OF THE JOURNAL OF

24  INDUSTRIAL HYGIENE AND TOXICOLOGY FOR JANUARY 1946.

25      MR. FLUCK, WOULD YOU TAKE A LOOK AT EXHIBIT 2,

26  AND TELL ME IF THAT'S AN ARTICLE WHICH WAS IN THE

27  LIBRARY OF THE INDUSTRIAL HYGIENE UNIT DURING THE

28  TIME THAT YOU WORKED THERE?

1    A.    YES.

2    Q.    IS THAT AN ARTICLE WHICH YOU REVIEWED IN

3    THE COURSE OF YOUR DUTIES AT THE INDUSTRIAL HYGIENE

4    UNIT?

5    A.    I DID.

6    Q.    DID YOU CONSIDER IT AUTHORITATIVE?

7    A.    IT ADDED TO OUR KNOWLEDGE OF ASBESTOS.

8    Q.    OKAY.

9    A.    I DON'T -- I WOULD CONSIDER IT

10   AUTHORITATIVE, BECAUSE THIS GENTLEMAN PHILLIP

11   DRINKER WAS A VERY HIGHLY RESPECTED INDUSTRIAL

12   HYGIENIST.

13   Q.    OKAY.  THANK YOU.

14        NOW YOU MENTIONED EARLIER, MR. FLUCK, THAT YOU

15   DID SOME WORK AT WHAT WE'RE CALLING THE ALGOMA

16   PLANT.

17        JUST SO THE RECORD IS CLEAR, MR. BURGI, WE

18   DON'T HAVE ANY PROBLEM WITH THE STIPULATION THAT IF

19   WE REFER TO THE ALGOMA PLANT THAT THAT'S THE PLACE

20   OF EMPLOYMENT OF THE PLAINTIFF IN CONNECTION WITH

21   THE BRANDT CASE.

22   MR. BURGI:    I HAVE NO PROBLEM WITH THAT.

23   MR. RILEY:    THANK YOU VERY MUCH.

24   Q.    HOW DID IT COME ABOUT THAT YOU DID WORK

25   AT THE ALGOMA PLANT?

26   A.    I DON'T REMEMBER.

27   Q.    OKAY.  DID YOU HAVE SOME PERSONAL

28   CONNECTION WITH THE TOWN OF ALGOMA?

1       A.      YES.

2       Q.      OKAY.  WHY DON'T YOU TELL US WHAT THAT

3   WAS?

4       A.      WELL, I SPENT MY CHILDHOOD IN ALGOMA.

5   MY FATHER WAS A PHARMACIST THERE, HAD HIS OWN

6   DRUGSTORE FOR 40 SOME YEARS.

7       Q.      WOULD IT HELP REFRESH YOUR RECOLLECTION

8   ABOUT YOUR WORK AT THE ALGOMA PLANT IF I SHOWED YOU

9   SOME DOCUMENTS THAT WERE APPARENTLY GENERATED BY THE

10  WISCONSIN STATE BOARD OF HEALTH IN CONNECTION WITH

11  THAT WORK?

12      A.      YES.

13      Q.      OKAY.

14      A.      IT'S BEEN A LONG TIME SINCE --

15      Q.      ALL RIGHT.  LET'S SEE WHAT WE CAN DO.

16      I TAKE IT YOU HAVE COPIES OF THESE MATERIALS?

17      MR. BURGI:     YES, I DO.

18      MR. RILEY:     OKAY.  HOW ABOUT YOU?  DO YOU

19  HAVE COPIES?

20      MR. HARRINGTON:     YES.

21      MR. RILEY:     OKAY.

22      Q.      LET ME SHOW YOU WHAT HAS ALREADY BEEN

23  MARKED IN ANOTHER DEPOSITION AS DETJIN EXHIBIT 1 FOR

24  IDENTIFICATION.

25      AND LET ME STATE FOR THE RECORD THAT THE FIRST

26  PAGE IS A MARCH 3, 1948 LETTER, FROM WILLIAM Z.

27  FLUCK TO MR. G.R. MERCER, FACTORY SUPERINTENDENT,

28  ALGOMA PLYWOOD AND VENEER, ALGOMA, WISCONSIN.

37

1   ATTACHED TO THAT DOCUMENT IS A THREE-PAGE REPORT

2   BEARING THE DATE FEBRUARY 13, 1948.

3       MR. FLUCK, DOES YOUR SIGNATURE APPEAR ON THE

4   FIRST PAGE OF DETJIN EXHIBIT 1?

5       A.    YES.

6       Q.    DOES IT ALSO APPEAR ON THE LAST PAGE OF

7   DETJIN EXHIBIT 1?

8       A.    YES.

9       Q.    OKAY.  ARE THOSE LAST THREE PAGES A TRUE

10  AND CORRECT COPY OF A REPORT THAT YOU DID IN

11  CONNECTION WITH A DUST STUDY AT THE ALGOMA PLANT IN

12  FEBRUARY OF 1948?

13      A.    YES.

14      Q.    AND IS THE FIRST PAGE A TRUE AND CORRECT

15  COPY OF A LETTER THAT YOU WROTE TO MR. MERCER AT THE

16  ALGOMA PLANT IN MARCH OF 1948?

17      A.    THAT'S RIGHT.

18      Q.    OKAY.  LET'S TAKE A LOOK AT THE STUDY

19  ITSELF WHICH BEGINS ON THE SECOND PAGE OF THIS

20  EXHIBIT.

21      WHAT WAS THE PURPOSE OF THE STUDY THAT YOU DID

22  AT THE ALGOMA PLANT IN FEBRUARY OF 1948?

23      A.    I'LL READ IT FROM HERE.

24      "TO DETERMINE ATMOSPHERIC CONCENTRATIONS OF

25       ASBESTOS DUST AT OPERATIONS WHERE 'KALO'

26       WAS BEING PROCESSED."

27      Q.    THAT APPEARS IN QUOTES IN THE REPORT; IS

28  THAT CORRECT?

38

1        A.    YES.

2        Q.    OKAY.

3        MR. BURGI:    I'M SORRY.  WAS THAT YES?  WAS

4   THAT YES, HIS QUESTION "THAT APPEARS IN QUOTES IN

5   THE DOCUMENT," WAS THE RESPONSE "YES"?

6        THE WITNESS:    OH, YES.

7        MR. BURGI:    FOR THE RECORD.

8        MR. RILEY:

9        Q.    ALL RIGHT.  YOUR REPORT GOES ON TO SAY

10  THAT "AIR SAMPLES WERE COLLECTED BY AN M.S.A.

11        MIDGET IMPINGER APPARATUS, AND DUST COUNTS

12        WERE MADE BY AN APPROVED LIGHT FIELD

13        TECHNIQUE."

14        WAS THE M.S.A. MIDGET IMPINGER APPARATUS

15  STANDARD IN THE INDUSTRIAL HYGIENE FIELD AT THAT

16  TIME?

17        A.    IT WAS.

18        Q.    OKAY.  AND THE MAKING OF COUNTS BY AN

19  APPROVED LIGHT FIELD TECHNIQUE, WAS THAT ALSO A

20  STANDARD TECHNIQUE --

21        A.    THAT WAS STANDARD TECHNIQUE.

22        Q.    -- ONE OF THE TECHNIQUES THAT WAS

23  DISCUSSED BY THE U.S. PUBLIC HEALTH SERVICE --

24        A.    THAT'S RIGHT.

25        Q.    -- AT THAT TIME?

26        DID THE U.S. PUBLIC HEALTH SERVICE FROM TIME

27  TO TIME PROVIDE TECHNICAL ASSISTANCE TO THE

28  WISCONSIN INDUSTRIAL HYGIENE UNIT?

1        A.      YES.

2        Q.      THE LAST SENTENCE OF THE FIRST PAGE OF

3   THIS REPORT SAYS, "THE RESULTS OF THE DUST COUNTS

4   ARE LISTED ON THE FOLLOWING TABLE:"

5        IF YOU TURN TO THE SECOND PAGE, DO WE THEN SEE

6   THE RESULTS OF YOUR DUST COUNTS AT THE ALGOMA PLANT?

7        A.      THAT'S RIGHT.

8        Q.      OKAY.   NOW, YOU USE THE ABBREVIATION

9   "M P C F" ABOVE THOSE, THE NUMBERS ON THAT TABLE.

10       CAN YOU TELL US WHAT M P C F REFERS TO?

11       A.      MILLIONS OF DUST PARTICLES PER CUBIC

12   FOOT OF AIR.

13       Q.      THAT'S WHAT THAT NOTES DOWN THERE RIGHT

14   UNDERNEATH THOSE COUNTS; IS THAT CORRECT?

15       A.      CORRECT.

16       Q.      AND THEN YOU GO ON TO WRITE "MAXIMUM

17   ALLOWABLE CONCENTRATION, (M.A.C.) FOR ASBESTOS DUST

18   EQUALS 5.0 M P C F."

19       WHAT WERE YOU REFERRING TO THERE?   IS THAT THE

20   MAXIMUM ALLOWABLE CONCENTRATION FOR ASBESTOS DUST AT

21   THE TIME?

22       A.      THAT WAS THE STANDARD AT THE TIME, YES.

23       Q.      OKAY.

24       WHAT YOU'VE DESCRIBED, IS THAT THE RECOGNIZED

25   SAFE LEVEL OF EXPOSURE STANDARD BY THE A.C.G.I.H.?

26       MR. BURGI:      IF YOU RECALL.

27       THE WITNESS:      IT WAS THE RECOGNIZED LEVEL,

28   BUT WHETHER THAT COMMITTEE ON M.A.C.'S WAS IN

40

1    EXISTENCE IN FEBRUARY OF '48, I DON'T KNOW.

2         Q.    OKAY.

3         A.    I'M REASONABLY SURE IT WAS.

4         IF THAT COMMITTEE THAT ACTUALLY PUBLISHED

5    RESULTS WASN'T IN EXISTENCE, THEN IT WAS THESE

6    STANDARDS THAT WE GOT FROM THE U.S. PUBLIC HEALTH

7    SERVICE.

8         Q.    OKAY.  SO IT MAY HAVE BEEN FROM SOME

9    OTHER SOURCE?

10        A.    IT MAY HAVE BEEN FROM SOME OTHER SOURCE.

11        Q.    BUT WHATEVER THE SOURCE, THIS WAS THE

12   RECOGNIZED SAFE LEVEL?

13        A.    IT WAS THE RECOGNIZED LEVEL, YES.

14        Q.    OKAY.

15        A.    THE RECOGNIZED SAFE LEVEL.

16        Q.    AND WAS THIS MAXIMUM ALLOWABLE

17   CONCENTRATION FOR ASBESTOS DUST, DID THAT HAVE BUILT

18   INTO IT THE TIME WEIGHTED AVERAGE THAT YOU'VE

19   DISCUSSED BEFORE?

20        A.    YES.

21        Q.    YOU ALSO LISTED A MAXIMUM ALLOWABLE

22   CONCENTRATION FOR WOOD DUST HERE.

23        WAS WOOD DUST SOMETHING THAT WAS ALSO IN THE

24   AIR?

25        A.    YES.

26        Q.    OKAY.  YOU HAVE A SUMMARY HERE, AND

27   UNDER THE HEADING "SUMMARY," IT SAYS, "NUMBER 1, ALL

28   ATMOSPHERIC CONCENTRATIONS OF ASBESTOS WERE WELL

41

1   BELOW THE MAXIMUM ALLOWABLE CONCENTRATION OF 5.0
2   MILLION PARTICLES PER CUBIC FOOT OF AIR."
3       NOW, WHAT DID THAT FINDING INDICATE TO YOU AS
4   AN INDUSTRIAL HYGIENIST?
5       A.   WELL, IT INDICATED THAT THEY HAD QUITE
6   GOOD CONTROL PROCEDURES, AND IT INDICATED THAT THERE
7   WAS -- THAT IT WAS VERY LIKELY A SAFE WORKING
8   ATMOSPHERE.
9       Q.   NOW IF YOU'LL TURN TO THE THIRD PAGE OF
10  THE REPORT, YOU HAVE "RECOMMENDATIONS." IT SAYS,
11  "NUMBER 1, IT IS RECOMMENDED THAT ANOTHER ASBESTOS
12  DUST STUDY BE MADE AT A TIME WHEN ASBESTOS DUST
13  PRODUCING PROCESSES ARE IN FULL OPERATION."
14      WHAT WAS THE PURPOSE OF THAT RECOMMENDATION?
15      A.   IT WAS VERY PROBABLY THAT SOME MACHINE
16  OR OTHER, SOME DUST PRODUCING MACHINE, WAS NOT IN
17  OPERATION THE DAY I TOOK THE SAMPLES. THAT'S THE
18  ONLY THING I CAN THINK OF.
19      Q.   ALL RIGHT.
20      A.   IT'S A LONG TIME AGO TO TRY TO REMEMBER.
21      MR. BURGI:   IS THAT YOUR RECOLLECTION OR IS
22  THAT SPECULATION?
23      THE WITNESS:   THAT'S THE ONLY REASON I WOULD
24  HAVE MADE SUCH A RECOMMENDATION.
25      MR. RILEY:   JUST SO WE'RE CLEAR, MR. BURGI,
26  FROM NOW ON IF YOU HAVE ANY QUESTIONS, I WOULD
27  PREFER THAT YOU SAVE THEM UP AND HANDLE THEM ON
28  CROSS-EXAMINATION INSTEAD OF INTERRUPTING MY

42

1    EXAMINATION, AND I'LL BE HAPPY TO RETURN THE

2    COURTESY.  OKAY?

3         MR. BURGI:     VERY WELL.

4         MR. RILEY:     THANK YOU.

5         Q.     LET ME BACK UP FOR ONE SECOND.  WAS IT

6    THE ORDINARY PRACTICE FOLLOWED AT THE INDUSTRIAL

7    HYGIENE UNIT WHILE YOU WERE THERE TO DO A WRITTEN

8    REPORT WHEN YOU WENT OUT AND DID A STUDY SUCH AS

9    THIS ONE?

10        A.     YES.

11        Q.     OKAY.  NOW LET'S LOOK AT THE FIRST PAGE

12   OF DETJIN EXHIBIT 1, THIS MARCH 3, 1948, LETTER TO

13   MR. MERCER.

14        WHAT WAS YOUR PURPOSE IN WRITING THE LETTER TO

15   MR. MERCER?

16        A.     WELL, THAT WAS SIMPLY A METHOD OF

17   FORWARDING THE REPORT TO WHOEVER HAD BEEN DESIGNATED

18   TO ME AS THE RESPONSIBLE OFFICIAL.

19        Q.     OKAY.

20        A.     I SEE HERE HE WAS THE FACTORY

21   SUPERINTENDENT.  THAT WOULD HAVE BEEN VERY MUCH IN

22   ORDER, FOR US TO SUBMIT THE REPORT TO ABOUT THE TOP

23   LEVEL MAN WE FOUND AT THE PLANT.

24        Q.     OKAY.  AND WAS THAT THE ORDINARY

25   PRACTICE FOLLOWED AT THE INDUSTRIAL HYGIENE UNIT?

26   TO SEND COPIES OF THE REPORT TO THE TOP RESPONSIBLE

27   PERSON AT THE PLANT?

28        A.     YES.

43

1          Q.        OKAY.  YOU INDICATED IN YOUR LETTER, DID

2     YOU NOT, THAT "WE WERE PLEASED TO FIND THAT ALL

3     ASBESTOS DUST CONCENTRATIONS WERE WELL BELOW THE

4     MAXIMUM ALLOWABLE CONCENTRATION"?

5          A.        RIGHT.

6          Q.        OKAY.  AND WHY DID THAT PLEASE YOU,

7     MR. FLUCK?

8              I THINK I KNOW, BUT WHY DON'T YOU TELL US.

9          A.        THAT'S LIKE SAYING "YOURS VERY TRULY,"

10    OR "SINCERELY YOURS."  IT WAS RATHER A STOCK PHRASE,

11    I GUESS.

12         Q.        OKAY.  I TAKE IT YOU WEREN'T PLEASED TO

13    FIND THE DUST, BUT YOU WERE ACTUALLY PLEASED TO FIND

14    THE DUST CONCENTRATIONS BELOW THE MAXIMUM ALLOWABLE

15    CONCENTRATION; TRUE?

16         A.        YES.

17         Q.        BECAUSE OF WHAT THAT INDICATED ABOUT THE

18    CONDITIONS IN THE WORKING PLACE?

19         A.        YES.

20         Q.        IT WAS OF COURSE YOUR CONCERN AT THE

21    INDUSTRIAL HYGIENE UNIT TO HAVE A SAFE WORKING

22    ENVIRONMENT IN THE STATE OF WISCONSIN; IS THAT TRUE?

23         A.        THAT WAS OUR JOB TO TRY TO PROMOTE A

24    SAFE WORKING ENVIRONMENT.

25         Q.        THAT'S WHAT YOU FOUND AT ALGOMA PLYWOOD

26    WHEN YOU WENT ON THE STUDY?

27         A.        YES.

28         MR. BURGI:     OBJECT TO THE QUESTION.

44

1          MR. HARRINGTON:    OBJECT TO THE FORM OF THAT

2     QUESTION AS BEING VAGUE AS TO TIME AND PLACE; AND

3     ALSO THE FORM.   LEADING AND SUGGESTIVE.

4          MR. BURGI:    I ALSO FEEL THAT IT SETS UP AND

5     MISLEADS THE TESTIMONY AND MISSTATES PRIOR

6     TESTIMONY, AND I JOIN IN THE OBJECTION OF THE OTHER

7     COUNSEL HERE.

8          MR. RILEY:

9          Q.    JUST SO WE'RE CLEAR, YOU UNDERSTOOD I

10    WAS REFERRING TO YOUR FEBRUARY 1948 REPORT WITH MY

11    QUESTION.   CORRECT?

12         A.    I WAS READING MARCH -- WAIT.   YEAH.   THE

13    ONE I HAVE HERE, THE LETTER, IS MARCH 3RD.

14         Q.    THAT'S RIGHT.   AND THE REPORT IS

15    FEBRUARY 13, 1948?

16         A.    FEBRUARY 13.   CORRECT.

17         Q.    YOU UNDERSTOOD I WAS REFERRING WITH MY

18    QUESTION TO THE 1948 REPORT?

19         A.    YES.

20         Q.    OKAY.   JUST SO THERE ISN'T ANY QUESTION

21    ABOUT THESE ATTORNEYS' OBJECTIONS TO THE FORM OF MY

22    QUESTION, I'LL REPHRASE MY QUESTION.

23         WITH RESPECT TO SAFETY IN THE WORK PLACE WHAT

24    DID YOU FIND WHEN YOU WENT OUT TO THE ALGOMA PLANT

25    IN FEBRUARY OF 1948 AND MEASURED ASBESTOS DUST IN

26    THE AIR?

27         A.    WELL, TO PUT IT BLUNTLY, IT LOOKED

28    PRETTY GOOD.   I MEAN, IT WAS A GOOD, CLEAN LOOKING

45

1    PLANT, AND THE RESULTS OF THE TEST WE MADE INDICATED

2    THAT IT WAS A SAFE ENVIRONMENT.

3        Q.        THANK YOU.

4        MR. FLUCK, I WOULD LIKE YOU TO LOOK AT A

5    DOCUMENT WHICH HAS BEEN PREVIOUSLY MARKED AS DETJIN

6    EXHIBIT SIX FOR IDENTIFICATION, PLEASE.

7        FOR THE RECORD, THAT'S A COPY OF A JUNE 21,

8    1948 LETTER, FROM MRS. GERTRUDE C. BRICE, PLANT

9    NURSE, TO DR. PAUL A. BREHM, SUPERVISOR, INDUSTRIAL

10   HYGIENE UNIT, WISCONSIN STATE BOARD OF HEALTH.

11       NOW MR. FLUCK, THIS LETTER STATES:

12           "DEAR MR. BREHM:  MR. FLUCK MADE DUST

13           STUDIES OF OUR KALO OPERATIONS IN MARCH OF

14           THIS YEAR AND AT THAT TIME RECOMMENDED THAT

15           ANOTHER ASBESTOS DUST STUDY BE MADE WHEN THE

16           DUST PRODUCING PROCESSES WOULD BE IN FULL

17           OPERATION.  THEY ARE NOW IN FULL OPERATION.

18           WILL YOU KINDLY MAKE ARRANGEMENTS FOR A

19           REPEAT DUST STUDY?  YOUR ATTENTION IS

20           APPRECIATED."

21       NOW, DOES THAT DOCUMENT REFRESH YOUR

22   RECOLLECTION THAT IN APPROXIMATELY JUNE OF 1948

23   SOMEONE AT THE ALGOMA PLANT REQUESTED A REPEAT STUDY

24   TO FOLLOW UP ON THE STUDY YOU DID IN FEBRUARY?

25       A.    YES.

26       Q.    OKAY.  NOW, DOES THIS LETTER HELP

27   REFRESH YOUR RECOLLECTION ABOUT HOW IT WAS THAT YOU

28   CAME TO DO A STUDY AT ALL AT ALGOMA?

1      AND I'M REFERRING NOW TO YOUR DESCRIPTION

2  EARLIER OF IT EITHER BEING SOMETHING PROMPTED BY THE

3  INDUSTRIAL HYGIENE UNIT OR PROMPTED BY A REQUEST

4  FROM INDUSTRY.

5      DOES IT HELP YOU IN ANY WAY?

6      A.    I CAN'T BE CERTAIN, BUT IT WOULD SEEM

7  THAT THE REQUEST HAD COME FROM THE INDUSTRY, AND

8  VERY PROBABLY FROM THE PLANT NURSE.

9      Q.    OKAY.

10     A.    BUT I DON'T REMEMBER SPECIFICALLY.

11     Q.    ALL RIGHT.  FAIR ENOUGH.

12     WOULD YOU PLEASE LOOK AT DETJIN EXHIBIT SEVEN

13  FOR IDENTIFICATION.  THAT'S A COPY OF A JUNE 30,

14  1948 LETTER, FROM MRS. GERTRUDE C. BRICE TO DOCTOR

15  PAUL A. BREHM.  THAT LETTER STATES:

16          "WE HAVE NOT HEARD FROM YOU IN RESPONSE TO

17          OUR LETTER OF JUNE 21, REQUESTING A REPEAT

18          DUST STUDY OF OUR KALO OPERATIONS.  SINCE

19          THE FACTORY WILL BE CLOSED JULY 3 TO

20          JULY 19 FOR MASS VACATIONS, IT WILL BE OF

21          NO USE TO COME DURING THAT TIME.  WILL YOU

22          KINDLY ARRANGE FOR THE DUST STUDY FOR ANY

23          TIME AFTER JULY 19?"

24     DOES THAT REFRESH YOUR RECOLLECTION IN TERMS

25  OF FOLLOW-UP THAT WAS DONE BY THE ALGOMA PLANT

26  CONCERNING YOUR WORK THERE?

27     A.     IT SAYS THEY WANTED ANOTHER STUDY.  I

28  DON'T REMEMBER THAT SPECIFIC LETTER.

1     Q.     GENERALLY, WHEN YOU WERE DOING YOUR WORK

2 AT THE ALGOMA PLANT, WERE THOSE INDIVIDUALS -- DID

3 THEY INDICATE TO YOU THAT THEY WANTED YOU TO DO THIS

4 DUST WORK OR WAS THIS SOMETHING THAT YOU WERE DOING

5 THAT THEY DIDN'T WANT IT TO HAPPEN?  I MEAN --

6     A.     THEY WANTED ME TO DO IT.

7     MR. BURGI:     OBJECT TO THE QUESTION ON THE

8 GROUNDS IT CALLS FOR SPECULATION.

9     MR. RILEY:

10     Q.     GO AHEAD.

11     I WANT TO KNOW WHAT ATTITUDE YOU PERCEIVED ON

12 THE PART OF THE ALGOMA PEOPLE WITH RESPECT TO YOUR

13 WORK THERE.

14     A.     THEY WELCOMED OUR PRESENCE.

15     Q.     MR. FLUCK, I'D LIKE YOU TO LOOK AT WHAT

16 HAS BEEN MARKED AS DETJIN EXHIBIT EIGHT FOR

17 IDENTIFICATION, THE FIRST PAGE OF WHICH IS A COPY OF

18 AN AUGUST 18, 1948 LETTER, FROM PAUL A. BREHM TO

19 MR. G.R. MERCER AT THE ALGOMA PLANT.  ATTACHED TO

20 THAT IS A TWO-PAGE REPORT OF A FOLLOW-UP DUST STUDY

21 DATED JULY 29, 1948.

22     I WOULD LIKE YOU TO FIRST LOOK AT THE JULY 29,

23 1948 REPORT THAT'S ATTACHED TO THE LETTER.

24     WOULD YOU READ THE FIRST PARAGRAPH OF THAT

25 REPORT, PLEASE?

26     A.     "THIS STUDY WAS MADE AS A FOLLOW-UP OF A

27     PREVIOUS STUDY (FEBRUARY 13, 1948) OF

28     ASBESTOS DUST CONCENTRATIONS IN THE

48

1              ATMOSPHERE OF THE 'KALO' DEPARTMENT.

2              THE PURPOSE OF THE REPEAT STUDY WAS TO

3              EVALUATE THE EXPOSURE TO ASBESTOS DUST AT

4              A TIME WHEN THE DEPARTMENT WAS IN FULL

5              OPERATION."

6         Q.    ALL RIGHT.  AND DOES THAT ACCURATELY

7    STATE THE PURPOSE OF YOUR FOLLOW-UP DUST STUDY?

8         A.    THAT'S RIGHT.

9         Q.    AND YOUR SIGNATURE APPEARS ON THE SECOND

10   PAGE OF THE REPORT?

11        A.    YES.

12        Q.    SO THIS IS A TRUE AND CORRECT COPY OF

13   THE REPORT THAT YOU DID?

14        A.    YES.

15        Q.    ALL RIGHT.

16        YOU MAKE REFERENCE ONCE AGAIN TO THE MIDGET

17   IMPINGER AND APPROVED LIGHT FIELD TECHNIQUES AS THE

18   PROCESS YOU USED IN DOING THE FOLLOW-UP STUDY?

19        A.    YES.

20        Q.    AGAIN, THOSE WERE STILL STANDARD IN THE

21   INDUSTRY?

22        A.    YES.

23        Q.    ALL RIGHT.  WOULD YOU PLEASE LOOK AT THE

24   DUST COUNTS THAT ARE RECORDED IN YOUR REPORT?

25        WERE YOU AGAIN RECORDING THOSE COUNTS IN

26   MILLIONS OF DUST PARTICLES PER CUBIC FOOT OF AIR?

27        A.    THAT'S CORRECT.

28        Q.    DID YOU COMPARE THOSE DUST COUNTS TO THE

1    MAXIMUM ALLOWABLE CONCENTRATION FOR ASBESTOS DUST?

2          A.     YES.

3          Q.     AND THAT'S WHAT YOU INDICATED THERE AS A

4    5.0 MILLION PARTICLES PER CUBIC FOOT OF AIR FOR

5    ASBESTOS DUST?

6          A.     YES.

7          Q.     AND WHAT DID YOU FIND AS THE RESULT OF

8    YOUR STUDY THAT YOU DID AT THE ALGOMA PLANT IN JULY

9    OF 1948?

10         A.     IT'S MENTIONED IN THE SUMMARY THERE.

11   "ALL ATMOSPHERIC CONCENTRATIONS WERE BELOW THE

12   MAXIMUM ALLOWABLE CONCENTRATION OF 5.0 MILLION

13   PARTICLES."

14         Q.     AND WHAT DID THAT INDICATE TO YOU WITH

15   RESPECT TO SAFETY AT THE PLANT?

16         A.     IT WAS VERY GOOD, SAFE.

17         Q.     WOULD YOU LOOK AT THE FIRST PAGE OF

18   EXHIBIT EIGHT, PLEASE?

19          NOW, THAT IS A LETTER FROM DOCTOR BREHM TO

20   MR. MERCER AT THE ALGOMA PLANT; CORRECT?

21         A.     YES.

22         Q.     NOW THE LETTER DOESN'T SHOW YOU AS

23   HAVING RECEIVED A COPY OF THAT.  IN THE ORDINARY

24   COURSE OF THE WORK OF THE INDUSTRIAL HYGIENE UNIT

25   WHEN YOU WERE THERE WHEN A REPORT SUCH AS THIS THAT

26   YOU DID WAS SENT OUT TO THE PLANT, WOULD YOU HAVE

27   RECEIVED A COPY OF THE LETTER OR SEEN THE

28   CORRESPONDENCE AT SOME POINT IN TIME?

50

1        A.      I WOULD HAVE SEEN IT, YES.

2        Q.      ALL RIGHT.  DR. BREHM WROTE IN THE FIRST

3   PARAGRAPH: "ENCLOSED IS A COPY OF THE MOST RECENT

4                DUST STUDY CONDUCTED IN YOUR PLANT IN

5                REGARD TO THE ASBESTOS DUST EXPOSURE.

6                YOU WILL NOTE THAT CONDITIONS WERE VERY

7                SATISFACTORY AT THE TIME OF THIS VISIT."

8        DID YOU AGREE WITH THAT STATEMENT?

9        A.      YES.

10       Q.      OKAY.  DO YOU KNOW, MR. FLUCK, WHETHER

11  OR NOT THE FOLKS AT THE ALGOMA PLANT SENT YOUR

12  REPORTS ON TO ANYONE ELSE IN THEIR CORPORATE

13  ORGANIZATION?

14       A.      THE PLANT NURSE TOLD ME WHAT SHE WAS

15  GOING TO DO WITH THEM.  SHE TOLD ME THAT SHE WAS

16  GOING TO FORWARD THEM TO MANAGEMENT, VARIOUS

17  MANAGEMENT LEVELS.

18       Q.      MR. FLUCK, WOULD YOU LOOK AT WHAT HAS

19  PREVIOUSLY BEEN MARKED AS DETJIN EXHIBIT ELEVEN FOR

20  IDENTIFICATION, PLEASE?

21          FOR THE RECORD, THAT'S A COPY OF AN

22  OCTOBER 28, 1948 LETTER, FROM MRS. GERTRUDE C. BRICE

23  TO DR. PAUL A. BREHM.

24          NOW, THERE'S A REFERENCE IN THIS LETTER TO A

25  VISIT WHICH YOU HAD MADE TO THE PLANT AND A REQUEST

26  FOR FURTHER WORK ON BEHALF OF THE INDUSTRIAL HYGIENE

27  DIVISION.

28          GIVEN THE FACT THAT THIS LETTER RELATES TO

51

1    YOUR WORK, IN THE ORDINARY COURSE OF THINGS AT THE

2    STATE BOARD OF HEALTH WOULD DR. BREHM HAVE SHOWN YOU

3    THIS CORRESPONDENCE AND DISCUSSED IT WITH YOU?

4        A.    YES.

5        Q.    OKAY.  AND DID THIS REQUEST FROM THE

6    ALGOMA PLANT ULTIMATELY PROMPT YOU TO GO BACK TO THE

7    ALGOMA PLANT?

8        A.    YES.

9        Q.    WOULD YOU LOOK, PLEASE, AT WHAT HAS

10   PREVIOUSLY BEEN MARKED AS DETJIN EXHIBIT FOURTEEN

11   FOR IDENTIFICATION, PLEASE.

12       IS EXHIBIT FOURTEEN A TRUE AND CORRECT COPY OF

13   A REPORT THAT YOU WROTE IN CONNECTION WITH A DUST

14   STUDY YOU DID AT THE ALGOMA PLANT IN NOVEMBER OF

15   1948?

16       A.    YES.

17       Q.    IS THAT YOUR SIGNATURE WHICH APPEARS ON

18   THE SECOND PAGE OF THE REPORT?

19       A.    YES.

20       Q.    OKAY.  AT THE FIRST PAGE OF THE REPORT

21   YOU SAY "THE PURPOSE OF THIS STUDY WAS TO DETERMINE

22   ATMOSPHERIC CONCENTRATIONS OF DUST IN THE VICINITY

23   OF THE K-LO BAGGING OPERATIONS AND DURING THE

24   UNLOADING OF K-LO FROM FREIGHT CARS."

25       IS THAT AN ACCURATE STATEMENT OF THE PURPOSE

26   OF YOUR STUDY?

27       A.    YES.

28       Q.    YOU MAKE REFERENCE THEN TO THE BAGGING

52

1    OPERATIONS AT THE PLANT AND LOCAL EXHAUST

2    VENTILATION; CORRECT?

3          A.    YES.

4          Q.    THERE WAS LOCAL EXHAUST VENTILATION AT

5    THE LOCATIONS YOU STUDIED IN 1948 THAT WAS ALREADY

6    IN PLACE; IS THAT RIGHT?

7          A.    THAT'S RIGHT.

8          Q.    WAS THERE ALSO LOCAL EXHAUST VENTILATION

9    IN OTHER PLACES IN THE PLANT?

10         A.    YES.

11         Q.    CAN YOU DESCRIBE FOR US THE TYPES OF

12   VENTILATION EQUIPMENT THAT THEY HAD IN PLACE?

13         A.    THERE WERE EXHAUST HOODS AT THE VARIOUS

14   SAWS AND SANDING OPERATIONS AND (AT) THE BAGGING

15   OPERATION.

16         Q.    OKAY.  NOW YOU INDICATE ON THE FIRST

17   PAGE OF THIS REPORT, "VISUAL INSPECTION SHOWED A

18   CONSIDERABLE AMOUNT OF THE DUST GENERATED DURING

19   BAGGING OPERATIONS WAS NOT BEING CAUGHT BY THE

20   HOOD."

21          WAS THAT AN OBSERVATION YOU ACTUALLY MADE WHEN

22   YOU WERE OUT THERE?

23         A.    RIGHT.  RIGHT.

24         Q.    ALL RIGHT.  DID YOU CONCLUDE THAT THE

25   INEFFICIENCY OF THAT EXHAUST FAN HAD SOME IMPACT ON

26   THE DUST COUNTS?

27         A.    YES.

28         Q.    OKAY.  ON THE SECOND PAGE OF THE REPORT

53

1   YOU'VE ONCE AGAIN INDICATED DUST COUNTS WITH

2   REFERENCE TO MILLIONS OF PARTICLES PER CUBIC FOOT OF

3   AIR; CORRECT?

4        A.    THAT'S RIGHT.

5        Q.    AND UNDER "CONCLUSIONS," YOU WROTE:

6             "ALTHOUGH THE DUST CONCENTRATION OF 24 TO

7             40 MILLION MIGHT NOT CAUSE AN ACUTE HEALTH

8             HAZARD, BECAUSE WORKERS ARE EXPOSED FOR

9             ONLY ABOUT ONE AND ONE HALF HOURS PER DAY

10            AND BECAUSE THE ASBESTOS DUST IS DILUTED

11            WITH CALCIUM SILICATE AND WOOD, SUCH

12            CONCENTRATIONS ARE, NEVERTHELESS, A

13            BORDERLINE SITUATION FROM THE ASBESTOSIS

14            STANDPOINT AND CAN CAUSE RESPIRITORY

15            IRRITATIONS."

16       I'M GOING TO BREAK THAT DOWN AND ASK YOU SOME

17  SPECIFICS QUESTIONS ABOUT VARIOUS PORTIONS OF THAT

18  STATEMENT.

19       YOU SAY THAT THE ASBESTOS DUST IS DILUTED WITH

20  CALCIUM SILICATE; CORRECT?

21       A.    YES.

22       Q.    YOU WERE MEASURING THEN IN THESE DUST

23  COUNTS MORE THAN JUST THE ASBESTOS IN THE AIR?

24       A.    THAT'S CORRECT.  THE TOTAL DUST.

25       Q.    THIS IS TOTAL DUST THAT YOU ARE

26  REPORTING HERE; CORRECT?

27       A.    YES.

28       Q.    AND THAT'S TRUE WITH THE PRIOR REPORTS

1    WE'VE ALREADY LOOKED AT?

2         A.    CORRECT.

3         Q.    WAS IT YOUR UNDERSTANDING THAT ONLY A

4    PORTION OF THAT DUST WAS ASBESTOS?

5         A.    YES.

6         Q.    AND YOU MAKE REFERENCE TO THE EXOSURE OF

7    WORKERS TO THESE LOCATIONS AS BEING ABOUT ONE AND

8    ONE HALF HOURS PER DAY; CORRECT?

9         A.    YES.

10        Q.    DOES THAT HAVE SOMETHING TO DO WITH THE

11   TIME WEIGHTED AVERAGE CONCEPT WE TALKED ABOUT

12   BEFORE?

13        A.    IT DOES.

14        Q.    WOULD YOU EXPLAIN THAT TO ME?

15        A.    A PERSON CAN BE EXPOSED TO LEVELS ABOVE

16   THE STANDARD, THE M.A.C., FOR SHORT PERIODS OF TIME,

17   IF HE'S NOT EXPOSED EIGHT HOURS A DAY, EVERY DAY OF

18   HIS WORKING DAY.

19        HERE, IT WAS AN HOUR AND A HALF, IT SAYS; AND

20   IF I REMEMBER IT FROM A PREVIOUS LETTER, THIS

21   UNLOADING OPERATION IS A -- IS NOT A CONTINUOUS

22   THING.  IT HAPPENS ONLY A CERTAIN NUMBER OF DAYS OUT

23   OF THE MONTH, OR WHATEVER THE PHRASE WAS.  IT'S NOT

24   A CONTINUOUS OPERATION, AND THE WORKER WASN'T

25   EXPOSED EIGHT HOURS A DAY.

26        Q.    OKAY.  NOW YOU WROTE NEXT, "THE DOUBLE

27   HOOD NOW BEING USED IS NOT UTILIZING AVAILABLE POWER

28   TO GET THE MAXIMUM BENEFIT."

1      IS THAT A CONCLUSION THAT YOU DREW BASED ON

2  YOUR VISUAL OBSERVATIONS AS WELL AS THE DUST COUNTS?

3      A.     YES.  AND MY KNOWLEDGE OF VENTILATION,

4  INDUSTRIAL VENTILATION SYSTEMS.  IT WASN'T AN

5  OPTIMUM DESIGN.

6      Q.     ALL RIGHT.  TAKING EVERYTHING INTO

7  CONSIDERATION THEN, DID YOU CONCLUDE CONCENTRATIONS

8  OF KALO DUST AT THE CAR UNLOADING OPERATIONS WERE

9  NOT HIGH ENOUGH TO CONSTITUTE A HEALTH HAZARD UNDER

10  PRESENT CONDITIONS OF EXPOSURE OF ABOUT FOUR OR FIVE

11  DAYS PER MONTH?

12      A.     YES.

13      MR. HARRINGTON:     I OBJECT TO THE FORM OF

14  THAT QUESTION.

15      MR. BURGI:     JOIN IN THAT OBJECTION.

16      MR. RILEY:

17      Q.     LET'S TAKE IT ONE STEP AT A TIME.

18      I READ YOUR CONCLUSION THERE; CORRECT?

19      A.     THAT'S RIGHT.

20      Q.     AND WAS THAT CONCLUSION BASED UPON THE

21  ONE AND ONE HALF HOUR PER DAY EXPOSURE AND THE

22  DILUTED NATURE OF THE ASBESTOS IN THE TOTAL DUST

23  SAMPLE?

24      A.     THAT'S RIGHT.

25      MR. HARRINGTON:     OBJECT TO THE FORM OF THE

26  QUESTION.

27      MR. BURGI:     JOIN IN THE OBJECTION.

28  / / /

56

1       MR. RILEY:

2       Q.    MR. FLUCK, JUST TO MAKE SURE OUR RECORD

3   ISN'T CLUTTERED:  WHEN YOU CONCLUDED "CONCENTRATION

4   OF KALO DUST AT THE CAR UNLOADING OPERATIONS WERE

5   NOT HIGH ENOUGH TO CONSTITUTE A HEALTH HAZARD UNDER

6   PRESENT CONDITIONS OF EXPOSURE OF ABOUT FOUR OR FIVE

7   DAYS PER MONTH," WHAT DID YOU TAKE INTO ACCOUNT IN

8   REACHING THAT CONCLUSION?

9       MR. HARRINGTON:    I OBJECT TO THE FORM OF THE

10  QUESTION.

11      -- YOU CAN ANSWER, SIR.  THESE ARE JUST LEGAL

12  OBJECTIONS.

13      MR. RILEY:    WHAT'S THE BASIS FOR THAT

14  OBJECTION?

15      MR. HARRINGTON:    I THINK THE FORM IS LEADING

16  AND SUGGESTIVE.

17      MR. RILEY:    I'LL LIVE WITH THAT ONE.

18      MR. BURGI:    I'LL JOIN.

19      MR. RILEY:    WHY NOT?

20      MR. HARRINGTON:    AND I ALSO THINK THAT IT

21  LACKS FOUNDATION.

22      BUT GO AHEAD, YOU CAN ANSWER THE QUESTION,

23  SIR.  I'M NOT TRYING TO THROW YOU.

24      THE WITNESS:    WOULD YOU READ THE QUESTION,

25  AGAIN?

26              (RECORD READ.)

27  / / /

28  / / /

57

1     MR. RILEY:

2     Q.     AND BEFORE YOU SAY THAT, THAT WAS YOUR

3  CONCLUSION; CORRECT?

4     A.     YES.

5     Q.     OKAY.  WHAT DID YOU TAKE INTO ACCOUNT IN

6  REACHING THAT?

7     MR. HARRINGTON:     THAT WAS THE BASIS OF MY

8  OBJECTION, THAT YOU INCLUDED THE CONCLUSION IN YOUR

9  PRIOR QUESTION BEFORE IT CAME FROM THE WITNESS; AND

10  NOW I'M OBJECTING TO IT, YOUR LAST QUESTION, BECAUSE

11  IT WAS LEADING AND SUGGESTIVE.

12     MR. RILEY:     WHICH LAST QUESTION?

13     MR. HARRINGTON:     "THIS WAS YOUR CONCLUSION;

14  CORRECT?"

15     MR. RILEY:     ALL RIGHT.  WE'RE GOING TO

16  SATISFY MR. HARRINGTON IF IT TAKES US ALL MORNING.

17     Q.     YOU WROTE, "CONCENTRATIONS OF KALO DUST

18  AT THE CAR UNLOADING OPERATIONS WERE NOT HIGH ENOUGH

19  TO CONSTITUTE A HEALTH HAZARD UNDER PRESENT

20  CONDITIONS OF EXPOSURE OF ABOUT FOUR OR FIVE DAYS

21  PER MONTH."

22      WAS THAT YOUR CONCLUSION, SIR?

23     A.     YES.

24     MR. HARRINGTON:     ALL RIGHT.  I OBJECT TO THE

25  FORM OF THAT QUESTION, AGAIN, BASED ON THE FORM AND

26  ON LACK OF FOUNDATION IN TERMS OF QUALIFYING THE

27  WITNESS MEDICALLY.

28  / / /

58

1        MR. RILEY:

2        Q.      NOW, WHAT DID YOU TAKE INTO ACCOUNT IN

3    REACHING THAT CONCLUSION, SIR?

4        A.      TO PUT IT BLUNTLY, MY PROFESSIONAL

5    JUDGMENT.

6         I'M GETTING TIRED OF THESE QUESTIONS.  EXCUSE

7    ME.

8        Q.      MY QUESTIONS?  LET'S --

9        A.      I'LL ELABORATE.  WE TOOK INTO ACCOUNT MY

10   FINDINGS ON THE DUST COUNTS, MY KNOWLEDGE OF WHAT

11   THOSE FINDINGS MEANT, THE TIME THAT THE WORKER WAS

12   EXPOSED.

13       Q.      OKAY.  NOW WITH SPECIFIC REFERENCE TO

14   YOUR REPORT WHERE YOU SAID THE ASBESTOS DUST IS

15   DILUTED WITH CALCIUM SILICATE, IS THAT SOMETHING

16   THAT YOU TOOK INTO ACCOUNT AS WELL?

17       A.      YES.

18       Q.      ALL RIGHT.  NOW YOU HAVE A

19   "RECOMMENDATIONS SECTION" UNDERNEATH HERE, THE

20   "CONCLUSION SECTION," AND IT STATES, "IT IS

21   RECOMMENDED THAT THE PRESENT BAGGING EXHAUST HOODS

22   BE MODIFIED BY REMOVING THE PERFORATED INNER WALL."

23        WAS THAT YOUR RECOMMENDATION, SIR?

24       A.      YES.

25       Q.      OKAY.  THANKS.

26        MR. FLUCK, WOULD YOU PLEASE LOOK AT WHAT HAS

27   PREVIOUSLY BEEN MARKED AS DETJIN EXHIBIT FIFTEEN FOR

28   IDENTIFICATION, PLEASE.

59

1        FOR THE RECORD, THAT IS A REPORT, A COPY OF A

2   REPORT BEARING THE DATE DECEMBER 1, 1948, IT REFERS

3   TO THE ALGOMA PLANT, AND IT APPEARS TO HAVE BEEN

4   WRITTEN BY WILLIAM Z. FLUCK.

5        NOW, IS THAT YOUR REPORT, SIR?

6        A.    YES.

7        Q.    THAT'S YOUR SIGNATURE, ISN'T IT,

8   MR. FLUCK?

9        A.    YES.

10        Q.    OKAY.  COULD YOU TELL US, PLEASE, WHAT

11   THE PURPOSE OF DOING THIS STUDY WAS?

12        A.    TO DETERMINE THE EFFECTIVENESS OF THE

13   LOCAL EXHAUST SYSTEM AT THE K-LO BAGGING OPERATION.

14        Q.    WAS THIS A FOLLOW-UP TO THE DUST STUDY

15   THAT YOU JUST LOOKED AT WHICH WAS MARKED AS EXHIBIT

16   FOURTEEN?

17        A.    YES.

18        Q.    DOES THIS REPORT FOCUS IN ON THAT

19   VENTILATION EQUIPMENT THAT WAS REFERRED TO IN

20   EXHIBIT FOURTEEN?

21        A.    YES.

22        Q.    ON PAGE 2 OF THE REPORT YOU INDICATE THE

23   DUST COUNTS THAT YOU FOUND; CORRECT?

24        A.    YES.

25        Q.    OKAY.  AND THE CONCLUSION SECTION YOU

26   WROTE: "DUST COUNTS TAKEN AT THE BREATHING ZONE OF

27              THE BAGGING OPERATOR AND VISUAL

28              OBSERVATION OF FLOW OF DUSTY AIR INTO THE

60

1              EXHAUST HOODS INDICATE THAT THE HOODS ARE

2              PERFORMING A VERY SATISFACTORY JOB OF

3              CONTROLLING DUST GENERATED BY THE BAGGING

4              OPERATION."

5      WAS THAT YOUR CONCLUSION, SIR?

6      A.    IT WAS.

7      Q.    YOU THEN WROTE, "IT WAS OBSERVED THAT

8              SHAKING OF DUSTY BAGS AND CLEANING OF

9              WORKERS' CLOTHING BY BLOWING OFF WITH

10             COMPRESSED AIR GENERATED LARGE CLOUDS OF

11             DUST.  THE DUST COUNT OF 20 MILLION OF

12             SAMPLE NUMBER THREE SHOWS THAT SUCH

13             PRACTICES CAN VERY RAPIDLY INCREASE THE

14             DUSTINESS OF THE ROOM."

15     IS THAT ALSO AN OBSERVATION THAT YOU MADE?

16     A.    THAT'S RIGHT.

17     Q.    WERE YOU DIRECTING THE OBSERVATION AT

18 THE WORK PRACTICE THERE OF USING COMPRESSED AIR?

19     A.    YES.

20     Q.    IF YOU WOULD JUST FOR REFERENCE LOOK AT

21 EXHIBIT FOURTEEN AND EXHIBIT FIFTEEN, AND LOOK AT

22 THE DUST COUNTS.

23     THE QUESTION IS, WERE THE DUST COUNTS IN YOUR

24 DECEMBER 1948 STUDY HIGHER OR LOWER THAN THE DUST

25 COUNTS IN YOUR NOVEMBER 1948 STUDY?

26     MR. BURGI:    I'M GOING TO OBJECT TO THE

27 QUESTION ON THE GROUNDS IT'S VAGUE AND AMBIGUOUS

28 WITH RESPECT TO SPECIFIC LOCATIONS.

61

1       THE WITNESS:    THE DECEMBER IS ALSO LOWER

2   THAN THE NOVEMBER.

3       MR. RILEY:

4       Q.     AND WHAT DID THAT INDICATE TO YOU, SIR?

5       A.     IT INDICATED AN IMPROVEMENT IN THE

6   VENTILATION SYSTEM.

7       Q.     OKAY.  NOW IN THE NOVEMBER REPORT WITH

8   REFERENCE TO THOSE HIGHER DUST COUNTS, YOU

9   CONCLUDED, QUOTE, "CONCENTRATIONS OF K-LO DUST AT

10          THE CAR UNLOADING OPERATIONS WERE NOT HIGH

11          ENOUGH TO CONSTITUTE A HEALTH HAZARD UNDER

12          PRESENT CONDITIONS OF EXPOSURE OF ABOUT

13          FOUR OR FIVE DAYS PER MONTH."

14   WITH RESPECT TO THE LOWER COUNTS YOU'VE

15   IDENTIFIED IN THE DECEMBER 1948 REPORT, WHAT WAS

16   YOUR CONCLUSION WITH REGARD TO WHETHER OR NOT THE

17   CONCENTRATIONS WERE HIGH ENOUGH TO CONSTITUTE A

18   HEALTH HAZARD?

19       MR. HARRINGTON:    JUST TO BE CONSISTENT, I

20   SHOULD INTERPOSE ANOTHER OBJECTION HERE.

21       GO AHEAD, SIR.

22       MR. RILEY:    TO THE FORM OF THE QUESTION?

23       MR. HARRINGTON:    ON THE GROUNDS I PREVIOUSLY

24   STATED.

25       MR. RILEY:    WAIT A MINUTE.  YOU DIDN'T

26   PREVIOUSLY STATE AN OBJECTION TO THE QUESTION WITH

27   RESPECT TO THIS DECEMBER 1948 STUDY.  I WANT YOU TO

28   GO AHEAD AND STATE YOUR OBJECTION.

62

1    MR. HARRINGTON:    I'M OBJECTING TO THE FORM

2    OF THE QUESTION.  THAT'S ALL I HAVE TO SAY.

3    MR. RILEY:    NO.  THE RULES PROVIDE THAT IF

4    YOU HAVE AN OBJECTION TO THE FORM OF THE QUESTION,

5    THE REASON YOU MAKE IT NOW IS SO THAT IT CAN BE

6    CURED SEASONABLY, WITHOUT RETURNING TO CALIFORNIA.

7        NOW, I DON'T THINK IT'S SATISFACTORY SIMPLY

8    TO SAY THAT YOU OBJECT TO THE FORM OF THE QUESTION.

9    I'D LIKE TO KNOW SPECIFICALLY WHAT YOU THINK IS

10   WRONG WITH THAT QUESTION.

11   MR. HARRINGTON:    CAN I HEAR THE QUESTION

12   AGAIN?

13   MR. RILEY:    I THINK THAT INDICATES HOW

14   SERIOUSLY YOU ARE, HOW SERIOUS YOU ARE IN MAKING

15   THAT OBJECTION.

16       PLEASE READ IT.

17       (RECORD READ.)

18

19   MR. RILEY:    NOW, DO YOU HAVE SOMETHING TO

20   SAY, MR. HARRINGTON, ABOUT THAT QUESTION?

21   MR. HARRINGTON:    YES.  I'M OBJECTING TO THE

22   FORM OF THE QUESTION BECAUSE I THINK IT'S VAGUE AND

23   AMBIGUOUS AS TO WHAT YOU ARE REFERRING TO

24   SPECIFICALLY, AND WITHOUT FOUNDATION AS TO LEVELS

25   ABOVE THE MAXIMUM ALLOWABLE CONCENTRATION WHICH MAY

26   BE RECORDED IN THE DOCUMENT THAT YOU ARE REFERRING

27   TO.

28   MR. BURGI:    I ALSO THINK THERE'S A LACK OF

1    FOUNDATION ON THE ISSUE OF WHAT CONSTITUTES A HEALTH

2    HAZARD.

3        MR. RILEY:    WELL, I THINK THIS MAN HAS

4    TESTIFIED IN SOME DETAIL ON THAT SUBJECT, SO I'M

5    SATISFIED WITH THE QUESTION.

6        Q.    DO YOU HAVE THE QUESTION IN MIND?

7    WE'LL READ IT AGAIN SO WE GET ALL THAT LAWYER TALK

8    OUT OF THE WAY.  DO YOU WANT IT READ, MR. FLUCK?

9        A.    I THINK I KNOW THE QUESTION.

10        IF MY ANSWER ISN'T CORRECT --

11        MR. HARRINGTON:    MR. FLUCK, THESE OBJECTIONS

12    DO NOT IN ANY WAY GO TO YOUR ANSWERS, SIR.

13        THESE OBJECTIONS ARE DIRECTED TO THE LEGAL

14    FORM OF THE QUESTION.  THEY AREN'T INTENDED TO

15    REFLECT ON YOU IN ANY WAY WHATSOEVER, SIR.  I HOPE

16    YOU UNDERSTAND THAT.

17        THE WITNESS:    MAY I GIVE AN ANSWER AND SEE

18    IF IT'S APPROPRIATE?

19        MR. RILEY:

20        Q.    PLEASE ANSWER.

21        A.    MY ANSWER IS THAT THE RESULTS OF THE

22    DECEMBER 1ST, 1948 SURVEY, INDICATE A LACK OF A

23    HEALTH HAZARD.

24        Q.    OKAY.

25        A.    DUST CONCENTRATIONS WERE NOT HIGH ENOUGH

26    TO CONSTITUTE A HEALTH HAZARD.

27        Q.    THANK YOU.

28        NOW YOU DID MAKE RECOMMENDATIONS IN YOUR

1    DECEMBER 1, 1948 REPORT; CORRECT?

2         A.    YES.  WE MADE RECOMMENDATIONS WHEREVER

3    WE SAW A WAY OF IMPROVING A SITUATION, AND I SAW A

4    WAY OF IMPROVING THE VENTILATION SYSTEM.

5         THAT RECOMMENDATION REALLY HAD NOTHING TO DO

6    WITH THE HEALTH HAZARD.  THAT WAS AN IMPROVEMENT OF

7    THE VENTILATION SYSTEM.

8         Q.    OKAY.  AND IN YOUR DECEMBER REPORT YOU

9    HAVE TWO RECOMMENDATIONS WRITTEN DOWN THERE:

10   "NUMBER ONE, IT IS RECOMMENDED THAT SHAKING AND

11   INSPECTING OF EMPTY BAGS BE DONE DIRECTLY IN FRONT

12   OF DUST COLLECTOR HOOD; NUMBER TWO, THE USE OF A

13   COMPRESSED AIR HOSE IN THE BAGGING ROOM SHOULD BE

14   PROHIBITED IF POSSIBLE."

15        THOSE ARE YOUR RECOMMENDATIONS, SIR?

16        A.    YES.

17        Q.    OKAY.  AND WHY DID YOU MAKE THOSE

18   RECOMMENDATIONS?

19        A.    THOSE ARE MADE TO IMPROVE THE SITUATION.

20        Q.    OKAY.  WAS IT YOUR INTENT TO REFLECT IN

21   MAKING THOSE RECOMMENDATIONS THAT YOU THOUGHT THAT

22   THERE WAS A HAZARD?

23        A.    NO.

24        Q.    THANK YOU.

25        A.    THAT WAS JUST IMPROVING THE PROCEDURE.

26        Q.    OKAY.

27        MR. FLUCK, I'D LIKE YOU, PLEASE, TO LOOK AT

28   WHAT HAS PREVIOUSLY BEEN MARKED AS DETJIN EXHIBIT

65

1    SIXTEEN FOR IDENTIFICATION.  IT'S A ONE-PAGE

2    DOCUMENT.  IT PURPORTS TO BE A COPY OF A

3    FEBRUARY 23, 1948 LETTER, FROM D.H. BYERS,

4    SCIENTIST, LABORATORY SECTION, DIVISION OF

5    INDUSTRIAL HYGIENE OF THE U.S. PUBLIC HEALTH

6    SERVICE, TO MR. WILLIAM Z. FLUCK.

7         IS THAT A TRUE AND CORRECT COPY OF A LETTER

8    WHICH YOU RECEIVED ON OR ABOUT FEBRUARY 23RD,

9    1949 --

10        A.     YES.

11        Q.     -- FROM MR. BYERS?

12        A.     YES.

13        Q.     ALL RIGHT.

14        NOW YOU MENTIONED EARLIER THAT YOU WERE --

15   THAT YOU WERE MEASURING THE TOTAL DUST IN THE AIR AT

16   THE ALGOMA PLANT.  CORRECT?

17        A.     THAT'S RIGHT.

18        Q.     AND YOU ALSO MENTIONED EARLIER THAT THE

19   DUST YOU WERE MEASURING WAS NOT PURE ASBESTOS IT

20   ALSO HAD, I THINK YOU USED THE WORD "DILUTED WITH

21   CALCIUM SILICATE."  IS THAT CORRECT?

22        A.     THAT'S RIGHT.

23        Q.     NOW THE MAXIMUM ALLOWABLE CONCENTRATION

24   FOR ASBESTOS -- WAS IT YOUR UNDERSTANDING THAT THAT

25   WAS THE MAXIMUM ALLOWABLE CONCENTRATION FOR ANY DUST

26   THAT CONTAINED ANY PORTION OF ASBESTOS OR FOR PURE

27   ASBESTOS DUST?

28        A.     THE MAXIMUM ALLOWABLE CONCENTRATION IS

1    FOR THE ASBESTOS PORTION OR FOR PURE ASBESTOS, IF

2    YOU WANT TO CALL IT THAT.

3         Q.     ALL RIGHT.

4         I WILL REPRESENT TO YOU -- WELL, LET'S LOOK AT

5    EXHIBIT SIXTEEN.  IT SAYS, "DEAR MR. FLUCK: THE

6              SAMPLE OF SETTLED DUST WHICH YOU SUBMITTED

7              WITH YOUR LETTER OF JANUARY 18, 1949, HAS

8              BEEN ANALYZED WITH THE FOLLOWING RESULTS:"

9         I WILL REPRESENT TO YOU THAT THE PEOPLE WHO

10   PRODUCED EXHIBIT SIXTEEN HAVE NOT PRODUCED A

11   JANUARY 18, 1949 LETTER FROM YOU, THAT'S REFERRED TO

12   IN THIS DOCUMENT.  I WOULD OF COURSE SHOW IT TO YOU

13   IF I HAD IT, BUT I DON'T.

14        BUT I'D LIKE YOU TO REVIEW THAT AND SEE IF

15   THIS LETTER REFRESHES YOUR RECOLLECTION THAT YOU IN

16   FACT CONTACTED THE U.S. PUBLIC HEALTH SERVICE WITH

17   RESPECT TO THE DUST YOU COLLECTED AT THE ALGOMA

18   PLANT?

19        A.     YES.  WE SUBMITTED A SAMPLE FOR

20   ANALYSIS.

21        Q.     OKAY.  NOW, WHY DID YOU SUBMIT A SAMPLE

22   OF THE DUST FROM THE ALGOMA PLANT TO THE U.S. PUBLIC

23   HEALTH SERVICE FOR ANALYSIS?

24        A.     BECAUSE ALTHOUGH WE KNEW THAT THE DUST

25   WAS NOT 100 PERCENT ASBESTOS, WE WANTED TO FIND OUT

26   APPROXIMATELY WHAT PERCENTAGE WAS; AND WE ALSO WERE

27   INTERESTED IN SILICA FROM THE SILICOSIS STANDPOINT.

28   THIS WAS SIMPLY TO IMPROVE THE QUALITY OF OUR STUDY.

1      Q.      OKAY.  WERE YOU FAMILIAR WITH MR. BYERS
2  AT THE TIME?

3      A.      YES.

4      Q.      OKAY.  DID YOU CONSIDER HIM TO BE A
5  COMPETENT MEMBER OF THE U.S. PUBLIC HEALTH SERVICE?

6      A.      YES.  INDEED.  ONE OF THE TOP MEN IN THE
7  COUNTRY IN HIS PROFESSION.

8      Q.      OKAY.  NOW, WHAT DID YOU LEARN FROM
9  MR. BYERS ABOUT THE COMPOSITION OF THE DUST FROM THE
10  ALGOMA PLANT?

11      A.      WELL, IT SAYS HERE IN HIS REPORT
12  "13 PERCENT FREE SILICA, AND THE ASBESTOS CONTENT IS
13  MORE THAN 5 PERCENT AND PROBABLY LESS THAN 12."

14      Q.      NOW, HOW DID YOU USE THAT INFORMATION IN
15  DOING YOUR WORK AT THE ALGOMA PLANT?

16      A.      THAT GAVE, THAT PERMITTED US A MORE
17  EXACT -- TO COME UP WITH A MORE EXACT, MORE
18  MEANINGFUL, M.A.C. THAN THE FIVE PARTS PER MILLION
19  FOR PURE ASBESTOS.  WE COULD COME UP WITH A MORE
20  LOGICAL OR REASONABLE OR SCIENTIFICALLY ACCURATE
21  M.A.C. FOR THE ALGOMA DUST.

22      Q.      SO YOU WERE GOING TO USE THAT
23  INFORMATION TO COME UP WITH A MAXIMUM ALLOWABLE
24  CONCENTRATION FOR THE DUST YOU FOUND AT ALGOMA?

25      A.      YES.

26      Q.      OKAY.  WOULD YOU LOOK AT DETJIN EXHIBIT
27  SEVENTEEN FOR IDENTIFICATION, PLEASE.

28          FOR THE RECORD, THAT'S A COPY OF A JULY 20,

1    1949 LETTER FROM MRS. GERTRUDE C. BRICE TO DR. ALLAN

2    FILEK, DIRECTOR, INDUSTRIAL HYGIENE UNIT, STATE

3    BOARD OF HEALTH.

4         MR. FLUCK, WHO WAS DR. FILEK IN 1949?

5         A.    HE WAS ONE OF THE WISCONSIN DEPARTMENT

6    OF HEALTH DOCTORS.  I DON'T KNOW HIS EXACT TITLE.

7         BUT HE, UPON THE DEATH OF DR. PAUL BREHM, THE

8    DIRECTOR OF THE INDUSTRIAL HYGIENE UNIT, DR. FILEK

9    FOR A SHORT TIME NOMINALLY WAS THE HEAD OF THE UNIT.

10        NOW, CORRESPONDENCE TO THE INDUSTRIAL HYGIENE

11   UNIT WENT THROUGH THIS DR. FILEK WHO WAS NOT AN

12   INDUSTRIAL HYGIENIST.  HE WAS THE MEDICAL FIGUREHEAD

13   THROUGH WHOM CORRESPONDENCE WENT.

14        Q.    OKAY.  THIS LETTER INDICATES THAT THE

15   PLANT NURSE AT THE ALGOMA PLANT WAS REQUESTING A

16   COUNT MADE OF ASBESTOS DUST CONCENTRATIONS, AND

17   THERE'S A REFERENCE TO A PRIOR SURVEY DONE BY YOU.

18   CORRECT?

19        A.    YES.

20        Q.    ALL RIGHT.  DID YOU GO BACK TO THE

21   ALGOMA PLANT AS A RESULT OF THIS REQUEST AND DO

22   ANOTHER STUDY?

23        A.    I'M NOT SURE.  VERY LIKELY I WOULD HAVE

24   BEEN THE ONE TO GO, BUT I'D HAVE TO --

25        Q.    LET'S REFRESH YOUR RECOLLECTION.

26     I'D LIKE YOU TO --

27        A.    I WAS THERE AT THE TIME.  I VERY

28   PROBABLY DID.

69

1        Q.       LET'S LOOK AT DETJIN EXHIBIT EIGHTEEN

2   FOR IDENTIFICATION.   IT'S A TWO-PAGE DOCUMENT, THE

3   FIRST PAGE OF WHICH IS A COPY OF AN AUGUST 10, 1949

4   LETTER FROM WILLIAM Z. FLUCK TO MR. G.R. MERCER;

5   THE SECOND PAGE IS A DUST SURVEY BEARING THE DATE

6   AUGUST 2ND, 1949.

7        LET'S LOOK AT THE DUST SURVEY BEARING THE DATE

8   AUGUST 2ND, 1949.

9        IS THAT A TRUE AND CORRECT COPY OF A REPORT

10  THAT YOU DRAFTED, SIR?

11       A.       I CAN'T READ MY SIGNATURE ON THIS COPY,

12  BUT --

13       Q.       I DON'T SEE A SIGNATURE THERE.

14       A.       EVERYTHING ELSE LOOKS AUTHENTIC.

15       MY INITIALS ARE ON IT, THE INITIALS OF THE

16  SECRETARY -- IT'S THE TYPE OF THING I WOULD HAVE

17  WRITTEN, AND I WROTE THE COVER LETTER, SO OBVIOUSLY

18  -- SO EVEN WITHOUT THE SIGNATURE I WOULD SAY THAT

19  YES, THAT'S A COPY OF MY REPORT.

20       Q.       OKAY.  ONCE AGAIN, YOU WERE STUDYING

21  AIRBORNE CONCENTRATIONS OF DUST AT THE ALGOMA PLANT

22  IN THIS REPORT.  IS THAT TRUE?

23       A.       YES.

24       Q.       DID YOU REPORT YOUR FINDINGS IN TERMS OF

25  DUST COUNTS?

26       A.       YES.

27       Q.       THOSE APPEAR ON THE FACE OF THE REPORT

28  THEMSELVES; CORRECT?

1      A.      THAT'S RIGHT.

2      Q.      ALL RIGHT.   ONCE AGAIN, YOU INDICATE

3  "MAXIMUM ALLOWABLE CONCENTRATION FOR ASBESTOS DUST

4  EQUALS 5.0 M P C F, MILLION PARTICLES PER CUBIC

5  FOOT"?

6      A.      YES.

7      Q.      IS THAT THE PURE ASBESTOS DUST STANDARD

8  YOU REFERRED TO EARLIER?

9      A.      THAT'S RIGHT.

10     Q.      WHAT WAS YOUR SUMMARY CONCLUSION WITH

11 RESPECT TO THE SURVEY THAT YOU DID?

12     A.      ALL ATMOSPHERIC CONCENTRATIONS WERE WELL

13 BELOW THE M.A.C. FOR ASBESTOS DUST OF 5.0 MILLION

14 PARTICLES.

15     Q.      NOW IN YOUR -- THE AUGUST 10 LETTER,

16 THAT'S YOUR SIGNATURE CORRECT, SIR?

17     A.      YES.

18     Q.      AND IS YOUR LETTER A TRUE AND CORRECT

19 COPY OF THE SAME?

20     A.      YES.

21     Q.      YOU WERE WRITING TO MR. MERCER AT THE

22 ALGOMA PLANT; CORRECT?

23     A.      YES.

24     Q.      YOU ENCLOSE WITH YOUR LETTER THREE

25 COPIES OF YOUR AUGUST 2ND, 1949 REPORT.   IS THAT

26 TRUE?

27     YOU WROTE, "WE WERE PLEASED TO FIND ALL

28 OF THE COUNTS TO BE VERY LOW, INDICATING EXCELLENT

1   DESIGN AND MAINTENANCE OF YOUR DUST EXHAUST SYSTEM."

2   THAT WAS YOUR CONCLUSION; CORRECT?

3       A.    YES.

4       Q.    ONCE AGAIN, YOU WERE PLEASED ABOUT THAT

5   FROM THE INDUSTRIAL HYGIENE STANDPOINT?

6       A.    YES.

7       Q.    THEN YOU WROTE, "IT IS DIFFICULT TO SET

8               AN ACCURATE M.A.C. (MAXIMUM ALLOWABLE

9               CONCENTRATION) FOR THE DUST LIBERATED INTO

10              THE AIR AT YOUR VARIOUS K-LO PROCESSING

11              MACHINES.  AN ANALYSIS OF DUST FROM THE

12              DUST COLLECTOR WAS ANALYZED BY THE

13              LABORATORY OF THE U.S. PUBLIC HEALTH

14              SERVICE AND WAS FOUND TO CONTAIN

15              13 PERCENT FREE SILICA AND 5 TO 12 PERCENT

16              ASBESTOS.  AS BOTH OF THESE MATERIALS HAVE

17              ABOUT THE SAME DEGREE OF TOXICITY AN

18              M.A.C. OF 20 MILLION WOULD BE PERMISSIBLE,

19              ASSUMING THE DUST BREATHED BY THE MEN TO

20              BE THE SAME AS THAT CAUGHT IN THE DUST

21              COLLECTOR."

22        NOW, IS YOUR REFERENCE TO THE U.S. PUBLIC

23  HEALTH SERVICE A REFERENCE TO MR. BYERS' ANALYSIS

24  THAT WE'VE JUST TALKED ABOUT?

25      A.    YES.

26      Q.    OKAY.  NOW, CAN YOU EXPLAIN -- WELL, WE

27  BETTER BACK UP FOR MR. HARRINGTON'S SAKE HERE.

28      MR. HARRINGTON:    YOU DON'T HAVE TO DO

1   ANYTHING FOR MY SAKE, COUNSEL.

2        MR. RILEY:    WE'LL SAVE SOME TIME.

3        MR. HARRINGTON:    I HAVE AN OBLIGATION TO

4   MAKE SURE THE QUESTIONS ARE LEGAL.    JUST SO THAT

5   THE WITNESS UNDERSTANDS THAT, AND YOU CAN GO AHEAD

6   AND ASK HIM ANY WAY YOU WANT.

7        MR. RILEY:

8        Q.    WHERE YOU WRITE, "AS BOTH OF THESE

9              MATERIALS HAVE ABOUT THE SAME DEGREE OF

10             TOXICITY, AN M.A.C. OF 20 MILLION WOULD BE

11             PERMISSIBLE, ASSUMING THE DUST BREATHED BY

12             THE MEN TO BE THE SAME AS THAT CAUGHT IN

13             THE DUST COLLECTOR."

14       THAT WAS YOUR CONCLUSION.    CORRECT, SIR?

15       A.    YES.

16       Q.    OKAY.  NOW, HOW DID YOU COME ABOUT THIS

17   CONCLUSION THAT THE M.A.C. OF 20 MILLION PARTICLES

18   WAS APPROPRIATE FOR THIS DUST FROM THE ALGOMA PLANT?

19       A.    THAT WAS BASED ON THE ANALYSIS OF THE

20   DUST THAT WE -- THE ANALYSIS WE GOT FROM THE PUBLIC

21   HEALTH SERVICE, WHICH MENTIONS 13 PERCENT FREE

22   SILICA AND SOMEWHERE BETWEEN 5 AND 12 PERCENT

23   ASBESTOS.

24       IF YOU TAKE THE UPPER LIMIT OF THE -- THE

25   UPPER READING OF ASBESTOS AT 12 PERCENT, THAT PLUS

26   THE 13 PERCENT FREE SILICA IS 25 PERCENT.  SO,

27   25 PERCENT OF THE DUST WAS QUOTE, TOXIC, END QUOTE,

28   DUST.

73

1        THEREFORE, IF 25 PERCENT WAS TOXIC MATERIAL,

2   THAT MEANS THAT YOU COULD UP THE LIMIT TO FOUR TIMES

3   THAT.  EACH, ASBESTOS AND SILICA, EACH HAVE A -- I

4   USE THE TERM "TOXIC LIMIT" INTERCHANGEABLY WITH

5   M.A.C. -- HAS AN M.A.C. OF FIVE PARTS PER MILLION.

6   AND THE TWO OF THEM COMBINED ONLY ADD TO 25 PERCENT

7   OF THE TOTAL SAMPLE.  YOU COULD, THEREFORE, USE FOUR

8   TIMES THE INDIVIDUAL M.A.C.

9        Q.    OKAY.  DID THE ESTABLISHMENT IN YOUR

10  MIND OF A 20 MILLION PARTICLE M.A.C. FOR THIS ALGOMA

11  DUST HAVE TO DO WITH THE FACT THAT ONLY 25 PERCENT

12  OF IT WAS ASBESTOS OR SILICA?

13       A.    ASBESTOS AND SILICA COMBINED -- OR LESS.

14  IF YOU NOTICE, HE SAYS 5 TO 12 PERCENT

15  ASBESTOS.  THAT WAS TAKING THE MAXIMUM READING OF

16  THE ASBESTOS.

17       Q.    AND YOU SAY 20 MILLION HERE.  WERE YOU

18  REFERRING TO 20 MILLION PARTICLES PER CUBIC FOOT OF

19  AIR?

20       A.    YES.  I WAS REFERRING TO THE STANDARD

21  MILLION PARTICLES PER CUBIC FOOT OF AIR.

22       Q.    SO THE UNITS OF MEASUREMENT WERE THE

23  SAME; CORRECT?

24       A.    CORRECT.

25       Q.    NOW DOES THIS M.A.C. FOR THE ALGOMA DUST

26  HAVE BUILT IN THE SAME TIME WEIGHTED AVERAGE ASPECT

27  OF IT AS WELL?

28       A.    YES.

1          THIS WOULD BE THE M.A.C. OR THE PERMISSIBLE
2    LIMIT FOR EIGHT HOURS A DAY --
3          Q.     OKAY.
4          A.     -- CONTINUOUS EXPOSURE.
5          Q.     OKAY.  AND IF YOU FOUND ANY PARTICULAR
6    LOCATION IN THE PLANT WHERE THE EXPOSURE FOR A BRIEF
7    PERIOD OF TIME WAS IN EXCESS OF 20 MILLION
8    PARTICLES, WOULD THAT MEAN THAT IT NECESSARILY WAS
9    OR WAS NOT IN EXCESS OF THE M.A.C.?
10         A.     WE'D GO BACK TO THE TIME WEIGHTED
11   EXPOSURE.  WE'D CONSIDER THE AMOUNT OF TIME THE MAN
12   WAS IN THE HIGHER EXPOSURE AND THE AMOUNT OF TIME
13   THAT THE MAN WAS IN THE LOWER EXPOSURE, AND WORK
14   OUT --
15         Q.     OKAY.
16         A.     -- AND DETERMINE WHETHER IT WAS IN THE
17   HAZARDOUS RANGE OR NOT.
18         Q.     IF THE EXPOSURE TO SOME LEVEL ABOVE THE
19   20 MILLION PARTICLE M.A.C. WAS FOR LESS THAN EIGHT
20   HOURS A DAY, THEN THAT WOULDN'T NECESSARILY MEAN
21   THAT IT WAS IN EXCESS?  HOW DOES THAT WORK?
22         LET ME STRIKE THAT QUESTION.  I THINK THAT WAS
23   A POORLY PHRASED QUESTION.
24         I GUESS WHAT I'M TRYING TO FIGURE OUT IS THIS:
25   IF IN THE ALGOMA PLANT THERE WAS AN EXPOSURE FOR A
26   SHORT PERIOD OF TIME TO SOME LEVEL IN EXCESS OF
27   20 MILLION PARTICLES AND EXPOSURE FOR A MUCH LONGER
28   PERIOD OF TIME TO A LEVEL BELOW THE 20 MILLION

1    PARTICLE M.A.C., WHAT DOES THAT INDICATE WITH

2    RESPECT TO WHETHER OR NOT EXPOSURE IS ABOVE OR BELOW

3    THE M.A.C. ON A TIME WEIGHTED AVERAGE BASIS?

4         A.    WE WOULD TAKE INTO ACCOUNT THE AMOUNT OF

5    TIME AT EACH EXPOSURE AND COME UP WITH A NUMBER THAT

6    AVERAGED OUT THE EXPOSURES --

7         Q.    OKAY.

8         A.    -- BASED ON THE TIME AT EACH EXPOSURE.

9         Q.    MR. FLUCK, IT'S MY UNDERSTANDING, YOU

10   CORRECT ME IF I'M WRONG, PLEASE, THAT THE FOCUS OF

11   THE WORK OF THE INDUSTRIAL HYGIENE UNIT OF THE

12   WISCONSIN STATE BOARD OF HEALTH WAS HEALTH AND

13   SAFETY IN WORK PLACE?

14        A.    YES.

15        Q.    DID THE STATE BOARD OF HEALTH WHILE YOU

16   WERE THERE FUNCTION INDEPENDENTLY OF OUTSIDE

17   INTERESTS?

18        MR. BURGI:    I'M GOING TO OBJECT TO THE

19   QUESTION ON THE GROUNDS IT CALLS FOR SPECULATION.

20        MR. RILEY:    ALL RIGHT.  I DON'T WANT YOU TO

21   SPECULATE.  I WANT YOU TO TELL ME BASED ON YOUR

22   EXPERIENCE --

23        A.    YES.

24        Q.    -- WHETHER OR NOT THERE WERE OUTSIDE

25   INFLUENCES --

26        A.    NO.

27        Q.    -- ON YOUR WORK FOR THE STATE BOARD OF

28   HEALTH?

1       A.      WE WERE VERY DEFINITELY INDEPENDENT.

2   THAT WAS OUR PRIDE.  THAT'S THE THING WE CHERISHED,

3   WAS BEING INDEPENDENT OF ANY OTHER OUTSIDE SOURCES.

4       Q.      WHILE YOU WERE WORKING THERE DID YOU

5   FEEL YOURSELF ~~BEHOLDING~~ *BEHOLDEN (sic)* TO ANY MANUFACTURING

6   INTERESTS?

7       A.      WE WEREN'T ~~BEHOLDING~~ *BEHOLDEN (sic)* TO MANUFACTURING OR

8   TO LABOR OR ANYBODY ELSE.  WE CAME UP WITH THE FACTS

9   AS WE SAW THEM.

10      Q.      DID YOU WORK HARD AT YOUR JOB, SIR?

11      A.      YES.

12      Q.      DID YOU TAKE IT SERIOUSLY?

13      A.      I CERTAINLY DID.

14      Q.      DID YOU TRY TO KEEP CURRENT WITH THE

15  LITERATURE IN THE AREA OF INDUSTRIAL HYGIENE?

16      A.      YES.

17      Q.      AT ANY TIME DURING YOUR WORK AT THE

18  ALGOMA PLANT DID YOU FIND ANY EVIDENCE THAT THE

19  WORKERS THERE WERE AT RISK OF DEVELOPING ASBESTOS

20  RELATED DISEASE?

21      MR. BURGI:      I OBJECT TO THE QUESTION ON THE

22  GROUNDS IT LACKS FOUNDATION WITH RESPECT TO HOW ANY

23  OF THESE STUDIES ARE RELATED TO THAT QUESTION.

24      MR. HARRINGTON:      I'LL JOIN IN THE OBJECTION.

25      MR. RILEY:      YOU GO AHEAD AND ANSWER MY

26  QUESTION, PLEASE.

27      WOULD YOU READ IT, READ THE QUESTION, PLEASE?

28  / /

77

1          (RECORD READ.)

2

3      THE WITNESS:     NO.

4      MR. RILEY:

5      Q.     WHAT DID YOU CONCLUDE ABOUT PLANT SAFETY

6  AT THE ALGOMA PLANT WITH RESPECT TO ASBESTOS, BASED

7  ON YOUR WORK THERE?

8      MR. BURGI:     SAME OBJECTION.

9      THE WITNESS:     IT WAS VERY GOOD.

10     MR. RILEY:

11     Q.     OKAY.  I HAVE NO FURTHER QUESTIONS.

12 THANK YOU, MR. FLUCK.

13     MR. BURGI:     IT IS NOW 12:00.  WOULD THIS BE

14 AN APPROPRIATE TIME FOR A BREAK?

15     MR. RILEY:     LET'S GO OFF THE RECORD.

16          (RECESS TAKEN.)

17

18                    EXAMINATION

19 BY MR. HARRINGTON:

20     Q.     MR. FLUCK, I WANT TO THANK YOU, ALSO,

21 FOR ALLOWING US TO COME INTO YOUR HOME FOR THESE

22 PROCEEDINGS.  IT WAS GRACIOUS OF YOU, AND WE

23 APPRECIATE THAT.

24     YOU'VE MENTIONED SOME RECOMMENDATIONS DURING

25 THE TESTIMONY THAT YOU GAVE IN RESPONSE TO

26 MR. RILEY'S QUESTIONS, RECOMMENDATIONS THAT YOU MADE

27 TO THE EMPLOYER OF MR. BRANDT AT ALGOMA -- CORRECT?

28 -- CONCERNING DUST CONTROL MEASURES?

78

1      A.      I MADE RECOMMENDATIONS TO THAT COMPANY.

2  I DON'T KNOW, I DON'T KNOW MR. BRANDT.

3      Q.      OKAY.  YOU MADE RECOMMENDATIONS, AND YOU

4  IDENTIFIED THEM IN YOUR PRIOR TESTIMONY CONCERNING

5  ADDITIONAL MEASURES TO CONTROL DUST WHICH MAY

6  CONTAIN ASBESTOS FIBERS AT ALGOMA.  IS THAT CORRECT,

7  SIR?

8      A.      YES.

9      Q.      LET ME JUST ASK YOU WHEN YOU WENT TO

10 ALGOMA, YOU WERE INVITED THERE BY THE EMPLOYER; IS

11 THAT CORRECT?

12     A.      APPARENTLY.  I'M NOT SURE.  I HAVEN'T

13 SEEN -- I DON'T REMEMBER, AND I HAVEN'T SEEN

14 ANYTHING THAT INDICATES HOW THE STUDY STARTED.

15     Q.      DO YOU RECALL WHETHER THE STATE

16 DEPARTMENT OF HEALTH, INDUSTRIAL HYGIENE UNIT, AT

17 THE TIME YOU WERE EMPLOYED BY IT HAD THE AUTHORITY

18 UNDER ANY PROVISION OF WISCONSIN LAW TO FORCE THEIR

19 WAY INTO A PLANT TO TAKE DUST STUDIES?

20     A.      NO.  WE DID NOT HAVE THAT AUTHORITY.

21     WE WENT ON INVITATION OR WE MIGHT REQUEST, BUT

22 OUR REQUEST HAD TO BE ACCEPTED.  WE HAD NO AUTHORITY

23 TO GO INTO THE PLANT.

24     Q.      SO YOU HAD TO RELY ON THE COOPERATION OF

25 THE EMPLOYER OR THE PLANT MANAGEMENT?

26     A.      YES.

27     Q.      OKAY.  AND WITH REGARD TO THE

28 RECOMMENDATIONS THAT YOU'VE TESTIFIED YOU MADE TO

1   THE ALGOMA PLANT MANAGEMENT, DID YOU HAVE ANY

2   AUTHORITY TO FORCE THEM TO DO THOSE THINGS?

3        A.      NO, WE DID NOT.

4        WE HAD -- WE COULD ONLY RECOMMEND.  WE COULD

5   PRESENT THE DATA AND RECOMMEND.  WE HAD NO

6   ENFORCEMENT AUTHORITY.

7        Q.      OKAY.  SO ONCE AGAIN, YOU WERE IN A

8   SITUATION WHERE YOU HAD TO RELY ON THE PLANT

9   MANAGEMENT AUTHORITIES TO FOLLOW THROUGH ON YOUR

10  RECOMMENDATIONS; IS THAT RIGHT?

11       A.      YES.

12       Q.      BECAUSE YOU COULD ONLY RECOMMEND THINGS

13  TO THE EMPLOYER, IT WAS ONLY THE EMPLOYER THROUGH

14  THE DUST CONTROL DEVICES AND METHODS WHICH YOU MIGHT

15  RECOMMEND OR OTHER INDUSTRIAL, PROFESSIONAL

16  INDUSTRIAL HYGIENISTS FROM THE STATE MAY RECOMMEND

17  TO THEM, THAT COULD INSURE THAT THE EMPLOYEES'

18  EXPOSURE TO ASBESTOS DUST IN THAT PLANT WAS WITHIN

19  THE RECOGNIZED SAFE LEVELS; IS THAT RIGHT?

20       A.      WELL, WE HAD NO AUTHORITY TO -- NO

21  ENFORCEMENT AUTHORITY.  BUT THERE COULD BE PRESSURE

22  PUT ON BY OTHER PERSONS.

23       Q.      OKAY.  IN THE LAST ANALYSIS, IT WAS

24  REALLY THE EMPLOYER THAT CONTROLLED, THROUGH

25  INITIATING EFFECTIVE DUST CONTROL MEASURES --

26       A.      YES.

27       Q.      -- AND THE EMPLOYEES' LEVEL OF EXPOSURE

28  TO ASBESTOS?

80

1      A.      YES.

2      Q.      AND IT WAS THE EMPLOYER, THROUGH

3   FOLLOW-THROUGH ON RECOMMENDATIONS FROM PROFESSIONALS

4   LIKE YOURSELF AND OTHER PEOPLE IN YOUR DEPARTMENT,

5   WHO COULD ULTIMATELY KEEP THE EMPLOYEES' LEVEL OF

6   EXPOSURE TO ASBESTOS FIBERS WITHIN THE RECOGNIZED

7   SAFE LIMITS, T.L.V., IS THAT RIGHT?

8      MR. BURGI:      I OBJECT TO THE QUESTION ON THE

9   GROUNDS IT LACKS FOUNDATION, IMPROPERLY STATES PRIOR

10  TESTIMONY, AND IS VAGUE AND AMBIGUOUS.

11     MR. HARRINGTON:      ALL RIGHT.

12     THE WITNESS:      SHOULD I ANSWER THE QUESTION?

13     MR. HARRINGTON:

14     Q.      I'LL TRY AND REPHRASE IT, SIR.

15     MR. BURGI:      ALSO, IT CALLS FOR SPECULATION.

16     MR. HARRINGTON:

17     Q.      TO YOUR KNOWLEDGE, SINCE YOUR DEPARTMENT

18  DID NOT HAVE THE AUTHORITY TO FORCE AN EMPLOYER TO

19  INITIATE DUST CONTROL MEASURES TO KEEP THE LEVELS OF

20  ASBESTOS FIBERS WITHIN RECOGNIZED SAFE LIMITS, WAS

21  THERE ANYONE ELSE WHO COULD DO THAT SORT OF THING.

22     MR. BURGI:      OBJECTION, WITH RESPECT TO THE

23  FACT IT CALLS FOR SPECULATION.

24     THE WITNESS:      I CAN ANSWER THAT WITHOUT

25  SPECULATING.

26       THERE ARE OTHER AGENCIES INVOLVED, YES.  I

27  BELIEVE EVERY STATE HAS A LABOR DEPARTMENT OR

28  INDUSTRIAL COMMISSION OR SOME OTHER AGENCY INVOLVED

81

1    PRIMARILY IN SAFETY INSPECTIONS.  IT MAKES ROUTINE

2    INSPECTIONS.  AND THEY COULD INCLUDE EXCESSIVE DUST,

3    IF THAT WERE THERE; THEY COULD INCLUDE THAT IN THEIR

4    INSPECTIONS, AND REQUIRE -- ISSUE AN ORDER FOR

5    CONTROL.

6         I'M NOT -- I DON'T KNOW WHETHER THAT EVER

7    HAPPENED HERE, BUT THERE ARE OTHER AGENCIES WHO HAVE

8    CONTROL OR ENFORCEMENT AUTHORITY.

9         Q.    OKAY.  BUT CONTROL MUST START WITH THE

10   PLANT MANAGEMENT?

11        A.    WELL, YES.

12        Q.    AND IF PLANT MANAGEMENT ISN'T DOING

13   THEIR JOB, THEN THE OTHER AGENCIES MAY, WITH

14   APPROPRIATE REGULATORY AUTHORITY, MAY COME IN AND

15   TAKE APPROPRIATE MEASURES?

16        A.    YES.  THERE ARE REGULATORY AGENCIES.

17        MR. BURGI:    SAME OBJECTION TO THIS LINE OF

18   QUESTIONING ON THE GROUNDS IT CALLS FOR SPECULATION.

19        MR. HARRINGTON:

20        Q.    WERE YOU A MEMBER OF THE A.C.G.I.H.

21   YOURSELF?

22        A.    YES.

23        Q.    OKAY.  FROM WHAT YEARS WERE YOU A

24   MEMBER, SIR?

25        A.    FROM 1937 TILL TODAY.  I AM NOW AN

26   EMERITUS MEMBER.

27        Q.    WAS DR. BREHM FROM WISCONSIN ALSO A

28   MEMBER?

82

1      A.    YES, HE WAS.  HE WAS TWICE CHAIRMAN OF

2 THE ORGANIZATION.

3      Q.    SO WISCONSIN WAS WELL REPRESENTED IN THE

4 EARLY YEARS OF THE A.C.G.I.H.?

5      A.    YES.

6      MR. BURGI:    I OBJECT TO THE QUESTION ON THE

7 GROUNDS IT CALLS FOR SPECULATION.

8      MR. HARRINGTON:

9      Q.    DO YOU KNOW, SIR, WHEN THE FIRST MAXIMUM

10 ACCEPTABLE CONCENTRATIONS FOR DANGEROUS SUBSTANCES

11 WERE PREPARED?

12      MR. RILEY:    DID YOU MEAN TO MESS UP THE

13 PHRASE?  SO FAR IT'S BEEN REFERRED TO AS MAXIMUM

14 ALLOWABLE CONCENTRATIONS.

15      MR. HARRINGTON:    I DIDN'T MEAN TO MESS IT

16 UP.

17      MR. RILEY:    OKAY.

18      MR. HARRINGTON:

19      Q.    DO YOU KNOW WHEN THE FIRST MAXIMUM

20 ALLOWABLE CONCENTRATIONS FOR DANGEROUS SUBSTANCES

21 OCCURRED?

22      MR. BURGI:    OBJECT ON THE GROUNDS IT'S

23 VAGUE AND AMBIGUOUS.

24      MR. RILEY:    I'LL OBJECT TO THE PHRASE

25 "DANGEROUS SUBSTANCES," AS WELL.

26      MR. BURGI:    IT'S VERY BROAD.

27      THE WITNESS:    THERE HAVE BEEN MAXIMUM

28 ALLOWABLE CONCENTRATIONS SINCE PROBABLY 1915 OR '20,

1   BUT THERE WAS NEVER A COMPREHENSIVE LIST OF THEM

2   UNTIL THE TIME OF OR SLIGHTLY AFTER THIS 1937

3   SYMPOSIUM OR COURSE OR WHATEVER ONE CHOOSES TO CALL

4   IT THAT THE PUBLIC HEALTH SERVICE HAD.

5        THERE WERE SCATTERED LISTS, AS BUREAU

6   STANDARDS HAD PERHAPS TWENTY.  SOME STATES MIGHT PUT

7   OUT FIVE OR TEN OR FIFTEEN, BUT THERE WAS NOT A

8   COMPREHENSIVE LIST UNTIL THE MID '30'S, LATE '30'S.

9        MR. HARRINGTON:

10       Q.    THE COMPREHENSIVE LIST THAT YOU REFERRED

11   TO --

12       A.    I MEAN MORE THAN JUST ONE OR TWO

13   SUBSTANCES.  THERE ARE HALF A DOZEN SUBSTANCES.

14       Q.    THE COMPREHENSIVE LIST THAT YOU REFERRED

15   TO, SIR, DO YOU KNOW WHETHER THAT LIST CONTAINED

16   MAXIMUM ALLOWABLE CONCENTRATIONS FOR ASBESTOS

17   FIBERS?

18       A.    IT DOES NOW, IT HAS FOR MANY YEARS,  BUT

19   I DON'T KNOW WHEN, I DON'T KNOW WHEN IT WAS FIRST

20   ESTABLISHED.

21       WELL, IT -- OBVIOUSLY, IT WAS THERE IN '48 OR

22   '49 WHEN I MADE MY STUDY.  THAT MUCH I COULD SAY,

23   BECAUSE THAT'S WHAT I USED.

24       Q.    WAS THAT A STANDARD ESTABLISHED BY THE

25   SUBCOMMITTEE ON THRESHOLD LIMITS OF THE A.C.G.I.H.?

26       A.    YES.

27       Q.    WE'VE ESTABLISHED THAT WAS 5.0 MILLION

28   PARTICLES PER CUBIC FOOT?

84

1      A.      YES.

2      Q.      THAT WAS FOR ASBESTOS; CORRECT?

3      A.      CORRECT.

4      Q.      DID THAT STANDARD, SIR, AS FAR AS BASED

5  UPON YOUR KNOWLEDGE AND EXPERIENCE AS AN INDUSTRIAL

6  HYGIENIST AND A MEMBER OF THE A.C.G.I.H. AT THE

7  TIME, COMPRISE A CONCENSUS OPINION OF INDUSTRIAL

8  HYGIENISTS IN THIS COUNTRY CONCERNING RECOGNIZED

9  SAFE LEVELS FOR ASBESTOS?

10      A.      VERY DEFINITELY.  YES.

11      Q.      WAS THE M.A.C. FOR ASBESTOS FIBER

12  PUBLISHED IN VARIOUS MEDICAL AND TRADE PUBLICATIONS

13  AT ABOUT THAT TIME?

14      MR. BURGI:      OBJECT TO THE QUESTION AS VAGUE.

15      THE WITNESS:      IT WAS PUBLISHED, YES.  IT'S

16  PUBLISHED ANNUALLY IN THE PROCEEDINGS OF THE

17  AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL

18  HYGIENISTS, AND THAT OF COURSE IS COPIED IN MANY OF

19  THE PROFESSIONAL JOURNALS THAT APPLY TO THE

20  INDUSTRIAL HYGIENE AND INDUSTRIAL MEDICINE AND

21  RELATED PROFESSIONS.

22      MR. HARRINGTON:

23      Q.      OKAY.  JUST SO I CAN SATISFY THE

24  OBJECTION, I'M GOING TO REPHRASE THAT QUESTION.

25      TO YOUR KNOWLEDGE, SIR, IN WHAT PUBLICATIONS

26  WAS THE MAXIMUM ALLOWABLE CONCENTRATION FOR ASBESTOS

27  FIBERS PUBLISHED SINCE THE ENACTMENT AS WE'VE

28  DESCRIBED BY THE A.C.G.I.H.?

1     A.     IN THEIR OWN PUBLICATION, IS THE ONE I'M

2  SURE OF.  OTHER THAN THAT, I DON'T REALLY KNOW.  BUT

3  THEY PUT OUT THEIR OWN LISTING, AND I'M FAIRLY

4  CERTAIN THAT IT'S PUBLISHED IN THE JOURNAL OF

5  INDUSTRIAL HYGIENE TOXICOLOGY.

6     IT'S PUBLISHED IN PROFESSIONAL SAFETY-TYPE

7  JOURNALS.  THAT I KNOW, BECAUSE I'VE SEEN IT.  I

8  CAN'T GIVE YOU THE NAMES OF THESE BECAUSE I'VE

9  FORGOTTEN THE NAMES.

10     Q.     GO AHEAD.  I DIDN'T WANT YOU TO -- IF

11  YOU WERE --

12     A.     I'M JUST DREDGING BACK IN MY MEMORY.

13     Q.     OKAY.  WE'RE USING THE TERM FOR THE

14  EARLY YEARS "MAXIMUM ALLOWABLE CONCENTRATIONS"?

15     A.     YES.

16     Q.     THERE IS ALSO A TERM THAT'S USED LATER

17  ON CALLED "THRESHOLD LIMIT VALUE"?

18     A.     YES.

19     Q.     ARE THOSE THE SAME THINGS?

20     A.     ESSENTIALLY, YES.

21     IT WAS -- FOR MANY YEARS IT WAS REALIZED THE

22  TERM MAXIMUM ALLOWABLE CONCENTRATION DID NOT GIVE A

23  PROPER MEANING TO IT.  IT'S NOT THE MAXIMUM

24  ALLOWABLE CONCENTRATION, IT'S A GUIDELINE.

25     AND THE TERM THRESHOLD LIMIT WAS CONSIDERED A

26  MORE MEANINGFUL TERM BECAUSE IT'S NOT A MAXIMUM

27  ALLOWABLE CONCENTRATION.  THRESHOLD LIMIT MEANS

28  SOMETHING YOU AIM AT.

1    Q.    BUT JUST --

2    A.    THAT IS THE SAME THING.  THE NUMBERS ARE

3  THE SAME.  THE NUMBERS ARE TRANSPOSABLE FROM ONE TO

4  THE OTHER.

5    Q.    THE FACT IS THAT LATER, M.A.C.'S BEGAN

6  BEING REFERRED TO AS T.L.V.'S?

7    A.    CORRECT.

8    Q.    OKAY.  BASED UPON YOUR EXPERIENCE IN THE

9  EARLY YEARS AS BEING ONE OF THE VERY EARLY

10  CONTRIBUTORS AND FOUNDING PROFESSIONALS OF THE

11  A.C.G.I.H., DO YOU KNOW UPON WHAT INFORMATION THE

12  MAXIMUM ALLOWABLE CONCENTRATIONS THAT WERE

13  ESTABLISHED BY THAT GROUP WERE BASED UPON?

14    MR. BURGI:    I'M GOING TO OBJECT TO THE

15  QUESTION ON THE GROUNDS IT STATES FACTS THAT ARE NOT

16  IN EVIDENCE AND MISSTATES PRIOR TESTIMONY.

17    MR. HARRINGTON:    IN WHAT REGARD?

18    MR. BURGI:    YOU SAID HE WAS ONE OF THE

19  FOUNDING -- I UNDERSTAND HE WAS AN EARLY MEMBER, BUT

20  I DON'T RECALL ANY TESTIMONY THAT HE FOUNDED THE

21  ORGANIZATION.

22    MR. HARRINGTON:    THAT'S OBJECTIONABLE.  I'LL

23  REPHRASE THE QUESTION.

24    Q.    BASED UPON YOUR EXPERIENCE AND KNOWLEDGE

25  AS ONE OF THE EARLY MEMBERS OF THE A.C.G.I.H., DO

26  YOU KNOW UPON WHAT INFORMATION THE MAXIMUM ALLOWABLE

27  CONCENTRATIONS THAT WERE SET BY THAT ORGANIZATION,

28  WHAT GENERIC TYPES OF INFORMATION THOSE WERE BASED

1   ON?

2       A.      THE GROUP THAT MADE THIS DETERMINATION

3   REVIEWED EVERY PIECE OF LITERATURE AVAILABLE TO IT.

4   AND BELIEVE ME, THEY MADE IT A VERY, VERY THOROUGH

5   REVIEW.  EVERY PUBLISHED STUDY THERE WAS IN ANY

6   JOURNAL WHATSOEVER, WHETHER IT IS THE JOURNAL OF NEW

7   ENGLAND MEDICINE, THE GERMAN PUBLICATIONS, THE

8   RUSSIANS, EVERYBODY ELSE, THEY REVIEWED EVERYTHING

9   THAT WAS AVAILABLE.  THEN THEY CONFERRED WITH OTHER

10  EXPERTS IN THE FIELD AND CAME UP WITH A CONSENSUS

11  OPINION THAT WAS BASED ON THE BEST AVAILABLE

12  KNOWLEDGE AT THE TIME.  THE TOP BRAINS AND ALL THE

13  LITERATURE THAT WAS AVAILABLE.

14      Q.      DO YOU RECALL, SIR, WHETHER OR NOT THAT

15  LITERATURE AND THOSE STUDIES WHICH YOU HAVE REFERRED

16  TO AS BEING AVAILABLE AT THE TIME INCLUDED

17  TOXICOLOGICAL STUDIES ON ANIMALS?

18      A.      THERE WERE MANY PEOPLE DOING

19  TOXICOLOGICAL STUDIES ON ANIMALS, YES.

20      THE PUBLIC HEALTH SERVICE DID IT, THERE WERE

21  VARIOUS RESEARCH GROUPS, MEDICAL ORGANIZATIONS --

22  PROBABLY JOHNS-HOPKINS, HARVARD, YALE -- ALL OF

23  THESE PEOPLE, PLUS PROBABLY PRIVATE ORGANIZATIONS

24  WERE DOING TOXICOLOGICAL RESEARCH.  THEY HAVE BEEN

25  FOR YEARS, AND IT WAS INCREASED AFTER THE EMPHASIS

26  ON INDUSTRIAL HYGIENE.

27      YES.  TOXICOLOGICAL RESEARCH INCLUDING

28  ANIMALS.

88

1      Q.      DO YOU RECALL THAT TOXICOLOGICAL

2    RESEARCH INCLUDING STUDIES PERTAINING TO ASBESTOS

3    FIBERS?

4      A.      I DON'T RECALL A SPECIFIC ONE, NO.

5      Q.      YOU ARE NOT SAYING THAT DIDN'T HAPPEN,

6    YOU JUST DON'T HAVE A PRESENT --

7      A.      THAT'S RIGHT.

8      Q.      -- RECOLLECTION?

9       SIR, WAS IT ONE OF THE RESPONSIBILITIES OF THE

10   WISCONSIN DEPARTMENT OF HEALTH, INDUSTRIAL HYGIENE

11   DIVISION, IN THE 1940'S, WHEN YOU WERE EMPLOYED WITH

12   IT, TO ADVISE INDUSTRIES IN THE STATE ON HOW TO

13   PROTECT THEIR EMPLOYEES FROM POSSIBLE HARMFUL

14   SUBSTANCES THAT WOULD BE FOUND IN THE WORK PLACE?

15     A.      I DON'T UNDERSTAND JUST WHAT YOU MEAN BY

16   THAT.  COULD YOU CLARIFY IT A LITTLE BIT?

17     Q.      LET ME SEE IF I CAN REPHRASE THAT.

18      YOU WERE CONCERNED IN THE INDUSTRIAL HYGIENE

19   DEPARTMENT IN THE '40'S WITH, AND I BELIEVE YOU'VE

20   ALREADY TESTIFIED, LOCATING POTENTIAL HAZARDS IN THE

21   WORK PLACE AND RECOMMENDING TO THAT INDUSTRY METHODS

22   TO ELIMINATE OR DIMINISH A POTENTIAL HAZARD?

23     A.      YES.

24     Q.      AND THAT WAS REALLY SORT OF AN

25   EDUCATIONAL PROCESS THAT YOU WOULD GO THROUGH WITH

26   THE PARTICULAR INDUSTRY, WASN'T IT?

27     A.      YES.

28     Q.      IT WAS A TRANSMITTAL OF INFORMATION FROM

89

1   THE PROFESSIONALS AT THE DEPARTMENT OF INDUSTRIAL

2   HYGIENE TO THOSE PEOPLE IN THAT PARTICULAR PLANT OR

3   INDUSTRY?

4       A.     RIGHT.

5       Q.     AND THAT'S WHAT YOU DID WITH THE ALGOMA

6   PLANT WHEN YOU WERE CONDUCTING THE STUDIES AND

7   TRANSMITTING THAT INFORMATION TO THEM; CORRECT?

8       A.     THAT'S RIGHT.

9       Q.     YOU WERE INFORMING THEM OF A POTENTIAL

10  HAZARD WHICH MAY EXIST TO THEIR EMPLOYEES FROM THE

11  WORK PLACE AND STUDYING THAT AND RECOMMENDING

12  CERTAIN ALTERNATIVE RECOMMENDATIONS?

13      MR. RILEY:     EXCUSE ME A SECOND.  I'M GOING

14  TO OBJECT TO THE FORM OF THAT QUESTION.  THAT JUST

15  -- THE SUGGESTION THAT HE TOLD THEM THAT THEY DID

16  HAVE A HAZARDOUS SITUATION ABSOLUTELY FLIES IN THE

17  FACE OF EVERYTHING THAT HE SAID TODAY.  THAT

18  MISSTATES THE PRIOR TESTIMONY.

19      MR. HARRINGTON:     THAT WAS NOT MY INTENT.

20  THAT WAS NOT MY INTENT OF PHRASING THE QUESTION THAT

21  WAY.

22      MR. BURGI:     WAS THERE SOME OBJECTION TO THE

23  QUESTION OTHER THAN THE MANNER?

24      MR. RILEY:     I OBJECT TO THE FORM OF THE

25  QUESTION, BECAUSE IT MISSTATES PRIOR TESTIMONY.  IT

26  SNEAKS IT IN -- NOT INTENTIONALLY -- IT'S PUT IN AS

27  A PREDICATE TO A DIFFERENT QUESTION, KIND OF A

28  BEATING-YOUR-WIFE QUESTION.  IT WAS IMPLICIT, AND

1    THE WITNESS HAD NO OPPORTUNITY IN ANSWERING THE

2    QUESTION AS PHRASED TO POINT THAT OUT.

3        MR. BURGI:    I DON'T SEE IT, BUT --

4        MR. HARRINGTON:    LET'S GO ABOUT THIS ANOTHER

5    WAY.

6        Q.    WHEN YOU LEARNED THAT ASBESTOS FIBERS

7    WERE BEING USED AT THE ALGOMA PLANT, THAT RAISED AT

8    LEAST A POTENTIAL HAZARD OR THE QUESTION OF A

9    POTENTIAL HAZARD TO THOSE EMPLOYEES AT THAT PLANT;

10   IS THAT CORRECT?

11       A.    POTENTIAL, YES.

12       Q.    AND YOU COMMUNICATED THAT FACT TO THE

13   MANAGEMENT AT ALGOMA?

14       A.    I DON'T KNOW BUT WHAT THEY KNEW ABOUT IT

15   BEFORE WE DID, BECAUSE I DO NOT -- I CAN'T RECALL

16   HOW -- WHAT INSTIGATED THE STUDY.

17       IT COULD -- VERY LIKELY IT'S THAT THEY KNEW OF

18   A POTENTIAL, POTENTIAL HAZARD, AND ASKED US TO COME

19   IN.  I'M 99 PERCENT CERTAIN THAT'S WHAT HAPPENED.

20   THAT'S THE WAY MOST OF OUR STUDIES WERE MADE.

21       SO, WE DIDN'T GO TO THEM AND SAY "YOU HAVE A

22   POTENTIAL HAZARD, WE WANT TO EXPLORE IT."

23       Q.    I UNDERSTAND YOUR TESTIMONY, AND THAT'S

24   FINE.

25       WHAT YOU ARE SAYING IS REALLY YOU THINK THAT

26   THEY WERE IN TERMS OF THEIR PARTICULAR PLANT, WERE

27   AHEAD OF YOU IN RECOGNIZING A POTENTIAL HAZARD IN

28   THEIR PLANT; IS THAT CORRECT?

1      A.      YES.

2      Q.      AND THEN THEY CALLED YOU IN TO ASSIST

3  THEM IN STUDYING THE PROBLEM?

4      A.      THAT'S WHAT I THINK.  THAT'S THE BEST OF

5  MY RECOLLECTION AS TO THE ORIGIN OF THE STUDY.

6      Q.      DO YOU HAVE ANY KNOWLEDGE, SIR, AS TO

7  WHETHER SUCH STUDIES OR INVITATIONS TO THE

8  DEPARTMENT OF HEALTH, INDUSTRIAL HYGIENE DIVISION,

9  WERE MADE BY THE ALGOMA PLANT AFTER YOU LEFT?

10      A.      I HAVE NO FIRST-HAND KNOWLEDGE OF THAT,

11  NO.

12      Q.      SO THAT WOULD BE AFTER I THINK IT WAS

13  DECEMBER OF '49 YOU SAID YOU LEFT THE DEPARTMENT?

14      A.      THAT'S RIGHT.

15      Q.      AND YOU HAVE NO FIRST-HAND KNOWLEDGE

16  THERE?

17      A.      NO, I DO NOT.

18      Q.      HAVE YOU HEARD ANYTHING ABOUT IT FROM

19  ANYONE ELSE?

20      A.      YES.  I'VE HEARD THAT THERE ARE STUDIES

21  MADE AFTER I LEFT.

22      Q.      CAN YOU TELL ME WHEN THEY WERE MADE?

23      A.      NO.

24      Q.      DO YOU KNOW WHO MADE THEM?

25      A.      WHOEVER WAS AT THE INDUSTRIAL HYGIENE

26  UNIT AT THE TIME.

27      IT COULD HAVE BEEN -- THERE HAVE ONLY BEEN

28  THREE PEOPLE THERE SINCE ME THAT I KNOW -- WELL,

1    FOUR -- WELL, WHOEVER WAS THERE.   WILLIAM ~~LEAR~~, *LEA VE*

2    EDWARD OTTERSON, OR WALTER ~~POPPY~~ ARE THE ONLY NAMES *POPPE WS*

3    THAT I RECALL WHO HAVE BEEN THERE SINCE I HAVE.

4        I DON'T KNOW WHOSE THERE NOW.   I'VE LOST

5    CONTACT FIVE YEARS OR MORE AGO.

6        Q.    YOU DON'T RECALL WHAT YEARS THESE

7    STUDIES MAY HAVE OCCURRED?

8        A.    NO.

9        Q.    WERE YOU AT ANY TIME A MEMBER OF THE

10   INDUSTRIAL HYGIENE SECTION OF THE AMERICAN PUBLIC

11   HEALTH ASSOCIATION?

12       A.    FOR A VERY SHORT TIME.   I FOUND IT --

13   I'VE BEEN A MEMBER OF SO MANY ORGANIZATIONS, THAT

14   ONE DIDN'T SEEM WORTHWHILE.

15       Q.    OKAY.  DID YOU EVER ATTEND ANY ANNUAL

16   MEETINGS OF THAT ORGANIZATION?

17       A.    THE PUBLIC HEALTH ASSOCIATION?

18       Q.    YES.

19       A.    NO.

20       Q.    OKAY.

21       Q.    I TAKE IT FROM YOUR PRIOR TESTIMONY THAT

22   IT'S YOUR BELIEF THAT EXPOSURE TO AIRBORNE ASBESTOS

23   FIBERS BELOW THE MAXIMUM ALLOWABLE CONCENTRATION OR

24   THRESHOLD LIMIT VALUE IS SAFE?

25       MR. RILEY:   YOU'VE GOT THAT PHRASE IN THE

26   PRESENT TEST.  ARE YOU TALKING ABOUT HIS --

27       MR. HARRINGTON:

28       Q.    AT THE TIME THAT YOU MADE THE STUDIES AT

1    ALGOMA.

2        A.    THAT WAS MY CONCLUSION AT THAT TIME,

3    YES.

4        Q.    YOU WERE ALSO OF THE OPINION AT THE TIME

5    THAT IF ( E WERE EXPOSED TO LEVELS OF ASBESTOS

6    FIBERS ABOVE THE MAXIMUM ALLOWABLE CONCENTRATION

7    THAT COULD PRESENT A POTENTIAL HEALTH HAZARD --

8        MR. RILEY:    EXCUSE ME A SECOND.  I'M

9    GOING TO OBJECT TO THE FORM OF THE QUESTION.

10       I THINK IT'S VAGUE AND AMBIGUOUS, BECAUSE I

11   CAN'T TELL FROM YOUR QUESTION WHETHER YOU MEAN TO

12   INCLUDE IN THAT THE NOTICE OF TIME WEIGHTED AVERAGE,

13   WHETHER YOU MEAN A SINGLE EXPOSURE TO A LEVEL ABOVE

14   THE M.A.C., OR WHETHER YOU MEAN SOMETHING THAT ON A

15   TIME WEIGHTED AVERAGE BASIS IS ABOVE THE M.A.C.

16       AND BECAUSE OF THAT AMBIGUITY I WOULD OBJECT.

17   I THINK YOU CAN JUST CLARIFY IT AND ELIMINATE THE

18   PROBLEM.

19       MR. HARRINGTON:    I'M JUST ASKING IT IN A

20   GENERAL WAY, IN THE SIMPLEST TERMS POSSIBLE, SO THAT

21   IT'S THE MOST UNDERSTANDABLE.

22       MR. RILEY:    WELL, THE BASIS FOR MY OBJECTION

23   IS THAT I DON'T THINK THAT KIND OF A SIMPLIFICATION

24   MAKES ANYTHING CLEAR.  I THINK IT MAKES IT MUCH MORE

25   CONFUSING.

26       MR. HARRINGTON:    I THINK THAT THE WITNESS

27   CAN ELABORATE IN HIS ANSWER IF HE WANTS TO.

28       Q.    LET ME JUST ASK THE QUESTION OVER AGAIN,

1    AND THEN YOU CAN ANSWER, SIR.

2         YOU ALSO FELT AT THE TIME THAT YOU WERE DOING

3    THE STUDIES IN ALGOMA THAT EXPOSURES TO ASBESTOS

4    OVER THE THRESHOLD LIMIT VALUE COULD HAVE POTENTIAL

5    -- NOW I DID IT AGAIN, EXCUSE ME -- OVER THE MAXIMUM

6    ALLOWABLE CONCENTRATION, COULD HAVE A POTENTIAL

7    HEALTH HAZARD.

8         MR. RILEY:    I'M GOING TO MAKE THE SAME

9    OBJECTION, BECAUSE YOU HAVE NOT MADE IT CLEAR

10   WHETHER YOU MEAN TO INCLUDE THE TIME WEIGHTED

11   AVERAGE ASPECT INVOLVED THIS.

12        MR. HARRINGTON:

13        Q.    YOU CAN GO AHEAD AND ANSWER.

14        A.    I CAN GIVE A QUALIFIED ANSWER.

15   EXPOSURES TO LEVELS OVER THE M.A.C. FOR A PROLONGED

16   PERIOD OF TIME -- I MEAN AVERAGE EXPOSURES OVER THE

17   M.A.C. FOR A PROLONGED PERIOD OF TIME COULD POSSIBLY

18   RESULT IN ASBESTOSIS.

19        IT WOULD HAVE TO BE -- THEY WOULD NUMBER 1,

20   HAVE TO BE ABOVE THAT M.A.C., PROBABLY CONSIDERABLY

21   ABOVE.  BECAUSE REMEMBER, THERE ARE SAFETY FACTORS

22   BUILT INTO THESE M.A.C.'S.

23        IT HAS TO BE CONSIDERABLY ABOVE THE M.A.C.,

24   AND IT WOULD HAVE TO AVERAGE OUT, OR ON A TIME

25   WEIGHTED BASIS, BE ABOVE THE M.A.C.  SHORT-TERM

26   EXPOSURES OVER THAT LIMIT, EVEN QUITE A BIT ABOVE

27   THAT LIMIT, WOULD NOT, WOULD PROBABLY NOT RESULT IN

28   ASBESTOSIS.

1       Q.      THE FACT THAT EXPOSURES OVER THE M.A.C.
2    AS YOU DESCRIBED IN YOUR ANSWER MAY LEAD TO
3    POTENTIAL HEALTH HAZARD WAS SOMETHING WHICH WAS
4    KNOWN TO YOU AND OTHER INDUSTRIAL HYGIENISTS AT THE
5    TIME OF YOUR STUDIES AT ALGOMA; IS THAT CORRECT?
6       A.      YES.
7       MR. RILEY:      OBJECT TO THE FORM OF THE
8    QUESTION.
9       MR. HARRINGTON:      WAS THERE AN OBJECTION TO
10   THAT QUESTION?
11      MR. RILEY:      UH-HUH.   THE FORM OF THE
12   QUESTION.
13      MR. BURGI:      HE RESPONDED, AS WELL.
14      MR. HARRINGTON:      ALL RIGHT.
15       MAY I JUST HEAR THE QUESTION AGAIN SO THAT I
16   CAN SEE IF I WANT TO STICK WITH THAT PHRASING?
17                   (RECORD READ.)
18
19      MR. HARRINGTON:
20       Q.      WHAT WAS AT THE TIME THAT YOU WERE DOING
21   THE STUDIES AT ALGOMA THE EXTENT OF YOUR KNOWLEDGE
22   AND TO YOUR KNOWLEDGE OTHER INDUSTRIAL HYGIENISTS
23   WHO WERE A MEMBER OF THE MEMBERS OF THE A.C.G.I.H.
24   CONCERNING POSSIBLE HEALTH HAZARDS OF ASBESTOS
25   EXPOSURES OVER THE M.A.C.?
26      MR. RILEY:      JUST SO WE'RE CLEAR, DO YOU MEAN
27   OVER THE M.A.C. AS HE'S DESCRIBED IT FOR A PROLONGED
28   -- HE SAID CONSIDERABLY ABOVE THE M.A.C. FOR A

```
 1    PROLONGED PERIOD OF TIME, AVERAGED, ON A

 2    TIME-WEIGHTED AVERAGE BASIS?  IF THAT'S WHAT YOU

 3    MEAN AND THAT CAN BE OUR SHORTHAND, THAT'S FINE.

 4         IF THERE'S GOING TO BE SOME AMBIGUITY BECAUSE

 5    IT'S NOT REPEATED EACH TIME, THEN I WOULD OBJECT.

 6         MR. BURGI:    I'M SORRY.  I ALSO HAVE TO

 7    OBJECT IN THAT WE'VE NOT ESTABLISHED THAT ANY OTHER

 8    MEMBERS OF THE A.C.G.I.H. IN FACT SHARED HIS

 9    DESCRIPTION OF THE OTHER FACTORS IN ADDITION TO

10    BEING ABOVE THE T.L.V.

11         MR. HARRINGTON:

12         Q.    YOU CAN GO AHEAD AND ANSWER IF YOU CAN.

13         A.    THERE ARE STUDIES IN ASBESTOS USING

14    INDUSTRIES THAT SHOW THAT THERE IS SUCH A THING AS A

15    DISEASE CALLED ASBESTOSIS THAT OCCURRED TO A FEW

16    PEOPLE AT VERY HIGH CONCENTRATIONS OF ASBESTOS IN

17    THE AIR OVER VERY LONG PERIODS OF TIME.  THAT WAS

18    THE EXTENT OF OUR KNOWLEDGE.

19         THERE WAS SUCH A THING AS ASBESTOSIS -- WHICH

20    YOU'LL HAVE TO GET A DEFINITION FROM A DOCTOR,

21    THERE ARE STUDIES THAT DEFINE SUCH A DISEASE --

22    IN VERY SMALL, VERY LOW NUMBERS COMPARED TO

23    SOMETHING LIKE SILICOSIS.  BUT THERE WAS SUCH A

24    DISEASE, APPARENTLY, AS ASBESTOSIS.  THERE ARE

25    PUBLISHED STUDIES THAT SHOW THAT.

26         AND AS I RECALL, IN EVERY CASE THE

27    CONCENTRATIONS WERE VERY, VERY HIGH AND OVER LONG,

28    LONG PERIODS OF TIME.
```

1        Q.      AND THOSE STUDIES THAT YOU REFERRED TO

2   THAT TALKED ABOUT ASBESTOSIS WERE AVAILABLE IN

3   THE --

4        A.      YES.

5        Q.      -- '40'S?

6        A.      THEY WERE PUBLISHED IN THE STANDARD

7   JOURNALS.  THEY WERE VERY AVAILABLE TO EVERYBODY.

8        Q.      AT THE TIME YOU WERE PERFORMING YOUR

9   WORK AT ALGOMA?

10       A.      YES.

11       Q.      I THINK YOU ALREADY IDENTIFIED ONE OF

12  THOSE AS EXHIBIT ONE HERE TODAY?

13       MR. RILEY:    NO.  WAIT.  WAIT.  WAIT.  YOU'VE

14  JUST CHARACTERIZED EXHIBIT ONE IN A WAY -- THIS MAN

15  HASN'T TESTIFIED AT ALL WITH REGARDS TO THE

16  SUBSTANCE OF EXHIBIT ONE.

17       IF YOU TRY TO PUT IT INTO THAT PIGEONHOLE, I

18  THINK IT'S INAPPROPRIATE.  I OBJECT TO THAT.  HE

19  HADN'T DESCRIBED THAT ARTICLE IN THAT FASHION.

20       MR. HARRINGTON:

21       Q.      WELL, SIR YOU HAVE REFERRED TO SOME

22  ARTICLES AND STUDIES THAT WERE AVAILABLE AT THE

23  TIME, AND YOU PREVIOUSLY IDENTIFIED EXHIBIT NUMBER

24  ONE, WHICH IS A 1938 STUDY.

25       IS THAT ONE OF THE STUDIES THAT YOU WERE

26  REFERRING TO?

27       MR. RILEY:    REFERRING TO WHEN?  I JUST DON'T

28  UNDERSTAND.

1       MR. HARRINGTON:    AS BEING AVAILABLE AND

2   CONCERNING ASBESTOSIS AT ABOUT THE TIME THAT HE WAS

3   WORKING AT ALGOMA AS AN INDUSTRIAL HYGIENIST.

4       MR. RILEY:    THAT'S THE EXTENT OF YOUR

5   CHARACTERIZATION?

6       MR. HARRINGTON:    I'M ASKING HIM IF THAT WAS

7   ONE OF THE STUDIES THAT WAS AVAILABLE.

8       THE WITNESS:    THIS WAS AVAILABLE TO US AND

9   TO ALL INDUSTRIAL HYGIENISTS AND ANYONE ELSE

10  INTERESTED ON THE SUBJECT.  THIS IS A PUBLICATION OF

11  THE PUBLIC HEALTH -- IT'S A PUBLIC HEALTH BULLETIN

12  DONE BY THE PUBLIC HEALTH SERVICE BY THE NATIONAL

13  INSTITUTE OF HEALTH.  IT WAS AVAILABLE TO ALL OF US.

14      IN FACT, WE ALL RECEIVED COPIES.  EVERY

15  INDUSTRIAL HYGIENE UNIT RECEIVED COPIES.  IT'S

16  AVAILABLE TO SAFETY PEOPLE, IT WAS AVAILABLE TO

17  INDUSTRY IF THEY WERE INTERESTED, IT'S AVAILABLE TO

18  ANYBODY.  IT'S A GOVERNMENT PUBLICATION.  IT'S

19  AVAILABLE.

20      MR. HARRINGTON:

21      Q.    YOU WERE REFERRING TO EXHIBIT NUMBER

22  ONE; CORRECT?

23      A.    THE ONE I HAD IN MY HAND.  THAT'S

24  EXHIBIT --

25      MR. RILEY:    THAT'S ONE.

26      MR. HARRINGTON:    THAT'S ONE.

27      MR. RILEY:    OFF THE RECORD.

28      MR. HARRINGTON:    LET'S JUST SAY ON THE

1    RECORD THAT WE HAVE STIPULATED THAT WHAT THE WITNESS

2    WAS REFERRING TO WAS EXHIBIT NUMBER ONE.

3         MR. BURGI:    SO STIPULATED.

4         MR. HARRINGTON:

5         Q.    SIR, WOULD YOU REFER TO DETJIN EXHIBIT

6    NUMBER FOURTEEN AGAIN?

7         REFERRING TO THE FIRST ENTRY ON THE SECOND

8    PAGE, THE DUST COUNT --

9         A.    YES.

10        Q.    -- IT SAYS 40.5, AND I THINK THAT'S

11   MILLION PARTICLES PER CUBIC FOOT OF AIR?

12        A.    YES.

13        Q.    SIR, WAS THAT DUST COUNT, 40.5, AT THAT

14   LOCATION ON THAT DAY AS REFLECTED BY EXHIBIT NUMBER

15   FOURTEEN OVER OR UNDER THE MAXIMUM ALLOWABLE

16   CONCENTRATION FOR ASBESTOS FIBERS ESTABLISHED BY THE

17   A.C.G.I.H.?

18        MR. RILEY:    EXCUSE ME FOR A MOMENT.

19        I OBJECT TO THE FORM OF THE QUESTION.  I THINK

20   IT'S VAGUE AND AMBIGUOUS AS STATED.  IT'S AGAIN

21   UNCLEAR AS TO WHETHER YOU ARE TAKING INTO ACCOUNT

22   WHAT HE HAS TESTIFIED HE TOOK INTO ACCOUNT IN TERMS

23   OF TIME WEIGHTED AVERAGES AND THE DILUTED ASBESTOS

24   CONTENTS OF THE DUST, THE SAMPLES.  I DON'T THINK

25   IT'S A FAIR QUESTION AS PHRASED.

26        MR. HARRINGTON:

27        Q.    YOU CAN ANSWER.

28        MR. RILEY:    GO AHEAD AND ANSWER OVER THE

1    OBJECTION.

2         THE WITNESS:      IF ONE WERE EXPOSED TO THAT

3    CONCENTRATION FOR PROLONGED PERIODS, SUCH AS EIGHT

4    HOURS A DAY, IT WOULD BE OVER THE M.A.C.

5         MR. HARRINGTON:

6         Q.      WHAT ABOUT THE SECOND ENTRY ON THAT

7    PAGE?

8         A.      WOULD YOU REPEAT THAT, PLEASE?

9         Q.      WHAT ABOUT THE SECOND ENTRY ON THE SAME

10   PAGE OF EXHIBIT NUMBER FOURTEEN?  IS THAT OVER OR

11   UNDER?

12        MR. RILEY:      SAME OBJECTION.  IT'S VAGUE AND

13   AMBIGUOUS AS TO WHETHER YOU MEAN TO INCLUDE TIME

14   WEIGHTED AVERAGE AND THE DILUTION OF THE DUST COUNT.

15        THE WITNESS:      SHOULD I ANSWER THAT QUESTION?

16        MR. RILEY:    GO AHEAD.  YES, SIR.

17        THE WITNESS:      MY ANSWER IS THE SAME.

18        IF THAT WERE FOR EIGHT HOURS A DAY FOR A

19   LIFETIME, IT WOULD BE OVER THE M.A.C.

20        MR. HARRINGTON:

21        Q.      WITH REGARD TO --

22        A.      MAY I QUALIFY THAT?

23        NOT NECESSARILY.  AS WE GOT FURTHER

24   INFORMATION ABOUT THE CONTENT OF THE DUST, KNOWING

25   THAT IT'S ONLY A RELATIVELY LOW PERCENTAGE OF SILICA

26   AND ASBESTOS, THIS WOULD BE CONSIDERED A BORDERLINE

27   SITUATION, VERY DEFINITELY A BORDERLINE SITUATION.

28        Q.      YOU ARE REFERRING TO --

1      A.      EVEN IF IT WERE EIGHT HOURS A DAY FOR A
2  LIFETIME.
3      Q.      YOU ARE REFERRING TO THE SECOND ENTRY
4  THERE THAT MEASURED 25.1?
5      A.      CORRECT.
6      Q.      AND ONCE AGAIN, YOU RECOMMENDED TO THE
7  MANAGEMENT THERE THAT AS A RESULT OF THAT STUDY,
8  THAT THEY TAKE SOME MEASURES TO MODIFY BAGGING
9  EXHAUST HOODS IN ORDER TO LOWER THOSE LEVELS?
10     A.      YES.
11     Q.      WAS YOUR OPINION AT THE TIME THAT THOSE
12  LEVELS, ANY LEVEL THAT YOU FELT WAS BORDERLINE OR
13  ABOVE, COULD BE ADEQUATELY CONTROLLED IF THE
14  MANAGEMENT INSTITUTED THE DUST COLLECTION
15  RECOMMENDATIONS THAT YOU INDICATED?
16     MR. RILEY:      OBJECT TO THE FORM OF THE
17  QUESTION.
18     THE WITNESS:     ANY CONCENTRATION --
19     MR. BURGI:      I'LL JOIN.
20     THE WITNESS:      -- CAN BE CONTROLLED WITH
21  SUFFICIENT CONTROL TECHNIQUES, SUFFICIENT CONTROL
22  MEASURES.
23     MR. HARRINGTON:
24     Q.      LET ME REPHRASE THAT QUESTION TO SATISFY
25  THESE OBJECTIONS.
26         HOW COULD THOSE DUST LEVELS, THOSE THAT WE'VE
27  DISCUSSED, THE 40.5 AND THE 25.1 FROM EXHIBIT NUMBER
28  FOURTEEN, BE CONTROLLED?

102

1        MR. BURGI:     I'LL OBJECT.  CALLS FOR

2    SPECULATION.  INCOMPLETE HYPOTHETICAL, IF IT IS IN

3    FACT A HYPOTHETICAL.

4        MR. HARRINGTON:     I'M ASKING HIM FOR HIS

5    KNOWLEDGE IN THAT AREA.

6        MR. BURGI:     SAME OBJECTION.

7        THE WITNESS:     WITH IMPROVED EXHAUST

8    VENTILATION THOSE LEVELS COULD BE LOWERED.

9        MR. HARRINGTON:

10       Q.    AND THAT'S WHAT YOU TOLD ALGOMA TO DO;

11   CORRECT?

12       A.     THAT'S WHAT IT SAYS HERE.

13       MR. HARRINGTON:     OKAY.  I DON'T HAVE ANY

14   FURTHER QUESTIONS AT THIS TIME.  THANK YOU, SIR.

15       MR. BURGI:     I HAVE A FEW QUESTIONS FOR YOU.

16   I'M KIND OF PICKING UP LOOSE ENDS, SO I MIGHT LACK A

17   LITTLE BIT OF CONTINUITY, BUT I'LL DO MY BEST.

18

19                      EXAMINATION

20   BY MR. BURGI:

21       Q.     YOU MENTIONED THAT TO THE BEST OF YOUR

22   RECOLLECTION THE THREE WEEK CONFERENCE THAT YOU WENT

23   TO BEFORE STARTING YOUR ACTIVE DUTIES WITH WISCONSIN

24   PUBLIC HEALTH, DURING THAT PROGRAM YOU DON'T RECALL

25   THE DISCUSSION OF ASBESTOS EXPOSURE OR ASBESTOSIS;

26   IS THAT CORRECT?

27       A.     I CAN'T BE SURE.

28       Q.     WHEN IS THE FIRST OCCASION YOU BECAME

1    AWARE THAT EXPOSURE TO ASBESTOS POSED A POTENTIAL

2    HEALTH HAZARD?

3         MR. RILEY:    OBJECT TO THE FORM OF THE

4    QUESTION, UNLESS YOU FRAME IT IN TERMS OF DOSAGE.

5    THAT'S OVERLY BROAD.

6         THE WITNESS:    THAT'S TOO LONG AGO FOR ME TO

7    REMEMBER EXACTLY WHAT HAPPENED.

8         MR. BURGI:

9         Q.    SO YOU DO NOT RECALL THE FIRST OCCASION

10   THAT YOU HEARD THAT EXPOSURE TO ASBESTOS COULD POSE

11   A POTENTIAL HELTH HAZARD?

12        MR. RILEY:    AT ANY LEVEL?  THAT'S THE BASIS

13   FOR MY OBJECTION.

14        MR. BURGI:    AT ANY LEVEL.  YOU CAN'T QUALIFY

15   IT WITH RESPECT TO THE LEVEL, IT'S UP TO HIM.

16        MR. RILEY:    NOT IF THE QUESTION IS IMPROPER

17   IT ISN'T.

18        THE WITNESS:    I WOULD LIKE TO SAY --

19        MR. RILEY:    HE DOESN'T HAVE AN OBLIGATION TO

20   MAKE YOUR QUESTION A FAIR ONE BY ADDING INFORMATION

21   WHICH YOU INTENTIONALLY LEFT OUT.

22        THE WITNESS:    WITH 99 PERCENT CERTAINTY WE

23   LEARNED OF IT AT THAT CONFERENCE, BECAUSE WE WERE

24   HANDED OUT INFORMATION ON ALL THE KNOWN TOXIC

25   MATERIALS, AND WE WERE GIVEN A BOOK THAT THE PUBLIC

26   HEALTH SERVICE HAD PUBLISHED THAT HAD JUST ABOUT

27   EVERYTHING KNOWN ABOUT INDUSTRIAL HYGIENE IN IT.

28   AND I'M AGAIN, 99 PERCENT CERTAIN THAT ASBESTOSIS

1  WAS KNOWN BEFORE 1937.

2      IF I COULD REVIEW THE LITERATURE I COULD FIND

3  OUT WHEN IT WAS FIRST PUBLISHED, AND I'M SURE IT WAS

4  BEFORE 1937.

5      MR. BURGI:

6      Q.    I'M JUST ASKING FOR YOUR INDEPENDENT

7  RECOLLECTION AS YOU SIT HERE TODAY.

8      A.    I DON'T RECALL IT SPECIFICALLY.

9      Q.    ALL RIGHT.

10      MR. HARRINGTON:    EXCUSE ME.  I JUST WANT TO

11  CLARIFY THE RECORD THAT THE CONFEREN  YOU REFERRED

12  TO WAS THE ONE IN WASHINGTON IN 1937?

13      THE WITNESS:    YES.

14      MR. BURGI:    ABSOLUTELY.

15      THE WITNESS:    MAY AND JUNE OF 1937.

16      MR. BURGI:

17      Q.    WHAT WAS THE FIRST OCCASION YOU HEARD

18  THE TERM ASBESTOSIS?

19      A.    THE SAME ANSWER AS I JUST GAVE YOU.  I

20  CAN'T REMEMBER, BUT A LONG TIME AGO.  WELL BEFORE

21  1948 OR '49.

22      Q.    DID YOU AT ANY TIME DURING YOUR EMPLOY

23  WITH THE WISCONSIN PUBLIC HEALTH BECOME AWARE OF ANY

24  OTHER DISEASES ASSOCIATED WITH ASBESTOS EXPOSURE?

25      A.    I DIDN'T UNDERSTAND THE LAST PART OF THE

26  QUESTION.

27      MR. BURGI:    WOULD YOU READ THAT BACK?

28  / / /

1          (RECORD READ.)

2

3      MR. RILEY:   SAME OBJECTION AS BEFORE.

4       ARE YOU REFERRING TO AT ANY LEVEL?

5      MR. BURGI:   ANY LEVEL.

6      MR. RILEY:   OKAY.

7      THE WITNESS:   I'LL HAVE TO ASK A QUESTION.

8       YOU SAY ANY OTHER DISEASES?

9      MR. BURGI:

10      Q.   OTHER THAN THAT THAT WE'VE USED COMMONLY

11  AS THE TERM ASBESTOSIS.

12      A.   NO.

13      Q.   DID YOU AT ANY TIME WHILE EMPLOYED BY

14  THE WISCONSIN PUBLIC HEALTH BECOME AWARE THAT

15  ASBESTOS EXPOSURE MAY LEAD TO CANCER?

16      MR. RILEY:   OBJECTION.  THAT'S ASKED AND

17  ANSWERED.

18       YOU JUST ASKED HIM IF HE HEARD OF ANY OTHER

19  DISEASE AND HE TOLD YOU NO.

20      MR. BURGI:   I'M ASKING SPECIFICALLY ABOUT

21  CANCER.

22      THE WITNESS:   THE ANSWER IS NO.

23      MR. RILEY:   DO YOU MEAN TO EXCLUDE CANCER

24  FROM THE PRIOR QUESTION?

25      MR. HARRINGTON:   I DON'T UNDERSTAND HOW.

26  THAT'S NOT APPLICABLE.

27      MR. BURGI:   HE MAY RESPOND.  THE OBJECTION

28  IS ON THE RECORD.

1          MR. RILEY:     I OBJECT.

2          THE WITNESS:     ASBESTOSIS WAS THE ONLY THING

3    WE KNEW IN CONNECTION -- THE ONLY DISEASE WE KNEW IN

4    CONNECTION WITH ASBESTOS.

5          MR. BURGI:

6          Q.     ALL RIGHT.  DID YOU AT ANY TIME WHILE

7    EMPLOYED BY WISCONSIN PUBLIC HEALTH HEAR THE TERM

8    MESOTHELIOMA?

9          MR. RILEY:     SAME OBJECTION.

10         THE WITNESS:     I DON'T KNOW WHEN I LEARNED

11   VARIOUS THINGS, AND YOU ARE GOING BACK AN AWFUL LONG

12   WAYS FOR A PERSON TO REMEMBER.

13         MR. BURGI:

14         Q.     SO YOU HAVE NO SPECIFIC RECOLLECTION?

15         A.     I HAVE NO SPECIFIC RECOLLECTION WHEN I

16   FIRST HEARD THAT.

17         Q.     YOU MENTIONED ONE OF THE PEOPLE AT THIS

18   CONFERENCE IN WASHINGTON D.C. WAS DR. SAYERS; IS

19   THAT CORRECT?

20         A.     YES.

21         Q.     AND YOU MENTIONED THAT IN YOUR OPINION

22   HE WAS AN AUTHORITY ON THE ISSUE OF ASBESTOS

23   EXPOSURE?

24         MR. RILEY:     OBJECT TO THE FORM OF THE

25   QUESTION.  YOU CAN ASK HIM IF HE THOUGHT HE WAS, BUT

26   I DON'T THINK HE STATED THAT BEFORE.  I THINK HE

27   SAID HE WAS A SURGEON.

28         MR. BURGI:     OKAY.  I'LL REPHRASE THE

1  QUESTION.

2      Q.      WAS IT YOUR OPINION THAT DR. SAYERS WAS

3  AN AUTHORITY ON THE ISSUE OF EXPOSURE TO TOXIC

4  SUBSTANCES, INCLUDING ASBESTOS?

5      MR. RILEY:      AS OF 1937?

6      MR. BURGI:      AS OF THE DATE OF THE

7  CONFERENCE.

8      MR. RILEY:      THANK YOU.

9      THE WITNESS:      I CAN'T SAY THAT DR. SAYERS

10  HIMSELF WAS AN AUTHORITY.

11      HE WAS THE HEAD OF THE ORGANIZATION, BUT HE

12  HAD WITH HIM DOCTORS AND OTHER SCIENTISTS WHO WERE

13  VERY DEFINITELY AUTHORITIES ON THESE INDUSTRIAL

14  EXPOSURES, INDUSTRIAL -- POTENTIAL INDUSTRIAL

15  HAZARDS.  SO SOMEBODY IN HIS GROUP WAS ONE OF THE --

16  WOULD HAVE BEEN CONSIDERED ONE OF THE LEADING

17  AUTHORITIES AT THE TIME.

18      MR. BURGI:

19      Q.      SO, WERE YOU OF THE OPINION AT THE TIME

20  OF THIS CONFERENCE THAT ANY DOCUMENT OR PUBLICATION

21  UNDER DR. SAYERS' NAME WOULD BE AUTHORITATIVE ON THE

22  ISSUE OF ASBESTOS EXPOSURE.

23      MR. RILEY:      EXCUSE ME.  I THOUGHT HE JUST

24  SAID HE COULDN'T SAY THAT WITH RESPECT TO

25  DR. SAYERS.

26      MR. BURGI:

27      Q.      I SAID PUBLISHED UNDER THE NAME OF

28  DR. SAYERS.

1    A.    THAT'S A VERY STRANGE QUESTION.

2    Q.    LET ME REPHRASE IT.

3    YOU JUST MENTIONED THAT DR. SAYERS HAD AT HIS

4    DISPOSAL A NUMBER OF EXPERTS; IS THAT CORRECT?

5    A.    YES.

6    Q.    AND WERE YOU OF THE OPINION AT THE TIME

7    OF THIS CONFERENCE THEN THAT ANY PUBLICATION WHICH

8    WAS PRINTED OR AUTHORED BY DR. SAYERS WOULD BE

9    AUTHORITATIVE ON THE ISSUE OF ASBESTOS EXPOSURE?

10   A.    DEPENDS ON WHAT YOU MEAN BY

11   "AUTHORITATIVE."

12   BY AUTHORITATIVE, IF YOU MEAN BY AUTHORITATIVE

13   WOULD IT HAVE THE FORCE OF LAW OR SOMETHING LIKE

14   THAT, NO.  AND THE PEOPLE -- NO.  THAT'S IT.  IT

15   WOULD VERY DEFINITELY BE RESPECTED BY PEOPLE IN THE

16   PROFESSION.

17   Q.    WOULD IT ALSO BE RESPECTED BY YOU?

18   A.    NOT NECESSARILY BELIEVED BY EVERY ONE OF

19   THEM.

20   Q.    WOULD IT ALSO BE RESPECTED BY YOURSELF?

21   A.    I CAN'T ANSWER THAT QUESTION.  THAT'S

22   OUT OF CONTEXT.

23   ALONG WITH EVERYTHING ELSE THAT WAS AVAILABLE

24   IT PROBABLY WOULD BE.  BUT IF IT HAD A DIVERSED

25   OPINION WHICH HAD JUST BEEN BROUGHT OUT SAY AS A

26   RESULT OF SOME BASIC STUDY ON TOXICOLOGY, HE HAD A

27   RIGHT TO HIS OPINION, HIS PEOPLE.

28   BUT THERE WOULD BE OTHER AUTHORITIES WHO MIGHT

1    ALSO HAVE OPINIONS.

2         I'M NOT SAYING THAT EVERYTHING THAT DR. SAYERS

3    PUT HIS NAME ON WAS THE GOSPEL TRUTH AT THE TIME.

4    IT WAS SOME DATA THAT WE'D ALL READ AND RESPECTED    *RESPECTED*

5    VERY HIGHLY.    *original spelling O.R. (12)*

6         Q.    DID YOU READ DR. SAYERS' PUBLICATION

7    ENTITLED "ASBESTOSIS," WHICH IS PRINTED IN THE

8    AMERICAN JOURNAL OF PUBLIC HEALTH, 1939?

9         A.    I CAN'T RECALL THAT SPECIFICALLY.

10        Q.    DO YOU KNOW IF THAT WAS A JOURNAL OR

11   PUBLICATION THAT WOULD HAVE BEEN CONTAINED IN YOUR

12   LIBRARY AS YOU PREVIOUSLY DESCRIBED?

13        MR. RILEY:    I'M SORRY.  COULD YOU TELL ME

14   WHAT JOURNAL IT WAS?

15        THE WITNESS:    VERY LIKELY.  BUT I CAN'T SAY

16   IT WAS.

17        MR. BURGI:

18        Q.    "AMERICAN JOURNAL OF PUBLIC HEALTH."  IT

19   WAS CO-AUTHORED BY A DOCTOR DREESON.

20        A.    I CAN'T REMEMBER THE SPECIFIC ONE.

21        Q.    JUST WITH RESPECT TO YOUR OVERALL

22   KNOWLEDGE OF EXPOSURE TO ASBESTOS, DID YOU ATTEND

23   ANY SEMINARS OR EDUCATIONAL COURSES WHILE IN THE

24   MILITARY ON THE ISSUE OF EXPOSURE TO ASBESTOS?

25        A.    NO.  NOTHING RELATED TO ASBESTOS ALONE.

26        Q.    CAN YOU THINK OF ANY SEMINARS OR COURSES

27   WHICH YOU ATTENDED AT ANY TIME IN WHICH THE ISSUE OF

28   EXPOSURE TO ASBESTOS WAS INCLUDED AS PART OF THE

1  SUBJECT MATTER?

2      A.      I ATTENDED MEETINGS OF THE AMERICAN

3  INDUSTRIAL HYGIENE ASSOCIATION, THE AMERICAN

4  CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENIST.

5  I USE THE TERMS TOGETHER, BECAUSE FOR MANY YEARS

6  THEY HAD ANNUAL MEETINGS TOGETHER FOR ALMOST EVERY

7  YEAR FROM THE TIME OF '37 UNTIL I RETIRED IN '71.

8      AND WHILE I WAS IN THE SERVICE AT ONE OF THOSE

9  MEETINGS A -- THERE WAS A NAVY MAN THAT PRESENTED A

10 PAPER ON ASBESTOS AND SOMETHING THAT HAD TO DO WITH

11 SHIP BUILDING.  I RECALL THAT BECAUSE I HAD BEEN

12 WITH THE NAVY, AND SO I WOULD THEREFORE BE

13 INTERESTED IN SOMETHING A NAVY MAN HAD TO SAY.

14      I DON'T KNOW, I CAN'T TELL YOU WHAT THE

15 CONCLUSIONS WERE OR ANYTHING ELSE.  IT WAS ONE OF

16 THE MANY, MANY PAPERS THAT LITERALLY -- ONE OF THE

17 THOUSANDS OF PAPERS THAT I HAVE HEARD PRESENTED AT

18 THESE MEETINGS OVER A PERIOD OF, YOU KNOW, HOWEVER

19 MANY YEARS FROM '37 TO '71.

20      BUT THERE WAS SOMETHING ABOUT ASBESTOS SOME

21 TIME IN MY MILITARY CAREER.  PROBABLY IN THE '40'S

22 OR PROBABLY IN THE '50'S.  I DON'T KNOW.  I DON'T

23 KNOW WHEN.

24      Q.      DID YOU AT ANY TIME AS A RESULT OF

25 ATTENDING ANY OF THESE CONFERENCES OR THROUGH YOUR

26 OWN INDEPENDENT STUDIES BECOME AWARE OF A WISCONSIN

27 DEPARTMENT OF PUBLIC HEALTH MEETING OF 1932 WHICH

28 WAS PUBLISHED AND WHICH A CASE STUDY OF ASBESTOSIS

1 IN A WORKER WAS DISCUSSED WHERE THE WORKER HAD ONLY

2 SIX YEARS OF WORK EXPOSURE?

3      A.     DID YOU SAY WISCONSIN? WISCONSIN PUBLIC

4 HEALTH?

5      Q.    YES.

6     MR. RILEY:    THE QUESTION IS WERE YOU AWARE

7 OF ANY SUCH PUBLICATION THAT HE JUST DESCRIBED.

8     THE WITNESS:    BUT I THOUGHT HE MAY HAVE MADE

9 A MISTAKE AND SAID PUBLIC HEALTH.

10     MR. RILEY:    NO.

11     THE WITNESS:    PLEASE REPEAT THAT.

12     MR. BURGI:

13      Q.    OKAY. I'M ASKING WHETHER OR NOT YOU AT

14 ANY TIME BECAME AWARE OF A WISCONSIN DEPARTMENT OF

15 PUBLIC HEALTH MEETING OF 1932 WHICH WAS LATER

16 PUBLISHED IN WHICH A CASE STUDY OF ASBESTOSIS IN A

17 WORKER WHO WAS EXPOSED FOR ONLY SIX YEARS WAS

18 DISCUSSED AT THE CONFERENCE AND LATER PUBLISHED?

19     IT WAS ALSO REPORTED TO THE WORKERS

20 COMPENSATION BOARD.

21      A.    I'M NOT FAMILIAR WITH THAT CASE, NO.

22 THERE ARE MANY PUBLISHED CASES OF ASBESTOSIS. NOT

23 MANY, BUT THERE WERE SOME PUBLISHED CASES.

24     I SAW STATISTICS IN THE PAST THAT WERE GATHERED

25 ON ALL OCCUPATIONAL DISEASES. A FEW STATES WERE

26 ABLE TO COLLECT THOSE AND SUBMIT THEM THROUGH THE

27 U.S. PUBLIC HEALTH SERVICE, AND THOSE WOULD BE SENT

28 TO US SO WE COULD GET SOME IDEA OF WHAT DISEASES

1   WERE IMPORTANT.

2       AND OCCASIONALLY, ASBESTOSIS WAS MENTIONED IN

3   THOSE REPORTS OF OCCUPATIONAL DISEASES, ALONG WITH

4   MANY, MANY OTHER SUBSTANCES.

5       Q.   DO YOU HAVE ANY RECOLLECTION OF ANY SUCH

6   REPORTS IN WHICH THE WORK EXPOSURE WAS SIX YEARS?

7       A.   I WOULDN'T REMEMBER THE EXPOSURE TIME.

8       Q.   JUST FOR THE SAKE OF MY OWN

9   CLARIFICATION IS THERE ANY DIFFERENCE IN THE DUTIES

10  AND RESPONSIBILITIES OF A BIO-ENVIRONMENTAL ENGINEER

11  AS OPPOSED TO AN INDUSTRIAL HYGIENIST, AS YOU

12  UNDERSTAND IT?

13      A.   IT WENT A LITTLE BIT FARTHER.

14      Q.   IN WHAT DIRECTION?

15      A.   IN THE DIRECTION THAT IT, IT PUT MORE

16  EMPHASIS ON OTHER EXPOSURE FACTORS, SUCH AS NUCLEAR

17  RADIATION, NOISE LEVELS, SPECIFIC TOXIC HAZARDS THAT

18  YOU DON'T RUN INTO IN INDUSTRIAL HYGIENE, AIR

19  POLLUTION -- THESE ARE ALL PART OF THE WORK OF AN

20  INDUSTRIAL HYGIENIST UP TO A CERTAIN POINT.  BUT

21  MOST INDUSTRIAL HYGIENISTS LIMIT THEMSELVES TO THE

22  EXPOSURES AS WE FIND IN THE AVERAGE FACTORY.  WE

23  JUST WENT A LITTLE BIT FARTHER.

24      Q.   IF I UNDERSTAND CORRECTLY, YOU RECALL

25  ONLY TWO FACILITIES AT WHICH YOU DID TESTING

26  SPECIFICALLY FOR ASBESTOS EXPOSURE; IS THAT CORRECT?

27      A.   THAT'S RIGHT.  AND I DON'T EVEN REMEMBER

28  THE NAME OF ONE, BUT I KNOW THAT I DID BECAUSE IT

113

1    WAS A DIFFERENT MANUFACTURING PROCESS.

2         Q.     DO YOU KNOW WHAT TOWN IT WAS LOCATED IN?

3         A.     NO.

4         Q.     DO YOU KNOW HOW MANY OCCASIONS YOU

5    VISITED THAT OTHER FACILITY?

6         A.     PROBABLY JUST ONCE.  I DON'T, I DON'T

7    REMEMBER.

8         Q.     NOW YOU MENTIONED IN PREVIOUS TESTIMONY

9    THAT THE -- I KEEP CALLING IT T.L.V. -- WHAT'S THE

10   EXPRESSION YOU USE?

11        MR. RILEY:    M.A.C.

12        MR. BURGI:     THE M.A.C.

13        Q.     YOU MENTIONED THAT FACTORED INTO THE

14   M.A.C. WAS A SAFETY FACTOR OR SAFETY LEVEL.

15        COULD YOU ELABORATE ON THAT FOR ME?

16        A.     THAT'S VERY DIFFICULT TO HAVE TO EXPLAIN

17   BECAUSE I'M NOT IN THE BUSINESS OF TOXICOLOGY,

18   MYSELF.  IN OTHER WORDS, THE STUDY OF THE TOXIC

19   EFFECT.

20        BUT WHAT IT AMOUNTS TO IS THAT MANY OF THESE

21   M.A.C.'S ARE DETERMINED ON THE BASIS OF VERY

22   EXTENSIVE STUDIES OF EXPOSURE OF PEOPLE TO A

23   SUBSTANCE.  THERE ARE VARIOUS WAYS OF DETERMINING

24   THE LEVELS.  ONE IS BY ANIMAL EXPERIMENTATION.  THAT

25   IS A VERY POOR ONE.  ONE IS BY ACTUALLY SUBJECTING

26   HUMAN VOLUNTEERS TO THE TOXIC MATERIAL.  THAT ISN'T

27   A VERY GOOD ONE.

28        THE MOST USED METHOD OF DETERMINING M.A.C. IS

1    TO STUDY AN INDUSTRY WHERE PEOPLE HAVE BEEN EXPOSED
2    TO A SUBSTANCE FOR A LONG PERIOD OF TIME AND WHERE
3    YOU CAN GET A REASONABLY ACCURATE DETERMINATION OF
4    HOW MANY HOURS A DAY THEY'VE BEEN EXPOSED TO WHAT
5    LEVELS, THEN MAKING A MEDICAL DETERMINATION OF
6    WHETHER THERE'S BEEN ANY DAMAGE DONE TO THESE PEOPLE
7    -- FIRST OF ALL, KEEPING RECORDS OF WHETHER ANY
8    OCCUPATIONAL DISEASES OCCURRED; AND SECONDLY, X-RAY
9    EXAMINATIONS, ET CETERA, ET CETERA.
10        AND THEN BASED ON THE FACT THAT YOU STUDIED
11    20,000 PEOPLE IN A CERTAIN INDUSTRY AND THE EXPOSURE
12    HAS BEEN THIS, THESE PEOPLE HAVE BEEN EXPOSED TO
13    THAT LEVEL, THESE PEOPLE HAVE BEEN EXPOSED TO THAT
14    LEVEL, THESE TO THAT LEVEL, YOU COME UP WITH A LEVEL
15    THAT IS SAFE; AND THEN YOU MULTIPLY IT BY THREE OR
16    FOUR OR FIVE OR WHATEVER, DEPENDING ON HOW ACCURATE
17    YOU THINK YOUR M.A.C.'S MIGHT BE.  YOU GIVE IT SOME
18    SORT OF A SAFETY FACTOR, AND DON'T -- I DON'T KNOW
19    EXACTLY WHAT THAT WOULD BE.  BUT THE LEVELS THAT ARE
20    PUBLISHED ARE CONSIDERED TO BE WELL ON THE SAFE
21    SIDE, THEY ARE ONLY A GUIDELINE THAT IS CONSIDERED
22    TO BE WELL ON THE SAFE SIDE.
23        SO MANY PEOPLE THINK THAT IF YOU EXCEED A
24    LEVEL OF WE'LL SAY A CERTAIN PERCENTAGE IN THE AIR
25    OF CHLORINE GAS, WHEN YOU GET ABOVE THAT EVERYBODY
26    DIES AND IF YOU STAY BELOW THAT -- WELL, THAT IS NOT
27    TRUE.  THERE ARE ALL SORTS OF SHADES OF MEANING.
28        ALL IT IS IS THAT THE T.L.V. OR M.A.C., IT'S

1    ASSUMED THAT BASED ON A LOT OF DATA THAT ALMOST ALL

2    OF THE WORKERS WILL BE PROTECTED.  THERE'S NO SUCH

3    THING AS SAYING THAT EVERY WORKER WILL BE PROTECTED

4    AGAINST SOMETHING ALL THE TIME.  BUT THE T.L.V. OR

5    M.A.C.'S ARE ON THE SAFE SIDE -- ON THE SAFE SIDE.

6         Q.    NOW IF I UNDERSTAND CORRECTLY, THE

7    5.0  MILLION PARTS PER CUBIC INCH OF ASBESTOS IS THE

8    M.A.C. AS YOU UNDERSTOOD IT WHEN YOU STARTED WITH

9    THE WISCONSIN DEPARTMENT OF PUBLIC HEALTH?

10        A.    YES.

11        Q.    AND --

12        MR. RILEY:    JUST FOR CLARITY, YOU KEEP

13   REFERRING TO IT AS THE DEPARTMENT OF PUBLIC HEALTH,

14   AND IT'S THE STATE BOARD OF HEALTH.  YOU MIGHT

15   CONFUSE IT WITH THE U.S. DEPARTMENT OF PUBLIC

16   HEALTH.

17        MR. BURGI:

18        Q.    DO YOU UNDERSTAND THAT I'M REFERRING TO

19   THE STATE BOARD OF HEALTH WHEN I USE THE PHRASE

20   WISCONSIN; IS THAT CORRECT?

21        A.    I'VE LOST THE QUESTION.

22        Q.    IN THE QUESTIONS WHICH I'VE BEGUN THE

23   DESCRIPTION OF THE ENTITY YOU WORK FOR WITH THE TERM

24   "WISCONSIN," YOU UNDERSTOOD THAT WAS REFERRING TO

25   THE WISCONSIN STATE BOARD OF HEALTH; IS THAT

26   CORRECT?

27        A.    YES.

28        Q.    NOW DURING YOUR EMPLOY WITH THE

1    WISCONSIN STATE BOARD OF HEALTH DID THE 5.0 MILLION

2    PARTS PER CUBIC INCH M.A.C. EVER CHANGE?

3         A.     THAT'S 5.0 MILLION PARTICLES PER CUBIC

4    FOOT.

5         Q.     THAT'S RIGHT.  PER CUBIC FOOT.  I SAID

6    INCH.  MY APOLOGY.

7         A.     THAT WAS THE RECOGNIZED LEVEL ALL THE

8    TIME I WAS WITH THEM.

9         Q.     SO WHEN YOU LEFT IN '49 IT WAS STILL

10   5.0 MILLION PARTS PER CUBIC FOOT?

11        A.     YES.

12        Q.     SO IT'S YOUR UNDERSTANDING THAT THE

13   5.0  MILLION PARTS PER CUBIC INCH M.A.C. WHICH WAS

14   IN EFFECT AND WHICH YOU RELIED UPON WHILE YOU WERE A

15   MEMBER OF THE WISCONSIN STATE BOARD OF HEALTH HAD

16   FACTORED INTO IT A SAFETY LEVEL OR SAFETY FACTOR OF

17   THE KIND THAT YOU JUST PREVIOUSLY DESCRIBED?

18        A.     YES.

19        Q.     CAN YOU REFER ME TO ANY LITERATURE OR

20   PUBLICATION WHICH SUPPORTS THAT BELIEF OF YOURS,

21   THAT THERE WAS IN FACT A SAFETY LEVEL OR SAFETY

22   FACTOR CALCULATED INTO THAT 5.0 MILLION PARTS PER

23   CUBIC FOOT?

24        A.     I WOULD THINK THAT THE PUBLISHED VALUES

25   OF -- IT'S NOW CALLED T.L.V.'S, M.A.C.'S, PUT OUT BY

26   THE CONFERENCE OF GOVERNMENTAL INDUSTRIAL

27   HYGIENISTS, HAS A DESCRIPTION OF THEIR APPROACH TO

28   THE ESTABLISHMENT OF THESE LEVELS.  THERE ARE MANY

1  OTHER FACTORS THAT ARE CONSIDERED. YOU COULD TALK

2  ABOUT M.A.C.'S OR T.L.V.'S FOR HALF AN HOUR AND NOT

3  UNDERSTAND EVERYTHING THAT GOES INTO IT.

4       Q.    I'M MAINLY FOCUSING, THOUGH, ON YOUR

5  BELIEF THAT THERE WAS A SAFETY FACTOR IN THIS

6  M.A.C., AND I'M TRYING TO FIND OUT WHERE YOU CAME

7  ABOUT THAT BELIEF, WHAT WAS THE SOURCE?

8       A.    FROM EVERYTHING THAT WE LEARNED ALL THE

9  TIME WE WERE IN THE BUSINESS. THERE WERE LOTS OF

10 SOURCES. YOU READ THE STUDIES THAT PEOPLE MADE, YOU

11 LEARNED -- YOU LISTENED TO WHY THEY ESTABLISHED

12 THESE LEVELS. I CAN'T REFER YOU TO ANY SPECIFIC

13 PUBLICATION.

14      Q.    WELL, IT'S YOUR UNDERSTANDING THAT THE

15 5.0  MILLION PARTICLES PER CUBIC FOOT WAS

16 ESTABLISHED BY THE A.C.G.I.H.; IS THAT CORRECT.

17      MR. RILEY:    WHAT? I'M --

18      THE WITNESS:    NOT NECESSARILY.

19      MR. RILEY:    I'M NOT SURE THAT'S WHAT HE SAID

20 EARLIER TODAY.

21      MR. BURGI:    I'LL MOVE TO STRIKE THAT

22 QUESTION.

23      MR. RILEY:    IF YOU MEAN TO EXCLUDE ANY OTHER

24 SOURCES ALSO RECOGNIZING IT, BECAUSE I THINK THAT'S

25 WHAT HE SAID EARLIER -- INCLUDING THE A.C.G.I.H, BUT

26 NOT EXCLUDING ANY OTHER SOURCE --

27      MR. HARRINGTON:    HAVE YOU WITHDRAWN THE

28 QUESTION NOW?

1      MR. BURGI:     YES.  I HAVE WITHDRAWN THE

2  QUESTION.

3      Q.     WOULD IT BE CORRECT TO SAY THAT THE

4  SOURCE OF THE 5.0 MILLION PARTS PER CUBIC FOOT AS A

5  STANDARD FOR ASBESTOS EXPOSURE USED BY YOUR

6  DEPARTMENT WAS THE RESULT OF A NUMBER OF

7  PUBLICATIONS INCLUDING THE A.C.G.I.H.?

8      A.     THE A.C.G.I.H. SIMPLY COLLATED THE DATA.

9  THEY SIMPLY GOT ALL OF THE INFORMATION THAT WAS

10  AVAILABLE AND MADE A DECISION AS TO WHAT WAS THE

11  MOST REASONABLE NUMBER.

12      Q.     DO YOU KNOW --

13      A.     THERE WERE PROBABLY MANY PROPOSED BY

14  MANY PEOPLE, AND THIS GROUP JUST EVALUATED THE DATA

15  AND CAME UP WITH A REASONABLE CONCLUSION.

16      Q.     DO YOU KNOW OF ANY A.C.G.I.H.

17  PUBLICATION WHICH SPECIFICALLY STATES THAT

18  5.0 MILLION PARTS PER CUBIC INCH, WHICH IS THE

19  M.A.C., AT ANY TIME --

20      A.     AGAIN, YOU USED "PER CUBIC INCH."

21      Q.     I'M SORRY.

22      A.     PER CUBIC FOOT.

23      Q.     PER CUBIC FOOT.

24      A.     AND THE PUBLICATIONS ARE PUT OUT EACH

25  YEAR, THEY PUBLISH THE DATA EVERY YEAR, I THINK.

26  THEY MAY HAVE MISSED ONE YEAR DURING THE WAR, BUT

27  THEY ROUTINELY PUBLISH THEIR DATA EACH YEAR.

28      Q.     AND DO YOU KNOW OF ANY SUCH PUBLICATION

1 IN WHICH IT'S STATED THAT THE M.A.C. HAS FACTORED
2 INTO IT A SAFETY LEVEL OR SAFETY FACTOR?
3    MR. RILEY:   IN THOSE EXACT WORDS? ARE YOU
4 TALKING ABOUT ANYTHING THAT INDICATES THAT?
5    I OBJECT TO THE FORM OF THE QUESTION. YOU
6 SHOULD CLARIFY THAT.
7    MR. BURGI:
8    Q.   FIRST OF ALL, IN THOSE EXACT WORDS.
9    MR. RILEY:   DO YOU REALLY THINK THAT'S A
10 REASONABLE QUESTION?
11    MR. BURGI:   YES, I DO.
12    MR. RILEY:   OKAY. I OBJECT TO THE FORM OF
13 THE QUESTION.
14    THE WITNESS:   I CAN'T TELL YOU OF ANY
15 PUBLICATION. I CAN'T THINK OF ONE NOW.
16    MR. BURGI:
17    Q.   CAN YOU REFER ME TO ANY PORTION OF ANY
18 A.C.G.I.H. PUBLICATION WHICH YOU INTERPRET TO MEAN
19 THAT THERE'S A SAFETY FACTOR OR SAFETY LEVEL
20 CALCULATED INTO THE 5.0 MILLION PARTS PER CUBIC FOOT
21 ON ASBESTOS EXPOSURE?
22    A.   YOU CAN WRITE TO THE A.C.G.I.H., THEIR
23 EXECUTIVE SECRETARY. THAT'S THE SORT OF QUESTION
24 HE'S SUPPOSED TO ANSWER. I CAN'T TELL YOU.
25    Q.   OKAY. NOW YOU'VE DISCUSSED IN SOME
26 DETAIL THE TIME WEIGHTED EXPOSURE THEORY OF YOURS.
27    CAN YOU REFER ME TO ANY PUBLICATIONS OR
28 LITERATURE THAT YOU RELY UPON FOR YOUR DEFINITION OF

1    THE TIME WEIGHTED UNIT, TIME WEIGHTED EXPOSURE?

2        A.      AGAIN, THE PUBLICATION OF THE A.C.G.I.H.

3    COMMITTEE ON THRESHOLD LIMIT VALUES.

4        Q.      AND IT'S YOUR UNDERSTANDING THAT IN

5    THEIR PUBLICATION THEY SPECIFICALLY DISCUSS TIME

6    WEIGHTED UNITS?

7        A.      YES.

8        MR. RILEY:      DO YOU MEAN TO SAY TIME WEIGHTED

9    UNITS OPPOSED TO TIME WEIGHTED AVERAGE?  THIS MAN

10   USED TIME WEIGHTED AVERAGE AND YOU ARE USING A

11   DIFFERENT TERM.

12       MR. BURGI:      ABSOLUTELY.

13       Q.      TIME WEIGHTED AVERAGE.

14       A.      IN THE MORE RECENT PUBLICATIONS OF THE

15   PROCEDURES OF THIS COMMITTEE ON THRESHOLD LIMIT

16   VALUES AS IT'S CALLED NOW THEY VERY SPECIFICALLY

17   MENTIONED A T.L.V., AND THEN SOME OTHER DESIGNATIONS

18   THAT MEANS TIME WEIGHTED AVERAGE.

19       Q.      OKAY.  LET ME BE MORE SPECIFIC, THEN.

20   LET'S GO BACK TO YOUR TIME WITH THE STATE OF

21   WISCONSIN STATE BOARD OF HEALTH.

22       DURING THAT PERIOD OF TIME CAN YOU REFER ME TO

23   ANY PUBLICATIONS OR LITERATURE THAT YOU RELIED UPON

24   FOR YOUR UNDERSTANDING --

25       A.      NO.

26       Q.      -- OF TIME WEIGHTED AVERAGE?

27       A.      I CAN'T.

28       THAT IS A BASIC CONCEPT THOUGH THAT WOULD BE

1   USED BY ANY ENGINEER OR SCIENTIST.  IT WOULDN'T EVEN

2   HAD TO HAVE A PUBLICATION.  WE'D HAVE COME UP WITH

3   THAT BY OURSELVES.

4        IT'S PRETTY OBVIOUS THAT A CONCENTRATION THAT

5   A PERSON CAN TOLERATE FOR EIGHT HOURS A DAY IS NOT

6   THE CONCEPT THAT ONE CAN TOLERATE MORE THAN THAT FOR

7   ONE MINUTE OR ONE HALF MINUTE OR ONE SECOND, JUST TO

8   USE EXTREMES.  AND THAT IS SOMETHING THAT IS JUST

9   BASIC SCIENTIFIC KNOWLEDGE.  YOU WOULDN'T HAVE TO

10  ASK ANYBODY.

11       Q.    THERE'S NO SPECIFIC AUTHORITY YOU CAN

12  GIVE ME THAT YOU RELY UPON FOR THAT UNDERSTANDING?

13       MR. RILEY:    OTHER THAN WHAT HE JUST SAID?

14       THE WITNESS:    I'M AS MUCH OF AN AUTHORITY ON

15  THAT AS ANYBODY IS.  I WAS PART OF THE GROUP THAT

16  MADE THESE DECISIONS.

17       MR. BURGI:

18       Q.    OKAY.

19       A.    AND IT'S A VALID ASSUMPTION THAT YOU'LL

20  FIND THAT YOU'LL GET FROM ANYBODY IN THE BUSINESS.

21       I CAN'T REFER YOU TO A SPECIFIC PUBLICATION

22  THAT WOULD SPELL THAT OUT IN BLACK AND WHITE.

23       Q.    I WANT TO GO BACK TO AGAIN, FOCUSING ON

24  YOUR WORK FOR THE STATE OF WISCONSIN, STATE BOARD OF

25  HEALTH.

26       DURING THAT PERIOD OF TIME WAS IT YOUR

27  UNDERSTANDING THAT THE INCREASE IN HAZARD TO THE

28  WORKER IS DIRECTLY PROPORTIONAL TO THE INCREASE IN

1   HIS EXPOSURE TO ASBESTOS PARTICLES?

2        MR. RILEY:    I OBJECT TO THE FORM OF THE

3   QUESTION.

4        THE WITNESS:    INCREASED EXPOSURE, IF YOU

5   INCLUDE CONCENTRATION AND TIME, YES.

6        MR. BURGI:

7        Q.    SO, FOR EXAMPLE, ONE WHO'S EXPOSED TO

8   SAY TEN MILLION PARTS PER CUBIC FOOT OVER AN EIGHT

9   HOUR DAY --

10       MR. RILEY:    OF WHAT?

11       MR. BURGI:    OF ASBESTOS.

12       MR. RILEY:    PURE?

13       MR. BURGI:    WELL, LET'S GO BACK AND ASK

14  THAT.

15       Q.    IS IT YOUR UNDERSTANDING THAT THE M.A.C.

16  OF 5.0 MILLION PARTS PER CUBIC FOOT THAT YOU USED AS

17  A SAFETY LEVEL TO DETERMINE WHETHER OR NOT A WORKER

18  WAS BEING EXPOSED TO UNDULY HAZARDOUS QUANTITIES OF

19  ASBESTOS REFERS ONLY TO PURE ASBESTOS?

20       A.    THAT REFERS TO THE ASBESTOS CONTENT OF

21  WHATEVER YOU ARE MEASURING. ASBESTOS DOESN'T HAVE

22  TO BE ALL BY ITSELF. IT'S THE ASBESTOS CONTENT OF

23  THE DUST THAT YOU ARE MEASURING IN THE AIR AT THE

24  BREATHING AREA.

25       Q.    NOW MY QUESTION IS, TAKING INTO ACCOUNT

26  YOUR DEFINITION OF WHAT IS MEANT BY 5.0 MILLION

27  PARTS PER CUBIC FOOT OF ASBESTOS THAT A WORKER IS

28  EXPOSED TO, WHAT WOULD BE THE PROPORTION OF GREATER

123

1   HAZARD TO A WORKER WHO'S EXPOSED TO SAY TEN MILLION

2   PARTS PER CUBIC FOOT OVER THE SAME PERIOD OF TIME?

3       A.      (NO AUDIBLE RESPONSE).

4       Q.      IN OTHER WORDS, DOES THE INCREASED RISK

5   GO DIRECTLY PROPORTIONAL, OR IS THERE SOME KIND OF

6   SLIDING SCALE, IN YOUR OPINION?

7       MR. RILEY:    I OBJECT TO THE FORM OF THE

8   QUESTION.  I THINK THAT'S VAGUE AND AMBIGUOUS.

9       THE WITNESS:    THAT CAN'T BE ANSWERED.

10  THERE'S NO DEFINITE ANSWER TO THAT.  THAT WOULD

11  DIFFER WITH EVERY SUBSTANCE YOU ARE TALKING ABOUT.

12      MR. BURGI:

13      Q.    I'M REFERRING ONLY TO ASBESTOS.

14      MR. RILEY:    SAME OBJECTION.

15      THE WITNESS:    I DO'T THINK THAT CAN BE

16  ANSWERED THAT IT'S DIRECTLY PROPORTIONAL.  I DON'T

17  THINK SO.

18      MR. BURGI:

19      Q.    YOU STATED IN PREVIOUS TESTIMONY, YOU

20  SAID, OBVIOUSLY, IF YOU CAN TOLERATE A SMALL LEVEL

21  OF ASBESTOS OVER A LONG PERIOD THEN YOU CAN TOLERATE

22  A LARGE QUANTITY OVER A SHORT PERIOD.

23      A.    RIGHT.

24      Q.    IS THAT A CORRECT CHARACTERIZATION?

25      A.    YES.

26      MR. RILEY:    I'LL OBJECT TO THE

27  CHARACTERIZATION.

28      THE WITNESS:    WITHIN LIMITS IT'S CORRECT.

1        MR. BURGI:      ALL RIGHT.

2        Q.      IS THERE ANY PARTICULAR AUTHORITY THAT

3   YOU RELY UPON WITH RESPECT TO DETERMINING THE

4   PROPORTION TO WHICH SHORT LEVELS CAN BECOME

5   HAZARDOUS AS OPPOSED TO PROLONGED PERIODS?

6        A.      AGAIN --

7        MR. RILEY:      I OBJECT TO THE FORM OF THE

8   QUESTION.

9        THE WITNESS:      AGAIN, I REFER YOU TO THIS

10  COMMITTEE THAT -- NOW, AT LEAST THEY COME UP WITH

11  EVEN SHORT TERM EXPOSURE LEVELS AND MAXIMUM SHORT

12  TERM EXPOSURE LEVELS.  EACH MATERIAL IS EVALUATED

13  SEPARATELY AND THEY CAN COME UP WITH A MODIFICATION

14  OF THE BASIC LEVEL.

15       Q.      JUST SO I CAN UNDERSTAND THE TIME

16  WEIGHTED AVERAGE, A QUESTION AROSE IN MY MIND WITH

17  RESPECT TO THE LOADING PROCEDURES THAT WERE

18  DISCUSSED AT THE PLANT THAT YOU DID TESTING OF --

19       A.      (NODS HEAD.)

20       Q.      -- AND YOU MENTIONED THAT THE LOADING

21  PROCEDURE ONLY TOOK ROUGHLY AN HOUR AND A HALF.

22       AND THEREFORE, THE WORKERS COULD BE EXPOSED TO

23  HIGHER LEVELS OF ASBESTOS CONTENT DURING THAT HOUR

24  AND A HALF AS OPPOSED TO A WORKER WHO IS EXPOSED TO

25  LET'S SAY OVER AN EIGHT HOUR PERIOD.

26       MR. RILEY:      IS THAT A QUESTION?

27       THE WITNESS:      I LOST THE QUESTION SOMEWHERE.

28  / / /

125

1          MR. BURGI:     ALL RIGHT.

2          Q.     LET ME GIVE YOU A HYPOTHETICAL.

3          MR. RILEY:     I'M GOING TO OBJECT RIGHT NOW TO

4    ANY HYPOTHETICAL.

5          MR. BURGI:     ON WHAT GROUNDS, COUNSEL?

6          MR. RILEY:     THIS MAN HAS NOT BEEN OFFERED AS

7    AN EXPERT WITNESS.

8          MR. BURGI:     THE HYPOTHETICAL IS FOR THE

9    PURPOSE OF MY OBTAINING AN UNDERSTANDING OF HOW HE

10   WROTE THESE REPORTS AND HOW HE CALCULATED THE

11   FIGURES THAT ARE IN THESE REPORTS THAT ARE NOW

12   ADMITTED INTO EVIDENCE AS EXHIBITS 13, 14, 15 AND SO

13   ON, IN WHICH HE HAS TESTIFIED PREVIOUSLY TO THE WAY

14   HE DID STUDIES AT THIS PLANT IN ALGOSA.

15         MR. RILEY:     IT'S ALGOMA.

16         MR. BURGI:     ALGOMA.  EXCUSE ME.

17         MR. RILEY:     I DON'T THINK THAT YOUR DESIRE

18   TO UNDERSTAND HIS TESTIMONY PERMITS YOU TO ASK HIM

19   HYPOTHETICAL QUESTIONS.  THAT'S NOT MY UNDERSTANDING

20   OF HOW A DEPOSITION OF THIS TYPE OF WITNESS OR ANY

21   TESTIMONY WITH REGARD TO THIS TYPE OF WITNESS IS TO

22   PROCEED.

23         UNDER YOUR THEORY YOU COULD ASK HYPOTHETICAL

24   QUESTIONS OF ANY WITNESS ON THE GROUNDS THAT YOU'D

25   LIKE TO USE IT AS A TOOL.  I DON'T THINK THE RULES

26   OF EVIDENCE PERMIT THAT.

27         MR. BURGI:     WELL, YOUR OBJECTION IS

28   PRESERVED, AND I WILL ASK THE QUESTION.

1      MR. RILEY:    OH, YEAH.

2      MR. HARRINGTON:    I'LL JOIN IN THE OBJECTION

3  TO THE FORM OF THE QUESTION.

4      MR. RILEY:    I CAN'T STOP YOU, I'LL JUST TRY

5  TO PERSUADE YOU THAT IT'S JUST FLAT WRONG.

6      MR. BURGI:

7      Q.    IF ONE OF THESE WORKERS IS PERFORMING

8  THE UNLOADING OF A BOX CAR FOR AN HOUR AND A HALF

9  AND HIS EXPOSURE LEVEL IS 40 PARTS PER CUBIC FOOT,

10  AND THE REMAINDER OF HIS DAY HE'S OCCUPIED BY

11  PERFORMING DUTIES WHICH EXPOSES HIM TO 5.0 PARTS,

12  5.0 MILLION PARTS PER CUBIC FOOT, HOW WOULD YOU GO

13  ABOUT CALCULATING THE AMOUNT OF EXPOSURE HE HAS OVER

14  AN EIGHT HOUR DAY?

15      MR. RILEY:    EXCUSE ME A SECOND, OBJECTION.

16  NOT ONLY ON THE GROUNDS IT'S A HYPOTHETICAL

17  QUESTION, BUT IT'S NOT EVEN A GOOD HYPOTHETICAL

18  QUESTION.  BECAUSE AMONG OTHER THINGS YOU AREN'T

19  MAKING IT CLEAR WHETHER YOU ARE TALKING ABOUT THE

20  TOTAL DUST, SOME UNDETERMINED PORTION OF WHICH IS

21  ASBESTOS; OR WHETHER YOU ARE TALKING ABOUT ALL

22  ASBESTOS.  I THINK THAT IT'S AN UNFAIR HYPOTHETICAL

23  AS WELL AS IMPROPER ON THE BASIS OF BEING

24  HYPOTHETICAL.

25      MR. BURGI:    I'M TALKING ABOUT ASBESTOS AS

26  DEFINED BY THE M.A.C., WHICH HE HAS PREVIOUSLY

27  TESTIFIED ABOUT.  SO, THAT WOULD BE 5.0 MILLION

28  PARTS PER CUBIC FOOT AS HE HAS DEFINED IT.

127

1       MR. RILEY:      EXCUSE ME.  BUT HE HAS
2   IDENTIFIED THE M.A.C. FOR THE ALGOMA DUST AT
3   20 MILLION PARTICLES, AND I'M AFRAID THAT THERE'S A
4   LOT OF POSSIBLE CONFUSION HERE.
5       MR. BURGI:      I'M NOT REFERRING TO ALGOMA IN
6   PARTICULAR --
7       MR. RILEY:      OKAY.
8       MR. BURGI:      -- IN MY HYPOTHETICAL.  IT'S
9   ONLY WITH RESPECT TO GETTING INSIGHT INTO HIS
10  UNDERSTANDING OF THE AVAILABLE LITERATURE AND HOW HE
11  CALCULATED EXPOSURE.
12      MR. RILEY:      BUT NOT AT ALGOMA?
13      MR. BURGI:      IT RELATES TO ALGOMA IN THAT IT
14  WOULD GIVE INSIGHT INTO HOW HE DOES HIS CALCULATIONS
15  IN GENERAL.
16      MR. RILEY:      I'M ASKING YOU -- AT LEAST MAKE
17  IT CLEAR WHETHER YOU ARE TALKING ABOUT THE ASBESTOS
18  COMPONENT OF ANY DUST IN THIS HYPOTHETICAL; OR THE
19  TOTAL DUST, ANY ONE PORTION OF WHICH IS ASBESTOS; OR
20  PERHAPS TOTAL DUST, A KNOWN PORTION OF ASBESTOS.  I
21  THINK WE'RE GETTING INTO THE PITFALLS OF
22  HYPOTHETICAL HERE IN AN IMPROPER CIRCUMSTANCE.  I
23  CAN'T STOP YOU FROM DOING IT.
24      IN ADDITION TO MY OBJECTION THAT YOU ARE DOING
25  IT AT ALL I THINK YOU ARE DOING IT WRONG -- EVEN IF
26  YOU WERE PERMITTED TO ASK THE HYPOTHETICAL.
27      MR. BURGI:      WHEN I'M REFERRING TO AN M.A.C.
28  OF ASBESTOS THAT IS ALL I AM REFERRING TO -- NOT ANY

1   COMBINATION OF ANY SUBPARTS OR OTHER SUBSTANCES.

2        MR. RILEY:    OKAY.

3        WHAT ABOUT THE HYPOTHETICAL DUST COUNTS?  ARE

4   THEY ALL ASBESTOS DUST OR ARE THEY ASBESTOS AND SOME

5   OTHER DUST IN THE AIR?

6        MR. BURGI:    I'M REFERRING ONLY TO ASBESTOS

7   DUST COUNTS.

8        IF ONE WORKED AN HOUR AND A HALF UNLOADING A

9   BOX CAR, EXPOSED TO 40 MILLION PARTS PER CUBIC FOOT

10  FOR AN HOUR AND A HALF AND SPENT THE REMAINDER OF

11  THE DAY IN AN ATMOSPHERE OF 5.0 MILLION PARTS PER

12  CUBIC FOOT, HOW WE WE GO ABOUT DETERMINING HIS

13  EXPOSURE OVER AN EIGHT HOUR DAY.

14       MR. RILEY:    SAME OBJECTION.

15       GO AHEAD AND ANSWER.

16       THE WITNESS:    I WOULD MAKE A CALCULATION

17  BASED ON THE ASBESTOS CONTENT OF THE DUST, BASED ON

18  THE TIME, ON THE COUNT AT EACH LOCATION THAT THE MAN

19  WORKED, AND THE PERCENTAGE OF THE TIME HE WORKED AT

20  EACH LOCATION.  THAT WOULD ALL BE CRANKED INTO THE

21  CALCULATIONS.

22       I CAN'T GIVE YOU A SPECIFIC NUMBER NOW.  MY

23  MENTAL CALCULATOR ISN'T THAT GOOD.

24       BUT IT WOULD TAKE INTO ACCOUNT THE

25  CONCENTRATION OF ASBESTOS IN THE DUST, THE DUST

26  COUNTS AT EACH LOCATION, AND THE PERCENTAGE OF TIME

27  SPENT AT EACH LOCATION.

28  / / /

1      MR. BURGI:

2      Q.      IN PREVIOUS TESTIMONY YOU MENTIONED THAT

3   DURING YOUR TIME WITH THE STATE OF WISCONSIN, STATE

4   BOARD OF HEALTH, YOU WERE NOT AWARE OF RECORDED

5   CASES OF ASBESTOSIS IN WISCONSIN, AND YET A FEW

6   MINUTES AGO YOU DISCUSSED THAT THERE WERE REPORTED

7   CASES OF ASBESTOSIS IN WISCONSIN WHEN I REFERRED YOU

8   TO THE ONE THAT WAS REPORTED TO THE WORKERS'

9   COMPENSATION BOARD.

10      WHAT I'D LIKE TO ASK YOU AT THIS POINT IS

11   DURING YOUR PERIOD WITH THE STATE OF WISCONSIN,

12   STATE BOARD OF HEALTH, WERE YOU AWARE OF ANY CASES

13   OF ASBESTOSIS IN WISCONSIN?

14      MR. RILEY:     EXCUSE ME A MOMENT.  I OBJECT TO

15   THAT.

16      I DON'T THINK HE SAID ANYTHING LIKE WHAT YOU

17   JUST CHARACTERIZED, AND I THINK THE QUESTION IS

18   UNFAIR.

19      IF YOU WANT TO ASK HIM AGAIN WAS HE AWARE OF

20   ANY RECORDED CASES FROM WISCONSIN AS OPPOSED TO SOME

21   OTHER JURISDICTION WHICH MAY HAVE FOUND -- THE

22   REPORTS MAY HAVE FOUND THEIR WAY INTO WISCONSIN, ASK

23   IT THAT WAY.  I DON'T THINK IT'S FAIR TO SUGGEST

24   THAT HE'S --

25      MR. BURGI:    I AGREE.

26      Q.     ARE YOU AWARE -- EXCUSE ME.

27      WERE YOU AWARE AT ANY TIME WHILE EMPLOYED BY

28   THE STATE OF WISCONSIN, STATE BOARD OF HEALTH, OF

1    ANY REPORTED CASES OF ASBESTOSIS WITHIN THE STATE OF

2    WISCONSIN?

3         A.    I DON'T REMEMBER, BUT I'D LIKE TO

4    QUALIFY THAT.

5         THAT WOULD MEAN THAT I'D HAVE TO READ EVERY

6    STATISTICAL REPORT EVER PUT OUT BY ANY, BY ANY

7    AGENCY IN THE STATE, AND ONE OR TWO OR A FEW CASES

8    OF ASBESTOS, ASBESTOSIS, REPORTED BEFORE MY TIME.

9         THERE'S NO REASON WHY I WOULD -- THAT WOULD BE

10   BROUGHT TO MY ATTENTION.  I WOULD HAVE NO REASON TO

11   GO BACK THROUGH ALL THE STATISTICS KEPT BY THE STATE

12   OR BY ANYBODY ELSE -- BECAUSE I COULD FIND A CASE OF

13   EVERYTHING THAT'S EVER BEEN RECORDED IF I LOOKED FAR

14   ENOUGH.

15        MR. BURGI:    MOVE TO STRIKE AS NONRESPONSIVE.

16        Q.    I'M JUST INTERESTED IN WHETHER OR NOT

17   YOU WERE AWARE OF ANY CASES REPORTED IN THE STATE OF

18   WISCONSIN?

19        A.    I DON'T REMEMBER.

20        Q.    OKAY.

21        CORRECT ME IF I'M WRONG, BUT I UNDERSTOOD FROM

22   YOUR PRIOR TESTIMONY THAT YOU SAID, QUOTE, "WE DID

23   NOT CONSIDER ASBESTOS A SERIOUS HAZARD IN

24   WISCONSIN."

25        A.    THAT'S RIGHT.  BECAUSE THERE WEREN'T

26   ENOUGH REPORTED CASES, CERTAINLY.

27        Q.    NOW, WHEN YOU SAY "WE," WHO WERE YOU

28   INCLUDING OTHER THAN YOURSELF?

1        A.      WELL, I MEAN OUR UNIT, THE STATE HEALTH

2    DEPARTMENT, THE SAFETY PEOPLE, THE INDUSTRIAL

3    COMMISSION, ANYONE WHO HAS ANY CONCERN WITH

4    INDUSTRIAL DISEASES.

5        Q.      IS THERE ANYTHING UNIQUE ABOUT WISCONSIN

6    THAT LED YOU TO THAT CONCLUSION OF THE INDUSTRIES IN

7    WISCONSIN?

8        A.      WHAT WAS THE LAST PART OF THAT?

9        MR. RILEY:    I OBJECT TO THE FORM OF THE

10   QUESTION.

11       THE WITNESS:    I HEARD ONLY "INDUSTRY."  WHAT

12   ABOUT INDUSTRY?

13       MR. BURGI:    STRIKE THE QUESTION.

14       Q.      YOU MENTIONED THAT WHENEVER YOU

15   APPROACHED A PARTICULAR SUBSTANCE AND ITS POTENTIAL

16   HEALTH HAZARDS THAT YOU REVIEWED ALL OF THE MEDICAL

17   RECORDS OR CHECKED THE MEDICAL RECORDS BEFORE YOU

18   EVEN WENT TO DO A DUST COUNT WITH RESPECT TO

19   HAZARDOUS DUST.  IS THAT CORRECT?

20       A.      I DIDN'T SAY THAT WE REVIEWED ALL

21   MEDICAL RECORDS.  I SAID WE REVIEWED ALL AVAILABLE

22   LITERATURE -- AT LEAST THAT'S WHAT I MEANT TO SAY.

23   WE HAD NO WAY OF EVALUATING THE MEDICAL RECORD OF

24   EVERY WORKER IN WISCONSIN.

25       Q.      OKAY.  DO YOU RECALL THE NAMES OF ANY

26   JOURNALS, LITERATURE OR ARTICLES THAT YOU REVIEWED

27   AT ANY TIME WHILE EMPLOYED BY THE STATE OF

28   WISCONSIN, STATE BOARD OF HEALTH, WITH RESPECT TO

1    THE ISSUE OF ASBESTOS EXPOSURE?

2       MR. RILEY:    EXCUSE ME.  IN ADDITION TO THE

3    TWO THAT HE IDENTIFIED PREVIOUSLY IN THIS

4    DEPOSITION?

5       MR. BURGI:

6       Q.    WELL, FIRST OF ALL, ARE THE TWO THAT YOU

7    PREVIOUSLY IDENTIFIED DOCUMENTS THAT YOU STUDIED

8    WITH RESPECT TO THIS ISSUE?

9       MR. RILEY:    I THINK IT'S BEEN ASKED AND

10   ANSWERED AS TO WHAT HE DID WITH RESPECT TO THOSE

11   ARTICLES.

12      THE WITNESS:    YES.  WE STUDIED THE

13   RECOGNIZED JOURNALS AND RECOGNIZED PUBLICATIONS.  WE

14   STUDIED THEM BASICALLY WHEN THEY CAME IN.

15      MR. BURGI:

16      Q.    RIGHT.

17      A.    JUST TO SEE WHAT WAS NEW IN OUR FIELD.

18      IT WAS A NEW FIELD, AND WE WERE LEARNING.

19   THEN WHEN WE WENT IN TO MAKE A STUDY WE REVIEWED ALL

20   THE LITERATURE WE COULD GET OUR HANDS ON, INCLUDING

21   SOME OF WHICH WE HAD RIGHT IN OUR OWN LIBRARY -- AND

22   MUCH MORE, WHICH WE GOT FROM THE MEDICAL LIBRARY AT

23   THE UNIVERSITY OF WISCONSIN HOSPITAL, OR WHATEVER IT

24   IS.

25      WE REVIEWED EVERYTHING WE COULD FIND ON THE

26   SUBJECT.  BUT WE SPECIFICALLY, SPECIFICALLY, EVERY

27   MONTH LOOKED AT THE JOURNALS WHICH WE GOT.  IT

28   WASN'T JUST THIS ONE.  WE GOT LOTS OF OTHERS IN THE

1   FIELD.  BUT THIS ONE THAT WAS MENTIONED WAS MORE OR

2   LESS THE BEST KNOWN AND THE MOST UP-TO-DATE

3   INFORMATION.

4        Q.     YOU ARE REFERRING TO THE PUBLIC HEALTH

5   BULLETIN?

6        A.     THE PUBLIC HEALTH BULLETIN.  AND WHAT'S

7   THE NAME OF THAT OTHER ONE?  "THE INDUSTRIAL JOURNAL

8   OF INDUSTRIAL HYGIENE AND TOXICOLOGY."

9        Q.     ALL RIGHT.  AS YOU SIT HERE TODAY DO YOU

10  HAVE ANY INDEPENDENT RECOLLECTION OF ANY OTHER

11  JOURNALS, LITERATURE OR PUBLICATIONS THAT YOU RELIED

12  UPON?

13       A.     WE RELIED ON EVERYTHING THAT CAME TO OUR

14  ATTENTION.  WE HAD VARIOUS FORMS OF MEDICAL

15  ABSTRACTS THAT CAME TO US.

16       WE HAD INFORMATION FROM THE AMERICAN CHEMICAL

17  SOCIETY, WE HAD HUNDREDS OF BITS OF INFORMATION OF

18  WHICH MAY BE A DOZEN OR TWO WHICH WERE IMPORTANT

19  ENOUGH TO READ IN DETAIL EVERY TIME AND TO FILE AND

20  TO REFER TO WHEN WE NEEDED THEM.

21       BUT YOU CAN FIND THOUSANDS AND THOUSANDS OF

22  ARTICLES ON ALMOST ANY SUBJECT YOU WANTED, AND I

23  DIDN'T READ EVERY ONE OF THEM.

24       BUT WE DID, WE DID KEEP CURRENT WITH THE

25  RECOGNIZED JOURNALS THAT HAD ANYTHING TO DO WITH

26  INDUSTRIAL HYGIENE.

27       Q.     AND DID THIS INCLUDE FOREIGN

28  PUBLICATIONS?

134

1    A.    NOT PER SE.  BUT WE GOT THE ABSTRACTS

2  THAT COVERED THE FOREIGN PUBLICATIONS.

3    Q.    WHO PUBLISHED THESE ABSTRACTS, IF YOU

4  RECALL?

5    A.    SOME OF THEM WERE PUBLISHED -- I BELIEVE

6  SOME WERE PUBLISHED BY THE -- BY THIS JOURNAL OF

7  INDUSTRIAL HYGIENE AND TOXICOLOGY.

8    I CAN'T GO ANY FARTHER THAN THAT.  I DON'T

9  RECALL JUST WHO PUBLISHED THEM.

10    Q.    OKAY.

11    A.    YOU'LL FIND IN ALL MEDICAL LITERATURE

12  THERE ARE ABSTRACTS AVAILABLE.  SOME ARE PUBLISHED

13  BY THE JOURNALS, THERE'S A SECTION IN SOME OF THE

14  JOURNALS.

15    SOME OF THOSE WERE SENT TO US DIRECTLY FROM

16  THE PUBLIC HEALTH SERVICE.  THEY HAD A GROUP THAT

17  REVIEWED A LOT OF LITERATURE AND SENT US THE

18  ABSTRACTS OF THINGS THAT THEY FELT WERE IMPORTANT.

19    Q.    I'D LIKE TO REFER YOU TO EXHIBIT

20  NUMBER ONE, WHICH IS A PUBLIC HEALTH BULLETIN

21  NUMBER 241.

22    COULD YOU HAND THAT TO THE WITNESS FOR ME?

23    MR. RILEY:    SURE.

24    THE WITNESS:    UH-HUH.

25    MR. BURGI:

26    Q.    I'D LIKE TO ASK YOU TO TURN TO PAGE 93.

27    A.    OKAY.  I HAVE 93.

28    Q.    EXCUSE ME.  PAGE 90.

1    I'D LIKE YOU TO READ UNDER THE HEADING

2    "THRESHOLD CONCENTRATION OF ASBESTOS DUST," THAT

3    FIRST PARAGRAPH.

4        A.    I DON'T FIND THAT IN MINE.

5        MR. RILEY:    YOU TOLD HIM --

6        MR. BURGI:    I'M SORRY.  IT'S ON 91.

7        MR. RILEY:    CAN I LOOK -- HE HAS MY COPY.

8    CAN I JUST READ THIS?

9        MR. BURGI:

10       Q.    WOULD YOU READ IT FOR THE RECORD, SIR?

11       A.    READ WHAT?  THE FIRST PARAGRAPH?

12       Q.    YES.  WILL YOU?

13       A.    "THRESHOLD CONCENTRATION OF ASBESTOS

14             DUST:  FROM A PRACTICAL STANDPOINT, ONE OF

15             THE MOST IMPORTANT RESULTS OF A MEDICAL

16             AND ENGINEERING STUDY SUCH AS THIS IS THE

17             DELINEATION OF SAFE WORKING CONDITIONS IN

18             THE INDUSTRY UNDER STUDY.  IDEALLY, A

19             THRESHOLD CONCENTRATION OF DUST SHOULD BE

20             THE HIGHEST DUST CONCENTRATION.  IT WOULD

21             NOT PRODUCE PNEUMOCONIOSIS IN ORIGINALLY

22             HEALTHY WORKMEN DURING THEIR ENTIRE

23             WORKING LIFE.

24             "THE CHIEF DIFFICULTY IN THIS STUDY AS IN

25             MOST OF THE EARLIER STUDIES OF THE PUBLIC

26             HEALTH SERVICE IS THAT VERY FEW WORKMEN

27             WERE EXPOSED FOR LONG ENOUGH" --

28             CORRECTION -- "ARE EXPOSED FOR A LONG

136

1    PERIOD OF TIME TO K-LO CONCENTRATIONS OF

2    ASBESTOS DUST.  BECAUSE OF THE IMPORTANCE

3    OF THE PROBLEM IT SEEMS TO BE DESIRABLE TO

4    USE SUCH DATA AS ARE AT HAND TO DEFINE

5    TENTATIVE SAFE WORKING CONDITIONS THAT MAY

6    SERVE AS STANDARDS FOR THE GUIDANCE OF

7    FACTORY MANAGERS AND ENGINEERS UNTIL MORE

8    COMPLETE DATA IS AVAILABLE."

9    Q.    WILL YOU GO DOWN ONE MORE PARAGRAPH?

10   YES.  ONE MORE PARAGRAPH WHERE IT BEGINS, "BECAUSE

11   CLEAN-CUT" -- AND READ THAT FOR ME AS WELL?

12   MR. RILEY:    WAIT A MINUTE.  IF WE'RE GOING

13   TO SKIP AROUND I'M GOING TO OBJECT TO THAT.  IF YOU

14   ARE TALKING ABOUT READING INTO THE RECORD, WHY DON'T

15   YOU READ IT IN CONTEXT?

16   MR. BURGI:

17   Q.    GO AHEAD.  WILL YOU CONTINUE TO READ

18   UNTIL YOU GET TO THE END OF THE THIRD PARAGRAPH?

19   A.    ARE YOU ASKING ME?

20   Q.    YES, PLEASE.

21   A.    I SHOULD READ TILL I GET TO THE END OF

22   THE THIRD PARAGRAPH?

23   Q.    YES.  WHICH ENDS WITH THE WORD

24   "AVAILABLE."

25   JUST CONTINUE TO READ, AND I'LL TELL YOU TO

26   STOP.

27   A.    "IN AN ANALYSIS OF THIS KIND OF CASE

28   THAT OCCURRED RELATIVE TO KALO DUST

1    EXPOSURES ARE OF A SPECIAL SIGNIFICANCE
2    BECAUSE THEY INDICATE WHAT THE SAFE LIMITS
3    OF EXPOSURE MAY BE.  THESE CASES MUST BE
4    EXAMINED INDIVIDUALLY AS WELL AS
5    STATISTICALLY IN ORDER TO BE SURE THAT
6    THERE ARE NO UNUSUAL FEATURES THAT WOULD
7    COMPLICATE STATISTICAL ANALYSIS.  BELOW
8    THE TWO AND A HALF MILLION PARTICLES PER
9    CUBIC FOOT THE INTERPRETATION OF TABLE 43
10   OFFERS NO DIFFICULTIES.  NONE OF THE
11   39 PERSONS EXPOSED TO DUST CONCENTRATIONS
12   BELOW TWO AND A HALF MILLION PARTICLES PER
13   CUBIC FOOT HAD A CASE OF ASBESTOSIS.
14   ALTHOUGH, AS A MATTER OF FACT, ONLY SIX
15   PERSONS HAD BEEN EMPLOYED MORE THAN FIVE
16   YEARS.
17   "THREE DOUBTFUL CASES OF ASBESTOSIS FELL
18   IN THE RANGE OF TWO AND A HALF TO ONE --
19   TWO AND A HALF TO 4.9 MILLION PARTICLES.
20   BECAUSE CLEAN CUT CASES OF ASBESTOSIS WERE
21   FOUND ONLY IN DUST CONCENTRATIONS
22   EXCEEDING 5.0 MILLION PARTICLES PER CUBIC
23   FOOT AND BECAUSE THEY WERE NOT FOUND AT
24   LOWER DUST CONCENTRATIONS, 5.0 MILLION
25   PARTICLES PER CUBIC FOOT MAY BE REGARDED
26   TENTATIVELY AS THE THRESHOLD VALUE FOR
27   ASBESTOS DUST EXPOSURE UNTIL BETTER DATA
28   ARE AVAILABLE."

1      Q.     THANK YOU.

2          SO, IS IT YOUR CONCLUSION FROM THAT PARAGRAPH

3   THAT 5.0 MILLION PARTS PER CUBIC FOOT IS A TENTATIVE

4   M.A.C. WITH RESPECT TO DR. DREESEN'S REPORT?

5      MR. RILELY:     EXCUSE ME A SECOND.   I DON'T

6   THINK THAT THAT'S FAIR, UNLESS YOU WANT HIM TO READ

7   DR. DREESEN'S REPORT IN ITS ENTIRETY.

8          YOU HAVE JUST PICKED OUT THREE PARAGRAPHS FROM

9   PAGE 91.   MY RECOLLECTION IS THAT WE'VE GOT

10  125 PAGES IN THIS ARTICLE, INCLUDING THE CITATIONS.

11  I DON'T THINK IT'S REALLY FAIR TO ASK THIS MAN TO

12  OFFER AN OPINION WITH REGARD TO THIS PIECE OF

13  LITERATURE WITH THAT KIND OF EXPOSURE.

14         MOREOVER, I THINK A REQUEST FOR THAT KIND OF

15  AN OPINION UNRELATED TO THE FACTUAL TESTIMONY IS

16  INAPPROPRIATE.

17     MR. BURGI:

18      Q.     NEVERTHELESS, THE QUESTION IS STILL

19  PENDING, WHETHER OR NOT YOU BELIEVE AFTER READING

20  THAT THAT DR. DREESEN FELT 5.0 MILLION PARTS PER

21  CUBIC FOOT WAS A TENTATIVE M.A.C. AT THE TIME HE

22  ISSUED THIS REPORT?

23     MR. RILEY:     ALTHOUGH THE WORD "M.A.C."

24  DOESN'T APPEAR IN THAT QUOTED PORTION.

25     MR. BURGI:     I BELIEVE HE USES THE TERM

26  THRESHOLD VALUE, A TENTATIVE THRESHOLD VALUE.

27        MR. HARRINGTON:     I'LL JOIN IN THE OBJECTION.

28        MR. RILEY:     I OBJECT.   I DON'T THINK THAT'S

1   FAIR.

2        THE WITNESS:     YOU ARE TAKING THAT OUT OF

3   CONTEXT.   THREE PARAGRAPHS OUT OF A LENGTHY DOCUMENT

4   LIKE THAT MAKES IT DIFFICULT TO ANSWER SUCH A

5   QUESTION.

6        HOWEVER, EVEN IF THAT WAS THE TENTATIVE

7   THRESHOLD LIMIT VALUE THAT THEN WAS CORROBORATED

8   OVER THE YEARS, AND UP UNTIL AT LEAST THE 1950'S,

9   THE LAST I REMEMBER, THAT WAS CONSIDERED THE MAXIMUM

10  ALLOWABLE CONCENTRATION, NOT THE THRESHOLD -- NOT

11  THE TENTATIVE BUT THE MAXIMUM ALLOWABLE

12  CONCENTRATION.

13       LATER WORK IDENTIFIES 5.0 MILLION PARTICLES

14  PER CUBIC FOOT AS THE M.A.C, NOT THE TENTATIVE

15  M.A.C.

16       WHOSE IS THIS?

17       MR. RILEY:     MINE.  THANK YOU.

18       MR. BURGI:

19       Q.    DURING YOUR EMPLOY WITH THE STATE OF

20  WISCONSIN, STATE BOARD OF HEALTH, DID YOU RECEIVE

21  ANY INFORMATION FROM ANY SOURCE WHICH SUPPORTED OR

22  INDICATED THAT 5.0 MILLION PARTS PER CUBIC FOOT WAS

23  NOT A SAFE LEVEL FOR M.A.C.

24       MR. RILEY:     COULD YOU READ THE QUESTION FOR

25  ME, PLEASE?

26

27                 (RECORD READ.)

28       THE WITNESS:     NOTHING AUTHORITATIVE.

140

1      MR. BURGI:

2      Q.     CAN YOU NAME ME ANY SOURCE WHICH YOU

3   RECALL --

4      A.     NO.

5      Q.     -- WHICH YOU DO NOT CHARACTERIZE AS

6   AUTHORITATIVE?

7      A.     I CAN'T NAME ANY.

8      Q.     IF YOU HAD RECEIVED INFORMATION DURING

9   THAT PERIOD OF TIME THAT 5.0 MILLION PARTS PER CUBIC

10  FOOT WAS NOT A SAFE LEVEL, WOULD YOU HAVE

11  RECOMMENDED ANOTHER --

12     MR. RILEY:     EXCUSE ME A SECOND.

13      THAT'S ANOTHER HYPOTHETICAL QUESTION, WITHOUT

14  A FOUNDATION, AT LEAST, IN THIS RECORD.  AND I THINK

15  IT'S AN INAPPROPRIATE QUESTION TO ASK OF THIS

16  WITNESS, AND I OBJECT.

17     MR. HARRINGTON:     I JOIN IN THE OBJECTION.

18     MR. BURGI:     YOU ARE FREE TO RESPOND.

19     MR. RILEY:     GO RIGHT AHEAD.

20     THE WITNESS:     I SHOULD ANSWER?

21     MR. RILEY:     YEAH.  SURE.

22     THE WITNESS:     ONE BIT OF INFORMATION LIKE

23  THAT WOULD NOT CAUSE US TO CHANGE OUR LEVEL.

24      WE WOULD TAKE THAT ALONG WITH ALL THE OTHER

25  INFORMATION, JUDGE THE VALUE OF IT COMPARED WITH

26  EVERYTHING ELSE WE KNEW, AND WE WOULD NOT CHANGE OUR

27  THRESHOLD, OUR MAXIMUM ALLOWABLE CONCENTRATION BASED

28  ON ONE BIT OF INFORMATION FROM ONE SOURCE.

1      MR. BURGI:

2      Q.     DO YOU KNOW OF ANY SOURCE DURING YOUR

3   PERIOD WITH WISCONSIN STATE BOARD OF HEALTH OF WHICH

4   YOU BECAME AWARE THAT RECOMMENDED A LOWER STANDARD

5   THAN 5.0 MILLION PARTS PER CUBIC FOOT FOR AN M.A.C.

6   ON ASBESTOS EXPOSURE?

7      A.     I DON'T REMEMBER.

8      Q.     DID ANY MEMBER OF THE ASBESTOS INDUSTRY

9   EVER TELL YOU THAT THEY HAD REASON TO BELIEVE THAT

10  5.0 MILLION PARTICLES PER CUBIC INCH -- EXCUSE ME --

11  PER CUBIC FOOT OF ASBESTOS IN AN M.A.C. WAS AN

12  UNSAFE LEVEL?

13     MR. RILEY:     EXCUSE ME A SECOND.

14     THAT QUESTION PRESUMES THAT SOMEONE IN THE

15  INDUSTRY HELD THAT VIEW, AND I OBJECT TO THE FORM OF

16  THE QUESTION.

17     MR. HARRINGTON:     OBJECT TO THE FORM OF THE

18  QUESTION.

19     THE WITNESS:     I SHOULD STILL ANSWER IT?

20     MR. RILEY:     OVER THE OBJECTION, CERTAINLY.

21     I'M NOT QUITE SURE WHAT THE QUESTION IS, BUT

22  YOU CAN ANSWER IT.

23     THE WITNESS:     I DON'T RECALL ANY.

24     I'M ALMOST CERTAIN THAT WE DIDN'T RECEIVE ANY

25  INFORMATION.

26     MR. BURGI:

27     Q.     DURING YOUR EMPLOY WITH THE STATE OF

28  WISCONSIN, STATE BOARD OF HEALTH, DID YOU RECEIVE

1    ANY INFORMATION FROM ANY MANUFACTURER OF ASBESTOS OR

2    ASBESTOS CONTAINING PRODUCTS WITH RESPECT TO ANY

3    ASSOCIATED HEALTH HAZARDS WITH EXPOSURE TO THEIR

4    PRODUCTS?

5         A.    I DON'T RECALL.

6         Q.    WHILE YOU WERE EMPLOYED BY THE STATE OF

7    WISCONSIN, STATE BOARD OF HEALTH, IT WAS YOUR

8    UNDERSTANDING THAT ASBESTOS WAS A TOXIC SUBSTANCE;

9    IS THAT CORRECT.

10    MR. RILEY:    OBJECT TO THE FORM OF THE

11   QUESTION.  VAGUE AND AMBIGUOUS AS TO WHAT YOU MEAN

12   BY "TOXIC SUBSTANCE."  IT'S VAGUE AND AMBIGUOUS,

13   BECAUSE IT DOESN'T SPECIFY AT WHAT LEVEL OR OVER

14   WHAT PERIOD AND UNDER WHAT CIRCUMSTANCES.

15    MR. HARRINGTON:    I JOIN IN THE OBJECTION TO

16   THE EXTENT IT DOES NOT SPECIFY ANY LEVEL OR ANY

17   CIRCUMSTANCES.

18    THE WITNESS:    I'D LIKE TO ANSWER THAT WITH A

19   QUOTE FROM A VERY FAMOUS DOCTOR:  EVERYTHING CAN

20   POTENTIALLY BE TOXIC, INCLUDING PURE AIR AND PURE

21   WATER.

22     HE FIRST STARTED OUT HIS LECTURES BY SAYING

23   EVERYTHING BUT PURE AIR AND PURE WATER CAN BE TOXIC.

24   LATER ON HE SAID EVEN THOSE CAN BE.  SO ANYTHING YOU

25   CAN NAME CAN BE A TOXIC MATERIAL IF YOU SET CERTAIN

26   CONDITIONS AND IN CERTAIN AMOUNTS.

27    MR. BURGI:

28         Q.    IT'S YOUR UNDERSTANDING THAT ASBESTOS IS

1  A TOXIC SUBSTANCE IN A CERTAIN AMOUNT OF EXPOSURE --
2  TO BORROW YOUR PHRASE?
3       MR. RILEY:    ARE YOU GOING TO ADD HIS
4  COMPLETE PHRASE?  UNDER CIRCUMSTANCES -- IF YOU HAVE
5  ENOUGH UNDER THE RIGHT CIRCUMSTANCES?  ARE YOU
6  GOING TO --
7       MR. BURGI:    THAT'S REPETITIOUS.
8  "CIRCUMSTANCES" IS HOWEVER HE DEFINES THE
9  CIRCUMSTANCES.
10      MR. RILEY:    WHETHER HE WAS REPETITIOUS OR
11 NOT, I WANT TO KNOW WHETHER YOU ARE GOING TO ADOPT
12 ALL OF HIS LANGUAGE OR JUST SOME OF IT?
13      MR. BURGI:    I THINK THE QUESTION IS A
14 COMPLETE QUESTION.
15      MR. RILEY:    I'LL OBJECT TO IT, THEN.
16      THE WITNESS:    IT'S A POTENTIALLY TOXIC
17 MATERIAL, JUST LIKE ALL CHEMICALS.
18      MR. BURGI:
19      Q.    DURING YOUR EMPLOY WITH THE STATE OF
20 WISCONSIN, STATE BOARD OF HEALTH, YOU TESTED
21 NUMEROUS SUBSTANCES; IS THAT CORRECT?
22      A.    YES.
23      Q.    AND YOU TESTED WORKERS' EXPOSURE TO
24 NUMEROUS SUBSTANCES; IS THAT CORRECT??
25      A.    YES.
26      Q.    AND DURING THAT ENTIRE PERIOD OF TIME
27 YOU ONLY TESTED TWO FACILITIES WITH RESPECT TO
28 ASBESTOS EXPOSURE; IS THAT CORRECT?

1      A.     THAT'S ALL I REMEMBER.

2      Q.     WASN'T THE MINING INDUSTRY IN A MUCH

3  BETTER POSITION TO KNOW OF THE POSSIBLE HAZARDS

4  ASSOCIATED WITH ASBESTOS EXPOSURE --

5      MR. HARRINGTON:   OBJECT TO THE FORM OF THE

6  QUESTION.

7      MR. BURGI:

8      Q.   -- THAN WAS YOUR DEPARTMENT?

9      MR. HARRINGTON:   OBJECT TO THE FORM OF THE

10  QUESTION.

11     MR. RILEY:   I'M GOING TO OBJECT TO THE FORM

12  OF THE QUESTION, TOO.

13     YOU ARE ASKING HIM TO SPECULATE AS TO THE

14  CAPACITY OF SOMETHING YOU'VE DESCRIBED AS THE MINING

15  INDUSTRY.  THAT'S NOT FAIR.  THERE'S NO

16  BASIS FOR THAT.

17     MR. BURGI:   I'M SORRY.  I THOUGHT I USED THE

18  TERM "ASBESTOS MINING INDUSTRY."

19     MR. RILEY:   EVEN WITH THAT, IF YOU DID ADD

20  IT, IF YOU DIDN'T MEAN TO OMIT IT, IF YOU ADDED IT,

21  I DON'T THINK THAT SAVES THE QUESTION.

22     I DON'T THINK IT'S FAIR TO ASK HIM TO

23  SPECULATE UNDER THOSE CIRCUMSTANCES.

24     MR. HARRINGTON:   I STILL OBJECT TO THE FORM

25  OF THE REPHRASED QUESTION.

26     MR. RILEY:   I OBJECT AS WELL.

27     THE WITNESS:   I CAN'T ANSWER THAT.

28     THAT WOULD BE PURELY A MATTER OF PROFESSIONAL

1  OPINION, NOT OF FIRST-HAND KNOWLEDGE.  I CAN'T

2  ANSWER THAT.

3      MR. BURGI:

4      Q.    DID ANY MEMBER OR REPRESENTATIVE OF THE

5  ASBESTOS INDUSTRY REVEAL ANY EVIDENCE TO YOU OR ANY

6  MEMBER OF YOUR DEPARTMENT THAT YOU ARE AWARE OF THAT

7  ALLEGED THAT ASBESTOS COULD CAUSE CANCER?

8      MR. HARRINGTON:    JUST A MINUTE.  LET ME I

9  INTERPOSE AN OBJECTION.  YOU'VE ASKED ABOUT ASBESTOS

10  PRODUCTS MANUFACTURERS, AND THEN YOU'VE ASKED ABOUT

11  ASBESTOS MINERS, AND NOW YOU ARE REFERRING TO THE

12  ASBESTOS INDUSTRY.  WHAT ARE YOU TALKING ABOUT?

13      MR. BURGI:    WHEN I REFER TO THE ASBESTOS

14  INDUSTRY I'M INCLUDING FROM MINING TO FINISHED

15  PRODUCT, ANY MEMBER OF THAT INDUSTRY WHO'S ENGAGED

16  IN THE MINING OR PRODUCTION OF ASBESTOS CONTAINING

17  PRODUCTS.

18      MR. HARRINGTON:    MAY I HEAR THE QUESTION

19  AGAIN NOW, PLEASE?

20          (RECORD READ.)

21

22      MR. RILEY:    I'M GOING TO OBJECT TO THAT,

23  BECAUSE THE WAY IT'S PHRASED IT SUGGESTS THAT SUCH

24  EVIDENCE EXISTED AND WAS A QUESTION OF WHETHER IT

25  WAS REVEALED OR NOT.  I THINK THAT BEING IMPLICIT IN

26  THE QUESTION MAKES IT INAPPROPRIATE.  IT IS ALSO

27  INAPPROPRIATE AS TO FORM IN OTHER RESPECTS.

28      MR. BURGI:    HE EITHER RECEIVED SUCH EVIDENCE

1    OR HE DIDN'T.

2         MR. HARRINGTON:     LET ME JUST ADD THE BASIS

3    OF MY OBJECTION.  THE BASIS OF MY OBJECTION IS THAT

4    THE WORD "REVEALED" IS VAGUE AND AMBIGUOUS, BECAUSE

5    THERE IS NO DELINEATION BETWEEN INFORMATION WHICH

6    MAY HAVE BEEN AVAILABLE THROUGH SECONDARY SOURCES --

7    PUBLICATIONS, ET CETERA, THROUGH TRADE GROUPS THAT

8    HE WAS ASSOCIATED WITH -- AND DIRECT COMMUNICATIONS

9    FROM ANY OF THOSE PERSONS THAT YOU ARE REFERRING TO

10   IN THE ASBESTOS INDUSTRY DEFINITION.

11       MR. RILEY:     I ALSO THINK THE QUESTION IS

12   VAGUE AND AMBIGUOUS, SINCE THERE IS NO DOSAGE LEVEL

13   OR CIRCUMSTANCE OF EXPOSURE INFORMATION IN THERE.

14       MR. BURGI:

15       Q.     YOU ARE FREE TO RESPOND.

16       A.     I DON'T RECALL ANY CONTACT DIRECTLY FROM

17   ANY ASBESTOS INDUSTRY INDICATING THAT THERE WAS A

18   PROBLEM OF CANCER.

19       MR. BURGI:

20       Q.     I WANT TO TAKE A LOOK AT SOME OF THE

21   DOCUMENTS HERE THAT WE REFERRED TO EARLIER THAT WERE

22   PART OF THE DETJIN -- IS THAT HOW YOU PRONOUNCE IT?

23       MR. RILEY:     DETJIN.

24       MR. BURGI:

25       Q.     -- DETJIN EXHIBITS.

26       I NOTICED IN EXHIBIT NUMBER ELEVEN THAT THE

27   ISSUE OF THE BAGGING OPERATION ARISES FOR THE FIRST

28   TIME WITH RESPECT TO YOUR TESTING OF THE FACILITY;

1   IS THAT CORRECT?

2        MR. RILEY:    WELL, WAIT A MINUTE.  I'M GOING

3   TO --

4        MR. BURGI:    STRIKE THAT.  I'LL REPHRASE IT.

5        Q.    SIR, IS THERE ANY REASON WHY IN YOUR

6   TESTING OF THE ALGOMA PLANT ON FEBRUARY 13, '48,

7   THAT YOU DID NOT TEST EITHER THE BAGGING OPERATION

8   OR THE UNLOADING OF BOX CAR OPERATION?

9        MR. RILEY:    EXCUSE ME A MOMENT.  YOU ARE

10  REFERRING TO A DOCUMENT THAT THE WITNESS DOESN'T

11  HAVE BEFORE HIM, NOR DO I.

12       MR. BURGI:    THAT QUESTION REFERS TO NO

13  DOCUMENT.

14       MR. RILEY:    IT REFERS TO HIS TESTING IN

15  FEBRUARY OF 1948.  THE DOCUMENT YOU'VE REFERRED HIM

16  TO IS AN OCTOBER 28, 1948 LETTER.

17       MR. BURGI:    MY LAST QUESTION REFERRED TO NO

18  DOCUMENT.

19       WOULD YOU READ IT BACK, PLEASE?

20       MR. RILEY:    WAIT A MINUTE.  READ IT BACK.

21       MR. BURGI:    I STRUCK THE QUESTION, COUNSEL.

22       LET ME REPHRASE IT AGAIN SO THAT IT'S CLEAR

23  FOR EVERYONE.

24       Q.    AT THIS TIME WITH THIS QUESTION I'M NOT

25  REFERRING TO ANY DOCUMENTS.

26       IS THERE ANY REASON WHY YOUR TESTING OF THE

27  ALGOMA PLANT, FEBRUARY 13, 1948, DID NOT INCLUDE

28  TESTS OF THE BAGGING OPERATION OR THE BOXCAR LOADING

1    OPERATIONS WHICH YOU LATER TESTED?

2       MR. RILEY:    I'M GOING TO OBJECT TO THE FORM

3    OF THE QUESTION.

4       YOU OUGHT TO AT LEAST HAVE THE COURTESY TO PUT

5    THE DOCUMENT THAT YOU ARE REFERRING TO, THE

6    FEBRUARY 13 TEST, IN FRONT OF HIM SO HE CAN LOOK AT

7    IT TO DETERMINE WHETHER EVEN THE FACTUAL PREDICATE

8    TO YOUR QUESTION IS TRUE.

9       MR. BURGI:

10       Q.    DO YOU UNDERSTAND MY QUESTION?

11       A.    YES.   THEY WEREN'T CONSIDERED

12    SIGNIFICANT ENOUGH TO BOTHER WITH AT THE TIME.

13       WE DO NOT WHEN WE GO INTO A FACTORY, SPEND

14    THREE WEEKS THERE AND TEST EVERY MACHINE EVERYPLACE

15    IN THE FACTORY.

16       WE EVALUATE WHAT SEEMS TO BE WORTHWHILE

17    LOOKING AT.   AND THESE OPERATIONS WERE OF SUCH SHORT

18    DURATION, SO INFREQUENT, THAT THERE WAS NOT IN OUR

19    PROFESSIONAL JUDGMENT ANY ~~TIME~~ *NEED (OR)* TO WASTE TIME AND

20    MONEY TO TEST THEM.

21       Q.    DURING YOUR EMPLOY WITH THE WISCONSIN

22    STATE BOARD OF HEALTH DID YOU BECOME AWARE OF ANY

23    TESTING SPECIFICALLY OF THE K-LO PRODUCT?

24       A.    WHAT DO YOU MEAN BY TESTING OF THE K-LO

25    PRODUCT?   WHAT SORT OF TESTING?

26       Q.    WELL, LET ME BE MORE SPECIFIC.

27       DURING YOUR EMPLOY WITH THE WISCONSIN STATE

28    BOARD OF HEALTH DID YOU BECOME AWARE OF ANY ANIMAL

1   STUDIES WHICH TESTED SPECIFICALLY EXPOSURE TO K-LO

2   CONTAINING ASBESTOS PRODUCTS?

3          A.     I DON'T REMEMBER.

4          Q.     DURING YOUR EMPLOY WITH THE WISCONSIN

5   STATE BOARD OF HEALTH DID YOU BECOME AWARE OF ANY

6   STUDIES WHICH DEALT SPECIFICALLY WITH EXPOSURE TO

7   K-LO PRODUCTS?

8          A.     I DON'T REMEMBER.

9          Q.     I'D LIKE TO REFER YOU TO EXHIBIT

10  SIXTEEN, PAGE TWO.

11      MR. RILEY:     THERE IS NO SECOND PAGE TO

12  EXHIBIT SIXTEEN.

13      MR. BURGI:     I HAVE A PAGE TWO, WHICH HAS 118

14  AT THE BOTTOM OF IT.

15      MR. RILEY:     YOU ARE TALKING ABOUT --

16      MR. HARRINGTON:     THAT'S ON EXHIBIT FOURTEEN.

17      MR. BURGI:     ALL RIGHT.  FOURTEEN, PAGE TWO.

18         Q.     DO YOU HAVE THAT IN FRONT OF YOU, SIR?

19         A.     A LISTING OF -- YES.

20         Q.     I'D LIKE TO REFER YOU TO YOUR

21  CONCLUSIONS.

22      IN YOUR CONCLUSION YOU SAY "SUCH

23  CONCENTRATIONS ARE, NEVERTHELESS, A BORDERLINE

24  SITUATION FROM THE ASBESTOSIS" -- EXCUSE ME --

25  "ASBESTOS STANDPOINT AND CAN CAUSE RESPIRATORY

26  IRRITATIONS."

27      DO YOU SEE THAT PORTION?

28         A.     YES.

1    MR. HARRINGTON:    YOU MISREAD THAT, COUNSEL.

2  THAT WORD IS "ASBESTOSIS" ON MY COPY.

3    MR. BURGI:    IT IS IN FACT ASBESTOSIS.

4    MR. RILEY:    AND I'LL OBJECT TO READING ONLY

5  A PORTION OF THE SENTENCE.

6    MR. BURGI:

7    Q.    WOULD YOU EXPLAIN FOR ME WHAT YOU MEANT

8  BY RESPIRITORY IRRITATIONS?

9    A.    IT'S OF GENERAL KNOWLEDGE IN THE

10  INDUSTRIAL HYGIENE PROFESSION THAT HIGH

11  CONCENTRATIONS, HIGH ANYTHING, IN THE NEIGHBORHOOD

12  OF 30, 40 PARTS PER MILLION, OF ANY DUST, EVEN A

13  SO-CALLED --

14    MR. RILEY:    YOU SAID 30 OR 40.  DO YOU MEAN

15  30 OR 40 MILLION?

16    A.    30 OR 40 MILLION, YEAH.  30 OR 40

17  MILLION, EVEN WHAT WE CALL NUISANCE DUSTS, CAN CAUSE

18  RESPIRATORY IRRITATION.

19    THAT MAY HAVE BEEN POOR WORDING ON MY PART IN

20  WRITING THE REPORT, WHERE I SAY "FROM THE ASBESTOSIS

21  STANDPOINT."

22    BUT EVEN IF YOU TAKE IT WORD FOR WORD IT

23  STILL IS BASED ON SIMPLY A SIMPLE ~~REGULATORY~~ RESPIRATORY

24  IRRITATION, JUST LIKE YOU'D GET FROM INHALING DUST

25  ON A DUSTY ROAD OR SOMEBODY ELSE'S TOBACCO SMOKE OR

26  SOMETHING OF THAT.  THAT WAS PUT IN THERE AS AN

27  INCENTIVE FOR MANAGEMENT TO CUT THE DUST COUNT DOWN.

28  WE WOULD PUT IN THE SAME RECOMMENDATION FOR WOOD

FLOUR (wf)

1   DUST OR FOR FLOWER DUST OR WHEAT DUST, TO REDUCE THE

2   IRRITATION FROM THE DUST.

3          Q.      AND WHAT WAS MEANT BY "BORDERLINE

4   SITUATION" FROM THE ASBESTOSIS STANDPOINT?

5          A.      AGAIN, WE USED THAT WORDING IN ORDER TO

6   ENCOURAGE MANAGEMENT TO DO SOMETHING ABOUT IT.   IT'S

7   A PLAY ON WORDS TO SORT OF TEASE THEM ALONG TO DO

8   SOMETHING.

9          Q.      NOW WITH RESPECT TO YOUR TESTING AT THE

10  ALGOMA PLANT WAS ANY SYSTEM OR METHOD UTILIZED TO

11  DETERMINE IF THE SAME QUANTITY OF MATERIALS WERE

12  BEING PROCESSED OR MANUFACTURED DURING YOUR TESTING

13  AS OPPOSED TO WHEN YOU WERE NOT THERE TESTING?

14         A.      NO.   WE DIDN'T GO INTO IT IN TERMS OF

15  THEIR PRODUCTION CAPACITY.

16         IF WE HAD FOUND SERIOUS CONCENTRATIONS WE

17  WOULD HAVE SPENT A LOT MORE TIME THERE AND LOOKED

18  INTO THEIR MANUFACTURING PROCESS AND DETERMINED HOW

19  IT FLUCTUATED DAY BY DAY AND WEEK BY WEEK.   BUT YOU

20  DON'T SPEND THAT MUCH TIME UNTIL YOU FIND A NEED FOR

21  IT.   WE DON'T KNOW HOW IT FLUCTUATED.

22         Q.      SO NO SUCH SYSTEM OR METHOD WAS USED TO

23  TRY AND ASSURE YOURSELF THAT THE AMOUNT OF PRODUCT

24  BEING MANUFACTURED DURING YOUR TESTING WAS IN FACT

25  AN AVERAGE OR SOMEHOW REPRESENTED WHAT THEY NORMALLY

26  PRODUCED?

27         MR. RILEY:      OBJECTION.   JUST ASKED, JUST

28  ANSWERED.

1    THE WITNESS:    I ANSWERED THAT IN THE LAST
2  QUESTION.
3    MR. BURGI:
4    Q.    I WANT TO REFER YOU TO ANOTHER EXHIBIT.
5  THAT WOULD BE EXHIBIT SIX OF DETJIN --
6    MR. RILEY:    SIX?
7    MR. BURGI:    HANG ON JUST A SECOND.
8    MR. RILEY:    I THINK HE'S GOING TO PICK
9  ANOTHER DOCUMENT.
10    MR. BURGI:    DO YOU HAVE YOUR HAND ON THE
11  NURSE'S DOCUMENT, WHERE SHE MENTIONS THE INSURANCE?
12    MR. RILEY:    NO.
13    MR. BURGI:
14    Q.    ALL RIGHT.  IT'S EXHIBIT NUMBER
15  SEVENTEEN.  MY APOLOGY.  HERE'S MY COPY.
16    A.    WHAT'S THE QUESTION?
17    Q.    AFTER YOUR DEPARTMENT HAVING RECEIVED
18  THIS CORRESPONDENCE DID YOU HAVE ANY CONCERN THAT
19  THE WORK AT THE ALGOMA PLANT WOULD BE ALTERED FOR
20  PURPOSES OF OBTAINING FAVORABLE STUDIES FOR THE
21  INSURANCE CARRIER OF THE ALGOMA FACILITY?
22    MR. RILEY:    WHAT?  EXCUSE ME A SECOND.  I
23  JUST GOT MY HAND ON THE DOCUMENT HERE.
24    I OBJECT TO THAT.
25    THERE IS NOTHING IN THIS LETTER THAT MAKES ANY
26  REFERENCE TO -- I MEAN, I DON'T KNOW WHAT THOSE TWO
27  HAVE TO DO WITH ONE ANOTHER.
28    I WANT THE RECORD TO REFLECT WHAT THIS SAYS:

1    "WE WOULD LIKE A COUNT MADE OF THE

2    ASBESTOS DUST CONCENTRATIONS IN OUR K-LO

3    MANUFACTURING PLANT AT OUR CONVENIENCE.

4    MR. WILLIAM FLUCK MADE A SURVEY HERE

5    JULY 29 OF LAST YEAR AND OUR INSURANCE

6    CARRIER REQUESTS A REPEAT COUNT AT THIS

7    TIME.  YOUR ATTENTION IS APPRECIATED.

8    VERY TRULY YOURS."

9        I THINK IT'S TOTALLY INAPPROPRIATE TO SUGGEST

10   THAT THAT DOCUMENT HAS IN IT THE SUGGESTION OR

11   INNUENDO YOU PUT IN YOUR QUESTION.

12       MR. BURGI:    I MADE NO SUCH INNUENDO.  I JUST

13   WONDERED WHETHER HE HAD ANY SUCH CONCERN WHEN HE DID

14   HIS TESTING.

15       MR. RILEY:    CONCERN ABOUT WHAT?

16       THE WITNESS:    REPEAT THE QUESTION.   WHAT

17   WAS THE CONCERN?

18       MR. BURGI:

19       Q.    DID YOU HAVE ANY CONCERN THAT THE WORK

20   THAT WAS BEING PERFORMED DURING YOUR TESTING WAS IN

21   ANY WAY ALTERED FOR THE BENEFIT OF THE ALGOMA PLANT

22   TO SECURE INSURANCE?

23       MR. RILEY:    I OBJECT TO THE FORM OF THE

24   QUESTION.  ALTERED BY WHOM?

25       MR. BURGI:

26       Q.    ALTERED BY THE ALGOMA PLANT.

27       MR. RILEY:    ALTERED HIS WORK?

28   / / /

1      MR. BURGI:    LET'S REPHRASE THE QUESTION.

2      Q.    WHEN YOU PERFORMED --

3      A.    LET ME SEE THAT.

4      Q.    WHEN YOU PERFORMED YOUR TESTING AT THE

5  ALGOMA PLANT FOLLOWING THIS JULY 20, 1949 LETTER

6  FROM NURSE BRICE, DID YOU HAVE ANY CONCERN THAT THE

7  PRODUCTION WOULD BE ALTERED IN ORDER TO GET

8  FAVORABLE TEST RESULTS BY ALGOMA?

9      A.    I HAD NO CONCERN.  I HAD NO CONCERN AT

10  ALL.

11      I CAN'T IMAGINE ANY MANUFACTURING PLANT

12  SHUTTING DOWN THEIR PROCESS JUST TO --

13      Q.    ANY ALTERATION OF ANY KIND?

14      A.    NO.  I WASN'T CONCERNED ABOUT THAT.

15      Q.    OKAY.  THANK YOU.

16      YOU MENTIONED IN PREVIOUS TESTIMONY THAT YOU

17  HAD BECOME AWARE THROUGH SOME SOURCE THAT SOME

18  TESTING HAD BEEN PERFORMED AT THE ALGOMA PLANT AFTER

19  YOU LEFT, BUT YOU DID NOT KNOW WHO DID THE TESTING;

20  IS THAT CORRECT?

21      A.    YEAH.

22      Q.    HOW DID YOU ACQUIRE THE BELIEF THAT

23  TESTING WAS PERFORMED?

24      A.    I RECEIVED A COPY OF A REPORT FROM THIS

25  GENTLEMAN HERE.

26      MR. RILEY:    ME.

27      MR. BURGI:

28      Q.    AND WHO IS THAT?

1      MR. RILEY:    BOB RILEY.

2      MR. BURGI:

3      Q.    BOB RILEY.

4      PRIOR TO RECEIVING A COPY OF THAT REPORT FROM

5  BOB RILEY WERE YOU AWARE THAT ANY TESTING HAD BEEN

6  PERFORMED AFTER YOU LEFT THE WISCONSIN STATE BOARD

7  OF HEALTH ON THE ALGOMA PLANT?

8      A.    NO.

9      Q.    DID YOU DISCUSS THE REPORT WHICH YOU

10  RECEIVED FROM COUNSEL AT ANY TIME.

11     MR. HARRINGTON:    YOU'D BETTER DEFINE WHO YOU

12  MEAN WHEN YOU SAY "COUNSEL."

13     MR. BURGI:    REPHRASE IT?  OKAY.

14     MR. HARRINGTON:    BECAUSE THERE'S TWO OF US.

15     MR. BURGI:    ALL RIGHT.

16     Q.    WHEN IS THE FIRST TIME YOU ENGAGED IN

17  ANY CONVERSATION WITH ANY PARTY TO THE LITIGATION

18  THAT WE'RE PRESENTLY ENGAGED IN THIS DEPOSITION FOR?

19     MR. RILEY:    A PARTY TO THE LITIGATION?  I

20  DON'T THINK THAT'S --

21     MR. BURGI:

22     Q.    ANY PARTY.

23     MR. RILEY:    BY "PARTY," HE MEANS A PLAINTIFF

24  OR A DEFENDANT.

25     MR. BURGI:

26     Q.    PLAINTIFF, DEFENDANT, COUNSEL --

27     MR. RILEY:    I'M NOT A PARTY IN THIS

28  LITIGATION.

1          MR. BURGI:

2          Q.     -- WHETHER AN INVESTIGATOR --

3          A.     FOR WHOM DID I FIRST HEAR ABOUT THE

4    LITIGATION?

5          Q.     YES.

6          A.     FROM MR. RILEY.

7          Q.     WHEN DID THAT OCCUR?

8          A.     ABOUT A YEAR AGO.

9          Q.     AND DID YOU DISCUSS THE LITIGATION

10   ITSELF?

11         A.     NO.

12         Q.     DID YOU DISCUSS ANY OF THE INFORMATION

13   WITH RESPECT TO WHAT WE'VE DISCUSSED TODAY AS TO

14   YOUR WORK FOR THE WISCONSIN STATE BOARD OF HEALTH?

15         A.     HE HAD COPIES OF MY REPORT.   WE

16   DISCUSSED THAT.

17         Q.     AND DID YOU DISCUSS EACH REPORT WITH

18   HIM?

19         A.     EXCUSE ME?

20         Q.     DID YOU DISCUSS EACH REPORT WITH HIM

21   THAT WE'VE GONE THROUGH TODAY?

22         A.     I DON'T KNOW.

23         IT SEEMS TO ME THAT HE ONLY HAD TWO REPORTS

24   WITH HIM AT THE TIME, BUT I'M NOT SURE.

25         Q.     WAS THAT DONE VIA TELEPHONE OR IN

26   PERSON?

27         A.     IN PERSON.

28         Q.     DID HE COME TO YOUR HOME?

1    A.    YES.

2    Q.    AND HOW LONG DID THAT VISIT LAST?

3    A.    AN HOUR, HOUR AND A HALF? I DON'T KNOW.

4    Q.    AND AT THAT TIME DID HE PROVIDE YOU WITH

5 ANY PAPERS OTHER THAN THE TWO REPORTS THAT YOU

6 MENTIONED?

7    A.    NO.

8         HE DIDN'T EVEN PROVIDE ME WITH THOSE.  WE JUST

9 TALKED ABOUT THEM.

10    Q.    OKAY.  AND AT WHAT POINT DID HE PROVIDE

11 YOU WITH THE LATER REPORTS THAT WERE DONE BY SOMEONE

12 ELSE?

13    A.    WHEN I ASKED HIM FOR -- SAY THAT AGAIN,

14 PLEASE.  I DIDN'T HEAR ALL THE QUESTION.

15    Q.    AT WHAT POINT IN TIME DID HE PROVIDE YOU

16 WITH THE LATER REPORTS OF THE ALGOMA PLANT THAT WERE

17 PERFORMED BY SOMEONE ELSE?

18    A.    WHEN I ASKED HIM FOR THE REPORT FOR

19 WHATEVER WAS AVAILABLE.  I WANTED TO SEE MY OWN

20 REPORT BEFORE I TALKED ABOUT IT.  I WANTED -- I HAD

21 SEEN IT, BUT HADN'T BEEN ABLE TO STUDY IT, AND I

22 WANTED TO REFRESH MY MEMORY ON THAT.

23    Q.    WHAT DOCUMENTS DID HE PROVIDE TO YOU

24 OTHER THAN YOUR OWN REPORTS?

25    A.    TWO TECHNICAL STUDIES.

26    Q.    AND WHAT TECHNICAL STUDIES WERE THOSE?

27    A.    THE ONES THAT ARE LISTED AS -- THE ONE

28 BY THE PUBLIC HEALTH SERVICE.

1      Q.      THE ONES THAT WERE ADMITTED AS EXHIBITS

2    ONE AND TWO?

3      A.      YES.

4      Q.      AND IN ADDITION TO YOUR REPORTS THEN AND

5    EXHIBITS ONE AND TWO OF THIS DEPOSITION, HE ALSO

6    PROVIDED YOU WITH A COPY OF A REPORT OF THE ALGOMA

7    FACILITY AFTER YOU HAD LEFT THE WISCONSIN STATE

8    BOARD --

9      A.      YES.

10     Q.      HOW MANY SUCH REPORTS WERE THERE?

11     A.      I DON'T KNOW.  I JUST GLANCED THROUGH

12   THEM.  I DIDN'T COUNT THEM.  WHAT WERE THERE?  TWO?

13   I DON'T KNOW.

14     MR. RILEY:    THEY'RE ALL MARKED AS EXHIBITS

15   IN OTHER DEPOSITIONS.  THEY'RE ALL MARKED.

16     MR. BURGI:

17     Q.      DID YOU MEET AT ANY TIME OTHER THAN THAT

18   ONE OCCASION OTHER THAN A YEAR AGO WHEN HE CAME OUT

19   TO YOUR HOME?

20     A.      HE CAME ONE OTHER TIME.

21     Q.      HOW MANY OCCASIONS?

22     A.      ONE OTHER TIME, I SAID.  A TOTAL OF TWO

23   TIMES PRIOR TO THIS.

24     Q.      OKAY.  WHEN WAS THE SECOND OCCASION?

25     A.      SOMETIME -- SEPTEMBER SOMETIME?  I THINK

26   EITHER LATE AUGUST OR EARLY SEPTEMBER.

27     Q.      DID HE COME TO YOUR HOME ONCE AGAIN?

28     A.      YES.

1    Q.    AND DID YOU DISCUSS IN DETAIL YOUR
2  REPORTS AT THAT TIME?
3    MR. RILEY:    OBJECT TO THE FORM OF THE
4  QUESTION IN TERMS OF IT BEING VAGUE AND AMBIGUOUS.
5    THE WITNESS:    WE JUST DISCUSSED THE REPORTS.
6    MR. BURGI:
7    Q.    DID YOU ALSO DISCUSS THE TWO ITEMS WHICH
8  ARE ADMITTED AS EXHIBITS ONE AND TWO TO THIS
9  DEPOSITION?
10    A.    NO.  HE JUST ASKED IF I'D SEEN THEM.
11    Q.    AND HOW LONG DID THAT VISIT LAST?
12    A.    I DON'T KNOW.  MY GOSH.  AN HOUR?  HOUR
13  AND A HALF?
14    Q.    AND DID HE PROVIDE YOU WITH ANY
15  ADDITIONAL INFORMATION AT THAT MEETING?
16    A.    AT THAT SECOND MEETING WAS THE FIRST
17  TIME I LEARNED ABOUT THE LITIGATION.  I DIDN'T EVEN
18  KNOW WHICH SIDE HE WAS ON OR ANYTHING ELSE.
19    Q.    SO AT THE FIRST MEETING YOU WERE NOT
20  AWARE THAT THERE WAS ANY LITIGATION PENDING?
21    A.    YES.  I WAS AWARE THERE WAS SOME
22  LITIGATION PENDING BUT I DIDN'T KNOW WHO WAS DOING
23  WHAT TO WHOM.  I DIDN'T ASK ANY QUESTIONS.
24    Q.    DO YOU HAVE IN YOUR POSSESSION ANY
25  DOCUMENTS WHICH RELATE TO YOUR WORK AT THE WISCONSIN
26  STATE BOARD OF HEALTH?
27    MR. RILEY:    DO YOU MEAN OTHER THAN THESE
28  DOCUMENTS?

1        MR. BURGI:     ABSOLUTELY.

2        MR. RILEY:     SOMETHING HE'S KEPT?

3        MR. BURGI:     ABSOLUTELY.

4      THE WITNESS:     I HAVE, PROBABLY, IF THEY

5   WEREN'T DESTROYED BY THE RAT, SOME REPRINTS OF

6   STUDIES THAT WE PUBLISHED OR HAD READY TO PUBLISH.

7        THE REASON I SAY "BY THE RAT," WE HAD A RAT IN

8   OUR GARAGE WHERE I STORE ALL OF MY, ALL OF MY

9   PAPERS; AND I HAD TO THROW ALMOST EVERYTHING AWAY

10  AFTER SHE GOT THROUGH.

11       MR. BURGI:

12       Q.    DO YOU KNOW IF ANY OF THOSE STUDIES

13  DISCUSS OR MENTION IN ANY WAY ASBESTOS EXPOSURE?

14       A.    THEY DO NOT.

15       Q.    DO YOU HAVE ANY BOOKS OR PUBLICATIONS IN

16  YOUR POSSESSION WHICH YOU RELY UPON FOR YOUR

17  OPINIONS WITH RESPECT TO ASBESTOS EXPOSURE?

18       A.    I DON'T HAVE ANY.  I GOT RID OF ALL OF

19  MY REFERENCE BOOKS THAT PERTAINED TO INDUSTRIAL

20  HYGIENE.  I HAVE ONE ON NOISE AND ONE ON NUCLEAR

21  PHYSICS, BUT I HAVE NOTHING ON INDUSTRIAL HYGIENE.

22       Q.    SO YOU HAVE NO REFERENCE SOURCES OR

23  JOURNALS WHICH RELATE TO ASBESTOS EXPOSURE PRESENTLY

24  IN YOUR POSSESSION?

25       A.    NO.

26       MR. BURGI:     I'M EMBARASSED.  I FORGOT YOUR

27  NAME.

28       MR. RILEY:     I'M BOB RILEY.

1    MR. BURGI:

2        Q.      DID MR. RILEY DISCUSS ANY SPECIFIC

3   TESTIMONY WITH YOU ON ANY OCCASION PRIOR TO TODAY?

4        MR. RILEY:      OBJECT TO THE FORM OF THE

5   QUESTION.  I THINK THAT'S VAGUE AND AMBIGUOUS.

6         YOU MEAN SOMEBODY ELSE'S TESTIMONY?

7        MR. BURGI:

8        Q.      DID MR. RILEY DISCUSS WITH YOU THE TYPES

9   OF QUESTIONS THAT WOULD BE ASKED OF YOU TODAY?

10       A.      OH, NO.

11       MR. BURGI:      I HAVE NO FURTHER QUESTIONS.

12       MR. RILEY:      I JUST HAVE A COUPLE FOLLOW-UP

13  QUESTIONS.

14

15                  FURTHER EXAMINATION

16  BY MR. RILEY:

17       Q.      HAVE YOU ALSO BEEN CONTACTED BY A

18  REPRESENTATIVE OF THE PLAINTIFF IN CONNECTION WITH

19  THIS DEPOSITION?

20       A.      I DON'T KNOW.  SOMEBODY CALLED ME ON THE

21  PHONE AWHILE BACK AND ASKED ME A LOT OF QUESTIONS

22  AND KNEW THAT THERE WAS GOING TO BE THIS DEPOSITION.

23       BUT I DON'T HEAR VERY WELL OVER THE PHONE, AND

24  I CUT HER OFF AFTER AWHILE 'CAUSE I WASN'T GOING TO

25  ANSWER A LOT OF QUESTIONS OVER THE PHONE.

26       Q.      WAS IT YOUR UNDERSTANDING THAT THIS

27  PERSON WAS SOMEONE FROM THE OFFICE OF THE LAW FIRM

28  THAT REPRESENTED THE PLAINTIFF?

```
 1        A.      I DON'T EVEN REMEMBER THE NAME OF THE
 2   LAW FIRM.  I COULDN'T HEAR IT VERY CLEAR.  SOMEBODY
 3   CALLED AND SAID "I'M WITH SUCH AND SUCH A LAW FIRM
 4   AND WE'RE GOING TO HAVE THIS -- I UNDERSTAND YOU ARE
 5   HAVING THIS DEPOSITION ON TUESDAY THE 14TH, BLAH,
 6   BLAH, BLAH, COULD I ASK YOU SOME QUESTIONS" -- AND
 7   BEFORE I COULD ANSWER SHE STARTED ASKING QUESTIONS,
 8   AND HALF OF WHICH I COULDN'T HEAR, AND SO I JUST
 9   DECLINED TO ANSWER ANY MORE.
10        I ANSWERED A FEW ABOUT "WAS I WITH THE STATE
11   HEALTH DEPARTMENT," ET CETERA, ET CETERA, AND CUT
12   HER OFF.  I DON'T KNOW WHERE SHE WAS FROM, WHAT HER
13   NAME WAS OR ANYTHING.
14        Q.      OKAY.
15        A.      MAYBE IT WAS ONE OF YOU GUYS.
16        Q.      I CAN TELL YOU, IT'S NOBODY FROM MY
17   OFFICE.
18        MR. BURGI:      OBJECTION.  CALLS FOR
19   SPECULATION.
20        MR. RILEY:      THAT'S A STATEMENT OF FACT, NOT
21   A QUESTION.
22        Q.      MR. BERGAN ASKED YOU --
23        MR. BURGI:      BURGI.
24        MR. RILEY:
25        Q.      MR. BURGI ASKED YOU IF ANYBODY EVER GAVE
26   YOU ANY INFORMATION ABOUT TESTING, ANIMAL TESTING
27   THAT WAS DONE WITH RESPECT TO THE K-LO PRODUCT.
28        I WANT TO FOLLOW UP ON THIS QUESTION, BECAUSE
```

1   YOU INDICATED THAT YOU HAD NOT RECEIVED ANY SUCH

2   CONTACT.

3        IF AT THE TIME THAT YOU WERE DOING YOUR WORK

4   AT THE ALGOMA PLANT YOU HAD BEEN TOLD THAT RATS,

5   GUINEA PIGS AND HAMSTERS WERE EXPOSED OVER THEIR

6   LIFETIMES TO EXPOSURES OF K-LO DUST RANGING UP TO

7   ONE HUNDRED MILLION PARTICLES PER CUBIC FOOT OF AIR,

8   24 HOURS A DAY, LIVING IN THE ENVIRONMENT; AND THAT

9   WHEN THE RATS AND HAMSTERS AND GUINEA PIGS WERE

10  SACRIFICED THERE WAS EVIDENCE OF FIBROSIS IN THE

11  ANIMALS AKIN TO ASBESTOSIS IN SOME OF THE ANIMALS,

12  WOULD THAT INFORMATION HAVE CHANGED IN ANY WAY YOUR

13  WORK AT THE ALGOMA PLANT?

14       MR. BURGI:    I WANT TO INTERPOSE AN

15  OBJECTION.  INCOMPLETE HYPOTHETICAL.  VAGUE, AND

16  ALSO AMBIGUOUS.  CALLS FOR SPECULATION, ALSO.

17       MR. RILEY:

18       Q.    GO AHEAD AND ANSWER.

19       A.    ASBESTOSIS IN THESE EXPERIMENTAL

20  ANIMALS?

21       Q.    FIBROSIS CONSISTENT WITH ASBESTOSIS.

22       A.    HIGH CONCENTRATIONS WAY ABOVE THE

23  PERMISSIBLE RANGE --

24       Q.    YES.

25       A.    -- M.A.C.?

26       Q.    YES.

27       A.    IT WOULDN'T AFFECT US VERY MUCH BECAUSE

28  THERE ARE MANY ARTICLES COME OUT, MANY SO-CALLED

1    STUDIES PUT OUT BY INDIVIDUALS OR EVEN INSTITUTIONS
2    THAT -- UNLESS THEY'RE CORROBORATED BY OTHERS -- ARE
3    ALMOST COMPLETELY MEANINGLESS.  SO, MANY OF THESE
4    THINGS TURN OUT TO BE WRONG.
5         SECONDLY, FINDING FIBROSIS AT CONCENTRATIONS
6    MANY TIMES HIGHER THAN THE M.A.C. IS SOMETHING YOU'D
7    EXPECT.  WE ALREADY KNEW THERE WAS FIBROSIS CAUSED
8    BY ASBESTOS, BUT -- SO, THERE ARE TWO PARTS TO THAT
9    ANSWER.  HIGH CONCENTRATIONS OF FIBROSIS WOULDN'T
10   SURPRISE ME; AND SECONDLY, IF IT WAS SOMETHING EVEN
11   MORE_SERIOUS THAN THAT IN EXPERIMENTAL ANIMALS.
12   THEN YOU HAVE TO TRANSLATE THAT TO HUMANS, OF
13   COURSE.
14        WE HARDLY PAID ANY ATTENTION TO ONE STUDY
15   BECAUSE THERE ARE SO DARN MANY OF THESE STUDIES THAT
16   COME OUT THAT ARE NEVER REPEATED.  AND EVEN IF THEY
17   ARE, THEN YOU HAVE TO TAKE THAT DATA AND ASSOCIATE
18   IT WITH ALL THE OTHER KNOWN DATA AND DECIDE WHICH IS
19   THE MOST MEANINGFUL.
20        Q.    OKAY.
21        A.     AND BASICALLY, WHEN PEOPLE START
22   TOXICOLOGICAL STUDIES ON ANIMALS THEY ALWAYS START
23   OUT AT HIGH CONCENTRATIONS OF THE MATERIAL AND THEN
24   WORK ON DOWN.  THEY START AT CONCENTRATIONS THAT
25   THEY ARE REASONABLY CERTAIN WOULD CAUSE SOME
26   PROBLEM, AND THEN THEY WORK ON DOWN TO FIND A LEVEL
27   FROM THERE.
28        THEY DON'T USE THAT AS A LEVEL FOR ANYTHING.

1   THEY START WITH THE HIGH CONCENTRATION TO TRY TO

2   FIND OUT WHAT DOES THIS DO, WHERE DOES IT AFFECT THE

3   ORGANISM, SO WE KNOW WHAT TO LOOK FOR IN HUMANS.

4        THEN YOU HAVE TO APPLY THAT TO HUMANS, THEN

5   YOU HAVE TO EQUATE IT WITH THE WORK ENVIRONMENT.

6        A SINGLE ANIMAL EXPERIMENTATION, WE'D HARDLY

7   PAY ANY ATTENTION TO IT BECAUSE THERE ARE THOUSANDS

8   OF THESE THAT COME OUT, AND MANY OF THEM ARE

9   MEANINGLESS.

10        I DON'T KNOW WHICH ONE YOU ARE REFERRING, TO

11   BUT IN GENERAL THAT WOULD BE OUR APPROACH TO IT.

12        Q.     OKAY.

13        A.     WE DON'T SLUFF THEM OFF, BUT WE DON'T

14   CHANGE OUR IDEAS JUST ON THE BASIS OF ONE PERSON OR

15   ONE GROUP'S NEW CONCEPT, WHICH MIGHT GO COMPLETELY

16   WRONG.  THERE HAVE BEEN HUNDREDS OF OTHERS WHO HAVE

17   SAID SOMETHING ELSE PERHAPS.  WE WOULDN'T -- WE

18   DON'T GET EXCITED ABOUT ONE PAPER.

19        Q.     AND WOULD THE INFORMATION THAT I JUST

20   DESCRIBED HAVE CAUSED YOU TO CHANGE YOUR CONCLUSIONS

21   AND RECOMMENDATIONS WITH REGARD TO THE ALGOMA PLANT

22   IN ANY WAY?

23        MR. BURGI:     SAME OBJECTION.

24        THE WITNESS:     NOT AT ALL.  NOT AT 100 PARTS

25   PER MILLION, A HUNDRED MILLION PARTICLES PER CUBIC

26   FOOT -- EXCUSE ME, I'M MIXING MY TERMINOLOGY -- A

27   HUNDRED MILLION PARTICLES PER CUBIC FOOT, AND

28   CAUSING SOME FIBROSIS IN EXPERIMENTAL ANIMALS

1   -- THAT WOULDN'T HAVE CHANGED ANYTHING WHATSOEVER.

2        Q.     OKAY.  THANK YOU.

3         NOTHING FURTHER.

4        MR. HARRINGTON:     JUST A COUPLE QUESTIONS.

5

6                   FURTHER EXAMINATION

7   BY MR. HARRINGTON:

8        Q.    .MR. FLUCK, HAVE WE EVER MET BEFORE

9   TODAY, YOU AND I?

10       A.     NOT THAT I KNOW OF.

11       Q.     OKAY.  YOU'VE NEVER SPOKEN WITH ME?

12       A.     NEVER SPOKEN TO YOU, NO.  YOU WEREN'T

13  THE ONE WHO WAS ON THE PHONE.

14       Q.     OKAY.

15       A.     NOPE, WE HAVEN'T MET.

16       Q.     ALL RIGHT.  THANK YOU.

17       MR. RILEY:     OKAY.

18       THE WITNESS:     NOT THAT I KNOW OF.  IT MIGHT

19  HAVE BEEN IN THE DEEP DARK PAST SOMEWHERE I BUMPED

20  INTO YOU.

21       MR. RILEY:     ANYTHING FURTHER?

22       MR. BURGI:     NO.  DO YOU WANT TO ENTER INTO A

23  STIPULATION?

24       MR. RILEY:     MR. FLUCK, YOU HAVE THE RIGHT TO

25  REVIEW THE TRANSCRIPT OF THIS DEPOSITION TO

26  DETERMINE WHETHER OR NOT THIS COURT REPORTER HAS

27  TRANSCRIBED ACCURATELY EVERYTHING THAT YOU SAID.

28       YOU DON'T HAVE TO DO THAT IF YOU ARE CONFIDENT

1   THAT THIS COURT REPORTER WHO IS A PROFESSIONAL WILL

2   TRANSCRIBE ACCURATELY WHAT YOU SAID.  YOU CAN WAIVE

3   YOUR RIGHT TO READ AND SIGN THE TRANSCRIPT, BUT THAT

4   IS CERTAINLY A RIGHT THAT YOU HAVE TO ENSURE THAT

5   THIS TRANSCRIPT OF YOUR DEPOSITION IS TRANSCRIBED

6   ACCURATELY.

7        MR. BURGI:   CORRECT ME IF I'M WRONG, HE ALSO

8   HAS A RIGHT TO CHANGE ANY OF HIS TESTIMONY.

9        MR. RILEY:   I THINK THAT'S A VERY NOVEL

10  NOTION.  I DON'T BELIEVE HE HAS A RIGHT TO CHANGE

11  HIS TESTIMONY.

12       I BELIEVE HE HAS A RIGHT TO CORRECT

13  DESCRIPTION ERRORS.

14       MR. HARRINGTON:   RIGHT.  THAT'S MY

15  UNDERSTANDING, ALL THE ERRORS IN THE TRANSCRIPT, NOT

16  THE SUBSTANCE, THAT YOU WANT TO CHANGE.

17       MR. BURGI:   THERE MUST BE A VARIANCE IN

18  CALIFORNIA LAW.  WE CAN CHANGE THE TRANSCRIPT, BUT

19  IT MAY BE COMMENTED ON.

20       MR. RILEY:   CALIFORNIA IS UNIQUE IN MANY

21  RESPECTS.  MAYBE IT'S UNIQUE IN THAT ONE AS WELL.

22       THE WITNESS:   I'D LIKE TO ASK A QUESTION.

23  YOU MEAN REVIEW IT PRIOR TO ITS BEING PRINTED OR

24  WHATEVER?  I HAVE TO SIGN IT, DON'T I?  ISN'T THAT

25  THE TIME WHEN I CAN SAY YES OR NO?

26       MR. RILEY:   YOU CAN WAIVE THE RIGHT TO

27  REVIEW AND SIGN IT.  IF IT'S ALL RIGHT WITH THE

28  PARTIES WE'LL JUST GO AHEAD AND USE IT WITHOUT YOUR

1   SIGNATURE, IF THAT'S STIPULATED.  BUT YOU ARE THE

2   FIRST PERSON WHO HAS THE DECISION TO MAKE.

3       YOU CAN REVIEW IT FOR TRANSCRIPT ACCURACY AND

4   MAKE ANY CORRECTIONS IF THERE ARE TRANSCRIPT ERRORS,

5   AND THEN SIGN IT TO VERIFY THAT IT IS AN ACCURATE

6   TRANSCRIPT OF WHAT YOU SAID; OR YOU MAY WAIVE THAT

7   RIGHT.  AND WE CAN'T -- OUR RIGHT TO STIPULATE HAS

8   NOTHING TO DO WITH THAT FIRST DECISION.  THAT'S UP

9   TO YOU.

10      THE WITNESS:    I'D LIKE TO REVIEW IT TO BE

11  SURE I SAID WHAT --

12      MR. RILEY:    SURE.

13      THE WITNESS:    -- WHAT I MEANT TO SAY.

14      I DON'T INTEND TO CHANGE ANYTHING.  I DON'T

15  INTEND TO CHANGE MY OPINIONS.  BUT IF I MISSPOKE

16  SOMEWHERE --

17      MR. RILEY:    SURE.

18      THE WITNESS:    I'D LIKE TO REVIEW IT.

19      MR. RILEY:    WELL, IF YOU HAVE ANY SUGGESTED

20  CHANGES, YOU CAN MAKE IT CLEAR WHY IT IS YOU WANT TO

21  MAKE THE CHANGE, AND THAT CAN BE DEALT WITH AT THE

22  TIME.

23      THE COURT REPORTER WILL CONTACT YOU WHEN THIS

24  IS AVAILABLE, MAKE IT AVAILABLE TO YOU SO YOU MAY

25  READ IT, AND THEN YOU CAN GO FORWARD FROM THERE.

26      MR. BURGI:    DO YOU WANT TO SPECIFY AN AMOUNT

27  OF TIME WITH RESPECT TO THE STIPULATION?

28      MR. RILEY:    IT IS NECESSARY THAT WE HAVE

1    THIS THING REASONABLY QUICKLY, SINCE WE'RE SCHEDULED

2    TO GO TO TRIAL ON NOVEMBER 4.  AND WE'LL TALK WITH

3    THE COURT REPORTER OFF THE RECORD ABOUT WHEN THAT

4    TRANSCRIPT WILL BE MADE AVAILABLE.  I THINK WE CAN

5    SAY ON THE RECORD THAT IT WILL BE DONE WITH ALL

6    DISPATCH, AND WE WILL GET IT TO YOU.

7        MR. BURGI:    I MEAN WITH RESPECT TO THE

8    NUMBER OF DAYS THE WITNESS WILL HAVE FOR ITS REVIEW

9    AND RETURN TO THE REPORTER.

10       MR. RILEY:    CAN WE STIPULATE HE'LL HAVE

11   FIVE DAYS TO DO THAT?  IS THAT ANY PROBLEM WITH YOU?

12       THE WITNESS:    ONE WILL DO.

13       MR. RILEY:    FINE.

14        WE'LL GIVE YOU A LITTLE LEEWAY OF FIVE DAYS.

15        MR. FLUCK, THANK YOU FOR YOUR COURTESY, AGAIN,

16   IN HAVING US IN YOUR HOME.

17       MR. HARRINGTON:    THANK YOU, SIR.

18                    *  *  *

19

20

21

22

23

24

25

26

27

28

1    SIGNATURE PAGE:

2

3            I DECLARE UNDER PENALTY OF PERJURY THAT THE

4    FOREGOING IS TRUE AND CORRECT.

5            EXECUTED AT _____Lompoc_____,

6    CALIFORNIA, ON THIS ___23___DAY OF __October_____,

7    19_85__.

8

9

10        ___William Z. Fluck_____

              WILLIAM Z. PLUCK

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

171

1                    DEPOSITION CERTIFICATE

2      STATE OF          )
                         ) SS.
3      CALIFORNIA        )

4

5          I, THE UNDERSIGNED, A NOTARY PUBLIC IN AND FOR

6      THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

7          THAT, PRIOR TO BEING EXAMINED, THE WITNESS

8      NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY

9      SWORN TO TESTIFY THE TRUTH, THE WHOLE TRUTH AND

10     NOTHING BUT THE TRUTH.

11         THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN

12     SHORTHAND AT THE TIME AND PLACE THEREIN NAMED AND

13     THEREAFTER REDUCED TO WRITING UNDER MY DIRECTION AND

14     SUPERVISION.

15         I FURTHER CERTIFY THAT I AM NOT INTERESTED IN

16     THE EVENT OF THE ACTION.

17         I DECLARE UNDER PENALTY OF PERJURY THAT THE

18     FOREGOING IS TRUE AND CORRECT.

19

20         WITNESS MY HAND AND OFFICIAL SEAL THIS 18TH DAY

21     OF OCTOBER, 1985.

22

23

24                                 Mary A. Arseneau
       MARY A. ARSENEAU
25     NOTARY PUBLIC           CALIFORNIA C.S.R. NO. 4848
       CALIFORNIA
26     Santa Barbara County
       My Commission Expires July 15, 1987
27

28

CENTRAL COAST COURT REPORTERS - (805) 928-2683 OR 544-6352