UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

GARY SUOJA, Individually and as Special
Administrator of the estate of OSWALD
Suoja, deceased,

        Plaintiff,

-vs-                         Case No. 99-CV-475-BBC

OWENS-ILLINOIS, INC.,       Madison, Wisconsin
                           November 30, 2015
        Defendant.       9:12 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF COURT TRIAL
MORNING SESSION
HELD BEFORE THE HONORABLE STEPHEN L. CROCKER,

APPEARANCES:

For the Plaintiff:
                Cascino Vaughan Law Offices, Ltd.
                BY:  ROBERT MCCOY
                    DANIEL HAUSMAN
                220 South Ashland Avenue
                Chicago, Illinois  60607

For the Defendant:
                Schiff Hardin
                BY:  BRIAN WATSON
                    EDWARD CASMERE
                233 South Wacker Drive, Ste. 6600
                Chicago, Illinois  60606

Also appearing:  Michael Barron - paralegal

Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

1  Also appearing:
2                    Gary Suoja – son
                     Kimberly Suoja – daughter
3
4                         * * * * *
5                         **I-N-D-E-X**
6  Opening statement by Mr. McCoy                 12-25
   Opening statement by Mr. Casmere               25-40
7
8  PLAINTIFF'S WITNESSES          EXAMINATION          PAGES
9  STEPHEN KENOYER        Direct by Mr. McCoy       42-94
                          Cross by Mr. Casmere      95-116
10
11                       **E-X-H-I-B-I-T-S**
12 PLAINTIFF'S EXHIBITS                     IDENTIFIED/RECEIVED
13 Ex. 91     Kenoyer CV                      43        ---
      92      Kenoyer general report          46        ---
14   136      PowerPoint                       41        ---
     222      1971 Limit values               90        ---
15
16 DEFENDANT'S EXHIBITS
17 Ex. 1933  OI opening statement             40        ---
18
19
20                         * * * * *
21      (Proceedings called to order.)
22           THE CLERK:   Case Number 99-CV-475-SLC.
23 *Deloris Agnes Suoja v. Owens-Illinois, Inc*. is called
24 for a court trial.  May we have the appearances, please.
25           MR. MCCOY:   Robert McCoy and Daniel Hausman for

1  the plaintiffs.  And with us is Gary Suoja and also his

2  sister, Kimberly Suoja.

3        THE COURT:  All right.  Mr. Suoja, Ms. Suoja,

4  good morning to you.  Counsel, good morning to you.

5        MR. MCCOY:  Good morning, Judge.

6        MR. CASMERE:  Good morning, Your Honor.  Edward

7  Casmere on behalf of Owens-Illinois.

8        MR. WATSON:  Good morning, Your Honor.  Brian

9  Watson on behalf of Owens-Illinois.  With us as well is

10  our paralegal Michael Barron.

11        THE COURT:  All right.  Good morning to all of

12  you as well.  All right.  Please be seated.  Counsel,

13  we're here for a bench trial by agreement of the

14  parties.  You've also consented to my jurisdiction.

15  Let's talk about how we're going to do this with the

16  bench trial format here.  We've already talked a little

17  bit telephonically about what you would like to do, and

18  my intent is to give both sides as much of what you both

19  want as I can; in other words, I'm going to try to stay

20  out of your way to make your record and to brief this

21  case post-trial, which you asked for.  There won't be a

22  ruling from the bench on ultimate issues.  We're going

23  to reserve on all that to give you a chance to brief it

24  post-trial.

25        For that reason, my intent during the trial is to

1  let virtually everything in at this time.  There's no

2  jury.  Courts, judges compartmentalize, so if something

3  comes in just because I want a complete record and you

4  don't think it should have come in, you can argue that

5  post-trial in your briefs.  The Court will find facts.

6  I'll probably find pretty extensive facts in this case

7  and explain why I'm accepting certain things and not

8  accepting certain other things just so it's clear.

9      Along the way, I do expect you to make your usual

10 objections to testimony and so forth and I will rule on

11 those as we go.  Sometimes if it's a close call, again,

12 for the purpose of completing the record, I may allow it

13 in subject to review post-trial.  So I don't want to

14 make it seem like this is ambiguous or wishy-washy, but

15 it isn't going to be over until we get the post-trial

16 briefs.  Okay?

17     The Court's intent is to let both sides put in

18 everything they want to put in within the limits of

19 fairness and equity during the trial.  Okay?  So I just

20 wanted to assure you all of that before we even started.

21     At some point we need to talk about how quickly you

22 want to get the briefing in.  I don't think we need to

23 worry about that today.  I think what I'd like to do is

24 start with the witnesses sooner rather than later.  But

25 I'm not going to jam you guys up.  If you need 30 days

1    post-trial for the first plaintiff's brief, 30 days for

2    the defendant's brief, whatever.  Okay?  We've got

3    holidays.  You've got other cases.  I don't want this to

4    linger, but I'm not going to jam you guys up.  Okay?

5        One thing I want to mention before I forget it is

6    deposition transcript excerpts that you're offering into

7    evidence.  Of course that's allowed.  I think Mr. McCoy

8    floated the notion of actually reading them to the Court

9    during the trial and I put the kibosh on that.  Don't

10   need it.  Don't want it.  It's a waste of time.  I want

11   the live witnesses to be able to testify.

12       However, post-trial when you refer to that, I don't

13   just want the references you gave the Court in your

14   submissions.  I don't just want line and page references

15   because neither I nor my staff have the time or the

16   inclination to go look those up.  I want you to build

17   into your request for briefing time the need for your

18   paralegals, your associates, whatever, actually to cut

19   and paste the actual deposition testimony into a

20   document so that it's there for the Court.  I'm not

21   going to micromanage the formatting, but I don't want to

22   have to go looking for it and neither do my law clerks.

23   Okay?  I want you guys to put that all in a format

24   that's it easy for the Court to find, digest and

25   consider.

1     All right.  I think that's it for me preliminarily.
2  Oh, timing.  It's 9:15 now.  I don't know in you're
3  planning on giving openings.  I read all your
4  submissions.  I read that 11:59 submission last night,
5  basically on the *Fuchsgruber* rule and strict products
6  liability.  We don't really need to worry about that
7  right now.
8     I don't really need long opening statements.
9  Frankly I don't need them at all.  But I think you guys
10  would be more comfortable if you gave them, so I'm
11  allowing them.  I don't know that we're going to need a
12  morning break.  I was planning to go until about noon,
13  then we'll take an hour for lunch, not because I need
14  it, but sometimes that helps with witness prep and so
15  forth.  We'll go 1 to 4:30.  Probably take a break in
16  the middle there whenever it's good.  We're stopping at
17  4:30 or so because I have other cases and a lot of daily
18  stuff that I have to do.  I'm the traffic cop for this
19  court, so I can't let things sit too long.
20     Tomorrow we could start as early as 8:30 if you
21  wanted to.  We'll stop at between 4:30 and 5 every day,
22  probably closer to 4:30.  If you're good with going
23  shorter for lunch, that's fine, but I'd like to give you
24  guys as much trial time interrupted as possible to get
25  your witnesses in.  Okay?  So that's what I wanted to

1  start with.

2      Mr. McCoy, let's just talk mechanics and

3  procedures.  Any questions about that or any other

4  suggestions or requests regarding how we're going to do

5  this bench trial?

6          MR. MCCOY:  No.  I don't -- I don't have

7  anything other than basically what Your Honor laid out.

8  That's pretty much how I understood it --

9          THE COURT:  Okay.

10          MR. MCCOY:  -- and expected.  I would just say

11  this:  We have -- we do have opening and it's 20 minutes

12  is what Your Honor I think had said --

13          THE COURT:  I said no more than 20 minutes.

14          MR. MCCOY:  Right.  Right.  So that's fine and

15  that's what we expected here and I think that is

16  important.  The first witness for us is going to be

17  Stephen -- a live witness -- will be Stephen Kenoyer who

18  is here.  He's industrial hygiene.  And then our medical

19  expert has testified by trial deposition, which we'll be

20  submitting that.

21          THE COURT:  Okay.

22          MR. MCCOY:  And then the next two witnesses we

23  have live and there's other deposition witnesses,

24  including one of the treating physicians testified by

25  deposition also for trial.  But the other two witnesses

1   we have live then will be -- first will be Kimberly and

2   then will be Gary.  So my expectation is that we'll

3   basically fill up most of today is just my expectation.

4           THE COURT:  Okay.  That's fine.  And when you

5   say fill up most of today, do you have other witnesses

6   you were planning on calling tomorrow or is that your

7   case?

8           MR. MCCOY:  That's our live witnesses.

9           THE COURT:  Okay.

10          MR. MCCOY:  Some of that just depends how

11  quickly some of these exhibits go because we have a fair

12  number of photos and things like that and some articles.

13  But with normal expectations, we probably might finish

14  all of our witnesses today.  If not, we'll finish up

15  tomorrow fairly quickly I think.

16          THE COURT:  Sure.  Okay.  Thank you.  That's

17  helpful.  Mr. Casmere, I presume you've got the point

18  position for trial.  Your input, please.

19          MR. CASMERE:  Yes, Your Honor.  As I understood

20  it from Mr. Casmere, we're going to do three of their

21  witnesses and then I have two witnesses that I would

22  intend to start with tomorrow.

23          THE COURT:  Okay.

24          MR. CASMERE:  And the one thing that -- before

25  we leave, and as Your Honor will see in my

1   no-more-than-20-minute opening statement, is there are

2   sort of three aspects of this case from our point of

3   view, and it's important for us to, before we leave

4   here, understand when the window is closed in terms of

5   their product identification witnesses and that aspect

6   of the case that when we do our briefing we know what

7   we're shooting at.  And that's just putting down a

8   marker that I want to make sure we clarify that at some

9   point because there is some version of sort of a

10   pseudodirected verdict-type angle to this case for us on

11   some of these issues.

12        THE COURT:  Sure.  And I know you've got two

13   more points to make, but let me drop my footnote in

14   response to that.  This is the loosest bench trial I've

15   ever done, but it nonetheless is a bench trial.  When we

16   leave court, when the parties have rested, the evidence

17   is closed.  Okay?  So there won't be any oh, by the way,

18   from either side after the fact.  I can assure you all

19   of that.  That's why it's important before you rest to

20   make sure that during the trial somebody has said "and

21   these are the deposition excerpts that we want into the

22   record for the bench trial."

23      But other than that, you're right.  And you talked

24   about a psuedodirected verdict.  Again, I understand

25   that at the close of the plaintiff's case you're going

1    to the motion.  I'll tell you right now regardless

2    whether you deserve to have it granted, I doubt that

3    I'll grant it because under the rubric and philosophy of

4    this trial, I want your witnesses to testify just in

5    case we need them.  But I interrupted you.  Next point.

6           MR. CASMERE:  I'll save the other two points

7    for my less-than-20-minute opening.  The only other

8    thing is a bench copy of our exhibit list and the

9    exhibits on a thumb drive if the Court wants them.

10          THE COURT:  As you wish.

11          MR. CASMERE:  Not that you need more to read

12   right now, Your Honor.

13          THE COURT:  Thank you.  Well, I actually pay

14   attention when the witnesses testify.  I think that's my

15   job is to make credibility determinations, to the extent

16   that I have to.  So I don't do extra reading.  I don't

17   check my email.  I'll actually be listening.

18       Toward that end, I'd like to keep this informal and

19   helpful to both sides.  In this court I was -- I started

20   as a trial attorney in the Dirksen Building.  If you're

21   talking, you're standing.  That's not the rule here.  If

22   you want to stand when you're talking, you can.  You

23   don't have to.  If you need timeouts to talk amongst

24   yourselves, that's okay.  But the point is I want to

25   keep it moving.  I want to give the live witnesses their

1    opportunity to present their testimony.  And that's true

2    for both sides.  Okay?

3              MR. CASMERE:  Thank you.

4              THE COURT:  Rule 615.  Does anybody want to

5    exclude or is this an open book?

6              MR. CASMERE:  We'd like to exclude at least the

7    expert witness.

8              THE COURT:  Okay.  Mr. McCoy, any objection to

9    that?

10             MR. MCCOY:  No.

11             THE COURT:  Okay.  Is he going to be the first

12   witness anyway?  I guess he can sit out until after the

13   openings.  But with that then, if there are no other

14   preliminary matters, we'll ask the expert to step out,

15   please.  Mr. McCoy, are you ready to open?

16             MR. MCCOY:  Yes, we're set to go.

17             THE COURT:  All right.  Let's begin, please.

18             MR. MCCOY:  Presumably this will be coming up

19   on the screen.

20             THE COURT:  Yeah, I've got it.  Do you want to

21   turn the witness screen toward you so you can see it?

22             MR. MCCOY:  That might help.

23             THE COURT:  And if you want the podium, it's

24   there in the corner.

25             MR. MCCOY:  I don't need the podium.  I just

1  talk faster when I'm up, so it will probably make it go

2  a little quicker.

3           THE COURT:  Okay.  As long as the court

4  reporter can hear you, you can wander and wave your

5  arms.  But only if the court reporter can hear you.

6           MR. MCCOY:  All right.  Then I'll --

7           THE COURT:  It's probably easier if you sit

8  down or -- I mean we can plug in the podium if you wish.

9  But I can see you perfectly fine from your chair.  I

10  know you like to walk around.

11          MR. MCCOY:  Standing up I get --

12          THE COURT:  Yeah, just be near enough the mic

13  that we get a recording, please.

14          MR. MCCOY:  Is that okay now?  Judge, this is

15  the case that was filed back in 1999, I believe, that

16  got caught up in the MDL and finally got remanded, I

17  think, in 2013.  So it's been sitting around a long

18  time.  There's nothing that the Suojas could do about

19  that.  Mrs. Suoja was the original plaintiff and she

20  died.  So here we are about 20 years almost, 19 years

21  after he died.

22      The evidence isn't perfect because some of it has

23  been lost along the way.  The MDL didn't allow discovery

24  until very late, opened up in 2012, and a lot of things

25  disappeared here that might be helpful to this case.

1   But we got what we got.  We got two -- and I'll go

2   through this now.

3        So first, Judge, I want to start with our first

4   slide here and that is that what's important in this

5   case, because this is a strict products liability case

6   about unreasonably dangerous products, is the normal

7   incidence of mesothelioma is one in a million.

8             THE COURT:  Actually that's a billion.

9             MR. MCCOY:  That's a mistake.  Right.  So

10   that's the advantage of a bench trial, I guess.

11             THE COURT:  Okay.  So the exhibit should drop

12   three zeros?

13             MR. MCCOY:  Yeah.  Right.  It's one in a

14   million.  That's normal.  Insulators, now Mr. Suoja was

15   an insulator.  He was an insulator for all his career.

16   Insulators though it's one in ten.  They were called

17   asbestos workers originally was the name of their union.

18   Fifty percent of these insulators in the studies have

19   died from asbestos-related diseases.  It's a dangerous

20   product.

21        There's 10,000 mesothelioma cases a year.  Go to

22   the next slide.  And that was reported years ago.  Now,

23   there's been more data.  20,000 lung cancers from

24   asbestos.

25        The next picture is a picture of the family, and on

1    the far right is Ozzie Suoja.  Even when he passed away,

2    he had kept himself in good shape.  His death cause was

3    -- we've got another misspelling there, might be because

4    the medical record spelled it's wrong, but it's

5    epithelia mesothelioma, and it's of the abdomen area.

6    And the other, that's the pathology report there, the

7    treating physicians.

8        The next slide is his death certificate which shows

9    two things as the cause of death.  One is a misspelled

10   mesothelioma and the second cause of death is asbestos

11   exposure.  Death certificates are presumptively correct

12   in Wisconsin.  There shouldn't be any contest about that

13   in terms of the findings in this case.  The defense

14   doesn't have even a medical expert, although I know they

15   cross-examined our expert.

16       1943, Judge.  That's the key date here.  In 1943

17   two things happened:  One is that Owens-Illinois got a

18   letter saying, when they're starting to think about

19   marketing the product that became Kaylo which was a

20   pipe-covering material that was typically in three-foot

21   lengths and in this case we're dealing mostly with the

22   form that was slightly molded to fit halfway around a

23   pipe, that that product which had anywhere from about 13

24   to 20 something percent asbestos in it was, in the words

25   of the letter that they got from the very well-known

1  nationally known laboratory they hired, was a first

2  class hazard.  That's a letter in 1943 to the industrial

3  hygienist and the medical director of industrial -- of

4  Owens-Illinois, which at that time was a large glass

5  company that needed to do other kinds of business.  So

6  that's '43.

7        One thing -- the second thing in '43 is that's when

8  Ozzie Suoja began work as an asbestos worker insulator.

9  And he continued that until 1985 when he retired, early

10  '85.

11        The next picture is what we're looking at, that's

12  the pipe insulation, and that's the molded piece that

13  you can see that fits usually in halves around the

14  pipes.  That's Owens-Illinois's Kaylo.

15        The strict product liability claim is about several

16  things:  1, that Owens-Illinois did not warn; 2, no

17  precautionary instructions; 3, there was no -- there was

18  an inadequate investigation regarding hazards of the

19  health of this Kaylo product, and that substitutes were

20  available.  Those were all separately pled bases for

21  strict products liability.

22        Strict products liability is joint and several

23  liability in Wisconsin at the time that he was diagnosed

24  in '96 and it's a constitutionally protected right.

25  That's something obviously we'll put in the post-trial

1  briefing.

2      The negligence claim is also in the case right now.

3  That is similar evidence.  I would mention here, Judge,

4  the choice of Owens-Illinois would be, if there was a

5  verdict -- I should say a finding against Owens-Illinois

6  in this case -- they have a right of contribution.  I

7  think it's a one-year statute of limitations from the

8  time that they've been adjudicated responsible that they

9  can go out and collect their money from all the other

10  claimed tortfeasors.  So that's their statutory right if

11  there's an award against them to contribution.

12      THE COURT:  You mentioned it, but let me just

13  ask for informational purposes.  I will not ask

14  rhetorical questions during this trial.  But are there

15  Pierringer releases out there?  I mean what about the

16  other parties that have been sued or settled?

17      MR. MCCOY:  Right.  There are and those have

18  been disclosed and there are some offsets.  Right.

19      THE COURT:  Okay.  Just asking.  I'm sure those

20  will be made clear to the Court.

21      MR. MCCOY:  Right.  There are offsets, yes.

22  And that's how they'd be treated in joint and several

23  liability.

24      The next picture is a picture of the wedding, a

25  picture as they got a little bit older in years.  I

1  think the one up in the right, you'll see this was the

2  25th vows and then I think the next one might be the

3  50th they renewed their vows.  Very close family

4  relationship.  You'll be hearing about that.

5      So the next thing I want to go to is this timeline

6  which we put together about the Kaylo exposures in this

7  case in the 50's and the 60's.  The early 1980's is when

8  Ozzie Suoja began testifying in other people's

9  mesothelioma cases.  That's when he first had definitely

10 significant fear and apprehension and anguish of what

11 might happen to him because that's what was happening to

12 his co-workers.  There will be testimony about that.

13     In 1991, family members were diagnosed with

14 asbestos disease, adding to his own apprehension and

15 fear based on the fact that he was the one who brought

16 this home.

17     1993, maybe a little bit before, early systems

18 including abdominal pain.  And this again was a

19 mesothelioma of the abdomen.  He had also had diarrhea

20 which became uncontrollable.

21     In 1996, the pain continues.  He goes to the

22 hospital for surgery.  They found a mass in there at the

23 time.  They diagnosed his mesothelioma.  The treaters,

24 they closed him up because they couldn't do anything.

25 All they could do is palliative care.  And then they had

1   additional complications like a tube inserted all the

2   way through his nose that was permanent in there to

3   correct some of the bowel problems.  He had total bowel

4   obstruction.  They put him on morphine, and then even

5   with the morphine, the records show he's in pain all

6   over at the end.

7        And finally, on December 29, 1996, he passed away.

8   Fortunately his period of time didn't create a lot of

9   medical bills that Owens-Illinois is responsible for

10  because he's not the kind of guy who complained and went

11  to doctors.  When he had something wrong with him, he

12  was very stoic and kept it inside of himself.

13       But by the time they saw this mesothelioma, all the

14  organs in his abdomen were covered and that includes

15  intestines, kidney, spleen, stomach, on and on and on

16  completely from the pelvis all the way up to the top of

17  the rib cage there.  That's mesothelioma.  It spreads

18  like wildfire.

19       So continuing on -- and another thing I should

20  mention, Judge, is he did have diabetes, which was very

21  controlled and it's not listed as a cause of death and

22  the doctors don't give any opinion saying that that was

23  a cause of death or that it shortened his life.  So

24  although it did lead to his blindness basically in this

25  case, you can't say that a blind person's life and the

1   activities that a blind person can do somehow are worth

2   less than those of a person who isn't blind because he

3   stayed very active even with his blindness.  He had

4   diabetes, I think, in his 40's.  So he controlled it.

5   Took care of himself.  You saw his weight.  He was very

6   careful with that.  There will be some more testimony on

7   this.

8        Important other dates -- I want to move this along

9   quickly because I know we're getting near my 20 minutes.

10  '43 we already talked about.  OI began Kaylo product.

11  That's on the left.  They conducted the Saranac test;

12  got a letter saying it was a first class hazard.  '43

13  through '85 Ozzie is the insulator.

14       1958 is one of his co-workers, Mr. Zimmer at the

15  Badger Ordnance, which is the job site where we've got

16  the exposures to the Kaylo, worked with him at Badger,

17  will talk about the Kaylo.  April 30 of '58,

18  Owens-Illinois sells the Kaylo business to a company

19  Owens-Corning, which it had a 20 percent business

20  interest at the time.  But that's the date for the

21  manufacturing to stop.

22       '68 to '69 is another exposure period, give or take

23  a year or so depending on a couple witnesses on that.

24  But basically co-worker Schlub worked with him for five

25  to six months at Badger and throughout this time period,

1   Of course this is what insulators do.  They put on

2   insulation or they take it off.  That's basically all

3   they do.  It's not like a lot of other trades that do a

4   lot of different things.  But they're removing a lot of

5   Kaylo that was put on earlier.

6        Schlub testifies that in the early 80's, this is

7   when he began testifying, learning about, and fearing

8   himself.  '91 he learned about it for his family --

9   oops.  Okay.  And in '96 is when he passed away.

10        And finally, I would point out that the life

11   expectancy of Ozzie Suoja is 11.6 years at the time of

12   his death.  That's how much life -- when he died, he

13   knew he had lost the rest of his life and the activities

14   that he was very involved with.

15        Next.  This is a quotation from the co-workers,

16   Mr. Schlub and Mr. Zimmer.  These are the two guys who

17   testified.  We got their depositions in 2012.  They were

18   the ones left.  The rest of the union was gone.  And so

19   this is what we'll submit.  I'm just giving you a couple

20   highlights of what we're going to be submitting.  The

21   materials, according to Schlub, the insulating materials

22   were deteriorated.  We had to remove them and replace

23   them with new insulation.  Very typical insulator work.

24   The materials he removed with Mr. Suoja were the same

25   Kaylo he had installed from '55 to '58.  In other words,

1   during the period when OI was a seller, he was also

2   working at Badger and putting in Kaylo and now he's

3   removing it with Ozzie ten years later.

4        The removal of the pipe insulation created dust.

5   We worked in it.  We breathed it, get it on our

6   clothing, get it on our hands.  Again, classic insulator

7   stuff.  This case is about insulators who had the worst

8   exposures of anybody.  It's not a case where we've got

9   small exposures to people here.

10       Next slide here -- that's the one I just read.

11  Okay.  So here we are.  My life in the trade I had been

12  using the materials.  I knew what it looked like, what

13  it felt like, what it smelled like.  I could tell it was

14  a Kaylo asbestos material.  Even though the materials,

15  when you take them out of the box don't have a name on

16  them, if you work with them for decades you learn to

17  recognize them.  Mr. Schlub said that.  He said it

18  several times in his deposition.  I could tell Kaylo was

19  different from other insulations.  He knew what they

20  were removing ten years later, and it's also the same

21  stuff that he saw put on.

22       Co-worker Zimmer.  A few feet from Kaylo being

23  removed at Badger -- Zimmer was a few feet away in '58,

24  which is during the period when OI was still having

25  their product that they had sold out there for inventory

1    purposes.  But he knew Zimmer did both; that they were

2    taking off what had been put on earlier and also

3    installing new stuff in '58.  So if it was put on

4    earlier, it was definitely in the OI period.

5         The next quote did you ever work at a place with

6    Badger?  Yes.  Were you there?  That was probably '58.

7    Late '58?  Yeah.  Was there any removal going on?  There

8    was.  Could you tell what brand, what brand insulation

9    was being removed?  And the answer -- the answer we got

10   it cut off, but the answer was he knew it was Kaylo.  So

11   both in '58 they were -- Ozzie was working with him

12   removing Kaylo, installing new Kaylo, and then again ten

13   years later they're taking off the old Kaylo with

14   Schlub.

15        I would point out a couple things here, Judge, to

16   make this case a little tough.  One is OI sales records

17   are lost.  I'd also point out two things about Ozzie

18   Suoja.  When you get to the question of what -- whether

19   he might have been at all at fault for this because he

20   wasn't wearing, as was all the insulators in this period

21   of time not wearing masks even in '67/'68, but keeping

22   in mind he's a nonsmoker and a nondrinker.  He is a

23   person who takes care of himself.  Again, the jury

24   instruction is a presumption that a deceased person is

25   not negligent.  We would ask you to apply that.  But

1    more than that, the evidence certainly supports he was a

2    person who took care of himself.  He didn't

3    intentionally expose himself to what he knew at the time

4    would cause mesothelioma.  Even though there was some

5    evidence that insulators were getting information, it

6    was basically if you smoked, don't breathe asbestos.

7    That was the understanding that was out there in the

8    trade.  So he's a nonsmoker.

9        Causation.  It's significant exposure.  This is the

10   highest exposure trait.  That's what Mr. Kenoyer will

11   talk about this morning.  One month insulator work, pipe

12   covering is enough to cause mesothelioma by itself.

13   Now, we've got about -- at least six, seven months,

14   maybe more of Owens-Illinois alone.  One month alone

15   would cause it.

16       It's also important to remember this is a single or

17   unified disease process from the lifetime of cumulative

18   exposures.  This is not something where you've got two

19   separate car crashes within the same accident where you

20   can assess different liability.  Here we have one and

21   only one disease process that falls certainly within the

22   parameters of what would be joint and several liability

23   at the time.

24       Dangers of asbestos.  '48 report of Owens-Illinois

25   from their laboratory said it was killing the animals in

1   the studies that they had done.  '52 report said it was

2   killing the animals.  They got these reports straight

3   from the Saranac Laboratories that they hired.  Well,

4   basically they didn't do anything to change Kaylo, they

5   just kept selling it because they had started selling it

6   in '43 all the way through '58.  And then they sell it

7   to a company to have an ownership interest in.  So there

8   wasn't any change in their behavior because of this and

9   the product was dangerous.

10         Industrial Hygiene Foundation is an organization

11   that provided industry members, including

12   Owens-Illinois, all the information about health

13   hazards.  They got blurbs about asbestos.  Again, their

14   industrial hygienist and medical doctor didn't do

15   anything to change it.  They're an NSC member.  That's

16   another very reputable organization on safety and hazard

17   procedures.  Again, they got that information.  Didn't

18   do anything because of it.

19         The defense that you're going to hear about is that

20   there was something called five million particles per

21   cubic foot that if you didn't exceed it, it was okay.

22   Well, first off that standard wasn't intended to protect

23   against cancer, which takes a lot less asbestos than

24   other forms of disease that had been studied for the

25   five million particles per cubic foot.

1          The second thing was that Kaylo exceeded those

2     exposures and that Owens-Illinois never went out in the

3     field to measure what was actually going on.  They never

4     actually studied field conditions, they just got the

5     laboratory report that the animals were dying and did

6     nothing.

7          The punitive damages phase of this case, if it were

8     necessary, is still in the MDL.  It hasn't been remanded

9     yet.  The dangers of asbestos, again, no action was

10    taken.  No warnings.  No safety instructions.  No

11    further testing in the field or to see what was

12    happening to the insulators, even though they're selling

13    the product that they were told to be dangerous and

14    killed animals.

15         The next thing here was what did they do?  They

16    advertised the product as nontoxic.  They called it that

17    in the advertising materials.

18              THE COURT:  Are you close to wrapping up?

19              MR. MCCOY:  Yep.  This is the last one.  So

20    these -- actually I've got two.  So here is pictures of

21    what asbestos looks like.  It starts as a rock, but it's

22    got these fibers in it.  There are some of the fibers in

23    the far right corner that have actually been released.

24    That's what happens when you break it up, cut it, saw it

25    like the insulators do, hammer it off when they remove

1   it.

2       And finally, this unreasonably dangerous product,

3   you can't smell it, you can't taste it, you can't feel

4   it, you can't see these fibers.  We're talking about the

5   fibers now.  You can't -- you don't feel anything, and

6   yet Owens-Illinois had that information about what

7   happened after time of those exposures.  It's fatal at

8   low doses.  It's fatal to half of the insulator trade.

9   It's fatal to 100,000 persons per year.  And there's no

10  cure.  That product is unreasonably dangerous.  That's

11  it, Judge.

12          THE COURT:  All right.  Thank you, Mr. McCoy.

13  All right.  On behalf of the defendant.  If you need to

14  set up, that doesn't count against your 20 minutes.

15          MR. CASMERE:  Thank you.  Can Your Honor see?

16          THE COURT:  I've got a screen in front of me.

17          MR. CASMERE:  Thank you, Your Honor.  So the

18  facts are sticky stubborn things.  No matter how hard

19  someone may try to change, manipulate or alter the

20  facts, in the end facts are facts.  And sometimes the

21  facts get in the way of a good story.  When you follow

22  the facts and you follow the evidence, sometimes you

23  find that the facts don't support the claim that

24  somebody wants to make.  And this is one of those times.

25          There was something not right about the testimony

1    in this case.  So we checked the facts.  The miles upon

2    miles of white steam insulation at Badger Ordnance Works

3    that had to be replaced because it was water damaged or

4    deteriorated was not Owens-Illinois Kaylo.  It was

5    something else.  It was an 85 percent magnesia product

6    made by Johns Manville.  The testimony in this case

7    about the description of the materials they were taking

8    off doesn't fit Kaylo.  The facts don't fit.

9        Mr. Suoja was a union asbestos worker for over 40

10   years.  But the claim against Owens-Illinois is limited

11   to a single job site for a few months in 1968.  Through

12   that entire career, that job site was over 7,500 acres,

13   it had over 1,500 different buildings, and it had at the

14   most conservative estimate over 200 miles of insulated

15   steam pipe.

16       The claim is that Mr. Suoja was removing white

17   insulation from those steam pipes because it was

18   deteriorated and he did that while working for a company

19   called L&S Insulation.  The Social Security records show

20   when Mr. Suoja worked for L&S Insulation.  He didn't

21   begin to work for L&S Insulation until the third quarter

22   of 1968 and he worked there until the 80's.

23       We also know from the L&S ledger books when it was

24   exactly that they were there and had people there doing

25   insulation.  And they first showed up to do insulation

1    work in September of 1959.  Those other entries are for

2    aluminum jacketing and asbestos corrugated board work,

3    having nothing to do with the claim against

4    Owens-Illinois.  So the first time L&S is there is

5    September of 1959 and they're there in the 60's, in the

6    late 60's, and Mr. Suoja doesn't show up working at L&S

7    until 1968.

8         The claim against Owens-Illinois is based on the

9    lack of a warning on a box that he never saw, on a

10   product he never used, and exposure that he never had.

11   It's based on a claim of exposure to Owens-Illinois

12   Kaylo more than ten years after Owens-Illinois got out

13   of the business.  Owens-Illinois got out of the asbestos

14   insulation business April 30th of 1958.

15        The claim of this rip-out exposure is based

16   entirely on speculation, unreliable and uncredible

17   testimony.  Even if you take that testimony at face

18   value, it's inconsistent with itself and it's

19   demonstrably not Owens-Illinois Kaylo, the material that

20   they describe.  And it also contradicts the objective,

21   documentary and testimonial evidence from other

22   witnesses.

23        Now, there's three reasons why this claim fails,

24   Your Honor.  Mr. Suoja was not exposed to Owens-Illinois

25   Kaylo.  There was no defect in Owens-Illinois Kaylo.

1    There's no breach of any duty based on the knowledge at

2    the time, the state of the art at the time when

3    Owens-Illinois sold it.  And third, neither OI's conduct

4    nor its product caused Mr. Suoja's injury.  They were

5    not a substantial contributing factor to his illness.

6    No exposure.  No defect.  No causation.  It's a

7    three-legged stool, this liability claim against

8    Owens-Illinois.  If any one of those legs fall out, they

9    don't have a viable cause of action -- they don't have a

10    viable claim.

11        I want to focus for a couple minutes on the no

12    exposure claim.  They can't meet their burden based on

13    speculation and testimony that's not credible.  But

14    rather than just point out the flaws in that testimony

15    of why it's not credible, we went and checked the facts.

16        We went to Badger Ordnance.  We looked.  And Badger

17    Ordnance, as I said, had over 200 miles of elevated

18    steam pipes.  It was built between 1942 and 1944.

19    That's before the commercial manufacturing and sale of

20    Kaylo.  Owens-Illinois sold Kaylo commercially from

21    about 1948 to April of 1958 when that business was sold

22    to a separate company, Owens-Corning FIBERGLAS, for whom

23    Owens-Illinois has no liability.

24        The insulation contract for the initial

25    construction of Badger was contract number 168 and it

1    was for over $700,000 in 1940 dollars.  That contract

2    went to a company called AM&M, Asbestos Magnesia &

3    Materials out of Chicago.  AM&M was a Johns Manville

4    distributor.  The records show that when it was 30

5    percent complete, phase one was 30 percent complete,

6    they had already done 45,000 linear feet which makes it

7    about 150,000 linear feet or 28-and-a-half miles just

8    for phase one of the initial insulation of Johns

9    Manville product in the 1940s.

10       There was a phase two contract, contract number

11   661, in 1944.  That also went to AM&M Insulation, the

12   Johns Manville distributor.

13       We also found evidence of photographs of the

14   storeroom of Badger Ordnance Works in the 1940's and

15   what it shows is Johns Manville 85 percent magnesia

16   insulation.

17       We also found photographs from the history museum

18   at Badger Ordnance of insulators installing on outdoor

19   steamlines Johns Manville 85 percent magnesia

20   insulation.  The white steam pipe insulation is Johns

21   Manville 85 percent magnesia.  And the important thing

22   about 85 mag, Your Honor, is that it's water soluble.

23   It can be mixed with water.  If water gets on it, it

24   deteriorates.  It will slump.  It will sag.  It will be

25   ruined by water.

1    Now, the plaintiffs have disclosed three witnesses
2  -- oh, by the way, Your Honor, the boxes out in the
3  field and the boxes in the storeroom, Johns Manville 85
4  percent magnesia.

5    Now, the plaintiffs have disclosed three witnesses
6  to prove their exposure claim against Owens-Illinois.
7  The first is Mr. Schlub.  He starts in the union in
8  1955, but he says he worked with Mr. Suoja at Badger for
9  L&S in 1967.  Now, he's wrong by about a year because
10  Mr. Suoja doesn't show up at L&S until '68.  But it's
11  close enough.  He says they were working on outside
12  steamlines.

13    Now, Mr. Schlub says that he knows they were
14  ripping out Kaylo in the late 1960's because it was
15  deteriorated from weather and it was rained on, it was
16  white, and he knows that 85 percent magnesia products
17  are white.  He believes that Kaylo is an 85 percent
18  magnesia product and that it's not a calcium silicate
19  product.  He also believes that it was what was
20  originally installed in the 1940's because he was told
21  by people that what they were ripping out was what was
22  originally installed in the 1940's.  That's not Kaylo.

23    Now, Mr. Schlub was also there, he says in late
24  1959, not 1958, but late 1959 for a different company.
25  He says he can recognize Kaylo because it was again an

1   85 percent magnesia product that was white.  Now, he

2   does not say he worked with Mr. Suoja in 1959.  But even

3   if he did, it's not Owens-Illinois Kaylo.  And what he's

4   describing as a white insulation that deteriorates is an

5   85 percent magnesia.  And he believes that Kaylo is an

6   85 percent magnesia.  That's in his testimony.  That's

7   Mr. Schlub.  He's their best witness.  He's the only

8   witness that matters in this case.

9       Mr. Haase is the second individual.  He started in

10  the union in 1963.  And Mr. Haase is important for two

11  things:  He says that he saw Mr. Suoja working for L&S

12  at Badger in 1969.  That's about right.  That matches

13  the Social Security records and that matches the other

14  records.  And he also says that it was common knowledge

15  during that time frame among the insulators union, the

16  union that Mr. Suoja and Mr. Haase remembers, that

17  working with asbestos products could be hazardous to

18  their health.

19      The third witness that they offer -- and by the

20  way, Mr. Haase doesn't say anything about Kaylo at all,

21  so he's no help there.  The third witness they offer is

22  this Mr. Zimmer.  Now, Mr. Zimmer actually doesn't

23  matter at all because Mr. Zimmer starts in the trade in

24  1957 and what he testified was that he showed up at

25  Badger in late 1958 for L&S.  Well, we know that that

1    actually can't be true, it's late '59.  But either way,

2    if it's late '58 or late '59, it's not Owens-Illinois's

3    product.

4         We also know that Mr. Suoja didn't work for L&S in

5    '58 or '59.  It was a decade later in '68.  Now,

6    Mr. Zimmer says he didn't do the work, he was just an

7    apprentice.  But he saw other people, not Mr. Suoja.  He

8    just says he didn't see Mr. Suoja do anything.  All he

9    says is I think I saw Mr. Suoja there.  There's no

10   connection between any exposure to any product.  But we

11   know Mr. Suoja is not there.

12        But Mr. Zimmer says he knows that they were

13   removing old Kaylo because it was white and you could

14   tell that that was Kaylo and that it was the stuff that

15   they originally put on.  Now, Mr. Zimmer's testimony is

16   also inconsistent with what he said in his own lawsuit

17   as a client for Mr. McCoy's firm, as is Mr. Schlub.

18   Mr. Zimmer said that what he was using at Badger

19   Ordnance was a product called Armabestos, A.P. Green,

20   and M Block.

21        Those are the three witnesses that they have.

22   Zimmer doesn't put Mr. Suoja anywhere near Kaylo and he

23   puts him off by a decade.  That's provable by the

24   documents.  Mr. Haase doesn't put Mr. Suoja with any

25   Kaylo at all, but he just confirms he was at Badger for

1    L&S in '69.  And then you have Mr. Schlub, who says I

2    was with him in the late 60's and it was an 85 percent

3    magnesia product.

4        There are two other witness that we're going to

5    offer testimony:  A Mr. Locher who simply says that

6    during that time frame, there were numerous different

7    asbestos-containing insulations that were white.  They

8    were called white line products and that included

9    thermasbestos, Johns Manville 85 percent magnesia,

10   PABCO, Kaylo, calcilite and Carey.  White doesn't mean

11   Kaylo.

12       You also -- we'll also offer the testimony of

13   Mr. Borchardt who says that the term Kaylo, when used at

14   L&S, whether it -- it was used as a generic term for

15   calcium silicate insulation.  Kind of like Kleenex for

16   facial tissue.  And he says when they say Kaylo, it

17   could be Johns Manville, it could be Baldwin-Ehret-Hill,

18   it could be PABCO, it could be Atlas, or it could be

19   Owens-Corning FIBERGLAS Kaylo.

20       The other important thing that Mr. Borchardt says

21   is that where Mr. Suoja worked from 1954 to 1968 was a

22   company called McDermott in Rockford.  And Mr. Borchardt

23   says McDermott had the jurisdiction in Illinois.  They

24   didn't come up to Wisconsin to do work.  So we have

25   Mr. Suoja '68 to '83 at Badger for L&S.

1        Now, that's the credible evidence.  '68 to '70
2    timeframe, Mr. Suoja is at Badger.  He's working on
3    outdoor steamlines with white insulation that had been
4    deteriorated.  Kaylo was hydrophobic.  It was not
5    soluble in water.  It was insoluble in water.  The
6    advertisements show that.  The advertisement that
7    Mr. McCoy showed you in his opening says it's insoluble
8    in water.  You could boil it.  You could be in a flood
9    for weeks.  It was insoluble in water.  The white stuff
10   that was deteriorated was 85 percent magnesia.  Kaylo
11   was a calcium silicate.  It does not deteriorate in
12   water.
13       Now, the evidence in this case I think is going to
14   be that there's over a million feet of insulated steam
15   pipes at Badger.  Any Kaylo that can be put there is a
16   miniscule amount and the odds are over 99.5 percent that
17   whatever was on those pipes wasn't Owens-Illinois Kaylo.
18   But more importantly, the witnesses' description of what
19   Kaylo is and what they saw, it cannot be Kaylo.  If it's
20   getting deteriorated from water, that's not Kaylo.  If
21   it's an 85 percent mag, it's not Kaylo.  Any claim of
22   Kaylo removal in the 60's is pure speculation and the
23   facts don't fit.  And the leaps of faith that need to be
24   made and the assumptions that need to be made just to
25   get the possibility of exposure are too great.

1        I want to talk very briefly about the other two

2   legs of the stool, Your Honor.  No defect.  No breach.

3   The state of the art at the time.  The information out

4   there at the time going back to 1930 was that asbestos

5   can cause a disease, asbestosis.  The Insulators Workers

6   Journal, the journal that went to the home of every

7   insulator in the union that Mr. Suoja was a member in

8   1930 published that report.  In 1938, the government

9   said the same thing.  In 1947, Wisconsin General Orders

10  said that you had to keep it below the five million

11  particle per foot level, and that here were the things

12  you needed to do as an employer to protect employees to

13  make sure you're not exceeding the safe level.

14       In 1951, the Walsh Healey Act did the same thing.

15  And what's important about that is that Badger Ordnance

16  is a government-owned facility and the Walsh Healey Act

17  applied.

18       In 1951, Badger Ordnance had a safety handbook that

19  said you needed to wear a mask or respirator under dusty

20  operations.

21       In 1957, the Asbestos Workers Journal started

22  talking again about the health hazards of asbestos.

23       In 1961, the Asbestos Workers Journal put out an

24  advertisement with a photograph or a picture of the grim

25  reaper and asked and told their members to wear your

1  respirator.

2      In the 1960's there are more studies published in

3  the journal.  And in 1964, there's a huge conference

4  with this Dr. Selikoff who spoke to the insulators and

5  told them they had to protect themselves and wear their

6  masks or respirators.  And that's all before Mr. Suoja

7  shows up at Badger Ordnance.

8      Owens-Illinois did test its product.  It tested it

9  extensively.  The letter that Mr. McCoy referred to was

10  at the beginning stage where they didn't say it was a

11  first class hazard, they said because you have silica

12  and asbestos, you have all the ingredients of a first

13  class hazard.  So we better study it.  So they did.

14  They did animal studies for almost ten years.  At the

15  end of those studies, what they were looking for is to

16  find out what the manufacturing process rendered the raw

17  materials inert.  And what they found at the end of

18  those studies was that the silica changed, the

19  diatomaceous earth changed, but the asbestos remained

20  asbestos.  And what the laboratory told Owens-Illinois

21  was you've got to do the same things that's in Walsh

22  Healey, that's in the General Orders.  In your plants,

23  you have to make sure you're not exceeding the TLV; you

24  have to have your workers wear respirators where it is

25  being exceeded.  And the Saranac Laboratory published

1    those results to the entire world.  They didn't find any

2    cancer.  They found nine guinea pigs that got some form

3    of asbestosis, but the rats and the hamsters didn't.

4    There was no asbestos-related disease in

5    Owens-Illinois's plant.  And what Owens-Illinois was

6    told was do the same things that's in Walsh Healey.

7         And Your Honor, here is a picture of the November

8    1961 advertisement that was in or ad that was in the

9    Asbestos Workers Journal.

10        Now lastly, causation.  Mr. Suoja admitted over a

11   40-year career exposure to dozens upon dozens of

12   different products.  To pick out this Kaylo product

13   that's not really Kaylo for a few months in the 1960's

14   and say that's a substantial factor, that's not fair and

15   that's not accurate.  But even more importantly, the

16   claim is that the lack of a warning on a box caused

17   this.  Mr. Suoja never saw the box.  He was at the

18   facility ten years later.  As Mr. McCoy just said, you

19   can't see anything on the pipe covering once it's on.

20   There's no way to communicate any dangers.  His clock

21   stops April 30 of 1958 with respect to Owens-Illinois

22   and its knowledge and what its obligations are.  There's

23   no way to communicate anything a decade later on

24   something on a pipe.  He never saw the box.  Moreover,

25   his employers knew, the facility owner knew, they all

1  knew exactly what to do and whether they did it or not

2  was up to them.  They're trying to make the facts fit a

3  claim that just simply don't fit.

4       I want to -- there's no issue on substitutes in

5  this case.  They have no experts to talk about asbestos

6  substitutes.  There were no substitutes that worked at

7  that time.  But there's going to be no evidence, there's

8  no expert testimony on substitutes.

9       It is several liability.  There are Pierringer

10 releases.  They settled with a lots of different people.

11 This is a several liability case.  Owens-Illinois should

12 be zero percent responsible.  But if it's not, it's only

13 responsible for what percentage it caused to the overall

14 risk or the overall disease amongst all the other

15 exposures.  It's several liability.

16      The claims about family members and fear about

17 cancer, those aren't compensable.  You can't recover for

18 those.  Those aren't causes of action.  The sales

19 records from Owens-Illinois weren't lost.  In 1953,

20 Owens-Illinois entered into a distribution agreement

21 with Owens-Corning FIBERGLAS.  From '53 to '58,

22 Owens-Corning FIBERGLAS sold the product and they had

23 sales records.  And Mr. McCoy has some of them, he just

24 doesn't have a lot.

25      And in April of 1958, Owens-Corning bought the

1 business lock, stock and barrel and continued to make

2 and sell Kaylo over the years.  Owens-Illinois is not

3 responsible for their Kaylo.

4     We did advertise the product as nontoxic because

5 that's exactly how it was described in the industrial

6 hygiene medical literature at the time because it wasn't

7 a systemic poison and there will be evidence on that.

8 And then finally, there's no punitive damages in this

9 case.

10     In the end, this case is about an exposure that he

11 never had, to a product that he never used, on a box he

12 never saw.  Thank you.  (10:10 a.m.)

13        THE COURT:  All right.  Well, thank you.  All

14 right.  Let's go straight into the first witness.

15 Mr. McCoy.

16        MR. MCCOY:  Yes.  I'll get Mr. Kenoyer back in

17 here.  He's on his way.  He's just using the restroom

18 real quick.

19        MR. CASMERE:  Your Honor, for the record

20 Owens-Illinois's open statement will be Exhibit 1933.

21        THE COURT:  Understood.  Thank you.

22        MR. MCCOY:  I can provide a copy of our opening

23 statement to you, Judge.

24        THE COURT:  It's not necessary and if anyone is

25 going to be ordering the transcript to accompany your

 1   post-trial briefs, it's all going to be in there anyway.

 2   I'm not saying you have to, but if the transcript is

 3   coming in, you can ask for the opening as well if you

 4   wish.

 5           MR. MCCOY:  I was just going to give you the

 6   PowerPoint that we used.

 7           THE COURT:  That's fine.  Do you want to put a

 8   number on it?  Mr. Kenoyer, please come forward and the

 9   court reporter will swear you.

10       **STEPHEN KENOYER, PLAINTIFF'S WITNESS, SWORN,**

11           MR. MCCOY:  136 is the PowerPoint.

12           THE COURT:  I'll take the exhibit.  Okay.  Now,

13   Mr. McCoy, you were starting to tell me about the

14   computer?

15           MR. MCCOY:  Yes.  Mr. Kenoyer has copies of any

16   articles and so on that he might reference on the

17   computer.  Is that -- I don't know what the procedures

18   would be.

19           THE COURT:  The pretrial conference order said

20   you're supposed to check all this before you come in to

21   make sure it's all working and I see him up here looking

22   for an extension.

23           THE WITNESS:  Well, am I going to be able to

24   use it?

25           THE COURT:  If you can get it set up in the

1  next 60 seconds you can.  But this is something

2  Mr. McCoy was supposed to take care of before we started

3  this morning.

4          MR. MCCOY:  Separately we have a PowerPoint

5  he's done that we have on our computer.

6          THE COURT:  Like I said, I'm not going to

7  micromanage how or what you put in, but I want it to

8  move smoothly.  This was supposed to be taken care of

9  before we begin, even in the absence of a jury.

10         MR. MCCOY:  Understand.

11                   DIRECT EXAMINATION

12  BY MR. MCCOY:

13  Q    Ready?

14  A    Yes, sir.

15  Q    Okay.  Mr. Kenoyer, can you introduce yourself and

16  spell your last name for us.  Give us your name, spell

17  your last name.

18  A    Yeah.  My name is Stephen Kenoyer.  It's

19  K-e-n-o-y-e-r.  I'm a senior industrial hygienist with

20  Gobbell Hays partners.  Our office is located in San

21  Antonio, Texas.

22  Q    Now, what is the -- how long have you worked for

23  Gobbell Hays?

24  A    Since 2001.

25  Q    What type of business does Gobbell Hays do?
                    STEPHEN KENOYER - DIRECT

1  A    It's an architect engineering firm.  Essentially we

2  deal with the built environment.

3  Q    With what?

4  A    Buildings.

5  Q    Building environment?

6  A    Yes.

7  Q    And can you tell us what kind of educational

8  background you had before Gobbell Hays?

9  A    Well, I have a BS in physics and a master's in

10  environmental science.  As far as special training, I

11  used to hold Texas licenses as an air monitor, project

12  manager, and inspector.  I also used to be licensed as a

13  Texas lead inspector.  And I'm currently licensed as a

14  mold consultant in Texas.

15  Q    And Exhibit No. 91, this is a copy of your current

16  CV?

17  A    Yes, sir.

18  Q    Okay.  So in terms of the training and experience

19  that you've had in asbestos, can you describe what

20  you've done?

21  A    Initially starting with a former company called

22  Astex, which is A-s-t-e-x.  About 1990 we started off

23  doing what are called phase one environmental

24  assessments, which included the collection of random

25  asbestos bulk samples.  From that, progressed to doing

                    STEPHEN KENOYER - DIRECT

1   full what are called asbestos surveys into the project

2   design for asbestos abatement and then I would manage

3   various other project managers during the abatement

4   process.

5   Q    And when you say project design for abatement, can

6   you give us a brief description of how that might work?

7   A    Yes.  It's basically -- it defines what the scope

8   of work is, the square footage, where the work is to be

9   done, the type of materials to be removed, respiratory

10  protection the workers are supposed to use, the type of

11  containment that is required.

12  Q    Containment means, for example, what?

13  A    Well, you have -- for friable material, a typical

14  containment would consist of two layers of poly on the

15  floor and on the walls, decontamination unit, HEPA fans

16  for negative pressure, possibly a bag out.  Other forms

17  on piping.  It could be using a glove bag methodology.

18  Q    And how did you learn about project design for the

19  abatement work?

20  A    Initially it is actually taking the course works,

21  the project -- it was not project design.  I wasn't

22  licensed for that.  But project management.  That's a

23  40-hour course.  And so the consultant I worked with is

24  the one who actually did the design.

25  Q    And abatement refers to what type of work of

                    STEPHEN KENOYER - DIRECT

1   asbestos?

2   A     The removal of the asbestos.

3   Q     Now, have you studied the publications concerning

4   the historical information about asbestos?

5          MR. CASMERE:  Your Honor, can I have a 702

6   objection to the qualifications of this witness?  May I

7   inquire?

8          THE COURT:  Because there's no jury, I'll let

9   you save it for your cross.  As was made clear at the

10  beginning, even if you convince me he's not qualified to

11  offer this testimony, I'm going to let him put it in and

12  we can always strike it later.

13         MR. CASMERE:  Thank you.

14         THE COURT:  I do want to let you make your

15  appropriate record at the appropriate time.  Understood?

16         MR. CASMERE:  Yes, sir.

17         THE COURT:  Let's continue.

18  BY MR. MCCOY:

19  Q     The question is have you studied the historical

20  publications about asbestos?

21  A     Yes.

22  Q     And have you prepared a report that summarizes a

23  lot of the historical publications?

24  A     Are you referring to the general report?

25  Q     Yes.
                    STEPHEN KENOYER - DIRECT

1    A    Yes, sir.

2    Q    And Exhibit No. 92 includes the -- is this a copy

3    of that general report you referred to?

4    A    Yes.

5    Q    And what is the -- what does this general report

6    cover as it would relate to your testimony here today?

7    A    Well, in general you've got sections basically 1

8    through 7, and then section 8, which is the -- deals

9    with thermal system insulation.

10    Q    All right.  So in the introduction you state "This

11    report is based on a review of pertinent literature and

12    exposure assessment studies cited in this report and our

13    qualifications and experiences, environmental scientists

14    and industrial hygienists."  Did you write this with

15    somebody else?

16    A    That's correct.

17    Q    So who else was a coauthor of this?

18    A    Well, this specific document would be Ken Garza.

19    Q    And it says at the beginning *General Asbestos*

20    *Report of Kenneth Garza and Stephen Kenoyer*.

21    A    That's correct.

22    Q    So what did you contribute in terms of work on this

23    report?

24    A    Well, I mean this thing has been worked on,

25    written, rewritten.  Everybody's got their hands,

                    STEPHEN KENOYER - DIRECT

1  including Steve Hays has got some input on it.

2  Q    Steve Hays meaning the president --

3  A    That's correct.

4  Q    -- of Gobbell Hays?

5  A    That's correct.

6  Q    Okay.  So it's a collaborative effort of people at

7  Gobbell Hays?

8  A    That's correct.

9  Q    And have you -- did you review these publications

10 that are cited in here?

11 A    Yes.

12 Q    Let me pass this up to the Court for a moment.

13 Exhibit 92.  So your testimony here today, is it based

14 on citations within this report?

15 A    Yes.

16 Q    And other knowledge -- I mean this isn't every

17 article on asbestos that you've reviewed; right?

18 A    No, it's not.

19 Q    There's a lot of general information about asbestos

20 in the field of industrial hygiene that you don't put in

21 here; right?

22 A    Yes.  One part of it -- I mean there's thousands of

23 reports out there, studies out there, so you're kind of

24 limited to what you can actually do in a report which is

25 manageable.
                    STEPHEN KENOYER - DIRECT

1    Q    And there's a section in here -- after the

2    introduction, you've got a section entitled *Industrial*

3    *Hygiene*, and that's about the field of industrial

4    hygiene --

5    A    Correct.

6    Q    -- is that right?  Now, how long have you been

7    involved with industrial hygiene work?

8    A    Basically all my professional career is all

9    industrial hygiene work.  So from 1990 on.

10   Q    So about 26 years?

11   A    Yes, sir.

12   Q    Now, you're not actually a certified industrial

13   hygienist; right?

14   A    That's correct.  I'm not.

15   Q    But you are -- for 26 years you've been practicing

16   industrial hygiene.

17   A    That's correct.

18   Q    And then it continues on, a brief Section 3 on

19   Regulations and Literature.  This is all specific to

20   asbestos; right?

21   A    That's correct.

22   Q    4 is Air-borne Asbestos Hazard.  5 is

23   Asbestos-containing Dust and Resuspension; right?

24          THE COURT:  I think he's already referred us to

25   Section 8 on page 15.  Maybe we could go there.
                STEPHEN KENOYER - DIRECT

1          MR. MCCOY:  Right.

2    Q    What I want to get at is all these sections up

3    front.  Bystander exposure plays a role in your

4    testimony?

5    A    That's correct.

6    Q    Fiber type and size plays a role?

7    A    That's correct.

8    Q    And then we get specifically to asbestos.  There's

9    Section 8:  Asbestos-containing Thermal Insulation, TSI;

10   correct?

11   A    That's right.

12   Q    And that's what you focus on for the insulator

13   trade?

14   A    That's correct.

15   Q    All right.  So what other information have you

16   learned that would inform you about what insulators do?

17   And I'm referring back into the earlier time period to

18   the 40's and 50's and 60's.

19   A    For that time period primarily, again aside from

20   looking at certain studies that discuss what the process

21   was, what people were doing, it was also -- I was

22   reading numerous, like hundreds of depositions of people

23   working in that period.

24   Q    And that's part of the litigation work you've done

25   for a number of different cases; right?
                    STEPHEN KENOYER - DIRECT

1   A    That's correct.

2   Q    And some of those cases have also been for my firm;

3   right?

4   A    That's correct.

5   Q    And cases have also -- you've also done case files

6   for other lawyers; right?

7   A    That's correct.

8   Q    So when you were doing your actual field work on

9   the abatement-type projects, did you actually observe

10  the insulation materials in place?

11  A    Yes.  And just to be clear, on most of those

12  instances we were the ones who actually went and did the

13  initial sampling on them.  So we identified what is or

14  is not asbestos and then did the remediation.

15  Q    When you do sampling, what do you have to do?

16  A    We were physically taking a small knife, taking out

17  what's a bulk sample, putting it in a bag, and sending

18  it to a laboratory for analysis.

19  Q    Did that include pipe-covering materials?

20  A    Yes.

21  Q    Now, just to be clear, you're not the author of any

22  published peer-reviewed type articles; right?

23  A    No.

24  Q    And what's the compensation in terms of the rate

25  that's charged to my firm for this case?
                    STEPHEN KENOYER - DIRECT

1   A   $160 per hour.

2   Q   That's for your time?

3   A   Yes, sir.

4   Q   Okay.  And as part of your work in this case,

5   you've also prepared a specific report to the case of

6   Mr. Suoja; right?

7   A   That's correct.

8   Q   And that's also part of Exhibit No. 92?

9   A   That's correct.

10  Q   And this report contains a summary of materials

11  that you reviewed; right?

12  A   That's correct.

13  Q   And also contains a statement of A through G

14  opinions specific to Mr. Suoja's case; right?

15  A   Correct.

16  Q   Okay.  What I'd first like to ask you is to

17  describe how asbestos fibers behave when they're

18  released into the air.  And I'm talking in the context

19  of insulator work on piping.

20  A   Yeah.  Well, essentially, I mean they're very small

21  particles, and we have, again, the section in there

22  probably describe it better than what I'm going to do

23  just sitting here.  But they're very light.  They get

24  carried easily by breezes and winds.  They take a long

25  time, depending on their size, to actually resettle
                STEPHEN KENOYER - DIRECT

1    down.  And once they do settle down, any kind of air

2    disturbance then will resuspend them back in the air.

3    Q    Now, you put together a PowerPoint presentation for

4    today; right?

5    A    Yes.

6    Q    Okay.  I'm going to go ahead and start that.  The

7    first slide is -- that you put is titled *Dangers of*

8    *Insulation Dust*.  And you've got --

9            THE COURT:  Mr. Kenoyer, I think Mr. McCoy is

10   showing it on the witness screen there, so you don't --

11           THE WITNESS:  Oh, that's what I thought we

12   would be able to see.  Okay.

13           THE COURT:  Right.  So you're not going to need

14   your laptop after all.

15           THE WITNESS:  Okay.

16           MR. MCCOY:  I'll move this over a little bit so

17   you're not looking away from the judge all the time

18   there.

19           THE COURT:  I won't take it personally.

20           MR. MCCOY:  Can't quite move it too far.

21   BY MR. MCCOY:

22   Q    So the first article you've selected is what one?

23   A    It's by Stephen Markowitz.  2015.

24           MR. CASMERE:  Your Honor, I obviously have an

25   objection to all this testimony, but especially if he's
                    STEPHEN KENOYER - DIRECT

1   going to give any testimony about medical issues.  But

2   again, under observing the process, I guess I'll hold

3   off and wait.

4            THE COURT:  Sure.  Well, I'll tell you what.

5   What I understand you to be doing is making a standing

6   and universal objection to everything we're about to

7   hear.

8            MR. CASMERE:  Yes, sir.

9            THE COURT:  Okay.  Record made.

10           MR. CASMERE:  Thank you.

11  BY MR. MCCOY:

12  Q    This is a peer-reviewed publication; right?

13  A    Yes.

14  Q    Okay.  Dr. Markowitz is a medical doctor; right?

15  A    I believe so.  I'm not sure.  I don't have his

16  credentials right in front of me.

17           MR. MCCOY:  Your Honor, I can get the --

18           THE COURT:  Well, if he doesn't know, you can't

19  teach him on the stand.  So let's just keep going.

20           MR. MCCOY:  I have the publication.

21           THE COURT:  It's his testimony, not yours.

22           MR. MCCOY:  Okay.  I understand.

23  BY MR. MCCOY:

24  Q    Do you in your profession review publications by

25  medical doctors?
                    STEPHEN KENOYER - DIRECT

1    A    Yes.

2    Q    Okay.  You're not a medical doctor obviously.

3    A    No.

4    Q    Why would you, as an industrial hygienist, be

5    studying publications that medical doctors wrote?

6    A    Pretty much for the situation for asbestos is

7    determining what type of exposures would increase risk.

8    Q    All right.  So you've given us on this slide

9    quotations out of Mr. or Dr. Markowitz's publication

10   here.

11   A    That's correct.

12   Q    Okay.  And the first one you've selected -- I'll

13   let you go ahead and read this one for us.

14   A    Okay.  It says "According to the most recent WHO

15   estimates, more than 107,000 people die each year on a

16   global basis from asbestos-related lung cancer,

17   malignant mesothelioma and asbestosis resulting from

18   exposure at work."

19   Q    What's the --

20          THE COURT:  Mr. McCoy, let me interrupt, and I

21   want to be clear here.  If you're giving the Court a

22   primmer on asbestos and the dangers of asbestos, that's

23   not really necessary.  Let's face it, you and I went

24   through the Bushmaker trial before.  It's not this

25   record, but we're really here to figure out was there

                    STEPHEN KENOYER - DIRECT

1    causation.  Is there liability here.  So if it's

2    important to you, certainly you can put this all in, but

3    I don't need Mr. Kenoyer to read me other people's

4    quotes.  I think what would be more helpful to the Court

5    is to jump to his opinions as an industrial hygienist

6    about what happened here and why it's relevant to

7    finding liability against this defendant.

8         MR. MCCOY:  I understand, Judge.  I'm just --

9    if these become part of the record, then I won't have

10   him read each one to you.  I mean that's not necessary.

11        THE COURT:  Well, let's be clear.  I'm letting

12   you offer them.  I'm not keeping them out.  But as I

13   just promised Mr. Casmere, he's got a standing objection

14   to be considering them at the close of the case.  So

15   yes, it is coming in today, and you don't need to have

16   Mr. Kenoyer read them to the Court because I will read

17   everything you all give me.  Again, I understand the

18   impulse when there's a jury, you have to educate the

19   jury, and I don't -- I don't deny you that instinct.

20   But here it's not necessary.

21        So if we're going to go to his opinions about what

22   happened here and why it's a basis for liability, that

23   would be most helpful to the Court.

24        MR. MCCOY:  I understand.  Okay.

25   BY MR. MCCOY:
                    STEPHEN KENOYER - DIRECT

1  Q    So we'll move through the second quote here of

2  Dr. Markowitz and we'll offer this through the

3  PowerPoint and we won't read it to the Court.

4       Now, the next slide on the dangers of insulation

5  dust, this is a publication made when, by who?

6  A    This is David S. Beyer.  This is actually -- the

7  ream of documents we have in there are the National

8  Safety Council.

9  Q    What role did the National Safety Council play in

10  terms of promulgating information that would be used

11  back in the 1930's and 40's?

12  A    They were an organization that put on a variety of

13  symposiums where different members would come and

14  discuss different issues in industrial hygiene.

15  Q    And what did they do in terms of publishing

16  information in addition to symposiums?

17  A    Well, they would print -- put their symposiums and

18  write them up as documents.

19  Q    *National Safety News*.  What's that?

20  A    That's the one this one actually appeared in.

21  Q    And is that a publication of the National Safety

22  Council?

23  A    Yes.

24  Q    So the significance of this to you as an industrial

25  hygienist practitioner, what does this 1933 signify?

STEPHEN KENOYER - DIRECT

1    A    Well, basically here, and it kind of continues

2    through this grouping of documents, is there's three,

3    four major concepts.  One is that dust is hazardous.

4    You have dust that are visible, you can basically just

5    see.  But the smaller dust that you cannot necessarily

6    see are just as hazardous or not more so.  They also

7    discuss dealing with ventilation and respirators.

8    Q    Okay.  This is still part of the Beyer publication?

9    A    That's correct.

10   Q    In terms of ventilation and respirators known

11   during this period of time, what would be the types of

12   things known back then compared to what we are using

13   today?

14   A    Well, I mean the process is basically the same,

15   especially the ventilation.  And as one of these

16   discusses, you're basically -- you can isolate the work

17   area, basic room.  So where the dust is being created,

18   isolate it from other workers and then you essentially

19   are using what we call negative air machines where

20   you're taking air from the dirty environment and

21   extracting it outside.

22   Q    So Dr. Sayers is the next publication you had.

23   This is also the National Safety Council?

24   A    Yes.

25   Q    And this is what you're referring to where you talk

                    STEPHEN KENOYER - DIRECT

1   about engineering?

2   A    Yeah.  In this case, yes.  He's specifically

3   referring to that.

4   Q    Engineering of what?

5   A    Of the work environment.  It's where the

6   ventilation of what I'll call the negative air machines

7   where you're removing the dust hazards.

8   Q    And dust control measures would be what?

9   A    The dust controls would be the negative air

10  machines, but you can also set up containments to

11  isolate where the work is being done from people are not

12  doing that work.

13  Q    What about in this time period in the 1930's, what

14  types of dust control measures were being used?

15  A    I don't think any was being used during that period

16  of time.  That's why these people are pointing this out.

17  They're saying it needs to be done.

18  Q    For asbestos.

19  A    For asbestos, yes.

20  Q    And what types were available and known for dust

21  control back then?

22  A    Essentially the same machines that we have now.

23  Q    What other techniques besides machines?

24  A    Well, one does talk about wetting materials down.

25  That's basically it.  I mean unless you were getting rid
                    STEPHEN KENOYER - DIRECT

1  of the product itself, that's how you have to deal with

2  the dust.

3      And again, right here it's talking about the two

4  types of respiratory protection, which is you're

5  breathing outside air, the supplied air version or

6  you're having filtered respirators.

7  Q    How about when you talk about asbestos, what do you

8  have to do?

9  A    As far as what?

10  Q    Respiratory protection.  What works and what

11  doesn't work?

12  A    Well, you actually, you have to have an actual

13  respirator as opposed to what they call a nuisance dust

14  mask which doesn't provide any protection.  But there's

15  different levels of respirators from half face, full

16  face.  Now, like I say, you could do supplied air, which

17  is air pumped in from outside.

18  Q    When you talk about asbestos, what -- you said that

19  certain types don't work.  What would be that type?

20  A    A dust mask.  It's basically just a typical dust

21  mask you see painters and stuff will put on.  It just

22  does not seal around the face and so those provide no

23  respiratory protection.

24  Q    So what do you need for asbestos?

25  A    You need an actual respirator which actually seals

                    STEPHEN KENOYER - DIRECT

1  around your mouth and your face.

2  Q    What's the significance of this next quote, the

3  next quote there?

4  A    Where it starts "As a rule"?

5  Q    Yes.

6  A    Well, as far as the concept of industrial hygiene

7  goes, there's steps you take.  One dealing with

8  hazardous materials.  One is an informational step.

9  It's informing people of that; is it a hazard; how do

10  you treat it.  If you're going to be working with it,

11  the next step may be the negative air machine.  You're

12  actually doing a mechanical process dealing with it.

13       The last step you do is put a person in a

14  respirator, because again, it's dealing with the amount

15  of risk involved.  So putting a person in a respirator,

16  you've kind of dropped off the others and the highest

17  risk is now -- the person is now up to the highest risk

18  level.

19  Q    How does this -- it talks about mask or respirators

20  should be used only where the exposure is intermittent

21  and brief.  How does that compare to what insulators

22  have in their exposures?

23  A    I would say their exposure is not necessarily

24  intermittent or brief.  Since they're working on it

25  continuously, they're continuously generating dust.

STEPHEN KENOYER - DIRECT

1    Q    So do you have an opinion then about the protection

2    that an insulator would get from wearing the masks or

3    respirators?

4    A    Well, I mean you can go into the different levels

5    of respirators.  I mean today, if a person is going to

6    be working with that kind of property -- that kind of

7    product, then they're put in what's called a PAPR, which

8    is a powered air purifying respirator.  It's not the

9    highest level of safety, but it's pretty high up there.

10   Q    And that's a level of protection that would be used

11   if it was a breathing-type protection for an insulator,

12   is that what you're saying?

13   A    If -- compared to today's standard, if you're

14   removing that type of material, that's the type of

15   respirator you would have to be in.

16   Q    This is -- the next publication is by Lawrence.

17   Also National -- is this National Safety Council?

18   A    Yes, sir.

19   Q    Is there anything additional that this publication

20   adds to what you've already talked about?

21   A    Two things on here.  Again, I kind of mentioned it,

22   that he's recommending the asbestos be dampened is the

23   word he uses and also he's bringing the concept of

24   periodic medical examinations for the workers.

25   Q    Okay.  Now, continuing here.  You had included a
                    STEPHEN KENOYER - DIRECT

1  reference to this publication by Merewether as part of

2  the slides on dangers of insulation dust.  What does

3  this add, in addition to what we've already talked

4  about?

5  A    Well, it just kind of complements it and it kind of

6  goes back to what I said a little bit ago.  Again, he's

7  talking about the size of the dust particles and

8  pointing out that it's basically the invisible ones you

9  can't see which really can do the most harm to you.  So

10  even though you may be seeing some, just because you

11  don't see any dust in the air doesn't mean there is not

12  a hazard there.

13  Q    Okay.  I want to go back into the 1940's, 50's and

14  60's.  What types of activities did insulators perform

15  on piping systems that caused exposures if they worked

16  with asbestos materials?

17  A    Well, the easiest way is the one as Dr. Balzer has

18  laid it out as part of his studies.  They've got the

19  prefabrication, the actual installation, mixing -- if

20  you want to go up a couple more slides.  One more.  If

21  you want to bring all those up:  Prefab application,

22  finishing, tear out, mixing.

23      Now, one thing to note, he lists a series of

24  percentages, and those would be all average percentages

25  you would expect a worker to do.  But reality is for an

STEPHEN KENOYER - DIRECT

  
1  insulator, an insulator may be doing nothing.  But a

2  prefabrication, prefabrication is cutting the insulation

3  into the right sizes to be installed.  The application

4  is the person who is applying it.  The finishing, that's

5  the person who is actually doing the finish work,

6  putting on cloth material, adding the mud to the joints

7  and along the seams.

8      Tear out, kind of obvious, it's the person who's

9  removing the insulation.  Mixing, again that's a mixing

10  of the mud.  It's a dry powder mix, put in a bucket, add

11  water to it, and they use a mixture to mix it up.  And

12  then the general on here is clean up.  It can be moving

13  boxes, that kind of stuff.

14      But again, to go back to the concept of what an

15  insulator does, if you're working a job where all you're

16  doing is tearing out, then the entire time you're there

17  you're doing tear out.  I mean so you're not -- that one

18  person is not doing every job.  So one person may be

19  doing the fabrication.  He may be cutting the

20  insulation, handing it to somebody else.  Or they may

21  have a person there who is just doing the mixing all day

22  long.

23  Q    So these activities from Balzer are sort of like

24  averages of what insulators would do over their

25  lifetime, percentages, and it would vary maybe from job

                    STEPHEN KENOYER - DIRECT

1  to job what they're actually doing?

2  A    Correct.  Or another way if you look at it is what

3  has to happen on a typical job.  A typical job you could

4  say well, 10 percent of it is going to be

5  prefabrication.  You can break it down in that form too.

6  Q    And have measurements been made of the fiber

7  release during these types of activities for insulators?

8  A    Yes.

9  Q    That's the earlier charts we had; right?

10  A    That's correct.

11  Q    I'm going to go back to those.

12  A    Okay.

13  Q    Okay.  These are ones that you prepared; right?

14  A    That's correct.

15  Q    All right.  So the first one is titled

16  personal-removal.  What's this refer to and where did

17  you get the data from it?

18  A    Well, the placing of the data from you can see on

19  the right-hand column.  Those are the names of the

20  articles and the dates.  This is an individual insulator

21  who is actually doing the physical removal.  The column

22  on the left says *Total*.  Those are the total number of

23  samples that were involved in the average.  And then the

24  column next to that, those are the actual sample

25  results.  And at the bottom of that we have an average.

STEPHEN KENOYER – DIRECT

1          MR. CASMERE:  Can I have a clarification as to

2    whether these are fiber per CC results or something

3    else, Your Honor?

4          THE WITNESS:  Fiber per CC.

5    BY MR. MCCOY:

6    Q    What does that mean, fibers per CC?

7    A    Well, that's just the -- it's the fibers per the

8    volume of air is essentially what it breaks down to.  So

9    it's part of how they do the analytical.  They count up

10   a certain number of fibers.  They have an equation that

11   he fits it in based on the amount of volume of air

12   that's run through the cassette and your result is in

13   fibers per CC.

14   Q    And how are those fibers actually measured?

15   A    They're counted.  They look through a certain

16   microscope, we call it a PCM microscope, and they

17   literally are just counting -- what they typically do is

18   they'll take a PCM, which is a circle, cut out a quarter

19   of it.  They put it on a plate and they basically look

20   at 100 spots on it and they count how many fibers that

21   meet a certain criteria, and based on that number, once

22   they do the calculation, that's where you get the fibers

23   per CC.

24   Q    You said PCM?  Is that a technique?

25   A    Phase contrast microscoscopy, yes.
                    STEPHEN KENOYER - DIRECT

1    Q    When did that become a method for counting the

2    fibers?

3    A    Well, it certainly became standard with OSHA

4    regulations.  That's how -- OSHA kind of standardized

5    that for everybody to be counting the same way.

6    Q    When was that?

7    A    Well, OSHA came in in '71, so when the actual

8    regulation -- I guess, what, '71/'72 is about that time

9    when it --

10   Q    So was PCM available then before OSHA?

11   A    It was, and I couldn't give you the specific date.

12   I mean there were other methods that were being used

13   prior to that though.

14   Q    What were the other methods?

15   A    Well, one of them that typically you'll see is the

16   impinger.  And the impinger, essentially you're drawing

17   air through a liquid and whatever is in the air gets

18   trapped in the liquid.  And then they set that up on a

19   plate and they look through a microscope and count the

20   dust particles in that is essentially how that works.

21   Q    Was there a change then in using impingers to PCM

22   that took place?

23   A    Again, that would be -- would solidify when OSHA

24   came in because OSHA recommended that.

25   Q    Why did that change occur?
                    STEPHEN KENOYER - DIRECT

1    A    Well, the impinger -- you're getting all dust, so

2    it's not necessarily asbestos fibers in there.  So with

3    OSHA, they wanted a more standardized form that focused

4    more on the fibers.  They also have it organized more in

5    a fashion where -- I don't want to say this in a rude

6    way -- but almost like anybody could read these and get

7    the same type of results from one person to another

8    across the country.

9    Q    Is that PCM that you're talking about now where it

10   was everybody could get the same results more easily?

11   A    Basically, yes.

12   Q    Okay.  So what you're saying is essentially the

13   impinger method was not as precise for asbestos as the

14   PCM.

15   A    Correct.

16   Q    Okay.  I'm going to move on then to the next --

17   first off, this personal-removal now, was this for

18   insulators being studied?

19   A    This is for insulators being studied, yes.

20   Q    Okay.  Now, when -- you reviewed information about

21   the work of Mr. Suoja; right?

22   A    Yes.

23   Q    You looked at what to understand his work?

24   A    There was two depositions.  One is Lawrence Zimmer

25   and George --

                    STEPHEN KENOYER - DIRECT

1  Q     Schlub?

2  A     -- Schlub.  Okay.

3  Q     S-c-h-l-u-b?

4  A     L-u-b, yes.

5  Q     Okay.  Was there anything in their description

6  about Mr. Suoja's work or the work they were doing with

7  him that would be inconsistent with any of the testimony

8  you're giving here based on the studies of insulators?

9  A     No.

10 Q     Okay.  So in terms of these personal removal fiber

11 counts that you're providing here, are these fiber or

12 dust counts I should say?

13 A     These are fiber counts, five million per CC.

14 Q     In terms of these fiber counts, would these then be

15 applicable to the type of work Mr. Suoja was doing?

16 A     Yes.

17 Q     You also have NIOSH cited as a reference, 1972.

18 What did they do that's relevant here to get those

19 studies?

20 A     Well, that document, they actually study a variety

21 of different asbestos activities, products, I believe

22 even factories where things are being manufactured.

23 Q     The Balzer work, is that like a field study of

24 insulators working?

25 A     The first one is.  The second one, 1972, that is

                    STEPHEN KENOYER - DIRECT

1   more of a simulation.

2   Q    Okay.  And personal, when you say personal -- we

3   know what removal is, but what's personal mean?

4   A    Personal is these samples represent what would be

5   the person who's doing the removing's breathing zones,

6   what he's breathing.

7   Q    Have you yourself had to do personal samples?

8   A    Yes.  I've set personal samples on workers, yes.

9   Q    Next slide is titled *Personal-installations.*  So

10  now we're talking about samples of people installing?

11  A    That's correct.

12  Q    Is this pipe covering?

13  A    Yes.

14  Q    Okay.  So the data that you're using here, can you

15  just describe for us what the significance of the

16  reports are for the --

17          THE COURT:  Mr. McCoy, before we go into this,

18  could I ask for an informational question?

19          MR. MCCOY:  Sure.

20          THE COURT:  Is there any claim here that

21  Mr. Suoja installed Owens-Illinois product, Kaylo?

22          MR. MCCOY:  I believe that's an inference that

23  could be drawn from the testimony of Mr. Zimmer.  And

24  we'll lay this out.  Mr. Casmere spent longer than me on

25  it, but we'll lay that out in the briefing.
                STEPHEN KENOYER - DIRECT

1          THE COURT:  Okay.  Well, if that's part of the

2    claim, then please continue.  I was not clear on that.

3          MR. MCCOY:  It's primarily removable, but there

4    is that installation on that first job.

5          THE COURT:  Please keep going.

6    BY MR. MCCOY:

7    Q    All right.  So the question, Mr. Kenoyer, is what's

8    the significance of this data on personal installation

9    to evaluating Mr. Suoja's exposures?

10   A    Well, just looking at the numbers, to me -- again,

11   the way we typically will do this, like we say in the

12   report, is we compare what the numbers would be to what

13   is the baseline outdoor or indoor concentration would

14   be.  And we had the numbers in there.  Without

15   belittling it, it's ten to the minus 4, so it's a small

16   number.  So basically if you're looking at this, which

17   has got an average of 16, you're essentially talking

18   about a million times higher than what's a baseline of

19   outside.

20   Q    And when you say outside, you mean in like the air

21   outside as people are on the street?

22   A    Well, it's outside.  It's also representative of

23   what covers a range of what would be in normal typical

24   buildings which not having an asbestos problem in them.

25   Q    How would you characterize then an exposure like

                    STEPHEN KENOYER - DIRECT

1  that that's a million times higher than the normal air?

2  A    I would call that significant.

3  Q    And what does significant mean in the industrial

4  hygiene profession?

5  A    Well, the way we term it is, and again, without

6  kind of -- you know, it's every decimal point, you know,

7  you get away from the baseline, that the more -- you get

8  across then the more significant that number becomes.

9  It's just a striking comparison of numbers.

10 Q    How does this kind of exposure relate in terms of

11 the risk for this particular type of activity of this

12 profession?

13 A    It's going to increase the risk.

14 Q    Increase the risk of what?

15        MR. CASMERE:  Your Honor, I'm sorry.  If he's

16 going to give a medical opinion, I feel compelled to

17 stand up.

18        MR. MCCOY:  It's not medical, Judge.  I mean

19 this is --

20        THE COURT:  Well, how can he talk about

21 causation of diseases from increased risk?  What's his

22 basis of knowledge?

23        MR. MCCOY:  Well --

24        THE COURT:  If he's got it, you can ask him.

25        MR. MCCOY:  I'll lay that.
              STEPHEN KENOYER - DIRECT

  
1       THE COURT:  Mr. Casmere, I'll let you

2   cross-examine.  I understand your point.  There's no

3   jury.  Let's just keep going.

4       MR. CASMERE:  Okay.  I'll sit down.

5   BY MR. MCCOY:

6   Q    Do industrial -- the profession of industrial

7   hygiene deal with risk of exposures?

8   A    Yes.

9   Q    And can you explain how that works for asbestos?

10  A    Again, you're -- typically you're looking at what

11  the sample results are and you're comparing them to --

12  we can compare them to what his background is.  Some

13  circumstances you may want to compare to a regulatory

14  number depending what the circumstance is such as OSHA.

15  The higher you are above that number, then the higher

16  the risk is.

17      There's also a risk -- and I know he's concerned

18  about the medical, but there's the medical risk, which

19  is one thing.  But just as an industrial hygiene, you're

20  looking at what is the overall risk from an activity.

21      THE COURT:  Okay.  I'm sorry, but please

22  clarify.  You differentiated overall risk from medical

23  risk.

24      THE WITNESS:  Well, the medical risk would

25  be -- it's the true epidemiological studies where

                 STEPHEN KENOYER - DIRECT

1   somebody is doing a study over a population.  Now, we'll

2   -- they'll say okay, based on this population doing this

3   work, they're going to have this number of risks of

4   getting the disease.

5        And what we're looking at is from a worker safety

6   point of view, and in that case, the risk is is this

7   person going to be exposed to a hazard.  You could say

8   yes or no.  And then the question is what, you know, how

9   big of a hazard is that?  You could say well, that's a

10  small hazard because maybe the numbers are close to

11  background, for example.  Or in this case, you've got a

12  background which is one number and you're a million

13  apart.  Well, that's a big risk.  That's a big

14  differentiation.  So based on that, you make a decision

15  of how you're going to offer some kind of protection.

16  Because like we always said, you can do the mechanical

17  protection.  You can remove the product.  You can get a

18  substitute.  Or at the very end, you put a person in a

19  respirator.  So that's a distinction I would look at

20  when I'm talking about a risk in a situation.

21            THE COURT:  Just to make sure I understand --

22  Mr. McCoy, I'll turn it back to you in just a moment --

23  but the distinction I hear you making right now to me is

24  the risk that you are concerned about is all medical.

25  You're just not differentiating what will result from

                    STEPHEN KENOYER - DIRECT

1    that risk.  That would be the medical epidemiology.

2             THE WITNESS:  Yes.  Because ultimately anything

3    we do in industrial hygiene, and again even to the

4    extent of how high a person climbs up on scaffolding,

5    there is a risk there.  He may fall, that's a known

6    risk, and break his leg or something and I can recognize

7    that.  Now, I'm not the medical doctor who's going to

8    say yes, you have a broken leg.  So that, I guess, is

9    the distinction I would make.  The risk.

10            THE COURT:  I understand.  Thank you.

11   Mr. McCoy, back to you.

12   BY MR. MCCOY:

13   Q    Mr. Kenoyer, in terms of the different occupations

14   that have been reported to have asbestos exposures, how

15   do these numbers for the insulators' work compare?

16   A    Pretty much the only ones off the top of my head

17   which would be higher would be people working with

18   fireproofing, spray-applied fireproofing, doing the

19   spraying.

20   Q    The data that we're looking at here on this chart,

21   is that collected by the same types of methods you

22   talked about?

23   A    These are, yes, and they're all fiber per CC.

24   Q    Are these insulators?

25   A    Yes.  And not to be confusing, but if you see

                    STEPHEN KENOYER - DIRECT

1  fibers per CC or fibers per milliliter, it's the same

2  thing.  Some people will use it one way, some people use

3  it the other.

4  Q    Milliliter is the same as --

5  A    Yeah.  It's just how they did the math and did the

6  measurements, yes.  But it's the same result.

7  Q    All right.  So the next chart, bystander-removal,

8  is this also reflective or derived -- that's a bad

9  question.  Is this also measurements reported for

10  insulator's work?

11  A    That's correct.  And again, it's not millimeter,

12  but it would be fibers per CC.

13  Q    What does it mean when you say bystander?

14  A    Well, for example, for an insulator who's doing the

15  removal, these samples would represent the person

16  standing next to him.

17  Q    Do any of these bystander exposures that you're

18  looking at here go -- maybe I should say standing next

19  to him, how far would that distance be?

20  A    I'm not sure if all of them say, but the simulation

21  one with Balzer in 1972 I think -- I think it ranged,

22  they were talking maybe five to ten feet.  I mean it's

23  in a simulation, so they're in a -- they built a room

24  essentially to do the simulation in.

25  Q    How does that matter if someone is working with

                    STEPHEN KENOYER - DIRECT

1   like a crew of insulators?

2   A    Well, obviously you're going to have variability

3   based on that circumstance because you can have somebody

4   to the right who's maybe actually ripping insulation off

5   and somebody on the left who's not.  It may go vice

6   versa.  So basically what you can do is accept these as

7   basically the average type of exposure persons can have.

8   Q    And so this once again is data of insulator's work?

9   A    That's correct.

10  Q    And the final slide is bystander-installation?

11  A    That's correct.

12  Q    Okay.  And is this also then insulator work?

13  A    Yes, it is.

14  Q    That slide we've already looked at?

15  A    Correct.

16  Q    Are these then the pictures of types of materials

17  that the insulators were using?

18  A    Correct.

19  Q    This would be what form here?

20  A    I would call that a block.

21  Q    Okay.  And this one would be what?

22  A    I'd call them half rounds.

23  Q    Are you familiar with the product Kaylo itself?

24  A    Yes.  Yes, I am.

25  Q    All right.  So what I want to ask is if you have an
                    STEPHEN KENOYER - DIRECT

1   insulator who's got a 40-year career of asbestos

2   insulation work starting in '43 through '85, is it

3   necessary to actually have to calculate out all of his

4   exposures to evaluate the significance of the risk?

5   A     No.  You don't need to calculate it out all the

6   way.

7   Q     Why do you say that about an insulator?

8   A     Because I know the kind of exposure he's going to

9   have.  Just based on the numbers we were just looking at

10  and knowing what the background numbers are, I mean you

11  automatically can reason that that's going to be a

12  high-risk job for asbestos.

13  Q     Okay.  What does the term or terminology *low-dose*

14  *exposure to asbestos* mean to you in the industrial

15  hygiene profession?

16  A     Well, the low dose brings into question what is a

17  dose.  The simple form of dose is the amount of a

18  chemical or something that your body takes in and it

19  gets added up over the lifetime is basically what

20  they're saying.  So when the low dose, when they're

21  talking about that is they're looking at, for asbestos,

22  low exposure numbers over a long period of time where

23  you have a very small total dose and the question is in

24  those scenarios is that enough or at what point is that

25  enough for you to have an asbestos-related disease.

                  STEPHEN KENOYER - DIRECT

1    Q    Have you reviewed in the literature about low-dose

2    exposures?

3    A    Yes.

4    Q    And these are quotations that you pulled out of

5    certain articles for us; right?

6    A    That's correct.

7    Q    Okay.  The first one is the Iwatsubo.  So what I

8    want to ask you is what's the importance in the context

9    of an insulator of a low-dose exposure to asbestos?

10   A    You don't have a low-dose exposure to asbestos.

11   Q    Okay.  So what's the importance of low-dose

12   exposures then for this type of a case?

13   A    Again, it's the idea of trying to find out what a

14   baseline is, what somebody who is doing some type of

15   work can get an exposure to some degree and will have --

16   increases his risk so he gets a chance of getting a

17   disease.  So this is sort of like where the baseline of

18   it is.

19   Q    So even if you had only much lower exposure than

20   insulators, this is a summary of what that risk would be

21   in these slides; right?

22   A    That's correct.  And the key points, which I'll

23   kind of summarize here quickly, is a lot of these point

24   out that there is no -- well, there is a dose response

25   relationship meaning the amount that you're exposed to,

                    STEPHEN KENOYER - DIRECT

1    there is a corresponding relationship.  That other

2    aspect is that they are not finding that there is a

3    threshold limit and that essentially means that if you

4    go below this dose, that you have no risk of any

5    disease.

6    Q    How does this work for mesothelioma specifically?

7    A    Well, that's where a lot where the issue of low

8    dose comes into.

9    Q    What's the findings on the low dose in

10   mesothelioma?

11   A    Again, there is a dose-response relationship and

12   there is no threshold, bottom threshold.

13   Q    What do you mean when you say there's no bottom

14   threshold for mesothelioma?

15   A    Well, what --

16        THE COURT:  He just told us.  I mean now you're

17   just asking him to repeat himself.  So let's move on.

18        MR. MCCOY:  I wasn't sure if you -- okay.  I

19   appreciate it, Judge.

20        THE COURT:  I am listening, Mr. McCoy.  So

21   let's try new questions.

22   BY MR. MCCOY:

23   Q    Okay.  So the next article is Hillerdahl.  Does

24   that provide any additional information on low dose

25   mesothelioma?

                STEPHEN KENOYER - DIRECT

1    A    Yeah.  That's basically just kind discussing the

2    same topics, yes.

3    Q    Rodelsperger.  Does that provide any additional

4    information on the low dose?

5    A    Yeah.  He's defining it a little more precisely as

6    including a number of less than 0.15 fiber years.

7    Q    What does that mean, a fiber year?

8    A    Fiber years would be the -- again, it's your

9    asbestos dose over "X" number of years.  It could be

10   your lifetime.  So it's based on your exposure that's

11   added up for "X" number of years.

12   Q    So what does it mean when it says a significant OR?

13   What's OR?

14   A    That's an odds ratio.

15   Q    Okay.  And what's this mean when he says odds ratio

16   calculated even for the lowest exposure category and

17   then he's got that formula?

18   A    Well, what that -- the basic aspect of the odds

19   ratio, going to statistics here, is that it is the

20   probability of getting disease from an exposed group as

21   the probability of getting a disease from an unexposed

22   group.  And basically all they're saying, if your OR is

23   a positive number, then you have an increased risk.  And

24   so here he's saying that they've got a solid -- a

25   significant -- that significance is a statistical
                    STEPHEN KENOYER - DIRECT

1    word -- OR for a number that's greater than zero and

2    less than 0.15.

3        So again, they're just going back with the concept

4    there's a low-dose level and there's also no threshold

5    is basically what he's saying.

6    Q    And again, a fiber year represents what period of

7    time or what amount?

8    A    Well, the period of time could be your lifetime.

9    Q    Okay.

10   A    I mean it could be your occupation period of 20

11   years.  So that, depending on what you're trying -- what

12   question you were trying to answer.

13   Q    So what does it mean in terms of amount to have a

14   fiber year?

15   A    That would be representative of your total

16   exposure.

17   Q    Is there a quantity associated with that beyond --

18   you used the terminology of one fiber year?

19   A    I mean you can calculate.  I'm not sure what you

20   mean by quantity other than if you're going to calculate

21   somebody's fiber years.

22   Q    Go ahead.  How would you calculate a fiber year?

23   A    In the most simplest terms if you wanted to do

24   that, say you have an exposure -- and we'll go back to

25   those slides, say 15, and you just want to know what

                    STEPHEN KENOYER - DIRECT

1  would be his dose for one year of working.  And you

2  assume he's working 40 hours a week, 50 weeks a year,

3  well basically all that is is the exposure times the

4  number of years.  So in this case, it's one year, so he

5  has fiber years of 15.

6  Q    If it's exposure, the 15 means 15 --

7  A    Fibers per CC.

8  Q    Okay.

9  A    Doing that work, and assuming he's doing that 40

10  hours a week, 50 weeks a year.

11  Q    Okay.  So it's based on that exposure of 15 fibers

12  per CC occurring during a 40-hour week for a year?

13  A    That's correct.

14  Q    And that would be 15 fiber years.

15  A    That's correct.

16  Q    Okay.  The next article you have on the low dose is

17  Lacourt.  And what else does this add to what we've

18  already talked about?

19  A    Nothing really.  He's just -- they're just backing

20  up what's already being said.

21  Q    And finally, you've got an article here by

22  Markowitz.  What's that add to this on the low dose?

23  A    Again, other than this, it's just repeating the

24  same thing.  It's just this is now 2015, and Markowitz,

25  actually what he's doing is he's looking over a variety
          STEPHEN KENOYER - DIRECT

1  of studies that have been done.  So he's not just doing

2  it on his own, he's looking at some of these other

3  studies that we talked about also.

4  Q    Okay.  Now, I'd like to go back to Oswald Suoja for

5  a moment and just ask you to assume he's got one month

6  or more of work installing a pipe-covering insulation

7  before the end of 1958 or removing a pipe-covering

8  insulation.  How would you characterize that exposure

9  for an insulator?

10 A    I would characterize that as being significantly

11 high, even for that short a period.

12 Q    And why do you say that?

13 A    Because again, we can go back and look at what

14 those actual exposure numbers were.  I mean some of them

15 are 15, 16, and if you just think about what that

16 dose -- if he's doing that, you know, eight hours a day

17 for even a month, that's going to be way above what

18 these low-dose studies are talking about.

19 Q    You stated in your report here, Opinion No. E,

20 "Since the 1930's working with around hazardous

21 containments in the workplace, the need for appropriate

22 training and appropriate respiratory, adequate

23 engineering controls are recommended.  Asbestos was

24 included among these workplace hazards.  Good industrial

25 hygiene practices would have included warnings."  How
                    STEPHEN KENOYER - DIRECT

1    did you come to that conclusion?

2    A    That is basically from those documents that we

3    looked at earlier dealing with the dust, dangers of

4    dust.

5    Q    And that's an opinion specific to Mr. Suoja -- your

6    knowledge of Mr. Suoja's work?

7    A    That's correct.

8    Q    All right.  So changing subjects a little bit, has

9    -- was -- has asbestos over the years then been the

10   subject of industry guidelines or government exposure

11   limits?

12   A    Yes.

13   Q    And going back in time to the 40's, what were the

14   ones in place at that time?

15   A    The ACGIH established five million particles per

16   cubic feet of air in 1946.

17   Q    Per cubic what?

18   A    Cubic feet of air.

19   Q    Okay.  And the ACGIH was what type of an

20   organization?

21   A    It's a professional organization.  It's American

22   Council of Governmental Industrial Hygienists.

23   Q    It's not a governmental agency.

24   A    No.

25   Q    And how did they get information to establish that
                    STEPHEN KENOYER - DIRECT

1   five million particles per cubic foot?  Did they do any

2   testing themselves?

3   A    I don't believe they did testing themselves.  I

4   think they reviewed other people's studies.

5   Q    Okay.  And do you know when this five million

6   particles per cubic standard was introduced?

7   A    By them I think it was 1946, although others were

8   talking about it prior to that.

9   Q    Okay.  I've moved on to the next slide you prepared

10  which has got Balzer 1968 at the top.  Is that that same

11  Balzer article you've talked about already?

12  A    It is.  And again, all we're showing here, giving

13  you an idea what the type different of work categories

14  and he's got a series of samples -- this dotted square

15  just kind of represents his sample range.  That's the

16  number of samples fall in that.  The line with the dot

17  in there, that's the average.  And then he's got a

18  bracket which is called the error range on that.

19      That big dotted line that runs up and down through

20  the whole thing, that's that five million particles per

21  cubic feet.  And you can see how on certain job

22  categories the average is above that five, and that's

23  prefabrication, tearing out, and mixing.  Those are the

24  highest ones.  But even other -- most of the other ones,

25  except for the general, have some range of numbers that

                    STEPHEN KENOYER - DIRECT

1    are going to be above that five.  And again, you go back

2    to that data we produced up there, that corresponds

3    pretty well with what those data points are showing up

4    there.

5    Q    Okay.  This is all insulator data?

6    A    This is insulator data.

7    Q    Your next --

8    A    Okay.

9    Q    -- slide is called -- titled *Concentration*

10   *Comparisons*.  Why don't you explain how these relate to

11   what you've been talking about.

12   A    Okay.  What I want to do is just do kind of a way

13   of graphically representing what these numbers kind of

14   mean because people can get kind of lost in there.  So

15   the ambient outside range, I said 10 to the minus four,

16   so it's 0.0001 is going to be our floor, our bottom.

17   The 1946 ACGIH, that's the five million particles per

18   cubic feet.

19       Now, in the other document which you have, the

20   ATSUR, there is a way of converting that into fibers per

21   CC, basically multiplying by 3.  So that's what I did.

22   So instead of having 5, I now have 15.  The bottom one,

23   this comes from a couple documents which is in our

24   general report produced by Calidria, who is an asbestos

25   producer.  They're basically saying if you can get to

                    STEPHEN KENOYER - DIRECT

1  the point where you see visible dust in the air, you're

2  at 8 to 10 million particles.  So I just did the

3  conversion again, multiplied by 3 that's 24.  So just as

4  a comparison, if you switch to the next when you're

5  ready.

6  Q    Sure.  When you're ready.  Okay.  There we got it.

7  Next slide.

8  A    So basically this is sort of what we're dealing

9  with.  The one ambient, that's the background.  That's

10  kind of the normal.  Everything exposed to.  When you

11  compare that to the ACGIH, which now is at 15, you can

12  really see the stark difference in those levels.

13       Now, the next one, that's when you get visible

14  dust.  Now, go back and look at all those studies

15  that -- the numbers I have in there, and you'll see that

16  he's working in this area, you know, with the ACGIH, the

17  visible dust.  That's his type of exposures.  So I just

18  did this so you can actually kind of get a better feel

19  for looking at something other than numbers.

20  Q    So when you say ACGIH, now you're talking about the

21  five million particles per cubic foot?

22  A    That's correct.

23  Q    That was the other slide that had the dotted line

24  vertically showing that; right?

25  A    That's correct.  And if you go back and look at
                    STEPHEN KENOYER - DIRECT

1  that, that corresponds very well to this too.

2  Q    So what does the significance here mean when you

3  have a comparison of the five million particles per

4  cubic foot and visible dust?

5          THE COURT:  Well, we've been through that.

6  That was the Calidria article.  That's 8 to 10 million

7  parts.  Let's keep going.

8          MR. MCCOY:  All right.

9  BY MR. MCCOY:

10 Q    And you said insulators are working primarily in

11 what range?

12 A    Well, if you look between these two tall bars, the

13 ACGIH and the visible dust, that's the areas where

14 they're working.

15 Q    Some of the exposures can be higher a little bit

16 and some of them can be lower.

17 A    That's correct.

18 Q    But most of them you're saying are in that.

19 A    On average they'll fall into that range.

20 Q    Okay.  Have you seen in your work -- well, first

21 off, the term 85 percent magnesia and the term calsil,

22 are these terms you're familiar with?

23 A    Somewhat, yes.

24 Q    And does that represent some kind of a chemical

25 difference?
                    STEPHEN KENOYER - DIRECT

1   A    Well, they're -- yeah, there's a chemical

2   difference between them, yes.

3   Q    And what chemical is different from there?

4   A    Well, one of them has magnesium.  I don't have the

5   chemical formula so --

6   Q    Okay.  And in terms -- what does the magnesium

7   serve as?

8   A    My understanding is they're used as fillers for

9   making the asbestos pipes.

10  Q    Okay.  So you've encountered both types?

11  A    I'm familiar with both types, yes.

12  Q    Okay.  Has there been, in your experience, any type

13  of difference visually between those two?

14  A    Not that I'm aware of.

15  Q    To the naked eye.

16  A    To the naked eye.

17  Q    All right.  Now, what I also want to cover here is

18  -- we covered that.  Okay.

19      This five million particle per cubic foot standard

20  which was an ACGIH guideline you said about 1946; right?

21  A    Correct.

22  Q    Okay.  Has that been lowered over time?

23  A    Well, that has been replaced.  It was replaced by

24  OSHA in particular.

25  Q    What happened to it?
                    STEPHEN KENOYER - DIRECT

1   A    They just got rid of that standard and put a new

2   standard in.

3   Q    Okay.

4   A    The only difference is they're using fibers per CCs

5   as for the PELs.

6   Q    And how does the standard that replaced it compare

7   in terms -- can you make a comparison between the fibers

8   per CC standard and the OSHA standard that came about?

9   A    Well, the OSHA standard reduced the levels,

10  concentrations.

11  Q    Reduced what had been the guidelines of the ACGIH?

12  A    Correct.  They did it over a number of years down

13  to 0.1 fibers per CC now.

14  Q    You're familiar with the -- this is Exhibit No.

15  222.

16        MR. CASMERE:  Just give us a year, please.

17  BY MR. MCCOY:

18  Q    And that's a 1971; right?

19  A    That's correct.

20  Q    Okay.

21        MR. MCCOY:  Here is a copy, Judge.  I don't

22  have a slide.

23        THE COURT:  I'm sorry, the number for this was

24  222?

25        MR. MCCOY:  Right.  Plaintiff's 222.
                STEPHEN KENOYER - DIRECT

1   BY MR. MCCOY:

2   Q    So this 19 -- what is this document?

3   A    Documentation of Threshold Limit Values for

4   Substance in Workroom Air.

5   Q    And what does it mean when it says *Documentation*?

6   A    Well, I think all they're saying is as they go

7   through, they do documentation of what are the threshold

8   limit values.  That's my understanding what this means

9   when they say the documentation.

10  Q    Okay.  Documentation meaning the documents that

11  they were based on?

12  A    Well, this is the documentation of what these

13  values are.

14  Q    Okay.  And this is an ACGIH publication?

15  A    Yes.

16  Q    Okay.  Committee on threshold limit values.  Is

17  that threshold limit value, is that like a five million

18  particle per cubic foot?

19  A    Oh, yes.  That would be, yes.

20  Q    And so that's a 1971 edition; right?

21  A    Correct.

22  Q    And what does that provide in the way of additional

23  or newer information about the five million particle per

24  cubic foot guideline?

25  A    Well, in this they're switching it to five fibers

                    STEPHEN KENOYER - DIRECT

1  per milliliter.

2  Q    And what does that state about the basis or the

3  reasons for the changes?

4  A    Well, they just go through a process of where

5  they're talking about where it started off with

6  Dreessen, where he came up with a five, and then he goes

7  through a process of dealing mainly with asbestosis.

8  Then they raise the concern of increasing cancer among

9  asbestos workers and they go through review of the

10 Committee of Hygiene Standards for the British

11 Occupational Hygiene Society.  Basically they come to

12 the conclusion that the five cc limit is not

13 sufficiently low, at which point they recommend coming

14 down to five milliliters.

15 Q    All right.  And since that time it's dropped even

16 further?

17 A    That's correct.

18         THE COURT:  Mr. McCoy, let me just ask for

19 housekeeping purposes, will you be done with the direct

20 by noon?

21         MR. MCCOY:  I think I'm done here.

22         THE COURT:  Didn't mean to rush you.

23         MR. MCCOY:  I was just checking my notes here.

24 Judge, I'm finished with my questions.  I didn't know in

25 terms of offering actually these exhibits, I assume
             STEPHEN KENOYER - DIRECT

1 that's going to be done afterwards in the post-trial

2 briefing.

3        THE COURT:  Yes.  And consistent with my

4 statement to Mr. Casmere before, nobody leaves the

5 courthouse at the close of the evidence until we all

6 know which exhibits are in and which exhibits are out.

7 And we don't have to do it as we go.  But to the extent

8 that an exhibit needs a foundation from a witness, I'd

9 like that done.  But we don't have to agree today as to

10 what's in and what's out.  So if you want to offer that

11 now, subject to them objecting to it, that's fine.

12        MR. MCCOY:  Okay.  I'm offering the exhibits

13 that we tendered here, including the PowerPoint.

14        THE COURT:  Okay.  Mr. Casmere, are you in a

15 position to tell me now, subject to your general

16 objection to Mr. Kenoyer's entire line of testimony, any

17 separate objection to the exhibits?  Or would you like

18 to reserve and get back to the Court on that?

19        MR. CASMERE:  I just have I guess a question.

20 Most of these are what we would consider like 803.18,

21 state of the art type literature.  And so from having

22 them go into the record, I have no problem with that.

23 But having them be admitted as evidence for the

24 substantive evidence, that I object to because I

25 don't -- under 803.18.
                STEPHEN KENOYER - DIRECT

1        THE COURT:  Understood.  And Mr. McCoy, can you

2   tell the Court now which fork of that road you're

3   taking?  And if you can't, you can reserve on that.  But

4   Mr. Casmere is entitled to know.  Do you understand the

5   question he's asking?

6        MR. MCCOY:  I certainly understand 803.18 very

7   well, yes.  I'm just trying to think if there's anything

8   that's not in that category.  I guess CV's --

9        THE COURT:  Well, that's different.  I don't

10  think he's worried about the CV.

11        MR. MCCOY:  I mean the general report is not

12  really 803.18, it's just foundation for his

13  qualifications.

14        THE COURT:  Right.  But he's not asking about

15  the general report, he's asking about the background

16  documents that you questioned Mr. Kenoyer about.  Tell

17  you what, I don't want to waste Mr. Kenoyer's time while

18  we go through that.  The objection is there.  Mr. McCoy,

19  I'll give you the chance with Mr. O'Connor -- I'm sorry,

20  with Mr. Hausman's assistance to sort that all out at

21  the appropriate time.  But we don't need to do that now.

22  Okay?

23        MR. MCCOY:  Okay.

24        THE COURT:  Would you like a five-minute break

25  before we do the cross?
                    STEPHEN KENOYER - DIRECT

1          THE WITNESS:  Yes, sir.

2          THE COURT:  All right.  Let's take a

3    five-minute break.

4        (Recess          11:33-11:38 a.m.)

5          THE COURT:  We're back on the record.  Let's

6    continue.

7          MR. CASMERE:  Thank you, Your Honor.  May I

8    proceed?

9          THE COURT:  You may.

10                CROSS-EXAMINATION

11   BY MR. CASMERE:

12   Q   Mr. Kenoyer, let's start with something easy.  This

13   photograph of this block material from the presentation,

14   is that asbestos containing or not?

15   A   I would have to sample it to be able to positively

16   ID it.

17   Q   Is that calcium silicate or 85 magnesia?

18   A   I don't know.

19   Q   What year was this manufactured?

20   A   I don't know.  It's just used as a example.

21   Q   Who manufactured it?

22   A   I don't know.

23   Q   You can't tell just by looking at it, can you?

24   A   No.

25   Q   Same question.  This insulation, the half round
                STEPHEN KENOYER - CROSS

1  that was in your presentation, is that same answers?

2  A    Same answers.

3  Q    You can't tell what it is or who made it or when;

4  right?

5  A    That's correct.

6  Q    Can you tell the Court where you got your Ph.D. in

7  industrial hygiene?

8  A    I don't have an Ph.D. in industrial hygiene.

9  Q    Okay.  How about can you tell the Court where you

10  got your master's degree in industrial hygiene?

11  A    I don't have a master's degree in industrial

12  hygiene.

13  Q    Can you tell the Court where you got your

14  bachelor's degree in industrial hygiene?

15  A    I don't have a bachelor's degree in industrial

16  hygiene.

17  Q    As a matter of fact, you never even took a course

18  in undergraduate or graduate school that had the name

19  industrial hygiene in the title.

20  A    That's correct.  It did not have the name

21  industrial hygiene in the title.

22  Q    You're not a certified industrial hygienist.

23  A    That's correct.

24  Q    You've never sat for the certified industrial

25  hygienist examination.
                  STEPHEN KENOYER - CROSS

1    A    That's correct.

2    Q    Does the American Board of Industrial Hygiene

3    recognize you as an industrial hygienist?

4    A    Probably not.

5    Q    Well, you'd know it if they did, wouldn't you?

6    A    I've never spoken to them.

7    Q    Do you even know what the qualifications are

8    required by them to be a certified industrial hygienist?

9    A    Essentially you end up having to take a test.

10   Q    I'm not asking essentially, I'm asking if you know

11   what the requirements are for that organization to

12   become a certified industrial hygienist.  Do you know?

13   A    You put in an application and you take a test.

14   Q    That's it?

15   A    As far as I'm aware of, yes.

16   Q    Have you ever applied?

17   A    No.  Now, as to how I know that, because the person

18   I worked with, Ken Garza, did get his industrial

19   hygiene.  He has a BS in biology and a master's in

20   environmental science.

21   Q    I understand you may work with people who are

22   actually industrial hygienists, but I want to talk about

23   you for a few minutes.  Okay?

24   A    Sure.

25   Q    Are you a member of the American Industrial Hygiene
                    STEPHEN KENOYER - CROSS

1    Association?

2    A     No.

3    Q     Do they recognize you as an industrial hygienist?

4    A     I don't know if they're even aware I'm here.

5    Q     You said ACGIH?  You said that term earlier?

6    A     I believe so, yes.

7    Q     What does that stand for?

8    A     America Council of Government Industrial

9    Hygienists.

10   Q     That's not right.  Do you want to try it again?

11   A     Are you sure that's not right?

12   Q     American Conference of Governmental Industrial

13   Hygienists.

14   A     Oh, American Conference.

15   Q     You're not a member of that organization, are you?

16   A     No.

17   Q     Do you know what it takes to become a member?

18   A     No.

19   Q     Do you know if they recognize you as an industrial

20   hygienist?

21   A     I would doubt if they even know who I am.

22   Q     As a matter of fact, you've never applied for a

23   membership in any professional organization related to

24   industrial hygiene.

25   A     That's correct.
                    STEPHEN KENOYER - CROSS

1 Q Your bachelor's degree focused on how electrical

2 circuits work; correct?

3 A In part.  It was more solid state physics, but yes.

4 Q You describe solid state physics as how the

5 electrical components or circuitry works.

6 A Yeah, but it's more the material form of it, not as

7 most people think of electrical circuits.

8 Q No training or work in industrial hygiene as an

9 undergraduate; is that right?

10 A Training or work in industrial -- no.

11 Q That's right.  I'm correct.

12 A That's correct.

13 Q What year were you born by the way?

14 A 1958.

15 Q What year did you graduate from -- with your

16 bachelor's degree?

17 A 1990.

18 Q In 1990, is that when you went to work for Astex?

19 A Yeah, approximately.  Yes, '90.

20 Q Your work experience prior to that was working in

21 restaurants?

22 A That's correct.

23 Q Your master's in environmental science, I believe

24 you've described that as doing a variety of things that

25 dealt with water resources, statistical work, and some

STEPHEN KENOYER - CROSS

1  other math; right?

2  A    That's a general way of saying it, yes.

3  Q    Nothing specific to industrial hygiene there

4  either.

5  A    Well, the statistical work does apply to industrial

6  hygiene.  I also took course work in -- there's a

7  quantitative analysis which deals with the

8  instrumentation involved in chemical analysis.

9  Q    What I heard you just say is that you do math in

10  industrial hygiene so that your math and statistics work

11  and your graduate applies to industrial hygiene; is that

12  fair?

13  A    They do apply to industrial hygiene.

14  Q    Do you hold yourself out as a medical doctor?

15  A    No.

16  Q    How about as a toxicologist?

17  A    No.

18  Q    How about as a microscopist?

19  A    No.

20  Q    How about as a registered safety engineer?

21  A    No.

22  Q    How about an epidemiologist?

23  A    No.

24  Q    You have agreed that you are not a warnings expert?

25  A    That's correct.
                   STEPHEN KENOYER - CROSS

1   Q    You have not studied the effectiveness of warnings

2   in the workplace.

3   A    That's correct.

4   Q    You are not qualified to testify about what types

5   of warnings are effective for changing worker behavior,

6   are you?

7   A    That's correct.  No, I'm not.

8   Q    You have no knowledge about the history of

9   warnings.

10  A    No, not really.

11  Q    You have never published any papers on asbestos; is

12  that right?

13  A    That's correct.

14  Q    You have one publication listed in your CV and it

15  has nothing to do with asbestos; right?

16  A    That's correct.

17  Q    As a matter of fact, do you know whether that

18  article -- it was published in what journal?

19  A    I think it's Microscope is what it's called.

20  Q    The Microscope.  Do you know if that's a

21  peer-reviewed journal?

22  A    No, I don't.

23  Q    Do you know what a peer-reviewed journal is?

24  A    Yes.

25  Q    Explain it.
                    STEPHEN KENOYER - CROSS

1   A    Essentially when people submit a study or a report,

2   that study report gets handed off to other "experts."

3   They do reviews, they criticize it, may want to

4   recommend changes, something like that, and then it gets

5   sent back to the original authors.  They may reject it

6   or they change it and resubmit it.

7   Q    This article that you published or that you list on

8   your CV as having published in The Microscope, what was

9   the subject of that article?

10  A    That had to do with coal ash soot.

11  Q    And how much of the actual written word that was

12  published did you write?

13  A    None.  I was just asked to review it.

14  Q    You were just asked to read it by the authors?

15  A    That's correct.

16  Q    And then you put your name on it as one of the

17  coauthors?

18  A    They put my name on it.  That's why they wanted me

19  to review it.

20  Q    Have you ever taught any classes at an accredited

21  university in the United States of America on industrial

22  hygiene?

23  A    No.

24  Q    How about anywhere in the world?

25  A    No.

STEPHEN KENOYER - CROSS

1   Q    Now, your company --

2   A    I've done training for HAZWOPER in various

3   hospitals.

4   Q    I'm asking about universities, sir.

5   A    Oh, you just said anywhere in the world.  So I

6   thought you were expanding that.

7   Q    Anything else you want to say about that?

8   A    No, that's all.

9   Q    Your company, Gobbel Hays, has never billed you out

10  as a senior industrial hygienist, have they?

11  A    Probably not.

12  Q    They have never billed you out as just a regular

13  old industrial hygienist either, have they?

14  A    They typically would probably bill me out as a

15  project manager or now I'm basically as an office

16  manager for them.

17  Q    Well, what you told my partner a couple weeks ago

18  was that the entire time you've been with Gobbel Hays,

19  you've been billed out as a senior project manager; is

20  that right?

21  A    Yeah.  I'd to look -- I also told him I'd have to

22  look at the actual -- how they label it on the invoices.

23  But when they --

24  Q    Did you do that?

25  A    No, I have not.  But when they list a person,

                    STEPHEN KENOYER - CROSS

1  employee, and what they're going to bill at what rate,

2  they have their category set based on that rate.

3  Q    As a matter of fact, have you gone on the Gobbel

4  Hays website recently?

5  A    No.

6  Q    Your company doesn't even list you on the website

7  as an industrial hygienist, do they?

8  A    I don't know.  I haven't been on there.

9  Q    I went on there over the weekend.  Do you want to

10  see what it says?

11  A    Sure.

12  Q    Can you read that or do you need me to zoom in?

13  A    No, I can read that.

14  Q    Does your own company list you as an industrial

15  hygienist on their website?

16  A    No.  They list it as an environmental scientist.

17  Q    Mr. McCoy, asked you some questions about your

18  expertise in testifying and that you've done a little

19  bit of work for his firm; right?

20  A    Yes.  As far as testifying, yes.

21  Q    This is the first time you've ever walked into a

22  courtroom and sat down to testify as a "expert"; right?

23  A    No.

24  Q    In asbestos?

25  A    Asbestos, yes.
                    STEPHEN KENOYER - CROSS

1    Q    Let me ask that in a better way.  Have you ever

2    testified as an expert -- as an expert in asbestos

3    before today?

4    A    No.

5    Q    Has any court in the United States certified you or

6    said that you're qualified to testify as an expert on

7    asbestos, in industrial hygiene?

8    A    Not that I'm aware of.

9    Q    Now, the fact of the matter is that Mr. McCoy's

10   firm has hired you and your colleagues several hundred

11   times in the last couple of years to give testimony;

12   right?

13   A    That's correct.

14   Q    He mentioned that there were other people, other

15   lawyers I think he said that had hired you to testify as

16   an industrial hygienist in asbestos cases; right?

17   A    A few, yes.

18   Q    Three; right?

19   A    I don't know the number off the top of my head.

20   Q    You testified once for the Waters & Kraus firm?

21   A    That's correct.

22   Q    You never testified for them again.

23   A    That's correct.

24   Q    You testified once for the Salls (ph) Tillery firm

25   out of Kentucky; right?
                    STEPHEN KENOYER - CROSS

1  A    That's correct.

2  Q    You testified once for them, never testified again;

3  right?

4  A    That's correct.

5  Q    And the third name -- do you remember who the third

6  firm was?

7  A    It was Weitzel and --

8  Q    The Weitz & Luxenberg firm out of New York.  You

9  testified for them once; right?

10  A    They were out of California were the ones I was

11  testifying for, yes.

12  Q    You testified for them once.

13  A    That's correct.

14  Q    Never again.

15  A    Never again.

16  Q    In asbestos cases, the only firm for whom you have

17  testified more than once is Mr. McCoy's firm; is that

18  right?

19  A    That's correct.

20  Q    The only presentation regarding asbestos that you

21  list on your CV, there's only one of them; right?

22  A    Yes.

23  Q    That was a presentation that was supposed to be

24  given by your colleague Mr. Hays; right?

25  A    That's correct.
                    STEPHEN KENOYER - CROSS

1   Q    He got sick or injured a couple weeks before that

2   presentation.  You stepped in and gave that

3   presentation.

4   A    That's correct.

5   Q    So far that's the only presentation you've ever

6   given on asbestos; is that right?

7   A    That's correct.

8   Q    You currently hold no professional licenses that

9   identify you as an industrial hygienist.

10  A    That's correct.

11  Q    You currently hold no professional licenses that

12  have anything to do with asbestos.

13  A    That's correct, yes.

14  Q    You used to; right?

15  A    Used to.

16  Q    But you gave those up about ten or twelve years

17  ago; right?

18  A    That's correct.

19  Q    And you gave them up because you were tired of

20  dealing with contractors.

21  A    That's part of it.

22  Q    So that we're all clear, those licenses you had

23  were basically to manage and do abatement work; correct?

24  A    To manage the abatement work, yes, and do

25  inspections.
                    STEPHEN KENOYER - CROSS

1    Q    Did you actually do hands-on the abatement work or

2    did you just observe and manage it?

3    A    Observed and managed it.

4    Q    When you talked about doing bulk samples before,

5    that's where you go and you take a little chunk out of

6    the material, put it in a bag, and send it off to a

7    laboratory; right?

8    A    That's correct.

9    Q    Did you do the bulk analysis?

10   A    No.

11   Q    Somebody else did that.

12   A    That's correct.

13   Q    You never saw anybody work with asbestos-containing

14   insulation materials until the 1990's when you got

15   involved in the abatement work; right?

16   A    That's correct.

17   Q    And you've actually never seen anybody install

18   asbestos-containing insulation materials.

19   A    That's correct.

20   Q    You've only seen the abatement/removal process.

21   A    That's correct.

22   Q    Now, your reports are cosigned by somebody named

23   Garza?

24   A    Kenneth Garza.

25   Q    He's an industrial hygienist; right?

                    STEPHEN KENOYER - CROSS

1    A    That's correct.

2    Q    In your reports you testify or you state

3    conclusions not in the singular I or me or my opinions,

4    but as we or we find; correct?

5    A    That's correct.  That's how these -- those cases

6    were set up to be done.

7    Q    You also told us this morning that the large

8    report, which is 57 pages, is a collection of material

9    that was put together by you, by Mr. Garza, and

10   Mr. Hays; right?

11   A    We have all worked on it, yes.

12   Q    Anybody else?

13   A    No.

14   Q    You can't tell the Court which of those words you

15   wrote or which of those words somebody else wrote.

16   A    Not specifically because they've been -- we've all

17   been rewriting it as we go along.

18   Q    The reason that you cosign those reports with

19   Mr. Garza is because he's a certified industrial

20   hygienist; right?

21   A    No.  That is how Bob McCoy wanted these cases to be

22   set up.  We were supposed to produce a general report,

23   which both Ken and I would sign, and then each one of

24   the lawsuits, because there's going to be quite a few of

25   them, they would come to me or come to Ken, but we would

STEPHEN KENOYER - CROSS

1  both sign it.  That's how it was agreed to be done.

2  Q    Why did you both have to sign them?

3  A    That's how we agreed to do it when we decided to

4  take on the cases.

5  Q    Sir, which opinions are yours in that report and

6  which opinions are Mr. Garza?

7  A    Well, we all discuss what our opinions are.  It's

8  not like our opinions are that far off or we wouldn't be

9  working together on it.

10  Q    But the opinions --

11  A    The basic concept is asbestos is a hazardous.  You

12  disturb asbestos, it's going to get airborne.  It'll

13  stay airborne for a long time.  Any exposures above

14  background is significant.  The rest of the stuff, wind,

15  the diseases were identified, where -- whether these

16  people, the plaintiffs talk about warnings, respiratory

17  detection or training, I mean those are all basic

18  concepts of the asbestos industry.

19  Q    That's a pretty short report.  Maybe we should let

20  you testify this morning rather than Mr. McCoy.  We'd

21  have been done a lot sooner.

22          THE COURT:  We'll strike that as unnecessary.

23  Let's keep moving.

24  Q    You agree that when you look at insulation on a

25  pipe, you can't tell who manufactured it?
                    STEPHEN KENOYER - CROSS

1    A    Generally, yeah.  There may be instances where you

2    might see a label on it, but generally I would agree

3    with you.

4    Q    Now, you've never been to Badger Ordnance Works?

5    A    No, I have not.

6    Q    You don't know where it is?

7    A    No, not specifically.

8    Q    You didn't do any monitoring, air monitoring there

9    did you?

10   A    No.

11   Q    You didn't do any sort of the case-specific

12   exposure dose calculation at all?

13   A    No.

14   Q    As of a few days ago, you associated the product

15   Kaylo with a manufacture called Pittsburgh Corning;

16   right?

17   A    Yes, I did get that confused with the other

18   Illinois.  I always get those confused.

19   Q    Lot of people do apparently.

20   A    Yeah.

21   Q    Did you do anything to verify the accuracy or the

22   assumptions that were given you by the Cascino Vaughan

23   law firm?

24   A    Only by what's in the depositions.

25   Q    Did you actually read those depositions all the way

                    STEPHEN KENOYER - CROSS

1  through or just certain highlighted portions of them?

2  A    Well, I read them to the extent since I highlighted

3  them, so I read them generally through.  Not every word.

4  Q    Now, your opinions that you gave us today about

5  exposures from thermal insulation materials, that

6  applies to every brand of pipe covering; right?

7  A    Asbestos fiber, yes.

8  Q    So those opinions, those numbers you gave us, it

9  applies to asbestos-containing pipe covering?

10 A    Yes.

11 Q    Regardless of who made it?

12 A    That's correct.

13 Q    It applies to asbestos-containing block regardless

14 of who made it?

15 A    Yeah, I'm not sure, I'd have to go back and look.

16 I don't know if those things included block.

17 Q    In your report though, in your report where you

18 have studies about the exposure levels on thermal

19 insulation products, it includes all of the different

20 types of thermal insulation; right?

21 A    That's correct.

22 Q    That includes cements?

23 A    Yes, it does.

24 Q    Also known as muds?

25 A    That's correct.

                    STEPHEN KENOYER - CROSS

1    Q     Asbestos cloth?

2    A     That's correct.

3    Q     Asbestos blankets?

4    A     Not so much asbestos.  I mean it may be taught, but

5    I don't think there are any numbers associated with

6    them.

7    Q     How about asbestos-containing mastics?

8    A     What type of mastic are you talking about?  Are you

9    talking about the cements before that?

10   Q     The stuff they would paint on the pipes after they

11   were done.

12   A     I think there is some data on that.

13   Q     And that applies -- those numbers apply regardless

14   of what product or who manufactured it; right?

15   A     Generally yes, unless for some reason it

16   specifically mentions the product name.

17   Q     You made no attempt to break out any of the

18   exposures to any type of product in this case?

19   A     To a specific product, no.

20   Q     You did not try to calculate what a 40-year total

21   dose exposure would have been for Mr. Suoja.

22   A     No.

23   Q     Now, if you assume that over a 40-year career as an

24   asbestos worker that the work was constant and it was

25   pretty much similar over 40 years, the exposure over

                    STEPHEN KENOYER - CROSS

1    each of those 40 years would be about constant; is that

2    right?

3    A    Yes.

4    Q    And if you have one year of exposure to a product

5    out of that, it would be one-fortieth of the total

6    exposure; right?

7    A    That's correct.

8    Q    And if you have one month of a product over that

9    40-year career, that would be 1-480th of the total

10   exposure; right?

11   A    Assuming your math is correct, yes.

12   Q    Now, in your reports that you had where you were

13   giving exposure levels of fiber per CCs, you had

14   products like Unibestos listed in there.  You remember

15   that?

16   A    Yes.

17   Q    Now, Unibestos was a product that was 65 percent

18   asbestos; correct?

19   A    I believe that's what it said, yes.

20   Q    And the exposure levels from that product were a

21   lot higher than the products that were 20 percent

22   asbestos; right?

23   A    That's correct.

24   Q    Did you take a look at any evidence or anything to

25   see if Mr. Suoja was exposed to Unibestos products?

                    STEPHEN KENOYER - CROSS

1    A     No.  And again, you need to look at those as the

2    types of exposures that a person could have.  You can

3    look at the average, and when you do an average, you get

4    a series of numbers.  You do an average, what does that

5    tell you?  Well, it's telling you what the average of

6    that series of numbers.

7         But you can also look at it point by point and get

8    an idea what the type of exposures could be.  They're

9    just tools for understanding numbers.

10   Q     Now, if the precautionary measures like exhaust

11   ventilation were employed at job sites, that would

12   reduce the exposure; right?

13   A     Depending how it's done, yes.

14   Q     Precautionary measures such as wet methods where

15   you would wet down the material before you used it, that

16   would reduce exposures; right?

17   A     That's correct.

18   Q     Other dust suppression techniques, if they were

19   used, that would reduce the exposure; correct?

20   A     That's correct.

21   Q     If someone used a US Bureau of Mines approved

22   respirator, that would eliminate the exposure to that

23   person, wouldn't it?

24   A     No.

25   Q     Why not?

                    STEPHEN KENOYER - CROSS

1    A    Because it's not going to go to zero.  They have

2    protection factors.  So there is going to be some level

3    of exposure that's going to occur even with the

4    respirators on.

5    Q    So what level of exposure would occur in 1968 if

6    someone was wearing a U.S. Bureau of Mines approved

7    respirator while they are using asbestos-containing

8    insulation materials?

9    A    What type of respirator?

10   Q    One that's designed by the U.S. Bureau of Mines for

11   asbestos use.  You know that those existed; right?

12   A    Well, there's various types.  You have half face,

13   you've got full face, you've got PAPRs.  There have

14   different protection factors.

15   Q    What's the best one?

16   A    Well, light air is the best one.  It's going to

17   reduce it completely.

18         MR. CASMERE:  Do you want to stop at noon, Your

19   Honor, or do you want me to go for another --

20         THE COURT:  If this is a good breaking point,

21   let's do that.

22         MR. CASMERE:  It's probably a good breaking

23   point.

24         THE COURT:  Okay.  Then let's take the full

25   hour.  Tomorrow you guys -- or this afternoon you can

                    STEPHEN KENOYER - CROSS

1   report if you need the full hour because we can always

2   tighten it up.  Mr. Kenoyer, you're free to go out to

3   lunch with your lawyers.  Just do not talk about your

4   testimony in any fashion.  Understood?

5           THE WITNESS:  Okay.  Yes, sir.

6           THE COURT:  With that, we'll resume at one

7   o'clock.

8       (Noon recess          12:01 p.m.)

9

10

11                    *  *  *  *  *

12           I, LYNETTE SWENSON, Certified Realtime
    and Merit Reporter in and for the State of Wisconsin,
13  certify that the foregoing is a true and accurate record
    of the proceedings held on the 30th day of November 2015
14  before the Honorable Stephen L. Crocker, Magistrate
    Judge for the Western District of Wisconsin, in my
15  presence and reduced to writing in accordance with my
    stenographic notes made at said time and place.
16  Dated this 15th day of December 2015.

17

18                          /s/_____

19                          Lynette Swenson, RMR, CRR
                            Federal Court Reporter
20

21

22  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
23  unless under the direct control and/or direction of the
    certifying court reporter.

24

25