UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

GARY SUOJA, Individually and as Special
Administrator of the estate of Oswald
Suoja, deceased,

      Plaintiff,

-vs-                    Case No. 99-CV-475-BBC

OWENS-ILLINOIS, INC.,       Madison, Wisconsin
                       December 1, 2015
      Defendant.       8:30 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF COURT TRIAL
MORNING SESSION
HELD BEFORE THE HONORABLE STEPHEN L. CROCKER,


APPEARANCES:

For the Plaintiff:
              Cascino Vaughan Law Offices, Ltd.
              BY:  ROBERT MCCOY
                  DANIEL HAUSMAN
              220 South Ashland Avenue
              Chicago, Illinois  60607

For the Defendant:
              Schiff Hardin
              BY:  BRIAN WATSON
                  EDWARD CASMERE
              233 South Wacker Drive, Ste. 6600
              Chicago, Illinois  60606

Also appearing:  Michael Barron - paralegal

Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703

1                          **I-N-D-E-X**

2      <u>PLAINTIFF'S WITNESSES</u>          <u>EXAMINATION</u>       <u>PAGES</u>

3      GARY SUOJA          Continued direct by Mr. McCoy   5-41
                           Cross by Mr. Casmere           41-56
4                          Redirect by Mr. McCoy            57
       PETER NEUSHUL       Direct by Mr. Casmere          76-124

5

6                          **E-X-H-I-B-I-T-S**

7      <u>PLAINTIFF'S EXHIBITS</u>              <u>IDENTIFIED</u>/<u>RECEIVED</u>

8      Ex. 16          '96 medical record        48         ---
          18B          '96 medical record        49         ---
9         133          Funeral bills             33         ---

10     <u>DEFENDANT'S EXHIBITS</u>

11     Ex. 1659        Trust agreement           47         ---
          1722         12/96 hospital record     51         ---
12        1722A        12-96 hospital record     51         ---
          1722D        12-96 hospital record     51         ---
13        1931         PowerPoint               117         ---

14

15                        *  *  *  *  *

16         (Proceedings called to order.)

17         THE CLERK:  Case Number 99-CV-475-SLC.  *Deloris*

18   *Agnes Suoja v. Owens-Illinois, Inc*. is called for a

19   second day court trial.  May we have the appearances,

20   please.

21         MR. MCCOY:  Robert McCoy and Dan Hausman for

22   the plaintiffs.  And Gary Suoja is with us today.

23         THE COURT:  All right.  Good morning.  And

24   welcome back.

25         MR. CASMERE:  Morning, Your Honor.  Edward

1  Casmere, Brian Watson, and Michael Barron for

2  Owens-Illinois.

3       THE COURT:  Good morning to you as well and

4  welcome back.  All right.  Please be seated.  Any

5  preliminary matters before we continue Mr. Suoja's

6  testimony?

7       MR. MCCOY:  Mr. Casmere and I had talked about

8  one matter, Judge, and that is the exhibits.  We both

9  basically thought that we need to sit down with each

10  other, go through these exhibits for a few hours and

11  figure out what ones we actually have objections to, and

12  then when we tender these to the Court, we will have

13  that out of the way and not have to --

14       THE COURT:  Sure.

15       MR. MCCOY:  -- take up extra time on that.  We

16  were thinking, if it's all right with Your Honor, to do

17  that tomorrow morning, because I'm sure we'll be done

18  today on the testimony.

19       THE COURT:  Oh, that's fine.  I was going to

20  ask you two what worked best for you, because as I

21  mentioned yesterday, I have Wednesday in reserve for the

22  trial.  If I'm not in front you guys in this case, I'll

23  just be upstairs doing other stuff.  So if you want to

24  stick around, take care of that, we go back on the

25  record, you make your record, both of you make your

1  record on that tomorrow, then we close the evidentiary

2  portion of this bench trial, that's absolutely fine.

3  Mr. Casmere?

4          MR. CASMERE:  Judge, I was just going to say

5  that our idea is that we'll finish the witnesses today,

6  we'll sit tonight at the hotel, go through the list,

7  report back tomorrow morning, say here is the exhibits

8  that we agree on, the exhibits we know we're going to

9  fight about in the papers and the ones if there's any in

10 the middle to advise the Court on.  Here's all the

11 depositions that we're going to have submitted to the

12 Court and come in and just report that, put that on the

13 record and then be out of the Court's hair.

14         THE COURT:  Sure.  Well, you're not in the

15 Court's hair.  It's a pleasure seeing you guys every

16 single day.  That's of record.

17     But then the question is do you want to do it

18 tonight and then come in first thing tomorrow?  I was

19 inferring from what Mr. McCoy said that you might need

20 some time tomorrow.  You don't have to decide right now,

21 but if you know you want to come in at nine, we'll just

22 say let's come back at nine.

23         MR. CASMERE:  I'd like to come back at nine and

24 I'd like to see if we can all be on the road by noon.

25         THE COURT:  Fine with me.  Mr. McCoy?

1        MR. MCCOY:  Nine o'clock is fine.  We were

2  going to spend the time tonight to get this done.  We

3  had a trial back in May of this year where, similar

4  circumstances, and it took us several hours to iron out

5  the exhibits.

6        THE COURT:  Well, I think you guys are locked

7  in mortal combat, cordial, but mortal combat for the

8  rest of your careers.  This is just one among many, many

9  lawsuits in which you two are facing each other.  I

10  forget how many we have in this court, but this is just

11  one of about half a dozen.

12        MR. MCCOY:  Not all are Mr. Casmere, but my

13  firm does have a few coming through that MDL.

14        MR. CASMERE:  This is my last one in this

15  court, Your Honor.

16        THE COURT:  If you want to take a victory lap

17  around the building, we'll let the CSOs know not to

18  worry.

19     Okay.  Then shall we continue with Mr. Suoja?

20        MR. MCCOY:  Yes, Your Honor.

21        THE COURT:  All right.  Mr. Suoja, if you

22  please would resume the stand, and let me remind you,

23  just for the record, that you remain under oath.

24     **GARY SUOJA, PLAINTIFF'S WITNESS, RESUMES STAND,**

25                  DIRECT EXAMINATION

1    BY MR. MCCOY:

2    Q    Okay.  Mr. Suoja, yesterday we had some pictures.

3    I've just got a couple left that I want to briefly go

4    through that you all had selected.  What I think I'm

5    going to do is just give you the five or six that are

6    left so we can go through these rather quickly.

7            MR. MCCOY:  This is all part of that Exhibit

8    27, Judge.

9    Q    Okay.  These are in no particular order, but I'll

10   let you go ahead and describe these documents for us.

11   A    The first picture I see there is -- appears to be

12   my dad with a dog in front of his parents' farmhouse in

13   Minnesota, just south of Jacobson.

14   Q    And my question on this is what do these photos

15   show about the relationship of your father to other

16   family members or to your immediate siblings with your

17   father?

18   A    Okay.  Well, the farmhouse is one of the first

19   places that we went.  My dad and I would frequently,

20   when I was younger, travel together alone because of a

21   rift in the families.  The farmhouse was whenever we

22   went to Superior, dad and I would go visit his family,

23   his mother and Uncle Tovio, who still lived at the

24   farmhouse and worked the farm.  So that was where the

25   farm was.  And whenever we were up to Superior, which

1   was at least twice a year, we also made the additional

2   trip over to see Grandma Suoja and Tovia and his sister

3   Julia as well and frequently Lillian in Grand Rapids.

4   Q    So Tovio is what relationship to your dad?

5   A    Tovio is my dad's brother, older brother.

6   Q    And you mentioned two other, Sylvia and you

7   mentioned another one.  Who are they to your father?

8   A    It was Julia, who was my dad's older sister.  She

9   was crippled with rheumatoid arthritis, severely

10  crippled with rheumatoid arthritis.  And then the other

11  sister was Lillian, and Lillian was two years younger

12  than my dad and to my eyes through the years she looked

13  to be my dad's twin.  When you would actually look at

14  them, they really could have been twins when you looked

15  at them.

16  Q    You mentioned something about a rift in the family.

17  What family are you taking about?  I mean -- go ahead.

18  A    When my dad announced he was going to marry my

19  mother, he was raised Lutheran.  My mother was Catholic,

20  French Canadian Catholic, some American Indian.  The

21  Lutherans were nondrinkers.  The Catholics were not.

22  They were -- they enjoyed themselves.  My grandpa had

23  been a moonshiner, my Grandpa Dalbec.  There was a big

24  rift between the two of them.

25       My mother had my older brother out of wedlock and

1  there was apparently a big divide, and for awhile the

2  family disowned my father.  His family disowned him.

3  That rift cooled over the years.  But for a number of

4  years, only my dad and I would go visit his family in

5  Jacobson.  I can't tell you how long that went on, but

6  as I grew older, I remember all of a sudden all the

7  families were joined up again and all the problems were

8  healed.  I resented that a little bit because I no

9  longer had my dad to myself.  Everybody was there at the

10 farm and it was not quite as special after that as it

11 used to be.

12      As time went on and my brother was older and in his

13 teens, then they didn't want to travel as much.  My

14 sister had friends in Superior.  So it was back to my

15 dad and I, you know, another five or six years later,

16 and we continued to go up to Minnesota all the time.

17 Q    Has some of your father's brothers and sisters

18 outlived him?

19 A    Yes.

20 Q    Okay.  Which ones?

21 A    Well, Lillian outlived him and I believe Lillian

22 was 88 or 90 when she passed on.  And that was fairly

23 recently here.  I believe it was about four or five

24 years ago.  Heddi passed away at 92.

25 Q    That's a sister?

1   A    That's a sister.

2   Q    Of your dad?

3   A    Of my dad, yes.

4   Q    Okay.

5   A    She was one of the older sisters.  And then Ailie

6   lives in California and she is in her late 80's.  I

7   don't know exactly her age.  She is still living at, I

8   believe, a rest home in California.

9   Q    We've got some more pictures.

10  A    This is a picture of my dad at the foot of a

11  Christmas tree with my sister Suzie.  That's at our home

12  in Rockford -- or excuse me.  That would have been --

13  that would have been in Superior at that age.

14  Q    Okay.  Suzie, she got married; right?

15  A    Yes, my sister got married when she was 19.

16  Q    And she's down in Rockford now right?

17  A    Yes.  She's in Rockford and unable to attend the

18  trial.

19  Q    Can you explain her condition?

20  A    Yes.  Suzie is diagnosed with COPD.  She has been

21  on an oxygen machine since 2009.  And she also has a

22  great deal of anxiety about changes in her schedule.

23  Her schedule is very limited because she's tied to the

24  oxygen machine and she becomes very fearful when she

25  goes on a portable and it's -- she just has a difficult

1    time.  It was to the point where in July I wanted to

2    come and visit her in September and she -- you could

3    hear her anxiety level go up as I was talking to her

4    planning it.  And she said she couldn't do it.  She just

5    couldn't handle it because she had three doctors

6    appointments in September and just that amount of

7    pressure was too much for her.  She had to end the

8    conversation to go to bed and rest.

9    Q    Has she had to have any hospital emergency

10   treatment for that anxiety?

11   A    Earlier this year she was hospitalized.  She was in

12   the emergency room and then hospitalized for three days.

13   It related to helping to clear out her lungs, a buildup

14   of carbon dioxide in her system.  And they also

15   prescribed antianxiety medications for her.  And those

16   seemed to work.  But I noticed before we came up to

17   trial here that they're not working as well as they did

18   earlier.  So...

19   Q    You visited her before the trial?

20   A    Yes.  And I'll visit her again as soon as I leave

21   here.

22   Q    All right.  So while we're on the subject of Sue,

23   your sister, can you describe for us what you know or

24   have observed about her relationship she had over the

25   years with your dad?

1  A    Well, my sister Sue was my dad's little girl and

2  we've shown a number of pictures with my dad and Sue.

3  He was -- he was very close.  Sue and I were roughly two

4  years apart in age.  We were playmates growing up and we

5  played with dad.  When dad would come home, we were

6  together.  He was as close to her, if not closer than he

7  was to me, and frankly, she was his little darling.

8      When she got married, dad -- she ended up in a

9  divorce.  She had an abusive husband.  And she was home

10 with two children and I can remember in one of my

11 visits, my mother was complaining dad was always over at

12 her house helping her.  He helped her with the furnace.

13 He helped her covering pipes.  He helped her with money.

14 He was there pretty much continually just making sure

15 everything was okay and taking care of her to the extent

16 that he felt appropriate.

17 Q    Okay.  Anything else you want to add on Sue right

18 now?

19 A    No.  I think that's -- well, I should say that even

20 after they moved to Sun Prairie and then up to Superior,

21 Sue and her current husband Jerry used to take trips.

22 They'd go up to Sun Prairie to see them.  They used to

23 go snowmobiling, do all the things that are done in

24 Wisconsin in the winter.  They'd go, from the middle of

25 Wisconsin, they'd go over to Superior.  That was always

1   included on their itinerary.  It's where we've gone

2   since we were kids when the winter comes:  Christmas,

3   holidays, we were almost always in Superior for one

4   thing or another.

5   Q    Okay.  Next picture you've got is?

6   A    This is a picture of my dad, my mother, my sister

7   Sue, and Jeffrey, her grandson, at the airport.  I

8   understand from talking to my sister Kimberly, this is

9   -- this is the photograph of them waiting when she was

10  returning from Czechoslovakia.  This was at O'Hare on

11  her return.

12  Q    So your dad living in Superior at this time came

13  down to meet her at O'Hare in '94.

14  A    That's correct.  I think this was around '94, late

15  '94.

16  Q    Back to the rest of the photos there.

17  A    All right.  The next photo is a photograph of the

18  school in Janesville for the visually impaired.

19  Q    Do all three of these next ones go together?

20  A    Yes.  Then there's a picture of my dad at the

21  school with his -- this would be, I guess, his great

22  grandson Jeffrey.  That's DeAnna's little boy.  DeAnna

23  is my sister's daughter.

24       Then a picture of my sister Sue with my dad at the

25  School for the Visually Impaired.

1   Q    What time frame is this -- is this a granddaughter

2   or great granddaughter?

3   A    No, that's a grandson Jeffrey.

4   Q    Grandson.  Okay.

5   A    And Jeffrey would have been four.  This is probably

6   around '89 or '90.

7   Q    That's one of Sue's children?

8   A    It's Sue's grandson.  My sister Sue's grandson.

9   Her daughter DeAnna, DeAnna's son.

10  Q    Okay.  Is there anything that you would add about

11  your dad's involvement with that school at Janesville or

12  his activities in connection with, as his vision

13  declined, that you didn't hear Kimberly or you haven't

14  talked about?

15  A    Well, he was -- the School for the Blind in

16  Janesville was one of his job sites.  He had covered

17  pipes in that particular facility approximately 30/35

18  years before, and so he was quite familiar with the

19  school and the layout and he was very proud of his

20  ability to get around the school because he remembered

21  the layout and he remembered the work that he had done.

22  I was never at the school itself so I don't know, but

23  the stories when I met dad after he'd come back from the

24  school were that people who worked at the school still

25  remembered him from 35 years prior and spoke of him

1  fondly.  So he was quite proud of that that they

2  remembered him.

3  Q    All right.  The final picture that you have there.

4  A    This is a picture of my dad at DeAnna's wedding.

5  And across the back there's my mother, my dad, DeAnna,

6  my grandmother, I think that's Kimberly there, and

7  then -- I believe that is Kimberly.  And then in the

8  front from the right to the left is my sister Sue, her

9  husband Jerry with a very 1970's open shirt, and their

10  son Donny.  The dog I don't know.

11  Q    Was there anyone in the family that didn't like dad

12  after the rift closed?

13  A    Oh, no.  No, he was thought of quite fondly.  As a

14  matter of fact, my mother's family thought very highly

15  of him.  He was -- somewhat to the resentment of my

16  mother because there were times that my Uncle Ernie that

17  I was named after, my mother's younger brother, he would

18  say if ever there was a dispute between the two of them,

19  they'd go for Ozzie.  That sometimes irritated my mother

20  to no end.

21  Q    All right.  So tell us -- I know Kimberly has

22  already talked about this, but what things did your dad

23  do for your mom?

24  A    Well, when we were -- this is a little

25  embarrassing.  When we were younger, dad -- mother would

1   do the cooking, but dad would do everything else.  He'd

2   clean up, he'd wash the dishes, he'd dry the dishes.

3   And even as we were older and he was trying to get us

4   kids to do some of the work around the house, we didn't

5   necessarily do the best job, but dad would always follow

6   up.  He would see that things are done.  He pretty much

7   did everything else.

8        Mother would typically do the grocery shopping, but

9   it was not unusual to see dad down at the store where we

10  worked doing the grocery shopping as well.  Maintained

11  all the vehicles.  Made sure that mother got to wherever

12  she wanted to be.  There were times that mother would

13  also get a job and work and dad would always make sure

14  that she had a vehicle to drive.  Or if vehicles were

15  tied up for some reason, he'd make sure she got a ride

16  there.  That was always his responsibility.  So he

17  pretty much -- he did everything.

18  Q    As your father's condition worsened toward the end,

19  what was his thoughts about your mother now having to be

20  alone?

21  A    Well, he was -- when he talked to me about it, he

22  was -- he was concerned.  He wanted to make sure that

23  she was visited regularly.  My recollection is he was

24  saying he wanted to make sure that my brother Derald

25  would come over and visit her every day.  And then where

1  he used to go to see grandmother every morning for

2  breakfast, that was important that he have Derald, who

3  was still in Superior, come over and see mother

4  thereafter every morning.  And he did from my

5  understanding.

6     So he wanted to make sure she was taken care of.

7  He wanted to make sure that the finances were squared

8  away, and he kind of looked at me when we were going to

9  make sure that that would happen.  And so he had

10 concerns to see that she was taken care of.

11 Q   When did your father learn about any of his fellow

12 insulator brother co-workers dying from mesothelioma?

13     MR. CASMERE:  I'm just going to object to

14 speculation, foundation, and relevance, Your Honor.  I

15 understand the process here.

16     THE COURT:  And to what purpose are you

17 eliciting this testimony, Mr. McCoy?

18     MR. MCCOY:  The purpose of this testimony,

19 Judge, is to establish the apprehension and anguish and

20 those types of things that were in his father's mind

21 that go back to this time period when all this

22 testifying started.

23     MR. CASMERE:  But those aren't -- that's not a

24 basis for recoverable damages, Your Honor.

25     THE COURT:  I agree.  Again, as long as we're

1    on schedule, and understanding that the testimony will

2    be stricken later, I will allow it.  But I do want you

3    to ask it slightly differently.  And I think it's

4    implicit in the way that Mr. Suoja is going to be

5    answering.  But whatever his father said to him about

6    this as opposed to a narration as to what the father,

7    Mr. Suoja, was actually thinking.  Does that distinction

8    make sense?  Mr. Gary Suoja can say this is what dad

9    said to me.  That doesn't make it relevant necessarily,

10   but I'll let you ask that.  Okay?

11          MR. MCCOY:  And also what Gary observed

12   personally.

13          THE COURT:  Sure.  Anything that Mr. Gary Suoja

14   actually saw is fair game.  And that's apart from the

15   relevance, but we're setting that aside for briefing

16   later.

17          MR. MCCOY:  Right.

18          MR. CASMERE:  And I suppose I should add a

19   hearsay objection just to complete the record, which I

20   think I'll have some more coming up.

21          THE COURT:  Right.  We know from pretrial

22   proceedings there will be some material hearsay

23   objections looming.  But yes, hearsay is also a concern

24   here, but we'll let it in, again, under the Court's

25   ground rules of making a complete record today with the

1   understanding by both sides that some of this testimony

2   from any witness might be stricken later.

3       With all of those conditions, Mr. McCoy, back to

4   you.

5           MR. MCCOY:  Okay.

6   BY MR. MCCOY:

7   Q    All right.  We'll -- slightly rephrasing that

8   question, what did your father tell you about any

9   involvement, knowledge he had of his fellow insulator

10  co-workers and their health conditions?

11  A    Well, the first time that the subject came up that

12  I recall, in one of my trips through town and I was

13  there, stopped by to see my folks, my dad was dressed

14  and heading out the door and it was before he retired

15  because he was driving, and he indicated that he was

16  driving to a deposition and he mentioned that one of the

17  co-workers that I had known had died.  It was -- I don't

18  know specifically what he had died of, and he was going

19  to the deposition related to it.  This was a co-worker

20  who had drank a lot and I remembered him because he also

21  had his dog that he'd put sunglasses on and he'd feed

22  the dog beer.

23      He had passed on and dad was going to testify, but

24  it was related to work and asbestos and he was going to

25  testify.  And he was -- that was kind of it.  And it was

1    -- and my recollection was it was in the 80's and it

2    would have been the early 80's because dad was still

3    driving then.

4    Q    Okay.  Was there other times that your father

5    testified in asbestos cases for his co-workers?

6    A    He -- over the ensuing number of years, in

7    conversations he had indicated that he had testified in

8    depositions due to asbestos on a number of different

9    cases.  I don't recall how many.  He just indicated that

10   it was occurring, certainly more than once, and it was

11   on several occasions.

12   Q    Based on what your father said to you and what you

13   saw or observed of him, what effect did this testifying

14   have on your father?

15   A    Well, part of the conversation was he was proud to

16   do it and felt it was appropriate that he should be

17   doing it.  The sense I got from our conversations, the

18   sense of it was sort of a sense of betrayal in dealing

19   with asbestos and now these guys are dying from it.  And

20   these were -- these were friends.  Most of these fellas

21   were friends, because dad made friends very easy.

22   Q    What, if anything, did your father say about his

23   own health concerns when he was doing this testifying?

24   A    He didn't say anything.

25   Q    During the time that he was testifying or as a

1  result of his testifying, have you ever seen any of the

2  transcripts from your father's testimony?

3  A    No.

4  Q    Was my firm representing your family for asbestos

5  claims at the time he was doing the testifying?

6  A    No.  I should say not to my knowledge you weren't.

7  Q    All right.  Now, I'd like to direct your attention

8  to the year 1991.  Did you learn anything about asbestos

9  fibers affecting you?

10 A    Yes, I did.

11      MR. CASMERE:  Your Honor, I have similar

12 objections to this line of questioning about potential

13 family members with any diseases or the impact of

14 asbestos.

15      THE COURT:  Understood.  And I'll allow it at

16 least as an offer of proof.  But Mr. McCoy, so the

17 record is a little bit more self-contained, for what

18 purpose are you eliciting this testimony from Mr. Gary

19 Suoja?

20      MR. MCCOY:  It's for the purposes of damages.

21      THE COURT:  Whose damages?

22      MR. MCCOY:  For the estate's damages.

23      THE COURT:  And how can the estate be damaged

24 by Mr. Gary Suoja's exposure to asbestos?

25      MR. MCCOY:  Well, I'll tie this up as to what

1  his father's, again, mental suffering and anguish was as

2  a result of this happening.  I'm not -- we're not

3  seeking damages for Gary having the condition, we're

4  seeking damages for the estate for how this impacted on

5  his father.

6          THE COURT:  Okay.  Understanding that it's

7  probably not relevant and may be stricken later, and

8  again, we're going to do a lot of sorting and culling

9  later, I'll let you make the record today.  So I won't

10 forbid the questioning.  Please continue.

11 BY MR. MCCOY:

12 Q    How did you learn about it?

13 A    In 1991 during the summer, just out of the blue, I

14 lost breath and went to the doctor to check it and the

15 doctor put me in the hospital immediately.  I had

16 pneumonia in one lung and filled with fluid and partial

17 pneumonia in the other, about a third of the lung filled

18 with fluid.  I was in the hospital for three days for

19 that.

20     I was released, was out for a day.  The following

21 day I had trouble breathing; went back in, put me back

22 in the hospital.  My lungs had collapsed.  One lung had

23 fully collapsed, the other had partially collapsed from

24 a buildup of fluid in my chest cavities.

25     During the course of rehabilitation, I asked the

1  doctor what would cause this and the answer was well,

2  there's five different possible things that could cause

3  it, all of them fatal.  And in about 25 percent of the

4  cases we don't know.  We don't know in your case, but we

5  did notice that you have asbestos plaques in your x-rays

6  are showing up.  I had no idea what that was or, you

7  know, how it would be there.  I said did this cause it?

8  And they said, it doesn't appear.  We have no way of

9  connecting them.  We don't believe that it is the cause.

10       So it was a long slow recovery from this.  And

11  during that time I talked to my parents and --

12  Q    Let me go to the next question then.  So your

13  understanding was you had asbestos plaques.

14  A    Yes.  That's what the doctors told me.

15  Q    And did you speak to your father about the asbestos

16  fibers or plaques?

17  A    Yes, I did.

18  Q    And when did that occur?

19  A    That occurred in a telephone conversation.  I was

20  just curious, you know, how could I get asbestos in my

21  lungs.

22  Q    Let me again follow with my questions, okay?

23  A    Sure.

24  Q    Okay.  So you were diagnosed in '91.  How long

25  after that did you talk -- was it until you talked to

1    your father?

2    A    It was some time within the next several months.

3    Q    And what did you tell him in that conversation?

4    A    Well, I told him that they had found asbestos

5    plaques in the x-rays and I asked him how could that

6    have occurred.

7    Q    What did he say then?

8    A    Well, my question to him was I had helped my dad,

9    you know, in a minor amount, you know, with some of his

10   jobs in the past and I just was curious as to whether

11   that might, you know, have caused the asbestos.  And his

12   response -- he just became kind of I guess mellow or

13   morose instead of being upbeat in the conversation and

14   he started explaining to me how asbestos can be carried

15   in the clothes from workmen and that it gets into their

16   clothes and they come home and they play with their kids

17   and the asbestos is, you know, then passed on to the

18   children and in the house and affects the members of the

19   family.

20        He explained that even when you wash them, there

21   was some distinction between washing in an automatic

22   washing machine and an electric drier versus what my

23   mother did, because she used a ringer tub with, you

24   know, wash it around and then rinse it and squeeze the

25   water out with a ringer.  She insisted on that.  And

1  then dry the clothes on a line.  And there was some

2  distinction in that and that wasn't as efficient, I

3  guess, at getting rid of the asbestos.  But he was

4  saying that he'd probably been bringing home the

5  asbestos to the family for years.  And he was --

6  Q    Was the washing machine part of that conversation

7  too?

8  A    Yeah, the washing machine was part of the

9  conversation too because of the type of washing.  I

10 don't understand quite where it came from, it was just

11 what was said.

12 Q    What else did your dad say on this topic of the

13 asbestos being brought home, if anything else?

14 A    Well, he was -- he just was -- he was upset.  It

15 was -- the sense of the whole thing was he was upset.  I

16 didn't much want to keep on talking about it because it

17 was bothering him.

18 Q    When you say it was bothering him, what did he

19 express, if anything, about what might happen to the

20 family?

21 A    Well, he was saying that it probably affected the

22 entire family.

23 Q    Did your father's concerns about affecting the

24 entire family, his bringing it home on the clothes, this

25 is what you're talking about; right?

1    A     That's correct.

2    Q     Did your father's concerns about that become true?

3    A     Well, to my knowledge that is true.

4    Q     Who else besides you?

5    A     Well, I mentioned to my sister Sue that I had

6    asbestos plaques from the x-rays, that they showed

7    asbestos plaques.  And she sort of said as a matter of

8    fact so do I.  I also talked to my mother and she also

9    indicated that she had had x-rays that showed asbestos

10   plaques.

11   Q     About when was your father diagnosed first with the

12   diabetes?

13   A     He was 40 years old.  I was in college and so that

14   would have been -- in 1963 I would have been, I believe,

15   either a freshman or starting my sophomore year in

16   college.

17   Q     And how did you -- I think you talked about it

18   some, but basically what was his activity level even

19   though he had the diabetes and his vision problems

20   increased?

21   A     Well, he still stayed very active.  He had some

22   difficulty and was slowed for a year or two because he

23   tried to -- the doctors tried to treat his diabetes with

24   pills.  And he was trying to avoid taking insulin

25   injections.  So they kept on working it and finally

1  decided that insulin injections were what he had to do

2  to control his diabetes, and so that's what he started

3  doing.  But all during that time he continued working.

4  It just affected how he felt.

5       And then after several years, he started doing the

6  insulin injections.  And whenever I was home from

7  school, he would actually show me the routine that he'd

8  go through:  Pinch his stomach and give himself an

9  injection or sometime on the hip and squeeze the skin

10 and give himself an injection; test his blood sugar.

11 And then he went through the routine of how he would eat

12 and maintain his diet.

13      He was a bit resentful because one of his

14 complaints was it was -- he was always hungry.  But he

15 was very, very disciplined and he very methodical in

16 what he did.  He kind of went through the routine.  And

17 of course when you're there at the house with him, you

18 see him maintain the routine and he was pretty strict in

19 making sure it wasn't broken.

20 Q    So directing your attention to the earlier part of

21 the 1990's, did you start observing some change in that

22 activity level?

23 A    I began -- I began to notice a change.

24 Q    Have you picked out some photos to show in

25 connection with that time period?

1    A    Yes.

2            THE COURT:  Is this part of the 25 or is this a

3    different group?

4            MR. MCCOY:  This is all part of 27.

5            THE COURT:  27?  Got it.

6    BY MR. MCCOY:

7    Q    I don't know which order you want those in,

8    Mr. Suoja, but put those in the order you want.

9    A    What we have here are -- these are -- first are

10   three photographs from 1993.

11   Q    Okay.  What happened in '93 that you --

12   A    '93 was their 50th wedding anniversary.

13   Q    All right.

14   A    You'll see that dad's coat is the same in all three

15   of these.  And the first photo is a picture of dad

16   exiting a limo and you'll see the limousine driver

17   looking at him with kind of a concerned look.  And when

18   I -- when I came in to town for this celebration, I

19   noticed -- it appeared to me that there had been a

20   significant deterioration in dad's health.  You have to

21   remember that I would see him maybe every other year or

22   so and so it was like a snapshot in time where I would

23   notice if there was a big difference whereas at least it

24   seemed to me that others who were seeing him day-to-day

25   wouldn't.  And I noticed that when he was trying to get

1  out of the limousine there, he tried to get out but he

2  couldn't.  He kind of fell back into the seat.  And then

3  he came out and he had that smile on his face like he

4  was, you know, felt silly about it.  The limousine

5  driver, you can see the expression of concern on his

6  face because he fell back in.

7       And he did get out.  But then as he -- you know,

8  once we were at the church, it's a fairly good size

9  church and he had to walk down to get up to the front

10 pew.  And I noticed his gate was no longer this strident

11 gate that I had seen with him in the past.  Even when he

12 was having his vision problems, he could get up and go.

13 But he now had a different gate.  There was something --

14 he just appeared like he didn't have the energy.  And he

15 appeared to be -- it appeared that either he had

16 suddenly gotten tremendously old or something was wrong.

17      And then the next photo is a picture of the family

18 in front of the altar in the church.  And this is my

19 sister Sue, Kimberly, my mother, my dad, myself, and my

20 brother Derald.

21 Q    And what's significant about that photo, the

22 changes that you were observing?

23 A    Well, there dad was smiling, but it appeared to me

24 a little bit of a forced smile from the photograph.  But

25 it also shows the size of the church, to give you some

1  idea of the size of the church, and I think that's

2  important.  We can talk about that later on.

3      The next photo is a photo during this same time

4  period at the 50th anniversary.  This is downstairs in

5  their house in Billings Park and that's myself behind

6  the little bar that they had downstairs.  This is Uncle

7  Ed, that's the first one on the left.  The next

8  individual is Bernard Auberg and he was -- he married my

9  grandma's Aunt Ardelle.  They lived in Withee,

10  Wisconsin.  He ran the GMC dealership and all the GM

11  dealerships in Withee.  Then there's my dad.  And then

12  there's a gentleman I don't recognize, and then myself

13  behind.

14  Q    So your dad is third from the --

15  A    Third from the left.

16  Q    Third from the left.

17  A    But you'll notice that everybody is having

18  something of a good time there.

19  Q    Why?

20  A    My dad is not drinking there, but you'll notice

21  that he also -- in that picture he seems to be somewhere

22  else.  And I noticed that a number of times when I was

23  there.  He was no longer fully engaged in the family.

24  He would have these periods when he'd go and he'd kind

25  of sit down and he removed from the family.  And that

1  was very unusual for dad.

2        My brother and I had weird comments like well,

3  being married for 50 years, you'd do the same.  But it

4  was noticeable that he wasn't right in the middle of the

5  mix and in the conversation.  It was just a noticeable

6  change.

7  Q    Okay.  Next photo you've got?

8  A    And these are two photos of the -- one is with my

9  sister Kimberly with dad and this is very near the end

10  in 1996.  And a photo of my sister Sue with my dad, also

11  near the end in 1996.

12  Q    So the first is Kimberly?

13  A    Yes.

14  Q    With the shorter hair.  The next is Sue.  Okay.

15  What do those photos tell you in terms of his condition?

16  A    You can see from the last two photographs that dad

17  was very near the end.  He was really deteriorating.

18  The mesothelioma, at this point they had diagnosed him

19  with mesothelioma, and you could see how he was ending

20  up from a very vigorous person.  Even with his blindness

21  he was still vigorous and active, and then from what I

22  could see, beginning in '93, there was a loss of the

23  vigor and a greater deterioration.  And then at the tail

24  end, he was definitely on the downside.

25  Q    You mentioned something about the size of the

1    church being something you want to talk about in that

2    one photo.  Can you do that briefly for us?

3    A    Well, St. Francis appears to be -- it's a church

4    with a basement where they have gatherings underneath.

5    It seems to hold about 300 people, maybe more for the

6    pews.  For my dad's funeral, the church -- all the pews

7    were filled.  There were people lining the side.  The

8    entry to the church and the vestibule where they

9    conducted baptisms was filled.  The entry off to the

10   side, and I think we have another exhibit which was the

11   announcement, shows the design of the church.  The

12   portico where cars would pull up to let elderly out or

13   those who had some difficulty and when it was raining,

14   it was filled with people.

15       The church has two parking lots that probably

16   together are a full city block or more, more than likely

17   hold at least 200 cars.  Both of them were filled.

18   People were coming up and saying they couldn't find

19   parking.

20   Q    It's okay.  We'll take a brief break here.

21   A    I apologize.

22   Q    Do you need to stand up?

23   A    I'm sorry.

24   Q    Do you want water?

25   A    Yeah.

1   Q     Were all the children at the funeral?

2   A     They were.  The families were there.  But most of

3   the people I didn't recognize.  These were people who

4   had known dad through the years.  We're in the middle of

5   January, early January in Superior.  To me that says who

6   -- I'm sorry.

7   Q     If we may pause for a minute here.

8          THE COURT:  Do you want to take a break?

9   Q     Are you okay?

10  A     I think I'll be okay.

11         THE COURT:  Where are you at, Mr. McCoy?

12         MR. MCCOY:  I'll be done in less than ten

13  minutes.

14  Q     Are you ready?

15  A     I'm ready.

16  Q     Let me just finish things off about the funeral.  I

17  don't think we need to elaborate on this much.  This is

18  all part of Plaintiff's Exhibit 27.  Briefly what's

19  that, those two pages right there?

20  A     These are the -- I guess they would be the funeral

21  announcement for my dad and this is -- shows the church

22  and the portico.

23  Q     You don't have to explain them.  I think they are

24  self-explanatory.

25  A     All right.

1   Q    This picture, which is titled *I'm free*, what is

2   that?

3   A    That was, in effect I guess, an announcement of the

4   funeral and --

5   Q    All right.  And this one right here, this is the

6   23rd Psalm and that's part of the program for the

7   funeral?

8   A    That's correct.

9   Q    Did you help plan the speech or the program or who

10  did that?

11  A    That was done by my sisters.  My mother and my

12  sisters, but mostly my sisters.

13  Q    These photos are the tombstone; is that right?

14  A    Yes.  The --

15  Q    Who is there in that one?

16  A    Well, the first photo is a picture of the headstone

17  and it shows my Aunt Lillian to the left, my mother in

18  the center, and Aunt -- his -- my Aunt Heddi to the

19  right.  Lillian and Heddi were my dad's sisters.

20  Q    And then the next is just a picture of?

21  A    This is just a picture of the headstone.

22  Q    Have you visited that since your father passed?

23  A    No.  I take that back.  I did visit.  I was there

24  again at my mother's funeral, but I have not been there

25  since.

1    Q     That's up in Superior; right?

2    A     That's in Superior.

3    Q     This exhibit here, this one has got a different

4    number.  It's not part of 27, this is 133.  Is that the

5    funeral bill?

6    A     These are the bills.  There is a grouping of the

7    bills and --

8    Q     Okay.  That's fine.  Going back to the parts of

9    this -- let me -- actually let me ask a couple other

10   questions here.  We're almost done.

11         Okay.  Back in the earlier days, did your dad ever

12   take you by Badger Ordnance?

13   A     Yes, he did.

14         MR. MCCOY:  And I understand there's objections

15   on this, Judge.  I'm not offering it to prove the use of

16   Kaylo.

17         THE COURT:  Well, actually you are and we'll

18   get the objection in time, but I'm going to let you make

19   the record.  So ask the question, get the answer, we'll

20   get the objection and we'll take it from there.

21         MR. MCCOY:  Okay.

22   BY MR. MCCOY:

23   Q     In any event, can you describe for us how you knew

24   that?

25   A     Well --

1          MR. CASMERE:  Your Honor, I'm going to object.

2     This calls for hearsay.  I object to the form,

3     foundation, calls for speculation.

4          THE COURT:  I think all of those are valid.  I

5     am fairly confident that this is not admissible, but

6     like I said, I will let you ask the questions and get

7     the answers subject to being stricken later.

8          MR. MCCOY:  Go ahead.  Just be brief about it.

9     BY MR. MCCOY:

10    Q    How did -- what were you doing with your dad at

11    this time?

12    A    This was the time frame when my dad bought the new

13    '55 Pontiac from Uncle Bernard in Withee.

14    Q    That was 1955?

15    A    1955 or '56, somewhere in there.  And instead of

16    taking the normal trips home, we made a one-time

17    deviation and he went -- because he wanted to show me

18    where he worked.  And we went down this long straight

19    road that I had never been on before or since and there

20    were large stacks up.  And as we drove along, he said

21    this is Badger Ordnance, and he was pointing off to the

22    left as we were heading south.  And there were just a

23    bunch of overhead pipes, just many of them.  And he was

24    talking, as he drove along, and he was talking about --

25    he said can you imagine being up there in January when

1    the wind is blowing, he said.  And he said you can't mix

2    the mud with the gloves that we had.  He says you have

3    to get your hands into the mud to get a proper mix so it

4    will seal or something else.  But he was talking about

5    how would you like to be up there in the middle of

6    January with the wind blowing when it's cold and

7    covering pipe up there.  That was -- that was the time

8    -- that was the only time I went by Badger Ordnance and

9    that's why I recall it.

10   Q    Okay.  Now, just another point here.  There has

11   been a list of job sites that was provided during the

12   discovery proceedings in this case attached to the

13   interrogatories.  I believe -- do you remember that?

14   A    Yes, there were.  There were --

15   Q    Briefly tell me how that list was prepared.  How

16   was it done?

17   A    Well, my mother ended up sending the

18   interrogatories.  But --

19   Q    Who had input into it really is my question.

20   A    Well, I had input into it and I believe my brother

21   Derald had input into it because he had also worked as

22   an asbestos worker.  And my mother had input.  And we

23   were actually on the phone.  I asked them to send me a

24   copy and we were going over it on the phone to make sure

25   we covered all of the places that were worked.  So all

1  of us had input into where the work was and we did that.

2  Q    So it was prepared from -- not from your father's

3  recollection, but from what others knew about him.

4  A    That's correct.  My father was deceased.

5  Q    That's all I needed to establish there.  And I'm

6  assuming part of your input was to remember that Badger.

7  A    Well, yes, that was it.  And there were a number of

8  other sites too.

9  Q    Okay.  Now, did you -- I'm going to direct your

10 attention, I think it's to August of 1996, the year your

11 father passed away?

12 A    Yes.

13 Q    Okay.  Were you out visiting with him?

14 A    Yes, I was.

15 Q    Okay.  What was the basic reason for that visit?

16 A    The reason was it was -- my youngest son was about

17 14 or 15 and I did the road trip back to Superior with

18 him.

19 Q    To visit your father and mother?

20 A    To visit my father and mother, to go back to

21 Superior.

22 Q    All right.  So on that occasion, which is about

23 four months before he passed away, what did you observe

24 about him at that time relating to his health?

25 A    He was sick.  He complained separately, he didn't

1   complain to everyone, but separately he was not feeling

2   well and he had problems with his intestines.  And his

3   -- he had -- I forget how he put it, he just was having

4   trouble with his bowels is how he described it.

5   Q    Something he told you?

6   A    Yes.

7   Q    What did you say to him about it?

8   A    I said "Well, can I take you to the doctor?  I'll

9   be happy to take you to the doctor.  I can stay longer.

10  We can go to the doctor."  And he said "No, no, I'm

11  fine.  We'll take care of it."

12  Q    So he didn't go at that time?

13  A    No.  No, he did not.

14  Q    All right.  And then later or maybe not later, but

15  what had happened at that time in August as far as any

16  of his possessions like his baskets or things that he

17  owned?  What did you see and learn at that time about

18  things in August?

19  A    Well, he had kind of a workroom downstairs, and

20  when I was down there -- because that's where I stayed.

21  There's a bedroom downstairs in the basement and there

22  were only two bedrooms up, but they had a foldout bed

23  downstairs.  And when I looked at his workroom, I

24  noticed that all of his tools, almost all of the tools

25  were gone.  And his supplies, he had them in the

1  overhead between the floor joists and he had them

2  arranged in particular order.  You know, when I had been

3  there in '91, for example, they were all laid out and he

4  could pretty much point things out, know where they are.

5  And there were almost no supplies.  There were some of

6  the bigger, thicker ones, but there was almost nothing

7  there.  And I didn't -- I didn't understand.  I asked my

8  mother what's going on and she just said he hasn't been

9  doing anything lately.  But everything was pretty much

10  gone.  I had no idea where or what and there's just not

11  much left.

12  Q   How about some of his basket collection?  Had he

13  done things with that?

14  A   Well, it appears that all of the baskets had been

15  either sold or given away.  And I had previously gotten

16  a few.  I did notice that my sister got the really nice

17  ones.  I didn't get quite as nice a selection of

18  baskets.

19  Q   So this was all August of '96.

20  A   That's correct.

21  Q   Then you went back to Seattle.  What happened next

22  as far as your father's health that involved you?

23  A   Well, I pretty much was in phone contact with what

24  was going on because I wanted to know when they were

25  taking him to the doctor and what was going on.

1  Q     And you did keep in touch with all the medical

2  procedures.  We don't have to go through those.

3  A     I talked to my mother primarily as to what was

4  going on and they scheduled an operation in October.

5  Q     So what I want -- what I want to get at, because

6  we've got all the medical records on this, is who was

7  there as the time drew closer to the end?

8  A     Well, my mother of course was there.  Kimberly came

9  up and was there quite a bit.  My sister came later.  I

10 came back in December, about the middle of December as I

11 recall, and all of us were there from about the 15th of

12 December on until Christmas Eve.  I had to leave.  So

13 basically we were all there until almost the end and

14 then I was gone and the other siblings remained there.

15 Q     And then you came back when he passed away?

16 A     Yes.

17 Q     I have one last part of this Exhibit 27.  Can you

18 tell us what that is?

19 A     That is a poem that my sister Sue wrote for reading

20 at the funeral.

21 Q     It talks about this one provision says "Smile

22 whenever you remember my dad.  He would want you to

23 laugh and not be sad.  His jokes were famous as you all

24 know."

25       What about the jokes?  Is that part of his

1  personality?

2  A    That was.  That was one of the defining elements of

3  his personality.  I'd prefer not to read anything from

4  that, please.

5  Q    At the end it closes with "I love you, dad.

6  Suzanne."  When you say you prefer not to read anything,

7  is that because those are your memories also?

8  A    Yes.  Very, as you can tell, very emotional.

9  Q    Okay.

10          MR. MCCOY:  That's all the questions I've got.

11          THE COURT:  All right.  It's only been an hour.

12  Do you want a five-minute break before we do the cross?

13  Why don't we do that.

14          THE WITNESS:  If I could.  Thank you.

15          MR. CASMERE:  Thank you, Your Honor.

16     (Recess          9:35-9:44 a.m.)

17          THE COURT:  Let's go back on the record.

18  Cross-exam.

19              CROSS-EXAMINATION

20  BY MR. CASMERE:

21  Q    Hi, Mr. Suoja.

22  A    Mr. Casmere.

23  Q    As I told you the first time I met you, I am very

24  sorry for your family's loss and your father sounded

25  like a wonderful, wonderful man.

1  A    He was.

2  Q    And I only can hope that some day my children will

3  speak of me the way that you speak of your father.

4  A    You'd be very fortunate.

5  Q    But you understand that I have to ask you some

6  questions now based on the statements that have been

7  made and also based on the fact that you're continuing

8  to pursue this claim.

9  A    Yes, I understand.

10  Q    And while there are some cross-examinations that I

11  look forward to and I enjoy, this isn't one of them.

12  A    I don't think I will either.

13  Q    Now, you were in your 50's when your father passed.

14  A    That's correct.

15  Q    You are now in your early 70's looking forward to

16  retiring pretty soon; right?

17  A    Changing occupations.

18  Q    Now, you are familiar with the fact that your

19  father was an insulin-dependent diabetic.

20  A    That's correct.

21  Q    You're also familiar with the fact that

22  insulin-dependent diabetics are known to have

23  gastrointestinal and diarrhea issues.

24  A    No, I did not know that.

25  Q    Okay.  You don't know what the testimony was from

1  the doctors in this case about the issues that your

2  father was having with his intestinal issues, do you?

3  A    No, I do not.

4  Q    I want to ask you a couple of questions subject to

5  my objections about what you said at the end there about

6  driving by Badger Ordnance.  You don't know whether your

7  father was talking in the past tense that he had been

8  there some time in the past or whether it was more

9  recent when you had that conversation.

10 A    No, he was talking in the present.  That's where he

11 worked.

12 Q    Do you remember your deposition in this case?

13 A    Not that much.  Was this the part of the deposition

14 which wasn't allowed by court order?

15 Q    I don't know.  We'll see what Judge Crocker

16 decides.

17 A    Okay.

18 Q    But you were asked, after you told this story about

19 driving by at Badger, you were asked:  "So let me

20 clarify a little bit."

21         THE COURT:  Let's get a page and a line

22 number --

23         MR. CASMERE:  Okay.  I'll just --

24         THE COURT:  -- in case counsel wants to follow

25 along.

1          MR. CASMERE:  It's page 53, line 19.

2    BY MR. CASMERE:

3    Q    You were asked:

4         "Question:  So let me clarify that a little bit.

5    It may be your impression that the work was still going

6    on, but you don't actually know one way or the other.

7         "Answer:  I can't recall that it was, you know,

8    definitely one way or the other.  But the impression I

9    had was that it was."

10        Was that your testimony, sir?

11   A    Well, that was part of the testimony.  But if you

12   read up above as well, you know, the underlined portion,

13   that it was potentially still going on, my recollection

14   of it is not that it was something he did before.  He

15   was talking about having to insulate this up above, but

16   the impression I had was that it still going on.

17   Q    How about you answer my question first.  Was what I

18   read your testimony?

19   A    That was part of what was in the deposition, yes.

20   Q    Thank you.  Now, you also joked or you also talked

21   about the fact that your dad told you about the time

22   when he worked at the Chiclets factory?

23   A    That's correct.

24   Q    When did he do that?

25   A    I do not know the date off the top of my head.  I

1   was still fairly young because it was a highlight to go

2   to the Chiclets factory.

3   Q    You talked about the fact that your dad told you

4   that he did work at Swedish Hospital.

5   A    Yes.

6   Q    When did he do that?

7   A    I can't say exactly when that is, but we were there

8   to pick him up and he showed me where he was insulating

9   pipes in one of the tunnels.

10  Q    You can't give us a year on that.

11  A    I cannot off the top of my head give you a year.

12  Q    You were sitting here yesterday when I showed

13  Mr. Kenoyer the affidavit that your mom signed; right?

14  A    I was.

15  Q    You saw the testimony and the evidence about your

16  mom swearing to certain activities that your dad did up

17  in Superior at a shipyard; right?

18  A    That's correct.

19  Q    Did your dad ever tell you about that work?

20  A    Yes.  I was aware he worked in the shipyards in

21  Superior.

22  Q    Did he ever he will you a story about driving by --

23  when you were driving by the shipyards about him working

24  with those materials then?

25  A    No.

1   Q    So the only story you remember is the one you told

2   today.

3   A    Well, no, that's not the other one.  What I told

4   you is the story about me and my dad driving by Badger

5   Ordnance.  There were other job sites that I visited

6   with him.  You've mentioned two of them.  I was on job

7   sites, other job sites with him.  And the reason I

8   remember Badger Ordnance is whenever I was alone with my

9   dad and we were driving up north, that was a highlight.

10  That was a thrill for me.

11  Q    Now, you certainly would not state under oath or

12  under penalty of perjury that you know that your father

13  worked with a specific manufacturer's product.

14  A    No.  At any given time, no, I could not say that.

15  Q    You certainly wouldn't swear that he worked with

16  National Gypsum Corporation asbestos-containing

17  products.

18  A    No, I would not know that.

19       MR. CASMERE:  Owens-Illinois Exhibit 1659, Your

20  Honor.

21       MR. HAUSMAN:  What was the number again?

22       MR. CASMERE:  1659.

23  BY MR. CASMERE:

24  Q    Is that your signature, Mr. Suoja?

25  A    It is.

1          MR. MCCOY:  Your Honor, we have again a motion

2    in limine I'll adopt as an objection, standing objection

3    if I can to these bankruptcy claims, trust submissions.

4          THE COURT:  Understood.  And the objection is

5    continuing.  And again, it's a two-way street.  I will

6    let the defendant make its record through counsel

7    subject to being stricken later.

8    BY MR. CASMERE:

9    Q    Mr. Suoja, Owens-Illinois Exhibit 1659 is the NGC

10   Bodily Injury Trust Release and Indemnity Agreement.  Do

11   you see that?

12   A    Yes, I do.

13   Q    On page four of that, there is the following:  "By

14   executing this release and indemnity agreement below, in

15   addition to agreeing to the terms set forth herein, I,

16   the claimant, hereby certify under penalty of perjury

17   that" and there's 1, 2, 3 and 4.  And number 3 is "the

18   injured party was exposed to National Gypsum Company

19   asbestos-containing products."  It's executed under

20   penalty of perjury the 14th of April 2008 signed by you;

21   is that correct?

22   A    That's correct.

23   Q    And you understand that the injured party in this

24   was referring to your father.

25   A    That's correct.

1   Q    You also understand that you executed that

2   agreement in order to obtain settlement monies from the

3   National Gypsum Trust.

4   A    That's correct.

5   Q    There are a couple of things in the medical records

6   that I wanted to ask you about, and I'm not going to go

7   through all of them, but there are a couple of

8   statements that I want to see if you can provide some

9   information on.  The Court will have the actual medical

10  records so we don't need to go through all of them, but

11  there are just a few that I wanted to ask you about.

12  A    Sure.

13           MR. CASMERE:  Plaintiff 16, Your Honor, is a

14  September 1996 medical record.

15  Q    Do you see that, Mr. Suoja?

16  A    Yes, I do.

17  Q    And in here, it's based on a visit at I believe the

18  Duluth Clinic and there's a notation in here that says

19  "He has slight stomach cramps.  Some pain in the lower

20  quadrant of his abdomen."  Do you see that?

21  A    Yes.

22  Q    Is that consistent with your understanding of your

23  father's condition in September of 1996?

24  A    I probably would have worded it differently, but

25  yes, I'd say it's somewhat consistent.

1  Q    And here is the part that I wanted to ask you about

2  more specifically.  On the second page of this document,

3  the doctor notes "The husband and wife did get into

4  frequent arguments during the visit regarding personal

5  issues."

6       Do you see that?

7  A    Yes, I do.

8  Q    Did you have an understanding at that time that

9  your parents were having frequent arguments about

10 anything?

11 A    You needed to know my mother.  My mother was a very

12 argumentative person.  She also did not want to deal

13 with anyone who was sick or ill.  That was part of the

14 reason why my dad prepared all of his own meals is my

15 mother did not seem to have the ability to nurse him in

16 her demeanor.  And so just going to this process, I can

17 see her having a lot of trouble with that.

18 Q    The next record is Plaintiff's 18 and we've labeled

19 this 18B because it's a subset of those records.

20 A    Yes.

21 Q    It's a November 1996 record, the doctor's note that

22 your father is "feeling bloated."

23 A    Right.

24 Q    Did you understand that that was a description of

25 how he felt at that time?

1  A    No.  When I was there in November, he didn't say

2  any or excuse me, in August he didn't say feeling

3  bloated.  But I would understand because when I was

4  there in December, his stomach was significantly

5  distended, so I can understand why it would be bloated.

6  Q    It also says that besides this, he is feeling well.

7  Do you see that?

8  A    Yes, I do.

9  Q    Below that there is a note that says "He continues

10 to be frustrated by his dependency on his wife due to

11 his blindness."  Do you see that?

12 A    Yes, I do.

13 Q    Is that your understanding of your father at that

14 time?

15 A    Yes.  There was a frustration with my mother.  She

16 did not like the fact that he could not see.

17 Q    On next page of this document, social history, this

18 medical record, it noted that "He and his wife

19 frequently argue during exams and he reports that she

20 gets angry with him easily."  Do you see that?

21 A    Yes, I do.

22 Q    Is that your understanding of the situation at that

23 time?

24 A    That was the situation since he contracted

25 diabetes.

1  Q    There's a note here that "The patient has a very

2  sedentary lifestyle so when he does climb one or two

3  flights of stairs, he becomes dyspneic."

4  A    You'll have to explain to me what that is.

5  Q    That means short of breath Your Honor -- Mr. Suoja.

6  A    Okay.  And what is the date on this?

7  Q    November of 1996.

8  A    I can believe that to be the case.  That was very

9  near the end.

10 Q    There's just a couple more.  I don't want to do too

11 much of this.  There's three more, sir.  Owens-Illinois

12 1722.  This is hospital records notes from December 19,

13 1996.  That's when your father was in the hospital

14 towards the end of his life; is that correct?

15 A    That is correct.

16 Q    There's a notation here that "Patent and spouse

17 have a history of conflict.  Deloris thought patient

18 could stay here to die."  Is that correct?

19 A    That's what it says.

20 Q    Is that your understanding of your mom's position

21 at that time?

22 A    No, I would not say it is.  And the reason is my

23 mother called me because she said dad wanted to come

24 home to die and he did go home, I guess, the last two or

25 three days.

1          MR. CASMERE:  Owens-Illinois 1722A, just from

2    the same group of records, Your Honor.

3    Q    This is a December 15, 1996 record.  Do you see

4    that, Mr. Suoja?

5    A    December 15 -- I'm you having a hard time -- is

6    that '96 where you're pointing your finger?

7    Q    I believe it is.

8    A    Okay.

9    Q    I've highlighted a portion here from these notes

10   where it says "Most of kids are far distant but at least

11   one lives here."  That's referring to your brother

12   Derald?

13   A    That would be correct.

14   Q    It continues "She has contacted his union and will

15   need records re: mesothelioma for lawyers."  Did I read

16   that correctly?

17   A    Yes.

18   Q    Is it your understanding that your mom was

19   contacting lawyers to file a lawsuit for your father's

20   death before he passed away in December of 1996?

21          MR. MCCOY:  Judge, I'm going to object to that.

22   Are we talking about, for clarity, is that at the time

23   of this record or --

24          THE COURT:  He's just -- he's quoting the

25   record.  He's asking Mr. Suoja his understanding, and if

1   Mr. Suoja understands the question, he can answer it.

2   If not, I'm sure Mr. Suoja will say so.

3         THE WITNESS:  I wouldn't be surprised.

4   BY MR. CASMERE:

5   Q    Last one, sir.  Owens-Illinois 1722D, which is

6   again part of the same records.  This is December 19,

7   1996.  Do you see that, sir?

8   A    Yes, I do.

9   Q    Notation here in the record is "He thought his wife

10  could care for him.  I spoke with her yesterday and she

11  was willing to consider having him at home but didn't

12  see why he couldn't stay here as long as was needed

13  until death occurred."

14       Do you see that?

15  A    I do.  I'll take your word for what it says.  It's

16  very difficult for me to make that out.

17  Q    Is that your understanding of your mom's position

18  at that time?

19  A    I really don't know.

20  Q    Just one last area I think I want to cover with

21  you.  And it deals with the probate estate.

22  A    Um-hmm.

23  Q    In 2002, you were appointed the special

24  administrator of the estate of your father; correct?

25  A    Probably on substitution of my mother.

1          MR. MCCOY:  Judge, I have the same objections

2     on this as before.

3          THE COURT:  Sure.  And you've got a motion in

4     limine on this too if I recall correctly.

5          MR. MCCOY:  I think that's correct, yes.

6          THE COURT:  Okay.  Subject to a continuing

7     objection, I will let them make their record on this.

8     BY MR. CASMERE:

9     Q    The sole purpose for that appointment was to

10    prosecute the lawsuit for asbestos-related claims for

11    your father.

12    A    I don't know.  That was certainly part of it.

13    Q    You collected various recoveries for the estate

14    during the course of that appointment as special

15    administrator and distributed the funds; correct?

16    A    That's correct.  Not quite all of them, but almost

17    all of it.

18    Q    In December 2006, you petitioned the probate court

19    to discharge you as the special administrator of the

20    estate.

21    A    That's correct.

22    Q    At that time you gave an accounting of all the

23    settlement proceeds and said that the money had been

24    disbursed; correct?

25    A    That's correct.  And at that time it had been.

1   Q    And you had requested the probate court to approve

2   the accounting and to close the estate.

3   A    That's correct.  That's -- something like that.  I

4   don't recall everything that was in there, but that was

5   correct.

6   Q    And you told essentially the probate court that all

7   of the assets of the estate had been collected and

8   disbursed.

9   A    That's right.  I signed what the attorneys had

10  prepared for me.

11  Q    Your intention at that time was to represent to the

12  probate court that all of the available claims that were

13  made were made and that were able to be collected were

14  collected and were disbursed.

15  A    That was pretty much my understanding at that time.

16  I shouldn't say exactly that.  My understanding is there

17  was one or two little lingering items yet, but that was

18  my understanding at the time.  I thought it was pretty

19  much wrapped up.

20  Q    You had no understanding at that time that the

21  claim against Owens-Illinois was to proceed.

22  A    I had no such understanding.  I wasn't aware of it.

23  Q    You had no intention at that time to continue a

24  claim against Owens-Illinois outside of the knowledge of

25  the probate court.

1  A      Yeah, I had no knowledge of it.

2  Q      You weren't trying in any way to hide this claim

3  from the probate court.

4  A      No.

5  Q      Up until about a year ago when certain events

6  transpired in this case, did you even know that this

7  claim was still pending in federal court?

8  A      I learned about it through the internet while it

9  was still in bankruptcy court in Pennsylvania and there

10  was a small settlement amount that came in in the

11  neighborhood of $500.  And when this came in, I asked if

12  there was -- are there any more, and they said there's

13  one that's in bankruptcy and it should be coming here

14  quickly.  And I said what is it?  Where?  Who can I talk

15  to?  I had some frustration trying to get information.

16       So I finally just went to the internet and I

17  googled my dad's name and I found the case in the

18  bankruptcy court and it hadn't been resolved yet.  But I

19  started following it there and then trying to get

20  information and -- from Cascino Vaughan on what was

21  going on.

22  Q      But at the time that you filed the petition for

23  dissolution, you at that time believed that all of the

24  valid claims had been made and the money collected and

25  disbursed?

1   A    That was correct, because my information came from

2   my attorneys.

3           MR. CASMERE:  Thank you, Mr. Suoja.

4           THE COURT:  Very well.  Mr. McCoy, did you wish

5   to redirect?  (10:06 a.m.)

6           MR. MCCOY:  Only one question.

7                   <u>REDIRECT EXAMINATION</u>

8   BY MR. MCCOY:

9   Q    Mr. Suoja, the medical record statements about your

10  mom quarreling with your dad over his medical treatment,

11  does that -- was that something unusual or different?

12  A    No.  That was -- that was very common.  Way too

13  common unfortunately.

14  Q    Does that mean that your dad didn't care about your

15  mom or vice versa?

16  A    Absolutely not.  He had a great deal of frustration

17  with her, as did all of the siblings, but he still

18  wanted her taken care of.  I mean he stuck with her

19  through all these years and to me it just makes him a

20  bigger man.

21  Q    I don't know if we ever got down.  When were they

22  married?

23  A    In October of 1943.

24  Q    And how many years did your mom live after your

25  dad?

1  A    Approximately six or seven.  She passed away, I

2  believe it was April of 2003.  So...

3          MR. MCCOY:  That's all the questions I've got.

4  Thanks.

5          THE COURT:  All right.  Mr. Suoja, you are done

6  with your testimony.  Thank you.  You may resume your

7  seat.

8          (Witness excused at 10:08 a.m.)

9          THE COURT:  Do we need a quick break just for

10  housekeeping purposes before -- first of all, let's make

11  sure, Mr. McCoy.  Do you have any other live witnesses

12  you wish to present as part of this bench trial?

13          MR. MCCOY:  No, Your Honor.

14          THE COURT:  All right.

15          MR. MCCOY:  Judge, let me correct one thing on

16  that.  I had planned and indicated on our 26(a)(3)

17  disclosure and our disclosures earlier on that that

18  Dr. Neushul, who is the Owens-Illinois expert, would

19  also be a witness for us.  I know Mr. Casmere disagrees

20  with me.  I said I would wait and conduct my examination

21  when he testifies.

22          THE COURT:  Is he one of your witnesses?

23          MR. CASMERE:  Your Honor, he is one of my

24  expert witnesses.  And I don't know what he said on his

25  Rule 263 disclosures, but if he wants to call

1   Dr. Neushul in his case-in-chief as his witness and he

2   wants to say that he hired him as an expert, he's

3   standing out in the hall.  He can go engage him and call

4   him and do a direct examination and I'll cross him.  But

5   he's not on their witness list as far as I know.  He

6   hasn't been retained by them.  He can cross-examine him

7   after I call him, but I don't like this idea that he

8   claims it's his witness for part of his case-in-chief.

9   That's not accurate.

10          MR. MCCOY:  Judge, cross-examination afterwards

11   is fine.  That's what I had said I would do.

12          THE COURT:  Well, I'm looking at the 26(a)(3)

13   report that the plaintiff filed.  It's Docket 122.  And

14   sub paragraph 1(a) is the category Witnesses Plaintiff

15   Expects to Present at Trial in Person and Peter Neushul

16   is No. 6, retained OI witness.  Is that the one we're

17   talking about?

18          MR. CASMERE:  Yes, Your Honor.

19          THE COURT:  So he listed him.  Now for Rule 50

20   purposes, since I'm reserving anyway, I'm not sure if it

21   matters.  Often for the benefit of witnesses who travel

22   in to court, we don't make them come back and the

23   parties reach an agreement ahead of time.  Mr. Casmere,

24   I don't know if for tactical, procedural or legal

25   reasons you have a problem with Dr. Neushul testifying

1    to whatever Mr. McCoy wants to ask him on cross, even if

2    it exceeds the scope of your direct.  I mean I'll play

3    this by the book if you need me to.

4            MR. CASMERE:  I think it's a distinction

5    without a difference at this point in this bench trial,

6    Your Honor, because of the way we're proceeding.  I just

7    don't want to be on a record anywhere conceding that

8    this type of procedure or tactic by Mr. McCoy is in any

9    way legitimate.  But under the way that we're conducting

10   this, I don't want to get in the way of that.

11           THE COURT:  Understood.  And I wanted to make

12   sure that I did understand your position, because let me

13   observe perhaps for the fifth time, because it's a bench

14   trial and because the parties have agreed to post-trial

15   briefing, it's the Wild West, okay?  This is not at all

16   the way the Court would conduct a jury trial.  We

17   couldn't.  It wouldn't be fair to either side.  There

18   would be a lot more in limine decisions.  There would be

19   a lot more side bars.  All of the testimony would be

20   significantly more limited.  And we all understand that.

21   So I just want to make sure that in proceeding in this

22   fashion we don't inadvertently prejudice either side's

23   position on how they want the case to move forward.

24           You've assured me that that is not the case here.

25   You've made your record on your displeasure with the way

1    this was handled.  Duly noted.  If this is your last

2    one, you don't have to worry about it.  Maybe Mr. Watson

3    will in the future.  But let's just go ahead and if

4    Dr. Neushul is your first witness, we'll let him testify

5    for both.

6         But let's just clarify with Mr. McCoy about the

7    exhibits, then I'm going to ask you for your Rule 50

8    motion.  And of course as I've already indicated, I'm

9    going to reserve, but you do need to make it for

10   procedural purposes.  So Mr. McCoy, let's just play out

11   the hand.  You're done with your live witnesses with the

12   distinction we've just made with Dr. Neushul.  And

13   Mr. Casmere, despite his displeasure with this, is not

14   going to stand on procedure.  Understood.

15        With regard to exhibits, you've already indicated

16   to the Court on the record that you and your team,

17   Mr. Hausman and perhaps your paralegal are going to meet

18   with Mr. Casmere and Mr. Watson and their paralegal

19   tonight and sort through the exhibits.  And then

20   tomorrow morning you will be offering all of plaintiff's

21   exhibits, indicating which are agreed to and if there

22   are any objections to your exhibits which are objected

23   to, and then it will be up to the Court after post-trial

24   briefing to accept or reject exhibits at that time.  Is

25   that your understanding of where we find ourselves with

1   the exhibits?

2           MR. MCCOY:  Yes, Judge.

3           THE COURT:  Okay.  And Mr. Casmere, again just

4   to make sure that the record is clean, that's your

5   understanding as well; that we don't need to have

6   plaintiff's exhibits offered and accepted or rejected by

7   the Court now.  You can still make your Rule 50 motion

8   and you reserve the right and the Court is giving you

9   the right to object and make your record on rejections

10  tomorrow subject to the Court ruling at the close of the

11  briefing.

12          MR. CASMERE:  Yes, Your Honor.  Thank you.

13          THE COURT:  Okay.  So with all of those

14  conditions and the record now having been made,

15  Mr. McCoy, is the plaintiff resting its case-in-chief,

16  the estate?

17          MR. MCCOY:  The only other matter, Judge, which

18  Mr. Hausman called my attention to is the page and line

19  designations on deposition testimony and we also have

20  two trial depositions that I mentioned earlier.

21          THE COURT:  Understood.  And that's a good

22  pickup because that's critical to your causation proof.

23          MR. MCCOY:  Two separate items in there.  One

24  is the older testimony taken before this trial and then

25  there was two trial depositions specifically for this

1  trial.

2         THE COURT:  Is it accurate for me to

3  characterize the submission of all of those affidavits

4  as subject to the same procedure for the other written

5  exhibits?  In other words, you're going to offer them

6  tomorrow as part of the package and some may be accepted

7  without objection, some will be objected to.  The

8  parties will brief it and then when the Court rules

9  finally, it will indicate which are accepted and which

10  are rejected.  Is that your understanding?

11         MR. MCCOY:  That was my understanding.  I

12  didn't specifically mention the testimony.  In my

13  conversation with Mr. Casmere, just so you know, we

14  talked about the exhibits.  But in my thinking I was

15  applying it to both.

16         THE COURT:  Sure.  Well, you're entitled to

17  know.  I mean you're not going to close your case until

18  you know if your deposition testimony is coming in.  So

19  Mr. Casmere, again without beating a dead horse or

20  perhaps to beat it again, is that your understanding and

21  are you okay with proceeding in that fashion with the

22  deposition?

23         MR. CASMERE:  Yes, Your Honor, with the

24  additional whack on the dead horse of that there are

25  multiple deposition designations that may or may not be

1  dealt with based on sort of the rebuttal claim that

2  they've been making.  If we don't put in something,

3  they're not going to put in something.  We will make

4  that all clear as Your Honor has identified.

5          MR. MCCOY:  That's my understanding too.

6          THE COURT:  Sure.  As I think is implicit in

7  what you're both telling me, tonight when you meet you

8  will both be in a better position to understand what you

9  actually want based on how the evidence devolves during

10 the rest of this morning and this afternoon's testimony.

11 So with that as the understanding of both sides and of

12 record now in the trial, the Court will accept that

13 agreement.  It makes a lot of sense here under the way

14 this trial is proceeding.

15     So with all of those qualifiers and conditions of

16 record and agreed to by both sides, Mr. McCoy, is the

17 plaintiff now resting?

18         MR. MCCOY:  I would like to just publish four

19 exhibits here; take about five minutes.  I've got them

20 marked and --

21         THE COURT:  Well, you're publishing them to me.

22 Do you want to just hand them to me?

23         MR. MCCOY:  I would like to just -- it will be

24 so quick when I publish these.

25         THE COURT:  But I don't understand.  Publish to

1    whom?

2         MR. MCCOY:  Well, I'd like Your Honor to see

3    this as part of our case.

4         THE COURT:  Right.  But why will it take five

5    minutes?  Why don't you just hand them to me.

6         MR. MCCOY:  I've just got certain portions

7    highlighted here.  That's all I wanted to show right

8    now.  Very brief, like one sentence out of a ten-page

9    document.

10        THE COURT:  I'll tell you what.  Why should we

11   deviate from course now.  Everybody sit down.

12   Mr. McCoy, read your excerpts, give me page or exhibit

13   numbers.  And you don't have to step forward, just stay

14   at your desk.

15        MR. MCCOY:  I'll just put them on the ELMO.

16        THE COURT:  No, just read them to me.

17        MR. MCCOY:  Okay.  This Exhibit 41, Judge, is

18   an interim report regarding the biological activity of

19   Kaylo dust to the Owens-Illinois Glass Company by the

20   Saranac Laboratory, October 30, 1948, submitted by

21   Arthur J. Vorwald, MD Director.  The Edward L. Trudeau

22   Foundation.  So the part that I've marked here.

23   "Conclusions.  1. Kaylo, because of its content of an

24   appreciable amount of fibrous chrysotile is capable of

25   producing asbestosis and should be handled as a

1  hazardous industrial dust."

2          THE COURT:  Duly noted.  That's the first one.

3          MR. MCCOY:  Okay.  The second one March 12,

4  1943.  A letter from Leroy U. Gardner, MD Director, this

5  is from Saranac.

6          MR. CASMERE:  What's the exhibit number, Bob?

7          MR. MCCOY:  Exhibit No. 38.  It's to Mr. U.E.

8  Bowes, Director the Research, Owens-Illinois Glass

9  Company.  "Dear Mr. Bowes" -- and the part that I've

10 highlighted.  "The fact that you are starting with a

11 mixture of quartz and asbestos would certainly suggest

12 that you have all the ingredients of a first class

13 hazard."

14          THE COURT:  That's number two.

15          MR. MCCOY:  Next one.  From Owens-Illinois

16 Interrogatory answers, a couple portions.

17          THE COURT:  Do you have a number on that?

18          MR. MCCOY:  This is Exhibit 29.  These were

19 from the case of *Montgomery County Board of Education v.*

20 *W.R. Grace* is what it's captioned as, in the Middle

21 District of Alabama, U.S. District Court.  This was

22 signed October 31, 1983.

23     First portion is "Defendant now believes that its

24 asbestos-containing products were hydrous calcium

25 silicates containing between 13 and 25 percent asbestos.

1  Chrysotile asbestos was the primary type apparently

2  used.  Amosite was used to a lesser extent."  That was

3  from Interrogatory 8.

4      Next portion.  Interrogatory 13.  "Answer:  The

5  identity of all documents which refer or the question of

6  the identity of all documents which refer, reflect or

7  relate to sale, distribution or shipment of asbestos

8  construction products within said region or regions,

9  including but not limited to all sales records,

10  invoices, computer printouts, bills of lading, freight

11  bills, shipping orders or other documents of transfer

12  and the identity of the person or persons who have the

13  custody thereof."  The answer, the part that I have

14  highlighted here, "This defendant ceased the

15  manufacture, sale and distribution of

16  asbestos-containing products in 1958 and has not been

17  able to locate information in its records sufficient to

18  enable it to fully answer this interrogatory."

19      Interrogatory 16.  "Question:  Identify all your

20  chief medical officers from 1930 to the present time.

21  "Answer:  Charles Shook, MD, deceased, employed from

22  March 1946 until June 30, 1960.  Dr. Shook was the

23  medical director during the period in which this

24  defendant manufactured, sold or distributed

25  asbestos-containing products."

1      Answer in part to Interrogatory 8.  "W.G. Hazard

2  was employed as this defendant's industrial hygienist

3  during the period of time in which this defendant

4  engaged in the manufacture, sale and distribution of

5  asbestos-containing products."  That's -- we have some

6  additional parts that we're going to be tendering, but

7  that's what I wanted to read today.

8          THE COURT:  Very well.

9          MR. MCCOY:  I'm trying to give Your Honor just

10  a little more background right now.  So anyways, the

11  rest will come through the full documents.  Okay.

12     So briefly, Judge, on Mr. Suoja's medical records,

13  these are from the treating physician stack that he

14  acknowledges the records of Mr. Suoja when he gave his

15  trial deposition.  I want to just briefly read these

16  statement portions.  On 9-10-96, hospital visit record.

17  The statement:  "History of present illness.  Some pain

18  in right lower quadrant of his abdomen.  He feels cold

19  all the time.  He is drowsy without energy and weak.

20  His appetite has decreased."

21     Next portion that I want to read is going forward

22  to December 13, 1996, another history and physical

23  report.  "During the ensuing months, he has had

24  progressive discomfort develop in his abdomen and back

25  and has been unable to eat very adequately.  He has

1  developed significant lower extremity swelling and

2  progressive weakness."

3       And finally another portion, this is progress notes

4  on December 15 of 1996, and the part that I'm reading is

5  -- states "pain all over."  And that's signed by a

6  nurse.  That's all I wanted to read.  Again, we'll have

7  more selections in the post-trial briefing.

8            THE COURT:  Understood.  Okay.  So let me ask

9  again, Mr. McCoy, subject to the agreements that the

10 parties have tendered to the Court and the Court has

11 accepted about exhibits and deposition transcript

12 portions, is the plaintiff resting?

13           MR. MCCOY:  Yes, sir.

14           THE COURT:  Very well.  Did you want to make

15 your Rule 50 motion now?

16           MR. WATSON:  I can make it now or we can pack

17 up so the Court is running on time for the 10:30.

18           THE COURT:  Let's do it that way.  We've got at

19 least part of our crew sitting in the back, so let's

20 adjourn and we'll just reconvene as soon as I'm done

21 with the initial appearance.  Okay?

22           MR. WATSON:  Thank you, Your Honor.

23           MR. CASMERE:  Dr. Neushul is here and ready to

24 go.

25           THE COURT:  Got it.

1       (Recess       10:25-10:35 a.m.)

2            THE COURT:  Mr. McCoy, what we're going to do,

3    the defense attorney just showed up to talk to his guy

4    on the removal, so what we're going to do is get the

5    Rule 50 motion and response at this time just so that

6    you guys don't waste your time any more than we have to.

7    Okay?

8            MR. MCCOY:  Okay.

9            THE COURT:  Are you comfortable with that?

10           MR. MCCOY:  Yes.

11           THE COURT:  All right.  Mr. Watson, I presume

12   you've got the point position?

13           MR. WATSON:  That's correct.

14           THE COURT:  All right.  If you would, please.

15           MR. WATSON:  Your Honor, Owens-Illinois at this

16   time moves for a judgment as a matter of law under

17   Federal Rule of Civil Procedure 50(a).  Plaintiff has

18   been fully heard on the issues during trial and a

19   reasonable jury would not have a legally sufficient

20   evidentiary basis to find for plaintiff and against

21   Owens-Illinois on those issues.

22       Rule 50(a) requires that the motion specify the

23   judgment sought and the law and facts entitle the movant

24   to the judgment.  Owens-Illinois will specify the law

25   and facts that entitle it to judgment in its post-trial

1  papers, but at this point in the evidentiary record as

2  it stands now, Your Honor, Owens-Illinois requests that

3  the Court grant its motion for judgment as a matter of

4  law and resolve the issues on both plaintiff's claims

5  against Owens-Illinois and Owens-Illinois's affirmative

6  defenses under Rule 50(a).

7           THE COURT:  All right.  Thank you, Mr. Watson.

8  And just so it's clear, and I think this is implicit,

9  when you talk about the record as made, that would

10  include the exhibits that the parties are going to sort

11  through tonight and present to the Court tomorrow

12  morning.

13          MR. WATSON:  It would include the exhibits as

14  well as the deposition testimony that plaintiff intends

15  to offer and the parties will confer on as stated

16  previously.

17          THE COURT:  Understood.  Thank you.  Motion

18  made.  Mr. McCoy, I don't think there's a lot of

19  response you need to make at this time, but I presume

20  you object?

21          MR. MCCOY:  Yes.  Plaintiff objects and the

22  majority of our cases is through the testimony and

23  documents that have not been presented so far would be

24  in the post-trial briefing and our response will be in

25  that post-trial briefing to this motion.

1          THE COURT:  I think that suffices for today's
2     purposes.
3          MR. MCCOY:  I only have one question, Judge.
4     Can we get some indication of what affirmative defenses
5     are actually being pursued when you say in that motion?
6          THE COURT:  Mr. Watson, can you tick those off
7     off the top of your head?
8          MR. WATSON:  Your Honor, in our proposed
9     special verdict form we identify our affirmative
10    defenses that we set out.  Included in those are the
11    statute of limitations under the federal enclave
12    doctrine, and also included in that is to the extent the
13    sophisticated user defense is considered a affirmative
14    defense that Owens-Illinois has the obligation to
15    establish, the record shows at this point Owens-Illinois
16    is entitled to judgment on as matter of law under the
17    sophisticated user doctrine, which is outlined in our
18    proposed special verdict form.
19         THE COURT:  Understood.  All right.  So
20    Mr. McCoy, does that answer your question for today's
21    purposes?
22         MR. MCCOY:  Yes.  The statute of limitations
23    defense is about the federal enclave or something like
24    that; right?
25         THE COURT:  Yeah, that's what he just said.

1   And then sophisticated user was the other.

2           MR. MCCOY:  Okay.

3           THE COURT:  And that's all of record as well.

4   As we all understand due to the singular nature of this

5   bench trial, the Court is not in a position to grant or

6   deny the motion because the parties are still sorting

7   through the evidence.  We're doing this as an

8   accommodation to both sides, so I'll reserve on it.

9   That said, let's face it, the Court intends to rule on

10  the merits without doing a Rule 50 motion.  I don't

11  think that's necessary.  But the defendant has to make

12  the motion to preserve the record.  It has.  I'll

13  reserve.  You can renew the motion at the close of your

14  case, if you wish.

15          MR. WATSON:  Let me add also, Your Honor, just

16  so we're clear, Owens-Illinois had previously moved for

17  summary judgment based on issues of lack of standing,

18  mootness, and the lack of a cognizable claim for Gary

19  Suoja following the previous wrongful death lawsuit that

20  was not consolidated.  The Court in an order denied

21  Owens-Illinois's motion for summary judgment in order --

22          THE COURT:  Go ahead.

23          MR. WATSON:  Those are defenses.

24  Owens-Illinois is continuing to assert those, and if

25  necessary, to raise them now to preserve it under 50(a)

1  does so.

2          THE COURT:  Understood.  So the record is as

3  clear as I can make it today, due to the parties'

4  consent to my jurisdiction over the trial, pretty much

5  on the eve of trial, I did not take the time to read all

6  of Judge Crabb's previous orders.  To the extent that

7  she has entered orders that are binding, that's the law

8  of the case and I'm not going to change those.

9      Now, denying summary judgment under Rule 56 is not

10 binding, that's different.  If I recall correctly, she

11 found at least a couple of issues were waived by the

12 defendant.  That probably is law of the case and I'm not

13 going to countermand that.  I don't know if that was

14 part of the summary judgment order or not.  But that's

15 something we can sort out after the briefing when the

16 Court issues its final order.  But Mr. Watson, you

17 certainly have made a precise record on all of that.

18 Okay?

19     I think that's all we need to do on that.

20 Mr. Watson, anything else to perfect your record or are

21 you good with where we landed?

22          MR. CASMERE:  I trust you.

23          MR. WATSON:  No, Your Honor.

24          THE COURT:  All right.  Mr. McCoy, anything

25 else on that then?

1          MR. MCCOY:  No.

2          THE COURT:  All right.  You guys can go back on

3    break.  We've called for our defendant in our criminal

4    case.  That should not take more than five to ten

5    minutes once we get him into the courtroom.

6          (Recess          10:45-10:50 a.m.)

7          THE COURT:  Okay.  So we're back on the record.

8    Mr. Watson, you indicated that you've got one more issue

9    you just wanted to make part of the record?

10          MR. WATSON:  Yes, Your Honor.  As I raised

11   earlier, Owens-Illinois had previously moved for summary

12   judgment in this case, raising issues and affirmative

13   defenses.  Included in those affirmative defenses were

14   that plaintiff lacks standing; this claim is moot;

15   plaintiff failed to consolidate the wrongful death cases

16   and there's no cognizable wrongful death claim in this

17   case; and issue preclusion and collateral estoppel are

18   plaintiff's claim against Owens-Illinois.

19      We also move under Rule 50(a) to include all of

20   those defenses.

21          THE COURT:  Okay.  So the record is now

22   perfected.  They're all reserved and preserved for later

23   consideration by the Court.  Thank you.

24      All right.  Have you got your witness ready?

25          MR. CASMERE:  Yes, Your Honor.

1    THE COURT:  All right.  Please call him.

2    MR. CASMERE:  Your Honor, Owens-Illinois calls

3 Dr. Peter Neushul.

4    **PETER NEUSHUL, DEFENDANT'S WITNESS, SWORN,**

5    MR. CASMERE:  May I proceed, Your Honor?

6    THE COURT:  You may.

7                    DIRECT EXAMINATION

8 BY MR. CASMERE:

9 Q    Dr. Neushul, would you please introduce yourself to

10 the court.

11 A    My name is Peter Neushul.  I'm from Santa Barbara,

12 California.

13 Q    Doctor, would you pull that microphone a little bit

14 closer to you?

15 A    Yes.

16 Q    All right.  Thank you.  What do you do for a

17 living, Doctor?

18 A    I am a working historian.

19 Q    I have hired you as an expert witness in this case;

20 is that right?

21 A    That is correct.

22 Q    I asked you to take a look at four different things

23 in your capacity as an expert historian; is that right?

24 A    That's correct.

25 Q    What are the four areas that I asked you to take a

1  look at in this case?

2  A    You asked me to take a look at the history of

3  Badger Ordnance Works and what went on there.  You asked

4  me to look over the state of the art with regard to

5  asbestos.  You asked me to look at materials pertaining

6  to the asbestos workers union.  I also looked at the

7  extensive body of papers related to the Saranac Lake

8  Laboratory and their relationship with Owens-Illinois.

9  Q    I want to just very briefly identify what some of

10  your opinions are that you're going to give the Court as

11  a preview for the Court, then we're going to go through

12  and go through your qualifications and talk to you about

13  those opinions.  Okay?

14  A    That sounds good.

15  Q    Just for as a preview to the Court, with respect to

16  Badger Ordnance Works, have you formed opinions about

17  the historical records about when, where, why, and how

18  Badger Ordnance was constructed over the years?

19  A    Yes, I have.

20  Q    And have you also formed opinions about what

21  happened during that construction?

22  A    Yes, I have.

23  Q    And that's based on the historical record?

24  A    Looking at primary historical documentation.

25  Q    And do you have opinions about the safety programs

1  at Badger Ordnance and the information that Badger

2  Ordnance had about asbestos and how to use it safely?

3  A   Yes.  Badger Ordnance was -- had its own safety

4  protocols that are quite detailed.  It's a munitions

5  facilities.  It's quite dangerous.  The contractors were

6  very sophisticated that did the work in building Badger

7  Ordnance.  So they did have knowledge of the potential

8  hazards of asbestos and also the means for preventing

9  injury as a result to exposure to asbestos.

10         MR. MCCOY:  Your Honor, I have an objection to

11  the statement at this time of that conclusion.  I'll put

12  that on the record because foundation and all that

13  hasn't been laid.

14         THE COURT:  Okay.  Let's be clear.  Are you

15  objecting to him testifying as an expert or to the

16  conclusion that he just offered as a headline version or

17  both?

18         MR. MCCOY:  It might be both.  That's why I say

19  I haven't heard the predicate for all that.

20         THE COURT:  Okay.  We'll approach this the same

21  way we approached Mr. Kenoyer.  You've got your

22  objection.  You don't need to renew it.  We'll allow --

23  is it Mr. Neushul or Dr. Neushul?

24         THE WITNESS:  Dr. Neushul.

25         THE COURT:  Dr. Neushul to testify.  So let's

1  continue, please.

2  BY MR. CASMERE:

3  Q    Were you able to form any opinions about whether

4  -- strike that.  Let's just go through the -- I was

5  going to give the Court a preview of the opinions, but

6  it looks like it's just faster if we go the old

7  fashioned way.  Okay?

8      So we've identified the areas that I've asked you

9  to look at.  Now I want to talk to you about your

10  qualifications and your background; okay?

11  A    Okay.

12  Q    Could you please tell the Court your academic

13  background and what degrees you have.

14  A    I have a bachelor's degree, a master's degree, and

15  a Ph.D. in American history generally.  My Ph.D. focuses

16  in particular on 20th Century U.S. and science and

17  technology within that area.  I also look at

18  environmental history, and I look at the history of

19  medicine.  But you had -- and the period that I look at

20  in particular is World War II and the decades following

21  World War II.

22      But my specialty and the fields that I focus on the

23  most are history of technology and history of science.

24  Q    Do you have any teaching responsibilities or have

25  you in the past?

1    A    I have taught for many years at UC Santa Barbara.

2    I taught at the California Institution of Technology,

3    Caltech in Pasadena.  I taught at the City College in

4    Santa Barbara.  I have not taught recently, but I have

5    been -- I've taught at these various institutions over

6    the last 15/20 years.

7    Q    What did you teach?  History?

8    A    I did teach history.  I designed a course on

9    history of U.S. Science and Technology Policy at UC

10   Santa Barbara that I taught.  I taught the same

11   course -- actually I taught environmental history at

12   Caltech.  I taught environmental history at UC Santa

13   Barbara.  The most recent course I did was a course on

14   the history of surfing that I taught at UC Santa

15   Barbara.  I can expand on that.  It's kind of an

16   interesting topic when I did that.

17          THE COURT:  We don't understand surfing in

18   Wisconsin.

19   Q    Why do you teach a class on the history of surfing

20   in Santa Barbara, California?

21   A    You know, the topics that I've worked on over the

22   years have been very, very -- I find them fascinating,

23   but students are not terribly interested in the history

24   of the U.S. Science and Technology Policy.  A colleague

25   of mine from Caltech, we both have surfed together for

1   many, many years and we were surfing and thought let's

2   teach a course on the history of surfing that brings in

3   American history and brings in history of science and

4   technology, which believe it or not have a very large

5   connection to surfing.

6       And so it was a way of -- in particular, our job is

7   to teach the historical method to students, how is it

8   that you do history.  We want to get them interested as

9   undergrads, we want to teach them the methods in

10  master's programs and they need to become masters of

11  that method in Ph.D. programs.  But the way to hook

12  them, the way to get them into it, they've got to get

13  interested in history.  And so we saw this as an avenue

14  for making our rather dry, rather complicated field

15  accessible to undergraduates.  And we were right.  It

16  was an enormously popular course.

17  Q    Is there anything about the history of surfing,

18  oceanology, meteorology that has a connection to

19  technology and/or the second World War?

20  A    Absolutely.  I mean we see surfing as -- and we

21  eventually a book came out of this class which was also

22  something we planned to do when we started the class.

23  But take, for example, D-Day.  Everybody knows about

24  D-Day.  You had to be absolutely sure on D-Day that the

25  wave heights were not going to be too high, because as

1  we know, immediately after D-Day that was a storm that

2  destroyed the Mulberry harbors that were there and

3  caused absolute chaos.  So if we're going to move

4  millions of pounds of material and thousands of people

5  onto a beach with people trying to kill you from the

6  shore, you need to be sure the wave heights are correct.

7  And so the basis for wave prediction today that the

8  people use when they decide whether there's going to be

9  waves on the Great Lakes or whether there's going to be

10 waves on a point in California are derived from buoys,

11 and this data, there were human buoys so to speak in

12 World War II that were collecting data all around France

13 to ensure that they knew that on that day, when

14 Eisenhower decides we're going to go for this, that the

15 wave heights were not too high.  So that's just one of

16 the connections.

17     We also sent in people in wet suits, which are key

18 to surfing, to explore the bottom contours, look at the

19 oceanology, and deal with many of the bombs and things

20 that the Germans had placed under water.  They knew we

21 were coming.  They knew we were going to come.  And so

22 the question was when and where.  But they were

23 prepared.

24     And so all of these things feed into this sport,

25 which interestingly we learned that one of the

1  professors at UCSB was one of the two people, two

2  oceanographers, who made the call that the wave heights

3  were going to be at the correct level and D-Day would

4  happen.

5  Q     Are you a member of any professional organizations?

6  A     Yes.  I'm a member of the American Historical

7  Association, which is the general field that covers what

8  I do.  I'm a member of the Society for the History of

9  Technology and the History of Science Society.

10 Q     How about the Environmental History Society?

11 A     I've been a member of that as well over the years.

12 I may have let that lapse recently, but I have been a

13 member of that and have given papers at their

14 conferences.

15 Q     Have you published books or articles on the history

16 or historical method?

17 A     I haven't published them on the historical method.

18 Everything that I've written utilizes the historical

19 method, utilizes my craft, the collection of sources,

20 ranking of those sources, use of those sources in

21 producing history.  I've written several books over the

22 years.

23 Q     Have you testified in asbestos litigation as a

24 expert witness on state of the art and history?

25 A     I have.

1  Q     Have you testified in courtrooms around the country

2  as an expert witness in asbestos cases?

3  A     Yes, I have.

4  Q     Do you recall some of the jurisdictions where

5  you've testified in a courtroom?

6  A     I've done so in Louisiana.  I've done so in

7  Illinois.  I've done so in Minnesota.

8  Q     How about in Philadelphia?

9  A     Yes.  I've done so in Philadelphia.

10 Q     From a practical experience, who hires you outside

11 of attorneys?

12 A     I've spent the last 20 years working as a historian

13 employed by the U.S. Army Corps of Engineers, which is

14 germane to this case in particular because they built

15 Badger Ordnance Works.

16 Q     How is it -- so the U.S. Army Corps of Engineers

17 built Badger Ordnance Works?

18 A     Yes.  They're the overall contractor, and I've --

19 they then hire or they then hired Hercules Powder

20 Company.  They hired Mason & Hanger, which is a very

21 distinguished, the oldest construction company in the

22 United States who I've encountered at other sites, other

23 core sites.  They built Badger.  So I know about the

24 U.S. Army Corps of Engineers.  In particular, the

25 southwestern division, I wrote a history of the

1  southwestern division.  I wrote a history of the

2  Los Angeles district; writing a book right now on the

3  think tank side of the Army Corps of Engineers, the ones

4  that are preparing us for things like global warming and

5  whatnot.

6  Q    What other major things did the U.S. Army Corps of

7  Engineers build?  Just give us two.

8  A    Well, the Manhattan Project, the Manhattan District

9  was formed.  So that's a major thing.  They built the

10 Pentagon.  They built dams all over.

11 Q    What work did you do or do you do for the U.S. Army

12 Corps of Engineers?

13 A    The core is a federal entity that spends billions

14 and billions of dollars and we need to know where that

15 money goes.  And part -- the Army has a tradition of

16 doing this generally, and of course the Corps is part of

17 the Army.  But they're concerned about their history,

18 what have we done, where did we do it.  And it's part of

19 the mandate of the Corps that they preserve the history

20 of their projects.

21 Q    The U.S. Army Corps of Engineers considers you an

22 expert historian?

23 A    I would certainly say so.  These are not -- I'm not

24 -- I compete to write these books for the Corps.  So the

25 Corps will issue a contract, a federal contract, and

1  various historians will submit proposals to write the

2  book that goes with the contract.  And so over the last

3  20 years I've had contracts with them.

4  Q    Have you ever had any opportunity to interview

5  generals or soldiers after they've come back from

6  battle?

7  A    In my work for the Corps, I've interviewed a lot of

8  high-ranking officials:  Some generals, some colonels.

9  Q    Why do you do that?

10 A    Well, as part of these histories actually, it's

11 required that we do a certain number of oral interviews;

12 in other words, if you're writing the history of a

13 district or division, you must interview all of the

14 colonels that were in charge of that district.  Usually

15 there are generals in charge of divisions.  You need to

16 interview all the various generals that were at the top,

17 the so-called -- within the core of the so-called

18 green-suiters who run that organization.

19 Q    How about the California Coastal Commission?  Have

20 you ever worked for them?

21 A    Yes.  I did a survey for the Coastal Commission of

22 all of southern California's wetlands.  This was part of

23 mitigation for a nuclear power plant at San Orofre which

24 finally enough has recently shut down.  But that was

25 adjacent to a wetland.  So I did a lot of interviewing

1   of scientists as part of that and collection of their

2   papers in building a database of what we know and what

3   we knew about southern California wetlands.

4   Q    They have wetlands in southern California?

5   A    They used to have vast wetlands.  They now have

6   very few left.  But we're understanding -- we've

7   understood over the years in taking environmental

8   history that these are our filtering organs and that

9   we're essentially ripping our liver out every time we

10  get rid of one of those.  And so our appreciation for

11  wetlands has changed.  I think across the United States

12  we don't call them bogs anymore, you know, swamps.

13  They're wetlands.  They're very diverse.

14  Q    That work was done as a historian for the

15  California Coastal Commission?

16  A    Yeah.  I was hired as a historian for that

17  organization.

18  Q    How about NASA?  Have you ever done any work for

19  NASA as a historian?

20  A    Yes.  I was hired to gather and organize the papers

21  of the head of the Office of Man Space Flight many years

22  ago.  And so I -- he happened to have retired in the

23  Santa Barbara area and so I was employed by NASA to go

24  and organize his papers, interview him, and prepare a

25  database of those papers.

1   Q    How about the National Endowment for the

2   Humanities?

3   A    I've had NEH grants over the years.  Most recently

4   we had a grant to study essentially the wetland that

5   surrounds the UC Santa Barbara campus.  And so I did

6   some history of the Army Corps because I brought the

7   Corps knowledge to the table.  They did all the flight

8   control in that area.  They did all that work.  And so

9   my contribution to that NEH grant was to look at and do

10  a series of interviews as well, lots of oral history.

11  Q    Are there any other public entities that come to

12  mind right now that you've worked for as a historian?

13  A    I think that in terms of public entities that

14  covers it.  I mean I've had lots of grants from -- had

15  through the University of California.  I looked at the

16  University -- at energy history at one point.  So I've

17  had grants that come from public entities.  They almost

18  always come from public entities.

19  Q    How did you get involved in testifying as an expert

20  witness in asbestos cases?  Just give us the brief

21  background on that.

22  A    I was doing some post-doctoral work at Caltech.  I

23  believe they contacted one of the professors there who

24  was someone I had worked with for several, four or five

25  years, and he, I believe, referred attorneys who I later

1   learned may have been with a firm that may have

2   represented Owens-Illinois.  They got in touch with me.

3   I think they got in touch with a lot of historians at

4   this point in that litigation.

5   Q    At the time that you were first contacted, were you

6   given materials or asked to do anything specific with

7   respect to research on asbestos?

8   A    They gave me a series of depositions with a

9   pulmonologist, I believe, from that era.  They gave me

10  some -- I believe at some point or another I looked at

11  paper that cames from what I now know are the Saranac

12  Lake documents.  So I was sort of given a bunch of

13  materials to look at.  I honestly didn't know whether

14  this was a plaintiff's firm or -- I had no idea what the

15  background was.  I think they just wanted me to

16  generally look at it and give an impression of it.

17  Q    You were asked to give your opinions without

18  knowing who was asking.  Is that fair?

19  A    That's true.

20  Q    What does it mean to be a working or legitimate

21  historian in terms of the historical method?  Can you

22  explain that to the Court?

23  A    Sure.  I think the historical method is

24  something -- if you want to do history, you're going to

25  fall in love with it when you're an undergrad, and let's

1   face it, there's not a lot of money in history.  History

2   is something you do for love.  So you say you go on, you

3   get a master's degree.  One of the immediate focuses of

4   that is you've got to learn how to do something

5   original.  You've got to be able to publish something.

6   And we have very, I think, stringent standards for what

7   is history and what isn't history.  So in the field that

8   I was interested in, technology, when I first started

9   out, the journal was technology and culture.  You had to

10  write something to publish in technology and culture.

11  And you had to get money to support the research that

12  you needed.  So I would write grants to get support and

13  I would try to publish a paper in here.  If I could show

14  that I'm capable of publishing, that I understood the

15  method well enough to publish, I would then hopefully

16  enter a Ph.D. program where I believe in order to be

17  sort of a master of that methodology, I really think

18  it's important that one go through sort of the baptism

19  of fire of a Ph.D. program where you have to write a

20  dissertation.

21  Q    What is the historical method?

22  A    It's the marshaling of resources.  But you can't

23  just say to somebody hey, go write a history of the

24  southwestern division.  You have to -- of the Army Corps

25  of Engineering, whatever the heck that is.  You have to

1  understand, have done sort of the basics of history.

2  You understand the general history.

3      Let's say you're writing about a World War II

4  topic.  You understand the basics of that, and then

5  you're being asked -- you're going to zero in on one of

6  these topics and hopefully you're picking something that

7  you can't just retell the story, you have to find new

8  sources, a new approach, new material, and then you have

9  to marshal those resources, rank them, and look at how

10  they fit within what we already know and then hopefully

11  produce something that is unique, that is new, and that

12  is publishable.

13  Q     How do you prioritize source material under the

14  historical method?

15  A     The goal of history, what you want to find is

16  primary documentation.

17  Q     Could you explain to the Court the different levels

18  of source material?  You just mentioned primary

19  documentation or primary sources.  Are there others?

20  A     Yeah.  There's secondary.  I mean you can find a

21  book that somebody wrote into the tertiary area of

22  biography or an autobiography.  Those are not

23  particularly useful.  You have magazine articles.  What

24  you want for primary is actual raw data from that time,

25  letters that were written.

1       Let's say you're writing about Badger Ordnance

2   Work.  You want the actual correspondence that led to

3   the decision to build it, that determined who was going

4   to build it, that described what they did there.  You

5   want material from the 1940's for that.

6   Q    What are some examples of -- would that be an

7   example of a primary source?

8   A    Exactly.  Those documents, which in this case do

9   exist, are primary sources with regard to that facility.

10  Q    In the field of history, are primary sources

11  considered more -- how do you rank them in terms of

12  what's more useful to the historian?

13  A    Well, you want something that is going to give you

14  the best picture of what happened at that time.  Let's

15  say you pick a really controversial topic and you just

16  talked to the general about it, that may not be enough.

17  You need to talk to other people that played other roles

18  that were, say, on the ground, and you need to put --

19  and I've done this, for example, with a battle in World

20  War II.  That may be the best way for me to describe

21  that.

22      There's a famous battle called Tarawa in which we,

23  the Marines, went ashore and took this atoll right when

24  we started our offensive to retake the islands from the

25  Japanese.  When I was an undergrad, I saw a movie of

1    this and I could not believe that there was actually

2    colored film of World War II.  I didn't understand at

3    that time that that existed.  And so I thought it was,

4    you know, Vietnam.  This is in the 70's.  But I

5    understood from the person that showed it, this was

6    actually a World War II movie; that it had won an Oscar

7    for its production in World War II.  And later in life,

8    my brother is a career Marine, I thought well, the two

9    of us should write a paper for an important journal in

10   the Navy.  Maybe it will help your career.  Maybe this

11   will be something interesting we could do together.

12        So I said I've seen this movie.  Let's find out if

13   any of the people that made it are still alive.  Let's

14   write a paper about it.  And so we did.  We found that a

15   lot of the people that actually took the live footage --

16   there's live footage in this battle of people killing

17   each other.  I mean it's a very famous documentary.  It

18   was made by a guy name Louie Hayward who was a famous

19   movie actor who was also in the Marines during World War

20   II.

21        So I found that these gentlemen were alive and I

22   did some interviews with them.  But at the same time, I

23   went to the Marine Corps archives and learned that they

24   had been interviewed immediately after the battle

25   because it's such an important battle.  The film, they

1    didn't want to release it.  FDR didn't want to release

2    it at first because it's absolutely kind of -- it's

3    brutal.  But then he decided that Americans need to know

4    that we could conceivably lose 2,000 people in a morning

5    and so that might be the course we would take as the war

6    went on, and so he decided to release the film.

7          But they had been interviewed, and I then did these

8    oral histories with them, and I had the opportunity to

9    kind of -- and I do use oral history.  There are

10   historians that don't use oral histories.  The British

11   do not use oral history.  I use it and it's a primary

12   source.  The person was there.  Okay?  They were a

13   witness to the event.  Let's say you have a group of

14   people, so you have lots of different people's

15   perspective on it.

16         But what I found fascinating from this story from

17   the perspective of the historical method is that here I

18   have transcribed descriptions of what happened based on

19   interviews with these gentlemen right after the battle,

20   and then I'm talking to them 40/50 years later, their

21   memory of it is very, very different at that point.  And

22   some of them -- this obviously is a very upsetting

23   experience to have this happen and so talking to them 50

24   years later, you know, they -- some of them didn't like

25   each other because this was a famous battle and they

1 didn't feel that what had been written based on

2 descriptions of what others had said was correct.  And

3 so even though they were shoulder to shoulder taking

4 these pictures and watching the horrors of Tarawa, they

5 went in -- they didn't think the Japanese were still

6 alive after the bombardment, but our shells had skipped

7 over the island and so they were not only all alive, but

8 they had guns capable of sinking landing craft.  And so

9 it was a slaughter when they came in, and the

10 photographers were there taking a picture of the

11 slaughter.

12      So this was a moving, very moving thing for these

13 gentlemen.  But from an oral history perspective, from a

14 ranking of primary sources perspective, I would have to

15 say that the interview taken right after they did this

16 was a lot more valuable than something that came 50

17 years later.  They're both primary sources, but I would

18 rank one after the other.

19 Q    Where do the photographs or the videos or the

20 documentary evidence rank from that battle as a primary

21 source as opposed to the oral histories?

22 A    I think the photographs -- and I took -- I took

23 clips out of the film and made stills to put into the

24 magazine article.  Those can't change.  You know, I mean

25 those are what they are.  There was some fighting over

1  who actually was holding the camera when it took place.

2  But the photographs are actually very useful, I believe.

3  Although they are chaotic, war is chaotic, but that is a

4  way of bringing into focus.  So I think those were very

5  valuable as primary sources.

6  Q    You also mentioned some work regarding penicillin?

7  A    That's correct.  That's where I learned that the

8  British don't do oral history.  I mean I wrote --

9  probably one of the better things I ever did was to look

10 at mass production of penicillin during World War II.

11 And I went to Oxford in the early 90's when two members

12 of the team, Sir Edward Abraham and Norman Heatley were

13 still alive, the team that -- they didn't discover

14 penicillin, but they showed the clinical effectiveness

15 of penicillin and they did the earliest -- they

16 developed the methods for producing penicillin in

17 quantity, and boy, did we want penicillin obviously

18 during World War II.

19     So -- but I gave a paper in London based on this

20 research and they could not believe that I would

21 actually go and talk to people about this.  And in a

22 way, based on my other experiences, if I look at what I

23 published from that, oral histories were useful, but I

24 found a lot of primary documentation and most of the

25 footnotes are going to refer to that primary

1 | documentation.  I still remember sitting with Heatley.
2 | I had breakfast with him.  And he said look, I kept a
3 | diary of what I did during this time and I'm correcting
4 | it now.  I'm changing the things that I made mistakes
5 | on.  And I thought okay, well, I don't need to look at
6 | that.  You can't do that.  That's an immediate -- that's
7 | a hot rock right there.  So I'm never, ever going to
8 | cite Norman Heatley's diary because I happen to know
9 | that he decided to go back and revise his mistakes,
10 | which we would all like to do but which then that would
11 | cause that potential primary source to not be useful.
12 | Q    Is there such a thing as hindsight bias or 20/20
13 | hindsight in history in the historical method?
14 | A    No.  You can't have that.  That's the no-no.  You
15 | cannot get -- you don't get a do-over in history.  And
16 | so it's particularly difficult when you're talking about
17 | history of medicine because when you look at history of
18 | medicine, you go that's wrong.  That's wrong.  That's
19 | wrong.  That's all wrong.  Why are they even thinking
20 | this way.  But you can't do that.  You have to look at
21 | things within the context of when they happened, what we
22 | knew, when we knew it, and you can't be a Monday morning
23 | quarterback when it comes to history.
24 | Q    Is avoiding hindsight bias or the 20/20 hindsight
25 | part of the historical method?

1    A    Absolutely.  I mean if I'm reading an undergraduate

2    paper, that may work its way in on occasion and that's

3    when you start grading down.  And if someone in a

4    master's program wants to write something that's

5    publishable, obviously they have to avoid that.  They

6    cannot stray in that area.  Any time if you were to give

7    a paper, say you're presenting part of what you want to

8    be your Ph.D. thesis, which you're going to be

9    encouraged to do at meetings of major societies and you

10   were to do something like that, the audience will attack

11   you and persuade you of otherwise.

12   Q    Do you teach the historical method to students when

13   you do teach?

14   A    Of course.  To me, especially when you're dealing

15   with a course that requires a paper, and all of my

16   courses require a paper, I want them to get the

17   experience of collecting primary sources, assembling

18   primary sources, ranking those sources, and integrating

19   them into what I hope will be an original piece.

20   Q    When it comes to the work that you do on asbestos

21   in the general what we call state of the art or the

22   history of knowledge about asbestos, how do you go about

23   learning that?

24   A    I use the historical method.

25   Q    And do you rely on any materials that I or any

1  other lawyer gives you to be the bases for your opinions

2  or do you do your own research?

3  A    I do my own research.  But in a lot of these cases,

4  this litigation has gone on for decades now and so many

5  of the people that were involved in it have passed away

6  and so there may be depositions with industrial

7  hygienists or depositions with people familiar with

8  facilities and whatnot that could sometimes as an oral

9  history, that might be interesting.  Or there may be

10 exhibits attached to some of these things where

11 attorneys have an amazing access to primary

12 documentation sometimes.  The power of subpoenas is

13 incredible to me as a historian.

14 Q    Do you review those primary documents, whether it

15 comes to you from a lawyer or you get it on your own or

16 do you just rely on a lawyer telling you what it says?

17 A    I go for my own material immediately.  I have found

18 on occasion that materials that have been -- that I've

19 received via attorneys can be useful though.  The

20 Saranac Lake documents, for example, I've looked at

21 those.  I've been to the Walter Reed Library, the

22 archive where those are held and looked at those.  But

23 I've also seen copies of those that have been produced

24 by attorneys over the year.

25 Q    You've been to Saranac Lake?

1  A    Yes, of course.

2  Q    And what other -- have you been to other federal

3  archives or what our places have been to look for

4  primary source materials related to asbestos litigation

5  or asbestos information?

6  A    I've been to the U.S. National Archives.  There's a

7  very long -- there's a lot of connection between

8  asbestos litigation and the U.S. Navy and the U.S.

9  government and policies that the government developed,

10  and so going to the U.S. National Archives is something

11  I did very, very early on in my search for primary

12  documentation relative to this topic.

13  Q    How about the Armed Forces Institute at Pathology?

14  A    That's what's at Walter Reed and that's where the

15  papers of Arthur Vorwald, who was a person that

16  succeeded Leroy Upson Gardner as the person in charge of

17  the Saranac Lake Laboratory, his papers ended up there.

18  So those are the Saranac Lake documents.  And there's a

19  finding aid to them.  I believe the collection has been

20  moved now over to the Library of Congress, but at the

21  time it was at Walter Reed.

22  Q    How about the Harvard School of Public Health?

23  A    Yes.  I went there to look at the papers of the

24  principals behind the history of industrial hygiene,

25  people like Philip Drinker, Theodore Hatch, Willis

1   Hazard.  A lot of these -- Harvard is the place where

2   industrial emerged.  Alice Hamilton.  And so their

3   papers are there.  I went there very early on to get a

4   feel for what their history was, whatever correspondence

5   they had during these -- as the field of industrial

6   hygiene emerged and formed.

7   Q    Have you been to other archives, federal

8   institutions that house historical documents through the

9   course of your work in this litigation?

10  A    Yes.  I looked at -- well, a lot of the federal

11  documentation interestingly relative to this case is

12  still at the Badger Ordnance Works.  There's one of the

13  few remaining buildings there is operated by the Badger

14  History Group and they have collected a large number of

15  papers, a lot of it, some of it of the Army Corps

16  documentation relative to -- that relates to this case.

17  So it's primary documentation.

18  Q    So you actually went there.

19  A    I did, yeah.  I've been to Baraboo, Wisconsin, and

20  I've driven from there to -- I met -- one of the first

21  things I did was try to find out if there was a local

22  historical site, because this was the largest munitions

23  facility in the world in 1942.  It's a enormous facility

24  of great importance to the war effort.  So there had to

25  be something there.  And sure enough, there was, this

1   Badger History Group, and there was a history of the

2   whole area that was written with several chapters on

3   this by a gentleman who was a member of the group.  And

4   then there's a person that used to work at the facility

5   who still maintains an archive there on one of these

6   last buildings at the site.  And so I went to the public

7   library, went to other public libraries in that area,

8   but I also visited him at that site and looked at the

9   papers that he had.

10  Q    Are those the types of activities that a historian

11  would use applying the historical method?

12  A    I'm looking for primary, so yes.

13  Q    Did I tell you or anyone working for me tell you

14  where to go, what to do or who to talk to?

15  A    No.  You wouldn't have known that.

16  Q    Thank you.

17  A    Sorry about that, but no.  I didn't even speak to

18  you about that.  I just went and did it.

19  Q    And how much do you charge for your time doing the

20  legal work?

21  A    When I'm doing research, traveling to Baraboo or

22  working in a federal archive, I'll charge $200 an hour.

23  Q    How about for your time testifying?

24  A    When I'm testifying, I charge $400 an hour.

25  Q    All right.  Let's talk -- unless there's an

1  objection to your qualifications, I'd like to talk about

2  your actual opinions in this case.

3       THE COURT:  Well, you don't have to offer

4  experts in federal court anymore.  It speaks for itself.

5  If Mr. McCoy has some problems with Dr. Neushul, he can

6  cross-examine him on that.

7       MR. CASMERE:  Thank you, Your Honor.

8  BY MR. CASMERE:

9  Q    Let's talk a little bit about the first aspect of

10 what I asked you to look at which was Badger Ordnance.

11 Can you tell the Court just a little bit about the

12 history of Badger Ordnance and what you learned from

13 your research and the opinions that you have with

14 respect to Badger Ordnance and when it was constructed.

15 A    Okay.  So a very large munitions facility built in

16 World War II by the U.S. Army Corps of Engineers.  It

17 was going to be operated by the Hercules Powder Company

18 and they are one of the contractors that the Corps looks

19 at in the design of the plant.  I had written about them

20 before, looked at their munitions capability in World

21 War I.  So I knew about them.

22       There was a company called Mason & Hanger, which is

23 still in existence today, which is a huge federal

24 contractor dating back to building bridges for Robert E.

25 Lee and for the Confederacy.  So they've been around a

1   very long time.  They built three or four munitions

2   facilities around the United States.  I recognize them

3   about having written about Pantex in Amarillo, Texas,

4   which was a facility first for assembling nuclear

5   weapons, then for disassembling nuclear weapons.  So

6   they've been around a long time.  Very distinguished

7   firm.

8   Q    Were you able to find out how large a facility it

9   was?

10  A    Yeah.  There's aerial pictures of it.

11  Q    How big is it?

12  A    It covers thousands of acres.  It's a very big, big

13  area.  It's that way by design, because if you have an

14  explosion, I'm thinking of, say, the recent James Bond

15  movie, everything doesn't -- you don't want everything

16  to blow up at once.  It has to be spread around.  And so

17  the design of a munitions facility, through via the Army

18  Corps of Engineers, the Ordnance Department, is to move

19  things around so that you can't have -- you're going to

20  minimize injury if there's an accident.

21        MR. MCCOY:  Your Honor, I have an objection and

22  I have a question.  It's in regards to the materials

23  that he's said he has reviewed now.  The last report I

24  had is 9-20 of 2012.  Is there -- I don't know if there

25  was an update on that report.

1          THE COURT:  You're talking about his expert

2    report, the 26(a)(2) report?

3          MR. MCCOY:  Right.  Just to make sure I'm

4    looking at the right report here.

5          MR. CASMERE:  There's a 9-18-2014 report.

6          MR. MCCOY:  I guess I don't have that.

7          THE COURT:  Was that provided?

8          MR. CASMERE:  Yes.  It was provided and all of

9    his materials were provided, all of his documents that

10   he's going to talk about with respect to Badger Ordnance

11   were produced to Mr. McCoy's firm.

12         MR. MCCOY:  Can I just glance at that one for a

13   moment?  That might cure my objection, Judge.

14         THE COURT:  Well, they provided it.  There's no

15   objection.  We just need to make sure you're prepared.

16         MR. MCCOY:  I just want to see what's in it

17   now.  There's -- I'll withdraw the objection for the

18   moment, Judge, based on the updated report.

19         THE COURT:  Okay.  I won't look for trouble.

20   Let's keep going.

21   BY MR. CASMERE:

22   Q    Were you able to, in terms of the size, 7,500

23   acres, does that sound about right?

24   A    Yeah.

25   Q    Were you able to determine how many buildings were

1  constructed on Badger Ordnance facility?

2  A     There were hundreds of buildings.

3  Q     Does 1,500 sound about right?

4  A     It definitely could be that many.

5  Q     Were you able to determine how many miles of steam

6  pipe or insulated steam pipes were on the Badger

7  Ordnance facility?

8  A     I believe one of the histories says upwards of 200

9  miles.

10 Q     Were you able to look at and find the documents for

11 the original construction of the facility?

12 A     Yes.

13 Q     Were you able to find documents that related to the

14 original contracts for insulation work at the facility?

15 A     Yes.

16 Q     Have you formed opinions about when that work was

17 done and by whom?

18 A     Okay.  The Corps hired Hanger & Mason -- Mason &

19 Hanger.  Mason & Hanger hired the Asbestos & Magnesium

20 Manufacturing Company of Chicago as the contractor to

21 install Johns Manville insulation on the 200 miles of

22 steam line, of course this is during World War II, at

23 Badger Ordnance Works.

24 Q     Were there -- was there one contract for the

25 initial insulation work or was there more than one?

1  A    Mason & Hanger did the job in two phases, so

2  there's two sets of binders of their core contracts and

3  the same contractor did both phases.

4  Q    Do you remember the contract numbers off the top of

5  your head?

6  A    Those I do not remember.

7  Q    Does -- I do.  So does 168 sound right to you?

8  A    Yeah.  I think it was 168 and 161 possibly or 160,

9  but they had different numbers.

10  Q    661?

11  A    Yeah, that's correct.

12  Q    All right.  Were you able to determine from the

13  primary sources from the documents in terms of how much

14  work was done at any given point in time?  Did they give

15  progress reports?

16  A    Yeah.  These are progress reports written by Mason

17  & Hanger for their employer, the U.S. Army Corps of

18  Engineers, so they're describing various problems.  I

19  know there was a huge problem with availability of

20  stainless steel, for example, so there's correspondence

21  about that.  But they also report on the progress of

22  each contractor, and so there was a shortage of

23  insulators at one point.  That comes up in the

24  discussion.  They describe how many people are working.

25  They describe the feet of material that are being

1  applied at various phases in the contract.

2  Q    I want to pause you right there.  Was there ever

3  any progress report about the insulation work and how

4  much was done at, say, 30 percent of the work?

5  A    Yes, there was.  And I think at that point there

6  were tens of thousands of feet that had been applied.

7  Q    And the Court will have the documents so we don't

8  need to go through those specifically.  But also did

9  they refer to the insulators as insulators or asbestos

10 workers; do you recall that?

11 A    I believe it was as asbestos workers.

12 Q    You said that the Asbestos Magnesia Materials

13 Company out of Chicago, have you run into them before in

14 your other historical research?

15 A    Yes.  I've had cases in Chicago, Illinois, over the

16 years and I'm familiar with that company.

17 Q    Are you familiar from your historical research of

18 the product 85 percent magnesia?

19 A    Yes.

20 Q    Are you familiar with your historical research the

21 product known as calcium silicate?

22 A    Yes, of course.

23 Q    What are the main distinguishing differences

24 between those that you've learned through the historical

25 research you've done?

1    A    Calsil is something that emerges later than 85

2    percent mag, although they're both being sold in

3    conjunction.   Both are manufactured by a variety of

4    different companies.   Of course asbestos-containing

5    Kaylo is one of the calsils.   Calsils are much harder.

6    They can -- they are, especially in the case of Kaylo,

7    are much more resistant to weathering.   They're not --

8    they cannot be dissolved in water.   For example, when 85

9    percent mag is applied, sometimes broken pieces will be

10   ground up and used in the cement that's used to fill the

11   gaps in between when it's being reapplied and then

12   recovered, let's say, in the next year use situation.

13   Q    So are you saying that 85 percent magnesia can be

14   dissolved in water?

15   A    It can be -- it is definitely -- it can be

16   vulnerable certainly to weathering.

17   Q    Specifically as to Owens-Illinois Kaylo, can the

18   calcium silicate Owens-Illinois Kaylo be dissolved in

19   water?

20   A    No.

21   Q    Is that relevant at all in terms of the research

22   you've done in terms of why the Navy switched from one

23   type of insulation to another?

24   A    Certainly the Navy, even during World War II, was

25   interested in promoting the production of calsils

1  because they were more -- they were stronger, tougher,

2  more resistant.  Of course Owens-Illinois was not able

3  to produce in quantity in World War II for the Navy.  I

4  think there's correspondence to that effect.

5      But that is something the Navy encouraged research

6  on in the post-World War II era was on the development

7  of calcium silicates.

8  Q    There was, as you mentioned, two phases of the

9  initial construction of Badger Ordnance during World War

10  II; is that right?

11  A    During World War II, yes.

12  Q    Then what happened when the war ended?

13  A    The war ended.  The facility goes into moth balls.

14  Q    Did it ever get sort of reawakened?

15  A    It gets reawakened the next time we have a war of

16  significance and that's the Korean conflict.  So they

17  not only will get it up and running again, but they'll

18  build one new part of it.

19  Q    And when did they build that new part of it?

20  A    I believe it was '53/'54.

21  Q    And what was that?

22  A    It was called a ball powder mill.

23  Q    That was an actual plant or buildings that they

24  were building?

25  A    It was a new building.

1   Q     It wasn't outdoor steam pipe insulation, it was

2   actually a building that they were constructing?

3   A     It was an actual building.

4   Q     What happened at the end of the Korean conflict?

5   A     Shut it down again.

6   Q     When did it get shut down or put on stand-by

7   status, do you recall?

8   A     I believe by '56 or '57.  No, no.  Sorry.  Little

9   later than that.  I think 58ish, 59ish.

10  Q     Did it ever undergo any sort of reworking or

11  modernization because of the Vietnam War?

12  A     Yeah.  I believe they got it up and running again

13  for Vietnam and so they have to R&R parts of it that

14  have been in moth balls.

15  Q     What does R&R mean?

16  A     Just rehabilitate and resuscitate.

17  Q     And who -- you mentioned before that it was

18  Hercules that sort of operated the plant under the

19  ownership, the Army Corps of Engineers?

20  A     Yeah.  Well, the Corps is the overall contractor.

21  They do all the building for the Army, the same way as

22  today, whether it's --

23  Q     Who runs Badger Ordnance in the 1950's?

24  A     That's going to be the Ordinance Department, but

25  they're going to employ -- oh, in the 50's, the

1  Ordinance Department will contract with Olin

2  Corporation, who contracts with a group called Liberty

3  to run the plant in the 50's.

4  Q    In the 40's, it's Hercules that's sort of operating

5  the plant, and in the 50's it's this Olin/Liberty?

6  A    Yes.

7  Q    Do you know who was operating in the 60's?

8  A    60's it might still have been Olin, but I don't

9  recall.

10 Q    Throughout this entire period of time, who actually

11 owned Badger Ordnance?

12 A    It belongs to the federal government.

13 Q    Now, were you able to find out anything about

14 safety or industrial hygiene or knowledge about asbestos

15 at Badger Ordnance in the 1940's and 1950's?

16 A    40's through 50's, you take a company like

17 Hercules, they're a long-time member of the National

18 Safety Council.  They obviously have a lot of knowledge

19 about safety with regard to munitions manufacturing,

20 dust.  So they would have had access to all of that

21 literature, the body of literature that stretches back

22 to the 1930's with regard to safety.  And included in

23 that is an understanding of the potential hazards of

24 asbestos and also an understanding of how you avoid the

25 potential hazard.

1    Q    Did you ever find any handbooks or safety handbooks

2    at Badger Ordnance that applied to work done at Badger

3    Ordnance?

4    A    Yeah.  There's -- there are safety -- there's a

5    safety manual related to that.

6    Q    Do you remember the year of the safety manual?

7    A    I believe this was in '50/'51.

8    Q    Do you recall whether there was any information in

9    there about the requirements to use masks or respirators

10   around dusty conditions?

11   A    Respirations are required in dusty conditions.

12   Q    Are you familiar with the Walsh Healey Act?

13   A    Absolutely.

14   Q    What is that?

15   A    Walsh Healey is one of the great New Deal

16   achievements of the Roosevelt administration and Frances

17   Perkins.  It starts in 1935.  But the iteration that

18   we're talking about would have been in the 1950's when

19   the 1951 version, they include the threshold limit value

20   for things, a lot of items, but also for asbestos.

21   Q    Did the Walsh Healey Act apply to work done at

22   Badger Ordnance?

23   A    Of course.

24   Q    Did the Walsh Healey Act contain information about

25   how to reduce exposures to asbestos?

1    A    It definitely includes the threshold limit value

2    and it includes measures -- it requires that the work in

3    place be maintained at a level -- at levels below that.

4    Q    Did the United States Army Corps of Engineers have

5    its own industrial hygiene laboratory?

6    A    The Army had its own industrial hygiene laboratory.

7    The Corps may also have had a hygiene laboratory, but

8    the Army overall had an industrial hygiene laboratory.

9    Q    Were you ever able to find out any information

10   about what type of activities were done at Badger

11   Ordnance to ensure following the industrial hygiene

12   standards at the time?

13   A    Well, it's interesting because the Wisconsin

14   Industrial Commission also adopts the threshold limit

15   value in 1947, and right down the street from here, if

16   you go and pull the papers from the Commission, they

17   actually had a file on Badger Ordnance Works.  And so

18   they -- their laboratory was being used to look at lead

19   levels in the blood of workers at the Badger Ordnance

20   Works and they also had a collection of -- they were

21   asking for data on x-ray exposures at Badger.

22       I know they had x-ray facilities there.  My

23   deduction from that is that they also had x-ray

24   facilities for nondestructive testing for looking at

25   pipes or looking at materials at this obviously highly

1   dangerous important facility where you didn't want to

2   have breaks.  And so they were interested in the health

3   effects of that on their x-ray technicians.

4   Q    The last question I have for you on Badger Ordnance

5   is you had mentioned that the original construction or

6   insulation contracts went to AM&M out of Chicago.  How

7   do you know that they were a Johns Manville distributor?

8   A    There are pictures of the storage facilities from

9   the 1940's, pictures of insulators applying it and the

10  boxes say Johns Manville on them.

11  Q    How about did AM&M advertise in anything?

12  A    Yellow page advertisements.  They carry JM.

13  Q    And are yellow page advertisements or do you know

14  were they called *red books* in Chicago back at that time?

15  A    Yes.

16  Q    Are red books or yellow page advertisements

17  examples of documentary primary sources?

18  A    They can be very, very useful.  I mean nobody

19  changes the phone book or the yellow pages.  Everybody

20  knows that from doing genealogical research.  So if

21  you're doing corporate genealogical research, you can

22  use the yellow pages as a path to what a corporation

23  carried or what product they used.

24  Q    I want to switch gears now and talk about the

25  second phase, which was sort of the general state of the

1  art.  The Court has seen a lot of the articles

2  yesterday.

3            MR. CASMERE:  And subject to my

4  cross-examination, Your Honor, and the rulings made

5  therein, I don't intend to rehash a lot of those same

6  studies because in another case, that would already be

7  before the jury.  So with Your Honor's permission, I

8  won't -- I'll just reincorporate some of the

9  cross-examination points and what was read to

10  Mr. Kenoyer yesterday so I don't rehash the same topics

11  for Your Honor.

12            THE COURT:  I not only allow it, I would prefer

13  that.  So please continue.

14  BY MR. CASMERE:

15  Q   Can you tell the Court very briefly when you look

16  at the history of the development of knowledge about

17  asbestos, what importance is there on things like case

18  reports versus epidemiological studies versus other

19  types of information?  Just very briefly.

20  A   Case reports are unique.  Those are the first steps

21  that if you're looking at history of science, those are

22  what will signal that there's a pattern, that there's a

23  problem in an area.  And they're unique and they're

24  publishable.  And those can then lead to broader studies

25  known as -- what will be become known as epidemiological

1   studies that gather those together and come to broader

2   conclusions about a potential, in this case a potential

3   hazard.

4   Q    We have a PowerPoint presentation that identifies

5   some of sort of what you've figured are sort of the

6   milestones in state of the art for asbestos?

7   A    That's correct.

8          MR. CASMERE:  That's Exhibit 1931, Your Honor.

9   Q    We're not going to go through all of them, but I

10  want to just highlight a couple of them and have you

11  talk to the Court about why you feel that these

12  particular studies are significant sort of mileposts in

13  the development of knowledge about asbestos.  Okay?

14  A    Um-hmm.

15  Q    Is that a yes?

16  A    Yes.

17  Q    All right.  The first one on your list is the 1930

18  Merewether report; is that right?

19  A    That's correct.

20  Q    Tell the Court very briefly why this is a milepost.

21  Or how would you describe it?

22  A    Well, Dr. Merewether is an inspector working for

23  the crown in England, and in 1928 and 1929 he begins to

24  collect case studies where he's beginning to see

25  asbestosis in manufacturing facilities.  And this

1   coincides with the growth of the asbestos manufacturing

2   industry in England.  And he will then, after seeing

3   that pattern, write a report here that talks about the

4   dangers of asbestosis.

5   Q    Did Dr. Merewether's report include any information

6   about how to protect against dust diseases such as

7   asbestosis?

8   A    Yes.  He's looking at the corporate setting, and

9   the paper is authored by Merewether and Price.  Price is

10  the engineering side of it.  So they look at ways to

11  make so-called scheduled areas safe for workers in this

12  new emerging industry in England.

13  Q    1930 Asbestos Worker Journal.  Why is this

14  significant?

15  A    That speaks to how early it was that asbestos

16  workers from this old and distinguished union in the

17  United States had access to the data from the Merewether

18  report.  What you see in this journal is actually a copy

19  of something that the Bureau of Labor published after

20  they got American -- after they got Merewether's data

21  and then it's reprinted in the Asbestos Workers Journal

22  in 1930, which is, of course, the same year that the

23  data comes out from England.

24  Q    Did the Asbestos Worker Journal in 1930 talk about

25  the ability of people to get the disease process

1    asbestosis from exposure to asbestos?

2    A    That's correct.

3    Q    Did it also talk about any methods that could be

4    used to prevent that from happening?

5    A    I believe it definitely does talk about that as

6    well.

7    Q    1938.  What's the next significant document here?

8    A    This is essentially the American equivalent of

9    Merewether.  It's a study by Waldemar Dreessen of the

10   U.S. Public Health Service.  It was funded, I happen to

11   know, from social security funding from the New Deal

12   legislation.  But he's looking at doing the same sort of

13   thing that Merewether did, looking at the asbestos

14   weaving industry in North Carolina and determining that

15   there are potential hazards from asbestos, and at the

16   same time, concluding that if levels are maintain below

17   five million particles, that you're not likely to

18   develop the disease, the scarring of the lungs known as

19   asbestosis.

20          MR. CASMERE:  Your Honor, did you want to stop

21   at ten to or do you want me to keep going?

22          THE COURT:  I'm looking for my criminal

23   attorneys.  They haven't hit the room yet, so let's just

24   keep going for a little bit longer.

25   BY MR. CASMERE:

1  Q    We'll skip over the next couple.  It's not because

2  I don't value your opinion on those, Dr. Neushul, but I

3  want to expedite things.  Tell me about Fleischer

4  Drinker in 1946.  Or I'm sorry, tell the Court about

5  Fleischer Drinker in 1946.

6  A    This is a study that was -- came at the end of

7  World War II when one of the eminent investigators, the

8  gentleman from Harvard, Philip Drinker, who was in

9  charge of industrial hygiene for the government during

10 World War II at shipyards, part of their protocol was to

11 look at conditions for people applying asbestos aboard

12 ships during the war.

13 Q    Can I stop you there for a second?

14 A    Yes.

15 Q    Who was Philip Drinker?

16 A    Philip Drinker is a professor at Harvard University

17 who is the preeminent authority on dust in the United

18 States, I'd say, during the 20th century.

19 Q    Did he have any significant contributions to public

20 health in the United States of America?

21 A    He did.  The reason everyone should recognize

22 Philip Drinker's name is because he is the inventor of

23 the iron lung and he had been working on the iron lung

24 for helping rehabilitate workers from mining accidents.

25 Then we have a polio epidemic which, of course, struck

1    our president, which put people in a position where they

2    needed to be able to breathe, and he developed a chamber

3    with using vacuum cleaner motors for making someone

4    breathe artificially while they would hopefully

5    eventually be able to breath on their own again.  Some

6    people were not able to.  Called the iron lung.

7    Q     Did Philip Drinker have any affiliation with the

8    Harvard School of Public Health?

9    A     He was a professor there.

10   Q     During the war, did he have any positions?

11   A     Yes.  He was head of -- he headed up industrial

12   hygiene basically for the U.S. Navy.  For the U.S.

13   Maritime Commission, he was the major domo behind the

14   creation of something known as the minimum requirements

15   that were dispersed throughout industry, throughout all

16   the Navy's yards, throughout the U.S. government during

17   World War II.

18   Q     Did the United States government through Philip

19   Drinker investigate the use of asbestos-containing

20   materials at shipyards during the second World War?

21   A     They did.  And that paper is one of the results of

22   that investigation.

23   Q     This paper talks about four shipyards.  Is that the

24   only four shipyards that Dr. Drinker looked at or

25   Mr. Drinker looked at?

1    A    No.  He personally and members of his team, in this

2    case it's Fleischer, Gade & Viles, but there were other

3    inspectors as well, went around and visited shipyards

4    all across the United States.

5    Q    What did Dr. Drinker -- is it Dr. Drinker or is it

6    Mr. Drinker?

7    A    No, he wasn't a doctor.

8    Q    What did Philip Drinker and his colleagues conclude

9    about whether or not asbestos pipe covering was a

10   dangerous occupation?

11   A    They concluded that based on this study of over a

12   thousand insulators, that it was -- it could be a safe

13   occupation.

14   Q    Now, did they also in this study talk about the

15   ways in which you could reduce exposures through

16   protective measures?

17   A    Absolutely.  One of the -- the shipyards of World

18   War II were sort of the Wild West zone.  I mean we were

19   trying to create ships as far as we could, and that was

20   one of the reasons for the industrial hygiene measures

21   is that there were areas aboard ship where the threshold

22   limit value could be exceeded.

23   Q    Now, you had mentioned earlier or I think Mr. McCoy

24   had read that -- strike that.

25        Who is Willis Hazard?

1  A    Willis Hazard is a -- was a student of Philip

2  Drinkers at Harvard.  He was educated at Harvard.  He

3  was later an instructor alongside Drinker at Harvard.

4  He will go to work for Owens-Illinois in their personnel

5  department before World War II.  He will return after

6  World War II and become their industrial hygienist.

7       During the war, he, like Drinker and everyone else

8  in the United States worked for the war efforts and he

9  was a major in the public health service and was

10  assigned to New Jersey, but maintained his

11  correspondence with Drinker.  They were very close

12  throughout his life during the war and actually

13  corresponded about pipe insulation and about Navy yards

14  during the war.

15  Q    The industrial hygienist employed by Owens-Illinois

16  during the entire time that it was involved in the Kaylo

17  business was whom?

18  A    Willis Hazard.

19  Q    And Mr. Hazard worked with and knew Philip Drinker?

20  A    He was a colleague of his.  He was a student of

21  his.  They were friends.  They held patents together on

22  dust control equipment.  They were part of the pioneers

23  of the beginning of the field of industrial hygiene.

24  Q    Does Dr. Drinker and Ted Hatch, do they publish a

25  text on industrial hygiene in the 1930's, 1940's, and

1   1950's?

2   A     They do.  I believe it's called *Industrial Dust* and

3   it's the textbook -- it's the seminal text on that

4   topic.

5   Q     In that preface of that text by Mr. Drinker and Ted

6   Hatch, do they acknowledge any individuals for helping

7   them read and criticize various parts of their

8   manuscript?

9   A     Yeah, they do.  They acknowledge Willis Hazard

10  because he was part of the faculty at the time with them

11  when the book was produced.

12           THE COURT:  Why don't we stop there.  My

13  lawyers aren't here, but we're going to go summons them.

14  You guys get the full hour for lunch.  Let's resume at

15  one o'clock.  Dr. Neushul, you're free to go.  You're

16  free to have lunch with your lawyers.  Please don't talk

17  to them about your testimony.

18           THE WITNESS:  Thank you.

19           MR. CASMERE:  Thank you, Your Honor.

20        (Noon recess    11:55 a.m.)

21

22

23

24

25

1          I, LYNETTE SWENSON, Certified Realtime

2    and Merit Reporter in and for the State of Wisconsin,

3    certify that the foregoing is a true and accurate record

4    of the proceedings held on the 1st day of December 2015

5    before the Honorable Stephen L. Crocker, Magistrate

6    Judge for the Western District of Wisconsin, in my

7    presence and reduced to writing in accordance with my

8    stenographic notes made at said time and place.

9    Dated this 16th day of December 2015.

10

11                        /s/_____

12                        Lynette Swenson, RMR, CRR
                          Federal Court Reporter

13

14

15   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means
16   unless under the direct control and/or direction of the
     certifying court reporter.

17

18

19

20

21

22

23

24

25