UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

GARY SUOJA, Individually and as
Special Administrator for the Estate
of OSWALD F. SUOJA, Deceased,

              Plaintiff,          Case No. 99-cv-475-SLC

     vs.                    Madison, Wisconsin
                             December 1, 2015
OWENS-ILLINOIS, INC.,        1:00 p.m.

              Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF COURT TRIAL
AFTERNOON SESSION
HELD BEFORE MAGISTRATE JUDGE STEPHEN L. CROCKER

APPEARANCES:

For the Plaintiff:
        Cascino Vaughan Law Offices, Ltd.
        BY:  ROBERT G. MCCOY
            DANIEL B. HAUSMAN
        220 S. Ashland Avenue
        Chicago, Illinois 60607

For the Defendant:
        Schiff Hardin LLP
        BY:  EDWARD M. CASMERE
            BRIAN O'CONNOR WATSON
        233 South Wacker Drive
        Suite 6600
        Chicago, Illinois 60606

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter
United States District Court
120 North Henry Street
Madison, Wisconsin  53703
1-608-255-3821

```
                      I-N-D-E-X
```

| DEFENDANT'S WITNESSES | EXAMINATION | PAGES |
|---|---|---|
| PETER NEUSHUL | Direct by Mr. Casmere | 3-23 |
| | Cross by Mr. McCoy | 23-80 |
| EARL GREGORY | Direct by Mr. Watson | 81-115 |
| | Cross by Mr. McCoy | 116-147 |
| | Redirect by Mr. Watson | 148-149 |

```
                    E-X-H-I-B-I-T-S
```

| PLAINTIFF'S EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| Ex. 32  - Invoice | 30 | - |
| Ex. 37  - Final Investigation Report | 56 | - |
| Ex. 38  - 3/12/43 Gardner Letter | 51 | - |
| Ex. 39  - Special Hazards Study | 62 | - |
| Ex. 41  - 10/30/48 Interim Report | 53 | - |
| Ex. 138 - Kaylo Promotional | 143 | - |

| DEFENDANT'S EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| Ex. 1162 - Gregory Report | 117 | - |
| Ex. 1163 - Gregory Supplemental | 117 | - |
| Ex. 1164 - Gregory CV | 81 | 81 |
| Ex. 1198 - Hiarchy of Controls | 100 | - |
| Ex. 1258 - Federal Register | 93 | - |
| Ex. 1944 - 1956 Industrial Hygiene Quarterly | 148 | - |

```
                         ***
```

1      (Called to order)

2          THE COURT:  All right.  Welcome back everyone.

3   Anything preliminary before we continue with the direct?

4   Are we good?  All right.

5          MR. CASMERE:  Thank you, Your Honor.

6                   DIRECT EXAMINATION

7               (Continued from recess.)

8   BY MR. CASMERE:

9   Q.    Dr. Neushul, Professor Drinker's study in 1946, was

10  that the first large-scale epidemiological study of the

11  users of finished insulation products that was published

12  anywhere in the world?

13  A.    Yes, it was.

14  Q.    What was the next large-scale epidemiological study

15  published on the health effects of insulation workers;

16  when was that next published after 1946?

17  A.    That's not going to happen until the mid 1960s when

18  Dr. Irving Selikoff's work is published.

19  Q.    Can you pull that microphone a little closer?

20  A.    Sorry.

21  Q.    Between 1946 and the mid 1960s, was there any

22  publication in the peer-reviewed literature in the world

23  that said that the conclusions in Fleischer-Drinker were

24  wrong?

25  A.    No.

PETER NEUSHUL - DIRECT

1  Q.   I'm going to skip next very briefly to the *Journal*

2  *of American Medical Association* in 1949.   What's

3  significant about this in the state of the art?

4  A.   Well, it's making clear that there have been cases

5  of asbestosis in lung cancer and that you have to have

6  asbestosis or asbestosis is a requirement if you are

7  going to see lung cancer.

8  Q.   Explain what that means.

9  A.   Over time with the disease asbestosis we began to

10  see case studies where there were instances of cancer in

11  people that had asbestosis.   And so it takes quite some

12  time before there will not be a -- before that

13  connection, until the 1960s, before people will say that

14  you could conceivably have lung cancer without

15  asbestosis.

16  Q.   Was it considered in the 1940s and 1950s and even

17  into the 1960s that in order for someone to get a cancer

18  from asbestos that they had to first suffer from the

19  disease asbestosis?

20  A.   That's correct.

21  Q.   What does that mean, in terms of the idea if you

22  protect against asbestosis, what does that mean?

23  A.   Well, it means that if you follow, for example, some

24  of the guidelines that appeared in the 30s with

25  Merewether, if you follow the threshold limit value that

PETER NEUSHUL - DIRECT

1  is propagated in 1938 that we talked about earlier and

2  that will be dispersed by the ACGIH beginning in 1946, we

3  have 5 million particles per cubic foot, which was

4  believed if you broke below that you could not contract

5  asbestosis.  And if you eliminated asbestosis, then you

6  would not see a lung cancer.

7  Q.   The *Journal of American Clinical Pathology* in 1955,

8  that editorial by Dr. Hueper, is that an example of what

9  you're talking about in terms of the presence of

10 asbestosis being a prerequisite to any subsequent

11 development of cancer?

12 A.   That's correct.  Wilhelm Hueper would track

13 potential carcinogens.  And in this case he's concluding

14 that this is a potential carcinogen, but only if you have

15 asbestosis, if you contract an asbestosis.

16 Q.   For whom did Dr. Hueper work in the 1950s?

17 A.   He worked for the U.S. Government.

18 Q.   The National Cancer Institute?

19 A.   That's correct.

20 Q.   I want to also talk about a 1955 study by Richard

21 Doll.  Can you tell the Court who Richard Doll was?

22 A.   Richard Doll is the preeminent epidemiologist of the

23 20th century.  He's the scientist who, through a study of

24 British doctors, showed that smoking causes lung cancer.

25 So he's very very well known.  And this study that he

PETER NEUSHUL - DIRECT

1   does is a result of seeing many cases of -- seeing cases

2   of asbestosis, cases of asbestosis in combination with

3   lung cancer.  And so he conducts a study to see, you

4   know, is there a connection here.

5   Q.   What did Dr. Doll conclude?

6   A.   He concludes that there is a connection between

7   asbestosis and lung cancer.

8   Q.   Did he conclude anything about the working

9   conditions that the people were in and how that led or

10  did not lead to the development of their disease?

11  A.   He does look at the cases and the conditions which

12  the workers were working within and notes that the cases

13  that he's seeing came before measures were put in place,

14  as a result of Merewether, to reduce dust in the

15  workplace to keep it at a safe level.

16       So he'll conclude at the end that, yes, there is a

17  connection.  But because the dusty conditions that people

18  contracted asbestosis in have been taken care of, you

19  will not see lung cancer increasing as a result of

20  exposure to asbestos.

21  Q.   The Asbestos Worker Journal in 1957, how does that

22  contribute to the development of knowledge and the

23  dispersion of knowledge on the hazards of asbestos?

24  A.   Well, it shows that this organization is, the one

25  that we talked about earlier, in the 1930s, has continued

1  to monitor potential health hazards of asbestos and is

2  aware of them.

3  Q.   Who received the *Asbestos Worker Journal*?

4  A.   That goes to all union members.

5  Q.   Which union?

6  A.   The Asbestos Workers Union.

7  Q.   The union that Mr. Suoja was a member of?

8  A.   That's correct.

9  Q.   A couple more here.  In terms of Dr. Wagner, which

10  is spelled W-A-G-N-E-R, but pronounced *Wagner*, correct?

11  A.   That's correct.

12  Q.   What did Dr. Wagner do in terms of the state of the

13  art?

14  A.   Dr. Wagner studies a group of cases of a special

15  cancer he determines is called mesothelioma in South

16  Africa and publishes a paper in 1960.

17  Q.   Prior to Dr. Wagner's work that was published in

18  1960, had there been any connection in the peer-reviewed,

19  published literature between exposure to asbestos and

20  this disease mesothelioma?

21  A.   No.  This paper is looked upon as the seminal piece

22  in terms of reviewing the connection between asbestos and

23  mesothelioma.

24  Q.   What group of workers was Dr. Wagner looking at in

25  this study?

PETER NEUSHUL - DIRECT

1  A.   He's looking at people working in mines and people

2  living in the vicinity of mines.

3  Q.   Where were those mines located?

4  A.   In South Africa.

5  Q.   1961, the *Asbestos Worker Journal*, are you familiar

6  with the *Grim Reaper* advertisement?

7  A.   That's correct.  This is an illustration that was

8  created in '57, but appears in 1961 in the *Asbestos*

9  *Workers Journal*.

10 Q.   Can you provide the Court with a little bit of

11 context for how this came about?

12 A.   This is produced by a union worker or supervisor at

13 Long Beach Naval Shipyard.  So it's created by a

14 government entity, but it's appearing in the Asbestos

15 Workers Union.

16 Q.   This appeared on the back page of the November 1961

17 *Asbestos Worker Journal* that went to the home of every

18 card-carrying member of the Asbestos Workers Union?

19 A.   That's correct.

20 Q.   Did the *Asbestos Worker Journal* continue to publish

21 information about the health hazards of asbestos in the

22 1960s?

23 A.   They did.  The union cooperated with Irving Selikoff

24 on his seminal research on lung cancer, and he actually

25 addressed the union on a number of occasions, and his

PETER NEUSHUL - DIRECT

1  paper was I think serialized actually in the journal.

2  Q.   Who was Dr. Irving Selikoff?

3  A.   Dr. Irving Selikoff is the preeminent researcher --

4  asbestos disease researcher of the 20th century.  He's a

5  very eminent doctor.

6  Q.   What is the Lasker Prize or the Lasker Award?

7  A.   That's the equivalent of the Nobel Prize for

8  medicine.  I don't believe there is one for medicine.  So

9  here in the United States, winning the Laker Prize is

10  something that I believe -- I mean, obviously he won it,

11  but he got it for looking at a treatment for

12  tuberculosis.  Isoniazid, I believe it was.

13      But he did clinical studies of people that had TB

14  and it was using some of the new antibiotics that came

15  after World War II on the heel of penicillin.  And I

16  believe in those clinics is where he may well have seen

17  people that had asbestos-related disease and that may

18  have been -- led him to his further research in that

19  area.

20  Q.   What is the Cummings Award?

21  A.   The Cummings Award is the -- sort of a lifetime

22  achievement award for members of -- for industrial

23  hygienists, the American Industrial Hygiene Association.

24  Q.   Did Philip Drinker win the Cummings Award?

25  A.   Yes, he did.

1  Q.   Did Alice Hamilton win the Cummings Award?

2  A.   Yes, she did.

3  Q.   Did Willis Hazard, Owens-Illinois's industrial

4  hygienist, win the Cummings Award?

5  A.   Yes, he did.

6  Q.   Again, the issue about the asbestosis being a

7  prerequisite for the subsequent development of cancer,

8  did the U.S. Department of Health, Education and Welfare

9  publish anything about that?

10  A.   They did.   This paper here points out that in 1964

11  there's still some indecision about the connection

12  between asbestosis and cancer, although they're certainly

13  leaning in that direction.

14  Q.   In 1968 Dr. Selikoff published a seminal piece of

15  work called *Asbestos Exposure, Smoking and Neoplasia*,

16  correct?

17  A.   That's correct.

18  Q.   And what did this add to the development of

19  knowledge about asbestos exposure and injury?

20  A.   Well, I think the point he's trying to make in this

21  paper is that there's a symbiosis between smoking and

22  exposure to asbestos.   And I know he personally addresses

23  the union and says you must stop smoking because you're

24  going to vastly increase your chance of contracting lung

25  cancer.

2-P-11

1  Q.   Would it be accurate to say that Dr. Selikoff's work

2  in conjunction with the asbestos workers in the mid 1960s

3  identified the fact that workers who were using these

4  types of products were starting to come up with diseases

5  related to asbestos?

6  A.   That's correct.

7  Q.   And Dr. Selikoff then raised the issue of whether --

8  of why they were getting these diseases?

9  A.   Yes, he did.

10  Q.   Did Dr. Selikoff's work then raise the questions of

11  either: (a) is the exposure level that we thought that

12  these workers were having higher than we thought; or (b)

13  is the exposure level what we thought, it's just not as

14  safe as we thought?

15  A.   Yeah.  He begins to question the threshold limit

16  value.  And he's citing in this paper the '46 Drinker

17  study, which was this large study of insulators that

18  occurred before and determined that that occupation was

19  in conditions below the TLV.  And so he's beginning to

20  question whether the TLV is actually adequate in terms of

21  preventing disease.

22  Q.   And how about Dr. Cooper and Leroy Balzer in 1968,

23  do they come to the same conclusions about the exposures

24  in the past being below the TLV for members of this

25  union?

1  A.   They do.  In a way they're testing the testing of

2  Fleischer, Drinker, Gade and Viles; did they not get

3  incorrect dust counts when they went through these ships

4  and looked at this.  And they conclude that they are,

5  that in fact it is below 5 million particles per cubic

6  foot.

7  Q.   Did Dr. Selikoff publish industrial hygiene progress

8  reports in the *Asbestos Worker Journal*?

9  A.   He did.  He's a scientist who crossed over from

10 *ivory tower* into other parts of our society.  He

11 addressed workers and he put information in the *Asbestos*

12 *Workers Journal*.  And again, I don't think he could have

13 achieved what he did scientifically without the

14 cooperation of the Asbestos Workers Union.

15 Q.   Were those reports in any particular color?

16 A.   They're called *Green Sheets* and I believe that they

17 appeared at the back and the color was green.

18 Q.   Did Dr. Selikoff report on how successful he was in

19 convincing insulators to use respiratory protection?

20 A.   Yes, he did.

21 Q.   And what did he conclude?

22 A.   It was not successful.

23 Q.   Why not?

24 A.   It's very -- historically, going all the way back to

25 the 30s and before -- it's very very difficult to get

PETER NEUSHUL - DIRECT

1  someone to wear a respirator.

2  Q.   All right.  Thank you, Doctor.  I want to now shift

3  gears very quickly because I believe that Mr. McCoy will

4  ask you some more specific questions about these areas.

5  But I want to talk to you about Owens-Illinois and the

6  Saranac Laboratory briefly.  Can you tell the Court what

7  the Saranac Laboratory was and why it shifted?

8  A.   The Saranac Laboratory is in Saranac Lake, New York.

9  It is the leading laboratory for the study of

10  dust-related disease during the early to mid 20th

11  century.

12  Q.   The Owens-Illinois Glass Company, can you just

13  briefly describe who that was or what that was during the

14  1930s, 40s and 50s?

15  A.   Well, Owens-Illinois exists because of a fellow

16  named *Michael Owens* inventing the bottle-making machine;

17  in other words, we don't blow bottles anymore, which is a

18  very dangerous activity.  He created a machine by 1909

19  that was capable of making I think nine bottles a minute.

20  So that's the basis for this company, that they make

21  glass.  And it's specifically glass containers.

22      And they'll partner with another company called

23  *Libby* and the names will change, but that's the origins

24  of this company.  And during the 1940s they're still

25  doing that.  They make glass land mines in World War II,

PETER NEUSHUL - DIRECT

1  maybe some other things with glass.  But they're a glass

2  company.

3  Q.   Glass bottles, beer bottles, wine bottles; is that

4  right?

5  A.   Exactly.

6  Q.   Is that still the main business of the company

7  today?

8  A.   I believe today that the company is diversified into

9  plastics, but they still do make glass bottles.

10  Q.   Did Owens-Illinois have any connection with the

11  Saranac Laboratory before the studies on Kaylo?

12  A.   Yes, they did.

13  Q.   Can you explain to the Court what that was briefly?

14  A.   Well, they were making glass all over the United

15  States and glass is made from silica and silica causes

16  silicosis.  And indeed silica is a component of the new

17  product that they'll make from '48 to '58 and it's a

18  potentially hazard material that can cause this disease

19  *silicosis*, which is a fibrosis of the lungs.

20  Q.   What's the connection between silicosis and

21  tuberculosis and the Saranac Laboratory?

22  A.   Well, tuberculosis comes up in all of these studies

23  because there was great concern if you're working in

24  dusty conditions, if one of your employees has TB and

25  they cough and the tubercle bacillus lands on dust, and

PETER NEUSHUL - DIRECT

1  the next worker then breathes in that dust, you can have

2  a spread of TB that will be increased as a result of

3  working in a dusty environment; hence the need to control

4  dust to prevent not just silicosis, but the really big

5  problem, which is TB.

6  Q.   So Owens-Illinois invented this new product called

7  *Kaylo*, calcium silicate insulation, right?

8  A.   They -- they -- you know, yes, they create a new

9  product, a new insulation.  It's a new division for them.

10 It's not a bottle obviously.  So they're making calcium

11 silicate.

12 Q.   All right.  Did they ask the Saranac Laboratory to

13 test it?

14 A.   Yes, they do.

15 Q.   Did the Saranac Laboratory test it?

16 A.   Yes.

17 Q.   Over how many years?

18 A.   It begins in '43 and the published results of the

19 study will appear in '55.

20 Q.   Did the Saranac Laboratory, when it published its

21 results in 1955, that was published where?

22 A.   I believe it was in *Archives of Environmental*

23 *Health*.  It's an industrial -- not an industrial hygiene,

24 but a natural sort of thing.  It's scientific journal.

25 Q.   Is there any evidence in the historical record that

PETER NEUSHUL - DIRECT

 1  Owens-Illinois edited or in any way changed or even knew

 2  that the Saranac Laboratory was going to publish that

 3  result when it did?

 4  A.    They encouraged them to publish it, but we're not

 5  told that it was published and we're surprised when they

 6  received a copy of it.

 7  Q.    Is there any evidence that Owens-Illinois edited a

 8  single word in that published document from the Saranac

 9  Laboratory?

10  A.    They had no idea it was even being prepared.

11  Q.    Did the Saranac Laboratory do things other than just

12  test the Kaylo product itself on animals?

13  A.    Yes.  It was discovered that the asbestos component

14  of Kaylo remained as asbestos after going through this

15  process of creating the calcium silica.  And Saranac

16  Laboratory said, "Well, if you have a" -- "you have a

17  potential component of this.  It could be hazardous.  You

18  need to make sure that in your plant that things are

19  safe."  Of course they're using silica there as well.

20  That's a significant component of Calsil.

21      So Saranac came out to do a health survey at

22  Owens-Illinois's invitation.  And they suggested it and

23  Owens-Illinois brought them out there to do a health

24  survey.  Now, of course I believe Saranac had done this

25  for silica plants for them, but they had now did this for

PETER NEUSHUL - DIRECT

1  this new product.

2  Q.   Did Saranac Laboratory review any x-rays of workers

3  of Owens-Illinois at the Kaylo plant?

4  A.   Yeah.   They put -- we had an x-ray program where the

5  x-rays would be read by Saranac, but they had had a

6  similar arrangement with them for work on silicosis as

7  well.

8  Q.   Did the Saranac Laboratory ever find, during the

9  entire time Owens-Illinois manufactured Kaylo, a single

10  Kaylo plant worker that had any asbestos-related disease?

11  A.   They did not.

12  Q.   Did the Saranac Laboratory make recommendations to

13  Owens-Illinois about what type of dust supression

14  techniques it should use in its plants?

15  A.   They did.   They did a very detailed survey.   They

16  sent out a couple of hygienists who went through the

17  whole process.   And, you know, if there was an area where

18  dust counts were high, they recommended measures be taken

19  to prevent any possibility that they'd be above the TLV.

20  Q.   Did Owens-Illinois follow those recommendations?

21  A.   Yes, they did.

22  Q.   Is there any recommendation made by the Saranac

23  Laboratory that Owens-Illinois did not follow?

24  A.   No.   They followed the recommendations of Saranac.

25  Q.   Did the Saranac Laboratory ever tell Owens-Illinois

PETER NEUSHUL - DIRECT

2-P-18

1  that it should stop making Kaylo?

2  A.   They did not.

3  Q.   Did the Saranac Laboratory ever tell Owens-Illinois

4  that it should take asbestos out of Kaylo.

5  A.   No, they did not.

6  Q.   Did Saranac Laboratory ever recommend to

7  Owens-Illinois that they place a warning on the product?

8  A.   No, they did not.

9  Q.   Did -- why did the Saranac Laboratory and

10  Owens-Illinois want to study this calcium silicate

11  material in the first place; what was the point?

12  A.   At the beginning I believe they wanted to find out

13  whether the materials that they were using in it changed

14  as a result of this heating process that the combination

15  went through.  It's silica, there's an asbestos

16  component, there's diatomaceous earth; there's a series

17  of different things that are potentially lined -- that

18  are potentially hazardous: what happened to that after

19  the process.  And so they send dust from the cut-up

20  material to Saranac to have them tested: what are the

21  potential health consequences of this.

22  Q.   Now, the exposure levels of the studies, were they

23  at the 5 million particle per cubic foot level?

24  A.   They were -- these are experiments with three

25  different types of animals and they were far far in the

PETER NEUSHUL - DIRECT

1  hundreds of million -- over a hundred million particles.

2  They're trying to create as dusty an environment.  And

3  this is a protocol that was involved at Harvard by Cecil

4  Drinker, who's Philip Drinker's brother, and his

5  sister-in-law, Catherine Drinker, for putting animals in

6  a situation where you could expose them to as much dust

7  as possible.

8  Q.   Does Saranac Laboratory expose the animals for the

9  lifetime of the animal to 20 times the TLV; is that

10 right?

11 A.   That's correct.

12 Q.   What did they find after all this?  Did the silica

13 change during the manufacturing process?

14 A.   Initially they thought that everything had changed

15 because there is no asbestosis appearing in the animals

16 in the first phase of experiments, so they thought that

17 everything had changed.

18     But they continue the experiment, at

19 Owens-Illinois's request, because they're interested in

20 looking at TB, looking at some impact on TB in animals,

21 because obviously they're worried about that in their

22 facility.  And as the studies continued, they learned

23 that while the silica had become a silicate, it was no

24 longer potentially harmful, the asbestos had not.

25 Q.   The asbestos stayed asbestos?

PETER NEUSHUL - DIRECT

1    A.    Stayed asbestos, was still potentially hazardous.

2    Q.    The level that Saranac Laboratory suggested

3    Owens-Illinois maintain for exposure to its employees at

4    the Kaylo manufacturing plant was what?

5    A.    5 million particles per cubic foot.

6    Q.    If Owens-Illinois kept its employees at that level,

7    what was supposed to happen to those employees?

8    A.    Well, you should, if you were below the TLV, you

9    should not contract asbestosis working an eight-hour day,

10   40-hour workweek.  So it's a minimum level that if you

11   keep it -- keep your working conditions below that,

12   you're not -- you're believed not to contract asbestosis.

13   Q.    At that time, if you were believed to be protecting

14   against asbestosis, was it also believed that you would

15   protect against any other asbestos-related disease?

16   A.    That's correct.

17   Q.    What level did the State of New Jersey recommend

18   that Owens-Illinois keep its manufacturing plant

19   exposures at?

20   A.    The State of New Jersey, the State of Wisconsin, all

21   states ascribe to the threshold limit value produced by

22   the American Conference of Governmental Industrial

23   Hygienists on their threshold limit value list beginning

24   in 1946 of 5 million particles per cubic foot.

25   Q.    The Kaylo manufacturing plant was in New Jersey?

PETER NEUSHUL - DIRECT

1  A.    That's correct.

2  Q.    Now, the information that Owens-Illinois had about

3  the potential hazards of asbestos in the 1940s and 1950s,

4  was that any different than the information that was

5  published in the Merewether and Price article in 1930?

6  A.    No.

7  Q.    Was it any different than what was published by the

8  United States Public Health Service and *Public Health*

9  *Service Bulletin 241* in 1938?

10  A.    No.

11  Q.    Was it any different than the information that was

12  provided in the Wisconsin Industrial Commission TLV

13  adoption in 1947?

14  A.    No.

15  Q.    Was it any different than what was published by the

16  United States Government and adopted in the Walsh-Healey

17  Act in 1951?

18  A.    No.

19  Q.    Finally, we touched on this during your review of

20  the state of the art, but the Asbestos Workers Union, is

21  there a union in the country prior to 1965 -- or strike

22  that.  1958, when Owens-Illinois got out of the business

23  in 1958, did the Asbestos Workers Union know that

24  exposure to asbestos could cause asbestosis?

25  A.    I think that there was an awareness of that since

1  the 1930s.

2  Q.    Did the Asbestos Workers Union have knowledge and

3  publish on the ways to reduce those exposures?

4  A.    There are -- there was a Medical Committee.   There

5  were measures, as we've seen, that it was known that you

6  should wear a respirator.

7  Q.    Did Owens-Illinois have knowledge that was superior

8  to the Asbestos Workers Union about the potential health

9  hazard of asbestos?

10 A.    I don't believe there is anything Owens-Illinois

11 could have told this very old and distinguished union

12 about the potential hazards of asbestos.

13 Q.    How about the owners of Badger Ordinance Work, the

14 United States Government?

15 A.    The United States Government participated in most of

16 the studies that resulted in our knowledge of the

17 potential asbestos hazards.   So, no, there's nothing they

18 could tell the United States Government.

19 Q.    Was the onus put on plant owners or employers at the

20 worksite who are monitoring the type of activity to

21 insure that the TLVs were complied with?

22 A.    In the -- during the 1950s it was the responsibility

23 of the controller of the workplace to maintain those --

24 insure that the conditions were not hazardous.

25 Q.    And why is that?

PETER NEUSHUL - DIRECT

2-P-23

1  A.   Because they -- especially, for example, at Badger

2  Ordinance Works, you're not going to get in there unless

3  you're allowed in there.  It's a munitions facility which

4  had all kinds of safety measures in place because you

5  want to avoid accidents.  But that facility was under the

6  control of the owner/operator of it.  And safety, as we

7  know, was a component of the protocol set there,

8  including use of respirators.

9          MR. CASMERE:  Thank you, very much, Dr. Neushul.

10  Those are all the questions I have for you at this time.

11          THE COURT:  All right.  Cross-exam.

12          MR. MCCOY:  Thank you.

13          MR. CASMERE:  Do you want the Elmo?

14          MR. MCCOY:  Yeah.  Switch to us.

15          MR. CASMERE:  Is your screen on there,

16  Dr. Neushul?

17          THE WITNESS:  Yes, it is.

18                    CROSS-EXAMINATION

19  BY MR. MCCOY:

20  Q.   Dr. Neushul, just kind of a preliminary question:

21  Are you doing more surfing than teaching these days?

22  A.   You know, I love to surf as much as I can.  I'm

23  getting a little old, but I still do it.

24  Q.   All right.  And you're not teaching anymore, right?

25  A.   I have not taught lately, no.

                PETER NEUSHUL - DIRECT/CROSS

1  Q.   How much a year do you get from testifying in

2  asbestos cases?

3  A.   From testifying, probably -- I rarely testify, so

4  probably less than $4,000, on average.

5  Q.   How about from all of the consulting work that you

6  do on asbestos cases?

7  A.   It varies from year to year.  It could be as much as

8  $80,000 or it could be less than $50,000.

9  Q.   Okay.  Somewhere between 50 and 80, right?

10  A.   It really depends on the year.

11  Q.   Okay.  And you started doing the work with the

12  asbestos cases back in 2001, right?

13  A.   I believe that's when I started.

14  Q.   Okay.  And before that time, you hadn't had any

15  experience with asbestos, right?

16  A.   I knew what it was, but I had no experience with the

17  litigation at all.

18  Q.   And you hadn't reviewed the asbestos literature

19  before, right?

20  A.   No.

21  Q.   Okay.  You were doing other kinds of projects.  I

22  think you talked about a few other fields, right?

23  A.   Well, I worked on the War Production Board for my

24  dissertation and I had seen asbestos.  There's a part of

25  that WPB called the *Asbestos Cork Section*, so I had

PETER NEUSHUL - CROSS

1  looked that, but not in view of looking at litigation.

2  Q.   And that was it for asbestos?

3  A.   That, before 2001, that was it.

4  Q.   So now the lawyers that first contacted you were

5  from which firm?

6  A.   There was a firm called *Morgenstein & Jubelirer*.

7  Q.   And that later became part of the Shiff Hardin firm,

8  right?

9  A.   It did eventually become part of that.

10  Q.   The same lawyers you're working for today, right?

11  A.   I've worked for lawyers all over.  But some of the

12  same ones on occasion I encounter.

13  Q.   You still work for the Shiff Hardin lawyers on how

14  many cases; in the last three or four years, how many?

15  A.   Probably around 20.

16  Q.   Okay.  And your work is on Owens-Illinois related

17  cases, right?

18  A.   Yes, cases are related primarily to Owens-Illinois.

19  Q.   Okay.  By the way, you mentioned something about the

20  Merewether publication in 1930; is that the right

21  Merewether I got?

22  A.   I believe that's the one that I was talking about.

23  Q.   Okay.  You said something about Owens-Illinois had

24  that same knowledge when it was making Kaylo as

25  Merewether had in 1930, right; it hadn't changed really?

PETER NEUSHUL - CROSS

1  A.    I don't think it changed, no.

2  Q.    Okay.  So I want to just go to a page of the

3  Merewether article.  Oh, by the way, did you bring any of

4  your files with you today?

5  A.    All I have is the clothes on my back.

6  Q.    Okay.  So this Merewether report from 1930; now, I'm

7  going to just go forward to this and first I want to

8  begin with this paragraph right here.

9           THE COURT:  So the record is clear, why don't

10  you give us a page number, too, please.

11          MR. MCCOY:  I will.

12  BY MR. MCCOY:

13  Q.    This is page No. 17.  Okay.  And in this paragraph

14  right here it says, "The insidious onset" -- let me get

15  this a little bigger.  So it says, "The insidious onset

16  and unobtrusive signs and symptoms of the disease in its

17  earlier course, its covert advance by imperceptible

18  stages, its points of resemblance latterly to fibroid

19  tuberculosis, with which infection it is sometimes

20  associated, and the migration of those affected from the

21  industry, have all combined to delay its recognition as

22  an entity, and to obscure the causal agent."

23      So did Owens-Illinois get more knowledge than that

24  by the time that it was making Kaylo or during the course

25  of making Kaylo?  I mean, the knowledge increased above

PETER NEUSHUL - CROSS

1  that, right; it was recognized?

2          MR. CASMERE:  I Object to the form of that

3  question.  I'm not sure which question he's asking.

4          MR. MCCOY:  Okay.  I'll rephrase the question.

5  BY MR. MCCOY:

6  Q.  By the time Owens-Illinois got into the 1950s, the

7  asbestos was a -- was no longer an obscure causal agent,

8  right?

9  A.  We knew, and certainly Owens-Illinois knew, that

10 asbestos could cause asbestosis.  What's interesting here

11 is that --

12 Q.  Doctor, my question was, by the time Owens-Illinois

13 got into the production and into the 50s production of

14 the Kaylo, Owens-Illinois had more knowledge than this

15 being an obscure causal agent, right?

16 A.  I think at that point that probably we were more

17 sure that it caused asbestosis.

18 Q.  Okay.  So -- and it also talked about in here this

19 section here on *Preventive Measures*.  Now, this is fairly

20 long, but Section 6 --

21         THE COURT:  Are you going to read in the whole

22 thing or how about if he reads it to himself?

23         MR. MCCOY:  I was going to pick out certain

24 points and ask him about it.

25         THE COURT:  As long as you don't read the whole

PETER NEUSHUL - CROSS

2-P-28

 1  thing.

 2          MR. MCCOY:  No.  Okay.  That's what I was trying

 3  to avoid here.

 4  BY MR. MCCOY:

 5  Q.   Okay.  So if you need me to read more, Doctor, let

 6  me know.  But I want to direct your attention to the --

 7  it says, "The necessary preventive measures," and then it

 8  says, "control of the disease by periodic medical

 9  examination of workers."  You would agree that's a

10  preventive measure, at least in the literature of the

11  state of the art?

12  A.   Yes.

13  Q.   Okay.  "Education of the individual," you would

14  agree that's a preventive measure for state of the art

15  purposes?

16  A.   Sure.

17  Q.   Okay.  "To appreciation of the risk and personal

18  responsibility," right?

19  A.   That's what it says.

20  Q.   Okay.  So "The protection afforded by respirators is

21  only partial," you said Owens-Illinois had that

22  knowledge, right?

23  A.   I think that we knew that respirators could be not

24  properly used; that, you know, that that was a problem.

25  Q.   Right, only partial protection, right?

1   A.    In this instance perhaps in 1930 and what I'm

2   reading in this paper.

3   Q.    Right.  And the same is true when you go forward in

4   time, you said Owens-Illinois had the same knowledge,

5   right?

6   A.    I think respirator technology changed.

7   Q.    Well, my question is about Owens-Illinois.  You said

8   Owens-Illinois had the same knowledge.  So they would

9   have still had knowledge, when they were making Kaylo,

10  that the respirator protection was only partial, right?

11  A.    I think that they certainly knew that optimally you

12  would want to avoid having to ever use respirators.

13  Q.    You would not want to use respirators?

14  A.    You would want to create conditions where they're

15  completely unnecessary.

16  Q.    Okay.  That's the last line of defense, respirators?

17  A.    It would be one of the last lines.

18  Q.    The first lines of defense would be these other

19  measures like the periodic screening or some sort of

20  control of the dust by engineering, like wetting, or

21  those type things, right?

22  A.    Certainly those could be measures.

23  Q.    So, in any event, did Owens-Illinois put on -- let's

24  put it this way: Owens-Illinois did not put on the Kaylo

25  boxes or any of the brochures or pamphlets the need for

1  these preventative measures discussed in Merewether when

2  it was making Kaylo; is that right?

3  A.   They did not put anything described in Merewether on

4  the boxes.

5  Q.   Okay.  I'm going to move on to something else.   One

6  of the things you mentioned was something about the

7  Badger Ordinance and some materials you had seen, right?

8  A.   I did mention Badger Ordinance and materials.

9  Q.   All right.  And in the course of reviewing those

10  documents from Badger Ordinance, am I correct that you

11  did not find any document which said that -- like an

12  order form or a delivery ticket -- that said a JM product

13  was delivered there?

14  A.   All I saw were pictures of the product.  I didn't

15  see an actual order.

16  Q.   You didn't see anything saying how much was

17  delivered, right?

18  A.   A delivery form, no.

19  Q.   Okay.  And you didn't see anything saying how much

20  JM material was ordered, right?

21  A.   I did not see any actual orders.

22  Q.   Okay.  I want to show you what we have marked as

23  Plaintiff's Exhibit 32 in this case.  First, you've seen

24  invoices before from Owens Corning Fiberglas, right?

25  A.   Yes, I have.

1   Q.   Okay.  And that was a company that was, for some

2   period of time, a fairly large distributor for

3   Owens-Illinois Kaylo, right?

4   A.   They distributed Owens-Illinois's product.

5   Q.   Okay.  And the same company that later bought the

6   manufacturing, right?

7   A.   They eventually bought the product.

8   Q.   Right.  And the same company that Owens-Illinois had

9   about a 20% interest in stock-wise, right?

10  A.   I think at one time just --

11       MR. CASMERE:  I'm just going to object to the

12  relevance of that, Your Honor.  That's --

13       THE COURT:  I'll let him lay his background

14  foundation.  I assume we're heading somewhere here.

15  BY MR. MCCOY:

16  Q.   Your answer was what?

17  A.   The two were separated.  But at one time they may

18  have had an interest in them.

19  Q.   Okay.  So, in any event, this is an invoice here

20  from Exhibit 32 that says *Shipped To: Sprinkmann Sons*

21  *Corporation*, in care of Badger Ordinance in Baraboo,

22  Wisconsin.  That's the same place we're talking about,

23  right?

24  A.   That's correct.

25  Q.   Okay.  And this invoice is dated -- it says *Customer*

PETER NEUSHUL - CROSS

1  *Order* and *Date: May 10, 1954*, right?

2  A.   That's correct.

3  Q.   So -- and then it shows it was -- I guess that's cut

4  off.  It should say *Invoiced To*, right?  Right?

5  A.   I would assume so.

6  Q.   So *Invoiced To: Sprinkmann Sons Corporation*.   And

7  this material in here then in the invoice, this is Kaylo

8  material, right, all these entries here?

9  A.   I don't see the word *Kaylo* on there.  But I'm

10 assuming if it came from Berlin, New Jersey, up at the

11 right-hand corner there, that it is most likely Kaylo.

12 Q.   Kaylo.  And that's because Berlin was where Kaylo

13 was being made by Owens-Illinois at this time, right?

14 A.   That's correct.

15 Q.   So we've basically got Owens-Illinois selling it to

16 Owens Corning, selling it to Sprinkmann, and shipping it

17 to Badger, right?

18 A.   That appears to be what's going on there.

19 Q.   Okay.  Did you find any documents concerning

20 Sprinkmann in the materials that you reviewed at Baraboo?

21 A.   I did not.

22 Q.   And you understand Sprinkmann to be an insulation

23 contractor just like the AM&M, right?

24 A.   I believe they are, yes.

25 Q.   Okay.  So this represents linear feet, right, this

PETER NEUSHUL - CROSS

1    column?

2    A.    That's correct.

3    Q.    Okay.   In any event, did you see any records about

4    how much Kaylo was actually delivered to Badger Ordinance

5    in the materials that you reviewed?

6    A.    No, I did not.

7    Q.    I mean, oftentimes these records are very hard and

8    difficult to find back in this era, right?

9    A.    For a plant of that size with thousands of buildings

10   and hundreds of miles of pipe, I mean, literally the

11   paper would be incredible, I'm sure, the number of

12   receipts.

13   Q.    Very hard to find that, if one still exists even,

14   right?

15   A.    I think that a lot of that material was most likely

16   disposed of.   And what I'm seeing are contracts and

17   things in that order, kind of a higher level than

18   the on-the-ground number of receipts.

19   Q.    Yeah.   An in any of those contracts, it didn't say

20   what materials it actually used, right?

21   A.    The contracts I saw were describing who the

22   contractors were, but not describing what materials they

23   were putting in.   I did, however, see pictures of the

24   materials being applied.

25   Q.    Right.   But the brand name wasn't listed?

1   A.    It's shown in the pictures.

2   Q.    I'm saying the brand name wasn't listed in the

3   contracts, right?

4   A.    It doesn't go to that level of detail.

5   Q.    Okay.  You saw in the pictures, as far as -- you saw

6   I think a storeroom that had JM materials in it?

7   A.    That's correct.

8   Q.    Okay.  And you don't know what year that picture was

9   taken, do you?

10  A.    1940s.

11  Q.    1940s?

12  A.    That's correct.

13  Q.    Okay.  And then you saw a picture of a JM box laying

14  out in the, like, an open work field area with the

15  piping, right?

16  A.    I think it's adjacent to people actually putting the

17  insulation on.

18  Q.    Right.  You saw, like, one box in the picture,

19  right?

20  A.    I can't remember if it was one or two, but there are

21  boxes in the picture I believe.

22  Q.    Yeah.  What I'm getting at, too, is this amount of

23  material represented in this invoice for Kaylo would be

24  more than a box, right?

25  A.    Yeah, I would assume it's more than a box.

PETER NEUSHUL - CROSS

2-P-35

1  Q.   Okay.  It looks like in total it's about 900, 2,600,

2  3,500, maybe 3,800 linear feet, right?

3  A.   Correct.

4  Q.   So that's quite a few boxes, right?

5  A.   I think in terms of the scale of the overall plant,

6  no.  But perhaps in terms of, you know, what maybe -- I

7  think they were doing new construction at that time, so I

8  don't know the overall order.  As you pointed out, we

9  don't have all of that information.

10 Q.   Okay.  This size of an order could even be like a

11 railroad car load, right?

12 A.   That size, I don't think so.  But I -- you know,

13 again, I can't adduce how large the order was.  We've got

14 a few pages there.

15 Q.   How many -- what would be the range of feet in a box

16 of this material?

17 A.   It would depend on the size of the pipe covering.

18 If it's a smaller size, it would probably be a lot more

19 in terms of footage.  I don't know though the range.

20 Q.   So this is -- is this two-inch thick material; is

21 that what we're looking at here?

22 A.   Three-foot by two-inch.

23 Q.   So in a two-inch box, two-inch thick box, how many

24 feet are you going to get?

25 A.   I don't know.

PETER NEUSHUL - CROSS

1  Q.   A box size is approximately what for this

2  insulation?

3  A.   I don't know.  Six feet high?  I'm not sure.

4  Q.   You don't know?

5  A.   Don't know.

6  Q.   Okay.  So here's -- this is Billing No. 1292, right?

7  A.   Yes.

8  Q.   Okay.  And here's another one that says *Billing No.*

9  *1137*, right?

10  A.   Yep.

11  Q.   And this is Invoice B3-4421, first page.  Second

12  page is B3-4464, right?

13  A.   That's correct.

14  Q.   So separate orders, right?

15  A.   It appears so.

16  Q.   Right.  And just about the same size in terms of the

17  quantity of material though, that same 35', 3,800 square

18  foot or linear foot, right?

19  A.   I don't remember what the previous page had on it.

20  Q.   Okay.  Anyways, separate orders.  Here's another

21  order.  Well, this is part of the same invoice before.

22  This is like B3-4464, same invoice, right?

23  A.   Yes.

24  Q.   Okay.  And then here we've got another invoice.

25  This is Billing No. 1320, B3-4495 this time.  Again it

PETER NEUSHUL - CROSS

1  looks about like the same numbers or you still don't

2  remember?

3  A.   I don't remember from -- I have not memorized each

4  page as you go through them.

5  Q.   So again, these are all 5/10/54 orders, right?

6  A.   That's correct.

7  Q.   Okay.  And they're all going to Sprinkmann Sons and

8  Badger, right?

9  A.   That's correct.

10  Q.   Here's another order also to Sprinkmann.  This one

11  is a 19 -- whoops -- a 1954 order, right?  Whoops.  I'm

12  off the page.  1954 order, right?

13  A.   That's correct.

14  Q.   They're also going to Sprinkmann and that's a July

15  30 order, right?

16  A.   That's correct.

17  Q.   And this says Invoice No. B3-4956, right?

18  A.   That's what it says.

19  Q.   Okay.  And again it's got the linear feet on there.

20  So can we agree that Sprinkmann got delivered a lot more

21  than one box of Kaylo, right?

22  A.   It looks like --

23  Q.   Many boxes, right?

24  A.   -- a couple thousand feet of two-inch pipe covering

25  from what you've showed me there.

1  Q.   Okay.   Now, just as another matter here, we have a

2  final page on Exhibit 32.  This one says *L&S Insulation;*

3  *C/O Badger Ordinance; Baraboo, Wisconsin*, is where it was

4  shipped to.  L&S, you understand that to be another

5  contractor, right?

6  A.   That's correct.

7  Q.   And this is also an Owens Corning Fiberglas invoice,

8  right?

9  A.   That's correct.

10 Q.   So again this would be -- and it's coming from

11 Berlin, right?

12 A.   That's correct.

13 Q.   So this is also Kaylo, right?

14 A.   That's correct.

15 Q.   And this one is --

16       MR. CASMERE:  I'm sorry.  Can we have a year on

17 this, Your Honor?

18       MR. MCCOY:  I was just getting there.

19       MR. CASMERE:  Thank you.

20       MR. MCCOY:  I'll let you take over for me.

21       MR. CASMERE:  I would like to.

22 BY MR. MCCOY:

23 Q.   Okay.  July 8th, 1959, right?

24 A.   That's correct.

25 Q.   Okay.

PETER NEUSHUL - CROSS

 1              MR. CASMERE:  I would just -- no.  Sorry.

 2    BY MR. MCCOY:

 3    Q.   Okay.  So, in any event -- and, you know, granted,

 4    this one would be after the period when --

 5    A.   It's not Owens-Illinois Kaylo.

 6    Q.   Right.  It would be after -- it would be when Owens

 7    Corning was out there?

 8    A.   That's correct.

 9    Q.   Okay.  So, in any event, did you see any information

10    about L&S as the contractor in the documents you reviewed

11    for Baraboo?

12    A.   No.

13    Q.   So you're not able to tell us, one way or the other,

14    about how much work Sprinkmann or L&S actually did at

15    Baraboo; is that right?

16    A.   Well, I know that they did -- that there was a

17    building built, as I mentioned earlier, between '53, '54,

18    the ball mill.  So that was new construction during the

19    early 1950s and I'm assuming that that's what that

20    two-inch material went into.

21    Q.   You're assuming that, but you don't actually know

22    one way or the other, right?

23    A.   There's no -- just a list of the names of the

24    contractors for the 1050s, unlike the one that existed

25    from the 1940s.

                     PETER NEUSHUL - CROSS

1   Q.   The Baraboo construction and redesign work went on

2   for a couple decades, right?

3   A.   No.  The place went into mothballs, then it would

4   come out of mothballs and it would go back into

5   mothballs.  So there was new construction in the early

6   1950s.  That's ball mill.

7   Q.   I'm sorry?

8   A.   There was a mill built in the early 1950s and I'm

9   assuming that's what that material went into.

10  Q.   Right.  But over this period of time there was

11  ongoing construction, even if you're saying it started

12  and stopped, right?

13  A.   I believe that they expanded the plant

14  significantly.  They certainly resurrected parts of it.

15  You know, for the Vietnam War they had to, you know, get

16  things running again.  But I don't know the details on

17  what happened in the 60s.  I don't remember them as I sit

18  here today.

19  Q.   Right.  You never interviewed anybody who actually

20  worked out of Baraboo, right?

21  A.   The archivist that I talked to had worked at

22  Baraboo, but I did not do a formal interview with him.

23  Q.   Right.  Okay.  And I think you said that that was

24  good practice as an historian was interview people alive

25  who actually worked there, right?

PETER NEUSHUL - CROSS

 1   A.   It can be.  I think oral history, as I explained

 2   earlier, has its downfalls.  But, you know, certainly

 3   talking to somebody -- it was very valuable for me to

 4   talk to him because he told me where the papers were.

 5   Q.   Right.  He told you where the papers were, but you

 6   never interviewed anybody who did actual work out in the

 7   facility, right?

 8   A.   I did not interview anybody that worked on there in

 9   the 1940s.

10   Q.   Or in 1950s, right?

11   A.   Did not talk to anyone who worked there in the 19 --

12   worked on it in the 1950s.

13   Q.   Or the 1960s, right?

14   A.   No.

15   Q.   All right.  The next thing I wanted to ask about is

16   you had mentioned something about a practice out of

17   Baraboo concerning respirators.  Do you happen to know

18   what document you're referring to?

19   A.   I believe there's a 1951 -- a manual.  I don't have

20   it in front of me.

21   Q.   Uh-huh.

22   A.   Perhaps you'll show it to me.  But it does mention

23   respirators.

24   Q.   Do you know who actually got copies of the manual?

25   I mean, was it distributed -- what I'm asking is, was

PETER NEUSHUL - CROSS

1   this distributed to the individual workers or who?

2   A.   I do not know if it was distributed to individual

3   workers.

4   Q.   Did the manuals say that the respirators provided

5   only partial protection like Merewether?

6   A.   No.

7   Q.   So somebody reading -- would somebody reading the

8   manual read something that says, "The respirator will

9   protect you against asbestos"?  They wouldn't read that,

10  right?

11  A.   Those words do not appear in that manual.

12  Q.   The respirators, just back in that time, often were

13  just for general dust, right?

14  A.   They were, in that time, respirators for all

15  different kinds of dust.

16  Q.   Was there any specificity in the manual?

17  A.   In that manual, no.

18  Q.   So it could have been anything going all the way

19  down to one of those paper masks that didn't work very

20  well, right?

21  A.   At a munitions facility, if they're calling for

22  respirators because of the danger of the materials that

23  are being used, I would assume it was a sophisticated

24  respirator, having looked at, you know, other ordinance

25  facilities.

                    PETER NEUSHUL - CROSS

1  Q.    But that's an assumption, right?

2  A.    Certainly as an historian, I'm assuming that the

3  injury and the gravity means that using the paper

4  respirator would not have been sufficient in that

5  situation.

6  Q.    Okay.  But the manual didn't say anything about the

7  type of respirator, right?

8  A.    It doesn't define exactly what type of respirator it

9  is.

10  Q.    Did the manual say there was a hazard from asbestos?

11  A.    It does not say *hazard from asbestos* in the manual.

12  It says *dusty conditions*.

13  Q.    Okay.  And did the manual say anything about

14  supervisors having meetings with employees and telling

15  them -- educating them about asbestos like the Merewether

16  report?

17  A.    I don't believe that it has a section on people

18  meeting and discussing asbestos.

19  Q.    And did the manual say anything about needing to do

20  medical screenings of employees over time like Merewether

21  said?

22  A.    There may be a section on x-rays in the manual, but

23  I don't recall as I sit here right now.

24  Q.    Okay.  Assuming that this A&M or AM&M Company out of

25  Chicago -- you mentioned that name, right?

PETER NEUSHUL - CROSS

 1  A.    A&M Manufacturing.

 2  Q.    Yeah.   -- assuming they did any work at Badger -- I

 3  think you said they had a contract; you saw something

 4  about a contract?

 5  A.    We know they did work at Badger.

 6  Q.    Okay.   They had a contract, right?

 7  A.    That's correct.

 8  Q.    Okay.   You don't know whether they used employees

 9  from another contractor, like a subcontractor, to fulfill

10  their contract; you don't know that, do you?

11  A.    That I cannot discern from the contract.

12  Q.    Okay.   And it's also possible that employees in

13  these insulation contractors are loaned from one

14  principal employer to another when there's not enough

15  work at their principal employer, right?

16  A.    It's possible that could happen.

17  Q.    You don't actually know anything about Oswald

18  Suoja's own work at Badger; is that right?

19  A.    To my knowledge, Mr. Suoja never was deposed and so

20  I have no idea if he ever worked there at all.

21  Q.    Okay.   Now, even assuming that AM&M was advertising

22  JM products in the phone book -- you said, right?

23  A.    That's correct.

24  Q.    Okay.   -- that doesn't mean that they necessarily,

25  if they delivered product to Badger Ordinance, delivered

1   that JM product; it doesn't mean that, right?

2   A.   I suppose that they may not have.  But it's the

3   boxes are there in the pictures, so the warehouse is full

4   of it.

5   Q.   Right.  That's in the 1940s you saw those two

6   pictures, right?

7   A.   That's when they had the contract.

8   Q.   Okay.  And it could be though that they delivered

9   other products besides JM and they're just not in photos,

10  right?

11  A.   It's possible there's another warehouse full of

12  another material I suppose, but I haven't seen a picture

13  of that.

14  Q.   And it's also possible they hired subcontractors who

15  provided a different kind of material than JM, right?

16  A.   It may have been, except that the footage that is

17  being described in the contract is so massive that one

18  can imagine that it must have stayed consistent.

19  Q.   That's just imagining though, right?

20  A.   Excuse me?

21  Q.   That's just imagining, right?

22  A.   The numbers aren't imagination; they are there.

23  Q.   Right.  But the need for consistency could just as

24  easily be because it's so big, you had to have a couple

25  of different types of products out there, right?

2-P-46

1   A.   There may have been another product out there.

2   Q.   Right, a couple different subcontractors because

3   it's so big, right?

4   A.   I just haven't seen no evidence of that.

5   Q.   Okay.  But you don't know one way or the other,

6   right?

7   A.   I don't want to guess.

8   Q.   Okay.  You haven't made any publications in the

9   literature on asbestos; is that right, Doctor?

10  A.   I have not.

11  Q.   You're familiar with the threshold limit values?

12  A.   That's correct.

13  Q.   That's the ACGIH standard, right?

14  A.   That's correct.

15  Q.   And you said that those were adopted in Wisconsin;

16  is that right?

17  A.   That's right.

18       (Reporter clarification).

19          MR. MCCOY:  Were adopted.  I apologize.  Let me

20  get some water.

21  BY MR. MCCOY:

22  Q.   You've acknowledged that a stated purpose of the

23  TLVs, that's the *threshold limit values*, set in 1948 was

24  to seek values which would impose no impossible burden on

25  the manufacturer, right?

PETER NEUSHUL - CROSS

1  A.   I don't remember saying that.  The list appears in

2  '46 for the first time.

3          MR. MCCOY:  This is from the *Humphreys* case,

4  October 16, 2014.

5          MR. CASMERE:  Go ahead.

6          MR. MCCOY:  Okay.

7  BY MR. MCCOY:

8  Q.   You testified in this case up in Minnesota on

9  October 16th of 2014, right?

10 A.   That's correct.

11 Q.   And that was the *Humphreys* case?

12 A.   That's correct.

13 Q.   Now it's a trial, right?

14 A.   It was a trial.

15 Q.   St. Paul, right?

16 A.   That's correct.

17 Q.   So I'm going to show you a couple pages of your

18 testimony.

19          THE COURT:  Are you refreshing his recollection

20 or impeaching him?

21          MR. MCCOY:  I think I'm refreshing his

22 recollection.

23          THE COURT:  Then why don't you let him read it

24 and see if that refreshes his recollection.

25          MR. MCCOY:  Okay.  I'll do that, Judge.

1  BY MR. MCCOY:

2  Q.   I'll show you the transcript starting line 6, on

3  page 8, going over to page 9, line 11.

4  A.   I'm reading from the *1948 10th Annual Meeting of the*

5  *American Conference of Governmental Industrial*

6  *Hygienists.*

7  Q.   Okay.  So would you agree that that refreshes your

8  recollection that a stated purpose for the TLVs was to

9  seek values which would impose no impossible burden on

10  the manufacturers?

11  A.   It refreshes my recollection of reading something

12  out of this manuscript that said, "Values, on the one

13  hand, protect the individual workers and, on the other,

14  would impose no impossible burden on the manufacturer."

15  Q.   Okay.  So there's a -- in the TLVs the thought

16  process of adopting those was to not impose impossible

17  burdens on manufacturers; that was part of it, right?

18  A.   In that line out of that transaction that appears to

19  be a sentence.  The TLVs are guidelines for

20  manufacturers.  They have always been guidelines.

21  Q.   Okay.  So but when you say "no impossible burden,"

22  that could mean if it's too difficult to, at that time

23  period, to keep the exposures below a certain level, then

24  the level would be set so it wasn't impossible for the

25  manufacturers to meet that under the normal conditions,

1  right?

2  A.   I think clearly that zero would probably be

3  impossible.  And again I'm guessing.  I don't want to

4  guess what's in the rest of that document.  I read a

5  couple of lines out of it.  But clearly they want to find

6  some way in which the manufacturer can continue to

7  produce, but has to do so below a TLV.

8  Q.   Okay.  Now, let's move on here.  The first report in

9  the United States on cancer and asbestos comes about in

10  1935, right, in the literature?

11  A.   There's a case study I believe in the 30s.

12  Q.   That's the Lynch publication?

13  A.   That's correct.

14  Q.   And that's part of the information that was

15  disseminated that Owens-Illinois would have had, right?

16  A.   It's part of the general state of the knowledge of

17  asbestos of that time.  Whether they had a copy of that

18  in 1930, I don't know.

19  Q.   Okay.  Well, let's talk about Owens-Illinois for a

20  minute.  It's your -- it's your position that

21  Owens-Illinois kept itself abreast of the literature for

22  the time when it was manufacturing Kaylo, right?

23  A.   They had a very sophisticated industrial hygienist

24  who I believe kept them abreast of the literature.

25  Q.   Right.  And they also had an excellent medical

1  director in Dr. Shook, right?

2  A.   Dr. Shook was excellent.

3  Q.   Okay.  And they had a library of medical industrial

4  hygiene publications at Owens-Illinois, right?

5  A.   I believe they did, yes.

6  Q.   A publication like *Lynch* would be one likely to find

7  its way into the library, right?

8  A.   I don't think that would, but it's possible that

9  Shook might have had something like that.

10  Q.   All right.  So during the time that Owens-Illinois

11  made the Kaylo; Owens-Illinois, we can agree, did not

12  warn -- put warnings on the Kaylo boxes or the

13  literature, right?

14  A.   I'm sorry?

15  Q.   On the product literature, I mean.  During the time

16  that Owens-Illinois was making Kaylo, Owens-Illinois did

17  not put warnings about asbestos on the Kaylo boxes or on

18  the promotional literature, right?

19  A.   There were no warnings.

20  Q.   And Owens-Illinois did not, during that time period,

21  provide precautionary instructions about how to use

22  protective measures for Kaylo, right?

23  A.   They did not provide instructions for protective

24  measures.

25  Q.   Owens-Illinois did not provide any information, that

1  you're aware of, to Badger Ordinance about the necessary

2  protective measures when Kaylo was used?

3  A.   I've seen no correspondence whatsoever between

4  Owens-Illinois and Badger Ordinance.

5  Q.   Let me -- Owens-Illinois -- I'm just going to do

6  these in order.  It will go a little faster.

7  Owens-Illinois was a member of the Industrial Hygiene

8  Foundation from 1936 to 1976; is that right?

9  A.   That's correct.

10  Q.   Okay.  And that's an organization that disseminated

11  information about health concerns to the members, right?

12  A.   That's correct.

13  Q.   And you're aware that in March -- by a letter dated

14  March 12, 1943, from Leroy Gardner, the director at

15  Saranac, to Mr. U.E. Bowes, director of research at

16  Owens-Illinois, that there was information transmitted to

17  Owens-Illinois from Saranac, right?

18  A.   Yes.

19  Q.   Okay.  And I'll put that letter here for a moment.

20  This is Plaintiff's Exhibit 38, same one that we had

21  published a little bit earlier before you testified.  So

22  this is that letter from Dr. Gardner, who is an MD,

23  right?

24  A.   That's correct.

25  Q.   Okay.  And he was heading up at that time the

2-P-52

1  Saranac research for O-I?

2  A.   Yes, he was.

3  Q.   Mr. U.E. Bowes, Director of Research, that was under

4  his watch that Kaylo was being developed, right?

5  A.   He employs -- is the person in charge of employing

6  Saranac.

7  Q.   So here it says in this third paragraph, "The fact

8  that you are starting with a mixture of quartz and

9  asbestos would certainly suggest that you have all the

10  ingredients for a first-class hazard."  And then

11  ultimately they were proposing the start of these Saranac

12  studies for Owens-Illinois in that letter, right?

13  A.   That's correct.

14  Q.   Okay.  Now, the information about -- well, first

15  off, Owens-Illinois was doing pilot manufacturing of

16  Kaylo starting in 1943, right?

17  A.   That's correct.

18  Q.   And some of that pilot manufacturing was sold

19  outside of O-I, right?

20  A.   Very little, but there was some sold I believe; not

21  necessarily in '43, but in '44.

22  Q.   Okay.  So let me ask you this question: was this

23  letter or this information in this letter about a

24  first-class hazard, did you find any evidence that

25  Owens-Illinois had published that in any of the documents

PETER NEUSHUL - CROSS

 1  that went out with the product?

 2  A.    I have not seen that.

 3  Q.    In 1948 there was the interim report issued about

 4  the Saranac studies, right?

 5  A.    Yes.  There were a number of interim reports.  There

 6  was one in 1948.

 7  Q.    I'm showing you this document.  This is the 1948 --

 8  October 30, 1948 interim report from Saranac to O-I,

 9  right?

10  A.    That's correct.

11  Q.    Now, in this time period it says "Arthur J. Vorwald

12  M.D., Director, the Edward L. Trudeau Foundation."  Is

13  that the same as Saranac basically?

14  A.    Yes.  Dr. Gardner had tuberculosis and died in

15  between this report and the earlier correspondence in the

16  early 40s.

17  Q.    It's a continuation of the same work though

18  basically, right, the same research?

19  A.    The same research.

20  Q.    So this is regarding biological activity of Kaylo

21  dust and it's to Owens-Illinois by Saranac.  And I want

22  to direct your attention to just a couple pages here.

23  This is page -- and this is Exhibit 41, for the record,

24  by the way, we were talking about.  So on this page here

25  I guess, I think this is page 5.  It's hard to read.

1  It's page 5 of the document.  So it says in here, I'm

2  reading, "Thus, it appears that very small numbers of

3  fibers are capable of producing asbestosis, although the

4  development of the lesions is delayed.  The present

5  experiment with Kaylo is also an example of this fact."

6       So when it talks about the producing asbestos --

7  asbestosis, small number of fibers, was that something

8  that Owens-Illinois published with its brochures and the

9  literature, promotional materials?

10 A.   They didn't.  But the fibers there are not Kaylo, if

11 you read the rest of the page on the previous one.

12 Q.   All right.  So these fibers are what kind?

13 A.   They're pure asbestos, for all I know.  It's not

14 really well defined on the previous page, but it's not

15 Kaylo.

16 Q.   Okay.  It's not the finished Kaylo product, but it's

17 the same type of asbestos fibers that go into Kaylo,

18 right?

19 A.   I have no idea what kind of asbestos fibers there

20 are.  It says "ball mill asbestos" on the previous page.

21 What kind of asbestos, I do not know.

22 Q.   It could be chrysotile, it could be amosite?

23 A.   They make -- it could be, but they make it clear

24 it's not part of the Kaylo experiment.

25 Q.   Okay.  In any event, that's what they said.  And it

1  says, "The present experiment with Kaylo is also an

2  example of this fact," correct?

3  A.   That's what that says.

4  Q.   All right.  So now let's go on here to the

5  conclusions.  We're on page 6 now.  And it says, "Kaylo,

6  because of its content of an appreciable amount of

7  fibrous chrysotile, is capable of producing asbestosis

8  and should be handled as a hazardous industrial dust,"

9  correct?

10  A.   That's what it says.

11  Q.   So did Owens-Illinois again publish with promotional

12  literature or advise anybody at Badger that it was a

13  hazardous industrial dust to Kaylo?

14  A.   They had no correspondence with Badger.

15  Q.   Did Owens-Illinois tell the -- well, first off, the

16  product Kaylo, Owens-Illinois certainly knew, was going

17  to be used by members of the Asbestos Workers Union,

18  right?

19  A.   I would certainly assume they expected that to

20  happen.

21  Q.   So did Owens-Illinois provide any information to the

22  Asbestos Workers Union about the hazardous industrial

23  dust status of Kaylo?

24  A.   I've seen no correspondence between Owens-Illinois

25  and the Asbestos Workers Union.

1   Q.    Did Owens-Illinois provide a statement to the

2   Asbestos Workers Union saying that it would take only

3   small numbers of fibers to produce asbestosis?

4   A.    There's no such statement made to the Asbestos

5   Workers Union.

6   Q.    Did Owens-Illinois provide any information to the

7   Asbestos Workers Union or Baraboo personnel saying that

8   the Lynch publication in 1935 had found cancer in the

9   person that was studied in that?

10   A.    They would have had no connection to them in 1935,

11   so they would not have corresponded with them, but they

12   did not.

13   Q.    Okay.  Well, when they later had a connection with

14   them when Owens-Illinois was making Kaylo, Owens-Illinois

15   didn't provide any information about that Lynch

16   cancer publication?

17   A.    They did not, as far as I can tell, they did not

18   reproduce a '35 page and send it there.

19   Q.    Then another report came out in 1952.  This was the

20   final report from Saranac about Kaylo, right?

21   A.    I believe it is.

22   Q.    Okay.  That's this one right here, which is Exhibit

23   37.  It's the *Investigation Concerning the Capacity of*

24   *Inhaled Kaylo Dust to Injure the Lung*, right?

25   A.    That's what it is called.

PETER NEUSHUL - CROSS

 1   Q.   And that's known as the *final report* from Saranac,

 2   right?

 3   A.   Well, the final reports can be the published paper.

 4   But, yeah, that's the final of a series of reports.

 5   Q.   Well, the final report that came to Owens-Illinois's

 6   personnel is this one, right?

 7   A.   This came to Owens-Illinois personnel, yes.

 8   Q.   Okay.  This is what Owens-Illinois was paying

 9   Saranac for, right?

10   A.   That's correct.

11   Q.   Okay.  And the final report reflects the findings

12   that I think you've already described, like "The 9

13   animals exposed to Kaylo for more than 30 months showed

14   not only lesions like those of the 30-month animals, but

15   also exhibited a true fibrosis of the type characteristic

16   of the response to the guinea pigs to the inhaled

17   asbestos fibers," right?

18   A.   They're finding asbestosis.

19   Q.   All right.  It's also finding lesions, right?

20   A.   That's what it says there.

21   Q.   Okay.  Lesions could be the development ultimately

22   of a cancer, right?

23   A.   That's not what it says there.

24   Q.   Okay.  And again "The results" -- this is page 15

25   I'm at now -- "The results of the inhalation experiment

1   prove that Kaylo dust, when inhaled into the lungs of

2   guinea pigs for a prolonged period (30 to 33 months), is

3   capable of producing the peribronchiolar fibrosis

4   characteristic of the disease asbestosis," right?

5   A.   That's what it says there.

6   Q.   So if it says here at the end on the *Summary*, 17,

7   page -- "Kaylo dust, when inhaled for a prolonged

8   period" --

9   A.   Sorry.  Can't read it.

10  Q.   Whoops.  Lost the focus.  My finger did that.

11  "Kaylo dust, when inhaled for a prolonged period, is

12  capable of producing, in the lungs of guinea pigs" -- "in

13  the lungs of guinea pigs, but not of rats, the

14  peribronchiolar fibrosis typical of asbestosis," right?

15  A.   That's correct.

16  Q.   All right.  That's what Owens-Illinois got.  And you

17  said something about -- and this went to, like,

18  Mr. Hazard, the industrial hygienist from Harvard, right?

19  A.   He would have received a copy of that report and

20  others.

21  Q.   I'm sorry to interrupt.

22  A.   And probably others did as well.

23  Q.   Dr. Shook, the medical director, would have known

24  about it, right?

25  A.   He may have.

PETER NEUSHUL - CROSS

 1  Q.   Okay.  Now, these documents -- again, this

 2  information wasn't published by Owens-Illinois through

 3  any of the materials associated with Kaylo or to any of

 4  the customers, right?

 5  A.   The information in those reports was published by

 6  Saranac.  It does not mention the name *Kaylo*.

 7  Q.   Okay.  My question was, did Owens-Illinois itself

 8  publish that information in these reports?

 9  A.   No.  It went into a peer-review journal.

10  Q.   All right.  When you say it went into a journal

11  though, you said Owens-Illinois didn't have anything to

12  do with that, right?

13  A.   They encouraged them to publish it, but they had

14  nothing to do with the content.  They didn't even know it

15  was being prepared for publication.  And they were, I

16  think the words were, *pleasantly surprised* when they

17  received the published result.

18  Q.   And you didn't -- you don't know who actually -- or

19  you haven't seen any information, as far as any recorded

20  conversations, about what was discussed between

21  Owens-Illinois and the authors when they actually

22  published it in the peer-review journal, you haven't

23  seen -- you didn't interview any of those people, right?

24  A.   Those people had passed away before I knew what this

25  was.

PETER NEUSHUL - CROSS

1  Q.   Right.  So you don't know what they actually might

2  have communicated orally between each other, right?

3  A.   We have their correspondence.

4  Q.   Yeah.  But I'm just saying, that's not the oral

5  communications that I asked you about, the interviews;

6  they didn't have that, right?

7  A.   No.  I don't believe there's any tape-recordings of

8  conversations between the director, Arthur Vorwald, or

9  Dr. Schepers and Mr. Hazard.

10  Q.   Okay.  So the publication occurred in the *Archives*

11  *of Industrial Health* in September of 1955, three years

12  after this final report, right?

13  A.   Yes.

14  Q.   Seven years after the preliminary report, right?

15  A.   Which preliminary report?

16  Q.   The 1948 report.

17  A.   Okay.  There's several of those, but after the '48

18  one, yes.

19  Q.   Okay.  So Owens-Illinois itself took no action to

20  publish, but ultimately it got published in 1955, toward

21  the end of the time when Owens-Illinois stopped selling

22  Kaylo, right?

23  A.   Owens-Illinois did not publish it themselves and

24  that probably makes it more valuable from an academic

25  standpoint.  It was published by Saranac Laboratory.

PETER NEUSHUL - CROSS

1  Q.   Yeah.  But that's not my question, Doctor, please,

2  okay?  I want to get you out of here.  My question was,

3  Owens-Illinois didn't take any action itself, like back

4  in '48, to publish; they waited until somebody did it in

5  '55, which is near the time when they stopped selling

6  Kaylo, right?

7  A.   They did not take action to publish the results

8  themselves.  They encouraged Saranac Lake to do so.

9  Q.   So the publication by Saranac doesn't say anything

10 about the product's name is *Kaylo*, does it?

11 A.   It does not.

12 Q.   Okay.  And it doesn't say that the product should be

13 treated as a hazardous industrial dust, does it?

14 A.   I believe -- I don't recall those words being in

15 there, no.

16 Q.   And it doesn't say anything about when using that

17 product, you need to use the measures -- the preventive

18 measures that Merewether had talked about in 1930; it

19 doesn't say that in this published version?

20 A.   I don't believe Merewether is cited in that paper.

21 Q.   Okay.  And preventive measures aren't cited either,

22 right?

23 A.   I don't believe those were cited in there.

24 Q.   So it basically doesn't provide any information

25 about what kinds of exposures would occur to people

1   actually using Kaylo, does it?

2   A.    It's not a study of that.

3   Q.    Owens-Illinois did have studies done about the

4   exposures to people that were cutting and sawing and

5   handling finished Kaylo products, right?

6   A.    They had Saranac come and take dust measurements in

7   the workplace of people performing those activities, in

8   the vicinity of people performing those activities.

9   Q.    Okay.  And that study -- there was also a study done

10  by Aetna, right?

11  A.    Yes.  I'm aware of that study.

12  Q.    And that's -- I want to have Exhibit No. 39.  I'll

13  show you, this is the *Special Hazards Study* that was done

14  by Aetna, Exhibit 39, right?

15  A.    That's correct.  That's when the plant has changed

16  hands and gone over to Owens Corning.

17  Q.    And this is prepared for Owens-Illinois, Kaylo

18  Division.  And it's by Aetna, the Engineering Department

19  of Aetna Life Affiliated Companies, right?

20  A.    That's correct.

21  Q.    And this was a little difficult here to read, but

22  it's April 28 and May 2, 1958, right?

23  A.    I believe that's correct, yes.

24  Q.    I apologize.  My copy is not so good.  So this was

25  done a couple days or about -- see, the business was sold

1  April 30th, right?

2  A.   I believe so.

3  Q.   So part of these studies were done a couple days

4  before and the rest were done a couple days after, right?

5  A.   That may be.

6  Q.   This was actually done in the plant in Berlin,

7  right?

8  A.   I believe it's in Berlin, yes.

9  Q.   Yes.  It's hard to read again, but that's Berlin.

10  So it says, "The purpose of this visit was to determine

11  the employee exposure to dust in production operations."

12  So these production operations that we looked at, at

13  least some of them in here, were the ones where the Kaylo

14  had been finished and now they had to cut it into those

15  three-foot lengths or bag it, or whatever, or put it into

16  boxes, right?

17  A.   It wasn't produced in bags; it was cut into lengths.

18  And I think further in the report they break down what

19  portions may have pertained to that or not.

20  Q.   Anyways, they took some samples then, just talking

21  about these two samples right here --

22        THE COURT:  Mr. McCoy, let me interrupt with an

23  informational question.  Why is it relevant to your

24  lawsuit against Owens-Illinois that this report was

25  submitted to Owens Corning?

PETER NEUSHUL - CROSS

```
 1              MR. MCCOY:  Well, it was for Owens-Illinois.

 2              THE COURT:  Look at the receipt.  Look at the

 3    receipt stamp.

 4              MR. MCCOY:  I see the receipt.

 5              THE COURT:  Who received it?

 6              MR. MCCOY:  Well, it says --

 7              THE COURT:  Who received it?

 8              MR. MCCOY:  Owens-Illinois.  I can ask --

 9              THE COURT:  Who --

10              MR. MCCOY:  Owens-Illinois got it, Judge.

11              THE COURT:  No.  It says Owens Corning got it.

12              MR. MCCOY:  That's where the copy came from.

13              THE COURT:  When did they stop selling the

14    product?

15              MR. MCCOY:  It says 19 --

16              THE COURT:  When did Owens-Illinois stop selling

17    the product?

18              MR. MCCOY:  Well, it says 1958.  But I'm saying

19    Owens-Illinois got a copy of this document.  The witness

20    has testified before --

21              MR. CASMERE:  Hold on.  I have an objection.

22    There's no foundation that we ever got this document.

23    And when he goes to move it into evidence, I have an

24    objection.

25              THE COURT:  It's out.  It's out.  You're wasting
```

PETER NEUSHUL - CROSS

 1  our time.

 2          MR. MCCOY:  Let me lay the foundation.

 3          THE COURT:  You can ask three questions and lay

 4  the foundation.  If you don't, your cross-examination is

 5  over.  You can either move on or lay the foundation and

 6  take your chances.

 7  BY MR. MCCOY:

 8  Q.   Okay.  Dr. Neushul, this Aetna study was something

 9  that Owens-Illinois did get a copy of, right?

10  A.   I don't know.

11  Q.   I want to direct your attention to testimony that

12  you gave in the case of *Green v. Owens-Illinois*.  And

13  this was given on Friday, November 2, 2007.  I don't know

14  if you remember this one or not.

15  A.   I don't.

16  Q.   Okay.  This shows I took your deposition on that

17  day, right?

18  A.   I guess so.

19          MR. MCCOY:  Okay.  Judge, I'm going to offer

20  this one for -- I think I can refresh the witness's

21  recollection again on this.

22          THE COURT:  Which is fine.  I'll let you do

23  that.  But does Dr. Neushul say in that testimony that

24  Owens-Illinois got this report?

25          MR. MCCOY:  Okay.  I'll just use it for -- he

PETER NEUSHUL - CROSS

1 said "I don't know" here.

2          THE COURT:  No, no.  Mr. McCoy, let's make sure

3 we understand each other.

4          MR. MCCOY:  Okay.

5          THE COURT:  I gave you two choices: you can

6 either move on past the 1958 report or you can attempt to

7 lay the foundation.  But if you don't lay the foundation,

8 your cross-examination is over.  And it's not clear to me

9 which path you're taking.  Are we moving on?

10          MR. MCCOY:  I'll just use it to refresh his

11 recollection.

12          THE COURT:  Okay.  But what I just asked,

13 Mr. McCoy -- please, just answer my question -- does that

14 testimony by Dr. Neushul indicate that Owens-Illinois

15 received this 1958 report?

16          MR. MCCOY:  Yes.

17          THE COURT:  Okay.  Let's proceed.

18 BY MR. MCCOY:

19 Q.   Okay.  All right.  So I'm going to direct you to

20 these lines here.  This is page 49, line --

21 A.   That's talking about --

22 Q.   12 through --

23 A.   Sure.  So Exhibit 7, this again is part of the body

24 of Saranac Lake documents and it's generated by the

25 Saranac Lake Laboratory in its report on the Kaylo

1  Division plant at Sayreville, New Jersey.  And I believe

2  this is part of the survey that Owens-Illinois employed

3  the lab to do at their facility.  Is that what you're

4  talking about?

5  Q.   Let's see.  I'm talking about this one right here.

6  Exhibit No. 8, line 18 describes it.

7  A.   It says, "Yes.  Is this also a document that was

8  received by Owens-Illinois?"

9      "Yes.  This was received and prepared for

10  Owens-Illinois Kaylo Division in Berlin, New Jersey."

11  Q.   Okay.  Thank you.

12  A.   I don't know what that is.

13  Q.   Thank you.  That was your testimony back in 2007,

14  right?

15      MR. CASMERE:  I'm sorry.  Could we have an

16  identification of what's the exhibit number?

17  A.   What's the exhibit number?

18  Q.   Exhibit 8.  I'll let you finish reading.  It says

19  it's a *Special Hazards Survey*, right?

20  A.   Yeah.  But I don't -- that could have been one of

21  the surveys done by --

22  Q.   A *Dust Survey* from the Aetna Company, right?

23  A.   Where does it say that?  I just want to make sure

24  what you're saying is there.

25  Q.   Right there.  Go to the next page.

1  A.    This was also received -- prepared by the

2  Owens-Illinois Kaylo Division in Berlin, New Jersey.   The

3  previous one was at Sayreville.   And this is a *Special*

4  *Hazards Survey*, a *Dust Survey*, from the Aetna Company.

5          MR. CASMERE:   Your Honor, I'm going to object to

6  this coming in.   But if he wants to ask questions about

7  it so we can end this, I --

8          THE COURT:   That's fine.   But Mr. -- again, this

9  is a *Wild West* bench trial, but we're veering off the

10 path.   Let's do it this way:

11     Mr. McCoy, Dr. Neushul testified for about 90

12 minutes on direct, give or take a minute, a little bit

13 less.

14          MR. MCCOY:   Okay.

15          THE COURT:   You've had him for 75 minutes.   I'll

16 give you 15 more, but at three o'clock you're done.   So

17 use your time wisely.   Understood?

18          MR. MCCOY:   Yes.

19          THE COURT:   And if you've done early, I'll give

20 you bonus points.   But at three I pull the plug.

21          MR. MCCOY:   I'm going to work early.   I need my

22 bonus.   It's Christmastime, Judge.

23          THE COURT:   I was just saying, you got 'til

24 three.   Make it count.

25          MR. MCCOY:   Okay, Judge.

PETER NEUSHUL - CROSS

 1  BY MR. MCCOY:

 2  Q.   So anyways, I just want to direct your attention to

 3  these two findings:

 4      *Air Sample No. 3*:  "Horizontal Splitting Saw - taken

 5  at the breathing level of the operator operating the

 6  pieces as they came through the saw - taken between the

 7  saw and the operator."

 8      And that was recorded at "91.8 million particles per

 9  cubic foot of air," right?

10  A.   That's what it says there, yes.

11  Q.   The next one is *Air Sample No. 4*.  I can't quite

12  read there, but it says "Finishing" -- "taken at the

13  level of operator feeding flat" -- I can't read that

14  word -- "to the trim saw."

15      And that sample came in at "46.3 million particles

16  per cubic foot of air," right?

17  A.   That's correct.

18  Q.   Okay.  So --

19          MR. CASMERE:  I'm going to object unless he

20  establishes that those are total dust or asbestos dust

21  samples.

22          MR. MCCOY:  Okay.

23          THE COURT:  I'm not sure where this is going.

24  So from the Court's perspective, we can always strike it

25  later.  Right now we're going by the clock.

 1           MR. MCCOY:  All right.

 2  BY MR. MCCOY:

 3  Q.   Okay.  So again, the purpose was "to determine

 4  employee exposure to dust in production operations,"

 5  right?

 6  A.   Yes.

 7  Q.   All right.  So were these samples reported to the

 8  committee for the ACGIH?

 9  A.   Those total dust samples were not reported to the

10  ACGIH.

11  Q.   Were these in the publication, the samples at this

12  level, in the publication that was made in 1955 by the

13  Saranac Labs?

14  A.   The study of animals, no.

15  Q.   So essentially these -- and these levels of exposure

16  were not published in any of the Kaylo promotional

17  materials that went out to Baraboo or to anybody, right?

18  A.   No.

19  Q.   Okay.  Did Owens-Illinois understand that asbestosis

20  had a latency period when it began making Kaylo?

21  A.   I believe that certainly Hazard and Shook must have

22  understood, as did many entities, that there was a

23  potential latency before asbestosis could emerge if one

24  were working of course in conditions that exceeded the

25  TLV.

1    Q.    What did Owens-Illinois understand to be the latency

2    period beyond which you should be studying to see how

3    many people were getting sick?

4    A.    They didn't find any illness at all because they

5    were staying -- presumably because they were staying

6    within the TLV.  They -- I would assume Shook and Hazard

7    would have understood that depending on the levels of

8    exposure; the levels of exposure, for example, that --

9    Q.    That's not my question, Doctor.  I'm trying to stay

10   in my time period.  So Owens-Illinois didn't have any

11   understanding of the latency period; is that what you're

12   saying?

13          MR. CASMERE:  Objection.  Asked and answered,

14   Your Honor.

15          THE COURT:  Well, that's also not what he said.

16          MR. MCCOY:  Okay.

17          THE COURT:  Why don't you pose a new question.

18          MR. MCCOY:  All right.  Let me go on.

19   BY MR. MCCOY:

20   Q.    Owens-Illinois was only in full production of Kaylo

21   for eight years, right?

22   A.    Most likely, yes.

23   Q.    So the studies of their own in-plant workers would

24   have been people less than eight years, right?

25   A.    The x-rays that they were taking during that period

PETER NEUSHUL - CROSS

1  of time most likely ended when they sold the facility.

2  Q.   Okay.   As far as publications are concerned and the

3  literature, mesothelioma was reported at least in the

4  Smith-Cartier article in about 1952, right?

5  A.   There are articles that we've gone back on and

6  looked at and said, yes, that may well have been

7  mesothelioma.   But the seminal piece is in 1960 published

8  by Wagner, as I presented earlier.

9  Q.   The Smith-Cartier, '52 sounds about right?

10  A.   I don't have it in front of me, but it could

11  certainly be '52.

12  Q.   This is *AMA Archives of Industrial Hygiene and*

13  *Occupational Medicine*, *March 1952*.   And in this

14  publication, which is the *Proceedings of the Cancer*

15  *Prevention Committee*, I direct your attention to page

16  262.   This *Abstract of Discussion* has a chart here,

17  "Cases of carcinoma of the lungs detected among 4,000

18  asbestos workers 1940 to '50."   And so over here, *Type of*

19  *Tumor*, there's one report of pleural mesothelioma there,

20  right?

21  A.   That's correct.

22  Q.   Okay.   And another report of pleural mesothelioma

23  there, right?

24  A.   That's correct.

25  Q.   Okay.   All right.   So in terms of Owens-Illinois

PETER NEUSHUL - CROSS

1  keeping abreast of this literature, did Owens-Illinois

2  make any changes in terms of health information when

3  these reports of mesothelioma came out in '52 in terms of

4  what was being advised through the product information?

5  A.    No.

6  Q.    And in terms of the amount of asbestos needed to

7  cause the mesothelioma cancer, that's a lot less than

8  what's needed for asbestosis, right?

9  A.    I believe there can be cases of --

10        MR. CASMERE:  I'm going to object.  This is

11  beyond the scope of this witness's testimony.  He's not a

12  medical doctor.

13        MR. MCCOY:  Judge, he's testified about many

14  medical articles and his understanding of that.

15        THE COURT:  You can ask him about an article

16  he's read, but you can't ask him for his medical opinion.

17        MR. MCCOY:  Okay.

18  BY MR. MCCOY:

19  Q.    Have you read medical articles that say that it

20  takes a lot less asbestos to cause mesothelioma?

21        MR. CASMERE:  I'm going to object to the scope

22  if those articles exist after April 30th of 1958.

23        MR. MCCOY:  Judge, I'll withdraw the question.

24  I can move on.  We've got enough testimony.

25        THE COURT:  You've got seven more minutes.

PETER NEUSHUL - CROSS

```
 1              MR. MCCOY:   Okay.

 2  BY MR. MCCOY:

 3  Q.   You talked about the -- you mentioned the Industrial

 4  Hygiene Foundation, right?

 5  A.   I believe you did.

 6  Q.   Okay.  And that's an organization that

 7  Owens-Illinois, you said, was a member of, right?

 8  A.   They were the founding members.

 9  Q.   And there was information distributed to the

10  membership through the Industrial Hygiene Digest, right,

11  that was sent to the members?

12  A.   Abstracts were sent to members, yes.

13  Q.   Okay.  I'm going to just show a couple of these.

14  This one is January 1945, Industrial Hygiene Digest.

15  This is what was sent to the members, right?

16  A.   I can't -- okay.  January '45.

17  Q.   I'm going too fast?

18  A.   I see.

19  Q.   Right down here.  That was sent to the members,

20  right?

21  A.   Members of the IHF, which included numerous

22  governmental entities and universities and corporations

23  received this.

24  Q.   And Owens-Illinois?

25  A.   And Owens-Illinois.
```

2-P-75

1  Q.   Okay.  And in this particular publication there's a

2  statement: these are abstracts of medical literature that

3  has been published, right?

4  A.   That's correct.

5  Q.   Okay.  And that makes it more convenient for the

6  members to read it in short synopsis, right?

7  A.   That's correct.

8  Q.   So here it talks about *Asbestosis and Pulmonary*

9  *Carcinoma*, H.W. Wedler.  And this one was published in

10  1943 and it talks about --

11  A.   In German.

12  Q.   Right, in German.  But the abstracts of course is in

13  English, right?

14  A.   It is.

15  Q.   Okay.  "14 instances of malignant disease of the

16  lungs and pleura."  And so this is ex -- 16%, this is in

17  excess of the proportion of the lung carcinoma.  And it's

18  discussing autopsy records on asbestosis, right?

19  A.   It's looking at the connection between asbestosis

20  and lung cancer.

21  Q.   So that's the number of cases being reported of lung

22  cancer, right?

23  A.   Those are case studies of, you know, people with

24  asbestosis who have gotten lung cancer.

25  Q.   Another publication of -- this is the *Foundation*

1  *Facts* page and this is August 1949, again sent to the --

2  distributed to the members, right, of the IHF?

3  A.    Yes.

4  Q.    Okay.  So this one talks about analysis of

5  asbestosis and cancer of the lungs in an editorial, JAMA,

6  August 13th of 1949.  Here the records of the English,

7  American and German physicians in the *Annual Report* of

8  *the Chief Inspector of Factories* in English -- England

9  for '47 show the occurrence of cancer related to

10  pulmonary asbestosis.  And it says the incidence rate of

11  cancer in lungs asbestosis being 10 to 15 times as high

12  as among the general population.  So once again, that

13  information got to O-I, right?

14  A.    It did.  And these are the sorts of case studies

15  that prompted through Richard Doll's study.

16  Q.    The National Safety Council was another organization

17  that Owens-Illinois was part of.  And I think Mr. Hazard

18  specifically was an officer in one of the sections,

19  right?

20  A.    Owens-Illinois founded the Glass and Ceramic section

21  of the National Safety Council.

22  Q.    And the National Safety Council also had

23  publications about asbestos-related diseases that would

24  have found their way to Owens-Illinois's people during

25  Kaylo times, right?

PETER NEUSHUL - CROSS

1  A.   There were publications.  They did receive the

2  *National Safety News* and the *Transactions*.  And if there

3  were anything on that, they would have received that.

4  Q.   Okay.  I spilled my water.  Not too much in there.

5  The safety manual that you found at Badger, did you find

6  any evidence that Owens-Illinois had had a copy of that

7  in their files and was relying on that when Kaylo was

8  being shipped to Badger?

9  A.   I have not seen a connection between those two.

10 Q.   Did you have any information that Owens-Illinois had

11 any knowledge about the specific safety practices that

12 Badger was employing?

13 A.   I've seen absolutely no correspondence between the

14 two entities.

15 Q.   You testified or would you agree with the statement

16 that the 5 million particles per cubic foot is not an

17 effective standard?

18 A.   It lasted until the late 1960s.  But of course

19 today, you know, looking back with 20/20 vision, we could

20 say it was not effective, but -- and that's most

21 unfortunate -- but it has proven not to be effective as

22 they thought it had been.

23 Q.   The asbestos in the materials like pipe covering was

24 more dangerous, you're saying, than what was originally

25 reported?

```
 1  A.   We'll learn in the 1960s that that occupation is in

 2  fact not as safe as thought it would -- as it was

 3  believed to have been.

 4  Q.   Right.  But the product that was being sold back in

 5  the 40s and the 50s, that product, whatever asbestos in

 6  it, was -- whatever dangers, were the same back then as

 7  they would be 10 or 15 years later in a product, right?

 8           MR. CASMERE:  Object to the form of the

 9  question.  I can't even understand it.

10           THE COURT:  Right.  I'll sustain to the form.

11  You've got two minutes left.

12  BY MR. MCCOY:

13  Q.   The formula for Kaylo was not changed substantially,

14  as far as asbestos content, over the time period from

15  when commercial operation began in 1948; is that a fair

16  statement?

17  A.   They did create a high-temp Kaylo towards the latter

18  part of production that had a different -- it had amosite

19  in it.

20  Q.   More amosite asbestos, right?

21  A.   I believe they substituted the amosite for the

22  crocidolite that was in the low-temp variety.

23  Q.   But the percentage --

24           MR. CASMERE:  I'll stipulate that the percentage

25  stayed relatively the same between 1948 and 1958, Your
```

PETER NEUSHUL - CROSS

1  Honor.

2            THE COURT:  Stipulation accepted.

3  BY MR. MCCOY:

4  Q.   You would agree that the TLVs that were in

5  place before the 19 -- before 1970, those were not

6  designed to be protective for mesothelioma; is that

7  right?

8  A.   I think as our understanding of mesothelioma matures

9  we'll realize certainly that the TLV is not protecting

10 against that.

11 Q.   Okay.  And they were not designed with that scenario

12 of mesothelioma --

13 A.   We didn't know --

14 Q.   -- protection in mind?

15 A.   -- we didn't know about it.

16 Q.   But in 1952 it was out there, right?

17 A.   You can find a case study, but that does not lead to

18 a change in policy.

19            THE COURT:  Okay.  Let's wrap it up, Mr. McCoy.

20 BY MR. MCCOY:

21 Q.   Alternative products were available during the time

22 period that Owens-Illinois was manufacturing Kaylo?

23            MR. CASMERE:  Objection to form.  Foundation.

24 Beyond the scope of this witness, Your Honor.

25            THE COURT:  You're done.  You've had your 90

PETER NEUSHUL - CROSS

1   minutes.

2           MR. MCCOY:  I called him as my witness.  I want

3   to --

4           THE COURT:  You're done.  Mr. McCoy, you heard

5   me before.  Don't try to back door the Court or you will

6   be in big trouble.  Do you understand?

7           MR. MCCOY:  I understand.

8           THE COURT:  Thank you.

9           MR. CASMERE:  No questions, Your Honor.

10          THE COURT:  Didn't think so.  Dr. Neushul, you

11  are done.  You are free to go about your business.  Thank

12  you.  All right.  Counsel, do you want a break?

13          MR. CASMERE:  No.  If it's okay with the court

14  reporter and Your Honor, I'll go grab Dr. Neushul -- or

15  Dr. Gregory and I'll send him in.

16          THE COURT:  Well, let's check with opposing

17  counsel.  They're entitled to a quick comfort break if

18  they need it.  Mr. McCoy, would you or Mr. Suoja or

19  anyone else just want five minutes?

20          MR. MCCOY:  It's -- are you fine?

21          THE COURT:  Let's take five --

22          MR. CASMERE:  Yes, sir.

23          THE COURT:  -- then come right back.

24      (Recess at 3:03 p.m. until 3:08 p.m.)

25          THE COURT:  Counsel, we're back on the record.

PETER NEUSHUL - CROSS

1  Mr. Watson, do you want to just announce your witness so

2  we can swear him?

3          MR. WATSON:  Your Honor, Owens-Illinois calls

4  Earl Gregory.

5          THE COURT:  Now the oath.

6  **EARL GREGORY, DEFENDANT'S WITNESS, SWORN**

7                  DIRECT EXAMINATION

8  BY MR. WATSON:

9  Q.   Good afternoon, sir.  Would you please introduce

10 yourself and give us your background briefly?

11 A.   Earl Daniel Gregory.  I'm a certified industrial

12 hygienist and I have a master's degree in industrial

13 hygiene as well as a Ph.D. in industrial hygiene from the

14 University of Cincinnati.

15 Q.   Dr. Gregory, I conferred with plaintiff's counsel

16 and Exhibit 1164 is your CV.  And Owens-Illinois offers

17 Exhibit 1164 as a Rule 1006 summary of your

18 qualifications.

19          MR. WATSON:  Mr. McCoy, do you agree?

20          MR. MCCOY:  No objection.

21          THE COURT:  All right.  We'll accept it.

22 BY MR. WATSON:

23 Q.   Dr. Gregory, I want to provide to the Court an

24 overview of the four topics we asked you to research and

25 evaluate in this case.  Is that fair?

1  A.    Yes.

2  Q.    We first asked you to evaluate whether Mr. Suoja was

3  ever exposed to asbestos from Owens-Illinois Kaylo.

4  A.    That's correct.

5  Q.    What was your conclusion?

6  A.    My conclusion, based on all the testimony and the

7  documents that I've reviewed in this case, was that there

8  was no evidence that he was exposed to asbestos from

9  Owens-Illinois thermal insulation products.

10  Q.    We, second, asked you to evaluate what

11  responsibilities the employers, jobsite owners, jobsite

12  possessors and controllers had to protect Mr. Suoja; is

13  that right?

14  A.    That's correct.

15  Q.    What were your conclusions?

16  A.    Well, employers, jobsite controllers, and jobsite

17  owners or premises owners have the responsibility, the

18  duty and the authority and the obligation to protect all

19  employees from occupational safety and health hazards.

20  Q.    The third thing we asked you to do was evaluate the

21  concept of the threshold limit value and its importance

22  in this case, right?

23  A.    That's correct.

24  Q.    What was your conclusion, Dr. Gregory?

25  A.    Well, the threshold limit value during the time

EARL GREGORY - DIRECT

1  period when Mr. Suoja worked at the Badger Ordinance was

2  5 million particles per cubic foot.  In fact it had been

3  5 million particles per cubic foot since about 1938 and

4  it remained that way until approximately 1970.  And that

5  was considered during that time period to be a safe

6  exposure level that as long as exposure levels were below

7  the 5 million particles per cubic foot, then employees

8  exposed below those levels would not suffer any adverse

9  health effects or occupational diseases while working

10  with asbestos-containing products.

11  Q.   Dr. Gregory, the fourth topic that we asked for your

12  research and evaluation was to evaluate whether putting a

13  warning on a package of Owens-Illinois Kaylo would have

14  affected Mr. Suoja's asbestos exposure at all.  Did you

15  reach a conclusion?

16  A.   Yes, I did.

17  Q.   What was your conclusion, Dr. Gregory?

18  A.   In my opinion, it would not have had any effect at

19  all on his exposures to any Owens-Illinois

20  asbestos-containing thermal insulation products.

21  Q.   Have you researched and formed those opinions to a

22  reasonable degree of scientific certainty in your

23  industrial hygiene?

24  A.   Yes, I have.

25  Q.   Let's talk generally about the types of materials

1  you reviewed in this case.  Does it include the

2  admissions and statements in written discovery?

3  A.   Yes, it does.

4  Q.   Does it include the Asbestos Trust claims?

5  A.   Yes, it does.

6  Q.   Asbestos Trust affidavits?

7  A.   That's correct.

8  Q.   And the complaint by Mr. Suoja?

9  A.   Yes.

10  Q.   It also includes testimony in this case --

11  A.   Yes.

12  Q.   -- including George Schlub, Larry Zimmer, Harold

13  Haase, Frank Hofstetter and others?

14  A.   That's correct.

15  Q.   You also reviewed historic records about the Badger

16  Ordinance facility?

17  A.   That's correct.

18  Q.   Inspector journals?

19  A.   That's correct.

20  Q.   Wisconsin industrial regulations?

21  A.   That's also correct.

22  Q.   Federal regulations, including the Walsh-Healey Act?

23  A.   That's correct.

24  Q.   And records from Owens-Illinois during the relevant

25  time frame?

EARL GREGORY - DIRECT

1    A.    That's correct.

2          MR. MCCOY:   Can I renew my MIL objection on the

3    trust fund materials, bankruptcy materials?

4          THE COURT:   Understood.   And just so the record

5    is self-contained at this point, it's a standing

6    objection.   It will be resolved in post-trial briefing.

7    With that, let's continue.

8    BY MR. WATSON:

9    Q.    Are these the types of records that you and other

10   experts in the industrial hygiene field would reasonably

11   rely on in forming your opinions in this case?

12   A.    That is correct.

13   Q.    You also requested records from the prior state

14   court lawsuit involving Mr. Suoja; is that right?

15   A.    That's correct.

16   Q.    You understand that those weren't produced in this

17   case and that the plaintiff's attorney asserts that their

18   file was lost; is that right?

19   A.    That is my understanding.

20   Q.    Would that information be helpful to you?

21   A.    Yes, of course.   Any information involving his

22   potential exposure to asbestos-containing products,

23   including specific work activities that he performed,

24   would have been helpful.

25   Q.    Let's turn to your first conclusion that you gave us

 1  initially, Dr. Gregory.  How did you reach that

 2  conclusion --

 3  A.   Well --

 4  Q.   -- of whether Mr. Suoja was ever exposed to an

 5  Owens-Illinois product?

 6  A.   Well, based on Mr. Zimmer's and Mr. Schlub's

 7  testimonies, who -- they testified that they worked with

 8  Mr. Suoja at the Badger Ordinance.

 9       And Mr. Zimmer, for example, said he worked with

10  Mr. Suoja in late 1958, but he didn't indicate that

11  Mr. Suoja was working with any Owens-Illinois Kaylo

12  products.  He just stated that Mr. Suoja was at the

13  jobsite.  And of course the jobsite is around 7,500 acres

14  with over 1,400 buildings.  So but Mr. Zimmer didn't say

15  that he saw Mr. Suoja remove or install any

16  Owens-Illinois thermal insulation products.  So there's

17  just no evidence from his testimony that Mr. Suoja was

18  working with any O-I thermal insulation products.

19       Now, Mr. Zimmer did say that others -- other

20  insulators that he was an apprentice to -- Mr. Zimmer was

21  an apprentice during that time period -- he said that it

22  was his opinion that other insulators were removing Kaylo

23  products, but he did not say that Mr. Suoja was

24  performing such activities.

25       And then for George Schlub, he indicated that he

EARL GREGORY - DIRECT

1  worked with Mr. Suoja at the Badger facility in around

2  1967 for on and off maybe five to six months.  And he

3  indicated that -- Mr. Schlub stated that he removed what

4  he felt was Kaylo insulation from piping.  And he defined

5  the Kaylo insulation as 85% magnesia.  And Kaylo is a

6  calcium silicate thermal insulation product and it's not

7  an 85% magnesia product.  There are two different types

8  of thermal insulation products.

9       And he based his opinion that he was removing Kaylo

10 on the fact that other insulators stated that in the 40s

11 the Kaylo was installed when the facility was being

12 built.  But in fact O-I Kaylo was not commercially

13 available until 1948, and we know that the Badger

14 facility was up and running in January of 1943, so it

15 couldn't have been Kaylo that was installed during the

16 initial construction of that facility.  And, also, Kaylo

17 is not an 85% magnesia product; it's a calcium silicate

18 product.

19      And he indicated that the purpose -- Mr. Schlub

20 indicated that the purpose of his activities during that

21 time period at the Badger facility was to recover damaged

22 and weathered pipe insulation that had been exposed to

23 rain and dust from dust blowing in the fields outside

24 where the pipe covering existed.  And he described the

25 insulation as weathered and falling apart and

1   deteriorated.

2        But calcium silicate products, which included the

3   Kaylo, the O-I Kaylo product, is not soluble in water and

4   it doesn't break down in water and it stands up very well

5   to weather conditions, including high humidities and rain

6   and those kind of elements; whereas 85% magnesia, by

7   definition, is 85% magnesium carbonate, which is soluble

8   in water.

9        That was one of the reasons that the insulation

10  industry got away from the 85 magnesia product, because

11  it did break down in wet environments, particularly

12  outdoors in the rain where the humidity was high.  And

13  they got away from that 85 magnesia product and went to a

14  calcium silicate product which is not soluble, it doesn't

15  deteriorate in high moisture conditions.

16  Q.   What product, in your opinion, is Mr. Schlub most

17  likely identifying?

18  A.   Well, since he stated that he was told by other

19  insulators that the insulation was put on back during the

20  40s during the building of the plant, and based on the

21  pictures that I saw with all the evidence, the product

22  that was being installed was Johns Manville 85% magnesia.

23        MR. MCCOY:  Your Honor, objection.  I don't

24  think that's been disclosed in his opinion.

25        THE COURT:  I'll tell you what, I'll let the

EARL GREGORY - DIRECT

1  testimony stand.  If you're right in the briefing, I can

2  strike that opinion.  But we'll just keep going today,

3  okay?

4  BY MR. WATSON:

5  Q.   Is it your opinion that the product that Mr. Schlub

6  is identifying was not Owens-Illinois Kaylo?

7  A.   That's my opinion.  Based on the fact that

8  Mr. Schlub testified that it was an 85% magnesia product,

9  but Kaylo is not an 85% magnesia product; and he

10  testified that it was weathered and had been broken down

11  and deteriorated by rain and the outdoor environment; and

12  the fact that he said that the other insulators indicated

13  that the insulation had been installed during the initial

14  construction of the plant; and based on the photographs

15  that I saw; 85% magnesia manufactured by Johns Manville

16  was being installed during the construction of that

17  plant.

18  Q.   So, in your opinion --

19          MR. MCCOY:  Same objection.

20          THE COURT:  Understood.

21  BY MR. WATSON:

22  Q.   In reading Mr. Schlub's deposition testimony; even

23  though he uses the term *Kaylo* to identify the material,

24  is it your opinion that the material that he's

25  identifying is not Owens-Illinois Kaylo?

2-P-90

1  A.    That's my opinion, right, that it's not

2  Owens-Illinois Kaylo thermal insulation products and that

3  most likely it's an 85% magnesia product manufactured by

4  Johns Manville as well as some other manufacturers during

5  that time period.

6  Q.    Let me talk more about Mr. Zimmer's testimony and

7  your opinions about Mr. Zimmer's testimony.  How large,

8  in your review of the record, was the Badger Ordinance

9  facility?

10  A.    It was, based on the historical records that I

11  reviewed, it was 7,500 acres.

12  Q.    How many hundreds of miles in the historical records

13  of overhead pipeline and insulated pipeline was there at

14  Badger Ordinance?

15  A.    I saw one statement indicating there was over 200

16  miles of such pipeline.

17  Q.    What is your opinion about if somebody is simply

18  present at a jobsite that's the size and scope of 7,500

19  acres with 200 miles of steam lines, that one individual

20  testifying about asbestos work is necessarily identifying

21  the exposures that another individual would have anywhere

22  on the jobsite?

23  A.    My opinion is in order to determine whether someone

24  was exposed to the same situation that you were exposed

25  to, there has to be evidence that that person was

EARL GREGORY - DIRECT

1  performing a similar job in close proximity to where the

2  individual was working.

3      In other words, just because you are two insulators

4  working at the same jobsite, one could be on one end of

5  the jobsite, the other could be on the other end of the

6  jobsite.  One could be performing activities that are

7  totally different from the other person.

8  Q.   And how did Mr. Zimmer identify the product that he

9  called *Kaylo*?

10 A.   He called it a *white, smooth product.*

11 Q.   Did Mr. Zimmer testify that he actually performed

12 the work?

13 A.   No.  In fact he stated that as an apprentice, he

14 wasn't allowed to touch the product.  He had other duties

15 that he had to perform before he was able to be a

16 journeyman insulator.

17 Q.   What insulation products would fit Mr. Zimmer's

18 description of a smooth and white pipe covering?

19 A.   Well, most thermal insulation pipe covering during

20 that time period -- and even after that time period and

21 before that time period, for that matter -- were white

22 and smooth.  I mean, I can only think of one particular

23 product that could not be described as white and smooth.

24 And I base that on the fact that I've seen it in

25 different plants where I've worked as well as I've read

EARL GREGORY - DIRECT

1  the testimonies of many insulators who had described

2  insulation that they have removed.  And in most cases,

3  most pipe covering insulation was white and smooth.

4           MR. MCCOY:  Your Honor, I'd like to again make

5  that same objection that I don't believe this is

6  disclosed.

7           THE COURT:  Okay.  Understood.  We can resolve

8  it later.  For now the testimony stands subject to being

9  stricken later.  Let's keep going.

10 BY MR. WATSON:

11 Q.   Have you reviewed the *Federal Register* of

12 identifying information of asbestos-containing products?

13 A.   Yes, I have, the 1990 edition.

14 Q.   Are you familiar with that document?

15 A.   Yes, I am.

16 Q.   Does that -- what does that document show?

17 A.   Well, the Federal Government EPA, in 1990, asked all

18 manufacturers or former manufacturers of

19 asbestos-containing products to disclose the identity of

20 that product, the composition of that product, the

21 physical appearance of that product, and the years that

22 it was manufactured and the amount of asbestos and type

23 of asbestos that was contained within those products.

24 That was published in 1990 from all responding companies.

25 And in there you'll see that many of the companies that

EARL GREGORY - DIRECT

1    produced thermal insulation pipe covering or block

2    insulation, they described their product as white in

3    color.

4         MR. MCCOY:  Same objection, Your Honor.

5         THE COURT:  And it stands.

6    BY MR. WATSON:

7    Q.   I'm now showing you on the screen, Owens-Illinois

8    Exhibit 1258.  Do you see that document?

9    A.   Yes, I do.

10   Q.   Is that the same *Federal Register* that you were

11   talking about before?

12   A.   That is.

13        MR. WATSON:  Your Honor, we offer Owens-Illinois

14   Exhibit 1258.

15        THE COURT:  Do you want to object or save it for

16   later?

17        MR. MCCOY:  As long as we have that standing

18   objection.

19        THE COURT:  Sure.  And with the exhibits,

20   Mr. Watson, we don't need to offer during the testimony

21   because you guys are going to go through that exercise

22   tonight.

23        MR. WATSON:  It's a force of habit that's been

24   drilled into me, Your Honor.

25        THE COURT:  Hard habit to break, I understand

1  that, but we'll reserve.

2  BY MR. WATSON:

3  Q.   In your opinion, is the description of "smooth and

4  white insulation product" consistent with Armabestos pipe

5  covering?

6  A.   Well, based on what I have read, it is, yes.

7  Q.   Is your description of "smooth and white pipe

8  covering" consistent with a product like Careytemp

9  insulation?

10  A.   Yes, it is.

11  Q.   Is your -- in your opinion, is the description of a

12  product that's "smooth and white" consistent with Johns

13  Manville 85% magnesium?

14  A.   Yes, it is.

15  Q.   Is the description consistent with many other

16  insulation products?

17  A.   Yes, it is.

18  Q.   Owens-Illinois fiberglass that was made in the

19  1960s; is that true?

20  A.   Yes.

21  Q.   In your opinion, why is it highly unlikely that an

22  insulator like Mr. Schlub or Mr. Zimmer could even

23  identify the brand of insulation that's been installed on

24  a pipeline?

25          MR. MCCOY:   It's part of the standing objection.

1          THE COURT:  You've got it.

2  A.    Well, once the product is removed from the container

3  and installed on the piping, it all looks the same, with

4  the exception of again one product that I'm aware of

5  called *Unibestos*.

6  Q.    And did you see in the record any evidence of

7  Unibestos being installed at Badger Ordinance?

8  A.    Yes, I did.

9  Q.    By whom?

10  A.    Well, Frank Hofstetter indicated that when he worked

11  at the Badger Ordinance in '53, '54, '55, he wasn't sure

12  of the years, that he installed Unibestos as well as 85%

13  magnesia pipe covering.

14  Q.    In your review of the record, what's the take-away

15  from this first part of your opinion about whether

16  Mr. Suoja was ever exposed to an Owens-Illinois product?

17  A.    Well, there's just no evidence, from what I have

18  reviewed, that indicated Mr. Suoja was exposed to

19  Owens-Illinois Kaylo thermal insulation products.

20  Q.    Now, Mr. Suoja worked for 40-plus years as a union

21  insulator, right?

22  A.    That's correct, 41 years.

23  Q.    Did you reach a conclusion about his exposures to

24  asbestos-containing products other than Owens-Illinois

25  Kaylo?

EARL GREGORY - DIRECT

1  A.   He most certainly, as an insulator over all those

2  years, particularly up until about 1973 -- after 1973,

3  asbestos-containing thermal insulation products were no

4  longer manufactured -- but from '43 to the end of '73 he

5  certainly had significant exposures to

6  asbestos-containing products; not only thermal

7  insulation, but cements, possibly sprays, textiles are

8  asbestos-containing cloth, and blanket material and

9  several other types of asbestos-containing materials that

10  he'd encounter as an insulator and that he was near while

11  other people were working with them.

12  Q.   What exposure levels or is there a study that shows

13  what exposure levels you would expect a union insulator

14  performing those types of duties would sustain?

15  A.   The best one that would be most relevant in this

16  case would be the Balzer and Cooper 1968 studies of

17  contractors who performed light and heavy industrial

18  construction operations.  And they were insulators who

19  were using various asbestos-containing thermal insulation

20  as well as asbestos-containing cements or mud and

21  asbestos-containing cloth in the building of office

22  buildings and industrial plants and all types of

23  construction projects.

24      And those studies that were done were fairly

25  comprehensive.  They took a lot of air samples, evaluated

1  a lot of insulators, and they reported some average

2  exposure levels during certain activities that insulators

3  are involved with.

4  Q.    Could you give the Court at least a hierarchy of the

5  types of work and corresponding types of exposure levels

6  that a person would have performing that work?

7  A.    Well, an insulator does several different tasks.

8  First of all, they have to prepare their insulation to be

9  installed.  Now, sometimes that's done in a shop away

10 from the jobsite.  But in most cases, and in the

11 construction trades, it's done right at the building

12 that's being constructed.

13      So there's cutting of the material, there's cutting

14 of angles, because they have to fit around elbows and Ts,

15 around valves and things like that.  So there's a lot of

16 preparation and cutting work that goes on.

17      And then once they start installing the thermal

18 insulation, then they have to put an insulating cement

19 around it.  So they have to do mixing.  Sometimes they

20 mix, other times the apprentice does the mixing of the

21 cement material, which is basically a cement material

22 with asbestos that you mix in a powder form, and you add

23 water and you essentially trowel it on and smooth out all

24 the uneven parts of the thermal insulation that you've

25 installed, particularly around joints or between the

1    sections of the molded insulation that you're putting on

2    the piping or on the vessels.

3         And then depending upon the specification required

4    for the insulation job, there's also a finish coat of

5    either a canvas material or an asbestos cloth that goes

6    over the cement material and ends up being a nice, smooth

7    finish.  In some cases they don't put the asbestos cloth

8    on, they just finish off the insulating cement, and in

9    some cases they paint over the insulating cement or the

10   canvas or the asbestos cloth.

11   Q.   Could we move to Topic No. 2, Dr. Gregory?

12   A.   Yes.

13   Q.   And that was the topic where we asked you to

14   evaluate what responsibilities the employers and jobsite

15   owners and jobsite controllers had to protect Mr. Suoja.

16   And could you give us again what your conclusion was?

17   A.   Well, they have the responsibility, when they hire

18   someone or bring them onto their premises or to their

19   construction site, to pay them for their activities, but

20   not to in any way harm their health or their safety.  So

21   they have a contract with that employee to provide them a

22   safe and healthful workplace so that when they leave that

23   jobsite the only thing they are is tired, they're not

24   overexposed, they have all their fingers and their toes.

25        And the employer controls in the jobsite.  The

1  controller and the premise controller, they control

2  everything.  Whenever you hire and you fire, you control

3  everything: you control the material, you control the

4  hires, you control the procedures, you control the

5  activities.  Just everything that goes on in the

6  workplace, the employer and the jobsite controllers

7  control.

8      That's the reason that OSHA regulations and all

9  state regulations and the Walsh-Healey regulations put

10 the accountability for protecting employees on the

11 employer and jobsite controllers, because they have the

12 ability, the authority and the duty and the

13 responsibility to protect all the employees that they

14 employ or that are on their jobsites.

15 Q.   Are you familiar with a hierarchy of controls in

16 industrial hygiene?

17 A.   Yes.  Ever since the 1930s there's been what's

18 called the *industrial hygiene hierarchy of controls*.  And

19 it basically is three different control methods that

20 start out with the best control being engineering

21 controls; in other words, catch the material, contain the

22 material before it gets to the employee's breathing zone

23 using engineering controls such as ventilation,

24 isolation, wet-down methods; all of those types of

25 procedures.  Those are engineering controls.

1        The next level under that hierarchy, and --

2   Q.   Can I stop you right there, Dr. Gregory?

3   A.   Sure.

4   Q.   You have for us Exhibit 1198, which I'm showing you

5   now.  And do you recognize this document?

6   A.   Yes, I do.

7   Q.   And could you tell us what Exhibit 1198 shows?

8   A.   That's the hierarchy of controls.  And since the

9   1930s, there's been a couple of levels added:

10  Elimination and substitution.  In other words, if you can

11  eliminate the hazardous material, you don't have to worry

12  about control.  So it's not really a control method; it's

13  eliminating the material so that there's no need to have

14  any control.

15       But the last three sections are the *classic*

16  industrial hygiene hierarchy of controls.  Engineering

17  controls, for example, they're in the gold and the

18  yellow.  That's engineering wet methods, any way that you

19  can contain and isolate and prevent the air contaminant

20  from getting to the employee's breathing zone.

21       The next hierarchy of control is administrative

22  control.  That just means that you limit the person's

23  exposure to a potentially hazardous air contaminant by

24  reducing the number of hours they're exposed to that

25  material so that over an eight-hour day or over a 40-hour

EARL GREGORY - DIRECT

2-P-101

1  week their exposure level is within the TLVs or

2  permissible exposure limits.

3      And the last one, and what is considered the least

4  effective, but sometimes it's the only effective method,

5  and that's the use of personal protective equipments.

6      So, in other words, if your engineering controls

7  aren't successful in controlling and containing the

8  contaminant before it gets to the worker's breathing

9  zone, and if your administrative controls aren't

10 successful and feasible in reducing the employee's

11 exposure to within the safe limits, then you use a

12 respirator.  A respirator just filters out the air

13 contaminant before it reaches the employee's lungs.  So

14 that is the last means of control, but in some cases the

15 only effective means of control.

16 Q.   And I'm showing you now page 3 of that same exhibit.

17 Is that essentially a summary of the hierarchy controls

18 that you've described?

19 A.   Yes, it is.

20 Q.   Why are Mr. Suoja's employers in the best position

21 to insure workplace safety?

22 A.   Well, if we look at these controls; engineering

23 controls, that's ventilation, building isolation systems

24 to control the dust, keep it away from the employee's

25 breathing zone.  Only the employer, the jobsite owner and

1   the premise owner can do that.  They are the only ones

2   that have authority at that workplace to install

3   ventilation and to put in isolation techniques.

4        And they have of course the resources to do it.

5   They know where the operation is occurring, they know

6   under the conditions that the operation is being

7   performed, and they know when they need to put in

8   engineering controls.

9        And the same with administrative controls: if you

10  want to limit an insulator's cutting of thermal

11  insulation or mixing of asbestos-containing cement to two

12  hours versus four hours, the only one that can do that is

13  that person's boss, the employer or the general

14  contractor that comes to the subcontractor and says, "I

15  want you to limit it to reduce this guy's exposure by

16  using administrative controls.  If you don't do it, get

17  off our property."  So they have control, too, just like

18  the premise owners.

19       Personal protective equipment is something that I've

20  fought throughout my whole career of trying to get people

21  to wear what they know they need to wear to protect

22  themselves.  In fact the last day that I was in private

23  industry I had to fire one of our employees who I told

24  three times to wear a respirator while they were

25  unloading a toxic chemical from a tank car.  And even

EARL GREGORY - DIRECT

1   though that was my last day, you'd think I'd be

2   benevolent.

3        I told him, "This is the third time I told you.  I'm

4   going to go to your boss.  I'm going to recommend that

5   you be terminated because I can't stand leaving this

6   place knowing that you're not taking the precautions that

7   are necessary to protect you from overexposure to

8   methylene chloride," which is a suspected carcinogen.

9        So getting people to wear respirators has always

10  been a challenge.  And that's the reason why the other

11  controls are preferred, because you're not depending upon

12  the employees.  Now, some employees are very

13  conscientious and will wear their protective equipment.

14  But most people have other motivators that motivate them

15  against the motivation to work safely.  And those are

16  things like being comfortable, avoiding taking extra

17  effort or extra time or being able to get through the job

18  quickly.

19       And so what you have to do to counter those bad

20  motivators that encourage people to take the comfortable

21  way out -- it's uncomfortable to wear a respirator, so

22  most people will avoid that discomfort and assume the

23  risk of being overexposed -- but it's up to the employer

24  to say, "That's not going to happen.  If you're going to

25  work here, you're going to protect yourself.  I'm not

 1  going to allow you to be overexposed."

 2  Q.   How would employers and jobsite owners obtain

 3  information about the potential hazards or dangers from

 4  asbestos-containing products?

 5  A.   Well, in this particular case the State of

 6  Wisconsin, since 1947, had adopted the threshold limit

 7  value for asbestos of 5 million particles per cubic feet.

 8  That's the Industrial Commission of Wisconsin that

 9  promulgated that law way back then.  And, also,

10  Walsh-Healey, that standard came out in 1942 and that

11  adopted the American Conference of Governmental

12  Industrial Hygienists TLV for asbestos, which is --

13  Q.   And the Wisconsin Industrial Commission and the

14  Walsh-Healey Act would describe threshold limit values,

15  ventilation, protection of individuals, equipment and

16  other maintenance controllabilities on the jobsite; is

17  that right?

18  A.   That's correct.  They're essentially following the

19  hierarchy of controls as far as engineering controls,

20  administrative controls and personal protective

21  equipment.

22  Q.   In your opinion, who is primarily at fault for

23  Mr. Suoja's overexposure to asbestos during his career?

24  A.   Well, the person or the company, the individuals

25  that control the work activities of Mr. Suoja, which

EARL GREGORY - DIRECT

 1  would have been his employer, the jobsite controller or

 2  the premise owner.  Any one of them could have insisted

 3  that he be protected from overexposures to asbestos.

 4  Q.   I want to briefly, since I've mentioned it before,

 5  Topic No. 3, which was to evaluate the concept of

 6  threshold limit value and its importance in this case;

 7  very briefly, could you describe for the Court what

 8  exactly is the TLV or threshold limit value?

 9  A.   The TLV is an eight-hour, time-weighted average

10  limit and it essentially gives airborne concentrations of

11  substances below which it is believed that nearly all

12  employees or workers may be exposed to for eight hours a

13  day, 40 hours a week, through a working lifetime without

14  suffering adverse health effects or occupational

15  diseases.

16  Q.   You've mentioned 5 million particles per cubic foot

17  TLV, right?

18  A.   Yes.

19  Q.   Could you tell the Court what exactly that means?

20  A.   Well, that is the -- that was the TLV for asbestos

21  from 1938 to about 1970.

22  Q.   How would someone determine the exposure levels in

23  order to compare it against the threshold limit value?

24  A.   You have to do air monitoring in the employee's

25  breathing zone, and there's various devices that have

1  been used in the field of industrial hygiene.

2      And basically you just sample in the breathing zone

3  and you collect the amount of dust that's in that

4  employee's breathing zone.  And then you analyze it,

5  essentially count the particles or the fibers of

6  asbestos.  And then you keep track of the amount of air

7  that you've sampled so that you can indicate the number

8  of particles per cubic feet of air that that employee was

9  exposed to in their breathing zone.

10 Q.   We heard something yesterday about conversion

11 factors from fibers per cc.  Could you tell us what

12 exactly the conversion factor is?

13 A.   Yes.  The ACGIH in 1970, when they converted from

14 million particles per cubic feet to fibers per cc, used a

15 factor of 6.  And that's defined as 1 million particles

16 per cubic feet equals 6 fibers per cc.  In fact when they

17 published in 1970, when they published their new

18 standard, which was 2 million particles per cubic feet,

19 they also published it as 12 fibers per cc.

20 Q.   Is it your understanding that the Industrial

21 Commission of Wisconsin was actually available to go do

22 sampling at jobsites?

23 A.   Yes.  In fact I was surprised to see that they had

24 an industrial hygienist in 1937, a man by the name of

25 *William Fluck*.  And he worked for the Wisconsin Board of

EARL GREGORY - DIRECT

1  Health Industrial Hygiene Unit.  And after reading his

2  deposition, I found out that during that time period they

3  were active in investigating requests or complaints from

4  employers or from unions to go into plants.  And they did

5  air monitoring for all the different air contaminants

6  that existed in various industrial operations, including

7  asbestos.

8  Q.   Were the TLVs and permissible exposure levels

9  considered state of the art, in terms of industrial

10  hygiene, from the 1930s through 1968?

11  A.   Yes, they were.  I mean, that's what we based all of

12  our industrial hygiene practice on.  In fact I remember

13  in 1974, when I just got out of graduate school and I was

14  industrial hygienist for the Occupational Safety Health

15  Administration, I was going around, under the new Health

16  Hazard Program for Asbestos that had been developed, and

17  I was doing a lot of air monitoring for asbestos.

18      And I would tell the employers, you know, if you

19  keep your employees' exposure levels below this

20  permissible exposure limit, which at that time in 1974

21  was 2 fibers per cc, then your employees are not going to

22  suffer adverse health effects, because this permissible

23  exposure limit was adopted from the TLVs and it's been

24  shown to be a safe level of exposure.

25  Q.   Would jobsite owners, employee -- employers,

EARL GREGORY - DIRECT

1  premises owners, know about the threshold limit values

2  for asbestos from the Wisconsin Industrial Commission

3  orders?

4  A.   Yes.

5  Q.   Would they know about it from the Walsh-Healey Act?

6  A.   They should have known.  When you hire someone or

7  when you put out a contract for someone to do work on

8  your property or if you're a general contractor and

9  you're hiring a subcontractor, you have the obligation

10  and the duty to make sure that you're aware of all

11  occupational safety health standards that apply to that

12  operation and to make sure that your subcontractors are

13  complying with those safety and health regulations.

14  Q.   Would that include L&S Insulation at Badger

15  Ordinance?

16  A.   Yes, it would.

17  Q.   Would that include the United States of America at

18  Badger Ordinance?

19  A.   Yes, it would.

20  Q.   Would that include Owen Corporation, the controller

21  of Badger Ordinance?

22  A.   Yes, it would.

23  Q.   Threshold limit values and permissible exposure

24  levels are still in existence today, aren't they?

25  A.   Yes, they are.

EARL GREGORY - DIRECT

2-P-109

1    Q.    The numbers are just lower?

2    A.    That's correct.

3    Q.    In your opinion, what is the significance about

4    threshold limit value in the 1940s and 1950s, in your

5    industrial hygiene opinion, during the time that

6    Owens-Illinois made and sold Kaylo in the 1940s and

7    1950s?

8    A.    Well, the threshold limit value at that time was

9    5 million particles per cubic feet and it was not

10   challenged by any industrial hygienists or medical

11   doctors or safety health regulators.  It was considered

12   to be a safe exposure level that as long as exposures did

13   not exceed that, occupational diseases would not occur.

14   Q.    I want to change topics really quick.  And you're

15   familiar with the Fleischer-Drinker report, aren't you?

16   A.    Yes, I am.

17   Q.    And you've assessed that from an industrial

18   hygienist perspective?

19   A.    That is correct.

20   Q.    Do you consider the Fleischer-Drinker study to be a

21   good look at the work practices and controls that an

22   operator can have in an environment?

23   A.    Yes.  Fleischer and Drinker, both two MDs, one an

24   admiral of the U.S. Navy, went in to, actually at the

25   request of the U.S. Navy, to evaluate the use of asbestos

EARL GREGORY - DIRECT

1   in shipyards.  And they not only did air monitoring, but

2   they evaluated engineering controls and they did x-rays

3   of all the insulators to try to determine whether or not

4   there was an increase incidence of asbestosis, which at

5   that time, that was the only recognized adverse health

6   effect from overexposure to asbestos was the development

7   of asbestosis.

8   Q.   And at that time when Fleischer and Drinker did

9   those studies and published their findings, what were

10  their conclusions?

11  A.   Their conclusion was that pipe covering was not a

12  dangerous occupation based on the fact that they only

13  found three cases of asbestosis in all of the employees

14  that they had x-rayed and based on the monitoring that

15  they had performed, which basically the results were

16  within the 5 million particles per cubic foot TLV of that

17  time period.

18  Q.   If they used control methods and kept exposure

19  limits within the threshold limit values then you

20  wouldn't see adverse health consequences?

21  A.   That's correct.

22  Q.   Let's move to the fourth topic, Dr. Gregory, and

23  that was warnings.  And we asked you to evaluate whether

24  putting a warning on a package of Owens-Illinois Kaylo

25  would have affected Mr. Suoja's asbestos exposure at all;

2-P-111

1  is that right?

2  A.   That's correct.

3  Q.   And your conclusion was, if I heard it before, it

4  would have no effect?

5  A.   That's correct.

6  Q.   Number one, Mr. Suoja was never exposed to an

7  Owens-Illinois product?

8  A.   That's correct, based on the evidence that I've

9  reviewed.

10  Q.   And the second is, what difference would a warning

11  have even made?

12  A.   That's correct, because you still have to implement

13  these controls to reduce the exposure.  You have to use

14  engineering, administrative or personal protective

15  equipment and Mr. Suoja would not have been able to do

16  that.

17       Also, there were no boxes around in '67.

18  Owens-Illinois stopped making thermal insulation products

19  April 30th of 1958 when they sold their thermal

20  insulation division to Owens Corning Fiberglas.  And

21  there wouldn't have been any -- assuming, which is not

22  supported by the evidence, assuming Owens-Illinois Kaylo

23  would have been sold in that facility, which is not

24  supported by the evidence, the boxes would have been long

25  gone.  So the boxes would not have served any purpose as

1  far as warning Mr. Suoja.

2      Even if there were a box there, the box -- the

3  warning does not give him the power to put in ventilation

4  controls to reduce the number of hours that he works or

5  to give him a respirator and wear a respirator.  So it --

6  warnings do not do anything to reduce an employee's

7  exposure.

8  Q.   What information would a warning have provided that

9  the employers and jobsite owners didn't already know?

10  A.   Well, right.  I mean, they were aware of the

11  Walsh-Healey Act.  They were aware of the Industrial

12  Commission of Wisconsin's requirements for the threshold

13  limit value for asbestos.  They were aware of engineering

14  controls.  They were aware of the hazards of overexposure

15  to asbestos.

16  Q.   What difference would that warning have made to

17  Mr. Suoja's union?

18  A.   It would not have made any difference because the

19  Asbestos Workers Union, of all organizations, had more

20  knowledge about the hazards of asbestos than any other

21  organization in the country.  I mean, they hired the

22  number-one authority on asbestos-related hazards in the

23  entire world, Dr. Irving Selikoff, around 1960 to do a

24  study of their workers to determine whether their workers

25  were at any increased risk of developing asbestos-related

 1  diseases.

 2      And that study resulted in a lot of good

 3  information, and that information was sent out to the

 4  Asbestos Workers Unions in quarterly publications that

 5  gave them warnings about the potential hazards of

 6  overexposure to asbestos, it gave them information on

 7  their exposure levels to asbestos, and it gave them

 8  information on how to control their exposures.

 9      In fact in 1961 the Asbestos Workers Union published

10  a poster called the *Grim Reefer -- Reaper* poster.  And it

11  has a picture of a family in one corner and the *Grim*

12  *Reaper* in the other.

13          THE COURT:  We've actually seen it twice in this

14  trial.

15          THE WITNESS:  Okay.  I'm sorry.

16          THE COURT:  You didn't know, but we're all

17  familiar with it.

18  A.   Okay.  You don't get more effective warning than

19  that.  But as a result of that, in 1969 the Asbestos

20  Workers Union sent out questionnaires to their membership

21  and 12,000 members filled out that questionnaire.  And

22  the purpose of that questionnaire was to find out how

23  well those warnings were working and to determine whether

24  employees were wearing the respirators.  And the result

25  of that survey was only 7% of the union workers were

EARL GREGORY - DIRECT

1  wearing their respirators full time, which is what you

2  need to do in order to protect yourself from overexposure

3  to asbestos as an insulator.

4  Q.   How did the union communicate that information to

5  members of the union like Mr. Suoja?

6  A.   That was published in what was called an *Asbestos*

7  *Workers Journal* magazine that went out quarterly.

8  Q.   To all the union members?

9  A.   To all the members, that's correct.

10  Q.   Was this information that was available to

11  Mr. Suoja?

12  A.   Yes.  He should have received those publications.

13  Q.   What difference did that *Grim Reaper* ad make in

14  terms of the conduct of asbestos workers?

15  A.   Well, based on the results of the respirator

16  questionnaires, only 7% of the responders, 12,000 total

17  asbestos union workers, said that they wear their

18  respirators all the time, which is what they have to do

19  or had to do during that time period to reduce their

20  exposure levels to within safe limits.

21  Q.   Did any manufacturer put a warning on its thermal

22  insulation product in the 1940s and 1950s?

23  A.   Not that I'm aware of.

24  Q.   When did warnings come on to thermal insulation

25  products?

EARL GREGORY - DIRECT

1   A.    In the mid 1960s is what I've found during my

2   research.

3   Q.    Did the conduct of asbestos workers, including the

4   survey that you just told the Court about, change after

5   warnings went on thermal insulation products?

6   A.    No.  I mean, even the depositions that I read here

7   from Mr. Van Beck, who was the vice president of

8   Sprinkmann & Sons insulating contractor, he indicated

9   that the respirators were not enforced until OSHA came

10  around, which is just a crying shame that you have to

11  wait for the government to make you protect your

12  employees.  But he admitted that.

13        And, also, Mr. Borchardt, who was a vice president

14  for L&S, indicated that he had heard in the 50s and the

15  60s about old insulators dying of asbestosis, but yet he

16  didn't enforce respirators until the advent of OSHA.  He

17  said he supplied them, made them available.

18        But like the example I gave earlier: you can make

19  them available, but you have to motivate people to wear

20  them.  And sometimes that takes the threat of not keeping

21  your job in order to get people to wear what they need to

22  wear to protect their health.

23            MR. WATSON:  Thank you, very much, Doctor.

24            THE WITNESS:  Your welcome.

25            THE COURT:  All right.  Cross-exam.  Oh, do you

EARL GREGORY - DIRECT

1  need a break?  No.  I'm sorry.  I misunderstood your

2  gesture.  Let's keep going.

3                     CROSS-EXAMINATION

4  BY MR. MCCOY:

5  Q.   Dr. Gregory, I just wanted to confirm, I have this

6  copy of your report which says filed 9/20/12 and signed

7  on September 18th, 2012.  Is that what you know to be

8  your last version of this report?

9  A.   No.  There was actually a report in 2014 --

10 Q.   Okay.

11 A.   -- September 2014.

12 Q.   I wanted to make sure.

13          THE COURT:  You want to confirm that you sent

14 that over?

15          MR. WATSON:  I can confirm multiple times we

16 gave a copy of it, even in our exhibits, and gave a copy

17 to them before this examination of Mr. Gregory commenced.

18          THE COURT:  It was produced?

19          MR. WATSON:  It was produced to them timely.

20 There was a court-ordered deadline for us to supplement

21 after remand.  Plaintiff produced supplemental reports

22 and we produced supplemental reports.  They were

23 exchanged.  I'm happy to make an offer later to the

24 Court, including certificate of service, in order to show

25 that.

                    EARL GREGORY - CROSS

1          THE COURT:  I'm fine.

2          MR. MCCOY:  Judge, I just wanted to know if they

3    had a copy of the 2014.

4          MR. WATSON:  I gave it to Mr. Hausman earlier.

5    I can get another copy.

6          MR. MCCOY:  Yeah.  Have you got another copy?

7          THE COURT:  See if he's got it handy.

8          MR. MCCOY:  Do you know what number it is?  I'm

9    going to proceed while we're looking for it.

10          MR. CASMERE:  We'll put it on the thumb drive

11    while you're going.

12          MR. MCCOY:  Okay.  The number is fine.

13          MR. WATSON:  Your Honor, for the record, 1162 is

14    Earl Gregory's expert report.

15          MR. MCCOY:  Okay.  We'll pull that up.

16          MR. WATSON:  Exhibit 1163 is Earl Gregory's

17    supplemental expert report.

18          THE COURT:  And that would be the most recent?

19          MR. WATSON:  That would be the most recent one

20    that Mr. Gregory just identified in 2014.

21          THE COURT:  Understood.

22          MR. MCCOY:  Okay.  We'll pull that up.  All

23    right.

24    BY MR. MCCOY:

25    Q.   Thank you, Mr. Gregory.  That's the question I had.

EARL GREGORY - CROSS

 1          MR. CASMERE:  Doctor.

 2  BY MR. MCCOY:

 3  Q.   Dr. Gregory.  First of all, I wanted to ask you

 4  something.  You had a lot of discussion about duties of

 5  the places that own the properties and the employers and

 6  so on.  What is a manufacturer's responsibility, in the

 7  context of a product like the Kaylo, back in the time

 8  period in the 1940s and 50s, for -- as a manufacturer to

 9  provide information?

10  A.   Well, as a manufacturer, just like any manufacturer,

11  you're an employer who has employees, so you have the

12  same responsibility to protect your own employees against

13  the hazard of asbestos as any other employer that's using

14  an asbestos-containing product.  So as an employer, they

15  have the same responsibilities.

16  Q.   Okay.  You're talking about the duties within the

17  context of industrial hygiene; is that what you're

18  referring to?

19  A.   Yes, in the manufacturing plant there.

20  Q.   Okay.  What about a finished product leaving the

21  hands of a manufacturer, what type of information should

22  have been on that one?  And again, I'm going back to that

23  time frame when O-I was manufacturing Kaylo.

24  A.   Well, during that time period they were making a

25  product that contained asbestos.  And they knew about the

EARL GREGORY - CROSS

1  potential hazards of asbestos, so they had monitoring

2  performed in their plant where they manufactured the

3  product.  In fact they had the insurance company in and

4  they had an outside consulting group to do air

5  monitoring; plus they had their own industrial hygienist,

6  a person by the name of *Willis Hazard*, who did

7  monitoring.  So their responsibility was to make sure

8  their own people were not overexposed to asbestos.

9  Q.   Right.  Just so I understand, are you saying that

10 the product manufacturer, from an industrial hygiene

11 perspective, had no responsibility for the product once

12 it left the manufacturing facility?

13 A.   No.  I'm just saying --

14 Q.   Okay.  All right.  So that's what I'm trying to get

15 you to address.

16       THE COURT:  I think you misunderstand each

17 other.  Why don't you focus in more tightly on what you

18 want him to tell you.

19 BY MR. MCCOY:

20 Q.   What is the responsibility, from the industrial

21 hygiene perspective, that the manufacturer had back in

22 that time period for the product that went out of its

23 manufacturing plant doors?

24 A.   There were no responsibilities of a manufacturer to

25 provide any warning labels or any information on

EARL GREGORY - CROSS

1  asbestos-containing products back during that time

2  period.  In 1983 that changed.

3  Q.  I'm not asking about just asbestos-containing

4  products.  I'm asking generally, from an industrial

5  hygiene perspective, what responsibility did the

6  manufacturer have for the product that was going out of

7  its doors?

8  A.  From an industrial hygiene standpoint, only the

9  employer, the jobsite controller, the premise owner, the

10  people who have a contract with employees to provide them

11  a safe and healthful workplace, they're the only ones

12  with the responsibility, not the manufacturer.

13  Q.  Okay.  And so if we went to the industrial hygiene

14  literature in that period of time, what you're saying is

15  there's nothing addressing a manufacturer's

16  responsibilities, right?

17  A.  I'm not aware of anything.  At least when I was in

18  graduate school, we were taught that the responsibility

19  was the employer's, mainly because they're the only ones

20  that can control exposures --

21  Q.  Right.

22  A.  -- and people.

23  Q.  So nothing, you're saying, here today addresses what

24  responsibilities Owens-Illinois would have; is that

25  correct?

EARL GREGORY - CROSS

```
 1              MR. WATSON:  Objection, Your Honor.

 2              THE COURT:  Well, I'll overrule the objection if

 3    Dr. Gregory understands the question as posed; if not,

 4    I'll ask Mr. McCoy to repose it; but let's find out.

 5    A.   I don't understand that question.

 6    Q.   Okay.  What I wanted to know was if there's nothing

 7    from an industrial hygiene perspective that would impose

 8    any duties on a manufacturer back in that time frame,

 9    then what you're saying here today doesn't relate to

10    Owens-Illinois's duties, right?

11              MR. WATSON:  Objection, Your Honor.  Vague.

12    Compound.

13              THE COURT:  Well, again, let's see if

14    Dr. Gregory understands the question.

15    A.   I still don't understand the question.  If you can

16    break it down into segments because it sounds compound to

17    me.

18    Q.   Okay.  But what I'm trying to find out is, is it

19    your opinion then that Owens-Illinois had no industrial

20    hygiene responsibility for the products going out its

21    door?

22    A.   The field of industrial hygiene is based on an

23    employer protecting their employees.  And there were

24    industrial hygienists that could be hired back in that

25    time period, which like I said, Owens-Illinois had hired
```

1   their own industrial hygienist to protect their own

2   employees.

3   Q.   Okay.  And that was all Owens-Illinois was

4   responsible for was protecting their own employees, from

5   an industrial hygiene perspective, right?

6   A.   As far as protecting employees from an industrial

7   hygiene perspective, that was the responsibility during

8   that time period.

9   Q.   Okay.  So Owens-Illinois had no responsibility to

10  the members of the Asbestos Workers Union for Kaylo; is

11  that right?

12  A.   If Owens-Illinois knew something about asbestos that

13  the Asbestos Workers Union did not know, then

14  Owens-Illinois would -- it should have told the Asbestos

15  Workers Union.  But the Asbestos Workers Union knew more

16  about the hazards of asbestos than Owens-Illinois.

17  Owens-Illinois was using an asbestos product just like

18  the asbestos insulators were using.

19          MR. MCCOY:  Your Honor, I'll move to strike the

20  nonresponsive portion.

21          THE COURT:  Actually, he responded exactly to

22  the question you just asked him, so I'm not going to

23  strike it.

24  BY MR. MCCOY:

25  Q.   Okay.  Doctor, when you say the Insulators Union

 1  knew more -- okay.  Did the Insulators Union have a

 2  medical director?

 3  A.   I mean, they hired Irving Selikoff.

 4  Q.   But that was 1960, you said?

 5  A.   '60, I believe, yes.

 6  Q.   Okay.  Did they have a medical director in 1946?

 7  A.   I don't know one way or the other.

 8  Q.   And did the Insulators Union have an industrial

 9  hygienist on staff in 1946?

10  A.   I don't know --

11  Q.   Okay.

12  A.   -- whether they did or not; but I know that the U.S.

13  Army, who built Badger, did in fact in 1943.

14  Q.   Right.  Okay.  And if Owens-Illinois knew something

15  more about the dangers of Kaylo, then Owens-Illinois

16  should have told whoever would be its customers, right?

17  A.   If they knew something different than what their

18  customers knew and if they knew that the use of their

19  product was going to cause asbestos-related diseases,

20  then they should have told those customers.  But the

21  customers who were using the product knew as much, if not

22  more, about the potential hazards of asbestos than

23  Owens-Illinois knew.

24  Q.   Okay.  And the basis for your position is that

25  everybody knew about the TLV levels, right?

EARL GREGORY - CROSS

1  A.    Well, they should have known.  I mean, when you're

2  the U.S. Army with your own industrial laboratory in

3  Baltimore, Maryland in 1943; and, you know, the U.S. Army

4  got into industrial hygiene during World War I during the

5  use of gas warfare and they had a real strong incentive

6  to make sure they knew what was harmful to their

7  soldiers; and so they had a very good understanding of

8  TLVs.

9  Q.    Okay.  They understood the TLVs then; that's what

10  you're talking about?

11  A.    Yes, they understood that.  They understood the way

12  of controlling exposures to TLVs.  They understood, since

13  they understood TLVs, they understood that overexposure

14  to asbestos could cause asbestos-related diseases.

15  Q.    And the TLVs were related to asbestos exposures; is

16  that right?

17  A.    In the earlier period, that's true.

18  Q.    All right.  And that's something that the companies

19  would have known about TLVs, right?

20  A.    Yes.  They should have known about that.

21  Q.    All right.  So -- and I want to show you a document

22  from the -- this is the *American Industrial Hygiene*

23  *Association Quarterly*.  That's a respected journal in

24  your profession, right?

25  A.    Yes.

EARL GREGORY - CROSS

 1  Q.   Okay.

 2            THE COURT:   Do we have a number?

 3            MR. MCCOY:   I don't have a number on this one,

 4  Judge.

 5            THE COURT:   I think you've identified it with

 6  sufficient specificity that we can find it later.

 7            MR. MCCOY:   Okay.

 8            THE COURT:   How about a date for that particular

 9  issue?

10            MR. MCCOY:   This particular issue is September

11  of 1956.

12  BY MR. MCCOY:

13  Q.   And the document we're referring to here is a

14  prepared discussion by Herbert Stokinger, Chief

15  Toxicological Services, Public Health Services,

16  Cincinnati.  Is that a person whose name you know?

17  A.   Yes.

18  Q.   He's a respected person in the field, right?

19  A.   Yes.

20  Q.   One of the primary people behind the TLVs, right?

21  A.   He was on the TLV Committee for many years, yes.

22  Q.   A leader on the committee, right?

23  A.   Yes.

24  Q.   Okay.  This is page 285 of this *Industrial Hygiene*

25  *Quarterly*.  I've highlighted just a section for

                    EARL GREGORY - CROSS

1    introduction.   "As a member of the Threshold Limits

2    Committee, I was concerned over the statement and took

3    trouble to review each substance in the threshold limit

4    list for 1955 as to the basis for the choice of the

5    level."

6        And that's what you meant when you say Dr. Stokinger

7    was a leader, because he was always one of the people who

8    had the most questions, right?

9    A.   He was one of the ones on the committee and he was a

10   chairman of the committee, yes.

11   Q.   All right.   The chairman.   Okay.   So in his prepared

12   discussion, he has a section here on levels for

13   cancerigen.   That's what we now call *carcinogens*, right?

14   A.   That's correct.

15   Q.   And he says, "There is still one group of substances

16   for which some method should be devised for establishing

17   safe air standards - the industrial cancerigens.   How

18   shall we establish the limits for this type of substance?

19   Thus far the question has been sidestepped completely.

20   As a result, with one exception, nickel carbonyl, limits

21   taking into consideration potential cancerigenicity have

22   not been assigned.   Several industrial substances are

23   known or suspected cancerigens; many more are suspect on

24   the basis of animal experiments."

25       "As a suggested method of approach, the following is

EARL GREGORY - CROSS

1   offered: To the level judged safe for other types of

2   systemic injury, add a safety factor for carcinogenicity.

3   The magnitude of the safety factor is suggested to be

4   from 100 to 500."

5        So that means 100 to 500 times lower than if you

6   haven't the potential for carcinogenicity, right?

7   A.   If it's a systemic injury-causing material.

8   Asbestos is not a systemic injury-causing material.

9   Q.   But the damage is to breathing, the lung system?

10  A.   Yes.  But a systemic injury-causing material is

11  absorbed through the lungs and then carried to other

12  portions of the body, the target organs and what have

13  you -- like lead, arsenic, and many other things -- but

14  asbestos stays within the target organ of the lungs.

15  Q.   Asbestos fibers are inhaled and transported to -- if

16  you've got, like, mesothelioma, they're being transported

17  into the lining of the lung, right?

18  A.   They can be, they can, but it's still not considered

19  a systemic point in there.  You know, the definition at

20  that time period was totally different.

21  Q.   Okay.  But it was known that asbestos fibers were

22  transported within the body, right?

23  A.   During that time period, I don't know.  I mean, it

24  was at that time period there had been a study in 1955 by

25  Sir Richard Doll that indicated that workers exposed to

1  asbestos had a high incidence rate of lung cancer.

2  Q.   Right.  And there had been reports in the literature

3  going back to the 1930s about getting cancer from

4  asbestos, right?

5  A.   But none of them were conclusive and considered

6  valid.  The 1955 was really the first conclusive

7  epidemiological study that indicated overexposure to

8  asbestos could be a cause of lung cancer.

9  Q.   Right.  In any event, the concerns of -- expressed

10  by Dr. Stokinger were for the suspected cancerigens,

11  right?

12  A.   But he did not indicate asbestos and asbestos was

13  not a systemic material that could cause injury.

14  Q.   He wasn't talking about any specific cancerigen; he

15  was talking generally about cancerigens, right?

16  A.   Obviously not.  And he was on the TLV Committee.  If

17  he saw a reason to change that, he could have changed it,

18  and it was not changed.

19  Q.   What I wanted to ask was did this information get

20  reported to the unions about the safety factors you have

21  of cancerigens?

22  A.   I don't know if he communicated that information to

23  the unions or not.  But the unions certainly had the TLVs

24  available to them.

25  Q.   Right.  But not the safety factor that was talked

EARL GREGORY - CROSS

 1   about, they didn't know about that one, at least you

 2   don't have any information about that, right?

 3   A.   Well, the safety factor was never implemented.  To

 4   my knowledge, it was never implemented, never accepted by

 5   the scientific community.  It was suggested there.  But

 6   apparently the committee, the ACGIH TLV Committee,

 7   rejected it or never -- at least they never implemented

 8   it.

 9   Q.   Okay.  That's what -- let me put it this way: what

10   happened to asbestos was the TLV ultimately went down,

11   right?

12   A.   Eventually, yes.

13   Q.   And it went down by quite a factor, right?

14   A.   No.  Again from 1938 to 1969 it remained 5 million

15   particles per cubic foot.  It was then proposed in '69 to

16   be dropped to 2 million particles per cubic foot.

17   Q.   Right.  And since that time it's gone down

18   considerably more, right?

19   A.   Since OSHA promulgated their first standard in

20   1971 --

21   Q.   Right.

22   A.   -- it's gone down to 120-fold, that's correct.

23   Q.   120-fold?

24   A.   Since 1971, because their standard was 12 fibers per

25   cc.  Current standard, or their most recent standard in

EARL GREGORY - CROSS

1  1994, was .1 fibers per cc.

2  Q.   Because it now takes into account cancer, right?

3  A.   It has taken into account cancer since approximately

4  1964.

5  Q.   Okay.  So, in any event, what about Badger

6  Ordinance, was this information conveyed to Badger

7  Ordinance that there was a need for a safety factor for a

8  cancerigen in the time period of the 40s or 50s, do you

9  know?

10  A.   Well, the facility was owned by the U.S. Army, who

11  had their own industrial hygiene laboratory.  I don't

12  know for a fact whether they read that article.  But as

13  an industrial hygienist, they would have had access to

14  that particular article.

15  Q.   All right.  And are you aware of any practices out

16  at Badger being followed where instead of following the

17  published TLV that they were following a safety factor of

18  a hundred to 500 times lower?

19  A.   No.  I have not seen any evidence of that.

20  Q.   Okay.  Are you aware of any document that

21  Owens-Illinois published as a manufacturer in connection

22  with its products that said if you're going to use the

23  TLV that you should consider a much -- a big safety

24  factor for the possible carcinogenicity?

25  A.   I'm not aware of any manufacturing company that has

1  ever communicated or published that information about any

2  carcinogen --

3  Q.    And --

4  A.    -- or suspected carcinogen, for that matter.

5  Q.    -- in terms of what capabilities a manufacturer of a

6  product does have, they're certainly in the best position

7  to let the people using their product know what's in it,

8  right?

9  A.    As far as the contents, yes, the manufacturer has

10  the most knowledge of the contents of any product that

11  they manufacture.

12  Q.    Did Owens-Illinois publish anything on its boxes to

13  say this has got a 15 to 25 percent asbestos content on

14  it?

15  A.    I don't know of any manufacturer that published any

16  information about the percentage of asbestos in any of

17  their asbestos-containing products back during that time

18  period.

19  Q.    Right.   Okay.   And, also, a manufacturer is in a

20  position to test its product for safety purposes as

21  certainly as well as anybody, right?

22  A.    You need to define what you mean by "safety

23  purposes" because I don't quite understand that.

24  Q.    Well --

25  A.    If you're talking about exposure, only the employer

1  is in the best position to measure their employees'

2  exposure to any given product containing asbestos, not

3  the manufacturer.   The manufacturer can't even get on the

4  jobsite without special permission.

5  Q.   I understand.   The information that the manufacturer

6  can generate is by simulating the field exposures, right,

7  before the product is sold; they can do that?

8  A.   No.   They cannot do that with any kind of scientific

9  validity or reliability, of course not.

10 Q.   It's impossible for manufacturers to simulate those

11 conditions?

12 A.   Virtually impossible unless they went out and did

13 the same insulation job at the same facility during the

14 same environmental conditions that the contractor was

15 using the product in, which is highly unlikely.

16 Q.   All right.   I mean, it's possible that

17 Owens-Illinois could have given somebody a saw and said,

18 "Okay, cut some Kaylo," and had different kinds of wind

19 or air conditions when that was being done, right; they

20 could have done that?

21 A.   It would have made no sense from an industrial

22 hygiene standpoint because --

23 Q.   I understand.

24 A.   -- you're not in the environment where the insulator

25 is, you don't know how often it's being cut, you don't

EARL GREGORY - CROSS

1  know how much is being cut, you don't know how many

2  others are cutting it around you.

3      So, no, the manufacturer really can't represent the

4  exposure in the workplace.  Only the employer and the

5  jobsite controller can do that through industrial hygiene

6  sampling.

7  Q.   And a manufacturer could send some of its people

8  out, if it's got an industrial hygienist who knows about

9  sampling techniques, into the field to take measurements;

10 they can do that, right?

11 A.   If they could get permission to go on site.  I've

12 never seen permission given to a manufacturer in that

13 time period.  I mean, to go on a U.S. Army ammunition

14 construction site, it's going to take special security

15 clearance back during the time period when we're fighting

16 the Nazis in Europe.  So I can't imagine that you would

17 ever get clearance to do that; I mean, let's put it that

18 way.

19 Q.   So that doesn't make any sense either for a

20 manufacturer to be doing that, right, asking permission?

21 A.   It's up to the employer, the jobsite owner.  Even if

22 a manufacturer goes out and does it, the manufacturer has

23 no control over putting the hierarchy of control measures

24 into effect to reduce that employee's exposure.  All it

25 is is a bunch of numbers that no one reacts to because

EARL GREGORY - CROSS

1    only the employer has the ability, the resources, the

2    responsibility and the authority to put in controls to

3    reduce their employees' exposures to asbestos-containing

4    products, because they control the workplace, they

5    control the employee.

6    Q.    Right.  And as far as what you said about this; that

7    the testimony you've read in this case was that very few

8    of these insulators, even as late as when the Selikoff

9    survey went out in 1969, were wearing respirators, right?

10   A.    That's correct, based on that questionnaire.

11   Q.    And that was even true that the companies who were

12   running the insulation companies like the one that you

13   said a Mr. Van Beck worked for that they also knew that

14   respirators were not being worn, right?

15   A.    Yes, they did.

16   Q.    And so in terms of what was known to the property

17   owners or what the property owners did, maybe let's

18   ask -- let's do that; in terms of what the property

19   owners did or the employers did, the evidence that you've

20   seen is that whatever it was, it didn't work as far as

21   getting people to wear masks, right?

22   A.    Based on that survey and based on the depositions,

23   very few people were wearing the respirators.

24   Q.    And that's an important thing in the field of

25   industrial hygiene that you motivate the employees to do,

EARL GREGORY - CROSS

 1  the workers, to use the necessary protective measures,

 2  right?

 3  A.    Yes, it is.

 4  Q.    Okay.  So now what I want to ask about briefly is in

 5  terms of your actual knowledge at Badger -- one moment.

 6  I'll be right back.

 7  A.    Sure.

 8  Q.    You never visited the Badger jobsite, right?

 9  A.    No, I have not.

10  Q.    Did you actually interview everybody who's worked at

11  Badger -- anybody who worked at Badger, I should say?

12  A.    No, I have not.

13  Q.    Did you interview anybody from Owens-Illinois about

14  what the practices were at Owens-Illinois for Kaylo?

15  A.    No, I've not interviewed.  I mean, I've read

16  depositions from Owens-Illinois employees and management

17  personnel, but I haven't interviewed them.

18  Q.    Okay.  And I take it you haven't interviewed anybody

19  from the Insulators Union back in the 40s and 50s about

20  their knowledge of asbestos hazards beyond what you saw

21  in the journals, right?

22  A.    That's correct.  I mean, I've read a lot of

23  depositions from insulators and, you know, I have a good

24  understanding of their knowledge, but I didn't interview

25  any of them.

EARL GREGORY - CROSS

1   Q.   Okay.   I want to address again the idea of testing a

2   product for a moment.   Are you saying that an employer

3   has no responsibility -- I'm sorry, that a manufacturer

4   has no responsibility for testing the product, before it

5   goes out the door, for safety purposes, from an

6   industrial hygiene perspective?

7   A.   Well, during that time period there were no

8   requirements that companies publish any kind of

9   information about their product.   In 1983 OSHA passed the

10   material safety data sheet or Hazard Communication

11   Standard that required that manufacturers and

12   distributors generate material safety data sheets that

13   included potential safety and health hazards as well as

14   the ingredients of all products that are manufactured and

15   sold to customers or distributed to customers.

16   Q.   That's a legal requirement?

17   A.   That is, as of 1983, yes.

18   Q.   So again are you saying that as an industrial

19   hygienist, there was no responsibilities for testing the

20   product of the manufacturer back in the 40s and 50s?

21   A.   In this particular situation Owens-Illinois was

22   using asbestos to make an asbestos-containing product,

23   like many other manufacturers during that time period.

24   They knew, like all other users, that overexposure to

25   asbestos caused asbestosis.   So there was no reason to

EARL GREGORY - CROSS

1  test the product.  They couldn't add any further

2  information to what was already known about the potential

3  hazards of asbestos.

4      And they weren't the ones that were using the

5  product.  The insulators, the site controllers and

6  employers were using the products.  They're the ones that

7  had the control over the working conditions and the

8  personnel and they're the ones that had the ability to

9  prevent overexposures to a known asbestos type of hazard.

10 Q.  Okay.  So there wasn't any responsibility on

11 Owens-Illinois to conduct any further testing --

12      THE COURT:  Mr. McCoy, we're replowing this

13 ground for the third time.  Do you have any new topics?

14      MR. MCCOY:  Okay.  I'll move on, Judge.

15 BY MR. MCCOY:

16 Q.  At Badger Ordinance do you know how much pipe

17 covering was replaced on the jobs described by

18 Mr. Suoja's co-workers because the piping itself was

19 leaking or had deteriorated or needed to be checked?

20 A.  I don't know how much.  I mean, Mr. Schlub indicated

21 that there were, I believe he indicated, thousands of

22 linear feet of material that was recovered because it was

23 deteriorated and damaged.

24 Q.  My question is do you know how much was replaced

25 because the piping underneath was bad and needed to be

EARL GREGORY - CROSS

1   replaced or needed to be tested, how much of the

2   insulation was replaced because the piping underneath was

3   bad?

4   A.   No, I don't.

5   Q.   And do you know how much of the pipe covering was

6   taken off and replaced at Badger on these jobs because

7   there was a need to reroute pipelines at Badger?

8   A.   I mean, I don't know the exact details of how much

9   was replaced or recovered or anything like that.  When

10  Mr. Schlub was there in, he indicated, '67, that was

11  right during the Vietnam War.  And I imagine that they

12  were -- you know, the whole plant had been reactivated to

13  supply ammunition for the Vietnam War.

14  Q.   Okay.  And do you have any idea as to the levels of

15  dust that were present when the conditions at Badger were

16  described as *dusty* during the insulators' work?

17  A.   No.  That's impossible to determine because

18  Mr. Schlub indicated that 99% of the pipe insulation that

19  was removed or replaced was outdoors.  And you don't know

20  the wind conditions during that time period or anything

21  like that, so you really don't know what the levels of

22  exposure were.  The only one that would know that would

23  be someone that did the monitoring, that had the ability

24  to do the monitoring and the authority and the

25  responsibility, which would have been the employer, the

EARL GREGORY - CROSS

1  site controller or the site owner.

2  Q.   And there's no indication in any of the co-worker

3  testimony that someone was actually out there with a

4  monitor determining what the air levels were for asbestos

5  or general dust?

6  A.   No.  I didn't see any indication that there was any

7  monitoring performed.

8  Q.   And did you see any procedures that Badger actually

9  had at its facility, in its safety manual or any document

10 specific to Badger, that said this is how and when air

11 monitoring should be conducted for removal of insulation,

12 back in that time period of the 40s and 50s?

13 A.   I didn't see anything in there, but they certainly

14 had the responsibility under the Walsh-Healey Act.

15 Q.   Did you see any procedures or manuals, I should say

16 instructions or manuals, directing about how that

17 hierarchy you talked about of the engineering and

18 administrative and personal protection controls should be

19 applied at Badger for that kind of work?

20 A.   No, but it's included in a general format in the

21 Wisconsin Industrial Commission regulation involving

22 asbestos and many other air contaminants.  They cover

23 hierarchy of control.  They don't call it that, but they

24 talk about ventilation, personal protective equipment and

25 administration control.

1         Also, the Walsh-Healey Act does the same thing.  And

2    the Walsh-Healey Act, the first one was in 1942.  They

3    covered those types of controls.

4    Q.   Right.  So did you see any evidence that there was

5    actually implementation of these Wisconsin TLVs and those

6    standards at Badger during the time when the co-workers

7    were testifying?

8    A.   I didn't see any specific written information

9    indicating that they were complying with regulations that

10   they were required to comply with, which includes the

11   Walsh-Healey Act and the Wisconsin Industrial Commission

12   regulations pertaining to asbestos.

13   Q.   And are you aware of any warnings going out on the

14   Kaylo boxes about needing to comply with the regulations?

15   A.   I'm not aware of any warnings.  And warnings on a

16   box would not have anything to do with whether or not

17   someone was going to implement engineering controls

18   because only the employer, the site owner and the

19   controller can implement engineering controls.  A warning

20   on a box just doesn't control exposures.

21   Q.   Okay.

22   A.   And there were no boxes.  I saw no evidence that

23   there were any Owens-Illinois boxes at that site.

24   Q.   I see.  And the Wisconsin Industrial Commission, you

25   mentioned, was active in investigating jobsites, right?

EARL GREGORY - CROSS

1  A.    That's correct.

2  Q.    Okay.  Was there any evidence that the Wisconsin

3  Industrial Commission was out at Badger in this time

4  period?

5  A.    I didn't see that kind of evidence.  That's very

6  detailed evidence.  You would have to go to the Wisconsin

7  Board of Health Industrial Hygiene Unit and see if they

8  have those kind of records that go back to that time

9  period, and it's unlikely that they have those records.

10  Q.    I see.  Did you see any of the testimony that there

11  was only two jobsites in total that the State of

12  Wisconsin investigated before the mid 1950s?

13  A.    Oh, I'm sure they investigated more than two

14  jobsites, otherwise they wouldn't have a job.  I don't

15  know what they did the rest of the time, in other words.

16  Q.    I just wondered if you'd --

17  A.    I was only with OSHA seven years.  I investigated

18  450 jobsites.

19  Q.    All right.  So -- okay.  Take a moment.  I'm getting

20  done here.  Let me ask a couple more questions.  Hold

21  that before we turn it on.  Okay.

22       Did you have any personal, formal training in the

23  different types of pipe covering that were sold in the

24  40s and 50s in terms of looking at these and knowing what

25  differences might exist in textures and colors and so on;

EARL GREGORY - CROSS

2-P-142

1  did you have that kind of training?

2  A.   Well, based on all the depositions and documents and

3  product bulletins that I've reviewed and the

4  asbestos-containing insulation that I've observed at

5  plants that I've worked at, I have a working knowledge of

6  what the asbestos-containing insulation products looked

7  like during that time period.

8  Q.   Okay.  But had you looked at the different brands

9  carefully enough, used many many times, and gotten formal

10  training about any sight differences in color and

11  textures and so on?

12  A.   I just read depositions of different insulators who

13  have reported the different textures and the ones that

14  they liked the best for the reasons that they liked the

15  best.

16  Q.   Right.  And they're -- okay.  And in there they're

17  describing what they know is colors and textures and so

18  on; that's reasons why they prefer certain ones, right?

19  A.   Well, it varied.  I mean, some of them didn't like a

20  product because it cracked easily --

21  Q.   Right.

22  A.   -- broke easily.  Others liked it because it was

23  stiffer, less friable.  And so it varied depending upon

24  the particular product.

25  Q.   Right.  They are expressing their preferences and

1 the differences on the products, right?

2 A.   That's correct.

3 Q.   Okay.   Now, I wanted to show you a document that

4 we've used.   And this is -- this is a document that's

5 titled at the top, *Have All These Advantages?*   This is an

6 Owens-Illinois Kaylo promotional literature piece.

7         MR. WATSON:   Can we have an exhibit number, Your

8 Honor?

9         THE COURT:   Of course.   Do you want to put a

10 number on it?

11         MR. MCCOY:   I think we have one on our exhibit

12 list.

13         MR. HAUSMAN:   It's part of 136, but we could

14 give it a separate number.

15         THE COURT:   As long as we know where to find it

16 later.

17         MR. HAUSMAN:   Let's give it 138 by itself.

18         MR. MCCOY:   This will be Exhibit 138.

19 BY MR. MCCOY:

20 Q.   So it's titled *Have All These advantages?*   And it's

21 a Kaylo -- at the bottom, "First in calcium silicate.

22 Pioneered by Owens-Illinois Glass Company."   And I wanted

23 to direct your attention to this.   Okay.   It says in

24 here, "ease of cutting and fitting."   Do you see that

25 statement there?

EARL GREGORY - CROSS

2-P-144

1   A.    Yes, I do.

2   Q.    Okay.  And it says, "Ordinary tools of the trade are

3   used to install Kaylo heat insulation.  The material is

4   non-irritating to the skin and non-toxic."  So that is a

5   communication by the manufacturer about its product

6   safety, right?

7   A.    That's correct.

8   Q.    Okay.

9   A.    During that time period it was considered nontoxic.

10  The definition of *toxicity* changed in the 1960s.

11  Toxicity was only those materials that caused systemic

12  poisoning or damage to the body, like lead, arsenic and

13  things that you inhale or ingest and then they travel

14  systemically throughout the body and cause their damage.

15      Asbestos was not considered a toxic material until

16  that definition changed in the 1960s.  In fact the ACGIH

17  TLVs listed it as a mineral dust.  They didn't list it as

18  a toxic dust.  And all the textbooks during that time

19  period listed it as a mineral dust, not a toxic dust,

20  because of the definition that was used for *toxicity*

21  versus *nontoxicity* in the field of toxicology.

22  Q.    Yeah.  That's your explanation here.  And you're not

23  a medical doctor, right?

24  A.    I'm an industrial hygienist and I know the

25  difference between *toxicity* and *nontoxicity* and I have

EARL GREGORY - CROSS

1  read many of those old textbooks.

2  Q.   But for the *average Joe*, looking at such an

3  advertisement, *toxic* and *nontoxic* mean other things than

4  your industrial hygiene analogies, right?

5           THE COURT:  Mr. McCoy --

6           MR. WATSON:  Objection, Your Honor.

7           THE COURT:  -- I'll give you ten more minutes

8  because I don't know how this helps you prove liability

9  here.

10          MR. WATSON:  And, for the record, Your Honor,

11  objection as to foundation and speculation as to the

12  *average Joe*.

13          THE COURT:  Well, let's just move on.  I'm not

14  seeing the relevance here.  I'll give you ten more

15  minutes, okay?  You use it however you choose.  But at

16  five to, you're done.

17          MR. MCCOY:  Okay.  All right.  We'll take that

18  one off.

19          MR. CASMERE:  Is it appropriate to ask, under

20  the rule of completeness, to direct the witness to Item

21  No. 4 on that?

22          THE COURT:  No.  I think he answered that

23  question pretty thoroughly.

24          MR. CASMERE:  Okay.

25

EARL GREGORY - CROSS

BY MR. MCCOY:

Q.   In terms of a company like Owens-Illinois, and let's assume for a moment they had information about the product's exposures that were very high, in excess of the 5 million particles per cubic foot.

A.   So you're asking me to assume facts that haven't been established or not in evidence, in other words?

Q.   I'm asking you to assume those facts.

A.   You're asking me to take a very unscientific approach?

THE COURT:   Let's consider it a hypothetical; how's that?

A.   Okay.  Go ahead.  Repeat that again.  I'm sorry.

Q.   So let's assume that Owens-Illinois had information about the product that it was selling creating very high exposures above what would be the 5 million particle per cubic foot range.  What -- would you agree that Owens-Illinois was in a position where it could have provided that information to others outside of the company?

A.   Well, you're asking me to assume that Owens-Illinois knew the exposure levels at the Badger facility to insulators, which I don't know how they would have known that, but you're asking me to assume that they had information that those employees were overexposed,

EARL GREGORY - CROSS

1  correct; is that what you're asking me to assume?

2  Q.   If you assume that that -- right, that those levels

3  were the same as what would happen at Badger, and

4  Owens-Illinois knew about that and that they were above

5  the TLV, then that would be some information that

6  Owens-Illinois should convey to the customers, right?

7          MR. WATSON:  Objection, Your Honor.  Form.

8  Foundation.  Incomplete hypothetical.

9          THE COURT:  Yes.  That hypothetical is just a

10  mess.  Please move on.  He doesn't have to answer that.

11  That's got no bearing on what we're doing here.

12          MR. MCCOY:  Okay.  All right.

13  BY MR. MCCOY:

14  Q.   The data that a manufacturer has that shows that its

15  product has dangers, that information should be provided

16  to the customers, right?

17          MR. WATSON:  Objection.  Asked and answer, Your

18  Honor, for the third time.

19          THE COURT:  Right.  This is the ground replowed

20  three times.  We're not going to do it four.  Find a new

21  topic, please.  You've got seven minutes left.

22          MR. MCCOY:  All right.  Judge, if that's been

23  plowed, then that's all the questions I've got.

24          THE COURT:  As you wish.  Do you wish to

25  redirect.

EARL GREGORY - CROSS

```
 1           MR. WATSON:  One thing on redirect, Your Honor.

 2           THE COURT:  I'm not going to limit you at this

 3  point.

 4                    REDIRECT EXAMINATION

 5  BY MR. WATSON:

 6  Q.   Dr. Gregory, Mr. McCoy directed you to an industrial

 7  hygiene publication earlier; is that right?

 8  A.   That's correct.

 9  Q.   He directed you to remarks of Dr. Stokinger; is that

10  right?

11  A.   That's correct.

12  Q.   Dr. Stokinger's remarks, later in that same 1956

13  document, which we can identify as Owens-Illinois Exhibit

14  1944, reflect the fact that Dr. Stokinger could not

15  conclude that asbestos was a cancerigen, right?

16  A.   I didn't read the rest of that article.  I just saw

17  the part that he had highlighted.

18           THE COURT:  If you just want to put the article

19  in as an exhibit, then it's part of the record.

20           MR. WATSON:  Okay.

21           MR. CASMERE:  We'll do that.

22           MR. WATSON:  We'll do that, Your Honor.  We'll

23  offer at the appropriate time Owens-Illinois 1944, which

24  is the Industrial Hygiene Quarterly publication,

25  September 1956.
```

EARL GREGORY - REDIRECT

1           THE COURT:  Understood.  And again, this is just

2      another example of the benefit of a bench trial versus a

3      jury trial: you don't have to clean that up now because

4      the jury is not going to go home with the misimpression.

5      The Court has the ability to read the article later.

6           MR. WATSON:  And with that, Your Honor, no more

7      questions.

8           THE COURT:  Very well.  Dr. Gregory, you're

9      done.  You're free to go about your business.

10           THE WITNESS:  Thank you.

11           THE COURT:  You have a safe trip home.

12           THE WITNESS:  Thank you, very much.

13           THE COURT:  So where do we find ourselves with

14      regard to the defendant's case?

15           MR. CASMERE:  With the same stipulation, Your

16      Honor, that we're going to work out the and submit the

17      exhibits and the deposition designations, we have no more

18      live witnesses.

19           THE COURT:  If you want to reoffer your Rule 50

20      motion, why don't you do that tomorrow morning after the

21      exhibits come in; how does that sound?

22           MR. WATSON:  Sounds fair, Your Honor.

23           MR. CASMERE:  But subject to that, we will rest.

24           THE COURT:  And that is the set of conditions to

25      which the parties previously agreed.  It is a two-way

EARL GREGORY - REDIRECT

1    street.  It applies with equal force to the defendant.

2        Mr. McCoy, I can predict the answer to this question

3    but I want to ask it to complete the record: do you have

4    any rebuttal evidence at this time?

5            MR. MCCOY:  No rebuttal evidence.

6            THE COURT:  Very well.  Then let's just make

7    sure that we leave today on the same page collectively.

8    We'll adjourn for tonight.  We will reconvene tomorrow

9    morning at nine.  The agenda tomorrow morning is for the

10   parties to present to the Court their exhibits.

11       And there may be three columns here -- it's perhaps

12   a Venn diagram -- where there is a group of exhibits to

13   which both sides agree they can come in, depending -- it

14   doesn't matter who offered them.  A lot of these exhibits

15   were offered by both sides.  There will probably be some

16   exhibits that the plaintiff wishes to offer that -- to

17   which the defendant objects.  There may be some exhibits

18   to which the defendant -- which the defendant wishes to

19   offer to which the plaintiff objects.  You will make that

20   clear to the Court tomorrow.  Once we've done that, we

21   will close the evidentiary record and end the bench

22   trial, *qua* bench trial, and set the briefing schedule for

23   what follows.

24       And again, so it's clear: although we're ending the

25   bench trial, the Court is reserving ruling on evidentiary

1  objections, including striking portions of testimony

2  subject to the parties' briefing of those topics.  And

3  that will all be made as clear as the Court can make it

4  in its order on the bench trial.

5        Mr. McCoy, does that comport with your understanding

6  of where we are and where we're headed?

7              MR. MCCOY:  Yes, Judge.

8              THE COURT:  Very well.  Mr. Casmere, does that

9  comport with your understanding of where we are and where

10  we're headed?

11             MR. CASMERE:  Yes, Your Honor.

12             THE COURT:  Mr. McCoy, anything else this

13  afternoon before we adjourn?

14             MR. MCCOY:  No.

15             THE COURT:  Anything else on behalf of

16  Owens-Illinois before we adjourn?

17             MR. CASMERE:  No.  No, Your Honor.

18             THE COURT:  Very well.  Then we're done.

19        (Adjourned at 4:57 p.m.)

20                          ***

21

22

23

24

25

1        I, CHERYL A. SEEMAN, Certified Realtime and

2   Merit Reporter, in and for the State of Wisconsin,

3   certify that the foregoing is a true and accurate record

4   of the proceedings held on the 1st day of December, 2015,

5   before Magistrate Judge Stephen L. Crocker, of the

6   Western District of Wisconsin, in my presence and reduced

7   to writing in accordance with my stenographic notes made

8   at said time and place.

9   Dated this 21st day of December, 2015.

15                      _____/s/_____

16                      Cheryl A. Seeman, RMR, CRR
                        Federal Court Reporter

23  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means unless
    under the direct control and/or direction of the
    certifying reporter.