# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GARY SUOJA, Individually and as Special Administrator of the Estate of OSWALD SUOJA, Deceased,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>Owens-Illinois, Inc.,<br>　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)　　Case No. 99-cv-475-bbc<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## Plaintiff's Post-Trial Brief

Robert G. McCoy
Dan B. Hausman
Attorneys for Plaintiff
bmccoy@cvlo.com
dhausman@cvlo.com
(312) 944-0600


Cascino Vaughan Law Offices, Ltd.
220 S Ashland Ave
Chicago, IL 60607
(312) 944-0600

# Table of Contents

**Title Page**……………………………………………………………….…1

**Table of Contents**…………………………………………………..….…2

**I.  Introduction**…………………………………..…………………..4

**II. Kaylo Product Exposure**……..………………………………………..7
     **A.**  **George Schlub**………………………………...………..…7
     **B.**  **Lawrence Zimmer**………………………………………..17
     **C.**  **Harold Haase**……………………………...………..…22
     **D.**  **Sales Record Evidence**……………………...…………..23
     **E.**  **The JM Defense**………………………………...….…..26
     **F.**  **Gregory Opinion**………………………………..…….…32
     **G.**  **Greater Weight of the Evidence about OI Kaylo Exposure**…..…36

**III. Strict Products Liability**…..……………………………….........38
     **A.**  **Elements of Strict Products Liability Claim**………….………..38
     **B.**  **Analysis of the 5 SPL Elements**………………………..…..……40
          1.  **#1 – The product was in defective condition when the product left the possession or control of the seller; #2 – The product was unreasonably dangerous to the user or consumer** ……………………………40
             i.  **Design defect**…………………………...………..…41
             ii.  **Failure to warn**………………………………………..52
          2.  **#3 – Causation**…………………………..…………..74
             i.  **Causation of Ozzie's mesothelioma by asbestos**…………………74
             ii.  **Kaylo is a substantial factor in the causation**………………79
          3.  **#4 - OI was in the business of selling Kaylo**……………………85
          4.  **#5 - No substantial change after leaving manufacturer**……………...85
     **C.**  **Summary of Strict Products Liability Claim**…………..………..86

**IV. Sophisticated User / Purchaser Defense**………………………….…87
     **A.**  **Strict Product Liability - Not a Defense**…………..……..…87
     **B.**  **Evidence Does Not Prove Sophistication**………………..…...88
     **C.**  **Reliance on the User being Sophisticated Enough to Protect** …..91
     **D.**  **Sophisticated User Defense Forfeited**……………………….93

**V.  The TLV Defense**…………………………………………94
     **A.**  **Not Protective Against Mesothelioma**………..………….…94
     **B.**  **No Justifiable Reliance by OI that TLVs Protected against Mesothelioma**……………………………………………97

**VI. Contributory Negligence**……………………………..…..……100

    **A.**    **Evidence Discussion**………………………......………..……………102
        **1.** **Worker education and motivation**………………………………………102
        **2.** **Peer group information**…………………………………………………106
        **3.** **Available protective equipment was inadequate**………………….…………107
        **4.** **Evidentiary summary**…………………………………………….……114
    **B.**    **Case Law**……………….………………………………………………115
    **C.**    **Summary of Contributory Negligence Evidence**………………….117

**VII. The Statute Of Limitations Defense under the Federal Enclave Doctrine**…………………………………………………………………118
    **A.**    **Dispositive Motion Deadline**………………..…………………...118
    **B.**    **Not Pled as Affirmative Defense**……………………………....119
    **C.**    **Defense Inapplicable** ……………………………………….121

**VIII. The Special Administration Defense**………………………………123

**IX. Damages**………………………………………………………………125
    **A.**   **Ozzie's Life before Mesothelioma**………………..……….…..126
    **B.**    **Relationship with Delores**……………………………….....135
    **C.**    **Relationships with Children**…………………………….138
    **D.**    **Concerns and Fears about Asbestos**……………………147
    **E.**    **Onset of Mesothelioma – Early Symptoms**………………149
    **F.**    **Diagnosis and Care** …………………………………………157
    **G.**    **Physical Pain and Discomfort**…………………………………169
    **H.**    **End of Life** ……………………………………………..……170
    **I.**    **Recoverable Damages**……………………………………173
        **1.** **Summary of amounts to be awarded**……………………………173
        **2.** **Medical and funeral bills**………………………………………173
        **3.** **Pain and suffering**………………………………………………173
        **4.** **OI's position on compensation**…………………………………176
        **5.** **Children's Damages**……………………………………………178

**X. Joint & Several Liability**………………………………………...180
    **A.**    **History of Common Law**………………………………...180
    **B.**    **Single, Indivisible Injury**……………………………....181
    **C.**    **Contributory Negligence**……………………………….186
    **D.**    **Offsets for Other Recoveries**……………………………186

**XI. OI's Request for Apportioned Liability**………………………187

**XII. Conclusion**………………………………………………..…189

**Certificate of Filing**………………………………………………190

## I. Introduction

The resolution of this case is determined by the greater weight of the evidence on the disputed points.  The complaint seeks damages on behalf of the estate of Oswald Suoja and his children due to his death alleged to be from mesothelioma caused by asbestos exposure to Owens- Illinois, Inc. ("OI") Kaylo insulation.  The primary claim against OI is based on strict products liability.  If that claim is resolved in favor of Plaintiff, this Court need not consider the negligence claim.  In addition to the evidence presented live during the trial, certain key evidence is summarized in part in this introduction.[1]

Testimony of Kaylo product exposure was taken in 2012 by deposition from two elderly coworkers – Gordon Schlub and Lawrence Zimmer.  Their testimony established Oswald (Ozzie) Suoja had more than six months of exposure to dusty conditions from removal and reapplication of OI Kaylo on the piping systems at Badger Ordnance.

Testimony about mesothelioma and dangers of asbestos was given in a trial deposition on November, 25, 2015, by Plaintiff expert Dr. Arthur L. Frank, a medical doctor and professor of occupational and environmental medicine with 47 years of research experience and over 100 publications in the field of asbestos diseases.[2]  Dr. Frank spent over a decade working on Dr.

---

[1] Throughout this brief, Plaintiff references exhibits and documents as follows:
- Transcripts with an ECF # from this case are cited as (ECF #___ at page number assigned by court reporter.)
- Other documents with an ECF # from this case are cited as (ECF #___ at ECF page number.)
- Exhibit images filed with this Court by USB drive or provided to Plaintiff by OI on a USB drive are cited as (Ex __ at PDF page number.) if referencing a specific page.
- Attachments are filed as attachments with Plaintiff's post-trial brief and highlighted and cited as (Att. __.)

[2] Dr. Frank testified in person before this Court (Magistrate Judge Crocker) at the trial of *Bushmaker v. Rapid American Corporation*, USDC WD WI Case No. 09-CV-726-SLC, on March 7, 2013.   Dr. Frank is a licensed medical doctor and professor at Drexel University

Irving Selikoff's seminal epidemiological studies of 17,800 members of the insulator trade which were the intended users of OI Kaylo.  The studies showed 10 percent of insulators die from mesothelioma and another 40% percent from other asbestos related disease.  Dr. Frank explained the incurable and hidden disease process which results in mesothelioma.  Dr. Frank is also a board certified physician in occupational medicine, which has the goal of prevention of disease through protective measures.  Dr. Frank's testimony is central to issues such as dangerousness of Kaylo, causation, and joint and several liability.

Dr. Thomas Wiig has been a board certified surgeon since 1981and was involved with diagnosis and care of Ozzie for mesothelioma.  In his trial deposition Dr. Wiig described the medical care and findings in the last few months of Ozzie's life.  The mesothelioma tumors "encased and studded" the entire abdominal cavity wall lining and organs within including the

---

School of Public Health and College of Medicine who has published over 200 articles – 50% on the subject of asbestos disease.  (ECF #165 at 6-7, 21.) He is board certified in the field of occupational medicine, which has prevention as the chief goal, and in internal medicine.  (ECF #165 at 9-11.)  He has background of 47 years epidemiological and other research on asbestos diseases.  (ECF #165 at 10.)  Dr. Frank is also a professor civil, architectural, and environmental engineering at Drexel.  (ECF #165 at 7.)

Beginning as a medical student, Dr. Frank spent 12 years during the period 1968-83 actively working with Dr. Irving Selikoff who specialized in asbestos disease research.  (ECF #165 at 7-8, 67.)  Dr. Frank served in the U.S. Public Health Service for 37 years and achieved the rank of Captain/Colonel.  (ECF #165 at 8.)  Dr. Frank served on active duty between 1973 and 1975 at the National Cancer Institute, studying the effects of asbestos on tissue. (ECF #165 at 8.)

Dr. Frank is a fellow of the elite Collegium Ramazzini, an international professional society which is active in the field of asbestos disease.  (ECF #165 at 20-21.)   He has served as a government consultant to U.S. and foreign governments on asbestos disease.  (ECF #165 at 10.)  Dr,. Frank's CV is a trial exhibit.  (Ex 93.)

Dr. Frank bills about $400,000 per year recently for lawsuit consulting and testifying.  (ECF #165 at 93.)  The income from Dr. Frank's lawsuit consulting and testifying is paid to Drexel University and used for the benefit of Dr. Frank's students and research.  (ECF #165 at 22-23.)

liver, spleen, pancreas, kidneys, stomach, small, intestine, colon, and bladder.[3]   Ozzie's bowel

movements were obstructed by the tumors and required emergency room treatment.  A

"nastrogastric tube" was inserted in Ozzie's nose and extended to his stomach to help control

vomiting and keep food from passing into the bowels.  No treatment option was available other

than palliative care, which failed to alleviate the pain.  Even narcotics administered intravenously

could not control the pain extending "all over" Ozzie's body.

[3]The testimony of Dr. Wiig is quoted and discussed in detail in the damages section below.

## II. Kaylo Product Exposure

OI manufactured and sold Kaylo beginning in 1943 and continuing until "mid-1958." (Att. #8, Ex 29, at 2, 6, #8(a-d.)   Kaylo was packaged in cartons which had distinctive markings. (Att. 74, Ex 34 Kaylo box photo.)   OI transferred the entire Kaylo business to Owens Corning Fiberglas "in 1958."  (Att. #8, Ex.29 at 1.)  OI continued as a shareholder in OCF after selling the business to OCF.  (ECF #147 at 18.)   During the OI period, Kaylo contained between 13 to 25% asbestos.  (Att. #8 Ex 29 at 6-7, #8(i-j).)

Ozzie had exposures, discussed below, from personal hands on work and as a bystander from dusty OI Kaylo.   (ECF #165 at 51.)  Bystander exposures occur when working near someone else using OI Kaylo.  (ECF #165 at 44.)  The bystander exposures occurred from other members in the crews of insulators working at Badger with Ozzie.

Coworkers Gordon Schlub and Lawrence Zimmer testified to Ozzie's exposures to OI Kaylo at the Badger Ordnance U.S. Government Army ammunition plant near Baraboo, WI. (ECF #154 at dep page 29-30, ECF # 155 at dep page 25.)  Both were members of Local 19, based out of Milwaukee, of the "International Association of Heat and Frost Insulators and Asbestos Workers."  (ECF #154 at 10; Att. #17 Ex 27 union card of Ozzie.)   Local 19 in earlier years was "called the Asbestos Workers Union."  (ECF #154 at dep page 40.)

### A. George Schlub

Coworker Schlub was a veteran of the Korean War who began working for Local 19 in 1955.  (ECF #154 at dep page 8-9.)  He was 80 years old when he testified at a deposition in 2012 at his home in Rockford, IL.[4]  (ECF #154 at dep page 6.)   Schlub started in the "asbestos

---

[4] Schlub was not available to testify for trial.  (Att. 93 at ¶¶4-9.)

7

worker" trade in 1955, working out of Local 19 in Milwaukee.  (ECF #154 at dep page 9.)  The

duties of an asbestos worker are "applying insulation to pipes, you know, heating pipes, cooling

pipes, to ductwork, vessels, and whatever needs insulating."  (ECF #154 at dep page 9-10.)

Schlub worked with Ozzie at Badger starting in about 1967.[5]  (ECF #154 at dep page 28.)

The total time they worked together at Badger was 5-6 months in the "late 60s and early 70s."

(ECF #154 at dep page 11, 28.)   Both Ozzie and Schlub were working for L&S Insulation

Company on the 1967 job.  (ECF #154 at dep page 17-18.)

Badger Ordnance was owned by the U.S. Government and covered 10,000 acres. (ECF

#154 at dep page 11.)  The facility had "miles and miles, probably thousands of miles of piping."

There's piping over 10,000 acres out there, pipes that carried the steam and condensate around.

It was up on poles."  (ECF #154 at dep page 22.)

The work with Ozzie was "mostly . . . removing or re-weatherproofing insulation

materials that were on pipes already."  (ECF #154 at dep page 12.)   "99 percent of the insulation

that [Schlub] and Mr. Suoja were working on was outside."  (ECF #154 at dep page 27.)

"Thousands of feet . . . of insulation was removed and also reapplied" during the job when

Schlub worked with Ozzie. (ECF #154 at dep pages 12, 14.)  Schlub identified the insulation

material at Badger as "Kaylo asbestos material" installed before 1958.  (ECF #154 at dep pages

16, 17, 18-19, 21, 25, 33, 36.)  Both removal and reapplication of Kaylo created "lots of dust."

(ECF #154 at dep page 14, ECF #155 at dep pages 26-27.)

Key passages from Schlub's testimony about the Badger work with Ozzie include:

---

[5] Schlub's work at Badger with Ozzie was "off and on" and extended into the early 1970s.  (ECF
#154 at dep page 11, 28.)  Schlub recalled the job began in 1967.  OI may contend based on
social security records that the job began in 1968.  The date of 1967 v. 1968 does not appear to
be material.

Q. Did the removal of the pipe insulation create dust or not?[6]

A. Oh, certainly, lots of dust.

Q. Was it dust that you could see with your eyes?

A. You could see it. It was outside, and the wind was blowing it around, whipping it around on days that it was windy.

Q. Did you work in that dust? When I say "you," I'm meaning did you and Souja and the rest of your crew work in that dust.

A. Sure, we did. We had to. We had to. They didn't give us masks to wear either. We had to work in it. And we would breathe it in, and it would get on our clothing and get on our hands. We didn't have no washroom facilities, so we'd probably be eating our lunches without washing our hands, you know. That's as I remember it.

Q. How long was the work out there -- I asked you that. It was for about months, was it?

A. Months, yeah, months. It wasn't always consecutive months, but it was on and off, on and off through the summer usually when we did it.

Q. Was Souja there pretty much the whole time you were there, or was he there just for some of

---

[6] Schlub explained the removal process:

Q. How did you remove the insulation?
A. How would we remove it? We would cut the -- The insulation is wired on, and we had to cut the wires.

(ECF #154 at dep page 14.)

Coworker Lawrence Zimmer, discussed below, described the visible dust during application of Kaylo.

Q. What kind of tools did you fellows use --
A. Saws.
Q. -- to cut insulation?
A. Saws.
Q. What was that like when you were cutting insulation?
A. It was dusty.
Q. What was it like when you were cutting Kaylo insulation?
A. It was dusty.

(ECF #155 at dep page 24-25.)

it or what?
      A. I worked with Ozzie there -- yeah, he was
there. Him and I worked many months there, yeah.
      Q. Could you tell the -- The insulation that
you were taking off, could you tell whose it was,
like what brand it was?
      A. I knew what it was because I worked with
it all my life -- not all my life, but all my life in
the trade I had been using that materials. I knew
what it looked like, what it felt like, what it
smelled like. And I could tell that it was a Kaylo
asbestos material.

(ECF #154 at dep page 14-16.)

Under extensive cross-examination Schlub never wavered from his certainty that Kaylo

was the insulation brand at Badger.  He described Kaylo as a common brand of insulation

delivered to many jobs in boxes marked Kaylo.  Schlub testified:  "Kaylo was real popular.

Most contractors would send in Kaylo insulation out on the job for us to apply.  We knew it was

Kaylo because it said right on the box it was Kaylo.  Also, besides being – you know, the other

appearance to it."  (ECF #154 at dep page 21.)

Schlub distinguished the Kaylo brand from other insulation brands based on his

knowledge of differences in color, texture, and other characteristics.


      Q. Were there other brands of insulation
that you guys were removing out there besides Kaylo
in the 1960s and early 1970s when you and Souja were
there?
      A. To my knowledge, no. It was Kaylo.
(ECF #154 at dep page 17.)

      Q. When you were there in the '50s, would
you -- were you able to tell what insulation was
already present and existing on pipes at that time?
      MR. MORRIS: Object to form, foundation.
Go ahead.
BY THE WITNESS:
      A. I was familiar with it, yes.

Q. Whose was it?

MR. MORRIS: Same objections.

BY THE WITNESS:

A. It was Kaylo.

Q. How do you know it was Kaylo?

A. Because I worked with Kaylo and I knew what it looked like. It was white, chalky. It was very distinctive in the texture of it. I could tell by the texture and the composition that it was Kaylo because I was familiar with Kaylo, so it was something that I had always worked with.

Q. Back when you were working as a journeyman, would you have been able to tell the difference between -- like, if we laid up, like, Johns Manville Thermobestos insulation, Carey, Kaylo, and other brands of insulation, would you be able to tell them apart back in the day when you were working --

MR. MORRIS: Objection, form, foundation.

BY MR. ARCHER:

Q. -- on a daily basis?

A. I could tell Kaylo was different from the other insulations, yes. And at that time I was an apprentice too in the '50s. I was a journeyman in the '60s, but in the '50s I was an apprentice.

Q. What were some characteristics that Kaylo -- that set apart Kaylo from other brands?

A. Just the appearance of it, the composition, the color, the texture, the different white coloring of it, the fiber, whatever.

Q. What about the texture would tell you that it was Kaylo?

A. Well, it had a real smooth texture, where the others might have a rough or porous. Kaylo had a real solid, firm composition. I didn't give it a lot of thought at the time; but working with it, it's right there in front of you all the time. I didn't think, well, you know, what it's made of or anything. I knew it was asbestos, but I didn't -- it didn't dwell in my mind. But it was right in front of my eyes all the time, so I could tell the difference between that and other brands that I had used.

(ECF #154 at dep pages 18 -20.)

Q. How about Johns Manville products? Do

11

you recall whether or not you were using any of those during your time at Badger Ordnance with Mr. Souja?

A. My recollection was that Kaylo was used at that time.

Q. And your understanding is that Kaylo is not made by Johns Manville, correct?

A. It's made by Owens Illinois, I understand.

(ECF #154 at dep page 33.)

Q. Is it your testimony, then, that when you removed the pipe insulation from Badger Ordnance, that you could tell that the product that you were removing was Kaylo as opposed -- Kaylo brand as opposed to Johns Manville or Pabco or Pittsburgh Corning?

A. In my mind I could say that I could tell it was Kaylo.

Q. How does Kaylo look -- Kaylo brand pipe insulation look different from, let's say, Pabco brand pipe insulation?

A. I think I told you that before, that it has a different coloration, it has different composition, it's not as white in coloration.

Q. And when you say a "different composition," you just mean the texture of the material itself?

A. The texture, if it's porous or smooth or whatever, yes.

Q. Which is Kaylo, porous or smooth?

(ECF #154 dep pages 35 -36.)

Based on Schlub's testimony, Kaylo was installed at Badger Ordnance during the period when OI was the manufacturer. Schlub was familiar with Kaylo from the time he began work in the insulator trade in 1955. "But in the 50s I had – well, I had five years of work in the trade in the 50s, so I worked with it [Kaylo] quite a bit." (ECF# 154 at dep pages 22.) Schlub knew the Kaylo at Badger had been installed before 1958, i.e. during the period OI was the manufacturer. Schlub worked an earlier job at Badger in the late 1950s which involved removal of the exiting

insulation. [7]   Schlub observed Kaylo was already installed when working at Badger in the late

1950s.

> Q. When you were there in the '50s, would
> you -- were you able to tell what insulation was
> already present and existing on pipes at that time?
>      MR. MORRIS: Object to form, foundation.
> Go ahead.
> BY THE WITNESS:
>      A. I was familiar with it, yes.
>      Q. Whose was it?
>      MR. MORRIS: Same objections.
> BY THE WITNESS:
>      A. It was Kaylo.

(ECF #154 at dep pages 18-19.)

> Q. Yeah, subject to the objection, would you
> be able to say that you and Souja worked -- or
> removed Kaylo insulation that had been installed
> before 1958 out there at Badger Ordnance?
> MR. MORRIS: Same objections.
> BY THE WITNESS:
>      A. Yes. I could say that, yeah.
>      Q. How?
>      A. Because I knew I'd -- Sometimes the
> covering that I tore off was covering that I had put
> on, you know, and had to be replaced again.

(ECF #154 at dep pages 21 -22.)

> Q. Do you have any doubt in your mind that
> you and Mr. Souja were exposed to dust from Kaylo
> insulation that had been installed out there at
> Badger Ordnance pre 1958?
>      MR. MORRIS: Hold on. Objection, form,
> foundation, calls for speculation, relevance as to
> whether or not he has doubt.
> BY THE WITNESS:
>      A. There's no speculation. I knew that I
> was exposed to it. I'm not speculating that I was
> exposed to it. I knew I was exposed to it.

---

[7] Schlub worked multiple times at Badger starting in about in 1959.  (ECF #154 at dep pages 22.)
Schlub did not work with Ozzie on any job at Badger before 1967.

Q. Do you have any doubt?
MR. MORRIS: Same objections.
BY THE WITNESS:
A. No doubt in my mind. It was Kaylo, and
it was put on and it had to be reapplied or
removed/reapplied. I knew that because that was my
trade, and I knew it like I knew the back of my hand.

(ECF #154 at dep page 25.)

Schlub distinguished Kaylo from other brands of insulation products based on "physical"

composition such as "texture" and "coloration."  However, he denied knowing or using

"chemical" composition of insulation products to distinguish the brands.

Q. How does Kaylo look -- Kaylo brand pipe
insulation look different from, let's say, Pabco
brand pipe insulation?
A. I think I told you that before, that it
has a different coloration, it has different
composition, it's not as white in coloration.
Q. And when you say a "different
composition," you just mean the texture of the
material itself?
A. The texture, if it's porous or smooth or
whatever, yes.
Q. Which is Kaylo, porous or smooth?
A. Smooth and more -- less porous.
Q. But when you talk about composition,
you're not talking about chemical composition,
correct?
A. No, just the physical composition. I
wouldn't know about chemicals.

(ECF #154 at dep page 36.)

During cross-examination of Schlub, defense counsel nonetheless persisted in examining

about the chemical formula terminology of "calcium silicate" and "85 magnesia" for insulation

products.  The difference between calcium silicate and magnesia insulation products is in the

14

chemical formulas with which lay witnesses are not familiar.[8]  Over objection of plaintiff

counsel, defense counsel used chemical formulation terms in questioning Schlub:

> Q. Out of the three categories of insulation
> we just talked about -- 85 Magnesia, Magnesia cement,
> and calcium silicate -- do you remember what category
> of product Kaylo was?
> MR. ARCHER: Assumes facts.
> BY THE WITNESS:
> A. It was an asbestos product, is what I
> know.
> Q. Do you recall whether or not Kaylo was an
> 85 Magnesia product or a calcium silicate product?
> MR ARCHER:  Same
> A. It was 85 percent or whatever. I don't
> know, 85 what, whatever.[9]

(ECF #154 at dep page 31.)

---

[8] As set forth in the 1952 publication by E.C. Shuman, OI's research director:

> Always among the first to recognize
> and adopt improved materials and meth-
> ods, the oil industry has quickly ac-
> cepted a new heat insulation material of
> the hydrous calcium silicate type. A
> chemically reacted mixture of lime and
> silica, containing small amounts of
> asbestos fiber for hinging action, the
> new material looks quite similar to other
> rigid insulating materials commonly
> used in the industry. It is not glass. In out-
> ward appearance, its distinguishing
> characteristics are an almost chalky
> whiteness and a comparatively smooth
> surface texture, even when sawed.

(Att. 43, Ex 42 at 4.)

[9] From a technical standpoint Schlub was correct that Kaylo was considered to be 15% asbestos fibers and 85% other ingredients.  In the 1990 U.S. Environmental Protection Agency mandated Federal Register publication of the asbestos content of materials, Owens-Corning listed Kaylo as containing "15% asbestos, quicklime, silica, diatomaceous earth, clay, chromite, limestone, and sodium silicate."  (Att. 19, Ex 1258 at p 5156.)

Schlub characterized "Cal-sil" as having "different coloration and composition than Kaylo" which "wasn't as vividly bright white."  (ECF #154 at dep page 34.)   Regardless of the chemical formulation of Kaylo, Schlub distinguished Kaylo from other brands of insulating products based on physical composition and appearance of products he took out of boxes labeled with brand names during the many years he worked as an insulator.   He stated he did not know "chemical composition."  Any lack of knowledge or mistake by Schlub about the chemical formulation of Kaylo is not material to his ability to distinguish brands of asbestos insulation products based on appearance and physical characteristics.

Schlub also testified that other insulators told him Kaylo was used at Badger Ordnance in the 1940s.[10]  Plaintiff does not dispute what another insulator told Schlub falls in the hearsay category.  While Plaintiff does not necessarily rely on this testimony to prove that Kaylo was used at Badger, this Court can consider the admission of hearsay testimony under FRE 807.  The coworker statements were made on personal knowledge based on actually working at Badger in the 1940s and satisfy the "trustworthiness" component of Rule 807 (a)(1).  The unavailability of any insulation product sales or delivery records for the 1940s time period is a factor the Court can consider under 807(a)(3).   OI has asked this Court to admit evidence about JM in the 1940s

---

[10] Schlub testified about Kaylo at Badger:
>           Q. How did you know that it was installed in
> the '40s?
>           MR. MORRIS: Same objections.
> BY THE WITNESS:
>           A. Because I worked with people in the
> trades that had worked there in the '40s and applied
> it, and they were also on the job when I worked there
> in the '50s. So they said, well, too that they knew
> that this was some covering that they had put on and
> in the '40s when the plant was being built.

(ECF #154 at dep page 23.)

based on undated photos without foundation of where and when the product was used other than advertising in a Chicago phone book.  (See discussion below at  § I. E. The JM Defense.) If the Court does consider OI's evidence, the Court should also consider that persons actually working on the job said Kaylo was used in the 1940s at Badger.

**B. Lawrence Zimmer** (deceased)

Coworker Lawrence Zimmer became an "asbestos worker" in 1957 and a member of Local 19 in 1958.  (ECF #155 at dep page 13.)  Zimmer was 73 years old when he gave a deposition on February 2 and February 3, 2012, in the Souja case.[11]   (ECF #155 at dep page 10.) He retired from the insulator trade in 1997 and also served 6 years in the U.S. Army. (ECF #155 at dep page 12-13.)  Zimmer passed away before the trial.  (Att. 93 at ¶2.)

Like Schlub, Zimmer's extensive hands-on experience gave him personal knowledge to distinguish Kaylo based on physical properties like color and texture.

> Q. What insulation products did you work with while you
> were working at L & S?
> A. All of them.
> Q. What does that include?
> A. Kaylo, Pabco, and drywall, Gold Bond.
> Q. I'm asking you about insulation products -- insulation
> while you were at L & S.
> A. Well, it was Kaylo and Eagle-Picher.

---

[11] OI made a pretrial objection to use of Zimmer's testimony apparently because OI did not attend Zimmer's deposition.  The objection has no basis as OI's counsel the Schiff Hardin law firm received proper notice of the deposition.  The deposition notice issued for Zimmer's dep lists *Suoja* as a case in the caption. (Att. 86 at 1,3.)  The notice lists "Owens-Illinois" as a defendant about which Zimmer will testify.  (Att. 86, at 5.)  The email serving the notice lists ____ attorneys from the Schiff Hardin firm including Ed Casmere, OI's lead counsel at trial. (Att. 86 at 6-7.)  OI's own failure to attend a properly noticed deposition is not grounds to exclude the testimony.  The notice of Zimmer's deposition is submitted under Federal Rule of Evidence 104 as the basis for determining admissibility of evidence.  "The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

Q. Were there any brands of insulation products that you had worked with more while you were at L & S?

A. Kaylo.

Q. Why is that?

A. That's what they put on a job.

Q. How could you tell it was Kaylo?

A. It said so on the box.

Q. Do you remember specific places where you had worked with Kaylo when you first started at L & S?

A. I worked it all. They had it on all the jobs -- all the steam piping and stuff.

Q. Does that include 1957?

A. Yes.

Q. Does that include 1958?

A. Yes.

Q. Could you tell the difference between Kaylo pipe insulation and other brands of pipe insulation, say for instance Pabco?

MR. MALONEY: Objection to foundation.

THE WITNESS: It was white and smooth.

BY MR. ARCHER:

Q. What was white and smooth?

A. Kaylo. You'd rub your hand on it and --

Q. How much work with Kaylo did you do during the first say year or so of your work as an insulator or insulator helper?

A. Quite a bit.

Q. What is quite a bit? Would that be every day? Every week? Every month? What?

A. It would be just about every day.

Q. How did you all -- how did you fellows work with the Kaylo insulation?

A. What do you mean?

Q. Take us through the process of insulating, fabricating, whatever you're doing in order to install Kaylo on say a piece of pipe or a vessel or whatever it might be.

A. Well, depending on the size of the pipe, you had to wire it on or band it on and then mud all the joints and then cover it with a cloth. And then later they would have plastic.

(ECF #155 at dep pages22-24.)

18

Zimmer installed and removed "Kaylo" on job at Badger Ordnance on a job starting

"late" 1958.  (ECF #155 at dep page 25.)

> Q. Did you ever work at a place called Badger Ordinance?
> A. Yes.
> Q. When were you there?
> A. That was probably in '58.
> Q. Late '58?
> A. Yeah.

The Kaylo insulation removed when Zimmer worked at Badger with Suoja had been in place for

"over a year."  Thus, the Kaylo removed was made during the OI period.  The removal work was

"dusty."

> Q. Did that Kaylo insulation that was being removed
> appear to have been there for at least some time?
> A. Yes.
> Q. More than a year?
> A. That's why it was being replaced.
> Q. What was it like when the Kaylo insulation would be --
> was being removed out there at Badger Ordinance?
> THE WITNESS: It was dusty.
> Q. Why was it dusty? Describe for us what would have
> created the dust.
> A. Because the Kaylo would stick to the pipe. And even
> if you took the piece off, the stuff would stick to
> it, and they would scrape that before you put new
> stuff on.

(ECF #155 at dep page 26.)

Ozzie was working at Badger before Zimmer began on the job and had the same

exposures to Kaylo as Zimmer.

> Q. How about a fellow by the name of Oswald Souja?
> A. Yes.
> Q. Was he also an insulator like yourself?
> A. Yes.
> Q. Was he out at Badger Ordinance?
> A. Yes.
> Q. Was he there in the '50's like you were?
> A. Yes.

Q. Would you be able to say one way or another if he was
exposed to the same things you were out there as far
as dust?
A. Yes. I think he was on the job longer.
Q. Was he there before you?
A. Yes.

(ECF #156 at dep page 54.)

In addition to the removal exposures to OI Kaylo on the job with Zimmer, Ozzie was

exposed to OI Kaylo during installation of new pipe insulation.  Zimmer's work at Badger was in

his first year as an insulator when Kaylo was used "just about everyday.  (ECF #155 at dep page

24.)  Installing new Kaylo insulation "was dusty" (ECF #155 at dep page 24-25.)  Although the

job in late 1958 was after OI sold the Kaylo manufacturing operations to Owens Corning by

agreement dated May, 1958, OI's responsibility for Kaylo sales continued until the end of 1958.

The evidence establishes OI was still in the chain of sale of the Kaylo even after May 9,1958,

because of the inventory of materials and unfilled orders sold to OCF. [12]  A reasonable inference

_____

[12] By agreement dated May 9, 1958, **Error! Main Document Only.**OI sold the Kaylo Division
to Owens-Corning Fiberglas Corporation (OCF).  (Att. 77, Ex 30 at 1).  OI's responsibility for
Kaylo extends beyond the date th May 9 agreement date.  The sale included inventory of finished
Kaylo  and asbestos fibers to make Kaylo described as: "raw materials for the production of
Products, Products in process of manufacture, finished Products in warehouse, and the
manufacturing supplies and repair parts at the Kaylo plant".  (Att. 77, Ex 30 at ¶2.)   The sales
price of the Kaylo inventory of finished product and fibers was $633,661.41.  (Att. 77, Ex 30 at
¶2.) By being in the chain of sale of the inventory of finished product and fibers that OCF later
sold, OI has responsibility to the ultimate consumers. After  the sale occurred in 1958, the
monthly sales of finished Kaylo product were reported on the OI books to be $1,744,854 or an
average of about $435,000 per month.  (Att. 78, ex 33.)   The sales price included a 32.3% profit
making the total of all product costs (including cost of materials, costs of equipment and
buldings, overhead, marketing, sales, delivery, etc.) was an average of $251,000 per month.
(Att. 78, ex 33.)  A reasonable inference can be drawn that the $633,000 value of the inventory
materials sold was sufficient to produce an additional six months of Kaylo sales by OCF.  OI
remained in the Kaylo chain of sale for six months by having sold the materials to OCF.
Additionally, OI kept the right to receive payment of executory contracts for unfilled
Kaylo orders already sold by OI.  Based on the sales invoices in 1954, the time lag between
when an order was placed and when it was shipped was more than 20 days.  (Att. 21, ex 32.)
This would also extend the period of time for which the Kaylo delivered after the sale of the

is the delay in shipping orders and the inventory sold adds 6 months or longer to the period of responsibility for OI.

According to Zimmer, Ozzie was on the job at Badger even before Zimmer arrived in "late 1958." Based on this testimony, a reasonable inference is that Ozzie worked for several months in 1958 installing new Kaylo for which OI is responsible. Thus, when working at Badger in 1958, Ozzie was both installing and removing Kaylo for which OI was responsible. OI mentioned during the trial that Suoja's social security records show his first employment with L&S Insulation was in 1968. (Att. 20, .Ex 1608 at 4.) OI apparently contends Zimmer was wrong that Ozzie worked at Badger in 1958 because Zimmer was working for L&S. OI's argument is speculative and does not discredit the testimony of Zimmer. First, Zimmer never said Ozzie was working for L&S Insulation at Badger. Second, the testimony shows multiple insulation contractors worked at the huge Badger facility and more than one contractor could have been present at the same time.[13] Third, the primary insulation contractor may hire a subcontractor or utilize personnel loaned from another employer.14

---

business was still the responsibility of OI who received payment on the for the orders placed before the sale date of May 9, 1958

[13] The names of the insulation contractors associated with work at Badger included L&S Insulation, Sprinkmann Sons, and A&M Manufacturing.

[14] Discussing an insulation contractor working at Badger Ordnance, OI expert Dr. Neuschel admitted:

> Q. Okay. You don't know whether they used employees
> from another contractor, like a subcontractor, to fulfill
> their contract; you don't know that, do you?
> A. That I cannot discern from the contract.
> Q. Okay. And it's also possible that employees in
> these insulation contractors are loaned from one
> principal employer to another when there's not enough
> work at their principal employer, right?

**C. Harold Haase** (deceased)

A third coworker who testified for the Suoja case is Harold Haase.  Haase, also a member

of Local 19 insulators, testified on  February 11, 1999, in the earlier Wisconsin state court action

filed by Delores Suoja. (ECF #149 at 2, 10.)  Haase was 62 years old when he testified and died

before this trial.  (ECF #149 at 10; Att. 93, at ¶3.)  Haase testified to work at Badger in about

1969 or 1970 for L&S Insulation with "30 or 40 guys" or including Ozzie.[15]  Haase was only on

─────────────────────────────

                    A. It's possible that could happen.
(ECF #198 at 44.)

[15] Haase testified about Badger:
                    Q. And who were you working for when you were at
          Badger Ordinance?
                    A. I was with L&S.
                    Q. And to the best of your recolleceion, what time
          period were you at Badger Ordinance?
                    A. Oh, I would have to say '69 or '70, somewhere in
          there.
                    Q. About how long did that job last?
                    A. Well, that job went on for about twelve years, but
          I wasn't there that long. I was only there for a
          few months.
                    Q. When you say a few months, you mean --
                    A. Two or three months, yeah. I had been there and
          back and there and back.
                    Q. Was there any asbestos containing products being
          used on that job?
                    A. Yes. All of it.
                    Q. Can you tell us the type of work that was involved?
                    A. All pipe covering, then sheet metal
                    Q. What types of asbestos containing materials were
          being used?
                    A. It was all pipe covering.
                    Q. And when you say pipe covering, what do you mean by
          that? Do you mean the pre-formed?
                    A.Pre-formed pipe covering, yeah. We were
          recovering. Yeah, the pre-formed pipe covering.
          Yeah, we were recovering all the old steam lines.
                    Q. What about on the elbows? What was being used on
          those?

22

the job at badger for a "few months" and described the work as "recovering all the old

steamlines" with asbestos containing material.  Haase did not work alongside Ozzie, but all the

insulators "were basically doing the same thing."  Haase did not know the tradename of "any

product Mr. Suoja worked with or around" at Badger.[16]  (ECF #149 at 21-23; 64-65.)

The value of the Haase' testimony is confirming that Ozzie did work at Badger in the late

1960s.  Haase also establishes the large crews would have created bystander exposures for

everyone.

**D. Sales Records Evidence**

At trial plaintiff presented Kaylo invoices issued by Owens Corning in 1954 for product

delivered to Badger for use by a contractor called Sprinkmann Sons.[17]  (Exs 32 (Att. 21), 33.)

---

A. That was mud, yeah. A lot of rockwell and we would
go over it with a layer of magnesium.
A. Do you have any recollection on that job of who
made the pipe covering?
A. No, I can't really recall.
Q. Who was on that job with you?
A. Well, there were 30 or 40 guys on this job too.
Gene Hanson was the foreman. There was -- Oh,
geeze, let me think here. Gus Pasatok, Ed Holcomb,
Bill -- I can't think of his name right now. Well,
there was several. Ozzie Suoja was there. There
were several others. There were probably 20 or 30
guys.
(ECF #149 at 21-23.)

[16]When asked to compare "Unibestos" with "Thermobestos" Haase stated:  "if you took them out
a box, you wouldn't ne to tell the difference, I don't think."  (ECF #149 at 48.)  Haase was not
asked to distinguish "Kaylo" or whether he worked with Kaylo at Badger.   Haase also had much
less experience than Schlub or Zimmer to be able to distinguish brands of insulation.  Zimmer
began in the trade in 1957 and Zimmer began in 1955.  Haase did not begin until "1963."  (ECF
#149 at 11.)

[17] The OCF invoices were identified during testimony by OI expert Peter Neuschel who was also
on the list of witnesses for plaintiff.   (ECF #198 at 32-38; ex 32.)

23

During these years Owens Corning was a distributor for OI manufactured Kaylo.   The invoices confirm at least 622 boxes and one mile - 5274 feet - of OI Kaylo were delivered to Badger for use by the Milwaukee based insulation contractor Sprinkmann Sons. [18]

Plaintiff requested in discovery OI records of direct deliveries to Badger and other places where Ozzie worked.  OI did not produce any sales or delivery records specific to Badger .  OI admits the available "documents relating to sales are not a complete record of Kaylo sold." (ECF Doc #88 at motion in limine # 11.)

Although the one mile is only a small portion of the Badger facility, these are the only available sales records.   Based on the limited number of available sales records and the coworker testimony that only Kaylo was removed, the Court can extrapolate that more Kaylo was used at Badger.  See *Anderson v. Combustion Eng'g, Inc.*, 2002 WI App 143, ¶11 (Wis. Ct. App. 2002).[19]   Additionally, OI had knowledge to preserve its internal sales records for future lawsuits based on OI's knowledge of the hazards of Kaylo which could lead to potential lawsuits. OI's knowledge began in 1943 and continued to accumulate throughout the period OI sold Kaylo.  (See § III. B. 1. ii. of the brief)  OI's inability to locate sales records for the period of the

---

[18] The total linear footage ("LF") listed on the invoices for 1954 is 5274.  (Att. 21, Ex 32.)  The total number of boxes ("PKGS.") listed on the invoices for 1954 is 622.  (Att. 21, Ex 32.)

[19] "But, here again, the jury was entitled to extrapolate from Hakes's and Mlinar's testimony about the specific instances to the conditions under which Mr. Anderson worked during his career at the Oak Creek plant, especially given the extremely high levels of amosite asbestos fibers found in his lungs."  *Anderson*, 2012 WI App 143 at ¶ 11.

1940s and 1950s when Badger was constructed is grounds for drawing an adverse inference against OI about the quantity of Kaylo used at Badger.[20]

The hearsay evidence rule precludes any argument by OI that Kaylo that the records show only a limited quantity shipped to Badger.[21]  To overcome the hearsay rule, OI must show complete records are available from the potential sources of sales and deliveries of OI Kaylo to Badger.  The sales and delivery records are incomplete based on the evidence of the potential sources of records.  In addition to OI's own incomplete records, OI's expert admitted the records from the Badger Ordnance facility are incomplete and do not show brands of insulation products.[22]  Other records that might show OI Kaylo used at Badger include deliveries by

---

[20] "At issue is evidence spoliation, 'the destruction or withholding of critically probative evidence resulting in prejudice to the opposing party.' *Neumann v. Neumann (In re Estate of Neumann)*, 242 Wis. 2d 205, 245 (Wis. Ct. App. 2001).

"A party has a duty to preserve evidence over which it had control and reasonably knew or could reasonably foresee was material to a potential legal action.").  Failure to do so would constitute spoliation of evidence. *See Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002) ("Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case.")."  *Joseph v. Carnes*, 566 Fed. Appx. 530, 535 (7th Cir. Ill. 2014).

"The spoliation doctrine allows a fact-finder to draw a negative inference against a party who destroys relevant documents." Jamie S. Gorelick et al., <u>Destruction of Evidence</u> § 2.1, at 32 (1989).  *Kochanski v. Speedway SuperAmerica, LLC*, 2014 WI 72, ¶12 (Wis. 2014).

"Discovery is a meaningful part of our adversarial system, and were parties to circumvent discovery requests by selectively destroying potentially damaging information, the process would become ineffectual. There is no doubt that the district court was correct in giving a negative inference instruction, and that it could have rightly imposed sanctions on Pribyl." *3M v. Pribyl*, 259 F.3d 587, 606 (7th Cir. Wis. 2001).

[21] Plaintiff moved in limine to exclude such argument in a motion in limine under Federal Rule of Evidence 803(7) and other grounds.  (ECF # 117, MIL # 11.)

[22]  Dr Neushul stated;
        Q. Okay. In any event, did you see any records about
   how much Kaylo was actually delivered to Badger Ordinance
   in the materials that you reviewed?
        A. No, I did not.

insulation contractors from their own warehouse inventory.  OI made no showing these contractor records are available or complete for materials provided to Badger.

**E. The JM Defense**

OI contended at trial that the product Ozzie encountered at Badger Ordnance was Johns-Manville ("JM") brand pipe insulation.  Assuming the evidence of JM brand use is admitted, OI only established JM product was used for work in the 1940s.  No witness who worked at Badger testified the jobs Ozzie worked on involved installation or removal of JM brand pipe insulation.  Coworkers Schlub and Zimmer were able to differentiate the brands of insulation – including JM.  Both testified the pipe insulation on the Badger jobs with Ozzie was Kaylo.[23]   OI relied only on expert witnesses to opine that JM was removed during jobs which Ozzie worked.

---

> Q. I mean, oftentimes these records are very hard and difficult to find back in this era, right?
> A. For a plant of that size with thousands of buildings and hundreds of miles of pipe, I mean, literally the paper would be incredible, I'm sure, the number of receipts.
> Q. Very hard to find that, if one still exists even, right?
> A. I think that a lot of that material was most likely disposed of. And what I'm seeing are contracts and things in that order, kind of a higher level than the on-the-ground number of receipts.

(ECF #198 at 33.)

[23] Schlub worked with the JM brand "Thermobestos" pipe insulation, but said it was not used at Badger.

> Q. During your career do you remember working with a product called Thermobesto?
> A. Yes.
> Q. Do you recall whether or not you used Thermobestos at Badger Ordnance in the 1960s with Mr. Souja?
> A. I don't recall using it, no.

(ECF #154 at 33.)

26

OI offered historical summaries of the construction, maintenance, and operations at Badger Ordnance.  OI experts relied upon these historical summaries.  (Att. 22, Ex 1730; Ex 1738.)  Although plaintiff contends the summaries are inadmissible hearsay under FRE 803, the Court may exercise it discretion to admit the summaries.   The historical summaries showed major projects were completed or under construction at Badger starting in 1942 and continuing into the 1970s.  Although there were gaps in the work during peacetime, most of the work was done after OI began manufacturing and selling Kaylo in 1943.  OI's evidence of JM in the 1940s does not preclude Kaylo being used for work at Badger which occurred after Kaylo was available in 1943.

If admitted the historical summaries show the following chain of construction projects at Badger.

- 1942 Construction of Badger begins (Att. 22, OI Ex 1730 at 17.)

- 1945 (August 13) Construction shut down at end of WW II  (Att. 22, OI Ex 1730 at 17, 21.)

- 1951-54 Rehabilitation for Korean War.  (Att. 22, OI Ex 1730 at 17.)

- 1954-55 Ball Powder facilities constructed (Att. 22, OI ex 1730 at 17)

---

Schlub could "tell" Kaylo "as opposed to Johns Manville" or other insulation brands was being removed at Badger:

Q. Is it your testimony, then, that when you removed the pipe insulation from Badger Ordnance, that you could tell that the product that you were removing was Kaylo as opposed -- Kaylo brand as opposed to Johns Manville or Pabco or Pittsburgh Corning?

A. In my mind I could say that I could tell it was Kaylo.

(ECF #154 at 35-36.)

27

- 1959 (November 18) standby status with maintenance (Att. 22, OI ex 1730 at 17.)

- 1966 (March 28)   reactivated for Vietnam War (Att. 22, OI ex 1730 at 17.)

- 1975 Plant on standby and modernization status (Att. 22, OI ex 1730 at 17.)

The historical summary prepared in 1984 states:  With the exception of minor alterations undertaken in the course of routine maintenance and modernization, the plant's World-War-II era buildings and equipment remain largely intact."  (Att. 22, Ex. 1730 at 18.)    Thus, the piping equipment which OI claims was constructed with JM insulation in the 1940s underwent little change.  Instead, new production systems were constructed as newer types of and production processes for munitions emerged.  (Att. 22, Ex. 1730 at 32-36.)  The inference should be drawn that work which Ozzie did in the 1950s and 1960s was on newer systems that did not have the JM insulation.

OI's evidence of Johns-Manville (JM) product involved only part of the work in the early 1940s.  OI's JM evidence does not preclude the use of OI Kaylo for other parts of the work in the 1940s or the work in the 1950s.  Once the more weather resistant Kaylo was available in the marketplace stating in 1943, the inference can be drawn that Kaylo would be preferred for the outdoor applications such as at Badger.[24]

First, OI introduced photos depicting boxes of Johns Manville pipe insulation lying in a field or in a storeroom.  (Att. 89, Ex 1789 at 2; Att. 90, Ex 1793 at 5; Att. 91, Ex 1869 at 1.) The photos are not dated and are unsupported by foundation that they are pictures of the Badger Ordnance facility.   OI's expert witness stated the photos were only for work "in the 1940s." (ECF #198 at 34.)   OI expert Dr. Neushul conceded that other brands of pipe insulation besides

---

[24] Dr. Neushul conceded Kaylo was sold to customers beginning in 1943 or 1944.  (ECF#198 at 52.)

JM could have been used at Badger in the 1940s.[25]  No witness testified JM was used at Badger.

No documents were introduced to show delivery or sale to Badger of JM brand pipe covering.

OI expert Dr. Neushul did not interview any person who worked at Badger, except a records

custodian.[26] (ECF # 198 at 40-41.)

In contrast plaintiff introduced invoices which listed 622 boxes of Kaylo delivered to

Badger before the end of 1954.  (Att. 21, Ex 32.)  Even assuming JM pipe insulation was used

for some portion of the work in the 1940s, plaintiff's evidence that OI Kaylo was installed,

removed, and reapplied on the jobs in the 1950s, 1960s, and other jobs in the 1940s is not

disputed.   The greater weight of the evidence from coworker testimony and invoices is that OI

Kaylo was removed and reapplied/installed on the Badger jobs which Ozzie worked on.

OI also attempted to establish JM was used at Badger because an insulation contractor

called A&M Manufacturing was awarded a contract for work at Badger Ordnance.   The A&M

contract was only for the work in 1942.[27]   No contracts were located for other work in the 1940s

or for the work in the 1950s or 1960s.  (ECF #198 at 39.)  Thus, the 1942 contract does not refute

---

[25] Dr. Neuchul stated:
          Q. Right. But the need for consistency could just as
     easily be because it's [Badger Ordanance] so big, you had to have a couple
     of different types of products out there, right?
          A. There may have been another product out there.
(ECF #198 at 45-46.)

[26] Dr. Neushul, a historian by training, admitted he did not follow his customary practice of
interviewing persons involved in the historical activities at a facility like Badger.  (ECF #198 at
40-41.)  Neushul's opinion testimony that does support OI's case should be given minimal
weight due to his bias and lack of qualifications.  Dr. Neushul had no experience in asbestos and
did not review the literature until he was approached by OI lawyers about testifying in 2001.
(ECF #198 at 24-25.)  He has no publications in the field of asbestos, is no longer teaching,
makes $50-80,000 per year testifying or consulting for primarily OI, and spends most of his time
surfing.  (ECF #198 at 23-24; 46.)

[27] (ECF #198 at 34.)

Plaintiff's evidence that Kaylo was installed, removed, or reapplied during other work in the

1940s, 1950s or 1960s.  OI's expert conceded 1) the A&M contract did not show the brand of

material used and 2) records of the insulation brand used had been "disposed of"[28]  To make the

link to JM being used, OI's expert relied on advertising in the yellow pages of a phone book by

A&M that it was a JM distributor.  (ECF #195 at 116.)  Plaintiff objects to the phone book as

inadmissible hearsay under FRE 803.  Even if the phone book ad is considered, OI offered no

---

[28] Dr. Neushul testified:

> Q. All right. And in the course of reviewing those
> documents from Badger Ordinance, am I correct that you
> did not find any document which said that -- like an
> order form or a delivery ticket -- that said a JM product
> was delivered there?
> A. All I saw were pictures of the product. I didn't
> see an actual order.
> Q. You didn't see anything saying how much was
> delivered, right?
> A. A delivery form, no.
> Q. Okay. And you didn't see anything saying how much
> JM material was ordered, right?
> A. I did not see any actual orders.

(ECF # 198 at 30.)

Dr. Neushul conceded delivery and order records of insulation brand used were "disposed of."

> A. I think that a lot of that material was most likely
> disposed of. And what I'm seeing are contracts and
> things in that order, kind of a higher level than
> the on-the-ground number of receipts.
> Q. Yeah. An in any of those contracts, it didn't say
> what materials it actually used, right?
> A. The contracts I saw were describing who the
> contractors were, but not describing what materials they
> were putting in. I did, however, see pictures of the
> materials being applied.
> Q. Right. But the brand name wasn't listed?
> A. It's shown in the pictures.
> Q. I'm saying the brand name wasn't listed in the
> contracts, right?
> A. It doesn't go to that level of detail.

(ECF #198 at 33-34.)

evidence A&M only used JM brand.  A distributor can buy material from other suppliers.   No employee of A&M or other witness testified what A&M used on the Badger job.   OI also did not provide evidence that A&M actually performed the contracted work as opposed to hiring a subcontractor for some or all of the work.  OI's expert testimony is speculative and should be given minimal or no weight.

OI also contended in its trial brief that a "myriad of insulation products, including A.P. Green, AC&S, Baldwin Ehret Hill, Celotex, Eagle-Picher, Fibreboard, GAF/Ruberoid, Johns Manville, Owens Corning Fiberglas, Owens-Illinois and other manufacturers" were used at Badger Ordnance.  (ECF #135 at 7.)   The manufacturers listed by OI made insulation products that included cements or muds applied as a covering over the pipe insulation.  Since OI itself did not make a cement or mud, another manufacturer's brand of cement or mud had to be used to cover the Kaylo.   Although other brands of cements and muds were used at Badger, no coworker on Ozzie's jobs testified any brand of "pipe insulation" besides Kaylo was used.

OI also contended in its trial brief that "Kaylo" is a "generic" name given too many pipe insulation brands.  (ECF #135 at 5-6.)  In the trial brief OI cited to several published case law decisions to support this argument.  (ECF #135 at 6.)  In the instant *Suoja* case, both coworkers Schlub and Zimmer testified they could distinguish the Kaylo brand from other brands.  Neither said Kaylo was a "generic" term used for many brands of insulation.  This Court must adhere to the evidence presented in this case.

The evidence of pipe insulation at Badger boils down to Kaylo, JM or both – not the "myriad" claimed by OI.  As discussed above, the greater weight of the evidence is Kaylo was the pipe insulation involved for jobs which Ozzie worked.

**F. Gregory Opinion**

Defendants offered opinion testimony of "expert" witness Earl Gregory to discredit the testimony of Ozzie's coworkers that OI Kaylo was used.  Dr. Gregory asserted Schlub and Zimmer could not distinguish between brands of insulation which had been removed from boxes because "it all looks the same."[29]  Dr. Gregory provided no study or research to support his opinion given in response to a leading question.

In an apparent contradiction of his opinion, Dr. Gregory acknowledged he himself had acquired a "working knowledge" about differences in color and texture of brands of insulation by reading the depositions of many insulators.[30]  Dr. Gregory's opinion is an improper and

---

[29] Dr. Gregory testified:
> Q. In your opinion, why is it highly unlikely that an insulator like Mr. Schlub or Mr. Zimmer could even identify the brand of insulation that's been installed on a pipeline?
> A. Well, once the product is removed from the container and installed on the piping, it all looks the same, with the exception of again one product that I'm aware of called Unibestos.

(ECF #198 at 94-95.)

[30] Dr. Gregory testified:
> Q. . . . Did you have any personal, formal training in the different types of pipe covering that were sold in the 40s and 50s in terms of looking at these and knowing what differences might exist in textures and colors and so on; did you have that kind of training?
> A. Well, based on all the depositions and documents and product bulletins that I've reviewed and the asbestos-containing insulation that I've observed at plants that I've worked at, I have a working knowledge of what the asbestos-containing insulation products looked like during that time period.
> Q. Okay. But had you looked at the different brands carefully enough, used many many times, and gotten formal training about any sight differences in color and textures and so on?

incorrect expert opinion that Zimmer and Schlub are not credible.[31]  To the contrary, if Dr. Gregory and other insulators can distinguish brands of insulation based on texture and color, the testimony of Schlub and Zimmer about recognizing the texture and color of Kaylo is also credible.

Dr. Gregory also contended, based on his reading of the testimony of Schlub, the insulation material removed at Badger was "weathered and falling apart and deteriorated." (ECF #198 at 87-88.)  Gregory offered his opinion the condition of the insulation meant the product was not Kaylo: "But calcium silicate products, which included the Kaylo, the O-I Kaylo product, is not soluble in water and it doesn't break down in water and it stands up very well to weather conditions, including high humidifies and rain and those kind of elements; whereas 85%

---

A. I just read depositions of different insulators who have reported the different textures and the ones that they liked the best for the reasons that they liked the best.
(ECF #198 at 141-42.)

[31] Opinions by expert witnesses about credibility of other witnesses are not favored.  In *Goodwin v. MTD Prods.*, 232 F.3d 600, 609 (7th Cir. Wis. 2000), the Court held:

MTD also wanted to introduce Plamper's "expert opinion" that he did not believe Goodwin when he stated he was in the operator's zone behind the lawn mower with the discharge chute facing down when he was injured. We agree with the trial judge who properly concluded that, although defense counsel could argue to the jury that the accident occurred in a different way, MTD was not entitled to have an expert give an opinion as to the veracity of Goodwin's testimony concerning the circumstances surrounding the accident when that opinion was merely based on speculation and not on admissible scientific evidence. Any argument by MTD that Plamper was entitled to give expert opinion as to whether he believed Goodwin's testimony that he was in the operator's zone behind the mower with the discharge chute facing down is without merit because an expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact, in this case a jury. *Hasham,* 200 F.3d at 1047 ("We will not second-guess a jury on credibility issues.").

magnesia, by definition, is 85% magnesium carbonate, which is soluble in water."   (ECF 198 at

88.)

　　　　Dr. Gregory is mistaken about Schlub's testimony.  According to Schlub, the insulation

removed "was real white and new and hadn't been weathered because it was covered up."[32]

Schlub removed "thousands of feet" of insulation which was in good enough condition to be

"reapplied."[33]  Schlub used the term "deteriorated" to describe sections of the "weather-proof

covering" and not the insulation material itself. [34]  When asked if the insulation itself was

_____

[32]The weather-proof covering applied over the insulation at Badger protected the insulation
material underneath.  According to Schlub, the weather-proofed insulation "could last forever."
(ECF #154 at dep page 24.)  Schlub stated the existing insulation material at Badger was mostly
in "new" condition at the time of removal.  The insulation "appeared to be new because it was
weather-proofed and it had the appearance of – the stuff that had the weatherproofing on it
looked new yet, underneath that it looked new yet.  It was real white and new and hadn't been
weathered because it was covered up."  (ECF #154 at 23-24.)  In areas where the
weatherproofing covering had deteriorated from weather or fallen off, the insulation had a "dirty
looking" appearance on the outside, but remained intact on the inside.  (ECF #154 at dep page
24.)

[33] Schlub stated about the work at Badger:
　　　　　　　　A. I would put it thousands of feet that we
removed and also reapplied. It had to be insulated,
so we had to reapply the insulation and weather-proof
that too.  But it was thousands of feet that we did.
It was all outside, most of it.
　　　　　　　　Q. How did you remove the insulation?
　　　　　　　　A. How would we remove it? We would cut
the -- The insulation is wired on, and we had to cut
the wires. It was deteriorated and hanging there,
and the weather-proofing was mostly gone. We had to
cut it down with our nippers and let it fall to the
ground, you know.
(ECF #154 at dep page 14.)

[34] Schlub testified:
　　　　　　　　Q. What about the deteriorated insulation?
　　　　　　　　A. Deteriorated stuff, the weather-proofing
had been -- had weathered and was falling off and the
insulation was weathered. It was rained on and had
dirt on it and stuff from dust blowing around the

deteriorated, Schlub said the insulation had a "dirty looking" appearance where the

weatherproofing had fallen off.  *Id.*   Schlub also described insulation as "deteriorated" in places

where it was "hanging down" from chicken wire used to attach the insulation to piping.  (See

footnote 34.)   The description of insulation pieces as "dirty looking" or "hanging down" does

not establish the insulation had "broken down" as Dr. Gregory contended.   Schlub stated: ". . .

underneath that deterioration, it's real white and chalky, the stuff that hasn't been eroded. It still

has the white appearance of Kaylo."  (ECF #154 at dep page 24-25.)  The evidence does not

show the type of severe weather damage which OI's expert alleges occurs with the water soluble

"85% magnesium carbonate" brands but not with Kaylo.  If anything, the absence of structural

damage should be construed as evidence the allegedly more weather resistant Kaylo was used.

Apart from his misreading of Schlub's testimony, Dr. Gregory gave no basis to opine

about deterioration in the insulation at Badger.[35]  Dr. Gregory never visited the Badger facility or

interviewed anyone who worked there.[36]  Gregory claimed to have read or had access to many

---

fields there, and it had a real dirty-looking
appearance.
(ECF #154 at 24.)

[35] Dr. Gregory's opinion should also be disregarded or discounted because his qualifications
reflect no specialized engineering or materials science experience to support an opinion which :
1) compares levels of deterioration of different insulation brands, 2) assesses deterioration of
insulation installed with weather proofing ,  3) assesses the impact of operating/weather
conditions such as encountered at Badger, or 4) relies on  the "advertising" claim that OI Kaylo
was more "weather resistant."  Dr. Gregory personally has not published any articles about
asbestos materials or in the field of asbestos.  (Att. 88, OI ex 1164 at 4.)

[36] Dr Gregory testified:
        Q. You never visited the Badger jobsite, right?
        A. No, I have not.
        Q. Did you actually interview everybody who's worked at
    Badger -- anybody who worked at Badger, I should say?
        A. No, I have not.
(ECF #198 at 135.)

documents in the operations records for the Badger facility.   However, he did not cite a single document describing the deterioration of the insulation materials at Badger.

Dr. Gregory's opinion that the Badger insulation was not OI Kaylo also conflicts with personal observations by Ozzie's two on site coworkers and the available sales records. Gregory' opinion also conflicts with common sense.  Since the insulation at Badger was 99% outside, the choice of more weather resistant Kaylo after it became available in 1943 is a matter of common sense.

**G. Greater Weight of the Evidence about OI Kaylo Exposure**

The greater weight of the evidence is Ozzie worked on jobs where OI Kaylo was removed and reapplied for more than 6 months at Badger in the 1950s and 1960s.  The greater weight of the evidence also shows OI Kayo was installed wen Ozzie worked at Badger in the 1950s.  The coworkers are credible witnesses in comparison to OI's paid expert team who had no hands on connection to the work at Badger.  OI presented no witness who worked at Badger to contradict Schlub or Zimmer.  The Kaylo invoices for 1954 work do not lie in revealing what might later have been removed or establishing the preferred material at Badger to be Kaylo...

The photos of JM product at Badger do not mean JM was removed when Ozzie worked at badger a decade later.  The production lines were built at distinct periods when wars were ongoing and different and distinct production purposes as weapons technology became more modern.  OI witnesses concede the JM product evidence is confined to the production systems built at Badger starting in 1942 in the World War II era.   The WW II systems became technologically obsolete and new modern systems were built during and after the Korean War in the early and mid-1950s.  In the 1950s Kaylo was widely available and designed for places

36

exposed to the weather.  Consistent with the observations of Ozzie's coworkers Kaylo is the product more likely to be used for work at Badger after it became available in 1943.  The newer systems constructed in the 1950s at Badger were the ones most likely to be kept in service by renovation or maintenance in in the later 50s and 60s when Ozzie worked with Schlub and Zimmer.

## III. Strict Products Liability

Kaylo was a defective and unreasonably dangerous product as manufactured and sold.[37]

During normal and intended use, Kaylo released asbestos fibers which permanently lodged in the

body and were capable of causing fatal disease including mesothelioma.  The disease process

was insidious and could not be detected until the later stages.

### A. Elements of Strict Products Liability Claim

*Restatement (Second) of Torts § 402A* (1965) provides as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to
the user or consumer or to his property is subject to liability for physical harm
thereby caused to the ultimate user or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without
    substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of
    his product, and

    (b) the user or consumer has not bought the product from or entered into
    any contractual relation with the seller.

The Supreme Court of Wisconsin "adopted *§ 402A* in 1967 in *Dippel v. Sciano,* 37 Wis.

2d 443, 155 N.W.2d 55 (1967)."  *Horst v. Deere & Co.*, 2009 WI 75, ¶22 (Wis. 2009).[38]

---

[37] The complaint alleges OI did not adequately warn of danger, provide safety instructions,
investigate and test Kaylo, or design Kaylo with available substitutes in place of asbestos.  (ECF
#2 at 1, 3, and 4, Att. 84.)

[38] As the Wisconsin Supreme Court explained:

Historically, with the exception of the sale of food, a supplier of a product was generally
not liable for injuries caused by that product without a showing of negligence or privity

The Plaintiff must prove the following five elements to prevail under a strict products liability claim in Wisconsin:

"(1) that the product was in defective condition when it left the possession or control of the seller,

(2) that it was unreasonably dangerous to the user or consumer,

---

of contract. See *Restatement (Second) of Torts § 402A* (hereafter "*§ 402A*") *cmt. b* (1965). This began to change in the 1950s and 1960s as courts developed theories of liability, often based on warranty-like concepts, to hold manufacturers or sellers liable for injuries even without negligence or privity of contract.

*Horst* 2009 WI 75 at ¶21.

This strict products liability structure, whereby a manufacturer bears the costs for injuries resulting from product use, even when the manufacturer was not negligent, arose for at least three important policy reasons.

First, strict products liability serves as a cost shifter. See *§ 402A cmt. c*. It takes the usually overwhelming cost of injury off of the injured person and places it on the manufacturer. The manufacturer generally passes the costs for injuries and preventative safety measures on to all consumers through higher product prices. This liability system, then, spreads the cost of the injury risk to all consumers. Id. The justification relied upon by courts is that companies have the capacity to bear the costs and the ability to assume them more efficiently than individuals.

A second rationale underpinning strict products liability is fundamental fairness to the injured person. Id. If manufacturers can reasonably design a safer product or a product that better accords with the safety expectations of consumers but choose not to do so, they should be held liable for the resultant injuries.

Finally, a third reason for strict products liability is that it provides a strong incentive for deterrence. Restatement (Third) of Torts: Products Liability (hereafter "Restatement (Third)") *§ 2 cmt. a* (1998). When a manufacturer can reasonably prevent an injury, strict products liability gives them a strong incentive to do so. This litigation threat promotes manufacturer investment in safer designs, quality control, and the furnishing of adequate warnings to the purchasers and users of products. Id.; *§ 402A cmt. j*.

*Id.* at ¶¶ 23-26.

(3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages,

(4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and

(5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it."

*Horst* at ¶22, note 6. (Quoting *Dipple v. Sciano,* 37 Wis. 2d 443, 460 1967).

## B. Analysis of the 5 SPL Elements

Each of the five elements is discussed below.  The first two elements are discussed in combination and the final three are discussed separately.

### 1. *#1 – the product was in defective condition when the product left the possession or control of the seller*

### *#2 – the product was unreasonably dangerous to the user or consumer*

The Wisconsin Supreme Court has stated:

In order to prevail in a products liability case, a plaintiff has the burden to prove that the product at issue is defective and unreasonably dangerous." *Vincer,* 69 Wis. 2d at 330, 331. A product is defective if it is "in a condition not contemplated by the ultimate consumer." *Id.* at 330 (quotation omitted). A product is unreasonably dangerous where it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer." *Id.* at 331 (quotation omitted).

*Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, ¶77 (Wis. 2001).

*Godoy v. E.I. du Pont de Nemours & Co.*, 2009 WI 78, ¶29, discussed "three categories of product defects--manufacturing defects, design defects, and defects based on a failure to adequately warn" recognized in Wisconsin strict product liability cases.[39]

> A product has a manufacturing defect when it deviates from the manufacturer's specifications, and that deviation causes it to be unreasonably dangerous. A product has a design defect when the design itself is the cause of the unreasonable danger. Finally, a product is defective based on a failure to adequately warn when an intended use of the product is dangerous, but the manufacturer did not provide sufficient warning or instruction.

*Id.* The defects which made Kaylo unreasonably dangerous fall within the categories of 1) design and 2) failure to adequately warn/instruct about intended use. Each category of defect is discussed in a section below.

### i. Design defect

---

[39]     n.11 See, e.g., *City of Franklin v. Badger Ford Truck Sales, Inc.,* 58 Wis. 2d 641, 648-49, 207N.W.2d 866 (1973), affirming a jury verdict that a wheel was defectively constructed because the wheel did not meet manufacturer specifications).

n.12 See, e.g., *Green, 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727* (concluding that latex gloves were defectively designed because they contained excessive levels of allergy-causing latex proteins, and because they were powdered, which increased the likelihood that the allergenic proteins would be inhaled); *Sumnicht v. Toyota Motor Sales, U.S.A., Inc., 121 Wis. 2d 338, 346,375, 360 N.W.2d 2 (1984)* (concluding that a car seat was defectively designed because it was not padded with energy-absorbing material).

n.13 See, e.g., *Schuh v. Fox River Tractor Co., 63 Wis. 2d 728, 737, 218 N.W.2d 279 (1974)* (concluding that a tractor could be unreasonably dangerous and defective when the manufacturer failed to adequately inform the consumer that engaging the clutch would not turn off the fan).

*Godoy,* 2009 WI 78 at ¶29 n.11-13.

In the context of a design defect, "Strict products liability focuses not on the defendant's conduct, but on the nature of the defendant's product." *Green,* 2001 WI 109 at ¶56.  In *Green*, a leading strict product liability case on design defect, the Supreme Court of Wisconsin affirmed the jury verdict for the plaintiff.  The court held that "the jury could properly find that because the evidence introduced at trial showed that S&N's gloves contained a substance which causes an allergic reaction in 5 to 17 percent of their consumers, those gloves were defective and unreasonably dangerous."  *Id.* at ¶4.

The Court in *Green* reasoned evidence showed the gloves were defective because "they contained excessive levels of allergy-causing proteins" that were "easily inhaled."  *Id.* at ¶ 78.  The Court found the evidence showed that both "flaws can cause some consumers to suffer injuries."  *Id.*  The Court found that the evidence showed that "the  health care community was unaware that persons could be allergic to latex; hence, the 'ordinary consumer' of S&N's gloves--i.e., health care workers--could not have contemplated at the time of Green's sensitization that S&N's gloves contained flaws that could cause injuries."  *Id.*  The Court concluded that the jury reasonably found that the "gloves were in a condition not contemplated by the ordinary consumer--i.e., that the gloves were defective."  *Id.*

The Court in *Green* analyzed whether the latex gloves met the "consumer expectations" test.  The Court focused on the evidence gloves caused allergic reaction in 5 to 17 percent of consumers which constituted a significant risk of harm to consumers.  *Green*, 2001 WI 109 at ¶84.  *Green* stands for the premise that consumer expectation of the seller's behavior is high when the product is dangerous to a large percentage in the intended user group.  The Court in *Green* held that, "in order to prove that an allergy-causing product is unreasonably dangerous, a plaintiff must prove the following elements: (1) the product contains an ingredient that can cause

allergic reactions in a substantial number of consumers; and (2) the ordinary consumer does not know that the ingredient can cause allergic reactions in a substantial number of consumers." *Id.* at 83.

The evidence in this case is stronger than in *Green*. Dr. Arthur Frank testified about the study of a cohort group of 17,800 unionized asbestos workers – the same trade and union which Ozzie belonged to. The study was conducted by Dr. Irving Selikoff, Dr. Frank's mentor and colleague. Dr. Frank personally participated in the research.[40] Based on his knowledge of union insulators in this study, Dr. Frank stated: "about ten percent that die of mesotheliomas, about 20 percent that die of lung cancer, ten percent that die of asbestosis, and the other ten percent die of other cancers related to asbestos." (ECF #165 at 38.) Dr. Frank also quoted the 1997 publication of the "Helsinki criteria" which states "currently about 10,000 mesotheliomas and 20,000 asbestos-induced lung cancers are estimated to occur annually." (Att. 24, Ex 204 at 311; ECF #165 at 61.) By 2015, "according to the most recent WHO estimated, more than 107,000 people die each year on a global basis from asbestos-related lung cancer, malignant mesothelioma, and asbestosis resulting from exposure at work." (Att. 28, Ex 207 at 334; ECF #194 at 54.)

Compared to the *Green* case, the evidence in this case shows a more severe and frequent impact of asbestos on consumers. The *Green* decision dealt with a product causing allergic reactions. Asbestos containing products cause more serious health issues such as cancer and death. Death in insulators was at the rate of 50% from asbestos - much higher rate than 5 to 17 percent for allergic reaction in Green.[41]

---

[40] See footnote 2 in Section I.

[41] Dr. Frank stated: "about ten percent that die of mesotheliomas, about 20 percent that die of lung cancer, ten percent that die of asbestosis, and the other ten percent die of other cancers related to asbestos." (ECF #165 at 38.)

Kaylo product design was defective and unreasonably dangerous by not meeting consumer expectations in light of the severity of the harm inflicted and number of persons harmed.  Factors to be taken into account for assessing consumer contemplation about Kaylo include the following:

1. The ingredients of Kaylo included a large percentage of a substance which causes great bodily harm.  OI stated in response to interrogatories "its asbestos-containing products were hydrous calcium silicates containing between 13% and 25% asbestos.  (Att. 8, Ex 29 at 7.)

2. Normal installation and removal of Kaylo creates visible dust and releases asbestos fibers in large quantities. Millions of fibers are released during a single day of cutting Kaylo. (ECF #165 at 77-78.)  Fibers stay in the air for hours and reintrain. (ECF #165 at 79.) The fiber release for other asbestos products has been measured to be in the billions or trillions.  (ECF #165 at 77-78.)

3. The design of Kaylo was not based on a study about long term health effects in insulators by industry or scientific research.  OI's internal research about the dangers of Kaylo, which was conducted by Saranac labs and is discussed more thoroughly below at §III. B. 1. ii., consisted of three year Kaylo exposure studies of guinea pigs to garner results about asbestosis. (Att. 29, Ex 38; Att. 30, Ex 41; Att. 32, Ex 37.)[42]

4. Kaylo was not designed to protect against cancer, including mesothelioma.

---

[42]  Dr. Irving Selikoff's study in the Journal of the American Medical Society of the long term effect of asbestos in causing cancer or long term mesothelioma in insulators was published in 1964.  (Ex 1300.)  OI did not undertake a study of insulators itself despite knowing about reports of cancer from asbestos beginning in 1935 (See §III. B. 1. ii.)

5.  The design of Kaylo did not take into account that human body has insufficient defenses against inhaled asbestos in large quantities.  Individual asbestos fibers are so small that they are not visible to the naked eye and often an electron microscope is needed to see them.[43]  "You can't see them, you don't taste them, you don't feel them . . . you have now warning sign that you're being exposed"  (ECF # 165 at 28.)  "You can be exposed to fairly high levels and not see them in the air. And if you see asbestos fibers or dust from a product, then the levels are really quite high."   (ECF # 165 at 28.)  Fibers migrate and travel within the body when inhaled, including to the peritoneal cavity – the site of Ozzie's mesothelioma tumor.[44]  After inhalation, the fibers stay in the body for "long

---

[43]  Dr. Frank testified:

        [Q.] Are most asbestos fibers visible?
        A. No, most of them are not visible to the
naked eye.
(ECF #165 at  25.)

        … Even electron
microscopic views are needed to see some of them.
Ordinary light microscope views will not show you
all of the fibers.
(ECF #165 at 25.)

[44]        Q. What happens to asbestos fibers that are
inhaled by a person?
        A. Well, they tend to go into two directions.
When you inhale a snootful of asbestos, some will
go down in the lung and it will get moved out of
the lung in many, many different ways. Some of it
gets brought back up through what's called the
mucociliary escalator. Some will be gobbled up by
macrophages, they're sort of like Pacmen of the
lung. Some will be moved out to the pleura. It's
in the pleura where they will cause pleural
mesotheliomas. Some of them will go down through
the diaphragm that separates the chest cavity from
the abdominal cavity and the fibers will end up
through the diaphragm down in the abdominal cavity.

periods," and each fiber can cause one or more DNA mutations.[45]  Which fibers cause

mutations and how many mutations is not known, but development of cancer requires a

large number of DNA mutations.[46]  Mesothelioma is a dose-response disease which is a

---

(ECF #165 at 25-26.)

> it is my opinion held with a reasonable degree of medical certainty that Mr. Suoja
> . . . developed and then died from a malignant peritoneal mesothelioma that was
> caused by his exposures to asbestos.

(ECF #165 at 53.)


[45] Dr. Frank testified:

> Asbestos: A fiber may get near a
> cell, may cause a mutation, we're not sure exactly
> how, and that fiber doesn't dissolve or go away, it
> stays there sometimes inside the cell possibly for
> long periods of time, and the same fiber may cause
> additional mutations or additional fibers that come
> in or that the cell is exposed to may do it as
> well. We just don't know.

(ECF #165 at 33.)

[46] Dr. Frank explained the process by which cancer occurs:

> Cancer is a process whereby the DNA of individual
> cells are altered. For some carcinogens,
> cancer-causing agents, that is, we know what the
> mechanism is, they knock off electrons or the
> chemicals interdigitate among the structure of the
> so-called double helix.
>
> For asbestos, we don't really know
> what the mechanism is, but we do know without
> question that the different types of asbestos will
> cause a wide variety of cancers, including
> mesothelioma.
>
> Q. When you say affects the DNA, that's a part
> of the cancer process, right?
>
> A. Yes. The cell has essentially two parts;
> there's the nucleus, the central part of the cell,
> and inside that is a substance called DNA, which
> carries the genetic material for that cell. Then
> there's the outer part of the cell, everything but
> the nucleus . . .

single disease process caused by the "cumulative exposure" to asbestos.[47]  The latency

period for mesothelioma to be diagnosed is a minimum ten years and continues for a

person's lifetime.[48]   The number of mutations required for mesothelioma has not been

---

…it is the
nucleus that carries the information about cells
being able to replicate and divide and make more of
themselves. And when that process goes wrong,
several things can happen; the cell can die, the
cell can become a mutated cell, but one of the
things that happens is that they become cancer
cells and then grow uncontrollably.

Q. When you say a cancer cell, is that a
mutated cell?

A. It's a mutated cell. The DNA gets altered
so that it now has a mutation, a change in the
structure from normal to something that's abnormal,
and when the cells reproduce, the cells just keep
growing, which is not how body cells are supposed
to function.

(ECF #165 at 30-32.)

[47] Dr. Frank explained:

… And all
of the asbestos-related diseases that we know about
are all what we call dose response, as are most of
the disease we see in man.

. . . .

Q. How does the dose response concept relate
to the cumulative exposure? And talk about
asbestos.

A. It has to do with -- the cumulative
exposure or the cumulative dose comes from all of
the exposures that one has over time. Someone like
Mr. Suoja, who worked as an insulator for decades,
all of the exposures that he had day one, day two,
day a thousand, day 10,000, all of those were part
of his cumulative exposure, which at the end of the
day is what gave him his disease.

(ECF #165 at 35.)

[48] Dr. Frank stated:

A. Latency refers, again, to any medical issue
that a person might have. If you're in a chemical

studied but the data for lung cancer is 23,000 mutations are needed for a lung cancer cell.[49] Ozzie's treating physician, Dr. Wiig stated "millions upon millions" of mutations are required "for a cancer to grow uncontrollably." (ECF #164 at dep pages 54-55.)

6.  The design of Kaylo was approved without testing or measurement in the field for amounts of asbestos fibers released during normal and intended use.[50] OI had plenty of resources and opportunity to conduct such studies including:

    a.  Saranac Laboratory reported to OI that the limited guinea pig studies they conducted on OI's behalf showed that exposure to asbestos fibers caused asbestosis in the animals.[51]

---

plant and a valve breaks and you get chlorine gas
all over you and you start coughing, the latency,
the period from exposure to the onset of disease,
is literally a matter of seconds.
For mesotheliomas following exposure
to asbestos, they begin to occur about ten years
after first exposure. There are reported cases of
lesser amounts of time, but I generally use about
ten years. And then the risk of getting that
disease lasts throughout one's lifetime.
(ECF #165 at 36.)

[49] Dr. Frank stated:
We don't know how many fibers it takes to
cause one mutation or how many mutations are needed
for mesothelioma. People have studied that, let's
say, for lung cancer, and data came out a few years
ago that there were 23,000 mutations that were
needed for a normal cell to end up as a cancer
cell.
(ECF # 165 at 32.)

[50] The failure to adequately investigate is pled in paragraph 22(c) of Plaintiff's Complaint. (ECF #2 at 4.)

[51] Saranac Laboratory studies discussed below at §III. B. 1. ii..

    b.  OI did not measure levels of asbestos fibers released during the customary work practices such as cutting, sawing and handling of Kaylo.  An insurance company performed such a study in a report released two days after OI sold the Kaylo business reported high exposure levels form cutting and handling Kaylo. [52]  OI could have conducted these same tests before starting to sell Kaylo in 1943.

    c.  OI had the resources (industrial hygienists, corporate medical department, outside laboratory studies) to conduct an investigation to include air testing and additional animal studies or trial studies of the effects on human users and chose not to conduct additional research despite their own findings of the dangers of asbestos.[53]

7.  OI did not conduct testing of the health effects of Kaylo over an extended period of time to account for the latency period of use to get disease.  Mesothelioma has a minimum ten year latency period.  (ECF #165 at 36.)   The Fleischer Drinker study in 1946 - three years after OI began production of Kaylo - showed nonmalignant asbestos disease was not likely to be found until ten years after the first exposure.  (Att. 72, Ex 1460; ECF #197 at 38-39.)   OI's expert Dr. Neushul admitted OI had knowledge of the latency period.[54]

---

[52] The 1958 "Special Hazards Survey" conducted by OI's insurance carrier at OI's Kaylo plant is discussed below at footnote 69.

[53] See discussion of OI's staff at §III. B. 1. ii.

[54]       Q. Okay. Did Owens-Illinois understand that asbestosis had a latency period when it began making Kaylo?
       A. I believe that certainly Hazard and Shook must have Understood
(ECF #198 at 70-71.)

8.   The design of Kaylo did not take into account the normal conditions in the field work by
     insulators who did not have proper breathing protection available at job sites or point of
     use ventilation.

9.   The design of Kaylo rejected the safer alternative of synthetic fibers or fiberglass
     available in the 1940s.[55]  In the "hierarchy" of preventing disease in occupational
     settings, substitution for the dangerous ingredient is at the top of the list as the preferred
     method.[56]

---

[55] OI industrial Hygienist Willis Hazard testified with reference to Kaylo, "there was talk of
replacing asbestos with fiberglass . . . in the early 1950s."  Mr. Hazard was "in favor of that
because fiberglass is harmless and asbestos is not."  (ECF #150 at 36.)   Dr. Frank also testified
fiberglass was a substitute in the 1940s:

        Q. Was there some way back in the earlier time
to have something other than asbestos for
prevention purposes?
        THE WITNESS: There were other
products available in the 1940s that ended up being
a substitute for asbestos; the artificial fibrous
materials that we refer to generally as fiberglass
but it really is various fibrous glass products or
other kinds of products or materials that could
substitute for asbestos.
(ECF #165 at 76-77.)

[56] Dr. Frank stated:

So you make an assessment and then
you suggest either a substitution of a less
hazardous material, which we could have done in
that case, or you put in good ventilation to
properly take up the dust that gets formed. And
then as a last resort, you use personal protective
equipment, you put workers in respirators or other
kinds of air-supplied equipment so that they don't
breathe the hazardous materials.
(ECF #165 at 15.)

What you need to do is provide good
ventilation. If you can't prov -- or you
substitute for another product. If you can't

The Court in *Green* explained how the manufacturer could avoid liability for a product which was unreasonably dangerous in design based on consumer expectations:  "Upon the plaintiff making this showing, the burden then shifts to the manufacturer to prove that the product includes a warning or directions. . . . If the manufacturer fails to meet this burden, a trier of fact can properly conclude that the product is unreasonably dangerous."  *Id.*  Because OI chose not to include warnings or safety instructions with Kaylo, strict liability must be imposed for a product design that is fatal to 50% of the insulators.[57]

---

provide good ventilation, you provide respirators.
(ECF #165 at 17.)

Dr. Gregory testified:
> That's the hierarchy of controls. And since the
> 1930s, there's been a couple of levels added:
> Elimination and substitution. In other words, if you can
> eliminate the hazardous material, you don't have to worry
> about control. So it's not really a control method; it's
> eliminating the material so that there's no need to have
> any control.
> But the last three sections are the *classic*
> industrial hygiene hierarchy of controls. Engineering
> controls, for example, they're in the gold and the
> yellow. That's engineering wet methods, any way that you
> can contain and isolate and prevent the air contaminant
> from getting to the employee's breathing zone.
> The next hierarchy of control is administrative
> control. That just means that you limit the person's
> exposure to a potentially hazardous air contaminant by
> reducing the number of hours they're exposed to that
> material so that over an eight-hour day or over a 40-hour
> week their exposure level is within the TLVs or
> permissible exposure limits.
> And the last one, and what is considered the least
> effective, but sometimes it's the only effective method,
> and that's the use of personal protective equipments.
(ECF # 198 at 100-101.)

[57] Dr. Neushul testified:

### ii. Failure to warn

In addition to the design defects of Kaylo being grounds for strict product liability, the second category of defect is based on the failure to provide proper warnings or safety instructions.  As recognized in *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis. 2d 882 (Wis. 1979) and the WI jury instructions, strict products liability can also be based on the absence of a warning which makes the product unreasonably dangerous for an intended and proper use.[58]

---

> During the time
> that Owens-Illinois was making Kaylo, Owens-Illinois did
> not put warnings about asbestos on the Kaylo boxes or on
> the promotional literature, right?
>     A. There were no warnings.
>     Q. And Owens-Illinois did not, during that time period,
> provide precautionary instructions about how to use
> protective measures for Kaylo, right?
>     A. They did not provide instructions for protective
> measures.
>     Q. Owens-Illinois did not provide any information, that
> you're aware of, to Badger Ordinance about the necessary
> protective measures when Kaylo was used?
>     A. I've seen no correspondence whatsoever between
> Owens-Illinois and Badger Ordinance.

(ECF #198 at 50-51.)

[58]    3262   STRICT LIABILITY:  DUTY OF MANUFACTURER (SUPPLIER) TO WARN (FOR ACTIONS COMMENCED BEFORE FEBRUARY 1, 2011)

A manufacturer (supplier) of a product must provide warnings concerning any dangerous condition of the product or any danger connected with its proper use of which he or she knows or should know.  "Proper use" means a use which is intended by the manufacturer (supplier).  In addition, a manufacturer (supplier) has the duty to warn of dangers inherent in a use not intended by the manufacturer (supplier), if such unintended use was reasonably foreseeable by the manufacturer (supplier).

However, a manufacturer (supplier) does not have a duty to warn about dangers that are known to the user, or are obvious to or readily discoverable by potential users, or

Based on the coworker testimony, the intended and proper use of Kaylo by insulators resulted in visible dust being released which contained asbestos fibers. OI's responsibility was to warn and instruct users about the dangers and precautionary measures from this normal and intended use based upon what OI knew or should have known.[59]

---

are so commonly known that it can reasonably be assumed that users will be familiar with them. Additionally, the manufacturer does not have to warn about dangers associated with unforeseeable misuses of the product.

WIS JI-CIVIL 3262.

> However, as we have earlier concluded the existence of a hidden as opposed to an obvious defect in the Series 38 Buffalo stuffer was properly a jury question. Therefore, the duty of Smith's to warn of the potential hazard should have been presented to the jury.

*Kozlowski v. John E. Smith's Sons Co.*, 87 Wis. 2d 882, 899 (Wis. 1979).

[59]    The warning must be adequate and appropriate under the circumstances. *See Schuh*, 63 Wis. 2d at 739, 218 N.W.2d at 285. A manufacturer must "anticipate the environment which is normal for the use of his product." *Kozlowski*, 87 Wis. 2d at 896, **[368]** 275 N.W.2d at 921. In other words, the manufacturer has the duty to foresee all reasonable uses and misuses and the resulting foreseeable dangers. *Schuh*, 63 Wis. 2d at 742-43, 218 N.W.2d at 286-87. The duty to warn arises when the manufacturer has, or should have, knowledge of a dangerous use. *Krueger v. Tappan Co.*, 104 Wis. 2d 199, 207, 311 N.W.2d 219, 223 (Ct. App. 1981).

An inadequate warning on a product can, by itself, render the design defective. *Westphal v. E.I. du Pont de Nemours & Co.*, 192 Wis. 2d 347, 363, 531 N.W.2d 386, 391 (Ct. App. 1995); *Krueger*, 104 Wis. 2d at 206, 311 N.W.2d at 223 (citing Restatement (Second) of Torts § 402A cmts. h and j). Whether a warning is adequate is generally an issue of fact to be determined by the jury. *See, e.g.,* **Schuh**, 63 Wis. 2d at 739, 218 N.W.2d at 285; *Gracyalny*, 723 F.2d at 1316. The jury is to consider all pertinent factors, such as the likelihood of a particular accident taking place and the seriousness of the consequences, in deciding whether the warning is sufficient to apprise the user of the particular hazard. *Schuh*, 63 Wis. 2d at 739, 218 N.W.2d at 285.

*Tanner v. Shoupe*, 228 Wis. 2d 357, 367-368 (Wis. Ct. App. 1999).

A timeline of the evidence shows both actual knowledge by OI and information in medical, scientific and trade organization publications that OI should have known about while manufacturing and selling Kaylo.

*OI's actual knowledge of dangers to insulators*

OI had actual knowledge that asbestos fibers causes the fatal disease asbestos before the company embarked on production and marketing of Kaylo to outside customers in 1943.[60]  OI not only knew of the foreseeable risk of harm, but knew that visible asbestos containing dust – which is hazardous by nature - would be present during normal everyday use of Kaylo by the insulators like Ozzie.  Despite this knowledge, OI chose to put Ozzie at risk by not providing any safety instructions or warnings.  72 years later OI contends it has no responsibility to the Suoja family for this conduct.

Set forth below are separate timelines of OI's knowledge about the dangers of Kaylo and how to protect against such dangers.  The first timeline is the actual knowledge of OI and the second is what OI should have known.

Timeline I - OI's "actual" knowledge[61]

---

[60] Dr. Neushul testified:
> Q. And some of that pilot manufacturing was sold
> outside of O-I, right?
> A. Very little, but there was some sold I believe; not
> necessarily in '43, but in '44.
(ECF #198 at 52.)

[61] This timeline is reproduced on page 60 without footnotes for ease of reading.

1943:  Medical director and IH on staff who kept OI "abreast of literature"[62]

1943:  OI is told the Kaylo design including asbestos presents a "first class hazard"[63]

1947:  OI production manager aware Kaylo dangerous and caused asbestosis[64]

_____

[62] "Charles Shook, M.D., deceased, employed from March 25, 1946 until June 30, 1960 . . . Dr. Shook was the Medical Director during the period in which this defendant manufactured, sold, or distributed asbestos-containing products."  (Att. 8, Ex 29 at 14 #16.)

"W.G. Hazard was employed as this defendant's industrial hygienist during the period of time in which this defendant engaged in the manufacture, sale and distribution of asbestos-containing products."  (Att. 8, Ex 29 at 6 #8h.)

OI expert Dr. Neushul stated:
> Q. Okay. Well, let's talk about Owens-Illinois for a
> minute. It's your -- it's your position that
> Owens-Illinois kept itself abreast of the literature for
> the time when it was manufacturing Kaylo, right?
> A. They had a very sophisticated industrial hygienist
> who I believe kept them abreast of the literature.
> Q. Right. And they also had an excellent medical
> director in Dr. Shook, right?
> A. Dr. Shook was excellent.
> Q. Okay. And they had a library of medical industrial
> hygiene publications at Owens-Illinois, right?
> A. I believe they did, yes.

(ECF #198 at 49-50.)

[63] On March 12, 1943, Leroy Gardner, M.D. and Director of Saranac Labs wrote to U.E. Bowes, Director of Research for OI.  (Att. 29, Ex 38.)  Dr. Gardner discussed "the composition of [OI's] synthetic insulating material" stating that "he was disappointed to hear that what we thought to be synthetic asbestos proved to be chrysotile."  (Att. 29, Ex 38.)  Dr. Gardner stated "[t]he fact that you are starting with a mixture of quartz and asbestos would certainly suggest that you have all the ingredients for a first class hazard." (Att. 29, Ex 38.)  Dr. Gardner provided an estimate of the "cost of making the preliminary tests."  (Att. 29, Ex 38.)

[64] Over the course of his depositions, Richard Grimmie described his positions at Owens-Illinois, which included positions involving supervision of production and the position of foreman:
> …In
> 1947 you went to work for Owens-Illinois. Is that
> correct?
> A Yes, sir .
> Q And that was as a maintenance handyman?
> A Yes, sir .

(ECF #147 at 13.)

A "ANSWER : This is taken from my personnel file :
Foreman, January 1st, 1950 ; assistant personnel
director 9/1/1950 ; production supervisor,
7/15/51 ; personnel director, 5/6/53 ; production
shift supervisor, 3/1/54 ; production supervisor,
7/1/54 ; production and personnel manager,
9/16/60 ; production superintendent, 12/1/75 ."
(ECF #148 at ECF pages 24-25.)

Grimmie was responsible for safety at the OI Kaylo plant:
Q Is it fair to say that as part of your
responsibilities from '51 until the time you retired,
you were involved with the implementation or
enforcement of safety programs at the plant?
A Yes, sir .
(ECF #147 at 21.)

Grimmie was aware of asbestosis in 1947 and knew Kaylo could injure lungs:
Q Let me ask the question this way : Is it
true that you became aware of the disease, asbestosis,
some time in 1947?
A Yes, sir, I believe so .
(ECF #147 at 22.)

Q Is that correct, sir, you knew that if the
asbestos in Kaylo was breathed, that it could get into
your lungs and could injure your lungs?
MR . BERRY : Objection on competency
grounds .
Q You can answer .
A Yes, sir .
(ECF #147 at 23.)

Grimmie knew that trimming Kaylo released asbestos fibers:
When the Kaylo product was trimmed and in
the factory the ends were trimmed as part of the
production process, correct?
A Yes .
Q And that released asbestos fiber, did it
not?
A Yes .
(ECF #147 at 27-28.)

1948:  Saranac Lab tells OI Kaylo is hazardous industrial dust that can cause fatal asbestosis[65]

1950:  OI's production manager knows Kaylo can produce asbestosis[66]

1950s:  OI implements and requires protective measures for Kaylo plant employees [67]

---

[65] The October 30, 1948 "Interim Report Regarding the Biological Activity of Kaylo Dust to the Owens-Illinois Glass Company" by "the Saranac Laboratory" discusses "animal experiments with Kaylo."  (Att. 30, Ex 41 at 1, 2.)  In 1945, prior to the release of Kaylo on the market, Saranac Laboratory began exposing guinea pigs to "atmospheric suspensions of Kaylo dust for eight hours daily, five and one-half days a week."  (Att. 30, Ex 41 at 3.)  The "conclusions drawn [we]re based upon the results of a full three years' exposure."  (Att. 30, Ex 41 at 2.)  The results "prove that Kaylo is capable of producing the characteristic reaction, asbestosis" and that "a seemingly negligible proportion of fibrous asbestos is sufficient" to cause the reaction.  (Att. 30, Ex 41 at 4, 6.)  The Saranac Laboratory acknowledged that "Asbestosis, both in man and animals, is a chronic, slowly developing peribronchiolar fibrosis."  (Att. 30, Ex 41 at 6.)   The Saranac Laboratory went on to offer information that "may be of aid to the Owens-Illinois health department in formulating a safety program, which is necessary in view of the results of the Kaylo experiment."  (Att. 30, Ex 41 at 6.)   The report concluded that "Kaylo, because of its content of an appreciable amount of fibrous chrysotile, is capable of producing asbestosis and should be handled as a hazardous industrial dust."  (Att. 30, Ex 41 at 7.)

[66]     OI production manager Grimme testified:
        Q. . . .Were you told in 1948 by Owens-Illinois that Kaylo was capable of producing asbestosis?
        A I'm not sure it was 1948 but, yes, I was told that the asbestos in Kaylo would cause asbestosis .
        Q All right . And just so I understand your answer . Are you telling me that if asbestos was released from Kaylo when it was either cut or packaged that, that was capable of causing asbestosis? Is that what you are saying?
        A I knew that . Yes, sir .
        Q And would you agree with me that you knew that from the people at Owens-Illinois prior to 1950?
        A I believe so . Yes, sir .
(ECF #147 at 43-44.)

[67] OI production manager Grimmie stated:
        A It was my understanding that dust would be released from the trim saw process
        . . . .

1952:  Saranac Lab tells OI that workers using Kaylo must be protected[68]

---

While you were at Owens-Illinois, were
people who worked in the trim saw area required to wear
respirators?
A Yes, sir .
(ECF #147 at 48, 59.)

Q And am I also correct that the failure
to wear a respirator when you worked for Owens-Illinois
resulted in threatened disciplinary action and
reprimand?
A That was the threat .
Q Am I correct that while you worked with
Owens-Illinois, if a man did not wear a respirator, you
would personally warn him of the dangers of asbestosis?
A That has happened .
(ECF #148 at 175.)

Q When you were at Owens-Illinois, did they
have a program where they would give their employees
annual X-rays?
A Yes, sir …
A As I understood, the annual X-ray would be
compared to the last annual and the original to see if
there was any change in the lung area .
(ECF #147 at 65-66.)

Q Can you recall while you were employed by
Owens-Illinois informing the employees that cutting
Kaylo without adequate respiratory protection or dust
collection equipment could be hazardous to their
health?
A I may have said that, I don't remember
specifically when . That would seem to me to be common
sense .
(ECF #147 at 139-140.)

---

[68] In the February 7, 1952 cover letter transmitting to OI the final report of the animal health
effects, Arthur Vorwald, M.D. from Saranac Labs stated "the results of the study indicate that
every precaution should be taken to protect workers against inhaling the [Kaylo] dust.
Therefore, control measures should be directed to reducing the amount of atmospheric dust,
especially at those points of operation where dust is generated." (Att. 31, Ex 1109.)

58

1952:  Final Saranac Lab report confirms Kaylo causes asbestosis[69]

1958:  OI insurer issues report about excessive exposures from cutting and handling Kaylo[70]

---

[69] The January 30, 1952 "Investigation Concerning the Capacity of Inhaled Kaylo Dust to the Owens-Illinois Glass Company" by "the Saranac Laboratory" discussed the "comprehensive investigation," "started in February 1945" that "was undertaken in which the effect of inhaled Kaylo dust on animals was studied" before "Kaylo was used commercially on a large scale." (Att. 32, Ex 37 at 1-2.)  The January 30, 1952 reports reviews previous reports, including the "third report, dated October 30, 1948." (Att. 32, Ex 37 at 4-5.)  The January 30, 1952 report confirms that the third report stated that Kaylo "material is not inert but is capable, on prolonged inhalation, of producing asbestosis in guinea pigs." (Att. 32, Ex 37 at 5.)  The January 30, 1952 report reviews the entire experimental findings, stating that the "results of the inhalation experiment prove that Kaylo dust, when inhaled into the lungs of guinea pigs for a prolonged period (30 to 36 months), is capable of producing the peribronchiolar fibrosis characteristic of the disease asbestosis." (Att. 32, Ex 37 at 16.)

[70] A report dated April 28 and May 2, 1958 entitled "Special Hazards Survey" was "prepared for Owens-Illinois Kaylo Division Berlin N.J." by "F.W. Schl and J.K. Robinson" from the "engineering department of Aetna Life Affiliated Companies."[70] (Att. 33, Ex 39 at 1.)  The purpose of the report "was to determine the employee exposure to dust in production operations" by taking twelve "air samples" measuring the amount of asbestos released through using Kaylo.[70] (Att. 33, Ex 39 at 2-3.)  The report pointed out the "maximum acceptable concentration of the dust" that is "100% asbestos is 5 million particles per cubic foot of air." (Att. 33, Ex 39 at 3.)  The report then stated that since "we know that the dust here is considerably less than 100% free silica or 100% asbestos, the maximum acceptable limits generally has been established at 10 million particles for an operation of this type." (Att. 33, Ex 39 at 3.)  Specific results include:

> Air Sample No. 3 – Horizontal Splitting Saw – taken at the breathing level of the operator separating the pieces as the come through the saw – taken between the saw and the operator. 91.8 million particles per cubic foot of air.
> Air Sample No. 4 – [?} Finishing – [?] end – taken at the breathing level of operator feeding flat ware to the trim saw.  46.3 million particles per cubic foot of air.

(Att. 33, Ex 39 at 2-3.)

The report goes on to further state that "results from the air sampling show that a number of the counts are above the limits." (Ex.39 at 3-4.)  "Air Sample No. 3 shows a dangerously high count" for "splitting of flat ware on a band saw" and "Air sample No. 4 shows a high count" not for "a sawing operation but rather to a handling of the flat ware." (Att. 33, Ex 39 at 4.)  The "Special Hazards Survey" also discussed safety measures for the plant.  Recommendations were

made concerning bringing up the "respirator program" to "Owens-Illinois standards," conducting a study about "the possibility of installing exhaust system," and consideration for a "vacuum cleaning system."  (Att. 33, Ex 39 at 7.)

OI objected to the Aetna insurance company report at trial on relevance grounds because OI had not received a copy.  (ECF #198 at 64.)  OI expert Dr. Neushul denied knowing if OI received a copy:

> Q. Okay. Dr. Neushul, this Aetna study was something
> that Owens-Illinois did get a copy of, right?
> A. I don't know.

(ECF #198 at 65.)

Plaintiff then laid the foundation for admission by confronting Dr. Neushul with his testimony in 2007 where he admitted OI received a copy.

> Q. I want to direct your attention to testimony that
> you gave in the case of *Green v. Owens-Illinois*. And
> this was given on Friday, November 2, 2007. I don't know
> if you remember this one or not.
> A. I don't.
> Q. Okay. This shows I took your deposition on that
> day, right?
> A. I guess so.
> Q. Let's see. I'm talking about this one right here.
> Exhibit No. 8, line 18 describes it.
> A. It says, "Yes. Is this also a document that was
> received by Owens-Illinois?"
> "Yes. This was received and prepared for
> Owens-Illinois Kaylo Division in Berlin, New Jersey."
> Q. Okay. Thank you.
> A. I don't know what that is.
> Q. Thank you. That was your testimony back in 2007,
> right?
> MR. CASMERE: I'm sorry. Could we have an
> identification of what's the exhibit number?
> A. What's the exhibit number?
> Q. Exhibit 8. I'll let you finish reading. It says
> it's a Special Hazards Survey, right?
> A. Yeah. But I don't -- that could have been one of
> the surveys done by --
> Q. A Dust Survey from the Aetna Company, right?
> A. Where does it say that? I just want to make sure
> what you're saying is there.
> Q. Right there. Go to the next page.
> A. This was also received -- prepared by the

Timeline I - OI's "actual" knowledge (without footnotes)

1943:  Medical director and IH on staff who kept OI "abreast of literature"
1943:  OI is told the Kaylo design including asbestos presents a "first class hazard"
1947:  OI production manager aware Kaylo dangerous and caused asbestosis
1948:  Saranac Lab tells OI Kaylo is hazardous industrial dust that can cause fatal asbestosis
1950:  OI's production manager knows Kaylo can produce asbestosis
1950s:  OI implements and requires protective measures for Kaylo plant employees
1952:  Saranac Lab tells OI that workers using Kaylo must be protected
1952:  Final Saranac Lab report confirms Kaylo causes asbestosis
1958:  OI insurer issues report about excessive exposures from cutting and handling Kaylo

The Saranac studies and testimony of OI's employees and about what OI knew is conclusive evidence that OI had actual knowledge to warn and instruct the Kaylo users in accordance with the consumer contemplation test.  OI did nothing.  OI actually kept the valuable knowledge gleaned from the Saranac studies a secret from its own employees.  OI's production manager Grimmie stated he was never told about the Saranac findings:

Q  "I hear that there was a Saranac

Owens-Illinois Kaylo Division in Berlin, New Jersey. The previous one was at Sayreville. And this is a Special Hazards Survey, a Dust Survey, from the Aetna Company.
(ECF #198 at 66-68.)

OI may contend the work practices studied by Aetna were at OI's Kaylo factory and did not look at field conditions.  Cutting, sawing and handling of the finished Kaylo product are substantially similar activities whether conducted in the factory or in the field.

Although the insurance company study is dated two days after the agreement to sell the Kaylo business to Owens- Corning, the document provides actual measurements of high levels of dust exposure from normal use of Kaylo.  These measurements establish the dangers which were foreseeable during the normal and intended use of Kaylo.   Assuming OI did not know the measurements until after the business was sold, OI could have learned earlier by proper investigation or testing during the cutting and sawing of Kaylo by insulators in the field. (Discussed at section III.B.1.i.)  However, an inference can be drawn that the measurements during the ongoing study by the insurance carrier were earlier made known to OI which prompted the sale of the business before the final report was issued.

Laboratory that had been retained to conduct a
five-year study for Owens-Illinois on the effects of
asbestosis to the lung area ."
Do you recall giving that testimony,
Mr . Grimmie?
A Yes, sir . I stand corrected .

(ECF #147 at 30.)

Q You are aware, sir, are you not, that as a
result of those experiments at the Saranac
Laboratories, that certain reports were generated to
the Owens-Illinois Company from Saranac?
A Yes, sir .

(ECF #147 at 31.)

Did Owens-Illinois ever tell you about any
of the studies they did -- they were involved with,
with the Saranac Laboratory on animals concerning the
ability of asbestos to cause disease in those animals?
                    Q Were you ever told that, Mr . Grimmie?
A No .

(ECF #148 at ECF page 182.)

Q At any time while you worked for
Owens-Illinois or Owens-Corning Fiberglas, were you
told that studies were conducted on animals at the
Saranac Laboratory to determine the ability of Kaylo to
cause disease? Were you ever told anything about that?
A No .
Q And were you ever given results of any of
those studies?
A No .

(ECF #148 at ECF page 183.)

*Additional sources of knowledge for OI*

The dangers of asbestos were written in the medical and scientific literature dating back

to the 1920s or before.  Lung cancer was reported as early as 1935.  Importantly, in the 1930s

and 1940s, the risk of lung cancer was established in mainstream medical publications and trade

organization literature to be many times higher in persons with asbestosis – the disease which OI

knew from Saranac Lab and other sources was caused by asbestos fibers in Kaylo.  OI's actual or

probable knowledge of these publications must be judged in light of the OI medical director

Shook and industrial hygienist Hazard who kept OI "abreast" of the literature.[71]  OI, as a

company, was a member of the Industrial Hygiene Foundation ("IHF"), a premier source of

medical hazard information to industry.[72]  OI's hygienist Mr. Hazard was a prominent member

of committees of the National Safety Council.[73]


Timeline II - What OI Should Have Known through Scientific Publications and Trade
Organization Information[74]

---

[71] "Charles Shook, M.D., deceased, employed from March 25, 1946 until June 30, 1960 . . . Dr. Shook was the Medical Director during the period in which this defendant manufactured, sold, or distributed asbestos-containing products."  (Att. 8, Ex 29 at 14 #16.)

"W.G. Hazard was employed as this defendant's industrial hygienist during the period of time in which this defendant engaged in the manufacture, sale and distribution of asbestos-containing products."  (Att. 8, Ex 29 at 6 #8h.)

[72] OI joined the IHF in 1936 and remained a member through 1976.  (Att. 34, Ex 121.)  The IHF was founded in 1935 and was a "nonprofit research organization dedicated to the improvement of healthful working conditions in industry" that "disseminated information about health concerns to the members.  (ECF #145 at 44-45; ECF #198 at 51.)  The IHF sent the *Industrial Hygiene Digest* to its members. (ECF #198 at 74.)

[73] Dr. Neushul stated:
>           Q. The National Safety Council was another organization
>     that Owens-Illinois was part of. And I think Mr. Hazard
>     specifically was an officer in one of the sections,
>     right?
>           A. Owens-Illinois founded the Glass and Ceramic section
>     of the National Safety Council.
(ECF #198 at 76.)

[74] This timeline is reproduced on page ___ without footnotes for ease of reading.

1890s:  Medical literature about dangers of asbestos[75]

1920s: Detailed studies of asbestos risks in manufacturing workplaces[76]

1930:  Merewether describes dangers of asbestos in multiple settings and protective measures for British government[77]

---

[75]     modern history goes
back to a publication in Great Britain in the late
1890s talking about the hazards of asbestos.
(ECF #165 at 15.)

The hazards of asbestos have been known for
more than a century and the need to protect
individuals written about some 80 years ago,
correct?
        A. Correct. And I cited both of those in the
direct testimony, the report from Great Britain in
the late 1890s, it was 1898 or '99, her Majesty's
Inspectorate of Factories report
(ECF #165 at 102.)

[76]     in the earlier times what people
started doing is looking at those people that
worked with asbestos. And the first disease that
was described is what we today call asbestosis. It
didn't get that name until 1924 by studying what
occurred to people handling asbestos and they would
get fibrosis of the lung often severe enough to
kill them.
(ECF #165 at 16.)

[77] E.R.A. Merewether and C.W. Price, "Report on Effects of Asbestos Dust on the Lungs and
Dust Suppression in the Asbestos Industry," Report  laid before British Parliament on March 24,
1930.
Findings of the March 24, 1930 report include:
        "inhalation of asbestos dust over a period of years results in the development of a serious
        type of fibrosis of the lungs."  (Att. 35, Ex 201 at 5.)
        "Ultimately, if no acute respiratory infection has precipitated a fatal termination, a stage
        is reached when the lungs can do little more than maintain life."  (Att. 35, Ex 201 at 5.)
        "There is no doubt but that fibrosis of the type produced by asbestos can of itself lead to
        complete disablement and to a fatal termination."  (Att. 35, Ex 201 at 8.)
        "it is only when the fibrosis progresses to the extent of obliterating this reserve, that
        undue shortness of breath on any extra effort draws the worker's attention to the fact that
        his health is not what it should be. The other symptoms of the disease such as cough are

1935:  Cancers from asbestos from asbestos reported in literature[78]

---

equally unassuming and are readily ascribed to some common and trivial cause."  (Att. 35, Ex 201 at 5.)

The March 24, 1930 report also lists preventative measures that include "medical examinations of the workers" and "education of the individual."  (Att. 35, Ex 201 at 9.)  However, the report warns that the "protection afforded by respirators is only partial, and there is real danger that the use of them may give a sense of false security."  (Att. 35, Ex 201 at 9.) Defense expert Dr. Peter Neushul stated that Owens-Illinois had the same knowledge when it was making Kaylo as Merewether had in 1930.  (ECF #198 at 25-26.)  Neushul agreed that the Merewether article listed the preventative measures just described and stated that respirators would be "one of the last lines" of defense and the first lines of defense would be periodic screenings and controlling the dust.  (ECF #198 at 29.)  Neushul stated that in making Kaylo, OI "did not put anything described in Merewether on the boxes."  (ECF #198 at 30.)  OI did not put on the Kaylo boxes or any of the brochures or pamphlets the need for the preventative measures discussed in Merewether.  (ECF #198 at 29-30.)

Dr. Frank described the March 24, 1930 report as follows:

> Merewether and Price in 1930 had a very
> seminal paper, it was a physician working with an
> industrial hygienist, and what they wrote basically
> is as follows: They said that men get disease,
> women get disease, different products can give you
> disease. What you need to do is provide good
> ventilation. If you can't prov -- or you
> substitute for another product. If you can't
> provide good ventilation, you provide respirators.
> And they even went so far as to say the regular
> respirators they had in those days were not very
> easy to wear and so you might have to consider
> supplying air-supplied hoods.

(ECF #165 at 17.)

[78] Dr. Frank stated:
> Q. Basically what does this history establish
> about the dangers of asbestos?
> A. The history is it has been accumulating for
> the last hundred years, but particularly the last
> 80 years is that asbestos is a hazardous material,
> a toxic material, a carcinogenic material. Cancers
> were suggested as early as 1935.

(ECF #165 at 75.)

Dr. Neushul acknowledged the 1935 Lynch publication found cancer:

1938:  First report in literature of asbestos causing mesothelioma[79]

1938:  Merewether reports that visible dust from asbestos means a "dangerous concentration"[80]

1938: Dreessen reports hazards of asbestos in textile industry[81]

---

       Q. Did Owens-Illinois provide any information to the Asbestos Workers Union or Baraboo personnel saying that the Lynch publication in 1935 had found cancer in the person that was studied in that?

       A. They would have had no connection to them in 1935, so they would not have corresponded with them, but they did not.

(ECF #198 at 56.)

[79] Dr. Frank stated "The first report of asbestos-causing mesothelioma was in 1938.  (ECF #165 at 75.)

[80]      Stephen Kenoyer stated:

       Q Okay. Now, continuing here. You had included a reference to this publication by Merewether as part of the slides on dangers of insulation dust. What does this add, in addition to what we've already talked about?

       A Well, it just kind of complements it and it kind of goes back to what I said a little bit ago. Again, he's talking about the size of the dust particles and pointing out that it's basically the invisible ones you can't see which really can do the most harm to you. So even though you may be seeing some, just because you don't see any dust in the air doesn't mean there is not a hazard there.

(ECF # 194 at 61-62.)

"Merewether, E.R.A., Dusts and the Lungs with Particular Reference to Silicosis and Asbestos, Industrial Medicine, Medical Press and Circular Supplement, July 20, 1938."  (Att. 36, Ex 137 at 9.)

"Asbestos has disabling and lethal potentialities. . . the dusts which cause serious local effects on the lungs and often do cause disablement and death are those containing free silica and asbestos." (Att. 37, Ex 205 at 4.)

1930s-40s:  National Safety Council publishes procedures for control of asbestos dusts[82]

1942:  Dr. Hueper's textbook definitively links lung cancer to asbestos exposure[83]

1942:  Exposures exceeding TLV look good to naked eye (Dr. Cook)[84]

---

[81] Waldemar C. Dreessen et al., "A Study of Asbestos in the Asbestos Textile Industry," 1938, U.S. Treasury Department Public Health Bulletin No. 241.  The summary of medical findings in this publication indicates exposure to asbestos dust is dangerous.  (Att. 38, Ex. 1141 at 123.)

Dr. Frank  stated:
> Q. And that's the Public Health Service
> Bulletin 241 that was published in 1938, correct?
> A. Yes.
> Q. Dr. Dreessen reported on textile industry
> exposures in the United States similar to what
> Dr. Merewether did in the United Kingdom?
> A. Yes.
> Q. He reported that you could get asbestosis
> from overexposure to asbestos?
> A. Right.

(ECF #165 at 108.)

[82]  NSC published procedures include "taking air from the dirty environment and extracting it outside," " isolat[ing] where the work is being done from people [who] are not doing that work," "wetting materials down," "having filtered respirators" that "actually seals around your mouth and your face," and "periodical medical examinations for the workers."  (ECF #194 at 57-61.)  NSC publications in the National Safety News and Transactions were received by OI.  (ECF #198 at 76-77.)

[83]  Dr. Frank stated:
> Lung
> cancer was definitively linked in 1942 in Dr.
> Hueper -- H-E-U-P-E-R [sic], Dr. Hueper's book, so
> we've known about the cancer-causing potential of
> asbestos since the early 1940s.

(ECF #165 at 75.)

[84] Cook. Warren A., "The Occupational Disease Hazard," Industrial Medicine, The Science, the Law and the Economics of Industrial Health, April, 1942.  (Att. 39, Ex 209 at 1-2.)  The article states:
> In the case of the asbestos dust condition, our evaluation of the exposure should be based
> on the knowledge that the present toxic limit for asbestos is 5 million particles of dust per
> cubic foot of air. . .  This is a very small concentration, so small in fact that the condition

may look good even to the critical eye and still present an exposure greater than this low limit . . . in the case of asbestos dust, however, and this holds with even more certainty for dusts high in free silica content, the toxic limit is so low that the only safe procedure is to have recourse to actual dust determinations."
(Att. 39, Ex 209 at 3; ECF #197 at 31.)


Mr. Kenoyer was questioned about the Cook article:

This is the PowerPoint presentation you had,
Mr. Kenoyer. And I want to go to the last slide on that
for a moment that we didn't use. This is titled again
*The Dangers of Insulation Dust*. This is a Warren Cook
and he was an expert in the field of asbestos disease at
this time, right?
A. Yes, sir.
Q. 1942?
A. 1942.
Q. Okay. And he makes the statement here -- this is
four years after that 1938 Dreessen report that
Mr. Casmere asked you about -- Mr. Cook says, "In the
case of the asbestos dust conditions, our evaluation of
the exposure should be based on the knowledge that the
present toxic limit for asbestos is 5 million particles
of dust per cubic foot of air." That was what was
suggested after the Dreessen report, right?
A. That's correct.
Q. Okay. And Mr. Cook says about this, "This is a very
small concentration, so small in fact that the condition
may look good even to the critical eye and still present
an exposure greater than this low limit."
Is that a summary, that these exposures would be
above this 5 million particle per cubic foot very low
limit, based on all of the data that you had talked about
earlier?
A. Yes.
(ECF #197 at 30-31.)

Mr. Kenoyer also states:

One is that dust is hazardous.
You have dust that are visible, you can basically just
see. But the smaller dust that you cannot necessarily
see are just as hazardous or not more so.
(ECF #194 at 57.)


the point where you see visible dust in the air, you're

1943:  Excess of lung cancer in persons with asbestosis[85]

1944:  Construction worker (a plumber) reported to have "mesothelioma"[86]

1945:  Asbestosis found in insulators with ten years or more exposure[87]

1949:  10 to 25 higher risk of lung cancer in persons with asbestos exposure [88]

---

at 8 to 10 million particles.
(ECF #194 at 87.)

[85] H.W. Wedler, "Asbestosis and Pulmonary Carcinoma," Deut. Med. Wochschr., 69, 575-576 (Aug. 6, 1045.)  (Att. 39, Ex 229 at 4)  The Wedler article abstract appeared in the January, 1945 Industrial Hygiene Digest.  (Att. 39, Ex 229 at 1, 4.)  The abstract of the article was sent to OI.  (ECF #198 at 74.)
The abstract discussed asbestosis and lung cancer:
> Q. So here it talks about *Asbestosis and Pulmonary Carcinoma*, H.W. Wedler. And this one was published in 1943 and it talks about --
> A. In German.
> Q. Right, in German. But the abstracts of course is in English, right?
> A. It is.
> Q. Okay. "14 instances of malignant disease of the lungs and pleura." And so this is ex -- 16%, this is in excess of the proportion of the lung carcinoma. And it's discussing autopsy records on asbestosis, right?
> A. It's looking at the connection between asbestosis and lung cancer.
> Q. So that's the number of cases being reported of lung cancer, right?
> A. Those are case studies of, you know, people with asbestosis who have gotten lung cancer.

(ECF #198 at 75.)

[86] Dr. Frank stated:
> The first report
> of asbestos-causing mesothelioma was in 1938.16 There
> was a report in the literature in 1950 -- I'm
> sorry, 1944, a gentleman who was a plumber.

(ECF #165 at 75.)

[87] Table 5 in the Fleischer Drinker study shows the duration of work years and the number of persons with asbestos disease – all persons with disease had at least ten years work.  (Att. 72, OI Ex 1460 at 8.)

1952:  Smith-Cartier publication of two case reports of mesothelioma[89]

1955:  Doll – lung cancer connected to asbestos exposure[90]

---

[88] In 1949, the *Industrial Hygiene Digest* reported an abstract of an article, published in the Journal of the American Medical Society, entitled "Asbestosis and Cancer of the Lung." (Att. 41, Ex 60.) The abstract stated:  "Records of English, American and German phisicians and the Annual Report of the Chief Inspector of Factories in England for 1947 show that the occurrence of cancer of the lung is related to pulmonary asbestosis.  This relation is supported by the following observations: (1) The incidence rate of cancer of the lungs in asbestosis patients is 10 to 15 times as high as among the general population."  (Att. 41, Ex 60 at 2.)  OI received the IHF publication with this abstract.  (ECF #198 at 76.)

[89] William E. Smith, "Survey of Some Current British and European Studies of Occupational Tumor Problems," A.M.A. Archives of Industrial Hygiene and Occupational Medicine, Vol. 5 Nuber 3, March, 1952 (Att. 42, Ex 231 at 1,3.)

Dr. Peter Neushul discussed the article:
> Q. Okay. As far as publications are concerned and the literature, mesothelioma was reported at least in the Smith-Cartier article in about 1952, right?
> A. There are articles that we've gone back on and looked at and said, yes, that may well have been mesothelioma. But the seminal piece is in 1960 published by Wagner, as I presented earlier.
> Q. The Smith-Cartier, '52 sounds about right?
> A. I don't have it in front of me, but it could certainly be '52.
> Q. This is *AMA Archives of Industrial Hygiene and Occupational Medicine, March 1952*. And in this publication, which is the *Proceedings of the Cancer Prevention Committee*, I direct your attention to page 262. This *Abstract of Discussion* has a chart here, "Cases of carcinoma of the lungs detected among 4,000 asbestos workers 1940 to '50." And so over here, *Type of Tumor*, there's one report of pleural mesothelioma there, right?
> A. That's correct.
> Q. Okay. And another report of pleural mesothelioma there, right?
>
> A.  That's correct.

(ECF #198 at 72.)

[90]  Dr. Frank stated:

70

Timeline II - What OI Should Have Known through Scientific Publications and Trade
Organization Information (without footnotes)

 1890s:  Medical literature about dangers of asbestos
 1920s:  Detailed studies of asbestos risks in manufacturing workplaces
 1930:  Merewether describes dangers of asbestos in multiple settings and protective
 measures for British government
 1935:  Cancers from asbestos from asbestos reported in literature
 1938:  First report in literature of asbestos causing mesothelioma
 1938:  Merewether reports that visible dust from asbestos means a "dangerous
 concentration"
 1938:  Dreessen reports hazards of asbestos in textile industry
 1930s-40s:  National Safety Council publishes procedures for control of asbestos dusts
 1942:  Dr. Hueper's textbook definitively links lung cancer to asbestos exposure
 1942:  Exposures exceeding TLV look good to naked eye (Dr. Cook)
 1943:  Excess of lung cancer in persons with asbestosis
 1944:  Construction worker (a plumber) reported to have "mesothelioma"
 1945:  Asbestosis found in insulators with ten years or more exposure
 1949:  10 to 25 higher risk of lung cancer in persons with asbestos exposure
 1952:  Smith-Cartier publication of two case reports of mesothelioma
 1955:  Doll – lung cancer connected to asbestos exposure


*Summary of evidence – failure to warn and instruct*

 OI knew to include with the product literature, advertising, and packaging an effective

warning.   OI knew to communicate the danger of contracting cancer and other fatal incurable

diseases, safety instructions about ventilation and breathing protection designed for asbestos

fibers, and that the industry standard of TLVs was not protective against cancer, and that

---

 Q. Doll had said similar things because the
people he studied all had asbestos who also had
lung cancer?
 A. Well, he was studying factories from the
'30s to the '50s and they all had very high
exposures, including unreported cases, at least
unreported in the scientific literature, of
mesotheliomas going back to 1928 that never get
into the literature.
(ECF #165 at 117-118.)

exposures to visible dust were unsafe.   OI knew these communications had to be delivered to

insulators like Ozzie in such way as to motivate them to protect against the dangers of Kaylo.

Rather than issue a proper warning, OI represented Kaylo as "non-toxic" in promotional

literature.  OI's research director, E. C. Shuman, authored an article published in a 1952 trade

journal referring to calcium silicate products (Kaylo is such a product) as "non-toxic" and stating

that "applicators appreciate the fact."  (Att. 43, Ex 42 at 8.)  Kaylo pipe insulation advertisements

from April 1952, which were published after the results of the Saranac tests, indicate that Kaylo

has been "thoroughly tested" and is "non-toxic." [91]   (Att. 43, Ex 42 at 9.)

---

[91] OI's expert Dr. Gregory contended that "During that time period it [Kaylo] was considered
nontoxic.  (ECF #198 at 143-45.)   Applying the consumer contemplation standard under
Wisconsin law, OI should not have used the word non-toxic to promote sales of a product which
caused incurable and fatal diseases.  OI's staff industrial hygienist Willis Hazard in the 1940s
recognized asbestos as a "toxic product."  Mr. Hazard testified:
>    Q. By the way, this time period in the late 40's
> early 50's, did Owens-Illinois have a medical library?
>    A Dr . Shook had some volumes of medical journal
> I if that's what you mean . There was no big library .
>    Q. You continued, did you not, the practice you
> described earlier of trying to keep up to date with I
> II the medical literature that was developing in the
> industrial hygiene area?
>    A Yes .
>    Q. And I assume you did that with particular
> emphasis on silicosis?
>    A Yes .
>    Q. And did you also do it with emphasis on
> asbestos?
> On all possibly toxic materials that people
> our plant might use .
>    Q. So would it be fair to say that during this
> period from '46 to the mid-50's, as part of your duties
> and your responsibilities, you were attempting to the
> best of your ability to keep abreast of all of the
> health and medical literature dealing with asbestos
> and its relation to health?
>    A And other toxic products too .
>    Q. But at least for the purposes of this-litigation,

Many of entries on the timelines concern knowledge which put OI on notice to further investigate hazards of asbestos in Kaylo users (not just animals or plant workers) or under conditions more comparable to those in which insulators worked.  OI did not due the further investigations.  In *Arbet v. Gussarson*, 66 Wis. 2d 551 (Wis. 1975), the Wisconsin Supreme Court recognized the failure to test or investigate potential hazards is a relevant allegation in a claim for strict liability, by stating:

> The second amended complaint attempts to state causes of action against American Motors based upon ordinary negligence and upon strict liability. [1] The complaint contains substantially similar allegations of negligent conduct to support both theories: . . . (4) failure to properly manufacture and inspect to insure that cars sold were not unreasonably dangerous; (5) failure to test and to establish quality controls to insure that the plastic breather mechanism would operate properly; (6) failure to warn potential users of the car of the above hidden dangers in the event of a collision. In addition, to support the strict liability theory the complaint alleges the car was defective and unreasonably dangerous, that American Motors was in the business of selling automobiles, and that the car was expected to and did reach the Arbets in substantially the same condition as when it was sold... **This complaint states a cause of action for strict liability** under Wisconsin products liability law.

*Arbet,* 66 Wis.2d at 554-55 (emphasis added).[92]

---

you were doing it with regard to asbestos?
      A. Yes.
(ECF #150 at 53-54.)

In writing the 1952 report to OI, the Saranac Lab made reference to the "toxic properties of the final product ." (Att. 32, ex 37 at 3.)  Dr. Gregory's view that some persons "considered" Kaylo nontoxic, does not excuse OI's failure to spread an accurate message about Kaylo hazards based on what OI knew from the Saranac studies and from the literature.

[92] This Court should find the evidence of what OI knew or should have known is sufficient for a strict liability failure to warn or instruct claim.  If such a finding is made, the Court need not consider the negligence claims of Plaintiff.  If the Court does find the need to address the negligence claims, the evidence of what OI knew or should have known also provides a basis for liability in negligence.

*2. #3 - Causation*

The element of causation involves two inquiries.[93]  First, was Ozzie's death and

mesothelioma caused by asbestos?  Second, was OI Kaylo a substantial factor in the causation?

### i. Causation of Ozzie's Mesothelioma by Asbestos

A death certificate is a "vital statistic" subject by statute to the administrative procedures

of the state department of health and the state registrar.  Wis. Stat. §§ 69, et seq.  Before the

certificate of death can be issued, the statute requires a "medical certification" by a physician

caring for the decedent.  Wis. Stat. §69.18(2).  After Ozzie died on September 29, 1996, his

death certificate was signed and certified by DME Betty Smith, a coroner.  (Att. 23, Ex 22)  The

certificate was signed on January 6, 1997 and lists the immediate cause of his death as

Mesothelioma.[94]  (Att. 23, Ex 22.)  The death certificate lists the "final disease or condition

resulting in death" as "asbestos exposure."[95]  (Att. 23, Ex 22.)  The certificate was issued by the

Registrar on January 14, 1997.  (Att. 23, Ex 22.)

By statute a death certificate cannot be changed "after 365 days have elapsed . . . unless

the state registrar has received a court order to make the amendment."  Wis. Stat. § 69.11(4)(a).

The statutory procedure to obtain a court order to amend a death certificate in Wisconsin after

---

[93] In Wisconsin, the test for causation is whether the conduct at issue was a "substantial factor" in producing plaintiff's injury.  *Baumeister v. Automated Prods.*, Inc., 2004 WI 148, ¶24 (Wis. 2004).

[94] The death certificate contains a typographical error, spelling Mesothelioma as "Mesothrlia." Dr. Arthur Frank testified that "mesothelioma is misspelled."  (ECF #165 at 73)

[95] The reference to "asbestos exposure" supports a conclusion that "Mesothrlia" is a typographical error.

365 days is to file a petition with the circuit court under Wis. Stat. § 69.12.  Section 69.12(1)

provides:

> If . . . a person with a direct and tangible interest in the vital record alleges that
> information on the vital record does not represent the actual facts in effect at the
> time the record was filed, the person may petition the circuit court of the county in
> which the event which is the subject of the vital record is alleged to have
> occurred. . . . If the court finds that the petitioner has established the actual facts
> of the event in effect when the record was filed, the clerk of court shall report the
> court's determination to the state registrar.

As a consequence of the state statutory procedures, the Wisconsin Supreme Court ruled a

death certificate prepared by a medical examiner is presumptively valid in proceedings to amend

the certificate.  *Sullivan v. Waukesha County (In re Sullivan)*, 218 Wis. 2d 458, ¶17 (Wis.

1998).[96]  The presumption must be rebutted by following the statutory procedure laid out in Wis.

Stat. § 69.12 to establish another cause of death.  Here, OI failed to pursue the statutory

procedure to change the death certificate to reflect a cause of death other than mesothelioma.  In

*Sullivan* the Wisconsin Supreme Court held:

> A person who files a petition under *Wis. Stat. § 69.12(1)* alleges only that the information
> in a vital record does not represent the actual facts existing at the time the vital record
> was filed. The relief sought by a petitioner is to have the circuit court enter the actual
> facts and order the state registrar to change the vital record. When considering a petition
> filed under this section, the circuit court's only role is to review the evidence presented by
> a petitioner and to determine whether the petitioner "has established the actual facts of
> the event in effect when the record was filed." *Wis. Stat. § 69.12(1)*. If the circuit court
> finds that a vital record does not represent the actual facts, the court reports the actual
> facts to the state registrar. See *Wis. Stat. § 69.12(1)*. The state registrar will then change
> the vital record to reflect the actual facts entered by the circuit court. See *Wis. Stat. §
> 69.12(1)*, *(4) (a)*.

---

[96] "In reviewing the actual facts existing at the time a certificate of death was filed, a circuit court
must accord the information certified by a medical examiner a presumption of validity. This is a
rebuttable presumption that the information on the certificate of death represents the actual facts
in effect at the time the certificate was filed."  *Sullivan v. Waukesha County {In re Sullivan}*, 218
Wis. 2d 458, 467-468 ¶17 (Wis. 1998).

> When entertaining a petition to review the facts represented in a certificate of death under *Wis. Stat. § 69.12(1)*, a circuit court must consider and enter the "actual facts" existing at the time the certificate of death was filed. The actual facts may include the information contained in the certificate of death or other facts existing at the time the certificate of death was filed that were unavailable to or not considered by the party filing the certificate.

*In re Sullivan,* at ¶¶13-14.  As a consequence of the lack of compliance with the statutory procedures by OI, the presumption of correctness of the diagnosis of mesothelioma as the cause of death should be applied.

Plaintiff's medical expert Dr. Arthur Frank testified that Ozzie's mesothelioma was caused by asbestos and was the cause of death.  (ECF #165 at 52-53.)  Dr. Frank concluded:

> it is my opinion held with a reasonable degree of medical certainty that Mr. Suoja . . . developed and then died from a malignant peritoneal mesothelioma that was caused by his exposures to asbestos.

(ECF #165 at 53.)

Dr. Frank described his methodology for the "attribution" of the cause of a potential asbestos related disease. [97]  (ECF #165 at 52-54.)   The methodology included a "differential diagnosis," the exposure duration, and the latency period.  (ECF #165 at 53-55.)   The methodology for attribution used by Dr. Frank meets the Bradford – Hill criteria and follows the asbestos specific Helsinki Conference criteria.  (ECF #165 56-57.)

Dr. Frank's opinions on attribution are supported by his personal participation in the research and knowledge of the group of 17,800 member of the insulator's trade union which Dr.

---

[97] Under Seventh Circuit law, the primary concern in admission of a qualified expert's testimony is the methodology followed.  *Schultz v. Akzo Nobel Paints*, LLC**,** 721 F.3d 426, 432 (7th Cir, 2013) the inquiry must 'focus . . . solely on principles and methodology, not on the conclusions they generate.")

Selikoff had studied.[98]  (ECF #165 at 55.)  The Bradford-Hill criteria approve use of epidemiological evidence gathered from cohort groups such as the insulator study by Dr. Selikoff.  (ECF #165 at 56-57.)

The Helsinki criteria were published in a scientific journal after development by a consensus group of 19 worldwide participants attending a conference in 1997.[99]  (ECF #165 at 59-61; Att. 24, ex 204.)  For mesothelioma attribution the Helsinki report concludes "the most practical and useful measure occupational asbestos exposure. Using structured questionnaires and checklists, trained interviewers can identify persons who have a work history compatible with significant asbestos exposure."  (ECF #165 at 61, Att. 24, ex 204 at 313.)   The portion of the Helsinki report specific to asbestos provides:

> The following points needs to be considered in the assessment of occupational etiology. The great majority of mesotheliomas are due to asbestos exposure. Mesothelioma can occur in cases with low asbestos exposure; however, very low background environmental exposures carry only an extremely low risk. About 80 percent of mesothelioma patients have had some occupational exposures to asbestos and, therefore, a careful occupational and environmental history should be taken.  An occupational history of brief or low level exposure should be considered sufficient for mesothelioma to be designated as occupationally related. A minimum of ten years from the first exposure is required to attribute the mesothelioma to asbestos exposure, though in most cases, the latency interval is longer, e.g., on the order of 30 to 40 years.  Smoking has no influence on the risk of mesothelioma.

(ECF #165 at 63.)

---

[98] Dr. Frank testified: "[H]aving worked with Dr. Selikoff in his study of 17,8000 asbestos insulators, having examined insulators for many, many years, specifically I can say in my opinion, Mr. Suoja's exposure to asbestos as an insulator working at various construction sites was the cause of his mesothelioma." (ECF #165 at 55.)

[99] The Helsinki criteria were reviewed at another conference in 2014 with no relevant changes for mesothelioma attribution.  (ECF #165 at 64.)

In attributing Ozzie's mesothelioma to asbestos, there are two salient facts.  Ozzie was a career asbestos worker and his diagnosis of mesothelioma in 1996 meets the latency criteria. Insulators have the highest exposure of any occupational group and far exceed the Helsinki criteria of a "brief or low level exposure" to asbestos.  Dr. Frank testified:

> Q. From an occupational standpoint, where do the insulator fall as far as the likelihood that that group would get peritoneal mesothelioma?
> A. There is no group that I'm aware of -- and I've studied many, many different trades and exposures -- there's no group I'm aware of who as a group has more exposure to asbestos than insulators. Miners and millers have less exposure, other trades that have high incidence of asbestos-related disease, plumbers and pipefitters, sheet metal workers, carpenters, electricians, and others, none of them have had as much exposure as insulators and none of those groups show as high a rate of disease as insulators. So they are sort of at the top of the heap in terms of exposure and, therefore, they're at top of the heap for the likelihood of getting a mesothelioma. And the background rate for mesothelioma in the general population is generally thought of as about one in a million, and among insulators, the rate of mesothelioma including peritoneal mesotheliomas, but all of them together, is more like one in ten, not one in a million.

(ECF #165 at 38-39.)  Two of Ozzie's treating physicians concurred in Dr. Frank's opinion that Ozzie died from asbestos related mesothelioma.   Dr. Wiig testified that Ozzie's mesothelioma was caused by "his exposure remotely to asbestos."  (ECF #164 at 12.)   Dr. Wiig also wrote in Ozzie's medical records "The final path report available on the second postoperative day on the basis of the special stains indicated mesothelioma.  This may well be related to his remote lengthy history of asbestos exposure."  (Att. 62, Ex 19 at 125.)  Dr. Slag's letter in Ozzie's medical records states:

"Shortly before your husband died, he was found to have an intra-abdominal malignanvy, which is described by our pathology specialists as an epithelial mesothelioma. This is a tumor that is often associated with exposure to asbestos, and I believe that your husband did have an exposure to asbestos."

(Att. 25, Ex 134 at 32.)

Diabetes, the other significant medical condition for Ozzie, did not cause his death. Ozzie's death certificate lists diabetes as a condition "not resulting in the underlying cause" of death. (Att. 23, Ex 22.) Dr. Frank found based on review of Ozzie's medical records and death certificate that Mr. Suoja's diabetes was "controlled" and did not cause Ozzie's death:

Q. Did the diabetes cause his death?
A. No, mesothelioma caused his death.

(ECF #165 at 73.)

### ii. Kaylo is a substantial factor in the causation

In addition to whether Ozzie's mesothelioma is attributed to asbestos, causation requires a finding that the OI Kaylo exposure was a substantial factor. Dr. Frank provided undisputed testimony about published literature and studies showing a month or less was a sufficient exposure to cause peritoneal mesothelioma. Ozzie's exposure for more than six months to OI Kaylo far exceeds the minimum duration needed to cause his mesothelioma. Since the Kaylo exposure alone is sufficient to cause Ozzie's mesothelioma, the OI product is a substantial factor in causing Ozzie's mesothelioma.

Dr. Frank testified in detail about the short duration of asbestos exposure needed to cause mesothelioma.[100]   The time period reported in the literature of exposure required to cause mesothelioma is as short as one day.

Taking into account the scientific literature and his experience, Dr. Frank was asked by hypothetical question if one month of installing and removing insulation was enough to cause peritoneal mesothelioma. (ECF #165 at 80.)   Dr. Frank responded one month was sufficient based on the scientific literature:

> Q. Okay. I'd like you to assume that
> Mr. Suoja had personally installed or removed

---

[100] Dr. Frank testified that "in both humans and animals, as little as one day of exposure or less than a full working day has been shown to give rise to people developing mesothelioma.  (ECF #165 at 39.)  He supported this opinion by citing the animal experiments by Dr. Wagner that "showed that as little as one day of exposure would give rise to mesotheliomas."  (ECF #165 at 39-40.)  Dr. Frank also cited Dr. Greenberg's 1974 paper in the British Journal of Industrial Medicine stating that it "reported short-term exposures giving rise to mesothelioma, and the shortest exposure he reported on was a gentleman who cut asbestos boards in his back yard for one day."  (ECF #165at 40; Ex 202.)  Dr., Frank also mentioned a "report out of Australia of someone with six hours of exposure." (ECF #165 at 40.)  Dr. Frank further cited the 1965 Newhouse paper and the Miller paper to support his position.  (ECF #165 at 50.)


Dr. Frank read a portion of the 1999 article entitled "Mesothelioma: cases associated with non-occupational and low dose exposures" by G Hillerdale into the record:
> Given the extensive use of the mineral,
> many people have been occupationally exposed to
> asbestos. This exposure can only have been -- can
> have been only brief but perhaps intense during the
> short -- that short period. In many or most
> instances, the workers have no idea of the exposure
> and it can be impossible or almost impossible to
> elucidate it. Also, the level of exposure is often
> very difficult to estimate, should the information
> be available.
(ECF #165 at 49; Att. 70, Ex 223.)

asbestos-containing pipe insulation for at least
one month in 1950s or 1960s and the visible dust
was generated from cutting or removing that pipe
covering insulation and crews of multiple
insulators, and also assume that Mr. Suoja was
diagnosed with peritoneal mesothelioma in 1996.
What is your opinion as to whether this exposure
alone could cause peritoneal mesothelioma if that
was his only dose?
. . . .

 A. Are you talking about his whole career he
only spent one month, or with a particular product?

 Q. I'm asking you --

 A. In general, one month would be sufficient
to give him his peritoneal mesothelioma. If that's
the only exposure he had, that would be sufficient,
in my opinion.

 Q. Okay. And what is the basis for your
saying this?

 A. For all the things we've been talking about
this morning, about how little asbestos it takes to
actually give one a mesothelioma. If you're giving
me a month of exposure, even, let's say, four weeks
of five or six work days, compared to one day, both
in humans and animals doing it, that's certainly,
in my mind, sufficient.

 Q. How about under the Bradford Hill or
Helsinki Criteria?

 A. Same thing. The Helsinki Criteria talk
about, you know, even low exposures can do it. A
3 month is not necessarily a low exposure.

(ECF #165 at 79-81.)  This Court should find the exposure to the OI Kaylo is substantial because

it exceeds the minimum duration reported to be needed in the literature and Helsinki medical

criteria for attribution.

OI did not present a medical or other causation expert in defense of the case.  Instead, OI

stated in its trial brief that the causation testimony of Dr. Frank should be excluded.  (ECF # 135

at 9-11.)  OI contends Dr. Frank's testimony is excluded by Judge Crabb's earlier opinion, based

on plaintiff's stipulation, that "any exposure to asbestos, no matter how slight, remote or

insignificant, is a cause or substantial contributing factor in causing Plaintiffs' diseases." (ECF #82 at 1-2.) OI objects to Dr. Frank's entire testimony based on the argument that testimony about the "cumulative" exposure causing Ozzie's mesothelioma is excluded by the stipulation and Judge Crabb's ruling.[101]   As discussed below, OI did not comply with an earlier ruling by Judge Crabb directing OI to file a motion in limine in order to exclude Dr. Frank's testimony. Alternatively, the objection fails on the merits because "cumulative" exposure as the cause of mesothelioma is terminology used in countless scientific publications.

The term "cumulative" exposure is used by many authors in describing the cause of mesothelioma and other asbestos related diseases. (Att. 70, Ex 223 at 4; Att. 71, Ex 202 at 2; Att. 69, Ex 224 at 3; Att.73 Ex 225 at 2; ECF #165 at 127, 130.) Dr. Frank made reference to the same concept in his trial testimony. (ECF #165 at 35.)   The scientific use and validity of the term in describing asbestos exposures is disputed by OI without citing any scientific authority. Judge Crabb's opinion, which OI relies on, makes no reference to the term "cumulative."

---

[101] OI failed to follow Judge Crabb's ruling by eliciting from Dr. Frank and questioning him about the same "every exposure" testimony which Judge Crabb excluded based on plaintiff's stipulation that Dr. Frank would not offer such testimony. OI counsel asked Dr. Frank:

> Q. But if they have an exposure, no matter how slight, no matter how minimal, your opinion is that that is part of the cause of the disease?
> A. It's part of their cumulative exposure.
> Q. And thus the cause?
> A. And thus the cause because it is the cumulative exposure that is the cause.

(ECF #165 at 97-98.)   Plaintiff stayed within the scope of Judge Crabb's ruling on direct examination and does not rely on OI cross examination. However, to the extent OI argues Dr. Frank gave testimony precluded by Judge Crabb's opinion, OI counsel opened up the door by violating the ruling in questioning Dr. Frank.

OI is also untimely in the objection to exclude Dr. Frank's causation testimony.  OI earlier made a request to exclude testimony about "cumulative" exposures all causation testimony of Dr. Frank in a reply supporting OI's *Daubert* motion in limine.  Judge Crabb denied the relief sought in the reply filed by OI.  Judge Crabb ruled a new motion in limine was required to limit causation evidence beyond Plaintiff's stipulation that the "each and very exposure" testimony would not be offered.[102]   The scheduling order deadline for the non-*Daubert* motions in limine was October 19, 2015.  (ECF # 77, filed 4/10/15.)  The deadline for *Daubert* motions, which is what the total exclusion of Dr. Frank's causation testimony falls within, was January 8, 2015.  (Text Only order 8/14//2015.)  Despite these deadlines and Judge Crabb's order, OI never filed a further motion in limine about Dr. Frank.  OI's objections at trial and in the trial brief should be overruled as untimely or forfeited based on Judge Crabb's order and *Daubert* procedure.

---

[102] "Three motions filed by defendant Owens-Illinois, Inc. and related to the admissibility of expert testimony are before the court in these two asbestos cases. In the first motion, defendant seeks to exclude an opinion by plaintiffs' experts that "any exposure to asbestos, no matter how slight, remote or insignificant, is a cause or substantial contributing factor in causing Plaintiffs' diseases." Defendant argues that the opinion is not "scientifically reliable" and is therefore inadmissible under Fed. R. Evid. 702. In addition, defendant says that the evidence is irrelevant and unfairly prejudicial.  . . .

The first question is which of these motions are still in dispute. In response to the first motion, plaintiffs filed a two-page brief in which they stated that testimony that "'any exposure' is a cause of the asbestos related disease will not be presented at trial." . . . However, not willing to take "yes" for an answer, defendant continued to make arguments about these motions in its reply briefs. Then both sides filed additional briefs about the "any exposure" theory of causation and defendant expanded its argument regarding the evidence that should be excluded. Because plaintiffs did not respond substantively to either of defendant's first two motions, I am granting them as undisputed. **If defendant wants to obtain additional rulings about the permissible scope of causation evidence, it will have to file a timely motion in limine.**" (emphasis added) (ECF # 82 at 1-2.)

Judge Crabb's directive that a timely new motion was required to exclude additional testimony of Dr. Frank, comports with the Seventh Circuit precedent on *Daubert* motions. The Seventh Circuit requires the judges follow "proper framework" when considering motions to strike expert testimony. E..g, *Manpower, Inc. V. Insurance Company of Pennsylvania*, 732 F.3d 796, 805 (7th Cir. 2013). Proper framework requires, at a minimum, filing a motion specifying the testimony to be stricken and an opportunity to respond. The Court of Appeals reviews *de novo* whether the proper framework under Rule 702 and *Daubert* has been followed. *Manpower*, 732 F.3d at 805. Here, apart from OI's *Daubert* motion about the "any exposure" testimony, no motion has been filed to exclude Dr. Frank to provide proper framework for *Daubert* inquiry which should occur before trial begins.

If this Court decides to undertake a *Daubert* inquiry at this time, Dr. Frank's testimony should be included because it meets the standards of admissible expert testimony laid out by the United States Court of Appeals for the Seventh Circuit.[103]

---

[103] Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), govern the admission of expert testimony in federal courts, even when our jurisdiction rests on diversity. *See Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010) (holding "standards for admitting expert evidence" are "matters that fall on the procedural side of the *Erie* divide," and are thus governed by federal law) (citations omitted). *Daubert* itself commenced as a state court action before it was removed to the Southern District of California on diversity grounds. *Daubert,* 509 U.S. at 582.

Rule 702 provides: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, expert testimony must not only assist the trier of fact. It must also demonstrate sufficient reliability—a key concern of the district court below. *Id.*

### 3. #4 - OI was in the business of selling Kaylo

OI admitted it was in the business of selling Kaylo in interrogatory answers.  OI stated

the following:

> Owens-Illinois Glass Company began limited pilot plant operations involving the production of asbestos-containing products in 1943.  It began manufacture of commercial quantities of "Kaylo" asbestos-containing products in about 1948 and continued manufacture until about April 30, 1958.

(Att. 8, Ex 29 at 6.)

### 4. #5 No substantial change after leaving manufacturer

As discussed at section II., in the Kaylo product exposure section, witnesses recognized

Kaylo on the pipes at Badger Ordnance Work, which shows Kaylo was not changed substantially

after leaving the manufacturer.  No evidence has been presented that Kaylo was improperly

---

The district court is the gatekeeper of expert testimony. We stress that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]"  *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citations omitted).

*Daubert* provides several guideposts for determining reliability. These guideposts examine (1) whether the scientific theory has been or can be tested; (2) whether the theory has been subjected to peer-review and/or academic publication; (3) whether the theory has a known rate of error; and (4) whether the theory is generally accepted in the relevant scientific community.  *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 593-94).

Importantly, this list is neither exhaustive nor mandatory. *Chapman v. Maytag Corp. (In re Chapman)*, 297 F.3d 682, 687 (7th Cir. 2002). In some cases it may also be appropriate to examine, as the district court did here, whether there is "too great an analytical gap between the data and the opinion proffered." *G.E. v. Joiner*, 522 U.S. 136, 146 (1997).  Ultimately, reliability is determined on a case-by-case basis.  *Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007);  *C.W. v. Textron, Inc.*, 807 F.3d 827, 834-835 (7th Cir. Ind. 2015).

applied or used at Badger Ordnance Works.  The asbestos fibers that caused the damage to Ozzie were a component of all Kaylo manufactured by OI.

## C. Summary of Strict Products Liability Claim

The greater weight of the evidence establishes OI is liable under the strict products liability claim.  Plaintiff has proven the 5 elements required for a strict products liability claim in both the categories of design defect and failure to warn/instruct.

## IV. Sophisticated user/purchaser defense

At trial OI counsel stated the "sophisticated user" was being asserted as a defense during the Rule 50 motion discussion.   OI claims the owners and operators of Badger Ordnance and insulation contractors, including Ozzie's employers, were "sophisticated users" of insulation products.   As a result of the sophistication of these other entities who controlled the work practices followed by Ozzie, OI contends it had no duty to take actions to warn or protect Ozzie.

Case law and the evidence in this case preclude application of such a defense for the following reasons which are each discussed in detail below.

- The sophisticated user defense bars does not apply to strict product liability claims under Wisconsin law

- The evidence does not establish the operators at Badger Ordnance or Ozzie's employers were sophisticated
  - OI did not provide information about the hazards of Kaylo to the users
  - They did not implement protective measures or give safety instructions to Ozzie
  - The TLV did not protect career insulators from cancer

- OI has not proven reliance upon the ability of operators of Badger Ordnance and insulation contractors, including Ozzie's employers, during the relevant time period to protect Ozzie.
.
- The sophisticated user defense is forfeited
  - an affirmative defense that was not plead properly and is therefore waived
  - the defense was not timely raised as a dispositive motion

## A. Strict product liability – not a defense

The sophisticated user doctrine is not a defense to strict product liability claims asserted in this case. *See Mohr v. St. Paul Fire & Marine Ins. Co.*, 2004 WI App 5, ¶34, 269 Wis. 2d 302, 331-332, 674 N.W.2d 576, 591 (Wis. Ct. App. 2003) ("While we have acknowledged the difficulty of distinguishing between a negligence claim and a strict product liability claim when

both are based on an allegedly inadequate warning, . . . we are reluctant, without more guidance from the supreme court, to import doctrines from the former into the latter."). In *Mohr*, the Court declined to apply the sophisticated user doctrine to analysis of a strict products liability claim under Restatement (Second) of Torts, § 402A.  Mohr, 2004 WI App 5 at ¶34.

In light of the refusal of the Wisconsin appellate courts to extend the doctrine of sophisticated user to strict product liability claims, this Court should reject OI's attempt to do in the *Suoja* case.

## B. Evidence does not prove sophistication

The evidence required to prove a sophisticated user defense in Wisconsin is discussed in *Haase v. Badger Mining Corp.*, 2003 WI App 192, 266 Wis. 2d 970, 669 N.W.2d 737 (Wis. Ct. App. 2003).  In *Haase* the court ruled the Neenah Foundry employing the victim in a silicosis case was a sophisticated user.  *Haase,* 2003 WI App 192 at ¶24.  The court cited evidence including:

- Testimony of two former Neenah safety directors stating that "Neenah was well aware of the hazards attendant to the industry;"
- Participation and attendance in industry trade organizations which provided "literature about foundry hazards and worker protection;"
- Neenah was "technologically advanced;"
- "Neenah devoted significant amounts of time towards:"
  - "keeping abreast of industry safety standards and changes in government regulations;"
  - "improving ventilation and dust control systems in the foundry;" and
  - "purchasing respiratory protective equipment, including air fed helmets and high efficiency filter respirators;"
- Training employees to recognize hazards and protect themselves; and
- Medical monitoring of exposed employees

*Haase,* 2003 WI App 192 at ¶24.  Other uncontroverted evidence established Neenah failed to require safety precautions (wearing respirators) which were known to the company.  *Haase,*

2003 WI App 192 at ¶24.  Evidence "did not show that Neenah was unfamiliar with them [respirators] or that Neenah was unsure of how to adequately protect its workers."  2003 WI App 192 at ¶24.  The court concluded from such evidence that Badger Mining, the supplier of the silica sand, could reasonably rely on Neenah implementing the safety precautions necessary to protect its own employees.  2003 WI App 192 at ¶24.

*OI's evidence*

OI's evidence does not approach the level of sophistication of Neenah Foundry in the *Haase* case.  At most OI has shown that the owner and operators of Badger Ordnance and the insulations contractors should have known about the TLVs or regulations adopting such levels.  Knowing about TLVs does not create the sophistication needed to protect Ozzie from the brief and lower exposure levels that cause mesothelioma.

The evidence here shows a lack of sophistication even assuming the TLV was known to Badger and the employers.  First, as discussed in the separate TLV section, the TLV did not protect insulators from cancer.  If a user only knows about and follows the TLVs, they are not protecting against mesothelioma.  Second, a sophisticated user must know the necessary protective measures to prevent asbestos related cancer such as ventilation systems and air supplied respirators.  Third, OI did not demonstrate Badger Ordnance's operators or Ozzie's employers required or implemented any safety measures for asbestos.  OI used special protective measures in areas of OI's Kaylo production operations, but has not shown these were used by the insulators or Badger.  OI also did not advise Badger or the insulation contractors of the knowledge OI gleaned about Kaylo hazards from Saranac Lab reports need for such protective

measures.[104] OI's experts pointed to publication by the Saranac Laboratory of the some data

from the studies in a1955 article.  (Ex 1116.)  However, the publication of the data omitted

significant information necessary to educate readers about Kaylo does not mention the name

Kaylo or advise that is must treated as "a hazardous industrial dust."[105]  The 1955 publication,

---

[104] Some examples in the testimony by OI's expert Dr. Neushul of the information that OI did
not provide to the purchasers or users of Kaylo are:

> Q. Okay. So let me ask you this question: was this
> letter or this information in this letter about a
> first-class hazard, did you find any evidence that
> Owens-Illinois had published that in any of the documents
> that went out with the product?
> A. I have not seen that.
> . . ..
> Q. So did Owens-Illinois again publish with promotional
> literature or advise anybody at Badger that it was a
> hazardous industrial dust to Kaylo?
> A. They had no correspondence with Badger.
> . . ..
> Q. Did Owens-Illinois provide any information to the
> Asbestos Workers Union or Baraboo personnel saying that
> the Lynch publication in 1935 had found cancer in the
> person that was studied in that?
> A. They would have had no connection to them in 1935,
> so they would not have corresponded with them, but they
> did not.

(ECF #198 at 52-56.)

[105] Dr. Neushul testified about information omitted from or not included in the publication of the
Saranac data

> Q. So the publication by Saranac doesn't say anything
> about the product's name is *Kaylo*, does it?
> A. It does not.
> Q. Okay. And it doesn't say that the product should be
> treated as a hazardous industrial dust, does it?
> A. I believe -- I don't recall those words being in
> there, no.
> Q. And it doesn't say anything about when using that
> product, you need to use the measures -- the preventive
> measures that Merewether had talked about in 1930; it
> doesn't say that in this published version?
> A. I don't believe Merewether is cited in that paper.
> Q. Okay. And preventive measures aren't cited either,

which was delayed for 7 years after the 1948 Saranac Lab report advised OI that Kaylo was a hazardous industrial dust causing cancer, added little to the knowledge of the allegedly sophisticated users.[106]

Defendants cite no evidence that the potentially sophisticated users implemented measures to protect from asbestos such as formation of a professional safety staff, medical monitoring of exposed persons, implementation of ventilation and dust control systems , or provision of respiratory protective equipment.  No evidence is in the record that the potentially sophisticated users notified Ozzie to recognize the dangers of asbestos or how to protect himself.

**C. Reliance on the user being sophisticated enough to protect**

OI did not introduce evidence that OI relied upon what the operators of Badger Ordnance or Ozzie's employers knew about the dangers of asbestos and how to protect against those.  The case law requires such evidence.  According to case law, for applicability of the sophisticated user defense, the Defendant must prove it had reason to believe the user had knowledge of the dangerousness of the products at the time it supplied the product.  *See Mohr*, 2004 WI App. 5 at ¶ 20 ("We first observe that the issue . . ., correctly framed, is whether KDI had reason to believe that the high school had knowledge the platforms were likely to be dangerous if used in less than five feet of water, not whether the high school actually did have that knowledge.").

_____

right?
    A. I don't believe those were cited in there.
    Q. So it basically doesn't provide any information about what kinds of exposures would occur to people actually using Kaylo, does it?
    A. It's not a study of that.
(ECF #198 at 61-61.)

[106] According to the transmittal letter sent to OI with the final 1952 Saranac Lab report, OI was granted the opportunity to review the "manuscript" of any future article before being submitted to the publisher by Saranac Lab.   (Att 31, OI ex 1109)

OI's offered expert opinion testimony that it could rely upon property owners and insulation contractors knowing about the TLV and taking measures to comply with the TLV. Cite to TLV section.  OI's TLV evidence does not provide a basis for reliance by OI that the operators of Badger or Ozzie's employers were protecting him.  The TLV evidence proves that the lack of protection and the lack of a basis for reliance. As discussed in the TLV section of this brief, the TLV did not protect against mesothelioma or offer any guidance on protective measures.

OI's asserted "it had no reason to believe that the foreseeable use of such products would create a hazard to users" in interrogatory answers.  (Owens-Illinois, Inc.'s Responses to Plaintiffs' Interrogatories, Att. 9, Ex.139, 14-15.)  OI's position that OI lacked knowledge of the hazards during use of Kaylo by insulators precludes any reliance on Badger or Ozzie's employers protecting Ozzie.  OI cannot claim reliance on alleged sophisticated users knowing what OI denies knowing.

No Wisconsin appeals court has considered the application of the sophisticated user defense in an asbestos case.  Courts in other jurisdictions have refused to apply the sophisticated user doctrine in asbestos cases.[107]

---

[107] For example in *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 704 (Tenn. 2011), the Court stated:

Comment *n* of section 388 of the Restatement acknowledges that the duty to warn of hazards associated with the use of a product increases with the amount of danger involved. It is established that asbestos is an extremely dangerous substance and that unprotected exposure to respirable asbestos fibers over a period of time may well result in death. Given the highly hazardous nature of asbestos, the dire consequences to the unwarned consumer, and the important distinctions between the use of asbestos by an employer in industry and the use of pharmaceuticals and medical devices by a doctor in treating his or her patient, we find good reason not to extend the learned intermediary doctrine to products liability cases where an employee claims damages for injuries from a

**D. Sophisticated user defense forfeited**

Plaintiff adopts the briefing contained in the "statute of limitations defense under the federal enclave doctrine" portion of this brief at section VII.A. and VII.B. as to the reasons why the defense should be forfeited by OI's failure to bring the dispositive defense prior to the dispositive motion deadline set by the MDL-875 Court and by OI's failure to plead the affirmative defense as required under Federal Rules of Civil Procedure 8(c) and 12(b)(6).[108]

---

product containing asbestos or some other highly toxic substance purchased by the employer and used by the employee during the course of his or her employment.

[108] OI did not provide Plaintiff with any document specifically pleading the sophisticated user defense in response to Plaintiff's requests asking for clarification of OI's position regarding ECF Doc #4.

## V. The TLV defense

OI contends in this case the TLV (Threshold Limit Values) of the American Conference of Governmental Industrial Hygienists (ACGIH) protects OI from being liable because OI believed exposures from use of Kaylo did not exceed the TLV.  Alternatively OI contends that the property owners and employers of Ozzie were responsible to keep exposures below the TLV. The TLV for asbestos fibers before 1971 was 5 million particles per cubic foot (5mppcf).

The TLV defense has no application in defense of Ozzie's claim based on mesothelioma for at least two reasons.  These are:

1.  The TLV did not protect against cancer including mesothelioma which occurs at levels of exposure well below the TLV.

2.  OI's reliance on the TLV was not justified based on information OI knew or should have known about  (not based on adequate data about asbestos exposure -TLVs are set at levels which will allow the continued production of products rather than protecting all workers

## A. Not protective against mesothelioma

All witnesses in this case agree that the TLVs before 1970 did not and were not intended to protect from the low levels of asbestos exposure needed to cause mesothelioma.  Dr. Frank explained how the 5mppcf standard adopted in the 1940s was intended only to protect against the nonmalignant disease asbestosis.  Dr. Frank explained "it takes more asbestos to produce asbestosis than it does to produce cancers, so it certainly did not protect against cancer."   Dr. Frank explained how the levels for protecting against cancer were recognized to be "100 to 500 times less" than the TLV for asbestosis.  Dr. Frank testified:

Q. You mentioned something earlier about -- I

94

can't remember your exact terminology, but recommended levels in the earlier years.

A. OSHA is a government agency that put in legally allowable limits. Prior to that --

Q. When did OSHA's limits go in --

A. 1972.

Q. Okay.

A. Prior to 1972, there were -- some states may have had legal limits. I don't know about where Mr. Suoja worked, so I can't speak to those, but many places adopted or made use of what were essentially recommendations, which was one organization called the ACGIH, American Conference of Governmental Industrial Hygienists, and the ACGIH had and continues to have recommended levels of exposure for many, many materials, including asbestos. So prior to OSHA, these were often recommendations; some states adopted them.

Q. What was the ACGIH level?

A. For many years, it was 5 million particles per cubic foot.

Q. And how does that factor into the causation assessment for Mr. Suoja's mesothelioma?

A. Well, we know that that is a level that -- first of all, it didn't protect people from getting asbestosis.

Q. It didn't protect from what?

A. Asbestosis. And it takes more asbestos to produce asbestosis than it does to produce the cancers, so it certainly didn't protect against cancer. And that was well recognized in the work of Dr. Stokinger, Herbert Stokinger, who in 1956 wrote that if the ACGIH was interested in protecting against cancer from asbestos, the levels should be 100 to 500 times less because of all the levels we're speaking to at that point was preventing asbestos.[109]

---

[109] The need for a safety factor in TLV's to protect against cancer causing agents ("cancerigens") was stated a 1956 peer reviewed publication of a speech by Dr. Herbert Stokinger, the "chairman" of the TLV committee. (Att. 53, OI ex 1944 at 284, 286.; ECF #198 at 126.) Dr. Stokinger expressed the need for a "safety factor" of " from 100 to 500" times lower than the TLV to protect "from all industrial cancerigens." (Att. 53, OI ex 1944 at 284, 286.) OI expert Dr. Gregory attempted to put his own spin on Stokinger's publication by contending the safety factor was not applicable to asbestos. (ECF #198 at 124-29.) Dr. Gregory, who is not a medical doctor and has not published an article about asbestos, based his contention on his belief that

(ECF #165 at 81-83.)  OI expert Dr. Neushul agreed the TLV before 1970 did not protect against

mesothelioma:

> Q. You would agree that the TLVs that were in
> place before the 19 -- before 1970, those were not
> designed to be protective for mesothelioma; is that
> right?
> A. I think as our understanding of mesothelioma matures
> we'll realize certainly that the TLV is not protecting
> against that.

(ECF #198 at 79.)

The absence of protection against cancer from the TLV of 5 mppcf is set forth in a

publication by the TLV committee.  The "Documentation of the Threshold Limit Values lists and

summarizes the scientific literature used to set the TLV for each substance.[110]  (Att. 54, Ex 220.)

For asbestos the 1962 Documentation summary states: "The present threshold limit relates to the

prevention of asbestosis."  (Att. 54, Ex 220 at 11.)  The 5 mppcf TLV was revised and lowered

to take into account cancer and other data in 1971.  The 1971 TLV Documentation recognized

the inadequate medical literature that was taken into account in setting the 5 mppcf level,

acknowledging "Medical data on which the limits had been based were inadequate" and pointed

to the "rising worldwide rate of lung cancer among asbestos workers." (Att. 55, Ex 222 at 18.)

---

"asbestos stays within the target organ of the lungs" and thus is not a "systemic injury causing
material."  (ECF #198 at 127.)  Dr. Gregory is wrong based on the evidence before this Court.
First, Ozzie developed peritoneal mesothelioma because fibers were transported or traveled to
his abdominal cavity.  Within that cavity many organs were affected.  Second, Dr. Frank,
plaintiff's medical expert with a hundred publications in the field of asbestos disease, described
the how asbestos fibers travel throughout many parts of the body and cause cancers, including
mesothelioma, in multiple systems and organs.  These included without limitation the "lung
pleura. . . chest cavity . . . abdominal cavity . . . GI tract . . . esophagus, stomach . . . colorectal
cancers . . . bowel lumen . . . intestines."  (ECF #165 at 25-26.)

[110] The 5 mppcf TLV for asbestos was adopted in 1938 and remained unchanged through 1969.
(ECF #198 at 129.)   The first edition of the TLV "Documentation" was not published until
1962.

OI expert Dr. Gregory admitted that "Since OSHA first promulgated their standard in 1971, -- it's [the TLV] gone down to 120-fold."   (ECF #198 at 129.)

The TLV of 5 mppcf was incorporated as law in Wisconsin by regulation of the state Industrial Commission in 1947.  (ECF #198 at 112; ECF #195 at 114.)  By merely incorporating the ACGIH TLV, the Wisconsin regulations also did not protect against cancer.   The 1951 federal Walsh-Healy Act also adopted the TLV guidelines and did not create an independent standard to protect against cancer.  (ECF #195 at 113.)  These regulatory laws suffered the same inadequacy in worker protection as the TLVs which they incorporated.

## B. No Justifiable Reliance by OI that TLVs Protected against Mesothelioma

The evidence before this Court demonstrates OI was not justified in relying on the TLV of 5mppcf to protect insulation workers such as Ozzie installing and removing Kaylo in the normal and intended manner.  Other sections of this brief including section III.B.1.ii. detail OI's awareness of the dangers of Kaylo and specifically literature about cancer and mesothelioma being associated with asbestos.  Despite such knowledge, OI took no steps to determine if the purchasers and users of Kaylo were aware of the cancer risk, to investigate exposure levels during the use of Kaylo, and or to recommend safety measures to protect against cancer.

In the first instance OI kept abreast of the literature through a medical director and industrial hygienist.  Through this literature, OI would understand the purpose of the TLV to protect the interests of the manufacturers.  OI expert Dr. Neushul conceded the purpose of the TLVs in the 1940s was to "pose no impossible burden on the manufacturers" and that TLVs were set so a manufacturer could "continue to produce.'"  (EFC #198 at 48-49.)  The gist of Dr. Neushul's expert testimony is the early TLVs were set based on the normal levels of exposure

from us of the manufacturer's product.   No testing was done to assess the levels needed to prevent disease on a long term basis.

OI expert Dr. Gregory painted the picture of the TLVs as an all-purpose safety umbrella on which OI could rely.  According to Dr. Gregory, the TLVs eliminated the need to issue warnings or safety instructions or do further safety testing of Kaylo.[111]  Dr. Gregory's opinion is not supported by the evidence.

OI's own employee experts had the same knowledge of the shortcomings in the TLVs not protecting against cancer and being set at levels intended to permit exposures occurring in normal industrial operations to continue.  Knowing this information, OI took no actions to advise Kaylo purchasers and users of the lack of protective value for TLVs for insulators using Kaylo and other insulation products on a regular basis.  OI expert Dr. Gregory conceded OI did not

---

[111] Dr. Gregory asserted:

> Q. Right. Okay. And if Owens-Illinois knew something
> more about the dangers of Kaylo, then Owens-Illinois
> should have told whoever would be its customers, right?
> A. If they knew something different than what their
> customers knew and if they knew that the use of their
> product was going to cause asbestos-related diseases,
> then they should have told those customers. But the
> customers who were using the product knew as much, if not
> more, about the potential hazards of asbestos than
> Owens-Illinois knew.
> Q. Okay. And the basis for your position is that
> everybody knew about the TLV levels, right?
> A. Well, they should have known.

(ECF #198 at 123-24.)

Dr. Gregory merged the government regulations and laws that adopted the TLVs into his assertions about why OI had no responsibility.  (ECF #198 at 112.)   In addition to the factual evidence showing Dr. Gregory improperly concluded OI could rely on TLVs and do nothing, Dr. Gregory's assessment of the duties of a manufacturer is not the legal standard for liability of a manufacturer.  The legal standard is discussed elsewhere in this brief.

convey to users, purchasers, or Badger Ordinance information about the safety factor needed to protect from cancer. [112]  Dr. Gregory had no evidence that insulation work "practices" at Badger were following the safety factor of 100 to 500 times lower than the TLV.[113]  The description of the dusty conditions at Badger proves no safety factor was being applied.  If a safety factor was used, the exposure levels would be so low that no dust would be visible.  (ECF # 165 at 134-36.) Finally, Dr. Gregory conceded he did not know if the asbestos worker's union knew about the need for a safety factor.[114]

---

[112]Dr. Gregory testified:

> Q. Okay. So, in any event, what about Badger Ordinance, was this information conveyed to Badger Ordinance that there was a need for a safety factor for a cancerigen in the time period of the 40s or 50s, do you know?
>
> A. Well, the facility was owned by the U.S. Army, who had their own industrial hygiene laboratory. I don't know for a fact whether they read that article. But as an industrial hygienist, they would have had access to that particular article.
>
> Q. All right. And are you aware of any practices out at Badger being followed where instead of following the published TLV that they were following a safety factor of a hundred to 500 times lower?
>
> A. No. I have not seen any evidence of that.
>
> Q. Okay. Are you aware of any document that Owens-Illinois published as a manufacturer in connection with its products that said if you're going to use the TLV that you should consider a much -- a big safety factor for the possible carcinogenicity?
>
> A. I'm not aware of any manufacturing company that has ever communicated or published that information about any carcinogen --
>
> Q. And --
>
> A. -- or suspected carcinogen, for that matter.

(ECF #198 at 130-31.)

[113] See prior footnote.

[114] Dr. Gregory testified:

The greater weight of evidence – if not all the evidence - in this record is that OI has not proven reasonable – if any - reliance on the ability of TLVs to protect Ozzie Suoja.  OI has no basis to assert reliance on the TLVs informing the users and purchasers of Kaylo about the measures needed to protect Ozzie.  OI has no basis for relying on Badger Ordnance to utilize the TLVs to protect Ozzie.  OI has no basis claiming reliance on any governmental regulation or law incorporating the inadequate TLV standard.

Contrary to OI's attempt to use TLVs as a defense, use of the TLVs as a protective standard increased the risk of cancer to Ozzie.  OI was aware of the dangerous gap created by an industry standard designed to protect the interests of manufacturers such as OI.   If, as OI contends, Badger Ordinance and Ozzie's employer's followed the TLVs as a safety standard, OI should educate them about the knowledge OI had.  That knowledge included the published literature about cancer and the lack of testing or investigation of the risk of cancer to insulators using Kaylo.

---

Q. What I wanted to ask was did this information get reported to the unions about the safety factors you have of cancerigens?

A. I don't know if he communicated that information to the unions or not. But the unions certainly had the TLVs available to them.

(ECF #198 at 129.)

## VI. Contributory Negligence

OI has suggested Ozzie was contributorily negligent in his use of asbestos products.  On a case by case basis, determination of contributory negligence is highly dependent on the factual evidence.  The greater, if not overwhelming, weight of the evidence is Ozzie was not contributorily negligent when working with OI Kaylo.  Three evidentiary factors are controlling.  The first factor is Ozzie was a careful person who took care of his physical well-being and avoided or protected himself when he was aware of potential dangers:  non-smoker, non-drinker, and determined adherence to the regime of diet and medicine to care for his diabetes.  The second factor is the lack of education and training about the cancer risk and proper protective measures before and during the jobs where Ozzie was exposed to OI Kaylo.  The third factor is the unavailability of adequate protective equipment.

The legal analysis of contributory negligence begins with two considerations.  First, OI bears the burden of proof on the issue.  *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 121 (Wis. 1985) ("the burden of proof to establish contributory negligence is upon the defendant").  Second, Wisconsin law creates a presumption, which must be rebutted, that a deceased person was not negligent.  WIS JI-CIVIL 353; *Fiedler v. Kapsa*, 255 Wis. 559, 563 (Wis. 1949).[115]  The

---

[115]      353      PRESUMPTIONS:  DECEASED PERSON WAS NOT NEGLIGENT
Because (decedent) has died and cannot testify, you must presume that (decedent) was not negligent at and before the time of the occurrence, unless you find the presumption is overcome by other evidence.
In deciding whether (decedent) was negligent, you must weigh the presumption with all the other evidence.  Unless you are satisfied by the greater weight of the credible evidence, to a reasonable certainty, that it is more likely that (decedent) was negligent, you must find that (decedent) was not negligent.
WIS JI-CIVIL 353

Under the law of Wisconsin plaintiff had the benefit of the presumption of due care accorded a deceased party but only for the purpose of calling for evidence. This presumption is a procedural device allocating the burden of going forward with the

evidence does not support overriding the presumption or a finding that the greater weight of the evidence favors OI.

In assessing the defense of contributory negligence, the comments in Section 402A of the Restatement of Torts Second, which Wisconsin has adopted, provide some guidance.  As the Court of Appeals for the Fifth Circuit explained:

> Section 402A, comment n, of the Restatement of the Law of Torts, deals with contributory negligence and that form of negligence which "commonly passes under the name of assumption of risk"; the two overlap in actions based on strict liability:
>
> "n. Contributory negligence. Since the liability with which this section deals is not based upon negligence and the seller, but is strict liability, the rule applied to strict liability cases [see § 524] applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in *voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense* under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds *unreasonably* to make use of the product and is injured by it, he is barred from recovery."

*Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1106 (5th Cir. 1973)

## A. Evidence Discussion

Discussion of the evidence bearing on contributory negligence is divided into the following sections: worker education & motivation, peer group information, available protective equipment was inadequate, and summary.

## 1. *Worker education and motivation*

OI must carry the burden of showing Ozzie understood the danger and how to protect himself.   The first question is; what danger did Ozzie need to understand?  The answer must be

---

evidence. Anno. 144 A. L. R. 1473. It affects the burden of persuasion only in the absence of rebuttal proof
*Fiedler v. Kapsa*, 255 Wis. 559, 563 (Wis. 1949)

viewed in the light of Dr. Frank's undisputed medical testimony and literature about the

extraordinary dangers of asbestos as a latent disease process which has no cure and cannot be

sensed by taste, sight, feeling or smell.  Dr. Frank stated;

> Q. Does a person taste, feel, or smell
> asbestos fibers when they enter someone's body?
> A. We've already established you can't see
> them, you don't taste them, you don't feel them.
> They have no warnings signs or, you know, methods
> to let you know that you're being exposed.

(ECF #165 at 28.)  No sensation of pain is felt as the DNA mutations began the process of

creating a tumor cell.  OI's own expert conceded OI understood the unique characteristics when

they were producing Kaylo.[116]   That unique disease process required worker education so the

workers could appreciate the dangers of asbestos.  The scientific literature known to OI's

medical and industrial hygiene staff stated:  "The insidious onset and unobtrusive signs and

symptoms of the disease in its earlier course, its covert advance by imperceptible stages, . . . and

the migration of those affected from the industry, have all combined to delay its recognition as

an entity, and to obscure the causal agent."[117]   OI's claims of contributory negligence must be

judged in light of Ozzie's lack of education and appreciation for the "insidious" harm inflicted

---

[116] OI expert Dr. Neushul agreed OI knew the information set forth 1930 article written by
Merewether.

> Q. Okay. By the way, you mentioned something about the
> Merewether publication in 1930; is that the right
> Merewether I got?
> A. I believe that's the one that I was talking about.
> Q. Okay. You said something about Owens-Illinois had
> that same knowledge when it was making Kaylo as
> Merewether had in 1930, right; it hadn't changed really?
> A. I don't think it changed, no.

(ECF #198 at 25-26.)

[117] (Att. 35, Ex 201 at 9, E.R.A. Merewether and C.W. Price, "Report on Effects of Asbestos
Dust on the Lungs and Dust Suppression in the Asbestos Industry," Report laid before British
Parliament on March 24, 1930; ECF #198 at 26.)

by Kaylo.  A separate consideration is OI's decisions to not share such information by providing warnings and safety instructions with Kaylo.

Before Ozzie can be charged with contributory negligence, OI must show 1) Ozzie was educated to "appreciate" the dangers of asbestos in Kaylo and need for safety measures and 2) Ozzie was "motivated" to protect himself and use protective equipment, and 3) adequate protective equipment was available.  Dr. Frank explained the importance of "a sane appreciation of the risk. You need to educate workers about the hazards of materials that they are working with."  (ECF #165 at 19.)   OI industrial hygiene expert Dr. Earl Gregory stressed the importance of motivating workers to protect themselves:

> Q. And that's an important thing in the field of industrial hygiene that you motivate the employees to the workers, to use the necessary protective measures, right?
> A.  Yes, it is.

(ECF #198 at 134-35.)   Wearing of breathing protection was cited by Dr. Gregory as an area where motivating requires careful attention.[118]

OI own expert admits OI cannot meet the standard for showing contributory negligence of an asbestos worker in the time period of Ozzie's work at Badger.  When asked if warnings about protective measures would matter, Dr. Gregory testified:

> Q. . . . [W]hat difference would a warning have even made?
> A. That's correct, because you still have to implement these controls to reduce the exposure. You have to use engineering, administrative or personal protective equipment and Mr. Suoja would not have been able to do that.

---

[118] Dr. Gregory testified:  "But like the example I gave earlier: you can make them [respirators] available, but you have to motivate people to wear them."  (ECF #198 at 115.)

(ECF #198 at 111.)  Taken at face value, Dr. Gregory's testimony is an admission that a warning by OI would not have provided Ozzie ability to protect himself because the other needed controls were not in place.  Contributory negligence requires that a person is at fault for failing to take action to prevent their injury.  According to Dr. Gregory, Ozzie was not in a position to take action to prevent the inevitable exposure to the dust generated during normal use of Kaylo.

OI chose not to provide the education and motivation by warning or instruction accompanying the product.[119]  (See section III.B.1.ii.)  OI wants to escape responsibility for selling a dangerous product by blaming Ozzie for not protecting himself.  The greater weight of the evidence does not support a finding of contributory negligence.  Ozzie was not told Kaylo contained asbestos fibers which would initiate a process of DNA mutation s that could lead to fatal and incurable cancer like mesothelioma.  Ozzie was not told about proper ventilation and respiratory protection for asbestos containing Kaylo.  The proper protective equipment was not available during the OI Kaylo work at Badger.

OI did not establish property owners, employers of insulators, or Ozzie's peers in the insulator trade filled the void in worker knowledge and motivation created by OI's defective Kaylo.  OI did not show that Badger had on site the skilled resources of a medical director or industrial hygienist such as OI had on staff.  Although Badger was a U.S. Government facility, the operations were managed by outside contractors.  (Att. 22, Ex 1730; Att. 75Ex 1738.)[120]  The

---

[119] Ozzie and his peers were not trained in the hierarchy of scientific methods of protecting against asbestos fibers discussed by Dr. Frank, a Board certified expert in preventative medicine, and Dr. Gregory as mentioned in section III.B.1.i.

[120] "The Liberty Powder Defense Corporation, a subsidiary of Olin Corporation, succeeded the Hercules Powder Company as the operating contractor on the site in March 1951."  (Att. 22, Ex 1730 at 32.)  "On January 3, 1966 the Olin Corporation reactivated the plant . . . and the plant has remained on standby and modernizations status, under the management of Olin Corporation."  (Att. 22, Ex 1730 at 36.)

"Safe Practices Handbook" found in the records at Badger makes no mention of dangers or protective measures specific to asbestos.  (Att. 76, Ex 1862.)  OI expert Dr. Gregory admitted he had no evidence of air monitoring to measure levels of exposure to asbestos or that such procedures existed at Badger.[121]   OI did not provide evidence of any ventilation systems used to reduce the dust from insulation work at Badger.

## 2. *Peer group information*

Importantly, union or company meetings open to Ozzie and his peers in the insulator trade did not discuss the hazards of asbestos until the 1970s.  Coworker Zimmer testified:

> Q. Do you remember attending any union meetings where the dangers of asbestos were discussed?
> A. Yes.
> Q. Do you remember when those meetings were?
> A. In the '70's.
> Q. And do you remember what was said about the dangers of asbestos during those meetings?

---

"A letter of intent dated 10 November 1941 to the Hercules Powder Company out of Wilmington Delaware, authorized that Company to proceed with preliminary surveys and to initiate design for the Plant. Hercules Powder Company was chosen as operating contractor." (Att. 75, 1738 at 3.)  "On 30 April 1951, the Liberty Powder Defense Corporation of East Alton, IL (a subsidiary of Olin Corporation) took over as operator of Badger from Hercules."  (Att. 75, 1738 at 9.)

[121] Dr. Gregory testified:
> Q. And there's no indication in any of the co-worker testimony that someone was actually out there with a monitor determining what the air levels were for asbestos or general dust?
> A. No. I didn't see any indication that there was any monitoring performed.
> Q. And did you see any procedures that Badger actually had at its facility, in its safety manual or any document specific to Badger, that said this is how and when air monitoring should be conducted for removal of insulation, back in that time period of the 40s and 50s?
> A. I didn't see anything in there, but they certainly had the responsibility under the Walsh-Healey Act.

(ECF #198 at 139-40.)

A. Well, the one thing I remember was Sprinkmann & Sons.
They said that they would -- that it would be caught
in the hairs of your noise.
Q. Did -- do you remember any other meetings when the
dangers of asbestos were discussed in 1970's?
A. No.

(ECF #156 at 57-58.)   Telling union members the fibers are "caught in the nose hairs" imparts a

false sense of security that the body naturally protects against asbestos.

Coworker Harold Haase denied knowing "that asbestos was dangerous."[122]  Haase

explained his understanding: "They knew it [asbestos] was more or less a dust factor, you know.

---

[122] Haase testified:
Q. And it was common knowledge in the asbestos trade,
as far as you knew even in the mid '50s, that
asbestos was dangerous. True?
A. Well, no, not necessarily. They knew it was more
or less a dust factor, you know. Not something
else.
Q. But when you started in the early '60s, there were
older guys that took you aside and said that the
trade was hazardous?
A. Oh, yes.
(ECF #149 at 43.)

The reference to  the "mid 50's" appears to be a typographical error because Haase did not begin
in the insulation trade until 1963.  (ECF #149 at 11.) Haase also testified:
Q. And that's because it was common knowledge within
the folks at Local 19 that working with asbestos
could be hazardous?
A. Yes, I would assume that.
Q. You would say that. Right?
A. Well, it was -- it's like anything else, you know.
Car exhaust is bad for you to breath too, and you
don't walk around with a mask outside.
Q. But you don't sit in garages running your car
either; do you? Right?
A.True.
(ECF #149 at 44.)

This testimony does establish what Ozzie knew.  The testimony does show Local 19 members
had a lack of education and motivation needed for protection against asbestos.  "Could be

Not something else." (ECF #149 at 43.)  Haase perceived the danger of asbestos to be like "car exhaust is bad for you to breathe too, but you don't walk around with a mask outside."  (ECF #149 at 44.)  The analogies drawn by Haase illustrate the inadequate education about and motivation to protect against the dangers of asbestos that members of Local 19 received through the union publications, meetings, and other sources.

OI introduced several editions of the "Asbestos Worker" trade magazine sent to union members.[123]  No testimony established Ozzie read the publications or that he was educated and motivated by the contents to protect himself from asbestos fibers.  Coworker Zimmer was unable to recall reading about asbestos in the trade journal.[124]  The coworker testimony that masks were not worn shows magazine did not educate or motivate the union members who may have read the publications.

---

hazardous" is not an understanding of the specific characteristics of 1) the incurable cancer and other fatal diseases that asbestos causes or 2) that exposures of short duration can cause mesothelioma or 3) that most conditions involving work with asbestos insulation presents a hazard.  Haase's analogy to car exhaust dangers and not wearing a mask shows a lack of understanding about how deadly asbestos is.  The testimony also does not indicate any knowledge of the type of protective equipment necessary when working with asbestos.

[123]No presumption can be made about Ozzie reading the Asbestos Worker trade publication.  The analogy can be drawn to the bar journals sent to lawyers who belong to certain organizations.  Many lawyers do not read any or all of the contents of the magazines.  The position of OI that members of an organization are presumed to have read and know everything in a trade journal is akin to saying a lawyer commits malpractice for not reading a bar journal article.

[124] Zimmer testified:
> Q. While you were a member of the Asbestos Workers Union, did you ever receive union publications or newsletters?
> A. Yes.
> Q. Did you ever read those newsletters?
> A. Sometimes.
> Q. Do you remember seeing anything in the newsletters that discussed the dangers or the use of asbestos?
> THE WITNESS: I can't recall.

(ECF #156 at 5.)

Statistical data was introduced during the testimony of Dr. Frank about the use of breathing protection by insulators.  (Att. 46, OI Ex 1313.)  The data is striking in showing lack of motivation or education provided to the asbestos workers about the need for protective measures. In the study of more than 17,000 insulators, no insulator said they wore a mask because of Dr. Selikoff's article.  Dr. Frank testified:

> Q. In the course of your work with this group of 17,000 insulators, was there ever someone who said that, oh, gee, I read Dr. Selikoff's article, and by 1970, I was -- when I read that, I was persuaded that I had to wear a mask to protect myself?
> THE WITNESS: I've never heard that -- I'll leave it at that. I've never heard that.

(ECF #165 at 131.)  Second, according to an insert in a 1969 Asbestos Worker Journal publication "four percent said they always wear mask and 30 percent said they never use protection."  (ECF #165 at 113; Att. 46, OI ex 1313.)

### 3. *Available protective equipment was inadequate*

Ozzie and other insulators were not given or trained to wear proper breathing protection at Badger.  Despite the dusty conditions at Badger, "[t]hey didn't give us masks to wear either. We had to work in it [the dust]."  (ECF #154 at 15.)  The practice at the time was that "The companies never gave never gave us masks to wear."  (ECF #154 at 42.)  Masks were not required until toward "maybe the 80s."  (ECF #154 at 43.)  Ozzie did not get motivation from members of his peer group of insulators at Badger to wear "face masks" because as Schlub stated:  "[w]e never used them at Badger."  (ECF #154 at 42.)   Zimmer stated use of masks

began "in the 1970s someplace."[125]   The motivation for insulators to use the masks began after

Ozzie's OI Kaylo exposure at Badger.

OI's contentions about insulators not wearing masks overstate the protective value of the

breathing protection.  Breathing protection ranks last in the hierarchy of protective measures in

occupational settings.[126]  The masks available to insulators who did buy their own before the

1980s were not effective or practical for regular use.[127]  Schlub testified:  "Some of the guys

---

[125] Zimmer testified:

> Q. Did you ever use a breathing mask --
> A. Yes.
> Q. -- or a respirator?
> And why were you using a breathing mask?
> A. I was working with Kaylo.
> Q. And what kind of breathing mask did you use?
> A. I don't know the name of the brand.
> Q. Was it a paper mask?
> A. No. It was rubber with cloth like -- like a pad.
> Q. Do you happen to recall when you began using those
> masks?
> 15 A. That would be in the '70's someplace.

(ECF #156 at 58.)

[126] As Dr. Frank, a specialist in preventing occupational disease, explained:   "And then as a last resort, you use personal protective equipment, you put workers in respirators or other kinds of air-supplied equipment so that they don't breathe the hazardous materials."  (ECF #165 at 17.) OI expert Dr. Gregory described the "hierarchy of controls in industrial hygiene" and acknowledged "personal protective equipments" are "considered the least effective."  (ECF #198 at 99-101.)

[127] OI introduced a 1964 survey of the asbestos worker union which showed 96% of the members were dissatisfied with the available masks for several reasons.  (Att. 46, Ex 1313.)  Seventy-two percent of the members responding complained of discomfort, interference with breathing, and problems with filters.  Ninety-six percent of the members were dissatisfied with the available masks. The published data in exhibit 1313 was as follows:

> Worker dissatisfaction with available masks fell into these categories:
>
> | | |
> |---|---|
> | Discomfort | 37% |
> | Interference with breathing | 21% |
> | Problems with filters | 14% |
> | Unavailability of masks or replacement filters | 7% |
> | Inconvenient to work with | 7% |

110

would buy their own, but they were – they weren't –they were just Mickey Mouse masks.  They

weren't real good filters." (ECF #154 at 42.)   Zimmer described the masks as a "cloth . . . like a

pad."  (ECF #156 at 58, quoted in a footnote a few sentences above.)  Ozzie was not negligent by

doing his job without wearing masks which offered minimal or no protection, which he was not

trained to wear, and which his peers did not wear.  OI has not even shown the type of equipment,

such as ventilation systems or air supplied respirators, which would have protected Ozzie, were

available at Badger or through his employers.[128]

The inadequacy of masks available for insulators until sometime after 1970 is

demonstrated by the mask survey completed in the fall of 1969.  (Att. 46, Ex 1313.)The survey

found over 5000 of the 8700 union members responding considered the available masks

"unsatisfactory."  The report on the survey stressed the importance of designing new masks to

cure the problems with available masks.  The report stated:

> Results of the survey have been
> analyzed by scientists and hygienist
> associated with the IIHRP. In de-
> signing the new mask, they realized
> two essential features were impor-
> tant: 1. The mask must be acceptable
> to insulation workers--in terms of
> comfort, breathing, vision, effective
> filtration, etc.; 2. Effectiveness must
> be measured in terms of keeping out
> fibrous dust.

(Att. 46, Ex 1313 at 3.)

---

| | |
|---|---|
| Interference with vision | 6% |
| Ineffectiveness | 4% |
| Condensation problems | 2% |
| No problem with existing masks | 4% |

[128] Dr. Frank testified "air supplied hoods" were available in the 1930s.  (ECF #165 at 17.)

Based on problems with existing masks in 1969 and evidence the design of a new mask was just beginning, this Court should find the masks available to insulators were not protective against asbestos fibers and reasonably practical to be worn for long periods given the requirements of the job.

Assuming Ozzie did read every page of the Asbestos Worker Journal, an individualized review of the items cited by OI shows why they did not educate and motivate Ozzie to understand the protective equipment needed.

1. 1930 Journal (Att. 52, Ex 1283.):  Included an article which discussed the "pulmonary asbestos menace" and referenced the importance of ventilation.  Ozzie did not see this article which was published when he was only 7 years old.   The word "pulmonary asbestos menace' does not convey the message of the fatal and incurable cancer which can result. The reference to ventilation is not specific to what ventilation is necessary for protection.

2. 1957 Journal (Att. 47, Ex 1287.)   This publication only mentions granting authority to the union Board to investigate unspecified health issues.

3. 1961 Journal (Att. 48, Ex 1295):  Contains the "Grim Reaper" advertising with a "Respirator" picture.  The advertisement does not describe the reasons for wearing the respirator, when it should be worn, or what type of respirator is needed.   OI did not establish through expert testimony that the respirator pictured – which has no cartridge filters – is protective against asbestos fibers and cancer.  If the pictured respirator is not protective, the worker has a false sense of security.  The advertisement does not mention the importance of ventilation as the superior means of exposure control.  The burden to prove by the greater weight of the evidence that the advertising, assuming Ozzie saw it, informed and motivated persons to wear proper protective equipment.  The presumption that a picture of the Grim Reaper alone can convey such information is speculative.
   Also, based on the date of the publication being 1961, the Journal was issued after Ozzie already had a substantial exposure to OI Kaylo when working at Badge in1958 with coworker Zimmer.

4. 1962 Journal (Att. 49, Ex 1297 at 1.)   States Dr. Selikoff is "conducting" a survey of "our industry health hazards."   This general reference says nothing about the hazards being studied or that asbestos can cause incurable cancer.

5. 1964 (February) (Att. 50, Ex 1299 at 1.)  The publication says the study of Dr. Selikoff will be published by the American Medical Association. No mention is made about asbestos or the anticipated findings.

6.   1964 (November) Journal (Att. 51, Ex 1300 at 7-11.)  The publication is a full reprint of Dr. Selikoff's first article setting forth his findings about the study of insulators.  The article is published in the Journal of the Medical Association and is not intended for the lay reader.  The article is an epidemiological study of disease.  No evidence was presented that Ozzie read the publication or heard about from anyone else.  No information is provided about how an insulator can be protected, what safety equipment should be used, what working conditions and practices are dangerous, or what levels of exposure are dangerous.

Based on the date of the publication being 1961, the Journal was issued after Ozzie already had a substantial exposure to OI Kaylo when working at Badge in1958 with coworker Zimmer.

7.   1969 (May) Journal insert (Att. 46, Ex 1313.)  The insert is about a study to develop a mask that will be acceptable and effective.  It does not provide any information about what to do from a safety standpoint before the new mask is developed.  Does not advise workers that masks available at the time were not protective for mesothelioma. The insert makes no mention of ventilation as a superior method of controlling exposures.

Additionally, Elmer Borchardt, President of L & S Insulation Company, Inc., stated the

following about masks during a deposition:

> Q I want to go back briefly. You indicated that
>  masks were always available. Do you recall talking
> about that?
> A Yes, I said I know that masks were available when
> I started with the company.
> Q Was there a specific purpose or design type of mask
> that was chosen?
> A No, whatever safety salesman might suggest to us is
> what was purchased, and I didn't do any of that
> purchasing.
> Q So these masks were not purchased specifically for
> asbestos, but just for any general type of dust:
> would that be correct?
> A That's correct.

(ECF #186 at 78.)

Elmer Borchardt stated the following about the Selikoff article during a deposition:

> Q. My question, again sir: What was your
> understanding  as far as the hazard that that
> article talked about related to asbestos? What
> did it indicate that people could potentially
> get as far as the conditions or diseases?

113

> A.  If they were exposed to asbestos and smoke, they
>      were high risk.
>
> Q. High risk for what, sir?
> A. Cancer.

(ECF # 187 at 10.)  Ozzie was a non-smoker who Borchardt and other employers in the

insulation business would perceive to not be at risk.  They had no information that only a few

days of exposure could cause mesothelioma.

**4. *Evidentiary summary***

OI's evidence about contributory negligence lacks any proof that Ozzie observed, read,

or discussed the dangers of asbestos or how to protect himself before 1970s.  Despite needing to

overcome the presumption of no contributory negligence, OI asks this Court to infer that Ozzie

saw and heard the information which OI presented through coworkers and union publications.

That information did not provide the education and motivation to protect Ozzie from cancer

before and during the period of his asbestos exposures.  Ozzie was a careful person with his

health and would not knowingly place himself in an environment with such a high risk of cancer.

The information cited by OI failed to educate and motivate any of Ozzie's coworkers to wear

masks at Badger.   Only 4% of the insulator union members wore masks regularly in the late

1969 study which cited as its purpose the design of an acceptable and effective mask.   Based on

the evidence, the masks before 1970 were not protecting workers and not suitable for comfort

and practical use during normal insulation work conditions.  OI's own expert admitted that Ozzie

had no ability to control and implement the hierarchy of necessary protective measures and

equipment.   OI also did not meet the burden of providing evidence the available equipment

would have protected Ozzie.

In making the comparison of Ozzie's contributory negligence to the defective OI Kaylo, the percentage assigned to Ozzie is zero.  If contributory fault needs to be determined in any other part of the Court's decision, the same number – 0% - should be used for Ozzie's fault.

**B. Case law**

Several cases have considered similar evidence as in *Suoja* about contributory negligence for tradesmen working with or around asbestos.  These cases are not binding precedent on what is the greater weight of the evidence on disputed issues of fact.  However, they provide examples where jury findings have been sustained based on sufficiency of the evidence challenges.

One example is *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1081 (5th Cir. 1973).  In *Borel*, the United States Court of Appeals for the Fifth Circuit affirmed a verdict for an insulator exposed to asbestos finding that the insulator did not assume the risk and was not contributorily negligent.  The *Borel* Court summarized the contributory negligence evidence in its record as follows:

> When asked about the use of respirators, Borel replied that they were not furnished during his early work years. Although respirators were later made available on some jobs, insulation workers usually were not required to wear them and had to make a special request if they wanted one. Borel stated that he and other insulation workers found that the respirators furnished them were uncomfortable, could not be worn in hot weather, and -- "you can't breathe with the respirator." Borel further noted that no respirator in use during his lifetime could prevent the inhalation of asbestos dust. As an alternative precaution, therefore, he would sometimes wear a wet handkerchief over his nostrils or apply mentholatum, but these methods were also unsatisfactory and did not exclude all the dust.

*Borel*, 493 F.2d at 1082.  After reviewing the evidence the *Borel* Court found no contributory negligence, stating:

> There is strong evidence in the record that Borel never actually knew or appreciated the extent of the danger involved. Borel testified that he never realized that inhaling asbestos dust could cause serious illness until his doctors first diagnosed his condition as asbestosis in 1969. Nor can we say that the danger was so obvious that Borel should be

115

> charged with knowledge as a matter of law.
> . . ..
> In the case at bar, we are not confronted with a failure to follow adequate instructions or warnings. Indeed, the evidence tended to establish that the defendants gave no instructions or warnings at all. They never suggested that respirators should be worn by insulation workers or provided any other directions as to the product's use. Nor are we confronted with any other type of conduct that was not reasonably foreseeable by the defendant manufacturers. From all that appears, Borel used the defendants' product exactly for its intended purpose. Rather, the defendants allege merely that Borel was contributorily negligent in failing to use a respirator. This form of contributory negligence amounts to a failure to discover a defect in the product or to guard against the possibility of its existence and is not a defense to a strict liability action

*Borel*, 493 F.2d at 1098-99.  The evidence about Ozzie's understanding and knowledge of the dangers and available equipment parallels that of his union brother in *Borel*. This Court should make similar findings.

In *Kosloske v. Owens-Corning Fiberglas Corp.*, 1996 Wisc. App. LEXIS 1232 (Wis. Ct. App. 1996), the Court of Appeals of Wisconsin affirmed the trial court ruling that the manufacture failed to produce sufficient evidence to go to the jury on the claim that the decedent boiler operator exposed to asbestos was contributorily negligent.[129]  The Court ruled that refusing to give a contributory negligence instruction in an asbestos case involving a non-insulator tradeworker was proper, explaining:

> Owens-Corning argues that the evidence justified such an instruction, pointing to Kosloske's testimony in a pretrial deposition that, while he "had heard that asbestos materials might have a potential health problem" and was aware that asbestos had been used "somewhere" in the WEPCO plant, sometimes he would not wear a face mask or respirator at work. Based on that testimony, Owens-Corning argues that a reasonable jury could find Kosloske contributorily negligent for his own safety.

*Kosloske*, 1996 Wisc. App. LEXIS 1232 at *6.  The *Kosloske* Court rejected the argument of Owens-Corning, stating:

> We have read relevant portions of Kosloske's deposition and we agree with him that it can lead to only one conclusion: Kosloske, following his employer's safety instructions,

---

[129] This decision is unpublished and is cited only for persuasion.

116

> would wear a mask or respirator whenever conditions in a particular area of the plant called for it, and if none was available, he would not go into the area.  **[7]** And he followed those instructions in all of his work at the plant, including the occasional times when he would be in an area where other employees were working with insulation. What Owens-Corning's argument boils down to is that, in the context of a four-and-one-half-hour deposition, admitted into evidence as part of a seven-day trial, Kosloske's affirmative response to a single question--whether he sometimes would and sometimes would not wear a respirator while in an area where insulators were working--warrants submission of a question on his contributory negligence. Taken in context of his responses to questions in the preceding few pages of the deposition transcript, it is apparent that this was simply a restatement of **[8]** his repeated testimony that, as instructed by his employer, he wore protective devices when and where the conditions in the plant required--specifically when there was any dust in the area where he was working.
>
> On this record, we believe the trial court could properly rule that Kosloske's testimony provides no reasonable basis for a jury finding that he was negligent for his own safety.

*Kosloske,* 1996 Wisc. App. LEXIS 1232 at *6-8.  Although the decedent in *Kosloske* sometimes wore a mask as directed, the court recognized he did violate any instructions by not wearing the mask.  The Court in *Kosloske* also found absence of proof that the mask was protecting him. Likewise, OI did not prove Ozzie failed to follow any directives by Badger or his employers to wear masks and did not provide evidence about whether the masks known and available to the insulators at Badger were protective.

### C. Summary of Contributory Negligence Evidence

OI has not carried the burden of proof in rebutting the presumption against contributory negligence or in proving what Ozzie personally knew or should have known about the health hazards of asbestos and how to protect himself.  Ozzie was not educated or motivated by OI or anyone else in how to properly protect himself against asbestos.  Ozzie, a careful person by habit, did not fail to follow any job site safety instructions about wearing or using protective equipment. Finally, the equipment available at Badger did not include ventilation systems or the types of respirators that could protect Ozzie

117

## VII. The statute of limitations defense under the federal enclave doctrine

The statute of limitations defense under the federal enclave doctrine is a dispositive motion and should be considered forfeited by OI's failure to bring the dispositive defense prior to the dispositive motion deadline set by the MDL-875 Court and by OI's failure to plead the affirmative defense as required under Federal Rules of Civil Procedure 8(c) and 12(b)(6). OI stated the intention to raise the federal enclave doctrine as an affirmative defense during the Rule 50 discussion at trial, but OI has never filed a written motion setting forth the grounds for the defense.   Plaintiff had no notice to do discovery on this defense.

Even if this Court finds that the statute of limitations/federal enclave defense is properly before it, the defense is inapplicable.


### A. Dispositive motion deadline

During proceedings in the asbestos MDL-875, a dispositive motion deadline was set by scheduling order.  (Att. 81, CVLO 3 Ex 1, ¶7.)  The MDL Court's suggestion of remand order states the court has "adjudicated all outstanding motions, including dispositive motions."  (Att. 82 at ¶d.)   The remand order states the case is "prepared for trial without delay . . . subject to any trial related motions in limine  . . ." (Att. 82 at ¶f.)

 Any dispositive motion brought at this stage is in conflict with the order of remand.  In *Bushmaker v. A.W Chesterton Company, et al.*, No. 09-cv-726 (E.D. Wis. July 21, 2012), Judge Crocker denied motions *in limine* because they were case-dispositive.  (Att. 83.)  The Court stated:

> The entire point of transferring this case to the MDL court was for "consolidated and coordinated pretrial proceedings." As the MDL court's website explains, "[t]he purposes of this transfer or 'centralization' process are to avoid duplication of discovery, to prevent

> inconsistent pretrial rulings, and to conserve the resources of the parties, their counsel and the judiciary." Available at http://www.jpml.uscourts.gov/panel-info/overview-panel visited Nov. 13, 2012); *see also* 28 U.S.C. § 1407(a) (transfer made upon determination that transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."). These goals would be undermined if the parties were free to wait to file a potentially case-dispositive motion until their case was remanded to the trial court.

(Att. 83 at 4-5.)  As in *Bushmaker*, the dispositive motion deadline has passed and it should be ruled that any dispositive motion brought by OI has been forfeited.

This Court placed OI on notice in past rulings of the need for timely filing of dispositive motions.  In the opinion dated April 10, 2015, this Court (Judge Crabb) held OI had "forfeited" the issue of challenging the special administrator appointment of Gary Suoja in MDL-875.  (ECF #77 filed 4/10/15 at 2.)   In an order dated September 9, 2015, this Court (Judge Crabb) found multiple forfeitures of arguments not timely raised by OI and denied summary judgment.   (ECF #114 filed 09/09/15 at 1, 3, 4, 6, 7, 10.)

## B. Not pled as affirmative defense

OI did not plead the affirmative defense of the statute of limitations under the federal enclave doctrine in this case.[130]  Plaintiff was made aware of the defense in writing when OI filed its trial brief 9 days before trial on November 21, 2015.  (ECF # 135 at 21-23.)  Federal Rules of Civil Procedure 8(c) and 12(b)(6) require OI to affirmatively assert the defense of statute of limitations in responsive pleading.  Making a statement in a trial brief or motion does not comply with the requirement of a pleading.

The Wisconsin Supreme Court and the United States Court of Appeals for the Seventh Circuit have held that the affirmative defense of statute of limitations was waived when it was

---

[130] OI has not provided Plaintiff with any document specifically pleading the statutes of limitation/federal enclave defense or any other affirmative defense in response to Plaintiff's requests asking for clarification of OI's position regarding ECF Doc #4.

119

not pled.[131]  As a general rule, issues about the pleadings requirements in diversity actions are considered to be "procedural" and governed by federal law.[132]  Precedent requires this Court find the federal enclave defense is forfeited by the failure to make any pleading.

---

[131]     We conclude that the defendants did waive their statute of limitations defense in this case. They did not include that defense in their answers to the original and amended complaints. R. 8, 29. In fact, the first and only mention of the statute of limitations came in their reply memorandum in support of the motion for summary judgment, submitted a year after the case was filed. . . .

By omitting mention of the statute of limitations until they filed their reply memorandum, the defendants deprived Venters of any reasonable opportunity to address that defense. At that juncture, the parties had largely completed an exhaustive discovery process, and the scheduled trial date was only a month away. The reply itself was filed on the eve of oral argument before the district court, and it is undisputed that plaintiff's counsel did not receive a copy of the reply until the morning of argument and that she had to read it while en route to Lafayette for the argument that afternoon. At the conclusion of the argument, counsel drew the district court's attention to the fact that the reply raised a number of new issues and requested leave to file a sur reply. Tr. Jan. 19, 1996 at 45-46. That request was denied, although the court did grant her one business day in which to designate additional  evidentiary materials pertinent to the summary judgment motion. *Id.* at 45, 46; see R. 57. When the district court subsequently relied on the statute of limitations in granting the defendants summary judgment on the free speech claim, it did not consider the evident prejudice to Venters in doing so. See Mem. & Order at 6-7. We cannot overlook the failure to comply with Rule 8(c) in this context. Intentionally or not, Venters was bushwacked. We recognize that the limitations defense may have been meritorious; and Venters' counsel should have had some inkling that the defense might be raised given the date that her own allegations placed on the events central to her free speech claim. But it was not Venters' obligation to raise the defense, and if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff.

*Venters v. City of Delphi*, 123 F.3d 956, 968-969 (7th Cir. Ind. 1997)

Wisconsin law also requires pleading of affirmative defenses:

As to setting forth affirmative defenses in an answer, it has been said:

'. . . Where such affirmative or new matter is of a character such as cannot be proved under a denial of the plaintiff's allegations, a defendant who wishes to avail himself of it must plead it specially. Since the plaintiff must apprise the defendant in the beginning as to what he relies upon for a recovery, it is only right that the defendant should be required also to inform the plaintiff of any special or affirmative defenses he expects to make by pleading the facts constituting such defenses.' 61 Am. Jur. 2d, *Pleading*, p. 580, sec. 152.

## C. Defense inapplicable

Firstly, Plaintiff does not concede that Badger Ordnance Works is a federal enclave established by condemnation in 1942.  As discussed above, OI suggested the federal enclave doctrine as the basis for the affirmative defense of statute of limitations only a few days before trial. Plaintiff had no opportunity to conduct discovery regarding the issue.  Necessary discovery would include an inquiry into the legislative history of Wisconsin statutes and the documents surrounding the transfer of land that are over 70 years old.[133]

OI contends the federal enclave doctrine is applicable to Badger and this Court must apply the two year statute of limitations in effect under Wisconsin law at the time of the transfer

---

There is no question that affirmative defenses must be specially pleaded. Sec. 263.13 (2), Stats.; *Shetney v. Shetney* (1970), 49 Wis. 2d 26, 36, 181 N. W. 2d 516; *Stanley v. Milwaukee Automobile Ins. Co.* (1956), 274 Wis. 226, 230, 79 N. W. 2d 662.

We conclude that the respondents should have pleaded their affirmative defense.  Failure to plead the statute of limitations is a waiver of the defense
*Hartford Fire Ins. Co. v. Osborn Plumbing & Heating, Inc.*, 66 Wis. 2d 454, 468 (Wis. 1975).

[132]    "The adequacy of a pleading is governed by federal law, not state pleading rules. *Colton v. Swain*, 527 F.2d 296, 304 (7th Cir.1975)"  *Moffett v. Gene B. Glick Co.*, 604 F. Supp. 229, 233 (N.D. Ind. 1984)

[133]  OI, which has the burden of proof on an affirmative defense, must present complete evidence of the terms of the alleged land transfer and the laws in place at the time for Badger Ordnance Works land.  If the right to change the statute of limitations was not barred by the transfer, the federal enclave doctrine is not applicable:

The conditions expressed in the California Acts, by which California consented to "the purchase or condemnation" of land by the United States for the prescribed purposes, do not undertake to make applicable to the federal enclaves all future laws of California. Since a State may not legislate with respect to a federal enclave unless it reserved the right to do so to do so when it gave its consent to the purchase by the United States, only state law existing at the time of the acquisition remains enforceable, not subsequent laws. See *Stewart & Co.* v. *Sadrakula, supra; Arlington Hotel* v. *Fant*, 278 U.S. 439.

*Paul v. United States*, 371 U.S. 245, 268 (U.S. 1963)

of the Badger Works Ordnance land.  However, the determination of a federal enclave and the applicable state laws within the enclave are highly fact dependent.  The United States Supreme Court has carved exceptions to the general rule of applying the laws existing at the time of cessation.  One example is *Paul v. United States*, 371 U.S. 245, 268-269 (U.S. 1963), where the Supreme Court of the United States held:

> If the price-control laws California is now seeking to apply to sales on federal enclaves were not in effect when the United States acquired these lands, the case is on all fours with *Pacific Coast Dairy* v. *Department of Agriculture, supra*. There the Court held that the California statutes under which some of the present acquisitions were made granted the United States exclusive jurisdiction over the tracts in question in spite of the express conditions therein contained ( *id*., at 293) and that this price-control law was not enforceable on a federal enclave in California because it was adopted "long after the transfer of sovereignty." 318 U.S., at 294. The United States seeks shelter under that rule, saying California is trying to enforce its current regulatory scheme, not the price regulations in effect when the purchases were made. Yet if there were price control of milk at the time of the acquisition and the same basic scheme has been in effect since that time, we fail to see why the current one, albeit in the form of different regulations, would not reach those purchases and sales of milk on the federal enclave made from nonappropriated funds. Congress could provide otherwise and has done so as respects purchases and sales of milk from appropriated funds. But since there is no conflicting federal policy concerning purchases and sales from nonappropriated funds, we conclude that the current price controls over milk are applicable to these sales, provided the basic state law authorizing such control has been in effect since the times of these various acquisitions.

When the Badger Ordnance land was transferred, a wrongful death and survival rights existed under Wisconsin law.  A statute of limitations was part of the Wisconsin statutory scheme for wrongful death and survival claims.  Any later modification of the statute of limitations is within that basic scheme of state law that existed at the time of transfer.  The *Paul* exception applies to incorporate future Wisconsin state law modification of the statute of limitations.

## VIII. The Special Administration Defense

OI stated at trial that they would continue to assert defenses related to Gary Suoja's role as special administrator of the estate of Ozzie Suoja.[134]  Plaintiff adopts its prior briefing related to the issue and the rulings by this Court that denied OI's motion for summary judgment. [135]

---

[134]   Owens-Illinois had previously moved for summary judgment based on issues of lack of standing, mootness, and the lack of a cognizable claim for Gary Suoja following the previous wrongful death lawsuit that was not consolidated. The Court in an order denied Owens-Illinois's motion for summary judgment in order –
THE COURT: Go ahead.
MR. WATSON: Those are defenses. Owens-Illinois is continuing to assert those (ECF #195 at 73:16-24.)

[135]   I am denying defendant's request to conduct discovery on plaintiff's status as the administrator of the estate because I agree with plaintiff that defendant has forfeited this issue. Defendant says that it believes that plaintiff may have been discharged as the administrator in 2007. However, plaintiff did not file his motion to be named as a party in this case until 2008. If defendant believed that plaintiff was not a proper party, it should have objected at that time or sought discovery on this issue at some point over the next six years while discovery was still open. . . .

The question whether an individual is the real party in interest under Fed. R. Civ. P.17 in not jurisdictional, PNC Bank, N.A. v. Spencer, 763 F.3d 650, 654 (7th Cir. 2014), which means the issue can be waived. . . .

Because defendant does not point to any impediment to its investigating this issue many years ago, I decline to allow defendant to pursue the issue now.
(ECF # 77 at 2-3.)

Now before the court is defendant's motion for summary judgment, in which it argues that plaintiff's claims should de dismissed for three reasons: (1) "the action is moot"; (2) plaintiff "lacks standing"; and (3) issue preclusion bars plaintiff's claims. Dkt. #89. In addition, plaintiff has filed a motion for leave to file a surreply brief, along with a proposed brief. Dkt. #112. Defendant has mischaracterized its first two arguments as jurisdictional. Properly construed, these are arguments about proper procedure under state law. Because defendant could have raised any of those arguments more than six years ago, I conclude that defendant has forfeited these issues.
(ECF Doc # 114 at 1.)

OI elicited testimony during trial and submitted exhibits related to Gary Suoja's involvement as special administrator of Ozzie's estate. This evidence was before the Court when it made its previous decisions concerning this issue.

Additionally, Gary Suoja was appointed special administrator by the Douglas County Probate Court on October 23, 2015. (Att. 87.) This Court should take judicial notice that Gary Suoja is the special administrator of the estate of Oswald Suoja.

### IX. Damages

When he died on December 28, 1996, Ozzie lost 12 years from that long vacation in life we all live for called retirement.[136]  His still surviving children Kimberly, Sue and Gary lost his companionship for that same 12 years.  In 1992, four years before death, the growing mesothelioma tumors began to take their toll on his health.  His began to experience physical, mental, and social pain and suffering.  Ozzie's suffering included knowing asbestos was depriving him of and inevitably would deny him future active lifestyle and relationships.  The part of retirement he experienced before was full of the rewards and pleasure of an active life with family, friends, household chores, helping neighbors, making baskets, and other hobbies.

Compensation must be awarded for every minute of the mental pain and suffering Ozzie experienced when the incurable asbestos tumors began to insidiously sap his energy and life.  Compensation must be awarded for the physical pain and suffering Ozzie experienced as the mesothelioma grew, studding and encasing all organs within his abdominal cavity.  Compensation must be awarded for the companionship lost by Ozzie's children.

If this case were tried to a jury, the applicable damages instructions are Wis. JI-Civil 1855 (Estate's claim) and 1897 (Child's claim).[137]  This Court can be guided by these instructions and the Court's own understanding of the law.

---

[136] Ozzie was born January 29, 1923, and died December 29, 1996.  (Att. 23, Ex 22.)  According to published U.S. government vital statistics data, the life expectancy chart for white males who are between 73-74 years old is 12.0 years.  (Att. 26, Ex 79 at 19.)

[137] Wis.  JI-Civil  1855 provides:
> 1855   ESTATE'S RECOVERY FOR PAIN AND SUFFERING
> The law provides that the estate of a deceased person is entitled to be compensated fairly and reasonably for pain and suffering endured by (name) from the time of the accident up to the time of death.
>
> Pain and suffering includes all physical pain and discomfort, worry and mental distress.  In determining the amount of damages for pain and suffering, you

*A. Ozzie's Life before Mesothelioma*

will consider the nature, extent, and duration of all physical pain and suffering, mental anguish, apprehension, discomfort or sorrow the deceased consciously endured and suffered between the time of the accident and death and insert as your answer such sum as will, in your judgment, represent reasonable compensation for such pain and suffering as you are reasonably certain (name) endured and suffered as a natural result of injuries received in the accident.

Wis.  JI-Civil 1897 provides:

1897    DEATH OF PARENT: CHILD'S LOSS OF SOCIETY AND
COMPANIONSHIP

Question __ asks you to determine (child)'s loss of society and companionship resulting from the death of (parent).

Society and companionship includes the love, affection, care, protection, and guidance a child would have received from (his) (her) parent had (he) (she) continued to live. It does not include the loss of monetary support or the grief and mental suffering caused by the parent's death.

In determining (child)'s loss of society and companionship, you should consider the age of the deceased parent and the age of the child; the past relationship between the child and the parent; the love, affection, and conduct of each toward the other; the society and companionship that had been given to the child by the parent; the personality, disposition, and character of both the child and the parent.  The amount inserted by you should reasonably compensate (child) for the loss of society and companionship (he) (she) has sustained since the death of (parent) and the amount (he) (she) will sustain in the future.

If you find that (child) will sustain a loss of the (parent)'s society and companionship in the future, you should include in your award such sum as will fairly and reasonably compensate (child) for the future loss  [**Note**: In medical negligence cases, add the following:  but only until (child) reaches (his) (her) 18th birthday; see note in Comment].

Although the law provides that a party cannot recover more than ($350,000) ($500,000) for the loss of a parent's society and companionship, this dollar limit is not a measure of damage.  It is a limit on recovery.  Therefore, you should determine the amount that you believe will reasonably compensate (child) for any loss of society and companionship (he) (she) has sustained.

Until onset of the mesothelioma tumors, Ozzie led an active life before and after retirement with family, friends, household chores, and his hobbies.  He had retired at age 62 in 1985.

Ozzie was a person socially liked by everyone.  He had a good sense of humor and liked to joke.  He had close and caring relationships with his wife and each of his four children.  He was a non-drinker and non-smoker.[138]

Ozzie was born January 29, 1923, and grew up at his parents' farmhouse near Jacobson, Minnesota.  (ECF #195 at 6.)  He married his wife Delores on October 16, 1942 in Superior, WI, "where Ozzie was working at the time."  (ECF #197 at 47.)   They had four children – Derald (adopted), Gary, Sue, and Kimberly.  (ECF #197 at 47.)  Ozzie "was raised Lutheran" but converted to his wife's Catholicism.  They attended church "every Sunday and special holidays" and raised their children Catholic.[139]  For nearly 15 years after marriage the family lived in a trailer because Ozzie traveled for work. [140]   The family lived in many places such as the

---

[138] The medical records state "Habits:  Tobacco-none.  Alcohol – none."  (Att. 25, Ex 134 at SM 281.)  This is confirmed by Kimberly (ECF #197 at 69.)

[139] Kimberly testified:
> Q. Right. So if we go back a little bit in time, can you tell us about any religious convictions or views that your father had?
> A. He was raised Lutheran. And when he decided to marry my mother, he converted to Catholicism and we were raised as Catholic.
> Q. Did your family attend church?
> A. Yes, they did.
> Q. How often?
> A. Every Sunday. Any special -- special holidays, they were there at church.

(ECF #197 at 48.)

[140] Kimbely stated;  "And due to the construction business he was in of pipe insulating, he did have to travel. So they had a trailer, a mobile trailer, that the family stayed in."  (ECF #197 at 47.)  Gary testified:
> Q. All right. Let's go back in time. So your family,

Dakotas, Fargo, Minnesota, Green Bay, Milwaukee, Rockford (IL), and Sun Prairie.  (ECF #197 at 45; 103-05.)   Due to the frequent travel by Ozzie for work in early years, the family lived in trailers until they purchased a house in Rockford in1957.  (ECF #197 at 105.)   After Ozzie retired he and Delores moved to Superior "where majority of the family was."[141]   Some of Ozzie's family members were also in the Duluth, Minnesota area which was a couple of hours away from Superior.[142]

---

or your father I should say, started the family in a
trailer; is that right?
        A. Well, they originally had a house that I barely have
any recollection of in Superior when my dad was working
there.
        Q. Okay.
        A. Then they bought a small trailer as we started
traveling as a family, three kids and my parents, to the
various job locations. And we were in places like Alma,
Wisconsin. We were in Minnesota near Fargo in a small
town there. We ended up in Milwaukee, Wisconsin in a
trailer park down by Mitchell Field and we were there for
some time. And then he moved up to -- we moved up to
Green Bay because dad had a job there, so we were in
Green Bay for about six months or maybe longer. I don't
remember the exact time. And then we moved back to the
trailer park in Milwaukee and we were there until
sometime in probably '54 or late '53.
        Q. Okay. So as far as staying in trailers, how long
did that continue?
        A. That continued up until 1957.
(ECF #197 at  104-5.)

[141] (ECF # 197 at 51-52.)

[142] (ECF # 197 at 51-52.)

Ozzie had a strong work ethic and did not miss time when he was ill.[143]  He toiled under conditions which sometimes produced a large number of burns and welts on his arms, hands, and forehead.[144]

Ozzie shared vacations with his children and other family members.  Many of the vacations were to the Superior or nearby Duluth area to visit family.[145]  One of the more memorable vacations was a month long trip to Seattle to visit Gary.[146]

---

[143]Kimberly testified: "If he had a cold or anything like that, he was always willing to go to work. He -- he would never stay home. I don't remember him ever staying home just because he was sick."  (ECF #197 at 50.)

[144] Kimberly described the burns:
> A. He would often get burns on his arms or hands and sometimes on his forehead and he would show me the burns that he would get. They could be about a couple inches in length and maybe an inch in diameter or more. And they would be kind of like a goose egg. They were swollen and very red and sore.

(ECF #197 at 50.)

[145] Kimberly described the vacations:
> Q. Can you remember any types of vacation trips or anything like that that your family shared with your father?
> A. Oftentimes we would visit Superior because that's where my parents met and married and that's where the majority of the family was. Some was also in Minnesota, but it was very -- not too far, just a couple hours away from Superior, were some of dad's family.

(ECF #197 at 51-52.)

[146] Kimberly described the trip to Montana with her father and mother:
> Q. How about any long vacations, do you remember any of those that you shared with your dad?
> A. Yes. It wasn't too long after my brother Gary returned from Vietnam that we took a very long -- the whole month of August to travel out to Seattle, Washington. And we went through the Dakotas and the Badlands and to see Mount Rushmore and all of the beautiful sites that were along the way and also coming back.

Anniversaries were special events spent celebrating by Ozzie and his family.  Pictures of the family members at the 25th, 40th and 50th anniversaries were provided at trial.[147]  All of Ozzie's children attended each anniversary.  Many relatives and friends were at the anniversary parties.  Ozzie and his family attended the reunion of the "Dalbec" side of the family from which Delores came that was portrayed in several photos at trial.[148]  Birthdays were also special events.  Kimberly stated:

> Q. And as far as birthdays, is there any birthday celebrations that you remember that were involving your father and others?
> A. There was -- I enjoyed celebrating birthdays; so to me, every birthday was really a celebration. When I was much younger I always baked a cake for dad, even though he wouldn't really have any cake. But I would usually end up making a sugar-free dessert for him.
> Q. That's because of the diabetes?
> A. That's correct.
> Q. Was there a birthday when your mother turned 70?
> A. Yes, there was.
> Q. Okay.
> A. That was a big celebration when all of the siblings were together again in Billings Park, which is also in Superior, Wisconsin. Several family members -- aunts, uncles, cousins, nieces, nephews -- as well as friends of the family came to that celebration. We had even rented a center for that celebration, so there was quite a few people there.
> Q. Was your father alive for that?
> A. Yes, he was.

---

> Q. How long did this trip take?
> A. It was about -- it was a good month. And my dad did all of the driving and loading the car and unloading the car each day.
> Q. Who was on that trip besides your dad and you?
> A. There was my mother; there was my grandmother, which was my mother's mother; and my cousin Denise.

(ECF #197 at 52-53.)

---

[147] (ECF #197 at 53-56.)

[148] (ECF #197 at 112-13.)

Q. How about your brothers and sisters, were they there?

A. They were all there, mm-mm.

(ECF # 197 at 54-55.)

Ozzie was a very social person who enjoyed sharing his humor in the company of friends and family.[149]   Kimberly described his personality:

Q. Now, going ahead in time a little bit from your younger days, what memories do you have of family events with your father?

A. Dad always enjoyed family events. He liked having people come to the house and visit. He was very social. And people enjoyed being around him because he had a very good sense of humor. He was usually not one to complain or talk about himself. He liked to play cards and was very happy to see people that came over, whether they were, you know, family or friends. He always enjoyed having that company around the house.

(ECF #197 at 51.)

Ozzie's other hobbies and activities included collecting coins, horseshoes, playing Yahtzee and cribbage, gardening, and making things.[150]  Ozzie continued to play cribbage after his vision declined.  Gary explained:

---

[149] Kimberly described a few of the other family members and friends she knew her father regularly spent time with.   (ECF #197 67-68.)

[150] Kimberly testified:

Q. So can you describe some of the activities or hobbies that your father had besides his work?

A. Dad always enjoyed collecting coins. He enjoyed his, oh, playing horseshoes. And he loved to play Yahtzee.

And of course he loved playing cribbage. That is something he enjoyed doing with both his sons and anybody else that was willing to play along with him. He always enjoyed playing cribbage.

He had a metal detector that he enjoyed playing with or working on.

131

> Q. Even with the limited vision, how was he doing as far as socially relating with other people?
>
> A. He was still playing cribbage. So, you know, he was fine. When we'd played cribbage, he would watch, he'd watch it. And sometimes, you know, we'd always see some of the relatives at some point or another during our visits. And all of them would said, "Blind my foot." You know, he's watching the pegs and if you go one too many, he'd catch it. And all of them said that: my Uncle Arnie said that, Suzie's husband said it -- "That son of a gun. He told me he couldn't see. He caught me long-pegging by one."

(ECF #197 at 117-18.)  Overcoming the vision limitations that led to "legal" blindness, Ozzie

continued to lead an active lifestyle.  He fully utilized his remaining eyesight which included a

form of tunnel vision and recognition of light and dark.[151]  Ozzie attended the School for the

---

> He liked to just work on making things. He was creative. He devised a way of making his own wheelbarrow more square, you know, that he would build with wood. And he would use that for hauling wood from outside the lot line to the house because he made a fire with some barrels that he put together so we could heat the basement. So he devised that and built a place to have a fire down in the basement so the wheelbarrow could haul the wood to the house and then he could just carry it downstairs. I know that he and I had even made a doghouse for my dog Ginger.
>
> His hobby was gardening. He loved to be out, you know, in the fresh air and working in the garden. And he was very good at keeping the yard immaculate. It was always in good shape.

(ECF #197 at 56.)

[151]Kimberly testified:

> Q. Did your father ever become, like, totally and completely blind or did he retain some vision?
>
> A. To my knowledge, he always did retain some vision, although it may have been minimal, because this was a gradual thing to lose his vision, because it was more of a tunnel vision that he had, but even that became smaller and smaller over the years. But I know that he could see shadows and he could tell light from dark.

Visually Handicapped in Janesville for about 5 summers.  At the school he learned craft skills which he used to weave "hundreds" of baskets.   Ozzie utilized a work area he set up in his garage specially designed for his limited vision.[152]   Kimberly testified:

> A. Yes. He attended the -- excuse me -- the School for the Visually Handicapped, which is located in Janesville, Wisconsin.
> Q. How often did he go there and for how long?
> A. There was an adult session that was open during the summers. So he went about five summers, though they may not have been consecutive summers. But they had the regular school year and adults could go during the summer.
> Q. Did he go every summer?
> A. They may not have been consecutive.
> Q. Mm-mm.
> A. But he did go at least two or three in a row.
> Q. Okay. And was this all after retirement when he started attending the Janesville school?
> A. Yes.
> Q. Did he learn about craft work there?
> A. Yes, he did.
> . . ..
> Q. . . . So can you describe for us what we've got here in front of you now, Kimberly?
> A. These are the baskets that dad had made when he was at home. This was one of the things that he learned to do when he was at the School for the Visually Impaired in Janesville. He had other classes, too, like rug weaving. There was some woodwork and some jewelry making. But there was the basket weaving and he seemed to really take a liking to that. He always enjoyed working with his hands, so this was something that he enjoyed working with.
> Q. In front of you there's about six different examples and I think we've got more in photograph. Are all these ones that he made?

(ECF #197 at 68.)

[152] Gary testified  "He had the garage set up so that he could have all of his equipment in the right place so he could find it.   Basement was all set up so he could have things in the right place and he could -- you know, so even if it were fairly dark and he had trouble seeing, he could get around with no problem."  (ECF #197 at 116-17.)

> A. Yes, yes, indeed.
> Q. How many total baskets did he make over the years?
> A. There was hundreds of them. I didn't keep a number
> and I don't think he did either. He made a variety of
> shapes and styles. But I have no idea what the count
> was; I just know it was hundreds.

(ECF #197 at 70-71.)

Ozzie developed a diabetic condition at age 40 when Kimberly was "a little girl."[153]  He

was "very rigorous in caring for himself" and staying "physically active."  Ozzie was

"methodical" in making sure he had proper meals for his diabetic condition.  Gary testified:

> Q. How would you describe your father's health from
> what you observed at this time at the 40th anniversary?
> A. Well, to me he was fine. He was very active. He
> was sharp. He was -- you know, he was great. He took --
> even though he had diabetes, he took excellent care of
> himself. I mean, he was very methodical on how things
> went. And if it was time for him to eat, he would eat.
> He would prepare his own meals to make sure he knew
> what was in them. And he would eat on time. And if he
> didn't have it on time, he would let everyone know that
> it was time for him to eat. He would check his own blood
> sugar.
> He was -- he was very, I guess from the legal term,
> he was very *rigorous* in caring for himself. Unlike his
> sons, he maintained his weight very excellently. And I
> think that was in large part due to he stayed very
> physically active.

(ECF #197 at 113; ECF #195 at 25-26.)  Kimberly also confirmed how careful her father was in

following the treatment regime and meal plan for his diabetic condition. [154]  At least three of

---

[153] (ECF #197 at 68-69; ECF # 195 at 25.)

[154] Kimberly explained:
> Q. How about as far as the treatment regimen for his
> diabetes, did you see him do that?
> A. I was a little girl when dad was first diagnosed
> with diabetes. I think they may have started him out on
> pills at first. But that's not something that worked

Ozzie's sibling lived into their late 80s or 90s, which reflects on the longevity that he might expect without the mesothelioma.[155]

## B. Relationship with Delores

---

well for him, so needles injection -- insulin injections
was something that he had to take for the rest of
his life.
And he was always very good about getting up early,
eating his breakfast, his three meals a day and his snack
if he felt he needed one. He would carry little candy
bars with him in his lunch, too, in case he needed some
of the extra sugar during the day. But always very
faithful. And, you know, he never drank at all, so there
was -- you know, he didn't have to be concerned about
getting that type of sugar in his system, too.
He was always a very good eater. Ma would make sure
that he had plenty of *rabbit food*, as they both referred
to it. That means carrots and celery, you know, served
at supper time. So there was always something handy for
him to eat like that in addition to his hot vegetables,
potatoes and meat.
(ECF #197 at 68-69.)

[155] Gary stated:
        Q Has some of your father's brothers and sisters
outlived him?
        A Yes.
        Q Okay. Which ones?
        A Well, Lillian outlived him and I believe Lillian
was 88 or 90 when she passed on. And that was fairly
recently here. I believe it was about four or five
years ago. Heddi passed away at 92.
        Q That's a sister?
        A That's a sister.
        Q Of your dad?
        A Of my dad, yes.
        Q Okay.
        A She was one of the older sisters. And then Ailie
lives in California and she is in her late 80's. I
don't know exactly her age. She is still living at, I
believe, a rest home in California.
(ECF #195 at 8-9.)

Ozzie's wife Delores always came first in his life.  He converted to Catholicism and quit playing baseball for her.  He gave her the new car and used the old one himself.  He allowed his wife to do what she wanted.  As Kimberly proudly stated:  "There wasn't nothing he wouldn't do for her."  Kimberly summarized how her father was dedicated to her mother:

> Q. As far as what your dad did for your mother, can you tell us about that?
> A. There was nothing he wouldn't do for her. Mom always got the brand-new car. Dad always had the clunker, mainly, well, cost-wise: one brand-new car in the family was enough. But because dad worked at various jobsites, he would have to haul his tools with him. And so he wanted the car -- the older car that wouldn't matter so much if there was a rip in the upholstery or something like that. It wasn't as a sacrifice as having a new car and hauling all his tools around.
> But he -- she always had money to do things. She liked to go out to lunch with her friends and socialize and she was always able to do that. He was -- he would never really deny her anything. Even if she wanted to go to school, he would always encourage her to go to school, though she never took advantage of that. But she was pretty much free to do what she wanted.
> And he would -- he would take care of the cars. Always, every Saturday morning, he was washing the cars and making sure the oil was at the right limit, checking the air in the tires or changing tires if he needed to.

(ECF #197 at 57-58.)   Gary also described the caring relationship Ozzie had for his mother:

> Q All right. So tell us -- I know Kimberly has already talked about this, but what things did your dad do for your mom?
> A Well, when we were -- this is a little embarrassing. When we were younger, dad -- mother would do the cooking, but dad would do everything else. He'd clean up, he'd wash the dishes, he'd dry the dishes. And even as we were older and he was trying to get us kids to do some of the work around the house, we didn't necessarily do the best job, but dad would always follow up. He would see that things are done. He pretty much did everything else.
> Mother would typically do the grocery shopping, but

it was not unusual to see dad down at the store where we
worked doing the grocery shopping as well. Maintained
all the vehicles. Made sure that mother got to wherever
she wanted to be. There were times that mother would
also get a job and work and dad would always make sure
that she had a vehicle to drive. Or if vehicles were
tied up for some reason, he'd make sure she got a ride
there. That was always his responsibility. So he
pretty much -- he did everything.

(ECF #195 at 14-15.)

Delores passed away in 2003.   Mesothelioma – caused by asbestos - deprived Ozzie of

seven years of companionship with his wife.  Four additional years of their relationship were

made less enjoyable by the bowel problems starting in 1992 that forced Ozzie to the bathroom 8-

10x per day and pain that began soon after.  Ozzie lived these years with the sorrow that he had

become a burden to Delores and the mental anguish and apprehension that Delores could not

take care of herself without him.  Gary described the deep concern Ozzie had for the future of his

wife at the end of his life:

> Q As your father's condition worsened toward the end,
> what was his thoughts about your mother now having to be
> alone?
> A Well, he was -- when he talked to me about it, he
> was -- he was concerned. He wanted to make sure that
> she was visited regularly. My recollection is he was
> saying he wanted to make sure that my brother Derald
> would come over and visit her every day. And then where
> he used to go to see grandmother every morning for
> breakfast, that was important that he have Derald, who
> was still in Superior, come over and see mother
> thereafter every morning. And he did from my
> understanding.
> So he wanted to make sure she was taken care of.
> He wanted to make sure that the finances were squared
> away, and he kind of looked at me when we were going to
> make sure that that would happen. And so he had
> concerns to see that she was taken care of.

(ECF #195 at 15-16.)

***Relationships with Children***

Ozzie had close and enduring relationships with each of his children beginning in their

childhood and continuing right up to the end of his life.

*Kimberly:*

Kimberly, Ozzie's youngest child, was born on February 11, 1958.  She described the

time with her father in her younger years – a time when the lasting parent-child bonds are

formed:

> Q. So I'd like to talk to you about your younger days.
> And what I want to ask you is what memories do you have
> of your father spending time and doing things with
> yourself from your younger days.
> A. I remember him playing with me on the living room
> floor. And dad would always like to be outside. He
> liked to garden. So I was with him when he was planting
> a garden. And he would teach me about seeds and how deep
> they needed to go and how to water the garden and watch
> it grow.
> When it was time to harvest any of the vegetables,
> he would haul the hose out, you know, from the house.
> And as we pulled carrots or radishes from the ground, we
> would rinse them off by the hose and I would eat fresh
> carrots right from the ground.
> He had put up a swing set for me in the back yard.
> He had also built a sandbox for me. And I would go on
> rides with him to get sand and bring it home and we would
> fill my sandbox.
> He had also built a rabbit's cage, because I got a
> black and a white rabbit, and he built a cage for them
> outside near the garden. And he would put up a swimming
> pool for me and take it down and he'd just let me play in
> the pool.
> But also inside, you know, down in the basement he
> had a small work area and he enjoyed working with his
> hands. So he liked to build things. And he built, like,
> a two-tier box seat with rollers on it so I could just
> slide around in the basement on wheels. And he built me
> a very sturdy toy box, which I still have to this day.

> Q. Okay. Did you ever, like, greet your dad when he would come home?
>
> A. Yes. Some of my fondest memories are when daddy came home, I would run out the front door to greet him as he came in through the gate. And I would grab his lunch box and carry it into the house for him.

(ECF # 197 at 48-49.)  Kimberly lived her parents until she was 24 years old.  She then moved to Monona.  In 1981 or 1982 her parents moved from Sun Prairie to Superior – about 300 miles or a 5 ½ hour drive from Madison where Kimberly continues to live.  Despite the distance, Kimberly continued to visit her parents 2-3 times per year and spoke with them by telephone 2-3 times per month.  Her parents also visited her in Madison.[156]  Even as the end of his life approached, Ozzie

---

[156] Kimberly stated:

> Q. Okay. And when did they leave Sun Prairie and go back to Superior?
>
> A. They moved back to Superior, I think it was 1981 or '82, somewhere in there.
>
> Q. Superior to Madison, about how far is that in distance?
>
> A. It's around 300 miles, but it can take five to five and-a-half hours.
>
> Q. To drive?
>
> A. To drive, yeah.
>
> Q. So after your parents moved back up to Superior, did you continue to see your parents?
>
> A. Oh, yes, yes.
>
> Q. How often did you see them?
>
> A. Two or three times a year that I would go up there. Sometimes they would come down to Madison and visit friends that they had met down here or they would like to go to a parish festival, which is something that they always enjoyed going to. But we would always be on the phone talking to each other maybe two or three times a month.

(ECF # 197 at 59.)

traveled in 1995 from Superior to O'Hare Airport in Chicago to meet Kimberly as she was

returning from teaching in the Czech Republic.[157]

Ozzie provided Kimberly financial support for groceries, gas, and buying cars.  He also

provided financial and emotional support to help her through the period when she suffered from

breast cancer.[158]  As her father's illness progressed near the end of life, Kimberly spent more

time visiting her parents.[159]  As her father neared the end of life, Kimberly took photos of his and

her hands together as a lasting memory.

> Q. . . . So these photos that
> we have on here, what's this right here?
> A. That is a picture that I took. That is my hand and
> my father's hand.
> Q. How close was this to when he passed away?
> A. Days.
> Q. And this one?
> A. Taken at the same time, my hand and my father's
> hand.

---

[157] (ECF #195 at 12.)   Kimberly returned from the Czech Republic in 1995.  (ECF #197 at 75.)

[158] Kimberly testified:

> Q. What did your father do in terms of helping you
> during that period?
> A. He was of course very concerned. I think that a
> parent is never ready for a life-threatening illness for
> their own child. And I was not able to work during that
> time, so he helped me monetarily with some rent and
> groceries.

(ECF #197 at 78.)

[159] Kimberly explained:

> Q. Okay. Now, before you had been visiting him several
> times a year, but now you had extended visits. What was
> the reason why you had extended stays before and after
> the Czech Republic?
> A. Because dad was feeling pretty sick, mom would take
> him to the doctor. And they were -- he was having
> trouble. He'd go from diarrhea to having no stools at
> all.

(EFC #197 at 77.)

> Q. And this one?
> A. Taken at the same time.
> Q. Did you want to take more, except your sister Sue stopped you?
> A. Yeah.
> Q. Why did you take these pictures?
> A. I wanted -- I just wanted to -- because I loved him. I just wanted more of him. I -- dad always had huge hands. He had *big mitts*, as he would say, and my hands were actually a lot smaller than his. And it was just a very special way to remember him at a very personal and private time in his life.

(ECF # 197 at 79-80.)

*Gary:*

Gary Suoja, born on December 28, 1944, was Ozzie's first blood child and the second eldest child in Ozzie's family. (ECF #197 at 101.) Gary served in the Vietnam War and is a licensed attorney who practices affordable housing law in the Seattle area. (ECF # 197 at 102-105.) Gary testified to the companionship he shared with his father in his childhood years:

> Q And my question on this is what do these photos show about the relationship of your father to other family members or to your immediate siblings with your father?
> A Okay. Well, the farmhouse is one of the first places that we went. My dad and I would frequently, when I was younger, travel together alone because of a rift in the families.[160] The farmhouse was whenever we went to Superior, dad and I would go visit his family, his mother and Uncle Tovio, who still lived at the farmhouse and worked the farm. So that was where the farm was. And whenever we were up to Superior, which was at least twice a year, we also made the additional trip over to see Grandma Suoja and Tovia and his sister Julia as well and frequently Lillian in Grand Rapids.
> Q So Tovio is what relationship to your dad?
> A Tovio is my dad's brother, older brother.

---

[160] Gary explained the family "rift" developed over Ozzie's conversion to the Catholic views of Delores. The rift later closed and Delores' family thought "highly" of Ozzie. (ECF #195 at 14-15.)

(ECF #195 at 5.)

Q. Tell us about the relationship that you had with
your father in your younger days.

A. Well, he was the thrill of my life really. He and
my sister Sue, who was a little more than two years
younger than I, we -- you know, our day was made when dad
came home, because the first thing we would do is we
would start playing and we looked forward to playing with
him. He loved -- he was always happy to see us. Excuse
me. It was a -- it was wonderful. It was wonderful
being around him.

Q. Why was it wonderful being around him?

A. Well, he was always -- he was always up for us. He
was always ready to deal with us. You know, you just --
you felt good around dad. And for us kids, it was always
an enjoyable, fun time.
He would have friends come over and some of his
friends were the nicest people in the world. And I would
sit there and listen to, you know, some of their stories
or listen to him talk. And it was just a very enjoyable
time to be around dad. He was -- he was a great guy. He
was just a positive, enjoyable person. He wasn't
perfect, you know, and he was a disciplinarian, too, but
he was a wonderful wonderful father.

Q. Do you have any recollections of any specific types
of activities or events as a younger child you shared
with him?

A. Well, as we were small children we would -- he would
always play horse with us. He would bounce us on the
sofa. He would, you know, throw us up in the air, let us
land on the sofa and bounce around, wrestle with him.
As I grew older we would play sports, throw
baseballs, throw footballs. He was always up to playing
baseball. He was quite a good baseball player. And at
least the story he tells was that at one point he was
very close to being selected to play for the Superior
Blues during the war years. But he felt he was going to
be the third baseman for the Superior Blues, which is a
semi-pro baseball team.

Q. So what happened that he -- did he ever get there?

A. Mother took great exception to him not being home
and she had a difficult time with that issue. I could
understand that. But he decided it was not worth the
battle, so he just quit.

Q. Stayed home instead?

142

A. Stayed home instead.

(EFC #197 at 106-07.)  Ozzie opted for being with his family over his love for baseball.

Gary spent summers at home with his mother and father after leaving home to attend undergraduate college and law school.   After relocating to Seattle and serving in Vietnam, Gary continued in close contact with his parents by phone and occasional visits.[161]

---

[161] Gary explained the continuous communications and visits with his parents:

Q. Okay. I'd like to go forward in time some. Did you keep in touch with your father even though you were out in Seattle?

A. Oh, yes.

Q. How did you do that?

A. Well, it was either phone calls or visits or there were visits to me. Beginning once I left for college, I still came back and all the summers were spent at home. And that continued up until the summer of '67 when I got married. But once we were in Seattle, we were there in 1970, dad, Kim and mother came out to see us in 1970, so they were out for a visit. And, you know, we hadn't been there even a year and they were out.
Subsequently, about a year later, I had my orders from Vietnam. So I headed back then with two very small children and we went back. And we went through Minnesota and visited all of my dad's family and then in Superior and then down to see ma and dad. And then down to the St. Louis area, which is where my wife was from. And that's where she spent the time while I was in Vietnam. So it was a trip through.
And then we kind of reversed the process when I came back from Vietnam. We also did the road trip, just kind of the opposite direction, on the way back to Fort Lewis. So that was up to approximately middle of '72.
There would continue to be phone calls all the time. I shouldn't say *all the time*. I would probably call five or six times a year: usually birthdays, Mother's Days, you know, holidays and so on.
. . ..
When the kids -- when my older kids were 14 we made a road trip back to Superior, my youngest son was just a toddler, and we made a road trip back to Superior. And then we would, you know, we would visit all the relatives

*Sue:*

Ozzie's first daughter Sue was born in 1947.  (ECF # 197 at 102.) She was unable to be present at trial due to her health.[162]  Kimberly and Gary testified about the close relationship between Sue and her father.  Sue stated:

> Q. Okay. Can you just tell us a little bit about her in terms of what things that she shared with your father?
> A. My sister and dad had a close relationship. Dad was always concerned about his little girls. They were very special to him. Not that the boys weren't. But daughters are very special. And Sue always loved dad and she always looked up to him and admired him just as -- just as I did. And she would visit and call just as much as she was able to because she was raising a couple of children on her own.
> Q. Right. Okay. And she was down in Rockford throughout this time period?
> A. Yes.
> Q. Okay. So when the -- when your father and mother and you moved up to Sun Prairie, did she stay in Rockford?
> A. Yes.
> Q. Okay. And now, even though she was in Rockford, she continued to visit with your father?
> A. Yes, yes.
> Q. How often, like, a year did she visit with your father?
> A. It could have been, like, three times, three or four times a year, usually special occasions like Father's Day, his birthday.

(ECF #197 at 60-61.)  Gary testified:

---

> because they were pretty much in one area at that point. My dad was in Superior.
> My dad came out -- the family came out to visit us in Mercer Island in the late 80s. And then in approximately '91 I was back again to Superior, and then I was back again in '93, and then I was back again in '96. So it wasn't like -- you know, the gap between '93 and '96 was one of the longer periods.

(ECF #197 at 108-10.)

[162] (ECF # 197 at 60; ECF #195 at 9.)

All right. So while we're on the subject of Sue,
your sister, can you describe for us what you know or
have observed about her relationship she had over the
years with your dad?

  A Well, my sister Sue was my dad's little girl and
we've shown a number of pictures with my dad and Sue.
He was -- he was very close. Sue and I were roughly two
years apart in age. We were playmates growing up and we
played with dad. When dad would come home, we were
together. He was as close to her, if not closer than he
was to me, and frankly, she was his little darling.
When she got married, dad -- she ended up in a
divorce. She had an abusive husband. And she was home
with two children and I can remember in one of my
visits, my mother was complaining dad was always over at
her house helping her. He helped her with the furnace.
He helped her covering pipes. He helped her with money.
He was there pretty much continually just making sure
everything was okay and taking care of her to the extent
that he felt appropriate.

  Q Okay. Anything else you want to add on Sue right
now?

  A No. I think that's -- well, I should say that even
after they moved to Sun Prairie and then up to Superior,
Sue and her current husband Jerry used to take trips.
They'd go up to Sun Prairie to see them. They used to
go snowmobiling, do all the things that are done in
Wisconsin in the winter. They'd go, from the middle of
Wisconsin, they'd go over to Superior. That was always
included on their itinerary. It's where we've gone
since we were kids when the winter comes: Christmas,
holidays, we were almost always in Superior for one
thing or another.

(ECF #195 at 10-12.)  The poem written by Sue for her father's funeral is testimonial evidence of

their close relationship.  (Att. 18, Ex 27 at p 3.)

*Derald:*

Derald was the son of Delores and was born out of wedlock on June 25, 1941.  Ozzie

"legally" adopted Derald as his own son.[163]  Of the four children Derald was geographically

closest to his father after Ozzie in the later years of Ozzie's life.  When Delores and Ozzie

moved back to Superior, Derald was also living with his family in Superior.[164]  Derald passed

away before the trial.  Kimberly described the companionship and regular visits that Ozzie

"often" enjoyed with Derald and Derald's family:

> Q. Right. So the ones that were closest in terms of
> once your father and mother moved back up to Superior,
> that would have been Derald in Superior?
> A. Yes.
> Q. Okay. And Derald was married?
> A. Yes.
> Q. And he's passed away now, right?
> A. Yes.
> Q. His -- did he have children?
> A. Yes.
> Q. What can you tell us about the time that your father
> spent with Derald's family, including his grandchildren.
> A. Well, as far as I know, my brother would come to the
> house often and sit and visit and eat a meal with them,
> sometimes breakfast, and just *chew the fat*, as dad would
> say, and drink coffee and just touch base with each other
> and just visit in general.
> Q. How about the grandchildren of Derald -- Derald's
> children?

---

[163] Gary explained about his brother:

> A. My mother had my brother out of wedlock in 1941.
> His father was a fellow named *Pete Pederson*.
> Q. And what did your father do as far as Derald?
> A. Well, Derald was always just my brother. He was
> just the other brother in the family. And my dad
> eventually -- when I say "eventually," my dad adopted him
> I believe when I was about 10 or 11 or so. I seem to
> recall that's about the time he was formally adopted.
> Q. Like a legal, formal adoption?
> A. That's correct.

(ECF #197 at 101.)

[164] (ECF # 197 at 60.)

> A. The girls did not live inside of Superior; they
> lived outside. His oldest daughter is in Iron River and
> his youngest daughter, Lisa, is in South Range. They
> were not as close to Superior. But when they would come
> to town, they would stop in to visit.

(ECF #197 at 61-62.)

### D. Concerns and Fears about asbestos

Beginning in the 1980s, Ozzie became aware of mesothelioma risk to his profession because he began testifying in cases involving his union brothers.[165]  Ozzie expressed a "sense of betrayal" in describing to Gary his feelings about having to testify.   (ECF #195 at 19.)

In 1991 Ozzie became distraught about asbestos exposure affecting his own children and spouse.  The triggering event was Gary advised his father that he (Gary) had been diagnosed with asbestos plaques.  (ECF #197 at 21-22.)  Ozzie responded by explaining how he had heard workmen carry the fibers into the house and expose family when they play with the kids or when clothes are washed[166].  Ozzie was "upset" that he may have unknowingly "affected the entire family."  Gary testified:

---

[165] (ECF #195 at 18-19.)  The testimony Ozzie gave in other cases is not available.  The depositions were before Cascino Vaughan law Offices began representing  the Suoja family.  Gary Suoja  had never seen the testimony.   (ECF # 195 at 19-20.)

[166] Gary described the circumstances:
> Q Okay. So you were diagnosed in '91. How long
> after that did you talk -- was it until you talked to
> your father?
>> A It was some time within the next several months.
>> Q And what did you tell him in that conversation?
>> A Well, I told him that they had found asbestos
> plaques in the x-rays and I asked him how could that
> have occurred.
>> Q What did he say then?
>> A Well, my question to him was I had helped my dad,
> you know, in a minor amount, you know, with some of his
> jobs in the past and I just was curious as to whether

Q What else did your dad say on this topic of the asbestos being brought home, if anything else?

A Well, he was -- he just was -- he was upset. It was -- the sense of the whole thing was he was upset. I didn't much want to keep on talking about it because it was bothering him.

Q When you say it was bothering him, what did he express, if anything, about what might happen to the family?

A Well, he was saying that it probably affected the entire family.

(ECF #195 at 24.) Ozzie carried to his grave the knowledge that his entire family had been

poisoned.

---

that might, you know, have caused the asbestos. And his response -- he just became kind of I guess mellow or morose instead of being upbeat in the conversation and he started explaining to me how asbestos can be carried in the clothes from workmen and that it gets into their clothes and they come home and they play with their kids and the asbestos is, you know, then passed on to the children and in the house and affects the members of the family.

He explained that even when you wash them, there was some distinction between washing in an automatic washing machine and an electric drier versus what my mother did, because she used a ringer tub with, you know, wash it around and then rinse it and squeeze the water out with a ringer. She insisted on that. And then dry the clothes on a line. And there was some distinction in that and that wasn't as efficient, I guess, at getting rid of the asbestos. But he was saying that he'd probably been bringing home the asbestos to the family for years. And he was --

Q Was the washing machine part of that conversation too?

A Yeah, the washing machine was part of the conversation too because of the type of washing. I don't understand quite where it came from, it was just what was said.

(ECF #195 at 22-24.)

148

### E. Onset of Mesothelioma - Early Symptoms

According to the medical records and the observations of family members, Ozzie began to experience changes to health in 1992 which included symptoms of physical pain and suffering. The record of the medical consultation on September 10, 1996, reflects the earlier onset of the symptoms. The record states: "Patient here with his wife today. He states that off and on for the past four years he had a problem with intermittent diarrhea and constipation." (Att. 25, Ex 134 at SM 288.) In a follow-up consultation on September 30, 1996, Ozzie makes a similar statement of the earlier onset: "He states he has not had a solid stool for the last three years." (Att. 25, Ex 134 at SM280.) Based on the evidence, these early bowel problems reflect the beginning of significant growth of the mesothelioma tumors and a point when the pain and suffering began.

Ozzie was a "stoic" personality, who did not complain, and was not the type of personality to quickly see a doctor.[167] Consistent with his personality, Ozzie waited several years before he told doctors about the pain and bowel problems. Although Ozzie did not see a doctor and the tumors were not diagnosed until November, 1996, the circumstantial evidence shows the onset of physical symptoms in 1992 or earlier was from the growing tumors. The

---

[167] Kimberly explained her father's unwillingness to be slowed by health issues.

      Q. All right. What can you tell us about your father's work habits as far as if there was something wrong with him, would he take time off, miss work, or what do you remember?

      A. Dad was always very stoic about how he felt. He never complained about any of his ailments. If he had a cold or anything like that, he was always willing to go to work. He -- he would never stay home. I don't remember him ever staying home just because he was sick. He would get up and go to work and that was it. He would never complain about being sick.

(ECF #197 at 50-51.)

symptoms included tiredness, daily diarrhea, constipation, abdomen pain, and withdrawal from social activities.

The onset of symptoms in Ozzie several years before diagnosis of the tumors is consistent with typical course of mesothelioma.  Dr. Frank testified that the growth of the mesothelioma tumors such as those found in Ozzie "obviously takes years" from the time when first tumor cell is formed and also from when the symptoms begin.[168]   Although Ozzie also had diabetes, the thirty year history of medical complications from that condition which he had since age 40 was limited to loss of vision.[169]   The management and control of the diabetic condition did not change so as to suggest the symptoms in the final years of Ozzie's life were attributable to diabetes.  Only after the tumor became widespread were Ozzie's blood sugar levels reported to be widely fluctuating in a consultation on November 5, 2016.  (ECF #197 at 86; ECF #164 at 21 [dep page 68].)

Dr. Wiig's testimony and the medical records leads to the conclusion the diabetic condition did not cause the physical symptoms Ozzie experienced in the last few years of life.  Dr. Wiig explained, "it takes long – a long period of time for those kinds of swings to result in

---

[168] Dr. Frank stated:

> Q. Now, from the time that we have the first cancer cell, how long does it take to grow a mesothelioma that would actually cover a lot of the organs in the abdominal cavity?
> A. We don't really know. Literally earlier today I looked at another case of a peritoneal mesothelioma where the first symptoms were in 2010 and the disease wasn't diagnosed until 2015, so it obviously takes years.

(ECF #165 at 36-37.)

[169]As discussed elsewhere, the diabetes was controlled through the regime of medications and diet to which Ozzie religiously adhered.  (Discussed in section IX.C.)  Ozzie carefully watched his weight as the photos illustrate.  (Att. 66, Ex 25 at 8, 13.)

complications developing."[170]  OI produced no evidence of 1) what is the "long period" of time

of blood sugar fluctuation s needed to cause the complications, 2) what the complications might

be, or 3) why the extensive abdominal organ, tissue, and cavity tumor growth itself would not

cause of the blood sugar level fluctuations.  Dr. Wiig further testified that that blindness was the

only complication that he "saw resulting from Mr. Suoja's diabetes:"

Ozzie's treating physician Dr. Wiig testified:

> Q. Mr. Suoja developed blindness because of his
> diabetes?
> A. Yes.
> Q. Any other complications that you saw
> resulting from Mr. Suoja's diabetes?
> A. No, not -- not that were obvious.

---

[170] Dr. Wiig stated:

> Q. What happens when insulin levels or the blood
> sugar levels vary wildly?
> A. Well, that adds to complications of diabetes
> and, you know, it makes -- it makes those
> complications much more likely, but -- but it takes
> long -- a long period of time for those kinds of
> swings to result in complications developing.
> Q. And -- and, Doctor, just so I have an
> understanding, what -- what do you mean by a
> complication or complications?
> A. Well, he already had the complications that
> had developed over a long time, so it means that his
> eyes had suffered the ravages of retinopathy, or the
> small vessel problems, and if it -- if it -- obviously
> that doesn't just happen very quickly. It takes a
> long time for those accrued issues of diabetes to --
> to result in those kinds of complications, and the
> same is true for -- for other complications. You can
> minimize the risk of developing complications if you
> keep your blood sugar tightly controlled.

(ECF #164 at 21 [dep pages 68-69].)

(ECF #164 at 21 [dep page 69].)    The only plausible finding is that something else besides the

diabetes produced the symptoms that Ozzie reported as early as1992.  The only plausible

something else in Ozzie's medical records is the mesothelioma tumor.

Physical, social, and emotional changes in Ozzie were observed by both Gary and

Kimberly in the same period as when Ozzie reported the bowel problems began.  Using photos

of his father, Gary described the physical and emotional changes – "significant deterioration in

Dad's health" - that he first observed at this parents 50th wedding anniversary in 1993:

> Q So directing your attention to the earlier part of
> the 1990's, did you start observing some change in that
> activity level?
> A I began -- I began to notice a change.
> Q Have you picked out some photos to show in
> connection with that time period?
> Q Okay. What happened in '93 that you --
> A '93 was their 50th wedding anniversary.
> Q All right.
> A You'll see that dad's coat is the same in all three
> of these. And the first photo is a picture of dad
> exiting a limo and you'll see the limousine driver
> looking at him with kind of a concerned look. And when
> I -- when I came in to town for this celebration, I
> noticed -- it appeared to me that there had been a
> significant deterioration in dad's health. You have to
> remember that I would see him maybe every other year or
> so and so it was like a snapshot in time where I would
> notice if there was a big difference whereas at least it
> seemed to me that others who were seeing him day-to-day
> wouldn't. And I noticed that when he was trying to get
> out of the limousine there, he tried to get out but he
> couldn't. He kind of fell back into the seat. And then
> he came out and he had that smile on his face like he
> was, you know, felt silly about it. The limousine
> driver, you can see the expression of concern on his
> face because he fell back in.
> And he did get out. But then as he -- you know,
> once we were at the church, it's a fairly good size
> church and he had to walk down to get up to the front
> pew. And I noticed his gate was no longer this strident
> gate that I had seen with him in the past. Even when he

was having his vision problems, he could get up and go.
But he now had a different gate. There was something --
he just appeared like he didn't have the energy. And he
appeared to be -- it appeared that either he had
suddenly gotten tremendously old or something was wrong.
And then the next photo is a picture of the family
in front of the altar in the church. And this is my
sister Sue, Kimberly, my mother, my dad, myself, and my
brother Derald.
        Q And what's significant about that photo, the
changes that you were observing?
        A Well, there dad was smiling, but it appeared to me
a little bit of a forced smile from the photograph. . . .
The next photo is a photo during this same time
period at the 50th anniversary. This is downstairs in
their house in Billings Park and that's myself behind
the little bar that they had downstairs.  . . .
        Q So your dad is third from the --
        A Third from the left.
        Q Third from the left.
        A But you'll notice that everybody is having
something of a good time there.
        Q Why?
        A My dad is not drinking there, but you'll notice
that he also -- in that picture he seems to be somewhere
else. And I noticed that a number of times when I was
there. He was no longer fully engaged in the family.
He would have these periods when he'd go and he'd kind
of sit down and he removed from the family. And that
was very unusual for dad.
My brother and I had weird comments like well,
being married for 50 years, you'd do the same. But it
was noticeable that he wasn't right in the middle of the
mix and in the conversation. It was just a noticeable
change.

(ECF # 195 at 27-30.)   The "noticeable" lack of energy and social withdrawal detected by Gary

reflect the physical pain & suffering, mental anguish, apprehension, and discomfort produced by

the tumors growing within Ozzie.

     Kimberly used her 1994-95 trip to the Czech Republic as a reference point for when the

deterioration of Ozzie's condition was visible.  Kimberly spent three weeks in the summer of

1994 with her parents before leaving to teach in the Czech Republic for a year.  During this stay,

she noticed her father's activity level had declined and he said that "my guts hurt."  Kimberly

testified:

> Q. Okay. -- what did you observe about your father
> during that time that you were there before you went to
> the Czech Republic that was different than what you might
> have been seeing before that?
> A. I was noticing that dad was becoming a little more
> quiet, not quite as social as he used to be. He may not
> just walk outside with somebody or walk them to their car
> and still chat for another 15 or 20 minutes. He would --
> he wasn't as active physically as he always used to be.
> He would sit in a large chair in the living room and
> watch TV, sometimes closing his eyes and just relaxing.
> Q. Okay. When you say "closing his eyes," was that
> something he had done for -- you know, regularly before
> this or was this something newer?
> A. No. He was usually involved, awake and involved.
> And it's not that he would necessarily sleep in the
> chair -- the TV would be on and he would listen to TV --
> but, you know, just kind of closing his eyes.
> Q. Was there any comments that he made or anything you
> observed about why he was closing his eyes?
> A. He would sometimes have a hand or two over his
> abdomen. And either mom or I would say, "Ozzie, Ozzie,
> what's wrong? What's happening?"
> And he would say, "Oh, my guts hurt."
> Q. So that was a recent type of statement he was
> making?
> A. It -- yeah, before I left, yes.

(ECF #197 at 75-77.)   Upon her return form the Czech Republic in 1995, Kimberly stayed with

her parents for three weeks and noticed the same "behavior" with her father who had now

become "more pale in the year that I was gone."  She stated:

> Q. Okay. When you came back from the Czech Republic,
> did you stay with your parents again for a longer time?
> A. For three weeks, yes.
> Q. Okay. And were you still noticing the same types of
> behavior by him?
> A. Yes, I was. But I was also noticing that he did get

more pale in the year that I was gone.

(ECF #197 at 77.)

The testimony of Gary and Kimberly, the medical records, and testimony of Dr. Frank are all consistent with the growth of the mesothelioma tumors starting in 1992 or before. Underneath the stoic personality, Ozzie knew what was going on and was suffering mentally and physically as his activities became limited.  He had already testified in the cases of his union brothers to know.  As the tumor was eating the inside of his abdominal cavity, mental anguish, apprehension and sorrow were also eating inside his stoic personality.

Gary's visit to Superior in August, 1996, demonstrates with certainty Ozzie's awareness long before diagnosis of the incurable tumors within his body.  During that visit, Ozzie was "sick" and told Gary "separately" about "trouble with his bowels."  Although Gary offered to take his father to the doctor, Ozzie did not want to go at that time"[171]  During the same trip, Gary

---

[171] Gary testified:
> Q Okay. Now, did you -- I'm going to direct your attention, I think it's to August of 1996, the year your father passed away?
> A Yes.
> Q Okay. Were you out visiting with him?
> A Yes, I was.
> Q Okay. What was the basic reason for that visit?
> A The reason was it was -- my youngest son was about 14 or 15 and I did the road trip back to Superior with him.
> Q To visit your father and mother?
> A To visit my father and mother, to go back to Superior.
> Q All right. So on that occasion, which is about four months before he passed away, what did you observe about him at that time relating to his health?
> A He was sick. He complained separately, he didn't complain to everyone, but separately he was not feeling well and he had problems with his intestines. And his -- he had -- I forget how he put it, he just was having

155

observed that the tools and supplies that Ozzie always had in the work area in the garage for

making baskets and other work were gone.  The baskets themselves which Ozzie had made were

also gone. [172]  This evidence shows how Ozzie was already preparing for the end of his life even

before seeing doctors for the diagnosis he knew was inevitable.

---

trouble with his bowels is how he described it.
      Q Something he told you?
      A Yes.
      Q What did you say to him about it?
      A I said "Well, can I take you to the doctor? I'll
be happy to take you to the doctor. I can stay longer.
We can go to the doctor." And he said "No, no, I'm
fine. We'll take care of it."
      Q So he didn't go at that time?
      A No. No, he did not.
(ECF #195 at 37-38.)

[172]Gary explained:

      Q All right. And then later or maybe not later, but
what had happened at that time in August as far as any
of his possessions like his baskets or things that he
owned? What did you see and learn at that time about
things in August?

      A Well, he had kind of a workroom downstairs, and
when I was down there -- because that's where I stayed.
There's a bedroom downstairs in the basement and there
were only two bedrooms up, but they had a foldout bed
downstairs. And when I looked at his workroom, I
noticed that all of his tools, almost all of the tools
were gone. And his supplies, he had them in the
overhead between the floor joists and he had them
arranged in particular order. You know, when I had been
there in '91, for example, they were all laid out and he
could pretty much point things out, know where they are.
And there were almost no supplies. There were some of
the bigger, thicker ones, but there was almost nothing
there. And I didn't -- I didn't understand. I asked my
mother what's going on and she just said he hasn't been
doing anything lately. But everything was pretty much
gone. I had no idea where or what and there's just not
much left.

      Q How about some of his basket collection? Had he

156

*F. Diagnosis and Care*

The diagnosis and care Ozzie received for mesothelioma is described in medical records and the testimony of treating physician Dr. Thomas Wiig.[173]  A timeline of the medical care from the records is set forth below.

1992:           Chronic diarrhea and constipation begin (Att. 25, Ex 134 at S281.)

9/10/1996:     Consult with nurse practitioner.  Ozzie reports pain in right lower quadrant of abdomen (Att. 25, Ex 134 at S 288.)

9/30/1996:     Consult with doctor.  Ozzie reports no solid stools for past three years.  Watery diarrhea up to 8-10x per day.  Pain reported in 3 quadrants.  Stool sample suggestive of "inflammatory or chronic infectious process"   (Att. 25, Ex 134 at S 280-82)

10/7/1996:     Ultrasound of abdomen shows "small fluid collection." Could represent a "cystic liver mass . . . which could explain some of his right upper quadrant pain" (Att. 60, Ex 134 at SM279.)

10/9/1996:     CT scan of abdomen and pelvis.  "Worrisome for peritoneal carcinomatosis" (Att. 61, Ex 134 at SM338-39.)

---

done things with that?
            A Well, it appears that all of the baskets had been
either sold or given away. And I had previously gotten
a few. I did notice that my sister got the really nice
ones. I didn't get quite as nice a selection of
baskets.
            Q So this was all August of '96.
            A That's correct.
(ECF #195 at 39-40.)

[173] Dr. Wiig is currently the Chief Medical Informatics Officer for Essentia Health Care where he has worked since 1981.  (ECF # 164 at 4.)  He held the position of general surgeon until 2012. (ECF # 164 at 4-5.)  He is a board certified medical doctor in the field of general surgery since 1981.  (ECF # 164 at 6.)  Dr. Wiig is a member of the American College of Surgeons and has an academic appointment at the University of Minnesota School of Medicine.  (ECF # 164 at 6-7.) Dr. Wiig's CV is marked as exhibit 100.  He reviewed the medical records of Ozzie in preparation for the trial deposition he gave on November 23, 2015.  (Ex 134; ECF #164.)

10/28/1996:   Colonoscopy and CT Scan findings result in referral to Dr. Wiig (Att. 56, Ex 134 at SM278.)

10/31/1996:   Consult with Dr. Wiig - recommends laparoscopy and potential biopsies  (Att. 57, Ex 134 at SM277.)

11/11/1996:   Laporascopic surgery in hospital with general anesthesia.  Observed "multiple tumor studded nodules over all surfaces within the abdominal cavity."  Biopsies taken.  1200 cc of fluid removed.  (Att. 59, Ex 134 at SM242.)

11/12/1996:   Pathology report diagnosis mesothelioma in all 4 biopsy specimens.  (Att. 27, Ex 134 at SM1,3.)

11/14/1996   Dr. Wiig reports. "Not a surgical candidate because of diffuse nature of peritoneal involvement." " …necessary to pursue symptomatic and palliative approach." (Att. 58 Ex 134 at SM234.)

12/12/1996   Admitted to emergency room and hospitalized.  Abdomen and back discomfort. Unable to eat adequately.  "Lower extremity swelling and progressive weakness." "Significant bowel obstruction."  "Started on NG  tube, intravenous fluids, and Morphine for pain."  "Hospice offered."  (Att. 62, Ex 134 at SM124-26.)

12/15/1996   "Pain all over." (Att. 63, Ex 134 at SM176.)   176

12/24/1996   Discharged home to hospice care  (Att. 65, Ex 134 at SM114.)

12/29/1996   Ozzie dies.  Death Certificate lists Mesothelioma and asbestos exposure as cause of death.  (Att. 23, Ex  22.)

Over the objections of Owens-Illinois counsel, Dr. Wiig described the findings in medical records and his conclusions about the care of Ozzie [174]:

---

[174] OI objected to Dr. Wiig's testimony because "plaintiff disclosed Dr. Wiig as a non-retained expert who would testify about the medical care and treatment that Dr. Wiig provided."  (ECF #164 at dep page 7.)  The Rule 26(a)(2)(C) non-retained expert disclosure for Dr. Wiig stated:

Dr. Wiig is a non-retained expert who provided medical care and treatment to Mr. Suoja. This report is prepared by counsel.
The witness is expected to testify about
• medical care and treatment of the injured party, including without limitation, matters expressed in medical records,
• the pre-existing health of the injured party before the alleged asbestos related condition (including whether any pre-existing condition is life threatening or shortening),

Q. Now, Dr. Wiig, can you describe for us what role that you personally had in the care and treatment of Oswald Suoja?

A. Yes. I was asked to see Mr. Suoja after he was worked up for complaints referable to some indistinct abdominal complaints which initially brought him to his primary care team and then resulted in a referral to a gastroenterologist. Up to the point that I saw him, the workup included some lab work and imaging studies including ultrasound, barium enema, and CT scan, and those studies suggested that

---

• future medical care and treatment needed,
• whether the condition at issue is related to exposure to asbestos (if any opinion on this).

Summary of the facts and opinions on which the witness is expected to testify: The witness is expected to testify to his treatment as disclosed in the medical records and to opinions formed in the course of the treatment he provided, and future medical care and treatment reasonably expected to be needed.

(ECF # 84 at 13.)  The disclosure is sufficient to encompass the medical records which Dr. Wiig used in preparing for his testimony.  (Ex. 134.)  The medical records themselves were disclosed in advance of Dr. Wiig's testimony to defense counsel during the pretrial exchange of exhibits and a second time in advance of Dr. Wiig's deposition. (Att. 80.) OI's objection that some records used during testimony of Dr. Wiig were generated by other physicians or medical personnel caring for Ozzie is not grounds for excluding their use during Dr. Wiig's testimony. The medical records themselves are all admissible under the hearsay exception for medical records.  FRE 803(4).  Dr. Wiig also established the foundation that Ozzie's "care and treatment, these [medical] records are a collaborative effort where different physicians, including yourself, shared information with each other." (ECF #164 at 31-32.)   Dr. Wiig was familiar with and utilized records generated by other physicians:

[Q.] You are familiar with the records to be able to describe what other physicians that were involved in the care and treatment of Mr. Suoja recorded. Is that right?

A. Yes.

Q. And you were advised by these physicians and through the records during the time that you also were serving in the role of the -- of the surgeon as far as the care and treatment of Oswald Suoja. Is that right?

A.  Yes

(ECF #164 at 10-11.)

Plaintiff also disclosed another treating physician - Dr. Slag - to testify.   Dr. Slag had a medical condition which prevented his testimony.  (ECF #164 at 16-17.)

there were some indistinct abnormalities that may
indicate -- may have indicated that there was the
presence of indistinct tumor masses in his abdomen.
The feeling on the part of the gastroenterologist was
that further clarification could be obtained by a
surgical exploration and, after colonoscopy failed to
reveal any further clarification, he was referred to
me.

At that point, I reviewed the results of the
workups. I reviewed the x-rays with the radiologist,
the CT scan specifically, and I discussed the -- the
situation with Mr. Suoja and his wife, and we agreed
that -- that in order to obtain further clarification
of exactly what was going on with reference to his
complaints, that we should entertain the possibility
of a laparoscopy. After I discussed that procedure
with he and his wife, they agreed to proceed ahead.
The procedure was performed, and at the time
of the procedure, we discovered that there was a very
extensive malignancy with tumor evidence basically
throughout his abdominal cavity, encasing and
studding, if you will, most all of his abdominal
organs and the lining of his abdominal cavity on the
inside of his abdominal wall. I performed multiple
biopsies and also suctioned out somewhat more than a
liter of abdominal fluid and sent all of those
specimens for pathologic examination. So basically,
the study which I -- the surgical procedure that I
performed was basically a diagnostic study; not a
therapeutic study or surgery.

He tolerated the procedure okay with some
minor nausea and he needed a couple of days in the
hospital to gain his strength back and to -- to get
over his nausea.

And the final pathology result which I
revealed to he and his wife did, in fact, confirm
that -- with special stains that were performed by the
pathology department, did confirm that all of the
tissue specimens that I obtained were malignant and
that they were -- they were indicating mesothelioma,
peritoneal and abdominal mesothelioma.

(ECF #164 at 8-10.)

The laparoscopy performed by Dr. Wiig enabled him to observe the abdominal cavity and

organs affected by the tumor.  He also took four biopsy specimens.  Dr. Wiig described the

procedure and his observations of widespread tumor growth:

> A. The abdominal cavity is the space between the
> chest cavity and the pelvis that contains all of the
> extraabdominal organs, so all of the solid organs,
> such as liver, spleen, pancreas, kidneys, et cetera,
> and then all of the hollow viscous organs, such as the
> stomach, small intestine, and colon and bladder.
>
> Q. And how was it that you were able to observe
> the tumor?
>
> A. We used what's called a minimally invasive
> technique, so rather than having to make a large
> incision, we were able to visualize the -- these
> various tumor surfaces and organ surfaces with the use
> of a laparoscope. So basically, you -- an internal
> periscope, if you will, uses a camera and internal
> illumination. The abdominal cavity is inflated,
> somewhat like a balloon, if you will. The organs are
> floated apart by carbon dioxide, and this allows us to
> see the various surfaces, and then we're able to
> manipulate and do whatever work we need to do. Many
> current -- currently, many surgical procedures of
> various kinds are -- are commonly done using the
> laparoscope. This offered Mr. Suoja a -- a chance at
> having this step accomplished with the least amount of
> invasion into his body as possible.
>
> Q. What characteristics did you observe through
> the laparoscope to know that this was a -- a cancerous
> or tumorous disease?
>
> MR. WATSON: Objection; form,
> foundation, as to the ability to observe the cavity in
> order to diagnose --
>
> A. Well, the -- obviously, any surgeon who has
> performed a number of laparoscopic procedures knows
> full well what normal organs internally look like, and
> when they appear distinctly abnormal with nodularity,
> abnormal growths, gray tissue that should not be
> there, encasements by gritty and granular kinds of
> gristle tissue and so on that normally should not be
> present in those locations, that is a strong
> indication of malignant growth in those locations, and
> Mr. Suoja's abdominal cavity demonstrated those

growths over most -- as I -- as I indicated earlier,
over most of the organ surfaces, both his bowel
surfaces, his -- the surfaces of his lining of his
abdomen, and even some of his solid organs.

(ECF #164 at 11-13.)

Following the surgery, the biopsy specimens "from four distinctly different areas of the

abdomen" were submitted to a pathologist for assessment.  The pathologist reported all

specimens showed "epithelial mesothelioma" which was the final diagnosis.[175]  Dr. Wiig

described the pathological findings:

A. This is a surgical pathology report,
basically describing the specimens that I submitted
from the -- the tissue specimens that I submitted.
Describes the source from -- the location that I took
them, and then follows on down describing the gross
inspection, the macroscopic inspection, and then
finally the microscopic examination of the -- of
the -- microscopic inspection of all the tissue
specimens, and included in the microscopic inspection
is -- are a description of the special stains that
were performed to help elucidate and identify
characteristics of the tumor cells.
Q. So four different specimens were examined:
A, B, C, D. Right?
A. That's right, from four distinctly different
areas of the abdomen.
Q. All right. And what were the findings on --
on these specimens?
A. Each one of the specimens demonstrated tissue
cells that were consistent with epithelial
mesothelioma.
Q. Suoja Medical Page 2 is also part of the
surgical pathology report. Right?
A. That's correct.
Q. And the date on this report is -- looks like
the specimen was received on November 11th of 1996.
Right?
A. Yes.
Q. Okay. And the Suoja Medical Page 3, that's

---

[175] The surgical pathology report is exhibit 134 at Suoja Medical 1-3. (Att. 27.)

the diagnosis from the report. Right?

  A. Yes.

  Q. Okay. And what was the diagnosis?

  A. The final diagnosis is signed out as
peritoneal biopsies, all four specimens labeled A
through D are epithelial mesothelioma.

  Q. And what does that term "peritoneal" mean?

  A. It means that -- that it was a surface --
they were surface biopsies. They weren't deep,
intra-tissue biopsies within, for instance, the -- the
deep, internal portions of a solid organ, like a deep
internal liver biopsy or something. They were surface
biopsies.

  Q. And who was the pathologist that prepared
this report?

  A. Dr. Bruce Henke. He's also retired.

(ECF #164 at 23-25.)

In reviewing Ozzie's medical records, Dr. Frank confirmed the widespread tumors in

Ozzie.  Dr. Frank explained the multiple biopsies were from different locations in the abdominal

cavity and were all positive.  As a result, Dr. Frank described how the tumors extended "From

his pelvis, from the mesentery, which is the connective tissue between the organs, the omentum,

which is more of this connective tissue, and from the left diaphragm, so all the way from the

bottom of the abdominal cavity to the top."  (ECF #165 at 74.)

After the surgery and pathology findings, Dr. Wiig advised Ozzie and his wife of the

diagnosis.  Dr. Wiig concluded Ozzie was "not a surgical candidate" to remove the tumor.  Dr.

Explaining his statement in the medical records, Wiig testified:

  Q. And the next sentence says, "The patient was
not a surgical candidate because of the diffuse nature
of the peritoneal involvement." What -- what does
that -- what does that mean in the context of
Mr. Suoja's care and treatment?
…

  A. Because of the extensive involvement --
basically covering every surface in the peritoneal
cavity -- there simply is no physical or mechanical

ability to remove the tumor. It basically would
remove -- mean removing every single abdominal organ
from his body, and that's in -- that is incompatible
with life.
        Q. Is -- is that judgment about whether there
can be surgery to correct the tumor something that
you're -- you were involved with?
        A. Yes.

(ECF #164 at 30-31.)

Ozzie was discharged from the hospital on November 13, 1996, and referred for a consult

with an oncologist.  In consultation with the oncologist, Ozzie and his wife were advised "that no

further treatment options could be realistically offered."  (ECF #164 at 14.)   Ozzie was offered

"comfort" or "palliative" care and was sent home.   Dr. Wiig testified:

        Q. So what was the next step after you conveyed
the -- the diagnosis to the Suojas, Mr. and Ms. Suoja,
as far as care and treatment?
        A. We asked -- we -- I wrote for a consult for a
medical oncologist -- that's a medical cancer therapy
treatment specialist -- to see him in consultation to
offer whatever additional information might be
necessary for them to make any further decisions about
further treatments.
        Q. Okay. Who was the oncologist?
        A. Dr. Robert Dalton.
        Q. He's at the same clinic, or was?
        A. Yes.
        Q. He's now retired?
        A. Yes.
        Q. All right. So what -- what happened as a
result of -- did the Suojas then have a consultation
with Dr. Dalton?
        A. Yes.
        Q. And what was the outcome of that as far as
further care and treatment?
MR. WATSON: Objection; form, foundation
to this doctor's participation in that treatment.
        A. At that point, it was recognized that no
further treatment options could be realistically
offered Mr. Suoja to achieve any meaningful outcomes,
whether it be cure or long -- longevity, and so he was

164

basically offered comfort care.

    Q. Is that the same as palliative care?

    A. Yes

(ECF #164 at 13-14.)

Following Ozzie's discharge from the hospital, his condition quickly worsened.  Ozzie

went to the emergency room "with increasing abdominal pain" a few weeks later and was

admitted hospital a second time.  Ozzie was diagnosed with bowel obstruction like "kinking of a

garden hose" which caused "backup" of food and liquid.  A nastrogastric tube was inserted from

his "nose and then down into his stomach" to try to "reduce" the bowel obstruction and pain.  Dr.

Wiig attributed the bowel obstruction to the tumor progression and described the emergency

room procedures and second hospitalization:

    Q. All right. So this makes reference to an
admission via the emergency room with increasing
abdominal pain and evidence of bowel obstruction in
the emergency room. What is bowel obstruction?

    A. Bowel obstruction is basically akin to --
analogous to thinking of kinking off a garden hose to
run out and change the sprinkler, so some process or
another blocks the bowel from being able to propel the
normal food material or even just liquid material
through it, and so what happens is that the normal
muscular activity of the bowel to propel food comes
down to the point of blockage and then hits -- hits
the kink, or the obstruction, and that food or liquid
material begins to back up and -- and distend and get
inflated to a degree more than it's accustomed to, and
that results in bloating and cramping discomfort.

    Q. Was the emergency room able to correct this
situation in Mr. Suoja?

    A. Well, they -- they put down what's called a
nasogastric tube, so that's a tube that goes through
the nose and then down into the stomach. That helps
suction food so that -- or suction liquid material
from the stomach so that at least no further liquid
will proceed down the bowel, and it also keeps the
patient from feeling the unending need to try and
vomit. So it -- it tries to at least reduce the

patient's degree of discomfort and his degree of
pain -- well, his degree of pain and the degree of
discomfort from the sense of need to -- needing to
vomit.

       Q. At this point in time of the -- after the
diagnosis of mesothelioma and the -- and the course
that the disease took, to what would you attribute
that bowel obstruction?

       A. Oh, I think, based on what my findings were
at the time of the laparoscopy, the bowel obstruction
would have to be felt to be due to the tumor
progression.

(ECF #164 at 36-37.)

By the time of the second hospital stay, Ozzie's condition had deteriorated to the point

that palliative care was no longer feasible.   Ozzie was discharged December 24, 1996, on home

hospice care.  Dr. Wiig explained:

       A. Well, initially, I was managing his
postoperative discomfort and he was discharged to his
home and he was given follow-up appointments with
Dr. Dalton to initiate the palliative care formats,
and -- after the postoperative period was over with.

       Q. Okay. And so what -- what ensued as far as
the palliative care stage?
MR. WATSON: Objection; form,
foundation, vague, overbroad, lack of foundation.

       A. Well, his condition worsened at home and he
actually required readmission fairly soon, within a
few weeks, and it was due to increased discomfort and
probable bowel obstruction. So at that point, he was
placed actually on hospice care, not palliative care,
because it was felt, due to the degree of
deterioration that he had undergone, that his life
span was in fact more limited than anyone had
appreciated, and so he was stabilized and controlled,
got his pain under control and his vital signs under
control in the hospital stay, and then he was
discharged to home hospice.

       Q. All right. So there was -- this was -- the
laparoscopy procedure, was that done in the hospital?

       A. That was done in the hospital in early to mid
November, and the -- this hospital stay that I'm

166

referring to was in early Ja -- to mid Ja -- December.
Excuse me. Early to mid-December.
     Q. The two hospital stays and then -- and then
to hospice. Is that what happened?
     A.  That's correct.

(ECF #164 at 14-15.)

Dr. Wiig described the regime of treatment Ozzie received for pain.  The medications

progressed from antibiotics to oral opioid medications to patches to IV (intravenous) morphine.

Despite treatment with intravenous morphine, Ozzie suffered pain "all over" his body at the end.

     Q. The other question I have is there was
some -- some mention about the pain medications, I
think. Can you briefly describe for us the regimen of
pain medication that Mr. Suoja received during his
care and treatment starting with the visit back in
September of -- of 1996, September 10th?
     MR. WATSON: Objection; form,
foundation, cumulative. The witness has already
testified about this.
     A. Well, I think that initially, he wasn't
changed to -- or he wasn't placed on any, back in
September, new or different pain medication regimens.
It was felt that some of his symptomatology might be
due to some overgrowth of abnormal bacteria due to
some bowel sluggishness, diabetic-related, and so he
was placed on a course of some intestinal antibiotics
looking to try and treat intestinal overgrowth of
abnormal bacteria to try to get his bacteria back in
the proper alignment and balance.
But after the surgery, my laparoscopic
surgery, he was placed on oral medications, oral
opioid medications, for the purposes of controlling
his acute postoperative pain; and by the time, then,
that he came back in with his bowel obstruction, he
had basically lost the ability to re -- take and
retain his oral medications and so they were
increasingly unreliable and so he was changed to
patches, which are absorbed through the skin, and so
he was placed on Duragesic patches, which are
time-released and give a more reliable and more
appropriate long-term pain control format rather than
the peaks and valleys of the oral tablets are able to.

And then after he was discharged for his
brief time back home from home hospice, he was
actually using some of their IV morphine regimens, so
he did in fact sort of pretty quickly march along
the -- the pathway of increasing intensity of opioid
pain management. That's pretty common for
hospice-type patients.

(ECF #164 at 83-85.)

Dr. Wiig stated Ozzie's persistent abdominal pain was "a continuation of the same type

of pain."   (ECF #164 at 20.)  During the early stages of Ozzie's care, the cause of the pain could

not be pinpointed.[176]   The finding of the tumors clarified that the pain was caused by the

mesothelioma tumor.  Dr. Wiig stated:

---

[176]       Q. All right. So the nurse practitioner then --
that was my mistake -- and this is a Janet Cismoski
who's prepared this document that's page number 288.
Right?
       A. Yes.
       Q. Okay. And in here, she notes the sentence --
I'm going to read this. It's about halfway in that --
that first large paragraph: "Some pain in the right
lower quadrant of his abdomen." Do you see that
sentence?
       A. Yes.
       Q. Okay. Now, based on the work you did and the
records of the care and treatment of Mr. Suoja, to
what would you attribute that expression of pain that
was in the -- in the record on 9/10/96?
       MR. WATSON: Objection; form,
foundation
       A. Well, I -- you know, it's very difficult to
say with any degree of certainty what that pain could
be due to. Based on ultimately what I saw, it's
certainly possible that it could have been due to the
encasement of his bowel by the tumor because the bowel
was well encased with tumor, but there are certainly
plenty of things that can cause discomfort in the
abdomen at any given time. So –
(ECF #164 at 17-18.)

168

Q. So at this point in time, after you have observed that, the tumor and the diagnosis has been made, what -- what is the -- what is your judgment in terms of what would be the cause of this kind of pain that would require morphine?

A. Well, I think in -- at -- in this time frame and with the diagnosis now having been established, it has to be assumed that it's secondary to the tumor . . ..

(ECF #164 at ECF page 28.)

### G. Physical Pain and Discomfort

As described above, Kimberly recalled complaints by her father in 1994 that his "guts" were hurting.  Ozzie privately repeated the feeling of "pain" in his gut privately to Gary in August, 1996.  Once the medical care began in September, 1996, the records contain an unending trail of increasing physical pain and discomfort that ultimately could not be controlled by intravenous morphine.  Examples of the statements of pain in medical records are reflected in the timeline below of the medical records that begin with the first visit on September 10, 1996:

9/10/96      "pain in the right lower quadrant"  (Att. 25, Ex 134 at S 288)

9/30/96      "right upper quadrant pain . . . pain . . .in the left lower quadrant and left upper quadrant at times"  (Att. 25, Ex 134 at S 280)

10/31/96      "significant abdominal discomfort" "lower abdominal pain" (Att. 52, Ex 134 at S 277)

---

Q. Okay. Those are the two possible directions that you see in his records would be either the growth -- growing tumor at that time or the diabetes?

A. Yes.

Q. Or I suppose the combination of both. Right?

A. Yes.

Q. Could be?

A. Yes.

(ECF #164 at 19.)

12/13/96      "progressive discomfort in abdomen and back" "Morphine for pain" "significant lower extremity swelling" (Att. 62, Ex 134 at S 124)  "'increasing abdominal pain" (Att. 65, Ex 134 at S 113)

12/15/96      "pain all over"  (Att. 63, Ex 134 at S176)

The medical records ascending scale of severity of the pain which spread from one quadrant of his abdomen to his entire abdomen to his back and to "all over" his body.  Viewed in light of Ozzie's stoic non-complaining personality nature and earlier reports to his children, this Court should find that Ozzie suffered long term and continuous pain from the growing mesothelioma beginning in 1993.  The ultimate intensity of the pain, which Ozzie despite the morphine consciously endured all over his body in the last two weeks of life, must be rated at the highest level of the pain scale.

Other findings of physical discomfort – if not pain - include without limitation the watery diarrhea starting 1992, the feeling of being bloated, loss of appetite, bowel obstruction, the insertion of the NG tube, lower extremity swelling, and laparoscopic surgery.  The long term and frequent discomfort from these conditions and medical treatments is worthy of significant compensation in addition to what is awarded for the pain.

### H. End of Life

The end of Ozzie's life was accompanied by the intense physical pain and suffering, mental anguish, and discomfort discussed above.   Ozzie' ending also highlight the companionship he lost with others and his children lost with him.  As Ozzie's health failed in his days, Ozzie was hospitalized as his health failed in final days, but he wanted to be home to die. Gary testified:  My mother called me because she said dad wanted to come home to die and he did go home, I guess, the last two or three days." (ECF 198 at 51.)  Ozzie was discharged from

the hospital on December 24 and all the family members gathered in Superior.  Gary described

the last few days of Ozzie's life:

> Q . . .[W]ho was
> there as the time drew closer to the end?
> A Well, my mother of course was there. Kimberly came
> up and was there quite a bit. My sister came later. I
> came back in December, about the middle of December as I
> recall, and all of us were there from about the 15th of
> December on until Christmas Eve. I had to leave. So
> basically we were all there until almost the end and
> then I was gone and the other siblings remained there.
> Q And then you came back when he passed away?
> A Yes.

(ECF #195 at 14.)

The funeral is a testament to family affection, friendships, dedication, and devotion that

Ozzie had built in his lifetime and had lost because of the mesothelioma. The church was filled

and persons were lined up around the block waiting to get in.  Gary described the funeral

proceedings:

> Q You mentioned something about the size of the
> church being something you want to talk about in that
> one photo. Can you do that briefly for us?
> A Well, St. Francis appears to be -- it's a church
> with a basement where they have gatherings underneath.
> It seems to hold about 300 people, maybe more for the
> pews. For my dad's funeral, the church -- all the pews
> were filled. There were people lining the side. The
> entry to the church and the vestibule where they
> conducted baptisms was filled. The entry off to the
> side, and I think we have another exhibit which was the
> announcement, shows the design of the church. The
> portico where cars would pull up to let elderly out or
> those who had some difficulty and when it was raining,
> it was filled with people.
> The church has two parking lots that probably
> together are a full city block or more, more than likely
> hold at least 200 cars. Both of them were filled.
> People were coming up and saying they couldn't find

Parking.

(ECF #195 at 30-31.)   Ozzie's daughter Sue wrote a poem that provides insight about her

father's love of life.[177]   Part of the poem read:   ""Smile whenever you remember my dad. He

---

[177]The complete poem reads:

> God sent his angels for my dad today
> But he's not really going away!
> Because he's living here, within my heart,
> So I know we'll never be apart!!!
> It will be hard now, not to have him near,
> But he will always remain very dear!
> And I'll remember all the good things he's done
> All the laughter- all the fun!!!!
> Now I know dad got mad, once or twice
> When he caught us kids not being very ni:::e!
> And he'd yell and smack us on the behind ....
> Trying so hard to get us to mind.
> And I guess we scared him a time or two
> By swallowing coins or not coming right home
> From school.
> Or when a sister tried to stop her brothers fight
> By getting out a butcher knife one night!!!!
> And when little sister went far away
> Dad worried about her everyday! ...
> But he took it all in stride
> Keeping his fears hidden deep inside
> Dad really worked very hard all his life
> And he did it all for his kids and his wife!
> He was faithful and true, he was loving
> And kind
> And I know it was hard for him to leave
> Us behind!
> But we'll make it dad
> We'll see it through
> All because of what we learned from you!
> So, smile whenever you remember my dad
> He'd want you to laugh and not be sad!
> His jokes were famous as you all know!
> And he was telling them, till he had to go!!!!
> It's so very hard for this to end
> Saying good-bye to my dad and my friend
> So I thank god and my mom too----
> For giving me a dad like you !!! !!

would want you to laugh and not be sad. His jokes were famous as you all know."  For over three years, Ozzie consciously suffered every day from the knowledge he would no longer live that life.  This Court must award substantial compensation for Ozzie's mental suffering and anguish.

## I.  Recoverable damages

The compensable categories for damages and the amounts which plaintiff recommends be awarded are listed below.

### 1.  Summary of amounts to be awarded

Plaintiff recommends the Court award damages in the following amounts
.

```
Ozzie (Total)                            $1,625,773
        Medical & Funeral  $    25,773
        Pain & Suffering    $1,600,000

Gary       $ 90,000
Kimberly   $150,000
Sue        $110,000
```

Punitive –still retained by MDL Court

Based on the evidence above, the compensation is warranted for the reasons summarized below.

### 2.  Medical and funeral bills

Medical bills are undisputed and total $17,115.01.  Funeral bills are $8,658.  (Att. 79, Ex 133 at 1-3.)[178]   OI is perhaps fortunate in the bills being low because Ozzie, by nature of his personality, waited until his incurable condition became intolerable before seeking medical care.

### 3.  Pain & suffering

---

I love you, dad
Suzanne
(Att. 18, Ex. 27 Suzanne's Poem.)
[178] $700 (cemetery deed) + $2,465 (monument) + $7,713 (burial service) = $8,658

As he approached the end life, there is no doubt from the evidence that Ozzie suffered uncontrollable pain and was bedridden from the mesothelioma. The compensation for such a tortured ending to life must reflect the high value our society places on human life. Nothing in the past history of Ozzie's life of dedication and devotion to his family should reduce the value of his life below that of others. The only limiting condition in his past history is blindness, but we cannot say that a blind person's life is worth less. Especially this is true for Ozzie who embraced and accepted his vision limitations without complaint and made adjustments to continue his active lifestyle. His involvement with Delores, his children, other family, friends, hobbies, household chores, and other activities was adjusted but remained fulfilling unitl the mesothelioma began to destroy his lifestyle.

The duration of the pain and suffering is a factor which the Court can consider. The answer is the duration should be measured from when the growth of the mesothelioma tumors began to significantly affect Ozzie's health and lifestyle.[179] They caused disruptive bowel patterns beginning in 1992, social withdrawal and slowed walking in 1993, and complaints of pain beginning in 1994. The award for pain and suffering must take into account the entire four year period. The evidence is not disputed that by 1993, a more rapid decline began in Ozzie's physical health – above and beyond the normal aging process and any past problems associated with diabetes. Both of the family members who testified observed the deterioration several years before the tumor diagnosis. The medical records show 1992 is the onset of severe bowel problems as a persistent and daily condition. (Att. 25, Ex 134 at SM280; SM288.) By 1993

---

[179] Under Wisconsin law damages can be awarded for injuries occurring anytime after the "accident." The medical evidence establishes a disease process of genetic mutations for mesothelioma which is underway from the time of exposure. The accident here is the exposure and all later pain and suffering is compensable. The Court should take note that plaintiff is not seeking compensation during the earlier stages of the disease process for which no pain and suffering can be proven.

Ozzie started to reflect signs of tiredness and social withdrawal.   By 1994 Ozzie, a stoic and habitual non-complainer – told family members "my guts hurt."   Before he saw the doctors, Ozzie knew the end was near when he stopped basket weaving and cleared out the tools and supplies from his work area.  Consistent with the medical testimony of Dr. Frank, the growth of the tumors "obviously" took several years.  The compensation awarded by this court should start with the pain and suffering from the 1992 time period.

Even if damages are only viewed as beginning with the diagnosis, the widespread tumor which destroyed all the organs in the abdominal cavity is a devastating injury.  One way to view the pain and suffering physical damages is to award Ozzie $100,000 for each organ or area in his body which was "studded and encased" by the mesothelioma tumors causing pain so severe that the highest level of painkiller was not effective.  Dr. Wiig identified the specific organs which the tumor destroyed to include the liver, spleen, pancreas, kidneys, stomach, small intestine, colon, bladder, etc.  (EC #164 at ECF page 6.)   The tumors also destroyed the lining of the abdominal cavity, the omentum connective tissue between organs, and the mesentery connective tissue in the abdominal cavity.  (ECF #164 at ECF page 6; ECF #165 at 74.)  Appropriate compensation for the physical pain, suffering, and disability for those eight organs and three areas of the body is $1,100,000.

The four year duration of the physical pain and suffering includes many events and conditions causing physical pain, suffering, and discomfort in addition to the massive tumor growth found at the end stages.  In combination with the tumors, plaintiff requests the court award $1,300,000 for the overall physical trauma Ozzie consciously suffered.

Under Wisconsin law, pain and suffering is defined to include more than physical effects. The jury instruction phraseology is "Pain and suffering includes all physical pain and discomfort,

worry and mental distress."  The instruction also states "you will consider the nature, extent, and duration of all physical pain and suffering, mental anguish, apprehension, discomfort or sorrow the deceased consciously endured and suffered  . . ."   In the category of these mental or emotional effects are the evidence that Ozzie could no longer maintain his active and social lifestyle, that he feared the future fate of his wife, that he was conscious in knowing the relationships with his children, family, and friends had been destroyed and would be ending many year before his normal life expectancy, that he was unable to pursue his hobbies.  A testament what Ozzie knew he was losing prematurely is the crowd that overflowed a large church for his funeral.  Ozzie's awareness of his impending fate that 50% of his coworkers experienced is shown by cleaning out his work area months before he even saw a doctor.  The mental aspects of this pain and suffering should be valued at $300,000 or higher.  In total this court should award at least $1,600,000 to Ozzie's estate for pain and suffering.

### 4.  OI's Position on Compensation

OI attempts to downplay Ozzie's pain and suffering by asking the Court to draw implausible inferences.  For example, during cross examination of Gary, OI counsel repeatedly pointed to medical notes that Ozzie and his wife had a history of "arguing" at the visits to doctors.  (EFC #195 at 49-51.)  OI apparently wants the Court to infer these notes mean the relationship between Ozzie and his wife is worthless in valuing the compensation to be awarded. To the contrary, the "arguing" shows concerns of a spouse that her husband get the right treatment and best care possible.[180]  Such quarrels were historically part of the strong bond of the 53 year marital relationship – a bond which Ozzie knew would be broken as his health

---

[180] Dr. Wiig characterized Ozzie as a "cooperative" patient who followed recommendations. (ECF # 164 at dep page 38.)

deteriorated.  Delores Suoja was a concerned and close companion who was with Ozzie for the medical consultations.

OI counsel persisted in using sound bites in medical records to suggest Delores did care about Ozzie.  That is not true.  The medical records specifically state on December 19 during the second hospitalization: "Delores would like to take patient home."  (Att 64, ex 134 at SM 132.) Despite the complications of caring for Ozzie in his waning days, Ozzie wanted to be home and Delores wanted him home at the end.[181]  Gary explained the love and affection his father expressed for his mother regardless of their bickering.

> Q Mr. Suoja, the medical record statements about your mom quarreling with your dad over his medical treatment, does that -- was that something unusual or different?
> A No. That was -- that was very common. Way too common unfortunately.
> Q Does that mean that your dad didn't care about your mom or vice versa?
> A Absolutely not. He had a great deal of frustration with her, as did all of the siblings, but he still wanted her taken care of. I mean he stuck with her through all these years and to me it just makes him a bigger man.

(ECF #195 at 57.)  At the end of case, OI has no viable evidence to negate the mental suffering Ozzie experienced from worrying about how Delores would cope with the future without him.

---

[181] On cross examination Gary testified:

> Q There's a notation here that "Patent and spouse have a history of conflict. Deloris thought patient could stay here to die." Is that correct?
> A That's what it says.
> Q Is that your understanding of your mom's position at that time?
> A No, I would not say it is. And the reason is my mother called me because she said dad wanted to come home to die and he did go home, I guess, the last two or three days.

(ECF #195 at 51.)

OI also pointed to evidence that Ozzie was "legally" blind.  While the blindness restricted certain activities such as driving a car and work at the house, Ozzie did not let his vision slow him down.  He remained actively engaged in life with family, friends, and hobbies.  The bottom line is OI wants this Court to reduce damages because Ozzie had lost most of his vision.  The argument lacks both evidentiary and legal merit.  The argument is discriminatory.  The value of an active person's pain and suffering is not less because of impaired vision.

OI also raised the possibility of the diabetes or other health conditions affecting Ozzie. OI did not produce any medical testimony to link up the diabetes to the pain and suffering for which compensation is sought.  Once the tumors were located, nothing in the medical records suggests that Ozzie's pain and other physical symptoms – except the blindness –were attributed to any health condition other than the mesothelioma.  Dr. Frank concluded  no condition in Suoja's medical history – other than the mesothelioma – would have shortened his life expectancy.  (ECF #165 at 73.)   Dr. Wiig had no opinion whether or not diabetes would shorten Ozzie's life.[182]  (ECF #164 at 37.)

### 5. *Children's Damages*

Adult children can be awarded compensation of up to $350,000 for the death of a parent under Wisconsin law.  This Court saw and heard  the emotional testimony provided by Gary and Kimberly.  Both had so much to say about the closeness of relationship with their father that the Court exercised its discretion to limit the time of their testimony.  Proof of society and companionship is the triggering evidence for the compensation to be awarded the children.

For both Kimberly and Gary, the bonds formed by their father's affection, concern, and mentoring early in life never ended.  When the family celebrated special events, the children

---

[182]Plaintiff filed a motion in limine to exclude consideration of other health conditions besides the mesothelioma.

were all present inforce.  Due to the MDL-875 delay, nineteen years passed since Ozzie died until Kimberly and Gary testified before this Court.  The sincere and emotional testimony delivered after such a long passage of time reflects on the closes to their father.  They lost twelve years of time with him due to early death and three more years due to his social withdrawal as the tumors began to limit Ozzie's life.  The loss of 15 years of companionship and society with a father with whom the bond has always been close and ongoing is so important that it cannot truly be measured by money.

Plaintiff requests this court to award the statutory maximum of $350,000 to the children. For Kimberly, the amount of $10,000 per year for the 15 years is $150,000.  Sue was not able to testify in person, but Gary and Kimberly explained how she had the same lifelong closeness with Ozzie.  The poem Sue wrote for his funeral is testament to the closeness of the relationship up to the end.  Since Sue is older than Kimberly by more than a decade, the damages requested for Sue is $110,000.  Gary described his father as the "thrill of his life."  Having relocated to Seattle area, Gary did spend less time with Ozzie than Kimberly and Sue.  But the closeness did not go away and the personal and phone contact continued.  The damages requested for Gary are $90,000 to complete the maximum total of $350,000.

<u>**X. Joint & Several Liability**</u>

Wisconsin's common law of damages governs this action.  Under common law, joint and several liability is applied to products liability claims which involve a single indivisible injury. For new strict products liability claims in Wisconsin, common law joint and several liability did was in effect until the legislature enacted a prospective change in 2011.  The legislation does not affect this action filed in 1999.

**A. History of Common Law**

At common law Wisconsin courts recognized any "one of two or more joint tort-feasors or one of two or more wrong doers whose concurring acts of negligence result in injury, are each individually liable for the entire damage which resulted from their joint or concurrent acts or negligence."  *Kingston v. Chicago & N.W. Ry. Co.*, 211 N.W. 913, 914 (1927), *accord Walker v. Kroger Grocery & Baking Co.*, 252 N.W. 721, 727 (1934).  The *Kingston* court relied upon the following quote from *Cook v. Minneapolis, St. Paul & Sault Ste. Marie R. Co.*, 98 Wis. 634, 642 (1898):

> Where two causes, each attributable to the negligence of a responsible person, concur in producing an injury to another, either of which causes would produce it regardless of the other, because, whether the concurrence be intentional, actual or constructive, each wrongdoer, in effect, adopts the conduct of his coactor, and for the further reason that it is impossible to apportion the damage or to say that either perpetrated any distinct injury that can be separated from the whole. The whole loss must necessarily be considered and treated as an entirety.

*Kingston*, 211 N.W. at 914.

An insulator's exposures which produce mesothelioma fall within the parameters of the "concurrent" causes set forth in *Kingston* and *Cook*.  The undisputed medical evidence shows mesothelioma is caused by the "cumulative" exposures and that a single month of exposure or less is sufficient to cause mesothelioma.  (Discussed in section III.B.2.)  The disease evolves

from a single or unified process for which it is impossible to know which fibers caused the DNA

mutations.  As an actor responsible for several months of Ozzie's exposure, OI is jointly and

severally liable under *Kingston*.

**B. Single, Indivisible Injury**

The development of cancer, including mesothelioma, is established by the medical

evidence in this case to be the result of a single, unified disease process.  The cumulative

exposure to asbestos fibers is the cause because it is scientifically impossible to know which

fiber (of the millions of fibers inhaled daily by an insulator) caused which mutation.[183]  As Dr.

Frank explained:

> Q. So the development of the actual first
> cancer cell, first mesothelioma cancer cell, is
> that a separate type of disease process or a single
> unified process?
> A. It's a single unified process of turning
> from a normal cell into a cancer cell. It's one
> process. You end up with a malignancy. You may
> have multiple steps in getting there, but it's the
> same process we would see for any single kind of
> cancer that would be formed from any kind of
> cancer-causing exposure.
> . . ..
> Q. But my question is, in terms of the
> different exposures, do those create separate
> disease processes or is this a single process?
> . . ..
> THE WITNESS: It's one process that
> may have multiple steps, but it's the same process
> and it's the same disease caused by -- you have to
> say the cumulative exposure that one has because
> you don't know which fiber on which day may have
> initiated that process in the first place.

---

[183] As discussed in section III.B.2., the disease process for cancer is a series of genetic (DNA)
mutations which can ultimately become a tumor cell.

(ECF #165 at 33-34.)  Dr. Frank also described the several different types of asbestos fibers but explained that all can cause disease:  "So they are chemically each different from the other, but they are all fibers and all have been shown to cause disease."  (ECF 165 at 24.)  Ozzie's cumulative exposures caused asbestos fibers to be retained in his body.  The fibers acted concurrently to create a single unified cancer disease process.  The undisputed medical evidence lays the foundation for joint and several liability under Wisconsin common law.

Other medical evidence about causation of mesothelioma also falls within the *Cook* and *Kingston* holdings.  A large number of fibers are inhaled – millions - each day by an insulator.  (see Section III.B.2.)   Thousands of genetic DNA mutations – estimated at 23,000 for lung cancer - are needed to cause cancer.  (see Section III.B.2.)  As to the many days in which Ozzie was exposed to asbestos, these medical facts make it "impossible to apportion the damage or to say that either perpetrated any distinct injury that can be separated from the whole."  *Kingston*, 211 N.W. at 914, quoting *Cook*.  As Dr. Frank stated, mesothelioma is the result of the "cumulative" exposure, and causation by particular fibers or exposures cannot be separated by science or medicine.  (ECF # 165 at 33-34.)

A third medical factor involved is the latency of mesothelioma which results in decades passing before the cancer is diagnosed.  (see Section III.B.2.)  The latency period makes impossible to know the timing of when and what mutations are occurring.  All asbestos fibers inhaled during the latency period are capable of producing cancer.  (see Section III.B.2.)  The asbestos fibers remain in the body for long periods of time and continue to cause injury or create an injury producing situation for many years or decades after the exposure. (see Section III.B.2.) The fibers from the different exposures during the latency period are simultaneously present within the body and concurrently causing the mutations needed for the first cancer cell to

develop. The fibers from the separate exposures "concur in time" to produce a single injury which gives rise to joint and several liability under Wisconsin common law. When "two actors negligently conduct themselves so as to injure another, they become jointly and severally liable to the other if their actions concur in time to directly produce injury or to create an injury-producing situation." *Johnson v. Heintz*, 73 Wis. 2d 286, 302 (1976). The fibers inhaled during different exposures within the latency period all "concur in time" to increase the risk and ultimately cause enough genetic mutations to produce a tumor cell. [184]

A final medical factor is that a one month exposure to OI's Kaylo is alone sufficient to cause Ozzie's peritoneal mesothelioma. (see Section III.B.2.) This factor falls within the parameters of *Kingston/Cook* which find joint and several liability when "either of which causes would produce it regardless of the other." *Kingston*, 211 N.W. at 914, quoting *Cook*.[185]

The 2011 amendment to Wis. Stat. § 895.045(3) also confirms joint and several liability for strict product liability claims was common law. The Wisconsin legislature prospectively enacted a law to change common law by requiring apportionment of fault among responsible entities in strict products liability actions. *Id.* The need for legislative action corroborates that common law of strict product liability did not provide for the allocations of fault argued by OI. This case continues to be governed by the pre-20l1 law of joint and several liability. The

---

[184] Repeated asbestos exposures are treated as a single occurrence in the world of asbestos insurance subrogation litigation in Wisconsin. The Wisconsin Supreme Court held: "In the case at hand, each individual claimant's injuries stem from the continued and repeated exposure to asbestos-containing products. Thus, under the policy language and the cause theory, each claimant's repeated exposure is one occurrence." *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 2009 WI 13, P39 (Wis. 2009).

[185] Another approach suggested by commentators is to shift the burden of proof in multiple actor cases to the defendants to show a reasonable basis for dividing liability. See *Borel v. Fibreboard Paper Products Corp.* 493 F.2d at 1076, 1095-96 note 31 (5th Cir. 1973). The Court in *Borel* applied these principles and found joint and several liability applied in the case of an asbestos worker like Ozzie. 493 F.2d at 1096.

Wisconsin Supreme Court unanimously held the common law right of joint and several liability which existed at the time of the injury is constitutionally protected and cannot be change by later law. *Matthies v. Positive Safety Manufacturing Company*, 2001 WI 82.

OI will undoubtedly ague the "fairness" of joint and several liability. As Wisconsin courts have explained, OI has a solution to those concerns because a contribution action can be pursued against the other defendants. *Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶15 (Wis. 2001). If a contribution claim cannot be asserted against an alleged joint tortfeasor due to a *Pierringer* release, OI is entitled to offsets for the funds recovered by Plaintiff from other sources.

OI's pretrial "Bench Brief Regarding Apportionment of Liability" does not address the medical evidence of the mesothelioma disease process. (ECF #140.) The medical evidence is the basis on which Plaintiff contends joint and several liability applies.[186] OI's Bench Brief focused on the ruling by this Court in the *Bushmaker* case about pre-trial verdict form submissions. The complete *Bushmaker* ruling is attached. (Att. 92, Case: 3:09-cv-00726-slc Document # 146 Filed: 03/01/13.) The *Bushmaker* ruling was issued before trial began and did consider the medical evidence cited above.

The Court found in *Bushmaker* that Plaintiff had not submitted any opposition to the Special Verdict Form proposed by the Defendant which included a single question apportioning liability for both the strict products liability and negligence claims. (Att. 92, at 21.) In the absence of any written objections or timely supplemental brief by Plaintiff, this Court adopted the special verdict form of the Defendant and found Plaintiff waived further opportunity to

---

[186] The medical evidence was of record in the trial deposition of Dr. Frank taken 4 days before OI filed the Bench Brief. (See ECF #165.)

object.  The Court in *Bushmaker* noted Plaintiff mentioned the case of *Fuchsgruber v. Custom Accessories, Inc.,* 2001 WI 81 (Wis. 2001), after the Court announced the adoption of the defense verdict form.  (Att. 92 at 21.)  The Court said *Fuchsgruber* involved a single chain of product distribution and did not hold that joint and several liability applied when more than one product is involved.  (Att. 92 at 21-22.)  Plaintiff does not contend in *Suoja* that *Fuchsgruber* holds joint and several law applies to cases involving more than one brand of asbestos containing product.  Plaintiff bases the application of joint and several liability in *Suoja* on the mesothelioma medical evidence and common law of strict products liability.  *Fuchsgruber* is cited by Plaintiff only for the proposition the common law governs strict products liability claims.

OI may argue the 1995 amendment to the comparative negligence statute, Wis. Stat§ 895.045 changes the common law of strict products liability.  This argument was rejected in *Fuchsgruber* where the Court stated the comparative negligence statute *"does not apply to strict liability actions."* 2001 WI 81 at ¶ 3.  The Court emphasized the basis of the ruling was that common law governing strict product liability was not changed:

> The new statute does not ... explicitly or even implicitly suggest a legislative purpose to change the common law of strict product liability.
> . . .
> While the 1995 amendment clearly ushered in a significant development in negligence law, there is nothing in the language of the new statute that even hints at a legislative purpose to accomplish such a sweeping change in the common law of strict product liability in this state.

*Fuchsgruber*, 2001 WI 81 at ¶¶26, 29.   *Industrial Risk Insurers v. American Engineering Testing, Inc.,* 2009 WI App 62, (2009) also rejected the argument that the common law of joint and several liability in strict products liability cases was changed by the comparative negligence

185

statute.   In *Industrial Risk* the court of appeals held a defendant found to be 10% responsible

was jointly and severally liable for the entire award.  2009 WI App 62 at ¶28.


**C. Contributory Negligence**

In a strict products liability case, the award of damages is diminished by the percentage,

if any, of Ozzie's contributory negligence compared to the product defect.  *Fuchsgruber*, 2001

WI 81 at ¶20.  The absence of contributory negligence is discussed in the earlier contributory

section of this brief.


**D. Offsets for Other Recoveries**

If this Court finds OI is jointly and several liable for all damages due to Ozzie's

mesothelioma, OI is entitled to an offset against the past recoveries by plaintiff.  The amount of

the offset is $230,700.64.[187]

---

[187]  On November 19, 2015, Plaintiff sent by e-mail a disclosure of settlements as of November 17, 2015.  As part of post-trial briefing, Plaintiff counsel reviewed that disclosure and found several errors.  The November 19, 2015 disclosure incorrectly added the total dollar value of the settlements as $331,078.60.   The accounting records show the correct total of past settlement payments is $230,700.64.  Two other mistakes in the disclosure are 1) not listing a settlement with Travelers Insurance Wisconsin made on November 6, 2015, and .2)  listing a settlement was made with Metropolitan Life Insurance on August 30, 1999; no settlement with Metropolitan Life is contained in Plaintiff's records.

## XI. OI's Request for Apportioned Liability

OI contended in pretrial briefing that fault must be allocated among potentially responsible entities.  (ECF #140.)   Plaintiff opposes any allocation of fault being used to diminish the recovery of the Ozzie's estate or his children if OI's liability is predicated on the strict products liability claim.  Apportionment of fault is possible only if OI's liability is predicated purely on the negligence claim or if a contribution claim can be pursued.  If joint and several liability is not applied and fault is to be apportioned, OI carries the burden of proving the fault to be assigned to other entities.

OI offered minimal admissible evidence to allocate fault to other entities.  The evidence needed includes  1) product brand identification, 2) a basis for the significance of Ozzie's exposures to other products, 3) the work conditions of the other locations where Ozzie was exposed, 4) responsible entity identification  5) knowledge of asbestos dangers specific to other allegedly responsible entities, 6) evidence of the resources (medical, industrial hygiene, and safety staff) available to other allegedly responsible entities  to know what had been published in medical/ industrial hygiene/safety literature, and 7) the safety measures present at the different locations such as engineering controls for dust, ventilation, and breathing protection.   OI carries the burden of proof on the fault of other entities.  Allocation of fault to other entities cannot be based on speculation.

If this Court finds that OI Kaylo rather than Johns-Manville brand pipe insulation was removed and reinstalled on the jobs which Ozzie worked at Badger, evidence of other product brands to which Ozzie was exposed is limited.  As discussed above and in Plaintiff's pending motion in limine, OI failed in discovery to answer the interrogatory questions about other entities

which were claimed by OI to be responsible for Ozzie's injuries.  While coworkers testified they knew names of other brands of pipe insulation and cements, they did not identify names of any other brands used on the jobs which Ozzie worked.

OI offered affidavits and releases submitted for bankruptcy trust claims, but all are deficient in one more of the elements required in a strict product liability civil tort claim.  (Exs 1653-80.)   Some are also hearsay.  Rather than speculate in anticipation of the basis under which OI will seek admission and argue evidentiary sufficiency, Plaintiff reserves responding to specific documents and arguments until the reply brief.

Examples of some – not necessarily all – deficiencies or the purposes of the civil tort system of evidence contained in trust fund affidavits and releases is set forth below.  The affidavits and releases do not:

- Describe the characteristics of the products to show that they are "defective and unreasonably dangerous."
- Provide evidence about asbestos content and fiber release for the products.
- Describe what warnings and safety instructions accompanied the products
- Provide evidence about knowledge and culpability of other manufacturers.

Plaintiffs will respond in reply to the specific claims which OI makes about the fault of other entities in OI's post-trial brief.

## XII. Conclusion

Ozzie Suoja was a special and caring person to family, friends, and others whose lives he touched.  He took pride in caring for himself and maintaining an active life no matter what obstacles he faced.  Mesothelioma was the only obstacle he could not overcome.   He had no way to escape the pain and suffering ultimately inflicted.  Consistent with his lifetime stoicism, he did not want his family to suffer with him and delayed seeing doctors knowing he could not be cured.

OI Kaylo exposures consumed over six months of Ozzie's working life and significantly contributed to the unified disease process that cumulative asbestos exposures cause.  Joint and several liability applies to the strict products liability claim.  OI cannot escape responsibility for selling a deadly product that had no warnings and which caused a disease – mesothelioma – for which the industry standards were not protective.  OI knew all this and said nothing to uses and consumes about the internal studies which showed Kaylo to be a killer.  OI never undertook to study the likelihood of cancers in the group of insulators, like Ozzie, during the 15 years of selling Kaylo.


Dated: January 29, 2016

 _/s/ Robert G. McCoy_____
Attorney for Plaintiff

Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
(312) 944-1870 (fax)
bmccoy@cvlo.com

**Certificate of Service**

I hereby certify that on January 29, 2016, I caused the forgoing to be electronically filed with the United States District Court for the Western District of Wisconsin using the CM/ECF system which will automatically send all necessary notifications of this filing to CM/ECF participants in this case.

Dated: January 29, 2016

_/s/ Robert G. McCoy_____
Attorney for Plaintiff

Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
(312) 944-1870 (fax)
bmccoy@cvlo.com