# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| GARY SUOJA, Individually and as Special Administrator of the Estate of OSWALD SUOJA, Deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 99-cv-475-bbc |
| v. | ) ) | |
| Owens-Illinois, Inc., | ) | |
| Defendant. | ) | |

## Plaintiff's Post-Trial Reply Brief

Robert G. McCoy
Dan B. Hausman
Attorneys for Plaintiff
bmccoy@cvlo.com
dhausman@cvlo.com
(312) 944-0600


Cascino Vaughan Law Offices, Ltd.
220 S Ashland Ave
Chicago, IL 60607
(312) 944-0600

## Table of Contents

**Title Page**…………………………………………………………………………..1

**Table of Contents**……………………………………………………...…….…...2

**I. Introduction**…………………………………………..……………….........4

**II. Response to Section IV. Legal Argument (ECF#205 at 82.** ...……...……….5

    A.  ECF#205 at 82 (OI argued no showing of exposure to asbestos from Owens-Illinois Kaylo)………………………………………………………5

    B.  ECF#205 at 87 (OI argued the exclusion of the "any exposure" theory precludes substantial-factor causation)
     ECF#205 at 88 (OI argued no showing exposure to asbestos from Owens-Illinois Kaylo was a substantial factor)………………………………24

    C.  ECF#205 at 90 (OI argued no evidence of spoliation by OI)…………...…27

    D.  ECF#205 at 92 (OI argued the presence of asbestos is not a design defect).27

    E.  ECF#205 at 95 (OI argued Kaylo no showing design of Kaylo was unreasonably dangerous) ………………………………………….31

    F.  ECF#205 at 96 (OI argued no showing of failure to warn). ………………32

    G.  ECF#205 at 104 (OI argued the Saranac studies did not provide knowledge of need to warn)…………………......................................................39

    H.  ECF#205 at 107 (OI argued lack of product warning was not a proximate cause)…………………………………………………………..41

    I.  ECF#205 at 111 (OI argued Plaintiff has no cognizable wrongful death claim)…………………………………………………………...…43

    J.  ECF#205 at 111 (OI argued there are no remaining damages)…………..44

    K.  ECF#205 at 112 (OI is not responsible for other's fault) ………………45

    L.  ECF#205 at 115 (OI argued claims are time barred under the federal enclave doctrine)…………………………………………………………..48

    M.  ECF#205 at 117 (OI argued failure to warn claims barred by sophisticated user doctrine)……………………………………………………49

    N.  ECF#205 at 120 (OI argues they did not waive affirmative defenses)….50

O.   ECF#205 at 121. (OI preserved summary judgment arguments)……….51

P.   ECF#205 at 92 n.. 12 (OI discussed Plaintiff conceding if no strict liability found then no negligence)…………………………………………………52

**III. Response to Section V. Procedural and Evidentiary Objections (ECF#205 at 122.)……………………………………………………………………53**

  A.   ECF#205 at 122 (Undesignated Prior Testimony)…………………………53

    i.   ECF#205 at 124 (Arthur L. Frank, MD, PhD)…………………………53

    ii.   ECF#205 at 131 (Thomas Wiig, MD)……………………………..…60

    iii.   ECF#205 at 133 (Elmer Borchardt)…………………………………62

  B.   ECF#205 at 133 (Designated Prior Testimony)…………………………62

    i.   ECF#205 at 133 (George Schlub) ...........................................62

    ii.   ECF#205 at 134 (Lawrence Zimmer)………………………………64

    iii.   ECF#205 at 136 (Elmer Borchardt)………………………………70

    iv.   ECF#205 at 137 (Michael Dowling) ………………………………70

    v.   ECF #205 at 138, 139 (Donald Popalisky) ……………………………71

    vi.   ECF#205 at 139 (Elmer Borchardt)………………………………71

    vii.   ECF#205 at 140 (Richard Grimmie)………………………………72

  C.   ECF#205 at 144 (Trial Testimony)…………………………………...81

    i.   ECF#205 at 144 (Stephen Kenoyer)…………………………………..81

    ii.   ECF#205 at 146 (Gary Suoja)………………………………………83

    iii.   ECF#205 at 147 (Peter Neushul)…………………………………84

  D.   ECF#205 at 147 (Exhibits)…………………………………………85

**IV. Response to Section III. Proposed Findings of Fact  (ECF#205 at 15.)..…92**

**V.  Conclusion…………………………………….…………………...…….167**

**VI. Certificate of Service……………………………………….………… 168**

# I. Introduction

Plaintiff replies to each section of OI's response brief, ECF #205.  The table of contents sets forth the order by which the reply brief tracks the responses.

# II. Response to Section IV. Legal Argument (ECF#205 at 82.)[1]

### A. ECF#205 at 82 (OI argued no showing of exposure to asbestos from Owens-Illinois Kaylo)

OI responds to the evidence of exposure to OI Kaylo by arguing Plaintiff has no "credible" evidence. (ECF#205 at 82-88.) OI's argument has several weaknesses.

First, Plaintiff relies on witnesses (Schlub and Zimmer) with personal knowledge of working at Badger and with Ozzie. OI has no witness with personal knowledge or document that contradicts Schlub's and Zimmer's recollection that Kaylo was removed or installed on the jobs Ozzie worked at Badger.

Second, OI does not dispute the weather resistant formulation of calcium silicate based Kaylo made Kaylo ideally suited for piping at Badger Ozzie worked on which was 99% outdoors. (ECF#201 at 33-35, 8.) OI agrees 85% magnesia based pipe insulation such as JM brand does not withstand adverse weather conditions as well as Kaylo. (ECF#205 at 32.) Kaylo was sold to outside customers beginning in 1943 or 1944. (ECF#201 at 7.) The inference that

---

[1] Throughout this brief, Plaintiff references exhibits and documents as follows:
- Transcripts with an ECF # from this case are cited as (ECF#___ at page number assigned by court reporter.)
- Other documents with an ECF # from this case are cited as (ECF#___ at ECF page number.) ECF#205 is OI's response brief. The ECF page number is used in these citations, not OI's page numbering.
- The citation PFF# _____ references OI's PFF by the number OI assigned the PFF in ECF# 205 and Plaintiff's response, which are on page 92 to 166 in this reply. OI's PFF and Plaintiff's responses to those PFFs should be analyzed together.
- Exhibit images filed with this Court by USB drive or provided to Plaintiff by OI on a USB drive are cited as (Ex __ at PDF page number.) if referencing a specific page.
- Attachments are filed as attachments with Plaintiff's post-trial reply brief, highlighted if necessary, and cited as (Att. __.)

more weather resistant Kaylo material would be used at Badger more frequently as Kaylo became more widely known is not refuted.  (ECF#201 at 33-35.)

Third, OI relies on evidence which is not specific to the locations of jobs which Ozzie worked on.  In a facility with thousands of miles of piping, OI asks this Court to speculate in finding pictures of JM product or the incomplete contractor records from WWII are the same places where Ozzie worked in the later 1950s and 1960s.  The personal observations of the witnesses who saw the products being installed and removed in the places where Ozzie worked are the greater weight of the evidence.

*Witness testimony*

To prove exposure to OI Kaylo, Plaintiff relies on personal knowledge and eyewitness testimony of two insulators who worked with Ozzie at Badger for more than 6 months during the dusty conditions created by removal and replacement of thousands of feet of OI period Kaylo. OI cites no testimony of other witnesses who worked with Ozzie at Badger that know products used.  OI cites no additional witnesses who knew a different brand of molded pipe insulation was removed on jobs at Badger when Ozzie worked.

OI contends coworkers who worked with Ozzie at Badger - Schlub and Zimmer - are wrong in their testimony that OI Kaylo was removed by Ozzie.  (ECF#205 at 79-81.)  OI asks this Court to discredit the recollections of two career insulators with personal knowledge of 1) the appearances and textures of the different insulation brands and 2) the work at Badger over a period of more than 6 months of daily work with Ozzie which involved extensive removal work. (ECF#201 at 7-21.)  The recollections were based on months of working at Badger with Ozzie and other work both performed at Badger when Ozzie was not present.  Both coworkers testified

to their ability to recognize and distinguish between Kaylo and other brands – OI does not dispute that Schlub or Zimmer personally had experience to know the different characteristics that could be used to distinguish  brands of molded pipe insulation - such as overall appearance, texture, color, composition, etc.  (ECF#201 at 11, 18; ECF 154 at dep pages 18-20; ECF 155 at dep pages 22-24.)  Neither coworker waivered in their recollection that Kaylo was installed during the period OI was being removed when Ozzie worked at Badger.  (ECF#201 at 9-14, 17-20.)

*Gordon Schlub*

Citing to Schlub's testimony, OI argues that "it is clear from the testimony that the insulation product that he described was 85% magnesia—a product that Johns Manville made and Owens-Illinois did not. Mr. Schlub's testimony was proven wrong by objective evidence 1) that Kaylo was an insoluble, calcium silicate insulation; 2) that Badger Ordnance Works originally was constructed with Johns Manville 85% magnesia insulation; and 3) that white asbestos insulation other than Owens-Illinois was installed at Badger Ordnance Works." Schlub Dep. 12:1–22, 14:15–21, 24:5–11, 31:18–23, 34:3–7, 34:18–20, dkt. 154." (ECF#205 at 85.)  OI goes on to argue that, "Even if the Court were to credit Mr. Schlub's claimed use of "Kaylo" in the late 1960s to replace "deteriorated" insulation, the only reasonable inference is that the product was made by a different company Ex. 29, at 1, 7, 8; Ex. 139, at 24; Ex. 30, at 1" ECF#205 at 85.)

While OI does not cite to testimony of Gregory in argument, OI presented a PFF in which OI attempts to discredit Schlub's testimony using opinion testimony by OI's paid expert Dr. Gregory that makes a general conclusion about Ozzie's exposure based on Schlub's testimony.

(ECF#205 at 40-41, PFF# 59.)  OI cannot usurp the function of this Court as the finder of fact by relying on the opinions of an expert witness about credibility of a lay witness.   OI does not respond to the citation in Plaintiff's opening brief that Dr. Gregory's opinion about credibility of Schlub is improper under Seventh Circuit case law.  (ECF#201 at 33, n. 31.)  See *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury."); *United States v. Vest*, 116 F.3d 1179 (7th Cir. 1997), cert. denied, 522 U.S. 1119 (1998) (deeming improper the testimony of an expert who "was in no better position than a lay person to say whether the patient testified truthfully").

As set forth in Plaintiff's opening brief, Dr. Gregory is an industrial hygienist who never viewed the insulation at the Badger site where Schlub worked several times for many months.  (ECF#201 at 35, n. 36.)  Gregory has no personal knowledge of Badger.  Although OI touts Dr. Gregory in conclusory fashion as "an expert with uncontested credentials," he is an industrial hygienist trained in matters such as asbestos safety procedures and air testing.[2]  Dr. Gregory is not an all-purpose expert.  OI makes no response to Plaintiff's opening brief which describes Dr. Gregory's lack of specific training and experience on the key issue of distinguishing brands of insulation during the removal process.  (ECF#201 at 35, n. 35.)  OI's failure to respond should be deemed an admission that Dr. Gregory has no expertise to rend an opinion on the appearance of different brands of molded pipe insulation or the ability of a particular brand to withstand the weather conditions over time.  On the other hand Dr. Gregory conceded that insulators can recognize "textures that they liked the best" in the different brands.  (ECF#201 at 32-33, n. 30.)

---

[2] Dr. Gregory's "credentials" were marked as a trial exhibit.  (Att.1, Ex.1164.)

Schlub used "the appearance of it, the composition, the color, the texture, the different white coloring of it, the fiber, whatever" to identify Kaylo as the material removed at Badger. (ECF#154 at 18-20; 201 at 10-12.)

OI contends, citing to Dr. Gregory, that Schlub's testimony about "deteriorated" insulation must be the JM brand of 85% magnesia and could not be Kaylo.  (ECF#205 at 40-41, PFF# 59.)    As discussed in Plaintiff's opening brief, Dr. Gregory mischaracterizes Schlub's testimony.  (ECF#201 at 34-35.)  Schlub was primarily referring to the weather proof covering over the insulation as the material which was "deteriorated."  (ECF#201 at 34-35.)   Most of the insulation underneath looked like "new."  (ECF#201 at 34-35.)   Schlub also explained his use of the word "deteriorated" meant the pipe insulation was "discolored" or "hanging down" from the wires around the insulation. (ECF#205 at 34-35.)   Dr. Gregory misquotes Schlub and incorrectly testified in court that Schlub stated the insulation was "falling apart."  (ECF#205 at 40-42, PFF# 59.)   Only by misstating the testimony of Schlub is Dr. Gregory able to opine that Schlub was describing JM magnesia rather than Kaylo.[3]  Schlub's opinion based on knowing the appearance, texture and other characteristics of Kaylo or JM when removed from the original boxes is still valid because the insulation removed at Badger was mostly in the same "new" condition as when it came out of the boxes.

---

[3] Dr. Gregory did not testify what would be the actual differences in the appearance of JM magnesia and Kaylo as the result of exposure to outdoor weather conditions.  He only commented that the JM magnesia is "water-soluble" and Kaylo "doesn't break down in water." (ECF#201 at 33-34; ECF 198 at 88.)   Assuming Schlub's testimony could be read as proving some weather related structural damage to the insulation, the trier of fact is still left to speculate as to the difference between how JM and Kaylo would look.

OI also cites the opinion of Dr. Gregory that Kaylo was not removed because Schlub was told by fellow insulators they had installed Kaylo in the 1940s.[4]  (ECF#205 at 40-41, PFF# 59.)  The original construction of Badger continued through the end of WWII until August 13, 1945.[5]  (ECF#201 at 27-28.).  Kaylo became available for sale to customers in 1943 or 1944 and could have been used for some portions of the original construction.  (See PFF# 9.)   Whatever is meant by OI's interrogatory statement of Kaylo becoming "commercially available" in 1948, does not change that it was sold earlier on at least some limited basis.[6]  Badger was a large outdoor project for which the more weather resistant calcium silicate material was ideally suited.  Dr. Gregory's opinion about when Kaylo was first sold to Badger is not founded on any expertise and is speculative.  What the insulators who worked on site told Schlub about using Kaylo should be given greater weight than Dr. Gregory's unqualified assertions.[7]

---

[4] Assuming Dr. Gregory is correct that Kaylo was not used at Badger in the 1940s, only 200 miles of piping was completed in the WWII phase.   The construction of Badger continued on a large scale for at least 5 years in the 1950s during the period when OI Kaylo was "commercially available."  (ECF#201 at 27-28.)  Schlub personally observed Kaylo insulation was already in place when he worked at Badger for the first time in 1959.  (ECF#201 at 13.)   Schlub never stated all the Kaylo was put in during the 1940s.  Zimmer also observed Kaylo that was in place "more than a year" and was being "replaced" when he worked at Badger in 1958-59. (ECF#155 at dep page 26.)   The inference to be drawn based on personal observation of Schlub and Zimmer is Kaylo was installed on the units built after World War II before OI sold the Kaylo business in 1958.

[5] Construing the evidence most favorably to OI, a maximum of 14.2% of the pipe insulation during the WWII phase is JM.   (See PFF# 15.)  At least 85% of WWII phase is unaccounted for by the maximum inference possible from the Badger records

[6] OI offers no proof as to what the term "commercially available" means or how that precludes selling Kaylo for use at Badger.  OI expert Dr. Neushul agreed Kaylo was sold to outside customers beginning in 1943 or 1944.  (ECF#198 at 52.)

[7] Although claiming Dr. Gregory can rely on what other insulators told Schlub, OI elsewhere moves to strike Schlub's testimony as hearsay.  If Dr. Gregory relies on the testimony, it should be deemed trustworthy and admitted for all purposes.

OI also contended Schlub is not credible because, according to Dr. Gregory, Schlub said Kaylo was "85% magnesia."  Contrary to Dr. Gregory's reading of Schlub's deposition, Schlub never made such a statement.  Schlub denied even knowing the chemical formulation for insulation products. (ECF#201 at 14-16; ECF#154 at dep page 36.)   In distinguishing Kaylo Schlub relied on his personal observations from using the product taken out of boxes marked Kaylo.  When asked if Kayo was 85 Magnesia or calcium silicate, Schlub replied:  "It was an asbestos product, is what I know."  (ECF#154 at dep page 31.)  After defense counsel persisted in examining Schlub about chemical formulations of Kaylo, Schlub correctly recalled Kaylo was "85%."[8]  But Schlub again denied knowing whether the 85% was magnesia or calcium silicate: "It was 85 percent or whatever, I don't know, 85 what, whatever."  (ECF#154 at dep page 31; ECF#201 at 15.)  By misreading Schlub's testimony Dr. Gregory again finds support for an opinion about Schlub's credibility that should be rejected by this Court.

*Lawrence Zimmer*

OI contends Ozzie's coworker Zimmer is not credible in testifying he worked with Ozzie at Badger in late 1958 and that Kaylo installed before 1958 was removed on the job.[9]  (ECF#205 at 85-86, 30-33 at PFFs# 50-56.)   After receiving notice and falling to attend Zimmer's

---

[8] Schlub is correct that Kaylo is formulated with 85% non-asbestos materials. (ECF#201 at 15, n. 9.)

[9] OI states in a PFF:  "While Mr. Zimmer discussed his *own* work around "Kaylo" somewhere on the 10,000 acres at Badger Ordnance Works in late 1958, it would require guesswork and speculation to find that the product he identified was Owens-Illinois Kaylo and not Owens Corning Fiberglas Kaylo (or any other another manufacturer whose "smooth and white" insulation was installed on 200 miles of steam lines). *Id.* at 25:22–27:1. It would also require pure speculation that Mr. Suoja—whose objective records show he did *not* work at Badger Ordnance Works in late 1958—somehow found his way not only to Badger Ordnance Works, but also to the exact spot on a 10,000-acre jobsite where the Owens-Illinois Kaylo was purported used. (ECF#205 at 85.)

deposition, OI challenges his credibility based on evidence outside the transcript.[10] (See ECF#205 at 17-21; PFF#s 50-56.)  The "extrinsic" evidence is discussed below.

As an apprentice in the Milwaukee based Local 19 of the Asbestos Worker (Insulator) Union, Zimmer observed the insulators at Badger installing and removing Kaylo insulation. (ECF#201 at 17, 19.)  Zimmer was "within a matter of just feet" from the Kaylo insulation being removed.  (ECF#155 at dep page 27.)   He described Ozzie as being "there in the 1950s like you [Zimmer] were."  (ECF#201 at 19-20; ECF#156 at dep page 54.)  The evidence establishes Badger is a facility where the insulation work is essentially all piping.  OI provides no evidence to show individual insulators on the job with Zimmer were doing anything different than typical piping work to be expected at Badger.  OI provides no evidence about other molded pipe insulation products besides Kaylo being involved on the job where Zimmer was present with Ozzie.  This Court should draw the reasonable inference that Ozzie was doing the same work as other insulators at Badger.  Like other insulators on the job, Ozzie would be exposed to dust from his personal work and as a bystander from the Kaylo product recognized by Zimmer.  Zimmer confirmed this, stating Ozzie "was exposed to the same things as you [Zimmer} were out there as far as dust."  (ECF#210 at 19-20; ECF#156 at dep page 54.)  Although Zimmer was an apprentice who could watch but not perform insulation removal, Ozzie was a full member of the Union and was able to do removal work personally.  Ozzie was "on the job longer" than Zimmer, meaning the inference should be drawn Ozzie had more exposure.  (ECF#156 at dep page 54.)

---

[10] OI's objection to admission of Zimmer's testimony based on OI not attending was answered up front in Plaintiff's opening brief.  (ECF#201 at 17, n. 11)  OI has abandoned the objection. (ECF#201 at 134.)

OI's specific page and line evidentiary objections to Zimmer's testimony are addressed below.  (See ECF#201 at 129.)

OI contends the social security records discredit Zimmer's testimony that Ozzie worked with him in the 1958-1959 time frame at Badger.  (ECF#205 at 83, 29 at PFF# 26.)   Although Zimmer was working for L&S Insulation, Zimmer's testimony does not identify which contractor Ozzie was working for.   Ozzie could have been working for McDermaid or be on loan from McDermaid to work for L&S or another contractor. (See PFF# 26-27; ECF#201 at 21-22, n. 14.)  The social security records are not necessarily in conflict with Zimmer's testimony.

OI also argues the L&S Insulation company records show L&S did not work at Badger until mid-1959.  (ECF#205 at 21, PFF #28.)  If the Court finds L&S did not begin work at Badger until mid-1959, Plaintiff concedes that date is after the period when the Kaylo being used was from the inventory sold by OI with the business.  Such a finding only affects the claim that Ozzie installed or was a bystander to installing OI Kaylo at Bader in 1958-59.  However, the remaining evidence still supports a finding that Ozzie personally removed or was exposed as a bystander during the removal of Kaylo on the 1958-59 job with Zimmer.

OI's expert Dr. Gregory testifies Zimmer is wrong about Ozzie being exposed to OI Kaylo at Badger.  (ECF#205 at 40-41, PFF# 59.)  As discussed in the section above on Schlub's testimony, expert opinions on lay witness credibility should be excluded.  If Dr. Gregory's opinion is allowed, greater weight should be given to the personal observations of Zimmer than to opinions of a paid expert who never saw the insulation at Badger and has no expertise about distinguishing brands of insulation.  The gist of Dr. Gregory's opinion is "Zimmer did not say he saw Mr. Suoja remove or install any Owens-Illinois thermal insulation products."  (ECF#205 at 40, PFF# 59.)   Dr. Gregory makes no mention of Zimmer's testimony that Ozzie had exposures

13

to the "same things" as Zimmer - meaning OI Kaylo.  This court, not OI's expert, should judge the credibility and weight to be given Zimmer's testimony.

*Other witnesses*

OI cites to testimony of several witnesses to prove that other products in addition to Kaylo were used at Badger for the apparent purpose of discrediting the testimony of Schlub and Zimmer.  The witnesses cited by OI about other brands of insulation products are:

- Frank Hofstetter (ECF#205 at 22, 24-25, PFF#s 20, 25.):   Plaintiff renews the objections to Mr. Hofstetter's 1991 deposition testimony that 1) he was not timely disclosed as a witness and 2) the deposition is inadmissible under FRE 802 and FRCP 32(a) because it was taken in another case for which Suoja's counsel was not present and no motive for cross examination about the issues in the Suoja case is established.  (ECF#130 at 3, ¶9.)   In citing to Hofstetter's testimony, OI does not address the objection.

If allowed over objection, Hofstetter was a union asbestos worker deposed about other cases in 1991.  Hofstetter was not asked if he worked with Ozzie at Badger.[11]   Hofstetter worked at Badger in 1954-55 for Sprinkmann.  (ECF#201 at 23-24, PFF#s 20, 25.)   OI cites to testimony that Hofstetter recalled other brands of molded pipe insulation at Badger such as "Unibestos."[12] (ECF#201 at 23-24, PFF# 25.)   Hofstetter does not testify to the quantity of Unibestos or any other brand of molded pipecovering that was used or the part of Badger it was

---

[11] The objection to Hofstetter is set forth in response to PFF #25.

[12] Hofstetter also recalled brands of insulation cement mixes used.  As discussed elsewhere, cements (plastic) were necessarily used to cover the molded pipe insulation and to fill in holes and joints.  (ECF#190 at 109-110; See PFF#  48; ECF#155 at 23-24.)  Since OI did not make an insulation cement brand, other brand names were required for the cements.

for.  He was not asked if Kaylo was installed or removed.  Hofstetter was not shown or asked about the Sprinkmann Kaylo invoices which are for the same period as when he worked at Badger.

    - John Locher (ECF#205 at 22-24, PFF# 23-24.):  Plaintiff renews the objection to Locher's October 2, 1980.  (ECF#130 at 2, ¶2.)  The deposition is inadmissible under FRE 802 and FRCP 32(a) because it was taken in another case for which Suoja's counsel was not present and no motive for cross examination about the issues in the *Suoja* case is established.  (ECF#130 at 3, ¶9.)  OI did not respond to the objection.

    If allowed over objection, Locher was the general purchasing agent for Sprinkmann.  Mr. Locher was not asked about the brand of product Sprinkmann delivered to Badger or the work at Badger.  (ECF#205 at 22-24, PFF# 23-24.)  Locher acknowledges Kaylo was one of several brands of molded pipe insulation used in Sprinkmann's business in the time period when OI made Kaylo.  (ECF#205 at 22-24, PFF# 23-24.)

    - Ralph Van Beck (ECF#205 at 34-35, PFF# 48.):  OI argues Van Beck – an insulator who became a field superintendent and Vice President for Sprinkmann - establishes the brand of insulation being removed cannot be recognized.  (ECF#201 at 34-35, PFF# 48.)  As discussed in response to the PFF, Van Beck's testimony is about molded insulation in place on a pipeline which cannot be seen because it is covered by mastic, cheesecloth, and cements.  (See  PFF# 48.)  Van Beck offered no testimony about recognizing the brand of molded insulation as it is being removed.  The testimony cited by OI, does not mention work at Badger or any work by Ozzie.

- Harold Haase (ECF#205 at 29-31, PFF# 36-39.):  Haase was a Local 19 insulator who worked for L&S Insulation at Badger in about 1969 or 70.  (ECF#205 at 30, PFF# 37-38.)  Haase remembers Ozzie on the job at Badger but "didn't not work along side of him."  (ECF#205 at 30, PFF# 37-38.)  Haase did not know the "manufacturer" of the pipecovering used at Badger and was not asked about the brand of pipe covering being removed.  (ECF#205 at 31, PFF# 39.)

OI argues Haase's testimony "cannot be reconciled" with testimony of Schlub and Zimmer that they could distinguish Kaylo from other brands of insulation.  (ECF#205 at 35, PFF# 49.)  Haase was not asked if he could distinguish "Kaylo" from other molded pipe insulation.  On the focal issue of whether Kaylo can be distinguished from other brands, Haase provides no testimony.  He was only asked to "compare" "Unibestos" and "Thermobestos" and answered based on appearance when taken out of the box.  (ECF 149 at 48; ECF#205 at 35, PFF# 49.)  He was not asked to compare texture or other properties as did Schlub and Zimmer during removal.  OI provides no foundation that Haase worked with either product enough or studied the differences to make the comparison.  Contrary to what Haase might "think," OI's expert Dr. Gregory testified Unibestos has a unique appearance from other pipe insulation. (ECF#201 at 32, n. 29.)

OI essentially asks this Court to find all insulators had the same knowledge of the products they used and that career insulators could not distinguish Kaylo from other brands of pipe covering.  The weight of the evidence does not support such a finding.  Common sense teaches that persons doing the same job acquire different levels of skills and knowledge of their job and the materials used.  Haase's belief he did not "think" Unibestos and Thermobestos looked different is not conclusive of the knowledge of other insulators such as Schlub and Zimmer who observed the color, texture and composition of the material removed at Badger.  As

16

discussed in Plaintiff's opening brief, Haase had less experience in the insulation trade than either Schlub or Zimmeer. (ECF#201 at 23, n. 16.)  Based on Haase's inability to recall any brand names of insulation at Badger, he is not the type of person who knew about or paid attention to differences in the materials he is using.  As discussed in Plaintiffs' opening brief, OI's expert industrial hygiene witness conceded that he reviewed testimony of other insulators who could tell the differences based on appearance.  (ECF#201 at 32-33, n. 30.)

     - Elmer Borchardt (ECF#205 at 25-28, PFF#s 27, 29, 31. 32.):  Borchardt was the owner of L&S Insulation and motivated to protect the interests of his company in asbestos litigation. Borchardt's depositions were taken in other cases.  Borchardt did not provide any testimony about Badger and was not asked about Ozzie.  OI cites Borchardt as saying "Kaylo" was a "generic" name for other brands of insulation. (ECF#205 at 28, PFF# 32.)  However Borchardt did not say that insulators who use the different brands cannot recognize Kaylo from other brands.  Borchardt does not contradict or discredit the testimony of Schlub and Zimmer that they could distinguish the Kayo brand.  OI cites testimony by Borchardt about work by a contractor called "McDermott, but does not provide any testimony and was not asked about the company called "McDermaid" which Ozzie worked for.  (See PFF# 27.)  Borchardt stated OI used asbestos on a "minority' of jobs which is not probative of the Badger facility where the testimony of witnesses working at Badger is only about asbestos being used.  (See PFF# 31.) The minority period includes all the jobs after asbestos was no longer available as an insulation material.  Borchardt also testified the L&S records of products used on jobs had been lost. (Att.2, ECF#180 at 42:25-43:22.)   Zimmer, who worked for L&S beginning in 1957, stated Kaylo was used by L&S on "all the jobs – all steam piping and stuff" in his early years.  (ECF#201 at 18.)

*JM evidence*

OI argues the photos and construction records prove "Badger Ordinance Works was originally built with Johns Manville 85% magnesia insulation so there is no legitimate evidentiary basis that any 'rip-out' work involved an Owens-Illinois product." (ECF#205 at 79.) The photos only depict a handful of boxes and only a small section of the total piping. (Exs. 1868, 1869.) OI provides no evidence that Ozzie and his coworkers worked on the section of piping in the JM photos. According to the legend on the JM photos, the photos were taken during 1944 in one section of the plant (the "Rocket Propellant Production Area"). (ECF#201 at 27; Exs. 1868,1869.) Except for the small section of piping and handful of JM boxes in the photos, OI cannot connect JM to other parts of the Rocket Propellant unit or any other area of Badger.

OI also relies on the A&M insulation company being a "JM Distributor" to argue A&M only used JM for all work at Badger. The construction at Badger was ongoing for a period of about 20 years beginning in World War II. (ECF#201 at 27-28.) Over the years multiple production systems (units) were constructed and were subjected to extensive renovations. (ECF#201 at 27-28.) About two hundred miles of piping was built during the WWII period. (See PFF# 15.) The Rocket Propellant unit was only a portion of the 200 miles, and OI does not provide evidence of how much. Following the WWII construction phase, construction of new production systems and renovations created a facility which was "probably thousands of miles" of piping (ECF# 154 at dep page 22; ECF#201 at 8; See PFF# 15) OI's evidence about the A&M insulation company using JM per the photos only relates to the WWII units and to a maximum of 2.8% of the total piping at Badger. (See PFF# 15.) Construing the OI's evidence

18

most favorably to OI, the brand of molded pipecovering installed on 97.2% of the Badger piping is still an unknown.

Based on the number of production units built and the total miles of piping, the statistical odds are against Ozzie during his 6 months or longer at Badger only removing JM molded pipe insulation. No records or testimony establishes if, how much, or when JM was used as a total percentage of all the units constructed at Badger.  Many of the historical Badger records were missing or unavailable, and the available records did not identify the brands of insulation used. (ECF#201 at 25-26, 25-26 n. 22.).  Even if JM magnesia molded pipe covering was used for the Rocket Propellant in 1944 work, it would be speculative to say JM was used for other units.[13]  To the contrary, the evidence shows the calcium silicate based preformed pipe covering products like OI Kaylo were more weather resistant.  The inference should be drawn that Kaylo – rather than JM magnesia - would more likely be used for the outdoor applications after Kaylo entered the marketplace in 1943 or 1944.[14]

*No OI Kaylo evidence*

OI argues Plaintiff did not prove the Kaylo which was removed was installed in the period when OI was the manufacturer before May, 1958.  (ECF#205 at 80.)  The greater weight of the evidence is otherwise.  First Zimmer was working in 1958-59 and said the Kaylo removed was at least a year old OI also contends:

---

[13] OI could have cross examined Schlub and Zimmer about whether Ozzie worked on the Rocket Propellant unit, but OI did not do so.

[14] The record does contain evidence of other types of JM asbestos insulation products besides the molded pipecovering.  The other types of products are necessarily used with the molded pipecovering.  For instance JM asbestos containing cements that covered and sealed the molded pipe covering would still be necessary.  (See ECF#205 at 29,  PFF# 48.)  There is no evidence OI made cements.

Q. Was this in late '58 this was happening?

A. Yep.

Q. Did that Kaylo insulation that was being removed

appear to have been there for at least some time?

A. Yes.

Q. More than a year?

A. That's why it was being replaced.

(ECF#155 at dep page 26.)  Schlub said when he worked at Badger in 1959, Kaylo was already

in place. (ECF#201 at 23.)  Schlub learned some of the Kaylo had been installed as early as the

1940s:

A. Well, I knew it was installed in the

'40s. That's when they originally installed it. So

1I knew it had to be installed then, in the '40s.

Q. How did you know that it was installed in

the '40s?

A. Because I worked with people in the

trades that had worked there in the '40s and applied

it, and they were also on the job when I worked there

in the '50s. So they said, well, too that they knew

that this was some covering that they had put on and

in the '40s when the plant was being built.

(ECF#154 at dep page 23.)[15]  Plaintiff also found invoices for over 600 boxes of Kaylo shipped to Sprinkmann for Badger work in 1954-55.  The reasonable inference to be drawn is that large quantities of Kaylo had been installed before May, 1958 at Badger.

OI also argues the Kaylo invoices cover only a small part of the Badger facility. (ECF#205 at 86-87.)  OI misconstrues the evidentiary purpose for which Plaintiff offers the invoices.  The invoices show OI Kaylo was used at a later point in time during the Badger construction than the 1944 JM photos.  The inference can be drawn that insulation at Badger was not all JM and included a large quantity of Kaylo.  The invoices were also offered to corroborate the testimony about later removal of Kaylo.  The Kaylo invoices were not offered to prove the total quantity of OI Kaylo used at Badger.[16]  If OI can extrapolate from a handful of JM boxes that large quantities of JM was used, Plaintiff can do the same or better from invoices showing over 600 boxes of Kaylo.

*1958 Inventory sale*

OI argues "the undisputed sale of the Owens-Illinois Kaylo Division on April 30, 1958 proves that any conceivable "Kaylo" exposure in late 1958 or 1959 was a product made by a different company" (ECF#205 at 83-84.)  OI argues no inference can be drawn that OI is responsible for Kaylo sold after April 30, 1958 despite the sale of the Kaylo materials inventory by OI to the purchaser of the Kaylo business.  (ECF#205 at 83-83, n. 11.)  OI contends the lump

---

[15] OI objection to the testimony as hearsay is discussed below.  However, OI's own expert Dr. Gregory cited Schlub's testimony about what other insulators said as a reliable basis in formulating his (Dr. Gregory's) opinions.  (ECF#205 at 40-41, PFF 59.)

[16] Plaintiff discusses elsewhere in this reply OI's argument the available invoices require this Court to find the only Kaylo used at Badger is what is in the invoices.

sum dollar value of $633,661 placed on all inventory items in the business sale agreement is not

broken out. However, OI does not dispute all items of inventory were for Kaylo production.  An

inference can properly be drawn that these inventory items lasted for a period of time in the

production and sale of Kaylo by the new owner.  OI has not suggested any inference other than

the 6 months set forth in the brief of plaintiff.  (ECF#201 at 20, n. 12.)  That period of time (6

months after April 30, 1958 is October 31, 1958) means Ozzie would be installing new Kaylo for

which OI is legally responsible at Badger when Zimmer began to work in late 1958 – especially

since Ozzie was working at Badger before Zimmer.[17]  (ECF#201 at 19-20.)


*Ozzie never testified*

OI argued that "Mr. Suoja never testified that he used Owens-Illinois Kaylo, at Badger

Ordnance Works or anywhere else, and plaintiff did not offer any of Mr. Suoja's prior

testimony" (ECF#205 at 84.)  OI makes no showing Ozzie's past testimony could be located by

either party.  Gary Suoja, who testified Ozzie had given testimony in the 1980s, stated he has

never seen the testimony.  (ECF195 at 18:23-20:6.)


*Exposure case law cited by OI*

OI cites as legal authority the decision in *Miller v. American Art Clay Co Inc,* 28 F.Supp

3d 825, 831 (WDWI 2014), an asbestos case decided by Judge Peterson of this Court.  In *Miller*

the Court granted summary judgment because the plaintiff could not prove the brand of clay used

was asbestos containing.  *Miller* can be distinguished.  In *Suoja* the pipe covering brand Kaylo,

---

[17] Assuming the Court does not accept the inventory sale position, the evidence of OI Kaylo
removal is not affected.

which is asbestos containing according to OI's own interrogatory answers, is identified on separate jobs where Ozzie worked by two coworkers.

*Summary*

In a facility as large as Badger which employed multiple contractors, was built in multiple phases over a nearly 30 year period, and used more than one brand of molded pipecovering, witnesses who did not work with Ozzie at Badger have minimal evidentiary value.[18]  Greater weight should be given to the witnesses with personal knowledge of Ozzie's work at Badger and personal knowledge of the insulation used or removed.  The contentions OI makes in its brief that the size of Badger makes proof of the insulation used at specific times and places in the facility difficult are exactly why the knowledge of the coworkers who saw what was removed on the jobs with Ozzie is the best evidence available.[19] The greater weight of evidence is the personal observations and knowledge of Ozzie's two coworkers.  Finally, Kaylo was a calcium silicate weather resistant product that would be preferred in the outdoor settings of Badger to the JM magnesia pipecovering.

---

[18] Plaintiff listed the names of three contractors identified as working at Badger in the opening brief.  (ECF #201 at 21, n. 13.)  Other contractors not listed in the opening brief included without limitation Johnson Insulating, AC&S Insulating, and McDermaid.  (ECF#154 at dep pages 17-18; See PFF# 34.)

[19] Evidence of installation of large quantities of Kaylo during the OI period corroborates that Kaylo was later removed.  The evidence includes 1) the Sprinkmann Kaylo invoices listing over 600 boxes delivered to Badger in 1954, 2) Zimmer working in late 1958 and 1959 at Badger seeing Kaylo being installed, 3) Schlub being told that Kaylo was installed in the 1940s, and 4) Schlub working at Badger in 1959 and observing Kaylo was the insulation already in place. (ECF#201 at 23-24, 19-20, 12-13; ECF#205 at 40-41, PFF# 59.)

B. ECF#205 at 87 (OI argued the exclusion of the "any exposure" theory precludes substantial-factor causation)

ECF#205 at 88 (OI argued no showing exposure to asbestos from Owens-Illinois Kaylo was a substantial factor)

OI contends plaintiff has not shown substantial factor causation as to the OI Kaylo exposures. (ECF#205 at 82-85.) This Court is the fact finder on the question of substantial factor which means "a cause" and not the only cause.

OI begins by incorrectly stating that Dr. Frank relies only on the "theory" of "every exposure" is a cause. (ECF#205 at 82-83.) Plaintiff stipulated the "every exposure" causation testimony would not be offered in response to an initial *Daubert* motion. (ECF#201 at 83, 83 n. 102.) The stipulation was acknowledged by this Court in Judge Crabb's earlier opinion. (ECF#82 at 1-2; ECF#201 at 83, 83 n. 102.)[20] OI elicited the opinion in violation of the MIL, but Plaintiff does not rely on that opinion. (ECF#201 at 82 n. 101.) OI's post trial argument to exclude other causation testimony by Dr. Frank "as a matter of law" should be rejected as untimely. (ECF#201 at 83-84.) Judge Crabb already ruled "If defendant wants to obtain additional rulings about the permissible scope of causation evidence, it will have to file a timely motion in limine." (ECF#201 at 83, 83 n. 102.) OI never filed such an MIL. OI did not respond to the statements in Plaintiff's opening post trial brief that OI has "forfeited" objections to

---

[20] OI cites a supplemental authority the case of *McIndoe v. Huntington Ingalls Inc.*, F.3d, 2016 WL 1253903 (9th Cir. 2016). *McIndoe* is a decision holding the every exposure based causation opinion – which plaintiff stipulated Dr. Frank is not relying on - is not admissible.

additional causation evidence based on Judge Crabb's ruling and *Daubert* procedures for striking expert testimony.[21]  (ECF#201 at 83-84.)

OI next contends the OI Kaylo exposure of six months or more in the testimony of Schlub and Zimmer is not a "substantial factor."  OI contends every day of every month of Ozzie's 40 year career as an insulator contributed equally to Ozzie's total asbestos exposure.   In essence OI now wants this Court to embrace same causation theory OI moved to exclude that "every exposure" is a cause.   OI asks this Court to impose even a lesser burden of proof on OI by assuming asbestos exposures occurred daily without proof of asbestos being used or released into the air breathed by Ozzie on any given day.  OI's position is that the Court should find that the mere fact of being an insulator means exposure to asbestos every day.  The Court should not engage in such speculation.  OI is required to provide the same quality of evidence to prove exposures to other products on days when Ozzie was not working at Badger that Plaintiff had to meet in proving exposure to OI Kaylo at Badger.  To meet the burden imposed, Plaintiff provided evidence of the type of work (removing, replacing, and installing), visibly dusty conditions, Ozzie's personal activities or presence as a bystander, crew sizes, duration, specific brand of product, and asbestos content.  In arguing OI Kaylo cannot be a substantial factor because Ozzie had a 492 month career as an insulator; OI does not cite evidence of exposure to any other product on any day.[22]  (ECF#205 at 83-85.)  The failure to cite evidence, as this Court required in the post-trial briefing instructions, is grounds for rejecting OI's substantial factor causation argument.

---

[21] "Additional" refers to other evidence besides the "every exposure" testimony which was stipulated as not being offered.
[22] The 492 months in Ozzie's career apparently comes from PFF# 61 which is also devoid of any specific evidence of asbestos exposure.

If this Court does choose to consider unspecified record evidence about other exposures, the OI Kaylo exposure is more than substantial.  As a starting point, based on Dr. Frank's uncontroverted testimony, Ozzie's exposures at Badger alone are a sufficient dose to cause mesothelioma.[23]  (ECF#201 at 79-82.)   An exposure which alone can cause the disease should be considered substantial.

The OI Kaylo Badger work is also substantial because it accounts for the majority of exposure evidence in the record.  As a starting point, Ozzie's Badger work was six months or longer, involved dusty tear out work of thousands of feet of pipe insulation, was done without protective equipment, involved Ozzie personally handling the Kaylo and also being exposed as a bystander working with large crews of fellow insulators.  (ECF#201 at 79-81.)  OI does not dispute the testimony of Dr. Frank that a one day exposure can cause mesothelioma or that 30 days of the type of work Ozzie did at Badger is alone enough to cause mesothelioma.  (ECF#201 at 80-81.)

OI at trial did not present any witness about duration, quantity, or intensity of exposures Ozzie had to other asbestos products.  OI presented no medical expert to connect exposure to another product or at another job location as a cause of Ozzie's mesothelioma.  OI's evidence, if admitted and probative, of other exposures is primarily trust fund claim filings by Plaintiff's counsel and releases showing settlements with other defendants.  These documents are conclusory assertions of exposure which provide little information in determining whether exposure to a particular is substantial under standards of civil tort system.  A complete analysis of the documents tendered by OI appears in response to PFFs below and in a document created

_____

[23] In response to a hypothetical, Dr. Frank testified 30 days of work removing the insulation is enough to cause mesothelioma. (ECF#201 at 80-81.)

by Plaintiff for the Court's convenience.  (PFF#s 61-64; Att.3.)  In weighing what product exposures are a substantial cause of Ozzie's mesothelioma, the eyewitness testimony of Schlub and Zimmer about dusty conditions created by OI Kaylo removal and replacement at Badger is far more detailed and specific than any other evidence.

C. ECF#205 at 90 (OI argued no evidence of spoliation by OI)

Plaintiff withdraws his spoliation argument at ECF#201 at 24-25, 25 n. 20.

D. ECF#205 at 92 (OI argued the presence of asbestos is not a design defect)

In addition to other basis for strict liability, Plaintiff argued in his opening brief that Kaylo was defective and unreasonably dangerous due to a design defect.  (ECF#201 at 41-51.) OI did not respond to Plaintiff's citation to *Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, 83 (Wis. 2001) for the preposition that a product is defectively designed and unreasonable dangerous if it does not meet consumer expectations in light of the severity of harm inflicted and the number of persons harmed.  (ECF#201 at 42-44.)   OI did not directly address any of the nine factors Plaintiff discussed that support a finding that Kaylo was defectively designed and unreasonably dangerous.  (ECF#201 at 44-50.)  As discussed below, some of these nine factors discussed by Plaintiff in his opening brief are applicable to the arguments OI raised in this section of their response brief and were not challenged by OI.

Rather than addressing Plaintiff's discussion of design defect, OI set forth other arguments as to why OI is not liable for design defect.  These arguments are addressed below.

*Design defect claim is available under Godoy*

27

Relying on *Godoy,* OI argues that:

> The plaintiff's design defect claim boils down to an argument that Owens-Illinois
> should be held liable for including "asbestos" in an "asbestos product."  Pl.'s
> Compl. ¶¶ 16, 23, dkt. 2.  Wisconsin law is clear that a "claim for defective design
> cannot be maintained here where the presence of [a substance] is the alleged
> defect in design, and its very presence is a characteristic of the product itself."
> *Godoy*, 319 Wis. 2d at 110–15, 768 N.W.2d at 683–86. …
> The plaintiff's evidence centered on a claim that the asbestos in Kaylo posed an
> unreasonable, hidden danger that insulators like Mr. Suoja, "Asbestos Workers,"
> would not contemplate. As *Godoy* holds, that may be a failure to warn claim, but
> it is not, as a matter of law, a viable design defective claim. *Id.*

(ECF#205 at 92-93.)

OI argues the complaint allegations about design defects should be dismissed based on

the decision in *Godoy v. E.I. Dupont*, 319 Wis.2d 91 (2009).   The allegations at issue here are in

paragraphs 21 and 22 of the Complaint and allege:

> Decedent used and handled, or was otherwise exposed to, the supplying
> defendants' asbestos products in the conditions in which they left the control of
> such defendants and in a manner that was reasonably foreseeable and/or
> anticipated by such defendants.

(ECF#2 at ¶ 21.)

> Defendants manufactured, supplied or installed a product, or equipment, that was
> unreasonably dangerous in nature in that it contained asbestos, and in particular:
> a. Was not accompanied by an adequate warning relating to the health hazards of
> asbestos products;
> b. Was not accompanied by instructions concerning precautionary measures to be taken
> to minimize the risk of health hazards associated with asbestos products;
> c. Was not subjected to adequate investigation regarding its hazards to health; and
> d. Was improperly designed with, or specified for, the use of asbestos as opposed to
> nonasbestos substitutes.

(ECF#2 at ¶ 22.)

28

The design allegations in *Godoy* were dismissed because they involved products which necessarily used the allegedly defective lead pigment and the alleged defect is the mere presence of the lead pigment. *Godoy* 319 Wis.29 at 115. *Godoy* is distinguished from this case.[24]

Plaintiff specifically plead that Kaylo was designed with the use of asbestos as opposed to nonasbestos substitutes. (ECF#2 at ¶ 22d.) Plaintiff argued in his opening brief that OI chose to include asbestos in Kaylo instead of safer synthetic fibers or fiberglass, which were available in the 1940s when Kaylo was designed. (ECF#201 at 50.) Pleading and argument concerning available substitutes distinguishes this case from *Godoy.*

Additionally, Plaintiff argued in his opening brief that the design of Kaylo is not safe considering that asbestos is used. (ECF#201 at 44-50.) If proper warnings, safety instructions, or protective measures are included as part of the product design, then Kaylo would not be defective. Plaintiff's pleading specifically cited these reasons as to why Kaylo was dangerous in light of the use of asbestos. (ECF#2 at ¶ 21.) The mere presence of asbestos is not the plead defect and therefore this case is distinguishable from *Godoy.*

Plaintiff also plead that it was reasonably foreseeable and/or anticipated by OI that Ozzie would handle and use Kaylo. (ECF#2 at ¶ 21.) The typical use of Kaylo by insulators leads to release of asbestos fibers. A design defect exists as to the failure to protect against or prevent the release of asbestos fibers. (ECF#201 at 48-50.) This pleading and argument distinguishes this case from *Godoy.*

Asbestos is not an inherent characteristic of insulation as there was insulation available in the marketplace prior to asbestos. This determination is something that a finder of fact can apply

---

[24] OI could have brought a motion to dismiss this case based on the failure to state a claim prior to the dispositive motion deadline. The forfeiture of dispositive motions brought past the deadline is discussed in Plaintiff's initial brief. (ECF#201 at 118-119.)

to this case because it is in the scope of personal knowledge a finder of fact has.  No evidence has been offered that asbestos is inherent to insulation beyond Stephen Kenoyer confirming that a single article from 1970 stated this.  (See PFF# 110.) This evidence must be compared to Plaintiff's unchallenged assertions regarding the availability of substitutes.  (ECF#201 at 50.)  OI has made no showing that asbestos is inherent to insulation.

*Green does not require proof that a lower level of asbestos would render Kaylo harmless*

OI argues Plaintiff must prove "that putting a lower level of asbestos in Owens-Illinois Kaylo would have rendered the product harmless."  (ECF#205 at 93.)  *Green* does not require such proof.  The element of proof for strict liability is whether the product is unreasonably dangerous based on the condition of the product when it leaves the possession of the manufacturer.  The element of proof is discussed in more detail in Plaintiff's opening brief, which was not challenged by OI.  (ECF#201 at 38-41.)  A strict liability claim does not require proof of whether a product is more or less dangerous if the formula is changed.

*No evidence of available substitutes*

The only evidence OI offered that Kaylo could have been made with non-asbestos substitutes is one scientific article on the subject that Plaintiff's expert confirmed was written, the federal register showing that asbestos insulation contained asbestos, and one statement about OI determining they couldn't use substitute materials .  (ECF#205 at 64-65, 94.)  Plaintiff disputed each PFF in detail in the PFF section.  (See PFF#s 109-111.)  Plaintiff also presented unchallenged evidence that substitutes were available.  (ECF#201 at 50.)  The greater weight of the evidence supports a finding that substitutes were available.

E. ECF#205 at 95 (OI argued Kaylo no showing design of Kaylo was unreasonably dangerous)

   Plaintiff discussed in his opening brief Ozzie's peer group's information concerning the hazards of asbestos (ECF#201 at 106-109.), worker education and motivation regarding protection (ECF#201 at 102-106.), the inadequacy of available protective equipment (ECF#201 at 109-114.), and the evidence contained in the Asbestos Worker Journal presented by OI (ECF#201 at 112-113.).[25]  Plaintiff's brief establishes:

- The mesothelioma disease process is latent and insidious and a person can't sense asbestos fibers entering their body.  (ECF#201 at 103.)

- The inadequacy of the information insulators were given about asbestos dangers. (ECF#201 at 106-108.)

- Insulators did not necessarily read union magazine articles and those articles did not educate or motivate insulators to wear respirators capable of protecting themselves, as evidenced by the lack of use of respirators by insulators. (ECF#201 at 108-109.)

- Insulation workers were not educated about the hazards of asbestos and how to protect themselves, including knowledge of the hierarchy of scientific methods of protecting.  (ECF#201 at 104-106.)

- Insulation workers were not motivated to protect themselves against asbestos hazards.  (ECF#201 at 104-106.)

- The inadequacy of masks available to insulators prior to 1970.  (ECF#201 at 109-114.)

---

[25] While this discussion was in a section discussing a potential contributory negligence claim by OI, it is also applicable to the question of consumer contemplation

31

- The Asbestos Journal Worker did not educate and motivate insulators to
  understand the protective equipment needed.  (ECF#201 at 112-113.)

Plaintiff's brief shows that insulators did not know the hazards of asbestos and how to
avoid them prior to 1970.  OI does not contest Plaintiff's arguments and evidence and instead
states that the "intended user was an insulator who indisputably knew he was working with
asbestos insulation (he belonged to the 'Asbestos Workers Union') and whose own union told
him of the risks of his job and how to avoid them. The plaintiff offered no testimony to the
contrary."  (ECF#205 at 96.)

OI argues that the "ordinary asbestos insulator's expectations about Owens-Illinois Kaylo
were made clear by the evidence that the insulator's union recognized and told its membership of
asbestos-related health hazards starting in 1930, and repeatedly thereafter."  (ECF#205 at 95.)
OI's only evidence presented to support their argument is citation to Asbestos Journal Worker's
articles and Harold Haase's testimony.  Plaintiff discussed this evidence and testimony in his
opening brief, in this reply above, and in his response to OI's PFFs.  (ECF#201 at 107-108, 112-
113; See PFF#s 135-140.)

The greater weight of the evidence supports a finding that Kaylo was unreasonably
dangerous beyond the contemplation of the consumer.

F. ECF#205 at 96 (OI argued no showing of failure to warn).

The TLV defense would only be a defense to failure to warn claims.  Design defects,
failure to investigate, and failure to instruct on safety measures are not impacted by OI's
lawyers' argument that based on the TLV OI had no knowledge of the dangers of Kaylo that
would necessitate a warning.

Plaintiff's opening brief discussed how strict products liability can be based on the absence of a warning which makes the product unreasonably dangerous for an intended and proper use.  (ECF#201 at 52-53.)  OI did not dispute that failure to warn is a grounds for strict liability.

Plaintiff's opening brief established OI's actual knowledge of the dangers present during the normal and everyday use of Kaylo.  (ECF#201 at 54-62.)  OI did not challenge any of the following regarding OI's actual knowledge:[26]

1943:  Medical director and IH on staff who kept OI "abreast of literature" (ECF#201 at 55.)
1943:  OI is told the Kaylo design including asbestos presents a "first class hazard" (ECF#201 at 55.)
1947:  OI production manager aware Kaylo dangerous and caused asbestosis (ECF#201 at 55-56.)
1950:  OI's production manager knows Kaylo can produce asbestosis (ECF#201 at 57.)
1950s:  OI implements and requires protective measures for Kaylo plant employees (ECF#201 at 57-58.)
1958:  OI insurer issues report about excessive exposures from cutting and handling Kaylo (ECF#201 at 59-60.)

OI's actual knowledge established in Plaintiff's opening brief shows that OI knew that asbestos was very dangerous, "a first-class hazard," and released visible dust during normal and intended use.  OI knew that this dust injured the user and caused asbestosis.  OI required adequate respiratory protection, dust collection equipment, and an x-ray screening program for their own employees. OI knew that even with the protective measures in place in their plant working with Kaylo could produce up to 91.8 mmpcf of asbestos.  OI's actual knowledge concerning the dangers associated with Kaylo during normal and intended use necessitates a warning regardless of their additional knowledge of the TLV.

---

[26] Beyond procedural and evidentiary objections, which Plaintiff addressed elsewhere.

Plaintiff's brief also established what OI should have known about the dangers present during the intended use of Kaylo through scientific publications and trade organization information.  (ECF#201 at 62-71.)  OI did not challenge any of the following regarding what OI should have known: [27]

1935:  Cancers from asbestos reported in literature (ECF#201 at 65.)
1938:  First report in literature of asbestos causing mesothelioma (ECF#201 at 66.)
1942:  Dr. Hueper's textbook definitively links lung cancer to asbestos exposure (ECF#201 at 67.)
1942:  Exposures exceeding TLV look good to naked eye (Dr. Cook) (ECF#201 at 67-69.)
1944:  Construction worker (a plumber) reported to have "mesothelioma" (ECF#201 at 69.)
1952:  Smith-Cartier publication of two case reports of mesothelioma (ECF#201 at 70.)
1955:  Doll – lung cancer connected to asbestos exposure (ECF#201 at 70-71.)

Based on scientific publications and trade organization information, OI should have known that Kaylo could cause cancer during normal and intended use.  As discussed below, the TLV was not designed to protect against cancer.  OI failed to warn in light of what they should have known.

Additionally, OI did not address Plaintiff's reliance on *Arbet v. Gussarson*, 66 Wis. 2d 551 (Wis. 1975), where the Wisconsin Supreme Court recognized the failure to test or investigate potential hazards is a relevant allegation in a claim for strict liability.  (ECF#201 at 73.)  What OI actually knew or should have known created an additional duty to investigate potential hazards that OI did not meet.

Rather than addressing Plaintiff's case in chief, OI set forth other arguments as to why OI did not fail to warn.  These arguments are addressed below.

*TLV did not protect against mesothelioma*

---

[27] Beyond procedural and evidentiary objections, which Plaintiff addressed elsewhere.

OI's argument that they did not fail to warn is based upon their assertion that the 5 mppcf asbestos Threshold Limit Value was considered to be a safe level of exposure in the 1940s and 1950s.  (ECF#205 at 97.)  OI states that the "uncontroverted evidence" establishes that "researchers reported as early as 1938 that, if asbestos exposures could be kept below 5 million particles of asbestos per cubic foot of air (5 mppcf), new cases of **asbestosis** would not arise." (ECF#205 at 97, emphasis added.)

Plaintiff explained in his opening brief that the TLV was not intended to protect against mesothelioma; the TLV was only intended to protect against asbestosis, which requires higher doses of asbestos exposure to cause than mesothelioma does.  (ECF#201 at 94-97.)  For asbestos the 1962 Documentation summary states: "The present threshold limit relates to the prevention of asbestosis."  (Ex 220 at 11.)  OI industrial hygienist Willis Hazard admitted that the TLV only applied to asbestosis and not to cancer or mesothelioma.[28]  OI did not address Plaintiff's argument.

---

[28] Willis Hazard testified:
Q: You mentioned at one point this afternoon
   the concept of TLV or Threshold Limit Value . Do you
   remember that?
A; And is it correct, sir, that the Threshold
   Limit Value that you talked about did not apply and
   did not contemplate cancer?
A Yes .
Q It only applied or was directed toward the
   possibility or the hope that if it were met that
   asbestosis might be averted?
A That was the concept in the period that
   we're talking about .
Q:And you mentioned, and certainly it did not
   apply with mesothelioma?
A No .
(ECF#150 at 143:19- 144:11.)

There is no "*post hoc* rationalization" by Plaintiff, as OI asserts, that "the asbestos Threshold Limit Value was not actually safe because workers exposed below that level began developing asbestos disease in the 1960s. (ECF#205 at 100.)   The TLV was only developed to protect against asbestosis, so it was not safe as to cancer.  In his September 1956 "Prepared Discussion," published in *Industrial Hygiene Quarterly,* Dr. Herbert Stokinger stated "to the level judged safe for other types of systemic injury add a safety factor for carcinogenicity. The magnitude of the safety factor is suggested to be from 100 to 500."  (Ex.230 at 286; ECF#198 at 125-127.)  The literature establishes that OI should have known the TLV would not protect against cancer even if their industrial hygienists testimony admitting they actual knew it was meant for only asbestosis is not given weight.

OI never researched whether Kaylo would cause cancer.  OI had the resources to do so, including a medical director and industrial hygienist who kept OI "abreast of the literature" and who should have known to research based on OI's actual knowledge and what OI should have known from the scientific publications and trade organization information about the dangers of Kaylo.  (ECF#201 at 63.)  OI had the opportunity to do so through its Saranac laboratory studies, as discussed in Plaintiff's brief and in response to OI's argument below.  (ECF#201 at 57-62.)  OI chose to only do short term rodent and guinea pig studies and not to do field studies of actual levels of asbestos exposure for the latency period which OI knew existed.  (ECF#201 at 57-62; ECF#198 at 70-71.)

Furthermore, as Plaintiff discussed in his opening brief, there was no justifiable reliance by OI that TLVs protected against mesothelioma.  (ECF#201 at 97-100.)

Even if this Court finds that OI was justified in generally relying on the TLV to protect against mesothelioma, it would have to find that OI actually relied on the TLV to protect at

Badger.  Plaintiff's discussion of the sophisticated user/purchaser defense outlines the evidentiary showing necessary to absolve OI from needing to provide warnings and rely only on the TLV.  (ECF#201 at 87-92.)  OI did not address either of Plaintiff's arguments regarding reliance.

*Lea, Byers, Hazard Testimony*

OI cites testimony of William Lea and Dohrman Byers for the premise that the TLV was safe.  (ECF#205 at 98-99.)

In citing to William Lea, OI states that he:

testified that the 5 mppcf safety standard for asbestos exposure was adopted under Wisconsin law and applied to Wisconsin workplaces; that, at the time, he believed that exposures to asbestos to levels below 5 mppcf on a time-weighted average basis "were safe"; and that no one challenged the safety of this standard during the relevant period. William Lea Dep. 39:21–40:5, 40:11–13, 48:18–49:3, dkt. 191; Ex. 1917–1953 (visits to Badger Ordnance Works).

(ECF#205 at 98.)  Plaintiff discussed objections to the use of Byer's testimony in his response to OI's PFFs and disputed the proposed facts that the TLV was safe based on the testimony.  (See PFF#s 79-80.)

In citing to Dohrman Byers, OI states that: "The asbestos Threshold Limit Value was 'predicated on the idea that this level of exposure would be safe for eight hours per day, daily for the normal working individual. Dohrman Byers Dep. 13:14–16, dkt. 193." (ECF#205 at 98.) Plaintiff discussed objections to the use of Byer's testimony in his response to OI's PFFs and disputed the proposed facts that the TLV was safe based on the testimony.  (See PFF#s 75-76.)

OI states "the actual knowledge of Owens-Illinois was in complete accord with this evidence of constructive knowledge" (referring to the testimony of Lea and Byers).  (ECF#205 at

99.)  As discussed above, OI industrial hygienist Willis Hazard admitted that the TLV only applied to asbestosis and not to cancer or mesothelioma.  (See PFF# 100.)

*Fleischer Drinker report does not eliminate the need to warn*

OI asserts that their staff's knowledge of the 1946 Fleischer-Drinker report eliminates the need for a warning on Kaylo because according to that report insulator was not a dangerous occupation since insulators encountered levels of asbestos dust below the TLV, few insulators were reported to have asbestosis, and none were reported to have cancer.  (ECF#205 at 102-103.)

Plaintiff discussed the Fleischer Drinker report in his opening brief and described that it did not study a cohort group over a period of time that accounts for the latency period of mesothelioma.  (ECF#201 at 49.)  The 1971 TLV Documentation confirmed that the medical literature – i.e. Fleischer Drinker report - that was taken into account in setting the 5 mppcf level was inadequate, acknowledging "Medical data on which the limits had been based were inadequate" and pointed to the "rising worldwide rate of lung cancer among asbestos workers." (Ex.222 at 18; See PFF# 86.)  OI's experienced corporate medical director and industrial hygienist should have known of the weaknesses in the data that did not support the conclusions stated in the Fleischer Drinker publication.  (See PFF# 86.)

Additionally, the Fleischer Drinker report was not used to determine OI's safety practices (or lack of practices) during the development and marketing of Kaylo.  No evidence establishes that OI relied on the Fleischer Drinker report to protect Kaylo users from cancer.  Nothing shows OI relied on the Fleischer Drinker report to protect Kaylo users at all.  OI hired Saranac Laboratories even after the Fleischer Drinker report was published and did studies which proved Kaylo cause asbestosis, as discussed below.

The Fleischer Drinker report did not consider cancer so OI's claim that "There was no evidence of cancer among the insulators at all" is irrelevant.  (ECF#205 at 103; Ex.228 at 15.)

### G. ECF#205 at 104 (OI argued the Saranac studies did not provide knowledge of need to warn)

It is only necessary to determine whether the Saranac studies did not create the need to warn if this Court first determines the presence of the TLV eliminated OIs need to warn users of the dangers of Kaylo.  Other basis for liability such as design defects, failure to investigate, and failure to instruct on safety measures are not impacted by OI's argument that the Saranac studies did not create a need to warn.

Plaintiff discussed the Saranac studies in his opening brief.  (ECF#201 at 55-59, 61-62.) Unqualified conclusions from those studies and communications from the lab include:

- "[t]he fact that you are starting with a mixture of quartz and asbestos would certainly suggest that you have all the ingredients for a first class hazard." (Ex.38.)
- "Kaylo, because of its content of an appreciable amount of fibrous chrysotile, is capable of producing asbestosis and should be handled as a hazardous industrial dust."  (Ex.41 at 7.)
- "the results of the study indicate that every precaution should be taken to protect workers against inhaling the [Kaylo] dust.  Therefore, control measures should be directed to reducing the amount of atmospheric dust, especially at those points of operation where dust is generated." (Ex.1109.)
- Kaylo dust, when inhaled into the lungs of guinea pigs for a prolonged period (30 to 36 months), is capable of producing the peribronchiolar fibrosis characteristic of the disease asbestosis."  (Ex.37 at 16.)

OI does not now address the unqualified conclusions of the reports and the recommendations in communications.  OI points to no evidence that OI rejected the Saranac research or that OI preformed more research to study Kaylo further.  The studies provided OI with actual knowledge of the dangers of asbestos to insulators, which refutes OI's argument that

"there is no permissible inference on this record that Owens-Illinois knew or should have known that such insulators were at risk of developing asbestos-related disease from exposure below the asbestos Threshold Limit Value." (ECF#205 at 107.)

OI's attorneys attempt to argue the Saranac studies did not provide them with information that necessitated a warning. OI argues that the tests never found cancer. (ECF#205 at 106.) However the studies didn't conclude that Kaylo did not cause cancer or eliminate the possibility that it caused cancer. The studies did not look for cancer.

OI also argued that since the studies "were conducted at levels many times greater than the Threshold Limit Value" they "revealed nothing more than that, at excessive levels, the asbestos in Kaylo had not lost its capacity to cause lung fibrosis." (ECF#205 at 106.) However, the studies concluded that Kaylo was dangerous and did not couch that danger by mention of the amount of asbestos inhaled. Because of that danger discovered in the Saranac studies, OI needed to provide warnings to Kaylo users so they could protect themselves.

OI asserted that "Saranac Laboratory did not tell Owens-Illinois to stop making Kaylo, or to take the asbestos out of Kaylo, or to put a warning label on Kaylo." (ECF#205 at 106.) Saranac didn't have to directly state that OI needed a warning label on Kaylo for its communications to put OI on notice that Kaylo needed a warning label. The unqualified conclusions of the reports and the recommendations in communications with OI discussed above make clear that a warning was needed.

Finally, OI argues that since "no Owens-Illinois [manufacturing plant] employee was found to have asbestos disease" OI did not have to warn of the dangers of Kaylo. (ECF#205 at 106.) However, OI continued on to state that OI had an x-ray screening program and a "very good dust control in its manufacturing plant." (ECF#205 at 107.) From their communications

40

with Saranac, OI's attorneys would like this Court to infer that OI saw the need for and instituted

x-ray screening and good dust control in their plant yet made a determination that it was

unnecessary to warn potential customers to do the same.  Such an inference would be illogical.


H. ECF#205 at 107 (OI argued lack of product warning was not a proximate cause)

Plaintiff's opening brief established, and OI did not challenge, that in the field of

industrial hygiene, proper warnings must motivate workers to protect themselves and instruct

them on how to do so.  (ECF#201 at 104-105.)  It was also unchallenged that Ozzie was a careful

person that avoided danger as evidenced by him being a non-smoker, non-drinker, and adhering

to his regime to care for his diabetes.  (ECF#201 at 101, 127, 134.)  There is evidence in the

record from which the inference can be drawn that Ozzie would have followed a proper warning

on Kaylo that motivated him to protect himself.

Additionally, Ozzie's employers would have gained knowledge about the hazards of

Kaylo and how to protect their employees had OI issued proper warnings.  During the 1950s and

1960s, Elmer Borchardt, President of L & S Insulation Company, Inc., thought that asbestos did

not increase the risk of cancer for a non-smoker like Ozzie and did not associate masks with

protection of worker's health.  (ECF#201 at 113-114.)   Borchardt testified that L & S never

provided any safety information to workers about the hazard of asbestos fibers because L & S

wasn't aware of the hazards.[29]  Ralph Van Beck, former vice President of Sprinkmann Sons

---

[29]  Elmer Borchardt testified:
Q   Did L & S ever provide safety information to the
      workers about the hazard of asbestos fibers?
A   L & S did not because they didn't have any.
Q  ·.There weren't any meetings warning the workers?
A  No, had nothing because we weren't aware of it.
(ECF#185 at 45:9 – 45:13.)

Corporation, testified that Sprinkmann started to use safety measures when OSHA brought warnings in 1972.[30]  A separate inference can be drawn that Ozzie's employers would have changed their behavior to provide protection for Ozzie and their other employees had OI given them a proper warning regarding Kaylo.

While OI did not challenge Plaintiff's proof that failing to provide a warning was a proximate cause of Ozzie's injury and did not provide evidence to establish Ozzie would have failed to heed a proper warning, OI still argued that the "failure to warn causes of action would fail for an independent reason. The plaintiff has failed to prove proximate cause. The weight of the credible evidence is that the absence of a warning label on Owens-Illinois Kaylo was not the reason that Mr. Suoja was exposed to asbestos, as and when he was, or of Mr. Suoja's failure to take any personal precautions with respect to such exposure."  (ECF#205 at 107.) The greater weight of the evidence supports a finding that the absence of a warning was a cause of Ozzie's injury.

OI argues that "there is nothing that was on, or not on, a box of Owens-Illinois Kaylo that could have required anything to occur at Badger Ordinance that was not already required under Wisconsin and federal law."  (ECF#205 at 109.)  OI also argues that "Mr. Suoja, his union, and

---

[30] Ralph Van Beck testified:
Q So when did Sprinkmann tell the Local 19 insulators
   that were working for Sprinkmann to use some type of
   safety protective measures for asbestos? When did
   that start?
MS. SCHUETT: Objection, form, foundation.
THE WITNESS:
A I would suspect when OSHA brought out the warnings.
MR. MC COY:
Q Is that like about 1972?
A It's probably in that area, yes.
(ECF#190 at 70:19-71:3.)

his employer knew about the hazards of excessive asbestos exposure and how to avoid them."
(ECF#205 at 110.)  These arguments have been discussed and refuted by Plaintiff in his opening
brief, this brief, and his response to OI's PFFs.  (ECF#201 at 52-73, 87-93, 94-99, 100-117.)

The evidence makes clear that Plaintiff has proven proximate causation no matter who
has the burden of proof.  However, OI's assertion that Plaintiff has the burden of proof to show
that Plaintiff would follow the warning is incorrect.  It can be presumed that a plaintiff would
follow a proper warning. The cases OI cites to support attempt to shift the burden of proof to the
Plaintiff are distinguished below:

- In *Schreiner v. Wieser Concrete Prods*., the trial court determined summary judgment
  was appropriate when the Plaintiff did not oppose the defendant's motion for summary
  judgment.  2006 WI App 138, ¶9 (Wis. Ct. App. 2006).  The Court reasoned the lack of
  warning to remove plastic sheets was not causal because "the farm already had a policy
  to remove the plastic before adding silage, and therefore Schreiner already knew not to
  leave the plastic on the silage."  *Id.*  In this case, no evidence has been presented that a
  proper warning would have only replicated a policy that was already in place to protect
  Ozzie from Kaylo.
- In *Kurer v. Parke, Davis & Co.*, 272 Wis. 2d 390, 395, 400 (Wis. Ct. App. 2004) the
  pharmaceutical product contained a '"Detailed Patient Package Insert" that directed the
  patient to consult her doctor for the symptoms associated with the damages claimed and
  advised the doctor of the potential disease that was the basis for the lawsuit.  The Court
  determined the insert "effectively" warned the Plaintiff.  *Id.* at 415.  In this case, no
  warning was provided to Ozzie by OI.
- *Sub-Zero, Inc. v. Gen. Elect. Co.*, No. 09-cv-00497-WMC, 2010 WL 3584427, at *18
  (W.D. Wis. Sept. 10, 2010) the defendant was granted their summary judgment motion as
  to failure to warn when the Plaintiff "chose not to present any response."  The Court
  stated there "may well be responses to these arguments," but "this court cannot, and will
  not" provide them for Plaintiff.  *Id* at * 18.  In this case, Plaintiff has disputed OI's
  claims.
- In *Forst v.SmithKline Beecham Corp.*, 602 F. Supp. 2d 960, 967 (E.D. Wis. 2009) the
  court denied the defendant's motion for summary judgment claims on failure to warn in a
  pharmaceutical case where there was a warning for the product to prescribing physicians
  in place.  The case does not support OI's claim and OI has not shown they provided any
  warning to Ozzie or his employers.

I. ECF#205 at 111 (OI argued Plaintiff has no cognizable wrongful death claim)

OI asserts as a dispositive argument that the wrongful death claims were discharged by Delores in the state court action.   (ECF#205 at 111.)  The flaw in the reasoning is that the state court judge denied a motion to add OI to the state court case.   As a result the OI claims could not be consolidated in a single action.  As a result of the state court order, a separate case had to be pursued against OI under federal diversity jurisdiction.  However, only one action was pursued against OI consistent with the statute.   The history of the state court action is set forth in ECF#101, Att.15.


J. ECF#205 at 111 (OI argued there are no remaining damages)

OI argues trial testimony by Gary and Kimberly constitute admissions or estoppel that are dispositive of this claim.  (ECF#205 at 111-12.)  The statements by Gary and Kimberly do not change the circumstances that the claim against OI was pending and not abandoned.   The inactivity of the OI claim for over a decade in MDL-875 until sometime after 2009 must be considered.  During this time period, the expectation of recovery from the OI claim was unknown.   No need existed to continue the probate action.

This court has already held that arguments about the status of Gary's special administration appointment are forfeited because OI did not raise the challenges when MDL-875 claim was reactivated and Judge Robreno appointed Gary special administrator in 2009. (ECF#114.)  The arguments now raised after trial are in the same vein and covered by the past ruling which is law of the case.  The probate discharge records were available to OI when Judge Roreno issued his order.  The dispositive motion should have been raised at that time.  Also, closing of an inactive probate case is routinely requested by state court probate registrars.   However, the same probate cases are routinely reopened when additional proceeds do

or might become available.  That has happened in this case where the state court probate appointment has been recently reactivated.  (Att.16.)

In the case of Kimberly's bankruptcy, her testimony at trial of the tort case was she did not even know a case was still pending until a few weeks before trial.  (ECF#197 at 87:10-87-16.)[31]  This was in part because she had entrusted Gary to handle all matters relating to the asbestos case.  Thus Kimberly was not aware of a pending case when she filed the bankruptcy discharge documents.  While the bankruptcy documents may have ot be amended, her ignorance about a pending claim cannot constitute a judicial admission or estoppel.

## K. ECF#205 at 112 (OI is not responsible for other's fault)

*No apportionment should be made*

Plaintiff argued in his opening brief that joint and several liability is applicable in this case (ECF#201 at 180-186.) and that apportionment of fault is only possible if OI's liability is predicated purely on negligence claims.  (ECF#201 at 187.)   Plaintiff's argument discussed the following:

- OI is jointly and severally liable under *Kingston* and the common law (ECF#201 at 180-181.);

---

[31] Kimberly Suoja testified:
   Q. And I want to move forward to economize our time
   here. You understand we're here because a lawsuit was
   filed arising out of your father's death?
   A. Yes.
   Q. You didn't even know this lawsuit existed until May
   of this year?
   A.  Yes.
(ECF#197 at 87:10-87-16.)

- The medical evidence establishes that Ozzie's injury was a single, indivisible injury (ECF#201 at 181-183.);

- The 2011 amendment to Wis. Stat. § 895.045(3) confirms joint and several liability for strict product liability claims was common law and the Wisconsin Supreme Court held the right to joint and several liability is constitutionally protected.  (ECF#201 at 183-184.);

- *Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶ 15 (Wis. 2001) holds the comparative negligence statute does not apply to strict liability actions.  (ECF#201 at 184-185.).  *Industrial Risk Insurers v. American Engineering Testing, Inc.,* 2009 WI App 62, (2009) also rejected the argument that the common law of joint and several liability in strict products liability cases was changed by the comparative negligence statute.  (ECF#201 at 185-186.); and

- Distinguished the *Bushmaker* ruling.  (ECF#201 at 184-185.)

OI only cited to the *Bushmaker* decision to dispute Plaintiff's argument that "the Wisconsin Supreme Court altered the rules governing apportionment of liability in strict liability cases." (ECF#205 at 115.)  OI did not address Plaintiff's other arguments above.  As Plaintiff stated in his opening brief and reasserts here, *Bushmaker* is distinguishable from this case.  (ECF#201 at 184-185.)  OI did not address Plaintiff's reasoning why *Bushmaker* is distinguishable.

OI cites to the case of *Gosz. Gosz* does not address  the common law of liability as laid out in Plaintiff's Opening brief.

OI also argued that "allocation is required to . . . uphold the terms of *Pierringer* releases of settled defendants." (ECF#205 at 113.)  Under joint and several liability, an apportionment is not necessary because OI can seek a contribution action against the defendants that settled through

*Pierringer* releases. *Fuchsgruber,* 2001 WI 81, ¶ 3. Additionally, "*Pierringer*" releases were only executed with four entities; Building Services Industrial Sales Co., Inc., Garlock Inc., Rapid American Corporation, and Sprinkmann Sons Corporation, while Fibreboard invokes "Pierringer protection". (Exs. 1664, 1668, 1679, 1680, 1667; See PFF# 147; Att.3.)

*No evidence to establish other's fault*

If the Court finds that it must apportion liability, either because OI is liable under negligence or OI's legal argument is correct, it must be determined how to make that apportionment. OI argues that "the Court must consider and apportion liability among: Mr. Suoja; each of Mr. Suoja's employers; each owner of the premises where Mr. Suoja worked; and each asbestos product to which Mr. Suoja was exposed … and apportion liability among the entities who settled and executed *Pierringer* releases." (ECF#205 at 114.)

However OI takes no position on how to make the apportionment among different entities. Apportionment can only be made to entities that have been proven to be at fault under either negligence or strict liability theories. OI must prove that each entity which is to be apportioned fault was a substantial factor in the cause of injury. For entities that OI claims were negligent, OI must prove exposure, medical causation, and culpability of the entity. For entities that OI claims are liable under strict product liability, OI must prove the five factors outlined in Plaintiff's opening brief. (ECF#201 at 38-40.)

OI has the burden of proof as to these entities. As Plaintiff discussed in his opening brief, OI offered minimal admissible evidence to allocate fault to other entities. (ECF#201 at 187-188; See PFF#61-64; Att.3.) Because OI has not carried the burden of proof on mos to the other entities as to proving a substantial exposure or the fault of the other entity, this Court should attribute 65% or more of the fault to OI in any apportionment.

**L. ECF#205 at 115 (OI argued claims are time barred under the federal enclave doctrine)**

OI continues to assert that "plaintiff's claims are barred by a two-year statute of limitations, under the federal enclave doctrine." (ECF#205 at 116.) Plaintiff addressed the statute of limitations defense under the federal enclave doctrine in his opening brief and provided multiple arguments as to why the defense is inapplicable. (ECF#201 at 118-122.)

Plaintiff asserted that the dispositive motion deadline has passed in this case and the federal enclave statute of limitation defense, and any other dispositive motion brought past the deadline, is forfeited. (ECF#201 at 118-119.) OI did not dispute Plaintiff's argument regarding the dispositive motion deadline.

Plaintiff argued that the statute of limitations defense under the federal enclave doctrine was not pled as an affirmative defense. (ECF#201 at 119.) OI addressed the argument that it did not waive affirmative defenses in a separate section of their brief. (ECF#205 at 120-121.) Plaintiff addresses OI's counter-arguments elsewhere in this reply.

Plaintiff also argued that the defense is inapplicable even if it is properly before the Court. Plaintiff discussed the prejudice it has faced in conducting discovery due to the late revelation of the defense by OI and did not concede that Badger is a federal enclave. (ECF#201 at 121.) Now that OI has affirmatively set forth the defense and the documents that it relies upon to attempt to show that Badger is a federal enclave, Plaintiff has been able to better respond to the threshold question whether Badger is a federal enclave. As set forth in his response to OI's PFF #5, OI has not proven that Badger is a federal enclave. (PFF# 5.) Additionally, Plaintiff presented a legal argument based on *Paul v. United States*, 371 U.S. 245, 268-269 (U.S. 1963)

that an exception to the federal enclave doctrine applies to incorporate future Wisconsin state law modification of the statute of limitations which would act to put Plaintiff's complaint within the statute of limitations.  (ECF#201 at 122.)  The *Paul* exception was not contested by OI.


M. ECF#205 at 117 (OI argued failure to warn claims barred by sophisticated user doctrine)

Plaintiff argued that the sophisticated user defense is not applicable to strict product liability claims in his opening brief.  (ECF#201 at 87-88.)  OI did not contest Plaintiff's argument about lack of applicability to strict product liability claims in response.  Plaintiff also argued that the defense should be forfeited by OI's failure to bring the dispositive defense prior to the dispositive motion deadline and by OI's failure to plead the affirmative defense. (ECF#201 at 93.)  OI did not dispute Plaintiff's argument regarding the dispositive motion deadline.  OI addressed the argument that it did not waive affirmative defenses in a separate section of their brief.  (ECF#205 at 120-121.)  Plaintiff addresses OI's counter-arguments elsewhere in this reply.

Rather, OI stated that "plaintiff's failure to warn claims are barred by the 'sophisticated user' doctrine because Owens-Illinois had no duty to warn purchasers and employers about known potential hazards of asbestos" and argued that under the doctrine as held in *Hasse*, "a manufacturer has no duty to warn the user of a potential hazard that is known to his employer." (ECF#205 at 117-118.)

Plaintiff's opening brief provided a detailed discussion of the evidence – which goes beyond the employer simply knowing about the danger - required to prove the sophisticated user defense in *Hasse* and how OI's evidence in this case does not approach that level.  (ECF#201 at 88-91.)  Plaintiff outlined how the TLV was not meant to and did not protect insulators against

cancer and how no showing was made that the necessary protective measures to prevent asbestos related cancer were known by Ozzie's employers and were implemented by Ozzie's employers. (ECF#201 at 89-91.)  Plaintiff also discussed how the *Mohr* case requires reliance on the "sophisticated user" to protect, how reliance on only the TLVs was not enough to protect users from cancer, and how OI's position that it had no reason to believe that the use of Kaylo was a hazard to users forecloses the ability of OI to rely on others knowing what OI did not.  (ECF#01 at 91-92.)

In response, OI did not contest many of the points argued in Plaintiff's brief.  OI asserted that Ozzie's employers' knowledge of the TLV and regulations that incorporated it was sufficient to invoke the sophisticate user doctrine (which Plaintiff has refuted at length) and Borchardt testified that masks were available since the 1950s.  (ECF#205 at 118-119.)  Borchardt's testimony of the availability of masks does not mean his company was a "sophisticated user" in light of his testimony that he thought asbestos did not increase the risk of cancer for a non-smoker like Ozzie, he did not associate masks with protection of worker's health, and L & S never provided any safety information to workers about the hazard of asbestos fibers because L & S wasn't aware of the hazards  (ECF#185 at 45:9–45:13; ECF#186 at 78; ECF#187 at 10:17-10:25.)


N. ECF#205 at 120 (OI argues they did not waive affirmative defenses)

Plaintiff argued that the statute of limitations defense under the Federal Enclave and the sophisticated user defense were forfeited by OI because they were not affirmatively pled. (ECF#201 at 93, 119-120.)

OI responded to Plaintiff's argument asserting that it pled the affirmative defenses because it "filed a short form answer and affirmative defenses (dkt. 4), which explicitly incorporated by reference the Asbestos Defendant's Master Affirmative Defenses under the Order for Pleadings in Cases Which Contain Asbestos-Related Personal Injury Claims, *In Re: Asbestos Litigation*, Misc. Docket No. 86-0457 (E.D. Pa. Aug. 20, 1986) and Pretrial Order No. 1, *In Re: Asbestos Products Liability Litigation (No. VI)*, No. MDL 857 (E.D. Pa. Sept. 18, 1991)."[32]

OI has shown no basis from which they can rely on EDPA case management orders for a response to a pleading filed in a WDWI court.  OI has shown no excuse as to why they did not plead the affirmative defenses.  While OI is correct that Plaintiff "withdrew a motion to compel a more specific pleading" OI has failed to show how Plaintiff knew of the sophisticated user defense and the statute of limitations defense under the federal enclave or how the burden to plead an affirmative defense shifted to the Plaintiff because of this withdrawal.

Even if the Court determines that the Master Affirmative Defenses apply in this case, the Statute of Limitations defense as pleaded was not sufficiently raised because it made no mention of the Federal Enclave aspect of the defense.

Plaintiff was harmed because there was no opportunity for Plaintiff to adequately conduct discovery concerning the two defenses, as the deadline for discovery was closed when Plaintiff was apprised of the defenses and trial was a month away.  Under the case law cited in Plaintiff's opening brief, OI forfeited their affirmative defenses.  (ECF#201 at 120, n. 131.)

---

[32] As Plaintiff noted in his initial brief, OI did not provide Plaintiff with any document specifically pleading the statutes of limitation/federal enclave defense or the sophisticated user defense in response to Plaintiff's requests asking for clarification of OI's position regarding ECF Doc #4. (ECF#201 at 119, n. 130.)  OI's response brief is the first place OI laid out where OI claims to have pled those defenses.

**O. ECF#205 at 121. (OI preserved summary judgment arguments)**

OI incorporated their summary judgment arguments from "Def.'s Mot. Summ. J., dkt. 89; Def.'s Reply Mot. Summ. J., dkt. 111" regarding three issues this Court found in favor of Plaintiff.  Plaintiff relies on this Court's ruling and reasserts and incorporates Plaintiff's briefing on the same summary judgment arguments. (ECF#s 101, 102, 103, 104, 105, 106, 107, 112, 114.)

**P. ECF#205 at 92 n.. 12 (OI discussed Plaintiff conceding if no strict liability found then no negligence)**

OI misconstrued Plaintiff's statement on page four of Plaintiff's post-trial brief.  In his opening brief, Plaintiff wrote that the "primary claim against OI is based on strict products liability. If that claim is resolved in favor of Plaintiff, this Court need not consider the negligence claim."  (ECF#201 at 4.)  OI responded that:

> The plaintiff apparently concedes that, if the evidence does not establish strict liability, this Court need not consider the negligence claim. Pl.'s Post-Trial Br. 4. "Doubtless what he meant is that a claim of strict products liability is much like a negligence claim because it requires proof either that the product was unreasonably dangerous or, what amounts to the same thing, that it was defective." (citations omitted)

(ECF#205 at 92, n.12.)

Plaintiff does not waive the negligence claim.  The Court should first consider SPL claims for which joint and several liability would apply.   The focus of the SPL claim is the dangerousness of the product in light of the claims of failure to adequately warn, instruct on precautionary measures, use substitutes for asbestos, or investigate the dangers of Kaylo.  As to only the warnings claim under WI law, what OI knew or should have known is an element.  If the SPL claim is not resolved in Plaintiff's favor, the negligence claims should be evaluated

using the same evidence of what OI knew or should have known and the breach of the duty of reasonable care in light of that knowledge.

## III. Response to Section V. Procedural and Evidentiary Objections (ECF#205 at 122.)

OI has made relevance objections throughout this section of their brief.  Plaintiff has discussed the relevance of evidence where the evidence is cited in Plaintiff's opening post-trial brief and this post-trial reply brief.  Plaintiff asserts those discussions as part of its response to this section of OI's brief.  Plaintiff responds to OI's objections below.

### A.  ECF#205 at 122 (Undesignated Prior Testimony)

OI creates a category which it calls "undesignated trial testimony.  The category includes testimony from the *Humphreys* case and a prior deposition transcript of Earl Gregory in another case.  Plaintiff filed these to facilitate cross examination and in accordance with Plaintiff's understanding that depositions which might be used for any purpose at trial must be filed.  Other than parts referred to in cross examination, the testimony is not and was never part of Plaintiff's case.

As to the other items in OI's list of "undesignated testimony," Plaintiff does not agree the materials should be excluded from the record.  Each listed item will be discussed below witness by witness.

#### i. ECF#205 at 124 (Arthur L. Frank, MD, PhD)

OI objects to the admission of testimony by Dr. Frank, Plaintiffs' medical expert, on several grounds.

*Undesignated Testimony Argument – Dr. Frank*

First, OI argues the testimony is "undesignated" because Plaintiff did not submit page

and line designations.  (ECF#205 at 117-18.)  Dr. Frank's deposition was taken in Philadelphia

on November 25, 2016 – five days before the start of trial.  The transcript states the testimony is

the "Trial deposition of ARTHUR L. FRANK, M.D., PH.D., taken pursuant to notice."

(ECF#165 at 1.)  Dr. Frank's transcript was filed with the Court as ECF#165 on December 1,

2015, as part of the record in the *Suoja* case.  The transcript was recognized in open Court on

December 1, 2015, as part of the trial evidence during a discussion of the evidence to be

considered.

> MR. MCCOY: The only other matter, Judge, which
> Mr. Hausman called my attention to is the page and line
> designations on deposition testimony and we also have
> two trial depositions that I mentioned earlier.
>
> THE COURT: Understood. And that's a good
> pickup because that's critical to your causation proof.

(ECF#195 at 62:17-62:22.)  Like other witnesses whose testimony was taken specifically for the

purpose of the *Souja* trial, Plaintiff did not submit designations of what was already intended for

trial.  For example no designations were submitted by either party for the witnesses who testified

in person before the Court.


*Disclosure Argument – Dr. Frank*

Second OI argues Dr. Frank's Rule 26(a)(2) report dated August 8, 2012, failed to provide

disclosure of all his testimony. (ECF#205 at 120-22.)  OI fails to accurately state the scheduling

orders.  Pursuant to a joint stipulated scheduling proposal of the parties, which was adopted as

order of this Court, the parties were given until September 19, 2014 to supplement the Rule 26(a)(2) disclosures made in the MDL-875 proceedings.  (Att.4 at ¶1, ECF# 18; Att.9, ECF#20.)  The stipulation also allowed for depositions to be taken on the supplementation.  (ECF#20 at ¶2.)  Plaintiff timely supplemented the Rule 26(a)(2) disclosure for Dr. Frank on September 19, 2014. (ECF#22-1, 22-2, 22-3.)  In arguing Dr. Frank's disclosure is untimely, OI makes no mention of the stipulation and order in this Court authorizing the supplementation.[33]  The stipulated order is controlling and\ the disclosure argument must be rejected.

The case law in the Seventh Circuit does not require an expert to spell out every topic of his testimony.  The gist of the law in this Circuit is the report and other disclosures must be inclusive enough so the "opposing party has sufficient information to allow it to prepare adequately for the expert's testimony."[34]

OI asserts Dr. Frank testified about matters not in his report, but does not spell out what was undisclosed.  OI does specify any exposure evidence, medical records, opinions, or literature reference which was not disclosed.  OI does not demonstrate how it was prejudiced or unable to

---

[33] OI took the opportunity under the same scheduling order to file supplemental reports for OI experts Dr. Neushul and Dr. Gregory.  (Att.5; Ex.1163, ECF#198 at 117:16-117:20.)  In making arguments about improper or untimely disclosure, OI does not mention the deadline of this Court for Rule 26()a)(2) supplementation or that OI itself supplemented based on this Court's deadlines.  Instead OI cites to rulings by the Magistrate in MDL-875 that are not specific to the *Suoja* case and preceded the stipulation by OI.   (ECF#205 at 121.)  The supplementation deadlines set by stipulation of the parties and order of this Court after remand, not a non-case specific ruling in MDL-875, are controlling.  The soundbite OI cites from an MDL-875 ruling does not include  the background that MDL Magistrate's ruling was not based on whether Rule 28e supplementation would be allowed for summary judgment purposes.

[34] The requirement stated in Rule 26(a)(2) for the disclosure of an expert's opinions and the reasons underlying those opinions is to ensure that an opposing party has sufficient information to allow it to prepare adequately for the expert's testimony. *See Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 762 (7th Cir. 2010); *Bone Care Int'l, LLC v. Pentech Pharms., Inc*., No. 08-cv-1083, 2010 U.S. Dist. LEXIS 104549, at *42 (N.D. Ill. Sept. 30, 2010) ("The centripetal principle of the rule is to prevent a party from being ambushed by new theories or evidence to which the party lacks sufficient time to respond.").

prepare for the trial testimony of Dr. Frank, especially given the opportunity for a supplemental deposition before trial.  OI counsel was well prepared for the trial deposition and conducted a 44 page cross examination and marked 7 exhibits from medical and insulator trade literature at the trial deposition.  (ECF#185.)  Defense counsel also was provided an extensive list of Dr. Frank's past testimony in several hundred asbestos cases as part of the Rule 26(a)(2) disclosure in the *Suoja* case.  (ECF#22-1 at 16-65.)   The list of past testimony is pages 49 pages long.   Plaintiff also made a timely Court ordered supplemental disclosure of a 28 page affidavit of general asbestos medical information signed by Dr. Frank.   The supplementation was filed on September 14, 2014, over one year before the trial deposition.  (ECF #22—1, 22-2, 22-3.)  OI could have, but did not choose to take the supplemental deposition of Dr.  Frank.  Any new disclosure in the supplementation would be cured by the opportunity for a supplemental deposition, which OI did take. For example the 28 page affidavit which was used for supplementation is not a specific opinion about any case, but only a summary of the medical literature by Dr. Frank.  OI cannot complain about such supplementation after forgoing the supplemental deposition – apparently because the transcripts from the hundreds of times Dr. Frank has testified cover the need for examining Dr. Frank about the general medical literature in the affidavit.

Finally, assuming any disclosure problems exist, the case law does not favor or allow striking expert testimony which primarily informs this Court as the trier of fact about medical information reported in published literature or gleaned from the personal experience of an expert.[35]  The United States Supreme Court has held an expert may discuss medical or scientific

---

[35]The reports of experts are intended to alert the opponent to the substance of the experts' opinions; they are not intended to duplicate every word an expert might say on the witness stand. *See Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009) ("The purpose of these reports is not to

information gained from his experience and the background literature that is basic to his

specialized field.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 ("[N]o one denies that an

expert might draw a conclusion from a set of observations based on extensive and specialized

experience.").

      OI does not identify any testimony which represents a deviation from the opinions in Dr.

Frank's report.  When testifying about matters not specifically listed in the report, if the expert

has not "deviated from the established scope of his expected opinion," then the failure to include

specific references to such matters is not a proper basis for exclusion under Rule 26(a)(2).  *See*

*Metavante Corp.*, 619 F.3d at 762-763 (upholding trial judge's denial of a motion to exclude

expert witness testimony based on the assertion that it was not sufficiently disclosed in a Rule

26(a)(2) report);  *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2010) (reversing lower court's

determination that expert witness reports were deficient after finding the reports were not

"insufficient to alert the defendants to the best strategy for combating the [plaintiff's] case").


*Daubert Challenge to Dr. Frank*

      OI next contends Dr. Frank cannot base his opinion on the "cumulative" exposures to

asbestos.  (ECF#205 at 122-26.)  The cumulative exposure to asbestos is not an opinion or a

novel statement of science.  Cumulative is a principle of science and term widely used in medical

literature to describe the causes of diseases which result from multiple exposures to the same

toxin. (ECF#201 at 46-47, 82-83, 181-82.)   Dr. Frank pointed to several examples in the medical

literature using the term "cumulative exposure" and recognized principle which underlies this

---

replicate every word that the expert might say on the stand. It is instead to convey the substance
of the expert's opinion … so that the opponent will be ready to rebut, to cross-examine, and to
offer a competing expert if necessary.").

terminology to describe the multiple exposures which lead to causation of asbestos disease. (ECF#201 at 46-47, 82-83, 181-82.)

OI contends that "cumulative" exposure is the same as the "each and every" exposure is a cause testimony which is not allowed as an opinion pursuant to stipulation.[36] The two terms have different meanings. When multiple toxic exposures are involved, "cumulative" relates to the sum of all exposures causing the disease mesothelioma in Ozzie. The "each and every" relates to which of the separate or individual exposures are considered a substantial cause.[37]

OI attempts to extend Plaintiff's stipulation in response to OI's earlier motion in limine to cover the cumulative exposure testimony. OI contends the "cumulative exposure" testimony of Dr. Frank is no different than the "every exposure" testimony and must be stricken. This Court already rejected OI's argument to strike any part of Dr. Frank's testimony besides what was in the stipulation entered in response to the earlier OI motion. Specifically this Court (Judge Crabb) ruled OI must file a new motion in limine to strike any further part of Dr. Frank's testimony. The history of those rulings is laid out in Plaintiffs' opening post trial brief. (ECF#201 at ECF 201, 82-83.) The ruling by Judge Crabb is law of the case. OI's failure to file a timely MIL should result in rejecting and striking the argument that Ozzie's cumulative exposure testimony is improper.

Assuming this Court considers OI's *Daubert* argument on the merits, OI is not correct in comparing the terms "cumulative" and "each and every" exposure in the context of the medical

---

[36] As discussed in Plaintiff's opening brief, OI counsel improperly elicited the barred testimony from Dr. Frank by a leading question on cross examination. (ECF#201 at 82, 82 n. 101; ECF#205 at 30-31.) Plaintiff does not rely on that testimony. This Court should apply the MIL ruling mutually and strike the testimony.

[37] The Seventh Circuit recognized this same distinction between "general" and "specific" causation for multiple exposures to the same toxin in *C.W. v. Textron,* 807 F.3d 827, 838-39 (7th Cir. 2015).

testimony by Dr. Frank.  While the semantics of the word choice can be confusing to nonexperts,

Dr. Frank and other scientists have a precise understanding of meaning and principle for the term

cumulative exposure which appears routinely in the scientific literature. In comparison the

terminology about "each and every" exposure is a cause does not appear directly in the medical

literature and represents a litigation opinion which Plaintiff stipulated would not be relied upon

by Dr. Frank.  The use of recognized scientific principles and terminology is proper in the

methodology of causation.  If Dr. Frank is relying on proper methodology using principles and

terms regularly described in scientific literature, this Court should not strike his testimony.  *Smith*

*v. Ford Motor Company,* 215 F.3d 713, (7th Cir. 2000.)  ("the court's gatekeeping function

focuses on an examination of the expert's methodology" citing to *Daubert, 509 U.S. at 595* ("The

focus, of course, must be solely on principles and methodology, not on the conclusions that they

generate.")).

   OI cites to the case of Schultz v. Akzo Nobel Paints, LLC,  721 F.3d 426  (7th Cir. 2013),

which implies certain levels of toxic exposure are so *deminimis* as to not constitute a substantial

factor cause.  The circumstances in *Suoja*  do not approach a *deminimis* exposure to asbestos or

OI Kaylo.   On the record before this Court, an exposure of one day is enough to cause

mesothelioma.  (ECF#201 at 80 and note 100.)   Dr. Frank's opinion that 30 days exposure to OI

Kaylo alone can cause Ozzie's mesothelioma does not approach the deminimis level of below

one day.

   Finally, OI cites to the trial court decision in *Krik v. Crane Co,* No. 10C7435N.D. I\ll.,

April 21, 2105.)   (ECF #205 at 129-30.)  OI makes no showing that the Court in *Krik* made any

finding about the scientific principle and meaning represented by the "cumulative" exposure to a

toxin such as asbestos.  The  Court in *Krik* superimposed its own definition on "cumulative" to

equate the meaning to "each and every" exposure.  Such a finding is contrary to the scientific

principle and meaning of the cumulative exposure which is not an opinion.  OI also

misrepresents that the ruling came after a full *Daubert* hearing by the Judge making the decision

to equate cumulative exposure with "each and every" exposure.  (ECF#205 at 130.)  The ruling

OI cites is not based on a *Daubert* hearing.  The *Daubert* hearing in Krik was held by another

Judge who ruled the causation testimony of Dr. Frank would be allowed providing he did not

rely on the "each and every" exposure opinion. (Att.7, Judge Lee's December 22, 2014

memorandum opinion and order.)  Needless to say, the Krik case is on appeal due to the conflict

in the two rulings.  A the end of the day, OI's failure to file the MIL mandated by Judge Crabb in

order to further limit or strike Dr. Frank's testimony is fatal to OI's arguments based on *Daubert*.

The Seventh Circuit case law is clear that the *Daubert* protocol requires a hearing to strike the

testimony.[38]  Without the MIL being filed, OI failed to trigger the required hearing and this Court

has no basis to strike further testimony of Dr. Frank based on OI's belated and untimely

"*Daubert*" argument.[39]


### ii.  ECF#205 at 131 (Thomas Wiig, MD)

---

[38] In *Metvante Corporation v. Emigrant Savings Bank*, 619 F.3d 748 (7th Cir. 2010),  the Seventh
Circuit held a Daubert hearing with notice is required even in a bench trial.  The Court held:
> We agree that the district court failed to perform a *Daubert* analysis. The court, in its oral
> ruling, stated only that "I find nothing in Mr. Moffat's opinions to run afoul of either *Rule
> 702* or notice requirements to opposing counsel." R.545 at 2.  Although we have held that
> the court in a bench trial need not make reliability determinations before evidence is
> presented, *In re Salem, 465 F.3d 767, 776-77 (7th Cir. 2006)*, the determinations must
> still be made at some point. Two of our sister circuits have held that *Daubert's*
> requirements of reliability and relevancy continue to apply in a bench trial.
619 F.3d at 760.

[39] OI cited as supplemental authority the case of *McIndoe v. Huntington Ingalls Inc*., F.3d, 2016
WL 1253903 (9th Cir. 2016).  The case is only another example of a court striking the every
exposure opinion which Plaintiff agreed to not offer.

OI objects to admission of the testimony of Dr. Wiig taken by agreement before trial as a "trial deposition." First OI makes the same argument raised about Dr. Frank that Plaintiff did not submit page and line designations of Dr. Wiig's testimony. Plaintiff's response is also the same. The trial testimony of Dr. Wiig was recognized in open Court as part of the trial record and no page and line designations were submitted for testimony of any witness which was taken as part of the trial record. Dr. Wiig's transcript was filed with the Court as ECF#164 on December 1, 2015 as part of the trial record.

Second OI argues Dr. Wiig cannot testify about records created other physicians that are part of Ozzie's medical file at the health care group where Dr. Wiig was employed. Dr. Wiig's role as the surgeon in a team of physicians sharing records and collaborating in the care of Ozzie is set forth in Plaintiff's opening brief. (ECF#201 at 157-162 and especially note 174; ECF#164 at 10-11, 31-32.) OI ignores and does not address this basic foundation for Dr. Wiig knowing the records of and services rendered by other providers on Ozzie's medical team. Further, the medical records of the other providers are admissible without any testimony and were not objected to by OI. Dr. Wiig's reliance on what is already in evidence to describe the care and treatment of Ozzie is proper.

A physician is qualified to testify as to a patient's condition on the basis of his review of the medical records created by other physicians caring for that patient. *See*, *e.g.*, *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (admitting opinion testimony from a physician who performed a records review without an examination, noting that "[t]he lack of an examination . . . does not render [the physician's] testimony inadmissible"). The case for admission here is stronger than in *Walker*. Dr. Wiig performed the surgery on and had several personal consults with Ozzie.

<u>iii. ECF#205 at 133 (Elmer Borchardt)</u>

OI objects to admission of the affidavits of Elmer Borchardt contained in ECF#144.

Plaintiff has made no reference to the affidavits at trial or in post-trial briefing and does not

object to the affidavits being stricken for trial.

<u>B. ECF#205 at 133 (Designated Prior Testimony)</u>

Plaintiff does not agree any of the materials in OI's list of "designated prior testimony

should be excluded from the record.  Each listed item will be discussed below witness by

witness.

<u>i. ECF#205 at 133 (George Schlub)</u>

OI objected to George Schlub's January 27, 2012 testimony (ECF#154.)  Plaintiff

responds to the specific objections by filling in OI's chart with a response column:

| Plaintiff's Designations | Owens-Illinois's Objections | Response to Objection |
|---|---|---|
| 6:16–33:20 | 10:18–11:10 Lack of foundation; vague; ambiguous; overbroad | Establishes the qualifications and personal knowledge of the witness specific to Ozzie.  Questions on general preliminary matters are permitted |
| | 12:13–14:14 Lack of foundation; compound; vague; ambiguous; overbroad | 12:7 to 14:8 are lawyer colloquy and withdrawn.  12:13-16 and 14:10-14 are based on personal knowledge of working at Badger |
| | 12:17–14:7 Lack of relevance as to | Withdrawn |

| | | |
|---|---|---|
| | colloquy | |
| | 15:6–15:15 Lack of foundation; compound | No contemporaneous form objection asserted at the deposition.  Now waived.  Foundation is personal knowledge of working at Badger. |
| | 15:16–15:20 Compound; leading | No contemporaneous form objection was asserted.  Now waived. |
| | 15:21–16:1 Compound; vague; ambiguous; overbroad | No contemporaneous form objection asserted at the dep. |
| | 16:2–16:13 Lack of foundation; calls for speculation; compound*

17:12–17:16 Lack of foundation; calls for speculation; overbroad*

18:24–19:10 Lack of foundation; and calls for speculation* | *Answer is based on personal knowledge of characteristics of brands of molded pipe insulation established in the deposition.  See ECF #201 at 12-14 for a partial summary of the testimony establishing personal knowledge |
| | 19:11–19:24 Lack of foundation*; calls for speculation; vague | *Same as above |
| | 20:18–21:6 Lack of foundation; calls for speculation; vague; ambiguous; overbroad | *same.  Foundation why the witness has personal knowledge based on a lot of experience with Kaylo |
| | 21:7–22:3 Lack of foundation; calls for speculation; compound | Testimony is based on personal knowledge about Kaylo and personal experience of working on the insulation in1959 and again in 1967 or 1968 and later. |
| | 22:15–22:21 Vague; ambiguous; overbroad | Witness is clarifying he worked with Kaylo at other places besides Badger in the 1950s. |
| | 22:22–23:20 Lack of foundation; hearsay; calls for speculation; calls for
expert opinion; vague; ambiguous; overbroad | Witness is not giving an opinion. The statements of the insulators who worked in the 1940s are admissible under FRE807 (residual hearsay) as trustworthy and the best available evidence since most Badger records missing.  OI expert Dr. Gregory |

| | | |
|---|---|---|
| | | relied on the statements about the 1940s as trustworthy in his courtroom testimony.  See ECF#205 at 40-41, OI PFF#59.)  The interests of justice are served by both parties being allowed to use evidence that covers what is not available due to the missing Badger records from the 1940s. |
| | 24:12–25:3 Lack of foundation; calls for speculation; calls for expert opinion; vague; ambiguous; overbroad | Alay witness can offer "opinion" testimony limited to personal perceptions of non-technical issues.  FRE 702.  The question and answers are confined to personal experience. |
| | 25:4–25:21 Lack of foundation; hearsay; calls for speculation; lack of relevance |  Answer is based on personal knowledge of characteristics of brands of molded pipe insulation established in the deposition.  See ECF #201 at 12-14 for a partial summary of the testimony establishing personal knowledge.  The ability of the witness to distinguish Kaylo  from other brands is relevant |
| | 26:12–26:15 Lack of relevance as to colloquy | withdrawn |
| | 33:10–33:11 Nonresponsive | Answer is responsive and relevant to witness' knowledge of Kaylo. |
| 34:21–35:4 | No additional objection | No additional response |
| 35:22–36:5 | No additional objection | No additional response |
| 36:19–37:2 | 36:24–37:2 Nonresponsive | Responsive to the immediately preceding questions for which witness is supplementing his answer |
| 41:20–43:8 | No additional objection | No additional response |
| 44:3–44:9 | 44:3–44:9 Nonresponsive; no question pending | Responsive to the immediately preceding questions for which witness is supplementing his answer |

ii. ECF#205 at 134 (Lawrence Zimmer)

OI objected to Lawrence Zimmer's February 2, 2012, and February 3, 2012 testimony.

(ECF#155-156.)  OI first argued that "plaintiff's counsel stipulated at Mr. Zimmer's deposition

that he would testify against only two defendants, Westinghouse and Georgia-Pacific."

(ECF#205 at 134.)  OI quoted a small portion of plaintiff's counsel Ron Archer's statements

during the deposition.  Additional deposition testimony is needed to determine the extent of the

stipulation and is as follows:

> MS. CHENEVERT: Ron, I have a question for you. For the coworkers listed on
> this notice that we haven't discussed, will you withdraw those -- will you
> withdraw Mr. Zimmer as a witness in those cases?
>
> THE WITNESS: Yes. Against Georgia Pacific, yes.
>
> MR. SAWYER: Would you also withdraw as a witness to Westinghouse?
>
> MR. ARCHER: If he doesn't know them, he doesn't know them so, yeah.
>
> MR. MALONEY: Could we just withdraw him as to all defendants?
>
> MR. ARCHER: No. I'm not going to just give away everything for you guys.
> These two are the two that are here for real defendants. I don't need to talk to
> anyone else really. You don't need anything really. He's given no testimony
> against you, and he's not going to. He would have already if he had it. And that's
> something you can put in your motions.

(ECF#156 at 81:13-82:6.)

For there to be a stipulation based on what was said during the deposition it must meet

two requirements.  1) It must be for "coworkers listed on this notice that we haven't discussed"

and 2) it must be for a defendant he has "given no testimony against."  Even if this Court finds

that the requirements were independent and separate stipulation requests were made, Archer

agreed to neither for OI.

As Zimmer had discussed Ozzie earlier in the deposition the stipulation would not apply to the *Suoja* case.[40]

Mr. Archer responds in the negative to the question regarding withdrawing Suoja to all defendants stating: "No. I'm not going to just give away everything for you guys."  Ron Archer's statement cited by OI that "these two are the two that are here for real defendants. I don't need to talk to anyone else really. You don't need anything really.  He's given no testimony against you, and he's not going to" has no bearing on OI in the *Suoja* case for two reasons.  First, Zimmer had already testified about Kaylo at Badger.[41]  OI argues that the testimony was about OCF and not OI, but the particular testimony referenced in the previous footnote[42] is about removal of Kaylo which Plaintiff claims was OI Kaylo.  The fact finder must determine whether the Kaylo

---

[40]  Q. How about a fellow by the name of Oswald Souja?
 A. Yes.
 Q. Was he also an insulator like yourself?
 A. Yes.
 Q. Was he out at Badger Ordinance?
 A. Yes.
 Q. Was he there in the '50's like you were?
 A. Yes.
ECF#156 at 54:4-54:11

[41] Q. Did you ever work at a place called Badger Ordinance?
 A. Yes.
 Q. When were you there?
 A. That was probably in '58.
 Q. Late '58?
 A. Yeah.
 Q. Was there any removal of insulation going on out there
 while you were there?
 A. There was.
 Q. Could you tell what brand of insulation was being
 removed, or can you tell us what brand of insulation
 was being removed out there?
 A. It was Kaylo.
ECF#156 at   25:13-25:25
[42] Plaintiff does not limit any other argument made by Plaintiff and just refers to ECF#156 at 25:13-25:25 here for purposes of argument about whether there was a stipulation to OI.

referenced by Zimmer was OI Kaylo so the stipulation would only be to OI if the fact finder has

already determined the insulation wasn't OI Kaylo.  Second, OI was not in attendance at the

deposition, despite being noticed, so Archer's statement that, "those are the two that are here for

the real defendants. I don't need to talk to anyone else really" couldn't have been directed at OI

since OI wasn't there.

Plaintiff responds to the specific objections by filling in OI's chart with a response

column:

| Plaintiff's Designations | Owens-Illinois's Objections | Response to Objection |
|---|---|---|
| 10:14–14:7 | 11:6–13:2 Lack of relevance | Withdraw 11:6 to 12:7 and 12:10-15. Military experience is relevant to training and experience – especially for a witness whose credibility is challenged.  Retirement status is background. |
| 21:23–27:12 | 21:23–27:12 Lack of foundation; lack of relevance as nothing is related to Mr. Zimmer's work with or around Oswald Suoja | *Testimony is relevant to1) personal experience with Kaylo and foundation to recognize the product at Badger when working with Ozzie in 1958-59; and 2) dusty conditions created when removing or installing Kaylo;  3)  work at Badger in 1958-59; 4) description of the process of applying pipe insulation, and 5) that the Kaylo at Badger was from the OI period based on the age when removed, and 6) the foundational basis of Zimmer's observations at Badger. See ECF #201 at 17-21 for a partial summary of the relevance of Zimmer's testimony.  OI's repeated challenge to Zimmer's credibility requires the complete foundation for his knowledge be in the record. |
|  | 22:7–23:12 Lack of foundation; vague; ambiguous; overbroad as to place and time | Same as *above.  Establishes Zimmer's knowledge of Kaylo and other  brands of materials before and after working at |

| | | |
|---|---|---|
| | | Badger to be able to distinguish Kaylo when he worked with Ozzie at Badger. Form objection is waived by absence contemporaneous form objection. |
| | 23:20–25:12 Lack of foundation; vague; ambiguous; overbroad as to place and time | Same as * above.  The process of applying pipe insulation is relevant to show the dust created when installing and removing the layers of insulation, inability to distinguish molded pipe insulation which is in place and has been covered over by layers, the ability to distinguish the brands underneath as the covering layers are removed, and other reasons.  Form objection is waived by absence contemporaneous form objection. |
| | 22:12–22:14 Asked and answered | Question is clarified and witness clarifies answer. |
| | 23:5–23:11 Lack of foundation; vague; ambiguous; overbroad as to place; time; and "Kaylo" product | Foundation is personal knowledge of using Kaylo and other brands.  Other questions and answers relate the personal knowledge about Kaylo and other brands to work with Ozzie at Badger.  See ECF #201 at 17-21 for a partial summary of the relevance of Zimmer's testimony.  Form objection is waived by absence contemporaneous form objection. |
| | 23:13–23:17 Compound | Question is not compound.  Form objection is waived by absence contemporaneous form objection. |
| | 23:17–23:19 Compound | Question is not compound.  Form objection is waived by absence contemporaneous form objection. |
| | 23:23–24:5 Compound; lack of foundation; vague; ambiguous; overbroad | The process of applying pipe insulation is relevant to show the dust created when installing and removing the layers of insulation, inability to distinguish molded pipe insulation which is in place and has been covered |

68

| | | |
|---|---|---|
| | | over by layers, the ability to distinguish the brands underneath as the covering layers are removed, and other reasons. Form objection is waived by absence contemporaneous form objection. |
| | 25:22–26:2 Lack of foundation; calls for speculation as Mr. Zimmer admits that he did not perform the work or help remove "Kaylo" at Badger Ordnance Works (26:21–24) | Mr. Zimmer was an apprentice helper on the job who could not use the "tools" but could observe the work and do other tasks which placed him within "feet" as opposed to "yards" from the removal work. (27:2-11. Objection is also waived as not asserted contemporaneously to provide notice of need to cure. |
| | 26:5–26:9 Lack of foundation; calls for speculation | Testimony is based on experience as an insulator and personal knowledge of work at Badger. Objection is also waived as not asserted contemporaneously to provide notice of need to cure. |
| | 27:15–27:20 Compound; lack of foundation; calls for speculation | Should be 26:15-20. Not compound Testimony is based on experience as an insulator and personal knowledge of work at Badger and Kaylo. Objection is also waived as not asserted contemporaneously to provide notice of need to cure. |
| | 27:4–27:6 Compound | Not compound. From objection is also waived as not asserted contemporaneously to provide notice of need to cure. |
| 54:4–54:17 | 54:4–54:11 Leading | Foundational questions can be leading. Form objection is also waived as not asserted contemporaneously to provide notice of need to cure. |
| | 54:10–54:11 Lack of foundation; vague; ambiguous; overbroad as to "50s like you were" | Foundation is personal knowledge of witness. Questions are proper. Form objections are also waived as not asserted contemporaneously to provide notice of need to cure. |

| | | |
|---|---|---|
| | 54:12–54:15 Lack of foundation; compound; vague; ambiguous; overbroad; calls for speculation | Foundation is personal knowledge of witness.  Question is proper.  Form objections are also waived as not asserted contemporaneously to provide notice of need to cure. |
| | 54:15 Nonresponsive portion | Answer is responsive to the question of how much exposure Ozzie had compared to Zimmer.  The objection is also waived  as not asserted contemporaneously to provide notice of need to cure. |
| | 54:16–54:17 Lack of foundation; calls for speculation | Foundation is personal knowledge from the job.  Zimmer would observe who "was already there" when he started. |
| 57:21–59:3 | 57:21–57:25 Lack of foundation; hearsay | Foundation is personal knowledge from being in the union and attending meetings. The statements at the meetings are to show what the witness understood about asbestos dangers, not the truth of the matter asserted. The objections is also waived  as not asserted contemporaneously to provide notice of need to cure. |
| 81:13–81:25 | 81:13–81:25 Lack of relevance as to colloquy | Withdrawn for the purposes of Zimmer's substantive testimony.  OI asserts these passages in objecting to disclosure of Zimmer's testimony |

### iii. ECF#205 at 136 (Elmer Borchardt)

OI objects to admission of Elmer Borchardt's July 2, 2008 testimony.  (ECF#180.)

Plaintiff has made no reference to this testimony at trial or in post-trial briefing and does not

object to it being stricken for trial.

### iv. ECF#205 at 137 (Michael Dowling)

OI objects to admission of Michael Dowling's October 27, 1998 testimony. (ECF#146.) Plaintiff has made no reference to this testimony at trial or in post-trial briefing and does not object to it being stricken for trial.

### v. ECF #205 at 138, 139 (Donald Popalisky)

OI objects to admission of Donald Popalisky's June 13, 1980 and March 17, 1987 testimony. (ECF#152-153.) Plaintiff has made no reference to this testimony at trial or in post-trial briefing and does not object to it being stricken for trial.

### vi. ECF#205 at 139 (Elmer Borchardt)

OI objects to admission of Elmer Borchardt's May 12, 2003 testimony. (ECF#187.) Plaintiff responds to the specific objections by filling in OI's chart with a response column:

| Plaintiff's Designations | Owens-Illinois's Objections | Plaintiff's Response to Objections |
|---|---|---|
| 9:23-10:25 | 10:11-10:16 Nonresponsive | The response to the previous question (10:5-10:9) was not completed and 10:11-10:16 finishes the answer. No contemporaneous objection. |
| 15:22-18:25 | 17:4-18:2 Lack of foundation; calls for speculation (see 35:14)<br>18:3-18:25 Misstates prior testimony, lack of foundation, nonresponsive | Borchardt is President of L&S has personal knowledge of what the company understood to be the hazards of asbestos.<br><br>No contemporaneous objections. |
| 19:17-19:21 | No further objection | |

vii. ECF#205 at 140 (Richard Grimmie)

OI objects to admission of Richard Grimmie's September 20, 1991 and October 28, 1991

testimony.  (ECF#147-148.)  Plaintiff responds to the specific objections by filling in OI's chart

with a response column:

| Plaintiff's Designations | Owens-Illinois's Objections | Plaintiff's Response to Objections |
|---|---|---|
| 9:07-9:08 | No objection | |
| 12:15-13:06 | Lack of relevance as to plant environment; lack of relevance as to Owens corning Fiberglas and not Owens-Illinois | The relevance of Grimmie's testimony concerning Owens-Illinois is established Plaintiff's introductory response, above setting for his qualifications and employment history at page 2.  Grimmie's testimony establishes certain activities took place in the OI Kaylo plant production. These  plant "environment "activities  are substantially similar, if not identical to activities when the finished Kaylo materials  are used in the field - e.g., cutting and sawing of  the product, sweeping debris, handling such  removing and placing into cartons.  Plaintiff personally performed or was around others who performed the same or substantially similar activities in the field. The exposures during such plant activities and safety practices and procedures which OI followed in the plant are comparable to and relevant to prove what exposures occurred in the field and what O-I should have done to warn |

| | | and instruct end users about safety measures.  Other evidence establishes the exposures and the safety measures taken by O-I in its own plant. |
|---|---|---|
| 13:11-13:22 | Lack of relevance as to plant environment and not a finished product | See Plaintiff's response to OI's objections to p.12:15 to 13:06, above. |
| 14:01-16:19 | Lack of relevance as to a plant environment and not a finished product | See Plaintiff's response to OI's objections to p.12:15 to 13:06, above. |
| 16:24-20:02 | Lack of relevance as to a plant environment and not a finished product; lack of relevance as to Owens Corning Fiberglas and not Owens-Illinois; lack of foundation; lack of relevance as to "relationship" between Owens Corning Fiberglas and Owens-Illinois | See Plaintiff's response to OI's objections to p.12:15 to 13:06, above.  The testimony OCF took over the distribution, sales and marketing for Kaylo in the early or mid-1950s, is relevant because OCF is often mentioned as the seller or source from which Kaylo was purchased. The distribution relationship which existed between O-I and OCF explains why OI as manufacturer is responsible for Kaylo before 1958 even though OCF may have been the source from which it was purchased. |
| 20:06-20:14 | Lack of relevance as to Owens Corning Fiberglas and not Owens-Illinois; lack of relevance as to a plant environment and not a finished product | See Plaintiff's response to OI's objections to p.12:15 to 13:06, above. |
| 21:17-22:04 | Lack of relevance as to Owens Corning Fiberglas and not Owens-Illinois; lack of relevance as to a plant environment and not a finished product | See Plaintiff's response to OI's objections to p.12:15 to 13:06, above. |
| 22:11 ("is it…")-22:17 | Lack of relevance as to a plant environment and not a finished product; lack of | Grimmie testified that by in 1947 he learned of the disease asbestosis and knew Kaylo |

73

| | foundation; overbroad; vague; calls for speculation; calls for expert opinion as to witness's belief | contained harmful asbestos fibers.  His testimony is personal knowledge, not speculation.  Grimmie's later positions at OI included personnel assistant, personnel director, and production supervisor.  Grimmie's testimony is relevant to (1) information O-I had of the potential harmful effects of its asbestos containing products; and (2) information an OI employee in a management position with safety responsibility had of these potential harmful effects.  What OI knew or should have known about the dangers of asbestos is an element which plaintiff must prove in this case.  O-I could have provided warnings to customers and/or users regarding the dangers of asbestos in its products, and warned them to take safety precautions when disturbing OI's asbestos containing materials.  For foundation, see Plaintiff's response, above, at p.2. |
|---|---|---|
| 23:16 ("You knew…") -23:18 | Lack of relevance as to a plant environment and not a finished product; lack of foundation; overbroad; vague; calls for speculation; calls for expert opinion | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 23:22-23:24 | Lack of relevance as to a plant environment and not a finished product; lack of foundation; overbroad; vague; calls for speculation; calls for expert opinion | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 27:20("When the Kaylo…")-28:01 | Lack of relevance as to a plant environment and not a finished product; lack of | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, |

| | | |
|---|---|---|
| | foundation; overbroad; vague; calls for speculation; calls for expert opinion | above. |
| 29:03- 29:12 | Lack of foundation; improper refreshing of recollection | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above.  Relevant because OI had certain knowledge from the Saranac study about the health hazards of asbestos of which Grimmie should have been aware as a manager with safety responsibility.  Past testimony is properly used to refresh the witness recollection. |
| 29:22-30:08 | Lack of foundation; improper refreshing of recollection | See Plaintiff's response to OI's objections to p.29:03 to 29:12, above. |
| 30:14-30:20 | Lack of foundation; improper refreshing of recollection | See Plaintiff's response to OI's objections to p.29:03 to 29:12, above. |
| 31:21-31:25 | Lack of foundation; improper refreshing of recollection | See Plaintiff's response to OI's objections to p.29:03 to 29:12, above. |
| 43:22-43:23 | Lack of foundation; lack of relevance as to a plant environment and not a finished product | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 44:03-44:09 | Lack of foundation; lack of relevance as to a plant environment and not a finished product | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 44:12-44:14 | Lack of relevance as to a plant environment and not a finished product; lack of foundation; overbroad; vague; calls for speculation; calls for expert opinion | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 44:17-44:17 | Lack of relevance as to a plant environment and not a finished product; lack of foundation; overbroad; vague; calls for speculation; calls for expert opinion | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 47:14-47:17 | Lack of relevance as to a plant | See Plaintiff's response to |

| | | |
|---|---|---|
| | environment and not a finished product; lack of foundation; overbroad; vague; calls for speculation; calls for expert opinion | OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 48:01-48:05 | Lack of relevance as to a plant environment and not a finished product; lack of foundation; overbroad; vague; calls for speculation; calls for expert opinion | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 48:07-48:08 | Lack of relevance as to a plant environment and not a finished product; lack of foundation; overbroad; vague; calls for speculation; calls for expert opinion | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above |
| 59:10-60:21 | Lack of relevance as to a plant environment and not a finished product; lack of relevance as to Owens Corning Fiberglas and not Owens-Illinois | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above.  Failure to warn or instruct users in the field to follow the same safety measures as OI adopted in its plants is evidence of claims asserted. |
| 65:08-66:03 | Lack of relevance as to a plant environment and not a finished product; lack of foundation; calls for speculation; calls for expert opinion | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, above.  Grimmie's testimony reannual x-rays for OI employees is relevant  to  OI's knowledge of the health hazards of cutting or otherwise disturbing asbestos |
| 66:06–66:06 | Lack of relevance as to a plant environment and not a finished product; lack of foundation; calls for speculation; calls for expert opinion | containing materials.  Further, OI could have warned customers or users about the health hazards of cutting, or otherwise disturbing its asbestos products and recommended annual x-rays for end users. |
| 80:07–80:09 | Lack of relevance as to a plant environment and not a finished product; Lack of | See Plaintiff's response to OI's objections to p.12:15 to 13:06 and 22:11 to 22:17, |

| | | |
|---|---|---|
| | relevance as to witness's health status or his knowledge of latency; calls for expert opinion; lack of foundation for witness's medical opinion as to latency | above.  Grimmie was not asked for an expert medical opinion.  He was asked if he understands there is a latency period for asbestos disease, and he answered he does. Latency of asbestos |
| 80:13–81:09 | Lack of relevance as to a plant environment and not a finished product; lack of relevance as to witness's health status or his knowledge of latency; calls for expert opinion and lack of foundation for witness's medical opinion as to latency | disease is not an opinion.  It is a scientific fact to which medical experts testify.   The testimony is relevant to show OI's knowledge of the latency period. O-I's knowledge of the long term health effects of exposure to asbestos relates to the type and content of the warnings |
| 81:11–81:12 | Lack of relevance as to a plant environment and not a finished product; Lack of relevance as to witness's health status or his knowledge of latency; calls for expert opinion; lack of foundation for witness's medical opinion as to latency | OI should have given to customers and users of its asbestos containing products. Knowledge of the latency period for asbestos disease is also relevant to OI's failure to adequately test the long-term health effects on persons who are exposed to asbestos fibers from OI's products.  OI argues it did know asbestos was dangerous because no OI employee got sick from asbestos before O-I sold the Kaylo business.   The testimony is relevant to show that O-I knew the period for diagnosis disease was likely to be longer than  the 14 year period for which O-I owned the Kaylo business. |
| 81:21-81:22 | Lack of relevance as to a plant environment and not a finished product; Lack of relevance as to witness's health status or his knowledge of latency; calls for expert opinion and lack of foundation for witness's medical opinion | See Plaintiff's response to OI's objections to p.80:07 to 80:09, 80:13 to 81:09, and 81:11 to 81:12. |

| | | |
|---|---|---|
| | as to latency; lack of foundation for what witness heard | |
| 82:7 ("Were you...")–82:12 | Lack of relevance as to a plant environment and not a finished product; lack of relevance as to witness's health status or his knowledge of latency; calls for expert opinion and lack of foundation for witness's medical opinion as to latency | See Plaintiff's response to OI's objections to p.80:07 to 80:09, 80:13 to 81:09, and 81:11 to 81:12. |
| 82:25–83:03 | Lack of relevance as to a plant environment and not a finished product; lack of relevance as to witness's health status or his knowledge of latency; calls for expert opinion and lack of foundation for witness's medical opinion as to latency | See response to OI's objections to p.12:15 to 13:06, 22:11 to 22:17, and p.80:07 to p.80:09, above. OI references the plant x-ray program which did not show any findings of injured workers in a section where they assert they thought Kaylo was safe.  Since the x-ray program only covered the period of ten years when OI was manufacturing Kaylo, the duration of the x-ray program at OI was not long enough to assess the effects of the exposures given the latency period.  Grimmie, as a person in management and one with safety responsibility is admitting the program was insufficient.    Selling Kaylo product without investigating the safety of the product during the appropriate latency period and without warnings or safety instructions is evidence of negligence. |
| 83:06–83:06 | Lack of relevance as to a plant environment and not a finished product; lack of relevance as to witness's health status or his knowledge of latency; calls for expert opinion and lack of foundation for witness's medical opinion as to latency | |
| 129:21–129:24 | Lack of foundation; lack of relevance as to a plant environment and not a finished product | Relevant to show stacking or packing of Kaylo in cartons creates in dust.  When Kaylo was unpacked at locations where Ozzie was working, unpacking would also result in release of this dust.  Relevant |

| | | to show OI should have warned about the handling of the product users in the field and investigated the hazards of such dust. |
|---|---|---|
| 130:07-131:09 | Lack of relevance as to a plant environment and not a finished product; relevance; lack of foundation; calls for speculation as to what witness would expect | See Plaintiff's response to OI's objections to p.12:15 to 13:06, 22:11 to 22:17, and p.129:21 to 129:24, above. |
| 131:11-131:15 | Lack of relevance as to a plant environment and not a finished product; lack of relevance; lack of foundation; and calls for speculation as to what witness would expect | See Plaintiff's response to O-I's objections to p.130:07 to 131:09, above. |
| 139:14-140:06 | Lack foundation and calls for speculation; lack of relevance as to a plant environment and not a finished product | Grimmie testified that it would make common sense to warn workers that cutting Kaylo without wearing adequate respiratory protection presents a potential health hazard. See also Plaintiff's response to OI's objections to p.130:07 to 131:09, above. |
| 140:09-140:14 | Lack foundation and calls for speculation; lack of relevance as to a plant environment and not a finished product | |
| 141:09-141:18 | Lack foundation and calls for speculation; lack of relevance as to a plant environment and not a finished product | See Plaintiff's response to O-I's objections to p.12:15 to 13:06 and 22:11 to 22:17, above.  Grimmie testified that OI employees were complaining about dust in the plant in 1953. This testimony is relevant to OI's knowledge of the health hazards of asbestos.  Failure to investigate the safety of the product during the latency period without warnings or safety instructions is evidence of negligence. |
| 210:4-210:8 | Lack foundation and calls for speculation; lack of relevance as to a plant environment and not a | See Plaintiff's response to O-I's objections to p.12:15 to 13:06 and 22:11 to 22:17, above.  Grimmie's answer |

| | finished product | corrects earlier testimony about his employment history based in this transcript. |
|---|---|---|
| 211:10-212:6 | Lack foundation and calls for speculation; lack of relevance as to a plant environment and not a finished product | See Plaintiff's response to O-I's objections at 210:4 to 210:8. |
| 360:04-360:15 | Lack of relevance as to a plant environment and not a finished product; lack of relevance as to Owens Corning Fiberglas and not Owens-Illinois | See Plaintiff's response to O-I's objections to p.12:15 to 13:06 and 22:11 to 22:17, above. |
| 361:17-362:09 | Lack of relevance as to a plant environment and not a finished product | See Plaintiff's response to O-I's objections to p.12:15 to 13:06 and 22:11 to 22:17, above.  Witness testified about what he was doing while employed by OI, including warning people that they could get diseases if they did not wear a respirator while working with Kaylo.  Failure to investigate the safety of the product during the latency period without warnings or safety instructions is evidence of negligence. |
| 368:16-368:20 | Lack of relevance as to a plant environment and not a finished product; lack of foundation and calls for speculation | See Plaintiff's response to O-I's objections to p.12:15 to 13:06 and 22:11 to 22:17, above.   Other evidence establishes O-I's industrial hygiene/medical department had information about dangers of asbestos from the Saranac animal studies and about levels of asbestos exposure which were dangerous.  The testimony is relevant to establish O-I' industrial and hygiene and medical departments did not communicate the dangers of Kaylo exposures to the |

| | | production department. A jury can infer this was negligence to not instruct/advise the production department to put warnings and safety instructions on Kaylo packages. |
|---|---|---|
| 369:08-369:11 | Lack of relevance as to a plant environment and not a finished product; lack of foundation and calls for speculation | See response to O-I objections at 368:16-20 |
| 369:15-369:16 | Lack of relevance as to a plant environment and not a finished product; lack of foundation and calls for speculation; lack of relevance as to Owens Corning Fiberglas and not Owens-Illinois | See response to O-I objections at 368:16-20 |
| 370:14-370:22 | Lack of relevance as to a plant environment and not a finished product; lack of foundation and calls for speculation; lack of relevance as to Owens Corning Fiberglas and not Owens-Illinois | See response to O-I objections at 368:16-20. Testimony is equally applicable to Grimmie's period of employment with OI. |

## C. ECF#205 at 144 (Trial Testimony)

### i. ECF#205 at 144 (Stephen Kenoyer)

OI also argues disclosure of Kenoyer's January 23, 2013, amended "General Report" is not timely. As per the discussion above about disclosure of Dr. Frank's testimony, OI's argument must be rejected based on the stipulated deadline of September 19, 2014 set by this Court for supplementation of Rule 26(a)(2) disclosures. (ECF#20; reply brief at 53-56.)

81

Plaintiff timely supplemented on that date.  (ECF#22-4, 22-5, 22-6.)  The discussion above about

the supplementation of Dr. Frank's disclosure is fully applicable.  OI supplemented and added

new opinions and reliance materials for its industrial hygiene expert Dr. Gregory on the same

day.  (Att.5; Ex.1163, ECF#198 at 117:16-117:20.)   Kenoyer only supplemented his general

report which is a compilation of citations to published literature.  OI does not claim or point to

any new opinions added by Kenoyer.

      Kenoyer testified about the scientific literature on asbestos exposures and the significance

of an insulator's exposures.  Has expertise in these areas which can assist this Court as the trier

of fact.  In particular for the *Suoja* case, Kenoyer on direct examination distilled the "thousands"

of publications about asbestos to those which are relevant to Ozzie's exposures.  (ECF #194 at

47, 42-94.)  He was then cross examined on the same and new literature by OI counsel.

(ECF#194 at 95-116; ECF#195 at 3-30.)

      Kenoyer's qualifications included without limitation:[43]

- an undergraduate degree in physics (helpful to understanding the behavior of the microscopic asbestos fibers and other principles of science),
- a Master's degree in environmental science  (ECF#194 at 43.)
- studied and prepared as a coauthor a 50+ page "general report" on the "historical publications" about asbestos (ECF#194 at 45-47; ECF#22-6.)
- 26 years practicing industrial hygiene since 1990 (ECF#194 at 48.)
- For much of the 26 years Kenoyer performed project design and management for asbestos abatement.  (ECF#194 at 43-44.)
- Read hundreds of depositions of persons working in the 1940s, 50s, and 60s in asbestos cases.  (ECF#194 at 49.)

      OI's primary argument that Kenoyer is not a "certified" industrial hygienist has been

rejected by other courts.  See *Bennett v. Mis Corp.*, No. 07-14005, 2008 U.S. Dist. LEXIS 67960,

at *4-5 (E.D. Mich. Sept. 5, 2008) (observing that the American Board of Industrial Hygiene

---

[43] Kenoyer's CV was marked as an exhibit.  (Att.6, Ex. 91; ECF#194 at 43:15-43:17.)

("ABIH") "is a self-governing body" and that "[c]ertification by the ABIH is voluntary"); *Dugas v. 3M Co.*, No. 3:14-cv-1096-J-39JBT, 2016 U.S. Dist. LEXIS 41546, at *11-12 (M.D. Fla. March 29, 2016) (rejecting defendant's argument that an expert's "lack of certification as an industrial hygienist [made him] unqualified to offer opinions on the proper design and identification of respiratory protection" because the expert had years of experience in the industrial hygiene field).  OI makes no showing how a "certification" is needed for Kenoyer to review the literature and practice in the field of industrial hygiene.  If Kenoyer had misquoted the literature, OI counsel or OI's own expert could have pointed out his mistakes.  No examples are cited where Dr. Gregory testified or OI counsel established Kenoyer was not well-versed in the literature presented to this Court.  OI counsel actually expanded the scope of literature discussed by Kenoyer by probing him on cross examination about literature and terminology that was not included in the direct examination.  (ECF#194 at 95; ECF#195 at 3-30.)

This Court can consider the qualifications in weighing the testimony of Kenoyer.  The same can be said for the qualifications of OI's "historian" Dr. Neushul who had no asbestos experience until OI counsel hired him to testify.  (ECF#201 at 29 n. 26.)  Dr. Neushul is also not a certified industrial hygienist and never worked in the field.  Yet Dr. Neushul's testimony covered many of the same articles and other matters such as exposure levels as Kenoyer did.  (ECF#198 at 3-80.)  Striking Kenoyer's testimony based on the record is not proper.

ii. ECF#205 at 146 (Gary Suoja)

Plaintiff responds to the specific objections to Gary Suoja's trial testimony by filling in OI's chart with a response column below.

| Gary Suoja's Testimony | Owens-Illinois's Objections | Plaintiff's Response to |
|---|---|---|

|  |  | Objections |
|---|---|---|
| 2-A-15:18- 2-A-16:10 | Hearsay; calls for speculation; lack of foundation | Withdrawn |
| 2-A-18:7-A-19:21 | Lack of relevance; hearsay; lack of foundation | Withdrawn |
| 2-A-20:7- 2-A-20:10 | Lack of relevance; lack of foundation | Withdrawn |
| 2-A-21:12-2-A-25:10 | Lack of relevance; hearsay; lack of foundation | Withdrawn |
| 2-A-34:23-2-A-36:9 | Hearsay; lack of foundation; calls for speculation | Withdrawn |

### iii. ECF#205 at 146 (Peter Neushul)

Plaintiff responds to the specific objections to Gary Suoja's trial testimony by filling in

OI's chart with a response column:

| Peter Neushul's Testimony | Owens-Illinois's Objections | Plaintiff's Response to Objections |
|---|---|---|
| 2-P-26:6-2-P-27:4 | Foundation; compound; hearsay | Withdrawn |
| 2-P-31:8-2-P-31:18 | Lack of relevance | Withdrawn |
| 2-P-62:9- 2-P-70:18 | Foundation; hearsay; lack of relevance | The foundation for OI's receipt of the Aetna special report about Kaylo hazards  was laid by introducing the testimony of OI's historian expert Dr. Neushel from another case (*Green*).  (ECF#198 at 65-68.)  In *Green* Dr. Neushel testified "Yes.  This was received and prepared for Owens-Illinois Kaylo Division in Berlin, New Jersey." (ECF#198 at 67-68.)   Dr. Neushel's testimony about the history of OI Kayo documents provides the |

| | | foundation for admission of the Aetna report and should be admitted.  The weight to be given the testimony is for the Court to determine. |
|---|---|---|
| 2-P-78:22 | Transcription error [sic: "crocidolite"; chrysotile] | Agreed |


### D. ECF#205 at 147 (Exhibits)

Plaintiff used exhibit 34 to support the statement in his opening brief. that "Kaylo was packaged in cartons which had distinctive markings."  (ECF#201 at 7.)   Plaintiff does not object to exhibit 34 being stuck.  Plaintiff offers the following testimony of Lawrence Zimmer as support for the above statement in Plaintiff's opening brief:

> Q. How could you tell it was Kaylo?
> A. It said so on the box.

(ECF#155 at 22:21-22:22.)

Plaintiff responds to the specific objections to Plaintiff's exhibits by filling in OI's chart with a column that contains Plaintiff's responses:

| Exhibit | Plaintiff's Description | Owens-Illinois's Objections | Plaintiff's Response to Objections |
|---|---|---|---|
| 32 | OCF Sales via L&S Insulation and Sprinkmann Sons Corp. to Badger Ordnance Works | Lack of authentication; lack of foundation; hearsay | Neushul authenticated and foundation laid pursuant to FRE 901 (ECF#198 at 30:22-32:18.) |
| 33 | Affidavit of Bruce Carter (Baron & Budd) - OI Kaylo sales records 1950s | Lack of authentication; lack of foundation; hearsay; lack of relevance | Exhibit used pursuant to FRE 104 only, the date referred to is not substantive |
| 35 | Picture of sample | Lack of | Demonstrative only |

| | texture of Pipe covering | authentication; lack of foundation; lack of relevance | |
|---|---|---|---|
| 36 | Photo of half round insulation pipe covering | Lack of authentication; lack of foundation; lack of relevance | Demonstrative only |
| 37 | Final Saranac Report 1/30/1952 | Lack of foundation; lack of relevance | Hazard's 3/27/1981 deposition established foundation (Att.10 at 2, 10, 28, 29, 35 of PDF.) |
| 38 | Letter dated 3/12/1943 from L. Gardner to U. Bowes | Lack of foundation; lack of relevance | Neushul's 11/02/2007 deposition established foundation (Att.11 at 2:20-2:21, 4:12-4:24, 17:5-18:8.) |
| 39 | Aetna Special Hazards Survey – Dust Survey April 20 and May 2, 1958 | Lack of authentication; lack of foundation; hearsay; lack of relevance | Neushul authenticated and foundation laid at trial and at *Berkshire* trial on January 25, 2008. (ECF#198 at 62:9-68:4; Att.12 at 120:6- 121-17.) |
| 42 | Declaration of Mark Gardner – Excerpts of Kaylo Advertisement in Petroleum Engineer | Lack of authentication; lack of foundation; hearsay; lack of relevance | The declaration of Mark Gardner on page 1 of the exhibit authenticates and lays foundation. |
| 54 | 1956 Industrial Conference Roster | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 55 | 1957 Industrial Conference Roster | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 56 | 1959 Industrial Conference Roster | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 57 | 1960 Industrial Conference Roster | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 59 | Foundation Facts, Vol. 2, No. 4 and Digest of Industrial Hygiene, April 1940 | Lack of authentication; lack of foundation; hearsay; lack of relevance | Exhibit not offered for truth of notice of damages FRE 803(18) |
| 60 | Industrial Digest – | Lack of | Exhibit not offered for truth of |

|  |  |  |  |
|---|---|---|---|
|  | August 1949 | authentication; lack of foundation; hearsay; lack of relevance | notice of damages FRE 803(18)  ECF #198 at 76.) |
| 64 | NSC Industrial Conference Mailing List, October 1953 to October 1954 | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 65 | NSC Industrial Conference Membership, October 1954 to October 1955 | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 66 | NSC Industrial Conference Standing Committee Members 1958–1959 | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 79 | National Vital Statistics Report Full Life Tables, 2008 – Vol. 61 Number 3 dated 9/24/2012 | Lack of relevance | Ozzie was aware that he was expected to live longer if he did not have mesothelioma.  He suffered because he knew he was going to miss time at the end of his life he should have been able to enjoy.  The life expectancy chart for a man Ozzie's age and race is relevant because it is probative about how much time was likely missed. |
| 89 | Excerpts from Industrial Hygiene Digest, Vol. 13, No. 8, August 1949 | Lack of authentication; lack of foundation; hearsay; lack of relevance | Exhibit not offered for truth of notice of damages FRE 803(18) |
| 91 | CV of Stephen Kenoyer | Hearsay; lack of relevance | Identified at trial (ECF#194 at 43:15-43:17.) Qualifications relevant |
| 92 | Report of Stephen Kenoyer dated 8/10/2012 | Hearsay; lack of foundation; lack of relevance | Rule 26(a)(2) expert disclosure is not offered for truth of matters asserted. Relates to issues of disclosure and other objections to Kenoyer's testimony |
| 93 | CV of Arthur Frank | Hearsay | Identified at deposition (ECF#185 at 7:13-7:16.) Qualifications relevant |
| 94 | Report of Arthur Frank dated 8/7/2012 | Hearsay | Rule 26(a)(2) expert disclosure is not offered for truth of matters asserted. Relates to issues of disclosure and other objections to Dr. Frank's testimony |
| 100 | CV of Thomas Wiig | Hearsay | Identified at deposition (ECF#164 at |

| | | | 6:20-7:10, 86:8-86:9.) Qualifications relevant |
|---|---|---|---|
| 121 | IHF Membership cards | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 128 | Affidavit of Michael Dowling | Lack of authentication; lack of foundation; hearsay; lack of relevance | Withdrawn |
| 136 | Opening Statement PowerPoint Presentation | Hearsay; lack of foundation; lack of relevance | Not offered as substantive except as referenced to in testimony |
| 137 | Stephen Kenoyer PowerPoint Presentation | Hearsay; lack of foundation; lack of relevance | ECF193 at 55, 93-94 for discussion. Allowed in at trial. |
| 140 | Pictures of asbestos fibers | Lack of authentication; lack of foundation; lack of relevance | Demonstrative only |
| 141 | Picture of Macrophages with Asbestos Fibers present | Lack of authentication; lack of foundation; lack of relevance | Demonstrative only |
| 142 | Report of Dr. Arthur Frank – dated 8/7/2012 | Hearsay; lack of relevance | Report is not offered for truth of matters asserted.  Relates to issues of disclosure and other objections to Dr. Frank's testimony |
| 205 | Industrial Medicine Symposium No. 3, (1938) – Dusts and the Lungs with Particular Reference to Silicosis and Asbestosis - Mereweather | Lack of foundation; hearsay without expert's testimony | FRE 808(18) through Kenoyer (ECF#194 at 61:25-62:12; ECF#137 at 9.) |
| 207 | Markowitz; Asbestos-Related Lung Cancer and Malignancy Mesothelioma of the Pleura (2015) | Lack of foundation; hearsay without expert's testimony | FRE 808(18) through Kenoyer (ECF#194 at 54:8-54:11, 82:21-83:3; ECF#137 at 2, 22.) |
| 208 | Balzer: The Work Environment of Insulating Worker – (1968) | Lack of foundation; hearsay without expert's testimony | FRE 808(18) through Kenoyer (ECF#194 at 85:9-86:4; ECF#137 at 14.) |

| 209 | Cook - Industrial Medicine Industrial Hygiene Section – "Occupational Disease Hazard – Evaluation in the Field" (1942) | Lack of foundation; hearsay without expert's testimony | FRE 808(18) through Kenoyer (ECF#197 at 30:14-30:22; ECF#137 at 26.) |
| --- | --- | --- | --- |
| 210 | Safety and Health in Shipbuilding and Ship Repairing – "Dust-Producing Potential of Construction Materials" Balzer, Fowler Cooper (1971) | Lack of foundation; hearsay without expert's testimony | FRE 808(18) |
| 217 | Lawrence - "The Control of Fumes in the Shipyard" (1943) | Lack of foundation; hearsay without expert's testimony | FRE 808(18) through Kenoyer (ECF#137 at 8.) |
| 218 | Beyer – "The Mechanical Control of Occupational Diseases" | Lack of foundation; hearsay without expert's testimony | FRE 808(18) through Kenoyer (ECF#194 at 56:4-56:8; ECF#137 at 3.) |
| 219 | Sayers - Industrial Dusts "What Industrial Dusts Are Harmful? Why?" (1937) | Lack of foundation; hearsay without expert's testimony | FRE 808(18) through Kenoyer (ECF#194 at 57:22-57:24; ECF#137 at 3.) |
| 220 | Documentation of Threshold Limit Values – ACGIH – (1962) | Lack of foundation; hearsay without expert's testimony; lack of relevance | FRE 803(18) |
| 222 | Documentation of the Threshold Limit Values for Substances in Workroom Air – ACGIH – (1971) | Lack of foundation; hearsay without expert's testimony; lack of relevance | FRE 803(18) through Kenoyer (ECF#194 at 90:14-91:4.) |
| 223 | Hillerdahl - "Mesothelioma cases associated with nonoccupational | Lack of foundation; hearsay without expert's testimony; lack of relevance | FRE 808(18) through Dr. Frank (ECF#185 at 45:7-46:4.) |

| | | | |
|---|---|---|---|
| | and low dose exposures" (1999) | | |
| 224 | Iwatsubo "Pleural Mesothelioma Dose Response     Relation at Low     Levels" (1998) | Lack of foundation; hearsay without expert's testimony; lack of relevance | FRE 808(18) through Dr. Frank (ECF#185 at 70:16-70:21.)  FRE 808(18) through Kenoyer (ECF#194 at 78:4-78:10; ECF#137 at 21.) |
| 225 | LaCourt – "Occupational and non-occupational attributable risk of asbestos exposure for pleural mesothelioma" (2014) | Lack of foundation; hearsay without expert's testimony; lack of relevance | FRE 808(18) through Dr. Frank (ECF#185 at 70:16-70:21.)  FRE 808(18) through Kenoyer (ECF#194 at 82:16-82:20; ECF#137 at 21.) |
| 226 | Rodelsperger - "Asbestos and Man-Made Vitreous Fibers as Risk Factors for Diffuse Malignant Mesothelioma" (2001) | Lack of foundation; hearsay without expert's testimony; lack of relevance | FRE 808(18) through Dr. Frank (ECF#185 at 70:16-70:21.)  FRE 808(18) through Kenoyer (ECF#194 at 80:3-80:6; ECF#137 at 20.) |
| 227 | NIOSH – Criteria for a recommended standard… Occupational Exposure to Asbestos (1972) | Lack of foundation; hearsay without expert's testimony; lack of relevance | FRE 803(18) frank |
| 229 | IHF Digest Vol. 9 No. 1 - Foundation Facts 1/1945 "Asbestosis and Pulmonary Carcinoma" Wedler (1943) | Lack of foundation; hearsay without expert's testimony | Exhibit not offered for truth of notice of damages |
| 230 | Stokinger – Industrial Hygiene Association Quarterly Vol. 17 No. 3, September | Lack of foundation; hearsay without expert's testimony; completeness (*see* Ex. 1944) | Substantive proof of science regarding the TLV not being for cancer Frank testifies to this at ECF#185 at 82:21-83:2.) |

| | | | |
|---|---|---|---|
| | 1956 | | |
| 232 | IHF Digest | Lack of foundation; hearsay without expert's testimony | Exhibit not offered for truth of notice of damages |

**IV. Response to Section III. Proposed Findings of Fact  (ECF#205 at 15.)**

Plaintiff has reproduced OI's Proposed Findings of Fact for the Court's convenience.

Plaintiff adopts the OI headings for the purposes of formatting the response, but does not

consider the headings to be proposed facts.  Plaintiff responds to each of the Proposed Findings

of Fact as follows:

### A.  Jurisdiction and Venue

1. Gary Suoja is a resident of Washington. Trial Tr. 1-P-102:5.

> Plaintiff does not dispute this PFF.

2. Oswald Suoja was a resident of Douglas County, Wisconsin at the time of his death. Ex. 1716, at 1.

> Plaintiff does not dispute this PFF.

3. Owens-Illinois is incorporated in Delaware with its principal place of business in Ohio. Ex. 29, at 3; Ex. 139, at 24–25.

> Plaintiff does not dispute this PFF.

4. Badger Ordnance Works, later known as Badger Army Ammunitions Plant, was located in Sauk County, Wisconsin. Ex. 1762, at 1–2; Ex. 1764, at 1–8; Ex. 1730, at 13.

> Plaintiff does not dispute this PFF.

5. On March 1, 1942, the United States acquired the Badger Ordnance Works land by condemnation, the State of Wisconsin ceded jurisdiction, and the land became a federal enclave. Ex. 1762, at 2 ("Therefore, be it adjudged, ordered and decreed by the Court that the possession and use of all of the land ... is hereby given to the United States of America as of the first day of March, 1942."); Ex. 1724, at 61 ("The Badger Army Ammunitions Plant land was acquired by the United States for use as an ammunition plant, so under ss. 1.02(intro.) and (1), Wis. States., it is a 'site for the erection of … magazines, arsenals, …' over which the United States has exclusive jurisdiction as a 'federal enclave.'"); Ex. 1725, at 58 (same); Ex. 1726, at 50 (same).

> Plaintiff disputes this PFF.  Exs. 1724, 1725, and 1726 appear to be documents related to case closure requests made by Badger Ordnance to the Department of Natural Resources for the State of Wisconsin about soil contamination and the Department of Natural Resources for the State of Wisconsin's responses to the case closure requests.  The specific citations to "federal enclave" appear to be statements made in an application by Badger Ordnance and signed

statements in support by a "Commander's Representative."  (Ex.1724 at 13, 61-62; Ex.1725 at 16, 58-59; Ex.1726 at 13, 51-52.)  No other exhibit or testimony was introduced to explain how Exs. 1724, 1725, and 1726 prove that Badger Ordnance was a federal enclave at relevant times.

Ex. 1763 is a Court order from January 16, 1942.  No other exhibits or testimony was introduced to indicate the order is final and in effect as to Badger Ordnance at relevant times.

The PFF is based on exhibits which are hearsay and inadmissible under Fed. R. Evid. 801 and 802.  The documents are untrustworthy and therefore inadmissible as an exception to hearsay pursuant to Fed. R. Evid. 803 (6)(E) and (8)(B).  The authenticity of Ex. 1763 was not established so the document is inadmissible under Fed. R. Evid. 803(16).  There has been no showing that Fed. R. Evid. 807 should apply.


**B. Oswald Suoja Was a Career Asbestos Insulation Worker.**

6. Oswald Suoja was a career asbestos insulation worker from approximately 1943 until his retirement in 1985. Ex. 26, at 1; Ex. 1666, at 9; Trial Tr. 1-P-68:8–9.

　　　　Plaintiff does not dispute this PFF.


7. Mr. Suoja became a card-carrying member of the "International Association of Heat and Frost Insulators and Asbestos Workers Union" on January 28, 1944 (Ex. 27, at 26–27), and he proudly called himself an "Asbestos Worker" (Trial Tr. 1-P-119:12).

　　　　Plaintiff does not dispute this PFF.


**C. Owens-Illinois Made and Sold Its Kaylo Product for a Limited Time Ending on April 30, 1958.**

8. Owens-Illinois is, and has always been, a glass manufacturing company. Trial Tr. 2-P-13:12–14:9. One of the raw materials in the manufacture of glass is silica. Trial Tr. 2-P-14:14–16. Because of its experience with manufacturing glass products in the 1940s, which are made with silica, Owens-Illinois developed a thermal insulation product, using lime, silica, diatomaceous earth, clay, and approximately 13 to 25% asbestos. Ex. 29, at 7; Richard Grimmie Trial Tr. 29:14–30:6, 33:22–35:19, dkt. 183.

　　　　Plaintiff does not dispute this PFF.


9. Between January 1948 and April 30, 1958, Owens-Illinois commercially manufactured and sold this asbestos thermal insulation product, which was called "Kaylo." Ex. 139, at 24; Ex. 29, at 7; Ex. 1940, at 1; Grimmie Trial Tr. 29:14–30:6, 33:22–35:19, dkt. 183. Owens-Illinois Kaylo was hard, cementitious, and insoluble in water:



Ex. 1011; Ex. 1012; Ex. 1013; Ex. 1014; Trial Tr. 2-A-108:23–109:20, 2-P-88:2–8.

Plaintiff disputes this PFF. OI manufactured and sold Kaylo prior to 1948. OI admitted that it "began limited pilot-plant operations involving the production of asbestos containing products in 1943." (Ex.29 at 6, #8.) OI's expert Dr. Neushul testified that some of the pilot manufacturing was sold outside of OI "not necessarily in 43', but in 44'." (ECF#198 at 52.)

Ex.1940 document is vague as to the scale of operations so is not probative. OI's own admissions are controlling as to pre-1948 sales.

Grimmie's testimony cited does not support the PFF. Exhibits 1011, 1012. 1013, and 1014, cited to support the PFF that Kaylo was "hard, cementitious" do not provide such support.

10. Owens-Illinois ceased the manufacture and sale of its Kaylo product on April 30, 1958, when it sold the Kaylo Division to a separate company, Owens Corning Fiberglas. Ex. 29, at 1, 7, 8; Ex. 139, at 24; Ex. 30, at 1. Owens-Illinois did not manufacture or sell Kaylo, or any other asbestos thermal insulation product, after April 30, 1958. Ex. 29, at 7; Ex. 139, at 1. Between May 1, 1958 and 1972, Owens Corning Fiberglas produced its own "Kaylo" asbestos thermal insulation product. Ex. 1258, at 5156; Ex. 29, at 1, 7, 8; Ex. 30, at 1.

Plaintiff does not dispute this PFF.

**D. Oswald Suoja Was Not Exposed to Asbestos from Owens-Illinois Kaylo at Badger Ordnance Works.**

11. The weight of the credible evidence does not support the plaintiff's claim that Mr. Suoja was ever exposed to asbestos from Owens-Illinois Kaylo at Badger Ordnance Works, which is the only jobsite where it is claimed that he had such exposure. Trial Tr. 1-A-19:15–16; Pl.'s Post-Trial Br. 4.

Plaintiff disputes this PFF. The greater weight of the evidence supports Plaintiff's claim. Plaintiff does not dispute the only evidence of Ozzie's Kaylo exposure is at the Badger job site.

Plaintiff disputes OI's use of the term "credible evidence" in PFF#s 11, 22, 34, 60, 72, 109, 110, and 141 as it is the finder of fact that must assess the credibility of evidence.

**1. Badger Ordnance Works**

94

12. Badger Ordnance Works was a government-owned, contractor-operated ammunition plant located on more than 10,000 acres. Ex. 1735, at 7;1 Ex. 1738, at 4; *see also* Pl.'s Post Trial Br. 8.

> Plaintiff does not dispute this PFF.

## 2. A&M's Johns Manville 85% Magnesia

13. As explained in the U.S. Army Materiel Command Historic Context Series, Badger Ordnance Works was originally constructed between 1942 and 1945, new facilities for the manufacture of ball powder propellant were built between 1954 and 1955, and the plant ultimately ceased production in 1975:

Construction of the plant began in February 1942. … Construction stopped on August 13, 1945. ….
During the period 1945 through 1950, various portions of the plant were in surplus, excess, standby, and caretaker status and were maintained by a small compliment of government employees. In February of 1951, rehabilitation of Badger was begun by the Fegles Construction Company of Minneapolis, Minnesota, under the direction of the Corps of Engineers. ….
On April 30, 1951, the Liberty Powder Defense Corporation of East Alton, Illinois, a subsidiary of Olin Mathieson Chemical Corporation which was later designated as Olin Corporation, became the operator of Badger ….
During 1954 and 1955, new facilities for the manufacture of ball powder propellant were constructed on a "lump sum" bid let by the Corps of Engineers….
On March 1, 1958, the plant was placed in inactive status and remained in this capacity until December 23, 1965, when it was reactivated.
During the inactive period from 1958 to 1965 the plant was maintained in standby status by Olin Corporation. ….
Olin Corporation received official notice to reactivate the plant on January 3, 1966, with the initial powder for this operating period being produced on May 19, 1966….
All production at Badger had ceased by January of 1975, and the plant has remained on standby and modernization status under the management of Olin Corporation since that time.
Ex. 1735, at 7–13.

> Plaintiff does not dispute this PFF.  See ECF#201 at 27-28 for a more complete summary.

## 2. A&M's Johns Manville 85% Magnesia

14. When completed, Badger Ordnance Works had a large on-site steam power plant, which provided heat and some power through a network of 200 miles of elevated steam lines to more than 1,400 buildings. Ex. 1734, at 44; Ex. 1738, at 8; Trial Tr. 2-A-106:2–9; Trial Tr. 2-P-90:7–16.

> Plaintiff does not dispute this PFF except the cited exhibits refer only to completion of the World War II phase of Badger.  Exs. 1734 and 1738 establish that Badger was constructed in

several phases.  (ECF # 201 at 27-28.)  The "200 miles" of piping is the first phase of construction completed during World War II.  (OI Ex 1738 at 7-8.)  The later construction of later phases resulted in a facility which had "thousands of miles of piping."  (ECF #154 at dep page 22.)

15. As the construction records show, Asbestos & Magnesia Materials Company ("A&M") was the original insulation contractor at Badger Ordnance Works. Ex. 1796, at 185; Trial Tr. 2-A-106:13–108:16. A&M performed both the initial insulation work, which started on August 6, 1942 (Ex. 1796, at 185, 621), and the additional insulation work, which started on July 24, 1944 (Ex. 1796, at 352, 372). When A&M completed only 30 percent of the initial insulation, it had already installed more than 45,000 feet of insulation:



Ex. 1796, at 621; Trial Tr. 2-A-106:13–108:6.

Plaintiff disputes this PFF in part.  Ex 1796 includes certain "Monthly Progress Reports" about the completion of Badger during the World War II phase in the 1940s.  Applying OI's methodology of completion % to the amount of feet in the remarks, other pages in Ex 1796 establish that completion of 2% of the work by A&M for the initial contract #168 totaled 1200 feet of piping.  (Ex 1796 at 168, 185.)  Based on this report, A&M's contract was only to insulate 60,000 feet of outside steam line.  If OI's methodology is applied to what OI cited to as page 621[44], the maximum footage of A&M's initial contract was for 150,000 feet of insulation (45,000 is 30% of 150,000).  The total footage or percentage of completion footage in the second A&M contract is not listed.  No evidence shows what portion of WWII piping insulation was done under the second contract

Ex.1796 also does not support a finding that A&M was "the original" insulation contractor for all the insulation work at Badger.  Ex.1796 only supports the inference that A&M had a contract to insulate about 1/7 or 14.2% (150,000/1,0556,000) of the Badger outside steam lines constructed in the WWII phase of work on the plant.  The 14.2% is calculated based 200 miles being 1,056,000 feet and using the maximum of 150,000 feet of insulation work which can be attributed to the A&M contract.  This Court could find the A&M percentage to be lower.[45]

---

[44] OI informed Plaintiff that they incorrectly cited to page 621 instead of 261 when Plaintiff informed OI that the exhibit image of Ex. 1796 disclosed to Plaintiff is only 395 pages and did not include the page 621

[45] Using the 60,000 feet, the percentage attributable to OI is 5.6% (60,000/1,056,000)

Ex 1796 only refers to work during the first phase of Badger construction which stopped when WWII ended in 1945. (ECF #201 at 27-28.) Additional construction and renovation took place after WWII, bringing the total piping at Badger to "thousands of miles". (ECF #201 at 27-28; ECF #154 at 22.) Since the 200 miles in the WWII phase is only a fraction of the "thousands of miles" of piping ultimately constructed at Badger, the PFF should be amended to reflect that the available Badger construction documents show A&M insulated about 14.2% of the WWII phase of the Badger construction.

Since the total plant piping was over 1,000 miles after all the phases were constructed, no more than 20% of the insulation work was done during the World War II phase. The actual percentage of insulation of the total piping ultimately constructed at Badger that can be attributed to A&M is less than 2.8% (20% x 14.2%).

Dr. Neushul's testimony, which is cited as the basis for the PFF, should be given minimal weight on matters relating to Badger about which he has no personal knowledge or expertise other than what he read in documents. Dr. Neushul opines as to his interpretation of what "documents that related to the original contracts for insulation work" state. (ECF#195 at 106:13-106:15.) Dr. Neushul admittedly only analyzed some records about construction from the WWI since he conceded most of the Badger records are missing. (ECF#201 at 25-26, 25 n. 22.) The finder of fact must analyze the documents that form the basis for an opinion, particularly when the expert has only read records and interpreted them.

16. Badger Ordnance Works was constructed with Johns Manville 85% magnesia asbestos insulation. The photographic evidence from the Badger History Group shows asbestos workers installing Johns Manville 85% magnesia asbestos insulation in 1944:



Ex. 1869, at 1–3; Ex. 1868, at 1–3; *see also* Ex. 1798, at 1–2 (custodian affidavit).
17.

Plaintiff disputes the first sentence of the PFF. Exhibits 1868 and 1869, the exhibits cited to support this PFF, show men around a small section of exterior piping and about 5 boxes of JM 85% magnesia asbestos insulation. These exhibits, which are labeled as being taken in 1944, do not establish what was used on the thousands of miles of piping constructed over a 20 year period at Badger. See PFF# 15 response and ECF#201 at 7-37.. Other brands of molded pipe insulation could be used in other places and at other times.

Plaintiff presented evidence contrary to this PFF that Kaylo insulation was used on Badger exterior piping. (ECF#201 at 7-37.) .

17. The photographic evidence from the National Archives shows the storage room filled with Johns Manville 85% magnesia asbestos insulation in 1944:

  

Ex. 1793, at 5.

Plaintiff disputes this PFF. Exhibit 1793, the exhibit cited to support this PFF, shows two boxes and one bag of JM insulation. It does not show a "storage" room "filled" with JM insulation. The exhibit cited does not support the PFF.

18. As advertised in the classified directories, A&M was a well-known Johns Manville contractor and distributor:



Ex. 1935, at 5, 8, 11, 13, 15, 17, 19, 21, 23, 25, 27, 19, 31;2 Trial Tr. 2-A-115:11–23.

Plaintiff disputes this PFF in part. Exhibit 1935 is classified advertisement in a phone book. The advertisement does not establish A&M was "well-known".

19. Peter Neushul PhD, an historian who specializes in the history of 20th

Century United States technology and science, provided the following opinion about the
original insulation at Badger Ordnance Works:

Q. Were you able to find documents that related to the original
contracts for insulation work at the facility?
A. Yes.
Q. Have you formed opinions about when that work was done and by
whom?
A. Okay. The Corps hired Hanger & Mason -- Mason & Hanger. Mason
& Hanger hired the Asbestos & Magnesium Manufacturing
Company of Chicago as the contractor to install Johns Manville
insulation on the 200 miles of steam line, of course this is during
World War II, at Badger Ordnance Works.
Trial Tr. 2-A-106:10–23, 2-A-115:4–10.

Plaintiff disputes this PFF.  Testimony and opinions are not a "fact."  The finder of fact
must assess credibility and weight of expert testimony.  The evidence shows that A&M only had
a contract for 14.2% or less of the WWII insulation at Badger.  See response to PFF# 15.


### 3. Sprinkmann's Insulation Work

20. In 1954 and 1955, the ball powder plant was constructed at Badger Ordnance Works (Ex.
1738, at 9; Ex. 1735, at 12; Trial Tr. 2-A-110:19–111:3) and Sprinkmann Sons Corporation was
the insulation contractor at the relevant times (Ex. 32, at 1–6; Frank Hofstetter Dep. 8:14–20,
20:22–23, dkt 184).


Plaintiff disputes this PFF.  Hofstetter did not say Sprinkmann was the only insulation
contractor for the ball powder unit.  Sprinkmann may have also hired a subcontractor.  Lines
20:22-23 of Frank Hofstetter's deposition were not designated by OI.  (ECF#172 at 12.)  See
PFF# 25 for other objections to Hofstetter's testimony.


21. Assuming, for the sake of argument, that the Court overrules Owens- Illinois's objections,
the plaintiff introduced five sales invoices from Owens Corning Fiberglas to Sprinkmann at
Badger Ordnance Works, during the construction of the ball powder plant. The invoices show
shipments of 5,274 linear feet of Owens-Illinois Kaylo from Berlin, New Jersey in May-July
1954. Ex. 32, at 1–6; *see also* Pl.'s Br. 24.

Plaintiff does not dispute this PFF.

22. There is no credible evidence that Mr. Suoja worked for Sprinkmann during this period or at
Badger Ordnance Works during this period. To the contrary, Mr. Suoja's Social Security records
show that he worked at Sprinkmann only between 1943 and 1951:

```
EMPLOYER NUMBER:  39-0628300
SPRINKMANN SONS CORP
12100 W SILVER SPRING RD
MILWAUKEE  WI 53225-2912
```

| | | | | |
|---|---|---|---|---|
| 1943 | | 345.00 | 771.00 | 807.00 | $1,923.00 |
| 1944 | 744.00 | 878.00 | | | $1,622.00 |
| 1947 | | 328.00 | 1,688.00 | 896.00 | $2,912.00 |
| 1948 | | 299.00 | 320.00 | 504.00 | $1,123.00 |
| 1950 | | 1,069.20 | 1,195.20 | 735.60 | $3,000.00 |
| 1951 | 64.80 | 277.20 | | | $342.00 |

Ex. 1609, at 1.

Plaintiff disputes this PFF. It is unclear which time period is referred to when OI states "during this period." Additionally, OI's expert Dr. Neushul admitted that primary insulation contractors may hire a subcontractor or utilize personnel loaned from another employer.[46] (ECF#198 at 44.) McDermaid is listed as Suoja's employer on the social security records in 1954-55. Sprinkmann could have hired McDermaid as a subcontractor at Badger or borrowed Ozzie as an employee from McDermaid.

The greater weight of the evidence supports Plaintiff's claim that Ozzie worked at Badger Ordnance. (ECF#201 at 7-37.)


23. John Locher, who handled purchasing at Sprinkmann from the late 1940s until his retirement in 1980, testified that the company carried an entire "white line" of asbestos insulation products, which included Kaylo, Johns Manville, Ehret Magnesia, Baldwin-Ehret-Hill, and Calsilite:
Q. When did you first become employed at Sprinkmann & Sons?
A. Well, after World War II, and I think it was May 1st, 1945 or it could have been '46. ….
….
Q. [Y]ou would agree with them that most likely you are the person who has the best knowledge concerning products Sprinkmann has bought since the late forties?
A That is correct.

---

[46] Discussing an insulation contractor working at Badger Ordnance, OI expert Dr. Neuschel admitted:
> Q. Okay. You don't know whether they used employees from another contractor, like a subcontractor, to fulfill their contract; you don't know that, do you?
> A. That I cannot discern from the contract.
> Q. Okay. And it's also possible that employees in these insulation contractors are loaned from one principal employer to another when there's not enough work at their principal employer, right?
> A. It's possible that could happen.
(ECF#198 at 44.)

….
Q. What do you mean when you say "white line"?
A. Well, at this particular temperature material … is white, and white
is Kaylo; it is Johns-Manville material.… It is all white.
Q. Baldwin-Ehret-Hill's material was white line?
A. Oh, sure.
Q. The Calslite you purchased, that is white line?
A. That is correct. White line is basically the material that is -- now, it
goes up to about, well, 12 to 1,500 degrees with the exception of
mineral wool.
John Locher Dep. 9–11, 38, dkt 188.

Plaintiff disputes this PFF in part.  The PFF does specify time period when each of the
products was carried and the relevant period is when OI Kaylo is on the market.  Testimony itself
is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value
of testimony.  Locher did not testify about Badger.

Plaintiff renews the objections to Locher's 1980 deposition testimony that the deposition
is inadmissible under FRE 802 and FRCP 32(a) because it was taken in another case for which
Suoja's counsel was not present and no motive for cross examination about the issues in the
Suoja case is established.  (ECF #130 at 2, ¶2.)   In citing to Locher's testimony, OI does not
address the objection.

24. As Mr. Locher explained, Sprinkmann purchased most of the "white line" asbestos insulation
products from Baldwin-Ehret-Hill, then Johns Manville, and then a very minimal amount of
Kaylo:
Q. Up until the time Ehret Magnesia had merged with Baldwin-Ehret-
Hill [in 1955] what would be your best estimate as to the percentage
of the products Sprinkmann bought that were from Ehret Magnesia?
A Well, we bought probably 95 percent of all our white line -- the white
line is the magnesia from Ehret….
….
Q If you were to rank the company from which you purchased would
Johns-Manville come in second … in terms of the amount of white
line products purchased by Sprinkmann.
A. Since I have been there I would say Johns-Manville would now be
second, yes.
Q. Did you purchase more Johns-Manville than Kaylo?

A. Yes. No question about that.
….
Q. Mr. Locher, can you tell me over the years in comparison to the other
products you purchased how much Kaylo was purchased by
Sprinkmann?
A. Let's see. We had a couple cars of that, or one car from Portage; a
very minimal amount really.

*Id.* at 25, 41, 40.

Plaintiff disputes this PFF.  The testimony cited does not specify at what point in time the comparisons were being made.  The relevant time period is when OI Kaylo was available and not "over the [30+] years" when Locher was Sprinkmann's purchasing agent.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Locher did not testify about Badger.

As stated in PFF response #23, Plaintiff objected to the use of John Locher's testimony.

25. Frank Hofstetter, an asbestos worker for Sprinkmann in 1954 and 1955, did not testify that Mr. Suoja was present at Badger Ordnance Works at this time and testified that he insulated pipes with several "white line" insulation products:

Q. Can you tell me what you were doing at Badger Ordinance in the early '50s?
A. Well, we were insulating pipes….
….
Q. So you think it was the early '50s?
A. It was. I think it was, yes. I think it was the early '50s, like '53, maybe '54, '55. Maybe once later on, too
….
Q. You were working for Sprinkmann at the time?
A. Yes.
….
Q. Can you tell me what products you worked with or around at Badger Ordinance, what products you believe contained asbestos that you worked with or around at Badger Ordinance during this time period ….?
A. Well, it was blue mud. The normal stuff, you know, Unibestos, 85% magnesia, Fibre Coat Mastic. Covering and block I mean.
….
Q. Were there any other types of pipecovering out there other than Unibestos?
A. Yeah, there was. I don't know, maybe Calsil or Thermobestos.
Q. Now you mentioned Calsil. Is that a brand name of a product or type of insulation? Can you tell me?

A. I don't know. It was written on the box.
Q. It said Calsil on the box?
A. Yeah.
….
Q. And you also talked about 85 magnesia. Was that mud or pipecovering?
A. Both. There was pipecovering and mud there.
….
Q. Who they were supplied by.
A. Sprinkmann.

Frank Hofstetter Dep. 8:14–20, 20:22–23, 11:24–12:6, 27:17–28:12, 11:24–12:6, dkt. 184.

Plaintiff disputes this PFF. Testimony itself is not necessarily a "fact." The finder of fact must assess credibility, weight, and probative value of testimony.

The testimony is also inadmissible. Plaintiff renews the objections to Hofstetter's 1991 deposition testimony that 1) he was not timely disclosed as a witness and 2) the deposition is inadmissible under FRE 802 and FRCP 32(a) because it was taken in another case for which Suoja's counsel was not present and no motive for cross examination about the issues in the Suoja case is established. (ECF #130 at 3, ¶9.) In citing to Hofstetter's testimony, OI does not address the objection.

Lines 20:22-23 of Frank Hofstetter's deposition were not designated by OI and is therefore prior testimony that should be excluded. (ECF#172 at 12.) However, OI did not quote these lines in this PFF.

26. In 1954 and 1955, Mr. Suoja lived in Rockford, Illinois, and worked for McDermaid Roofing & Insulating in Rockford, Illinois:

```
EMPLOYER NUMBER:  36-1561570
MCDERMAID ROOFING & INSULATING
1229 KISHWAUKEE ST
ROCKFORD  IL 61104-4840
```

| Year | | | | | |
|---|---|---|---|---|---|
| 1954 | | | 379.50 | 1,568.10 | $1,947.60 |
| 1955 | 1,899.00 | 1,860.20 | 440.80 | | $4,200.00 |
| 1956 | 2,004.27 | 1,955.04 | 240.69 | | $4,200.00 |
| 1957 | 2,053.16 | 1,658.70 | 488.14 | | $4,200.00 |
| 1958 | 1,766.56 | 1,775.28 | 658.16 | | $4,200.00 |
| 1959 | 1,959.59 | 2,049.48 | 790.93 | | $4,800.00 |
| 1960 | 1,934.68 | 1,940.04 | 925.28 | | $4,800.00 |
| 1961 | 2,198.00 | 1,984.58 | 617.42 | | $4,800.00 |
| ·1962 | 2,099.92 | 2,281.94 | 418.14 | | $4,800.00 |
| 1963 | 2,162.14 | 2,362.15 | 275.71 | | $4,800.00 |
| 1964 | 1,846.66 | 2,238.70 | 714.64 | | $4,800.00 |
| 1965 | 2,717.90 | 2,082.10 | | | $4,800.00 |
| 1966 | 3,169.78 | 2,870.08 | 560.14 | | $6,600.00 |
| 1967 | 3,184.40 | 3,415.60 | | | $6,600.00 |
| 1968 | 3,794.79 | 3,260.50 | 193.10 | | $7,248.39 |

*Id.* at 5; Trial Tr. 1-P-84:3–5 ("Q. While you were living in Rockford, … your father worked at McDermaid? A. Yes."); Trial Tr. 1-P-103:7–9.

Plaintiff does not dispute this PFF.

27. There is no evidence that McDermaid ever worked at Badger Ordnance Works. McDermaid worked in Illinois and very seldom bid in Wisconsin:
Q. Back in the '50s and '60s was McDermott Insulation a competitor of
L & S?
A. In a sense, but not really because they worked primarily in their five counties in Illinois; and that was not a region that we wanted to bid in. They very seldom bid in Wisconsin, and we very seldom bid in Illinois.
Elmer Borchardt Dep. 75:3–9, dkt. 186.

Plaintiff disputes this PFF.  The deposition questioning is about McDermott Insulation, and there is no showing that McDermott Insulation is the same company as McDermaid.  The witness does not say that "McDermaid" never worked at Badger .

Plaintiff's response to PFF#22 discusses how OI's expert Dr. Neushul admitted that primary insulation contractors may hire a subcontractor or utilize personnel loaned from another employer.  Borchardt did not testify that McDermaid employees were never borrowed by other companies working at Badger.  The testimony that L&S and McDermott were "not really competitors" makes it more likely employees were loaned back and forth when needed for jobs.

Plaintiff renews the objections to Borchardt's 1996 deposition testimony that the deposition is inadmissible under FRE 802 and FRCP 32(a) because it was not noticed for this case and no motive for cross examination about the issues in the Suoja case is established.  (ECF# 130 at 2, ¶3.)   In citing to Borchardt's testimony, OI does not address the objection.


### 4. L&S Insulation's Repair Work

28. In 1959, L&S Insulation began performing repair work as an insulation contractor at Badger Ordnance Works. Ex. 1698, at Book 2, 249.

Plaintiff disputes this PFF.   OI does not provide evidence to establish the ledger entry date is the date "L&S began performing work."   Testimony cited by OI only establishes the ledger is a record regularly compiled by L&S.  (See OI  PFF#29.)  For example ledger dates might be when the job was completed, when the contract was signed, when the secretary made the entry for an ongoing job, or other possibilities.  Mr. Borchardt, the witness providing the testimony establishing the ledgers are business records, did not explain what the date entered in the ledger meant.  (See response to OI PFF#29 below.) Also, the L&S contract ledgers first identify a "contract" with Badger Ordnance as Job #5225 dated in the L&S contract ledger book as February 28, 1956.  (Att __ at PDF page 393 from OI ex 1698.)

29. Elmer Borchardt, the president of L&S Insulation, testified that the company kept contract ledger books, which list the contracts in numerical sequence from at least 1947 until the 1970s:
Q. You brought four books today; correct? And they're the contract
ledger books of L & S Corporation?
A. Yes.
Q. And we'll get into those in more detail later; but those books,
essentially, represent the -- as I understand it, numerical sequence,
the contracts that L & S entered into from at least 1947 until the
1970s; is that correct?
A. That's correct.
….
Q. Okay. And with that, the ledgers you brought here today were
business records of L & S; correct?

A. Contract recording dates.
Q. But they are generally business records that L & S kept; correct?
A. Yes.
Q. And they were kept in the ordinary course of your business; correct,
and documents prepared by L & S; correct?
A. All of them are there.
Q. But I'm correct, my statement?
A. Yes.
Elmer Borchardt Dep. 5:22–6:6, 25:1–17, dkt. 187.

        Not disputed.


30. L&S Insulation's contract ledger books show the following insulation work at Badger
Ordnance Works:
2 249 6328 6/4/1959 Badger Ordnance Works - Baraboo, WI patching & aluminum jacketing
2 263 6422 9/28/1959 Badger Ordnance Works - Baraboo, WI misc. insulation work
2 265 6436 10/9/1959 Badger Ordnance Works miscellaneous insulation
3 193 8025 5/6/1966 Badger Ordnance Works Baraboo, WI miscellaneous insulation
3 194 8035 5/26/1966 Badger Ordnance Works Baraboo, WI miscellaneous insulation
3 200 8075 7/19/1966 Badger Ordnance Works miscellaneous pipe & duct insulation
3 203 8099 8/26/1966 Badger Ordnance Works steam pipe insulation
3 228 8270 6/14/1967 Badger Ordnance Works miscellaneous insulation
3 241 8364 12/26/1967 Badger Ordnance Works insulation repairs
3 247 8405 3/5/1968 Badger Ordnance Works Sulfur Storage tank insulation
4 148 9815 1/8/1974 Badger Ordinance Warehouse steam pipe insulation
4 286 877 9/1/1978 Badger Ordnance Works miscellaneous insulation
Ex. 1698; *see also* Ex. 1697 (summary exhibit). All of this work took place at least a year after
Owens-Illinois sold the Kaylo Division to Owens Corning Fiberglas. Ex. 30, at 1; Ex.29, at 1, 7,
8; Ex. 139, at 24.

        Plaintiff disputes this PFF for the reasons stated in response to PFF# 29 above.  The dates
of the entries are not established as the date the work was first performed.   The list provided by
OI is not complete.  See Att. 8 for other jobs included in the ledger.


31. Mr. Borchardt also testified that L&S Insulation used Kaylo brand insulation only on a
minority of L&S Insulation's worksites:
Q. Mr. Borchardt, you testified that you did use the brand product
called Kaylo as opposed to the general Calsil product that your
tickets showed as Kaylo?
A. Yes.
Q. You did use that brand product as well?
A. Yes.
….
Q. Would that have been a substantial number - of the jobs that L & S
was doing or a small amount?

A. A minority.
Elmer Borchardt Dep. 59–60, 42, dkt. 185.


      Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Mr. Borchardt when living was the owner of a company which is a defendant in asbestos litigation and is biased in protecting his company's financial value and insurance coverage.   Zimmer, who worked for L&S beginning in 1957, stated Kaylo was used by L&S on "all the jobs – all steam piping and stuff" in his early years.  (ECF#201 at 18.)

      Plaintiff renews the objections to Borchardt's 1980 deposition testimony that the deposition is inadmissible under FRE 802 and FRCP 32(a) because it was taken in another case for which Suoja's counsel was not present and no motive for cross examination about the issues in the Suoja case is established.  (ECF #130 at 2, ¶3.)   In citing to Borchardt's testimony, OI does not address the objection.

32. Mr. Borchardt further explained that "Kaylo" was used as a generic term at L&S Insulation for high-temperature calcium silicate insulation products, which could include Baldwin-Ehret-Hill, Johns Manville, Pabco, or Atlas products:

Q. What did Kaylo mean generically?
A. Calcium silicate.
….
Q. All the products that you bought from BSI in that -- the High
Temperature Calsil products were called Kaylo by your company,
isn't that true?
A. We list it on the job tickets as Kaylo.
Q. And it could have been the Baldwin-Ehret-Hill, J-M, Pabco or Atlas
products that were actually going out to the job, isn't that true?
A. Yes.
*Id.* at 19–20, 42.


      Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  The cited testimony does not establish any brand of molded pipe covering other than Kaylo was bought from L&S's supplier Building Services (BSI).  In the relevant time frame of the work at Badger in late 1958 when L&S worked at Badger, Zimmer recalls Kaylo was the brand of pipecovering.  (See response to PFF# 31 above.)

      Plaintiff renews the objections to Borchardt's 1980 deposition testimony as stated in response to PFF# 31.


33. Assuming, for the sake of argument, that the Court overrules Owens-Illinois's objections, the plaintiff introduced one sales invoice from Owens Corning Fiberglas to L&S Insulation at

Badger Ordnance Works in July 1959. The invoice shows one shipment of 122.59 linear feet of Owens Corning Fiberglas Kaylo to Badger Ordnance Works. Ex. 32, at 6. There is no evidence that Owens-Illinois manufactured this Kaylo, and no reasonable inference can be drawn that, fifteen months after Owens-Illinois sold the Kaylo Division to Owens Corning Fiberglas in an asset purchase agreement, Owens Corning Fiberglas was still selling whatever undetermined amount (if any) of finished Kaylo it bought in April, 1958. Ex. 30, at 1; Ex. 29, at 1, 7, 8; Ex. 139, at 24.

Not disputed.  Plaintiff did not claim the July, 1959 L&S invoice was for a product made by OI.

34. There is no credible evidence that Mr. Suoja—who was working for McDermaid and living in Rockford—worked at Badger Ordnance Works in 1959. Indeed, there is no evidence that McDermaid *ever* worked at Badger Ordnance Works.

Plaintiff disputes this PFF.  The greater weight of the evidence supports Plaintiff's claims.  Ozzie was observed at Badger by coworker Zimmer beginning in late 1958 and had been on the job before Zimmer.   (ECF#201 at 17-21.)  Ozzie was either working for McDermaid per the social security records or was on McDermaid's payroll serving as a loaned employee to another contractor such as L&S.  (ECF#201 at 21, 21 n. 14.)  The evidence establishes Ozzie was at Badger, but not which contractor Ozzie was working for in the 1958-59 time frame.

35. As Mr. Suoja's Social Security records show, he began working at L&S Insulation in late 1968:

```
EMPLOYER NUMBER:   39-0925667
L & S INSULATION CO INC
PO BOX 14426
MILWAUKEE  WI 53214-0426
```

| Year | | | | | |
|------|------|------|------|------|------|
| 1968 | | | 3,572.70 | 2,871.08 | $6,443.78 |
| 1969 | 3,077.65 | 3,137.28 | 1,585.07 | | $7,800.00 |
| 1970 | 3,319.96 | 3,593.60 | 886.44 | | $7,800.00 |
| 1971 | 3,340.48 | 3,463.88 | 995.64 | | $9,000.00 |
| 1972 | 4,275.82 | 4,126.81 | 597.37 | | $10,610.57 |
| 1973 | 4,381.46 | 2,317.44 | | 3,911.67 | $13,200.00 |
| 1974 | 4,257.60 | 4,548.77 | 4,393.63 | | $14,100.00 |
| 1975 | 5,053.44 | 5,130.74 | 3,915.82 | | $15,300.00 |
| .1976 | 5,452.09 | 4,651.28 | 5,196.63 | | $16,500.00 |
| 1977 | 5,461.04 | 5,849.73 | 4,957.20 | 232.03 | $17,700.00 |
| 1978 | - | - | - | - | $22,900.00 |
| 1979 | - | - | - | - | $25,900.00 |
| 1980 | - | - | - | - | $29,700.00 |
| 1981 | - | - | - | - | $28,020.80 |
| 1982 | - | - | - | - | $27,631.50 |
| 1983 | - | - | - | - | |

Ex. 1609, at 6.

Plaintiff does not dispute this PFF.

107

**5. Coworker Harold Haase's Testimony**

36. Harold Haase testified by deposition in Mr. Suoja's prior state court lawsuit. Harold Haase Dep. 2:11–20, dkt. 149.

      Plaintiff does not dispute this PFF.

37. In 1969 or 1970, Mr. Haase worked for L&S Insulation with Mr. Suoja at Badger Ordnance Works:
Q. Let me direct your attention then to another place, Badger
Ordinance. Are you familiar with that site?
A. Yes.
….
Q. And who were you working for when you were at Badger
Ordinance?
A. I was with L&S.
Q. And to the best of your recollection, what time period were you at
Badger Ordinance?
A. Oh, I would have to say '69 or '70, somewhere in there.
Q. About how long did that job last?
A. Well, that job went on for about twelve years, but I wasn't there that
long. I was only there for a few months.
Q. When you say a few months, you mean --
A. Two or three months, yeah. I had been there and back and there and
back.
….
Q. Who was on that job with you?
A. Well, there were 30 or 40 guys on this job too. Gene Hanson was the
foreman. There was -- Oh, geeze, let me think here. Gus Pasatok, Ed
Holcomb, Bill -- I can't think of his name right now. Well, there was
several. Ozzie Suoja was there. There were several others. There
were probably 20 or 30 guys.
Haase Dep. 20:24–23:6.

      Plaintiff disputes this PFF in part.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Haase did not say Ozzie worked "with"  Haase.  He said Ozzie "was there" at Badger.

38. Mr. Haase testified that Badger Ordnance Works was a "huge place" and that he did not work alongside Mr. Suoja:
Q. Moving onto Badger Ordinance. That was a huge place. Right?
A. Right.
….
Q. Was [Mr. Suoja] on your crew, or was he working for somebody else?
A. He was just working.… I didn't work along side of him, no.
*Id.* at 64:3–4, 64:16–20.

Plaintiff disputes this PFF in part.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.   Plaintiff does not dispute the summary of the testimony.

39. During this time, Mr. Haase repaired old, outdoor, insulation-covered steam lines and installed insulation on tanks, but he admittedly could not identify who made the insulation materials:
Q. Was there any asbestos containing products being used on that job?
A. Yes. All of it.
Q. Can you tell us the type of work that was involved?
A. All pipe covering, then sheet metal.
….
Q. Do you have any recollection on that job of who made the pipe covering?
A. No, I can't really recall.
*Id.* at 22:4–24:18.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Haase testified about the insulation products "used on the job".  He was not asked and did not address what insulation products were being removed.

### 6. Coworker George Schlub's Testimony

40. Assuming, for the sake of argument, that the Court overrules Owens-Illinois's objections, the plaintiff offered the testimony of a second coworker at Badger Ordnance Works, George Schlub, whose testimony was inconsistent with the facts in the case and contradictory. Mr. Schlub's testimony was inconsistent with the objective evidence that 1) Kaylo was an insoluble, calcium silicate asbestos insulation (not an 85% magnesia asbestos insulation); 2) Badger Ordnance was constructed with Johns Manville 85% magnesia asbestos insulation; and 3) white asbestos insulation other than Kaylo was installed at Badger Ordnance Works. *Compare supra* at ¶¶ 12–35 *with* George Schlub Dep., dkt. 154.

Plaintiff disputes this PFF.  Schlub's testimony was not inconsistent with or contradictory of the evidence about OI Kaylo as a product used at Badger.  (ECF #201 at 7-17.)  Plaintiff disputes that the portion of the Badger facility Ozzie worked on or the entire Badger facility was built with JM magnesia.  (ECF #201 at 7-37.)

41. Mr. Schlub was 80 years old when he testified, a fellow client of the plaintiff's counsel, and an admittedly biased witness who liked to help out his fellow asbestos workers. *Id.* at 6:3–22, 8:13–17.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.

The testimony OI cited does not support an inference of bias.  George Schlub stated that "I have hobbies, and I try to help out people, especially people in my trade if they need assistance" in response to being asked "What do you do nowadays that you're retired?" (ECF#154 at 8:13-17.)

42. In 1959, Mr. Schlub worked as an asbestos worker for the first time at Badger Ordnance Works and admitted that Mr. Suoja was not there at that time:
Q. Do you remember what year that was that you started at Badger Ordnance?
A. I got in the trade in 1955, and I – it was probably 1959 when I first went to Badger Ordnance to do work.
….
Q. Mr. Souja was not working with you in 1959, correct?
A. That's correct.
    *Id.* at 26:22–27:2.

Plaintiff disputes this PFF in part.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Schlub stated Ozzie was "not working with him," but did not say Ozzie was not working at Badger at the time.  The testimony of coworker Zimmer places Ozzie working at Badger in the 1958-59 timeframe. (ECF#201 at 17-21.)  In a large facility where multiple insulation contractors worked employing large crews, no inference can be drawn that Ozzie was not working at Badger in the 1959 time frame.

43. In 1968 (not 1967) — then ten years after Owens-Illinois sold its Kaylo Division — Mr. Schlub returned to Badger Ordnance Works and worked, on and off, approximately five or six months for L&S Insulation with Mr. Suoja:
Q. So your best estimate is that you were working at Badger Ordnance with Mr. Souja around 1967?
A. Yes.
Q. Roughly. Do you know how long a period you and Mr. Souja were working at Badger Ordnance?
A. Off and on, I would say maybe five months, six months.
Q. And for this period of five to six months, were you both working for L&S Insulation?
A. When I worked with Ozzie, yes.
*Id.* at 28:9–20.

Plaintiff disputes this PFF in part.  The work began in "roughly 1967" and the 5-6 months when both Ozzie and Schlub worked for L&S Insulation spanned more than the year 1968. (ECF#201 at 8.)

44. Mr. Schlub repaired old outdoor insulation-covered pipes—where the insulation was "deteriorated," "hanging there," and "weathered" from the rain—which was consistent with soluble 85% magnesia asbestos insulation:

Q. What were you doing there?
A. We were repairing insulation-covered pipes where the weather had gotten to it and the weather-proofing had -- the weather-proofing had fallen off, and they -- the materials, *insulating materials, were deteriorated and we had to remove them and replace them with new insulation*. And there was also some new construction that was going on too that we worked on too. It was new work, and we had to insulate that too. But mostly it was removing or re-weather-proofing insulation materials that were on the pipes already.
….
Q. How did you remove the insulation?
A. How would we remove it? We would cut the -- The insulation is wired on, and we had to cut the wires. *It was deteriorated and hanging there*, and the weather-proofing was mostly gone. We had to cut it down with our nippers and let it fall to the ground, you know.
….
Q. What about the deteriorated insulation?
A. Deteriorated stuff, the weather-proofing had been -- *had weathered and was falling off and the insulation was weathered. It was rained on* and had dirt on it and stuff from dust blowing around the fields there, and it had a real dirty-looking appearance.
*Id.* at 12:1–22, 14:15–21, 24:5–11.

 Plaintiff disputes this PFF. Testimony itself is not necessarily a "fact." The finder of fact must assess credibility, weight, and probative value of testimony.

 Plaintiff disputes that Mr. Schlub's testimony cited "was consistent with soluble 85% magnesia asbestos insulation" and adopts Plaintiff's evidence summary on this issue in his opening brief. (ECF#201 at 34-35.)

45. Although Mr. Schlub called the asbestos insulation "Kaylo," he also testified that "Kaylo" was 85% magnesia asbestos insulation:

Q. Do you recall whether or not Kaylo was an 85 Magnesia product or a calcium silicate product?
A. It was 85 percent or whatever.
*Id.* at 31:18–23.

 Plaintiff disputes this PFF. Testimony itself is not necessarily a "fact." The finder of fact must assess credibility, weight, and probative value of testimony.

 Plaintiff disputes that Schlub testified that "Kaylo was 85% magnesia asbestos insulation" and adopts Plaintiff's summary of the evidence and argument on this issue in its opening brief. (ECF#201 at 15, n. 9.)

46. Mr. Schlub went on to testify that "Kaylo" was different than calcium silicate asbestos insulation:

Q. How about a calcium silicate pipe covering? Can you describe what that looks like?

A. Cal-sil was similar, but it had *different* characteristics. It had *different* coloration and composition than Kaylo.

*Id.* at 34:3–7.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.

Plaintiff's adopts its summary of Schlub's testimony about the chemical formulation of Kaylo in his opening brief. (ECF#201 at 14-16.)   Schlub did not know the chemical formulation of Kaylo.  Additionally, the question in PFF# 46 appears to be understood by Schlub to refer to a molded pipe covering brand called "Calsil" rather than to products formulated with calcium silicate.

The testimony of Hofstetter demonstrates that a pipe covering insulation asbestos product was labeled as "Calsil" on its box.[47]  The testimony of Locher discusses the product "Calsilite,"

---

[47] Hofstetter testified:

Q:  At Badger Ordinance in the '50s you named Unisbestos and  85 magnesia. Were those – Well, let me ask them separately. The Unbestos, was that pipecovering and block?

A:  Pipecovering

Q:  All right. Were there any other types of pipecovering out there other than Unibestos?

A  Yeah, there was. I don't know, maybe Calsil or Thermobestos.

Q:  Okay, Now you metioned Calsil. Is that a brand name of a product type of insulation? Can you tell me?

A:  I don't know. It was written on the box.

Q:  It sail Calsil on the box?

A:  Yeah.

Q:  Do you remember how – and this is kind of an, I realize, farfetched – how it was spelled on those boxes?

A:  I believe it was C-A-L.

Q:  And the other part of it, do you recall? C-A-L –

A:  C-A-L.

Q:  And that was –

A:  S-I-L on the end.

which was sold by Ruberoid and GAF.[48]  According to the Federal Register, "Calsilite" pipe covering and block insulation was produced by Ruberoid then Aniline & Film Corporation then GAF Corporation from 1949 to 1971 on a commercial basis.  (Ex.1258 at 5147-5148.)  The inference can be drawn that tradesman called "Calsilite" by the name of "Calsil," which would further support Schlub believing the question referred to a molded pipe covering brand called "Calsil."

---

Q:  Okay, C-A-L-S-I-L. Am I spelling it right?
A   I think so, yeah.
(ECF#184 at 28:17-29:16.)

[48] Locher testified:
Q. Of the cement that you bought from Standard Asbestos in
   Kansas City was one of them a One Cote cement?
A. I believe the only one that we got from them was a One
   Cote cement.
Q. Do you know when you purchased that? Over what years?
A. It was probably in the sixties.
Q. Do you recall purchasing asbestos products from GAF?
A. yes.
Q. What asbestos products?
A. All right, really what happened is we used to, I think as
   I had made it clear by most of our white line the
   Baldwin-Ehret-Hill and the salesman used to call on us.
   He was out of a job, had to look for another one. He got
   a job with GAF selling their white line called Calsilite,
   I think was the name of the product.  And, so, he came in
   one day and gave us a pretty good price. And I think we
   bought anywhere from two to four cars from him.
Q. Did that go by the brand name Ruberoid?
A. Yeah, I think was it Calsilite Ruberoid was the manu-
   facturer. It was owned by GAF. I think that is the way
   it worked, I don't know.
Q. Is the Calsilite white line products what you referred to
   the only items you remember buying from GAF?
A. Yes.
Q. And to your knowledge they contained asbestos, did they
   not?
A. Those days, yes.
Q. And that was pipe covering and block?
A. Yes. It was very similar to Johns-Manville products.
   I think they had a license out of JM or something, they
   had an agreement.

(ECF#188 at 31:16-32:21)

47. Mr. Schlub believed the asbestos insulation at Badger Ordnance Works was "Kaylo" because it was "bright," "white," "chalky" material, which he associated with 85% magnesia asbestos insulation and not calcium silicate asbestos insulation:

Q. How do you know it was Kaylo?
A. Because I worked with Kaylo and I knew what it looked like. *It was white, chalky.* It was very distinctive in the texture of it. I could tell by the texture and the composition that it was Kaylo because I was familiar with Kaylo, so it was something that I had always worked with.
….
Q. Now, you had mentioned when counsel was asking you questions that you could tell what the brand of the pipe insulation was that you were removing at Badger Ordnance; do you recall that?
A. I recall after tearing it off and seeing the *bright chalky material* that was left after I removed all the weather material, I could tell that that was Kaylo.
….
Q. Can you describe for me what an 85 Magnesia pipe covering looks like?
A. It's made of a substance that looks like *chalk*. It's formed to fit the pipe. When you work with it, it gives off dust, and the appearance is *real white* when the material is new.
….
Q. So your testimony is that cal-sil was not as bright white as 85 Mag?
A. To my recollection, that's true.
*Id.* at 19:4–10, 34:21–35:4, 33:21–34:2, 34:18–20.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  OI has also excerpted out of context questions and answers from multiple places.

Plaintiff's adopts its summary of Schlub's testimony about the chemical formulation of Kaylo in his opening brief. (ECF#201 at 14-16.)   Schlub did not know the chemical formulation of Kaylo.    Additionally, the question in PFF# 47 appears to refer to a molded pipe covering brand called "Calsil" rather than to products formulated with calcium silicate.   See Response to PFF# 47.  Schlub was being asked to compare the brand of pipecovering called  "CalSil" with "85 Mag" and said the brand "CalSil" is not as bright white as "85 Mag."  Schlub was not asked to compare Kaylo with "85 Mag."

Schlub also did not state the only pipe covering he "associated" as being ""bright," "white," "chalky" material"" was 85 Mag.   Necessarily


48. Mr. Schlub's testimony cannot be reconciled with the testimony of Ralph Van Beck, an asbestos worker from 1947 until 1966 and a former vice president of thermal insulation at Sprinkmann, who testified there was no way to determine the manufacturer of asbestos insulation when it has been installed on the pipe line:

Q. Am I right that after a thermal product had been installed on a job
site, you could not tell the manufacturer?
A. That's probably correct.
Q. For example, when you're insulating a pipeline, you would put the
pipe insulation on. You would maybe wire or twine it. You would
put cheesecloth. And you would put cement all on top of that
pipeline.
A. Yes.
Q. You might even use a mastic as well?
A. You might.
Q. Would there be any way, as you looked at a[n] insulated pipeline, to
determine the manufacturer of any of those products?
A. No. Not that I'm aware of.
Ralph Van Beck Dep. 9:17–10:16, 107:4–110:4 (objections omitted), dkt. 190.


Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony.

The testimony cited does not support this PFF.  Van Beck is discussing identification of
the manufacturer or brand asbestos insulation under different conditions then those present when
Schlub and Zimmer identified Kaylo.   Van Beck's testimony is about molded insulation in place
on a pipeline which cannot be seen because it is covered by mastic, cheesecloth, and cements.
Van Beck offered no testimony about whether brands of molded insulation can be recognized as
they are  removed.   Schlub and  Zimmer identified Kaylo which they could observe since the
covering, cements, and  mastics covering the molded pipe insulation were removed when the
insulation was removed from and  replaced on pipelines. (ECF#201 at 8-9, 19-20.)

49. Additionally, Mr. Schlub's testimony cannot be reconciled with the testimony of Harold
Haase, a career asbestos worker and fellow client of plaintiff's counsel, who testified that you
could not identify the manufacturer out of the box:
Q. I'm asking you to compare Unibestos to another cal-sil product like
Thermobestos.
A. If you took them out of a box, you wouldn't be able to tell the
difference, I don't think.
Harold Haase Dep. 48:7–14 (objection omitted), dkt. 149.


Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony.

Plaintiff discussed Haase's testimony in his opening brief.  (ECF#201 at 23, n. 16.)


**7. Coworker Lawrence Zimmer's Testimony**
50. Assuming, for the sake of argument, that the Court overrules Owens-Illinois's objections, the
plaintiff introduced the deposition testimony of a third coworker at Badger Ordnance Works,
Lawrence Zimmer. His testimony was also inconsistent with the objective evidence. *Compare
supra* at ¶¶ 12–35 *with* Lawrence Zimmer Dep., dkt. 155– 56. Most notably, however, Mr.

Zimmer did *not* testify that Mr. Suoja ever worked with or around Owen-Illinois Kaylo at Badger Ordnance Works. *Id.*

Plaintiff disputes this PFF.  Zimmer's testimony is not inconsistent with other evidence. (ECF#201 at 17-21; Reply Brief Section II.A.; See PFF# 51-56 below.)   Zimmer testified he personally was exposed to Kaylo dust when it was being removed and installed.   (ECF#210 at 17-19.)   Zimmer also testified that  Ozzie "was exposed to the same things you [Zimmer] were out there as far as dust."  (ECF#201 at 19-20; ECF#156 at dep page 54.)

51. Mr. Zimmer's testimony was inconsistent with the objective evidence that 1) Mr. Suoja worked for McDermaid (not L&S Insulation) in late 1958; 2) L&S Insulation did not work at Badger Ordnance Works in late 1958; 3) Badger Ordnance Works was constructed with Johns Manville 85% magnesia asbestos insulation; and 4) white insulation products other than Kaylo were installed at Badger Ordnance Works. *Compare id. with supra* at ¶¶ 12–35.

Plaintiff disputes this PFF.   Zimmer's testimony is not inconsistent with other evidence as set forth in plaintiff's opening brief and other PFF responses, and reply brief.   (See, e.g, ECF#201 at 7-37; response to PFF#s 26, 27, 29, 30.)   In formulating the PFF, OI attributes statements to Zimmer which were not part of his testimony.  Zimmer did not testify which contractor Ozzie was working for.  Zimmer also did not testify Kaylo was the only white insulation product used at Badger.

52. Mr. Zimmer was 73 years old when he testified, had suffered from Parkinson's disease during the last 12 years, and was a fellow client of plaintiff's lawyer. Zimmer Dep. at 9:5–6, 10:19–20, 40:1–3.

Plaintiff does not dispute this PFF.

53. In 1958, Mr. Zimmer joined the Asbestos Workers Union as a helper-apprentice and started working for L&S Insulation:
Q. I understand that you joined -- joined the union in 1958?
A. Yes.
….
Q. Okay. Did you have any apprenticeship?
A. Well, they called us helpers at that time. The apprenticeship program
was inaugurated at my joining…. They swore me in, and then they
passed the -- what you call it. That I think was a four-year
apprenticeship program from then o[]n.
….
Q. What local?
A. 19.
Q. Where is that out of?
A. Milwaukee.

….
Q. Who were you working for?
A. L & S.
*Id.* at 55:19–56:6, 13:9–17.

Plaintiff disputes this PFF in part.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.   Zimmer was an asbestos worker in 1957 with L&S before he joined the union.   (ECF#201 at 17-18; ECF#155 at dep pages 13, 22-23.)

54. Mr. Zimmer's claim that he worked as a helper-apprentice at Badger Ordnance Works in "Late '58" (*id.* at 25:13–18) is contradicted by L&S Insulation's contract records, which establish that L&S Insulation did not work there until June 4, 1959 (Ex. 1698, at Book 2, 249; Ex. 1697, at 1 (summary exhibit)).

Plaintiff disputes this fact.  The entries in the L&S ledger are not definitive as to the dates when work was performed.   See Plaintiff's response to PFF# 28-30 and Reply Brief Section II.A.


55. Mr. Zimmer speculated that "Kaylo" was being removed at Badger Ordnance Works, because it was "smooth and white," but he admittedly did not perform the work:
Q. Could you tell what brand of insulation was being removed, or can
you tell us what brand of insulation was being removed out there?
A. It was Kaylo.
Q. How do you know?
A. Because it was smooth and white.
….
Q. Did you do that work out there?
A. No.
Q. Did you help to remove the Kaylo?
A. No, I did not. I was an apprentice then.
Q. Were you --
A. I wasn't allowed to touch tools.
*Id.* at 25:22–27:1. Mr. Zimmer never claimed that Owens-Illinois made those "Kaylo" products.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Zimmer's testimony is not speculation as he personally observed the removal of the insulation as an apprentice  at Badger Ordnance.  (ECF#201 at 17-20.)  Before working at Badger, Zimmer was well acquainted with the appearance and other characteristics of Kaylo from using it almost daily after becoming an insulator.  (ECF#201 at 17-20.)

56. In prior sworn affidavits, Mr. Zimmer contradicted his deposition testimony and attested that he used *other* asbestos insulation products—including Kaiser M-Block insulation, Armstrong Armabestos pipecovering, and USG/A.P. Green insulation—during this time at Badger Ordnance Works:

### PRODUCT LIST:

A. Plastic K-N, KK-N, Ram used at Steel Mills
B. KR 1202/ 1204 M/C Brick-Metal Encased Firebrick
C. M- Block Insulation
D. Hard Top Finishing Cement- Mud

E. Plastic Insulation Cement
F. Vee Block Mix/Castable Insulating Cement
G. Kaiser Mineral Wool Cement
H. Super D block Insulation (6% Amosite)

**I was exposed to the Kaiser Aluminum & Chemical asbestos-containing products identified above while working at the below sites:**

*Fill in tables below and circle the letters that correspond to the products above.*     CIRCLE BELOW:

| Location | City | State | From | To | Products |
|---|---|---|---|---|---|
| Badger Ordnance Works | Baraboo | WI | 1957 | 1960 | A. B. C. D. E. F. G. H. |

Ex. 1182.4     4 As noted at the deposition, the plaintiff's counsel had not produced Mr. Zimmer's
bankruptcy affidavits in response to discovery. Zimmer Dep. 8:3–14, dkt. 155.

### PRODUCT LIST:

A. Armaspray
B. Asbestos Cement
C. Accobest Gaskets

D. Armabestos Pipecovering
E. Sprayed Limpet Asbestos
F. Asbestos Vinyl Floor Tile

**I was exposed to the Armstrong asbestos-containing products identified above while working at the below sites:**

*Fill in tables below and circle the letters that correspond to the products above.*     CIRCLE BELOW:

### WORK HISTORY:

| Location | City | State | From | To | Products |
|---|---|---|---|---|---|
| Badger Ordnance Works | Baraboo | WI | 1957 | 1960 | A. B. C. D. E. F. |

Ex. 1174.

1. Site/Plant where exposure occurred:

Name of Site/Plant of Exposure: Badger Ordnance Works _____, or if this site is on the approved
USG/A.P. Green site list, enter the Site Code from Exhibit A (available on website): _____ (if a
Site Code is entered, please skip to question 2)

City: Baraboo _____

State/Province: WI _____

Country: _____

If this exposure involved **USG/A.P. Green** product(s) or conduct, list the names of the products or the name of
the contractor and nature of the conduct to which the injured party is alleging exposure and provide the
evidentiary basis for the claim that USG/APG products/conduct were at that site.

_____

_____

2. Date Exposure Began: 01/1958        Date Exposure Ended: 12/1958
                        (mm/yyyy)                          (mm/yyyy)

3. Occupation at Time of Exposure (e.g., Boilermaker, Laborer, etc.): Asbestos Worker _____

Ex. 1188.


Plaintiff disputes this PFF.  The claim statement does not contradict the testimony of
Zimmer in the *Suoja* case.  Zimmer was not asked in his *Suoja* testimony to identify all asbestos
products he could recall at Badger.  Zimmer was only asked about the job when he worked with
Suoja at Badger.  The products on the claim statement could have been used on work Zimmer
did at Badger when Suoja was not present.  The bankruptcy claims statements are specific to
products of the manufacturer against which the claim is asserted.  The statements do not ask
about or provide Kaylo as an optional choice.  Only one brand of pipecoveirng – Armabestos -is
identified in Zimmer's bankruptcy trust fund claim statements.   The statement does not provide
any detail about the quantity of Armabestos, where Armabestos was used, or if was used on the
job when Ozzie worked.  The other insulation materials identified are types which necessarily
are used with – not in place of - the molded pipecovering such as Kaylo.  ((ECF#190 at 109-110;
Att.1 at OI PFF# 48; ECF#155 at 23-24.)  Use of other materials or brands does not preclude
Kaylo being installed and removed.

OI asserts that the bankruptcy claim affidavits of Zimmer were not produced before Zimmer's
dep.  OI cites to pages of the deposition transcript where Georgia Pacific (GP) counsel makes an
unsubstantiated, self-serving and hearsay assertion that a discovery request was not complied
with.  (ECF 155 at 8.)  GP counsel makes no mention of bankruptcy trust claim statements not
being produced.  OI cites to no court finding of discovery non-compliance relating to Zimmer's
bankruptcy claim forms.

**8. Stephen Kenoyer's "Expert" Testimony**

57. Assuming, for the sake of argument, that the Court overrules Owens-Illinois's objections, the plaintiff also offered the testimony of a purported industrial hygiene expert, Stephen Kenoyer. He also did not testify that Mr. Suoja was exposed to asbestos from Owens-Illinois Kaylo at Badger Ordnance Works. Trial Tr. 1-A-42:12–92:24. In fact, contrary to Mr. Schlub's and Mr. Zimmer's testimony, Mr. Kenoyer testified that someone cannot identify the manufacturer of insulation on a pipe:

Q. You agree that when you look at insulation on a pipe, you can't tell
who manufactured it?
A. Generally, yeah. There may be instances where you might see a label
on it, but generally I would agree with you.
….
Q. This photograph of this block material from the presentation [Ex.
137], is that asbestos containing or not?
A. I would have to sample it to be able to positively ID it.
Q. Is that calcium silicate or 85 magnesia?
A. I don't know.
Q. What year was this manufactured?
A. I don't know. It's just used as a example.
Q. Who manufactured it?
A. I don't know.
Q. You can't tell just by looking at it, can you?
A. No.
Q. Same question. This insulation, the half round that was in your
presentation [Ex. 137], is that same answers?
A. Same answers.
Q. You can't tell what it is or who made it or when; right?
A. That's correct.
Trial Tr. 1-A-110:24–111:3, 1-A-95:12–96:5

        Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.
        Plaintiff disputes OI's statement that Stephen Kenoyer is not qualified as an expert witness because he is a "purported industrial hygienist.".  Plaintiff addressed Kenoyer's qualifications as an expert at Reply Brief Section III.C.i.
        Plaintiff disputes OI's statement that "Mr. Kenoyer testified that someone cannot identify the manufacturer of insulation on a pipe."  Kenoyer is acknowledging that he personally does not have training or experience to make such judgments.  He was not asked about and did not address whether other persons, such as insulators who work with the product in field, can distinguish the brands.

58. Additionally, Mr. Kenoyer testified that he and many other people confuse the manufacturers of "Kaylo":

Q. As of a few days ago, you associated the product Kaylo with a
manufacture[r] called Pittsburgh Corning; right?
A. Yes, I did get that confused with the other Illinois. I always get those

confused.
Q. Lot of people do apparently.
A. Yeah.
Trial Tr. 1-A-111:14–20.

Plaintiff disputes this PFF.  Plaintiff does not dispute the testimony is properly quoted, but disputes the fact is relevant.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.

Kenoyer was not offered as a witness who can differentiate the brands of pipe covering that are in place.  He did not work professionally until 1990 – long after the sale of brands of molded asbestos pipe covering ceased after the 1972 OSHA regulations.  His expertise is in identifying the asbestos content of in place materials. (ECF 194 at 50.)   He supervised or planned projects involving removal of pipe insulation, but did not do "hands on" work with the pipe insulation materials. (ECF 194 at 108.)   He was also was not involved with any projects where insulation was removed from the boxes and "installed."  (ECF#194 at 108.)

## 9. Earl Gregory, PhD, CIH's Expert Testimony

59. Earl Gregory, PhD, CIH, a certified industrial hygienist with uncontested credentials, testified that, based on the objective evidence in this case, Mr. Suoja was not exposed to asbestos from Owens-Illinois Kaylo:
Q. We first asked you to evaluate whether Mr. Suoja was ever exposed
to asbestos from Owens-Illinois Kaylo.
A. That's correct.
Q. What was your conclusion?
A. My conclusion, based on all the testimony and the documents that
I've reviewed in this case, was that there was no evidence that he was
exposed to asbestos from Owens-Illinois thermal insulation
products.
….
Q. How did you reach that conclusion … of whether Mr. Suoja was ever
exposed to an Owens-Illinois product?
A. Mr. Zimmer, for example, said he worked with Mr. Suoja in late
1958, but he didn't indicate that Mr. Suoja was working with any
Owens-Illinois Kaylo products. He just stated that Mr. Suoja was at
the jobsite. And of course the jobsite is around 7,500 acres with over
1,400 buildings. So but Mr. Zimmer didn't say that he saw Mr. Suoja
remove or install any Owens-Illinois thermal insulation products. So
there's just no evidence from his testimony that Mr. Suoja was
working with any O-I thermal insulation products.….

And then for George Schlub, he indicated that he worked with Mr.
Suoja at the Badger facility in around 1967 for on and off maybe five
to six months. And he indicated that -- Mr. Schlub stated that he
removed what he felt was Kaylo insulation from piping. And he
defined the Kaylo insulation as 85% magnesia. And Kaylo is a
calcium silicate thermal insulation product and it's not an 85%

magnesia product. There are two different types of thermal
insulation products.
And he based his opinion that he was removing Kaylo on the fact
that other insulators stated that in the 40s the Kaylo was installed
when the facility was being built. But in fact O-I Kaylo was not
commercially available until 1948, and we know that the Badger
facility was up and running in January of 1943, so it couldn't have
been Kaylo that was installed during the initial construction of that
facility.
And, also, Kaylo is not an 85% magnesia product; it's a calcium
silicate product. And he indicated that the purpose -- Mr. Schlub
indicated that the purpose of his activities during that time period at
the Badger facility was to recover damaged and weathered pipe
insulation that had been exposed to rain and dust from dust blowing
in the fields outside where the pipe covering existed. And he
described the insulation as weathered and falling apart and
deteriorated. But calcium silicate products, which included the
Kaylo, the O-I Kaylo product, is not soluble in water and it doesn't
break down in water and it stands up very well to weather
conditions, including high humidities and rain and those kind of
elements; whereas 85% magnesia, by definition, is 85% magnesium
carbonate, which is soluble in water. …
Trial Tr. 2-P-82:2–9, 2-P-86:1–88:8.

Plaintiff disputes this PFF.  The opinion of Dr. Gregory as a paid expert is not admissible
on witness credibility.  (Reply brief at Section II.A.)   If the opinions about witness credibility
are allowed, Dr. Gregory's lack of experience in distinguishing brands of insulation products,
misreading of the evidence, and his resulting flawed opinions are discussed in Plaintiff's reply
brief.  (Reply brief at Section II.A

### E. Exposure to Asbestos from Owens-Illinois Kaylo Was Not a Substantial
### Factor in Causing Oswald Suoja's Disease.

60. Because the weight of the credible evidence does not show any exposure to asbestos from
Owens-Illinois Kaylo, there is no credible evidence that exposure to asbestos from Owen-Illinois
Kaylo was a substantial factor in causing Mr. Suoja's disease. Even assuming, for the sake of
argument, the plaintiff's evidence (over objection) shows some fleeting indirect exposure to
asbestos from Owens-Illinois Kaylo at Badger Ordnance Works, the evidence does not support a
finding of substantial factor causation.

Plaintiff disputes this PFF for which no authority is cited.  The greater weight of the
evidence supports Plaintiff's claims.

### 1. Oswald Suoja's Cumulative Exposure

61. Mr. Suoja had a forty-year cumulative exposure to asbestos from approximately 1943 until December 1984. *E.g.*, Ex. 1655, at 7; Ex. 1194, at 7 ("Plaintiff admits the truth of any documents about exposure to asbestos products which are contained in the bankruptcy trust submissions.").

Plaintiff disputes this PFF.  No inference can be drawn that Ozzie was exposed to asbestos every day of the 41 years his career spanned.  During the last eleven years of Ozzie's career, he had little if any asbestos exposure due to manufacturers discontinuing asbestos use when OSHA regulations came out in 1972 and the use of  protective equipment becoming routine for insulators when doing removal of asbestos materials.  Before 1972, some jobs were non-asbestos or some materials were non asbestos such as fiberglass.  OI designated testimony from Elmer Borchardt, the now deceased former owner of L&S Insulation.  Borchardt testified L&S only used asbestos on a "minority" of its jobs.  (ECF#205 at 27-28, PFF# 31.)  According to the social security records, Ozzie worked for L&S from 1968 to1983.  (Ex.1609 at 6.)  OI designated testimony from Van Beck, the Sprinkmann field superintendent who says protection was used beginning after 1968.

The trust fund claim which OI cites to only lists a beginning and ending date for exposure.  (Ex.1655 at 7.)  The claim document makes no statement about how many dates in between that asbestos exposure occurred.  The citation to OI Ex. 1194, at 7, is not probative.  Exhibit 1194 contains a general statement, but given reference to a specific document about a particular product.  OI fails to cite evidence in any claim submission which establishes the exposure – contrary to the directive of this Court.

62. In bankruptcy trust submissions, Mr. Suoja's estate admitted that he sustained asbestos exposure from a long list of products and jobsites:
• Precision Magnesia asbestos cement at Butler Shipyards where Mr. Suoja worked 12 to 14 hours a day, six days a week, from 1943 until 1945, covering all pipes they have in the warship. Ex. 1666, at 3, 9; Ex. 1194, at 7.
• Babcock & Wilcox asbestos products between 1943 and 1984. Ex. 1662, at 1; Ex. 1194, at 7.
• Celotex Corporation asbestos products from 1952 until 1954 at the Milwaukee House of Corrections, from 1951 until 1952 at Tanners Creek Power, in 1960 at Sundstrand, and at Badger Ordnance Works. Ex. 1675, at 5–8; Ex. 1194, at 7.
• Eagle-Picher Industries asbestos products. Ex. 1665; Ex. 1194, at 7.
• Fiberboard asbestos products from January 1951 until January 1952 at Schlitz Brewery and from 1943 until 1945 at Butler Shipyards. Ex. 1666, at 3, 9; Ex. 1194, at 7.
• Flintkote Company asbestos products. Ex. 1194, at 7–8.
• H K Porter Company asbestos products from January 1, 1943 until December 31, 1984. Ex. 1655, at 7; Ex. 1194, at 7.
• Johns Manville asbestos products. Ex. 1678; Ex. 1194, at 7.
• National Gypsum Company asbestos products from January 1, 1951 until December 31, 1979. Ex. 1654, at 1; Ex. 1194, at 7.
• Owens Corning Fiberglas asbestos products. Ex. 1194, at 7–8.
• Raytech Industries Incorporated asbestos products. Ex. 1660; Ex. 1194, at 7.
• Rockwool Manufacturing Company asbestos products. Ex. 1194, at 7–8.

• Union Asbestos & Rubber Co. (UNARCO) asbestos products. Ex. 1672; Ex. 1194, at 7.

Plaintiff disputes this PFF in part.  Although the documents are admissions of "exposure," the PFF is not relevant.  OI cites documents such as bankruptcy trust fund submissions, the state court complaint, and discovery responses which state Ozzie had exposure to certain products or in certain settings.  The Court must evaluate each as OI has provided minimal argument relating these to defenses to the claims.  In particular, the OI's PFF or argument omits the necessary finding that an exposure must be "substantial."  The relevant exposures are those which can be considered a "substantial" causal exposure.  OI's proof does not establish each "exposure" is a substantial cause and fails for that reason.  Having not made the argument, OI has forfeited that necessary position and the evidence of other "exposures" becomes irrelevant.

Assuming this Court does not find forfeiture and undertakes the analysis that OI omits, the question of a substantial exposure requires more evidence than OI offers for most of the exposures.  For this Court must evaluate if an exposure is substantial, OI must establish the release of fibers through visible dust or equivalent evidence, duration, activities of Ozzie which establish he handled the materials or was a bystander to the work, asbestos content of materials, working conditions such as protective equipment, and other factors.  Nor does OI provide an expert opinion about which exposures are a medical cause to assist the Court.  OI cannot rely on the "every exposure" theory which is not allowed pursuant to stipulation on OI's own motion in limine.  Dr. Frank provided an opinion based on hypothetical assumptions that Ozzie's work at Badger would cause mesothelioma if the conditions existed for 30 days.  (ECF#185 at 79:17-80:14.)  If this Court applies the testimony of Dr. Frank to the OI's other products evidence, almost all products does not meet the parameters in the 30 day hypothetical given to Dr. Frank.  OI's exposure evidence has no probative value without the proof of being substantial.

An example of an exposure which can be found "substantial" based on the evidence submitted by OI is the affidavit of Ozzie's wife attached to the claim submission for Fibreboard products.  The affidavit states "Precision Magnesia asbestos cement at Butler Shipyards where Mr. Suoja worked 12 to 14 hours a day, six days a week, from 1943 until 1945, covering all pipes they have in the warship."  (Ex.1666 at 3, 9; Ex.1194 at 7.)  From this and other evidence in the record, the Court can infer how the cement product was used, created dust, and that even if the Precision Magnesia was not used everyday, the job was long enough for the exposure to be substantial.  The same necessary information is not available for other products which OI seeks to include in the cumulative exposure.

OI cited to executed releases to support other exposure. The releases are compromises of disputed claims and liability is not admitted by the settling defendant.  (Att.3.)

Plaintiff also filed a motion in limine to exclude bankruptcy claim evidence which is hearsay is not admissible into evidence.  (ECF#117, MIL # 13.)   OI did not respond to this MIL for each individual claimed exposure.

To assist the Court, Plaintiff provides a chart of the claimed other exposures, attached as attachment 3, to set forth which ones lack evidence of being a substantial exposure or are inadmissible hearsay.

63. In a sworn "affidavit of exposure," Mr. Suoja's Estate also admitted that he was exposed to asbestos from General Electric turbines or steam lines connected to General Electric turbines at Indiana Michigan Power Co. between 1948 and 1955. Ex. 1669, at 1.

 Plaintiff disputes this PFF.  The affidavit signed by Mrs. Suoja makes no mention of "turbines."  The document only refers to "boilers, steam lines, water lines."  The affidavit does not show GE made any of these products.  The affidavit states Ozzie "dealt with asbestos," but does not say the duration of the jobs, what product was asbestos, whether dust was created, the protective measures, and other necessary information to know if the exposure is substantial.

64. Additionally, in a prior state court lawsuit, Mr. Suoja's estate admitted that he sustained exposure from a litany of asbestos products. Before the plaintiff's lawyers "lost" the litigation file from the prior state court lawsuit (Stipulation, dkt. 171)
Mr. Suoja's estate admitted that he was exposed to asbestos from:
• Pittsburg Corning asbestos products. Ex. 1620, at No. 43.
• Rapid American Corporation asbestos products. Ex. 1620, at No. 47.
• Unibestos asbestos products. Ex. 1620, at No. 62.
• Walker-Jamar asbestos-containing jobsites. Ex. 1620, at No. 81.
• McDermaid asbestos-containing jobsites. Ex. 1620, at No. 82.
• Weil McLain asbestos-containing boilers at Milwaukee County
Stadium. Ex. 1621, at No. 34.
• large quantities of asbestos products from A.P. Green Inc., ACandS Inc., Allied Insulation Supply Co. Inc., API, Inc., Armstrong Cork Co., Armstrong World Industries Inc., Asbestos Claims Management Corp., Building Services Industrial Sales Co., Inc., Crown Cork & Seal Co., GAF Corporation, Garlock Inc., Johns Manville Corporation, L&S Insulation Company Inc., Mundet Cork Co., National Gypsum Corp., Owens Corning Corp., Philip Carey Manufacturing Co., Pittsburgh Plate Glass Co., Pittsburgh Corning Corporation, PPG Industries Inc., Rapid American Corp., Raybestos-Manhattan, Inc., Raymark Corp., Sprinkmann Sons Corporation, and United States Gypsum Corp. Ex. 1618, at ¶¶ 12, 14, 41.6 (footnote_ *See Enquip, Inc. v. Smith-McDonald Corp*., 655 F.2d 115, 118 (7th Cir. 1981) ("[An admission] from one proceeding is indeed admissible and cognizable as an admission in another.").

 Plaintiff disputes this PFF including relevance. Plaintiff adopts the response to PFF# 62 about the need to prove an exposure is substantial.  OI does not analyze the individual products in the state court case for this evidence.  OI has forfeited argument about whether the state court case exposures are "substantial."
 Assuming this Court does not find forfeiture, Ex.1618 is the state court complaint. Plaintiff also filed a motion in limine to exclude evidence which only reflects "claims" made in bankruptcy submissions.  (ECF#117, MIL # 13.)   The Suoja estate did not admit that he was exposed to asbestos from the asbestos products cited in Ex.1618.  The Suoja estate only made claims related to products from those entities.  The statements in the complaint, if treated as admissions, do not establish whether any product exposure is substantial.  The only allegation about the exposure for any particular product is in paragraph 14 which states:  "During Decedent's normal course of employment, and in the performance of his duties, Decedent was required to handle or be around others who handled large quantities of the asbestos products

manufactured and distributed by the named Defendants." (Ex 1618, ¶14.) The "large quantities" is in reference to all products and does not break out the quantity of any single product. The allegation also does not specify the activities being performed, the dustiness of the conditions, or duration of exposure to any single product. The factors needed to assess if an exposure occurred or is substantial are not provided by this general allegation.

OI Ex 1620 is a discovery response to requests to admit cited by OI from the state court case. The response does not admit any single exposure is "substantial." When responding to whether exposure to a particular product was "a substantial contributing cause," plaintiff repeatedly stated "Plaintiff cannot admit or deny this request because the manufacturers of these products contest this issue." (See OI Ex 1620 E.g. RTA responses 44, 48,52, 56, 60, et seq.) No admission of a substantial exposure can be found in or inferred from any statement in exhibit 1620.

Ex. 1621 No.34 is not an admission as to exposure to asbestos. The Suoja estate stated only that the "Decedent worked in the vicinity of Weil McLain boilers at the Milwaukee County Stadium site" in response to an interrogatory asking to "list all equipment such as boilers and turbines that you worked on that was believed to contain asbestos products."

Attachment 3 is a chart that reflects Plaintiff's position on the claimed other exposures from the state court case.

OI also contends spoliation applies to the lost state court litigation file of Plaintiff's firm. A finding of spoliation requires two elements which OI cannot meet merely because a litigation file was lost.[49] First, the record must establish what material records were lost. Here, the evidence shows that none of the medical records, releases in settlement of state court claims, several discovery filings from the state court action, the exposure history of Ozzie, pleadings in the state court case, summary judgment and motion filings, the deposition of coworker Harold Haase are all available either from the records of the Dane County Clerk where the state court case was filed or other sources including Plaintiff's counsel. The extensive records which are available do not demonstrate any material records that are unavailable because the litigation file was lost. OI has not cited to or demonstrated what information is missing that suggests an adverse inference would even make a difference on a material issue in the case. For example, OI used the available state court records (pleadings, motions, discovery responses), releases, and bankruptcy claims to list about 50 other entities which OI's claims to be responsible for Ozzie's injury. Second, spoliation requires a finding of intentional conduct in losing the records. Here the state case was closed in 1998 and the MDL-875 action against OI sat dormant for more than a decade after that. The Suoja records at Cascino Vaughan Law Offices (CVLO) are kept in multiple places such as a medical records department, a trust fund claim department, general transcripts file for all cases, job site files, defendant specific files, client specific files and other ways of storing information which is not consistent to any one case. Given the passage of time, no intent can be inferred from losing a single litigation file. Ozzie's records from many other places within CVLO were available and produced. CVLO also provided the entire file obtained from storage of the Dane County Circuit Court to OI. The litigation file may have contained materials which are not discoverable such as notes of counsel, but the other materials that might be in a typical litigation file are still available.

---

[49] The standard for an adverse inference instruction requires proof of bad faith, which means proving that the documents "were destroyed for the purpose of hiding adverse information." *Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428 (7th Cir. 2010).

## 2. Oswald Suoja's Purported "Kaylo" Exposure

65. By contrast, the plaintiff's evidence showed that Mr. Suoja worked only five or six months (less than 1.25% of his 40-year exposure history) at Badger Ordnance Works. The only conceivable potential exposure to Owens-Illinois Kaylo is invoices (which is not proof of actual exposure) showing that in 1954 (thirteen years before Mr. Suoja worked at Badger Ordnance Works) 5,274 linear feet of Owens-Illinois Kaylo was shipped to that site. That amount of Owens-Illinois Kaylo would constitute less than .5% of the 1,056,000 linear feet (or 200 miles) of insulated overhead steam lines (assuming each line was insulated only once and never repaired and re-insulated with other products). Ex. 1734, at 44; Ex. 1738, at 8; Trial Tr. 2-A-106:21, 2-P-90:15–16. There is no evidence in this record to show where at Badger Ordnance Works any of the Owens-Illinois Kaylo was used, who installed it, how long it remained in place, or when it was removed (if ever) and by whom.

Plaintiff disputes this PFF, including the admissibility of the "no evidence argument." The greater weight of the evidence supports Plaintiff's claims of Kaylo exposure for more than 6 months at Badger. (ECF#201 at 7-37.)   Ozzie worked for 6 months in 1969 on a job at Badger where he was part of large insulation crews that removed thousands feet of Kaylo installed before 1958 during the OI manufacturing period.  (ECF#201 at 7-17.)   Ozzie also worked for several months at Badger in 1958-59 when Kaylo was removed that had been installed before 1958.  (ECF#201 at 17-21.)

Plaintiffs' case is primarily based on personal knowledge that OI Kaylo was removed. Since the witnesses have personal knowledge Kaylo was removed, no records are needed to show it was installed. OI's attempt to cast doubt on the removal evidence by arguing that the Plaintiff has installation records for only a small amount of Kaylo relative to the plant size, does not defeat the personal knowledge of what was removed. In a facility the size of Badger – thousands of miles of piping -, OI has not shown the ability to link where, when, and by whom a brand of product was installed with the locations of where Ozzie.  Thus the "no evidence" is not a proper or relevant PFF – or one which should be given minimal weight.

Second the "no evidence" PFF is not admissible without proper legal foundation.  Since the records are not complete, the absence of records does not establish the OI Kaylo installed at Badger is limited what Plaintiff could locate.  Under FRE 803(7), which incorporates 803(6), the finding of no evidence in the records must meet certain foundation standards. [50]   The standard under FRE 803(6) includes showing the records are regularly kept and would reflect the transaction of OI Kaylo being delivered to or installed at Badger.  OI has not shown that most of the records about insulation products used at Badger have been kept.  OI has also not shown the records which were prepared would show all the OI Kaylo at Badger.  To the contrary, the evidence shows many of the records have not been kept.

The records not available which might show additional OI Kaylo sales/purchases/deliveries to Badger or the contractors working at Badger include the following:
- OI's own records of Kaylo sales.  (ECF#201 at 24-26;  ECF#117, MIL #11);

---

[50] Plaintiff argued the hearsay issue in in the opening brief and in part in an MIL about the missing OI sales records.   (ECF#117, MIL # 11; ECF#201 at 23-26.)

- Badger's records of product purchased or installed.   (Dr. Neushul conceded most Badger records are missing and those available did not list brands of insulation or identify the contractors except for the 1940 work by A&M.  (ECF#201 at 25-26, 29-30.)
- Badger's records of insulation contractors working on the jobs in the post WWII period.  (Dr. Neushul conceded that there was not even a list of names of contractors available in the records.[51]  (ECF#201 at 29.)
- Records of insulation contractors working at Badger that reflect OI Kaylo purchases, sales, and deliveries to Badger

Additionally the records may not reflect the transaction which shows delivery or installation of OI Kaylo at to Badger.  In particular, contractors may deliver OI Kaylo to Badger without specifying the brand on the delivery ticket, shipping, or sales records.  The same can be true for Badge's own records which show a contract to install insulation, but not the brand.

The "no evidence" inference from the records is not proper based on the lack of foundation under the Federal Rules of Evidence.  OI  did not show the foundation the records were kept and would show all delivery or installation of OI Kaylo at Badger.

**3. Stephen Kenoyer's "Expert" Testimony**

66. Assuming, for the sake of argument, that the Court overrules Owens-Illinois's objections, Mr. Kenoyer did not testify that any claimed exposure from Owens-Illinois Kaylo was "substantial" in view of Mr. Suoja's cumulative exposure to asbestos. Trial Tr. 1-A-42:12–92:24.

Plaintiff disputes this PFF for several reasons.  First Kenoyer is not a medical doctor who testifies to substantial factor causation.  The environmental science or industrial hygiene literature which forms the basis for Kenoyer's expertise is about "significant" toxic exposures which are identified, assessed, recognized, and controlled.  Second, the PFF is not relevant since Kenoyer is not a medical causation witness.  Third, although Kenoyer's did not offer an opinion about OI Kaylo by name, he offer an opinion based on the hypothetical circumstances of Ozzie's Kaylo exposure  Kenoyer testified exposures during insulator work to molded (preformed) insulation such as Kaylo for a duration of 6 months involving visible dust are "significantly high."[52]

---

[51] Dr. Neushul testified:
> There's no -- just a list of the names of the
> contractors for the 1050s, unlike the one that existed
> from the 1940s.

(ECF#198 at 39:23-39:25.)

[52]Kenoyer testified:
> Q Okay. Now, I'd like to go back to Oswald Suoja for
> a moment and just ask you to assume he's got one month
> or more of work installing a pipe-covering insulation
> before the end of 1958 or removing a pipe-covering
> insulation. How would you characterize that exposure
> for an insulator?
>
> A I would characterize that as being significantly

67. Mr. Kenoyer performed no dose assessment to compare any exposure from
Owens-Illinois Kaylo against Mr. Suoja's cumulative exposure:
Q. You made no attempt to break out any of the exposures to any type
of product in this case?
A To a specific product, no.
Q You did not try to calculate what a 40-year total dose exposure
would have been for Mr. Suoja.
A No.
….
Q. You didn't do any sort of the case-specific exposure dose calculation
at all?
A No.
Trial Tr. 1-A-111:11–13, Trial Tr. 1-A-113:17–22.

     Plaintiff disputes this PFF, including relevance.  OI did not show that Kenoyer attempted
to or even could perform such analysis from the available evidence about Ozzie's exposures.
Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight,
and probative value of testimony.  Given the wide variability of the exposures encountered by an
insulator and the low dose to cause mesothelioma, a "dose reconstruction" is not needed to know
the Kaylo exposures are significant.  (ECF#194 at 77-80.)  Kenoyer testified:  "

     Q. So what I want to ask is if you have an
     insulator who's got a 40-year career of asbestos
     insulation work starting in '43 through '85, is it
     necessary to actually have to calculate out all of his
     exposures to evaluate the significance of the risk?
     A No. You don't need to calculate it out all the
     way.
     Q Why do you say that about an insulator?
     A.  Because I know the kind of exposure he's going to
     have. Just based on the numbers we were just looking at
     and knowing what the background numbers are, I mean you
     automatically can reason that that's going to be a
     high-risk job for asbestos.
(ECF#194 at 77-78.)

68. Instead, Mr. Kenoyer explained that his opinion rests on the belief that "[a]ny exposures
above background is significant." Trial Tr. 1-A-110:11–15. This theory, and any testimony based
on this theory, was excluded under *Daubert*. Opinion & Order, dkt. 82; Def.'s Mot. Bar 1, 19,
dkt. 27.

---

high, even for that short a period.
E9ECF#194 at 83:4-83:11.)  Kenoyer also presented a detailed PowerPoint presentation about
the high exposures during the installation and removal of pipe insulation.  (ECF#194 at 64:15-
65:13, 67:16-68-16, 69:2-69:16, 70:7-71:14, 72:6-76:11, 80:3-81:2;  Ex.137 at 10-14, 20.)

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Kenoyer is not giving a medical causation opinion about Ozzie.  Kenoyer is only testifying that in his profession, any asbestos exposure is important from an assessment and prevention perspective.

## 4. Arthur Frank, MD, PhD's Expert Testimony

69. Assuming, for the sake of argument, that the Court overrules Owens-Illinois's objections, the plaintiff's causation expert, Dr. Arthur Frank, did not offer any opinion that Mr. Suoja was exposed to asbestos from Owens-Illinois Kaylo, let alone a specific-causation opinion that exposure from Owens-Illinois Kaylo was a substantial contributing factor in causing Mr. Suoja's disease. Arthur Frank, MD, PhD Dep., dkt. 165.

Plaintiff disputes this PFF.  The greater weight of the evidence supports Plaintiff's claims. (ECF#201 at 74-84.)  Dr. Frank testified without dispute that one day of exposure can cases mesothelioma and 30 days of the type of work Suoja did at Badger is alone enough to cause mesothelioma. (ECF#210 at 80-81 and note 100; ECF #165 at 39)  This Court can use this testimony to determine what is a substantial exposure.  For Dr. Frank to tell this Court what is substantial is usurping the role of the fact finder.

70. Although Dr. Frank testified that it was scientifically possible to perform "a dose reconstruction, try to estimate what the exposure was" (*id.* at 69:21–23), he did not perform any dose reconstruction for Mr. Suoja's asbestos exposure or compare any exposure from Owens-Illinois Kaylo against Mr. Suoja's cumulative exposure from all sources during his forty-year career.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  While Dr. Frank testified that someone will "try to estimate what the exposure was" through a "dose reconstruction" he also stated that "the exact measurement" were "ever reported in the literature" and no one had "knowledge of what the exact exposure was" in "thousands of legal cases" he looked at.[53]

---

[53] Dr.Frank testified:
First of all, if you go through all
of the literature, nobody knew what the exact
measurement of any of these cases were ever that's
been reported in the literature that I'm aware of.
I've looked at thousands of legal cases and not a
single case have I ever had knowledge of what the
exact exposure was. Occasionally somebody will do
what's called a dose reconstruction, try to
estimate what the exposure was.
(ECF#165 at 69:15-69:23.)

71. Like Mr. Kenoyer, Dr. Frank explained his belief that any and every
exposure—no matter how minimal, no matter in what circumstances—is a substantial
exposure:
Q. [I]t doesn't matter what type of asbestos, how much he was exposed,
how long, or what type of exposure it was, correct?
A. None of the above.
….
Q. And you can't say that one was insubstantial and one was
substantial?
A. They were all substantial scientifically.
….
Q. [E]ssentially it's your opinion that the only exposure that a person
has that is not causative in their asbestos-related disease is the
exposure that they didn't have it?
A. Right…. Q. But if they have an exposure, no matter how slight, no matter how
minimal, your opinion is that that is part of the cause of the disease?
A. It's part of their cumulative exposure.
Q. And thus the cause?
A. And thus the cause because it is the cumulative exposure that is the
cause.
Q. And that's true in your mind and in your opinion even for a single
exposure on a single day?
….
A. The answer is yes.
*Id.* at 86:1–4, 99:13–15, 97:18–98:12, 99:16–100:2. This causation theory, and any testimony
based on this theory, was excluded under *Daubert*. Opinion & Order, dkt. 82; Def.'s Mot.
Bar 1, 19, dkt. 27.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony.  This testimony was elicted by
OI in violation of OI's own MIL and should be stricken from the record.  (ECF#201 at 82, note
101.)

**F. Owens-Illinois Kaylo Was Not Defective or Unreasonably Dangerous**
**Based on the State of the Art in the 1940s and 1950s.**
72. Even if the plaintiff had proven exposure and substantial factor causation, the credible
evidence does not support a finding that Owens-Illinois Kaylo was defective or unreasonably
dangerous, because it lacked a warning label, based on the medical and scientific state of the art
in the 1940s and 1950s.

Plaintiff disputes this PFF for which no citation is given.  The greater weight of the
evidence supports Plaintiff's claims. (ECF#201 at 40-73.)

**1. The Threshold Limit Value was recognized as a "safe" level of exposure to asbestos in the 1940s and 1950s.**

73. It was understood in the 1940s and 1950s that people would not suffer any adverse health effects if their asbestos exposure levels were below the then-recognized "safe" level of exposure (the Threshold Limit Value) on a time-weighted average basis. Willis Hazard Dep. 110–112, 116, dkt. 150.

Plaintiff disputes this PFF.  The greater weight of the evidence supports Plaintiff's claims that TLVs are not safe levels of exposure protecting against cancer including mesothelioma. (ECF#201 at 94-99.)  No understanding existed in the 1940s and 1950s that TLVs related to any asbestos disease except asbestosis.

The TLV for asbestos in the 1940, 50s, and 60s is not relevant to this lawsuit.  OI's corporate industrial hygienist from that era admitted his knowledge the TLV did not apply to cancer including mesothelioma::

Q. You mentioned at one point this afternoon
the concept of TLV or Threshold Limit Value. Do you
remember that?
A. Yes.
Q.  And is it correct, sir, that the Threshold
Limit Value that you talked about did not apply and
did not contemplate cancer?
A.  Yes.
Q.  It only applied or was directed toward the
possibility or the hope that if it were met that
asbestosis might be averted?
A. That was the concept in the period that
we're talking about.
Q.  And you mentioned, and certainly it did not
 apply with mesothelioma.
A.  No.

 (ECF#150 at dep pages 143-44.)  The admission by the corporate employee expert with contemporaneous knowledge of the OI Kaylo period is binding in this litigation.   The TLVs are not relevant because they do not apply to mesothelioma.  The TLVs are not relevant because OI's industrial hygienist for the Kaylo development and marketing did not rely on TLVs to protect against cancer. The chairman of the TLV committee published a presentation which expressly stated TLVs – except for nickel carbynol - do not protect against cancer risk which requires taking into account a 100-500 times lower safety factor from the published TLV. (ECF#201 at 95 and note 109.)

If this Court finds relevance to the TLV safe level argument, other evidence establishes the work of insulators doing pipe covering and removal often exceeds the TLV levels.  Published literature establishes insulator exposures routinely exceed the 1948 TLV.  Plaintiff's expert Kenoyer summarized the range of insulator exposures in published literature and showed the levels often exceed the TLVs.  (Att.13, Ex.137 at slides 10-13, 23-25; ECF 194 at 62-65, 69-71, 74-76, 84-88.)[54]  The data cited by Kenoyer was published after OI stopped selling Kaylo.  That

---

[54] Stephen Kenoyer testified:

does not excuse the failure of OI as manufacturer to conduct even a single test to measure exposure levels when insulators installed and removed Kaylo.  The reasonable inference is OI would have known the same data as in the later literature.  The failure to conduct such investigation is part of liability claim in this case. (ECF#201 at 48-50.)  Based on the evidence, no safe level can be inferred for the work of Ozzie which often exceeded the TLV.

Additionally, the PFF is not proper based on the evidence that the asbestos TLV was established based on faulty conclusions reached from the data in the Fleischer article.  (See PFF# 100.)


74. In 1946, the American Conference of Governmental Industrial Hygienists ("ACGIH") recommended exposure limits for over 100 contaminants, including asbestos dust. Ex. 1376, at 54–56; Ex. 1386, at 178–182; Ex. 1388, at 65-140–65-144; Ex. 1396, at 5–14. The ACGIH explained that the Threshold Limit Values "represent conditions under which it is believe that nearly all workers may be repeatedly exposed, day after day, without adverse effect." Ex. 1386, at 178. For asbestos dust, the Threshold Limit Value was set at an 8-hour time-weighted average exposure of 5 million particles of asbestos per cubic foot of air ("5 mppcf"). Ex. 1376, at 55; Ex. 1386, at 181; Ex. 1388, at 65-143.

Plaintiff adopts the response to PFF# 73.  The ACGIH was a private organization and not an agency acting or authorized to act for any governmental agency or body.  (ECF#150 at dep page 144.)

75. Dohrman Byers, who served on the ACGIH's Threshold Limit Value Committee in the 1950s and worked as an industrial hygienist for the United States Public Service and the States of Montana, Massachusetts, and New Jersey, testified that the Threshold Limit Value was considered to be a "safe" level of exposure:
Q. Can you tell us what the Threshold Limit committee did?
A. In detail, or --?
Q. In general.
A. Well, the Threshold Limits Committee met periodically to examine data on the toxicity and epidemiology and other aspects of the effects of occupational health hazards, chemical and otherwise. And on the basis of these, to establish a recommended guideline of permissible level of exposure which they called the threshold limit values. These

---

if you can get to
the point where you see visible dust in the air, you're
at 8 to 10 million particles
(ECF#194 at 86:25-87:1.)

That big dotted line that runs up and down through
the whole thing, that's that five million particles per
cubic feet. And you can see how on certain job
categories the average is above that five, and that's
prefabrication, tearing out, and mixing.
(ECF#194 at 85:19-85:23.)

were predicated on the idea that this level of exposure would be safe
for eight hours per day daily for the normal working individual.
Now, a safety factor was incorporated into these.
….
Q. Now, these threshold limits, were they also called threshold limit
values?
A. That's the term now. Originally they were called maximum
allowable concentrations.
….
Q. You said there was a safety factor built into these maximum
allowable concentrations. Could you please explain what that is?
A. All right. The -- well, the human, or any animal, do not all react the
same; there is a range of actions, and it was desired to set a level which would protect practically
everybody, recognizing that there
are some hypersusceptible individuals and there are occasionally
individuals who have, let's say, reduced health capacity. With the
data at hand we would try to arrive at a level which would appear
to protect most individuals, by that I mean a very high percentage.
And then, depending on the nature of the chemical, we would
reduce the level for added safety to compensate for any errors in
judgment, to some extent, to compensate for some people being
more susceptible than we expected, or in other words, just a safety
factor. And we would attempt to use at least a two-fold factor; in
other words, if we thought twenty was a good, probably safe limit,
we would recommend ten.
….
Q. During the time that you were on the Threshold Limits Committee,
did anybody ever raise a question as to the safety of the maximum
allowable concentration for asbestos?
A. To the best of my knowledge, no.
Q. I take it from approximately 1942 until, well, even perhaps presently,
you have been attending annual meetings of the ACGIH?
A. Yes, I have attended most of them up until 1981, anyway.
Q. At any point in time was there on the agenda at the annual meeting
a discussion of changing the maximum allowable concentration for
asbestos, at the annual meeting?
A. Yes, that did come up, but I believe that it was in the late 1960s.
Q. Can you tell us when, approximately, that was?
A. Because of the final evidence of carcinogenic potential of asbestos,
they made a change and as I have to say, I believe the change came
in the late 1960s -- 1968, '69.
Dohrman H. Byers Dep. 13:4–21:12, dkt. 193.

  Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony.
  Plaintiff adopts the response to PFF# 73

Plaintiff renews the objections to Byers' 1985 deposition testimony that 1) he was not timely disclosed as a witness and 2) the deposition is inadmissible under FRE 802 and FRCP 32(a) because it was taken in another case for which Suoja's counsel was not present and no motive for cross examination about the issues in the Suoja case is established.  (ECF #130 at 3, ¶6.)  In citing to Byer's testimony, OI does not address the objection.

76. Mr. Byers further testified that the Threshold Limit Value was measured by the asbestos dust (not the total dust) that was in the air:
Q. Now, when you were on the Threshold Limits Committee, was there a maximum allowable concentration recognized for asbestos?
A. To the best of my knowledge, yes, there was.
Q. What level was that?
A. I believe it was five million particles per cubic foot?
Q. Now, did that standard apply to just the asbestos that was in the air, or did that standard apply to all of the dust in the air, some unknown portion of which might be asbestos?
A. The standard was set on the presumption of 100 percent asbestos.
Q. So it was a pure asbestos standard?
A. Yes.
*Id.* at 17:2–9.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.
The objections to Dohrman H. Byers' testimony in the response to PFF# 75 apply to this PFF. Plaintiff adopts the response to PFF# 73.

77. In 1947, the Wisconsin Industrial Commission adopted the 5 mppcf Threshold Limit Value for asbestos and defined levels above 5 mppcf as "harmful exposure" under the Wisconsin General Orders on Dusts, Fumes, Vapors and Gases. Ex. 1412, at 12 & Rev. 4; Trial Tr. 2-A-114:9–23; 2-P-104:2–21. As the Wisconsin Industrial Commission explained, the Threshold Limit Value was "designed to prevent the inhalation by workmen of harmful dusts, fumes, vapors and gases to an extent which may cause incapacitation, disability or in *any way seriously injures any part of the body*." Ex.1412, at 7 (emphasis added).

Plaintiff adopts the response to PFF# 73

78. William Lea, PhD, worked in the Health Occupational Health Division for the Wisconsin State Board from 1940 until his retirement in 1974 and visited Badger Ordnance Works repeatedly in the 1950s:

135



Ex. 1917–53 (showing various visits); Trial Tr. 2-A-114:9–23.

Plaintiff does not dispute this PFF except for relevance.  Dr. Lea did not testify about insulation or asbestos issues concerning Badger.  According to the testimony of OI expert Neushul, the WI Occupational Health Division was investigating "lead levels in the blood of workers at the Badger Ordnance" and "the health effects of that [an on site x-ray laboratory] on their x-ray technicians."  (ECF#195 at 114-15.)

Plaintiff objects that OI exhibits 1929 – 1934, 1936-1939, 1943-1944, 1946-1950 were offered in evidence.

79. As a member of the ACGIH, Dr. Lea testified that the Threshold Limit Value for asbestos was considered to be a "safe" level of exposure:

Q. And what did these dust counts of below the maximum allowable concentration indicate to you about the safety of the workers at the Algoma plant?

A. Well, we viewed it as indicating conditions were safe, for prolonged exposure, since they were well below the accepted.

Q. And you mentioned the concept of prolonged exposure. Does the time weighted average come into play, in any dust study, including the Algoma dust study?

A. Oh, sure.

….

Q. And that would factor into your conclusion that the level of dust there was safe, in the plant?

A. Yes.

….

Q. During the entire duration of your work at the State Board of Health, and your membership in the ACGIH, were you aware of anyone challenging the safety of the maximum allowable concentration for asbestos?

A. No.

Q. During that same period of time, are you aware of any written literature in the field, which challenged the safety of the maximum allowable concentration for asbestos?

A. No.

Lea Dep. 39:21–40:5, 40:11–40:13, 48:18–49:3, dkt. 191.

Plaintiff disputes this PFF including as to relevance.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.

Plaintiff adopts the responses to PFF#s 73 and 78.

Plaintiff renews the objections to Lea's 1985 deposition testimony that 1) he was not timely disclosed as a witness and 2) the deposition is inadmissible under FRE 802 and FRCP 32(a) because it was taken in another case for which Suoja's counsel was not present and no motive for cross examination about the issues in the Suoja case is established.  (ECF #130 at 3, ¶5.)  In citing to Lea's testimony, OI does not address the objection.

80. Dr. Lea further testified that the Threshold Limit Value was measured by the asbestos dust (not the total dust) that was in the air:
Q. Let's focus on the asbestos maximum allowable concentration. Was
that a standard to be applied to all the dust in the air that contains
some portion of asbestos, or just the asbestos dust that was in the air?
A. Just the asbestos. Q. So it was a pure asbestos standard?
A. Right.
*Id.* at 34:22–35:4.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.

Plaintiff adopts the responses to PFF#s 73, 78, and 79.

81. Like Dr. Lea and Mr. Byers, Mr. Hazard testified that the Threshold Limit testified that the Threshold Limit Value was considered to be a "safe" level of exposure:
Q. During the time that Owens-Illinois manufactured and sold Kaylo,
did the Threshold Limit Value for asbestos remain 5 million asbestos
particles per cubic foot?
A. Yes.
….
Q. Did the concept of the TLV have within it a safety margin?
A. Yes, there was a safety margin. A person could be exposed to the
TLV for his working life and he would be safe.
Hazard Dep. 116, 13.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.

Plaintiff adopts the responses to PFF#s 73 and 100.

82. Like Dr. Lea and Mr. Byers, Mr. Hazard also testified that the Threshold Limit Value for asbestos applied to the asbestos component of a mixed dust like Kaylo:
Q. [W]as the 5 million standard applicable to total dust, some of which
might be asbestos particles, or was it applicable to … asbestos
particles?

A. It was applicable to the asbestos particles.
Hazard Dep. 113:19–22. Later, Hazard explained, "[Y]ou are not interested in total dust.
You want to know how much asbestos your guy is breathing in." *Id.* at 118:8–9.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony.
Plaintiff adopts the responses to PFF#s 73 and 100.

83. From 1946 until 1968, ten years *after* Owens-Illinois stopping making Kaylo, the ACGIH's
Threshold Limit Value remained at 5 mppcf for asbestos. Ex. 1376, at 55; Ex. 1386, at 181; Ex.
1388, at 65-143; Ex. 1396, at 14.

Response: Plaintiff adopts the response to PFF# 73.

84. Dr. Gregory, a certified industrial hygienist with uncontested credentials, provided the
following opinion about the Threshold Limit Value:
Q. The third thing we asked you to do was evaluate the concept of the threshold limit value and
its importance in this case, right?
A. That's correct.
Q. What was your conclusion, Dr. Gregory?
A. Well, the threshold limit value during the time period when Mr.
Suoja worked at the Badger Ordinance was 5 million particles per
cubic foot. In fact it had been 5 million particles per cubic foot since
about 1938 and it remained that way until approximately 1970. And
that was considered during that time period to be a safe exposure
level that as long as exposure levels were below the 5 million
particles per cubic foot, then employees exposed below those levels
would not suffer any adverse health effects or occupational diseases
while working with asbestos-containing products.
Trial Tr. 2-P-82:20–83:10.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony.
Plaintiff adopts the response to PFF# 73.

**2. Insulators like Mr. Suoja were exposed to asbestos at levels below
the Threshold Limit Value in place during the 1940s and 1950s.**

85. "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels" by Philip
Drinker, the Chief Health Consultant for the United States Maritime Commission, and colleagues
was published on January 1946 in *The Journal of Industrial Hygiene and Toxicology* (the
"Fleisher-Drinker report"). Ex. 228, at 9.

Plaintiff does not dispute this statement.  Plaintiff does object to a scientific publication
or the quotation of such a publication to being a "fact."  The scientific literature is hearsay which
was offered and can be admitted for limited purposes under FRE 803(18).  According to OI's
own counsel at trial, Rule 803(18) materials are not "substantive" evidence.  (ECF194 at 93-94.)

138

86. The Fleisher-Drinker report made three conclusions: 1) the asbestos exposures of insulators were generally below the Threshold Limit Value on a time weighted average; 2) only three cases of asbestosis and absolutely no cancer was found among the 1,074 insulators studied (some of whom had prior asbestos exposure before working at the shipyards); and 3) insulation work was "relatively safe" and 'not a dangerous" occupation. Ex. 228, at 15–16; Trial Tr. 2-A-120:3–122:22, 2-P-3:9–13.

Plaintiff disputes this PFF and adopts the response to PFF# 85.

The article states that "there are no established figures for permissible or safe dustiness in pipe covering operations." (Ex.228 at 13.) "The asbestos exposures of insulators" could not be "generally below the Threshold Limit Value" because no value was established for pipe covering operations at the time. As to the MPPCF recorded in the study, the particular conditions of the study must be considered including safety measures in effect. The article does not support a statement as to the TLV as general as the PFF. The study showed some operations at the shipyard exceeded 5 MPPCF. (Ex.228 at 15.)

The study data does not support conclusions about insulation work being a safe occupation. Persons who stopped working at the shipyard before the study was done were not included in the data. These would include the ones with more serious disease that caused death or disablement. The data showed a high incidence of asbestosis after 20 years which was not reported in the conclusions. (ECF#201 at 69, note 87.) Ultimately Fleisher-Drinker was professionally rejected as providing a basis for the TLV. (Ex 222, Att. ___; ECF# at 90-93.) The 1971 ACGIH documentation recognized the weakness in the Fleischer Drinker study, stating:

A conference on the biologic effects of asbestos(10) in 1965 caled attention to a very real probability that the 5 mppcf limit recommended by Dreessen is inadequate to give complete working-life-time protection against all forms of asbestos. Medical data on which the limits had been based were inadequate; more than half of the asbestos workers studied were under 30 years of age and thus provided an insufficient exposure time for asbestos to develop. Of the 105 workers exposed to <5 mppcf, 82 had worked < 5 years; 101, < 10 years; only 4 had > 10 years exposure. Seven of 36 workers exposed 5 – 9.9 years had asbestosis; 3 of 50 workers exposed to 10 – 19.9 mppcf dor < 5 years had asbestosis(6). Moreover it was a "point-in-time" study; many of the ill were missing and the dead uncounted, hence not considered in the over-all evaluation of the limit.

 (Att..14, Ex 222 at 18.)

The study did not consider the cancer risk so the PFF is not relevant. Of the 51 workers that were in the pipe covering industry for more than 10 years, it was determined that 3 had asbestosis. (Ex.228 at 15.) Plaintiff adopts the response to PFF# 73.

The article states that "asbestos pipe covering of naval vessels is a relatively safe occupation." (Ex.228 at 15.) The article does not make a blanket statement as to "insulation work" in other settings.

87. Two decades later, in 1965, Dr. Irving Selikoff and his colleagues published a study that explained, "The only large scale survey of asbestos insulation workers was undertaken in the U.

139

S. by Fleischer *et al*. in 1945. They found only three cases of asbestosis and concluded that 'asbestos pipe covering of naval vessels is a relatively safe operation.'" Ex. 1502, at 140; Trial Tr. 1-P-21:2–16.

Plaintiff adopts the response to PFF# 85.  The statements in Dr. Selikoff's publication quoted in the PFF are incomplete.  Dr. Selikoff concluded the Fleischer study did not come to correct conclusions based on the limited data reported.  Plaintiff adopts the response to PFF#  86. The more complete findings of Dr. Selikoff's research are detailed in plaintiff's opening brief and in this reply. (ECF#201 at 4-5, 43, 77,109, 112-113; Reply Brief Section II.F.)

88. In 1968, the *Journal of the American Medical Association* published "Asbestos Exposure, Smoking, and Neoplasia" by Dr. Selikoff and colleagues, who again cited the Fleisher-Drinker report and explained that the results of dust-exposure surveys in the insulator trade "have generally been within the 5 million particles per cubic foot permissible limits currently accepted by the American Conference of Governmental Industrial Hygienists." Ex. 1524, at 110; Trial Tr. 1-P-21:2–23:15.

Plaintiff adopts the response to PFF #85 and 86.

89. Later in 1968, the *American Industrial Hygiene Association Journal* published "The Work Environment of Insulating Workers" by J. LeRoy Balzer and Dr. Clark Cooper in May-June 1968. Ex. 208, at 222; Trial Tr. 2-P-11:22–12:12. The authors studied the work environment and exposure levels experienced by union insulators:

> Although we attempted to sample the dustiest operations, the timeweighted averages for dust samples containing asbestos would probably not exceed the TLV in most situations, even on ships. This conforms to findings by Fleischer *et al.*

Ex. 208, at 227.

Plaintiff adopts the response to PFF #85 and 86.

90. Based on the Fleisher-Drinker report, Owens-Illinois's industrial hygienist at the time, Bill Hazard, concluded that people handling Owens-Illinois Kaylo were in a safe environment: Philip Drinker "published in the Journal of the American Industrial Hygiene Association [a study] where they examined shipyard insulation workers, men who installed pipe insulation on shipboard. They concluded that the occupation of insulation insulators was a safe one." Hazard Dep. 104:15–23.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  It is unclear what timeframe is referenced in regards to the statement in the PFF of "industrial hygienist at the time."

Plaintiff adopts the responses to PFF##73, 85, 86, and 100.

Plaintiff disputes that Bill Hazard "concluded that people handling Owens-Illinois Kaylo were in a safe environment."  Bill Hazard further stated in the next lines of the deposition cited that, "the exposures that these men had were comparable not the same, but comparable to what we had in our own manufacturing plant. We concluded that people handling Kaylo were also in a

safe environment" ECF#150 at 102:22–25.  Bill Hazard's testimony of a "safe environment" is
limited to exposures in the OI manufacturing plant or substantially similar conditions.


91. Like Mr. Hazard, William Fluck, who worked in the Industrial Hygiene Unit at the
Wisconsin State Board of Health during the relevant period, testified that the Fleisher-Drinker
report was authoritative and he had reviewed the report in the course of his duties:
Q. Is that an article which you reviewed in the course of your duties at
the industrial hygiene unit?
A. I did.
Q. Did you consider it authoritative?
A. It added to our knowledge of asbestos …. I would consider it
authoritative, because this gentleman, Phillip Drinker, was a very
highly respected industrial hygienist.
Fluck Dep. 35:2–12, dkt. 192.

      Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony. It is unclear what timeframe is
referenced in regards to the statement in the PFF of "during the relevant period."
      Plaintiff renews the objections to Fluck's 1985 deposition testimony that 1) he was not
timely disclosed as a witness and 2) the deposition is inadmissible under FRE 802 and FRCP
32(a) because it was taken in another case for which Suoja's counsel was not present and no
motive for cross examination about the issues in the Suoja case is established.  (ECF #130 at 3,
¶7.)   In citing to Fluck's testimony, OI does not address the objection.
      Plaintiff adopts the response to PFF#85 and 86.
      The PFF also lacks relevance as not being about any work of Fluck of the State Bd of
Health connected to Badger.


92. Dr. Peter Neushul, an historian who specializes in the history of United States 20th Century
technology and science, provided the following opinions about the Fleisher-Drinker report:
Q. What did Philip Drinker and his colleagues conclude about whether
or not asbestos pipe covering was a dangerous occupation?
A. They concluded that based on this study of over a thousand
insulators, that it was – it could be a safe occupation.
….
Q. Professor Drinker's study in 1946, was that the first large-scale
epidemiological study of the users of finished insulation products
that was published anywhere in the world?
A. Yes, it was.
….
Q. Between 1946 and the mid-1960s, was there any publication in the
peer-reviewed literature in the world that said that the conclusions
in Fleischer-Drinker were wrong?
A. No.
Trial Tr. 2-A-122:8–13, 2-P-3:9–13, 2-P-3:21–25.

Plaintiff adopts the response to PFF#85 and 86.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.


93. Dr. Gregory, a certified industrial hygienist with uncontested credentials, provided the following opinion about the Fleisher-Drinker report:
Q. And you're familiar with the Fleisher-Drinker report, aren't you?
A. Yes, I am.
Q. And you've assessed that from an industrial hygienist perspective?
A. That is correct.
….
Q. And at that time when Fleischer and Drinker did those studies and published their findings, what were their conclusions?
A. Their conclusion was that pipe covering was not a dangerous
occupation based on the fact that they only found three cases of
asbestosis in all of the employees that they had x-rayed and based
on the monitoring that they had performed, which basically the
results were within the 5 million particles per cubic foot TLV of that
time period.
Q. If they used control methods and kept exposure limits within the
threshold limit values then you wouldn't see adverse health
consequences?
A. That's correct.
Trial Tr. 2-P-109:14–110:21.

Plaintiff disputes this PFF and adopts the resonse to PFF #85 and 86.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.


94. The plaintiff's purported industrial hygiene expert, Stephen Kenoyer, acknowledged the same facts contained in the Fleisher-Drinker report:
Q. Can you identify for the Court a single article published anywhere
in the peer-reviewed literature, anywhere in the world, in and
language, that said … that users of finished insulation products were
being exposed above the threshold limit value?
A. In what time period?
Q. Before 1965. A. I'm not aware of one before 1965.
….
Q. What Dr. Drinker and his colleagues concluded after looking at the
work of these insulators was that it may be concluded that such
pipecovering is not a dangerous occupation, correct?
A. That's what he says there, yes.
Q. They also state, on page 15, just before that, that it appears that
asbestos pipecovering of naval vessels is a relatively safe occupation,

correct?

A. That's what he says there.

…

Q. Can you identify for the Court a single study published in the peerreviewed
literature, anywhere in the world, before 1965, that said the
conclusions of Fleischer-Drinker were wrong?

A. No, I don't believe so, not before 1965.

Trial Tr. 1-P-23:20–24:9, 1-P-15:23–16:6, 1-P-23:16–23:20.

Plaintiff disputes this PFF and adopts the response to PFF#85 and 85.  Testimony itself is
not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value
of testimony.

**3. Wisconsin and federal law required the asbestos Threshold Limit Value to be enforced at
Badger Ordnance Works in the 1940s, 1950s, and 1960s.**

95. In 1947, the Wisconsin Industrial Commission enacted the Wisconsin General Orders on
Dusts, Fumes, Vapors and Gases, which applied to all employers in Wisconsin for the protection
of employees at "all places of employment and public buildings." Ex. 1412, at 10. To ensure
compliance with the allowable dust levels, including the Threshold Limit Value of 5 mppcf for
asbestos, employers were obligated to provide general and exhaust ventilation (Sections 4 and 5)
personal protection (Section 6), exhaust equipment (Order 2020), respirators and similar
protective devices (Order 2021), and wetting or dampening procedures to reduce dust (Order
2022). *Id.* at 13–21.

Plaintiff disputes this PFF, including the relevance and adopts the response to PFF #73
and 100.   Compliance with TLVs did not protect against cancer or mesothelioma.

The PF also calls for a legal conclusion that WI administrative regulations govern the
practices at a federal government facility. Since most of the work at Badger was undertaken to
meet national security needs – often on an expedited basis-, this Court cannot presume the WI
regulations were applicable.

Order 2020 and 2021 describe requirements for "exhaust equipment" and "respirators and
similar protective devices" but do not obligate employers to provide them unless certain
exposure levels are exceeded.  (Ex. 1412 at 21-22.)  OI makes no showing of any air testing
being done at Badger to establish the existence of airborne asbestos levels required to trigger the
need for special ventilation or other equipment. Section 6 states "approved respirators may be
used."  (Ex. 1412 at 16.)

Whether special equipment was needed at Badger or the regulations applied is
speculative.

96. A booklet published by the Department of Labor in 1951 stated the Walsh-Healey Act
"safety and health standards . . . will be applied in determining whether, in specific cases,
Government contracts are being performed under safe and sanitary conditions." Ex. 1573, at
Forward. The booklet made clear:

(a) Workers shall not be exposed to concentrations of atmospheric contaminants hazardous to
health. The most recent values for maximum concentrations as recommended by the American

Conference of Governmental Industrial Hygienists shall be used as a guide in appraising occupational health hazards, and in evaluating controls.…

(b) Control of atmospheric contaminants may be accomplished by any of the following methods:

(i) Substitution of a less toxic material for the material contaminating the workroom atmosphere.

(ii) Exhaust ventilation so that the contaminant is removed from the workroom atmosphere.

(iii) Isolation of the operation, so that the contaminant does not enter the general workroom atmosphere in hazardous concentrations, provided that any worker who is exposed to a health hazard by entering the isolated area shall be furnished personal protection in accordance with the provisions of this code.

(iv) Enclosure of the operation, so that the contaminant does not escape into the workroom atmosphere in hazardous concentrations.

(v) Change the process or operating method (such as by wet methods, the use of foams, colloids, etc.), so that the hazard is controlled.

(vi) Increase of general ventilation, so that the contaminant is diluted to a safe concentration.

*Id.* at 23. The 1951 booklet also stated that "the values recommended by the American Conference of Governmental Industrial Hygienists should be used as a guide in appraising occupational health hazards and in evaluating control" (5 mppcf for asbestos) and that "Personal protective equipment and/or protective barriers shall be provided whenever substances … are encountered in a manner capable of causing injury." *Id.* at 23–24.

Plaintiff disputes this PFF which call for a legal conclusion and lacks relevance to protecting Ozzie from mesothelioma. Plainif adopts the response to PFF #73 and 100.

Whether the booklet "made" something "clear" cannot be presumed and is for the fact finder to decide.

OI makes no showing of any air testing being done at Badger to establish the existence of airborne asbestos levels required to trigger the need for special ventilation or other equipment under the Walsh Healy Act.  Assuming the Act applies to Badger,  OI does not provide any citation to documents or testimony which show how the Walsh Healy Act requirements were being met or not met at Badger.


97. The Wisconsin General Orders on Dusts, Fumes, Vapors and Gases and the Walsh-Healey Act applied to the insulation work at Badger Ordnance Works. Trial Tr. 2-A-113:21–115:3, 2-P-107:25–109:25, 2-P-112:8–15.

Plaintiff disputes this PFF and adopts the response to PFF#95, 73, and 100.  .  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.


**4. Owens-Illinois understood Kaylo to be a safe product for its intended use during the 1940s and 1950s.**

98. The plaintiff introduced the deposition testimony of Bill Hazard, Owens-Illinois's former industrial hygienist, who testified about Owens-Illinois's knowledge in the 1940s and 1950s. Willis Hazard Dep., dkt. 150; Pl.'s Design. 7–9, dkt. 172.

      Plaintiff does not dispute this PFF. Mr. Hazard also testified about other matters.

99. Mr. Hazard graduated from Harvard College in 1929, earned a Master's degree in physics from Harvard in 1930, became an instructor at the Harvard School of Public Health from 1930 until 1934, and worked at Owens-Illinois from 1934 until 1942. *Id.* at 15–16. Between 1942 and 1946, Mr. Hazard served as a Captain and Major in the Department of Industrial Hygiene of the United States Public Health Service during World War II. After the war, Mr. Hazard return to Owens-Illinois where he worked until 1974. *Id.* at 15–17, 117–18.

      Plaintiff does not dispute this PFF.

100. Mr. Hazard testified why Owens-Illinois considered Kaylo to be a safe product, which did not require a warning, based on the Fleisher-Drinker Report, the Threshold Limit Value, and the Saranac Laboratory study of Kaylo:
Q. Why didn't Owens-Illinois put a warning on?
A. The product was safe and the dust from the product was safe.
Q. And on what do you base that opinion?
A. Early in the days when Kaylo was being made, we worked with
Saranac Laboratory for them to conduct animal inhalation at the Berlin Plant and was sent to
Saranac where they dispersed it
in a room which was lined with animal cages and wharf the animals
breathed this dust. This dust being Kaylo dust.
They followed the animals for a matter of weeks and weeks. The
daily exposure was eight hours a day, five and a half days a week,
week after week. Then at intervals when they assumed from their
experience that the animals might have been affected by breathing
the dust, they sacrificed groups of animals.
The first two experiments, first two series of experiments, were
negative. The dust had no affect on the animals. The third series of
experiments showed that the animals had contracted pulmonary
asbestosis which was quite surprising, really, and at first somewhat
of a concern. However, it was concluded after succeeding
experiments that there was no danger to the user of regular
commercial Kaylo. The reason for this, the reasons were two.
First, the exposure to the dust that the animals had was very, very
high in actual figures in the order of 105, 110, 115 million particles,
million asbestos fibers per cubic foot of air. The threshold limit value
for man is only 5 million fibers per cubic foot of air. So the cloud was
extraordinarily dense and the reason for this was to speed up the
effect on the animals. As it is, each series ran for two or three years,
but they gave them big doses in order to speed up the affect.
Now, the second aspect was that the animals breathe dust five and a

half days a week, eight hours a day, week after week during their
lifetime. This is a very accelerated experiment. No man ever breathes
Kaylo dust for his lifetime. It would be impossible.
So because of these two factors: One, the immense concentration that
the animals were exposed to; and second, the fact that they here
exposed for their lifetime made it unnecessary to label the product
with some cautionary label. In addition to this, it was published in the '40's a paper by Drinker
… published in the Journal of the American Industrial Hygiene
Association where they examined shipyard insulation workers, men
who installed pipe insulation on shipboard. They concluded that the
occupation of insulation insulators was a safe one….
There were other things that were important in making this decision.
The Kaylo plants at Berlin and Sayreville, New Jersey, had no
workmen's compensation claims for any disease caused by breathing
dust even after a good many years. They had no increased sick
absenteeism in any way related to asbestos or Kaylo dust. The industrial hygiene people and
doctors from the State of New Jersey
Health Department found the insurance carrier, Workmen's
Compensation insurance carrier from the Health Foundation, from
Saranac Laboratory itself, and tests that we made at Owens-Illinois,
showed that the dust exposure at Sayreville and Berlin was within
safe limits, particularly as regards asbestos dust.
So the conclusion was that this product was not harmful; hence, no
reason to put a warning label on the carton.
*Id.* at 100–104.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony.  The greater weight of the
evidence is TLVs did not protect for cancer or mesothelioma.  (Response to PFF# 73.)  OI knew
or should have known TLVs did not protect users of Kaylo which the Saranac labs reported
needed to be treated as a hazardous industrial dust that could be fatal.  Contrary to Hazard's
contentions, no documents show TLVs were relied upon by OI during the development and
marketing of Kaylo in the 1940s and 1950s, OI issued no warnings or precautionary instructions
to inform users or their employers keep exposures below TLVs, and the conclusions in the
Fleischer Drinker article – which formed the original basis for the TLVs - did not fit the data or
consider cancer risk or latency period.  (ECF#201 at 52-73, 94-100; Reply Brief Section II.F.)
Plaintiff adopts the response to PFF# 73.
Cancer as a risk of mesothelioma was reported in scientific literature in 1935 and
mesothelioma was reported in 1938.  (ECF#201 at 65-66, notes 78 and 79.  OI's industrial
hygienist William Hazard was aware the TLV did not apply to cancer and the latency period of
asbestos disease.[55]  OI has presents no contemporaneous documents from the 1940s or 1950s to

---

[55] Willis Hazard testified:
Q: You mentioned at one point this afternoon
   the concept of TLV or Threshold Limit Value . Do you
   remember that?
A; And is it correct, sir, that the Threshold

corroborate the explanation Hazard offers in 1981 for OI not warning.  The testimony of other witnesses who worked for OI  contradicts Hazard.  OI production manager Grimmie was told by OI management that Kaylo was a dangerous product in the late 1940s.  (ECF#201 at 55-56.)

Even if Hazard's explanation about the lack of warnings because of TLVs, OI should have undertaken medical surveys or additional animal testing for cancer/mesothelioma risks and field testing for exposure levels to verify the effectiveness of the TLVs and whether TLVs were exceeded during Kaylo work..  The failure to investigate claim is a separate basis for OI liability than failure to warn.  While investigating the risks of cancer or field exposure level during the latency period, OI should have issued warnings and safety instructions. The latency period was known to OI in the 1940s.  (ECF#201 at 49, note 54.)

**5. Insulators like Mr. Suoja were not at a known risk of developing cancer in the 1940s and 1950s.**

101. Before 1965, as the plaintiff's purported industrial hygiene expert admitted, there were no articles published anywhere in the peer-reviewed literature, in any language, anywhere in the world, that users of finished insulation products were at risk of developing cancer:
Q. Can you identify for the Court a single article published anywhere
in the peer-reviewed literature, in any language, anywhere in the
world, before 1965 that said that users of finished insulation
products were at risk of getting cancer?
A. Not that I'm aware of.
Trial Tr. 1-P-24:4–9.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Additionally, Kenoyer did not admit that there was no article; he only admitted that he was not aware of an article.

102. In the 1940s and 1950s, no manufacturer of asbestos insulation products ever placed a warning on its finished products, and the first warnings on finished products began appearing only in the mid-1960s:

Limit Value that you talked about did not apply and
did not contemplate cancer?
A Yes .
Q It only applied or was directed toward the
possibility or the hope that if it were met that
asbestosis might be averted?
A That was the concept in the period that
we're talking about .
Q:And you mentioned, and certainly it did not
apply with mesothelioma?
A No .
(ECF#150 at 143:19- 144:11.)

147

Q. Did any manufacturer put a warning on its thermal insulation
product in the 1940s and 1950s?
A. Not that I'm aware of.
Q. When did warnings come on to thermal insulation products?
A. In the mid 1960s is what I've found during my research.
Trial Tr. 2-P-114:21–115:2.

  Plaintiff does not dispute this PFF.

103. In August 1949, *The Journal of the American Medical Association* contained an editorial,
"Asbestosis and Cancer of the Lung." Ex. 1465, at 1219; Trial Tr. 2-P-4:1–7. The article
concluded that, "[a]s the available evidence shows that the occurrence of cancer of the lung is
related to pulmonary asbestosis and is *not merely a possible sequela of exposure to asbestos
dust.*" Ex. 1465, at 1220 (emphasis added).

  Plaintiff does not dispute this PFF.

104. In 1955, the *British Journal of Industrial Medicine* published an article by Dr. Richard Doll
reviewing the worldwide reported cases of lung cancer in persons with asbestosis and his study
of asbestos textile manufacturing plant workers from a plant in the United Kingdom. Ex. 1476;
Trial Tr. 2-P-5:20–6:20. Dr. Doll concluded that asbestos textile manufacturing plant workers
*with asbestosis* are at a higher risk of getting lung cancer than the general population. Ex. 1476,
at 86.

  Plaintiff disputes this PFF.  The article cited in this PFF does not state that it is a review
of "the worldwide reported cases."  The article cited in the PFF states that, "sixty-one cases of
lung cancer have been recorded in persons with asbestosis (Boemke, 1953, Hueper, 1052) since
Lynch and Smith (1935) reported the first case."  (Ex. 1476 at 81.)
  The article cited in the PFF does not support OI's statement that "Dr. Doll concluded that
asbestos textile manufacturing plant workers *with asbestosis* are at a higher risk of getting lung
cancer than the general population."  The article states that, "from the data it can be concluded
that lung cancer was a specific industrial hazard of certain asbestos workers."  (Ex. 1476 at 86.)

105. In December 1955, Dr. W.C. Hueper, the Chief of the Environmental Cancer Section of the
National Cancer Institute, in the *American Journal of Clinical Pathology* published an editorial
that was entitled, "Silicosis, Asbestosis, and Cancer of the Lung." Ex. 1478, at 1388; Trial Tr. 2-
P-5:7–19. The article explained that, "Epidemiological data available at present indicate that an
increased liability to cancer of the lung is limited to *the presence of asbestosis* of the lung and
does not extend to asbestos without the existence of a pneumoconiosis resulting therefrom." Ex.
1478, at 1389.

  Plaintiff does not dispute this PFF.

106. In 1960, years after Owens-Illinois ceased the sale of Kaylo, the *British Journal of
Industrial Medicine* published a paper by Dr. J. C. Wagner of 33 cases of mesothelioma found
among people living or working in the area of a South African crocidolite asbestos mine. Ex.

1486, at 260; Trial Tr. 2-P-7:9–8:4. The paper, "Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province," was the first to suggest an association between mesothelioma and exposure to asbestos. Ex. 1486, at 260; Trial Tr. 2-P-7:17–23.

Plaintiff disputes this PFF.  OI's statement that the paper was "of 33 cases of mesothelioma found among people living or working in the area of a South African crocidolite asbestos mine" is not supported by the article cited in the PFF.  The article cited in the PFF states, "In the last four years we have seen 33 histologically proven cases; 28 of these had some association with the Cape asbestos field and four cases had been exposed to asbestos in industry."  (Ex.1486 at 260.)

107. In April 1964, *The Journal of the American Medical Association* published a paper by Dr. Irving Selikoff and colleagues that was titled, "Asbestos Exposure and Neoplasia." Dr. Selikoff reported on the increased incidence of cancer in members of the International Association of Heat and Frost Insulators and Asbestos Workers. Ex. 1493, at 22.

Plaintiff disputes this PFF.  Plaintiff objects to the exhibit on FRE 803(18) grounds as OI cites to no expert witness testimony concerning the article.

108. In 1964 Dr. Irving Selikoff convened a conference in New York City to discuss his research and the biological effects of asbestos. The conference remarks were published in the *Annals of the New York Academy of Sciences*. The publication included the comments of Dr. E.C. Hammond, from the American Cancer Society and collaborator with Dr. Irving Selikoff:
> I believe that there was hardly anybody a few years ago who would have
> suspected that there was a lung cancer risk in this group of insulation workers.
> These men were not asbestos weavers nor asbestos miners, and nobody at that
> time had suggested an increased risk at all for insulation workers.

Ex. 1497, at 600.

Plaintiff disputes this PFF.  The exhibit cited to support this PFF was not offered at trial. (ECF#173.)

**6. Asbestos was a characteristic ingredient of all high temperature asbestos insulation in the 1940s and 1950s.**

109. The plaintiff offered no credible evidence that Owens-Illinois Kaylo—or any other high temperature asbestos insulation in the 1940s and 1950s—was or could have been made with non-asbestos substitutes. Asbestos was a characteristic ingredient of all high temperature asbestos insulation in the 1940s and 1950s. Trial Tr. 1-P-6:9–20; Ex. 1258, at 5144–5162.

Plaintiff disputes this PFF.  The greater weight of the evidence supports a finding of fact that Kaylo could have been made with non-asbestos substitutes.

Hazard testified there was talk of replacing the asbestos in Kaylo with fiberglass in the early 1950s and Dr. Frank testified fiberglass and other materials were available as a substitute for asbestos in the 1940s.  (ECF#201 at 50, 50 n. 55.)

149

Exhibit 1258, the Federal Register "Asbestos; Publication of Identifying Information; Notice." is not probative as to whether high-temperature asbestos insulation could have been made with a non-asbestos substitute because any insulation made without asbestos would not appear in the notice that provides summaries "of certain asbestos products." (Ex.1258 at 2.)

110. The credible evidence showed that, in the 1940s and 1950s, there were no available alternatives for asbestos in high-temperature thermal insulation products above 750° Fahrenheit. As the plaintiff's purported industrial hygiene expert, Mr. Kenoyer, admitted:
Q. This is the Tebb[e]ns (ph), Leroy Balzer, Clark Cooper, Tabershaw
article, correct?
A. That's what it says, yes.
Q. That's the one you cited from 1970, right?
A. Yes. We do mention that one, yes.
Q. Can you go to the top of page 2, please? In this article the authors
note: "However, at present there are no thermally suitable
alternatives to asbestos-containing materials for the prevention of
heat loss from high temperature (750 F. and higher) pipes and
boilers," correct?
A. That's what it says.
Trial Tr. 1-P-6:9–20.

Plaintiff disputes this PFF.  The greater weight of the evidence supports a finding of fact that alternatives to asbestos were available for high temperature insulation products. (ECF#201 at 50, 50 n. 55.)  See PFF #109.

Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Kenoyer's testimony cited in the PFF is not an admission but rather a statement confirming what an article stated.

111. Owens-Illinois made several efforts to substitute other materials for the asbestos due to cost—including glass fiber, fiberglass—but the efforts were unsuccessful.
Ex. 29, at 9, No. 10(b); Willis Hazard Dep. 35–36, dkt. 172.

Plaintiff disputes this PFF.  The evidence cited does not support the PFF.  OI cites an answer OI gave in previous litigation that was not contemporaneous with OI's manufacture of Kaylo.  The answer given in 1983 has no probative value as to the truth of the matter asserted as it is a statement made to defend OI.

No testimony of Hazard from page 35 of his deposition was designated and testimony on page 35-36 was about whether documents were received by OI in the regular course of business. (ECF#172 at 7-9; ECF#150 at 35-36.)  The Hazard testimony cited does not support the PFF.

**7. Owens-Illinois tested the Kaylo product with Saranac Laboratory in the 1940s and 1950s.**

112. As Mr. Hazard explained, Owens-Illinois hired Saranac Laboratory to conduct animal studies before the commercial manufacture and sale of the Kaylo product. Willis Hazard Dep. 36–37, 147–152; Trial Tr. 2-P-15:12–19.

Plaintiff disputes this PFF. Testimony itself is not necessarily a "fact." The finder of fact must assess credibility, weight, and probative value of testimony.

Of the pages cited by OI in this PFF, the prior testimony from Willis Hazard's February 11, 1981 deposition offered at trial consisted of lines 36:22-37:10 and 147:16 to 150:9. (ECF#172 at 8-9.)

Willis Hazard states OI financed the Saranac study beginning in 1943. As previously stated in Plaintiff's response to PFF# 9, the commercial sale and manufacture of Kaylo began in 1943.

113. Saranac Laboratory was the leading laboratory for the study of dust-related disease during the early to mid-20th century. Trial Tr. 2-P-13:6–11.

Plaintiff does not dispute this PFF.

114. At the outset, on February 12, 1943, Owens-Illinois asked Saranac Laboratory to research the Kaylo product for "any air hazard" to "employees working in the plant" or "applicators or erectors at the point of use." Ex. 1055, at 1.

Plaintiff disputes this PFF. The exhibit cited does not support the PFF. The inquiry in the exhibit about "any air hazard" was limited to an instruction that the following point merits consideration: "Does the hydrous calcium silicate of itself constitute any air hazard from an air hygiene standpoint?" (Ex.1055 at 1.) A separate point meriting consideration discussed consideration of "employees working in the plant" or "applicators or erectors at the point of use." (Ex.1055 at 1.)

115. On March 12, 1943, Saranac Laboratory wrote that the fact that the product has a mixture of quartz and asbestos "would certainly suggest that you have all the ingredients for a first-class hazard," but "the asbestos may or may not be in such form as to be inhalable." Ex. 1058, at 1.

Plaintiff does not dispute this PFF.

116. On October 30 and 31, 1947, Saranac Laboratory provided an interim report that the manufacturing process of the Kaylo product appeared to render the asbestos and silica in Kaylo dust inert and "biologically inactive." Ex. 1074, at 1; Ex. 1073, at 10. Saranac Laboratory suggested that further studies should be performed to see if the Kaylo dust has an influence on tuberculosis. Ex. 1074, at 1; Ex. 1073, at 11.

Plaintiff disputes this PFF in part. Plaintiff disputes that asbestos appeared to be inert in Kaylo. Ex.1074 states, "I have tried to express assurance that Kaylo alone is biologically

inactive.  Yet, my conservatism dictates caution lest the assurance might be too optimistic because of inconclusive experimental evidence." (Ex.1074 at 1.)  Exhibit 1073 states that more studies need to be done to "enable us to conclude finally that Kaylo is inert." (Ex.1073 at 11.)

117. On October 30, 1948, Saranac Laboratory provided another interim report to Owens-Illinois. Ex. 1086, at 1. The animals, rats, hamsters, and guinea pigs were exposed to Kaylo dust for eight hours a day, five and one-half days a week at atmospheric concentrations averaging 116 million particles per cubic foot of air. *Id.* at 3. While the rats and hamsters still showed no signs of fibrosis, nine guinea pigs that were exposed to those levels for three years straight (essentially the lifetime of the animal) did show evidence of fibrosis characteristic of asbestosis, but not silicosis. *Id.* at 3–5. The initial conclusion that the manufacturing process rendered the raw materials of silica, asbestos, and diatomaceous earth biologically inert, was amended to say the asbestos had not changed as result of the manufacturing process. *Id.* at 4. The asbestos in Kaylo was capable of causing asbestosis in the guinea pigs, but not rats, under the excessive exposure conditions of the animal tests. *Id. The study did not find any cancer or neoplastic changes in any of the animals*. *Id.* at 4–6.

Plaintiff disputes this PFF in part.  The exhibit cited in the PFF does not provide evidence to establish what the "lifetime of the animal" was.  (Ex. 1086, at 3-5.)  The exhibit cited in the PFF does not make a conclusion that Kaylo was not capable of causing asbestosis in rats.  (Ex. 1086, at 4-6.)  The exhibit cited in the PFF does not mention cancer or neoplastic changes; the study did not look for cancer or neoplastic changes so has no findings as to cancer.  (Ex. 1086.)

118. On November 16, 1948, Saranac Laboratory advised Owens-Illinois that the tentative conclusion that Kaylo dust was biologically inert had to be altered, as the asbestos remained asbestos, and must be regarded as "potentially hazardous." Ex. 1087, at 1. Owens-Illinois was told that it should institute control measures at its Kaylo manufacturing plant to prevent overexposure to manufacturing plant employees. Saranac Laboratory also suggested continuing the experiments regarding tuberculosis. *Id.* at 2, 4.

Plaintiff disputes this PFF in part.  "Biologically inert" is not stated in Ex.1087 at 1.

119. In 1949, Owens-Illinois contracted with Saranac Laboratory to conduct annual reviews of x-rays of Kaylo manufacturing plant personnel to monitor health of employees. Ex. 1092, at 1.

Plaintiff disputes this PFF.  The exhibit cited to support this PFF was not offered at trial. (ECF#173.)

120. On December 12, 1950, Owens-Illinois followed up on a prior request for publication of the results of the Saranac Laboratory study. Owens-Illinois also asked if Saranac Laboratory could visit the Kaylo manufacturing plant to take air samples. Ex. 1100, at 1.

Plaintiff disputes this PFF.  The exhibit cited to support this PFF states that the earlier request was "to consider the possibility of publishing some of your experimental findings," a prior request was not mentioned   (Ex. 1100, at 1.)

121. On December 18, 1950, Saranac Laboratory advised Owens-Illinois the publication should wait until the final report was complete and until the Saranac Laboratory personnel could conduct a study of the Kaylo manufacturing plant in January 1951. Ex. 1101, at 1.

Plaintiff disputes this PFF.  The exhibit cited to support this PFF states that "the brochure" should wait, not the publication, "until all of the experimental studies with Kaylo have been collected and written up."  (Ex. 1101, at 1.)  The exhibit goes on to state "our paper concerning the investigation of 'asbestos' has been in the hands of the publisher for some time" and they were "informed" it "would appear within five months" in the "Archives of Industrial Hygiene and Occupational Medicine."

122. On January 30, 1951, representatives from the Saranac Laboratory visited the Kaylo manufacturing plant in New Jersey to evaluate the process and related dust control measures, and make recommendations. Ex. 1103, at 1. The purpose of the survey "was to observe the plant operations and to discover whether any hazards to health might be created by dust liberated from the raw materials handled or from the finished products manufactured." *Id.*

Plaintiff does not dispute this PFF.


123. In a May 29, 1951 report, Saranac Laboratory found that "considerable attention had been given in this plant to the control of dust" and that it was important that the control measures in place be maintained. Ex. 1103, at 1. Saranac Laboratory also noted that the State of New Jersey, in 1943, and the ACGIH had recently adopted the Threshold Limit Value for silica and asbestos and, while the dust counts were "relatively low," certain areas of the plant had dust counts that "might be hazardous, or at least one which approached the maximum allowable limit established by code." *Id.* at 5–6. Saranac Laboratory recommended that Owens-Illinois continue to pay attention to housekeeping, dust suppression, exhaust ventilation, and dust counting, as well as conforming to regulations about exposure levels and monitoring worker health including pre-employment examinations and annual chest x-rays. *Id.* at 7–8.

Plaintiff disputes this PFF in part.  Ex. 1103 does not state "that 'considerable attention had been given in this plant to the control of dust' and that it was important that the control measures in place be maintained" at page 1.
Plaintiff also disputes OI's statement that "Saranac Laboratory recommended that Owens-Illinois continue to pay attention to housekeeping, dust suppression, exhaust ventilation, and dust counting, as well as conforming to regulations about exposure levels and monitoring worker health including pre-employment examinations and annual chest x-rays."  The finder of fact must determine what Saranac Laboratory recommended based on the text of the exhibit.


124. On November 6, 1951, Mr. Hazard confirmed with Dr. Miriam Sachs of the State of New Jersey Department of Health that air sampling performed by the department at the Kaylo manufacturing plant was "in line with the industrial health standards of the state." Ex. 1107, at 1.

Plaintiff does not dispute this PFF.

125. On February 7, 1952, Saranac Laboratory issued its final report on the Kaylo studies to Owens-Illinois. Ex. 1108, at 1. The final report summarized the previous interim reports and described the overexposure of the animals. *Id.* at 3–4. The animals were exposed eight hours a day, five days a week, plus four hours on Saturday. *Id.* at 5. The concentration of Kaylo dust to which the uninfected animals were exposed was generally within the range of 100 to 125 million particles per cubic foot (mppcf) and the overall average was 115 mppcf. *Id.* at 6. The infected animals were exposed at an average of 205 mppcf. *Id.* The report concluded that Kaylo dust "is capable of producing in the lungs of guinea pigs, but not of rats, the peribronchiolar fibrosis typical of asbestosis." *Id.* at 18. It further noted that Kaylo dust "will not cause in guinea pigs, rats, or hamsters either silicosis or the diffuse fibrosis which is sometimes follows the inhalation of diatomaceous earth." *Id.* The report did not find any cancer or neoplastic changes in any of the animals. *Id.* at 1–18.

   Plaintiff disputes this fact in part.  The exhibit cited to support this PFF does not state the animals were "overexposed."  The inference made should be that level of exposure was administered to accurately study the hypothesis.

   The exhibit cited in the PFF does not mention cancer or neoplastic changes; the report did not look for cancer or neoplastic changes so has no findings as to cancer..  (Ex. 1108.)

126. Saranac Laboratory never told Owens-Illinois that it should stop making the Kaylo product. Trial Tr. 2-P-17:25–18:2. Nor did Saranac Laboratory ever recommend Owens-Illinois to place a warning on the Kaylo product. Trial Tr. 2-P-18:6–8; Hazard Dep. 125–26, dkt. 150. Additionally, Saranac Laboratory did not find any Kaylo plant worker who developed asbestos-related disease when Owens-Illinois made Kaylo. Trial Tr. 2-P-17:8–11.

   Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Testimony by OI experts and employees is not conclusive as to the lack of existence of something happening.

   Additionally, OI did not account for the latency period of mesothelioma in any study of Kaylo plant workers.  (ECF#201 at 49.)

127. In September 1955, the Saranac Laboratory study was published in the *American Medical Association's Archives of Industrial Health*. Ex. 1116; Trial Tr. 2-P-15:20–24. The publication described the exposure levels, the effect on the animal tissue from the asbestos, silica, and calcium silicate. Ex. 1116, at 343. The publication noted the experiments "were designed to reveal the nature of the pulmonary tissue reaction to inhaled dust of the material in normal animals and those harboring an experimentally induced tuberculous infection." *Id.* According to the authors, the study was important despite experience with other "siliceous materials" because "[r]ecognition must be given, however, to the possibility that any potentially hazardous raw material used to make a product might not be entirely converted to a nonhazardous form during the manufacturing process and, therefore, might appear to a greater or less extent in an unchanged condition in the final product." *Id.* The article also noted that, despite the prolonged exposure to massive amounts of the dust, no cancer was found in any of the animals: "*no neoplastic change could be postulated*." *Id.* at 347 (emphasis added).

Plaintiff disputes this PFF.  The finder of fact must determine what the publication described, whether and why the authors thought the study was important, and whether the finding that "no neoplastic change could be postulated" was despite the prolonged exposure to massive amounts of the dust based on the text of the exhibit.

128. Dr. Lea testified about the Saranac Laboratory study. As noted above, Dr. Lea was an unbiased industrial hygienist working for the Wisconsin State Board of Health during the relevant period, studied Kaylo dust levels at Algoma Hardwoods in Wisconsin, and concluded that the workers there were not at risk of asbestos disease. As Dr. Lea testified,
Q. If you had been told that the Kaylo product that was studied by you
Unit at Algoma was the subject of animal experiments, where rats
and hamsters and guinea pigs were exposed to massive amount of,
amounts approaching 100 million particles per cubic foot of air, 24
hours a day, for the life time of the animals, and that those animals,
when examined, showed evidence of fibrosis, similar to asbestosis,
if you had been given that information at the time you were doing
your work at the Algoma plant, would that have changed, in any
way, the test that you did or the conclusions that you drew, with
respect to the safety of the plant?
A. No.
….
Q. Why not?
A. Well, we're back, sort of, to the previous problem, with high
exposure for short durations, being numerically equivalent to low
exposure, for a long time. As I say, sometimes that doesn't work.
Q. And in the context of the Kaylo product, if animal experiments
involved exposure levels, way above the maximum allowable
concentration for the life time of the animals, would that, in any way,
change your analysis of the maximum allowable concentration, or
the conclusions that you drew about the safety of the Algoma plant?
A. No.
Lea Dep. 93:5–94:16, dkt. 191.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.

The cited testimony does not state or support the PFF statement that "the workers there were not at risk of asbestos disease."  The cited testimony states that animal experiments would not have an effect on his conclusions in regard to the safety of the Algoma plant.

The cited testimony does not state or support the PFF statement that William L. Lea "testified about the Saranac Laboratory study. As noted above, Dr. Lea was an unbiased industrial hygienist working for the Wisconsin State Board of Health during the relevant period, studied Kaylo dust levels at Algoma Hardwoods in Wisconsin."

Plaintiff noted objections to William L. Lea's testimony in his response to PFF# 79 and asserts them for this PFF.

155

129. Similarly, Mr. Fluck testified about the Saranac Laboratory study. As noted above, Mr. Fluck was an unbiased industrial hygienist working for the Wisconsin State Board of Health during the relevant period, studied Kaylo dust levels at Algoma Hardwoods in Wisconsin, and concluded that the workers there were not at risk of asbestos disease. As Mr. Fluck testified,

Q. If at the time that you were doing your work at the Algoma plant you had been told that rats, guinea pigs and hamsters were exposed over their lifetimes to exposures of Kaylo dust ranging up to 100 million particles per cubic foot of air, 24 hours a day, living in the environment; and that when the rats and hamsters and guinea pigs were sacrificed there was evidence of fibrosis in the animals akin to asbestosis in some of the animals, would that information have changed in any way you work at the Algoma plant?
A. Asbestosis in these experimental animals?
Q. Fibrosis consistent with asbestosis.
A. High concentrations way above the permissible range?
Q. Yes.
A. It wouldn't affect us very much because there are many articles come out, many so-called studies put out by individuals or institutions that – unless they're corroborated by others – are almost meaningless. So many of these things turn out to be wrong. Secondly, finding fibrosis at concentrations many times higher than the M.A.C. is something you'd expect. We already knew there was fibrosis cause by asbestos …. High concentrations of fibrosis wouldn't surprise me; and secondly, if it was something even more serious than that in experimental animals, then you have to translate that to humans of course. We hardly paid any attention to one study because there are so darn many of these studies that come out that are never repeated. And even if they are, then you have to take that data and associate it with all the other known data and decide which is the most meaningful ….
….
Q. And would the information that I just described have caused you to change your conclusions and recommendations with regard to the Algoma plant in any way?
A. Not at all. Not at … a hundred particles per cubic foot, and causing some fibrosis in experimental animals – that wouldn't have changed anything whatsoever.
Fluck Dep. 163:3–166:1, dkt. 192.

Plaintiff disputes this PFF. Testimony itself is not necessarily a "fact." The finder of fact must assess credibility, weight, and probative value of testimony.

The cited testimony does not state or support the PFF statement that "the workers there were not at risk of asbestos disease." The cited testimony states that animal experiments would not have an effect on his conclusions in regard to the way he works at the Algoma plant.

The cited testimony does not state or support the PFF statement that "Mr. Fluck was an unbiased industrial hygienist working for the Wisconsin State Board of Health during the relevant period, studied Kaylo dust levels at Algoma Hardwoods in Wisconsin."

156

Plaintiff noted objections to Fluck's testimony in his response to PFF# 91 and asserts them for this PFF.

**8. Owens-Illinois Kaylo was considered to be a "non-toxic" product in the 1940s and 1950s.**

130. The plaintiff offered Owens-Illinois advertisements that described Kaylo to be a "non-toxic" material. *E.g.*, Ex. 40, at 1. There is no evidence that Mr. Suoja, his employers, Badger Ordnance Works, or anyone else read and relied upon the advertisements.

Plaintiff does not dispute this PFF. However, the reasoning of OI in this PFF should be applied throughout the case. There must be proof that an entity saw and relied on something (i.e. the TLV) for a finding of fact to be made about it in relation to that entity.

131. Dr. Gregory, a certified industrial hygienist with uncontested qualifications, explained that asbestos was not considered a toxic material in the relevant time period:
During that time period [1950s] it was considered nontoxic. The definition
of toxicity changed in the 1960s. Toxicity was only materials that caused
systemic poisoning or damage to the body, like lead, arsenic and things that
you inhale or ingest and then they travel systemically throughout the body
and cause their damage. Asbestos was not considered a toxic material until
that definition changed in the 1960s.
In fact the ACGIH TLVs listed it as a mineral dust. They didn't list it as a
toxic dust. And all the textbooks during that time period listed it as a
mineral dust, not a toxic dust, because of the definition that was used for
toxicity versus nontoxicity in the field of toxicology …. I'm an industrial
hygienist and I know the difference between toxicity and nontoxicity and I
have read many of those old textbooks.
Trial Tr. 2-P-144:9–145:1.

Plaintiff disputes this PFF. Testimony itself is not necessarily a "fact." The finder of fact must assess credibility, weight, and probative value of testimony.
Dr. Gregory's testimony did not discuss whether insulators, insulators' employers, or Badger considered Kaylo to be "nontoxic."

132. The plaintiff's purported industrial hygiene expert, Stephen Kenoyer, acknowledged that the published literature in the 1950s described asbestos as "nontoxic":
Q. It's *Industrial Medicine and Hygiene*, edited by E.R.A Merewether,
1956; do you see that?
A. Yes, sir.
Q. And the esteemed Dr. Merewether, the expert on asbestos at that
time, on page 7 of his treatise, he identifies asbestos as non-toxic,
correct?
A. That's what it says; yes, sir.
Trial Tr. 1-P-24:23–25:4; Ex. 1348, at 7.
….
Q. According to the ACGIH, asbestos does not belong in the Toxic Dust
category as of 1958, right?

A. That's correct.
Trial Tr. 1-P-25:13–15; Ex. 1386, at 181.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Stephen Kenoyer did not acknowledge the "published literature" described asbestos as "nontoxic."  In the testimony cited in this PFF, Stephen Kenoyer acknowledged the 56' Merewether article identified asbestos as "nontoxic" and the ACGIH in 58' did not place asbestos in the Toxic Dust category.

## G. The Lack of Any Warning on Owens-Illinois Kaylo Was Not a Cause of Mr. Suoja's Asbestos Exposure and Disease.

133. Even though Mr. Suoja was exposed to asbestos from approximately 1943 until December 1984 (*e.g.*, Ex. 1662, at 1; Ex. 1655, at 7; Ex. 1194, at 7), there is no evidence that Mr. Suoja's work practices changed despite repeated warnings about using precautions against potentially harmful exposures.

Plaintiff disputes this PFF.  Ex. 1655 and 1194 and the length of Ozzie's exposure is discussed in response to PFF#  61.  Ex.1622 does not state how many and the extent of the boiler asbestos exposures which occurred throughout the time period of 1943-1984.

## 1. Asbestos Worker Union Knowledge

134. Mr. Suoja became a card-carrying member of the Asbestos Workers Union in January 1944 (Ex. 27, at 26–27), was very involved in his union (Trial Tr. 1-P-84:13), and went to union meetings (Trial Tr. 1-P-84:15–17).

Plaintiff does not dispute this PFF.

135. The Asbestos Works Union published the *Asbestos Worker Journal* to all union members:
Q. How did the union communicate that information to members of the
union like Mr. Suoja?
A. That was published in what was called an *Asbestos Workers Journal*
magazine that went out quarterly.
Q. To all the union members?
A. To all the members, that is correct.
Q. Was this information that was available to Suoja?
A. Yes. He should have received those publications.
Trial Tr. 2-P-114:4–12; *accord* Trial Tr. 2-P-7:4–8.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  There is no proof that Ozzie read and relied upon the *Asbestos Workers Journal.*  (ECF#201 at 108.)

136. Beginning in 1930, the *Asbestos Worker Journal* published information on preventing asbestos exposures above the Threshold Limit Value. The September 1930 issue of the *Asbestos*

*Worker Journal* published an article titled "The 'Pulmonary Asbestosis' Menace." Ex. 1283, at 9; Trial Tr. 2-A-118:13–119:6. The article noted that:

> A report on pulmonary asbestosis by Dr. E.R.A Merewether is reviewed . . . . In this study only workers who were using more or less pure asbestos were included . . . the degree of concentration of the dust and the length of exposure [are] the most important factors [in the development of the disease asbestosis]. In cases in which there is continued exposure to high concentrations of the dust the fibrosis may be fully developed in from 7 to 9 years, while with milder degrees of exposure it may take from 15 to 25 years to develop fully.

Ex. 1283, at 10.

Plaintiff disputes this PFF.  The journal OI cited does not discuss the TLV.  Plaintiff discussed this article in his brief.  (ECF#201 at 112 #1.)

137. The November 1961 edition of the *Asbestos Worker Journal* published a fullpage warning with a depiction of the Grim Reaper telling the union members to "WEAR YOUR RESPIRATOR":



Ex. 1295, at 29; Trial Tr. 2-P-8:5–19, 2-P-113:9–12.

Plaintiff does not dispute this PFF.  Plaintiff discussed this article in his brief.  (ECF#201 at 112 #3.)

138. The November 1962 edition of the *Asbestos Worker Journal* published a report on the 20th International Convention, Atlantic City, New Jersey September, 1962. The report announced:

> **Health Hazards.** The action of the last convention [1957] has been carried out ... your President ... met with Dr. Irving Selikoff .... It is my recommendation that this investigation be continued.... The asbestosis and silicosis problems were discussed by the delegates. All Locals gave a report of this serious problem.

Ex. 1297, at 22.

Plaintiff disputes this PFF.  Plaintiff objects to the exhibit on FRE 803(18) grounds as OI cites to no expert witness testimony concerning the article.

139. The May 1969 edition of the *Asbestos Worker Journal* included an "Insulation Hygiene Progress Report" from Dr. Selikoff reporting on respiratory use: "Only 4 percent of the workers

said they always work a mask at a duty job and almost 30 percent said they never used such protection." Ex. 1313, at 3; Trial Tr. 2-P-113:18–114:3.

Plaintiff does not dispute this PFF. Plaintiff discussed this article in his brief. (ECF#201 at 113 #7.)

140. Harold Haase, a fellow Local 19 union member and coworker of Mr. Suoja at Badger Ordnance Works, testified that it was common knowledge in the early 1960s that working with asbestos could be hazardous:
Q. When you started in the early '60s, there were older guys that took you aside and said that the trade was hazardous?
A. Oh, yes.
….
Q. And that's because it was common knowledge within the folks at Local 19 that working with asbestos could be hazardous?
A. Yes, I would assume that.
Q. You would say that. Right?
A. Well, it was -- it's like anything else, you know. Car exhaust is bad for you to breath too, and you don't walk around with a mask outside.
Q. But you don't sit in garages running your car either; do you? Right?
A. True.
Harold Haase Dep. 43:11–44:11, dkt. 149.

Plaintiff disputes this PFF. Plaintiff discussed the testimony of Haase, including this testimony, in his brief. (ECF#201 at 107-108.) Haase denied knowing "that asbestos was dangerous." (ECF #149 at 43; ECF#201 at 107.)

141. No witness in this case offered credible evidence that Mr. Suoja ever saw a box of Owens-Illinois Kaylo or that, had he seen a warning label on Owens-Illinois Kaylo, he would have changed his work practices and, as a result, would not have developed his injury.

Plaintiff does not dispute this PFF.

## 2. L&S Insulation's Mask Program

142. Mr. Borchardt, the president of L&S Insulation for whom Mr. Suoja worked at Badger Ordnance Works, testified that masks were available since the 1950s:
Q. Did L & S, at any time, provide masks for their workers to use?
A. Yes.
Q. When did that first take place?
A. That occurred prior to my starting with the company.
Q. Prior to 1950?
A. Yes, and it was just one of those items that was -- they were there and they were available for those that wanted to use them.
Q. When you started out with the company, did anybody use them?

160

A. When I started in pipe covering, I knew -- I recall people using masks
occasionally.
Q. Did a time come when L & S required that they be used?
A. Yes.
Q. When did that occur?
A. With the advent of OSHA.
Q. So, about the time OSHA went into effect, that's when L & S ordered
the workers to use the masks?
A. Yes.
Elmer Borchardt Dep. 42–43, dkt. 185.

Plaintiff disputes this PFF.  Plaintiff discussed his reason for disputing Borchardt's
testimony in response to PFF# 33 and adopts the same reasons for dispute for this PFF.

This PFF is incomplete.  During the 1950s and 1960s, Borchardt thought that asbestos did
not increase the risk of cancer for a non-smoker like Ozzie, did not associate masks with
protection of worker's health, and stated that masks were not purchased specifically for asbestos
but for general dust.  (ECF#201 at 113-114.)

143. Mr. Schlub, one of Mr. Suoja's coworkers in the late 1960s, testified that they did not use
masks at Badger Ordnance Works:
Q. When were you first using masks in the field, if ever, as an asbestos
worker?
A. Face masks?
Q. Yeah.
A. We never used them at Badger Ordnance, I know that.
George Schlub Dep. 42:6–12, dkt. 154.

Plaintiff does not dispute this PFF.


### 3. Earl Gregory, PhD, CIH's Expert Testimony

144. Dr. Gregory, a certified industrial hygienist with uncontested qualifications, offered
uncontradicted expert testimony that a warning on a package of Owens-Illinois Kaylo would not
have affected Mr. Suoja's asbestos exposure at all:
Q. And we asked you to evaluate whether putting a warning on a
package of Owens-Illinois Kaylo would have affected Mr. Suoja's
asbestos exposure at all; is that right?
A. That's correct.
Q. And your conclusion was, if I heard it before, it would have no
effect? -
A. That's correct.
….
Q. What information would a warning have provided that the
employers and jobsite owners didn't already know?

161

A. Well, right. I mean, they were aware of the Walsh-Healey Act. They
were aware of the Industrial Commission of Wisconsin's
requirements for the threshold limit value for asbestos. They were
aware of engineering controls. They were aware of the hazards of
overexposure to asbestos.
Q. What difference would that warning have made to Mr. Suoja's
union?
A. It would not have made any difference because the Asbestos
Workers Union, of all organizations, had more knowledge about the
hazards of asbestos than any other organization in the country….
Trial Tr. 2-P-110:23–114:21.

Plaintiff disputes this PFF.  Testimony itself is not necessarily a "fact."  The finder of fact
must assess credibility, weight, and probative value of testimony.  Gregory's testimony cited in
this PFF is about "what information would a warning have provided that the employers and
jobsite owners didn't already know" and not about what it would have provided Ozzie that he
didn't already know.

## H. Plaintiff Has No Cognizable Damages Against Owens-Illinois.
145. Even if the plaintiff's evidence had proven liability against Owens-Illinois, the evidence
does not support a finding of damages against Owens-Illinois.

Plaintiff disputes this PFF.  The greater weight of the evidence supports Plaintiff's claim.
(ECF#201 at 125-178.)

## 1. Delores Suoja already recovered for the Estate.

146. In 1997, Delores Suoja filed a lawsuit individually and on behalf of the Estate of Oswald
Suoja in Wisconsin state court against other defendants for wrongful death and survival
damages. Ex. 1618, at 1–2. Delores Suoja settled with the defendants and dismissed the lawsuit.
Exs. 1645, 1671–1680.

Plaintiff disputes the relevance of this PFF.  Plaintiff filed a motion in limine to exclude
argument or evidence about existence of a separate lawsuit filed on behalf of Oswald Suoja in
state court in 1997 which did not name Owens-Illinois as a defendant. (ECF#117, MIL # 3.)
Ex. 1645, which is an exhibit cited to support this PFF, was not offered at trial.
(ECF#173.)

147. In particular, Mrs. Suoja and Estate of Mr. Suoja settled and executed releases (so-called
*Pierringer* releases) with National Gypsum Company, Raytech Corporation, Babcock & Wilcox,
Building Service Industrial Sales Company, Inc., Eagle-Picher Industries, Fiberboard
Corporation, Garlock Inc., General Electric, Owens Corning Fiberglas, Johns Manville, Union

Asbestos & Rubber Co. (UNARCO/UNR), Celotex Corporation, H K Porter, Rapid American Corporation, and Sprinkmann Sons Corporation. Exs. 1654–1680.

Plaintiff disputes this PFF including without limitation on relevance grounds.  Plaintiff settled and executed releases, covenants not to sue, or *Pierringer* releases with the entities named in this PFF.  The only releases that were *Pierringer* releases were with Building Service Industrial Sales Company, Inc., Garlock Inc., Rapid American Corporation, and Sprinkmann Sons Corporation.  (Exs. 1664, 1668, 1679, 1680.)

Exs. 1656, 1657, 1661, which are exhibits cited to support this PFF, were not offered at trial and should therefore be excluded.  (ECF#173.)

See Att.3.

148. Kimberly Suoja, one of Mr. Suoja's daughters, testified that she knew her mother had filed the lawsuit and thought the claim related to her father's asbestos exposure was all said and done:

Q. And you understand your mother actually filed a lawsuit, don't you?
A. Yes, I believe that is true, yes.
Q. And so I guess my question here is, did Gary ever tell you that he
was pursuing a lawsuit, this lawsuit, in federal court at any time?
A. I don't believe so.
….
Q. Did you know that this federal case was originally filed by your
mother; did you know that, or not?
A. Well, I knew something was filed by mom, but I thought that ended.
….
Q. And you thought that the claim related to your father's asbestos
exposure was all said and done a long time ago?
A. Yeah.
Trial Tr. 1-P-89:6–12, 1-P-98:15–18, 1-P-91:4–7.

Plaintiff disputes this PFF including without limitation as to relevance.  Testimony itself is not necessarily a "fact."  The finder of fact must assess credibility, weight, and probative value of testimony.  Kimberly Suoja is has no legal experience to know what claims are asserted by the lawyers and which are viable.

## 2. Kim Suoja admitted there are no remaining damages.

149. On May 20, 2009, Kim Suoja filed for bankruptcy with an attorney and declared under oath that she had no contingent interests in the estate of Mr. Suoja and no contingent or unliquidated claims of any nature:

| | |
|---|---|
| 20. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X |
| 21. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims.  Give estimated value of each. | X |

Trial Tr. 1-P-92:15–97:3, Ex. 1941, at 10.

163

Plaintiff disputes the relevance of this but does not dispute this PFF is based on a document making such statements.   The legal meaning of the document is not a proper "fact" because it requires a legal conclusion.

150. On August 27, 2009, the United States Bankruptcy Court for the Western District of Wisconsin granted Ms. Suoja a discharge based on her sworn statements. Trial Tr. 1-P-97:4–11, Ex. 1942, at 1.

Plaintiff does not dispute this PFF except as to relevance.

**3. Plaintiff admitted there are no remaining damages.**

151. On April 29, 2002, the plaintiff (a lawyer himself) filed a petition with the Circuit Court of Douglas County, asking that letters of special administration be issued to him with only these specific powers: the power to prosecute an action regarding injuries to the decedent on behalf of the Estate of Mr. Suoja. Ex. 1718, at 1.

Plaintiff makes no response to this PFF.  This Court has already ruled any defenses based on the special administration appointment are forfeited. (ECF#114 at 2-6.)  Plaintiff incorporates that order and the briefing leading to the order.

Plaintiff filed a motion in limine to exclude evidence Gary Suoja is not the proper party to pursue the claims, not the proper special administrator of the estate of Oswald Suoja, or was discharged as a special administrator. (ECF#117, MIL #1.)

152. On April 29, 2002, the Circuit Court of Douglas County issued letters of special administration to the plaintiff, and granted only these specific powers: the power to prosecute an action regarding injuries to the decedent on behalf of the Estate of Mr. Suoja. Ex. 1717, at 1.

Plaintiff adopts the response to PFF# 151.

153. On February 3, 2006, the Wisconsin probate court administering the estate asked the plaintiff about the status of this federal case. Ex. 1717, at 1.

Plaintiff adopts the response to PFF# 151.

154. On December 18, 2006, the plaintiff filed a petition for discharge as special administrator with the Circuit Court of Douglas County, stating under oath that he had completed the assigned duties and the items were received and disbursed. Ex. 1706, at 1.

Plaintiff adopts the response to PFF# 151.

155. On January 2, 2007, the Circuit Court of Douglas County entered an order discharging plaintiff as special administrator of the Estate of Mr. Suoja and finding he had properly performed authorized duties and filed any required accounts or reports. Ex. 1705, at 1.

      Plaintiff adopts the response to PFF # 151.

156. The plaintiff testified that, in doing so, all of the valid claims for Estate of Mr. Suoja been made and all of the money had been collected and disbursed:
Q. You collected various recoveries for the estate during the course of
that appointment as special administrator and distributed the funds;
correct?
A. That's correct. Not quite all of them, but almost all of it.
Q. In December 2006, you petitioned the probate court to discharge you
as the special administrator of the estate.
A. That's correct.
Q. At that time you gave an accounting of all the settlement proceeds
and said that the money had been disbursed; correct?
A. That's correct.
Q. And you had requested the probate court to approve the accounting
and to close the estate.
A. That's correct….
Q. And you told essentially the probate court that all of the assets of the
estate had been collected and disbursed.
A. That's right. I signed what the attorneys had prepared for me.
….
Q. But at the time that you filed the petition for dissolution, you at that
time believed that all of the valid claims had been made and the
money collected and disbursed?
A. That was correct, because my information came from my attorneys.
Trial Tr. 2-A-54:13–57:2.

      Plaintiff adopts the response to PFF #151.  For the purposes of the pending claim against Owens-Illinois, Gary Suoja was appointed special administrator in the probate court for Douglas County, Wisconsin on October 23, 2015.[56]  (Att.___ at ___.)  Gary was already special administrator pursuant to the 2009 order of Judge Robreno in the asbestos MDL-875.

## I. Plaintiff's Claim Is Time-Barred.

157. Mr. Suoja died on December 29, 1996. Ex. 22, at 1.

      Plaintiff does not dispute this PFF.

158. Before Mr. Suoja's death, Delores Suoja, his wife and beneficiary, knew of the fact of his injury and the potential claim:

---

[56] This Court can take judicial notice of the order of another tribunal.

Q This is a December 15, 1996 record. Do you see that, Mr. Suoja?
….
A Okay. Q I've highlighted a portion here from these notes where it says "Most
of kids are far distant but at least one lives here." That's referring to
your brother Derald?
A That would be correct.
Q It continues "She has contacted his union and will need records re:
mesothelioma for lawyers." Did I read that correctly?
A Yes.
Q Is it your understanding that your mom was contacting lawyers to
file a lawsuit for your father's death before he passed away in
December of 1996?
….
A. I wouldn't be surprised.
Trial Tr. 2-A-52:3–53:3; Ex. 1722A.

   Plaintiff does not dispute this PFF except for relevancy.  The claim against OI was filed
on August 5, 1999 less than three years after the diagnosis of mesothelioma on November 11,
1996.  (ECF#s 2, 164 at 24.)  Also, the dispositive motion deadline in MDL 875 passed several
years ago and any statute of limitations argument is forfeited.  (See ECF#114.)

## **V. Conclusion**

Based on evidence, this Court shold find for the Plaintiff on the strict products liability claim and award damages for which OI is jointly and severally liable.

If the Court does not find for Plaintiff on strict products liability, then the Court should consider the negligence claim.  The Court should find for Plaintiff on negligence claim and award damages to be apportioned among all tortfeasors who are a substantial case of the injury.  The Court should apportion to OI 65% of the fault for the majority of the proven dose and for the conduct of OI.

Damages in the amount requested by Plaintiff are not disputed.  The Court should award as a minimum the amount of damages requested in Plaintiff's opening brief.

Dated: May 6, 2016

 /s/ Robert G. McCoy
Attorney for Plaintiff

Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
(312) 944-1870 (fax)
bmccoy@cvlo.com

**Certificate of Service**

I hereby certify that on May 6, 2016, I caused the forgoing to be electronically filed with the United States District Court for the Western District of Wisconsin using the CM/ECF system which will automatically send all necessary notifications of this filing to CM/ECF participants in this case.


Dated: May 6, 2016

 _/s/ Robert G. McCoy_____
Attorney for Plaintiff

Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
(312) 944-1870 (fax)
bmccoy@cvlo.com