**WILLIS HAZARD**
**St. Jacques v. OCF**

| Page | Line | to | Page | Line |
|------|------|----|------|------|
| 8 | 12 | | 8 | 14 |
| 13 | 7 | | 14 | 12 |
| 16 | 3 | | 17 | 3 |
| 18 | 17 | | 19 | 3 |
| 20 | 18 | | 20 | 21 |
| 21 | 6 | | 21 | 28 |
| 23 | 13 | | 23 | 17 |
| 25 | 12 (exhibits listed) | | 32 | 25 |
| 35 | 9 | | 35 | 14 |
| 41 | 15 | | 41 | 17 |
| 41 | 26 | | 42 | 18 |
| 44 | 2 | | 45 | 1 |
| 46 | 18 | | 48 | 3 |
| 48 | 14 | | 48 | 18 |
| 54 | 21 | | 55 | 12 |
| 55 | 17 | | 55 | 24 |
| 56 | 1 | | 56 | 13 |
| 58 | 20 | | 59 | 25 |
| 60 | 24 | | 60 | 27 |
| 61 | 8 | | 62 | 2 |
| 76 | 9 | | 76 | 16 |
| 77 | 2 | | 77 | 7 |
| 81 | 18 | | 82 | 22 |
| 90 | 24 | | 93 | 20 |

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

RECEIVED

MAY 6 1981

GREENE, O'REILLY
AGNEW & BROWN

DOROTHY ST. JACQUE, )
            Plaintiff, )
                      )
                      )
    vs.               )        CASE NO.    C 137466
                      )
JOHNS-MANVILLE CORP., etc,. )
t al.,                )
            Defendants. )
                      )
AND ALL RELATED CASES )

DEPOSITION OF WALTER HAZARD,

Taken on behalf of the Plaintiffs

at Sheritan Hotel, Toledo,

Ohio, on March 27, 1981,

commencing at 9:30 A.M., pursuant

to Supoenae.


Reported By: Jerry Lefler, CSR, SCO
Certificate No: 2856

COMPUTERIZED SHORTHAND REPORTERS
800 28th Street
Santa Monica, CA  90405

APPEARANCES

For Plaintiff(s)

GREENE, O' REILLY, AGNEW & BROILLET
BY:  AARON SIMON, ESQ.
1122 Wilshire Boulevard
Los Angeles, CA   90017

POSE, KLEIN & MARIAS
BY:  NOT PRESENT
888 West 6th Street
Los Angeles, CA   90017

SIMKE, CHODOS, & SILBERFELD
BY: NOT PRESENT
6300 Wilshire Boulevard
Los Angeles, CA   90801

GRISHAM, VANDENBERG, NOTT, CONWAY & CANNON
BY: JOHN CANNON, ESQ
120 East Ocean Boulevard
Long Beach, CA   90802

THOMAS MARTIN
BY:  NOT PRESENT
4647 Long Beach Boulevard
Long Beach, CA   90805

CANTRELL & GREEN
BY:  NOT PRESENT
200 Pine Avenue, Suite 309
Long Beach, CA   90506

GIRARDI, KEESE & CRANE
BY:  NOT PRESENT
445 South Figueroa Street
Los Angeles, CA   90071

EDWIN C. MARTIN, JR.
BY: NOT PRESENT
501 Shatto Place, #100
Los Angeles, CA   90020

For Defendant (s)

ADAMS, DUQUE & HAZELTINE
BY: JAN SAURMAN, ESQ.
523 West 6th Street
Los Angeles, CA   90017

RANDOLPH, SELMAN & LEMANAS
BY: JOSEPH SHAUB, ESQ.
11620 Wilshire Boulevard
Los Angeles, CA   90025

STEARNS & NELSON
BY: Not present
1800 North Highland
Hollywood, CA  90028

LaFOLLETTE, JOHNSON, SCHROETER & DeHASS
BY: HEIDI DeGROUT HUTCHINSON, ESQ.
320 North Vermont Avenue
Los Angeles, CA  90004

COYLE, MARRONE & ROBINSON
BY: NOT PRESENT
3356 Barham Boulevard
Los Angeles, CA  90068

HAIGHT, DICKSON, BROWN & BONESTEEL
BY: STEVEN L. HOCH, ESQ.
2400 24th Street
Santa Monica, CA  90405

BUCK, MOLONY, NIMMO & AMMIRATO
BY: NOT PRESENT
100 East Ocean Boulevard., Suite 620
Long Beach, CA  90802

McHALE & CONNOR
BY: NOT PRESENT
626 Wilshire Boulevard
Los Angeles, CA  90017

BOLTON, HEMER & DUNN
BY: NOT PRESENT
900 Wilshire Boulevard
Los Angeles, CA  90017

JAMES E. CUSICK, ESQ.
BY: NOT PRESENT
4201 Wilshire Boulevard
Los Angeles, CA  90010

CARLSTROEM & SANFORD
BY: NOT PRESENT
6006 Wilshire Boulevard
Los Angeles, CA  90036

CHASE, ROTCHFORD, DRUKKER & BOGUST
BY: RICHARD S. KEMAYLYAN, ESQ.
606 South Olive Street, 22nd Fl.
Los Angeles, CA  90014

PAUL, HASTINGS, JANOFSKY & WALKER
BY: MR. BESSON, ESQ.
South Flower Street
Los Angeles, CA  90071

McCUTCHEN, BLACK VERLEGER & SHEA
BY:  NOT PRESENT
3435 Wilshire Boulevard
Los Angeles, CA  90010

SCHELL & DELAMER
BY:  JOHN ELLIS, ESQ.
1200 Wilshire Boulevard
Los Angeles, CA  90017

BREIDENBACH, SWAINSTON, YOKAITIS & CRISPO
BY:  NOT PRESENT
888 West Sixth Street
Los Angeles, CA  90017

YUSIM, CASSIDY, STEIN & HANGER
BY: NOT PRESENT
8383 Wilshire Boulevard., Suite 330
Los Angeles, CA  90211

WELLS, BARBER & SHERLOCK
BY: NOT PRESENT
1540 Wilshire Boulevard
Los Angeles, CA  90017

HALL, LINDEMAN, SMALL, BURNS & COLUMBO
BY:  NOT PRESENT
3600 Wilshire Boulevard
Los Angeles, CA  90010

GILLILAND, ROBERSON & MOSER
BY:  NOT PRESENT
606 South Olive Street
Los Angeles, CA  90014

BRILL, HUNT & DeBUYS
BY:  NOT PRESENT
3055 Wilshire Boulevard
Los Angeles, CA  90010

NORBY & BRODEUR
BY: ALFRED G. LUCKY, ESQ.
21533 Hawthorne Boulevard
Torrance, CA  90503

PATTERSON, RITNER & LOCKWOOD
BY:  NOT PRESENT
1543 W. Olympic Boulevard
Los Angeles, CA  90015

MARTIN & STAMP
BY:  NOT PRESENT
110 Pine Avenue
Los Angeles, CA  90802

CAPLAN & OVERLANDER
BY:  NOT PRESENT
727 West Seventh Street
Los Angeles, CA  90017

McKAY & BYRNE
BY:  MICHAEL A. BYRNE, ESQ.
3250 Wilshire Boulevard
Los Angeles, CA  90010

MORGAN, WENZEL & McNICHOLAS
BY:  NOT PRESENT
1545 Wilshire Boulevard
Los Angeles, CA  90017

MORRIS & POLICH
BY:  NOT PRESENT
900 Wilshire Boulevard
Los Angeles, CA  90017

HILLSINGER & COSTANZO
BY:  NOT PRESENT
3345 Wilshire Boulevard
Los Angeles, CA  90010

SHIELD & SMITH
BY:  NOT PRESENT
1200 Wilshire Boulevard
Los Angeles, CA  90010

JOSEPH BOGAN, ESQ.
401 North Brand Boulevard, #726
Glendale, CA  91203

GIBSON, DUNN & CRUTCHER
BY: ANDREW BERRY, ESQ.
515 South Flower Street
Los Angeles, CA  90010

ON BEHALF OF:  Libert Mutual, AC&S, Flintkote
YORK, HUFFMAN & STAMPLE
BY: MR. STAMPLE, ESQ.

SECOR, IDE & CALLAHAN
BY:  JOHN CALLAHAN, ESQ.
645 National Bank Building
Toledo, Ohio  43604

ALSO PRESENT:   ROBERT BUNDA, ESQ., FOR OWENS-ILLINOIS
                ANDREW BERRY, FOR GIBSON, DUNN & CRUTCHER

INDEX

| WITNESS | EXAMINATION | PAGE # |
|---------|-------------|--------|
| HAZARD, Walter | By Mr. Silberfeld | 8, 91, 118 |
| | By Mr. Simon | 90, 97 |
| | By Mr. Bogan | 97 |
| | By Mr. Hoch | 106 |
| | By Mr. Berry | 125 |

PLAINTIFF'S EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1. | Letter 2/12/43 air hygiene aspects of fiberglas | 33 |
| 2. | Letter 12/24/46 animal experimentation on K-LO | 33 |
| 3. | Telegram 1/3/47 animal experiments | 33 |
| 4. | Letter 1/4/47 animal experiments | 33 |
| 5. | Letter 1/8/47 dust problem | 33 |
| 6. | Letter 1/10/47 response to 1/8/47 letter | 33 |
| 7. | Letter 1/27/47 to Dr. Bowditch | 33 |
| 8. | Letter 1/27/47 to Mr. Chard | 33 |
| 9. | Letter 2/5/47 Saranac Lab visit | 33 |
| 10. | Letter 2/10/47 to Mr. Hazard | 33 |
| 11. | Report on Animal Inhalation of Kaylo | 33 |
| 12. | Continuation of Exhibit 11 | 33 |
| 13. | Letter 11/11/47  Delay of reports | 33 |
| 14. | Letter 1/9/48 Fluorescent tubes and dust | 33 |
| 15. | Letter | 33 |
| 16. | Letter 1/28/48 future Kaylo program | 33 |
| 17. | Letter 2/9/48 dead flourescent tubes | 33 |
| 18. | Letter 2/29/48 Delays of Reports | 33 |
| 19. | Letter 3/31/48 extention of commitment | 33 |
| 20. | Letter 4/26/48 disappointment in investigations | 33 |
| 21. | Letter 9/21/48 animal experiments | 33 |
| 22. | Letter 9/24/48 appreciation letter | 33 |
| 23. | Letter 11/26/48 results animal experiments | 33 |
| 24. | Report biological activity of KAYLO dust | 33 |

25.     Report biological activity of KAYLO dust          33

26.     Letter 7/6/49 animal experiments                  33

27.     Letter 1/5/50 animal experiments                  33

28.     Letter 1/12/50 containing interim report          33

29.     Interim report activity of KAYLO dust             33

30.     Letter charge of x-ray film                       33

31.     Letter x-ray film                                 33

32.     Letter 2/24/50 shipment of KAYLO from Berlin,NJ 33

33.     Letter 3/7/50 silica content of KAYLo             33

34.     Letter 3/10/50 Thank you letter                   33

35.     Letter 4/3/50 fee agreement for x-ray film ... 32

36.     Letter 5/18/50 chest x-ray tied to animal
        experimentation                                   33

37.     Letter 6/1/50 x-ray costs                         33

38.     Telegram Invitation to discuss Kaylo Expermnts. 33

39.     Letter 6/6/50 Confirmation of Telegram(exh 38.) 33

40.     Letter 8/3 50 animal experiments                  33

41.     Letter 10/14/50 regarding visit to Berlin NJ      33

42.     Letter 10/30/50 proposed vist to Sayreville NJ   33

43.     Letter 12/12/50 Establish a brochure on the the
        health aspects of KAYLO dust                      33

44.     Letter 12/18/50 answer to Exhibit 43              33

45.     Letter 12/19/50 Electron micrograph of dust       33

46.     Letter 12/26/50 confirmation of delivery of dust
        for electron microscope.                          33

47.     Letter 1/15/51 Possible examination of KAYLO
        operations                                        33

48.     Telegram Confirmation to Saranac of exh 47        33

49.     Letter 1/22/51 letter confirmation of exh 48      33

50.        Letter 1/25/51 Arrival time of visit                           33

51.        Letter 2/28/51 samples of air borne dust                       33

52.        Letter 4/30/51 hold up of field tests                          33

53.        Letter 5/2/51 acknowledgement of exh 52                        33

54.        Letter 5/5/51 apology for late report                          33

55.        Letter 5/1/51 improvement of dust conditions                  33

56.        Letter 7/11/51 Question in report results                      33

57.        Letter 7/13/51 Location of "final report"                      33

58.        Letter 8/7/51 review of report                                 33

59.        Letter 8/7/51 questions on dust analyses                       33

60.        Letter 9/17/51 acknowledgement of final report               33

61.        Letter 10/26/51 delivery of attached bill                      33

62.        Letter 10/29/51 payment for animal experiments               33

63.        Letter 11/31/51 acknowledge exh 62                            33

64.        Letter 1/4/52 attached dust samples                           33

65.        Letter 2/7/52 Cover letter final report                       33

66.        Report Investigation concerning the capacity of
           inhaled MIYLO dust to injure the lung                          33

67.        Letter 3/11/52 attached samples of dust                       33

68.        Letter 4/8/52 Analysis of quartz                              33

69.        Letter 5/10/52 Analysis of quartz                             33

70.        Letter 5/12/52 Letter and report to General
           Research Division                                             33

71.        Letter 11/21/52 Schedule to X-ray people                      33

72.        Letter 10/5/55 recalling animal experiments                   33

73.        Letter 6/12/5- concerning article "Effect of
           Inhaled Commercial Hydrous Calcium Silicate
           Dust on Animal Tissues.                                       33

74.        Article as described in exh 73                                33

8

1        Friday, March 27, 1981, Toledo, Ohio

2                    9:30 A.M.

3                    -oOo-

4

5                 WALTER HAZARD,

6        having been duly sworn by the Reporter

7        was examined and testified as follows:

8

9                 EXAMINATION

10

11   BY MR. SILBERFELD:

12        Q.   Would you state your full name for the record,

13   please?

14        A.   Willis Gilpen Hazard.                     to 13

15        Q.   Mr. Hazard, may we have your home address,

16   please?

17        A.   3609 Maple Way Drive, Toledo.

18        Q.   What is the home telephone number, sir?

19        A.   382-7348.

20        Q.   Do you have any present plans of moving from

21   that address?

22        A.   No, sir.

23        Q.   Can you give us the name of someone in the

24   Toledo area, a friend or a family member who would know

25   your whereabouts if you're not at home?

26        A.   I have a son living just outside of Toledo.

27        Q.   Your son's name?

28        A.   David C. Hazard.

1      Q.   Do you know your son's address?

2      A.   West Broadway, Maumee 700 block.  I can't think

3 of the street number.

4      Q.   Is your son employed at the present time?

5      A.   Yes.

6      Q.   By whom, sir?

7      A.   Owens-Corning.

8      Q.   Mr. Hazard, you've had your deposition taken, I

9 believe on one previous occasion.

10     A.   Yes.

11     Q.   In connection with the asbestos cases, you

12 understand that?

13     A.   Yes, sir.

14     Q.   Just so that we're all clear, let me give you

15 some preliminary remarks about this deposition.  We've

16 already been introduced.

17     The purpose for our being here is that we're here to

18 take your deposition in connection with the Los Angeles

19 area asbestos cases that are pending there.  You

20 understand that?

21     A.   Yes.

22     Q.   The deposition will be essentially a question

23 and answer session under oath.  Everything that is said

24 here today is taken down by the court reporter who is

25 seated between us.  At the conclusion of the deposition

26 he will cause his notes to be transcribed into booklet

27 form.  Have you seen the booklet of your previous

28 deposition?

75.      Letter 2/13/43 Synthetic Calcium Silicate          36

76.      Letter 11/21/44 Proceed with investigation to
         determine the health hazard.                       37

77.      Hazard/Biographical Data                           41


                    DEFENDANT'S EXHIBITS


1.       Study of Kaylo dust and lung injury                98

2.       Letter 6/12/56 Brochure on health aspects          19
         of Kaylo dust

3.       Study Properties of Kaylo Products                 29

         Protions Mr Hazard's Depo                          126

1    A.    Yes, sir.

2    Q.    Have you had a chance to review it and make any

3    changes that were necessary?

4    A.    Yes.

5    Q.    Do you recall making any changes that were

6    significant rather than just spelling errors or

7    something

8    like that?

9    A.    Well, I remember one, the word silicate was

10   used when it should be silica, and one or two like that.

11   But essentially the others were mistakes.

12   Q.    Mistakes in --

13   A.    Grammar, typing; yes, sir.

14   Q.    Other than those, your testimony at that time

15   was substantially correct?

16   A.    Yes.

17   Q.    In any event, at the conclusion of this

18   deposition you'll get a booklet just like the booklet

19   you've already seen and you'll be asked to read it and

20   sign it.  At that time you'll be permitted to make any

21   changes that you wish in the testimony that you give;

22   however, I should caution you that if you make changes

23   in your testimony that might prove embarassing to

24   yourself or your former employees.  You understand that?

25   A.    Yes.

26   Q.    The reason for that is at the time of trial it

27   might be suggested that your testimony here today wasn't

28   as honest or as forthright or as complete as it might

1    have been because you made a change.  Do you understand?

2        A.    I see.

3        Q.    I'll try to help you avoid making changes by

4    asking you questions which are clear and understandable.

5    If I ask you a question which is unclear, please tell me

6    so and I'll rephrase it, all right?

7        A.    Yes.

8        Q.    The oath you've just taken is the same oath you

9    would take as if you were testifying in a court of law, you

10   understand that?

11       A.    Yes.

12       Q.    Even though we're gathered in fairly informal

13   surroundings, the testimony you give today has the same

14   force and effect as if a judge and jury were present.  You

15   understand that?

16       A.    Yes.

17       Q.    Do you have any questions about the deposition

18   procedure before we go any further?

19       A.    No, I believe not.

20       Q.    You've had --

21   MR. CALLAHAN:  We're working under the same type of

22   protective order, the same terms as the protective order in

23   the Ames case; is that correct?

24   MR. SILBERFELD:  Yes.  I think somebody was concerned

25   about any objections being preserved on behalf of all

26   counsel when one counsel makes them, and that's fine with

27   me.  Anything else preliminary?  Okay.

28       Q.    Mr. Ames -- Mr. Hazard, in preparation for

1    this deposition today, have you reviewed any documents

2    other than the stack of materials I just presented to you

3    and your counsel this morning?

4         A.   I think I have.  I don't think everything is

5    there.  You mean reviewed in preparation for this

6    deposition?

7         Q.   Yes.

8         A.   I don't remember whether I reviewed anything

9    besides that or not.

10        Q.   In the last few days, have you read anything or

11   looked at anything in preparation for this deposition?

12        A.   No.  There is one thing, though, that comes to

13   mind.

14        Q.   What is that, sir?

15        A.   The results of the tests were published in a

16   technical journal, and I don't think that's in there.

17        Q.   You mean Dr. Schepers's article?

18        A.   Yeah.

19        MR. CALLAHAN:  Did you read that within the last

20   couple of days?

21        THE WITNESS:  No.

22        MR. CALLAHAN:  Okay.  Yes, it is there.  That's it.

23   Thank you.

24        Q.   BY MR. SILBERFELD:  Other than your counsel,

25   Mr. Callahan, have you spoken to anybody in preparation for

26   this deposition today?

27        A.   Mr. Berry and Mr. Callahan are the only ones.

28        Q.   Mr. Berry is the gentleman seated here at

1    the table?

2        A.    Yes.

3        Q.    When did you meet with Mr. Berry?

4        A.    The day before yesterday.

5        Q.    How long was the meeting?

6        A.    Oh, it was a couple hours, three hours maybe.

7        Q.    Can you outline for us, Mr. Hazard, your

8    educational background?

9        A.    I graduated at Harvard College -- I

10   graduated at Harvard College in 1929.  I received a

11   Master's Degree in 1930.  How far do you want me to go?

12   You talking about my formal education or my whole lifetime?

13       Q.    Let's start with formal education, then we'll

14   go to on the job training and seminars and those kinds of

15   things?

16       A.    Okay.  Well, the formal education is what I

17   just said.  A degree from Harvard College in 1929, and

18   a Master's Degree from Harvard in 1930.

19       Q.    In what field of study was your Master's Degree,

20   sir?

21       A.    Physics.

22       Q.    After your Master's Degree, did you take any

23   educational training beyond the Master's Degree?

24       A.    Not with that type, no.

25       Q.    What sort of educational training of any kind

26   did you get after that?

27       A.    I attended seminars in the field of industrial

28   hygiene, and attended technical meetings in industrial

14

1   hygiene.  And that was about it.

2       Q.   Do you know who sponsored some or all of the

3   seminars that you attended on the subject of industrial

4   hygiene?

5       A.   Some were sponsored by the Harvard

6   School of public health, by the University of

7   Pittsburgh Graduate School, and by some other

8   educational institutions.  Some of the seminars were

9   sponsored by a technical society, namely the American

10  Industrial Hygiene Association, the American Public Health

11  Association, and the other such scientific organizations or

12  associations.

13      Q.   All right.  In the course of your employment,

14  did you ever receive any on the job training in the subject

15  of industrial hygiene?

16      A.   Well, not by my employer, but I would consider

17  these to be on the job training also.

18      Q.   So these, referring to the seminars and the

19  technical meetings, occurred while you were employed in

20  your lifetime?

21      A.   Yes, that's right.  This is not the complete

22  list but this is characteristic of the organizations.

23      Q.   Would it be a correct statement, Mr. Hazard,

24  that the seminars and technical meetings that you attended

25  throughout your life have had to do with industrial hygiene

26  primarily?

27      A.   Yes.

28      Q.   Now, are you employed at the present time?

1      A.    No, sir.

2      Q.    Are you working in any capacity, either on a

3  part-time basis or on a consulting basis with anyone?

4      A.    I'm a consultant in the field of industrial

5  hygiene, not connected all the time with the same person or

6  company, but miscellaneous.

7      Q.    At the present time, what percentage of your

8  time is devoted to these consulting services?

9      A.    Oh, maybe 10 percent.

10     Q.    How many people or companies or governmental

11  entities do you consult for at the present time?

12     A.    I don't consult any -- for anybody directly,

13  but as a job comes up, I hope to get it.

14     Q.    Well, in the last six months, can you give us

15  the names of some of the people that you've consulted for?

16     A.    Well, I got to think.  I can't think of the

17  names of the companies.

18     Q.    Have you done any consulting work for your former

19  employer, Owens-Illinois?

20     A.    No, sir.

21     Q.    Have you been active since the time of your

22  retirement on behalf of Owens-Illinois in connection

23  with the asbestos litigation?

24     A.    No, I haven't been active on behalf of

25  Owens-Illinois.  I've been asked to give this deposition,

26  and one in February.  But it was not Owens-Illinois

27  that asked me.

28     Q.    Who was it that asked you?

1          A.    Mr. Callahan directly.

2          Q.    I see.

3     Would you outline for us in general terms your

4     employment background?

5          A.    I came to work for Owens-Illinois in 1934 as

6     a member of their personnel division in Toledo.   The work

7     there was in connection with health conditions in their

8     manufacturing plants.   Particularly as related to the

9     measurement and control of dust, fumes, gasses, vapors,

10    excessive heat, and excessive noise, and such industrial

11    hygiene matters.   And the -- well, I'll keep on going.

12         In 1942 through 1946 I was away from Owens-Illinois and

13    was in the United States Public Health Service, and was

14    assigned to the state Health Department in New Jersey.   New

15    Jersey had many, many war plants in that era, and my job was

16    to visit these plants and examine their industrial hygiene

17    conditions.

18         In 1946 I returned to Owens-Illinois and remained

19    there until 1942, when I retired.

20         Q.    I think you may have misspoken.   You said '42.

21         A.    Oh.   '72.   Sorry.   Thank you.

22         Q.    All right.

23    Now, between 1946 and 1972, was your employment with

24    Owens-Illinois interrupted for any period of time?   Or

25    was it continuous?

26         A.    It was continuous.

27         Q.    During that time, what job titles did you hold?

28    '46 to '72.

A.   I was their industrial hygienist.  And I was operating in the personnel division.  Or later the industrial relations division.

Q.   Who did you report to, Mr. Hazard, up the line in an organizational sense as the industrial hygienist?

A.   Well, when I came back I reported to the director of industrial relations, whose name was Ollander, M. M. Ollander.  And he retired sometime in the 1960's, I guess it was, late 1950's.

Q.   What was Mr. Ollander's title?

A.   director of industrial relations.  And he was succeeded by a series of men, some of whose names I've forgotten.  But the longest stretch of my career was under M. M. Ollander.

MR. SIMON:  Is that Milton, sir?

THE WITNESS:  Yes.

Q.   BY MR. SILBERFELD:  Mr. Hazard, when you were with Owens-Illinois, before your stint with the United States Public Health Service from '42 to '46, who did you report to up the line?

A.   Forty-two to '46?

Q.   Before --

A.   Before '42?

Q.   Before you went to the Public Health Service and you were with the company, who did you report to?

A.   It was Milt Ollander in that era too.

Q.   It was?

18

A.   Yes.  It was not in the very beginning.  He
didn't come with the company until the mid thirties, I
guess.  And prior to that I've forgotten who I reported to.
But it was in the personnel or industrial relations area.

Q.   From '46 to '72, do you have that period in time
in mind?

A.   Un-huh.

Q.   Were you the only industrial hygienist that
Owens-Illinois had?

A.   Yes.

Q.   Did you have a staff working under you, sir, at
any time during that period?

A.   I used part of the staff of our Technical
Center.  I used some of the technical people in our
Workers' Compensation insurance carrier, which had a good
industrial hygiene program.  That's all I can think of.

Q.   Could you describe this Technical Center
within the company?

A.   Yes.

Q.   What did that consist of?

A.   It was concerned with all kinds of aspects of
manufacture of their products, which originally and
basically were glass products.

A wide range of technical activity.

Q.   What particular scientific disciplines were
employed in the Technical Center?

A.   Well, they had physicists and chemists and
engineers primarily.

1    Q.    Any medically trained people?

2    A.    Not in the technical center.  But there was a

3  company medical director with whom I worked closely, too.

4    Q.    Who was that from '46 to 72?

5    A.    Well, it will come to me.  I can't think of his

6  name right now.

7    MR. SIMON:  Shook?

8    THE WITNESS:  Shook.  Yeah.  Charlie Shook.

9    Q.    BY MR. SILBERFELD:  Now, you mentioned also

10  that you used the services of the technical people at the

11  Workers' Comp. carrier.

12    A.    Yeah.

13    Q.    Who was the Workers' Comp. carrier for

14  Owens-Illinois during those years?

15    A.    It was Aetna Surety and Casualty Company in

16  Hartford.

17    Q.    And where was the technical staff located that

18  you drew from for assistance?

19    A.    It was in Hartford.

20    Q.    Were there particular contacts at Aetna that

21  you had dealings with in connection with the technical side

22  of your work?

23    A.    Well, the first part of the period it was a man

24  named Fred Sehl, S-e-h-l, and he was succeeded by John

25  Robinson, who -- I guess he was there all the time between

26  Fred Sehl's departure and my retirement.  John Robinson

has since retired himself.

    Q.    And I ask you the same question that I asked

20

1   you about the Technical Center of Owens-Illinois.

2   What scientific disciplines did Aetna have available to

3   you that you could draw on for assistance or hope?

4       A.   They had chemists, engineers, some in the area

5   of physics, because they had quite an elaborate X-ray setup,

6   and they had medical doctors.

7       Q.   Did they have industrial hygienists on their

8   staff as well?

9       A.   Yes.

10      Q.   Mr. Hazard, as the industrial hygienist for

11  Owens-Illinois, can you tell us what your job duties

12  were?  Were they basically the same as you've described

13  earlier?

14      A.   Yes, they were.

15      Q.   During the course of your employment with the

16  company, did you at any time assume any additional duties?

17      A.   I don't remember any.

18      Q.   During the course of your employment with

19  Owens-Illinois, did you become a member of any

20  professional associations or societies?

21      A.   Yes.

22      Q.   Can you tell us which ones?

23      A.   The American Industrial Hygiene Association.

24  I was a director and later president of it.  The

25  American Public Health Association, which had a section on

26  industrial hygiene.  The American Society of

27  Heating and Ventilating Engineers, which was active in the

28  work of plant ventilation and control of dust exposure.

1      MR. SIMON:  Could you repeat the name of the

2  organization?

3      THE WITNESS:  The American Society of Heating and

4  Ventilating Engineers.

5      MR. SIMON:  Thank you, sir.

6      THE WITNESS:  During the -- wait a minute.  I was

7  active in the American Standards Association, which drew up

8  standards relating to all sorts of scientific work,

9  including ventilation and measurement of various

10  contaminants such as dusts.

11      Q.    BY MR. SILBERFELD:  Any others that you recall,

12  sir?

13      A.    I don't recall any others.

14      Q.    In your last deposition the Industrial

15  Hygiene Foundation was mentioned.

16      A.    Yeah, that's right.

17      Q.    Were you a member of that one as well?

18      A.    That was an organization, that is an

19  organization that companies belong to.  And I represented

20  Owens-Illinois at some of their meetings.  I did not

21  hold individual membership in it.

22      Q.    Were there any other corporate memberships

23  which Owens-Illinois held where you were the

24  representative attendee?

25      A.    Owens-Illinois had a membership in the

26  National Safety Council and in the industrial hygiene

27  activities of that organization I represented the

28  corporation.

1    Q.    Mr. Hazard, did the American Industrial

2 Hygiene Association publish any regular magazine or

3 periodical or journal?

4    A.    Yes, they had a journal which in the early days

5 came out quarterly and then bi-monthly and then finally

6 monthly.

7    Q.    What was the name of the journal?

8    A.    Journal of American Industrial -- wait a minute.

9 Journal of the American Industrial Hygiene Association.

10    Q.    What year or years were you the President of

11 the organization?

12    A.    Let's see.

13    Q.    1940's, 1950's,

14 1960's?

15    A.    I'd say 1950's.  Late 1950's.

16    Q.    Did the American Public Health Association

17 publish a journal?

18    A.    Yes.  They had the American Journal of Public

19 Health,  which was a monthly -- is a monthly journal.

20    Q.    Did the section on industrial hygiene publish

21 its own journal?

22    A.    No.

23    Q.    Did you regularly receive the American Public

24 Health Association Journal?

25    A.    Yes.

26    Q.    Did the American Society of Heating and

27 Ventilating Engineers publish any journal or magazine?

28    A.    Yes.  They had -- that was a monthly journal.

1  Heating and Ventilating Engineering, I think it was called.

2  The name changed several times.

3      Q.   Did the American Standards Association publish

4  a journal or magazine?

5      A.   I think they had a magazine, but that was more

6  of association activities.  Their big work was the

7  standardization codes in various areas, and these came out

8  as pamphlets or booklets in each instance.

9      Q.   Would it be a correct statement, Mr. Hazard,

10  that you read these journals in an effort to keep abreast

11  of what was happening in the industrial hygiene field?

12      A.   Yes, that's true.

13      Q.   I take it also that you considered it part of

14  your responsibility as the industrial hygienist for

15  Owens-Illinois to stay abreast of the developments in

16  your field?

17      A.   Yes.

18      Q.   In the course of your training to become an

19  industrial hygienist, did you take any courses in medicine?

20      A.   No, sir, I don't believe so.

21      Q.   Have you in the course of your life taken any

22  courses in physiology?

23      A.   Yes, to the extent of what you might call

24  respiratory physiology; that is, the function and action of

25  the lungs.

26      Q.   When did you take a course in respiratory

27  physiology?

28      A.   Well, it was in the late thirties, as I

1       remember it.

2            Q.   At Harvard?

3            A.   Yes.

4            Q.   Part of your MA training?

5            A.   No, it was after that.

6            Q.   Have you in the course of your life taken any

7       courses in epidemiology?

8            A.   No formal course.  But I've attended technical

9       meetings where epidemiologic subjects were discussed.

10           Q.   What is your understanding of what epidemiology

11      is?

12           A.   It's the study of a group of people as they react

13      to various outside agents.  As contrasted with the reaction

14      of a single individual.

15           Q.   Would it be correct that one of the purposes of

16      an epidemiological study is to determine cause and effect

17      relations?

18           A.   Yes.

19           Q.   Can you tell us, in connection with what

20      association or what technical meeting epidemiological

21      subjects were discussed?

22           A.   Well, the one that comes to mind is at meetings

23      of the American Industrial Hygiene Association where

24      epidemiologic studies are important because they are, as you

25      say, the study of the cause and effect.

26           Q.   Let me take a break from questions and answers

27      and go over these documents.  For the record, let me state

28      that this morning before we went on the record formally I

1   provided to Mr. Hazard and Mr. Callahan a group of

2   documents which I asked Mr. Hazard to look at and determine

3   from the entire stack those documents that he could

4   identify from his present recollection and those that he

5   could not, and we've now separated the stack into documents

6   that he recalls and documents that he does not recall.

7   What I propose to do is take the stack of documents that he

8   does recall or does have a memory of and mark those.  I'll

9   identify them as best I can and then I'll ask questions of

10  the witness when I'm all done identifying them.  Okay?

11      Exhibit Number 1 to this deposition is a two-paged

12  document on the letterhead of Owens-Illinois Glass

13  Company dated February 12, 1943, addressed to Dr.

14  Gardner from U. E. Bowes.

15      Exhibit Number 2 --

16      MR. HOCH:  Is there a subject on that?

17      MR. SILBERFELD:  No.  I can tell you generally what

18  it's about.  There is no subject line.

19      Exhibit Number 2 is a copy of a letter dated

20  December 24, 1946, from Mr. Mandred Bowditch, to Mr.

21  Hazard.

22      Exhibit 3, a copy of a Western Union telegram from

23  Mr. Hazard to Manford Bowditch, dated December 24, no

24  year.

25      MR. BERRY:  It does have a date way up in the

26  right-hand corner.

27      MR. SILBERFELD:  It seems to be a received stamp of

28  some kind, or a clocked-in stamp, and it has the year '47.

But the actual text of the telegram doesn't have a year,
although that is in the upper right-hand corner, you're
right, Mr. Berry.

Exhibit Number 4 is a copy of a letter addressed to
Mr. Hazard from Mr. Bowditch dated January 4, 1947.

Exhibit Number 5 is a letter on the letterhead of
Owens-Illinois glass, dated January 8, 1947, from Mr.
Hazard to Mr. Bowditch.

Exhibit 6 is a copy of a letter from Mr. Bowditch
to Mr. Hazard, dated January 10, 1947.

Exhibit 7 is a copy of a letter from Mr. Hazard to
Mr. Bowditch, dated January 27, 1947.

Exhibit 8 is a copy of a letter from Mr. Bowditch
to Mr. Hazard dated January 30, 1947.

Exhibit 9 is a copy of a letter from Mr. Hazard to
Mr. Bowditch, dated February 6, 1947.

Exhibit 10 is a copy of a letter from Mr. Bowditch
to Mr. Hazard, dated February 10, 1947.

Exhibit 11 is an 11 page report dated October 30,
1947, entitled "interim report on animal inhalation
experiments with Kaylo."

Exhibit 12 is a copy of a letter from Dr.
Vorwald to Mr. Hazard, dated October 31, 1947.

Exhibit 12 is a copy of a letter from Mrs. Lillian
Blinn -

MR. BOGAN:  13.

MR. SILBERFELD:  Exhibit 13 is a copy of a letter
from Mrs. Lillian R. Blinn, executive secretary to

Dr. Vorwald, to Mr. Hazard, dated November 11, 1947.

Exhibit 14, a copy of a letter from Mr. Hazard to Dr. Vorwald dated January 9, 1948.

Exhibit 15 is a copy of a letter from Dr. Vorwald to Mr. Hazard, dated January 19, 1948.

Exhibit 16 is a copy of a letter from Mr. Hazard to Dr. Vorwald dated January 28, 1948.

Exhibit 17 is a copy of a letter from Mrs. Blinn to Mr. Hazard dated February 9, 194B.

Exhibit 18 is a copy of a letter from a Grippa G. Robert, M. D., to Mr. Hazard, dated February 20, 1948.

MR. HOCH:  The date again?

MR. SILBERFELD:  February 20, 1948, I believe.

Exhibit 19 is a copy of a letter from U. E. Bowes to Dr. Arthur J. Vorwald, dated March 31, 1948.

Exhibit 20 is a copy of a letter from Dr. Vorwald to Mr. Bowes dated April 26, 1948.

Exhibit 21 is a copy of a letter from Mr. Hazard to Dr. Vorwald, dated September 21, 1g48.

Exhibit 22 is a copy of a letter from Mrs. Lillian R. Blinn to Mr. Hazard, dated September 24, 194B.

Exhibit 23 is a copy of a letter from -- let me withdraw that.  We've got two copies of the same thing. Exhibit 23 is a copy of a letter from Dr. Vorwald to Mr. Bowes, dated November 16, 194B.

Exhibit 24 is entitled "interim report regarding the biological activity of Kaylo dust,"  bears a date of

October 30, 1948.

Exhibit 25 is an interim report regarding the biological activity of Kaylo dust, dated April 30, 1949.

Exhibit 26, a copy of a letter from Mr. Hazard to Dr. Vorwald dated July 6, 1949.

Exhibit 27 is a copy of a letter from Mr. Hazard to Dr. Vorwald dated January 5, 1950.

Exhibit 28 is a copy of a letter from Dr. Vorwald to Mr. Hazard, dated January 12, 1950.

Exhibit 29 is an interim report regarding the biological activity of Kaylo dust, dated January 1, 1950.

Exhibit 30 is a copy of a letter from Dr. Vorwald to Mr. Hazard, dated February 1, 1950.

Exhibit 31 is a copy of a letter from Mr. Hazard to Dr. Vorwald, dated February 14, 1950.

Exhibit 32 is a copy of a letter from Mrs. Lillian R. Blinn to Mr. Hazard dated February 25 — pardon me -- February 24, 1950.

Exhibit 33 is a copy of a letter from Mr. Hazard to Mrs. Lillian R. Blinn dated March 7, 1950.

Exhibit 34 is a copy of a letter from Mrs. Blinn to Mr. Hazard, March 10, 1950.

Exhibit 35 is a copy of a letter from Mr. Hazard to Dr. Vorwald, dated April 3, 1950, and also bearing a dictation date of March 31, 1950.

Exhibit 36 is a copy of a letter from Mr. Hazard to

Dr. Vorwald, bears a date of May 18, 1950,

and a dictation date of May 17, 1950.

Exhibit 37 is a copy of a letter from Dr. Vorwald

to Mr. Hazard, dated June 1, 1950.

Exhibit 38 is a copy of a telegram from Mr. Hazard to

Dr. Vorwald, bears a date of June 6, 1950.

Exhibit 39 is a copy of a letter from Mrs.

Blinn to Mr. Hazard, dated June 6, 1950.

Exhibit 40 is a copy of a letter from Mr. Hazard to

Dr. Vorwald, dated August 2nd, 1950.

Exhibit 41 is a copy of a letter from Dr. Vorwald

to Mr. Hazard, dated October 15, 1950.

Exhibit 42 is a copy of a letter from Mr. Hazard to

Dr. Vorwald, dated October 30, 1950.

Exhibit 43 is a copy of a letter from Mr. Hazard to

Dr. Vorwald, dated December 12, 1950.

Exhibit 44 is a copy of a letter from Dr. Vorwald

to Mr. Hazard dated December 18, 1950.

Exhibit 45 is a copy of a letter from Dr. Vorwald

to Mr. Hazard dated December 19, 1950.

Exhibit 46 is a copy of a letter from Mr. Hazard to

Dr. Vorwald, dated December 26, 1950.

Exhibit 47 is a copy of a letter from Mr. Hazard to

Dr. Vorwald dated January 15, 1951.

Exhibit 4B is a copy of a telegram from Mr. Hazard to

Dr. Vorwald, dated January 19, 1951.

Exhibit 49 is a copy of a letter from Dr. Vorwald

to Mr. Hazard, dated January 22, 1951.

Exhibit 50 is a copy of a letter from Mrs. Blinn to Mr. Hazard, dated January 25, 1951.

Exhibit 51 is a copy of a letter from Edward C. J. Urban, to Mr. Hazard, dated February 26, 1951.

Exhibit 52 is a copy of a letter from Mr. Hazard to Dr. Vorwald dated April 30, 1951.

Exhibit 53 is a copy of a letter from Mrs. Blinn to Mr. Hazard, dated May 2, 1951.

Exhibit 54 is a copy of a letter from Mr. Thomas M. Durkan, to Mr. Hazard, dated June 6, 1951.

Exhibit 55 is a copy of a letter from Mr. Hazard to Dr. Vorwald dated June 8, 1951.

Exhibit 56 is a copy of a letter from Mr. Hazard to Thomas M. Durkan, dated July 11, 1951.

Exhibit 57 is a copy after a letter from Mr. Hazard to Dr. Vorwald dated July 13, 1951.

Exhibit 58 is a copy of a letter from Thomas M. Durkan to Mr. Hazard, dated August 7, 1951.

Exhibit 59 is a copy of a letter from Mr. Hazard to Mr. Durkan, dated August 7, 1951.

Exhibit 60 is a copy of a letter from Dr. Vorwald to Mr. Hazard, dated August 17, 1951.

Exhibit 61 is a copy of a letter from Mrs. Blinn to Mr. Hazard, dated October 26, 1951.

Exhibit 62 is a copy of a letter from Mr. Hazard to the Trudeau foundation, October 29, 1951.

Exhibit 63 is a copy of a letter from Mrs. Blinn to Mr. Hazard, dated October 31, 1951.

1  Exhibit 64 is a copy of a letter from Mr. Hazard to

2  Dr. Vorwald, and attached to the letter are two pages

3  entitled "samples of dust from Saryville, New Jersey

4  plant for analysis, Owens-Illinois Glass Company."  Did

5  I give you the date of the letter?

6  MR. BOGAN:  No.

7  MR. SILBERFELD:  I'm not going to.  January 4, 1952.

8  Exhibit 65 is a copy of a letter from Dr. Vorwald

9  to Mr. Hazard, February 7, 1952.

10  Exhibit number 66 is a document entitled "Investigation

11  concerning the capacity of inhaled Kaylo dust to

12  injure the lung," bears a date of January 30, 1952,

13  authored by the Saranac laboratory.

14  67 is a copy of a letter from Mr. Durkan to Mr.

15  Hazard, dated March 11, 1952.

16  Exhibit 68 is a copy of a letter from Mr. Hazard to

17  Mr. Durkan, dated April 8, 1952.

18  Exhibit 69 is a copy of a letter from Mr. Durkan

19  to Mr. Hazard, dated May 10, 1952.

20  Exhibit 70 is a copy of a letter from Mr. Hazard to

21  Mr. Durkan, dated May 12, 1952.

22  Exhibit 71 is a document on the intra-company

23  correspondence of Owens-Illinois Glass Company, addressed

24  to Mr. P. A. Gillis, and signed by Bill.  Bears a date

25  of November 21, 1952.

26  Next is a memo on the intra-company correspondence of

27  Owens-Illinois to the attention of Mr. M. M. Ollander,

28  it is unsigned, bears a date of October 5, 1955.  That will

1    be 72.

2        Exhibit 73 is a copy of a letter from W. G. Hazard to

3    Mr. Ira I. Brought, dated June 12, 1956.

4        MR. BERRY:  Didn't you already mark that as 72,

5    Mr. Silberfeld.  You've got October, '55, I think you

6    said.

7        MR. SILBERFELD:  It's '55, whatever I said.

8        MR. BERRY:  Okay.

9        MR. SILBERFELD:  73, we've gotten all the information

10   on.

11       74 is a multi-paged document which is a Xeroxed copy

12   from some journal, an article entitled, "The effect of

13   inhaled commercial hydrous calcium silicate dust on

14   animals tissues, an experimental study," by G. W. H.

15   Schepers, M. D., and others.

16       MR. HOCH:  What was the date on that, if there is one?

17       MR. BERRY:  1955.

18       MR. HOCH:  I think it's 55.

19       MR. SILBERFELD:  Where would the date be?

20       MR. SIMON:  September, 55.

21       MR. SILBERFELD:  I'm sorry.  You're right.  Reprinted

22   from

23   the AMA archives of Industrial Health, September 55,

24   volume 12, and then the pages.

25       MR. HOCH:  Thank you.

26       Q.  BY MR. SILBERFELD:  Mr. Hazard, it's correct,

27   is it not, that before we started the deposition today I

28   presented these documents to you and your counsel?

1      A.    Yes.

2           Q.    And you had the opportunity to go through the

3      entire stack of documents and take out those which you

4      recognized and those which you did not?

5      A.    Yes.

6      (Whereupon Plaintiff's Exhibits 1-74 were marked for

7      identification at this time.)

8           Q.    The documents that I just read which have now

9      been marked as Exhibits 1 through 74 are documents which

10     you recall from your years of employment at

11     Owens-Illinois?

12     A.    Yes.

13          Q.    Okay.   Now, with regard to Exhibits 1 through

14     74, those of them that were authored by you, sir, were they

15     authored by you in the regular course of business at

16     Owens-Illinois Glass Company?

17     A.    Yes.

18          Q.    And those that were authored by you, sir, were

19     they authored by you at or about the time that is shown on

20     the documents with the various dates?

21     A.    Yes.

22          Q.    And with regard to those documents in Exhibits

23     1 through 74 that were received by you, were they received

24     by you in your capacity as the industrial hygienist of

25     Owens-Illinois Glass Company?

26     A.    Yes, sir.

27          Q.    Were they received by you in the regular and

29     ordinary course of the business of Owens-Illinois Glass?

1    A.    Yes.

2    Q.    Were these records, Exhibits 1 through 74, kept

3    by you in the ordinary course of your duties as the

4    industrial hygienist of Owens-Illinois Glass Company?

5    A.    Kept by me or by the girl who worked for me.

6    Q.    All right.  So they were either kept by you or

7    someone working for you at Owens-Illinois?

8    A.    Yes.

9    MR. SIMON:  Sir, those documents among the ones that

10   you reviewed that are signed with the signature "Bill" were

11   authored by you; is that correct?

12   THE WITNESS:  Yes.

13   MR. SIMON:  Thank you.

14   MR. BERRY:  Off the record.  Forget it.

15   (Discussion held off the record.)

16   Q.    BY MR. SILBERFELD:  Mr. Hazard, the documents

17   which are before us, Exhibits 1 through 74, are Xeroxed

18   copies of originals, or carbons, as the case may be,

19   correct?

20   A.    I don't want to get picky, but are they -- are

21   you sure they're Xeroxed?  They are photocopies.

22   MR. SIMON:  That's one.

23   MR. SILBERFELD:  That's like jello and Klennex, the

24   same thing.

25   Q.    They are photocopies, in any event, of either

26   originals or carbons?

27   A.    Yes.

28   Q.    Are they, from your review of the documents,

35

1  true and correct copies of either the originals that were

2  sent by you or the copies or carbons that were received by

3  you?

4      A.  Yes, so far as I know they are true and

5  originals.

6      MR. BERRY:  You still got the problem.  You have him

7  authenticating file copies from Saranac as if they were

8  received by him.  Don't worry about it.

9      Q.  BY MR. SILBERFELD:  In terms of the substance

10  of the documents that are contained in Exhibits 1 through

11  74, are you satisfied that they are true and correct as far

12  as the substance is concerned?

13     MR. SIMON:  The text itself.

14     THE WITNESS:  Yes, sir.

15     Q.  BY MR. SILBERFELD:  Although what we may have

16  here is a carbon as distinguished from an original or

17  original distinguished from a carbon, the text of the

18  documents that we have here before us are as you recall

19  them at the time that you either sent them or got them; is

20  that correct?

21     A.  Yes.

22     MR. SILBERFELD:  Any other problems?  Seriously.

23  Does that solve if for you?

24     MR. BERRY:  Yeah.  I just figured you wanted it the

25  right way.

26     MR. BOGAN:  Did he either receive or send every one

27  of these?

28     MR. SILBERFELD:  Yes.  Now, Jack, let's go to the

1    ones that we don't have any idea of.

2        Exhibit number 75 is a two-paged letter, copy of a

3    letter, from Dr. Gardner to Mr. Bowes.

4        (Whereupon Plaintiff's Exhibit 75 was marked for

5        identification at this time.)

6        Q.   Mr. Hazard -

7    MR. BOGAN:  What's the date?

8    MR. SILBERFELD:  February 23, 1943.

9        Q.   In February of 1943, did Owens-Illinois

10   Glass Company have an employee by the name of U. E. Bowes?

11       A.   Yes.

12       Q.   Was Mr. Bowes the Director of Research

13   for the company at that time?

14       A.   Yes, he was.

15       Q.   Were you familiar in 1943 with a Leroy U.

16   Gardner, M. D.?

17       A.   Yes.

18       Q.   Who was Dr. Gardner at that time?

19       A.   He was the director of the laboratory known

20   as the Saranac laboratories, Saranac Lake, New

21   York.

22       Q.   I take it that you would be unfamiliar with

23   this document because this was at the time when you were at

24   the Public Health Service.

25       A.   That's true.

26       Q.   Okay.  How long, Mr. Hazard, was Mr. Bowes

27   the Director of Research for Owens-Illinois Glass?

28       A.   I don't know.  Approximately, I'd say, 10 years.

1    Q.   During what years was he the Director of

2  Research?

3    A.   I don't know the dates.

4    Q.   After you returned from the Public Health

5  Service, did you ever have occasion to review

6  correspondence from Dr. Gardner to Mr. Bowes?

7    A.   I don't remember whether I saw the

8  correspondence or not.  I was familiar with the substance

9  of it.

10    Q.   Have you seen the stack of letters which you

11  have been presented with here this morning, the smaller

12  stack, before today?

13    MR. CALLAHAN:  Those are the ones you could not

14  recall.

15    THE WITNESS:  I don't -- you mean the actual pieces

16  of paper?

17    MR. SILBERFELD:  Yes, sir.

18    THE WITNESS:  I don't remember seeing them before

19  today.

20    MR. SILBERFELD:  Let me mark as 76 a letter from

21  Mr. Bowes to Dr. Gardner, dated November 21,

22  1944.

23    (Whereupon Plaintiff's Exhibit 76 was marked for

24    identification at this time.)

25    Q.   BY MR. SILBERFELD:   I appreciate the fact, Mr.

26  Hazard, that you don't recall the context of the letter or

27  the substance of it.  Can you identify Mr. Bowes'

28  signature there?

1    A.    Yes, that's his signature.

2    Q.    On the letterhead of Owens-Illinois Glass,

3    yes.

4    MR. SIMON:  Is that your understanding, sir, that

5    that is on the letterhead of Owens-Illinois Glass as

6    that letterhead existed on the date shown on the letter?

7    THE WITNESS:  Yes.

8    MR. SIMON:  Thank you.

9    MR. SILBERFELD:  There is a reference in one of these

10   letters, Mr. Hazard --

11   MR. CALLAHAN:  We've been in session about an hour

12   now, an hour and a half, really.

13   MR. SILBERFELD:  I've got two documents.  Just finish

14   this and then we'll take a break.  Is that all right?

15   MR. CALLAHAN:  Un-huh.

16   MR. SILBERFELD:  There is a reference on one of these

17   letters, Mr. Hazard, to an A. C. Hirth.  Do you know who

18   that was in 1944?

19   A.    Yes, sir, I do.

20   Q.    BY MR. SILBERFELD:  Who was that?

21   A.    He was an attorney who was on the payroll of

22   Owens-Illinois.

23   Q.    At some point in time in the 1940's,

24   did Owens-Illinois have a subsidiary company by the name

25   of the American Structural Products Company?

26   A.    Yes, sir.

27   Q.    What was the business of the American

28   Structural Products Company?

1      A.    They made this product Kaylo, and as I

2  remember it, another division made glass block which was

3  trade named Insulux block, which was a totally

4  different product from Kaylo.  But I believe both of

5  those divisions were in the American Structural Products

6  Company.

7      MR. SILBERFELD:  Okay.  Let's take a break.  10

8  minutes?

9      MR. CALLAHAN:  Right.

10                      (Recess held.)

11     Q.    BY MR. SILBERFELD:  Mr. Hazard, before we go on

12  to talk about your work at Owens-Illinois, I just want

13  to concentrate on 1942 to 1946 for a minute.  That

14  was the period of time you were with the United States

15  Public Health Service, correct?

16     A.    That's right.

17     Q.    What were your duties and responsibilities with

18  the United States Public Health Service?

19     A.    I was in their division of industrial hygiene,

20  and I was assigned to the State of New Jersey to work

21  with the personnel of the State Health Department and

22  the State Division of Industrial Hygiene.

23     Q.    What were your duties and responsibilities, sir?

24     A.    Principally to visit plants around the state

25  which had war contracts and determine whether the working

26  conditions were safe and whether the dusts and fumes and

27  gasses and other situations were under control.

28     Q.    Okay.

40

1    A.   We also did some publications, bulletins, in

2  this area, which were sent to various plants for them to

3  use in training their own personnel.

4    Q.   To the extent that your work on behalf of the

5  Public Health Service disclosed excessive amounts of

6  dust or fumes or contaminants, did you have the authority

7  on behalf of the United States government to affect some

8  action in that regard?

9    A.   No, not directly.  Our purpose was to point out

10  such conditions to the plant management, suggest ways of

11  correcting it, but then it was up to him to go ahead and

12  correct it.

13    MR. BERRY:  You didn't mark the 1944 Hirth thing as

14  77, did you?  The last document before he with went.

15    MR. HOCH:  The last one is 76.

16    Q.   BY MR. SILBERFELD:  During those years, from

17  1942 to 1946, do you recall ever visiting the

18  Owens-Illinois plant at Berlin?

19    A.   I don't believe I did.

20    Q.   The Johns-Manville plant at Manville,

21  New Jersey?

22    A.   I don't remember.

23    Q.   Okay.  During the course of your professional

24  life, Mr. Hazard, have you authored any publications, or

25  chapters in books or anything like that?

26    A.   Chapters in books, in the general area of

27  ventilation and dust and fume and gas measurements.

28    Q.   I believe at your last deposition there was a

1    curriculum vitae that was marked as an exhibit, if I'm not

2    mistaken.  Do you have a current curriculum vitae?

3         A.   I don't have any with me.

4         Q.   Maybe our good friend Mr. Callahan has one.

5         MR. CALLAHAN:  Can you identify that?

6         THE WITNESS:  Yes.

7         MR. SILBERFELD:  I'd like to mark this as 77 to this

8    deposition.  We'll get a copy of it later, Jack.

9         Q.   There is a list of publications here, Mr.

10   Hazard.  Is this the entire list of publications which

11   you've authored or participated in?

12        A.   Those are the principal ones.  I don't recall

13   any others, but I'm not sure about that. ·

14        Q.   Thank you, sir.

15        Now, Mr. Hazard, when was the first time that you

16   personally became aware that there may be a health hazard

17   associated with exposure to asbestos?

18        MR. HOCH:  Objection, vague, ambiguous, unintelligent,

19   not specified the environment, type of asbestos, or

20   quantity or quality or era.

21        MR. SILBERFELD:  You done, Steve?

22        MR. HOCH:  Yes.

23        MR. SILBERFELD:  You can answer the question.  You

24   can go ahead and answer the question, sir.  Do you have it

25   in mind?

26        THE WITNESS:  Yes.  You mean asbestos in general?

27        MR. SILBERFELD:  Yes, sir, in general, and then we'll

28   break it down a little bit.

1    THE WITNESS:  It was probably about 1931.

2       Q.    BY MR. SILBERFELD:  How did you gain that

3    knowledge?

4       A.    From some of the papers and articles which were

5    at the Harvard School of Public Health when I was

6    working there.

7       Q.    And do you recall at this time the names of any

8    of those articles that you knew about then?

9       A.    No, I don't remember the names.

10      Q.    But they were in the library of the Harvard

11   School of Public Health?

12      A.    Yes.

13      Q.    This was while you were a student at

14   Harvard, correct?

15      A.    Well, I wasn't technically a student at that

16   time.  This was after I got out of the graduate school.

17   But I had access to the library of the School of Public

18   Health.

19      Q.    So your research or reading in that area was

20   part of your continuing effort to keep abreast of the

21   industrial hygiene literature?

22      A.    Yes.  And also at that time industrial hygiene

23   was new to me, so I was learning.

24      Q.    Okay.

25      A.    Or attempting to.

26      Q.    Now, what specifically did you learn back in or

27   around 1931 with regard to the health effects of

28   asbestos exposure?

43

1    A.   It was said that breathing asbestos dust of

2  small particle size over a prolonged period of years could

3  cause a change in the membranes of the lungs.  This change

4  was characterized first by a shortness of breath.  It was

5  observable by chest x-ray.  It did not predispose to any

6  infection, and the principal effect was shortness of breath.

7  By predisposing to any infection, I mean it did not make a

8  person susceptible to pulmonary tuberculosis.

9    Q.   Was it your understanding at that time that the

10  physiological effect in the process was a scaring of the

11  lung tissue?

12    A.   Well, in a sense it was a scaring.  It was a

13  thickening and converting the lung tissue to a fibrous type

14  of material.  That's about the same thing as scaring, I

15  guess.

16    Q.   You said that based upon your reading at that

17  time it was observable on X-ray.  What was observed on

18  X-ray that was different from a normal chest X-ray?

19    A.   Well, the lung tissue that exhibited this scaring

20  or thickening could be observeed on X-ray.  It was a change

21  from normal appearance.

22    Q.   In learning the discipline of industrial

23  hygiene, Mr. Hazard, did you take any particular interest

24  in asbestos health effects as opposed to other dusts?

25    MR. HOCH:  Can I have that question read back, please,

26  Jerry.

27  (Record read.)

44

1        THE WITNESS:  I didn't.

2        Q.   BY MR. SILBERFELD:  And what did you do to

3   follow up on that particular interest in asbestos

4   health effects?

5        A.   Well, it was one of several dusts that produced

6   lung effects, and I was interested in the effects of all

7   these dusts, of which asbestos was one.

8        Q.   This disease process that you've described to

9   us having to do with exposure to asbestos, did you know

10  at that time that it was called by the shorthand term

11  asbestosis?

12       A.   Yes.

13       Q.   Now, when you joined the Owens-Illinois

14  company for the very first time, did the company

15  manufacture any product containing asbestos?

16       A.   No, sir.

17       Q.   When, to your knowledge, was the first time

18  that the company manufactured any product containing

19  asbestos?

20       A.   Well, I think it was around 1944, thereabouts,

21  during a period that I was not with the company.

22       Q.   But you learned of this development after you

23  returned in 1946, I take it?

24       A.   Yes.

25       Q.   What was the particular product that was

26  developed by the company in 1944?

27       A.   It was this material which is known as

28  Kaylo, which is a calcium hydrous silicate

1  chemical.

2      Q.   Do you know roughly the materials that make up

3  Kaylo?  In 1944.

4      A.   Well, there was lime, some form of lime,

5  calcium, silica, one or two other things, which

6  when processed were converted to the calcium hydrous

7  silicate.  And in addition, to give the resulting material

8  some strength, asbestos was added.  It did not enter

9  into the chemical reaction but it gave the material some

10  physical strength.

11      Q.   Do you know of the total of a hundred percent

12  of ingredients, what percentage, approximately, was

13  asbestos?

14      A.   About 15 percent.

15      Q.   Do you have an understanding, sir, that there

16  are various types of asbestos fiber?

17      A.   Yes.

18      Q.   Do you know what type of asbestos fiber was

19  used in Kaylo?

20      A.   I think it was Chrysotile.

21      Q.   You mentioned that the Kaylo product

22  contains silica.  It was well known in the middle

23  1940's, was it not, that there was a disease

24  process called silicosis?

25      A.   Yes, that's correct.

26      Q.   As far as you knew, was Kaylo, insofar as

27  it had silica in it, capable of producing silicosis?

28      A.   No, it was not.

1    Q.   Why not?

2    A.   It was because the silica, which was SIO 2,

3    was converted to a silicate.  And silicates do not cause

4    silicosis.

5    Q.   So the finished product that came to be known

6    as Kaylo was not capable of producing silicosis?

7    A.   That's correct.

8    MR. SIMON:  Can I interpose one question?

9    MR. SILBERFELD:  No.  Go ahead.

10   MR. SIMON:  Sir, was it your understanding -- you

11   spoke of asbestos in terms of its strength

12   characteristics.  Was it your understanding back in the

13   1940's that asbestos was selected for its

14   strength characteristics as opposed to any thermal

15   qualities that it might have had?

16   THE WITNESS:  That was my understanding.

17   MR. SIMON:  Thank you, sir.

18   Q.   BY MR. SILBERFELD:  When you returned to

19   Owens-Illinois in 1946, did you become involved in any

20   research, study or survey of the health effects associated

21   with Kaylo?

22   A.   Yes.

23   Q.   When was the first time that you became so

24   involved?

25   A.   I think it was probably in 1946, when I

26   returned.

27   Q.   What was the occasion that you became involved?

28   A.   Mr. Bowes, who was Director of Research,

1   had been in touch with Dr. Gardner of the Saranac
2   laboratory, and they had set up a program, or were about to
3   set it up, I guess, for studying the health effects of
4   Kaylo dust.  And during this they used animal
5   experimentation at the Saranac laboratory.
6       Q.   Did you become familiar, in or about 1946, with
7   the nature of the animal experimentation being conducted by
8   Saranac labs?
9       A.   Forty-six or '47.  Maybe it was '47.  But, yes,
10  I did become familiar.
11      Q.   What understanding did you obtain at that time
12  as to what Saranac was doing in these animal studies?
13      A.   Well, they had developed a routine procedure
14  for exposing animals, hamsters and rabbits, in a dust room
15  or animal rooms where clouds of dust were set up in the air,
16  and the animals were in cages and they breathed whatever
17  the dust was for a long time.  Now, the dust exposure that
18  these animals had was extremely high, very, very high, much
19  higher than any human being would breathe.  And the length
20  of exposure was long.  It was eight hours a day, five days,
21  five and a half days a week, week after week, month after
22  month, and it was the equal of the animal's lifetime,
23  actually.  No human would have dust exposure like that.
24  But the purpose was to accelerate the effect of the dust so
25  that its toxicity could be determined in a reasonable
26  length of time.
27      Q.   So to be very simple and basic about it, Mr.
28  Hazard, the purpose of the studies at Saranac on

48

1  Kaylo were to determine whether there were any health

2  hazards associated with Kaylo?

3       A.   Yes, that's right, health hazards for humans.

4       Q.   Correct.  It wasn't --

5       MR. SIMON:  Sir, could you explain what you mean by

6  the term toxicity?

7       A.   Well, it's the harmfulness of an outside

8  material on the human body.

9       MR. SIMON:  To the best of your knowledge, is that

10  the generally accepted definition of the term?

11       THE WITNESS:  That's a pretty crude definition.  I

12  think that's the thought.

13       MR. SIMON:  Thank you.

14       Q.   BY MR. SILBERFELD:  Now, the purpose of these

15  experiments on rabbits and hamsters was to find out what

16  the likely reaction of humans would be to exposure to

17  Kaylo?

18       A.   Yes, that's right.

19       MR. HOCH:  Roman, just for the sake of clarity, since

20  in the report, all copies of the report, be they interim or

21  final, there is a difference between reactions of certain

22  of the animals to others.  I want to be sure when you say --

23  you said rabbits and hamsters.  You may be leaving out

24  guinea pigs.  I assume you're just referring to the animal's

25  reaction generally.

26       MR. SILBERFELD:  I used rabbits and hamsters because

27  that's what the witness mentioned.  Let's talk about

28  animals.

1    MR. HOCH:  Thank you.

2    Q.  BY MR. SILBERFELD:  Mr. Hazard -- withdraw that.

3    Had you had exposure to animal studies before you

4    learned of these Saranac studies on Kaylo?

5    A.   I don't understand what you mean, had I had

6    exposure.

7    Q.   Had you read about animal studies?

8    A.   Oh, yes, I had.

9    Q.   In general?

10   A.   Yes.

11   Q.   Not necessarily animal studies of Kaylo or

12   dust, but animal studies generally.

13   A.   Yes.  I knew that was a technique that was used.

14   Q.   Animal studies were, in the 1940's and

15   well before that, a well recognized and accepted method of

16   testing toxicity?

17   A.   Yes.

18   Q.   One of the efforts of any researcher in

19   connection with an animal study is to design the study in

20   such a way that the exposure of the animals approximates

21   what is believed to be the exposure to humans; isn't that

22   correct?

23   A.   Sometimes that's impossible.

24   Q.   In terms of best estimates.

25   MR. HOCH:  I think that misstates his prior testimony.

26   MR. SIMON:  Sir, was it your understanding that

27   animal --

28   MR. CALLAHAN:  I don't wish to object to it at this

1    point, but I don't think we're following the guidelines

2    precisely, and it might be somewhat onerous on Mr. Hazard

3    to be --

4         MR. BOGAN:  Why don't one of you ask the questions.

5         Q.   BY MR. SILBERFELD:  Mr. Hazard, you had seen,

6    in the course of your training and in the course of keeping

7    abreast of the industrial hygiene literature, animal

8    studies of various kinds, had you not?

9         A.   I'd seen reports of them.

10        Q.   Yes.

11        A.   Yes.

12        Q.   You understood at that time, did you not, that

13   the design of an animal study was intended so that the

14   exposure of the animals approximated the exposure of humans

15   to whatever the substance was that was involved in the

16   study.

17        MR. HOCH:  You asking specifically or generally?  Are

18   you referring to any one test?

19        MR. SILBERFELD:  No.  Generally animal studies in

20   general and their design.

21        Q.   Do you understand my question, sir?

22        A.   I think I do, but I don't quite agree with it.

23        Q.   All right.

24        A.   I don't think that the animals, the animal

25   experimentation, or the animal exposure is anywhere nearly

26   like what a human exposure would be.  Not as intense and as

27   prolonged.

28        Q.   BY MR. SILBERFELD:  It is intended by exposing

1   animals, as you said earlier, to high levels of whatever

2   the material is for long periods of time to get in a short

3   period of time an answer to the question of toxicity,

4   correct?

5       A.   Yes, that's right.

6       Q.   And if you tried to duplicate human exposure it

7   might take you many, many years to do that, and you

8   wouldn't get an answer for many, many years?

9       A.   You mean have the animals exposed to what a

10  human is exposed to?

11      Q.   Yes, sir.

12      A.   It would take many, many years.  Wouldn't live

13  that long.

14      Q.   You might have generations passed before you

15  got an answer to the question whether something was toxic,

16  correct?

17      A.   Yes.

18      Q.   But in concentrating exposure and making higher

19  levels of exposure in animals, the results as far as

20  toxicity is concerned are still valid as to humans, are

21  they not, generally speaking?

22      MR. HOCH:  Objection, overly broad.  Also calls for a

23  medical opinion.

24      MR. SILBERFELD:  Go ahead and answer.

25      THE WITNESS:  I would like to look at it in another

26  way.

27      MR. SILBERFELD:  All right.

28      THE WITNESS:  If the animal experimentation, which is

1  intense and prolonged, shows no toxic effect on the animal,

2  you can validly assume that the human exposure won't be

3  harmful.

4       MR. SILBERFELD:  All right.

5       Q.   If, on the other hand, the animal experiment

6  does show some health effect on the animal as a result of

7  the exposure, in your judgment, again speaking generally of

8  animal studies, can the results of those studies be

9  extrapolated to human exposure?

10      A.   No.

11      MR. HOCH:  Same objection.

12      MR. SILBERFELD:  Go ahead.

13  .   THE WITNESS:  They are a warning flag, but further

14  investigation is needed to see whether, in fact, the human

15  exposure is serious.

16      Q.   BY MR. SILBERFELD:  And in your opinion is the

17  only way of determining whether humans are at risk to a

18  particular substance to actually test it on humans?

19      A.   No.  No.

20      Q.   How would you then determine, if you got a warning

21  flag from an animal study, whether humans were at risk?

22      MR. HOCH:  Same objections, and also objections on

23  foundation as to this witness' competency in this area.

24      MR. SILBERFELD:  Go ahead and answer.

25      MR. CALLAHAN:  Go ahead.

26      THE WITNESS:  You would inaugurate a program in the

27  plant or at the operation where the exposure for humans

28  exists to determine whether they are being affected by the

1    contaminant?

2        Q.   BY MR. SILBERFELD:  Well, that's what I meant

3    when I said a human experiment.

4        A.   That's not an experiment.  That's a study under

5    normal working conditions of whether the humans are effected

6    in any way by this contaminant.  I don't like the idea of

7    an experiment on humans.

8        Q.   Let me withdraw the word experiment and say,

9    having received a warning flag by an animal study, would it

10   be your opinion that the only way to correlate that to the

11   human experience would be to study humans in the exposed

12   environment?

13       MR. HOCH:  Roman, excuse me.  Can I have a continuing

14   objection on this line of questions on the foundation and

15   expertise and overly broad and vague and ambiguous and what

16   have you?

17       MR. SILBERFELD:  You got it.

18       MR. HOCH:  Thank you.

19       Q.   BY MR. SILBERFELD:  Do you have the question in

20   mind, sir?

21       A.   I wish you would repeat the question.

22       MR. CALLAHAN:  Read it again, would you please.

23   (Record read.)

24       MR. CALLAHAN:  The only way to correlate it.

25       THE WITNESS:  Well, again, I don't like the word

26   study humans.  You can make observations.

27       MR. SILBERFELD:  All right.  Let me phrase it in that

28   context.

-54

1      Q.    Assuming you've done a valid animal study and

2   you've gotten this warning flag that you described, okay?

3      A.    Un-huh.

4      Q.    Are you with me so far?

5      A.    Sure.

6      Q.    And now you'd like to know whether or not the

7   warning flag that you've received from the animals is valid

8   or applicable to the human condition.  Is it your opinion,

9   Mr. Hazard, that the only way in which you can answer that

10  question is by observing human beings in the exposure to

11  the particular product or substance involved?

12     A.    Well, I think that's probably a true statement.

13  I'm hesitant about the only way.  There may be other ways

14  that I'm not familiar with.  But this would involve -- well,

15  would you like me to recount what we did?

16     Q.    All right.

17     A.    Or is that too specific right now?

18     Q.    We'll get into -- you're speaking of Kaylo

19  now?

20     A.    Yeah.

21     Q.    We'll get into that in just a moment.  Based

22  upon your training and experience, the way to correlate the

23  result of an animal study for humans is to study or observe

24  the humans in the environment with the exposed material?

25     A.    Yes.

26     Q.    Now, at Saranac these animal studies were

27  done and certain results were obtained; isn't that correct?

28     A.    Yes.

1     Q.   The particular product that was used at

2  Saranac was the finished product Kaylo, isn't that

3  true?

4     A.   Yes.

5     Q.   The Saranac studies that were done and the

6  various interim reports that were issued were not studies

7  involving the raw materials that go into Kaylo; isn't

8  that correct?

9     A.   Yes.

10     Q.   It was actually the finished product, the block

11  or the dust of the block -

12     A.   Yes.

13     MR. BOGAN:  In all fairness, the question is compound.

14  I think the facts bare out it was the dust of the block.

15     MR. SILBERFELD:  One time you sent them block, too.

16     MR. BOGAN:  Then they sent it back.

17     Q.   BY MR. SILBERFELD:  In all events, Mr. Hazard,

18  the substance that was used in the Saranac experiments

19  was the dust created by the manufacture of Kaylo?

20     A.   Well, no.  No.

21     Q.   This was dust created by the sawing and planing

22  of the finished product?

23     A.   That, and other ways too, I think.  But it was

24  dust of the finished product.

25     Q.   All right.  At any time during your years with

26  the company, did you participate in any work to replace the

27  asbestos in the product with any other substance?

28     A.   I did not participate, no.

Q.    To your knowledge, between 1946 and 1972, was
the replacement of asbestos in Kaylo ever considered
by the company?

A.    Yes, it was.

Q.    When, for the first time?

A.    I suppose it was in the late 1950's.

Q.    What was the particular replacement for
asbestos that was considered at that time?

A.    Well, glass fiber had been developed by that
time, and since its structure and appearance was something
like asbestos fiber, physical appearance, I mean, it
was hoped that glass fiber could be substituted for
asbestos.

Q.    With regard to the asbestos containing
Kaylo that was manufactured by Owens-Illinois
during various years, can you describe for us generally the
uses of that product that you're aware of?

A.    I think you said the asbestos containing
Kaylo.

Q.    Yes, sir.  As distinguished from Kaylo
that didn't have --

A.    Oh, I see.  I thought -- yeah.

The uses?

Q.    Yes, sir.  The uses that you were aware of.

A.    One was thermal insulation, and one was a
structural product in slab form for roof covering.  I think
those were the two ones that I remember the most.

Q.    During your years as the industrial hygienist,

1   were you aware that the thermal insulation product was used

2   in shipyards around the nation?

3       A.   I think I was aware of that, and it was used

4   around piping and other places, not just shipyards.

5       Q.   Had you heard from any source during the period

6   1946 to 1972, that the application of Kaylo thermal

7   insulation pipe covering created dust?

8       MR. HOCH:  Can I have that question read back, please.

9   (Record read.)

10      MR. BERRY:  I guess I would object on behalf of

11  Owens-Illinois.

12      MR. HOCH:  Can I have the question read back first.

13  Sorry, Jerry.

14  (Record read.)

15      MR. HOCH:  I'm going to object on the grounds it is

16  vague, ambiguous and unintelligent, it's overly broad, it

17  doesn't specify where, how, it doesn't specify what kind of

18  dust, and in as much -- well, that's sufficient, I think.

19      MR. BERRY:  On behalf of Owens-Illinois, just to

20  tie into the objection, I object because it's not specific

21  as to time with respect to Owens-Illinois.  That is, it

22  doesn't break in '58.

23      MR. SILBERFELD:  Go ahead, Mr. Hazard, you can answer

24  the question.

25      MR. CALLAHAN:  Do you know the question?

26      THE WITNESS:  Would you read it again, please.

27      MR. SILBERFELD:  I'll just repeat the substance of it.

28      Q.   Did you become aware that the application of

1    thermal pipe covering created dust?

2        A.   Yes.

3        MR. HOCH:   Same objections.

4        Q.   BY MR. SILBERFELD:   When did you first become

5    aware of that?

6        A.   Oh, gosh.   I suppose when I was at the School

7    of Public Health in '30 to '34, sometime.

8        Q.   What was your understanding at that time as to

9    how the dust was created?

10       MR. HOCH:   Same objections on the word dust and the

11   use of that phrase.   Go ahead and answer the question, sir.

12       MR. SILBERFELD:   Go ahead and answer the question.

13       THE WITNESS:   Dust was created in the general

14   handling of pipe insulation.   The cutting of it, the stacking

15   of it, handling it in general.   Hitting two pieces against

16   each other, that sort of thing.

17       Q.   BY MR. SILBERFELD:   In the thirties, when you

18   first learned about this situation, did you know that --

19   well, withdraw that.

20       With regard to the work that was done by Saranac

21   laboratory for Owens-Illinois, it's your understanding,

22   is it not, that the study by the laboratory was financed by

23   Owens-Illinois?

24       A.   Yes.

25       Q.   Who originated the study?

26       A.   It was originated when I was not at the company.

27   I believe Mr. Bowes originated it.

28       Q.   And the contact at Saranac laboratories at

1    that time was Dr. Gardner; is that correct?

2        A.    Yes.

3        Q.    Did you know of Dr. Gardner's reputation

4    in the 1940's?

5        A.    Yes.

6        Q.    What was Dr. Gardner's reputation?

7        A.    It was the highest.  He was very highly

8    regarded as a toxicologist.

9        Q.    Did he have any particular training or aptitude

10   as far as you knew in pulmonary problems?

11       A.    Yes, he did.

12       Q.    Dr. Gardner stayed with the project, did

13   he not, until his death?   .

14       A.    Yes.

15       Q.    Then the project was picked up and carried

16   forward by Dr. Vorwald?

17       A.    Yes.

18       Q.    Did you know Dr. Vorwald's reputation at the

19   time he was involved in the project?

20       A.    Yes.

21       Q.    What was his reputation?

22       A.    It was -- he had a very high reputation.  He

23   was familiar with the effects of breathing dust, and he was

24   a good investigator, experimentor, I mean, conducting

25   experiments.

26       Q.    Now, as the exhibits which we've marked today,

27   Mr. Hazard, demonstrate, you had some regular contact with

28   the people at Saranac in connection with the Kaylo

60

1    study, did you not?

2        A.   Yes.

3        Q.   In addition to the documents that we've marked

4    here today, did you maintain any personal files of the work

5    that was being done on behalf of the company at Saranac?

6        A.   It was my understanding that in those exhibits

7    are my personal files.

8        Q.   From your review of the exhibits this morning,

9    are there any documents not in this stack which would be in

10   your personal files if you have any left?

11       A.   I don't know of any.

12       Q.   We've picked you clean, in other words.

13       A.   Clean as a whistle.

14       Q.   The sense I get from some of the correspondence

15   is that you and Dr. Vorwald became friendly.

16       A.   Yes.

17       Q.   Did you maintain that friendship throughout the

18   time that he was involved in the Kaylo study?

19       A.   Yes.

20       Q.   Were you involved in any research about the

21   health effects of Kaylo independent of the work that

22   was being done for your company by Saranac?

23       A.   I don't remember any.

24       Q.   Now, with regard to the animal studies that

25   were conducted by Saranac, did you consider the results

26   of the final report issued in 1952 to be a warning flag, as

27   you used that term earlier today?

28       MR. HOCH:  I'm sorry.  Can I have that question read

1   back, please?

2   (Record read.)

3       THE WITNESS:  Well, in effect it was a warning -

4       MR. BERRY:  Wait.

5       MR. SIMON:  They may want to object to the question.

6       THE WITNESS:  Oh.

7       MR. CALLAHAN:  Go ahead, you may answer.

8       THE WITNESS:  In effect, the results were a warning

9   flag.

10      Q.    BY MR. SILBERFELD:  And they were a warning

11  flag because adverse results had been reported in the

12  animals that were exposed to Kaylo dust, isn't that

13  right?

14      A.    Yes.

15      Q.    Now, following the issuance of the final report

16  of Saranac, did Owens-Illinois, to your knowledge,

17  conduct any further study, observation, testing or

18  experimentation to determine the significance of this

19  warning flag to human beings?

20      A.    We had a program in effect, already in effect

21  at the manufacturing plants, and it had failed to show that

22  there was any danger.  And we continued that and strengthend

23  it to some extent, and kept it going.

24      Q.    You're speaking of the X-ray program?

25      A.    Yeah, annual physical examinations, chest

26  X-rays, which were run by -- or read by specialists in that

27  field, and several other things.

28      Q.    These were examinations conducted on the

1    employees at Berlin and Saryville?

2         A.    Yes.

3         Q.    When did those examinations begin, sir?

4         A.    I believe they began at the time each plant

5    opened.  Annually thereafter.

6         Q.    Can you date for us the opening of the Berlin

7    plant?

8         A.    No.

9         Q.    Saryville?

10        A.    No.

11        Q.    Okay.

12        A.    I wasn't here at that time.

13        Q.    Was that during your service with the

14   Public Health Service?

15        A.    As I remember it, it was.

16        Q.    So that those two plants would have opened

17   somewhere between 1942 and 1946, as far as you

18   remember?

19        A.    Yes, as far as I can remember, yes.

20        Q.    Okay.  In terms of the annual physical

21   examinations and chest X-rays, was there any distinction

22   made, Mr. Hazard, at any time that those exams were

23   conducted, between production employees and non-production

24   employees?

25        A.    What do you mean, distinction?

26        Q.    Well, for example, did the annual physical

27   examinations and chest X-ray program involve only the

28   production employees?

1   A.   No, it involved the salaried employees, or the

2   administrative employees.

3   Q.   So included in the program were not only the

4   production employees, namely the people manufacturing the

5   product, but also the administrative and support people?

6   A.   Yes.

7   Q.   Okay.

8   A.   This was true in all the plants.  It wasn't

9   unique to those two.

10   Q.   The administrative and support people were

11   included in the annual physical and x-ray program even

12   though they did not have direct daily exposure to the

13   product; isn't that correct?

14   A.   Yes.

15   MR. HOCH:   That's an objection, that's assuming

16   something which may not be true.  It's also vague as to

17   what you mean by direct, it's also vague as to what you're

18   talking about in terms of products.

19   MR. SILBERFELD:  Go ahead and answer the question.

20   THE WITNESS:  The administrative and salaried

21   employees received periodic physical examinations and chest

22   X-rays in the interest of accuracy that maybe their chest

23   X-rays were every two years rather than annually.  I'm not

24   sure about that.

25   Q.   BY MR. SILBERFELD:  When the final report of

26   Saranac came out and the warning flag went up, so to

27   speak, did Owens-Illinois do anything further than what

28   you've already described in the annual physical and X-ray

64

1    program to observe or study its own employees' exposure to

2    Kaylo?

3        A.    Well, we were already doing further things, and

4    we continued them.

5        Q.    Further things than the annual physical and the

6    chest x-ray?

7        A.    Yes.

8        Q.    What things were those, sir?

9        A.    Well, since the opening of the plants, we had

10   kept accurate records of sickness absenteeism, according to

11   type of illness.  And these records covered sicknesses of

12   one day or more in length, which was very unusual in those

13   years.

14       We had no Workman's Compensation claims, Workers'

15   Compensation claims, I'm sorry, in those years for any dust

16   related disease.  We had routine inspections of the plants

17   with air sampling so that dust determination, the level of

18   dust determination could be made.  These were done by our

19   Workers' Compensation carrier, Aetna.  They were done by

20   the State of New Jersey Department of Health; they were

21   done by Saranac laboratory, they were done by the

22   Industrial Health Foundation in Pittsburgh, I

23   believe.  At that time it was called the Industrial

24   Hygiene Foundation.  And we made our own tests.  That was

25   most of the program.  This had been going on before the warning

26   flag came up even.

27       Q.    So this had gone on before 1952?

28       A.    Yes.

1    Q.   And using 1952 as a cut-off, and I'm not

2  suggesting that things changed after that, but just up

3  until that time, there had been no Workers' Compensation

4  claims associated with where the person was claiming there

5  was a breathing problem associated with exposure to

6  Kaylo?

7    A.   That's true.

8    Q.   And the sickness and absentee record did not

9  indicate a disproportionate sickness and absentee rate

10  based upon exposure to Kaylo?

11    A.   It indicated no effect at all on the sickness

12  rate.

13    Q.   Were these sickness and absentee records kept

14  by the Personnel Department or by you?

15    A.   They were gathered by the Personnel Department

16  and the original of the records, for example, would be

17  placed in that individual's personal history folder at the

18  plant, and copies of them would come to me in Toledo,

19  and I would tabulate them.

20    Q.   Was there some place on the form for an

21  indication of the sickness disease or malidity that kept

22  the person from work?

23    A.   Yes.  It was standard practice for the

24  United States Public Health Service to gather

25  information of this sort; all the -- their information,

26  their misdemeanor history record, their sickness absence

27  record, rather, covered only eight day and longer cases.

28  We covered those cases, and also the one through seven day

1    cases.  And on the form there was a space for diagnosis,

2    is also three check places for general character of the

3    disease, respiratory illness, digestive illness,

4    non-respiratory and non-digestive.  And as I say a place

5    for the written out diagnosis.

6         Q.    Was the information about the illness and

7    whether it was respiratory, digestive or neither filled in

8    by a medically trained person?

9         A.    It was filled in by the nurse at the plant.

10        Q.    Okay.  And none of the records, at least up

11   until 1952, demonstrated any effect as a result of

12   Kaylo?

13        A.    That's true.

14        Q.    And up until 1952, as best you can recall,

15   Berlin and Saryville had been in operation somewhere

16   between six and 10 years?  Is that correct?

17        A.    Yes.  Yeah.

18        Q.    Now, did the sickness and absentee records

19   program continue after 1952?  Did the keeping of those

20   records continue?

21        A.    May I ask you, is '52 the end of the

22   Saranac experiments?

23        Q.    Yes, sir.

24        A.    Not when we sold it to OCF.

25        Q.    You sold it to OCF, I believe in '58.

26        A.    Fifty-eight.  After '52 we continued to keep

27   those records, yes.

28        Q.    I take it you stopped doing that when you sold

1      the Kaylo business to OCF?

2      A.   Sure.

3      Q.   Between 1952 and 1958, did you have any

4   Workers' Compensation claims where the claim was made that

5   a breathing problem was created by exposure to Kaylo?

6      A.   No, sir.

7      Q.   Did the air sampling at Berlin and

8   Saryville take place from the time that the plants

9   opened?

10     A.   Yes.

11     Q.   Up to and including 1958?

12     A.   Yes.

13     Q.   Did the inspections by the New Jersey

14  Department of Health continue from the opening of those

15  plants until the sale of the business to OCF?

16     A.   They were not periodic inspections.  They were

17  repeat inspections but at irregular intervals.

18     Q.   At what intervals were those inspections?

19     A.   No regular intervals.  When they wanted to come

20  in and inspect the place.

21     Q.   Okay.

22     A.   Now, our inspections by the Workers'

23  Compensation carrier were annual.

24     MR. CALLAHAN:  This be a good point to take a break,

25  Roman?

26     MR. SILBERFELD:  As good as any, sure.

27     MR. CALLAHAN:  One o'clock?

28     MR. SILBERFELD:  One o'clock.

1          MR. BOGAN:  Can we do 1:30, because some people have

2     to eat lunch and check out of their hotel rooms, and it's

3     going to be a little time.

4          MR. CALLAHAN:  Okay.

5          MR. SILBERFELD:  1:30.

6          (Lunch recess held until 1:30 P.M.)

7          Q.   BY MR. SILBERFELD:  Mr. Hazard, are you ready

8     to continue with your deposition this afternoon?

9          A.   Yes, sir.

10         Q.   Just before we broke for lunch you were telling

11    us about the annual inspections conducted by your Workers'

12    Compensation insurance company of the Berlin and

13    Saryville plants.  Do you recall that testimony?

14         A.   Yes.

15         Q.   Were those inspections conducted on an annual

16    basis from the time those plants opened until the

17    Kaylo division was sold?

18         A.   Yes, they were.

19         Q.   Were reports of any of those examinations or

20    inspections prepared by the Workers' Comp. insurance

21    company and circulated to the company?

22         A.   Yes.

23         Q.   Did they have a particular title?

24         A.   For the reports?

25         Q.   Yes, sir.

26         A.   Well, I don't remember.

27         Q.   In substance, what did the inspection reports

28    contain?

69

1     A.    They contained the results of air samples to

2   determine how much dust was in the air, and they, I think,

3   invariably they would also -- I know they had several times

4   laboratory analysis showing the percent of asbestos in

5   the total dust.

6     Q.    I take it that these inspections were done by

7   the technical group at Aetna?

8     A.    Yes.

9     Q.    To whom were they directed at Owens-Illinois?

10    A.    They were directed to the Manager of the

11  plant.  Saryville or Berlin.

12    Q.    Did you, in your capacity as the industrial

13  hygienist for the company, obtain copies of these reports

14  at regular intervals when the inspections were done?

15    A.    Yes.

16    Q.    Did you keep them in the records of your office

17  at Owens-Illinois?

18    A.    Yes.

19    Q.    Have you had the opportunity since you were

20  first contacted about the last deposition to see any of

21  those reports?

22    A.    No.

23    Q.    Do you know if those reports are still in

24  existence?

25    A.    No, I don't know.  I expect they are.

26  Insurance companies very seldom throw things away.

27    Q.    With regard to these reports, talking now about

28  the Owens-Illinois copies of those reports, do you know

1   if any of the Owens-Illinois copies are still in

2   existence?

3       A.   No, I don't.

4       Q.   Was there any regular document retention policy

5   at Owens-Illinois, say, in the period of 1942

6   to 1958?

7       A.   Well, not in my department.  There may have

8   been elsewhere in the company.

9       Q.   Do you recall any instance in the same period

10  of time where these reports of the Worker Comp inspections

11  were destroyed or thrown out?

12      A.   No.

13      Q.   At any time during the years that Kaylo

14  was being manufactured by Owens-Illinois, did the

15  company, through your work, conduct any studies or

16  observations of the application of Maylo in the field?

17      A.   Installing Kaylo in the --

18      Q.   Yes.

19      A.   No.

20      Q.   At any time while Owens-Illinois was

21  manufacturing Kaylo, did you receive any studies which

22  reported on the installation of Kaylo in the field and

23  any health effects that might flow from that?

24      A.   No, sir.

25      Q.   To your knowledge, did any governmental entity

26  conduct any survey of the health effects associated with

27  the installation of asbestos containing thermal

28  insulation products in general?

1    MR. HOCH:  You asking for his recollection?

2    MR. SILBERFELD:  Yes.

3    THE WITNESS:  There was an elaborate study made by

4    not a governmental agency, but the School of Public Health

5    at Harvard, of installers of asbestos containing

6    insulation.

7    Q.   BY MR. SILBERFELD:  Who were the authors of

8    that study?

9    A.   The authors were Fleischer, Walter Fleischer,

10   and Phillip Drinker, who was my boss earlier, and two

11   other, two co-authors.

12   Q.   Other than Fleischer-Drinker, do you recall,

13   during your years as the industrial hygienist, up until

14   1958, any other surveys or studies of the health effects

15   associated with the installation or application of asbestos

16   containing insulation products?

17   A.   No, I don't recall any others, but I have a

18   feeling it was unnecessary to have any other, really,

19   because Fleischer-Drinker was so thorough.

20   Q.   To your knowledge, in the same period of time,

21   up until 1958, did any of the trade or technical

22   organizations of which Owens-Illinois or you personally

23   were a member conduct any surveys of the health effects

24   associated with asbestos-containing thermal insulation

25   products?

26   MR. BERRY:  In the installation thereof?

27   MR. SILBERFELD:  Yes.  I'm sorry.  Such a long

28   question.

MR. BERRY:  Let him do it again, Bill.

2      Q.    BY MR. SILBERFELD:  During the years that you

3  were involved in industrial hygiene up until 1958, to your

4  knowledge, did any of the trade or technical organizations

5  of which you or Owens-Illinois were a member conduct any

6  surveys or studies into the health effects of the

7  installation or application of asbestos-containing

8  thermal insulation products?

9      A.    I don't remember any such studies.

10     Q.    Now, the information that was gathered by

11  Owens-Illinois that you described to us this morning,

12  namely the sickness and absenteeism reports, the absence of

13  any Workers' Compensation claims, the dust counts that you

14  personally conducted and the inspections by the Department

15  of Health, and the Workers' Comp. carrier, at any time was

16  any of that information made available to any of the

17  customers of Owens-Illinois?

18     A.    I don't recall that it was.

19     Q.    We talked earlier this morning about

20  epidemiology, and the establishment of cause and effect

21  between some substance and a disease.  Are you familiar

22  with a concept called risk factors?  Or risk ratios?

23     A.    Risk ratio.  No, that doesn't register.

24     Q.    Are you familiar with a concept called relative

25  risk factors?

26     A.    Well, I can imagine what it means, but I'm not

27  actually familiar as a technical term.

28     Q.    What understanding do you have of what it means,

1   or what it might refer to?

2      A.   That would compare two operations, materials,

3   or exposures, that are not the same, but you can -- but

4   they are -- it's a comparison between them.

5      Q.   As in a controlled and exposed group?  That

6   sort of thing?

7      A.   I would think so.

8      Q.   Are there statistics that you're aware of, Mr.

9   Hazard, that relate to the significance of an

10  epidemiological connection based upon the number of people

11  in a certain group?  Do you know what I mean?

12     A.   No, I don't quite follow you.

13     Q.   I don't really know that I know what I mean.

14        In conducting an epidemiological survey, isn't it

15  true that the incidence of disease is an important factor

16  in determining whether or not there is a cause and effect

17  relationship between the substance and the disease?

18     MR. HOCH:  I'll put an objection on lack of

19  foundation, lack of expertise.

20     MR. SILBERFELD:  Okay.  Go ahead and answer.

21     THE WITNESS:  You mean for a given material?

22     MR. SILBERFELD:  Yes, sir.

23     THE WITNESS:  Yes.  Yes, I would say so.

24     Q.   BY MR. SILBERFELD:  And isn't it also true that

25  the higher the incidence of disease as a result of exposure

26  to a given material, the higher the likelihood of a cause

27  and effect relationship between the substance and the

28  disease?

1        MR. HOCH:  I have my continuing objection?

2        MR. SILBERFELD:  Yes.

3        MR. HOCH:  Thank you.

4        THE WITNESS:  Yes, I think so.

5        Q.   BY MR. SILBERFELD:  Are you aware of any

6   surveys or studies and statistics which discuss what

7   incidence is necessary in a given substance disease

8   experiment in order to establish cause and effect?

9        MR. CALLAHAN:   The question is, were you aware of it?

10       MR. KAMALIA:  Would you read that back?

11  (Record read.)

12       THE WITNESS:  What incidence?  I'm not sure what that

13  means.

14       MR. SILBERFELD:  Okay.

15       Q.   What I'm trying to get to is this, Mr. Hazard:

16  Is there epidemiological information available which would

17  assist us in determining the answer to the following

18  hypothetical:  If we had a thousand people exposed to a

19  particular substance, and five of them got a disease as a

20  result of the exposure to the substance, and 99,095 of them

21  did not, what I'd like to know, is there anything in the

22  literature that you're aware of or that you had experience

23  with that would say that is not a significant factor of

24  disease and, therefore, there is not a cause and effect

25  relationship?

26       A.   No, I don't know of anything like that.  I do

27  know that the purpose of industrial hygiene is to keep

28  anybody from getting ill from a given exposure, and that is

1   the reason for the threshold limit value concept.  That is

2   supposed to be safe for everyone, every normal person.  Not

3   handicapped people.  But I don't think that's exactly what

4   you asked.

5       MR. SELMAN:  Excuse me.  I'd like to move to strike

6   the answer as being nonresponsive.

7       Q.   BY MR. SILBERFELD:  My question really was

8   whether you personally were familiar with statistical

9   information which is commonly used, formulas which might

10  commonly be used, to establish a connection between a

11  particular substance involved and a disease based upon the

12  numbers of people who got sick as a result of exposure to

13  it.  Are you aware of any such study?

14      A.   No, I don't know of any.

15      Q.   You're familiar, are you not, Mr. Hazard, with

16  a concept called latency?

17      A.   Yes.

18      Q.   Would you explain what your understanding of

19  that concept is?

20      A.   As I understand it, when a person is exposed to

21  some outside stress or chemical, with some types of

22  materials he will have a fast reaction; with other

23  materials it will take a long time before they show their

24  effects.  And this long time, as I understand it, is a

25  latent period of that chemical.

26      Q.   And -

27      A.   A delayed reaction.

28      Q.   It's true, is it not, that there is a latency

1   period for diseases associated with exposure to

2   asbestos?

3       MR. HOCH:   You're asking that question as of today?

4       MR. SILBERFELD:   Yes.

5       MR. HOCH:   His knowledge today.

6       MR. SILBERFELD:   Yes.

7       MR. CALLAHAN:   If you know.

8       MR. BERRY:   Rephrase the question, Roman.

9       Q.   BY MR. SILBERFELD:   You understand, as you sit

10  here today, that there is a latency period associated with

11  diseases which may be caused by exposure to asbestos?

12      A.   Yes.

13      Q.   As you sit here today, what is your

14  understanding of what that latency period is for the

15  disease called asbestosis?

16      A.   I've read that it's some years.

17      Q.   Do you have any reasonable estimate for us as

18  to the number of years?

19      MR. HOCH:   In his opinion or what he read?

20      MR. SILBERFELD:   What his belief is today.

21      MR. HOCH:   Based upon his readings?

22      MR. SILBERFELD:   Based upon any --

23      MR. HOCH:   You're getting into an opinion area where

24  my objection would be.   My objection will stand.

25      THE WITNESS:   Well, as of today, my first reaction is

26  I would go to some worthwhile reference book and see what

27  the current investigators feel.   I'm not -- I don't feel

28  I'm up-to-date on the latest thing in asbestosis or

77

1     asbestos.

2          Q.   BY MR. SILBERFELD:  Well, when did you first

3     learn about the concept of latency?

4          A.   Oh, gosh.

5          Q.   Would this have been back in the thirties when

6     you first heard about the disease?

7          A.   Yes.

8          Q.   At that time what was the prevailing thought,

9     if you will, as to what the latency period was as far as

10    you can recall?

11         MR. HOCH:  Objection; vague, ambiguous and

12    unintelligent.  For what?  What are we talking about?  What

13    kind of context?  What kind of environment?

14         MR. SIMON:  He's talking about the latency period

15    between initial exposure to asbestos fibers and the

16    onset of disease or manifestation.  Is that how you

17    understand the question?

18         THE WITNESS:  Un-huh.

19         MR. HOCH:  Can we have a coherent question?

20         MR. SILBERFELD:  You got it.

21         MR. HOCH:  That was an addendum to a question.

22         MR. CALLAHAN:  You better read that one again.

23         MR. BERRY:  It's two different pieces.

24         Q.   BY MR. SILBERFELD:  At the time that you first

25    learned of the disease process called asbestosis in the

26    thirties, did you obtain an understanding at that time of

27    what latency period was associated with asbestosis,

28    meaning the time from first exposure to the substance and

1    the onset of disease or manifestation of symptoms?

2        A.   Well, my recollection is that I thought it was

3    a matter of some years.

4        Q.   Can you define that any further for us?

5        A.   Well, I just don't know.  It's very fuzzy.

6        Q.   Longer than 10 years?

7        A.   No, not necessarily.  But sometimes, maybe.

8        Q.   Mr. Hazard, are you familiar with a term or a

9    concept called the dose response relationship?

10       A.   Yes.

11       Q.   What is your understanding of that, sir?

12       A.   The dose response for a given material depends

13   on the concentration that the person is exposed to and the

14   length of time that he's exposed.

15       Q.   So as an example, if you have a higher

16   concentration for a shorter period of time, that may equal

17   a lower concentration for a longer period of time, depending on

18   what the actual numbers are?

19       A.   That's possible.

20       Q.   That's essentially the concept of dose response,

21   is it not?

22       A.   Un-huh.

23       Q.   Is that a yes?

24       A.   Yes.

25       Q.   With regard to asbestosis, is it your

26   understanding that there is a cumulative effect to the

27   injury; meaning, a continued exposure tends to worsen the

28   effect of the disease, or not?

1    A.   Well, it depends on what the exposure is.  If

2    the exposure is to a level that's lower than the threshold

3    limit value, if you just said it doesn't apply, because

4    that's what the threshold limit value was for.  Now, when

5    you get above the threshold limit value, with some

6    materials there can be a cumulative effect.

7    Q.   Okay.  With regard to the health problems that

8    you understood existed in the 1950's as a result of

9    exposure to asbestos, we've already talked about

10   asbestosis.  Are there any other health effects that

11   you understood to exist with regard the period of the

12   1950's?

13   A.   Well, in the 1950's we thought that

14   the big effect of asbestosis was a simple one, shortness

15   of breath.  It was totally unlike silicosis caused by

16   breathing free silica sand because there the effect is

17   to make the person susceptible to tuberculosis, pulmonary

18   tuberculosis.  That's very serious.

19   But the only thing that we could identify in the case

20   of asbestosis -- and this is all from reading because

21   we never had any asbestosis.  It's not my personal

22   experience -- was the shortness of breath.

23   Q.   But you kept abreast of what was going on in

24   the literature in order to do the best job you could for

25   the company?

26   A.   Yes, sir.

27   Q.   Did you understand in the 1950's, Mr.

28   Hazard, that there was a risk of cancer associated with

1    exposure to asbestos?

2       A.   No.

3       Q.   Had you read anything in the 1950's,

4    be it a case report or an epidemiological survey, that

5    suggested cancer as a possibility as a result of

6    exposure to asbestos?

7       A.   No, sir, we didn't connect the two.  Or didn't

8    read about a connection.

9       Q.   What is your understanding, Mr. Hazard, of the

10   relationship between Owens-Illinois Glass Company and

11   Owens-Corning Fiberglas between 1952 and 1958?

12      A.   Well, in the early days, of course,

13   Owens-Illinois and Corning glass works formed

14   Owens-Corning Fiberglas, and at that time one of them

15   had a third of the stock and a third was held publicly or

16   not.  Through the years, and I don't know when the date was,

17   what part of 1958 -- or the 1950's -- the holdings

18   of Owens-Illinois and of Corning glass works in this

19   daughter company, OCF, diminished, so the connection

20   between Owens-Illinois and OCF became less and less

21   and less.  And in the 1950's I would say that we

22   regarded OCF as a completely separate company.  We had

23   no communication at my level between them, and they were

24   just another company.

25      Q.   Was there an industrial hygienist counterpart

26   to you at OCF that you knew of between '52 and '58?

27      A.   I didn't know of any.

28      Q.   Well, there may not have been a person who had

81

1   the title of industrial hygienist.  Was there somebody that

2   you had at least intermittant contact with at OCF who

3   dealt with health issues as you did?

4       A.   No, I don't remember any such person.

5       Q.   Are you aware, sir, that at some point in time

6   Owens-Corning Fiberglas began to distribute Kaylo

7   manufactured by OI?

8       A.   Yes.

9       Q.   Do you know when that was?

10      A.   58, I would say.  56.

11      Q.   Was it just before the sale of the division to

12  Owens-Corning Fiberglas, or many years before?

13      A.   Oh, I misunderstood.

14      Q.   I was talking about just a distribution

15  agreement rather than the sale of the division.

16      A.   I remember there was a distribution agreement,

17  and I don't know when it was.

18      Q.   In 1958 the Kaylo division was ultimately

19  sold to Owens-Corning.

20      A.   Yes.

21      Q.   Between the period of 1950 to

22  participate, let's say, did you know a man by the name of

23  Edward Ames?

24      A.   Yes.

25      Q.   How long had you known Mr. Ames?

26      A.   Well —

27      Q.   If you can recall, sir.

28      A.   I'm trying to dredge it up.  He was the

1  director of public relations, I remember, when I got to

2  know him.

3      Q.   For what company?

4      A.   OCF.  And prior to that, it seems to me he

5  worked for Owens-Illinois, but I don't -- he was in the

6  publicity field, as I recall it, or advertising, or

7  something of that nature.  That's pretty fuzzy in my memory.

8      Q.   Do you know a man by the name of Greggory?

9  That's a last name.

10     A.   I know the name but I don't believe I know the

11  man.

12     Q.   Do you know a Harold Boeschenstein in those

13  years?

14     A.   Yes.

15     Q.   Who was Mr. Boeschenstein?

16     A.   He was originally with Owens-Illinois -- in

17  fact, beginning in the thirties, where he was -- he was

18  Sales Manager at Owens-Illinois.  And when OCF was

19  set up eventually, I'm not sure when, he left

20  Owens-Illinois and joined OCF, where he stayed for

21  the rest of his career.  He was the President of OCF, as

22  I recall.

23     Q.   During that same period, 1950 to '58,

24  did you know a man by the name of John Black?

25     A.   John Black.  No, that doesn't register.

26     Q.   How about Everett Shuman?

27     A.   Yeah, I knew Ev Shuman.

28     Q.   Who was Everett Shuman?

1      A.   He was with Owens-Illinois as a Plant

2  Manager for one of our Jersey plants.  I don't know whether

3  it was Berlin or just where it was.

4      Q.   Have you had any contact with Mr. Shuman,

5  say, in the last 12 months?

6      A.   No, sir.

7      Q.   Do you know a man by the name of Richard

8  Bech?

9      A.   Dick Bech?

10     Q.   Yes, sir.

11     A.   Yeah.  Do you know him?  The reason I ask is

12  that there are a couple of Dick Becks, and the one I know

13  is lame.  He has a limp.

14     Q.   I don't know.

15     A.   I don't know if that's the one or not.

16     MR. SIMON:  Tell you next week.

17     Q.   BY MR. SILBERFELD:  Who is the Richard Bech

18  that you knew?  Are you saying you knew several of them?

19     A.   Well, I knew the names Richard Bech around that

20  time.  He was the only one I knew.

21     Q.   Who was the one that you knew?

22     A.   He worked for Owens-Illinois, and it seems

23  to me he was in the accounting end of the business.

24     Q.   How about John Viverberg?  Does that name

25  ring a bell?

26     A.   The name rings a bell, but I don't know him.

27     Q.   At any time up until 1958 when you were gathering

28  this information about the Berlin and Saryville

1   plants, did you ever have occasion to share that

2   information with anyone at Owens-Corning Fiberglas?

3        A.   No.

4        Q.   Did you ever discuss the work that you were

5   doing on air samples and this human observation of the

6   Berlin and Saryville plants with Mr. Shuman?

7        A.   Well, as I said, I knew Ev Shuman, and I

8   can't place just what capacity he was in when I did know

9   him.  It's possible that I talked something about dust

10   counts with him.

11        Q.   Do you recall ever discussing with Edward

12   Ames the work done on behalf of your company by Saranac?

13        A.   Discussing it with Edward Ames?

14        Q.   Yes, sir.

15        A.   I don't recall that.

16        Q.   Do you recall discussing the results of the

17   Saranac reports with Mr. Shuman?

18        A.   No.

19        Q.   As far as you can recall, Mr. Hazard, did

20   Mr. Shuman ever discuss with you any work that he was

21   doing with regard to substituting asbestos in the

22   insulation products manufactured by your company?

23        A.   No, I don't think he ever discussed it with me.

24        Q.   Now, are you familiar with the name Dr.

25   Schepers?

26        A.   Yes.

27        Q.   And when you first heard about Dr. Schepers,

28   in what capacity was he functioning?

1      A.   Well, as I remember it, he came from South

2   Africa.  I think he did work in the mining industry over

3   there.  And when he came to this country, and I don't know

4   why he came to this country, he gave some papers, one or

5   two papers at some of these industrial hygiene or

6   occupational medicine meetings.  So I guess that's when I

7   first saw him or -- I guess I heard of him before that.

8   And then the next time was when he was at Saranac

9   laboratory as the replacement for Vorwald, Dr.

10  Vorwald.

11      Q.   Yes, sir.

12      A.   Yeah.

13      Q.   Now, I asked you earlier this morning whether

14  you were familiar with the reputations of Dr. Gardner

15  and Dr. Vorwald.  Did you at some point become familiar

16  with the reputation of Dr. Schepers?

17      A.   No, I didn't -- I didn't know him that well.  I

18  knew him from hearing him talk at meetings and from, as I

19  recall, he was a co-author or author of some papers that I

20  probably read.  But I didn't have a very strong opinion of

21  his technical ability at that time.

22      Q.   You mean you had no opinion one way or the

23  other?

24      A.   Yeah.

25      Q.   One of the exhibits that we've identified here

26  today is a Xerox of the published final report.  Do you

27  recall that document, sir?

28      A.   Yes.

1    Q.   That was published in a journal in about 1955,

2  do you recall that?

3    A.   Yes.

4    Q.   Okay.

5    A.   Well, let's see.  Fifty-five?

6    Q.   I think the date on it is about 1955.

7    A.   Is it?  I don't recall the animal experiments

8  at Saranac had been completed before he published that.

9  Well, the date is on it, that's it.

10    Q.   Okay.  Do you recall being consulted by Dr.

11  Schepers or anyone at Saranac prior to the publication

12  of the final report?

13    A.   As I remember it, we were not consulted.  We

14  wanted them to publish it.  We wanted them to publish it

15  very much.  We wanted very much to have it published.  But

16  there was a delay, and we didn't see any draft of the paper,

17  and finally it appeared.  Kaylo was not mentioned in

18  it.  It was the chemical name that was used.

19    Q.   As you just said, in the actual published

20  report the name Kaylo does not appear, correct?

21    A.   That's right.

22    Q.   It talks of hydrous calcium silicate.

23    A.   Yes.

24    Q.   Notwithstanding the fact that the name

25  Kaylo does not appear in the published report, there

26  is no doubt in your mind that the product involved in that

27  study is Kaylo, isn't that right?

28    A.   Yes, that's the way I feel.

1    Q.    Okay.  And the published version that has

2    Dr. Schepers's name on it is in fact the work that was

3    conducted by Dr. Gardner and Dr. Vorwald earlier

4    in the 1940's and the early 1950's?

5    A.    I believe that's correct.

6    Q.    To your knowledge, did Owens-Illinois have

7    an understanding or an agreement with Saranac that they

8    would have prior publication approval of any manuscript

9    that went to press?

10   A.    Not to my knowledge.

11   Q.    Was there a feeling at Owens-Illinois when

12   the article was published that they should have been

13   consulted prior to the publication of the article?

14   A.    We felt that this would be the usual practice,

15   that the sponsor of the experiments, which was

16   Owens-Illinois, would have some contact, not review of

17   the draft, but at least know where it stood.  And there was

18   no such contact.

19        On the other hand, we were so glad to get it in print,

20   but we didn't get too mad at him.  Especially since it was

21   a long delay before it did get in print.

22        Q.    Now, at some point in time there was discussion,

23   was there not, Mr. Hazard, about the Melin Institute

24   taking over the running of Saranac lab?  Do you recall

25   that?

26   A.    Vaguely I recall it.  I think there was some

27   discussion of that.

28   Q.    Okay.

1    A.   They never did it, of course.

2    Q.   Can you tell us who the Melin Institute was?

3    A.   Well, Melin Institute is a very reputable

4    research organization in Pittsburgh, part of the Melin

5    foundation, and they used to have what they call fellowships in

6    the Melin Institute.  And one of these fellowships housed

7    the Industrial Hygiene Foundation.  That was in one of

8    these Melin Institute fellowships.  So Melin  -- the

9    Industrial Hygiene Foundation was sponsored by industry,

10   industrial companies, for research and study in this field

11   of industrial hygiene, and it was through this activity

12   that Melin Institute was mentioned, I guess, as a

13   possible successor for Saranac laboratory.

14   Q.   As far as you recall today, what were the

15   circumstances surrounding the possible takeover of

16   Saranac by the Melin Institute?

17   A.   I don't know.

18   Q.   Do you recall anything about what was going on

19   at Saranac that would occasion even a discussion of a

20   takeover by Melin or anyone?

21   A.   No.  I don't remember -- or I didn't know any

22   of those details.  I did -- I do have a recollection that

23   Saranac laboratory at that period was in hard financial

24   times.  And why that was, I don't know.  Except they had

25   these series of directors, and whether that involved

26   Schepers directly or not, I don't know.  But they were in

27   hard times.

28   Q.   Now, up through -- can you place that in time

1   for us?

2         A.   Oh, gosh.

3         Q.   Are we talking middle 1950's?

4         A.   Probably late 1950's.  I thought that

5   when that Schepers, the Saranac paper was published,

6   that Saranac laboratory was in pretty good shape.  I

7   just assumed that.  I didn't know the details.  And when

8   they became hard up, the organization, from a financial

9   standpoint, I don't know when it was.  I'd say late

10  1950's.

11        Q.   Okay.  Did you personally ever participate in

12  an effort to have Dr. Schepers replaced at Saranac

13  laboratory?

14        A.   Have him replaced?

15        Q.   Yes.

16        A.   No.

17        Q.   Did you know at any time that there was a

18  movement afoot to have Dr. Schepers replaced at

19  Saranac laboratories?

20        A.   Well, I certainly didn't know it at that time.

21        Q.   Have you heard of that since?

22        A.   I've heard of it since.

23        Q.   Okay.  When did you hear of it since?

24        A.   Well, to be honest with you, it was when this

25  whole Kaylo thing came up.  Two years ago.

26        Q.   Two years ago.  How did you hear of it?

27        A.   I don't know.  Somebody told me.  I don't know

28  who.  Somebody told me.

1    Q.   What did they tell you, in substance?

2    A.   Well, just about what you've said; that there

3  was a movement to replace Dr. Schepers.  I don't know

4  who told me or what the movement was about.

5    Q.   Do you know the reason for it?

6    A.   No.

7    Q.   Do you have any personal opinion as to any

8  reason somebody might have for removing Dr. Schepers or

9  seeing that he was removed?

10    A.   The only thing I can read into it is that

11  Saranac laboratory might have been on hard times, which

12  ties in with the rumor that the Melin Institute was in

13  some negotiation for the laboratory.  And that's about all

14  I know.

15    Q.   While you were the industrial hygienist for

16  Owens-Illinois, did you ever recommend that a warning

17  label of any type be used on Owens-Illinois products?

18    A.   No.

19    MR. SILBERFELD:   Let's go off the record a second.

STOP

20

21                    EXAMINATION

22

23  BY MR. SIMON:

24    Q.   Mr. Hazard, you maintained a file containing

25  the results of the Saranac lab studies; is that correct?

26    A.   Yes.

27    Q.   When the Kaylo division was sold to

28  Owens-Corning in 1958, what is your understanding of

1   what became of your file or files dealing with the

2   Kaylo studies?

3        A.   The files, my files, relating to Kaylo

4   were packed up in cartons Friday afternoon by my girl and

5   me, and they were carried over by the janitors to

6   Owens-Corning's office.  And that's all I know about

7   what happened.  I mean, what else there was.

8        Q.   Do you know that to be a fact, sir?

9        A.   Yes.

10       Q.   Did your files include all of the interim

11   reports as well as the final report issued by Saranac?

12       A.   Yes.

13   MR. SIMON:  Thank you.

14   MR. SILBERFELD:  The last thing I have is yesterday,

15   Mr. Hazard, we took Mr. Ames' deposition, and one of the

16   documents he produced was this document here that's been

17   previously marked as Exhibit 25 to Mr. Ames' deposition.

18   I don't want to remark it again.

19       Q.   Let me show it to you and ask if you recognize

20       A.   Oh, yes, I do.

21   MR. HOCH:  Roman, would you refresh our recollection?

22   MR. SILBERFELD:  That's the excerpt of the transcript

23   of Mr. Hazard's speech to the Rhode Island group.

24   MR. HOCH:  Thank you.

25   THE WITNESS:  I remember it.

26   MR. SILBERFELD:  You remember it, sir?

27   THE WITNESS:  Yes.

28       Q.   BY MR. SILBERFELD:  What was the occasion for

1   the talks or the remarks that you gave to the Rhode Island
2   Industrial Health Institute?  Was there an annual meeting
3   or quarterly meeting or something?
4       A.   Well, I don't remember.  It was, I'd say, an
5   annual meeting.  It certainly wasn't quarterly.  And I am
6   sure they had written to me and asked me to give a talk.
7   But outside of that, I don't have any vivid recollection.
8   I remember this because it always caught my eye, I wondered
9   why a reprint from that journal appeared on yellow colored
10  paper.
11      MR. SILBERFELD:  Probably wasn't yellow to start with.
12      A.   It was.  Usually it's on white paper.
13      Q.   This, as I understand it, is an excerpt from a
14  longer speech or set of remarks.
15      A.   Well, that I don't remember.  It says excerpt --
16      Q.   Okay.
17      A.   -- I believe, doesn't it?
18      Q.   Yes.
19      A.   But I don't know how much longer the original
20  was.
21      Q.   Did you personally do the research for the
22  statements that are contained at least in the excerpt?
23      A.   Well, I'd have to see the excerpts.
24      MR. SILBERFELD:  Let's go off the record a minute.
25  (Discussion held off the record.)
26      MR. SILBERFELD:  Back on the record.
27      Q.   Mr. Hazard, during the break did you have an
28  opportunity to look at that excerpt from your remarks to

1    the Rhode Island Industrial Hygiene Institute?

2        A.   I looked at the last, I think there were four

3    numbered paragraphs at the end.

4        Q.   I believe my question before we got off during

5    the break was whether or not you personally conducted the

6    research supporting the statements made in that excerpt.

7        A.   Well, I didn't read the whole thing.  I looked

8    at these four items here.

9        Q.   Those four items are what --

10       A.   The --

11       Q.   Are they the conclusion?

12       A.   The following points might well be discussed

13   with employees when they are hired and periodically

14   afterwards.  It doesn't say they are conclusions.  These

15   are points to be discussed when people are hired who work

16   with the glass fiber.

17       Q.   Did you personally argue those remarks as

18   opposed to deliver them even though somebody else may have

19   written them?  Did you write those remarks?

20       A.   I think I wrote them, yes.

21       Q.   Thank you.

22       Now, Mr. Callahan has been good enough to produce for

23   us this box of three by five cards and notes.  Do you

24   recognize the box?

25       A.   I do.

26       Q.   Would you tell everyone what the box is?

27   Consists of?

28       A.   Well, not the box itself, but the notes are

1    notes that I made when I was asked to give a talk on some

2    subject.  They are not verbatim.  They are notes, just to

3    jog my memory.

4         Q.   They have been previously referred to in

5    another deposition as speech cards.

6         A.   Okay.

7         Q.   Is that a fair characterization of them?

8         A.   Yes.

9         Q.   And there are various subject headings here,

10   Mr. Hazard.  Let me just show you one that says, "AIHA"

11   on it, referring to the American Industrial Hygiene

12   Association?

13        A.   Yes.

14        Q.   Were these heading tabs put on by you as you --

15        A.   Yes.

16        Q.   -- collected the cards?

17        A.   Yes.

18        Q.   Also, at least on some of these stacks that

19   have rubber bands around them and have these little

20   identifying tabs, there are little yellow pieces of paper

21   stuck in them that says, "Post 1958" or "Pre 1958," in

22   handwriting.  Do you know who created those little slips of

23   paper?

24        MR. CALLAHAN:  If you know.

25        THE WITNESS:  I don't know.  Do you have any other of

26   those?

27        MR. SILBERFELD:  Sure.  Here is another one.

28        THE WITNESS:  No, I don't know.  Frankly, it doesn't

1    look like my writing to me.

2        MR. SILBERFELD:  Okay.

3        Q.   Have you had a chance to look at this box today?

4        A.   No.

5        Q.   Would you take a look for a minute.  In looking

6    at it, tell me if there are any major subject headings of

7    cards that you believe are missing.

8        A.   Does anyone know where Penington, New Jersey

9    is?  Penington.

10       MR. BERRY:  Yes, Bill.

11       THE WITNESS:  If you're interested to note, that

12   these are speech cards for a talk I gave before the

13   Penington Lions Club in 1944.

14       Q.   BY MR. SILBERFELD:  Speaking of the Penington Lions Club,

15   what's the ceiling made of -- no.

16       THE WITNESS:  I thought there were about an equal

17   number of cards based on trips, routine trips that I made

18   to Owens-Illinois plants.  And when you asked me if all

19   those speech cards were there, I don't see those trip

20   speech cards.  I don't know where they are.

21       Q.   BY MR. SILBERFELD:  How did you keep or

22   catalogue these cards during the time that you were

23   employed at Owens-Illinois?

24       A.   Pretty much the way they are now.

25       Q.   In a box of this kind?

26       A.   No.  No.  They were in a file drawer.

27       Q.   File drawer.

28       A.   But if they related to the American

1    Industrial Hygiene Association, why, I'd have those in a

2    group.

3         Q.   As they are here?

4         A.   Yes.  If it was the Industrial Health

5    Foundation, I would have those in a group.  Or in the case

6    of plants, I'd have all the cards for a given plant in a

7    group.

8         Q.   And you believe that there is probably an equal

9    number of cards to what's existing here that had to do with

10   trips you made to various OI plants?

11        A.   Yes, that's my recollection.  About the same

12   number.

13        Q.   Were those trip report cards kept in the same

14   manner as these were kept in a file drawer somewhere?

15        A.   Yes, sir.

16        Q.   Do you know what's become of those cards?

17        A.   I don't know.

18        Q.   Do you know how it happened that these

19   particular cards managed to get from the file drawer at

20   OI to this table today?

21        A.   I was wondering that, and I don't know.

22        MR. SILBERFELD:  I don't have anything further, other

23   than I'd like to talk to Mr. Callahan, probably off the

24   record, about some procedure for copying these.  We can do

25   that at the end.

26        MR. CALLAHAN:  All right.

27        MR. SIMON:  Just a couple questions, Mr. Hazard.

28

1              FURTHER EXAMINATION

2

3    BY MR. SIMON:

4        Q.    As a member of the Industrial Hygiene

5    Foundation, did OI receive a publication known as the

6    IHF Digest?

7        A.    Yes.

8        Q.    Was that routinely circulated to you?

9        A.    Yes.

10       Q.    Did you review it each month?

11       A.    When time permitted, yes.

12       Q.    That publication contained abstracts of new

13   publications concerning the industry?

14       A.    Yes, sir

15       Q.    Including medical engineering, chemical and

16   toxilogical topics?

17       A.    Yes.

18       MR. SIMON:  Thank you.  That's all I have.

19       MR. BOGAN:   I've got several questions.

20       MR. BERRY:  Joe, you want me to go first or do you

21   want me to do my act?

22       MR. BOGAN:  Doesn't matter to me.  Let me go ahead

23   and we may be able to wrap it up a little bit quicker.

24

25                        EXAMINATION

26

27   BY MR. BOGAN:

28       Q.    Mr. Hazard, I represent Owens-Corning

1    Fiberglas in the litigation.  We appreciate your bearing

2    with us today under all the questioning.

3        I want to go back for a moment to some testimony you

4    gave a few minutes ago regarding the Kaylo files which

5    you said were packed in a carton on a Friday afternoon and

6    carried over by janitors to Owens-Corning Fiberglas.  Do

7    you recall that?

8        A.   Yes.  I remember assisting with the packing of

9    them.  And I did not actually see the janitors pick them up

10   because we went home at 4:30 and they picked up the files,

11   these files and other files after the building was empty.

12   But it was my impression that they were carried over to

13   Owens-Corning's offices by the janitors.

14       Q.   As far as your own knowledge is concerned, you

15   don't know one way or the other where they were carried; is

16   that a fair statement?

17       A.   Yes.

18       Q.   I want to show you a document I've marked

19   Defendant's 1, and ask you to take a moment to leaf through

20   it.  It's about four or five pages in length.  Familiarize

21   yourself with it.  It is a cover memo and a draft pamphlet

22   dated December 9, 1952.  The cover memo is to Mr. George E. White

23   from Mr. Curtiss W. Howard on the Owens-Illinois Glass Company

24   memo stationery, I believe.

25       (Whereupon Defendant's 1 was marked for

26       identification at this time.)

27       MR. SIMON:  That will be Defendant's A.

28       MR. BOGAN:  He called it Defendant's 1.

1      MR. SILBERFELD:  Maybe you could identify the rest of

2  them for us.

3      MR. BOGAN:  There is only a couple of others.

4  Defendant's 2 is -- appears to be a memorandum dated 6/12/56,

5  to W. J. Stewart, signed by W. E. H., with no subject

6  title on it.

7      Defendant's 3 is a report of some 24 pages in length,

8  entitled "Hydrous calcium silicates," looks like Roman

9  Numeral V, "physical and chemical properties of Kaylo

10  products."  And there is a handwritten date in there of

11  October 13, 1952.

12      (Whereupon Defendant's Exhibits 2 and 3 were marked

13      for identification at this time.)

14      THE WITNESS:  I remember this draft.

15      Q.   BY MR. BOGAN:  There is some acclaim given to

16  you on the front page that says in paragraph two, "Considerable

17  time has been spent on this subject with Dr. Shook and

18  Bill Hazard, both of whom made major contributions."

19  Are you familiar with the draft itself, the draft pamphlet?

20      A.   I know I've read it.

21      Q.   I want to turn your attention to page four and

22  ask you, if you would, sir, to read the short paragraph

23  that's stated there under "general conclusions."  Would you

24  read it out loud, if you would?

25      A.   Yes.  "The general conclusions:  Experience in

26  the factories and field and research findings have proven

27  that normal handling of Kaylo products is safe from a

28  health standpoint.  The usual precautionary measures taken

1    for any product containing asbestos are needed in a

2    continued exposure to heavily concentrated Kaylo dust."

3        Q.    All right.  Mr. Hazard, did that statement

4    represent your professional opinion as an industrial

5    hygienist of the product Kaylo on or about December 9,

6    1952?

7        A.    Very briefly, it did, yes.

8        Q.    Did that statement represent your professional

9    opinion as an industrial hygienist of the product

10   Kaylo in the Spring of 1958 when the Kaylo plant

11   was sold to Owens-Corning Fiberglas?

12       A.    Yes.

13       Q.    Did that statement you just read represent, to

14   your knowledge, the position of Owens-Illinois related

15   to the product Kaylo on or about December 9, 1952?

16       A.    Yes.

17       Q.    And the same question as far as your knowledge

18   of the position of Owens-Illinois related to the product

19   Kaylo on or about the spring of 1958 when the

20   Kaylo plant was sold to Owens-Corning Fiberglas?

21       A.    Yes.

22       Q.    Now, if you would, I'm going to show you an

23   exhibit previously marked number 73, which is the --

24   appears to be a letter that you wrote to Ira Brought,

25   dated June 12, 1956.  I think you've indicated earlier

26   that you're at least familiar with that letter.

27       A.    Yes, sir.

28       Q.    I want to show you Defendant's 2, which is a

1    memorandum apparently by W. E. H., I assume that's you, to

2    Mr. W. J. Stewart of the same date as the letter to

3    Ira Brought, and have you take a look at that for a

4    moment.

5        A.   Yes.

6        Q.   From reading the memorandum -- incidently, did

7    you author this memorandum?

8        A.   Yes

9        Q.   Those are your initials at the bottom?

10       A.   W. G. H.

11       Q.   G. H., excuse me.  In reading this memorandum,

12   does it refresh your recollection that the letter we've had

13   marked as Exhibit 73 is somehow associated with that

14   particular memorandum?

15       A.   Yes.  It's the same Mr. Ira Brought that

16   they both relate to.

17       Q.   Do you know who Mr. Ira Brought was

18   employed by on or about June 12, 1956?

19       A.   No, I don't know.  I have a feeling that he may

20   have been employed by Toledo Edison, because his office is

21   in the Edison building.

22       Q.   Reading the first paragraph of Exhibit 73,

23   "ttached is a reprint of the article entitled, 'The Effect

24   of Inhaled Hydrous Calcium Silicate Dust on Animal Tissue AMA

25   Archives of Industrial Health,' pages 338 to 360,

26   1955, what you asked for on the phone this morning."   Do

27   you know why Mr. Brought would have been requesting such

28   a reprint?

102

1    A.   No, I don't know why he was.   And I never met

2   him, talked with him on the phone and wrote to him.

3    Q.   Have you ever received any information that

4   Mr. Brought was employed by Owens-Corning Fiberglas

5   on or about the date of this letter?

6    A.   I don't remember any such information.

7    Q.   If you would, would you read into the record

8   the paragraph starting with "the reaction was milder."

9    A.   "The reaction was milder than what would result

10  from breathing dust of the commercial product 65 percent

11  mag asbestos workers and applicators are exposed to

12  higher concentrations of asbestos dust during their

13  normal work than would result from handling Kaylo."

14   Q.   Could that have been 85 percent mag?

15   A.   Yes, it could have.   Yes, it is.

16   Q.   This was, I take it, your statement that you

17  made in this letter on that date?

18   A.   Yes.

19   Q.   As of that time, being an industrial hygienist

20  and working for Owens-Illinois, was it your belief that

21  that statement was accurate?

22   A.   Yes.

23   Q.   As of the sale of the Kaylo plant to

24  Owens-Corning Fiberglas in the Spring of 1958, had you

25  changed your mind regarding the comments you made in the

26  letter that you've just read into the record?

27   A.   No.

28   Q.   Finally, I'm going to show you a somewhat

1   lengthy report which we've identified as Defendant's 3, and

2   ask you simply to leaf through it and see if it appears

3   familiar to you.

4        A.   I've read it. I mean, I'm sorry, I thumbed

5   through it.

6        Q.   You thumbed through it.  Mr. Hazard, have you

7   seen that document before?

8        A.   I don't remember.

9        Q.   Are you familiar with the general contents

10  contained therein?

11       A.   Not very familiar.  There is one thing that

12  makes me think that I haven't seen it, because -- there is

13  one thing that makes me think I haven't seen it, because

14  towards the end here they talk about "... the hazards of

15  such dust to health have been investigated by the

16  Trudeau laboratories at Saranac lake, New Jersey."

17  If anything stuck in my mind, I think that would.  There is

18  no Saranac lake, New Jersey, where this work was

19  done.

20       Q.   Do you know who the author of that document was?

21       A.   No.

22       Q.   It appears to be -

23       A.   Well, prepared by, here it is here.  G. L. -

24       Q.   Is that Kalousek?

25       A.   It looks like it.

26       Q.   Do you know who that individual is or was?

27       A.   No, sir.

28       Q.   Do you know any of the other names shown on

1  page two of that document?

2      A.   W. C. Taylor approved it.  I heard his name.

3  I didn't know him.  And J. W. Hackett noted it, and I

4  knew Jim Hackett.  He was the Director of Research,

5  seems to me, at one point in Owens-Illinois.

6      Q.   Does this appear to you to be -- have you ever

7  seen a similar report?

8      A.   Yes.  The title page was the page they used,

9  the cover of all their research reports.

10     Q.   Research reports?

11     A.   Yes.

12     Q.   Directing your attention to page 22, the second

13 paragraph, notwithstanding the misplaced geography of

14 Saranac, would you read that second paragraph into the

15 record, please.

16     A.   "The dust of Kaylo consists of a hydrous

17 calcium silicate and asbestos, and the hazards of

18 such dust to health have been investigated by the

19 Trudeau laboratories at Saranac lake, New Jersey.

20 The hydrous calcium silicate is harmless and the

21 asbestos manifested the usual effect of this mineral.

22 The actual hazard to health of those handling Kaylo wasv

23 considered to be small."

24     Q.   As of October of 1952, did you agree with the

25 statement you just read?

26     A.   Let me see the -- the first part of the

27 sentence, the "hydrous calcium silicate is harmless," I

28 agree with.  "The asbestos manifested the usual effect of

1   this mineral," that is a very indefinite statement.

2        Q.   Indefinite from what standpoint?

3        A.   It does not point out that the exposure to

4   asbestos from handling Kaylo was minimal.

5        Q.   Well --

6        A.   True, a big cloud of asbestos dust, you

7   know what the usual effects are.

8        Q.   How about the last sentence which states "the

9   actual hazard to the health of those handling Kaylo

10  was considered to be small."  Did you agree with that

11  statement in 1952?

12       A.   Well, small -- it was small all right.

13       Q.   And your professional opinion as an industrial

14  hygienist, you would agree that the actual hazard to the

15  health of those using Kaylo as of 1952 was considered

16  to be small?

17       A.   Considered to be small?  Yes.

18       Q.   And did your opinion change in that time until

19  the plant was sold to Owens-Corning Fiberglas in 1958?

20       A.   No.

21       Q.   And the last sentence relating to the actual

22  hazard to the health of those handling Kaylo

23  considered to be small, was it your belief that in 1952,

24  through 1958, when the plant was sold to Owens-Corning,

25  it was the position of Owens-Illinois that that

26  statement was correct?

27       A.   That the hazard was small?

28       Q.   Right.

1    A.    Yes.

2    MR. BOGAN:  Thank you very much, Mr. Hazard.

3    MR. SIMON:  Anybody else have questions?

4    MR. HOCH:  I do.

5    MR. BERRY:  Why don't you go ahead and then we'll see

6    what the time is.

7

8                        EXAMINATION

9

10   BY MR. HOCH:

11       Q.    Mr. Hazard, can you hear me?

12       A.    Yes, sir.

13       Q.    My name is Steven Hoch, Mr. Hazard, I represent

14   Johns-Manville in this litigation.

15       I want to make it clear that in the -- in your

16   training and experience as an industrial hygienist you do

17   not hold yourself out to be a medical expert; is that

18   correct?

19       A.    That's correct.

20       Q.    And when it comes to the point in industrial

21   hygienist analysis of a situation, when he wants to know

22   about a disease and a disease process he would rely upon

23   physicians for that information, correct?

24       A.    Yes.

25       Q.    Discussing, if we can -- I apologize, we may

26   have to jump around because I've taken some notes as the

27   deposition has gone on and I want to try to get it all tied

28   up so I may be jumping around subjects.

1    In discussing the reports and the ongoing work that

2    was done at Saranac sponsored by Owens-Illinois, you

3    were involved in it, as I understand it, from the time you

4    came back from your service with the Public Health

5    Department up until the report was published, correct?

6        A.   Yes.

7        Q.   During that time period, which would be about

8    1946 until 1955, was there, in your impression as an

9    industrial hygienist, a significant problem with

10   tuberculosis in this country?

11       A.   I don't know how to answer that because

12   tuberculosis has always been a problem, and, you know,

13   what's significant to --

14       Q.   Okay.  At some time in the 1950's, is it

15   correct that there was a drug that was discovered and used

16   as a successful treatment to prevent and cure tuberculosis?

17   Are you familiar with that?

18       A.   To help cure it, yes.

19       Q.   As a result of that -- strike that.

20       Saranac labs, prior to the invention of that drug,

21   was primarily in the business of investigation into

22   tuberculosis?

23       A.   Yes.  Just one thing:  The institution was

24   founded as a tuberculosis sanitarium, and the Saranac

25   laboratory was a small adjunct of the sanitarium, which was

26   a very large hospital.

27       Q.   I understand that.  In the reports as we've

28   looked at them here today that were marked as exhibits,

1    there was constant reference made to a possibility of

2    causing tuberculosis.

3         A.   Yes.

4         Q.   Is that correct?

5         A.   Yes.

6         Q.   There was a significant problem in your mind,

7    was there not, sir, that the ingredients that went into

8    making Kaylo contained substances which could cause or

9    increase a risk of tuberculosis; is that correct?

10        A.   Well, one ingredient, yes.

11        Q.   Which ingredient was that?

12        A.   The -- may I change that?

13        Q.   Sure.

14        A.   I remember none of the ingredients as fostering

15   tuberculosis.

16        Q.   That was the outcome of the report, correct?

17        A.   Well, I'm not sure what you mean.  That was

18   common knowledge.  We knew what was in Kaylo, and we

19   knew what the effect of each ingredient was.

20        Q.   The reports by Dr. Vorwald, do they not, sir,

21   discuss the fact that tuberculosis was not --

22        A.   I see what you mean.

23        Q.   You understand what I'm saying?

24        A.   Yes.

25        Q.   He was -- the Saranac studies, in part,

26   were to determine whether or not anything in Kaylo

27   would increase the risk of tuberculosis?  That was one of

28   the things you wanted to find out?

1    A.    That was one of the things they investigated,

2  yes.

3    Q.    One of the other things you wanted to find out,

4  if any of the products or substances used in Kaylo

5  would cause silicosis?

6    A.    Yes.

7    Q.    Now, these reports and the studies done by

8  Saranac prior to Dr. Schepers publishing his article,

9  are you aware of the distribution of any of those reports

10  outside of Owens-Illinois?

11    A.    Are you speaking of the reports on the animal

12  experiments?

13    Q.    Right, the reports that we have here in

14  exhibits.

15    A.    Yeah.

16    Q.    In the 1 through 74 category.

17    A.    I'm not aware of their being distributed

18  elsewhere.

19    Q.    Was it the custom and practice in the period of

20  time that these studies and reports were going on that the

21  individuals at the Saranac lab would be bound by some

22  confidentiality not to release this information to anyone

23  else other than the appropriate people at Owens-Illinois?

24    A.    I don't know of any such agreement.

25    Q.    My question to you is, were you aware that was

26  the custom at the time?

27    A.    Yes, I think in some instances it was, when the

28  sponsor was paying the full cost of the investigation.

1    Q.    That, in fact, was what Owens-Illinois was

2    doing, correct?

3    A.    Yes, as far as I know.

4    Q.    Let me jump up to Dr. Schepers.  Are you

5    aware that before his tenure at the Saranac labs he was

6    affiliated with another institution, and his affiliation

7    terminated as the laboratory, I think it was a hospital,

8    I'm not sure, went under, went financially broke?

9    A.    No, I was not aware of that.

10    Q.    Do you have any recollection or knowledge, sir,

11    that the reason Dr. Schepers -- strike that.  Do you

12    have any recollection or knowledge, sir, that the reason

13    there was a, I think in your words, a move to get Schepers

14    out, which was something you heard about two years ago, had

15    anything to do with the fact that the Melin Institute

16    felt that he couldn't administer Saranac labs?

17    MR. SIMON:  Let me object to that as misstating prior

18    testimony and lacking foundation.  Go ahead, sir.

19    THE WITNESS:  No, I was not aware of that.

20    Q.    BY MR. HOCH:  Now, when we talked about the

21    actual animal studies that went on at Saranac lab, I

22    believe you indicated that the animals used were exposed to

23    high levels of dust over their lifetime, correct?

24    A.    Approximately, yes.

25    Q.    These high levels of dust, to the best of your

26    recollection, were in the area in excess of 150 million

27    particles per cubic foot?

28    A.    A hundred and fifteen?

1    Q.    Fifty, 50.

2    A.    I had in mind 115.

3    Q.    That was a low point, correct?

4    A.    No.

5    Q.    That was an average?

6    A.    110, 112, 115, as i recall.

7    Q.    To the best of your recollection, were any of

8    the dust counts ever done at any of the Owens-Illinois

9    facilities that you were aware of, did they ever reach that

10   level?

11   A.    Oh, no.  Nowhere near it.

12   Q.    Was there any employee of Owens-Illinois

13   that you were aware of who would be exposed to asbestos

14   dust, exposed for eight hours a day, five and a half days a

15   week, for his entire life?

16   A.    No.

17   Q.    And it was your testimony that in the review of

18   X-rays and physical examinations and Workers' Compensation

19   reports and illness reports, there were no employees of

20   Owens-Illinois who worked with asbestos who came

21   down with any pulmonary problem that you became aware of at

22   all?

23   A.    Nothing due to asbestos.

24   Q.    A cold or flu sometimes?

25   A.    Yes.

26   Q.    Okay.

27   Q.    I don't mean this to sound facetious, sir, but

28   did the animals used in the Saranac studies, were they

1    given time off for lunch and to remove themselves from dust

2    exposure?

3         A.   It's my recollection that they were in steadily

4    for eight hours, or shift.

5         Q.   This was an enclosed room?

6         A.   Yes.

7         Q.   With no ventilation.  Strike that.  This was an

8    enclosed room whose purpose it was to keep that cloud at a

9    fairly constant level?

10        A.   That's correct.

11        Q.   There weren't any windows that you're aware of

12   or exhaust fans?

13        A.   Not that I'm aware of.  I suppose there was air

14   movement through the thing.  It was to keep the

15   concentrations at a high level.

16        Q.   You referred to the Fleischer-Drinker study,

17   sir.  Can you tell us, in your own words, what was your

18   understanding as an industrial hygienist as to the outcome

19   of that study?  What did it show or tend to show?

20        A.   They examined and studied insulation workers,

21   mostly on board ship, but in shipyards, to see if they

22   contracted asbestosis.  Some of the insulation material

23   was very high in asbestos and some was fairly low, too.

24   The same as Kaylo is.

25        And they found in a group -- I've forgotten how many --

26   a total of 100 persons were involved, were studied; I think

27   in the group three persons showed signs of asbestosis.

28   But these persons had long prior exposures as insulators,

1    and they -- so that their lifetime dose had been a long

2    period.  The dust level to which insulators were exposed

3    was below 3 million asbestos particles per cubic foot

4    of air, on the average.  So their conclusion was that

5    asbestos insulators did not have a dangerous level of

6    exposure to asbestos, first as shown by their medical

7    or rhentological findings, and second by the levels of dust

8    which they were working in which were below the average TLV

9    on asbestos.

10       Q.    Does the date of 1948 coincide with your

11   understanding when the Fleischer-Drinker study was

12   published?

13       A.    It sounds about right.

14       Q.    From the period of which the Saranac

15   studies were going on, which encompassed the year 1948,

16   what was the TLV for asbestos?

17       A.    Five million particles per cubic foot of air.

18       Q.    Was that a TLV that was recommended by the

19   United States Public Health Service?

20       A.    Well, it was set up by the American Conference

21   of Governmental Industrial Hygienists, and it was adopted

22   by the United States Public Health Service.

23       Q.    Part of Fleischer-Drinker's work indicated

24   that the insulators had an exposure below that?

25       A.    Yes.

26       Q.    And part of Fleischer-Drinker's work

27   indicated that the insulators were constantly changing

29   their environment, they would come into a room, they'd work,

1   leave a room, things like that?

2        A.   I don't remember that that was in the paper,

3   but it could have been.

4        Q.   That coincides with your understanding of what --

5        A.   Yes.

6        Q.   -- the work would be?

7        A.   Yes.

8        Q.   Do you have a recollection, sir, of what the

9   reputation of Dr. Fleischer and Dr. Drinker were in

10  and around that period of the publishing of that paper?

11       A.   They have the highest reputation.

12       Q.   You had a chance to work with Dr. Drinker

13  during the war?

14       A.   Yes.  And Walter Fleischer was down the hall in

15  the same department as Drinker.

16       Q.   Was their reputation more than just a local

17  reputation?

18       A.   Oh, yes.

19       Q.   Nationwide?

20       A.   Yes.

21       Q.   What was their field of -- the real field of

22  endeavor?

23       A.   Drinker's field, I guess primarily was the

24  effects and the control of industrial dust.  Now, he made

25  perhaps an alarming reputation, more exciting reputation,

26  because he was the one -- he was one of the two co-inventors

27  of the iron lung which was used in the treatment of --

28  what's the name of it -- polio.  And he got a national

1   reputation out of that invention.

2       Q.   The threshold limit value for asbestos that

3   was recommended by the American Conference of Governmental

4   Industrial Hygienists, was that something that was accepted

5   and used by Owens-Illinois?

6       A.   Yes.

7       Q.   Was it accepted and used, as far as you were

8   concerned and had knowledge of, by the industrial medical

9   community?

10      A.   Yes.

11      Q.   By that I mean, the industrial medical

12  community at large, the entire nation.

13      A.   Yes.

14      Q.   You discussed latency period a little while ago.

15  Do you recall whether or not the Fleischer-Drinker

16  report addressed the latency period?

17      A.   What did he say?

18      Q.   Do you recall whether the Fleischer-Drinker

19  report addressed the latency period?

20      A.   Oh.  Yes, I believe it did.

21      Q.   Did they mention the years of exposure that

22  some of these men had?

23      A.   Yes.

24      Q.   Are you familiar with Dr. Selikoff's work

25  generally?

26      A.   Generally, but not in detail.

27      Q.   Are you familiar with his study published in

29  and around 1964 in the New York Academy of

1    Science?

2         A.   Yes.

3         Q.   That was an epidemiological study, was it not?

4         A.   Yes

5         Q.   It dealt with a large cohort of insulators who

6    Dr. Selikoff followed and took histories of for a good

7    number of years?

8         A.   Yes.

9         Q.   Isn't it correct that, as far as your opinion

10   as a professional industrial hygienist, sir, that Dr.

11   Selikoff's paper was really the first paper to put a time

12   span on this latency period?

13        MR. SIMON:   I'll object to that as being

14   argumentative, calling for a conclusion from an expert

15   whose credentials have not been established as such, and

16   being a leading question, and being vague and ambiguous.

17   Go ahead, sir.

18        THE WITNESS:   Would you repeat the question.

19        MR. HOCH:   Would you read it back, Jerry.

20   (Record read.)

21        THE WITNESS:   I don't remember that it was the first

22   paper, but I certainly regard his work highly.

23        Q.   BY MR. HOCH:   So you don't know one way or the

24   other whether that's correct?

25        A.   No.

26        Q.   In your opinion as a professional industrial

27   hygienist, in attempting to keep abreast of current medical

28   literature, is it your opinion that that paper authored by

1    Dr. Selikoff was the first such study which indicated,

2    in fact, that insulators are at risk to asbestosis?

3         MR. SIMON:  Same objections.

4         THE WITNESS:  I don't know.

5         MR. HOCH:  Okay.

6         Q.  Just one last question.  Mr. Hazard, in the

7    product known as 85 percent magnesia, what was, to

8    your understanding, the approximate by weight percentage of

9    asbestos?

10        A.  I don't know.

11        Q.  Did you know in 1956?  Is it something you

12   forgot or did you know it then?

13        A.  Well, I forgot, I'm sure I have.

14        MR. HOCH:  Okay.  Thank you, sir.

15        THE WITNESS:  Okay.

16        MR. SILBERFELD:  Anybody else other than Mr. Berry?

17   You're on.

18        MR. BERRY:  You want to do re-cross based upon this

19   and then we can just take that and dump it in?  In other

20   words, you want to do re-cross based upon the questions so

21   far.  Then I can do my incorporation by reference, and you

22   can become Stan Levy for re-cross as to mine.

23        MR. SILBERFELD:  Let's go off the record a second.

24             (Discussion held off the record.)

25

26                  FURTHER EXAMINATION

27

28   BY MR. SILBERFELD:

1    Q.   Mr. Hazard, Defendant's Exhibit 1 to this

2    deposition, which is the memo of Mr. Howard to Mr.

3    White, and the four pages attached thereto, you recall

4    testifying about that earlier?

5    A.   Yes.

6    Q.   On page two -- well, withdraw that.  What

7    specifically did you do with regard to the preparation of

8    that document, or the underlying work that is talked about

9    in that document, rather?

10   A.   I don't know if I could tell you specifically.

11   I think the first page was probably prepared mostly by

12   Curt Howard.

13   Q.   I think you may have misunderstood my question,

14   and I may have phrased it badly.  What I was interested in

15   finding out was what you did to gather the supporting

16   information for what is reported in this memorandum.   In

17   other words, what did you do that gave you the credit on

18   page one that says you and Dr. Shook spent considerable

19   time?  What did you do, if you remember?

20   A.   Well, with Dr. Shook's help, I guess -- and

21   this is dredging up a memory -- we prepared two, three and

22   four.

23   Q.   Okay.  It refers in here to the research findings

24   of the Saranac laboratory.  Since this has a date of

25   December 9, 1952, by then the final report of the

26   laboratory was already out on Kaylo.

27   A.   Yes.

28   Q.   It also talks about experience in the factories.

1    What does that refer to, if you know?  Experience in the

2    factories as being a basis for what he said in here?

3         A.    I think it means where that program was at the

4    Saryville and Berlin plant.  The annual physical exam,

5    the chest x-rays, the examination of the Workman's Comp

6    aspect, Workers' Comp., the air sampling.  I think those --

7    sick absenteeism records.

8         Q.    Now, on page two of this document underlined it

9    says, "What has Owens-Illinois done to investigate the

10   health aspects of Kaylo?"

11        A.    Where were we?

12        Q.    It says, "What has Owens-Illinois done to

13   investigate the health aspects of Kaylo?"  And it lists

14   three types of investigations that Owens-Illinois has

15   done.  Paragraph C. provides as follows:  "Owens-Illinois

16   has followed closely the experience of people in the field

17   who cut, fit and handle Kaylo materials.  No

18   complaints have been received from any users reflecting any

19   health or physical impairment on the part of the people

20   handling Kaylo material.  Good reports have been

21   received from them comparing the working with and handling

22   of Kaylo to other materials."  Can you tell me what

23   work was done by you and Dr. Shook to monitor the

24   experience of people in the field who cut, fit and handled

25   Kaylo?

26        A.    I have to go back a little bit.  We had

27   salesmen or sales engineers visiting customers' plants, or

28   plants where this product was used, run by our customers,

1    and they were alert to the possibility of this health

2    aspect.  They brought back no reports of any damage or

3    injury of a health nature.  So that we knew that we were

4    handling a safe product.

5        Q.   And these were reports that you got back from

6    your sales people in 1952 and before?

7        A.   Yes.

8        Q.   And as of that time, just for frame of

9    reference purposes, Kaylo had been on the market 10

10   years or less?

11       A.   Yes, I guess.

12       MR. SILBERFELD:  Thank you.          -

13       MR. SIMON:  If I might follow up.  Are you aware if any

14   of these sales people had any education in the field of

15   industrial hygiene or occupational safety?

16       THE WITNESS:  I was not aware that they had.  However,

17   when you're talking to workmen, or the supervisor of

18   workmen, "Have you ever had any complaints about Kaylo?"

19   "No, none at all."  That's pretty good evidence.

20       MR. SIMON:  Was that the extent of their examination

21   as you understood it?

22       THE WITNESS:  Yes.  They didn't perform any medical

23   tests.

24       MR. SIMON:  No dust samples?

25       THE WITNESS:  No dust samples.

26       MR. SIMON:  No surveys as we discussed earlier?

27       THE WITNESS:  No.  But there were no complaints of

29   difficulties with Kaylo.

1        MR. SIMON:  Okay.  Thank you, sir.

2        Q.    BY MR. SILBERFELD:  With regard, Mr. Hazard, to

3    Defendant's Exhibit 3 to this deposition, which is the

4    hydrous calcium silicates report that you looked at

5    earlier, you remember reading from page 22?

6        A.    Yes.

7        Q.    It says in here, "The hydrous calcium

8    silicate is harmless and the asbestos," referring to the

9    asbestos in the dust of Kaylo, correct?

10       A.    Yes.

11       Q.    "The asbestos manifested the usual effect of

12   this mineral."  By this mineral was meant asbestos,

13   correct?

14       A.    Yes.

15       Q.    And the usual effect of this mineral referred

16   to asbestosis, did it not?

17       A.    Yes.

18       Q.    In response to questions from Mr. Hoch,

19   counsel for J-M, you talked about the

20   Fleischer-Drinker study, do you remember that?

21       A.    Yes.

22       Q.    Do you recall, of the three cases that were

23   reported in Fleischer-Drinker as having had

24   asbestosis, what the shortest exposure, shortest time

25   from first exposure was?

26       A.    Shortest time from first exposure to the

27   development of asbestosis?

28       Q.    Yes, sir.

1    A.   No, I don't.

2    Q.   You do recall, do you not, that in all three

3 cases of asbestosis reported in Fleischer-Drinker,

4 there were substantial periods of time between first

5 exposure and the onset of symptoms or discovery of the

6 disease?

7    MR. HOCH:   Objection; vague as to substantial; indefinite.

8    THE WITNESS:   That was my recollection.

9    Q.   BY MR. SILBERFELD:   That each of those cases

10 had latency periods, as we know them now, of over 10 years?

11    A.   Yes.

12    Q.   Some of them longer than 10 years?

13    A.   Yes.

14    Q.   And it was found by Fleischer-Drinker that

15 the TLV, or the concentrations of asbestos in the air

16 in those workers were below three million particles?

17    A.   Yes.

18    Q.   Which was within --

19    A.   Well, at the time of their study?

20    Q.   At that time of their study.

21    A.   That's true, at the time of their study.

22    Q.   That was below the TLV at the time?

23    A.   Un-huh.

24    Q.   Yes?

25    A.   Yes.

26    Q.   Yet, three workers exposed to asbestos

27 which was within the then accepted TLV came down with

28 asbestosis, correct?

1    MR. HOCH:  That's a mischaracterization of the report,

2    Roman.  What you're saying is that at the time that Dr.

3    Fliescher and Dr. Drinker were in there taking their

4    dust studies that was the total exposure for those three

5    people.  And that's a misstatement of the report and it's a

6    total twisting and confusion of what the report stands for.

7    MR. SELMAN:  Furthermore, the report is a written document.

8    It speaks for itself.

9    MR. HOCH:  Right.  That's true for everything we've

10   been saying.

11   Q.   BY MR. SILBERFELD:  Do you know, Mr. Hazard,

12   how many workers were studied in Fleischer-Drinker?

13   A.   Well, it's my impression there were several

14   hundred.  Maybe over a thousand.  I'm not sure.

15   Q.   As an industrial hygienist who has had at least

16   some passing experience with epidemiology, would you

17   consider three cases out of a thousand to be a significant

18   incidence of disease?

19   MR. HOCH:  Objection, foundation.

20   THE WITNESS:  No, I don't think they would be

21   significant, especially in view of other factors that I

22   think Fleischer-Drinker pointed out, such as the period

23   that these men had been working as insulators, which was

24   long, and their likely prior exposure before the test that

25   Fleischer-Drinker made.

26   Q.   So you would not consider three cases out of a

27   thousand to be a significant incidence?

28   A.   Not with those other aspects.

1    Q.   Is there a figure in your mind that you would

2  consider a significant incidence of disease, say, in a

3  population of a thousand men exposed to asbestos?

4    MR. SELMAN:  Objection.  Wasn't that asked and answered?

5    THE WITNESS:  No, I have no figure in mind of that

6  sort.

7    Q.   BY MR. SILBERFELD:  Do you have an estimate for

8  us?

9    MR. BERRY:  Same objection.

10   MR. KAMALIA:  An estimate?  I think that is irrelevant.

11   MR. SIMON:  He's asking at what levels --

12   MR. KAMALIA:  Speculation.  I don't think there is

13  any foundation for him giving that opinion.

14   THE WITNESS:  No, I can't say.  I don't know.

15   Q.   BY MR. SILBERFELD:  If hypothetically, Mr.

16  Hazard, the results of Fleischer-Drinker were that 50

17  men out of 1,000 had asbestosis, would you consider

18  that to be a significant incidence of disease based upon

19  the exposures and the work that those men did?

20   MR. HOCH:  Objection.

21   MR. BOGAN:  In all fairness, I'm going to object.

22  Excuse me, Mr. Hazard.  If you're asking him to recompute

23  all the figures and statistics of the report then he ought

24  to have an opportunity to read the report and render his

25  opinion.  But there is no time frame involved.  I don't

26  know if you're talking about last week or the report itself,

27  or what context you're talking in.  I'll object to it on

28  that basis.

1    Q.   BY MR. SILBERFELD:   In the context of the

2    report, the only factors that I'm changing are instead of

3    three cases of asbestosis or illness being found, I'm

4    now just picking the number 50.   My question is, out of a

5    thousand men, if you had an incidence of disease in 50,

6    would you consider that to be a significant factor?

7        MR. HOCH:   Aside from other objections, inasmuch as

8    that is an hypothetical, it is an incomplete hypothetical

9    because the witness does not have the work history or

10   exposure history of the so-called phanthom 50 people;

11   therefore, it cannot possibly be answered and calls for

12   speculation.

13       THE WITNESS:   I have the same thoughts going through

14   my mind but this gentleman expressed them better.   I would

15   like to know what the work history of these 50 people were,

16   what the ages were and so on.

17       MR. SILBERFELD:   In that event, I give up.   Anybody

18   else have anything?

19       MR. BERRY:   Let me see --

20       MR. BOGAN:   Let's go off the record a second.

21       (Discussion held off the record.)

22

23                        EXAMINATION

24

25   BY MR. BERRY:

26       Q.   Mr. Hazard, as you know, my name is Andrew

27   Berry and I'm appearing today on behalf of

28   Owens-Illinois.   I have at this point only one question.

1        You made reference this morning -- Mr. Silberfeld made

2  reference this morning to a so-called "warning flag," quote,

3  close quote, derived from the Saranac animal

4  experiments.  Do you recall this line of questioning?

5     A.   Yes.

6     Q.   Did you have in mind with respect to that

7  phrase, plant workers in Berlin and Saryville, or

8  users and applicators of the product, or what?

9     A.   Plant workers in Berlin and Saryville.

10  We felt that the users of the product had no dangerous

11  exposure.  There was no need to put a warning label on the

12  package.

13     MR. BERRY:  That's all I have at the moment, subject

14  to whatever.  Go off the record again.

15          (Discussion held off the record.)

16          (Recess held.)

17  MR. BERRY:  Back on the record.  Gentlemen, in the

18  interest of time and concluding the deposition today,

19  because we have now exceeded slightly the limits set by the

20  agreed upon method of proceeding with Mr. Hazard, on behalf

21  of Gibson, Dunn & Crutcher, as to whom I'm associated

22  counsel for this deposition, for Owens-Illinois, I would

23  be willing to stipulate in lieu of conducting an

24  examination of Mr. Hazard which would necessitate this

25  deposition being continued to a later date, the portions of

26  the deposition of Mr. Hazard taken in Massechutsetts and

27  other Northeastern United States cases on February 11,

28  1981, in Toledo, Ohio, from pages -- the mid-point of

1   page 94 to page 128, the mid-point of page 128, and the

2   exhibits identified in those pages of the testimony of Mr.

3   Hazard, I would propose to give to the court reporter the

4   entire -- a copy of the entire testimony of that deposition,

5   with all of the exhibits, and I would propose that the

6   portions I have just described and the exhibits identified

7   therein be annexed and made a part of this deposition as if

8   taken herein with references to counsel, if necessary,

9   being corrected to reflect the counsel appearing here today.

10      MR. SILBERFELD:  Further, Mr. Berry, that that

11  copy of the transcript and the exhibits will be marked as

12  Defendant's 4 to this deposition.

13      MR. BERRY:  Fine.  And further, that in addition to

14  objections other than as to form, which were specifically

15  preserved in the February -- what we'll call the

16  February 11th deposition, I would be willing to

17  stipulate that all objections, including those as to form,

18  be preserved.

19      I represent to you that Mr. Hazard's testimony

20  refers to no other companies other than those already

21  mentioned here today in the categories in which mentioned

22  here today.

23      MR. SILBERFELD:  So stipulated.

24      MR. HOCH:  So stipulated.

25      MR. BERRY:  If anyone objects, would he, she speak?

26  No such objection.

27      MR. SILBERFELD:  Wait.  Now with regard to the

28  stipulation on -- has Jack left?  With regard to the

1  stipulation with Mr. Hazard's transcript, I propose the

2  same one we followed yesterday.

3       MR. BERRY:  All right.

4       MR. SILBERFELD:  If we can get him in here to agree

5  with it, that would be fine.

6       Mr. Callahan, is the stipulation that we had with

7  regard to Mr. Ames' deposition, the correcting and signing,

8  acceptable for Mr. Hazard as well?

9       MR. CALLAHAN:  Yes.

10      MR. SILBERFELD:  Then we also have to make some

11  arrangement with regard to the speech cards.  I would like

12  to have them marked and attached as exhibits to the

13  deposition.  We have to make some arrangements for copying of

14  them.  What I would propose, since we're all leaving Toledo

15  today, is that they be entrusted to the court reporter,

16  that he make copies of them and have them delivered back to

17  you by Federal Express.

18      MR. CALLAHAN:  Let me ask the author here to make

19  sure everything is all right.  He reposses confidence --

20      MR. SILBERFELD:  Is that acceptable?

21      MR. CALLAHAN:  Yes.  You'll have the cards.  May I

22  have your card?  I have no --

23      MR. SILBERFELD:  One further thing, Mr. Callahan.

24  That - is, these cards are separately bundled.  What I would

25  propose; although we're not going to mark them now, is that

26  we mark each bundle as an exhibit, and the subcards as

27  subparts.

28      MR. CALLAHAN:  All right.

1        MR. SILBERFELD:  Thank you.  That will be entrusted

2   to the court reporter.

3        (Deposition concluded at 4:00 P.M.)

4

5

6   I certify (or declare) under penalty of perjury that the

7   foregoing is true and correct.  Los Angeles, California.

8   Dated this day of    , 1981.

9

10

11

12                   WALTER HAZARD

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ERRORS

Proposed corrections

| Page | Line | |
|------|------|---|
| 21 | 21 | Change:  "was" to "were" |
| 22 | 15 | Change:  silicate to "silica". |
| 23 | 2 | Change"  "Symposium" to "symposiums" |
| 23 | 3 | Delete:  "the" |
| 41 | 9 | Delete:  "of our batch house" |
| 63 | 23 | Change:  "was" to "were" |
| 76 | 2 | Not "seven years" but "nine years" |
| 107 | 3 | Change:  "auto" to "bottle" |
| 107 | 4 | Change:  "silicate sand, S102" to "silica sand, $SiO_2$ |
| 107 | 5 | Change:  "would be" to "were beset" |
| 2 | 25 | Defendat      should be    Defendant |
| 34 | 18 | Expansing     should be    Expansion |
| 85 | 19 | Pile          should be    Pilot |
| 99 | 19 | Change "putting" to "pulling". |
| 102 | 3 | Change "breathe" to "Breathed." |
| 108 | 19 | Delete:  "and memogreen" |
| 110 | 15 | Change:  "got" to "to have" |
| 112 | 19 | Change:  "retaining" to "containing" |
| 113 | 6 | After "those" - add - "particles" |

<u>TYPOS (cont.)</u>

117    13    Change: "special" to threshold"

120    11    Add hyphen between "asbestos" and "containing"
                  (to form "asbestos-containing")

122     7    Add after "and": "was"
                  ("and was heated")

138    21    Change:  "silicate" to "silica"


_Willis G. Hazard_
Willis G. Hazard

164

taken at the time and place in the foregoing caption specified and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney of any party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Toledo, Ohio, on this _____ day of February, 1981.

DIANNE BOCHI,
Notary Public
in and for the State of Ohio.

My Commission expires February 25, 1982.

- - -

163

MR. LEVY:          I have no other

questions.

(Whereupon, the deposition was

concluded at 5:05 o'clock p.m.)


_____
WILLIS HAZARD

- - -

C E R T I F I C A T E

STATE OF OHIO    )
                 ) SS.
COUNTY OF LUCAS  )

I, Dianne Bochi, a Notary Public in and for

the State of Ohio, duly commissioned and qualified,

do hereby certify that the within-named witness,

WILLIS HAZARD, was by me first duly sworn to tell

the truth, the whole truth and nothing but the truth

in the cause aforesaid; that the testimony then given

by him was by me reduced to stenotype in the presence

of said witness, afterwards transcribed upon a type-

writer; and that the foregoing is a true and correct

transcription of the testimony so given by him as

aforesaid.

I do further certify that this deposition was